# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

No. 23-1900

---

RONALD KOONS et al.,
*Plaintiffs-Appellees,*

v.

MATTHEW J. PLATKIN et al.,
*Defendants-Appellants*

---

AARON SIEGEL et al.,
*Plaintiffs-Appellees,*

v.

MATTHEW J. PLATKIN et al.,
*Defendants-Appellants*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(Nos. 22-cv-7463, 22-cv-7464 (RMB))

---

## Emergency Motion for Stay Pending Appeal

---

MATTHEW J. PLATKIN
*Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
*Solicitor General*

ANGELA CAI
*Deputy Solicitor General*

JEAN REILLY
*Assistant Attorney General*

DAVID CHEN
VIVIANA HANLEY
  *Deputy Attorneys General*

Office of the New Jersey Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625-0080
(609) 414-5954
angela.cai@njoag.gov

*Attorneys for Defendants-Appellants
New Jersey Attorney General
Matthew J. Platkin and Superintendent of
New Jersey State Police Colonel
Patrick Callahan*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS............................................................................. i

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ...................................................................................1

BACKGROUND ...................................................................................3

ARGUMENT ........................................................................................5

   I.     THE STATE WILL LIKELY PREVAIL ON APPEAL. ...........................6

     A.   The Sensitive-Places Provisions Are Constitutional.................6

     B.   The Private-Property Provision Is Constitutional ...................13

   II.   THE EQUITIES COMPEL A STAY ...........................................18

CONCLUSION.....................................................................................22

CERTIFICATE OF COMPLIANCE........................................................23

CERTIFICATION OF BAR MEMBERSHIP..............................................24

CERTIFICATE OF SERVICE ................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott v. Perez*,
   138 S.Ct. 2305 (2018) ..................................................................................18

*Adderley v. Florida*,
   385 U.S. 39 (1966) ......................................................................................11

*Andrews v. State,*
   50 Tenn. 165 (1871) ......................................................................................7

*Antonyuk v. Hochul*,
   No. 22-2908, 2022 WL 18228317 (2d Cir. Dec. 7, 2022) ........................3

*Benisek v. Lamone*,
   138 S.Ct. 1942 (2018) ..........................................................................21, 22

*Bldg. & Constr. Trades Council v. Assoc. Builders & Contractors*,
   507 U.S. 218 (1993) ....................................................................................12

*Bonidy v. U.S. Postal Serv.*,
   790 F.3d 1121 (10th Cir. 2015) ................................................................11

*Cedar Point Nursery v. Hassid*,
   141 S.Ct. 2063 (2021) ................................................................................13

*Drake v. Filko*,
   724 F.3d 426 (3d Cir. 2013) ........................................................................3

*Florida v. Jardines*,
   569 U.S. 1 (2013) ........................................................................................16

*FTC v. Qualcomm Inc.*,
   935 F.3d 752 (9th Cir. 2019) ....................................................................21

*GeorgiaCarry.Org v. Georgia,*
   687 F.3d 1244 (11th Cir. 2012) ....................................................13, 15, 16

*Hohe v. Casey,*
    868 F.2d 69 (3d Cir. 1989)......................................................................21

*In re Revel AC,*
    802 F.3d 558 (3d Cir. 2015)..............................................................5, 18

*Maryland v. King,*
    567 U.S. 1301 (2012)............................................................................18

*Mendez v. City of Gardena,*
    No. 15-56090 (9th Cir. 2015) ...............................................................5

*Nautilus Grp. v. Icon Health & Fitness,*
    372 F.3d 1330 (Fed. Cir. 2004)............................................................5

*New York State Rifle & Pistol Association v. Bruen,*
    142 S.Ct. 2111 (2022) ...............................................................passim

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................18, 21

*Reeves v. Stake,*
    447 U.S. 429 (1980) ..............................................................................12

*Uniformed Fire Officers Ass'n v. De Blasio,*
    973 F.3d 41 (2d Cir. 2020)...................................................................19

*United States v. Class,*
    930 F.3d 460 (D.C. Cir. 2019) ......................................................11, 12

*United States v. Claxton,*
    766 F.3d 280 (3d Cir. 2014).................................................................5

*Winter v. NRDC,*
    555 U.S. 7 (2008) ..................................................................................18

iii

**Statutes**

2022 N.J. Laws, ch. 131 ................................................................4, 5, 13

**Court Rules**

L.A.R. 27.7 ...........................................................................................1

**Miscellaneous**

Glenn Thrush, *What Do Most Mass Shooters Have in Common?*
  *They Bought Their Guns Legally*,
  N.Y. Times (May 16, 2022), https://tinyurl.com/4y2cztxr ...................20

Laws Enacted by the Legislature of 1895 Affecting
  Municipality of Detroit,
  §44, https://tinyurl.com/25b42z3b ......................................................11

Michael Sisak, *Mass shooters exploited gun laws, loopholes before carnage*,
  AP (May 27, 2022),
  https://tinyurl.com/y6v348m6 ............................................................20

Mitch Smith, *Highland Park Shooting Reveals Limits of Illinois's Gun
  Restrictions*,
  N.Y. Times (July 6, 2022), https://tinyurl.com/2ve49cvt .....................20

# INTRODUCTION[1]

The district court preliminarily enjoined substantial portions of New Jersey law governing the carrying of firearms in sensitive places and on another's private property. This Court should grant a stay pending expedited appeal.

For centuries, States like New Jersey have recognized commonsense firearms regulations are critical for public safety. In the 20th century, New Jersey regulated firearms by limiting public carry to those with "justifiable need." The Supreme Court invalidated that type of rule in *New York State Rifle & Pistol Association v. Bruen*, 142 S.Ct. 2111 (2022), but reaffirmed the States' prerogative to mitigate the risk of gun violence, including by prohibiting firearms at sensitive places, consistent with the American historical tradition. *Id.* at 2133-34. The Second Amendment, *Bruen* explained, still permits States to promote safety in many ways, including with laws that do not implicate the Second Amendment right or that are justified by historical analogues. *Id.* at 2133; *see also id.* at 2161-62 (Kavanaugh, J., concurring).

New Jersey took that lesson to heart. After careful consideration of the Second Amendment's limits and the State's safety needs, the Legislature enacted a law that stopped requiring justifiable need and instead restricted carry in sensitive places. The statute protects individuals in places where vulnerable persons—like children and

---

[1] The State requests expedited consideration of this motion. L.A.R. 27.7. The State is also simultaneously moving to expedite the underlying appeal.

the frail—congregate, such as schools, playgrounds, zoos, parks, and medical facilities; where First Amendment and other governmental activity occurs, including courthouses, polling places, and permitted assemblies; crowded and volatile settings, especially where alcohol is served; and critical transportation and infrastructure locations, among other places. And the Legislature also enshrined private property owners' rights by establishing that individuals cannot carry firearms onto another's private property without the owner's consent.

Because the district court erred in preliminarily enjoining vast swaths of New Jersey's sensitive-places and private-property provisions, this Court should stay that decision pending appeal. *First*, the preliminary injunction incorrectly bars the State from restricting carry in many sensitive places—including zoos and libraries, public gatherings and parks, and even bars. But the State offered reams of evidence that governments at both the Founding and Reconstruction limited carry in identical or similar locations, from fairs and ballrooms, to educational institutions, to parks and zoos. *Second*, the court wrongly found that individuals have a Second Amendment right to carry on another's private property if that property is open to the public (like a store or gym) and the owner does not expressly forbid weapons. But laws requiring individuals to obtain consent before carrying on another's private property merely protect owners' property rights rather than burdening the Second Amendment, and are justified by substantial historical evidence.

2

A stay is urgently needed. The preliminary injunction prevents the State from enforcing its democratically-enacted laws. It bars the State from protecting residents and law enforcement from gun violence in sensitive places. It empowers individuals to carry firearms onto their neighbors' porches and into local businesses without seeking the owners' consent. And it risks significant confusion on the ground. When federal courts in New York issued near-identical preliminary injunctions against near-identical provisions, the Second Circuit issued stays pending appeal. *See, e.g.*, *Antonyuk v. Hochul*, No. 22-2908, 2022 WL 18228317 (2d Cir. Dec. 7, 2022), *motion to vacate denied*, No. 22A557 (U.S. Jan. 11, 2023); *see Koons*, 22-cv-7464, Docket Entry (D.E.) 88-2. This Court should do the same.

## BACKGROUND

Like many States, New Jersey has long regulated public carry of firearms. From 1924 through 2022, New Jersey required carry permit applicants to establish a particularized self-defense need. *See Drake v. Filko*, 724 F.3d 426, 432 (3d Cir. 2013). But *Bruen* invalidated that requirement as inconsistent with "the Nation's historical tradition of firearm regulation." 142 S.Ct. at 2130-31. *Bruen* identified a different historical tradition for addressing the risk of firearms violence in public: limitations on "sensitive places." *Id.* at 2133. Looking to 18th- and 19th-century history, *Bruen* cited restrictions on firearms at legislatures, courthouses, and polling

3

places, and explained that modern "regulations prohibiting the carry of firearms in *new* and analogous sensitive places" are also "constitutionally permissible." *Id.*

After months of deliberation, New Jersey enacted Chapter 131. *See* 2022 N.J. Laws, ch. 131 (D.E. 88-1). In addition to modifying permitting requirements, the law added carry prohibitions in enumerated sensitive places including: government buildings like courthouses or polling places; demonstrations requiring a government permit; schools; playgrounds, youth sports events, and zoos; parks, beaches, and recreation facilities; public libraries and museums; bars; entertainment facilities and casinos; airports and transportation hubs; and healthcare facilities. *Id.* §7(a)(1)-(23). The Legislature also prohibited carrying firearms onto someone else's private property without the owner's permission. *Id.* §7(a)(24).

Plaintiffs—residents and firearm-advocacy organizations—sued immediately and sought temporary restraining orders and preliminary injunctions. The district court first granted a TRO in *Koons* on January 9, restraining firearms regulations at libraries and museums, entertainment facilities, places that serve alcohol, vehicles, and the private-property provision. D.E. 34-35. The court issued a second TRO in *Siegel* on January 30, adding against casino and parks provisions, despite decades-old regulations prohibiting carry at each. D.E. 51-52. Finally, on May 16, the court issued a preliminary injunction imposing a third set of rules. D.E. 124 (Op.); 125 (Order). The court again enjoined carry restrictions at public libraries and museums,

entertainment facilities and casinos, places serving alcohol, vehicles, and parks, but now also enjoined restrictions at zoos, permitted assemblies, film sets, and medical offices. And it revised its ruling regarding the private-property provision, limiting its injunction to property held open to the public and to curtilage. Order at 2.[2]

The State immediately appealed, and seeks a stay of the injunction as to the sensitive-places and private-property provisions.[3]

## ARGUMENT

This Court will grant a stay pending appeal where the movant "is likely to succeed on the merits" and where the equities support a stay. *In re Revel AC*, 802

---

[2] This motion does not address other aspects of the preliminary injunction. The State will appeal the preliminary injunction against Chapter 131's requirement of liability insurance to publicly carry, Op.70-89, but no stay is needed since that requirement is not effective until July 1. The court also denied relief as to most of Chapter 131's permitting requirements, Op.35-65, and carry restrictions at playgrounds and youth sporting events, Op.172, 178-79, and deferred challenges to carry restrictions at airports and transportation hubs, Op.186-93.

[3] New Jersey satisfied FRAP 8 by requesting a stay pending appeal from the district court in its preliminary injunction opposition. PI.Opp.100. *See also* D.E. 88-2 (Second Circuit granting stays in *Antonyuk* and *Christian v. Nigrelli* after New York similarly sought stay as alternative in preliminary injunction oppositions); *Nautilus Grp. v. Icon Health*, 372 F.3d 1330, 1332 (Fed. Cir. 2004) (same); *Mendez v. City of Gardena*, No. 15-56090 (9th Cir. 2015) (same). It follows that the "district court's failure to rule" on this request is "an implicit denial of that motion." *United States v. Claxton*, 766 F.3d 280, 291 (3d Cir. 2014). And it is wholly unsurprising that the district court declined to stay its order: that court thrice found for Plaintiffs-Appellees on both likelihood of success and the equities. Nothing requires the State to again request a stay pending appeal.

F.3d 558, 565, 568, 571 (3d Cir. 2015). Movant's likelihood of success need "not

[be] greater than 50%." *Id.* Here, both the merits and the equities compel a stay.

## I.    THE STATE WILL LIKELY PREVAIL ON APPEAL.

The district court erred in preliminarily enjoining the State's sensitive-places

and private-property provisions.

A.    <u>The Sensitive-Places Provisions Are Constitutional</u>.

1. The State established that its sensitive-places restrictions are justified by an

overwhelming historical tradition. There are two aspects to *Bruen*'s inquiry: whether

the challenged law burdens the Second Amendment right (plaintiffs' burden) and, if

so, whether the law "is consistent with the Nation's historical tradition of firearm

regulation" (the government's burden). 142 S.Ct. at 2130. On the second question,

there are two kinds of proof: governments can cite historical *twins*—that is, identical

provisions during the 18th or 19th centuries that show, by definition, the provisions

do not violate the Constitution—and/or historical *analogues*. *Id.* at 2131-34. In

examining historical analogues, courts consider, *inter alia*, whether the historical

and modern restrictions "impose[s] a comparable burden on the right of armed self-

defense" and are "comparably justified." *Id.* at 2133.

New Jersey amply met its burden to identify historical predecessors for each

sensitive place. Below, the State introduced dozens of laws spanning centuries that

prohibited firearms-carry in places identical or analogous to those now enjoined. *See*

D.E. 91 (PI.Opp.) 28-29 (sensitive places overall); 34-37 (assemblies); 37-38 (zoos);

38-42 (parks, beaches, recreational facilities); 43-46 (public libraries, museums); 46-

48 (establishments serving alcohol); 48-53 (entertainment facilities, casinos); 57-59

(healthcare); 59 (movie sets); 62-67 (vehicles); *see* D.E. 76, 84-90 (historical

primary-source and expert evidence).

Multiple examples reveal the breadth of the historical evidence. *Inter alia*, the

State offered over a *dozen* historical statutes that barred carry at "public gatherings"

and "assemblies"—direct precursors to permitted assemblies. PI.Opp.34-36 (citing,

*e.g.*, *Andrews v. State*, 50 Tenn. 165, 182 (1871) (affirming restrictions)); D.E. 86

¶13. It proffered at least *nine* prohibiting carry "where persons are assembled for

educational, literary or scientific purposes"—analogues to today's public libraries

and museums. PI.Opp. 43-45; *see also* D.E. 85 ¶30. At least *ten* prohibited guns from

"fairs," "ballroom[s]," "race-courses," or "social part[ies]"—supporting restrictions

at entertainment facilities and bars. PI.Opp.49-52. And New Jersey introduced over

*thirty* historical prohibitions on firearms in parks, PI.Opp.39, including at three of

the first American zoos, which were on park premises. *Id.* at 37-38.

There is no evidence suggesting that any contemporaneous courts saw these

sensitive-place provisions as unconstitutional. Indeed, *none* of the provisions cited

was struck down; all went unchallenged or withstood review. PI.Opp.29; D.E. 85

¶¶26-30; D.E. 86 ¶18. Contemporaneous treatises treated them as uncontroversial.

*See* PI.Opp.30, 36. And Plaintiffs-Appellees introduced no evidence suggesting that other States declined to adopt them based on constitutional concerns. The unrebutted historical record thus supports Chapter 131, including extensive evidence from the 19th century when handguns became widely available to the public, PI.Opp.28-29, and led to an "unprecedented societal concern" regarding community gun violence. *Bruen*, 142 S.Ct. at 2132. Given *Bruen*'s history-focused analysis, it strains credulity that States could restrict firearms at such places in the 18th and 19th centuries, but cannot have the same or similar provisions in the 21st.

2. The district court committed three core errors in rejecting this evidence.

*First*, the court's primary objection—that the analogues were too few to be "representative of the entire nation," Op.178; *see also e.g.*, *id*. at 165, 170, 180, 184, 186, 193, 196, 198—is unfounded. *Bruen* undermines this numerosity command: *Bruen* found that "legislative assemblies, polling places, and courthouses" were the paradigmatic sensitive places, but the sources on which it relied identified at most two examples of laws restricting carry for each. 142 S.Ct. at 2133; *see* PI.Opp.31 & n.16. Indeed, the district court acknowledged that "[j]ust because there is little 18th- and 19th-century evidence justifying sensitive place laws … does not mean that they cannot survive scrutiny under the Second Amendment." Op.116. After all, Founding and Reconstruction-era laws, even from a subset of jurisdictions, supply powerful evidence that the Second and Fourteenth Amendments were not then understood to

prohibit such policies—particularly if no contrary evidence indicates that any court or any other jurisdiction disagreed. Treating three, nine, or even thirty restrictions as numerically insufficient led the court astray.[4]

*Second*, and relatedly, the district court wrongly put stock in the mere *lack* of laws in other jurisdictions. *See, e.g.*, Op.170 (citing "lack of consensus" regarding carrying in zoos); *id.* at 165, 178, 180, 184. Then, as now, a government could have myriad policy reasons to eschew a particular policy—a natural consequence of our federalist system—but that says little about its constitutionality. Indeed, many States today allow permit-less carry, despite *Bruen*'s holding that permitting regimes are constitutional. Instead, evidence of unconstitutionality of a sensitive place includes contemporaneous judicial decisions invalidating such sensitive-place laws; evidence that other jurisdictions rejected the law on constitutional grounds; or primary sources raising similar concerns. *Bruen*, 142 S.Ct. at 2133 (noting that "no disputes regarding the lawfulness" of sensitive-place prohibitions supports their validity). But the mere lack of uniform national policy says little about prior understandings of the Second

---

[4] As *Bruen* explains, the situation could be different if the State proffered just "three colonial regulations" and those laws "contradict[] the overwhelming weight of other evidence." 142 S.Ct. at 2142, 2153; Op.142. But no contrary evidence exists here.

Amendment right. The district court's error disempowers States from maintaining laws they were free to enact centuries ago.[5]

*Third*, the district court impermissibly demanded that historical analogues be nearly identical to the modern statute, contravening *Bruen*. *See id*. at 2133 (noting an analogue need not be "a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."). The district court correctly realized that the same interests animating school carry restrictions (protecting the vulnerable and children) justified restrictions at playgrounds and youth sports events. Op.172, 178-79. Yet it refused to extend that logic to restrictions at other places where children or vulnerable people gather, like zoos, libraries, museums, parks, and medical offices. Op.171. The court also refused to analogize firearms restrictions in 19th-century entertainment venues (like fairs or ballrooms) to 21st-century entertainment venues (like movie theatres or casinos), even though both addressed risks of firearms in crowded and chaotic scenes (especially with intoxicated individuals). And the court improperly rejected clear parallels between restrictions at permitted assemblies and historical restrictions at courthouses, legislatures, and polling places based on police presence at the

---

[5] Similarly, the court erred when dismissing contemporaneous state-court decisions that upheld sensitive-places provisions, reasoning they relied on the since-rejected "collective right[s]" Second Amendment theory. Op.161. But courts that adopted an individual-rights Second Amendment theory also upheld these provisions. Op.163-64 (Missouri, Tennessee).

10

latter—even though *Bruen* rejected the idea that security was dispositive, 142 S.Ct. at 2134, and even though security exists at many permitted gatherings, *see* D.E. 120 at 9 n.6. The district court's restrictive approach imposes precisely the "regulatory straightjacket" *Bruen* sought to avoid. 142 S.Ct. at 2133.[6]

3. Moreover, regardless of whether a location is "sensitive," the Legislature can restrict firearms at places where the Government is the proprietor. *See Adderley v. Florida*, 385 U.S. 39, 47 (1966) ("The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."). Restrictions on firearms in public libraries, public buses, government-owned entertainment venues, and public medical clinics thus fall outside the Second Amendment altogether. *See* PI.Opp.23-28.

Because "the government—like private-property owners—has the power to regulate conduct on its property," it can restrict carrying like a private owner. *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019) (parking lot by Capitol); *see Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1123 (10th Cir. 2015) (U.S. Postal Service property). That analysis is not unique to Second Amendment jurisprudence,

---

[6] The district court also erred in its review of multiple individual pieces of evidence, including ones outside the record. *Compare, e.g.*, Op.169 (emphasizing Detroit zoo allowed firearms carry), *with* Laws Enacted by the Legislature of 1895 Affecting Municipality of Detroit at 142, §44, https://tinyurl.com/25b42z3b (restricting carry in Detroit parks); Op.173-74 (citing laws for village squares in addressing parks), *with* PI.Opp.40 (explaining village squares dissimilar to parks).

but a feature of constitutional law: when the government acts as owner rather than sovereign, particularly when competing with private owners in the marketplace, the government enjoys many of the same rights as its competitors. *See, e.g.*, *Reeves v. Stake*, 447 U.S. 429, 436-39 (1980) (explaining policies do not implicate Commerce Clause under "market participant" test); *Bldg. & Constr. Trades Council v. Assoc. Builders & Contractors*, 507 U.S. 218, 227 (1993) (same for preemption). The logic is simple: If the government offers a service as a market participant—*e.g.*, a library or concert hall—entrants acquiesce to its terms. If someone accepts restrictions when entering a private dialysis clinic, so too when he enters one run by UMDNJ.

The district court's rejection of this doctrine likely will not withstand scrutiny. The court provided little first-principles reasoning why the Legislature cannot restrict firearms at government properties. It largely ignored the Commerce Clause and preemption precedents from which the market-participant distinction is drawn, dismissing them in a footnote without confronting their logic. Op.115 n.33. It limited the government's power to cases where it acts "as an employer to manage its internal affairs," Op.110, even though the underlying precedents advance no such distinction. And the court cabined *Class* and *Bonidy* based on the specific locations involved, ignoring their doctrinal through-line that "the government—like private-property owners—has the power to regulate conduct on its property." *Class*, 930 F.3d at 464. That rule applies perfectly to government-operated libraries, buses, entertainment

facilities, and medical offices, where the government acts like any private owner would and may restrict carry.

B.    The Private-Property Provision Is Constitutional.

Chapter 131 separately provides that individuals cannot carry firearms onto another's private property without that owner's consent. Ch. 131, §7(a)(24). By enjoining this provision as to all places open to the public and as to curtilage, the district court erred for two independent reasons: this provision does not infringe the Second Amendment's text and is consistent with substantial history.

The question is one of property law, not of Second Amendment rights. Given "the well-established property law, tort law, and criminal law that embodies a private property owner's exclusive right to be king of his own castle," *GeorgiaCarry.Org v. Georgia,* 687 F.3d 1244, 1264 (11th Cir. 2012), such an owner can always expressly allow or refuse firearms-carry on their property. *See Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2077 (2021) (the "right to exclude … is a fundamental element of the property right that cannot be balanced away"); PI.Opp.5-6 (detailing private-property right to exclude). But if owners do not expressly permit *or* allow carrying, property law must clarify whether their silence constitutes consent to carry firearms on their property or not. *See id.* at 6-7 (explaining that default rules, like intestacy, clarify how property is governed unless altered by owner). Consistent with decades-

old laws in other States, *id.* at 8 n.3 (listing examples), the Legislature concluded that silence does not reflect consent to carry on the owner's property.

That legislative choice does not infringe the Second Amendment right. While *Bruen* establishes a right to bear arms "*in public*" for self-defense, 142 S.Ct. at 2134-35, owners remain the masters of their private property—and there is no Second Amendment right to carry on their private land without their consent. Moreover, as the Legislature found, and the uncontested preliminary record establishes, few New Jerseyans believed that an owner's mere silence grants permission to carry firearms on their property, and the vast majority agreed silence should not constitute consent. *See* PI.Opp.8 & n.4 (just 15.8% of residents believe customer can carry firearms into business without owner's consent). Because the ability to carry on another's property derives from the property holder's permission rather than any constitutional right, a law seeking to effectuate private owners' beliefs and intent regarding their property does not contravene the Second Amendment. *See* PI.Opp.19.

Overwhelming history is in accord. From before the Founding until decades after Reconstruction, New Jersey barred carrying firearms onto another's property absent the owner's express consent. PI.Opp.9-15. In 1771, for example, the State barred "carry[ing] any Gun on any Lands not his own, and for which the owner pays taxes, or is in his lawful possession, unless he has license or permission, in writing, from the owner," and had similar prohibitions through at least 1895. PI.Opp.10-12

(detailing laws from 1722 through 1895). Nor was this an outlier: at least six other States had laws around the Founding or Reconstruction that prohibited carrying on private property without express consent. *See* PI.Opp.15-17 (citing, *e.g.*, Louisiana barring "carry[ing] firearms on the premises or plantations of any citizen, without the consent of the owner or proprietor"). None drew distinctions between homes and property open to the public, Op.133-34, and none were ever invalidated. Nor is this surprising given "the special role" that the right to control one's "private property occupied" at the Founding. *GeorgiaCarry*, 687 F.3d at 1264; *see* PI.Opp.11-14; D.E. 84 ¶¶ 18-23 (expert historian underscoring special importance of right to exclude at Founding). The order below means New Jersey cannot maintain the same property law in 2023 it had in 1771—the opposite of how *Bruen* works.

The district court's contrary conclusions—relying on the since-stayed district court order in *Antonyuk*—fall short. Despite recognizing that owners are the masters of their property, the court identified a different rule for private property open to the public (like retail stores and gyms) and curtilage, versus "private property not held open to the public." Op.118, 123-26. The court determined that, as to the former, the public's implicit license to enter the store or curtilage automatically comes with a *presumptive* right to carry firearms there—one the State may not alter. But its rule is not grounded in any constitutional principle or precedent. After all, if the State can establish—as a matter of state property law—that invitations for plumbers to enter

the home does not impliedly invite them to bring firearms, *see* Op.118, 122, the State can likewise establish that an implied license to the public to enter an individual's porch or visit a retail business does not either. The district court's only authority was state trespass *statutes*, Op.126, but the Legislature can amend any statutory implied license of entry. And the court cited nothing showing the Second Amendment's text constitutionalizes one version of trespass law over another.

To the contrary, the district court failed to grapple with the hornbook property law that "a license" to enter, whether "express or implied," "is limited … to a specific purpose." *Florida v. Jardines*, 569 U.S. 1, 9 (2013). That is, holding that an implied license exists merely invites the question what specific license it grants—including whether it includes carrying firearms. *See id.* (noting door-knocker grants license to approach home, not to bring trained police canines). And while this "license may be implied from … background social norms," *id.*, unrebutted record evidence confirms the overwhelming majority do *not* expect that a customer can bring a firearm into a private business without express permission. PI.Opp.7-8. To the contrary, as for any other property, owners can still allow or prohibit carry, *see GeorgiaCarry*, 687 F.3d at 1264 (involving venue open to public); Op.128 (acknowledging same), so States can adopt default rules that respect those private-property rights.

Nor does the historical record support the district court's distinctions. None of the Founding and Reconstruction-era statutes that required owners' affirmative

consent to carry firearms on their private property turned on whether the property was open to the public. *See* PI.Opp.10-12 (1771 statute prohibiting carrying without consent "on any Lands not his own, and for which the owner pays taxes, or is in his lawful possession"); D.E. 84 ¶¶32-38 (expert historian confirming laws applied to businesses).[7] The court thus had to reject the history outright—reasoning that several such laws were "hunting regulations designed to discourage poaching," Op.136-37, and the remaining three were categorically too few, Op.143.

Both conclusions were error. As to the former, although some of these private-property laws included limitations on hunting, these statutes also included *separate* standalone sections restricting carry on private property without an owner's consent, which contemporaneous treatises and newspapers confirm had no hunting element. *See* PI.Opp.12-14 (expert and primary-source analysis). In any event, the *motivation* to require consent to carry on private property is irrelevant: where there is a historical "twin"—*i.e.*, if Founding- or Reconstruction-era States had the same restriction—it is necessarily consistent with the Second Amendment. *Compare Bruen*, 142 S.Ct. at 2131-33 (distinguishing analogies and twins), *with* Op.137 (refusing to "engage[] in a purely textual analysis" of historical laws). And the court further erred in finding

---

[7] The district court noted the preliminary injunction record does not include evidence of *prosecutions* for carrying in businesses held open to the public, Op.134, but no case suggests such evidence is necessary if the law itself draws no such distinctions, and unrebutted expert testimony confirms such distinctions did not exist.

the remaining identical laws insufficient, when none were invalidated or challenged, and where no record evidence indicates other States read the Second Amendment differently. *See supra* at 8-9 (rebutting district court's numerosity analysis). Multiple States ratifying the Fourteenth Amendment understood that they could still forbid carrying on private property without the owner's consent, and none said otherwise. New Jersey can do the same today.

## II.   THE EQUITIES COMPEL A STAY.

The equities overwhelmingly support a stay. *See Revel*, 802 F.3d at 569; *Nken v. Holder*, 556 U.S. 418, 425-26 (2009). Initially, New Jersey "suffers … irreparable injury" whenever it is barred "from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *Abbott v. Perez*, 138 S.Ct. 2305, 2324 n.17 (2018). Indeed, the injunction undermines the judgment of New Jersey's democratic branches on how best to keep residents safe, both in sensitive locations and on their private property. But here, that harm is especially profound: the preliminary injunction threatens "an ongoing and concrete harm to" the State's "law enforcement and public safety interests," *King*, 567 U.S. at 1303, and produces confusion on the ground. *See Winter v. NRDC*, 555 U.S. 7, 32-33 (2008) (equities independently sufficient for stay).

The safety threats are unfortunately clear. The preliminary-injunction record contains evidence amply demonstrating the link between loosening carry laws and

firearms violence, *see* D.E. 90-45 at 203-06 (collecting studies showing increased "likelihood a generally law-abiding citizen" will misuse firearms under shall-issue laws), and between presence of weapons and aggression, D.E. 90-40 (meta-analysis of 78 studies).[8] The evidence thus confirms the commonsense reality that accidents, misunderstandings, or arguments that would otherwise end in hurt feelings—like a drunken bar-fight—can turn deadly with firearms. And law enforcement is impacted too: the presence of armed civilians at sensitive places complicates police work, even decreasing effectiveness in responding to crisis scenarios. *See* D.E. 90-45 at 211-12 (discussing impact on police response); D.E. 90-43 at 13-15 (13% drop in violent-crime clearance rates after adopting right-to-carry laws). Such harms, including firearms deaths, "could not be undone, thus rendering the consequences irreparable." *Uniformed Fire Officers Ass'n v. De Blasio*, 973 F.3d 41, 48 (2d Cir. 2020). By allowing loaded guns in zoos, theaters, bars, protests, and Fourth of July celebrations—among others—the order threatens public safety.

---

[8] The district court cited outdated articles outside the record suggesting more public carry would not lead to increased gun violence, Op.227-28, but "the predominant conclusion from studies in the last five years has been that [such] laws increase violent crime." D.E. 90-43 at 1 & n.1; *see* D.E. 90-45 at 198-99.

The district court erred in dismissing these public safety risks on the basis that only permit holders can lawfully carry.[9] Unfortunately, permitting is not a panacea: even among permit holders, the risk of gun violence, either intentional or accidental, remains ever-present. Take, as one among many examples, last year's Highland Park shooting, in which a licensed owner killed seven people at a crowded Fourth of July parade. *See* Mitch Smith, *Highland Park Shooting Reveals Limits of Illinois's Gun Restrictions*, N.Y. Times (July 6, 2022), https://tinyurl.com/2ve49cvt; *see also, e.g.*, Michael Sisak, *Mass shooters exploited gun laws, loopholes before carnage*, AP (May 27, 2022), https://tinyurl.com/y6v348m6 (mass shooter obtained "carry license and legally owned … handguns police said he used to kill worshipers at Tree of Life synagogue"). Nor are these isolated incidents. *See* Glenn Thrush, *What Do Most Mass Shooters Have in Common? They Bought Their Guns Legally*, N.Y. Times (May 16, 2022), https://tinyurl.com/4y2cztxr. And this says nothing of the challenges to law enforcement when individuals can carry firearms into crowded and chaotic locations during a rapidly unfolding scene.

Moreover, the injunction creates confusion for both the general public and law enforcement, as the district court issued three different opinions addressing different sensitive places, sometimes expanding and sometimes contracting the list. *Compare*

---

[9] This logic also proves too much: it suggests no sensitive-place provision would be appropriate once a permitting regime is in place. But *Bruen* and centuries of history are squarely to the contrary.

D.E. 35 (initial TRO); D.E. 52 (second TRO expanding list of enjoined restrictions to parks and casinos, thus nullifying decades-old regulations), D.E. 125 (enjoining other sensitive-place restrictions, while simultaneously lifting injunction on private-property rule for property closed to the public). For example, as of January 9, an individual could carry firearms into bars but not parks; as of January 30, he could carry in parks but not zoos or medical offices; and as of May 16, he can carry in all such places, but must now decide whether the location is "open to the public" such that he has an "implied license" to carry on the private property without the owner's consent. This Court should suspend such piecemeal "judicial alteration of the status quo," *Nken*, 556 U.S. at 428-29, so that the public and law enforcement alike have clear guidance regarding public-carry rules—as laid out in the statutory text—while this Court considers the merits in an expedited appeal.[10]

Plaintiffs-Appellees' asserted injuries do not overcome these harms. Although they argued their Second Amendment injury is *per se* irreparable, the two are not synonymous, *see Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989), and a PI "does not follow as a matter of course" from likelihood of success, *Benisek v. Lamone*, 138

---

[10] While Plaintiffs-Appellees may argue that the *district court's* orders are the status quo, that is incorrect. For one, as explained above, the orders themselves repeatedly shifted. For another, courts traditionally assess the last status quo *before* judicial intervention. *See Nken*, 556 U.S. at 428-29; *FTC v. Qualcomm Inc.*, 935 F.3d 752, 757 (9th Cir. 2019). Finally, the State diligently sought prompt relief, *see* D.E. 46; D.E. 104, but the court indicated the State could not seek appellate review any more swiftly without introducing jurisdictional defects. *See* D.E. 107; 56 at 84.

S.Ct. 1942, 1943-44 (2018). Plaintiffs-Appellees submitted nothing to substantiate harm to their safety if they cannot carry in the enjoined places, and record evidence suggests none. *See* D.E. 90-44 at 27 (study finding "little evidence that self-defense gun use reduces the likelihood of victim injury during a crime"). That is particularly true of the private-property rule: if any Plaintiff-Appellee wishes to carry in a retail establishment, they can simply request consent from the owners. At the very least, they have established no harms sufficient to justify exposing nine million residents to a heightened risk of gun violence on their own property and in sensitive places. As the Second Circuit found in near-identical challenges to near-identical sensitive-places and private-property provisions, a stay is warranted.

## CONCLUSION

This Court should grant a stay.

Respectfully submitted,

MATTHEW J. PLATKIN
Attorney General of New Jersey

By:   /s/ Angela Cai
Deputy Solicitor General

Dated:  May 22, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 27(d) and L.A.R. 31.1(c), I certify that:

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 27(d)(2)(A) because the brief contains 5,199 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and thus does not exceed the 5,200-word limit.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using the Microsoft Word word-processing system in Times New Roman that is at least 14 points.

3.    This brief complies with L.A.R. 31.1(c) in that prior to being electronically submitted, it was scanned by the following virus-detection software and found to be free from computer viruses:

Company: McAfee, Inc.

Product: McAfee VirusScan Enterprise + AntiSpyware Enterprise, version 8.8.


Dated: May 22, 2023          /s/ Angela Cai
                             Angela Cai
                             Deputy Solicitor General
                             Office of the New Jersey Attorney General

## <u>CERTIFICATION OF BAR MEMBERSHIP</u>

I certify that that I am a member in good standing of the bar of the United

States Court of Appeals for the Third Circuit.


Dated: May 22, 2023

/s/ Angela Cai
Angela Cai
Deputy Solicitor General
Office of the New Jersey Attorney General

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the appellate CM/ECF system. Counsel of record for all parties are registered CM/ECF users and will be served by the appellate CM/ECF system. I have also served all parties via e-mail.

Dated: May 22, 2023                    /s/ Angela Cai
                                       Angela Cai
                                       Deputy Solicitor General
                                       Office of the New Jersey Attorney General