## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

RONALD KOONS, et al.,

      *Plaintiffs-Appellees*,

      v.

MATTHEW J. PLATKIN, et al.,

      *Defendants-Appellants*.

No. 23-1900

AARON SIEGEL, et al.,

      *Plaintiffs-Appellees*,

      v.

MATTHEW J. PLATKIN, et al.,

      *Defendants-Appellants*.

## SIEGEL PLAINTIFFS-APPELLEES' RESPONSE TO DEFENDANTS-APPELLANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ............................................................................... 1

BACKGROUND .................................................................................. 2

ARGUMENT ....................................................................................... 7

I.    The State's Motion Is Procedurally Improper ................................. 8

II.   The State's Motion Is Substantively Meritless ............................. 10

      A.    The State Identifies No Viable Basis to Disturb the District
            Court's Conclusion That Plaintiffs Are Likely to Succeed on
            the Merits ...........................................................................11

      B.    The Remaining Factors All Favor Leaving The District
            Court's Status-Quo-Preserving Injunction In Place ......................... 20

CONCLUSION ................................................................................. 22

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez,*
    138 S.Ct. 2305 (2018)........................................................................21

*Antonyuk v. Hochul*,
    2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022)....................................9

*Bos. Parent Coal. For Acad. Excellence Corp.*
    *v. Sch. Comm. of City of Bos.*,
    996 F.3d 37 (1st Cir. 2021) ...............................................................10

*Cedar Point Nursery v. Hassid,*
    141 S.Ct. 2063 (2021).......................................................................15

*Christian v. Nigrelli,*
    2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022) ...............................10

*Conestoga Wood Specialties Corp.*
    *v. Sec'y of U.S. Dep't of Health & Human Servs.*,
    2013 WL 1277419 (3d Cir. Feb. 8, 2013).......................................7, 8

*District of Columbia v. Heller*,
    554 U.S. 570 (2008).......................................................................2, 17

*Drake v. Filko,*
    724 F.3d 426 (3d Cir. 2013) ...............................................................3

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011)..............................................................20

*GeorgiaCarry.Org, Inc. v. Georgia*,
    687 F.3d 1244 (11th Cir. 2012) .........................................................15

*In re Revel AC, Inc.,*
    802 F.3d 558 (3d Cir. 2015) ................................................................7

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010)......................................................................2, 14

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   142 S.Ct. 2111 (2022) ................................................................ *passim*

*Pennsylvania v. HHS*,
   101 F.3d 939 (3d Cir. 1996) ....................................................9

*Rogers v. Grewal*,
   140 S.Ct. 1865 (2020) ...........................................................14

*United States ex rel. Barnwell v. Rundle*,
   461 F.2d 768 (3d Cir. 1972) ..................................................10

*United States v. Cianfrani*,
   573 F.2d 835 (3d Cir. 1978) ....................................................7

*United States v. Claxton*,
   766 F.3d 280 (3d Cir. 2014) ....................................................9

## Statutes

2022 N.J. Laws, ch. 131 ...............................................................4

N.J. Admin. Code §7:2-2.17 .........................................................5

N.J. Admin. Code §13:69D-1.13 ....................................................5

N.J. Stat. Ann. §2C:43-3 ..............................................................6

N.J. Stat. Ann. §2C:43-6 ..............................................................6

N.J. Stat. Ann. §2C:58-4.6 .................................................... 4, 5, 6

## Rules

D.N.J. L.Civ.R. 7.1.......................................................................9

Fed. R. App. P. 8........................................................... 8, 9, 10

## Other Authorities

16A Wright & Miller, *Fed. Prac. & Proc.* §3954 (5th ed. 2023) .............................8

Eliza Fawcett, *Bystander Killed Gunman 2 Minutes Into Indiana Mall Shooting*, N.Y. Times (July 18, 2022), https://rb.gy/6k21d......................21

Patrick J. Charles, *The Fugazi Second Amendment:*
  Bruen*'s Text, History, and Tradition Problem and How to Fix It*,
  71 Clev. St. L. Rev. 623 (2023) ..........................................................................14

# INTRODUCTION

Last June, the Supreme Court held that the Second Amendment protects "an individual's right to carry a handgun for self-defense outside the home." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111, 2122 (2022).  Although *Bruen* preserved the states' ability to prohibit firearms in particularly "sensitive places," the Court emphasized that the historical record revealed "relatively few" such places and warned states not to "define[] the category of 'sensitive places' … too broadly," lest they "eviscerate the general right to publicly carry arms for self-defense." *Id.* at 2133-34.  While *Bruen* specifically addressed New York's "proper cause" licensing regime, it doomed New Jersey's similar "justifiable need" regime.  Thus, for months, the state debated what its new regime would look like.  Remarkably, the state "paid little to no mind to *Bruen*" during those debates.  Op.3 n.2.  And it showed:  When the state in December 2022 enacted the law at issue here—Chapter 131—it classified dozens of locations as sensitive places (*e.g.*, all private property and a substantial portion of government property), thus rendering most of New Jersey a Second-Amendment-free zone where carrying firearms for self-defense is now a crime.

Two weeks ago, after issuing two temporary restraining orders in January 2023, the district court issued a decision resolving two motions for preliminary injunctions.  Although the court upheld several of Chapter 131's challenged provisions, it preliminarily enjoined various sensitive-place provisions.  The court's

1

230-page opinion is painstakingly detailed, but its bottom-line conclusion is that New Jersey "cannot disobey the Supreme Court by declaring most of New Jersey off limits for law-abiding citizens who have the constitutional right to armed self-defense." Op.5.

The state has now filed an emergency motion asking this Court to stay that decision so that its *Bruen*-defying law can take effect, which would upend the status quo that has existed for most of the past year. The Court should reject that request, as the state's motion is flawed from start to finish. Indeed, it is not even procedurally proper, as the state never sought a stay in the district court in accordance with the applicable rules. And the state cannot satisfy any of the traditional factors for obtaining a stay in all events. While plaintiffs have agreed to the state's request to expedite this appeal, the state has come nowhere close to demonstrating that it is entitled to further relief in the interim.

## BACKGROUND

1.    As the Supreme Court held in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Second Amendment guarantees an individual right to keep and bear arms for the core purpose of self-defense, which is protected against infringement by the states. Nonetheless, both before and after those decisions, New Jersey deprived law-abiding citizens of any avenue to bear arms for self-defense outside the home by making it

nearly impossible to obtain the license that state law required to do so.  Specifically, to obtain a license and thereby avoid criminal punishment just for exercising a constitutional right, a law-abiding citizen had to demonstrate a "justifiable need to carry a handgun." *Drake v. Filko*, 724 F.3d 426, 428 (3d Cir. 2013) (emphasis omitted).

In June 2022, the Supreme Court issued *Bruen*, which addressed a materially identical New York law and held it unconstitutional.  The Court confirmed that the right "to keep and bear Arms" means just that—the right to keep *and bear* arms, whether inside or outside the home. *Bruen*, 142 S.Ct. at 2134-35.  The Court reiterated that the Second Amendment is no "second-class right" subject to a unique set of rules or available to only those with "some special need" to exercise it. *Id.* at 2156.  And the Court made clear that, when evaluating government burdens on the Second Amendment's "unqualified command," courts must assess "this Nation's historical tradition" of firearms regulation—"the government may not simply posit that the regulation promotes an important interest" and call it a day. *Id.* at 2125-34. Only if the state can "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms" may a court uphold a restriction on that right. *Id.* at 2127.

In the course of explaining how this historical burden-shifting regime works, the Court observed that laws forbidding the carrying of firearms in certain "sensitive

3

places" may accord with historical tradition. *Id.* at 2133. But it noted that "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses." *Id.* And the Court explicitly rejected New York's attempt to justify its special-need restriction as a "sensitive place" law, stating that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly" and has "no historical basis." *Id.* at 2133-34.

2.    New Jersey legislators debated how to replace its "justifiable need" regime for six months after *Bruen* and ultimately enacted a new law on December 22, 2022: Chapter 131 of the 2022 Laws of New Jersey. *See* 2022 N.J. Laws, ch. 131. "The legislative record reveals" that, during that period, "the Legislature paid little to no mind to *Bruen* and the law-abiding New Jerseyans' right to bear arms in public for self-defense." Op.3 n.2. Unsurprisingly, that cavalier approach produced a law that is squarely in *Bruen*'s teeth. As relevant here, Chapter 131 prohibits carrying firearms in 25 "sensitive places," including:

- "within 100 feet of a place where a public gathering, demonstration or event is held for which a government permit is required," N.J. Stat. Ann. §2C:58-4.6(a)(6);

- "zoos," *id.* §2C:58-4.6(a)(9);

- "a park, beach, recreation facility or area or playground owned or controlled by a State, county or local government unit," *id.* §2C:58-4.6(a)(10); *see also* N.J. Admin. Code §7:2-2.17(b);

- "a publicly owned or leased library or museum," N.J. Stat. Ann. §2C:58-4.6(a)(12);

- "a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises," *id.* §2C:58-4.6(a)(15);

- "a privately or publicly owned and operated entertainment facility," *id.* §2C:58-4.6(a)(17);

- "a casino and related facilities," *id.* §2C:58-4.6(a)(18); *see also* N.J. Admin. Code §13:69D-1.13;

- "a health care facility," N.J. Stat. Ann. §2C:58-4.6(a)(21);

- "a public location being used for making motion picture or television images," *id.* §2C:58-4.6(a)(23); and

- "private property, … unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises," *id.* §2C:58-4.6(a)(24).

In addition, New Jersey made it virtually impossible for New Jerseyans to exercise their right to self-defense while transiting between these locations, as Chapter 131 prohibits "carry[ing] or transport[ing] a firearm … while in a vehicle in New Jersey, unless the handgun is unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle." *Id.* §2C:58-4.6(b)(1).

A violation of any sensitive-place provision is a third-degree crime, *see id.* §2C:58-4.6(a), punishable by a three-to-five-year prison sentence and a $15,000

fine, *see id.* §§2C:43-3(b)(1), 2C:43-6(a)(3).  A violation of the vehicle provision is a fourth-degree crime, *see id.* §2C:58-4.6(b), punishable by an 18-month prison sentence and a $10,000 fine, *see id.* §§2C:43-3(b)(2), 2C:43-6(a)(4).

3.    The same day that Governor Murphy signed Chapter 131 into law, two sets of plaintiffs—the "*Siegel* plaintiffs" (the parties submitting this filing) and the "*Koons* plaintiffs"—filed two separate lawsuits that collectively challenged on Second Amendment and other grounds the provisions of Chapter 131 identified above, along with various other provisions of New Jersey law.  Op.6-9.  Both sets of plaintiffs sought temporary restraining orders and preliminary injunctions.  On January 9, 2023, the district court issued a temporary restraining order in the *Koons* case with respect to five of the aforementioned sensitive-place provisions.  Op.7-8. On January 30, 2023, the court issued a temporary restraining order in the *Siegel* case (which the court had consolidated with the *Koons* case) with respect to four more.  Op.8-9 & n.9.  Accordingly, most of the aforementioned provisions took effect for only a matter of days in the post-*Bruen* period.

Two weeks ago, the district court granted a preliminary injunction with respect to all of the aforementioned provisions—although it did "find[] that most of the new legislation's firearm permitting requirements are consistent with the Second Amendment" and so left them undisturbed.  Op.5.  In reaching its conclusions, the court observed that, "despite assurances by the State that it would present sufficient

historical evidence as required by *Bruen* to support each aspect of the new legislation, the State failed to do so." Op.3.  The Court also lamented that, "[a]t this preliminary injunction stage, the State has proceeded to justify the new legislation with 'more of the same' that it had presented during the initial proceedings for temporary restraints," which left "the Court to do what the Legislature had said it had done, but clearly did not." Op.4.  The court also explained that, while the state "[c]learly … disagrees with *Bruen*," "it cannot disobey the Supreme Court by declaring most of New Jersey off limits for law-abiding citizens who have the constitutional right to armed self-defense." Op.5.

## ARGUMENT

A stay pending appeal is an "extraordinary remed[y]," *United States v. Cianfrani*, 573 F.2d 835, 846 (3d Cir. 1978), that is "rarely granted," *Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 2013 WL 1277419, *1 (3d Cir. Feb. 8, 2013).  Before granting one, this Court not only must assure itself that a moving party has complied with the procedural prerequisites set forth in Federal Rule of Appellate Procedure 8, but also must ask "(1) whether the appellant has made a strong showing of the likelihood of success on the merits; (2) will the appellant suffer irreparable injury absent a stay; (3) would a stay substantially harm other parties with an interest in the litigation; and (4) whether a stay is in the public interest." *In re Revel AC, Inc.*, 802 F.3d 558, 565 (3d Cir. 2015).

The "bar" thus "is set particularly high." *Conestoga*, 2013 WL 1277419, *1. New Jersey plainly fails to clear it here.

## I.     The State's Motion Is Procedurally Improper.

The first fatal problem with New Jersey's motion is that it is procedurally improper. Federal Rule of Appellate Procedure 8(a)(1)(A) provides that, before requesting a stay pending appeal from a court of appeals, the movant must file an "initial motion" requesting that relief "in the district court." Fed. R. App. P. 8(a)(1)(A) (capitalization altered). That is "[t]he cardinal principle with respect to stay applications under Rule 8." 16A Wright & Miller, *Fed. Prac. & Proc.* §3954 (5th ed. 2023). If "the district court denie[s] the motion or fail[s] to afford the relief requested," the movant may seek a stay pending appeal from the court of appeals. Fed. R. App. P. 8(a)(2)(A)(ii). But unless the movant "show[s]" the court of appeals "that moving first in the district court would be impracticable," it must start there. Fed. R. App. P. 8(a)(2)(A)(i).

New Jersey did not file a motion in the district court requesting a stay pending appeal. Any such motion would have had to comply with the Federal Rules of Civil Procedure—including the district court's own local rules. Among other things, the District of New Jersey's local rules provide that, "[u]nless a Judge advises the attorneys otherwise, all motions, regardless of their complexity and the relief sought, shall be presented and defended in the manner set forth in L.Civ.R. 7.1." D.N.J.

L.Civ.R. 7.1(b).  Local Civil Rule 7.1, in turn, provides that the movant must submit a "moving paper[]," which "shall be a separate document" from "[t]he brief." L.Civ.R. 7.1(d)(1).  As the dockets in the *Siegel* and *Koons* cases reveal, the state never filed a motion requesting a stay pending appeal in accordance with those rules.

New Jersey does not seriously suggest otherwise.  Instead, it argues in a footnote, *see* Mot. 5 n.3, that it complied with Rule 8 because, in literally *the last sentence of a 100-page brief* captioned "Defendants' Brief in Opposition to Plaintiffs' Motions for Preliminary Injunction"—it said:  "In the alternative, the State requests a stay of any injunction so that it can appeal to the Third Circuit.  *See* Fed. R. App. P. 8(a)."  Dkt.91 at 100; *see Pennsylvania v. HHS*, 101 F.3d 939, 945 (3d Cir. 1996) ("argument mentioned in passing, but not squarely argued, is waived").  The state does not and cannot explain how that fleeting request in a legal brief qualifies as a motion in the District of New Jersey.  *Cf.* D.N.J. L.Civ.R. 7.1(d)(1).  And because the district court had no "outstanding motion" on its docket on which to rule, it makes no sense (as the state urges) to treat the court's silence as "an implicit denial of that motion."  *United States v. Claxton*, 766 F.3d 280, 291 (3d Cir. 2014).  *Contra* Mot.5 n.3.  Indeed, it is notable that, in the two cases to which the state tries to analogize, the district courts *explicitly refused to grant stays pending appeal* in their preliminary-injunction decisions.  *See Antonyuk v. Hochul*, 2022 WL 16744700, at *85 (N.D.N.Y. Nov. 7, 2022); *Christian v. Nigrelli*, 2022 WL

9

17100631, at *11-*12 (W.D.N.Y. Nov. 22, 2022). Here, by contrast, there is no indication that the district court is even aware that the state thinks it moved for a stay.

This Court thus can entertain New Jersey's motion (if at all) only if the state "show[s] that moving first in the district court would be impracticable." Fed. R. App. P. 8(a)(2)(A)(i). But the state does not affirmatively make any such argument. And to the extent the state means to suggest that it satisfies this exception simply because the district court already "found for Plaintiffs-Appellees on both likelihood of success and the equities," Mot.5 n.3, that argument is unavailing. Quite obviously, a district court will have just made those very findings in *every* case involving a stay pending appeal in the preliminary-injunction context. That is why a wall of precedent confirms that such findings are not enough to excuse a moving party from the requirements of Rule 8. *See, e.g.*, *Bos. Parent Coal. For Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 43-44 (1st Cir. 2021) (collecting cases). This Court therefore may not "consider" the state's motion at all. *United States ex rel. Barnwell v. Rundle*, 461 F.2d 768, 769 (3d Cir. 1972).

## II. The State's Motion Is Substantively Meritless.

Even assuming the Court could ignore that terminal procedural defect, the state's motion is just as deficient as a substantive matter. The state does not and cannot demonstrate that it is likely to succeed on the merits in this Court or that any

of the remaining factors favor disturbing a decision that preserves the status quo and protects constitutional rights.

**A.    The State Identifies No Viable Basis to Disturb the District Court's Conclusion That Plaintiffs Are Likely to Succeed on the Merits.**

*Bruen* established a straightforward framework for assessing firearms regulations: "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct"; thus, "[t]o justify its regulation" of firearms, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 142 S.Ct. at 2126. The state makes two basic arguments why the sensitive-place provisions at issue purportedly satisfy this test, and each is unpersuasive.

1. New Jersey's most ambitious argument is that, when the state prohibits the carrying of firearms for self-defense on government property or private property that is held open to the public, those restrictions "fall outside the Second Amendment altogether." Mot.11; *see* Mot.11-18. That is demonstrably wrong. As noted, the threshold inquiry into whether conduct is "presumptively protect[ed]" by the Second Amendment simply asks whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S.Ct. at 2126. The Second Amendment secures the "right of the people to … bear Arms." U.S. Const. amend. II. When examining that text in *Bruen*, the Court explained it presumptively protects the ability of law-abiding citizens "to carry handguns publicly for their self-defense"—and that

11

"publicly" simply means "outside the home." 142 S.Ct. at 2122; *see id.* ("the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense *outside the home*" (emphasis added)); *id.* at 2134 ("Nothing in the Second Amendment's text draws *a home/public distinction* with respect to the right to keep and bear arms." (emphasis added)).

When plaintiffs and other law-abiding citizens enter onto government property or private property that is open to the public while carrying firearms for self-defense, they unquestionably "bear Arms" outside the home. Chapter 131's ban on carrying firearms in those locations indisputably prohibits activity that "the Second Amendment's plain text covers." *Id* at 2126. Thus, "the Constitution presumptively protects that conduct," and the state's restrictions are permissible only if it can "demonstrate that the[y are] consistent with this Nation's historical tradition of firearm regulation." *Id.*

The state resists the conclusion that Second Amendment rights presumptively apply on government property by pointing to "the Commerce Clause and preemption precedents." Mot.12. But this so-called "first-principles reasoning," Mot.12, has nothing to do with "the plain text of the Second Amendment," *Bruen*, 142 S.Ct. at 2134, which is the only text that matters when assessing whether conduct "fall[s] outside the Second Amendment altogether," Mot.11. Indeed, the state's conspicuous silence on the Second Amendment's text just underscores that there is no basis to

exclude the carrying of firearms on government property from *the text* of the Second Amendment, and that the legitimacy of any such prohibitions instead turns entirely on historical tradition.

The state commits similar mistakes when addressing private property. According to the state, Chapter 131's default rule vis-à-vis prohibiting the carrying of firearms on private property is a "question … of property law, not of Second Amendment rights."  Mot.13.  That argument confuses the rights of the property owner with the rights of the state.  To be sure, private-property owners can exclude those who wish to carry firearms from their property without implicating the Second Amendment, because private-property owners are typically not state actors bound by the Second Amendment.  That is why "Plaintiffs have not asserted a right to carry on every private parcel of land in New Jersey in *all* cases, nor have they asserted a right to *trespass* with firearms (*i.e.*, to carry 'against an owner's wishes')."  Op.122. But that hardly means that the Second Amendment has nothing to say about *government*-imposed restrictions on the carrying of firearms on private property.

Here, New Jersey, not a private-property owner, has created a default rule that prohibits the carrying of firearms on private property.  That is unquestionably a law that restricts conduct that "the Second Amendment's plain text covers."  142 S.Ct. at 2129-30.  By New Jersey's contrary telling, a law that prohibited firearms on private property even when the property owner *welcomes* them would not implicate

the Second Amendment at all.  Nothing in the text of the Second Amendment comes close to supporting such a remarkable claim.  Thus, as with the state's restrictions on the carrying of firearms on government property, its restrictions on the carrying of firearms on private property can survive only if they accord with historical tradition.

2.     Unable to explain why government and private property are not presumptively within the scope of the Second Amendment, New Jersey retreats to a less ambitious argument.   Relying on research conducted by its preferred historians—such as Patrick Charles, *see* Mot.7 (citing Dkt.91 at 28, which cites Charles), whose work is a favorite of Supreme Court *dissents*, *see Bruen*, 142 S.Ct. at 2180-98 (Breyer, J., dissenting); *McDonald*, 561 U.S. at 914 (Breyer, J., dissenting); *cf. Rogers v. Grewal*, 140 S.Ct. 1865, 1870 n.3 (2020) (Thomas, J., dissenting from denial of certiorari) (noting that scholars had "repudiated" Charles' analysis), and who recently derided *Bruen* as creating a "fugazi Second Amendment" that is "historically ruined and fake," Patrick J. Charles, *The Fugazi Second Amendment:* Bruen*'s Text, History, and Tradition Problem and How to Fix It*, 71 Clev. St. L. Rev. 623, 627 (2023)—the state insists that it "amply met its burden to identify historical predecessors for each sensitive place."  Mot.6.  The state is exceedingly unlikely to demonstrate that the district court erred in concluding otherwise.

14

First, while this Nation's traditions certainly allow *private-property owners* to decide whether to exclude those who wish to carry firearms from their property, *see Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2077 (2021); *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012), there is no comparable tradition that allows the *government* to make that decision on behalf of private-property owners in the first instance. The only evidence the state musters in support of its contrary claim is a handful of colonial statutes from four states and a handful of Reconstruction-era statutes from three states. *See* Mot.14-15 (citing Dkt.91 at 9-17). As the district court explained in exhaustive detail, that evidence does not get the job done. Op.131-45.

The colonial statutes—such as New Jersey's 1722 "Act to prevent Killing of Deer out of Season, and against Carrying of Guns and Hunting by Persons not qualified"—are all self-evidently "designed to discourage poaching." *See* Op.132-41. The state insists that the hunting-related nature and "*motivation*" of these statutes is "irrelevant." Mot.17. But *Bruen* begs to differ, as it emphasizes that "how" and "why" states regulated firearms in earlier generations are the two core "metrics" when assessing whether an earlier regulation supports a modern one. 142 S.Ct. at 2132-33. That leaves a handful of Reconstruction-era statutes from three states. Setting aside that these laws did not address private property generally open to the public, if "*three* colonial regulations" cannot "suffice to show a tradition"

capable of sustaining a firearms regulation, *id.* at 2142; *accord* Mot.9 n.4, a comparable number of Reconstruction-era statutes is insufficient *a fortiori*, *see Bruen*, 142 S.Ct. at 2138 ("[P]ost-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment'" and "do not provide as much insight into its original meaning as earlier sources.'").

As for the rest of Chapter 131's sweeping restrictions, the state fails to identify any "enduring American tradition," *id.* at 2154, of broadly prohibiting firearms on all government-owned property—because no such tradition has ever existed, *see id.* at 2133 (discussing government property and explaining that "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited"). Yet the state does not even address "each sensitive place" at issue—presumably because the list is too long. The state instead focuses on only a handful of sensitive places (like "entertainment facilities") and claims that the district court erred because the state found "[a]t least *ten*" statutes that "prohibited guns" from places like "'ballroom[s],' 'race-courses,' or 'social part[ies]'" (which are purportedly analogous to "21st-century entertainment venues"). Mot.7, 10.

That submission is flawed on multiple levels. At the outset, *Bruen* examined the "historical record" just a year ago and identified "*relatively few* 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited." 142 S.Ct. at 2133 (emphasis added). The notion that New Jersey has suddenly unearthed enough

historical support to declare most of the state a "sensitive place," and thereby "eviscerate the general right to publicly carry arms for self-defense" that *Bruen* just confirmed, *id.* at 2134, is unlikely in the extreme.

Unsurprisingly, New Jersey has done no such thing.  Take, for instance, its effort to sustain its restrictions at all "entertainment facilities."  As noted, *Bruen* makes clear that a law implicating Second Amendment conduct can survive only if it is part of "an enduring American tradition of state regulation," and admonishes that a "handful of late-19th-century" examples do not establish one.  142 S.Ct. at 2138, 2155.  But that is all that the state has mustered with respect to entertainment facilities.  Virtually all the statutes that it cited came from the late-nineteenth century, *see* Dkt.91 at 49-50, and that "temporal distance from the founding" alone "seriously" lessens their relevance, *Bruen*, 142 S.Ct. at 2154.  On top of that, they all came from a handful of former Confederate states (Texas, Georgia, Tennessee, and Missouri) *resisting* Reconstruction—hardly the place to look for our Nation's historical traditions.  *See Heller*, 554 U.S. at 614 ("Blacks were routinely disarmed by Southern States after the Civil War.").  And although the state cited two founding-era statutes that it claims to be analogous, *see* Dkt.91 at 49 & n.42, it simply ignored that *Bruen* examined statutes exactly like them and concluded that they do *not* support any categorical restrictions on the right to carry in public for self-defense, *see* 142 S.Ct. at 2139-45.  The district court did not err in conducting this type of

17

analysis vis-à-vis entertainment facilities, *see* Op.182-84; Op.152-68—or vis-à-vis any other sensitive-place provision that it preliminarily enjoined, *see* Op.152-206.

The state's counterarguments miss the mark. The state first accuses the district court of conducting a crude "numerosity" test. Mot.8. That accusation is ironic given that the state is arguing that the "breadth" of (inapposite) historical statutes it found should suffice to sustain its restrictions. Mot.7. In all events, in its 230-page opinion, the court did not simply tabulate the number of laws and close up shop. Just consider the court's discussion of public parks, which is Exhibit A of the state's argument. *See* Mot.8 (citing Op.178). As the court explained there, "one state law and about 25 local ordinances" from the "mid- to -late 19th century … banning firearms at parks" are insufficient to establish an enduring American tradition not because they flunk a numerosity test, but because (among other reasons) "the modern equivalent of parks existed during this nation's founding," the founding era did not prohibit firearms in them, the state's temporally distant laws "governed less than 10% of the nation's entire population," some came from cities in territories, and some "banned firearms at parks to protect birds—not parkgoers." Op.177-78. That analysis is perfectly faithful to *Bruen*.

The state next asserts that "the district court wrongly put stock in the mere *lack* of laws in other jurisdictions." Mot.9. Again, that argument is irreconcilable with *Bruen*. As *Bruen* explained, "when a challenged regulation addresses a general

societal problem" that has persisted for centuries, "the *lack* of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."    142 S.Ct. at 2131 (emphasis added).  As the state concedes, Chapter 131 is intended to address issues that existed "centuries ago."  Mot.10.  It is hard to see how the lack of comparable laws in prior generations "says little about prior understandings of the Second Amendment."  Mot.9-10.

Finally, the state contends that, when analyzing places like "zoos, libraries, museums, parks, and medical offices," "the district court impermissibly demanded that historical analogues be nearly identical to the modern statute."  Mot.10.  But the state never establishes that reasoning by analogy is appropriate here.  As *Bruen* emphasizes, "courts can use analogies to … historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible."  142. S.Ct. at 2133. To state the obvious, zoos, libraries, museums, parks, and medical offices are not 21st-century inventions.  It is thus entirely consistent with *Bruen* to assess whether earlier generations *in fact* restricted carrying of firearms in those locations—as opposed to making inapt comparisons between "museums" and "youth sports events."  Mot.10.  In all events, even assuming the court should have followed the state's lead when, for example, the state described "ballrooms in 1816 New Orleans"

as the historical precursor to the "MetLife Stadium," Mot.10; Dkt.91 at 49, n.43, the state leaves to the imagination how a single ballroom law establishes an enduring American tradition of firearms regulation.

*    *    *

In short, the state does not and cannot establish that it is likely to succeed on the merits in this Court. All the sensitive-place provisions at issue plainly implicate the Second Amendment's plain text, and all of those provisions are just as plainly inconsistent with historical tradition.

### B.    The Remaining Factors All Favor Leaving The District Court's Status-Quo-Preserving Injunction In Place.

As one would expect in a contest between law-abiding citizens' ability to exercise constitutional rights and the state's interest in enforcing novel restrictions suppressing those recently reaffirmed rights, the remaining factors strongly favor leaving the district court's status-quo-preserving injunction in place. To begin, the court correctly concluded that *plaintiffs* would suffer irreparable harm absent a preliminary injunction, as "Chapter 131 forces [them] to choose between the noncompensable loss of their Second Amendment rights or face significant criminal penalties for exercising such rights." Op.222-23; *see Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (infringement of Second Amendment rights constitutes irreparable harm). The state counters that states necessarily suffer irreparable harm when "democratically-enacted laws" are enjoined. Mot.3, 18. But that is not true

20

when (as here) the statute is unconstitutional. *See Abbott v. Perez*, 138 S.Ct. 2305, 2324 (2018) ("*Unless that statute is unconstitutional*, [the injunction] would … irreparably harm the State[.]" (emphasis added)).

The state also argues that denying a stay would "threaten[] public safety." Mot.19-20. But it does not argue that any such threats materialized either during the six-month period after *Bruen* and before Chapter 131's enactment, or during the four-month period after the district court issued its temporary restraining orders. And as the court below rightly observed, "what the State … ignore[s], and what their empirical evidence fails to address, is that this legislation is aimed primarily—not at those who unlawfully possess firearms—but at law-abiding, responsible citizens who satisfy detailed background and training requirements and whom the State seeks to prevent from carrying a firearm in public for self-defense." Op.4. While the state protests that "permitting is not a panacea" because licensed firearms owners sometimes "kill[]" others in "mass shooting" events, Mot.20, it does not explain how a stay would deter such criminals who already face far greater penalties for those crimes—or why it is safer to leave law-abiding citizens as unarmed sitting ducks, *cf.* Eliza Fawcett, *Bystander Killed Gunman 2 Minutes Into Indiana Mall Shooting*, N.Y. Times (July 18, 2022), https://rb.gy/6k21d.

Finally, the state argues that denying a stay would "create[] confusion for both the general public and law enforcement, as the district court issued three different

opinions addressing different sensitive places." Mot.20.  But the state's stay request pertains only to one of the district court's opinions—the preliminary-injunction opinion—and the state does not meaningfully argue that it is "confusing."  Indeed, the only purported confusion it identifies is that a firearms owner "must now decide whether the location is 'open to the public' such that he has an 'implied license' to carry on the private property without the owner's consent."  Mot.21.  But New Jerseyans (like all Americans) decide every day whether locations are "open to the public," and while the state may take a dimmer view of its citizens, plaintiffs are confident that they and other law-abiding citizens remain up to that task.

## CONCLUSION

The Court should deny the state's motion.

Respectfully submitted,

DANIEL L. SCHMUTTER
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, NJ 07450

s/Erin E. Murphy
PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
ANDREW C. LAWRENCE*
MARIEL A. BROOKINS*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Supervised by principals of the firm who are members of the Virginia Bar

*Counsel for Siegel Plaintiffs-Appellees*

May 30, 2023

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 5,193 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

2. This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

3. This motion complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies required by the Court; and Windows Defender has been run on the file containing the electronic version of this brief and no viruses have been detected.

4. I hereby certify, pursuant to Local Rule 28.3(c), that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

May 30, 2023

s/Erin E. Murphy
Erin E. Murphy

## CERTIFICATE OF SERVICE

I hereby certify that, on May 30, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy