# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

Nos. 23-1900, 23-2043

---

RONALD KOONS et al.,
*Plaintiffs-Appellees,*

v.

MATTHEW J. PLATKIN et al.,
*Defendants-Appellants*

---

AARON SIEGEL et al.,
*Plaintiffs-Appellees / Cross-Appellants,*

v.

MATTHEW J. PLATKIN et al.,
*Defendants-Appellants / Cross-Appellees*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(Nos. 22-cv-7463, 22-cv-7464 (RMB))

---

**JOINT APPENDIX**

**VOLUME III**

**JA465 – JA949**

---

MATTHEW J. PLATKIN
  *Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
  *Solicitor General*

ANGELA CAI
  *Deputy Solicitor General*

JEAN REILLY
  *Assistant Attorney General*

DAVID CHEN
VIVIANA HANLEY
SAMUEL RUBINSTEIN
  *Deputy Attorneys General*

Office of the New Jersey Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625-0080
(609) 414-5954
angela.cai@njoag.gov

*Attorneys for Defendants-Appellants*
*New Jersey Attorney General*
*Matthew J. Platkin and Superintendent of*
*New Jersey State Police Colonel*
*Patrick Callahan*

# JOINT APPENDIX
## TABLE OF CONTENTS

**VOLUME I**                                                                    **JA Page**

Defendants' Notice of Appeal (ECF 126)[1] ...................................... JA1

*Siegel* Plaintiffs' Notice of Cross-Appeal (ECF 128)...................................... JA4

Order Granting In Part And Denying In Part Plaintiffs' Motions for
    Preliminary Injunction (ECF 125)............................................... JA6

Opinion Granting In Part And Denying In Part Plaintiffs' Motions for
    Preliminary Injunction (ECF 124)............................................... JA10

**VOLUME II**

*Koons* District Court docket sheet .................................................... JA245

*Koons* Complaint (ECF 1) ............................................................. JA264

*Siegel* Complaint (Case No. 22-cv-7463, ECF 1)............................................. JA286

Defendants' Expedited Motion to Consolidate (Case No. 22-cv-7463,
    ECF 7)..................................................................... JA345

*Siegel* Plaintiffs' Motion for Temporary Restraining Order And For A
    Preliminary Injunction (Case No. 22-cv-7463, ECF 8)............................. JA349

    Declaration of Aaron Siegel (Ex. 2) ........................................ JA352

    Declaration of Jason Cook (Ex. 3)............................................ JA360

    Declaration of Joseph DeLuca (Ex. 4)........................................ JA368

    Declaration of Nicole Cuozzo (Ex. 5) ....................................... JA374

    Declaration of Timothy Varga (Ex. 6)........................................ JA377

---

[1] ECF numbers are to the *Koons* docket (Case No. 1:22-cv-07464) unless otherwise indicated.

Declaration of Christopher Stamos (Ex. 7) ................................................. JA382

Declaration of Kim Henry (Ex. 8) ............................................................ JA385

Declaration of Scott Bach (Ex. 9) ............................................................. JA388

Declaration of Daniel Schmutter (Ex. 10) ................................................. JA391

*Koons* Plaintiffs' Motion for Order to Show Cause, Motion for
    Temporary Restraining Order, Motion for Preliminary Injunction
    (ECF 8) ................................................................................................ JA438

Declaration of Ronald Koons (ECF 10) ..................................................... JA441

Declaration of Nicholas Gaudio (ECF 11) ................................................. JA446

Declaration of Jeffrey Muller (ECF 12) ..................................................... JA455

*Koons* Show Cause Order (ECF 13) .......................................................... JA462

## **VOLUME III**

Opinion on *Koons* Plaintiffs' Motion for Temporary Restraining Order
    (ECF 34) ............................................................................................... JA465

Order re: *Koons* Plaintiffs' Motion for Temporary Restraining Order
    (ECF 35) ............................................................................................... JA525

Transcript of *Koons* TRO Motion Hearing (ECF 37) ................................. JA527

Legislators' Motion to Intervene (ECF 47) ................................................. JA625

Proposed Intervention Pleading (Ex. A) .................................................... JA628

L. 2022, c. 131 (Ex. B) ............................................................................. JA655

Summary of legislative history of A4769 (Ex. C) ...................................... JA682

A4769 – as introduced (Ex. D) ................................................................. JA687

Report of the Assembly Judiciary Committee (Ex. E) ............................... JA720

Report of the Assembly Appropriations Committee (Ex. F) ...................... JA727

Report of the Assembly Oversight Committee (Ex. G) .............................. JA737

Report of the Senate Budget and Appropriations Committee (Ex. H) ....... JA745

*Siegel* Consolidation Order (ECF 50) ............................................................. JA753

Opinion on *Siegel* Plaintiffs' Motion for Temporary Restraining Order
(ECF 51) ................................................................................................... JA759

Order re: *Siegel* Plaintiffs' Motion for Temporary Restraining Order
(ECF 52) ................................................................................................... JA805

Order granting Legislators' Motion to Intervene (ECF 53) ............................ JA807

*Siegel* Plaintiffs' Letter seeking clarification of TRO Order (ECF 54) ............ JA810

Transcript of Siegel TRO Motion Hearing (ECF 56) ...................................... JA812

Supplemental Declaration of Aaron Siegel (ECF 64) ...................................... JA897

Supplemental Declaration of Jason Cook (ECF 65) ........................................ JA900

Supplemental Declaration of Joseph DeLuca (ECF 66) .................................. JA903

Supplemental Declaration of Timothy Varga (ECF 67) .................................. JA904

Declaration of Ria Jairam (ECF 68) ................................................................ JA907

*Koons* Amended Complaint (ECF 69) ............................................................. JA910

Declaration of Gil Tal (ECF 70) ...................................................................... JA933

Supplemental Declaration of Nicholas Gaudio (ECF 71) ............................... JA943

Stipulation & Order dismissing county prosecutors as defendants
(ECF 73) ................................................................................................... JA947

**VOLUME IV**

Certification of Joseph R. Klett (ECF 76) ....................................................... JA950

1722 NJ Law "… against Carrying of Guns … by Persons not
Qualified" (Ex. A) ................................................................................... JA958

1751 Supplement to 1722 NJ Law "… against Carrying of Guns …
by Persons not Qualified" (Ex. B) ........................................................... JA964

1769 NJ Law "… for the more effectual Preservation of Deer …" (Ex. C) ............................................................................. JA974

1771 NJ Law "… to prevent trespassing with Guns" (Ex. D).................. JA980

NJ State Constitution of 1776 (Ex. E) ........................................ JA986

1771 NJ Law "… to prevent trespassing with Guns" (Ex. F) ................. JA997

1753 Pennsylvania Gazette extract (Ex. G).................................. JA1005

1846 NJ Law Revision "… to prevent trespassing with Guns" (original enrolled law) (Ex. H) ............................................ JA1008

1846 NJ Law Revision "… to prevent trespassing with Guns" (as printed in Revised Statutes of 1846) (Ex. I) .................................. JA1026

1852 NJ Supplement (Ex. J) ................................................ JA1032

First 1859 NJ Supplement (Ex. K) .......................................... JA1036

Second 1859 NJ Supplement (Ex. L) ........................................ JA1039

1866 NJ Supplement (Ex. M) ................................................ JA1043

1867 NJ Supplement (Ex. N)................................................. JA1048

1873 NJ Supplement (Ex. O)................................................. JA1051

1846 NJ Law relative to "Carrying guns, where prohibited" (as printed in Revised Statutes of 1877) (Ex. P) ................................ JA1054

1846 NJ Law referred to as "An act to Prevent Trespassing with Guns" (as included in 1880 synopsis of laws) (Ex. Q) ...................... JA1060

1895 NJ Law "to prevent trespassing with guns" (Ex. R)......................... JA1067

1911 NJ Supplement (Ex. S) ................................................ JA1075

1928 Repeal of 1846 NJ Law (Ex. T)........................................ JA1081

N.J. Stat. Ann. § 2A:63-1 (Ex. U) ......................................... JA1096

Certification of Sarah Adelman (ECF 77) ................................... JA1099

Certification of George Fedorczyk (ECF 78) .................................................. JA1107

Certification of Bonny Fraser (ECF 79) ....................................................... JA1114

Certification of Steven Gorelick (ECF 80) .................................................... JA1122

Certification of Robin Madden (ECF 81) ...................................................... JA1127

Certification of Judith A. Nason (ECF 82) .................................................... JA1132

Certification of David L. Rebuck (ECF 83) ................................................... JA1137

Declaration of Hendrik Hartog (ECF 84) ...................................................... JA1143

    Resume of Hendrik Hartog (Ex. A) .......................................................... JA1153

    1722 NJ Statute: "An Act to prevent killing of deer out of season, and against carrying of guns and hunting by persons not qualified." (Ex. B) .................................................................... JA1163

    1769 NJ Statute: "An Act for the more effectual preservation of deer in this Colony." (Ex. C) ...................................................... JA1167

    1771 NJ Statute: "An Act for the preservation of deer and other game, and to prevent trespassing with guns." (Ex. D) ........................ JA1172

    1846 NJ Statute: "An Act for the preservation of deer and other game, and to prevent trespassing with guns." (Ex. E) ......................... JA1180

    Lucius Elmer's 1868 Digest of the Laws of New Jersey 362 (4th ed., Newark, 1868) (Ex. F) ......................................................... JA1186

    1895 NJ Public Law, ch. § 148 (Ex. G.) .................................................... JA1194

**VOLUME V**

Declaration of Brennan Gardner Rivas (ECF 85) ............................................ JA1196

    Curriculum Vitae of Brennan Gardner Rivas (Ex. A) ................................ JA1219

    2 Edw. 3, c. 3 (1328) (Eng.) (Ex. B) ....................................................... JA1223

    25 Edw. 3, st. 5, c. 2, § 13 (1350) (Eng.) (Ex. C) ................................... JA1224

    1786 Va. Laws 33, ch. 21 (Ex. D) ........................................................... JA1227

1835 Mass. Acts 750 (Ex. E) ..................................................................... JA1228

Francois Xavier Martin, A Collection of Statutes of the Parliament
    of England in Force in the State of North Carolina, 60-61
    (Newbern 1792) (Ex. F)......................................................................... JA1232

1821 Me. Laws 285, ch. 76, § 1 (Ex. G) ..................................................... JA1235

1813 La. Acts 172, § 1 (Ex. H)................................................................... JA1242

Revised Statutes of the State of Arkansas, Adopted at the October
    Session of the General Assembly of Said State, A.D. 1837
    (Ex. I) .................................................................................................. JA1247

1870 Tex. Gen. Laws 63, ch. 46, § 1 (Ex. J) .............................................. JA1249

1871 Tex. Gen. Laws 25, ch. 34 § 1 (Ex. K) .............................................. JA1252

Penal Code of the State of Texas, (1879), Title X, Offenses Against
    the Public Peace, Chapter 4, Unlawfully Carrying Arms (Ex. L)........ JA1255

Ch. 22, 1869 Tenn. Pub. Acts 23 (36th Assembly, 1st Sess.) §2
    (Ex. M)................................................................................................ JA1257

Act No. 285, 1870 Ga. Laws 421 (Ex. N) .................................................. JA1260

Revised Statutes of the State of Missouri (1879), ch.24, §1274
    (Ex. O) ................................................................................................ JA1263

1890 Okla. Stat. 495-96 (Ex. P)................................................................. JA1266

Annotated Code of the General Statute Laws of the State of
    Mississippi (1892), "Crimes and Misdemeanors," §1030 (Ex. Q) ...... JA1269

Laws of Vermont, Special Session (1891), No. 85, §2 (Ex. R) ................. JA1272

1870 La. Acts 159-60, § 73 (Ex. S) ........................................................... JA1275

George Washington Paschal, A Digest of the Laws of Texas, 3rd ed.
    (1873) II: 1317-1318 (Ex. T)............................................................... JA1293

John Prentiss Poe, The Maryland Code: Public Local Laws,
    Adopted by the General Assembly of Maryland March 14, 1888
    (Vol. 2, 1888), 1457 (Ex. U) .............................................................. JA1296

1886 Md. Laws 315, ch. 189 §1 (Ex. V) ..................................................... JA1298

1877 Va. Acts 305, Offenses Against The Peace, § 21 (Ex. W) ............... JA1299

Oscar F. Greene, Revised Ordinances of the City of Boulder (1899),
    157 (Ex. X) ........................................................................................ JA1303

"An Ordinance," San Antonio Express (San Antonio, Texas),
    December 23, 1870 (Ex. Y) ................................................................. JA1304

Declaration of Patrick J. Charles (ECF 86) ...................................... JA1305

Curriculum Vitae of Patrick J. Charles (Ex. 1) ......................................... JA1319

2 Edw. 3, c. 3 (1328) (Eng.) (Ex. 2) .......................................................... JA1326

Royal Proclamation as to the Wearing of Arms in the City, and at
    Westminster; and as to Playing at Games in the Palace at
    Westminster, Memorials of London and Life 268-69
    (H.T. Riley ed., 1868) (Ex. 3) ............................................................. JA1327

John Carpenter, Liber Albus: The White Book of the City of
    London at 335 (Henry Thomas Riley ed., 1861) (Ex. 4) .................... JA1330

4 Hen 4, c. 29 (1403) (Eng.) (Ex. 5) .......................................................... JA1332

An Act to Prevent Routs, Riots, and Tumultuous Assemblies, and
    the Evil Consequences Thereof, September Session, Chapter
    VIII (Mass. 1786) (Ex. 6) ................................................................... JA1333

An Act for the More Speedy and Effectual Suppression of Tumults
    and Insurrections in the Commonwealth, January Session,
    Chapter IX (Mass. 1787) (Ex. 7) ........................................................ JA1335

An Act to Prevent Routs, Riots, and Tumultuous Assemblies
    (N.J. 1797) (Ex. 8) .............................................................................. JA1339

An Act to Prevent Hunting with Fire-Arms in the City of New-
    York, and the Liberties Thereof (NY 1763) (Ex. 9) ............................ JA1341

An Act Against Riots and Rioters (Pa. 1705) (Ex. 10) ............................. JA1342

William Rawle, A View of the Constitution of the United States 126
    (2d ed., 1829) (Ex. 11) ........................................................................ JA1343

3 Calendar of Close Rolls, Richard II, 1385-1389, at 399-400 (May 16, 1388, Westminster) (H.C. Maxwell-Lyte ed., 1914) (Ex. 12) ....... JA1345

1 Calendar of Close Rolls, Richard II, 1377-1381, at 34 (December 1, 1377, Westminster) (H.C. Maxwell-Lyte ed., 1914) (Ex. 13) ......... JA1347

1647 Md. Laws 216 (Ex. 14) ................................................................... JA1348

1650 Md. Laws 273 (Ex. 15)................................................................... JA1349

Chapter XVII: Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, Etc., May 22, 1890, reprinted in General Ordinances of the Town of Columbia, In Boone County, Missouri 34, 35 (Lewis M. Switzler ed., 1890) (Ex. 16) .................... JA1350

1877 Mo. Laws 158, 166 (Ex. 17)............................................................ JA1352

Ordinance No. 577: An Ordinance Defining What Shall constitute Misdemeanors or Offenses Against the City of Webb City, and Providing Penalties Therefor, May 15, 1905, reprinted in Revised Ordinances of the City of Webb City, Missouri, 1905, at 99-100 (1905) (Ex. 18) .................................................................... JA1354

An Ordinance in Relation to Carrying Deadly Weapons, July 17, 1894, The Revised Ordinances of the City of Huntsville, Missouri of 1894, at 58-59 (1894) (Ex. 19) ......................................... JA1356

1874 Mo. Laws 43 (Ex. 20)...................................................................... JA1361

1875 Mo. Laws 50 (Ex. 21)...................................................................... JA1362

1883 Mo. Laws 76 (Ex. 22)...................................................................... JA1364

*State v. Reando* (Mo. 1878) (Ex. 23)......................................................... JA1365

Ordinance No. 76: An Ordinance Prohibiting Deadly Weapons, July 1, 1887, reprinted in Stockton Review and Rooks County Record (KS), July 1, 1887 (Ex. 24)...................................................... JA1366

Public Statutes of the State of Tennessee Since the Year 1858, at 108 (James H. Shankland ed., 1871) (Ex. 25)...................................... JA1368

1870 Tex. Gen. Laws 63 (Ex. 26)............................................................. JA1369

1870 Ga. Laws 421 (Ex. 27) ...................................................................... JA1370

1889 Ariz. Sess. Laws 16 (Ex. 28) ............................................................ JA1371

1890 Okla. Stat. 495 (Ex. 29) ..................................................................... JA1373

A Digest of the Laws and Ordinances for the Government of the
City of Harrisburg, Pennsylvania in Force January 1, A.D. 1906,
at 557-58 (1906) (Ex. 30) ..................................................................... JA1375

The Revised Ordinances of Provo City, Utah 96 (1893) (Ex. 31) ............. JA1377

The Revised Ordinances of Payson City, Utah 84 (1893) (Ex. 32) ........... JA1378

The Revised Ordinances of Tooele City, Utah 87 (1893) (Ex. 33)............ JA1379

An Ordinance to Prohibit Intoxication, Breach of Peace, Carrying
Deadly Weapons, the Use of Obscene Language, the Discharge
of Fire-Arms, and to Close Places of Amusement on Sunday in
the City of Wallace, Kansas, Jan. 31, 1889, reprinted in Wallace
County Register (KS), Feb. 9, 1889, at 2 (Ex. 34) ............................... JA1381

Ordinance No. 97: Ordinance Related to Carrying Deadly Weapons,
May 17, 1882, reprinted in Burlington Democrat (KS), May 26,
1882, at 2 (Ex. 35) ................................................................................ JA1383

Miscellaneous Ordinance, Jun. 24, 1871, reprinted in Abilene
Weekly Chronicle (KS), Jun. 29, 1871, at 3 (Ex. 36) .......................... JA1385

Declaration of Peter Kochenburger (ECF 87) .................................................. JA1387

Curriculum Vitae of Peter Kochenburger (Ex. A)...................................... JA1401

Declaration of Angela Cai and Exhibits Volume I (ECF 88).......................... JA1418

P.L. 2022 ch. 131, A4769/S3124, An Act concerning the sale and
possession of firearms and supplementing and amending
various parts of the statutory law (Ex. 1) ............................................. JA1431

Compilation of Order, D.E. 41, *Christian v. Nigrelli*, No. 22-2987
(2d Cir. Dec. 12, 2022); Order, D.E. 75, *Antonyuk v. Hochul*,
No. 22-2908 (2d Cir. Dec. 7, 2022); Order, D.E. 53, *Hardaway
v. Nigrelli*, No. 22-2933 (2d Cir. Dec. 7, 2022) (Ex. 2) ...................... JA1470

Transcript of Preliminary Injunction Hearing, Corbett v. Hochul,
1:22-cv-5867-LGS (S.D.N.Y. Nov. 29, 2022) (Ex. 3) ......................... JA1473

63 Proceedings and Acts of the Maryland General Assembly 338,
§ 5 (June 15-July 3, 1773) (Ex. 4) ....................................................... JA1504

1870 Tex. Gen. Laws 63 (Ex. 5)................................................................ JA1505

1786 Va. Laws 25 (Ex. 6)......................................................................... JA1508

Gen. Digest of the Ordinances & Res. of the Corp. of New Orleans
371 (1831) (Ex. 7) ............................................................................... JA1509

1869-70 Tenn. Pub. Acts 23 (Ex. 8) ........................................................ JA1510

Art. 320, Tex. Act of April 12, 1871 (Ex. 9) ............................................ JA1513

Mo. Rev. Stat. 1879, at 224 (§ 1274) (Ex. 10) ......................................... JA1515

1859 Conn. Acts 62, ch. 82, § 5 (Ex. 11) ................................................. JA1517

1867 Kans. Sess. Laws 25 (Ex. 12) .......................................................... JA1521

1771 N.J. Laws 344, §1 (Ex. 13) .............................................................. JA1523

1865 La. Extra Acts 14, No. 10 § 1 (Ex. 14) ............................................ JA1531

1876 Iowa Acts 142, ch. 148, § 1 (Ex. 15) ............................................... JA1537

1929 Iowa Acts 90, § 30 (Ex. 16) ............................................................. JA1540

1919 Me. Laws 193 (Ex. 17) ..................................................................... JA1543

Ark. Rev. Stat. § 13, p. 280 (1838) (Ex. 18)............................................. JA1548

1839 Ala. Acts no. 77, § 1 (Ex. 19) .......................................................... JA1550

1821 Tenn. Acts ch. 13, § 1 (Ex. 20) ....................................................... JA1553

Ian Ayres & Spurthi Jonnalagadda, Guests with Guns: Public
Support for "No Carry" Defaults on Private Land, 48 J. L.
Medicine & Ethics 183, Table A4 (2020) (Ex. 21) .............................. JA1556

1873 Ga. Code 818, § 4528 (Ex. 22)........................................................ JA1591

Fourth Annual Report of the Board of Commissioners of the Central
Park 106 (1861) (Ex. 23) ...................................................................... JA1593

Acts of Assembly Relating to Fairmount Park 18 (1870) (Ex. 24)............ JA1594

Michael John Sullivan, The Revised Ordinance of the City of St.
Louis, Together with the Constitution of the United States,
Constitution of the State of Missouri, the Scheme for the
Separation of the Governments of the City and County of St.
Louis, the Charter of the City, and a Digest of the Laws
Applicable to the City 635 (1881), § 3 (Ex. 25).................................... JA1595

Egbert Jamieson and Francis Adams, The Municipal Code of
Chicago, Comprising the Laws of Illinois Relating to the City of
Chicago and the Ordinances of the City Council, Codified and
Revised 391 (1881). Art XLIII, § 1690 (Ex. 26).................................. JA1596

Annual Reports of the City Officers and City Boards of the City of
Saint Paul 689 (1889) (Ex. 27).............................................................. JA1599

W.W. Thompson, A Digest of the Acts of Assembly Relating To,
and the General Ordinances of the City of Pittsburgh, From
1804 to Jan. 1, 1897 at 496 (2d Ed. 1897) (Ex. 28) ............................. JA1601

Excerpt from William Blackstone, Commentaries on the Laws of
England, 3d. (10th ed. 1787) (Ex. 29) .................................................. JA1603

Excerpt from William Griffith, A Treatise on the Jurisdiction and
Proceedings of Justices of the Peace in Civil Suits in New
Jersey (1813) (Ex. 30) .......................................................................... JA1612

Excerpt from John Locke, Second Treatise of Government (1690)
(Ex. 31) ................................................................................................. JA1625

1715 Md. Laws, ch. 26 § 7, as supplemented by 1766 Md. Laws
ch. 6, at 90 (Ex. 32) .............................................................................. JA1630

1721 Pa. Act ch. 426 § 3, printed in Mitchell & Flanders, The
Statutes at Large of Pa. 1682 to 1801, vol.2, at 255 (Ex. 33) .............. JA1634

1763 N.Y. Law ch. 1233 §1, printed in Laws of N.Y., 1691 to 1771,
vol. 2, at 442 (Ex. 34) ........................................................................... JA1639

1867 Tex. Act Vol, 20, p. 90, at art. 6510, printed in Paschal, A
Digest of the Laws of Tex. Ann., vol. 2, at 1321 (Ex. 35) ................... JA1643

1893 Ore. Act S.B. 15, § 1, at 79 (Ex. 36).................................................. JA1647

La. R.S. 821, § 1809, printed in R.H. Marr, Ann. Rev. Stat. La., vol.
1, at 600 (1915) (Ex. 37)........................................................................ JA1658

1870 Tenn. Acts. ch. 13 (Ex. 38).................................................................. JA1664

1996 La. Sess. Law. Serv. 1st Ex. Sess. Act 4 (S.B.2), R.S.
40.1379.3(O) (Ex. 39)............................................................................ JA1668

Bill 3730, 1996 S.C. Assemb., Rev. to § 23-31-210(M)(10) (Ex. 40)....... JA1674

29Excerpt from 1564 Stat. King Henry III (Ex. 41)................................... JA1687

Wingate, An Exact Abridgement of All Statutes In Force & Use
From The Beginning Of Magna Carta Until 1641 (1666), at 591
at § 9 (Ex. 42) ....................................................................................... JA1690

1776 Del. Const. art. 28 (Ex. 43)................................................................ JA1693

Excerpts from Benjamin Vaugahn Abbott, Judge and Jury: A
Popular Explanation of Leading Topics in the Law of the Land
(1880) (Ex. 44) ...................................................................................... JA1696

1874 Mo. Laws at 43, s. 1 (Ex. 45)............................................................. JA1712

The Norman Transcript, (Norman, Okla. Terr), Vol. 2, No. 5, Ed. 1
(Nov. 22, 1890) (Ex. 46)........................................................................ JA1715

The Missouri Republican, (St. Louis, Mo.) (Nov. 20, 1872) (Ex. 47)....... JA1717

The Moniteau Journal (California, Mo.) (Oct. 3, 1872) (Ex. 48).............. JA1718

## VOLUME VI

Collected Venue Policies, NJ (Ex. 49) ....................................................... JA1719

Excerpts from R. Rosenzweig & E. Blackmar, *The Park And The
People: A History Of Central Park* (Cornell Univ. Press 1992)
(Ex. 50) .................................................................................................. JA1790

Declaration of Angela Cai and Exhibits Volume II (ECF 89).......................... JA1818

    1789 Mass. Acts ch.28, at 438 (Ex. 51)...................................................... JA1831

    1895 Mich. No. 436 Sec. 44, at 596 (Ex. 52) ............................................. JA1834

    1905 Minn. 620, Sec. 53 (Ex. 53)................................................................ JA1843

    1917 Wisc. Ch. 668, at 1243 Sec. 29.57(4) (Ex. 54).................................. JA1872

    1921 N.C. Public Laws & Res. ch. 6 § 3, at 54 (Ex. 55)........................... JA1929

    1937 N.J. Rev. Stat. 32:14-13.1(8) (Ex. 56).............................................. JA1932

    1875 Laws & Ord. Governing Village of Hyde Park at 310, § 6 (Ex.
        57) ..................................................................................................... JA1935

    1883 Rev. Ord. of the City of Danville, ch.19 § 4, at 83 (Ex. 58) ............. JA1941

    Tower Grove Park of the City of St. Louis 117 (1883) (Ex. 59)................ JA1945

    Rev. Ordinances of Salt Lake City 248, ch. 27 § 6 (1888) (Ex. 60) .......... JA1949

    Laws & Ordinances for the Gov't of the Mun. Corp. of the City of
        Williamsport, Pa. 141 (1891) (Ex. 61) ................................................. JA1953

    Park Ordinances, Springfield, Mass. (1891) (Ex. 62) ................................ JA1964

    Compiled Ordinances of the City of Grand Rapids 163, § 432
        (1907) (enacted 1891, amended 1892 & 1897) (Ex. 63)...................... JA1965

    3rd Ann. Rep. of the Park Comm'rs of the City of Lynn 23 (1891)
        (Ex. 64) .............................................................................................. JA1970

    Laws & Ordinances of the City of Peoria, Illinois 667 (1892) (Ex.
        65) ..................................................................................................... JA1973

    Mun. Code of the City of Spokane, Wash. 123 (1903) (enacted
        1892) (Ex. 66)..................................................................................... JA1977

    Charter of the City of Wilmington, Rules and Regulations of the
        Board of Park Commissioners, Part VII, § 7 (1893) (Ex. 67).............. JA1982

    Rev. Ordinances of the City of Canton, Ill. 240 (1895) (Ex. 68).............. JA1984

Gen. Ordinances of the City of Indianapolis 648, § 1971 (1904)
(enacted 1896) (Ex. 69) ........................................................ JA1989

Digest of the Acts of Assembly Relating to & the Gen. Ordinances
of the City of Pittsburgh 496 (1897) (enacted 1893) (Ex. 70) ............ JA1995

Digest of the Laws & Ordinances for the Gov't of the Mun. Corp. of
the City of Reading, PA 240 (1897) (Ex. 71).................................... JA2001

Rev. Ordinances of the City of Boulder, CO 157 (1899) (Ex. 72)............. JA2002

General Municipal Ordinances of the City of Oakland, Cal.,
Addendum at 15 (1909) (Ex. 73)........................................... JA2003

The Code of City of Birmingham, Alabama 662 (1917) (Ex. 74) ............. JA2004

Firearms Regulations in the National Parks, 1897-1936 (NPS 2008)
(Ex. 75) ............................................................................... JA2008

Sen Yuan Wu, N.J. Pop. 1790 to 2010, Div. Labor Market &
Demographic Rsch. (Dec. 2010) (Ex. 76)............................... JA2083

2021 Population Density: N.J. Counties, U.S. Census Bureau, Pop.
Div. (Apr. 2022), prepared by N.J. Dept. Labor & Workforce
Dev't (Ex. 77) ..................................................................... JA2086

1874 Mo. Laws 43 (§ 1) (Ex. 78) ................................................. JA2087

1883 Mo. Laws 76 (§ 1) (Ex. 79) ................................................. JA2090

1889 Ariz. Sess. Laws 17 (§ 3) (Ex. 80).................................... JA2093

1890 Okla. Sess. Laws 496 (§ 7) (Ex. 81)................................... JA2096

1903 Mont. Laws. 49-50 (§ 3) (Ex. 82)...................................... JA2099

M. Kevane & W. Sundstrom, Development of Public Libraries in
the U.S., 1870-1930, Information & Culture, Vol 49, no. 2
(2014) (Ex. 83) .................................................................... JA2103

## VOLUME VII

Pop. of Mass. by Counties & Minor Civil Divs., Census Bulletin
(Nov. 8, 1990) (Ex. 84)........................................................ JA2132

1746 N.J. Laws ch. 102 (Ex. 85) ...................................................... JA2139

1797 N.J. Laws (R.S. 572), at 367 (Ex. 86)................................... JA2144

1874 N.J. Laws (P.L. 1871, p.109) (Ex. 87)................................... JA2149

G. Fenich, A Chronology of (Legal) Gaming in the U.S., Gaming
    Rsch & Rev. J, vol.3, Iss.2 (1996) (Ex. 88)........................... JA2151

Report & Recommendations of the Governor's Advisory
    Commission on Gambling, Jun. 30, 1998 (Ex. 89) .................... JA2165

Port Authority of NY & NJ, Dec. 2021 Traffic Report, Aviation
    Dep't, https://www.panynj.gov/airports/en/statistics-general-
    info/Monthly_Airport_Activities.html (Ex. 90)....................... JA2447

Caroline Norris, A History of Madness: Four Venerable Virginia
    Lunatic Asylums, Virginia Magazine of History & Biography,
    Vol. 125, Issue 2 (2017) (Ex. 91) ........................................ JA2450

1776 N.C. Sess. Laws 168 (Ex. 92)................................................ JA2478

1800 Ga. Laws 428 (Ex. 93)........................................................... JA2479

1837 Md. Acts 108 (Ex. 94) ........................................................... JA2481

1868 Oh. Supp. Rev. Stat 13 (Ex. 95) ............................................ JA2484

1872 Wisc. Rev. Stat 1960 (Ex. 96) ............................................... JA2486

1872 Conn. Acts 108 (Ex. 97) ........................................................ JA2489

1872 Or. Acts 26 (Ex. 98)............................................................... JA2491

1873 S.C. Rev. Stat. 404 (Ex. 99)................................................... JA2493

1887 W.Va. Code, ch. 148, § 7 (Ex. 100) ..................................... JA2495

Declaration of Angela Cai and Exhibits Volume III (ECF 90) ....................... JA2499

1881 Kan. Sess. Laws 92, § 23 (Ex. 101).................................... JA2512

1875 Ark. Acts 156 (Ex. 102)....................................................... JA2514

1847 Va. Laws 129 (Ex. 103)....................................................... JA2516

1868 W. Va. Code 153 (Ex. 104) ................................................................ JA2523

1872 Portland Ord. No. 1108 (Ex. 105) ...................................................... JA2526

1813 Ky. Acts 10 (Ex. 106) ........................................................................ JA2528

1813 La. Acts 172 (Ex. 107)....................................................................... JA2532

1819 Ind. Acts 39 (Ex. 108)........................................................................ JA2536

1838 Va. Acts 76 (Ex. 109) ........................................................................ JA2538

1859 Ohio Acts 56 (Ex. 110)...................................................................... JA2541

1861 Ga. Laws 859 (Ex. 111) ..................................................................... JA2544

1835 Mass. Rev. Stat., ch. 134, § 16 (Ex. 112) ........................................ JA2546

1838 Terr. of Wis. Stat. § 16 (Ex. 113) ..................................................... JA2548

Me. Rev. Stat., ch. 169, § 16 (1840) (Ex. 114)......................................... JA2550

Mich. Rev. Stat., ch. 162, § 16 (1846) (Ex. 115)...................................... JA2552

Excerpts from M. Dalton, The Country Justice (1690) (Ex. 116)............. JA2554

Terr. of Minn. Rev. Stat., ch. 112, § 18 (Ex. 117)..................................... JA2560

1854 Ore. Stat. ch. 16, § 17 (Ex. 118) ....................................................... JA2562

1857 D.C. Rev. Code ch. 141, § 16 (Ex. 119)............................................ JA2564

1860 Pa. Laws p. 432, § 6; § 8 (Ex. 120) .................................................. JA2566

1844 Miss. Law p. 182, Art. 16, § 1, in Anderson Hutchinson, Code
    of Mississippi, from 1798 to 1848, 182 (1848) (Ex. 121)................... JA2568

1856-1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled
    "Revenue," ch. 34, § 23, pt. 4 (Ex. 122)............................................. JA2570

1866 Ga. Laws p. 27-28, Title VI, No. 41 (Ex. 123)................................. JA2572

Rev. Code of Alabama, p. 169, ch. 3, § 10 (1867) (Ex. 124).................... JA2575

1867 Miss. Laws 327-28, An Act To Tax Guns And Pistols in The County Of Washington, ch. 249, § 1 (Ex. 125)....................................JA2577

George W. Hess, Revised Ordinances of the City of Evanston, 131-132 (1893) (Ex. 126) ..........................................................JA2580

1895 Neb. Laws 210, Laws of Nebraska Relating to the City of Lincoln, Art. XVI, § 6 (Ex. 127) ............................................JA2582

1902-04 Va. Acts 155-157, An Act to Raise Revenue for Support of the Government and Public Free Schools, sched. B, § 6, Tangible Personal Property, Eighteenth (Ex. 128)..............................JA2584

Orville Park, Park's Annotated Code of the State of Georgia 1914, Penal Code, Article 3, Carrying pistols without license, § 348(a)-(d) (Ex. 129)..............................................................JA2587

Ohio Law, p. 633, §§ 24-25 (1884) (Ex. 130)..........................................JA2590

Mass. Law, p. 479-484, ch. 22, §§ 1-10 (1776) (Ex. 131) ........................JA2592

1777 Pa. Laws 110-113 (Ex. 132) ..............................................................JA2598

Va. Act of May 5, 1777, ch. 3 (Ex. 133) ....................................................JA2604

Excerpt from Bernard Schwartz, The Bill of Rights: A Documentary History, Vol, 2, at 662 (1971) (Ex. 134) ......................JA2608

Excerpt from Debates & Proc. in the Convention of the Commonwealth of Mass. Held in the Year 1788 (1856) (Ex. 135).......................................................................................JA2616

Charles C. Branas, SeungHoon Han, and Douglas J. Wiebe, Alcohol Use and Firearm Violence, 38 Epidemiologic Rev. 32, 40-43 (2016) (Ex. 136) ...................................................................JA2618

Jonathan Jay, Alcohol Outlets and Firearm Violence: a Place-Based Case–Control Study Using Satellite Imagery and Machine Learning, Inj. Prev. 61, 64 (2019) (Ex. 137)........................................JA2632

Pamela J. Trangenstein et al., Outlet Type, Access to Alcohol, and Violent Crime, 42 Alcohol Clin. Exp. Re. 2234, 2241 (2018) (Ex. 138) ..............................................................................JA2638

Matthew Miller et al., 'Road rage' in Arizona: Armed and
    Dangerous, 34 Accident Analysis and Prevention, 807, 811
    (2002) (Ex. 139) .................................................................... JA2650

Arlin J. Benjamin Jr., Sven Kepes, & Brad. J. Bushman, Effects of
    Weapons on Aggressive Thoughts, Angry Feelings, Hostile
    Appraisals, and Aggressive Behavior: A Meta-Analytic Review
    of the Weapons Effect Literature, 22 Personality & Social
    Psych. R. 347, 359 (2018) (Ex. 140) ...................................... JA2658

David Hemenway, Chloe Shawah, & Elizabeth Lites, Defensive
    gun use: What can we learn from news reports?, 9 Injury
    Epidemiology 19, 27 (2022) (Ex. 141)................................... JA2689

David Hemenway, Deborah Azrael, & Matthew Miller, Whose guns
    are stolen? The epidemiology of Gun theft victims, 4 Injury
    Epidemiology 11, 14 (2017) (Ex. 142)................................... JA2699

**VOLUME VIII**

John J. Donohue et al., More guns, more unintended consequences:
    the effects of right-to-carry on criminal behavior and policing in
    U.S. cities, Nat'l Bureau of Econ. Research, Working Paper
    Series, Working Paper 30190, at 29,
    http://www.nber.org/papers/w30190 (Ex. 143)..................................... JA2704

D. Hemenway & S.J. Solnick, The epidemiology of self-defense
    gun use: Evidence from the National Crime Victimization
    Surveys 2007–2011, 79 Preventative Medicine 22, 27 (2015)
    (Ex. 144) .............................................................................. JA2740

John J. Donohue, Abhay Aneja, & Kyle D. Weber, Right-to-Carry
    Laws and Violent Crime: A Comprehensive Assessment Using
    Panel Data and a State-Level Synthetic Control Analysis, 16 J.
    Empirical L. Studies 198, 240 (April 2019) (Ex. 145)........................ JA2746

Michael Siegel et al., Easiness of Legal Access to Concealed
    Firearm Permits and Homicide Rates in the United States, 107
    AJPH Research 1923, 1929 (2017) (Ex. 146)....................................... JA2796

1875 Wyoming Terr. Acts ch.52, §1 (Ex. 147) ........................................... JA2803

Code of City of Lynchburg, Va. Ch. XIX, § 20 (1887) (Ex. 148) ............. JA2806

1869 N.M. Gen Laws ch.32, at 313 (Ex. 149)............................................. JA2809

A. Holgersson & U. Bjornstig, Mass-casualty attacks on public
transportation, J Transp. Security 7:1–16 (2014) (Ex. 150)................ JA2812

1795 Mass Gen Law ch.26, § 2 (Ex. 151) ................................................. JA2828

1686 N.J. Laws, ch. 9, in The Grants, Concessions, and Original
Constitution of the Province of New Jersey, at 289–90 (2d ed.
1881) (Ex. 152).................................................................................... JA2830

Second Supplemental Declaration of Jason Cook (ECF 98)............................ JA2834

Supplemental Declaration of Nicole Cuozzo (ECF 99) ................................... JA2837

Declaration of Ronald D'Angelo (ECF 100)..................................................... JA2839

David Jensen Affidavit (ECF 103) ................................................................... JA2841

1777 N.J. Laws 26-36, ch. XX (Ex. 1) ....................................................... JA2843

1780 N.J. Laws 39-54, ch. XIII (Ex. 2) ...................................................... JA2855

1798 N.J. Laws 609-28, ch. DCCCXXII (Ex. 3)........................................ JA2872

1806 N.J. Laws 771-83, ch. CLVI (Ex. 4).................................................. JA2893

1829 N.J. Laws 109-33, An Act for the punishment of crimes (Ex.
5)......................................................................................................... JA2907

Act of May 28, 1746, ch. X, Acts and Laws of Massachusetts Bay
207-08 (Ex. 6)...................................................................................... JA2933

19 Colonial Records of the State of Georgia: Part I, Statutes,
Colonial and Revolutionary 137-40 (Ex. 7) ........................................ JA2935

Digest of the Laws of Georgia 157-58 (1800) (Ex. 8) .............................. JA2940

1812 Del. Laws 522-24, ch. CXCV (Ex. 9) ............................................... JA2943

1818 Vermont Acts & Resolves 22-65, ch. II (Ex. 10) ............................. JA2947

1823 N.H. Laws 72-75, ch. XXXIV (Ex. 11)............................................. JA2992

1885 N.J. Laws 52, ch. XLIV (Ex. 12)...................................................... JA2997

1799 N.J. Laws 561-63, ch. DCCCVI (Ex. 13)........................................... JA2999

1811 N.J. Laws 300 (Ex. 14) ................................................................... JA3003

Public Laws of South Carolina 275-76 (1790) (Ex. 15)............................ JA3005

Acts and Laws of the State of Connecticut 36-37 (1784) (Ex. 16) ............ JA3008

Manual of the Laws of North Carolina 234-36 (1814) (Ex. 17) ............... JA3011

Digest of the Laws of Georgia 428 (1800) (Ex. 18)................................... JA3015

Public Laws of Rhode-Island and Providence Plantations 568
    (1798) (Ex. 19) ................................................................................ JA3017

1812 Del. Laws 522-24, ch. CXCV (Ex. 20) ............................................ JA3019

5 Laws of the Colony of New York 11-13, ch. 1410 (1894) (Ex. 21) ....... JA3023

## VOLUME IX

Letter from Defendants (ECF 104).................................................................. JA3027

Letter from Defendants (ECF 105).................................................................. JA3029

Supplemental Certification of Director Rebuck (Ex. 1)............................ JA3031

Letter from Defendants (ECF 107).................................................................. JA3034

Letter from *Siegel* Plaintiffs Regarding Standing (ECF 114).......................... JA3035

Declaration of Kenneth Armellino (Ex. 1) ................................................ JA3038

Declaration of Daniel L. Schmutter (Ex. 2)................................................ JA3048

Third Supplemental Declaration of Jason Cook (ECF 115)............................ JA3091

*Siegel* Plaintiffs' Emergency Motion for Leave to File Supplemental
    Papers Containing Newly Obtained Information on Issues of
    Standing (ECF 116) ........................................................................... JA3093

Transcript of Hearing on Motion for a Preliminary Injunction (ECF
    118) .................................................................................................. JA3095

Letter from Defendants enclosing electronic copies of exhibits submitted to the court at motion hearing (ECF 119) ................................. JA3263

Timothy Cunningham, 1 A New and Complete Law Dictionary (1771) (Tab 1) ..................................................................... JA3265

Samuel Johnson, Dictionary of the English Language (1773) (Tab 2) ................................................................................ JA3270

T. Sheridan, A Complete Dictionary of the English Language (1797) (Tab 3) ...................................................................... JA3277

N. Bailey, Dictionarium Britannicum (1736) (Tab 4) ................................ JA3282

S. Colt, Revolving gun, patented Feb. 25, 1836 (from Rutgers University Libraries) (Tab 5) ................................................. JA3286

James Robinson Planché, 1 A Cyclopædia of Costume or Dictionary of Dress (1876) (Tab 6) ..................................................... JA3289

Order administratively terminating actions pending appeal (ECF 130) ........... JA3297

FOR PUBLICATION                                          [Docket No. 8]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

RONALD KOONS, *et al.*,

          Plaintiffs,

    v.

WILLIAM REYNOLDS, *et al.*,

          Defendants.

Civil No. 22-7464 (RMB/EAP)

**OPINION**

**APPEARANCES**
David D. Jensen
David Jensen PLLC
33 Henry Street
Beacon, NY 12508

    *On behalf of Plaintiffs*

Angela Cai, Deputy Solicitor General
Jean Reilly, Assistant Attorney General
David Chen, Deputy Attorney General
Amy Chung, Deputy Attorney General
Viviana Hanley, Deputy Attorney General
Chandini Jha, Deputy Attorney General
Samuel L. Rubinstein, Deputy Attorney General
Office of the New Jersey Attorney General
25 Market Street
Trenton, New Jersey 08625

    *On behalf of New Jersey State Defendants and Defendant Annemarie Taggart (in her official capacity as the Prosecutor of Sussex County, New Jersey)*

James F. Ferguson
Atlantic County Department of Law
1333 Atlantic Avenue
Atlantic City, NJ 08401

1

*On behalf of Defendant William Reynolds (in his official capacity as the Prosecutor of Atlantic County, New Jersey)*

Howard L. Goldberg
Office of Camden County Counsel
520 Market Street – Courthouse– 14th Floor
Camden, NJ 08102

*On behalf of Defendant Grace Macaulay (in her official capacity as the Prosecutor of Camden County, New Jersey)*

**BUMB, United States District Judge**

This matter comes before the Court upon the Motion for a Temporary Restraining Order and Preliminary Injunction by individual plaintiffs Ronald Koons, Nicholas Gaudio, and Jeffrey Muller, as well as the following four organizations that each such individual is a member of:  Second Amendment Foundation, Firearms Policy Coalition, Inc., Coalition of New Jersey Firearm Owners, and New Jersey Second Amendment Society (together, "Plaintiffs") against the New Jersey Attorney General, Matthew J. Platkin, Superintendent of the New Jersey State Police, Patrick Callahan (both "New Jersey State Defendants" or "State Defendants"), and County Prosecutors William Reynolds (Atlantic County Prosecutor), Grace C. Macaulay (Camden County Prosecutor), and Annemarie Taggart (Sussex County Prosecutor) (together, "Defendants"). For the reasons set forth below, the motion for a temporary restraining order will be GRANTED, and the Court will RESERVE its decision on the motion for a preliminary injunction.

JA466

## I.      BACKGROUND

This case concerns a constitutional challenge on Second and Fourteenth Amendment grounds to newly enacted New Jersey legislation that restricts the possession of a firearm in any location classified by the state legislature as a "sensitive place" and certain other restrictions on carrying functional firearms in vehicles.  Plaintiffs, who have permits from the State of New Jersey to conceal carry handguns, contend that just until a few short weeks ago, persons in this state with a permit were generally free to carry a handgun "as they went about their business," with limited exceptions for specific locations including schools, colleges, universities, other educational institutions, state parks, casinos, and any "federal facility" as such term is defined by applicable federal law. [Docket No. 9 (hereafter, "Pls.' Br."), at 3 (citations omitted).]

The New Jersey legislation at issue here was enacted in response to the United States Supreme Court decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, holding "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." 597 U.S. ___, 142 S. Ct. 2111, 2122 (2022).  The *Bruen* Court struck down a New York statute that required an applicant for a permit to carry a handgun to demonstrate "proper cause," and, in doing so, acknowledged the unconstitutionality of analogous statutes in other states that required a "showing of some additional special need," such as New Jersey's law that required an applicant to show "justifiable need" for a permit to carry. *Id.* at 2124 n.2.

JA467

### A.    Plaintiffs' Complaint and Request for Emergent Injunctive Relief

Plaintiffs allege that "[a]t first, the State of New Jersey complied with the Court's directive" in *Bruen*, by abandoning its "justifiable need" requirement.  [Pls.' Br. at 1.]  But on December 22, 2022, Governor Phil Murphy signed into law Chapter 131 of the 2022 Laws of New Jersey that imposed a new set of requirements, many of which became effective immediately, including declaring certain locations as "sensitive places" where firearms are prohibited, even by carriers with permits, as well as a ban on carrying functional firearms in vehicles.  Plaintiffs decry the challenged legislation as declaring war on the Second Amendment because it essentially renders the entire State of New Jersey a "sensitive place" where firearms are prohibited.  [Pls.' Br. at 1 (New Jersey "has declared most of the State to be off limits to carry through the artifice of 'sensitive places'").]

Of note is the fact that Plaintiffs' current challenge does not attack the entire piece of legislation.  As Defendants point out and Plaintiffs do not challenge here, other relevant provisions of Chapter 131 strengthened the criteria used to determine whether an applicant is qualified to purchase or carry firearms.  2022 N.J. Laws c. 131 § 2.  The chapter also enhanced requirements for character references and instituted a firearms safety course requirement.  *Id.* §§ 2, 3.  Further safety-related changes to carry requirements are set to take effect in seven months:  Section 4 requires that anyone carrying a handgun in public obtain liability insurance, and Sections 5 and 6 set out requirements for the safe carry of handguns.  *Id.*

4

In their Complaint, Plaintiffs assert a cause of action against each Defendant for Deprivation of Civil Rights pursuant to 42 U.S.C. § 1983, alleging that each Defendant has the authority to enforce the State's criminal laws, including Chapter 131 subparts 12, 15, 17, and 24 of Section 7(a), as well as Section 7(b)(1)'s prohibition on carrying functional firearms in vehicles, notwithstanding that these provisions are unconstitutional and violate the Second Amendment (as applied to the states through the Fourteenth Amendment). [Docket No. 1 ¶¶ 67—69.] Defendants do not oppose their authority to enforce these laws. In fact, at oral argument, the State confirmed that Defendants would not agree to forgo prosecuting Plaintiffs for violations of these provisions. [Transcript of Oral Argument held on January 5, 2023 ("Tr."), at 27 (The Court: "Is the State willing to agree not to prosecute each of these plaintiffs?" Ms. Cai: "No.").]

On December 24, 2022, Plaintiffs filed a Motion for Order to Show Cause, Motion for Temporary Restraining Order, and Motion for Preliminary Injunction. [Docket No. 8.] On December 26, 2022, the Court entered an Order requiring Defendants to appear and Show Cause why the relief sought should not be granted, as well as setting a briefing schedule for this motion. [Docket No. 13.] On January 5, 2023, the Court held oral argument.

### B.    The Challenged Legislation and Potential Penalties of Conviction

Section 7(a) of the newly enacted legislation lists 25 categories of locations where it is a third-degree offense "to knowingly carry a firearm." 2022 N.J. Laws c. 131. The punishment for a crime of the third degree is imprisonment for up to five

years.  *See* N.J.S.A. §§ 2C:43-6(a)(3), 2C:44-1(f)(1)(d).  In the current suit, Plaintiffs

seek to enjoin the law's enforcement of the following enumerated "sensitive places"

set forth in Section 7(a):

(1)   Subpart 12 (prohibiting firearms in "a publicly owned or leased library or museum");

(2)   Subpart 15 (prohibiting firearms in "a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises");

(3)   Subpart 17 (prohibiting firearms in "a privately or publicly owned and operated entertainment facility within this State, including but not limited to a theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held"); and

(4)   Subpart 24 (prohibiting firearms in "private property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit under N.J.S.2C:58-4, provided that nothing in this paragraph shall be construed to affect the authority to keep or carry a firearm established under subsection e. of N.J.S.2C:39-6").

2022 N.J. Laws c. 131.

In addition, Section 7(b) of the legislation imposes an additional "sensitive

place" restriction that bans functional firearms in vehicles, more specifically, it makes

it a fourth-degree offense to transport or carry a firearm "while in a vehicle in New

Jersey, unless the firearm is unloaded and contained in a closed and securely

fastened case, gunbox, or locked unloaded in the trunk of the vehicle."  *Id.*  The

maximum sentence for this crime is 18 months' imprisonment.  *See* N.J.S.A. §§

6

2C:43-6(a)(4), 2C:44-1(f)(1)(e).  Plaintiffs highlight the unconstitutional effect of Section 7(b):  that permitted firearm carriers such as themselves now must transport a firearm in a vehicle the same way as someone who does not have a concealed carry permit from the State.  [Pls.' Br. at 8 (citing N.J.S.A. 2C:39-6(g)).]

In their submissions, Plaintiffs acknowledge that the "sensitive places" and vehicle carry restrictions both carve out exemptions for certain persons (law enforcement, members of the Armed Forces, airport security officers, arson investigators, nuclear site guards, etc.).  [*Id.* at 89 (citing N.J.S.A. 2C:39-6).]  They do not challenge those carve-outs.  However, Plaintiffs contend that the only exemption the law gives for an ordinary, law-abiding, private citizen is authorization to "store a handgun or ammunition within a locked lock box and out of plain view within the vehicle in the parking area."  2022 N.J. Laws c. 131 § 7(c)(2).  A holder of a valid and lawfully issued permit to carry can "transport a concealed handgun in the immediate area surrounding [his] vehicle within a prohibited parking lot for the limited purpose of storing or retrieving the handgun within a locked lock box in the vehicle's trunk or other place inside the vehicle that is out of plain view," and can "transport a concealed handgun between a vehicle parked within a prohibited parking lot area and a place other than a prohibited place . . . provided that the person immediately leaves the parking lot area and does not enter into or on the grounds of the prohibited place with the handgun." [*Id.* at § 7(c)(3)-(4).]

Again, although Plaintiffs do not concede the constitutionality of any of the chapter's other "sensitive place" designations, [Pls.' Br. at 10.], they only challenge

the foregoing subparts because they "all satisfy three essential criteria." [*Id.*]
Specifically, that these new regulations are: "(1) plainly unconstitutional; (2) do not
depend on other legislative acts, such as the enactment of a local ordinance or a state
regulation; and (3) substantially interfere with a law-abiding citizen's ability to carry
a handgun for the purpose of protection." [*Id.* at 11.]  Because they are being
irreparably harmed each day that the unconstitutional legislation remains in effect,
Plaintiffs ask this Court to immediately, temporarily, preliminarily, and ultimately,
permanently restrain Defendants' enforcement of these challenged provisions.[1]

### C.    The Individual Plaintiffs

In support of their request, the three individual Plaintiffs have submitted
sworn declarations.  [Docket Nos. 10 (Decl. of Ronald Koons), 11 (Decl. of Nicholas
Gaudio), 12 (Decl. of Jeffrey Muller).]  Plaintiff Koons, a retired U.S. Air Force
member, former official of the Federal Aviation Association, and a pastor at a
church in Egg Harbor Township, New Jersey, swears in his Declaration that he
regularly carried a handgun while driving in a car or doing business at a number of
private businesses.  [Docket No. 10 ¶¶ 3, 4, 5, 9.]  He carried a handgun while in

---

[1] In another case filed on the same day as the present action, *Siegel, et al. v. Platkin, et
al.*, Civ. No. 22-07463 (KMW/AMD), certain plaintiffs have challenged the
constitutionality of many other provisions of Chapter 131 governing firearm
restrictions in New Jersey.  The Court agrees with Plaintiffs that the present case
raises a distinct and separate issue regarding only whether certain enumerated
locations constitute constitutionally permissible "sensitive places" where handguns
may be prohibited even by permitted carriers and not other constitutional attacks on
the new law.  [*See* Docket No. 16, at 1.]

Atlantic City, New Jersey to protect himself and other individuals from church for self-defense.  [*Id.* ⁋ 9.]  Now that the law is in effect, he avers, he has stopped carrying a gun "during the normal course of [his] life" because the "'sensitive places' are so extensive, and the penalties are so great for violating them, it [is] too much of a risk to take."  [*Id.* ⁋ 12.]  As to the private property legislation, Plaintiff Koons avers that the majority of places where he transacts business "have never expressed an opinion about whether they want firearms on premises.  Since [he] lack[s] express consent, [he] would not be able to carry there."  [*Id.* ⁋ 13.]

Plaintiff Gaudio, a systems engineer for Lockheed Martin with a United States Department of Defense Top Secret security clearance, avers in his Declaration that he began carrying a handgun on a regular basis after he received his permit to carry a firearm.  [Docket No. 11 ⁋⁋ 3, 4.]  However, as a result of the new legislation, "[he] will have no option but to leave [his] handgun at home when [he] is traveling in public by automobile, effectively negating all of the protections and freedoms that [his] family and [he] have enjoyed since [obtaining the permit to carry] and rendering [his] New Jersey Permit to Carry useless."  [*Id.* ⁋ 16.]  Moreover, as to the prohibition on driving with a functional firearm, Plaintiff Gaudio avers that the new legislation effectively prevents him from defending himself while driving or as a passenger.  [*Id.* ⁋ 15.]  He is also afraid of the risk of being charged with brandishing a weapon as the "act of uncasing, loading, and holstering a handgun in public could easily be perceived as brandishing a handgun by passersby and bystanders, which creates the potential for law enforcement officers to misinterpret [his] only legal

9

option to arm [himself] in public for a threatening act.  This could potentially result in a situation where [he] could get arrested or injured due to a misunderstood innocent and legal action."  [*Id.*]

Plaintiff Muller, a victim of a vicious kidnapping, had obtained a carry permit pursuant to the previous "justifiable need" standard.  [Docket No. 12 ⁋⁋ 36.]  After receiving his permit, he remained "very concerned about [his] personal safety, and [he] began to carry [his] handgun on a nearly constant basis."  [*Id.* ⁋ 8.]  As a result of the new legislation, he avers, he has "no choice but to stop carrying a handgun away from [his] own home and property."  [*Id.* ⁋ 18.]  According to Muller the irony of the State's reaction to the Supreme Court's decision in *Bruen* protecting the right to bear arms is this legislation, pursuant to which "I have largely lost the ability to bear arms that I have had since 2011."  [*Id.*]  Like Plaintiff Gaudio, Plaintiff Muller is unable to protect himself while in a car and is concerned that loading and unloading a gun when getting into and out of a car as the legislation requires would cause "someone who saw [him] loading or unloading [his] gun [to] call the police."  [*Id.* ⁋ 13.]

### D.   Defendants' Response to the Request for Immediate Relief

In response,[2] Defendants first argue that there is no need for urgency, and, at a minimum, this Court should afford Defendants more time to set forth the legal justifications for the newly enacted legislation.  [State's Br. at 7 ("The State files this

---

[2] The State Defendants filed a Brief in Opposition [Docket No. 21 ("State's Br.")], which Defendant Reynolds, Defendant Macaulay, and Defendant Taggart have since joined in. [Docket Nos. 19, 22, 32.]

response to the TRO application only, and requests an opportunity to fully brief the PI motion.")]  Next, Defendants assert that Plaintiffs have failed to establish an Article III injury redressable by the issuance of a temporary restraining order.  [*Id.* at 9.]  Because each Plaintiff has failed to establish a sufficiently imminent injury, Defendants argue, standing is lacking and the Court's jurisdiction is defective.  [*Id.*]  Finally, as to the merits of Plaintiffs' motion, Defendants argue that many of the provisions challenged by Plaintiffs fall outside the scope of the Second Amendment, and even if they are covered by the text of the Second Amendment the provisions are supported by a historical tradition of firearm regulation consistent with the dictate of *Bruen*.  [*Id.* at 20.]

## II.    GOVERNING LEGAL STANDARDS

### A.    Procedural Legal Standard

Federal Rule of Civil Procedure 65 governs the issuance of temporary restraining orders and preliminary injunctions.  In the Third Circuit, the four requirements Plaintiffs must satisfy to obtain the emergent injunctive relief sought are familiar ones:

> (1) a reasonable probability of eventual success in the litigation, and (2) that [they] will be irreparably injured . . . if relief is not granted . . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), *as amended* (June 26, 2017) (citing *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917,

11

919–20 (3d Cir. 1974) (citations omitted)).  The Third Circuit has also made clear that "[p]reliminary injunctive relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'"  *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (quoting *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir.1994)).

Relatedly, temporary restraining orders have the same requirements and are "stay-put orders . . . designed to maintain the status quo during the course of proceedings. They 'function[ ], in essence as an automatic preliminary injunction.'" *J.O. ex rel. C.O. v. Orange Twp. Bd. of Educ.*, 287 F.3d 267, 272 (3d Cir. 2002) (quoting *Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 864 (3d Cir.1996)).  However, relevant for purposes of appeal, "a party cannot be a prevailing party if the interim relief received is not merit-based."  *Id.* at 273 (citations omitted).

B.     **Substantive Legal Standard**

The Second Amendment states that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In *Bruen*, the Supreme Court rejected the two-step approach adopted by many of the Courts of Appeals to assess Second Amendment claims, abandoning the second step of the analysis at which courts "appl[ied] means-end scrutiny in the Second Amendment context."  142 S. Ct. at 2127.  Relying on its precedential decisions in *Heller* and *McDonald*, the Supreme Court explained that it had not once, but twice "declined to engage in means-end

12

scrutiny because 'the very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.'" *Id.* at 2129 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008) (emphasis in original)); *see also McDonald v. Chicago*, 561 U.S. 742, 790-91(2010) (explaining that the Second Amendment does not permit "judges to assess the costs and benefits of firearms restrictions" under a means-end scrutiny analysis).

By making "the constitutional standard endorsed in *Heller* more explicit," the *Bruen* Court clarified that:

> the standard for applying the Second Amendment is as follows:  When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The Government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition.

*Bruen*, 142 S. Ct. at 2129–30.  Drawing an analogy to the First Amendment, the *Bruen* Court reasoned that when the Government restricts constitutionally protected conduct like speech, "the Government bears the burden of proving the constitutionality of its actions." *Id.* at 2130 (citations omitted). Thus, the State must be able to meet its burden of proof in the Second Amendment context and "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126.

The *Bruen* Court was clear in its instruction to this Court when undertaking a constitutional analysis of a state's gun control legislation.  This Court must rely on history to inform the meaning of constitutional text rather than make empirical

13

judgments about the costs and benefits of firearms restrictions.  As the Court

explained, "[i]f the last decade of Second Amendment litigation has taught this

Court anything, it is that federal courts tasked with making such difficult empirical

judgments regarding firearm regulations under the banner of 'intermediate scrutiny'

often defer to the determinations of legislatures." *Bruen*, 142. S. Ct. at 2131.  And,

> while that judicial deference to legislative interest balancing is
> understandable—and, elsewhere, appropriate—it is not deference that
> the Constitution demands here.  The Second Amendment 'is the very
> product of an interest balancing by the people' and it 'surely elevates
> above all other interests the right of law- abiding responsible citizens to
> use arms' for self-defense . . . It Is this balance—struck by the traditions
> of the American people—that demands our unqualified deference.

*Id.*

The *Bruen* Court then applied the test set forth in *Heller* to the challenged

legislation, further instructing District Courts considering Second Amendment

challenges "to assess whether modern firearms regulations are consistent with the

Second Amendment's text and historical understanding." *Id.* at 2131.  The *Bruen*

Court gave important examples indicating how District Courts might detect

unconstitutional legislative overreach in Second Amendment terms:

> [i]n some cases, that inquiry will be fairly straightforward. For instance,
> when a challenged regulation addresses a general societal problem that
> has persisted since the 18th century, the lack of a distinctly similar
> historical regulation addressing that problem is relevant evidence that
> the challenged regulation is inconsistent with the Second Amendment.
> Likewise, if earlier generations addressed the societal problem, but did
> so through materially different means, that also could be evidence that a
> modern regulation is unconstitutional. And if some jurisdictions
> actually attempted to enact analogous regulations during this
> timeframe, but those proposals were rejected on constitutional grounds,

14

JA478

that rejection surely would provide some probative evidence of
unconstitutionality.

*Id.* By contrast, in "other cases implicating unprecedented societal concerns or

dramatic technological changes," historical analogies will not be as easy to draw and

"may require a more nuanced approach." *Id.* at 2132. Nevertheless, "the

Constitution can, and must, apply to circumstances beyond those the Founders

specifically anticipated." *Id.* (citing *United States v. Jones*, 565 U.S. 400, 404–05

(2012)).

Thus, in keeping with *Heller*, District Courts must look to historical context

because "it has always been understood that the Second Amendment . . . codified a

*pre-existing* right." *Id.* at 2127 (quoting *Heller*, 554 U.S. at 592) (emphasis in original).

The *Bruen* Court also emphasized the important balance that District Courts must

strike when considering statutes that plainly implicate the Second Amendment:

> analogical reasoning under the Second Amendment is neither a
> regulatory straightjacket nor a regulatory blank check. On the one hand,
> courts should not "uphold every modern law that remotely resembles a
> historical analogue," because doing so "risk[s] endorsing outliers that
> our ancestors would never have accepted." *Drummond v. Robinson*, 9
> F.4th 217, 226 (CA3 2021). On the other hand, analogical reasoning
> requires only that the government identify a well-established and
> representative historical analogue, not a historical twin. So even if a
> modern-day regulation is not a dead ringer for historical precursors, it
> still may be analogous enough to pass constitutional muster.

*Id.* at 2133.

The *Bruen* Court further instructed "that *Heller* and *McDonald* point toward at

least two metrics: how and why the regulations burden a law-abiding citizen's right

to armed self-defense." *Id.* And as stated in those precedential cases, "individual

15

self-defense is the central component of the Second Amendment right." *Id.* (internal quotations and citations omitted). And central to the consideration of a reviewing District Court is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* (citations omitted).

Of critical importance to the current controversy, the *Bruen* Court expressly considered and commented upon the permissibility of the type of "sensitive place" legislation at issue here:

> Consider, for example, *Heller's* discussion of "longstanding" laws forbidding the carrying of firearms in sensitive places such as schools and government buildings. Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible.

> Although we have no occasion to comprehensively define "sensitive places" in this case, we do think respondents err in their attempt to characterize New York's proper-cause requirement as a "sensitive-place" law. In their view, "sensitive places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations. But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry

16

arms for self-defense that we discuss in detail below. Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.

[*Id.* at 2133–34 (internal quotations and citations omitted).]

With the guiding instructions and principles given in *Bruen*, this Court examines the challenged state law provisions. But before doing so, the Court repeats the following observation. The State's Brief spends considerable time setting forth what the Legislature's concerns were: "The Legislature found that the elimination of the 'justifiable need' requirement resulted in 'the likelihood that a much greater number of individuals will now qualify to carry handguns in public,' necessitating identifying 'sensitive places where, due to heightened public safety concerns, carrying a dangerous, potentially lethal device or weapon, including a handgun, is not permissible.'" [State's Br. at 5 (citing 2022 N.J. Laws c. 131 § 1(e)).] The Legislature also recognized the unique dangers of having loaded firearms in vehicles. [*Id.* at 7.]

However, it is this type of deference seeking that the Supreme Court has cautioned federal courts to avoid. It is not the role of this Court to either pass judgment (*i.e.*, "make difficult empirical judgments") on the costs and benefits of firearms restrictions or to defer to the intent of the Legislature (which parenthetically, the Supreme Court found understandable). *Bruen*, 142 S. Ct. at 2131. This Court's role is straightforward. The Court must answer two questions: one, does the Second Amendment's plain text cover the challenged provision? And two, does historical

17

JA481

evidence support the restriction?

## III.   ANALYSIS

Before the Court turns to the merits of Plaintiffs' Motion, it addresses two of Defendants' preliminary arguments.  As noted, Defendants press this Court to refrain from acting urgently and to afford them more time to set forth the legal justifications for the legislation.  [State's Br. at 7.]  As State Defendants argue, a "hasty injunction would short-circuit the democratic process while the litigation process is underway."[3] [State's Br. at 2.]  This Court concurs, in that no injunction should ever be hastily issued, but Defendants must do more than promise they will justify the constitutional basis for its legislation later.  Surely, Defendants had—or should have had—the historical materials and analyses the State relied upon when it began its legislative response to *Bruen*.  After all, the Supreme Court was clear that in order for any gun control legislation to pass constitutional muster under the Second Amendment, such legislation must be consistent with historical tradition.  The State has had six months

---

[3] In support, Defendants point to the Second Circuit's stays of District Court orders enjoining the enforcement of similar New York legislation.  [State's Br. at 2 n.1 (citing Order, Docket No. 41, *Christian v. Nigrelli*, No. 22-2987 (2d Cir. Dec. 12, 2022); Order, Docket No. 75, *Antonyuk v. Hochul*, No. 22-2908 (2d Cir. Dec. 7, 2022); Order, Docket No. 53, *Hardaway v. Nigrelli*, No. 22-2933 (2d Cir. Dec. 7, 2022)).] But Defendants leave out part of the story:  on December 21, 2022, plaintiffs in *Antonyuk* petitioned the United States Supreme Court to vacate the Second Circuit's stay order.  Brief of Applicants, *Antonyuk v. Nigrelli*, No. 22A557 (U.S. Dec. 21, 2022).  Thus, it is by no means clear that New York's newly adopted gun control legislation will remain in effect while the case proceeds.  Here, Defendants are in essence asking this Court to allow New Jersey's legislation to continue with no reasonable end in sight, as this litigation could take years to resolve.  Instead, until such time, this Court will uphold the status quo.

since *Bruen* to identify well-established and representative historical analogues.[4]  *See Bruen*, 142 S. Ct. at 2133 ("analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.")  In fact, Chapter 131 expressly states that the "sensitive-place prohibitions on dangerous weapons set forth in this act are rooted in history and tradition . . . analogous to historical laws that can be found from the Founding era to Reconstruction, which are also found in modern laws in many states."  2022 N.J. Laws c. 131 § 1(g).[5]

That Defendants dedicate a significant portion of their argument discussing the benefits of the firearms regulations and not evidence of historical analogues is quite telling.  And although Defendants represent that the "State will offer ample evidence that Chapter 131 is constitutional," [State's Br. at 2], they do not adequately explain why—if such evidence was critical to the passage of the legislation that would pass constitutional muster post-*Bruen* and available to the Legislature as set forth in Section 1(g) of the statute—they have not introduced such

---

[4] The New Jersey Assembly passed the legislation on November 21, 2022, and the New Jersey Senate passed the bill on December 19, 2022.  Both bills were introduced in mid-October. https://njleg.state.nj.us/bill-search/2022/

[5] Thus, the State will not be given significant time moving forward to produce sufficient justification for the new firearm restrictions.  At oral argument the State seemed to clarify that there were not necessarily more historical analogues that this Court might need to consider, but that the historical context and analysis require a deeper inquiry.

evidence here.  Certainly, Defendants anticipated challenges to the legislation and should have been better prepared to defend the legislation's constitutionality. Plaintiffs implore this Court to consider the only reasonable conclusion from Defendants' posturing:  their dragging of feet is evidence that no such historical tradition and evidence exists.  Perhaps.  At this juncture, there is no bona fide basis for this Court to withhold its ruling because the State says it needs more time to come forward with historical evidence that the Legislature represented it had at the time of the law's passage.  The Court will therefore proceed to consider the evidence and argument the parties have presented.[6]

Defendants also remonstrate against the restraints, urging that the "risk of dangerous and fatal situations looms large if the sensitive places provisions are enjoined.  For example, a crowded entertainment venue (such as sporting events) could become deadly if fan rivalries are aggravated by a volatile mix of alcohol and firearms. [State's Br. at 36–37.]  After all, "[a] shooting death or injury cannot be undone."  [*Id.* at 37.]  It is a prod that seeks to embroil this Court in assessing the benefits of the challenged gun control regulations, something this Court is expressly

_____

[6] As noted, Defendants may ultimately come forward with historical materials or analyses that demonstrate comparable traditions of regulation.  That remains to be seen, but this Court is under a duty to rule on the matter before it at this time.  And if Defendants have historical evidence they wish this Court to consider during the pendency of the restraints, they are free to seek to dissolve the restraints.  As the Court in *Antonyuk* pointed out when presented with a similar argument, temporary restraining orders do not actually require an opportunity for opposition or papers. 2022 WL 5239895, at * 5.  There, the court also found that the State defendants had had a reasonable opportunity in their opposition papers and oral argument to come forward with all historical statutes they believed to be analogues.

prohibited from doing under Supreme Court jurisprudence.  *See Bruen*, 142 S. Ct. at 2129 (explaining that "[a] constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all") (citations and quotations omitted).

The Court turns to the parties' arguments.

## A.    Standing

To have standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561(1992)).  Defendants first challenge any issuance of restraints on jurisdictional grounds, contending that each Plaintiff has failed to demonstrate concrete plans to imminently visit each of the challenged "sensitive places," that Plaintiffs fail to establish any credible threat of enforcement, and that Plaintiffs have not demonstrated traceability or redressability as to their claims.  This Court disagrees and finds that the Plaintiffs have sufficiently shown that they have suffered an imminent injury:  not being able to carry their handguns in public locations for the purpose of self-defense, a right guaranteed by the Second Amendment.  If Plaintiffs resumed such conduct, they would suffer imminent injury in the form of criminal penalties, which Defendants, who have not disavowed an intent to enforce the new law, have full authority to bring against them.

At oral argument, the State conceded that Plaintiffs have shown a

particularized injury,[7] given that they each have valid permits to carry handguns and were generally permitted to do so in the challenged "sensitive places" prior to the enactment of the relevant provisions of Chapter 131.  [Tr. at 18.]  Instead, the State argued that Plaintiffs fail to show imminent harm to obtain the temporary restraints they seek because individual Plaintiffs' Declarations did not set forth a future intent to visit each of the enumerated "sensitive places."  [*Id.* at 18–19.]

The Court makes two initial observations.  First, is the *Bruen* Court's holding that individuals have a Second Amendment "right to carry a handgun for self-defense outside the home."  *Bruen*, 142 S. Ct. at 2122.  Second, is the fact that the narrow category of sensitive places challenged (*public* libraries and museums, bars/restaurants/where alcohol is served, entertainment facilities, in vehicles, and on private property such as businesses) clearly concern locations that are generally open to, and frequented by, ordinary members of the public.  Indeed, Plaintiffs affirmed at oral argument that they intended this suit as a narrow attack on these specific locations because if such restrictions were enjoined, there would again be a

---

[7] Curiously enough, in their supporting briefs, both sides rely upon the Third Circuit's decision in *Ellison v. Am. Bd. of Orthopaedic Surgery*, in which the Circuit held that a surgeon did not have standing to sue a medical board for preventing him from obtaining privileges to practice in New Jersey when the surgeon "had not attempted to apply for medical staff privileges or taken any concrete steps to practice in New Jersey." 11 F.4th 200, 203 (3d Cir. 2021). The Circuit explained that "[i]njury in fact is often determinative of standing," the purpose of which is to determine whether a plaintiff has "a direct stake in the outcome." *Id.* at 205.  Here, the Court agrees with Plaintiffs that *Ellison* is distinguishable as Plaintiffs' conduct in obtaining permits from the State to conceal carry wherever permitted equates to concrete steps taken to carry a handgun in the locations now prescribed as "sensitive places."  Thus, Plaintiffs have shown a particularized injury.

significant number of locations where they could go about conducting their daily lives. [Tr. at 89 ("eliminating those categories would open up a fair amount of conduct that isn't opened right now in terms of people actually going about their daily lives and carrying arms").]

"[T]he injury required for standing need not be actualized. A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).  The Court is satisfied that Plaintiffs have met this showing.  Here, as summarized above, Plaintiffs have submitted sworn statements that the challenged regulations are so broad that they severely impact their ability to even leave their own home and property with their firearms, notwithstanding the fact that they were previously permitted by the State to freely do so, without fear of severe criminal penalty.  This has substantially impacted their ability to carry a handgun at all within the State.  It is the Court's view that such threatened injury is sufficient to show standing at this stage with respect to the challenged provisions.  [*See e.g.*, Docket No. 12 (Muller Decl.) ¶¶ 16, 19.]  The Court notes, however, that the Supreme Court has cautioned that "the proof required to establish standing increases as the suit proceeds."[8]  [*Id.*]

Defendants contend that the Plaintiffs fail to substantiate or even allege

---

[8] The Court reserves on the question as to whether it should parse each "sensitive place' mentioned in the relevant provisions of the statute with respect to each individual Plaintiff at the preliminary injunction ("PI") stage. However, if discovery reveals additional standing issues, the Court expects the State to raise such issues at the PI stage.

concrete plans to imminently visit the places for which they challenge Chapter 131's provisions.  For example, with respect to the restriction on carrying firearms in public libraries or museums, Defendants admit that "[t]he closest that any Plaintiff comes is Plaintiff Muller's statement that he has carried his handgun while visiting the library in the past." [State's Br. at 11 (internal citations and quotations omitted).] And although Mr. Muller did state that he does not remember visiting a museum since having his permit to carry, the State does not look at what he does positively affirm under oath:  that he would resume carrying a handgun in public more frequently if he did not face criminal penalties, including "attend[ing] a public event or go[ing] to a venue like a museum or theater."  [Muller Decl. ¶¶ 11, 19.]  The other Plaintiffs similarly affirm that they, too, would generally resume carrying a handgun with them in public, including at the grocery store, in bars and restaurants, and during their ordinary suburban activities, among other locations.  [Koons Decl. ¶ 14; Gaudio Decl. ¶ 18.]

The Court finds that all Plaintiffs clearly have standing to challenge the sweeping restrictions on carrying handguns on private property or in vehicles.  Of the three remaining "sensitive place" restrictions, the Court is satisfied based on the Plaintiffs' pleadings, arguments, and Declarations that at least one Plaintiff has frequented a location covered by each of the challenged provisions.  Further, these "sensitive places" all appear to be limited to places that are generally open to the public and where ordinary persons like Plaintiffs would be expected to frequent upon occasion.  The Court need not get bogged down in knowing how frequently each

24

Plaintiff checks books out of his local library or who is more of a movie-goer.

Instead, Plaintiffs have shown an immediate threat if they were to resume carrying

their handguns with them in public as they did prior to the law's enactment,

notwithstanding that they have a Second Amendment right to do so in public for self-

defense.[9]

Indeed, the challenged provisions became effective immediately, and there

exists no way for Plaintiffs to obtain an exception under the law to avoid a criminal

prosecution.  This is only further evidence of imminent harm.  The State's demand

that Plaintiffs demonstrate a concrete future intent to visit every single one of the

statutorily prescribed "sensitive places" is too demanding, especially since some

provisions contain catch-alls.  *See* 2022 N.J. Laws c. 131, Section 7(a) subpart 17

(banning firearms in all entertainment facilities "including but not limited to" those

listed).  Having reviewed the Plaintiffs' Declarations, including allegations that at

least one Plaintiff has visited a location covered by each of the challenged provisions

of the legislation and that Plaintiffs would resume carrying handguns with them

publicly wherever permissible, the Court is satisfied that Plaintiffs, as the holders of

concealed carry permits, have demonstrated standing to pursue the current relief

against an imminent, particularized, and concrete injury.

The Court also outright rejects Defendants' argument that Plaintiffs have

---

[9] The Court concurs with counsel for Plaintiffs that "[p]eople's lives do not
necessarily lay out into a scheduling book that run six months or a year or however
long into the future."  [Tr. at 34.]

failed to establish any credible threat of enforcement of the laws against them.

Absent a concession by Defendants that they do not intend to enforce the newly

enacted legislation, Plaintiffs have averred credible threats of prosecution.  Indeed, as

Plaintiffs point out, every indication is that the State of New Jersey intends to

prosecute any violation of these laws to the fullest extent.[10] [Docket No. 28 ("Pls.'

Reply") at 5 (explaining that the law does not require petitioner to expose himself to

actual arrest or prosecution to challenge a statute as unconstitutional because

"what's more significant" is the fact that Defendants do "not disavow the possibility

of prosecution") (citing *Artway v. Attorney General*, 81 F.2d 1235, 1248 (3d Cir.

1998)).]  As noted above, at oral argument, the Court explored the threat of

prosecution and queried whether Defendants would agree not to prosecute a

violation under these provisions of the new legislation, but the Defendants would not

agree that they would not prosecute Plaintiffs for violations of the newly enacted

legislation.  [Tr. at 27.]

Finally, Defendants argue that Plaintiffs have failed to demonstrate

traceability or redressability as to their claims.  Specifically, they argue, Plaintiffs

have "adduce[d] no evidence that the proprietors of entertainment venues,

_____

[10] At least one court has adopted the opposite view and refused to enjoin a similar
law post-*Bruen*, but in that case the court was applying D.C. Circuit precedent that
required the plaintiffs to establish prior threats of prosecution or a special likelihood
of enforcement to demonstrate an imminent injury.  *See Angelo v. District of Columbia*,
2022 WL 17974434, at *6 (D.D.C. Dec. 28, 2022) (explaining that "to establish
Article III standing, a plaintiff bringing a preenforcement challenge must do more
than show that the government enforces its laws as written").  This Court does not
take the same view in its standing analysis.

restaurants, and other private establishments would not have allowed Plaintiffs to bring firearms into those locations were it not for Section 7(a)(24)." [State's Br. at 14.] It is an illogical argument this Court explores in greater detail below: in order for Plaintiffs to demonstrate redressability they must first give up their right to bear arms, and then go on to the private property to inquire as to the proprietor's intent. If the proprietor does not expressly authorize the presence of firearms, then the Plaintiffs now have the answer they needed, but by that time they have violated the law and exposed themselves to prosecution. This convoluted scenario demonstrates how the challenged legislation is directly traceable to the Plaintiffs' complained of injury.[11]

For the reasons set forth above, the Court finds that at this stage of the proceeding the individual Plaintiffs have made a sufficient showing of standing. The Court therefore turns to the requirements under Federal Rule of Civil Procedure 65.

**B.    Likelihood of Success on the Merits – The State's Historical Justification for the Challenged "Sensitive Places"**

As an initial matter, this Court echoes the observations made in *Antonyuk v. Hochul*, Civ. No. 22-0986 (Suddaby, J.), 2022 WL 5239895, at *14 (N.D.N.Y. Oct. 6, 2022) (considering a Second Amendment challenge to a similar law in New York that prohibited firearms in sensitive locations). First, although the Supreme Court in *Bruen* did not go so far as to restrict the definition of "sensitive places" to only

---

[11] As noted earlier, the parties do not contest that the named Defendants are not the proper Defendants. As averred by Plaintiffs, each Defendant is tasked with the duty to enforce the provisions of Chapter 131.

government-sanctioned or affiliated places, it did indicate a skepticism as to expanding the definition of "sensitive places" based on the historical record.  *See Bruen*, 142 S. Ct. at 2133 (indicating that "although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouse—we are also aware of no disputes regarding the lawfulness of such prohibitions") (citations omitted)[12]; *see also Antonyuk*, 2022 WL 5239895, at *14.  Thus, "sensitive place" is a term within the Second Amendment context that should not be defined expansively.

The Court's second observation is that the plain text of the Second Amendment clearly covers the conduct at issue: "carrying a handgun in public for self-defense."  *Id.* (citing *Bruen*, 142 S. Ct. at 2150 (explaining that a historical analysis of public discourse during the Reconstruction "demonstrate[s] how public carry for self-defense remained a central component of the protection that the Fourteenth Amendment secured for all citizens").  Defendants dispute this proposition but seem to do so only with respect to the private property provision of Section 7(a)(24).  To the extent Defendants challenge other provisions, they inject language into the legislation that does not exist. [*See e.g.*, State's Br. at 24 (suggesting

---

[12] As Plaintiffs point out, what is notable about these few "sensitive places" where weapons were prohibited is the long tradition of the government providing security. [Pls.' Br. at 23–24.]  Defendants do not quarrel with this proposition.

that the government is the proprietor of the library or museum or vehicle referenced in Section 7(a) of the statute, which is not the case).

Again, Defendants must be able to rebut the presumption that the challenged conduct is constitutionally protected by "demonstrat[ing] that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.  To reiterate, Defendants "may not simply posit that the regulation promotes an important interest.  Rather, the [Defendants] must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*[13] (emphasis added).  Carefully following this roadmap set forth in *Bruen*, the Court now considers each of the challenged "sensitive places" set forth in Plaintiffs' pending motion for emergent injunctive relief.[14]

### 1.    Subpart 12 – Public Libraries or Museums

Section 7(a), subpart 12 of the legislation prohibits licensed firearm owners

---

[13] Plaintiffs argue that because the scope of the Second Amendment was set in 1791, that is the key time period for historical tradition analysis as opposed to the prevailing understanding of an individual right when the 14th Amendment was ratified in 1868.  [Pls.' Br. at 19.]  Because New Jersey's lack of support for its newly enacted legislation fails in either time period, whether it be 1791 when the Bill of Rights was enacted or 1868 when the 14th Amendment was, for reasons set forth herein, at this stage the Court need not decide this issue that had been left unresolved in *Bruen*.  *See Bruen,* 142 S. Ct. at 2163 ("Here, the lack of support for New York's law in either period makes it unnecessary to choose between them.") (Barrett, J., concurring).

[14] By stating that Defendants have not met their burden as to presenting historical evidence, the Court does not mean to shift the burden that Plaintiffs have in obtaining injunctive relief.  Rather, it is a factor this Court considers as to whether Plaintiffs have met their burden as to the likelihood of success on the merits prong.

JA493

from carrying handguns in "a publicly owned or leased library or museum." 2022
N.J. Laws c. 131.  In their brief, Defendants have conflated this section of the
legislation with "locations for government and constitutionally-protected activity"
suggesting a connection with public libraries and museums as "places where the
rights to speech and intellectual freedom are at their apex." [State's Br. at 29.] This
is a stretch to say the least.

First, the Second Amendment's plain text covers the conduct in question
(carrying a concealed handgun for self-defense in public).  As a result, Defendants
must be able to rebut the presumption of protection against this regulation by
demonstrating that the regulation is consistent with this Nation's historical tradition
of firearm regulation.

Next, Defendants contend that where the government is a proprietor of a
library or museum, it has a right to exclude firearms.  However, the provision does
not limit libraries and museums to government-owned ones, and Defendants do not
cite to any historical statutes that expressly or analogously prohibited firearms in
museums and libraries, despite the fact that at least with respect to libraries, they
have been in existence since the days of Benjamin Franklin.  [*See* Pls.' Br. at 21
("Benjamin Franklin founded America's first lending library in Philadelphia in
1731") (citing "*At the Instance of Benjamin Franklin": A Brief History of the Library
Company of Philadelphia* (2015)).]  Plaintiffs further point to evidence that by 1850, the
United States Census reported 1,217 public libraries in the country.  [*Id.* at 22 (citing

Dept. of Interior, Compendium of Seventh Census: 1850 at 159, Table CLXVII (1854)).]

Moreover, the two historical analogues provided by the State to justify its firearm prohibition in publicly owned museums and libraries are inapposite.  First, Defendants rely upon a 1773 Maryland law that prohibited bringing any weapon into the Maryland House of Assembly.  63 Proceedings and Acts of the General Assembly 338 § 5 (June 15–July 3, 1773). [Docket No. 20, Ex. 4.]  But the provision here does not deal with legislative houses of assembly, places where the Supreme Court specifically acknowledged there is no dispute.  *See Bruen*, 142 S. Ct. at 2134 (listing legislative assemblies as an example of a "sensitive place" where firearms have been historically and constitutionally restricted).

The other is an 1870 Texas law prohibiting guns in "places where persons are assembled for educational, literary or scientific purposes."  1870 Tex. Gen. Laws 63. [Docket No. 20, Ex. 5.]  Plaintiffs are correct that the *Bruen* Court found two cases from around this time adopting "reasonable grounds" restrictions on firearms in Texas that were "outliers," and in any event, the Court should not stake its "interpretation of the Second Amendment upon a single law, in effect in a single [State]." *Bruen*, 142 S. Ct. at 2120, 2153.  Thus, there does not appear to be historical support for this restriction, at least at this juncture.

Accordingly, Plaintiffs have met their burden of showing that they are likely to succeed on their constitutional challenge as to this provision.

31

### 2.    Subpart 15 – Bars, Restaurants, and Where Alcohol is Served

Subpart 15 bans handguns in "a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises." 2022 N.J. Laws c. 131 § 7(a).   First, the Second Amendment's plain text covers the conduct in question (carrying a concealed handgun for self-defense in public).  As a result, Defendants must be able to rebut the constitutional presumption against this regulation by demonstrating it is consistent with this Nation's historical tradition of firearm regulation.

In short, Defendants have presented no historical support to permit New Jersey to restrict concealed carry in bars and restaurants where alcohol is served.  The most they do is cite to an 1867 Kansas statute that prohibited the possession of firearms by intoxicated persons.  1867 Kan. Sess. Laws 25 [Docket No. 20, Ex. 12.]  It is a prohibition that gets no quarrel from Plaintiffs, for one, and has no relevance here as the restriction at issue clearly does not address possession of firearms by intoxicated persons.  *See also* Mo. Rev. Stat. 1879 §1274 (declaring it unlawful to possess a firearm when intoxicated) [Docket No. 20, Ex. 10.][15]

The other analogue Defendants erroneously rely upon is an 1859 Connecticut law.  [*Id.*, Ex. 11.]  The law is an amendment to "[a]n Act for forming and

---

[15] At oral argument the State suggested that it should be permitted to explore why such legislation was enacted, presumably because guns and alcohol do not mix.  It seems unlikely that historical analysis will support the conclusion that law-abiding citizens with conceal carry permits should be restricted from any place that serves alcohol.  Nonetheless, Defendants will be afforded an opportunity to delve into the history of such statutes to support their argument.

conducting the Military Force.'" [*Id.*]  Thus, on its face it is a law that addresses the

conduct of the military, such that the owner of any "booth, shed, tent" or other

structure temporarily erected "within one mile of any military parade-ground,

muster-field or encampment, [and] used and occupied for the sale of spirituous or

intoxicating liquor, or for the purpose of gambling" would be notified by law

enforcement to "vacate and close the same immediately."  [*Id.* § 5.]  This statute

applies to the military and is not historical evidence probative of the restriction of

one's right to carry a firearm anywhere where alcohol is served.

Accordingly, at this stage, Plaintiffs have met their burden of showing that

they are likely to succeed on their constitutional challenge as to this provision

### 3.    Subpart 17 – Entertainment Facilities

As an initial impression, subpart 17 of the legislation is exceptionally broad,

which makes it is a criminal offense to carry handguns in "a privately or publicly

owned and operated entertainment facility within this State, including but not

limited to a theater, stadium, museum,[16] arena, racetrack or other place where

performances, concerts, exhibits, games or contests are held." 2022 N.J. Laws c. 131

§ 7(a).

First, the Second Amendment's plain text covers the conduct in question

(carrying a concealed handgun for self-defense in public).  As a result, Defendants

must be able to rebut the presumption of protection against this regulation by

---

[16] Museum also appears in Section 7(a), subpart 12, discussed above.

demonstrating that the regulation is consistent with this Nation's historical tradition of firearm regulation.

The historical laws Defendants rely upon generally restrict firearms in places "where crowds gather." [State's Br. at 29.]  However, the Court finds that the historical analogues Defendants rely on do not support the specific restricted locations as set forth in the legislation.  Defendants' reliance on a 1786 Virginia law is faulty as it cites only half of the statute.  The statute prohibited a person from "rid[ing] by night []or by day in fairs or markets, in terror of the county." 1786 Va. Laws 25 (emphasis added). [Docket No. 20, Ex. 6.]  Thus, it is the conduct of terrorizing the county, not the possession of a firearm in fairs or markets, that the statute prohibited.  This historical analogue is inapposite.  Indeed, the *Bruen* Court considered this same statute, explaining that it falls within a category of laws for which a common theme is to "prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people."  *Bruen*, 142 S. Ct. at 2145.  Thus, this historical law concerns "something more than merely carrying a firearm in public." *Id.*  Instead, the historic Virginia statute criminalizes the underlying conduct at issue.

As for the 1870 Texas statute relied upon by Defendants that prohibited firearms in a "ball-room, social party, or social gathering," the statute, in addition to likely being an outlier (*see Bruen*, 142 S. Ct. at 2153), expressly exclude[d] from application "persons authorized or permitted by law to carry arms at the places." Art. 320, Tex. Act of April 12, 1871. [Docket No. 20, Ex. 9.]  The challenged law

34

JA498

here has no similar exclusion that would presumably apply to the Plaintiffs here, and thus, the statute is distinguishable.

A similar flaw exists with respect to the Missouri statute cited by Defendants. Mo. Rev. Stat. 1879, at 224 (§ 1274). [*Id.*, Ex. 10.]  Although the 1879 Missouri law prohibited concealed weapons in "any other public assemblage of persons met for any lawful purpose," the statute was explicit that the statute did not apply to "persons moving or traveling peaceably through [the] state," and that "it shall [be] a good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property." *Id.* § 1275.  The *Bruen* Court recognized that several like jurisdictions codified narrow exceptions to, but generally permitted open carry, including Tennessee. *Bruen*, 142 S. Ct. at 2147 (explaining that the Tennessee Supreme Court in 1871 interpreted its laws to "permit the public carry of larger, military-style pistols because any categorical prohibition on their carry" would violate the right to bear arms) (citations omitted).  Thus, the Court has doubts that the Tennessee statute cited by Defendants actually restricted firearms in the way that Defendants contend.  In any event, this statute prohibiting deadly weapons in any "fair, race course, or other public assembly of the people" is not sufficient to establish a tradition of banning firearms in the broad number of locations set forth in Section 7(a), subpart 17 of the statute.  *See* 1870 Tenn. Pub. Acts 23. [Docket No. 21, Ex. 8.]

35

JA499

This leaves only Defendants' citation to a New Orleans law prohibiting weapons in public ballrooms.  [State's Br. at 29 (citing Gen. Digest of the Ords. & Res. of the Corp. of New Orleans 371 (1831)).]  Indeed, there appears to be many differences between the public ballrooms of 1831 and modern-day concert venues and amusement parks.  Still, "one example does not a tradition make" and the Court must not stake its interpretation of the second amendment based upon "a single State or a single city."  *Antonyuk*, 2022 WL 5239895, at *18; *Bruen*, 142 S. Ct. at 2154.  As in *Antonyuk*, the Court finds that in the present suit, the Defendants have failed to identify a historical analogue that supports a restriction as broad as the challenged provision.  2022 WL 5239895, at *19 (stating that there was an "obvious distinction" between New York's challenged statute prohibiting firearms in "amusement parks, performance venues, concerts, exhibits, conference centers banquet halls, and gaming facilities" and historical statutes restricting firearms in ball rooms or social parties").

Accordingly, at this juncture Plaintiffs have met their burden of showing that they will likely succeed in establishing that this provision is unconstitutional.

### 4.      Subpart 24 – Private Property (Unless Indicated Otherwise by Owner)

Subpart 24 of the statute deals with private property, which is defined as:

[P]rivate property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit under N.J.S.2C:58-4, provided that nothing in this paragraph shall be construed to affect the authority to

36

keep or carry a firearm established under subsection e. of N.J.S.2C:39-6.

2022 N.J. Laws c. 131 § 7(a).  As is apparent from the language, Subpart 24 is very broadly defined.  As a result, Plaintiffs argue, this provision essentially bans the carrying of firearms by permit holders in almost all of New Jersey.

First, the plain text of the Second Amendment covers the conduct in question. But unlike the other provisions that Plaintiffs challenge, this provision bans the carrying of firearms <u>unless and until</u> the owner has affirmatively and expressly consented to the carrying of a firearm on the premises.

Plaintiffs contend that this provision establishes an "anti-carry" presumption and therefore establishes an unconstitutional "default ban" on the carry of firearms for self-defense.  [Pls.' Br. at 26.]  In other words, Defendants are flipping the constitutional presumption that a permitted gun owner can carry for self-defense in public by declaring that all *private* property, which is the vast majority of property in the State, is now off limits unless a property owner affirmatively consents or posts a "guns allowed" sign.  Defendants disagree, arguing that while there has always been a presumption that one has a right to carry on public property, no such presumption exists with respect to private property because a property owner has always had the right to be "king of his own castle."  *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F. 3d 1244, 1264 (11th Cir. 2012).

Defendants' argument is somewhat of an "apples and oranges" argument. Just because a property owner has always had the right to exclude firearms from his

property—a proposition Plaintiffs do not dispute—does not mean that the right of the people to keep and bear arms was presumed only on public property. Defendants seem to turn a private property owner's lack of consent and/or right to exclude into a general proposition that the Second Amendment does not presume the right to bear arms on private property. Nothing in the text of the Second Amendment draws that distinction. Nor can this Court find such distinction made by the Court in *Heller* or *Bruen*, as Defendants argue.

Indeed, the historical evidence suggests otherwise and Defendants' insistence that no such presumption exists because a private property owner has the right to exclude firearms from his property misses the point.[17] [State's Br. 22–23.] Here, the State itself, not a private property owner, is excluding firearm owners from most of New Jersey by default. In fact, the State's argument that Section 7(a)(24) "protects property owners' right to exclude firearms from their property by *removing their obligation* to affirmatively tell every repairperson or customer that firearms are prohibited," [*Id.* at 23–24 (emphasis added)], seems to acknowledge what has been

---

[17] In principal part, the State relies upon *GeorgiaCarry.Org, Inc. v. Georgia* for this proposition. The State is correct insofar as the right to exclude another from one's property is an inviolable property right that is in no way abridged by the Second Amendment, which "codified a preexisting right." 687 F.3d at 1263–64. But the State's suggestion that a rebuttable presumption has historical lineage and consensus is a misreading of *GeorgiaCarry.Org*. Nothing articulated herein stands for the proposition that a gunowner has "a right to carry a firearm in a place . . . *against the owner's wishes*." *Id.* at 1264 (emphasis added).

customary:  that a rebuttable presumption to carry exists.[18]  Why else would the State

be "removing" the private owner's obligation to advise that no guns are allowed on

her property?  In the end, this Court finds Plaintiffs' argument persuasive.  And by

reversing the presumption to carry for self-defense, the State is, in essence,

criminalizing the conduct that the *Bruen* Court articulated as a core civil right.  "The

Nation's historical traditions have not countenanced such an incursion into the right

to keep and bear arms across all varieties of private property spread across the land."

*Christian v. Nigrelli*, 2022 WL 17100631, at *9 (W.D.N.Y. Nov. 22, 2022).

Defendants offer two state statutes for the proposition that Section 7(a)(24) is

consistent with this country's history and tradition.  The first is a 1771 New Jersey

law that prohibited "carry [of] any gun on any lands not his own . . . unless he hath

license or permission in writing from the owner or owners, or legal possessor."  1771

N.J. Laws 346, § 1.  The second is an 1865 Louisiana law that prohibited "carry[ing]

fire-arms on the premises or plantations of any citizen, without the consent of the

owner or proprietor."  1865 La. Extra Acts 14, No. 10 § 1.  The Court finds neither

---

[18] The State also points to an article that "the vast majority of New Jerseyans . . . prefer not to have firearms on their property without express consent."  [Docket No. 21, at 24 n.10 (citing Ian Ayres and Spurthi Jonnalagadda, *Guests with Guns:  Public Support for 'No Carry' Defaults on Private Land*, 48 J.L. MEDICINE & ETHICS 183, Table A4 (2020)).]  As the Supreme Court cautioned the lower courts, it is not this Court's role to make these types of empirical judgments.  *Bruen*, 142 S. Ct. at 2131.  A majority of New Jerseyans may, indeed, prefer there not to be an individual right under the Second Amendment to self-defense in public.  But that "preference" would be foreclosed by *Bruen*.  As a legal matter, contemporary preferences that conflict with this nation's history and tradition have no bearing on the question whether a law coheres with the Second Amendment.

to be convincing evidence, however.  The New Jersey law, titled "An Act for the Preservation of Deer and other Game, and to prevent trespassing with Guns," should not be read out of context. [Docket No. 20, Ex. 13.]  It is not gun control legislation, but rather a law to address the problem of poaching and trespass.  *See, e.g.*, *Chew v. Thompson*, 9 N.J.L. 249, 249 (1827) (applying law).  The Louisiana law appears historically inconsistent and unconstitutional, and in any event, it is but one example. The Court should not stake its "interpretation of the Second Amendment upon a single law, in effect in a single [State]."  *Bruen*, 142 S. Ct. at 2153. Additionally, the lack of other examples in the historical record is suggestive of the point that firearm owners have been permitted to carry their weapons on private property without prior consent.  *See id.* at 2131.

In fact, the State's own historical evidence supports a finding that there is a presumption under the Second Amendment that an individual can enter private property with a firearm unless the property owner says otherwise.  For instance, in the hunting context, *criminal* liability for a trespass on the land of another for the purpose of hunting wild animals has typically required the landowner to post a notice or personally forbid others from trespassing.  *See, e.g.*, *State v. Wouters*, 71 N.J. Super. 479, 485, 117 A.2d 299, 302 (App. Div. 1962) (citing N.J.S.A.23:71, which provides for a fine for entering the land of another to hunt in disregard of conspicuous notice or personal knowledge forbidding trespass); *Hopewell Twp. v. Gruchowski*, 29 N.J. Super. 605, 608, 103 A.2d 177, 179 (Cty. Ct. 1954) ("Since 1895 the [New Jersey] Legislature has passed several laws concerning trespassing and for

the first time introduced criminal sanctions.  The first was L.1895, p. 307, an act to prevent trespassing with guns.  This law and all subsequent trespass laws have one element in common: to constitute a violation of them, the land must have been conspicuously posted with notices forbidding trespassing or the defendant must have been personally forbidden to trespass.  The posting of the land or the giving of personal notice is a major substantive element of the offense.").  In other words, in New Jersey the burden is on the landowner to demarcate his property and to advise others not to trespass.  Only then can the trespasser be found criminally liable for trespassing for the purpose of hunting.

Similarly, under New Jersey's ordinary criminal trespass statute, the trespasser commits an offense only if, "knowing that he is not licensed or privileged to do so," he enters or surreptitiously remains."  N.J.S.A. 2C: 18-3 (emphasis added).  "The offense is a crime of the fourth degree if it is committed in a dwelling."  *Id.*  Likewise, under the defiant trespasser subsection, "[a] person commits a petty disorderly persons offense if, knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice against trespass is given by: (1) [a]ctual communication to the actor; or (2) [p]osting in a manner prescribed by law or reasonably likely to come to the attention of intruders; or (3) [f]encing or other enclosure manifestly designed to exclude intruders." N.J.S.A. 2C: 18-3b.(1)–(3) (emphasis added).  Just as in the hunting context, the burden under the criminal trespass statute is not on the unsuspecting actor, but on the landowner to indicate to others not to trespass.

The foregoing notwithstanding, Defendants point to others states that have required a property owner's consent to make their presumption point. Specifically, the State cites the New Jersey Legislature's finding that "[m]any states require a property owner's permission before another may enter private dwellings *and private lands* with a firearm or other weapons." [State's Br. at 6 (citing Ch. 131 § 1(h)) (emphasis added).] The State lists several purportedly analogous restrictions. [*Id.* at 6 n.5 (citing Ak. Stat. Ann. § 11.61.220; D.C. Code § 7-2509.07; Ga. Code Ann. § 16-11-127(b)(4); La. Rev. Stat. § 40:1379.3(O); Ohio Rev. Code Ann. § 2923.126(B)(6); S.C. Code Ann. § 22-31-225; Tex. Parks & Wildlife Code Ann. § 62.012).] The problem with the Defendants' (as well as the Legislature's) reliance on these statutes, however, is that they are modern day statutes and the Defendants offer no historical precursors or analogy. As the *Bruen* Court made clear, and this Court observed above, contemporary statutes that conflict with our nation's history and tradition have no place in a Second Amendment analysis. *See supra* at 39 n. 18. Nonetheless, putting the lack of any historical analysis aside, with the exception of Texas' law and the District of Columbia's law,[19] every other statute stands for a much narrower proposition, that a firearm owner must obtain prior consent to enter *into* or *within* a private *residence* or *dwelling*, and the Ohio and Georgia laws prohibit the carrying of firearms into places of worship. From these few modern-day statutes

---

[19] The D.C. law prohibits carrying a firearm *onto* private *residential* property, unless authorized in advance of entry, which the Court notes may sweep too broadly. D.C. Code § 7-2509.07(b)(1). The Texas law the State cites is another hunting provision and is thus factually distinguishable.

Defendants cannot leap to an unsupported general conclusion that there was no

historical presumption that one had a right to carry firearms onto private property.

Not to mention that this all begs the question:  was not the longstanding presumption

to carry under the Second Amendment the driving force that ultimately led to the

enactment of these statutes?  It seems so.  Defendants' attempt to argue otherwise is

unpersuasive.  For the above reasons, the Court agrees with Plaintiffs,[20] at least at

this stage, that this provision unconstitutionally turns the presumption of the right to

keep and bear arms under the Second Amendment on its head.

    Defendants next attempt to defend the legislation by contending that the

legislation simply "regulates . . . how property owners communicate their right to

exclude."  [Tr. at 58.]  Defendants also argue that nothing in Supreme Court

jurisprudence suggests that the Second Amendment took away a state's ability to

regulate property rights.  [Def. Br. at 23; *see also* Tr. at 68 ("Nothing about the

substantive right to bear arms has changed at all because the property owner always

has the right to exclude, and the government is just letting the property owners know

---

[20] Plaintiffs cite to various analogous cases in other constitutional challenges to
demonstrate why subpart 24, in particular, is unconstitutional.  For example, a state
cannot pass legislation that praying before a meal is unlawful unless a restauranteur
expressly consents.  *See Kennedy v. Bremerton School District*, 597 U. S. ___, 142 S. Ct.
2407, 2421 (2022) (explaining that the Free Exercise Clause protects individuals'
ability to actively practice their religious beliefs).  Nor could the State ban an
individual from wearing a political T-shirt in an office park unless the leasing agent
expressly consents.  Plaintiffs also cite to *Minnesota Voters All. v. Mansky*, 585 U.S.
___, 138 S. Ct. 1876, 1885 (2018) (explaining that "Minnesota's ban on wearing any
'political badge, political button, or other political insignia' plainly restricts a form of
expression within the protection of the First Amendment.").

of ways to make that clear.  This is no different.").]  All that is true, but it is a

disingenuous argument by the State:  it ignores the other half of the legislation that

criminalizes innocent conduct as it relates to the possession of a firearm, that is,

one's Second Amendment right to carry and self-defend.  Under the legislation, a

gun owner faces prosecution even when he does not know that the property owner

does not consent to his possession of a firearm and by the time he finds out, he has

already committed a criminal violation.  At oral argument, the State conceded this

troubling point:

> THE COURT:  [D]oes the UPS man, woman, violate the law when he
> gets up to the front door and the owner says you should not have come
> on my property if you're armed?
>
> MS. CAI:  Yes.  Yes.

[Tr. at 63.]

> THE COURT:  But to make it liable for trespassing under New Jersey, it has
> to be known to the potential trespasser ahead of time before he or she can be
> charged with trespassing.  This law has no such provision.  This law says you
> can walk down the winding driveway, get to the front door and the [armed]
> repairmen is told [by the owner you do not have consent and] have just now
> violated the law, I'm calling the police.
>
> MS. CAI:   And that's exactly what the law provides…
>
> THE COURT:  But I think you're ignoring one salient fact, is that
> you're now making it criminal for a person who has a license to conceal
> carry to not know in advance what that right is.
>
> MS. CAI:  So that's right, Your Honor.

[*Id.* at 66–67.]

Also, at oral argument the State attempted to minimize the plain language of

44

the legislation by suggesting that the only real injury to the gun owner is "having to ask for permission." [*Id.* at 67.]   Again, Defendants miss the mark.  Putting aside how a gun owner goes about asking the question whether the private owner consents,[21] as Defendants conceded at oral argument, the provision plainly provides that by the time the gun owner has asked the question and is told that the owner does not consent, he has already subjected himself to criminal prosecution.[22]

Defendants downplay the Court's concern by pointing to the language that excepts incidental conduct under N.J.S.A. 2C:2-11.  This is of little comfort to a holder of a permit to carry, however.  Contrary to their argument, even a *de minimis* infraction is a criminal violation.[23]   As the Court discussed at oral argument, the

---

[21]  At oral argument, the State gave some examples of how a permit holder might go about determining whether he has consent to carry his firearm on the property:  "It could be on your website.  It could be calls.  It does not have to be a sign . . . or on their doors."  [Tr. at 24, 63.]

[22] At oral argument the State took the position that "it's very unlikely that that private owner would be calling the police to enforce the provision against the plaintiff." [Tr. at 28.]  This is speculative at best, and certainly a risk Plaintiffs have indicated they are not willing to take.

[23] N.J.S.A. 2C:2-11 provides with respect to a *de minimis* infraction that:

> The assignment judge may dismiss a prosecution if, having regard to the nature of the conduct charged to constitute an offense and the nature of the attendant circumstances, it finds that the defendant's conduct:
>
> > a. Was within a customary license or tolerance, neither expressly negated by the person whose interest was infringed nor inconsistent with the purpose of the law defining the offense;

45

Defendants' position, in essence, requires a gun owner in certain cases to "read his neighbor's mind."  Other than suggesting that the permit holder check the establishment's website or make a call to a property owner, Defendants offered little guidance as to how a holder of a permit to carry a firearm would know whether he had consent before his possession of a firearm made him criminally liable.

A fundamental basic principle has long undergirded criminal law in this country, "namely, the importance of showing what Blackstone called 'a vicious will.'"  *Rehaif v. United States*, 139 S. Ct. 2191, 2196 (2019) (citing 4 W. Blackstone, Commentaries on the Law of England 21 (1769)).  "The understanding that an injury is criminal only if inflicted knowingly 'is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.'"  *Id.* (citations omitted).  It is this "knowingly" requirement that helps to "separate those who understand the wrongful nature of their act from those who do not."  *U.S. v. X-*

---

> b. Did not actually cause or threaten the harm or evil sought to be prevented by the law defining the offense or did so only to an extent too trivial to warrant the condemnation of conviction; or
>
> c. Presents such other extenuations that it cannot reasonably be regarded as envisaged by the Legislature in forbidding the offense. The assignment judge shall not dismiss a prosecution under this section without giving the prosecutor notice and an opportunity to be heard. The prosecutor shall have a right to appeal any such dismissal.

N.J.S.A. 2C:2-11.

*Citement Video, Inc.*, 513 U.S. 64, 72–73 n.3 (1994).  The cases in which the Supreme Court has emphasized the importance of scienter to separate wrongful from innocent acts are legion.  *See Rehaif*, 139 S. Ct. at 2196–97 (collecting cases).  But here, by Defendant's own admission, the wrongful conduct includes scenarios in which the permit holder does not know, or even know how to know, if he has the owner's consent to carry until it is too late.  This, by definition, is the criminalization of an innocent act, to wit, the lawful possession of a firearm.  Stated differently, by removing any requirement of a permit holder's *mens rea*, the legislation punishes an individual for the exercise of his Second Amendment rights.

In sum, no matter how the State tries to dress up Section 7(a)(24),[24] the legislation presents considerable constitutional problems.  No party disputes here that private property owners in New Jersey—and across the country for that matter—have long had the right to exclude firearms from their properties.  As discussed above, New Jersey's attempt to craft how private property owners communicate the word "no" works, in effect, to deter a law-abiding citizen who has a permit to conceal carry from exercising his constitutional right under pain of criminal prosecution.[25]  That is not how the Second Amendment works.

---

[24] "And so what this law does is regulate what private property owners communicate and not the right to bear arms of the individual."  [Tr. at 66.]

[25] The Court agrees with the observation the *Antonyuk* court made with respect to the comparable New York law; through this provision, the State of New Jersey is in effect making a decision for private property owners that they are perfectly able to make for themselves and have done so long before the passage of this legislation, "as well as arguably compelling speech on a sensitive issue."  2022 WL 5239895, at *21.

Accordingly, for all of the above reasons, at this stage Plaintiffs have met their burden of showing that they will likely succeed in proving that this provision is unconstitutional.

### 5.    Section 7(b) – Functional Firearms in Vehicles

Pursuant to Section 7(b) of the statute, a vehicle is essentially a prohibited sensitive place "unless the handgun is unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle." 2022 N.J. Laws c. 131.

First, the Second Amendment's plain text covers the conduct in question (carrying a concealed handgun for self-defense in public).  As a result, Defendants must be able to rebut the presumption of protection against this regulation by demonstrating that the regulation is consistent with this Nation's historical tradition of firearm regulation.

Defendants contend that where the government is a proprietor of a vehicle, it has a right to exclude firearms.  But the provision is not limited to government-

---

By enacting legislation that says—before a gun owner can enter private property, the property owner must tell the gun owner what the gun owner already knows (that he has the right to bear arms)—the State is imposing a superfluous impediment that infringes upon one's right to bear arms under the Second Amendment.

owned or public transit vehicles.[26]  [State's Br. at 31.] The Court is also not persuaded by Defendants' argument that the requirement to carry firearms in vehicles only when unloaded, locked, and in the trunk does not wholly restrict the right to carry, given that "individual self-defense is the central component of the Second Amendment right." *Bruen*, 142 S. Ct. at 2133.

According to Defendants, motor vehicles pose different problems than Founding-era modes of transport.  The speed and distance which modern motor vehicles can travel make them facilitators of escape in gun crimes, and their speed has created the need for police to enforce speed limits, exposing officers to danger whenever they approach a vehicle at a traffic stop." [State's Br. at 33.]  But again, Defendants are asking this Court to engage in a balancing of interests and usefulness inquiry that the Supreme Court has expressly indicated this Court cannot do.  And while the Supreme Court recognized that some modern day regulations may have been unimaginable at the time of our Nation's Founding, that still does not excuse the duty of this Court to engage in a historical inquiry that involves reasoning by

---

[26] Defendants discuss the safety concerns that animate from permitting the carrying of concealed weapons on a crowded bus.  [*See* State's Br. at 32.]  Again, as the Supreme Court cautioned, it is not the role of this Court to pass empirical judgment on the wisdom of a regulation that restricts conceal carry of a firearm on a crowded bus.  It is worth noting, however, that the Iowa statute that Defendants cite for the proposition that Iowa prohibited firearms in and around mass transit is incorrect. The statute forbid the presenting or discharging of a firearm at a railroad car or train. It did not sweep as broadly as the current legislation.  *See* 1876 Iowa Acts 142, ch. 148 § 1. [Docket No. 20, Ex. 15 ("If any person shall throw any stone, or other substance of any nature whatever, or shall present or discharge any gun, pistol, or other fire arm at any railroad train, car, or locomotive engine he shall be deemed guilty of a misdemeanor.").]

analogy. *Bruen,* 142 S. Ct. at 2132 ("Much like we use history to determine which modern 'arms' are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge."). A "proper analogue for a distinctly modern regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.*[27] Defendants concede that the fact that restrictions in motor vehicles "logically could not have existed prior to the popularization of automobiles is hardly a problem." [State's Br. at 33.]

Moreover, the laws and the courts interpreting such laws that Defendants cite to as historical evidence of prohibition of concealed weapons in transportation do not stand for that proposition. Defendants' citations to Reconstruction analogues for the proposition that states restricted carrying a concealed firearm in very narrow

---

[27] Defendants cite to 20th century statutes to support their proposition that States began to restrict carrying firearms in motor vehicles contemporaneous with the popularization of automobiles, but their reliance is misplaced. The Iowa statute expressly permits the carrying of a pistol or revolver in a motor vehicle. 1929 Iowa Acts 90, § 30 ("No person shall carry a gun or any firearms, *except a pistol or revolver,* in or on a motor vehicle unless the same be unloaded in both barrels and magazine, and taken down or contained in a case.") [Docket No. 20, Ex. 16 (emphasis added).] Similarly, the Maine legislation is limited to a shotgun or rifle, not all firearms. 1919 Me. Laws 193 (Ex. 17) ("No person shall have a rifle or shotgun, either loaded or with a cartridge in the magazine thereof, in or on any motor vehicle while the same is upon any highway or in the fields or forests.") [Docket No. 20, Ex. 17.] Such laws are not analogues for the New Jersey statute at issue, which contains no such exceptions to the general right to carry as guaranteed by the Second and Fourteenth Amendments.

journey exceptions fail.  First, the Arkansas legislation expressly permitted the conceal carry "upon a journey."  Ark. Rev. Stat. Art. I § 13, pg. 280 (1838) ("Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty.") [Docket No. 20, Ex. 18.]  Moreover, the Alabama statute, 1839 Ala. Acts no. 77, says nothing about the restriction on the transportation of firearms, but rather was enacted solely "to suppress the evil practice of carrying weapons secretly," an issue not relevant here.  [*Id.*, Ex. 19.]  Thus, not only does the statute say nothing about the restriction on carrying firearms in a vehicle, but it does suggest that if there is a carrying it should not be concealed.  Nor does the other statute cited in the State's Brief from Tennessee provide historical evidence in support of the current restriction. *See* 1821 Tenn. Acts. ch 13, §1., p.15 [Docket No. 20, Ex.20.]  That statute expressly provides that the restriction does not apply to "any person that may be on a journey to any place out of his county or state." *Id.*

In *Antonyuk,* the reviewing court considered a statute that banned firearms on public transportation in New York, which certainly is distinct from the legislation at issue here pertaining to private vehicle travel.  However, even in consideration of public transportation, the reviewing court found that the historical analogues before it actually proved that firearms were generally permitted and temporarily enjoined such provision.  2022 WL 5239895, at *17 (explaining that "historical analogues exist containing specific exceptions permitting the carrying firearms while traveling (presumably because of danger often inherent during travel)") (citations omitted).

Here, the Court finds that the State has not been able to demonstrate that the current restriction prohibiting functional firearms while traveling in a vehicle in New Jersey is consistent with the Nation's tradition of firearm regulation.[28]

Accordingly, at this juncture Plaintiffs have met their burden of showing that they will likely succeed in establishing that this provision is unconstitutional.

### 6. The Legislation Sweeps So Broadly that Plaintiffs Cannot Decipher What Constitutes a "Sensitive Place"

Finally, the Court has yet another constitutional concern in addition to the above challenges that the individual Plaintiffs raise. The below scenario posed by the Court at oral argument demonstrates the cumulative effect of the legislation: to make it so unwieldy and burdensome for a permit holder to exercise his constitutional right to carry a firearm:

> THE COURT: And so the State envisions it [Chapter 131] that if someone with a concealed carry permit wakes up and plans his day, that . . . he puts the firearm in the trunk. He goes to his cousin who doesn't want firearms. He leaves it in the trunk. He then goes to the local market that permits firearms. He goes and he gets it out of the trunk, puts it together in public view, citizens see. Citizens are going to get alarmed. Perhaps he's brandishing the weapon, one might argue. And then goes to the local market, then he comes back out, he then brandishes the weapon, one could argue, puts it into the trunk and goes to another establishment where he's not quite sure, so he puts it in the trunk and then goes up, gets the expressed consent, yes, that's fine, goes back to his trunk, puts the firearm, assembles the firearm and then goes about and reenters the property. That's how the State envisions the day in the life of a gun owner?

---

[28] Of note, the State conceded at oral argument that the provision restricting functional firearms in vehicles did infringe in some sense the "immediate ability to have that firearm loaded and on you." [Tr. at 83.] The Court appreciates the State's candor, and finds that such conduct is clearly protected by the Second Amendment, which at its core protects the right to self-defense. *Bruen*, 142 S. Ct. at 2122.

MS. CAI:  That could be, Your Honor.

[Tr. at 81–82.]

As Plaintiffs lament, the challenged provisions force a person permitted to carry a firearm in New Jersey to "navigate a 'veritable minefield.'"  [Pls'. Br. at 12.] Their view is a legitimate one.  The Court knows of no constitutional right that requires this much guesswork by individuals wanting to exercise such right.  With such sweeping legislation that includes catch-alls,[29] Plaintiffs cannot decipher what constitutes a "sensitive place," and so they have abandoned their constitutional right to bear arms out of fear of criminal penalty.  Relatedly, Plaintiffs argue that these provisions sweep so broadly that the legislation "effectively shuts off most public areas from carrying for self-defense."  [Pls.' Br. at 30.]  In the final analysis, at some point on the line, when a constitutional right becomes so burdensome or unwieldy to exercise, it is, in effect, no longer a constitutional right.  Plaintiffs have made a convincing case that this legislation has reached that point.

While the State presses that it has legitimate societal reasons for its legislation, it bears repeating that this is an arena into which this Court cannot venture.  *Bruen*, 142 S. Ct. at 2129 ("the Second Amendment does not permit . . . 'judges to assess the cost and benefits of firearms restrictions'") (citation omitted).  It is not the role of this

---

[29] Subpart 17 bans handguns in ""a privately or publicly owned and operated entertainment facility within this State, *including but not limited to* a theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held."" 2022 N.J. Laws c. 131 § 7(a) (emphasis added).

53

JA517

Court to either defer to the Legislature or to pass judgment on the wisdom of the firearms restrictions.

Accordingly, for this reason as well, Plaintiffs have met their burden in showing that they are likely to succeed on the merits of their constitutional challenges to the foregoing provisions.

### C.    The Challenged Provisions Are Irreparable Constitutional Violations

The Court next addresses whether Plaintiffs are likely to experience irreparable injury if the Temporary Restraining Order is not issued.  Finding the constitutional deprivations alleged to be irreparable by their very nature, the Court concludes that Plaintiffs have met their burden.

In addition to likelihood of success on the merits, the movant must establish that it is more likely than not that it will suffer irreparable harm absent the relief requested.  *Reilly*, 858 F.3d at 179.  A deprivation of a constitutional right can demonstrate irreparable injury justifying injunctive relief, and "most courts hold that no further showing of irreparable injury is necessary."  Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) (collecting cases).  In the First Amendment context, a deprivation "unquestionably constitutes irreparable injury," even if the deprivation is for "minimal periods of time."  *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).  This Court finds that the same is true in the Second Amendment context.  Because the Second Amendment protects the right to bear arms for self-defense in public, state restrictions that are so extensive and

54

burdensome as to render that right illusory must constitute irreparable injury. *See Rhode v. Becerra*, 445 F. Supp. 3d 902, 953 (S.D. Cal. 2020) (finding that burdensome restriction on purchase of ammunition constituted irreparable injury), *vacated and remanded on other grounds sub nom. Rhode v. Bonta*, 2022 WL 17099119 (9th Cir. Nov. 17, 2022); *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016) (concluding that District of Columbia's "good reason" requirement to obtain license to carry concealed firearm constituted irreparable injury). As the *Bruen* Court observed, "[t]he constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald*, 561 U.S. at 780).

Additionally, the fundamental interests that the Second Amendment protects—like those of the First Amendment—are not easily remediable by monetary damages or other non-injunctive relief. *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (holding that infringement of Second Amendment right cannot be compensated by monetary damages because it protects "intangible and unquantifiable interests" similar to those protected by the First Amendment). In weighing requests for injunctive relief post-*Bruen*, other courts have adopted the same conclusion and found similar Second Amendment deprivations to constitute irreparable injury. *See, e.g.*, *Spencer v. Nigrelli*, 2022 WL 17985966, at *13 (W.D.N.Y. Dec. 29, 2022) (finding pastor's inability to exercise right to carry firearm at place of worship to constitute irreparable harm) (citing *A.H. by & through Hester v. French*, 985

55

F.3d 165, 184 (2d Cir. 2021) ("The denial of a constitutional violation ordinarily

warrants a finding of irreparable harm, even when the violation persists for 'minimal

periods' of time.")); *Hardaway v. Nigrelli*, 2022 WL 16646220, at *17 (W.D.N.Y.

Nov. 3, 2022) (same); *Antonyuk v. Bruen*, 2022 WL 3999791, at *36 (N.D.N.Y. Aug.

31, 2022) (finding irreparable harm in challenge to New York's Concealed Carry

Improvement Act based on plaintiff's "diminished safety in all the locations that he

currently carries his concealed handgun that he will not be able to carry it").

 Here, Plaintiffs persuasively explain that the constitutional deprivation alleged

constitutes an irreparable injury.[30]  [Pls.' Br. at 12.]  Plaintiffs have demonstrated that

they have been immediately harmed by the enactment of the challenged provisions of

Chapter 131.  Before the law was passed, Plaintiffs were generally free to exercise

their Second Amendment right to bear arms in public for self-defense by carrying a

licensed firearm on their person, for instance, at a "library or museum," "bar or

restaurant where alcohol is served," or "entertainment facility"; on "private

property"; or in their vehicles or on public transportation.  Now, Plaintiffs all testify

that they have ceased carrying their firearms *because of* the new restrictions.  [*See*

Koons Decl. ¶¶ 12, 13; Gaudio Decl. ¶ 15; Muller Decl. ¶ 18.]

---

[30] Citing *Grace v. District of Columbia* and *Rhode*, Plaintiffs suggest that the loss of
psychic comfort that underlies being prohibited from carrying a licensed firearm for
self-defense in public is a component of the irreparable injury that they experience.
[Pls.' Reply at 13.]  The Court does not express a view on this point, in particular.
The deprivation constitutes an irreparable injury simply because it so restricts
Plaintiffs' ability to exercise their right to self-defense in public as to render it a
nullity, whatever their underlying sentiment for carrying a firearm for self-defense.

JA520

The Court finds that the challenged provisions have chilled Plaintiffs' reasonable exercise of their Second Amendment right.  For example, because Mr. Koons regularly meets for breakfast at restaurants that occasionally have liquor licenses, he now leaves his firearm at home.  [*See* Koons Decl. ¶ 13.]  Likewise, Mr. Gaudio, who testified to carrying a handgun when "conducting [his] everyday suburban activities"—such as, visiting Shop Rite and a movie theater as well as "attending a community event . . . at a YMCA camp"—now leaves his firearm at home because of the new restrictions. [Gaudio Decl. ¶¶ 9, 10, 16.]  Similarly, Mr. Muller stated that he carried his handgun "most of the time"—at stores, friends' homes, restaurants, parks, and other locations—but now feels as though he has "no choice but to stop carrying a handgun" outside of his own home and property. [Muller Decl. ¶¶ 9–11, 18.]  Together, the new restrictions are so extensive and burdensome that they render Plaintiffs' right to armed self-defense in public a nullity.

Furthermore, the Court rejects Defendants' view that Plaintiffs "cannot show irreparable harm just by alleging Second Amendment injury."  [State's Br. at 19.] Defendants argue that, under Third Circuit precedent and other circuit court decisions, the Court may not rely upon a constitutional deprivation alone to satisfy the irreparable harm prong for injunctive relief.  [*Id.* at 18–19.]  The Court disagrees. At oral argument and in their papers, Plaintiffs convincingly explain that these cases do not involve an ongoing injury that can be remedied by injunctive relief only.  [Tr. at 9091; Pls.' Reply at 14.]  Plaintiffs' right to carry a firearm in public for self-defense can be restored only by enjoining implementation of the challenged

provisions.

Finally, as discussed above, *see supra* Section III.A, the Court finds that Plaintiffs' credible fear of prosecution for violating one of the challenged restrictions constitutes irreparable injury. [*See* Koons Decl. ¶ 12; Gaudio Decl. ⁋ 15; Muller Decl. ¶ 13.]  Unlike the *Angelo v. District of Columbia* court, which found under D.C. Circuit precedent that gun permit holders could not establish standing to challenge newly enacted legislation prohibiting them from carrying their handguns on public transportation because they could not point to prior threats of enforcement or a special likelihood of enforcement, 2022 WL 17974434, at *6 (D.D.C. Dec. 28, 2022), this Court comes to a contrary conclusion and reasons that Plaintiffs need not actually be subject to "arrest, prosecution, or other enforcement action" to challenge a criminal statute. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).  It is enough that Plaintiffs' prior conduct has been rendered criminal by the challenged provisions of Chapter 131.

Thus, in light of *Bruen*, the effect of the challenged provisions is an immediate constitutional deprivation of Plaintiffs' Second Amendment right to carry a handgun for self-defense in public.  Plaintiffs can no longer exercise this right by carrying their firearms at locations they were accustomed to visiting in their day-to-day lives and in ways law-abiding gun owners routinely do.  Additionally, if they were to do so, Plaintiffs would face an "imminent" threat of prosecution, which the State acknowledged at oral argument.  [Tr. at 27.]  Accordingly, Plaintiffs have satisfied the irreparable injury prong justifying injunctive relief.

**D.     Other Interested Parties and the Public Interest**

Finally, the Court agrees with Plaintiffs that since injunctive relief will only

impact individuals who have already gone through the State's vetting process to

obtain a permit to carry a handgun, other interested parties will not be harmed by the

relief requested.  [Pls.' Br. at 33.]  And after all, "neither the Government nor the

public generally can claim an interest in the enforcement of an unconstitutional law."

*Am. C.L. Union v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003), *aff'd and remanded*,

542 U.S. 656 (2004). Lastly, at oral argument, this Court specifically pressed the

State whether it had empirical evidence to suggest that concealed carry permit

holders are responsible for gun crimes or an increase in gun crimes in New Jersey,

which they cite as justification for the law.  However, the State had no such

evidence.  [Tr. at 96.]  Already having found that the Plaintiffs are likely to suffer

irreparable injury and succeed on the merits of their Second Amendment claim, the

Court now finds that the balance of equities and public interest also tip in Plaintiffs'

favor.  Thus, all four requirements for injunctive relief have been satisfied.

Further, Plaintiffs are excused from giving security because the Court is

satisfied that there is no risk that a Defendant will sustain "costs and damages" if

"found to have been wrongfully enjoined or restrained" pursuant to Fed. R. Civ. P.

65(c).  The Court also finds that based on the showing made by Plaintiffs, good cause

exists to extend the duration of this Temporary Restraining Order beyond fourteen

(14) days pursuant to Fed. R. Civ. P. 65(b)(2).  Thus, this Temporary Restraining

Order will be in effect pending a hearing on Plaintiff's motion for a preliminary

injunction (which shall occur as expeditiously as possible once a briefing schedule for such motion has been set).

## IV.   CONCLUSION

Plaintiffs have demonstrated a probability of success on the merits of their Second Amendment challenge to the relevant provisions of Chapter 131 Section 7(a), which criminalizes carrying handguns in certain "sensitive places," subparts 12 (public libraries or museums), 15 (bars, restaurants, and where alcohol is served), 17 (entertainment facilities), and 24 (private property), as well as section 7(b)'s ban on functional firearms in vehicles.  The State may regulate conduct squarely protected by the Second Amendment only if supported by a historical tradition of firearm regulation.  Here, Plaintiffs have shown that Defendants will not be able to demonstrate a history of firearm regulation to support any of the challenged provisions.  The deprivation of Plaintiffs' Second Amendment rights, as the holders of valid permits from the State to conceal carry handguns, constitutes irreparable injury, and neither the State nor the public has an interest in enforcing unconstitutional laws.  Accordingly, good cause exists, and the Court will grant the motion for temporary restraints.  An accompanying order of today's date shall issue.

January 9, 2023                          s/Renée Marie Bumb
Date                                     Renée Marie Bumb
                                         United States District Judge

JA524

[Docket No. 8]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

RONALD KOONS, *et al.*,

          Plaintiffs,

   v.

WILLIAM REYNOLDS, *et al.*,

          Defendants.

Civil No. 22-7464 (RMB/EAP)

**ORDER**

**BUMB, United States District Judge**

     As set forth in the accompanying Opinion of today's date, Plaintiffs have made the requisite showing for emergent temporary relief.  As such, the Plaintiffs' Motion for a Temporary Restraining Order is **GRANTED,** and the Court **RESERVES** its decision as to the Plaintiffs' Motion for a Preliminary Injunction. [Docket No. 8.]  Accordingly,

     **IT IS** on this **9th** day of **January 2023** **ORDERED** that Defendants, as well as their officers, agents, servants, employees, and attorneys (and any other persons in active concert or participation with them) are **TEMPORARILY RESTRAINED** from enforcing the following provisions of Chapter 131 of the 2022 Laws of New Jersey:  Section 7(a), subparts 12, 15, 17, and 24, and Subsection 7(b)(1); and it is further

1

**ORDERED** that Plaintiffs are **EXCUSED** from giving security; and it is further

**ORDERED** that this Temporary Restraining Order shall **REMAIN IN EFFECT** pending a hearing and ruling on Plaintiffs' motion for a preliminary injunction [Docket No. 8]; and it is further

**ORDERED** that the parties shall meet and confer regarding an expedited discovery and briefing schedule for Plaintiffs' preliminary injunction motion and propose such schedule to the Court within three (3) business days from the date hereof.

<u>s/Renée Marie Bumb</u>
Renée Marie Bumb
U.S. District Judge

JA526

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

RONALD KOONS; NICHOLAS GAUDIO;  )  CIVIL ACTION NUMBER:
JEFFREY M. MULLER; SECOND     )
AMENDMENT FOUNDATION; FIREARMS  )  1:22-cv-07464-RMB-EAP
POLICY COALITION, INC.; COALITION )
OF NEW JERSEY FIREARM OWNERS; and )
NEW JERSEY SECOND AMENDMENT    )
SOCIETY,            )
       *Plaintiffs*,    )
vs.               )
               )
WILLIAM REYNOLDS, in his official )  MOTION HEARING FOR A
capacity as the Prosecutor of   )
Atlantic County, New Jersey;   )  TEMPORARY RESTRAINING
GRACE C. MACAULAY, in her official)
capacity as the Prosecutor of   )  ORDER
Camden County, New Jersey;    )
ANNEMARIE TAGGART, in her official)
capacity as the Prosecutor of   )
Sussex County, New Jersey; MATTHEW)
J. PLATKIN, in his official    )
capacity as Attorney General of  )
the State of New Jersey; and   )
PATRICK CALLAHAN, in his official )
capacity as Superintendent of the )
New Jersey State Police,     )
       *Defendants*.  )

Mitchell H. Cohen Building & U.S. Courthouse
4th and Cooper Streets, Camden, New Jersey 08101
Thursday, January 5, 2023
Commencing at 11:00 a.m.

**B E F O R E:**      **THE HONORABLE RENÉE MARIE BUMB,**
           **UNITED STATES DISTRICT JUDGE**

   John J. Kurz, Federal Official Court Reporter
      John_Kurz@njd.uscourts.gov
        (856)576-7094

Proceedings recorded by mechanical stenography; transcript
    produced by computer-aided transcription.

1    **A P P E A R A N C E S:**

2    DAVID JENSEN PLLC
     BY:  DAVID D. JENSEN, ESQUIRE
3    33 Henry Street
     Beacon, New York 12508
4    For the Plaintiffs

5    ATLANTIC COUNTY DEPARTMENT OF LAW
     BY:  MURIANDA L. RUFFIN, ASSISTANT COUNTY COUNSEL
6    1333 Atlantic Avenue, 8th Floor
     Atlantic City, New Jersey 08401
7    For the Defendant William Reynolds, Atlantic County Prosecutor

8    OFFICE OF CAMDEN COUNTY COUNSEL
     BY:  HOWARD LANE GOLDBERG, FIRST ASSISTANT COUNTY COUNSEL
9    520 Market Street, 14th Floor, Courthouse
     Camden, New Jersey 08102
10   For the Defendant Grace C. Macaulay, Camden County Prosecutor

11   OFFICE OF THE NEW JERSEY ATTORNEY GENERAL
     BY:  ANGELA CAI, DEPUTY SOLICITOR GENERAL
12        JEAN REILLY, ASSISTANT ATTORNEY GENERAL
     R.J. Hughes Justice Complex
13   25 Market Street, P.O. Box 080
     Trenton, New Jersey 08625
14   For the Defendants Attorney General Platkin and Superintendent
     of NJ State Police Callahan, and Sussex County Prosecutor

15

16   **A L S O   P R E S E N T:**

17   Arthur Roney, The Courtroom Deputy

18   Jordan Pino, Judicial Law Clerk

19

20

21

22

23

24

25

| 1 | (PROCEEDINGS, held in open court before The Honorable |
| 2 | Renée Marie Bumb, United States District Judge, at 11:00 a.m. |
| 3 | as follows:) |
| 4 | THE COURTROOM DEPUTY:  All rise. |
| 5 | THE COURT:  Good morning. |
| 6 | Okay.  You can have a seat.  Thank you. |
| 7 | All right.  Let me get to know counsel.  You're |
| 8 | welcome to remove your mask when you're speaking and while |
| 9 | you're seated at counsel table. |
| 10 | All right.  Let me get to know the parties.  So we're |
| 11 | here in the case Koons versus Reynolds, et al.  The docket |
| 12 | number is 22-7464.  Let me start with appearances.  I'll start |
| 13 | with the plaintiff. |
| 14 | MR. JENSEN:  Good morning, Your Honor.  David Jensen |
| 15 | for the plaintiffs. |
| 16 | THE COURT:  Good morning.  And welcome. |
| 17 | MS. CAI:  Good morning, Your Honor.  Angela Cai for |
| 18 | the Attorney General, the Superintendent of State Police, and |
| 19 | the acting Sussex County prosecutor. |
| 20 | THE COURT:  Okay.  So you're entering an appearance |
| 21 | for Sussex County, okay.  All right.  Welcome. |
| 22 | MS. REILLY:  Assistant Attorney General Jean Reilly |
| 23 | for the same defendants as Ms. Cai. |
| 24 | THE COURT:  Okay.  Welcome. |
| 25 | MR. GOLDBERG:  Good morning, Your Honor.  First |

 1 | Assistant County Counsel, Howard Goldberg, on behalf of

 2 | Prosecutor Grace Macaulay for Camden County.

 3 |        THE COURT:  Okay.  Welcome.

 4 |        MS. RUFFIN:  Good morning, Your Honor.  Attorney

 5 | Murianda Ruffin, just substituting in today for Attorney James

 6 | Ferguson.  We are county counsel for Atlantic County, for the

 7 | Atlantic County prosecutor.

 8 |        THE COURT: Okay.  All right.  Welcome.  Good to see

 9 | you all.

10 |        All right.  I set this down for a hearing.  This is

11 | before me on the plaintiffs' application for temporary

12 | restraints.  Mr. Jensen, I'll hear from you.

13 |        I thought the way that I would lay out the oral

14 | argument, counsel, is to lay it out by various topics.  I

15 | wanted to first address the issue of standing.  I then want to

16 | turn to the issue of irreparable injury.  I then want to turn

17 | to the likelihood of success on the merits and then public

18 | interest.

19 |        So it seems to me, it would make more sense if I

20 | could first have you, Mr. Jensen, address the issue and then

21 | turn to the defendants to respond, and I'll have various

22 | questions, okay?

23 |        MR. JENSEN:  Sure.  That sounds great.

24 |        THE COURT:  Is that okay?

25 |        MR. JENSEN:  Yes.

```
 1              THE COURT:  Okay.  So let me start with the issue of
 2      standing.
 3              I have before me, Mr. Jensen -- well, do you want to
 4      make a preliminary statement?  I didn't want to interrupt your
 5      presentation if you wanted to make a preliminary statement.
 6              MR. JENSEN:  Sure.  I might as well.
 7              THE COURT:  Okay.
 8              MR. JENSEN:  Use the lecturn, I assume.
 9              THE COURT:  Yes, please.
10              And I'm just a little hard of hearing, Mr. Jensen, so
11      if you can just keep your voice up, please.
12              MR. JENSEN:  You bet.
13              THE COURT:  Okay.  Thank you.
14              MR. JENSEN:  Good morning, Your Honor.  I'm here
15      today on behalf of the plaintiffs, which is three individuals
16      and four organizations, but I'm really here on behalf of
17      hundreds of thousands of lawful gun owners in New Jersey.
18              Most of the people living in the United States have
19      been able to exercise their right to bear arms well before the
20      Supreme Court decided *Bruen*.  For many years, people in states
21      like Connecticut and Delaware and Pennsylvania have been able
22      to obtain permits to carry handguns; and once they've done so,
23      they've been able to carry handguns with them as they went
24      about their daily business, so driving their vehicles, stopping
25      for gas, going to restaurants, shopping at the grocery store.
```

```
 1              There have always been some limited areas where

 2    people have not been able to take guns.  Until two weeks ago,

 3    the only place the statutes of New Jersey placed off limits

 4    were schools.

 5              Obviously acting in the role of proprietor, the State

 6    had placed correctional institutions, police departments,

 7    courthouses, places like that off limits as a general

 8    proposition.  But you'll notice a common theme running through

 9    these places, which is that these are places that often

10    restrict access.  They often require people to pass through

11    security screenings, and they often have their own armed

12    security present.

13              There are also places --

14              THE COURT:  And the plaintiffs aren't challenging

15    those provisions in the newly enacted legislation.  They're not

16    challenging schools, they're not challenging day care centers,

17    et cetera, correct?

18              MR. JENSEN:  That is correct.  And certainly some of

19    these areas, based on what the Supreme Court has already said

20    in both *Heller* as well as in *Bruen*, would appear to pass

21    muster.

22              We specifically singled out particular areas where

23    our assessment was that if there is indeed a right to bear arms

24    in public for the purpose of self-defense, it does not appear

25    that these can be defended.  And further, it really doesn't
```

```
1    require any further examination of the record or development of
2    the record.
3            Since the Court asked to proceed under the issue of
4    standing, I'll do that, but that was basically the introductory
5    statement I had prepared to open things up.
6            THE COURT:  Mr. Jensen, and thank you.  And in your
7    comments to me about standing, the question I have for you and
8    I have for your adversaries is, do I parse out the provisions
9    when I look at the issue of standing?
10           So, for example, subchapter 17 refers to
11   entertainment facilities as designated as "sensitive place."
12   Do I then parse out a racetrack from a stadium from a theater,
13   or do I just look at the provision broadly?  In your comments
14   to me, if you can address that.
15           MR. JENSEN:  Well, I think that may be a question
16   that doesn't necessarily have a pat answer that applies across
17   the board, because certainly some of these areas, you know,
18   arenas, stadiums, theaters, there's not really a real clear
19   basis for drawing a distinction between those categories.  It
20   would probably be accurate to call them all "entertainment
21   facilities."
22           I think perhaps the issue you might be going to here
23   is that we've sort of got two parallel tracks of injury here,
24   right.  We've got a list of 25 places where the State has said,
25   all right, if you bring a gun into here, even though you're
```

```
 1   licensed, et cetera, you're committing a felony, and that
 2   results in -- you can characterize that as 25 distinct
 3   deprivations.  For that matter, you could probably break that
 4   list out longer and make it 50 or 100 or 150 places.
 5            THE COURT:  Under the plaintiffs' analysis, what's
 6   left?
 7            MR. JENSEN:  Well, under the plaintiffs' analysis,
 8   since we've only challenged those four sensitive places, as
 9   well as the vehicle carrier restrictions, everything else is
10   left.
11            However, and this goes to sort of the second part of
12   this, which is what this is doing in the overall scheme of
13   things, this death-by-a-thousand-cuts scheme.
14            Once you have enough of these limitations down,
15   you've effectively created a situation where there's really no
16   place left to carry or, to the extent there is a place left to
17   carry, you're talking about having to very carefully map out
18   what you're going to be doing for the next 20 minutes.  Are you
19   going to veer off a public sidewalk, for example?
20            So if you take these four sensitive places and the
21   vehicle carrier restriction that we've challenged, and I think
22   we made this clear on the brief, we're not trying to signal
23   that other areas are permissible.  We're really going for the
24   low-hanging fruit here.  But just eliminating those categories
25   would open up a fair amount of conduct that isn't opened right
```

```
 1   now in terms of people actually going about their daily lives
 2   and carrying arms.
 3        THE COURT:  And that's the key, "with respect to
 4   their daily lives."
 5        MR. JENSEN:  With respect to their daily lives,
 6   because that's the issue we're actually protecting here.  And
 7   this actually really does tie directly in to standing.  Because
 8   in putting together this claim that we haven't articulated a
 9   claim of concrete injury or imminent injury, what this whole
10   framing of the issue is presupposing is that we're not talking
11   about the right that the Supreme Court has recognized, right.
12   The right to wear, bear, and carry arms upon the person in case
13   of confrontation with another person.  We're talking about this
14   much more constricted idea that as long as someone has some
15   theoretical ability to carry a gun somewhere within the state
16   of New Jersey, then the right to bear arms has been protected.
17   And once you drop that constricted view where someone needs to
18   say, okay, well, on this date I would go to this particular
19   location and I would carry a gun and then I would come back
20   home and you make it more about whether or not people have the
21   actual right of armed self-defense, this claim that we haven't
22   articulated a concrete enough injury goes out the window.
23        You know, one thing I would refer the Court to in
24   this regard is the Seventh Circuit's decision in *Moore versus*
25   *Madigan*.  And in that decision, one thing that Judge Posner did
```

1    in distinguishing the Second Circuit's prior decision upholding

2    the proper-cause law there was to refute the attempt to connect

3    the Second Amendment in terms of its scope to the right to

4    privacy and this notion that, you know, there's a quote that's

5    been quoted a few times.

6         Judge Posner disagreed with the suggestion that the

7    Second Amendment should have much greater scope inside the home

8    than outside simply because other provisions of the

9    Constitution have been held to make that distinction.

10        The interest in having sex inside one's home is much

11   greater than the interest in having sex on the sidewalk in

12   front of one's home, but the interest in self-protection is as

13   great outside as inside the home.  And what is, I would say, an

14   unavoidable takeaway of *Heller* and *McDonald* and *Bruen* is that

15   the core interest that is being protected by the Second

16   Amendment is that of armed self-defense.

17        So then if we dive down into some of the cases that

18   the State is citing in support of this standing argument, you

19   know, for example -- and this we did address in the brief so

20   I'll be concise with it -- *Ellison versus American Board of*

21   *Orthopaedic Physicians.*

22        Well, in the big picture, what we've got -- and I

23   think that if you look at standing decisions over time, you'll

24   see the steam come out -- what exactly a plaintiff needs to

25   have to allege a concrete and imminent injury depends, to a

1   certain extent, on the specific facts at issue.  But the big

2   picture idea is the plaintiff needs to have done something to

3   distinguish themselves from just any member of the population.

4   And ideally what they need to have done is they need to have

5   done everything possible to get right up to the point where

6   they would be engaging in this conduct but for the restriction

7   at issue.

8           So in *Ellison*, the whole problem was the parties got

9   sidetracked on this question of whether or not he needed to

10  have an actual position with a hospital or needed to apply for

11  admitting privileges and then be told, well, because you

12  haven't taken this test --

13          THE COURT:  Right, which he had not yet done, and so

14  on that grounds I think the --

15          MR. JENSEN:  Well, no.  The Court actually said, for

16  purposes of discussion, we're going to accept that it would

17  have been futile to apply for admission privileges because they

18  required this board certification that he couldn't get without,

19  in effect, already having admitting privileges, right?  Kind of

20  a circular thing.

21          What the Court said is he's not admitted to practice

22  medicine in New Jersey.  So no matter what, even if we accept

23  this as futile, there's still a significant amount more that he

24  needs to do in order to be at a point where he would be in a

25  position to say, okay, so now the only thing that is holding me

 1   back is this restriction that I've challenged in this lawsuit.

 2            I would need to pull up my iPad to give you the

 3   cases, but if you go on to the next one or two pages of the

 4   State's brief, they go on to cite additional cases where, most

 5   significantly, one theme you have is that there's the

 6   possibility of an exception, all right.

 7            So let's say that instead of enacting the sensitive

 8   place law that it enacted, the New Jersey Legislature said,

 9   okay, so we're going to have all these sensitive places, but if

10   you really need to be in one of these places, you could make an

11   application to the State Police or the Attorney General and

12   maybe we'd let you in.

13            Now, I'm not saying that that sort of a framework

14   would be constitutional; but I am saying that in terms of

15   standing and ripeness, if that's the way the law was set up, I

16   think you'd have a standing and ripeness problem if someone

17   hadn't pursued that option and then been told no.

18            Now, that's not what we're dealing with here.  All of

19   the individual plaintiffs we have in this case have permits to

20   carry.  Up until December 22nd, they were carrying.  And the

21   only reason they're not carrying right now is because of this

22   law.  There is absolutely nothing else that they could do to

23   get closer to crossing that line, the line of the statutes

24   we've challenged, aside from going out and breaking the law.

25            THE COURT:  What evidence do you point to that they

1    will be prosecuted and charged with violating the law if they

2    do go out?

3          MR. JENSEN:  Well, in terms of evidence, we don't

4    have any evidence right now aside from the fact that the law

5    has been passed.  It's categorized as a serious crime and the

6    defendants are not coming in and disavowing it.  Because,

7    again, under *Steffel versus Thompson* and progeny, what we know

8    is that we can't be required to engage in serious criminal

9    conduct merely to raise a constitutional claim and to say this

10   law is infringing my rights.  But if what we have right now

11   isn't enough, then, effectively*, Steffel v. Thompson* is out the

12   window because you have no means of challenging this except

13   saying, okay, I'm now going to carry my gun into the gas

14   station, please come arrest me and charge me with a felony.

15          To state the obvious, people should not have to

16   undergo that kind of a risk in order to simply vindicate their

17   rights.

18          Well, let me put it this way:  I think that basically

19   stakes out the essential parameters of standing.

20          THE COURT:  Okay.

21          MR. JENSEN:  I'd be happy to entertain any questions

22   or otherwise.  I'm sure the Court wants to hear from Ms. Cai.

23          THE COURT:  Yes.  Thank you.

24          Ms. Cai.

25          MR. JENSEN:  Thank you.

```
 1            MS. CAI:  Your Honor, would it make sense for me to

 2    give a brief opening as well, very briefly, just to set the

 3    scene?

 4            THE COURT:  Yes, if you'd like.

 5            MS. CAI:  I do think it actually ties into the

 6    standing issue, so hopefully it's not too disparate.

 7            So in this facial challenge against Chapter 131,

 8    plaintiffs are making the extraordinary request of asking this

 9    Court to short-circuit the typical procedural process for legal

10    challenges.  And that legal process typically, as it happens,

11    exists for a reason.  It's because the development of a record

12    through discovery and fact-finding, both on jurisdictional

13    issues and on merits issues, adequate timing for briefing of

14    dispositive legal arguments, and the Court's careful evaluation

15    of the law as applied to the facts are all very crucial.

16            THE COURT:  And do you agree with me, Ms. Cai, that

17    if I were to allow that process -- to endorse your argument,

18    your position, that that would, in effect, mean that the

19    plaintiffs would not be permitted to or would be deprived of

20    carrying their firearms for perhaps years while this works

21    through the process?

22            MS. CAI:  So two points at that, Your Honor.  So

23    first, we're here on a TRO.  So I think the time of whatever

24    this Court's decision impact is is from now until whenever the

25    PI is decided.
```

```
 1              THE COURT:  No.  But you've asked -- my understanding
 2    of your argument is, is that nothing should be done until this
 3    entire matter works its way through what you call the
 4    democratic process.  That democratic process could take years;
 5    could it not?
 6              MS. CAI:  It depends, Your Honor.  It depends on the
 7    discovery schedule and all that's said and whether or not it's
 8    dispositive motions very early on or not.
 9              THE COURT:  Okay.
10              MS. CAI:  I will say, though, it's the plaintiffs'
11    burden at the TRO stage and the PI stage to demonstrate, more
12    than just on allegation, that they are entitled to emergency
13    relief specifically for the period for which they're seeking
14    relief.
15              THE COURT:  Okay.
16              MS. CAI:  And so for right now, we're just looking at
17    the period between the TRO and the PI.
18              THE COURT:  Okay.  So I interrupted you in your
19    opening statement, so go ahead.
20              MS. CAI:  No; that's quite all right.  And I think in
21    this case, plaintiffs bring a challenge to a state law but also
22    on Second Amendment grounds, which, by its very nature,
23    especially after the *Bruen* decision, requires a special kind of
24    development and careful examination of historical evidence to
25    satisfy the Supreme Court's text and history-based approach.
```

 1          When we get to the merits, I think it will become

 2    clear to the Court that, one, the State has carried its burden.

 3    But, two, as the reply from the plaintiffs that came in a

 4    couple days ago shows, some of their misconceptions of what

 5    those historical pieces of evidence actually say and don't say

 6    requires a much more careful reading and takes a lot longer

 7    than a rushed rush to judgment that the plaintiffs are putting

 8    before this Court would suggest.  And I do want to get through

 9    that.  But I did want to start with the Court's inquiry on

10    standing.

11          And I think a couple things are undisputed.  It's

12    undisputed, I think, that plaintiffs bear the burden and that

13    burden on a PI posture or TRO posture is more than just relying

14    on the allegations in the Complaint.  And so we are not asking

15    this Court at this time to dismiss their Complaint for lack of

16    standing.  What we are arguing is plaintiffs come to this Court

17    seeking extraordinary relief.  They have a very high bar to

18    proffer evidence on all of the elements.  And on each element

19    of standing they have not done so.  That's not to say it is

20    impossible for them to do so.  They could possibly cure some of

21    the deficiencies that I want to go through.  Perhaps they

22    can't.  I don't know.  And so that's the process that I think

23    would be required, even on a PI posture.  And that may take

24    time, too.  And if they are unable to do that on the PI

25    posture, then we go on to whether or not even their allegations

1    are deficient and all that.

2              So we put forward three separate and I think they're

3    pretty independent standing problems.  And I want to go through

4    each of them a little bit separately.  Some of them will be

5    intertwined.  And I think Your Honor was maybe hoping for a

6    provision-by-provision breakdown of which arguments apply to

7    which, and I'll try to signpost that to the best that I can.

8    Some of them are generally applicable across all of their

9    claims, and some of them are more applicable to specific claims

10   than others.

11             THE COURT:  Well, the one that comes to -- the one

12   that I think is distinguishable -- and I meant to ask

13   Mr. Jensen about this, and I'll get back to it -- is the

14   libraries and museums.  I didn't see in the declarations

15   where -- I think for one of the plaintiffs he had visited a

16   museum armed, I think.  But I don't know of any intent to visit

17   a public museum or library in the near future.

18             However, the other provision seemed to me to be so

19   broadly defined; that doesn't plaintiff make a legitimate

20   argument that because they are so broadly defined, that they

21   pretty much can't go anywhere in the state of New Jersey

22   without their weapon?

23             MS. CAI:  I don't think they've met that burden, Your

24   Honor, in what they've offered to the Court.  And I'm sort of

25   harping back to the burden, but I think it's important at this

```
 1    stage, we can't just presume things to be true.  The plaintiff

 2    has to proffer some evidence.  They don't have to prove their

 3    evidence, although the State is entitled to cross-examine them

 4    on whether or not that's appropriate.

 5              I do think there are some provisions for which the

 6    deficiency is far more lacking than others.  And I can go

 7    through them bit by bit.

 8              THE COURT:  Okay.

 9              MS. CAI:  So it seems like, you know, it was the

10    first deficiency I was going to start with, which is the --

11    what I call the lack-of-imminent-injury problem.  And so I want

12    to clarify something.  Mr. Jensen was talking about his clients

13    as people who have carry permits and perhaps separate from the

14    general public.  That solves a particularized injury problem.

15    So Article III injury has to be both concrete -- or it's three

16    things: concrete, particularized to the individual, and

17    imminent.

18              Our issue in this part of the argument is on the

19    imminence problem, not the particularized problem.

20              I do understand that his clients are able to carry

21    firearms concealed in ways that people who don't have conceal

22    permits don't.  And so it's not about whether or not they have

23    taken the step of obtaining a concealed carry permit.  That's

24    not the problem.  The problem is the imminence of the injury.

25              So, for example, plaintiffs challenge the
```

```
 1    restrictions on firearms carry at public libraries and museums,

 2    entertainment facilities, places that serve alcohol, vehicle

 3    restrictions, including public transit and private vehicles.

 4    But nowhere in their declarations do they put forward anything

 5    saying anything about their future imminent intent to visit

 6    these places.  No plaintiff has said anything about future

 7    intent to visit a library or museum.  They also haven't said

 8    anything about intentions to in the future visit a movie

 9    theater or an entertainment facility.  They could easily do

10    that if they were to say, for example, I --

11              THE COURT:  But isn't it enough for the plaintiff to

12    have to say that this is my daily routine, I typically get up,

13    I go to a restaurant, I go to a hardware store, I go to all of

14    these various different places, this is my ordinary routine,

15    and I should be permitted, because I have a license to conceal

16    carry, to take my firearm with me, but because the statute is

17    so broadly defined, I'm leaving my firearm at home.

18              It seems to me what the State is saying is that each

19    plaintiff should be able to say, okay, tomorrow when I get up,

20    I'm going to go to Lowe's because I'm going to go home and

21    paint my house, and then after that I might go join a friend

22    for lunch at Applebee's, and then after that I may have to then

23    run because I need something else at Home Depot.

24              It seems to me the State is asking the plaintiffs to

25    do that.  What do you say?
```

```
 1            MS. CAI:  So the State is not asking for a

 2   day-by-day, hour-by-hour or future intention.  What the

 3   plaintiff is missing -- plaintiffs are missing in their

 4   allegations is any statement about future intent.  And

 5   especially on the TRO posture.  We're talking about an

 6   injunction for a matter of days or weeks.  We don't know how

 7   frequently any particular plaintiff intends to visit a

 8   restaurant that serves alcohol, for example, or how frequently

 9   they would be going to a movie theater.

10            THE COURT:  But isn't once enough?

11            MS. CAI:  No, Your Honor.

12            THE COURT:  Why do you say "frequently"?

13            MS. CAI:  Because if there is no concrete plan to

14   visit, for example, a movie theater in the next month or two,

15   they don't have adequate standing to ask this Court to enjoin

16   that provision because they will not be harmed in any Article

17   III way.

18            THE COURT:  Well, and then that gets to my first

19   question that I asked Mr. Jensen is, do I parse out the various

20   provisions in the statute?

21            Do I say, okay, I've looked at the declarations of

22   the plaintiffs and nowhere do they talk about, well, I want to

23   go see the next movie.  Therefore, movie theaters, they haven't

24   shown standing as to movie theaters.  But they do say that they

25   regularly meet their friends at a restaurant that serves
```

```
 1   alcohol, so there they've showed standing.  Is that the

 2   analysis that I engage in?

 3          MS. CAI:  I think you do, right.  Because I think

 4   each plaintiff has to show -- has to demonstrate standing as to

 5   each of the claims they're bringing.

 6          THE COURT:  Well, how do -- so we're kind of jumping

 7   around, but then how do you define entertainment facilities?

 8          MS. CAI:  So --

 9          THE COURT:  Doesn't that depend upon what people view

10   to be entertainment?  Does that include a concert in a church?

11          MS. CAI:  Your Honor, I think if there are as applied

12   questions that pertain to a particular plaintiff, like they're

13   not sure, we could talk about that.

14          I don't think there is any question, though, that

15   plaintiffs are challenging the entertainment facility provision

16   as it applies, and the statute makes this clear, does apply to

17   theaters, stadiums, museums, racetracks, arenas, and other

18   places where performances, concerts, exhibits, games or

19   contests are held.  And so that's a pretty defined set of

20   places.

21          THE COURT:  No.  Ms. Cai, but what you're asking --

22   it seems to me what you're saying is that this Court, in order

23   to find that the plaintiffs have standing, would have to parse

24   through the plaintiffs' declarations to see if, and if they

25   did, what they had concrete plans to do.  That's how I'm
```

 1    understanding your argument to me.

 2              MS. CAI:  Yes.  And that argument comes straight from

 3    the Supreme Court's decision in *Lujan*.  So plaintiff's claimed

 4    injury in that case was obviously different from what it is

 5    here.  It's the inability to view endangered species that they

 6    claim would be further imperiled by the regulation they're

 7    challenging.

 8              THE COURT:  Okay.  So then under your argument, do

 9    you agree then that if each plaintiff has averred that wherever

10    they go, they go by car, that satisfies standing as to the

11    subchapter dealing with transportation?

12              MS. CAI:  I think that would be true, Your Honor.  I

13    think the affidavits are even lacking on that part.  Now, it

14    may be very easily fixable, but it is still the plaintiffs'

15    burden at this stage to do that.

16              I will note that as to Section 7(b)(1), which applies

17    to both public and private vehicles, no plaintiff has alleged,

18    even in the past, that they've ridden public transit and

19    certainly no future intention to do so.

20              I also want to point out that the Supreme Court has

21    been very clear that allegation of past injury or past, you

22    know, past visits to certain locations standing alone without

23    averments of future imminent intent is not enough to satisfy

24    the imminent injury requirement.

25              And so, again, these are not necessarily things that

1   would be necessarily difficult for a plaintiff to demonstrate.

2   There are some plaintiffs who seem to aver that they are

3   unlikely to ever visit a museum, a movie theater, or public

4   transit.  So, for example, the Muller affidavit at paragraph 11

5   suggests that this person is very unlikely to visit those

6   places according to what he's already testified to.  Other

7   plaintiffs may have an easier time.  We're just submitting to

8   the Court that on this posture, the plaintiffs have not met

9   their burden in the rushed affidavits that they submitted to

10  this Court.

11          We are not saying that the Court should dismiss the

12  Complaint because it could never satisfy that burden.  So

13  that's on just one of the three standing problems I wanted to

14  talk about.

15          The second standing problem, which I didn't really

16  hear Mr. Jensen talk about, is demonstrating that Chapter 131

17  is actually the cause of any injury that they allege.  So this,

18  I mean, the Supreme Court has recognized that traceability and

19  redressability are very related in the causation context.  And

20  so a good example I think to illustrate this is entertainment

21  facilities, for example.

22          So plaintiffs say I want to be able to go to concerts

23  and performances and all that, and Chapter 131 should be

24  enjoined because it says that I can't carry my firearm at those

25  venues.

1           The problem is many, if not most, large entertainment

2      facilities and some movie theaters already, by their own

3      policies, prohibit firearms.

4           So plaintiffs' challenged Chapter 131 on a facial

5      posture asking this Court to invalidate the statute.  But the

6      statute is not the but-for cause of their claimed injury, even

7      if they can get over the imminence requirement that we were

8      just talking about.  And so that's the problem for all of

9      the -- well, most of the places that they're challenging.  So

10     libraries, entertainment venues, at least some of the private

11     enterprises they're going to that have made it clear on their

12     own websites or on their doors that firearms are not allowed.

13     So the YMCA, for example, Costco, perhaps the local coffee

14     shop.  There's no evidence that these places would allow

15     plaintiffs to carry with a firearm.  And, in fact, some of them

16     already have existing policies prohibiting weapons.  So that's

17     one of the problems that plaintiff has never provided this

18     Court a satisfying answer to.

19          It could also be overcome with more specific evidence

20     at the PI stage.  So, for example, one of the plaintiffs says I

21     want to be able to carry at my local coffee shop or my local

22     YMCA.  If they have an affidavit from the coffee shop owner or

23     whoever runs the YMCA that but for Chapter 131 you would be

24     allowed to carry here, then, yes, they have demonstrated

25     causation on that point.

```
1          THE COURT:  So the State is suggesting that the

2    plaintiffs must lay out how they intend to spend the rest of

3    their lives for the next several months --

4          MS. CAI:  No, Your Honor.

5          THE COURT:  -- to establish standing?

6          MS. CAI:  No, Your Honor.  I think they just need to

7    give at least one example for each category, each provision

8    that they're challenging, that they're actually intending to go

9    to.

10          THE COURT:  So the State's position -- I want to make

11    sure I understand your position.  The State's position is that

12    the plaintiff must, if they're going to challenge each subpart

13    or each provision, must at least satisfy standing as to one of

14    the categories; is that the position?

15          MS. CAI:  Yeah.

16          THE COURT:  Okay.

17          MS. CAI:  Because they need to have some injury to

18    challenge the provision at issue, to make the claim at issue.

19          And I will fully acknowledge that the

20    but-for-causation problem in this part of the standing

21    challenge almost certainly does not apply to the plaintiff's

22    own vehicle, right?  They don't need to show that because but

23    for the statute, they've demonstrated that they would be

24    carrying loaded guns in their automobiles.

25          THE COURT:  Okay.  So you concede standing as to
```

```
 1   subchapter 7, the transportation, (d).

 2          MS. CAI:  Not standing in general, Your Honor, but on

 3   this, the causation part of standing.

 4          THE COURT:  Well, how do you quarrel with the fact

 5   that each plaintiff rides his -- each declaration discusses how

 6   when they go places they get in the car.  How do you quarrel

 7   with that standing?

 8          MS. CAI:  There's a different -- this is the third --

 9   the third problem with standing is the credible likelihood of

10   enforcement.

11          THE COURT:  Okay.

12          MS. CAI:  So that's what I wanted to get to.

13          THE COURT:  Okay.

14          MS. CAI:  And so I think that the issue there is the

15   Supreme Court has been clear and this Court, as affirmed by the

16   Third Circuit in cases like Fischer, have made clear that the

17   mere existence of a law is not sufficient to demonstrate

18   credible likelihood of enforcement.

19          It's not the case that the plaintiff has to be

20   prosecuted, but the plaintiff has to do more.  And in SBA List,

21   the Supreme Court case, the Court gave three ways of getting

22   there.  One is past history of enforcement.  Two is any kind of

23   specific threat of enforcement against a plaintiff or similarly

24   situated person.

25          The third is some other operation of the statute that
```

 1   makes it especially easy for enforcement.  So, for example, a

 2   citizens suit provision is the example that the Supreme Court

 3   gave.  Plaintiffs have not even tried to meet this burden.

 4   They have not tried to demonstrate any of this.

 5          THE COURT:  Well, let me ask you this:  Is the State

 6   willing to agree not to prosecute each of these plaintiffs?

 7          MS. CAI:  No.  And that's not what the requirement

 8   is, right.  So --

 9          THE COURT:  So then help me understand when the

10   threat of prosecution becomes credible.

11          MS. CAI:  So if, for example, plaintiffs adduced any

12   evidence about how the State had previously enforced sensitive

13   places restrictions and places like government buildings,

14   schools, et cetera, they haven't done any of that.  And I think

15   if you think about the claim by claim, there are some claims

16   for which the credible threat of enforcement issue becomes very

17   crystallized, and so the private property restriction is one of

18   them.

19          So plaintiffs say, well, everything is likely to be

20   enforced because the statute has been passed and law

21   enforcement says we enforce all of our statutes, right.  But

22   the problem is, think about the commonsense scenario that that

23   provision would provide.  If a plaintiff carries a concealed

24   firearm on to private property and the owner hasn't indicated

25   one way or the other whether or not they consent --

```
 1              THE COURT:  He's in violation of the law.

 2              MS. CAI:  But it's not clear how that would be

 3    enforced, and it's not clear that the threat of enforcement

 4    would be that credible, and here's why --

 5              THE COURT:  Well, I just asked you if the State was

 6    willing not to enforce the laws and you would not concede that.

 7    So the law, the default is, is that unless the owner has

 8    consented, and in the scenario that you're positing, in that

 9    case the owner hasn't consented, then under the law, the gun

10    owner violates the law, right?

11              MS. CAI:  That's --

12              THE COURT:  Should he wait for the police to come

13    arrest him before there's a credible threat of prosecution?

14              MS. CAI:  No, Your Honor.  No, Your Honor.  But the

15    issue is how it's enforced.

16              So one scenario is the owner, upon seeing the

17    plaintiff with the concealed weapon -- I'm not sure how that

18    would even happen.  A lot of times perhaps the owner wouldn't

19    even know -- is actually okay with having it on their property

20    all along.  They just haven't expressed their consent either

21    way.  This is what the plaintiffs are worried about, right,

22    people who are fine or don't really care about you bringing

23    your firearm but haven't expressed consent.  I think it's very

24    unlikely that that private owner would be calling the police to

25    enforce the provision against the plaintiff.
```

```
 1            THE COURT:  What evidence do you have to support

 2   that?

 3            MS. CAI:  The burden is not on the State to support

 4   that.  But I think it's common sense to say if I am a person

 5   who is perfectly fine with others bringing firearms onto my

 6   property, I just haven't told that person, if a person happens

 7   to do that in violation of the technical law on my own

 8   property, but I'm not willing, as most people probably are, to

 9   pick up the phone or do anything about it, that's going to be,

10   admittedly, difficult for the State to enforce, especially

11   because it's on private property.

12            And so that's an example of why I think the burden,

13   you know, plaintiffs have to satisfy their burden.  And maybe

14   it's a little bit easier with respect to carrying at a large

15   stadium where it would be more likely that law enforcement will

16   see you do it or whatever.  But with respect to private

17   property I think it's harder to know.  And if the --

18            THE COURT:  But under your analysis, what is the

19   plaintiff to do?  It's the plaintiff's burden, I agree with you

20   on that.  Is the plaintiff supposed to present evidence that he

21   went up to ten different property owners and even though there

22   was no sign that said you can have a gun here, that they were

23   all okay with it?  I mean, I'm not sure I'm following your

24   argument.

25            MS. CAI:  No.  I think it would have to be something
```

 1   more specific.  And I don't want to lay out a roadmap for how

 2   plaintiffs would cure their own standing deficiencies, but

 3   perhaps any examples of other enforcement in this area that

 4   could shed light on how likely the enforcement is.

 5              THE COURT:  But the law was just enacted.  So how can

 6   you criticize plaintiffs for not coming forward with such

 7   evidence?  I guess that is what is troubling to me; that in the

 8   cases of standing that you are discussing, there, there is a

 9   historical pattern.

10              So, for example, in some of the cases, the plaintiff

11   lacks standing because though there's been a statute on the

12   books for 20 years, it's never been prosecuted, right?

13              So do you quarrel with the plaintiffs' position that

14   they have every right to believe that they will be prosecuted

15   if they are found to be in violation of the provision?

16              MS. CAI:  Of course not, Your Honor.  I mean, the

17   State would never say we're not going to enforce, you know, a

18   duly enacted criminal law unless there was some other specific

19   circumstance at stake.

20              THE COURT:  Okay.

21              MS. CAI:  I'm just saying that as the Supreme Court

22   and other cases, including the Sixth Circuit and the Third

23   Circuit, have said, the plaintiffs' burden is to say more than

24   the law exists and there's no disavowal of enforcement.  And

25   how they choose to do that, whether it's through history of

```
 1  enforcement of similar statutes or through an example of a
 2  similarly situated person who has been enforced against, that's
 3  up to them.  And if they would like to do that, we can evaluate
 4  the evidence and see if it reaches the threshold.
 5          And I think, you know, in cases like Kendrick, which
 6  is a DNJ decision that cited to D.C. Circuit case law on this
 7  issue, as well as the recent Angelo decision of the D.C.
 8  Circuit, there is a real issue on this point.  And this applies
 9  to all of their claims because the burden on the plaintiff for
10  challenging a newly enacted law is to demonstrate that specific
11  provisions that they fear enforcement of will actually be
12  likely to be applied to them and enforced against them.
13          THE COURT:  And just to be clear, that wasn't a D.C.
14  Circuit decision.
15          MS. CAI:  Sorry.  District of D.C., citing D.C.
16  Circuit law, yes.
17          THE COURT:  And that seemed to rely upon D.C. Circuit
18  law that really, I think, is distinguishable from this Court's
19  precedence.
20          MS. CAI:  There are different ways of looking at it,
21  Your Honor.  And I think the D.C. Circuit in those cases have
22  gone even further to say you actually need to be prosecuted,
23  which is not our position here.  But I think, you know, the
24  Supreme Court in SBA List, the Sixth Circuit in the McKay case
25  and other cases and other courts have recognized the three-part
```

1    factor.  You know, it doesn't have to be all three but one of

2    the three additional proffers that the plaintiff has to give.

3              And I think especially at the PI posture where, you

4    know, a quasi-summary judgment standard is the standard, the

5    plaintiff has to do more than just say the law exists.  And so

6    unless the Court has any other questions on standing...

7              THE COURT:  Thank you.

8              All right.  Mr. Jensen, you want to respond.

9              MR. JENSEN:  Yes, Your Honor.

10             THE COURT:  Yes.

11             MR. JENSEN:  I'll try to be brief.

12             So, first and foremost, we're not talking -- as the

13   Court has already recognized, we're talking about a law that

14   was just enacted.  There's not going to be a history of

15   enforcement and a requirement that you must show a history of

16   enforcement to show imminence, particularly in the context of

17   newly enacted legislation, is going to create a situation where

18   the legislation is simply not reviewable, which is not the end

19   goal of the standing statutes.  It's to ensure that we have

20   particularized controversies that are susceptible to

21   determination by the courts.

22             And moreover, this is not a mere technical violation.

23   We're not talking about something like driving five miles per

24   hour over the speed limit where maybe they'll pull you over,

25   maybe they won't; and if they do, you're going to get handed a

 1  piece of paper that says write a check for 50 or $100.  We're

 2  talking about serious criminal statutes where the result is

 3  going to be someone is going to be arrested, they are going to

 4  be held in jail unless and until they make bail, and they are

 5  going to face a serious threat of a term of imprisonment.

 6          A couple of the cases that we're referencing, you

 7  know, in particular, *Kendrick*, I was local counsel on that

 8  case, the issue there was the plaintiffs were challenging

 9  parameters related to the permitting process.  They hadn't

10  applied for permits.  Now, whether or not that was rightly

11  decided based on the particular claims they were putting

12  forward is debatable.  But long story short, that's not what

13  we're dealing with here.

14          We're not dealing with -- and I still haven't heard

15  any specific thing that any of the plaintiffs could do to get

16  themselves closer to the line than they already are.  They've

17  already passed all of the processes they would need to pass to

18  be able to engage in that conduct.

19          THE COURT:  What about your adversary's position that

20  the plaintiffs have to sort of lay out their concrete plans, I

21  guess, as they see their life unfolding for the next several

22  days or weeks?

23          MR. JENSEN:  I normally try to avoid answering

24  questions with questions, but take this as a rhetorical

25  question.  When's the next time you're going to a movie

 1    theater?

 2          People's lives do not necessarily lay out into a

 3    scheduling book that run six months or a year or however long

 4    into the future.

 5          What the plaintiffs are saying here is that when they

 6    were able to -- and if they were now able to, they would

 7    continue to do this -- when they were able to, they carried

 8    guns with them throughout their daily lives.  Sometimes that

 9    might involve going to museums.  Sometimes that might involve

10    going to restaurants or gas stations or where have you.

11          Requiring a higher level of specificity or

12    concreteness than that is basically turning the right of armed

13    self-defense on its head.

14          THE COURT:  Although I didn't see anything in the

15    declarations -- and you'll correct me if I'm wrong -- that the

16    plaintiffs intended to visit libraries and museums, and maybe I

17    missed it.

18          MR. JENSEN:  I don't think anyone said I have a

19    definite plan right now to go to the Sussex County Library or

20    what have you next week.

21          THE COURT:  Because not everybody is a library-goer

22    and not everybody is a museum-goer.  So to that, the State

23    might have a point.

24          MR. JENSEN:  Well, but the real issue here is what's

25    the injury?  And the injury is deprivation of the right to

 1    armed self-defense.  And the issue is, does that right attach

 2    to you as an individual that then subject you to specific

 3    justified limitations, or does the right in the first place

 4    only come up in particular locations.

 5           They're trying to put forward a view where this is a

 6    right that only comes up in particular locations.  As long as

 7    you have some ability to carry a gun in some manner within the

 8    geographic confines of New Jersey, the right to bear arms is

 9    being protected.  But that's not what the right of armed

10    self-defense entails.  It entails the ability to actually be

11    able to protect one's self when the need for defense arises.

12    And this in and of itself ties back into this "sensitive

13    places" issue.  Because one of the defining characteristics of

14    sensitive places, like this courthouse, is you're not too

15    likely to need a firearm to defend yourself.  If someone

16    attacks me right now, we've got, I don't know, at least one CSO

17    in the room.  I think a bunch more would probably come in

18    pretty quick, all right.

19           That is distinguishable from going to a museum or

20    library, and the basis for distinction doesn't relate to how

21    frequently someone goes there.  It relates to whether, if they

22    are going to go there, that need is going to arise.

23           One other thing that I think should be addressed just

24    briefly, *Fischer versus Governor of New Jersey*, which I believe

25    actually went up to the Third Circuit out of this Court, so you

1    may actually be more familiar with the facts than I am, but

2    stated generally the plaintiffs in *Fischer* are challenging a

3    New Jersey law that governs withdrawal from a public sector

4    union, specifically a teacher's union.  The New Jersey statute

5    says you've got to request withdrawal from the union within ten

6    days of your anniversary date.  And the plaintiffs are saying,

7    under the Supreme Court decision, that's unconstitutional.

8            The problem is, the way that this had actually worked

9    out for all the plaintiffs is that their union rules let them

10   withdraw earlier, and they had withdrawn earlier.  So then you

11   do get into a question of, well, just because the statute is on

12   the books doesn't mean it's being applied to you.  How do you

13   have standing?  That is apples and oranges from what we are

14   dealing with here.

15           THE COURT:  Okay.

16           MR. JENSEN:  And beyond that, the only other thing I

17   can say is that I think that the Court has accurately

18   identified the issue with, in particular, the *Naviguard*

19   decision out of the D.C. Circuit where the reality is we've got

20   a circuit split.

21           I don't think that line of authority will ultimately

22   prevail because I think particularly when you get up to the

23   Supreme Court level, this notion that people should have

24   standing without having to risk getting sent to prison is going

25   to be persuasive with the Court.  But long story short, I think

 1   there are one or two outcomes you get out of the D.C. Circuit

 2   that you would not get out of the Third Circuit.

 3        So unless the Court has anything further...

 4        THE COURT:  No.  Let's turn to -- I want to get to

 5   irreparable injury, and we'll do that at the end.  But I want

 6   to turn to the "sensitive place" designations, and I want to do

 7   them by -- I want to focus -- I want to skip past the subpart

 8   12.  I want to turn to subpart 15 just briefly, and 17, and

 9   then I want to talk to you about the private property.

10        You know what, let me just hear you as to "sensitive

11   place" designation all along, and we'll keep the

12   transportation, the vehicle one, for a separate conversation.

13        Okay.  Go ahead.

14        MR. JENSEN:  Okay.  So what we know under -- to start

15   this conversation off, we need to talk about what the framework

16   of review is, right?  So under *Bruen*, which is really primarily

17   where we're going to be looking to to find out how do we

18   evaluate these restrictions, the starting premise is, if

19   something falls within the scope of the Second Amendment,

20   meaning we are talking about the act of keeping or bearing

21   arms, it is presumptively unconstitutional unless the

22   government bears the burden of identifying a historical

23   analogue that amounts to what could be called and what, in

24   fact, the Court did call an enduring tradition, an enduring

25   American tradition.

```
 1          Now, one issue that has already come up quite a bit

 2   on the briefing is precisely what period we're looking at.  And

 3   when you look at Bruen around -- I want to say this is roughly

 4   page 2133, 2134 --

 5          THE COURT:  Well, I think that we can skip that

 6   conversation now.  And I don't really want to delve into it.

 7   Because, as in Bruen, it didn't matter to the Supreme Court's

 8   decision whether or not you looked at the 1791 period or you

 9   looked at the 1868 period, right, under the Bruen decision?

10          MR. JENSEN:  Yes, that's correct.

11          THE COURT:  Your argument is the same here.

12          MR. JENSEN:  I think that is the same.  But to the

13   extent it does make a difference, what does need to be noted is

14   that in Bruen, the Court directly said we have narrowly looked

15   to 1791 to determine the scope of the Bill of Rights.  There is

16   an ongoing academic debate, that term, direct quote.  They cite

17   Amar and Khan -- Akhil Amar and K. Lash, and I'm drawing a

18   blank on Lash's first name -- for these articles talking about

19   a somewhat novel theory that when the Fourteenth Amendment was

20   adopted, it basically reenacted the entire Bill of Rights.  So

21   maybe for the entire ten original protections, we ought to be

22   looking at 1868 instead of 1791.

23          THE COURT:  And let's not get bogged down in that

24   conversation.

25          MR. JENSEN:  Okay.
```

```
1              THE COURT:  Yes.

2              MR. JENSEN:  I think we made the point, so let's not

3    get bogged down in it.

4              THE COURT:  Understood.

5              MR. JENSEN:  So let's look at -- so with regard to

6    15, first of all, let's start at the manner in which the

7    statute has articulated it.  And this is bars and restaurants

8    that serve alcohol and, paraphrasing, other places where

9    alcohol is available or is sold for consumption on premises,

10   okay.

11             And the way that the State is characterizing this,

12   which it's a direct quote, locations where vulnerable or

13   incapacitated people gather, which I don't really know that

14   that's an entirely accurate way to describe restaurants.

15             What we have under Bruen to start out with is the

16   State of New York argued that any place where people gather and

17   where law enforcement is presumptively available ought to fall

18   under the guise of a sensitive place.  The Supreme Court

19   emphatically rejected that.  So whatever we have as a starting

20   premise, we pretty much know that if what the justification is

21   is that, well, hey, people gather here and if you call the

22   police, they'll presumably show up --

23             THE COURT:  Well, I think there are two principles,

24   if not more, that Bruen was clear on.  One is that the

25   sensitive place designation should not be so expansive, and
```

 1   cautioned courts against expanding the definition of sensitive

 2   place.  You agree with that?

 3          MR. JENSEN:  Yes.

 4          THE COURT:  The other principle is exactly the one

 5   that you articulated.  Because otherwise, according to the

 6   Supreme Court, the city of Manhattan becomes designated a

 7   sensitive place.

 8          MR. JENSEN:  Correct.

 9          THE COURT:  Okay.  And so in that vein, your argument

10   is?

11          MR. JENSEN:  Well, okay, so let's call that context.

12   The simple fact that people gather in an area is not going to

13   be enough to make it a sensitive place.  And frankly, that sort

14   of has to be the case because ultimately people gather there.

15   Look, people gather in public places.  That's kind of the

16   definition of a public place, right.

17          So with regard to restaurants and bars that serve

18   alcohol, the State's identified three laws.  And I will follow

19   the Court's admonition not to get bogged down in the details,

20   but it should be noted, not one of these is from anything close

21   to 1791, all right.

22          So, first of all, we've got an 1870 Texas law, and

23   what that law actually prohibited was going into any church or

24   religious assembly, any schoolroom or other place where people

25   are assembled for educational, literary, or scientific purposes

1  or into a ballroom, social party, or other social gathering

2  composed of ladies and gentlemen, or to any election precinct

3  on the day or days of any election, or to any other place where

4  people may be assembled to muster or to perform any other

5  public duty or any other public assembly.

6      By its terms, this does not cover restaurants.  It

7  does not, for that matter, cover bars.  And any attempt to

8  convert this into something that might cover restaurants and

9  bars requires us to sort of read a lot in there that basically

10  goes, well, so we're talking about places where people assemble

11  or they gather.  But that would just be going back to do you

12  have a right to bear arms in public in the first place.  And

13  there are probably two notes that should be thrown out there

14  with regard to this Texas law.  One is that the law was amended

15  a year later to strike out the reference to literary purposes.

16      The second is that in the grand scheme of things,

17  Texas was one of at least two states that had rejected a view

18  of the right to bear arms.  Now, this is the right to bear arms

19  as stated under the Texas Constitution that as a general

20  proposition applied to handguns in the first place.  So

21  restrictions that are being upheld in Texas at this time period

22  are not really particularly pertinent because this is this

23  whole line of authority that the Supreme Court rejected in

24  *Heller* in the first place.

25      THE COURT:  So, Mr. Jensen, and you've made all of

```
 1   those arguments in your brief, so to move things along, I don't
 2   want you to have to reiterate what's in your brief.  I
 3   understand the positions you've taken with respect to the
 4   statutes that the defendants have cited, and I have some
 5   questions for them about that.
 6           And we're only going to focus now on 15 and 17.
 7   Anything else in your brief that you want to add?
 8           MR. JENSEN:  Well, okay.  So let me just on 15, I
 9   will hit these two points very quickly.
10           THE COURT:  Yes.
11           MR. JENSEN:  The other two laws that are being cited,
12   1859 Connecticut, this doesn't have anything to do with
13   restricting carrying guns.  It says you can't sell alcohol or
14   have a gambling facility within either a half a mile or a mile
15   of a military encampment.  I don't know.  General Order No. 1
16   generally says you can't drink while you're on duty, right.
17   The military's ability to prohibit alcohol use or restrict
18   alcohol use by members of the service is kind of not what we're
19   talking about here.
20           And then finally, this 1867 Kansas law says you can't
21   be intoxicated.  All right.  Section 5 of this new legislation
22   already says you can't be intoxicated while carrying a gun.
23   We're not challenging that.  I don't think anyone in their
24   right mind is going to assert a constitutional right to walk
25   around drunk and armed.
```

1    With regard to 17, entertainment facilities, well,

2    we're starting out with the Statute of Northampton.  The big

3    issue there is -- and believe me, plenty of ink has been

4    spilled on the issue of the Statute of Northampton over the

5    past 12 years.  The Supreme Court has resolved this.

6         THE COURT:  Right.  And in your brief you refer to

7    the Statute of Northampton, but actually the statute that the

8    State cites was actually addressed by the Supreme Court.

9         MR. JENSEN:  Well, yes.  It was a state analogue to

10   the Statute of Northampton.

11        THE COURT:  Yes.  Okay.

12        MR. JENSEN:  And significantly, if you start doing

13   research in Virginia case law, you really won't find anything

14   that construes this.  So all we really have to go from is the

15   established common law meaning of the statute at the time of

16   the framing or any other time that might be material.

17        And notably, while we're not going to find authority

18   in Virginia that addresses this, there is some authority from

19   other states.  I believe *State v. Huntley* from North Carolina

20   addressed this issue, the Statute of Northampton and a phrase,

21   "liability" for a phrase, by explaining that the general act of

22   possessing or carrying a gun did not come within the statute in

23   the first place.

24        We've got that same 1870 Texas law that we're just

25   talking about, which, again, the only way you're going to get

```
 1  this into an entertainment venue is simply by saying, well, the
 2  premise here is that any place where people assemble, guns can
 3  be banned.  But that premise has already pretty much been
 4  rejected.
 5          And more to the point, you know, one of the things
 6  that, I think, even if I'm right and this Civil War era stuff
 7  isn't really directly pertinent, one thing we do really get
 8  from Bruen is that in looking at analogous laws, they found
 9  five laws from the 1860s generally from territories and
10  oftentimes they weren't enforced for very long, but on their
11  face, they broadly precluded the carry of guns.  A lot of times
12  it was just within the confines of an organized town or city.
13          But the fact that you could locate one or two or in
14  that case five laws that stood for the proposition or that
15  embraced this restriction wasn't enough to show an enduring
16  American tradition.  And if you stop and think about this, you
17  know, take one step back from the situation and look at this
18  from the framework of, well, what should the law be, if you're
19  defining constitutional rights based on what we could call the
20  low water mark or the lowest common denominator, meaning if you
21  look through the history of the country, where is an example
22  where we can find this right either hasn't been observed or has
23  been winnowed down to nothing, well, we wouldn't have any
24  rights.  People would cite Korematsu and they would say it's
25  fine for the government to make race- or ethnicity-based
```

 1    distinctions.

 2              And that is part of why -- a significant part of why

 3    the mere fact that someone can point to a law that is arguably

 4    analogous here isn't enough.  We need to be able to show that

 5    there was actually an enduring tradition that supported this

 6    regulation.

 7              THE COURT:  Okay.  Let me hear from your adversary,

 8    please.

 9              MR. JENSEN:  You bet.

10              THE COURT:  Okay.

11              So, Ms. Cai, I really want to move on to the

12    privately owned property.  But do you have anything else to add

13    to your submissions with respect to 15 and 17, the

14    entertainment provision and the alcohol provision?  Do you have

15    anything else to add?

16              MS. CAI:  I do, Your Honor.

17              THE COURT:  Okay.

18              MS. CAI:  I think --

19              THE COURT:  And in your comments, though, because one

20    of the questions I do want you to address is, I understand the

21    State to be saying that the conduct at issue here is not

22    covered by the Second Amendment, and so that is a question I

23    most certainly want you to address.  Okay.

24              MS. CAI:  With respect to places that -- so Section

25    15 and Section 17, generally speaking, we don't make a text of

 1    the Second Amendment argument unless the entertainment facility

 2    is operated by the government as a market participant, as

 3    actually many of the largest venues in New Jersey are.  So PNC

 4    Bank Art Center, for example, is a government-run facility.  So

 5    that's the only distinction I'm making on the first step *Bruen*

 6    inquiry about the text.  That argument I'll save for the other

 7    provisions where that's much more applicable.

 8              THE COURT:  Okay.

 9              MS. CAI:  So on the historical analogue, so starting

10    with I guess we're talking about entertainment facilities, I

11    think what's notable is the State provided five or six

12    historical analogues specifically prohibiting firearms at not

13    just places where people assemble, but crowded places for

14    social or entertainment or ballrooms, the kind of things, the

15    specific kind of things that Section 17 prohibits.  And so if

16    you want to find a almost historical twin, there are a number

17    of them that we've identified.  And plaintiffs have --

18              THE COURT:  But didn't *Bruen* caution against that?

19              MS. CAI:  Yeah, absolutely.  We don't have to do that

20    for everyone.  I'm just saying even if -- the plaintiffs are

21    asking in a lot of cases for, well, this is not close enough.

22    They haven't given anything about why the examples we gave on

23    entertainment facilities are not close enough.  And so that may

24    be a question for some of the other provisions.  But I think as

25    to entertainment facilities, we have identified very, very

 1   direct historical analogues that they haven't challenged.

 2          I think one thing that sort of illustrates my earlier

 3   point about sort of hasty TRO proceedings is what the

 4   plaintiffs were trying to argue in their reply brief on the

 5   Tennessee statute that is in our Exhibit 8, the 1869 Tennessee

 6   statute.  So they say this statute allowed open carry, so you

 7   shouldn't consider it.  That's plain wrong from the text.  And

 8   I have a copy of the statute if the Court wants to look at it,

 9   and I can walk through it.

10          But the statute literally says:  "It shall not be

11   lawful for any person attending any fair, racecourse, or other

12   public assembly of the people to carry on his person, concealed

13   or otherwise, any pistol or any other deadly or dangerous

14   weapon."

15              THE COURT:  What exhibit is that?

16              MS. CAI:  This is Exhibit 8.  And I'm happy to --

17              THE COURT:  I have a copy of it.

18              MS. CAI:  And I think --

19              THE COURT:  May I?  I want to get to this.  The State

20   has throughout its papers told this Court not to make a hasty

21   decision.  And of course, this Court would never make a hasty

22   decision.  But the State has done so saying we promise we'll

23   give you the historical evidence to support this legislation.

24          But when this legislation was passed, the legislature

25   said we have plenty of historical evidence to support this

```
 1  legislation.  So it's there.  What more time do you need?  It's
 2  been there.
 3          MS. CAI:  It's certainly there, Your Honor.  And
 4  that's why we provided the Court with, you know, I think 20
 5  historical exhibits demonstrating --
 6          THE COURT:  Is that all you have?
 7          MS. CAI:  It's not though, Your Honor, because --
 8          THE COURT:  But if you had more -- is this all that
 9  the legislature had?
10          MS. CAI:  I -- I can't know exactly what the
11  legislators were looking at.  I can't get into their minds or
12  their research, but --
13          THE COURT:  Well, I'm looking at the plain language
14  of the statute.  I'm looking at the plain language of the
15  legislation that says that these laws are rooted in historical
16  evidence and supported.  I don't have the language right in
17  front of me, but the legislation itself says that historical
18  tradition supports this legislation.
19          So it seems to me that the legislature has had this
20  evidence at the time of passage.  And for the State to come
21  forward to me today and say we need more time to show you the
22  legislation, the legislature said they had it.
23          MS. CAI:  So the argument is not that the State needs
24  more time to come up with historical analogues.
25          THE COURT:  Okay.
```

```
 1              MS. CAI:  The argument is historical evidence is
 2      oftentimes tricky.  What do particular phrases mean at the
 3      moment in history that they existed?
 4              THE COURT:  Okay.
 5              MS. CAI:  Is there other context supporting that
 6      particular understanding of what these statutes meant?  I mean,
 7      this is the work of historians.  And the State -- I'm sure the
 8      legislature had many of these in mind.  I can't purport to know
 9      exactly which ones they did or didn't.  And there's also a
10      whole doctrine where exactly what the legislature had in mind
11      is not necessarily what justifies the law.
12              But in any event, I think the key is as demonstrated
13      by plaintiffs' attempt to challenge the State's historical
14      analogues with misreadings of what the statutes actually say,
15      and there are other scenarios where perhaps the readings are
16      ambiguous or debatable, those are the kinds of conversations
17      and factual development that needs to happen in the normal
18      course of litigation.
19              And so I think it's -- and the other thing that I
20      think needs to happen --
21              THE COURT:  Although this Court's perfectly capable
22      of reading the statute and construing it as well.  Do you agree
23      with that?
24              MS. CAI:  Of course.  Of course.  But I think there's
25      something about historical statutes that's a little bit
```

```
 1   different because the way in which people used certain phrases,

 2   for example, or what led to the establishment of certain

 3   statutes and how they were adopted by other municipalities or

 4   other states, you know, does figure into the analysis.

 5             I will note that at no time in this submission does

 6   the State rely on purely territorial laws or any territorial

 7   laws.  We are only relying on state statutes or local

 8   provisions that existed in U.S. states at the time.

 9             And so on entertainment facilities, I mean, I think

10   there's plenty of historical tradition to support this.  The

11   other thing I would note is that I think plaintiffs' discussion

12   of what Bruen said about sensitive places and what an enduring

13   historical tradition analysis requires is a little bit off

14   base.

15             So what Bruen said explicitly is that you can't say

16   all of New York is a sensitive place.  I mean, we totally agree

17   with that.  But it's silent on how expansive one should look at

18   sensitive places because it didn't conduct the historical

19   inquiry into how expansively did the historical tradition look

20   at sensitive places.  And that's exactly what we are doing now.

21             Moreover, I think what's really important is we can

22   look to what Bruen said about places that they thought were

23   settled sensitive places.  And Bruen said that although the

24   historical record "yield relatively few 18th and 19th century

25   sensitive places where weapons were altogether prohibited, we
```

 1 | are also aware of no disputes regarding the lawfulness of such
 2 | prohibitions."
 3 | So the Court was able to draw conclusions about
 4 | sensitive places, government buildings and schools, for
 5 | example, based on relatively few historical analogues because
 6 | those analogues were not challenged in court.  And I think
 7 | that's the thing that plaintiffs are missing.  They have not
 8 | demonstrated that the analogues that we put forth -- sometimes
 9 | numerous -- have ever been challenged at the time or any time
10 | close to when they were enacted.
11 | And instead, the State has put forward evidence, at
12 | least examples -- and we can do more of this on sort of a more
13 | voluminous briefing timeline and briefing pages -- that
14 | actually some of these laws were upheld immediately after they
15 | were enacted.  And so the Texas statute that plaintiffs were
16 | talking about is a good example of this.
17 | And so just to focus on that for a little bit, this
18 | is the 1870 Texas statute that's in Exhibit 5.  You know, the
19 | Court in *Bruen* talked about the Texas court's *English versus*
20 | *State* decision was incorrect to assume that the Second
21 | Amendment right only applied to the militia context.  Totally
22 | agreed.  We're not challenging that.  A separate part of that
23 | *English v. State* decision in 1872 talks about sensitive places.
24 | And the *Bruen* court doesn't abrogate this at all.  It doesn't
25 | talk about this at all.

```
 1          But the Texas Supreme Court made clear that the
 2   legislature can regulate firearms carry in sensitive locations.
 3   And, in fact, has said it appears to us, little short of
 4   ridiculous, that anyone should claim the right to carry upon
 5   his person any of these mischievous devices, for instance,
 6   going into a church, a lecture room, a ballroom or any other
 7   place where ladies and gentlemen are congregated together.
 8          And so I think nothing about what the plaintiffs are
 9   arguing is supported by what Bruen was saying, which is what
10   you look to is what statutes were enacted and how courts and
11   the people understood the lawfulness of those enactments at the
12   time.  And so I think that that's what the historical analysis
13   and further briefing will show.  But we have put forth examples
14   on a number of these or actually, on all of them.
15          One final point on places that serve alcohol, and
16   this applies to all the arguments that plaintiffs are making,
17   plaintiffs, the gist of their reply and what Mr. Jensen is
18   coming up here to say is that, well, you need to give like the
19   same statute in history in order for it to be justified.  But
20   Bruen said that's not correct.  And the Third Circuit in the
21   Range decision said that is absolutely not the right mode of
22   analysis.
23          Instead, what Bruen and Range tells courts to do is
24   to look at why and how the statute limits firearms.  In the
25   alcohol context, it's because alcohol and firearms don't mix.
```

| 1 | Now, plaintiffs say well, it's enough to say if you are |
| 2 | actively drunk, you can't carry.  If that's the line that they |
| 3 | are drawing, I think that requires then the State to be limited |
| 4 | in every single way to how history -- how an 18th century |
| 5 | statute or 19th century statute decided to limit that |
| 6 | particular form of intoxication.  So if in history, drunk meant |
| 7 | having a certain level of drunkenness and anything below that |
| 8 | is fine, I think plaintiffs would have to come up here by their |
| 9 | own logic and say, well, if you're not so drunk, then you can |
| 10 | carry.  And I think -- |

11            THE COURT:  No.  But I think --

12            MS. CAI:  I'm sorry, Your Honor.

13            THE COURT:  In fairness, the State cites to the
14  Kansas statute to support as evidence of a historical analogue
15  to support subpart 15.  But that Kansas statute clearly says as
16  the plaintiff says.  It says, intoxicated people can't possess
17  firearms.  And I think for the State to say otherwise, the
18  statute is plain on its face.  And to ask this Court to delve
19  down below and to do a deep dive into, well, why was that
20  statute enacted, et cetera, et cetera, that seems -- no one's
21  quarreling here that intoxicated people shouldn't be possessing
22  firearms.

23            MS. CAI:  I agree that's exactly what the Kansas
24  statute says.  But I do think what the *Range* decision
25  suggests -- says that courts have to do is to delve down into

 1   the reason for that restriction and how widely applicable that

 2   is.

 3           THE COURT:  Okay.  I think there we have a

 4   disagreement.  I think *Bruen* says explicitly that a district

 5   court is not to delve into the utility or the wisdom of a

 6   regulation.

 7           MS. CAI:  Your Honor, I want to make one point very

 8   clear.  We are not asking this Court to evaluate the utility of

 9   the current regulation.  What *Bruen* says, though, is that

10   courts have to evaluate the how and why of why historical

11   statutes were enacted.

12           And so, for example, in *Range*, the plaintiff there

13   argued, well, the historical statutes never say that someone

14   who is convicted of fraud -- in this case welfare fraud --

15   could be disarmed.  In fact, he pointed to statutes where the

16   prosecutions for embezzlement led to basically taking away all

17   the possessions of an individual except for firearms.  And the

18   Third Circuit says we looked to why it is that categories of

19   statutes were enacted.  And the category of statutes we look to

20   is that people who have been dishonest and breaking the law

21   were disarmed generally.  So we don't look to the

22   provision-by-provision historical twin but rather to why

23   historical analogues were enacted, and we carried that forward

24   to today.

25           THE COURT:  And so your argument with respect to --

 1    let's stick with the Kansas statute, is what?

 2            MS. CAI:  The reason that the Kansas statute and

 3    similar statutes were enacted is that the legislatures at that

 4    time correctly recognized that people who are intoxicated or

 5    could be intoxicated or go to places to be intoxicated should

 6    not have firearms on them.  And so we can't, you know, we're

 7    not doing an analysis of whether the current statute, Section

 8    15, is narrowly tailored to only apply to people who have

 9    already started drinking at the restaurant versus later.

10    That's not what *Bruen* tells the Court to do.  It's whether or

11    not --

12            THE COURT:  So I guess your argument is, is that it

13    is presumed that anyone who goes into an establishment that

14    sells alcohol is going to drink?

15            MS. CAI:  No, Your Honor.  And that's --

16            THE COURT:  But that's how you'd get there.

17            MS. CAI:  No.  I don't think that's the logic we're

18    trying to draw.  The logic we're trying to draw is historically

19    legislatures have had no problem prohibiting the mixture of

20    alcohol and firearms, period.

21            Now, the current regime, it's hard to know exactly

22    who started drinking or not at any particular restaurant.  And

23    so you may disagree with the policy decision of the current

24    legislature to not make it a certain BAC level or whatever.

25    But the point is, the same animating why laws were enacted is

 1   the same for the Kansas law and today, which is that alcohol

 2   and firearms do not mix.  And I think that's why we're looking

 3   at this level of generality, because I think the question, as

 4   the Texas decision I just quoted to this Court describes, is

 5   the legislature's wisdom about what combinations of alcohol --

 6   I'm sorry, of locations and firearms do not mix well is based

 7   on, you know, we have historical analogues of legislatures

 8   making that determination with respect to alcohol, similarly

 9   with respect to social gatherings and large crowds, and so

10   that's why we carried those forward to today.

11          THE COURT:  Okay.  All right.  Can we turn to,

12   Ms. Cai, I have my questions for you, can we now turn to

13   subpart 17, which is the provision -- not 17.  I'm sorry.

14   Number 24, the private property provision.

15          MS. CAI:  Yes, Your Honor.  Did you want me to answer

16   or did you want Mr. Jensen to go?

17          THE COURT:  I do.  I think to move things along, I do

18   have some questions.  The question I have for you, it seems to

19   me in subpart 24, and this is what I want you to address, is

20   isn't the State turning the presumption of the right to carry

21   on its head?

22          MS. CAI:  No, Your Honor.  I think plaintiffs already

23   agree that one does not have a right to carry on other's

24   private property without their consent.  And the *GeorgiaCarry*

25   case from the Eleventh Circuit makes very clear that all of

1    Second Amendment history supports that proposition.

2            THE COURT:  Well, let's back up for a second.

3            You agree that a person has a right to carry a

4    firearm on private property unless the person says no?  Do you

5    agree with that principle?

6            MS. CAI:  I don't necessarily, Your Honor.  I think

7    the problem is, well, how do we know whether or not the

8    property owner consents?  And that's the whole inquiry for

9    Section 23.

10           THE COURT:  Okay.  Because that's why -- there is a

11   presumption under the Second Amendment that you have a right to

12   bear arms, okay.  That presumption carries on to private

13   property.  You agree with that?

14           MS. CAI:  I think it certainly applies to your own

15   private property and private property where the owner has

16   consented.

17           THE COURT:  Why does the owner -- so is the State's

18   argument that there is no presumption to the Second Amendment

19   right to carry?  There is no such presumption; is that the

20   State's argument?

21           MS. CAI:  There is such a presumption in public, and

22   that's the exact language that *Bruen* and *Heller* uses, but on

23   someone else's private property, from *Blackstone* forward, and

24   this is all in the *GeorgiaCarry* decision, which plaintiffs

25   don't refute.

```
 1              THE COURT REPORTER:  I'm sorry.

 2              (Reporter clarified the record.)

 3              MS. CAI:  In the GeorgiaCarry decision from the

 4    Eleventh Circuit.

 5              The right to property has always included the right

 6    to exclude.  And all that Section 24 regulates is how property

 7    owners communicate their right to exclude.

 8              THE COURT:  But why does the State feel the need to

 9    tell property owners how to communicate?  I mean, putting aside

10    whether or not there are First Amendment concerns.  Why does

11    the State feel the need to communicate to private property

12    owners what they must communicate?  Because it's well known

13    that private properties have every right to post no gun signs,

14    right?

15              MS. CAI:  Yes, of course.

16              THE COURT:  And that's the state of the existence

17    today; that if a private property owner doesn't want guns on

18    his or her property, he posts "no guns" signs, correct?

19              MS. CAI:  But you don't only have to do that, Your

20    Honor.  So I think that's what the legislature is getting to.

21    You don't have to post a sign.  You can communicate that in

22    other ways.  And --

23              THE COURT:  Okay.  So why does the State have to

24    compel, quote-unquote, a private property owner to post a sign

25    that says you have my express consent?  Why?
```

1    MS. CAI:  So just as a technical, I don't think that

2  there's any compulsion happening here, because the private

3  property owner -- so in the opposite of Chapter 131, if it

4  didn't exist, if Section 24 didn't exist and that the opposite

5  regime were in place, a private property owner who didn't want

6  firearms on their property would then be compelled to speak in

7  a certain way, to tell people, everyone who comes in, the

8  plumber, the dishwasher repair person, any customer, all that,

9  I don't want you to have firearms here.  That's the alternate

10  regime, or there's confusion about what silence means.

11    And so what Section 24 does is it tells property

12  owners:  If you want your property rights to be exercised in

13  this way, this is what you do, which is, you don't need to say

14  anything, or if you want them to be exercised in this other

15  way, to allow firearms, this is what you do, which is that you

16  say something.

17    THE COURT:  But private property owners -- it's yes

18  or no.  Private property owners today know if they don't want

19  guns, they post a "no gun" sign, right?

20    MS. CAI:  I actually don't know if that's true, Your

21  Honor.  So Exhibit 21 is an empirical study of what private --

22  of what people believe to be the default rules of what happens

23  or doesn't happen if you don't say anything about firearms

24  carried on your premises.  And if you look at the provisions --

25  or the results that we cite from New Jersey, individuals,

1    respondents from New Jersey, a statistically significant sample

2    actually believed that if they don't say anything, you are not

3    allowing the repair person or the customer to come on to their

4    property.  And so that's -- I'm not saying that the legislature

5    is necessarily relying on that specific piece of evidence, but

6    we are saying that the reason that the legislature wanted to

7    clarify property owners' communication is to make it clear to

8    property owners how they can exercise their rights in a way

9    that actually fits with their expectations.

10           THE COURT:  But who was confused before?  What

11   doesn't make any sense to me, it seems to me that this statute,

12   it seems to me, is compelling private property owners to

13   express a view as to their view on this legislation.  Because

14   it says you have to, unless there's a sign that says we consent

15   to guns on our property, then the default is no guns are

16   permitted, right?  That's what the statute says.  It

17   immediately -- if there is no "we consent" sign, it immediately

18   defaults to no guns.

19           MS. CAI:  It does not have to be sign, Your Honor.

20   It could be on your website.  It can be --

21           THE COURT:  Okay.  Let's stick with the sign so it's

22   just easier to understand, okay.

23           So unless the private property owner says we consent,

24   it defaults to "no guns" under this statute, right?

25           MS. CAI:  That's correct.

```
1            THE COURT:  Okay.  That's the way it's always been;

2   that a person can go onto property unless there's a no gun

3   posted.  So it just seems to me that this is a superfluous

4   impediment that the State is imposing on private property

5   owners.  And that tends to be -- and whenever there's a

6   superfluous impediment, it seems to me that that infringes.

7            MS. CAI:  If I can --

8            THE COURT:  Help me understand what I'm missing.

9            MS. CAI:  If I can give the Court a very practical

10  example.

11           THE COURT:  Yeah.

12           MS. CAI:  So if I'm a homeowner before Chapter 131

13  went into effect.

14           THE COURT:  Yeah.

15           MS. CAI:  And maybe I have little kids.  Maybe I have

16  a lot going on in the house, there's contractors coming in and

17  out, I may not be thinking about whether or not the people

18  coming in and out of my house, the plumber, the roofer, are

19  carrying firearms.  On the other hand, I may have a very, very

20  strong preference and desire for people coming into my house

21  not to have firearms because --

22           THE COURT:  Then post "no guns allowed."

23           MS. CAI:  So the problem with that is the onus,

24  right, that would require the State to tell those property

25  owners you have to speak in this way.  And all Section 24 does
```

```
 1    is reverse that to say you don't have to speak.  These other

 2    property owners have to speak.

 3              THE COURT:  Do you agree it's less onerous to post a

 4    no gun sign than to make a private property owner express a

 5    view?  Because this is how I see it, and you can respond to it.

 6              It seems to me, let's take a business owner, for

 7    example.  As the law stood before the enactment of this law, if

 8    there was no sign posted, no guns, there was ambiguity as to

 9    whether or not that property was protected.  Agreed with that?

10              MS. CAI:  Yes.  And that's a problem, right.  Yeah.

11              THE COURT:  Okay.  But that may be -- that may be

12    what the business owner desires, let's say.  This ambiguity

13    works as a deterrent, for example.

14              Now, under the new legislation it seems to me that

15    the State is removing that ambiguity and that state is now

16    forcing a private property owner to broadcast -- against its

17    will -- that its property is unprotected.  And so because by

18    default if there's no signage, there's no expressed consent,

19    the law says no guns.  And it just seems to me that the

20    ambiguity that perhaps worked to a business owner's advantage

21    no longer does under this law.  And we're getting a little bit

22    far afield of the Second Amendment issue that may delve into

23    First Amendment concerns and policy concerns that this Court

24    doesn't delve into, but it does seem to pose an additional

25    obstacle to the person entering the property.
```

 1          The other question I have is, at what point does the

 2     gun owner know whether or not he has expressed consent?  Does

 3     he walk down the winding driveway, get to the front door and

 4     until he's gotten to the front door, violate the law because he

 5     only learns when he gets to the front door that he didn't have

 6     consent?

 7          At what point does the gun owner know that he

 8     shouldn't have a gun on my property?

 9          MS. CAI:  So to answer that question first, Section

10     24 makes clear that if you don't have expressed consent in some

11     way, and it does not have to be a sign broadcasting "my

12     property is unprotected," it only broadcasts that I'm not

13     allowing other people into the property with firearms.  It

14     doesn't say the property is unprotected.  But you don't have to

15     post a sign.  It could be direct communications with all the

16     delivery people who come.  It could be on your website.  It

17     could be calls.  It does not have to be a sign, and so it's not

18     compelling someone to speak.

19          THE COURT:  No; I understand that.  The statute

20     doesn't say that.  But is the law violated -- does the UPS man,

21     woman, violate the law when he gets up to the front door and

22     the owner says you should not have come on my property if

23     you're armed?

24          MS. CAI:  Yes.  Yes.

25          But to Your Honor's question about, you know, who is

1   the government regulating, in the opposite scenario, the

2   government would be saying if you don't want guns on your

3   property, you need to broadcast that to everyone via a sign or

4   something else.

5          THE COURT:  Why can't the State just run an ad

6   tomorrow saying if you don't want guns on your property, post a

7   no gun sign?

8          MS. CAI:  It could.  It certainly could.

9          THE COURT:  That seems much less onerous.

10          MS. CAI:  I think this gets to whether or not this is

11   actually a Second Amendment question at all.  So imagine that's

12   what the State did.  Broadcast to property owners:  Know your

13   rights.  You can always exclude anyone from your property who

14   you didn't want firearms [sic].  We encourage you to do it this

15   way, all that.

16          THE COURT:  Yeah.

17          MS. CAI:  Nothing about the substantive right to bear

18   arms has changed at all because the property owner always has

19   the right to exclude, and the government is just letting the

20   property owners know of ways to make that clear.  This is no

21   different.

22          THE COURT:  Is not the State posing additional

23   obstacles that are unnecessary?

24          MS. CAI:  I don't think that the State is posing

25   obstacles, and I don't think that they're unnecessary.  And

1    those are two different things.

2           The obstacle to any particular person's ability to

3    carry on someone else's private property is that private

4    property owner's wishes.  So that's what's preventing any

5    particular person from carrying on their property.

6           THE COURT:  Right.  But you've just told me that the

7    armed UPS man or woman violates the law if he gets up to

8    deliver the package and the person, the homeowner answers the

9    door and says, "You're armed.  You were not allowed on my

10   property."  You've just told me that.

11          So what is a person to do going forward with this

12   legislation, never enter private property?  Because the law

13   doesn't even require signage.  It just says verbal.  So what is

14   someone who has a license to conceal carry to do, never enter

15   for risk of violating the law?  And in the UPS example, leave

16   the packages on the street?  I mean, have you thought this

17   through?

18          MS. CAI:  I think that the law makes it very clear

19   that you cannot enter someone else's property, their castle,

20   without their permission with a firearm.  And I think that

21   happens for a number of reasons.  And we can talk about the

22   policy reasons, none of which is about the Second Amendment

23   analysis at all.

24          THE COURT:  Well, it is because you haven't really

25   addressed the presumption; that there is a presumption of the

```
 1   right to carry.

 2           MS. CAI:  So -- but I think the problem is there is

 3   no presumption of the right to carry on private property if the

 4   property owner does not want you there.  And so that has always

 5   been true.  And I don't even, you know, to be honest, I don't

 6   know under prior trespass law what, you know, what exactly the

 7   line was with respect to whether or not you can carry on

 8   someone else's property without their expressed consent,

 9   especially if that property owner may be liable for damages

10   from injuries with your firearm.

11           THE COURT:  But to make it liable for trespassing

12   under New Jersey, it has to be known to the potential

13   trespasser ahead of time before he or she can be charged with

14   trespassing.  This law has no such provision.  This law says

15   you can walk down the winding driveway, get to the front door

16   and the repairman is told you have just now violated the law,

17   I'm calling the police.

18           MS. CAI:  And that's exactly what the law provides,

19   and that's only because there has always been, and there's no

20   question, that private property owners have a right to exclude

21   firearms from their property.  And so what this law does is

22   regulate what private property owners communicate and not the

23   right to bear arms of the individual.

24           THE COURT:  They've always had that right.  But I

25   think you're ignoring one salient fact, is that you're now
```

1    making it criminal for a person who has a license to conceal

2    carry to not know in advance what that right is.

3              MS. CAI:  So that's right, Your Honor.  There's two

4    components to that.  One is, if we're doing a Second Amendment

5    analysis, we look to the historical analogues, if you assume

6    that the Second Amendment does cover this conduct.  And on

7    that, Exhibit 13 and 14 are exact replicas of the same statute.

8    And, in fact, Exhibit 13 is actually more prohibitive because

9    the consent had to be in writing.  And that's a 1771 New Jersey

10   statute that specifically said you need to obtain expressed

11   permission if you enter someone else's property with a firearm.

12             And so if we're going down the historical analysis

13   route, and plaintiffs actually have no answer to this

14   whatsoever, I think that indicates if we're doing a Second

15   Amendment analysis on Section A24, plaintiffs cannot succeed on

16   the merits.

17             But with respect to what exactly is the injury to the

18   plaintiff and whether or not -- and I know you want to talk

19   about irreparable harm a little bit later, but once we're on

20   this point, I'm reluctant just to go off of it.  I think it

21   seems to me that what the plaintiffs are arguing is the

22   irreparable harm to me is having to ask for permission.  And if

23   we assume that's a title -- or Article III injury, assuming

24   that even is one, I think that's not --

25             THE COURT:  I really don't think -- Ms. Cai, I don't

 1    think that's a fair attack on the record.

 2            Again, having to ask isn't the injury.  It's the risk

 3    that the plaintiffs are being put upon in the scenario that I

 4    have posited for you, which is that under this law, it is not

 5    known at what time in the scenario the plaintiff learns that he

 6    doesn't have the consent.  But by then, it's a little too late.

 7    He has already violated the law.  And that's the problem as I

 8    see it with this statute, because it puts a gun owner at risk

 9    of prosecution.  And it's a risk that these plaintiffs are not

10    willing to take, and so they leave their guns at home.  And

11    prior to the enactment of this statute, it didn't have that

12    risk.  There was no risk of criminal prosecution.  The State

13    has now put the risk of criminal prosecution on the gun owner's

14    inability to read his neighbor's mind.  And as I see it, that's

15    the problem with the statute.

16            I asked you about the UPS carrier, the armed UPS

17    carrier.  You tell me he has violated the law if he gets up to

18    the front door and the owner says you shouldn't have come on my

19    property, you violated the law.

20            Is that how this law is going to operate; that

21    someone who has gone to the extra measures of getting a

22    concealed carry permit should phone his neighbor, phone his

23    local hardware store, or phone his doctor's office to determine

24    whether or not he can even come with a gun?  Is that how this

25    law is supposed to work?

 1              MS. CAI:  So, yes, Your Honor.  I think the risk is

 2      to a person who's carrying a gun on someone else's property

 3      without having tried to -- without having asked for permission.

 4              Now, whether or not the UPS owner example, the very

 5      brief and incidental dropping off the package on the driveway

 6      would actually be prosecuted, that's another problem with risk

 7      of enforcement.  The statute actually provides an exception for

 8      brief and incidental de minimis infractions.  And so I don't

 9      know exactly what that would look like.  And it probably

10      depends on whether or not, you know, the homeowner is

11      sufficiently upset and whether or not the prosecutor thinks

12      that that's de minimis or not.

13              THE COURT:  Where is that brief and incidental

14      exception?

15              MS. CAI:  It is in Section 7(b).  I don't have

16      exactly which sub-subprovision.  I believe it is --

17              THE COURT:  I don't see it.

18              MS. CAI:  I can provide that exact cite to Your

19      Honor.  I'm positive that there is a de minimis exception for

20      all of the sensitive places.

21              THE COURT:  I didn't see it.  I would like to --

22              MS. CAI:  Oh, I'm sorry, it's 7(c).  I'm sorry, Your

23      Honor.  It wasn't 7(b).

24              THE COURT:  And what does it say?  Can you read it to

25      me?  Can you read that language to me?

 1            MS. CAI:  Yes.  I'm looking for the specific part,

 2   Your Honor, that my colleagues have just referred me to.

 3            Oh, I'm sorry.  Okay.  Oh, yes, Your Honor, so 7(a),

 4   the very first sentence:  Except as otherwise provided in the

 5   section and in the case of a brief incidental entry onto

 6   property which shall be deemed a de minimis infraction, within

 7   the contemplation of N.J.S. 2C:2-11, it shall be a crime.

 8            THE COURT:  So it's still a crime.  As I read this,

 9   it's still a crime under the de minimis.

10            MS. CAI:  No, Your Honor.  That's not how I read it.

11   Except as otherwise provided and except as in the case of a

12   brief incidental entry onto property --

13            THE COURT:  Which shall be deemed a de minimis

14   infraction within the contemplation of 2C:2-11.  That's a

15   criminal statute.

16            MS. CAI:  It's a criminal statute, but it doesn't

17   criminalize your conduct.  So it's not -- if you look at

18   2C:2-11.

19            THE COURT:  What does that say?

20            MS. CAI:  I don't have that right in front of me,

21   Your Honor.  But it makes it --

22            THE COURT:  Do you know?

23            MR. JENSEN:  I don't know what that says, no.

24            THE COURT:  Well, that says to me that even if it's a

25   de minimis infraction, it's still a prosecution.  Because that

 1   was my next question, which is if I'm walking, if I have a

 2   concealed carry and I'm walking with my child and her ball, and

 3   her ball, she kicks it inadvertently onto my neighbor's

 4   property who I know doesn't want any firearms, does she leave

 5   the ball there?

 6          MS. CAI:  Well, Your Honor, I think that's not even a

 7   question about Section 7(a) -- A724.  If your neighbor has

 8   already made it known to you that they don't want your firearms

 9   there --

10          THE COURT:  Yeah.  I leave the ball there.

11          MS. CAI:  Even before Chapter 131 went into place,

12   that neighbor could call the police and try to institute a

13   trespass action against you in any event, if they've made

14   crystal clear to you do not bring firearms onto my property.

15   So that's not really a question about Chapter 131.

16          THE COURT:  Well, I mean, we could go down the parade

17   of horribles.  I'm walking with my child and she gets very sick

18   and she's now on his yard.  I choose helping her or getting

19   prosecuted, I guess.

20          MS. CAI:  I mean, in all of New Jersey law, there's

21   always an exception for duress and other exigent circumstances.

22   And so I think we don't have to go down those examples because

23   I think what the plaintiffs are challenging is a facial

24   challenge, the entire statute.  We've discussed why it's

25   perhaps not even irreparable to require someone to ask a

1   question why it's not within the text of the Second Amendment

2   to regulate property owner communication.  And perhaps at the

3   end of the road what's perhaps most important is that even

4   under a Second Amendment historical analysis, the historical

5   analogues are directly on point.

6           THE COURT:  Okay.

7           MS. CAI:  Does the Court want me to go further on

8   other provisions or --

9           THE COURT:  Let me have, Mr. Jensen, can you respond

10   to the private property and then I want to turn to

11   transportation.

12           MR. JENSEN:  Yes, Your Honor.  And I'll try to be

13   brief.

14           First and foremost, the historical analogues are not

15   on point.  These are both laws that, on their face, are

16   directed for the purpose of preventing poaching.  And as a side

17   note, and perhaps I shouldn't say "side note" because it's

18   quite material, when you get into that vehicle issue, I know we

19   haven't gotten there yet, but many of the restrictions, modern

20   day restrictions that are being cited in the context of

21   restrictions on carrying firearms in motor vehicles are also

22   restrictions that are directed towards this aim of keeping

23   people from road hunting or keeping people from poaching.

24           So this 1771 New Jersey law, which is captioned an

25   Act for the Preservation of Deer and Other Game and To Prevent

1   Trespassing with Guns, virtually every operative provision of

2   this law is directed at poaching.

3           Yes.  If you take this language out of Section 1 and

4   read it in isolation, it would appear to say, well, you just

5   can't walk onto somebody's plantation or premises with a gun.

6   If you look at everything else in the statute, it's clear that

7   what's being talked about here is taking game.

8           And notably, if you do a little legal research on how

9   this New Jersey law was construed, that's pretty much the

10  result you walk away with.

11          *Crew v. Thompson*, 9 N.J.L. 249, 1827, they quote from

12  a claim for damages asserted against someone who apparently

13  trespassed on someone else's land and shot a deer or in some

14  manner killed a deer.  And that claim is being articulated

15  under Section 1, the language that we're talking about.  But it

16  is extraordinarily clear that the whole gravamen of this is you

17  trespassed on my land and shot my game so I'm coming after you

18  for damages.

19          Much later, *State versus One 1990 Honda Accord*, 154

20  N.J. 373, a 1998 decision from the Supreme Court of New Jersey,

21  this law is being characterized as a forfeiture statute for

22  fish and game violations.  That's nearly verbatim.

23          This is also true of this 1865 Louisiana act which,

24  on its face, applies to entering onto plantations.  And not

25  insignificantly, if you look at the next following act in this

```
 1   exhibit, which is an act that's becoming effective on the same
 2   date, this is simply a blanket prohibition on entering a
 3   plantation without permission, gun or not.
 4            To stretch this into the premise that there is some
 5   sort of grounded historical tradition of, by default,
 6   preventing guns from going onto private property requires a
 7   great deal of mental gymnastics.
 8            Now, one thing that happens when we start talking
 9   about legal rules and historical precedence is we kind of lose
10   track of what's actually going on here.  So what the State
11   would like to call reversing the presumption and I would call
12   making the conduct illegal --
13            THE COURT:  Can you talk to me about the presumption,
14   because I think that there's a disagreement between the parties
15   about the presumption that the Second Amendment holds.  The
16   State makes a distinction between public and private property;
17   and you say?
18            MR. JENSEN:  I say under Bruen, if we are talking
19   about the act of keeping or bearing arms as it's presumptively
20   protected, and the authorities that have been cited do not
21   overcome that presumption --
22            THE COURT:  Whether it's public or private property?
23            MR. JENSEN:  Whether it's public or private property.
24   And to be fair, the majority of the East Coast is private
25   property.
```

1          And as the Court has already alluded to, this is

2   creating a situation where how is someone even realistically

3   supposed to know this?  You're walking down the street, there's

4   a field that has grass.  Is it private?  Is it public?  Are you

5   supposed to, what, go down to the property clerk's office and

6   do a records search to try to figure this out?

7          None of the laws, meaning the modern laws that are

8   being cited in the State's brief to say oh, this is an

9   established practice, actually stand for this proposition.  The

10  furthest they go is we have a couple of states that have said

11  you can't enter into someone's residence, someone else's

12  residence with a firearm without their permission.  Is that

13  constitutional or not?  I don't know.  It's really not the

14  issue presented here.

15         In terms of an actual modern analogue, and I'm

16  offering this for purposes of illustrating the burden we're

17  talking about, obviously under *Bruen*, the analytic framework is

18  looking back to 1791 or perhaps 1868.  The only place I can see

19  an actual analogue to this is Illinois.  So Illinois was the

20  last state to completely prohibit private citizens from

21  carrying guns.  And in the case I alluded to, *Moore versus*

22  *Madigan,* that changed.  But the statutes at issue in Illinois,

23  unlawful use of weapons and aggravated unlawful use of weapons,

24  while they generally prohibit people from carrying guns, one of

25  the exceptions is if you're on private property with the

 1   permission of the owner or occupant of that property, okay.

 2        So when we were arguing *Moore*, at no point in the

 3   litigation did anyone, the Attorney General's Office, the State

 4   Police, our side, anyone, say, oh, this is a sensitive place

 5   restriction.  This is a law that allows carry subject to a

 6   requirement that you obtain the owner's permission.  Everyone

 7   said, including all the reviewing courts, this is a ban.

 8        Move this outside the context of guns.  I can't think

 9   of any example where the default presumption is something is

10   illegal on private property unless the owner has expressly

11   consented.  And I particularly can't think of any example that

12   touches on constitutionally protected conduct, all right.

13        THE COURT:  Well, that's what the State is arguing.

14   The State is arguing that there is no -- that your argument

15   carries no weight because there is no such presumption that you

16   have a right to carry a firearm onto private property.

17        MR. JENSEN:  Well, I think saying that there is no

18   presumption you have a right to carry a firearm in the first

19   place is getting everything exactly wrong.  There is a

20   presumption that you have a right to carry a firearm.  And the

21   issue is whether or not we have established a sufficiently

22   engrained historical tradition to overcome that.

23        Just -- this is going to sound like a ridiculous

24   example, but that's kind of because it's ridiculous -- a

25   private property owner, like my house, I can choose to exclude

1    all sorts of people.  I could choose to exclude people who are

2    gay.  I could choose to exclude people who are members of races

3    I don't like.

4            Just to be clear, I'm certainly not doing this.

5    That's not my view.  But I would be free to do this.

6            Now, if the legislature enacts a law that says the

7    default rule is that gay people are not allowed in other

8    people's private residences unless they have affirmatively

9    consented in advance, would we even be standing here having

10   this argument?  Would this not, on its face, be a law that

11   serves the purposes of suppressing the conduct?

12           Your Honor, unless you have anything further, I'll

13   sit down just because I know we've been here for a long time.

14           THE COURT:  Okay.  Yeah.  Thank you.  I want to move

15   to the issue of the transportation.

16           Ms. Cai, let me hear you on the issue of

17   transportation.

18           MS. CAI:  Yes, Your Honor.

19           THE COURT:  On the -- it is 7(b).

20           MS. CAI:  Yes.  I'll start by saying, as applied to

21   public transit, plaintiffs have a standing problem because

22   they've never alleged any intent to ride public transit.  On

23   that front as well, there's also whether or not it falls within

24   the text of the Second Amendment at all, because the government

25   when it operates a public transit vehicle is acting as a

```
 1   proprietor of property as well as a market participant.  So

 2   under cases like Class, the D.C. Circuit decision, and Bonidy,

 3   the Tenth Circuit decision, it just doesn't fall even within

 4   the text.

 5            THE COURT:  Okay.

 6            MS. CAI:  On private vehicles, I think what the

 7   plaintiffs are suggesting is that there needs to be some kind

 8   of historical analogue prohibiting firearms carry for something

 9   that didn't exist at the time of the founding or at

10   reconstruction, which is automobiles.  And I think the problem

11   there is of course, Bruen already says if it's a new social

12   problem that could not have been imagined by our founders or

13   people in history, then you don't -- you look to even less of a

14   direct analogue.  You kind of look to the intent and what's

15   going on there.  And so I think here it makes a lot of sense to

16   look at what states started doing as soon as automobiles came

17   into practice, which is in the 1910s and '20s.  And we've given

18   examples of direct, you know, even in 1919 and 1920 states --

19   and this is Exhibit 16 and 17 -- requiring firearms to be

20   unloaded in automobiles.

21            Now, plaintiffs quip, well, it was long guns and

22   rifles and not handguns, et cetera.  The problem with that kind

23   of analysis is it doesn't get into at all why it was that the

24   State was restricting the manner of carry in the way that they

25   were.  So I don't see any rationale that the plaintiffs have
```

 1    advanced for why the State could prohibit one versus the other.

 2    The fact that the State chose to prohibit one versus the other

 3    doesn't say it could not have also prohibited handguns loaded

 4    in the firearm, so I think that's the problem there.

 5          If we want to look beyond automobiles because perhaps

 6    one thinks there are other ways of traveling that were similar

 7    to automobiles, we can look to the historical analogues that we

 8    cited prohibiting carrying firearms on day journeys basically,

 9    journeys within the State.  And plaintiffs' response is, well,

10    it defined journeys narrowly.  True.  But because Chapter 131

11    and Section 7(b)(1) only applies to New Jersey, it also applies

12    in a similar way.  It does not prohibit someone from carrying a

13    loaded handgun once they've traveled out of the state, which

14    is, you know, I think the bright historical analogue for the

15    longer journey that was where firearms carry was allowed under

16    the historical analogue.  So I think that -- if you wanted to

17    line it up that way, I think that also supports our case.

18          And so I think this is the end-all, be-all of just,

19    you know, how to think about why historical regulations were in

20    place and whether they're relevantly similar.  And I think on

21    both of those analogues, the statutes were relevantly similar.

22          THE COURT:  Do you agree that self-defense is at the

23    core of the Second Amendment?

24          MS. CAI:  Of course.

25          THE COURT:  So how does someone who has an approved

 1   concealed carry defend himself if it's in the trunk, if the

 2   firearm is in the trunk?

 3           MS. CAI:  So, first, Your Honor, the statute does not

 4   require that the firearm be in the trunk.  It just requires

 5   that it be unloaded and fastened in some case.  It could be on

 6   the -- in the glove box, it could be on the passenger side

 7   seat.  It could be, you know, in any number of locations where

 8   they --

 9           THE COURT:  Okay.  Fair enough.

10           How does he protect himself with a disassembled or

11   unloaded firearm?

12           MS. CAI:  Of course the person would have to then, if

13   it faces a self-defense situation, take it out and load it.

14           But that's the exact prohibitions that states have

15   put forth in history, and those were not challenged as

16   unconstitutional, or at least the plaintiffs have not given us

17   any evidence.

18           And that's because the government, you know, the

19   right to self-defense, as *Bruen* and *McDonald* and *Heller* have

20   noted, is not unlimited in every manner and to every person and

21   to every place.  And so --

22           THE COURT:  Do you agree with the plaintiffs that

23   this provision treats every permit holder the same?

24           MS. CAI:  I -- yes.

25           THE COURT:  Okay.

 1          MS. CAI:  I wasn't sure if there was a -- every

 2   permit holder has the same, yes, has the same -- has to follow

 3   the same rules.

 4          But I think if we look to the rationales that the

 5   courts interpreting the historical statutes have justified

 6   them, plaintiffs have no responses.  So we explain on page 34

 7   of the brief that the journeys regulation was to prevent people

 8   from, quote, going about the streets armed in a manner which,

 9   if in a sudden fit of passion, might endanger the lives of

10   others.  This is the road rage analogue from the 1800s, I

11   suppose.  And that's precisely one of the reasons why Section

12   (b)(1) was enacted.  The legislature wanted people to be able

13   to transport their firearms between places where they're

14   allowed to carry them, right.  So it didn't prohibit having

15   firearms in your vehicle.  It just prohibited people from

16   having such easy access to the firearm that if they were in a

17   sudden fit of passion or if there was a car accident or

18   something like that, that it would create danger to others.

19   And so that's the prohibition that exists now and has always

20   animated the restrictions historically.

21          THE COURT:  And so the State envisions it that if

22   someone with a concealed carry permit wakes up and plans his

23   day, that he puts the -- let's just use the trunk -- he puts

24   the firearm in the trunk.  He goes to his cousin who doesn't

25   want firearms.  He leaves it in the trunk.  He then goes to the

 1    local market that permits firearms.  He goes and he gets it out

 2    of the trunk, puts it together in public view, citizens see.

 3    Citizens are going to get alarmed.  Perhaps he's brandishing

 4    the weapon, one might argue.  And then he goes to the local

 5    market, then he comes back out, he then brandishes the weapon,

 6    one could argue, puts it into the trunk and goes to another

 7    establishment where he's not quite sure, so he puts it in the

 8    trunk and then goes up, gets the expressed consent, yes, that's

 9    fine, goes back to his trunk, puts the firearm, assembles the

10    firearm and then goes about and reenters the property.  That's

11    how the State envisions the day in the life of a gun owner?

12         MS. CAI:  That could be, Your Honor.  I will note

13    that, once again, it doesn't have to be in the trunk.  Now, if

14    he wanted to keep it in the trunk while he wasn't there, I

15    think that's a very good idea, and I think perhaps that's

16    actually required by 7(b)(2) which plaintiffs don't challenge.

17    But he could very well take the bag or the case or whatever it

18    is stored in, bring it into the car if he's not comfortable

19    loading it outside in view of others.  If he's concerned about

20    that risk which I'm not quite sure, you know, if that risk,

21    that concern is super legitimate, but he can just -- he could

22    load it in the car and put it in his holster.

23         THE COURT:  Does that scenario I just laid out for

24    you sound like self-defense?

25         MS. CAI:  I presume that the plaintiff is doing that

1    because he wants to have the firearm loaded when he walks into

2    the store that allows him to have it.  And so, yes, he's arming

3    himself.

4              THE COURT:  And while he's traveling.  But he's told

5    he cannot, right?

6              MS. CAI:  Well, while he's traveling, when he's

7    driving the car, he has the firearm, he can have the firearm

8    within reach, and it's just about whether or not he can have it

9    loaded and unsecured somewhere in the car while he's doing

10   that.  And so I think there's perhaps some infringement on the

11   immediate ability to have that firearm loaded and on you.  That

12   restriction -- and I do admit that is a restriction -- has been

13   historically upheld.

14             THE COURT:  And I appreciate your candor.

15             MS. CAI:  Yeah.

16             THE COURT:  Yes.

17             MS. CAI:  Yeah.  And my point is just that that

18   particular restriction has historical analogues and the

19   analogues have been upheld.

20             I will also note, and this relates back to something

21   that Mr. Jensen said about the New Jersey statute and the

22   Louisiana statute on going into someone else's property without

23   their consent, but it also applies to their argument on their

24   reply brief page 11 on the main statute that prohibits loaded

25   firearms in vehicles.

1      Plaintiffs say, you know, that restriction is

2  confined to hunting.  This is where the rush really does not

3  work, because that law in our -- I believe it's Exhibit 27 --

4  or sorry, 17, the law actually amended the title from

5  "prohibiting hunting from automobiles," to the more general

6  "possessing of loaded shotgun or rifle in motor vehicles in

7  highways, field, or forests," and so it's not just about

8  hunting.

9      And the same with the New Jersey law and the

10  Louisiana law, there are separate provisions on poaching and

11  trespassing on other game lands.  But the specific provisions

12  were just about private property.  And, in fact, what

13  Mr. Jensen just did was read the word "premises" or

14  "plantation" out of the title of the Louisiana statute.

15      And so if you look at Exhibit 12 -- I'm sorry,

16  Exhibit 14, you'll see that it's prohibiting carrying of

17  firearms on premises or plantation of any citizen without the

18  consent of the owner.  And so it does not only apply to

19  plantations.  It's any premises held by a private owner.  So I

20  think being careful about what the statutes actually say is

21  really important.

22      And I understand the rush to get something before the

23  Court is maybe what led to these mistakes, but I think that's

24  also why the historical record has to be fully developed so

25  that we can actually have a full record to go on.

```
 1              THE COURT:  And, again, because this is a theme

 2    throughout the State's papers, what is it that the State is

 3    missing other than a more thorough analysis, if you will?

 4    Because if the historical analogues existed at the time of the

 5    legislation's passage, why aren't they before me now?

 6              MS. CAI:  Sure, Your Honor.

 7              I think that the legislature saw sufficient numbers

 8    of analogues to do what it wanted to do, which is pass the law

 9    in the way that it did.

10              THE COURT:  And so where are they?

11              MS. CAI:  So we have submitted a number of them to

12    this Court.

13              THE COURT:  Yes.

14              MS. CAI:  There may be others out there.

15              THE COURT:  Oh, okay.

16              MS. CAI:  I don't know, right.  And so if there are

17    others out there that support -- that further support the

18    longstanding history or if there's additional case law out

19    there that supports the idea that these laws were not

20    challenged or weren't deemed constitutional, we would want to

21    provide them to this Court.

22              THE COURT:  Okay.  I wanted to make sure I understood

23    what you were saying.

24              You are not telling me that there are, in fact,

25    additional historical analogues; that there may be others out
```

1    there.

2            MS. CAI:  That's correct, Your Honor.

3            THE COURT:  Okay.

4            MS. CAI:  And to the extent that plaintiffs are

5    saying well, this law actually meant X or Y, that's different

6    from what the State is positing.  I think we would then have a

7    development of why it is that they're wrong or we're wrong and

8    all that.

9            And Mr. Jensen just cited a number of cases that he

10   did not put in his brief and so we would want to respond to

11   that as well with further briefing.

12           THE COURT:  All right.  While you're standing, talk

13   to me about irreparable injury.

14           MS. CAI:  Sure, Your Honor.

15           A very general point and then a more specific point

16   on irreparable injury.

17           THE COURT:  Yes.

18           MS. CAI:  So the general point is that the black

19   letter law is that irreparable harm is a separate and

20   independent gateway requirement for emergency relief that's

21   separate from the merits.  And you can look to any number of

22   Third Circuit cases, but I think the Supreme Court's decision

23   in *Benisek versus Lamone*, which we cite in our brief, makes

24   this crystal clear.

25           It says a preliminary injunction does not follow as a

```
 1  matter of course from a plaintiff's showing of a likelihood of
 2  success on the merits.  And as the movant also must show,
 3  quote, that he is likely to suffer irreparable harm in the
 4  absence of preliminary relief and, of course, if the rest of
 5  the factors tip in his favor.
 6          And so Third Circuit cases like *Anderson* and *Hohe* and
 7  other courts of appeals cases, we cite the Eleventh Circuit en
 8  banc case in *Siegel*, those all confirm that even with
 9  constitutional cases where plaintiffs have been held to have
10  shown a likelihood of success on their constitutional claims,
11  some of them are First Amendment claims, they still have to do
12  more than that and show irreparable harm.
13          And I think one of the ways in which this is best
14  illustrated, and I think I already talked about this a little
15  bit, is with respect to the private property problem.  So
16  plaintiffs say, well, we need to then get permission to go on
17  to other people's property with our firearms.  And that may be
18  Article III injury.  But I don't see how that's irreparable for
19  the period of time that they're asking for the injunction.
20  Simply asking for permission to clarify whether or not the
21  private property owner does or doesn't want firearms on their
22  property is not irreparable harm.  And so I think that's the
23  more specific example that I can provide to this Court.
24          THE COURT:  But that's not the only injury that the
25  plaintiffs are complaining about, in fairness.  They are
```

```
 1   complaining about the right to self-defense, to defend

 2   themselves, and that these provisions, in essence, because they

 3   are forced to keep their firearms at home, deprive them of

 4   their constitutional right to self-defense.

 5           The cases are clear that a First Amendment violation

 6   is by definition irreparable injury.  Is there a reason why the

 7   First Amendment should be prioritized over the Second

 8   Amendment?

 9           MS. CAI:  I think the law of the Third Circuit is not

10   even that all First Amendment injuries are necessarily

11   irreparable.  The Hohe case and the Conchatta case make that

12   clear.  Instead --

13           THE COURT:  That's true.  I'm sorry, Ms. Cai.  That's

14   true.  But I think you have to look at it in context.

15           So in a First Amendment case, for example, if there

16   were a law or a decree that you are precluded from on May 1st

17   protesting on the courthouse steps, that might not be an

18   immediate irreparable injury, but you don't have such exception

19   here.  The law has taken effect immediately.

20           MS. CAI:  Your Honor, I think what the case law says,

21   and if you look at the case that it all comes back to, the

22   Elrod case, is there's irreparable harm in that case because

23   the First Amendment political speech context in particular is

24   central to irreparable timeliness component, because people

25   want to make a political speech at a particular moment in time,
```

 1   otherwise the speech has a different meaning where it has less

 2   value or it has less impact.

 3          THE COURT:  Of course.  And these plaintiffs want to

 4   get in the car and defend themselves tomorrow, this afternoon,

 5   30 minutes from now.  What's the difference?

 6          MS. CAI:  I think the difference is that plaintiffs

 7   haven't even attempted to say what it is that is irreparable

 8   about their desire to carry firearms.  If that were true, Your

 9   Honor, if the plaintiffs were right, all they had to do was

10   succeed on the merits of their Second Amendment claim, then we

11   would be reading the irreparable harm element out of

12   preliminary injunction and TROs entirely.

13          THE COURT:  Well, that's why I asked the question

14   though, Ms. Cai, which is, the case law seems to me to be very

15   clear that a First Amendment violation is by definition

16   irreparable.  It seems to me the State is insisting that a

17   First Amendment right is more important than a Second Amendment

18   right.  That's what it seems to me the State is saying.

19          MS. CAI:  In a number of doctrines, the Supreme Court

20   has basically made special exceptions for the First Amendment,

21   not just relative to the Second Amendment, but across all other

22   constitutional rights.  And I don't -- you know, I don't

23   purport to have the full sort of doctrinal explanation of why

24   that has to be true.

25          But what I do know is that the black letter law is

1    that irreparable harm has to be a separate, standalone

2    requirement from likelihood of success on the merits.

3            It is possible that plaintiffs could show irreparable

4    harm.  They just haven't tried to do so.  All they do is rely

5    on we're going to succeed on the merits, and that's just not

6    enough according to case law.

7            THE COURT:  All they do is what?

8            MS. CAI:  Is to say we will succeed on the merits,

9    and that's just not enough.

10           Thank you, Your Honor.

11           THE COURT:  You want to respond.

12           MR. JENSEN:  Sure, Your Honor.

13           You know, preliminarily, another rhetorical question:

14   Is the denial of the right to vote an irreparable injury if a

15   plaintiff doesn't come in with proof that their vote would have

16   altered the outcome of the election?  Because that's pretty

17   much what I'm hearing here for why the interest in armed

18   self-defense isn't an irreparable injury.

19           To be frank, I don't -- knock on wood -- I don't see

20   irreparable injury as a particularly close issue here.  We

21   cited a raft of decisions that have found that the denial of

22   Second Amendment rights is an irreparable injury.

23           What I would really say is just take one step back

24   and look at what we're actually doing here.  You know,

25   obviously this requirement of irreparable injury stems back to

```
 1   the division of courts between courts of law and courts of
 2   equity and the general presumption that if a plaintiff has a
 3   claim, that claim should be answered in money damages.
 4           It's also extremely well established that the denial
 5   of constitutional rights, as a general premise, is an
 6   irreparable injury.  Yes, there are some specific applications
 7   where it's not going to be an irreparable injury.  For example,
 8   if you have a Takings Clause claim, the whole premise of this
 9   is you're supposed to be paid for your property.  The injury
10   and the remedy for it is a claim for money damages, even though
11   you have a constitutional entitlement.
12           If it's a situation like Hohe where, look, the law
13   hasn't even come into effect yet, there's still plenty of time
14   for the court to act, yeah, if the law comes into effect, it
15   may impose an irreparable injury.  But as we stand here right
16   now, it's not clear someone's facing imminent irreparable
17   injury.
18           If someone needs to exercise their right of armed
19   self-defense and they don't have a functional arm on their
20   person, that is the irreparable injury; or, otherwise stated,
21   having to go out, go forth in the world without having that
22   level of comfort or assurance is what the irreparable injury
23   is, much in the same way that the inability to freely express
24   one's thoughts would be an irreparable injury regardless of
25   whether or not someone had anything that was actually
```

1  particularly insightful or relevant to say.

2         With regard to these vehicle cases, I understand, and

3  I think the Court does, too, that we're looking for historical

4  analogues and relevant similarity, but just one big picture

5  point.  I have lived all over this country.  I have owned guns

6  and hunted everywhere I lived.  I do not know of any state that

7  does not prohibit private citizens from having loaded rifles

8  and shotguns in vehicles.  However, the only state that is

9  prohibiting at least licensed individuals from having

10  operative, functional handguns on their persons in their

11  vehicles is New Jersey.  New York also passed a whole host of

12  these laws in response to *Bruen*, although even in New York they

13  didn't go that far.  So not only are we lacking historical

14  analogues here, frankly, we're lacking modern analogues.

15         This 1919 main law by its terms applies only to

16  rifles and shotguns.  The 1929 Iowa law, it says all firearms,

17  but then it exempts handguns.  That's a fairly common

18  legislative approach that I've seen in current times in the

19  statute books, which is either the statute only applies to

20  rifles and shotguns or it applies to all firearms, but it

21  exempts people who are licensed to carry with regard to a

22  handgun.

23         And why can the State allow people to carry handguns

24  but not rifles or shotguns at least in vehicles?  I think it's

25  the same reason why can the state of New Jersey say you must

 1    carry your handgun in a concealed manner.  Or alternatively,

 2    they could potentially also say you must carry your handgun in

 3    an open manner.  The real question is, is the right of armed

 4    self-defense being protected here?  And of course, in the big

 5    picture, it's not real clear that in a personal defense

 6    situation a rifle or shotgun in a vehicle is going to be of a

 7    lot of use.

 8            The way this is going to come up is you're going to

 9    be stopped at a stop sign and two guys are going to come

10    running up and rip you out of the car before you realize what

11    happened.  And that gun that's in the box, on the seat beside

12    you, or in the trunk, you're never going to have a chance to

13    grab it.  And even if you were driving around Camden with a

14    12-gauge in the front seat, which might draw a little attention

15    to yourself, it's also pretty unlikely you're going to be able

16    to get that weapon out of the car.  In terms of the actual

17    historical --

18            THE COURT:  But to the argument that the plaintiff

19    makes is that it renders meaningless the right to self-defense.

20            MR. JENSEN:  It effectively does, I mean, because

21    look, all right, let's just state the obvious, the apparent

22    purpose of this is the State's concern about road rage

23    incidents.  And I am sure we are all united in our desire to

24    not be shot while driving down the New Jersey Turnpike, all

25    right.  Now, the problem is if someone decides I'm going to go

```
 1   shoot some other motorist, they're not reacting to a defensive

 2   situation.  They've got time to get the gun out of the box and

 3   load it and go murder this other person.  It's the person who

 4   is reacting to a defensive situation that's going to be bearing

 5   the brunt of this burden.

 6            When we look at these historical laws, we've talked

 7   about Northampton.  The 1869 Tennessee statute says you can't

 8   have guns at racecourses.  I think we're talking about

 9   horseraces.  Like not really much of an analogy.

10            1870 Texas law we've talked about a few times may not

11   be a totally pertinent example.  But other social gathering,

12   that's a pretty far stretch to a vehicle.

13            1876 Iowa act, it's illegal to shoot at trains.  I

14   don't really see what this has to do with being able to carry a

15   firearm in a vehicle.

16            We've got these laws that are either prohibitions on

17   concealed carry or restrictions on carry but which have

18   exceptions for people on journeys.  Well, this seems to reflect

19   the idea that going back a long way, even if you're going to

20   restrict people's ability to have arms, they're going to have a

21   particular need for it while they're on a journey.  Journeys

22   typically involve vehicles.  It seems to really be saying

23   exactly the opposite of the way it's being portrayed right now.

24            Well, there you have it.  Do you have any more

25   questions for me, or shall I keep talking?
```

 1          THE COURT:  Can you distinguish the cases of

 2     irreparable injury that the defendants have cited to?

 3          MR. JENSEN:  Well, just what I said.  First and

 4     foremost, whether or not irreparable injury is imminent.  If

 5     the law isn't coming into force for some period of time, it may

 6     not be imminent.  If the underlying injury is one that would be

 7     remedied by money damages in the first place, that's not by

 8     definition irreparable injury.

 9          Also, a good example would be *Los Angeles versus*

10     *Lyons*, right, that's where someone was basically choked half to

11     death by a member of the LAPD and they were trying to get an

12     injunction saying, hey, LAPD, stop using these strangleholds.

13     It's an unreasonable use of force.  It violates my Fourth

14     Amendment rights.

15          Well, presumably, the actual act of being subjected

16     to a stranglehold is an irreparable injury.  The issue there is

17     because the whole premise of this is you're raising the issue

18     of misconduct, something that shouldn't be happening in the

19     first place.  You've got an issue of immanence, right?

20     Basically it's the same thing as we have with Parratt-Hudson

21     doctrine with regard to the idea that -- well, let me just

22     leave it at that.  I'm going to get too far afield if I go down

23     that one.

24          But the idea that whether or not the injury that's

25     being threatened is actually one that is likely to occur,

1   because Parratt-Hudson has to do with unauthorized

2   deprivations, like Parratt was the prison -- or maybe it was

3   Hudson.  The prison guard steals the inmate's things, and the

4   government is like but the prison guards aren't supposed to

5   steal these things.  Maybe, maybe not the active theft is an

6   irreparable injury.  But because the whole premise of this is

7   we're talking about unauthorized actions, things that shouldn't

8   be happening, it's not imminent.

9           In the context of, the Constitution secures a right

10  to engage in personal conduct, right, whether that's the right

11  to go to a school that isn't segregated, whether that's the

12  right to speak freely, whether that's the right to vote in an

13  election.  There is no basis for saying that the ability to

14  engage in the core conduct of the Second Amendment, the keeping

15  and bearing of arms, is not irreparable injury.

16          THE COURT:  Thank you, Mr. Jensen.

17          MR. JENSEN:  Thank you.

18          THE COURT:  I know we've been long.  I just have a

19  quick question for you, Ms. Cai, and then one observation that

20  I want to make and then I'll let you folks -- we'll adjourn.

21  And this goes to the public interest factor.

22          Does the State have any evidence that concealed carry

23  holders are responsible for an increase in gun crimes?

24          MS. CAI:  Not specifically, Your Honor, no.

25          THE COURT:  Okay.  The next is an observation that

1    says -- that deals with the -- I had a look at 2C.  You might

2    recall that we were looking at the de minimis infractions

3    earlier and you had promised to get that to me.  You don't need

4    to.  I have it here.  2C:2-11, it is a de minimis infraction

5    under the code.  And the legislation treats it -- the new

6    legislation treats it as such.  It is considered a prosecution.

7    It gives the authority of the assignment judge to dismiss the

8    prosecution if having regard to the nature of the conduct

9    charged to constitute an offense and the nature of the

10   attendant circumstances the Court finds that the defendant's

11   conduct... and then there are three elements that the Court

12   must find under 2C:2-3.  And so that was the question that I

13   had.  It nonetheless is considered an infraction under the

14   code, but it gives the judge the authority not to press the

15   charges.

16          So the point is, there's no need for you to follow up

17   on that, okay?

18          MS. CAI:  Thank you, Your Honor.  My team did bring

19   it up, but thanks.

20          THE COURT:  Yes.  Okay.  Unless there's nothing else,

21   I thank you all.

22          Mr. Goldberg, I don't want to leave you folks out,

23   Ms. Ruffin.

24          MR. GOLDBERG:  Nothing to add, Your Honor.  Thank

25   you.

```
1              MS. RUFFIN:  Nothing to add, Your Honor.

2              THE COURT:  And you've joined in all the arguments

3   here today?

4              MR. GOLDBERG:  Yes.

5              MS. RUFFIN:  Yes.

6              THE COURT:  Good to see you all.

7              It is my intent and my hope to get a decision to you

8   just as expeditiously as I can, okay?

9              Thank you, all.

10             MR. JENSEN:  Thank you, Your Honor.

11             MS. CAI:  Thank you, Your Honor.

12             THE COURTROOM DEPUTY:  All rise.

13             (Proceedings concluded at 1:20 p.m.)
```

14        **- - - - - - - - - - - - - - - - - - - - - -**

**FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**

15        **- - - - - - - - - - - - - - - - - - - - - -**

```
16        I certify that the foregoing is a correct transcript

17   from the record of proceedings in the above-entitled matter.

18

19

20   /S/John J. Kurz, RDR-RMR-CRR-CRC          January 6, 2023

21   Court Reporter/Transcriber

22

23

24

25
```

**Leon J. Sokol, Esq.**
**CULLEN AND DYKMAN, LLP**
**433 Hackensack Avenue**
**Hackensack, NJ 07601**
**(201) 488-1300**

**Edward J. Kologi, Esq.**
**KOLOGI • SIMITZ**
**Counsellors at Law**
**500 N. Wood Avenue**
**Linden, NJ 07036**
**(908) 486-8877**

**Attorneys for Intervenors-Applicants Senate President**
**Nicholas P. Scutari and Assembly Speaker Craig J.**
**Coughlin**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RONALD KOONS; NICHOLAS GAUDIO; EFFREY M. MULLER; SECOND AMENDMENT FOUNDATION; FIREARMS POLICY COALITION, INC.; COALITION OF NEW JERSEY FIREARM OWNERS; and NEW JERSEY SECOND AMENDMENT SOCIETY, | Civil Action No: 1:22-cv-7464 RMB/EAP (CONSOLIDATED)<br><br>Hon. Renee Marie Bumb, U.S.D.J.<br>Hon. Elizabeth A. Pascal, U.S.M.J. |
| **Plaintiffs,**<br><br>v.<br><br>WILLIAM REYNOLDS in his official capacity as the Prosecutor of Atlantic County, New Jersey; GRACE C. MACAULAY in her official capacity as the Prosecutor of Camden County, New Jersey; ANNEMARIE TAGGART in her official capacity as the Prosecutor of Sussex County, New Jersey; MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of | NOTICE OF MOTION ON SHORT NOTICE TO INTERVENE PURSUANTTO FED. R. CIV. P. 24(b) BYINTERVENORS-APPLICANTS SENATE PRESIDENT NICHOLAS P. SCUTARI AND ASSEMBLY SPEAKER CRAIG J. COUGHLIN |

JA625

**New Jersey; and PATRICK CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police,**

        **Defendants.**

**and**

**NICHOLAS P. SCUTARI, President of the New Jersey Senate, and CRAIG J. COUGHLIN, Speaker of the New Jersey General Assembly,**

        **Intervenors-Applicants**

TO:    Daniel L. Schmutter, Esq.
        HARTMAN & WINNICKI, P.C.
        74 Passaci Street
        Ridgewood, New Jersey 07450

        David Jensen PLLC
        DAVID D. JENSEN
        33 Henry Street
        Beacon, New York 12508

        Angela Cai, D.A.G.
        Office of the Attorney General
        Dept. of Law & Public Safety
        25 W. Market Street
        P.O. Box 080
        Trenton, New Jersey 08625

**PLEASE TAKE NOTICE** that on February 21, 2023 or on such Short Notice as the

Court may allow, Intervenors-Applicants, Nicholas P. Scutari, New Jersey Senate President, and

Craig J. Coughlin, Speaker of the New Jersey General Assembly, by and through their counsel

Cullen and Dykman LLP, and Kologi ◆ Simitz, shall move before the Hon. Renee Marie Bumb,

U.S.D.J., at the United Stated District Court for the District of New Jersey, Mitchell H. Cohen

Building and U.S. Courthouse, 4th & Cooper Street, Camden, New Jersey, for an Order granting

Intervenors-Applicants' Motion to Intervene pursuant to Fed. R. Civ. P. 24(b).

**PLEASE TAKE FURTHER NOTICE** that in support of this Motion Intervenors-Applicants will rely on the accompanying Affirmation of Edward J. Kologi, Esq. (including proposed Answer of Intervenors-Applicants) and Brief.

**PLEASE TAKE FURTHER NOTICE** that oral argument is respectfully requested on the return date only if the within Motion is opposed.

A proposed form of order is submitted herewith.

Respectfully submitted,

Cullen and Dykman, LLP

By: */s/ Leon J. Sokol*
         Leon J. Sokol

Kologi ◆ Simitz, Counsellors at Law

By:*/s/ Edward J. Kologi*
        Edward J. Kologi

Attorneys for Applicants-Interveners
Senate President Nicholas P. Scutari and
Assembly Speaker Craig J. Coughlin

Dated: January 24, 2023

3

JA627

Leon J. Sokol, Esq.
**CULLEN AND DYKMAN, LLP**
**433 Hackensack Avenue**
**Hackensack, NJ 07601**
**(201) 488-1300**

Edward J. Kologi, Esq.
**KOLOGI • SIMITZ**
**Counsellors at Law**
**500 N. Wood Avenue**
**Linden, NJ 07036**
**(908) 486-8877**

**Attorneys for Intervenors-Applicants Senate President**
**Nicholas P. Scutari and Assembly Speaker Craig J.**
**Couglin**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **RONALD KOONS; NICHOLAS GAUDIO; EFFREY M. MULLER; SECOND AMENDMENT FOUNDATION; FIREARMS POLICY COALITION, INC.; COALITION OF NEW JERSEY FIREARM OWNERS; and NEW JERSEY SECOND AMENDMENT SOCIETY,**<br><br>        **Plaintiffs,**<br><br>**v.**<br><br>**WILLIAM REYNOLDS in his official capacity as the Prosecutor of Atlantic County, New Jersey; GRACE C. MACAULAY in her official capacity as the Prosecutor of Camden County, New Jersey; ANNEMARIE TAGGART in her official capacity as the Prosecutor of Sussex County, New Jersey; MATTHEW J. PLATKIN, in his official  capacity as Attorney General of the State of** | **Civil Action No: 1:22-cv-7464 RMB/EAP (CONSOLIDATED)**<br><br>**Hon. Renee Marie Bumb, U.S.D.J.**<br>**Hon. Elizabeth A. Pascal, U.S.M.J.**<br><br><br><br>**PROPOSED ANSWER OF INTERVENORS-APPLICANTS SENATE PRESIDENT NICHOLAS P. SCUTARI AND ASSEMBLY SPEAKER CRAIG J. COUGHLIN TO COMPLAINTS IN:**<br><br>**(1) CIVIL CASE NO 22-7464 (KOONS, ET AL V. REYNOLDS, ET AL); AND**<br><br>**(2) CASE NO. 22-7363 (SIEGEL, ET AL V. PLATKIN, CIVIL CASE NO. 22-7463)** |

JA628

**New Jersey; and PATRICK CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police,**

**Defendants.**

**and**

**NICHOLAS P. SCUTARI, President of the New Jersey Senate, and CRAIG J. COUGLIN, Speaker of the New Jersey General Assembly,**

**Intervenors-Applicants**

Pursuant to Rule 8 of the Federal Rules of Civil Procedure, Intervenors-Applicants Senate President Nicholas P. Scutari and Assembly Speak Craig J. Coughlin, (collectively "Intervenors-Applicants"), answer the Consolidated Complaints of the Plaintiffs as follows:

**Complaint in <u>KOONS, ET AL. V. REYNOLDS, ET AL.</u>, Civil Action No. 1:22-Cv-7464-Rmb/Eap**

1.          Denied.

2.          Denied.

<b>VENUE AND JURISDICTION</b>

3.          The allegations of Paragraph 3 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

4.          As to the allegations of Paragraph 4 of the Complaint are admitted, except it is denied that Plaintiff has legal authority, capacity and standing to bring the within lawsuit and to assert the claims set forth in the Complaint.

5.          The allegations of Paragraph 5 of the Complaint are not factual allegations and

2

are instead legal argument and therefore a response is not necessary to same.

**PARTIES**

6.        As to the allegations in Paragraph 6 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

7.        As to the allegations in Paragraph 7 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

8.        As to the allegations in Paragraph 8 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

9.        As to the allegations in Paragraph 9 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

10.      As to the allegations in Paragraph 10 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

11.      As to the allegations in Paragraph 11 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

12.      As to the allegations in Paragraph 12 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

JA630

13.  The allegations in Paragraph 13 of the Complaint pertain exclusively to the status or description of a party other than Intervenors; hence, no response is required.

14.  The allegations in Paragraph 14 of the Complaint pertain exclusively to the status or description of a party other than Intervenors; hence, no response is required.

15.  The allegations in Paragraph 15 of the Complaint pertain exclusively to the status or description of a party other than Intervenors; hence, no response is required.

16.  The allegations in Paragraph 16 of the Complaint pertain exclusively to the status or description of a party other than Intervenors; hence, no response is required.

17.  The allegations in Paragraph 17 of the Complaint pertain exclusively to the status or description of a party other than Intervenors; hence, no response is required.

## PERTINENT CONSTITUTIONAL PROVISIONS

18.  The allegations of Paragraph 18 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

19.  The allegations of Paragraph 19 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

20.  The allegations of Paragraph 20 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

21.  The allegations of Paragraph 21 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

22.  The allegations of Paragraph 22 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

23.  The allegations of Paragraph 23 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

24.        The allegations of Paragraph 24 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

25.        The allegations of Paragraph 25 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

26.        The allegations of Paragraph 26 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

## PERTINENT STATUTES AND REGULATIONS

<u>Background and Overview</u>

27.        The allegations of Paragraph 27 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

28.        The allegations of Paragraph 28 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

29.        As to the allegations of Paragraph 29 of the Complaint the cited statutes speak for themselves and therefore a response is not necessary to same.

30.        As to the allegations of Paragraph 30 of the Complaint the cited statutes speak for themselves and therefore a response is not necessary to same.

31.        As to the allegations of Paragraph 31 of the Complaint the cited statutes speak for themselves and therefore a response is not necessary to same.

32.        As to the allegations of Paragraph 32 of the Complaint the cited statutes speak for themselves and therefore a response is not necessary to same.

33.        As to the allegations of Paragraph 33 of the Complaint the cited statutes speak for themselves and therefore a response is not necessary to same.

34.        As to the allegations of Paragraph 34 of the Complaint the cited statutes speak for

themselves and therefore a response is not necessary to same.

35.     As to the allegations of Paragraph 35 of the Complaint the cited statutes speak for

themselves and therefore a response is not necessary to same.

36.     As to the allegations of Paragraph 36 of the Complaint the cited statutes speak for

themselves and therefore a response is not necessary to same.

37.     Denied.

38.     Denied.

The "Sensitive Place" and Vehicle Restrictions Challenged Here

39.     The allegations of Paragraph 39 of the Complaint are not factual allegations and

are instead legal argument and therefore a response is not necessary to same.

40.     The allegations of Paragraph 40 of the Complaint are not factual allegations and

are instead legal argument and therefore a response is not necessary to same.

41.     As to the allegations of Paragraph 41 of the Complaint the cited statutes speak for

themselves and therefore a response is not necessary to same.

**DEFENDANTS' ACTUAL AND THREATENED ENFORCEMENT OF
THE CHALLENGED LAWS AND ITS INJURY TO THE PLAINTIFFS**

Plaintiff Ronald Koons

42.     As to the allegations in Paragraph 42 of the Complaint the Applicants-Intervenors

are without knowledge or information sufficient to respond to this allegation and

they leave the Plaintiffs to their proofs.

43.     As to the allegations in Paragraph 43 of the Complaint the Applicants-Intervenors

are without knowledge or information sufficient to respond to this allegation and

they leave the Plaintiffs to their proofs.

44.     As to the allegations in Paragraph 44 of the Complaint the Applicants-Intervenors

6

JA633

are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

45.      As to the allegations in Paragraph 45 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

46.      As to the allegations in Paragraph 46 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

47.      Denied.

Plaintiff Nicholas Gaudio

48.      As to the allegations in Paragraph 48 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

49.      As to the allegations in Paragraph 49 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

50.      As to the allegations in Paragraph 50 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

51.      As to the allegations in Paragraph 51 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

52.      Denied.

Plaintiff Jeffrey M. Muller

53.        As to the allegations in Paragraph 53 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

54.        As to the allegations in Paragraph 54 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

55.        As to the allegations in Paragraph 55 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

56.        As to the allegations in Paragraph 56 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

57.        As to the allegations in Paragraph 57 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

58.        Denied.

Plaintiff Second Amendment Foundation

59.        As to the allegations in Paragraph 59 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

60.        As to the allegations in Paragraph 60 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and

JA635

they leave the Plaintiffs to their proofs except to deny that their members' constitutional rights are being violated.

#### Plaintiff Firearms Policy Coalition

61.     As to the allegations in Paragraph 61 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

62.     As to the allegations in Paragraph 62 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs except to deny that their members' constitutional rights are being violated.

#### Plaintiff Coalition of New Jersey Firearms Owners

63.     As to the allegations in Paragraph 63 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

64.     As to the allegations in Paragraph 64 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs except to deny that their members' constitutional rights are being violated.

#### Plaintiff New Jersey Second Amendment Society

65.     As to the allegations in Paragraph 65 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

66.     As to the allegations in Paragraph 66 of the Complaint the Applicants-Intervenors

JA636

are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs except to deny that their members' constitutional rights are being violated.

## CAUSE OF ACTION FOR DEPRIVATION OF CIVIL RIGHTS
### 42 U.S.C. § 1983

67.　　The allegations of Paragraph 67 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

68.　　Denied.

69.　　Denied.

70.　　Denied.

WHEREFORE, Applicants-Intervenors Senate President Nicholas P. Scutari and Assembly Speaker Craig J. Coughlin demand judgment against Plaintiffs dismissing the Complaint with prejudice and for attorney's fees and costs of suit.

## <u>AFFIRMATIVE DEFENSES</u>

1.　　The Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b) (6) as it fails to state a claim upon which relief can be granted.

2.　　Plaintiffs lack the requisite standing to maintain this action.

3.　　Plaintiffs have not suffered a concrete particularized injury in fact in connection with the enactment and/or enforcement of L. 2022, c. 231.

4.　　Plaintiffs cannot establish any credible threat of enforcement of L. 2022, c. 231 against them.

5.　　Plaintiffs cannot meet their burden of showing that any injury is fairly traceable to the enactment of L. 2022, c. 231,

6.　　 L. 2022, c. 231 is amply supported by historical tradition with respect to those

10

JA637

provisions that fall within the plain text of the Second Amendment.

7.   Various sensitive places that are within the scope of L. 2022, c. 231 constitute "new and analogous sensitive places [that] are constitutionally permissible" within the meaning of *Bruen*. *Bruen*, 142 S.Ct. at 2133.

8.   Various sensitive places that are within the scope of L. 2022, c. 231 are constitutionally permissible because they entail the restriction of firearms in locales where vulnerable or incapacitated people gather.

9.   Various sensitive places that are within the scope of L. 2022, c. 231 are constitutionally permissible because they are locations for core First Amendment activity.

10.   Section 7(a)(24) of L. 2022, c. 231 (pertaining to firearms carry on private property) does not change the scope of the right to carry on private property. Hence, the section is constitutionally permissible.

11.   Section 7(a)(24) of L. 2022, c. 231 (pertaining to firearms carry on private property) does not prevent the owners of private establishments from indicating their consent to allow visitors or licensees to carry firearms on the owner's property. Hence, the section is constitutionally permissible.

12.   L. 2022, c. 231 properly allows property owned by the government in its proprietary capacity to be controlled by the government in a manner that is fully consistent with background principles of property law, including the right of an owner of property to: (1) exclude others; or (2) impose conditions of entry on to the property. Hence, government has the right to exclude firearms with respect to this class of property.

13.   Section 7(b)(1) of L. 2022, c. 231 (carriage of firearms in motor vehicles) is constitutionally permissible because it is amply supported by historical tradition with respect to

the carriage of firearms in Founding-era and Reconstruction-era modes of transport

14.   Section 7(b)(1) of L. 2022, c. 231 (carriage of firearms in motor vehicles) is constitutionally permissible because: (1) motor vehicles pose different problems than Founding-era and Reconstruction-era modes of transport; and (2) motor vehicles constitute "new and analogous sensitive places [that] are constitutionally permissible" within the meaning of _Bruen_. _Bruen,_ 142 S.Ct. at 2133.

15.   The Intervenors-Applicants hereby adopt the Affirmative Defenses of all co-defendants.

16.   The Intervenors-Applicants reserve the right to interpose such other defenses as may be warranted after further investigation and discovery.

Respectfully submitted,

Cullen and Dykman LLP

By: _/s/ Leon J. Sokol_
    Leon J. Sokol

Kologi ◆ Simitz, Counsellors at Law

By:_/s/ Edward J. Kologi_
    Edward J. Kologi

Attorneys for Intervenors-Applicants
Senate President Nicholas P. Scutari and
Assembly Speaker Craig J. Coughlin

Dated: January 23, 2023

JA639

**Complaint in <u>SIEGEL, ET AL. V. PLATKIN, ET AL.,</u> Civil Action No. 1:22-cv-7464-RMB/EAP**

## INTRODUCTION

1.      The allegations of Paragraph 1 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

2.      Denied.

3.      Denied.

4.      Denied.

5.      Denied.

6.      As to the allegations in Paragraph 6 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

7.      Denied.

8.      Denied.

9.      Denied.

10.     Denied.

11.     Denied.

12.     Denied.

13.     As to the allegations in Paragraph 13 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

## JURISDICTION AND VENUE

14.     Admitted.

15.     As to the allegations in Paragraph 15 of the Complaint the Applicants-Intervenors

JA640

are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

16.     Admitted.

## PARTIES

17.     As to the allegations in Paragraph 17 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

18.     As to the allegations in Paragraph 13 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

19.     As to the allegations in Paragraph 13 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

20.     As to the allegations in Paragraph 13 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

21.     As to the allegations in Paragraph 13 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

22.     As to the allegations in Paragraph 13 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

23.     As to the allegations in Paragraph 13 of the Complaint the Applicants-Intervenors

are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

24.     As to the allegations in Paragraph 24 of the Complaint the Applicants-Intervenors are without knowledge or information sufficient to respond to this allegation and they leave the Plaintiffs to their proofs.

25.     The allegations in Paragraph 25 of the Complaint pertain exclusively to the status or description of a party other than Intervenors; hence, no response is required.

26.     The allegations in Paragraph 26 of the Complaint pertain exclusively to the status or description of a party other than Intervenors; hence, no response is required.

## FACTUAL ALLEGATIONS

### A.  Prior Law Governing the Public Possession of Handguns

27.     Denied.

28.     Denied.

29.     As to the allegations of Paragraph 29 of the Complaint the cited statutes speak for themselves and therefore a response is not necessary to same.

30.     As to the allegations of Paragraph 30 of the Complaint the cited statutes speak for themselves and therefore a response is not necessary to same.

31.     As to the allegations of Paragraph 31 of the Complaint the cited statutes speak for themselves and therefore a response is not necessary to same.

32.     As to the allegations of Paragraph 32 of the Complaint the cited statutes speak for themselves and therefore a response is not necessary to same.

33.     As to the allegations of Paragraph 33 of the Complaint the cited statutes speak for themselves and therefore a response is not necessary to same.

34.          Denied.

**B.  Bruen Decision**

35.          The allegations of Paragraph 35 of the Complaint are not factual allegations and
             are instead legal argument and therefore a response is not necessary to same.

36.          The allegations of Paragraph 36 of the Complaint are not factual allegations and
             are instead legal argument and therefore a response is not necessary to same.

37.          The allegations of Paragraph 37 of the Complaint are not factual allegations and
             are instead legal argument and therefore a response is not necessary to same.

**C.  New Jersey Announces "Massive Resistance" to Bruen**

38.          Denied.

**D.  New York's Massive Resistance**

39.          Denied.

40.          Denied.

**E. New Jersey's Massive Resistance: A4769 -- The New "Justifiable Need"**

41.          Denied.

42.          Denied.

43.          Denied.

44.          The allegations of Paragraph 44 of the Complaint are not factual allegations and
             are instead legal argument and therefore a response is not necessary to same.

45.          Denied.

46.          Denied.

47.          Denied.

48.          Denied.

**I.  Prohibited Sensitive Places: Nearly Everywhere in the State**

49.          Denied.

50.          The allegations of Paragraph 50 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

51.          The allegations of Paragraph 51 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

52.          The allegations of Paragraph 52 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

53.          The allegations of Paragraph 53 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

54.          The allegations of Paragraph 54 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

55.          Denied.

56.          Denied.

57.          The allegations of Paragraph 57 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

**II. Insurance Requirement**

58.          As to the allegations of Paragraph 58 of the Complaint the cited statutes speak for themselves and therefore a response is not necessary to same.

59.          Denied.

60.          The allegations of Paragraph 60 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

**III.  Massive Fee Increase**

61.     The allegations of Paragraph 61 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

62.     Denied.

63.     Denied.

64.     The allegations of Paragraph 64 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

65.     The allegations of Paragraph 65 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

66.     Denied.

67.     The allegations of Paragraph 67 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

68.     Denied.

69.     The allegations of Paragraph 69 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

**IV.     Onerous New Permit Requirements**

70.     Denied.

71.     The allegations of Paragraph 71 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

72.     The allegations of Paragraph 72 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

73.     The allegations of Paragraph 73 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

74.     Denied.

18

JA645

75.         The allegations of Paragraph 75 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

76.         Denied.

77.         The allegations of Paragraph 35 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

78.         Denied.

79.         Denied.

80.         The allegations of Paragraph 80 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

81.         Denied.

82.         Denied.

83.         The allegations of Paragraph 83 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

**V.  Unjustified Display of a Handgun**

84.         Denied.

85.         Denied.

86.         The allegations of Paragraph 86 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

**VI. Special Elite Class of Handgun Carry and Firearm Possession**

87.         Denied.

88.         Denied.

89.         Denied.

90.         The allegations of Paragraph 90 of the Complaint are not factual allegations and

are instead legal argument and therefore a response is not necessary to same.

**VII. A4769 is Simply "Justifiable Need" Part 2.**

91.     Denied.

92.     The allegations of Paragraph 92 of the Complaint are not factual allegations and
are instead legal argument and therefore a response is not necessary to same.

**F. A4769 Violates the Fundamental Constitutional Rights of Plaintiffs.**

Paragraphs 93 through 251.  As to the factual allegations contained in Paragraphs 93
through 251 of the Complaint the Applicants-Intervenors are without knowledge
or information sufficient to respond to this allegations and they leave the Plaintiffs to
their proofs except to deny any violation of the Plaintiff's constitutional rights.

**COUNT ONE**
**Deprivation of Plaintiffs' Rights Under U.S. CONST. amends. II and XIV**

252.    The Applicants-Intervenors hereby incorporate all previous responses to the
preceding paragraphs.

253.    As to the allegations of Paragraph 253 of the Complaint the cited constitutional
provision speaks for itself and therefore a response is not necessary to same.

254.    The allegations of Paragraph 254 of the Complaint are not factual allegations and
are instead legal argument and therefore a response is not necessary to same.

255.    The allegations of Paragraph 255 of the Complaint are not factual allegations and
are instead legal argument and therefore a response is not necessary to same.

256.    Denied.

257.    As to the allegations of Paragraph 257 of the Complaint the cited statutes speak
for themselves and therefore a response is not necessary to same.

258.    Denied.

JA647

259.   Denied.

260.   Denied.

261.   Denied.

262.   Denied.

263.   Denied.

264.   Denied.

265.   Denied.

266.   Denied.

267.   Denied.

268.   Denied.

269.   Denied.

270.   Denied.

271.   Denied.

272.   Denied.

273.   Denied.

274.   Denied.

275.   Denied.

276.   Denied.

277.   Denied.

278.   Denied.

279.   Denied.

280.   Denied.

281.   Denied.

282.    Denied.

283.    Denied.

284.    Denied.

285.    Denied.

286.    Denied.

287.    Denied.

## COUNT TWO
### Deprivation of Plaintiffs' Rights Under U.S. CONST. amend. XIV
### (Equal Protection)

288.    The Applicants-Intervenors hereby incorporate all previous responses to the preceding paragraphs.

289.    As to the allegations of Paragraph 289 of the Complaint the cited constitutional provision speaks for itself and therefore a response is not necessary to same.

290.    Denied.

291.    Denied.

292.    Denied.

293.    Denied.

294.    Denied.

295.    Denied.

## COUNT THREE
### Deprivation of Plaintiffs' Rights Under U.S. CONST. amend. XIV
### (Due Process of Law – Void for Vagueness/Lack of Notice)

296.    The Applicants-Intervenors hereby incorporate all previous responses to the preceding paragraphs.

297.    As to the allegations of Paragraph 297 of the Complaint the cited constitutional provision speaks for itself and therefore a response is not necessary to same.

JA649

298. The allegations of Paragraph 298 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

299. The allegations of Paragraph 299 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

300. The allegations of Paragraph 300 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

301. Denied.

302. Denied.

303. Denied.

304. Denied.

305. Denied.

306. As to the allegations of Paragraph 306 of the Complaint the cited statutes speak for themselves and therefore a response is not necessary to same.

307. Denied.

308. Denied.

309. As to the allegations of Paragraph 309 of the Complaint the cited statutes speak for themselves and therefore a response is not necessary to same.

310. Denied.

311. Denied.

## COUNT FOUR
### Deprivation of Plaintiffs' Rights Under U.S. CONST. amend. I and XIV
### (Compelled Speech)

312. The Applicants-Intervenors hereby incorporate all previous responses to the preceding paragraphs.

313.    Denied.

314.    Denied.

315.    The allegations of Paragraph 315 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

316.    Denied.

## COUNT FIVE
### Deprivation of Plaintiffs' Rights Under U.S. Const. amend. I and XIV

317.    The Applicants-Intervenors hereby incorporate all previous responses to the preceding paragraphs.

318.    Denied.

319.    Denied.

320.    Denied.

321.    Denied.

322.    Denied.

323.    Denied.

324.    Denied.

## COUNT SIX
### Deprivation of Plaintiffs' Rights Under U.S. Const. amend. I and XIV
### (Right to Access Library)

325.    The Applicants-Intervenors hereby incorporate all previous responses to the preceding paragraphs.

326.    The allegations of Paragraph 326 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

327.    The allegations of Paragraph 327 of the Complaint are not factual allegations and are instead legal argument and therefore a response is not necessary to same.

JA651

328.     Denied.

WHEREFORE, Applicants-Intervenors Senate President Nicholas P. Scutari and Assembly Speaker Craig J. Coughlin demand judgment against plaintiffs dismissing the Complaint with prejudice and for attorney's fees and costs of suit.

## **AFFIRMATIVE DEFENSES**

1.     The Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b) (6) as it fails to state a claim upon which relief can be granted.

2.     Plaintiffs lack the requisite standing to maintain this action.

3.     Plaintiffs have not suffered a concrete particularized injury in fact in connection with the enactment and/or enforcement of L. 2022, c. 231.

4.     Plaintiffs cannot establish any credible threat of enforcement of L. 2022, c. 231 against them.

5.     Plaintiffs cannot meet their burden of showing that any injury is fairly traceable to the enactment of L. 2022, c. 231,

6.      L. 2022, c. 231 is amply supported by historical tradition with respect to those provisions that fall within the plain text of the Second Amendment.

7.  Various sensitive places that are within the scope of L. 2022, c. 231 constitute "new and analogous sensitive places [that] are constitutionally permissible" within the meaning of *Bruen*.  *Bruen,* 142 S.Ct. at 2133.

8.     Various sensitive places that are within the scope of L. 2022, c. 231 are constitutionally permissible because they entail the restriction of firearms in locales where vulnerable or incapacitated people gather.

9.  Various sensitive places that are within the scope of L. 2022, c. 231 are

constitutionally permissible because they are locations for core First Amendment activity.

10.    Section 7(a)(24) of L. 2022, c. 231 (pertaining to firearms carry on private property) does not change the scope of the right to carry on private property. Hence, the section is constitutionally permissible.

11.    Section 7(a)(24) of L. 2022, c. 231 (pertaining to firearms carry on private property) does not prevent the owners of private establishments from indicating their consent to allow visitors or licensees to carry firearms on the owner's property. Hence, the section is constitutionally permissible.

12.    L. 2022, c. 231 properly allows property owned by the government in its proprietary capacity to be controlled by the government in a manner that is fully consistent with background principles of property law, including the right of an owner of property to: (1) exclude others; or (2) impose conditions of entry on to the property. Hence, government has the right to exclude firearms with respect to this class of property.

13.    Section 7(b)(1) of L. 2022, c. 231 (carriage of firearms in motor vehicles) is constitutionally permissible because it is amply supported by historical tradition with respect to the carriage of firearms in Founding-era and Reconstruction-era modes of transport

14.  Section 7(b)(1) of L. 2022, c. 231 (carriage of firearms in motor vehicles) is constitutionally permissible because: (1) motor vehicles pose different problems than Founding-era and Reconstruction-era modes of transport; and (2) motor vehicles constitute "new and analogous sensitive places [that] are constitutionally permissible" within the meaning of *Bruen*. *Bruen*, 142 S.Ct. at 2133.

15.    The Intervenors-Applicants hereby adopt the Affirmative Defenses of all co-defendants.

JA653

16.     The Intervenors-Applicants reserve the right to interpose such other defenses as may be warranted after further investigation and discovery.

Respectfully submitted,

Cullen and Dykman, LLP

By: */s/ Leon J. Sokol*
        Leon J. Sokol

Kologi ◆ Simitz, Counsellors at Law

By:*/s/ Edward J. Kologi*
        Edward J. Kologi

Attorneys for Applicants-Interveners
Senate President Nicholas P. Scutari and
Assembly Speaker Craig J. Coughlin

Dated: January 23, 2023

JA654

# CHAPTER 131

AN ACT concerning the sale and possession of firearms and supplementing and amending various parts of the statutory law.

BE IT ENACTED *by the Senate and General Assembly of the State of New Jersey:*

C.2C:58-4.2  Findings, declarations.

1.   The Legislature finds and declares that:

a.   The decision of the United States Supreme Court in New York State Rifle & Pistol Association v. Bruen holds significant implications for carrying a handgun in New Jersey and the law governing the issuance of permits to carry a handgun.  The Bruen decision establishes that states cannot deny permits to carry a handgun to otherwise-qualified citizens who fail to show that they have the "proper cause" to carry a handgun.  New Jersey law relies on a similar standard, considering whether an applicant has a "justifiable need," in determining whether to issue a permit to carry a handgun.

b.   In accordance with the precedent established in the Bruen decision, laws requiring showings of particularized need are no longer legally viable to determine whether a person may carry a handgun in public.  The Bruen decision does make clear, however, that the Legislature can enact laws to protect our communities from threats to public health, safety, and welfare posed by gun violence, which take into account as appropriate the Supreme Court's Second Amendment ruling while continuing to promote and enhance public safety.

c.   Statistics show that expanding handgun carrying creates safety risks, helping to fuel the epidemic of gun violence.  For example, a study by researchers at the Johns Hopkins Bloomberg School of Public Health found that the estimated average rate of officer-involved shootings increased by 12.9 percent in 10 states that relaxed restrictions between 2014 and 2020 on civilians carrying concealed firearms in public.  Accordingly, evidence demonstrates that more guns on the streets can translate into more acts of gun violence.  To mitigate the impact of having more people carrying guns in public places, steps must be taken to better ensure that those who exercise the right to carry are responsible, law-abiding, and appropriately trained individuals who would not pose undue safety risks if armed in public places.

d.   In Bruen, the Supreme Court recognized that states may prohibit individuals who are not "law-abiding, responsible citizens" from carrying firearms in public, and endorsed the use of "licensing requirements for carrying a handgun for self-defense."  Although the Court did not provide a complete list of lawful requirements, it specifically cited a "background check, mental health check, training in firearms handling and in laws regarding the use of force, among other possible requirements" as permissible.  The purpose of these checks, the Court explained, is to "ensure only that those bearing arms in the jurisdiction are in fact, 'law-abiding, responsible citizens.'"  It is thus important to bolster and improve the process in this State for ensuring that only such individuals possess and carry firearms.  Toward that end, this act strengthens the criteria and background investigation requirements that are used to determine whether an applicant is qualified to carry a firearm in New Jersey.

e.   This act also designates places in which the carrying of a firearm or destructive device is prohibited.  Previously, application of the justifiable need standard minimized the serious dangers of misuse and accidental use inherent in the carrying of handguns in a public place.  Given the likelihood that a much greater number of individuals will now qualify to carry handguns in public, it is now both necessary and appropriate to clearly identify in the law those sensitive places where, due to heightened public safety concerns, carrying a dangerous, potentially lethal device or weapon, including a handgun, is not permissible.  These prohibitions are based on common sense principles and historical analogues.

P.L. 2022, CHAPTER 131

2

f.   Notwithstanding its rejection of a particularized need standard, the Bruen decision recognizes that the carrying of firearms in sensitive places can "be prohibited consistent with the Second Amendment."  Indeed, the Court assumed it settled that "laws forbidding the carrying of firearms in sensitives places such as schools and government buildings," as well as other places such as "legislative assemblies, polling places, and courthouses," are "longstanding" and not subject to disputes regarding their constitutionality.  The Court added that other "sensitive place" regulations may be permissible if "consistent with the Second Amendment's text and historical understanding" – that is, "relevantly similar" to historical analogues.

g.   The sensitive-place prohibitions on dangerous weapons set forth in this act are rooted in history and tradition.  They are analogous to historical laws that can be found from the Founding era to Reconstruction, which are also found in modern laws in many states.  History and tradition support at least the following location-based restrictions on carrying firearms:

(1) Places that are the site of core constitutional activity, such as but not limited to the exercise of First Amendment rights, or that are otherwise vital to the functioning of democracy and our system of government.  That includes prohibitions of firearms in facilities within the criminal justice system;

(2) Schools, universities, other educational institutions, where people assemble for educational purposes and for the purposes of teaching, learning, research, and the pursuit of knowledge;

(3) Parks and other recreation spaces, including locations where children congregate;

(4) Locations that protect vulnerable classes of people, such as the young and the frail;

(5) Places where intoxicating substances are sold, places where large groups of individuals congregate, and places where volatile conditions may pose a threat to public safety; and

(6) Various forms of transportation and public infrastructure, whose safety, security, and stability are critical to supporting social function.

h.   The historical record also supports restriction of firearm possession on private property when the owner has not given their consent.  Many states require a property owner's permission before another may enter private dwellings and private lands with a firearm or other weapons.  Requiring consent from the property owner before carrying weapons onto private property is also in line with both the reasonable expectations and property rights of New Jersey property owners.

i.   Additionally, the fees to obtain a firearms purchaser identification permit or a permit to purchase a handgun in New Jersey were initially set by statute over 50 years ago at $5 and $2, respectively, and in over a half century the law has never been changed to increase these fees, notwithstanding the impact of inflation, increasing costs of background checks and related investigations, and the investment made over the years to technologically upgrade the firearms application and registration system established and maintained by the New Jersey State Police.

j.   Accordingly, the Legislature finds it is necessary and proper to revise this State's procedural and substantive laws related to firearms to update the process and the standards applicable to firearm purchase and possession as well as our handgun carry law, and to continue to promote public safety and reduce gun violence in a manner consistent with the Second Amendment principles articulated by the current Supreme Court jurisprudence.  These revisions will focus on factors other than the need or purpose a person may assert as justification to carry a handgun, such as the person's background and qualifications, with the ultimate goal of keeping New Jersey streets and neighborhoods safe from gun violence.

JA656

P.L. 2022, CHAPTER 131

3

2.   N.J.S.2C:58-3 is amended to read as follows:

Purchase of firearms.

2C:58-3. a. Permit to purchase a handgun.

(1) A person shall not sell, give, transfer, assign or otherwise dispose of, nor receive, purchase, or otherwise acquire a handgun unless the purchaser, assignee, donee, receiver or holder is licensed as a dealer under this chapter or has first secured a permit to purchase a handgun as provided by this section.

(2) A person who is not a licensed retail dealer and sells, gives, transfers, assigns, or otherwise disposes of, or receives, purchases or otherwise acquires a handgun pursuant to this section shall conduct the transaction through a licensed retail dealer.

The provisions of this paragraph shall not apply if the transaction is:

(a) between members of an immediate family as defined in subsection n. of this section;

(b) between law enforcement officers;

(c) between collectors of firearms or ammunition as curios or relics as defined in Title 18, U.S.C. section 921 (a) (13) who have in their possession a valid Collector of Curios and Relics License issued by the Bureau of Alcohol, Tobacco, Firearms, and Explosives; or

(d) a temporary transfer pursuant to section 1 of P.L.1992, c.74 (C.2C:58-3.1) or section 1 of P.L.1997, c.375 (C.2C:58-3.2).

(3) Prior to a transaction conducted pursuant to this subsection, the retail dealer shall complete a National Instant Criminal Background Check of the person acquiring the handgun. In addition:

(a) the retail dealer shall submit to the Superintendent of State Police, on a form approved by the superintendent, information identifying and confirming the background check;

(b) every retail dealer shall maintain a record of transactions conducted pursuant to this subsection, which shall be maintained at the address displayed on the retail dealer's license for inspection by a law enforcement officer during reasonable hours;

(c) a retail dealer may charge a fee for a transaction conducted pursuant to this subsection; and

(d) any record produced pursuant to this subsection shall not be considered a public record pursuant to P.L.1963, c.73 (C.47:1A-1 et seq.) or P.L.2001, c.404 (C.47:1A-5 et al.).

b.   Firearms purchaser identification card.

(1) A person shall not sell, give, transfer, assign or otherwise dispose of nor receive, purchase or otherwise acquire an antique cannon or a rifle or shotgun, other than an antique rifle or shotgun, unless the purchaser, assignee, donee, receiver or holder is licensed as a dealer under this chapter or possesses a valid firearms purchaser identification card, and first exhibits the card to the seller, donor, transferor or assignor, and unless the purchaser, assignee, donee, receiver or holder signs a written certification, on a form prescribed by the superintendent, which shall indicate that the person presently complies with the requirements of subsection c. of this section and shall contain the person's name, address and firearms purchaser identification card number or dealer's registration number.  The certification shall be retained by the seller, as provided in paragraph (4) of subsection a. of N.J.S.2C:58-2, or, in the case of a person who is not a dealer, it may be filed with the chief police officer of the municipality in which the person resides or with the superintendent.

(2) A person who is not a licensed retail dealer and sells, gives, transfers, assigns, or otherwise disposes of, or receives, purchases or otherwise acquires an antique cannon or a rifle or shotgun pursuant to this section shall conduct the transaction through a licensed retail dealer.

JA657

P.L. 2022, CHAPTER 131
4

The provisions of this paragraph shall not apply if the transaction is:

(a) between members of an immediate family as defined in subsection n. of this section;

(b) between law enforcement officers;

(c) between collectors of firearms or ammunition as curios or relics as defined in Title 18, U.S.C. section 921 (a) (13) who have in their possession a valid Collector of Curios and Relics License issued by the Bureau of Alcohol, Tobacco, Firearms, and Explosives; or

(d) a temporary transfer pursuant to section 1 of P.L.1992, c.74 (C.2C:58-3.1) and section 1 of P.L.1997, c.375 (C.2C:58-3.2).

(3) Prior to a transaction conducted pursuant to this subsection, the retail dealer shall complete a National Instant Criminal Background Check of the person acquiring an antique cannon or a rifle or shotgun.  In addition:

(a) the retail dealer shall submit to the Superintendent of State Police, on a form approved by the superintendent, information identifying and confirming the background check;

(b) every retail dealer shall maintain a record of transactions conducted pursuant to this section which shall be maintained at the address set forth on the retail dealer's license for inspection by a law enforcement officer during reasonable hours;

(c) a retail dealer may charge a fee, not to exceed $70, for a transaction conducted pursuant to this subsection; and

(d) any record produced pursuant to this subsection shall not be considered a public record pursuant to P.L.1963, c.73 (C.47:1A-1 et seq.) or P.L.2001, c.404 (C.47:1A-5 et al.).

c.   Who may obtain.  Except as hereinafter provided, a person shall not be denied a permit to purchase a handgun or a firearms purchaser identification card, unless the person is known in the community in which the person lives as someone who has engaged in acts or made statements suggesting the person is likely to engage in conduct, other than justified self-defense, that would pose a danger to self or others, or is subject to any of the disabilities set forth in this section or other sections of this chapter.  A handgun purchase permit or firearms purchaser identification card shall not be issued:

(1) To any person who has been convicted of: (a) any crime in this State or its felony counterpart in any other state or federal jurisdiction; or (b) a disorderly persons offense in this State involving an act of domestic violence as defined in section 3 of P.L.1991, c.261 (C.2C:25-19) or its felony or misdemeanor counterpart involving an act of domestic violence as defined under a comparable statute in any other state or federal jurisdiction, whether or not armed with or possessing a weapon at the time of the offense;

(2) To any person who is presently confined for a mental disorder as a voluntary admission as defined in section 2 of P.L.1987, c.116 (C.30:4-27.2) or who is presently involuntarily committed to inpatient or outpatient treatment pursuant to P.L.1987, c.116 (C.30:4-27.1 et seq.);

(3) To any person who suffers from a physical defect or disease which would make it unsafe for that person to handle firearms, to any person with a substance use disorder involving drugs as defined in section 2 of P.L.1970, c.226 (C.24:21-2), or to any alcoholic as defined in section 2 of P.L.1975, c.305 (C.26:2B-8) unless any of the foregoing persons produces a certificate of a medical doctor, treatment provider, or psychiatrist licensed in New Jersey, or other satisfactory proof, that the person is no longer suffering from that particular disability in a manner that would interfere with or handicap that person in the handling of firearms; to any person who knowingly falsifies any information on the application form for a handgun purchase permit or firearms purchaser identification card;

(4) To any person under the age of 18 years for a firearms purchaser identification card and to any person under the age of 21 years for a permit to purchase a handgun;

P.L. 2022, CHAPTER 131
5

(5) To any person where the issuance would not be in the interest of the public health, safety or welfare because the person is found to be lacking the essential character of temperament necessary to be entrusted with a firearm;

(6) To any person who is subject to or has violated a temporary or final restraining order issued pursuant to the "Prevention of Domestic Violence Act of 1991", P.L.1991, c.261 (C.2C:25-17 et seq.) prohibiting the person from possessing any firearm or a temporary or final domestic violence restraining order issued in another jurisdiction prohibiting the person from possessing any firearm;

(7) To any person who as a juvenile was adjudicated delinquent for an offense which, if committed by an adult, would constitute a crime and the offense involved the unlawful use or possession of a weapon, explosive or destructive device or is enumerated in subsection d. of section 2 of P.L.1997, c.117 (C.2C:43-7.2);

(8) To any person whose firearm is seized pursuant to the "Prevention of Domestic Violence Act of 1991", P.L.1991, c.261 (C.2C:25-17 et seq.) and whose firearm has not been returned; or

(9) To any person named on the consolidated Terrorist Watchlist maintained by the Terrorist Screening Center administered by the Federal Bureau of Investigation;

(10) To any person who is subject to or has violated a court order prohibiting the custody, control, ownership, purchase, possession, or receipt of a firearm or ammunition issued pursuant to the "Extreme Risk Protective Order Act of 2018", P.L.2018, c.35 (C.2C:58-20 et al.);

(11) To any person who is subject to or has violated a court order prohibiting the custody, control, ownership, purchase, possession, or receipt of a firearm or ammunition issued pursuant to P.L.2021, c.327 (C.2C:12-14 et al.);

(12) To any person who is subject to or has violated a temporary or final restraining order issued pursuant to the "Sexual Assault Survivor Protection Act of 2015," P.L.2015, c.147 (C.2C:14-13 et al.);

(13) To any person who has previously been voluntarily admitted to inpatient treatment pursuant to P.L.1987, c.116 (C.30:4-27.1 et seq.) or involuntarily committed to inpatient or outpatient treatment pursuant to P.L.1987, c.116 (C.30:4-27.1 et seq.), unless the court has expunged the person's record pursuant to P.L.1953, c.268 (C.30:4-80.8 et seq.);

(14) To any person who is subject to an outstanding arrest warrant for an indictable crime in this State or for a felony, other than a felony to which section 1 of P.L.2022, c.50 (C.2A:160-14.1) would apply, in any other state or federal jurisdiction; or

(15) To any person who is a fugitive from justice due to having fled from any state or federal jurisdiction to avoid prosecution for a crime, other than a crime to which section 1 of P.L.2022, c.50 (C.2A:160-14.1) would apply, or to avoid giving testimony in any criminal proceeding.

In order to obtain a permit to purchase a handgun or a firearms purchaser identification card, the applicant shall demonstrate that, within four years prior to the date of the application, the applicant satisfactorily completed a course of instruction approved by the superintendent in the lawful and safe handling and storage of firearms. The applicant shall be required to demonstrate completion of a course of instruction only once prior to obtaining either a firearms purchaser identification card or the applicant's first permit to purchase a handgun.

The applicant shall not be required to demonstrate completion of a course of instruction in order to obtain any subsequent permit to purchase a handgun, to replace an existing firearms purchaser identification card, or to renew a firearms purchaser identification card.

An applicant who is a law enforcement officer who has satisfied the requirements of subsection j. of N.J.S.2C:39-6, a retired law enforcement officer who has satisfied the requirements of subsection l. of N.J.S.2C:39-6, or a veteran who was honorably discharged as

a member of the United States Armed Forces or National Guard who received substantially equivalent training shall not be required to complete the course of instruction required pursuant to the provisions of this subsection.

A person who obtained a permit to purchase a handgun or a firearms purchaser identification card prior to the effective date of P.L.2022, c.58 shall not be required to complete a course of instruction pursuant to this subsection.

d.   Issuance.  The chief police officer of an organized full-time police department of the municipality where the applicant resides or the superintendent, in all other cases, shall upon application, issue to any person qualified under the provisions of subsection c. of this section a permit to purchase a handgun or a firearms purchaser identification card.

A firearms purchaser identification card issued following the effective date of P.L.2022, c.58 shall display a color photograph and be electronically linked to the fingerprints of the card holder.  A person who obtained a firearms purchaser identification card prior to the effective date of P.L.2022, c.58 shall not be required to obtain a firearms purchaser identification card that displays a color photograph and is electronically linked to fingerprints.  The superintendent shall establish guidelines as necessary to effectuate the issuance of firearms purchaser identification cards that display a color photograph and which are electronically linked to the fingerprints of the card holder.

The requirements of this subsection concerning firearms purchaser identification cards issued following the effective date of P.L.2022, c.58 shall remain inoperative until such time as the superintendent establishes a system to produce cards that comply with this requirement and, until such time, applicants issued a firearms purchaser identification card shall be provided with cards that do not conform to the requirements of this section, which shall be afforded full force and effect until such time as the system is established and a compliant card is issued in accordance with this subsection.  An applicant issued a non-compliant firearms purchaser identification card shall obtain a card, at no cost to the applicant, which conforms to the requirements of this section no later than one year after receiving notice that the system to produce cards that comply with this requirement is operational.

If an application for a permit or identification card is denied, the applicant shall be provided with a written statement of the reasons for the denial.  Any person aggrieved by the denial of a permit or identification card may request a hearing in the Superior Court of the county in which the person resides if the person is a resident of New Jersey or in the Superior Court of the county in which the person's application was filed if the person is a nonresident.  The request for a hearing shall be made in writing within 30 days of the denial of the application for a permit or identification card.  The applicant shall serve a copy of the request for a hearing upon the chief police officer of the municipality in which the person resides, if the person is a resident of New Jersey, and upon the superintendent in all cases.  The hearing shall be held and a record made thereof within 60 days of the receipt of the application for a hearing by the judge of the Superior Court.  No formal pleading and no filing fee shall be required as a preliminary to a hearing.  Appeals from the results of a hearing shall be in accordance with law.

The Administrative Director of the Courts shall coordinate with the superintendent in the development of an electronic filing system to receive requests for hearings and serve the chief police officer and superintendent as required in this section.

e.   Applications.  Applications for permits to purchase a handgun and for firearms purchaser identification cards shall be in the form prescribed by the superintendent and shall set forth the name, residence, place of business, age, date of birth, occupation, sex, any aliases or other names previously used by the applicant, gender, and physical description, including

distinguishing physical characteristics, if any, of the applicant, and shall state whether the applicant is a citizen, whether the applicant is an alcoholic as defined in section 2 of P.L.1975, c. 305 (C. 26:2B-8) or is a drug-dependent person as defined in section 2 of P.L.1970, c.226 (C.24:21-2), whether the applicant has ever been confined or committed to a mental institution or hospital for treatment or observation of a mental or psychiatric condition on a temporary, interim or permanent basis, giving the name and location of the institution or hospital and the dates of confinement or commitment, whether the applicant has been attended, treated or observed by any doctor or psychiatrist or at any hospital or mental institution on an inpatient or outpatient basis for any mental or psychiatric condition, giving the name and location of the doctor, psychiatrist, hospital or institution and the dates of the occurrence, whether the applicant presently or ever has been a member of any organization which advocates or approves the commission of acts of force and violence to overthrow the Government of the United States or of this State, or which seeks to deny others their rights under the Constitution of either the United States or the State of New Jersey, whether the applicant has ever been convicted of a crime or disorderly persons offense in this State or felony or misdemeanor in any other state or federal jurisdiction, whether the applicant is subject to a restraining order issued pursuant to the "Prevention of Domestic Violence Act of 1991", P.L.1991, c.261 (C.2C:25-17 et seq.) or an order entered under the provisions of a substantially similar statute under the laws of another jurisdiction prohibiting the applicant from possessing any firearm, whether the applicant is subject to a restraining order issued pursuant to the "Sexual Assault Survivor Protection Act of 2015," P.L.2015, c.147 (C.2C:14-13 et al.) or an order entered under the provisions of a substantially similar statute under the laws of another jurisdiction, whether the applicant is subject to a protective order issued pursuant to the "Extreme Risk Protective Order Act of 2018", P.L.2018, c.35 (C.2C:58-20 et al.), whether the applicant is subject to a protective order issued pursuant to P.L.2021, c.327 (C.2C:12-14 et al.) prohibiting the applicant from possessing any firearm, and other information as the superintendent shall deem necessary for the proper enforcement of this chapter.  For the purpose of complying with this subsection, the applicant shall waive any statutory or other right of confidentiality relating to institutional confinement.  The application shall be signed by the applicant and shall contain as references the names and addresses of two reputable citizens personally acquainted with the applicant.

An applicant for a permit to purchase a handgun shall also certify, with respect to each handgun listed on the form, whether the applicant is purchasing the handgun on the applicant's own behalf or, if not, that the purchase is being made on behalf of a third party to whom the applicant may lawfully transfer the handgun.

Application blanks shall be obtainable from the superintendent, from any other officer authorized to grant a permit or identification card, and from licensed retail dealers, or shall be made available through an online process established or made available by the superintendent.

The chief police officer or the superintendent shall obtain the fingerprints of the applicant and shall have them compared with any and all records of fingerprints in the municipality and county in which the applicant resides and also the records of the State Bureau of Identification and the Federal Bureau of Investigation, provided that an applicant for a handgun purchase permit who possesses a valid firearms purchaser identification card, or who has previously obtained a handgun purchase permit from the same licensing authority for which the applicant was previously fingerprinted, and who provides other reasonably satisfactory proof of the applicant's identity, need not be fingerprinted again; however, the chief police officer or the superintendent shall proceed to investigate the application to determine whether or not the applicant has become subject to any of the disabilities set forth in this chapter.

P.L. 2022, CHAPTER 131
8

f.   Granting of permit or identification card; fee; term; renewal; revocation.   The application for the permit to purchase a handgun together with a fee of $25, or the application for the firearms purchaser identification card together with a fee of $50, shall be delivered or forwarded to the licensing authority who, upon determining that the application is complete, shall investigate the same and, provided the requirements of this section are met, shall grant the permit or the identification card, or both, if application has been made therefor, within 30 days from the date of receipt of the completed application for residents of this State and within 45 days for nonresident applicants.   A permit to purchase a handgun shall be valid for a period of 90 days from the date of issuance and may be renewed by the issuing authority for good cause for an additional 90 days.   A firearms purchaser identification card issued or renewed after the effective date of P.L.2022, c.58 shall expire during the tenth calendar year following its date of issuance and on the same calendar day as the person's date of birth.

If the date of birth of the firearms purchaser identification card holder does not correspond to a calendar day of the tenth calendar year, the card shall expire on the last day of the birth month of the card holder.

A firearms purchaser identification card issued pursuant to this section may be renewed upon filing of a renewal application and payment of the required fee, provided that the holder is not subject to any of the disabilities set forth in subsection c. of this section and complies with all other applicable requirements as set forth in statute and regulation.   If an application for renewal of a firearms purchaser identification card is denied, the applicant shall be provided with a written statement of the reasons for the denial.   Any person aggrieved by the denial of an application for renewal of a firearms purchaser identification card may request a hearing in the Superior Court of the county in which the person resides if the person is a resident of New Jersey or in the Superior Court of the county in which the person's application was filed if the person is a nonresident.   The request for a hearing shall be made in writing within 30 days of the denial of the application for renewal of the firearms purchaser identification card.   The applicant shall serve a copy of the request for a hearing upon the chief police officer of the municipality in which the applicant resides, if the person is a resident of New Jersey, and upon the superintendent in all cases.   The hearing shall be held and a record made thereof within 60 days of the receipt of the application for a hearing by the judge of the Superior Court.   A formal pleading and filing fee shall not be required as a preliminary to a hearing.   Appeals from the results of a hearing shall be in accordance with law.

The Administrative Director of the Courts shall coordinate with the superintendent in the development of an electronic filing system to receive requests for hearings and serve the chief police officer and superintendent as required in this section.

A firearms purchaser identification card issued prior to the effective date of P.L.2022, c.58 shall not expire.

A firearms purchaser identification card shall be void if the holder becomes subject to any of the disabilities set forth in subsection c. of this section, whereupon the card shall be returned within five days by the holder to the superintendent, who shall then advise the licensing authority.   Failure of the holder to return the firearms purchaser identification card to the superintendent within the five days shall be an offense under subsection a. of N.J.S.2C:39-10.   Any firearms purchaser identification card may be revoked by the Superior Court of the county wherein the card was issued, after hearing upon notice, upon a finding that the holder thereof no longer qualifies for the issuance of the permit.   The county prosecutor of any county, the chief police officer of any municipality or any citizen may apply to the court at any time for the revocation of the card.

P.L. 2022, CHAPTER 131

9

There shall be no conditions or requirements added to the form or content of the application, or required by the licensing authority for the issuance or renewal of a permit or identification card, other than those that are specifically set forth in this chapter.

g.   Disposition of fees.   All fees for permits shall be paid to the State Treasury for deposit into the Victims of Crime Compensation Office account if the permit is issued by the superintendent, to the municipality if issued by the chief police officer, and to the county treasurer if issued by the judge of the Superior Court.

h.   Form of permit; establishment of a web portal; disposition of the completed information.   (1) Except as otherwise provided in paragraph (2) of this subsection, the permit shall be in the form prescribed by the superintendent and shall be issued to the applicant electronically through e-mail or the web portal established or designated for this purpose by the superintendent or in such form or manner as may be authorized by the superintendent. Prior to the time the applicant receives the handgun from the seller, the applicant shall provide to the seller an acknowledgement of the permit in the form required under the process established by the superintendent, and the seller shall complete all of the information required on the web portal.  This information shall be forwarded to the superintendent through the web portal, or in such other manner as may be authorized by the superintendent, and to the chief police officer of the municipality in which the purchaser resides, except that in a municipality having no chief police officer, the information shall be forwarded to the superintendent.  The purchaser shall retain a copy of the completed information and the seller shall retain a copy of the completed information as a permanent record.

A transfer of a handgun between or among immediate family members, law enforcement officers, or collectors of firearms or ammunition as curios or relics shall be conducted via the web portal established or designated by the superintendent, which shall include among other things a certification that the seller and purchaser are in fact immediate family members, law enforcement officers, or collectors of firearms or ammunition as curios or relics.

(2) The requirements of this subsection concerning the delivery and form of permit and disposition of copies shall not be applicable when these functions may be completed by utilizing an electronic system as described in paragraph (2) of subsection b. of N.J.S.2C:58-2 or section 5 of P.L.2022, c.55 (C.2C:58-3.3a).

i.   Restriction on number of firearms person may purchase.   Only one handgun shall be purchased or delivered on each permit and no more than one handgun shall be purchased within any 30-day period, but this limitation shall not apply to:

(1) a federal, State, or local law enforcement officer or agency purchasing handguns for use by officers in the actual performance of their law enforcement duties;

(2) a collector of handguns as curios or relics as defined in Title 18, United States Code, section 921 (a) (13) who has in the collector's possession a valid Collector of Curios and Relics License issued by the federal Bureau of Alcohol, Tobacco, Firearms and Explosives;

(3) transfers of handguns among licensed retail dealers, registered wholesale dealers and registered manufacturers;

(4) transfers of handguns from any person to a licensed retail dealer or a registered wholesale dealer or registered manufacturer;

(5) any transaction where the person has purchased a handgun from a licensed retail dealer and has returned that handgun to the dealer in exchange for another handgun within 30 days of the original transaction, provided the retail dealer reports the exchange transaction to the superintendent; or

(6) any transaction where the superintendent issues an exemption from the prohibition in this subsection pursuant to the provisions of section 4 of P.L.2009, c.186 (C.2C:58-3.4).

P.L. 2022, CHAPTER 131

10

The provisions of this subsection shall not be construed to afford or authorize any other exemption from the regulatory provisions governing firearms set forth in chapter 39 and chapter 58 of Title 2C of the New Jersey Statutes;

A person shall not be restricted as to the number of rifles or shotguns the person may purchase, provided the person possesses a valid firearms purchaser identification card and provided further that the person signs the certification required in subsection b. of this section for each transaction.

j.   Firearms passing to heirs or legatees.  Notwithstanding any other provision of this section concerning the transfer, receipt or acquisition of a firearm, a permit to purchase or a firearms purchaser identification card shall not be required for the passing of a firearm upon the death of an owner thereof to the owner's heir or legatee, whether the same be by testamentary bequest or by the laws of intestacy. The person who shall so receive, or acquire the firearm shall, however, be subject to all other provisions of this chapter. If the heir or legatee of the firearm does not qualify to possess or carry it, the heir or legatee may retain ownership of the firearm for the purpose of sale for a period not exceeding 180 days, or for a further limited period as may be approved by the chief law enforcement officer of the municipality in which the heir or legatee resides or the superintendent, provided that the firearm is in the custody of the chief law enforcement officer of the municipality or the superintendent during that period.

k.   Sawed-off shotguns.  Nothing in this section shall be construed to authorize the purchase or possession of any sawed-off shotgun.

l.   Nothing in this section and in N.J.S.2C:58-2 shall apply to the sale or purchase of a visual distress signalling device approved by the United States Coast Guard, solely for possession on a private or commercial aircraft or any boat; provided, however, that no person under the age of 18 years shall purchase nor shall any person sell to a person under the age of 18 years a visual distress signalling device.

m.   The provisions of subsections a. and b. of this section and paragraphs (4) and (5) of subsection a. of N.J.S.2C:58-2 shall not apply to the purchase of firearms by a law enforcement agency for use by law enforcement officers in the actual performance of the officers' official duties, which purchase may be made directly from a manufacturer or from a licensed dealer located in this State or any other state.

n.   For the purposes of this section, "immediate family" means a spouse, domestic partner as defined in section 3 of P.L.2003, c.246 (C.26:8A-3), partner in a civil union couple as defined in section 2 of P.L.2006, c.103 (C.37:1-29), parent, stepparent, grandparent, sibling, stepsibling, child, stepchild, and grandchild, as related by blood or by law.

o.   Registration of handguns owned by new residents.  Any person who becomes a resident of this State following the effective date of P.L.2022, c.52 and who transports into this State a firearm that the person owned or acquired while residing in another state shall apply for a firearms purchaser identification card within 60 days of becoming a New Jersey resident, and shall register any handgun so transported into this State within 60 days as provided in this subsection.

A person who registers a handgun pursuant to this subsection shall complete a registration statement, which shall be in a form prescribed by the superintendent.  The information provided in the registration statement shall include, but shall not be limited to, the name and address of the person and the make, model, and serial number of the handgun being registered. Each registration statement shall be signed by the person, and the signature shall constitute a representation of the accuracy of the information contained in the registration statement.

P.L. 2022, CHAPTER 131
11

The registration statement shall be submitted to the law enforcement agency of the municipality in which the person resides or, if the municipality does not have a municipal law enforcement agency, any State Police station.

Within 60 days prior to the effective date of P.L.2022, c.52, the superintendent shall prepare the form of registration statement as described in this subsection and shall provide a suitable supply of statements to each organized full-time municipal police department and each State Police station.

A person who fails to apply for a firearms purchaser identification card or register a handgun as required pursuant to this subsection shall be granted 30 days to comply with the provisions of this subsection.  If the person does not comply within 30 days, the person shall be liable to a civil penalty of $250 for a first offense and shall be guilty of a disorderly persons offense for a second or subsequent offense.

If a person is in possession of multiple firearms or handguns in violation of this subsection, the person shall be guilty of one offense under this subsection provided the violation is a single event.

The civil penalty shall be collected pursuant to the "Penalty Enforcement Law of 1999," P.L.1999, c.274 (C.2A:58-10 et seq.) in a summary proceeding before the municipal court having jurisdiction.   A law enforcement officer having enforcement authority in that municipality may issue a summons for a violation, and may serve and execute all process with respect to the enforcement of this subsection consistent with the Rules of Court.

p.  A chief police officer or the superintendent may delegate to subordinate officers or employees of the law enforcement agency the responsibilities established pursuant to this section.

3.  N.J.S.2C:58-4 is amended to read as follows:

Permits to carry handguns.

2C:58-4. a. Scope and duration of authority.  Any person who holds a valid permit to carry a handgun issued pursuant to this section shall be authorized to carry a handgun in a holster concealed on their person in all parts of this State, except as prohibited by subsection e. of N.J.S.2C:39-5 and section 7 of P.L.2022, c.131 (C.2C:58-4.6).  One permit shall be sufficient for all handguns owned by the holder thereof, but the permit shall apply only to a handgun carried by the actual and legal holder of the permit and, except as otherwise provided in subsection b. of section 6 of P.L.2022, c.131 (C.2C:58-4.5), shall not be construed to authorize a holder to carry a handgun openly, provided that a brief, incidental exposure of a handgun while transferring it to or from a holster or due to the shifting of the person's body position or clothing shall be deemed a de minimis infraction within the contemplation of N.J.S.2C:2-11.

All permits to carry handguns shall expire two years from the date of issuance or, in the case of an employee of an armored car company, upon termination of the employee's employment by the company occurring prior thereto whichever is earlier in time, and they may thereafter be renewed every two years in the same manner and subject to the same conditions as in the case of original applications.

b.  Application forms.  All applications for permits to carry handguns, and all applications for renewal of permits, shall be made on the forms and in the manner prescribed by the superintendent.  Each application shall set forth the full name, date of birth, sex, residence, occupation, place of business or employment, any aliases or other names previously used by the applicant, and physical description of the applicant, and any other information the superintendent may prescribe for the determination of the applicant's eligibility for a permit

P.L. 2022, CHAPTER 131
12

and for the proper enforcement of this chapter. The application shall be signed by the applicant under oath, and shall be endorsed by not less than four reputable persons who are not related by blood or by law to the applicant and have known the applicant for at least three years preceding the date of application, and who shall certify thereon that the applicant has not engaged in any acts or made any statements that suggest the applicant is likely to engage in conduct, other than lawful self-defense, that would pose a danger to the applicant or others. The reputable persons also shall provide relevant information supporting the certification, including the nature and extent of their relationship with the applicant and information concerning their knowledge of the applicant's use of drugs or alcohol.

c.   Investigation and approval.   Each application shall be accompanied by a $200 application fee and shall in the first instance be submitted to the chief police officer of the municipality in which the applicant resides, or to the superintendent if: (1) the applicant is an employee of an armored car company; (2) there is no chief police officer in the municipality where the applicant resides; (3) the applicant does not reside in this State; or (4) the applicant is a mayor or other elected member of the municipal governing body.

In the case of an application made to the chief police officer of a municipality, $150 of the fee shall be retained by the municipality and the remaining $50 shall be forwarded to the superintendent. The fee amount retained by the municipality shall be used to defray the costs of investigation, administration, and processing of the permit to carry handgun applications. Application fees made to the superintendent shall be deposited into the Victims of Crime Compensation Office account.

The chief police officer, or the superintendent, as the case may be, shall determine whether the application is complete and, if so, shall cause the fingerprints of the applicant to be taken and compared with any and all records maintained by the municipality, the county in which it is located, the State Bureau of Identification and the Federal Bureau of Identification or, for an applicant who previously submitted fingerprints in order to apply for a firearms purchaser identification card or a permit to purchase a handgun in accordance with N.J.S.2C:58-3 or a permit to carry a handgun in accordance with this section, may solicit such other identification information as may be authorized by the superintendent for the conduct of a comparable criminal record check. The chief police officer or the superintendent, as the case may be, shall also determine and record a complete description of each handgun the applicant intends to carry. The chief police officer, or the superintendent, as the case may be, shall interview the applicant and the persons endorsing the application under subsection b. of this section, and shall make inquiry concerning, and investigate to the extent warranted, whether the applicant is likely to engage in conduct that would result in harm to the applicant or others, including, but not limited to, whether the applicant has any history of threats or acts of violence by the applicant directed toward self or others or any history of use, attempted use, or threatened use of physical force by the applicant against another person, or other incidents implicating the disqualifying criteria set forth in subsection c. of N.J.S.2C:58-3, including but not limited to determining whether the applicant has been subject to any recent arrests or criminal charges for disqualifying crimes or has been experiencing any mental health issues such as suicidal ideation or violent impulses, and the applicant's use of drugs or alcohol.

The chief police officer or the superintendent may require such other information from the applicant or any other person, including but not limited to publicly available statements posted or published online by the applicant, as the chief police officer or superintendent deems reasonably necessary to conduct the review of the application.

An application shall not be approved by the chief police officer or the superintendent unless the applicant demonstrates that the applicant is not subject to any of the disabilities set forth

in subsection c. of N.J.S.2C:58-3, that the applicant is thoroughly familiar with the safe handling and use of handguns, including providing proof of completion of any training or proficiency requirements established under the law, and that the applicant is in compliance with the liability insurance requirement of section 4 of P.L.2022, c.131 (C.2C:58-4.3).

Once the application is deemed complete by the chief police officer or the superintendent, if it is not approved or denied by the chief police officer or the superintendent within 90 days of filing, it shall be deemed to have been approved; provided, however, the chief police officer or the superintendent may, for good cause shown and upon written notification to the applicant, extend by up to an additional 30 days the time period for which the application may be approved or denied.  The written notification sent to the applicant shall provide a detailed explanation of the reasons for the extension.  An applicant also may agree in writing to an additional extension of time past the 120 day statutory time frame.

A chief police officer or the superintendent may delegate to subordinate officers or employees of the law enforcement agency the responsibilities established pursuant to this section.

d.   Issuance of permit; establishment of web portal; disposition of completed information. If the application has been approved by the chief police officer or the superintendent, as the case may be, the chief police officer or the superintendent shall issue the permit to the applicant in the form prescribed by the superintendent.

The permit shall be issued to the applicant electronically through electronic mail or through the web portal established or designated for this purpose by the superintendent, or in such form or manner as may be authorized by the superintendent, if, but only if, the chief police officer or superintendent determines that the applicant:

(1) has not engaged in any acts or made any statements that suggest the applicant is likely to engage in conduct, other than lawful self-defense, that would pose a danger to the applicant or others and is not subject to any of the disabilities set forth in subsection c. of N.J.S.2C:58-3;

(2) is thoroughly familiar with the safe handling and use of handguns;

(3) has completed the training requirements established pursuant to subsection g. of this section, provided that any requirement for classroom instruction and target training shall not be required for a renewal applicant who completed the instruction and training when obtaining a permit to carry a handgun issued within the previous two years; and

(4) is in compliance with the liability insurance requirement of section 4 of P.L.2022, c.131 (C.2C:58-4.3).

The provisions of this section requiring the issuance of a permit to carry a handgun utilizing the web portal established pursuant to this subsection and requiring the superintendent or chief police officer to determine that an applicant has completed the training requirement pursuant to subsection c. of this section and paragraph (3) of this subsection and is in compliance with the liability insurance requirements pursuant to subsection c. of this section and paragraph (4) of this subsection shall remain inoperative until the first day of the seventh month next following the date of enactment of P.L.2022, c.131 (C.2C:58-4.2 et al.).

e.   Appeals from denial of applications.  An applicant who is denied a permit to carry a handgun shall be provided with a written statement of the reasons for the denial.  Any applicant aggrieved by the denial by the chief police officer or the superintendent of approval for a permit to carry a handgun may request a hearing in the Superior Court of the county in which the applicant resides or in any county in which the applicant intends to carry a handgun, in the case of a nonresident, by filing a written request for a hearing within 30 days of the denial. The aggrieved applicant shall serve copies of the request upon the superintendent, the county prosecutor, and the chief police officer of the municipality where the applicant resides, if the

P.L. 2022, CHAPTER 131
14

applicant is a resident of this State.  The hearing shall be held within 60 days of the filing of the request, and no formal pleading or filing fee shall be required.  Appeals from the determination at the hearing shall be in accordance with law and the rules governing the courts of this State.

The Administrative Director of the Courts shall coordinate with the superintendent in the development of an electronic filing system to receive requests for hearings and serve the chief police officer and superintendent as required in this section.

f.   Revocation of permits.  Any permit issued under this section shall be void at the time the holder thereof becomes subject to any of the disabilities set forth in subsection c. of N.J.S.2C:58-3, and the holder of a void permit shall immediately surrender the permit to the superintendent who shall give notice to the licensing authority.  Any permit may be revoked by the Superior Court, after hearing upon notice to the holder, if the court finds that the holder is no longer qualified for the issuance of a permit.  The county prosecutor of any county, the chief police officer of any municipality, the superintendent, or any citizen may apply to the court at any time for the revocation of any permit issued pursuant to this section.

g.   Training requirement.  (1) On or prior to the first day of the seventh month following the enactment of P.L.2022, c.131 (C.2C:58-4.2 et al.), the superintendent shall establish training requirements in the lawful and safe handling and storage of firearms, which shall consist of an online course of instruction, in-person classroom instruction, and target training administered by a certified firearm instructor on a firing range approved by the superintendent and on the list of approved ranges published on the State Police website.  The training shall include, but not be limited to, demonstration of a level of proficiency in the use of a handgun in such manner as required by the superintendent and training, developed or approved in conjunction with the Police Training Commission, on justification in the use of deadly force under State law.

(2) A person who obtained a permit pursuant to this section prior to the first day of the seventh month following the date of enactment of P.L.2022, c.131 (C.2C:58-4.2 et al.) and which permit is not scheduled to expire until at least one year following the enactment of P.L.2022, c.131 (C.2C:58-4.2 et al.) shall comply with the training requirement established pursuant to this subsection no later than the first day of the tenth month following the date of enactment of P.L.2022, c.131 (C.2C:58-4.2 et al.).

h.   For purposes of this section, "holster" means a device or sheath that securely retains a handgun which, at a minimum, conceals and protects the main body of the firearm, maintains the firearm in a consistent and accessible position, and renders the trigger covered and inaccessible while the handgun is fully seated in the holster.

C.2C:58-4.3  Liability insurance, handgun, public, carrying.

4.  a. Every private citizen who carries a handgun in public in this State shall maintain liability insurance coverage insuring against loss resulting from liability imposed by law for bodily injury, death, and property damage sustained by any person arising out of the ownership, maintenance, operation or use of a firearm carried in public wherein such coverage shall be at least in an amount or limit of $300,000, exclusive of interest and costs, on account of injury to or death of more than one person and for damage to property, in any one incident.

b.   Proof of liability insurance, as required pursuant to subsection a. of this section, shall be produced by the person carrying a handgun in public, within a reasonable amount of time following any injury, death, or property damage alleged to have been caused by the person carrying the handgun in public.  This requirement shall be satisfied by delivering a full and complete copy of the applicable policy or policies of insurance that meet the standards

P.L. 2022, CHAPTER 131

15

established by subsection a. of this section and that were in force at the time of the injury, death, or property damage.

Notwithstanding the provisions of this subsection, disclosure of policy information under this section shall not constitute an admission that the alleged injury, death, or property damage is subject to the policy.

Information concerning the insurance policy shall not be admissible as evidence at trial by reason of disclosure pursuant to this subsection. The disclosure shall be confidential and available only to the injured person, representative of the decedent, or owner of damaged property and the attorney representing the injured person, representative of the decedent, or owner of damaged property and personnel in the office of the attorney.

c. A violation of this section shall be a crime of the fourth degree and shall constitute full and sufficient grounds for revocation of a permit to carry a handgun issued pursuant to N.J.S.2C:58-4.

C.2C:58-4.4  Safety requirements, handgun carry.

5. Safe carry requirements for authorized holders of a permit to carry a handgun.

a. The holder of a permit to carry a handgun issued pursuant to N.J.S.2C:58-4 shall not:

(1) use or consume alcohol, a cannabis item, or a controlled substance while carrying a handgun;

(2) be under the influence of alcohol, cannabis, or a controlled substance while carrying a handgun;

(3) carry a handgun in public outside of a holster or carry a handgun in public in a holster that does not meet the requirements of subsection h. of N.J.S.2C:58-4;

 (4) carry more than two firearms under the permittee's control at one time; or

(5) engage in an unjustified display of a handgun.

A violation of this subsection shall be a crime of the fourth degree, and any such violation shall constitute full and sufficient grounds for revocation of a permit to carry a handgun issued pursuant to N.J.S.2C:58-4.

b. The holder of a permit to carry a handgun issued pursuant to N.J.S.2C:58-4, if stopped or detained by a law enforcement officer while carrying a handgun in public or traveling with a handgun in a motor vehicle, shall:

(1) immediately disclose to the law enforcement officer that they are carrying a handgun or that a handgun is stored in the vehicle; and

(2) display the permit to carry a handgun issued pursuant to N.J.S.2C:58-4.

A violation of paragraph (1) of this section shall be a crime of the fourth degree. A person who violates paragraph (2) of this subsection shall be guilty of a disorderly persons offense for a first offense and subject to a $100 fine and a crime of the fourth degree for a second or subsequent offense.

c. A holder of a permit to carry a handgun issued pursuant to N.J.S.2C:58-4 who is carrying a handgun in public and is detained by a law enforcement officer as part of a criminal investigation shall provide the handgun to the law enforcement officer upon request for purposes of inspecting the handgun. The provisions of this subsection shall not be construed to affect or otherwise limit the authority of a law enforcement officer to conduct a lawful search or seizure.

A violation of this subsection shall be a crime of the fourth degree.

C.2C:58-4.5  Restrictions, public carrying, handgun.

6. Requirements and restrictions on the lawful carrying of a handgun in public.

P.L. 2022, CHAPTER 131
16

Except as permitted pursuant to N.J.S.2C:39-6, in addition to any criminal penalties under subsection b. of N.J.S.2C:39-5, sections 5 and 7 of P.L.2022, c.131 (C.2C:58-4.4 and C.2C:58-4.6), or any other law, it shall be a crime of the fourth degree for any person in a public place:

a.    to carry a handgun concealed on or about their person, except as permitted in accordance with N.J.S.2C:39-6, without possessing on their person a valid and lawfully issued permit to carry under N.J.S.2C:58-4 and proof of the liability insurance required pursuant to section 4 of P.L.2022, c.131 (C.2C:58-4.3); or

b.    to carry a handgun openly, whether or not in possession of a valid and lawfully issued permit to carry under N.J.S.2C:58-4 and proof of the liability insurance required pursuant to section 4 of P.L.2022, c.131 (C.2C:58-4.3).

C.2C:58-4.6  Prohibited areas, carrying, firearms, destructive device.

7.    Places where the carrying of a firearm or destructive device is prohibited.

a.    Except as otherwise provided in this section and in the case of a brief, incidental entry onto property, which shall be deemed a de minimis infraction within the contemplation of N.J.S.2C:2-11, it shall be a crime of the third degree for any person, other than a person lawfully carrying a firearm within the authorized scope of an exemption set forth in N.J.S.2C:39-6, to knowingly carry a firearm as defined in subsection f. of N.J.S.2C:39-1 and a crime of the second degree to knowingly possess a destructive device as defined in subsection c. of N.J.S.2C:39-1 in any of the following places, including in or upon any part of the buildings, grounds, or parking area of:

(1) a place owned, leased, or under the control of State, county or municipal government used for the purpose of government administration, including but not limited to police stations;

(2) a courthouse, courtroom, or any other premises used to conduct judicial or court administrative proceedings or functions;

(3) a State, county, or municipal correctional or juvenile justice facility, jail and any other place maintained by or for a governmental entity for the detention of criminal suspects or offenders;

(4) a State-contracted half-way house;

(5) a location being used as a polling place during the conduct of an election and places used for the storage or tabulation of ballots;

(6) within 100 feet of a place where a public gathering, demonstration or event is held for which a government permit is required, during the conduct of such gathering, demonstration or event;

(7) a school, college, university or other educational institution, and on any school bus;

(8) a child care facility, including a day care center;

(9) a nursery school, pre-school, zoo, or summer camp;

(10) a park, beach, recreation facility or area or playground owned or controlled by a State, county or local government unit, or any part of such a place, which is designated as a gun-free zone by the governing authority based on considerations of public safety;

(11) youth sports events, as defined in N.J.S.5:17-1, during and immediately preceding and following the conduct of the event, except that this provision shall not apply to participants of a youth sports event which is a firearm shooting competition to which paragraph (3) of subsection b. of section 14 of P.L.1979, c.179 (C.2C:58-6.1) applies;

(12) a publicly owned or leased library or museum;

(13) a shelter for the homeless, emergency shelter for the homeless, basic center shelter program, shelter for homeless or runaway youth, children's shelter, child care shelter, shelter

for victims of domestic violence, or any shelter licensed by or under the control of the Juvenile Justice Commission or the Department of Children and Families;

(14) a community residence for persons with developmental disabilities, head injuries, or terminal illnesses, or any other residential setting licensed by the Department of Human Services or Department of Health;

(15) a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises;

(16) a Class 5 Cannabis retailer or medical cannabis dispensary, including any consumption areas licensed or permitted by the Cannabis Regulatory Commission established pursuant to section 31 of P.L.2019, c.153 (C.24:6I-24);

(17) a privately or publicly owned and operated entertainment facility within this State, including but not limited to a theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held;

(18) a casino and related facilities, including but not limited to appurtenant hotels, retail premises, restaurant and bar facilities, and entertainment and recreational venues located within the casino property;

(19) a plant or operation that produces, converts, distributes or stores energy or converts one form of energy to another;

(20) an airport or public transportation hub;

(21) a health care facility, including but not limited to a general hospital, special hospital, psychiatric hospital, public health center, diagnostic center, treatment center, rehabilitation center, extended care facility, skilled nursing home, nursing home, intermediate care facility, tuberculosis hospital, chronic disease hospital, maternity hospital, outpatient clinic, dispensary, assisted living center, home health care agency, residential treatment facility, residential health care facility, medical office, or ambulatory care facility;

(22) a facility licensed or regulated by the Department of Human Services, Department of Children and Families, or Department of Health, other than a health care facility, that provides addiction or mental health treatment or support services;

(23) a public location being used for making motion picture or television images for theatrical, commercial or educational purposes, during the time such location is being used for that purpose;

(24) private property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit under N.J.S.2C:58-4, provided that nothing in this paragraph shall be construed to affect the authority to keep or carry a firearm established under subsection e. of N.J.S.2C:39-6; and

(25) any other place in which the carrying of a firearm is prohibited by statute or rule or regulation promulgated by a federal or State agency.

b. (1) A person, other than a person lawfully carrying a firearm within the authorized scope of an exemption set forth in subsection a., c., or l. of N.J.S.2C:39-6, who is otherwise authorized under the law to carry or transport a firearm shall not do so while in a vehicle in New Jersey, unless the handgun is unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle.

(2) A holder of a valid and lawfully issued permit to carry a handgun shall not leave a handgun outside of their immediate possession or control within a parked vehicle, unless the handgun is unloaded and contained in a closed and securely fastened case, or gunbox, and is

P.L. 2022, CHAPTER 131
18

not visible from outside of the vehicle, or is locked unloaded in the trunk or storage area of the vehicle.

A violation of paragraph (1) or (2) of this subsection is a crime of the fourth degree.

c.   Notwithstanding the provisions of subsections a. and b. of this section, the holder of a valid and lawfully issued permit to carry under N.J.S.2C:58-4 who is otherwise prohibited under this section from carrying a concealed firearm into the parking area of a prohibited location specified in subsection a. of this section shall be permitted to:

(1) transport a concealed handgun or ammunition within a vehicle into or out of the parking area, provided that the handgun is unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk or storage area of the vehicle;

(2) store a handgun or ammunition within a locked lock box and out of plain view within the vehicle in the parking area;

(3) transport a concealed handgun in the immediate area surrounding their vehicle within a prohibited parking lot area only for the limited purpose of storing or retrieving the handgun within a locked lock box in the vehicle's trunk or other place inside the vehicle that is out of plain view; and

(4) transport a concealed handgun between a vehicle parked within a prohibited parking lot area and a place other than a prohibited place enumerated in subsection a. of this section, provided that the person immediately leaves the parking lot area and does not enter into or on the grounds of the prohibited place with the handgun.

d.   The holder of a valid and lawfully issued permit to carry under N.J.S.2C:58-4 shall not be in violation of subsection a. of this section while the holder is traveling along a public right-of-way that touches or crosses any of the places enumerated in subsection a. of this section if the concealed handgun is carried on their person in accordance with the provisions of this act or is being transported in a vehicle by the permit holder in accordance with all other applicable provisions of law.

e. (1) Nothing in this act shall be construed to prohibit the holder of a valid and lawfully issued permit under N.J.S.2C:58-4 who is lawfully authorized to provide security at a place enumerated in subsection a. of this section from carrying a firearm, openly or concealed, provided that the authorization is set forth in writing, and only to the extent permitted by the entity responsible for security at the place in question.

(2) Unless otherwise required or prohibited by law, the owner or entity in control of any place enumerated in subsection a. of this section or owner or entity responsible for providing security may allow or prohibit retired law enforcement officers who are authorized to possess and carry a handgun pursuant to subsection l. of N.J.S.2C:39-6 or qualified retired law enforcement officers within the meaning of the federal "Law Enforcement Officers Safety Act of 2004," Pub.L. 108-277 to carry a concealed handgun on the premises of such place.

f.   Nothing in this section shall be construed to prohibit an employee of an armored car company who is the holder of a valid and lawfully issued permit to carry a handgun issued pursuant to N.J.S.2C:58-4 who is contractually authorized to provide services for a client at a place enumerated in subsection a. of this section from carrying a firearm, openly, in the regular course of employment.

g.   Nothing in this section shall prohibit the carrying or transporting of a firearm in accordance with subsections e. and f. of N.J.S.2C:39-6 or where it is otherwise expressly authorized by law.

8.  N.J.S.2C:39-6 is amended to read as follows:

Exemptions.

2C:39-6. a. Provided a person complies with the requirements of subsection j. of this section, N.J.S.2C:39-5 does not apply to:

(1) Members of the Armed Forces of the United States or of the National Guard while actually on duty, or while traveling between places of duty and carrying authorized weapons in the manner prescribed by the appropriate military authorities;

(2) Federal law enforcement officers, and any other federal officers and employees required to carry firearms in the performance of their official duties;

(3) Members of the State Police and, under conditions prescribed by the superintendent, members of the Marine Law Enforcement Bureau of the Division of State Police;

(4) A sheriff, undersheriff, sheriff's officer, prosecutor's detective or investigator, State investigator employed by the Division of Criminal Justice of the Department of Law and Public Safety, investigator employed by the State Commission of Investigation, inspector of the Alcoholic Beverage Control Enforcement Bureau of the Division of State Police in the Department of Law and Public Safety authorized to carry weapons by the Superintendent of State Police, State park police officer, or State conservation police officer;

(5) Except as hereinafter provided, a State correctional police officer, or a prison or jail warden of any penal institution in this State or the warden's deputies, or an employee of the Department of Corrections engaged in the interstate transportation of convicted offenders, while in the performance of the employee's duties, and when required to possess the weapon by a superior officer, or a correctional police officer or keeper of a penal institution in this State at all times while in the State of New Jersey, provided the person annually passes an examination approved by the superintendent testing the person's proficiency in the handling of firearms;

(6) A civilian employee of the United States Government under the supervision of the commanding officer of any post, camp, station, base or other military or naval installation located in this State who is required, in the performance of the employee's official duties, to carry firearms, and who is authorized to carry firearms by the commanding officer, while in the actual performance of the employee's official duties;

(7) (a) A regularly employed member, including a detective, of the police department of any county or municipality, or of any State, interstate, municipal or county park police force or boulevard police force, at all times while in the State of New Jersey;

(b) A special law enforcement officer authorized to carry a weapon as provided in subsection b. of section 7 of P.L.1985, c.439 (C.40A:14-146.14);

(c) An airport security officer or a special law enforcement officer appointed by the governing body of any county or municipality, except as provided in subparagraph (b) of this paragraph, or by the commission, board or other body having control of a county park or airport or boulevard police force, while engaged in the actual performance of the officer's official duties and when specifically authorized by the governing body to carry weapons;

(8) A full-time, paid member of a paid or part-paid fire department or force of any municipality who is assigned full-time or part-time to an arson investigation unit created pursuant to section 1 of P.L.1981, c.409 (C.40A:14-7.1) or to the county arson investigation unit in the county prosecutor's office, while either engaged in the actual performance of arson investigation duties or while actually on call to perform arson investigation duties and when specifically authorized by the governing body or the county prosecutor, as the case may be, to carry weapons. Prior to being permitted to carry a firearm, a member shall take and successfully complete a firearms training course administered by the Police Training

Commission pursuant to P.L.1961, c.56 (C.52:17B-66 et seq.), and shall annually qualify in the use of a revolver or similar weapon prior to being permitted to carry a firearm;

(9) A juvenile correctional police officer in the employment of the Juvenile Justice Commission established pursuant to section 2 of P.L.1995, c.284 (C.52:17B-170) subject to the regulations promulgated by the commission;

(10) A designated employee or designated licensed agent for a nuclear power plant under license of the Nuclear Regulatory Commission, while in the actual performance of the person's official duties, if the federal licensee certifies that the designated employee or designated licensed agent is assigned to perform site protection, guard, armed response or armed escort duties and is appropriately trained and qualified, as prescribed by federal regulation, to perform those duties. Any firearm utilized by an employee or agent for a nuclear power plant pursuant to this paragraph shall be returned each day at the end of the employee's or agent's authorized official duties to the employee's or agent's supervisor. All firearms returned each day pursuant to this paragraph shall be stored in locked containers located in a secure area;

(11) A county correctional police officer at all times while in the State of New Jersey, provided the officer annually passes an examination approved by the superintendent testing the officer's proficiency in the handling of firearms;

(12) A county prosecutor, assistant prosecutor, federal prosecutor, municipal prosecutor, Attorney General, assistant attorney general, deputy attorney general and federal, State, county, or municipal court judge, including a judge of the Tax Court and any other court of limited jurisdiction established, altered, or abolished by law, a judge of the Office of Administrative Law, a judge of the Division of Workers' Compensation at all times while in this State. Prior to being permitted to carry a firearm, a person subject to this paragraph shall take and successfully complete a firearms training course administered by the Police Training Commission pursuant to P.L.1961, c.56 (C.52:17B-66 et seq.), and shall annually qualify in the use of a handgun or similar weapon prior to being permitted to carry a firearm. The superintendent may issue identification cards indicating that such a person is permitted to carry a handgun pursuant to this paragraph.

b. Subsections a., b. and c. of N.J.S.2C:39-5 do not apply to:

(1) A law enforcement officer employed by a governmental agency outside of the State of New Jersey while actually engaged in the officer's official duties, provided, however, that the officer has first notified the superintendent or the chief law enforcement officer of the municipality or the prosecutor of the county in which the officer is engaged; or

(2) A licensed dealer in firearms and the dealer's registered employees during the course of their normal business while traveling to and from their place of business and other places for the purpose of demonstration, exhibition or delivery in connection with a sale, provided, however, that the weapon is carried in the manner specified in subsection g. of this section.

c. Provided a person complies with the requirements of subsection j. of this section, subsections b. and c. of N.J.S.2C:39-5 do not apply to:

(1) A special agent of the Division of Taxation who has passed an examination in an approved police training program testing proficiency in the handling of any firearm which the agent may be required to carry, while in the actual performance of the agent's official duties and while going to or from the agent's place of duty, or any other police officer, while in the actual performance of the officer's official duties;

(2) A State deputy conservation police officer or a full-time employee of the Division of Parks and Forestry having the power of arrest and authorized to carry weapons, while in the actual performance of the officer's official duties;

(3) (Deleted by amendment, P.L.1986, c.150.)

(4) A court attendant appointed by the sheriff of the county or by the judge of any municipal court or other court of this State, while in the actual performance of the attendant's official duties;

(5) A guard employed by any railway express company, banking or building and loan or savings and loan institution of this State, while in the actual performance of the guard's official duties;

(6) A member of a legally recognized military organization while actually under orders or while going to or from the prescribed place of meeting and carrying the weapons prescribed for drill, exercise or parade;

(7) A municipal humane law enforcement officer, authorized pursuant to subsection d. of section 25 of P.L.2017, c.331 (C.4:22-14.1), or humane law enforcement officer of a county society for the prevention of cruelty to animals authorized pursuant to subsection c. of section 29 of P.L.2017, c.331 (C.4:22-14.5), while in the actual performance of the officer's duties;

(8) An employee of a public utilities corporation actually engaged in the transportation of explosives;

(9) A railway policeman, except a transit police officer of the New Jersey Transit Police Department, at all times while in the State of New Jersey, provided that the person has passed an approved police academy training program consisting of at least 280 hours.  The training program shall include, but need not be limited to, the handling of firearms, community relations, and juvenile relations;

(10) A campus police officer appointed under P.L.1970, c.211 (C.18A:6-4.2 et seq.) at all times.  Prior to being permitted to carry a firearm, a campus police officer shall take and successfully complete a firearms training course administered by the Police Training Commission, pursuant to P.L.1961, c.56 (C.52:17B-66 et seq.), and shall annually qualify in the use of a revolver or similar weapon prior to being permitted to carry a firearm;

(11) (Deleted by amendment, P.L.2003, c.168).

(12) A transit police officer of the New Jersey Transit Police Department, at all times while in the State of New Jersey, provided the officer has satisfied the training requirements of the Police Training Commission, pursuant to subsection c. of section 2 of P.L.1989, c.291 (C.27:25-15.1);

(13) A parole officer employed by the State Parole Board at all times.  Prior to being permitted to carry a firearm, a parole officer shall take and successfully complete a basic course for regular police officer training administered by the Police Training Commission, pursuant to P.L.1961, c.56 (C.52:17B-66 et seq.), and shall annually qualify in the use of a revolver or similar weapon prior to being permitted to carry a firearm;

(14) A Human Services police officer at all times while in the State of New Jersey, as authorized by the Commissioner of Human Services;

(15) A person or employee of any person who, pursuant to and as required by a contract with a governmental entity, supervises or transports persons charged with or convicted of an offense;

(16) A housing authority police officer appointed under P.L.1997, c.210 (C.40A:14-146.19 et al.) at all times while in the State of New Jersey; or

(17) A probation officer assigned to the "Probation Officer Community Safety Unit" created by section 2 of P.L.2001, c.362 (C.2B:10A-2) while in the actual performance of the probation officer's official duties.  Prior to being permitted to carry a firearm, a probation officer shall take and successfully complete a basic course for regular police officer training administered by the Police Training Commission, pursuant to P.L.1961, c.56 (C.52:17B-66 et seq.), and

P.L. 2022, CHAPTER 131
22

shall annually qualify in the use of a revolver or similar weapon prior to being permitted to carry a firearm.

d. (1) Subsections c. and d. of N.J.S.2C:39-5 do not apply to antique firearms, provided that the antique firearms are unloaded or are being fired for the purposes of exhibition or demonstration at an authorized target range or in another manner approved in writing by the chief law enforcement officer of the municipality in which the exhibition or demonstration is held, or if not held on property under the control of a particular municipality, the superintendent.

(2) Subsection a. of N.J.S.2C:39-3 and subsection d. of N.J.S.2C:39-5 do not apply to an antique cannon that is capable of being fired but that is unloaded and immobile, provided that the antique cannon is possessed by (a) a scholastic institution, a museum, a municipality, a county or the State, or (b) a person who obtained a firearms purchaser identification card as specified in N.J.S.2C:58-3.

(3) Subsection a. of N.J.S.2C:39-3 and subsection d. of N.J.S.2C:39-5 do not apply to an unloaded antique cannon that is being transported by one eligible to possess it, in compliance with regulations the superintendent may promulgate, between its permanent location and place of purchase or repair.

(4) Subsection a. of N.J.S.2C:39-3 and subsection d. of N.J.S.2C:39-5 do not apply to antique cannons that are being loaded or fired by one eligible to possess an antique cannon, for purposes of exhibition or demonstration at an authorized target range or in the manner as has been approved in writing by the chief law enforcement officer of the municipality in which the exhibition or demonstration is held, or if not held on property under the control of a particular municipality, the superintendent, provided that performer has given at least 30 days' notice to the superintendent.

(5) Subsection a. of N.J.S.2C:39-3 and subsection d. of N.J.S.2C:39-5 do not apply to the transportation of unloaded antique cannons directly to or from exhibitions or demonstrations authorized under paragraph (4) of subsection d. of this section, provided that the transportation is in compliance with safety regulations the superintendent may promulgate. Those subsections shall not apply to transportation directly to or from exhibitions or demonstrations authorized under the law of another jurisdiction, provided that the superintendent has been given 30 days' notice and that the transportation is in compliance with safety regulations the superintendent may promulgate.

e. Nothing in subsections b., c., and d. of N.J.S.2C:39-5 shall be construed to prevent a person keeping or carrying about the person's place of business, residence, premises or other land owned or possessed by the person, any firearm, or from carrying the same, in the manner specified in subsection g. of this section, from any place of purchase to the person's residence or place of business, between the person's dwelling and place of business, between one place of business or residence and another when moving, or between the person's dwelling or place of business and place where the firearms are repaired, for the purpose of repair. For the purposes of this section, a place of business shall be deemed to be a fixed location.

f. Nothing in subsections b., c., and d. of N.J.S.2C:39-5 shall be construed to prevent:

(1) A member of any rifle or pistol club organized in accordance with the rules prescribed by the National Board for the Promotion of Rifle Practice, in going to or from a place of target practice, carrying firearms necessary for target practice, provided that the club has filed a copy of its charter with the superintendent and annually submits a list of its members to the superintendent and provided further that the firearms are carried in the manner specified in subsection g. of this section;

JA676

(2) A person carrying a firearm or knife in the woods or fields or upon the waters of this State for the purpose of hunting, target practice or fishing, provided that the firearm or knife is legal and appropriate for hunting or fishing purposes in this State and the person has in the person's possession a valid hunting license, or, with respect to fresh water fishing, a valid fishing license;

(3) A person transporting any firearm or knife while traveling:

(a) Directly to or from any place for the purpose of hunting or fishing, provided the person has in the person's possession a valid hunting or fishing license; or

(b) Directly to or from any target range, or other authorized place for the purpose of practice, match, target, trap or skeet shooting exhibitions, provided in all cases that during the course of the travel all firearms are carried in the manner specified in subsection g. of this section and the person has complied with all the provisions and requirements of Title 23 of the Revised Statutes and any amendments thereto and all rules and regulations promulgated thereunder; or

(c) In the case of a firearm, directly to or from any exhibition or display of firearms which is sponsored by any law enforcement agency, any rifle or pistol club, or any firearms collectors club, for the purpose of displaying the firearms to the public or to the members of the organization or club, provided, however, that not less than 30 days prior to the exhibition or display, notice of the exhibition or display shall be given to the Superintendent of the State Police by the sponsoring organization or club, and the sponsor has complied with any reasonable safety regulations the superintendent may promulgate. Any firearms transported pursuant to this section shall be transported in the manner specified in subsection g. of this section;

(4) A person from keeping or carrying about a private or commercial aircraft or any boat, or from transporting to or from the aircraft or boat for the purpose of installation or repair of a visual distress signaling device approved by the United States Coast Guard.

g. Any weapon being transported under paragraph (2) of subsection b., subsection e., or paragraph (1) or (3) of subsection f. of this section shall be carried unloaded and contained in a closed and fastened case, gunbox, securely tied package, or locked in the trunk of the automobile in which it is being transported, and in the course of travel shall include only deviations as are reasonably necessary under the circumstances.

h. Nothing in subsection d. of N.J.S.2C:39-5 shall be construed to prevent any employee of a public utility, as defined in R.S.48:2-13, doing business in this State or any United States Postal Service employee, while in the actual performance of duties which specifically require regular and frequent visits to private premises, from possessing, carrying or using any device which projects, releases or emits any substance specified as being noninjurious to canines or other animals by the Commissioner of Health and which immobilizes only on a temporary basis and produces only temporary physical discomfort through being vaporized or otherwise dispensed in the air for the sole purpose of repelling canine or other animal attacks.

The device shall be used solely to repel only those canine or other animal attacks when the canines or other animals are not restrained in a fashion sufficient to allow the employee to properly perform the employee's duties.

Any device used pursuant to this act shall be selected from a list of products, which consist of active and inert ingredients, permitted by the Commissioner of Health.

i. (1) Nothing in N.J.S.2C:39-5 shall be construed to prevent any person who is 18 years of age or older and who has not been convicted of a crime, from possession for the purpose of personal self-defense of one pocket-sized device which contains and releases not more than three-quarters of an ounce of chemical substance not ordinarily capable of lethal use or of inflicting serious bodily injury, but rather, is intended to produce temporary physical

discomfort or disability through being vaporized or otherwise dispensed in the air. Any person in possession of any device in violation of this subsection shall be deemed and adjudged to be a disorderly person, and upon conviction thereof, shall be punished by a fine of not less than $100.

(2) Notwithstanding the provisions of paragraph (1) of this subsection, nothing in N.J.S.2C:39-5 shall be construed to prevent a health inspector or investigator operating pursuant to the provisions of section 7 of P.L.1977, c.443 (C.26:3A2-25) or a building inspector from possessing a device which is capable of releasing more than three-quarters of an ounce of a chemical substance, as described in paragraph (1) of this subsection, while in the actual performance of the inspector's or investigator's duties, provided that the device does not exceed the size of those used by law enforcement.

j.   A person shall qualify for an exemption from the provisions of N.J.S.2C:39-5, as specified under subsections a. and c. of this section, if the person has satisfactorily completed a firearms training course approved by the Police Training Commission.

The exempt person shall not possess or carry a firearm until the person has satisfactorily completed a firearms training course and shall annually qualify in the use of a revolver or similar weapon. For purposes of this subsection, a "firearms training course" means a course of instruction in the safe use, maintenance and storage of firearms which is approved by the Police Training Commission.  The commission shall approve a firearms training course if the requirements of the course are substantially equivalent to the requirements for firearms training provided by police training courses which are certified under section 6 of P.L.1961, c.56 (C.52:17B-71). A person who is specified in paragraph (1), (2), (3), or (6) of subsection a. of this section shall be exempt from the requirements of this subsection.

k.   Nothing in subsection d. of N.J.S.2C:39-5 shall be construed to prevent any financial institution, or any duly authorized personnel of the institution, from possessing, carrying or using for the protection of money or property, any device which projects, releases or emits tear gas or other substances intended to produce temporary physical discomfort or temporary identification.

l.   Nothing in subsection b. of N.J.S.2C:39-5 shall be construed to prevent a law enforcement officer who retired in good standing, including a retirement because of a disability pursuant to section 6 of P.L.1944, c.255 (C.43:16A-6), section 7 of P.L.1944, c.255 (C.43:16A-7), section 1 of P.L.1989, c.103 (C.43:16A-6.1), or any substantially similar statute governing the disability retirement of federal law enforcement officers, provided the officer was a regularly employed, full-time law enforcement officer for an aggregate of four or more years prior to the officer's disability retirement and further provided that the disability which constituted the basis for the officer's retirement did not involve a certification that the officer was mentally incapacitated for the performance of the officer's usual law enforcement duties and any other available duty in the department which the officer's employer was willing to assign to the officer or does not subject that retired officer to any of the disabilities set forth in subsection c. of N.J.S.2C:58-3 which would disqualify the retired officer from possessing or carrying a firearm, who semi-annually qualifies in the use of the handgun the officer is permitted to carry in accordance with the requirements and procedures established by the Attorney General pursuant to subsection j. of this section and pays the actual costs associated with those semi-annual qualifications, who is 75 years of age or younger, and who was regularly employed as a full-time member of the State Police; a full-time member of an interstate police force; a full-time member of a county or municipal police department in this State; a full-time member of a State law enforcement agency; a full-time sheriff, undersheriff or sheriff's officer of a county of this State; a full-time State or county correctional police

officer; a full-time State correctional police officer or county correctional police officer; a full-time State or county park police officer; a full-time special agent of the Division of Taxation; a full-time Human Services police officer; a full-time transit police officer of the New Jersey Transit Police Department; a full-time campus police officer exempted pursuant to paragraph (10) of subsection c. of this section; a full-time State conservation police officer exempted pursuant to paragraph (4) of subsection a. of this section; a full-time Palisades Interstate Park officer appointed pursuant to R.S.32:14-21; a full-time Burlington County Bridge police officer appointed pursuant to section 1 of P.L.1960, c.168 (C.27:19-36.3); a full-time housing authority police officer exempted pursuant to paragraph (16) of subsection c. of this section; a full-time juvenile correctional police officer exempted pursuant to paragraph (9) of subsection a. of this section; a full-time parole officer exempted pursuant to paragraph (13) of subsection c. of this section; a full-time railway policeman exempted pursuant to paragraph (9) of subsection c. of this section; a full-time county prosecutor's detective or investigator; a full-time federal law enforcement officer; or is a qualified retired law enforcement officer, as used in the federal "Law Enforcement Officers Safety Act of 2004," Pub.L. 108-277, domiciled in this State from carrying a handgun in the same manner as law enforcement officers exempted under paragraph (7) of subsection a. of this section.  A retired law enforcement officer shall be entitled to carry a handgun pursuant to this subsection under the following conditions:

(1) The retired law enforcement officer shall make application in writing to the Superintendent of State Police for approval to carry a handgun every two years.  A renewal application shall be submitted in the same manner.

(2) Upon receipt of the written application of the retired law enforcement officer, the superintendent shall request a verification of service from the chief law enforcement officer of the organization in which the retired officer was last regularly employed as a full-time law enforcement officer prior to retiring.  The verification of service shall include:

(a) The name and address of the retired officer;

(b) The date that the retired officer was hired and the date that the officer retired;

(c) A list of all handguns known to be registered to that officer;

(d) A statement that, to the reasonable knowledge of the chief law enforcement officer, the retired officer is not subject to any of the restrictions set forth in subsection c. of N.J.S.2C:58-3; and

(e) A statement that the officer retired in good standing.

(3) If the superintendent approves a retired officer's application or reapplication to carry a handgun pursuant to the provisions of this subsection, the superintendent shall notify in writing the chief law enforcement officer of the municipality wherein that retired officer resides.  In the event the retired officer resides in a municipality which has no chief law enforcement officer or law enforcement agency, the superintendent shall maintain a record of the approval.

(4) The superintendent shall issue to an approved retired officer an identification card permitting the retired officer to carry a handgun pursuant to this subsection.  This identification card shall be valid for two years from the date of issuance and shall be valid throughout the State.  The identification card shall not be transferable to any other person.  The identification card shall be carried at all times on the person of the retired officer while the retired officer is carrying a handgun.  The retired officer shall produce the identification card for review on the demand of any law enforcement officer or authority.

(5) Any person aggrieved by the denial of the superintendent of approval for a permit to carry a handgun pursuant to this subsection may request a hearing in the Superior Court of New Jersey in the county in which the person resides by filing a written request for a hearing within 30 days of the denial.  Copies of the request shall be served upon the superintendent

P.L. 2022, CHAPTER 131
26

and the county prosecutor.  The hearing shall be held within 30 days of the filing of the request, and no formal pleading or filing fee shall be required.  Appeals from the determination of the hearing shall be in accordance with law and the rules governing the courts of this State.

(6)  A judge of the Superior Court may revoke a retired officer's privilege to carry a handgun pursuant to this subsection for good cause shown on the application of any interested person. A person who becomes subject to any of the disabilities set forth in subsection c. of N.J.S.2C:58-3 shall surrender, as prescribed by the superintendent, the person's identification card issued under paragraph (4) of this subsection to the chief law enforcement officer of the municipality wherein the person resides or the superintendent, and shall be permanently disqualified to carry a handgun under this subsection.

(7)  The superintendent may charge a reasonable application fee to retired officers to offset any costs associated with administering the application process set forth in this subsection.

m.   Nothing in subsection d. of N.J.S.2C:39-5 shall be construed to prevent duly authorized personnel of the New Jersey Division of Fish and Wildlife, while in the actual performance of duties, from possessing, transporting or using any device that projects, releases or emits any substance specified as being non-injurious to wildlife by the Director of the Division of Animal Health in the Department of Agriculture, and which may immobilize wildlife and produces only temporary physical discomfort through being vaporized or otherwise dispensed in the air for the purpose of repelling bear or other animal attacks or for the aversive conditioning of wildlife.

n.   Nothing in subsection b., c., d. or e. of N.J.S.2C:39-5 shall be construed to prevent duly authorized personnel of the New Jersey Division of Fish and Wildlife, while in the actual performance of duties, from possessing, transporting or using hand held pistol-like devices, rifles or shotguns that launch pyrotechnic missiles for the sole purpose of frightening, hazing or aversive conditioning of nuisance or depredating wildlife; from possessing, transporting or using rifles, pistols or similar devices for the sole purpose of chemically immobilizing wild or non-domestic animals; or, provided the duly authorized person complies with the requirements of subsection j. of this section, from possessing, transporting or using rifles or shotguns, upon completion of a Police Training Commission approved training course, in order to dispatch injured or dangerous animals or for non-lethal use for the purpose of frightening, hazing or aversive conditioning of nuisance or depredating wildlife.


C.2C:58-4.7  Regulations, necessary to implementation.

9.   Notwithstanding any provision of the "Administrative Procedure Act," P.L.1968, c.410 (C.52:14B-1 et seq.) to the contrary, the Superintendent of State Police may adopt immediately upon filing with the Office of Administrative Law such regulations as the superintendent deems necessary to implement the provisions of P.L.2022, c.131 (C.2C:58-4.2 et al.), which shall be effective for a period not to exceed 18 months, and may thereafter be amended, adopted, or readopted by the superintendent in accordance with the requirements of the "Administrative Procedure Act," P.L.1968, c.410 (C.52:14B-1 et seq.).


C.2C:58-4.8  Application determinations, pending, filed, submitted.

10.  a.  Notwithstanding the provisions of subsection d. of N.J.S.2C:58-4, application determinations for a permit to carry a handgun that were pending before the Superior Court and filed prior to the date of enactment of P.L.2022, c.131 (C.2C:58-4.2 et al.) shall be made by the court.  A Judge of the Superior Court may rely on the approval by the chief police officer or superintendent, as the case may be, as the basis for issuing the permit.

P.L. 2022, CHAPTER 131

27

b.   Application determinations for a permit to carry a handgun that are submitted on or after the date of enactment of P.L.2022, c.131 (C.2C:58-4.2 et al.) shall be made by a chief police officer or superintendent, as the case may be, in accordance with subsection d. of N.J.S.2C:58-4.

C.2C:58-4.9  Severability.

11.  The provisions of P.L.2022, c.131 (C.2C:58-4.2 et al.) are severable; if any provision, or application of any provision, of this amendatory and supplementary act is held invalid by any court, the holding or judgment shall not affect the remaining provisions or applications of the provisions thereof.

12.  Sections 2, 3, 7, and 10 of this act shall take effect immediately and the remainder of this act shall take effect on the first day of the seventh month next following the date of enactment, but the Attorney General, Superintendent of State Police, and Commissioner of Banking and Insurance may take such anticipatory action as is necessary for the implementation of this act.

Approved December 22, 2022.

JA681

# *Bill A4769*

## *Session 2022 - 2023*

Makes various revisions to requirements for obtaining a firearm purchaser identification card, permit to purchase a handgun, and permit to carry a handgun; codifies sensitive places in which firearms and destructive devices are prohibited.*

### Bills and Joint Resolutions Signed by the Governor

### *Identical Bill Number:*S3214

This bill has been certified by OLS for a fiscal note.

### *Primary Sponsor:*

- Danielsen, Joe
- Greenwald, Louis D.
- Jasey, Mila M.
- McKeon, John F.
- Park, Ellen J.
- Chaparro, Annette
- Scutari, Nicholas P.
- Greenstein, Linda R.

### *Co-Sponsor:*

- Johnson, Gordon M.

- **10/13/2022**Introduced, Referred to Assembly Judiciary Committee
- **10/17/2022**Reported out of Asm. Comm. with Amendments, and Referred to Assembly Appropriations Committee
- **10/20/2022**Reported out of Assembly Comm. with Amendments, 2nd Reading
- **10/24/2022**Recommitted to Assembly Oversight, Reform and Federal Relations Committee
- **10/24/2022**Reported out of Assembly Comm. with Amendments, 2nd Reading
- **11/14/2022**Recommitted to Assembly Judiciary Committee
- **11/14/2022**Reported from Assembly Comm. as a Substitute, 2nd Reading
- **11/21/2022**Passed by the Assembly (43-29-1)
- **12/1/2022**Received in the Senate, Referred to Senate Budget and Appropriations Committee
- **12/5/2022**Reported from Senate Committee, 2nd Reading
- **12/19/2022**Substituted for S3214 (SCS)
- **12/19/2022**Passed Senate (Passed Both Houses) (21-16)
- **12/22/2022**Approved P.L.2022, c.131.

---

- **Introduced**
  (33 pages)**PDF FormatHTML Format**
- **Statement** - AJU 10/17/22
  (7 pages)**PDF FormatHTML Format**

- **Reprint** - AJU 10/17/22 1R
  (26 pages)**PDF FormatHTML Format**

- **Statement** - AAP 10/20/22 1R
  (10 pages)**PDF FormatHTML Format**

- **Statement** - AOF 10/24/22 2R
  (8 pages)**PDF FormatHTML Format**

- **Reprint** - AOF 10/24/22 3R
  (38 pages)**PDF FormatHTML Format**

- **Reprint** - AAP 10/20/22 2R
  (38 pages)**PDF FormatHTML Format**

- **Fiscal Estimate** - 10/31/22; 3R
  (5 pages)**PDF FormatHTML Format**

- **Statement** - JUD 3R ACS CC 11/14/22
  (9 pages)**PDF FormatHTML Format**

- **Fiscal Estimate** - 11/25/22; ACS
  (6 pages)**PDF FormatHTML Format**

- **Statement** - SBA 12/5/22 ACS
  (8 pages)**PDF FormatHTML Format**

- **Assembly Committee Substitute** - AJU 11/14/22 ACS
  (39 pages)**PDF FormatHTML Format**

- **Advance Law**
  (38 pages)**PDF FormatHTML Format**

- **Pamphlet Law**
  (27 pages)**PDF FormatHTML Format**

*Committee Voting:*

- **AJU - 10/17/2022 - r/Aca**
  **Yes:** 3
  **No:** 2
  **Not Voting:** 0
  **Abstain:** 0

  **Roll Call**

- **AAP - 10/20/2022 - r/Aca**
  **Yes:** 7
  **No:** 4
  **Not Voting:** 0
  **Abstain:** 0

  **Roll Call**

- **AOF - 10/24/2022 - r/Aca**
  **Yes:** 3
  **No:** 2
  **Not Voting:** 0
  **Abstain:** 0

  **Roll Call**

- **AJU - 11/14/2022 - r/ACS**
  **Yes:** 3
  **No:** 2
  **Not Voting:** 0
  **Abstain:** 0

  **Roll Call**

- **SBA - 12/5/2022 - r/ACS**

**Yes:** 8
**No:** 4
**Not Voting:** 0
**Abstain:** 0

**Roll Call**

*Session Voting:*

- **Asm. 11/21/2022 - 3RDG FINAL PASSAGE**
  **Yes:** 43
  **No:** 29
  **Not Voting:** 7
  **Abstain:** 1

  **Roll Call**

- **Sen. 12/19/2022 - SUB FOR S-3214**
  **Yes:** 0
  **No:** 0
  **Not Voting:** 40

  - Voice Vote Passed

- **Sen. 12/19/2022 - 3RDG FINAL PASSAGE**
  **Yes:** 21
  **No:** 16
  **Not Voting:** 3
  **Abstain:** 0

  **Roll Call**

JA686

# ASSEMBLY, No. 4769

# STATE OF NEW JERSEY

## 220th LEGISLATURE

INTRODUCED OCTOBER 13, 2022

**Sponsored by:**
**Assemblyman  JOE DANIELSEN**
**District 17 (Middlesex and Somerset)**
**Assemblyman  LOUIS D. GREENWALD**
**District 6 (Burlington and Camden)**
**Assemblywoman  MILA M. JASEY**
**District 27 (Essex and Morris)**
**Assemblyman  JOHN F. MCKEON**
**District 27 (Essex and Morris)**
**Assemblywoman  ELLEN J. PARK**
**District 37 (Bergen)**

**SYNOPSIS**
  Makes various revisions to requirements for obtaining firearm purchaser identification card, permit to purchase handgun, and permit to carry handgun; codifies sensitive places in which firearms and weapons are prohibited.

**CURRENT VERSION OF TEXT**
  As introduced.



**A4769** DANIELSEN, GREENWALD
2

1    **An Act** concerning the sale and possession of firearms and
2        supplementing and amending various parts of the statutory law.
3
4    **Be It Enacted** *by the Senate and General Assembly of the State*
5    *of New Jersey:*
6
7        1.    (New section) The Legislature finds and declares that:
8        a.    The decision of the United States Supreme Court in <u>New</u>
9    <u>York State Rifle & Pistol Association v Bruen</u> holds significant
10   implications for carrying a handgun in New Jersey and the law
11   governing the issuance of permits to carry a handgun. The <u>Bruen</u>
12   decision establishes that states cannot deny permits to carry a
13   handgun to otherwise-qualified citizens who fail to show that they
14   have the "proper cause" to carry a handgun. New Jersey law relies
15   on a similar standard, considering whether an applicant has a
16   "justifiable need," in determining whether to issue a permit to carry
17   a handgun.
18       b.    In accordance with the precedent established in the <u>Bruen</u>
19   decision, laws requiring showings of particularized need are no
20   longer legally viable to determine whether a person may carry a
21   handgun in public. The <u>Bruen</u> decision does make clear, however,
22   that the Legislature can enact laws to protect our communities from
23   threats to public health, safety, and welfare posed by gun violence,
24   which take into account as appropriate the Supreme Court's Second
25   Amendment ruling while continuing to promote and enhance public
26   safety.
27       c.    Statistics show that expanding handgun carrying creates
28   safety risks, helping to fuel the epidemic of gun violence. For
29   example, a study by researchers at the Johns Hopkins Bloomberg
30   School of Public Health found that the estimated average rate of
31   officer-involved shootings increased by 12.9 percent in ten states
32   that relaxed restrictions between 2014 and 2020 on civilians
33   carrying concealed firearms in public. Accordingly, evidence
34   demonstrates that more guns on the streets can translate into more
35   acts of gun violence. To mitigate the impact of having more people
36   carrying guns in public places, steps must be taken to better ensure
37   that those who exercise the right to carry are responsible, law-
38   abiding, and appropriately trained individuals who would not pose
39   undue safety risks if armed in public places.
40       d.    In <u>Bruen</u>, the Supreme Court recognized that states may
41   prohibit individuals who are not "law-abiding, responsible citizens"
42   from carrying firearms in public, and endorsed the use of "licensing
43   requirements for carrying a handgun for self-defense." Although the
44   Court did not provide a complete list of lawful requirements, it
45   specifically cited a "background check, mental health check, training

        EXPLANATION – Matter enclosed in bold-faced brackets **[**thus**]** in the above bill is
    not enacted and is intended to be omitted in the law.

        Matter underlined <u>thus</u> is new matter.

JA688

**A4769** DANIELSEN, GREENWALD

3

1   in firearms handling and in laws regarding the use of force, among
2   other possible requirements" as permissible. The purpose of these
3   checks, the Court explained, is to "ensure only that those bearing
4   arms in the jurisdiction are in fact, 'law-abiding, responsible
5   citizens.'" It is thus important to bolster and improve the process in
6   this State for ensuring that only such individuals possess and carry
7   firearms. Toward that end, this act strengthens the criteria and
8   background investigation requirements that are used to determine
9   whether an applicant is qualified to carry a firearm in New Jersey.
10      e. This act also designates places in which the carrying of a
11  weapon is prohibited. Previously, application of the justifiable need
12  standard minimized the serious dangers of misuse and accidental
13  use inherent in the carrying of handguns in a public place. Given
14  the likelihood that a much greater number of individuals will now
15  qualify to carry handguns in public, it is now both necessary and
16  appropriate to clearly identify in the law those sensitive places
17  where, due to heightened public safety concerns, carrying a weapon
18  of any kind, including a handgun, is not permissible. These
19  prohibitions are based on common sense principles and historical
20  analogues.
21      f. Notwithstanding its rejection of a particularized need
22  standard, the <u>Bruen</u> decision recognizes that the carrying of
23  firearms in sensitive places can "be prohibited consistent with the
24  Second Amendment." Indeed, the Court assumed it settled that
25  "laws forbidding the carrying of firearms in sensitives places such
26  as schools and government buildings," as well other places such as
27  "legislative assemblies, polling places, and courthouses," are
28  "longstanding" and not subject to disputes regarding their
29  constitutionality. The Court added that other "sensitive place"
30  regulations may be permissible if "consistent with the Second
31  Amendment's text and historical understanding" – that is,
32  "relevantly similar" to historical analogues.
33      g. The sensitive-place prohibitions on dangerous weapons set
34  forth in this act are rooted in history and tradition. They are
35  analogous to historical laws that can be found from the Founding
36  era to Reconstruction, which are also found in modern laws in many
37  states. History and tradition support at least the following location-
38  based restrictions on carrying firearms:
39      (1) Places that are the site of core constitutional activity, such as
40  but not limited to the exercise of First Amendment rights, or that
41  are otherwise vital to the functioning of democracy and our system
42  of government. That includes prohibitions of firearms in facilities
43  within the criminal justice system;
44      (2) Schools, universities, other educational institutions, where
45  people assemble for educational purposes and for the purposes of
46  teaching, learning, research, and the pursuit of knowledge;
47      (3) Parks and other recreation spaces, including locations where
48  children congregate;

**A4769** DANIELSEN, GREENWALD

4

(4) Locations that protect vulnerable classes of people, such as the young and the frail;

(5) Places where intoxicating substances are sold, places where large groups of individuals congregate, and places where volatile conditions may pose a threat to public safety; and

(6) Various forms of transportation and public infrastructure, whose safety, security, and stability are critical to supporting social function.

h.   The historical record also supports restriction of firearm possession on private property when the owner has not given their consent. Many states require a property owner's permission before another may enter private dwellings and private lands with a firearm or other weapons.  Requiring consent from the property owner before carrying weapons onto private property is also in line with both the reasonable expectations and property rights of New Jersey property owners.

i.   Additionally, the fees to obtain a firearms purchaser identification permit or a permit to purchase a handgun in New Jersey were initially set by statute over 50 years ago at $5 and $2, respectively, and in over a half century the law has never been changed to increase these fees, notwithstanding the impact of inflation, increasing costs of background checks and related investigations, and the investment made over the years to technologically upgrade the firearms application and registration system established and maintained by the New Jersey State Police.

j.   Accordingly, the Legislature finds it is necessary and proper to revise this State's procedural and substantive laws related to firearms to update the process and the standards applicable to firearm purchase and possession as well as our handgun carry law, and to continue to promote public safety and reduce gun violence in a manner consistent with the Second Amendment principles articulated by the current Supreme Court jurisprudence. These revisions will focus on factors other than the need or purpose a person may assert as justification to carry a handgun, such as the person's background and qualifications, with the ultimate goal of keeping New Jersey streets and neighborhoods safe from gun violence.

2.   N.J.S.2C:58-3 is amended to read as follows:

2C:58-3.  a.  Permit to purchase a handgun.

(1) No person shall sell, give, transfer, assign or otherwise dispose of, nor receive, purchase, or otherwise acquire a handgun unless the purchaser, assignee, donee, receiver or holder is licensed as a dealer under this chapter or has first secured a permit to purchase a handgun as provided by this section.

(2) A person who is not a licensed retail dealer and sells, gives, transfers, assigns, or otherwise disposes of, or receives, purchases

**A4769** DANIELSEN, GREENWALD

5

1   or otherwise acquires a handgun pursuant to this section shall
2   conduct the transaction through a licensed retail dealer.

3       The provisions of this paragraph shall not apply if the transaction
4   is:

5       (a) between members of an immediate family as defined in
6   subsection n. of this section;

7       (b) between law enforcement officers;

8       (c) between collectors of firearms or ammunition as curios or
9   relics as defined in Title 18, U.S.C. section 921 (a) (13) who have
10  in their possession a valid Collector of Curios and Relics License
11  issued by the Bureau of Alcohol, Tobacco, Firearms, and
12  Explosives; or

13      (d) a temporary transfer pursuant to section 1 of P.L.1992, c.74
14  (C.2C:58-3.1) or section 1 of P.L.1997, c.375 (C.2C:58-3.2).

15      (3) Prior to a transaction conducted pursuant to this subsection,
16  the retail dealer shall complete a National Instant Criminal
17  Background Check of the person acquiring the handgun.   In
18  addition:

19      (a) the retail dealer shall submit to the Superintendent of State
20  Police, on a form approved by the superintendent, information
21  identifying and confirming the background check;

22      (b) every retail dealer shall maintain a record of transactions
23  conducted pursuant to this subsection, which shall be maintained at
24  the address displayed on the retail dealer's license for inspection by
25  a law enforcement officer during reasonable hours;

26      (c) a retail dealer may charge a fee for a transaction conducted
27  pursuant to this subsection; and

28      (d) any record produced pursuant to this subsection shall not be
29  considered a public record pursuant to P.L.1963, c.73 (C.47:1A-1 et
30  seq.) or P.L.2001, c.404 (C.47:1A-5 et al.).

31      b.   Firearms purchaser identification card.

32      (1) 〖No〗 A person shall not sell, give, transfer, assign or
33  otherwise dispose of nor receive, purchase or otherwise acquire an
34  antique cannon or a rifle or shotgun, other than an antique rifle or
35  shotgun, unless the purchaser, assignee, donee, receiver or holder is
36  licensed as a dealer under this chapter or possesses a valid firearms
37  purchaser identification card, and first exhibits the card to the seller,
38  donor, transferor or assignor, and unless the purchaser, assignee,
39  donee, receiver or holder signs a written certification, on a form
40  prescribed by the superintendent, which shall indicate that 〖he〗 the
41  person presently complies with the requirements of subsection c. of
42  this section and shall contain 〖his〗 the person's name, address and
43  firearms purchaser identification card number or dealer's
44  registration number.   The certification shall be retained by the
45  seller, as provided in paragraph (4) of subsection a. of N.J.S.2C:58-
46  2, or, in the case of a person who is not a dealer, it may be filed
47  with the chief of police of the municipality in which 〖he〗 the
48  person resides or with the superintendent.

**A4769** DANIELSEN, GREENWALD

6

1    (2) A person who is not a licensed retail dealer and sells, gives,
2  transfers, assigns, or otherwise disposes of, or receives, purchases
3  or otherwise acquires an antique cannon or a rifle or shotgun
4  pursuant to this section shall conduct the transaction through a
5  licensed retail dealer.

6    The provisions of this paragraph shall not apply if the transaction
7  is:

8    (a) between members of an immediate family as defined in
9  subsection n. of this section;

10    (b) between law enforcement officers;

11    (c) between collectors of firearms or ammunition as curios or
12  relics as defined in Title 18, U.S.C. section 921 (a) (13) who have
13  in their possession a valid Collector of Curios and Relics License
14  issued by the Bureau of Alcohol, Tobacco, Firearms, and
15  Explosives; or

16    (d) a temporary transfer pursuant to section 1 of P.L.1992, c.74
17  (C.2C:58-3.1) and section 1 of P.L.1997, c.375 (C.2C:58-3.2).

18    (3) Prior to a transaction conducted pursuant to this subsection,
19  the retail dealer shall complete a National Instant Criminal
20  Background Check of the person acquiring an antique cannon or a
21  rifle or shotgun.  In addition:

22    (a) the retail dealer shall submit to the Superintendent of State
23  Police, on a form approved by the superintendent, information
24  identifying and confirming the background check;

25    (b) every retail dealer shall maintain a record of transactions
26  conducted pursuant to this section which shall be maintained at the
27  address set forth on the retail dealer's license for inspection by a law
28  enforcement officer during reasonable hours;

29    (c) a retail dealer may charge a fee<u>, not to exceed $25,</u> for a
30  transaction conducted pursuant to this subsection; and

31    (d) any record produced pursuant to this subsection shall not be
32  considered a public record pursuant to P.L.1963, c.73 (C.47:1A-1 et
33  seq.) or P.L.2001, c.404 (C.47:1A-5 et al.).

34    c.  Who may obtain.    **[**No**]** <u>Except as hereinafter provided, a</u>
35  person **[**of good character and good repute**]** <u>shall not be denied a</u>
36  <u>permit to purchase a handgun or a firearms purchaser identification</u>
37  <u>card, unless the person is known</u> in the community in which **[**he**]**
38  <u>the person</u> lives <u>as someone who has engaged in acts or made</u>
39  <u>statements suggesting the person is likely to engage in conduct,</u>
40  <u>other than justified self-defense, that would pose a danger to self or</u>
41  <u>others,</u> **[**and who**]** <u>or</u> is **[**not**]** subject to any of the disabilities set
42  forth in this section or other sections of this chapter **[**, shall be
43  denied a permit to purchase a handgun or a firearms purchaser
44  identification card, except as hereinafter set forth**]**.  **[**No**]** A
45  handgun purchase permit or firearms purchaser identification card
46  shall <u>not</u> be issued:

**A4769** DANIELSEN, GREENWALD

7

1    (1) To any person who has been convicted of any crime, or a
2    disorderly persons offense involving an act of domestic violence as
3    defined in section 3 of P.L.1991, c.261 (C.2C:25-19), whether or
4    not armed with or possessing a weapon at the time of the offense;
5    (2) To any drug-dependent person as defined in section 2 of
6    P.L.1970, c.226 (C.24:21-2), to any person who is <u>presently</u>
7    confined for a mental disorder [to a hospital, mental institution or
8    sanitarium] <u>as a voluntary admission as defined in section 2 of</u>
9    <u>P.L.1987, c.116 (C.30:4-27.2) or involuntarily committed to</u>
10   <u>inpatient or outpatient treatment pursuant to section 1 of P.L.1987,</u>
11   <u>c.116 (C.30:4-27.1),</u> or to any person who is presently [an habitual
12   drunkard] <u>an alcoholic, as defined by section 2 of P.L.1975, c.305</u>
13   <u>(C.26:2B-8);</u>
14   (3) To any person who suffers from a physical defect or disease
15   which would make it unsafe for [him] <u>that person</u> to handle
16   firearms, [to any person who has ever been confined for a mental
17   disorder,] or to any alcoholic <u>as defined by section 2 of P.L.1975,</u>
18   <u>c.305 (C.26:2B-8)</u> unless any of the foregoing persons produces a
19   certificate of a medical doctor or psychiatrist licensed in New
20   Jersey, or other satisfactory proof, that [he] <u>the person</u> is no longer
21   suffering from that particular disability in a manner that would
22   interfere with or handicap [him] <u>that person</u> in the handling of
23   firearms; to any person who knowingly falsifies any information on
24   the application form for a handgun purchase permit or firearms
25   purchaser identification card;
26   (4) To any person under the age of 18 years for a firearms
27   purchaser identification card and to any person under the age of 21
28   years for a permit to purchase a handgun;
29   (5) To any person where the issuance would not be in the interest
30   of the public health, safety or welfare <u>because the person is found to</u>
31   <u>be lacking the essential character or temperament necessary to be</u>
32   <u>entrusted with a firearm;</u>
33   (6) To any person who is subject to <u>or has violated</u> a <u>temporary</u>
34   <u>or final</u> restraining order issued pursuant to the "Prevention of
35   Domestic Violence Act of 1991", P.L.1991, c.261 (C.2C:25-17 et
36   seq.) prohibiting the person from possessing any firearm <u>or a</u>
37   <u>temporary or final domestic violence restraining order issued in</u>
38   <u>another jurisdiction prohibiting the person from possessing any</u>
39   <u>firearm;</u>
40   (7) To any person who as a juvenile was adjudicated delinquent
41   for an offense which, if committed by an adult, would constitute a
42   crime and the offense involved the unlawful use or possession of a
43   weapon, explosive or destructive device or is enumerated in
44   subsection d. of section 2 of P.L.1997, c.117 (C.2C:43-7.2);
45   (8) To any person whose firearm is seized pursuant to the
46   "Prevention of Domestic Violence Act of 1991", P.L.1991, c.261
47   (C.2C:25-17 et seq.) and whose firearm has not been returned; or

**A4769** DANIELSEN, GREENWALD

8

1     (9) To any person named on the consolidated Terrorist Watchlist
2 maintained by the Terrorist Screening Center administered by the
3 Federal Bureau of Investigation;
4     (10) To any person who is subject to <u>or has violated</u> a court order
5 prohibiting the custody, control, ownership, purchase, possession,
6 or receipt of a firearm or ammunition issued pursuant to the
7 "Extreme Risk Protective Order Act of 2018", P.L.2018, c.35
8 (C.2C:58-20 et al.);
9     (11) To any person who is subject to <u>or has violated</u> a court order
10 prohibiting the custody, control, ownership, purchase, possession,
11 or receipt of a firearm or ammunition issued pursuant to P.L.2021,
12 c.327 (C.2C:12-14 et al.)<u>;</u>
13     <u>(12) To any person who is subject to or has violated a temporary</u>
14 <u>or final restraining order issued pursuant to the "Sexual Assault</u>
15 <u>Survivor Protection Act of 2015," P.L.2015, c.147 (C.2C:14-13 et</u>
16 <u>al.);</u>
17     <u>(13) To any person who has previously been voluntarily admitted</u>
18 <u>or involuntarily committed to inpatient or outpatient treatment</u>
19 <u>pursuant to section 1 of P.L.1987, c.116 (C.30:4-27.1), unless the</u>
20 <u>court has expunged the person's record pursuant to P.L.1953, c.268</u>
21 <u>(C.30:4-80.8 et seq.);</u>
22     <u>(14) To any person who is subject to an outstanding arrest</u>
23 <u>warrant for an indictable crime in this State or for a felony, other</u>
24 <u>than a felony to which section 1 of P.L.2022, c.50 (C.2A:160-14.1)</u>
25 <u>would apply, in any other state or federal jurisdiction;</u>
26     <u>(15) To any person who is a fugitive from justice due to having</u>
27 <u>fled from any state or federal jurisdiction to avoid prosecution for a</u>
28 <u>crime, other than a crime to which section 1 of P.L.2022, c.50</u>
29 <u>(C.2A:160-14.1) would apply, or to avoid giving testimony in any</u>
30 <u>criminal proceeding; or</u>
31     <u>(16) To any person who has been convicted of more than one</u>
32 <u>crime of the fourth degree in violation of sections 4, 5, or 6 of</u>
33 <u>P.L.  , c.  (C.  )(pending before the Legislature as this bill)</u>.
34     In order to obtain a permit to purchase a handgun or a firearms
35 purchaser identification card, the applicant shall demonstrate that,
36 within four years prior to the date of the application, the applicant
37 satisfactorily completed a course of instruction approved by the
38 superintendent in the lawful and safe handling and storage of
39 firearms. The applicant shall be required to demonstrate
40 completion of a course of instruction only once prior to obtaining
41 either a firearms purchaser identification card or the applicant's first
42 permit to purchase a handgun.
43     The applicant shall not be required to demonstrate completion of
44 a course of instruction in order to obtain any subsequent permit to
45 purchase a handgun, to replace an existing firearms purchaser
46 identification card, or to renew a firearms purchaser identification
47 card.

**A4769** DANIELSEN, GREENWALD

9

1    An applicant who is a law enforcement officer who has satisfied
2    the requirements of subsection j. of N.J.S.2C:39-6, a retired law
3    enforcement officer who has satisfied the requirements of
4    subsection l. of N.J.S.2C:39-6, or a veteran who was honorably
5    discharged as a member of the United States Armed Forces or
6    National Guard who received substantially equivalent training shall
7    not be required to complete the course of instruction required
8    pursuant to the provisions of this subsection.
9    A person who obtained a permit to purchase a handgun or a
10   firearms purchaser identification card prior to the effective date of
11   P.L.2022, c.58 shall not be required to complete a course of
12   instruction pursuant to this subsection.
13   d.  Issuance.  The chief of police of an organized full-time
14   police department of the municipality where the applicant resides or
15   the superintendent, in all other cases, shall upon application, issue
16   to any person qualified under the provisions of subsection c. of this
17   section a permit to purchase a handgun or a firearms purchaser
18   identification card.
19   A firearms purchaser identification card issued following the
20   effective date of P.L.2022, c.58 shall display a color photograph
21   and [a thumb print] be electronically linked to the fingerprints of
22   the card holder.  A person who obtained a firearms purchaser
23   identification card prior to the effective date of P.L.2022, c.58 shall
24   not be required to obtain a firearm purchaser identification card that
25   displays a color photograph and [a thumb print] is electronically
26   linked to the fingerprints.  The superintendent shall establish
27   guidelines as necessary to effectuate the issuance of firearms
28   purchaser identification cards that display a color photograph and
29   [a thumb print] which is electronically linked to the fingerprints of
30   the card holder.
31   The requirements of this subsection concerning firearms
32   purchaser identification cards issued following the effective date of
33   P.L.2022, c.58 shall remain inoperative until such time as the
34   superintendent establishes a system to produce cards that comply
35   with this requirement and, until such time, applicants issued a
36   firearms purchaser identification card shall be provided with cards
37   that do not conform to the requirements of this section, which shall
38   be afforded force and effect until such time as the system is
39   established and a compliant card is issued in accordance with this
40   subsection. An applicant issued a non-compliant firearms purchaser
41   identification card shall obtain a card, at no cost to the applicant,
42   which conforms to the requirements of this section no later than one
43   year after receiving notice that the system to produce cards that
44   comply with this requirement is operational.
45   If an application for a permit or identification card is denied, the
46   applicant shall be provided with a written statement of the reasons
47   for the denial.  Any person aggrieved by the denial of a permit or
48   identification card may request a hearing in the Superior Court of

**A4769** DANIELSEN, GREENWALD
10

1    the county in which 〔he〕 the person resides if 〔he〕 the person is a
2    resident of New Jersey or in the Superior Court of the county in
3    which 〔his〕 the person's application was filed if 〔he〕 the person is
4    a nonresident. The request for a hearing shall be made in writing
5    within 30 days of the denial of the application for a permit or
6    identification card. The applicant shall serve a copy of 〔his〕 the
7    request for a hearing upon the chief of police of the municipality in
8    which he resides, if 〔he〕 the person is a resident of New Jersey, and
9    upon the superintendent in all cases. The hearing shall be held and
10   a record made thereof within 〔30〕 60 days of the receipt of the
11   application for a hearing by the judge of the Superior Court. No
12   formal pleading and no filing fee shall be required as a preliminary
13   to a hearing. Appeals from the results of a hearing shall be in
14   accordance with law.
15      The Administrative Director of the Courts shall coordinate with
16   the superintendent in the development of an electronic filing system
17   to receive requests for hearings and serve the chief of police and
18   superintendent as required in this section.
19      e. Applications. Applications for permits to purchase a
20   handgun and for firearms purchaser identification cards shall be in
21   the form prescribed by the superintendent and shall set forth the
22   name, residence, place of business, age, date of birth, occupation,
23   〔sex〕 any aliases or other names previously used by the applicant,
24   gender, and physical description, including distinguishing physical
25   characteristics, if any, of the applicant, and shall state whether the
26   applicant is a citizen, whether 〔he〕 the applicant is an alcoholic 〔,
27   habitual drunkard,〕 as defined in section 2 of P.L.1975, c. 305 (C.
28   26:2B-8) or is a drug-dependent person as defined in section 2 of
29   P.L.1970, c.226 (C.24:21-2), whether 〔he〕 the applicant has ever
30   been confined or committed to a mental institution or hospital for
31   treatment or observation of a mental or psychiatric condition on a
32   temporary, interim or permanent basis, giving the name and
33   location of the institution or hospital and the dates of confinement
34   or commitment, whether 〔he〕 the applicant has been attended,
35   treated or observed by any doctor or psychiatrist or at any hospital
36   or mental institution on an inpatient or outpatient basis for any
37   mental or psychiatric condition, giving the name and location of the
38   doctor, psychiatrist, hospital or institution and the dates of the
39   occurrence, whether 〔he〕 the applicant presently or ever has been a
40   member of any organization which advocates or approves the
41   commission of acts of force and violence to overthrow the
42   Government of the United States or of this State, or which seeks to
43   deny others their rights under the Constitution of either the United
44   States or the State of New Jersey, whether 〔he〕 the applicant has
45   ever been convicted of a crime or disorderly persons offense,
46   whether the 〔person〕 applicant is subject to a restraining order
47   issued pursuant to the "Prevention of Domestic Violence Act of

**A4769** DANIELSEN, GREENWALD

11

1 1991", P.L.1991, c.261 (C.2C:25-17 et seq.) prohibiting the
2 [person] applicant from possessing any firearm, whether the
3 [person] applicant is subject to a protective order issued pursuant
4 to the "Extreme Risk Protective Order Act of 2018", P.L.2018, c.35
5 (C.2C:58-20 et al.), whether the [person] applicant is subject to a
6 protective order issued pursuant to P.L.2021, c.327 (C.2C:12-14 et
7 al.) prohibiting the [person] applicant from possessing any firearm,
8 and other information as the superintendent shall deem necessary
9 for the proper enforcement of this chapter.  For the purpose of
10 complying with this subsection, the applicant shall waive any
11 statutory or other right of confidentiality relating to institutional
12 confinement.  The application shall be signed by the applicant and
13 shall contain as references the names and addresses of two
14 reputable citizens personally acquainted with [him] the applicant.
15 An application for a permit to purchase a handgun shall also
16 indicate, with respect to each handgun listed on the form, whether
17 the applicant is purchasing the handgun on the applicant's own
18 behalf or on behalf of a third party and shall specify that the
19 applicant is not an actual purchaser if the applicant is acquiring the
20 handgun on behalf of another person, unless otherwise permitted by
21 law.
22 Application blanks shall be obtainable from the superintendent,
23 from any other officer authorized to grant a permit or identification
24 card, and from licensed retail dealers, or shall be made available
25 through an online process established or made available by the
26 superintendent.
27 The chief police officer or the superintendent shall obtain the
28 fingerprints of the applicant and shall have them compared with any
29 and all records of fingerprints in the municipality and county in
30 which the applicant resides and also the records of the State Bureau
31 of Identification and the Federal Bureau of Investigation, provided
32 that an applicant for a handgun purchase permit who possesses a
33 valid firearms purchaser identification card, or who has previously
34 obtained a handgun purchase permit from the same licensing
35 authority for which [he] the applicant was previously fingerprinted,
36 and who provides other reasonably satisfactory proof of [his] the
37 applicant's identity, need not be fingerprinted again; however, the
38 chief police officer or the superintendent shall proceed to
39 investigate the application to determine whether or not the applicant
40 has become subject to any of the disabilities set forth in this
41 chapter.
42 f.   Granting of permit or identification card; fee; term; renewal;
43 revocation.  The application for the permit to purchase a handgun
44 together with a fee of [$2] $25, or the application for the firearms
45 purchaser identification card together with a fee of [$5] $50, shall
46 be delivered or forwarded to the licensing authority who, upon
47 determining that the application is complete, shall investigate the

**A4769** DANIELSEN, GREENWALD

12

1   same and, unless good cause for the denial thereof appears, shall
2   grant the permit or the identification card, or both, if application has
3   been made therefor, within 30 days from the date of receipt of the
4   <u>completed</u> application for residents of this State and within 45 days
5   for nonresident applicants.  A permit to purchase a handgun shall be
6   valid for a period of 90 days from the date of issuance and may be
7   renewed by the issuing authority for good cause for an additional 90
8   days.  A firearms purchaser identification card issued or renewed
9   after the effective date of P.L.2022, c.58 shall expire during the
10  tenth calendar year following its date of issuance and on the same
11  calendar day as the person's date of birth.

12      If the date of birth of the firearms purchaser identification card
13  holder does not correspond to a calendar day of the tenth calendar
14  year, the card shall expire on the last day of the birth month of the
15  card holder.

16      A firearms purchaser identification card issued pursuant to this
17  section may be renewed upon filing of a renewal application and
18  payment of the required fee, provided that the holder is not subject
19  to any of the disabilities set forth in subsection c. of this section and
20  complies with all other applicable requirements as set forth in
21  statute and regulation.  <u>If an application for renewal of a firearm</u>
22  <u>purchaser identification card is denied, the applicant shall be</u>
23  <u>provided with a written statement of the reasons for the denial.  Any</u>
24  <u>person aggrieved by the denial of an application for renewal of a</u>
25  <u>firearm purchaser identification card may request a hearing in the</u>
26  <u>Superior Court of the county in which the person resides if the</u>
27  <u>person is a resident of New Jersey or in the Superior Court of the</u>
28  <u>county in which the person's application was filed if the person is a</u>
29  <u>nonresident.  The request for a hearing shall be made in writing</u>
30  <u>within 30 days of the denial of the application for renewal of the</u>
31  <u>firearm purchaser identification card.  The applicant shall serve a</u>
32  <u>copy of the request for a hearing upon the chief of police of the</u>
33  <u>municipality in which the applicant resides, if the applicant is a</u>
34  <u>resident of New Jersey, and upon the superintendent in all cases.</u>
35  <u>The hearing shall be held and a record made thereof within 60 days</u>
36  <u>of the receipt of the application for a hearing by the judge of the</u>
37  <u>Superior Court.  A formal pleading and filing fee shall not be</u>
38  <u>required as a preliminary to a hearing.  Appeals from the results of a</u>
39  <u>hearing shall be in accordance with law.</u>
40      <u>The Administrative Director of the Courts shall coordinate with</u>
41  <u>the superintendent in the development of an electronic filing system</u>
42  <u>to receive requests for hearings and serve the chief of police and</u>
43  <u>superintendent as required in this section.</u>
44      A firearms purchaser identification card issued prior to the
45  effective date of P.L.2022, c.58 shall not expire.
46      A firearms purchaser identification card shall be void if the
47  holder becomes subject to any of the disabilities set forth in
48  subsection c. of this section, whereupon the card shall be returned

**A4769** DANIELSEN, GREENWALD

13

1   within five days by the holder to the superintendent, who shall then
2   advise the licensing authority.  Failure of the holder to return the
3   firearms purchaser identification card to the superintendent within
4   the five days shall be an offense under subsection a. of N.J.S.2C:39-
5   10.  Any firearms purchaser identification card may be revoked by
6   the Superior Court of the county wherein the card was issued, after
7   hearing upon notice, upon a finding that the holder thereof no
8   longer qualifies for the issuance of the permit.   The county
9   prosecutor of any county, the chief police officer of any
10   municipality or any citizen may apply to the court at any time for
11   the revocation of the card.
12      There shall be no conditions or requirements added to the form
13   or content of the application, or required by the licensing authority
14   for the issuance or renewal of a permit or identification card, other
15   than those that are specifically set forth in this chapter.
16      g.   Disposition of fees.  All fees for permits shall be paid to the
17   State Treasury <u>for deposit into the Victims of Crime Compensation</u>
18   <u>Office account</u> if the permit is issued by the superintendent, to the
19   municipality if issued by the chief of police, and to the county
20   treasurer if issued by the judge of the Superior Court.
21      h.   Form of permit; [quadruplicate] <u>establishment of a web</u>
22   <u>portal</u>; disposition of [copies] <u>the completed information</u>.   (1)
23   Except as otherwise provided in paragraph (2) of this subsection,
24   the permit shall be in the form prescribed by the superintendent and
25   shall be issued to the applicant [in quadruplicate] <u>electronically</u>
26   <u>through e-mail or the web portal established or designated for this</u>
27   <u>purpose by the superintendent or in such form or manner as may be</u>
28   <u>authorized by the superintendent</u>.   Prior to the time [he] <u>the</u>
29   <u>applicant</u> receives the handgun from the seller, the applicant shall
30   [deliver] <u>provide</u> to the seller <u>an acknowledgement of</u> the permit in
31   [quadruplicate] <u>the form required under the process established by</u>
32   <u>the superintendent,</u> and the seller shall complete all of the
33   information required on the [form] <u>web portal</u>.  [Within five days
34   of the date of the sale, the seller shall forward the original copy]
35   <u>This information shall be forwarded</u> to the superintendent <u>through</u>
36   <u>the web portal, or in such other manner as may be authorized by the</u>
37   <u>superintendent,</u> and [the second copy] to the chief of police of the
38   municipality in which the purchaser resides, except that in a
39   municipality having no chief of police, [the copy] <u>the information</u>
40   shall be forwarded to the superintendent.  The [third copy shall then
41   be returned to the] purchaser [with the pistol or revolver] <u>shall</u>
42   <u>retain a copy of the completed information</u> and the [fourth copy
43   shall be kept by the] seller <u>shall retain a copy of the completed</u>
44   <u>information</u> as a permanent record.
45      <u>A transfer of a handgun between or among immediate family</u>
46   <u>members, law enforcement officers, or collectors of firearms or</u>
47   <u>ammunition as curios or relics shall be conducted via the web portal</u>

**A4769** DANIELSEN, GREENWALD

14

1 established or designated by the superintendent, which shall include
2 among other things a certification that the seller and purchaser are
3 in fact immediate family members, law enforcement officers, or
4 collectors of firearms or ammunition as curios or relics.

5 (2) The requirements of this subsection concerning the delivery
6 and form of permit and disposition of copies shall not be applicable
7 when these functions may be completed by utilizing an electronic
8 system as described in paragraph (2) of subsection b. of
9 N.J.S.2C:58-2 or section 5 of P.L.2022, c.55 (C.2C:58-3.3a).

10 i. Restriction on number of firearms person may purchase.
11 Only one handgun shall be purchased or delivered on each permit
12 and no more than one handgun shall be purchased within any 30-
13 day period, but this limitation shall not apply to:

14 (1) a federal, State, or local law enforcement officer or agency
15 purchasing handguns for use by officers in the actual performance
16 of their law enforcement duties;

17 (2) a collector of handguns as curios or relics as defined in Title
18 18, United States Code, section 921 (a) (13) who has in [his] the
19 collector's possession a valid Collector of Curios and Relics
20 License issued by the federal Bureau of Alcohol, Tobacco, Firearms
21 and Explosives;

22 (3) transfers of handguns among licensed retail dealers,
23 registered wholesale dealers and registered manufacturers;

24 (4) transfers of handguns from any person to a licensed retail
25 dealer or a registered wholesale dealer or registered manufacturer;

26 (5) any transaction where the person has purchased a handgun
27 from a licensed retail dealer and has returned that handgun to the
28 dealer in exchange for another handgun within 30 days of the
29 original transaction, provided the retail dealer reports the exchange
30 transaction to the superintendent; or

31 (6) any transaction where the superintendent issues an exemption
32 from the prohibition in this subsection pursuant to the provisions of
33 section 4 of P.L.2009, c.186 (C.2C:58-3.4).

34 The provisions of this subsection shall not be construed to afford
35 or authorize any other exemption from the regulatory provisions
36 governing firearms set forth in chapter 39 and chapter 58 of Title
37 2C of the New Jersey Statutes;

38 A person shall not be restricted as to the number of rifles or
39 shotguns [he] the person may purchase, provided [he] the person
40 possesses a valid firearms purchaser identification card and
41 provided further that [he] the person signs the certification required
42 in subsection b. of this section for each transaction.

43 j. Firearms passing to heirs or legatees. Notwithstanding any
44 other provision of this section concerning the transfer, receipt or
45 acquisition of a firearm, a permit to purchase or a firearms
46 purchaser identification card shall not be required for the passing of
47 a firearm upon the death of an owner thereof to [his] the owner's
48 heir or legatee, whether the same be by testamentary bequest or by

1   the laws of intestacy.  The person who shall so receive, or acquire
2   the firearm shall, however, be subject to all other provisions of this
3   chapter. If the heir or legatee of the firearm does not qualify to
4   possess or carry it, 〔he〕 the heir or legatee may retain ownership of
5   the firearm for the purpose of sale for a period not exceeding 180
6   days, or for a further limited period as may be approved by the chief
7   law enforcement officer of the municipality in which the heir or
8   legatee resides or the superintendent, provided that the firearm is in
9   the custody of the chief law enforcement officer of the municipality
10  or the superintendent during that period.
11      k.   Sawed-off shotguns.   Nothing in this section shall be
12  construed to authorize the purchase or possession of any sawed-off
13  shotgun.
14      l.    Nothing in this section and in N.J.S.2C:58-2 shall apply to
15  the sale or purchase of a visual distress signalling device approved
16  by the United States Coast Guard, solely for possession on a private
17  or commercial aircraft or any boat; provided, however, that no
18  person under the age of 18 years shall purchase nor shall any person
19  sell to a person under the age of 18 years a visual distress signalling
20  device.
21      m.   The provisions of subsections a. and b. of this section and
22  paragraphs (4) and (5) of subsection a. of N.J.S.2C:58-2 shall not
23  apply to the purchase of firearms by a law enforcement agency for
24  use by law enforcement officers in the actual performance of the
25  current or former judge's duties, which purchase may be made
26  directly from a manufacturer or from a licensed dealer located in
27  this State or any other state.
28      n.    For the purposes of this section, "immediate family" means a
29  spouse, domestic partner as defined in section 3 of P.L.2003, c.246
30  (C.26:8A-3), partner in a civil union couple as defined in section 2
31  of P.L.2006, c.103 (C.37:1-29), parent, stepparent, grandparent,
32  sibling, stepsibling, child, stepchild, and grandchild, as related by
33  blood or by law.
34      o.    Registration of handguns owned by new residents.   Any
35  person who becomes a resident of this State following the effective
36  date of P.L.2022, c.52 and who transports into this State a firearm
37  that the person owned or acquired while residing in another state
38  shall apply for a firearm purchaser identification card within 60
39  days of becoming a New Jersey resident, and shall register any
40  handgun so transported into this State within 60 days as provided in
41  this subsection.
42      A person who registers a handgun pursuant to this subsection
43  shall complete a registration statement, which shall be in a form
44  prescribed by the superintendent.  The information provided in the
45  registration statement shall include, but shall not be limited to, the
46  name and address of the person and the make, model, and serial
47  number of the handgun being registered.   Each registration
48  statement shall be signed by the person, and the signature shall

1   constitute a representation of the accuracy of the information
2   contained in the registration statement.
3       The registration statement shall be submitted to the law
4   enforcement agency of the municipality in which the person resides
5   or, if the municipality does not have a municipal law enforcement
6   agency, any State Police station.
7       Within 60 days prior to the effective date of P.L.2022, c.52, the
8   superintendent shall prepare the form of registration statement as
9   described in this subsection and shall provide a suitable supply of
10  statements to each organized full-time municipal police department
11  and each State Police station.
12      A person who fails to apply for a firearm purchaser identification
13  card or register a handgun as required pursuant to this subsection
14  shall be granted 30 days to comply with the provisions of this
15  subsection.  If the person does not comply within 30 days, the
16  person shall be liable to a civil penalty of $250 for a first offense
17  and shall be guilty of a disorderly persons offense for a second or
18  subsequent offense.
19      If a person is in possession of multiple firearms or handguns in
20  violation of this subsection, the person shall be guilty of one
21  offense under this subsection provided the violation is a single
22  event.
23      The civil penalty shall be collected pursuant to the "Penalty
24  Enforcement Law of 1999," P.L.1999, c.274 (C.2A:58-10 et seq.) in
25  a summary proceeding before the municipal court having
26  jurisdiction.  A law enforcement officer having enforcement
27  authority in that municipality may issue a summons for a violation,
28  and may serve and execute all process with respect to the
29  enforcement of this subsection consistent with the Rules of Court.
30  (cf:  P.L.2022, c.58, s.1)
31
32      3.   N.J.S.2C:58-4 is amended to read as follows:
33      2C:58-4.   a.  Scope and duration of authority.  Any person who
34  holds a valid permit to carry a handgun issued pursuant to this
35  section shall be authorized to carry a handgun <u>in a holster concealed
36  on their person</u> in all parts of this State, except as prohibited by
37  subsection e. of N.J.S.2C:39-5 <u>and section 7 of P.L.    , c.   (C.    )
38  (pending before Legislature as this bill)</u>.  One permit shall be
39  sufficient for all handguns owned by the holder thereof, but the
40  permit shall apply only to a handgun carried by the actual and legal
41  holder of the permit <u>and, except as otherwise provided in subsection
42  b. of section 6 of P.L.    , c.   (C.          )(pending before the
43  Legislature as this bill), shall not be construed to authorize a holder
44  to carry a handgun openly, provided that a brief, incidental
45  exposure of a handgun while transferring it to or from a holster or
46  due to the shifting of the person's body position or clothing shall be
47  deemed a de minimis infraction within the contemplation of
48  N.J.S.2C:2-11</u>.

**A4769** DANIELSEN, GREENWALD

17

1  All permits to carry handguns shall expire two years from the
2  date of issuance or, in the case of an employee of an armored car
3  company, upon termination of **[**his**]** the employee's employment by
4  the company occurring prior thereto whichever is earlier in time,
5  and they may thereafter be renewed every two years in the same
6  manner and subject to the same conditions as in the case of original
7  applications.
8    b.  Application forms.  All applications for permits to carry
9  handguns, and all applications for renewal of permits, shall be made
10  on the forms and in the manner prescribed by the superintendent.
11  Each application shall set forth the full name, date of birth, **[**sex**]**
12  gender, residence, occupation, place of business or employment,
13  any aliases or other names previously used by the applicant, and
14  physical description of the applicant, and any other information the
15  superintendent may prescribe for the determination of the
16  applicant's eligibility for a permit and for the proper enforcement of
17  this chapter.  The application shall be signed by the applicant under
18  oath, and shall be **[**indorsed**]** endorsed by **[**three**]** not less than four
19  reputable persons who are not related by blood or by law to the
20  applicant and have known the applicant for at least three years
21  preceding the date of application, and who shall certify thereon that
22  the applicant **[**is a person of good moral character and behavior**]**
23  has not engaged in any acts or made any statements that suggest the
24  applicant is likely to engage in conduct, other than lawful self-
25  defense, that would pose a danger to the applicant or others.  The
26  reputable persons also shall provide relevant information supporting
27  the certification, including the nature and extent of their
28  relationship with the applicant and information concerning their
29  knowledge of the applicant's use of drugs or alcohol.
30    c.  Investigation and approval.  Each application shall be
31  accompanied by a $200 application fee and shall in the first
32  instance be submitted to the chief police officer of the municipality
33  in which the applicant resides, or to the superintendent **[**,**]** if: (1)
34  **[**if**]** the applicant is an employee of an armored car company **[**, or**]**
35  ; (2) **[**if**]** there is no chief police officer in the municipality where
36  the applicant resides **[**, or**]** ; (3) **[**if**]** the applicant does not reside in
37  this State; or (4) the applicant is a mayor or other elected member
38  of the municipal governing body.
39    In the case of an application made to the chief police officer of a
40  municipality, $150 of the fee shall be retained by the municipality
41  and the remaining $50 shall be forwarded to the superintendent.
42  The fee amount retained by the municipality shall be used to defray
43  the costs of investigation, administration, and processing of the
44  permit to carry handgun applications. Application fees made to the
45  superintendent shall be deposited into the Victims of Crime
46  Compensation Office account.

**A4769** DANIELSEN, GREENWALD
18

1    The chief police officer, or the superintendent, as the case may
2    be, shall <u>determine whether the application is complete and, if so,</u>
3    <u>shall</u> cause the fingerprints of the applicant to be taken and
4    compared with any and all records maintained by the municipality,
5    the county in which it is located, the State Bureau of Identification
6    and the Federal Bureau of Identification. 【He】 <u>The chief police</u>
7    <u>officer or the superintendent, as the case may be,</u> shall also determine
8    and record a complete description of each handgun the applicant
9    intends to carry. <u>The chief police officer, or the superintendent, as</u>
10   <u>the case may be, shall interview the applicant and the persons</u>
11   <u>endorsing the application under subsection b. of this section, and</u>
12   <u>shall make inquiry concerning, and investigate to the extent</u>
13   <u>warranted, whether the applicant is likely to engage in conduct that</u>
14   <u>would result in harm to the applicant or others, including, but not</u>
15   <u>limited to, whether the applicant has any history of threats or acts of</u>
16   <u>violence by the applicant directed toward self or others or any</u>
17   <u>history of use, attempted use, or threatened use of physical force by</u>
18   <u>the applicant against another person, or other incidents implicating</u>
19   <u>the disqualifying criteria set forth in subsection c. of N.J.S.2C:58-3,</u>
20   <u>including but not limited to determining whether the applicant has</u>
21   <u>been subject to any recent arrests or criminal charges for</u>
22   <u>disqualifying crimes or has been experiencing any mental health</u>
23   <u>issues such as suicidal ideation or violent impulses, and the</u>
24   <u>applicant's use of drugs or alcohol.</u>
25   <u>The chief police officer or the superintendent may require such</u>
26   <u>other information from the applicant or any other person, including</u>
27   <u>but not limited to publicly available statements posted or published</u>
28   <u>online by the applicant, as the chief police officer or superintendent</u>
29   <u>deems reasonably necessary to conduct the review of the</u>
30   <u>application.</u>
31   【No】 <u>An</u> application shall <u>not</u> be approved by the chief police
32   officer or the superintendent unless the applicant demonstrates that
33   【he】 <u>the applicant</u> is not subject to any of the disabilities set forth
34   in subsection c. of N.J.S.2C:58-3, that 【he】 <u>the applicant</u> is
35   thoroughly familiar with the safe handling and use of handguns<u>,</u>
36   <u>including providing proof of completion of any training or</u>
37   <u>proficiency requirements established under the law,</u> and that 【he
38   has a justifiable need to carry a handgun】 <u>the applicant is in</u>
39   <u>compliance with the firearm carry liability insurance requirement of</u>
40   <u>section 4 of P.L.  , c. (C.  )(pending before the Legislature as this</u>
41   <u>bill).</u>
42   【Each application form shall be accompanied by a written
43   certification of justifiable need to carry a handgun, which shall be
44   under oath and, in the case of a private citizen, shall specify in
45   detail the urgent necessity for self-protection, as evidenced by
46   specific threats or previous attacks which demonstrate a special
47   danger to the applicant's life that cannot be avoided by means other

1    than by issuance of a permit to carry a handgun.  Where possible,
2    the applicant shall corroborate the existence of any specific threats
3    or previous attacks by reference to reports of the incidents to the
4    appropriate law enforcement agencies.

5        If**]** Once the application is **[**not approved**]** deemed complete by
6    the chief police officer or the superintendent , if it is not approved
7    or denied by the chief police officer or the superintendent within
8    **[**60**]** 90 days of filing, it shall be deemed to have been approved
9    **[**unless the applicant agrees**]**; provided, however, the chief police
10   officer or the superintendent may, for good cause shown and upon
11   written notification to the applicant, extend by up to an additional
12   30 days the time period for which the application may be approved
13   or denied. The written notification sent to the applicant shall
14   provide a detailed explanation of the reasons for the extension.  An
15   applicant also may agree in writing to an additional extension of
16   time **[**in writing**]** past the 120 day statutory time frame.

17       d.   Issuance **[**by Superior Court**]** of permit; establishment of
18   web portal; disposition of completed information; fee.   If the
19   application has been approved by the chief police officer or the
20   superintendent, as the case may be, the **[**applicant shall forthwith
21   present it to the Superior Court of the county in which the applicant
22   resides, or to the Superior Court in any county where he intends to
23   carry a handgun, in the case of a nonresident or employee of an
24   armored car company.  The court shall**]** chief police officer or the
25   superintendent shall issue the permit to the applicant in the form
26   prescribed by the superintendent.

27       The permit shall be issued to the applicant electronically through
28   electronic mail or through the web portal established or designated
29   for this purpose by the superintendent, or in such form or manner as
30   may be authorized by the superintendent, if, but only if, **[**it is
31   satisfied**]** the chief police officer or superintendent determines that
32   the applicant:

33       (1) is a person **[**of good character**]** who has not engaged in any
34   acts or made any statements that suggest the applicant is likely to
35   engage in conduct, other than lawful self-defense, that would pose a
36   danger to the applicant or others and who is not subject to any of
37   the disabilities set forth in subsection c. of N.J.S.2C:58-3, **[**that he
38   is**]**:

39       (2) is thoroughly familiar with the safe handling and use of
40   handguns **[**,**]** ; and **[**that he has a justifiable need to carry a
41   handgun in accordance with the provisions of subsection c. of this
42   section.  The court may at its discretion issue a limited-type permit
43   which would restrict the applicant as to the types of handguns he
44   may carry and where and for what purposes the handguns may be
45   carried**]**

46       (3) has completed the training requirements established pursuant
47   to subsection g. of this section, provided that any requirement for

1 classroom instruction and target training shall not be required for a
2 renewal applicant who completed the instruction and training when
3 obtaining a permit to carry a handgun issued within the previous
4 two years; and
5   (4) is in compliance with the firearm carry liability insurance
6 requirement of section 4 of P.L. , c. (C. )(pending before the
7 Legislature as this bill).
8   At the time of issuance, the applicant shall pay to the county
9 clerk of the county where the permit was issued a permit fee of
10 **[**$20**]** $50.
11   e.  Appeals from denial of applications.  An applicant who is
12 denied a permit to carry a handgun shall be provided with a written
13 statement of the reasons for the denial. Any **[**person**]** applicant
14 aggrieved by the denial by the chief police officer or the
15 superintendent of approval for a permit to carry a handgun may
16 request a hearing in the Superior Court of the county in which **[**he**]**
17 the applicant resides or in any county in which **[**he**]** the applicant
18 intends to carry a handgun, in the case of a nonresident, by filing a
19 written request for a hearing within 30 days of the denial. **[**Copies**]**
20 The aggrieved applicant shall serve copies of the request **[**shall be
21 served**]** upon the superintendent, the county prosecutor, and the
22 chief police officer of the municipality where the applicant resides,
23 if **[**he**]** the applicant is a resident of this State. The hearing shall be
24 held within **[**30**]** 60 days of the filing of the request, and no formal
25 pleading or filing fee shall be required.  Appeals from the
26 determination at the hearing shall be in accordance with law and the
27 rules governing the courts of this State.
28   **[**If the superintendent or chief police officer approves an
29 application and the Superior Court denies the application and
30 refuses to issue a permit, the applicant may appeal the denial in
31 accordance with law and the rules governing the courts of this
32 State.**]**
33   The Administrative Director of the Courts shall coordinate with
34 the superintendent in the development of an electronic filing system
35 to receive requests for hearings and serve the chief of police and
36 superintendent as required in this section.
37   f.  Revocation of permits. Any permit issued under this section
38 shall be void at the time the holder thereof becomes subject to any
39 of the disabilities set forth in subsection c. of N.J.S.2C:58-3, and
40 the holder of a void permit shall immediately surrender the permit
41 to the superintendent who shall give notice to the licensing
42 authority. Any permit may be revoked by the Superior Court, after
43 hearing upon notice to the holder, if the court finds that the holder
44 is no longer qualified for the issuance of a permit. The county
45 prosecutor of any county, the chief police officer of any
46 municipality, the superintendent, or any citizen may apply to the

1 court at any time for the revocation of any permit issued pursuant to
2 this section.
3    g.   Training requirement.  (1) The superintendent shall establish
4 training requirements in the lawful and safe handling and storage of
5 firearms, which shall consist of an online course of instruction, in-
6 person classroom instruction, and target training administered by a
7 certified firearm instructor on a firing range approved by the
8 superintendent and on the list of approved ranges published on the
9 State Police website.  The training shall include, but not be limited to,
10 demonstration of a level of proficiency in the use of a handgun in
11 such manner as required by the superintendent and training,
12 developed or approved in conjunction with the Police Training
13 Commission, on justification in the use of deadly force under State
14 law.
15    (2) A person who obtained a permit pursuant to this section prior to
16 the effective date of P.L.     , c.     (C.     ) (pending before the
17 Legislature as this bill) shall comply with the training requirement
18 established pursuant to this subsection within 90 days following the
19 effective date of P.L.     , c.    (C.     ) (pending before the Legislature
20 as this bill)
21    h.   For purposes of this section, "holster" means a device or
22 sheath that secures a handgun which, at a minimum, is equipped
23 with a retention strap, conceals and protects the main body of the
24 firearm, maintains the firearm in a consistent and accessible
25 position, and renders the trigger covered and inaccessible while the
26 handgun is fully seated in the holster.
27 (cf: P.L.2018, c.37, s.1)
28
29    4.   (New section)  a.  Every private citizen who carries a handgun
30 in public in this State shall maintain liability insurance coverage, under
31 provisions approved by the Commissioner of Banking and Insurance,
32 insuring against loss resulting from liability imposed by law for bodily
33 injury, death, and property damage sustained by any person arising out
34 of the ownership, maintenance, operation or use of a firearm carried in
35 public wherein such coverage shall be at least in:
36    (1) an amount or limit of $100,000, exclusive of interest and costs,
37 on account of injury to, or death of, one person, in any one incident;
38    (2) an amount or limit, subject to such limit for any one person so
39 injured or killed, of $300,000, exclusive of interest and costs, on
40 account of injury to or death of, more than one person, in any one
41 incident; and
42    (3) an amount or limit of $25,000, exclusive of interest and costs,
43 for damage to property in any one incident.
44    b.   Proof of insurance as required in subsection a. of this section
45 shall be produced and displayed by the person carrying a handgun in
46 public upon request to any law enforcement officer or to any person
47 who has suffered or makes a good faith claim to have suffered either

**A4769** DANIELSEN, GREENWALD

22

1 injury or property damage arising out of the ownership, maintenance,
2 operation or use of a firearm carried in public.

3     c.   A violation of this section shall be a crime of the fourth degree
4 and shall constitute full and sufficient grounds for revocation of a
5 permit to carry a handgun issued pursuant to N.J.S.2C:58-4.

6

7     5.   (New section) Safe carry requirements for authorized
8 holders of a permit to carry a handgun.

9     a. The holder of a permit to carry a handgun issued pursuant to
10 N.J.S.2C:58-4 shall not:

11     (1) use or consume alcohol, a cannabis item, or a controlled
12 substance while carrying a handgun;

13     (2) be under the influence of alcohol, cannabis, or a controlled
14 substance while carrying a handgun;

15     (3) carry a handgun in public outside of a holster or carry a
16 handgun in public in a holster that does not meet the requirements
17 of subsection g. of N.J.S.2C:58-4;

18     (4) carry more than two firearms under the permittee's control at
19 one time; or

20     (5) engage in an unjustified display of a handgun.

21     (6) if carrying a handgun in public, refuse to provide the
22 handgun to a law enforcement officer upon request for purposes of
23 inspecting the handgun.

24     A violation of this subsection shall be a crime of the fourth
25 degree, and any such violation shall constitute full and sufficient
26 grounds for revocation of a permit to carry a handgun issued
27 pursuant to N.J.S.2C:58-4.

28     b.   The holder of a permit to carry a handgun issued pursuant to
29 N.J.S.2C:58-4, if stopped or detained by a law enforcement officer
30 while carrying a handgun in public, shall:

31     (1) immediately disclose to the law enforcement officer that they
32 are carrying a handgun; and

33     (2) display the permit to carry a handgun and proof of firearm
34 public carry liability insurance required pursuant to section 4 of
35 P.L.   , c.   (C.   )(pending before the Legislature as this bill) upon
36 the request of the officer.

37     A violation of paragraph (1) of this section shall be a crime of
38 the fourth degree.  A person who violates paragraph (2) of this
39 subsection shall be guilty of a disorderly persons offense for a first
40 offense and subject to a $100 fine and a crime of the fourth degree
41 for a second or subsequent offense.

42

43     6.   (New section) Requirements and restrictions on the lawful
44 carrying of a handgun in public.

45     In addition to any criminal penalties under subsection b. of
46 N.J.S.2C:39-5, section 7 of P.L.   , c.   (C.   )(pending before the
47 Legislature as this bill), or any other law, it shall be a crime of the
48 fourth degree for any person in a public place:

**A4769** DANIELSEN, GREENWALD
23

1    a.  to carry a handgun concealed on or about their person, except
2 as permitted in accordance with N.J.S.2C:39-6, without possessing on
3 their person a valid and lawfully issued permit to carry under
4 N.J.S.2C:58-4 and proof of firearm public carry liability insurance
5 required pursuant to section 4 of P.L. , c. (C. )(pending before the
6 Legislature as this bill); or

7    b.  to carry a handgun openly, whether or not in possession of a
8 valid and lawfully issued permit to carry under N.J.S.2C:58-4 and
9 proof of handgun public carry liability insurance required pursuant to
10 section 4 of P.L. , c. (C. )(pending before the Legislature as this bill).

11

12    7.  (New section) Places where the carrying of a weapon is
13 prohibited.

14    a.  Except as otherwise provided in this section, it shall be a crime
15 of the third degree for any person, other than a person lawfully
16 carrying a firearm within the authorized scope of an exemption set
17 forth in N.J.S.2C:39-6 and only to the extent permitted by the entity
18 responsible for security at the place in question, to knowingly carry a
19 weapon, as defined in subsection r. of N.J.S.2C:39-1, in any of the
20 following places, including in or upon any part of the buildings,
21 grounds, or parking area of:

22    (1) a place owned, leased, or under the control of State, county or
23 municipal government used for the purpose of government
24 administration, including but not limited to police stations;

25    (2) a courthouse, courtroom, or any other premises used to conduct
26 judicial or court administrative proceedings or functions;

27    (3) a State, county, or municipal correctional or juvenile justice
28 facility, jail and any other place maintained by or for a governmental
29 entity for the detention of criminal suspects or offenders;

30    (4) a State-contracted half-way house;

31    (5) a location being used as a polling place during the conduct of an
32 election;

33    (6) within 100 feet of a place where a public gathering,
34 demonstration or event is held for which a government permit is
35 required, during the conduct of such gathering, demonstration or
36 event;

37    (7) a school, college, university or other educational institution, and
38 on any school bus;

39    (8) a child care facility or day care center;

40    (9) a nursery school, pre-school, zoo, or summer camp;

41    (10) a park, beach, recreation facility or area or playground owned
42 or controlled by a State, county or local government unit, or any part
43 of such a place, which is designated as a gun free zone by the
44 governing authority based on considerations of public safety;

45    (11) at youth sports events, as defined in N.J.S.5:17-1, during and
46 immediately preceding and following the conduct of the event;

47    (12) a publicly owned or leased library or museum;

**A4769** DANIELSEN, GREENWALD
24

1    (13) a shelter for the homeless, emergency shelter for the homeless,
2    basic center shelter program, shelter for homeless or runaway youth,
3    children's shelter, child care shelter, shelter for victims of domestic
4    violence, or any shelter under the control of the Juvenile Justice
5    Commission or the Department of Children and Families;

6    (14) a community residence for persons with developmental
7    disabilities, head injuries, or terminal illnesses, or any other residential
8    setting licensed by the Department of Human Services or Department
9    of Health;

10    (15) a bar or restaurant where alcohol is served, and any other site
11    or facility where alcohol is sold for consumption on the premises;

12    (16) a site or facility where cannabis is sold for consumption on the
13    premises;

14    (17) a privately or publicly owned and operated entertainment
15    facility within this State, including but not limited to a theater,
16    stadium, museum, arena, racetrack or other place where performances,
17    concerts, exhibits, games or contests are held;

18    (18) a casino and related facilities, including but not limited to
19    appurtenant hotels, retail premises, restaurant and bar facilities, and
20    entertainment and recreational venues located within the casino
21    property;

22    (19) a plant or operation that produces, converts, distributes or
23    stores energy or converts one form of energy to another;

24    (20) an airport or public transportation hub;

25    (21) a health care facility, including but not limited to a general
26    hospital, special hospital, mental hospital, public health center,
27    diagnostic center, treatment center, rehabilitation center, extended care
28    facility, skilled nursing home, nursing home, intermediate care facility,
29    tuberculosis hospital, chronic disease hospital, maternity hospital,
30    outpatient clinic, dispensary, assisted living center, home health care
31    agency or residential health care facility;

32    (22) a facility licensed or regulated by the Department of Human
33    Services or Department of Health, other than a health care facility, that
34    provides addiction or mental health treatment or support services;

35    (23) a public location being used for making motion picture or
36    television images for theatrical, commercial or educational purposes,
37    during the time such location is being used for that purpose;

38    (24) private property, including but not limited to residential,
39    commercial, industrial, agricultural, institutional or undeveloped
40    property, unless the owner has provided express consent or has posted
41    a sign indicating that it is permissible to carry on the premises a
42    concealed handgun with a valid and lawfully issued license under
43    N.J.S.2C:58-4; and

44    (25) any other place in which the carrying of a handgun is
45    prohibited by statute or rule or regulation promulgated by a federal or
46    State agency or by municipal ordinance or regulation.

47    b.  (1) A person, other than a person lawfully carrying a firearm
48    within the authorized scope of an exemption set forth in subsection a.

**A4769** DANIELSEN, GREENWALD

25

1   or c. of N.J.S.2C:39-6, who is otherwise authorized under the law to
2   carry or transport a firearm shall not do so while in a vehicle in New
3   Jersey, unless the handgun is unloaded and contained in a closed and
4   securely fastened case, gunbox, or locked unloaded in the trunk of the
5   vehicle.

6   (2) A holder of a valid and lawfully issued permit to carry a
7   handgun shall not leave a handgun outside of their immediate
8   possession or control within a parked vehicle, unless the handgun is
9   unloaded and contained in a closed and securely fastened case, or
10  gunbox, and is not visible from outside of the vehicle, or is locked
11  unloaded in the trunk or storage area of the vehicle.

12  A violation of paragraph (1) or (2) of this subsection is a crime of
13  the fourth degree.

14  c.   Notwithstanding the provisions of subsections a. and b. of this
15  section, the holder of a valid and lawfully issued permit to carry under
16  N.J.S.2C:58-4 who is otherwise prohibited under this section from
17  carrying a concealed firearm into the parking area of a prohibited
18  location specified in subsection a. of this section shall be permitted to:

19  (1) transport a concealed handgun or ammunition within a vehicle
20  into or out of the parking area, provided that the handgun is unloaded
21  and contained in a closed and securely fastened case, gunbox, or
22  locked unloaded in the trunk or storage area of the vehicle;

23  (2) store a handgun or ammunition within a locked lock box and out
24  of plain view within the vehicle in the parking area;

25  (3) transport a concealed handgun in the immediate area
26  surrounding their vehicle within a prohibited parking lot area only for
27  the limited purpose of storing or retrieving the handgun within a
28  locked lock box in the vehicle's trunk or other place inside the vehicle
29  that is out of plain view; and

30  (4) transport a concealed handgun from a vehicle parked within a
31  prohibited parking lot area to a place other than a prohibited place
32  enumerated in subsection a. of this section, provided that the person
33  immediately leaves the parking lot area and does not enter into or on
34  the grounds of the prohibited place with the handgun.

35  d.   The holder of a valid and lawfully issued permit to carry under
36  N.J.S.2C:58-4 shall not be in violation of subsection a. of this section
37  while the holder is traveling along a public right-of-way that touches
38  or crosses any of the places enumerated in subsection a. of this section
39  if the concealed handgun is carried on their person in accordance with
40  the provisions of this act or is being transported in a vehicle by the
41  permit holder in accordance with all other applicable provisions of
42  law.

43  e.   (1) Nothing in this act shall be construed to prohibit the holder
44  of a valid and lawfully issued permit under N.J.S.2C:58-4 who is
45  lawfully authorized to provide security at a place enumerated in
46  subsection a. of this section from carrying a firearm, openly or
47  concealed, provided that the authorization is set forth in writing, and

1  only to the extent permitted by the entity responsible for security at the
2  place in question.

3  (2) Unless otherwise required or prohibited by law, the owner or
4  entity in control of any place enumerated in subsection a. of this
5  section or owner or entity responsible for providing security may allow
6  or prohibit retired law enforcement officers who are authorized to
7  possess and carry a handgun pursuant to subsection l. of N.J.S.2C:39-6
8  or qualified retired law enforcement officers within the meaning of
9  the federal "Law Enforcement Officers Safety Act of 2004," Pub.L.
10  108-277 to carry a concealed handgun on the premises of such place.

11  f. Nothing in this section shall prohibit the carrying of a firearm
12  where it is otherwise expressly authorized by law.
13

14  8.  (New section) A person purchasing a firearm or firearm
15  ammunition shall be required to disclose in a written document under
16  penalty, on a form prescribed by the superintendent, whether the
17  firearm or ammunition to be purchased is intended to be transferred to
18  a third party, and the name and address of that third party, if known.
19

20  9.  (New section) Notwithstanding any provision of the
21  "Administrative Procedure Act," P.L.1968, c.410 (C.52:14B-1 et seq.)
22  to the contrary, the Superintendent of State Police may adopt
23  immediately upon filing with the Office of Administrative Law such
24  regulations as the Superintendent deems necessary to implement the
25  provisions of this act, which shall be effective for a period not to
26  exceed 18 months, and may thereafter be amended, adopted, or
27  readopted by the Superintendent in accordance with the requirements
28  of the "Administrative Procedure Act," P.L.1968, c.410 (C.52:14B-1
29  et seq.).
30

31  10. Sections 2 and 7 of this act shall take effect immediately,
32  section 8 of this act shall take effect on the first day of second month
33  next following the date of enactment, and the remainder of this act
34  shall take effect on the first day of the seventh month next following
35  the date of enactment, but the Attorney General, Superintendent of
36  State Police, and Commissioner of Banking and Insurance may take
37  such anticipatory action as is necessary for the implementation of
38  this act.
39
40
41  STATEMENT
42

43  This bill removes from current law the justifiable need standard,
44  which is necessary to hold a permit to carry a handgun in this State,
45  in accordance with a recent decision of the United States Supreme
46  Court in New York State Rifle & Pistol Association v Bruen.  In
47  addition, the bill establishes certain criteria for obtaining a permit to
48  carry a handgun and codifies certain venues at which the right to

**A4769** DANIELSEN, GREENWALD
27

1 carry firearms would be restricted due to security and safety
2 concerns.
3     Under current law, in order to lawfully carry a handgun in
4 public, it is necessary for a private citizen to obtain a permit to
5 carry a handgun. Applicants for a permit to carry a handgun need
6 the approval of the chief of police in the municipality where they
7 reside and the approval of a Superior Court judge in the county
8 where they reside. Approval is contingent upon a person submitting,
9 along with the application, a written certification establishing
10 justifiable need. Justifiable need is defined as the urgent necessity
11 for self-protection, as evidenced by specific threats or previous
12 attacks which demonstrate a special danger to the applicant's life
13 that cannot be avoided by means other than by issuance of a permit
14 to carry a handgun. This bill eliminates the justifiable need
15 standard.
16     The bill also expands the disqualifying criteria that would
17 prohibit a person from obtaining a firearm purchaser identification
18 card (FPIC), permit to purchase a handgun (PPH), or permit to carry
19 a handgun. Under current law, a person who receives these
20 documents is required to be of "good character" and "good repute" in
21 the community and not subject to any of the disqualifying criteria
22 listed in subsection c. of N.J.S.2C:58-3. The bill expands the list of
23 disqualifying criteria to include:
24     • persons presently confined for a mental disorder as a voluntary
25       admission or involuntary commitment for inpatient or
26       outpatient treatment;
27     • persons who have violated a temporary or final restraining
28       order issued pursuant to the "Prevention of Domestic
29       Violence Act of 1991" or a temporary or final domestic
30       violence restraining order issued in another jurisdiction
31       prohibiting the person from possessing any firearm;
32     • persons who are subject to or have violated a temporary or
33       final restraining order issued pursuant to the "Sexual Assault
34       Survivor Protection Act of 2015";
35     • persons who have previously been voluntarily admitted or
36       involuntarily committed to inpatient or outpatient mental health
37       treatment, unless the court has expunged the person's record;
38     • persons who are subject to an outstanding arrest warrant for an
39       indictable crime in this State or for a felony in any other state
40       or federal jurisdiction. This provision would not include
41       individuals seeking reproductive health care services in this
42       State;
43     • persons who are a fugitive from justice due to having fled from
44       any state or federal jurisdiction to avoid prosecution for a crime
45       or to avoid giving testimony in any criminal proceeding. This
46       provision would not include individuals seeking reproductive
47       health care services in this State; and

**A4769** DANIELSEN, GREENWALD
28

1    •   persons who are convicted of a fourth degree crime for
2       violating the handgun carry requirements established under the
3       bill.
4      The bill also makes several changes to the procedure for applying
5 for an FPIC or PPH.  Under the bill, an applicant would be required to
6 provide any aliases or other names previously used by the applicant.
7 A PPH applicant also would be required to indicate, with respect to
8 each handgun listed on the form, whether the applicant is purchasing
9 the handgun on the applicant's own behalf or on behalf of a third
10 party.  In addition, the bill increases the fee to obtain an FPIC from
11 two dollars to $25.  The fee for the PPH would be increased from
12 five dollars to $50.
13      In addition, this bill renders a recent enactment (P.L.2022, c.58),
14 which requires FPICs to display a picture and thumb print,
15 inoperative until the Superintendent of State Police establishes a
16 system for issuing these cards.  The bill also clarifies that the FPIC
17 would be electronically linked to the fingerprints of the card holder,
18 rather than displaying a thumb print.
19      The bill also codifies the electronic method for reporting
20 handgun sales.  Under current law, the PPH is issued as a
21 quadruplicate document. A firearm retailer is required to complete
22 all four of the documents prior to selling a handgun and send the
23 first copy to Superintendent of State Police and the second copy to
24 the chief of police of the municipality in which the purchaser
25 resides. The third copy is retained by the retail dealer and may be
26 subject to inspection by law enforcement at any reasonable time.
27 The purchaser retains the fourth copy as a permanent record.  This
28 bill codifies the current procedure established by the State Police,
29 which established a web portal for electronically reporting handgun
30 sales.  The bill also requires that handgun transfers between or
31 among immediate family members, law enforcement officers, or
32 collectors of firearms or ammunition as curios or relics are to be
33 conducted via the web portal.
34      In addition, the bill revises the application process for obtaining
35 a permit to carry a handgun.  Under current law, a person applying
36 for a permit to carry a handgun is required to provide endorsements
37 from three people who have known the applicant for at least three
38 years and can attest that he or she is of good moral character and
39 behavior.  The bill requires an applicant to provide endorsements
40 from five people who are unrelated to the applicant.  The persons
41 providing the endorsement are to provide relevant information,
42 including the nature and extent of their relationship with the
43 applicant and information concerning their knowledge of the
44 applicant's use of drugs or alcohol.  The bill also requires the chief
45 of police or superintendent, as appropriate, to interview the
46 applicant and persons providing the endorsement.  The interviewer
47 is to inquire whether the applicant is likely to engage in conduct
48 that would result in harm to the applicant or others.  Additionally,

1    the interviewer is to inquire whether the applicant has any history of
2    threats or acts of violence by the applicant directed toward self or
3    others or any history of use, attempted use, or threatened use of
4    physical force by the applicant against another person, or other
5    incidents implicating the criteria that would disqualify a person
6    from obtaining a FPIC or PPH.  The chief of police or the
7    superintendent also may require information from the applicant or
8    any other person pertaining to publicly available statements posted
9    or published online by the applicant.  The bill also extends the time
10    frame which the superintendent or chief of police is required to
11    approve or deny an application for a permit to carry a handgun
12    application from 60 to 90 days.

13    The bill also requires the Superintendent of State Police to
14    establish a training requirement in the lawful and safe handling and
15    storage of firearms for persons who obtain a permit to carry a
16    handgun.  The training requirement is to consist of an online course
17    of instruction, in-person classroom instruction, and target training.
18    The training is to include, but not be limited to, demonstration of a
19    level of proficiency in the use of a handgun in such manner as
20    required by the superintendent and training on justification in the
21    use of deadly force under State law. The bill requires the training to
22    include demonstration of a level of proficiency in the use of a
23    handgun in a manner as may be required by the superintendent and
24    training on justification in the use of deadly force under State law.
25    A person who obtained a permit to carry a handgun prior to the
26    bill's effective date would be required to complete the classroom
27    instruction and target training within 90 days of the bill's effective
28    date.

29    In addition, the application fee for the permit to carry a handgun
30    would be $200.  In the case of an application made to the chief
31    police officer of a municipality, $150 of the fee is to be retained by
32    the municipality and the remaining $50 is to be forwarded to the
33    superintendent.  The fee amount retained by the municipality is to
34    be used to defray the costs of investigation, administration, and
35    processing of the permit to carry handgun applications.  Application
36    fees made to the superintendent are to be deposited into the Victims
37    of Crime Compensation Office account.  The bill also provides that
38    mayors and elected members of a municipal governing body are to
39    apply to the superintendent, rather than the chief law enforcement
40    officer, when applying for a permit to carry a handgun.

41    Under the bill, the permit would be issued to the applicant
42    electronically through email or through the web portal established
43    or designated for this purpose by the superintendent, or in such
44    form or manner as may be authorized by the superintendent.  Prior
45    to issuing the permit, the chief of police or superintendent is
46    required to determine whether:

**A4769** DANIELSEN, GREENWALD
30

1     • the applicant is a person of good character who is not subject
2        to any of the disabilities prohibiting the person from
3        purchasing a firearm;
4     • has not been convicted of a crime of the fourth degree in
5        violation of the carry permit requirements established by the
6        bill;
7     • is thoroughly familiar with the safe handling and use of
8        handguns; and
9     • is in compliance with the firearm carry liability insurance
10       established by the bill.
11    The bill requires a private citizen who obtains a carry permit to
12 obtain public carry liability insurance.  The bill requires the liability
13 insurance coverage to insure against loss resulting from liability
14 imposed by law for bodily injury, death, and property damage
15 sustained by any person arising out of the ownership, maintenance,
16 operation or use of a firearm carried in public.  The bill requires the
17 coverage to be at least in:
18     • an amount or limit of $100,000, exclusive of interest and
19        costs,  on account of injury to, or death of, one person, in
20        any one incident;
21     • an amount or limit, subject to such limit for any one person
22        so injured or killed, of $300,000, exclusive of interest and
23        costs, on account of injury to or death of, more than one
24        person, in any one incident; and
25     • an amount or limit of $25,000, exclusive of interest and
26        costs, for damage to property in any one incident.
27    The holder of a permit to carry a handgun would be required to
28 produce and display proof of insurance upon request to any law
29 enforcement officer or to any person who has suffered or claims to
30 have suffered either injury or property damage arising out of the
31 ownership, maintenance, operation or use of a firearm carried in
32 public.
33    In addition, the bill requires persons who obtain a permit to carry a
34 handgun to adhere to certain requirements.  Under the bill, a person
35 with a carry permit would prohibited from:
36     • using or consuming alcohol, a cannabis item, or a controlled
37        substance while carrying a handgun;
38     • being under the influence of alcohol, cannabis, or a
39        controlled substance while carrying a handgun;
40     • carrying a handgun not authorized under the permit;
41     • carrying a handgun outside of a holster or in an unauthorized
42        holster;
43     • carrying more than two firearms under the permittee's
44        control at one time;
45     • engaging in an unjustified display of a handgun;

**A4769** DANIELSEN, GREENWALD

31

1      • if carrying a handgun in public, failing to display the permit
2        to carry a handgun and proof of firearm public carry liability
3        insurance upon request of a law enforcement officer; or
4      • if carrying a handgun in public, refusing to provide the
5        handgun to a law enforcement officer upon request for
6        purposes of inspecting the handgun.

7    A person who violates these requirements would be guilty of a
8 crime of the fourth degree.  A violation also may serve as sufficient
9 grounds for revocation of a permit to carry a handgun.

10    The bill provides that when stopped by a law enforcement officer a
11 permit holder would be required to immediately disclose to the officer
12 that the permit holder is carrying a handgun in public and display
13 proof of liability insurance.   A person who fails to disclose to a law
14 enforcement officer that they are carry a handgun would be guilty of a
15 fourth degree crime.  A person who fails to display proof of firearm
16 public carry liability insurance would be guilty of a disorderly persons
17 offense and subject to a $100 fine and guilty of a crime of the fourth
18 degree for a second or subsequent offense.

19    The bill also delineates places in which a permit holder would be
20 prohibited from carrying a handgun.  Under the bill, it would be a third
21 degree crime to carry any firearm or weapon in the following
22 locations:

23      • a place owned, leased, or under the control of State, county, or
24        municipal government used for the purpose of government
25        administration, including but not limited to police stations;
26      • a courthouse, courtroom, or any other premises used to conduct
27        judicial or court administrative proceedings or functions;
28      • a State, county, or municipal correctional or juvenile justice
29        facility, jail and any other place maintained by or for a
30        governmental entity for the detention of criminal suspects or
31        offenders;
32      • a State-contracted half-way house;
33      • a location being used as a polling place during the conduct of
34        an election;
35      • a place where a public gathering, demonstration, or event is
36        held for which a government permit is required, during the
37        conduct of such gathering, demonstration, or event;
38      • a school, college, university, or other educational institution
39        and on any school bus;
40      • a child care facility or day care center;
41      • a nursery school, pre-school, zoo, or summer camp;
42      • a park, beach, recreation facility, or area or playground owned
43        or controlled by a State, county or local government unit;
44      • at youth sports events during and immediately preceding and
45        following the conduct of the event;
46      • a publicly owned or leased library or museum;

**A4769** DANIELSEN, GREENWALD

32

1     •   a shelter for the homeless, emergency shelter for the homeless,
2         basic center shelter program, shelter for homeless or runaway
3         youth, children's shelter, child care shelter, shelter for victims
4         of domestic violence, or any shelter under the control of the
5         Juvenile Justice Commission or the Department of Children
6         and Families;
7     •   a community residence for persons with developmental
8         disabilities, head injuries, or terminal illnesses, or any other
9         residential setting licensed by the Department of Human
10        Services or Department of Health;
11    •   a bar or restaurant where alcohol is served, and any other site
12        or facility where alcohol is sold for consumption on the
13        premises;
14    •   a site or facility where cannabis is sold for consumption on the
15        premises;
16    •   a privately or publicly owned and operated entertainment
17        facility within this State, including but not limited to a theater,
18        stadium, museum, arena, racetrack, or other place where
19        performances, concerts, exhibits, games, or contests are held;
20    •   a casino and related facilities, including but not limited to
21        appurtenant hotels, retail premises, restaurant, and bar
22        facilities, and entertainment and recreational venues located
23        within the casino property;
24    •   a plant or operation that produces, converts, distributes, or
25        stores energy or converts one form of energy to another;
26    •   an airport or public transportation hub;
27    •   a health care facility and any facility licensed or regulated by
28        the Department of Human Services or Department of Health,
29        other than a health care facility, that provides addiction or
30        mental health treatment or support services;
31    •   a public location being used for making motion picture or
32        television images for theatrical, commercial or educational
33        purposes, during the time such location is being used for that
34        purpose;
35    •   private property, including but not limited to residential,
36        commercial, industrial, agricultural, institutional, or
37        undeveloped property, unless the owner has provided express
38        consent or has posted a sign indicating that it is permissible to
39        carry on the premises a concealed handgun with a valid and
40        lawfully issued permit to carry; and
41    •   any other place in which the carrying of a handgun is
42        prohibited by statute or rule or regulation promulgated by a
43        federal or State agency or by municipal ordinance or
44        regulation.
45     The bill also requires the holder of a permit to carry a handgun to
46  adhere to certain requirements while transporting the handgun in a
47  vehicle.

**A4769** DANIELSEN, GREENWALD

33

1      Finally, the bill requires a person purchasing a firearm or firearm
2    ammunition to disclose in a written document under penalty of perjury
3    whether the firearm or ammunition to be purchased is intended to be
4    transferred to a third party, and the name and address of the third
5    party, if known.

ASSEMBLY JUDICIARY COMMITTEE

STATEMENT TO

**ASSEMBLY, No. 4769**

with committee amendments

# STATE OF NEW JERSEY

DATED:  OCTOBER 17, 2022

The Assembly Judiciary Committee reports favorably and with committee amendments Assembly Bill No. 4769.

As amended and reported by the committee, Assembly Bill No. 4769 removes from current law the justifiable need standard, which is necessary to hold a permit to carry a handgun in this State, in accordance with a recent decision of the United States Supreme Court in New York State Rifle & Pistol Association v Bruen.  In addition, the bill establishes certain criteria for obtaining a permit to carry a handgun and codifies certain venues at which the right to carry firearms would be restricted due to security and safety concerns.

Under current law, in order to lawfully carry a handgun in public, it is necessary for a private citizen to obtain a permit to carry a handgun. Applicants for a permit to carry a handgun need the approval of the chief of police in the municipality where they reside and the approval of a Superior Court judge in the county where they reside. Approval is contingent upon a person submitting, along with the application, a written certification establishing justifiable need. Justifiable need is defined as the urgent necessity for self-protection, as evidenced by specific threats or previous attacks which demonstrate a special danger to the applicant's life that cannot be avoided by means other than by issuance of a permit to carry a handgun.  This bill eliminates the justifiable need standard.

The bill also expands the disqualifying criteria that would prohibit a person from obtaining a firearm purchaser identification card (FPIC), permit to purchase a handgun (PPH), or permit to carry a handgun. Under current law, a person who receives these documents is required to be of "good character" and "good repute" in the community and not subject to any of the disqualifying criteria listed in subsection c. of N.J.S.2C:58-3.  This bill removes the "good character" and "good repute" criteria and revises the standard to require the issuance of a FPIC or PPH, unless the applicant is known in the community in which the person lives as someone who has engaged in acts or made statements suggesting the person is likely to engage in conduct, other than justified self-defense, that would pose a danger to self or others, or is subject to any of the disabilities set forth in current law.  The bill expands the list of disqualifying criteria to include:

2

- persons presently confined for a mental disorder as a voluntary admission or involuntary commitment for inpatient or outpatient treatment;
- persons who have violated a temporary or final restraining order issued pursuant to the "Prevention of Domestic Violence Act of 1991" or a temporary or final domestic violence restraining order issued in another jurisdiction prohibiting the person from possessing any firearm;
- persons who are subject to or have violated a temporary or final restraining order issued pursuant to the "Sexual Assault Survivor Protection Act of 2015";
- persons who have previously been voluntarily admitted or involuntarily committed to inpatient or outpatient mental health treatment, unless the court has expunged the person's record;
- persons who are subject to an outstanding arrest warrant for an indictable crime in this State or for a felony in any other state or federal jurisdiction. This provision would not include individuals seeking reproductive health care services in this State;
- persons who are a fugitive from justice due to having fled from any state or federal jurisdiction to avoid prosecution for a crime or to avoid giving testimony in any criminal proceeding. This provision would not include individuals seeking reproductive health care services in this State; and
- persons who are convicted of a fourth degree crime for violating the handgun carry requirements established under the bill.

The bill also makes several changes to the procedure for applying for an FPIC or PPH. Under the bill, an applicant would be required to provide any aliases or other names previously used by the applicant. A PPH applicant also would be required to indicate, with respect to each handgun listed on the form, whether the applicant is purchasing the handgun on the applicant's own behalf or on behalf of a third party. In addition, the bill increases the fee to obtain an FPIC from two dollars to $25. The fee for the PPH would be increased from five dollars to $50.

In addition, this bill renders a recent enactment (P.L.2022, c.58), which requires FPICs to display a picture and thumb print, inoperative until the Superintendent of State Police establishes a system for issuing these cards. The bill also clarifies that the FPIC would be electronically linked to the fingerprints of the card holder, rather than displaying a thumb print.

The bill also codifies the electronic method for reporting handgun sales. Under current law, the PPH is issued as a quadruplicate document. A firearm retailer is required to complete all four of the documents prior to selling a handgun and send the first copy to Superintendent of State Police and the second copy to the chief of

3

police of the municipality in which the purchaser resides. The third copy is retained by the retail dealer and may be subject to inspection by law enforcement at any reasonable time.  The purchaser retains the fourth copy as a permanent record.  This bill codifies the current procedure established by the State Police, which established a web portal for electronically reporting handgun sales.  The bill also requires that handgun transfers between or among immediate family members, law enforcement officers, or collectors of firearms or ammunition as curios or relics are to be conducted via the web portal.

In addition, the bill revises the application process for obtaining a permit to carry a handgun.  Under current law, a person applying for a permit to carry a handgun is required to provide endorsements from three people who have known the applicant for at least three years and can attest that he or she is of good moral character and behavior.  The bill requires an applicant to provide endorsements from five people who are unrelated to the applicant.   The persons providing the endorsement are to provide relevant information, including the nature and extent of their relationship with the applicant and information concerning their knowledge of the applicant's use of drugs or alcohol. The bill also requires the chief of police or superintendent, as appropriate, to interview the applicant and persons providing the endorsement.  The interviewer is to inquire whether the applicant is likely to engage in conduct that would result in harm to the applicant or others.   Additionally, the interviewer is to inquire whether the applicant has any history of threats or acts of violence by the applicant directed toward self or others or any history of use, attempted use, or threatened use of physical force by the applicant against another person, or other incidents implicating the criteria that would disqualify a person from obtaining a FPIC or PPH.  The chief of police or the superintendent also may require information from the applicant or any other person pertaining to publicly available statements posted or published online by the applicant.  The bill also extends the time frame which the superintendent or chief of police is required to approve or deny an application for a permit to carry a handgun application from 60 to 90 days.

The bill also requires the Superintendent of State Police to establish a training requirement in the lawful and safe handling and storage of firearms for persons who obtain a permit to carry a handgun. The training requirement is to consist of an online course of instruction, in-person classroom instruction, and target training.  The training is to include, but not be limited to, demonstration of a level of proficiency in the use of a handgun in such manner as required by the superintendent and training on justification in the use of deadly force under State law. The bill requires the training to include demonstration of a level of proficiency in the use of a handgun in a manner as may be required by the superintendent and training on justification in the use of deadly force under State law.  A person who obtained a permit to

4

carry a handgun prior to the bill's effective date would be required to complete the classroom instruction and target training within 90 days of the bill's effective date.

In addition, the application fee for the permit to carry a handgun would be $200. In the case of an application made to the chief police officer of a municipality, $150 of the fee is to be retained by the municipality and the remaining $50 is to be forwarded to the superintendent. The fee amount retained by the municipality is to be used to defray the costs of investigation, administration, and processing of the permit to carry handgun applications. Application fees made to the superintendent are to be deposited into the Victims of Crime Compensation Office account. The bill also provides that mayors and elected members of a municipal governing body are to apply to the superintendent, rather than the chief law enforcement officer, when applying for a permit to carry a handgun.

Under the bill, the permit would be issued to the applicant electronically through email or through the web portal established or designated for this purpose by the superintendent, or in such form or manner as may be authorized by the superintendent. Prior to issuing the permit, the chief of police or superintendent is required to determine whether:

- the applicant is a person of good character who is not subject to any of the disabilities prohibiting the person from purchasing a firearm;
- has not been convicted of a crime of the fourth degree in violation of the carry permit requirements established by the bill;
- is thoroughly familiar with the safe handling and use of handguns; and
- is in compliance with the firearm carry liability insurance established by the bill.

The bill requires a private citizen who obtains a carry permit to obtain public carry liability insurance. The bill requires the liability insurance coverage to insure against loss resulting from liability imposed by law for bodily injury, death, and property damage sustained by any person arising out of the ownership, maintenance, operation or use of a firearm carried in public. The bill requires the coverage to be at least in:

- an amount or limit of $100,000, exclusive of interest and costs, on account of injury to, or death of, one person, in any one incident;
- an amount or limit, subject to such limit for any one person so injured or killed, of $300,000, exclusive of interest and costs, on account of injury to or death of, more than one person, in any one incident; and
- an amount or limit of $25,000, exclusive of interest and costs, for damage to property in any one incident.

5

The holder of a permit to carry a handgun would be required to produce and display proof of insurance upon request to any law enforcement officer or to any person who has suffered or claims to have suffered either injury or property damage arising out of the ownership, maintenance, operation or use of a firearm carried in public.

In addition, the bill requires persons who obtain a permit to carry a handgun to adhere to certain requirements. Under the bill, a person with a carry permit would be prohibited from:

- using or consuming alcohol, a cannabis item, or a controlled substance while carrying a handgun;
- being under the influence of alcohol, cannabis, or a controlled substance while carrying a handgun;
- carrying a handgun not authorized under the permit;
- carrying a handgun outside of a holster or in an unauthorized holster;
- carrying more than two firearms under the permittee's control at one time;
- engaging in an unjustified display of a handgun;
- if carrying a handgun in public, failing to display the permit to carry a handgun and proof of firearm public carry liability insurance upon request of a law enforcement officer; or
- if carrying a handgun in public, refusing to provide the handgun to a law enforcement officer upon request for purposes of inspecting the handgun.

A person who violates these requirements would be guilty of a crime of the fourth degree. A violation also may serve as sufficient grounds for revocation of a permit to carry a handgun.

The bill provides that when stopped by a law enforcement officer a permit holder would be required to immediately disclose to the officer that the permit holder is carrying a handgun in public and display proof of liability insurance. A person who fails to disclose to a law enforcement officer that they are carrying a handgun would be guilty of a fourth degree crime. A person who fails to display proof of firearm public carry liability insurance would be guilty of a disorderly persons offense and subject to a $100 fine and guilty of a crime of the fourth degree for a second or subsequent offense.

The bill also delineates places in which a permit holder would be prohibited from carrying a handgun. Under the bill, it would be a third degree crime to carry any firearm or weapon in the following locations:

- a place owned, leased, or under the control of State, county, or municipal government used for the purpose of government administration, including but not limited to police stations;
- a courthouse, courtroom, or any other premises used to conduct judicial or court administrative proceedings or functions;

6

- a State, county, or municipal correctional or juvenile justice facility, jail and any other place maintained by or for a governmental entity for the detention of criminal suspects or offenders;
- a State-contracted half-way house;
- a location being used as a polling place during the conduct of an election;
- a place where a public gathering, demonstration, or event is held for which a government permit is required, during the conduct of such gathering, demonstration, or event;
- a school, college, university, or other educational institution and on any school bus;
- a child care facility or day care center;
- a nursery school, pre-school, zoo, or summer camp;
- a park, beach, recreation facility, or area or playground owned or controlled by a State, county or local government unit;
- at youth sports events during and immediately preceding and following the conduct of the event;
- a publicly owned or leased library or museum;
- a shelter for the homeless, emergency shelter for the homeless, basic center shelter program, shelter for homeless or runaway youth, children's shelter, child care shelter, shelter for victims of domestic violence, or any shelter under the control of the Juvenile Justice Commission or the Department of Children and Families;
- a community residence for persons with developmental disabilities, head injuries, or terminal illnesses, or any other residential setting licensed by the Department of Human Services or Department of Health;
- a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises;
- a site or facility where cannabis is sold for consumption on the premises;
- a privately or publicly owned and operated entertainment facility within this State, including but not limited to a theater, stadium, museum, arena, racetrack, or other place where performances, concerts, exhibits, games, or contests are held;
- a casino and related facilities, including but not limited to appurtenant hotels, retail premises, restaurant, and bar facilities, and entertainment and recreational venues located within the casino property;
- a plant or operation that produces, converts, distributes, or stores energy or converts one form of energy to another;
- an airport or public transportation hub;

JA725

- a health care facility and any facility licensed or regulated by the Department of Human Services or Department of Health, other than a health care facility, that provides addiction or mental health treatment or support services;
- a public location being used for making motion picture or television images for theatrical, commercial or educational purposes, during the time such location is being used for that purpose;
- private property, including but not limited to residential, commercial, industrial, agricultural, institutional, or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit to carry; and
- any other place in which the carrying of a handgun is prohibited by statute or rule or regulation promulgated by a federal or State agency or by municipal ordinance or regulation.

The bill also requires the holder of a permit to carry a handgun to adhere to certain requirements while transporting the handgun in a vehicle.

Finally, the bill requires a person purchasing a firearm or firearm ammunition to disclose in a written document under penalty of perjury whether the firearm or ammunition to be purchased is intended to be transferred to a third party, and the name and address of the third party, if known.

<u>COMMITTEE AMENDMENTS</u>

The committee amendments:

1) increase the maximum fee that a firearm retailer or dealer may charge for conducting long gun sales transactions from $25 to $70;

2) removes from section four a reference to the Commissioner of Banking and Insurance to clarify the availability of the firearm permit carry insurance coverage in the bill; and

3) make technical corrections.

# ASSEMBLY APPROPRIATIONS COMMITTEE

## STATEMENT TO

## [First Reprint]
## ASSEMBLY, No. 4769

### with committee amendments

# STATE OF NEW JERSEY

### DATED: OCTOBER 20, 2022

The Assembly Appropriations Committee reports favorably Assembly Bill No. 4769 (1R), with committee amendments.

As amended, this bill removes from current law the justifiable need standard, which is the standard an individual is required to meet to hold a permit to carry a handgun in this State, in accordance with a recent decision of the United States Supreme Court in New York State Rifle & Pistol Association v. Bruen.  In addition, the bill establishes certain criteria for obtaining a permit to carry a handgun and codifies certain venues at which the right to carry firearms would be restricted due to security and safety concerns.

Under current law, in order to lawfully carry a handgun in public, it is necessary for a private citizen to obtain a permit to carry a handgun. Applicants for a permit to carry a handgun need the approval of the chief of police in the municipality where they reside and the approval of a Superior Court judge in the county where they reside. Approval is contingent upon a person submitting, along with the application, a written certification establishing justifiable need. Justifiable need is defined as the urgent necessity for self-protection, as evidenced by specific threats or previous attacks which demonstrate a special danger to the applicant's life that cannot be avoided by means other than by issuance of a permit to carry a handgun.  This bill eliminates the justifiable need standard.

The bill also expands the disqualifying criteria that would prohibit a person from obtaining a firearms purchaser identification card (FPIC), permit to purchase a handgun (PPH), or permit to carry a handgun.  Under current law, a person who receives these documents is required to be of "good character" and "good repute" in the community and not subject to any of the disqualifying criteria listed in subsection c. of N.J.S.2C:58-3.  This bill removes the "good character" and "good repute" criteria and revises the standard to require the issuance of an FPIC or PPH, unless the applicant is known in the community in which the person lives as someone who has engaged in acts or made statements suggesting the person is likely to engage in conduct, other than justified self-defense, that would pose a danger to self or others, or is

JA727

2

subject to any of the disabilities set forth in current law. The bill expands the list of disqualifying criteria to include:

- persons presently confined for a mental disorder as a voluntary admission or involuntary commitment for inpatient or outpatient treatment;

- persons who have violated a temporary or final restraining order issued pursuant to the "Prevention of Domestic Violence Act of 1991" or a temporary or final domestic violence restraining order issued in another jurisdiction prohibiting the person from possessing any firearm;

- persons who are subject to or have violated a temporary or final restraining order issued pursuant to the "Sexual Assault Survivor Protection Act of 2015";

- persons who have previously been voluntarily admitted or involuntarily committed to inpatient or outpatient mental health treatment, unless the court has expunged the person's record;

- persons who are subject to an outstanding arrest warrant for an indictable crime in this State or for a felony in any other state or federal jurisdiction. This provision would not include individuals seeking reproductive health care services in this State;

- persons who are a fugitive from justice due to having fled from any state or federal jurisdiction to avoid prosecution for a crime or to avoid giving testimony in any criminal proceeding. This provision would not include individuals seeking reproductive health care services in this State; and

- persons who are convicted of a fourth degree crime for violating the handgun carry requirements established under the bill.

The bill also makes several changes to the procedure for applying for an FPIC or PPH. Under the bill, an applicant would be required to provide any aliases or other names previously used by the applicant. A PPH applicant also would be required to certify with respect to each handgun listed on the form, whether the applicant is purchasing the handgun on the applicant's own behalf or, if not, on behalf of a third party. In addition, the bill increases the fee to obtain an FPIC from two dollars to $25. The fee for the PPH would be increased from five dollars to $50.

In addition, this bill renders a recent enactment (P.L.2022, c.58), which requires FPICs to display a picture and thumb print, inoperative until the Superintendent of State Police establishes a system for issuing these cards. The bill also clarifies that the FPIC would be electronically linked to the fingerprints of the card holder, rather than displaying a thumb print.

The bill also codifies the electronic method for reporting handgun sales. Under current law, the PPH is issued as a quadruplicate document. A firearm retailer is required to complete all four of the

JA728

3

documents prior to selling a handgun and send the first copy to the Superintendent of State Police and the second copy to the chief of police of the municipality in which the purchaser resides. The third copy is retained by the retail dealer and may be subject to inspection by law enforcement at any reasonable time. The purchaser retains the fourth copy as a permanent record. This bill codifies the current procedure established by the State Police, which established a web portal for electronically reporting handgun sales. The bill also requires that handgun transfers between or among immediate family members, law enforcement officers, or collectors of firearms or ammunition as curios or relics are to be conducted via the web portal.

In addition, the bill revises the application process for obtaining a permit to carry a handgun. Under current law, a person applying for a permit to carry a handgun is required to provide endorsements from three people who have known the applicant for at least three years and can attest that he or she is of good moral character and behavior. The bill requires an applicant to provide endorsements from five people who are unrelated to the applicant. The persons providing the endorsement are to provide relevant information, including the nature and extent of their relationship with the applicant and information concerning their knowledge of the applicant's use of drugs or alcohol. The bill also requires the chief of police or superintendent, as appropriate, to interview the applicant and persons providing the endorsement. The interviewer is to inquire whether the applicant is likely to engage in conduct that would result in harm to the applicant or others. Additionally, the interviewer is to inquire whether the applicant has any history of threats or acts of violence by the applicant directed toward self or others or any history of use, attempted use, or threatened use of physical force by the applicant against another person, or other incidents implicating the criteria that would disqualify a person from obtaining an FPIC or PPH. The chief of police or the superintendent also may require information from the applicant or any other person pertaining to publicly available statements posted or published online by the applicant. The bill also extends from 60 to 90 days the time frame which the superintendent or chief of police is required to approve or deny an application for a permit to carry a handgun.

The bill also requires the Superintendent of State Police to establish a training requirement in the lawful and safe handling and storage of firearms for persons who obtain a permit to carry a handgun. The training requirement is to consist of an online course of instruction, in-person classroom instruction, and target training. The training is to include, but not be limited to, demonstration of a level of proficiency in the use of a handgun in such manner as required by the superintendent and training on justification in the use of deadly force under State law. The bill requires the training to include demonstration of a level of proficiency in the use of a handgun in a manner as may be

4

required by the superintendent and training on justification in the use of deadly force under State law. A person who obtained a permit to carry a handgun prior to the bill's effective date would be required to complete the classroom instruction and target training within 90 days of the bill's effective date.

In addition, the application fee for the permit to carry a handgun would be $200. In the case of an application made to the chief police officer of a municipality, $150 of the fee is to be retained by the municipality and the remaining $50 is to be forwarded to the superintendent. The fee amount retained by the municipality is to be used to defray the costs of investigation, administration, and processing of the permit to carry handgun applications. Application fees made to the superintendent are to be deposited into the Victims of Crime Compensation Office account. The bill also provides that mayors and elected members of a municipal governing body are to apply to the superintendent, rather than the chief law enforcement officer, when applying for a permit to carry a handgun.

Under the bill, the permit would be issued to the applicant electronically through email or through the web portal established or designated for this purpose by the superintendent, or in such form or manner as may be authorized by the superintendent. Prior to issuing the permit, the chief of police or superintendent is required to determine whether:

- the applicant is a person of good character who is not subject to any of the disabilities prohibiting the person from purchasing a firearm;
- has not been convicted of a crime of the fourth degree in violation of the carry permit requirements established by the bill;
- is thoroughly familiar with the safe handling and use of handguns; and
- is in compliance with the liability insurance requirement established by the bill.

The bill requires a private citizen who obtains a carry permit to obtain liability insurance. Under the bill, applications for a permit to carry handguns are to include proof of liability insurance coverage and a certification that the applicant will maintain the insurance coverage for the duration of the permit. The bill requires the liability insurance coverage to insure against loss resulting from liability imposed by law for bodily injury, death, and property damage sustained by any person arising out of the ownership, maintenance, operation or use of a firearm carried in public. The bill requires the insurance coverage to be at least in:

- an amount or limit of $100,000, exclusive of interest and costs, on account of injury to, or death of, one person, in any one incident;

5

- an amount or limit, subject to such limit for any one person so injured or killed, of $300,000, exclusive of interest and costs, on account of injury to or death of, more than one person, in any one incident; and
- an amount or limit of $25,000, exclusive of interest and costs, for damage to property in any one incident.

The holder of a permit to carry a handgun would be required to produce proof of liability insurance within a reasonable amount of time following any injury, death, or property damage alleged to have been caused by the person carrying the handgun in public.

In addition, the bill requires persons who obtain a permit to carry a handgun to adhere to certain requirements. Under the bill, a person with a carry permit would be prohibited from:

- using or consuming alcohol, a cannabis item, or a controlled substance while carrying a handgun;
- being under the influence of alcohol, cannabis, or a controlled substance while carrying a handgun;
- carrying a handgun not authorized under the permit;
- carrying a handgun outside of a holster or in an unauthorized holster;
- carrying more than two firearms under the permittee's control at one time;
- engaging in an unjustified display of a handgun; or
- if carrying a handgun in public, failing to display the permit to carry a handgun and proof of liability insurance upon request of a law enforcement officer.

A person who violates these requirements would be guilty of a crime of the fourth degree. A violation also may serve as sufficient grounds for revocation of a permit to carry a handgun.

The bill provides that a permit holder, when stopped by a law enforcement officer, would be required to immediately disclose to the officer that the permit holder is carrying a handgun in public and display proof of liability insurance. A person who fails to disclose to a law enforcement officer that the person is carrying a handgun would be guilty of a fourth degree crime. A person who fails to display a permit to carry a handgun would be guilty of a disorderly persons offense and subject to a $100 fine and guilty of a crime of the fourth degree for a second or subsequent offense. In addition, a permit holder who is carrying a handgun in public and is detained by a law enforcement officer as part of a criminal investigation would be required to provide the handgun to the officer for the purposes of inspection. A person who fails to provide the handgun would be guilty of a crime of the fourth degree.

The bill also delineates places in which a person would be prohibited from carrying a handgun. Under the bill, it would be a third degree crime to carry any firearm or weapon in the following locations:

6

- a place owned, leased, or under the control of State, county, or municipal government used for the purpose of government administration, including but not limited to police stations;
- a courthouse, courtroom, or any other premises used to conduct judicial or court administrative proceedings or functions;
- a State, county, or municipal correctional or juvenile justice facility, jail and any other place maintained by or for a governmental entity for the detention of criminal suspects or offenders;
- a State-contracted half-way house;
- a location being used as a polling place during the conduct of an election;
- a place where a public gathering, demonstration, or event is held for which a government permit is required, during the conduct of such gathering, demonstration, or event;
- a school, college, university, or other educational institution and on any school bus;
- a child care facility, including a day care center;
- a nursery school, pre-school, zoo, or summer camp;
- a park, beach, recreation facility, or area or playground owned or controlled by a State, county or local government unit;
- at youth sports events during and immediately preceding and following the conduct of the event;
- a publicly owned or leased library or museum;
- a shelter for the homeless, emergency shelter for the homeless, basic center shelter program, shelter for homeless or runaway youth, children's shelter, child care shelter, shelter for victims of domestic violence, or any shelter licensed by or under the control of the Juvenile Justice Commission or the Department of Children and Families;
- a community residence for persons with developmental disabilities, head injuries, or terminal illnesses, or any other residential setting licensed by the Department of Human Services or Department of Health;
- a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises;
- a Class 5 Cannabis retailer or medical cannabis dispensary, including any consumption areas licensed or permitted by the Cannabis Regulatory Commission;
- a privately or publicly owned and operated entertainment facility within this State, including but not limited to a theater, stadium, museum, arena, racetrack, or other place where performances, concerts, exhibits, games, or contests are held;
- a casino and related facilities, including but not limited to appurtenant hotels, retail premises, restaurant, and bar

7

facilities, and entertainment and recreational venues located within the casino property;

- a plant or operation that produces, converts, distributes, or stores energy or converts one form of energy to another;
- an airport or public transportation hub;
- a health care facility and any facility licensed or regulated by the Department of Human Service, Department of Children and Families, or Department of Health, other than a health care facility, that provides addiction or mental health treatment or support services;
- within 100 feet of a public location being used for making motion picture or television images for theatrical, commercial or educational purposes, during the time such location is being used for that purpose;
- private property, including but not limited to residential, commercial, industrial, agricultural, institutional, or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit to carry; and
- any other place in which the carrying of a handgun is prohibited by statute or rule or regulation promulgated by a federal or State agency or by municipal ordinance or regulation.

The limitation on places in which a person would be prohibited from carrying a handgun would not apply to active or retired law enforcement officers. However, retired law enforcement officer would be prohibited from carrying a handgun in nine of those locations unless the entity responsible for security at the location has affirmatively authorized the retired officer to carry a handgun. The nine locations include: government building; courthouses; correctional facilities; locations used as polling places; within 100 feet of a public gathering demonstration, or event is held for which a government permit is required; schools, universities, and school buses; childcare centers; healthcare facilities; and private property unless granted permission by the property owner.

The bill also requires the holder of a permit to carry a handgun to adhere to certain requirements while transporting the handgun in a vehicle.

COMMITTEE AMENDMENTS

The committee amended the bill to:

(1) remove the requirement that a person with a permit to carry a handgun who is stopped by a law enforcement officer provide the handgun to the officer for the purpose of inspection; as amended, the bill requires a person who is detained as part of a criminal investigation to provide the handgun to a law enforcement officer;

JA733

8

(2) remove the requirement that the holder of a permit to carry a handgun display proof of liability insurance to a law enforcement officer; the amendments preserve the requirement that a permit holder maintain liability insurance;

(3) remove from the bill's provisions references to "firearm carry insurance";

(4) require applicants for a permit to carry handguns to include with the application proof of liability insurance in compliance with the bill and a certification that the applicant will maintain the insurance coverage for the duration of the permit;

(5) provide that active law enforcement officers may carry a handgun in the locations in which a person is prohibited from carrying a handgun; as introduced, this exemption applied to persons lawfully carrying a firearm within the authorized scope of an exemption set forth in N.J.S.2C:39-6;

(6) establish locations in which a retired law enforcement officer is prohibited from carrying a firearm unless the entity responsible for security at the location has affirmatively authorized the retired officer to carry a handgun;

(7) clarify that a person charged with a fourth degree crime under the bill would be ineligible to obtain an FPIC or PPH; and

(8) make clarifying and technical changes.

FISCAL IMPACT:

The Office of Legislative Services (OLS) anticipates that the State and municipalities will incur indeterminate additional annual operating expenses from the processing of an increased number of applications; establishing training programs; enforcing, prosecuting, and trying the offenses established by the bill; and incarcerating any offenders. In addition, the OLS estimates increased State and municipal revenue because of the fee increases for the permit to carry application, the firearm purchaser identification card, the permit to purchase a handgun, and increased fines and penalties.

The bill's establishment of new crimes of the third degree and fourth degree, and disorderly persons offenses, will increase the workload of the Division of Criminal Justice in the Department of Law and Public Safety, county prosecutor's offices, the Administrative Office of the Courts, and municipal courts as additional defendants will be prosecuted and tried for these crimes and offenses. Crimes of the third and fourth degree are adjudicated by the Superior Court. Disorderly persons offenses are adjudicated by municipal courts, in most circumstances. A presumption of non-incarceration applies to first-time offenders of crimes of the third and fourth degree, and disorderly persons offenses. Repeat offenders, however, could be incarcerated, with the Department of Corrections incurring the cost.

JA734

9

## MINORITY STATEMENT

### By Assemblymen Bergen, McClellan and Rooney

Since 1966, New Jersey has denied law-abiding New Jerseyans their constitutional right to carry handguns to protect themselves and their loved ones from violent crime. The contrived, arbitrary, and unlawful requirement made law-abiding citizens demonstrate to the satisfaction of a government official that they "need" to carry a handgun. For more than half a century, this requirement nearly always resulted in the denial of a permit to carry a handgun – the denial of a fundamental constitutional right.

This year, the United States Supreme Court decided New York State Rifle & Pistol Association v. Bruen, declaring once and for all that all Americans, including New Jerseyans, have a fundamental right to carry handguns for lawful self-defense. The Bruen decision swept away New Jersey's scheme to deny this fundamental right.

However, this bill represents New Jersey's lawless and outright defiance of the authority of the United States Supreme Court. Like the Southern states in the aftermath of Brown v. Board of Education when they fought tooth and nail with "massive resistance" to prevent African-American children from merely attending the same schools as white children, New Jersey now manifests its own "massive resistance" to the authority of the United States Constitution.

This bill systematically prevents New Jerseyans from exercising their fundamental right of public self-defense by labelling nearly every public place a person might go as off limits.

Train and bus stations are prohibited, denying the fundamental constitutional right of self-defense to everyone who commutes to work.

Parks, beaches, and recreational facilities are prohibited, denying the fundamental constitutional right of self-defense to everyone who spends leisure time with their families.

Health care facilities are prohibited, denying the fundamental constitutional right of self-defense to everyone who ever goes to a doctor.

Libraries, museums, and theaters are prohibited, denying the fundamental constitutional right of self-defense to everyone who seeks knowledge and culture.

Restaurants with a liquor license are prohibited, denying the fundamental constitutional right of self-defense to everyone who wants to go out with his family to eat chicken wings or burgers even if they do not drink alcohol.

Homeless shelters are prohibited, denying the fundamental constitutional right of self-defense merely because a person is homeless.

10

Shelters for victims of domestic violence are prohibited, denying the fundamental constitutional right of self-defense to those who most need to be able to protect themselves from violent attack.

Public gatherings are prohibited, forcing New Jerseyans to choose between their fundamental First Amendment rights and their fundamental Second Amendment right.

All automobiles are prohibited, inviting car-jacking and violent crime in parking lots throughout the state.

And as if all of these prohibitions were not enough, all private property is presumptively prohibited, turning the constitutionally mandated presumption in favor of the fundamental right to bear arms into a presumption against the fundamental right to bear arms – exactly the same place New Jersey was in the more than 50 years before Bruen was decided.

It also creates traps for the innocent that threaten to turn otherwise respectable, law-abiding citizens into criminals.  If a law-abiding permit holder happens upon one of the numerous places banned, they will be susceptible to prosecution for a third-degree crime, punishable by 3-5 years in prison and a fine up to $15,000. Penalties and laws that are hard to follow is another form of oppression, especially when allowing a patchwork of municipal ordinances creates an even greater quagmire of rules and regulations to ensnare otherwise law-abiding citizens who are unknowingly in violation.

Further, the bill disenfranchises the Second Amendment rights of low-income New Jerseyans. As inflation continues to make them poorer, permit application fees will increase to $200 from $2 and insurance, which will likely be very costly, is now mandated.

While we are supposed to help the people who can least help themselves, and who typically live in areas with the most crime, much of which include gun violence by illegal-gun owners, this bill aims to strip them of their ability to protect themselves and their families and friends. They too may turn to illicit gun ownership.

Ultimately, this bill seeks to erase the authority of the United States Supreme Court and the Constitution of the United States of America, and, as such, this bill is fundamentally lawless and disenfranchises the rights of New Jerseyans.

It is disappointing to see that the sponsor has taken a Benedict Arnold-esque turn from a defender of Americans' rights to join the side that aims to subdue them.

JA736

ASSEMBLY OVERSIGHT, REFORM AND FEDERAL
RELATIONS COMMITTEE

STATEMENT TO

[Second Reprint]
**ASSEMBLY, No. 4769**

with committee amendments

# STATE OF NEW JERSEY

DATED:  OCTOBER 24, 2022

The Assembly Oversight, Reform and Federal Relations Committee reports favorably and with committee amendments Assembly Bill No. 4769 (2R).

As amended by the committee, Assembly Bill No. 4769 removes from current law the justifiable need standard, which is the standard an individual is required to meet to hold a permit to carry a handgun in this State, in accordance with a recent decision of the United States Supreme Court in New York State Rifle & Pistol Association v. Bruen.  In addition, the bill establishes certain criteria for obtaining a permit to carry a handgun and codifies certain venues at which the right to carry firearms would be restricted due to security and safety concerns.

Under current law, in order to lawfully carry a handgun in public, it is necessary for a private citizen to obtain a permit to carry a handgun. Applicants for a permit to carry a handgun need the approval of the chief of police in the municipality where they reside and the approval of a Superior Court judge in the county where they reside. Approval is contingent upon a person submitting, along with the application, a written certification establishing justifiable need. Justifiable need is defined as the urgent necessity for self-protection, as evidenced by specific threats or previous attacks which demonstrate a special danger to the applicant's life that cannot be avoided by means other than by issuance of a permit to carry a handgun.  This bill eliminates the justifiable need standard.

The bill also expands the disqualifying criteria that would prohibit a person from obtaining a firearms purchaser identification card (FPIC), permit to purchase a handgun (PPH), or permit to carry a handgun.  Under current law, a person who receives these documents is required to be of "good character" and "good repute" in the community and not subject to any of the disqualifying criteria listed in subsection c. of N.J.S.2C:58-3.  This bill removes the "good character" and "good repute" criteria and revises the standard to require the issuance of an FPIC or PPH, unless the applicant is known in the community in which the

2

person lives as someone who has engaged in acts or made statements suggesting the person is likely to engage in conduct, other than justified self-defense, that would pose a danger to self or others, or is subject to any of the disabilities set forth in current law.   The bill expands the list of disqualifying criteria to include:

- persons presently confined for a mental disorder as a voluntary admission or involuntary commitment for inpatient or outpatient treatment;
- persons who have violated a temporary or final restraining order issued pursuant to the "Prevention of Domestic Violence Act of 1991" or a temporary or final domestic violence restraining order issued in another jurisdiction prohibiting the person from possessing any firearm;
- persons who are subject to or have violated a temporary or final restraining order issued pursuant to the "Sexual Assault Survivor Protection Act of 2015";
- persons who have previously been voluntarily admitted or involuntarily committed to inpatient or outpatient mental health treatment, unless the court has expunged the person's record;
- persons who are subject to an outstanding arrest warrant for an indictable crime in this State or for a felony in any other state or federal jurisdiction. This provision would not include individuals seeking reproductive health care services in this State;
- persons who are a fugitive from justice due to having fled from any state or federal jurisdiction to avoid prosecution for a crime or to avoid giving testimony in any criminal proceeding.  This provision would not include individuals seeking reproductive health care services in this State; and
- persons who are convicted of a fourth degree crime for violating the handgun carry requirements established under the bill.

The bill also makes several changes to the procedure for applying for an FPIC or PPH.  Under the bill, an applicant would be required to provide any aliases or other names previously used by the applicant. A PPH applicant also would be required to certify with respect to each handgun listed on the form, whether the applicant is purchasing the handgun on the applicant's own behalf or, if not, on behalf of a third party.  In addition, the bill increases the fee to obtain an FPIC from two dollars to $25.  The fee for the PPH would be increased from five dollars to $50.

In addition, this bill renders a recent enactment (P.L.2022, c.58), which requires FPICs to display a picture and thumb print, inoperative until the Superintendent of State Police establishes a system for issuing these cards.   The bill also clarifies that the FPIC would be electronically linked to the fingerprints of the card holder, rather than displaying a thumb print.

3

The bill also codifies the electronic method for reporting handgun sales.  Under current law, the PPH is issued as a quadruplicate document. A firearm retailer is required to complete all four of the documents prior to selling a handgun and send the first copy to the Superintendent of State Police and the second copy to the chief of police of the municipality in which the purchaser resides. The third copy is retained by the retail dealer and may be subject to inspection by law enforcement at any reasonable time.  The purchaser retains the fourth copy as a permanent record.  This bill codifies the current procedure established by the State Police, which established a web portal for electronically reporting handgun sales.  The bill also requires that handgun transfers between or among immediate family members, law enforcement officers, or collectors of firearms or ammunition as curios or relics are to be conducted via the web portal.

In addition, the bill revises the application process for obtaining a permit to carry a handgun.  Under current law, a person applying for a permit to carry a handgun is required to provide endorsements from three people who have known the applicant for at least three years and can attest that he or she is of good moral character and behavior.  The bill requires an applicant to provide endorsements from five people who are unrelated to the applicant.  The persons providing the endorsement are to provide relevant information, including the nature and extent of their relationship with the applicant and information concerning their knowledge of the applicant's use of drugs or alcohol. The bill also requires the chief of police or superintendent, as appropriate, to interview the applicant and persons providing the endorsement.  The interviewer is to inquire whether the applicant is likely to engage in conduct that would result in harm to the applicant or others.  Additionally, the interviewer is to inquire whether the applicant has any history of threats or acts of violence by the applicant directed toward self or others or any history of use, attempted use, or threatened use of physical force by the applicant against another person, or other incidents implicating the criteria that would disqualify a person from obtaining an FPIC or PPH.  The chief of police or the superintendent also may require information from the applicant or any other person pertaining to publicly available statements posted or published online by the applicant.  The bill also extends from 60 to 90 days the time frame which the superintendent or chief of police is required to approve or deny an application for a permit to carry a handgun.

The bill also requires the Superintendent of State Police to establish a training requirement in the lawful and safe handling and storage of firearms for persons who obtain a permit to carry a handgun. The training requirement is to consist of an online course of instruction, in-person classroom instruction, and target training.  The training is to include, but not be limited to, demonstration of a level of proficiency in the use of a handgun in such manner as required by the

4

superintendent and training on justification in the use of deadly force under State law. The bill requires the training to include demonstration of a level of proficiency in the use of a handgun in a manner as may be required by the superintendent and training on justification in the use of deadly force under State law.  A person who obtained a permit to carry a handgun prior to the bill's effective date would be required to complete the classroom instruction and target training within 90 days of the bill's effective date.

In addition, the application fee for the permit to carry a handgun would be $200.  In the case of an application made to the chief police officer of a municipality, $150 of the fee is to be retained by the municipality and the remaining $50 is to be forwarded to the superintendent.  The fee amount retained by the municipality is to be used to defray the costs of investigation, administration, and processing of the permit to carry handgun applications.  Application fees made to the superintendent are to be deposited into the Victims of Crime Compensation Office account.  The bill also provides that mayors and elected members of a municipal governing body are to apply to the superintendent, rather than the chief law enforcement officer, when applying for a permit to carry a handgun.  As amended, the bill allows the superintendent or chief law enforcement officer to solicit such other identification information as may be authorized by the superintendent to the conduct a comparable criminal history records check for applicant who have already undergone a criminal history records check in the course of obtaining a FPIC or PPH.

Under the bill, the permit would be issued to the applicant electronically through email or through the web portal established or designated for this purpose by the superintendent, or in such form or manner as may be authorized by the superintendent.  Prior to issuing the permit, the chief of police or superintendent is required to determine whether:

- the applicant is a person of good character who is not subject to any of the disabilities prohibiting the person from purchasing a firearm;
- has not been convicted of a crime of the fourth degree in violation of the carry permit requirements established by the bill;
- is thoroughly familiar with the safe handling and use of handguns; and
- is in compliance with the liability insurance requirement established by the bill.

The bill requires a private citizen who obtains a carry permit to obtain liability insurance.  Under the bill, applications for a permit to carry handguns are to include proof of liability insurance coverage and a certification that the applicant will maintain the insurance coverage for the duration of the permit.  The bill requires the liability insurance coverage to insure against loss resulting from liability imposed by law

5

for bodily injury, death, and property damage sustained by any person arising out of the ownership, maintenance, operation or use of a firearm carried in public.  The bill requires the insurance coverage to be at least in:

- an amount or limit of $100,000, exclusive of interest and costs, on account of injury to, or death of, one person, in any one incident;
- an amount or limit, subject to such limit for any one person so injured or killed, of $300,000, exclusive of interest and costs, on account of injury to or death of, more than one person, in any one incident; and
- an amount or limit of $25,000, exclusive of interest and costs, for damage to property in any one incident.

The holder of a permit to carry a handgun would be required to produce proof of liability insurance within a reasonable amount of time following any injury, death, or property damage alleged to have been caused by the person carrying the handgun in public.

In addition, the bill requires persons who obtain a permit to carry a handgun to adhere to certain requirements.  Under the bill, a person with a carry permit would be prohibited from:

- using or consuming alcohol, a cannabis item, or a controlled substance while carrying a handgun;
- being under the influence of alcohol, cannabis, or a controlled substance while carrying a handgun;
- carrying a handgun not authorized under the permit;
- carrying a handgun outside of a holster or in an unauthorized holster;
- carrying more than two firearms under the permittee's control at one time;
- engaging in an unjustified display of a handgun; or
- if carrying a handgun in public, failing to display the permit to carry a handgun and proof of liability insurance upon request of a law enforcement officer.

A person who violates these requirements would be guilty of a crime of the fourth degree.  A violation also may serve as sufficient grounds for revocation of a permit to carry a handgun.

The bill provides that a permit holder, when stopped by a law enforcement officer while publicly carrying the handgun or transporting it in motor vehicle, would be required to immediately disclose to the officer that the permit holder is carrying or transporting a handgun and display the permit to carry a handgun.  A person who fails to disclose to a law enforcement officer that the person is carrying a handgun would be guilty of a fourth degree crime.  A person who fails to display a permit to carry a handgun would be guilty of a disorderly persons offense and subject to a $100 fine and guilty of a crime of the fourth degree for a second or subsequent offense.  In addition, a permit holder who is carrying a handgun in public and is

6

detained by a law enforcement officer as part of a criminal investigation would be required to provide the handgun to the officer for the purposes of inspection.  A person who fails to provide the handgun would be guilty of a crime of the fourth degree.

The bill also delineates places in which a person would be prohibited from carrying a handgun.  The amended bill clarifies that it would be a de minimis infraction for which a person would not be prosecuted if the entry onto one of the prohibited locations was a brief, incidental entry onto property.  Under the bill, it would be a third degree crime to carry any firearm or weapon in the following locations:

- a place owned, leased, or under the control of State, county, or municipal government used for the purpose of government administration, including but not limited to police stations;
- a courthouse, courtroom, or any other premises used to conduct judicial or court administrative proceedings or functions;
- a State, county, or municipal correctional or juvenile justice facility, jail and any other place maintained by or for a governmental entity for the detention of criminal suspects or offenders;
- a State-contracted half-way house;
- a location being used as a polling place during the conduct of an election;
- a place where a public gathering, demonstration, or event is held for which a government permit is required, during the conduct of such gathering, demonstration, or event;
- a school, college, university, or other educational institution and on any school bus;
- a child care facility, including a day care center;
- a nursery school, pre-school, zoo, or summer camp;
- a park, beach, recreation facility, or area or playground owned or controlled by a State, county or local government unit;
- at youth sports events during and immediately preceding and following the conduct of the event;
- a publicly owned or leased library or museum;
- a shelter for the homeless, emergency shelter for the homeless, basic center shelter program, shelter for homeless or runaway youth, children's shelter, child care shelter, shelter for victims of domestic violence, or any shelter licensed by or under the control of the Juvenile Justice Commission or the Department of Children and Families;
- a community residence for persons with developmental disabilities, head injuries, or terminal illnesses, or any other residential setting licensed by the Department of Human Services or Department of Health;

JA742

7

- a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises;
- a Class 5 Cannabis retailer or medical cannabis dispensary, including any consumption areas licensed or permitted by the Cannabis Regulatory Commission;
- a privately or publicly owned and operated entertainment facility within this State, including but not limited to a theater, stadium, museum, arena, racetrack, or other place where performances, concerts, exhibits, games, or contests are held;
- a casino and related facilities, including but not limited to appurtenant hotels, retail premises, restaurant, and bar facilities, and entertainment and recreational venues located within the casino property;
- a plant or operation that produces, converts, distributes, or stores energy or converts one form of energy to another;
- an airport or public transportation hub;
- a health care facility and any facility licensed or regulated by the Department of Human Service, Department of Children and Families, or Department of Health, other than a health care facility, that provides addiction or mental health treatment or support services;
- within 100 feet of a public location being used for making motion picture or television images for theatrical, commercial or educational purposes, during the time such location is being used for that purpose;
- private property, including but not limited to residential, commercial, industrial, agricultural, institutional, or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit to carry; and
- any other place in which the carrying of a handgun is prohibited by statute or rule or regulation promulgated by a federal or State agency or by municipal ordinance or regulation

As amended, the bill allows municipalities to prohibit carrying a weapon, by ordinance or regulation, in a place which is not enumerated in the bill's list of prohibited locations if there is a public safety nexus justifying the prohibition and the prohibition is consistent with the nation's historical tradition of firearm regulation.

The limitation on places in which a person would be prohibited from carrying a handgun would not apply to active or retired law enforcement officers. However, retired law enforcement officer would be prohibited from carrying a handgun in eight of those locations unless the entity responsible for security at the location has affirmatively authorized the retired officer to carry a handgun. The nine locations include: government buildings; courthouses;

8

correctional facilities; locations used as polling places; within 100 feet of a public gathering demonstration, or event is held for which a government permit is required; schools, universities, and school buses; childcare centers; healthcare facilities.

The bill also requires the holder of a permit to carry a handgun to adhere to certain requirements while transporting the handgun in a vehicle.

COMMITTEE AMENDMENTS

The committee amended the bill to:

1) clarify that a permit holder when stopped in a motor vehicle by a law enforcement officer is to inform the officer that the permit holder is traveling with a handgun and display the permit to carry a handgun;

2) allow the Superintendent of State Police or chief law enforcement officer to solicit such other identification information as may be authorized by the superintendent to conduct a comparable criminal history records check for applicant who have already undergone a criminal history records check in the course of obtaining a FPIC, PPH, or PCH;

3) clarify that it would be a de minimis infraction for which a person would not be prosecuted if the entry onto one of the prohibited locations was a brief, incidental entry onto property;

4) remove a provision of the bill prohibiting retired law enforcement officers from entering private property while carrying a handgun; and

5) allow municipalities to prohibit, by ordinance or regulation, a person from carrying a weapon in a prohibited location which is not enumerated in the bill's list of prohibited locations if there is a public safety nexus justifying the prohibition and the prohibition is consistent with the nation's historical tradition of firearm regulation; and

6) make technical corrections.

JA744

SENATE BUDGET AND APPROPRIATIONS COMMITTEE

STATEMENT TO

ASSEMBLY COMMITTEE SUBSTITUTE FOR
ASSEMBLY, No. 4769

# STATE OF NEW JERSEY

DATED:  DECEMBER 5, 2022

The Senate Budget and Appropriations Committee reports favorably Assembly Bill No. 4769 ACS.

As reported by the committee, this bill removes from current law the justifiable need standard, which is the standard an individual is required to meet to hold a permit to carry a handgun in this State, in accordance with a recent decision of the United States Supreme Court in New York State Rifle & Pistol Association v. Bruen.  In addition, the bill establishes certain criteria for obtaining a permit to carry a handgun and codifies certain venues at which the right to carry firearms and certain destructive devices would be restricted due to security and safety concerns.

Under current law, in order to lawfully carry a handgun in public, it is necessary for a private citizen to obtain a permit to carry a handgun. Applicants for a permit to carry a handgun need the approval of the chief of police in the municipality where they reside and the approval of a Superior Court judge in the county where they reside. Approval is contingent upon a person submitting, along with the application, a written certification establishing justifiable need. Justifiable need is defined as the urgent necessity for self-protection, as evidenced by specific threats or previous attacks which demonstrate a special danger to the applicant's life that cannot be avoided by means other than by issuance of a permit to carry a handgun.  This bill eliminates the justifiable need standard.

The bill also expands the disqualifying criteria that would prohibit a person from obtaining a firearms purchaser identification card (FPIC), permit to purchase a handgun (PPH), or permit to carry a handgun.  Under current law, a person who receives these documents is required to be of "good character" and "good repute" in the community and not subject to any of the disqualifying criteria listed in subsection c. of N.J.S.2C:58-3.  This bill removes the "good character" and "good repute" criteria and revises the standard to require the issuance of an FPIC or PPH, unless the applicant is known in the community in which the person lives as someone who has engaged in acts or made statements suggesting the person is likely to engage in conduct, other than justified self-defense, that would pose a danger to self or others, or is subject to any of the disabilities set forth in current law.  The bill expands the list of disqualifying criteria to include:

2

- persons presently confined for a mental disorder as a voluntary admission or involuntary commitment for inpatient or outpatient treatment pursuant to the mental health screening law concerning assessments of persons believed to be in need of involuntary commitment to treatment, P.L.1987, c.116 (C.30:4-27.1 et seq.);
- persons who are subject to or have violated a temporary or final restraining order issued pursuant to the "Sexual Assault Survivor Protection Act of 2015";
- persons who have previously been voluntarily admitted or involuntarily committed to inpatient or outpatient mental health treatment, unless the court has expunged the person's record;
- persons who are subject to an outstanding arrest warrant for an indictable crime in this State or for a felony in any other state or federal jurisdiction. This provision would not include individuals seeking reproductive health care services in this State; and
- persons who are a fugitive from justice due to having fled from any state or federal jurisdiction to avoid prosecution for a crime or to avoid giving testimony in any criminal proceeding. This provision would not include individuals seeking reproductive health care services in this State.

The bill also makes several changes to the procedure for applying for an FPIC or a PPH. Under the bill, an applicant would be required to provide any aliases or other names previously used by the applicant. A PPH applicant also would be required to certify with respect to each handgun listed on the form, whether the applicant is purchasing the handgun on the applicant's own behalf or, if not, on behalf of a third party. In addition, the bill increases the fee to obtain an PPH from two dollars to $25. The fee for the FPIC would be increased from five dollars to $50.

In addition, this bill renders a recent enactment (P.L.2022, c.58), which requires FPICs to display a picture and thumb print, inoperative until the Superintendent of State Police establishes a system for issuing these cards. The bill also clarifies that the FPIC would be electronically linked to the fingerprints of the card holder, rather than displaying a thumb print.

The bill also expands the list of officials who are allowed to carry a firearm at all times in this State. Under current law, county and assistant prosecutors and deputy attorneys general are permitted to carry a firearm at all times in this State. The bill extends this privilege to federal and municipal prosecutors, the Attorney General, and assistant attorneys general. In addition, the bill allows federal, State, and county judges, including judges in Tax Court, Office of Administrative Law, and the Division of Workers' Compensation to carry a firearm at all times.

JA746

3

The bill also codifies the electronic method for reporting handgun sales. Under current law, the PPH is issued as a quadruplicate document. A firearm retailer is required to complete all four of the documents prior to selling a handgun and send the first copy to the superintendent and the second copy to the chief of police of the municipality in which the purchaser resides. The third copy is retained by the retail dealer and may be subject to inspection by law enforcement at any reasonable time.  The purchaser retains the fourth copy as a permanent record.  This bill requires the establishment of a web portal within six months of the bill's enactment for electronically reporting handgun sales.  The bill also requires that handgun transfers between or among immediate family members, law enforcement officers, or collectors of firearms or ammunition as curios or relics be conducted via the web portal.  In addition, the bill clarifies that a chief police officer or the Superintendent of State Police may delegate to subordinate officers the responsibilities of approving and issuing permits to carry a handgun and FPICs and PPHs.

In addition, the bill revises the application process for obtaining a permit to carry a handgun.  Under current law, a person applying for a permit to carry a handgun is required to provide endorsements from three people who have known the applicant for at least three years and can attest that he or she is of good moral character and behavior.  The bill requires an applicant to provide endorsements from four people who are unrelated to the applicant.  The persons providing the endorsement are to provide relevant information, including the nature and extent of their relationship with the applicant and information concerning their knowledge of the applicant's use of drugs or alcohol. The bill also requires the chief police officer or superintendent, as appropriate, to interview the applicant and persons providing the endorsements.  The interviewer is to inquire whether the applicant is likely to engage in conduct that would result in harm to the applicant or others.  Additionally, the interviewer is to inquire whether the applicant has any history of threats or acts of violence by the applicant directed toward self or others or any history of use, attempted use, or threatened use of physical force by the applicant against another person, or other incidents implicating the criteria that would disqualify a person from obtaining a FPIC or PPH.  The chief police officer or the superintendent also may require information from the applicant or any other person pertaining to publicly available statements posted or published online by the applicant.  The bill extends from 60 to 90 days the time frame which the superintendent or chief police officer is required to approve or deny an application for a permit to carry a handgun.

The bill also requires the superintendent to establish a training requirement in the lawful and safe handling and storage of firearms for persons who obtain a permit to carry a handgun.  The training requirement is to be established within six months of the bill's

JA747

4

enactment and consist of an online course of instruction, in-person classroom instruction, and target training. The bill requires the training to include demonstration of a level of proficiency in the use of a handgun in a manner as may be required by the superintendent and training on justification in the use of deadly force under State law. A person who obtained a permit to carry a handgun within six months following the bill's date of enactment and prior to the establishment of the training requirement would be required to complete the training within 10 months of the bill's date of enactment.

The application fee for the permit to carry a handgun would be $200 under the bill. In the case of an application made to the chief police officer of a municipality, $150 of the fee is to be retained by the municipality and the remaining $50 is to be forwarded to the superintendent. The fee amount retained by the municipality is to be used to defray the costs of investigation, administration, and processing of the permit to carry handgun applications. Application fees made to the superintendent are to be deposited into the Victims of Crime Compensation Office account. However, the bill removes from current law a $20 fee imposed by the county clerk.

The bill also provides that mayors and elected members of a municipal governing body are to apply to the superintendent, rather than the chief police officer, when applying for a permit to carry a handgun. In addition, the bill allows the superintendent or chief police officer to solicit such other identification information as may be authorized by the superintendent to conduct a comparable criminal history records check for applicants who have already undergone a criminal history records check in the course of obtaining a FPIC or PPH.

Under the bill, the permit would be issued to the applicant electronically through email or six months after the bill's enactment through the web portal established or designated for this purpose by the superintendent, or in such form or manner as may be authorized by the superintendent. The chief police officer or superintendent is to issue the permit if the applicant:

- has not engaged in any acts or made any statements that suggest the applicant is likely to engage in conduct, other than lawful self-defense, that would pose a danger to the applicant or others and who is not subject to any of the disabilities prohibiting the applicant from purchasing a firearm;
- is thoroughly familiar with the safe handling and use of handguns;
- has completed the training requirements established by the bill; and
- is in compliance with the liability insurance requirements established by the bill.

5

The provisions of the bill requiring the chief police officer or superintendent to verify the training requirement and liability insurance are to remain inoperative for six months following the bill's enactment.

The bill requires a private citizen who obtains a carry permit to obtain liability insurance. Under the bill, applications for a permit to carry handguns are to include proof of liability insurance coverage. The bill requires the liability insurance coverage to insure against loss resulting from liability imposed by law for bodily injury, death, and property damage sustained by any person arising out of the ownership, maintenance, operation or use of a firearm carried in public. The bill requires the insurance coverage to be at least in an amount or limit of $300,000, exclusive of interest and costs, on account of injury to, or death of, more than one person and damage to property, in any one incident.

The holder of a permit to carry a handgun would be required to produce proof of liability insurance within a reasonable amount of time following any injury, death, or property damage alleged to have been caused by the person carrying the handgun in public.

In addition, the bill requires persons who obtain a permit to carry a handgun to adhere to certain requirements. Under the bill, a person with a carry permit would be prohibited from:

- using or consuming alcohol, a cannabis item, or a controlled substance while carrying a handgun;
- being under the influence of alcohol, cannabis, or a controlled substance while carrying a handgun;
- carrying a handgun outside of a holster or in an unauthorized holster;
- carrying more than two firearms under the permittee's control at one time; or
- engaging in an unjustified display of a handgun.

A person who violates these requirements would be guilty of a crime of the fourth degree. A violation is to serve as sufficient grounds for revocation of a permit to carry a handgun.

The bill provides that a permit holder, when stopped or detained by a law enforcement officer while publicly carrying the handgun or transporting it in a motor vehicle, would be required to immediately disclose to the officer that the permit holder is carrying or transporting a handgun and display the permit to carry a handgun. A person who fails to disclose to a law enforcement officer that the person is carrying a handgun would be guilty of a fourth degree crime. A person who fails to display a permit to carry a handgun would be guilty of a disorderly persons offense and subject to a $100 fine for a first offense and guilty of a crime of the fourth degree for a second or subsequent offense. In addition, a permit holder who is carrying a handgun in public and is detained by a law enforcement officer as part of a criminal investigation would be required to provide the handgun to the

6

officer for the purposes of inspection.  A person who fails to provide the handgun would be guilty of a crime of the fourth degree.

The bill also delineates places in which a person would be prohibited from carrying a firearm or destructive device.  The limitation on places in which a person would be prohibited from carrying a firearm would not apply to persons permitted to carry a firearm in this State within the authorized scope of an exemption set forth in N.J.S.2C:39-6. The bill also clarifies that it would be a de minimis infraction for which a person would not be prosecuted if the entry onto one of the prohibited locations was a brief, incidental entry onto property.  Under the bill, it would be a third degree crime to carry any firearm or a crime of the second degree to possess a destructive device in the following locations:

- a place owned, leased, or under the control of State, county, or municipal government used for the purpose of government administration, including but not limited to police stations;
- a courthouse, courtroom, or any other premises used to conduct judicial or court administrative proceedings or functions;
- a State, county, or municipal correctional or juvenile justice facility, jail and any other place maintained by or for a governmental entity for the detention of criminal suspects or offenders;
- a State-contracted half-way house;
- a location being used as a polling place during the conduct of an election and places used for the storage or tabulation of ballots;
- within 100 feet of a place where a public gathering, demonstration, or event is held for which a government permit is required, during the conduct of such gathering, demonstration, or event;
- a school, college, university, or other educational institution and on any school bus;
- a child care facility, including a day care center;
- a nursery school, pre-school, zoo, or summer camp;
- a park, beach, recreation facility, or area or playground owned or controlled by a State, county or local government unit;
- at youth sports events during and immediately preceding and following the conduct of the event with exception to youth sports events that are firearm shooting competitions;
- a publicly owned or leased library or museum;
- a shelter for the homeless, emergency shelter for the homeless, basic center shelter program, shelter for homeless or runaway youth, children's shelter, child care shelter, shelter for victims of domestic violence, or any shelter licensed by or under the control of the Juvenile Justice Commission or the Department of Children and Families;

7

- a community residence for persons with developmental disabilities, head injuries, or terminal illnesses, or any other residential setting licensed by the Department of Human Services or Department of Health;
- a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises;
- a Class 5 Cannabis retailer or medical cannabis dispensary, including any consumption areas licensed or permitted by the Cannabis Regulatory Commission;
- a privately or publicly owned and operated entertainment facility within this State, including but not limited to a theater, stadium, museum, arena, racetrack, or other place where performances, concerts, exhibits, games, or contests are held;
- a casino and related facilities, including but not limited to appurtenant hotels, retail premises, restaurant, and bar facilities, and entertainment and recreational venues located within the casino property;
- a plant or operation that produces, converts, distributes, or stores energy or converts one form of energy to another;
- an airport or public transportation hub;
- a health care facility and any facility licensed or regulated by the Department of Human Services, Department of Children and Families, or Department of Health;
- a public location being used for making motion picture or television images for theatrical, commercial or educational purposes, during the time such location is being used for that purpose;
- private property, including but not limited to residential, commercial, industrial, agricultural, institutional, or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit to carry; and
- any other place in which the carrying of a firearm is prohibited by statute or rule or regulation promulgated by a federal or State agency.

This bill also allows retired law enforcement officers to renew their permit to carry a handgun every two years.  Under current law, retired law enforcement officers are required to annually renew their permit to carry.  The bill preserves the requirement under current law that retired law enforcement officers semi-annually qualify in the use of the handgun in accordance with the requirements and procedures established by the Attorney General.

The bill also requires the holder of a permit to carry a handgun to adhere to certain requirements while transporting the handgun in a vehicle.

JA751

8

Finally, the bill clarifies that application determinations for a permit to carry a handgun that were pending before the Superior Court and filed prior to the bill's enactment are to be made by the court. A Judge of the Superior Court may rely on the approval by the chief police officer or superintendent, as the case may be, as the basis for issuing the permit. Application determinations for a permit to carry a handgun that are submitted on or after the date of the bill's enactment will be made by a chief police officer or superintendent, as the case may be, in accordance with the provisions of the bill.

As reported by the committee, Assembly Bill No. 4769 (ACS) is identical to the Senate Committee Substitute for Senate Bill No. 3214 (SCS), which also was reported by the committee on this date.

FISCAL IMPACT:

The Office of Legislative Services (OLS) anticipates that the State and municipalities will incur indeterminate additional annual operating expenses from the processing of an increased number of applications; establishing training programs; enforcing, prosecuting, and trying the offenses established by the bill; and incarcerating any offenders. In addition, the OLS estimates increased State and municipal revenue because of the fee increases for the permit to carry application, the firearms purchaser identification card (FPIC), the permit to purchase a handgun (PPH), and increased fines and penalties.

The bill's establishment of crimes of the second, third, and fourth degree, and disorderly persons offenses will increase the workload of the Division of Criminal Justice in the Department of Law and Public Safety, county prosecutor's offices, the Administrative Office of the Courts, and municipal courts as additional defendants will be prosecuted and tried for these crimes and offenses. Crimes of the second, third, and fourth degree are adjudicated by the Superior Court. Disorderly persons offenses are adjudicated by municipal courts, in most circumstances. A presumption of non-incarceration applies to first-time offenders of crimes of the third and fourth degree, and disorderly persons offenses. Repeat offenders, however, could be incarcerated, with the Department of Corrections incurring the cost.

The Victims of Crime Compensation Office will receive a portion of the established $200 application fee for the permit to carry a handgun.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| AARON SIEGEL, JASON COOK, JOSEPH DELUCA, NICOLE CUOZZO, TIMOTHY VARGA, CHRISTOPHER STAMOS, KIM HENRY, AND ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MATTHEW PLATKIN AND PATRICK J. CALLAHAN, <br><br> Defendants. | HONORABLE KAREN M. WILLIAMS <br><br> Civil Action <br> No. 22-7463-KMW-AMD <br><br> **MEMORANDUM OPINION AND ORDER** |

APPEARANCES:

Daniel L. Schmutter, Esquire
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, NJ 07450
     Counsel for Plaintiffs Aaron Siegel, Jason Cook, Joseph Deluca, Nicole Cuozzo, Timothy
     Varga, Christopher Stamos, Kim Henry, and Association of New Jersey Rifle & Pistol
     Clubs, Inc.

Angela Cai, Esquire
Office Of The New Jersey Attorney General
25 Market Street
Trenton, NJ 08625
     Counsel for Defendants Matthew Platkin and Patrick J. Callahan

Williams, District Judge:

## I. INTRODUCTION

     THIS MATTER comes before the Court on Defendants' Emergency Motion for

Consolidation (ECF No. 7) and Plaintiffs' Motion for Temporary Restraining Order and

Preliminary Injunction (ECF No. 8). The Court held a hearing on January 12, 2023, and notes the

following appearances: Daniel L. Schmutter, Esquire, appearing on behalf of Plaintiffs; Angela Cai, Esquire, appearing on behalf of Defendants.  For the reasons outlined on the record and reiterated below, the Emergency Motion to Consolidate is granted, in part, and denied, in part.  A decision on the Motion for Temporary Restraining Order and Preliminary Injunction is reserved pending consolidation.

## II. BACKGROUND

On December 22, 2022, Plaintiffs, New Jersey citizens and a not-for-profit club representing the interests of target shooters, hunters, competitors, outdoors people, and firearm owners, filed a Complaint challenging the constitutionality of various provisions of New Jersey's newly passed law, Assembly Bill A4769 (alternatively referred to as "Chapter 131 of the 2022 Laws of New Jersey" or "Chapter 131"), regulating the carry of firearms in New Jersey.  *See, generally*, Compl., ECF No. 1.  On the very same day, and indeed minutes before, another group of Plaintiffs in *Koons v. Reynolds*, 1:22-cv-7464 ("*Koons*"), filed a Complaint challenging provisions of A4769 as well; this matter was assigned to the Honorable Renèe M. Bumb, U.S.D.J. There is some overlap of the provisions challenged in *Koons* and in this *Siegel* matter.  This Court set a briefing schedule on the Motion seeking a Temporary Restraining Order ("TRO") and scheduled a hearing for January 9, 2023.  *See* ECF No. 6.  Prior to this Court's January 9, 2023 hearing, Judge Bumb, having held a hearing on the TRO in the *Koons* matter on January 5, 2023, issued a 60-page Opinion (ECF No. 34). The accompanying Order (ECF No. 35):

> [o]rdered that Defendants, as well as, their officers, agents, servants, employees, and attorneys (and any other persons in active concert or participation with them) are TEMPORARILY RESTRAINED from enforcing the following provisions of Chapter 131 of the 2022 Laws of New Jersey: Section 7(a), subparts (12), (15), (17), and (24), and Subsection 7(b)(1).

2

JA754

Judge Bumb's Opinion and Order addressed five "sensitive place" provisions at issue in this matter.

## III. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 42, if actions before the Court involve a common question of law or fact, the Court may: "(1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay." Fed. R. Civ. P. 42(a)(1)-(3). "The Third Circuit recognizes that this rule confers upon a district court broad power, whether at the request of a party or upon its own initiative, to consolidate causes for trial as may facilitate the administration of justice." *April Denise Williams v. USA, et al.*, No. 18-14455, 2018 WL 4929390, at *6 (D.N.J. Oct. 11, 2018) (citing *Ellerman Lines, Ltd. v. Atl. & Gulf Stevedores, Inc.*, 339 F.2d 673, 675 (3d Cir. 1964)) (internal quotation marks omitted). This power may also be exercised insofar as consolidation would "avoid unnecessary costs or delay." *Skoorka v. Kean Univ.*, No. 16-3842, 2019 WL 4509294, at *3 (D.N.J. Sept. 19, 2019) (internal quotation marks omitted).

Consolidation "does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 298 n.12 (3d Cir. 2005) (citations and internal quotations marks omitted). In considering a request to consolidate, on one hand, the Court is mindful that two actions need not be identical but could instead simply share "common question[s] of law or fact." *In re Cendant Corp. Litig.*, 182 F.R.D. 476, 478 (D.N.J. 1998). After all, "[t]he purpose of consolidation is 'to streamline and economize pretrial proceedings so as to avoid duplication of effort, and to prevent conflicting outcomes in cases involving similar legal and factual issues.'" *Cima Labs, Inc. v.*

3

*Actavis Grp. HF*, Nos. 07-00893, 06-01970, 06-01999, 2007 WL 1672229, at *5 (D.N.J. June 7, 2007) (quoting *In re TMI Litig.*, 193 F.3d 615, 724 (3d Cir. 1999)).[1]

## IV. DISCUSSION

At the outset, the Court notes that both parties conceded during the January 12th hearing that neither oppose consolidation.   Defendants consistently argue for consolidation of the *Koons* matter with this matter.   Plaintiffs, initially opposing consolidation, argues for consolidation of this matter into the *Koons* matter in light of the significant developments in *Koons*.

The Court is aware that, while there is no express Rule mandating same, typically cases consolidated within this District are consolidated into the case with the earliest docket number (the first-filed matter).   The Court, however, has broad discretion on matters of consolidation and finds that the unique circumstances presented here dictate a one-time deviation from the typical practice. *See Ellerman Lines, Ltd. v. Atl. & Gulf Stevedores, Inc.*, 339 F.2d 673, 675 (3d Cir. 1964)(referencing the court's broad power regarding requests or *sua sponte* decisions to consolidate matters); *see also E.E.O.C. v. Univ. of Pennsylvania*, 850 F.2d 969, 977 (3d Cir. 1988) (referencing the court's discretion relating to an inter-district first-filed issue).   As such, the Court finds that consolidation of the *Siegel* matter into the *Koons* matter is appropriate here.   The *Siegel*

---

[1] Motions seeking temporary restraints or preliminary injunctions are governed by Federal Rule of Civil Procedure 65.   Courts consider the following factors in considering a request for temporary restraints: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Great Caesars Ghost LLC v. Unachukwu*, No. 19-5408, 2019 WL 1515156, at *1 (D.N.J. Feb. 19, 2019) (quoting *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004)).   The Court, having reviewed Judge Bumb's thorough, well-reasoned Opinion, the parties' submissions (including the supplemental submissions which address the impact of Judge Bumb's Opinion and Order on this matter) and arguments, and the relevant case law, finds no reason to reach a different result on the five provisions of Chapter 131 already enjoined by Judge Bumb.   However, because this Court will consolidate *Siegel* into *Koons* for the reasons set forth *infra*, the Court finds it appropriate to reserve its disposition of the pending Motion seeking a TRO.

4

JA756

and *Koons* matters were virtually simultaneously filed, with the *Koons* Complaint having been filed minutes before the *Siegel* Complaint.[2] The *Koons* matter has developed more than this matter, and significantly so. Judge Bumb enjoined enforcement of various provisions of Chapter 131, and the parties in *Koons* are working to propose a schedule to Judge Bumb for discovery and briefing relating to the *Koons* preliminary injunction motion.

This dovetails into the other considerations regarding consolidation – the risk of conflicting outcomes and judicial resources. The Court acknowledges the differences and similarities in the *Koons* and *Siegel* matters. However, as it relates to the preliminary injunction proceedings, this Court must protect against the prospect of conflicting outcomes where, as here, both *Koons* and *Siegel* address claims relating to the constitutionality of the same legislation against at least two identical Defendants – Matthew Platkin and Patrick Callahan. To be clear, while the prospect of conflicting outcomes has thus far been avoided, consolidation ensures it will not occur as these proceedings continue to develop in discovery and, ultimately, finality.

The burden on judicial resources is great if these matters were to proceed before two different judges in the same District – the Court simply lacks the time and resources for such waste. At this point, Judge Bumb has already expended more effort than this Court on these significant constitutional issues, having considered and issued an Opinion and Order on the TRO motion in the *Koons* matter. The parties will be burdened too. As set forth above, the commonalities in these two matters will lead to overlapping discovery requests, witnesses, and competing time frames from different Judges.

## V. CONCLUSION

---

[2] The *Siegel* matter has the earlier docket number because the case was opened first without the corresponding filing of the Complaint.

For all of these reasons, the Defendants' Motion to Consolidate is granted, in part, and denied, in part. The Court will consolidate the *Siegel* and *Koons* matters, but the *Siegel* matter will consolidate into the *Koons* matter with Judge Bumb.   The Motion seeking a TRO is reserved for further proceedings following reassignment of this matter to Judge Bumb.

For the reasons stated above, and for good cause shown,

**IT IS** this **13th** day of **January 2023,** hereby

**ORDERED** that Defendants' Motion (ECF No. 7) seeking an emergency consolidation is **GRANTED IN PART** and **DENIED IN PART**.   The Court will consolidate the *Siegel* and *Koons* matters, but the *Siegel* matter, 22-cv-7463, will consolidate into the *Koons* matter, 22-cv-7464, rendering *Koons* the lead case.   Accordingly, a decision on the pending Motion for Temporary Restraining Order (ECF No. 8) is reserved for further proceedings following reassignment of this matter to Judge Bumb.

KAREN M. WILLIAMS
United States District Judge

6

JA758

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

AARON SIEGEL, *et al.*,

               Plaintiffs,

    v.

MATTHEW PLATKIN, *et al.*,

               Defendants.

Civil No. 22-7464 (RMB/AMD)

**OPINION**

**APPEARANCES:**

Daniel L. Schmutter
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, NJ 07450

     *On behalf of Plaintiffs*

Angela Cai, Deputy Solicitor General
Jean Reilly, Assistant Attorney General
David Chen, Deputy Attorney General
Amy Chung, Deputy Attorney General
Viviana Hanley, Deputy Attorney General
Chandini Jha, Deputy Attorney General
Samuel L. Rubinstein, Deputy Attorney General
Office of the New Jersey Attorney General
25 Market Street
Trenton, New Jersey 08625

     *On behalf of New Jersey State Defendants*

**BUMB, United States District Judge:**

This matter comes before the Court upon the Motion for a Temporary Restraining Order and Preliminary Injunction by individual plaintiffs Aaron Siegel,

Jason Cook, Joseph Deluca, Nicole Cuozzo, Timothy Varga, Christopher Stamos, Kim Henry, and the Association of New Jersey Rifle and Pistol Clubs, Inc. (collectively, the "Plaintiffs" or "Siegel Plaintiffs") against Defendants Matthew Platkin in his official capacity as Attorney General of New Jersey and Patrick J. Callahan in his official capacity as Superintendent of the New Jersey Division of State Police (the "State" or "Defendants").  On December 23, 2022, Plaintiffs filed a Motion for a Temporary Restraining Order and Preliminary Injunction (the "Motion"). [Docket No. 8]

In addition to opposing the Motion, Defendants filed an Emergency Motion for Consolidation before the Honorable Karen M. Williams, U.S.D.J.  [Docket No. 7.] Judge Williams held a hearing on January 12, 2023, and thereafter granted the Motion to Consolidate, in part.  This matter has now been consolidated into Koons v. Reynolds, --- F.Supp.3d ---, Case No. 22-CV-7464, 2023 WL 128882 (D.N.J. Jan. 9, 2023), a case brought by individual plaintiffs Ronald Koons, Nicholas Gaudio, and Jeffrey Muller, Second Amendment Foundation, Firearms Policy Coalition, Inc., Coalition of New Jersey Firearm Owners, and New Jersey Second Amendment Society (together, the "Koons Plaintiffs") against the New Jersey Attorney General, Matthew J. Platkin, Superintendent of the New Jersey State Police, Patrick Callahan and County Prosecutors William Reynolds (Atlantic County Prosecutor), Grace C. Macaulay (Camden County Prosecutor), and Annemarie Taggart (Sussex County Prosecutor) (together, the "Koons Defendants").

On January 5, 2023, this Court heard oral argument on the Koons Plaintiffs'

separate Motion for a Temporary Restraining Order.  Like the <u>Siegel</u> Plaintiffs here, the <u>Koons</u> Plaintiffs challenged New Jersey's recently enacted legislation.  By Opinion and Order dated January 9, 2023, this Court agreed with the <u>Koons</u> Plaintiffs and entered an Order temporarily restraining the <u>Koons</u> Defendants, their officers, agents, servants, employees and attorneys from enforcing several provisions of Chapter 131 of the 2022 Laws of New Jersey, to wit, Section 7(a), Subparts 12, 15, 17, and 24, and Section 7(b)(1).

Unlike the <u>Koons</u> Plaintiffs, the <u>Siegel</u> Plaintiffs also assert challenges to additional "sensitive place" designations, as well as other new requirements applicable to concealed carry permit holders in Chapter 131.  On January 26, 2023, the Court held oral argument on the Siegel Plaintiffs' Motion.  For the reasons set forth below, the Motion will be granted, in part, and denied, in part.

## I.    BACKGROUND

The legislation at issue here, Chapter 131, was enacted in response to the United States Supreme Court decision in <u>New York State Rifle & Pistol Ass'n, Inc. v. Bruen</u>, which held "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home."  597 U.S. ___, 142 S.Ct. 2111, 2122 (2022).  The <u>Bruen</u> Court struck down a New York statute that required an applicant for a concealed carry permit to demonstrate "proper cause," and acknowledged the unconstitutionality of analogous statutes in other states that required a "showing of some additional special need," such as New Jersey's law requiring that an applicant show "justifiable need" to obtain a license to carry.  <u>Id.</u> at

JA761

2124 n.2.

In response to <u>Bruen</u>, the New Jersey Legislature passed sweeping legislation. On December 22, 2022, New Jersey Governor Phil Murphy signed into law Chapter 131 of the 2022 Laws of New Jersey that imposed a new set of requirements, many of which became effective immediately, including declaring certain locations as "sensitive places" where handguns are prohibited even by licensed carriers, as well as a ban on carrying functional guns in vehicles.

The <u>Koons</u> Plaintiffs, licensed carriers, alleged that the newly-enacted legislation was unconstitutional as to several provisions; however, they did not challenge most provisions of the legislation. The <u>Siegel</u> Plaintiffs, both licensed carriers and those in the process of obtaining licenses to carry, are not so surgical. Both sets of Plaintiffs, however, contend that the legislation saps the <u>Bruen</u> ruling of any significance, as it makes the lawful carrying of arms effectively impossible in almost all of New Jersey.

## A.    Plaintiffs' Complaint

Plaintiffs challenge Chapter 131 on several constitutional grounds, including deprivation of Plaintiffs' rights under the Second and Fourteenth Amendments (Count One), Equal Protection (Count Two) and Due Process (Count Three) under the Fourteenth Amendment, and various First Amendment challenges (Counts Four,

Five, and Six).[1]  [Docket No. 1 (the "Complt."), at 47–58.]  According to Plaintiffs, the new legislation "renders nearly the entire State of New Jersey a 'sensitive place' where handgun carry is prohibited."  [*Id.* ¶ 49.]  They challenge fifteen Section 7 restrictions (unlike the <u>Koons</u> Plaintiffs who challenged five restrictions) that prohibit carrying a handgun in a location classified by the state legislature as a "sensitive place," including a vehicle.  Plaintiffs also seek to invalidate New Jersey laws that pre-date the newly enacted legislation, including statutes and regulations limiting firearms at parks, schools, casinos, and gaming properties.  <u>See</u> N.J.S.A. 2C: 39–5(e); N.J.A.C. 7:2-2.17(b);  N.J.A.C. 13:69D-1.13;  N.J.AC. 7:25-5.23 (a), (c), (f), (i), and (m) as unconstitutional sensitive place designations in light of the Supreme Court's dictate in <u>Bruen</u>.  Finally, Plaintiffs challenge several of the permitting requirements, insurance requirements (Section 4), and fee increases (Sections 2 and 3) included in Chapter 131, but those challenges are not part of this emergent Motion for temporary restraints.  Because the parties' arguments, particularly those by Defendants, essentially mirror

---

[1] Plaintiffs contend that Chapter 131 "creates a costly and onerous obstacle to the exercise of the right to bear arms - one with no precedent in American history."  [Complt. ¶ 59.]  More specifically, in Count One of their Complaint, Plaintiffs assert Second Amendment claims against most (beyond those challenged in the <u>Koons</u> case) of the "sensitive place" provisions in Section 7, as well as against certain permitting provisions in Sections 2 and 3.  Count 2 asserts Equal Protection claims against Section 8's exemptions for judges, prosecutors and attorneys general and Section 7 (a)(24)'s private property default rule.  Count 3 asserts void-for-vagueness claims against certain provisions of Sections 2, 5, and 7, including Section (5)(a)(5) which makes it a crime of the fourth degree to engage in an "unjustifiable display of a handgun."  Count 4 asserts a First Amendment challenge again Section 7(a)(24).  Count 5 asserts a First Amendment challenge against certain permitting provisions in Section 3.  Count 6 asserts a First Amendment claim under Section 7(a)(12).

the arguments previously presented to this Court in <u>Koons</u>, the Court incorporates many of its applicable findings, as set forth below, from its earlier Opinion of January 9, 2023.

**B.      Plaintiffs' Motion for a Temporary Restraining Order**

First, Plaintiffs seek to immediately and temporarily enjoin enforcement of Section 7(a) of the legislation, as it relates to the following enumerated "sensitive places":[2]

1.      Subpart 6 (prohibiting handguns "within 100 feet of a place for a public gathering, demonstration or event is held for which a government permit is required, during the conduct of such gathering, demonstration or event");

2.      Subpart 9 (prohibition on carrying handguns at a zoo <u>only</u>[3]);

3.      Subpart 10 (prohibiting handguns at "a park, beach, recreation facility or area or playground owned or controlled by a State, county or local government unit, or any part of such a place, which is designated as a gun free zone by the governing authority based on considerations of public safety");[4]

4.      Subpart 11 (prohibiting handguns "at youth sports events, as defined in N.J.S.5: 17-1, during and immediately preceding in following the conduct of the event . . .");

5.      *Subpart 12 (prohibiting handguns in "a publicly owned or leased library or museum");

---

[2] Those provisions indicated with an asterisk ("*") were also challenged (and restrained by this Court) in <u>Koons</u>.

[3] Plaintiffs have not sought temporary restraints as to any of the other "sensitive places" expressly listed in Subpart 9, namely any "nursery school, pre-school, or summer camp."

[4] Relatedly, Plaintiffs challenge N.J.A.C. 7:22.17(b).

6.    *Subpart 15 (prohibiting handguns in "a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises");

7.    *Subpart 17 (prohibiting handguns in "a privately or publicly owned and operated entertainment facility within this State, including but not limited to a theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held");

8.    Subpart 18 (prohibiting handguns at "a casino and related facilities, including but not limited to appurtenant hotels, retail premises, restaurant and bar facilities, and entertainment in recreational venues located within the casino property);[5]

9.    Subpart 20 (prohibiting handguns at "an airport or public transportation hub");

10.   Subpart  21 (prohibiting handguns at "a health care facility, including but not limited to a general hospital, special hospital, mental psychiatric hospital, public health center, diagnostic center, treatment center, rehabilitation center, extended care facility, skilled nursing home, nursing home, intermediate care facility,  tuberculosis hospital, chronic disease hospital, maternity hospital, outpatient clinic, dispensary, assisted living center, home health care agency, residential treatment facility, or residential healthcare facility");

11.   Subpart 22 (prohibiting handguns in a "facility licensed or regulated by the Department of Human Services, Department of Children and Families or Department of Health, other than a health care facility, that provides addiction or mental health treatment or support services)

12.   Subpart 23 (prohibiting handguns at " a public location being used for making motion picture or television images for theatrical, commercial or educational purposes, during the time such location is being used for that purpose") ; and

[5] Relatedly, Plaintiffs challenge N.J.A.C. § 13:69D–1.13.

13.    **\*Subpart 24** (prohibiting handguns in "private property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit under N.J.S.2C:58-4, provided that nothing in this paragraph shall be construed to affect the authority to keep or carry a firearm established under subsection e. of N.J.S.2C:39-6").

2022 N.J. Laws c. 131.

Also in Section 7(a), Plaintiffs challenge Subpart 7, which prohibits handguns "in a school, college, university or other educational institution," because, they contend, the restriction could apply to multi-use properties that offer classes and the like might fall under the umbrella of this restriction. Id. Because they fear they will be exposed to criminal liability for carrying concealed in these multi-purpose properties, Plaintiffs challenge this restriction as well.

Moreover, Plaintiffs (like the Koons Plaintiffs) challenge Section 7(b) of the legislation that imposes an additional "sensitive place" ban on functional firearms in vehicles, and more specifically, making it a fourth degree offense to transport or carry a firearm "while in a vehicle in New Jersey, unless the handgun is unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle." *Id.* The maximum sentence for this crime is 18 months' imprisonment. *See* N.J.S.A. §§ 2C:43-6(a)(4). Like the Koons Plaintiffs, Plaintiffs here point out the unconstitutional effect of Section 7(b): that licensed handgun carriers such as themselves now must transport a handgun in a vehicle the same way as

someone who does not have a permit to carry from the State.

Finally, Plaintiffs seek a temporary restraining order barring the enforcement of several statutes and regulations that existed before <u>Bruen</u> was decided to the extent they restrict the type of ammunition a person may possess while in the woods, fields, marshlands, or on the water, or while hunting various game.  Those are N.J.A.C. 7:25-5,23(m), N.J.A.C. 7:25-5.23(i), N.J.A.C. 7:25-5.23(a),(c), and (f) (to the extent they restrict the type of ammunition a person may possess while In the woods, fields, marshlands, or on the water, or while hunting various game and N.J.A.C. 7:25-5.23(f)(5)(requiring firearms to be unloaded and enclosed in a securely fastened case when in a motor vehicle). (Collectively the "Fish and Game Restrictions").

## C.   Plaintiffs' Declarations, Backgrounds, and Daily Routines

In support of their request, Plaintiffs have submitted the sworn declarations of each individual Plaintiff.  [<u>See</u> Docket No. 8.]  Below, the Court has highlighted certain averments by some of the individual Plaintiffs most central to resolving the pending Motion.

Plaintiff Siegel, a handgun permit holder, lives in Hopatcong, New Jersey and is a registered nurse and a volunteer New Jersey Medical Reserve Corps.  [Docket No. 8-2 ¶ 2–4.]  He previously served as an Emergency Medical Technician, and in the course of his employment works "variously at medical offices and medical boarding homes."  [<u>Id.</u> ¶ 7–8.]  Prior to the passage of Chapter 131, he frequently carried his handgun in the course of his medical work.  [<u>Id.</u> ¶ 9.]  He frequently hikes and walks his dog in public parks and publicly owned beaches.  [<u>Id.</u> ¶ 11.]  He takes his son to

Tae Kwan Do classes at a martial arts school located in a strip mall  and takes his son to participate in youth Tae Kwan Do competitions.  [Id. ¶ 12.]  He also frequently takes his son to "museums throughout New Jersey, the public library, the Turtle Back Zoo in West Orange, New Jersey and the Van Saun Zoo in Paramus, New Jersey." [Id. ¶ 13.]  Every year he takes his son deer hunting.  [Id. ¶ 15.]  They go to movie theaters frequently.  [Id. ¶ 16.]  He "sometimes" attends New Jersey Devils Hockey games at the Prudential Center in Newark, New Jersey and, in doing so, "sometimes" takes the bus or train.  [Id. ¶ 17.]  He enjoys trips to the casinos in Atlantic City, New Jersey and dining out.  [Id. ¶¶ 1819.]  "From time to time" he drives his friends and family to the Newark Airport.  [Id. ¶ 20.]  Now that the law is in effect, he avers, he can carry his handgun "virtually nowhere outside [his] home."  [Id. ¶ 45.]

Plaintiff Cook, a Handgun Carry Permit holder, is the general manager of a pharmacy in Willingboro, New Jersey.  [Docket No. 8-3 ¶ 3.]  He obtained a handgun carry permit because he is concerned about the area where he works, "which is an area that experiences elevated levels of crime."  [Id. ¶ 6.]  Similar to the other Plaintiffs, prior to the passage of Chapter 131, he carried his firearm to almost everywhere he went including medical appointments where he did not need to disrobe.  [Id. ¶ 7.] Several times per month, he enjoys walking trails in State parks, and during the summer, the public beaches of the State.  [Id. ¶ 8.]  Several times per year, he enjoys "the Popcorn Park Zoo in Forked River, New Jersey, the Adventure Aquarium in Camden, New Jersey, and Jenkinson's Aquarium in Point Pleasant Beach, New Jersey.  [Id. ¶ 11.]  He enjoys dining out, going to the Atlantic City casinos, the theater,

and Atco Dragway racetrack at Waterford Township, New Jersey.  [Id. ¶¶ 1517.]  He avers because of the extensive prohibitions set forth in Chapter 131, he "can carry [his] handgun virtually nowhere outside [his] home."  [Id. ¶ 11.]

Plaintiff DeLuca, a Handgun Carry Permit holder, is an automotive repair mechanic in Marlton, New Jersey.  [Docket No. 8-4 ¶ 3.]  He avers many of the same routines and concerns similar to Plaintiffs Siegel and Cook.

Plaintiff Cuozzo, a firearms owner who is applying for Handgun Carry Permit, lives in New Egypt, New Jersey and is a member of the Bible Baptist Church there. [Docket No. 8-5 ¶¶ 36.]  He is applying for his carry permit because he recognizes the violent crime that can take place anywhere including in places of worship.  [Id. ¶ 5.]

Plaintiff Varga, a firearms owner who is applying for a Handgun Carry Permit, lives in Wall Township, New Jersey and is a Deacon of the Grace Bible Church there . [Docket No. 8-6 ¶¶ 1–3.]  He is applying for his carry permit because, like Plaintiff Cuozzo, he recognizes the violent crime that can take place anywhere, including in places of worship.  [Id. ¶ 5.]  His church also has a "meager" budget for security.  [Id. ¶ 17.]

Plaintiff Stamos, a Handgun Permit Holder, lives in Bayonne, New Jersey and is a data analyst. [Docket No. 8-7 ¶¶ 24.]  He annually accompanies his wife to the Paddle the Peninsula event at 16th Street Park in Bayonne and enjoys the park several times per year.  [Id. ¶ 67.]  From "time to time" he takes his nephew to the park and the Cottage Street Park, but he has refrained from carrying his handgun to these parks

because of the legislation.  [Id. ¶ 9.]

Plaintiff Henry resides in Pemberton, New Jersey.  She does not own and firearm but desires to apply for one.  [Docket No. 8-8 ¶¶ 89.]  She is a single mother of two children and lives "in constant fear from death threats from [her] ex-boyfriend." [Id. ¶ 9.]

### D.     Defendants' Response

Defendants oppose the Motion, arguing first that Plaintiffs fail to establish Article III injury redressable by the issuance of a temporary restraining order.  [See Docket No. 15 ("Defs.' Opp'n").]  They argue that each Plaintiff has failed to establish a sufficiently imminent injury, and therefore, that standing is lacking such that the Court's jurisdiction is defective.  [Id. at 1121.]

As to the merits of the Motion, Defendants contend that many of the provisions Plaintiffs challenge "fall outside the scope of the Second Amendment entirely."  [Id. at 1.]  Even if covered by the Second Amendment, Defendants also assert that the challenged provisions are supported by a historical tradition of firearm regulation consistent with the dictates of Bruen.  [Id.]  Defendants put the restrictions for which they claim there are supporting historical analogues into four categories:  (1) locations for Government and constitutionally-protected activity; (2) locations where crowds gather; (3) locations where vulnerable or incapacitated people gather; and (4) private

property without express permission of the property owner. [6]

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs the issuance of temporary restraining orders and preliminary injunctions. In the Third Circuit, the four requirements Plaintiffs must satisfy to obtain the emergent injunctive relief sought are familiar ones:

> (1) a reasonable probability of eventual success in the litigation, and (2) that [they] will be irreparably injured … if relief is not granted.... [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

Reilly v. City of Harrisburg, 858 F.3d 173, 176 (3d Cir. 2017), as amended (June 26, 2017) (citing Del. River Port Auth. v. Transamerican Trailer Transport, Inc., 501 F.2d 917, 919–20 (3d Cir. 1974) (citations omitted)). The Third Circuit has also made clear that "[p]reliminary injunctive relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'" Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004) (quoting American Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir.1994)).  Temporary restraining orders have the same requirements and are "stay-put orders … designed to maintain the status quo during the course of proceedings. They 'function[ ], in essence as an automatic

---

[6] The Court reiterates its observation made in Koons that while the State dedicates a significant portion of its opposition discussing the benefits of firearms regulations, the Bruen Court was clear that this Court shall not venture into or consider interest balancing in this context.

preliminary injunction.'" J.O. ex rel. C.O. v. Orange Twp. Bd. of Educ., 287 F.3d 267, 272 (3d Cir. 2002) (quoting Drinker v. Colonial Sch. Dist., 78 F.3d 859, 864 (3d Cir.1996)). However, relevant for purposes of appeal, "a party cannot be a prevailing party if the interim relief received is not merit-based." Id. at 273 (citations omitted).

## III.   ANALYSIS

### A.   Standing

For there to be a case or controversy before this Court under Article III, Plaintiffs must first satisfy their burden to establish standing.  Plaintiffs must show "(i) that [they] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief.  TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2203 (2021) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–561 (1992).  As this Court found in Koons, the State's demand that Plaintiffs allege a future, concrete time and date as to when they will visit each of Chapter 131's enumerated "sensitive places" is too demanding.  After all, risk of future harm is sufficient "so long as the risk of harm is sufficiently imminent and substantial." Id. at 2210 (citations omitted).  "[T]he injury required for standing need not be actualized. A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." Davis v. Fed. Election Comm'n, 554 U.S. 724, 734, 128 S. Ct. 2759, 2769 (2008).  The State is correct that Plaintiffs must demonstrate standing as to each claim.  Id.  However, once one plaintiff is found to have standing as to a

claim, the Court need not inquire as to the standing of other plaintiffs on that claim for purposes of the Motion.  See Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls, 536 U.S. 822, 826 n.1 (2002).

The Court now takes the opportunity to clarify its standing analysis.  Both the Koons Plaintiffs and Siegel Plaintiffs allege, generally, that they have visited the challenged "sensitive places" in the past.  However, the Court is not satisfied that the threat of criminal penalty for not abiding by the requirements of Chapter 131 is imminent based on such allegations alone.  What distinguishes the limited, challenged "sensitive places" in Koons from the longer list of challenged places here is that in Koons the sensitive places were not only "generally open to the public and where ordinary persons like Plaintiffs would be expected to frequent upon occasion," but also places where the Koons Plaintiffs visited as part of their ordinary, daily routines. Koons, 2023 WL 128882, at *24.  Thus, the Court could determine from the Koons Plaintiffs' sworn declarations that the threat of criminal penalty was imminent if the Court did not temporarily enjoin enforcement of the applicable provisions. Conversely, here there is no imminent threat of criminal penalty in places infrequently visited by Plaintiffs' or locations where Plaintiffs make plans far in advance to visit and thus, are not likely to be a part of or "happened upon" as part of the Plaintiffs' ordinary, daily routines.

As to the other two standing requirements, four of the Plaintiffs (Siegel, Cook, DeLuca, and Stamos) have concealed carry permits and have sufficiently shown that the threatened injury they would suffer (i.e., the threat of criminal prosecution) is

redressable by judicial relief, and that each Defendant is a proper party for the reasons stated in their Complaint, affidavits, motion papers, and oral argument. [See Docket Nos. 8, 8-1, 8-2, 8-3, 8-7.]  However, as noted earlier, unlike the Koons Plaintiffs who challenged a narrow category of sensitive places that are a part of their daily, ordinary life (public libraries and museums, bars/restaurants where alcohol is served, entertainment facilities, in vehicles, and on private property such as businesses), the Siegel Plaintiffs challenge far more restrictions.  The Court now examines standing as to the challenged restrictions.

### i.    The Overlapping "Sensitive Places" Restrained in Koons

As in Koons, each of four Plaintiffs who hold permits to carry handguns has submitted a sworn declaration that prior to Chapter 131, he exercised his carry permit in his day-to-day life, which included regularly going (typically by vehicle) to public libraries and museums, bars/restaurants where alcohol is served, entertainment facilities, and on private property such as commercial businesses. [Id.]  Similar to what the Court found in Koons, the Siegel Plaintiffs' Complaint is that, at least as to these provisions, the restrictions are "so sweeping and comprehensive so as to make it largely impossible for most people to carry a handgun during the course of their typical day." [Complt. ¶ 55.]  Each Plaintiff also has averred credible threats of prosecution, and there has been nothing presented to this Court to suggest that Defendants do not intend to enforce this legislation.  Thus, the Court finds that, as holders of concealed carry permits, these Plaintiffs have standing to pursue the current relief as to Sections 7(a) Subparts 12(public libraries and museums), 15 (bars or restaurants where alcohol

is served), 17 (entertainment facilities), and 7(a)(24)(private property), as well as 7(b)(1)( vehicles).

### ii.        Zoos and Medical/Treatment Facilities

Plaintiff Siegel avers that he frequently visits two specific zoos in New Jersey, namely, "the Turtle Back Zoo in West Orange, New Jersey and the Van Saun Zoo in Paramus, New Jersey."  [Docket No. 8-3 ¶ 13.]  Plaintiff DeLuca avers that "[f]rom time to time" he enjoys Cape May Zoo.  [Docket No. 8-4 ¶ 8.]  Similarly, Plaintiff Cook visits the Popcorn Park Zoo in Forked River, New Jersey.  With respect to the long list of medical/treatment facilities at Subparts 21 and 22, Plaintiff Siegel, who works as a nurse practitioner and previously served as an EMT, makes these same kinds of specific allegations in relation to his standing; naming Skylands Urgent Care in Lake Hopatcong, New Jersey, and Free Clinic Newton, in Newton, Jersey as the facilities where he works.

However, the Defendants are correct that this level of specificity in Plaintiffs' declarations, without more, creates a traceability or redressability issue as to zoos, and medical or treatment facilities.  What is conspicuously absent from Plaintiffs' declarations are allegations that but for Chapter 131, Section 7(a), Subparts 9, 21, and 22, they would conceal carry at Turtle Back Zoo, Van Saun Zoo, Cape May Zoo, Popcorn Park Zoo, Skylands Urgent Care, and Free Clinic Newton.  In fact, the Court even suspects that several of these places maintain policies prohibiting firearms outright, in which case, Plaintiffs certainly would not be able to claim they would carry

at these institutions "but for" Chapter 131. [7]   Plaintiff Siegel also avers that he visits the homes of his patients in the course of his work, but the provision that addresses this aspect is Section 7(a)(24)'s broad prohibition against having firearms on all private property unless express permission is given by the owner (which Plaintiffs have standing to challenge, no doubt).   Because of this traceability issue,[8] the Court finds that Plaintiffs have failed to show standing to challenge these three provisions in this Motion for temporary restraints.

### iii.   Airports and Movie Sets

With respect to the challenge to airports and movie sets, Plaintiffs' averments as to standing are also lacking.   Such locations are clearly not locations where Plaintiffs frequent as part of their ordinary, daily lives.   The Court also finds that averments of a past encounter, without more, do not establish that a revisit or reencounter is imminent.   In fact, only two of the Plaintiffs declare that they have ever previously

---

[7] As to Subparts 20 and 21, the Court notes that even if Plaintiff Cook had standing based on a "guns allowed" policy at either Skylands Urgent Care or Free Clinic Newton, the relief he seeks – invalidating the entirety of both subparts – is overbroad. At most, Plaintiff Cook could challenge only those types of medical facilities he works at (*e.g.*, a clinic) and not the many other types of medical facilities listed (*e.g.*, a mental psychiatric hospital, rehabilitation center, nursing home, tuberculosis hospital, dispensary, etc.).

[8] To be sure, the same traceability issue was not present in <u>Koons</u>.   The limited challenges to the sensitive place restrictions there clearly involved locations that were not only clearly a part of at least one of the <u>Koons</u> Plaintiffs' daily lives, but also because those provisions swept so broadly and applied to hundreds of locations (*e.g.*, anywhere that serves alcohol) judicial relief obviously alleviated the Plaintiffs' threatened injury.

encountered a movie being filmed out in public, and *if* they encountered such a scene again, they would likely be deterred from carrying their handgun.

As to airports, Plaintiff Siegel declares that "[f]rom time to time" he drives his friends and family and drops them off and pick them up from Newark Airport. [Docket No. 8-2 ¶ 20.]  This does not swear a sufficiently a concrete intention to go in the immediate future.  Plaintiff Cook's Declaration fares no better as he swears that "[a]t least once per month," he drives his family members and drops them off or picks them up at Newark Airport or Atlantic City Airport.  This does not set forth an intent to conceal carry in the immediate future. [Docket No. ¶ 18.]  Air travel does not appear to be a part of any of the Plaintiffs' daily lives, but instead, depends on the lives and plans of others, to wit, their families and friends.  Thus, the Court will also deny the Motion with respect to these specific provisions for lack of standing.

### iv.       Fish and Game Restrictions

Plaintiffs also lack standing to seek emergency restraint of the Fish and Game Restrictions pre-dating Bruen.  At most, Plaintiff Siegel alleges he goes deer hunting with his son annually.  [Docket No. ¶ 15.]  Yet, deer season in New Jersey is in the late autumn and early winter.  N.J. DEP'T ENV'T PROT., N.J. FISH & WILDLIFE, *Deer Season and Regulations*, https://dep.nj.gov/njfw/hunting/deer-season-and-regulations/ (last updated Jan. 13, 2023).  Thus, there is no imminent threat.

### v.        Public Gatherings and Events

At oral argument, Plaintiffs withdrew their application for a temporary

restraining order as to Section 7(a)(6), prohibiting handguns "within 100 feet of a place for a public gathering, demonstration or event is held for which a government permit is required, during the conduct of such gathering, demonstration or event." The parties generally agree that Plaintiffs' averments as to public gatherings are limited to past attendance, and the Defendants expressed a concern that such a public gathering or event might not even occur during the relatively short TRO phase of litigation. [Tr. at 51.] However, because Plaintiffs were willing to withdraw their Motion as to this "sensitive place," Defendants withdrew their standing challenge for purposes of the longer, PI phase.[9]

### vi.     Remaining Challenged "Sensitive Places"

As to the remaining challenged provisions, the Court is satisfied that Plaintiffs have standing because such places are clearly part of at least one Plaintiffs' daily life.

With regard to parks and beaches,[10] the Court is satisfied that such places are part of several of the Plaintiffs' daily lives. Plaintiff Siegel avers that he frequently hikes and walks in public parks near his home; he also goes to publicly owned beaches

---

[9] The Court finds Plaintiffs' void for vagueness argument convincing but leaves the issue for another day. Moreover, it seems Plaintiffs would be unduly burdened, or even unable, to determine whether a particular public gathering or event is one for which a government permit is required.

[10] As in Koons, the Court reserves on the definitive question as to whether it should parse each "sensitive place" in the relevant provisions of the statute to find standing. However, Plaintiffs raise a good point that the legislature made an intentional decision as to how to group the sensitive places enumerated in the respective subparts of Section 7(a).

including the Wildwood, New Jersey beach.  [Docket No. 8-2 ¶ 11.]  Plaintiff Cook enjoys walking trails in State parks several times per month.  [Docket No. 8-3 ¶ 8.] Plaintiff DeLuca "regularly" enjoys walking his dog in State parks and on public beaches.  [Docket No. 8-4 ¶ 7.]

With regard to youth sports events, Plaintiff Siegel declares that takes his son to Tae Kwan Do classes at a martial arts school near his home and he takes his son to participate in youth Tae Kwan Do competitions.  [Docket No. 8-2 ¶ 11.]

With regard to casinos, Plaintiff Cook avers that "[o]nce per month" he enjoys trips to the casinos in Atlantic City.  [Docket No. 8-2 ¶ 15.]  Although a close call, the Court finds that this is sufficient to have standing for purposes of temporary relief. Further, Plaintiff DeLuca weekly visits a friend and must traverse through the waters owned by a casino.  [Docket No. 8-4 ¶ 11.]

Like the Court found in <u>Koons</u>, these remaining "sensitive places" in Chapter 131 are places where these Plaintiffs ordinary routines often take them.  They require little planning, and are integrated into the Plaintiffs' daily lives, as their Declarations demonstrate.  As a result, they have shown an immediate threat of injury if they were to resume carrying their concealed handguns with them as they did prior to the law's enactment.   Having determined that Plaintiffs have standing as to some of the challenged restrictions, the Court turns next to the merits of the Motion.

**B.   Likelihood of Success on the Merits and <u>Bruen</u>'s Dictate of Historical Tradition**

With respect to the challenged provisions of New Jersey law for which Plaintiffs

have met their standing burden, the Court next considers Plaintiffs' likelihood of success on the merits.

The analysis by which the Court determines this prong is familiar to the parties. The Supreme Court in <u>Bruen</u>, in making "the constitutional standard endorsed in <u>Heller</u> more explicit," clarified that:

> the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The Government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition.

<u>Bruen</u>, 142 S. Ct. at 2129–30.  The Court's role is a straightforward one:  first, does the conduct being challenged fall within the text of the Second Amendment?  If so, is there historical support for the conduct being restricted?   Defendants must justify the provisions of Chapter 131 by "demonstrat[ing] that the regulation is consistent with this Nation's historical tradition of firearm regulation." <u>Bruen</u>, 142 S. Ct. at 2126.[11]

### i.        Subpart 10 (Parks, Beaches, Recreation Facilities, and Playgrounds); N.J.A.C § 7:2–2.17(b)

Section 7(a)(10) prohibits the carry of a firearm onto "a park, beach, recreation facility or area or playground owned or controlled by a State, county or local government unit, or any part of such a place, which is designated as a gun free zone by the governing authority based on considerations of public safety."  2022 N.J. Laws

---

[11] By stating that Defendants must justify the regulation at issue, the Court does not mean to shift the burden that Plaintiffs have to obtain injunctive relief.  Rather, it is a factor that this Court considers as to whether Plaintiffs have met their burden as to the likelihood of success on the merits prong.

c. 131 § 7(a)(10).  Plaintiffs contend that Subpart 10 violates their right to public carry.[12]

First, the Second Amendment's plain text covers the conduct in question (carrying a firearm in public for self-defense in the places identified in Subpart 10), so the threshold inquiry articulated in Bruen is met. As a result, Defendants must be able to rebut the presumption of protection against this regulation by demonstrating that the regulation is consistent with this Nation's historical tradition of firearm regulation. The Court proceeds in reverse order.

To begin, this Court will not grant the restraints Plaintiffs seek with respect to playgrounds.  In Bruen and Heller, the Supreme Court expressly identified restrictions at certain sensitive places (such as schools) to be well-settled, even though the 18th- and 19th-century evidence has revealed few categories in number.  Bruen, 142 S.Ct. at 2133 (citing Heller, 554 U.S. at 626)).  The inference, the Court suggested, is that some gun-free zones are simply obvious, undisputed, and uncontroversial.  These are: (a) certain government buildings (such as legislative assemblies or courthouses or where the Government is acting within the heartland of its authority), (b) polling places, and (c) schools.  Id.  Bruen further instructs courts to consider analogies to such sensitive places when considering whether the Government can meet its burden of showing that

_____

[12] Plaintiffs also claim that an existing New Jersey law similarly restricts their right to public carry, as the statute prohibits the possession of firearms and other weapons "while on State Park Service property without the specific approval of the Superintendent or designee." [Pls.' Br. at 14 (quoting N.J.A.C. § 7:2–2.17(b)).] Because such law involves the same analysis as Subpart 10, the Court addresses them together.

a given regulation is constitutionally permissible.  Id.

Here, Defendants subsume playgrounds within their discussion of historical statutes that regulate firearms where crowds gather and where the vulnerable or incapacitated are located.  [See Defs.' Opp'n at 34–35.]  Unfortunately, Defendants neither point to a particular or analogous prohibition on carrying firearms at playgrounds nor provide a more meaningful analysis, despite this Court's persistent invitation.  In particular, Defendants have done no analysis to answer the question Bruen leaves open: is it "settled" that this is a location where firearms-carrying could be prohibited consistent with the Second Amendment?  Where the right to self-defense and sensitive place designations could be read in harmony under the Second Amendment?  For that matter, nor have Plaintiffs.  This issue must be explored at the preliminary injunction stage.  Despite these shortcomings, the Court concludes that schools and playgrounds intersect, that is, playgrounds fall within the sphere of schools.  Therefore, under Bruen, the Court "can assume it settled" that playgrounds are a "sensitive place."  See Bruen, 142 S.Ct. at 2133.  Accordingly, because Plaintiffs cannot meet their burden as to their challenge to playgrounds in Subpart 10, the Motion will be denied as to playgrounds.

Second, the Court considers "recreational facilities," another exceptionally broad catch-all.  Defendants again situate their discussion of the historical evidence supporting a restriction on carrying firearms at such facilities under the banner of laws that restrict firearms where crowds gather and where the vulnerable or incapacitated are located.  The Court observes that Defendants rely upon the same historical

evidence that they invoked in <u>Koons</u> to support Subpart 17 (entertainment facilities).

But the Court already explained why such evidence should be rejected.  See <u>Koons v.</u>

<u>Reynolds</u>, 2023 WL 128882, at *14–*15.  Finding that there is no reason to reach a

different application here, the Court will grant Plaintiffs' Motion as to this restriction

of Subpart 10 with respect to such facilities.

Third, the Court considers public beaches.  Defendants have not come forward

with any historical evidence at all to suggest that the right to public carry for self-

defense on beaches is within our history or tradition, nor have Defendants put forward

an analogue from which this Court could conclude that Subpart 10 is constitutional

with respect to beaches.  Without more, the Court finds that Plaintiffs' have shown a

likelihood of success on the merits as to beaches.  <u>Bruen</u>, 142 S.Ct. at 2130.

Fourth and finally, the Court considers public parks, which requires greater

discussion as the State has provided something more for the Court to consider.

Defendants cite to the following as historical analogues for the State's authority to

restrict firearms in parks that are publicly owned or controlled.  First, Defendants rely

upon a Central Park Ordinance in New York from 1861.  [<u>See</u> Defs.' Opp'n at 35

(citing <u>Fourth Annual Report of the Commissioners of the Central Park</u> 106 (1861)).]

In that Ordinance, the Board of Commissioners of Central Park forbade all persons

"[t]o carry firearms or to throw stones or other missiles within [the park]."  The

Ordinance set forth other prohibited activities as well, such as no climbing or walking

up on the wall; no livestock; entry by gateways only; and no injury to any parts of the

park.  [<u>Id.</u>]  Defendants also cite to an Ordinance regarding Fairmount Park in

Philadelphia.  [See id. (citing Acts of Assembly Relating to Fairmount Park 18 (1870) ("No persons shall carry fire-arms, or shoot birds in the Park, or within fifty yards thereof, or throw stones or missiles therein.")).]  The other provisions are similar to those of the Central Park Ordinance.  Finally, Defendants present evidence that firearms were prohibited in parks in St. Louis, Missouri (1881), Chicago, Illinois (1881), St. Paul, Minnesota (1888), and Pittsburgh, Pennsylvania (1893).[13]  Id.

The Court acknowledges that Defendants have attempted to comply with Bruen insofar as they have introduced several historical analogues from which this Court could conclude that Subpart 10 accords with our historical tradition of firearm regulation, as it relates to public parks.  However, because Defendants' evidence is not convincing for at least three reasons, the Court will temporarily enjoin the prohibition on carrying in public parks.  First, the statutes Defendants cite all refer to public parks *in a city* (*i.e.*, New York, Philadelphia, St. Louis, Chicago, St. Paul, and Pittsburgh).  Thus, while there may be some historical precedent for restricting public carry in parks located in densely populated areas, Subpart 10 goes much further.  It forbids firearms in any park "owned or controlled by a State, county or local government unit." 2022

---

[13] As in Koons, there is uncertainty regarding whether the key time period for this Court's analysis of historical evidence is when the Second Amendment was adopted (*i.e.*, 1791) or when the Fourteenth Amendment was adopted (*i.e.*, 1868).  [Compare Pls.' Br. at 37–38, with Defs.' Opp'n at 40–41 n.24.]  "Because New Jersey's lack of support for its newly enacted legislation fails in either time period, . . . at this stage the Court need not decide this issue that had been left unresolved in Bruen." Koons, 2023 WL 128882, at *12 n.13 (citing Bruen, 142 S. Ct. at 2163 ("Here, the lack of support for New York's law in either period makes it unnecessary to choose between them.") (Barrett, J., concurring)).

N.J. Laws c. 131 § 7(a)(10). The New Jersey State Park Service alone "administers over 452,000 acres of land comprising parks, forests, historic sites, and other recreation areas." N.J. Dep't Env't Prot., N.J. State Park Serv., https://www.nj.gov/dep/parksandforests/ (last updated Jan. 26, 2023). Accordingly, the evidence cited does not support the sweeping proposition that New Jersey may prohibit law-abiding firearm owners from carrying their firearms in *all* public parks; Subpart 10 is not constitutional as drafted.

Second, Defendants' city laws do not establish a historical *tradition* of restricting firearms in all public parks because the practice of restricting firearms in city parks is not representative of the nation. Accord Antonyuk v. Hochul, --- F.Supp.3d ---, 2022 WL 16744700, at *67 (N.D.N.Y. Nov. 7, 2022). Six cities do not speak for, what was by 1893, 44 states. [Pls.' Reply Br. at 19–20.] Under Bruen, the state's evidence is not sufficient for the broader proposition that carrying firearms can be forbidden in all public parks in the State of New Jersey.

Third, it is worth noting that even before Bruen, other courts have recognized that overbroad restrictions on carrying a firearm in or near public parks for self-defense may violate the Second Amendment. See, e.g., People v. Chairez, 104 N.E.3d 1158, 1176 (Ill. 2018) (ruling that prohibition on carrying a firearm within 1,000 feet of a public park is unconstitutional and observing that "the State [of Illinois] conceded at oral argument that the 1000-foot firearm restriction zone around a public park would effectively prohibit the possession of a firearm for self-defense within a vast majority

of the acreage in the city of Chicago because there are more than 600 parks in the city"); Bridgeville Rifle & Pistol Club v. Small, 176 A. 3d 632, 654 (Del. 2017) (finding that, under Delaware's Constitution, the State's designation of public parks as gun-free zones did "not just infringe—but destroy[ed]—the core . . . right of self-defense for ordinary citizens").

In light of these cases, and the reasons identified above, the Court finds that Defendants' have not put forward sufficient evidence at this juncture to justify their regulation of firearms in public parks.  The analogous, existing restriction of N.J.A.C § 7:2–2.17(b), which requires the "specific approval" of the State Park Service to public carry on State Park Service lands, must be temporarily enjoined for the same reason.  Accordingly, the Court finds that Plaintiffs have met their burden at this stage of showing a likelihood of success that the restrictions of Subpart 10 are unconstitutional as to public parks, beaches, and recreational facilities; they have not shown a likelihood of success with respect to playgrounds.

### ii.        Subpart 11 (Youth Sports Events)

Plaintiffs also challenge Section 7(a), subpart 11, which bans handguns "at youth sports events, as defined in N.J.S.A. 5:17-1, during and immediately preceding and following the conduct of event."   2022 N.J. Laws c. 131 § 7(a)(11).[14]  As defined in Section 5:17-1(a), a "youth sports event" means "a competition practice or

---

[14] For reasons not clear to this Court, Plaintiffs challenge this restriction but not the restriction regarding "summer camps" in Section 7(a)(9).

instructional event involving one or more interscholastic sports teams or sports teams organized pursuant to a nonprofit or similar charter or which are member teams in a league organized by or affiliated with a county or minutes or recreation."

First, the Second Amendment's plain text covers the conduct in question (carrying a concealed handgun for self-defense in public).

"Bruen made clear that schools are paradigmatic sensitive locations where firearms can be banned."  [Defs.' Opp'n at 35.]  However, just as they argue with respect to playgrounds, Defendants also argue that the standard should be more broadly applied to any place where "great numbers of defenseless people (e.g., children) gather."  [Id. at 36.]

As discussed above, the Supreme Court has recognized the permissibility of a restriction when it applies to "schools."  See Bruen, 142 S. Ct. at 2133; Heller, 554 U.S. at 626.  As the Court in Heller stated, "[n]othing in our opinion should be taken to cast doubt on long-standing prohibitions on … laws forbidding the carrying of firearms in sensitive places such as … schools").   Heller, 554 U.S. at 626. Unfortunately, again, Defendants have done no meaningful analysis to answer the question as to whether this is a location that already is—or should be considered— settled, as Bruen discusses.  Both sides will need to explore this issue more fully at the preliminary injunction stage.  For purposes of this Motion, the Court concludes that schools and youth sports events intersect, that is, youth sports events fall within the sphere of schools.  Therefore, under Bruen, the Court "can assume it settled" that youth sports events are a "sensitive place."  See Bruen, 142 S.Ct. at 2133.  Accordingly,

because Plaintiffs cannot meet their likelihood of success burden regarding their challenge to the youth-sports-events restriction, this part of the Motion is denied.

### iii.        Subpart 12 (Public Libraries and Museums)

Section 7(a), subpart 12 bans handguns in "a publicly owned or leased library or museum." 2022 N.J. Laws c. 131. First, the Second Amendment's plain text covers the conduct in question (carrying a concealed handgun for self-defense in public). For similar reasons set forth by this Court in <u>Koons</u>, the Court finds that the historical analogues provided by the State are not sufficient to rebut the presumption of Second Amendment protection.

Defendants point out that this Court appeared to have overlooked the scope of New Jersey's law when it stated that the restriction "does not limit libraries and museums to government-owned ones." [Docket No. 25 ("Defs.' Suppl. Br."), at 7 n.3.] It is true that the Court did, but that does not change the Court's conclusion. Defendants contend that the Second Amendment does not limit the Government's right to exclude from its own property those persons who do not conform with conditions of their license. [Defs.' Suppl. Br. at 7.] But this argument shortcuts their obligation under <u>Bruen</u> by claiming that the State may prohibit the carrying of handguns on government property as the owner. Nothing in the approach <u>Bruen</u> dictates says that the analysis depends upon whether or not the State is the owner of the property. Nothing in <u>Bruen</u> allows that. The cases that Defendants rely upon pre-date <u>Bruen</u>. Those cases also applied intermediate scrutiny in considering whether the Government could show that the regulation was substantially related to the

achievement of an important governmental interest.  Bruen, 142 S. Ct. at 2127.  This is now precluded and is no longer the test.

If the Government had to prove prior to *Bruen* that the regulation was narrowly tailored to achieve a compelling governmental interest, and after Bruen it must prove that the regulation is consistent with historical tradition, then what is clear is that the fact that whether the Government is the proprietor is not relevant before and after Bruen.  Under the State's theory, any property it owned could be designated as gun-free.  Yet, no one could seriously contend, for example, that the State could impose a gun-free highway system simply because it owns the infrastructure.  Thus, before a state's regulation can pass constitutional master, it must satisfy Bruen regardless of whether the Government is the proprietor.  Defendants have failed to rebut the presumption that Second Amendment protection applies here.  The Court finds that Plaintiffs have therefore met their burden of showing that they will likely succeed in showing that this restriction is unconstitutional based upon the lack of historical evidence offered by the State.

### iv.        Subpart 15 (Bars, Restaurants, Where Alcohol is Served)

Subpart 15 bans handguns in "a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises." 2022 N.J. Laws c. 131 § 7(a).  First, the Second Amendment's plain text covers the conduct in question (carrying a concealed handgun for self-defense in public).  As a result, Defendants must rebut the presumption of protection against this regulation by

demonstrating that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Defendants make the same arguments here that they did in <u>Koons</u>.  Since nothing has changed since the Court's Opinion and Defendants have not offered any additional historical analogues despite this Court's instruction, the Court finds for the same reasons expressed in <u>Koons</u> that Plaintiffs have met their burden of showing that they are likely to succeed on their constitutional challenge as to this provision.

**v.        Subpart 17 (Entertainment Facilities)**

The Court repeats its impression noted in <u>Koons</u>, that is, subpart 17 of the statute is exceptionally broad, which makes it is a criminal offense to carry handguns in "a privately or publicly owned and operated entertainment facility within this State, including but not limited to a theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held." 2022 N.J. Laws c. 131 § 7(a).

First, the Second Amendment's plain text covers the conduct in question (carrying a concealed handgun for self-defense in public).  As a result, Defendants must rebut the presumption of protection against this regulation by demonstrating that the regulation is consistent with this Nation's historical tradition of firearm regulation. Defendants make the same arguments here that they did in <u>Koons</u>, nothing has changed since the Court's Opinion, and Defendants have not offered any additional historical analogues since then, despite this Court's invitation.  Accordingly, for the reasons the Court expressed in <u>Koons</u>, Plaintiffs have met their burden of showing that

they are likely to succeed on their constitutional challenge as to this provision.

> **vi.**      **Subpart 18 (Casinos); N.J.A.C. § 13:69D–1.13**

Section 7(a), Subpart 18 prohibits firearms in "a casino and related facilities, including but not limited to appurtenant hotels, retail premises, restaurant and bar facilities, and entertainment and recreational venues located with the casino property." 2022 N.J. Laws c. 131 § 7(a)(18).   Similarly, N.J.A.C. § 13:69D–1.13 prohibits firearms in casinos by establishing a default exclusionary rule, similar in structure to Subpart 24 (private property), which is discussed below.  See infra § III.B.vii.  Section 13:69D–1.13(a) provides the following:

> No person, including the security department members, shall possess or be permitted to possess any pistol or firearm within a casino or casino simulcasting facility without the express written approval of the Division provided that employees and agents of the Division may possess such pistols or firearms at the discretion of the director of the Division. At the request of the casino licensee's security department and upon its notification to the State Police, a law enforcement officer may, in an emergency situation, enter a casino or casino simulcasting facility with a firearm.

N.J.A.C. § 13:69D–1.13(a).  Additionally, the law provides that, to obtain permission from the Division of Gaming Enforcement to possess a firearm at a casino, the individual must demonstrate that: (1) "He or she has received an adequate course of training in the possession and use of such pistol or firearm"; (2) "He or she is the holder of a valid license for the possession of such pistol or firearm"; and (3) "There is a compelling need for the possession of such pistol or firearm within the casino or casino simulcasting facility."  Id. § 13:69D–1.13(b).  Finally, the law provides that casino licensees must post a conspicuous sign stating the following: "By law, no person shall

possess any pistol or firearm within the casino or casino simulcasting facility without the express written permission of the Division of Gaming Enforcement." Id. § 13:69D–1.13(c). Plaintiffs contend that Subpart 18 violates their right to public carry, [see Pls.' Br. at 36–38], and they argue that N.J.A.C. § 13:69D–1.13 is unconstitutional for the same reason, [see id. at 14–15]. Accordingly, they ask the Court to temporarily enjoin both laws.

First, the Second Amendment's text plainly covers the conduct in question (carrying a firearm in public for self-defense, at casinos), so the threshold question is met. See Bruen 142 S. Ct. at 2126, 2129–30 ("When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."). Accordingly, the burden to justify Subpart 18 and N.J.A.C. § 13:69D–1.13 rests with Defendants. See id. at 2130 ("The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.").

Defendants have not come forward with strong historical evidence that the State may prohibit firearms at casinos or related facilities. Defendants point to the same statutes restricting firearms "where crowds gather," but the Court has already discussed, and distinguished, such evidence above. See supra §§ III.B.i (recreational facilities), III.B.v (entertainment facilities). It is not any more convincing as applied here. Because the State has not met its burden of showing that Subpart 18 or N.J.A.C. § 13:69D–1.13 is within our Nation's historical tradition of firearm regulation, under Bruen the Court must temporarily enjoin such laws. See 142 S. Ct. at 2130.

The Court will make a few additional observations.  Section 13:69D–1.13 reflects a blend of firearm regulation principles that have come into focus in this litigation thus far.  The law represents a default rule forbidding a firearm owner from carrying his or her firearm at a designated location (*i.e.*, casinos), unless he or she has obtained permission to do so (here, it is "express written approval" from the Division of Gaming Enforcement).  N.J.A.C. § 13:69D–1.13(a) (emphasis added).  A default exclusionary rule for all casino licensees that situates approval authority in a government entity cannot cohere with the Second Amendment test articulated in Bruen.  The law wrests from casino licensees the power to exclude (or permit) firearms on their property.  Additionally, Section (b) articulates threshold requirements that an individual must meet for the Division of Gaming Enforcement to approve a request to public carry at a casino.  While the State of New Jersey may certainly condition the approval of a license to carry a firearm on any number of rational requirements, see Bruen, 142 S.Ct. at 2157 ("[Bruen] decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun") (Alito, J., concurring), it may not empower bureaucrats with the discretion to thereafter restrict the exercise thereof based on their assessment of an individual's "compelling need for the possession of such pistol or firearm."  N.J.A.C. § 13:69D–1.13(b).  Finally, casino licensees are free to restrict firearms on their property, see GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1264 (11th Cir. 2012), and the conspicuous notice is an established method of accomplishing that goal.  But the State may not compel casino licensees to prohibit firearms on their property, nor to post a notice to accomplish the

same.   N.J.A.C. § 13:69D–1.13(c).   For these additional reasons, the Court temporarily enjoins N.J.A.C. § 13:69D–1.13.

Ultimately, Plaintiffs have met their burden of demonstrating a likelihood of success on the merits of their challenge to Subpart 18 and N.J.A.C. § 13:69D–1.13.

### vii.    Subpart 24 (Private Property Unless Indicated Otherwise by Owner)

Subpart 24 of the statute deals with private property, which is broadly defined as:

> [P]rivate property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit under N.J.S.A. 2C:58-4, provided that nothing in this paragraph shall be construed to affect the authority to keep or carry a firearm established under subsection e. of N.J.S.A. 2C:39-6.

2022 N.J. Laws c. 131 § 7(a)(24).

First, the plain text of the Second Amendment covers the conduct in question, so the threshold inquiry articulated in Bruen is met.  See 142 S. Ct. at 2126, 2129–30 ("When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.").   Accordingly, the burden to justify Subpart 24 rests with Defendants.  See id. at 2130 ("The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.").  Defendants make the same arguments that they did in Koons to justify Subpart 24 and offer no additional historical analogues.  For the same reasons that this Court rejected Defendants' arguments in Koons, it rejects them

here.

Likewise, the Court rejects as unpersuasive Defendants' supplemental arguments claiming that the Court erred in its prior analysis. First, Defendants argue that the Court's conclusion in <u>Koons</u> as to Subpart 24 "springs from its mistaken premise that the Second Amendment 'presumes the right to bear arms on private property' that belongs to another." [Defs.' Suppl. Br. at 6.] No such presumption exists, they claim, because <u>Bruen</u> only held that " 'the Second Amendment's plain text . . . presumptively guarantees . . . a right to bear arms in *public* for self-defense.' " [<u>Id.</u> (citing <u>Bruen</u>, 142 S. Ct. at 2135).]   Drawing a distinction thus, Defendants seek to persuade this Court that the Second Amendment's text does not cover the right to public carry on someone else's private property, notwithstanding the Government's historical evidence. [<u>Id.</u>] At Oral Argument, Defendants doubled down and insisted that <u>Bruen</u>'s articulation of the right makes evident that self-defense "in public" necessarily excludes private property, ostensibly because one cannot be "in public" on private lands. [<u>See</u> Tr. at 67 ("And there's no question that whether or not it's a private residence or a small business or any other private property, that's not what the Court was talking about when it said [']in public.[']"); <u>see</u> <u>also</u> <u>id.</u> at 67–76.]  Second, they state that "there is simply no support in precedent for the idea that there is a presumptive right enshrined in the Constitution to bear arms on someone else's *private* property simply because the carrier does not know, and did not try to ascertain, whether the owner would consent." [Defs.' Suppl. Br. at 6.]  And third, Defendants argue that the Court misread or overlooked their historical evidence. [<u>Id.</u> at 10–11.]

The Court addresses each point in turn.

First, in their argument lurks a paralogism.  The Second Amendment's text draws *no* distinction between one's right to bear arms for self-defense on either *public* or *private* property.  Rather, as the Court confirmed in <u>Bruen</u>, the "textual elements" of the Second Amendment confirm that the right to "keep and bear arms" "outside the home" refers to one's right to " 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.' "  142 S. Ct. at 2134 (quoting <u>Heller</u>, 554 U.S. at 584).  Addressing the confrontation concern, this definition naturally encompasses one's right to public carry on another's property, unless the owner says otherwise.  After all, the Second Amendment in no way "abrogated the well[-]established property law, tort law, and criminal law that embodies a private property owner's exclusive right to be king of his own castle." <u>GeorgiaCarry.Org, Inc.</u> <u>v. Georgia</u>, 687 F.3d 1244, 1264 (11th Cir. 2012) (collecting historical citations).  In other words, "the pre-existing right codified in the Second Amendment does not include protection for a right to carry a firearm in a place . . . *against the owner's wishes*." <u>Id.</u> (emphasis added).  Thus, because the Second Amendment covers the conduct at issue, it is presumptively protected, unless Subpart 24 is consistent with this Nation's historical tradition of firearms regulation.  <u>Bruen</u>, 142 S. Ct. at 2135.

Furthermore, Defendant's principal argument—that <u>Bruen</u> held the plain text of the Second Amendment guarantees the right to bear arms in *public*, and therefore

*public* means *not private*—is wishful thinking.  <u>Bruen</u> does not so hold.   In discussing the right to carry, the Supreme Court distinguished between the need for self-defense in the home versus in public.  And while the Court recognized that the need for self-defense is perhaps "most acute" in the home, it did not hold that the need was insignificant "elsewhere," or "outside the home."  <u>Bruen</u>, 142 S. Ct. at 2135 (quoting <u>Heller</u>, 554 U.S. at 628).  In fact, the Court observed that if the Second Amendment applied only to the home, half of the Amendment would be nullified.  <u>Id.</u> at 2134–35.  By similar reasoning, if the Second Amendment applied only to *publicly*-owned property, half of the Amendment (or more) would be nullified.  In our state, the vast majority of property is privately owned.

Next, Defendants' second point is a misdescription of this Court's analysis.  In <u>Koons</u>, the Court did not find that there is a presumptive right to bear arms on someone else's private property simply *because* the firearm carrier did not try to ascertain whether the land owner would consent.  Instead, this Court applied the analytical structure endorsed in <u>Bruen</u> and concluded that (a) the Second Amendment's text plainly protected the <u>Koons</u> plaintiffs' right to public carry for self-defense, including on the private property of others, unless the owners state otherwise (*i.e.*, "that a rebuttable presumption to carry exists"), and (b) Defendants' purported historical evidence fell short of establishing that Subpart 24 is consistent with our history and tradition of firearms regulations.  <u>Koons</u>, 2023 WL 128882, at *16.  As the Court further explained, a regulation that mandates a lawful permit holder "try to

ascertain" the owner's consent transforms the presumption in favor of allowing the right to bear arms into a presumption against that right. Defendants are, "in essence, criminalizing the conduct that the Bruen Court articulated as a core civil right." Id.

Finally, Defendants' position has no basis in this country's history and tradition of firearms regulation.  Generally, the historical practice of establishing sensitive place designations—or "gun-free zones"—has centered on a few distinct locations: (a) government buildings (such as legislative assemblies or courthouses or where the State is acting within the heartland of its authority), (b) polling places, and (c) schools. Bruen, 142 S.Ct. at 2133–34 (citing Heller, 554 U.S. at 626); see also Brief of Indep. Inst. as Amicus Curiae in Support of Petitioners at 7–8, Bruen, 142 S.Ct. 2111 (No. 20-843) (hereinafter, "Brief of Indep. Inst.").  In the colonial and Founding era in particular, restrictions on the right to carry firearms in public appears to have been quite limited.  The " 'settlers had the liberty to carry their privately-owned arms openly or concealed in a peaceable manner,' and nine of the thirteen original colonies declined to regulate the keeping or bearing of arms whatsoever."  Brief of Indep. Inst., supra, at 12 (citing Stephen P. Halbrook, The Right to Bear Arms: A Constitutional Right of the People or a privilege of the Ruling Class? 109 (2021)). Following Independence from Britain and throughout the 19th Century, some states began to experiment with gun-free zones, but aside from the categories outlined above, many of these restrictions were short-lived.  See Brief of Indep. Inst., supra, at 11–17. Here, Defendants' rehash the same arguments regarding a 1771 New Jersey law and an 1865 Louisiana law that the Court analyzed, and disposed of, in Koons. [Defs.'

Suppl. Br. at 10–11; see 2023 WL 128882, at *17.]  They have provided no persuasive reason for this Court to reconsider its conclusions today.

In the end, Plaintiffs have met their burden of showing that they will likely succeed in proving that Subpart 24 is unconstitutional.

### viii.        Section 7(b) (Functional Firearms in Vehicles)

Section 7(b) of Chapter 131 makes a vehicle essentially a prohibited sensitive place "unless the handgun is unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle." 2022 N.J. Laws c. 131. First, the Second Amendment's plain text covers the conduct in question (carrying a concealed handgun for self-defense in public).  As a result, Defendants must be able to rebut the presumption of protection against this regulation by demonstrating that the regulation is consistent with this Nation's historical tradition of firearm regulation. Defendants make the same arguments that they did in <u>Koons</u> and offer no additional historical analogues.   For the same reasons this Court rejected Defendants' arguments in <u>Koons</u>, it rejects them here.  Plaintiffs have met their burden of showing that they will likely succeed in proving that this provision is unconstitutional.

### ix.        Subpart 7 (Multi-Purpose Facilities Relating to Schools)

Finally, Plaintiffs seek immediate relief against the State's restrictions on multi-use properties.  In the lead-in to the enumerated list of "sensitive places" in Section 7(a) of Chapter 131, the statute also specifies that is applies "in any of the following places, including in or upon any part of the buildings, grounds, or parking area of…"

2022 N.J. Laws c. 131.  Another New Jersey statute, pre-dating Bruen, makes it a crime to "enter upon any part of the buildings or grounds of any school, college, university, or other education institution."  N.J.S.A. 2C:39-5(e).  Plaintiffs' argument goes that, read in connection with Section 7(a)(7) which prohibits firearms in "a school, college, university or other educational institution," the restriction could include properties or places where "classes" that Plaintiffs attend.  For example, Plaintiff Siegel is concerned that his presence at his son's Tae Kwon Do classes in a strip mall might fall within the restricted location.

At oral argument, the State alleviated Plaintiffs concerns that the law would be enforced against them in this unpredictable manner.  Although the legislature did not include a new set of definitions as part of Chapter 131's long list of "sensitive places," there should be no doubt that the notion of what is and what is not a "school" for purposes of New Jersey law remains unchanged:

> THE STATE:   [W]hat I can tell you is this: The school, college, university or other educational institution language has existed in Section 2C:39-5 for at least 30 years. And [P]laintiffs have never challenged it before, at least these plaintiffs as far as I know. So it cannot be a genuine issue to say I'm confused now by what the word "school" means.  I will tell Your Honor that we think "school" means the meaning that it has in other parts of the New Jersey code. So it means places where people are regulated by other things that schools must have.

[Tr. at 30.]  Going through the other classes Plaintiffs expressed a concern about being able to attend with their firearms (motorcycle classes, firearms training, Sunday school within a church, Tae Kwon Do, and bagpipe lessons), the State conceded that none of these classes fell within the tradition legal definition as to what constitutes a "school."

[Tr. at 32.]

With respect to properties that have both restricted and non-restricted uses, the State clarified that other parts of the statute contain applicable exceptions as to common grounds:

> Section 7(d) talks about how a person would not be in violation if they're traveling along a public right-of-way that touches or crosses any of the places enumerated as sensitive, if they abide by the other carry provisions, you know, like carrying it on a holster and all that, which plaintiffs don't challenge.

[Tr. at 25.] Thus, Chapter 131 is only appliable in buildings or the part(s) of a building that have a restricted use, and thus, are a "sensitive place" when used as such. Further, the law excepts shared, public grounds, which includes parking areas and walkways.

Accordingly, the Court will deny the Motion as to Plaintiffs' challenges concerning multiuse property as moot.

## C.    Plaintiffs Have Met the Requirements for Emergent Relief

Plaintiffs have made a strong showing of irreparable harm if the emergent relief is not granted. As discussed above, Plaintiffs have made a strong showing of constitutional injury given their Second Amendment rights as secured by the Fourteenth Amendment. This Court also agrees that "[i]n cases alleging constitutional injury, a strong showing of a constitutional deprivation that results in noncompensable damages ordinarily warrants a finding of irreparable harm." A.H. by & through Hester v. French, 985 F.3d 165, 176 (2d Cir. 2021).   Defendants argue that violation of constitutional rights is insufficient to show irreparable harm. [Defs.' Opp'n at 23

(arguing that "neither the Supreme Court nor the Third Circuit has ever expanded Elrod to cover all alleged violations of constitutional rights").  However, Defendants' argument mischaracterizes the harm that Plaintiffs allege.  Plaintiffs do not allege a bare constitutional deprivation, but that they fear the threat of severe criminal penalties if they choose to exercise their Second Amendment rights.  Even if constitutional deprivations are not *per se* irreparable injuries, the threat of prosecution for engaging in constitutionally protected conduct certainly is.  Thus, the Court is satisfied that the first and second requirements for emergent relief have been met.

Finally, the Court finds that temporary restraints will only impact individuals who have already gone through the State's vetting process to obtain a concealed carry permit, so other interested parties will not be harmed if the requested relief is granted. After all, "neither the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law." Am. C.L. Union v. Ashcroft, 322 F.3d 240, 251 n.11 (3d Cir. 2003), aff'd and remanded, 542 U.S. 656 (2004).  The Court also finds that the State's interest, the possibility of harm, and the public interest all tip in a favor of granting Plaintiffs the relief they seek as to the applicable laws discussed above.

Further, Plaintiffs are excused from giving security because the Court is satisfied that there is no risk that a Defendant will sustain "costs and damages" if "found to have been wrongfully enjoined or restrained" pursuant to Fed. R. Civ. P. 65(c). The Court also finds that based on the showing made by Plaintiffs, good cause exists to extend the duration of this Temporary Restraining Order beyond fourteen (14) days

pursuant to Fed. R. Civ. P. 65(b)(2).  Thus, this Temporary Restraining Order will be in effect pending a hearing on Plaintiff's motion for a preliminary injunction (which shall occur as expeditiously as possible once a briefing schedule for such motion has been set).

## IV.   CONCLUSION

Plaintiffs have demonstrated a probability of success on the merits of their Second Amendment challenge to certain provisions of Chapter 131 Section 7(a), specifically: Subparts 10 (parks, beaches, and recreational facilities/areas), 12 (public libraries or museums), 15 (bars, restaurants, and where alcohol is served), 17 (entertainment facilities), 18 (casinos), and 24 (private property); Section 7(b)'s ban on functional firearms in vehicles; and related pre-Bruen New Jersey statutes—N.J.A.C. 7:2–2.17(b) and N.J.A.C. 13:69D–1.13.  The State may regulate conduct squarely protected by the Second Amendment only if supported by a historical tradition of firearm regulation.  Here, Defendants cannot demonstrate a history of firearm regulation to support these challenged provisions for which they have demonstrated Article III standing.  The threat of criminal prosecution for exercising their Second Amendment rights, as the holders of valid permits from the State to conceal carry handguns, constitutes irreparable injury on behalf of Plaintiffs, and neither the State nor the public has an interest in enforcing unconstitutional laws.

Accordingly, good cause exists, and the Court will **GRANT**, in part, and **DENY**, in part, the Motion for temporary restraints.   [Docket No. 8.]   An

accompanying Order of today's date shall issue.

<u>January 30, 2023</u>                                    <u>s/Renée Marie Bumb</u>
Date                                                  Renée Marie Bumb
                                                      United States District Judge

JA804

[Docket No. 8]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

AARON SIEGEL, *et al.*,

                    Plaintiffs,

          v.

MATTHEW PLATKIN, *et al.*,

                    Defendants.

Civil No. 22-7464 (RMB/AMD)

**ORDER**

**BUMB, United States District Judge**

As set forth in the accompanying Opinion of today's date, Plaintiffs have made the requisite showing for emergent temporary relief as to certain provisions of Chapter 131 of the 2022 Laws of New Jersey.  As such, the Plaintiffs' Motion for a Temporary Restraining Order AND Preliminary Injunction is **GRANTED,** in part; **DENIED**, in part; and the Court **RESERVES** its decision as to the Plaintiffs' Motion for a Preliminary Injunction.  [Docket No. 8.]  Accordingly,

**IT IS** on this **30th** day of **January 2023**, hereby

**ORDERED** that Defendants, as well as their officers, agents, servants, employees, and attorneys (and any other persons in active concert or participation with them) are **TEMPORARILY RESTRAINED** from enforcing the following provisions of Chapter 131 of the 2022 Laws of New Jersey:  Section 7(a), subparts 10 (except for playgrounds), 12, 15, 17, 18, and 24, and Subsection 7(b)(1), as well as

1

JA805

related New Jersey statutes N.J.A.C. 7:22.17(b) and N.J.A.C. 13:69D1.13; and it is further

      **ORDERED** that Plaintiffs are **EXCUSED** from giving security; and it is further

      **ORDERED** that this Temporary Restraining Order shall **REMAIN IN EFFECT** pending a hearing and ruling on Plaintiffs' Motion for a Preliminary Injunction [Docket No. 8]; and it is further

      **ORDERED** that the parties shall meet and confer regarding an expedited discovery and briefing schedule for Plaintiffs' preliminary injunction motion and propose such schedule to the Court within ten (10) days from the date hereof.

s/Renée Marie Bumb
Renée Marie Bumb
U.S. District Judge

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |
|---|---|
| AARON SIEGEL, *et al.*, | |
| Plaintiffs, | Civil No. 22-7464 (RMB/AMD) |
| v. | |
| MATTHEW PLATKIN, *et al.*, | **ORDER** |
| Defendants. | |

**BUMB, United States District Judge**

This matter comes before the Court upon the Motion to Intervene on Short Notice by Nicholas P. Scutari, President of the New Jersey Senate, and Craig J. Coughlin, speaker of the New Jersey General Assembly (together, the "Presiding Officers"). [Docket No. 47.] As set forth in their supporting brief, the Presiding Officers are permitted to intervene in this action pursuant to Federal Rules of Civil Procedure 24(b)(2)(A) (as governmental officers since the <u>Koons</u> and <u>Siegel</u> Plaintiffs are challenging the constitutionality of New Jersey statute, L. 2022, c. 131) and 24(b)(1)(B) (the general permissive intervention rule applicable to any proposed intervenor).

At the same time, the Court implores the Presiding Officers to focus their argument on the legitimate legal issues pending before this Court after the clear dictate from the United States Supreme Court in <u>New York State Rifle & Pistol</u>

1

JA807

<u>Ass'n, Inc. v. Bruen</u>, 597 U.S., 142 S. Ct. 2111 (2022).  The Presiding Officers note that they intend to "provide perspective on the critical public health, safety and welfare issues that led the Legislature to enact Chapter 131."  [Docket No. 47-1, at 7.]  But the <u>Bruen</u> Court expressly stated that "the government may not simply posit that the regulation promotes an important interest" in the Second Amendment context.  <u>Id.</u> at 2126.  Instead, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."  <u>Id.</u>

Additionally, pursuant to Rule 65, relevant factors for the Court to consider at the preliminary injunction phase include the public interest and possibility of harm to other interested persons.  As the Court considered in its earlier Opinion in <u>Koons</u>, the State, thus far, has failed to present any "empirical evidence to suggest that concealed carry permit holders are responsible for gun crimes or an increase in gun crimes in New Jersey, which they cite as justification for the law."  [Docket No. 34.]  Such evidence is certainly relevant to these factors.  However, the Presiding Officers must keep the litigation progressing on the right track.  All agree that violent crimes involving firearms are tragic.  But the dictate of <u>Bruen</u> is clear:  "legislative interest balancing is understandable—and, elsewhere, appropriate — [but] it is not deference that the Constitution demands here."  <u>Bruen</u>, 142 S.Ct. at 2131.  While the Legislature may disagree with <u>Bruen</u>, it may not disobey it.  Accordingly,

**IT IS** on this **30th** day of **January 2023**, hereby

**ORDERED** that the Presiding Officers' Motion to Intervene on Short Notice [Docket No. 47] is **GRANTED**.  The Presiding Officers shall confer with the parties in setting a proposed preliminary briefing schedule as directed by the Court.

<u>s/Renée Marie Bumb</u>
Renée Marie Bumb
U.S. District Judge

JA809

LAW OFFICES
# HARTMAN & WINNICKI, P.C.

Dariusz M. Winnicki *°
Richard L. Ravin *°□
Daniel L. Schmutter*
Andrew T. Wolfe*

74 PASSAIC STREET
RIDGEWOOD, NEW JERSEY 07450

\* \* \*

Phone: (201) 967-8040
Fax:   (201) 967-0590

---

\* New York and New Jersey Bars
* Florida Bar
□ Washington, D.C. Bar
◊ New Jersey Bar

WEBSITE
www.hartmanwinnicki.com

---

Porter E. Hartman (1920-2009)
Charles R. Buhrman (1938-1994)
William T. Marsden (1943-1993)
Cyrus D. Samuelson (1911-1998)

January 31, 2023

**VIA ECF**
The Honorable Renee Marie Bumb
U.S. District Court for the District of New Jersey
Mitchell H. Cohen Building
& U.S. Courthouse
4th & Cooper Streets
Camden, New Jersey 08101

>      Re:   **Koons, et al. v. Reynolds, et al. - No.: 1:22-cv-07464**
>            **Siegel, et al. v. Platkin, et al. - No.: 1:22-cv-07463**

Dear Judge Bumb:

We represent the *Siegel* plaintiffs in the above-referenced consolidated matters.

We write to request clarification regarding the Court's Opinion [ECF No. 51] and Order [ECF No. 52] issued in connection with *Siegel* Plaintiffs motion for a temporary restraining order ("TRO").

We note that on page 24 of the Opinion the Court discusses the prohibition on carry in playgrounds pursuant to Chapter 131 Section 7(a)(10). The Court notes that Defendants have not carried their burden to show that prohibition of carry in playgrounds is consistent with the historical tradition of firearms regulation. The Court then goes on to note that "schools and playgrounds intersect." The Court then denies relief as to playgrounds.

Our request for clarification arises from the fact that some playgrounds are indeed affiliated with schools (including what are often referred to as "schoolyards"), but some are not. Some playgrounds, for example, lie within, or are themselves, ordinary parks–a category already restrained by the Court, which is consistent with how Defendants chose to categorize playgrounds within Section 7(a)(10).

JA810

The Court's Order appears to deny relief as to all playgrounds regardless of whether they are affiliated with schools. It therefore does not seem to distinguish between playgrounds that, according to the Court, share the same constitutional status as schools on the one hand and those playgrounds that are contained within or are themselves simply parks, and therefore have the constitutional status of parks.

Since the Court held that the State did not make any *Bruen* record with respect to playgrounds, the Court's Opinion seems to call for the denial of a TRO as to playgrounds that are constitutionally equivalent to schools but should support a TRO as to playgrounds that are constitutionally equivalent to parks.

If we are reading the Court's Opinion correctly then we respectfully request a simple clarifying order with language amending the Order by replacing "(except for playgrounds)" with "(except for playgrounds affiliated with schools)." That would crisply effectuate what we believe the Court intended.

Thank for your attention in this regard.

Respectfully submitted,

s/ Daniel L. Schmutter
DANIEL L. SCHMUTTER

DLS/ars
Cc:   Angela Cai, Esq.
        David Jensen, Esq.
        Alan Cohen, Esq.
        Howard Goldberg, Esq.
        David Chen, Esq.
        Leon Sokol, Esq.

JA811

```
 1                  UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW JERSEY
 2   ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

 3   AARON SIEGEL; JAMES COOK;          )    CIVIL ACTION NUMBER:
     JOSEPH DELUCA; NICOLE CUOZZO;      )
 4   TIMOTHY VARGA; CHRISTOPHER         )    1:22-cv-07463-RMB-AMD
     STAMOS; KIM HENRY; and             )
 5   ASSOCIATION OF NEW JERSEY RIFLE &  )
     PISTOL CLUBS, INC.,                )
 6                  Plaintiffs,         )
                                        )
 7   vs.                                )
                                        )
 8   MATTHEW J. PLATKIN, in his official)    MOTION HEARING FOR A
     capacity as Attorney General of    )    TEMPORARY RESTRAINING
 9   New Jersey; and PATRICK J.         )    ORDER
     CALLAHAN, in his official capacity )
10   as Superintendent of the New Jersey)
     Division of State Police,          )
11                  Defendants.         )
     ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━
12
     RONALD KOONS, et al.               )    CIVIL ACTION NUMBER:
13                  Plaintiffs,         )
     vs.                                )    1:22-cv-07464-RMB-AMD
14                                      )
     WILLIAM REYNOLDS, in his official  )
15   capacity as the Prosecutor of      )
     Atlantic County New Jersey, et al.,)
16                  Defendants.         )

17   Mitchell H. Cohen Building & U.S. Courthouse
     4th and Cooper Streets
18   Camden, New Jersey 08101
     Thursday, January 26, 2023
19   Commencing at 9:45 a.m.

20

21   B E F O R E:          THE HONORABLE RENÉE MARIE BUMB,
                           UNITED STATES DISTRICT JUDGE
22

23          John J. Kurz, Federal Official Court Reporter
                   John_Kurz@njd.uscourts.gov
24                      (856)576-7094

25   Proceedings recorded by mechanical stenography; transcript
            produced by computer-aided transcription.
```

1    **A P P E A R A N C E S:**

2    HARTMAN & WINNICKI, P.C.
     BY:  DANIEL L. SCHMUTTER, ESQUIRE
3    74 Passaic Street
     Ridgewood, New Jersey 07450
4    For the Plaintiffs

5

6    OFFICE OF THE NEW JERSEY ATTORNEY GENERAL
     BY:  ANGELA CAI, DEPUTY SOLICITOR GENERAL
7        JEAN REILLY, ASSISTANT ATTORNEY GENERAL
         JEREMY FEIGENBAUM, SOLICITOR GENERAL
8    R.J. Hughes Justice Complex
     25 Market Street, P.O. Box 080
9    Trenton, New Jersey 08625
     For the Defendants Attorney General Platkin and Superintendent
10   of NJ State Police Callahan

11

12   ATLANTIC COUNTY DEPARTMENT OF LAW
     BY:  ALAN J. COHEN, ASSISTANT COUNTY COUNSEL
13   1333 Atlantic Avenue, 8th Floor
     Atlantic City, New Jersey 08401
14   For the Defendant William Reynolds

15

16   **A L S O   P R E S E N T:**

17   Arthur Roney, The Courtroom Deputy

18   Tate Wines, Judicial Law Clerk

19   Sam Rubinstein, Deputy Attorney General

20

21

22

23

24

25

 1                   (PROCEEDINGS, held in open court before The Honorable

 2      Renée Marie Bumb, United States District Judge, at 9:45 a.m. as

 3      follows:)

 4                   THE COURTROOM DEPUTY:  All rise.

 5                   THE COURT:  Good morning.  Sorry to keep you all

 6      waiting.

 7                   MR. SCHMUTTER:  Good morning, Your Honor.

 8                   THE COURT:  Nice to see you all.  You can have a

 9      seat.  Thank you.  And you're welcome to remove your mask while

10      you're speaking.

11                   All right.  Let me have appearances.  The case is

12      Siegel versus Platkin.  It's been consolidated.  The docket

13      number is 22-7464.  We'll start with the plaintiff.

14                   MR. SCHMUTTER:  Good morning, Your Honor.  Daniel

15      Schmutter from the firm of Hartman & Winnicki for the Siegel

16      plaintiffs.

17                   THE COURT:  Good morning.

18                   MS. CAI:  Good morning, Your Honor.  Deputy Solicitor

19      General Angela Cai for the defendants in this case.

20                   THE COURT:  Okay.  Nice to see you again.

21                   MS. REILLY:  Assistant Attorney General Jean Reilly

22      for the State.

23                   THE COURT:  Good to see you.

24                   MR. FEIGENBAUM:  Jeremy Feigenbaum, also for the

25      State.

```
 1              THE COURT:  Okay.

 2              MR. COHEN:  Thank you, Your Honor.  Alan Cohen,

 3   Atlantic County Counsel for William Reynolds, Atlantic County

 4   Prosecutor.

 5              THE COURT:  Good morning.

 6              Do you want to enter an appearance?

 7              MR. RUBINSTEIN:  Sam Rubinstein, Deputy Attorney

 8   General.

 9              THE COURT:  Okay.  Welcome.

10              Okay.  So we are here.  The plaintiff has filed a

11   Motion For A Temporary Restraining Order.  So I think the way

12   that I will do it is I will hear the parties on their

13   arguments, and I'll give you the following guidance:

14              The arguments that relate to the issues that the

15   Court ruled on in Koons, I've not seen much to dissuade this

16   Court of its earlier Opinion.  So if you want to focus on in

17   making those arguments, Ms. Cai, where you believe the Court

18   erred, that would be helpful.  And that's it for now.

19              Okay.  Mr. Schmutter.

20              MR. SCHMUTTER:  Thank you, Your Honor.

21              There's a lot of paper in this file, so I'm not going

22   to repeat, you know, what -- I'm going to try not to repeat

23   what's in the papers.  Your Honor has obviously read them,

24   including hopefully the transcript from the argument in front

25   of Judge Williams.  What I want to do really is answer the
```

1     Court's questions, but I want to just start with one important

2     point that I want to just make sure doesn't get lost in the

3     shuffle because there's a lot of stuff going on here.  And I

4     want to point out one of the major differences between this

5     case and Koons, which is our claim, our multiuse property

6     claim.

7           And that is really a bootstrap where the State of New

8     Jersey is effectively prohibiting carry in places that it

9     otherwise could not prohibit carry merely because of the

10    breadth and scope of the way the statute is drafted.

11          THE COURT:  What provision are you relying upon on

12    the multipurpose?  Can you direct me to that?

13          MR. SCHMUTTER:  I'm sorry, which -- in our Complaint

14    or in the --

15          THE COURT:  In the statute.

16          MR. SCHMUTTER:  Oh.  It covers the entire Section 7,

17    because the way Section 7 is drafted --

18          THE COURT:  Well, what specific language are you

19    relying upon?

20          MR. SCHMUTTER:  The language in Section 7(a) that

21    refers to all of the grounds in parking lots.

22          So the prohibition is broad.  Section (a), 7(a)

23    prohibits -- it has a prohibition on the entire property that

24    contains a prohibited use.

25          So let me see if I can get the Court the exact

 1   language, okay.  So it's section 7(a).  We've actually

 2   emphasized it on page 11 of our moving brief.  It is, "In any

 3   of the following places, including in or" -- I'm sorry, Judge.

 4            THE COURT:  Okay.  Yes.

 5            MR. SCHMUTTER:  -- "including in or upon any part of

 6   the buildings, grounds, or parking area of, colon," and then it

 7   lists the sensitive places.

 8            THE COURT:  And that's what you designate as

 9   quote-unquote multipurpose?  Got it.

10            MR. SCHMUTTER:  Multi, yes.  That creates the

11   multiuse problem.  And the multiuse problem occurs in a variety

12   of contexts.  We've identified two specific ones from the

13   allegations of our plaintiffs, but there's more than that.

14            So one of the really obvious -- I'm sorry, Judge.  Go

15   ahead.

16            THE COURT:  No.  I was going to tell you what you

17   say.  But I'll be patient.  One is schools.

18            MR. SCHMUTTER:  One is schools in places that are not

19   just schools, like churches.  That's a good example.  And we

20   have two church problems or house of worship problems.  One is

21   Mr. Varga's problem where he's on a -- his church is on a

22   14-acre campus and they've got multiple buildings, and one of

23   the buildings they lease to the Christian Academy.  Well,

24   that's easy, right?  We don't have to worry about vagueness

25   because that's a traditional K through 12 school.  So we know

```
 1  that's a school, so we don't have to go on vagueness there.

 2         THE COURT:  I'm going to just say this to you,

 3  Counsel.  You talk faster than me.

 4         MR. SCHMUTTER:  And -- yes.

 5         THE COURT:  And my court reporter always is telling

 6  me to please slow down, Judge.  So I know he's going to ask you

 7  to slow down.

 8         MR. SCHMUTTER:  Your Honor, we already had the

 9  conversation before we went on the record.

10         THE COURT:  But you didn't listen to him.

11         MR. SCHMUTTER:  I did not, and I apologize.  I'm

12  doing this 30 years and I still can't slow down.  My apologies

13  to the court reporter and the Court.

14         THE COURT:  Well, so if I go like this (indicating),

15  it won't be on the record, but it's like okay.  That means can

16  you please slow down, all right?

17         MR. SCHMUTTER:  Thank you, Judge.

18         So Mr. Varga's church is on a 14-acre campus, and

19  they've got multiple buildings.  Now, his problem and the

20  church's problem is that there's a school on a different part

21  of the property.  But the way this language reads, the entire

22  14 acres is prohibited, including the church building where

23  they pray.  And there may be no prohibited activity going on in

24  the church building, but this language makes carry prohibited

25  in the church building and everywhere else on campus.
```

```
 1            THE COURT:  But do you agree that -- to take that
 2   example in the 14-acre parcel, that if the church -- that if
 3   the school, the academy is segregated, that that would fall
 4   within one of the restrictions, but that the remaining part of
 5   that property would not?  You don't agree with that.  That's
 6   the argument you're making, right?
 7            MR. SCHMUTTER:  Correct.  The language makes the
 8   entire parcel prohibited.
 9            THE COURT:  But the question is, does it?
10            MR. SCHMUTTER:  Well, I mean, if the State wants to
11   stipulate that it doesn't, if they want to -- if the State
12   wants to solve our multiuse parking problem today -- multiuse
13   property problem today, I'm happy to do it.  But the language
14   doesn't seem to allow for it.
15            If they want to stipulate that in a multiuse property
16   like a strip mall, because strip mall is one of the other
17   situations where this comes up, right?  Let's say you have a
18   day care and then next to it you have a pizza place, a tailor
19   shop, a dry cleaner and a Wendy's.  Under this language, the
20   fact that the day care is prohibited means the Wendy's is
21   prohibited, the pizza place is prohibited, even if they
22   can't -- which they can't -- come up with a Bruen-based
23   historical tradition that would allow them to prohibit carry in
24   a pizza place.  They can't prohibit carry in a pizza place.
25   But this language lets them bootstrap themselves into it
```

```
 1   because it's connected or even on the same parcel as a

 2   prohibited place that we're not challenging.

 3              THE COURT:  Would the plaintiff take comfort if the

 4   Court construed that language as opposed to asking the State to

 5   stipulate?  If the Court construed that language, so, in other

 6   words, to take your example, that the language "any of the

 7   following places, including in or upon any part of the

 8   buildings, grounds, or parking area of..." that that language

 9   construed means -- so to use your example in Mr. Varga's case,

10   it would mean the parking lot of that academy.

11              You don't quarrel with the fact that the academy

12   falls within "school," right?

13              MR. SCHMUTTER:  Correct.

14              THE COURT:  Okay.  The parking area of that academy,

15   it would mean the building, which is the academy itself.  Would

16   you take solace in that construction?

17              MR. SCHMUTTER:  That partially solves the problem.

18              THE COURT:  What remains?

19              MR. SCHMUTTER:  Well, shared parking lots, for

20   example.

21              So strip malls have shared parking lots.  Multiuse

22   commercial buildings or office buildings have shared parking

23   lots.  So you have, let's say, a professional building...

24              THE COURT:  Okay.  Then let me take it one step

25   further.  If the construction were that that parking lot must
```

 1   be associated solely with the restricted place, would you take

 2   solace in that construction?

 3          MR. SCHMUTTER:  That's excellent.  I'm not sure that

 4   gets us all the way there, but we're doing great here.  I

 5   appreciate the Court's --

 6          THE COURT:  What remains?

 7          MR. SCHMUTTER:  Yes.  I'm sorry.

 8          THE COURT:  What remains?

 9          MR. SCHMUTTER:  Okay.  So if the Court were to limit

10   the construction to a parking lot solely dedicated to that use,

11   right?

12          THE COURT:  Yes.

13          MR. SCHMUTTER:  That would be very helpful.

14          If it limited it to a building solely dedicated -- on

15   a multiuse property solely dedicated to that use, that would be

16   very helpful.

17          We run into a -- we still have two problems that I

18   can think of right off the top of my head, and maybe we can

19   solve them with the Court's assistance.  So --

20          THE COURT:  Well, because I think at the end of the

21   day -- keep thinking -- because I think at the end of the day

22   that was the intent of the legislation.  I don't think that the

23   intent, it certainly seems to me, of the legislation was not

24   to, well, let's designate certain sensitive locations within a

25   strip mall, but, in essence, broaden those restrictions by

```
 1   declaring that the entire parking lot is a sensitive place.  I

 2   don't think that was the intent.  Because then why not just

 3   make all the parking lots in the state of New Jersey sensitive

 4   places?  I think we kind of resolve all of the different

 5   subsections; would you agree?

 6            MR. SCHMUTTER:  Yeah.  If Your Honor is saying that

 7   the Court could find that that was the intent and thereby limit

 8   the construction in that way, I agree.  We agree that the Court

 9   could do it that way.

10            THE COURT:  Because one of the arguments that the

11   plaintiffs make is that the construction that you have

12   articulated, in essence, deters the plaintiffs from carrying

13   handguns in places that clearly are not sensitive places.

14            MR. SCHMUTTER:  Correct.

15            THE COURT:  Yes.

16            MR. SCHMUTTER:  Correct.

17            THE COURT:  So if the pizza owner welcomes guns, the

18   plaintiff nonetheless, under the plaintiffs' interpretation of

19   the legislation, cannot carry the firearm because there's a

20   shared parking lot.  That's the argument?

21            MR. SCHMUTTER:  That is the argument, Judge.

22            THE COURT:  So now to get back to my question:  Is

23   that concern assuaged by a construction along the lines that we

24   have been discussing?

25            MR. SCHMUTTER:  The parking lot concern is, Judge.
```

```
 1              THE COURT:  Okay.

 2              MR. SCHMUTTER:  But then we have a couple of other

 3   pieces of this that if we can solve them, that would be

 4   outstanding.  So I really appreciate Your Honor's efforts in

 5   this regard.

 6              THE COURT:  Well, I don't know that it's the Court's

 7   obligation to solve them.  I think it certainly was the

 8   obligation of the legislature to solve them.  But if construing

 9   the terms and in accordance with that the Court solves a

10   legislative intent, then perhaps that solves the problem.  But

11   you have to tell me what remains.

12              MR. SCHMUTTER:  Absolutely, Judge.

13              So one more example is the multiuse building, office

14   building.  So take a professional building that has lawyers,

15   accountants and doctors, okay?

16              THE COURT:  Yeah.

17              MR. SCHMUTTER:  It may be a building filled with

18   lawyers and accountants and on the first floor in the back

19   there's a doctor's office, okay.  Doctor's offices are

20   prohibited now, unless it's restrained and we prevail on the

21   doctor claim.  But if we don't prevail on the doctor claim,

22   then that medical office that's in the corner of that large

23   building makes the entire building prohibited in the same way

24   that we've talked about.

25              So, again, we need a construction that says it's just
```

 1   the doctor's office, no other part of the building is

 2   prohibited.  And if it's a shared parking lot, the parking lot

 3   is not prohibited.  So it's similar to what we've been talking

 4   about as far as construction goes.

 5          The last piece is a little bit more complicated, but

 6   I think it could be solved in exactly the same way, again,

 7   because the Court can make a finding that this was the intent

 8   of the legislature, and that is Plaintiff Cuozzo's church

 9   problem.

10          THE COURT:  Plaintiff what?

11          MR. SCHMUTTER:  Cuozzo.  Nicole Cuozzo, two church

12   plaintiffs.

13          THE COURT:  Yes.

14          MR. SCHMUTTER:  Her problem is a little bit different

15   than Mr. Varga's problem because they don't have multiple

16   buildings.  They have one building.  So that church building

17   that they use is used for multiple purposes.  So you walk in

18   the building.  To the left is the area where they worship, the

19   sanctuary.  To the right they have classrooms where they do

20   Sunday school, where they do adult Bible classes and perhaps

21   other worship, religion-related educational things.

22          Now, Your Honor is aware, of course, that we have a

23   vagueness issue, because we're not actually sure that Sunday

24   school or adult Bible classes or some of these other things

25   that the plaintiffs do count under the school, college,

```
 1   university, other educational institution prohibition.

 2              THE COURT:  Yeah.  On that grounds, and I'm curious

 3   to hear what the State has to say, because they haven't, but we

 4   might have a disagreement.  To me, Bible classes aren't the

 5   same as school.  School is school.  Education institution is

 6   education institution.  University is university.

 7              Is the plaintiffs' concern that Bible classes might

 8   fit within one of those categories a genuine one?

 9              MR. SCHMUTTER:  Yes, it is.

10              THE COURT:  Because?

11              MR. SCHMUTTER:  Well, Judge, look, I apologize.  We

12   would love a narrow construction of school, college,

13   university, and educational institution.  Obviously college --

14              THE COURT:  Which would have been solved had the

15   legislature provided those definitions.

16              MR. SCHMUTTER:  Right.

17              THE COURT:  I agree with you.

18              MR. SCHMUTTER:  Correct.  So college and university

19   are obviously easy, right?  Rutgers, that's easy.  Even some

20   aspects of school, West Orange High School, that is a school.

21   The Christian Academy on Mr. Varga's church's property, that's

22   easy.  But School of Rock, that's a music school.  I don't

23   know.  Does that count?  Adults go there.  Children go there.

24   They teach you trombone.  They teach you guitar.  They teach

25   you drums.
```

```
 1              THE COURT:  Well, why wouldn't the School of Rock be
 2    a school?
 3              MR. SCHMUTTER:  Because you take music --
 4              THE COURT:  I mean, it doesn't matter what the
 5    subject matter is.
 6              MR. SCHMUTTER:  Well, because I could -- that's the
 7    question.  I mean, school, most people when they think of
 8    school, they think of a traditional K through 12 or college or
 9    university.  That's what people think of when they think of
10    school.  And that's typically what --
11              THE COURT:  Or an academy or a beauty school or a --
12              MR. SCHMUTTER:  Well, School of Rock is not a degree.
13    It's not like you're getting your degree in composition,
14    arrangement, or cello.  This is where people go to take guitar
15    lessons, you know, after school or where adults go to take
16    guitar lessons.  Same thing with the karate school.  This is
17    why we raised this issue.  And it is a genuine issue, Judge,
18    because we're actually very concerned about this.
19              THE COURT:  So whose obligation is it -- maybe it's a
20    rhetorical question.  Does it really come down to the Court
21    defining what "school" is?  Or does the Court -- you're asking
22    the Court to find that the legislation is vague because the
23    plaintiffs don't know what school means, which just seems to
24    the Court that the traditional notion of what a school is
25    controls.  And if there's any ambiguity, what the plaintiffs
```

 1    say is there shouldn't be any ambiguity because I should be

 2    permitted to carry my firearm into the School of Rock because I

 3    don't believe that fits within the school's definition.

 4            But let's just play this out.  Let's say that there

 5    was a definition provided by the legislature, which would have

 6    been wise.  Could not the plaintiff still come before me and

 7    say the definition just doesn't solve the problem?

 8            MR. SCHMUTTER:  Well, that, of course, would depend

 9    on the definition.  Some definitions are good and some

10    definitions are terrible.  You can still have a vague statute

11    if the definition is not effective.  But some definitions are

12    excellent.  I mean, it's really just a drafting thing.  You

13    know, nothing is perfect, right?  Language is inherently dicey.

14    We know this as lawyers and judges.  But there are good --

15    there's good drafting and there's bad drafting.

16            THE COURT:  Right.  But it just seems to me to be a

17    little -- a little -- I mean where are we headed?  That the

18    School of Rock by its title, it's a school.  I'm just -- this

19    is just a hypothetical.  The School of Rock by its definition

20    is a school.  Are the plaintiffs then going to come back and

21    say, well, but you can't go on what you title it?

22            MR. SCHMUTTER:  Correct.

23            Well, for example, I mean, the karate school, a

24    karate school could be called the Tae Kwon Do School of

25    Medford.  It could also be called the Wing Chung Kung Fu Center

 1   of West Orange.  It can't turn on the name.

 2          And Your Honor was correct, I think, in focusing on

 3   the traditional notion of school.  I think if you ask a person

 4   on the street and say what's a school, the first thing they're

 5   going to think of is K through 12, college, university.  That's

 6   what people -- that's the image of school that's going to pop

 7   into people's minds.  That's the first thing I think of when I

 8   think of school.  But all these other things raise the question

 9   of -- because this is a criminal statute, and that's the

10   problem.  That's the key to the due process issue, the void for

11   vagueness.  Criminal statutes have to be well-defined.  People

12   have to be able to tell readily what's prohibited and what's

13   not.

14          And if it turns on the sign that's on top of the

15   building, that can't be the standard.  Because they can call

16   themselves school.  They can call themselves not school.

17   Rutgers can't say we're not a school.  Obviously they're a

18   school.  West Orange High School can't say we're not a school.

19   Obviously they're a school.  But that's where the trouble is.

20   The trouble is these other things.

21          You know, I teach CLE classes regularly, and

22   sometimes they're held in a hotel conference room.  So is that

23   school?  Is that an educational -- because here's the problem,

24   it's "other educational institutions."  So it's not just the

25   word "school" like School of Rock or karate school.  "Other

```
 1    educational institution" is intended to be broadly inclusive.

 2              THE COURT:  Okay.  Your points are fair, and they're

 3    well-taken.

 4              And it's unfortunate that the legislature didn't

 5    provide these definitions.  That would have been an easier

 6    solution -- an easy solution.

 7              MR. SCHMUTTER:  There's a whole educational -- I'm

 8    sorry.

 9              THE COURT:  My question is:  Have you read this

10    legislation in pari materia, with other statutes that might

11    provide that answer?  In other words, are there other statutes

12    on the books that define the terms?

13              MR. SCHMUTTER:  There are other statutes.

14              THE COURT:  Okay.

15              MR. SCHMUTTER:  But they're all -- they're different

16    because unfortunately, and this is where the complication comes

17    in, the legislature could have solved this problem by referring

18    to one.  I'll note, Your Honor, that in the previous argument

19    before Judge Williams, the vagueness issue regarding vehicles,

20    the State took the position that vehicle means the definition

21    in Title 39, which is the Motor Vehicle Code.  That's fine, but

22    they didn't say that.

23              So --

24              THE COURT:  They didn't say it in this legislation.

25              MR. SCHMUTTER:  In the statute.  The statute doesn't
```

```
 1   say vehicle shall mean what vehicle means in Title 39:1-1.

 2   That's a very clear definition.

 3           THE COURT:  But can't the statutes be read in pari

 4   materia?

 5           MR. SCHMUTTER:  They can.  But the Court should

 6   construe it that way, right?

 7           THE COURT:  Okay.

 8           MR. SCHMUTTER:  So the problem with "other

 9   educational institution" and "school" is that there are many

10   statutes that refer to schools and educational institution and

11   they're not necessarily consistent, which is why it's actually

12   very important for the legislature to tell us which definition

13   are they talking about.

14           THE COURT:  So here's my question:  If the Court were

15   to construe those terms however it construes them, and the

16   Court were to construe what parking lot area means, in other

17   words, is the parking area solely dedicated to the sensitive

18   place designation, then what is left is part of the building,

19   and the Court were to construe that to mean solely that -- the

20   sensitive place is solely that sensitive place, the medical

21   office and no other areas, would that solve the problem?

22           MR. SCHMUTTER:  Just about, yeah, Judge.

23           I would also, because the same location, and this is

24   particularly relevant for Nicole Cuozzo and her church, the

25   same space can be used for multiple purposes.  So what I
```

 1  wouldn't want to see is a construction that if although they

 2  normally pray in the sanctuary, if they have Bible classes or

 3  if they have Sunday school, it overflows into the sanctuary, I

 4  don't want that to become suddenly a permanent sensitive place.

 5  So the restriction should be when it's used as that use.

 6          So I don't want a nonsensitive place to become a

 7  school forever simply because they've had school functions.

 8          THE COURT:  Okay.

 9          MR. SCHMUTTER:  So it's a temporal thing as well.

10          And finally, Judge, the --

11          THE COURT:  It seems very odd that the Court should

12  be sitting up here drafting the legislation.

13          MR. SCHMUTTER:  I wish the legislature had done it

14  the right way.  The problem is the legislature did this very

15  fast, very sloppy.

16          Judge, we followed this bill from its inception, and

17  there was loads of stuff in there that made no -- you know, we

18  were able to get some of the terrible language out of there.

19  But this was drafted, this was thrown together in -- I'm going

20  to say it -- in a fit of rage.  That's what this is.  This is

21  an angry response to *Bruen*.  And they threw everything they

22  possibly could into this bill and this was not carefully

23  drafted.  And there's some real mess here.

24          Now, I understand that it's not the job of the Court

25  to clean it up, but we're asking the Court, and we do think

```
 1    it's the job of the Court to say when something is drafted in a
 2    way that's unconstitutional.  And that's the problem that the
 3    State has.
 4               THE COURT:  Well, and I'm being called upon to
 5    resolve the issue of whether or not to restrain the
 6    enforcement, but within that calculation, it seems to me, the
 7    Court would be obligated to construe those terms.  Because once
 8    I've construed those terms, which I think should be narrowly
 9    construed because that's what *Bruen* calls for, I think to
10    construe them quite broadly disobeys the dictate of *Bruen*.
11               But if I were to construe them narrowly, then that
12    would then go to the issue of irreparable harm, et cetera, that
13    the plaintiffs have brought forth.
14               Do you agree with that?
15               MR. SCHMUTTER:  We do, Judge, if the construction
16    eliminates the constitutional defects.
17               THE COURT:  I understand.
18               MR. SCHMUTTER:  Which it might.  I mean, it could.
19    And we agree that the Court has the power to construe the
20    statute that way, in fact, the obligation under *Bruen*.  We
21    agree with that.
22               THE COURT:  Okay.
23               MR. SCHMUTTER:  I'll just add one final gloss.  The
24    Court's view or the Court's thought about how parking lot might
25    be narrowly construed should be expanded to all aspects of the
```

1    grounds.  So it's not just a parking lot that should be

2    construed to be solely for the use of that use, but any part of

3    the grounds that's solely for the use of that use similarly

4    should be narrowly construed that way.

5           THE COURT:  Try that again.

6           MR. SCHMUTTER:  So as the Court pointed out, it might

7    be the case that there's a shared parking lot and therefore the

8    parking lot can't be -- it might be the case the parking lot

9    could not be prohibited.  But there might be a clearly

10   designated parking lot for the day care.  The day care may have

11   its own clear, designated, segregated parking lot, in which

12   case a construction that says it's only the day care's parking

13   lot that can be prohibited, that would be a reasonable

14   construction.

15          But it might not just be parking lots.  There might

16   be grassy areas.  There might be other grounds.  Real estate

17   comes in a million different forms.  There might be other

18   things, not just parking lots, but other structures, grassy

19   areas, fields, whatever, that might be shared, in which case it

20   should not be construed as part of the prohibition, or it might

21   be specific to the prohibited use, in which case it could be

22   part of the prohibition.  We're just asking that this parking

23   lot concept of narrow construction apply to things that aren't

24   just parking lots.  It's other parts of the grounds that also

25   are specifically designated for that use.

```
 1              THE COURT:  Okay.  Fair enough.

 2              MR. SCHMUTTER:  Judge, I think that really does, to

 3    the extent that it successfully eliminates the overflow

 4    problem, that does appear to solve the problem.

 5              THE COURT:  Okay.

 6              MR. SCHMUTTER:  And, Judge, that's really -- that's

 7    really -- that's the thing I wanted to sort of focus on that's

 8    different about this case from Koons, because we think that's

 9    potentially a major problem unless there's a good, narrow

10    construction as appropriate.  Otherwise, Your Honor, I'm

11    available to answer your questions.

12              THE COURT:  All right.  Let me have a conversation

13    with the State then.

14              MR. SCHMUTTER:  Thank you, Judge.

15              THE COURT:  Okay.  Ms. Cai.

16              MS. CAI:  Your Honor, I assume you want to first

17    address the issues raised by the plaintiff?

18              THE COURT:  Yes; the multipurpose.

19              MS. CAI:  Yes.

20              THE COURT:  Because it does seem to me that -- well,

21    answer this question, please:  How can the State justify this

22    multiuse restriction?  Because it does seem to be far more

23    expansive than what Bruen dictates.

24              MS. CAI:  So I --

25              THE COURT:  Because Bruen dictates that the sensitive
```

```
 1   place designations must be narrow and must be restrictive.

 2   That's the dictate of Bruen.  So it seems to me for the State

 3   to come along and say, well, it's any parking lot that's

 4   adjoining or associated with, there's no definition here, but

 5   that's the argument the State makes.  If it's a parking lot,

 6   it's a sensitive place.  So can you talk to me about that?

 7             MS. CAI:  Your Honor, yes.  I think the question here

 8   is not really a Bruen question but a legislative intent

 9   statutory interpretation problem.  And I'm not sure if there is

10   really a problem on the specific scenarios that plaintiffs are

11   presenting.

12             So plaintiffs focus on Section 7(a).  But they

13   completely ignore the other scenarios the legislature has

14   already thought about in Section 7(c) and (d).  And so I want

15   to point Your Honor to Section 7(c)(4) in which the legislature

16   is contemplating what happens when someone is transporting a

17   concealed handgun from a prohibited parking lot area.

18             THE COURT:  Wait.  Let me just get there, please.

19             MS. CAI:  Oh, sure.  Yes.

20             THE COURT:  (c)(4), okay.

21             MS. CAI:  Yes.  So that provision contemplates a

22   scenario in which someone is transporting a concealed handgun

23   between your car and a prohibited parking area and a place that

24   is not prohibited.  So exactly the kind of strip mall situation

25   where perhaps they're parking in an area where there is a day
```

| 1 | care and there are kids coming in and out, but you're going to |

 1    care and there are kids coming in and out, but you're going to

 2    the pizzeria on the other end of the strip mall.  And it says,

 3    "provided that the person immediately leaves the parking lot

 4    area and does not enter into or on the grounds of the

 5    prohibited place with a handgun," i.e., the day care.  This is

 6    not -- they're permitted to do that under Section 7(c).

 7              THE COURT:  Okay.  So let's assume you're correct.

 8    That deals with parking lot.

 9              MS. CAI:  Yes.

10              THE COURT:  Okay.  What about the other argument?

11              MS. CAI:  Yeah.  And then Section 7(d) talks about

12    how a person would not be in violation if they're traveling

13    along a public right-of-way that touches or crosses any of the

14    places enumerated as sensitive, if they abide by the other

15    carry provisions, you know, like carrying it on a holster and

16    all that, which plaintiffs don't challenge.  So if we think

17    about what it is that plaintiffs are theorizing --

18              THE COURT:  Okay.  But you're ignoring the building.

19    That's a concern.  So let's talk about the -- so you've talked

20    about -- okay.  So going back to the language that the

21    plaintiff takes issue with, any part of the buildings, grounds,

22    or parking area of.  So assume I agree with you on the parking

23    area and the grounds, assume I agree with you on that, how do

24    you get around the buildings?

25              MS. CAI:  So the building -- so let's take the

```
 1   scenario, the specific scenario presented by the plaintiff,

 2   Mr. Varga, is the 14-acre church, that the property has a

 3   church and then somewhere else on the property there is a

 4   school.

 5           THE COURT:  Yeah.

 6           MS. CAI:  And he admits that.  The school is

 7   obviously a sensitive place.

 8           THE COURT:  Yeah.

 9           MS. CAI:  And so the building where firearms are

10   prohibited is the school, not the building that is the church.

11   And if an individual is traveling along the pathway between

12   those places, under Section 7(d), they would not be in

13   violation of the statute.  Now --

14           THE COURT:  Let's take the more difficult, the one

15   that he -- so let's assume the pizzeria is on the 3rd floor,

16   the day care is on the 1st floor.

17           MS. CAI:  Right.  So if there's a public staircase

18   from the day care up to the pizza parlor, and assuming the

19   pizza parlor is fine with you carrying firearms, that would not

20   be a violation.

21           THE COURT:  Tell me why.

22           MS. CAI:  Because --

23           THE COURT:  Cite to me the --

24           MS. CAI:  Sure.  Because Section 7(d) says you are

25   not in violation of subsection (a) if the holder is traveling
```

```
 1   along a public right-of-way, i.e., the staircase, that touches

 2   or crosses any of the places enumerated as sensitive.

 3            THE COURT:  So it sounds to me that what you're

 4   saying is that Mr. Schmutter's concerns are really -- he

 5   shouldn't be concerned.

 6            MS. CAI:  I do agree with that, Your Honor.  I think

 7   the haste with which some of these challenges are brought,

 8   they're -- we made the argument that there is no credible

 9   threat of enforcement for some of these specific scenarios.

10   And that's exactly the problem here.  There is no --

11            THE COURT:  So when he stood up, he asked for a

12   stipulation.  It sounds like he got it.

13            MS. CAI:  I don't -- you know, so there are some

14   questions that we would have on -- because we haven't seen the

15   properties in question, right?  So we don't know, you know, are

16   there situations which the day care is run out of the back of

17   the pizza parlor.  There may be a problem.  I mean, that's not

18   even an actual scenario they presented.  But we haven't seen

19   the property at issue for the Varga church scenario.  So are

20   the buildings touching in a way where kids are going in and out

21   of the school into the church?  We don't know.

22            And so if the church is a totally separate building

23   from the school and there's no school activity within the

24   church, then that's fine, yes.  Then we can stipulate to that.

25            Without knowing more about the specific scenario, the
```

 1    State can't know, you know, you're not going to be enforced

 2    because we haven't seen the issue that's actually fleshed out.

 3    So I don't want to be in the business of saying Mr. Varga would

 4    not be in violation without having seen the actual property and

 5    what it actually says.  But in general, I do think that there

 6    is a haste to sort of create controversy when there is no

 7    actual controversy.

 8            THE COURT:  Well, I think that I would be a little

 9    reluctant to accuse the plaintiffs of haste if I were standing

10    in your shoes.

11            But it sounds to me that what you are saying is that

12    the concerns that the plaintiffs have are really alleviated by

13    the subsections that you have identified and that if there is a

14    shared parking lot, they are not prohibited from carrying as

15    long as they're going from the parking lot to the location that

16    permits firearms; that if they are in a multipurpose building,

17    they're not in violation of the statute as long as they're

18    going directly from where they're going to the place that

19    permits firearms.  And I think that assuages your concerns,

20    Mr. Schmutter.

21            MS. CAI:  And I can address the specific school's

22    definition.

23            THE COURT:  We're going to get there.  I think

24    that -- there you have it.

25            MR. SCHMUTTER:  If the Court construes these various

 1   provisions --

 2          THE COURT:  Why do I need to construe it?  You just

 3   got a stipulation.

 4          MR. SCHMUTTER:  Because Sections 7(c) and 7(d) don't

 5   work the way counsel just described them.  They don't do

 6   what --

 7          THE COURT:  Well, if they're stipulating to it and I

 8   so order it, at least for purposes of this temporary

 9   restraining order.

10          MR. SCHMUTTER:  Sure.  It --

11          THE COURT:  So there you have it.

12          MR. SCHMUTTER:  If -- if that -- if it works out the

13   way -- if it solves the specific problems that we identified in

14   the ways we've identified them, yes, it solves the problem.

15          THE COURT:  Okay.

16          MR. SCHMUTTER:  And the TRO could reflect that.  As

17   long as -- I don't want to be caught in the specific language

18   of 7(c) and 7(d).  They don't do what Ms. Cai said they do.

19   And so I want to -- if the Court is going to order something in

20   a TRO that says --

21          THE COURT:  I'm going to -- I'm going to say,

22   assuming however I rule, that this is what they've stipulated

23   to and the plaintiffs need not be concerned that they will be

24   criminally charged with violating this subsection.  There you

25   have it.

```
 1                MR. SCHMUTTER:  As I said, Judge, as long as I don't
 2      have to live with specific language in 7(c) and 7(d) at my
 3      clients' peril, because these don't actually do what they say.
 4                If the Court construes it and the order reflects that
 5      our actual concerns that were articulated today are in fact
 6      solved by this stipulation, then we're fine.
 7                THE COURT:  And I think counsel just solved those.
 8      Okay.
 9                MR. SCHMUTTER:  Thank you, Judge.
10                THE COURT:  So here's my question, Ms. Cai:  Is the
11      School of Rock a school?
12                MS. CAI:  I actually don't know what the School of
13      Rock is.  And I don't think that's actually raised in the -- I
14      don't know what it does.  I don't know if, you know, people go
15      every day and it's regulated by the Department of Education and
16      all that.  But what I can tell you is this:  The school,
17      college, university or other educational institution language
18      has existed in Section 2C:39-5 for at least 30 years.  And
19      plaintiffs have never challenged it before, at least these
20      plaintiffs as far as I know.  So it cannot be a genuine issue
21      to say I'm confused now by what the word "school" means.
22                I will tell Your Honor that we think "school" means
23      the meaning that it has in other parts of the New Jersey code.
24      So it means places where people are regulated by other things
25      that schools must have.
```

```
 1              So the Department of Education sets a number of

 2    restrictions that apply to schools and educational

 3    institutions.  You have to have a certain number of fire exits.

 4    You need to have certain safety precautions.  You need to have

 5    COVID restrictions, all of that.  And I don't think that going

 6    to Mrs. Smith's house for bagpipe lessons, even if she calls it

 7    Mrs. Smith's School of Bagpipes, makes that place a school.

 8              THE COURT:  Okay.

 9              MS. CAI:  And I don't think that Mr. Schmutter

10    teaching a CLE class at a law firm turns the law firm into a

11    school.

12              THE COURT:  Fair enough.

13              Are there any concerns -- again, because we are here

14    on a TRO, are there any places that the plaintiffs frequent,

15    and I'm specifically referring to those who have carry

16    permits -- the four of them, right?

17              MS. CAI:  Yeah.

18              THE COURT:  There's four?

19              MR. SCHMUTTER:  Well, we have seven plaintiffs.

20              THE COURT:  But four have permits.

21              MR. SCHMUTTER:  Now five, I think, because Mr. Varga

22    got his permit while this was pending.

23              THE COURT:  Okay.  Are there any places where the

24    plaintiffs who have carry permits who are concerned that they

25    might be in violation of the legislation because it might come
```

```
 1   within the penumbra of a school?  And the one that comes to
 2   mind is the plaintiff who goes to Bible classes.
 3            Are there any of those -- can I get the State to
 4   commit, are there any of those that the State would genuinely
 5   say constitutes school or educational institution?
 6            MS. CAI:  I don't think so on the facts alleged.
 7            I will say this, Your Honor:  Some of the allegations
 8   as to continuing education classes are so vague that I don't
 9   know what it is that they're going to.
10            THE COURT:  Fair enough.
11            MS. CAI:  So, you know, if it's actually nursing
12   school for an additional degree, then, yes, that's a school.
13   But I can tell you Sunday school within a church, you know,
14   when the adults gather on Wednesdays to study the Bible, that's
15   not a school.  A Tae Kwon Do class is not a class.  A bagpipe
16   lesson is not a school under the definition.
17            So I think for the particular place, I think there
18   are only three plaintiffs that have any --
19            THE COURT:  Motorcycle classes and firearms training
20   were the other ones.
21            MS. CAI:  I don't think those are schools.
22            THE COURT:  There you have it, Mr. Schmutter, see.
23   They're not schools.
24            MR. SCHMUTTER:  Judge, that's very helpful.
25            THE COURT:  For purposes of today's temporary
```

1   restraining order; yes.

2          MS. CAI:  So I don't think there are any other

3   questions on the multiuse property and schools definitions, but

4   if there are, I'm happy to answer them.

5          THE COURT:  I think it's been resolved for today's

6   purposes, for the purposes of this motion.  Obviously the

7   parties are going to have their quarrels down the road, and

8   this will need to be fleshed out, but I think in terms of a

9   temporary restraining order.  Okay.

10          MR. SCHMUTTER:  Can I make a suggestion, Judge?

11          THE COURT:  I am always open to suggestions.

12          MR. SCHMUTTER:  Thank you, Judge.

13          THE COURT:  Maybe the two of you should just go talk

14   and we can resolve this.

15          MR. SCHMUTTER:  That would be great actually.

16          If -- however the Court ends up ruling on this, one

17   thing that could be helpful for the PI phase is for the State

18   to proffer a definition that they actually want to live with.

19   Because counsel referenced the Department of Education,

20   referenced regulatory statutes with respect to schools and

21   standards and things like that.  That gets much closer to what

22   folks would understand a traditional school to be.  So maybe --

23          THE COURT:  Right.  And I think that, again, it just

24   seems so odd that the parties should be standing before me and

25   defining what it means.  So how does it work?  That the Court

 1    adopts the definition that the parties have come up with, which

 2    I'm perfectly willing to do?

 3              MR. SCHMUTTER:  Maybe it results in a stipulation.  I

 4    don't know, Your Honor.  But I'm just saying between now or

 5    when the Court rules, between today or when the Court rules and

 6    the PI phase, maybe there's a conversation to be had about what

 7    counts as school, university, college, or other educational

 8    institution.  Maybe we present the stipulation to the Court as

 9    to what the definition actually is going to be.

10              THE COURT:  And then how does that become implemented

11    for the future?

12              MR. SCHMUTTER:  It becomes -- well, perhaps it

13    becomes a finding, a ruling, a finding by the Court --

14              THE COURT:  Oh, I see.

15              MR. SCHMUTTER:  -- in a preliminary injunction.  It

16    becomes a finding for -- I'm not sure.  It becomes a finding

17    for the preliminary injunction for the rest of the case or

18    stipulation that governs the case through trial.  I'm not sure

19    exactly the mechanics.  But surely the parties can resolve less

20    than the whole case, can resolve certain issues by stipulation,

21    and the Court I believe -- the Court can adopt those.  So that

22    might be the mechanism.  I'm just kind of thinking about it.

23              THE COURT:  I'm open to it.  The parties, I would

24    certainly encourage the parties to talk.  I certainly don't

25    want to be put in the position that I have to prejudge as to

```
 1  every single case what a school is or isn't.  If it resolves
 2  the issue, then I welcome it.  Okay.
 3          MS. CAI:  I'll make one just sort of clarification on
 4  that.
 5          THE COURT:  Yeah.
 6          MS. CAI:  We're happy to talk.  I will say plaintiffs
 7  are bringing a void for vagueness challenge.  And that does not
 8  and has never turned on are there examples of circumstances a
 9  plaintiff can think of where they're not sure of what the law
10  is.  And so cases like, you know, Third Circuit's case Fullmer,
11  Supreme Court case Grayned that we've cited talk about just
12  because the law doesn't explicitly cover your CLE class or
13  doesn't say X, Y or Z doesn't make it unconstitutionally vague.
14  And so I think on a PI posture, TRO posture, plaintiffs can't
15  say, well, we have a live controversy just because we've
16  thought of a scenario that in our minds may or may not be.
17          Now, I have come here to alleviate the specific
18  concerns for these specific plaintiffs as described in their
19  affidavits, but --
20          THE COURT:  And I welcome that.  And I think that's
21  welcomed by the plaintiffs.  But to be fair to their argument,
22  though, Ms. Cai, what they are saying is that have been exposed
23  or will be exposed to criminal liability because they're just
24  not quite sure because the legislation reads too broadly, too
25  expansively, and they're just not quite sure whether or not
```

```
 1   having a firearm during Bible class is -- I mean, one could
 2   quarrel about whether that's really genuine argument or not;
 3   but if it's a genuine fear, then I think that's alleviated by
 4   what we just -- by what has occurred here.
 5            MS. CAI:  I agree that it has been alleviated.  My
 6   point is just that, as a matter of sort of zooming out from
 7   this particular case and this particular argument, for the
 8   purposes of a plaintiff establishing a successful void for
 9   vagueness claim, every plaintiff who brings such a claim says I
10   have confusion or I am going to be affected by this.
11            Many of them under this Court's precedence and the
12   Supreme Court's precedence are not successful and cannot be
13   successful just because they've raised a situation which is
14   theoretically possible.  That's all I'm saying in terms of the
15   precedence.
16            THE COURT:  Fair enough.
17            MS. CAI:  That said, I think we have resolved the
18   specific dispute here.
19            THE COURT:  Fair enough.
20            MS. CAI:  Thank you, Your Honor.
21            THE COURT:  Okay.  So let me hear you as to the
22   remaining arguments that you have.  And if you could focus on
23   in your remarks to me the issue of standing.
24            MR. SCHMUTTER:  Well, Judge, I'd like to answer Your
25   Honor's questions in regard to standing if Your Honor has
```

```
 1   questions.  I mean, I really think it's been fully briefed.  If
 2   Your Honor wants me to go through the argument, I can, but I
 3   think if Your Honor has any questions or issues, I'm happy to
 4   answer them.
 5           THE COURT:  So I am confident that you read the
 6   Court's prior decision in Koons.
 7           MR. SCHMUTTER:  Yes.
 8           THE COURT:  And so one of the issues that the Court
 9   focused on in Koons with respect to standing, in the Koons
10   case, the sensitive places that were challenged there really
11   were part and parcel to their everyday life.  And so that
12   motivated the Court.  That was what animated the Court's
13   decision to find standing.
14           Museums I didn't parse out, libraries and museums.  I
15   didn't parse that out as specifically as perhaps I could have.
16   But some of these sensitive places designations here seem to me
17   one could say are not necessarily part of one's everyday life.
18   Could you respond to that?
19           MR. SCHMUTTER:  Yes, Your Honor.
20           So let me just take a slight step back and point out
21   that our facts are more granular and more specific than in
22   Koons.  We think that the Court's ruling in Koons as to how to
23   understand and look at standing is actually correct, but we
24   actually present the Court with even more granular facts.
25           We have people specifically going to museums and
```

```
 1   libraries.  We have people going to parks and beaches and

 2   playgrounds.  We have people going to racetracks specifically.

 3   So we actually provide the Court with a very full and detailed

 4   record as to those standing facts.

 5            Now --

 6            THE COURT:  And I don't necessarily -- you'll agree

 7   with this:  I don't necessarily need to resolve the issue --

 8   although I think I will -- resolve the issue of standing as to

 9   the sensitive place designations in Koons because I've already

10   restrained the enforcement of those.

11            MR. SCHMUTTER:  Right.

12            THE COURT:  So focus your argument, your comments, if

13   you will, please, on the other designations.

14            MR. SCHMUTTER:  Absolutely.

15            And we note that it's actually very interesting the

16   breadth issue, because the State -- the legislature very

17   specifically grouped certain things together.  And we think it

18   is correct to look at the groups as a whole for standing

19   purposes.

20            So you don't need standing for each element of

21   7(a)(9) -- I'm just picking one out of thin air -- or 7(a)(10).

22   You don't have to have standing for each one of those to knock

23   out that whole.

24            And we believe the reason --

25            THE COURT:  Oh, is that so?
```

1    MR. SCHMUTTER:  Well, we believe the reason for that

2  is because what the State has actually done here -- and we've

3  briefed this in a slightly different context.  The State is

4  intending to aggregate categories for the purposes of the

5  historical analysis under *Bruen*.  So what they're doing is

6  they're creating these sort of artificial categories of

7  unrelated things and saying constitutional activities or

8  crowded areas.  And by doing that, they are trying to solve

9  their numerosity problem.

10    As the Court is aware, because this is all over the

11  Koons decision and all over *Bruen*, of course, you cannot

12  establish historical tradition with outliers.  One, two, three,

13  none of that counts.  And of course, the Court was talking

14  about 3 out of 13 colonies.  If they're going to try to rely on

15  19th Century citations, which of course we've addressed, we've

16  talked about that, but if they're going to try to rely on 19th

17  Century, we're talking about 30 and 40 states already.  So one,

18  two and three examples are absolutely not going to count.

19    So this is what they're doing.  Their strategy is to

20  group things in ways that allow them to try to sort of truck in

21  these piles and try to say, well, no, it's not just one, two or

22  three.  It's actually four, five, six or whatever because these

23  are all similar in some important way.  But you can't do that.

24    THE COURT:  Right.

25    MR. SCHMUTTER:  You can't take dissimilar items and

```
 1   say it's crowds.  I mean, we know that Bruen specifically
 2   disallowed the concept of crowdedness as a basis for this.
 3           And it's pretty clear what they're doing and why
 4   because they don't have numerosity.  They don't have a
 5   tradition of any of this stuff.  These are all isolated
 6   examples, none of which count.
 7           THE COURT:  And by "numerosity," because you use that
 8   in your brief, numerosity you mean?
 9           MR. SCHMUTTER:  Having enough.
10           THE COURT:  Analogs.
11           MR. SCHMUTTER:  Having enough citations, correct.
12   Having enough citations to be a tradition.  Remember, Bruen
13   says you have to show a tradition.  Traditions have a
14   numerosity element and a longevity element.  And so a tradition
15   is widespread, right?  Can't just be Tennessee.  It's got to be
16   a widespread tradition in the United States.  That's the
17   numerosity problem.  And it has to be long-lasting.  So a
18   statute like in Texas that's around for a year and then gets
19   repealed or amended doesn't count either.  And Bruen is very
20   clear about this.
21           What's great about Bruen is it goes into so much
22   detail about how to think about these things and how to
23   understand the historical record, which is why the Court in
24   Bruen discards all of the stuff that New York tries to throw at
25   it because it's just random things here and there.  That's
```

```
 1    exactly what New Jersey is doing.  And so they're trying to

 2    end-run around that by aggregating things that really should

 3    not be properly aggregated.  And it relates to standing because

 4    that's what they've done in the statute.  They've aggregated

 5    things in the statute.

 6              Their position is, a particular line of them,

 7    7(a)(9), 7(a)(10), 7(a)(11), whatever, to the extent that it

 8    lists four or five things, they're saying those are similar in

 9    relevant ways, therefore, we get to -- we don't have to show

10    numerosity for parks because we can show parks, beaches,

11    playgrounds, the similar things as they've aggregated them.

12              So if they're going to try to do that, if the

13    legislature is going to try to do that, which we think is not

14    proper for --

15              THE COURT:  Then you're going to try to do it with

16    respect to standing?

17              MR. SCHMUTTER:  We're saying that the Court can find

18    standing in the aggregate as well.

19              Now, we don't think the Court needs to in our case

20    because we have such granularity and such detailed standing

21    facts, but the Court can find standing in the aggregate in that

22    way because of the choice that the legislature made.  That's

23    really the only reason I addressed that.  We don't think the

24    Court has to do it to give us the relief we're looking for, but

25    we think the Court can do it, and we think that would be an
```

1    appropriate --

2            THE COURT:  Let me see -- I want to make sure that I

3    understand your argument.

4            So are you saying that -- because in the Koons case

5    the Court restrained the entire subpart, I called it, and I did

6    so because for the reasons that I set forth in the Opinion.

7    Are you saying that I should not -- and I left that issue open

8    in Koons, by the way.

9            MR. SCHMUTTER:  Correct.

10           THE COURT:  That I should not parse out the subpart?

11   So, in other words, if I find that there's standing as to

12   zoos -- so let's do parks and beaches and recreational

13   facilities, they are all in one subpart, right?  Am I right?

14           MR. SCHMUTTER:  I'm sorry.  Parks and beaches, yes.

15           THE COURT:  Parks, beaches, and recreational

16   facilities.

17           MR. SCHMUTTER:  That's one subpart, Judge.

18           THE COURT:  One subpart.

19           Are you saying that I need not parse those out if I

20   find standing as to parks and I don't need to find standing as

21   to beaches or recreational facilities; is that what you're

22   saying?

23           MR. SCHMUTTER:  Correct.  Because let's take the best

24   example which is number 21.  There are 17, 18, 20 different

25   lists there.  Healthcare facility including, but not limited

 1  to, general hospital, special hospital, psychiatric -- I'm not

 2  going to list all of them.  It's an entire paragraph.  There's

 3  probably 25 different items.  The idea that plaintiffs have to

 4  show standing as to all 25 of those is preposterous.

 5       The State has deliberately said we think these are

 6  similar in a relevant way and therefore -- because they could

 7  create a list, they could get as granular as they want to and

 8  create a list of 50 different things just by giving them

 9  different names.  The idea that you have to have standing as to

10  each one of those 50 items simply because they've given them

11  slightly different names can't possibly be required under

12  *Lujan*.

13       THE COURT:  At this stage or at any stage?

14       MR. SCHMUTTER:  At any stage.

15       THE COURT:  Because that's what the Court in *Antonyuk*

16  did.  The Court in *Antonyuk*, of which I find the reasoning in

17  that case very persuasive, that Court went through every single

18  sensitive place designation, parsed out parks, zoos.  You're

19  saying that I need not?

20       MR. SCHMUTTER:  It's not required.  The Court doesn't

21  have to do that.

22       Now, as I indicated -- well, for example, let's look

23  at 21 because it's a great example.  Our best plaintiff as to

24  21 and 22, which are these sort of medical and treatment

25  facilities, is Mr. Siegel.  Mr. Siegel is a nurse practitioner.

1    Mr. Siegel is in the healthcare business.  Does he have to go

2    to every one of these 25 things in order for us to challenge,

3    broadly challenge 21?  You know, you're going to have 50

4    plaintiffs.  You're going to have 100 plaintiffs to do that.

5    That's not -- the standing doesn't require that.

6              And, again, one of the most important reasons why

7    that's true is because this is a choice that the legislature

8    made.  The legislature grouped these together on purpose

9    because the legislature thought that these were relevantly

10   similar in why they are entitled under *Bruen* to prohibit these.

11             And so if we're going to do it -- if this is a *Bruen*

12   challenge, which it is, we get to hold the legislature to that

13   choice and say if you think these are similar, we get to

14   challenge them as similar; and therefore, we don't have to get

15   as granular as 25 different items.  That would be the

16   reasoning.  It's based on the choice of the legislature.  And

17   although we don't think the Court has to do it for everything

18   because we actually have a lot of --

19             THE COURT:  Overlapping.

20             MR. SCHMUTTER:  -- facts, the burden would be

21   overwhelming and not required by *Lujan*.  That's basically what

22   we're saying there, Judge.

23             THE COURT:  Okay.

24             MR. SCHMUTTER:  I think I answered Your Honor's

25   question.  Was there something I didn't get to on the question,

```
 1    standing question that Your Honor raised?

 2              Oh, yes.  Your Honor was asking about non -- things

 3    that are not part of one's daily life.  And I don't think I got

 4    to that, right?

 5              THE COURT:  Yes.

 6              MR. SCHMUTTER:  Right.  I want to make sure I get to

 7    that.

 8              So I'm assuming Your Honor is talking about things

 9    like movie sets or I assume that includes news.

10              THE COURT:  There's probably -- most of us in this

11    courtroom have never come upon a movie set.

12              MR. SCHMUTTER:  I have, many times.  I mean, Your

13    Honor, here's a good example actually --

14              THE COURT:  Yeah.

15              MR. SCHMUTTER:  -- when they were filming the

16    Sopranos movie.  I was at the courthouse in Newark and I was

17    walking to Hobby's Delicatessen to get lunch and one of the

18    scenes was filmed right in front of Hobby's.  That whole street

19    was shut down.  So it is my tendency to -- I came upon this

20    street where it looked like it was with cars from the '60s.  I

21    saw cameras.  I saw everything.  I walked right up to them and

22    said, Oh, what are you filming?  And they said, Oh, we're

23    filming a documentary on the history of Newark, which I knew

24    was not true because I knew they were filming Sopranos.  But

25    the point is I engaged them, and I was also going to Hobby's
```

 1   for lunch.  Well, the only way to get to Hobby's was to walk

 2   across the set.  So people run into this stuff all the time.  I

 3   mean, maybe I just happen to attract movie sets, but --

 4            THE COURT:  Well, I think that you -- I don't want to

 5   get too bogged down in movie sets, but --

 6            MR. SCHMUTTER:  It could also be a news site where

 7   they're filming a news report.  That seems like it would fall

 8   within the language here.

 9            THE COURT:  But I think that your arguments are more

10   persuasive at the preliminary injunction stage as opposed to

11   the temporary restraining stage, Mr. Schmutter.  I mean,

12   unless -- and I didn't see it in the declarations, unless

13   there's a movie set going on within the near future that the

14   plaintiff knows about, it seems to me that it's sort of a *Lujan*

15   problem, which is it might happen some day, which I'm not

16   quarreling with you for which there would be standing.  I'm

17   just not so sure there's standing at this stage.

18            MR. SCHMUTTER:  May I offer something in response,

19   Judge?

20            THE COURT:  Sure.

21            MR. SCHMUTTER:  So we understand that the standing

22   analysis is a little bit different for this than for a

23   restaurant, right?  I go to restaurants all the time.  I go to

24   restaurants with liquor licenses.  I go to Chili's and they

25   serve beer, whatever.  The problem under *Lujan* is that if this

1   is an insufficient showing of standing, you're never going to

2   be able to show standing and never be able to challenge this

3   because these are --

4        THE COURT:  No.  Mr. Schmutter, at this stage.

5   Remember, we're here on temporary restraints.  We're not here

6   on a preliminary injunction hearing.

7        I don't think the State's going to stand up and

8   quarrel that you have an issue on standing at all.  I think

9   they're quarreling with the -- and there's always a blur

10  between imminent injury, there's a blur with respect to

11  standing, and it's hard to sometimes parse those out.  I

12  don't -- I think that it's an issue that's going to be

13  resolved.  I'm just not so sure at this juncture you've shown

14  standing.

15       MR. SCHMUTTER:  Judge, if the State is willing to

16  stipulate that they're not going to object to that aspect of

17  standing at the PI stage, we'll be happy with that.

18       THE COURT:  Oh.

19       MR. SCHMUTTER:  I mean, I think they're going to

20  continue that argument.  I think they're going to --

21       THE COURT:  Oh.  We're getting somewhere.  Let me

22  find out.

23       Ms. Cai, you agree they have standing at the PI

24  stage?

25       MS. CAI:  It depends on the -- well, so we have four

```
 1   different standing arguments.  Right now I think we're only
 2   talking about the imminence problem, with respect.
 3           THE COURT:  Yes.
 4           MS. CAI:  So without conceding anything on the other
 5   three.
 6           I think there are a few places where the plaintiffs'
 7   own allegations are so vague that they would ever go back to
 8   that place or at least within the scope of the litigation that
 9   there may be a problem.
10           But with respect to some of these where they say they
11   go a few times a year, we're not challenging their ability to
12   show imminence for that at the time, yeah.
13           THE COURT:  Okay.  Let's have that conversation,
14   okay?
15           MS. CAI:  Yeah.
16           THE COURT:  Because if it alleviates the Court having
17   to resolve them at the temporary restraining order stage, I
18   would welcome that opportunity.
19           Let's go through them.  Public gathering, what's the
20   State's position?  They'll eventually show standing or not?
21           MS. CAI:  Sorry.  I couldn't hear Your Honor.
22           THE COURT:  Public gathering.
23           I think there you will concede standing because your
24   argument there is, well, if they want to know if it's a public
25   gathering, go to the website, which, you know, we can talk
```

 1    about that some other day, but --

 2              MS. CAI:  Sure, Your Honor.

 3         So I think with respect to public gatherings, you

 4    know, their current allegation is they -- so the only three

 5    plaintiffs who talk about it are Siegel, Cook and DeLuca.  They

 6    say the same thing, that they have chanced upon it from time to

 7    time.

 8              THE COURT:  Okay.

 9              MS. CAI:  You know, for me that's a little harder to

10    know whether or not within even the timing of this litigation

11    or even, you know, in the next few years whether or not that's

12    going to happen.  So we would say the plaintiffs have a burden

13    to show something more specific on that particular claim.

14              THE COURT:  Well, but the State is in possession of

15    that.  The State is in possession of permits that are in the

16    area where the plaintiffs live, right?

17              MS. CAI:  I suppose that's true.  But that doesn't

18    mean that the plaintiffs are, you know, likely or, you know,

19    will chance upon them in the future.

20              THE COURT:  Well, let's see how it goes.

21         How does the argument go, that they don't have

22    standing because they haven't been able to show that there's a

23    public gathering scheduled any time soon during the pendency of

24    the litigation?  Is that how the argument goes?  That seems a

25    little silly.

1    MS. CAI:  For the PI stage, yes, it is.  Because the

2    PI would have -- well, so just as the TRO -- sorry, Your Honor.

3    I should be standing.  Just as the TRO inquiry is whether or

4    not the plaintiff will suffer irreparable harm during the

5    period in which the TRO is in effect, so for this case perhaps

6    the next three weeks or so, that's their burden to prove.  For

7    the PI stage, it is a longer time frame.

8    THE COURT:  Yeah.

9    MS. CAI:  But it would be within -- you know, we

10   don't know exactly how long the litigation is so they don't

11   have to be so specific.  But it can't be, "At some point in my

12   life I may chance upon a movie set."

13   THE COURT:  Fair enough.  Let me rephrase.  Do you

14   concede that there will be a public gathering between now and

15   the end of the PI stage?

16   MS. CAI:  I don't know with respect to these

17   plaintiffs in particular.  But I admit that that's a closer

18   question.  There are some other ones where there are more

19   serious questions.

20   THE COURT:  No.  I'm just trying to resolve some of

21   these issues that I, frankly, don't think need to be addressed,

22   because I think -- let me just put it out there.  I think that

23   by the time we get to the PI stage, the State could not

24   challenge plaintiffs' standing as to public gathering.  It's an

25   issue that has to be resolved.  And I don't know how else a

```
 1   plaintiff resolves the issue other than the State denying that

 2   there will be no public gatherings for which a permit is

 3   required for the next six months.  And I don't think the State

 4   can do that.

 5          MS. CAI:  Understood, Your Honor.  I will say, we are

 6   here on a TRO, not the PI.  And so all that Your Honor has to

 7   resolve today is whether or not a TRO is required for that

 8   provision.

 9          THE COURT:  I know, Ms. Cai.  But he's willing not to

10   pursue a TRO on a public gathering if there's a concession that

11   the plaintiffs have standing at the PI stage.  He's willing not

12   to push that.  Why wouldn't the State take that?

13          MS. CAI:  Okay.  So, Your Honor, I think -- I think

14   for that one, fine, sure.  But not -- you know, we have to go

15   through them one by one.

16          THE COURT:  We are.  We're going to.

17          MS. CAI:  Okay.  All right.

18          THE COURT:  I don't know why the State wouldn't

19   accept what Mr. Schmutter's offering; that if the State is not

20   going to object as to standing at the PI stage as to some of

21   these issues, he is willing to withdraw his application for a

22   temporary restraining order as to some of these.  Why wouldn't

23   the State take that?

24          MS. CAI:  I'm sorry.  I did not understand

25   Mr. Schmutter to be saying that.
```

```
 1              THE COURT:  Am I right?

 2              MR. SCHMUTTER:  Yes.

 3              THE COURT:  Yes.

 4              MS. CAI:  Okay.

 5              THE COURT:  You got a concession on public gathering.

 6              What's the other ones that we were discussing?

 7              MR. SCHMUTTER:  Film location.

 8              THE COURT:  Film location.  Stipulation on that?

 9              MS. CAI:  No, Your Honor.  And that one, the

10    plaintiffs, so the only plaintiffs who talk about it are Siegel

11    and Cook.  So at least for public gatherings they say they

12    chance upon them from time to time and that will happen.

13              THE COURT:  Yeah.

14              MS. CAI:  For movie sets they have no allegation as

15    to imminence at all in their allegations.

16              THE COURT:  No.  No.  No.  And he's willing to

17    concede and he's willing to withdraw the TRO if the State

18    agrees that there's standing at the PI stage.  And they have

19    alleged that they've come upon movie sets.

20              MS. CAI:  Right.  So I think the problem there is

21    that for movie sets, they not only have a PI stage problem,

22    they have a general *Lujan* problem.  So just as the plaintiff in

23    *Lujan* said I will at some point go to Egypt and Sri Lanka and

24    all these places to view the endangered species, I can't tell

25    you when, I don't have a plane ticket, the Court said that is
```

 1   not enough for standing.  The same is true for the movie set.

 2   So the State cannot stipulate that at the PI stage or in

 3   general there is standing.

 4          Now, plaintiffs can cure the defects in standing from

 5   their affidavits by just submitting more specific future

 6   intentions.

 7          THE COURT:  What would they say?  We know that

 8   there's going to be a film, there's going to be a movie filmed

 9   in May in Camden, New Jersey and we want to go to it?  Is that

10   what they would say?

11          MS. CAI:  They could say, you know, my block or the

12   street that I go to often has had movie sets frequently, and I

13   anticipate having this problem, facing this problem within the

14   scope of the litigation and so therefore I need a PI to address

15   that.

16          THE COURT:  But isn't that what they said already?

17          MS. CAI:  No, they have not said that.  Their

18   allegation says they have at some point in the past encountered

19   a movie set and approached to inquire.  But we have no idea if

20   that was 10 years ago, 20 years ago, whether or not it is at

21   all likely that it will happen to them within the scope of the

22   timing of the litigation.

23          So on that, the plaintiffs -- or sorry, the State

24   cannot concede that there would be no imminence problem for

25   standing during the scope of the litigation.

```
 1              THE COURT:  Okay.

 2              MR. SCHMUTTER:  Judge, the standard that the State

 3    just articulated, no plaintiff will ever have standing to

 4    challenge that.

 5              THE COURT:  It seems to me.  And that seems

 6    problematic, doesn't it?

 7              MR. SCHMUTTER:  Yes.

 8              THE COURT:  Yeah.

 9              MS. CAI:  Your Honor --

10              MR. SCHMUTTER:  I'm sorry.  They're asking for

11    someone who says, well, my block has a lot of movies so I'm

12    going to be going to those movies.  Nobody can say that.

13    Nobody can say that unless you live in Manhattan maybe, but you

14    know...

15              THE COURT:  Well, I guess the issue that concerns me

16    is so that this entire litigation is resolved, at the end of

17    the day, the Court finds, if I agree with the State, that the

18    Court finds that there's been no standing challenge as to --

19    let's just take their position -- as to the movie sets and as a

20    result that issue can't be resolved; but what happens is the

21    next time someone wants to go to a movie set carrying a

22    firearm, a new lawsuit is filed, it just seems to be such a --

23    it just seems -- why wouldn't the State be interested in

24    resolving the challenges to this legislation at once?  Why the

25    piecemeal litigation?  Seems to me, but --
```

| | |
|---|---|
| 1 | MR. SCHMUTTER:  The State is trying to take a |
| 2 | position to prevent any plaintiff from ever really having |
| 3 | standing.  That's what they're doing.  And that's |
| 4 | inappropriate.  *Lujan* doesn't require that. |
| 5 | MS. CAI:  Your Honor, may I respond? |
| 6 | THE COURT:  Sure. |
| 7 | MS. CAI:  So, first of all, the standing problem is |
| 8 | not the State's burden to prove or disprove.  It's the |
| 9 | plaintiffs' burden at all times. |
| 10 | THE COURT:  I agree with that. |
| 11 | MS. CAI:  And with respect to whether or not |
| 12 | theoretically it's true that no plaintiff could challenge the |
| 13 | statute, I disagree with that.  Even if that were true, the |
| 14 | Supreme Court has explicitly said in *Clapper* that is not a |
| 15 | reason to find standing.  So even under that extreme |
| 16 | hypothetical, which I don't think is accurate, that is not a |
| 17 | basis to find standing, and that's plaintiffs' only argument |
| 18 | for why there is standing. |
| 19 | THE COURT:  Right.  But the question that I posed to |
| 20 | the State, though, Ms. Cai, is why wouldn't the State want to |
| 21 | waive its challenge to standing and resolve all of the |
| 22 | constitutional challenges to this legislation to prevent the |
| 23 | merry-go-round of litigation revolving around this litigation? |
| 24 | That's the question. |
| 25 | MS. CAI:  So -- |

```
 1              THE COURT:  The Court can't force you to do that.
 2    But wouldn't it be a wise thing to do?
 3              MS. CAI:  Your Honor, the initial premise is standing
 4    is a jurisdictional question.
 5              THE COURT:  Which you can waive.
 6              MS. CAI:  No, we cannot.
 7              THE COURT:  You can't waive the opposition --
 8              MS. CAI:  We cannot waive standing.  So that is a
 9    fact of, you know, black letter law.  Jurisdictional questions
10    as to the Court's jurisdiction for whether or not it has
11    Article III jurisdiction over the case is not something we can
12    waive.
13              THE COURT:  No; I agree with that.  But if you
14    stipulate to it --
15              MS. CAI:  That does not prevent the --
16              THE COURT:  If you stipulated to it, then I have
17    jurisdiction.
18              MS. CAI:  I do not believe that is correct, Your
19    Honor.  I'm sorry.  Parties cannot waive jurisdiction.  And
20    that is a black letter tenet of how courts operate under
21    Article III.
22              THE COURT:  So here's where we're going to leave it.
23    We're going to move on.
24              MR. SCHMUTTER:  Can I help, Judge?  I'm sorry.  I
25    interrupted Your Honor.  I apologize.
```

```
 1              THE COURT:  Well, maybe.  Go ahead.

 2              MR. SCHMUTTER:  The parties can't stipulate to

 3  subject matter jurisdiction, but the parties can stipulate to

 4  facts or law that the Court may use to find jurisdiction.

 5              THE COURT:  Okay.

 6              MR. SCHMUTTER:  I believe that's what Your Honor is

 7  asking the State.

 8              THE COURT:  And that is my understanding of the law.

 9  And we're going to leave it at this.  Here's what I would say:

10  It seems to me to be a prudent decision on the part of the

11  State to stipulate to the issue of standing as to all of the

12  challenges of this legislation so that the constitutionality of

13  it can be resolved in one fell swoop as opposed to inviting a

14  merry-go-round of litigation.  That's all I'm saying.  Can I

15  force the State to do that?  Of course I can't.  And we're

16  going to leave it at that, okay?

17              All right.

18              MR. SCHMUTTER:  Are there any other questions I can

19  answer, Your Honor?

20              THE COURT:  No.  Let me have a conversation with

21  Ms. Cai.

22              MR. SCHMUTTER:  Thank you, Judge.

23              THE COURT:  Thank you.

24              Ms. Cai, I wanted to focus on the arguments that --

25  and as I indicated earlier, I don't see a reason why I should
```

```
 1    deviate from my finding in Koons.  But I did want you to focus

 2    on the two arguments that you have made that have criticized

 3    the decision: the private property argument as well as the

 4    government as proprietor.  Could you address those comments?

 5              MS. CAI:  Sure.  Do you want me to do it in that

 6    order?

 7              THE COURT:  Well, however you wish.  Yeah.

 8              MS. CAI:  Okay.  So I'll do that first and then sort

 9    of come back because I do want to respond to some of what

10    Mr. Schmutter said as well as go over some of the new

11    provisions that are being challenged here that I think do

12    not -- the conclusion does not follow from the Koons decision.

13    But I'm happy to start.  I can start with the government as

14    proprietor example.

15              And so I think in the provisions challenged in Koons,

16    the issue came up with respect to public libraries and public

17    transit vehicles, and I think, you know, the same problem will

18    also --

19              THE COURT:  And I agree with you that my comment

20    about not limited to public museums was erroneous.

21              MS. CAI:  Understood, Your Honor.

22              THE COURT:  It doesn't -- I'm not persuaded that I

23    should change my Opinion.  That will be for you to tell me to

24    do so and persuade me, but I agree with that.

25              MS. CAI:  Sure, Your Honor.  And we weren't coming
```

 1   today to try to, you know, reverse the TRO decision.  The PI

 2   schedule we proposed is relatively quick, and so we can revisit

 3   all of that at that stage.

 4            THE COURT:  Which we have to talk about, by the way,

 5   yeah.

 6            MS. CAI:  Yes, Your Honor.

 7            So with respect to the government as proprietor

 8   issue, I think that actually wasn't really fleshed out very

 9   much I think in Your Honor's Opinion in Koons because that just

10   didn't come up in that same way.  And it applies in this case

11   both to the provisions that I just mentioned in Koons, but also

12   to things like airports and other buildings that the government

13   happens to own that, you know, just are in the marketplace, so

14   to speak.

15            And so there, I think, the Court of Appeals decisions

16   in *Bonidy*, which is about the postal service, and *Class*, which

17   is about the Capitol building parking lot, are very

18   instructive.  And --

19            THE COURT:  But they all predate *Bruen*, though.

20            MS. CAI:  Yes, Your Honor.  But specifically -- so if

21   you look at *Class*, for example, the decision as to the

22   government as proprietor aspect of it was specifically not

23   about the interest balancing at all.  It was about whether or

24   not the text of the Second Amendment even covers these types of

25   buildings to begin with or these types of properties to begin

1    with.

2         And I think one sort of concept to think about is if

3    the parking lot happened to be owned by a private owner, and

4    that's the same for, you know, I believe the Prudential Center

5    has a private owner, but PNC Bank Arts Center is partly owned

6    by the state, for example, the government as proprietor would

7    be subject to different rules about what weapons it can

8    prohibit or other things to protect its customers if it

9    couldn't -- versus the private owner, right?  And so that's the

10   problem with the government as proprietor.

11        If the government happens to own a building,

12   especially if it's just competing in the marketplace with other

13   private owners, and you see this concept in the Commerce Clause

14   context as well.  So when the government is a market

15   participant, it's exempt from some of these Commerce Clause

16   challenges for the same reasons.  That's what we're getting at

17   with some of these provisions.

18        And I think with respect to certainly some of these

19   entertainment venues, buses, right?  There's the Lakeland Bus

20   which is private and there's NJ Transit.  You can take either

21   to go to Newark Penn Station.  No one would dispute that

22   Lakeland, the company, can say no guns on our buses.  And so

23   when the government happens to be competing with the private

24   bus service, we don't think it's logical to say -- and this is

25   just all about whether or not the Second Amendment even covers

```
 1    this kind of restriction -- it's not logical to say the
 2    government can't similarly prohibit firearms on the public
 3    buses that compete with the private buses.
 4             THE COURT:  But it seems to me Bruen changed that
 5    entire analysis.  It seems to me that Bruen said that if the
 6    State is going to preclude firearms on its own property, it
 7    must comply with Bruen and there must be a historical
 8    tradition.  Because, otherwise, are you saying then that the
 9    State of New Jersey can say no firearms in all of the highways
10    that we own?
11             MS. CAI:  So I think that's a little different.
12             THE COURT:  How so?
13             MS. CAI:  Because there, the highways are not the
14    government participating in the marketplace, right?  There are
15    no private highways as far as I'm aware.  So I do agree with
16    Your Honor that the public squares, the proverbial public
17    square is not a place where the government can use the "this
18    doesn't fall within the Second Amendment" argument when it
19    prohibits -- if it chooses to prohibit firearms, and which we
20    have not.  Instead, we're focused on the government as a
21    competitor to private enterprise, and so --
22             THE COURT:  So it sounds like you're saying -- so in
23    those cases, the government's really not the government?
24             MS. CAI:  It is.  Of course, it's still the
25    government.
```

```
 1              THE COURT:  Right.

 2              MS. CAI:  But the context in which it exists and its

 3   relationship with the public is no different.  So when I go to

 4   a concert at PNC, it's not different from when I go to a

 5   concert at Prudential.  And just because PNC happens to be

 6   partly owned or wholly owned -- actually I'm not sure -- by a

 7   branch of the government doesn't mean that its relationship to

 8   me has changed.

 9              And so I think the Bonidy case talks about the postal

10   service as, you know, it is a government institution but it

11   also, for all intents and purposes, serves the same purpose as

12   a UPS or FedEx or any number of deliverers.

13              THE COURT:  All right.  So square that with Bruen

14   then.  Square what you're saying to me with Bruen.

15              MS. CAI:  Yeah.  So I --

16              THE COURT:  Because Bruen did not make that

17   distinction.  The Bruen Court was very clear, it seems to me.

18   Whether it was privately owned or publicly owned, Bruen didn't

19   make that distinction.  I know the State disagrees with that.

20   Didn't make that distinction whether it's privately owned or

21   publicly owned.  But you got to meet the Bruen test.

22              MS. CAI:  So, Your Honor --

23              THE COURT:  How do you square -- and, again, those

24   cases you rely upon are before Bruen.  Help me understand how

25   you square that with Bruen.
```

1          MS. CAI:  Yes, Your Honor.  I think *Bruen* doesn't

2    squarely address the question of the government as proprietor

3    in the situations I'm talking about.  So that's why we're here.

4    I don't think it forecloses or changes the analysis that the

5    Court -- the Tenth Circuit in *Bonidy* and the D.C. Circuit in

6    *Class* had analyzed.  Because what *Bruen* said was what you can't

7    do is start balancing whether or not the restriction is an

8    appropriate one that serves the government's interest.

9          And I will acknowledge there are parts of the *Bonidy*

10   Opinion that went forward and did that also.  That's not what

11   we're relying on.  And with *Class*, that is absolutely not what

12   we're relying on, because the discussion of whether or not that

13   parking lot adjacent to the Capitol building is protected by

14   the Second Amendment or not is a question about what the Second

15   Amendment covers and not whether or not there are analogous

16   restrictions or whether or not it's a good policy or bad

17   policy.  So none of that was discussed in the part that we're

18   talking about.

19         So I think *Bruen* certainly doesn't answer -- I agree

20   with Your Honor, it doesn't answer the question of what happens

21   when the government happens to be a proprietor and competing in

22   the marketplace with private actors, can it also restrict

23   firearms.  But I think that the logic still applies.

24         There's a separate part of *Bruen*, obviously the part

25   that talks about government buildings as presumptively

1    constitutional sensitive places.

2            THE COURT:  Right.  And I want to set those to the

3    side, okay?

4            MS. CAI:  Yes; understand.

5            THE COURT:  So courthouses, legislative assemblies, I

6    think the *Bruen* Court was very clear that those are

7    appropriately deemed "sensitive places."

8            But I'm still having difficulty understanding the

9    State's argument that if it's government owned, just like the

10   pizzeria owner can say no guns so can the government; that just

11   seems to eviscerate *Bruen*.  And I'm just trying to understand.

12   It sounds to me like you're qualifying that statement, that if

13   it's "government owned."  But I'm not understanding how you're

14   qualifying it.

15           MS. CAI:  So I'll offer this, Your Honor, for this

16   part of the argument, separate from the government buildings as

17   "sensitive places" argument.  I think what you can do is

18   qualify it as when the government acts as a private owner would

19   for that property.

20           THE COURT:  Boy, that seems to be giving -- that

21   seems to be grounds for mischief on the part of the government.

22           MS. CAI:  I'm not quite sure I understand, Your

23   Honor.

24           THE COURT:  Well, because if you're saying well, if

25   they're acting like a private owner, it's giving them, the

1   government, a little bit of wide latitude to decide what they

2   want to do.  And if the dictates of *Bruen* say there's no

3   historical analogs to support the restriction and the

4   government can come back and say oh, but we're acting like a

5   private owner, we can do what we want, it seems to sort of go

6   in circles and eviscerate the holding in *Bruen*.

7         MS. CAI:  Well, the analysis doesn't stop there.  So

8   you can interrogate whether or not that's true.  And courts do

9   that all the time in the Commerce Clause context, right?  Is

10  the government actually acting as a market participant?  You

11  have all kinds of cases about whether or not that's true.  I

12  don't have them at the tip of my tongue today, but we can

13  certainly talk about that in further briefing.

14        But I think that the scope of the Second Amendment

15  issue for both this argument and for the private property

16  argument is something that, you know, that I think the State

17  wants to emphasize.  You know, Your Honor's sort of inviting me

18  to talk about these issues that sort of were addressed in the

19  Koons decision.  I don't want to belabor them too much, but I'm

20  happy to give a few more bars on it if Your Honor wants.

21        THE COURT:  No.  I want to just -- let me just

22  hear -- let me hear what you had to say.  Hang on a second,

23  please.

24        Okay.  I would be interested in knowing the cases

25  that discuss the government acting as a market participant in

 1    the Commerce Clause.  I don't think that the State has made

 2    that argument clearly.

 3              MS. CAI:  Sure, Your Honor.

 4              THE COURT:  Certainly at the PI stage.

 5              MS. CAI:  I'm happy to do that.  And I think

 6    that's -- I don't remember if they cited those cases exactly in

 7    *Class*, but what I remember from *Class* is that it talks about

 8    how the Capitol grounds ban doesn't even impinge on a right

 9    protected by the Second Amendment as opposed to there's a

10    historical tradition or we think that the right violates or

11    impinges on the Second Amendment, but its interest is

12    outweighed by that prior analysis.  That was not even at issue

13    in *Class*.

14              THE COURT:  Okay.

15              MS. CAI:  It was at the very first textual:  Does the

16    Second Amendment cover this stage?  And I believe that the

17    cases were cited there.  But we are happy to give the Court a

18    more fulsome analysis of that.

19              THE COURT:  Okay.  So your argument is and therefore

20    it does not come within the penumbra of the Second Amendment?

21              MS. CAI:  Correct.

22              THE COURT:  Okay.  I think that's going to need to be

23    fleshed out at the PI stage, because I don't think that the

24    State has done a sufficient job in making that argument.

25              MS. CAI:  Surely, Your Honor.  We can do that.

1        And Your Honor wanted me to address the private

2   property issue again.

3        THE COURT:  Yes.

4        MS. CAI:  Okay.  So I think the main point I just

5   want to -- I don't want to belabor this at all -- is just the

6   question of whether or not someone has a presumptive Second

7   Amendment right to carry on someone else's private property,

8   even if the question of permission is unclear, is not something

9   protected by the Second Amendment.

10        THE COURT:  Yeah.  How can you say that?  Help me

11   understand that.

12        MS. CAI:  Yeah.  So there's a few reasons for that.

13   So the first is that *Bruen*, *Heller*, *McDonald* talk about the

14   right to carry under the Second Amendment as a presumptive

15   right in public.  And I think that's very, very important.  And

16   that's language that the Court had used time and again.  And

17   there's no question that whether or not it's a private

18   residence or a small business or any other private property,

19   that's not what the Court was talking about when it said in

20   public.  So --

21        THE COURT:  And so that's how the State is construing

22   the term "in public"?  In public also means in the community,

23   right?  Out in the open and in the community.  And in the

24   community includes private property.

25        MS. CAI:  I think, Your Honor --

 1          THE COURT:  I don't see anywhere in *Bruen* where they

 2   said it's limited to publicly-owned property.

 3          MS. CAI:  I think, Your Honor, the issue with that

 4   comes with -- it's important to think about in terms of what a

 5   property right does.

 6          So I don't think -- and I don't think the plaintiffs

 7   are arguing, although I could be wrong -- that there is

 8   anything that would support the idea that with respect to the

 9   right to exclude at trespass, that there is a different form of

10   property right for someone who has fee simple in their private

11   residence versus their agricultural property versus their

12   coffee shop.

13          THE COURT:  Right.

14          MS. CAI:  The right to exclude could be limited by

15   other laws, such as law against discrimination, you know,

16   *Shelley versus Kraemer*, all of that.  But with respect to

17   whether or not you can exclude individuals from coming onto

18   your property with a firearm, that is not different depending

19   on if you have a home or if you happen to open up that home to

20   selling baked goods, to whether or not you are running a baked

21   goods shop.  You as the property owner has the same right to

22   exclude that has been enshrined from *Blackstone* to present,

23   from *Locke* to present in the same way.  And nothing in *Bruen*

24   would change that.

25          THE COURT:  Right.  And the plaintiffs don't quarrel

```
 1   with that.  The plaintiffs acknowledge that a private property

 2   owner has the right to exclude, right?  And the State can

 3   assist in the regulation of those property rights by if a

 4   private property owner puts up a no guns sign and the plaintiff

 5   ignores it, then that can be enforced under traditional laws,

 6   the no trespassing laws, violating the homeowner's or the

 7   pizzeria's owner's sign.

 8           But it seems to me that what the State is then doing

 9   is saying because the private property owner has that right to

10   exclude, it translates into therefore there is no presumption

11   of the right to carry.  I don't know how you get to that leap.

12   You'd have to show me historical analogs that show that when --

13   let's go to the colonial times -- that when Thomas Jefferson

14   rode on his horse, he stopped at the edge of the acreage and,

15   what, ask if he could carry his firearm onto the property?  I

16   don't think you're going to find such analogs.  What do you say

17   to that?

18           MS. CAI:  Your Honor, we -- so putting aside whether

19   or not the Second Amendment even covers the conduct, we have --

20           THE COURT:  Why wouldn't it?  Tell me about that.

21   Why wouldn't it?

22           MS. CAI:  So if all the government is doing is

23   changing the law of trespass, so the government can change the

24   law of trespass without infringing on the Second Amendment.  So

25   if the government said instead of telling people you need to
```

1  put up a sign to tell people that they are trespassing on your

2  property, instead of doing that, you can actually not put up a

3  sign and instead you can put it on the Internet, if the

4  government said that, for example, in a law and clarified you

5  don't need to put up a sign for any kind of trespass, you can

6  just put it on your own personal website, you know, that's a

7  law that the government can change.  There may be other issues

8  with that, but that's not a Second Amendment problem.

9         THE COURT:  But you're only changing the law of

10  trespass to make it harder for them to carry their firearms.

11  That's the only reason you're doing it.  The law of trespass

12  has worked quite fine over the centuries.  And so aren't you

13  just really dressing up the ability to carry a firearm?  Why

14  are you interfering -- well, not you, why is the State

15  interfering with the law of trespass that has worked quite fine

16  over the years?

17         MS. CAI:  So two things, two responses to that, Your

18  Honor.  So the first is that -- so we can talk about the

19  interests at issue, although I will say that's not really a

20  Second Amendment inquiry.

21         THE COURT:  No.  I don't want to --

22         MS. CAI:  And the Supreme Court has told us not to do

23  that.  But I'm happy to address that, Your Honor, if that's

24  helpful.

25         THE COURT:  Yes.

*1*          MS. CAI:  Yes.

*2*          THE COURT:  Because I don't understand -- I don't

*3* understand the argument.  I want to understand the argument.

*4* But it seems to me that this is a -- that this private property

*5* subsection is a clever way for the State to try to say on the

*6* one hand it's protecting private property owners, but what it's

*7* really doing is preventing the right to carry.

*8*          And so you can say what you say, but what you're

*9* doing is not appropriate.  It's unconstitutional.  So you have

*10* to persuade me that what you're saying and that what you're

*11* doing can live in harmony, and that's where -- that's your job.

*12*          MS. CAI:  Let me offer up something in the record

*13* that demonstrates why the law that the State enacted solves a

*14* property rights problem that individuals in the state have.

*15* And that is -- so in Exhibit 21 is an empirical study of what

*16* people in the public, and there's a, you know, statistically

*17* significant sample and all that and at the state level as well.

*18* So there are New Jersey respondents to this empirical study

*19* that demonstrates not only do people believe that you shouldn't

*20* be able to bring a firearm onto someone else's property without

*21* their explicit permission, importantly in table A5 and A6, what

*22* they demonstrate is that people don't actually think the law

*23* does that.

*24*          So, for example, so I'm quoting to the Court the

*25* nationwide data, but --

```
 1              THE COURT:  But, Ms. Cai, I'm sorry, then educate the

 2    public.  Don't punish the lawful abiding citizens who have a

 3    right to carry firearms.  It's that simple, isn't it?

 4              MS. CAI:  Well, Your Honor, I think --

 5              THE COURT:  Educate the public.

 6              MS. CAI:  I think what the State chooses as the most

 7    effective method of protecting property owners' rights is a

 8    question of state interest and not of the Second Amendment, and

 9    here's why:

10              So if the government -- and I think we discussed this

11    the last time we were here as well, but let me just make it a

12    little more crisp, I guess.  If the government went on a radio

13    campaign, TV campaign, saying, you know, instead of enacting

14    section A24, a know-your-rights campaign, telling people you

15    should be putting up signs to prevent firearms on your

16    property --

17              THE COURT:  Not "you should."  Not "you should," but

18    "you may."  "You may."

19              MS. CAI:  I'm sorry.  If you want.  If you want.  If

20    this is your preference.  If you wanted that preference as a

21    property owner known and enforced, this is what you would need

22    to do.  If the government was telling people that and if it was

23    doing that super effectively --

24              THE COURT:  Yeah.

25              MS. CAI:  -- and then 90 percent of the people went
```

1    out and did that --

2              THE COURT:  Yeah.

3              MS. CAI:  -- it would have the same effect of not

4    allowing individuals to come upon their property, right?

5              But if the plaintiffs' argument is that the effect of

6    the government's choice of protecting private property owners'

7    own preferences gives them less of an ability to carry

8    firearms, they don't have a very successful Second Amendment

9    argument, because it's the preferences of the private property

10   owner that's stopping them from carrying firearms.

11             The government can take action to let the property

12   owners effectuate their personal right to not allow firearms on

13   their property, the complete right to exclude that's been

14   recognized for centuries, but that doesn't affect the Second

15   Amendment.

16             Now, I want to talk about the historical analogs as

17   well because that's the second step of the *Bruen* analysis,

18   whether or not even if the conduct impinges on the Second

19   Amendment, it is nonetheless constitutional if it's rooted in

20   historical tradition.

21             And we can provide the Court more exhibits on this

22   and more historical evidence on this at the PI stage.  But I

23   will note, it doesn't get much better than a pre-founding,

24   lasting through the founding New Jersey law for this very state

25   that has prohibited the same conduct in terms of guns and

| 1 | trespass.  And I know Your Honor thought that perhaps that |
|---|---|

1    trespass.  And I know Your Honor thought that perhaps that

2    statute only applied to individuals who are trying to poach.

3    As we pointed out in our supplemental briefs, that is not what

4    the statute does.

5              THE COURT:  Well, but you ignored the title of it.

6              MS. CAI:  Your Honor, the title says both poaching

7    and guns with trespass.  There are two objects in that title.

8    And different provisions of the statute prohibited different

9    actions.  And so poaching was a separate prohibition in section

10   2.  To violate section 1, there needed not be any intention to

11   poach, hunt or anything like that.  And had the government

12   wanted it to be a poaching-only prohibition, it would not have

13   enacted section 1.

14             We have a lot more on this, Your Honor, including

15   examples of what the statute used to say, what it said

16   afterwards to give more context.

17             THE COURT:  Why haven't you presented it to me now?

18             MS. CAI:  Because, Your Honor --

19             THE COURT:  I offered it in Koons.  You see, the

20   State stands up and says we have so much more, we have so much

21   more.  But the time for giving that to me has passed.  And I

22   would appreciate it if you had given it to me now because it

23   just makes more sense.  Why -- what is the -- what are you

24   hiding?

25             MS. CAI:  Sorry, Your Honor.  We're not hiding it.

1    It was -- we did not think it was appropriate to introduce new

2    evidence when the TRO has already been fully briefed.  You

3    know, because Your Honor raised those questions that we

4    honestly did not anticipate because we thought the law was

5    clear on its face in the Koons TRO, we were going to try to

6    revisit that on the PI stage, which is happening very soon.

7    And so we are not necessarily asking for the Court, like, at

8    this time to vacate its TRO.

9            THE COURT:  I know.  All I'm going to say is if you

10   think I got it wrong, I'd rather know I got it wrong sooner

11   than later.  And it's just unfortunate that I keep hearing from

12   you, Ms. Cai, and I don't -- you know, I'm trying to be as fair

13   as I can.  I keep hearing that the State has this evidence, it

14   has this evidence, and I keep asking well, where is it?  Why

15   are you hiding it?  That's the Court -- I think it's a fair

16   question.

17           MS. CAI:  Your Honor, the core evidence is the 1771

18   New Jersey statute, and we think that statute is clear on its

19   face that the prohibition was as to trespassing, just carrying

20   guns on someone else's property without prior written consent,

21   which is even stricter than what we have.

22           THE COURT:  I will look at it again.

23           MS. CAI:  Yes, Your Honor.  But to the extent that

24   Your Honor has questions and thinks that that is ambiguous, we

25   would like to introduce additional evidence to show that it is

```
 1   not.  And I will point out also that, of course, the 1865

 2   Louisiana statute doesn't say anything about hunting, and, you

 3   know, that's another example, but there are other ones as well

 4   that we can point the Court to if it wishes.

 5          So we thought that a founding-era statute and a

 6   reconstruction-era statute, especially when one of them was

 7   this state, is more than sufficient to demonstrate a historical

 8   analog.

 9          To the extent that Your Honor is skeptical, we are

10   happy to provide more context for that.

11          THE COURT:  I really do hope to be able to avoid the

12   issue of what governs the reconstruction era or the colonial

13   era.  But that's for another day.  That's for the PI stage

14   obviously, yeah.

15          MS. CAI:  I would love to go through some of the

16   other provisions.  But if you want Mr. Schmutter to respond,

17   I'm happy to do that as well.

18          THE COURT:  Well, I do have a couple of other

19   questions, but let's -- since we're doing it in this order.

20   Thank you, Ms. Cai.  Let me hear you on the private property

21   and anything that you want to respond to.

22          MR. SCHMUTTER:  Yes, Judge.  I'll go in reverse order

23   if that's okay.

24          THE COURT:  Okay.  I'm going to give you folks about

25   ten more minutes.
```

1          MR. SCHMUTTER:  Counsel just said that, referring to

2    the New Jersey statute from 1771, we fully briefed it.  It's a

3    single outlier.  Obviously can't satisfy *Bruen*.  But

4    interestingly, counsel said why would they have -- if it was

5    just about poaching, why would they have enacted section 1 that

6    talks about possession?

7          New Jersey does that all the time.  That is a

8    standard thing that New Jersey does.  It prohibits conduct but

9    also prohibits the conditions that might give rise to that

10   conduct.

11         So one of the best examples is one of the fish and

12   game regs that we're challenging.  You can't possess an uncased

13   firearm in a vehicle if you're out hunting.  That's not

14   because -- that's not because there's anything really

15   inappropriate for having an uncased firearm in a vehicle.  It's

16   they don't want people shooting animals from cars, right?

17   Because in some states you can do that.  In some states it's

18   perfectly legal to hunt from a vehicle.

19         New Jersey doesn't want people to do that, so New

20   Jersey prohibits hunting from a vehicle and then goes the next

21   step to prohibit possession of uncased firearms in the vehicle.

22   That's about hunting from a vehicle.  That's not about any

23   reason why a person should not have an uncased firearm in a

24   vehicle on hunting lands.

25         Now, the effect of that is it prevents the right to

 1   bear arms.  It prevents carry.  But New Jersey is loaded with

 2   that kind of regulatory approach.  They do that constantly.  So

 3   it shouldn't shock me that they tried to do it in 1771.  But

 4   it's incredibly obvious, as the Court already found, that's not

 5   about self-defense.  That's not about somebody walking around

 6   with a pistol or a knife to protect themselves against a

 7   violent attack.  It's about poaching.  It's completely obvious.

 8          Let me deal with the other aspect of private

 9   property, which is that, interestingly, they walked right into

10   the equal protection claim.  Because as the Court commented,

11   you can't just have special rules for people exercising a

12   constitutional right.  You can't.  And it's in our reply brief,

13   and it's an incredibly obvious example.  You could not possibly

14   have a rule that said if you are gay or Black, you have to get

15   explicit permission before you can walk onto private property.

16   You just can't do that.  I don't think anybody would think you

17   can.  It's literally the same.

18          Firearms owners are exercising their constitutional

19   right to bear arms, and it is no different than any other

20   constitutional right.  You can't have special rules.

21          THE COURT:  You would not quarrel with the -- this is

22   my question:  Would you quarrel with the State of New Jersey's

23   efforts to educate the public as to what their rights are?

24          MR. SCHMUTTER:  They did that, for the Eagles-Giants

25   game.  The Attorney General, I think it was on Twitter or maybe

1    on their website or both, the Attorney General said I want to

2    make sure nobody thinks that they can't put a sign up on their

3    bar saying no guns.  That's exactly what they did.  They can do

4    that.

5                THE COURT:  And would you -- if the State ran a

6    public campaign advising its citizens as to what the law

7    provides, would you be coming into court saying that violates

8    your Second Amendment?

9                MR. SCHMUTTER:  If they did specifically what?

10               THE COURT:  Fair question.

11               If the State ran a campaign that said:  Citizens of

12   this state, you should know that you have a right to post a

13   sign that says no guns allowed.  Would you say that violates

14   the Second Amendment?

15               MR. SCHMUTTER:  I'm actually not sure.  I mean, I

16   don't know that -- I don't know that we have to resolve that

17   for this hearing.

18               THE COURT:  It's a hypothetical.

19               MR. SCHMUTTER:  Yeah.  It's actually a really good

20   question.

21               I don't know -- I don't know what the government can

22   and can't say to encourage people to discourage the exercise of

23   a constitutional right.

24               THE COURT:  Well, perhaps therein lies the nuance.

25   Is it encouraging or educating?  We'll leave it at that.

```
 1              MR. SCHMUTTER:  Thank you, Judge.  I -- yeah.

 2              THE COURT:  Fair enough.  Okay.  What else?

 3              MR. SCHMUTTER:  On the government as proprietor, they

 4    get the government/proprietor concept completely wrong.  So,

 5    number one, the government as proprietor cases don't say that

 6    when the government is acting as a proprietor, they get to do

 7    all the same things private parties can do.  They can't.  And

 8    we see this in the First Amendment context.  The government as

 9    proprietor concept in the First Amendment context is entirely

10    based on a form analysis.  You cannot -- the government cannot

11    discriminate on the basis of content of speech even as a

12    proprietor.  So the government cannot prohibit constitutionally

13    protected activity merely because they're a proprietor.  So --

14              THE COURT:  What about the Commerce Clause argument?

15              MR. SCHMUTTER:  Well, I'm not sure what cases they're

16    referring to.  I'd like to read the cases as well, as I know

17    the Court would.  So, of course, for the PI stage we'll be

18    happy to respond to that.

19              THE COURT:  Yeah.

20              MR. SCHMUTTER:  But it's definitely not the case that

21    the government gets to do all the same things a private party

22    can do merely because they're operating some sort of business

23    like a, you know, a concert venue or whatever.

24              THE COURT:  Well, I think their argument is that if

25    it's passing muster under the Commerce Clause cases, of which
```

```
1   it hasn't been briefed, then it falls within that exception, if

2   you will.  But, okay.  So --

3           MR. SCHMUTTER:  But Your Honor's correct, though.

4   That's all pre-Bruen.  Bruen makes very clear rules.  And this

5   is one of the very important reasons why that's true.

6           Even when the government is acting as a so-called

7   "proprietor," the government still has the ability to implement

8   government policy in those contexts.  So the government -- if

9   the government were simply operating a business like another

10  business owner, they might be able to argue, well, you know,

11  they're no different than TGI Friday's, but that's not true.

12  Governments routinely implement government policy when they

13  operate so-called proprietary activities.

14          A state-run hospital, you can be sure that the

15  operation of a state-run hospital implements government policy,

16  political policy.  All government operations do that.  And

17  whether or not they actually do that in a given context, the

18  fact that the government has the power to do that and the

19  ability to do that means they are constrained by Bruen even as

20  a proprietor.  That's a very important concept there.  And

21  that's why Bruen governs even the government operating, let's

22  say, a post office or a government hospital or a PNC Bank Arts

23  Center.  They cannot have the right to implement an antigun

24  policy even in those venues because of Bruen, and Bruen

25  prohibits that.
```

```
 1            THE COURT:  All right.  It will be an issue that I
 2   certainly will need further briefing on.
 3            MR. SCHMUTTER:  Thank you, Judge.
 4            THE COURT:  Okay.  All right.  Thank you all.  I
 5   thank you both.  Thank you all.  Yes.
 6            MS. CAI:  You wanted to talk about the schedule, Your
 7   Honor.
 8            THE COURT:  I do.  So I will reserve.  I hope to get
 9   a decision as expeditiously as possible.
10            I do want to talk about the schedule.  I don't have
11   any specific dates in mind.  I'm going to give the parties some
12   guidance.
13            I did get the schedule that the State was proposing.
14   In fairness, Mr. --
15            MR. SCHMUTTER:  Jensen.
16            THE COURT:  Is not here.
17            MR. SCHMUTTER:  Right.
18            THE COURT:  And so I want all of you, including
19   Mr. Jensen, to have a conversation about the dates.  I think
20   the dates that are proposed by the State present the
21   problems -- yes.
22            MR. SCHMUTTER:  I'm sorry.  I just wanted to ask, did
23   Your Honor get our letter?
24            THE COURT:  Yes.
25            MR. SCHMUTTER:  Oh, okay.  Because Your Honor didn't
```

 1   mention that.

 2           THE COURT:  I was just going to say, present the

 3   problems that Mr. Schmutter raises, which is that if I adopt

 4   the schedule that's being proposed, it's going to be -- there's

 5   going to be a revolving door through the court.  I don't want

 6   that.

 7           I want to just resolve all of the issues as

 8   expeditiously as possible.  I think that Mr. Schmutter makes a

 9   good point, which is otherwise we're talking about appeals and

10   remands and appeals and remands.  And that's just -- that

11   doesn't serve any purpose.  It certainly doesn't serve -- well,

12   I'll leave it at that.

13           So I want a proposal that can resolve the litigation

14   all together.  It might be an ambitious one, but I think it's

15   the fairer one.  I think it serves the interest of both parties

16   and certainly the Court that this litigation get resolved in

17   one fell swoop.

18           So the schedule that the State has proposed, I think,

19   does not do that.  I do want you to speak with Mr. Jensen and

20   Mr. Schmutter, Ms. Cai, and come up with when the evidentiary

21   hearings will take place, et cetera, and propose it to me.

22           I know there's been a motion to intervene by the

23   state legislators, and I don't know exactly how that will

24   impact everything.  So I want you to go back sort of to the

25   well and figure that all out.  Yeah.

 1              MS. CAI:  So, Your Honor, I just want to make sure I

 2   understand correctly, so Your Honor wants a PI submission and

 3   hearing on all of the claims from Mr. Schmutter's clients even

 4   though they were not challenged in the TRO stage?

 5              THE COURT:  Yes.  I want everything resolved.  I know

 6   that's ambitious, but I think it serves no -- clearly there

 7   will be an appeal of this Court's decision.  And so it just

 8   doesn't serve while that appeal is pending that we're still

 9   working through other matters which will ultimately get

10   appealed.  I mean, it doesn't serve anyone's interest to have

11   this revolving door, it seems to me.  So I'd like the entire

12   litigation, to the extent practicable -- and it may not be;

13   you'll all tell me that -- to be resolved.  And then you folks

14   can take your controversy elsewhere.

15              MR. SCHMUTTER:  Thank you, Judge.

16              THE COURT:  Okay.  All right.  So I'll wait to hear.

17   I will try to get my ruling to you as expeditiously as

18   possible.

19              I am asking the parties to all get together,

20   including Mr. Jensen, and come up with a schedule that is in

21   line with the comments I've given you.  Yeah.  Any questions?

22              (No response.)

23              THE COURT:  No?  All right.  Good to see you all.

24   Thank you.

25              MR. SCHMUTTER:  Thank you, Judge.

1          THE COURTROOM DEPUTY:  All rise.

2          (Proceedings concluded at 11:27 a.m.)

3          _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

          **FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**

4          _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

5      I certify that the foregoing is a correct transcript

6  from the record of proceedings in the above-entitled matter.

7

8

9  /S/John J. Kurz, RDR-RMR-CRR-CRC          January 27, 2023

10 Court Reporter/Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RONALD KOONS, *et al.* )<br><br>            *Plaintiffs* )<br><br>    v. )<br><br>WILLIAM REYNOLDS, *et al.* )<br><br>            *Defendants* )<br><br>------------------------------------------ )<br>-- )<br><br>AARON SIEGEL, *et al.* )<br><br>            *Plaintiffs,* )<br><br>        v. )<br><br>MATTHEW PLATKIN, *et al.* )<br><br>            *Defendants.* | Civil Action No. 1:22-cv-07464-<br>RMB-AMD<br><br>**CIVIL ACTION**<br><br>**(ELECTRONICALLY FILED)**<br><br><br>**CONSOLIDATED ACTIONS** |

**SUPPLEMENTAL DECLARATION OF AARON SIEGEL IN FURTHER SUPPORT OF SIEGEL PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

1.      I, Aaron Siegel, am a plaintiff in the above-titled action.  I am over the age of 18, have personal knowledge of the facts and events referred to in this Declaration, and am competent to testify to the matters stated below.

2.      As I indicated in my previous declaration, as a nurse practitioner one of the places I work is Skylands Urgent Care in Lake Hopatcong, New Jersey. I

checked our practice handbook at Skylands Urgent Care, and I did not find any rule prohibiting the carry of handguns. I also asked my Practice Manager, and he told me that there is no prohibition on me carrying my handgun at Skylands Urgent Care. I would carry my handgun at Skylands Urgent Care, but I refrain from doing so because of Chapter 131 Section 7(a)(21), as I fear arrest and prosecution.

3.      On March 6, 2023, I have a dentist appointment. I have spoken with my dentist, and his office will allow me to carry my handgun when I am there. I would carry my handgun with me at my upcoming appointment, but I will refrain from doing so because of Chapter 131 Section 7(a)(21), as I fear arrest and prosecution.

4.      I have a chronic degenerative disc disease as well as spinal stenosis—both of which cause me considerable back pain on a regular basis. As a result, I regularly see an anesthesiologist/pain management specialist in New Jersey. I see him approximately every one to two month for various treatments. In a few weeks, I have an appointment to receive an epidural injection. Several weeks after my epidural I will need to see him again for a follow-up appointment. This is separate and apart from my regular visits for ongoing treatment. I asked his office if they have a policy against handgun carry, and they told me they do not.  I would carry my handgun with me at these appointments, but I will refrain from doing so because of Chapter 131 Section 7(a)(21), as I fear arrest and prosecution.

5.    On May 25, 2023, I will be taking my son to the Turtle Back Zoo in West Orange, New Jersey. I would carry my handgun with me when I do so, but I will refrain from doing so because of Chapter 131 Section 7(a)(9), as I fear arrest and prosecution.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States.

_____          2/7/2023_____
Aaron Siegel                                      Date

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| RONALD KOONS, *et al.* | ) | |
| | ) | Civil Action No. 1:22-cv-07464- |
| *Plaintiffs* | ) | RMB-AMD |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | |
| WILLIAM REYNOLDS, *et al.* | ) | **(ELECTRONICALLY FILED)** |
| | ) | |
| *Defendants* | ) | |
| | ) | |
| ----------------------------------------------- | ) | **CONSOLIDATED ACTIONS** |
| | ) | |
| AARON SIEGEL, *et al.* | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MATTHEW PLATKIN, *et al.* | ) | |
| | ) | |
| *Defendants*. | ) | |

**SUPPLEMENTAL DECLARATION OF JASON COOK IN FURTHER SUPPORT OF SIEGEL PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

1.     I, Jason Cook, am a plaintiff in the above-titled action.  I am over the age of 18, have personal knowledge of the facts and events referred to in this Declaration, and am competent to testify to the matters stated below.

2.     I have plans visit the Popcorn Zoo in Forked River, New Jersey on May 20, 2023 with my brother, his wife, and my nephew. I would carry my handgun with

me when I do so, but I will refrain from doing so because of Chapter 131 Section 7(a)(9), as I fear arrest and prosecution.

3.     On June 22, 2023, my sister and her boyfriend are flying to Florida. I will be driving them and dropping them off curbside at Newark Airport. I would carry my handgun with me when I do so, but I will refrain from doing so because of Chapter 131 Section 7(a)(20), as I fear arrest and prosecution.

4.     As I indicated in my previous declaration dated December 23, 2022, I like to visit movie sets on location.

5.     According to an article from February 3, 2023 on Patch.com, "Mean Girls The Musical" will be filming on location all over Middletown, New Jersey during the months of March and April 2023. According to the article, the production will have "Middletown transforming into the Chicago suburb of Evanston, Ill." See https://patch.com/new-jersey/middletown-nj/mean-girls-wanted-monmouth-county-film-extras-report (last visited February 4, 2023).

6.     I will be going to Middletown in March and/or April to find some of the locations during the filming so I can watch.

7.     I would carry my handgun at these filming locations, but I will refrain from doing so because of Chapter 131 Section 7(a)(23), as I fear arrest and prosecution.

JA901

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States.

_____Jason Cook_____          2/7/2023_____
Jason Cook                         Date

JA902

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RONALD KOONS, *et al.* | ) |
| *Plaintiffs* | ) Civil Action No. 1:22-cv-07464-RMB-<br>AMD |
| v. | ) |
| WILLIAM REYNOLDS, *et al.* | ) **CIVIL ACTION** |
| *Defendants* | ) **(ELECTRONICALLY FILED)** |
| ----------------------------------------------<br>- | ) **CONSOLIDATED ACTIONS** |
| AARON SIEGEL, *et al.* | ) |
| *Plaintiffs,* | ) |
| v. | ) |
| MATTHEW PLATKIN, *et al.* | ) |
| *Defendants.* | ) |

**SUPPLEMENTAL DECLARATION OF JOSEPH DELUCA IN FURTHER SUPPORT OF SIEGEL PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

1. I, Joseph DeLuca, am a plaintiff in the above-titled action. I am over the age of 18, have personal knowledge of the facts and events referred to in this Declaration, and am competent to testify to the matters stated below.

2. My wife and I will be visiting the Cape May Zoo over this upcoming Memorial Day weekend. I would carry my handgun with me when we do so, but I will refrain from doing so because of Chapter 131 Section 7(a)(9), as I fear arrest and prosecution.

3. My brother owns and operates a restaurant at South Jersey Regional Airport in Lumberton, New Jersey. I visit his restaurant approximately bi-weekly. My brother would let me carry my handgun at his restaurant, and I would do so. However, I refrain from carrying my handgun at his restaurant because of Chapter 131 Section 7(a)(20), as I fear arrest and prosecution.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States.

_____     2/7/2023

Joseph DeLuca                        Date

JA903

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| RONALD KOONS, *et al.* | ) | |
| | ) | Civil Action No. 1:22-cv-07464- |
| *Plaintiffs* | ) | RMB-AMD |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | |
| WILLIAM REYNOLDS, *et al.* | ) | **(ELECTRONICALLY FILED)** |
| | ) | |
| *Defendants* | ) | |
| | ) | |
| ----------------------------------------------- | ) | **CONSOLIDATED ACTIONS** |
| | ) | |
| AARON SIEGEL, *et al.* | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MATTHEW PLATKIN, *et al.* | ) | |
| | ) | |
| *Defendants.* | ) | |

**SUPPLMENTAL DECLARATION OF TIMOTHY VARGA IN FURTHER SUPPORT OF SIEGEL PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

1.      I, Timothy Varga, am a plaintiff in the above-titled action.  I am over the age of 18, have personal knowledge of the facts and events referred to in this Declaration, and I am competent to testify to the matters stated below.

2.      In my previous declaration dated December 23, 2022, I indicated that I had not yet received my permit to carry a handgun. However, since then I did receive

my permit, and the date of issue is December 13, 2022, prior to the filing of the Complaint in this action.

3. I am Northeast Regional Sales Executive for Ancra Cargo, Inc. I work remotely from my home in Wall Twp. I am on the company's Executive Committee.

4. Once per year, my employer schedules a national meeting of the Executive Committee. This year the meeting is in North Carolina from June 12-15. I am required to attend. I will be flying from Newark Airport, and I wish to bring my handgun with me in accordance with the requirements of federal law. I am licensed to carry my handgun in North Carolina. I would bring my handgun to Newark Airport to transport in my checked baggage on my flight to North Carolina in full compliance with federal law (49 C.F.R. § 1540.111); however, because of Chapter 131 Section 7(a)(20) I will refrain from doing so for fear of arrest and prosecution.

5. I have been seeing a chiropractor for treatment of my neck for many years. Over the next 6 to 12 months I will go approximately weekly or bi-weekly for such treatment. My chiropractor allows me to carry my handgun when I am there. I would carry my handgun at these appointments; however, because of Chapter 131 Section 7(a)(21) I will refrain from doing so for fear of arrest and prosecution.

JA905

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States.

Timothy Varga

2/7/2023
Date

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

RONALD KOONS, *et al.*                    )
                                          )
       *Plaintiffs*              )    Civil Action No. 1:22-cv-07464-
                                          )          RMB-AMD
                                          )
   v.                                   )
                                          )    <u>**CIVIL ACTION**</u>
WILLIAM REYNOLDS, et al.                  )
                                          )    **(ELECTRONICALLY FILED)**
       *Defendants*              )
                                          )
-------------------------------------------)
                                          )    **CONSOLIDATED ACTIONS**
AARON SIEGEL, *et al.*                    )
                                          )
       *Plaintiffs,*             )
                                          )
   v.                                   )
                                          )
MATTHEW PLATKIN, *et al.*                 )
                                          )
       *Defendants.*             )
                                          )
                                          )
                                          )
                                          )
                                          )
                                          )
                                          )

## DECLARATION OF RIA JAIRAM IN SUPPORT OF SIEGEL PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

    1.    I, Ria Jairam, am a member of Plaintiff Association of New Jersey Rifle

& Pistol Clubs, Inc.  I am over the age of 18, have personal knowledge of the facts

JA907

and events referred to in this Declaration, and am competent to testify to the matters stated below.

2.      I am what is often referred to as a monetized YouTuber. I make films and upload them to YouTube.com, where both subscribers to my channel and non-subscribers view my films. I have more than 13,000 subscribers to my YouTube.com channel. Every time a person views my films, I am paid money by YouTube.com.

3.      Most of my films involve educating my viewers on various aspects of amateur ("ham") and other radio communications. I frequently film in public locations.

4.      Linked below is one of my films, shot on location in Lincoln Park, New Jersey. The film depicts a test I conducted of a Retevis General Mobile Radio Service ("GMRS") radio. The film begins inside the home of a friend. I then walk outside on public streets to test the performance of the radio's antenna.

https://www.youtube.com/watch?v=ZUFkHx76Fqk

5.      Here is another one of my films. This one was filmed on Garrett Mountain at Rifle Camp Park in Passaic County, New Jersey showing various radio activities taking place.

https://www.youtube.com/watch?v=ToWg8FOG5ps

JA908

6.      I currently hold a New Jersey permit to carry a handgun. I would carry my handgun while making these films in public, but I refrain from doing so because of Chapter 131 Section 7(a)(23), as I fear arrest and prosecution.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States.

_____
Ria Jairam

2/7/2023
_____
Date

JA909

DAVID JENSEN PLLC
David D. Jensen (ID No. 032002003)
33 Henry Street
Beacon, New York 12508
Tel: 212.380.6615
david@djensenpllc.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| RONALD KOONS; NICHOLAS GAUDIO; JEFFREY M. MULLER; GIL TAL; SECOND AMENDMENT FOUNDATION; FIREARMS POLICY COALITION, INC.; COALITION OF NEW JERSEY FIREARM OWNERS; and NEW JERSEY SECOND AMENDMENT SOCIETY, | : : : : : : : : | Civil No. 22-7464 (RMB/EAP) |
| Plaintiffs, | : : | **AMENDED** **COMPLAINT** |
| v. | : : : | |
| MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey; and PATRICK CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police, | : : : : : : | |
| Defendants. | : : | |

**LOCAL CIVIL RULE 10.1 STATEMENT**

The street and post office address of each named party is:

Ronald Koons
300 Barr Ave.
Linwood, New Jersey 08221

Nicholas Gaudio
13 Hillcroft Lane
Cherry Hill, New Jersey 08034

Jeffrey M. Muller
P.O. Box 14
Branchville, New Jersey 07826

Gil Tal
30 Willow Lake Drive
Colts Neck, New Jersey 07722

Second Amendment Foundation
12500 NE 10th Place
Bellevue, Washington 98005

Firearms Policy Coalition, Inc.
5500 Painted Mirage Road, Suite 320
Las Vegas, Nevada 89149

Coalition of New Jersey Firearm Owners
P.O. Box 768
Sewell, New Jersey 08080

New Jersey Second Amendment Society
P.O. Box 96
Highstown, New Jersey 08520

Matthew Platkin
Office of the Attorney General of New Jersey
25 Market Street
Trenton, New Jersey 08611

Patrick Callahan
New Jersey State Police
P.O. Box 7068
West Trenton, New Jersey 08628

COME NOW Plaintiffs RONALD KOONS; NICHOLAS GAUDIO; JEFFREY M.

MULLER; GIL TAL; SECOND AMENDMENT FOUNDATION; FIREARMS POLICY

COALITION, INC.; COALITION OF NEW JERSEY FIREARM OWNERS; and NEW

JERSEY SECOND AMENDMENT SOCIETY, by and through their undersigned attorney, and

complain as follows:

1.      This 42 U.S.C. § 1983 action challenges newly enacted New Jersey laws

(A4769/S3214, Chapter 131 of the 2022 Laws) that, effective immediately, largely and

effectively prohibit private citizens from carrying handguns in public—notwithstanding that they

have met the background, training and qualification requirements needed to obtain a permit to

carry a handgun in New Jersey. Section 7(a) of these new laws create a lengthy list of "sensitive

places," where it is now a crime (felony) of the third degree to carry a handgun, even with a New

-2-

Jersey permit to carry a handgun. Furthermore, section 7(b) of the new laws make it a crime of the fourth degree to carry an operable handgun "while in a vehicle."

2.      These new "sensitive place" and vehicle transport restrictions are so far reaching and punitive that they effectively obliterate the ability to bear arms in public for the purpose of protecting one's self and family—which the Supreme Court has ruled to be the "core" of the Second Amendment's protections. As a practical matter, a person with a "permit to carry" now has the ability to "carry" an unloaded handgun inside a case while in their vehicle, and to then load that gun and carry it while they walk on the sidewalk or upon their own property. If this person ventures onto any place that is a "sensitive place"—and that is most public property and all private property without the owner's express consent—they commit a felony crime. Forced to issue permits to carry handguns to qualified adults without regard to their perceived "need" for self-defense, the State has taken the approach, too clever by half, of declaring most of the State to be off limits to carry by private citizens.

**VENUE AND JURISDICTION**

3.      The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343.

4.      The Court has personal jurisdiction over the Defendants because each acted, acts and threatens to act under the color of the laws of the State of New Jersey and each did so, does so and threatens to do so within the geographic confines of the State and District of New Jersey.

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1)-(2).

**PARTIES**

6.      Plaintiff RONALD KOONS is a natural person residing in the City of Linwood in Atlantic County, New Jersey.

JA912

7.     Plaintiff NICHOLAS GAUDIO is a natural person residing in the Township of Cherry Hill in Camden County, New Jersey.

8.     Plaintiff JEFFREY M. MULLER is a natural person residing in the Township of Frankford in Sussex County, New Jersey.

9.     Plaintiff GIL TAL is a natural person residing in Township of Colts Neck in Monmouth County, New Jersey.

10.    Plaintiff SECOND AMENDMENT FOUNDATION ("SAF") is a nonprofit corporation organized under the laws of the State of Washington, with its principle office in the City of Bellevue in King County, Washington.

11.    Plaintiff FIREARMS POLICY COALITION, INC. ("FPC") is an exempt (i.e. nonprofit) corporation organized under the laws of the State of Delaware, with its principle office in the City of Las Vegas in Clark County, Nevada.

12.    Plaintiff COALITION OF NEW JERSEY FIREARM OWNERS ("CNJFO") is a not-for-profit corporation organized under New Jersey law with its principle office in the Township of Sewell in Gloucester County, New Jersey.

13.    Plaintiff NEW JERSEY SECOND AMENDMENT SOCIETY ("NJ2AS") is a not-for-profit corporation organized under New Jersey law with its principle office in Mercer County, New Jersey.

14.    Defendant MATTHEW PLATKIN is the Attorney General of New Jersey, and he is named in his official capacity as such. As Attorney General, Defendant is the "chief law enforcement officer of th[e] State" of New Jersey, tasked with the "general supervision of criminal justice." N.J.S.A. § 52:17B-98. Among other things, Defendant is the head of the Department of Law and Public Safety, and as such, he is responsible to "[c]o-ordinate the

-4-

inspectional and law enforcement activities of the department." N.J.S.A. § 52:17B-27(a).

Defendant's principle office is in the City of Trenton in Mercer County, New Jersey.

15.     Defendant PATRICK CALLAHAN is the Superintendent of the New Jersey State

Police, and he is named in his official capacity as such. The Division of State Police is

responsible for enforcing the criminal laws of the State of New Jersey, including the statute

challenged here. As State Police Superintendent, Defendant is "[t]he executive and

administrative head of the Division of State Police." N.J.S.A. § 52:17B-7. Defendant's principle

office is in the Township of Ewing in Mercer County, New Jersey. 52:17B-7

## PERTINENT CONSTITUTIONAL PROVISIONS

16.     The Second Amendment to the United States Constitution provides:

> A well-regulated Militia being necessary to the security of a free State, the
> right of the people to keep and bear Arms shall not be infringed.

17.     The Second Amendment "guarantee[s] the individual right to possess and carry

weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008).

18.     The Fourteenth Amendment to the United States Constitution provides in

pertinent part:

> No state shall make or enforce any law which shall abridge the privileges
> or immunities of citizens of the United States; nor shall any state deprive
> any person of life, liberty, or property, without due process of law; nor
> deny to any person within its jurisdiction the equal protection of the laws.

19.     The Second Amendment "is fully applicable to the States." *McDonald v. City of

Chicago*, 561 U.S. 742, 750 (2010); *see also id.* at 805 (Thomas, J., concurring).

20.     The "core lawful purpose" of the right to keep and bear arms is "self-defense."

*Heller*, 554 U.S. at 571, 630; *accord McDonald*, 561 U.S. at 767-68.

JA914

21.     The Supreme Court has explicitly "h[e]ld . . . that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. ___, 142 S. Ct. 2111, 2122 (2022).

22.     More specifically, the issue in *Bruen* was a New York requirement to provide "proper cause" in order to obtain "an unrestricted license" to carry a handgun. *Bruen*, 142 S. Ct. at 2123. Without "proper cause," a person could "receive only a 'restricted' license for public carry, which allows him to carry a firearm for a limited purpose, such as hunting, target shooting, or employment." *Id.* (citations omitted). It was this "restricted" license—which allowed carry only at certain times and places—that the Supreme Court found unconstitutional.

23.     In *Bruen*, the Supreme Court ruled that the Second Amendment "presumptively guarantees . . . a right to 'bear' arms in public for self-defense." *Bruen*, 142 S. Ct. at 2135. As such, restrictions on the right to bear arms in public are presumptively unconstitutional, unless "the government [can] demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126.

24.     While restrictions on carrying firearms in "sensitive places" such as "legislative assemblies, polling places, and courthouses" may be justifiable by reference to historical tradition, the Supreme Court has expressly cautioned against reading this "sensitive places" exception "too broadly." *See Bruen*, 142 S. Ct. at 2134. The "sensitive places" exception does not authorize restrictions that "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." *Id.* at 2134.

**PERTINENT STATUTES AND REGULATIONS**

Background and Overview

25.     In New Jersey, it is illegal to carry a handgun for the purpose of self-defense "without first having obtained a permit to carry[.]" N.J.S.A. § 2C:39-5(b)(1). A person who does

JA915

so commits a crime (i.e. felony) of the second degree, for which the presumptive sentence of imprisonment is seven years. *See id.*; *see also id.* at § 2C:44-1(f)(1)(c). New Jersey law allows some people to carry handguns without obtaining permit to carry, including various law enforcement officers and personnel in prosecutors' office, members of the military acting in the course of duties, and qualified retired law enforcement officers. *See id.* § 2C:39-6(a), (b), (c), (*l*) (the "Exempt Persons").

26.     For many years, New Jersey law has required people to meet a number of requirements in order to obtain permits to carry handguns. Anyone who has a permit at the time of this Complaint has already passed a background investigation and met a number of requirements related to their age, criminal background and mental health, and have also demonstrated that they are "thoroughly familiar with the safe handling and use of handguns." N.J.S.A. § 2C:58-4(c) (2022); 2022 N.J. Laws c. 131, § 3; *see also* N.J.S.A. § 2C:58-3(c). New Jersey State Police regulations required them to obtain training, in both the use of firearms and in use of force laws, and to pass the same basic qualification requirements that apply to Exempt Persons. *See* N.J.A.C. § 13:54-2.4(b); *see also* N.J.S.A. § 2C:39-6(j); 2022 N.J. Laws c. 131, § 3 (new subpart (g) directing State Police to adopt training and qualification requirements).

27.     Until recently, New Jersey law required individuals seeking permits to carry handguns to show that they had "a justifiable need to carry a handgun," defined as "the urgent necessity for self-protection, as evidenced by specific threats or previous attacks which demonstrate a special danger to the applicant's life that cannot be avoided by means other than by issuance of a permit to carry a handgun." *See* N.J.S.A. § 2C:58-4(c) (2022). Following *Bruen*, the New Jersey Attorney General issued a directive against enforcement of the "justifiable need" requirement. *See* N.J. Attorney General Law Enforcement Directive No. 2022-07, *available at*

https://www.nj.gov/oag/dcj/agguide/directives/ag-Directive-2022-07_Directive-Clarifying-Requirements-For-Carrying-Of-Firearms-In-Public.pdf.

Enactment of A4769/S3214

28.     On December 22, 2022, New Jersey Governor Phil Murphy approved new legislation (A4769/S3214) that amends various aspects of New Jersey's gun laws, including the requirements for obtaining a permit and the places in which a person with a permit can carry a handgun. *See* 2022 N.J. Laws c. 131, §§ 3, 7. As justification, the legislation states that "with the precedent established in *Bruen*, laws requiring showings of particularized need are no longer legally viable to determine whether a person may carry a handgun in public." *Id.* § 1(b). The previous "justifiable need" standard had, according to the legislature, "minimized the serious dangers of misuse and accidental use inherent in the carrying of handguns in a public place," and the new "sensitive place" restrictions were now necessary because "a much greater number of individuals will now qualify to carry handguns in public." *Id.* § 1(c). Otherwise stated, the legislature's objective was to continue minimizing the carry of handguns as much as possible.

29.     Section 7(a) of the new legislation defines a "sensitive place" as any place that falls within one of 25 enumerated categories, as follows:

7. Places where the carrying of a firearm or destructive device is prohibited.

a. Except as otherwise provided in this section and in the case of a brief, incidental entry onto property, which shall be deemed a de minimis infraction within the contemplation of N.J.S.2C:2-11, it shall be a crime of the third degree for any person, other than a person lawfully carrying a firearm within the authorized scope of an exemption set forth in N.J.S.2C:39-6, to knowingly carry a firearm as defined in subsection f. of N.J.S.2C:39-1 . . . in any of the following places, including in or upon any part of the buildings, grounds, or parking area of:

(1) a place owned, leased, or under the control of State, county or municipal government used for the purpose of government administration, including but not limited to police stations;

(2) a courthouse, courtroom, or any other premises used to conduct judicial or court administrative proceedings or functions;

(3) a State, county, or municipal correctional or juvenile justice facility, jail and any other place maintained by or for a governmental entity for the detention of criminal suspects or offenders;

(4) a State-contracted half-way house;

(5) a location being used as a polling place during the conduct of an election and places used for the storage or tabulation of ballots;

(6) within 100 feet of a place where a public gathering, demonstration or event is held for which a government permit is required, during the conduct of such gathering, demonstration or event;

(7) a school, college, university or other educational institution, and on any school bus;

(8) a child care facility, including a day care center;

(9) a nursery school, pre-school, zoo, or summer camp;

(10) a park, beach, recreation facility or area or playground owned or controlled by a State, county or local government unit, or any part of such a place, which is designated as a gun free zone by the governing authority based on considerations of public safety;

(11) youth sports events, as defined in N.J.S.5:17-1, during and immediately preceding and following the conduct of the event, except that this provision shall not apply to participants of a youth sports event which is a firearm shooting competition to which paragraph (3) of subsection b. of section 14 of P.L.1979, c.179 (C.2C:58-6.1) applies;

(12) a publicly owned or leased library or museum;

(13) a shelter for the homeless, emergency shelter for the homeless, basic center shelter program, shelter for homeless or runaway youth, children's shelter, child care shelter, shelter for victims of domestic violence, or any shelter licensed by or under the control of the Juvenile Justice Commission or the Department of Children and Families;

(14) a community residence for persons with developmental disabilities, head injuries, or terminal illnesses, or any other residential setting licensed by the Department of Human Services or Department of Health;

(15) a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises;

JA918

(16) a Class 5 Cannabis retailer or medical cannabis dispensary, including any consumption areas licensed or permitted by the Cannabis Regulatory Commission established pursuant to section 31 of P.L.2019, c.153 (C.24:6I-24);

(17) a privately or publicly owned and operated entertainment facility within this State, including but not limited to a theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held;

(18) a casino and related facilities, including but not limited to appurtenant hotels, retail premises, restaurant and bar facilities, and entertainment and recreational venues located within the casino property;

(19) a plant or operation that produces, converts, distributes or stores energy or converts one form of energy to another;

(20) an airport or public transportation hub;

(21) a health care facility, including but not limited to a general hospital, special hospital, psychiatric hospital, public health center, diagnostic center, treatment center, rehabilitation center, extended care facility, skilled nursing home, nursing home, intermediate care facility, tuberculosis hospital, chronic disease hospital, maternity hospital, outpatient clinic, dispensary, assisted living center, home health care agency, residential treatment facility, residential health care facility, medical office, or ambulatory care facility;

(22) a facility licensed or regulated by the Department of Human Services, Department of Children and Families, or Department of Health, other than a health care facility, that provides addiction or mental health treatment or support services;

(23) a public location being used for making motion picture or television images for theatrical, commercial or educational purposes, during the time such location is being used for that purpose;

(24) private property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit under N.J.S.2C:58-4, provided that nothing in this paragraph shall be construed to affect the authority to keep or carry a firearm established under subsection e. of N.J.S.2C:39-6; and

(25) any other place in which the carrying of a firearm is prohibited by statute or rule or regulation promulgated by a federal or State agency.

30.     A person who carries a handgun in one of these new "sensitive places" commits a

crime (i.e. felony) of the third degree, for which the maximum sentence is five years'

imprisonment, and the presumptive sentence is imprisonment for four years. *See* 2022 N.J. Laws

JA919

c. 131, § 7(a); N.J.S.A. §§ 2C:43-6(a)(3), 2C:44-1(f)(1)(d). The "sensitive places" restriction

does not apply to the Exempt Persons (e.g. law enforcement officers, members of the military

and certain personnel in prosecutors' offices. *See* 2022 N.J. Laws c. 131, § 7(a). The "sensitive

places" restriction also does not apply to armored car guards and private security guards with

written authorization. *See id.* § 7(e)-(f).

31.     The "sensitive places" law provides an exception for locked up guns in parking

lots. *See id.* § 7(c). A person with a permit can drive into a parking lot of a "sensitive place" with

an unloaded handgun inside a case, and they can then store the handgun "within a locked lock

box and out of plain view within the vehicle." *See id.* § 7(c)(1)-(2). Alternatively, they can

"immediately leave[]" the parking lot with the handgun provided, they do not "enter[ing] into or

on the grounds of the prohibited place with the handgun." *See id.* § 7(c)(4). Finally, a person can

"transport a concealed handgun in the immediate area surrounding their vehicle . . . only for the

limited of storing or retrieving the handgun" within these parameters. *See id.* § 7(c)(3).

32.     The "sensitive places" law also provides that a person with a permit does not

violate the "sensitive places" law while "traveling along a public right-of-way that touches or

crosses" a "sensitive place." *See id.* § 7(d).

33.     In addition, Section 7(b) now prohibits people with permits to carry from carrying

handguns while they are "in a vehicle in New Jersey," instead requiring them to unload their

guns and place them in a locked container or a trunk:

> b. (1) A person, other than a person lawfully carrying a firearm within the authorized
> scope of an exemption set forth in subsection a., c., or l. of N.J.S.2C:39-6, who is
> otherwise authorized under the law to carry or transport a firearm shall not do so while in
> a vehicle in New Jersey, unless the handgun is unloaded and contained in a closed and
> securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle. . . .

34.     A person who carries an operable handgun in a vehicle in violation of this section

commits a crime (i.e. felony) of the fourth degree, for which the maximum sentence is 18

JA920

months' imprisonment and the presumptive sentence is nine months. *See* 2022 N.J. Laws c. 131, § 7(b); N.J.S.A. §§ 2C:43-6(a)(4), 2C:44-1(f)(1)(e). Again, this prohibition does not apply to Exempt Persons, nor to armored car guards or private security guards. *See* 2022 N.J. Laws c. 131, § 7(b), (e)-(f).

35.     Prior to A4769/S3214, New Jersey law prohibited individuals with permits to carry from carrying handguns in relatively few locations. The only statutory prohibition pertained to schools and other educational facilities, where it was a third degree crime to "possess[] any weapon . . . without the written authorization of the governing officer . . . , irrespective of whether he possesses a valid permit to carry the firearm or a valid firearms purchaser identification card." *See* N.J.S.A. § 2C:39-5(e)(1).

36.     Furthermore, New Jersey law has long required all people to transport guns "unloaded and contained in a closed and fastened case, gunbox, securely tied package, or locked in the trunk of the automobile in which it is being transported"—but provided exceptions for Exempt Persons and, until A4769/S3214, for those with permits to carry handguns. *See* N.J.S.A. § 2C:39-5(g). Now, in the context of the everyday activity of using a car, train or other "vehicle," a New Jersey "permit to carry" provides basically no benefit.

The "Sensitive Place" and Vehicle Restrictions Challenged Here

37.     Plaintiffs challenge the restrictions contained in subparts 10, 12, 15, 17, 20, 21 and 24 of section 7(a), as well as section 7(b)(1)'s prohibition on carrying handguns while in vehicles. Plaintiffs' challenge to subpart 10 does not include the restriction on carrying in "playgrounds," and Plaintiffs' challenge to subpart 20 does not concern any secured area in an airport (i.e. an area subject to security screening). In confining the present challenge to these particular provisions, Plaintiffs do not intend to signal that the remaining restrictions are constitutional or otherwise permissible. Rather, Plaintiffs consider the "sensitive place"

-12-

designations they have identified to be plainly unconstitutional, while also causing some of the greatest infringements of the right to bear arms.

38.     The specific "sensitive places" that Plaintiffs challenge are:

(10) a park, beach, recreation facility or area or playground owned or controlled by a State, county or local government unit, or any part of such a place, which is designated as a gun free zone by the governing authority based on considerations of public safety;

(12) a publicly owned or leased library or museum; . . .

(15) a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises; . . .

(17) a privately or publicly owned and operated entertainment facility within this State, including but not limited to a theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held; . . .

(20) an airport or public transportation hub;

(21) a health care facility, including but not limited to a general hospital, special hospital, psychiatric hospital, public health center, diagnostic center, treatment center, rehabilitation center, extended care facility, skilled nursing home, nursing home, intermediate care facility, tuberculosis hospital, chronic disease hospital, maternity hospital, outpatient clinic, dispensary, assisted living center, home health care agency, residential treatment facility, residential health care facility, medical office, or ambulatory care facility; . . . [and]

(24) private property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit under N.J.S.2C:58-4, provided that nothing in this paragraph shall be construed to affect the authority to keep or carry a firearm established under subsection e. of N.J.S.2C:39-6[.]

39.     The prohibition on carrying functional handguns in vehicles provides:

b. (1) A person, other than a person lawfully carrying a firearm within the authorized scope of an exemption set forth in subsection a., c., or l. of N.J.S.2C:39-6, who is otherwise authorized under the law to carry or transport a firearm shall not do so while in a vehicle in New Jersey, unless the handgun is unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle. . . .

## DEFENDANTS' ACTUAL AND THREATENED ENFORCEMENT OF
## THE CHALLENGED LAWS AND ITS INJURY TO THE PLAINTIFFS

Plaintiff Ronald Koons

40.     Plaintiff Ronald Koons is 61 year old married man who served in the Navy and

worked for many years at the Federal Aviation Administration. Plaintiff Koons and his wife

raised five children and currently have eight grandchildren.

41.     Several years ago, after retiring from the FAA, Plaintiff Koons became a pastor at

a local church. After concerns developed about the possibility of a criminal or terrorist attack at

the church, Plaintiff Koons began carrying a concealed handgun during various church activities.

42.     After the Supreme Court decided *Bruen*, Plaintiff Koons applied for and obtained

a permit to carry pursuant to N.J.S.A. § 2C:58-4. Plaintiff Koons obtained his permit on October

6, 2022, and he then began carrying a handgun on essentially a daily basis.

43.     Among other places, Plaintiff Koons often carried a handgun when he was

shopping at grocery stores and other retail outlets, stopping for gas, visiting with people,

attending to business around the church and eating in restaurants. Plaintiff Koons visited with

people in their homes, as well as in places such as the hospital in Atlantic City, and when he did

so he often carried his handgun with him. On days that Plaintiff Koons carried a handgun, he

generally carried it with him throughout the day, unless he was going to a place that prohibited

guns, such as a school. Plaintiff Koons carried his gun while he traveled in car.

44.     Now that Section 7 of A4769/S4132 has become effective, Plaintiff Koons largely

refrains from carrying a gun outside his home. He intends to continue carrying a handgun while

at the church, but he will transport the gun there unloaded and enclosed in a case, as he did

before he had a permit to carry. Otherwise, there is almost no place, other than on the sidewalk

or the property around his home, where he can now carry a gun lawfully, and the consequences

JA923

of violating the "sensitive place" or vehicle restrictions are overwhelming. As such, Plaintiff Koons no longer carries a handgun outside his home. Among other things, he does not carry handguns to the public places he carried them previously.

45.     However, if the provisions challenged in this lawsuit were no longer in effect, then Plaintiff Koons would be much more likely to again carry a handgun while in public.

Plaintiff Nicholas Gaudio

46.     Plaintiff Nicholas Gaudio is 42 year old widowed man who is a single parent of two children. Plaintiff Gaudio is an engineer, and he has a Top Secret security clearance.

47.     Plaintiff Gaudio became interested in obtaining a permit to carry in 2010, after he had recently returned to New Jersey after living in Virginia. After learning that the denial of his application was all but certain, he chose not to pursue it. However, after the Supreme Court decided *Bruen*, Plaintiff Gaudio applied for and obtained a permit to carry pursuant to N.J.S.A. § 2C:58-4. Plaintiff Gaudio obtained his permit on October 12, 2022, and he then began carrying a handgun throughout his everyday life in Cherry Hill.

48.     Among other places, Plaintiff Gaudio often carried a handgun when he was shopping at grocery stores and other retail outlets, stopping for gas, visiting with people, and otherwise attending to business. Plaintiff Gaudio carried a handgun while eating in restaurants, including restaurants that serve alcohol, and while visiting the library and attending the theater. Plaintiff Gaudio carried his handgun in parks and playgrounds throughout his neighborhood. Plaintiff Gaudio carried his handgun when he went to the doctor, as well as when he took his daughter to the hospital emergency room. On days that Plaintiff Gaudio carried a handgun, he generally carried it with him throughout the day, unless he was going to a place that prohibited guns, such as a school. Plaintiff Gaudio carried his gun while he traveled in car.

JA924

49.     Now that Section 7 of A4769/S4132 has become effective, Plaintiff Gaudio largely refrains from carrying a gun outside his home. While he would like to continue carrying his gun to the extent he can do so, there is almost no place away from his own property where he can do so, other than the street and the sidewalk. The consequences of violating the "sensitive place" or vehicle restrictions are overwhelming, particularly given that Plaintiff Gaudio has a security clearance and a family to provide for. As such, Plaintiff Gaudio no longer carries a handgun outside his home. Among other things, he does not carry handguns to the public places he carried them previously.

50.     However, if the provisions challenged in this lawsuit were no longer in effect, then Plaintiff Gaudio would be much more likely to again carry a handgun while in public.

Plaintiff Jeffrey M. Muller

51.     Plaintiff Jeffrey M. Muller is a 72 year old married man who obtained a permit to carry a handgun pursuant to N.J.S.A. § 2C:58-4 in June 2011. Plaintiff Muller has requalified for and renewed his permit every two years since then.

52.     Plaintiff Muller is one of the very few New Jersey citizens who was able to obtain a permit to a permit prior to *Bruen*. In January 2010, an out-of-state gang kidnapped Plaintiff Muller and took him to Missouri, where he was able to escape and summons help. Plaintiff Muller was thereafter a key witness in the kidnappers' prosecution. Notwithstanding this, Plaintiff Muller obtained a permit only after litigating a judge's denial of his application, which the New Jersey State Police had approved. One of Plaintiff Muller's attackers remains in prison in New Jersey, and another was released last month (in November 2022).

53.     After Plaintiff Muller obtained his permit to carry in June 2011, and he began carrying a handgun most of the time. The prosecution against Plaintiff Muller's attackers was

-16-

JA925

ongoing, and he was particularly concerned about protecting himself. In recent years, as time has

passed, Plaintiff Muller has carried a gun less than he did during the years following June 2011,

but until just now he has continued to carry a handgun on a regular basis.

54.     Among other places, Plaintiff Muller has often carried a handgun while shopping

at stores such as ShopRite, Lowe's and Tractor Supply Company, stopping at gas stations,

getting food at delis and restaurants, including restaurants that serve alcohol. Plaintiff Muller has

carried a handgun while attending appointments with his physician and dentist. Plaintiff Muller

has carried a handgun while walking in parks and while taking his grandchildren to playgrounds.

Plaintiff Muller has also carried a handgun while visiting libraries, as well as while attending

music shows at public entertainment venues. Finally, Plaintiff Muller has carried a handgun

while attending trade shows at casino facilities (i.e. in a conference room, not on the casino

floor). While he does not recall carrying a handgun while using public transit, or while visiting a

museum or a theater, Plaintiff Muller would want to be able to carry a handgun in any of these

places were he to be present there. As a general premise, when Plaintiff Muller carries a

handgun, he normally carries it with him throughout the day, unless he is going to a place that

prohibits guns, such as a school. Up until now, Plaintiff Mulller has normally carried his

handgun in a holster on his person while traveling in car.

55.     Now that Section 7 of A4769/S4132 has become effective, Plaintiff Muller

largely refrains from carrying a gun outside his home. While he would like to continue carrying

his gun to the extent he can do so, there is almost no place away from his own property where he

can do so, other than the street and the sidewalk, and the consequences of violating the "sensitive

place" or vehicle restrictions are overwhelming. As such, Plaintiff Muller does not carry

handguns to the public places he carried them previously.

JA926

56.     However, if the provisions challenged in this lawsuit were no longer in effect, then Plaintiff Muller would be much more likely to again carry a handgun while in public.

Plaintiff Gil Tal

57.     Plaintiff Gil Tal is a 45 year old married man who lives in Colts Neck, New Jersey and has two children. Plaintiff Tal is the part owner of a facility that provides men's health services in Parsippany, New Jersey. Plaintiff Tal is also a licensed pilot, and he owns a small plane that he normally stores in Englishtown, New Jersey.

58.     While Plaintiff Tal now lives in Monmouth County, for many years he lived in Staten Island, New York and commuted to the clinic's location. In 2010, Plaintiff Tal obtained an unrestricted "Business Carry" handgun license from the New York City Police Department, which allowed him to carry a handgun throughout the City and State of New York. Plaintiff Tal then began to carry a handgun as part of his daily routine. Among other things, he carried a handgun while getting food at delis and restaurants (including restaurants that serve alcohol), shopping at stores, attending medical appointments, going to parks, visiting libraries and attending public venues. Furthermore, Plaintiff Tal used public transportation frequently, and often carried a handgun when he doing so. However, Plaintiff Tal did not carry a handgun at the clinic, as he did not have the ability to lawfully carry a handgun in New Jersey.

59.     On December 16, 2022, authorities in Monmouth County, New Jersey issued Plaintiff Tal a permit to carry a handgun pursuant to N.J.S.A. § 2C:58-4. However, by the time Plaintiff Tal picked up the permit from the police department, Chapter 131 had become law, and like the other Plaintiffs, Plaintiff Tal accordingly refrained from carrying a gun outside his home.

60.     But for the "sensitive place" and vehicle carry restrictions in Chapter 131, Plaintiff Tal would resume carrying a handgun as part of his daily routine, largely similar to

when he lived in New York. Among other things, Plaintiff Tal would carry a handgun while shopping at stores, stopping at gas stations, using public transportation (including public transportation hubs), getting food at restaurants and delis, attending medical appointments, visiting parks and associated facilities, attending events at theaters and stadiums, visiting museums and libraries, and otherwise undertaking his day-to-day business. Furthermore, Plaintiff Tal would also carry a handgun while he was at the clinic. Finally, Plaintiff Tal would carry a handgun at airports in New Jersey where he operates his plane, including the Old Bridge Airport that he normally uses.

61.     If the provisions challenged in this lawsuit were no longer in effect, then Plaintiff Tal would be much more likely to again carry a handgun while in public.

Plaintiff Second Amendment Foundation

62.     Plaintiff Second Amendment Foundation ("SAF") is a nonprofit educational foundation incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF seeks to preserve the effectiveness of the Second Amendment through education, research, publishing, and legal action programs focused on the constitutionally protected right to possess firearms and firearm ammunition, and the consequences of gun control. SAF has over 700,000 members and supporters nationwide, including thousands of members in New Jersey.

63.     SAF brings this action on behalf of those members, including the named Plaintiffs herein. SAF's members are adversely and directly harmed by Defendants' enforcement of the laws challenged herein harms other members of SAF in the same basic manner that it harms the individual Plaintiffs in this action.

JA928

Plaintiff Firearms Policy Coalition

64.     Plaintiff Firearms Policy Coalition, Inc. ("FPC") is a non-profit organization incorporated under the laws of Delaware with a place of business in Clark County, Nevada. The purposes of FPC include defending and promoting Second Amendment rights, advancing individual liberty, and restoring freedom. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs.

65.     FPC has members in the State of New Jersey. FPC's members include individuals who are not prohibited under state or federal law from possessing, receiving, owning, or purchasing a firearm or ammunition. FPC's members are adversely and directly harmed by Defendants' enforcement and threatened enforcement of the laws challenged here in the same basic manner as the individual Plaintiffs here. The interests that FPC seeks to protect in this lawsuit are germane to the organization's purposes, and, therefore, FPC sues on behalf of its members, including the individual Plaintiffs herein. Plaintiff FPC has members who have been denied their right to carry by operation of Defendants' enforcement and threatened enforcement of the laws challenged herein. But for Defendants' enforcement of the laws challenged herein, FPC's non-prohibited members in New Jersey would carry a firearm outside the home for self-defense.

Plaintiff Coalition of New Jersey Firearm Owners

66.     Plaintiff Coalition of New Jersey Firearm Owners ("CNJFO") is a not-for-profit corporation organized under New Jersey law with its principle office in the Township of Sewell in Gloucester County, New Jersey. CNJFO's mission is to support the Second Amendment through education and awareness, particularly within the State of New Jersey. CNJFO advocates

JA929

for lawful, safe, and responsible firearms ownership in New Jersey, including by regularly reporting on the State's firearms laws.

67.     CNJFO has many members who reside in New Jersey, who hold permits to carry handguns, and who the challenged "sensitive place" and vehicle transport restrictions harm in the same basic manner as the individual Plaintiffs in this case. CNJFO participates in this action as a Plaintiff on behalf of its members.

Plaintiff New Jersey Second Amendment Society

68.     Plaintiff New Jersey Second Amendment Society ("NJ2AS") is a civil rights advocacy group dedicated to protection of the Second Amendment. NJ2AS has members across New Jersey who desire protect themselves and their constitutional rights.

69.     Many of these members have obtained permits to carry handguns, and the challenged "sensitive place" and vehicle transport restrictions harm these members in the same basic manner as they harm the individual Plaintiffs in this case. NJ2AS brings these claims on behalf of its members.

## CAUSE OF ACTION FOR DEPRIVATION OF CIVIL RIGHTS
## 42 U.S.C. § 1983

70.     Each and every Defendant, in their various capacities as County Prosecutors, the Attorney General and the State Police Superintendent, have the statutory duty to enforce the criminal laws of New Jersey, including the restrictions set forth in Section 7 of Chapter 131 of the 2022 New Jersey Laws, as alleged above, and they do indeed enforce and threaten to enforce these laws by virtue of their authority under the laws of New Jersey. As such, each and every Defendant acts under color of law within the meaning of 42 U.S.C. § 1983.

71.     Each and every Defendant stands ready, willing and able to enforce, and in fact actually does enforce, and actively threatens to enforce, Section 7 of A4769/S3214, including the

-21-

JA930

"sensitive place" and vehicle restrictions challenged here. Each and every Defendant presents an imminent threat of enforcement to the individual Plaintiffs and to various members of the organizational Plaintiffs. As such, each and every Defendant acts to cause the deprivations that Plaintiffs complain of.

72.     The challenged restrictions—subparts 10, 12, 15, 17, 20, 21 and 24 of section 7(a), as well as section 7(b)(1)'s prohibition on carrying handguns in vehicles—violate the right to bear arms. Prohibitions on carrying handguns in public are presumptively unconstitutional, and there is no established historical tradition that could justify the restrictions challenged here. In threatening to enforce the challenged restrictions and thereby causing the Plaintiffs to refrain from carrying guns as alleged above, Defendants thus act to deprive Plaintiffs of their rights, privilege or immunities, and more specifically, their Second Amendment right to bear arms, in violation of 42 U.S.C. § 1983.

73.     Plaintiffs are accordingly entitled to declaratory and injunctive relief, as well as attorney's fees and costs.

## PRAYER

WHEREFORE, Plaintiffs pray for the following relief:

    i.    a declaratory judgment that subparts 10, 12, 15, 17, 20, 21 and 24 of section 7(a) and subpart 1 of section 7(b) of A4769/S3214 violates the right to bear arms secured by the Second and Fourteenth Amendments;

    ii.    a preliminary and/or permanent injunction restraining Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of the injunction, from enforcing subparts 10, 12, 15, 17, 20, 21 and 24 of section 7(a) and subpart 1 of section 7(b) of A4769/S3214;

    iii.    such other and further relief, including injunctive relief, against all Defendants, as may be necessary to effectuate the Court's judgment, or as the Court otherwise deems just and equitable; and

JA931

iv.      attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable law.

Dated: February 7, 2023

s/ David D. Jensen
David D. Jensen
DAVID JENSEN PLLC
33 Henry Street
Beacon, New York 12508
Tel: 212.380.6615
david@djensenpllc.com

JA932

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RONALD KOONS, *et al.*, | : |
| | : No. 1:22-cv-07464 |
| Plaintiffs, | : |
| | : |
| v. | : **DECLARATION OF** |
| | : **GIL TAL** |
| MATTHEW PLATKIN, *et al.*, | : |
| | : |
| Defendants. | : |
| | : |

I, Gil Tal, declare as follows:

1.  I am 45 years old and married. I have two children, aged 9 and 14. I live in the Township of Colts Neck in Monmouth County, New Jersey.

2.  I am a member of the four organizations that are plaintiffs in this case: Second Amendment Foundation; Firearms Policy Coalition, Inc.; Coalition of New Jersey Firearm Owners; and New Jersey Second Amendment Society.

3.  I work at a men's health clinic in Parsippany, New Jersey. I am a part owner of the management company that owns the facility at which the clinic operates, but I do not have an ownership interest in the medical practice itself.

4.  Previously, I lived in Staten Island, New York. In 2010, I obtained an unrestricted "Business Carry" handgun license from the New York City Police Department, which allowed me to carry a handgun throughout the City and State of New York. I then began carrying a handgun as part of my daily routine. Among other things, I carried a handgun while getting food at delis and restaurants (including restaurants that serve alcohol), shopping at stores, attending medical appointments, going to parks, visiting libraries and attending public venues. Since 2010, I have renewed my New York license, and a copy of my current license is attached as Exhibit 1.

5.      When I lived in Staten Island, I frequently used public transportation, and (after obtaining my license) I often carried a handgun when doing so. For example, I used the Staten Island Ferry and New York City Subways, as well as public buses, on a frequent basis, and I normally carried a handgun while doing so.

6.      In addition, I also routinely carried a handgun while driving in my car, or while riding as a passenger in someone else's car. When doing so, I normally carried my handgun in a holster. If the gun was not on my person, or if it was unloaded, then I likely would not have been able to actually use it if someone suddenly attacked me or pulled me from the car. I did not normally load or unload my gun when getting in or out of a car, and I would not consider this a particularly safe practice, particularly in an area that is congested. Among other things, I would be concerned that someone who saw me loading or unloading my gun might call the police.

7.      Normally, if I had plans to go to a place at which handguns are prohibited—such as a school—I either left my weapon at home and was unprotected, or I would lock the weapon in my car using a gun safe in the center console, or avoid such places if no safe way of securing my weapon was available.

8.      I have never carried a handgun while at the clinic in Parsippany. While I am a part-owner of the management company that leases the facility, and I own the lease, equipment and have the employees on my payroll, I have no ownership interest in the medical practice itself. As such, it has always been my understanding that I could not carry a handgun at the clinic unless I had a New Jersey permit to carry a handgun.

9.      After the Supreme Court's decision last summer, I applied for a permit to carry a handgun pursuant to N.J.S.A. § 2C:58-4 from the police department in Colts Neck, New Jersey. I submitted fingerprints and documentation that I had taken a training course and passed a

qualification test. I understand that the Colts Neck Police Department approved my application and submitted it to the Monmouth County Prosecutor's Office, who then sent a letter of no objection to the Monmouth County Superior Court, which also approved my application.

10.     In late December 2022, I received notice that I could pick up my New Jersey permit to carry a handgun from the Colts Neck Police Department, and I thereafter went to the police department to do so. By the time I picked up the permit, which was after Christmas but before New Year's, the State had enacted Chapter 131, which prohibits people with permits from carrying handguns in a number of "sensitive places," as well as while in vehicles. A true and correct copy of my permit is attached as Exhibit 2. As indicated thereon, it has an issuance date of December 16, 2022.

11.     As stated, I understand that Chapter 131 prohibits individuals with permits to carry from carrying handguns in a number of "sensitive places," as well as while in vehicles. I understand that I cannot carry a handgun while in a car, but must instead transport it unloaded and enclosed in a case. Furthermore, I understand that all private property is now a prohibited sensitive location unless the owner has expressly provided consent. I also understand that there are a number of places, both public and private that are "sensitive places" regardless of consent, including libraries and museums, entertainment facilities such as theaters and arenas, restaurants that serve alcohol, health care facilities, parks, airports and public transportation hubs.

12.     As a result of these new restrictions, I have only a very limited ability to carry a handgun for the purpose of protecting myself. As a practical matter, it seems that I can carry a handgun while walking down the road.

13.     Furthermore, these new restrictions effectively prohibit me from carrying a handgun while I am driving a vehicle or riding in one as a passenger. If I arrived at a location

JA935

where I could carry a handgun, then I would need to remove my gun from its case and load it, presumably while sitting in the car. When I returned to the car, I would then need to unload the gun and place it back in the case. This simply is not practical.

14.     As a result of these new restrictions, and barring intervention by the courts, I have no choice but to stop carrying a handgun away from my own home and property.

15.     Notably, I have also obtained licenses to carry handguns from the States of Florida and Utah. A copy of these permits is attached as Exhibit 3. I have also been approved for a permit to carry firearms in Pennsylvania, but I have not yet had a chance to pick it up.

16.     I am involved in operating another men's health clinic that is based in North Carolina. When I attend to business at that clinic, I normally carry a handgun on my person. Under current law, I understand that I no longer need a license to carry a handgun in North Carolina. I also understand that, under the prior law, I could carry a handgun at the North Carolina clinic on the basis of my out-of-state licenses.

17.     I would resume carrying a handgun much more frequently if I did not face the sensitive place and vehicle carry restrictions challenged in this lawsuit. If I could, for example, buy gas or groceries, go to a park, see my doctor, go to a restaurant, attend a public event or go to a venue like a museum or a theater while armed, then I would be much more likely to resume carrying a handgun again on a regular basis.

18.     More specifically, I would carry a handgun while carrying out business at the Parsippany clinic, as I do when I normally attend to work at the clinic in North Carolina, if Chapter 131 did not prohibit me from carrying a handgun in a medical care facility. I work at the Parsippany location about four days a week, so this is the approximate frequency at which I would carry a handgun in New Jersey, but for the laws at issue in this case.

JA936

19.     Also more specifically, were it not for Chapter 131 and its prohibition on carrying guns in airports, I would carry a handgun in connection with using my airplane, which is normally stored at the Old Bridge Airport in Englishtown. When weather permits, I fly my plane as much as two to three times per week, and I land at airports throughout the region, including many in New Jersey.

20.     In addition, I would also carry a handgun while visiting several parks that are located near my home, including Holmdel Park, Manasquan Reservoir and Dorbrook Recreation Area. All of these parks are part of the Monmouth County Park System. I visit these parks on a regular basis with my children. I understand that the Monmouth County Park System has adopted rules that prohibit people from possessing weapons, except in connection with authorized hunting. Because of these rules, I understand that Holmdel Park, Manasquan Reservoir, Dorbrook Recreation Area and all other parks in the Monmouth County Park System are "sensitive places" where Chapter 131 makes it illegal to carry a handgun. As such, parks in the Monmouth County Park System are one of the places I refrain from carrying a handgun.

21.     Finally, and also more specifically, but for Chapter 131 and its "sensitive place" and vehicle carry restrictions, I would carry a handgun while using public transportation and public transportation hubs, as I did when I lived in Staten Island. The Parsippany clinic is located in reasonably close proximity to several New Jersey Transit train stations on both the Montclair-Boonton Line and the Morristown Line. While there is no train that connects directly to these stations from any location that is near my home, I could commute to one of these stations if I first took a car, a bus or another train. To do so, I would need to catch one of these trains at another station, which would most likely be the Newark Broad Street station, the Secaucus Junction station or the Hoboken station. However, I understand that Chapter 131 prohibits this,

JA937

because any such station would be a "public transportation hub," and also because Chapter 131

otherwise prohibits the carry of handguns inside any "vehicle," such as a car, train or bus. But for

these prohibitions, I would use public transportation vehicles and public transportation hubs to

commute to the Parsippany clinic at least some of the time, as well as to travel to other locations.

      I affirm all of the foregoing statements under penalty of perjury under the laws of the
United States of America.

Dated: February  7th 2023

_____
Gil Tal

JA938

**DocuSign**

## Certificate Of Completion

Envelope Id: CE1371968B5A4C8998B905F9CAE14466
Subject: Dec of Gil Tal - draft v5.pdf
Source Envelope:
Document Pages: 6
Certificate Pages: 1
AutoNav: Enabled
EnvelopeId Stamping: Disabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Signatures: 1
Initials: 0

Status: Completed

Envelope Originator:
Gil Tal
giltalny@gmail.com
IP Address: 20.236.201.103

## Record Tracking

Status: Original
    2/7/2023 6:56:02 PM

Holder: Gil Tal
    giltalny@gmail.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Gil Tal<br>giltalny@gmail.com<br>Security Level: Email, Account Authentication<br>(None) | *Gil Tal*<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 71.169.71.106 | Sent: 2/7/2023 6:56:02 PM<br>Viewed: 2/7/2023 6:56:07 PM<br>Signed: 2/7/2023 6:56:35 PM<br>Freeform Signing |

**Electronic Record and Signature Disclosure:**
    Not Offered via DocuSign

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 2/7/2023 6:56:02 PM |
| Certified Delivered | Security Checked | 2/7/2023 6:56:07 PM |
| Signing Complete | Security Checked | 2/7/2023 6:56:35 PM |
| Completed | Security Checked | 2/7/2023 6:56:35 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

JA939





JA941



**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RONALD KOONS, *et al.*, | : |
| | : No. 1:22-cv-07464 |
| Plaintiffs, | : |
| | : |
| | : |
| v. | : **SUPPLEMENTAL** |
| | : **DECLARATION OF** |
| MATTHEW PLATKIN, *et al.*, | : **NICHOLAS GAUDIO** |
| | : |
| Defendants. | : |
| | : |

I, Nicholas Gaudio, declare as follows:

1.      I am a Plaintiff in this case, and I submit this declaration to supplement the declaration I previously provided on December 23, 2022.

2.      In my prior declaration, I testified that I carried a handgun in local parks and associated facilities prior to Chapter 131's enactment, but that I would no longer do so if those parks were "gun free zones" and "sensitive places" under Chapter 131. In particular, several parks at which I have previously carried a handgun include Cooper River Park, John Adler Memorial Park, Maria Barnaby Greenwald Memorial Park, Challenge Grove Park, and Pennypacker Park, which are all located in Cherry Hill, New Jersey, within about 5 miles away from my home. Cooper River Park, John Adler Memorial Park, and Challenge Grove Park have playground areas, and I have also carried a handgun while at those playgrounds with my children. In addition, there are other recreation facilities (such as softball fields and basketball courts) at Cooper River Park, John Adler Memorial Park, Challenge Grove Park, and Maria Barnaby Greenwald Memorial Park. I have also carried a handgun while in or adjacent to these areas. I also carried a handgun at Challenge Grove Park during a permitted public gathering fall festival at adjacent Croft Farms which was less than 100 feet away.

JA943

3.　　　I understand that all of these parks are part of the Camden County Park System. I also understand that, in December 2022, around the time of Chapter 131's enactment, the Camden County Board of Commissioners adopted a resolution that "prohibits anyone from carrying any firearm concealed or otherwise, in any sensitive area within Camden County." Since I understand that the resolution includes as a sensitive area, "all recreational facilities and parks owned or operated by the county", the result of this resolution makes it illegal for me to carry a handgun in Camden County parks, including those parks named above, as well as their associated facilities. I no longer carry guns in these parks and facilities and playgrounds, nor would I carry a handgun in any other parks or facilities that are subject to similar resolutions.

4.　　　I feel the need to exercise my right to be able to protect my family while they are in defenseless and unprotected situations such as in parks.  In the 12 years that my children have been attending events at parks year-round in New Jersey, I have never witnessed armed police officers or security guards patrolling the areas.  These locations have been in Camden County, Burlington County, Cape May County in the townships of Cherry Hill, Haddonfield, Moorestown, Mount Laurel, Evesham, Riverton, Palmyra, Delanco, Burlington Township, Riverside, Wildwood, North Wildwood, Wildwood Crest, West Wildwood, and Cape May Courthouse.  A predator, sexual or violent, would likely face no armed resistance if attempting to harm my children at these locations unless I had the ability to legally carry a handgun.  My late wife, Christina Gaudio, taught an adjunct college Victimology class at Rosemont College in Pennsylvania in the 2014-2017 time frame, prior to her death.  One of the details from her teachings that made both of us uncomfortable with our children at public places is that pedophiles frequent places where children gather in large groups, specifically parks and sports

events, and therefore I want to be able to legally protect my children while they are in these vulnerable and frequently targeted locations.

5.      In my prior declaration, I also testified that I have checked a handgun as part of my baggage at the airport, including the Trenton-Mercer Airport (TTN), when I have traveled to locations in other states where I am permitted to carry a handgun. In more detail, I travel on commercial flights about one or two times per year, and prior to Chapter 131's enactment, I checked a gun as baggage 100 percent of the times I flew out of TTN since I became a non-resident carry permit holder from Florida in 2009.

6.      Since Chapter 131 has become law, I no longer attempt to check handguns at airports in New Jersey. This is because Chapter 131 designates "airports" to be "sensitive places." There does not appear to be any exemption or exception that would permit to transport a cased and unloaded handgun from my car to the baggage desk. Thus, because I cannot chance an arrest or criminal prosecution, I do not attempt to check handguns as baggage in New Jersey. As a practical matter, this leaves me unable to defend myself with a gun when I travel to places by means of commercial flights that leave from or return to New Jersey. Today, the same day I am signing this declaration, I flew from Florida to Philadelphia with a handgun as checked baggage. Part of the reason I flew through Philadelphia instead of an airport in New Jersey is that I wanted to be able to take my gun with me. This issue will continue to arise so long as Chapter 131's prohibition on guns in airports remains in effect.

7.      I also testified previously that, prior to Chapter 131, I carried a handgun while visiting health care facilities. This has included routine visits to my primary care physician and dentist, my daughters' pediatrician, several pharmacies with on-site medical clinics, a friend's post-injury medical, physical therapy, and chiropractic appointments (since she temporarily

JA945

could not drive after a car accident), and it also included an unplanned trip to the emergency room after my daughter was in a car accident in mid-December. Because Chapter 131 designates health care facilities as "sensitive places," I no longer carry a handgun in these locations, but I would if the "sensitive place" restriction did not apply.

8.      It is important to note that while some health care appointments are planned, others are unplanned, and they require last minute schedule changes to visit hospitals, clinics, and pharmacies. The "sensitive places" restriction is particularly burdensome when viewed in light of the fact that medical emergencies can develop very quickly, making it very difficult or impossible for a person to disarm themselves upon arrival at a health care facility.

I affirm all of the foregoing statements under penalty of perjury under the laws of the United States of America.

Dated: February 7, 2023

Nicholas Gaudio

-4-

JA946

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

RONALD KOONS, *et al.*,

      Plaintiffs,

v.

WILLIAM REYNOLDS, *et al.*,

      Defendants.

: No. 1:22-cv-07464-RMB-EAP

: **STIPULATION**

WHEREAS, Plaintiffs commenced this action against five official capacity Defendants responsible for enforcing the challenged provisions of Chapter 131 of the 2022 Laws of New Jersey; and

WHEREAS, Attorney General Matthew Platkin and State Police Superintendent Patrick Callahan, represented by the Attorney General's office, are defending the challenged provisions; and

WHEREAS, Atlantic County Prosecutor William Reynolds, Camden County Prosecutor Grace MacAulay and Acting Sussex County Prosecutor Annemarie Taggart (collectively the "County Prosecutors") acknowledge and agree that they must comply with the Court's orders and injunctions regarding the enforcement of Chapter 131 (and the orders or mandates of any other court with jurisdiction), regardless of whether they are parties to this action or not; and further, the County Prosecutors specifically pledge to do so; and

JA947

Dated this 7th day of February, 2023

| | |
|---|---|
| Plaintiffs Ronald Koons, Nick Gaudio, Jeffrey M. Muller, Second Amendment Foundation, Firearms Policy Coalition, Coalition of New Jersey Firearm Owners and New Jersey Second Amendment Society, | Defendants Matthew Platkin and Patrick Callahan and Acting Sussex County Prosecutor Annmarie Taggart, |
| s/ David D. Jensen<br>David D. Jensen<br>David Jensen PLLC<br>33 Henry Street<br>Beacon, New York 12508<br>Tel: 212.380.6615<br>david@djensenpllc.com | s/ Angela Cai<br>Angela Cai<br>Deputy Solicitor General<br>Office of the Attorney General<br>P.O. Box 080<br>Trenton, New Jersey 08625<br>Tel: (609) 376-2791<br>Angela.Cai@njoag.gov |
| Defendant Atlantic County Prosecutor William Reynolds, | Defendant Camden County Prosecutor Grace MacAulay, |
| s/ Alan Cohen<br>Alan Cohen<br>Atlantic County Department of Law<br>1333 Atlantic Avenue, 8th Floor<br>Atlantic City, NJ 08401<br>609-343-2279<br>Cohen_Alan@aclink.org | s/ Harold Goldberg<br>Howard Goldberg<br>First Assistant County Counsel<br>520 Market Street, 6th Floor<br>Camden, New Jersey 08102-1375<br>(856) 225-5543<br>Howard.Goldberg@camdencounty.com |

JA948

WHEREAS, Plaintiffs have prepared an Amended Complaint that omits the County Prosecutors as Defendants, and as well, challenges additional "sensitive place" restrictions in Chapter 131 and includes one additional Plaintiff,

NOW THEREFORE, it is hereby stipulated, ordered and agreed that:

1.     The claims against Defendants Atlantic County Prosecutor William Reynolds, Camden County Prosecutor Grace MacAulay and Acting Sussex County Prosecutor Annemarie Taggart shall be and hereby are DISMISSED without prejudice pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure;

2.     Plaintiffs will file their Amended Complaint on February 7, 2023 and their pending preliminary injunction motion shall include the additional "sensitive places" challenged therein; and

3.     The Court's temporary restraining order (Doc. No. 35) shall remain in full force and effect, and the parties shall submit their remaining preliminary injunction briefing in accordance with the schedule proposed previously.

It is **SO ORDERED** this 8th day of February, 2023.

Hon. Renée Marie Bumb
United States District Court Judge

-2-

JA949