**UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

---

Nos. 23-1900, 23-2043

---

RONALD KOONS et al.,
*Plaintiffs-Appellees,*

v.

MATTHEW J. PLATKIN et al.,
*Defendants-Appellants*

---

AARON SIEGEL et al.,
*Plaintiffs-Appellees / Cross-Appellants,*

v.

MATTHEW J. PLATKIN et al.,
*Defendants-Appellants / Cross-Appellees*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(Nos. 22-cv-7463, 22-cv-7464 (RMB))

---

**JOINT APPENDIX**

**VOLUME V**

**JA1196 – JA1718**

---

MATTHEW J. PLATKIN
  *Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
  *Solicitor General*

ANGELA CAI
  *Deputy Solicitor General*

JEAN REILLY
  *Assistant Attorney General*

DAVID CHEN
VIVIANA HANLEY
SAMUEL RUBINSTEIN
  *Deputy Attorneys General*

Office of the New Jersey Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625-0080
(609) 414-5954
angela.cai@njoag.gov

*Attorneys for Defendants-Appellants*
*New Jersey Attorney General*
*Matthew J. Platkin and Superintendent of*
*New Jersey State Police Colonel*
*Patrick Callahan*

# JOINT APPENDIX
## TABLE OF CONTENTS

## **VOLUME I**                                                    **JA Page**

Defendants' Notice of Appeal (ECF 126)[1] ..................................... JA1

*Siegel* Plaintiffs' Notice of Cross-Appeal (ECF 128)....................................... JA4

Order Granting In Part And Denying In Part Plaintiffs' Motions for
    Preliminary Injunction (ECF 125)............................................... JA6

Opinion Granting In Part And Denying In Part Plaintiffs' Motions for
    Preliminary Injunction (ECF 124)............................................... JA10

## **VOLUME II**

*Koons* District Court docket sheet .................................................... JA245

*Koons* Complaint (ECF 1) ............................................................... JA264

*Siegel* Complaint (Case No. 22-cv-7463, ECF 1)............................................. JA286

Defendants' Expedited Motion to Consolidate (Case No. 22-cv-7463,
    ECF 7)................................................................................ JA345

*Siegel* Plaintiffs' Motion for Temporary Restraining Order And For A
    Preliminary Injunction (Case No. 22-cv-7463, ECF 8)............................. JA349

    Declaration of Aaron Siegel (Ex. 2) .......................................... JA352

    Declaration of Jason Cook (Ex. 3)............................................. JA360

    Declaration of Joseph DeLuca (Ex. 4)......................................... JA368

    Declaration of Nicole Cuozzo (Ex. 5) ........................................ JA374

    Declaration of Timothy Varga (Ex. 6)......................................... JA377

---

[1] ECF numbers are to the *Koons* docket (Case No. 1:22-cv-07464) unless otherwise indicated.

Declaration of Christopher Stamos (Ex. 7) .................................................. JA382

Declaration of Kim Henry (Ex. 8) ............................................................. JA385

Declaration of Scott Bach (Ex. 9)............................................................... JA388

Declaration of Daniel Schmutter (Ex. 10) .................................................. JA391

*Koons* Plaintiffs' Motion for Order to Show Cause, Motion for
    Temporary Restraining Order, Motion for Preliminary Injunction
    (ECF 8)...................................................................................................... JA438

Declaration of Ronald Koons (ECF 10) ....................................................... JA441

Declaration of Nicholas Gaudio (ECF 11) ................................................... JA446

Declaration of Jeffrey Muller (ECF 12) ....................................................... JA455

*Koons* Show Cause Order (ECF 13) ............................................................ JA462

## **VOLUME III**

Opinion on *Koons* Plaintiffs' Motion for Temporary Restraining Order
    (ECF 34)...................................................................................................... JA465

Order re: *Koons* Plaintiffs' Motion for Temporary Restraining Order
    (ECF 35)...................................................................................................... JA525

Transcript of *Koons* TRO Motion Hearing (ECF 37)...................................... JA527

Legislators' Motion to Intervene (ECF 47) ................................................... JA625

    Proposed Intervention Pleading (Ex. A).................................................... JA628

    L. 2022, c. 131 (Ex. B) ............................................................................ JA655

    Summary of legislative history of A4769 (Ex. C)..................................... JA682

    A4769 – as introduced (Ex. D) ................................................................. JA687

    Report of the Assembly Judiciary Committee (Ex. E) .............................. JA720

    Report of the Assembly Appropriations Committee (Ex. F)...................... JA727

    Report of the Assembly Oversight Committee (Ex. G) ............................ JA737

Report of the Senate Budget and Appropriations Committee (Ex. H) ....... JA745

*Siegel* Consolidation Order (ECF 50) ............................................................. JA753

Opinion on *Siegel* Plaintiffs' Motion for Temporary Restraining Order
(ECF 51) ................................................................................................... JA759

Order re: *Siegel* Plaintiffs' Motion for Temporary Restraining Order
(ECF 52) ................................................................................................... JA805

Order granting Legislators' Motion to Intervene (ECF 53) ............................. JA807

*Siegel* Plaintiffs' Letter seeking clarification of TRO Order (ECF 54) ............ JA810

Transcript of Siegel TRO Motion Hearing (ECF 56) ....................................... JA812

Supplemental Declaration of Aaron Siegel (ECF 64) ...................................... JA897

Supplemental Declaration of Jason Cook (ECF 65) ......................................... JA900

Supplemental Declaration of Joseph DeLuca (ECF 66) ................................... JA903

Supplemental Declaration of Timothy Varga (ECF 67) ................................... JA904

Declaration of Ria Jairam (ECF 68) ................................................................ JA907

*Koons* Amended Complaint (ECF 69) ............................................................. JA910

Declaration of Gil Tal (ECF 70) ...................................................................... JA933

Supplemental Declaration of Nicholas Gaudio (ECF 71) ................................ JA943

Stipulation & Order dismissing county prosecutors as defendants
(ECF 73) ................................................................................................... JA947

## VOLUME IV

Certification of Joseph R. Klett (ECF 76) ........................................................ JA950

1722 NJ Law "… against Carrying of Guns … by Persons not
Qualified" (Ex. A) .................................................................................. JA958

1751 Supplement to 1722 NJ Law "… against Carrying of Guns …
by Persons not Qualified" (Ex. B) ........................................................... JA964

1769 NJ Law "… for the more effectual Preservation of Deer …" (Ex. C) ................................................................................ JA974

1771 NJ Law "… to prevent trespassing with Guns" (Ex. D) ................... JA980

NJ State Constitution of 1776 (Ex. E) ........................................ JA986

1771 NJ Law "… to prevent trespassing with Guns" (Ex. F) ................... JA997

1753 Pennsylvania Gazette extract (Ex. G) ................................. JA1005

1846 NJ Law Revision "… to prevent trespassing with Guns" (original enrolled law) (Ex. H) ............................................. JA1008

1846 NJ Law Revision "… to prevent trespassing with Guns" (as printed in Revised Statutes of 1846) (Ex. I) ................................. JA1026

1852 NJ Supplement (Ex. J) ............................................... JA1032

First 1859 NJ Supplement (Ex. K) ........................................ JA1036

Second 1859 NJ Supplement (Ex. L) ....................................... JA1039

1866 NJ Supplement (Ex. M) .............................................. JA1043

1867 NJ Supplement (Ex. N) .............................................. JA1048

1873 NJ Supplement (Ex. O) .............................................. JA1051

1846 NJ Law relative to "Carrying guns, where prohibited" (as printed in Revised Statutes of 1877) (Ex. P) ................................. JA1054

1846 NJ Law referred to as "An act to Prevent Trespassing with Guns" (as included in 1880 synopsis of laws) (Ex. Q) ....................... JA1060

1895 NJ Law "to prevent trespassing with guns" (Ex. R) ................... JA1067

1911 NJ Supplement (Ex. S) .............................................. JA1075

1928 Repeal of 1846 NJ Law (Ex. T) ..................................... JA1081

N.J. Stat. Ann. § 2A:63-1 (Ex. U) ...................................... JA1096

Certification of Sarah Adelman (ECF 77) ................................. JA1099

Certification of George Fedorczyk (ECF 78) ..................................................... JA1107

Certification of Bonny Fraser (ECF 79) ............................................................. JA1114

Certification of Steven Gorelick (ECF 80) ......................................................... JA1122

Certification of Robin Madden (ECF 81) ............................................................ JA1127

Certification of Judith A. Nason (ECF 82) .......................................................... JA1132

Certification of David L. Rebuck (ECF 83) ......................................................... JA1137

Declaration of Hendrik Hartog (ECF 84) ........................................................... JA1143

    Resume of Hendrik Hartog (Ex. A) ............................................................ JA1153

    1722 NJ Statute: "An Act to prevent killing of deer out of season,
       and against carrying of guns and hunting by persons not
       qualified." (Ex. B) ............................................................................. JA1163

    1769 NJ Statute: "An Act for the more effectual preservation of
       deer in this Colony." (Ex. C) ........................................................... JA1167

    1771 NJ Statute: "An Act for the preservation of deer and other
       game, and to prevent trespassing with guns." (Ex. D) ......................... JA1172

    1846 NJ Statute: "An Act for the preservation of deer and other
       game, and to prevent trespassing with guns." (Ex. E) .......................... JA1180

    Lucius Elmer's 1868 Digest of the Laws of New Jersey 362 (4th ed.,
       Newark, 1868) (Ex. F) ...................................................................... JA1186

    1895 NJ Public Law, ch. § 148 (Ex. G.) ...................................................... JA1194

## **VOLUME V**

Declaration of Brennan Gardner Rivas (ECF 85) ............................................... JA1196

    Curriculum Vitae of Brennan Gardner Rivas (Ex. A) ................................. JA1219

    2 Edw. 3, c. 3 (1328) (Eng.) (Ex. B) ......................................................... JA1223

    25 Edw. 3, st. 5, c. 2, § 13 (1350) (Eng.) (Ex. C) ...................................... JA1224

    1786 Va. Laws 33, ch. 21 (Ex. D) ............................................................. JA1227

1835 Mass. Acts 750 (Ex. E) ........................................................ JA1228

Francois Xavier Martin, A Collection of Statutes of the Parliament
    of England in Force in the State of North Carolina, 60-61
    (Newbern 1792) (Ex. F) ......................................................... JA1232

1821 Me. Laws 285, ch. 76, § 1 (Ex. G) ..................................... JA1235

1813 La. Acts 172, § 1 (Ex. H) .................................................... JA1242

Revised Statutes of the State of Arkansas, Adopted at the October
    Session of the General Assembly of Said State, A.D. 1837
    (Ex. I) ...................................................................................... JA1247

1870 Tex. Gen. Laws 63, ch. 46, § 1 (Ex. J) .............................. JA1249

1871 Tex. Gen. Laws 25, ch. 34 § 1 (Ex. K) .............................. JA1252

Penal Code of the State of Texas, (1879), Title X, Offenses Against
    the Public Peace, Chapter 4, Unlawfully Carrying Arms (Ex. L) ........ JA1255

Ch. 22, 1869 Tenn. Pub. Acts 23 (36th Assembly, 1st Sess.) §2
    (Ex. M) ..................................................................................... JA1257

Act No. 285, 1870 Ga. Laws 421 (Ex. N) ................................... JA1260

Revised Statutes of the State of Missouri (1879), ch.24, §1274
    (Ex. O) ...................................................................................... JA1263

1890 Okla. Stat. 495-96 (Ex. P) .................................................. JA1266

Annotated Code of the General Statute Laws of the State of
    Mississippi (1892), "Crimes and Misdemeanors," §1030 (Ex. Q) ...... JA1269

Laws of Vermont, Special Session (1891), No. 85, §2 (Ex. R) ................. JA1272

1870 La. Acts 159-60, § 73 (Ex. S) ............................................. JA1275

George Washington Paschal, A Digest of the Laws of Texas, 3rd ed.
    (1873) II: 1317-1318 (Ex. T) ................................................. JA1293

John Prentiss Poe, The Maryland Code: Public Local Laws,
    Adopted by the General Assembly of Maryland March 14, 1888
    (Vol. 2, 1888), 1457 (Ex. U) ................................................. JA1296

1886 Md. Laws 315, ch. 189 §1 (Ex. V) ..................................... JA1298

1877 Va. Acts 305, Offenses Against The Peace, § 21 (Ex. W) ............... JA1299

Oscar F. Greene, Revised Ordinances of the City of Boulder (1899),
    157 (Ex. X) ........................................................... JA1303

"An Ordinance," San Antonio Express (San Antonio, Texas),
    December 23, 1870 (Ex. Y)............................................... JA1304

Declaration of Patrick J. Charles (ECF 86) ..................................... JA1305

Curriculum Vitae of Patrick J. Charles (Ex. 1)............................. JA1319

2 Edw. 3, c. 3 (1328) (Eng.) (Ex. 2) ...................................... JA1326

Royal Proclamation as to the Wearing of Arms in the City, and at
    Westminster; and as to Playing at Games in the Palace at
    Westminster, Memorials of London and Life 268-69
    (H.T. Riley ed., 1868) (Ex. 3).......................................... JA1327

John Carpenter, Liber Albus: The White Book of the City of
    London at 335 (Henry Thomas Riley ed., 1861) (Ex. 4) ..................... JA1330

4 Hen 4, c. 29 (1403) (Eng.) (Ex. 5)....................................... JA1332

An Act to Prevent Routs, Riots, and Tumultuous Assemblies, and
    the Evil Consequences Thereof, September Session, Chapter
    VIII (Mass. 1786) (Ex. 6) ............................................. JA1333

An Act for the More Speedy and Effectual Suppression of Tumults
    and Insurrections in the Commonwealth, January Session,
    Chapter IX (Mass. 1787) (Ex. 7) ...................................... JA1335

An Act to Prevent Routs, Riots, and Tumultuous Assemblies
    (N.J. 1797) (Ex. 8)................................................... JA1339

An Act to Prevent Hunting with Fire-Arms in the City of New-
    York, and the Liberties Thereof (NY 1763) (Ex. 9)....................... JA1341

An Act Against Riots and Rioters (Pa. 1705) (Ex. 10) ...................... JA1342

William Rawle, A View of the Constitution of the United States 126
    (2d ed., 1829) (Ex. 11)................................................ JA1343

3 Calendar of Close Rolls, Richard II, 1385-1389, at 399-400 (May 16, 1388, Westminster) (H.C. Maxwell-Lyte ed., 1914) (Ex. 12) ....... JA1345

1 Calendar of Close Rolls, Richard II, 1377-1381, at 34 (December 1, 1377, Westminster) (H.C. Maxwell-Lyte ed., 1914) (Ex. 13) ......... JA1347

1647 Md. Laws 216 (Ex. 14) ................................................................. JA1348

1650 Md. Laws 273 (Ex. 15) ................................................................. JA1349

Chapter XVII: Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, Etc., May 22, 1890, reprinted in General Ordinances of the Town of Columbia, In Boone County, Missouri 34, 35 (Lewis M. Switzler ed., 1890) (Ex. 16) .................... JA1350

1877 Mo. Laws 158, 166 (Ex. 17) .......................................................... JA1352

Ordinance No. 577: An Ordinance Defining What Shall constitute Misdemeanors or Offenses Against the City of Webb City, and Providing Penalties Therefor, May 15, 1905, reprinted in Revised Ordinances of the City of Webb City, Missouri, 1905, at 99-100 (1905) (Ex. 18) ...................................................... JA1354

An Ordinance in Relation to Carrying Deadly Weapons, July 17, 1894, The Revised Ordinances of the City of Huntsville, Missouri of 1894, at 58-59 (1894) (Ex. 19) ......................................... JA1356

1874 Mo. Laws 43 (Ex. 20) .................................................................... JA1361

1875 Mo. Laws 50 (Ex. 21) .................................................................... JA1362

1883 Mo. Laws 76 (Ex. 22) .................................................................... JA1364

*State v. Reando* (Mo. 1878) (Ex. 23) ..................................................... JA1365

Ordinance No. 76: An Ordinance Prohibiting Deadly Weapons, July 1, 1887, reprinted in Stockton Review and Rooks County Record (KS), July 1, 1887 (Ex. 24) ...................................................... JA1366

Public Statutes of the State of Tennessee Since the Year 1858, at 108 (James H. Shankland ed., 1871) (Ex. 25) ...................................... JA1368

1870 Tex. Gen. Laws 63 (Ex. 26) ........................................................... JA1369

1870 Ga. Laws 421 (Ex. 27)........................................................ JA1370

1889 Ariz. Sess. Laws 16 (Ex. 28) ............................................. JA1371

1890 Okla. Stat. 495 (Ex. 29) .................................................... JA1373

A Digest of the Laws and Ordinances for the Government of the
    City of Harrisburg, Pennsylvania in Force January 1, A.D. 1906,
    at 557-58 (1906) (Ex. 30) ................................................... JA1375

The Revised Ordinances of Provo City, Utah 96 (1893) (Ex. 31) ............. JA1377

The Revised Ordinances of Payson City, Utah 84 (1893) (Ex. 32) ........... JA1378

The Revised Ordinances of Tooele City, Utah 87 (1893) (Ex. 33)............ JA1379

An Ordinance to Prohibit Intoxication, Breach of Peace, Carrying
    Deadly Weapons, the Use of Obscene Language, the Discharge
    of Fire-Arms, and to Close Places of Amusement on Sunday in
    the City of Wallace, Kansas, Jan. 31, 1889, reprinted in Wallace
    County Register (KS), Feb. 9, 1889, at 2 (Ex. 34) ............................... JA1381

Ordinance No. 97: Ordinance Related to Carrying Deadly Weapons,
    May 17, 1882, reprinted in Burlington Democrat (KS), May 26,
    1882, at 2 (Ex. 35) ................................................................. JA1383

Miscellaneous Ordinance, Jun. 24, 1871, reprinted in Abilene
    Weekly Chronicle (KS), Jun. 29, 1871, at 3 (Ex. 36) ......................... JA1385

Declaration of Peter Kochenburger (ECF 87) .................................... JA1387

Curriculum Vitae of Peter Kochenburger (Ex. A)...................... JA1401

Declaration of Angela Cai and Exhibits Volume I (ECF 88)........................... JA1418

P.L. 2022 ch. 131, A4769/S3124, An Act concerning the sale and
    possession of firearms and supplementing and amending
    various parts of the statutory law (Ex. 1) ............................................ JA1431

Compilation of Order, D.E. 41, *Christian v. Nigrelli*, No. 22-2987
    (2d Cir. Dec. 12, 2022); Order, D.E. 75, *Antonyuk v. Hochul*,
    No. 22-2908 (2d Cir. Dec. 7, 2022); Order, D.E. 53, *Hardaway
    v. Nigrelli*, No. 22-2933 (2d Cir. Dec. 7, 2022) (Ex. 2) ...................... JA1470

Transcript of Preliminary Injunction Hearing, Corbett v. Hochul,
  1:22-cv-5867-LGS (S.D.N.Y. Nov. 29, 2022) (Ex. 3) ......................... JA1473

63 Proceedings and Acts of the Maryland General Assembly 338,
  § 5 (June 15-July 3, 1773) (Ex. 4) ....................................... JA1504

1870 Tex. Gen. Laws 63 (Ex. 5) ............................................. JA1505

1786 Va. Laws 25 (Ex. 6) ................................................... JA1508

Gen. Digest of the Ordinances & Res. of the Corp. of New Orleans
  371 (1831) (Ex. 7) ....................................................... JA1509

1869-70 Tenn. Pub. Acts 23 (Ex. 8) ......................................... JA1510

Art. 320, Tex. Act of April 12, 1871 (Ex. 9) .............................. JA1513

Mo. Rev. Stat. 1879, at 224 (§ 1274) (Ex. 10) ............................. JA1515

1859 Conn. Acts 62, ch. 82, § 5 (Ex. 11) .................................. JA1517

1867 Kans. Sess. Laws 25 (Ex. 12) ......................................... JA1521

1771 N.J. Laws 344, §1 (Ex. 13) ........................................... JA1523

1865 La. Extra Acts 14, No. 10 § 1 (Ex. 14) ............................... JA1531

1876 Iowa Acts 142, ch. 148, § 1 (Ex. 15) ................................. JA1537

1929 Iowa Acts 90, § 30 (Ex. 16) .......................................... JA1540

1919 Me. Laws 193 (Ex. 17) ................................................ JA1543

Ark. Rev. Stat. § 13, p. 280 (1838) (Ex. 18) .............................. JA1548

1839 Ala. Acts no. 77, § 1 (Ex. 19) ....................................... JA1550

1821 Tenn. Acts ch. 13, § 1 (Ex. 20) ...................................... JA1553

Ian Ayres & Spurthi Jonnalagadda, Guests with Guns: Public
  Support for "No Carry" Defaults on Private Land, 48 J. L.
  Medicine & Ethics 183, Table A4 (2020) (Ex. 21) ......................... JA1556

1873 Ga. Code 818, § 4528 (Ex. 22) ........................................ JA1591

Fourth Annual Report of the Board of Commissioners of the Central
    Park 106 (1861) (Ex. 23) ....................................................................... JA1593

Acts of Assembly Relating to Fairmount Park 18 (1870) (Ex. 24)............ JA1594

Michael John Sullivan, The Revised Ordinance of the City of St.
    Louis, Together with the Constitution of the United States,
    Constitution of the State of Missouri, the Scheme for the
    Separation of the Governments of the City and County of St.
    Louis, the Charter of the City, and a Digest of the Laws
    Applicable to the City 635 (1881), § 3 (Ex. 25).................................... JA1595

Egbert Jamieson and Francis Adams, The Municipal Code of
    Chicago, Comprising the Laws of Illinois Relating to the City of
    Chicago and the Ordinances of the City Council, Codified and
    Revised 391 (1881). Art XLIII, § 1690 (Ex. 26)................................. JA1596

Annual Reports of the City Officers and City Boards of the City of
    Saint Paul 689 (1889) (Ex. 27) ............................................................. JA1599

W.W. Thompson, A Digest of the Acts of Assembly Relating To,
    and the General Ordinances of the City of Pittsburgh, From
    1804 to Jan. 1, 1897 at 496 (2d Ed. 1897) (Ex. 28) ............................ JA1601

Excerpt from William Blackstone, Commentaries on the Laws of
    England, 3d. (10th ed. 1787) (Ex. 29) .................................................. JA1603

Excerpt from William Griffith, A Treatise on the Jurisdiction and
    Proceedings of Justices of the Peace in Civil Suits in New
    Jersey (1813) (Ex. 30) .......................................................................... JA1612

Excerpt from John Locke, Second Treatise of Government (1690)
    (Ex. 31) ............................................................................................... JA1625

1715 Md. Laws, ch. 26 § 7, as supplemented by 1766 Md. Laws
    ch. 6, at 90 (Ex. 32) ............................................................................. JA1630

1721 Pa. Act ch. 426 § 3, printed in Mitchell & Flanders, The
    Statutes at Large of Pa. 1682 to 1801, vol.2, at 255 (Ex. 33) .............. JA1634

1763 N.Y. Law ch. 1233 §1, printed in Laws of N.Y., 1691 to 1771,
    vol. 2, at 442 (Ex. 34) .......................................................................... JA1639

1867 Tex. Act Vol, 20, p. 90, at art. 6510, printed in Paschal, A
    Digest of the Laws of Tex. Ann., vol. 2, at 1321 (Ex. 35) ................... JA1643

1893 Ore. Act S.B. 15, § 1, at 79 (Ex. 36) ................................................... JA1647

La. R.S. 821, § 1809, printed in R.H. Marr, Ann. Rev. Stat. La., vol.
    1, at 600 (1915) (Ex. 37) ......................................................................... JA1658

1870 Tenn. Acts. ch. 13 (Ex. 38) .................................................................. JA1664

1996 La. Sess. Law. Serv. 1st Ex. Sess. Act 4 (S.B.2), R.S.
    40.1379.3(O) (Ex. 39) .............................................................................. JA1668

Bill 3730, 1996 S.C. Assemb., Rev. to § 23-31-210(M)(10) (Ex. 40) ....... JA1674

29Excerpt from 1564 Stat. King Henry III (Ex. 41) ................................... JA1687

Wingate, An Exact Abridgement of All Statutes In Force & Use
    From The Beginning Of Magna Carta Until 1641 (1666), at 591
    at § 9 (Ex. 42) ......................................................................................... JA1690

1776 Del. Const. art. 28 (Ex. 43) ................................................................. JA1693

Excerpts from Benjamin Vaugahn Abbott, Judge and Jury: A
    Popular Explanation of Leading Topics in the Law of the Land
    (1880) (Ex. 44) ........................................................................................ JA1696

1874 Mo. Laws at 43, s. 1 (Ex. 45) .............................................................. JA1712

The Norman Transcript, (Norman, Okla. Terr), Vol. 2, No. 5, Ed. 1
    (Nov. 22, 1890) (Ex. 46) .......................................................................... JA1715

The Missouri Republican, (St. Louis, Mo.) (Nov. 20, 1872) (Ex. 47) ....... JA1717

The Moniteau Journal (California, Mo.) (Oct. 3, 1872) (Ex. 48) .............. JA1718

## VOLUME VI

Collected Venue Policies, NJ (Ex. 49) ........................................................ JA1719

Excerpts from R. Rosenzweig & E. Blackmar, *The Park And The
    People: A History Of Central Park* (Cornell Univ. Press 1992)
    (Ex. 50) ..................................................................................................... JA1790

Declaration of Angela Cai and Exhibits Volume II (ECF 89)......................... JA1818

1789 Mass. Acts ch.28, at 438 (Ex. 51)..................................................... JA1831

1895 Mich. No. 436 Sec. 44, at 596 (Ex. 52) ............................................ JA1834

1905 Minn. 620, Sec. 53 (Ex. 53)............................................................. JA1843

1917 Wisc. Ch. 668, at 1243 Sec. 29.57(4) (Ex. 54)................................. JA1872

1921 N.C. Public Laws & Res. ch. 6 § 3, at 54 (Ex. 55)........................... JA1929

1937 N.J. Rev. Stat. 32:14-13.1(8) (Ex. 56)............................................. JA1932

1875 Laws & Ord. Governing Village of Hyde Park at 310, § 6 (Ex.
    57).................................................................................................... JA1935

1883 Rev. Ord. of the City of Danville, ch.19 § 4, at 83 (Ex. 58) ............. JA1941

Tower Grove Park of the City of St. Louis 117 (1883) (Ex. 59)................ JA1945

Rev. Ordinances of Salt Lake City 248, ch. 27 § 6 (1888) (Ex. 60) .......... JA1949

Laws & Ordinances for the Gov't of the Mun. Corp. of the City of
    Williamsport, Pa. 141 (1891) (Ex. 61) ................................................. JA1953

Park Ordinances, Springfield, Mass. (1891) (Ex. 62) ................................ JA1964

Compiled Ordinances of the City of Grand Rapids 163, § 432
    (1907) (enacted 1891, amended 1892 & 1897) (Ex. 63)....................... JA1965

3rd Ann. Rep. of the Park Comm'rs of the City of Lynn 23 (1891)
    (Ex. 64) ............................................................................................ JA1970

Laws & Ordinances of the City of Peoria, Illinois 667 (1892) (Ex.
    65)..................................................................................................... JA1973

Mun. Code of the City of Spokane, Wash. 123 (1903) (enacted
    1892) (Ex. 66)..................................................................................... JA1977

Charter of the City of Wilmington, Rules and Regulations of the
    Board of Park Commissioners, Part VII, § 7 (1893) (Ex. 67).............. JA1982

Rev. Ordinances of the City of Canton, Ill. 240 (1895) (Ex. 68).............. JA1984

Gen. Ordinances of the City of Indianapolis 648, § 1971 (1904)
(enacted 1896) (Ex. 69) ........................................................ JA1989

Digest of the Acts of Assembly Relating to & the Gen. Ordinances
of the City of Pittsburgh 496 (1897) (enacted 1893) (Ex. 70) ............. JA1995

Digest of the Laws & Ordinances for the Gov't of the Mun. Corp. of
the City of Reading, PA 240 (1897) (Ex. 71)...................................... JA2001

Rev. Ordinances of the City of Boulder, CO 157 (1899) (Ex. 72)............. JA2002

General Municipal Ordinances of the City of Oakland, Cal.,
Addendum at 15 (1909) (Ex. 73)............................................ JA2003

The Code of City of Birmingham, Alabama 662 (1917) (Ex. 74) ............. JA2004

Firearms Regulations in the National Parks, 1897-1936 (NPS 2008)
(Ex. 75) ................................................................................. JA2008

Sen Yuan Wu, N.J. Pop. 1790 to 2010, Div. Labor Market &
Demographic Rsch. (Dec. 2010) (Ex. 76)............................... JA2083

2021 Population Density: N.J. Counties, U.S. Census Bureau, Pop.
Div. (Apr. 2022), prepared by N.J. Dept. Labor & Workforce
Dev't (Ex. 77) ......................................................................... JA2086

1874 Mo. Laws 43 (§ 1) (Ex. 78) ................................................. JA2087

1883 Mo. Laws 76 (§ 1) (Ex. 79) ................................................. JA2090

1889 Ariz. Sess. Laws 17 (§ 3) (Ex. 80)........................................ JA2093

1890 Okla. Sess. Laws 496 (§ 7) (Ex. 81)..................................... JA2096

1903 Mont. Laws. 49-50 (§ 3) (Ex. 82)......................................... JA2099

M. Kevane & W. Sundstrom, Development of Public Libraries in
the U.S., 1870-1930, Information & Culture, Vol 49, no. 2
(2014) (Ex. 83) ..................................................................... JA2103

## VOLUME VII

Pop. of Mass. by Counties & Minor Civil Divs., Census Bulletin
(Nov. 8, 1990) (Ex. 84).......................................................... JA2132

1746 N.J. Laws ch. 102 (Ex. 85) ............................................................... JA2139

1797 N.J. Laws (R.S. 572), at 367 (Ex. 86)............................................... JA2144

1874 N.J. Laws (P.L. 1871, p.109) (Ex. 87)............................................... JA2149

G. Fenich, A Chronology of (Legal) Gaming in the U.S., Gaming
    Rsch & Rev. J, vol.3, Iss.2 (1996) (Ex. 88)........................................ JA2151

Report & Recommendations of the Governor's Advisory
    Commission on Gambling, Jun. 30, 1998 (Ex. 89) ............................. JA2165

Port Authority of NY & NJ, Dec. 2021 Traffic Report, Aviation
    Dep't, https://www.panynj.gov/airports/en/statistics-general-
    info/Monthly_Airport_Activities.html (Ex. 90).................................. JA2447

Caroline Norris, A History of Madness: Four Venerable Virginia
    Lunatic Asylums, Virginia Magazine of History & Biography,
    Vol. 125, Issue 2 (2017) (Ex. 91) ....................................................... JA2450

1776 N.C. Sess. Laws 168 (Ex. 92)........................................................... JA2478

1800 Ga. Laws 428 (Ex. 93)...................................................................... JA2479

1837 Md. Acts 108 (Ex. 94) ...................................................................... JA2481

1868 Oh. Supp. Rev. Stat 13 (Ex. 95) ...................................................... JA2484

1872 Wisc. Rev. Stat 1960 (Ex. 96) .......................................................... JA2486

1872 Conn. Acts 108 (Ex. 97) ................................................................... JA2489

1872 Or. Acts 26 (Ex. 98).......................................................................... JA2491

1873 S.C. Rev. Stat. 404 (Ex. 99).............................................................. JA2493

1887 W.Va. Code, ch. 148, § 7 (Ex. 100) ................................................. JA2495

Declaration of Angela Cai and Exhibits Volume III (ECF 90) ........................ JA2499

1881 Kan. Sess. Laws 92, § 23 (Ex. 101).................................................. JA2512

1875 Ark. Acts 156 (Ex. 102).................................................................... JA2514

1847 Va. Laws 129 (Ex. 103).................................................................... JA2516

1868 W. Va. Code 153 (Ex. 104) ............................................................... JA2523

1872 Portland Ord. No. 1108 (Ex. 105) .................................................... JA2526

1813 Ky. Acts 10 (Ex. 106) ....................................................................... JA2528

1813 La. Acts 172 (Ex. 107) ...................................................................... JA2532

1819 Ind. Acts 39 (Ex. 108) ...................................................................... JA2536

1838 Va. Acts 76 (Ex. 109) ....................................................................... JA2538

1859 Ohio Acts 56 (Ex. 110) ..................................................................... JA2541

1861 Ga. Laws 859 (Ex. 111) .................................................................... JA2544

1835 Mass. Rev. Stat., ch. 134, § 16 (Ex. 112) ......................................... JA2546

1838 Terr. of Wis. Stat. § 16 (Ex. 113) ..................................................... JA2548

Me. Rev. Stat., ch. 169, § 16 (1840) (Ex. 114)......................................... JA2550

Mich. Rev. Stat., ch. 162, § 16 (1846) (Ex. 115)....................................... JA2552

Excerpts from M. Dalton, The Country Justice (1690) (Ex. 116).............. JA2554

Terr. of Minn. Rev. Stat., ch. 112, § 18 (Ex. 117)..................................... JA2560

1854 Ore. Stat. ch. 16, § 17 (Ex. 118) ....................................................... JA2562

1857 D.C. Rev. Code ch. 141, § 16 (Ex. 119)............................................ JA2564

1860 Pa. Laws p. 432, § 6; § 8 (Ex. 120) .................................................. JA2566

1844 Miss. Law p. 182, Art. 16, § 1, in Anderson Hutchinson, Code
    of Mississippi, from 1798 to 1848, 182 (1848) (Ex. 121).................... JA2568

1856-1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled
    "Revenue," ch. 34, § 23, pt. 4 (Ex. 122)............................................... JA2570

1866 Ga. Laws p. 27-28, Title VI, No. 41 (Ex. 123).................................. JA2572

Rev. Code of Alabama, p. 169, ch. 3, § 10 (1867) (Ex. 124).................... JA2575

1867 Miss. Laws 327-28, An Act To Tax Guns And Pistols in The County Of Washington, ch. 249, § 1 (Ex. 125) .................................... JA2577

George W. Hess, Revised Ordinances of the City of Evanston, 131-132 (1893) (Ex. 126) ........................................................... JA2580

1895 Neb. Laws 210, Laws of Nebraska Relating to the City of Lincoln, Art. XVI, § 6 (Ex. 127) ........................................................ JA2582

1902-04 Va. Acts 155-157, An Act to Raise Revenue for Support of the Government and Public Free Schools, sched. B, § 6, Tangible Personal Property, Eighteenth (Ex. 128) .............................. JA2584

Orville Park, Park's Annotated Code of the State of Georgia 1914, Penal Code, Article 3, Carrying pistols without license, § 348(a)-(d) (Ex. 129) ................................................................ JA2587

Ohio Law, p. 633, §§ 24-25 (1884) (Ex. 130) ........................................... JA2590

Mass. Law, p. 479-484, ch. 22, §§ 1-10 (1776) (Ex. 131) ......................... JA2592

1777 Pa. Laws 110-113 (Ex. 132) ............................................................. JA2598

Va. Act of May 5, 1777, ch. 3 (Ex. 133) .................................................... JA2604

Excerpt from Bernard Schwartz, The Bill of Rights: A Documentary History, Vol, 2, at 662 (1971) (Ex. 134) ...................... JA2608

Excerpt from Debates & Proc. in the Convention of the Commonwealth of Mass. Held in the Year 1788 (1856) (Ex. 135) ................................................................................................ JA2616

Charles C. Branas, SeungHoon Han, and Douglas J. Wiebe, Alcohol Use and Firearm Violence, 38 Epidemiologic Rev. 32, 40-43 (2016) (Ex. 136) .................................................................. JA2618

Jonathan Jay, Alcohol Outlets and Firearm Violence: a Place-Based Case–Control Study Using Satellite Imagery and Machine Learning, Inj. Prev. 61, 64 (2019) (Ex. 137) ....................................... JA2632

Pamela J. Trangenstein et al., Outlet Type, Access to Alcohol, and Violent Crime, 42 Alcohol Clin. Exp. Re. 2234, 2241 (2018) (Ex. 138) ................................................................................... JA2638

Matthew Miller et al., 'Road rage' in Arizona: Armed and
    Dangerous, 34 Accident Analysis and Prevention, 807, 811
    (2002) (Ex. 139) ................................................................... JA2650

Arlin J. Benjamin Jr., Sven Kepes, & Brad. J. Bushman, Effects of
    Weapons on Aggressive Thoughts, Angry Feelings, Hostile
    Appraisals, and Aggressive Behavior: A Meta-Analytic Review
    of the Weapons Effect Literature, 22 Personality & Social
    Psych. R. 347, 359 (2018) (Ex. 140) .................................... JA2658

David Hemenway, Chloe Shawah, & Elizabeth Lites, Defensive
    gun use: What can we learn from news reports?, 9 Injury
    Epidemiology 19, 27 (2022) (Ex. 141)................................. JA2689

David Hemenway, Deborah Azrael, & Matthew Miller, Whose guns
    are stolen? The epidemiology of Gun theft victims, 4 Injury
    Epidemiology 11, 14 (2017) (Ex. 142)................................. JA2699

## VOLUME VIII

John J. Donohue et al., More guns, more unintended consequences:
    the effects of right-to-carry on criminal behavior and policing in
    U.S. cities, Nat'l Bureau of Econ. Research, Working Paper
    Series, Working Paper 30190, at 29,
    http://www.nber.org/papers/w30190 (Ex. 143)................................... JA2704

D. Hemenway & S.J. Solnick, The epidemiology of self-defense
    gun use: Evidence from the National Crime Victimization
    Surveys 2007–2011, 79 Preventative Medicine 22, 27 (2015)
    (Ex. 144) .......................................................................... JA2740

John J. Donohue, Abhay Aneja, & Kyle D. Weber, Right-to-Carry
    Laws and Violent Crime: A Comprehensive Assessment Using
    Panel Data and a State-Level Synthetic Control Analysis, 16 J.
    Empirical L. Studies 198, 240 (April 2019) (Ex. 145)........................ JA2746

Michael Siegel et al., Easiness of Legal Access to Concealed
    Firearm Permits and Homicide Rates in the United States, 107
    AJPH Research 1923, 1929 (2017) (Ex. 146)...................... JA2796

1875 Wyoming Terr. Acts ch.52, §1 (Ex. 147) .......................................... JA2803

Code of City of Lynchburg, Va. Ch. XIX, § 20 (1887) (Ex. 148) ............. JA2806

1869 N.M. Gen Laws ch.32, at 313 (Ex. 149)................................................ JA2809

A. Holgersson & U. Bjornstig, Mass-casualty attacks on public
transportation, J Transp. Security 7:1–16 (2014) (Ex. 150)................. JA2812

1795 Mass Gen Law ch.26, § 2 (Ex. 151) ...................................................... JA2828

1686 N.J. Laws, ch. 9, in The Grants, Concessions, and Original
Constitution of the Province of New Jersey, at 289–90 (2d ed.
1881) (Ex. 152)...................................................................................... JA2830

Second Supplemental Declaration of Jason Cook (ECF 98)............................ JA2834

Supplemental Declaration of Nicole Cuozzo (ECF 99) .................................... JA2837

Declaration of Ronald D'Angelo (ECF 100)..................................................... JA2839

David Jensen Affidavit (ECF 103) .................................................................... JA2841

1777 N.J. Laws 26-36, ch. XX (Ex. 1) ........................................................ JA2843

1780 N.J. Laws 39-54, ch. XIII (Ex. 2) ....................................................... JA2855

1798 N.J. Laws 609-28, ch. DCCCXXII (Ex. 3)......................................... JA2872

1806 N.J. Laws 771-83, ch. CLVI (Ex. 4).................................................... JA2893

1829 N.J. Laws 109-33, An Act for the punishment of crimes (Ex.
5) ........................................................................................................... JA2907

Act of May 28, 1746, ch. X, Acts and Laws of Massachusetts Bay
207-08 (Ex. 6)........................................................................................ JA2933

19 Colonial Records of the State of Georgia: Part I, Statutes,
Colonial and Revolutionary 137-40 (Ex. 7) ......................................... JA2935

Digest of the Laws of Georgia 157-58 (1800) (Ex. 8) ............................... JA2940

1812 Del. Laws 522-24, ch. CXCV (Ex. 9) ................................................ JA2943

1818 Vermont Acts & Resolves 22-65, ch. II (Ex. 10) .............................. JA2947

1823 N.H. Laws 72-75, ch. XXXIV (Ex. 11)............................................. JA2992

1885 N.J. Laws 52, ch. XLIV (Ex. 12) ....................................... JA2997

1799 N.J. Laws 561-63, ch. DCCCVI (Ex. 13) .......................... JA2999

1811 N.J. Laws 300 (Ex. 14) ..................................................... JA3003

Public Laws of South Carolina 275-76 (1790) (Ex. 15) ............. JA3005

Acts and Laws of the State of Connecticut 36-37 (1784) (Ex. 16) ............ JA3008

Manual of the Laws of North Carolina 234-36 (1814) (Ex. 17) ............... JA3011

Digest of the Laws of Georgia 428 (1800) (Ex. 18) ................... JA3015

Public Laws of Rhode-Island and Providence Plantations 568
     (1798) (Ex. 19) ................................................................. JA3017

1812 Del. Laws 522-24, ch. CXCV (Ex. 20) ............................. JA3019

5 Laws of the Colony of New York 11-13, ch. 1410 (1894) (Ex. 21) ....... JA3023

## VOLUME IX

Letter from Defendants (ECF 104) .................................................. JA3027

Letter from Defendants (ECF 105) .................................................. JA3029

Supplemental Certification of Director Rebuck (Ex. 1) ............ JA3031

Letter from Defendants (ECF 107) .................................................. JA3034

Letter from *Siegel* Plaintiffs Regarding Standing (ECF 114) .......... JA3035

Declaration of Kenneth Armellino (Ex. 1) ................................ JA3038

Declaration of Daniel L. Schmutter (Ex. 2) .............................. JA3048

Third Supplemental Declaration of Jason Cook (ECF 115) ............ JA3091

*Siegel* Plaintiffs' Emergency Motion for Leave to File Supplemental
     Papers Containing Newly Obtained Information on Issues of
     Standing (ECF 116) ......................................................... JA3093

Transcript of Hearing on Motion for a Preliminary Injunction (ECF
     118) .................................................................................. JA3095

Letter from Defendants enclosing electronic copies of exhibits
submitted to the court at motion hearing (ECF 119)................................. JA3263

Timothy Cunningham, 1 A New and Complete Law Dictionary
(1771) (Tab 1)....................................................................... JA3265

Samuel Johnson, Dictionary of the English Language (1773)
(Tab 2) ................................................................................. JA3270

T. Sheridan, A Complete Dictionary of the English Language
(1797) (Tab 3)....................................................................... JA3277

N. Bailey, Dictionarium Britannicum (1736) (Tab 4)................................ JA3282

S. Colt, Revolving gun, patented Feb. 25, 1836 (from Rutgers
University Libraries) (Tab 5).................................................. JA3286

James Robinson Planché, 1 A Cyclopædia of Costume or
Dictionary of Dress (1876) (Tab 6)....................................... JA3289

Order administratively terminating actions pending appeal (ECF 130)........... JA3297

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| AARON SIEGEL, JASON COOK, JOSEPH DELUCA, NICOLE CUOZZO, TIMOTHY VARGA, CHRISTOPHER STAMOS, KIM HENRY, AND ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey; and PATRICK CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police, <br><br> Defendants. | No. 22-CV-7463 (RMB) (AMD) |

| | |
|---|---|
| RONALD KOONS; NICHOLAS GAUDIO; JEFFREY M. MULLER; SECOND AMENDMENT FOUNDATION; FIREARMS POLICY COALITION, INC.; COALITION OF NEW JERSEY FIREARM OWNERS; and NEW JERSEY SECOND AMENDMENT SOCIETY, *Plaintiffs,* <br> v. <br> WILLIAM REYNOLDS in his official capacity as the Prosecutor of Atlantic County, New Jersey; GRACE C. MACAULAY in her official capacity as the Prosecutor of Camden County, New Jersey; | No. 22-CV-7464 (RMB) (AMD) |

1

ANNEMARIE TAGGART in her official
capacity as the Prosecutor of Sussex
County, New Jersey; MATTHEW J.
PLATKIN, in his official capacity as
Attorney General of the State of New
Jersey; and PATRICK CALLAHAN, in his
official capacity as Superintendent of the
New Jersey State Police,
*Defendants.*

## DECLARATION OF DR. BRENNAN GARDNER RIVAS

1.      I am over the age of eighteen (18) years, competent to testify to the
matters contained in this declaration, and testify based on my personal knowledge
and information.

2.      I am an Historian and Independent Scholar. My chosen professional
name is Brennan Gardner Rivas. From 2021 until earlier this year, I was the Lloyd
Lewis Fellow in American History at The Newberry Library. From 2020 to 2021, I
was a Bill & Rita Clements Fellow for the Study of Southwestern America within
the Clements Center for Southwest Studies at Southern Methodist University.
From 2019 to 2020, I was a Lecturer in American History at Texas Christian
University. Before that, I was a graduate student in history who conducted research
and administrative tasks on behalf of my professors, taught undergraduate survey
courses, and worked at my university library. My educational background includes
a Ph.D. in History from TCU, where my Thesis was on the development,
evolution, and enforcement of gun and weapon policy in Texas from the era of
Mexican independence to the 1930s.

3.      I have been retained by the State of New Jersey to render expert
opinions in this case. I make this declaration on the basis of my training,

2

JA1197

professional expertise, and research. For my work in this case, I am being compensated at a rate of $200/hour for preparatory work and $325/hour for court work.

4.      My CV, detailing my education, experience, and publications, is attached to this declaration as Exhibit A. I have written a number of articles related to the regulation of guns, especially as to the history of nineteenth-century weapon policies and the socio-political context that made them possible.

5.      For this engagement, I was asked to provide expert testimony about historical gun regulations that pertained to travelers, and nineteenth century gun regulations in Texas.

## Application of Public Carry Laws to Travelers & Transportation

6.      Americans of the late eighteenth and nineteenth centuries had laws that broadly prohibited the carrying of firearms and other deadly weapons in public, including while travelling. Early versions of these regulations, particularly those enacted in the eighteenth century by colonial and early American legislatures, tended to draw heavily from legal language with deep roots in the English common law tradition, reaching at least as far back as the Statute of Northampton from 1328.[1] The Statute of Northampton generally prohibited the carrying of arms in "Fairs, Markets, nor in the Presence of the Justices or Ministers

---

[1] Patrick J. Charles, "The Faces of the Second Amendment Outside the Home: History versus Ahistorical Standards of Review," *Cleveland State Law Review* 60, no. 1 (2012), 7-40; Saul Cornell, "The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928," *UC Davis Law Review* 55, no. 5 (June 2022), 2560-2566.

nor in no Part elsewhere."[2] The public spaces specifically named and protected under the Statute were the very public areas that people frequented in their daily lives—the town markets and gatherings, and the town itself under the direction of local officials, formed the very heart of community life.

7. This tradition was absorbed into American law, where numerous colonies and states enacted similar measures that forbade someone to "go or ride" armed in public spaces. An early example provided that individuals shall neither "go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the Country,[3] upon pain of being arrested and committed to prison."[4]

---

[2] 2 Edw. 3, c. 3 (1328) (Eng.) (Ex. B); see also 25 Edw. 3, st. 5, c. 2, § 13 (1350) (Eng.) (Ex. C) (if "any Man of this Realm ride armed covertly or secretly with Men of Arms against any other . . . shall be judged Treason.").

[3] In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2144-50 (2022), the Supreme Court suggested that the phrases "to the terror of the country" and "to the terror of the people" cabined these early statutes to prohibiting firearm carry only in a threatening manner. But the latest research, published after *Bruen*, shows that, according to common law, the act of carrying deadly weapons in public spaces was inherently terrifying and therefore a breach of the peace. See Saul Cornell, "The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928," *U.C. Davis Law Review* 55 (June 2022), 2555-2556 ("There was no requirement that one establish an intent to terrify or that the armed travel terrorized any specific person, the injury was to the King's Peace and sovereignty."); Patrick J. Charles, "The Fugazi Second Amendment: Bruen's Text, History, and Tradition Problem and How to Fix It," *Cleveland State Law Review* 71, no. 3 (2022, forthcoming), draft p.12 ("What [English jurists'] restatements inform is that by the early-to-mid-seventeenth century, England's preeminent legal minds understood that the act of carrying dangerous weapons was sufficient to amount to an affray, 'strike a feare' or 'striketh a feare.' ") [draft available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4222490].

[4] 1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays (Ex. D). A non-exhaustive list of additional examples includes: 1835 Mass. Acts 750 ("If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace.") (Ex. E); Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792) (Ex. F) ("…nor to go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor it [sic, likely "in"] no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure,");

Under this scheme, no one was permitted to carry arms into public areas without having a justifiable reason. Anyone violating this rule would have been subject to questioning by local officials and "bound" to the peace through a peace bond or surety.[5]

8.     In the nineteenth century, the language of American public carry regulations began to shift away from the inherited language of common law, and toward more explicit statutory prohibitions. These public carry laws generally prohibited the concealment of certain specified weapons in public spaces, and are therefore known as concealed-carry laws. The approach of prohibiting the carrying of concealed weapons spread rapidly, including in slaveholding states and those removed from the Atlantic coast.[6]

---

see also 1821 Me. Laws 285, ch. 76, § 1 (Ex. G) (simplified to a requirement that officials "cause to be staid and arrested, all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this State").

[5] The peace bond was one of many processes inspired by America's common law heritage. See Laura Edwards, *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South* (Chapel Hill: University of North Carolina Press, 2009), 73-74, 96; Saul Cornell, "History, Text, Tradition, and the Future of Second Amendment Scholarship: Limits on Armed Travel under Anglo-American Law, 1688-1868," *Law and Contemporary Problems* 83, no. 3 (Summer 2020), 73-95; Saul Cornell, "Right to Carry Firearms outside of the Home: Separating Historical Myths from Historical Realities," *Fordham Urban Law Journal* 39, no. 5 (October 2012), 1719-1723. Edwards's passage on peace bonds is worth quoting at length: "Peace bonds threw enforcement back on the community, summoning family, friends, and neighbors to police the troublemakers. Bonds required one or more other people to put up the amount, making them liable if the accused broke the peace again. That economic obligation represented the signers' promise to keep the offender in line. Peace bonds put everyone else in the community on notice as well, investing them with the responsibility of policing the peace until the end of the probation period."

[6] Examples include: 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner, § 1 (Ex. H) ("That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine…"); Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State,

9.      The language of concealed carry laws might at first suggest that open carry of firearms was accepted and commonplace, but that was not the case. Individuals generally did not view concealed carry laws as giving permission to openly carry in populated places during a person's ordinary activities.[7] For example, in 1843, an appellate court in North Carolina stated, "No man amongst us carries [a firearm] about with him, as one of his every day accoutrements—as a part of his dress—and never we trust will the day come when any deadly weapon will be worn or wielded in our peace loving and law-abiding State, as an appendage of manly equipment."[8] And a Louisiana case from 1856 held that a partially visible weapon was a violation of the concealed carry law because it was "the result of accident or want of capacity in the pocket to contain, or clothes fully to cover the weapon, and not the extremely unusual case of the carrying of such weapon in full open view, and partially covered by the pocket or clothes."[9]

10.      As the nineteenth century wore on, concealed-carry laws became more likely to mandate a criminal penalty (often a fine) rather than engage the surety mechanism, and they also tended to provide a number of exceptions. These exceptions ranged from people fearing an imminent and deadly attack to peace officers and travelers. The statutes themselves varied from one state to another, and many left the definition of terms like "travel," "peace officer," and "journey" quite

---

A.D. 1837 (Ex. I) ("Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which the said offence shall have been committed, shall be fined in any sum not less than twenty-five dollars…").

[7] Mark Anthony Frassetto, "The Myth of Open Carry," *U.C. Davis Law Review* 55 (June 2022).

[8] *State v. Huntley*, 25 N.C. 418 (1843).

[9] *State v. Smith*, 11 La. Ann. 633 (1856).

6

ambiguous. In Texas, even exempted travelers were required to place their weapons in their baggage, which did not include saddlebags.[10]

11.    Although carry prohibitions made an exception for "travel," it was far from a blanket exception for people to go armed at all times outside their homes. To the contrary, the travel exception only confirms that nineteenth century carry prohibitions applied to individuals while going about in their communities.

12.    The travel exception was narrowly defined by state courts. The kind of "travel" which it described was not the everyday movement through public spaces like town squares and commercial districts, or the kind of travel associated with modern transportation. Instead, it encompassed a type of travel that separated a person, small group, or family from the protections of the law that went hand-in-hand with organized society and were a fundamental feature of community life—courts, magistrates, constables, and the security of being among one's neighbors. To be a traveler was to venture outside one's community sphere and become vulnerable to dangers such as robbers and predatory animals.

13.    A case from 1879 held that: "The court decided the case on the ground that defendant, whilst stopping over at Marianna, could not be said to be on a journey, and should, to avoid a breach of the law, have deposited his pistols with his baggage, and not carried them on his person. This is correct, if the appellant was really wearing them, or either of them, as a weapon. The exception in the statute is to enable travelers to protect themselves on the highways, or in transit

---

[10] Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930," PhD diss. (Texas Christian University, 2019), 108-110. John Thomas Shepherd, "Who Is the Arkansas Traveler: Analyzing Arkansas's Journey Exception to the Offense of Carrying a Weapon," Arkansas Law Review 66, no. 2 (2013): 463-484.

through populous places—not to allow them the privilege of mixing with the people in ordinary intercourse, about the streets, armed in a manner which, upon a sudden fit of passion, might endanger the lives of others. Travelers do not need weapons, whilst stopping in towns, any more than citizens do. They should lay them aside, unless the delay be slight, and the journey soon resumed."[11] An Alabama appellate court affirmed the decision of a lower court judge who, even though he acquiesced that the defendant had a right to carry a concealed weapon while traveling on a dangerous stretch of road, instructed the jury that "if they further believed, from all the evidence in the case, that the defendant was in the daily habit of coming to the city, engaging in his business in the city from morning until evening, mingling with the inhabitants of the city in business and social intercourse, and carried a pistol concealed about his person during this time, not being justified or excused otherwise than for the reason of his having to travel" along the dangerous stretch of roadway, "then he would be guilty, as charged in the indictment."[12] A Tennessee decision rejected the idea that a "journey" meeting the standards of a travel exception "should embrace a mere ramble in one's own neighborhood across the lines of contiguous counties."[13] The court's final word was that "The evil intended to be corrected is the carrying of deadly weapons on the streets, in society, in the community, or among the people with whom we are in the habit of associating—a habit which will ultimately convert a good man into an assassin, and a brave man into a coward."[14] These are only a small sample of the

---

[11] *Carr v. State*, 34 Ark. 448 (1879).

[12] *Eslava v. State*, 49 Ala. 355 (1873).

[13] *Smith v. State*, 50 Tenn. 511 (1872).

[14] *Smith v. State*, 50 Tenn. 511 (1872).

travel-related cases that formed the corpus of traveler-exception jurisprudence associated with nineteenth century concealed weapon laws.[15]

14.    Thus public carry laws in force during the late eighteenth and nineteenth centuries, whether they employed language from English common law or took the shape of concealed-carry laws, applied to public spaces in American communities large and small. The exceptions which some concealed weapon laws carved out for travelers remained closely guarded by appellate courts and did not apply to everyday travel.

## Firearm Prohibitions In Texas during the Reconstruction Era

15.    In 1870, the State of Texas enacted a law prohibiting individuals from carrying firearms in a broad range of sensitive places.[16] The statute provided:

> That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ballroom, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to

---

[15] See also *Darby v. State*, 23 Tex. Ct. App. 407 (1880), "He was not a traveler. He resided in Williamson county, and was merely going from his residence to the county site of said county, a distance of about eighteen miles, intending to return the next day. These facts certainly did not constitute him a traveler, within the common meaning of that word, and within the spirit of the statute." See also Shepherd, "Who Is the Arkansas Traveler," 466-482.

[16] 1870 Tex. Gen. Laws 63, ch. 46, § 1 (Ex. J).

locations Subject to Indian depredations ; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law.

16.    The historical context surrounding the 1870 Texas law is crucial to understanding its purpose. Several social and cultural forces converged during Reconstruction to make that period especially tumultuous in Texas and the South more broadly. One critical part of lawmakers' responses to these new societal concerns was to prohibit arms in certain public spaces, especially those that featured large gatherings of people. Although not all states enacted legislation similar to the 1870 law, those other states were not confronted with the unique social concerns in Texas that resulted in passage of the 1870 law.

17.    In Texas, the defeat of the Confederate cause led to political instability, racial violence, and a profound distrust of government institutions. Confederate sympathies there still ran high because Texans had not been conquered or occupied by U.S. Army forces during the war.

18.    Meanwhile, revolvers were flooding American consumer markets. After Samuel Colt's patent on his revolver design expired in 1857, other manufacturers began producing similar models for the United States military during the Civil War. After the war, demobilization ended those contracts, and gunmakers turned to American consumers to buy their pistols. The net result was more and cheaper pistols throughout the country[17], including in areas plagued by violence and social dislocation, such as postbellum Texas.

---

[17] Colt's Army revolvers cost about $20 at the time of the Civil War, but subsequent entrants into the market sold small pocket pistols for as little as $1.40. For example, *see* digitized Sears and Roebuck catalog (1898), pp. 365-367. Regardless of caliber, the pistols from Colt's ran about $12 to $13 in the catalog but retailed elsewhere for something closer to $18 (*see* p. 367). Meanwhile, the smaller caliber pocket pistols from other brands could be ordered for as little as

19.     Another factor involved in Texas's experience with gun regulation involved demographic changes. Since the 1820s, Texas had consistently drawn immigrants from other parts of the United States, but that growth accelerated rapidly after statehood and the conclusion of the U.S.-Mexican War. In just the three years between 1847 and 1850, the population grew from an estimated 142,000 to 212,295 (a growth of nearly fifty percent). By the time of the 1860 census, the population reached 604, 215.[18] Even during the Civil War, tens of thousands of people moved to Texas, and the pace of migration accelerated rapidly between 1870 and 1900 as the state's population of roughly 800,000 grew to more than 3,000,000.[19] Many (and possibly most) of these newly engrafted Texans intended to farm or ranch, meaning that they would live outside of the towns and market centers; but rail construction enabled industrial development and the formation of towns, which led to a period of urbanization in postbellum Texas.[20] The market towns of Texas—rail stops and county seats—created more opportunities for altercations that could result in violence and crime.

20.     Following the Civil War, Texans from all walks of life, from fire-eating secessionists to reluctant Confederates and dedicated unionists, all recognized that there was a gun problem in their state. The governor elected in 1866, who represented a coalition of Confederate sympathizers called Conservatives, specifically asked the legislature to do something about the

---

$1.40 (*see* p. 365). For the 1898 Sears & Roebuck catalog online, *see* https://archive.org/details/consumersguideno00sear/page/365/mode/1up?q=pistol.

[18] On population figures in Texas between 1847 and 1860, see Randolph B. Campbell, *Gone to Texas: A History of the Lone Star State* (New York: Oxford University Press, 2003), 205.

[19] On population figures in Texas between 1870 and 1900, see Campbell, *Gone to Texas*, 304.

[20] Texas went from having only 9 urban centers of 2,500 residents or more in 1870 to having 42 in 1900. See Campbell, *Gone to Texas*, 307.

problem. He said he did not believe "that it was intended by the Constitution to convey the idea that men and boys, vagabonds and vagrants, were to be licensed to have arms about their persons on all occasions."[21] He proposed a tax on all "pistols and weapons carried about the person," though disagreements about rates, terms, and other details prevented the proposal from being enacted.[22]

21. During the late 1860s, the Conservatives fell from power in favor of a fledgling Republican party composed of Freedpeople and Unionists. They, too, agreed that there was a gun problem in Texas, and they determined to do something about it. Republican leaders at the convention agreed with the Conservatives about the need for gun regulation, but their experiences of persecution at the hands of secessionists, Confederates, Conservatives and others (all of whom ultimately coalesced into a resurgent Democratic party) made it a priority for them. Republicans in 1868 did much the same thing that we do now: they gathered as much information as possible about crime in order to understand the problem they faced and inform the route they might take to address it. They created a special Committee on Lawlessness and Violence that requested all counties to send information about crimes committed since 1865. Not all counties participated, but the committee's reports told a "frightful story of blood."[23] The committee ultimately uncovered 939 homicides between 1865 and the summer of 1868, a disproportionate number of which involved Freedpeople killed at the hands of whites.[24] Convention delegates also received the annual report from military

---

[21] *House Journal* (1866), 199-200.

[22] Ibid.

[23] *Journal of the Reconstruction Convention* (1868-1869), 194.

[24] *Journal of the Reconstruction Convention* (1868-1869), 193-203, 194. White and black Texans were murdered in about equal numbers, which is itself a dramatic overrepresentation of the state's African American population, which constituted about 30% of the state overall. To make

12

authorities, which told of the rise of the Ku Klux Klan, conspiracies to intimidate Black voters, and declared that "the civil law east of the Trinity river is almost a dead letter."[25] The information gathered by Republicans in 1868 and 1869 became the evidentiary foundation for a law-and-order platform that their candidates promoted in upcoming campaigns.[26]

22.    As a result of these factors, the legislative session that met in 1870 enacted a law for the state that prohibited all firearms and weapons in certain public spaces. A member of the state senate introduced the bill that ultimately became the 1870 sensitive spaces law, which made it a misdemeanor for anyone to "have about his person" deadly weapons at public gatherings. The prohibited weapons were "A bowie knife, dirk or butcher knife, or firearms, whether known as a six-shooter, gun, or pistol of any kind." It is important to note that this bill included the terms "firearms" and "gun," which would have applied to rifles and shotguns as well as pistols. Even more exhaustive than the list of prohibited weapons was that of the social settings in which public carry would be illegal: "any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place

---

matters worse, the overwhelming majority of freedman deaths were committed by whites (373 of 429), yet only ten white deaths came at the hands of freedmen.

[25] See Report and Declaration of Special Committee on the condition of the State concerning elections, in *Journal of the Reconstruction Convention* (1868-1869), 107-115.

[26] *Journal of the Reconstruction Convention* (1868-1869), 194.

where people may be assembled to muster or perform any other public duty, or any other public assembly… ."[27]

23.     The primary exemption created by the 1870 sensitive spaces law was a proviso for "any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law."[28] This would have effectively limited the carrying of weapons to peace officers and active-duty soldiers or militiamen engaged in their duties. Armed soldiers or other officials frequently guarded polling stations in Texas during Reconstruction due to the high incidence of voter fraud. The drafters in 1870 likely also envisioned sheriffs, deputies, marshals, and constables who were loyal to the United States as well as the new State Police force and active-duty members of the militia.[29]

24.     Subsequent iterations of the 1870 law incorporated the same exception, though they deviated slightly from the original language and structure. A later reenactment of the same law embedded the exception within one of the several clauses that made up the list of weapon-free spaces. It prohibited the carrying of weapons in various public spaces "or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,)… ."[30] The context surrounding the exception clearly indicates that the drafters intended it to cover the carrying of arms to militia musters or by duly authorized persons performing a public duty; in other words,

---

[27] 1870 Tex. Gen Laws 63, Ch. 46, § 1 (Ex. J).

[28] Ibid.

[29] On the Texas State Police, an organization that existed during Republican rule in Texas, see John G. Johnson, "State Police," *Handbook of Texas Online*, https://www.tshaonline.org/handbook/entries/state-police, published by the Texas State Historical Association.

[30] 1871 Tex. Gen. Laws 25, ch. 34 § 1 (Ex. K).

the exception applied to peace officers as well as soldiers and militiamen in actual service. When state lawmakers issued a revised penal code in 1879, the exception was relocated to a subsequent article which read: "The preceding article shall not apply to peace officers or other persons authorized or permitted by law to carry arms at the places therein designated."[31] Even though the format and phrasing of the exception changed, its substance did not—the exception was for peace officers and active-duty militia. The exception would not have reached ordinary, civilian gunowners, as there was no general gun permitting scheme in Texas at the time.

25.     Realizing that the sensitive places statute was not enough to sufficiently curb the violence in their communities, the Texas legislature in 1871 enacted a more comprehensive deadly weapons prohibition that incorporated the sensitive places law passed one year earlier.[32] Section 1 of the 1871 law prohibited both concealed and open carry of deadly weapons in public altogether while Section 3 expanded the prohibition on carrying deadly weapons in sensitive places. Lawmakers added as sensitive places assemblies for "amusement," like "any circus, show, or public exhibition of any kind," as well as those assemblies "for educational or scientific purposes."[33] In 1879, the statute and its several sections were reformatted in the penal code as a chapter concerning the unlawful carrying of arms.[34] The sensitive places law and its exception became Articles 320 and 321.

26.     In 1872, a series of convictions for unlawfully carrying arms made their way to the state supreme court. The Defendant William Daniels had been

---

[31] Penal Code of the State of Texas, (1879), Title X, Offenses Against the Public Peace, Chapter 4, Unlawfully Carrying Arms, § 321 (Ex. L).

[32] 1871 Tex. Gen. Laws 25, ch. 34 § 1 (Ex. K).

[33] Ibid.

[34] Penal Code of the State of Texas, § 318-323 (Ex. L).

15

JA1210

convicted under Section 3 of the 1871 deadly weapon law, which was the updated sensitive places provision. He had gone to a church service with the handle of a butcher knife visible in his waistband. Two other appellants, William English and G. W. Carter, had been convicted under Section 1, which prohibited carrying deadly weapons (open or concealed) upon one's person or in one's saddlebags. The three cases were consolidated into one case, called *English v. State*[35], which addressed certain questions about Texans' constitutional and fundamental rights to carry weapons. A distinguished attorney who later joined the state supreme court argued that the 1871 deadly weapon law violated the Second Amendment to the US Constitution, that it violated the Article I, Sec. 13 of the Texas Constitution of 1869[36], and that it deprived Texans of their customary right to self-defense.[37] The court profoundly disagreed with these claims.

27.    The Chief Justice stated emphatically that "No kind of travesty, however subtle or ingenious could so misconstrue this provision of the constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the legislature to punish and prohibit."[38] The court went on to say that: "[W]e do not intend to be understood as admitting for one moment, that the abuses prohibited are in any way protected either under the state or federal constitution. We confess it appears to us little short of

---

[35] *English v. State*, 35 Tex. 473 (1872).

[36] "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the State, under such regulations as the Legislature may prescribe."

[37] The opinion did not mention it, but Section 2 of the law provided that anyone convicted of publicly carrying a prohibited weapon could plead self-defense at trial; that exception did not technically apply to the sensitive places provision outlined in Section 3.

[38] *English*, 35 Tex. 473.

16

ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together."[39]

28.     The decision in *English* ultimately rested upon state police power to affirm the constitutionality of the deadly weapon law. The court held that whatever conduct offends against public morals or public decency comes within the range of legislative authority.[40] The goal of a weapon-free public sphere, then, justified the enactments required to achieve it. Furthermore, the justices did not believe that the Texas law deviated from the national norm. "It is not our purpose to make an argument in justification of the law. The history of our whole country but too well justifies the enactment of such laws. This law is not peculiar to our own state, nor is the necessity which justified the enactment (whatever may be said of us to the contrary) peculiar to Texas. It is safe to say that almost, if not every one of the states of this Union have a similar law upon their statute books, and, indeed, so far as we have been able to examine them, they are more rigorous than the act under consideration."[41] A subsequent court, this one staffed with Democrats rather than Republicans, reaffirmed the constitutionality of the deadly weapon law in a case decided in 1875.[42]

29.     In the late 1870s and throughout the 1880s, Texas appellate judges consistently applied the sensitive places law without questioning its

---

[39] *Id* at 478-79.

[40] *Id*. at 473.

[41] *Id.* at 479.

[42] *State v. Duke*, 42 Tex. 455 (1875).

constitutionality. In 1878 they decided that a Justice of the Peace court qualified as a "public assembly" when it was in session hearing a cause.[43] The same year, the court determined that a man deputized to carry out a specific arrest did not qualify as a peace officer exempt from the weapon ban at polling places.[44] In 1889, a teacher feared that local residents would interfere with an entertainment event taking place at his school, so he took a pistol with him (and ended up brandishing it). Texas appellate judges forcefully condemned the idea that teachers were authorized to carry weapons in schoolhouses, saying that "such an effect could not be other than pernicious, and should not be tolerated."[45]

30.     The majority opinion in *NYSRPA v. Bruen* treated the 1871 Texas statute as an outlier, but its discussion was limited to the first section of that law banning open and concealed carry of arms in public altogether.[46] Section 3 of the 1871 law prohibiting carry in sensitive places was not unique. *English* recognized as much when it concluded, "This law is not peculiar to our own state, nor is the necessity which justified the enactment (whatever may be said of us to the contrary) peculiar to Texas."[47] That conclusion was not wrong as many states around that time enacted similarly broad sensitive places prohibitions. For

---

[43] *Summerlin v. State*, 1878 3 Tex. Ct. App. 444 (1878).

[44] *Snell v. State*, 4 Tex. App. 171 (1878)

[45] *Alexander v. State*, 11 S.W. 628 (Tex. App. 1889). The passage is worth quoting in full: "We can not believe that it was the purpose and intent of the Legislature to permit school teachers to carry prohibited weapons upon their persons in their school rooms among their pupils, or on the occasion of public assemblies in such school rooms. The law does not in terms accord them such a privilege, and, without a clearly expressed exception in such case, this court will not sanction a defense, the effect of which would be to authorize every school teacher in the State to carry prohibited weapons upon his person in our school rooms. Such an effect could not be other than pernicious, and should not be tolerated."

[46] 142 S. Ct. at 2153.

[47] *English*, 35 Tex. at 479.

example, in 1869, Tennessee lawmakers prohibited the carrying of deadly weapons "concealed or otherwise" at elections or "any fair, race course, or other public assembly of the people."[48] Similarly in 1870, Georgia lawmakers prohibited the carrying of deadly weapons "to any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster-grounds."[49] Laws in effect in Missouri in 1879 and Oklahoma Territory in 1890 were nearly identical to the sensitive places law from Texas.[50] Vermont and Mississippi both prohibited weapons inside schools, with the Mississippi legislature prohibiting students at colleges from possessing deadly weapons on campuses or within two miles of them (effectively disarming college

---

[48] Ch. 22, 1869 Tenn. Pub. Acts 23[22] (36th Assembly, 1st Sess.), "An Act to Amend the Criminal Laws of the State," §2 (Ex. M). The section read in full: "That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie knife or Arkansas tooth-pick, or other deadly or dangerous weapon." The following section (§3) stated: "That all persons convicted under the second section of this act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the court."

[49] Act No. 285, 1870 Ga. Laws 421 (Ex. N). The list of prohibited weapons included "any dirk bowie-knife, pistol or revolver, or any kind of deadly weapon." There was also no implicit or explicit exception for open carry. Violators convicted received a fine ($20-50), imprisonment (10-20 days), or both.

[50] *Revised Statutes of the State of Missouri* (1879), ch.24, §1274 (Ex. O); 1890 Okla. Stat. 495-96 (Ex. P).

students within the limits of college towns).[51] Other laws prohibited the carrying of weapons at or near polling places, churches, and parks.[52]

## Additional Research Into Municipal Ordinances

31.    In addition to state legislatures, other jurisdictions had authority to regulate the carry of firearms and other weapons in public spaces.[53] For instance, the statewide 1870 sensitive places law from Texas was quite similar to a municipal ordinance from that same year in the city of San Antonio, one of the leading metropolitan and commercial centers in Texas. That ordinance prohibited the carrying of "a bowie-knife, dirk, or butcher-knife or any fire arms or arms,

---

[51] *Annotated Code of the General Statute Laws of the State of Mississippi* (1892), "Crimes and Misdemeanors," §1030 (Ex. Q). "A student at any university, college, or school, who shall carry, bring, receive, own, or have on the campus, college or school grounds, or within two miles thereof, any weapon the carrying of which concealed is prohibited, or a teacher instructor, or professor who shall knowingly suffer or permit any such weapon to be carried, or so brought, received, owned, or had by a student or pupil, shall be guilty of a misdemeanor, and, on conviction, be fined not exceeding three hundred dollars or imprisoned in the county jail not exceeding three months, or both." *Laws of Vermont*, Special Session (1891), No. 85, §2 (Ex. R). "A person who shall carry or have in his possession while a member of and in attendance upon any school, any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon shall, upon conviction thereof, be fined not exceeding twenty dollars."

[52] 1870 La. Acts 159–60, "An Act to Regulate the Conduct and to Maintain the Freedom of Party Election," § 73 (Ex. S) (no carry concealed or unconcealed within a half mile of polling places on election day or registration places on days of voter registration); George Washington Paschal, *A Digest of the Laws of Texas*, 3rd ed. (1873) II: 1317-1318 (Ex. T) (no carry concealed or unconcealed within a half mile of polling places on election day or registration days on days of voter registration); John Prentiss Poe, *The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888* (Vol. 2, 1888), 1457 (Ex. U) (no carry by any person in Kent County on days of an election); 1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, ch. 189 §1 (Ex. V) (no carry by any person in Calvert County within 300 yards of polls on election day); 1877 Va. Acts 305, Offenses Against The Peace, § 21 (Ex. W) (no weapons in church during services, or anywhere beyond one's on premises on Sundays); Oscar F. Greene, *Revised Ordinances of the City of Boulder* (1899), 157 (no one save city police officers shall carry weapons into public parks) (Ex. X).

[53] See, *supra* at n.52., especially examples from City of Boulder and Counties of Kent and Calvert, Maryland.

whether known as six-shooter, gun or pistol of any kind," or any "brass-knuckles, slung shot, club, loaded or sword cane, or any other weapon of offence or defence" into a series of public spaces within the city. The list included: "any church, or religious assembly, any school-room, or other place where persons are assembled, for educational, literary or scientific purposes, or into any ball room, social or wedding party, or other assembly or gathering, for amusement or instruction, composed of males and females, or to any election precinct in the city, on the day or days of an election, or into any Court room or court of Justice, or to any other place where people or individuals may be assembled, to perform any public duty, or shall go into any other public assembly, or shall enter any bar-room, drinking saloon or any other place where people resort for business or amusement or shall join or accompany any public procession… ."[54]

32.　It is likely that yet more municipal governments (in Texas and throughout the country) enacted sensitive places ordinances. These local laws are much more challenging to identify in the historical record, though, because compilations of historical ordinances have often not been preserved or digitized. The best access to municipal ordinances is often local newspapers, many of which have not been digitized, are no longer extant, or are incomplete. A thorough search of newspaper databases may yield more examples of municipal sensitive places laws, and yet more may be contained in the pages of old newspapers housed in archival collections or on microfilm. Identifying additional examples of these regulations would be a time-consuming process.

**Conclusion**

---

[54] "An Ordinance," *San Antonio Express* (San Antonio, Texas), December 23, 1870 (Ex. Y).

33.     Many American jurisdictions had public carry laws that generally prohibited people from carrying deadly weapons within the confines of towns and cities. Even though a sizeable number of these laws specifically prohibited *concealed* carry, the open carrying of pistols, bowie knives and other such weapons was not commonplace. The exemptions for these public carry laws sometimes included "travelers" or persons on a "journey" within their purview, but the case law from the time clearly shows that antebellum appellate courts associated "travelers" on "journeys" with people who were venturing beyond the protection of the law and beyond the limits of their community. Routine travel in areas where a person had recourse to legal protection did not fall within this definition.

34.     American jurisdictions also enacted special ordinances and statutes designed to protect public gathering places beyond simply courthouses and polling places. Some protected schools and college campuses, others applied to entire commercial districts and city centers during electoral proceedings, and yet more provided for the disarming of *all* public gatherings. Taking regulatory action to protect people assembled for entertainment, recreation, education, and civic purposes from potential violence is not unusual or ahistorical.

22

I certify that pursuant to 28 U.S.C. § 1746 and under penalty of perjury that to the best of my knowledge, information, and belief, the foregoing is true and correct.

*Brennan Gardner Rivas*
Brennan Gardner Rivas
February 11, 2023

# Brennan Gardner Rivas
## Curriculum Vitae · Jan 2023

## Employment
Lloyd Lewis Fellow in American History, The Newberry Library, 2021-2022
Bill & Rita Clements Fellow for the Study of Southwestern America, Southern Methodist
    University, Clements Center for Southwest Studies, 2020-2021
Lecturer in American History (full-time), Texas Christian University, Department of History,
    2019-2020

## Education
Ph.D., History, Texas Christian University, 2019
    Thesis: "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, & Knuckles in
    the Lone Star State, 1836-1930"
    Advisor: Gregg Cantrell
M.A., History, Texas Christian University, 2013
    Thesis: "Texas Antitrust Law: Formulation and Enforcement, 1889-1903"
B.A. with Honors, History, Oklahoma State University, 2010

## Publications
*Refereed Journal Articles*
"An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-
    1900," *Southwestern Historical Quarterly* 121 (Jan 2018): 284-303.

*Law Articles*
"Strange Bedfellows: Racism and Gun Rights in American History and Current Scholarship"
in Joseph Blocher and Jake Charles, eds., *New Histories of Gun Rights and Regulation: Essays
    on the Place of Guns in American Law and Society* (New York: Oxford University Press,
    forthcoming)
"Enforcement of Public Carry Restrictions: Texas as a Case Study," *U.C. Davis Law Review*
    (May 2022)
"The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and
    Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan 2022)

*Short Pieces*
"Charles F. Cooley," in *Wanted in America: Posters Collected by the Fort Worth Police
    Department, 1898-1903*, edited by LeAnna Schooley and Tom Kellam. Fort Worth: TCU
    Press, 2019.
Review of David R. Berman, *George Hunt: Arizona's Crusading Seven-Term Governor*, in
    *Southwestern Historical Quarterly* 114, no. 3 (January 2016): 327-329.

## Public History
"In the Past, Americans Confronted Gun Violence by Taking Action," *Washington Post: Made
    by History Blog* (Jun 2022)

1

~ Op-ed showcasing open-mindedness of 19th century Americans about experimenting with new gun control measures

"The Origin of Public Carry Laws in Texas," *Texas Gun Sense Blog* (Feb 2021)

"Texas Gun Laws," Online Primary Source Collection, hosted by Omeka
~ Online collection featuring primary sources from my research; feature exhibit titled "Crafting a Public Carry Law"

"The Deadly Weapon Laws of Texas," Preserving Our Past: Community History Workshop, Center for Texas Studies at TCU (Nov 2020)
~ Public lecture featuring special insights for genealogical researchers

"The Deadly Weapon Laws of Texas," Graduate/Undergraduate Public History Seminar, Tarleton State University (Sept 2020)
~ Research presentation focusing on interpretation of county court records

"When Texas Was the National Leader in Gun Control: How the Land of Gunslinger Mythology Regulated Weapons to Reduce Violence," *Washington Post: Made by History Blog* (Sept 2019)
~ Op-ed highlighting long history of weapon regulation in Texas

## Fellowships and Awards

Lloyd Lewis Fellowship in American History, 2021-2022
~ Awarded by the Newberry Library to scholars using its collection to research topics in American history

Bill & Rita Clements Fellowship for the Study of Southwestern America, 2020-2021
~ Awarded by the SMU Clements Center for Southwest Studies to two scholars of Texas, the Southwest, or the U.S.-Mexico borderlands who are developing first books

The Benjamin W. Schmidt Memorial Scholarship, 2018-2019
~ Awarded by the TCU Department of History to a PhD candidate who shows exceptional professional promise; highest departmental prize for graduate students

Texas Christian University Department of History, Shinko and Thomas McDonald Research Prize in Texas History, 2019, 2017
~ Awarded by the TCU Department of History to a graduate student with the best research on antebellum Texas history

## Works in Progress

*The Revolver Must Go: The Rise and Fall of a Gun Control Movement in Texas*
Aim: Scholarly monograph exploring the rise of a gun control movement in nineteenth-century Texas and the regulatory strategies which it embraced. Widespread acceptance of strict, ambitious gun control laws in the "Wild West" belies current assumptions about Texas and challenges the reigning interpretation of the Second Amendment as a guarantor of expansive gun rights
Status: Editing manuscript

"The Texas Anti-Trust Movement: Antimonopoly, Populism, and Reform in the Long Progressive Era"
Aim: Scholarly article interpreting Texas antitrust policy an example of innovative reform in the Great Plains and trans-Mississippi West
Status: Research and writing in progress

JA1220

## University Teaching Experience

*Instructor of Record*

Lecturer in American History, Texas Christian University      2019-2020
- "American History to 1877: Social Movements & the Politics of Slavery" (HIST 10603)
- "American History since 1877: The Quest for Equality" (HIST 10613)
- "History of Texas: A Transnational Look at the American Southwest" (HIST 40743)

*Graduate Student Instructor*

Teaching Assistant, Texas Christian University      2017-2018
- American History to 1877 (HIST 10603)
- American History since 1877 (HIST 10613)

*Teaching Interests*

American History, Legal History, Southwestern Borderlands, Civil War Era, American West, Gilded Age & Progressive Era, Women's History

## Conference Presentations & Invited Talks

"A Case for More Case Studies," Originalism, the Supreme Court, Gun Laws, and History, Late-Breaking Roundtable, American Historical Association Annual Meeting, Philadelphia, Pennsylvania, January 2023

"Military Disarmament Orders and the Role of Reconstruction Historiography after *Bruen*," Current Perspectives on the History of Guns and Society Symposium, Wesleyan University, Middletown, Connecticut, October 2022

"Reassessing Assumptions about Historical Arkansas and Tennessee Handgun Regulations," Race and Guns Roundtable, Duke Center for Firearms Law, Durham, North Carolina, November 2021

"Enforcement of Public Carry Restrictions: Texas as a Case Study," The Second Amendment at the Supreme Court: 700 Years of History and the Modern Effects of Guns in Public, Davis, California, October 2021

"Race & Guns," Newberry Library Colloquium, Chicago, Illinois, October 2021

"Unlawful Carrying: Enforcing the Pistol Law in Texas, 1870-1920," Texas State Historical Association Annual Meeting, Corpus Christi, Texas, February 2019

"Regulating Deadly Weapons in Nineteenth-Century Texas," Invited Lecturer, Los Bexareños Hispanic Genealogical and Historical Conference, San Antonio, Texas, September 2018

"Impregnable Citadels of Capital: American Monopolies in the British Radical Press," Southern Conference on British Studies Annual Meeting, St. Pete Beach, Florida, November 2016

"Dating Violence in Texas: Why the State Family Code Obstructs Accurate Reporting about Sexual Assault," TCU Women & Gender Studies Research Symposium, 2015

## Service

Invited Guest, "How to Make the Most of Your Time in Graduate School," Dept. of History Orientation Day, 2020
- ~ Advise incoming graduate students on strategies for success in the PhD program, emphasizing importance of intellectual development

Panelist, "Everything You Wanted to Know about TCU but Were Too Afraid to Ask," Dept. of History Orientation Day, 2016
    ~ Provide honest and confidential information to prospective graduate students
Graduate Student Mentor, 2015
    ~ Informal departmental program designed to ease the transition for incoming graduate students

## Second Amendment Subject Matter Expert

*Duncan et al v. Bonta*, California, Case No. 17-1017-BEN-JLB
*Miller et al v. Bonta*, California, Case No. 3:19-cv-01537-BEN-JLB
*Angelo et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-01878-RDM
*Hanson et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-02256-RC
*Christian et al v. Nigrelli et al*, New York, No. 22-cv-00695 (JLS)
*Frey et al v. Nigrelli et al*, New York, Case No. 21 Civ. 5334 (NSR)
*Brumback et al v. Ferguson et al*, Washington, No. 1:22-cv-03093-MKD
*Sullivan et al v. Ferguson et al*, Washington, Case No. 3:22-cv-5403

## Professional Memberships

Society for Historians of the Gilded Age and Progressive Era
Texas State Historical Association
Southern Historical Association
American Historical Association

## Languages

Spanish (Proficient)
Latin (Proficient)

Case 1:22-Case-490B-ANDocument 48t 85-PagefLted 02Date5Filedfi07/20/2023ageID: 1346

**27 Ed. I. c. 3.**

Grandfather to our Lord the King that now is, wherein is contained, that Justices assigned to take Assises, if they be Laymen, shall make Deliverance; and if the one be a Clerk, and the other a Layman, that the Lay Judge, with another of the Country associate to him, shall deliver the Gaols: Wherefore it is enacted, That such [Justices '] shall not be made against the Form of the said Statute; and that the Assises, Attaints, and Certifications be taken before the Justices commonly assigned, which should be good Men and lawful, having Knowledge of the Law, and none other, after the Form of another Statute made in the Time of the said [King Edward the First;'] and that the Oyers and Terminers shall not be granted but before Justices of the one Bench or the other, or the Justices Errants, and that for great [hurt,] or horrible Trespasses, and of the King's special Grace, after the Form of the Statute thereof ordained in Time of the said Grandfather, and none otherwise.

**Justices of Assise and Gaol-delivery.**

**Oyers and Terminers.**

**III. Riding or going armed in Affray of the Peace.**

ITEM, It is enacted, That no Man great nor small, of what Condition soever he be, except the King's Servants in his presence, and his Ministers in executing of the King's Precepts, or of their Office, and such as be in their Company assisting them, and also [upon a Cry made for Arms to keep the Peace, and the same in such places where such Acts happen,'] be so hardy to come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure. And that the King's Justices in their presence, Sheriffs, and other Ministers (*) in their Bailiwicks, Lords of Franchises, and their Bailiffs in the same, and Mayors and Bailiffs of Cities and Boroughs, within the same Cities and Boroughs, and Borough-Holders, Constables, and Wardens of the Peace within their Wards, shall have Power to execute this Act. And that the Justices assigned, at their coming down into the Country, shall have Power to enquire how such Officers and Lords have exercised their Offices in this Case, and to punish them whom they find that have not done that which pertained to their Office.

**IV. The Statute of Lincoln, 9 Edw. II. concerning Sheriffs, &c. confirmed.**

ITEM, Because the Peace cannot be well kept without good Ministers, as Sheriffs, Bailiffs, and Hundreders, which ought to do Execution as well of the King's Privities as of other Things touching our Lord the King and his People; It is ordained and established, That the Statute made in the time of King Edward, Father to the King that now is, at Lincoln, containing that Sheriffs, Hundreders, and Bailiffs shall be of such People as have Lands in the same Shires or Bailiwicks, shall be observed in all Points after the Form thereof; and that Sheriffs and Bailiffs of Fee shall cause their Counties and Bailiwicks to be kept by such as have Lands therein.

**V. The Statute Westminster the Second, 13 Edw. I. chapter 39, concerning the Delivery of Writs to the Sheriff, confirmed.**

ITEM, Where it was ordained by the Statute of Westminster the Second, that they which will deliver their Writs to the Sheriff, shall deliver them in the full County, or in the Rere County, and that the Sheriff or under Sheriff shall thereupon make a Bill; It is accorded and established, that at what Time or Place in the County a Man doth deliver any Writ to the Sheriff or to the Under-Sheriff, that they shall receive the same Writs, and make a Bill, after the form contained in the same Statute, without taking any Thing therefore; and if they refuse to make a Bill, others that be present shall set to their Seals; and if the Sheriff or Under-Sheriff do not return the said Writs, they shall be punished after the form contained in the same Statute; and also the Justices of Assises shall have power to enquire thereof at every Man's Complaint, and to award Damages, as having respect to the Delay, and to the loss and peril that might happen

<sup>1</sup> Commissions     <sup>2</sup> Grandfather
<sup>3</sup> upon a Proclamation of Deeds of Arms in time of Peace, and that in Places where such Deeds are to be done,—See Lib. Rub. Scac. Westm. fo. 122 b. a Writ reciting a Grant of K. Richard I. "*q*d Comitatûs sint in Angl'in v. placitas: In*q*e Sarf & Wilton: In*q* Warrewich & Kenelinsworth: Ins Stanford & Warneford: In*q* Brakele & Mixebi: In*q* Blie & Tykehill. Ita *q*d pax *t*re n*r*e n*o* infringer', n* potestas Ju*s*ticiaria minorabit' Nec de l*i* re*s*is n*r*is dapnû inferet'."     <sup>4</sup> of the King

nr̃e Seign<sup>r</sup> le Roi qore est, en quele est contenuz *q̃* les Justices as assises p̃ndre assignez sils soient lais, facent les deliv̄ances; et si lun soit clerc, & lautre lais, *q̃* le dit lais, associe a lui un autre du pais, facent la deliv̄ance des gaols; p̃ qoi acorde est & establi, *q̃* tiels Justiceries ne soient mes g*n*tees countre la forme du dit estatut, & *q̃* les assises, atteintes, & c̃tifications soient p̃ses devant les Justices com̃unement assignez, *q̃* soient bones gentz & loialx & conissantz de la lei, & nemie autres; solonc la forme dun autre statut fait en temps meisme le ael; et *q̃* les oiers & t̃miners ne soient grantees forsq, - - - - devant les Justices de lun Baunk & de lautre, ou les Justices errantz; & ce p<sup>r</sup> led & orrible trespas, & de lespeciale g<sup>r</sup>ce le Roi, solonc forme de statut de ce ordene en temps meisme le ael; & nemie autrement.

Ensement acorde est & establi, *q̃* nul, g*n*t ne petit de quele condicion qil soit, sauve les p̃jantz le Roi en la p̃sence le Roi, & les Ministres le Roi, enfesantz execucion des mandementz le Roi, ou de lour office, & ceux qi sont en lour compaignies, eidantz as ditz ministres, & auxint au cri de fait darmes de pees, & ce en lieux ou tielx faitz se ferront, soit si hardi de venir devant les Justices le Roi, ou autres Ministres le Roi enfesant lour office, a force & armes; ne force mesner en affrai de la pees, ne de chivaucher ne daler arme, ne de nuit ne de jour, en faires, marchees, nen p̃sence des Justices, ne dautres Ministres, ne nule part aillours, sur peine de pdre lour armures au Roi & de lour corps a la prisone a la volunte le Roi. Et *q̃* Justices le Roi en lour p̃sences, viscountes & autres Ministres le Roi en lour baillies, seign's des fraunchises & lour baillifs en yceles, & Meire & Baillifs des Citees & Burghs deinz meismes les Citees & Burghs, Burghaldres, conestables, & gardeins de la pees deinz lour gardes, eient poair affaire execucion de cest acord. Et *q̃* les Justices assignez, a lour venu en pais, eient poair denquere coment tielx Ministres & seign's ont use lour office en ce, & de punir ceux qils trov̄ont, qi nount mie fait ce *q̃* a lour office appent.

Et p̃ce *q̃* la pees ne poet mie estre bien garde sauntz bons ministres, come Viscountes, Baillifs, & Hundreders qi deivent faire execucion, auxibien des p̃vetez le Roi come dautres choses tochantes le Roi & son poeple, acorde est & establi *q̃* lestatut fait en temps le Roi Edward, piere le Roi qore est, a Nicole, contenant *q̃* Viscontes, Hundreders & Baillifs soient des gentz eantz t̃res en meismes les Countez, ou baillies, soit garde en touz pointz solonc la forme dycel, & auxint *q̃* les Viscountes & Baillifs de fee, facent garder meismes lour Countez & Baillies p̃ gentz eantz t̃res en yceles.

Ensement la ou ordine est, p̃ statut de Westmonst̃ le second, *q̃* ceux *q̃* liv̄er volent lour briefs as viscountes, les liv̄ent en plein Counte, ou en rerecounte, & *q̃* visconte ou southviscounte facent sur ce bille; acorde est & establi *q̃* a quele heure ou a queu lieu deinz le Counte home livre a viscountes, ou a southviscountes, briefs, qils les resceivent & facent bille en la forme contenue en le dit estatut, & ce sanz rien p̃ndre; et sils refusent de faire bille, mettent autres lour seałx qi s̃ront p̃sentz; et si le Visconte ou le Southvisconte ne retorne mie les briefs, soient puniz solonc la forme contenue en le dit estatut; & jadumeins eient les Justices as assises p̃ndre assignez poair denquer de ce a chescuny pleinte & de agarder damages, eant regard au delai, & a les p̃tes & pils qi p̃ront avenir.

Generated on 2023-02-09 20:35 GMT / https://hdl.handle.net/2027/pst.000017915496
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google     Original from PENN STATE




DATE DOWNLOADED: Fri Feb 10 12:52:15 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
Statutes of the Realm (1235-1377).

ALWD 7th ed.
. Statutes of the Realm (1235-1377).

APA 7th ed.
(1235-1377). Statutes of the Realm. .

Chicago 17th ed.
Statutes of the Realm. , .

McGill Guide 9th ed.
Statutes of the Realm (: ., 1235-1377)

AGLC 4th ed.
Statutes of the Realm (., 1235-1377)

MLA 8th ed.
Statutes of the Realm. , . HeinOnline.

OSCOLA 4th ed.
Statutes of the Realm. , .

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

Case 1:22-Case-423-1308-AND-Doccument-48t 85Page-53 02Date-File-d-07/20/2023ageID: 1348

𝕾tatutū apud 𝖂estm̄ in 𝕻'liamento in festo 𝕾'ci 𝕳illarii anno regni 𝕽egis 𝕰. t'cii vicesimo q'nto tento, f'cm.

A STATUTE made at WESTMINSTER;
In the Parliament holden in the Feast of Saint Hilary;
In the Twenty-fifth Year of the Reign of K. EDWARD the Third.

*Ex magno Rot. Stat. in Turr. Lond. m.* 16.

AU plement somonz a Westm̄, en la feste de Seint Hiller lan du regne nr̄e Seign' le Roi Edward Dengler̄e vintisme quint, & de France douzisme, nr̄e ℓ' le Roi del assent des Prelatz, Ducs, Countes, Barons, & de tout la comunalte de son Roialme Dengler̄e, au dit plement somons, al hon' de Dieu & de Seinte Eglise, & en amendement de son dit Roialme, ad ordeine & establi les choses soutzescriptes.

En p'mes, p'ce q̄ tresg'untz & tresour'geoues damages & grevances sont faites au poeple p̄ les pno's & p'veo's des vitailles p' les hosteux nr̄e ℓ' le Roi, ma dame la Roigne, & de lo' enfantz, Si est acorde & assentuz en le dit plement, q̄ les pno's & p'veio's des bledz p' les ditz hosteux les p̄ignent p mesure rase, selonc ceo q̄ hōme use pmy le Roialme. Et q̄ touz bledz, feyns, litere & bestaill, & touz aut̄s vitailles & choses quecōqes, queles sont aprendre p' meismes les hosteux, soient p̄r'sez a la p̄roie value, p les Conestables & aut̄s bons gentz des villes ou tieles prises se feront, sanz ce q̄ p manaces, ou duresces soient les preisours chacez a mettre autre pris q̄ lour ℓ̄ement ne voet, & come curt cōement en les p̄scheins marchees: et q̄ entre les Purveours & ceux des queux les biens p̄ront prises, en la p̄sence des Conestables & preisours, soient tailles tantost faites, saunz ceo q̄ les gentz des queux les biens p̄ront prises soient aillours traitz ou t'vaillez; & meismes les tailles ensealez des seals les pnours des choses issint prises, p les queles tailles gre soit fait as ceux des queux les choses p̄ront issint prises: et si nul pnour ou P'veour p' les ditz hosteux face p autre mañe, soit meintenant arestu p la villee ou la prise p̄ra faite, et mesne a la p̄scheine gaole, et si de ceo soit atteint, soit la fait de lui come de laron, si la quantite des biens le demand; solonc ceo qen un estatut fait en temps meisme nr̄e ℓ' le Roi lan de son regne quint, & en un autre estatut fait en temps laiel nr̄e Seign' le Roi s' tieles prises, est contenuz plus au plein: et q̄ desore soit contenuz es cōmissions des tieux P'veours et pnours, lentent et la peine contenuz en cest estatut: et q̄ nule cōmission soit faite forsq̄, soulement souz les g'nt ou prive sealx le Roi; ne q̄ nul hōme soit tenuz de obeier a autre cōmission nen autre mañe q̄ nest dit en avant; et q̄ meisme lestatut tiegne lieu en toutz pointz dev̄s chescun pnour & p'veour, de chescune mañe des vittailles en chescune p̄tie du Roialme de quele condition qil soit.

Auxint p'ceo q̄ div̄ses opinions ount este einz ces heures qeu cas, q'nt il avient doit estre dit treson, & en quel cas noun, le Roi a la requeste des Seign's & de la Cōe, ad fait declarissement q̄ ensuit, Cest assavoir;

STATUTE THE FIFTH.

AT the Parliament summoned at Westminster in the Feast of St. Hilary, the Year of the Reign of our Lord King Edward the Third [after the Conquest,] of England the Five and twentieth, and of France the Twelfth; our said Lord the King, by the assent of the Prelates, Earls, Barons, and of all the Commonalty of his Realm of England summoned to the Parliament, to the honour of God and Holy Church, and in Amendment of his said Realm, hath ordained and established the Things underwritten.

FIRST, Forasmuch as great and outrageous damage and grievance hath been done to the People by the Takers and Purveyors of Victuals, for the Houses of our Sovereign Lord the King, the Queen, and their Children; It is accorded and assented in the said Parliament, That the Takers (') of Corn for the said Houses shall take the same by Measure striked according as it is used through the Land. And that such Corn, Hay, Litter, Bestall and all other Victuals and Things, which shall be taken for the said Houses, shall be [taken '] by the very Value, by the Constable and other good People of the Towns where such Taking shall be made, without that that the Praisers by Menace or Duress shall be driven to set any other Price than their Oath will, and as commonly runneth in the next Markets. And that betwixt the Purveyors and them whose Goods shall be taken in the presence of the Constables and Praisers, Tallies be made incontinently, without that that the People whose Goods shall be taken, shall be drawn or travelled elsewhere, and the same Tallies sealed with the Seals of the Takers of the Things so taken, by which Tallies Gree shall be made to them whose Goods shall be so taken; and if any Purveyor or Taker for the said Houses, do in any other Manner, he shall be [maintenant '] arrested by the Town where the Taking shall be made, and brought to the next Gaol; and if he be thereof attainted, it shall be done of him as of a Thief, if the Quantity of the Goods the same require; according as in a Statute made in the Time of our Sovereign Lord the King that now is, the Fifth Year of his Reign, and in another Statute made in the Time of the King's Grandfather upon such Takings, is contained more at the full: and that from henceforth in the Commissions of such Takers and Purveyors, the Intent and Pain limited in this Statute shall be contained: and that no Commission be made, but only under the King's great Seal or Privy Seal; nor that no Man be bound to obey [any such Commissions, other or in what Manner '] than is aforesaid; and that the same Statute take place in all Points against every Taker and Purveyor of every Manner of Victual in every part of the Realm, of what Condition soever he be.

ITEM, Whereas divers Opinions have been before this Time [in what Case Treason shall be said, and in what not;'] the King, at the Request of the Lords and of the Commons, hath made a Declaration in the Manner as hereafter followeth, that is to say; When a Man

' *and Purveyors*
' praysed          ' immediately
' any other Commyssions, or in other manner MS. Tr. 2.
' what case should be adjudged Treason, and what not;

I.
Corn shall be taken by Purveyors by Measure striked

Things taken by Purveyors shall be appraised at the very Value.

Tallies of the Goods taken.

Punishment for undue Purveyance as under Stat. 5 E. III. c. 2.

Purveyors' Commissions shall be under the Great or Privy Seal.

II.
Declaration what Offences shall be adjudged Treason.

*Compassing the Death of the King, Queen, or their eldest Son; violating the Queen, or the King's eldest Daughter unmarried, or his eldest Son's Wife; levying War; adhering to the King's Enemies; counterfeiting the King's Seals, or Money; importing counterfeit Money; killing the Chancellor, Treasurer, or Judges in Execution of their Duty.*

*The King shall have the Forfeiture of all the Offenders' Lands.*

*Petit Treason. Forfeiture of the Lands to the Lords.*

*New Questions of Treasons shall be decided in Parliament.*

doth compass or imagine the Death of our Lord the King, or of our Lady his [Queen¹] or of their eldest Son and Heir; or if a Man do violate the King's [Companion,²] or the King's eldest Daughter unmarried, or the Wife (³) the King's eldest Son and Heir; or if a Man do levy War against our Lord the King in his Realm, or be adherent to the King's Enemies in his Realm, giving to them Aid and Comfort in the Realm, or elsewhere, and thereof be [probably⁴] attainted of open Deed by [the People⁵] of their Condition: And if a Man counterfeit the King's Great or Privy Seal, or his Money; and if a Man bring false Money into this Realm, counterfeit to the Money of England, as the Money called Lushburgh, or other, like to the said Money of England, knowing the Money to be false, to merchandise or make Payment in Deceit of our said Lord the King and of his People; and if a Man slea the Chancellor, Treasurer, or the King's Justices of the one Bench or the other, Justices in Eyre, or Justices of Assise, and all other Justices assigned to hear and determine, being in their Places, doing their Offices: And it is to be understood, that in the Cases above rehearsed, [that⁶] ought to be judged Treason which extends to our Lord the King, and his Royal Majesty: And of such Treason the Forfeiture of the Escheats pertaineth to our Sovereign Lord, as well of the Lands and Tenements holden of other, as of himself: And moreover there is another manner of Treason, that is to say, when a Servant slayeth his Master, or a Wife her Husband, or when a Man secular or Religious slayeth his Prelate, to whom he oweth Faith and Obedience; and [of such Treason the Escheats ought to pertain⁷] to every Lord of his own Fee: And because that many other like Cases of Treason may happen in Time to come, which a Man cannot think nor declare at this present Time; It is accorded, That if any other Case, supposed Treason, which is not above specified, doth happen (⁷) before any Justices, the Justices shall tarry without any going to Judgement of the Treason, till the [Cause⁸] be shewed [and declared before the King and his Parliament,⁹] whether it ought to be judged Treason or [other¹⁰] Felony. And if percase any Man of this Realm ride armed [covertly¹¹] or secretly with Men of Arms against any other, to slay him, or rob him, or take him, or retain him till he hath made Fine or Ransom for to have his Deliverance, it is not the Mind of the King nor his Council, that in such Case it shall be judged Treason, but shall be judged Felony or Trespass, according to the Laws of the Land of old Time used, and according as the Case requireth. And if in such Case, or other like, before this Time any Justices have judged Treason, and for this Cause the Lands and Tenements have comen into the King's hands as Forfeit, the chief Lords of the Fee shall have the Escheats of the Tenements holden of them, whether that the same Tenements be in the King's hands, or in others, by Gift or in other Manner; Saving always to our Lord the King the Year, and the Waste, and the Forfeitures of Chattels, which pertain to him in the Cases above named; and that [the Writs¹²] of Scire facias be granted in such Case against the Land-tenants, without other Original, and without allowing [any Protection¹³] in the said Suit; and that of the Lands which be in the King's hands, Writs be granted to the Sheriffs of the Counties where the Lands be, to deliver them out of the King's hands without Delay.

*Certain Offences not Treason.*

*In such Cases already happened, the Chief Lords shall have the Escheats.*

*Saving the King's Year and Waste.*

*Scire facias to Terretenants, &c.*

*III. Challenge of an Indictor upon an Inquest.*

ITEM, It is accorded, That no Indictor shall be put in Inquests upon Deliverance of the Indictees of Felonies or Trespass, if he be challenged for that same cause by him which is so indicted.

¹ Wife     ⁵ of
² proveably *MS. Tr.* 2.     ⁶ People     ⁷ it
³ *such Manner of Treason giveth Forfeiture of Escheats*
⁴ of new, *MS. Tr.* 2.     ⁸ Case
⁹ *before the King in his Parliament, and it be declared*
¹⁰ else     ¹¹ openly
¹² Writs     ¹³ the Protection of our Lord the King

q'nt hôme fait compasser ou ymaginer la mort nře Seign' le Roi, ma dame sa compaigne, ou de lour fitz primer & heir; ou si hôme violast la compaigne le Roi, ou leisnesce fill le Roi nient marie, ou la compaigne leisne fitz & heir du Roi; & si hôme leve de guerre contre nře dit Seign' le Roi en son Roialme, ou soit aherdant as enemys nře Seign' le Roi en le Roialme, donant a eux eid ou confort en son Roialme ou p aillours, & de ceo pvablement soit atteint de ovt faite p gentz de lour condicion: et si hôme contreface [les g'nt ou prive sealx le Roi,¹] ou sa monoie, et si hôme apport faus monoie en ceste Roialme contrefaite a la monoie Denglet're, sicome la monoie appelle [Lucynburgh¹] ou autre semblable a la dite monoie Denglet're, sachant la monoie estre faus, p' marchander, ou paiement faire en deceit nře dit Seign' le Roi & son poeple; et si hôme tuast Chanceller, Tresorer, ou Justice nře Seign' le Roi del un Baunk ou del autre, Justice en Eir & des assises & toutes aut's Justices assignez a oier & t'miner esteiantz en lours places en fesantz lours offices: et fait a entendre qen les cases suisnomez doit estre ajugge treson [q̃ sestent²] a nře Seign' le Roi & a sa roial majeste; et de tiele mañe de treson la forfait'e des eschetes apptient a nře Seign' le Roi, sibien des Pres & teñz tenuz des aut's, come de lui meismes: et ovesq, ceo il yad autre mañe de treson, cest assavoir q'nt un servant tue son meistre, une fême q̃ tue son baron, q'nt hôme seculer ou de religion tue son Prelat, a qi il doit foi & obedience; & tiele mañe de treson donn forfait'e des eschetes a chescun Seign' de son fee ppre: et p' ceo q̃ plusurs aut's cases de semblable treson p'ront escheer en temps a venir, queux hôme ne p'ra penser ne declarer en p̃sent, assentu est q̃ si autre cas supposee treson q̃ nest especifie p amount aviegne de novel devant ascunes Justices, demoerge la Justice saunz aler au juggement de treson, tanq, p devant nře Seign' le Roi [en²] son plement soit le cas monstree & desclarre le quel ceo doit estre ajugge treson ou autre felonie. Et si p cas ascun hôme de cest Roialme chivach arme descovert ou secrement od gentz armees contre ascun autre, p' lui tuer ou derober, ou p' lui p̃ndre & retenir tanqil face fyn ou raunceon p' sa deliv'rance avoir, nest pas lentent du Roi & de son conseil q̃ en tiel cas soit ajugge treson, einz soit ajugge felonie ou t'spas solonc la lei de la Pre auncienement usee, & solonc ceo q̃ le cas demand: et si en tieu cas, ou autre semblable devant ces heures, ascune Justice eit ajugge treson, & p celle cause les Pres & teñz soient devenuz en la main nře Seign' le Roi come forfaitz, eient les chiefs Seign's de fee lours eschetes des teñz de eux tenuz, le quel q̃ les teñz soient en la main nře Seign' le Roi, ou en la main des aut's, p donn ou en autre mañe; Sauvant totefoitz a nře Seign' le Roi lan & le wast, & aut's forfait'es des chateux q̃ a lui attenent en les cases suisnomez; et q̃ briefs de Scire fač ve les Pres tenantz soient g'ntez en tieu cas, saunz autre originale & saunz allower la pleccion nře Seign' le Roi en la dite seute; et q̃ de les Pres q̃ sont en la main le Roi, soit g'nte brief as vicontes des Countees la ou les Pres sront de ostier la main le Roi saunz outre delaie.

Auxint acorde est, q̃ nul enditour soit mys en enquest s' la deliv'ance del endite de t'spas ou de felonie, sil soit chalange p tiele cause p celui q̃st endite.

¹ le grant seal le Roi, *Rot. Parl.* 25 *E.* 3. *P. II. nu.* vij. (17.)
² Lusseburgh *Rot. Parl.*     ³ q̃ ce estent *Rot. Parl.*
⁴ & *Rot. Parl.*

[ 35 ]

fame offenders come not as afore is faid, and the proclamation made and returned, they fhall be convict and at-tainted of the riot, affembly, or rout aforefaid : And moreover the Juftices of Peace in every county or corporation, where fuch riot, affembly, or rout of people fhall be made, in cafe the fame be made in their prefence, or if none be prefent, then the juftices having notice thereof, together with the fheriff, under fheriff, or ferjeant, of the fame county or corporation, fhall do execution of this act, every one upon pain of twenty pounds, to be paid to the Commonwealth; as often as they fhall be found in default of the execution of the faid act ; and on fuch default of the juftices and fheriff, under fheriff, or ferjeant, a commiffion fhall go from the General Court at the inftance of the party grieved, to enquire as well of the truth of the cafe, and of the original matter for the party complain-ant, as of the default or defaults of the faid juftices, fheriff, under fheriff, or ferjeant, in this behalf fuppofed, to be directed to fufficient and indifferent perfons at the nomination of the Judges; and the faid commiffioners prefently fhall return into the General Court the inquefts and matters before them in this behalf taken and found : But no perfons convicted of a riot, rout, and unlawful affembly, fhall be imprifoned for fuch offence by a longer fpace of time than one year. Perfons legally convicted of a riot, rout, or unlawful affembly, otherwife than in the manner directed by this act, fhall be punifhed by imprifonment and amercement, at the difcretion of a jury, under the like limitation.

## C H A P. XLIX.

### An ACT forbidding and punifhing AFFRAYS.

BE it enacted by the General Affembly, That no man, great nor fmall, of what condition foever he be, except the Minifters of Juftice in executing the precepts of the courts of juftice, or in executing of their office, and fuch as be in their company affifting them, be fo hardy to come before the juftices of any court, or either of their Minifters of Juftice, doing their office, with force and arms, on pain; to forfeit their armour to the Commonwealth, and their bodies to prifon, at the pleafure of a court; nor go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the county, upon pain of being arrefted and committed to prifon by any Juftice on his own view, or proof by others, there to abide for fo long a time as a jury, to be fworn for that purpofe by the faid Juftice, fhall direct, and in like manner to forfeit his armour to the Commonwealth; but no perfon fhall be impri-foned for fuch offence by a longer fpace of time than one month.

## C H A P. L.

### An ACT againft C O N S P I R A T O R S.

BE it declared and enacted by the General Affembly, That confpirators be they that do confederate and bind themfelves by oath, covenant, or other alliance, that every of them fhall aid and bear the other falfely and ma-licioufly, to move or caufe to be moved any enticement or information againft another on the part of the Common-wealth, and thofe who are convicted thereof at the fuit of the Commonwealth, fhall be punifhed by imprifonment and amercement, at the difcretion of a jury.

## C H A P. LI.

### An ACT againft conveying or taking P R E T E N S E D   T I T L E S.

BE it enacted by the General Affembly, That no perfon fhall convey or take; or bargain to convey or take, any pretenfed title to any lands or tenements, unlefs the perfon conveying or bargaining to convey, or thofe under whom he claims fhall have been in poffeffion of the fame, or of the reverfion or remainder thereof one whole year next before ; and he who offendeth herein knowingly, fhall forfeit the whole value of the lands or tenements; the one moiety to the Commonwealth, and the other to him who will fue as well for himfelf as for the Commonwealth : But any perfon lawfully poffeffed of lands or tenements, or of the reverfion or remainder thereof, may neverthelefs take or bargain to take the pretenfed title of any other perfon, fo far and fo far only as it may confirm his former eftate.

## C H A P. LII.

### An ACT to punifh B R I B E R Y and  E X T O R T I O N.

BE it enacted by the General Affembly, That no Treafurer, Keeper of any Public Seal, Councillor of State, Counfel for the Commonwealth, Judge, or Attornies at law, practifing either in the General Court, High Court of Chancery, Court of Appeals, Court of Admiralty, or Inferior Courts, Clerk of the Peace, Sheriff, Coroner, Efcheator, nor any officer of the Commonwealth, fhall, in time to come, take, in any form, any manner of gift, brokage, or reward for doing his office, other than is, or fhall be allowed by fome act of General Affembly, paffed after the inftitution of the Commonwealth; that is to fay, after the fifteenth day of May, in the year of our Lord, one thoufand feven hundred and feventy fix ; and he that doth, fhall pay unto the party grieved, the treble value of that he hath received, fhall be amerced and imprifoned at the difcretion of a jury, and fhall be difcharged from his office forever; and he who will fue in the faid matter, fhall have fuit as well for the Commonwealth as for himfelf, and the third part of the amercement.

CHAP.




DATE DOWNLOADED: Thu Feb 9 23:36:22 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
Revised Statutes of the Commonwealth of Massachusetts Passed November 4, 1835 to which are Subjoined, as Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, both Passed in February 1836 (1836).

ALWD 7th ed.
. Revised Statutes of the Commonwealth of Massachusetts Passed November 4, 1835 to which are Subjoined, as Act in Amendment Thereof, & an Act Expressly to Repeal the Acts Which are Consolidated Therein, both Passed in February 1836 (1836).

APA 7th ed.
(1836). Revised Statutes of the Commonwealth of Massachusetts Passed November 4, 1835 to which are Subjoined, as Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, both Passed in February 1836. Boston, Dutton & Wentworth.

Chicago 17th ed.
Revised Statutes of the Commonwealth of Massachusetts Passed November 4, 1835 to which are Subjoined, as Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, both Passed in February 1836. Boston, Dutton & Wentworth.

McGill Guide 9th ed.
Revised Statutes of the Commonwealth of Massachusetts Passed November 4, 1835 to which are Subjoined, as Act in Amendment Thereof, & an Act Expressly to Repeal the Acts Which are Consolidated Therein, both Passed in February 1836 (Boston: Dutton & Wentworth., 1836)

AGLC 4th ed.
Revised Statutes of the Commonwealth of Massachusetts Passed November 4, 1835 to which are Subjoined, as Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, both Passed in February 1836 (Dutton & Wentworth., 1836

MLA 9th ed.
Revised Statutes of the Commonwealth of Massachusetts Passed November 4, 1835 to which are Subjoined, as Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, both Passed in February 1836. Boston, Dutton & Wentworth. HeinOnline.

OSCOLA 4th ed.
Revised Statutes of the Commonwealth of Massachusetts Passed November 4, 1835 to which are Subjoined, as Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, both Passed in February 1836. Boston, Dutton & Wentworth.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and

# R E V I S E D   S T A T U T E S

OF THE

## Commonwealth of Massachusetts.

THE

# REVISED STATUTES

OF THE

## Commonwealth of Massachusetts,

**PASSED NOVEMBER 4, 1835;**

TO WHICH ARE SUBJOINED,

AN ACT IN AMENDMENT THEREOF, AND AN ACT EXPRESSLY TO
REPEAL THE ACTS WHICH ARE CONSOLIDATED THEREIN,

**BOTH PASSED IN FEBRUARY 1836;**

AND TO WHICH ARE PREFIXED,

# THE CONSTITUTIONS

OF THE

## United States and of the Commonwealth of Massachusetts.

PRINTED AND PUBLISHED, BY VIRTUE OF A RESOLVE OF NOV. 3, 1835;

UNDER THE SUPERVISION AND DIRECTION OF

## THERON METCALF AND HORACE MANN.



**Boston:**
PUBLISHED BY DUTTON & WENTWORTH, STATE PRINTERS
37 Congress Street.
................
1836.

said, may, on giving the security required, appeal to the court of common pleas, next to be held in the same county, or, in the city of Boston, to the municipal court.

*On appeal, witnesses to recognize.*

SECT. 10.  The magistrate, from whose order an appeal is so taken, shall require such witnesses, as he may think necessary to support the complaint, to recognize for their appearance at the court to which the appeal is made.

*Proceedings on appeal.*

SECT. 11.  The court, before which such appeal is prosecuted, may affirm the order of the justice, or discharge the appellant, or may require the appellant to enter into a new recognizance, with sufficient sureties, in such sum, and for such time, as the court shall think proper, and may also make such order, in relation to the costs of prosecution, as may be deemed just and reasonable.

*Recognizance, when to remain in force.*

SECT. 12.  If any party appealing shall fail to prosecute his appeal, his recognizance shall remain in full force and effect, as to any breach of the condition, without an affirmation of the judgment or order of the magistrate, and shall also stand as a security for any costs, which shall be ordered, by the court appealed to, to be paid by the appellant.

*Persons committed for not recognizing, how discharged.*

SECT. 13.  Any person, committed for not finding sureties, or refusing to recognize, as required by the court or magistrate, may be discharged by any judge or justice of the peace, on giving such security as was required.

*Recognizances to be transmitted to the court.*

SECT. 14.  Every recognizance, taken pursuant to the foregoing provisions, shall be transmitted by the magistrate to the court of common pleas for the county, or, in the city of Boston, to the municipal court, on or before the first day of the next term, and shall be there filed of record by the clerk.

*— when to be required on view of the court or magistrate.*

SECT. 15.  Every person who shall, in the presence of any magistrate mentioned in the first section of this chapter, or before any court of record, make an affray, or threaten to kill or beat another, or to commit any violence or outrage against his person or property, and every person, who in the presence of such court or magistrate, shall contend with hot and angry words, to the disturbance of the peace, may be ordered, without process or any other proof, to recognize for keeping the peace, or being of good behavior, for a term not exceeding three months, and in case of refusal, may be committed, as before directed.

*Persons who go armed may be required to find sureties for the peace, &c.*
*1794, 26, § 2.*

SECT. 16.  If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

*Court may remit part of penalty.*
*7 Mass. 397.*
*1810. 80.*

SECT. 17.  Whenever, upon a suit brought on any such recognizance, the penalty thereof shall be adjudged forfeited, the court may remit such portion of the penalty, on the petition of any defendant, as the circumstances of the case shall render just and reasonable.

*Surety may surrender his*

SECT. 18.  Any surety in a recognizance to keep the peace, or for good behavior, or both, shall have the same authority and right

A

# COLLECTION

## OF THE

# STATUTES

### OF THE PARLIAMENT O.

# ENGLAND

#### IN FORCE IN THE STATE OF

# NORTH-CAROLINA.



PUBLISHED ACCORDING TO A RESOLVE OF THE GENERAL ASSEMBLY

By FRANCOIS-XAVIER MARTIN, Esq.

COUNSELLOR AT LAW.

*NEWBERN:*

FROM THE EDITOR'S PRESS.

1792.

JA1232

( 60 )

## C H A P.    VIII.

*Nothing shall be taken for Beaupleader.*

ITEM, Whereas some of the realm have grievously complained, that they be grieved by Sheriffs, naming themselves the King's approvers, which take money by extortion for Beaupleader, the King will, that the statute of Marlebridge shall be observed and kept in this point.

## C H A P.    XIV.

*None shall commit Maintenance.*

ITEM, Because the King desireth that common right be administered to all persons, as well poor as rich, he commandeth and defendeth, that none of his Counsellors, nor of his house, nor none other of his Ministers, nor no great man of the realm by himself, nor by other, by sending of letters, nor otherwise, nor none other in this land, great nor small, shall take upon them to maintain quarrels nor parties in the country, to the let and disturbance of the common law.

Statutes made at Northampton, tribus Septimanis Paschae, in the Second Year of the Reign of Edward the Third, and in the Year of our Lord 1328.

## C H A P.    I.

*A Confirmation of the Great Charter and the Charter of the Forest.*

[*Unnecessary to be inserted.*]

## C H A P.    III.

*No Man shall come before the Justices, or go or ride armed.*

ITEM, It is enacted, that no man great nor small, of what condition soever he be, except the King's servants in his presence, and his Ministers in executing of the King's precepts, or of their office, and such as be in their company assisting them, and also upon a cry made for arms to keep the peace, and the same in such places where such acts happen, be so hardy to come before the King's Justices, or other of the King's

Minifters doing their office with force and arms, nor bring no force in an affray of peace, nor to go nor ride armed by night nor by day, in fairs, markets, nor in the prefence of the King's Juftices, or other minifters, nor in no part elfewhere, upon pain to forfeit their armour to the King, and their bodies to prifon at the King's pleafure. And that the King's Juftices in their prefence, Sheriffs and other minifters, in their bailiwicks, Lords of Franchifes, and their bailiffs in the fame, and Mayors and Bailiffs of cities and boroughs, within the fame cities and boroughs, and borough-holders, conftables and wardens of the peace within their wards fhall have power to execute this act. And that the Juftices affigned, at their coming down into the country, fhall have power to enquire how fuch officers and lords have exercifed their offices in this cafe, and to punifh them whom they find that have not done that which pertain to their office.

## C H A P.   V.

### *The Manner how Writs fhall be delivered to the Sheriff to be executed.*

ITEM where it was ordained by the ftatute of Weftminfter the fecond, that they which will deliver their writs to the Sheriff fhall deliver them in the full county, or in the rere county, and that the Sheriff or Under-Sheriff fhall thereupon make a bill : it is accorded and eftablifhed, that at what time or place in the county a man doth deliver any writ to the Sheriff or to the Under-Sheriff, that they fhall receive the fame writs, and make a bill after the form contained in the fame ftatute, without taking any thing therefore. And if they refufe to make a bill, others that be prefent fhall fet to their feals, and if the Sheriff or Under-Sheriff do not return the faid writs, they fhall be punifhed after the form contained in the faid ftatute. And alfo the Juftices of Affize fhall have power to enquire thereof at every man's complaint, and to award damages, as having refpect to the delay, and to the lofs and peril that might happen.

## C H A P.   VI.

### *Juftices fhall have Power to punifh Breakers of the Peace.*

ITEM, as to the keeping of the peace in time to come, it is ordained and enacted that the ftatutes made in time paft, with the ftatute of Winchefter, fhall be obferved and kept in every point : and where it is contained in the end of faid ftatute of Winchefter, that the Juftices affigned fhall have power to enquire of defaults, and to report to the King in his next parliament, and the King to remedy it, which no man hath yet feen, the fame Juftices fhall have power to punifh the offenders and difobeyers.

JA1234




DATE DOWNLOADED: Sat Feb 11 14:09:19 2023
SOURCE: Content Downloaded from _HeinOnline_

Citations:

Bluebook 21st ed.
1821 50 .

ALWD 7th ed.
, , 1821 50 .

Chicago 17th ed.
"," Maine - Public Acts, Revision of 1821, Regular Session : 50-682

AGLC 4th ed.
'' Maine - Public Acts, Revision of 1821, Regular Session 50.

OSCOLA 4th ed.
'' 1821 50

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  _https://heinonline.org/HOL/License_
-- The search text of this PDF is generated from  uncorrected OCR text.

## CHAPTER LXXVI.

An Act describing the power of Justices of the Peace in Civil and
Criminal Cases.

Sec. 1. **B**E *it enacted by the Senate, and House of Repre-* General juris-
*sentatives, in Legislature assembled,* That it shall be within diction of Jus-
the power, and be the duty of every Justice of the Peace Peace, and their
within his county, to punish by fine not exceeding five dol- al cases, in ar-
lars, all assaults and batteries that are not of a high and ag- reating, trying,
gravated nature, and to examine into all homicides, mur- committing of-
ders, treasons, and felonies done and committed in his coun-
ty, and commit to prison all persons guilty, or suspected to be
guilty of manslaughter, murder, treason or other capital of-
fence ; and to cause to be staid and arrested, all affrayers, riot-
ers, disturbers or breakers of the peace, and such as shall
ride or go armed offensively, to the fear or terror of the good
citizens of this State, or such others as may utter any menaces
or threatening speeches ; and upon view of such Justice,
confession of the delinquent, or other legal conviction of any
such offence, shall require of the offender to find sureties to
appear and answer for his offence, at the Supreme Judicial
Court, or Circuit Court of Common Pleas, next to be held
within or for the same county, at the discretion of the Justice,
and as the nature or circumstances of the case may require :
and for his keeping the peace, and being of the good behaviour,
until the sitting of the Court he is to appear before ; and to
hold to bail all persons guilty or suspected to be guilty of less-
er offences which are not cognizable by a Justice of the
Peace ; and require sureties for the good behaviour of dan-
gerous and disorderly persons ; and commit all such persons
as shall refuse so to recognize, and find such surety or sure-
ties as aforesaid ; and take cognizance of, or examine into all
other crimes, matters and offences, which by particular laws
are put within his jurisdiction.

Sec. 2. *Be it further enacted,* That all fines and forfeitures Breaches of the
accruing for the breach of any bye-law, in any town within towns may be
this State, may be prosecuted for, and recovered before any fore Justices of
Justice of the Peace in the town or county where the offence the Peace.
shall be committed, by complaint or information, in the same
way and manner other criminal offences are prosecuted be-
fore the Justices of the Peace within this State.

Sec. 3. *Be it further enacted,* That any person aggrieved Persons ag-
at the sentence given against him, by any justice of the Peace, appeal to the
may appeal therefrom to the next Circuit Court of Common Com. Pleas.
Pleas to be held within the same county, and shall, before his
appeal is granted, recognize to the State in such reasonable Must recognize
sum, not less than twenty dollars, as the Justice shall order,
with sufficient surety or sureties for his prosecuting his appeal ;
and shall be held to produce the copy of the whole process, and produce
and all writings filed before the Justice, at the Court appeal- at C. C. Com-
mon Pleas.

256

**Failing to prosecute his appeal, his default to be entered.**

ed to. And if he shall not there prosecute his appeal, and produce the copies as aforesaid, the Court shall order his default to be noted upon their record. And the said Court may

**Court may order such case to be laid before Grand Jury, or arrest appellant, and affirm sentence, &c.**

order the same case to be laid before the Grand Jury, or may issue an attachment against the body of such appellant, and cause him thereby to be brought before them, and when he is so in Court, shall affirm the sentence of the Justice against him, with all additional costs.

**Justices may command assistance of sheriff, deputies and constables at riots, affrays, &c.**

Sec. 4. *Be it further enacted,* That each Justice shall have authority to command the assistance of every Sheriff, Deputy Sheriff, Constable, and all other persons present at any affray, riot, assault or battery, and may fine any person refusing such assistance, in a sum not exceeding six dollars; to be disposed of for the use of the town where the offence shall be committed; and levied by warrant of distress on the offender's goods and chattels, and for want thereof on his body.

**Justices may, on their own view, (in absence of sheriff, deputies or constables,) require any person to apprehend offenders.**

Sec. 5. *Be it further enacted,* That any Justice of the Peace for the preservation thereof, or upon view of the breach thereof, or upon view of any other transgression of law, proper to his cognizance, done or committed by any person or persons whatever, shall have authority, (in the absence of the Sheriff, Deputy Sheriff or Constable,) to require any person or persons to apprehend and bring before him such offender or of-

**Penalty for refusing to obey such Justice.**

fenders. And every person so required, who shall refuse or neglect to obey the said Justice, shall be punished in the same manner as for refusing or neglecting to assist any Sheriff, Deputy Sheriff or Constable in the execution of his office as afore-

**If the Justice be *known* or *declared*—plea of ignorance of his office not admissible.**

said. And no person who shall refuse or neglect to obey such Justice, to whom he shall be known, or declare himself to be a Justice of the Peace, shall be admitted to plead excuse on any pretence of ignorance of his office.

**Justices may grant subpœnas for witnesses in criminal cases:**

Sec. 6. *Be it further enacted,* That Justices of the Peace within their respective counties, be, and they are hereby authorized and empowered to grant subpœnas for witnesses in all criminal causes pending before the Supreme Judicial Court and Circuit Court of Common Pleas, and before themselves

**But not on behalf of the State without consent of Attorney General, or County Attorney, except before himself.**

or any other Justice: *Provided,* That no Justice of the Peace shall grant subpœnas for witnesses to appear in any Court, except before himself, to testify on behalf of the State, unless by the request of the Attorney General or County Attorney. And all Sheriffs, Constables and other officers are directed and empowered to serve any warrant issuing from a Justice of the Peace.

**Justices to account annually to State, County and Town Treasurers for all fines, &c.**

Sec. 7. *Be it further enacted,* That the Justices of the Peace shall account annually with the Treasurer of the State, the Treasurer of their respective counties, and the town Treasurer, as the case may be, for all fines by them received or imposed, upon pain of forfeiting the sum of thirty dollars, to

**Penalty for neglect.**

be sued for and recovered by the Treasurer of the State, the county or town Treasurer for the time being, to which the said fines may respectively belong.

SEC. 8. *Be it further enacted*, That all civil actions, wherein the debt or damage does not exceed twenty dollars, (and wherein the title of real estate is not in question, and specially pleaded by the defendant,) shall, and may be heard, tried, adjudged and determined by any Justice of the Peace within his county; and the Justices are severally empowered to grant summons, capias and attachment, at the request of any person applying for the same, directed to some proper officer within the same county, empowered by law to execute the same. And such summons or capias and attachment shall be duly served by such officer, seven days at the least before the day therein set for trial, otherwise the party sued shall not be held to answer thereon; and if after such process shall be duly served, the party sued, after being duly called, shall not appear to answer to the same suit, the charge against him in the declaration shall be taken to be true, and the Justice shall give judgment against him for such damages as he shall find the plaintiff to have sustained, with costs; and if the person sued shall appear to defend the suit or oppose the same, the Justice shall award such damages as he shall find the plaintiff to have sustained: *Provided*, That no more damages than the sum of twenty dollars shall be awarded in any action originally brought or tried before a Justice of the Peace; but if the plaintiff shall not support his action, shall fail to prosecute, or become nonsuit, the Justice shall award to the party sued, his reasonable costs, taxed as the law directs. And upon all judgments given by a Justice of the Peace in civil actions, he shall award execution thereon in form by law prescribed.

*Margin notes: Justice's jurisdiction in civil actions, (where title to real estate is not in question,) to extend to 20 dollars. Justices may issue summons, capias, attachment, &c. —to be served seven days before trial. Proceedings before Justice. Judgment, &c. if plaintiff prevail. Damages not to exceed 20 dollars. Judgment in case defendant prevail. Execution.*

SEC. 9. *Be it further enacted*, That the amount of the sum or several sums, specified, expressed or supposed to be demanded by the plaintiff in his declaration, shall not be considered as any objection against the Justice's jurisdiction, provided the ad damnum, or damage is not laid or stated to exceed twenty dollars.

*Margin: Justice to have jurisdiction where the ad damnum does not exceed 20 dollars.*

SEC. 10. *Be it further enacted*, That any party aggrieved at the judgment of any Justice of the Peace, in a civil action, where both parties have appeared and plead, may appeal therefrom to the next Circuit Court of Common Pleas to be held within the same county; and shall before his appeal is allowed, recognize with a surety or sureties, in such reasonable sum as the Justice shall order, not exceeding thirty dollars, to pay all intervening damages and costs, and to prosecute his appeal with effect; and shall be held to produce a copy of the whole case, at the Court appealed to, and both parties shall be allowed to offer any evidence upon the trial at the Circuit Court of Common Pleas, in the same manner as if the cause had been originally commenced there. And no other appeal shall be had on such action after one trial at the Circuit Court of Common Pleas. And the Circuit Court of Common Pleas, when any person recognized as before men-

*Margin: Party aggrieved may appeal to C. C. Common Pleas. —Must recognize to prosecute. and produce copies at C. C. Pleas. Proceedings in that Court. No further appeal. Defendant in trespass failing to bring for-*

ward the action according to his recognizance.—Plaintiff to have his damages.

tioned to bring forward an action of trespass, doth neglect to do it, upon complaint thereof made in writing by the plaintiff, shall give judgment for such sum in damages, as the plaintiff hath declared for, together with all reasonable costs which accrued both in the same Court and before the Justice. And

Appellant failing to prosecute, on complaint judgment may be affirmed.

the Circuit Court of Common Pleas shall, when any appellant thereto shall fail to prosecute his appeal, or if he shall neglect to produce a copy of the case, affirm the former judgment upon the appellee's complaint, and award such additional damages as shall have arisen in consequence of the said appeal, and cost.

In action of trespass when defendant *pleads title to real estate*—mode of proceeding before Justice.

SEC. 11. *Be it further enacted,* That when an action of trespass shall be brought before any Justice of the Peace, and the defendant shall plead the general issue, he shall not be allowed to offer any evidence that may bring the title of real estate in question. And when the defendant in any such action shall plead the title of himself or any other person in justification, the Justice upon having such plea plead, shall order the defendant to recognize to the adverse party in a reasonable sum, with sufficient surety or sureties to enter the said action at the next Circuit Court of Common Pleas to be holden within the same county, and to prosecute the same in the same manner as upon an appeal from a Justice's judgment; and if such pleader shall refuse so to recognize, the Justice shall render judgment against him, in the same manner as if he had refused to make answer to the same suit. And either

Appeal allowed in such cases from C. C. C. Pleas to S. J. Court.

party in such cause, shall be allowed to appeal from the judgment of the Circuit Court of Common Pleas, in the same manner as if the suit had been originally commenced there.

General issue may be plead in all actions before Justices and special matter given in evidence except where *title* to real estate is relied on by defendant.

SEC. 12. *Be it further enacted,* That in all civil actions triable before a Justice of the Peace, except such actions of trespass wherein the defendant means to avail himself, by pleading the title of himself or any other person under whom he claims in justification of the trespass or trespasses alleged to be committed on real estate; the defendant shall be entitled to all evidence, under the general issue, which by law he might avail himself of under any special plea in excuse or justification, any law, usage or custom to the contrary notwithstanding.

Justices may grant subpœnas in *all* civil actions.

SEC. 13. *Be it further enacted,* That each Justice of the Peace may grant subpœnas for witnesses in all civil actions and causes pending before the Supreme Judicial Court, Circuit Court of Common Pleas, Court of Sessions, and before him or any other Justices, and in all civil actions and causes

May adjourn their Courts by proclamation:

pending before arbitrators or referees. And every Justice of the Peace shall have power by public proclamation to adjourn the trial of any action brought before him, from time to time, when equity may require it; but he shall not be of counsel to

No Justice to be of counsel in any suit before himself.

either party, or undertake to advise or assist any party in suit before him.

SEC. 14. *Be it further enacted,* That when an executor or administrator shall be guilty of committing waste, whereby he is rendered unable to pay the judgment recovered before any Justice of the Peace, against the goods and estate of the deceased in his hands, out of the same, the Justice may proceed against the proper goods and estate of such executor or administrator, in the same manner as the Circuit Court of Common Pleas are empowered to do.

<span style="float:right">In case of waste by executor or administrator, Justice may proceed as C. C. C. Pleas may in such cases.</span>

SEC. 15. *Be it further enacted,* That each Justice of the Peace shall keep a fair record of all his proceedings; and when any Justice of the Peace shall die before a judgment given by him is paid and satisfied, it shall be in the power of any Justice of the Peace in the same county to grant a scire facias upon the same judgment, to the party against whom such judgment was rendered up, for him to show cause if any he hath, why execution should not be issued against him. And although the costs and debt awarded by the deceased Justice when added together, shall amount to more than twenty dollars, it shall be no bar upon such scire facias, but judgment shall be given thereon for the whole debt and cost, together with the cost arising upon the scire facias. *Provided always,* That either party may appeal from the judgment as in other personal actions, where judgment is given by a Justice of the Peace. And every Justice of the Peace who shall have complaint made to him, that a judgment given by a Justice of the same county then deceased, remains unsatisfied, shall issue his summons to the person in whose possession the record of the same judgment is, directing him to bring and to produce to him the same record ; and if such person shall contemptuously refuse to produce the same record, or shall refuse to be examined respecting the same, upon oath, the Justice may punish the contempt by imprisonment, until he shall produce the same, or until he submits to be examined as aforesaid ; and when the Justice is possessed of such record, he shall transcribe the same upon his own book of records, before he shall issue his scire facias ; and shall deliver the original back again to the person who shall have produced it, and a copy of such transcription, attested by the transcribing Justice, shall be allowed in evidence in all cases, where an authenticated copy of the original might be received.

<span style="float:right">Justice to keep record of his proceedings.<br>When Justice shall die before a judgment given by him is satisfied, what proceedings to be had.<br>Appeal allowed to either party.<br>Justice to whom complaint is made in such cases. may summon the person possessing the record to produce it.<br>Punishment for refusal so to do.<br>Duty of the Justice when the record is produced, to transcribe it into his own records.<br>Copy of such transcript to be evidence.</span>

SEC. 16. *Be it further enacted,* That all Justices of the Peace before whom actions may be commenced under former commissions, and such commissions shall expire before judgment shall be rendered thereon, or judgment being rendered, the same remains in whole or in part unsatisfied, such Justices of the Peace who shall hereafter have their said commissions seasonably renewed, and being duly qualified agreeably to the Constitution of this State, to act under such commissions, be and they hereby are authorized and empowered to render judgment, and issue execution on all such ac-

<span style="float:right">Justices, whose commissions expire before judgment or satisfaction, may proceed, under a new commission, seasonably obtained. to render judgment, &c.</span>

37

tions, commenced as aforesaid, in the same manner as if the commissions under which such actions may be commenced, were in full force.

[Approved March 15, 1821.]

———— :oo: ————

## CHAPTER LXXVII.

An Act providing a speedy Method of recovering Debts, and for pre-
venting unnecessary costs attending the same.

*Justices may take recogniz- ances for debts.*    SEC. 1. B E it enacted by the Senate and House of Representa- tives, in Legislature assembled, That every Justice of the Peace in this State shall have power within his county to take re- cognizances for the payment of debts of any person who shall come before him for that purpose : which recognizance may be in substance as follows :—

*Form of recog- nizance.*    Know all men, that I, A. B. of    , in the County of    , do owe unto C. D. of    , the sum of    , to be paid to the said C. D. on the     day of     ; and if I shall fail of the payment of the debt aforesaid, by the time aforesaid, I will and grant that the said debt shall be levied of my goods and chattels, lands and tenements, and in want thereof of my body. Dated at    , this     day of    , in the year of our Lord    .    Witness, my hand and seal     A. B.
    ss. Acknowledged the day and year last abovesaid. Before E. F. Justice of the Peace.

*To be recorded by the Justice.*    SEC. 2. Be it further enacted, That every Justice of the Peace taking any such recognizance, shall immediately re- cord the same at large in a book to be kept by him for that purpose ; and after the same is recorded, may deliver it to *Execution may issue thereon within 3 years.* the Conusee ; and upon the Conusee's lodging the same with the said Justice, at any time within three years from the time when the same is payable, and requesting a writ of execu- tion, it shall be the duty of such Justice to issue a writ of ex- ecution thereon for such sum as shall appear to be due on the same ; which writ of execution shall be in substance as fol- lows :

State of Maine.

(SEAL.)    To the Sheriff of the County of    , or his depu- ty, or either of the Constables of the town of    , in said County,                          Greeting.

*Form of execu- tion.*    Because A. B. of    , in the County of    , on the day of    , in the year of our Lord     before E. F. Esq. one of the Justices of the Peace for the said County of    , acknowledged that he was indebted to C. D. of    , in the county of     in the sum of     which he ought to have paid on the     day of    , and     remains unpaid as it is said : We command you therefore, that of the goods, chat- tels or real estate of the said A. B. within your precinct, you cause to be paid and satisfied unto the said C. D. at the value




DATE DOWNLOADED: Fri Feb 10 13:02:36 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1812 2 .

ALWD 7th ed.
, , 1812 2 .

Chicago 17th ed.
"," Louisiana - 1st Legislature, 2nd Session : 2-266

AGLC 4th ed.
'' Louisiana - 1st Legislature, 2nd Session 2

OSCOLA 4th ed.
'' 1812 2

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
 Conditions of the license agreement available at
 *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

172

greeable to the assessment; and the said trustees shall at the end of the time for which they were elected, render an account of the same to the parish judge, and should any sums be unappropriated, the same shall be paid into the hands of the parish judge in trust for the succeeding trustees, and in case of default of the trustees whose term of time is thus expired, it shall be the duty of the parish judge to summon them to a settlement, enter judgment and issue execution for arrearages if necessary.

**Render account**

**Penalty for default.**

SECT. 3. *And be it further enacted,* That the trustees shall appoint one clerk and one collector, whose term of service shall expire at the same time with that of the trustees, which said officers shall be entitled to such fees as the said trustees may deem proper to allow them.

**Clerk and collector.**

**Fees.**

STEPHEN A. HOPKINS,
*Speaker of the house of representatives.*
J. POYDRAS,
*President of the senate.*
APPROVED, March 25th, 1813.
WILLIAM C. C. CLAIBORNE,
*Governor of the state of Louisiana.*

## AN ACT

*Against carrying concealed weapons, and going armed in public places in an unnecessary manner.*

**Preamble**

WHEREAS assassination and attempts to commit the same, have of late been of such frequent occurrence as to become a subject of serious alarm to the peaceable and well disposed inhabitants of this state; and whereas the same is in a great measure to be attributed to the dangerous and wicked practice of carrying about in public places concealed and deadly weapons, or going to the same armed in an unnecessary manner, therefore;

SECT. 1. *Be it enacted by the senate and house of representatives of the state of Louisiana, in general assembly convened,* That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol or any other deadly weapon concealed in his bosom, coat or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine not to exceed fifty dol-

**Penalty for carrying concealed weapons.**

JA1243

esclaves) et pour son usage, d'une piastre sur chaque mille piastres, suivant le tableau des taxes; et lesdits administrateurs, à l'expiration du terme pour lequel ils auront été élus, en rendront compte au juge de la paroisse, et, s'il restait en caisse des fonds disponibles, ils seront versés entre les mains du juge de paroisse qui les gardera jusqu'à la nomination d'autres administrateurs, et si lesdits administrateurs, à l'expiration du terme pour lequel ils auront été élus, négligeaient de rendre le compte susdit, il sera du devoir du juge de paroisse de les sommer de rendre leurs comptes et de les poursuivre en justice et de lancer contre eux des mandats d'execution pour les sommes arriérées, s'il le juge necessaire.

Redition de compte.

Peines pour defaut.

Sect. 3. *Et il est de plus decreté*, Que lesdits administrateurs nommeront un commis et un collecteur de taxe, dont le tems de service finira en même tems que celui des administrateurs et qui auront droit à la compensation que les administrateurs jugeront à propos de leur accorder.

Commis et collecteur.

Compensation.

STEPHEN A. HOPKINS,
*Orateur de la Chambre des Représentans,*
J. POYDRAS,
*Président du Senat.*

Approuvé le 25 Mars 1813.
Wm. C. C. CLAIBORNE,
*Gouverneur de l'Etat de la Louisiane.*

## ACTE

*Pour défendre de porter des armes cachées et de se présenter armé d'une manière inutile dans les endroits publics.*

Vu qu'il s'est commis dernièrement des assassinats et qu'il a eté essayé d'en commettre d'autres de manière à causer de sérieuses allarmes aux habitans paisibles et bien disposes de cet état, et vu qu'on doit en grande partie attribuer la cause de ces assassinats à la coûtume pernicieuse et condamnable de porter dans des endroits publics, des armes cachées et dangereuses, ou de s'y rendre armé d'une manière inutile,

Preambule.

Sect. 1ère. *Il est décrété par le sénat et la chambre des Représentans de l'Etat de la Louisiane réunis en Assemblée Générale*, Qu'à dater de la passation de cet acte, toute personne qui sera trouvée armée d'aucune arme cachée, tels que poignard, dague, couteau, pistolet ou toute autre arme meurtrière dans son habit ou ailleurs sur lui et qui ne seront point ostensibles, toute personne coupable de cette contravention, sera, sur conviction du fait, devant un juge-de-paix, condamné à une amende qui n'excédera pas

Peines contre ceux qui portent des armes cachees.

How distributed.

For the second offence.

lars nor less than twenty dollars, one half to the use of the state, and the balance to the informer; and should any person be convicted of being guilty of a second offence before any court of competent jurisdiction, shall pay a fine not less than one hundred dollars to be applied as aforesaid, and be imprisoned for a time not exceeding six months.

Penalty for stabbing &c.

SECT. 2. *And be it further enacted*, That should any person stab or shoot, or in any way disable another by such concealed weapons, or should take the life of any person, shall on conviction before any competent court suffer death, or such other punishment as in the opinion of a jury shall be just.

Suspected persons may be searched.

Fine.

Sureties of the peace.

SECT. 3. *And be it further enacted*, That when any officer has good reason to believe that any person or persons have weapons concealed about them, for the purpose of committing murder, or in any other way armed in such a concealed manner, on proof thereof being made to any justice of the peace, by the oath of one or more credible witnesses, it shall be the duty of such judge and justice to issue a warrant against such offender and have him searched, and should he be found with such weapons, to fine him in any sum not exceeding fifty dollars nor less than twenty dollars, and to bind over to keep the peace of the state, with such security as may appear necessary for one year; and on such offender failing to give good and sufficient security as aforesaid; the said justice of the peace shall be authorised to commit said offender to prison for any time not exceeding twenty days.

STEPHEN A. HOPKINS,
*Speaker of the house of representatives.*
J. POYDRAS,
*President of the senate.*
APPROVED, March 25th, 1813.
WILLIAM C. C. CLAIBORNE,
*Governor of the state of Louisiana.*

AN ACT

*To establish a permanent seat of justice in and for the parish of St. Tammany.*

Commissioners.

SECT. 1. *Be it enacted by the senate and house of representatives of the state of Louisiana, in general assembly convened,* That Thomas Spell, Robert Badony, Benjamin Howard, Joseph Hertraire and Ben-

cinquante piastres et qui ne sera pas moindre de vingt piastres, dont moitié au profit de l'état, et le reste au profit du dénonciateur; et toute personne convaincue de récidive devant toute cour de jurisdiction compétente, sera condamnée à une amende qui ne pourra être moindre de cent piastres dont il sera disposé comme ci-dessus et à un emprisonnement qui ne pourra excéder six mois. — Distribution. Récidive.

SECT. 2. *Et il est de plus décrété,* Que toute personne qui poignardera, blessera ou tirera en aucune manière sur toute autre personne ou personnes avec des armes ainsi cachées, ou qui leur ôtera la vie, sur conviction du fait devant toute cour de jurisdiction compétente, sera condamnée à mort ou à toute autre peine que le jury pourra trouver juste dans son opinion. — Peine de mort.

SECT. 3. *Et il est de plus décrété,* Que lorsque tout officier public à des raisons suffisantes de croire qu'une ou plusieurs personnes portent des armes cachées dans l'intention de commettre un meurtre, ou que d'aucune manière cette personne ou personnes portent des armes cachées, sur preuve authentique du fait et sur le témoignage d'une ou plusieurs personnes dignes de foi, devant un juge-de-paix, il sera du devoir dudit juge-de-paix de faire conduire pardevant lui le coupable, le faire fouiller, et en cas qu'il soit trouvé sur lui des armes cachées, il aura le pouvoir de le condamner à une amende qui ne pourra excéder cinquante piastres, ni être moindre de vingt piastres et de lui faire donner telle caution qu'il pourra trouver convenable pour conserver la tranquillité de l'état pendant une année, et si ledit coupable ne fournit pas bonne et suffisante caution, ledit juge-de-paix est autorisé de le faire emprisonner pour un tems qui ne pourra excéder vingt jours. — Pouvoir de fouiller. Amende. Caution.

STEPHEN A. HOPKINS,
*Orateur de la Chambre des Représentans,*
J. POYDRAS,
*Président du Sénat,*

Approuvé 25 Mars 1813.
WM. C. C. CLAIBORNE,
*Gouverneur de l'Etat de la Louisiane.*

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

ACTE
*Pour fixer d'une manière permanente le lieu des séances de la cour de paroisse de St.-Tammany.*

SECT. 1ère. *Il est décrété par le sénat et la chambre des représentans de l'état de la Louisiane réunis en assemblée générale,* Que Thomas Spell, Robert Badony, Benjamin Howard, Joseph Kertraire et — Commissaires.





DATE DOWNLOADED: Thu Dec 29 10:46:15 2022
SOURCE: Content Downloaded from HeinOnline

Citations:

Bluebook 21st ed.
William McK. Ball, Editor; Roane, Sam. C., Editor. Revised Statutes of the State of
Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D.
1837 (1838).

ALWD 7th ed.
Ball, William McK., Editor; Roane, Sam. C., Editor. Revised Statutes of the State of
Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D.
1837 (1838).

APA 7th ed.
Ball, W. (1838). Revised Statutes of the State of Arkansas, Adopted at the October
Session of the General Assembly of Said State, A.D. 1837. Boston, Weeks, Jordan.

Chicago 17th ed.
Ball William McK., Editor; Roane, Sam. C., Editor. Revised Statutes of the State of
Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D.
1837. Boston, Weeks, Jordan.

McGill Guide 9th ed.
William McK. Ball, Editor; Roane, Sam. C., Editor, Revised Statutes of the State of
Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D.
1837 (Boston: Weeks, Jordan., 1838)

AGLC 4th ed.
William McK. Ball, Editor; Roane, Sam. C., Editor, Revised Statutes of the State of
Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D.
1837 (Weeks, Jordan., 1838

MLA 9th ed.
Ball, William McK., Editor, and Sam. C. Roane, Editor. Revised Statutes of the State
of Arkansas, Adopted at the October Session of the General Assembly of Said State,
A.D. 1837. Boston, Weeks, Jordan. HeinOnline.

OSCOLA 4th ed.
Ball, William McK., Editor; Roane, Sam. C., Editor. Revised Statutes of the State of
Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D.
1837. Boston, Weeks, Jordan.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.

SEC. 12.   Every person who shall be convicted of any misdemeanor, the punishment of which is not defined in this or some other statute, shall be punished by imprisonment, not exceeding one year, or by fine not exceeding two hundred and fifty dollars, or by fine and imprisonment both.

SEC. 13.   Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which the said offence shall have been committed, shall be fined in any sum not less than twentyfive dollars, nor more than one hundred dollars, one half to be paid into the county treasury, the other half to the informer, and shall also be imprisoned not less than one, nor more than six months.

### ART. II.—LIBEL.

| SECTION | SECTION |
|---|---|
| 1. Definition of. | 5. Publisher or printer required to testify. |
| 2. Punishment of. | 6. Punishment of publisher or printer refusing to testify. |
| 3. The truth of the libel may be given in evidence. | 7. Their testimony not to be used against themselves. |
| 4. Proclaiming a person a coward, for not fighting a duel, &c. | |

SEC. 1.   A libel is a malicious defamation, expressed either by writing, printing, or by signs or pictures, or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, veracity, virtue or reputation, or to publish the natural defects, of one who is living, and thereby expose him to public hatred, contempt and ridicule.

SEC. 1.   Every person, whether writer, printer or publisher, convicted of the crime of libel, shall be fined in any sum not exceeding five thousand dollars, and may also be imprisoned, not exceeding one year, at the discretion of the jury who shall pass on the case; and when any such case shall be decided without the intervention of a jury, then at the discretion of the court.

SEC. 3.   In all prosecutions for libel, under the provisions of the preceding sections, the truth thereof may be given in evidence in justification.

SEC. 4.   If any person shall, in any newspaper, handbill or other advertisement, written or printed, publish or proclaim any other person as a coward, or use any other opprobrious or abusive language, for not

Case 1:22-cv-00034-ALB-SMD Document 18-65 Filed 07/20/2023 Page 1 of 30

# GENERAL LAWS

OF THE

# TWELFTH LEGISLATURE,

OF THE

# STATE OF TEXAS.

CALLED SESSION.

BY AUTHORITY.



AUSTIN:

PRINTED BY TRACY, SIEMERING & CO.

1870.

JA1249

Case 1:22-cv-00405-JRR   Document 83-6   Filed 07/20/23   Page 78 of 546

# CHAPTER XLVI.

### AN ACT REGULATING THE RIGHT TO KEEP AND BEAR ARMS.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law.

SEC. 2. That this act take effect and be in force in sixty days from the passage thereof.

Approved August 12, 1870.

———

# CHAPTER XLVII.

### AN ACT AUTHORIZING THE GOVERNOR TO ORDER AN ELECTION TO BE HELD IN HILL COUNTY FOR THE PERMANENT LOCATION OF THEIR COUNTY SEAT.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That the Governor of the State of Texas be, and is hereby authorized to order an election to be held in the county of Hill, on the second Monday in September, A. D. 1870, (or as soon thereafter as possible), for the permanent location of the county seat of the

county of Hill; said election shall be held at such places and under such rules and regulations as the Governor may prescribe.

SEC. 2. That the returns of said election shall be made to the Secretary of State, within twenty days after said election shall have been held, and the town receiving two-thirds of the votes cast shall be the permanent county seat of the county of Hill, but should no place receive two-thirds of the votes cast, the present county seat shall remain the permanent one.

SEC. 3. That the Governor shall, within twenty days after the returns of said election shall have been received, notify the Police Court of the county of Hill of the result of said election.

SEC. 4. That this act be in force from and after passage.

Approved August 12, 1870.

---

# CHAPTER XLVIII.

AN ACT MAKING APPROPRIATIONS FOR THE PAYMENT OF THE EXPENSES OF MAINTAINING RANGING COMPANIES ON THE FRONTIER.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That the sum of seven hundred and fifty thousand dollars, or so much thereof as may be necessary, be and the same is hereby appropriated, out of any moneys in the State Treasury (derived from the sale or hypothecation of the bonds of the State issued for frontier protection), for the purpose of paying all expenses connected with the organization, arming and maintenance of the ranging companies on the frontier, called into service under the provisions of the act approved June 13, 1870.

SEC. 2. That this appropriation shall be expended under the direction of the Governor; and the Comptroller of Public Accounts shall, under the special direction of the Governor, audit all claims and accounts incurred for the purposes hereinbefore mentioned, and shall draw his warrant on the Treasurer for the payment of the same.

SEC. 3. That this act shall take effect from and after its passage.

Approved August 12, 1870.

EXHIBIT C

GENERAL LAWS.                    25

# CHAPTER XXXIV.

### AN ACT TO REGULATE THE KEEPING AND BEARING OF DEADLY WEAPONS.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual 'service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed; *provided,* that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; *provided further,* that members of the Legislature shall not be included under the term "civil officers" as used in this act.

SEC. 2. Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person, or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense.

SEC. 3. If any person shall go into any church or religious assembly, any school room, or other place where persons are assem-

GENERAL LAWS.

bled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any elec.ion precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,) or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured and sold for the purposes of offense and defense, unless an officer of the peace, he shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first offense, be punished by fine of not less than fifty, nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not more than ninety days.

SEC. 4. This act shall not apply to, nor be enforced in any county of the State, which may be designated, in a proclamation of the Governor, as a frontier county, and liable to incursions of hostile Indians.

SEC. 5. All fines collected under the provisions of this act shall be paid into the treasury of the county, and appropriated exclusively to the keeping in repair and maintenance of public roads, and all weapons forfeited to the county under the provisions of this act shall be sold as may be prescribed by the county court, and the proceeds appropriated to the same purpose.

SEC. 6. It shall be the duty of all sheriffs, constables, marshals, and their deputies, and all policemen, and other peace officers, to arrest any person violating the first or third sections of this act, and to take such person immediately before a justice of the peace of the county where the offense is committed, or before a mayor or recorder of the town or city in which the offense is committed, who shall investigate and try the case without delay. On all such trials the accused shall have the right of a trial by jury, and of appeal to the district court; but, in case of appeal, the accused shall be required to give bond with two or more good and sufficient sureties in a sum of not less than one hundred nor more than two hundred dollars, if convicted under the first section and in a sum of not less than two hundred nor more than one thousand dollars, if convicted under the third section of this act; said bond to be payable to the State of Texas, and approved by the magistrate, and conditioned that the defendant will abide the judgment of the district court that may

be rendered in the case; and in case of forfeiture the proceedings thereon shall be as is or may be prescribed by law in similar cases; and all moneys collected on any bond or judgment upon the same, shall be paid over and appropriated as provided in the fifth section of this act.

SEC. 7. Any officer named in the sixth section of this act who shall refuse or fail to arrest any person whom he is required to arrest by said section on his own information, or where knowledge is conveyed to him of any violation of the first or third sections of this act, shall be dismissed from his office on conviction in the district court, on indictment or information, or by such other proceedings or tribunal as may be provided by law, and in addition, shall be fined in any sum not exceeding five hundred dollars, at the discretion of the court or jury.

SEC. 8. That the district courts shall have concurrent jurisdiction under this act, and it is hereby made the duty of the several judges of the district courts of this State to give this act especially in charge to the grand juries of their respective counties.

SEC. 9. It is hereby made the duty of the Governor to publish this act throughout the State; and this act shall take effect and be in force from and after the expiration of sixty days after its passage.

Approved April ·12, 1871.

---

## CHAPTER XXXV.

AN ACT TO AUTHORIZE THE COUNTY COURT OF ROBERTSON COUNTY TO LEVY AND COLLECT A SPECIAL TAX FOR THE TERM OF TWO YEARS TO BUILD A COURT HOUSE AND JAIL IN THE CITY OF CALVERT, THE COUNTY SEAT OF SAID COUNTY.

SECTION 1. *Be it enacted by the Legislature of the State of Texas*, That the County Court of Robertson county be and the same is hereby authorized to levy and collect, annually, for the term of two years, a special *ad valorem* tax upon all property, real, personal and mixed, in said county, not to exceed one half of one per centum in addition to all general and special taxes now authorized to be levied and collected by law, which tax shall be levied and collected the same as other taxes, and shall be appropriated and paid out solely for the purpose of building a substantial court house and jail at Calvert, the county seat of Robertson county, Texas.

SEC. 2. That this act shall take effect and be in force from and after its passage.

Approved April 12, 1871.

EXHIBIT D

who continue so unlawfully assembled, or engaged in a riot, after being warned to disperse, shall be punished by the addition of one-half the penalty to which they would otherwise be liable, if no such warning had been given.

---

# CHAPTER THREE.

## AFFRAYS AND DISTURBANCES OF THE PEACE.

|  | Article |  | Article |
|---|---|---|---|
| "Affray" defined | 313 | Shooting in public place | 316 |
| Disturbance of the peace | 314 | Horse-racing on public road or street | 317 |
| "Public place" defined | 315 |  |  |

**"Affray" defined.**
P.C. 381.

ARTICLE. 313. If any two or more persons shall fight together in a public place, they shall be punished by fine not exceeding one hundred dollars.

**Disturbance of the peace.**
(Act June 20, 1876, p. 24.)
P.C. 382.

ART. 314. If any person shall go into any public place, or into or near any private house, or along any public street or highway near any private house, and shall use loud and vociferous or obscene, vulgar or indecent language, or swear, or use, or curse, or expose his person, or rudely display any pistol or other deadly weapon in such public place, or upon such public street or highway, or near such private house, in a manner calculated to disturb the inhabitants thereof, he shall be fined in a sum not exceeding one hundred dollars.

**"Public place" defined.**
P.C. 383.

ART. 315. A public place within the meaning of the two preceding articles, is any public road, street or alley, of a town or city, inn, tavern, store, grocery, work-shop, or any place to which people commonly resort for purposes of business, recreation or amusement.

**Shooting in public place.**
(Act Nov. 12, 1866, p. 210.)

ART. 316. If any person shall discharge any gun, pistol, or fire-arms of any description, on or across any public square, street or alley in any city, town or village in this state, he shall be fined in a sum not exceeding one hundred dollars.

**Horse-racing on public road or street.**
(Act May 10, 1873, pp. 83–4.)

ART. 317. Any person who shall run, or be in any way concerned in running any horse race in, along, or across any public square, street or alley in any city, town or village, or in, along or across any public road within this state, shall be fined in a sum not less than twenty-five nor more than one hundred dollars.

---

# CHAPTER FOUR.

## UNLAWFULLY CARRYING ARMS.

|  | Article |  | Article |
|---|---|---|---|
| Unlawfully carrying arms | 318 | Arrest without warrant | 322 |
| Not applicable, when and to whom | 319 | Officer failing to arrest, punishable | 323 |
| Carrying arms in church or other assembly | 320 | Not applicable to frontier counties | 323 |
| Not applicable, to whom | 321 |  |  |

**Unlawfully carrying arms.**
(Act April 12, 1871, p. 25.)

ARTICLE 318. If any person in this state shall carry on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by fine of not less than twenty-five nor more than one hundred dollars; and, in addition thereto, shall forfeit to the county in which he is convicted, the weapon or weapons so carried.

**Not applicable when and to whom.**
(Act April 12, 1871, p. 25.)

ART. 319. The preceding article shall not apply to a person in actual service as a militiaman, nor to a peace officer or policeman, or person summoned to his aid, nor to a revenue or other civil officer engaged in the discharge of official duty, nor to the carrying of arms on one's own prem-

Case 1:22-cv-01424-RP Document 48 85 Page 84 Date Filed 07/20/2023 PageID: 1379

ises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack, upon legal process.

Art. 320.  If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball-room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other fire-arm, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of a knife manufactured and sold for the purposes of offense and defense, he shall be punished by fine not less than fifty nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person. *Carrying arms in church or other assembly. (Act April 12, 1871, p. 25.)*

Art. 321.  The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated. *Not applicable to whom. (Act April 12, 1871, p. 25.)*

Art. 322.  Any person violating any of the provisions of articles 318 and 320, may be arrested without warrant by any peace officer, and carried before the nearest justice of the peace for trial; and any peace officer who shall fail or refuse to arrest such person on his own knowledge, or upon information from some credible person, shall be punished by fine not exceeding five hundred dollars. *Arrest without warrant. Officer failing punished. (Act April 12, 1871, p. 26.)*

Art. 323.  The provisions of this chapter shall not apply to or be enforced in any county which the governor may designate, by proclamation, as a frontier county and liable to incursions by hostile Indians. *Not applicable to frontier counties. (Act April 12, 1871, p. 26.)*




DATE DOWNLOADED: Fri Feb  3 17:24:07 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1869-1870 23 .

ALWD 7th ed.
, , 1869-1870 23 .

Chicago 17th ed.
"," Tennessee - 36th General Assembly, Public & Private Acts, 1st Session : 23-24

AGLC 4th ed.
" Tennessee - 36th General Assembly, Public & Private Acts, 1st Session 23.

OSCOLA 4th ed.
" 1869-1870 23

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

23

## CHAPTER XXI.

AN ACT to Amend An Act, passed on the 13th of March, 1868, entitled "An Act to amend the revenue laws of the State."

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That An Act to amend the revenue laws of the State, passed on the 13th day of March, 1868, be so amended as to impose a tax of fifty cents on each room except two in a hotel or tavern, and a tax of fifty cents on each stall in a livery stable, or stable kept by hotel or tavern keepers, instead of one dollar, as now imposed by law. *(Hotels and Livery Stable)*

SEC. 2. *Be it further enacted,* That this Act take effect from and after its passage.

W. O'N. PERKINS,
*Speaker of the House of Representatives.*
D. B. THOMAS,
*Speaker of the Senate.*

Passed November 27, 1869.

## CHAPTER XXII.

### AN ACT to Amend the Criminal Laws of the State.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That all voters in this State shall be required to vote in the civil district or ward in which they may reside. Any person violating this Act shall be guilty of a misdemeanor, and upon conviction thereof shall not be fined less than twenty nor more than fifty dollars; *Provided,* that sheriffs and other officers holding elections shall be permitted to vote at any ward or precinct in which they may hold an election. *(To vote in Civil District or Ward.)*

SEC. 2. *Be it further enacted,* That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, bowie-knife, Arkansas tooth-pick, or weapon in form, shape *(Deadly Weapons.)*

JA1258

24

or size, resembling a bowie-knife, or Arkansas tooth-pick, or other deadly or dangerous weapon.

Penalty.

SEC. 3. *Be it further enacted,* That all persons convicted under the second section of this Act shall he punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the Court.

Liquor Shops.

SEC. 4. *Be it further enacted,* That no liquor shop in this State, shall be kept open on election days, nor shall any person, on said days, give or sell intoxicating liquors to any person for any purpose at or near an election ground.

Grand Juries.

SEC. 5. *Be it further enacted,* That the grand juries of this State shall have inquisitorial powers concerning the commission of the offenses created by these Acts, and may send for witnesses, as in cases of gaming, illegal voting, tippling and offenses now prescribed by law.

Judges.

SEC. 6. *Be it further enacted,* That it shall be the duty of the Circuit and Criminal Judges of this State to give the above in special charge to the several grand juries of the courts.

Proviso.

SEC. 7. *Be it further enacted,* That there shall be no property exempt from execution for fines and costs for this offense; *Provided,* That, if from any cause, there should be a failure to hold an election in any civil district or ward, then nothing in this Act shall be so construed as to prevent any voter from voting in any other civil district or ward in his county or town, for State or county officers, at the time prescribed by law.

SEC. 8. *Be it further enacted,* That this Act shall take effect from and after its passage.

W. O'N. PERKINS.
*Speaker of the House of Representatives.*
D. B. THOMAS,
*Speaker of the Senate.*

Passed December 1, 1869.

 

DATE DOWNLOADED: Fri Feb 3 17:48:31 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1870 421 .

ALWD 7th ed.
, , 1870 421 .

Chicago 17th ed.
"," Georgia - Session of 1870 : 421-422

AGLC 4th ed.
'' Georgia - Session of 1870 421

OSCOLA 4th ed.
'' 1870 421

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

To preserve the peace and harmony of the people of this State, etc.

# TITLE XVI.

## PENAL CODE—AMENDMENTS TO.

SECTIONS.
1. Carrying deadly weapons to certain places prohibited.
2. Violation—misdemeanor—penalty.
3. Chain-gang punishment prohibited.
4. Punishment in lieu of chain-gang.

SECTIONS.
5. Section 415 of the Code changed— nolle prosequi.
6. All indictments, etc., submitted to a jury.

(No. 285.)

*An Act to preserve the peace and harmony of the people of this State, and for other purposes.*

SECTION 1. *Be it enacted, etc.,* That, from and immediately after the passage of this act, no person in said State of Georgia be permitted or allowed to carry about his or her person any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon, to any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster-grounds. *Carrying deadly weapons to certain places prohibited. Exception.*

SEC. 2. *Be it further enacted,* That if any person or persons shall violate any portion of the above recited section of this act, he, she or they shall be guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the court. *Violation a misdemeanor—penalty.*

SEC. 3. All laws and parts of laws militating against this act are hereby repealed.

Approved October 18, 1870.

(No. 286.)

*An Act to alter and amend section 4245 of Irwin's Revised Code, by striking out of said section the words " to work in a chain-gang on the public works," and for other purposes.*

SECTION 1. *Be it enacted, etc.,* That the words "to work in a chain-gang on the public works," which occur in fourth and fifth lines of section 4245 of Irwin's Code, be, and the same are hereby, *Chain-gang punishment prohibited.*

To repeal Section 415 of the Revised Code.

stricken from said section, and chain-gangs shall no longer exist, or be tolerated in the State of Georgia, for persons convicted of misdemeanors.

SEC. 2. *Be it further enacted,* That said section be further amend- Punishment ed, by substituting for the words herein stricken out, the words in lieu of chain-gang. " to work on the city or town streets, or county roads, not longer than six months ; but in no case shall such prisoners be chained or otherwise confined in a gang, but shall be guarded."

SEC. 3. *Be it further enacted,* That all laws and parts of laws in conflict with this act be, and they are hereby, repealed.

Approved October 27, 1870.

(No. 287.)

*An Act to repeal section four hundred and fifteen* (415) *of Irwin's Revised Code, in relation to entering nolle prosequis, and to prescribe the mode of settlement in criminal cases.*

SECTION 1. *Be it enacted, etc.,* That section four hundred and Section 415 fifteen (415) of Irwin's Revised Code of Georgia, which said section of Code, as authorizes Solicitors-General in this State to enter a *nolle prose-* to *nolle pros-* *equi* on indictments, be, and the same is hereby repealed, and no ed. *nolle prosequi* shall be allowed, except it be in open court, for some fatal defect in the bill of indictment, to be judged of by the court, Judge shall in which case the presiding Judge shall order another bill of in- order sec- dictment to be forthwith submitted to the grand jury. ond bill.

SEC. 2. *And be it further enacted by the authority aforesaid,* That All indict- all cases of indictments, or special presentments, shall be submit- ments sub- ted to and passed upon by the jury, under the direction of the mitted to jury. presiding Judge, unless there is a settlement thereof between the Settle- prosecutor and defendant, which settlement shall be good and ment—when valid only by the approval and order of the court on examination good. into the merits of the case.

SEC. 3. *And be it further enacted, etc.,* That all laws and parts of laws conflicting with this act be, and the same are hereby, repealed.

Approved October 28, 1870.




DATE DOWNLOADED: Sat Feb  4 11:19:33 2023
SOURCE: Content Downloaded from *HeinOnline*


Citations:

Bluebook 21st ed.
John A.; et al. Hockaday, Compilers %26 Annotators. Revised Statutes of the State of
Missouri 1879 (1879).

ALWD 7th ed.
Hockaday, John A.; et al., Compilers & Annotators. Revised Statutes of the State of
Missouri 1879 (1879).

APA 7th ed.
Hockaday, J. (1879). Revised Statutes of the State of Missouri 1879. Jefferson City,
Carter & Regan, State printers and binders.

Chicago 17th ed.
Hockaday John A.; et al., Compilers %26 Annotators. Revised Statutes of the State of
Missouri 1879. Jefferson City, Carter & Regan, State printers and binders.

McGill Guide 9th ed.
John A.; et al. Hockaday, Compilers %26 Annotators, Revised Statutes of the State of
Missouri 1879 (Jefferson City: Carter & Regan, State printers and binders., 1879)


AGLC 4th ed.
John A.; et al. Hockaday, Compilers %26 Annotators, Revised Statutes of the State of
Missouri 1879 (Carter & Regan, State printers and binders., 1879)

MLA 8th ed.
Hockaday, John A., and Compilers & Annotators et al. Revised Statutes of the State of
Missouri 1879. Jefferson City, Carter & Regan, State printers and binders.
HeinOnline.

OSCOLA 4th ed.
Hockaday, John A.; et al., Compilers & Annotators. Revised Statutes of the State of
Missouri 1879. Jefferson City, Carter & Regan, State printers and binders.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

SEC. 1271. *Abandonment of children.*—If any father or mother of any child under the age of six years, or any other person to whom such child shall have been confided, shall expose such child in a street, field or other place, with intent wholly to abandon it, he or she shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding five years, or in the county jail not less than six months.   (G. S. 781, § 39.)

SEC. 1272. *Mistreatment of apprentices.*—If any master or mistress of an apprentice or other person having the legal care and control of any infant, shall, without lawful excuse, refuse or neglect to provide for such apprentice or infant, necessary food, clothing or lodging, or shall unlawfully and purposely assault such apprentice or infant, whereby his life shall be endangered, or his health shall have been or shall be likely to be permanently injured, the person so offending shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding three years, or by imprisonment in the county jail not exceeding one year, or by a fine of not more than one thousand dollars, or by both such fine and imprisonment. (New section.)

SEC. 1273. *Abandonment of wife or child.*—If any man shall, without good cause, abandon or desert his wife, or abandon his child or children under the age of twelve years born in lawful wedlock, and shall fail, neglect or refuse to maintain and provide for such wife, child or children, he shall, upon conviction, be punished by imprisonment in the county jail not more than one year, or by a fine of not less than fifty, nor more than one thousand dollars, or by both such fine and imprisonment.   No other evidence shall be required to prove that such husband was married to such wife, or is the father of such child or children, than would be necessary to prove such fact or facts in a civil action. (Laws 1867, p. 112, amended—*m*.)

SEC. 1274. *Carrying deadly weapons, etc.*—If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct, on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose, other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of firearms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall, directly or indirectly, sell or deliver, loan or barter to any minor, any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than five nor more than one hundred dollars, or by imprisonment in the county jail not exceeding three months, or by both such fine and imprisonment.   (Laws 1874, p. 43; laws 1875, p. 50, and laws 1877, p. 240, amended.)

SEC. 1275. *Above section not to apply to certain officers.*—The next preceding section shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to persons moving or traveling peaceably through this state, and it shall a good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property.   (New section.)

SEC. 1276. *Fire arms not to be discharged near court house.*—Hereafter it shall be unlawful for any person in this state, except he be a sheriff or other officer in the discharge of official duty, to discharge or fire off any

---

(*m*)   Wife held to be a competent witness to prove fact of abandonment.   43 Mo. 429.   The fact that the defendant has brought suit for divorce is no defense.   52 Mo. 172.

gun, pistol or fire arms of any description, in the immediate vicinity of any court house, church or building used for school or college purposes. (Laws 1879, p. 90, § 1.)

SEC. 1277. *Punishment.*—Any person, guilty of a violation of the preceding section, shall be deemed guilty of a misdemeanor, and, upon conviction, shall be punished by a fine of not less than five dollars nor more than twenty dollars, or by imprisonment in the county jail not exceeding twenty days. (Laws 1879, p. 91, § 2.)

SEC. 1278. *Immediate vicinity defined.*—The term immediate vicinity, as used in this article, shall be construed and held to mean a distance not exceeding two hundred yards. (Laws 1879, p. 91, § 3.)

SEC. 1279. *Intoxicated stage driver.*—Every person who, whilst actually employed in driving any stage, coach, wagon, omnibus, hack or other vehicle, shall be intoxicated to such a degree as to endanger the safety of any person therein, shall be deemed guilty of a misdemeanor, and shall, upon conviction, be punished by fine not less than twenty nor more than one hundred dollars. (G. S. 814, § 31.)

SEC. 1280. *Intoxicated pilot or engineer.*—Every person who, whilst actually employed in discharging the duties of a pilot or engineer on any steamboat, or of a conductor or engineer on railroad cars, shall be intoxicated to such a degree as to endanger the safety of such steamboat or cars, or of any person or passenger therein, shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding three years, or in the county jail not exceeding one year, or by fine not exceeding one thousand dollars. (G. S. 814, § 32.)

SEC. 1281. *Drunken conductor, whilst in charge of train.*—If any person shall, while in charge of a locomotive engine running upon the railroad of any such corporation, or while acting as the conductor of a car, or train of cars, on any such railroad, be intoxicated, he shall be deemed guilty of a misdemeanor. (G. S. p. 342, § 40.)

SEC. 1282. *Punishment for certain offenses.*—Every person who shall be convicted of murder in either degree, or manslaughter in the first degree, or who shall be convicted and sentenced to the penitentiary for any of the offenses specified in sections twelve hundred and fifty-three, twelve hundred and fifty-four, twelve hundred and fifty-five, twelve hundred and fifty-six, twelve hundred and fifty-seven, twelve hundred and fifty-eight, twelve hundred and fifty-nine, twelve hundred and sixty, twelve hundred and sixty-one, twelve hundred and sixty-two and twelve hundred and sixty-six, shall be forever disqualified from voting at any election, or holding any office of honor, trust or profit under the laws of this state, or of any city, or town thereof, or sitting as a juror in any case. (G. S. 782, § 40, am'd.)

---

# ARTICLE III.

## OFFENSES AGAINST PUBLIC AND PRIVATE PROPERTY.

SECTION
1283.  Arson in first degree.
1284.  Dwelling house, defined.
1285.  Arson in second degree.
1286.  Building containing public records.
1287.  Arson in third degree.
1288.  Burning brewery, etc.
1289.  Burning boat or vessel.
1290.  Arson in fourth degree.
1291.  Punishment for arson.
1292.  Burglary in first degree.
1293.  Burglary in second degree.
1294.  Burglary, second degree, continued.
1295.  Burglary, second degree, continued.

SECTION
1296.  Burglary, second degree, continued.
1297.  Burglary, second degree, continued.
1298.  Burglary, second degree, continued.
1299.  What breaking not burglary.
1300.  Burglary in first and second degrees, how punished.
1301.  Burglary and larceny.
1302.  Robbery in first degree.
1303.  Robbery in second degree.
1304.  Robbery in third degree.
1305.  Robbery, how punished.
1306.  Attempt to blackmail, how punished.
1307.  Grand larceny defined.

R S—15

# THE

# STATUTES OF OKLAHOMA

## 1890.

Compiled under the supervision and direction of Robert Martin,
Secretary of the Territory,

—BY—

WILL T. LITTLE,  L. G. PITMAN and R. J. BARKER,

—FROM—

The Laws Passed by the First Legislative Assembly of the Territory.

GUTHRIE, OKLAHOMA:
THE STATE CAPITAL PRINTING CO.,
PUBLISHERS.
1891.

(2430) § **6.** Every person who, with intent to extort any <span>Chap. 25.</span> money or other property from another, sends to any person any <span>Sending threatening letter.</span> letter or other writing, whether subscribed or not, expressing or implying, or adapted to imply, any threat, such as is specified in the second section of this article, is punishable in the same manner as if such money or property were actually obtained by means of such threat.

(2431) § **7.** Every person who unsuccessfully attempts by means <span>Attempting to export money.</span> of any verbal threat such as is specified in the second section of this article, to extort money or other property from another is guilty of a misdemeanor.

### ARTICLE 47.—CONCEALED WEAPONS.

SECTION.
1. Prohibited weapons enumerated.
2. Same.
3. Minors.
4. Public officials, when privileged.
5. Arms, when lawful to carry.

SECTION.
6. Degree of punishment.
7. Public buildings and gatherings.
8. Intent of persons carrying weapons.
9. Pointing weapon at another.
10. Violation of certain sections.

(2432) § **1.** It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided. <span>Prohibited weapons enumerated.</span>

(2433) § **2.** It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided. <span>Same.</span>

(2434) § **3.** It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article. <span>Minors.</span>

(2435) § **4.** Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: *Provided, however,* That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person. <span>Public officials, when privileged.</span>

(2436) § **5.** Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise. <span>Arms, when lawful to carry.</span>

(2437) § **6.** Any person violating the provisions of any one of the foregoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent con- <span>Degree of punishment.</span>

viction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

*Public buildings and gatherings.*

(2438) § **7.** It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

*Intent of persons carrying weapons.*

(2439) § **8.** It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

*Pointing weapons at another.*

(2440) § **9.** It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

*Violation of section seven.*

(2441) § **10.** Any person violating the provisions of section seven, eight or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three not more than twelve months.

## ARTICLE 48.—FALSE PERSONATION AND CHEATS.

SECTION.
1. False impersonation, punishment for.
2. False impersonation and receiving money.
3. Personating officers and others.
4. Unlawful wearing of grand army badge.
5. Fines, how paid.
6. Obtaining property under false pretenses.

SECTION.
7. False representation of charitable purposes.
8. Falsely representing banking corporations.
9. Using false check.
10. Holding mock auction.

*Punishment for false impersonation.*

(2442) § **1.** Every person who falsely personates another, and in such assumed character, either:

First. Marries or pretends to marry, or to sustain the marriage relation toward another, with or without the connivance of such other person; or,

Second. Becomes bail or surety for any party, in any proceeding whatever, before any court or officer authorized to take such bail or surety; or,

Third. Subscribes, verifies, publishes, acknowledges or proves, in the name of another person, any written instrument, with intent that the same may be delivered or used as true; or,

Fourth. Does any other act whereby, if it were done by the person falsely personated, he might in any event become liable to any suit or prosecution, or to pay any sum of money, or to incur any charge, forfeiture or penalty, or whereby any benefit might accrue to the party personating, or to any other person.





DATE DOWNLOADED: Sat Feb  4 11:17:04 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
R.H.; et al. Thompson. Annotated Code of the General Statute Laws of the State of
Mississippi (1892).

ALWD 7th ed.
Thompson, R.H.; et al. Annotated Code of the General Statute Ls of the State of
Mississippi (1892).

APA 7th ed.
Thompson, R. (1892). Annotated Code of the General Statute Laws of the State of
Mississippi. Nashville, Tenn, Marshall & Bruce.

Chicago 17th ed.
Thompson R.H.; et al. Annotated Code of the General Statute Laws of the State of
Mississippi. Nashville, Tenn, Marshall & Bruce.

McGill Guide 9th ed.
R.H.; et al. Thompson, Annotated Code of the General Statute Ls of the State of
Mississippi (Nashville, Tenn: Marshall & Bruce., 1892)


AGLC 4th ed.
R.H.; et al. Thompson, Annotated Code of the General Statute Laws of the State of
Mississippi (Marshall & Bruce., 1892

MLA 9th ed.
Thompson, R.H., et al. Annotated Code of the General Statute Laws of the State of
Mississippi. Nashville, Tenn, Marshall & Bruce. HeinOnline.

OSCOLA 4th ed.
Thompson, R.H.; et al. Annotated Code of the General Statute Laws of the State of
Mississippi. Nashville, Tenn, Marshall & Bruce.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

**1025** (2766). **The same; opening graves for certain purposes.**—Every person who shall open a grave or other place of interment with intent to move the dead body of any human being for the purpose of selling the same, or for the purpose of dissection, or to steal the coffin or any part thereof, or the vestments or other articles interred with the dead body, or any of them, shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding two years, or in the county jail not more than six months, or by fine of not more than three hundred dollars, or both.

**1026** (2985). **Deadly weapons; carrying of concealed.** (Laws 1888, p. 89).— Any person who carries concealed, in whole or in part any bowie-knife, dirk-knife, butcher-knife, pistol, brass or metallic knuckles, slung-shot, sword, or other deadly weapon of like kind or description, shall be guilty of a misdemeanor, and, on conviction, shall be punished by a fine of not less than twenty-five dollars nor more than one hundred dollars, or be imprisoned in the county jail not less than one month nor more than three months, or both.

**1027. The same; not applicable to certain persons.**—Any person indicted or charged for a violation of the last section may show as a defense—

(*a*) That he was threatened, and had good and sufficient reason to apprehend a serious attack from an enemy, and that he did so apprehend; or

(*b*) That he was traveling and was not a tramp, or was setting out on a journey, and was not a tramp; or

(*c*) That he was a peace officer or deputy in the discharge of his duties; or

(*d*) That he was at the time in the discharge of his duties as a mail carrier; or

(*e*) That he was at the time engaged in transporting valuables for an express company or bank; or

(*f*) That he was in lawful pursuit of a felon.

And the burden of proving either of said defenses shall be on the accused.

The "traveling or setting out on a journey" in the statute means a travel of such distance as to take one beyond the circle of his friends and acquaintances. McGuirk v. State, 64 Miss., 209.

The pursuit of a fugitive daughter, begun without knowing where it will lead, is "traveling on a journey." Haywood v. State, 66 Miss., 402.

"Threatened with an attack" does not contemplate mere denunciation, but menace such as to cause a reasonable apprehension of an attack that might properly be resisted with the deadly weapon. Tipler v. State, 57 Miss., 685.

Even if the accused be "threatened" and entertain the "apprehension," it will be no defense if he carried the weapon for some other reason, and for some other purpose. McGuirk v. State, 64 Miss., 209.

The threats must not be too remote. McGuirk v. State, 64 Miss., 210.

The act of 1888, amendatory of the Code, 1880, on the subject of carrying weapons concealed, was ex post facto in its application to offenses previously committed. (1) It cut off a defense, and (2) it changed, but did not mitigate, the penalty. Lindsey v. State, 65 Miss., 542; Hodnett v. State, 66 Miss., 26.

The statute makes the fact of carrying a weapon concealed criminal, regardless of intent. Strahan v. State, 68 Miss., 347.

**1028** (2986). **The same; and cartridges not sold to infant or drunk person.** —It shall not be lawful for any person to sell, give, or lend to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any deadly weapon, or other weapon the carrying of which concealed is prohibited, or pistol cartridge; and, on conviction thereof, he shall be punished by a fine not less than twenty-five dollars nor more than two hundred dollars, or imprisoned in the county jail not exceeding three months, or both.

**1029** (2987). **The same; father not to suffer infant son to have or carry.**— Any father who shall knowingly suffer or permit any son under the age of sixteen

JA1270

years to have or to own, or to carry concealed, in whole or in part, any weapon the carrying of which concealed is prohibited, shall be guilty of a misdemeanor, and, on conviction, shall be fined not less than twenty dollars nor more than two hundred dollars, or may be imprisoned not more than sixty days in the county jail, or both.

**1030** (2988). **The same; college students not to have, etc.**—A student of any university, college, or school, who shall carry, bring, receive, own, or have on the campus, college or school grounds, or within two miles thereof, any weapon the carrying of which concealed is prohibited, or a teacher, instructor, or professor who shall knowingly suffer or permit any such weapon to be carried, or so brought, received, owned, or had by a student or pupil, shall be guilty of a misdemeanor, and, on conviction, be fined not exceeding three hundred dollars or imprisoned in the county jail not exceeding three months, or both.

**1031** (2804). **The same; exhibiting in rude, angry, or threatening manner, etc.**—If any person, having or carrying any dirk, dirk-knife, sword, sword-cane, or any deadly weapon, or other weapon the carrying of which concealed is prohibited, shall, in the presence of three or more persons, exhibit the same in a rude, angry, or threatening manner, not in necessary self-defense, or shall in any manner unlawfully use the same in any fight or quarrel, the person so offending, upon conviction thereof, shall be fined in a sum not exceeding five hundred dollars or be imprisoned in the county jail not exceeding three months, or both. In prosecutions under this section it shall not be necessary for the affidavit or indictment to aver, nor for the state to prove on the trial, that any gun, pistol, or other fire-arm was charged, loaded, or in condition to be discharged.

The omission of the word "manner," after the words "rude, angry, and threatening," in an indictment, is a formal defect, and may be amended as such. In such indictment it is unnecessary to aver that the defendant was "carrying" the weapon. Gamblin v. State, 45 Miss., 658.

**1032** (2769). **Disturbance of family; noises and offensive conduct.**—A person who willfully disturbs the peace of any family or person by an explosion of gunpowder or other explosive substance, or by loud or unusual noise, or by any tumultuous or offensive conduct, shall be punished by fine and imprisonment, or either; the fine not to exceed one hundred dollars, and the imprisonment not to exceed six months in the county jail.

What constitutes the offensive conduct, or the nature or character of the offensive conduct, should be stated in the affidavit or indictment. Finch v. State, 64 Miss., 461.

This section and the next one are intended to protect the peace of families. An affidavit or indictment averring the disturbance merely of an individual, charges no offense under either section. Brooks v. State 67 Miss., 577.

**1033** (2770). **The same; using abusive, etc., language, etc.**—Any person who enters the dwelling-house of another, or the yard or curtilage thereof, or upon the public highway, or any other place near such premises, and in the presence or hearing of the family of the possessor or occupant thereof, or of any member thereof, or of any female, makes use of abusive, profane, vulgar, or indecent language, or is guilty of any indecent exposure of his person at such place, shall be punished for a misdemeanor.

Place is material. An indictment charging the use of abusive language in a yard, is not sustained by proof of its use near the yard. Quin v. State, 65 Miss., 479.

**1034** (2767). **Disturbance of worship; proceedings and penalty.**—If any person shall willfully disturb any congregation of persons lawfully assembled for reli-

 

DATE DOWNLOADED: Sat Feb  4 11:10:25 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1891-1892 95 .

ALWD 7th ed.
, , 1891-1892 95 .

Chicago 17th ed.
"," Vermont - 12th Biennial Session; Special Session - 1891 : 95-96

AGLC 4th ed.
'' Vermont - 12th Biennial Session; Special Session - 1891 95

OSCOLA 4th ed.
'' 1891-1892 95

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

SEC. 5.  This act shall take effect on the first day of May, 1893.

Approved November 22, 1892.

---

## No. 84.—AN ACT IN AMENDMENT OF SECTION 4074 OF THE REVISED LAWS, RELATING TO GAMES.

*It is hereby enacted by the General Assembly of the State of Vermont :*

Section four thousand and seventy-four of the Revised Laws is hereby amended by inserting therein, after the word "billiard table," in the first line of said section, the words "pool table."

Approved November 15, 1892.

---

## No. 85.—AN ACT AGAINST CARRYING CONCEALED WEAPONS.

*It is hereby enacted by the General Assembly of the State of Vermont:*

SECTION 1.  A person who shall carry a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, shall, upon conviction thereof, be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both, in the discretion of the court.

SEC. 2.  A person who shall carry or have in his possession while a member of and in attendance upon any school, any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon shall, upon conviction thereof, be fined not exceeding twenty dollars.

Approved November 19, 1892.

---

## No. 86.—AN ACT TO PREVENT FRAUD AT AGRICULTURAL FAIRS AND EXHIBITIONS OF HORSES.

| SECTION. | SECTION. |
|---|---|
| 1. Societies authorized to hold public fairs may offer premiums or purses for competition of horses in respect to speed, and may make rules for the conduct of their exhibitions. | 2. Societies may classify horses respecting previous exhibitions of speed. |
| | 3. Penalty for entering disguised horse, representing animal to be another horse; or entering horse in a class in which he is not elligible. |
| | 4. When to take effect. |

*It is hereby enacted by the General Assembly of the State of Vermont:*

SECTION 1.  Agricultural societies, corporations and associations, authorized under the laws of this State to hold public fairs

for the competition of horses or horse kind in respect to speed, are hereby authorized to offer premiums or purses for success in such competition, and to conduct and manage their exhibitions in accordance with their own rules and regulations, publicly advertised, and not in conflict with the laws of this State.

SEC. 2.  Such societies, corporations and associations are hereby authorized to establish and designate classes of horses or horse kind, with respect to the previous exhibitions of speed of such animals, or to any other reasonable and lawful grounds of classification, particularly set forth in such publicly advertised rules or regulations.

SEC. 3.  Whoever, for the purpose of competing for any purse or premium, offered by any such society, corporation or association within this State, shall knowingly and designedly enter or drive any horse or animal of the horse kind that shall have been painted or disguised ; or who, for such purpose, shall falsely and fraudulently represent any animal of the horse kind to be another or different animal from the one it really is ; or who knowingly or designedly, for the purpose of competing for any such premium or purse, shall enter or drive any horse, or animal of the horse kind, in a class where it is not entitled to be entered, under the said rules and regulations of the society, corporation or association offering such premium or purse, shall be deemed guilty of an offense under section four thousand one hundred and fifty-four (4154) of the Revised Laws of Vermont ; and upon conviction, shall be punished by a fine of not more than five hundred dollars, or by imprisonment not exceeding six months.

SEC. 4.  This act shall take effect from its passage.

Approved November 16, 1892.

---

## No. 87.—AN ACT TO PREVENT FRAUD IN THE SALE OF LARD.

*It is hereby enacted by the General Assembly of the State of Vermont :*

SECTION 1.  No manufacturer or other person shall sell, deliver, prepare, put up, expose or offer for sale any lard, or any article intended for use as lard, which contains any ingredient but the pure fat of swine, in any tierce, bucket, pail, or other vessel or wrapper, or under any label bearing the words "pure," "refined," "family," or either of them, alone or in combination with other words, unless every vessel, wrapper or label, in or under which such article is sold, delivered, prepared, put up or exposed for sale, bears on the top or outer side thereof, in letters not less than one-half inch in length and plainly exposed to view, the words "compound lard."



DATE DOWNLOADED: Fri Feb 10 12:19:32 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1870 145 .

ALWD 7th ed.
, , 1870 145 .

Chicago 17th ed.
"," Louisiana - 1st Legislature, 3rd Session; 1st Legislature, 2nd Session : 145-161

AGLC 4th ed.
'' Louisiana - 1st Legislature, 3rd Session; 1st Legislature, 2nd Session 145

OSCOLA 4th ed.
'' 1870 145

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
 Conditions of the license agreement available at
 *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

No. 100.]              AN ACT

To regulate the conduct and to maintain the freedom and purity of elections; to prescribe the mode of making, and designate the officers who shall make the returns thereof; to prevent fraud, violence, intimidation, riot, tumult, bribery or corruption at elections or at any registration or revision of registration; to limit the powers and duties of the sheriffs of the parishes of Orleans and Jefferson; to prescribe the powers and duties of the Board and officers of the Metropolitan Police in reference to elections; to prescribe the mode of entering on the rolls of the Senate and House of Representatives the names of members; to empower the Governor to preserve peace and order, to enforce the laws; to limit the powers and duties of the Mayors of the cities of New Orleans and Jefferson with regard to elections; to prohibit District or Parish Judges from issuing certain writs to Commissioners of Election; to make an appropriation for the expenses of the next revision of the registration and of the next election; and to enforce article one hundred and three of the constitution.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the State of Louisiana, in General Assembly convened,* That all elections for State, parish and judicial officers, members of the General Assembly, and for members of Congress shall be held on the first Monday in November, and said elections shall be styled the general elections. *(Time of holding elections.)*

They shall be held in the manner and form, and subject to the regulations hereinafter prescribed, and no other.

SEC. 2. *Be it further enacted, etc.,* That elections for Representatives in the General Assembly shall be held on the first Monday of November, one thousand eight hundred and seventy, and every two (2) years thereafter; and all elections to supply the place of Senators in the General Assembly, whose terms of service shall have expired, shall be held at the same time as herein provided for the election of Representatives. *(Elections for representatives in the General Assembly. Elections for State senators.)*

SEC. 3. *Be it further enacted, etc.,* That all elections shall be held in each parish at the several election polls or voting places to be established as is hereinafter prescribed. *(When held.)*

SEC. 4. *Be it further enacted, etc.,* That all elections shall be completed in one day, and the polls shall be kept open at each poll or voting place, from the hour of six in the morning until six o'clock in the afternoon. *(When completed—polls open.)*

SEC. 5. *Be it further enacted, etc.,* That each parish in this State, except the parishes of Orleans and Jefferson, is hereby fixed as an election precinct, and the supervisor of registration in each of said parishes shall direct what number of polls or voting places shall be established in each precinct, fix the places of holding the election, and appoint commissioners of election for each poll or voting place. In the city of New Orleans, each ward shall constitute a precinct, and in the remaining part of the parish of Orleans, the supervisor of registration for the said parish shall fix both the precincts and voting places in each precinct, and in the parish of Jefferson, the supervisor of registration shall fix both the precincts and the voting places in each precinct; in the parishes of Orleans and Jefferson the supervisor of registration of each parish shall appoint commissioners of election therefor, as in the other parishes. Any duly registered voter may vote at any poll or voting place within his precinct. *(Election precincts. Voting places.)*

SEC. 6. *Be it further enacted, etc.,* That the elections at each poll or voting place shall be presided over by three commissioners of election, residents of the parish, who shall be able to read and write, to be appointed by the supervisor of registration for the parish, *(Commissioners of election.)*

19

who shall, before entering upon the discharge of their duties, take and subscribe the oath or oaths prescribed for State officers. Should only one of the commissioners appointed be present, he shall appoint another, and both together shall appoint a third, and the commissioners so appointed shall take the oath, and perform all the duties of commissioners of election in the same manner as if they had been appointed by the supervisor of registration.

SEC. 7. *Be it further enacted, etc.,* That it shall be the duty of the commissioners of election to receive the ballots of all legal voters who shall offer to vote, and deposit the same in the ballot box to be provided for that purpose. The commissioners shall deposit the ballot of each voter in the ballot box in the full and convenient view of the voter himself.

SEC. 8. *Be it further enacted, etc.,* That in all cases the vote of the person offering to vote shall be taken from the hand of the voter by one of the commissioners of election, and any commissioner of election receiving a vote from the hands of any person other than the voter, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than one hundred dollars nor more than three hundred dollars; and any person taking a vote from a voter for the purpose of handing the same to the commissioner of election, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than one hundred dollars nor more than three hundred dollars; *Provided,* That any voter shall have the right to deposit his own vote in the ballot box with his own hand.

SEC. 9. *Be it further enacted, etc.,* That any commissioner of election, constable, police officer or election officer, who shall see any person taking from the hands of a voter his ballot with intent to pass it to the commissioners of election, or attempting so to pass such ballot, shall forthwith arrest such person and convey him at least one quarter of a mile from the polls, and keep him there under guard until the close of the polls.

SEC. 10. *Be it further enacted, etc.,* That the commissioners of election shall preserve order and decorum at the election, and shall commit to prison, or if at any place over one mile from the parish prison, to the custody of the officer, who shall convey the prisoner to a place at least a quarter of a mile from the polls, any disorderly person or persons for a term not to extend beyond the hour of closing the polls, provided he be permitted to vote before being imprisoned. It shall be the duty of the commissioners of election, or any of them, to issue a warrant forthwith for the arrest of such person or persons, and the officer making the arrest shall commit such person or persons as above provided until the close of the polls. Such warrants may be directed to any sheriff, constable or police officer, and shall be executed immediately by such officer. As soon as practicable after the closing of the polls, such person or persons shall be brought before the proper magistrate for examination, who shall proceed forthwith to examine the case.

SEC. 11. *Be it further enacted, etc.,* That it shall be the duty of the commissioners of election at each poll or voting place to keep a list of the names of the persons voting at such poll or voting place, which list shall be numbered from one to the end, and said lists of voters, with their names and number as aforesaid, signed and sworn to as correct by such commissioners, shall be delivered to the super-

Oath.

Absence.

Duties of commissioners.

Votes—how taken and deposited.

Penalty.

Order and decorum.

Arrest of disorderly persons.

Lists of persons voting.

visor of registration at the same time the box containing the ballots is delivered to him.

SEC. 12. *Be it further enacted, etc.*, That any commissioner of election shall have power to administer oaths and affirmations to persons offering to vote at any election conducted by them, and to examine such persons under oath touching their right to vote at such election; and in all cases the supervisor of registration for the parish shall appoint one of the commissioners of election to keep a record of the voters during the election, and another to receive the votes, and whenever a vote is received the commissioner of election keeping the record shall call the name of the voter aloud, and shall mark the letter "V" opposite said name on the record. *(Oaths and affirmations. Commissioner to receive votes. Record of persons voting—how kept.)*

SEC. 13. *Be it further enacted, etc.*, That all supervisors of registration, assistant supervisors of registration, commissioners of election, and officers attending supervisors of registration or commissioners of election, shall be free from arrest during the time of registration or of the revision of the registration, or of holding the election, or in going to or returning from the place of registration or poll or voting place, unless he or they shall be charged with an offense punishable with death or imprisonment in the peniten'ary. *(Officers of election free from arrest. Exception.)*

SEC. 14. *Be it further enacted, etc.*, That each commissioner of election shall receive as compensation the sum of five dollars per day for the number of days he is actually employed in the discharge of the duties of his office, for which he shall make a written and specific account, which shall be examined, and if found correct shall be approved and countersigned by the supervisor of registration of the parish and by the Governor, and upon presentation of such account to the Auditor of Public Accounts, said Auditor shall issue his warrant upon the Treasurer for the amount named therein. All proper expenses incurred for the rent of polling or voting places, and the hire of such furniture and incidental expenses necessary for the holding an election, shall be paid by the city or parish authorities in which the elections are held, upon the presentation of a detailed account, duly sworn to and approved by the supervisors of registration for the parish. *(Compensation of commissioners. Expenses.)*

SEC. 15. *Be it further enacted, etc.*, That any person duly appointed as a commissioner of election, who shall refuse or fail to serve as such, shall be fined in the sum of one hundred dollars, to be recovered by prosecution before any court of competent jurisdiction. *(Failure of commissioners to act—penalty.)*

SEC. 16. *Be it further enacted, etc.*, That no person shall be permitted to vote at any election to be held in this State, who has not been duly registered as a qualified voter in accordance with law. *(Person must be registered in order to vote.)*

SEC. 17. *Be it further enacted, etc.*, That any voter shall vote in the parish wherein he resides, except in the parishes of Orleans and Jefferson, wherein he shall vote at the election precinct in which he shall be a registered voter. *(Where a person may vote.)*

SEC. 18. *Be it further enacted, etc.*, That all the names of persons voted for by each voter shall be written or printed on one ticket, on which the names of the persons voted for, together with the office for which they are voted for, shall be accurately specified; and should two (2) or more tickets be folded together, the tickets so folded shall be rejected. The commissioners of election shall require every person offering to vote to exhibit his certificate of registration, and when the vote of such person is received, the commissioners of election shall write on or stamp on such certificate or affidavit the *(Tickets. Certificates of registration to be stamped.)*

148

word "voted," and the date of the vote, which shall be signed by one
of the commissioners; and any person being guilty of erasing or alter-

**Penalty for erasure of stamp**

ing any stamp or mark thus made by the commissioners of election,
or any one of them, shall upon conviction be deemed guilty of a
misdemeanor, and fined and imprisoned at the discretion of the
court.

SEC. 19. *Be it further enacted, etc.*, That the commissioners shall

**Oaths of voters may be required as to previous voting.**

have the right to require that any person attempting to vote shall
be put on his oath, and made to declare whether he has voted at
another poll or voting place, and in case such person shall make a
false oath, he shall be subjected to the penalties provided by law for

**Penalty for refusing to administer oath.**

perjury. And it is hereby made the duty of any commissioner of
election, upon the request of any voter, to administer the oath herein
required, and any commissioner of election refusing or neglecting
to administer the oath, when so requested, shall be deemed guilty of
a misdemeanor, and on conviction thereof shall be punished by a
fine of not less than one hundred dollars, and by imprisonment for
a term of not less than three months.

SEC. 20. *Be it further enacted, etc.*, That any person offering to vote

**As to certificate of registration.**

may be required by the commissioners to make oath and declare
that he is the person to whom was issued the registration certificate,
or other paper upon which he offers to vote, and that he has not
voted at any other poll or voting place; and in case he shall make a
false oath, he shall be liable to the pains and penalties of perjury
prescribed by law.

SEC. 21. *Be it further enacted, etc.*, That the supervisor of registra-

**Printed lists of registered voters to be furnished to Commissioners.**

tion for each parish throughout the State shall furnish to the com-
missioners of election, at each poll or voting place within his parish,
a written or printed list, in alphabetical order, of all the registered
voters, and the number of the certificate of registration of each
voter of the precinct in which the poll or voting place may be situ-
ated; and it shall be the duty of the commissioners of election, as
soon as a voter has deposited his vote, to erase his name from said

**Erasure penalties.**

list. Any person, except a commissioner of election, who shall
mark, disfigure or erase any part of said list, shall be immediately
arrested and confined until the close of the polls. It is made the
duty of all supervisors and assistant supervisors of registration,
commissioners of election, and public officers, to enforce the penalty
of this section.

SEC. 22. *Be it further enacted, etc.*, That the police jury of each

**Ballot boxes, by whom furnished.**

parish in the State, except the parish of Orleans, shall furnish to the
supervisor of registration as many ballot boxes as may be requisite
for the holding of all elections in the parish, and in the parish of
Orleans it shall be the duty of the Common Council of the city of
New Orleans to furnish the supervisor of registration as many
ballot boxes as may be necessary for the holding of all elections in
the parish.

SEC. 23. *Be it further enacted, etc.*, That it shall be the duty of the

**One for each poll.**

supervisor of registration of each parish to provide for each elec-
tion poll or voting place within the parish, one suitable ballot box, at
the expense of the parish, if not furnished by the parish.

SEC. 24. *Be it further enacted, etc.*, That it shall be the duty of the

**Law to be posted**

supervisor of registration in each parish, at least ten days before
any election, to cause to be printed and posted up in conspicuous
places throughout his parish, and at or near the polls or voting

places, a sufficient number of copies of the provisions of this law imposing penalties for offenses against the freedom and purity of elections.

SEC. 25. *Be it further enacted, etc.,* That the State Registrar of Voters shall furnish to all supervisors of registration all printed blanks and instructions, in conformity with this act, which may be necessary for conducting elections and making returns thereof, which shall be printed by some person to be appointed by the Governor, Lieutenant Governor and Speaker of the House of Representatives, and paid for at the rates allowed for the State printing. The printing shall be measured and approved by the officers aforesaid, and the Auditor of Public Accounts shall issue his warrants therefor upon the State Treasurer only when so approved, in such sums as may be convenient, of not less than fifty dollars nor more than one hundred dollars each. *(margin: Blanks and instructions. How paid for, etc.)*

SEC. 26. *Be it further enacted, etc.,* That all elections held in this State to fill any vacancies shall be conducted and managed, and returns thereof shall be made in the same manner as *(if)* [is] provided for general elections *(margin: Returns of elections to fill vacancies.)*

SEC. 27. *Be it further enacted, etc.,* That the supervisor of registration for the parish shall conduct all city, town, parish or charter elections, which may be held in his parish, and forward statements thereof to the returning officers in the same manner and form as is prescribed for general elections. *(margin: City, town, parish and charter elections.)*

SEC. 28. *Be it further enacted, etc.,* That the Governor shall commission all officers elect, except members of the General Assembly and the Governor. *(margin: Commissions of officers elect.)*

SEC. 29. *Be it further enacted, etc.,* That in any parish, precinct, ward, city or town, in which during the time of registration or revision of registration, or on any day of election, there shall be any riot, tumult, acts of violence, intimidation, armed disturbance, bribery or corrupt influences, at any place within said parish, or at or near any poll or voting place, or place of registration or revision of registration, which riot, tumult, acts of violence, intimidation, armed disturbance, bribery or corrupt influences, shall prevent, or tend to prevent, a fair, free, peaceable and full vote of all the qualified electors of said parish, precinct, ward, city or town, it shall be the duty of the commissioners of election, if such riot, tumult, acts of violence, intimidation, armed disturbance, bribery or corrupt influences, occur on the day of election, or of the supervisor of registration, or any assistant supervisor of registration of the parish, if they occur during the time of registration or revision of registration, to make in duplicate, and under oath, a clear and full statement of all the facts relating thereto, and of the effect produced by such riot, tumult, acts of violence, intimidation, armed disturbance, bribery or corrupt influences in preventing a fair, free, peaceable and full registration or election, and of the number of qualified electors deterred by such riot, tumult, acts of violence, intimidation, armed disturbance, bribery or corrupt influences, from registering or voting, which statement shall also be corroborated, under oath, by three respectable citizens, qualified electors of the parish. *(margin: Statement of riots and disturbances to be made.)*

When such statement is made by a commissioner of election or assistant supervisor of registration, he shall forward both copies to the supervisor of registration, immediately on the close of the election. The supervisor of registration shall forward one copy of

Removing.

all such statements, whether made by himself or by a commissioner of election, or by an assistant supervisor of registration, to the Governor, and shall deposit one copy with the clerk of a District Court of the parish.

Sec. 30. *Be it further enacted, etc.,* That no parish or district judge shall interfere, by writ of injunction or mandamus, or order of court to compel any commissioner of election to do any act or prohibit him from doing any act in his official capacity as commissioner of election, or relating in any manner to the conduct of the election. Any judge so interfering shall be guilty of a misdemeanor in office, and upon conviction thereof shall be punished by a fine of not less than one hundred dollars and imprisonment in the parish prison for not less than three months; *Provided,* That nothing in this section shall be so construed as to exempt any commissioner from a suit for damages or prosecution for violation of the law.

*(margin: Writs of injunction, etc. / Penalty. / Proviso.)*

Sec. 31. *Be it further enacted, etc.,* That it shall be the duty of the Governor to cause the Attorney General, or in case of his failure or refusal, to employ competent counsel to prosecute any judge who shall violate the provisions of the foregoing section of this act. In the parish of Orleans such prosecutions shall be before the district court having criminal jurisdiction. Whenever the judge of a district court having jurisdiction of such prosecutions shall be prosecuted for such an offense, the Governor shall appoint some practicing attorney to prosecute the cause. Any attorney so employed, as above directed by the Governor, shall, for each successful prosecution in which he shall have been engaged, receive as compensation a sum to be fixed by the Governor, the judge of a district court and two judges of the Supreme Court, which shall be paid to him upon the warrant of the Governor and such judges, out of any funds in the treasury not otherwise appropriated.

*(margin: Prosecution of judge, wrongfully granting certain writs.)*

Sec. 32. *Be it further enacted, etc.,* That all general elections for members of Congress shall be held at the same time, and conducted in the same manner, as is provided for the general elections.

*(margin: Members of Congress.)*

Sec. 33. *Be it further enacted, etc.,* That as soon as possible after the expiration of the time of making the returns of the election for representatives in Congress, a certificate of the returns of the election for such representatives shall be entered on record by the Secretary of State, and signed by the Governor, and a copy thereof, subscribed by said officers, shall be delivered to the person so elected, and another copy transmitted to the House of Representatives of the Congress of the United States, directed to the clerk thereof.

*(margin: Returns for Congressional Representatives.)*

Sec. 34. *Be it further enacted, etc.,* That in case of vacancy, by death or otherwise in the said office of Representatives in Congress, between the general elections, it shall be the duty of the Governor by proclamation, to cause an election to be held according to law, to fill the vacancy.

*(margin: Vacancy in office of Representative in Congress.)*

Sec. 35. *Be it further enacted, etc.,* That in every year in which an election shall be held for electors of President and Vice President of the United States, such election shall be held on the Tuesday next after the first Monday in the month of November, in accordance with an act of the Congress of the United States, approved January twenty-third, one thousand eight hundred and forty-five, entitled "An Act to establish a uniform time for holding elections for electors of President and Vice President, in all States of the Union;" and

*(margin: Presidential elections.)*

JA1281

such elections shall be held and conducted, and returns made thereof in the manner and form prescribed by law for the general elections.

Sec. 36. *Be it further enacted, etc.,* That whenever the seat of any senator or representatives shall become vacant, and there shall be a session of the General Assembly then sitting or to be held before the next general election, it shall be the duty of the Governor, within five days after being officially informed of such vacancy, to issue his writ of election, directed to the supervisors of registration in and for the parish or parishes in which such vacancy may exist, whose duty it shall be, within three days after its receipt, to give public notice that an election will be held to fill such vacancy on a day to be named by them, which day shall not be less than eight nor more than fifteen days after the publication of such notice, if such election be held during or within fifteen days next preceding a session of the General Assembly, but if not, then the election shall be held not less than twenty nor more than thirty days after the publication of such notice, and shall be held and conducted, and the returns thereof made in the manner and form provided by law for general elections. *Vacancies in members of General Assembly.*

Sec. 37. *Be it further enacted, etc.,* That in all future elections for senators, representatives, sheriffs, coroners, clerks of the district courts and other officers, if there should be an equal number of votes given to two or more candidates for the same office, the election for such office or offices thus not filled shall be again returned to the people in the parish or district, as the case may be, public notice of ten days to be first given in the same manner as in the general elections. *Tie vote.*

Sec. 38. *Be it further enacted, etc.,* That the provisions of this act, except as to the time of holding elections, shall apply in the election of all officers whose election is not otherwise provided for. *Elections not specified.*

Sec. 39. *Be it further enacted, etc.,* That it shall be the duty of the Governor, at least six weeks before every general election, to issue his proclamation, giving notice thereof, which shall be published in the official journal of the State, and copies thereof forwarded to the several supervisors of registration throughout the State. *Proclamation of election.*

Sec. 40. *Be it further enacted, etc.,* That notice of every general election held under the provisions of this act shall be given at least thirty days before the election, by notices posted up in each precinct, or if there be an official newspaper published in the parish, by publishing the notice in such paper. *Notices of election.*

Sec. 41. *Be it further enacted, etc.,* That the supervisors of registration, or commissioners of election, shall, on the day of election, close all drinking saloons, dram shops, groggeries or places where liquor is sold by the glass or bottle, situated within a radius of two miles of any poll or voting place. And said supervisors or commissioners of election shall have the power to call on any sheriff, constable or police officer to enforce this regulation. If such sheriff, constable or police officer shall refuse to obey any order issued under the authority of this section, the commissioner or supervisor giving the order shall summarily arrest and imprison such sheriff, constable or police officer, such imprisonment not to extend beyond the hour of closing the polls. And such sheriff, constable or police officer so refusing to obey such order shall be deemed guilty of a misdemeanor in office, and upon conviction thereof, shall be punished by imprisonment for a term not to exceed six months, nor less than three months, and by a fine of not more than (\$500) five hundred dollars, nor less than (\$100) one hundred dollars. *Drinking saloons.*

SEC. 42. *Be it further enacted, etc.*, That the Governor, any justice

Peace officers to
issue warrant
for closing
drinking houses

of the peace, alderman, mayor, judge, or any State officer who may be present at, or have knowledge of any drinking saloon, dram shop, groggery, or place where liquor is sold by the glass or bottle, which is open contrary to the provisions of the foregoing section within the limits therein prescribed, may in writing order any police officer or constable to seize any such liquors, or any carriages or vessels containing the same, or any booths or tents erected within said limits for the purpose of exposing such intoxicating liquors for sale.

SEC. 43. *Be it further enacted, etc.*, That the constable or police offi-

Officers to seize
liquors.

cer to whom such order shall be delivered, shall thereupon seize all such liquor, carriages, vessels, and the materials of any such tent or booth and hold and detain the same until twenty-four hours after the close of the election, then to be delivered on demand to the owner or the person from whom they were taken, on the payment of ten dollars for the safe keeping of said articles.

SEC. 44. *Be it further enacted, etc.*, That if these effects be not thus

Sale of liquors,
etc.

demanded, the same shall be sold at public auction by the police officer or constable making the seizure, and the proceeds of such sale, after deducting costs of sale and safe keeping, shall be paid to the owner of the articles sold, or the person from whom the same were taken.

SEC. 45. *Be it further enacted, etc.*, That no voter whose name is

Registered vot-
er not to be
challenged as to
residence.

registered according to law shall be challenged at the polls on any question of residence, but it shall be the duty of the commissioners of elections to require every person whose name appears on the registration books to prove his identity if required by the commissioners of election; and any commissioner of election who shall receive a second vote on the same day by virtue of the same certificate of registration, and any person who shall offer to vote a

Voting twice.

second time upon any certificate of registration, shall be deemed guilty of a misdemeanor, and on conviction thereof be fined or imprisoned, or both, at the discretion of the court, but the fine shall not exceed one hundred dollars in each case, nor the imprisonment one year, and the like punishment shall, on conviction, be inflicted on

Endorsement on
certificate.

any commissioner of election who shall neglect or refuse to make the endorsement required as aforesaid, on the said registration certificate.

SEC. 46. *Be it further enacted, etc.*, That if any clerk of a court, or

Wrongful issue
of naturalization
certificates.

deputy of any such clerk, or any other person, shall affix the seal of office to any naturalization paper or permit the same to be affixed, or give out, or cause or permit the same to be given out, in blank, whereby it may be fraudulently used, or furnish a naturalization certificate to any person who shall not have been duly examined and sworn in open court, in the presence of some of the judges thereof, according to the act of Congress, or shall aid in, connive at, or in any way permit the issue of fraudulent naturalization certificates, he shall be guilty of a misdemeanor; or if any one shall fraudulently use any such certificate of naturalization, knowing it to have been fraudulently issued, or shall vote, or attempt to vote thereon, or if any one shall vote, or attempt to vote, on any certificate of naturalization not issued to him, he shall be guilty of a misdemeanor; and either or any of the persons, their aiders or abettors, guilty of either of the misdemeanors aforesaid, shall, on conviction, be fined in a sum not exceeding one thousand dollars, and imprisoned in the penitentiary for a period not exceeding three days.

SEC. 47. *Be it further enacted, etc.,* That if any person, on oath or affirmation, in or before any court in the State, or officer authorized to administer oaths, shall, to procure a certificate of naturalization for himself or any other person, willfully depose, declare or affirm any matter to be fact, knowing the same to be false, or shall in like manner deny any matter to be fact, knowing the same to be true, he shall be deemed guilty of perjury, and any certificate of naturalization issued in pursuance of any such deposition or affirmation, shall be null and void; and it shall be the duty of the court issuing the same, upon proof being made before it that it was fraudulently obtained, to take immediate measures for recalling the same for cancellation; and any person who shall vote, or attempt to vote, on any paper so obtained, or who shall in any way aid in, connive at, or have any agency whatever in the issue, circulation or use of any fraudulent naturalization cirtificate, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall undergo an imprisonment in the penitentiary for not more than two years, and pay a fine, not more than one thousand dollars, for every such offense, or either or both, at the discretion of the court.

*False oath to procure certificate of naturalization.*

SEC. 48. *Be it further enacted, etc.,* That at all general elections the names of all candidates to be voted for in the cities of New Orleans and Jefferson shall be written or printed on one ticket, or slip of paper, and the number of the ward and election precinct in which the ticket is to be voted, shall be printed or written on the outside fold thereof.

*Names of candidates on one ticket.*

SEC. 49. *Be it further enacted, etc.,* That the supervisors of registration in the parishes of Orleans and Jefferson shall, during registration and at least within six days preceding any general election, furnish to the Board of Metropolitan Police Commissioners a copy of the lists of registered voters in each precinct in said parishes.

*Copy lists of registration in Orleans and Jefferson.*

SEC. 50. *Be it further enacted, etc.,* That the Board of Metropolitan Police Commissioners shall forthwith proceed by means of the police to inquire into and report to said supervisors the names of all persons falsely, fraudulently or improperly registered; and to this end the Board of Metropolitan Police Commissioners shall divide each ward into convenient subdivisions or blocks, and shall assign to each subdivision one or more police officers, whom they shall direct and cause to compare the names of the actual residents of said subdivisions or blocks with the names of the registered voters thereof, and to report to them the names of all persons whom they shall find to be falsely, fraudulently or improperly registered, and the Board of Metropolitan Police Commissioners shall report the same in an alphabetical list, with the names and residences thereof as registered, to the supervisors of registration of said parishes of Orleans and Jefferson, respectively, who shall immediately make publication thereof in the official journal of the State, with notice to all such persons to appear forthwith at the office of the supervisor of registration of said parishes, respectively, and show cause why their names should not be erased from the registry list. If any such person shall appear and show to the satisfaction of the Supervisor of Registration that he has been unjustly reported as falsely, fraudulently or improperly registered, or show other sufficient cause why his name should remain on the registry list, his name shall not be erased; otherwise the supervisor of registration shall cause all

*Duty of Metropolitan Police.*

20

154

names so reported to be erased from the registry list, and no person whose name is so erased shall vote at that election.

SEC. 51. *Be it further enacted, etc.,* That the mayors of the cities of New Orleans and Jefferson are hereby prohibited from appointing commissioners or (*thair*) [other] officers to hold or conduct any election whatever, and from doing any act toward the holding or conducting of any election.

<div style="margin-left:2em">Mayor prohibited from conducting elections in Orleans and Jefferson.</div>

Any mayor who shall do any act contrary to the provisions of this section shall be deemed guilty of a misdemeanor in office, and, upon conviction thereof, shall be punished by imprisonment for not less than three months, and by a fine of not less than three hundred dollars. Any citizen may prosecute any person violating this section.

SEC. 52. *Be it further enacted, etc.,* That it shall be unlawful for the sheriffs of the parishes of Orleans, Jefferson and St. Bernard, or either of them, to appoint any deputies to conduct or in any manner to interfere with the elections in said parishes, or to station any deputies or their officers at any poll or voting place or at any office of registration, for the purpose of receiving or carrying the ballot boxes, or to do any act toward conducting the elections, or toward maintaining or preserving the peace on the day of election. The whole care of the peace and order of the cities of New Orleans, Jefferson and Carrollton, and in the parishes of Orleans, Jefferson and St. Bernard, on the days of election, shall be in the charge of the Metropolitan Police, subject to the orders of the Governor.

*Sheriffs not to interfere in elections in Orleans and Jefferson and St. Bernard*

Any sheriff who shall do any act contrary to the provisions of this section shall be deemed guilty of a misdemeanor in office, and, upon conviction thereof, shall be removed from office, and be imprisoned for not less than three months, and be fined not less than three hundred dollars. Any citizen may prosecute any person violating the provisions of this section.

*Penalty.*

SEC. 53. *Be it further enacted, etc.,* That immediately upon the close of the polls on the day of election, the commissioners of election at each poll or voting place shall seal the ballot box by pasting slips of paper over the key hole and the opening in the top thereof, and fastening the same with sealing wax on which they shall impress a seal, and they shall write the names of the commissioners on the said slips of paper; they shall forthwith convey the ballot box so sealed to the office of, and deliver said ballot box to the supervisor of registration for the parish, who shall keep his office open for that purpose from the hour of the close of the election until all the votes from the several polls or voting places of the precinct shall have been received and counted. The supervisor of registration shall immediately upon the receipt of said ballot box note its condition and the state of the seals and fastenings thereof, and shall then in the presence of the commissioners of election and three citizens freeholders of the parish for such poll or voting place, open the ballot box and count the ballots therein, and make a list of all the names of the persons and offices voted for, the number of votes for each person, the number of ballots in the box, and the number of ballots rejected, and the reason therefor. Said statement shall be made in triplicate, and each copy thereof shall be signed and sworn to by the commissioners of election of the poll and by the supervisor of registration. As soon as the supervisor of registration shall have made

*Sealing of ballot boxes.*

*Delivery of ballot boxes.*

*Counting of ballots.*

*Statement of votes.*

the statement above provided for for each poll in his precinct or parish, and it shall have been sworn to and subscribed as above directed, the supervisor of registration shall inclose in an envelop of strong paper or cloth, securely sealed, one copy of such statement from each poll and one copy of the list of persons voting at each poll, and one copy of any statements as to violence or disturbance, bribery or corruption, or other offenses specified in section twenty-nine of this act, if any there be, together with all memoranda and tally lists used in making the count and statement of the votes, and shall send such package by mail, properly and plainly addressed, to the Governor of the State. The supervisor of registration shall send a second copy of said statement to the Governor of the State by the next most safe and speedy mode of conveyance, and shall retain the third copy in his own possession.

Sec. 54. *Be it further enacted, etc.*, That the Governor, the Lieutenant Governor, the Secretary of State, and John Lynch and T. C. Anderson, or a majority of them, shall be the returning officers for all elections in the State, a majority of whom shall constitute a quorum and have power to make the returns of all elections. In case of any vacancy by death, resignation or otherwise by either of the board, then the vacancy shall be filled by the residue of the board of returning officers. *[margin: Returning officers.]*

The returning officers shall, after each election, before entering upon their duties, take and subscribe to the following oath before a judge of the Supreme or any District Court:

I, A. B., do solemnly swear (or affirm) that I will faithfully and diligently perform the duties of a returning officer as prescribed by law; that I will carefully and honestly canvass and compile the statements of the votes and make a true and correct return of the election. So help me God. *[margin: Oath.]*

Within ten days after the closing of the election said returning officers shall meet in New Orleans to canvass and compile the statements of votes made by the supervisors of registration, and make returns of the election to the Secretary of State. They shall continue in session until such returns have been completed. The Governor shall at such meeting open, in the presence of the said returning officers, the statements of the supervisors of registration, and the said returning officers shall, from said statements, canvass and compile the returns of the election in duplicate. One copy of such returns they shall file in the office of the Secretary of State, and of one copy they shall make public proclamation by printing in the official journal and such other newspapers as they may deem proper, declaring the names of all persons and offices voted for, the number of votes for each person, and the names of the persons who have been duly and lawfully elected. The returns of the elections thus made and promulgated shall be *prima facie* evidence in all courts of justice and before all civil officers until set aside, after a contest according to law of the right of any person named therein to hold and exercise the office to which he shall by such return be declared elected. *[margin: Meetings.]* *[margin: Compiled returns.]*

The Governor shall within thirty days thereafter issue commissions to all officers thus declared elected who are required by law to be commissioned. *[margin: Commissions.]*

Sec. 55. *Be it further enacted, etc.*, That in such canvass and compilation the returning officers shall observe the following order: They shall compile first the statements from all polls or voting *[margin: Duties of returning officers.]*

places at which there shall have been a fair, free and peaceable registration and election. Whenever from any poll or voting place there shall be received the statement of any supervisor of registration, assistant supervisor of registration, or commissioner of election, in form as required by section twenty-nine of this act, on affidavit of three or more citizens, of any riot, tumult, acts of violence, intimidation, armed disturbance, bribery or corrupt influences, which prevented or tended to prevent a fair, free, and peaceable and full vote of all qualified electors entitled to vote at such poll or voting place, such returning officers shall not canvass, count or compile the statement of votes from such poll or voting place until the statements from all other polls or voting places shall have been canvassed and compiled. The returning officers shall then proceed to investigate the statements of riot, tumult, acts of violence, intimidation, armed disturbance, bribery or corrupt influences at any such poll or voting place, and if from the evidence of such statements they shall be convinced that such riot, tumult, acts of violence, intimidation, armed disturbance, bribery or corrupt influences, did not materially interfere with the purity and freedom of the election at such poll or voting place, or did not prevent a sufficient number of qualified voters thereat from registering or voting to materially change the result of the election, then, and not otherwise, said returning officers shall canvass and compile the vote of such poll or voting place with those previously canvassed and compiled; but if said returning officers shall not be fully satisfied thereof, it shall be their duty to examine further testimony in regard thereto, and to this end they shall have power to send for persons and papers. If, after such examination, the said returning officers shall be convinced that said riot, tumult, acts of violence, intimidation, armed disturbance, bribery or corrupt influences did materially interfere with the purity and freedom of the election at such poll or voting place, or did prevent a sufficient number of the qualified electors thereat from registering and voting, to materially change the result of the election, then the said returning officers shall not canvass or compile the statement of the votes of such poll or voting place, but shall exclude it from their returns.

*Clerks.*     The returning officers may appoint such clerks as may be necessary, for a length of time not to exceed thirty days, who shall be paid five dollars per day each for the time actually served, which time shall be specified in a written account, subscribed and sworn to by such clerk, and approved by the returning officers. The Auditor of Public Accounts shall issue his warrant upon the treasury for the amount of such account so subscribed and sworn to and approved.

*Returns of Assembly men.*     SEC. 56. *Be it further enacted, etc.*, That it shall be the duty of the Secretary of State to transmit to the Clerk of the House of Representatives and the Secretary of the Senate of the last General Assembly a list of the names of such persons as, according to the returns, shall have been elected to either branch of the General Assembly, and it shall be the duty of said clerk and secretary to place the names of the representatives and senators elect, so furnished, upon the roll of the House and of the Senate respectively; and those representatives and senators whose names are so placed by the clerk and secretary, respectively, in accordance with the foregoing provisions, and none other, shall be competent to organize the House of Representatives or Senate. Nothing in this act shall be

construed to conflict with article thirty-four of the constitution of the State.

SEC. 57. *Be it further enacted, etc.,* That should any of the returning officers named in this act be a candidate for any office at any election, he shall be disqualified to act as returning officer for that election, and a majority of the remaining returning officers shall summon some respectable citizen to act as returning officer in place of the one so disqualified.

*Candidates not to be returning officers.*

SEC. 58. *Be it further enacted, etc.,* That any civil officer or other person who shall assume or pretend to act in any capacity as a commissioner or other officer of election, to receive or count votes, to receive returns or ballot boxes, or to do any other act toward the holding or conducting of elections, or the making returns thereof, in violation of or contrary to the provisions of this act, shall be deemed guilty of a felony, and upon conviction thereof shall be punished by imprisonment in the penitentiary for a term not to exceed three years nor less than one year, and by a fine not exceeding three hundred dollars nor less than one hundred dollars.

*Intrusion into office.*

SEC. 59. *Be it further enacted, etc.,* That any person or persons who shall obstruct, hinder, or by violence or threats of violence, abusive language, or other species of intimidation, interfere with a supervisor or assistant supervisor of registration or commissioner of election, or with any person or persons duly appointed to execute orders of the supervisor of registration or commissioners of elections, in the discharge of their duties, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding three hundred dollars nor less than one hundred dollars, and by imprisonment for a period not exceeding three months nor less than one month.

*Intimidation, etc.*

SEC. 60. *Be it further enacted, etc.,* That any person or persons who shall counsel, aid, connive at, abet, encourage or participate in any riots, tumults, acts of violence, intimidation, or armed disturbance at or near the office of any supervisor or assistant supervisor of registration, on any day of registration or revision of registration, or at or near any poll or voting place, on any day of election, shall be deemed guilty of a felony, and on conviction thereof shall be punished by a fine not exceeding five hundred dollars nor less than one hundred dollars, and by imprisonment in the penitentiary for a period not exceeding two years nor less than six months.

*Abetting acts of violence.*

SEC. 61. *Be it further enacted, etc.,* That any person who shall register or cause to be registered his name, or that of any other person as a legal voter, in violation of law, or vote, or induce or cause another to vote, in violation of the laws, or of the constitutional provisions in such cases made and provided, shall be deemed guilty of a felony, and on conviction thereof shall be punished by a fine of not more than five hundred dollars nor less than one hundred dollars, and by imprisonment in the penitentiary for a period not less than one year nor more than three years.

*False registry and voting.*

SEC. 62. *Be it further enacted, etc.,* That any person or persons who shall purchase or cause to be purchased the registration papers or certificate of registration of any person duly registered according to law, shall be deemed guilty of a felony, and on conviction thereof shall be punished by a fine not exceeding five hundred dollars nor less than one hundred dollars, and by imprisonment in the penitentiary for a term not less than one year nor more than three years.

*Purchase of registration papers, etc.*

SEC. 63. *Be it further enacted, etc.,* That any person who shall vote or attempt to vote on any false or fraudulent paper or certificate of registration, or upon any paper or certificate of registration issued to a person other than the one voting or attempting to vote on said paper or certificate of registration, shall be deemed guilty of a felony, and on conviction thereof shall be punished by a fine not exceeding five hundred dollars nor less than one hundred dollars, and by imprisonment in the penitentiary for a term not less than one year nor more than three years.

False certificates, etc.

SEC. 64. *Be it further enacted, etc.,* That any person who shall induce, by offer of reward, by threats of violence, or otherwise, any person to vote or attempt to vote on any false or fraudulent paper or certificate of registration, or upon any papers or certificate of registration belonging to a person other than the one voting or attempting to vote on said paper or certificate of registration, shall be deemed guilty of a felony, and on conviction thereof shall be punished by a fine not exceeding five hundred dollars nor less than one hundred dollars, and by imprisonment in the penitentiary for a period not exceeding three years nor less than one year.

Bribery and violence.

SEC. 65. *Be it further enacted, etc.,* That any person who shall vote or attempt to vote more than once at the same election, shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than one hundred dollars, and by imprisonment in the penitentiary for a term of not less than three years.

Twice voting.

SEC. 66. *Be it further enacted, etc.,* That it shall be the duty of any commissioner of election to forthwith arrest any person who shall vote or attempt to vote more than once, and commit him to the parish prison, and to immediately file an information against such person with the district attorney or district attorney *pro tempore* whose duty it shall be to prosecute such person before the proper court; and upon his failure so to do, the Attorney General shall appoint some attorney to prosecute such person, and also to prosecute such district attorney or district attorney *pro tempore* for such failure. Any supervisor of registration, commissioner of election, district attorney, or district attorney *pro tempore* who shall refuse, neglect or fail to comply with the provisions of this section of this act, shall be deemed guilty of a misdemeanor in office, and upon conviction thereof shall be removed from office, and punished by a fine of not less than one hundred dollars, and imprisonment for not less than three nor more than six months.

Arrest of offenders.

SEC. 67. *Be it further enacted, etc.,* That any person who shall, by threats of discharge from employment, of withholding wages, or proscription in business, influence or attempt to influence any voter in the casting of his vote at any election, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not less than five hundred dollars, which shall go to the school fund of the parish, and by imprisonment in the parish prison for not less than three months.

Influencing voters.

SEC. 68. *Be it further enacted, etc.,* That any person who shall discharge from his employment any laborer, employe, tenant or mechanic, who shall have been working for such person under contract, written or oral, for a specified time before such time shall have expired, or who shall withhold from any laborer, employe, tenant or

Discharge from employment of voter.

mechanic any part of the wages due to such laborer, employe, tenant or mechanic, on account of any vote which such laborer, employe, tenant or mechanic has given or purposes to give, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than five hundred dollars, one half of which shall go to the school fund of the parish in which the offense was committed, and by imprisonment in the parish prison for not less than three months.

SEC. 69. *Be it further enacted, etc.,* That any person who shall molest, disturb, interfere with, or threaten with violence, any commissioner of election or person in charge of the ballot boxes, while in charge of the same, between the time of the close of the polls and the time that said ballot boxes are delivered to the supervisor of registration, shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than five hundred dollars, or by imprisonment in the penitentiary not less than one year, or both, at the discretion of the court. *[margin: Interference with commissioners, etc.]*

SEC. 70. *Be it further enacted, etc.,* That any person not authorized by this law to receive or count the ballots at an election, who shall, during or after any election, and before the votes have been counted by the supervisors of registration, disturb, displace, conceal, destroy, handle or touch any ballot, after the same has been received from the voter by a commissioner of election, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be punished by a fine of not less than one hundred dollars, or by imprisonment for not less than six months, or both, at the discretion of the court. *[margin: Disturbing the counting of ballots.]*

SEC. 71. *Be it further enacted, etc.,* That any person not authorized by this law to take charge of the ballot boxes at the close of the election who shall take, receive, conceal, displace or [in] any manner handle or disturb any ballot box at any time between the hour of the closing of the polls and the transmission of the ballot box to the supervisor of registration, or during such transmission, or at any time prior to the counting of the votes by the supervisor of registration, shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than five hundred dollars, or by imprisonment in the penitentiary not less than one year, or both, at the discretion of the court. *[margin: Interference with ballot boxes.]*

SEC. 72. *Be it further enacted, etc.,* That if any person shall by bribery, menace, willful falsehood, or other corrupt means, directly or indirectly attempt to influence any elector of this State in the giving his vote or ballot, or to induce him to withhold the same, or disturb or hinder him in the free exercise of the right of suffrage at any election in this State, he shall, on conviction thereof, be deemed guilty of a misdemeanor, and be fined not more than five hundred dollars, and be imprisoned in the parish prison for a term not exceeding six months, and shall also be ineligible to any office in the State for the term of two years. *[margin: Interference with free exercise of right of suffrage.]*

SEC. 73. *Be it further enacted, etc.,* That it shall be unlawful for any person to carry any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration; any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine of not less than one hundred dol- *[margin: Weapons.]*

lars, and by imprisonment in the parish jail for not less than one month; provided, that the provisions of this section shall not apply to any commissioner or officer of the election or supervisor or assistant supervisor of registration, police officer or other person authorized to preserve the peace on days of registration or election.

Liquors.

SEC. 74. *Be it further enacted, etc.,* That no person shall give, sell or barter any spirituous or intoxicating liquors to any person on the day of election, and any person found guilty of violating the provisions of this section shall be fined in a sum of not less than one hundred dollars, nor more than three hundred dollars, which shall go to the school fund.

Corruptly voting.

SEC. 75. *Be it further enacted, etc.,* That whoever, knowing that he is not a qualified elector, shall vote or attempt to vote at any election, shall be fined in a sum not to exceed one hundred dollars, to be recovered by prosecution before any court of competent jurisdiction.

Double vote.

SEC. 76. *Be it further enacted, etc.,* That whoever shall knowingly give or vote two or more ballots folded as one at any election, shall be fined in a sum not to exceed one hundred dollars, to be recovered by prosecution before any court of competent jurisdiction.

Bribery to influence voters.

SEC. 77. *Be it further enacted, etc.,* That whoever, by bribery or by a promise to give employment or higher wages to any person, attempts to influence any voter at any election, shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine of not less than one hundred dollars, and by imprisonment in the parish prison for not less than three months.

Obtaining illegal voting.

SEC. 78. *Be it further enacted, etc.,* That whoever willfully aids or abets any one, not legally qualified, to vote or attempt to vote at any election, shall be fined in a sum of not less than fifty dollars, to be recovered by prosecution before any court of competent jurisdiction.

Disorderly houses.

SEC. 79. *Be it further enacted, etc.,* That whoever is disorderly at any poll or voting place during an election, shall be fined in a sum not less than twenty dollars, to be recovered by prosecution before any court of competent jurisdiction.

Meetings of citizens.

SEC. 80. *Be it further enacted, etc.,* That whoever shall molest, interrupt or disturb any meeting of citizens assembled to transact or discuss political matters, shall be fined in a sum not less than fifty dollars, to be recovered by prosecution before any court of competent jurisdiction.

Any sheriff, constable or police officer present at the violation of this section shall forthwith arrest the offender or offenders, and convey him or them, as soon as practicable, before the proper court.

Imprisonment.

SEC. 81. *Be it further enacted, etc.,* That the court imposing any fine, as directed in sections seventy-four, seventy-five, seventy-six, seventy-seven, seventy-eight, seventy-nine and eighty of this act, shall commit the person so fined to the parish prison until the fine is paid; *Provided,* That said imprisonment shall not exceed six months.

Perjury.

SEC. 82. *Be it further enacted, etc.,* That in cases where any oath or affirmation shall be administered by any supervisor of registration, assistant supervisor of registration or commissioner of election, in the performance of his duty as prescribed by law, any person swearing or affirming falsely in the premises shall be deemed guilty of perjury, and subjected to the penalties provided by the law for perjury.

Duty of Governor to insure peace.

SEC. 83. *Be it further enacted, etc.,* That the Governor shall take all necessary steps to secure a fair, free and peaceable election; and shall, on the days of election, have paramount charge and con-

trol of the peace and order of the State, over all peace and police officers, and shall have the command and direction in chief of all police officers, by whomsoever appointed, and of all sheriffs and constables in their capacity as officers of the peace.

Sec. 84. *Be it further enacted, etc.* That to defray the expenses of the next revision of registration, and of the next general election, Expenses there is hereby appropriated out of any funds in the treasury not otherwise appropriated, the sum of fifty thousand dollars ($50,000), or so much thereof as may be necessary.

Sec. 85. *Be it further enacted, etc.,* That all laws or parts of laws contrary to the provisions of this act, and all laws relating to the Repeal. same subject matter are hereby repealed, and that this act shall take effect from and after its passage.

    (Signed)                 MORTIMER CARR,
             Speaker of the House of Representatives.
    (Signed)                 OSCAR J. DUNN,
          Lieutenant Governor and President of the Senate.

Approved March 16, 1870.
    (Signed)                 H. C. WARMOTH,
             Governor of the State of Louisiana.

A true copy:
         GEO. E. BOVEE,
              Secretary of State.

---

[No. 101.]           **AN ACT**

To define and regulate the cost of the Clerks, Sheriffs, Recorders and Notaries Public throughout the State of Louisiana, and providing forfeitures and penalties for overcharging or failing to perform their duties, and the mode of collecting their fees.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the State of Louisiana, in General Assembly convened,* That the Fees of clerks. clerks of the district courts throughout the State shall be entitled to demand and receive the following fees of office, and no more; and they shall not be entitled to charge any other fees of office than those specially set forth therein, for any services as clerks which they may be required to render:

For indorsing, registering and filing petition, for all, ten cents.

For indorsing, registering and filing answer, for all, ten cents.

For issuing citation, with copy of same, with certificate and seal on each, fifty cents, one charge for both.

For issuing attachment, with copy of same, with certificates and seals on both, one dollar, one charge for both.

For issuing *fieri facias*, with seal, fifty cents.

For issuing writ of seizure and sale, with seal, one dollar.

For issuing writ of sequestration, with copy of same, with certificates and seals, one dollar, one charge for both.

For issuing writ of *certiorari*, with copy of same, with certificates and seals, one dollar, one charge for both.

21

Texas. Laws, Statutes, etc. Digests

# A DIGEST

OF THE

# LAWS OF TEXAS:

## CONTAINING THE LAWS IN FORCE,

#### AND

## THE REPEALED LAWS

### ON WHICH RIGHTS REST,

From 1864 to 1872,

### CAREFULLY ANNOTATED.

BY GEORGE W. PASCHAL,

*OF AUSTIN, TEXAS,*

LATE REPORTER OF THE SUPREME COURT OF TEXAS, AUTHOR OF PASCHAL'S ANNOTATED CONSTITUTION, PASCHAL'S DIGEST OF DECISIONS, ETC., ETC.

**Third Edition—Volume II.**

WASHINGTON, D. C.:
**W. H. & O. H. MORRISON,**
LAW BOOKSELLERS AND PUBLISHERS.
1873.

JA1293

Digitized by Google

Original from
HARVARD UNIVERSITY

ceeding one thousand dollars, and imprisoned in the penitentiary for a period not exceeding three years.

**CHAPTER IV.**—RIOTS AND UNLAWFUL ASSEMBLIES AT ELECTIONS, VIOLENCE USED TOWARDS ELECTORS.

*11 July, 1870. Art. 6476 for caption.*

ART. 6485. [28] Any person who may, by threats, intimidation, or violence, resist or impede a registrar, or board of appeals or revision, in the discharge of their duties, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine of not less than fifty, nor more than one hundred dollars, and by imprisonment of not less than sixty days, or more than six months, in the county jail.

*Punishment of threats and intimidation impeding registration. Art. 6684.*

ART. 6486. [28] Any registrar who, by violence or threats, is impeded in the discharge of his duty, shall report the same to the sheriff, who shall furnish sufficient force to enable him to proceed in the discharge of his duty.

*Registrars to report violence.*

ART. 6487. [38] Any person or persons who shall disturb the registrars or boards of revision in the full and fair discharge of their duties, by acts of intimidation, by inciting or encouraging a tumult or mob, or who shall cause such disturbance, or encourage, or abet any tumult, mob, or violence in the vicinity of any place of registry, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding five hundred dollars, or by imprisonment in the penitentiary for a period not exceeding two years, nor less than six months

*Disturbers of registrars punished.*

*Fine or imprisonment.*

ART. 6488. [46] (cl. 1) Any person who shall, by threats of discharge from employment, of withholding wages, or of proscription in business, influence, or attempt to influence, any voter in the casting of his vote at any election, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not less than five hundred dollars, one-half of which shall go to the informer, and the other half to the school fund of the state, and by imprisonment in the county prison for not less than three months.

*Intimidation of voter by threats punished as misdemeanor. Art. 1893.*

*Fine not less than $500,*

*and 3 months imprisonment.*

ART. 6489. [43] (cl. 2) Any person who shall discharge from his employment any laborer, employé, tenant, or mechanic, who shall have been working for such person under contract, written or oral, for a specified time, before such time shall have expired, or who shall withhold from any laborer, employé, tenant, or mechanic, any part of the wages due to such laborer, employé, tenant, or mechanic, on account of any vote which such laborer, employé, tenant, or mechanic has given, or purposes to give, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by a fine of not less than five hundred dollars, one-half of which shall go to the informer, and the other half to the school fund of the state, and by imprisonment in the county jail for not less than three months.

*Punishment for discharging laborer on account of his vote; made a misdemeanor, and punished by*

*fine not less than $500*

*and 3 months' imprisonment.*

ART. 6490. [55] (1) It shall be unlawful for any person to carry any gun, pistol, bowie-knife, or other dangerous weapon, concealed or unconcealed, on any day of election, during the hours the polls are open, within a distance of one half mile of any place of election. (2) Any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine of not less than one hundred dollars, and by imprisonment in the county jail for not less

*Carrying weapons at election punished. Art. 1891.*

*Penalty for violating this section.*

Digitized by Google

Original from
HARVARD UNIVERSITY

Case 1:22-cv-07464-RMB-AMD Document 85 Page: Filed 02/20/21 Date: Filed: 07/20/2023 geID: 1418

Officers of election and police exempted.

than one month: *Provided,* That the provisions of this section shall not apply to any officer of the election, police officer, or other person authorized to preserve the peace on the days of election.

Selling liquor on days of election.

School fund.

ART. 6491. [56] No person shall give, sell, or barter any spirituous or intoxicating liquor to any person on the days of election ; and any person found guilty of violating the provisions of this section shall be fined in a of sum not less than one hundred dollars, nor more than three hundred dollars, which shall go to the school fund.

15 Aug., 1870; art. 6481 for caption. Disturbing election by mob punished. Arts. 1891-1894.

ART. 6492. [49] Any person or persons who shall disturb an election, by inciting or encouraging a tumult or mob, or shall cause such disturbance in the vicinity of any poll or voting place, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by a fine not exceeding five hundred dollars, nor less than two hundred dollars, and by imprisonment in the penitentiary for a period not exceeding two years, nor less than six months.

11 July, 1870. Art. 6476 for caption.

CHAPTER V.—MISCELLANEOUS OFFENSES AFFECTING THE RIGHT OF SUFFRAGE.

Alterations, changes, and mutilations of registration books punished by fine or imprisonment. Art. 1900.

ART. 6493. [26] If any person shall alter, change, mutilate, or in any manner deface any book of registration, or shall take and carry away the same from the office of the clerk of the district court, registrar, or judge of election, or other place where the same may be lawfully deposited, or from the lawful possession of any person whomsoever, with intent to destroy, suppress, alter, or conceal, or in any wise mutilate or destroy the same, so as to prevent the lawful use of such book or books of registration, such person shall be deemed guilty of felony, and, upon conviction thereof, shall be punished as prescribed in section twenty-five of this act.

Art. 6480.

Punishment for false registration and illegal voting. Perjury. Art. 1898.

ART. 6494. [32] (cl. 1) Any person who shall take and subscribe the registration oath falsely shall, upon conviction thereof, be punished as provided by law for the crime of perjury, and any person who shall knowingly and willfully vote, or attempt to vote, upon the registration certificate of another, or of one who may be dead, shall, upon conviction thereof, forfeit and pay a fine of five hundred dollars, and in default thereof shall be imprisoned in the county jail for a term not exceeding one year.

Penalty.

Giving false name punished by fine or imprisonment.

ART. 6495. [32] (cl. 2) Any person giving a false name, with intent to deceive a registrar, shall, upon conviction thereof, be deemed guilty of a misdemeanor, and fined in a sum not to exceed one hundred dollars, or be punished by imprisonment in the county jail for a term not to exceed one year.

15 Aug., 1870. Art. 6481 for caption. Disturbing ballots punished by fine or imprisonment.

ART. 6496. [47] Any person not authorized by this law to receive or count ballots at an election, who shall, during or after any election, and before the votes have been counted by the judges of election, disturb, displace, conceal, destroy, handle, or touch any ballot, after the same has been received from the voter by the judge of election, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be punished by a fine of not less than one hundred dollars, or by imprisonment for not less than six months, or both, at the discretion of the court.

At discretion.

Repeaters punished by fine and imprisonment. Art. 1897.

ART. 6497. [48] Any person who shall vote, or attempt to vote, more than once at the same election, shall be deemed guilty of a felony, and, upon conviction thereof, shall be pun-

Generated on 2023-02-19 14:52 GMT / https://hdl.handle.net/2027/hvd.hl3e66
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google      Original from HARVARD UNIVERSITY

20013470

# THE MARYLAND CODE.

# Public Local Laws,

## CODIFIED BY

## JOHN PRENTISS POE.

**ADOPTED BY THE GENERAL ASSEMBLY OF MARYLAND
MARCH 14, 1888.**

*Including also the Public Local Acts of the Session of 1888
incorporated therein.*

BY AUTHORITY OF THE  STATE OF MARYLAND.

## VOLUME II,

CONTAINING ARTICLE 11, FREDERICK COUNTY, TO ARTICLE 24,
WORCESTER COUNTY.

BALTIMORE:
KING BROS., PRINTERS AND PUBLISHERS.
1888.

JA1296

1874, ch. 250.

**99.** It shall not be lawful for any person in Kent county to carry, on the days of election, secretly or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon; and any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction thereof before any justice of the peace of said county, shall be fined not less than five nor more than twenty dollars, and on refusal to pay said fine shall be committed by such justice of the peace to the jail of the county until the same shall be paid.

Ibid.

**100.** The fines collected under the preceding section shall be paid by the officer collecting the same, to the school commissioners of the county, for school purposes.

Ibid.

**101.** Any constable of said county, or the sheriff thereof, who shall refuse to arrest any person violating section 99, upon information of such offence, shall be deemed guilty of a misdemeanor, and on conviction thereof before the circuit court shall be fined not less than twenty nor more than fifty dollars, and shall forthwith be discharged from office.

### FENCES.

P. L. L., (1860,) art. 14, sec. 91.

**102.** Wherever joint fences have been or may be established in said county, for the mutual advantage of different owners or possessors of adjoining lands, each party shall keep in good repair his proper proportion thereof, in manner following, that is to say: all post and rail or plank fences shall be at least four feet six inches high, and not more than four inches between the lower and second, and not more than five inches between the second and third rails; and all worm or other fences shall be five feet high; the height of said fences to be in every case computed from the ground or base of any embankment upon which they may be erected.

Ibid. sec. 92.

**103.** If either of the parties so making or keeping a joint fence shall not comply with the provisions of the preceding

92

G. L. Copeland; and also to issue his warrant
upon the Treasurer for the sum of sixty dol-
lars, payable to the order of Abram Zarks;
and also to issue his warrant upon the Treas-
urer for the sum of sixty dollars, payable to
the order of C. E. Gordon; the said sums of
money having been paid for State license erro-
neously issued to said persons by the Clerk of
the Circuit Court of Anne Arundel county.

SEC. 2. *And be it enacted*, That this act shall   Effective.
take effect from the date of its passage.

Approved April 7, 1886.

---

## CHAPTER 189.

AN ACT to prevent the carrying of guns, pis-
tols, dirk-knives, razors, billies or bludgeons
by any person in Calvert county, on the days
of election in said county, within one mile
of the polls.

SECTION 1. *Be it enacted by the General As-
sembly of Maryland*, That from and after the
passage of this act, it shall not be lawful for
any person in Calvert county to carry, on the
days of election and primary election, within
three hundred yards of the polls, secretly, or
otherwise, any gun, pistol, dirk, dirk-knife,
razor, billy or bludgeon, and any person violat-
ing the provisions of this act, shall be deemed          Unlawful to
guilty of a misdemeanor, and on conviction          carry weapons
thereof by the Circuit Court of Calvert county          to the polls.
having criminal jurisdiction thereof, or before
any Justice of the Peace in said county, shall
be fined not less than ten nor more than fifty
dollars for each offence, and on refusal or
failure to pay said fine, shall be committed to
the Jail of the county until the same is paid.

SEC. 2. *And be it enacted*, That the fines col-
lected under this act shall be paid by the offi-

# ACTS

AND

## JOINT RESOLUTIONS

PASSED BY

# THE GENERAL ASSEMBLY

OF THE

## STATE OF VIRGINIA

DURING THE

## SESSION OF 1877-78.

RICHMOND:
R. F. WALKER, SUPERINTENDENT PUBLIC PRINTING.
1878.

*Penalty* — ished by a fine not exceeding one hundred dollars, or by imprisonment in jail not exceeding six months.

### Cruelty to animals; profanity and drunkenness.

*Cruelty to animals.* — 15. If a person cruelly beat or torture any horse, animal or other beast, whether his own or that of another, he shall be fined not exceeding fifty dollars.

*Penalty*

*Profanity and drunkenness* — 16. If any person, arrived at the age of discretion, profanely curse or swear, or get drunk, he shall be fined by a justice one dollar for each offence.

*Penalty*

### Violation of the Sabbath.

*Violation of Sabbath* — 17. If a person, on a Sabbath day, be found laboring at any trade or calling, or employ his apprentices or servants in labor or other business, except in household or other work of necessity or charity, he shall forfeit two dollars for each offence; every day any servant or apprentice is so employed constituting a distinct offence.

*Penalty*

### Exceptions as to the mail, and as to certain persons.

*Transportation of mail excepted. Exception as to certain religionists* — 18. No forfeiture shall be incurred under the preceding section for the transportation on Sunday of the mail, or of passengers and their baggage. And the said forfeiture shall not be incurred by any person who conscientiously believes that the seventh day of the week ought to be observed as a Sabbath, and actually refrains from all secular business and labor on that day: provided he does not compel an apprentice or servant, not of his belief, to do secular work or business on Sunday, and does not on that day disturb any other person.

*Proviso*

*Sale of intoxicating liquors prohibited between certain hours* — 19. No bar-room, saloon, or other place for the sale of intoxicating liquors, shall be opened, and no intoxicating bitters or other drink shall be sold in any bar-room, restaurant, saloon, store, or other place, from twelve o'clock on each and every Saturday night of the week, until sunrise of the succeeding Monday morning; and any person violating the provisions of this section, shall be deemed guilty of a misdem_nor, and, if convicted, shall be punished by fine not less than ten nor more than five hundred dollars; and shall, moreover, at the discretion of the court, forfeit his license: provided that this law shall not apply to any city having police regulations on this subject, and an ordinance inflicting a penalty equal to the penalty inflicted by this section.

*Penalty*

*Proviso*

*Disturbance of religious worship* — 20. If a person willfully interrupt or disturb any assembly met for the worship of God, or being intoxicated, if he disturb the same, whether willfully or not, he shall be confined in jail not more than six months, and fined not exceeding one hundred dollars, and a justice may put him under restraint during religious worship, and bind him for not more than one year to be of good behavior.

*Penalty*

21. If any person carrying any gun, pistol, bowie-knife, dagger, or other dangerous weapon, to any place of worship while a meeting for religious purposes is being held at such place, or without good and sufficient cause therefor, shall carry any such weapon on Sunday at any place other than his own premises, shall be fined not less than twenty dollars. If any offence under this section be committed at a place of religious worship, the offender may be arrested on the order of a conservator of the peace, without warrant, and held until warrant can be obtained, but not exceeding three hours. It shall be the duty of justices of the peace, upon their own knowledge, or upon the affidavit of any person, that an offence under this section has been committed, to issue a warrant for the arrest of the offender. *[Carrying dangerous weapons at a place of worship or on Sunday. Penalty. Offenders subject to arrest without warrant. Duty of justice where he knows of offence under this section.]*

*Protection of religious assemblies; prohibition against sale of liquors or other things near such meetings; proviso.*

22. If any person shall erect, place, or have any booth, stall, tent, carriage, boat, vessel, vehicle, or other contrivance whatever, for the purpose or use of selling, giving, or otherwise disposing of any kind of spirituous and fermented liquors, or any other articles of traffic; or shall sell, give, barter, or otherwise dispose of any spirituous or fermented liquors, or any other articles of traffic within three miles of any camp-meeting, or other place of religious worship, during the time of holding any meeting for religious worship at such place, such person, on conviction before a justice of the peace, for the first offence, shall be fined not less than ten dollars, nor more than twenty dollars, and stand committed to jail until the fine and costs are paid; and for the second offence, shall be fined as aforesaid, and be imprisoned not less than ten nor more than thirty days. *[Sale of liquors, &c., prohibited. Penalty. Penalty for second offence.]*

23. If any person shall commit any offence against the provisions of the preceding section, he shall, in addition to the penalties therein mentioned, forfeit all such spirituous or fermented liquors, and other articles of traffic, and all the chests and other things containing the same, belonging to and in the possession of the person so offending, together with such booth, stall, tent, carriage, boat, vessel, vehicle, or other contrivance or thing prepared and used in violation of said section; and it shall be the duty of any sheriff, deputy sheriff, or constable, if he sees any person violating the preceding section, to arrest the offender and carry him before a justice of the peace. The sheriff, deputy sheriff, or constable, when he arrests the offender, shall seize the property hereby declared to be forfeited, or shall seize the same on a warrant against the offender, if such offender cannot be found; and the justice of the peace before whom such offender is convicted, or before whom the warrant is returned that the offender cannot be found, shall enter judgment of condemnation against such property, and issue a fieri facias for the *[Additional penalty. Duty of sheriffs, &c., to arrest offender and seize the property. Judgment of condemnation.]*

39

Fi. fa. to issue
Proviso

sale thereof: provided the person who has been returned not found, and whose property has been condemned in his absence, may appear at any time before the sale of the property and have the case tried as if he had appeared at the return of the warrant.

To whom provisions not to apply

24. The provisions of the two preceding sections shall not apply to any licensed tavern-keeper, merchant, shop-keeper, farmer, or other person in the usual and lawful transaction of his ordinary business, in the usual place of transacting such business, or to any person having permission, in writing from the superintendent of such meeting, to sell such articles as may be named in such permission: provided this permission shall not extend to the sale of any spirituous or fermented liquors.

Proviso

### Right of appeal.

Right of appeal preserved

25. Nothing in this chapter shall prevent the courts of record from exercising their common law or statutory jurisdiction in all cases for disturbing public worship: provided that the party convicted under the twenty-second or twenty-third sections of this chapter shall have the right to appeal to the next county court for the county where the conviction is had, upon giving bail for his appearance at court, and upon such appeal shall be entitled to a trial by jury: and provided further, that when any person or persons are proceeded against under the twenty-second or twenty-third sections of this chapter, he or they shall not be held to answer for the same offence before any grand jury or court of record, except as herein provided.

Proviso

Persons proceeded against not subject to answer before grand jury

### Temporary police force for religious meetings.

Temporary police authorized

26. The supervisor, or any justice of the magisterial district where the meeting is held, shall have power to appoint a temporary police to enforce the provisions of this chapter.

---

## CHAPTER VIII.

### OF OFFENCES AGAINST PUBLIC HEALTH.

### Selling unsound provisions.

Sale of unsound provisions

1. If a person knowingly sell any diseased, corrupted, or unwholesome provisions, whether meat or drink, without making the same known to the buyer, he shall be confined in jail not more than six months, and fined not exceeding one hundred dollars.

Penalty

thirty-two in township one north of range seventy west, is hereby named and shall hereafter be known as VALVER-DAN PARK.

### 510. Washington Park.

SEC. 5.   That the city property in the west half of the south-west quarter of section twenty-five in township one north of range seventy-one west, shall be named and here-after known as WASHINGTON PARK.


### PARKS.

An Ordinance for the Protection of the Several Parks Belonging to the
City and of the Buildings and Reservoirs and Trees and Other
Improvements at and Within Said Parks, and to Pro-
vide Penalties for Injuring the Same.
Passed October 4, 1898.

(With amendment as noted.)

### 511.   No firearms or shooting in.

SECTION I.   Any person other than the police officers of the city who shall take or carry or cause to be taken or carried into any of the parks belonging to the City of Boulder, any gun, pistol, revolver, or other firearm, or who shall shoot any firearm at or towards or over or into or upon any of said parks, shall be deemed guilty of a misdemeanor.   (As amended August 2, 1899.)

### 512.   No powder or explosives in.

SEC. 2.   Any person who shall take or carry or cause to be taken or carried into any of said parks, any powder of any quality or kind or any explosive or dangerous or inflammable or combustible substance, shall be deemed guilty of a misdemeanor.

### 513.   No fires or explosives.

SEC. 3.   Any person who shall start any fire or cause or permit to be started any fire in any of said parks, not

Case 1:22-Cuh6153-RMM-AtBbcuhmeorehb 3Page 7ftM3 11CubtEFAttdsJF10CKE89ppID 1426

EXHIBIT E

# An Ordinance.

# Concerning the carrying of Arms or Deadly Weapons.

Be it ordained by the City Council of the City of San Antonio.

SECTION 1. That if any person shall, within the Corporate limits of the City of San Antonio, go into any church, or religious assembly, any school-room, or other place where persons are assembled, for educational, literary or scientific purposes, or into any ball room, social or wedding party, or other assembly or gathering for amusement or instruction, composed of ladies and females, or to any election precinct in the city, on the day or days of any election, or into any Court room or court of Justice, or to any other place where people or individuals may be assembled, to perform any public duty, or shall go into any other public assembly, or shall enter any barroom, drinking saloon or any other place where people resort for business or amusement, or shall join or accompany any public procession, having about his or her person, a bowie-knife, dirk, or butcherknife or any fire-arms or arms, whether known as six-shooter, gun or pistol of any kind, or having about his or her person, what is known as brass-knuckles, slung shot, club, loaded or sword cane, or any other weapon of offence or defence. Such person shall be deemed guilty of a misdemeanor, and upon conviction thereof, before the Recorder of the city, shall be fined not less than five dollars nor more than one hundred dollars and costs, and in default of payment, shall be confined in the city prison, or placed at hard labor on the public works of the city, for not less than five days, nor more than thirty days, to be determined by the Recorder; Provided, this Ordinance shall not apply to any legally authorized conservator of the peace, when he may be in the lawful discharge of his duty.

SEC. 2. It shall be the duty of the Police of the city to strictly enforce this Ordinance, and promptly to arrest and disarm any person violating the same; Provided, that in all cases where arms are taken possession of by the police, as herein provided, they shall be returned to the owner when he leaves the city.

SEC. 3. This ordinance shall take effect and be in force from and after its publication.

Approved, San Antonio, December 14th, A. D. 1870.

WM. C. A. THIELEPAPE,
Mayor City of San Antonio.

Attest:
G. W. BARTHOLOMEW, Jr., City Clerk.

20-12-70d10t.

JA1304

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| AARON SIEGEL, JASON COOK, JOSEPH DELUCA, NICOLE CUOZZO, TIMOTHY VARGA, CHRISTOPHER STAMOS, KIM HENRY, AND ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey; and PATRICK CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police, <br><br> Defendants. | No. 22-CV-7463 (RMB) (AMD) |
| RONALD KOONS; NICHOLAS GAUDIO; JEFFREY M. MULLER; SECOND AMENDMENT FOUNDATION; FIREARMS POLICY COALITION, INC.; COALITION OF NEW JERSEY FIREARM OWNERS; and NEW JERSEY SECOND AMENDMENT SOCIETY, *Plaintiffs*, <br><br> v. <br><br> WILLIAM REYNOLDS in his official capacity as the Prosecutor of Atlantic County, New Jersey; GRACE C. MACAULAY in her official capacity as the Prosecutor of Camden County, New Jersey; | No. 22-CV-7464 (RMB) (AMD) |

ANNEMARIE TAGGART in her official
capacity as the Prosecutor of Sussex
County, New Jersey; MATTHEW J.
PLATKIN, in his official capacity as
Attorney General of the State of New
Jersey; and PATRICK CALLAHAN, in his
official capacity as Superintendent of the
New Jersey State Police,
*Defendants.*

## DECLARATION OF PATRICK J. CHARLES

Pursuant to 28 U.S.C. § 1746, I, Patrick J. Charles, declare and state as follows:

1.    I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration and testify based on my personal knowledge and information.

2.    I have been retained by the Office of the Attorney General for New Jersey as a historical and constitutional expert on Second Amendment matters. I also have expertise in legal history and its multiple uses in adjudicating constitutional questions.

3.    I have read the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. __, 142 S. Ct. 2111 (2022), and New Jersey has asked me to expound on the historical evidence that the Court relied upon to uphold restrictions on the carrying of dangerous weapons in schools and government buildings.

4.      Virtually all the information contained in this declaration is from research conducted prior to having been retained by the Office of the Attorney General for New Jersey on January 28, 2023. Beginning on that date, I have been compensated for my work on this declaration at a rate of $100 per hour.

## Background and Qualifications

5.      I am a historian, legal scholar, and author of dozens of articles and books on the Constitution, legal history, and standards of review. I received my L.L.M. in Legal Theory and History with distinction from Queen Mary University of London in 2014, J.D. from Cleveland-Marshall College of Law in 2009, and B.A. in History and International Affairs with honors from George Washington University in 2005. My writings on the history of the law have been cited by the Supreme Court of the United States, federal Circuit Courts of Appeal, federal District Courts, and State supreme courts. A true and correct copy of my curriculum vitae is attached as **Exhibit 1** to this declaration.

6.      For the past 12 years I have served as a historian for the United States Air Force (USAF) in several capacities, including deploying several times with Special Operations Forces (SOF) for contingency operations in Afghanistan and the Middle East. I currently serve as the Research Division Supervisor for the Air Force Historical Research Agency (AFHRA) located at Maxwell Air Force Base,

Alabama, where I oversee all historical information requests and archival research for the USAF.

7.      This declaration was compiled and completed outside my official duties for the USAF. Moreover, the contents and opinions expressed in this declaration are solely my own, and not those of the USAF, AFHRA, Department of Defense, or the federal government.

## *Bruen*, the "Sensitive Places" Doctrine, and the History of Carrying Firearms Into "Sensitive Places"

### I.    *Bruen* and the "Sensitive Places" Doctrine

8.      *Bruen* established a general test when examining the constitutionality of modern firearm regulations. First, the challenger must show that "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30. If the challenger succeeds in this pursuit, the "government must then justify its regulation by demonstrating that it is consistent with the Nation's tradition of firearm regulation." *Id*. at 2130. At this second step, the government is required to provide historical laws analogous—not identical—to the modern regulation. *Id*. at 2133. The *Bruen* Court went on to note that "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*.

9.     One regulatory area that the *Bruen* Court expounded upon was that of "sensitive places," *i.e.*, locations "where arms carrying could be prohibited consistent with the Second Amendment." *Id.* (citations omitted). And in expounding upon this rule, the Court singled out prohibitions on carrying in "schools and government buildings" as two constitutionally permissive examples. *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). The Court upheld arms carrying prohibitions at these two locations despite "the historical record yield[ing] relatively few" examples. *Id.* In other words, the Court found it "settled" that "these locations were [indeed] 'sensitive places'" because it was not made "aware of [any] disputes regarding the lawfulness of such prohibitions." *Id.*

10.     In support of its conclusion, the *Bruen* Court cited two sources. Both provided relatively few historical laws that *expressly* prohibited the carrying of firearms in school and government buildings by the mid-nineteenth century. *See* David. B. Kopel & Joseph S. Greenlee, *The "Sensitive Places" Doctrine: Location Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205, 229-36, 244-47 (2018); Brief of Amicus Curiae the Independent Institute in Support of Petitioners, *New York State Rifle & Pistol Association, Inc. v. Bruen*, No. 18-280, at 11-17. This historical research is consistent with my own, and is expounded upon in Part II.

## II.     The History of "Sensitive Places" Through the Nineteenth Century

11.     For nearly five centuries in England, from the late thirteenth century through the late eighteenth century, what constituted a "sensitive place" in which arms bearing could be prohibited was rather broad. It encompassed densely populated areas, as well as areas where people regularly congregated or conducted commerce. The text "fairs" and "markets" language contained within the 1328 Statute of Northampton makes this abundantly clear. 2 Edw. 3, c. 3 (1328) (Eng.) (**Exhibit 2**). So too do several other English legal sources. For instance, in 1351, Edward III issued a proclamation declaring it was unlawful to "go armed" with dangerous weapons "within the City of London, or within the Suburbs, or any other places between the said city and the Palace of Westminster…except the officers of the King…" *Royal Proclamation as to the Wearing of Arms in the City, and at Westminster; and as to Playing at Games in the Palace at Westminster*, MEMORIALS OF LONDON AND LIFE 268-69 (H.T. Riley ed., 1868) (**Exhibit 3**). Similarly, in John Carpenter's 1419 treatise *Liber Albus*, it stipulates that "no one, of whatever condition he be, go armed in the said *city [of London] or in the suburbs*, or carry arms, by day or by night, except the va[]lets of the great lords of the land, carrying the swords of their masters in their presence, and the serjeants-at-arms of his lordship the King, of my lady the Queen, the Prince, and the other children of his lordship the King, and the officers of the City, and such persons as shall come in their company in aid of them, at their command, for saving and

maintaining the said peace; under the penalty aforesaid, and the loss of their arms

and armour." JOHN CARPENTER, LIBER ALBUS: THE WHITE BOOK OF THE CITY OF

LONDON at 335 (Henry Thomas Riley ed., 1861) (**Exhibit 4**).

12.     As it pertains particularly to express prohibitions on carrying

dangerous weapons into schools and government buildings, English law is

relatively silent. This is because English prohibitions on going armed in "sensitive

places" were worded quite broadly, and therefore there was no need for the law to

carve out individual locations. Churches or places of worship is the one notable

exception. *See* 4 Hen 4, c. 29 (1403) (**Exhibit 5**) ("no Man be armed nor bear

defensible armor to Merchant Towns Churches nor Congregations in the same, nor

in the Highways, in affray of the Peace or the King's Liege people").

13.     The historical record shows that armed carriage restrictions and the

English common law against 'going armed' made their way to the United States.

*See* Patrick J. Charles, *The Faces of the Second Amendment Outside the Home:*

*History Versus Ahistorical Standards of Review*, 60 CLEV. ST. L. REV. 1, 31-32

(2012). Additionally, historians can state with certainty that state and local

governments were well within their authority to prohibit armed assemblies circa

the late eighteenth century, no matter whether said assemblies were deemed the

militia or not. *See* Patrick J. Charles, *The 1792 National Militia Act, the Second*

*Amendment, and Individual Militia Rights: A Legal and Historical Perspective*, 9

GEO. J.L. & PUB. POL'Y 323, 326-27, 374-90 (2011); AN ACT TO PREVENT ROUTS, RIOTS, AND TUMULTUOUS ASSEMBLIES, AND THE EVIL CONSEQUENCES THEREOF, SEPTEMBER SESSION, CHAPTER VIII (Mass. 1786) (**Exhibit 6**); AN ACT FOR THE MORE SPEEDY AND EFFECTUAL SUPPRESSION OF TUMULTS AND INSURRECTIONS IN THE COMMONWEALTH, JANUARY SESSION, CHAPTER IX (Mass. 1787) (**Exhibit 7**); AN ACT TO PREVENT ROUTS, RIOTS, AND TUMULTUOUS ASSEMBLIES (N.J. 1797) (**Exhibit 8**); AN ACT TO PREVENT HUNTING WITH FIRE-ARMS IN THE CITY OF NEW-YORK, AND THE LIBERTIES THEREOF (NY 1763) (**Exhibit 9**); AN ACT AGAINST RIOTS AND RIOTERS (Pa. 1705) (**Exhibit 10**); *see also* WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES 126 (2d ed., 1829) (**Exhibit 11**) (noting that the Second Amendment "ought not…in any government…be abused to the disturbance of the public peace," which included the assembling "of persons with arms, for an unlawful purpose"). This is because it had long been understood that any armed assemblage required the consent of government officials.[1]

---

[1] This understanding of the law goes all the way back to the 1328 Statute of Northampton. *See* 2 Edw. 3, c. 3 (1328) (Eng.) (**Exhibit 2**); *see also* 3 CALENDAR OF CLOSE ROLLS, RICHARD II, 1385-1389, at 399-400 (May 16, 1388, Westminster) (H.C. Maxwell-Lyte ed., 1914) (**Exhibit 12**); 1 CALENDAR OF CLOSE ROLLS, RICHARD II, 1377-1381, at 34 (December 1, 1377, Westminster) (H.C. Maxwell-Lyte ed., 1914) (**Exhibit 13**).

14.     By the mid-to-late nineteenth century, express location specific armed carriage prohibitions began to be codified.[2]  One example is that of Columbia, Missouri, which in 1890 passed an ordinance prohibiting the carrying of dangerous weapons "into any church, or place where people have assembled for religious worship; or into any school room, or place where people are assembled for educational, literary or social purposes; or into any court room, during the sitting of court, or to any election precinct on any election day; or into any other public assemblage of persons met for any lawful purpose…" *Chapter XVII: Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, Etc.*, May 22, 1890, *reprinted in* GENERAL ORDINANCES OF THE TOWN OF COLUMBIA, IN BOONE COUNTY, MISSOURI 34, 35 (Lewis M. Switzler ed., 1890) (**Exhibit 16**).[3] The Columbia ordinance mirrored Missouri state law.[4]

---

[2] There are, of course, a few exceptions, such as two mid-seventeenth century Maryland laws that prohibited dangerous weapons within legislative assemblies. 1647 Md. Laws 216 (**Exhibit 14**); 1650 Md. Laws 273 (**Exhibit 15**).

[3] *See* 1877 Mo. Laws 158, 166 (**Exhibit 17**) (1877 Missouri state law empowering city and town councils, such as Columbia, with the authority to "prohibit and punish the carrying of firearms and other deadly weapons, concealed or otherwise"). Like Columbia, Webb City, Missouri and Huntsville, Missouri enacted similar laws. *See Ordinance No. 577: An Ordinance Defining What Shall constitute Misdemeanors or Offenses Against the City of Webb City, and Providing Penalties Therefor*, May 15, 1905, *reprinted in* REVISED ORDINANCES OF THE CITY OF WEBB CITY, MISSOURI, 1905, at 99-100 (1905) (**Exhibit 18**); *An Ordinance in Relation to Carrying Deadly Weapons*, July 17, 1894, THE REVISED ORDINANCES OF THE CITY OF HUNTSVILLE, MISSOURI OF 1894, at 58-59 (1894) (**Exhibit 19**).

[4] The ordinance mirrored an 1874 Missouri state law titled "An Act to Prevent the Carrying of Weapons in Public Assemblies of the People." *See* 1874 Mo. Laws 43 (**Exhibit 20**) (prohibiting persons from "go[ing] into any church or place where people have assembled for religious worship" with "any kind of fire-arms" or "deadly weapon"); 1875 Mo. Laws 50 (**Exhibit 21**) (same). In 1883, the Missouri state law was amended to increase the fine. *See* 1883 Mo. Laws 76

15. Stockton, Kansas provides another example. In 1887, Stockton prohibited the carrying of dangerous weapons "into any church or place where the people have assembled for public worship, or into any school room or place where people have assembled for educational, literary or social purposes, or to any election on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons …or shall go upon the public streets or public places of the city…" *Ordinance No. 76: An Ordinance Prohibiting Deadly Weapons*, July 1, 1887, *reprinted in* STOCKTON REVIEW AND ROOKS COUNTY RECORD (KS), July 1, 1887, at 1 (**Exhibit 24**).

16. In addition to localities like Columbia, Missouri and Stockton, Kansas several states enacted laws that expressly defined so-called "sensitive places" where armed carriage could be prohibited. For instance, an 1869 Tennessee law prohibited the carrying of dangerous weapons into "any election…fair, race course, or other public assembly of the people." PUBLIC STATUTES OF THE STATE OF TENNESSEE SINCE THE YEAR 1858, at 108 (James H. Shankland ed., 1871) (**Exhibit 25**). Not long thereafter, Texas prohibited the carrying of dangerous weapons "into any church or religious assembly, any school-room or other place where persons

---

(**Exhibit 22**); *State v. Reando* (Mo. 1878) (**Exhibit 23**) (Missouri Supreme Court decision upholding 1874 law as constitutional, describing the law as "nothing more than a police regulation, made in the interest of peace and good order, perfectly within the power of the legislature to make.").

assembled for educational, literary, or scientific purposes, or into a ball room,

social party, or other social gathering, composed of ladies and gentlemen, or to any

election precinct on the day or days of any election, where any portion of the

people of this state are collected to vote at any election, or to any other place where

people may be assembled to muster or to perform any other public duty, or any

other public assembly…" 1870 Tex. Gen. Laws 63 (**Exhibit 26**). That same year,

Georgia provided that "no person in said State of Georgia be permitted or allowed

to carry about his or her person any . . . pistol or revolver, or any kind of deadly

weapon, to any Court of justice, or any election ground, or precinct, or any place of

public worship, or any other public gathering in this State…" 1870 Ga. Laws 421

(**Exhibit 27**). In 1889, Arizona law provided that "[i]f any person shall go into any

church or religious assembly, any school room, or `other place where persons are

assembled for amusement or for educational or scientific purposes, or into any

circus, show or public exhibition of any kind, or into a ball room, social party or

social gathering, or to any election precinct on the day or days of any election,

where any portion of the people of this Territory are collected to vote at any

election, or to any other place where people may be assembled to minister or to

perform any other public duty, or to any other public assembly, and shall have or

carry about his person a pistol or other firearm . . . he shall be punished by a fine

not less than fifty nor more than five hundred dollars, and shall forfeit to the

County the weapon or weapons so found on his person." 1889 Ariz. Sess. Laws 16 (**Exhibit 28**). Then there was the state of Oklahoma, which in 1890 prohibited the carrying of dangerous weapons "into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly..." 1890 Okla. Stat. 495 (**Exhibit 29**).

17.    Looking at these local and state "sensitive places" laws from a macro level—it is safe to conclude that come the mid-to-late nineteenth century state and local governments maintained the authority to prohibit the carrying of dangerous weapons in a variety of "sensitive places" where people were known to congregate.[5] Such "sensitive places" categories included 1) churches and places of

---

[5] It worth noting that several localities viewed the "sensitive places" doctrine as extending across their respective territorial limits. *See, e.g.,* A DIGEST OF THE LAWS AND ORDINANCES FOR THE GOVERNMENT OF THE CITY OF HARRISBURG, PENNSYLVANIA IN FORCE JANUARY 1, A.D. 1906, at 557-58 (1906) (**Exhibit 30**) (1873 ordinance prohibiting the open or concealed carrying of "any pistol, dirk-knife, slung-shot or deadly weapon, within the city limits...except police officers..."); THE REVISED ORDINANCES OF PROVO CITY, UTAH 96 (1893) (**Exhibit 31**) ("Every person who shall wear, or carry upon his person any pistol, or other fire arm, slungshot, false-knuckles, bowieknife, dagger or any other dangerous or deadly weapon within the city limits of this city is guilty of an offence, and upon conviction thereof shall be liable to a fine in any sum not exceeding twenty-five dollars, or to be imprisoned in the city jail not exceeding twenty-five days, or to both fine and imprisonment."); THE REVISED ORDINANCES OF PAYSON CITY, UTAH 84 (1893) (**Exhibit 32**) ("Every person who shall wear, or carry upon his person any pistol, or other firearm, slungshot, false-knuckles, bowieknife, dagger or any other dangerous or deadly weapon

worship; 2) places where large public assemblies generally took place, *i.e.*, parks, town squares, and the like; 3) polling places and other buildings where political activity generally took place; 4) schools and institutions of higher learning; 5) places where events of amusement took place, *i.e.*, places where people congregate for large planned events; and 6) bars, clubs, social venues, or anywhere in which alcohol or psychoactive or mood altering drugs were purchased or consumed.

---

within the limits of this city is guilty of an offense, and upon conviction thereof shall be liable to a fine in any sum not exceeding twenty-five dollars, or to be imprisoned in the city jail not exceeding twenty-five days, or to both fine and imprisonment."); THE REVISED ORDINANCES OF TOOELE CITY, UTAH 87 (1893) (**Exhibit 33**) ("Every person who shall wear, or carry upon his person any pistol, or other fire arm, slungshot, false-knuckles, bowieknife, dagger or any other dangerous or deadly weapon, is guilty of an offence, and upon conviction thereof shall be liable to a fine in any sum not exceeding twenty-five dollars, or to be imprisoned in the city jail not exceeding twenty-five days, or to both such fine and imprisonment."); *An Ordinance to Prohibit Intoxication, Breach of Peace, Carrying Deadly Weapons, the Use of Obscene Language, the Discharge of Fire-Arms, and to Close Places of Amusement on Sunday in the City of Wallace, Kansas*, Jan. 31, 1889, *reprinted in* WALLACE COUNTY REGISTER (KS), Feb. 9, 1889, at 2 (**Exhibit 34**) ("Any person who shall be found carrying on his person a pistol, bowie knife, dirk or other deadly weapon shall upon conviction be fined in any sum not exceeding $25 or by imprisonment in the city jail not exceeding 30 days; Provided however that this section shall not apply to any peace officer of the state, counties or cities of this state and provided further that if it shall appear to the court trying the offense that the accused was engaged in any legitimate business or calling that would necessitate the carrying of any such weapons, such persons shall be acquitted."); *Ordinance No. 97: Ordinance Related to Carrying Deadly Weapons*, May 17, 1882, *reprinted in* BURLINGTON DEMOCRAT (KS), May 26, 1882, at 2 (**Exhibit 35**) ("That is shall be unlawful for any person hereafter to carry on his or her person a pistol, bowie-knife, dirk or other deadly weapon, concealed or otherwise, within the corporate limits of said City of Burlington, *Provided*: This Section shall not apply to any person carrying a deadly weapon while in the performance of his or her legitimate business, wherein the law commands such person to carry a deadly weapon."); *Miscellaneous Ordinance*, Jun. 24, 1871, *reprinted in* ABILENE WEEKLY CHRONICLE (KS), Jun. 29, 1871, at 3 (**Exhibit 36**) ("That any person who shall carry within the corporate limits of the city of Abilene or commons, a pistol, revolver, gun, musket, dirk, bowie knife, or other dangerous weapon upon his person, either openly or concealed, except to bring the same and forthwith [to] deposit it or them at their house, store room, or residence, shall be fined seventy-five dollars.").

18.     Additionally, what historically buttresses that each of these categories were generally understood to be "sensitive places" is the fact that there is no historical evidence that informs otherwise. As far as I am aware, not one nineteenth century court of law found any of these "sensitive places" categories to be unconstitutional. The same is true for nineteenth century legal commentary—not one calls these sensitive places categories into constitutional question. This is rather important because *Bruen* denotes that when it comes to the "sensitive places" doctrine a *lack* of historical evidence disputing their lawfulness *presumes* their constitutionality. 142 S. Ct. at 2133.

19.     I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on ~~12 February 2023~~

_Patrick J. Charles_

PATRICK J. CHARLES

# PATRICK J. CHARLES
www.patrickjcharles.com

## EDUCATION

**Queen Mary-University of London School of Law**, LLM Legal Theory and History with Distinction, Dec 2014.
  Legal Theory and History Full Scholarship Recipient
  Peer Review Editor, Queen Mary Law Journal

**Cleveland-Marshall School of Law**, Juris Doctor, May 2009.
  2008 Judge John R. Brown Award for Legal Writing ($10,000 award given annually to best student article, note, comment or paper in the United States)

**George Washington University**, B.A. History with Honors, International Affairs Conflict & Security, International Affairs European Affairs, Jun 2005.

## EXPERIENCE

**Air Force Historical Research Agency, USAF**, Maxwell AFB, AL          *Lead Research Team Archivist*   04/22 – Pres

**U.S. Special Operations Command, Legislative Affairs, USAF**, Washington, DC  *Legislative Liaison*  01/21 – 4/22

**U.S. Senate, Office of U.S. Senator Martin Heinrich**, Washington, DC          *Legislative Fellow*   01/20 – 01/21

**Dept of State, Office of U.S. Foreign Assistance Resources**, Washington, DC  *Legislative Analyst*  07/19 - 01/20

**U.S. Special Operations Command, USAF**, MacDill AFB, FL                  *Senior Historian*  07/16 - 07/19

**Journal of Immigration, Asylum, and Nationality Law**, London, UK      *Peer Review Editor*   09/15 - 09/18

**24th Special Operations Wing, USAF**, Hurlburt Field, FL                      *Historian*   08-14 - 07/16

**352nd Special Operations Group, USAF**, Mildenhall, UK                      *Historian*  12/10 - 08/14

**Immigration Reform Law Institute**, Washington, DC                  *Legal Analyst/Legal Historian*  5/09 - 12/10

**United States Marine Corps**, Shanghai, China          *Sergeant/Assistant Detachment Commander*   8/97 - 8/02

## FELLOWSHIPS AND GRANTS

United States Air Force, Air Force Legislative Fellows Program, July 2019-April 2022.

Eisenhower Foundation Research Travel Grant 2019, Dwight D. Eisenhower Presidential Library, Abilene, KS.

Carl Albert Congressional Research Center Visiting Scholars Grant 2018, University of Oklahoma, Norman, OK.

Bordin-Gillette Research Fellowship 2018, University of Michigan Bentley Historical Library, Ann Arbor, MI.

Clark-Yudkin Research Fellowship 2013-14, United States Air Force Academy Library, Colorado Springs, CO.

## BOOK PUBLICATIONS AND BOOK CHAPTERS

*Vote Gun: How Gun Rights Became Politicized in the United States* (Columbia University Press, forthcoming 2023).

"The 'Reasonable Regulation' Right to Arms: The Gun Rights Second Amendment Before the Standard Model," *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment*, Jennifer Tucker, Barton C. Hacker, and Margaret Vining eds. (Smithsonian Institution Press, 2019).

*Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (Prometheus Books, 2019) (paperback edition with new foreword).

*Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (Prometheus Books, 2018).

*United States Special Operations History, 1987-2017* (7th edition, USSOCOM History and Research Office, 2017) (contributor).

*Historicism, Originalism and the Constitution: The Use and Abuse of History in American Jurisprudence* (McFarland, 2014).

*The Second Amendment: The Intent and its Interpretation by the States and the Supreme Court* (McFarland, 2009).

*Irreconcilable Grievances: The Events that Shaped the Declaration of Independence* (Heritage Books, 2008).

## ARTICLES AND OTHER PRINT PUBLICATIONS

"Racist History and the Second Amendment: A Critical Commentary," 43 *Cardozo Law Review* 1343 (2022).

"The Invention of the Right to 'Peaceable Carry' in Modern Second Amendment Scholarship," 2021 *Illinois Law Review Online* 195 (2021).

"The Faces of the Second Amendment Outside the Home, Take Three: Critiquing the Circuit Courts Use of History-in-Law," 67 *Cleveland State Law Review* 197 (2019).

"The Second Amendment and the Basic Right to Transport Firearms for Lawful Purposes, 13 *Charleston Law Review* 125 (2018) (invited).

"The Forgotten Emblems of the World War II Air Commandos," 6 *Air Commando Journal*, Issue 3, 2018: 42-47.

"The Difficulties in Changing an Air Force Emblem," 6 *Air Commando Journal*, Issue 3, 2018: 48.

"Dissecting the Origins of Air-Centric Special Operations Theory," 81 *Journal of Military History*, Issue 3, July 2017: 803-28.

"The Call to Embrace Immigration Federalism in the United States," 30 *Journal of Immigration, Asylum, and Nationality Law* 353 (2016).

"The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why it Matters," 64 *Cleveland State Law Review* 373 (2016) (lead article).

"The Sudden Embrace of Executive Discretion in Immigration Law," 55 *Washburn Law Journal* 59 (2015) (invited).

"The Second Amendment in the Twenty-First Century: What Hath *Heller* Wrought?" 23 *William & Mary Bill of Rights Journal* 1143 (2015).

"The 'Originalism is Not History' Disclaimer: A Historian's Rebuttal," 63 *Cleveland State Law Review Et Cetera* 1 (2015).

"Finding History: How Captain Cortez Enloe's Journal Sheds New Light on the History of the World War II Air Commandos and Operation THURSDAY," 3 *Air Commando Journal*, Issue 4, 2015: 11-17.

"Weighing the Constitutionality of State Immigration Verification Laws in the Wake of *Arizona v. United States*," 27 *Journal of Civil Rights & Economic Development* 441 (2014) (invited) (lead article).

"History in Law, Mythmaking, and Constitutional Legitimacy," 63 *Cleveland State Law Review* 23 (2014) (invited).

"The Statute of Northampton by the Late Eighteenth Century: Clarifying the Intellectual Legacy," 40 *Fordham Urban Law Journal City Square* 10 (2013).

"The Second Amendment and Militia Rights: Distinguishing Standard Model Legal Theory from the Historical Record," 40 *Fordham Urban Law Journal City Square* 1 (2013).

"Historical Reflections on the Beginnings of an Air Commando Theory," 2 *Air Commando Journal*, Issue 3, 2013: 9-13.

"The Second Amendment in Historiographical Crisis: Why the Supreme Court Must Reevaluate the Embarrassing 'Standard Model' Moving Forward," 39 *Fordham Urban Law Journal* 1727 (2012) (invited).

"Saving the Press Clause from Ruin: The Customary Origins of a 'Free Press' as Interface to the Present and Future," 2012 *Utah Law Review* 1691 (2012).

"Recentering Foreign Affairs Preemption in *Arizona v. United States*," 60 *Cleveland State Law Review* 133 (2012).

"The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review," 60 *Cleveland State Law Review* 1 (2012) (lead article).

"Decoding the Fourteenth Amendment's Citizenship Clause: Unlawful Immigrants, Allegiance, Personal Subjection, and the Law," 51 *Washburn Law Journal* 211 (2012) (invited and lead article).

"Scribble Scrabble, the Second Amendment, and Historical Guideposts: A Reply to Lawrence Rosenthal and Joyce Lee Malcolm," 105 *Northwestern University Law Review* 1821 (2011) (selected for print from Colloquy).

"Restoring 'Life, Liberty, and the Pursuit of Happiness' in Our Constitutional Jurisprudence: An Exercise in Legal History," 20 *William & Mary Bill of Rights Journal* 457 (2011).

"The 1792 National Militia Act, the Second Amendment, and Individual Militia Rights: A Legal and Historical Perspective," 9 *Georgetown Journal of Law & Public Policy* 323 (2011).

"The Second Amendment Standard of Review After *McDonald*: Historical Guideposts and the Missing Arguments in *McDonald v. City of Chicago*," 2 *Akron Law Journal of Constitutional Law & Policy* 7 (2011) (invited).

"The Constitutional Significance of a 'Well-Regulated' Militia Asserted and Proven with Commentary on the Future of Second Amendment Jurisprudence," 3 *Northeastern Law Journal* 1 (2011) (invited and lead article).

"Scribble Scrabble, the Second Amendment, and Historical Guideposts: A Reply to Lawrence Rosenthal and Joyce Lee Malcolm," 105 *Northwestern University Law Review Colloquy* 227 (2011).

"Representation Without Documentation?: Unlawfully Present Aliens, Apportionment, the Doctrine of Allegiance, and the Law," 25 *BYU Journal of Public Law* 35 (2011).

"Originalism, John Marshall, and the Necessary and Proper Clause: Resurrecting the Jurisprudence of Alexander Addison," 58 *Cleveland State Law Review* 529 (2010) (lead article).

"The Plenary Power Doctrine and the Constitutionality of Ideological Exclusions: A Historical Perspective," 15 *Texas Review of Law & Politics* 61 (2010).

"The Right of Self-Preservation and Resistance: A True Legal and Historical Understanding of the Anglo-American Right to Arms," 2010 *Cardozo Law Review De Novo* 18 (2010) (invited).

"'Arms for Their Defence'?: A Historical, Legal and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in *McDonald v. City of Chicago*," 57 *Cleveland State Law Review* 351 (2009) (lead article).

## NEWSPAPER AND ONLINE MEDIA PUBLICATIONS

"NRA Convention Protests Highlight US Gun Reform Divide," *Deutsche Welle*, May 30, 2022.

Q&A with Frank Wilkinson, "America's Long History of Gun Regulation," *Bloomberg News* and *Washington Post*, November 3, 2021.

"A Historian's Assessment of the Anti-Immigrant Narrative in *NYSRPA v. Bruen*," Second Thoughts: A Blog from the Center for Firearms Law at Duke University, August 4, 2021.

"Judging the Ninth Circuits Use of History in *Young v. Hawaii*," Second Thoughts: A Blog from the Center for Firearms Law at Duke University, April 16, 2021.

"The Black Panthers, NRA, Ronald Reagan, Armed Extremists, and the Second Amendment," *Second Thoughts: A Blog from the Center for Firearms Law at Duke University*, April 8, 2019.

"The 90th Anniversary of NRA's First Guiding Legislative Policies and the Implications for NYSRPA v. City of New York," *Second Thoughts: A Blog from the Center for Firearms Law at Duke University*, December 1, 2019.

"The Untold, Somewhat Embarrassing Story Behind the NRA's Laudatory Messages from Presidents Roosevelt, Truman, and Eisenhower," *Second Thoughts: A Blog from the Center for Firearms Law at Duke University*, September 23, 2019.

"The NRA is Blaming Journalists for Gun Violence," *Slate*, May 25, 2018.

"Why Does the NRA Almost Always Win?" *Buzzfeed News*, March 23, 2018.

"Conceal-Carrying the Day: We Debated Arming More People in the 1920s as a Solution to Gun Violence. The Idea Lost then, But It's Winning Now," *Slate*, March 6, 2018.

"Propaganda Machinery: How the NRA Pioneered the Right-Wing Art of Demonizing the Media," *Slate*, February 28, 2018.

"How the Gun Lobby Came to Be So Powerful," *Newsweek*, February 16, 2018.

"Justice Thomas Needs a History Lesson in the History of the 2nd Amendment," *History News Network*, December 11, 2015.

"The Hollow Impact of *Moore v. Madigan* on Gun Control?" *Huffington Post*, December 12, 2012.

"The Tale of Two Second Amendments," *Huffington Post*, September 7, 2012.

"Placing the Declaration of Independence in Historical Context: Thoughts on Educating Current and Future Generations About America's Founding Document," *ConSource Blog*, August 4, 2012.

Encyclopedia Entries "Second Amendment" and "Gun Control," *Encyclopedia Britannica*, December 2010.

## PUBLISHED BOOK REVIEWS

"Governing Immigration Through Crime: A Reader," 28 *Journal of Immigration, Asylum, and Nationality Law* 409 (2014).

"The Latino Threat: Constructing Immigrants, Citizens, and the Nation," 28 *Journal of Immigration, Asylum, and Nationality Law* 193 (2014).

## PRESENTATIONS, PANELS, AND DEBATES

"Race and Guns in America," Duke University Academic Roundtable, November 19, 2021.

"Debate with Stephen P. Halbrook: What Rights Does the Second Amendment Guarantee Outside the Home," Federalist Society, November 17, 2021 (available online).

"Militias Challenge Gun Laws in Virginia: 'It's About Shooting Tyrants in the Face'," *CBS News*, November 12, 2020 (available online).

"NRA Origins and 1930s Politics," C-SPAN 3 American History TV, Washington, DC, January 3, 2020 (available online).

"A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment," 2020 American Historical Association Meeting, January 3, 2020.

"Jim Bohannon Show: *Armed in America* Book Talk," *Westwood One Affiliates*, April 19, 2019 (available online).

"Law and Society Series: The Second Amendment 228 Years Later," Riley Institute and Charleston Law Review, Charleston, SC, February 2019.

"Book Talk: History of Gun Rights in America," National Constitution Center, Philadelphia, PA, February 2018 (available online).

"Guns in American Society," Wesleyan University, Middletown, CT, October 2017.

"Firearms and the Common Law Tradition," Aspen Institute, Washington, DC, September 2016.

"Fifty Years of 7th Special Operations Squadron History," Duxford Imperial War Museum, Cambridge, UK, May 2014.

"History and the Meaning of the Constitution," Cleveland-Marshall School of Law, Cleveland, Ohio, April 2014.

"How Much Do We Really Know About Our Gun Laws?" *NPR WBEZ 91.5 Afternoon Shift*, Chicago, IL, January 14, 2013 (available online).

"The Second Amendment is First on Our Minds," *NPR WBEZ 91.5 Morning Shift*, Chicago, IL, January 14, 2013 (available online).

"The Second Amendment Steps Outside," *Huffington Post Live*, New York, NY, December 12, 2012 (available online).

"The Objective Dilemma Facing State Immigration Enforcement," Indiana University School of Law—Indianapolis Junior Faculty Workshop, Indianapolis, Indiana, March 2012.

"Does the Second Amendment Extend Outside the Home?" Cleveland-Marshall School of Law, Cleveland, Ohio, March 2012.

"Foreign Affairs Preemption and the Federal-State Spheres of Government," St. John's University School of Law Immigration Symposium, New York, New York, March 2012.

"The History and Evolving Conceptions of the Right to Bear Arms," Fordham School of Law Second Amendment Symposium, New York, New York, March 2012 (available online).

"State Policy Potpourri: Some Comparative Assessments," and "Curtailing Birthright Citizenship," Washburn School of Law Breaching Borders Symposium, Topeka, Kansas, October 2011 (available online).

"Law Enforcement Authority to Verify Immigration Status: *Estrada v. Rhode Island*," Law Enforcement and Public Safety Channel, Washington, District of Columbia, April 2010.

"*McDonald v. City of Chicago*: An Anglo-American Right to Arms?" Cleveland-Marshall School of Law, Cleveland, Ohio, April 2010.

"Debate with Clark M. Neilly on *McDonald v. City of Chicago*," Akron University School of Law Federalist Society, Akron, Ohio, April 2010.

"Keynote Speaker for 'Chamber to Chambers: Second Amendment Symposium'," and "Panelist for 'Who's Right to Bear Arms?'" Northeastern University School of Law, Boston, Massachusetts, March 2010.

"Bearing Arms in the Ohio Constitution," Cleveland-Marshall School of Law, Cleveland, Ohio, April 2008.

"Washington's Decision: George Washington's Decision to Reaccept Black Enlistments," Trenton Chamber of Commerce Patriot Week, Trenton, New Jersey, December 2006.

## AWARDS

Joint Civilian Service Commendation Award, July 2019.

Allan S. Major Award for Air Force History Program Excellence, July 2016 (Air Force Level Award).

24th Special Operations Wing Supervisory Civilian of the Quarter, Civilian Category IV, July 2015.

Allan S. Major Award for Air Force History Program Excellence, July 2014 (Air Force Level Award).

352d Special Operations Group Supervisory Civilian of the Quarter, Civilian Category II, March 2013.

352d Special Operations Group Supervisory Civilian of the Quarter, Civilian Category II, March 2012.

Air Force Special Operations Command Excellence in Periodic History Award, February 2012.

Judge John R. Brown Award for Excellence in Legal Writing, August 2008 (National Award).

Certificate of Commendation, Commanding Officer, Marine Security Guard Battalion, May 2002.

Meritorious Mast, United States Marine Corps, April 2000.

Meritorious Mast, United States Marine Corps, August 1999.

Navy and Marine Corps Achievement Medal, United States Marine Corps, July 1999.

Certificate of Commendation, Commanding Officer, Marine Aviation Support Group, April 1998.

JA1325

Case 1:22-cv-04139-AT Document 48-8 Filed 07/20/23 Page 154 of 546 PageID: 1449

*27 Ed. I. c.3.*

Grandfather to our Lord the King that now is, wherein is contained, that Justices assigned to take Assises, if they be Laymen, shall make Deliverance; and if the one be a Clerk, and the other a Layman, that the Lay Judge, with another of the Country associate to him, shall deliver the Gaols: Wherefore it is enacted, That such [Justices '] shall not be made against the Form of the said Statute; and that the Assises, Attaints, and Certifications be taken before the Justices commonly assigned, which should be good Men and lawful, having Knowledge of the Law, and none other, after the Form of another Statute made in the Time of the said [King Edward the First ;²] and that the Oyers and Terminers shall not be granted but before Justices of the one Bench or the other, or the Justices Errants, and that for great [hurt,] or horrible Trespasses, and of the King's special Grace, after the Form of the Statute thereof ordained in Time of the said Grandfather, and none otherwise.

*Justices of Assise and Gaol-delivery.*

*Oyers and Terminers.*

ITEM, It is enacted, That no Man great nor small, of what Condition soever he be, except the King's Servants in his presence, and his Ministers in executing of the King's Precepts, or of their Office, and such as be in their Company assisting them, and also [upon a Cry made for Arms to keep the Peace, and the same in such places where such Acts happen,³] be so hardy to come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure. And that the King's Justices in their presence, Sheriffs, and other Ministers (⁴) in their Bailiwicks, Lords of Franchises, and their Bailiffs in the same, and Mayors and Bailiffs of Cities and Boroughs, within the same Cities and Boroughs, and Borough-Holders, Constables, and Wardens of the Peace within their Wards, shall have Power to execute this Act. And that the Justices assigned, at their coming down into the Country, shall have Power to enquire how such Officers and Lords have exercised their Offices in this Case, and to punish them whom they find that have not done that which pertained to their Office.

*III.*
*Riding or going armed in Affray of the Peace.*

ITEM, Because the Peace cannot be well kept without good Ministers, as Sheriffs, Bailiffs, and Hundreders, which ought to do Execution as well of the King's Privities as of other Things touching our Lord the King and his People; It is ordained and established, That the Statute made in the time of King Edward, Father to the King that now is, at Lincoln, containing that Sheriffs, Hundreders, and Bailiffs shall be of such People as have Lands in the same Shires or Bailiwicks, shall be observed in all Points after the Form thereof; and that Sheriffs and Bailiffs of Fee shall cause their Counties and Bailiwicks to be kept by such as have Lands therein.

*IV.*
*The Statute of Lincoln, 9 Edw. II. concerning Sheriffs, &c. confirmed.*

ITEM, Where it was ordained by the Statute of Westminster the Second, that they which will deliver their Writs to the Sheriff, shall deliver them in the full County, or in the Rere County, and that the Sheriff or under Sheriff shall thereupon make a Bill; It is accorded and established, that at what Time or Place in the County a Man doth deliver any Writ to the Sheriff or to the Under-Sheriff, that they shall receive the same Writs, and make a Bill, after the form contained in the same Statute, without taking any Thing therefore; and if they refuse to make a Bill, others that be present shall set to their Seals; and if the Sheriff or Under-Sheriff do not return the said Writs, they shall be punished after the form contained in the same Statute; and also the Justices of Assises shall have power to enquire thereof at every Man's Complaint, and to award Damages, as having respect to the Delay, and to the loss and peril that might happen

*V.*
*The Statute Westminster the Second, 13 Edw. I. chapter 39, concerning the Delivery of Writs to the Sheriff, confirmed.*

¹ *Commissions* ² *Grandfather*
³ *upon a Proclamation of Deeds of Arms in time of Peace, and that in Places where such Deeds are to be done,*—See Lib. Rub. Scac. Westm. fo. 122 b. a Writ reciting a Grant of K. Richard I. ... ⁴ *of the King*

---

nře Seignʳ le Roi qore est, en quele est contenuz q̃ les Justices as assises p̃ndre assignez sils soient lais, facent les deliv̄ances; et si lun soit clerc, & lautre lais, q̃ le dit lais, associe a lui un autre du pais, facent la deliv̄ance des gaols; p qoi acorde est & establi, q̃ tiels Justiceries ne soient mes g̃ntees countre la forme du dit estatut, & q̃ les assises, atteintes, & certificacions soient p̃ses devant les Justices cõmunement assignez, q̃ soient bones gentz & loialx & conissantz de la lei, & nemie autres; solonc la forme dun autre statut fait en temps meisme le ael; et q̃ les oiers & t̃miners ne soient grantees forsq̃ - - - - devant les Justices de lun Baunk & de lautre, ou les Justices errantz; & ce pʳ led & orrible trespas, & de lespeciale g̃ce le Roi, solonc forme de statut de ce ordene en temps meisme le ael; & nemie autrement.

Ensement acorde est & establi, q̃ nul, g̃nt ne petit de quele condicion q̃l soit, sauve les ß̃jantz le Roi en la p̃sence le Roi, & les Ministres le Roi, enfesantz execucion des mandementz le Roi, ou de lour office, & ceux q̃ soient en lour compaignies, eidantz as ditz ministres, & auxint au cri de fait darmes de pees, & ce en lieux ou tielx faitz se ferront, soit si hardi de venir devant les Justices le Roi, ou autres Ministres le Roi enfesant lour office, a force & armes; ne force mesner en affrai de la pees, ne de chivaucher ne daler arme, ne de nuit ne de jour, en faires, marchees, nen p̃sence des Justices, ne dautres Ministres, ne nule part aillours, sur peine de pdre lour armures au Roi & de lour corps a la prisone a la volunte le Roi. Et q̃ Justices le Roi en lour p̃sences, viscountes & autres Ministres le Roi en lour baillies, seign̄s des fraunchises & lour baillifs en yceles, & Meire & Baillifs des Citees & Burghs deinz meismes les Citees & Burghs, Burghaldres, conestables, & gardeins de la pees deinz lour gardes, eient poair affaire execucion de cest acord. Et q̃ les Justices assignez, a lour venu en pais, eient poair denquere coment tielx Ministres & seign̄s ont use lour office en ce, & de punir ceux q̃ils trov̄ont, q̃ nount mie fait ce q̃ a lour office appent.

Et p̃ce q̃ la pees ne poet mie estre bien garde sauntz bons ministres, come Viscountes, Baillifs, & Hundreders q̃ deivent faire execucion, auxibien des p̃vetez le Roi come dautres choses tochantes le Roi & son poeple, acorde est & establi q̃ lestatut fait en temps le Roi Edward, piere le Roi qore est, a Nicole, contenant q̃ Viscontes, Hundreders & Baillifs soient des gentz eantz t̃res en meismes les Countez, ou baillies, soit garde en touz pointz solonc la forme dycel, & auxint q̃ les Viscountes & Baillifs de fee, facent garder meismes lour Countez & Baillies p gentz eantz t̃res en yceles.

Ensement la ou ordine est, p statut de Westmonst̃ le secund, q̃ ceux q̃ liv̄er volent lour briefs as viscountes, les liv̄ent en plein Counte, ou en rerecounte, & q̃ visconte ou southvisconte facent sur ce bille; acorde est & establi q̃ a quele heure ou a queu lieu deinz le Counte home livre a viscountes, ou a southviscontes, briefs, q̃ils les resceivent & facent bille en la forme contenue en le dit estatut, & ce sanz rien p̃ndre; et sils refusent de faire bille, mettent autres lour sealx q̃i ß̃ront p̃sentz; et si le Visconte ou le Southvisconte ne retorne mie les briefs, soient puniz solonc la forme contenue en le dit estatut; & jadumeins eient les Justices as assises p̃ndre assignez poair denquer de ce a chescuny pleinte & de agarder damages, eant regard au delai, & a les ptes & pils q̃i p̃ront avenir.

Generated on 2023-02-09 20:35 GMT / https://hdl.handle.net/2027/pst.000017915496
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

# Memorials

OF

# LONDON AND LONDON LIFE,

IN THE

## XIIITH, XIVTH, AND XVTH CENTURIES.

BEING

A SERIES OF EXTRACTS,

LOCAL, SOCIAL, AND POLITICAL,

from the Early Archives of the City of London.

A.D. 1276 — 1419.

SELECTED, TRANSLATED, AND EDITED BY

HENRY THOMAS RILEY, M.A.

OF CORPUS CHRISTI COLLEGE, CAMBRIDGE ; AND OF THE INNER TEMPLE, BARRISTER-AT-LAW.

PUBLISHED BY ORDER OF THE CORPORATION OF LONDON, UNDER
THE SUPERINTENDENCE OF THE LIBRARY COMMITTEE.

LONDON

LONGMANS, GREEN, AND CO.

MDCCCLXVIII.

JA1327
Digitized by Google


" be so daring as to stand elsewhere than in [1] Bruggestrete, the
" stalls near to Wollechirchehawe, or Eldefisshestrete, in London, with
" such fish to sell, either by night or by day ; on pain of forfeiting
" such fish the first time, and of losing his freedom the second time,
" if such person be a freeman or freewoman of the City ; and on
" pain of imprisonment, if the person be a foreigner ; and on pain
" of imprisonment the third time, whether it be native or stranger,
" denizen or foreigner : those persons only excepted, who shall have
" herrings, white or dried, stock-fish, salt fish, salmon, and other
" manner of fish, in boats or in other vessels, for sale at the stairs of
" Billyngesgate. And it is not their intention but that those persons
" who heretofore used to carry fish through the City for sale to
" divers working-men, may carry them as before they were wont
" to do, for the sake of such working-men and other persons in the
" City ; but they are not to stand in any certain place to sell such
" fish, as now of late they have begun to do."

———◇———

*Royal proclamation as to the wearing of arms in the City, and at
   Westminster ; and as to playing at games in the Palace at West-
   minster.*

   25 Edward III. A.D. 1351.    Letter-Book F. fol. ccviii.    (Norman French.)

" FORASMUCH as heretofore at the Parliaments and Councils of our
" Lord the King, broils, riots, and disputes, have arisen and been
" moved, for that people have gone to the places where such Par-
" liaments and Councils have been summoned and assembled, armed
" with haketons, with plates, with swords, and with long daggers,
" and with other manner of arms ; by reason whereof the business
" of our Lord the King and of his realm has both been impeded,
" and the great people and others who have come there, by com-
" mand of the King, have been alarmed thereat ;—our Lord the
" King, desiring to provide a remedy against such evils, doth forbid
" that any one, on pain of forfeiture of so much as unto the King he
" may forfeit, of whatsoever estate or condition he be, shall go armed
" with haketon, or with plate, or with habergeon [2] [or with sword],
" or with long dagger, or with any other manner of arms suspected,
" within the City of London, or within the suburbs, or in any
" other places between the said city and the Palace of Westminster,
" or anywhere in the Palace, by land or by water, on the pain
" aforesaid ; save only the people of our Lord the King, whom he

[1] Bridge Street, Woolchurch Haw,    [2] Omitted in the MS, but supplied
and Old Fish Street.    from the *Rotul. Parliam.* vol. ii. p. 236.

Digitized by Google

" shall see fit to depute to such place as by his command they
" shall be deputed to, for keeping his peace at the said places; and
" also, except the officers of the King, according to the form of the
" Statute made at Norhamptone.    And it is not the intention of
" our Lord the King, that any Earl [or] Baron shall not have his
" sword carried with him, elsewhere than in the presence of the
" King, or from the place of Council.

" And also,—it is forbidden on behalf of our Lord the King and
" the Council, on pain of imprisonment, that any child, or other
" person, shall play in any place of the Palace of Westminster,
" during the Parliament which is summoned thereto, at [1] bars, or
" at other games not befitting, and such as taking off the hoods
" of people, or laying hands upon them; or in other way causing
" hindrance, whereby each person may not peaceably follow his
" business."

———◇———

*Presentation to a Chantry at St. Paul's, founded by Sir John de
Pulteneye.*

26 Edward III. A.D. 1352.    Letter-Book F. fol. ccxv.    (Latin.)

" To the venerable and discreet men, the Dean and Chapter of the
" Church of St. Paul, in London, Andrew Aubrey, Mayor of the same
" city, greeting in the Lord.    We do present unto you by these pre-
" sents our dearly beloved in Christ, Sir William Mason, Priest, to
" fill the perpetual Chantry now vacant, with all the rights thereof,
" which has been founded for a fitting Priest in the Church of St.
" Paul, aforesaid, to celebrate Divine Service for the soul of [2] John
" de Pulteneye, Knight, and the souls of other persons in the will
" of him, the same John, named, and the souls of all faithful per-
" sons deceased; and to our presentation, by reason of our hold-
" ing the office of Mayor of the city aforesaid, in virtue of the will
" of the said John, belonging; and we do beg of you, that you will
" admit the said John to the Chantry aforesaid, and, as the usage is,
" will canonically institute him in the same, and will deign to do, in
" favour of us, the other things which in this behalf unto your
" office pertain.    In witness whereof, we have caused these our letters
" patent, sealed with the Seal of the Mayoralty of the said city, to
" be made.    Given at London, on the Thursday next after the
" Feast of the Apostles Peter and Paul [29 June], in the 26th year
" of the reign of King Edward, after the Conquest the Third."

[1] The " prisoner's bars," or " base,"    factor to the City.    He was buried at
probably of modern times.    St. Paul's.

[2] Four times Mayor, and a great bene-

# LIBER ALBUS:

# THE WHITE BOOK

OF

# The City of London.

COMPILED A.D. 1419, BY

JOHN CARPENTER, *Common Clerk.*

RICHARD WHITINGTON, *Mayor.*

Translated from the Original Latin and Anglo-Norman,

BY

## HENRY THOMAS RILEY, M.A.,

CLARE HALL, CAMBRIDGE;
OF THE INNER TEMPLE, BARRISTER-AT-LAW.

London:

## RICHARD GRIFFIN AND COMPANY,

STATIONERS' HALL COURT.

MDCCCLXI.

C (1861)

Case 1:22-cv-00986-GTS-CFH   Document 49-21   Filed 10/13/22   Page 4 of 4

### That no one go armed.

Item, that no one, of whatever condition he be, go armed in the said city or in the suburbs, or carry arms, by day or by night, except the vadlets of the great lords of the land, carrying the swords of their masters in their presence, and the serjeants-at-arms of his lordship the King, of my lady the Queen, the [1]Prince, and the other children of his lordship the King, and the officers of the City, and such persons as shall come in their company in aid of them, at their command, for saving and maintaining the said peace; under the penalty aforesaid, and the loss of their arms and armour.

### Of Hostelers.

Item, that every hosteler and herbergeour cause warning to be given unto his guests that they leave their arms in their hostels where they shall be harboured; and if they shall not do so, and any one shall be found carrying arms contrary to the said proclamation, through default of warning by his host, such host is to be punished by imprisonment and by fine, at the discretion of the Mayor and Aldermen.

### Of the power of arresting Felons and Misdoers.

Item, that every man of standing in the said city, Alderman and commoner, who is of good repute, have power, in the absence of the officers, to arrest felons and misdoers, and to bring them unto the houses of the Sheriffs, that so due punishment may be inflicted upon such misdoers.

### That no one draw sword or knife.

Item, the better to keep the said peace, and that each person may fear the more to break the said peace, it is ordained that no person draw sword, or knife, or other arm; [and in such case], provided he do not strike, he is to pay unto the City half a mark, or remain in the prison of Newgate fifteen days. And if he draw blood of any one, he is to pay unto the City twenty shillings, or remain in prison forty days.

[1] Edward the Black Prince, son of Edward III.

Digitized by Google

JA1331

Case 1:23-cv-07433-RMB-AMD Document 88-5 Filed 02/13/23 Page 160 of 546 PageID: ...

# CAP. XXVI.——XXXIV.

## Concerning *Welshmen.*

[*Cap.* 26, 28, 30, 31, 32, 33, *and* 34. *are expresly repealed by* Stat. 21 Jac. 1. c. 28 § 11.; *See also Stats.* 26 *H.* 8. *c.* 6. *and* 27 *H.* 8. *c.* 26. *by the Operation of which, as well those Chapters, as c.* 27 & 29. *are superseded. See* Wotton's *Leges Wallicæ, App. No. VII. where a Copy of these Chapters is given from the Records of Caernarvon.*]

CAP. XXVI.—" *Englishmen* shall not be convicted by *Welshmen* in *Wales*. No *English* Burgesses having married *Welsh* Women shall have Franchise with *English* Burgesses."

CAP. XXVII.—" No Wasters, Rymers, Minstrels, or Vagabonds, shall be suffered in *Wales*, to make 'Kymorthas' or Collection upon the Common People there."

CAP. XXVIII.—" No Commanvaes [Conventicula, *Wotton*] or Congregations shall be suffered in *Wales*, for any Councils or other Purposes, without Licence of the Chief Officers of each Lordship, and in their Presence, on Pain of Fine and Imprisonment."

CAP. XXIX.—" No *Welshman* shall be armed, nor wear defensive Armour in Cities, Markets, Churches, or Congregations, on Pain of Fine and Imprisonment."

CAP. XXX.—" No Victuals or Armour shall be carried into *Wales*. except by the King's Licence, and for provisioning the *English* Castles and Towns, on Pain of Forfeiture thereof."

CAP. XXXI.—" No *Welshman* shall have any Castle, Fortress, or House of Defence, of his own or any others, to keep, otherwise than was used in the Time of *Edward* the Conqueror of *Wales*, with an Exception for Bishops and Lords " *pur leur corps propres.*"

CAP. XXXII.—" No *Welshman* shall be made Justice, Chamberlain, Chancellor, Treasurer, Sheriff, Steward, Constable of a Castle, Receiver, Escheator, Coroner, Chief Forester, or other Officer whatever, nor Keeper of Records, nor Lieutenant in the said Offices in *Wales*, nor be of Counsel to any *English* Lord, any Patent notwithstanding, except Bishops and such others as the King, by advice of his Council, shall find good and lawful Lieges."

CAP. XXXIII.—" Garrisons of Castles and walled Towns in *Wales* shall be wholly of *Englishmen*."

CAP. XXXIV.—" No *English* Man married to a *Welsh* Woman shall be in any Office in *Wales* or the *Marches*."

# CAP. XXXV.

## For amending 13 *Ric.* 2. *Stat.* 1. *c.* 12.

" Shoemakers and Cordwainers may tan Leather, notwithstanding the recited Statute."

[*The Stat.* 13 *Ric.* 2. *and this Stat.* 3 *H.* 4. *are both repealed by* 5 *Eliz. c.* 8. *and* 1 *Ja.* 1. *c.* 22. § 58.]

Anno

Digitized by Google
Original from HARVARD UNIVERSITY
Generated on 2023-02-09 22:55 GMT / https://hdl.handle.net/2027/hvd.32044038756136
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

ART. *Sixtieth.*    The Field Officers of each and every Regiment, shall appoint some suitable person, belonging to such Regiment, to receive such fines as may arise within the same, for any breach of any of the foregoing articles; and shall direct the same to be properly applied to the relief of such sick, wounded or necessitous soldiers as belong to such regiment; and such person shall account with such Officer for all fines received, and the application thereof.

*Field-officers to appoint persons to receive fines, &c.*

ART. *Sixty First.*    All crimes not capital, and all disorders and neglects, which Officers and Soldiers may be guilty of, to the prejudice of good order and military discipline, tho' not mentioned in the foregoing articles, are to be taken cognizance of by a general or regimental Court martial, according to the nature and degree of the offence, and be punished at their discretion.

*Crimes not mentioned in these articles, may be taken cognizance of.*

ART. *Sixty Second.*    Whenever any Officer or soldier shall be accused of a capital crime, or of having used violence or committed any offence against the person or property of the good people of this or either of the United States, such as is punishable by the known laws of the land, the commanding officer and officers of every regiment, troop or party, to which the person or persons so accused shall belong, are hereby required, upon application duly made by or in behalf of the party or parties injured, to use his utmost endeavours to deliver over such accused person or persons to the Civil Magistrate, and likewise to be aiding and assisting to the Officers of Justice in apprehending and securing the person or persons so accused, in order to bring them to trial.    And if any commanding Officer or Officers shall willfully neglect, or shall refuse upon the application aforesaid, to deliver over such accused person or persons to the Civil Magistrate, or to be aiding and assisting to the Officers of Justice in apprehending such person or persons, such officer or officers so offending, shall be cashiered.    *October 24, 1786.*

*Any officer or soldier, accused of a crime punishable by the known laws of the land —*

*To be delivered over to the civil magistrate.*

---

## 1786. — Chapter 38.

[September Session, ch. 8.]

AN ACT TO PREVENT ROUTS, RIOTS, AND TUMULTUOUS ASSEMBLIES, AND EVIL CONSEQUENCES THEREOF.

*Chap.* 38.

*Whereas the provision already made by Law, for the preventing routs, riots and tumultuous assemblies, and the evil consequences thereof, has been found insufficient;*

*Preamble.*

JA1333
Digitized by Google

*Be it therefore enacted by the Senate and House of Rep-*
*resentatives, in General Court assembled, and by the au-*
*thority of the same,* that from and after the publication of

Proclamation to
be made among
rioters.

this Act, if any persons to the number of twelve, or
more, being armed with clubs, or other weapons; or if any
number of persons, consisting of thirty or more, shall be
unlawfully, routously, riotously or tumultuously assem
bled, any Justice of the Peace, Sheriff or Deputy Sheriff
of the County, or Constable of the Town, shall among the
rioters, or as near to them as he can safely come, Com-
mand Silence, while Proclamation is making; and shall
openly make Proclamation, in these or the like words:

COMMONWEALTH OF *Massachusetts.*

**Form.**

By virtue of An Act of this Commonwealth, made and
passed in the year of OUR LORD, One thousand seven
hundred and eighty six, entitled, "An ACT for suppress-
ing routs, riots, and tumultuous assemblies, and the evil
consequences thereof," I am directed to charge and com-
mand, and I do accordingly charge and command, *all per-*
*sons,* being here assembled, immediately to disperse them-
selves, and peaceably to depart to their habitations, or to
their lawful business, upon the pains inflicted by the said
ACT.

GOD Save the COMMONWEALTH.

If the persons
assembled do
not disperse,
— officers em-
powered, &c.

And if such persons, assembled as aforesaid, shall not
disperse themselves within one hour after proclamation
made, or attempted to be made, as aforesaid, it shall be
lawful for every such officer to command sufficient aid,
and he shall seize such persons, who shall be had before a
Justice of the Peace; and the aforesaid Justice of the
Peace, Sheriff or Deputy Sheriff, is hereby further empow-
ered, to require the aid of a sufficient number of persons
in arms, if any of the persons assembled as aforesaid shall
appear armed: And if any such person or persons shall
be killed or wounded, by reason of his or their resisting
the persons endeavouring to disperse or seize them, the
said Justice, Sheriff, Deputy Sheriff, Constable and their
assistants, shall be indemnified and held guiltless.

*And be it further Enacted,* that if any person, being
commanded by such Justice, Sheriff, Deputy Sheriff or
Constable, as aforesaid, shall refuse or neglect to afford
the assistance required, and shall be convicted thereof
upon the oath of either of the said Officers, so command-

Commonwealth of *Massachusetts*.

[L. s.]  S —— ss.

*To the Sheriff of Our County of S*                    Greeting.

Whereas We commanded you, by our original Writ <span>Form of an alias writ.</span> *de homine replegiando*, that, [*here the original Writ* de homine replegiando, *shall be recited*] upon which Writ a return was made, that, [*here the return shall be recited*] whereupon Our Writ of Withernam was duly issued, commanding you, that [*here the Writ of Withernam shall be recited*] and at our said Court the said *G. H.* [*here all the consequent proceedings shall be recited*] whereupon, it was considered and adjudged by our said Court, that the body of the said *G. H.* should be taken and held, untill he shall produce the body of the said *C. D.* and untill he shall pay the sum of               taxed in costs, against him : WE therefore command You, that you take the body of the said *G. H.* into your custody, and him there to hold irreplevisably, in one of our Goals in our said County of *S*      , untill he shall produce the body of the said *C. D.* or is discharged by order of law. Witness           Esq ; at *B*      , the       day of in the year of our LORD                    Clerk.

*And be it further Enacted*, that in any stage of the pro- <span>Any person permitted to appear for the plaintiff, who shall stipulate as the Court shall direct, &c.</span> ceedings upon process, pursuant to this Act, any person shall be permitted to appear for the plaintiff, who will stipulate as the Court shall direct, for the payment of all costs and damages, that may be awarded against the Plaintiff, although he can produce no special power for that purpose.                    *February 19, 1787.*

---

## 1786. — Chapter 59.

[January Session, ch. 9.]

AN ACT FOR THE MORE SPEEDY AND EFFECTUAL SUPPRES- *Chap.* 59 SION OF TUMULTS AND INSURRECTIONS IN THE COMMON- WEALTH.

*Whereas in a free Government, where the people have a* <span>Preamble.</span> *right to bear arms for the common defence, and the military power is held in subordination to the civil authority, it is necessary for the safety of the State, that the virtuous citizens thereof should hold themselves in readiness, and when called upon, should exert their efforts to support the civil Government, and oppose the attempts of factious and wicked*

men, who may wish to subvert the Laws and Constitution
of their Country; and whereas a delay in suppressing
tumults and insurrections, in Diverse Counties of the State,
has been attended with alarming consequences, such tumults
and insurrections having lately grown into the unnatural
and dangerous Rebellion, which now exists in the Common-
wealth: for the prevention of like consequences in future:

Be it Enacted by the Senate, and House of Representa-
tives in General Court assembled, and by the authority
*Duty of civil offi-* of the same, That whenever an Insurrection shall have
*cers in case of an* taken place in either of the Counties of the Common-
*insurrection.* wealth, to obstruct the Course of Justice, or the due exe-
cution of the Laws, or there is reason to apprehend that a
dangerous Insurrection for such purposes will be excited,
it shall be the duty of the civil Officers, in such County,
as well the Sheriff, as the Justices of the several Courts
*Governour re-* of Judicature, within such County, immediately to give
*quested to exer-* information thereof to his Excellency the Governor, for
*cise the powers*
*vested in him by* the time being; who is hereby requested, thereupon, to
*the constitution.* exercise the powers vested in him by the Constitution,
and to give immediate directions to the Major General,
or commanding Officer of the Division, where such insur-
rection exists or is apprehended, and if he shall think it
necessary, to the Major General or commanding Officer
of any other Division or Divisions, to detach from his or
their Division or Divisions, such part of the militia for
the support of the civil authority, as he shall judge fully
adequate for that purpose, and for the apprehension and
safe keeping of those who may be concerned in such in-
surrection.

And Be it further Enacted by the authority aforesaid,
*If in the opinion* that if in the opinion of the Sheriff, or any two of the
*of the Sheriff or*
*any two Jus-* Justices, either of the Supreme Judicial Court, or the
*tices, it is nec-* Court of Common Pleas, in any of the Counties of this
*essary a force*
*should be in-* Commonwealth, it shall be necessary for the suppression
*stantly raised,* of any insurrection existing or apprehended, as aforesaid,
*they shall certify*
*the same to the* in such County, that a force shall be instantly raised and
*Major-General,* called forth for that purpose; and if by reason of distance,
*&c.* the necessary aid cannot be obtained by order of the Com-
mander in Chief; it shall be the duty of such Sheriff or
Justices, to certify the same under his or their hand, to
the Major General or commanding Officer of the Division,
wherein such County lies, or to the commanding Officer
of some Regiment or corps in the vicinity, and to request

JA1336

him or them to detach the whole, or such number of the militia under the command of such Officer, for the support of the civil authority, as the said Justices or Sheriff may think necessary, to defeat the purposes of such Insurgents, and to apprehend and safely keep them for tryal, and as soon as may be to give notice of such application to the Commander in Chief, that he may take the necessary orders thereupon ; and it shall be the duty of such Major *Duty of such Major-General.* General or Commanding Officer, upon such request being made, to detach such number of the militia as shall be requested as aforesaid, armed and equiped according to law ; and the militia so detached and collected shall afford their assistance to, and be under the direction of the civil Officer or Magistrate, unless in case of Rebellion declared by the Legislature.

*And be it further Enacted by the Authority aforesaid*, that if any commissioned Officer of the militia, shall re- *Punishment, if officers of the militia refuse to execute orders.* fuse, or wilfully neglect to execute any orders, he may receive from his superior Officer, to make a detachment from the corps under his command, or to march for the support of the civil Authority, or the suppression of any Insurrection as aforesaid, in addition to the punishment which may be inflicted by virtue of any Act for regulating the militia, if convicted thereof before the Justices of the Supreme Judicial Court, he shall be subject to be fined in a sum not exceeding *fifty pounds*, and to be adjudged incapable of sustaining any Office in this Commonwealth, for a term not exceeding ten years ; to either or both of the said Penalties, according to the aggravation of the offence, and circumstances of the offender, as to the Justices of the said Court shall seem meet.

*And be it further Enacted*, that if any person, whether non-commissioned Officer or private, and belonging either *Penalty if non-commissioned officers or privates refuse or neglect to march, &c.* to the train band or the alarm list, who shall be detached or ordered to march for the support of the civil Authority, or the suppression of any Insurrection, existing or apprehended as aforesaid, shall refuse or neglect to march, armed and equipped, in the manner, and at the time, which the Officer by whom he shall be detached shall direct, or shall desert or leave the service before he shall be regularly discharged, if convicted thereof before the Justices of the Supreme Judicial Court, he shall be subject to be fined at the discretion of the said Court, in a sum not exceeding *ten pounds*.

JA1337

*And be it further Enacted by the Authority aforesaid,*

Penalty for dis-
suading any mil-
itary officer, &c.
from the duty re-
quired of him.
that if any person in public or private discourse or con-
versation, or by any ways or means, shall dissuade or
endeavour to prevent any military Officer from performing
the duty required of him by this Act, or any person or
persons detached or ordered to march for the *purposes*
aforesaid, from marching to the place of rendezvous, or
from continuing in the service until regularly discharged,
each person so offending, being convicted thereof as afore-
said, shall pay a fine to the use of the Commonwealth, not
exceeding *fifty pounds*, and shall recognize for his good
behaviour for a term not exceeding three years.

*And be it further Enacted by the authority aforesaid,*

Compensation
shall be made to
the militia.
that compensation shall be made to such part of the mili-
tia, as may at any time hereafter be detached or employed
agreeably to, and for the purposes mentioned in this Act.

*February 20, 1787.*

## 1786. — Chapter 60.

[January Session, ch. 10.]

*Chap.* 60 AN ACT FOR INCORPORATING THE EASTERLY PART OF THE
TOWN OF *DARTMOUTH*, IN THE COUNTY OF *BRISTOL*, INTO
A SEPERATE TOWN, BY THE NAME OF *NEW BEDFORD*.

*Be it Enacted by the Senate, and House of Representa-
tives, in General Court assembled, and by the Authority of*

Boundaries.
*the same,* That the lands hereafter described, *to wit,* begin-
ning at a Bridge lying across a stream that runs through
the beach, by a place called *Clark's Cove,* thence running
northerly as the main branch of the stream runs, till it
comes to a little Bridge lying across the Country road, at
the foot of a hill about twenty rods to the eastward of the
dwelling house, where *James Peckman,* deceased, last
dwelt ; thence northerly on a streight line to *Nathaniel
Spooner's* Saw Mill ; from thence northerly on the west
side of *Bolton's* cedar Swamp, till it comes to the dividing
line between *Dartmouth* and *Freetown,* near the place
called *Aaron's* causeway ; thence east twenty two degrees
and one half north, in the dividing line between said
towns, to a Rock, known by the name of Peaked Rock ;
thence southerly by the Country road that leads from
*Dartmouth* to *Boston*, one hundred and eight rods, to the
south-west corner of *Ebenezer Lewis's* homestead farm ;
thence east about three hundred rods in the dividing line,

Case 1:22-cv-07464-RMB-AMD   Document 148   Page 167   02/Date Filed 07/20/2023   PageID: 1462

## CHAP. DCXXXVII.

## An Act to prevent Routs, Riots and tumultuous Assemblies.

Sect. 1. BE IT ENACTED *by the Council and General Assembly of this state, and it is hereby enacted by the authority of the same,* That from and after the publication of this act, if any persons, to the number of twelve or more, being armed with clubs, guns, swords, or other weapons, or if any number of persons consisting of thirty or more, shall be unlawfully, routously, riotously, or tumultuously assembled, any justice of the peace, sheriff, under-sheriff, or constable of the county where such assembly shall be, shall, among the rioters, or as near to them as he can safely come, command silence while proclamation is making, and shall, openly and with loud voice, make or cause to be made proclamation in these or the like words:

*Routs, riots, &c. how suppressed.*

State of New-Jersey. By virtue of an act of this state, intitled, "An act to prevent routs, riots and tumultuous assemblies," I am directed to charge and command all persons being here assembled immediately to disperse themselves, and peaceably to depart to their habitations, or to their lawful business, upon the pains and penalties contained in the said act. God save the state.

*Proclamation to be made;*

And all justices of the peace, sheriffs, under-sheriffs and constables, within the limits of their respective jurisdictions, are hereby authorized, empowered and required, on notice or knowledge of any such unlawful, routous, riotous, or tumultuous assembly, to resort to the place where such unlawful, routous, riotous, or tumultuous assembly shall be, and there to make or cause to be made proclamation in manner aforesaid.

*by a justice, &c.*

2. *And be it enacted by the authority aforesaid,* That if such persons, so unlawfully, routously, riotously and tumultuously assembled as aforesaid, shall, after proclamation made, or attempted to be made, in manner aforesaid, continue together and not disperse themselves within one hour, then it shall and may be lawful to and for every justice of the peace, sheriff, under-sheriff, or constable of the county where such assembly shall be, and to and for such other person and persons as shall be commanded to be assisting unto any such justice, sheriff, under-sheriff, or constable (who are hereby respectively authorized and empowered to command all the citizens of this state to be assisting to them therein) to seize and apprehend, and they are hereby required to seize and apprehend such persons so unlawfully, routously, riotously and tumultuously continuing together, after proclamation made, or attempted to be made, as aforesaid, and forthwith to carry the persons so apprehended before one or more of the justices of the peace of the county where such persons shall be so apprehended, in order to their being proceeded against for such their offences according to law; and if the persons so unlawfully, routously, riotously and tumultuously assembled, or any of them, shall happen to be killed,

*Rioters continuing together after proclamation made,*

*justices, &c. may command assistance to seize them,*

*that they may be proceeded against according to law.*

O

## ACTS OF THE GENERAL ASSEMBLY

wounded or hurt, in the difperfing, feizing or apprehending, or endeavouring to difperfe, feize or apprehend them, by reafon of their refifting the perfons fo difperfing, feizing or apprehending, or endeavouring to difperfe, feize or apprehend them, then every fuch juftice of the peace, fheriff, under-fheriff, or conftable, and all and fingular perfon and perfons being aiding or affifting to them or any of them, fhall be held guiltlefs, and be abfolutely indemnified and difcharged.

3. *And be it enacted by the authority aforefaid,* That if any perfon or perfons do or fhall, with force and arms, wilfully and knowingly oppofe, obftruct, or in any manner wilfully and knowingly let, hinder or hurt any perfon or perfons that fhall begin to proclaim, or go to proclaim according to the proclamation hereby directed to be made, whereby fuch proclamation fhall not be made, that then every fuch oppofing, obftructing, letting, hindering or hurting fuch perfon or perfons fo beginning, or going to make fuch proclamation as aforefaid, fhall be adjudged a mifdemeanor, and be punifhed by fine or imprifonment, or both, or by fine or imprifonment at hard labour, or both, the fine not to exceed one hundred dollars, nor the imprifonment fix months.

*[margin: Perfons oppofing or hurting a perfon who is about to proclaim, how to be punifhed.]*

4. *And be it enacted by the authority aforefaid,* That all perfons who, for the fpace of one hour after proclamation made, or attempted to be made as aforefaid, fhall unlawfully, routoufly, riotoufly and tumultuoufly continue together, to the number of twelve or more, if armed, or of thirty or more, if unarmed, as aforefaid, then fuch perfons fo offending fhall be adjudged guilty of a mifdemeanor, and, on conviction, fhall be punifhed by fine or imprifonment, or both, or by fine or imprifonment at hard labour, or both, the fine not to exceed one thoufand dollars, nor the imprifonment three years.

*[margin: Perfons riotoufly continuing together one hour after proclamation, how to be punifhed.]*

5. *And be it enacted by the authority aforefaid,* That this act fhall be read at the opening of every court of general quarter feffions of the peace by the clerk of the faid court, and at the annual meeting of each precinct, townfhip and corporation, by the refpective clerks thereof.

*[margin: This act to be read at the opening of the court, and at the annual town-meetings.]*

A.        Paffed at Trenton, February 24, 1797.

## C H A P.  DCXXXVIII.

## An Act concerning Inns and Taverns.

Sect. 1. **B**E IT ENACTED *by the Council and General Affembly of this ftate, and it is hereby enacted by the authority of the fame,* That the courts of general quarter feffions of the peace in and for the feveral counties of this ftate, fhall be, and they are hereby au-

also be neceſſary to annex to the ſaid Certificate, an Affidavit of the fol-
lowing Tenor, ſworn to before any Magiſtrate in the City of *New-York* :
A. B. *being duly ſworn, depoſeth and ſaith, That he certainly knows* [or has
Affidavits to prove, as the Caſe may be] *that the* Hemp *mentioned in the
above, or the annexed Certificate, was all raiſed after the firſt of* March,
*One thouſand ſeven hundred and ſixty-four, in the Colony of* New-York, *in
the County of* [here mentioning the County] *and that no Bounty has yet
been paid for it, or any Part of it, to the beſt of his Knowledge and Belief:*
And further ſaith not. The Inſpectors above mentioned, before they enter
on the Execution of their Office, ſhall take an Oath, faithfully to diſ-
charge the Duty of Inſpectors, according to the Meaning of this Act.

[The Reſt of this Act is OBSOLETE.]

4th *GEORGE* III.
A. D. 1763.

Form of Affidavit
to be ſworn to before
the Bounty ſhall be
paid.

---

## C H A P. MCCXXIX.

*An* A C T *to regulate the guaging of Wine, Rum, and other Spirituous Li-
quors, Molaſſes, and other Purpoſes therein mentioned.*
Paſs'd the 20th December, 1763.

Expired 1ſt Janu-
ary, 1771.

---

## C H A P. MCCXXX.

*An* ACT *to lay a Duty of Tonnage on Veſſels for defraying the Expence of
the Light-Houſe on* Sandy-Hook.
Paſs'd the 20th December, 1763.

Continued Chap.
1277.
Expired 1ſt Janu-
ary, 1772.
Provided for Ch.
1515.

---

## C H A P. MCCXXXI.

*An* ACT *impowering* John Cruger, Robert R. Livingſton, Philip Livingſton,
Leonard Liſpenard, *and* William Bayard, *Eſquires, to receive from the
Colony of* Pennſilvania, *the Sum of* Four Thouſand Three Hundred and
Sixty-eight Pounds Two Shillings and Six-pence, Sterling, *overpaid to
the ſaid Colony, out of the Parliamentary Grant for the Service of the
Year One thouſand ſeven hundred and ſixty.*
Paſs'd the 20th December, 1763.

This Money being
received and paid
into the Treaſury,
the Act is therefore
Obſolete.

---

## C H A P. MCCXXXII.

*An* ACT *to continue an Act, entitled, An Act for the Relief of Inſolvent
Debtors, and for repealing the Acts therein mentioned, with an Addition
thereto.*
Paſs'd the 20th December, 1763.

See Chap. 1148.
Continued Ch. 1309.

---

## C H A P. MCCXXXIII.

*An* A C T *to prevent hunting with Fire-Arms in the City of*
New-York, *and the Liberties thereof.*
Paſs'd the 20th December, 1763.

WHEREAS it has long been the Practice of great Numbers of idle
and diſorderly Perſons in and about the City of *New-York*, and
the Liberties thereof, to hunt with Fire-Arms, and to tread down the
Graſs, and Corn and other Grain ſtanding and growing in the Fields and
Incloſures there, to the great Danger of the Lives of his Majeſty's Sub-
jects, the Ruin and Deſtruction of the moſt valuable Improvements, the
grievous Injury of the Proprietors, and the great Diſcouragement of their
Induſtry.

Preamble.

5 T                                          I. In

Digitized from Best Copy Available

## CHAPTER CXXVI.

*An* ACT *against drunkenness and drinking of healths.* (*t*)
Passed in 1705.—Recorded A. vol. I. page 151.

---

## CHAPTER CXXVII.

*An* ACT *against riotous sports, plays and games.*
Passed in 1705.—Repealed 24th October, 1709.—Recorded A. vol.
I. page 151.

---

## CHAPTER CXXVIII.

*An* ACT *against riots and rioters.* (*u*)

What to be deemed a riot.

$B$E *it enacted,* That if any persons, to the number of three, or more, shall meet together with clubs, staves, or any other hurtful weapons, to the terror of any of the peaceable people or inhabitants of this province, and shall commit or design to commit, violence or injury upon the person or goods of any of the said inhabitants, and shall be convicted thereof, such persons shall be reputed and punished as rioters, according to the laws of England ; and such act of terror or violence, or design of violence, shall be deemed and accounted a riot.

Passed in 1705.—Recorded A. vol. I. page 153.

---

## CHAPTER CXXIX.

*An* ACT *limiting the presentments of the Grand Jury.*
Passed in 1705.—Repealed 24th October, 1709.—Recorded A. vol.
I. page 153.

---

## CHAPTER CXXX.

*An* ACT *for determining of debts under forty shillings.*
Passed in 1705.—Repealed *post.* chap. 212.—Recorded A. vol. I.
page 154.

**CHAP.**

---

(*t*) This act was supplied by the several subsequent acts for the suppression of vice and immorality ; and finally by the act of the 22d April, 1794, 4th vol. chap. 1747.

(*u*) See the index to this edition, titles *Penal Law,* and *Intrusions on lands*

Digitized by Google       JA1342

# A VIEW

### OF THE

# CONSTITUTION

### OF THE

## United States of America.

### BY WILLIAM RAWLE, LL.D.

### SECOND EDITION.

PHILADELPHIA:

**PHILIP H. NICKLIN, LAW BOOKSELLER,**

NO. 175, CHESTNUT STREET.

1829.

JA1343

Digitized by Google

Original from
HARVARD UNIVERSITY

by a state legislature. But if in any blind pursuit of inordinate power, either should attempt it, this amendment may be appealed to as a restraint on both.

In most of the countries of Europe, this right does not seem to be denied, although it is allowed more or less sparingly, according to circumstances. In England, a country which boasts so much of its freedom, the right was secured to protestant subjects only, on the revolution of 1688; and it is cautiously described to be that of bearing arms for their defence, "suitable to their conditions, and as allowed by law."* An arbitrary code for the preservation of game in that country has long disgraced them. A very small proportion of the people being permitted to kill it, though for their own subsistence; a gun or other instrument, used for that purpose by an unqualified person, may be seized and forfeited. Blackstone, in whom we regret that we cannot always trace the expanded principles of rational liberty, observes however, on this subject, that the prevention of popular insurrections and resistance to government by disarming the people, is oftener meant than avowed, by the makers of forest and game laws.†

This right ought not, however, in any government, to be abused to the disturbance of the public peace.

An assemblage of persons with arms, for an unlawful purpose, is an indictable offence, and even the carrying of arms abroad by a single individual, attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them, would be sufficient cause to require him to give surety of the peace. If he refused he would be liable to imprisonment.‡

*No soldier shall in time of peace be quartered in any house without the consent of the owner*, (here the restriction is general,)

---

* 1 Will. & Mary, c. 2.                                      † 2 Bl. 412.
‡ 3 Coke's Inst. 160. Hawkins, b. 1. c. 60.

Case 1:22-Gase4223-F90B-ANDocumentn48t 86Page:Fi73l 02Date3Fileagu27/20/2023geID: 1468

1388.

*Membrane* 8—*cont.*

to whom on that date the king committed the keeping of his house of converts of London with all things belonging to that office, and with fees and wages for himself, one chaplain and one clerk serving the house, and for John de Sancta Maria, Asetus Briart and Perota his wife converts thereof yet living, in the same manner as they used heretofore to account with William de Burstall late keeper thereof, allowing such wages for himself and those others as were allowed to the said William, and the treasurer and chamberlains paying him what shall be found due and in arrear ; as of his reverence for the Virgin King Edward I granted to his converts of London 202*l.* 4*d.* a year for their lives to be taken at the exchequer for their maintenance and maintenance of the keeper of the house, two chaplains, one clerk etc., so that upon the death of one of them so much a year should be deducted as the deceased used to take.

## MEMBRANE 7.

May 6.
Westminster.

To John Aston escheator in Devon. Order to remove the king's hand and meddle no further with the moiety of a messuage with a cellar under ground in the city of Exeter, and five ferlings 4 acres of land in Toppesham and at la Forde, delivering up any issues thereof taken ; as the king has learned by inquisition, taken by the escheator, that Robert Persoun at his death held no lands in chief by reason whereof the wardship of his land and heir ought to pertain to the king, but held the said moiety and cellar of the king in free burgage, and the said land of others than the king.

May 10.
Westminster.

To the collectors in the port of Suthampton of the custom upon wool, hides and woolfells for the time being. Order to pay to Garcius Arnaud of Salyns esquire of the lordship of Aquitaine 20*l.* a year which on 8 July 3 Richard II for good service the king granted him of the said custom from Easter then last for his life or until the king should take other order for his estate, and the arrears since Easter aforesaid.

*Et erat patens.*

May 10.
Westminster.

To the keepers, farmers, bailiffs or receivers for the time being of the manor of Asshedoun co. Essex, in the king's hand by reason of the nonage of the heir of Walter Fitz Wauter knight. Order so long as the manor shall be in the king's hand to pay to Alexander de Walden knight a yearly rent of 10*l.* of the issues thereof, which the said Walter gave him for life, and the arrears since the said Walter's death ; as for a fine paid by the said Alexander the king has confirmed the gift.

*Et erat patens.*

May 16.
Westminster.

To the bailiffs of Scardeburgh. Order to arrest and imprison until further order for their deliverance all those who shall be found going armed within the town, leading an armed power, making unlawful assemblies, or doing aught else whereby the peace may be broken and the people put in fear, and such as notoriously maintain and harbour them, and the armour found with them, causing their armour to be appraised and answer to be made to the king for it ; as in the statute lately published at Norhampton among other things it is contained that no man of whatsoever estate or condition shall be bold to appear armed before justices or other the king's ministers in

Digitized by INTERNET ARCHIVE

Original from UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL

JA1345

CALENDAR OF CLOSE ROLLS.

1388.

*Membrane 7—cont.*

performance of their office, lead an armed force in breach of the peace, ride or go armed by day or night in fairs and markets or elsewhere in presence of justices etc. under pain of losing his arms and of imprisonment at the king's will, except the king's serjeants and ministers in performance of his commands or of their offices, or others in their company aiding them, and at the proclamation of a feat of arms, and that in places where such feat shall be performed, and that the justices in their own presence, sheriffs and other the king's ministers in their bailiwicks, lords of liberties and their bailiffs in such liberties, mayors and bailiffs of cities and boroughs in such cities and boroughs, borsholders *(burgitentores)*, constables and guardians of the peace within their guardianships shall have power to execute the said statute.
*Et erat patens.*

May 15.
Kennington.

To the treasurer and the chamberlains. Order by assent and advice of the council to cause 591*l.* 10*s.* of the treasury to be paid of the king's gift to John Samoun of Notyngham ; as by his petition he has shewn the king that on 8 September last he sold at that price 84½ sacks of wool to Nicholas Brembre knight (now deceased), who by reason of a judgment against him rendered in parliament forfeited all his goods and chattels to the king, under a condition that the purchaser should give security to pay that sum at Michaelmas then next before taking the wool over sea for sale, provided that if such security were not fully found it should then be lawful for the said John to make his advantage of the wool, that the said Nicholas, not observing those conditions, caused it to be taken over for sale to the staple of Middelburgh, and that although the said John after in that staple claimed property in the wool, and by John de Byngham his attorney caused it to be there arrested, with his assent and with assent of John Frosshe and Thomas Ally of London upon pretence of certain sums due to them from the said Nicholas, licence of the court of the staple being first obtained, the wool was there sold lest it should be damaged, and by command of the king the money thereof arising was arrested by Thomas atte Mille his serjeant at arms, wherefore a plea moved in the king's court thereupon was quashed, and the petitioner may get no recovery thereof. Proviso that answer be made at the exchequer by William de Brampton governor of the said staple and other the ministers thereof for any money received at Middelburgh for the wool which is there under arrest. By K. and C.

May 13.
Westminster.

To the sheriffs of London. Order by mainprise of Master John Neuton, Master John Thorp and Thomas Asteley to set free Peter de Lyoun by them imprisoned in Newegate prison by command of Nicholas de Exton mayor of London upon suspicion of spying, for that he is of France and without licence entered the realm it is said, and sent after into chancery by command of the king ; as Master John and the others have mainperned in chancery for his good and peaceable behaviour toward the king and people.

April 23.
Westminster.

To Thomas Clifford keeper of the king's forest beyond Trent, or to his representative in the forest of Ingelwode. Order, notwithstanding the power granted to Richard Trotter keeper of the king's laund of Plumpton in that forest and to John his son by letters patent of the king to enclose a place containing 10 acres of land within the common of the forest between Todholgill and Blakebek and between the

Digitized by INTERNET ARCHIVE

Original from UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL

JA1346

Case 1:22-cv-... Case 1:23-... Document 48 Page: ... Date Filed: 07/20/2023 PageID: 147...

**1377.**                          *Membrane 21—cont.*

Nov. 30.
Westminster.

To John de Stourton escheator in Somerset. Order to deliver in dower to the said Margaret the advowson of Westcoker church extended at 20*l.* a year.

Dec. 1.
Westminster.

To the mayor and sheriffs of London. Order, when required by Thomas Tyle the king's butler, to admit Nicholas Symcok to the office of coroner in the city of London, taking of him an oath to behave well so long as he shall be therein ; as that office pertains to the said butler, who has made the said Nicholas his substitute, being engaged at the king's command upon divers business in divers parts of the realm.                                                By bill of the butler.

Nov. 22.
Westminster.

To John Parker of Olneye escheator in Bedfordshire. Order to cause the abbot of Wobourne to have seisin of a messuage, 30 acres of land and 2 acres of meadow in Eversholt held by John Page hanged for felony ; as the king has learned by inquisition, taken by the escheator, that the premises have been in his hand a year and a day, that the said John held them of the abbot, and that William de Otteford late escheator had the year and a day and the waste thereof.

Dec. 1.
Westminster.

To the mayor and bailiffs of Newcastle upon Tyne. Order to arrest and imprison until further order, according to the statutes, all those who shall be found by night or day making confederacies, congregations, unlawful assemblies or other mischief in that town, going armed, bearing arms or leading an armed power to the disturbance of the peace, and others who may be notoriously suspected, and by true men of their bailiwick to make inquisition of the names of such evildoers, their evildoings and those that harbour them, and likewise to arrest and imprison those who shall be indicted concerning the premises ; as in the statute published at Winchester in the time of King Edward [I] it is contained that if any strange passengers be found by night in cities, boroughs or towns they shall be by the watch arrested until the morrow, and if suspicion be had of them they shall be delivered to the sheriff's custody, who shall receive them without gainsaying, and if they shall not suffer themselves to be arrested hue and cry shall be raised upon them, and the watch with the whole town and neighbouring towns shall pursue them with hue and cry until taken and delivered to the sheriff ; and likewise in the statute published at Norhampton in 2 Edward III it is contained that, with particular exceptions therein specified, no man of whatsoever estate or condition shall go with armed force, lead any force to the disturbance of the peace, ride or go armed by day or night in fairs, markets or in presence of justices or other the king's ministers or elsewhere under pain of losing their arms and of imprisonment ; and in the statute published at Westminster in 5 Edward III it is contained that if suspicion of evil-doing by day or night be had against any called ' roberdesmen,' ' wastours ' and ' draughlacches,' they shall be straightway arrested and delivered to the custody of constables of towns, of the bailiffs of liberties if arrested within liberties, and of the sheriffs if without, to be imprisoned until the coming of justices for gaol delivery ; and now the king is informed that great number of evildoers and disturbers of the peace, fearing not the said statutes and pains, have heretofore made and cease [not] daily to make unlawful assemblies etc. by night and day in that town and neighbouring places, have gone and go armed

Generated on 2023-02-09 23:32 GMT / https://hdl.handle.net/2027/umn.319510020109295a
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MINNESOTA

216   *Assembly Proceedings, January—March* 1647/8.

Liber A   2^ly That noe one shall speake aboue once att one reading to any Bill w^th out lycence of the Gou^r  And if 2 psōns rise up together, the Gou^r shall Appoynt who shall speake first.  And noe one shall interrupt another, or speake till the other hath ended.

3^ly That noe one shall deliuer his opinion or speake to any bill sitting, But shall stand up reuerently and bareheaded directing his speech to the Gou^r

4^ly That euery Bill proposed to the howse shall be read 3 seuerall dayes before it shall be uoted to engrosm^t  And that betwixt euery such reading one day shall be intermitted unlesse w^th speciall lycence of the Gou^r

5^ly That before the grāll day of Sessions for the enacting of all the Lawes, notice shall bee gyuen 3 dayes before, att the least to all the County of S^t Maries to make their personall appearance, if they shall like thereof.

p. 131   6^ly That noe one shall come into the howse of Assembly (whilst the howse is sett) w^th any weapon uppon perill of such fine or censure as the howse shall thinke fit

7^ly Any of the 16 members bownd to attend the Assembly th^t shall be absent from the howse att the hower & place appointed shall be fyned (after the number of Ten of them shall be pnt w^th the Gou^r & the Clerk) in the Summe of 50^l Tob. unlesse lawfull excuse shall be shewen: to be imployed in defraying the charges of this pñt Assembly.

8^ly All misdemean^rs w^ch shall happen in the howse shall be censured & fyned by the howse.   To be imployed as afore.

9^ly Any one of the sixteen members th^t shall not attend the house, eyther through sicknes or other urgent occasion shall have power to constitute another Proxie in his roome during such his absence

The howse adiornd by the Gou^r till to morrow morning 9 clock

### Saturday 22^th Jan.

M^r Rob^t Clerk proxie for Wal. Smith

George Akerick appointed M^r Clark proxie for himselfe, & all his uoices

Jn^o Medley appoynted ffran: Posey proxie for himselfe and all his uoices

The ffreemen bownd to attend the assembly assembled except George Saphyer

was read An Act for the extent of Attachm^ts & exequūons.

The howse adiornd by the Gou^r till Munday morning 9 clock

or any one or more of the Counsell for the Vpper howse. Liber A
And m.̇ John Hatch m.̇ Walter Beane m.̇ John Medley, m.̇
Will.ᵐ Brough, m.̇ Rob.ᵗ Robins, m.̇ ffrancis Poesey, m.̇ Phillip
Land, m.̇ ffrancis Brooks, m.̇ Tho: Mathews, m.̇ Tho: Sherman,
St. Marys Kent    m.̇ George Manners Burgesses for S.ᵗ Maries
Providence als.    County Cap.ᵗ Robert Vaughan Comder. & Bur-
Anarrundell    gesse for the Ile of Kent County. m.̇ George
Puddington & m.̇ James Coxe Burgesses for the part of the
province, now Called Providence, or any fiue or more of them,
for the Lower howse, together with the Clarke of th.ᵗ howse
for the time being, who shall from time to time assemble
themselues at the time and place to bee by the Gou.̇ (or whom-
soev.ʳ. of the Counsell hee shall by hand writing under his hand
depute for th.ᵗ purpose) from time to time appoynted during
this p.ʳnt Assembly, Shall haue the full power of, & bee two
howses of Assembly to all intents and purposes. And all Bills
that shall bee passed by the s.ᵈ Two howses or the maior part of
both of them, & Enacted or Ordered by the Gou.̇ shall bee
Lawes of the province after publicōn thereof, under the hand
of the Gou.̇, & the Great Seale of the s.ᵈ province as fully to
all effects in Law as if they were aduised & assented unto by
all the ffreemen of the province personally

                                        Will.ᵐ Stone


   Orders made & agreed vppon by the Assembly for the better
ordering of Both Howses.


   1 That noe member of eyther howse shall vse reuyling
speeches or name any of the members of eyther howse by his
owne name but by the terme or denominaōn of the Gentleman
th.ᵗ spoke last or the like
   2 That none of eyther howse shall speake aboue once, att
one reading to any Bill w.ᵗʰout licence of the Gou.̇ or Speaker
respectively. And if 2 persons rise vp together the Gou.ʳ or
Speaker respectively, shall appoynt who shall speake first, & no
one shall interrupt another, or speake till the other haue ended.
   3 That none shall deliuer his opinion or speake to any Bill
sitting, but shall stand up bare headed, directing his speech to
the Gou.̇ or Speaker respectively.
   4 That Every Bill proposed to the howse, shall bee read
three severall dayes, before it be voted to Ingrosmt.̇ unlesse
uppon urgent occasion, or in matters of lesser consequence, it
bee otherwise thought fitt by both howses.
   5 That none shall come into eyther of the houses whillst
they are sett, with any gun or weapon uppon perill of such
fine or censure as the howses shall thinke fitt

GENERAL ORDINANCES.

or spirituous liquors, or any composition of which fermented, vinous or spiritous liquors form a part. *Provided,* that this section shall not be so construed as to prevent any druggist from selling or giving away, in good faith, wine for sacramental purposes, or alcohol for art, mechanical or scientific purposes on the applicant therefor, and seller thereof, complying with the laws of this state in such case made and provided; nor to prevent the selling or giving away by druggists of alcohol, or intoxicating liquors, on a written prescription, dated and signed, first had and obtained from some regularly registered and practising physician, and then only when such physician shall state in such prescription the name of the person for whom the same is prescribed and that such intoxicating liquor is prescribed as a necessary remedy in such case.

Sec. 159. Any person who shall sell or give away, to any person already intoxicated, any intoxicating liquor shall be deemed guilty of a misdemeanor and be fined if a druggist selling or giving away on prescription, not less than twenty-five dollars; if any other person, not less than forty dollars.

Passed May 22, 1890.

# CHAPTER XVII.

## CARRYING CONCEALED WEAPONS—FIRING GUNS, PISTOLS, FIRE CRACKERS, ETC.

*Be it ordained by the Board of Trustees of the Town of Columbia as follows:*

Sec. 160. Any person who shall fire or discharge, or who shall cause the same to be done by any person under his authority or control, any gun, pistol, cannon, anvil, or any device or contrivance, charged with any explosive, shall be deemed guilty of a misdemeanor and on conviction be fined not less than ten dollars for each offense.

Sec. 161. Any person who shall ignite or explode any explosive compound, or suffer the same to be done by any person under his control, or who shall fire, or cause to be fired or exploded, or suffer the same to be done by any person under his control, any fire cracker, or crackers, Roman candles, rockets, torpedoes, squibs, or any other kind of fireworks whatever, shall be deemed guilty of a misdemeanor and on conviction be fined not less than five dollars for each offense.

Digitized by Google

Sec. 162.  Any person who shall be guilty of carrying concealed upon or about his person any pistol, bowie knife, dirk, dagger, slung shot, or other deadly or dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than twenty-five nor more than one hundred dollars for every such offense.

Sec. 163.  Any person who shall go into any church, or place where people have assembled for religious worship; or into any school room, or place where people are assembled for educational, literary or social purposes; or into any court room, during the sitting of court, or to any election precinct on any election day; or into any other public assemblage of persons met for any lawful purpose, other than for military drill, or meetings called under the militia laws of this state, carrying concealed or in sight upon or about his person, any fire arms or other deadly or dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than one hundred nor more than one hundred and fifty dollars for ever such offense.

Sec. 164.  Any person who shall be guilty of exhibiting any fire arms, or other deadly or dangerous weapon in a rude, angry, or threatening manner; or who shall carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, shall be deemed guilty of a misdemeanor, and shall upon conviction be fined not less than fifty dollars for every such offense.

*Provided,* that the three last preceding sections shall not apply to police officers, nor to any officer whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to any posse when lawfully summoned and on duty; nor shall section 162 apply to persons moving or traveling peaceably through the state.

Passed May 22, 1890.

## ARTICLE IV.

SECTION

1. Recorder, jurisdiction of; his duties; who shall act when absent.
2. Vacancy in office of recorder, how filled.
3. Recorder's court, where and when held.
4. Title of prosecutions; duty of recorder; when complaint shall be in writing; when judgment may be rendered.
5. Recorder shall deliver books and papers to successor.
6. Warrants issued, how directed and executed; fees for making service; deputy may be appointed.
7. Persons brought before recorder, his duty; penalty for refusing to enter into recognizance.
8. Forfeiture of recognizance, duty of mayor.
9. When offense against criminal law appears, duty of recorder.
10. Duty of recorder to summons witnesses and enforce attendance; fees to witness.
11. When trial shall be continued; witness notified to attend.

SECTION

12. When defendant is found guilty, duty of recorder.
13. When defendant may be discharged.
14. Appeals, how taken.
15. When judgment may be rendered against complainant.
16. Recorder may administer oaths; may enforce obedience and imprison for contempt.
17. List of cases before recorder, when and how made; when filed with clerk; duty of clerk and marshal.
18. Chief of police, authority and duty of.
19. Policemen, powers and duty of.
20. Marshal subject to orders of mayor only; policemen subject to orders of mayor and marshal only.
21. Complaints against marshal to be laid before council.
22. Powers and duties of officers where defined by ordinance.
23. Violation of this act, misdemeanor.
24. Penalty for voting for or allowing fraudulent claims.
25. Inconsistent acts repealed.

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

## ARTICLE I.

SECTION 1. Any city of the third class in this State may become a body corporate under the provisions of this act, in manner provided by law, under the name of the city of ............, and by that name shall have perpetual succession; may sue and be sued; implead and be impleaded; defend and be defended in all courts of law and equity, and in all actions whatsoever; may receive and hold property, both real and personal, within such city, and may purchase, receive and hold real estate outside such city for the burial of the dead of such city, and may lease, sell or otherwise dispose of the same; may receive bequests, gifts and donations of all kinds of property, and may have and hold one common seal, and may break, change or alter the same at pleasure, and all courts of this State shall take judicial notice thereof.

SEC. 2. The jurisdiction of any city which shall organize under the provisions of this act shall not in anywise be affected or changed in consequence of such reorganization, but the limits, wards and boundaries of such city shall remain, after such change of organization, the same as at the time of such organization, and all laws or parts of laws or ordinances not inconsistent with this act, which were in operation in such city prior to its organization, shall continue to be in full force until repealed. The mayor and council of such city, with the consent of a majority of the legal voters of such city, voting at an election therefor, shall have power to extend the limits of the city over territory adjacent thereto, and shall, in every case, have power,

Generated on 2023-02-09 23:48 GMT / https://hdl.handle.net/2027/uc1.a0001940014
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google
Digitized by Google
Original from
UNIVERSITY OF CALIFORNIA

quarantine laws for that purpose, and to enforce the same within five miles of the city.

SEC. 23. The council may prohibit and punish the carrying of firearms and other deadly weapons, concealed or otherwise, and may arrest or imprison, fine or set to work all vagrants and persons found in said city without visible means of support or some legitimate business.

SEC. 24. The council shall have power to regulate levees, depots, depot grounds and places for storing freight and goods, and to provide for the passage of railways through the streets and public grounds of the city; also to regulate the crossing of railway tracks, and to provide precautions and prescribe rules regulating the same, and to regulate the running of railway engines, cars and tracks within the limits of the city, and to prescribe rules relating thereto, and to govern the speed thereof, and to make any rules or restrictions to prevent accidents at crossings and on the tracks of railways, and to prevent fires from engines.

SEC. 25. Private property may be taken for public use or for the purpose of creating or establishing market houses or market places, or for any other necessary purpose; but in every case the city shall make the person or persons whose property shall be taken or injured thereby, adequate compensation therefor, to be determined by the assessment of five disinterested freeholders of the city, who shall, in discharge of their duties, act under oath, faithfully and impartially make the assessment to them submitted; and in determining the same said freeholders shall consider the benefit resulting to as well as the damage sustained by the owner of the property so taken. Appeals may be taken from the decision of said freeholders in the same manner and within the same time as from judgments of a justice of the peace.

SEC. 26. For any purpose or purposes mentioned in the preceding sections, the council shall have power to enact and make all necessary ordinances, rules and regulations; and they shall also have power to enact and make all such ordinances, by-laws, rules and regulations, not inconsistent with the laws of the State as may be expedient for maintaining the peace and good government and welfare of the city and its trade and commerce; and all ordinances may be enforced by prescribing and inflicting upon its inhabitants or other persons violating the same such fine, not exceeding one hundred dollars, and such imprisonment, not exceeding three months, or both such fine and imprisonment as may be just for any offense, recoverable, with costs of suit, together with judgment of imprisonment, until the fine and costs are paid or satisfied, and any person committed for the non-payment of fine and costs, or either, while in custody, may be compelled to work on the streets, alleys, avenues and public grounds of the city, under the direction of the proper officer, and at such rate per day as the council may by ordinance prescribe, until such fine and costs are satisfied.

SEC. 27. Before the city council shall make any contract for building bridges or sidewalks, or for any work on streets, or for any other work or improvements, an estimate of the cost thereof shall be made by the proper officer and submitted to the council, and no contract shall be entered into for any work or improvements for a price exceeding such estimate.

SEC. 28. All claims against the city must be presented in writing, with full account of the items, and verified by the oath of the claimant or his agent that the same is correct, reasonable and just,

Digitized by Google      Original from UNIVERSITY OF CALIFORNIA

Generated on 2023-02-09 23:49 GMT / https://hdl.handle.net/2027/ucl.a0081940014
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

## COUNCIL BILL No. 607—ORDINANCE No. 577.

### MISDEMEANORS.

An Ordinance defining what shall constitute misdemeanors or offenses against the city of Webb City, and providing penalties therefor.

Be It Ordained by the Council of the City of Webb City, Missouri, as follows:

Section 1. **Disturbance of the Peace.** If any person shall wilfully disturb the peace of any neighborhood, or of any family, or of any person, by loud and unusual noise or by offensive or indecent conversation, or by threatening, quarreling, challenging or fighting, every person so offending shall, upon conviction, be adjudged guilty of a misdemeanor.

Sec. 2. **Drunk, Intoxication.** Any person who shall be found drunk or in a state of intoxication upon any street, alley, sidewalk, or in any business house or other public place within the city, to the annoyance of any person or persons, shall be deemed guilty of a misdemeanor.

Sec. 3. **Disturbing Religious Assemblies.** Every person who shall wilfully maliciously or contemptiously disquiet or disturb any camp meeting, congregation or other assembly met for religious worship, or when meeting at the place of worship or dispersing therefrom, or any school or other meeting or assembly of people met together for any lawful purpose whatever, by making a noise or by rude or indecent behavior or by profane or indecent discourse within the place of assembly or so near thereto as to interrupt or disturb the order or solemnity thereof, or who shall wilfully threaten or assault any person there being, shall be deemed guilty of a misdemeanor.

Sec. 4. **Assault.** Any person who shall in a rude, angry or threatening manner, touch, assault, strike, beat or wound another within this city, shall be deemed guilty of a misdemeanor.

Sec. 5. **Lewd Acts, Writings, Performances.** No person shall be or appear in or upon any street, avenue, sidewalk, alley or place open to public view in a state of nudity or

**711803 A**

JA1354



in a dress not belonging to or adapted to his or her sex, or in
any indecent or lewd dress, or shall make any public, unusual
or indecent exposure of his or her person, or be guilty of any
unseemly, obscene, indecent, filthy or lewd act, or of any lewd,
indecent, immoral or insulting conduct, language or behavior;
or shall exhibit, circulate or distribute, sell, offer or expose for
sale, or give or deliver to another, or cause the same to be
done, any lewd, indecent or obscene book, picture, pamphlet,
card, print, paper, writing, mold, cast, figure or other thing, or
shall exhibit or perform, or cause or allow to be exhibited or
performed in or upon any house, building, tent, wagon, lot or
premises, owned, occupied or controlled by him or under his
management or control, any lewd, indecent or immoral play,
representation, contribution or performance. Any person violat-
ing any of the provisions of this ordinance shall be deemed
guilty of a misdemeanor.

Sec. 6.  **Carrying Deadly Weapons.**  If any person shall
carry concealed upon or about his person any deadly or
dangerous weapon, or shall go into any church or place where
people have assembled for religious worship, or into any school
room or place where people are assembled for educational,
literary or social purposes, or to any election precinct on any
**election day,** or into any court room during the sitting of court,
or into any other public assemblage of persons met for any law-
ful purpose other than for militia drill or meeting called under
the militia laws of the state, having upon or about his person
any kind of firearms, bowie knife, dirk, dagger, slung shot or
other deadly or dangerous weapon, or shall in the presence of
one or more persons exhibit any such weapon in a rude, angry,
threatening, reckless or careless manner, or shall have or carry
any such weapon on or about his person when intoxicated or
under the influence of intoxicating drinks, or shall directly or
indirectly sell, deliver, give, loan or barter to any minor any
such weapon, without the written consent of the parent or
guardian of such minor, shall upon conviction be punished by a
fine of not less than fifty ($50.00) dollars nor more than two
hundred ($200.00) dollars.

Sec. 7.  **Discharging Firearms in City.**  Any person not

Case:1:22-Case4:22-1800-AMDocDocument 48:  8  Page: R84i 02Dat8:Filea:  9770720203getID: 1479

# THE REVISED ORDINANCES, *etc.*

## —OF THE—

# CITY OF HUNTSVILLE, MISSOURI,

## OF 1894.

---

COLLATED, REVISED, PRINTED AND PUBLISHED BY
AUTHORITY OF THE MAYOR AND BOARD OF
ALDERMEN OF THE CITY OF HUNTSVILLE,
MISSOURI, UNDER AN ORDINANCE OF
THE SAID CITY, ENTITLED:

---

"AN ORDINANCE IN RELATION TO ORDINANCES, AND
THE PUBLICATION THEREOF." APPROVED ON
THE 11TH DAY OF JUNE, 1894.

---

HERALD PRINT.
HUNTSVILLE, MISSOURI:
1894.

JA1356

Case 1:22-cv-04113-AMD Document 48-9 Page 185 of 546 Date Filed 07/20/2023 PageID: 1480

CC
Huntsville M
3
1894

JA1357

43-612

Case 1:22-cv-00431-AMD Document 48 Filed 02/20/23 Page 1481 of 2023 PageID: 1481

## AN ORDINANCE IN RELATION TO BUTCHERS.

*Be it ordained by the Board of Aldermen of the City of Huntsville, Missouri, as follows:*

SECTION 1.  No person shall carry on the business of a butcher within the city without taking out license therefor, and no person shall be permitted, under such license, to sell or dispose of meats at more than one place or stand within the city.

SECTION 2.  For the purposes of this ordinance a butcher is defined to be any person engaged in selling or disposing of fresh meats for food in quantities less than one quarter

SECTION 3.  Nothing herein contained shall be so construed as to prevent any grocer, at his place of business, from selling game, poultry or cured meats.

SECTION 4.  This ordinance shall take effect and be in force from and after its passage, approval and publication, and any person violating any provision of said ordinance shall be deemed guilty of a misdemeanor and upon conviction shall be punished by a fine in any sum not exceeding one hundred dollars.

<div align="right">S. G. RICHESON,<br>
Pres. of the Board of Aldermen.</div>

Approved July 17, 1894.

Attest:                                        S. G. RICHESON, Mayor.

J. A. HEETHER, Clerk.

———o———

## AN ORDINANCE IN RELATION TO CARRYING DEADLY WEAPONS.

*Be it ordained by the Board of Aldermen of the City of Huntsville. Missouri, as follows:*

SECTION 1.  If within the city any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under militia law of the state, having upon or about his person any kind of fire-arms, bowie-knife, dirk, dagger, sling-shot, or other deadly weap-

Case 1:22-Case4153-4000-AdDocuresnt4dt 8Page R680 02DocFleda907X02/X023gelD: 1482

on, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, he shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not less than five nor more than one hundred dollars, or by imprisonment in the city prison not exceeding thirty days nor less than five days or by both such fine and imprisonment; provided, the Mayor may grant permisson to any person to discharge gun, pistol or other fire-arms under proper circumstances shown to him.

SECTION 2. The next preceding section shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or to make arrests, nor to persons moving or traveling peaceably through this state; and it shall be good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his home, person or property.

SECTION 3. This ordinance shall take effect and be in force from and after its passage, approval and publication.

<div style="text-align:right">

S. G. RICHESON,
Pres. of the Board of Aldermen.

</div>

Approved July 17, 1894.

Attest:                                         S. G. RICHESON, Mayor.

J. A. HEETHER. Clerk.

————o————

# AN ORDINANCE IN RELATION TO THE USE OF FIRE-ARMS.

*Be it ordained by the Board of Aldermen of the City of Huntsville, Missouri, as follows:*

SECTION 1. It shall be unlawful for any person to discharge or fire off any gun, pistol or other fire-arm or other explosive within the city limits, unless by written permission of the Mayor.

SECTION 2. Nothing in the preceding section shall be construed as applying to officers in the discharge of their duties, licensed shooting galleries, or military funerals.

SECTION 3. Any person violating the provisions of this ordinance shall be deemed guilty of a misdemeanor, and upon conviction shall be punished by a fine in any sum not exceeding one hundred dollars.

Case 1:22-cv-01461-RBD-AB Document 40 Page 188 of 546 PageID 1483

SECTION 4.   This ordinance shall take effect and be in force from and after its passage, approval and publication.

S. G. RICHESON,

Pres. of the Board of Aldermen.

Approved July 17, 1894.

Attest:                                      S. G. RICHESON, Mayor.

J. A. HEETHER, Clerk.

—————o—————

## AN ORDINANCE IN RELATION TO DISTURBANCES OF THE PEACE.

*Be it ordained by the Board of Aldermen of the City of Huntsville, Missouri, as follows:*

SECTION 1.   If any person or persons within the city shall wilfully disturb the peace of any neighborhood, or any family or of any person by loud and offensive or indecent conversation, or by threatening, quarreling, challenging or fighting, every person so offending shall upon conviction, be adjudged guilty of a misdemeanor and punished by a fine in any sum not exceeding one hundred dollars, or by imprisonment in the city prison not exceeding thirty days.

SECTION 2.   This ordinance shall take effect and be in force from and after its passage, approval and publication.

S. G. RICHESON,

Pres. of the Board of Aldermen

Approved July 17, 1894

Attest:                                      S. G. RICHESON, Mayor.

J. A. HEETHER, Clerk.

—————o—————

## AN ORDINANCE IN RELATION TO ASSAULTS AND BATTERIES.

*Be it ordained by the Board of Aldermen of the City of Huntsville, Missouri, as follows:*

SECTION 1.   Any person who shall within the city assault or beat or wound another, under such circumstances as not to constitute any felonious assault, shall upon conviction be deemed guilty of a misde-

JA1360

SEC. 5. The clerks so appointed shall, before entering upon their duties, enter into bond, with two or more sufficient securities, in the sum of not exceeding five thousand dollars, payable to the state of Missouri, conditioned for the faithful performance of the duties devolved upon them by this act—said bond to be taken and the amount thereof fixed by the judge of the circuit court of the county in which such clerk shall be appointed; which bond shall be filed in the office of the clerk of the circuit court of said county, and may be sued on in the name of the state of Missouri, for the use of any one injured by the breach thereof.

SEC. 6. This act to take effect and be in force from and after its passage.

APPROVED March 19, 1874.

---

# CRIMES AND MISDEMEANORS: CARRYING CONCEALED WEAPONS.

### AN ACT to prevent the carrying of concealed weapons.

| SECTION | SECTION |
|---|---|
| 1. Carrying concealed weapons in public assemblages prohibited. | 2. Act to take effect immediately. |

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

SECTION 1. Whoever shall, in this state, go into any church or place where people have assembled for religious worship, or into any school-room, or into any place where people may be assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court-room during the sitting of court, or into any other public assemblage of persons met for other than militia drill or meetings, called under the militia law of this state, having concealed about his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not less than ten nor more than one hundred dollars, or by imprisonment in the county jail not to exceed six months, or by both such fine and imprisonment: *Provided*, that this act shall not apply to any person whose duty it is to bear arms in the discharge of duties imposed by law.

SEC. 2. This act shall take effect and be in force from and after its passage.

APPROVED March 26, 1874.

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

same is hereby amended so as to read as follows: Section 56. Every person who shall willfully and maliciously break, destroy or injure the door or window of any dwelling house, shop, store, or other house or building, or sever therefrom, or from the gate, fence or inclosure, or any part thereof, any material of which it is formed, or sever from the freehold any produce thereof, or anything attached thereto, or pull down, injure or destroy any gate, post, railing or fence, or any part thereof, or cut down, lap, girdle, or otherwise injure or destroy any fruit or ornamental or shade tree, being the property of another, or who shall cut down, lap, girdle, or otherwise injure or destroy any ornamental or shade tree standing or growing on any common or public ground, or any street, alley, sidewalk or promenade, or who shall, without the consent of the owner, cut down, destroy or carry any timber or trees whatsoever, being on any land not his own, and not the property of the United States, or who shall buy or in any way receive any timber, wood or trees that shall have been cut down upon or carried away from the lands of another, without the consent of the owner thereof, knowing the same to have been so cut down or taken away as aforesaid, or who shall willfully break, destroy or injure any goods, wares, merchandise or other personal property of another, shall, upon conviction, be adjudged guilty of a misdemeanor.

SEC. 2.  This act to take effect and be in force from and after its passage.

Approved March 18, 1875.

CRIMES AND PUNISHMENTS: CARRYING CONCEALED WEAPONS.

AN ACT to prevent the carrying of weapons in public assemblies of the people, and to repeal "An act to prevent the carrying concealed weapons," approved March 26, 1874.

SECTION
1. General provisions; penalty.
2. Inconsistent act repealed.

SECTION
3. Act to take effect.

*Be it enacted by the General Assembly of the State of Missouri, as follows :*

SECTION 1.  Whoever shall, in this state, go into any church or place where people have assembled for religious worship, or into any school room, or into any place where people be assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for other than militia drill, or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung shot, or other deadly weapon, shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by imprisonment in the county jail not to exceed six months, or by a fine

Digitized by 

Original from
UNIVERSITY OF CALIFORNIA

not less than ten nor more than one hundred dollars, or by both such fine and imprisonment: *Provided*, That this act shall not apply to any person whose duty it is to bear arms in the discharge of duties imposed by law.

SEC. 2. All acts and parts of acts inconsistent with this act are hereby repealed.

SEC. 3. This act shall take effect and be in force from and after its passage.

This bill having remained with the Governor ten days (Sundays excepted), and the General Assembly being in session, it has become a law this thirtieth day of March, A. D. eighteen hundred and seventy-five.

MICH'L K. McGRATH, *Secretary of State.*

---

## ELECTIONS: REGULATING BALLOTS, POLL-BOOKS, ETC.

AN ACT to amend sections 14 and 17 of chapter 2 of the General Statutes of Missouri, relating to elections, the same being sections 14 and 17 of chapter 51 of Wagner's Statutes.

| SECTION | SECTION |
|---|---|
| 1. Ballots, how prepared. | 3. Inconsistent acts repealed. |
| 2. Ballots, how to be counted. | 4. Act to take effect. |

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

SECTION 1. That section fourteen of the above recited act be amended so as to read as follows: Section 14. Each voter at any election shall, in full view, deliver to one of the judges of election a single ballot, which shall be a piece of white paper, on which shall be written or printed the names of the persons voted for, with a designation of the office which he or they may be intended to fill: *Provided*, That in counties having a population of one hundred thousand and over, said ballot shall not bear upon it any device whatever, nor shall there be any writing or printing thereon, except the names of persons, and the designations of the office to be filled, leaving a margin on either side of the printed matter for substituting names. Each ballot may bear a plain written or printed caption thereon, composed of not more than three words, expressing its political character, but on all such ballots the said caption or headlines shall not, in any manner, be designed to mislead the voter as to the name or names thereunder. Any ballot not conforming to the provisions of this act shall be considered fraudulent, and the same shall not be counted.

SEC. 2. That section seventeen of the above recited act be amended so as to read as follows: Section 17. After the poll-books are signed in the manner hereinafter provided in the form of the poll-books, the ballot boxes shall be opened and the tickets shall be taken


Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

SECTION 1. Any person or persons doing a commission business in this state who shall receive cattle, hogs, sheep, grain, cotton or other commodities consigned or shipped to him or them for sale on commission, and who shall wilfully make a false return to his or their consignor or shipper, in an account of sale or sales of any such cattle, hogs, sheep, grain, cotton or other commodities made and rendered by such person or persons for and to such consignor or shipper, either as to weights or prices, shall be guilty of a misdemeanor and shall, on conviction, be punished by imprisonment in the county jail not exceeding one year, or by a fine not exceeding five hundred dollars nor less than two hundred dollars, or by fine not less than one hundred dollars and imprisonment in the county jail not less than three months.

Approved April 2, 1883.

---

## CRIMES AND CRIMINAL PROCEDURE: Concealed Weapons.

AN ACT to amend section 1274, article 2, chapter 24 of the Revised Statutes of Missouri, entitled "Of Crimes and Criminal Procedure."

SECTION 1. Carrying concealed weapon, etc., penalty for increased.

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

SECTION 1. That section 1274 of the Revised Statutes of Missouri be and the same is hereby amended by inserting the word "twenty" before the word "five" in the sixteenth line of said section, and by striking out the word "one" in the same line and inserting in lieu thereof the word "two," and by striking out the word "three" in the seventeenth line of said section and inserting in lieu thereof the word "six," so that said section, as amended, shall read as follows: Section 1274. If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

Approved March 5, 1883.

Generated on 2023-02-10 03:37 GMT / https://hdl.handle.net/2027/mdp.39015073225826
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Newspapers
by ancestry

The State Journal (Jefferson City, Missouri) · Fri, Apr 12, 1878 · Page 2

https://www.newspapers.com/image/68084065

Downloaded on Oct 10, 2022



Copyright © 2022 Newspapers.com. All Rights Reserved.



JA1365

Case 1:22-cv-02423-RDB-AMD Document 48 Page: 194 Date Filed: 07/20/2023 PageID: 1489

Newspapers
by ancestry

https://www.newspapers.com/image/379709602

The Stockton Review and Rooks County Record (Stockton, Kansas) · Fri, Jul 1, 1887 · Page 1

Downloaded on Oct 11, 2022



Copyright © 2022 Newspapers.com. All Rights Reserved.



JA1366

Case 1:22-cv-07464-RMB-AMD Document 88-8 Filed 02/20/23 Page 195 of 546 PageID: 1490

Newspapers
by ancestry

The Stockton Review and Rooks County Record (Stockton, Kansas) · Fri, Jul 1, 1887 · Page 1

https://www.newspapers.com/image/379709602

Downloaded on Oct 11, 2022

[SEAL] F. A. CHIPMAN, C. W. SMITH,
City Clerk.                    Mayor.

Published July 1, 1887.

## ORDINANCE NO. 76.

AN ORDINANCE PROHIBITING CARRY-
ING DEADLY WEAPONS.

*Be it ordained by the Mayor and Councilmen of the City of Stockton, Kansas.*

SEC. 1.—If any person shall carry up-on or about his person any deadly or dangerous weapons, or shall go into any church or place where people have assembled for public worship, or into any school room or place where people have assembled for educational, liter-ary or social purposes, or to any elec-tion on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons not met for any unlawful pur-pose, or shall go upon the public streets or public places of the city having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, sling shot or other deadly weapon, or shall in any of the places above named exhibit such weapon in a rude, angry or threatening manner, or shall direct-ly or indirectly, sell or deliver, loan or barter to any minor, any such weapon without the consent of the parent or guardian of said minor, be shall upon conviction be punished by a fine of not less than ten nor more than fifty dol-lars. Provided, this ordinance shall not apply to peace officers of the city or state.

SEC 2.—This ordinance shall take effect from and after its publication in The Rooks County RECORD.

Approved, C. W. SMITH,
Attest, F. A. CHIPMAN,        Mayor.
City Clerk.

Copyright © 2022 Newspapers.com. All Rights Reserved.

Newspapers
POWERED BY

JA1367

**108** ELECTIONS.

Election polls.     SEC. 2. That said election shall be held at the different places in the cities and counties, as now provided by law, in this State, and according to the Constitution and existing laws governing elections in this State, so far as applicable, and the returning officers shall make their returns in the manner, and to the persons, as now provided by law.

### 1869–70—CHAPTER XXII.

[Enacted Dec. 1, 1869.]

Voters to ballot in their own districts.     SECTION 1. That all voters in this State shall be required to vote in the civil district or ward in which they may reside. Any person violating this act shall be guilty of a misdemeanor, and, upon conviction thereof, shall not be fined less than twenty nor more than fifty dollars: *Provided*, that Sheriffs excepted. Sheriffs and other officers holding elections shall be permitted to vote at any ward or precinct in which they may hold an election.

Deadly or dangerous weapons.     SEC. 2. That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie-knife or Arkansas tooth-pick, or other deadly or dangerous weapon.

Penalty.     SEC. 3. That all persons convicted under the second section of this act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the court. .

Saloons to be closed.     SEC. 4. That no liquor shop in this State shall be kept open on election days, nor shall any person, on said days, give or sell intoxicating liquors to any person for any purpose at or near an election ground.[1]

Powers of grand jury.     SEC. 5. That the grand juries of this State shall have inquisitorial powers concerning the commission of the offenses created by these acts, and may send for witnesses, as in cases of gaming, illegal voting, tippling, and offenses now prescribed by law.

Duty of the judges.     SEC. 6. That it shall be the duty of the Circuit and Criminal Judges of this State to give the above in special charge to the several grand juries of the courts.

No exemption from execution.     SEC. 7. That there shall be no property exempt from execution for fines and costs for this offense: *Provided*, that Failure to open poll. if from any cause, there should be a failure to hold an election in any civil district or ward, then nothing in this act shall be so construed as to prevent any voter from voting in

---

[1] See the act next following.

## CHAPTER XLVI.

### AN ACT REGULATING THE RIGHT TO KEEP AND BEAR ARMS.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law.

SEC. 2. That this act take effect and be in force in sixty days from the passage thereof.

Approved August 12, 1870.

## CHAPTER XLVII.

### AN ACT AUTHORIZING THE GOVERNOR TO ORDER AN ELECTION TO BE HELD IN HILL COUNTY FOR THE PERMANENT LOCATION OF THEIR COUNTY SEAT.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That the Governor of the State of Texas be, and is hereby authorized to order an election to be held in the county of Hill, on the second Monday in September, A. D. 1870, (or as soon thereafter as possible), for the permanent location of the county seat of the

To preserve the peace and harmony of the people of this State, etc.

# TITLE XVI.

## PENAL CODE—AMENDMENTS TO.

SECTIONS.
1. Carrying deadly weapons to certain places prohibited.
2. Violation—misdemeanor—penalty.
3. Chain-gang punishment prohibited.
4. Punishment in lieu of chain-gang.

SECTIONS.
5. Section 415 of the Code changed—*nolle prosequi.*
6. All indictments, etc., submitted to a jury.

(No. 285.)

*An Act to preserve the peace and harmony of the people of this State, and for other purposes.*

SECTION 1. *Be it enacted, etc.,* That, from and immediately after the passage of this act, no person in said State of Georgia be permitted or allowed to carry about his or her person any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon, to any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster-grounds. *Carrying deadly weapons to certain places prohibited. Exception.*

SEC. 2. *Be it further enacted,* That if any person or persons shall violate any portion of the above recited section of this act, he, she or they shall be guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the court. *Violation a misdemeanor—penalty.*

SEC. 3. All laws and parts of laws militating against this act are hereby repealed.

Approved October 18, 1870.

---

(No. 286.)

*An Act to alter and amend section 4245 of Irwin's Revised Code, by striking out of said section the words " to work in a chain-gang on the public works," and for other purposes.*

SECTION 1. *Be it enacted, etc.,* That the words " to work in a chain-gang on the public works," which occur in fourth and fifth lines of section 4245 of Irwin's Code, be, and the same are hereby, *Chain-gang punishment prohibited.*

16                    LAWS OF ARIZONA.

SEC. 3.   This Act shall take effect from and after its pass-age.

Approved March 18, 1889.

———————

No. 12.                    AN ACT

Concerning the Transaction of Judicial Business on Legal Holi-days.

*Be it enacted by the Legislative Assembly of the Territory of Arizona:*

SECTION 1.   No Court of Justice shall be open, nor shall any Judicial business be transacted on any Legal Holiday, ex-cept for the following purposes:

1.   To give, upon their request, instructions to a Jury when deliberating on their verdict.

2.   To receive a verdict or discharge a Jury.

3.   For the exercise of the powers of a magistrate in a criminal action, or in a proceeding of a criminal nature; pro-vided, that the Supreme Court shall always be open for the transaction of business; and provided further, that injunctions, attachments, claim and delivery and writs of prohibition may be issued and served on any day.

SEC. 2.   All Acts and parts of Acts in conflict with this Act are hereby repealed.

SEC. 3.   This Act shall be in force and effect from and after its passage.

Approved March 18, 1889.

———————

No. 13.                    AN ACT

Defining and Punishing Certain Offenses Against the Public Peace.

*Be it Enacted by the Legislative Assembly of the Territory of Arizona:*

SECTION 1.   If any person within any settlement, town, village or city within this Territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which he is con-victed, the weapon or weapons so carried.

SEC. 2.   The preceding article shall not apply to a per-son in actual service as a militiaman, nor as a peace officer

JA1371

or policeman, or person summoned to his aid, nor to a revenue or other civil officer engaged in the discharge of official duty, nor to the carrying of arms on one's own premises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack upon legal process.

SEC. 3.   If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this Territory are collected to vote at any election, or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of a knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty nor more than five hundred dollars, and shall forfeit to the County the weapon or weapons so found on his person.

SEC. 4.   The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated.

SEC. 5.   Any person violating any of the provisions of Articles 1 and 3, may be arrested without warrant by any peace officer and carried before the nearest Justice of the Peace for trial; and any peace officer who shall fail or refuse to arrest such person on his own knowledge, or upon information from some credible person, shall be punished by a fine not exceeding three hundred dollars.

SEC. 6.   Persons traveling may be permitted to carry arms within settlements or towns of the Territory for one-half hour after arriving in such settlements or town, and while going out of such towns or settlements; and Sheriffs and Constables of the various Counties of this Territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties of their respective offices.

SEC. 7.   It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted up in a conspicuous place in his bar room, or reception room if there be no bar in the house, a plain notice to travelers to divest themselves of their weapons in accordance with Section 9 of this Act, and the Sheriffs of the various Counties

(2430) § 6.  Every person who, with intent to extort any money or other property from another, sends to any person any letter or other writing, whether subscribed or not, expressing or implying, or adapted to imply, any threat, such as is specified in the second section of this article, is punishable in the same manner as if such money or property were actually obtained by means of such threat.

Chap. 25.

Sending threatening letter.

(2431) § 7.  Every person who unsuccessfully attempts by means of any verbal threat such as is specified in the second section of this article, to extort money or other property from another is guilty of a misdemeanor.

Attempting to extort money.

## ARTICLE 47.—CONCEALED WEAPONS.

| SECTION. | SECTION. |
| --- | --- |
| 1.  Prohibited weapons enumerated. | 6.  Degree of punishment. |
| 2.  Same. | 7.  Public buildings and gatherings. |
| 3.  Minors. | 8.  Intent of persons carrying weapons. |
| 4.  Public officials, when privileged. | 9.  Pointing weapon at another. |
| 5.  Arms, when lawful to carry. | 10.  Violation of certain sections. |

(2432) § 1.  It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

Prohibited weapons enumerated.

(2433) § 2.  It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

Same.

(2434) § 3.  It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article:

Minors.

(2435) § 4.  Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: *Provided, however,* That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

Public officials, when privileged.

(2436) § 5.  Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise.

Arms, when lawful to carry.

(2437) § 6.  Any person violating the provisions of any one of the foregoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court.  On the second and every subsequent con-

Degree of punishment.

**Chap. 25.**

viction, the party offending shall on conviction be fined, not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

**Public buildings and gatherings.**

(2438) § **7.** It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

**Intent of persons carrying weapons.**

(2439) § **8.** It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

**Pointing weapons at another.**

(2440) § **9.** It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

**Violation of section seven.**

(2441) § **10.** Any person violating the provisions of section seven, eight or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three not more than twelve months.

### ARTICLE 48.—FALSE PERSONATION AND CHEATS.

SECTION.
1. False impersonation, punishment for.
2. False impersonation and receiving money.
3. Personating officers and others.
4. Unlawful wearing of grand army badge.
5. Fines, how paid.
6. Obtaining property under false pretenses.

SECTION.
7. False representation of charitable purposes.
8. Falsely representing banking corporations.
9. Using false check.
10. Holding mock auction.

**Punishment for false impersonation.**

(2442) § **1.** Every person who falsely personates another, and in such assumed character, either:

First. Marries or pretends to marry, or to sustain the marriage relation toward another, with or without the connivance of such other person; or,

Second. Becomes bail or surety for any party, in any proceeding whatever, before any court or officer authorized to take such bail or surety; or,

Third. Subscribes, verifies, publishes, acknowledges or proves, in the name of another person, any written instrument, with intent that the same may be delivered or used as true; or,

Fourth. Does any other act whereby, if it were done by the person falsely personated, he might in any event become liable to any suit or prosecution, or to pay any sum of money, or to incur any charge, forfeiture or penalty, or whereby any benefit might accrue to the party personating, or to any other person.

**Fee for tapping.**

45. That hereafter the fees for tapping the city's water main pipes shall be as follows: One-half-inch taps, each, $3.25; three-quarters-inch taps, each, $4.25; one-inch taps, each, $5.25. All taps in excess of one inch shall be paid for at the rate established by the board of water commissioners, according to the size of the water main pipe desired to be tapped. 21 March, 1905. D, 282, §1.

**Taps, how made.**

46. No taps shall be made except in the presence of the duly authorized representative of the water board, after the fees aforesaid shall have been duly paid into the city treasury. Id., §2.

**Penalty.**

47. Any person violating any of the provisions of this ordinance, and being convicted thereof before the mayor or any alderman of the city, shall pay a fine of ten dollars for each offense, and in default of the payment thereof shall be imprisoned in the jail of Dauphin county for a period not exceeding thirty days. Id., §3.

**Repeal.**

48. That all ordinances or parts of ordinances in conflict herewith, be and the same are hereby repealed. Id., §4.

**Water districts.**

49. That for the purpose of electing a board of commissioners of the water and lighting department in accordance with the provisions of an Act of Assembly entitled "An Act providing for the incorporation and government of cities of the third class," approved May 23, A. D. 1889, the City of Harrisburg is hereby divided into three districts as follows, viz:

The First, Second and Ninth wards shall constitute the First district.

The Third, Fourth and Fifth wards shall constitute the Second district.

The Sixth, Seventh, Eighth and Tenth wards shall constitute the Third district. 30 Dec., 1904. D, 237, §1.

**Repeal.**

50. That all ordinances or parts of ordinances in conflict herewith, be and the same are hereby repealed. Id., §2.

# Water Closets.

[See SEWERS.]

# Weapons.

**Carrying weapons regulated.**

1. That any person who shall carry any pistol, dirk-knife, slung-shot or deadly weapon, within the city limits of Harrisburg, ex-

16

JA1375

cept police officers, shall be deemed guilty of misdemeanor, and being convicted thereof, shall be sentenced to undergo an imprisonment or be fined in any sum not less than fifty dollars, or both, at the discretion of the court; and in case of non-payment of the fine so imposed, shall be imprisoned for a period of not less than three months, and be required to give security for future good behaviour. The fines collected shall be paid into the city treasury for the use of the city. 12 April, 1873. P. L. 735, §1.

# Wires.

[See POLES AND WIRES.]

JA1376

Digitized by Google      Original from
HARVARD UNIVERSITY

disorderly house within the limits of this city, or who shall
suffer or permit any drunkenness, quarreling, fighting, unlaw-
ful games, or riotous or disorderly conduct whatever on his
premises shall be guilty of an offense, and upon conviction
thereof shall be liable to a fine in any sum not exceeding one
hundred dollars or to be imprisoned in the city jail not exceed-
ing one hundred days, or to both fine and imprisonment.

### Intoxication.

SEC. 110.   Every person found drunk or intoxicated in or
upon any street, alley, highways or public place within the
limits of this city is guilty of an offense, and upon conviction
thereof shall be liable to a fine in any sum not exceeding one
hundred dollars, or to be imprisoned in the city jail not ex-
ceeding one hundred days, or to both fine and imprisonment.

### Concealed Weapons.

SEC. 111.   Every person who shall wear, or carry upon
his person any pistol, or other fire arm, slungshot, false-
knuckles, bowieknife, dagger or any other dangerous or
deadly weapon within the limits of this city is guilty of an
offense, and upon conviction thereof shall be liable to a fine in
any sum not exceeding twenty-five dollars, or to be imprisoned
in the city jail not exceeding twenty-five days, or to both
fine and imprisonment; *Provided*, That nothing in this section
shall be construed to apply to any peace officer of the United
States, the Territory of Utah, or of this city.

### Resisting an Officer.

SEC. 112.   Any person who shall attempt by means of
any threat or violence, to deter or prevent any peace officer of
this city from performing any of the duties imposed upon him
by ordinance, order or resolution of the city council, or who
shall knowingly resist, by the use of force or violence, any
such officer in the performance of his duty, is guilty of an
offense, and upon conviction thereof shall be liable to a fine in
any sum not exceeding one hundred dollars, or to be imprisoned
in the city jail not exceeding one hundred days, or to both
fine and imprisonment.

### Refusing to Assist Officer.

SEC. 113.   Every person refusing or neglecting, when

JA1377


Digitized by Google

Original from
PRINCETON UNIVERSITY

disorderly house within the limits of this city, or who shall suffer or permit any drunkenness, quarreling, fighting, unlawful games, or riotous or disorderly conduct whatever on his premises shall be guilty of an offense, and upon conviction thereof shall be liable to a fine in any sum not exceeding one hundred dollars or to be imprisoned in the city jail not exceeding one hundred days, or to both fine and imprisonment.

## Intoxication.

SEC. 101.    Every person found drunk or intoxicated in or upon any street, alley, highways or public place within the limits of this city is guilty of an offense, and upon conviction thereof shall be liable to a fine in any sum not exceeding one hundred dollars, or to be imprisoned in the city jail not exceeding one hundred days, or to both fine and imprisonment.

## Concealed Weapons.

SEC. 102.    Every person who shall wear, or carry upon his person any pistol, or other firearm, slungshot, false-knuckles, bowieknife, dagger or any other dangerous or deadly weapon within the limits of this city is guilty of an offense, and upon conviction thereof shall be liable to a fine in any sum not exceeding twenty-five dollars, or to be imprisoned in the city jail not exceeding twenty-five days, or to both fine and imprisonment; *Provided*, That nothing in this section shall be construed to apply to any peace officer of the United States, the Territory of Utah, or of this city.

## Resisting an Officer.

SEC. 103.    Any person who shall attempt by means of any threat or violence, to deter or prevent any peace officer of this city from performing any of the duties imposed upon him by ordinance, order or resolution of the city council, or who shall knowingly resist, by the use of force or violence, any such officer in the performance of his duty, is guilty of an offense, and upon conviction thereof shall be liable to a fine in any sum not exceeding one hundred dollars, or to be imprisoned in the city jail not exceeding one hundred days, or to both fine and imprisonment.

## Refusing to Assist Officer.

SEC. 104.    Every person refusing or neglecting, when called upon by the mayor, marshal or other peace officer of

Digitized by Google

JA1378

Original from
PRINCETON UNIVERSITY

instruments, by bawling or noisy acclamations, by tumultuous or offensive language or conduct, by using profane or obscene language, by indecent or disorderly conduct, or by lewd or lascivious behavior, or who shall in such manner disturb any lawful assembly within this city, he shall be guilty of an offense, and upon conviction thereof shall be liable to a fine in any sum not exceeding one hundred dollars, or to be imprisoned in the city jail not exceeding one hundred days, or to both such fine and punishment.

### DISCHARGING FIRE ARMS.

Sec. 225. Every person who shall wantonly fire any gun, pistol or fire arms of any description, or discharge any anvil, or other device or instrument loaded with powder, within the settled portion of this city is guilty of an offense, and upon conviction thereof shall be liable to a fine in any sum not exceeding twenty-five dollars, or to be imprisoned in the city jail not exceeding twenty-five days, or to both such fine and imprisonment.

### KEEPING DISORDERLY HOUSES.

Sec. 226. Any person who shall keep an ill-governed or disorderly house, or who shall suffer or permit any drunkenness, quarrelling, fighting, unlawful games, or riotous or disorderly conduct whatever on his premises shall be guilty of an offense, and upon conviction thereof shall be liable to a fine in any sum not exceeding one hundred dollars, or to be imprisoned in the city jail not exceeding one hundred days, or to both such fine and imprisonment.

### INTOXICATION.

Sec. 227. Every person found so intoxicated within the limits of this city, as to in any manner endanger the peace and quiet of any neighborhood, and every person who disturbs the peace and good order of this city by being intoxicated, is guilty of an offense, and upon conviction thereof shall be liable to a fine in any sum not exceeding one hundred dollars, or to be imprisoned in the city jail not exceeding one hundred days, or both such fine and imprisonment.

### CONCEALED WEAPONS.

Sec. 228. Every person who shall wear, or carry upon his person, any pistol or other fire arm, slungshot, false-knuckles, bowieknife, dagger or any other dangerous or deadly weapon, is guilty of an offense, and upon conviction thereof shall be liable to a fine in any sum not exceeding twenty-five dollars, or to be imprisoned in the city jail not exceeding twenty-five days, or to both such fine and imprisonment, Provided, That nothing in this section shall be construed to apply

Digitized by Google

Original from
PRINCETON UNIVERSITY

88                         REVISED ORDINANCES

to any peace officer of the United States, the Territory of Utah,
or of this city.

### RESISTING AN OFFICER.

Sec. 229.  Any person who shall attempt by means of any
threat or violence, to deter or prevent any peace officer of this
city, from performing any of the duties imposed upon him by
ordinance, or who shall knowingly resist, by use of force or
violence, any such officer in the performance of his duty, is
guilty of an offense, and upon conviction thereof shall be liable
to a fine in any sum not exceeding one hundred dollars, or to
be imprisoned in the city jail not exceeding one hundred days,
or to both such fine and imprisonment.

### REFUSING TO ASSIST AN OFFICER.

Sec. 230.  Every person refusing or neglecting, when
called upon by the  Mayor, marshal  or  other peace officer to
aid in the suppression of a riot, or when called upon  by the
marshal or any policeman to aid in arresting and securing an
offender, is guilty of an offense, and  upon  conviction thereof
shall be liable to a fine in any  sum not exceeding fifty dollars,
or to be imprisoned in the city jail not exceeding fifty days, or
to both such fine and imprisonment.

### OBSTRUCTING AN OFFICER.

Sec. 231.  Every person  who  shall wilfully obstruct any
city officer from collecting any taxes, licenses, or other funds, in
which the people of the  city are interested, and  which such
officer, is by  ordinance  empowered to  collect, is guilty of an
offense, and upon conviction thereof shall be liable to a fine in
any sum not exceeding one  hundred  dollars, or to be  impris-
oned in the city jail  not  exceeding one hundred  days, or to
both such fine and imprisonment.

### AIDING PRISONERS TO ESCAPE.

Sec. 232.  Any person who shall aid, or assist any person
to escape from lawful  confinement, or who shall aid  or assist
another to escape from  any peace  officer of this city is guilty
of an offense, and upon conviction thereof shall  be liable to a
fine in any sum not  exceeding one  hundred dollars, or  to be
imprisoned in the city jail not exceeding one hundred days, or
to both such fine and imprisonment.

Sec. 233.  Every person who with intent, carries or sends
into the city jail anything useful to aid  a prisoner in making
an escape  or any  intoxicating liquor is guilty of  an offense,
and upon  conviction  thereof shall be liable  to a fine not ex-
ceeding one  hundred dollars or  to be imprisoned in  the city
jail not exceeding one hundred days, or to both such fine and
imprisonment.

Generated on 2023-02-10 04:06 GMT  /  https://hdl.handle.net/2027/njp.32101074865161
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

JA1380

Digitized by Google

Original from
PRINCETON UNIVERSITY

Newspapers
by ancestry

Wallace County Register (Wallace, Kansas) · Sat, Feb 9, 1889 · Page 1
https://www.newspapers.com/image/423866442
Downloaded on Oct 11, 2022



Copyright © 2022 Newspapers.com. All Rights Reserved.



JA1381

Newspapers
by ancestry

Wallace County Register (Wallace, Kansas) · Sat, Feb 9, 1889 · Page 2

https://www.newspapers.com/image/423866447

Downloaded on Oct 11, 2022

# An Ordinance,

An ordinance to prohibit intoxication, breach of peace, carrying deadly weapons, the use of obscene language, the discharge of fire arms, and to close places of amusement on Sunday in the city of Wallace, Kansas

Be it ordained by the Mayor and Councilmen of the city of Wallace, Kansas.

SEC. 1 If any person shall be drunk in any highway, street, alley or in any public place or if any person shall be drunk in his own house or private building or place, disturbing his family or others, he shall be deemed guilty of a misdemeanor and upon conviction shall be fined in any sum not exceeding $25, or by imprisonment in the city jail for a period not exceeding thirty days,

SEC. 2. Any person who shall willfully disturb the peace or quiet of any person or family or neighborhood shall upon conviction be fined in any sum not exceeding $25 or by imprisonment in the city jail not exceeding 30 days.

SEC. 3 Any person who shall be found carrying on his person a pistol, bowie knife, dirk or other deadly weapon shall upon conviction be fined in any sum not exceeding $25 or by imprisonment in the city jail not exceeding 30 days: Provided however that this shall not apply to any peace officer of the state, counties or cities of this state and provided further that if it shall appear to the court trying the offense that the accused was engaged in any legitimate business or calling that would necessitate the carrying of any such weapons, such person shall be acquitted.

SEC. 4 Any person who shall discharge any firearms or any other dangerous material or substance by force upon any street, lot, ground, alleys, or in the vicinity of any building, shall upon conviction be fined in any sum not exceeding $25 or by imprisonment in the city jail not exceeding 30 days.

SEC. 5 Any person who shall speak, utter, or use any obscene or indecent language in any public place in the presence and hearing of any female shall upon conviction be fined in any sum not exceeding $25 or be imprisoned in the city jail not exceeding 30 days.

SEC. 6 Any person who shall on the first day of the week, commonly called Sunday, keep open any billiard room, ball or pin alley, skating rink, house, ground or other place of amusement shall upon conviction be fined in any sum not exceeding $25 or be imprisoned in the city jail not exceeding 30 days.

SEC. 7 Whoever shall aid, assist or counsel another to commit any of the offenses herein prohibited shall be guilty of the same offense as if he had committed the same and punished accordingly notwithstanding the principal may not have been arrested or charged.

SEC. 8 All fines and costs imposed under this ordinance shall be by commitment of the accused to the city jail until the same is paid.

SEC. 9. This ordinance shall take effect and be in force from and after its passage and publication in the Wallace County Register.

Passed the 31st day of January 1889.

Attest C. J. Smith,           Peter Robinson,
        Clerk protem.              Mayor.

Published Feb. 9th 1889.

Copyright © 2022 Newspapers.com. All Rights Reserved.



Case 1:22-cv-07464-RMB-AMD   Document 48   Page: 211   Date Filed: 07/20/2023   PageID: 1506

The Burlington Democrat (Burlington, Kansas) · Fri, May 26, 1882 · Page 1
https://www.newspapers.com/image/383328894
Downloaded on Oct 11, 2022





Copyright © 2022 Newspapers.com. All Rights Reserved.

JA1383

Newspapers
by ancestry
https://www.newspapers.com/image/383328902

The Burlington Democrat (Burlington, Kansas) · Fri, May 26, 1882 · Page 2

Downloaded on Oct 11, 2022



Burlington, Kas., May 24th, 1882,

[Published May 26, 1882.]

## ORDINANCE NO. 97.

### Ordinance Relating to Carrying Deadly Weapons.

*Be it ordained by the Mayor and Councilmen of the City of Burlington.*

SECTION 1. That it shall be unlawful for any person hereafter to carry on his or her person a pistol, bowie-knife, dirk or other deadly weapon, concealed or otherwise, within the corporate limits of the said City of Burlington, *Provided:* Th s Section shall not apply to any person carrying a deadly weapon while in the performance of his or her legitimate business, wherein the law commands such person to carry a deadly weapon.

SEC. 2. Any person who shall be found within the corporate limits of the said city of Burlington, carrying on his or her person a pistol, bowie-knife, dirk, or other deadly weapon, concealed or otherwise, except as provided in the first section of this ordinance, shall, upon conviction thereof, be fined in a sum not less than five nor more than twenty-five dollars and costs for each and every such offense.

SEC. 3. This ordinance shall take effect and be in force on and after its passage and publication once in the Burlington INDEPENDENT.

Passed the council and approved by the Mayor, May 17th, 1882.

(Attest.)       J. E. WOODFORD.
               Mayor.

[SEAL.]    J. S. KING, City Clerk.

Copyright © 2022 Newspapers.com. All Rights Reserved.

Newspapers

Case 1:22-cv-07403-KPF-AMD Document 48 Page: 213 Date Filed: 07/20/2023 PageID: 1508

Newspapers
by ancestry

The Abilene Weekly Chronicle (Abilene, Kansas) · Thu, Jun 29, 1871 · Page 1

https://www.newspapers.com/image/384019148

Downloaded on Oct 11, 2022



Copyright © 2022 Newspapers.com. All Rights Reserved.



JA1385

Case 1:22-cv-07464-RMB-AMD   Document 48   Page: 214   Date Filed 07/20/2023   PageID: 1509

Newspapers
by ancestry

https://www.newspapers.com/image/384019163

The Abilene Weekly Chronicle (Abilene, Kansas) · Thu, Jun 29, 1871 · Page 3

Downloaded on Oct 11, 2022

[Published June 29, 1871.]

## Miscellaneous Ordinance.

*Be it ordained by the Mayor and Councilmen of the city of Abilene:*

SEC. 1. The city clerk of the city of Abilene shall be entitled to the following compensation for services and in more, payable quarterly by order on the treasury of the city of Abilene: For attending the meetings of the city council and keeping a record of their proceedings, one dollar for each meeting that he attends and fifty dollars salary. For recording or engrossing ordinances and all papers required to be recorded or engrossed, aside from the minutes and proceedings of the council, 12½ cents per folio and no more. For copies of records or ordinances furnished, and all copying and transcribing done at the request of the council, 12½ cents per folio. For each certificate or commission requiring seal fifty cents.

SEC. 2. The marshal of the city of Abilene shall receive $150 per month for his services and in addition thereto shall receive 25 per cent. of all fines assessed for violation of city ordinances against criminals arrested by him.

SEC. 3. The marshal of the city of Abilene shall be street commissioner, with all the rights, powers and duties heretofore given by ordinance to street commissioners over criminal for which the marshall shall receive no additional compensation.

SEC. 4. The city treasurer shall receive one tenth of one per cent on all moneys paid out by him on all city orders.

SEC. 5. The police judge shall receive the following compensation for services, a salary of $250 a year payable quarterly, payable quarterly by order on the city treasury of Abilene. He shall also be entitled to the same fees allowed justices of the peace by statute.

SEC. 6. Be it ordained by the mayor and the council of the city of Abilene, That Sec. one of an ordinance passed April 21st, 1871, and published May 18th 1871, be amended to read as follows: That E. H. Kilpatrick is hereby appointed city attorney within and for the city of Abilene.

SEC. 7. That any person who shall carry within the corporate limits of the city of Abilene at commoners, a pistol, revolver, gun, musket, rifle, bowie knife, or other dangerous weapon upon his person, either openly or concealed, or to bring the same and forthwith deposit it or them at their house, store room, or residence, shall be fined in a sum not more than seventy-five dollars. Provided that the provision of this ordinance shall not apply to city and county officers while in the discharge of their duty.

SEC. 8. That any person who shall intentionally discharge any pistol, revolver or gun, within the city of Abilene, in any street, alley, highway, lot, house or other place where the life or limb of any person could be endangered, shall be punished by a fine not less than ten nor more than three hundred dollars.

SEC. 9. This ordinance shall take effect and be in force from and after its publication, and all ordinances heretofore passed inconsistent with any of the provisions of this ordinance are hereby repealed.

Passed the council June 24th, A. D. 1871.

E. H. KILPATRICK,
City Clerk.

Approved June 26th, 1871.
J. A. GAUTHIE,
President.

I hereby certify that the above ordinance is a correct copy of the original now on file in my office.
E. H. KILPATRICK,
City Clerk.

Copyright © 2022 Newspapers.com. All Rights Reserved.



POWERED BY
Newspapers.com

JA1386

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| AARON SIEGEL, JASON COOK, JOSEPH DELUCA, NICOLE CUOZZO, TIMOTHY VARGA, CHRISTOPHER STAMOS, KIM HENRY, AND ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, INC., | Hon. Renée Marie Bumb, U.S.D.J. Hon. Ann Marie Donio, U.S.M.J. Docket No. 22-CV-7463 |
|    Plaintiffs, | **CIVIL ACTIONS (ELECTRONICALLY FILED)** |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey; and PATRICK CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police, | |
|    Defendants. | |

| | |
|---|---|
| RONALD KOONS; NICHOLAS GAUDIO; JEFFREY M. MULLER; GIL TAL; SECOND AMENDMENT FOUNDATION; FIREARMS POLICY COALITION, INC.; COALITION OF NEW JERSEY FIREARM OWNERS; and NEW JERSEY SECOND AMENDMENT SOCIETY, | Hon. Reéne Marie Bumb, U.S.D.J. Hon. Ann Marie Donio, U.S.M.J. Docket No. 22-CV-7464 |
|    Plaintiffs, | |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey; and PATRICK CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police, | |
|    Defendants. | |

JA1387

## DECLARATION OF PETER KOCHENBURGER

1.  I have been asked to briefly describe the existing liability insurance available to New Jersey residents who own handguns. As I discuss in this declaration, most, existing homeowners, renters, and personal auto insurance policies already provide liability coverage to their policyholders for claims related to firearm deaths or injuries that are accidently caused.  In addition, while it is currently a small market, several insurers offer separate insurance policies that specifically cover certain firearm-related claims.  All these policies are subject to various requirements, conditions, and exclusions that are found in most insurance policies.

*Background*

2.  I am a visiting professor of law at Southern University Law Center, a public HBCU law school in Louisiana, and just appointed the Managing Fellow of the Law Center's new Insurance Law and Policy Institute. From 2004 – June 2022 I was the Executive Director of the Insurance Law Center and Associate Clinical Professor of Law at the University of Connecticut School of Law.  The Insurance Law Center offers the only LLM in Insurance Law in the country and I remain affiliated with the Center.

JA1388

**3.** I currently serve on the Treasury Department's Federal Advisory Committee on Insurance, the Federal Reserve's Insurance Policy Advisory Committee, the New York Department of Financial Services Consumer Protection Advisory Board, and have been an appointed consumer representative at the National Association of Insurance Commissioners since 2010.[1] I was elected to the American Law Institute in 2013 and serve on several editorial boards for insurance law-related periodicals. I attach my CV to this certification, which includes a list of publications and presentations (Exhibit A).

4. I have been researching and writing on the relationships between insurance and firearms since 2013, starting with a 2014 law review article on how insurance could address gun violence, and most recently an article for Law360 that discussed the City of San Jose's 2022 ordinance requiring gun-owners to have liability insurance.[2] I have made numerous

---

[1] I am writing in my private capacity and my opinions should not be attributed to Southern University Law Center, Southern University, the University of Connecticut, nor any regulatory bodies or previous employers or clients.

[2] *Liability Insurance and Gun Violence,* 46 Conn. L. Rev. 1265; *The Insurance Industry's Growing Potential Role in Gun Safety,* Law360 (published May 14, 2022).

presentations in this area in academic settings, at bar conferences, insurance professional organizations, and actuarial organizations in the U.S. and England.

5. I am being compensated for my time on this case on an hourly basis at the rate of $250/hr. My compensation is not contingent on the results of my analysis or the substance of any opinion offered.

6. My opinions are based on my review of the relevant statute, my education, expertise, and research in the field of liability insurance coverage, and my review and analysis of potentially relevant insurance policies.

## *2022 N.J. Sess. Law 131 (Assembly Bill 4769)*

7. This legislation was signed into law in December 2022 and modifies various New Jersey statutes related to purchasing and carrying handguns. My certification centers on Section 4, which is a new provision and requires liability insurance as a condition of carrying a handgun in public. Section 4.a. states:

> Every private citizen who carries a handgun in public in this State shall maintain liability insurance coverage insuring against loss resulting from liability imposed by law for bodily injury, death, and property damage sustained by any person arising out of the ownership, maintenance, operation or use of a firearm carried in public wherein such coverage shall be at least in an amount or limit of

JA1390

$300,000, exclusive of interests and costs, on account of injury to or death of more than one person and for damage to property, in any one incident. NJ ST 2C:58 - 4.3 (New section).

Related sections establish proof of insurance requirements, admissibility in judicial proceedings and penalties for non-compliance.

### *Liability Coverage in Standard Homeowners, Renters, Personal Automobile, and Umbrella Insurance Policies*

8.  Homeowners, renters, and personal automobile insurance typically covers two primary risks: loss or damage to specific property, and potential legal liability arising from claims and lawsuits filed against the policyholder alleging bodily injury, property damage, or similar harm. It is the latter coverage – "liability insurance" - that is relevant to the new law.

9.  Liability insurance provides two essential protections for policyholders, (1) insurers retain and pay for an attorney or attorneys to represent the policyholder (often called the "duty to defend"), and (2) pay for settlements or adverse judgements against the policyholder up to the insurance policy limits ("duty to indemnify").[3]

---

[3] Please assume that when I describe any insurance coverage, it is always subject to various policy terms, conditions, and exclusions.

JA1391

10. While the property insurance component of these policies is limited to specifically described properties – one's home or dwelling, personal property, or cars owned by the policyholder – liability insurance for homeowners and renters essentially follows the policyholder and is *not* limited to covering claims and lawsuits that occur within the policyholder's residence.  It also protects insureds for claims arising from actions outside a home, an apartment, or any particular residence, as long as it occurs within the coverage territory, which is typically the U.S. and Canada.[4]  This is important here, as the new law applies to individuals carrying a handgun in public.

11. Liability insurance policies can also be thought of as "all-risk" policies, meaning that they cover claims arising from any circumstance or means, unless it is specifically excluded in the policy, either by exclusions that apply broadly, such as intentional harm exclusions, or those related to a particular act or element (e.g., exclusions for sexual abuse, and property

---

[4] Generally, liability insurance for motor vehicles is triggered when the claim arises from the use of the motor vehicle, including of course car accidents that occur on public streets and other locations.

JA1392

damage caused by pollutants).[5]  So, a liability claim is generally covered if there is (a) bodily injury or property damage, (b) caused by an "occurrence" (a defined term, which requires it be an "accident"), (c) during the policy period, (d) in the policy territory, and (e) not otherwise excluded. Automobile policies are specifically tied to auto accidents[6] and this coverage includes the named insured(s) and their family members when using any automobile, and typically anyone else using with permission an automobile identified in the automobile policy.

12. Homeowners, renters, and automobile policies rarely have specific exclusions for liability arising from the use of a firearm and I am not aware of any insurer that utilizes one routinely, nor of any public database that

---

[5] See, e.g., the ISO Forms HO 00 03 05 11, and HO-4 Ed. 4-84.

[6] Conversely, homeowners and renters liability coverage specifically exclude liability arising out of the use of an auto.  The insurance coverage boundary between homeowner's and renter's exclusions for claims "arising out of a" motor vehicle and the automobile insurance requirement that claims are from "auto accidents," is sometimes not clear and case law varies across the states and sometimes inconsistently applied within a particular jurisdiction.  For an example related to the use of a firearm, see *Aetna Cas. & Sur. Co. v. Safeco Ins. Co.,* 103 Cal.App.3d. 694, 697-700 (Cal. Ct. App. 1980).  Accordingly, only having auto liability insurance would not independently satisfy Section 4's insurance requirements.

tracks what insurers, if any, have firearm exclusions in their liability coverage.[7]  However, I have searched hundreds of ISO policy forms for firearm exclusions regularly over the last ten years and most recently to prepare for my certification, and I have not found any liability exclusion referencing firearms.

13. Thus, so long as the other conditions are met, liability "arising out of the ownership, maintenance, operation or use of a firearm carried in public"- the coverage required by Section 4 – would be included as a covered liability or risk, subject as all other risks, to the other terms in the policy. The "occurrence" or accident requirement in these policies covers a range of actions and behaviors, and negligent use of a firearm that resulted in bodily injury or property damage would be covered in the same manner as other causes of loss.  The policy extends to all insureds, usually defined as the named insured(s) – individuals specifically named in the policy (e.g., the homeowners) - relatives residing in the same household, and usually the named insured's children living away from home while attending school.

---

[7] There are hundreds of property-casualty insurers and insurance groups in the U.S., and while most of them utilize (in whole or in part) standard homeowner, renters, and personal automobile policy forms developed by ISO (formerly the Insurance Services Office, and now part of Verisk), some do not.

This means, for example, that a nineteen-year-old male residing in his parent(s)' or guardian's home is included in their homeowners or renters liability coverage under the same terms and conditions that apply to the named insureds.

14. A fourth type of insurance policy allows individuals to increase the amount of liability insurance above that provided by their primary or underlying homeowners, renters, or automobile insurance. These excess policies are often called "umbrella" policies because they typically extend the liability limits of both the homeowners/renters and personal auto policies, rather than being tied to only one of the coverages. While there is more variation in the policy forms used by different insurers, they generally contain either the same coverage grants (and exclusions) as the primary policies, or broaden them in some areas, such as reducing the scope of particular exclusions. They also require policyholders to maintain specified liability limits in their underlying policies. As umbrella and excess insurance policies are seldom needed to resolve liability claims against the policyholder, and because the insurer's duty to pay the policyholder's legal costs is already priced in the primary home, renters, and auto policies, excess or umbrella coverage is often surprisingly inexpensive compared to premiums for the primary policies.

*Stand-alone Policies*

15. Another option for obtaining the necessary liability insurance is to purchase a stand-alone liability insurance policy that is not tied to a homeowners, renters, or automobile policy.[8] These policies provide similar coverage as those afforded in homeowners and renters liability insurance forms and are similarly "all-risk" policies.

16. There are also liability insurance policies specific to firearm-related liability risks.[9] This is currently a small market and often underwritten by surplus lines insurers.[10]  However, since 2022 Public Law Chapter 131 was enacted

---

[8] For example, State Farm offers "comprehensive personal liability" policies, https://www.statefarm.com/simple-insights/residence/what-is-individual-liability-insurance-and-what-does-it-cover.  Many insurers, however, are no longer writing these policies, likely in part due to the expanding market for renters insurance.

[9] Prime Insurance Company, which does business in all 50 states, offers "Firearms and Concealed Weapons Insurance Coverage."  See, https://www.primeis.com/product-lines/personal-lines/concealed-weapons/.

[10] Surplus lines insurers typically offer insurance products that are either generally unavailable in the "admitted" (regular) market, or for policyholders who are considered too high-risk to obtain insurance from the admitted market. Generally, surplus lines insurance policies do not need to comply with state insurance rating and policy form law and may be exempt from other state requirements as well. Each state maintains a list of surplus lines insurers allowed to operate in the state, the types of policies that may be written, and the amount of deregulation they enjoy. The New Jersey Department of Banking & Insurance ("DOBI") website

JA1396

on December 22, 2022, and Section 4's insurance provision is not in effect until July 2023, it remains to be seen what admitted market and surplus line options will become available.

17. All these policies contain various exclusions, the most relevant one for firearm coverage is the exclusion for intentionally caused harm (often called "intentional acts" exclusions).  Though the wording and breadth of this exclusion vary, they are found in all liability insurance policies.  This exclusion, along with "criminal acts" exclusions,[11] mean that most intentional shootings would not be covered.[12] However, insuring

---

provides a list of helpful links on surplus lines insurance, https://www.state.nj.us/dobi/division_insurance/sleo.htm#whitelist.

[11] Criminal acts exclusions, while not ubiquitous, are becoming more common in personal lines liability policies.  While the scope of this exclusions varies, some purport to exclude acts that violate any statutes, regulations, and in some instances, local ordinances as well.  However, insurance is a heavily regulated product, particularly in personal lines markets, and states have the authority to require, prohibit or modify coverages, conditions, and exclusions, including intentional harm and criminal acts exclusions (which some states do).  Most states, including New Jersey, require personal lines insurers to file and obtain approval for proposed insurance policy forms, either prior to use or when introduced in the state. N.J.S.A. 17:36-5.15.

[12]  For example, "homicides," the categorization used by the Center for Disease Control, accounted for well over 40% of all firearm deaths in 2020 (suicide by firearm accounts for the majority of firearm deaths).  CDC Web-based Injury

intentionally caused harm broadly speaking has long been against public

policy in NJ (and in other states)[13] and the NJ Legislature can be presumed

to be aware of this limitation when drafting and passing the insurance

provisions in Assembly Bill 4769.[14]

### New Jersey Homeowners and Automobile Insurance Markets

18. There is robust national competition in the personal lines insurance market.

More than 30 insurance groups, for example, do business in New Jersey.[15]

---

Statistics Query and Reporting System (WISQARS). Select Fatal Injury and
Violence Data, filter by year, then mechanism (firearm) and intent (all).

[13] See, e.g., *Allstate Ins. Co. v. Malec*, 104 N.J. 1, 11–12 (N.J. 1986),
citing *Ambassador Ins. Co. v. Montes,* 76 *N.J.* 477, 483 (N.J. 1978).

[14] New Jersey law interprets the scope of intentional harm exclusions narrowly,
which means that a greater range of actions by an insured would likely be covered
under their liability insurance policy than in some other states. See, e.g.,
*Cumberland Mut. Fire Ins. Co. v. Murphy,* 183 N.J. 344 (N.J. 2005); *J.C. v.
Citizens Insurance Co. of America,* No. CV 137153 MAST JB, 2014 WL
12588288, at *4 (D. N.J. Dec. 31, 2014).

[15] Major nationwide insurers are well-represented; for example, in the DOBI
Homeowners Market Survey identifies the top ten homeowners insurers in New
Jersey in June 2022 as State Farm, New Jersey Manufacturers Group, Allstate,
Travelers, Liberty Mutual, America Family, Chubb, Plymouth Rock (Palisades
Group), USAA, and Farmers.  State Farm, the leading insurer, had 11.69% of the
Homeowners market.  DOBI market share reports available at
https://www.state.nj.us/dobi/division_insurance/ppareports.htm. For personal
automobile insurance, in June 2022 the top ten were GEICO (Berkshire
Hathaway), Progressive, New Jersey Manufacturers Group, Progressive, Allstate,

The percentage of homeowners with insurance coverage nationwide and in NJ is already high, due to mortgage lenders' insurance requirements, as well as the desirability of insuring what is typically one's most significant financial asset. The percentage of renters with insurance is lower, though the market is growing.[16] Because renters insurance does not cover the physical structure of the building, the premiums are much less than those charged for homeowners policies. In theory, drivers in New Jersey already have liability insurance, as New Jersey, as does essentially every other state, requires it as a condition of driving.[17] The required minimum liability limits are well under Section 4's $300,000 requirement, but higher liability limits are routinely available and frequently obtained, along with purchasing an umbrella policy.

State Farm, Plymouth Rock (Palisades Group), Liberty Mutual, USAA, Travelers and Farmers. GIECO had 24.27% of the New Jersey Market. *Id.*

[16] Though estimates vary, 85% - 95% of homeowners have homeowners insurance, the large majority the ISO HO O3 special form, which offers the broadest insurance coverage. The percentage of renters who have renters insurance is estimated at around 55% - 60%. See, e.g., https://www.policygenius.com/homeowners-insurance/homeowners-insurance-statistics/.

[17] Homeowners and renters, rather than automobile insurance, would provide most of the coverage available for firearm-related deaths or injuries.

*Conclusion*

Section 4 of 2022 N.J. Sess. Law 131 requires liability coverage that is likely met by standard homeowners and renters insurance policies, provided that the required minimum limits are met and there are no specific firearms exclusions. I am not aware of any policy that has such a firearms exclusion. Additional options for specific coverage may also become available in the future.

I certify that pursuant to 28 U.S.C. § 1746 and under penalty of perjury that to the best of my knowledge, information, and belief, the foregoing is true and correct.

_____
Peter Kochenburger
February 13, 2023

JA1400

# Exhibit A
# Peter Kochenburger C.V.

# PETER R. KOCHENBURGER
peterkochenburger@yahoo.com
860-655-8612

## CAREER PROFILE

Visiting Professor of Law at Southern University Law Center for 2022-2023 academic year. Immediately prior served as Executive Director of the Insurance Law LL.M. Program and Deputy Director of the Insurance Law Center at the University of Connecticut School of Law; responsibilities included directing the daily operations of the Insurance Law Center and LL.M. program, teaching insurance related courses, expanding the insurance law program within the U.S. and internationally, and advising international and graduate students. Worked as the actual or de facto project leader in drafting regulations, comprehensive academic studies, obtaining approval for new academic degree programs, developing training programs for domestic and foreign government agencies, and coordinating and leading specific consumer advocacy initiatives at the National Association of Insurance Commissioners (NAIC), the Federal Insurance Office, and other insurance-related bodies. Previous legal work in the private and public sectors in defense and plaintiffs' litigation, administrative/regulatory law, and public affairs work in insurance, financial services, and consumer protection.

Currently serving on the Federal Advisory Committee on Insurance at the Treasury Department, the Insurance Policy Advisory Committee at the Federal Reserve, and the New York Department of Financial Services' Consumer Protection Task Force. Appointed as a funded consumer representative to the NAIC since 2010 and a consumer stakeholder at the International Association of Insurance Supervisors since 2013. Drafted many insurance-related policy and briefing papers for the Attorney General of Iowa, C-suite executives at Travelers, and deans at the UConn School of Law, and provided my own written testimony to legislative and regulatory bodies such as the NAIC, the International Association of Insurance Supervisors, the National Council of Insurance Legislators, and at numerous academic conferences.

Elected to the American Law Institute in 2013. Expert witness and consultant to government agencies, nonprofit organizations, policyholders, and insurers; testified before Congressional subcommittee on international regulatory efforts and consumer protection, and speaker at various academic symposiums, the American and state bar associations, and continuing legal education programs for government lawyers, various trade and professional associations, and consumer groups. Participated and helped organize insurance law programs in China, Holland, Italy, Serbia, Taiwan, and the United Kingdom.

*Admitted to Connecticut and Massachusetts Bars*

## EDUCATION

Juris Doctorate, *graduated cum laude* □ **HARVARD LAW SCHOOL,** Cambridge, MA, 1986 Bachelor of Arts in History, *graduated cum laude* □ **YALE UNIVERSITY,** New Haven, CT, *McClintock Award for senior essay in American History*

## PROFESSIONAL EXPERIENCE

**SOUTHERN UNIVERSITY LAW CENTER,** Baton Rouge, LA.          8/2022 – Current
*Visiting Professor of Law, teaching Torts and Insurance Law, as well as*
*expanding student access to insurance law opportunities nationally.*

**UNIVERSITY OF CONNECTICUT SCHOOL OF LAW,** Hartford, CT
*Senior Research and Engagement Fellow*
*Associate Clinical Professor of Law (Emeritus status pending)*

*Executive Director of the Insurance Law LL.M. Program*          3/2004 – 7/2022
*Deputy Director of the Insurance Law Center*
*Associate Clinical Professor of Law*
*Director of Graduate Programs (3/2004 – 8/2015)*

Teach and developed insurance law courses and managed the daily operation, budget, and expansion of the Insurance Law Center, which offers the only LL.M. in Insurance Law in the United States and is the major center in the country for the study of insurance, law, and risk. Work with law firms, insurance companies, regulators, academic institutions, and consumer groups to enhance the Insurance Center's mission and programs.

Organize and participate in insurance-related seminars, including NAIC meetings, bar conferences, continuing education programs at various professional associations, and academic symposiums. Serve as consultant to media, government agencies, policyholders, insurers, and the media, and selected as a funded Consumer Representative at the NAIC since 2010. Developed and taught Liability Insurance as the School's first online course. As Director of Graduate Programs from 2004 -2015, recruited, advised, and taught international lawyers for the Law School's LL.M. program in United States Legal Studies. Coordinated efforts to expand the program, including developing relationships with various foundations and foreign law schools.

*Selected Accomplishments:*

▪ Oversaw day-to-day management of the Insurance Law Center, including coordinating a curriculum of over 18 insurance law related courses a year, advising LL.M. and J.D. students, program expansion and public relations, website design, finances, budgeting, and staffing. Created new relationships with state insurance departments and externship opportunities for our students at various insurance companies and law firms. Worked with insurance regulators in developing countries to send their attorneys to the School's LL.M. program.

▪ Organized symposiums on international insurance regulation, the ALI's Restatement of Law Liability Insurance, healthcare finance reform, insurance and climate change, and several joint forums with Renmin Law School in Beijing on insurance for environmental risks, cyber insurance, and insurance and climate change. Frequent speaker at academic, bar associations and other professional conferences in the U.S; internationally have lectured or been a panelist at the Renmin Law School, the University of International Business and Economics in Beijing, Xiamen University, the Fudan-Pacific Institute of Finance in Shanghai, the Catholic University of Milan, the Taiwan Insurance Law Association, and the International Association of Insurance Law meetings in Serbia and the UK.

- Have taught Principles of Insurance, Liability Insurance, Insurance Regulation, Comparative Insurance Regulation, Consumer Protection Law and Workers' Compensation Law, and co-taught a class in Reinsurance Law.
- Oversaw creation of the Law School's S.J.D. (Doctor of Science of Law) degree program; development of proposal through approval by the University Board of Trustees, licensing and accreditation from the State Board of Regents, and ABA Acquiescence (2010-2012).
- Developed and taught the first academic course taught at a U.S. law school on comparative insurance regulation, focusing on the European Union, U.S., and Chinese insurance regulation, with faculty and students from all three regions.
- Created Law School's first online course and one of the first online law school classes in the country that combines legal education with the most current research on student centered learning and assessment and achievement. Course emphasized written exercises and detailed discussion of case law in twelve different liability insurance areas. Helped design and teach similar courses in Reinsurance and Surety.
- Directed successful effort to rebuild LL.M. program for foreign lawyers by revamping educational program, marketing, and student services. Developed School's relationships with various government grant programs such as the Muskie Program and USAID, as well as the Saudi Arabian Cultural Mission, resulting in additional international lawyers attending the Law School on government scholarships. Served as Director of Graduate Programs from 2004 – 2015
- University service included teaching the required first-year honors course to pre-law students, participating as the Law School's representative on the University President's Committee on Corporate Social Responsibility from 2006-2009, the Provost's 2009 Task Force on Online Education, and the 2010 International Executive Committee.

**TRAVELERS PROPERTY CASUALTY**, Hartford, CT                   1993 to 3/2004
*Counsel – Travelers Property Casualty*                                   *1995 to 3/2004*
*Counsel & Legislative Director for Government Affairs – Travelers/Citigroup.*   *1998 to 2002*
*Associate Counsel – Travelers*                                           *1993 to 1995*

Provided analysis, strategic direction, and guidance in legal, political, and regulatory issues. Managed a diverse range of complex litigation activities nationwide related to company's entire product line (including workers' compensation and liability insurance) – more than 50% of cases with $1+ million exposure. Directed and mentored junior attorney. Hired and supervised outside counsel, including motions, discovery, briefing and settlements. Represented company in settlement conferences, negotiations, and trials. Previously directed legislative and regulatory affairs in 23 states, working closely with state officials, lobbyists, and trade associations. Drafted proposed legislation, testified at public hearings, and participated in regulatory proceedings. Implemented corporate business plans by retaining and directing local attorneys and lobbyists.

*Selected Accomplishments:*

- **Selected to take charge of and manage coverage and bad faith docket for Travelers' subsidiary (Minnesota-based Northland insurance specializing in surplus lines/specialty/trucking).** Established and maintained excellent working relationships with newly acquired subsidiary. Triaged cases and coordinated transition/integration of litigation within the Travelers' system of a company that had operated independently for 50 years. Won several summary judgment cases related to trucking cases as well as in a coverage/bad faith claim with exposure in excess of $25 million, through redirecting our litigation strategy and retaining new outside counsel. Obtained $8,000,000 verdict against another carrier in an excess verdict/bad faith

matter while serving as an outside legal consultant to Travelers.

- **Directed significant litigation, including major antitrust and class action suits.** Coordinated amicus support/strategy and won landmark case before the Kentucky Supreme Court involving workers' compensation.

- **Led Travelers' legal and political efforts in Nevada** as it opened its workers' compensation system to private competition.

- **Significant contributor to development of legal and political strategy regarding OSHA's proposed Ergonomics Standard –** which would have severely disrupted workers' compensation systems nationwide, according to industry opinion.

- **Spearheaded government affairs and litigation activities in Alabama,** then considered the most hazardous state in the country for corporate defendants. Quickly resolved multimillion-dollar exposure cases with favorable settlements. Formulated and executed company's political strategy for 2000 Alabama Judicial races. At the Alabama Supreme Court, overturned $4 million trial court judgment against Travelers.

- **Managed all major bad faith cases involving workers' compensation.** Developed favorable case law nationwide and established federal circuit court precedent for removal of such cases to federal court. Won numerous cases on summary judgment.

- **Administered all advertising injury coverage cases.** Developed and expanded case law in the federal circuit courts denying coverage for trademark infringement under commercial general liability insurance policies.

- **Other results:** Recognized as an internal expert on political and legal developments related to California workers' compensation and tort reform issues. Led efforts to defeat Florida legislation requiring insurers to cover certain environmental hazards in excess of industry standards. Passed legislation in Arizona expanding use of workers' compensation deductible policies among large employers.

**IOWA DEPARTMENT OF JUSTICE, Consumer Protection Division,** Des Moines, IA
>    1988 to 1993
*Assistant Attorney General & Deputy Administrator of the Iowa Consumer Credit Code*

Enforced a comprehensive regulatory system protecting consumers in credit transactions. Investigated and prosecuted cases involving consumer fraud, financial investment schemes, consumer credit and credit insurance. Conducted rule making on consumer issues and counseled governmental agencies and private parties on consumer credit law. Advised on federal and state legislative consumer credit proposals. Collaborated with state and federal agencies such as the FTC, FRB, other state attorneys' general offices and the state banking division.

*Selected Accomplishments:*

- **In a case of nationwide significance, successfully represented State of Iowa in litigation with Citibank,** resulting in company's agreement to abide by Iowa consumer lending laws.

- **Directed amicus litigation for 27 states against consumer lending institutions,** involving the exportation of credit card terms in violation of state law. Authored amicus brief to U.S. Supreme Court on behalf of the states.

- **Participated in and led multi-state enforcement activities** such as litigation against mortgage

JA1405

lenders for violations of mortgage escrow requirements.

**Drafted and promulgated consumer protection regulations governing credit insurance** and other regulations permitting the Department of Justice to collect hundreds of thousands of dollars in fees each year from consumer creditors.

**HARVARD LAW SCHOOL,** Cambridge, MA                              1986 to 1988
*Special Assistant to the Dean (1986-1988) / Associate Director of Student Services* (1987-1988)

Authored paper on legal demographics used in first year law classes. Researched and wrote on the Iran/Contra affair, Congressional ethics, and international terrorism. Reviewed academic and professional opportunities for law students on Dean's behalf. As Associate Director of Student Services, administered student service activities and coordinated programs expanding public interest law opportunities.

- **Teaching Fellow at Harvard Graduate School of Education in 1987.** As Teaching Assistant, taught sessions on legal analysis for college administrators in a graduate course in higher education and the law.

## ADDITIONAL PROFESSIONAL ACTIVITIES & LEADERSHIP

**National Association of Insurance Commissioners**
- Selected as a NAIC funded Consumer Representative each year since 2010. Represent and advocate for consumer interests before the NAIC, with a focus on state insurance regulation and the Federal Insurance Office, regulation of personal lines policies, the use of Big Data in underwriting and claims handling, international regulatory cooperation, and consumer protection. Successfully lobbied for consumer participation program at the International Association of Insurance Supervisors and led effort to establish initial NAIC funding for this program. Invited speaker at the 2013 NAIC Commissioners Conference and have conducted training sessions for state insurance department regulators and insurance supervisors from other countries.

**Other Advisory Bodies**
- Federal Reserve Board: Insurance Policy Advisory Committee, appointed to three-year term starting January 2022.
- U.S. Department of Treasury: Federal Advisory Committee on Insurance (Federal Insurance Office), appointed February 2020 for three-year term.
- New York Department of Financial Services' Consumer Protection Task Force, new entity - appointed December 2019.
- Connecticut Insurance Department's Advisory Council on Regulation, 2019-2020.

**International Association of Insurance Supervisors**
- Led efforts to create first consumer participation movement in the organization, serve as a consumer stakeholder, 2013 to present. Moderated debates on Solvency II (2012 IAIS annual meeting and 2015 NAIC International Insurance Forum), served on multiple panels at 2017 Global Seminar, and held numerous meetings with IAIS leadership on consumer participation.

**Expert Witness and Consultant**
- Serve as expert witness and advise law firms, policyholders, state agencies, and insurance companies on insurance regulatory, coverage, and bad faith issues. Work with media throughout the country on various insurance-related news articles and quoted in the New York Times, Bloomberg News, CNBC, AP, International Business Times, Money Magazine, The Guardian, Reuters, Boston Herald, The New Yorker, National Underwriter, AM Best, SNL Financial, Insurance Business Magazine, Insurance Business Journal, The Trace, NPR, Hearst News, New York Law Journal, Scientific America, Sacramento Bee, Hartford Courant, Des Moines Register, Bankrate, and other papers and media.

  Examples:
  - Expert witness for New York Department of Financial Services and Attorney General's Office in litigation with the National Rifle Association, Spring 2019.
  - Expert witness for Pennsylvania State University in insurance coverage litigation arising out of the Sandusky sexual abuse claims, 2015-2016.
  - Retained by the Federal Trade Commission to work with Professor Patricia McCoy to develop and implement a new training program on consumer credit issues for the Division of Financial Practices, 2008.
  - Co-authored 10-state survey of liability issues associated with the Safe Routes to School Program, sponsored by the Public Health Law and Policy association, 2011-2012.

**The American Law Institute**
- Elected in October 2013. Served in the Member Consultative Group for the Restatement of the Law of Liability Insurance project. Currently in the Member Consultative Groups for the Consumer Contracts and Data Economy projects.

**The American College of Coverage Counsel**
- Elected as a fellow in July 2022.

**American Bar Association**
- Associate Editor, Tort Trial & Insurance Practice Law Journal, 2009 to present.

**Connecticut Bar Association**
- Executive Committee, Insurance Law Section, 2011 to present.

**Municipal Government,** 11/2009 – 7/2022
- **Councilor, Mansfield Town Council.** Elected in fall 2009, 2011, 2013, 2015, 2017, 2019 and 2021 to serve on the 9-member governing body for the Town of Mansfield, Connecticut. Responsible for $55 million budget. Chaired Finance Subcommittee from 11/2019 – 7/2022.
- **Commissioner, Mansfield Planning & Zoning Commission/Inland Wetland Agency.** Elected in 1999 as a member of town planning and zoning agency. Review and regulate proposed commercial, university and residential development. Served until fall 2009, when elected to the Town Council.

**Patrons Group**
- Elected in May 2007 as a Director of Patrons Group, a property-casualty insurer located in Connecticut. Also served on Corporate Governance Committee. Helped lead successful affiliation with State Auto in fall 2007 and served on Patrons Advisory Council until its

dissolution at the end of 2013.

**U.S. State Department - Muskie Program**
- Served as evaluator for applications to the Muskie Program, a federally funded scholarship program that brings students from former Soviet Republics to the U.S. to earn a graduate degree. In January 2009 traveled to Moscow on Program's behalf to interview applicants and similar trip in February 2006 to Kyiv, Ukraine.

**Adjunct Professor, University of Connecticut School of Law,** spring 2002 and 2003
- Taught workers' compensation course to J.D. and LL.M. students.

**Lecturer in Law, Drake University Law School, fall 1990**
- Taught consumer protection law to second- and third-year law students; subjects included FTC enforcement, state consumer fraud statutes and Truth-in-Lending.

**President of the American Conference of Uniform Consumer Credit Code States,** 1991 to 1992
- Association of state officials who enforce and administer the Consumer Credit Code.

# Peter Kochenburger
## Publications

Books

- THE "DEMATERIALIZED" INSURANCE: DISTANCE SELLING AND CYBER RISKS FROM AN INTERNATIONAL PERSPECTIVE (Peter Kochenburger, Pierpaolo Marano & Ioannis Rokas eds., 2016)

Law Review Articles and Book Chapters

- Aviva Abramovsky & Peter Kochenburger, *Transparency and the Insurance Contract in the United States*, *in* 2 TRANSPARENCY IN INSURANCE LAW AND REGULATION 683 (Pierpaolo Marano & Kyriaki Noussia eds., 2020)

- Aviva Abramovsky & Peter Kochenburger, *Insurance Online: Regulation and Consumer Protection in a Cyber World*, *in* THE "DEMATERIALIZED" INSURANCE 117 (Peter Kochenburger, Pierpaolo Marano & Ioannis Rokas eds., 2016)

- Peter Kochenburger, *Liability Insurance and Gun Violence,* 46 CONN. L.REV. 1265 (2014) http://opencommons.uconn.edu/law_papers/226

- Peter Kochenburger & Joseph MacDougald, *Insurance and Climate Change,* 47 J.MARSHALL L. REV. 101 (2013) http://opencommons.uconn.edu/law_papers/475

- Peter Kochenburger & Patrick Salve, *An Introduction to Insurance Regulation*, *in* RESEARCH HANDBOOK ON INTERNATIONAL INSURANCE LAW AND REGULATION 221 (Julian Burling & Kevin Lazarus eds., 2012) (updated edition will come out in late 2022).

- Peter Kochenburger, *The Language Matters: Regulation of Insurance Policy Terms and Conditions, in* CHALLENGES IN HARMONIZATION OF THE SERBIAN INSURANCE LAW WITH THE EUROPEAN (EU) INSURANCE LAW (Association for Insurance Law of Serbia, April 2012)

- Amy Bach & Peter Kochenburger, *Insurance Consumer Protection Efforts by Government Regulators: Evolving under Scrutiny,* 13 N.Y. ST. B.A. GOV'T L. & POL'Y J. 16 (2011)

- Peter Kochenburger, Richean Zhiyan Li & Pierpaolo Marano, *Conflict of Interest of Insurance Brokers,* 2010 EUR. INSUR.L. REV. 21 (2010)

Short Articles

- Peter Kochenburger, Jeffrey Stempel & Erik Knutsen, *Covid Coverage Cases Conflict With Insurer Documentation* (published May 24, 2022).

- Peter Kochenburger, *The Insurance Industry's Growing Potential Role in Gun Safety*, Law360 (published May 14, 2022).

- Peter Kochenburger & Jeffrey Stempel, *How Sonic Boom Risk Informs 'Physical Loss' For COVID Era,* Law360 (published April 5, 2022).

- Peter Kochenburger, Opinion, *Arbitration? No thanks,* Insurance Business America Magazine, July 9, 2018, at 9.

- Peter Kochenburger, Opinion, *The Dangers of Big Data*, Insurance Business America, Insurance Business America Magazine, March 2017, at 21.

- Peter Kochenburger, Opinion, *Gun Liability Insurance, Too Important Not to Try,* Insurance Business America, July 23, 2015, at 21.

- Peter Kochenburger, *Flood Insurance Reform and Modernization,* INSURANCE REGULATION COMMITTEE, A.B.A. SEC. TORT TRIAL & INS. PRAC. (Winter 2013).

- Peter Kochenburger, *Federal Insurance Office*, INSURANCE REGULATION COMMITTEE, A.B.A. SEC. TORT TRIAL & INS. PRAC. (Summer 2011).

- Peter Kochenburger, *Tone Deaf When Filed – The 2009 Optional Federal Charter Bill,* INSURANCE REGULATION COMMITTEE, A.B.A. SEC. TORT TRIAL & INS. PRAC. (Summer 2009).

- Peter Kochenburger, *Connecticut Supreme Court Rules on Bad Faith Jurisdiction*, *DeOliveira v. Liberty Mutual*, 870 A.2d 1066 (Conn. 2005), WORKERS COMPENSATION AND EMPLOYERS' LIABILITY LAW COMMITTEE, A.B.A. SEC. TORT TRIAL & INS. PRAC, (Winter 2005).

**Peter Kochenburger**
**Selected Presentations: 2012 – July 2022**

**Regulatory**

- "Social Inflation: Fact or Fiction," National Council of Insurance Legislators, Summer 2022 Meeting, Jersey City, NJ (August 16, 2022), panelist.
- "Big Data and Cyber Security – Ensuring technology remains an asset not a liability," National Association of Insurance Commissioners International Insurance Forum, Washington D.C. (May 12, 2022), panelist.
- "Teaching Insurance Law at Law Schools," ABA Tort Trial Insurance Practice Section Conference, Baltimore, MD (April 29, 2022), panelist.
- Presentation to the Michigan Department of Insurance and Financial Services on Diversity, Equity, and Inclusion (November 22, 2021, virtual), co-presenter.
- "Claim Optimization and the Insurance Promise," presentation at the summer 2021 National Association of Insurance Commissioners national meeting, Market Regulation and Consumer Affairs Committee, Columbus, Ohio (August 16, 2021).
- "Use of Zip Code, Education, and Occupation as Rating Factors … in Insurance Underwriting," National Council of Insurance Legislators' interim meeting (June 18, 2021, virtual), panelist.
- "Innovation – Forecasting the Future of AI and Big Data," National Association of Insurance Commissioners' International Insurance Forum, (May 25, 2021, virtual) panelist.
- "Insurer's use of Criminal History Information," presentation at the National Council of Insurance Legislators' spring meeting (April 15, 2021, virtual).
- "Insurers' Use of Criminal History Information," presentation at the fall 2020 National Association of Insurance Commissioners national meeting (December 3, 2020, virtual).
- "All In on AI? A New Study Decoding the Mysteries of AI in Insurance Fraud," Coalition Against Insurance Fraud Webinar (September 30, 2020, virtual), panelist.
- "Insurance Regulation in the United States," Hartford, CT (September 16-17, 2019), Organized and led extensive two-day training session for insurance regulators from the China Banking and Insurance Regulatory Commission, taught introductory session. This is the second training session we have held for the Commission.
- The Center for Insurance Policy and Research, "Demystify the use of Artificial Intelligence in Insurance," (August 5, 2019) (NAIC's summer 2019 meeting in NYC), panelist.
- "From Intentional Harm to Negligent Conduct," presentation on the expansion of intentional act exclusions in liability insurance, National Association of Insurance Commissioners fall national meeting, San Francisco, CA (November 17, 2018)
- "Insurance Regulation in the United States," Hartford, CT (July 9-10, 2018), Organized and led extensive two-day training session for insurance regulators from the China Banking and Insurance Regulatory Commission, taught introductory session.
- National Association of Insurance Commissioners Global Forum, Washington DC (May 14, 2018), panelist on "The Role of Insurance & Reinsurance in Disaster Risk Management."
- National Conference of Insurance Legislators 2017 Annual Meeting, Phoenix, AZ (November 16-17, 2017), invited panelist on (1) the ALI's draft Restatement of the Law of Liability Insurance (with Restatement Reporter Tom Baker), (2) life insurance, big data, and consumer protection, (3) international insurance issues.
- National Association of Insurance Commissioners (NAIC) International Insurance Forum,

Washington D.C. (May 20, 2016). Invited speaker on Cybersecurity and Cyber Insurance panel (only consumer representative invited to serve on a panel).

- Public Hearing, NAIC Big Data Working Group, New Orleans (April 3, 2016). Invited to speak on the consumer perspectives panel.
- Public Hearing Testimony on Use of Consumer Data to Settle Automobile Insurance Claims, NAIC, Chicago (August 17, 2015). Invited speaker.
- NAIC International Insurance Forum, Washington D.C. (May 21, 2015). Invited panelist on "Global Insurance Standards – From Vision to Reality."
- NAIC International Insurance Forum, Washington D.C. (May 10, 2013). Moderated third debate on Solvency II between Therese Vaughan (former NAIC CEO) and Karel Van Hulle (former Head of Unit, Insurance and Pensions at the European Commission.
- NAIC Regulatory Leadership Forum, Kansas City, Missouri (March 13, 2013). Invited to speak on consumer issues with state insurance regulators.
- NAIC Commissioners Conference, Virgin Islands (February 3, 2013). Invited to present consumer representative views and activities at the NAIC's annual closed conference for commissioners.
- Center for Insurance Policy Research (NAIC) Summit on Flood Insurance, Atlanta (August 14, 2012), Invited panelist, presented on "Consumer Perspectives: Flood Insurance Reform" (with Sonja Larkin-Thorne).
- Public Hearing Testimony on Private Lender-Placed Insurance, National Association of Insurance Commissioners, Atlanta (August 9, 2012). Invited speaker.
- Congressional testimony "U.S. Insurance Sector: International Competitiveness and Jobs," before the Subcommittee on Insurance, Housing and Community Opportunity, Washington D.C. (May 17, 2012). Invited to speak on the Federal Insurance Office, and consumer protection and international cooperation.

### Professional Organizations and Bar Associations

- "Teaching Insurance Law at Law Schools," ABA Tort Trial Insurance Practice Section Conference, Baltimore, MD (April 29, 2022), panelist.
- Unfair Discrimination - How will new legislation in Colorado influence the industry approach to potential bias in insurance?' Casualty Actuarial Society Rate Making, Product, and Modeling seminar, (March 16, 2022, virtual), speaker.
- "Cyber Insurance – Risks v. Reality," ABA Insurance Coverage Litigation Committee mid-year program, Phoenix, AZ (February 24, 2022), panelist
- "The National Association of Insurance Commissioners' Insurance Data Security Model Law," ABA Insurance Regulation Committee webinar (January 24, 2022, recorded in September 2021), panelist
- AM Best TV webinar on COVID-19 Litigation (December 15, 2020), panelist.
- "Federalization of Insurance? The Federal Insurance Office," ABA Insurance Regulation Committee webinar (November 18, 2020), panelist.
- American College of Coverage Counsel, COVID-19 Liability Issues webinar (November 12, 2020, virtual), moderator and co-organizer.
- "Constitutional Issues: Power of Receivership Courts," International Association of Insurance Receivers, Webinar (October 13, 2020, virtual), panelist.
- "Navigating Opportunities and Risks Presented by Artificial Intelligence," Connecticut

Legal Conference, CBA Webinar (September 15, 2020, virtual), panelist (and organizer) for session on regulatory issues related to AI.

- "Act of God Exclusions and Coverage for COVID-19 Business Interruption Claims," The Chartered Institute of Arbitrators (July 15, 2020, virtual), advocate for insurer in mock oral argument before a panel of former insurance commissioners.

- "Future of Insurance Regulation," at Casualty Actuaries of New England fall meeting, Worcester, MA (October 11, 2019), one of two panelists.

- AM Best TV show (and webinar) on drones, aerial data-gathering, and insurance (July 16, 2019), panelist.

- Connecticut Bar Association's annual Legal Conference, Hartford CT (June 10, 2019), discussed pet insurance on animal law panel.

- "The Regulatory Response to InsurTech," Boston, MA (March 26, 2019) Casualty Actuarial Society seminar, organized and participated in regulatory discussion.

- AM Best TV, Gun Violence and Insurance: panelist and separately interviewed on this topic (filmed August 2018 and released in October and December 2018), http://www.ambest.com/video/video.aspx?s=1&rc=kochenburger119.

- Keynote speaker, "Liability Insurance and Gun Violence," Property & Liability Research Bureau Eastern Regional Adjusters Conference, Hartford CT (October 30, 2018).

- "Liability Insurance and Gun Violence," UK Institute and Faculty of Actuaries, Birmingham, UK (October 24, 2018 – via teleconference); Casualty Actuaries of New England, Springfield, MA (October 15, 2018).

- "The Regulatory Response to InsurTech," joint seminar held by Casualty Actuarial Society and Canadian Institute of Actuaries, Toronto (October 16, 2018), organized and participated in regulatory panel.

- Fourth Annual Telematics and Connected Vehicles Insurance Conference, Chicago IL (April 25, 2018). Panelist speaking on data ownership, privacy, and regulatory concerns.

- "Big Data Changes Everything, Why Insurance Lawyers Need to Catch up Fast," Connecticut Bar Association Annual Insurance Litigation Seminar, Hartford CT (April 13, 2018), Conference Co-Chair and moderator.

- American Bar Association Litigation Committee, 2018 Annual Insurance Coverage Seminar, Tucson, AZ (March 2, 2018), led roundtable discussion on the use of Big Data in insurance claims and underwriting.

- Defense Research Institute's Northeast Regional Claims Conference, Hartford CT (November 2, 2017), presented on insurance bad faith, the ALI draft Restatement of the Law of Liability Insurance (with co-panelist Kathleen J. Maus, Butler Weihmuller Katz Craig, LLP).

- "Looking Under the Hood and Into the World - Big Data and Insurance," Property Casualty Insurers Association's General Counsel Seminar, Philadelphia, PA (September 18, 2017), with co-panelists Dr. Cathy O'Neil and Robert Helfand.

- "Key Issues Facing Workers Comp – Point/Counterpoint," National Council on Compensation Insurance (NCCI), Orlando Florida (May 17, 2017). Debated workers compensation issues with Robert Hartwig at a plenary session of the NCCI's Annual Issues Symposium.

- Insurance Business Magazine, Flood Risk 2017, Orlando Florida (March 23, 2017). Panelist on claim handling session.

- Connecticut Bar Association Annual Insurance Law Symposium, Bad Faith Litigation, University of Connecticut School of Law (February 23, 2017), Conference Co-Chair, panelist and moderator.
- Connecticut Bar Association, "Getting to Less: Symposium on Strategies for Reducing Discovery in Insurance Coverage Litigation," University of Connecticut School of Law (February 26, 2016). Conference Co-Chair and moderated panel on current efforts to reduce discovery costs.
- Connecticut Bar Association, "Storm Law: Helping clients Prepare for and Respond to Natural Catastrophes," New Britain, CT (January 8, 2016), panelist on consumer protection and claim handling.
- Defense Research Institute Insurance Law and Claims Conference, Hartford CT (October 28, 2015). Presented on "The Unfair Claims Settlement Practices Act: Potential Limitations on Advocacy and Negotiation" (with Tom Farrish, Day Pitney, LLP).
- Association of Insurance Compliance Professionals Continuing Education Program, Providence, Rhode Island (May 8, 2015). Invited to speak on Cyber Risk and Cyber Insurance (with Theodore Augustinos, Locke Lord LLP).
- Connecticut Bar Association Symposium, "Insurance Claims Handling: Rights, Wrongs and Remedies," University of Connecticut School of Law (February 6, 2015). Conference Co-Chair, moderated discussion on Market Conduct Exams with senior staff from the Connecticut Insurance Department
- Association of Insurance Compliance Professionals Continuing Education Program, Hartford, CT (May 16, 2014). Invited to speak on Liability Insurance and Gun Violence.
- Connecticut Bar Association Symposium, "Insurance Coverage 101," University of Connecticut School of Law (January 23, 2014). Conference Co-Chair, moderated panel on Third-Party Liability Insurance.
- "Current Issues in Insurance Regulation: 2013," New York City Bar Association (April 19, 2013). Invited to speak on "Insurance and Climate Change after Superstorm Sandy."
- Connecticut Bar Association, "Liability Insurance and Litigation," University of Connecticut School of Law (March 7, 2013). Conference Co-Chair and spoke on "Finding and Avoiding Coverage: The International Act Exclusion."
- Connecticut Bar Association, training session for attorneys, New Britain, CT (January 18, 2012). Presentations on claims handling and the National Flood Insurance Program.

### Academic Conferences
- "The Role of Law and Government in Cyber Insurance Markets," conference jointly sponsored by the Insurance Law Center and University of Minnesota Law School (March 12, 2021, virtual), moderator, host co-chair.
- "The ALI's Restatement of Law, Liability Insurance – Was the World Turned Upside Down?" Hartford, CT (April 5, 2019), Conference Chair and moderator, sponsored by the Insurance Law Center/UConn Law School, the Connecticut Bar Association's Insurance Law Center, and Rutgers Law School Center for Risk and Responsibility.
- "Putting Humans in the AV Driver's Seat, Autonomous Vehicles – People, Policy & Law," Storrs CT (April 1, 2019), organized and moderated panel on autonomous vehicles and insurers for this multi-disciplinary conference organized by UConn's Transportation Technology & Society Research Group (member).

- "The Protection Gap in Property Insurance," Rutgers Center for Risk and Responsibility, Camden NJ (March 29, 2019), presentation on intentional act exclusions
- "Data Breaches Don't Discriminate – Cyber Insurance," American Association of Law Libraries Annual Meeting, Baltimore, MD (July 16, 2018), panelist.
- "Enterprise Risk Management – From Risk to Strategy," conference sponsored by UConn School of Business and Hartford CFA Society (March 20, 2018), moderated and helped organize Technology, Regulatory and Investment Risks panel.
- "Insurance in the Age of Trump," Insurance Law Center/UConn Law School (April 13, 2017). Conference Co-Chair, panelist and moderator.
- Resilience and the Big Picture: Governing and Financing Innovations for Long Island Sound and Beyond (April 22, 2016). Center for Energy and Environmental Law, University of Connecticut School of Law. Organized and moderated panel "Achieving Resilience Through Insurance and Finance."
- Connecticut Risk Management Conference, "The New Reality of Global Risk," University of Connecticut School of Business, Stamford (April 7, 2016). Organized and moderated panel on "Legal and Compliance Issues Across the World."
- Connecticut Risk Management Conference, "The Many Faces of Enterprise Risk Management," University of Connecticut School of Business, Stamford CT (March 20, 2015). Organized and moderated panel on "Cyber Risk, Insurance and Corporate Governance."
- "The Relationship between Insurance and Legal Regulation: Normative, Theoretical and Empirical Perspectives," UC Irvine School of Law, Irvine, CA (September 19, 2014). Panel Commentator.
- "Big Data and Insurance," University of Connecticut School of Law (April 3, 2014). Moderated panel on Big Data, Risk Classifications and Adverse Selection.
- University of Chicago Junior Faculty Workshop, Chicago IL (November 25, 2013). Presented early version of *Liability Insurance and Gun Violence*.
- "The Second Amendment and Gun Control," Connecticut Law Review's Fall 2013 Symposium (November 15, 2013). Invited to speak on liability insurance and gun violence.
- "The Law and Economics of Insurance," University of Connecticut School of Law (October 4, 2013). Moderated panel on insurance regulation.
- "Adaptation of the Built Environment to Achieve Resilience to Climate Change," 13th Kratovil Conference on Real Estate Law & practice, John Marshall Law School, Chicago Illinois (September 26, 2013). Invited to present *"Insurance and Climate Change: Spreading, Regulating and Avoiding the Risks.*" Paper co-authored with Joseph MacDougald, later published in the John Marshall Law Review.
- "Fragmented Risk," Rutgers School of Law (March 1, 2013). Commentator on Catastrophes and Fragmented Risk panel.
- "Climate Change Risks & Liability: The Future of Insurance & Litigation," University of Connecticut School of Law (October 5, 2012) (co-sponsored with the Center for Energy and Environmental Law). Co-Chair of the Conference, moderated panel "Domestic and International Responses."

**International**

- "Big Data, Predictive Analytics, and the Insurance Promise: the uses of AI in the Claims Adjustment and Fraud Detection Processes," (October 6, 2021, virtual) Third International Insurance Congress, Comillas Pontifical University, Madrid, speaker.
- International Association of Insurance Supervisors Market Conduct Working Group, Amsterdam (May 27, 2019), invited presenter on insurer use of personal consumer information. Only academic participating.
- "Big Data, Predictive Analytics, and the Insurance Promise: the uses of AI in the Claims Adjustment and Fraud Detection Processes," (October 6, 2021) Third International Insurance Congress, Comillas Pontifical University, Madrid (virtual), speaker.
- "Big Data, Insurance & Consumer Protection," The First Asia-Pacific Permanent Forum on Insurance Law, hosted by Xiamen University, China (November 10, 2018), UConn Law School is the founding U.S. member of this Forum.
- "Introduction to Insurance Regulation in the United States," National Chengchi University, Taiwan (November 6, 2018).
- Fifth Annual China-U.S. Insurance Law Conference co-sponsored with Renmin Law School, Suzhou, China (November 3, 2018), presentation on Cyber Insurance and Cybersecurity.
- "Retirement Security, Pensions and Insurance," Fourth Annual China-U.S. Insurance Law Conference with Renmin Law School, Hartford CT (October 13, 2017), Conference Co-Chair, moderator.
- International Association of Insurance Supervisors Global Seminar, Windsor, U.K. (June 29-30, 2017). Participated in two panels: (1) "Digitalisation in the Insurance Sector, Benefits and Risks to Consumers." (2) "Executive Committee Dialogue: ComFrame and the Insurance Capital Standard" (only U.S. academic speaking at this meeting).
- "Actuarial Perspectives in the Era of Social Consciousness, Can Liability Insurance Reduce Gun Violence?" Casualty Actuarial Society's Spring Meeting, Toronto Canada (May 24, 2017).
- "The U.S. and China: Environmental Change, Liability, and Insurance," Third Annual China- U.S. Insurance Law Conference, Renmin Law School, Beijing, China (October 30, 2016). Invited to present a talk on insurance and climate change.
- "Transparency in Insurance Regulation: Global Perspectives," National Taiwan University College of Law, Taipei Taiwan (September 23, 2016). Presented "Limitations of Transparency: Big Data, Dispute Resolution and Regulatory Enforcement," moderated panel on Transparency in Insurance Regulation in Asia.
- "The Changing Insurance Regulation of the European Union," Catholic University of Milan, Milan Italy (November 26, 2015), invite to moderate panel on "The Regulatory Framework."
- "Important Issues and New Perspectives of Insurance Law," The Inaugural Conference of the Taiwan Insurance Law Association, Taipei, Taiwan (October 22, 2015). Invited to speak on Big Data, insurance, and consumer protection (only U.S. speaker at the conference).
- "The U.S. and China, New Insurance Products and New Regulatory Challenges" Second Annual China-U.S. Insurance Law Conference, University of Connecticut School of Law (October 9, 2015). Organized and spoke on panel regarding Big Data

and insurance.

- "International Symposium on Improvement of Liability Insurance System," First Annual China-U.S. Insurance Law Conference, Renmin Law School, Beijing China (May 10, 2014). Presented on "Environmental Liability Insurance: Opportunities and Risks."
- "Legal Education for International Lawyers," presentation in Riyadh, Saudi Arabia for Saudi law students and lawyers interested in studying in the United States (March 4, 2014).
- University of International Business and Economics, Beijing China (June 2, 2013). Invited to speak at a Chinese Supreme Court training session for judges on "Personal Automobile Insurance and Consumer Protection in the U.S." (with Yan Hong).

- International Association of Insurance Regulators Annual Conference, Washington D.C. (October 9, 2012). Moderated second debate on Solvency II between Therese Vaughan (NAIC CEO) and Karel Van Hulle (Head of Unit, Insurance and Pensions at the European Commission.
- "Testing times, Uncertain Outcomes: How are Insurers and Reinsurers Expected to Measure Up?" International Insurance Law Association, London, U.K. (September 14, 2012). Invited speaker on two panels: (1) emerging legal issues in insurance, (2) a U.S. perspective on climate change and insurance.
- Thirteenth Annual Conference of the Association for Insurance Law of Serbia, Palic, Serbia (April 21, 2012). Invited to present *The Language Matters: Regulation of Insurance Policy Terms and Conditions."*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| AARON SIEGEL, JASON COOK, JOSEPH DELUCA, NICOLE CUOZZO, TIMOTHY VARGA, CHRISTOPHER STAMOS, KIM HENRY, AND ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey; and PATRICK CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police, <br><br> Defendants. | Hon. Renée Marie Bumb, U.S.D.J. <br> Hon. Ann Marie Donio, U.S.M.J. <br><br> Docket No. 22-CV-7463 <br><br><br> **CIVIL ACTIONS** <br> **(ELECTRONICALLY FILED)** |
| RONALD KOONS; NICHOLAS GAUDIO; JEFFREY M. MULLER; GIL TAL; SECOND AMENDMENT FOUNDATION; FIREARMS POLICY COALITION, INC.; COALITION OF NEW JERSEY FIREARM OWNERS; and NEW JERSEY SECOND AMENDMENT SOCIETY, <br><br> *Plaintiffs,* <br><br> v. <br><br> MATTHEW J. PLATKIN, in his official | Hon. Reéne Marie Bumb, U.S.D.J. <br> Hon. Ann Marie Donio, U.S.M.J. <br><br> Docket No. 22-CV-7464 |

JA1418

capacity as Attorney General of the State of
New Jersey; and PATRICK CALLAHAN,
in his official capacity as Superintendent of
the New Jersey State Police,

*Defendants.*

## Attorney Declaration of Angela Cai In Support Of
## Defendants' Opposition To Plaintiffs' Motions For Preliminary Injunction

I, ANGELA CAI, of full age, hereby declare as follows:

1. I am employed as Deputy Solicitor General by the State of New Jersey,
   Department of Law and Public Safety. I provide this Declaration in support of
   Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction.

2. Attached to this Declaration are true and accurate copies of the below Exhibits
   cited in the State's Brief In Opposition.

3. To accommodate technological constraints of CM/ECF, the exhibits are divided
   into three volumes.

4. Exhibit 1 to 28 are the same exhibits as those filed to my December 30, 2022
   Declaration In Support of Defendants' Opposition to Plaintiffs' Motion for a
   Temporary Restraining Order.

5. For the Court's ease of reference, where applicable, I list where the same
   exhibits appear as attached exhibits to a witness declaration submitted in
   support of Defendant's Opposition to Preliminary Injunction.

**Exhibits Volume 1:**

1. P.L. 2022 ch. 131, A4769/S3124, An Act concerning the sale and possession
   of firearms and supplementing and amending various parts of the statutory
   law.

2. Compilation of:

JA1419

    a.    Order, D.E. 41, *Christian v. Nigrelli*, No. 22-2987 (2d Cir. Dec. 12, 2022);

    b.    Order, D.E. 75, *Antonyuk v. Hochul*, No. 22-2908 (2d Cir. Dec. 7, 2022);

    c.    Order, D.E. 53, *Hardaway v. Nigrelli*, No. 22-2933 (2d Cir. Dec. 7, 2022).

3.    Transcript of Preliminary Injunction Hearing, *Corbett v. Hochul*, 1:22-cv-5867-LGS (S.D.N.Y. Nov. 29, 2022).

4.    63 Proceedings and Acts of the Maryland General Assembly 338, § 5 (June 15-July 3, 1773).

5.    1870 Tex. Gen. Laws 63.

    *A version of the same law can also be found in Rivas Decl. Ex. J and Charles Decl. Ex. 26.*

6.    1786 Va. Laws 25.

    *A version of the same law can also be found in Rivas Decl. Ex. D.*

7.    Gen. Digest of the Ordinances & Res. of the Corp. of New Orleans 371 (1831).

8.    1869-70 Tenn. Pub. Acts 23.

    *A version of the same law can also be found in Rivas Decl. Ex. M and Charles Decl. Ex. 25.*

9.    Art. 320, Tex. Act of April 12, 1871.

    *A version of the same law can also be found in Rivas Decl. Ex. K.*

10.    Mo. Rev. Stat. 1879, at 224 (§ 1274).

    *A version of the same law can also be found in Rivas Decl. Ex. O.*

11.    1859 Conn. Acts 62, ch. 82, § 5.

12.    1867 Kans. Sess. Laws 25.

13.    1771 N.J. Laws 344, §1.

    *A version of the same law can also be found in Hartog Decl. Ex. D*

*and in Klett Decl. Ex. F.*

14. 1865 La. Extra Acts 14, No. 10 § 1.

15. 1876 Iowa Acts 142, ch. 148, § 1.

16. 1929 Iowa Acts 90, § 30.

17. 1919 Me. Laws 193.

18. Ark. Rev. Stat. § 13, p. 280 (1838).

    *A version of the same law can also be found in Rivas Decl. Ex. I.*

19. 1839 Ala. Acts no. 77, § 1.

20. 1821 Tenn. Acts ch. 13, § 1.

21. Ian Ayres & Spurthi Jonnalagadda, Guests with Guns: Public Support for "No Carry" Defaults on Private Land, 48 J. L. Medicine & Ethics 183, Table A4 (2020).

22. 1873 Ga. Code 818, § 4528.

    *A version of the same law can be found in Charles Decl. Ex. 27.*

23. Fourth Annual Report of the Board of Commissioners of the Central Park 106 (1861).

24. Acts of Assembly Relating to Fairmount Park 18 (1870).

25. Michael John Sullivan, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, Constitution of the State of Missouri, the Scheme for the Separation of the Governments of the City and County of St. Louis, the Charter of the City, and a Digest of the Laws Applicable to the City 635 (1881), § 3.

26. Egbert Jamieson and Francis Adams, The Municipal Code of Chicago, Comprising the Laws of Illinois Relating to the City of Chicago and the Ordinances of the City Council, Codified and Revised 391 (1881). Art XLIII, § 1690.

27. Annual Reports of the City Officers and City Boards of the City of Saint Paul 689 (1889).

28. W.W. Thompson, A Digest of the Acts of Assembly Relating To, and the General Ordinances of the City of Pittsburgh, From 1804 to Jan. 1, 1897 at 496 (2d Ed. 1897).

29. Excerpt from William Blackstone, Commentaries on the Laws of England, 3d. (10th ed. 1787).

30. Excerpt from William Griffith, A Treatise on the Jurisdiction and Proceedings of Justices of the Peace in Civil Suits in New Jersey (1813).

31. Excerpt from John Locke, Second Treatise of Government (1690).

32. 1715 Md. Laws, ch. 26 § 7, as supplemented by 1766 Md. Laws ch. 6, at 90.

33. 1721 Pa. Act ch. 426 § 3, printed in Mitchell & Flanders, The Statutes at Large of Pa. 1682 to 1801, vol.2, at 255.

34. 1763 N.Y. Law ch. 1233 §1, printed in Laws of N.Y., 1691 to 1771, vol. 2, at 442.

   *A version of the same law can be found in Charles Decl. Ex. 9.*

35. 1867 Tex. Act Vol, 20, p. 90, at art. 6510, printed in Paschal, A Digest of the Laws of Tex. Ann., vol. 2, at 1321.

36. 1893 Ore. Act S.B. 15, § 1, at 79.

37. La. R.S. 821, § 1809, printed in R.H. Marr, Ann. Rev. Stat. La., vol. 1, at 600 (1915).

38. 1870 Tenn. Acts. ch. 13.

39. 1996 La. Sess. Law. Serv. 1st Ex. Sess. Act 4 (S.B.2), R.S. 40.1379.3(O).

40. Bill 3730, 1996 S.C. Assemb., Rev. to § 23-31-210(M)(10).

41. Excerpt from 1564 Stat. King Henry III.

42. Wingate, An Exact Abridgement of All Statutes In Force & Use From The Beginning Of Magna Carta Until 1641 (1666), at 591 at § 9.

43. 1776 Del. Const. art. 28.

44. Excerpts from Benjamin Vaugahn Abbott, Judge and Jury: A Popular Explanation of Leading Topics in the Law of the Land (1880).

45. 1874 Mo. Laws at 43, s. 1.

*A version of the same law can also be found in Charles Decl. Ex. 20*

46. The Norman Transcript, (Norman, Okla. Terr), Vol. 2, No. 5, Ed. 1 (Nov. 22, 1890).

47. The Missouri Republican, (St. Louis, Mo.) (Nov. 20, 1872).

48. The Moniteau Journal (California, Mo.) (Oct. 3, 1872).

49. Collected Venue Policies, NJ.

    a.    Zoological Society of New Jersey, Inc., Zoo Rules, https://turtlebackzoo.com/zoo-rules

    b.    Adventure Aquarium, Policies, https://www.adventureaquarium.com/plan/aquarium-policies

    c.    Camden County Library Customer Behavior Policy, https://tinyurl.com/ytvnfk62;

    d.    Old Bridge Library, Acceptable Behavior Policy, https://www.oldbridgelibrary.org/library-info/library-policies/acceptable-behavior-policy/.

    e.    MetLife Stadium in East Rutherford, https://www.metlifestadium.com/guest-services/guest-policies;

    f.    Prudential Center Visitor Guide, https://prucenter.com/a-z-guide#;

    g.    PNC Bank Arts Center FAQs, http://banksartscentre.com/faq/;

    h.    NJPAC https://www.njpac.org/visit/faq/#:~:text=NJPAC%20property%20includes%20all%20buildings,or%20hazardous%20devices%20or%20weapons (toggle to "are there any prohibited items")

    i.    Regal Movie Theaters, https://www.regmovies.com/static/en/us/admittance-procedures;

    j.    Medieval Times: https://www.medievaltimes.com/experience/faq (toggle to last FAQ)

    k.    CURE Insurance Arena in Trenton, https://www.cureinsurancearena.com/arena-policies;

    l.    State Theatre in New Brunswick, https://www.stnj.org/about/policies;

      m.   Boardwalk Hall Arena in Atlantic City, https://www.boardwalkhall.com/plan-your-visit/a-z-guide;

      n.   Borgata Event Center in Atlantic City, https://borgata.mgmresorts.com/en/entertainment/event-center.html;

      o.   Bergen Performing Arts Center in Englewood, https://www.bergenpac.org/plan-your-visit/faqs;

      p.   Levoy Theatre in Millville, https://levoy.net/policies/;

      q.   Wellmont Theatre in Montclair, https://wellmonttheater.com/venue/theater-policies-and-faqs/;

      r.   Mayo Performing Arts Center in Morristown, https://www.mayoarts.org/tickets/policies;

      s.   South Orange Performing Arts Center in South Orange, "House Policies" https://www.sopacnow.org/box-office/

      t.   Liberty Science Center in Jersey City, Code of Conduct, https://lsc.org/visit/health-accessibility-and-safety/code-conduct

      u.   Six Flags Great Adventure in Jackson, Park Policies, https://www.sixflags.com/greatadventure/plan-your-visit/park-policies

      v.   Red Bull Arena, Harrison, Prohibited Items & Bag Policy, https://www.newyorkredbulls.com/redbullarena/policies

50. Excerpts from R. Rosenzweig & E. Blackmar, THE PARK AND THE PEOPLE: A HISTORY OF CENTRAL PARK (Cornell Univ. Press 1992)

**Exhibits Volume 2:**

51. 1789 Mass. Acts ch.28, at 438.

52. 1895 Mich. No. 436 Sec. 44, at 596.

53. 1905 Minn. 620, Sec. 53

54. 1917 Wisc. Ch. 668, at 1243 Sec. 29.57(4)

55. 1921 N.C. Public Laws & Res. ch. 6 § 3, at 54.

56. 1937 N.J. Rev. Stat. 32:14-13.1(8).

57. 1875 Laws & Ord. Governing Village of Hyde Park at 310, § 6.

58. 1883 Rev. Ord. of the City of Danville, ch.19 § 4, at 83.

59. Tower Grove Park of the City of St. Louis 117 (1883)

60. Rev. Ordinances of Salt Lake City 248, ch. 27 § 6 (1888)

61. Laws & Ordinances for the Gov't of the Mun. Corp. of the City of Williamsport, Pa. 141 (1891)

62. Park Ordinances, Springfield, Mass. (1891)

63. Compiled Ordinances of the City of Grand Rapids 163, § 432 (1907) (enacted 1891, amended 1892 & 1897).

64. 3rd Ann. Rep. of the Park Comm'rs of the City of Lynn 23 (1891).

65. Laws & Ordinances of the City of Peoria, Illinois 667 (1892).

66. Mun. Code of the City of Spokane, Wash. 123 (1903) (enacted 1892).

67. Charter of the City of Wilmington, Rules and Regulations of the Board of Park Commissioners, Part VII, § 7 (1893).

68. Rev. Ordinances of the City of Canton, Ill. 240 (1895).

69. Gen. Ordinances of the City of Indianapolis 648, § 1971 (1904) (enacted 1896).

70. Digest of the Acts of Assembly Relating to & the Gen. Ordinances of the City of Pittsburgh 496 (1897) (enacted 1893).

71. Digest of the Laws & Ordinances for the Gov't of the Mun. Corp. of the City of Reading, PA 240 (1897).

72. Rev. Ordinances of the City of Boulder, CO 157 (1899).

    *A version of the same law can also be found in Rivas Decl. Ex. X.*

73. General Municipal Ordinances of the City of Oakland, Cal., Addendum at 15 (1909).

74. The Code of City of Birmingham, Alabama 662 (1917).

75. Firearms Regulations in the National Parks, 1897-1936 (NPS 2008).

76. Sen Yuan Wu, N.J. Pop. 1790 to 2010, Div. Labor Market & Demographic Rsch. (Dec. 2010).

77. 2021 Population Density: N.J. Counties, U.S. Census Bureau, Pop. Div. (Apr. 2022), prepared by N.J. Dept. Labor & Workforce Dev't.

78. 1874 Mo. Laws 43 (§ 1)

79. 1883 Mo. Laws 76 (§ 1)

   *A version of the same law can be found in Charles Decl. Ex. 22.*

80. 1889 Ariz. Sess. Laws 17 (§ 3)

   *A version of the same law can be found in Charles Decl. Ex. 28.*

81. 1890 Okla. Sess. Laws 496 (§ 7)

   *A version of the same law can also be found in Rivas Decl. Ex. P and Charles Decl. Ex. 29.*

82. 1903 Mont. Laws. 49-50 (§ 3)

83. M. Kevane & W. Sundstrom, Development of Public Libraries in the U.S., 1870-1930, Information & Culture, Vol 49, no. 2 (2014).

84. Pop. of Mass. by Counties & Minor Civil Divs., Census Bulletin (Nov. 8, 1990).

85. 1746 N.J. Laws ch. 102.

86. 1797 N.J. Laws (R.S. 572), at 367.

87. 1874 N.J. Laws (P.L. 1871, p.109).

88. G. Fenich, A Chronology of (Legal) Gaming in the U.S., Gaming Rsch & Rev. J, vol.3, Iss.2 (1996).

89. Report & Recommendations of the Governor's Advisory Commission on Gambling, Jun. 30, 1998.

90. Port Authority of NY & NJ, Dec. 2021 Traffic Report, Aviation Dep't, https://www.panynj.gov/airports/en/statistics-general-info/Monthly_Airport_Activities.html.

91. Caroline Norris, A History of Madness: Four Venerable Virginia Lunatic Asylums, Virginia Magazine of History & Biography, Vol. 125, Issue 2 (2017).

92. 1776 N.C. Sess. Laws 168.

93. 1800 Ga. Laws 428.

94. 1837 Md. Acts 108.

95. 1868 Oh. Supp. Rev. Stat 13.

96. 1872 Wisc. Rev. Stat 1960.

97. 1872 Conn. Acts 108.

98. 1872 Or. Acts 26.

99. 1873 S.C. Rev. Stat. 404.

100. 1887 W.Va. Code, ch. 148, § 7.


**Exhibits Volume 3:**

101. 1881 Kan. Sess. Laws 92, § 23.

102. 1875 Ark. Acts 156.

103. 1847 Va. Laws 129.

104. 1868 W. Va. Code 153.

105. 1872 Portland Ord. No. 1108.

106. 1813 Ky. Acts 10.

107. 1813 La. Acts 172.

   *A version of the same law can also be found in Rivas Decl. Ex. H.*

108. 1819 Ind. Acts 39.

109. 1838 Va. Acts 76.

110. 1859 Ohio Acts 56.

111. 1861 Ga. Laws 859.

112. 1835 Mass. Rev. Stat., ch. 134, § 16.

    *A version of the same law can also be found in Rivas Decl. Ex. E*

113. 1838 Terr. of Wis. Stat. § 16.

114. Me. Rev. Stat., ch. 169, § 16 (1840).

115. Mich. Rev. Stat., ch. 162, § 16 (1846).

116. Excerpts from M. Dalton, The Country Justice (1690).

117. Terr. of Minn. Rev. Stat., ch. 112, § 18.

118. 1854 Ore. Stat. ch. 16, § 17.

119. 1857 D. C. Rev. Code ch. 141, § 16.

120. 1860 Pa. Laws p. 432, § 6; § 8.

121. 1844 Miss. Law p. 182, Art. 16, § 1, in Anderson Hutchinson, Code of Mississippi, from 1798 to 1848, 182 (1848).

122. 1856-1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled "Revenue," ch. 34, § 23, pt. 4.

123. 1866 Ga. Laws p. 27-28, Title VI, No. 41.

124. Rev. Code of Alabama, p. 169, ch. 3, § 10 (1867)

125. 1867 Miss. Laws 327-28, An Act To Tax Guns And Pistols in The County Of Washington, ch. 249, § 1.

126. George W. Hess, Revised Ordinances of the City of Evanston, 131-132 (1893).

127. 1895 Neb. Laws 210, Laws of Nebraska Relating to the City of Lincoln, Art. XVI, § 6.

128. 1902-04 Va. Acts 155-157, An Act to Raise Revenue for Support of the Government and Public Free Schools, sched. B, § 6, Tangible Personal Property, Eighteenth.

129. Orville Park, Park's Annotated Code of the State of Georgia 1914, Penal Code, Article 3, Carrying pistols without license, § 348(a)-(d).

130. Ohio Law, p. 633, §§ 24-25 (1884)

131. Mass. Law, p. 479-484, ch. 22, §§ 1-10 (1776)

132. 1777 Pa. Laws 110-113.

133. Va. Act of May 5, 1777, ch. 3.

134. Excerpt from Bernard Schwartz, The Bill of Rights: A Documentary History, Vol, 2, at 662 (1971).

135.  Excerpt from Debates & Proc. in the Convention of the Commonwealth of Mass. Held in the Year 1788 (1856).

136. Charles C. Branas, SeungHoon Han, and Douglas J. Wiebe, Alcohol Use and Firearm Violence, 38 Epidemiologic Rev. 32, 40-43 (2016).

137. Jonathan Jay, Alcohol Outlets and Firearm Violence: a Place-Based Case–Control Study Using Satellite Imagery and Machine Learning, Inj. Prev. 61, 64 (2019).

138. Pamela J. Trangenstein et al., Outlet Type, Access to Alcohol, and Violent Crime, 42 Alcohol Clin. Exp. Re. 2234, 2241 (2018).

139. Matthew Miller et al., 'Road rage' in Arizona: Armed and Dangerous, 34 Accident Analysis and Prevention, 807, 811 (2002).

140. Arlin J. Benjamin Jr., Sven Kepes, & Brad. J. Bushman, Effects of Weapons on Aggressive Thoughts, Angry Feelings, Hostile Appraisals, and Aggressive Behavior: A Meta-Analytic Review of the Weapons Effect Literature, 22 Personality & Social Psych. R. 347, 359 (2018).

141. David Hemenway, Chloe Shawah, & Elizabeth Lites, Defensive gun use: What can we learn from news reports?, 9 Injury Epidemiology 19, 27 (2022).

142. David Hemenway, Deborah Azrael, & Matthew Miller, Whose guns are stolen? The epidemiology of Gun theft victims, 4 Injury Epidemiology 11, 14 (2017).

143. John J. Donohue et al., More guns, more unintended consequences: the effects of right-to-carry on criminal behavior and policing in U.S. cities, Nat'l Bureau of Econ. Research, Working Paper Series, Working Paper 30190, at 29, http://www.nber.org/papers/w30190.

144. D. Hemenway & S.J. Solnick, The epidemiology of self-defense gun use: Evidence from the National Crime Victimization Surveys 2007–2011, 79 Preventative Medicine 22, 27 (2015).

145. John J. Donohue, Abhay Aneja, & Kyle D. Weber, Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis, 16 J. Empirical L. Studies 198, 240 (April 2019).

146. Michael Siegel et al., Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States, 107 AJPH Research 1923, 1929 (2017).

147. 1875 Wyoming Terr. Acts ch.52, §1.

148. Code of City of Lynchburg, Va. Ch. XIX, § 20 (1887).

149. 1869 N.M. Gen Laws ch.32, at 313.

150. A. Holgersson & U. Bjornstig, Mass-casualty attacks on public transportation, J Transp. Security 7:1–16 (2014).

151. 1795 Mass Gen Law ch.26, § 2.

152. 1686 N.J. Laws, ch. 9, in The Grants, Concessions, and Original Constitution of the Province of New Jersey, at 289–90 (2d ed. 1881).

I declare that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

I further certify that on February 13, 2023, I electronically filed the foregoing Declaration and Exhibits with the Clerk of the United States District Court for the District of New Jersey. Counsel for all parties are registered CM/ECF users and will be served via CM/ECF.

By:  /s/  Angela Cai
Angela Cai
Deputy Solicitor General

February 13, 2023

JA1430

ASSEMBLY COMMITTEE SUBSTITUTE FOR

**ASSEMBLY, No. 4769**

———

# STATE OF NEW JERSEY

## 220th LEGISLATURE

———

ADOPTED NOVEMBER 14, 2022

**Sponsored by:**
**Assemblyman JOE DANIELSEN**
**District 17 (Middlesex and Somerset)**
**Assemblyman LOUIS D. GREENWALD**
**District 6 (Burlington and Camden)**
**Assemblywoman MILA M. JASEY**
**District 27 (Essex and Morris)**
**Assemblyman JOHN F. MCKEON**
**District 27 (Essex and Morris)**
**Assemblywoman ELLEN J. PARK**
**District 37 (Bergen)**
**Assemblywoman ANNETTE CHAPARRO**
**District 33 (Hudson)**
**Senator NICHOLAS P. SCUTARI**
**District 22 (Middlesex, Somerset and Union)**
**Senator LINDA R. GREENSTEIN**
**District 14 (Mercer and Middlesex)**

**Co-Sponsored by:**
**Senator Johnson**

**SYNOPSIS**
Makes various revisions to requirements for obtaining a firearm purchaser identification card, permit to purchase a handgun, and permit to carry a handgun; codifies sensitive places in which firearms and destructive devices are prohibited.

**CURRENT VERSION OF TEXT**
Substitute as adopted by the Assembly Judiciary Committee.

**(Sponsorship Updated As Of: 12/19/2022)**

1 **AN ACT** concerning the sale and possession of firearms and
2     supplementing and amending various parts of the statutory law.
3
4     **BE IT ENACTED** by the Senate and General Assembly of the State
5 of New Jersey:
6
7     1.  (New section)  The Legislature finds and declares that:
8     a.  The decision of the United States Supreme Court in <u>New</u>
9 <u>York State Rifle & Pistol Association v. Bruen</u> holds significant
10 implications for carrying a handgun in New Jersey and the law
11 governing the issuance of permits to carry a handgun. The <u>Bruen</u>
12 decision establishes that states cannot deny permits to carry a
13 handgun to otherwise-qualified citizens who fail to show that they
14 have the "proper cause" to carry a handgun. New Jersey law relies
15 on a similar standard, considering whether an applicant has a
16 "justifiable need," in determining whether to issue a permit to carry
17 a handgun.
18     b.  In accordance with the precedent established in the <u>Bruen</u>
19 decision, laws requiring showings of particularized need are no
20 longer legally viable to determine whether a person may carry a
21 handgun in public. The <u>Bruen</u> decision does make clear, however,
22 that the Legislature can enact laws to protect our communities from
23 threats to public health, safety, and welfare posed by gun violence,
24 which take into account as appropriate the Supreme Court's Second
25 Amendment ruling while continuing to promote and enhance public
26 safety.
27     c.  Statistics show that expanding handgun carrying creates
28 safety risks, helping to fuel the epidemic of gun violence. For
29 example, a study by researchers at the Johns Hopkins Bloomberg
30 School of Public Health found that the estimated average rate of
31 officer-involved shootings increased by 12.9 percent in ten states
32 that relaxed restrictions between 2014 and 2020 on civilians
33 carrying concealed firearms in public. Accordingly, evidence
34 demonstrates that more guns on the streets can translate into more
35 acts of gun violence. To mitigate the impact of having more people
36 carrying guns in public places, steps must be taken to better ensure
37 that those who exercise the right to carry are responsible, law-
38 abiding, and appropriately trained individuals who would not pose
39 undue safety risks if armed in public places.
40     d.  In <u>Bruen</u>, the Supreme Court recognized that states may
41 prohibit individuals who are not "law-abiding, responsible citizens"
42 from carrying firearms in public, and endorsed the use of "licensing
43 requirements for carrying a handgun for self-defense." Although the
44 Court did not provide a complete list of lawful requirements, it
45 specifically cited a "background check, mental health check, training

    **EXPLANATION – Matter enclosed in bold-faced brackets 【thus】 in the above bill is
not enacted and is intended to be omitted in the law.**

    Matter underlined <u>thus</u> is new matter.

ACS for **A4769** DANIELSEN, GREENWALD

3

1  in firearms handling and in laws regarding the use of force, among
2  other possible requirements" as permissible. The purpose of these
3  checks, the Court explained, is to "ensure only that those bearing
4  arms in the jurisdiction are in fact, 'law-abiding, responsible
5  citizens.'" It is thus important to bolster and improve the process in
6  this State for ensuring that only such individuals possess and carry
7  firearms. Toward that end, this act strengthens the criteria and
8  background investigation requirements that are used to determine
9  whether an applicant is qualified to carry a firearm in New Jersey.

10  e. This act also designates places in which the carrying of a
11  firearm or destructive device is prohibited. Previously, application
12  of the justifiable need standard minimized the serious dangers of
13  misuse and accidental use inherent in the carrying of handguns in a
14  public place. Given the likelihood that a much greater number of
15  individuals will now qualify to carry handguns in public, it is now
16  both necessary and appropriate to clearly identify in the law those
17  sensitive places where, due to heightened public safety concerns,
18  carrying a dangerous, potentially lethal device or weapon, including
19  a handgun, is not permissible. These prohibitions are based on
20  common sense principles and historical analogues.

21  f. Notwithstanding its rejection of a particularized need
22  standard, the Bruen decision recognizes that the carrying of
23  firearms in sensitive places can "be prohibited consistent with the
24  Second Amendment." Indeed, the Court assumed it settled that
25  "laws forbidding the carrying of firearms in sensitives places such
26  as schools and government buildings," as well as other places such
27  as "legislative assemblies, polling places, and courthouses," are
28  "longstanding" and not subject to disputes regarding their
29  constitutionality. The Court added that other "sensitive place"
30  regulations may be permissible if "consistent with the Second
31  Amendment's text and historical understanding" – that is,
32  "relevantly similar" to historical analogues.

33  g. The sensitive-place prohibitions on dangerous weapons set
34  forth in this act are rooted in history and tradition. They are
35  analogous to historical laws that can be found from the Founding
36  era to Reconstruction, which are also found in modern laws in many
37  states. History and tradition support at least the following location-
38  based restrictions on carrying firearms:

39  (1) Places that are the site of core constitutional activity, such as
40  but not limited to the exercise of First Amendment rights, or that
41  are otherwise vital to the functioning of democracy and our system
42  of government. That includes prohibitions of firearms in facilities
43  within the criminal justice system;

44  (2) Schools, universities, other educational institutions, where
45  people assemble for educational purposes and for the purposes of
46  teaching, learning, research, and the pursuit of knowledge;

47  (3) Parks and other recreation spaces, including locations where
48  children congregate;

JA1433

1    (4) Locations that protect vulnerable classes of people, such as
2    the young and the frail;
3    (5) Places where intoxicating substances are sold, places where
4    large groups of individuals congregate, and places where volatile
5    conditions may pose a threat to public safety; and
6    (6) Various forms of transportation and public infrastructure,
7    whose safety, security, and stability are critical to supporting social
8    function.
9    h.   The historical record also supports restriction of firearm
10   possession on private property when the owner has not given their
11   consent. Many states require a property owner's permission before
12   another may enter private dwellings and private lands with a
13   firearm or other weapons.  Requiring consent from the property
14   owner before carrying weapons onto private property is also in line
15   with both the reasonable expectations and property rights of New
16   Jersey property owners.
17   i.   Additionally, the fees to obtain a firearms purchaser
18   identification permit or a permit to purchase a handgun in New
19   Jersey were initially set by statute over 50 years ago at $5 and $2,
20   respectively, and in over a half century the law has never been
21   changed to increase these fees, notwithstanding the impact of
22   inflation, increasing costs of background checks and related
23   investigations, and the investment made over the years to
24   technologically upgrade the firearms application and registration
25   system established and maintained by the New Jersey State Police.
26   j.   Accordingly, the Legislature finds it is necessary and proper
27   to revise this State's procedural and substantive laws related to
28   firearms to update the process and the standards applicable to
29   firearm purchase and possession as well as our handgun carry law,
30   and to continue to promote public safety and reduce gun violence in
31   a manner consistent with the Second Amendment principles
32   articulated by the current Supreme Court jurisprudence. These
33   revisions will focus on factors other than the need or purpose a
34   person may assert as justification to carry a handgun, such as the
35   person's background and qualifications, with the ultimate goal of
36   keeping New Jersey streets and neighborhoods safe from gun
37   violence.
38
39   2.   N.J.S.2C:58-3 is amended to read as follows:
40   2C:58-3.  a.  Permit to purchase a handgun.
41   (1) 【No】 A person shall _not_ sell, give, transfer, assign or
42   otherwise dispose of, nor receive, purchase, or otherwise acquire a
43   handgun unless the purchaser, assignee, donee, receiver or holder is
44   licensed as a dealer under this chapter or has first secured a permit
45   to purchase a handgun as provided by this section.
46   (2) A person who is not a licensed retail dealer and sells, gives,
47   transfers, assigns, or otherwise disposes of, or receives, purchases

ACS for **A4769** DANIELSEN, GREENWALD

5

1  or otherwise acquires a handgun pursuant to this section shall
2  conduct the transaction through a licensed retail dealer.
3  The provisions of this paragraph shall not apply if the transaction
4  is:
5  (a) between members of an immediate family as defined in
6  subsection n. of this section;
7  (b) between law enforcement officers;
8  (c) between collectors of firearms or ammunition as curios or
9  relics as defined in Title 18, U.S.C. section 921 (a) (13) who have
10  in their possession a valid Collector of Curios and Relics License
11  issued by the Bureau of Alcohol, Tobacco, Firearms, and
12  Explosives; or
13  (d) a temporary transfer pursuant to section 1 of P.L.1992, c.74
14  (C.2C:58-3.1) or section 1 of P.L.1997, c.375 (C.2C:58-3.2).
15  (3) Prior to a transaction conducted pursuant to this subsection,
16  the retail dealer shall complete a National Instant Criminal
17  Background Check of the person acquiring the handgun.  In
18  addition:
19  (a) the retail dealer shall submit to the Superintendent of State
20  Police, on a form approved by the superintendent, information
21  identifying and confirming the background check;
22  (b) every retail dealer shall maintain a record of transactions
23  conducted pursuant to this subsection, which shall be maintained at
24  the address displayed on the retail dealer's license for inspection by
25  a law enforcement officer during reasonable hours;
26  (c) a retail dealer may charge a fee for a transaction conducted
27  pursuant to this subsection; and
28  (d) any record produced pursuant to this subsection shall not be
29  considered a public record pursuant to P.L.1963, c.73 (C.47:1A-1 et
30  seq.) or P.L.2001, c.404 (C.47:1A-5 et al.).
31  b.  Firearms purchaser identification card.
32  (1) 【No】 A person shall not sell, give, transfer, assign or
33  otherwise dispose of nor receive, purchase or otherwise acquire an
34  antique cannon or a rifle or shotgun, other than an antique rifle or
35  shotgun, unless the purchaser, assignee, donee, receiver or holder is
36  licensed as a dealer under this chapter or possesses a valid firearms
37  purchaser identification card, and first exhibits the card to the seller,
38  donor, transferor or assignor, and unless the purchaser, assignee,
39  donee, receiver or holder signs a written certification, on a form
40  prescribed by the superintendent, which shall indicate that 【he】 the
41  person presently complies with the requirements of subsection c. of
42  this section and shall contain 【his】 the person's name, address and
43  firearms purchaser identification card number or dealer's
44  registration number.  The certification shall be retained by the
45  seller, as provided in paragraph (4) of subsection a. of N.J.S.2C:58-
46  2, or, in the case of a person who is not a dealer, it may be filed
47  with the chief 【of】 police officer of the municipality in which 【he】
48  the person resides or with the superintendent.

ACS for **A4769** DANIELSEN, GREENWALD

6

1    (2) A person who is not a licensed retail dealer and sells, gives,
2  transfers, assigns, or otherwise disposes of, or receives, purchases
3  or otherwise acquires an antique cannon or a rifle or shotgun
4  pursuant to this section shall conduct the transaction through a
5  licensed retail dealer.

6    The provisions of this paragraph shall not apply if the transaction
7  is:

8    (a) between members of an immediate family as defined in
9  subsection n. of this section;

10    (b) between law enforcement officers;

11    (c) between collectors of firearms or ammunition as curios or
12  relics as defined in Title 18, U.S.C. section 921 (a) (13) who have
13  in their possession a valid Collector of Curios and Relics License
14  issued by the Bureau of Alcohol, Tobacco, Firearms, and
15  Explosives; or

16    (d) a temporary transfer pursuant to section 1 of P.L.1992, c.74
17  (C.2C:58-3.1) and section 1 of P.L.1997, c.375 (C.2C:58-3.2).

18    (3) Prior to a transaction conducted pursuant to this subsection,
19  the retail dealer shall complete a National Instant Criminal
20  Background Check of the person acquiring an antique cannon or a
21  rifle or shotgun.  In addition:

22    (a) the retail dealer shall submit to the Superintendent of State
23  Police, on a form approved by the superintendent, information
24  identifying and confirming the background check;

25    (b) every retail dealer shall maintain a record of transactions
26  conducted pursuant to this section which shall be maintained at the
27  address set forth on the retail dealer's license for inspection by a law
28  enforcement officer during reasonable hours;

29    (c) a retail dealer may charge a fee, not to exceed $70, for a
30  transaction conducted pursuant to this subsection; and

31    (d) any record produced pursuant to this subsection shall not be
32  considered a public record pursuant to P.L.1963, c.73 (C.47:1A-1 et
33  seq.) or P.L.2001, c.404 (C.47:1A-5 et al.).

34    c.  Who may obtain.     **[**No**]** Except as hereinafter provided, a
35  person **[**of good character and good repute**]** shall not be denied a
36  permit to purchase a handgun or a firearms purchaser identification
37  card, unless the person is known in the community in which **[**he**]**
38  the person lives as someone who has engaged in acts or made
39  statements suggesting the person is likely to engage in conduct,
40  other than justified self-defense, that would pose a danger to self or
41  others, **[**and who**]** or is **[**not**]** subject to any of the disabilities set
42  forth in this section or other sections of this chapter **[**, shall be
43  denied a permit to purchase a handgun or a firearms purchaser
44  identification card, except as hereinafter set forth**]**.   **[**No**]** A
45  handgun purchase permit or firearms purchaser identification card
46  shall not be issued:

ACS for **A4769** DANIELSEN, GREENWALD

7

1    (1) To any person who has been convicted of <u>: (a)</u> any crime <u>in</u>
2    <u>this State or its felony counterpart in any other state or federal</u>
3    <u>jurisdiction;</u> or <u>(b)</u> a disorderly persons offense <u>in this State</u>
4    involving an act of domestic violence as defined in section 3 of
5    P.L.1991, c.261 (C.2C:25-19) <u>or its felony or misdemeanor</u>
6    <u>counterpart involving an act of domestic violence as defined under</u>
7    <u>a comparable statute in any other state or federal jurisdiction,</u>
8    whether or not armed with or possessing a weapon at the time of the
9    offense;
10   (2) To **[**any drug-dependent person as defined in section 2 of
11   P.L.1970, c.226 (C.24:21-2), to**]** any person who is <u>presently</u>
12   confined for a mental disorder **[**to a hospital, mental institution or
13   sanitarium**]** <u>as a voluntary admission as defined in section 2 of</u>
14   <u>P.L.1987, c.116 (C.30:4-27.2) or who is presently involuntarily</u>
15   <u>committed to inpatient or outpatient treatment pursuant to</u> **[**section
16   1 of**]** <u>P.L.1987, c.116 (C.30:4-27.1 et seq.)</u> **[**or to any person who is
17   presently an habitual drunkard**]**;
18   (3) To any person who suffers from a physical defect or disease
19   which would make it unsafe for **[**him**]** <u>that person</u> to handle
20   firearms, **[**to any person who has ever been confined for a mental
21   disorder,**]** <u>to any person with a substance use disorder involving</u>
22   <u>drugs as defined in section 2 of P.L.1970, c.226 (C.24:21-2),</u> or to
23   any alcoholic <u>as defined in section 2 of P.L.1975, c.305 (C.26:2B-8)</u>
24   unless any of the foregoing persons produces a certificate of a
25   medical doctor<u>, treatment provider,</u> or psychiatrist licensed in New
26   Jersey, or other satisfactory proof, that **[**he**]** <u>the person</u> is no longer
27   suffering from that particular disability in a manner that would
28   interfere with or handicap **[**him**]** <u>that person</u> in the handling of
29   firearms; to any person who knowingly falsifies any information on
30   the application form for a handgun purchase permit or firearms
31   purchaser identification card;
32   (4) To any person under the age of 18 years for a firearms
33   purchaser identification card and to any person under the age of 21
34   years for a permit to purchase a handgun;
35   (5) To any person where the issuance would not be in the interest
36   of the public health, safety or welfare <u>because the person is found to</u>
37   <u>be lacking the essential character of temperament necessary to be</u>
38   <u>entrusted with a firearm;</u>
39   (6) To any person who is subject to <u>or has violated</u> a <u>temporary</u>
40   <u>or final</u> restraining order issued pursuant to the "Prevention of
41   Domestic Violence Act of 1991", P.L.1991, c.261 (C.2C:25-17 et
42   seq.) prohibiting the person from possessing any firearm <u>or a</u>
43   <u>temporary or final domestic violence restraining order issued in</u>
44   <u>another jurisdiction prohibiting the person from possessing any</u>
45   <u>firearm;</u>
46   (7) To any person who as a juvenile was adjudicated delinquent
47   for an offense which, if committed by an adult, would constitute a

1     crime and the offense involved the unlawful use or possession of a
2 weapon, explosive or destructive device or is enumerated in
3 subsection d. of section 2 of P.L.1997, c.117 (C.2C:43-7.2);
4     (8) To any person whose firearm is seized pursuant to the
5 "Prevention of Domestic Violence Act of 1991", P.L.1991, c.261
6 (C.2C:25-17 et seq.) and whose firearm has not been returned; or
7     (9) To any person named on the consolidated Terrorist Watchlist
8 maintained by the Terrorist Screening Center administered by the
9 Federal Bureau of Investigation;
10     (10) To any person who is subject to <u>or has violated</u> a court order
11 prohibiting the custody, control, ownership, purchase, possession,
12 or receipt of a firearm or ammunition issued pursuant to the
13 "Extreme Risk Protective Order Act of 2018", P.L.2018, c.35
14 (C.2C:58-20 et al.);
15     (11) To any person who is subject to <u>or has violated</u> a court order
16 prohibiting the custody, control, ownership, purchase, possession,
17 or receipt of a firearm or ammunition issued pursuant to P.L.2021,
18 c.327 (C.2C:12-14 et al.)<u>;</u>
19     <u>(12) To any person who is subject to or has violated a temporary</u>
20 <u>or final restraining order issued pursuant to the "Sexual Assault</u>
21 <u>Survivor Protection Act of 2015," P.L.2015, c.147 (C.2C:14-13 et</u>
22 <u>al.);</u>
23     <u>(13) To any person who has previously been voluntarily admitted</u>
24 <u>to inpatient treatment pursuant to P.L.1987, c.116 (C.30:4-27.1 et</u>
25 <u>seq.) or involuntarily committed to inpatient or outpatient treatment</u>
26 <u>pursuant to P.L.1987, c.116 (C.30:4-27.1 et seq.), unless the court</u>
27 <u>has expunged the person's record pursuant to P.L.1953, c.268</u>
28 <u>(C.30:4-80.8 et seq.);</u>
29     <u>(14) To any person who is subject to an outstanding arrest</u>
30 <u>warrant for an indictable crime in this State or for a felony, other</u>
31 <u>than a felony to which section 1 of P.L.2022, c.50 (C.2A:160-14.1)</u>
32 <u>would apply, in any other state or federal jurisdiction; or</u>
33     <u>(15) To any person who is a fugitive from justice due to having</u>
34 <u>fled from any state or federal jurisdiction to avoid prosecution for a</u>
35 <u>crime, other than a crime to which section 1 of P.L.2022, c.50</u>
36 <u>(C.2A:160-14.1) would apply, or to avoid giving testimony in any</u>
37 <u>criminal proceeding.</u>
38     In order to obtain a permit to purchase a handgun or a firearms
39 purchaser identification card, the applicant shall demonstrate that,
40 within four years prior to the date of the application, the applicant
41 satisfactorily completed a course of instruction approved by the
42 superintendent in the lawful and safe handling and storage of
43 firearms. The applicant shall be required to demonstrate
44 completion of a course of instruction only once prior to obtaining
45 either a firearms purchaser identification card or the applicant's first
46 permit to purchase a handgun.
47     The applicant shall not be required to demonstrate completion of
48 a course of instruction in order to obtain any subsequent permit to

1 purchase a handgun, to replace an existing firearms purchaser
2 identification card, or to renew a firearms purchaser identification
3 card.
4     An applicant who is a law enforcement officer who has satisfied
5 the requirements of subsection j. of N.J.S.2C:39-6, a retired law
6 enforcement officer who has satisfied the requirements of
7 subsection l. of N.J.S.2C:39-6, or a veteran who was honorably
8 discharged as a member of the United States Armed Forces or
9 National Guard who received substantially equivalent training shall
10 not be required to complete the course of instruction required
11 pursuant to the provisions of this subsection.
12     A person who obtained a permit to purchase a handgun or a
13 firearms purchaser identification card prior to the effective date of
14 P.L.2022, c.58 shall not be required to complete a course of
15 instruction pursuant to this subsection.
16     d.  Issuance.  The chief 【of】 police <u>officer</u> of an organized full-
17 time police department of the municipality where the applicant
18 resides or the superintendent, in all other cases, shall upon
19 application, issue to any person qualified under the provisions of
20 subsection c. of this section a permit to purchase a handgun or a
21 firearms purchaser identification card.
22     A firearms purchaser identification card issued following the
23 effective date of P.L.2022, c.58 shall display a color photograph
24 and 【a thumb print】 <u>be electronically linked to the fingerprints</u> of
25 the card holder.  A person who obtained a firearms purchaser
26 identification card prior to the effective date of P.L.2022, c.58 shall
27 not be required to obtain a 【firearm】 <u>firearms</u> purchaser
28 identification card that displays a color photograph and 【a thumb
29 print】 <u>is electronically linked to fingerprints</u>.  The superintendent
30 shall establish guidelines as necessary to effectuate the issuance of
31 firearms purchaser identification cards that display a color
32 photograph and 【a thumb print】 <u>which are electronically linked to
33 the fingerprints</u> of the card holder.
34     <u>The requirements of this subsection concerning firearms</u>
35 <u>purchaser identification cards issued following the effective date of</u>
36 <u>P.L.2022, c.58 shall remain inoperative until such time as the</u>
37 <u>superintendent establishes a system to produce cards that comply</u>
38 <u>with this requirement and, until such time, applicants issued a</u>
39 <u>firearms purchaser identification card shall be provided with cards</u>
40 <u>that do not conform to the requirements of this section, which shall</u>
41 <u>be afforded full force and effect until such time as the system is</u>
42 <u>established and a compliant card is issued in accordance with this</u>
43 <u>subsection. An applicant issued a non-compliant firearms purchaser</u>
44 <u>identification card shall obtain a card, at no cost to the applicant,</u>
45 <u>which conforms to the requirements of this section no later than one</u>
46 <u>year after receiving notice that the system to produce cards that</u>
47 <u>comply with this requirement is operational.</u>

ACS for **A4769** DANIELSEN, GREENWALD

10

1    If an application for a permit or identification card is denied, the
2    applicant shall be provided with a written statement of the reasons
3    for the denial.  Any person aggrieved by the denial of a permit or
4    identification card may request a hearing in the Superior Court of
5    the county in which 【he】 the person resides if 【he】 the person is a
6    resident of New Jersey or in the Superior Court of the county in
7    which 【his】 the person's application was filed if 【he】 the person is
8    a nonresident.  The request for a hearing shall be made in writing
9    within 30 days of the denial of the application for a permit or
10    identification card.  The applicant shall serve a copy of 【his】 the
11    request for a hearing upon the chief 【of】 police officer of the
12    municipality in which 【he】 the person resides, if 【he】 the person is
13    a resident of New Jersey, and upon the superintendent in all cases.
14    The hearing shall be held and a record made thereof within 【30】 60
15    days of the receipt of the application for a hearing by the judge of
16    the Superior Court.  No formal pleading and no filing fee shall be
17    required as a preliminary to a hearing.  Appeals from the results of a
18    hearing shall be in accordance with law.
19    The Administrative Director of the Courts shall coordinate with
20    the superintendent in the development of an electronic filing system
21    to receive requests for hearings and serve the chief police officer
22    and superintendent as required in this section.
23    e.  Applications.    Applications  for  permits  to  purchase  a
24    handgun and for firearms purchaser identification cards shall be in
25    the form prescribed by the superintendent and shall set forth the
26    name, residence, place of business, age, date of birth, occupation,
27    sex, any aliases or other names previously used by the applicant,
28    gender, and physical description, including distinguishing physical
29    characteristics, if any, of the applicant, and shall state whether the
30    applicant is a citizen, whether 【he】 the applicant is an alcoholic 【,
31    habitual drunkard,】 as defined in section 2 of P.L.1975, c. 305 (C.
32    26:2B-8) or is a drug-dependent person as defined in section 2 of
33    P.L.1970, c.226 (C.24:21-2), whether 【he】 the applicant has ever
34    been confined or committed to a mental institution or hospital for
35    treatment or observation of a mental or psychiatric condition on a
36    temporary, interim  or  permanent  basis,  giving  the  name  and
37    location of the institution or hospital and the dates of confinement
38    or commitment, whether 【he】 the applicant has been attended,
39    treated or observed by any doctor or psychiatrist or at any hospital
40    or mental institution on an inpatient or outpatient basis for any
41    mental or psychiatric condition, giving the name and location of the
42    doctor, psychiatrist, hospital or institution and the dates of the
43    occurrence, whether 【he】 the applicant presently or ever has been a
44    member of any organization which advocates or approves the
45    commission of acts of force and violence to overthrow the
46    Government of the United States or of this State, or which seeks to
47    deny others their rights under the Constitution of either the United

Case 1:22-cv-01428-RMB-AMD Document 48 Page 269 of 546 Date Filed 07/20/2023 PageID: 1564

1   States or the State of New Jersey, whether 【he】 the applicant has
2   ever been convicted of a crime or disorderly persons offense in this
3   State or felony or misdemeanor in any other state or federal
4   jurisdiction, whether the 【person】 applicant is subject to a
5   restraining order issued pursuant to the "Prevention of Domestic
6   Violence Act of 1991", P.L.1991, c.261 (C.2C:25-17 et seq.) or an
7   order entered under the provisions of a substantially similar statute
8   under the laws of another jurisdiction prohibiting the 【person】
9   applicant from possessing any firearm, whether the applicant is
10  subject to a restraining order issued pursuant to the "Sexual Assault
11  Survivor Protection Act of 2015," P.L.2015, c.147 (C.2C:14-13 et
12  al.) or an order entered under the provisions of a substantially
13  similar statute under the laws of another jurisdiction, whether the
14  【person】 applicant is subject to a protective order issued pursuant
15  to the "Extreme Risk Protective Order Act of 2018", P.L.2018, c.35
16  (C.2C:58-20 et al.), whether the 【person】 applicant is subject to a
17  protective order issued pursuant to P.L.2021, c.327 (C.2C:12-14 et
18  al.) prohibiting the 【person】 applicant from possessing any firearm,
19  and other information as the superintendent shall deem necessary
20  for the proper enforcement of this chapter.  For the purpose of
21  complying with this subsection, the applicant shall waive any
22  statutory or other right of confidentiality relating to institutional
23  confinement.  The application shall be signed by the applicant and
24  shall contain as references the names and addresses of two
25  reputable citizens personally acquainted with 【him】 the applicant.
26  An applicant for a permit to purchase a handgun shall also
27  certify, with respect to each handgun listed on the form, whether the
28  applicant is purchasing the handgun on the applicant's own behalf
29  or, if not, that the purchase is being made on behalf of a third party
30  to whom the applicant may lawfully transfer the handgun.
31  Application blanks shall be obtainable from the superintendent,
32  from any other officer authorized to grant a permit or identification
33  card, and from licensed retail dealers, or shall be made available
34  through an online process established or made available by the
35  superintendent.
36  The chief police officer or the superintendent shall obtain the
37  fingerprints of the applicant and shall have them compared with any
38  and all records of fingerprints in the municipality and county in
39  which the applicant resides and also the records of the State Bureau
40  of Identification and the Federal Bureau of Investigation, provided
41  that an applicant for a handgun purchase permit who possesses a
42  valid firearms purchaser identification card, or who has previously
43  obtained a handgun purchase permit from the same licensing
44  authority for which 【he】 the applicant was previously fingerprinted,
45  and who provides other reasonably satisfactory proof of 【his】 the
46  applicant's identity, need not be fingerprinted again; however, the
47  chief police officer or the superintendent shall proceed to

1 investigate the application to determine whether or not the applicant
2 has become subject to any of the disabilities set forth in this
3 chapter.
4    f.   Granting of permit or identification card; fee; term; renewal;
5 revocation. The application for the permit to purchase a handgun
6 together with a fee of [$2] $25, or the application for the firearms
7 purchaser identification card together with a fee of [$5] $50, shall
8 be delivered or forwarded to the licensing authority who, upon
9 determining that the application is complete, shall investigate the
10 same and, [unless good cause for the denial thereof appears]
11 provided the requirements of this section are met, shall grant the
12 permit or the identification card, or both, if application has been
13 made therefor, within 30 days from the date of receipt of the
14 completed application for residents of this State and within 45 days
15 for nonresident applicants. A permit to purchase a handgun shall be
16 valid for a period of 90 days from the date of issuance and may be
17 renewed by the issuing authority for good cause for an additional 90
18 days. A firearms purchaser identification card issued or renewed
19 after the effective date of P.L.2022, c.58 shall expire during the
20 tenth calendar year following its date of issuance and on the same
21 calendar day as the person's date of birth.
22    If the date of birth of the firearms purchaser identification card
23 holder does not correspond to a calendar day of the tenth calendar
24 year, the card shall expire on the last day of the birth month of the
25 card holder.
26    A firearms purchaser identification card issued pursuant to this
27 section may be renewed upon filing of a renewal application and
28 payment of the required fee, provided that the holder is not subject
29 to any of the disabilities set forth in subsection c. of this section and
30 complies with all other applicable requirements as set forth in
31 statute and regulation. If an application for renewal of a firearms
32 purchaser identification card is denied, the applicant shall be
33 provided with a written statement of the reasons for the denial. Any
34 person aggrieved by the denial of an application for renewal of a
35 firearms purchaser identification card may request a hearing in the
36 Superior Court of the county in which the person resides if the
37 person is a resident of New Jersey or in the Superior Court of the
38 county in which the person's application was filed if the person is a
39 nonresident. The request for a hearing shall be made in writing
40 within 30 days of the denial of the application for renewal of the
41 firearms purchaser identification card. The applicant shall serve a
42 copy of the request for a hearing upon the chief police officer of the
43 municipality in which the applicant resides, if the person is a
44 resident of New Jersey, and upon the superintendent in all cases.
45 The hearing shall be held and a record made thereof within 60 days
46 of the receipt of the application for a hearing by the judge of the
47 Superior Court. A formal pleading and filing fee shall not be

1 <u>required as a preliminary to a hearing. Appeals from the results of a</u>
2 <u>hearing shall be in accordance with law.</u>
3    <u>The Administrative Director of the Courts shall coordinate with</u>
4 <u>the superintendent in the development of an electronic filing system</u>
5 <u>to receive requests for hearings and serve the chief police officer</u>
6 <u>and superintendent as required in this section.</u>
7    A firearms purchaser identification card issued prior to the
8 effective date of P.L.2022, c.58 shall not expire.
9    A firearms purchaser identification card shall be void if the
10 holder becomes subject to any of the disabilities set forth in
11 subsection c. of this section, whereupon the card shall be returned
12 within five days by the holder to the superintendent, who shall then
13 advise the licensing authority. Failure of the holder to return the
14 firearms purchaser identification card to the superintendent within
15 the five days shall be an offense under subsection a. of N.J.S.2C:39-
16 10. Any firearms purchaser identification card may be revoked by
17 the Superior Court of the county wherein the card was issued, after
18 hearing upon notice, upon a finding that the holder thereof no
19 longer qualifies for the issuance of the permit. The county
20 prosecutor of any county, the chief police officer of any
21 municipality or any citizen may apply to the court at any time for
22 the revocation of the card.
23    There shall be no conditions or requirements added to the form
24 or content of the application, or required by the licensing authority
25 for the issuance or renewal of a permit or identification card, other
26 than those that are specifically set forth in this chapter.
27    g. Disposition of fees. All fees for permits shall be paid to the
28 State Treasury <u>for deposit into the Victims of Crime Compensation</u>
29 <u>Office account</u> if the permit is issued by the superintendent, to the
30 municipality if issued by the chief 【of】 police <u>officer</u>, and to the
31 county treasurer if issued by the judge of the Superior Court.
32    h. Form of permit; 【quadruplicate】 <u>establishment of a web</u>
33 <u>portal</u>; disposition of 【copies】 <u>the completed information</u>. (1)
34 Except as otherwise provided in paragraph (2) of this subsection,
35 the permit shall be in the form prescribed by the superintendent and
36 shall be issued to the applicant 【in quadruplicate】 <u>electronically</u>
37 <u>through e-mail or the web portal established or designated for this</u>
38 <u>purpose by the superintendent or in such form or manner as may be</u>
39 <u>authorized by the superintendent</u>. Prior to the time 【he】 <u>the</u>
40 <u>applicant</u> receives the handgun from the seller, the applicant shall
41 【deliver】 <u>provide</u> to the seller <u>an acknowledgement of</u> the permit in
42 【quadruplicate】 <u>the form required under the process established by</u>
43 <u>the superintendent,</u> and the seller shall complete all of the
44 information required on the 【form】 <u>web portal</u>. 【Within five days
45 of the date of the sale, the seller shall forward the original copy】
46 <u>This information shall be forwarded</u> to the superintendent <u>through</u>
47 <u>the web portal, or in such other manner as may be authorized by the</u>

ACS for **A4769** DANIELSEN, GREENWALD
14

1    superintendent, and [the second copy] to the chief [of] police
2    officer of the municipality in which the purchaser resides, except
3    that in a municipality having no chief [of] police officer, [the
4    copy] the information shall be forwarded to the superintendent.
5    The [third copy shall then be returned to the] purchaser [with the
6    pistol or revolver] shall retain a copy of the completed information
7    and the [fourth copy shall be kept by the] seller shall retain a copy
8    of the completed information as a permanent record.
9      A transfer of a handgun between or among immediate family
10   members, law enforcement officers, or collectors of firearms or
11   ammunition as curios or relics shall be conducted via the web portal
12   established or designated by the superintendent, which shall include
13   among other things a certification that the seller and purchaser are
14   in fact immediate family members, law enforcement officers, or
15   collectors of firearms or ammunition as curios or relics.
16      (2) The requirements of this subsection concerning the delivery
17   and form of permit and disposition of copies shall not be applicable
18   when these functions may be completed by utilizing an electronic
19   system as described in paragraph (2) of subsection b. of
20   N.J.S.2C:58-2 or section 5 of P.L.2022, c.55 (C.2C:58-3.3a).
21      i.   Restriction on number of firearms person may purchase.
22   Only one handgun shall be purchased or delivered on each permit
23   and no more than one handgun shall be purchased within any 30-
24   day period, but this limitation shall not apply to:
25      (1) a federal, State, or local law enforcement officer or agency
26   purchasing handguns for use by officers in the actual performance
27   of their law enforcement duties;
28      (2) a collector of handguns as curios or relics as defined in Title
29   18, United States Code, section 921 (a) (13) who has in [his] the
30   collector's possession a valid Collector of Curios and Relics
31   License issued by the federal Bureau of Alcohol, Tobacco, Firearms
32   and Explosives;
33      (3) transfers of handguns among licensed retail dealers,
34   registered wholesale dealers and registered manufacturers;
35      (4) transfers of handguns from any person to a licensed retail
36   dealer or a registered wholesale dealer or registered manufacturer;
37      (5) any transaction where the person has purchased a handgun
38   from a licensed retail dealer and has returned that handgun to the
39   dealer in exchange for another handgun within 30 days of the
40   original transaction, provided the retail dealer reports the exchange
41   transaction to the superintendent; or
42      (6) any transaction where the superintendent issues an exemption
43   from the prohibition in this subsection pursuant to the provisions of
44   section 4 of P.L.2009, c.186 (C.2C:58-3.4).
45      The provisions of this subsection shall not be construed to afford
46   or authorize any other exemption from the regulatory provisions

ACS for **A4769** DANIELSEN, GREENWALD

15

1    governing firearms set forth in chapter 39 and chapter 58 of Title
2    2C of the New Jersey Statutes;
3       A person shall not be restricted as to the number of rifles or
4    shotguns 【he】 the person may purchase, provided 【he】 the person
5    possesses a valid firearms purchaser identification card and
6    provided further that 【his】 the person signs the certification required
7    in subsection b. of this section for each transaction.
8       j.  Firearms passing to heirs or legatees.  Notwithstanding any
9    other provision of this section concerning the transfer, receipt or
10   acquisition of a firearm, a permit to purchase or a firearms
11   purchaser identification card shall not be required for the passing of
12   a firearm upon the death of an owner thereof to 【his】 the owner's
13   heir or legatee, whether the same be by testamentary bequest or by
14   the laws of intestacy.  The person who shall so receive, or acquire
15   the firearm shall, however, be subject to all other provisions of this
16   chapter. If the heir or legatee of the firearm does not qualify to
17   possess or carry it, 【he】 the heir or legatee may retain ownership of
18   the firearm for the purpose of sale for a period not exceeding 180
19   days, or for a further limited period as may be approved by the chief
20   law enforcement officer of the municipality in which the heir or
21   legatee resides or the superintendent, provided that the firearm is in
22   the custody of the chief law enforcement officer of the municipality
23   or the superintendent during that period.
24      k.  Sawed-off shotguns.  Nothing in this section shall be
25   construed to authorize the purchase or possession of any sawed-off
26   shotgun.
27      l.  Nothing in this section and in N.J.S.2C:58-2 shall apply to
28   the sale or purchase of a visual distress signalling device approved
29   by the United States Coast Guard, solely for possession on a private
30   or commercial aircraft or any boat; provided, however, that no
31   person under the age of 18 years shall purchase nor shall any person
32   sell to a person under the age of 18 years a visual distress signalling
33   device.
34      m.  The provisions of subsections a. and b. of this section and
35   paragraphs (4) and (5) of subsection a. of N.J.S.2C:58-2 shall not
36   apply to the purchase of firearms by a law enforcement agency for
37   use by law enforcement officers in the actual performance of the
38   【current or former judge's】 officers' official duties, which purchase
39   may be made directly from a manufacturer or from a licensed dealer
40   located in this State or any other state.
41      n.  For the purposes of this section, "immediate family" means a
42   spouse, domestic partner as defined in section 3 of P.L.2003, c.246
43   (C.26:8A-3), partner in a civil union couple as defined in section 2
44   of P.L.2006, c.103 (C.37:1-29), parent, stepparent, grandparent,
45   sibling, stepsibling, child, stepchild, and grandchild, as related by
46   blood or by law.

1    o.  Registration of handguns owned by new residents.  Any
2  person who becomes a resident of this State following the effective
3  date of P.L.2022, c.52 and who transports into this State a firearm
4  that the person owned or acquired while residing in another state
5  shall apply for a 【firearm】 <u>firearms</u> purchaser identification card
6  within 60 days of becoming a New Jersey resident, and shall
7  register any handgun so transported into this State within 60 days as
8  provided in this subsection.
9    A person who registers a handgun pursuant to this subsection
10 shall complete a registration statement, which shall be in a form
11 prescribed by the superintendent.  The information provided in the
12 registration statement shall include, but shall not be limited to, the
13 name and address of the person and the make, model, and serial
14 number of the handgun being registered.  Each registration
15 statement shall be signed by the person, and the signature shall
16 constitute a representation of the accuracy of the information
17 contained in the registration statement.
18   The registration statement shall be submitted to the law
19 enforcement agency of the municipality in which the person resides
20 or, if the municipality does not have a municipal law enforcement
21 agency, any State Police station.
22   Within 60 days prior to the effective date of P.L.2022, c.52, the
23 superintendent shall prepare the form of registration statement as
24 described in this subsection and shall provide a suitable supply of
25 statements to each organized full-time municipal police department
26 and each State Police station.
27   A person who fails to apply for a 【firearm】 <u>firearms</u> purchaser
28 identification card or register a handgun as required pursuant to this
29 subsection shall be granted 30 days to comply with the provisions
30 of this subsection.  If the person does not comply within 30 days,
31 the person shall be liable to a civil penalty of $250 for a first
32 offense and shall be guilty of a disorderly persons offense for a
33 second or subsequent offense.
34   If a person is in possession of multiple firearms or handguns in
35 violation of this subsection, the person shall be guilty of one
36 offense under this subsection provided the violation is a single
37 event.
38   The civil penalty shall be collected pursuant to the "Penalty
39 Enforcement Law of 1999," P.L.1999, c.274 (C.2A:58-10 et seq.) in
40 a  summary  proceeding  before  the  municipal  court  having
41 jurisdiction.  A law enforcement officer having enforcement
42 authority in that municipality may issue a summons for a violation,
43 and may serve and execute all process with respect to the
44 enforcement of this subsection consistent with the Rules of Court.
45   <u>p.  A chief police officer or the superintendent may delegate to</u>
46 <u>subordinate officers or employees of the law enforcement agency</u>
47 <u>the responsibilities established pursuant to this section.</u>
48 (cf:  P.L.2022, c.58, s.1)

ACS for **A4769** DANIELSEN, GREENWALD

17

1    3.   N.J.S.2C:58-4 is amended to read as follows:
2    2C:58-4.   a.   Scope and duration of authority.   Any person who
3  holds a valid permit to carry a handgun issued pursuant to this
4  section shall be authorized to carry a handgun <u>in a holster concealed</u>
5  <u>on their person</u> in all parts of this State, except as prohibited by
6  subsection e. of N.J.S.2C:39-5 <u>and section 7 of P.L.    , c.   (C.    )</u>
7  <u>(pending before the Legislature as this bill)</u>.   One permit shall be
8  sufficient for all handguns owned by the holder thereof, but the
9  permit shall apply only to a handgun carried by the actual and legal
10  holder of the permit <u>and, except as otherwise provided in subsection</u>
11  <u>b. of section 6 of P.L.    , c.    (C.          )(pending before the</u>
12  <u>Legislature as this bill), shall not be construed to authorize a holder</u>
13  <u>to carry a handgun openly, provided that a brief, incidental</u>
14  <u>exposure of a handgun while transferring it to or from a holster or</u>
15  <u>due to the shifting of the person's body position or clothing shall be</u>
16  <u>deemed a de minimis infraction within the contemplation of</u>
17  <u>N.J.S.2C:2-11</u>.
18    All permits to carry handguns shall expire two years from the
19  date of issuance or, in the case of an employee of an armored car
20  company, upon termination of **[**his**]** <u>the employee's</u> employment by
21  the company occurring prior thereto whichever is earlier in time,
22  and they may thereafter be renewed every two years in the same
23  manner and subject to the same conditions as in the case of original
24  applications.
25    b.   Application forms.   All applications for permits to carry
26  handguns, and all applications for renewal of permits, shall be made
27  on the forms <u>and in the manner</u> prescribed by the superintendent.
28  Each application shall set forth the full name, date of birth, sex,
29  residence, occupation, place of business or employment, <u>any aliases</u>
30  <u>or other names previously used by the applicant,</u> and physical
31  description of the applicant, and any other information the
32  superintendent may prescribe for the determination of the
33  applicant's eligibility for a permit and for the proper enforcement of
34  this chapter.   The application shall be signed by the applicant under
35  oath, and shall be **[**indorsed**]** <u>endorsed</u> by **[**three**]** <u>not less than four</u>
36  reputable persons who <u>are not related by blood or by law to the</u>
37  <u>applicant and</u> have known the applicant for at least three years
38  preceding the date of application, and who shall certify thereon that
39  the applicant **[**is a person of good moral character and behavior**]**
40  <u>has not engaged in any acts or made any statements that suggest the</u>
41  <u>applicant is likely to engage in conduct, other than lawful self-</u>
42  <u>defense, that would pose a danger to the applicant or others.   The</u>
43  <u>reputable persons also shall provide relevant information supporting</u>
44  <u>the certification, including the nature and extent of their</u>
45  <u>relationship with the applicant and information concerning their</u>
46  <u>knowledge of the applicant's use of drugs or alcohol</u>.
47    c.   Investigation and approval.   Each application shall <u>be</u>
48  <u>accompanied by a $200 application fee and shall</u> in the first

JA1447

1  instance be submitted to the chief police officer of the municipality
2  in which the applicant resides, or to the superintendent 【,】 if: (1)
3  【if】 the applicant is an employee of an armored car company 【,
4  or】 : (2) 【if】 there is no chief police officer in the municipality
5  where the applicant resides 【, or】 : (3) 【if】 the applicant does not
6  reside in this State; or (4) the applicant is a mayor or other elected
7  member of the municipal governing body.
8      In the case of an application made to the chief police officer of a
9  municipality, $150 of the fee shall be retained by the municipality
10  and the remaining $50 shall be forwarded to the superintendent.
11  The fee amount retained by the municipality shall be used to defray
12  the costs of investigation, administration, and processing of the
13  permit to carry handgun applications. Application fees made to the
14  superintendent shall be deposited into the Victims of Crime
15  Compensation Office account.
16      The chief police officer, or the superintendent, as the case may
17  be, shall determine whether the application is complete and, if so,
18  shall cause the fingerprints of the applicant to be taken and
19  compared with any and all records maintained by the municipality,
20  the county in which it is located, the State Bureau of Identification
21  and the Federal Bureau of Identification or; for an applicant who
22  previously submitted fingerprints in order to apply for a firearms
23  purchaser identification card or a permit to purchase a handgun in
24  accordance with N.J.S.2C:58-3 or a permit to carry a handgun in
25  accordance with this section, may solicit such other identification
26  information as may be authorized by the superintendent for the
27  conduct of a comparable criminal record check. 【He】 The chief
28  police officer or the superintendent, as the case may be, shall also
29  determine and record a complete description of each handgun the
30  applicant intends to carry.  The chief police officer, or the
31  superintendent, as the case may be, shall interview the applicant and
32  the persons endorsing the application under subsection b. of this
33  section, and shall make inquiry concerning, and investigate to the
34  extent warranted, whether the applicant is likely to engage in
35  conduct that would result in harm to the applicant or others,
36  including, but not limited to, whether the applicant has any history
37  of threats or acts of violence by the applicant directed toward self or
38  others or any history of use, attempted use, or threatened use of
39  physical force by the applicant against another person, or other
40  incidents implicating the disqualifying criteria set forth in
41  subsection c. of N.J.S.2C:58-3, including but not limited to
42  determining whether the applicant has been subject to any recent
43  arrests or criminal charges for disqualifying crimes or has been
44  experiencing any mental health issues such as suicidal ideation or
45  violent impulses, and the applicant's use of drugs or alcohol.
46      The chief police officer or the superintendent may require such
47  other information from the applicant or any other person, including

1 but not limited to publicly available statements posted or published
2 online by the applicant, as the chief police officer or superintendent
3 deems reasonably necessary to conduct the review of the
4 application.
5 【No】 An application shall not be approved by the chief police
6 officer or the superintendent unless the applicant demonstrates that
7 【he】 the applicant is not subject to any of the disabilities set forth
8 in subsection c. of N.J.S.2C:58-3, that 【he】 the applicant is
9 thoroughly familiar with the safe handling and use of handguns,
10 including providing proof of completion of any training or
11 proficiency requirements established under the law, and that 【he
12 has a justifiable need to carry a handgun】 the applicant is in
13 compliance with the liability insurance requirement of section 4 of
14 P.L.    , c.  (C.    )(pending before the Legislature as this bill).
15 【Each application form shall be accompanied by a written
16 certification of justifiable need to carry a handgun, which shall be
17 under oath and, in the case of a private citizen, shall specify in
18 detail the urgent necessity for self-protection, as evidenced by
19 specific threats or previous attacks which demonstrate a special
20 danger to the applicant's life that cannot be avoided by means other
21 than by issuance of a permit to carry a handgun.  Where possible,
22 the applicant shall corroborate the existence of any specific threats
23 or previous attacks by reference to reports of the incidents to the
24 appropriate law enforcement agencies.
25 If】 Once the application is 【not approved】 deemed complete by
26 the chief police officer or the superintendent , if it is not approved
27 or denied by the chief police officer or the superintendent within
28 【60】 90 days of filing, it shall be deemed to have been approved
29 【unless the applicant agrees】; provided, however, the chief police
30 officer or the superintendent may, for good cause shown and upon
31 written notification to the applicant, extend by up to an additional
32 30 days the time period for which the application may be approved
33 or denied. The written notification sent to the applicant shall
34 provide a detailed explanation of the reasons for the extension.  An
35 applicant also may agree in writing to an additional extension of
36 time 【in writing】 past the 120 day statutory time frame.
37 A chief police officer or the superintendent may delegate to
38 subordinate officers or employees of the law enforcement agency
39 the responsibilities established pursuant to this section.
40 d.  Issuance 【by Superior Court; fee】 of permit; establishment
41 of web portal; disposition of completed information.  If the
42 application has been approved by the chief police officer or the
43 superintendent, as the case may be, the 【applicant shall forthwith
44 present it to the Superior Court of the county in which the applicant
45 resides, or to the Superior Court in any county where he intends to
46 carry a handgun, in the case of a nonresident or employee of an
47 armored car company.  The court shall】 chief police officer or the

1 superintendent shall issue the permit to the applicant in the form
2 prescribed by the superintendent.
3     The permit shall be issued to the applicant electronically through
4 electronic mail or through the web portal established or designated
5 for this purpose by the superintendent, or in such form or manner as
6 may be authorized by the superintendent, if, but only if, 〖it is
7 satisfied〗 the chief police officer or superintendent determines that
8 the applicant:
9     (1) 〖is a person of good character〗 has not engaged in any acts
10 or made any statements that suggest the applicant is likely to
11 engage in conduct, other than lawful self-defense, that would pose a
12 danger to the applicant or others and 〖who〗 is not subject to any of
13 the disabilities set forth in subsection c. of N.J.S.2C:58-3 〖, that he
14 is〗 ;
15     (2) is thoroughly familiar with the safe handling and use of
16 handguns 〖.〗 ; 〖and that he has a justifiable need to carry a
17 handgun in accordance with the provisions of subsection c. of this
18 section. The court may at its discretion issue a limited-type permit
19 which would restrict the applicant as to the types of handguns he
20 may carry and where and for what purposes the handguns may be
21 carried〗
22     (3) has completed the training requirements established pursuant
23 to subsection g. of this section, provided that any requirement for
24 classroom instruction and target training shall not be required for a
25 renewal applicant who completed the instruction and training when
26 obtaining a permit to carry a handgun issued within the previous
27 two years; and
28     (4) is in compliance with the liability insurance requirement of
29 section 4 of P.L. , c. (C. )(pending before the Legislature as this
30 bill).
31     〖At the time of issuance, the applicant shall pay to the county
32 clerk of the county where the permit was issued a permit fee of
33 $20.〗
34     The provisions of this section requiring the issuance of a permit to
35 carry a handgun utilizing the web portal established pursuant to this
36 subsection and requiring the superintendent or chief police officer to
37 determine that an applicant has completed the training requirement
38 pursuant to subsection c. of this section and paragraph (3) of this
39 subsection and is in compliance with the liability insurance
40 requirements pursuant to subsection c. of this section and paragraph
41 (4) of this subsection shall remain inoperative until the first day of the
42 seventh month next following the date of enactment of P.L.     ,
43 c.   (C.   ) (pending before the Legislature as this bill).
44     e.   Appeals from denial of applications.   An applicant who is
45 denied a permit to carry a handgun shall be provided with a written
46 statement of the reasons for the denial. Any 〖person〗 applicant
47 aggrieved by the denial by the chief police officer or the

1     superintendent of approval for a permit to carry a handgun may
2 request a hearing in the Superior Court of the county in which 【he】
3 the applicant resides or in any county in which 【he】 the applicant
4 intends to carry a handgun, in the case of a nonresident, by filing a
5 written request for a hearing within 30 days of the denial. 【Copies】
6 The aggrieved applicant shall serve copies of the request 【shall be
7 served】 upon the superintendent, the county prosecutor, and the
8 chief police officer of the municipality where the applicant resides,
9 if 【he】 the applicant is a resident of this State. The hearing shall be
10 held within 【30】 60 days of the filing of the request, and no formal
11 pleading or filing fee shall be required. Appeals from the
12 determination at the hearing shall be in accordance with law and the
13 rules governing the courts of this State.

14     【If the superintendent or chief police officer approves an
15 application and the Superior Court denies the application and
16 refuses to issue a permit, the applicant may appeal the denial in
17 accordance with law and the rules governing the courts of this
18 State.】

19     The Administrative Director of the Courts shall coordinate with
20 the superintendent in the development of an electronic filing system
21 to receive requests for hearings and serve the chief police officer
22 and superintendent as required in this section.

23     f.   Revocation of permits. Any permit issued under this section
24 shall be void at the time the holder thereof becomes subject to any
25 of the disabilities set forth in subsection c. of N.J.S.2C:58-3, and
26 the holder of a void permit shall immediately surrender the permit
27 to the superintendent who shall give notice to the licensing
28 authority. Any permit may be revoked by the Superior Court, after
29 hearing upon notice to the holder, if the court finds that the holder
30 is no longer qualified for the issuance of a permit. The county
31 prosecutor of any county, the chief police officer of any
32 municipality, the superintendent, or any citizen may apply to the
33 court at any time for the revocation of any permit issued pursuant to
34 this section.

35     g.   Training requirement. (1) On or prior to the first day of the
36 seventh month following the enactment of P.L. , c. (C. )
37 (pending before the Legislature as this bill), the superintendent shall
38 establish training requirements in the lawful and safe handling and
39 storage of firearms, which shall consist of an online course of
40 instruction, in-person classroom instruction, and target training
41 administered by a certified firearm instructor on a firing range
42 approved by the superintendent and on the list of approved ranges
43 published on the State Police website. The training shall include, but
44 not be limited to, demonstration of a level of proficiency in the use of
45 a handgun in such manner as required by the superintendent and
46 training, developed or approved in conjunction with the Police

1   Training Commission, on justification in the use of deadly force
2   under State law.
3       (2) A person who obtained a permit pursuant to this section prior to
4   the first day of the seventh month following the date of enactment
5   of P.L.   , c.   (C.   ) (pending before the Legislature as this bill) and
6   which permit is not scheduled to expire until at least one year
7   following the enactment of P.L.   , c.   (C.   ) (pending before the
8   Legislature as this bill) shall comply with the training requirement
9   established pursuant to this subsection no later than the first day of
10  the tenth month following the date of enactment of P.L.   ,
11  c.   (C.   ) (pending before the Legislature as this bill).
12      h.  For purposes of this section, "holster" means a device or
13  sheath that securely retains a handgun which, at a minimum,
14  conceals and protects the main body of the firearm, maintains the
15  firearm in a consistent and accessible position, and renders the
16  trigger covered and inaccessible while the handgun is fully seated in
17  the holster.
18  (cf: P.L.2018, c.37, s.1)
19
20      4.  (New section)  a.  Every private citizen who carries a
21  handgun in public in this State shall maintain liability insurance
22  coverage insuring against loss resulting from liability imposed by
23  law for bodily injury, death, and property damage sustained by any
24  person arising out of the ownership, maintenance, operation or use
25  of a firearm carried in public wherein such coverage shall be at least
26  in an amount or limit of $300,000, exclusive of interest and costs,
27  on account of injury to or death of more than one person and for
28  damage to property, in any one incident.
29      b.  Proof of liability insurance, as required pursuant to
30  subsection a. of this section, shall be produced by the person
31  carrying a handgun in public, within a reasonable amount of time
32  following any injury, death, or property damage alleged to have
33  been caused by the person carrying the handgun in public.  This
34  requirement shall be satisfied by delivering a full and complete
35  copy of the applicable policy or policies of insurance that meet the
36  standards established by subsection a. of this section and that were
37  in force at the time of the injury, death, or property damage.
38      Notwithstanding the provisions of this subsection, disclosure of
39  policy information under this section shall not constitute an
40  admission that the alleged injury, death, or property damage is
41  subject to the policy.
42      Information concerning the insurance policy shall not be
43  admissible as evidence at trial by reason of disclosure pursuant to
44  this subsection.  The disclosure shall be confidential and available
45  only to the injured person, representative of the decedent, or owner
46  of damaged property and the attorney representing the injured
47  person, representative of the decedent, or owner of damaged
48  property and personnel in the office of the attorney.

1  c.  A violation of this section shall be a crime of the fourth
2 degree and shall constitute full and sufficient grounds for
3 revocation of a permit to carry a handgun issued pursuant to
4 N.J.S.2C:58-4.
5
6  5.  (New section) Safe carry requirements for authorized
7 holders of a permit to carry a handgun.
8  a.  The holder of a permit to carry a handgun issued pursuant to
9 N.J.S.2C:58-4 shall not:
10  (1) use or consume alcohol, a cannabis item, or a controlled
11 substance while carrying a handgun;
12  (2) be under the influence of alcohol, cannabis, or a controlled
13 substance while carrying a handgun;
14  (3) carry a handgun in public outside of a holster or carry a
15 handgun in public in a holster that does not meet the requirements
16 of subsection h. of N.J.S.2C:58-4;
17  (4) carry more than two firearms under the permittee's control at
18 one time; or
19  (5) engage in an unjustified display of a handgun.
20  A violation of this subsection shall be a crime of the fourth
21 degree, and any such violation shall constitute full and sufficient
22 grounds for revocation of a permit to carry a handgun issued
23 pursuant to N.J.S.2C:58-4.
24  b.  The holder of a permit to carry a handgun issued pursuant to
25 N.J.S.2C:58-4, if stopped or detained by a law enforcement officer
26 while carrying a handgun in public or traveling with a handgun in a
27 motor vehicle, shall:
28  (1) immediately disclose to the law enforcement officer that they
29 are carrying a handgun or that a handgun is stored in the vehicle;
30 and
31  (2) display the permit to carry a handgun issued pursuant to
32 N.J.S.2C:58-4.
33  A violation of paragraph (1) of this section shall be a crime of
34 the fourth degree.  A person who violates paragraph (2) of this
35 subsection shall be guilty of a disorderly persons offense for a first
36 offense and subject to a $100 fine and a crime of the fourth degree
37 for a second or subsequent offense.
38  c.  A holder of a permit to carry a handgun issued pursuant to
39 N.J.S.2C:58-4 who is carrying a handgun in public and is detained
40 by a law enforcement officer as part of a criminal investigation
41 shall provide the handgun to the law enforcement officer upon
42 request for purposes of inspecting the handgun. The provisions of
43 this subsection shall not be construed to affect or otherwise limit the
44 authority of a law enforcement officer to conduct a lawful search or
45 seizure.
46  A violation of this subsection shall be a crime of the fourth
47 degree.

ACS for **A4769** DANIELSEN, GREENWALD

24

1    6.    (New section) Requirements and restrictions on the lawful
2    carrying of a handgun in public.
3        Except as permitted pursuant to N.J.S.2C:39-6, in addition to any
4    criminal penalties under subsection b. of N.J.S.2C:39-5, sections 5
5    and 7 of P.L.    , c.    (C.    )(pending before the Legislature as this
6    bill), or any other law, it shall be a crime of the fourth degree for
7    any person in a public place:
8        a.    to carry a handgun concealed on or about their person,
9    except as permitted in accordance with N.J.S.2C:39-6, without
10   possessing on their person a valid and lawfully issued permit to
11   carry under N.J.S.2C:58-4 and proof of the liability insurance
12   required pursuant to section 4 of P.L. ,    c.    (C.    )(pending before
13   the Legislature as this bill); or
14       b.    to carry a handgun openly, whether or not in possession of a
15   valid and lawfully issued permit to carry under N.J.S.2C:58-4 and
16   proof of the liability insurance required pursuant to section 4 of
17   P.L. , c. (C. )(pending before the Legislature as this bill).
18
19       7.    (New section) Places where the carrying of a firearm or
20   destructive device is prohibited.
21       a.    Except as otherwise provided in this section and in the case
22   of a brief, incidental entry onto property, which shall be deemed a
23   de minimis infraction within the contemplation of N.J.S.2C:2-11, it
24   shall be a crime of the third degree for any person, other than a
25   person lawfully carrying a firearm within the authorized scope of an
26   exemption set forth in N.J.S.2C:39-6, to knowingly carry a firearm as
27   defined in subsection f. of N.J.S.2C:39-1 and a crime of the second
28   degree to knowingly possess a destructive device as defined in
29   subsection c. of N.J.S.2C:39-1 in any of the following places,
30   including in or upon any part of the buildings, grounds, or parking
31   area of:
32       (1) a place owned, leased, or under the control of State, county
33   or municipal government used for the purpose of government
34   administration, including but not limited to police stations;
35       (2) a courthouse, courtroom, or any other premises used to
36   conduct judicial or court administrative proceedings or functions;
37       (3) a State, county, or municipal correctional or juvenile justice
38   facility, jail and any other place maintained by or for a
39   governmental entity for the detention of criminal suspects or
40   offenders;
41       (4) a State-contracted half-way house;
42       (5) a location being used as a polling place during the conduct of
43   an election and places used for the storage or tabulation of ballots;
44       (6) within 100 feet of a place where a public gathering,
45   demonstration or event is held for which a government permit is
46   required, during the conduct of such gathering, demonstration or
47   event;

1    (7) a school, college, university or other educational institution,
2 and on any school bus;

3    (8) a child care facility, including a day care center;

4    (9) a nursery school, pre-school, zoo, or summer camp;

5    (10) a park, beach, recreation facility or area or playground
6 owned or controlled by a State, county or local government unit, or
7 any part of such a place, which is designated as a gun free zone by
8 the governing authority based on considerations of public safety;

9    (11) youth sports events, as defined in N.J.S.5:17-1, during and
10 immediately preceding and following the conduct of the event,
11 except that this provision shall not apply to participants of a youth
12 sports event which is a firearm shooting competition to which
13 paragraph (3) of subsection b. of section 14 of P.L.1979, c.179
14 (C.2C:58-6.1) applies;

15    (12) a publicly owned or leased library or museum;

16    (13) a shelter for the homeless, emergency shelter for the
17 homeless, basic center shelter program, shelter for homeless or
18 runaway youth, children's shelter, child care shelter, shelter for
19 victims of domestic violence, or any shelter licensed by or under the
20 control of the Juvenile Justice Commission or the Department of
21 Children and Families;

22    (14) a community residence for persons with developmental
23 disabilities, head injuries, or terminal illnesses, or any other
24 residential setting licensed by the Department of Human Services or
25 Department of Health;

26    (15) a bar or restaurant where alcohol is served, and any other
27 site or facility where alcohol is sold for consumption on the
28 premises;

29    (16) a Class 5 Cannabis retailer or medical cannabis dispensary,
30 including any consumption areas licensed or permitted by the
31 Cannabis Regulatory Commission established pursuant to section
32 31 of P.L.2019, c.153 (C.24:6I-24);

33    (17) a privately or publicly owned and operated entertainment
34 facility within this State, including but not limited to a theater,
35 stadium, museum, arena, racetrack or other place where
36 performances, concerts, exhibits, games or contests are held;

37    (18) a casino and related facilities, including but not limited to
38 appurtenant hotels, retail premises, restaurant and bar facilities, and
39 entertainment and recreational venues located within the casino
40 property;

41    (19) a plant or operation that produces, converts, distributes or
42 stores energy or converts one form of energy to another;

43    (20) an airport or public transportation hub;

44    (21) a health care facility, including but not limited to a general
45 hospital, special hospital, psychiatric hospital, public health center,
46 diagnostic center, treatment center, rehabilitation center, extended
47 care facility, skilled nursing home, nursing home, intermediate care
48 facility, tuberculosis hospital, chronic disease hospital, maternity

1   hospital, outpatient clinic, dispensary, assisted living center, home
2   health care agency, residential treatment facility, residential health
3   care facility, medical office, or ambulatory care facility;
4     (22) a facility licensed or regulated by the Department of Human
5   Services, Department of Children and Families, or Department of
6   Health, other than a health care facility, that provides addiction or
7   mental health treatment or support services;
8     (23) a public location being used for making motion picture or
9   television images for theatrical, commercial or educational
10   purposes, during the time such location is being used for that
11   purpose;
12     (24) private property, including but not limited to residential,
13   commercial, industrial, agricultural, institutional or undeveloped
14   property, unless the owner has provided express consent or has
15   posted a sign indicating that it is permissible to carry on the
16   premises a concealed handgun with a valid and lawfully issued
17   permit under N.J.S.2C:58-4, provided that nothing in this paragraph
18   shall be construed to affect the authority to keep or carry a firearm
19   established under subsection e. of N.J.S.2C:39-6; and
20     (25) any other place in which the carrying of a firearm is
21   prohibited by statute or rule or regulation promulgated by a federal
22   or State agency.
23     b.  (1) A person, other than a person lawfully carrying a firearm
24   within the authorized scope of an exemption set forth in subsection
25   a., c., or l. of N.J.S.2C:39-6, who is otherwise authorized under the
26   law to carry or transport a firearm shall not do so while in a vehicle
27   in New Jersey, unless the handgun is unloaded and contained in a
28   closed and securely fastened case, gunbox, or locked unloaded in
29   the trunk of the vehicle.
30     (2) A holder of a valid and lawfully issued permit to carry a
31   handgun shall not leave a handgun outside of their immediate
32   possession or control within a parked vehicle, unless the handgun is
33   unloaded and contained in a closed and securely fastened case, or
34   gunbox, and is not visible from outside of the vehicle, or is locked
35   unloaded in the trunk or storage area of the vehicle.
36     A violation of paragraph (1) or (2) of this subsection is a crime
37   of the fourth degree.
38     c.  Notwithstanding the provisions of subsections a. and b. of
39   this section, the holder of a valid and lawfully issued permit to carry
40   under N.J.S.2C:58-4 who is otherwise prohibited under this section
41   from carrying a concealed firearm into the parking area of a
42   prohibited location specified in subsection a. of this section shall be
43   permitted to:
44     (1) transport a concealed handgun or ammunition within a
45   vehicle into or out of the parking area, provided that the handgun is
46   unloaded and contained in a closed and securely fastened case,
47   gunbox, or locked unloaded in the trunk or storage area of the
48   vehicle;

1     (2) store a handgun or ammunition within a locked lock box and
2 out of plain view within the vehicle in the parking area;
3     (3) transport a concealed handgun in the immediate area
4 surrounding their vehicle within a prohibited parking lot area only
5 for the limited purpose of storing or retrieving the handgun within a
6 locked lock box in the vehicle's trunk or other place inside the
7 vehicle that is out of plain view; and
8     (4) transport a concealed handgun between a vehicle parked
9 within a prohibited parking lot area and a place other than a
10 prohibited place enumerated in subsection a. of this section,
11 provided that the person immediately leaves the parking lot area
12 and does not enter into or on the grounds of the prohibited place
13 with the handgun.
14     d.   The holder of a valid and lawfully issued permit to carry
15 under N.J.S.2C:58-4 shall not be in violation of subsection a. of this
16 section while the holder is traveling along a public right-of-way that
17 touches or crosses any of the places enumerated in subsection a. of
18 this section if the concealed handgun is carried on their person in
19 accordance with the provisions of this act or is being transported in
20 a vehicle by the permit holder in accordance with all other
21 applicable provisions of law.
22     e.   (1) Nothing in this act shall be construed to prohibit the
23 holder of a valid and lawfully issued permit under N.J.S.2C:58-4
24 who is lawfully authorized to provide security at a place
25 enumerated in subsection a. of this section from carrying a firearm,
26 openly or concealed, provided that the authorization is set forth in
27 writing, and only to the extent permitted by the entity responsible
28 for security at the place in question.
29     (2) Unless otherwise required or prohibited by law, the owner or
30 entity in control of any place enumerated in subsection a. of this
31 section or owner or entity responsible for providing security may
32 allow or prohibit retired law enforcement officers who are
33 authorized to possess and carry a handgun pursuant to subsection l.
34 of N.J.S.2C:39-6 or qualified retired law enforcement officers
35 within the meaning of the federal "Law Enforcement Officers
36 Safety Act of 2004," Pub.L. 108-277 to carry a concealed handgun
37 on the premises of such place.
38     f.   Nothing in this section shall be construed to prohibit an
39 employee of an armored car company who is the holder of a valid
40 and lawfully issued permit to carry a handgun issued pursuant to
41 N.J.S.2C:58-4 who is contractually authorized to provide services
42 for a client at a place enumerated in subsection a. of this section
43 from carrying a firearm, openly, in the regular course of
44 employment.
45     g.   Nothing in this section shall prohibit the carrying or
46 transporting of a firearm in accordance with subsections e. and f. of
47 N.J.S.2C:39-6 or where it is otherwise expressly authorized by law.

1   8.  N.J.S.2C:39-6 is amended to read as follows:

2   2C:39-6.  a.  Provided a person complies with the requirements

3   of subsection j. of this section, N.J.S.2C:39-5 does not apply to:

4   (1)  Members of the Armed Forces of the United States or of the

5   National Guard while actually on duty, or while traveling between

6   places of duty and carrying authorized weapons in the manner

7   prescribed by the appropriate military authorities;

8   (2)  Federal law enforcement officers, and any other federal

9   officers and employees required to carry firearms in the

10  performance of their official duties;

11  (3)  Members of the State Police and, under conditions

12  prescribed by the superintendent, members of the Marine Law

13  Enforcement Bureau of the Division of State Police;

14  (4)  A sheriff, undersheriff, sheriff's officer, [county prosecutor,

15  assistant prosecutor,] prosecutor's detective or investigator, [deputy

16  attorney general or] State investigator employed by the Division of

17  Criminal Justice of the Department of Law and Public Safety,

18  investigator employed by the State Commission of Investigation,

19  inspector of the Alcoholic Beverage Control Enforcement Bureau of

20  the Division of State Police in the Department of Law and Public

21  Safety authorized to carry weapons by the Superintendent of State

22  Police, State park police officer, or State conservation police

23  officer;

24  (5)  Except as hereinafter provided, a State correctional police

25  officer, or a prison or jail warden of any penal institution in this

26  State or the warden's deputies, or an employee of the Department of

27  Corrections engaged in the interstate transportation of convicted

28  offenders, while in the performance of the employee's duties, and

29  when required to possess the weapon by a superior officer, or a

30  correctional police officer or keeper of a penal institution in this

31  State at all times while in the State of New Jersey, provided the

32  person annually passes an examination approved by the

33  superintendent testing the person's proficiency in the handling of

34  firearms;

35  (6)  A civilian employee of the United States Government under

36  the supervision of the commanding officer of any post, camp,

37  station, base or other military or naval installation located in this

38  State who is required, in the performance of the employee's official

39  duties, to carry firearms, and who is authorized to carry firearms by

40  the commanding officer, while in the actual performance of the

41  employee's official duties;

42  (7) (a) A regularly employed member, including a detective, of

43  the police department of any county or municipality, or of any

44  State, interstate, municipal or county park police force or boulevard

45  police force, at all times while in the State of New Jersey;

46  (b)  A special law enforcement officer authorized to carry a

47  weapon as provided in subsection b. of section 7 of P.L.1985, c.439

48  (C.40A:14-146.14);

1    (c) An airport security officer or a special law enforcement
2 officer appointed by the governing body of any county or
3 municipality, except as provided in subparagraph (b) of this
4 paragraph, or by the commission, board or other body having
5 control of a county park or airport or boulevard police force, while
6 engaged in the actual performance of the officer's official duties and
7 when specifically authorized by the governing body to carry
8 weapons;

9    (8) A full-time, paid member of a paid or part-paid fire
10 department or force of any municipality who is assigned full-time
11 or part-time to an arson investigation unit created pursuant to
12 section 1 of P.L.1981, c.409 (C.40A:14-7.1) or to the county arson
13 investigation unit in the county prosecutor's office, while either
14 engaged in the actual performance of arson investigation duties or
15 while actually on call to perform arson investigation duties and
16 when specifically authorized by the governing body or the county
17 prosecutor, as the case may be, to carry weapons. Prior to being
18 permitted to carry a firearm, a member shall take and successfully
19 complete a firearms training course administered by the Police
20 Training Commission pursuant to P.L.1961, c.56 (C.52:17B-66 et
21 seq.), and shall annually qualify in the use of a revolver or similar
22 weapon prior to being permitted to carry a firearm;

23    (9) A juvenile correctional police officer in the employment of
24 the Juvenile Justice Commission established pursuant to section 2
25 of P.L.1995, c.284 (C.52:17B-170) subject to the regulations
26 promulgated by the commission;

27    (10) A designated employee or designated licensed agent for a
28 nuclear power plant under license of the Nuclear Regulatory
29 Commission, while in the actual performance of the person's
30 official duties, if the federal licensee certifies that the designated
31 employee or designated licensed agent is assigned to perform site
32 protection, guard, armed response or armed escort duties and is
33 appropriately trained and qualified, as prescribed by federal
34 regulation, to perform those duties. Any firearm utilized by an
35 employee or agent for a nuclear power plant pursuant to this
36 paragraph shall be returned each day at the end of the employee's or
37 agent's authorized official duties to the employee's or agent's
38 supervisor. All firearms returned each day pursuant to this
39 paragraph shall be stored in locked containers located in a secure
40 area;

41    (11) A county correctional police officer at all times while in the
42 State of New Jersey, provided the officer annually passes an
43 examination approved by the superintendent testing the officer's
44 proficiency in the handling of firearms<u>;</u>

45    <u>(12) A county prosecutor, assistant prosecutor, federal</u>
46 <u>prosecutor, municipal prosecutor, Attorney General, assistant</u>
47 <u>attorney general, deputy attorney general and federal, State, county,</u>
48 <u>or municipal court judge, including a judge of the Tax Court and</u>

1    any other court of limited jurisdiction established, altered, or
2    abolished by law, a judge of the Office of Administrative Law, a
3    judge of the Division of Workers' Compensation at all times while
4    in this State. Prior to being permitted to carry a firearm, a person
5    subject to this paragraph shall take and successfully complete a
6    firearms training course administered by the Police Training
7    Commission pursuant to P.L.1961, c.56 (C.52:17B-66 et seq.), and
8    shall annually qualify in the use of a handgun or similar weapon
9    prior to being permitted to carry a firearm. The superintendent may
10    issue identification cards indicating that such a person is permitted
11    to carry a handgun pursuant to this paragraph.
12       b.  Subsections a., b. and c. of N.J.S.2C:39-5 do not apply to:
13       (1) A law enforcement officer employed by a governmental
14    agency outside of the State of New Jersey while actually engaged in
15    the officer's official duties, provided, however, that the officer has
16    first notified the superintendent or the chief law enforcement officer
17    of the municipality or the prosecutor of the county in which the
18    officer is engaged; or
19       (2) A licensed dealer in firearms and the dealer's registered
20    employees during the course of their normal business while
21    traveling to and from their place of business and other places for the
22    purpose of demonstration, exhibition or delivery in connection with
23    a sale, provided, however, that the weapon is carried in the manner
24    specified in subsection g. of this section.
25       c.  Provided a person complies with the requirements of
26    subsection j. of this section, subsections b. and c. of N.J.S.2C:39-5
27    do not apply to:
28       (1) A special agent of the Division of Taxation who has passed
29    an examination in an approved police training program testing
30    proficiency in the handling of any firearm which the agent may be
31    required to carry, while in the actual performance of the agent's
32    official duties and while going to or from the agent's place of duty,
33    or any other police officer, while in the actual performance of the
34    officer's official duties;
35       (2) A State deputy conservation police officer or a full-time
36    employee of the Division of Parks and Forestry having the power of
37    arrest and authorized to carry weapons, while in the actual
38    performance of the officer's official duties;
39       (3) (Deleted by amendment, P.L.1986, c.150.)
40       (4) A court attendant appointed by the sheriff of the county or
41    by the judge of any municipal court or other court of this State,
42    while in the actual performance of the attendant's official duties;
43       (5) A guard employed by any railway express company, banking
44    or building and loan or savings and loan institution of this State,
45    while in the actual performance of the guard's official duties;
46       (6) A member of a legally recognized military organization
47    while actually under orders or while going to or from the prescribed

Case 1:22-cv-... Case 1:22-cv-... Document 48 Page 289 Date Filed 07/20/2023 PageID: 1584

1  place of meeting and carrying the weapons prescribed for drill,
2  exercise or parade;

3  (7) A municipal humane law enforcement officer, authorized
4  pursuant to subsection d. of section 25 of P.L.2017, c.331 (C.4:22-
5  14.1), or humane law enforcement officer of a county society for
6  the prevention of cruelty to animals authorized pursuant to
7  subsection c. of section 29 of P.L.2017, c.331 (C.4:22-14.5), while
8  in the actual performance of the officer's duties;

9  (8) An employee of a public utilities corporation actually
10  engaged in the transportation of explosives;

11  (9) A railway policeman, except a transit police officer of the
12  New Jersey Transit Police Department, at all times while in the
13  State of New Jersey, provided that the person has passed an
14  approved police academy training program consisting of at least
15  280 hours.  The training program shall include, but need not be
16  limited to, the handling of firearms, community relations, and
17  juvenile relations;

18  (10) A campus police officer appointed under P.L.1970, c.211
19  (C.18A:6-4.2 et seq.) at all times.  Prior to being permitted to carry
20  a firearm, a campus police officer shall take and successfully
21  complete a firearms training course administered by the Police
22  Training Commission, pursuant to P.L.1961, c.56 (C.52:17B-66 et
23  seq.), and shall annually qualify in the use of a revolver or similar
24  weapon prior to being permitted to carry a firearm;

25  (11) (Deleted by amendment, P.L.2003, c.168).

26  (12) A transit police officer of the New Jersey Transit Police
27  Department, at all times while in the State of New Jersey, provided
28  the officer has satisfied the training requirements of the Police
29  Training Commission, pursuant to subsection c. of section 2 of
30  P.L.1989, c.291 (C.27:25-15.1);

31  (13) A parole officer employed by the State Parole Board at all
32  times.  Prior to being permitted to carry a firearm, a parole officer
33  shall take and successfully complete a basic course for regular
34  police officer training administered by the Police Training
35  Commission, pursuant to P.L.1961, c.56 (C.52:17B-66 et seq.), and
36  shall annually qualify in the use of a revolver or similar weapon
37  prior to being permitted to carry a firearm;

38  (14) A Human Services police officer at all times while in the
39  State of New Jersey, as authorized by the Commissioner of Human
40  Services;

41  (15) A person or employee of any person who, pursuant to and as
42  required by a contract with a governmental entity, supervises or
43  transports persons charged with or convicted of an offense;

44  (16) A housing authority police officer appointed under
45  P.L.1997, c.210 (C.40A:14-146.19 et al.) at all times while in the
46  State of New Jersey; or

47  (17) A probation officer assigned to the "Probation Officer
48  Community Safety Unit" created by section 2 of P.L.2001, c.362

Case 1:22-cv-...Case 1:22-cv-... Document 48-8...Page... Date Filed 02/13/2... Date Filed 07/20/2023 PageID: 1585

1 (C.2B:10A-2) while in the actual performance of the probation
2 officer's official duties. Prior to being permitted to carry a firearm,
3 a probation officer shall take and successfully complete a basic
4 course for regular police officer training administered by the Police
5 Training Commission, pursuant to P.L.1961, c.56 (C.52:17B-66 et
6 seq.), and shall annually qualify in the use of a revolver or similar
7 weapon prior to being permitted to carry a firearm.
8     d. (1) Subsections c. and d. of N.J.S.2C:39-5 do not apply to
9 antique firearms, provided that the antique firearms are unloaded or
10 are being fired for the purposes of exhibition or demonstration at an
11 authorized target range or in another manner approved in writing by
12 the chief law enforcement officer of the municipality in which the
13 exhibition or demonstration is held, or if not held on property under
14 the control of a particular municipality, the superintendent.
15     (2) Subsection a. of N.J.S.2C:39-3 and subsection d. of
16 N.J.S.2C:39-5 do not apply to an antique cannon that is capable of
17 being fired but that is unloaded and immobile, provided that the
18 antique cannon is possessed by (a) a scholastic institution, a
19 museum, a municipality, a county or the State, or (b) a person who
20 obtained a firearms purchaser identification card as specified in
21 N.J.S.2C:58-3.
22     (3) Subsection a. of N.J.S.2C:39-3 and subsection d. of
23 N.J.S.2C:39-5 do not apply to an unloaded antique cannon that is
24 being transported by one eligible to possess it, in compliance with
25 regulations the superintendent may promulgate, between its
26 permanent location and place of purchase or repair.
27     (4) Subsection a. of N.J.S.2C:39-3 and subsection d. of
28 N.J.S.2C:39-5 do not apply to antique cannons that are being loaded
29 or fired by one eligible to possess an antique cannon, for purposes
30 of exhibition or demonstration at an authorized target range or in
31 the manner as has been approved in writing by the chief law
32 enforcement officer of the municipality in which the exhibition or
33 demonstration is held, or if not held on property under the control
34 of a particular municipality, the superintendent, provided that
35 performer has given at least 30 days' notice to the superintendent.
36     (5) Subsection a. of N.J.S.2C:39-3 and subsection d. of
37 N.J.S.2C:39-5 do not apply to the transportation of unloaded
38 antique cannons directly to or from exhibitions or demonstrations
39 authorized under paragraph (4) of subsection d. of this section,
40 provided that the transportation is in compliance with safety
41 regulations the superintendent may promulgate. Those subsections
42 shall not apply to transportation directly to or from exhibitions or
43 demonstrations authorized under the law of another jurisdiction,
44 provided that the superintendent has been given 30 days' notice and
45 that the transportation is in compliance with safety regulations the
46 superintendent may promulgate.
47     e. Nothing in subsections b., c., and d. of N.J.S.2C:39-5 shall
48 be construed to prevent a person keeping or carrying about the

1 person's place of business, residence, premises or other land owned
2 or possessed by the person, any firearm, or from carrying the same,
3 in the manner specified in subsection g. of this section, from any
4 place of purchase to the person's residence or place of business,
5 between the person's dwelling and place of business, between one
6 place of business or residence and another when moving, or
7 between the person's dwelling or place of business and place where
8 the firearms are repaired, for the purpose of repair. For the
9 purposes of this section, a place of business shall be deemed to be a
10 fixed location.
11     f.    Nothing in subsections b., c., and d. of N.J.S.2C:39-5 shall
12 be construed to prevent:
13     (1) A member of any rifle or pistol club organized in accordance
14 with the rules prescribed by the National Board for the Promotion
15 of Rifle Practice, in going to or from a place of target practice,
16 carrying firearms necessary for target practice, provided that the
17 club has filed a copy of its charter with the superintendent and
18 annually submits a list of its members to the superintendent and
19 provided further that the firearms are carried in the manner
20 specified in subsection g. of this section;
21     (2) A person carrying a firearm or knife in the woods or fields
22 or upon the waters of this State for the purpose of hunting, target
23 practice or fishing, provided that the firearm or knife is legal and
24 appropriate for hunting or fishing purposes in this State and the
25 person has in **[**his**]** the person's possession a valid hunting license,
26 or, with respect to fresh water fishing, a valid fishing license;
27     (3) A person transporting any firearm or knife while traveling:
28     (a) Directly to or from any place for the purpose of hunting or
29 fishing, provided the person has in the person's possession a valid
30 hunting or fishing license; or
31     (b) Directly to or from any target range, or other authorized
32 place for the purpose of practice, match, target, trap or skeet
33 shooting exhibitions, provided in all cases that during the course of
34 the travel all firearms are carried in the manner specified in
35 subsection g. of this section and the person has complied with all
36 the provisions and requirements of Title 23 of the Revised Statutes
37 and any amendments thereto and all rules and regulations
38 promulgated thereunder; or
39     (c) In the case of a firearm, directly to or from any exhibition or
40 display of firearms which is sponsored by any law enforcement
41 agency, any rifle or pistol club, or any firearms collectors club, for
42 the purpose of displaying the firearms to the public or to the
43 members of the organization or club, provided, however, that not
44 less than 30 days prior to the exhibition or display, notice of the
45 exhibition or display shall be given to the Superintendent of the
46 State Police by the sponsoring organization or club, and the sponsor
47 has complied with any reasonable safety regulations the
48 superintendent may promulgate. Any firearms transported pursuant

1   to this section shall be transported in the manner specified in
2   subsection g. of this section;
3     (4) A person from keeping or carrying about a private or
4   commercial aircraft or any boat, or from transporting to or from the
5   aircraft or boat for the purpose of installation or repair of a visual
6   distress signaling device approved by the United States Coast
7   Guard.
8     g. Any weapon being transported under paragraph (2) of
9   subsection b., subsection e., or paragraph (1) or (3) of subsection f.
10   of this section shall be carried unloaded and contained in a closed
11   and fastened case, gunbox, securely tied package, or locked in the
12   trunk of the automobile in which it is being transported, and in the
13   course of travel shall include only deviations as are reasonably
14   necessary under the circumstances.
15     h. Nothing in subsection d. of N.J.S.2C:39-5 shall be construed
16   to prevent any employee of a public utility, as defined in R.S.48:2-
17   13, doing business in this State or any United States Postal Service
18   employee, while in the actual performance of duties which
19   specifically require regular and frequent visits to private premises,
20   from possessing, carrying or using any device which projects,
21   releases or emits any substance specified as being noninjurious to
22   canines or other animals by the Commissioner of Health and which
23   immobilizes only on a temporary basis and produces only
24   temporary physical discomfort through being vaporized or
25   otherwise dispensed in the air for the sole purpose of repelling
26   canine or other animal attacks.
27     The device shall be used solely to repel only those canine or
28   other animal attacks when the canines or other animals are not
29   restrained in a fashion sufficient to allow the employee to properly
30   perform the employee's duties.
31     Any device used pursuant to this act shall be selected from a list
32   of products, which consist of active and inert ingredients, permitted
33   by the Commissioner of Health.
34     i. (1) Nothing in N.J.S.2C:39-5 shall be construed to prevent
35   any person who is 18 years of age or older and who has not been
36   convicted of a crime, from possession for the purpose of personal
37   self-defense of one pocket-sized device which contains and releases
38   not more than three-quarters of an ounce of chemical substance not
39   ordinarily capable of lethal use or of inflicting serious bodily injury,
40   but rather, is intended to produce temporary physical discomfort or
41   disability through being vaporized or otherwise dispensed in the air.
42   Any person in possession of any device in violation of this
43   subsection shall be deemed and adjudged to be a disorderly person,
44   and upon conviction thereof, shall be punished by a fine of not less
45   than $100.
46     (2) Notwithstanding the provisions of paragraph (1) of this
47   subsection, nothing in N.J.S.2C:39-5 shall be construed to prevent a
48   health inspector or investigator operating pursuant to the provisions

1    of section 7 of P.L.1977, c.443 (C.26:3A2-25) or a building
2    inspector from possessing a device which is capable of releasing
3    more than three-quarters of an ounce of a chemical substance, as
4    described in paragraph (1) of this subsection, while in the actual
5    performance of the inspector's or investigator's duties, provided that
6    the device does not exceed the size of those used by law
7    enforcement.
8    j.    A person shall qualify for an exemption from the provisions
9    of N.J.S.2C:39-5, as specified under subsections a. and c. of this
10    section, if the person has satisfactorily completed a firearms
11    training course approved by the Police Training Commission.
12    The exempt person shall not possess or carry a firearm until the
13    person has satisfactorily completed a firearms training course and
14    shall annually qualify in the use of a revolver or similar weapon.
15    For purposes of this subsection, a "firearms training course" means
16    a course of instruction in the safe use, maintenance and storage of
17    firearms which is approved by the Police Training Commission.
18    The commission shall approve a firearms training course if the
19    requirements of the course are substantially equivalent to the
20    requirements for firearms training provided by police training
21    courses which are certified under section 6 of P.L.1961, c.56
22    (C.52:17B-71). A person who is specified in paragraph (1), (2), (3),
23    or (6) of subsection a. of this section shall be exempt from the
24    requirements of this subsection.
25    k.    Nothing in subsection d. of N.J.S.2C:39-5 shall be construed
26    to prevent any financial institution, or any duly authorized
27    personnel of the institution, from possessing, carrying or using for
28    the protection of money or property, any device which projects,
29    releases or emits tear gas or other substances intended to produce
30    temporary physical discomfort or temporary identification.
31    l.    Nothing in subsection b. of N.J.S.2C:39-5 shall be construed
32    to prevent a law enforcement officer who retired in good standing,
33    including a retirement because of a disability pursuant to section 6
34    of P.L.1944, c.255 (C.43:16A-6), section 7 of P.L.1944, c.255
35    (C.43:16A-7), section 1 of P.L.1989, c.103 (C.43:16A-6.1), or any
36    substantially similar statute governing the disability retirement of
37    federal law enforcement officers, provided the officer was a
38    regularly employed, full-time law enforcement officer for an
39    aggregate of four or more years prior to the officer's disability
40    retirement and further provided that the disability which constituted
41    the basis for the officer's retirement did not involve a certification
42    that the officer was mentally incapacitated for the performance of
43    the officer's usual law enforcement duties and any other available
44    duty in the department which the officer's employer was willing to
45    assign to the officer or does not subject that retired officer to any of
46    the disabilities set forth in subsection c. of N.J.S.2C:58-3 which
47    would disqualify the retired officer from possessing or carrying a
48    firearm, who semi-annually qualifies in the use of the handgun the

1  officer is permitted to carry in accordance with the requirements
2  and procedures established by the Attorney General pursuant to
3  subsection j. of this section and pays the actual costs associated
4  with those semi-annual qualifications, who is 75 years of age or
5  younger, and who was regularly employed as a full-time member of
6  the State Police; a full-time member of an interstate police force; a
7  full-time member of a county or municipal police department in this
8  State; a full-time member of a State law enforcement agency; a full-
9  time sheriff, undersheriff or sheriff's officer of a county of this
10  State; a full-time State or county correctional police officer; a full-
11  time State correctional police officer or county correctional police
12  officer; a full-time State or county park police officer; a full-time
13  special agent of the Division of Taxation; a full-time Human
14  Services police officer; a full-time transit police officer of the New
15  Jersey Transit Police Department; a full-time campus police officer
16  exempted pursuant to paragraph (10) of subsection c. of this
17  section; a full-time State conservation police officer exempted
18  pursuant to paragraph (4) of subsection a. of this section; a full-time
19  Palisades Interstate Park officer appointed pursuant to R.S.32:14-
20  21; a full-time Burlington County Bridge police officer appointed
21  pursuant to section 1 of P.L.1960, c.168 (C.27:19-36.3); a full-time
22  housing authority police officer exempted pursuant to paragraph
23  (16) of subsection c. of this section; a full-time juvenile correctional
24  police officer exempted pursuant to paragraph (9) of subsection a.
25  of this section; a full-time parole officer exempted pursuant to
26  paragraph (13) of subsection c. of this section; a full-time railway
27  policeman exempted pursuant to paragraph (9) of subsection c. of
28  this section; a full-time county prosecutor's detective or
29  investigator; a full-time federal law enforcement officer; or is a
30  qualified retired law enforcement officer, as used in the federal
31  "Law Enforcement Officers Safety Act of 2004," Pub.L. 108-277,
32  domiciled in this State from carrying a handgun in the same manner
33  as law enforcement officers exempted under paragraph (7) of
34  subsection a. of this section.  A retired law enforcement officer
35  shall be entitled to carry a handgun pursuant to this subsection
36  under the following conditions **[**provided herein**]** :
37    (1)  The retired law enforcement officer shall make application
38  in writing to the Superintendent of State Police for approval to carry
39  a handgun **[**for one year**]** every two years.  **[**An**]** A renewal
40  application **[**for annual renewal**]** shall be submitted in the same
41  manner.
42    (2)  Upon receipt of the written application of the retired law
43  enforcement officer, the superintendent shall request a verification
44  of service from the chief law enforcement officer of the
45  organization in which the retired officer was last regularly
46  employed as a full-time law enforcement officer prior to retiring.
47  The verification of service shall include:
48    (a)  The name and address of the retired officer;

1  (b)  The date that the retired officer was hired and the date that
2  the officer retired;
3  (c)  A list of all handguns known to be registered to that officer;
4  (d)  A statement that, to the reasonable knowledge of the chief
5  law enforcement officer, the retired officer is not subject to any of
6  the restrictions set forth in subsection c. of N.J.S.2C:58-3; and
7  (e)  A statement that the officer retired in good standing.
8  (3)  If the superintendent approves a retired officer's application
9  or reapplication to carry a handgun pursuant to the provisions of
10  this subsection, the superintendent shall notify in writing the chief
11  law enforcement officer of the municipality wherein that retired
12  officer resides.  In the event the retired officer resides in a
13  municipality which has no chief law enforcement officer or law
14  enforcement agency, the superintendent shall maintain a record of
15  the approval.
16  (4)  The superintendent shall issue to an approved retired officer
17  an identification card permitting the retired officer to carry a
18  handgun pursuant to this subsection.  This identification card shall
19  be valid for [one year] <u>two years</u> from the date of issuance and
20  shall be valid throughout the State.  The identification card shall not
21  be transferable to any other person.  The identification card shall be
22  carried at all times on the person of the retired officer while the
23  retired officer is carrying a handgun.  The retired officer shall
24  produce the identification card for review on the demand of any law
25  enforcement officer or authority.
26  (5)  Any person aggrieved by the denial of the superintendent of
27  approval for a permit to carry a handgun pursuant to this subsection
28  may request a hearing in the Superior Court of New Jersey in the
29  county in which the person resides by filing a written request for a
30  hearing within 30 days of the denial.  Copies of the request shall be
31  served upon the superintendent and the county prosecutor.  The
32  hearing shall be held within 30 days of the filing of the request, and
33  no formal pleading or filing fee shall be required.  Appeals from the
34  determination of the hearing shall be in accordance with law and the
35  rules governing the courts of this State.
36  (6)  A judge of the Superior Court may revoke a retired officer's
37  privilege to carry a handgun pursuant to this subsection for good
38  cause shown on the application of any interested person.  A person
39  who becomes subject to any of the disabilities set forth in
40  subsection c. of N.J.S.2C:58-3 shall surrender, as prescribed by the
41  superintendent, the person's identification card issued under
42  paragraph (4) of this subsection to the chief law enforcement officer
43  of the municipality wherein the person resides or the
44  superintendent, and shall be permanently disqualified to carry a
45  handgun under this subsection.
46  (7)  The superintendent may charge a reasonable application fee
47  to retired officers to offset any costs associated with administering
48  the application process set forth in this subsection.

ACS for **A4769** DANIELSEN, GREENWALD
38

1     m.  Nothing in subsection d. of N.J.S.2C:39-5 shall be construed
2 to prevent duly authorized personnel of the New Jersey Division of
3 Fish and Wildlife, while in the actual performance of duties, from
4 possessing, transporting or using any device that projects, releases
5 or emits any substance specified as being non-injurious to wildlife
6 by the Director of the Division of Animal Health in the Department
7 of Agriculture, and which may immobilize wildlife and produces
8 only temporary physical discomfort through being vaporized or
9 otherwise dispensed in the air for the purpose of repelling bear or
10 other animal attacks or for the aversive conditioning of wildlife.
11     n.  Nothing in subsection b., c., d. or e. of N.J.S.2C:39-5 shall
12 be construed to prevent duly authorized personnel of the New
13 Jersey Division of Fish and Wildlife, while in the actual
14 performance of duties, from possessing, transporting or using hand
15 held pistol-like devices, rifles or shotguns that launch pyrotechnic
16 missiles for the sole purpose of frightening, hazing or aversive
17 conditioning of nuisance or depredating wildlife; from possessing,
18 transporting or using rifles, pistols or similar devices for the sole
19 purpose of chemically immobilizing wild or non-domestic animals;
20 or, provided the duly authorized person complies with the
21 requirements of subsection j. of this section, from possessing,
22 transporting or using rifles or shotguns, upon completion of a Police
23 Training Commission approved training course, in order to dispatch
24 injured or dangerous animals or for non-lethal use for the purpose
25 of frightening, hazing or aversive conditioning of nuisance or
26 depredating wildlife.
27 (cf: P.L.2019, c.407, s.2)
28
29     9.  (New section) Notwithstanding any provision of the
30 "Administrative Procedure Act," P.L.1968, c.410 (C.52:14B-1 et
31 seq.) to the contrary, the Superintendent of State Police may adopt
32 immediately upon filing with the Office of Administrative Law
33 such regulations as the superintendent deems necessary to
34 implement the provisions of P.L.   , c.   (C.  ) (pending before the
35 Legislature as this bill), which shall be effective for a period not to
36 exceed 18 months, and may thereafter be amended, adopted, or
37 readopted by the superintendent in accordance with the
38 requirements of the "Administrative Procedure Act," P.L.1968,
39 c.410 (C.52:14B-1 et seq.).
40
41     10.  (New section) a. Notwithstanding the provisions of
42 subsection d. of N.J.S.2C:58-4, application determinations for a
43 permit to carry a handgun that were pending before the Superior
44 Court and filed prior to the date of enactment of P.L.   , c.  (C.  )
45 (pending before the Legislature as this bill) shall be made by the court.
46 A Judge of the Superior Court may rely on the approval by the chief
47 police officer or superintendent, as the case may be, as the basis for
48 issuing the permit.

ACS for **A4769** DANIELSEN, GREENWALD

39

1      b.  Application determinations for a permit to carry a handgun that
2    are submitted on or after the date of enactment of P.L.   , c.  (C.  )
3    (pending before the Legislature as this bill) shall be made by a chief
4    police officer or superintendent, as the case may be, in accordance
5    with subsection d. of N.J.S.2C:58-4.

6

7      11.  (New   section)  The  provisions  of  P.L.     ,
8    c.  (C.     )(pending  before  the  Legislature  as  this  bill)  are
9    severable; if any provision, or application of any provision, of this
10   amendatory and supplementary act is held invalid by any court, the
11   holding or judgment shall not affect the remaining provisions or
12   applications of the provisions thereof.

13

14      12.  Sections 2, 3, 7, and 10 of this act shall take effect
15   immediately and the remainder of this act shall take effect on the
16   first day of the seventh month next following the date of enactment,
17   but the Attorney General, Superintendent of State Police, and
18   Commissioner of Banking and Insurance may take such anticipatory
19   action as is necessary for the implementation of this act.

N.D.N.Y.
22-cv-986
Suddaby, J.

# United States Court of Appeals
FOR THE
SECOND CIRCUIT

_____

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 7ᵗʰ day of December, two thousand twenty-two.

Present:

Robert D. Sack,
Richard C. Wesley,
Joseph F. Bianco,
        *Circuit Judges*.

_____

Ivan Antonyuk, et al.,

            *Plaintiffs-Appellees*,

        v.                                    22-2908(L),
                                              22-2972(Con)

Kathleen Hochul, in her Official Capacity as
Governor of the State of New York, et al.,

            *Defendants-Appellants*.

_____

Appellants request a stay pending appeal of the district court's order dated November 7, 2022 (N.D.N.Y. 22-cv-986, doc. 78), enjoining Appellants from enforcing certain aspects of New York's Concealed Carry Improvement Act ("CCIA").   Having weighed the applicable factors, *see In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007), we conclude that a stay pending appeal is warranted.   Accordingly, upon due consideration, it is hereby ORDERED that the motion for a stay pending appeal is GRANTED and the district court's November 7 order is STAYED pending the resolution of this appeal.   To the extent that the district court's order bars enforcement of the CCIA's provisions related to persons who have been tasked with the duty to keep the peace at places of worship, airports, and private buses, such categories are EXCEPTED from this order.   Appellees' motion to expedite the resolution of the matter is GRANTED.

FOR THE COURT:
Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

CERTIFIED COPY ISSUED ON 12/07/2022



JA1470

W.D.N.Y.
22-cv-771
Sinatra, J.

# United States Court of Appeals
FOR THE
SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 7th day of December, two thousand twenty-two.

Present:
      Robert D. Sack,
      Richard C. Wesley,
      Joseph F. Bianco,
          *Circuit Judges.*

Jimmie Hardaway, et al.,

          *Plaintiffs-Appellees,*

      v.                        22-2933

Steven A. Nigrelli, in his official capacity as
Superintendent of the New York State Police, et al.,

          *Defendants-Appellants.*

Appellants request a stay pending appeal of the district court's order dated November 3, 2022 (W.D.N.Y. 22-cv-771, doc. 52), enjoining Appellants from enforcing a provision of New York's Concealed Carry Improvement Act criminalizing possession of a firearm in a place of worship or religious observation. *See* N.Y. Penal Law § 265.01-e(2)(c). Having weighed the applicable factors, *see In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007), we conclude that a stay pending appeal is warranted. Accordingly, upon due consideration, it is hereby ORDERED that the motion for a stay pending appeal is GRANTED and the district court's November 3 order is STAYED pending the resolution of this appeal. To the extent that the district court's order bars enforcement of § 265.01-e(2)(c) as it pertains to persons who have been tasked with the duty to keep the peace at places of worship, such category is EXCEPTED from this order. The Clerk of Court shall set an expedited briefing schedule for the appeal.

          FOR THE COURT:
          Catherine O'Hagan Wolfe,
          Clerk of Court



JA1471

W.D.N.Y.
22-cv-695
Sinatra, J.

# United States Court of Appeals
### FOR THE
### SECOND CIRCUIT

————————

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 12th day of December, two thousand twenty-two.

Present:
> Robert D. Sack,
> Richard C. Wesley,
> Joseph F. Bianco,
> > *Circuit Judges*.

————————————————————————————

Brett Christian, et al.,

> *Plaintiffs-Appellees*,

> v.                                                        22-2987

Steven A. Nigrelli, in his official capacity as
Superintendent of the New York State Police, et al.,

> *Defendants-Appellants*.

————————————————————————————

Appellants request a stay pending appeal of the district court's order dated November 22, 2022 (W.D.N.Y. 22-cv-695, doc. 49), enjoining Appellants from enforcing a provision of New York's Concealed Carry Improvement Act criminalizing possession of a firearm in a restricted location with respect to private property open to the public. *See* N.Y. Penal Law § 265.01-d.

Having weighed the applicable factors, *see In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007), we conclude that a stay pending appeal is warranted. Accordingly, upon due consideration, it is hereby ORDERED that the motion for a stay pending appeal is GRANTED and the district court's November 22 order is STAYED pending the resolution of this appeal. The Clerk of Court shall set an expedited briefing schedule for the appeal.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

*[signature]*

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

*[signature]*

CERTIFIED COPY ISSUED ON 12/12/2022

JA1472

MBT7CORC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    JONATHAN CORBETT,

4                    Plaintiff,

5          v.                              22 Civ. 5867 (LGS)

6    KATHLEEN HOCHUL, LETITIA
     JAMES, KEVIN BRUEN, ERIC
7    ADAMS, KEECHANT SEWELL, and
     INSPECTOR HUGH BOGLE,
8
                     Defendants.
9                                          Remote Conference
     ------------------------------x
10
                                           New York, N.Y.
11                                         November 29, 2022
                                           2:30 p.m.
12
     Before:
13
                        HON. LORNA G. SCHOFIELD,
14                                         District Judge

15                            APPEARANCES

16

17   JONATHAN CORBETT
          Attorney for Plaintiff (pro se)
18
     NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
19        Attorney for Defendants Hochul, James, and Brown
     BY:  TODD A. SPIEGELMAN
20
     NEW YORK CITY LAW DEPARTMENT
21        Attorney for Defendants Adams, Sewell, and Bogle
     BY:  NICHOLAS R. CIAPPETTA
22

23

24

25

JA1473

```
 1              (Case called)
 2              THE COURT:  Hello, and thank you for convening.
 3              We're here to discuss primarily one matter, which is
 4     the plaintiff's motion for a preliminary injunction.  We also
 5     have the defendants' proposed motions to dismiss, and I will
 6     discuss that after we talk about the plaintiff's motion for
 7     injunctive relief.
 8              I should start out by saying that I have reviewed your
 9     papers, and it's my hope to issue an oral ruling at the
10     conclusion of our conference, but I did want to give both sides
11     an opportunity to speak particularly to some of the more
12     difficult issues.
13              So, Mr. Corbett, it's your motion.  There are issues
14     I'm particularly interested in, but if you would like to say a
15     few words by way of introduction, I'll let you do that first.
16              MR. CORBETT:  Good morning, your Honor.
17              I don't think I have too much to say as far as an
18     introduction.  I'm sure the Court has thoroughly reviewed the
19     papers and understands my position, so I'll just be available
20     for questions.
21              THE COURT:  Okay.  Well, let me start with a question,
22     then.
23              So with respect to the social media and references
24     requirements, I'm really focused on the standing issue.  I am
25     pretty persuaded that you don't have standing to raise those
```

1    issues, but I did want to give you a chance to address that if

2    there's anything you would like to say.  And I have read your

3    papers on the subject, but that's my question and that's my

4    first concern.

5            MR. CORBETT:  Yes.  I think it does make it tougher

6    with the timing thing, candidly.  I hear the government's

7    arguments.  The issue will certainly arise eventually whether

8    it is on this application or on renewal.  It's something that

9    licensing officers may take into consideration on their own,

10   even if state law doesn't require them to quite yet.  I think

11   it's a real issue.  And whether it's going to be next month or

12   two years from now, it's going to come up, it's going to be

13   something that directly injures my interests.  Immediacy is

14   certainly much harder in this case, especially when they're not

15   even processing applications at the moment.

16           THE COURT:  I'm glad you have a realistic view of that

17   issue.  And I don't doubt that it might come up some time, but

18   perhaps not in your case because a renewal application, of

19   course, only follows an original license that you're seeking to

20   renew, and we don't even have that yet.

21           So why don't we move on, then, if you don't mind, to

22   the training requirement, which I think is much more of a

23   question.  I'd like to start with the standing issue, but let

24   me ask the city defendants──so that's Mr. Spiegelman, I think.

25   It's your position that the plaintiff doesn't have standing to

1    raise that issue.  It seems to me that perhaps he does.  So if

2    you'd like to say anything on that subject, I'd be pleased to

3    hear it.  And again, I have read the papers.

4           MR. SPIEGELMAN:  Judge, I should say I represent the

5    state defendants, but we did argue that the plaintiff doesn't

6    have standing on this issue.  I just reiterate under binding

7    law, including the Second Circuit's decision in *Libertarian*

8    *Party*, the cognizable legal injury doesn't arise until the

9    application has been denied, and Mr. Corbett's application has

10   not been denied.  So he may obtain standing at some point, but

11   he doesn't have it yet.  I think the point that there is --

12          THE COURT:  If I could just interrupt for a second,

13   what about futility?  I take your point that the application

14   hasn't been denied, but futility is a separate basis for

15   standing.

16          MR. SPIEGELMAN:  Well, yes.  In the same case, the

17   Second Circuit was clear that objection or antipathy to the law

18   is not futility, and that is what we have here.  Plaintiff

19   Corbett thinks the laws unconstitutionally won't submit -- they

20   won't participate in the training, but that's simply not

21   enough.  He still has to go through the training and be denied

22   to have standing.  In *Libertarian Party* there was no training

23   requirement then, but there were other requirements that

24   applicants had to pay fees and they had to submit affidavits

25   for good moral character and proper cause.  Even with all that,

1    they didn't have standing.  Just the filling out of the

2    application, the affidavit, the fees, that wasn't the injury;

3    the injury was when there are denied, and so too here.

4              THE COURT:  I understand your argument.

5         Mr. Ciappetta, apologies for my confusing who your

6    clients were.  Would you like to be heard on that issue?

7              MR. CIAPPETTA:  Yes, just briefly.

8         I think we argued along the same lines.  I will just

9    add that the plaintiffs in his papers and his complaint

10   explicitly said that the training is a waste of his time.  And,

11   to me, that doesn't establish futility.  Whether or not he

12   feels that the course is going to be beneficial to him or not,

13   standing can't be based upon that.  And I would submit that the

14   training is useful.  It's 16 hours, plus two as a practical

15   component, and there's New York relevant laws.  So even though

16   he may be a licensee elsewhere, the training would be relevant,

17   but that's going on to different issue for now.

18             THE COURT:  Right.  I mean, I think the point is not

19   so much whether the training would be helpful, but the real

20   question is whether it's futile and whether futility confers

21   standing here.  It's not just that he has antipathy towards the

22   training requirement, but he refuses to do it.  And it's not

23   something that is in the control of some other person or that

24   may change as circumstances in the world change, it's something

25   he refuses to do.

1        So I guess my question is:  Why doesn't that make the

2   whole application process futile?  I mean, why do I have to

3   insist that his application be denied because he has refused to

4   take the training before I hear this?

5        MR. CIAPPETTA:  I think even if you look at the

6   recently decided *Bruen* case, your Honor, in that case, you have

7   an application and a denial.  That denial, as Mr. Spiegelman

8   said, is the quintessential hook for the standing.  And in

9   those cases, under that theory in the *Bruen* case, the person

10  said, Well, I can't establish proper cause so I'm not even

11  going to bother applying.  And that wasn't -- I think the Court

12  there would have said that there was a standing issue as well.

13       So we saw in that *Bruen* case you had an application,

14  you had a denial, and that was the basis for the federal

15  lawsuit.  Here, we don't even have that.  His application

16  remains pending; there's no decision on it yet.  And you could

17  have that situation --

18       THE COURT:  So here's a question.

19       MR. CIAPPETTA:  Yes.

20       THE COURT:  Is there any reason to think that he would

21  be granted the license that the requirement for training can be

22  waived or would be waived?

23       MR. CIAPPETTA:  Not as of this moment.

24       And, your Honor, as you reviewed my papers, I did

25  mention the fact that local licensing officers do have

307

discretion with respect to the training. They can evaluate

going back five years to see whether other experience may have

substituted for it. In reply, the plaintiff did say that he

hasn't taken any training in the last five years, so I do

acknowledge that that probably would mean that it couldn't be

established elsewhere. Though, I do think that the department

deserves a chance to look at the application.

But, certainly, there's a lot of situations with

respect to training where people may have established that

otherwise. So we wouldn't want them to say, Oh, it's futile, I

don't think that I have the five years, the five-year look-back

wouldn't help me. I think that's a decision for the department

to make. The department should be able to review it and it

shouldn't be based on whether the license applicant says, I

can't meet it or not.

Here, it might be a clearer question based on his

statement in his affidavit. But in a lot of circumstances, it

might not be so clear. Also, if "I won't be able to be

licensed" was the standard, I think there would be a whole host

of other situations where people would be running to court

without letting the NYPD process their applications. For

example, they could say, Oh, I have a criminal conviction in my

background, that means they'll deny me, I'm not going to even

bother applying; or, I have an order of protection against me

that most likely means I'll be denied, I won't apply. So I

1    think in those situations we'll have an efficiency of court

2    issue.

3              THE COURT:  A big difference is that the application

4    has been filed here.  I guess it depends on what the

5    circumstances are, but if an application has been filed and in

6    one of those other examples you gave and it's clear from the

7    statute that the applicant hasn't met a requirement or

8    condition for licensing, I think there's a fair question -- and

9    maybe not even question, a fair conclusion about futility.  But

10   let's go on to the merits of the training requirement.

11             Mr. Corbett, I know that you're *pro se* here, but you

12   are an attorney, but it's your license for a firearm that is at

13   issue here.  So with regard to the constitutionality of the

14   training requirement, it's your position that it's not

15   Constitutional and after the *Bruen* case it's clear that the

16   inquiry here, the proper inquiry, is a historical one.  And the

17   question is whether historically comparable regulations or

18   burdens were or have been imposed, and I didn't see any

19   evidence attached to your motion on that issue, and so I was

20   wondering what you have to say about that.

21             MR. CORBETT:  Yes, your Honor.

22             On that issue, the burden is on the government to

23   demonstrate that there is a historical analogue, not on the

24   challenger.  I think that we can easily see what the current

25   state of the law is in all 50 states.  I think that we can look

```
 1    back over the last century——and this is not something that

 2    requires a ton of research——an 18-hour training course has

 3    never been required.  The historical analogue that the

 4    government attempts to make is that of military service, trying

 5    to, again, bring back the word militia in the Second Amendment

 6    that has been resounding made a nullity by the Supreme Court at

 7    this point.  One could own a firearm and not be eligible for

 8    the militia in the 1800s.  There simply is no historical

 9    analogue that the government has pointed to.  Given that it's

10    not my burden, I think that the government clearly has not

11    carried theirs.

12          THE COURT:  Let me interrupt.

13          I agree with you that ultimately the government has

14    the burden here of showing that there is a historical analogue,

15    but on your motion for preliminary injunction you have the

16    burden of showing a likelihood of success on the merits.  So

17    that means that if they present me with evidence, which they

18    have, and you don't then you haven't carried your burden.  And,

19    frankly, even if I simply viewed it as their having the burden

20    even on your motion, if they put in evidence and you don't put

21    in evidence then they have carried their burden, unless I

22    discredit all of their evidence.  And I don't have any

23    countervailing evidence to do that with.

24          MR. CORBETT:  I think it's not so much discrediting

25    their evidence as finding that it's not legally relevant.  The
```

1    evidence that they submitted simply is not analogous to the

2    current rules.  Unless they've submitted evidence that is

3    actually on point, they haven't submitted any evidence that is

4    competent to carry their burden.

5         THE COURT:  Well, I mean, by the terms itself in the

6    Second Amendment, and even the discussion in the *Heller* case,

7    isn't the right to bear arms sort of intimately related and

8    derived from the whole concept of a militia, but broadly

9    defined, as *Heller* does?

10        MR. CORBETT:  There are many people who do believe

11   that there is a connection between their right and militia

12   membership.  However, the Supreme Court has been clear that

13   these are individual rights that we have that are unconnected

14   with militia membership.  So I don't think at this point, based

15   on current Supreme Court law, that that argument can save the

16   government's rule here.

17        THE COURT:  Okay.  Let me hear from one of the

18   defendants.  Why don't we start with Mr. Spiegelman again.

19        MR. SPIEGELMAN:  I'd be happy to.

20        Your Honor cited *Heller* and the text in the Second

21   Amendment itself, and *Heller* is clear that part of the Second

22   Amendment right is the proper use of handguns.  And even before

23   we get to this historical analysis, the Supreme Court found

24   "shall issue" licensing regimes would have training

25   requirements to be presumptively Constitutional.  And the

MBT7CORC

1   Concealed Carry Improvement Act transforms New York into a

2   "shall issue" regime, especially on the training requirement.

3   If the plaintiff -- if the applicant completes the 18 hours,

4   the licensing officer will issue them a license and so this is

5   now -- New York is now like 31 other states.

6          And I think if you look at the plaintiff's papers

7   carefully, it doesn't actually contend that a training

8   requirement in and of itself is unconstitutional, it's just the

9   fees he speculates might be incurred or the 18 hours, but

10  that's kind of a slender read to stand on.  I mean, New York

11  may be the highest, but it's not the highest by much, right?

12  Illinois is at 16.  New Mexico is at 15.  Do the extra two

13  hours make the whole requirement unconstitutional?  No.  If you

14  take plaintiff's arguments to its natural conclusion, the

15  highest state is always unconstitutional you just keep knocking

16  down the hours, which doesn't make a whole lot of sense.

17         And the historical analogues are on point.  I won't

18  belabor what we say in our papers, but the militia training was

19  much more extensive than 18 hours.  This was training every

20  year, six times a year, in some states, six hours a day until

21  you were 45, not once every three years for 18 hours.  And the

22  overarching purpose was firearms safety, even for the militia.

23  They don't want you shooting yourself with the gun.  And, of

24  course, the burden is much less here.

25         I think we're on firm ground with the training

JA1483

MBT7CORC

1    requirement.  Even the *Antonyuk* court, which looked at the law

2    pretty skeptically, upheld the training requirement, didn't

3    really say anything about the hours, just put that down as

4    fine.  And plaintiff's argument on the fees is based on

5    speculation.

6            I guess the last thing I'd say about that is,

7    historically, militia members incurred a lot of costs.  They

8    paid for their own equipment.  They didn't get reimbursed for

9    travel time and so on.  So the fees, whatever they are, are not

10   out of step, historically.

11           I think I'll leave it at that.

12           THE COURT:  Okay.  Thank you.

13           Mr. Ciappetta, would you like to be heard?  And I'm

14   particularly interested in the exorbitant fees argument that

15   Mr. Corbett makes.

16           MR. CIAPPETTA:  I'm sorry, your Honor.  I had to

17   unmute myself.

18           THE COURT:  Okay.

19           MR. CIAPPETTA:  Yes, I will address the fees.

20           First, I do want to talk about the *Bruen* test itself

21   for a moment.  I won't reiterate what the State said, but our

22   analysis was slightly different, and it goes to your question

23   on the burden.

24           While eventually the burden is to justify the

25   regulation based on a tradition and establishing a tradition in

1  regulation, there's a first step in *Bruen*, and that shouldn't

2  get lost here, and that's very important.  The Court made very

3  clear that there's a step-one analysis that needs to take

4  place.  And at that step one, you first have to determine

5  whether the proposed conduct is even covered by the Second

6  Amendment.  That's significant.  That's not something to just

7  speed through as the plaintiff does.

8          In *Bruen*, I think the question is fairly easy so they

9  didn't spend need to spend a ton of time and make decision on

10  it, but it is analysis that needs to occur in every single

11  case.  And here, we argue that the proposed conduct is owning

12  or possessing a firearm without obtaining training.

13          THE COURT:  Well, wait.  I mean, I understand that

14  that's your argument.  And the reason I didn't pursue it is

15  because it seems to me that it begs the argument and it

16  conflates the right to bear arms with any regulatory

17  requirements that might be imposed on it.  And so, I guess I

18  have trouble accepting your argument.

19          MR. CIAPPETTA:  Okay.  But I would say then -- I mean,

20  I assume the plaintiff is trying to propose that the proposed

21  conduct is a right to carry.  But I would suggest, your Honor,

22  then, if that's the case, that would make the first step of the

23  *Bruen* analysis virtually irrelevant, because at every single

24  regulation that would be challenged in any regard somebody

25  would say, Oh, my proposed conduct is the right to carry.

JA1485

1          So, for example, if they challenge the NYPD licensing

2     scheme in its entirety, you could say, Oh, that's my right to

3     carry.  I would suggest that there, it's the right to carry

4     without a license; and here, it's the right to carry without

5     undergoing any training.  And we say that conduct isn't

6     protected.

7          THE COURT:  Is there any binding case law?  I know

8     it's hard since *Bruen* is so recent, but is there any binding

9     case law or even persuasive case law that adopts your approach

10    for defining step one?

11         MR. CIAPPETTA:  Not in the Second Circuit, but there

12    have been decisions in district courts elsewhere.  I believe

13    there's a couple decisions in Texas that spend a great deal of

14    time.  Even the decision that came out of Texas, your Honor,

15    dealing with whether individuals 18 to 21 years of age have a

16    right to carry.  And in that case, and in also some of the

17    cases challenging sections of United States Code as to whether

18    a felon can carry or not, there's substantial analysis in those

19    cases.  In fact, I have one in front of me.  I believe it's

20    *United States v. Antonio Perez-Gallan*.  And there, was

21    whether -- if you were subject to a court order, whether that

22    violates *Bruen*.  And eat each of these levels, they're

23    conducting quite a bit of analysis at that first step.  So I

24    don't think it's just something that is always going to be the

25    cause, or even in certainly this case, it's just the right to

1    possess gets you through the *Bruen* step one.  I think it's much
2    more complicated than that.
3           THE COURT:  Okay.  Did you want to say anything else
4    about the constitutionality of the training requirement?
5           MR. CIAPPETTA:  Yes.
6           Likewise, with respect to the training, whether you
7    look at it in step one or in step two, I think the Supreme
8    Court has already tacitly approved training.  They mentioned in
9    Footnote 9 of the *Bruen* decision that there are long-standing,
10   presumptively lawful regulatory measures, and this seems to be
11   one of them.  They specifically talk about a training course.
12          THE COURT:  I had a question about that because,
13   frankly, it wasn't entirely clear to me from the *Bruen*
14   decision.  Where does that leave us with the historical
15   analysis?  I mean, they tell us the test is a historical
16   analysis, but does that mean that they've implicitly done this
17   historical analysis around training and come to that conclusion
18   or what?
19          MR. CIAPPETTA:  Yes, that's what I believe, your
20   Honor.  I believe that over the course of *Bruen* and over the
21   course of *Heller* that the Supreme Court identified these
22   long-standing, presumptively lawful regulatory measures, and
23   they've already done that analysis for us.  For example, also
24   in the category of dangerous arms they did that analysis
25   already and they already determined how, going forward, you

MBT7CORC

1    would look at a dangerous weapon; it would be whether -- you
2    wouldn't need to do that historical analysis, they've already
3    done it.  For example, with respect to felons, with respect to
4    the sensitive locations that they've identified—schools,
5    courthouses—you wouldn't need to do those again.  So if
6    somebody challenges them, the Supreme Court has already done
7    that analysis, correct.

8           So, for example, and as applicable to this case, these
9    long-standing presumptively lawful regulatory measures, one of
10   those is where there are narrow definite and objective
11   standards.  And this is certainly a narrow, definite, and
12   objective standard.  All you need to do, as Mr. Spiegelman
13   said, is look and see whether the person has a certificate of
14   completion for the training.

15          THE COURT:  Again, I'm trying to understand this.

16          So narrow -- I don't remember the language -- certain
17   and objective standards that -- not any narrow and objective
18   standards I presume would survive, it also has to have a
19   historical analogue, right?

20          MR. CIAPPETTA:  I would argue no.  If they're narrow
21   and objective, I believe the Supreme Court has already upheld
22   those presumptively.

23          THE COURT:  Okay.

24          MR. CIAPPETTA:  Particularly with respect to training
25   and course work.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JA1488

MBT7CORC

```
1          THE COURT:  Okay.  I mean, it seems to me you're

2    suggesting an overly broad reading, but that is not relevant

3    here since we're talking about training requirements.  But,

4    okay, go ahead.

5          MR. CIAPPETTA:  So here, as I said, this is very

6    objective, right?  I mean, you either take the course and you

7    get your certificate of completion or you don't.

8          Going back to your point -- which is a broader point,

9    right?  It really involved whether there's the exercise of

10   discretion upon the licensing officer.  And with respect to a

11   training program, and this is a training requirement, there's

12   no discretion that needs to be exercised if he sees the

13   certificate, that's a checkmark, that application requirement

14   has been completed.

15         THE COURT:  So you're suggesting that any narrow

16   requirement imposed on an applicant that is objective and not

17   discretionary would survive?

18         MR. CIAPPETTA:  Potentially.  I mean, I don't think I

19   need to make that argument in this particular case.

20         THE COURT:  Right.  Okay.

21         MR. CIAPPETTA:  But in the appropriate case, I would

22   certainly be willing to make that argument, and I believe it

23   would be a colorable one.

24         THE COURT:  Okay.  You're right.  It's completely

25   academic here.  So why don't we talk about some aspect that
```

MBT7CORC

1    isn't as academic.  And I'm still interested in the fees

2    argument.

3            MR. CIAPPETTA:  Yes.  I think that that's also

4    speculative.  The Supreme Court had some language in a footnote

5    that talked about cost.  I think that talks about numerical

6    dollar cost, hard costs, not soft costs, which is the time

7    involved to take a course, the number of hours in the course,

8    because --

9            THE COURT:  And what did we know about the standard of

10   how much is too much?

11           MR. CIAPPETTA:  That's a good question.  We don't know

12   that.  And I do think that's something that that's going to

13   have to be developed in case law.  I do think that while

14   perhaps it's a different standard for the Second Amendment,

15   there is case law dealing with fees and other context, and

16   we've litigated this in different aspects where the fee has to

17   be proportionate to the amount of work done in connection with

18   the application.  So the administrative fee couldn't be

19   $10,000, for example, because there's not $10,000 worth of work

20   done to review the application.

21           Here, I think the fee is only $350.  I can tell you,

22   certainly, that there's a tremendous amount of work that goes

23   into the review of an application, and even more so since the

24   CCIA was passed on September 1., because now you have a lot of

25   different things to review that you didn't have to review

```
 1    before.
 2              THE COURT:  Okay.  Let me hear from Mr. Corbett.
 3              Mr. Corbett, it's your motion, and I think you know
 4    the issues that I'm interested in.  I'll let you have the last
 5    word if there's anything else you'd like to add, or anything
 6    that's been said that you want to address.
 7              MR. CORBETT:  Thank you, your Honor.
 8              There is ambiguity in the Bruen case as to whether
 9    certain objective licensing measures need to pass a historical
10    analogue or not.  But to the extent that the Supreme Court
11    implied some kind of exception, the exception was not just for
12    any objective measures, but specifically for those that prevent
13    dangerous or non-law abiding people with having guns.  So
14    essentially there's some kind of tailoring there, there's some
15    kind of balancing test, if we're going to assume that there's
16    no historical analogue required for those things.
17              THE COURT:  I mean, but there is.  There's a very
18    strong historical analogue for dangerous or unsavory people
19    possessing guns.
20              MR. CORBETT:  Definitely.
21              The papers that I filed don't dispute that a training
22    requirement of some kind is Constitutional or that fees of some
23    kind are Constitutional; the question is whether or not they're
24    excessive.  And I think right now we have a few things that go
25    towards it being excessive.
```

1          Number one, the total cost of licensure is going to be
2     over $1,000.  The government can call that speculation, but
3     they haven't put forth any speculation of their own or any
4     evidence to disprove it.  It seems pretty clear from any
5     research that I've done and presented to the Court that it's
6     going to be over $1,000.  It's also going to be dozens of
7     hours.

8          THE COURT:  Wait.  Have you put any evidence that says
9     that?

10         MR. CORBETT:  Well, I put the actual costs that the
11    government charges for their licensure.  But the real issue is
12    that the training courses are going to be substantial.

13         If we look at training courses in other states that
14    are smaller in duration, you'll see that they run 5, 6, 7,
15    $800.  There's no way in New York, one of the most expensive
16    places in the country, we're going to escape anything like
17    that.  But even if it was just $500 for the licensing course,
18    that's in addition to the $350 for the application, in addition
19    to the $88, or whatever it is, for the fingerprints, in
20    addition to the time one has to take to complete all of these
21    steps.  So really, this does deny the ordinary citizen the
22    ability to get this license without trading extreme hardship.

23         On the other hand, the government really hasn't
24    demonstrated what good this course is going to do over shorter
25    courses that are common in other states.  It just doesn't seem

MBT7CORC

1   that there's any kind of justification other than an attempt to

2   just make it more difficult.

3        THE COURT:  But that doesn't make it unconstitutional.

4   I guess, at what point do you say it reaches the level where it

5   is so excessive that it's unconstitutional?  What's the measure

6   of that?

7        MR. CORBETT:  It's going to be hard to put an exact

8   number on that.  And the Supreme Court has always been very

9   good at putting these kind of vague standards and letting the

10  district courts kind of figure it out.  And it's unfortunate we

11  have to do that now with very little guidance, however the

12  licensing costs now will be the highest in the country, there's

13  no doubt about that.  The training number of hours will be the

14  highest in the country, there's no doubt about that either.  So

15  if there is a training requirement that can be challenged in

16  this country, it is New York's new requirement.

17       I wanted to add one more thing, just as a general

18  outlook for this case.  The government makes a lot of arguments

19  that make sense.  They're logical and, in a vacuum, they are

20  persuasive.  I would urge the Court to consider whether the

21  Supreme Court, as it's currently made up, will consider them

22  the same way.

23       The government's, for example, arguing that the

24  burdened right is not just the right to bear arms, but the

25  right to bear arms without a license and so forth.  These are

MBT7CORC

```
 1    questions that the Supreme Court would not even come close to
 2    agreeing with the government on.  There is an argument that is
 3    made there, it is a logical argument, but it is an argument
 4    that is foreclosed by Bruen, and it is an argument that will go
 5    nowhere.  The militia is not connected to this debate anymore.
 6    Comparing training requirements to militia training
 7    requirements is simply not a historical analogue that the
 8    Supreme Court will accept.  And I would urge the Court to see
 9    it as that.
10            THE COURT:  Okay.  I am prepared to rule, in that
11    case.  Let me begin with the legal standard, which I know was a
12    matter that the parties disputed.
13            I'm quoting now:  "A party seeking to stay government
14    action taken in the public interest pursuant to a statutory or
15    regulatory scheme must establish (1) a likelihood of success on
16    the merits, and (2) irreparable harm in the absence of an
17    injunction."  Evergreen Association, Inc. v. City of New York,
18    740 F.3d 233 at 245, Second Circuit 2014; accord Citizens
19    United v. Schneiderman, 115 F. Supp 3d 457 at 462, S.D.N.Y.
20    2015.  "A presumption of irreparable injury flows from a
21    violation of Constitutional rights."  We The Patriots USA Inc.
22    V. Hochul 17 F.4th 266 at 294, Second Circuit 2021.
23            I know that this is a less demanding standard than at
24    least what I believe the City advocated for, but I'm not sure
25    that the mandatory injunction standard has been applied in this
```

1  context.  And the quotation that I read from *Evergreen* is

2  explicitly addressed to a party seeking to stay government

3  action taken pursuant to a statutory or regulatory scheme.  So

4  for the purpose of my analysis here, I'm adopting the less

5  demanding standard, meaning less demanding standard imposed on

6  the plaintiff seeking relief.

7          So in terms of my analysis, just to cut to the chase,

8  I'm denying the request for preliminary injunction.  With

9  respect to the social media and reference requirements,

10  plaintiff has not established a likelihood of success on the

11  matters, and, specifically, that is on the standing issue.  In

12  order to have standing to sue, a litigant must have suffered an

13  injury in fact *Spokeo, Inc. v. Robins*, 578 U.S. 330 at 338,

14  2016.  "To establish injury in fact, a plaintiff must show that

15  he or she suffered an invasion of a legally protected interest

16  that is concrete and particularized in actual imminent, not

17  conjectural or hypothetical."  *Id*. at 339, *accord TransUnion,*

18  *LLC. v. Ramirez*, 141 Supreme Court 2190 at 2200, and the year

19  is 2021.  "A concrete injury must be *de facto*; that is, it must

20  actually exist; it must be real, and not abstract."  *Spokeo,*

21  578 U.S. at 340.

22          As I understand from our oral argument, I think

23  Mr. Corbett is realistic about this argument and understands

24  the impediment that the requirement of imminence imposes.

25  Here, I find, for the purposes of this motion, that the

1      plaintiff lacks standing to challenge the social media and

2      reference requirements because he applied for his license in

3      April 2022, and the two requirements we're talking about did

4      not apply to applications that were made before September 1,

5      2022.  So by the terms of the statute, those requirements don't

6      apply to plaintiff, so he cannot show injury in fact from these

7      requirements.

8              Plaintiff looks to the future and argues that these

9      requirements would apply to any renewal application.  I'm not

10     persuaded by this argument.  First, any renewal application is

11     at least three years away, and that is not actual or imminent.

12     Second, any renewal application is hypothetical because there

13     is not yet any license to renew.  So for that reason, I find

14     that plaintiff has not established a likelihood of success on

15     the two challenges, the social media requirement and the

16     references requirement, because he lacks standing.

17             Let me turn then to the training requirement.  I

18     conclude that the plaintiff has not shown a likelihood of

19     success on the merits of this challenge.  I'm assuming without

20     deciding that he is likely to be able to show that he has

21     standing to challenge the training requirement.  "In order to

22     challenge the New York firearm licensing laws, a person must

23     either have applied for and been denied a license or make a

24     showing that his or her application would have been futile."

25     *Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106 at 116,

 1    Second Circuit 2020, abrogated by *Bruen* on other grounds.

 2              Plaintiff here has filed an application and the

 3    training requirement by its terms applies to his application.

 4    He has not taken the required training.  He states that he has

 5    no intention of taking the required training and he hasn't had

 6    any training in the last five years.  Nothing in the statute

 7    suggests that the training requirement can be waived or that

 8    it's discretionary.  And so on these facts, it seems likely

 9    that the plaintiff can show that his application is futile and

10    likely to be denied.  It is sufficient to establish injury in

11    fact and, therefore, standing.

12              Onto the merits of the training requirement, the

13    plaintiff has not shown a likelihood of success in showing that

14    the requirement is unconstitutional.  "The Second and

15    Fourteenth Amendments protect an individual right to keep and

16    bear arms for self-defense."  *New York State Rifle and Pistol*

17    *Association, Inc, v. Bruen*, 2111 at 2125, and the year is 2022.

18     "When the Second Amendment's plain text covers an individual's

19    conduct, the Constitution presumptively protects that conduct.

20    The government must justify its regulation by demonstrating

21    that it is consistent with the Nation's historical tradition of

22    firearm regulation."  *Id.* at 2129 and 30.

23              "This historical inquiry will often involve reasoning

24    by analogy."  Id. at 2132.  "Analogical reasoning requires only

25    that the government identify a well-established and

1     representative historical analogue, not a historical twin."

2     *Id.* at 2133.  "Whether modern and historical regulations impose

3     a comparable burden on the right of armed self-defense and

4     whether that burden is comparably justified are central

5     considerations when engaging in an analogical inquiry.  Id."

6           So as a threshold matter, I find, for the purposes of

7     this motion, that the Second Amendment's plain text covers the

8     conduct in question, that is to own and carry a handgun in

9     public.  However, plaintiff has failed to show a likelihood of

10    success on the merits.  Defendants ultimately have the burden

11    of proof on this issue.  And here, they have made a sufficient

12    showing without any contrary evidence from plaintiff that the

13    training requirement is consistent with the Nation's historical

14    tradition of firearm regulation.

15           The State defendants attach and quote a New York law

16    called an Act for Regulating the Militia of the State of New

17    York, passed in 1780, which shows that the belonging to a

18    militia was something that was required basically of every

19    able-bodied man between the ages of 16 and 44, and that was the

20    State militia.  And those men were required to be enrolled and

21    to bear arms and at least four times a year——by the way, I

22    think it's four and not six——be "called out to be well and

23    sufficiently exercised trained and disciplined for their

24    instruction and improvement."  That is at Docket 16-8 at page

25    3.

MBT7CORC

1          State defendants also provided a similar New Jersey

2    law which states, "That the militia, on the days of exercise,

3    may be detained under arms on duty in the field any time not

4    exceeding six hours."  Based on these sources and evidence in

5    the record, the training requirement appears to be consistent

6    with, and even more lenient than, the training requirements of

7    the 18th and 19th centuries.  Although the plaintiff disputes

8    that the militia is an appropriate analogue, it is in that

9    context that the Second Amendment was adopted and, in that

10   context, that men were expected and did carry arms.

11          The plaintiff identifies several ways in which the

12   training requirement is different from its historical analogue.

13   As I said, I think that argument is unpersuasive because

14   defendants, as *Bruen* says, need not identify an historical

15   twin.  Plaintiff also argues that the training requirement is

16   unconstitutional because of exorbitant fees and also an

17   argument about excessive time, but the plaintiff has not

18   offered any evidence of what the fees actually will be.  And

19   the New York State militia statute makes clear that individuals

20   were required to soldier significant costs in connection with

21   their bearing arms.  So it seems to me there's ample historical

22   precedent not only for the training requirement but imposing

23   costs in connection with the bearing of arms and licensure on

24   the applicants.

25          So for these reasons, because the plaintiff has not

JA1499

1    established a likelihood of success on the merits of

2    challenging the training requirement, I am denying the motion

3    for preliminary injunction.

4            Mr. Corbett, I understood from your letter to the

5    Court that you intend to appeal; is that right?

6            MR. CORBETT:  Your Honor, as to the Court's holding on

7    the training requirement, yes, that is a likely outcome.

8            THE COURT:  Okay.  So given that, I think your

9    suggestion to wait on any motions to dismiss makes sense.  And

10   so I'm going to grant the plaintiff's application to stay any

11   motions to dismiss pending appeal and resolution of the

12   preliminary injunction order.

13           My plan is to issue a very brief written order

14   basically referencing my reasoning here on the record.  We have

15   a court reporter.  There will be a transcript.  And I'm also

16   going to stay discovery and any other proceedings until after

17   the preliminary injunction motion or appeal is resolved.

18           Anything else we should be talking about, Mr. Corbett?

19           MR. CORBETT:  Your Honor, I just wanted to give notice

20   that there may be a motion to amend the complaint to include

21   the time that it has taken to process this application.  We're

22   approaching the eight-month mark now.  The City has shown no

23   intention of rapidly processing my or any other application

24   that's been submitted, which will become a new Constitutional

25   issue.  So I just wanted to put that out there.  There will be

1      an interlocutory appeal, the Court will retain jurisdiction,

2      and that motion for leave to amend may be pending.

3            THE COURT:  Okay.  Mr. Spiegelman, do you want to

4      comment?  Is there any opposition to the motion to amend or to

5      the proposed timing of the motion to amend, which I presume is

6      relatively soon?

7            MR. SPIEGELMAN:  I think I need to see the motion to

8      say what the -- and talk it over with my clients to say what

9      the State defendants' position on it would be.

10           As to timing, I guess it's when plaintiff wants to

11     file it.

12           THE COURT:  All right.  But do you agree that I would

13     have jurisdiction to consider it and rule on that motion?

14           MR. SPIEGELMAN:  I think you would.

15           THE COURT:  I think you would, too, but I just wanted

16     to make sure there's no objection that.

17           So, Mr. Ciappetta, what is the position of the City

18     defendants as to any motion to amend?  Or do you want to confer

19     with your clients?

20           MR. CIAPPETTA:  We would have to confer.

21           I guess I do have one question for the Court though.

22     Assuming he makes that motion and it's granted, then would I

23     assume our time to respond to that or move would likely be

24     stayed as well?

25           THE COURT:  Yes, that's true.  And if I don't

JA1501

MBT7CORC

1    explicitly say so then, just ask me in a letter and I'll

2    endorse it to make that clear and on the record.

3            MR. CIAPPETTA:  We likely wouldn't have an objection.

4    I do need to speak with my client.  We're fairly permissive on

5    letting people amend their complaint, as long as it's not too

6    long into the litigation or it wouldn't involve discovery.  So

7    my inclination would be not to oppose it.

8            THE COURT:  Okay.  So, Mr. Corbett, I have a

9    requirement for premotion letters.  What I suggest you do is

10   make a premotion letter and just lay out your argument fully

11   and attach the proposed amended complaint to your letter.  And

12   what I suggest you do is do a compare so that we can see the

13   changes as compared to the original complaint, and then the

14   defendants can respond, likewise, in a letter and either say

15   that they don't oppose or put their arguments there.  Then I'll

16   just decide on the letters; I won't take full briefing.  So if

17   you would comply with my individual rules in that way, that

18   would be great.

19           MR. CORBETT:  Your Honor, if I may ask, you have

20   separate rules for *pro se* litigants and non.  I'm happy to

21   follow the non-*pro se* litigant rules; is that acceptable?

22           THE COURT:  That is preferable.  Thank you for raising

23   that.

24           Okay.  I assume there's nothing else.  So unless

25   anyone speaks up quickly, we're adjourned.

1          Thank you.  Have a good afternoon, gentlemen.

2          (Adjourned)

JA1503

338    *Assembly Proceedings, June 15–July 3, 1773.*

L. H. J.    5.<sup>th</sup> That no Person come into the House of Assembly, while
Liber No. 54    the same is sitting, with Sword or other Weapon, upon Penalty of
June 16    such ffine as shall be imposed on them by the Speaker, at the Discretion of the House

6.<sup>th</sup> That if any Member, bound to attend this Assembly, shall
be absent at the Hours and Place appointed, after the Speaker and
Twelve of the Members are met, according to the Order for Sitting,
shall be fined according to the Discretion of the Speaker, not exceeding five Shillings for any Offence, unless upon such Excuse as the
Speaker shall admit of

7.<sup>th</sup> All Misdemeanours which shall happen in the House shall
be censured or fined in the House

8.<sup>th</sup> That no Bill shall be read, a second Time during this Session,
till all the Members in Town shall be called in, except on some
Excuse to be admitted by the Speaker.

9.<sup>th</sup> That if any Member of this House do depart, without Leave
from the Hon.<sup>ble</sup> Speaker and the House, such Member shall forfeit
all his preceding Allowances, due to him for his Attendance that
Session

The following Resolves Viz.<sup>t</sup>

Resolved by the House, That the Members, who shall be appointed
as Members of the Committee of Aggrievances, have likewise the
Character of a Committee for Courts of Justice; and that that
Character, and the Duty of such Committee, be annexed to the said
Committee of Aggrievances as a standing Part of their Duty: And
that it be an Instruction to the said Committee of Courts of Justice,
that they observe the Nature of all the Commissions to the several
Courts of Judicature within this Province, and that they especially
observe any Alterations that may at any Time happen, by accidental
Omission or otherwise therein; and particularly relating to such
Words therein, as require the several Judges and Justices to hear,
try and determine, according to the Laws, Statutes, Ordinances, and
reasonable Customs of *England* and of this Province, or to such
other Words as have Relation thereto; and that they shall immediately make Report to the House of any Alteration that shall at any
Time happen in such Commission; and likewise, to have Regard, as
near as may be, to observe wherein they differ from the fforms of
the several Sorts of Commissions to the Judges and Justices in
*England;* and also, to enquire and report, whether it appears that
the several Magistrates in this Province have been duly qualified
agreeable to Law

p. 306    Resolved also, That this Province is not under the Circumstances of
a conquered Country, that if it were the present Christian Inhabitants
thereof, would be in the Circumstances, not of the Conquered but
of the Conqueror; it being a Colony of the *English* Nation, en-

# GENERAL LAWS

OF THE

# TWELFTH LEGISLATURE,

OF THE

# STATE OF TEXAS.

CALLED SESSION.

BY AUTHORITY.



AUSTIN:

PRINTED BY TRACY, SIEMERING & CO.

1870.

## CHAPTER XLVI.

### AN ACT REGULATING THE RIGHT TO KEEP AND BEAR ARMS.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law.

SEC. 2. That this act take effect and be in force in sixty days from the passage thereof.

Approved August 12, 1870.

---

## CHAPTER XLVII.

### AN ACT AUTHORIZING THE GOVERNOR TO ORDER AN ELECTION TO BE HELD IN HILL COUNTY FOR THE PERMANENT LOCATION OF THEIR COUNTY SEAT.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That the Governor of the State of Texas be, and is hereby authorized to order an election to be held in the county of Hill, on the second Monday in September, A. D. 1870, (or as soon thereafter as possible), for the permanent location of the county seat of the

county of Hill ; said election shall be held at such places and under such rules and regulations as the Governor may prescribe.

Sec. 2. That the returns of said election shall be made to the Secretary of State, within twenty days after said election shall have been held, and the town receiving two-thirds of the votes cast shall be the permanent county seat of the county of Hill, but should no place receive two-thirds of the votes cast, the present county seat shall remain the permanent one.

Sec. 3. That the Governor shall, within twenty days after the returns of said election shall have been received, notify the Police Court of the county of Hill of the result of said election.

Sec. 4. That this act be in force from and after passage.

Approved August 12, 1870.

---

## CHAPTER XLVIII.

AN ACT MAKING APPROPRIATIONS FOR THE PAYMENT OF THE EXPENSES OF MAINTAINING RANGING COMPANIES ON THE FRONTIER.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That the sum of seven hundred and fifty thousand dollars, or so much thereof as may be necessary, be and the same is hereby appropriated, out of any moneys in the State Treasury (derived from the sale or hypothecation of the bonds of the State issued for frontier protection), for the purpose of paying all expenses connected with the organization, arming and maintenance of the ranging companies on the frontier, called into service under the provisions of the act approved June 13, 1870.

Sec. 2. That this appropriation shall be expended under the direction of the Governor; and the Comptroller of Public Accounts shall, under the special direction of the Governor, audit all claims and accounts incurred for the purposes hereinbefore mentioned, and shall draw his warrant on the Treasurer for the payment of the same.

Sec. 3. That this act shall take effect from and after its passage.

Approved August 12, 1870.

trate invited by the Mayor to replace him thereto in case of his absence.
Provided that the place so reserved for the Mayor or other persons sent in his
place shall be furnished without said managers being entitled to any compen-
sation, and they shall adhere to this condition before obtaining a license to
open their theatres.

ART. 14. The Mayor, as often as he may deem it necessary, shall
examine whether the theatres, places of public resort be constructed with the
requisite solidity, and carefully kept in repair, so that the public may assem-
ble there without danger ; and he shall take suitable measures to prevent the
accidents that might result from any negligence in that respect on the part of
the proprietors, tenants or other persons having the management or direction
of the said theatres, places of public spectacles, or other places of public re-
sort.

ART. 15. The manager, acting manager or other person having the ma-
nagement or direction of a theatre, shall place and constantly keep, within the
play-house, several large tubs, and at least one fire-engine in good repair,
which must be filled on days of performance ; and on failure of complying with
this requisite, and until the manager shall have complied with it, the Mayor
shall order the theatre to be and remain shut up.

ART. 16. By virtue of the powers granted by law to the Mayor and
City Council, the Mayor shall cause to be shut up any place of public resort,
whenever the maintenance of order, the public safety or tranquillity may re-
quire it.

*Approved, June 8, 1816.*

*An Ordinance respecting public Balls.*
THE CITY COUNCIL ORDAINS AS FOLLOWS :

ART. 1. It shall not be lawful for any person to enter into a public ball-
room with any cane, stick, sword or any other weapon, and every person
having either a cane, stick, sword or any other weapon, shall, before he enter
the ball-room, deposite the same at the office which shall be at the door of
the entrance of said ball-room, where there will be a person appointed to re-
ceive and take care of such articles which he shall carefully keep, affixing to
each article a number, a check of which he shall give to the owner ; and said
articles shall not be returned to the persons respectively depositing them, until
said persons are quitting the balls and produce their checks.

ART. 2. Every person entering in any public ball-room, in contraven-
tion to the above provision, shall pay a fine of five dollars ; and every person
giving a public ball without having previously established an office at the
door of the entrance of said ball-room, and without appointing a person to
receive and take care, in the manner aforesaid, of the articles before mentioned
shall pay a fine of twenty-five dollars, and if the offence is repeated, the offen-
der shall forfeit the right to hold any further permission to give such public
balls.

JA1509

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

# A C T S

OF THE

# STATE OF TENNESSEE,

PASSED BY THE FIRST SESSION OF

# THE THIRTY-SIXTH GENERAL ASSEMBLY

## FOR THE YEARS 1869-70.

———————

PUBLISHED BY AUTHORITY.

———————

NASHVILLE, TENN.:

JONES, PURVIS & CO., PRINTERS TO THE STATE.

1870.

JA1510

23

## CHAPTER XXI.

AN ACT to Amend An Act, passed on the 13th of March, 1868, entitled "An Act to amend the revenue laws of the State."

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That An Act to amend the revenue laws of the State, passed on the 13th day of March, 1868, be so amended as to impose a tax of fifty cents on each room except two in a hotel or tavern, and a tax of fifty cents on each stall in a livery stable, or stable kept by hotel or tavern keepers, instead of one dollar, as now imposed by law.

*Hotels and Livery Stable*

SEC. 2. *Be it further enacted,* That this Act take effect from and after its passage.

<div align="right">

W. O'N. PERKINS,
*Speaker of the House of Representatives.*
D. B. THOMAS,
*Speaker of the Senate.*

</div>

Passed November 27, 1869.

----

## CHAPTER XXII.

### AN ACT to Amend the Criminal Laws of the State.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That all voters in this State shall be required to vote in the civil district or ward in which they may reside. Any person violating this Act shall be guilty of a misdemeanor, and upon conviction thereof shall not be fined less than twenty nor more than fifty dollars; *Provided,* that sheriffs and other officers holding elections shall be permitted to vote at any ward or precinct in which they may hold an election.

*To vote in Civil District or Ward.*

SEC. 2. *Be it further enacted,* That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, bowie-knife, Arkansas tooth-pick, or weapon in form, shape

*Deadly Weapons.*

or size, resembling a bowie-knife, or Arkansas tooth-pick, or other deadly or dangerous weapon.

Penalty.

SEC. 3. *Be it further enacted,* That all persons convicted under the second section of this Act shall he punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the Court.

Liquor Shops.

SEC. 4. *Be it further enacted,* That no liquor shop in this State, shall be kept open on election days, nor shall any person, on said days, give or sell intoxicating liquors to any person for any purpose at or near an election ground.

Grand Juries.

SEC. 5. *Be it further enacted,* That the grand juries of this State shall have inquisitorial powers concerning the commission of the offenses created by these Acts, and may send for witnesses, as in cases of gaming, illegal voting, tippling and offenses now prescribed by law.

Judges.

SEC. 6. *Be it further enacted,* That it shall be the duty of the Circuit and Criminal Judges of this State to give the above in special charge to the several grand juries of the courts.

Proviso.

SEC. 7. *Be it further enacted,* That there shall be no property exempt from execution for fines and costs for this offense; *Provided,* That, if from any cause, there should be a failure to hold an election in any civil district or ward, then nothing in this Act shall be so construed as to prevent any voter from voting in any other civil district or ward in his county or town, for State or county officers, at the time prescribed by law.

SEC. 8. *Be it further enacted,* That this Act shall take effect from and after its passage.

W. O'N. PERKINS.
*Speaker of the House of Representatives.*
D. B. THOMAS,
*Speaker of the Senate.*

Passed December 1, 1869.



# HEINONLINE

DATE DOWNLOADED: Thu Dec 29 11:57:33 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
Revised Statutes of Texas: Adopted by the Regular Session of the Sixteenth
Legislature, A.D. 1879 (1879).

ALWD 7th ed.
. Revised Statutes of Texas: Adopted by the Regular Session of the Sixteenth
Legislature, A.D. 1879 (1879).

APA 7th ed.
(1879). Revised Statutes of Texas: Adopted by the Regular Session of the Sixteenth
Legislature, A.D. 1879. Galveston, A.H. Belo & Co., State printers.

Chicago 17th ed.
Revised Statutes of Texas: Adopted by the Regular Session of the Sixteenth
Legislature, A.D. 1879. Galveston, A.H. Belo & Co., State printers.

McGill Guide 9th ed.
Revised Statutes of Texas: Adopted by the Regular Session of the Sixteenth
Legislature, A.D. 1879 (Galveston: A.H. Belo & Co., State printers., 1879)

AGLC 4th ed.
Revised Statutes of Texas: Adopted by the Regular Session of the Sixteenth
Legislature, A.D. 1879 (A.H. Belo & Co., State printers., 1879

MLA 9th ed.
Revised Statutes of Texas: Adopted by the Regular Session of the Sixteenth
Legislature, A.D. 1879. Galveston, A.H. Belo & Co., State printers. HeinOnline.

OSCOLA 4th ed.
Revised Statutes of Texas: Adopted by the Regular Session of the Sixteenth
Legislature, A.D. 1879. Galveston, A.H. Belo & Co., State printers.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
 Conditions of the license agreement available at
 *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

ises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack, upon legal process.

ART. 320. If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball-room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other fire-arm, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of a knife manufactured and sold for the purposes of offense and defense, he shall be punished by fine not less than fifty nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person. *Carrying arms in church or other assembly. (Act April 12, 1871, p. 25.)*

ART. 321. The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated. *Not applicable to whom. (Act April 12, 1871, p. 25.)*

ART. 322. Any person violating any of the provisions of articles 318 and 320, may be arrested without warrant by any peace officer, and carried before the nearest justice of the peace for trial; and any peace officer who shall fail or refuse to arrest such person on his own knowledge, or upon information from some credible person, shall be punished by fine not exceeding five hundred dollars. *Arrest without warrant. Officer failing punished. (Act April 12, 1871, p. 26.)*

ART. 323. The provisions of this chapter shall not apply to or be enforced in any county which the governor may designate, by proclamation, as a frontier county and liable to incursions by hostile Indians. *Not applicable to frontier counties. (Act April 12, 1871, p. 26.)*




DATE DOWNLOADED: Fri Dec  2 14:43:31 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
John A.; et al. Hockaday, Compilers %26 Annotators. Revised Statutes of the State of
Missouri 1879 (1879).

ALWD 7th ed.
Hockaday, John A.; et al., Compilers & Annotators. Revised Statutes of the State of
Missouri 1879 (1879).

APA 7th ed.
Hockaday, J. (1879). Revised Statutes of the State of Missouri 1879. Jefferson City,
Carter & Regan, State printers and binders.

Chicago 17th ed.
Hockaday John A.; et al., Compilers %26 Annotators. Revised Statutes of the State of
Missouri 1879. Jefferson City, Carter & Regan, State printers and binders.

McGill Guide 9th ed.
John A.; et al. Hockaday, Compilers %26 Annotators, Revised Statutes of the State of
Missouri 1879 (Jefferson City: Carter & Regan, State printers and binders., 1879)


AGLC 4th ed.
John A.; et al. Hockaday, Compilers %26 Annotators, Revised Statutes of the State of
Missouri 1879 (Carter & Regan, State printers and binders., 1879

MLA 9th ed.
Hockaday, John A., and Compilers & Annotators et al. Revised Statutes of the State of
Missouri 1879. Jefferson City, Carter & Regan, State printers and binders.
HeinOnline.

OSCOLA 4th ed.
Hockaday, John A.; et al., Compilers & Annotators. Revised Statutes of the State of
Missouri 1879. Jefferson City, Carter & Regan, State printers and binders.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

SEC. 1271. *Abandonment of children.*—If any father or mother of any child under the age of six years, or any other person to whom such child shall have been confided, shall expose such child in a street, field or other place, with intent wholly to abandon it, he or she shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding five years, or in the county jail not less than six months.   (G. S. 781, § 39.)

SEC. 1272. *Mistreatment of apprentices.*—If any master or mistress of an apprentice or other person having the legal care and control of any infant, shall, without lawful excuse, refuse or neglect to provide for such apprentice or infant, necessary food, clothing or lodging, or shall unlawfully and purposely assault such apprentice or infant, whereby his life shall be endangered, or his health shall have been or shall be likely to be permanently injured, the person so offending shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding three years, or by imprisonment in the county jail not exceeding one year, or by a fine of not more than one thousand dollars, or by both such fine and imprisonment. (New section.)

SEC. 1273. *Abandonment of wife or child.*—If any man shall, without good cause, abandon or desert his wife, or abandon his child or children under the age of twelve years born in lawful wedlock, and shall fail, neglect or refuse to maintain and provide for such wife, child or children, he shall, upon conviction, be punished by imprisonment in the county jail not more than one year, or by a fine of not less than fifty, nor more than one thousand dollars, or by both such fine and imprisonment.   No other evidence shall be required to prove that such husband was married to such wife, or is the father of such child or children, than would be necessary to prove such fact or facts in a civil action. (Laws 1867, p. 112, amended—*m.*)

SEC. 1274. *Carrying deadly weapons, etc.*—If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct, on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose, other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of firearms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall, directly or indirectly, sell or deliver, loan or barter to any minor, any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than five nor more than one hundred dollars, or by imprisonment in the county jail not exceeding three months, or by both such fine and imprisonment.   (Laws 1874, p. 43; laws 1875, p. 50, and laws 1877, p. 240, amended.)

SEC. 1275. *Above section not to apply to certain officers.*—The next preceding section shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to persons moving or traveling peaceably through this state, and it shall a good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property.   (New section.)

SEC. 1276. *Fire arms not to be discharged near court house.*—Hereafter it shall be unlawful for any person in this state, except he be a sheriff or other officer in the discharge of official duty, to discharge or fire off any

---

(m)  Wife held to be a competent witness to prove fact of abandonment.   43 Mo. 429.   The fact that the defendant has brought suit for divorce is no defense.  52 Mo. 172.




DATE DOWNLOADED: Wed Dec 28 10:51:14 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1859 61 .

ALWD 7th ed.
, , 1859 61 .

Chicago 17th ed.
"," Connecticut - Public Acts, May Session : 61-63

AGLC 4th ed.
'' Connecticut - Public Acts, May Session 61

OSCOLA 4th ed.
'' 1859 61

Provided by:
Connecticut State Library

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

shall be forever precluded from claiming and showing that said taxes have not been paid, but it shall be taken as conclusively proved that said taxes have been paid. *Provided, however,* that in all cases where the select-men of any town in this state have heretofore returned to the town clerk a list of the names of persons whose state or town taxes have been by them abated, and have neglected to subscribe their names thereto, the same shall not, by reason of such neglect, be thereby invalidated, and may be proved by any other proper evidence. <sub>Omission of signatures of selectmen not to invalidate lists of abatements heretofore made.</sub>

SEC. 4.  Any collector of taxes knowingly and de-signedly making a false certificate, and any selectman of any town knowingly and designedly making a false list of persons whose taxes shall be abated under this act, shall pay a fine not exceeding two hundred dollars ; said offence to be a crime, and to be prosecuted and pro-ceeded with like other criminal offences. <sub>Penalty for making false certificate or list.</sub>

SEC. 5.  The fifth section of the act to which this is an addition, and all acts and parts of acts inconsistent herewith, are hereby repealed.

Approved, June 24th, 1859.

---

## CHAPTER LXXXII.

### An Act in addition to and in alteration of "An Act for forming and conducting the Military Force."

*Be it enacted by the Senate and House of Representa-tives in General Assembly convened:*

SEC. 1.  There shall be one parade annually, some-time in the month of May, for one day only, by company ; also one parade annually, for one day only, by regiment or brigade, in the month of August or September, as the commanding officer of the division shall direct, with the approval of the commander-in-chief. <sub>Parades.</sub>

SEC. 2.  Chaplains, surgeons, paymasters, engineers and sergeant-majors, may appear on horseback only on days of general review ; on all other occasions, they shall appear on foot. <sub>What officers may appear on horseback, on days of general review, only.</sub>

SEC. 3.  Every company that shall comply with the provisions of the military laws, shall be allowed, out of <sub>Allowance for rent of armory and drill-room.</sub>

the state treasury, the sum of seventy-five dollars per annum, as rent for armory and drill-room, upon a certificate from the adjutant-general that such company is justly entitled to receive the same.

**Allowance to governor's guards.** SEC. 4. Any company of governor's guards which shall do duty in accordance with the provisions of law, shall be allowed seventy-five dollars per annum for armory rent.

**Temporary erections for sale of liquors or gaming, near parade ground, may be abated as nuisances.** SEC. 5. If any booth, shed, tent, or other temporary erection, within one mile of any military parade-ground, muster-field or encampment, shall be used and occupied for the sale of spirituous or intoxicating liquor, or for the purpose of gambling, the officer commanding said parade-ground, muster-field or encampment, the sheriff or deputy-sheriff of the county, or any justice of the peace, selectman, or constable of the town in which such booth, shed, tent, or other temporary erection is situated, upon having notice or knowledge that the same is so used or occupied, shall notify the owner or occupant thereof to vacate and close the same immediately; and, if said owner or occupant shall refuse or neglect so to do, said commanding officer, sheriff, deputy-sheriff, justice of the peace, selectman or constable, may forthwith abate such booth, shed, tent, or other such temporary erection, as a nuisance, and may pull down or otherwise destroy the same, with the assistance of any force, civil or military.

**Board of officers may be appointed to prepare system of regulations.** SEC. 6. The commander-in-chief is hereby authorized to appoint a board of officers to prepare a system of general regulations for the government of the militia, for which services no compensation shall be claimed or allowed.

**Quarter-master-general to inspect armories, gun houses, &c., annually.** SEC. 7. It shall be the duty of the quarter-master-general, annually, to inspect the armories and gun-houses of the several companies, and also the rooms occupied by the regimental bands; and, on or before the first day of November, to make to the adjutant-general a full report of the condition of the same, and what companies are entitled to the allowance for armory rent; for **Compensation.** which services he shall be allowed the sum of nine cents for every mile of necessary travel.

**Companies may adopt and enforce regulations, and by laws.** SEC. 8. Each company may adopt, by a vote of two-thirds of its members, rules, regulations and by-laws for the government of its members, not inconsistent with the militia laws; and such rules, regulations and by-laws

shall be binding, and may be enforced by process of law; and any member who shall violate any such rule, regulation or by-law, may be expelled from his company by a major vote of the same, provided that such vote is approved by the commander of the regiment.

SEC. 9.   Assessors of persons liable to pay the commutation tax, as provided in section nine of the act approved June 28, 1856, shall be allowed the sum of one cent for each person so assessed; and each collector of commutation taxes shall be allowed the sum of two cents for each tax actually collected and paid into the town treasury by him; and, if any assessor or collector shall refuse or neglect to perform the duty required by said act, he shall forfeit to the state not less than fifty nor more than one hundred dollars. *Compensation of assessors and collectors of commutation tax. Penalty for neglect.*

SEC. 10.   Second lieutenants of companies are hereby required to attend the officers' drill, established by act approved June 29, 1855, and to comply with all laws relative thereto. *Second lieutenants required to attend officers' drill.*

SEC. 11.   This act shall take effect from and after its passage; and section twenty-eight, of the act approved July 1, 1854,—section one, of the act approved June 28, 1856,—section one, section nine, of the act approved June 25, 1857,—and all other acts or parts of acts, inconsistent herewith, are hereby repealed.   Section three, of the act approved June 29th, 1855, is hereby re-enacted. *To take effect from passage. Repeal. Re-enactment of provision of 1855, for officers' drill.*

Approved, June 24th, 1859.

————

## CHAPTER LXXXIII.

An Act concerning Communities and Corporations.

*Be it enacted by the Senate and House of Representatives in General Assembly convened:*

The secretaries or clerks of all stock fire and fire and marine insurance companies who are by law required to make returns to the comptroller, in the month of January of each year, shall, at the time of making said return, pay the expense of making the record of the same. *Insurance companies to pay expense of recording returns to comptroller.*

Approved, June 24th, 1859.

# LAWS OF KANSAS.

———::———

## CHAPTER I.

### ACCOUNTS IN RELATION TO PENITENTIARY.

**SENATE RESOLUTION** providing for Inquiry into Accounts of Penitentiary.

*Resolved by the Legislature of the State of Kansas:*

That the Auditor of State be and he is hereby directed to institue a rigid inquiry as to labor performed by state convicts confined in the jails of Leavenworth and Douglas counties, as to labor performed for the counties, before he draws any order upon the Treasurer of State, for money appropriated at this session of the Legislature, in favor of either Douglas or Leavenworth counties, or the Sheriffs of the same, or either of the Penitentiary Commissioners, he shall be satisfied from investigation that the State has been and is credited for all labor performed by convicts for any party or parties as above.

*Auditor to institute inquiry.*

3

Digitized from Best Copy Available

Case 2:23-cv-00408-... Document 48-8 Page 350 of ... Date Filed 07/20/2023

# CHAPTER XII.

## ARMS.—PREVENT CARRYING OF.

### AN ACT to prevent the carrying of Deadly Weapons.

*Be it enacted by the Legislature of the State of Kansas:*

SECTION 1.   Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the Government of the United States, who shall be found within the limits of this State, carrying on his person a pistol, bowie-knife, dirk or other deadly weapon, shall be subject to arrest upon charge of misdemeanor; and upon conviction shall be fined in a sum not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months, or both, at the discretion of the court. *[margin: Conviction for carrying deadly weapons.]*

SEC. 2.   Justices of the Peace shall have original jurisdiction of all cases arising under this Act, and on complaint being made, shall proceed to hear and determine the same in a summary manner, and shall have full authority to enforce both fine and imprisonment as provided in this Act, *Provided*, that nothing in this Act shall conflict with the ordinance of any incorporated city of the State. *[margin: Complaint made before Justice of the Peace.]*

SEC. 3.   In all cases arising under this Act, the accused shall be entitled to a jury of six men, possessing the qualifications of electors, who, if they find the defendant guilty, shall assess the fine to be paid by him, and fix the term of his imprisonment; and if convicted, may appeal to the District Court of the proper county as in other cases provided by law. *[margin: Fine to be assessed.]*

SEC. 4.   This Act to take effect and be in force from and after its publication.

Approved, February 23d, 1867.

<div style="text-align:right">

S. J. CRAWFORD,
*Governer.*

</div>

JA1522

Digitized from Best Copy Available

Case 1:22-cv-01562-JRB-MPT Document 38 of Page 351 of 546 File 02/28/2023 PageID: 1646

# At a GENERAL ASSEMBLY held at

Burlington from the Twentieth Day of November to the Twenty-first Day of December 1771, in the Twelfth Year of the Reign of King George the Third, the following Laws were passed.

## SESSION THE FOURTH.

### CHAP. DXXXIX.

*An* ACT *to continue and amend an* Act, *entitled, An* Act *for better settling and regulating the* Militia *of this Colony of* New-Jersey ; *for the repelling Invasions, and suppressing Insurrections and Rebellions.**

Passed Dec. 21, 1771.

WHEREAS the Act passed in the Nineteenth Year of the Reign of our late Sovereign Lord King *George* the Second, entitled, *An* Act *for better settling and regulating the Militia of this Colony of* New-Jersey ; *for the repelling Invasions, and suppressing Insurrections and Rebellions,* will expire at the End of this Session of Assembly ; <sub> Preamble. (marginal note) </sub>

Sect. 1. BE IT ENACTED *by the Governor, Council and General Assembly, and it is hereby Enacted by the Authority of the same,* That the said Act, entitled, *An* Act *for better settling and regulating the Militia of this Colony of* New-Jersey ; *for the repelling Invasions, and suppressing Insurrections and Rebellions,** shall be, and hereby is continued, and every Article and Clause therein contained shall be and remain in full Force, from the Publication hereof, to the first Day of *May* which will be in the Year of our Lord One Thousand Seven Hundred and Seventy-seven, and from thence to the End of the next Session of the General Assembly of this Colony, and no longer. *(marginal note: Limitation.)*

2. AND WHEREAS it has been a Custom of late, in some of the Counties of this Colony, to choose the Militia Officers Constables ; for preventing the same for the Future, BE IT ENACTED *by the Authority aforesaid,* That, during the Continuance of this Act, it shall not be lawful for any Court of General Quarter-Sessions of the Peace, or for any of the Inhabitants of this Colony, at their annual Town-meetings, to appoint or choose any commissioned Officer, while in Commission, to be a Constable ; any Law, Usage or Custom to the contrary notwithstanding. *(marginal note: Commissioned Officers not to be chosen Constables.)*

### CHAP. DXL.

*An* ACT *for the Preservation of* Deer *and other Game, and to prevent trespassing with Guns.*

Passed Dec. 21, 1771.

WHEREAS the Laws heretofore passed in this Colony for the Preservation of Deer and other Game, and to prevent trespassing *(marginal note: Preamble.)*

* Chap. CC.

Digitized from Best Copy Available

Case 1:23-cv-02347-UNA Document 468-8 Page 2849 of Date Filed 07/20/2023 ID: 1647

ing with Guns, Traps and Dogs, have, by Experience, been found infufficient to anfwer the falutary Purpofes thereby intended ; Therefore,

No Perfon to carry a Gun on Lands not his own, except, &c.

Sect. 1. BE IT ENACTED *by the Governor, Council and General Affembly of this Colony of* New-Jerfey, *and it is hereby Enacted by the Authority of the fame,* That if any Perfon or Perfons fhall prefume, at any Time after the Publication hereof, to carry any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Poffeffion, unlefs he hath Licenfe or Permiffion in Writing from the Owner or Owners or legal Poffeffor, every fuch Perfon fo offending, and convicted thereof, either upon the View of any Juftice of the Peace within this Colony, or by the Oath or Affirmation of one or more Witneffes, before any Juftice of the Peace of either of the Counties, Cities or Towns-corporate of this Colony, in which the Offender or Offenders may be taken or refide, he, fhe or they, fhall, for every fuch Offence, forfeit and pay to the Owner of the Soil, or his Tenant in Poffeffion, the Sum of *Forty Shillings,* with Cofts of Suit ; which Forfeiture fhall and may be fued for and recovered by the Owner of the Soil, or Tenant in Poffeffion, before any Juftice of the Peace in this Colony, for the Ufe of fuch Owner or Tenant in Poffeffion.

Penalty.

No Perfon to drive Deer or other Game, except, &c.

2. AND BE IT ENACTED *by the Authority aforefaid,* That if any Perfon fhall prefume, at any Time after the Publication of this Act, to hunt or watch for Deer with a Gun, or fet in any Dog or Dogs to drive Deer, or any other Game, on any Lands not his own, and for which the Owner or Poffeffor pays Taxes, or is in his lawful Poffeffion, unlefs he hath Licenfe or Permiffion in Writing from fuch Owner or Owners or legal Poffeffor ; every fuch Perfon fo offending, and being convicted thereof in Manner aforefaid, fhall, for every fuch Offence, forfeit and pay to the Owner of the Soil, or Tenant in Poffeffion, the Sum of *Forty Shillings,* with Cofts of Suit ; provided, that nothing herein contained fhall be conftrued to extend to prevent any Perfon carrying a Gun upon the King's Highway in this Colony.

Penalty.

Penalty on Non-Refidents.

3. AND BE IT FURTHER ENACTED *by the Authority aforefaid,* That if the Perfon or Perfons offending againft this Act be Non-Refidents of this Colony, he or they fhall forfeit and pay for every fuch Offence *Five Pounds,* and fhall forfeit his or their Gun or Guns to any Perfon or Perfons who fhall inform and profecute the fame to Effect, before any Juftice of the Peace in any County of this Colony, wherein the Offender or Offenders may be taken or apprehended.

Penalty for killing, &c. Deer out of Seafon.

4. AND BE IT ENACTED *by the Authority aforefaid,* That if any Perfon or Perfons fhall kill, deftroy, hunt or take any Doe, Buck, Fawn, or any Sort of Deer whatfoever, at any other Time or Seafon, except only between the firft Day of *September* and the firft Day of *January* yearly and every Year, he, fhe or they fo offending, fhall forfeit and pay the Sum of *Forty Shillings* for each and every Offence ; to be fued for, recovered and applied as hereafter is directed.

What fhall be Evidence of fuch Killing, &c.

5. AND, for the better and more effectual convicting of Offenders againft this Act, BE IT ENACTED *by the Authority aforefaid,* That any and every Perfon or Perfons in whofe Cuftody fhall be found, or who fhall

JA1524

Digitized from Best Copy Available

Case 1:23-cv-02223-RMB-AMD Document 40 of Page 2353 of Date Filed 07/20/2023 #: 1648

shall expose to Sale, any green Deerskins, or fresh Venison killed at any Time after the first Day of *January*, and before the first Day of *September* aforesaid, and shall be thereof convicted by the Oath or Affirmation of one or more credible Witnesses, shall be deemed guilty of offending against this Act, and be subjected to the Penalties of killing Deer out of Season.

6. AND WHEREAS great Numbers of idle and disorderly Persons make a Practice of hunting on the waste and unimproved Lands in this Colony, whereby their Families are neglected, and the Publick is prejudiced by the Loss of their Labour, BE IT THEREFORE ENACTED *by the Authority aforesaid*, That, from and after the first Day of *January* next, no Person or Persons whatsoever (except such Persons as are by the Laws of this Colony qualified to vote for Representatives in General Assembly, in Right of their Freeholds, and their Sons being of the Age of eighteen Years or upwards, and living with their Parent or Parents, or being Freeholders) shall, on any Pretence whatever, hunt on the waste and unimproved Lands in this Colony ; and if any Person or Persons, not qualified as aforesaid, shall presume to hunt as aforesaid, he or they so offending shall forfeit and pay, for every such Offence, the Sum of *Twenty Shillings ;* to be recovered by Action of Debt, with Costs, by any Person who shall sue for the same ; to be applied one Half to the Prosecutor, and the other Half to the Use of the Poor of the Township or Precinct where the Fact was committed. *[margin: Who may hunt on un-improved Lands.]* *[margin: Penalty on Offenders.]*

7. AND BE IT ENACTED *by the Authority aforesaid*, That if any Person or Persons within this Colony shall set any Trap or other Device whatsoever, larger than what is usually and commonly set for Foxes and Muskrats, such Person, setting such Trap or other Device, shall pay the Sum of *Five Pounds*, and forfeit the Trap or other Device, shall suffer three Months Imprisonment, and shall also be liable to make good all Damages any Person shall sustain by setting such Trap or other Device, and the Owner of such Trap or other Device, or Person to whom it was lent, shall be esteemed the Setter thereof, unless it shall be proved, on Oath or Affirmation, what other Person set the same, or that such Trap or other Device was lost by said Owner or Person to whom it was lent, and absolutely out of his Power ; and if the Setter of the Trap or other Device be a Slave, and it be his own voluntary Act, he shall (unless the Master or Mistress shall pay the Fine) in Lieu of such Fine, be publickly whipped with thirty Lashes, and committed till the Costs are paid ; and that the said Trap or other Device shall be broken and destroyed in the View and Presence of the Justice of the Peace before whom they are brought : And if any Person or Persons shall have Possession of, or there shall be found in his or their House, any Trap or Traps, Device or Devices whatsoever, for taking of Deer, such Person or Persons shall be subjected to the same Penalty as if he or they were convicted of setting such Trap or Traps, or other Device. *[margin: Penalty on setting Traps, &c.]* *[margin: Penalty on a Slave setting such Trap, &c.]* *[margin: Penalty on keeping such Trap, &c.]*

8. AND, for encouraging the Destruction of such Traps and Devices, BE IT ENACTED *by the Authority aforesaid*, That if any Person shall seize any Trap or other Device for the taking Deer, and shall carry such Trap or other Device to any Magistrate of the County where such Trap or Device was seized, such Person shall be entitled to *[margin: Reward for seizing a Trap, &c.]*

4 Q an

Digitized from Best Copy Available

JA1525

Case 1:23-cv-02357-RMB-AMD Document 45-8 Page 264 of 08/08/23 Page 264 of 08/08/23 PageID: 1649

an Order from the said Magistrate to the Collector of such County, to pay him the Sum of *Ten Shillings*, out of any Money in his Hands raised for the Use of the County ; which Sums shall be allowed to such Collector on the Settlement of his Accounts.

<div style="margin-left:2em">
**Penalty on a Smith making or mending such Trap, &c.**
</div>

9. AND BE IT FURTHER ENACTED *by the Authority aforesaid,* That every Smith or other Artificer, who shall hereafter make or mend any such Trap or other Device aforesaid, he shall forfeit and pay the Sum of *Forty Shillings ;* and the Person carrying such Trap or other Device to the Artificer aforesaid, shall forfeit and pay the Sum of *Twenty Shillings.* And every Person who shall bring into this Colony any such Trap or Device as aforesaid shall forfeit and pay the Sum of *Forty Shillings.* And if the Person who shall carry the same to the Smith or Artificer shall be so poor as that he shall not be able to pay the Forfeiture aforesaid, he shall be committed to the common Gaol, until he shall prove who is Owner of such Trap or Device, or who delivered the same to him ; and in such Case the Forfeiture aforesaid shall be levied on the Goods, or in Failure of Goods, on the Body of the Owner of such Trap or Device, or the Person who delivered the same to the Pauper, and the Trap or Device shall be forfeited and destroyed.

<div style="margin-left:2em">
**Penalty on bringing such Trap, &c. into the Colony.**
</div>

<div style="margin-left:2em">
**Penalty for setting loaded Guns.**
</div>

10. AND WHEREAS a most dangerous Method of setting Guns has too much prevailed in this Province, BE IT ENACTED *by the Authority aforesaid,* That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of *Six Pounds ;* and on Non-payment thereof shall be committed to the common Gaol of the County for six Months.

<div style="margin-left:2em">
**Application of Penalties.**
</div>

11. AND BE IT FURTHER ENACTED *by the Authority aforesaid,* That the Fines and Forfeitures in this Act expressed, and not particularly appropriated, shall be paid, one Half to the Prosecutor, and the other Half to and for the Use of the Poor of the Town, Precinct or District, where the Offence is committed ; and that the Execution of this Act, and every Part thereof, shall be within the Cognizance and Jurisdiction of any one Magistrate or Justice of the Peace, without any Reference to the Act for Trial of small Causes in this Colony.

<div style="margin-left:2em">
**Jurisdiction given to one Magistrate.**
</div>

<div style="margin-left:2em">
**This Act not to affect Parks.**
</div>

12. AND BE IT ENACTED, That nothing in this Law shall be construed to extend to restrain the Owners of Parks, or of tame Deer, from killing, hunting or driving their own Deer.

<div style="margin-left:2em">
**Penalty on Magistrate neglecting his Duty.**
</div>

13. AND BE IT ALSO ENACTED *by the Authority aforesaid,* That if any Justice of the Peace or other Magistrate, within this Province, shall have Information of any Persons offending against this Act, in killing Deer out of Season, setting and making Traps, Non-Residents killing Deer, and Persons setting of Guns, and shall not prosecute the same to Effect within two Months after such Information, he shall forfeit and pay the Sum or Sums to which the Offender against this Act would have been liable.

14. AND

JA1526

Digitized from Best Copy Available

Case 1:23-cv-02223-RDM-QMB-PJB Document 36-3 Page 2 of Date 03/30/2023 ID: 1650

14. AND BE IT ENACTED *by the Authority aforesaid*, That the Justices at every Quarter-Sessions of the Peace shall cause this Act to be publickly read ; and give in Charge to the Grand-Jury to particularly inquire and present all Persons for killing Deer out of Season, setting or making Traps, and all Non-Residents killing, destroying, hunting and taking any Sort of Deer, and all Persons setting of Guns ; and, upon Conviction for either of the said Offences, the said Justices shall set and impose the Fines and Penalties herein before-mentioned, with Costs of Suit. *[margin: This Act to be published and executed.]*

15. AND BE IT ENACTED *by the Authority aforesaid*, That if any Person or Persons whatsoever, whether the Accused or Accuser, Plaintiff or Defendant, shall think themselves aggrieved by any of the Judgments given by the said Justices or other Magistrates, for any Suit commenced by Virtue of this Act ; then it shall and may be lawful for such Person or Persons to appeal, on giving sufficient Security for the Forfeitures and Costs, to the next Court of General Quarter-Sessions, held for such County where such Judgment shall be given ; which Court is hereby empowered to hear and determine all and every such Appeal or Appeals. *[margin: Appeal given to next Sessions.]*

16. AND BE IT ENACTED *by the Authority aforesaid*, That if any Person or Persons, within this Colony, shall, after the Publication of this Act, watch with a Gun, on any uninclosed Land within two Hundred Yards of any Road or Path, in the Night Time, whether the said Road is laid out by Law or not, or shall stand or station him or themselves upon or within two Hundred Yards of any Road as aforesaid, for shooting at Deer driven by Dogs, he or they so offending, shall, on Conviction, forfeit and pay the Sum of *Five Pounds* for every such Offence ; to be recovered by Action of Debt, or Presentment of the Grand-Jury as aforesaid, and pay all Damages. *[margin: Penalty for watching in the Night near a Road.]*

17. PROVIDED ALWAYS, That the sixth Section of this Act shall not be construed to affect any Native *Indian* ; and that nothing in this Act shall be construed to prevent the Inhabitants of *Essex, Bergen, Morris* and *Sussex*, from making, having in their Houses, or setting Traps of five Pounds Weight or more for Bears, Wolves, Foxes, or any other wild Beasts, Deer only excepted. *[margin: Not to affect* Indians, *nor* Essex, Bergen, Morris *or* Sussex.]*

18. AND BE IT FURTHER ENACTED *by the Authority aforesaid*, That all former Laws made in this Colony for the Preservation of Deer and other Game, and to prevent trespassing with Guns, and regulating the Size of Traps, shall be, and they are hereby repealed. *[margin: Repeal of Former Laws.]*

C H A P. DXLI.

*An* A C T *declaring the River* Delaware *a common* Highway, *and for improving the* Navigation *in the said River.*

Passed Dec. 21, 1771.

WHEREAS the improving the Navigation in Rivers is of great Importance to Trade and Commerce ; AND WHEREAS the River *Delaware* *[margin: Preamble.]*

Digitized from Best Copy Available

Case 1:23-cv-02223-RMB-AMD Document 88-8 Page 356 of Date Filed 07/20/2023 Page ID: 1651

*Delaware* may be rendered much more navigable than it now is; AND WHEREAS many Persons desirous to promote the publick Welfare have subscribed large Sums of Money for the Purpose aforesaid; and it is represented that others will subscribe considerable Sums, if Commissioners are appointed by Law to receive the Subscriptions, and apply the same; Therefore,

*Delaware a publick Highway.*

SECT. I. BE IT ENACTED *by the Governor, Council and General Assembly, and it is hereby Enacted by Authority of the same,* That the River *Delaware* shall be, and it is hereby declared to be a common Highway, for the Purposes of Navigation up and down the same.

*Commissioners appointed.*

2. AND BE IT FURTHER ENACTED *by the Authority aforesaid,* That *Joseph Galloway, Joseph Fox, Michael Hillegas, Abel James, Samuel Rhoads, James Allen, Peter Knight,* Esquires, *Daniel Williams, Henry Drinker, Clement Biddle, Jeremiah Warder* the Younger, *Jacob Bright, John Baldwin, Richard Wells,* Gentlemen, *Thomas Yardley, Jacob Orndt, Peter Kechline, Henry Kooken,* Esquires, *William Ledley, Nicholas Depui,* Son of *Samuel, Jacob Stroud* and *John Arbo,* Gentlemen, the Honourable, *John Stevens, James Parker* and *Daniel Coxe,* Esquires, *Samuel Meredith* and *Robert Field,* Esquires, Doctor *William Bryant, Abraham Hunt, Timothy Smith, Thomas Lowry, Ashur Mott, John Emley* of *Kingwood, Andrew Melick, Robert Hoops* and *Matthew Lowry,* Gentlemen, be, and they are hereby appointed and constituted Commissioners for improving the Navigation in the said River *Delaware;* who, or any twelve of them, the Survivors, or any twelve of them, shall have full

*To collect Subscriptions*

Power and Authority, by Virtue hereof, to collect, recover and receive from any Person or Persons whatsoever, all such Sums of Money, which have been, or shall be given or subscribed for rendering the said River more navigable; and so much of the said Monies as may be necessary

*and apply them.*

for that Purpose, to lay out and apply for and towards improving the Navigation in the said River *Delaware,* from the lower Part of the Falls near *Trenton,* to the River *Lehigh* at *Easton;* and the Residue thereof to lay out and apply for and towards improving the Navigation in that Part of the said River above the said River *Lehigh.* PROVIDED ALWAYS, That such Sums of Money as have been or shall be given or subscribed for the improving the Navigation of the said River, above the *Lehigh* aforesaid, separately, shall be laid out and applied for and towards that Purpose, and no other.

*To clear, straighten, &c.*

3. AND BE IT FURTHER ENACTED *by the Authority aforesaid,* That the said Commissioners, or any twelve of them, their Survivors, or any twelve of them, shall have full Power and Authority, by themselves, their Agents, Servants and Workmen, to clear, scour, open, enlarge, straighten or deepen, the said River where-ever it shall to them appear useful for improving the Channels; and also to remove any Obstructions whatsoever, either natural or artificial, which may or can in any Manner hinder or impede the Navigation in the said River; and to make and set up in the said River any Dams, Pens for Water Locks, or any other Works whatsoever, and the same to alter or repair as they shall think fit; and also to appoint, set out, and make near the said River, Paths or Ways, which shall be free and open for all Persons having Occasion to use the same for towing, hauling or drawing any Vessels, Boats, small Craft and

Rafts

Digitized from Best Copy Available

Case 1:22-cv-01223-RMB-AMD Document 38 of Page 2358 of Date Filed 42/22/2022 ID: 1652

Rafts, of any Kind whatfoever; and from Time to Time to do and ex-
ecute every other Matter or Thing neceffary or convenient for improv-
ing the Navigation in the faid River. PROVIDED ALWAYS, That no
Dam, Pen, Lock or other Work, made or fet up by the faid Commif-
fioners, fhall be appropriated to the private Ufe or Benefit of any Per-
fon or Perfons whatfoever, contrary to the true Intent and Meaning of
this Act.

4. AND BE IT FURTHER ENACTED by the Authority aforefaid, That *Watercourfe not to be diverted.*
no Perfon or Perfons whatfoever fhall prefume to divert, lead or draw
at any Time or Times, by any Race or other Device, any Water of
the faid River out of or from the natural Courfe or Channel, for the
Ufe of any Mill or Waterwork.

5. AND BE IT FURTHER ENACTED by the Authority aforefaid, That *Penalty on hindering the Commiffioners, &c. or obftructing the Navigation.*
if any Perfon or Perfons fhall prefume to oppofe or hinder the faid Com-
miffioners, or any of them, their Agents, Servants and Workmen, or
any of them, from doing any Act which they are hereby authorized and
empowered to do, or fhall make, erect, fet up, repair or maintain, or
fhall be aiding, affifting or abetting in making, erecting, fetting up,
repairing or maintaining, any Dam or Obftruction which may or can
in any Manner hinder or impede the Navigation in the faid River; or
fhall remove, deftroy, throw down, alter, injure or impair, any Dam,
Pen, Lock or other Work, made or fet up by the faid Commiffioners,
or by Order of them, or any twelve of them, their Survivors, or any
twelve of them; every Perfon fo offending, being legally convicted
thereof by Verdict of a Jury, or by his own Confeffion, before the Juf-
tices of the Peace in their Court of General Quarter-Seffions, fhall for-
feit and pay *Fifty Pounds* Proclamation Money of this Colony, for eve-
ry fuch Offence, or fhall fuffer Imprifonment for twelve Months with-
out Bail or Mainprize; one Moiety of which Forfeiture fhall be paid to *Application.*
the Informer, and the other Moiety to the Commiffioners herein ap-
pointed, or the Survivors of them as aforefaid, to be applied for and
towards improving the Navigation in the faid River.

6. AND WHEREAS Doubts may arife in what Counties Of- *Offences where triable.*
fences committed in the faid River *Delaware* againft this Act ought
to be tried; for removing thereof, BE IT ENACTED by the Authority
aforefaid, That every Offence committed in or on the faid River, againft
this Act, fhall be laid to be committed, and may be tried and deter-
mined as aforefaid, in any of the Counties within this Colony op-
pofite to or joining on that Part of the faid River in which fuch Of-
fence fhall be committed.

7. PROVIDED ALWAYS, AND BE IT FURTHER ENACTED by the *Not to injure Mill-Dams already erected.*
*Authority aforefaid,* That Nothing herein contained fhall give any Pow-
er or Authority to the Commiffioners herein appointed, or any of
them, to remove, throw down, lower, impair, or in any Manner to
alter a Mill-Dam erected by *Adam Hoops,* Efquire, late deceafed, in
the faid River *Delaware,* between his Plantation and an Ifland in the
faid River nearly oppofite to *Trenton,* or any Mill-Dam erected by any
other Perfon or Perfons in the faid River, before the Paffing of this Act;
nor to obftruct, or in any Manner to hinder the Heirs or Executors

4 R                                                                          of

JA1529

Case 1:23-cv-02223-RMB-AMD Document 48-8 Page 2058 of Date Filed 07/20/23 of 8D: 1653

of the faid *Adam Hoops*, or fuch other Perfon or Perfons, his or their Heirs and Affigns, from maintaining, raifing or repairing, the faid Dams refpectively, or from taking Water out of the faid River, for the Ufe of the faid Mills and Waterworks, erected as aforefaid, and none other.

**Commiffioners to keep Minutes and report.**

8. AND BE IT FURTHER ENACTED *by the Authority aforefaid,* That the faid Commiffioners fhall keep Minutes of their Proceedings, in Purfuance of the Power hereby given to them, fairly entered in a Book; and fhall once in every Year make Report of their Tranfactions in improving the Navigation in the faid River to the Council and Affembly of this Colony for the Time being, and fhall lay before them a juft and faithful Account of all Sums of Money by them received for the aforefaid Purpofes, and in what Manner they fhall be expended, that the fame may be adjufted and fettled.

## C H A P.  DXLII.

*An* A C T *for the more effectual maintaining, and keeping above the Flow of the Tide, that Part of the* Road *or* Caufeway *between the Toll-Bridge over* Newton *Creek and the faft Land of* Keziah Tonkin.*

Paffed Dec. 21. 1771.

**Preamble.**

WHEREAS *Thomas Attmore, Ifaac Burrough, Benjamin Thackray, Jacob Stokes, Hannah Cooper, Keziah Tonkin, Elizabeth Thackray* and *Job Haines,* Owners and Proprietors of the Meadows lying on the eafterly Side of *Newton* Creek, in the County of *Gloucefter,* have, by their Petition, fet forth, That they have fuffered, and are daily expofed to very confiderable Damage by Reafon of the Caufeway and Road between the Toll-Bridge, called *William Gerrard*'s, and the faft Land of *Keziah Tonkin,* not being raifed above the Flowing of the Tides;

**Poffeffors of the Toll-Bridge neglecting three Months.**

*Sect.* 1. BE IT THEREFORE ENACTED *by the Governor, Council and General Affembly,* That if the Owner or Owners, Poffeffor or Poffeffors, of the Toll-Bridge erected over *Newton* Creek, fhall neglect or refufe, for three Months after Publication hereof, to repair and raife, above the Flowing of the Tides, fuch Part of the Caufeway and Road, leading from the Town of *Gloucefter* to the *Coopers* Ferries, as lays on the Eaft Side of *Newton* Creek aforefaid, from the End of faid Toll-Bridge to the faft Land of *Keziah Tonkin;* then, and in fuch Cafe, it fhall and may be lawful for the Managers, or the Survivors of them already appointed, or that fhall be hereafter appointed, in Purfuance of an Act paffed in the third Year of His prefent Majefty's Reign, entitled, *An* Act *to enable the Owners and Poffeffors of the Meadows lying on a Branch of* Newton *Creek, in the County of* Gloucefter, *commonly called the* Back

**Managers of Back Creek Meadows to repair and raife the Caufeway.**

Creek, *to erect and maintain a Bank, Dam, and other Waterworks acrofs the faid Creek, in order to prevent the Tide from overflowing the fame, and to keep the former Watercourfe of faid Creek open and clear,*† to repair, amend and raife the faid Caufeway and Road, from the Bridge aforefaid,

* This Act, though ftrictly private, being of a very publick Import, is admitted in this Collection.
† Chap. CCCLV.

Digitized from Best Copy Available

# ACTS

## PASSED BY THE GENERAL ASSEMBLY

#### OF THE

# STATE OF LOUISIANA,

##### AT THE

## EXTRA SESSION,

#### HELD AND BEGUN IN THE CITY OF NEW ORLEANS,

##### ON THE 23d OF NOVEMBER, 1865.

PUBLISHED BY AUTHORITY.

NEW ORLEANS:
J. O. NIXON, STATE PRINTER,
1866.

JA1531

# ACTES

## PASSÉS PAR L'ASSEMBLÉE GÉNÉRALE

### DE

# L'ETAT DE LA LOUISIANE,

### A LA

# SESSION EXTRA,

TENUE ET COMMENCÉE DANS LA VILLE DE LA Nlle-ORLÉANS,

## LE 23me JOUR DE NOVEMBRE 1865.

———————◆◆◆———————

### PUBLIÉS PAR AUTORITÉ.

NOUVELLE-ORLÉANS:
J. O. NIXON, IMPRIMEUR D'ÉTAT.
1866.

JA1532

L:C2:seCasa2e223-RMB8Av1B0csDocument148c8Page43668 02Date15iled07720f2023geC0

incurred by his Excellency, J. Madison Wells, Governor of the State of Louisiana, in fitting up the Mechanics' Institute for the use of the General Assembly, the said amount to be paid on the warrant of the Auditor of Public Accounts, to the following persons, and as follows:

| | |
|---|---:|
| C. W. Grandjean, two thousand three hundred and twenty-seven dollars and eighteen cents | $2,327 18 |
| Allen Hill, two thousand and seventy-six dollars and fifty cents | 2,076 50 |
| A. Brosseau & Co., one thousand six hundred and thirty-nine dollars and ninety-two cents | 1,639 92 |
| Selby & Donlan, two hundred and eighty-four dollars and thirty-five cents | 284 35 |
| J. P. Coulon, three hundred and seventy-one dollars and sixty-five cents | 371 65 |
| P. Ward, one hundred dollars | 100 00 |
| John Gauche, twenty dollars and fifty cents | 20 50 |
| Sampson & Kean, thirty dollars | 30 00 |
| G. W. R. Bailey, two hundred dollars | 200 00 |
| Total | $7,050 10 |

Sec. 2. Be it enacted, &c., That this act shall take effect from and after its passage.

<div align="center">

DUNCAN S. CAGE,
Speaker of the House of Representatives.
ALBERT VOORHIES,
Lieutenant Governor and President of the Senate.

</div>

Approved December 18, 1865.

<div align="center">

J. MADISON WELLS,
Governor of the State of Louisiana.

</div>

A true copy:

J. H. Hardy,
Secretary of State.

---

No. 10.]                    AN ACT

To prohibit the carrying of fire-arms on premises or plantations of any citizen, without the consent of the owner.

Section 1. Be it enacted by the Senate and House of Representatives of the State of Louisiana, in General Assembly convened, That it shall not be lawful for any person or persons to carry fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor, other than in lawful discharge of a civil or military order; and any person or persons so offending shall be fined a sum not less than one dollar nor more than ten dollars, or imprisoned not less than one day nor more than ten days in the parish jail, or both, at the discretion of any court of competent jurisdiction.

*Penalty.*

JA1533

préparer, pour l'usage de l'Assemblée Générale, les salles de l'Institut des Artisans. Le susdit montant sera payé sur le mandat de l'Auditeur des Comptes Publics, aux personnes ci-après désignées, ainsi que suit:

| | |
|---|---:|
| C. W. Grandjean, deux mille trois cent vingt-sept piastres et dix-huit cents | $2,327 18 |
| Allen Hill, deux mille soixante-seize piastres et cinquante cents | 2,076 50 |
| A. Brousseau & Cie., mille six cent trente-neuf piastres et quatre-vingt-douze cents | 1,639 92 |
| Selby & Donlaw, deux cent quatrevingt-quatre piastres et trente-cinq cents | 284 35 |
| J. P. Coulon, trois cent soixante-onze piastres et soixante-cinq cents | 371 65 |
| P. Ward, cent piastres | 100 00 |
| John Gauche, vingt piastres et cinquante cents | 20 50 |
| Sampson & Keen, trente piastres | 30 00 |
| G. W. R. Bailey, deux cents piastres | 200 00 |
| Total | $7,050 10 |

SEC. 2. Décrètent de plus: Cet acte sortira son effet à compter de son adoption.

DUNCAN S. CAGE,
Orateur de la Chambre des Représentants.
ALBERT VOORHIES,
Lieutenant-Gouverneur et Président du Sénat.
Approuvé le 18 décembre 1865.
J. MADISON WELLS,
Gouverneur de l'Etat de la Louisiane.

Pour copie conforme:
J. H. HARDY,
Secrétaire d'Etat.

———

No. 10.]                    ACTE

Défendant le port d'armes à feu dans le domaine ou l'habitation de tout citoyen sans le consentement du propriétaire.

SECTION 1. Le Sénat et la Chambre des Représentants de l'Etat de la Louisiane, réunis en Assemblée Générale, décrètent: La loi défend à toute personne de porter des armes à feu dans le domaine ou l'habitation de tout citoyen, sans le consentement du propriétaire, excepté dans l'accomplissement légitime d'un ordre civil ou militaire; toute contravention à cette loi sera punie d'une amende d'au moins une piastre et de dix au plus, ou d'un emprisonnement d'un jour au moins, et qui n'en excèdera pas dix, dans la prison de paroisse; les deux peines pourront être infligées à la fois, à la discrétion de toute cour de juridiction compétente.

*Peine contre le port illégal d'armes à feu.*

JA1534

SEC. 2. Be it further enacted, &c., That all laws, or parts of laws, to the contrary notwithstanding, be and the same are hereby repealed.

*Repealing clause.*

DUNCAN S. CAGE,
Speaker of the House of Representatives.
ALBERT VOORHIES,
Lieutenant Governor and President of the Senate.
Approved December 20, 1865.

J. MADISON WELLS,
Governor of the State of Louisiana.

A true copy:
J. H. HARDY,
Secretary of State.

---

No. 11.]                    AN ACT

To Prevent Trespassing.

SECTION 1. Be it enacted by the Senate and House of Representatives of the State of Louisiana, in General Assembly convened, That whosoever shall enter upon any plantation without the permission of the owner or agent, shall be deemed guilty of a misdemeanor, and shall be liable to be arrested and brought before any court of competent jurisdiction, and upon proof of the fact shall be fined in a sum not exceeding one hundred dollars, or imprisoned for a term not exceeding one month, and may, moreover, be required to give bond for good behavior during six months.

*Persons offending against this Act, before whom tried.*

*Fine.*

SEC. 2. Be it further enacted, &c., That all laws, or parts of laws, contrary to the provisions of this act, be and the same are hereby repealed.

*Repealing clause.*

SEC. 3. Be it further enacted, &c., That this act shall take effect from and after its passage.

DUNCAN S. CAGE,
Speaker of the House of Representatives.
ALBERT VOORHIES,
Lieutenant Governor and President of the Senate.
Approved December 20, 1865.

J. MADISON WELLS,
Governor of the State of Louisiana.

A true copy:
J. H. HARDY,
Secretary of State.

---

No. 12.]                    AN ACT

To amend and re-enact the one hundred and twenty-first section of an act entitled "An Act relative to crimes and offences," approved March 14, 1855.

SECTION 1. Be it enacted by the Senate and House of Representatives of the State of Louisiana in General Assembly convened, That

JA1535

Sec. 2. Décrètent de plus: Toutes lois ou dispositions contraires Clause d'abroga-
à cet acte, sont et demeurent abrogées par les présentes. tion.

DUNCAN S. CAGE,
Orateur de la Chambre des Représentants.
ALBERT VOORHIES,
Lieutenant-Gouverneur et Président du Sénat.
Approuvé le 20 décembre 1865.
J. MADISON WELLS,
Gouverneur de l'Etat de la Louisiane.
Pour copie conforme:
J. H. HARDY,
Secrétaire d'Etat.

---

No. 11.]                    ACTE

Empêchant la violation du droit de propriété.

SECTION 1. Le Sénat et la Chambre des Représentants de l'Etat de
la Louisiane, réunis en Assemblée Générale, décrètent: Quiconque en- Devant quel
trera dans une habitation sans le consentement du propriétaire ou de juge sera tradui-
son agent, sera considéré coupable d'un délit, et sera sujet à être arrêté ne contrevenant
et traduit devant toute cour de juridiction compétente; la preuve du au présent acte.
fait susdit entraînera une condamnation à une amende qui n'excèdera Amende.
pas cent piastres, ou à un emprisonnement qui ne durera pas plus
d'un mois, et l'on pourra de plus exiger du coupable un cautionne-
ment qui répondra de sa bonne conduite pendant six mois.
Sec. 2. Décrètent de plus: Toutes lois ou dispositions à ce con- Clause d'abroga-
traires, sont par le présent abrogées. tion.
Sec. 3. Decrètent de plus: Cet acte sortira son effet à compter Mise à effet.
de son adoption.

DUNCAN S. CAGE,
Orateur de la Chambre des Représentants.
ALBERT VOORHIES,
Lieutenant-Gouverneur et Président du Sénat.
Approuvé le 20 décembre 1865.
J. MADISON WELLS,
Gouverneur de l'Etat de la Louisiane.
Pour copie conforme:
J. H. HARDY,
Secrétaire d'Etat.

---

No. 12.]                    ACTE

Amendant et réédictant la cent vingt-et-unième section de l'acte intitulé: "Acte relatif aux Cri-
mes et Délits," approuvé le 14 mars 1855.

SECTION 1. Le Sénat et la Chambre des Représentants de l'Etat
de la Louisiane, réunis en Assemblée Générale, décrètent :

3

# MCCLAIN'S

# ANNOTATED STATUTES

### OF THE

## STATE OF IOWA,

#### SHOWING THE

## GENERAL STATUTES IN FORCE JULY 4, 1880,

#### EMBRACING

THE CODE OF 1873 AS AMENDED, AND ALL PERMANENT, GENERAL AND
PUBLIC ACTS OF THE FIFTEENTH, SIXTEENTH, SEVENTEENTH
AND EIGHTEENTH GENERAL ASSEMBLIES, WITH A BRIEF
DIGEST UNDER EACH SECTION, OF THE DECISIONS
RELATING THERETO.

### BY EMLIN McCLAIN, ESQ.,

#### OF THE DES MOINES BAR.

---

## VOLUME II.

---

STANFORD LIBRARY

### CHICAGO:
#### CALLAGHAN & COMPANY.
#### 1880.

Digitized by Google



SEC. 3898. If any person maliciously or mischievously enter the enclosure of another in the night time and knock off, pick, destroy, or carry away any apples, peaches, pears, plums, grapes, or other fruit or flower of any tree, shrub, bush, or vine; or, if any person having entered the enclosure of another in the night time, with the intent to knock off, pick, destroy, or carry away any fruit or flower as aforesaid be actually found therein, he shall on conviction thereof, be punished by a fine not less than twenty-five nor to exceed one hundred dollars and costs of conviction, or by imprisonment in the county jail not exceeding thirty days. *Same in night time. 12 G. A. ch. 74, § 2.*

A party has no right to prevent a trespass of this kind by the use of means dangerous to life, or by in- | flicting great bodily injury, as by a spring gun: *Hooker v. Miller*, 37-613.

SEC. 3899. If any person maliciously or mischievously bruise, break, pull up, cut down, carry away, destroy, or in anywise injure any fruit or ornamental tree, shrub, or vine, growing or standing on the land of another, he shall be punished by a fine not less than ten nor exceeding one hundred dollars and costs of conviction, or by imprisonment in the county jail not exceeding thirty days. *Destroying or injuring fruit trees. Same, § 4.*

SEC. 3900. Any person who knowingly discharges fire arms of any description within, or in the immediate vicinity of, any enclosure where cattle, hogs, or sheep are being fed for the purpose of fattening the same; or any person who enters such enclosure with fire arms, or dog, unless such person shall be the owner of said stock, or have the control of the same, or shall have permission from such owner or the person having control thereof to enter said premises, shall be guilty of a misdemeanor. *Discharging firearms near where stock is being fed. 14 G. A. ch. 14, § 1.*

SEC. 3901. If any person mixes for sale naptha and illuminating oils, or shall keep or offer for sale or sell such mixture, or shall keep or offer for sale or sell oil made from petroleum for illuminating purposes, or any other product of petroleum inflammable at a less temperature or fire test than one hundred and ten degrees Fahrenheit, he shall be deemed guilty of a misdemeanor, and punished for the first offense by fine not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding thirty days; and for the second and every succeeding offense, by fine not less than one hundred and not more than one thousand dollars, or by imprisonment in the county jail not less than thirty days nor more than twelve months, or by both such fine and imprisonment. *Mixing for sale illuminating oils at a less fire test than one hundred and ten degrees. 14 G. A. ch. 47.*

### INTERFERENCE WITH RAILWAYS.

[Sixteenth General Assembly, Chapter 148.]

SECTION 1. If any person shall throw any stone, or other substance of any nature whatever, or shall present or discharge any gun, pistol, or other fire arm at any railroad train, car, or locomotive engine he shall be deemed guilty of a misdemeanor and be punished accordingly. *Discharging fire-arms, etc., at railroad train.*

SEC. 2. If any person not employed thereon, or not an officer of the law in the discharge of his duty, without the consent of the person having the same in charge, shall get upon, or off, any locomotive engine, or car of any railroad company while said engine *Jumping off cars while in motion.*

Digitized by Google

or car is in motion, or elsewhere than at the established depots of such company, or who shall get upon, cling to, or otherwise attach himself to any such engine or car, for the purpose of riding upon the same, intending to jump therefrom, when such engine or car is in motion, he shall be guilty of a misdemeanor and be punished by fine not exceeding one hundred dollars, or by imprisonment not exceeding thirty days.

———

# CHAPTER 4.

## LARCENY AND RECEIVING STOLEN GOODS.

SECTION 3902. If any person steal, take, and carry away of the property of another, any money, goods, or chattels; any writ, process, or public record; any bond, bank note, promissory note, bill of exchange, or other bill, order, or certificate; or any book of accounts respecting money, goods, or other things; or any deed or writing containing a conveyance of real estate; or any contract in force; or any receipt, release, or defeasance; or any instrument or writing whereby any demand, right, or obligation is created, increased, extinguished, or diminished, he is guilty of larceny, and shall be punished, when the value of the property stolen exceeds the sum of twenty dollars, by imprisonment in the penitentiary not more than five years; and when the value of the property stolen does not exceed the sum of twenty dollars, by fine not exceeding one hundred dollars, or imprisonment in the county jail not exceeding thirty days.

Larceny.
R. § 4237.
C. '51, § 2212.

To constitute larceny, the property must have been feloniously taken from the owner without his consent, or obtained by false representations, etc. If given by the owner to the defendant by virtue of his employment as agent, servant, or otherwise, and afterwards converted, the offense is embezzlement: *Ennis v. The State*, 3 Gr. 67.

If the original possession of the property was innocent, a subsequent conversion will not constitute larceny: *The State v. Wood*, 46–116.

The ownership of property need not be shown to have been in the party from whom it was taken, if it was in his possession: *The State v. Stanley*, 48–221.

A taking from the person is not necessary to constitute larceny, (a special penalty therefor being provided in § 3905, and picking up money dropped by another, with unlawful intent, and converting the same to one's own use without the knowledge of the owner, is sufficient to constitute the offense: *The State v. Pratt*, 20–267.

If one sell or dispose of the property of another under the well founded, though erroneous, belief that he is authorized so to do, he is not guilty of larceny: *The State v. Barrackmore*, 47–684.

Where an auctioneer employed to sell impounded animals sold one of them as his own, and it was taken away by the purchaser, *held*, that there was sufficient taking to constitute larceny on the part of the person selling: *The State v. Hunt*, 45–673.

"Money" and "bank notes" are subjects of larceny: *The State v. Carr*, 43–418; and an indictment describing such money and notes as "gold and silver coin" and "Clark's Exchange Bank bills of the value of," etc., *held* sufficient: *Munson v. The State*, 4 Gr. 483; so, also, an indictment *held* sufficient which charged the taking of "a promissory note for the payment of money, commonly called a

# ACTS AND JOINT RESOLUTIONS

PASSED AT THE

## REGULAR SESSION

OF THE

## Forty-third General Assembly

OF THE

## STATE OF IOWA

———————

PREPARED FOR PUBLICATION BY AND UNDER THE DIRECTION OF
**ROBERT HENDERSON**
SUPERINTENDENT OF PRINTING

———————

Published by
THE STATE OF IOWA
Des Moines
1929

JA1540

# AUTHENTICITY

STATE OF IOWA

Office of Superintendent of Printing

The former statute which required the compiler of the session laws to certify to the authenticity thereof has been repealed in the belief, evidently, that such authenticity is fully covered by the following section of the code, to wit:

"11312. Printed copies of the statute laws of this or any other of the United States, or of congress, or of any foreign government, purporting or proved to have been published under the authority thereof, or proved to be commonly admitted as evidence of the existing laws in the courts of such state or government, shall be admitted in the courts of this state as presumptive evidence of such laws."

Superintendent of Printing.

L    212

JUL 19 1929

5 any sneak boat or sink box, or from any sailboat, gasoline, or electric
6 launch or steamboat, or any other water conveyance, except propelled
7 by oar or paddle, or any other device used for concealment in the
8 open water; nor pursue, for the purpose of killing or capture, any
9 such bird by motor vehicle or aircraft; nor use any artificial light,
10 battery, or deception; contrivance or device with intent to attract or
11 deceive such bird, except that in hunting wild ducks and geese, decoys
12 and duck or goose calls may be used and artificial ambushes erected
13 and used on land, provided no false bottom is used and only natural
14 materials are used in its construction. No person shall at any time
15 hunt or shoot any game bird between sunset and one-half hour before
16 sunrise of the following morning."

1     Sec. 30.   Section seventeen hundred seventy-two (1772), code,
2 1927, is repealed and the following is enacted in lieu thereof, to wit:
3     "1772. **Carrying firearms in motor vehicles.**   No person shall
4 carry a gun or any firearms, except a pistol or revolver, in or on a
5 motor vehicle unless the same be unloaded in both barrels and maga-
6 zine, and taken down or contained in a case."
7     "1772-c1. **"Gun" defined.**   The word "gun" as used in chapter 86,
8 code of 1927, shall include every kind of gun or rifle, except a revolver
9 or pistol."
10     "1772-c2. **Use of rifles.**   No person shall at any time shoot any
11 rifle on or over any of the public waters of the state."

1     Sec. 31.   Section seventeen hundred eighty (1780), code, 1927, is
2 repealed and the following is enacted in lieu thereof, to wit:
3     "1780. **Transportation for sale prohibited.**   It shall be unlawful
4 for any person, firm, or corporation to offer for transportation or to
5 transport by common carrier or vehicle of any kind, to any place
6 within or without the state, for the purposes of sale, any of the fish,
7 game, animals, or birds taken, caught, or killed within the state, or
8 to peddle any of such fish, game, animals, or birds.
9     It shall be unlawful to ship from the state any birds caught, taken,
10 or killed in the state, or to take, ship, or carry from the state for any
11 purpose any such fish, game, animals, or birds unless lawfully caught,
12 taken, or killed by a non-resident licensee under the provisions of this
13 chapter, who may take or carry such birds as have been lawfully
14 caught, taken or killed, or take, carry, or ship such fish, game, or
15 animals as have been lawfully caught, taken, or killed, to his place
16 of residence as indicated on such license."

1     Sec. 32.   Section seventeen hundred eighty-one (1781), code, 1927,
2 is repealed and the following is enacted in lieu thereof, to wit:
3     "1781. **Transportation regulations and restrictions.**   Any person,
4 firm, or corporation desiring the shipment or transportation of any
5 fish or animals shall deliver to the common carrier to which the ship-
6 ment is offered, a statement under oath, in duplicate, showing the
7 name and address of the shipper, the date and number of his license,
8 where and by what officer issued, the name and residence of the con-
9 signee to whom the shipment is made, the kind and number of fish
10 or animals in the shipment, that the same have not been unlawfully
11 killed, bought, sold, or had in possession, and are not being shipped
12 for the purpose of market or sale, and that such shipment does not

# MAINE STATE LEGISLATURE

The following document is provided by the
**LAW AND LEGISLATIVE DIGITAL LIBRARY**
at the Maine State Law and Legislative Reference Library
http://legislature.maine.gov/lawlib



Reproduced from scanned originals with text recognition applied
(searchable text may contain some errors and/or omissions)

# Acts and Resolves

As Passed by the

# Seventy-Ninth Legislature

OF THE

# STATE OF MAINE

## 1919

Published by the Secretary of State, in accordance with the Resolves of the Legislature
approved June 28, 1820, March 18, 1840, and March 16, 1842.

KENNEBEC JOURNAL CO.
AUGUSTA, MAINE
1919

6939

# PUBLIC LAWS

OF THE

# STATE OF MAINE

As Passed by the Seventy-Ninth Legislature

**1919**

[supplied from page 3 of volume]

**CHAP. 180**

'Sec. 6.  **Members not to be candidates at any election, or primary.**  Such board shall consist of three members who shall be residents and legal voters of the city where such board is established; they shall not hold any state, county or city office or be candidates therefor at any election, primary election or caucus so long as they shall continue members of said board. One member of said board shall be appointed and commissioned by the governor, by and with the consent of the council, for the term of four years.  The other two members of the board shall be chosen one from the political party polling the highest number of votes for governor at the next preceding state election, and one from the political party polling the next highest number of votes for governor at said election; they shall each hold their office for the term of three years; each shall be nominated by the city committee of his own political party, and upon due notice thereof in writing, the several mayors of said cities shall forthwith appoint such persons, so nominated, members of said board.  If either or both of said political parties refuses or neglects to seasonably nominate a member of such board and to notify the mayor of such city, said mayor shall thereupon select and appoint a member of said board from the political party so neglecting and refusing to nominate, and said mayor shall so appoint in all such cases of vacancy, whether caused by death, resignation, declination, neglect or refusal to act after being so appointed, or by election or appointment to any state, county or city office, or however such vacancy may be caused; but in cases of necessity arising from the exigency of the public business, the other two members may proceed therewith as provided by this chapter until such vacancy shall be filled in the manner provided herein.  And if any member of said board be absent or disqualified by sickness or otherwise, such mayor shall upon notice thereof forthwith fill his place by the appointment of some qualified elector of said city of the same political party as the absent member represents, to act in his absence.'

<div align="center">Approved April 4, 1919.</div>

# Chapter 180.

An Act to Amend Section Sixty-four of Chapter Thirty-three of the Revised Statutes, as Amended by Chapter Two Hundred and Nineteen of the Public Laws of Nineteen Hundred and Seventeen, Relating to the Use of Automobiles in Hunting Wild Birds and Wild Animals.

*Be it enacted by the People of the State of Maine,* as follows:

**R. S., c. 33, § 64, 1917, c. 219, am. § 64; prohibiting hunting from automobiles, amended.**  Section sixty-four of chapter thirty-three, of the revised statutes, as amended by chapter two hundred and nineteen of the public laws of nineteen hundred and seventeen, is hereby amended by striking out after the word "section" in the sixth line thereof the words "whoever violates any provision of this section shall pay a fine of not

less than forty dollars nor more than one hundred dollars and costs for each offense", and inserting in place thereof the following:

**'Possession of loaded shotgun or rifle in motor vehicle on highways, fields or forests prohibited; penalty.** No person shall have a rifle or shotgun, either loaded or with a cartridge in the magazine thereof, in or on any motor vehicle while the same is upon any highway or in the fields or forests.

Whoever violates any provision of this section shall be subject to a penalty of not more than one hundred dollars and costs for each offense or imprisonment for not more than sixty days or both said fine and imprisonment in the discretion of the court.'

<div align="center">Approved April 4, 1919.</div>

# Chapter 181.

<div align="center">An Act to Amend Section Three of Chapter Eighty-four of the Revised Statutes, Relating to Clerks of the Judicial Courts.</div>

*Be it enacted by the People of the State of Maine,* as follows:

**R. S., c. 84, § 3; relating to the accounting of moneys received by clerk of court.** Section three of chapter eighty-four of the revised statutes is hereby amended by adding the following paragraph:

'Proceeds of all sales of property made under the decree of the supreme judicial court and any and all other sums of money from whatever source derived in civil proceedings coming into the custody of the supreme judicial court shall be deposited in such depository as the court shall designate, and shall be withdrawn therefrom upon order of the clerk of courts, countersigned by any justice of the supreme judicial court in term time or vacation. The court or any justice thereof in term time or vacation shall designate some proper bank or trust company as the depository for the funds hereinbefore referred to, and such designation shall be minuted on the docket of the court. At each regular term of court in each county, the presiding justice shall verify the account kept with such depository and shall cause to be minuted on the docket of such court that he finds the same to be accurate and duly vouched. He shall affix his signature to such certificates on the docket. Clerks of courts in the several counties shall keep a regular book containing the account of such funds showing the deposits and all accumulations thereof, and the amounts withdrawn therefrom, specifying the date of such withdrawal and the case to which such matters relate. All deposits shall be in the name of the court,' so that said section, as amended, shall read as follows:

**'Sec. 3. Court shall designate depository; accounts to be verified and minuted on docket at each term; deposits to be in name of court.** He shall

13





DATE DOWNLOADED: Thu Dec 29 10:46:15 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
William McK. Ball, Editor; Roane, Sam. C., Editor. Revised Statutes of the State of
Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D.
1837 (1838).

ALWD 7th ed.
Ball, William McK., Editor; Roane, Sam. C., Editor. Revised Statutes of the State of
Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D.
1837 (1838).

APA 7th ed.
Ball, W. (1838). Revised Statutes of the State of Arkansas, Adopted at the October
Session of the General Assembly of Said State, A.D. 1837. Boston, Weeks, Jordan.

Chicago 17th ed.
Ball William McK., Editor; Roane, Sam. C., Editor. Revised Statutes of the State of
Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D.
1837. Boston, Weeks, Jordan.

McGill Guide 9th ed.
William McK. Ball, Editor; Roane, Sam. C., Editor, Revised Statutes of the State of
Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D.
1837 (Boston: Weeks, Jordan., 1838)

AGLC 4th ed.
William McK. Ball, Editor; Roane, Sam. C., Editor, Revised Statutes of the State of
Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D.
1837 (Weeks, Jordan., 1838

MLA 9th ed.
Ball, William McK., Editor, and Sam. C. Roane, Editor. Revised Statutes of the State
of Arkansas, Adopted at the October Session of the General Assembly of Said State,
A.D. 1837. Boston, Weeks, Jordan. HeinOnline.

OSCOLA 4th ed.
Ball, William McK., Editor; Roane, Sam. C., Editor. Revised Statutes of the State of
Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D.
1837. Boston, Weeks, Jordan.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

JA1548

SEC. 12. Every person who shall be convicted of any misdemeanor, the punishment of which is not defined in this or some other statute, shall be punished by imprisonment, not exceeding one year, or by fine not exceeding two hundred and fifty dollars, or by fine and imprisonment both.

SEC. 13. Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which the said offence shall have been committed, shall be fined in any sum not less than twentyfive dollars, nor more than one hundred dollars, one half to be paid into the county treasury, the other half to the informer, and shall also be imprisoned not less than one, nor more than six months.

#### ART. II. — LIBEL.

| SECTION | SECTION |
|---|---|
| 1. Definition of. | 5. Publisher or printer required to testify. |
| 2. Punishment of. | 6. Punishment of publisher or printer refusing to testify. |
| 3. The truth of the libel may be given in evidence. | 7. Their testimony not to be used against themselves. |
| 4. Proclaiming a person a coward, for not fighting a duel, &c. | |

SEC. 1. A libel is a malicious defamation, expressed either by writing, printing, or by signs or pictures, or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, veracity, virtue or reputation, or to publish the natural defects, of one who is living, and thereby expose him to public hatred, contempt and ridicule.

SEC. 1. Every person, whether writer, printer or publisher, convicted of the crime of libel, shall be fined in any sum not exceeding five thousand dollars, and may also be imprisoned, not exceeding one year, at the discretion of the jury who shall pass on the case; and when any such case shall be decided without the intervention of a jury, then at the discretion of the court.

SEC. 3. In all prosecutions for libel, under the provisions of the preceding sections, the truth thereof may be given in evidence in justification.

SEC. 4. If any person shall, in any newspaper, handbill or other advertisement, written or printed, publish or proclaim any other person as a coward, or use any other opprobrious or abusive language, for not

# ACTS

## PASSED AT

## THE ANNUAL SESSION

### OF THE

## GENERAL ASSEMBLY

### OF THE

## STATE OF ALABAMA

## December 1838 through January 1839

[Original title page is missing]

seal, appoint such officers as they may think proper and remove the same for improper conduct or neglect of duty.

Sec. 2. *And be it further enacted,* The said Trustees or body corporate shall be priviledged to purchase, accept of and be invested with all manner of property, either real, personal, or mixed, to them and their successors in office, to have and to hold the same for the proper use and benefit of said Academy; *Provided,* the whole value of said property shall never exceed twenty thousand dollars.

*Trustees may hold property*

Sec. 3. *And be it further enacted,* That when any vacancy may occur by death, resignation, or otherwise, of any of the Trustees of said Academy, the survivors or residue of said Trustees, shall fill the same in such manner as shall be pointed out by the by-laws and regulations of said corporation; and that a majority of said board of Trustees shall be competent to transact all business pertaining to said corporation, and their acts shall be as binding and valid as if the whole board were present.

*Vacancies how filled.*

Sec. 4. *And be it further enacted,* That all property owned by said Trustees in their aforesaid corporate capacity, shall be and it is hereby declared free from all taxation.

*Property not taxable.*

Approved Feb. 1st, 1839.

---

[No. 76.]

AN ACT

To declare Chockolocco Creek a public highway from Davis' to Bagleys Mills in the County of Talladega.

Section 1. *Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened,* That the Chockolocco Creek from Davis' to Bagleys Mills in the County of Talladega is hereby declared a public highway.

Sec. 2. *And be it further enacted,* That if any person or persons, shall obstruct the navigation of said creek, by building milldams, felling trees, or in any other way, such person or persons, shall forfeit and pay the sum of five hundred dollars; one half to the State, and the other half to any person who may sue for the same, recoverable before any court of law having jurisdiction of the same and shall also forfeit and pay all damages which any person or persons, may sustain by reason of such obstructions, recoverable in like manner, and all such obstructions may be removed by order of the County or Circuit Courts of Talladega county as a public nuisance.

Approved Feb. 1, 1839.

---

[No. 77.]

AN ACT

To suppress the evil practice of carrying weapons secretly.

Section 1. *Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened,* That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansaw tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon, the person so offending, shall on conviction thereof, before any court having competent jurisdiction, pay a fine not less than fifty nor more than five hundred dollars, to be assessed by the jury trying the case; and be imprisoned for a term not exceeding three months, at the discretion of the Judge of said court.

JA1551

Sec. 2. *And be it further enacted,* That it shall be the duty of the Judges of the several Circuit Courts of this State to give this act specially in charge to the Grand Juries, at the commencement of each term of said Courts.

**Judges to give this law n charge to ury**

Sec. 3. *And be it further enacted,* That the Secretary of State shall cause this act to be published for three months in the papers of Mobile, Montgomery, Tuscumbia, Huntsville, Wetumpka and Tuscaloosa, which publishers shall be paid out of any money in the Treasury not otherwise appropriated.    Approved Feb. 1, 1839.

[No. 78]
## AN ACT
### To incorate the town of Mooresville in the county of Limestone.

Section 1. *Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened,* That the town of Mooresville, in the county of Limestone, be and the same is hereby incorporated, including all the territory within one fourth of a mile in every direction, from the store house of White and Dewoody in said town.

**Incorporation**

Sec 2. *And be it further enacted,* That all free white male persons of said town living and residing within the limits of said incorporation above the age of twenty-one years, are hereby authorised to vote for and elect persons residing in said town, or corporate limits as trustees of said corporation, a majority of whom shall constitute a quorum to do business who are empowered to superintend the police of said town by passing such by-laws not contrary to the laws of the United States and of this State as they may think proper for the Government of said town, and for the suppression and removal of nuisances, within the above mentioned boundaries.

**Trustees to be elected.**

Sec. 3. *And be it further enacted,* That said trustees or a majority of them, are hereby authorised to assess such taxes on all property lying within the limits of said corporation as they may think proper, for all the purposes of a proper police and necessary revenue therefor.

**Assess taxes.**

Sec. 4. *And be it further enacted,* That the said trustees shall meet on the day next succeeding the election and choose from among themselves a President who shall preside and keep order at all meetings of the trustees; and the President of said trustees is hereby vested with all the powers and privileges of a Justice of the peace within the corporate limits of said town, and at the same time and place, the said trustees shall elect a treasurer for the corporation and a constable, and the said constable so elected shall be vested with all the powers, privileges, and duties of a constable within the corporate limits aforesaid, and to whom the taxes aforesaid shall be given in on oath, and who shall collect and pay over the same to the treasurer of said town within ten days after the same is collected.

**Trustees to elect President.**

**To elect Treasurer & constable.**

Sec. 5. *And be it further enacted,* That the election of trustees shall be held on the second Monday in March 1839, and forever thereafter, on the same day in each succeeding year, from eleven o'clock, A. M. to four o'clock P. M., under the direction of a Justice of the Peace of said county; and two house-holders or free-holders residing within the limits aforesaid.

**Elections when held.**

JA1552

 

DATE DOWNLOADED: Thu Dec 29 10:44:02 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1821 15 .

ALWD 7th ed.
, , 1821 15 .

Chicago 17th ed.
"," Tennessee - 14th General Assembly, 1st Session : 15-16

AGLC 4th ed.
'' Tennessee - 14th General Assembly, 1st Session 15

OSCOLA 4th ed.
'' 1821 15

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

15

equity in this state, where any person or persons may be surrendered by his or their bail in discharge of themselves, it shall and may be lawful for the person or persons so surrendered to take the benefit of the prison rules of the county, under the same rules, regulations, and restrictions prescribed for the benefit of defendants arrested and in custody under a writ of *capias ad satisfaciendum.* <span style="float:right">take the benefit of prison rules.</span>

JAMES FENTRESS,
Speaker of the House of Representatives.
W. HALL,
Speaker of the Senate, *pro tem?*
October 18, 1821.

## CHAPTER XII.

*An Act prescribing certain duties of Sheriffs in this state.*

Be it enacted by the General Assembly of the State of Tennessee, That hereafter it shall not be lawful for any sheriff within this state to appoint more than two deputies within the county for which he shall have been appointed sheriff, nor shall it be lawful for a Justice of the Peace to act as deputy sheriff during his continuance in office : *Provided* nothing herein shall be so construed as to apply to, or prohibit special deputations on urgent occasions, and deputations for the purpose of holding elections. <span style="float:right">Sheriff to appoint not more than two deputies. No Justice to be a deputy.</span>

JAMES FENTRESS,
Speaker of the House of Representatives.
W. HALL,
Speaker of the Senate, *pro tem.*
October 19, 1821.

## CHAPTER XIII.

*An Act to prevent the wearing of dangerous and unlawful weapons.*

Be it enacted by the General Assembly of the State of Tennessee, That from and after the passage of this act, each and every person so degrading himself, by carrying a dirk, sword cane, French knife, Spanish stiletto, belt or pocket pistols, either public or private, shall pay a fine of five dollars for every such offence, which may be recovered by warrant before any Justice of the Peace, in the name of the county and for its use, in which the offence may have been committed ; and it shall be the duty of a Justice to issue a warrant on the application on oath of any <span style="float:right">Fine for carrying weapons.</span>

person applying ; and that it shall be the duty of every Judge, Justice of the Peace, Sheriff, Coroner and Constable within this state to see that this act shall have its full effect : *Provided nevertheless,* That nothing herein contained shall affect any person that may carry a knife of any size in a conspicuous manner on the strop of a shot pouch, or any person that may be on a journey to any place out of his county or state.

*Exception as to travellers and the may carry a knife of any size in a conspicuous manstrop of a shot pouch.*

JAMES FENTRESS,
Speaker of the House of Representatives.
W. HALL,
Speaker of the Senate, *pro tem*

October 19, 1821.

## CHAPTER XIV.

*An Act directing the proceedings in cases of forcible entry and detainer.*

SEC. 1. *Be it enacted by the General Assembly of the State of Tennessee,* That no person or persons shall enter upon or into any lands, tenements or other possessions, and detain or hold the same but where entry is given by law, and then only in a peaceable manner.

*What shall be a forcible entry and detainer.*

SEC. 2. *Be it enacted,* That if any person shall enter upon or into any lands, tenements, or other possessions and detain and hold the same with force or strong hand, or with weapons, or by breaking open the doors, windows or other part of a house whether any person be in it or not, or by any kind of violence whatsoever, or by threatening to kill, maim, or beat the party in possession, or by such words, circumstances or actions as have a natural tendency to excite fear or apprehension of danger, or by putting out of doors or carrying away the goods of the party in possession, or by entering peaceably, and then turning by force or frightening by threats or other circumstances of terror, the party out of possession, in such case every person so offending shall be deemed guilty of a forcibly entry and detainer, within the meaning of this act.

*Whatever makes an entry forcible, makes a detainer forcible.*

SEC. 3. *Be it enacted,* That no person who shall lawfully or peaceably enter upon, or into any lands, tenements, or other possessions, shall hold or keep the same unlawfully, and with force or strong hand, or weapons, or violence, or menaces, or terrifying words, circumstances or actions aforesaid, and it is

Digitized from Best Copy Available

# Guests with Guns: Public Support for "No Carry" Defaults on Private Land

*Ian Ayres and Spurthi Jonnalagadda*

## Introduction

All fifty states and DC allow some form of concealed carry, with most states requiring individuals to obtain a permit before they can carry.[1] Concealed carry, whether with or without a license, grants broad privileges to carriers to travel with their firearm in public. Moreover, on privately owned land, many states permit invitees, guests, employees, and customers to carry concealed or unconcealed firearms onto the real property of other people unless expressly prohibited by the owner. Many states even allow uninvited strangers to enter other people's rural land with firearms to hunt unless the landowner has "posted" the property with signs prohibiting trespassing. These legal rules create right-to-carry defaults that might conflict with landowner preferences and burden the ability of private property owners to control what happens on their premises.

An early draft of a forthcoming book (Ayres & Vars, forthcoming 2020) conjectured that a "majority of homeowners do not expect or desire dinner guests or repair people to bring concealed weapons onto their property." One of the book's anonymous reviewers responded, "Maybe in New Haven, but not necessarily in Tuscaloosa or Ft. Worth." This study grew out of a desire to empirically test this majoritarian conjecture. To obtain information on preferences about what people think the default should be, as well as what the law is, concerning the right to carry firearms onto pri-

vate land, we administered a survey to a representative sample of 2000 people across the US. In line with our findings, we argue that that there are compelling reasons to flip the right-to-carry default in favor of a "prohibited-unless-permitted" default that requires explicit permission before carrying a firearm onto private property.

## Theoretical Framework

Defaults are legal rules that govern parties in the absence of some explicit contrary agreement or altering action. Altering rules are the associated laws governing the necessary and sufficient conditions for displacing a default. Majoritarian defaults are set by lawmakers to reflect what a majority of parties prefer. Setting defaults to majority preference will often be efficient because majoritarian defaults can economize on transaction costs by eliminating the need to contract around the default.

However, there are a number of reasons why minoritarian defaults might produce more efficient or more equitable outcomes. For example, if transaction costs are greater for parties in the minority, setting the default to reflect the minority's preference may allow the "low cost" majority to contract around the default more efficiently than the "high cost" minority would have.[2] Alternatively, lawmakers might intentionally set defaults that are dispreferred in order to induce the parties, by their express contracting, to reveal private information. These information-forcing benefits of such "penalty" defaults have been shown to justify a variety of minoritarian defaults.[3] Finally, and most relevant to what follows, minoritarian defaults might be justified by externality or paternalism concerns. When a particular contractual outcome gives rise to either of these concerns, lawmakers might choose a

**Ian Ayres, Ph.D., J.D.,** *is the William K. Townsend Professor and Deputy Dean at Yale Law School. He received his B.A. from Yale College (1981), his J.D. (1986) from Yale Law School, and his Ph.D. in Economics (1988) from MIT.* **Spurthi Jonnalagadda** *is a law student at Yale Law School. She received her B.A. from Mount Holyoke College (2018) in South Hadley, MA.*

183

*The Journal of Law, Medicine & Ethics,* 48 S2 (2020): 183-190. © 2020 The Author(s)
DOI: 10.1177/1073110520979421

JA1556

minoritarian default that mitigates these concerns, relying on the inertial tendency of parties to stick with the default.[4] An externality-reducing default can be especially effective if combined with impeding altering rules that make the default stickier.

In the context of guns, a "no guns" default might be justified as a majoritarian rule to the extent that our survey evidence finds broad support for flipping the "permitted-unless-prohibited" presumption. Or, a "no guns" default might be justified as externality-reducing, even if only a minority support this presumption. Given the inertial tendency to stick with the status quo, lawmakers should expect that a "prohibited-unless-permitted" default would radically expand the private spaces where guns could not be carried. Reducing the number of places available for gun carriers to travel freely with their firearms might have knock-on effects, reducing preferences to carry and possess firearms more generally, as it becomes increasingly inconvenient to do so.[5]

## Legislative Landscape

Federal law prohibits concealed carry of a firearm in federal property, airports and airplanes, the Capitol building, and school areas.[6] Some states have expanded upon these limitations to include places of worship, hospitals and other healthcare facilities, sports arenas, alcohol outlets, and a few other places.[7]

Four jurisdictions have flipped defaults for private dwellings. In Louisiana, no one "may carry [a] concealed handgun into the private residence of another without first receiving the consent of that person"[8] and a similar statute exists in South Carolina.[9] D.C. states that "[the] carrying of a concealed pistol on private residential property shall be presumed to be prohibited unless otherwise authorized by the property owner."[10] Arkansas requires individuals to inform a private property owner if they are carrying a firearm.[11] In 2003, Alaska amended its concealed carry statute to include that, "a person commits the crime of misconduct ... if the person ... knowingly possesses a deadly weapon ... within the residence of another person unless the person has first obtained the express permission of an adult residing there to bring a concealed deadly weapon within the residence."[12]

Twenty-five states have flipped the default for hunting, requiring that hunters obtain permission before entering private property. Texas, for example, requires that hunters in counties with 3.3 million or more residents receive written permission and carry it with them so long as they are on the landowner's property.[13] States that have not flipped the default often establish as an altering rule that landowners "post" their land

to indicate that no trespassing is allowed. States like North Carolina[14] and Missouri[15] make posting land easier by allowing property owners to paint purple marks along their property line. Vermont, in contrast, requires private landowners to post "Permission Only" signs around their property line, with "the owner's name and a method by which to contact the property owner or a person authorized to provide permission" clearly printed on the posted notice.[16]

A few states have established "no carry" defaults for alcohol outlets[17] (and churches),[18] but no state has adopted generalized "no carry" defaults for retail establishments. States that recognize the rights of private property owners to control the carry of firearms onto their premises often make it burdensome to do so by imposing strict and specific altering rules, requiring, for example, posting multiple signs with minimum font sizes.[19] Other states encourage retail establishments to allow carry by immunizing them from tort liability if they allow, but not if they prevent, carry.[20]

All states, by remaining silent, effectively adopt a carry default that allows employees to bring guns onto their employers' property unless explicitly prohibited by the employer. Twenty-five states have passed "bring your gun to work" mandatory rules that prohibit employers from banning the possession of guns in employees' cars parked in the employer's parking lot.[21] Kentucky allows employees to request an injunction against any employer who "fires, disciplines, demotes, or otherwise punishes an employee who is lawfully exercising" their right to leave a firearm in their car at work.[22]

Finally, all states, by default, allow tenants to possess firearms in their rental units, unless the lease explicitly prohibits it. A few states go further and prohibit landlords from restricting tenant firearm possession in leases, foreclosing landlords' abilities to contract around this default.[23] Some states do not allow public housing to limit gun ownership,[24] but DC for example, has designated public housing as a gun-free zone.[25]

Our Online Appendix Table A1 summarizes the law in each of the fifty states and DC As it stands, forty-seven jurisdictions allow carry into private residences, twenty-six allow employees to carry a firearm onto an employer's parking lot, and twenty-five allow hunters to hunt on unposted rural lands, by default. All states have a carry default for places of employment and retail establishments (with some exceptions discussed above for bars and churches) and default or mandatory carry rights for rental units.

*The Journal of Law, Medicine & Ethics*, 48 S2 (2020): 183-190. © 2020 The Author(s)

Table 1
**Proportion of Respondents Favoring "Carry" Default by Owner Context and Region**

| Region | Total | Midwest | Mountain West | Northeast | South | West Coast | F-Test P-Value |
|---|---|---|---|---|---|---|---|
| N | 2,000 | 533 | 138 | 367 | 604 | 358 | |
| **Rural land owners** | | | | | | | |
| Hunters should be allowed to hunt without explicit consent | 12.3%*** | 10.5%*** | 18.8%*** | 12.8%*** | 11.9%*** | 12.3%*** | .1233 |
| **Home owners** | | | | | | | |
| Service providers should be allowed to bring gun without permission | 27.8%*** | 27%*** | 29.7%*** | 28.6%*** | 28.4%*** | 26.5%*** | .9231 |
| Friend should be allowed to bring gun without permission | 32.1%*** | 31.5%*** | 36.2%*** | 33.8%*** | 32.8%*** | 28.8%*** | .4654 |
| **Retailers** | | | | | | | |
| Customers should be allowed to bring gun in business without permission | 44.2%*** | 43.7%*** | 47.8% | 45.4%* | 44.7%*** | 41.6%*** | .7341 |
| Business should be protected from liability | 61%*** | 60.4%*** | 64.5%*** | 61.3%*** | 60.5%*** | 61.1%*** | .931 |
| **Employers** | | | | | | | |
| Employee should be allowed to bring gun into work without permission | 25.1%*** | 25.8%*** | 24.6%*** | 25.6%*** | 24.5%*** | 24.9%*** | .989 |
| Employee should be allowed to have gun in car at work without permission | 68.3%*** | 69.4%*** | 79%*** | 65.4%*** | 71.5%*** | 60.3%*** | .0002 |
| Employee should be allowed to have gun in car even if employer objects | 51.9%* | 53.1% | 57.2%* | 48.8% | 52.8% | 49.7% | .3794 |
| **Landlords** | | | | | | | |
| Tenant should be allowed to have gun without permission | 67.1%*** | 68.9%*** | 77.4%*** | 63.5%*** | 67.2%*** | 64%*** | .0259 |

Notes: F-Test p-value is for test that regional are jointly equal. Asterisks test whether proportion equals 50%: * p < 10%, ** p < 5%, *** p < 1%.

## Methods

We distributed a survey to 2000 individuals using YouGov, a custom research company that created a representative sample of individuals across demographic groups spanning the entirety of the United States based on the 2016 American Community Survey. Our respondents were selected through sample matching, wherein the final population was matched to a randomized target frame using a Euclidean distances metric.[26] The observations were collected from April 7–13, 2020 and are weighted based on demographic characteristics to further ensure that the sample is representative. We framed the survey as a series of seven vignettes, each presenting a different default rule.[27] We tested 5 different contexts of landowners: rural landowners, homeowners, retailers, employers, and landlords. In each context, we asked a question about what the respondent thinks the law should be, and a question about what the law is.

Our survey randomly assigned subjects to one of sixteen treatment groups in a 2x2x2 factorial design.[28] There were two global treatments. The first primed subjects as either landowners or gun owners. For example, subjects randomly assigned to the landowner frame were given the following vignette:

> You are throwing a party at your home and you find out after the party ends that one of your friends had been carrying a firearm while at the party.

> Should your family and friends be allowed to carry a gun onto your property without your explicit consent?
> ☐ Yes
> ☐ No

Does your state currently have laws that prevent acquaintances from carrying firearms into other people's homes without their explicit consent?
☐ Yes
☐ No
☐ I don't know

Subjects assigned to the gun-owner frame were asked the same questions, but the respondent was situated in the vignettes as the gun owner:

> Your friends are throwing a party at their home. You are legally licensed to carry a gun and you do so while at the party.

We hypothesized that priming subjects to take the part of the gun-owner (landowner) might decrease (increase) respondent support for "no carry" defaults.

The second global treatment randomly assigned half the subjects to vignettes that included the word "concealed" in all the vignettes presented to the respondent. We hypothesized that priming subjects with vignettes emphasizing the shrouded nature of concealed carry would increase respondent support for "no carry" defaults. Balance tables presented in Online Appendix Tables A2 and A3 show that assignment to each of these two sets of framings was successfully randomized.

We also had two vignette-specific treatments. First, the vignette related to tort immunization for retail establishments was randomized among an "allow" or "prevent" condition, addressing whether tort immunity should exist for establishments that allow guns on their property or those that prevent gun carry. Second, in the vignette related to a "no hunting" default, subjects were randomly assigned to groups with two different altering rule descriptions: a no hunting "with-

*The Journal of Law, Medicine & Ethics*, 48 S2 (2020): 183-190. © 2020 The Author(s)

JA1558

out the explicit consent of the owner" condition or a no hunting "unless you post 'No Trespassing' signs" condition.

## Results

*What the Law Should Be*
Table 1 reports our central results concerning respondent preferences across a variety of landowning contexts.[29]

We find only a small percentage of respondents (12.3%) report a preference for hunters to be allowed to hunt without the landowner's explicit permission.[30] Similarly, less than a third of respondents support a "carry" default for service providers (27.8%) or friends and family (32.1%) with regard to home residences. These sample proportions are all statistically different from 50% (p. < .01). Only about one-quarter of respondents (25.1%) expressed support for a default right of employees to bring guns into their places of employment (p. < .01). A larger, but still minority proportion of respondents (44.2%), believe customers, by default, should be allowed to carry into retail establishments, and this percentage is again statistically different from 50%.

Table 1 indicates that respondent preferences were sensitive to particular carrying contexts. Two-thirds of respondents (67.1%) supported the default right of tenants to possess weapons on property they had rented, and this proportion was statistically greater than 50% (p. < .01). An even larger proportion (68.3%) support the default right of employees to keep guns in their cars on their employer's parking lot (p. < .01). However only a bare majority (51.9%) supported the mandatory rule of many "bring your gun to work" statutes that grant a parking lot carry right, even if the employer objects, and this sample proportion was not statistically different than 50%. Finally, Table 1 shows that 61% of respondents support retailer businesses being immunized from tort liability, regardless of whether they allow or prevent gun carry in their stores.[31]

An important takeaway from Table 1 is the surprising consistency of respondent preferences across jurisdictions. The F-test results indicate there are no statistically significant differences in support for default carry rights for most of the contexts examined. For example, every region consistently disapproves of the hunting default — ranging from a high of 18.8% support in the Mountain West to a low of 10.5% in the Midwest. The only statistically significant regional dif-

Figure 1

**Logistic Regression Coefficients of "What the Law Should Be" by Demographics**



JA1559

*Ayres and Jonnalagadda*

Table 2
**Prevalence of Respondents Being Uninformed and Misinformed about the Law**

| | Carry Default | | No Carry Default | |
|---|---|---|---|---|
| | Wrong about law | Don't know law | Wrong about law | Don't know law |
| Law concerning whether contractors can concealed carry without explicit consent | 13.3% | 76.8% | 12.3% | 76.7% |
| Law concerning whether customers can concealed carry without explicit consent | 13.9% | 65.6% | - | - |
| Law concerning whether employee can concealed carry without explicit consent | 11.8% | 68.8% | - | - |
| Law concerning whether employee must be able to store gun in car | 12.7% | 72.7% | 9.0% | 77.4% |
| Law concerning whether friends can concealed carry without explicit consent | 18.0% | 72.1% | 12.3% | 67.1% |
| Law concerning whether hunting is allowed without explicit consent | 22.7% | 65.6% | 10.6% | 68.6% |
| Law concerning whether tenant can concealed carry without explicit consent | 23.4% | 69.4% | - | - |

ferences concern respondent beliefs around employees leaving guns in their cars and tenants being allowed to possess firearms without the landlord's explicit consent. While we generally see that the Mountain West prefers the current default and the West Coast tends to favor default carry the least, the more important result is the surprising consistency of respondents' support, or lack of support, in each context tested. Red states and blue states may differ substantially in their gun control regulations, but the citizens of these jurisdictions hold substantially similar beliefs about whether there should be a default right to carry firearms on other people's property.

To explore how underlying demographic variables influence the support of individual respondents, we regressed answers to support questions in regressions that included question fixed effects and separately controlled for respondent race, gender, income, age education, political affiliations, and regional residence, as well as whether the respondent owns a gun. The underlying logistic and linear regressions can be found in Online Appendix Tables A8 and A9, respectively. Figure 1 summarizes the demographic influences from the logistic regression.

We find that gun owners, Republicans, individuals who identify as neither a Republican nor a Democrat and men are more likely to believe that the law ought, by default, to allow carry onto other people's property. We find similar results for OLS specifications with the same controls (Online Appendix Table A9).

*What the Law Is*
Online Appendix Tables A10 and A11 show the results of specifications, regressing responses to our questions concerning the positive legal status of gun rights on the same demographic variables. These regressions do not find any consistent relationship between demographics and beliefs about what the law is. The more important survey result is that, as shown in Table 2, more than two-thirds of respondents reported not knowing whether their state, by default, allows firearms to be carried onto other people's property in a

variety of landowning contexts. The table divides respondents into those who come from jurisdictions that have a carry default and those from jurisdictions that, by default, do not allow carrying in these contexts. The "No Carry Default" columns have some blanks because as discussed above, there are no jurisdictions that currently have a no-carry default for retail customers, employees or tenants.

The table also reports the proportion of respondents who hold mistaken beliefs about what the law is. For example, 22.7% of respondents residing in hunting default jurisdictions mistakenly believe that the law, by default, prevents third-party hunting, while 10.6% of respondents residing in no-hunting default jurisdictions mistakenly believe that hunting, by default, is allowed. The table indicates that the likelihood of being misinformed is more prevalent when the underlying default allows carrying firearms onto another person's property.

Ignorance of the law can undermine the ability of individuals to exercise their rights as landowners and, more generally, as contractors. A homeowner who wrongly believes that repair people are, by default, not allowed to carry concealed weapons onto her property is less likely to explicitly condition entry on not carrying. In jurisdictions with a no-carry default with respect to private residences, such as South Carolina, misinformation about the law can lead a gun-owner to mistakenly bring a firearm onto another person's property.

*Treatment Effects*
Table 3 summarizes the average effects of our global treatments. Regression results testing for treatment effects for individual questions using linear and logistic regressions can be found in A7 and A12, respectively, and a summary of responses by state is available in Online Appendix Tables A4 (what law should be) and A6 (what law is).

In designing the survey, we expected that participants who were framed in the vignettes as gunowners would be more likely to support a default right to carry

*The Journal of Law, Medicine & Ethics*, 48 S2 (2020): 183-190. © 2020 The Author(s)

JA1560

Table 3

**Average Effects for Property/Gun and Conceal Carry Frames**

| Law should be (% believe law should allow carrying) | | | Law is (% believe law allows carrying) | | |
|---|---|---|---|---|---|
| With Land Owner Framing | With Gun Owner Framing | P-Value | With Land Owner Framing | With Gun Owner Framing | P-Value |
| 41.3% | 41.5% | 78.4% | 45.2% | 41.8% | 3.4% |
| With Concealed Carry Framing | Without Concealed Carry Framing | P-Value | With Concealed Carry Framing | Without Concealed Carry Framing | P-Value |
| 41.0% | 41.8% | 32.0% | 45.6% | 41.6% | 1.4% |

**Notes:** Percentages are averages of support for "carry" default across different owner contexts as described in the Appendix. P-values test whether frame proportions are equal.

than participants framed as landowners. As reported in Table 3, however, we find that the framing of the question did not significantly impact the proportion of people who believe the law should, by default, allow carrying on other people's property (p. > .7).[32] Similarly, we expected that the concealed carry framing would induce greater normative concern with carry defaults, given the hidden nature of the weapon. However, our results again find no significant difference between vignettes with or without concealed carry framing on beliefs of what the law should be (p. > .3).

Table 3 does, however, find that participants who were framed in the vignettes as gun owners were significantly less likely to report that their jurisdiction, by default, allows carrying of firearms onto other people's property (than participants framed as landowners). This result is surprising. The gun-owning condition caused different beliefs in what the law is — moreover it tended to make the treated group more mistaken, as it reduced the number of participants who believe their jurisdiction has a carry default, when most jurisdictions, for most contexts, by default, allow third-party firearm possession. One possible interpretation of this result is that when framed as gun-owners, survey respondents became more cynical about government providing appropriate legal rules. Online Appendix Table 13 shows, with linear regressions, that participants who were framed as a gun owner were significantly (p. < .01) more likely to believe that the law was consistent with what they believed the law should be, though the effect size was relatively small (1.9% estimated effect). Similarly, Table 3 shows that those participants exposed to the concealed carry framing were significantly more likely (than those who were not so exposed) to believe that the legal default permitted carry than those without that framing (p. < .05). This result is again consistent with a cynicism interpretation: as vignettes are framed to make gun carrying more dangerous, respondents are more likely to believe that the law provides the wrong default.

## Discussion

Our results strongly support a majoritarian justification for flipping to a "no carry" default onto rural lands for hunting, and into private residences and places of employment. We use majoritarian in a democratic, rather than in an outcome-based, sense. Our results reflect the preferences people have for what the law *should be*, not necessarily what they would choose for themselves. So, while people may prefer their own guests to carry, we find that people prefer a "no carry" default.

Flipping the default to coincide with what the majority of people want is democracy. Given that a substantial majority of people support a "no carry" default in these contexts, regardless of framing, there is a strong case for flipping the legal default to match their expectations. It also likely reduces transactional inefficiencies — like burdensome posting requirements or social invitations explicitly conditioned on invitees not carrying. States with posting requirements should flip the default to match the states that have already prohibited hunting without explicit landowner permission. Like South Carolina, Louisiana, DC, and Alaska, states should require individuals to seek explicit permission before entering a private dwelling.

Public preferences regarding defaults for retail establishments are not as overwhelming, but we still find statistically significant majorities rejecting the current "carry" default. In addition to this majoritarian evidence, there is also a substantial externality-reducing rationale for flipping the default. Following the 2019 WalMart shooting in El Paso, Texas, many retailers began to restrict the carry of firearms into their stores.[33] Costco prohibited anyone, except law enforcement officers, from carrying a firearm into its stores, justifying the policy as a means to "protect [its] members and employees" and WalMart requested that customers not openly carry firearms.[34]

Unfortunately, simply requesting that patrons refrain from carrying is not always effective, as some gun owners continue to carry into these establishments.[35] Retailers may fear customer backlash if they

JA1561

erect signs restricting or permitting gun carry in their stores and may be inclined to abide by a state's default rule regardless of their preferences. Thus, establishments may not be well situated to contract around the right-to-carry default effectively and efficiently, even if they wish to.

Given the public safety concerns and difficulties for retailers to enforce no firearm policies on their own, states should flip the default, preventing individuals from carrying into an establishment without explicit permission to do so. Retailers who are comfortable

Once flipped, states would need to educate gun owners that they are not permitted to carry freely onto private property. Federally licensed dealers could distribute materials at time of sale and states requiring permits or training for public carry could include this information as part of their instruction. While we do not make any strong prescriptions for penalties, states may consider imposing civil penalties on individuals who violate our proposed default by carrying firearms onto private property without the owner's permission. This may include imposing a civil fine for a

> Our results strongly support a majoritarian justification for flipping to a "no carry" default onto rural lands for hunting, and into private residences and places of employment. We use majoritarian in a democratic, rather than in an outcome-based, sense. Our results reflect the preferences people have for what the law *should be*, not necessarily what they would choose for themselves. So, while people may prefer their own guests to carry, we find that people prefer a "no carry" default.

permitting firearms in their stores can contract around this default and lawmakers need not impose overly onerous altering rules.

States that currently restrict the ability of employers to prevent employees from storing guns in their car while parked on the employer's parking lot unreasonably curtail the property rights of employers. While our results do not provide a majoritarian rationale for flipping the default, states ought to at least transform these "bring your gun to work" mandatory rules into mere defaults, maintaining the ability for employer landowners to post signs or contractually limit firearm carry onto their parking lots.

Similarly, statutes limiting a landlord's ability to contract around the tenant possession default also inappropriately limit the landlord's property rights and freedom of contract. Though our results do not provide a majoritarian justification, flipping the default may still be beneficial. Landlords may wish to know which of their tenants are armed, especially given instances where landlords have been shot by tenants in rent and eviction disputes.[36] While *Heller* prevents the government from limiting the ability to possess a firearm in the home, a private property owner is well within her right to do so. By flipping the default, we incentivize the gun owner to reveal that information to the landlord, allowing the landlord to be on notice of which tenants are carrying in their rental units.

first offense and requiring individuals to forfeit their gun and/or registering them in the NICS database — prohibiting future firearms purchases — upon further transgressions.

## Conclusion

The right to bear arms can only be exercised upon particular pieces of land. The Supreme Court's *Heller* decision firmly annunciates an individual right to possess firearms in one's own home.[37] The extent of the right to carry on streets, parks, and in other public places remains an open question.[38] But a substantial portion of the U.S. landmass is privately owned.

Landowners have a powerful self-defense interest to control whether invitees, licensees or tenants carry firearms onto their land. But right-to-carry defaults can undermine this central attribute of ownership. When Alaska's legislature was considering altering its right-to-carry default for private property, the Executive Director of the Alaska Network on Domestic Violence & Sexual Assault testified that "[when] a person carries concealed, that takes away my right to make a choice about whether or not I want to be in the presence of that weapon."[39] The presumptive right to carry concealed weapons onto other people's property takes away their opportunity to make informed choices about how best to remain secure.

We find that a substantial and statistically significant majority of Americans reject the default right to carry

weapons onto other people's residences, unoccupied rural land, retail establishments and businesses. Moreover, we find consistent majoritarian preference not just in the blue coastal regions, but in the all regions of the country. Since many defaults are never altered, "no carry" defaults are public-regarding by radically expanding the areas that are de jure gun free. Restricting the places where guns can be possessed can not only reduce the likelihood of impulsive misuse of firearms — a likely explanation for Missouri's "no carry" default in bars — and the settings (especially automobiles) from which guns can be stolen,[40] such restrictions might also, on the margin, reduce overall demand for gun ownership. While some people purchase guns solely to defend their homes, others may purchase in part for use in other contexts. As these contexts for use decrease, so too might the demand for guns.

### Editor's Note
Additional materials for this article can be found in the Online Appendix.

### Note
The authors do not have any conflicts of interest to disclose.

### Acknowledgment
Zachary Shelley provided excellent research assistance.

### References
1. See generally, *Concealed Carry*, Giffords Law Center, *available at* <https://lawcenter.giffords.org/gun-laws/policy-areas/guns-in-public/concealed-carry> (last visited October 8, 2020).
2. R. Korobkin, "The Status Quo Bias and Contract Default Rules," *Cornell Law Review* 83 (1998): 608–687, at 615.
3. I. Ayres and R. Gertner, "Filling Gaps in Incomplete Contracts: An Economic Theory of Default Rules," *Yale Law Journal* 99 (1989): 87-130, at 93.
4. See generally, I. Ayres, "Regulating Opt-Out: An Economic Theory of Altering Rules," *Yale Law Journal* 121 (2012): 2032-2116.
5. I. Ayres and F. Vars, *Weapon of Choice: Fighting Gun Violence While Respecting Gun Rights* (Harvard University Press, forthcoming).
6. See *Concealed Carry, supra* note 1.
7. *Id.*
8. La. Stat. Ann. § 1379.3 (West 2020).
9. S.C. Code Ann. § 23-31-225 (West 2019).
10. D.C. Code Ann. § 7-2509.07 (West 2019).
11. Ark. Code. Ann. § 5-73-306 (West 2019).
12. Alaska Stat. Ann. § 11.61.220 (West 2019).
13. Tex. Parks & Wild. Code Ann. § 62.012 (West 2019).
14. N.C. Gen. Stat. Ann. § 14-159.7 (West 2018).
15. Mo. Ann. Stat. § 569.145 (West 2020).
16. Vt. Stat. Ann. Tit. 10, § 5201 (West 2019).
17. See, e.g., Mo. Ann. Stat. § 571.107 (West 2020).
18. See, e.g., *supra* note 12.
19. See, e.g., Miss. Code Ann. § 45-9-101 (West 2019); Tex. Penal Code Ann. §30.06 (West 2019).
20. See, e.g., Wis. Stat. Ann. § 175.60 (West 2019).
21. Location Restrictions, *Giffords Law Center, available at* <https://lawcenter.giffords.org/gun-laws/policy-areas/guns-in-public/location-restrictions/> (last visited October 8, 2020).
22. Ky. Rev. Stat. Ann. § 237.106 (West 2019).
23. See, e.g., Minn. Stat. Ann. § 624.714 (West 2019).
24. See, e.g., Miss. Code Ann. §45-9-51 (West 2019).
25. D.C. Code Ann. § 22-4503.02 (West 2019).
26. A more detailed explanation can be found in the online appendix. YouGov has also been used in, I. Ayres and F. Vars, "Gun Owners Support the Right Not to Bear Arms," *Emory Law Review* (forthcoming).
27. The full survey can be found in the Online Appendix.
28. The survey also randomized the order in which vignettes were presented and subjects were randomized into two groups: in one group, "No" appeared first throughout the survey, and in the other, "Yes" appeared first (with "I don't know" always appearing at the end).
29. Analogous results by state are available in Online Appendix Table A4. We also present similar tables for beliefs about what the law is by region and state in Online Appendix Tables A5 and A6, respectively.
30. Appendix Table A7 presents linear regressions testing for treatment effects on each question — both with and without controls — and finds statistically significant treatment effects. Specifically, the "explicit consent" group was 10.5 percentage points less likely than the "No Trespassing" to say that the law should by default allow such hunting and 33 percentage points less likely to believe that that their state had such a law. This aspect of the experiments shows that altering rules can materially impact public support for the law. See Ayres, *supra* note 5.
31. 60.8% of individuals said businesses should have immunity if they prevented individuals from carrying guns, while 61.1% said businesses should have immunity if they allowed individuals to carry guns. These differences were not statistically significant (p. > .8).
32. The landowner-frame made respondents less likely to support tenants carrying firearms in rented property and the "carry" default for hunting on private land. See Appendix Table A7.
33. A. Gangitano and S. Wong, "Here Are the Gun Policies for America's Largest Retailers," *Hill*, September 7, 2019.
34. *Id.*
35. M. Corkery, "Retailers Walk Thin Line by Asking, Not Telling, Shoppers Not to Carry Guns," *New York Times*, September 9, 2019.
36. See, e.g., J.R. Miller, "Tenant Allegedly Shot Landlord in the Head Over $30 Rent Hike," *New York Post*, March 8, 2018.
37. *District of Columbia v. Heller*, 554 U.S. 570, (2008).
38. *New York State Rifle & Pistol Association, Inc., et al. v. City of New York, et. al.*, 590 U.S. ___, (2020).
39. *Concealed Deadly Weapons Legal: Hearing on H.B. 102 Before the H. State Affairs Standing Comm.*, 2003 Leg., 23th Sess., (Ak. April 8, 2003) (statement by Lauree Hugonin, Executive Director of ANDVSA).
40. See *Stolen Guns Pose a Tremendous Risk to Public Safety,* Everytown, *available at* <https://everytownresearch.org/stolen-guns-pose-tremendous-risk-public-safety> (October 8, 2020).

*The Journal of Law, Medicine & Ethics*, 48 S2 (2020): 183-190. © 2020 The Author(s)
JAI563

# Guests with Guns: Public Support for "No Carry" Defaults on Private Land

*Ian Ayres and Spurthi Jonnalagadda*

## APPENDIX

Table A1

**Default Carry Rules Across the US**

| State | Carry default for invitees on private property | Carry default for retail establishment | Carry default for workplace | Mandatory carry for employer parking lot | Carry default for tenants | Carry default for hunting on unposted rural land |
|---|---|---|---|---|---|---|
| **Alabama** | Y | Y | Y | Y<br>Ala. Code § 13A-11-90 (West 2019). | Y | N<br>Ala. Code § 9-11-241–241 (West 2019). |
| **Alaska** | N<br>Alaska Stat. Ann. § 11.61.220 (West 2019). | Y | Y | Y<br>Alaska Stat. §18.65.800 West 2019). | Y | Y |
| **Arizona** | Y | Y | Y | Y<br>Ariz. Rev. Stat. §12.781 (West 2019). | Y | Y |
| **Arkansas** | Y | Y | Y | Y<br>Ark. Code Ann. § 5-73-306 (West 2018). | Y | Y |
| **California** | Y | Y | Y | N | Y | Y |
| **Colorado** | Y | Y | Y | N | Y | N<br>Colo. Rev. Stat. Ann. § 33-6-116 (West 2019). |
| **Connecticut** | Y | Y | Y | N | Y | N<br>Conn. Gen. Stat. § 26-65 (West 2019). |
| **Delaware** | Y | Y | Y | N | Y | N<br>Del. Code Ann. Tit.7, § 714 (West 2019). |
| **D.C.** | N<br>D.C. Code Ann. § 7-2509.07 (West 2019). | Y | Y | N | Y | N<br>D.C. Code Ann. §22-3302 (West 2019). |
| **Florida** | Y | Y | Y | Y<br>Fla. Stat. Ann. § 790.251 (West 2020). | Y | Y |
| **Georgia** | Y | Y | Y | Y<br>Ga. Code Ann. § 16-11-135 (West 2019). | Y | N<br>Ga. Code Ann. § 27-3-1 (West 2019). |

# APPENDIX

Table A1 (continued)
**Default Carry Rules Across the US**

| State | Carry default for invitees on private property | Carry default for retail establishment | Carry default for workplace | Mandatory carry for employer parking lot | Carry default for tenants | Carry default for hunting on unposted rural land |
|---|---|---|---|---|---|---|
| Hawaii | Y | Y | Y | N | Y | N |
| | | | | | | Haw. Rev. Stat. Ann. § 183D-26 (West 2019). |
| Idaho | Y | Y | Y | N | Y | Y |
| Illinois | Y | Y | Y | Y | Y | N |
| | | | | 430 Ill. Comp. Stat. Ann. 66/65 (West 2020). | | 520 Ill. Comp. Stat. Ann. 5/2.33(West 2020). |
| Indiana | Y | Y | Y | Y | Y | N |
| | | | | Ind. Code Ann. § 35-47-2-1 (West 2019). | | Ind. Code Ann. § 14-22-10-1 (West 2019). |
| Iowa | Y | Y | Y | N | Y | N |
| | | | | | | Iowa Code Ann. § 716.7 (West 2020). |
| Kansas | Y | Y | Y | Y | Y | N |
| | | | | Kan. Stat. Ann. § 75-7c10 (West 2019). | | Kan. Stat. Ann. § 21-5810 (West 2019). |
| Kentucky | Y | Y | Y | Y | Y | N |
| | | | | Ky. Rev. Stat. Ann. § 237.106 (West 2019). | | Ky. Rev. Stat. Ann. § 150.092 (West 2019). |
| Louisiana | N | Y | Y | Y | Y | N |
| | La. Stat. Ann. § 40:1397.3 (West 2020) | | | La. Rev. Stat. § 32:292.1 (West 2020). | | La. Stat. Ann. § 56:265 (West 2020). |
| Maine | Y | Y | Y | Y | Y | Y |
| | | | | Me. Rev. Stat. tit.26 §600 (West 2019). | | |
| Maryland | Y | Y | Y | N | Y | N |
| | | | | | | Md. Code Ann., Nat. Res. § 10-411 (West 2019). |
| Massachusetts | Y | Y | Y | N | Y | Y |
| Michigan | Y | Y | Y | N | Y | Y |
| Minnesota | Y | Y | Y | Y | Y | Y |
| | | | | Minn. Stat. § 624.714 (West 2020). | | |
| Mississippi | Y | Y | Y | Y | Y | Y |
| | | | | Miss. Code. Ann. § 45-9-55 (West 2019). | | |

JA1565   2

# APPENDIX

Table A1 (continued)
**Default Carry Rules Across the US**

| State | Carry default for invitees on private property | Carry default for retail establishment | Carry default for workplace | Mandatory carry for employer parking lot | Carry default for tenants | Carry default for hunting on unposted rural land |
|---|---|---|---|---|---|---|
| **Missouri** | Y | Y | Y | Y | Y | N |
| | | | | Mo. Rev. Stat. § 571.030 (West 2020). | | Mo. Ann. Stat. § 578.520 (West 2020). |
| **Montana** | Y | Y | Y | N | Y | N |
| | | | | | | Mont. Code Ann. § 87-6-415 (West 2019). |
| **Nebraska** | Y | Y | Y | Y | Y | Y |
| | | | | Neb. Rev. Stat. Ann. § 69-2441 (West 2019). | | |
| **Nevada** | Y | Y | Y | N | Y | Y |
| **New Hampshire** | Y | Y | Y | N | Y | Y |
| **New Jersey** | Y | Y | Y | N | Y | Y |
| **New Mexico** | Y | Y | Y | N | Y | Y |
| **New York** | Y | Y | Y | N | Y | Y |
| **North Carolina** | Y | Y | Y | Y | Y | Y |
| | | | | N.C. Gen. Stat. § 14-269.2 (West 2018). | | |
| **North Dakota** | Y | Y | Y | Y | Y | Y |
| | | | | N.D. Cent. Code § 62.1-02-13 (West 2019). | | |
| **Ohio** | Y | Y | Y | Y | Y | N |
| | | | | Ohio Rev. Code Ann. § 2923.1210 (West 2019). | | Ohio Rev. Code Ann. § 1533.17 (West 2019). |
| **Oklahoma** | Y | Y | Y | Y | Y | N |
| | | | | Okla. Stat. tit. 21, § 31290.22 (West 2020). | | Okla. Stat. Ann. tit. 29, §5-202. (West 2020). |
| **Oregon** | Y | Y | Y | N | Y | Y |
| **Pennsylvania** | Y | Y | Y | N | Y | Y |
| **Rhode Island** | Y | Y | Y | N | Y | N |
| | | | | | | 20 R.I. Gen. Laws Ann. § 20-15-1 (West 2019). |
| **South Carolina** | N | Y | Y | N | Y | N |
| | S.C. Code Ann. § 23-31-225 (West 2019). | | | | | S.C. Code Ann. § 50-1-90 (West 2019). |

JA1566

3

# APPENDIX

Table A1 (continued)
## Default Carry Rules Across the US

| State | Carry default for invitees on private property | Carry default for retail establishment | Carry default for workplace | Mandatory carry for employer parking lot | Carry default for tenants | Carry default for hunting on unposted rural land |
|---|---|---|---|---|---|---|
| **South Dakota** | Y | Y | Y | N | Y | N |
| | | | | | | S. D. Codified Laws § 41-9-1 (West 2019). |
| **Tennessee** | Y | Y | Y | Y | Y | N |
| | | | | Tenn. Code Ann. § 39-17-1313 (West 2019). | | Tenn. Code Ann. § 70-4-106 (West 2019). |
| **Texas** | Y | Y | Y | Y | Y | N |
| | | | | Tex. Lab. Code Ann. § 52.061 (West 2019). | | Tex. Park & Wild. Code Ann. § 62.012 (West 2019). |
| **Utah** | Y | Y | Y | Y | Y | Y |
| | | | | Utah Code Ann. § 34-45-103 (West 2019). | | |
| **Vermont** | Y | Y | Y | N | Y | Y |
| **Virginia** | Y | Y | Y | N | Y | N |
| | | | | | | Va. Code Ann. §18.8-132 (West 2019). |
| **Washington** | Y | Y | Y | N | Y | N |
| | | | | | | Wash. Rev. Code Ann. § 77.15.435 (West 2020). |
| **West Virginia** | Y | Y | Y | Y | Y | Y |
| | | | | W.Va. Code § 8-12-5a (West 2019). | | |
| **Wisconsin** | Y | Y | Y | Y | Y | Y |
| | | | | Wis. Stat. § 943.13 (West 2019). | | |
| **Wyoming** | Y | Y | Y | N | Y | N |
| | | | | | | Wyo. Stat. Ann. § 23-3-305 (West 2019). |
| **Total (Default)** | **47** | **51** | **51** | **26** | **51** | **25** |

**Note:** We do not count any states that have a mandatory "Bring Your Gun to Work" rule for employer parking lots as a default carry.

# APPENDIX

Table A2
**Concealed Framing Balance**

| Variable | (1) No concealed framing Mean/SE | (2) Concealed framing Mean/SE | t-test p-value (1)-(2) |
|---|---|---|---|
| Northeast | 0.271 | 0.286 | 0.486 |
| | [0.015] | [0.015] | |
| Midwest | 0.071 | 0.060 | 0.319 |
| | [0.009] | [0.008] | |
| South | 0.177 | 0.176 | 0.973 |
| | [0.013] | [0.012] | |
| West Coast | 0.308 | 0.307 | 0.959 |
| | [0.015] | [0.015] | |
| Black non-Hispanic | 0.108 | 0.133 | 0.104 |
| | [0.010] | [0.011] | |
| White non-Hispanic | 0.649 | 0.621 | 0.232 |
| | [0.016] | [0.016] | |
| Hispanic | 0.156 | 0.163 | 0.717 |
| | [0.013] | [0.013] | |
| Other race/ethnicity | 0.087 | 0.083 | 0.745 |
| | [0.009] | [0.009] | |
| Male | 0.507 | 0.467 | 0.088* |
| | [0.017] | [0.016] | |
| 18-29 years old | 0.195 | 0.184 | 0.570 |
| | [0.014] | [0.013] | |
| 30-59 years old | 0.468 | 0.487 | 0.412 |
| | [0.017] | [0.016] | |
| 60+ years old | 0.337 | 0.329 | 0.706 |
| | [0.015] | [0.015] | |
| Family Income < $30k | 0.237 | 0.273 | 0.088* |
| | [0.015] | [0.015] | |
| Family Income $30k - $59k | 0.274 | 0.231 | 0.033** |
| | [0.015] | [0.014] | |
| Family Income $60k - $99k | 0.188 | 0.191 | 0.855 |
| | [0.013] | [0.013] | |
| Family Income > $100k | 0.157 | 0.168 | 0.495 |
| | [0.012] | [0.012] | |
| Married | 0.508 | 0.487 | 0.369 |
| | [0.017] | [0.016] | |
| High school education or less | 0.389 | 0.397 | 0.720 |
| | [0.016] | [0.016] | |
| Republican | 0.270 | 0.247 | 0.260 |
| | [0.015] | [0.014] | |
| Democrat | 0.341 | 0.378 | 0.102 |
| | [0.016] | [0.016] | |
| Other party | 0.389 | 0.375 | 0.548 |
| | [0.016] | [0.016] | |
| Own gun | 0.319 | 0.306 | 0.577 |
| | [0.015] | [0.015] | |
| N | 1000 | 1000 | |
| F-test of joint significance (p-value) | | | 0.695 |
| F-test, number of observations | | | 2000 |

The value displayed for t-tests are p-values.
The value displayed for F-tests are p-values.
Standard errors are robust.
***, **, and * indicate significance at the 1, 5, and 10 percent critical level.

# APPENDIX

Table A3

## Property Owner Framing Balance

| Variable | (1) Gun owner framing Mean/SE | (2) Property owner framing Mean/SE | t-test p-value (1)-(2) |
|---|---|---|---|
| Northeast | 0.290 | 0.266 | 0.239 |
| | [0.015] | [0.015] | |
| Midwest | 0.067 | 0.064 | 0.777 |
| | [0.008] | [0.008] | |
| South | 0.168 | 0.185 | 0.340 |
| | [0.012] | [0.013] | |
| West Coast | 0.298 | 0.318 | 0.347 |
| | [0.015] | [0.016] | |
| Black non-Hispanic | 0.118 | 0.122 | 0.818 |
| | [0.011] | [0.011] | |
| White non-Hispanic | 0.633 | 0.637 | 0.856 |
| | [0.016] | [0.016] | |
| Hispanic | 0.157 | 0.163 | 0.732 |
| | [0.013] | [0.013] | |
| Other race/ethnicity | 0.092 | 0.078 | 0.271 |
| | [0.009] | [0.009] | |
| Male | 0.475 | 0.499 | 0.312 |
| | [0.017] | [0.017] | |
| 18-29 years old | 0.186 | 0.194 | 0.700 |
| | [0.014] | [0.014] | |
| 30-59 years old | 0.472 | 0.483 | 0.648 |
| | [0.016] | [0.017] | |
| 60+ years old | 0.342 | 0.324 | 0.408 |
| | [0.016] | [0.015] | |
| Family Income < $30k | 0.262 | 0.247 | 0.463 |
| | [0.015] | [0.014] | |
| Family Income $30k - $59k | 0.242 | 0.263 | 0.286 |
| | [0.014] | [0.014] | |
| Family Income $60k - $99k | 0.195 | 0.184 | 0.543 |
| | [0.013] | [0.013] | |
| Family Income > $100k | 0.168 | 0.157 | 0.515 |
| | [0.012] | [0.012] | |
| Married | 0.519 | 0.477 | 0.072* |
| | [0.016] | [0.017] | |
| High school education or less | 0.378 | 0.408 | 0.192 |
| | [0.016] | [0.016] | |
| Republican | 0.250 | 0.267 | 0.410 |
| | [0.014] | [0.015] | |
| Democrat | 0.359 | 0.360 | 0.947 |
| | [0.016] | [0.016] | |
| Other party | 0.391 | 0.372 | 0.419 |
| | [0.016] | [0.016] | |
| Own gun | 0.306 | 0.320 | 0.520 |
| | [0.015] | [0.015] | |
| N | 1009 | 991 | |
| F-test of joint significance (p-value) | | | 0.720 |
| F-test, number of observations | | | 2000 |

The value displayed for t-tests are p-values.

The value displayed for F-tests are p-values.

Standard errors are robust.

\*\*\*, \*\*, and \* indicate significance at the 1, 5, and 10 percent critical level.

# APPENDIX

Table A4
## State-Level Summary of Opinions on What the Law Should Be

| State | N | Plumber should be allowed to bring gun without permission | Friend should be allowed to bring gun without permission | Customers should be allowed to bring gun in business | Business should be protected from liability | Employee should be allowed to bring gun into work without permission | Employer should be allowed to have gun in car w/work without permission | Employer should be allowed to have gun in car even if employer objects | Tenant should be allowed to have gun without permission | Hunters should be allowed to hunt without explicit consent |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 2000 | 27.5%*** | 32.1%*** | 44.2%*** | 63%*** | 25.1%*** | 68.3%*** | 51.0%* | 67.1%*** | 72.3%*** |
| Alabama | 31 | 35.5%* | 48.4% | 51.6% | 80.6%*** | 38.7% | 90.3%*** | 61.3% | 71%*** | 9.7%*** |
| Alaska | 7 | 14.3%*** | 0%*** | 57.1% | 57.1% | 28.6% | 100%*** | 57.1% | 85.7%*** | 14.3%*** |
| Arizona | 53 | 39.6%*** | 33.3%*** | 43.1% | 66.7%*** | 17.6%*** | 72.5%*** | 52.9% | 84.3%*** | 15.7%*** |
| Arkansas | 20 | 35% | 40% | 45% | 45% | 35% | 65% | 60% | 85%*** | 15%*** |
| California | 245 | 22.9%*** | 26.1%*** | 36.7%*** | 59.8%*** | 22%*** | 54.7% | 47.8% | 60%*** | 13.9%*** |
| Colorado | 12 | 25%** | 33.3% | 50% | 75%** | 16.7%*** | 83.3%*** | 50% | 75%** | 41.7% |
| Connecticut | 17 | 23.5%*** | 29.4%* | 47.1% | 70.6%* | 23.5%*** | 88.2%*** | 70.6%* | 76.5%*** | 11.8%*** |
| Delaware | 3 | 33.3% | 66.7% | 100%*** | 66.7% | 66.7% | 66.7% | 33.3% | 100%*** | 0%*** |
| District of Columbia | 6 | 16.7%** | 0%*** | 16.7%** | 16.7%** | 16.7%** | 66.7% | 50% | 16.7%** | 0%*** |
| Florida | 152 | 28.9%*** | 30.9%*** | 45.4% | 83.6%*** | 25%*** | 69.7%*** | 55.9% | 61.8%*** | 15.8%*** |
| Georgia | 74 | 33.8%*** | 39.2%* | 47.3% | 48.6% | 28.4%*** | 67.6%*** | 45.9% | 68.9%*** | 8.1%*** |
| Hawaii | 5 | 0%*** | 20%* | 0%*** | 60% | 20%* | 80%* | 40% | 20%* | 0%*** |
| Idaho | 11 | 27.3%* | 45.5% | 54.5% | 63.6% | 36.4% | 81.8%*** | 63.6% | 81.8%*** | 9.1%*** |
| Illinois | 82 | 23.2%*** | 26.8%*** | 35.4%*** | 64.6%*** | 24.4%*** | 61%** | 40.2%* | 63.4%*** | 15.9%*** |
| Indiana | 48 | 33.3%*** | 33.3%*** | 52.1% | 50% | 29.2%*** | 77.1%*** | 62.5%* | 66.7%*** | 6.3%*** |
| Iowa | 22 | 40.9% | 31.8%* | 36.4% | 54.5% | 18.5% | 68.2%* | 50% | 77.3%*** | 0%*** |
| Kansas | 13 | 30.8% | 46.2% | 53.8% | 61.5% | 38.5% | 76.9%** | 61.5% | 84.6%*** | 7.7%*** |
| Kentucky | 28 | 48.1% | 53.6% | 57.1% | 64.3% | 53.6% | 89.3%*** | 71.4%*** | 75%*** | 10.7%*** |
| Louisiana | 23 | 30.4%** | 34.8% | 39.1% | 60.9% | 21.7%*** | 87%*** | 69.6%** | 65.2% | 21.7%*** |
| Maine | 11 | 45.5% | 45.5% | 81.8%*** | 72.7%* | 54.5% | 81.8%*** | 63.6% | 72.7%* | 45.5% |
| Maryland | 43 | 11.6%*** | 16.3%*** | 34.9%** | 65.1%** | 9.3%*** | 69.8%*** | 46.5% | 67.4%*** | 7%*** |
| Massachusetts | 80 | 30%*** | 22.5%*** | 37.5% | 57.5% | 17.5%*** | 66% | 37.5% | 60% | 2.5%*** |
| Michigan | 58 | 31%*** | 31%*** | 41.1% | 53.4%- | 34.5%*** | 69%*** | 53.4% | 60%*** | 3.4%*** |
| Minnesota | 14 | 42.9% | 35.7% | 50% | 50% | 35.7% | 71.4%* | 71.4%* | 78.6%*** | 28.6%* |
| Mississippi | 12 | 16.7%*** | 25%** | 25%** | 33.3% | 25%** | 58.3% | 25%** | 66.7% | 8.3%*** |
| Missouri | 57 | 24.3%*** | 21.6%*** | 43.2% | 64.9%* | 8.3%*** | 70.3%*** | 56.8% | 62.2% | 5.4%*** |
| Montana | 6 | 33.3% | 33.3% | 50% | 100%*** | 50% | 83.3%** | 33.3% | 83.3%** | 16.7%** |
| Nebraska | 13 | 44.4% | 44.4% | 50% | 66.7% | 38.9% | 72.2%** | 55.6% | 66.7% | 16.7%*** |
| Nevada | 27 | 44.4% | 29.6%** | 48.1% | 66.7%* | 29.6%** | 92.6%*** | 70.4%** | 74.1%*** | 25.9%*** |
| New Hampshire | 5 | 20%* | 60% | 60% | 60% | 20%* | 100%*** | 80%* | 100%*** | 40% |
| New Jersey | 57 | 21.1%*** | 22.8%*** | 35.3%*** | 50.1% | 21.1%*** | 59.6% | 45.6% | 59.6% | 15.8%*** |
| New Mexico | 12 | 25%** | 25%** | 41.7% | 25%** | 25%** | 58.3% | 41.7% | 45.5% | 8.3%*** |
| New York | 129 | 28.7%*** | 14.9%*** | 48%*** | 61.2%*** | 22.5%*** | 56.6% | 41.1%** | 55.8% | 12.4%*** |
| North Carolina | 80 | 27.7%*** | 32.5%*** | 48.2% | 60.2%* | 24.1%*** | 72.3%*** | 50.6% | 79.5%*** | 18.1%*** |
| North Dakota | 2 | 50% | 100%*** | 100%*** | 50% | 50% | 50% | 50% | 100%*** | 50% |
| Ohio | 60 | 23.3%*** | 35%*** | 40% | 65.2%*** | 18.3%*** | 71.7%*** | 53.3% | 66.7%*** | 8.3%*** |
| Oklahoma | 21 | 28.6%** | 38.1% | 52.4% | 61.9% | 38.1% | 81%*** | 57.1% | 90.5%*** | 0%*** |
| Oregon | 39 | 38.5% | 28.5% | 48.7% | 71.8%*** | 35.0%* | 59% | 51.1% | 74.4%*** | 7.7%*** |
| Pennsylvania | 108 | 31.5%*** | 40.7%* | 58.9%* | 63%*** | 32.4%*** | 74.1%*** | 57.4% | 71.3%*** | 11.1%*** |
| Rhode Island | 6 | 16.7%** | 16.7%** | 50% | 83.3%** | 0%*** | 83.3%** | 83.3%** | 50% | 0%*** |
| South Carolina | 37 | 8.1%*** | 13.5%*** | 32.4%** | 62.2%- | 21.6%*** | 59.5% | 43.2% | 54.1% | 5.4%*** |
| South Dakota | 5 | 0%*** | 80% | 40% | 60% | 40% | 60% | 40% | 40% | 0%*** |
| Tennessee | 35 | 28.6%*** | 25.7%*** | 42.9% | 45.7% | 8.6%*** | 62.9% | 37.1% | 65.7%* | 5.7%*** |
| Texas | 84 | 24.5%*** | 27.7%*** | 34%*** | 58.5%* | 18.1%*** | 68.1%*** | 51.1% | 68.1%*** | 11.7%*** |
| Utah | 19 | 42.1% | 57.9% | 57.9% | 63.2% | 26.3%*** | 84.2%*** | 68.4%* | 78.9%*** | 15.8%*** |
| Vermont | 2 | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 0%*** |
| Virginia | 63 | 23%*** | 34.4%*** | 55.7% | 77%*** | 24.6%*** | 75.4%*** | 50.8% | 70.5%*** | 18%*** |
| Washington | 62 | 37.1%** | 37.1%** | 58.1% | 59.7% | 29%*** | 77.4%*** | 56.5% | 74.2%*** | 9.7%*** |
| West Virginia | 16 | 43.8% | 43.8% | 62.5% | 56.3% | 31.3% | 62.5% | 56.3% | 75%** | 0%*** |
| Wisconsin | 11 | 22.6%*** | 38.7% | 48.4% | 61.8% | 22.6%*** | 71%*** | 74.2%*** | 61.3% | 16.1%*** |
| F-Test P-Value | | .1278 | .0277 | .0348 | .1833 | .0133 | .0002 | .0609 | .0038 | .0038 |
| Number of states with marginally- or statistically significant differences | | 35 | 30 | 14 | 22 | 34 | 34 | 13 | 37 | 46 |

# APPENDIX

Table A5

## Region-level Summary of Beliefs About What the Law Is

| | Region Midwest | Mountain West | Northeast | South | West Coast | Total |
|---|---|---|---|---|---|---|
| | % | % | % | % | % | % |
| **Plumber is allowed to bring gun without permission** | | | | | | |
| Yes | 8.4 | 5.8 | 12.8 | 9.8 | 11.7 | 10.1 |
| No | 12.6 | 18.8 | 12.0 | 14.7 | 10.6 | 13.2 |
| I don't know | 79.0 | 75.4 | 75.2 | 75.5 | 77.7 | 76.8 |
| **Friend is allowed to bring gun without permission** | | | | | | |
| Yes | 7.5 | 5.8 | 12.5 | 10.1 | 12.8 | 10.1 |
| No | 19.5 | 20.3 | 15.3 | 21.4 | 12.3 | 18.1 |
| I don't know | 73.0 | 73.9 | 72.2 | 68.5 | 74.9 | 71.9 |
| **Customers are allowed to bring gun into business** | | | | | | |
| Yes | 18.6 | 21.7 | 16.1 | 20.0 | 17.3 | 18.6 |
| No | 15.8 | 18.1 | 16.1 | 16.4 | 14.0 | 15.8 |
| I don't know | 65.7 | 60.1 | 67.8 | 63.6 | 68.7 | 65.6 |
| **Employee is allowed to bring gun into work** | | | | | | |
| Yes | 19.5 | 15.2 | 20.4 | 18.0 | 22.1 | 19.4 |
| No | 12.4 | 13.0 | 10.9 | 14.4 | 7.0 | 11.8 |
| I don't know | 68.1 | 71.7 | 68.7 | 67.5 | 70.9 | 68.8 |
| **Employee is allowed to have gun in car at work** | | | | | | |
| Yes | 12.2 | 10.1 | 10.4 | 14.7 | 8.1 | 11.8 |
| No | 13.1 | 10.9 | 16.3 | 12.1 | 12.6 | 13.2 |
| I don't know | 74.7 | 79.0 | 73.3 | 73.2 | 79.3 | 75.1 |
| **Tenant is allowed to have gun without permission** | | | | | | |
| Yes | 6.8 | 4.3 | 8.2 | 7.3 | 8.4 | 7.3 |
| No | 22.5 | 28.3 | 19.6 | 27.6 | 19.3 | 23.4 |
| I don't know | 70.7 | 67.4 | 72.2 | 65.1 | 72.3 | 69.3 |
| **Hunters are allowed to hunt without explicit consent** | | | | | | |
| Yes | 23.1 | 18.8 | 26.4 | 21.9 | 20.7 | 22.6 |
| No | 10.7 | 7.2 | 11.4 | 11.4 | 9.2 | 10.5 |
| I don't know | 66.2 | 73.9 | 62.1 | 66.7 | 70.1 | 66.8 |

# APPENDIX

Table A6

## State-level Summary Beliefs About What the Law Is



Table A7

## Linear Regressions for Treatment Effects on All Questions



# APPENDIX

Table A8

## Logistic Regressions for Demographic and Treatment Effects on Opinions About What the Law Should Be

| | (1) Odds ratio for agreeing law should allow behavior | (2) Odds ratio for agreeing law should allow behavior | (3) Odds ratio for agreeing law should allow behavior |
|---|---|---|---|
| **Answer:** | | | |
| Property owner framing | 0.991 (-0.28) | 0.990 (-0.29) | 0.883 (-0.97) |
| Concealed framing | 0.967 (-0.99) | 0.962 (-1.07) | 1.000 (0.22) |
| Plumber should be allowed to bring gun without permission | | 1 () | 1 () |
| Friend should be allowed to bring gun without permission | | 1.253*** (2.90) | 1.266*** (3.09) |
| Customers should be allowed to bring gun in business | | 2.021*** (18.00) | 2.216*** (19.86) |
| Employee should be allowed to bring gun into work | | 0.864* (-1.95) | 0.849** (-2.05) |
| Employee should be allowed to have gun in car at work | | 5.888*** (23.48) | 6.215*** (24.84) |
| Employer should be allowed to have gun in car if employer objects | | 2.762*** (14.49) | 3.160*** (15.35) |
| Tenant should be allowed to have gun without permission | | 5.157*** (22.72) | 6.500*** (23.90) |
| Hunters should be allowed to hunt without explicit consent | | 0.360*** (-11.54) | 0.326*** (-11.71) |
| Midwest | | | 1 () |
| Mountain West | | | 1.097 (0.41) |
| Northeast | | | 0.984 (-0.28) |
| South | | | 0.904** (-2.00) |
| West Coast | | | 0.920 (-1.25) |
| White non-Hispanic | | | 1 () |
| Black non-Hispanic | | | 0.931 (-1.37) |
| Hispanic | | | 0.937 (-1.04) |
| Other race/ethnicity | | | 0.879* (-1.78) |
| Male | | | 1.208*** (4.74) |
| 18-29 years old | | | 1 () |
| 30-59 years old | | | 0.905* (-1.74) |
| 60+ years old | | | 0.790*** (-3.66) |
| Family Income < $30k | | | 1 () |
| Family Income $30k - $59k | | | 0.862*** (-2.84) |
| Family Income $60k - $100k | | | 0.950 (-0.81) |
| Family Income > $100k | | | 0.810*** (-2.99) |
| Prefer not to say income | | | 0.822*** (-2.93) |
| Married | | | 0.996 (-0.09) |
| High school education or less | | | 0.990 (0.24) |
| Democrat | | | 1 () |
| Republican | | | 2.937*** (19.47) |
| Other party | | | 1.941*** (14.96) |
| Own gun | | | 2.945*** (24.05) |
| Constant | 0.721*** (-11.28) | 0.405*** (-15.47) | 0.188*** (-16.61) |
| Prevent | | | |
| Explicit consent | | | |
| Observations | 15996 | 15996 | 15996 |

Exponentiated coefficients; t statistics in parentheses.
Coefficients are in terms of odds ratios.

# APPENDIX

Table A9

## Linear Regressions for Demographic and Treatment Effects on Opinions About What the Law Should Be

| | (1) Linear regression for opinions law should allow behavior | (2) Linear regression for opinions law should allow behavior | (3) Linear regression for opinions law should allow behavior |
|---|---|---|---|
| Property tenure frenzap | 0.00715 | -0.00715 | -0.00699 |
| | (-0.79) | (-0.79) | (-0.97) |
| Contested firearms | -0.00009 | -0.00003 | 0.00176 |
| | (-1.06) | (-1.06) | (0.24) |
| Prevent | | | |
| Explicit consent | | | |
| Service providers should be allowed to bring gun without permission | 0 | 0 | 0 |
| | (.) | (.) | (.) |
| Friend should be allowed to bring gun without permission | 0.0444*** | 0.0444*** | 0.0445*** |
| | (7.90) | (7.90) | (3.18) |
| Customers should be allowed to bring gun in business without permission | 0.151*** | 0.161*** | 0.161*** |
| | (19.71) | (19.21) | (19.87) |
| Employer should be allowed to bring gun into work without permission | -0.0281* | -0.0281* | -0.0281* |
| | (-1.96) | (-1.96) | (-1.96) |
| Employee should be allowed to have gun at car at work without perm | 0.461*** | 0.461*** | 0.461*** |
| | (26.61) | (26.61) | (27.60) |
| Employee should be allowed to have gun at car even if employer obj | 0.230*** | 0.239*** | 0.239*** |
| | (13.12) | (13.12) | (11.99) |
| Tenant should be allowed to have gun without permission | 0.383*** | 0.383*** | 0.387*** |
| | (20.10) | (20.10) | (24.40) |
| Hunters should be allowed to hunt without explicit consent | -0.139*** | -0.139*** | -0.139*** |
| | (-17.05) | (-17.05) | (-17.20) |
| Midwest | | | 0 |
| | | | (.) |
| Mountain West | | | 0.00357 |
| | | | (0.37) |
| Northeast | | | -0.00355 |
| | | | (-0.30) |
| South | | | -0.0194** |
| | | | (-2.07) |
| West Coast | | | -0.0145 |
| | | | (-1.29) |
| White non-Hispanic | | | 0 |
| | | | (.) |
| Black non-Hispanic | | | 0.0172 |
| | | | (1.41) |
| Hispanic | | | -0.0175 |
| | | | (-1.05) |
| Other race/ethnicity | | | -0.0347* |
| | | | (-1.82) |
| Male | | | 0.0466*** |
| | | | (6.66) |
| 18-29 years old | | | 0 |
| | | | (.) |
| 30-39 years old | | | 0.0130* |
| | | | (1.70) |
| 60+ years old | | | -0.0409*** |
| | | | (-3.61) |
| Family Income < $10k | | | 0 |
| | | | (.) |
| Family Income $30k - $59k | | | -0.0271*** |
| | | | (-2.59) |
| Family Income $60k - $100k | | | -0.00911 |
| | | | (-0.77) |
| Family Income > $100k | | | -0.0368*** |
| | | | (-3.80) |
| Prefer not to say income | | | -0.0365*** |
| | | | (-2.95) |
| Married | | | -0.00111 |
| | | | (-0.13) |
| High school education or less | | | 0.00212 |
| | | | (0.23) |
| Democrat | | | 0 |
| | | | (.) |
| Republican | | | 0.204*** |
| | | | (18.90) |
| Other party | | | 0.123*** |
| | | | (14.17) |
| Owns gun | | | 0.242*** |
| | | | (24.64) |
| Constant | 0.388*** | 0.388*** | 0.383*** |
| | (24.18) | (24.18) | (9.07) |
| Observations | 15998 | 15998 | 15998 |

t statistics in parentheses

# APPENDIX

Table A10

## Logistic Regressions for Demographic and Treatment Effects on Beliefs About What the Law Is

| Answer | (1) Odds ratio for believing law allows behavior | (2) Odds ratio for believing law allows behavior | (3) Odds ratio for believing law allows behavior |
|---|---|---|---|
| Property owner framing | 1.143** (2.03) | 1.173** (2.34) | 1.164** (2.10) |
| Concealed framing | 1.170** (2.39) | 1.172** (2.33) | 1.165** (2.20) |
| Plumber is allowed to bring gun without permission | | 1 (.) | 1 (.) |
| Friend is allowed to bring gun without permission | | 0.762** (-2.89) | 0.789** (-2.01) |
| Customers are allowed to bring gun into business | | 2.062*** (5.81) | 2.120*** (5.99) |
| Employee is allowed to bring gun into work | | 2.255*** (6.24) | 2.290*** (6.39) |
| Employee is allowed to leave gun in car at work | | 1.242 (1.63) | 1.285 (1.82) |
| Tenant is allowed to have gun without permission | | 0.442*** (-8.88) | 0.443*** (-8.88) |
| Hunters are allowed to hunt without explicit consent | | 0.765** (-2.00) | 0.765** (-2.00) |
| Midwest | | | 1 (.) |
| Mountain West | | | 0.896 (-0.72) |
| Northeast | | | 1.219* (1.86) |
| South | | | 1.071 (0.79) |
| West Coast | | | 1.222* (1.78) |
| White non-Hispanic | | | 1 (.) |
| Black non-Hispanic | | | 1.126 (1.05) |
| Hispanic | | | 1.150 (1.30) |
| Other race/ethnicity | | | 0.848 (-0.94) |
| Male | | | 0.991 (-0.11) |
| 18-29 years old | | | 1 (.) |
| 30-59 years old | | | 1.074 (0.80) |
| 60+ years old | | | 0.927 (-0.64) |
| Family income < $30k | | | 1 (.) |
| Family Income $30k - $50k | | | 1.100 (1.00) |
| Family Income $50k - $100k | | | 1.170 (1.49) |
| Family Income > $100k | | | 1.059 (0.47) |
| Prefer not to say income | | | 0.909 (-0.72) |
| Married | | | 0.865 (-1.96) |
| High school education or less | | | 0.921 (-1.07) |
| Democrat | | | 1 (.) |
| Republican | | | 1.129 (1.06) |
| Other party | | | 1.071 (0.77) |
| Own gun | | | 1.126 (1.59) |
| Constant | 0.607*** (-7.55) | 0.600*** (-4.71) | 0.495*** (-3.94) |
| Prevent | | | |
| Explicit consent | | | |
| Observations | 3111 | 4111 | 3111 |

Exponentiated coefficients; t statistics in parentheses
Coefficients are in terms of odds ratios.

# APPENDIX

Table A11

## Linear Regressions for Demographic and Treatment Effects on Opinions About What the Law Should Be

| | (1) Linear regressions for believing law allows behavior | (2) Linear regressions for believing law allows behavior | (3) Linear regressions for believing law allows behavior |
|---|---|---|---|
| Property owner framing | -0.032*** (2.03) | 0.0364** (2.34) | -0.0343*** (2.10) |
| Concealed framing | 0.0388** (2.39) | 0.0363** (2.13) | 0.0346** (2.13) |
| Present | | | |
| Explicit/control | | | |
| Plaintiff is allowed to bring gun without permission | | 0 (·) | 0 (·) |
| Friend is allowed to bring gun without permission | | -0.0647** (-2.01) | -0.0627** (-2.96) |
| Customers are allowed to bring gun into business | | 0.182*** (8.02) | 0.184*** (9.99) |
| Employee is allowed to bring gun into work | | 0.200*** (8.89) | 0.202*** (8.52) |
| Employee is allowed to have gun in car at work | | 0.0932 (1.61) | 0.0932 (1.61) |
| Tenant is allowed to have gun without permission | | -0.173*** (-5.33) | -0.173*** (-5.58) |
| Hunters are allowed to hunt without explicit consent | | -0.0628** (-2.03) | -0.0624** (-2.03) |
| Midwest | | | 0 (·) |
| Mountain West | | | -0.0239 (-0.75) |
| Northeast | | | 0.0445* (1.84) |
| South | | | 0.0155 (0.79) |
| West Coast | | | 0.0456* (1.79) |
| White non-Hispanic | | | 0 (·) |
| Black non-Hispanic | | | 0.0266 (1.57) |
| Hispanic | | | 0.0325 (1.29) |
| Other (non-Hispanic) | | | -0.0146 (-0.93) |
| Male | | | -0.00687 (-0.41) |
| 18-29 years old | | | 0 (·) |
| 30-59 years old | | | -0.0186 (0.84) |
| 60+ years old | | | -0.0172 (-0.65) |
| Family Income < $30k | | | 0 (·) |
| Family Income $30k - $59k | | | 0.0236 (1.06) |
| Family Income $60k - $100k | | | 0.0269 (1.41) |
| Family Income > $100k | | | 0.0131 (0.48) |
| Prefer not to say income | | | -0.0266 (-0.70) |
| Married | | | -0.0278 (-1.59) |
| High school education or less | | | -0.0187 (-1.07) |
| Democrat | | | 0 (·) |
| Republican | | | 0.0277 (1.10) |
| Other party | | | 0.0156 (0.78) |
| Own gun | | | -0.0268 (1.50) |
| Constant | 0.400*** (29.07) | 0.377*** (14.63) | 0.354*** (8.17) |
| Observations | 4111 | 4111 | 4111 |

t statistics in parentheses

* p<0.10    †† p>0.05    ††† p<0.01

# APPENDIX 5
# City-Specific Information (continued)

Table A12

**Logistic Regressions for Treatment Effects on All Questions**



Table A13

**Logistic Regressions for Treatment Effects on Belief That Law Matches Preferences**

| | (1) Believe law does not match preference: All Questions | (2) Believe law does not match preference: Plumber | (3) Believe law does not match preference: Friend | (4) Believe law does not match preference: Costumer | (5) Believe law does not match preference: Employee-Work | (6) Believe law does not match preference: Employee-Car | (7) Believe law does not match preference: Tenant | (8) Believe law does not match preference: Hunters |
|---|---|---|---|---|---|---|---|---|
| Property owner framing | 0.0185*** (3.21) | 0.0411*** (3.96) | 0.0438*** (2.71) | 0.00410 (0.29) | -0.00271 (-0.16) | 0.0106 (0.81) | 0.0217 (1.32) | 0.00068 (0.72) |
| Concealed framing | -0.00388 (-0.32) | 0.00640 (0.11) | -0.00329 (-0.21) | 0.00790 (0.52) | -0.00708 (-9.47) | -0.00910 (-0.60) | -0.0462 (-9.91) | 0.0419 (1.04) |
| Constant | 0.122*** (26.10) | 0.0983*** (7.91) | 0.135*** (10.00) | 0.120*** (9.82) | 9.184*** (12.24) | 0.0927*** (8.51) | 0.101*** (12.18) | 0.0892*** (9.92) |
| Observations | 14000 | 2000 | 2000 | 2000 | 2000 | 2000 | 2000 | 2000 |

*t* statistics in parentheses

## A14: YouGov's Sample Matching

In selecting the sample population, YouGov employs the process of sample matching. Sample matching is a way to select a representative population out of a non-randomly selected population. This process is two-fold. First, a target sample is randomly selected from the target population. Then, each member of the target sample is matched on various factors with a member of the opt-in pool of respondents that YouGov has compiled. This population is the matched population. In matching members, YouGov uses a proximity matching method in which a Euclidean distance is calculated for each variable being matched between members of the two populations. These distances are weighted, with weights being assigned based on which attributes are important to a given survey, and then aggregated. Participants are selected based on their closeness to the target frame with reference to these calculated distances. YouGov's current sampling frame is based the 2016 American Community Survey and contains U.S. citizens across various demographic groups, states, and other variables.

## A15: Hypothesis & Treatment Groups

There were two global treatment groups in our survey. The first primed respondents as gun owners or the landowner. We hypothesized that those primed as gun owners would be more likely to believe the law should protect gun rights, and therefore would favor a carry default. Similarly, we believed respondents primed as landowners would prefer a "no carry" default. The second global prime was including or omitting the word "concealed" in each of the questions. Here we hypothesized that emphasizing the hidden nature of the weapon might make individuals more likely to prefer a "no carry" default.

# APPENDIX

We had two question specific treatment groups. First, the vignette related to tort immunization for retail establishments was randomized among an "allow" or "prevent" condition, addressing whether tort immunity should exist for establishments that allow guns on their property or those that prevent gun carry. Given that currently some states immunize retailers that allow firearms, we wanted to see if those laws were in line with individual preference or if people believed that retailers should immunized if they prevent firearms. In the second question specific treatment, respondents were randomized between a no hunting "without the explicit permission of the landowner" condition or a no hunting "if land is posted condition." We wanted to capture any differences in preference for altering rules to hunt on land given that some jurisdictions require landowner permission to hunt and others require the landowner to post if they want to restrict hunting.

## A16: Full Version of Survey

### PRIMING FOR LANDOWNER RIGHTS

1. You have hired a plumber to come and fix a pipe in your home. As the plumber is working, you notice they are carrying a gun that you were not informed of.

   Should your plumber or other service provider be allowed to bring a [concealed] gun into your home without your explicit consent?
   ☐ Yes
   ☐ No

   Does your state currently have laws that prevent service providers from [concealed] carrying firearms into other people's homes without their explicit consent?
   ☐ Yes
   ☐ No
   ☐ I don't know

2. You are throwing a party at your home and you find out after the party ends that one of your friends had been carrying a firearm while at the party.

   Should your family and friends be allowed to carry a [concealed] gun onto your property without your explicit consent?
   ☐ Yes
   ☐ No

   Does your state currently have laws that prevent acquaintances from carrying [concealed] firearms into other people's homes without their explicit consent?
   ☐ Yes
   ☐ No
   ☐ I don't know

3. You run a local business and you learn that customers have been carrying firearms into your store.

   Should customers be allowed to carry a [concealed] gun into your retail establishment without your explicit consent?
   ☐ Yes
   ☐ No

# APPENDIX

Should you be protected from paying damages in a lawsuit against you if you [prevent/allow] customers [from carrying/to carry] [concealed] guns into your business?
☐ Yes
☐ No

Does your state currently have laws that [prevent/allow] customers [from carrying/to carry] [concealed] firearms into retail establishments without the establishment's explicit consent?
☐ Yes
☐ No
☐ I don't know

4. You run a local business and you learn through some of your employees that another employee is carrying a firearm into the workplace.

Should your employee be allowed to carry their [concealed] gun into your business without your explicit consent?
☐ Yes
☐ No

Does your state currently have laws that prevent employees from carrying [concealed] firearms into places of employment without the employer's explicit consent?
☐ Yes
☐ No
☐ I don't know

5. You run a local business and you learn through some of your employees that another employee keeps a firearm in their vehicle in your parking lot.

Should your employee be allowed to keep their gun in their vehicle in the parking lot of your business without your explicit consent?
☐ Yes
☐ No

Should your employee be allowed to keep their gun in their vehicle even if you explicitly object?
☐ Yes
☐ No

Does your state currently have laws requiring that employees be able to carry firearms in their cars onto the employer's parking lots [even if the employer explicitly objects]?
☐ Yes
☐ No
☐ I don't know

6. As a landlord you are renting rooms to various tenants. You later discover that one of your tenants has a firearm in their apartment.

Should your tenant be allowed to possess a gun without your explicit consent?
☐ Yes
☐ No

# APPENDIX

Does your state currently have laws that prevent tenants from possessing firearms on rented property without their landlord's explicit consent?
☐ Yes
☐ No
☐ I don't know

7. You own a large, wooded, plot of land in a rural part of the state and on a recent visit you noticed empty bullet shells around your property. You learn that people have been hunting on your property.

Should people be allowed to enter your property to hunt [without your explicit consent/unless you post "No Trespassing" signs]?
☐ Yes
☐ No

Does your state currently have laws that [prevent strangers from carrying firearms onto rural property without the landowner's explicit consent/allow strangers to carry firearms onto rural property unless "No Trespassing" signs are posted]?
☐ Yes
☐ No
☐ I don't know

**PRIMING FOR GUN RIGHTS**

8. You are a plumber who is legally licensed to carry a concealed weapon. You tend to carry your firearm during house visits.

Should you be allowed to carry a [concealed] gun into your customer's home without the owner's explicit consent?
☐ Yes
☐ No

Does your state currently have laws that prevent service providers from carrying [concealed] firearms into other people's homes without their explicit consent?
☐ Yes
☐ No
☐ I don't know

9. Your friends are throwing a party at their home. You are legally licensed to carry a gun and you do so while at the party.

Should you be allowed to carry a [concealed] gun onto your family and friends' property without their explicit consent?
☐ Yes
☐ No

Does your state currently have laws that prevent acquaintances from carrying [concealed] firearms into other people's homes without their explicit consent?
☐ Yes
☐ No
☐ I don't know

# APPENDIX

10. You are legally licensed to carry a gun. You enter a local business while carrying your firearm.

    Should you be allowed to carry a [concealed] gun into a retail establishment without the explicit consent of the store owner?
    ☐ Yes
    ☐ No

    Should the business owner be protected from paying damages in a lawsuit against them if they [prevent/allow] customers [from carrying/to carry] [concealed] guns into the business?
    ☐ Yes
    ☐ No

    Does your state currently have laws that [prevent/allow] customers [from carrying/to carry] [concealed] firearms into retail establishments without the establishment's explicit consent?
    ☐ Yes
    ☐ No
    ☐ I don't know

11. You are legally licensed to carry a gun. Sometimes you carry your gun into your workplace without informing your employer.

    Should you be allowed to carry your [concealed] gun into your workplace without the explicit consent of your employer?
    ☐ Yes
    ☐ No

    Does your state currently have laws that prevent employees from carrying [concealed] firearms into places of employment without the employer's explicit consent?
    ☐ Yes
    ☐ No
    ☐ I don't know

12. You are legally licensed to carry a gun and you keep a firearm in your vehicle which you leave parked in the parking lot during work.

    Should you be allowed to keep your gun in your vehicle in the parking lot without your employer's explicit consent?
    ☐ Yes
    ☐ No

    Should you be allowed to keep your gun in your vehicle even if your employer explicitly objects?
    ☐ Yes
    ☐ No

    Does your state currently have laws requiring that employees be able to carry firearms in their cars onto the employer's parking lots [even if the employer explicitly objects]?
    ☐ Yes
    ☐ No
    ☐ I don't know

# APPENDIX

13. You are renting an apartment and you legally possess a gun that you keep in your apartment.

    Should you be allowed to possess a gun without the explicit consent of your landlord?
    ☐ Yes
    ☐ No

    Does your state currently have laws that prevent tenants from possessing firearms on rented property without their landlord's explicit consent?
    ☐ Yes
    ☐ No
    ☐ I don't know

14. Your neighbor owns a large, wooded plot of land in a rural part of the state. You are planning a hunting trip with your friends.

    Should you be allowed to enter the property to hunt [without the explicit consent of the property owner/ unless "No Trespassing" signs are posted]?
    ☐ Yes
    ☐ No

    Does your state currently have laws that [prevent strangers from carrying firearms onto rural property without the landowner's explicit consent/allow strangers to carry firearms onto rural property unless "No Trespassing" signs are posted?
    ☐ Yes
    ☐ No
    ☐ I don't know

**Demographic Questions**
15. Do you own a firearm?
    ☐ Yes
    ☐ No

# APPENDIX



# APPENDIX



# APPENDIX



22

# APPENDIX



# APPENDIX



# APPENDIX



# APPENDIX



# APPENDIX

## A17: A Note about Defaults

In majoritarian default setting, the default is set to the preference that most people have. Our questions as framed asked people for their preferences on default rules, not necessarily their preference for carry for guests. So, our survey results indicate the democratic preference that most people have, but that might not actually be the majoritarian preference. In designing our survey, we assumed that these two would coincide. However, it is possible that people prefer that their guests be allowed to carry, but generally believe the law should default to no carry. Our results show that a majority of people prefer a no carry default for private residences, rural land for hunting, places of employment and retail establishments. If it is the case that this default preference does not align with individual preference, then our results provide a stronger rationale for adopting minority defaults. In some case minority defaults may be more efficient, they might be public-regarding or paternalistic, or they might be a way to signal social values. If it is the case that sometimes, individual preference does not align with democratic preference, then that may be another basis for preferencing the minoritarian default over the majoritarian one.

27




DATE DOWNLOADED: Fri Dec 30 14:22:19 2022
SOURCE: Content Downloaded from *HeinOnline*


Citations:

Bluebook 21st ed.
R.H.; Cobb T.R.R.; Irwin Clark, D. Code of the State of Georgia (2).

ALWD 7th ed.
Clark, R.H.; Cobb T.R.R.; Irwin, D. Code of the State of Georgia (2).

APA 7th ed.
Clark, R. (2). Code of the State of Georgia. Macon, Ga, J.W. Burke.

Chicago 17th ed.
Clark R.H.; Cobb T.R.R.; Irwin, D. Code of the State of Georgia. Macon, Ga, J.W.
Burke.

McGill Guide 9th ed.
R.H.; Cobb T.R.R.; Irwin Clark, D., Code of the State of Georgia (Macon, Ga: J.W.
Burke., 2)


AGLC 4th ed.
R.H.; Cobb T.R.R.; Irwin Clark, D., Code of the State of Georgia (J.W. Burke., 2)

MLA 8th ed.
Clark, R.H., et al. Code of the State of Georgia. Macon, Ga, J.W. Burke. HeinOnline.

OSCOLA 4th ed.
Clark, R.H.; Cobb T.R.R.; Irwin, D. Code of the State of Georgia. Macon, Ga, J.W.
Burke.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

Offenses against the public morality, health, police, etc.

§4528. *Deadly weapons not to be carried to public places.* [No person in this State is permitted or allowed to carry about his or her person, any dirk, bowie knife, pistol or revolver, or any kind of deadly weapon, to any Court of justice, or any election ground, or precinct, or any place of public worship, or any other public gathering in this State, except (n) Acts of 1870, militia muster grounds; and if any person or persons shall violate any portion of this section, he, she or they shall be guilty of a misdemeanor, and upon conviction, shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the Court.] (a.)

*p. 421.*

§4529. (4455.) *Other offenses against public peace.* All other offenses (a) Acts of 1865- against the public peace, not provided for in this Code, shall be prosecuted and indicted as heretofore, and the punishment in every such case, shall be [as prescribed in section 4310 of this Code.] (a.)

'66, p. 233.

---

## TENTH DIVISION.

### OFFENSES AGAINST THE PUBLIC MORALITY, HEALTH, POLICE, ETC.

SECTION.
4530. Bigamy.
4531. Punishment on married person.
4532. On unmarried person.
4533. Incest.
4534. Adultery.
4535. Lewdness.
4536. Lewd houses.
4537. Disorderly houses.
4538. Gaming houses.
4539. Gaming in liquor shops.
4540. Gaming tables.
4541. Gambling.
4542. Gaming with minors.
4543. Minors not to play billiards.
4544. Gaming with clerks and bank officers.
4545. Players—witnesses.
4546. Judge's charge.
4547. Suspected houses.
4548. Sale of lottery tickets forbidden.
4549. Tickets in gift enterprises.
4550. Unwholesome provisions.
4551. Unwholesome bread, etc.
4552. Unlawful sale of kerosene.
4553. Test of kerosene.
4554. Other illegal oils.
4555. Sale of naptha.
4556. Sale of uninspected oils.
4557. Kerosene defined.
4558. Spreading small pox.

SECTION.
4559. Violating quarantine.
4560. Vagrants.
4561. Common rogues.
4562. Nuisances.
4563. Disinterring bodies.
4564. Bastardy.
4565. Retailing without license.
4566. Illegal marrying.
4567. Marrying white and colored.
4568. Illegal voting.
4569. Buying or selling votes.
4570. Sale of liquor on election days.
4571. Minors voting.
4572. Adultery with negroes.
4573. Whipping wife.
4574. Interfering with religious worship.
4575. Retailing near church.
4576. Vending near camp grounds.
4577. Police at places of worship.
4578. Running freight trains on Sunday.
4579. Violating Sabbath.
4580. Hunting on Sunday.
4581. Illegal bathing.
4582. Fines from Sabbath-breakers.
4583. Bonds in case of vagrancy.
4584. Attorney or Solicitor—duty in such case.
4585. Water and light on railroads.
4586. Equal accommodation of races.

4530. (4456.) *Polygamy and bigamy.* Polygamy, or bigamy, shall consist in knowingly having a plurality of husbands or wives at the same time.

Indictment for bigamy must set forth what—admissions of defendant as to marriage: 11 Ga., 53. Definition of bigamy: 20 Ga., 703. Principal in first and second degree: 34 Ga., 275. Bigamy under §1667: 40 Ga., 244. "Legitimate:" 20 Ga., 702; 34 Ga., 407.

4531. (4457.) *Punishment—if before marriage.* If any person or persons within this State, being married, do or shall at any time hereafter marry any person or persons, the lawful husband or wife being alive, and knowing that such lawful husband or wife is living, such person or persons so offending shall, on conviction, be punished by confinement at labor in the penitentiary, for any time not less than two years nor longer than four years, and the second marriage shall be void; but five years' absence of the husband or wife, and no information of the fate of such husband or wife, shall be sufficient cause of acquittal of the person indicted;

# APPENDIX.

## A.

### ORDINANCES OF THE CENTRAL PARK.

The Board of Commissioners of the Central Park do ordain as follows:

All persons are forbidden—

To enter or leave the Park except by the gateways.

To climb or walk upon the wall.

To turn cattle, horses, goats, or swine into the Park.

To carry firearms or to throw stones or other missiles within it.

To cut, break, or in any way injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, or other constructions upon the Park ;

Or to converse with, or in any way to hinder those engaged in its construction.

Two pounds are hereby established within the Central Park, for the impounding of horses, cattle, sheep, goats, dogs, swine, and geese found trespassing upon said Park. All such animals found at large upon the Park may be taken by any person or persons, and driven or carried to one of the said pounds, and may be kept enclosed therein during five days, at the end of which time, if not previously claimed, they may be sold at public auction; provided that within two days after they shall have been impounded, notice of the sale shall have been conspicuously posted in the pound.

Any person claiming property in such impounded animals before the day of sale, may recover the same after suitable proof of his or her right thereto, upon payment for each animal

Digitized by Google

Original from
HARVARD UNIVERSITY

SECT. 19. The said Park Commissioners shall have the power to govern, manage, lay out, plant and ornament the said Fairmount Park, and to maintain the same in good order and repair; and to construct all proper bridges, buildings, railways, and other improvements therein, and to repress all disorders therein under the provisions hereinafter contained.

SECT. 20. That the said Park Commissioners shall have authority to license the laying down, and the use for a term of years, from time to time, of such passenger railways as they may think will comport with the use and enjoyment of the said Park by the public, upon such terms as said Commissioners may agree; all emoluments from which shall be paid into the City Treasury.

SECT. 21. The said Park shall be under the following rules and regulations, and such others as the Park Commissioners may from time to time ordain:

I. No persons shall turn cattle, goats, swine or horses or other animals loose into the Park.

II. No persons shall carry fire-arms, or shoot birds in the Park, or within fifty yards thereof, or throw stones or other missiles therein.

III. No one shall cut, break, or in anywise injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, structures or statuary, or foul any fountains or springs within the Park.


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

## ARTICLE XI.

### PROTECTION OF BIRDS.

SECTION
1. Disturbance of birds or nests prohibited.
2. Penalty for disturbing same.
3. Throwing stones, wood, &c., prohibited.

SECTION
4. Penalty for throwing same.
5. Protection of all birds, except hawks, &c., intended.
6. Duty of police.

SECTION 1.   All persons are forbidden to molest, injure or disturb in any way, any small bird in the city of St. Louis, or the nest, young or brood of any small bird in said city.   <small>Birds, or nests not to be disturbed. Ord. 8436, sec. 1.</small>

SEC. 2.   If any person shall willfully injure, molest, take or disturb in any way, any small bird in the city of St. Louis, or the nest, eggs, young or brood of any such small bird, he shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall forfeit and pay to said city not less than five dollars for each bird so by him injured, molested, taken or disturbed, and not less than twenty dollars for each nest of eggs or brood of young of any such small bird in the city of St. Louis, so by him injured, molested taken or disturbed.   <small>Penalty for disturbing birds or nests. Ibid. sec. 2.</small>

SEC. 3.   No person shall throw from his hand any fragment of stone, wood, metal or other missile capable of inflicting injury, in any street, alley, walk or park of the city of St. Louis, or use or have in his possession ready for use in any street, alley, walk or park of the city of St. Louis, any sling, cross bow and arrow, air gun or other contrivance for ejecting, discharging or throwing any fragment, bolt, arrow, pellet, or other missile of stone, metal, wood or other substance capable of inflicting injury or annoyance.   <small>Throwing stones, wood, &c., prohibited. Ibid. sec. 3.</small>

SEC. 4.   If any person shall throw from his hand, in any alley, street, walk or park of the city of St. Louis, any missile of wood, stone, metal or other substance, or sub-   <small>Penalty. Ibid. sec. 4.</small>

Generated on 2022-12-29 17:48 GMT / https://hdl.handle.net/2027/nyp.33433014685702
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

THE

# MUNICIPAL CODE

OF

# CHICAGO:

COMPRISING THE

LAWS OF ILLINOIS RELATING TO THE CITY OF CHICAGO,

AND THE

## ORDINANCES OF THE CITY COUNCIL;

CODIFIED AND REVISED

BY

## EGBERT JAMIESON AND FRANCIS ADAMS.

PUBLISHED BY AUTHORITY OF THE CITY COUNCIL.

CHICAGO:
BEACH, BARNARD & CO., LEGAL PRINTERS,
1881.

JA1596

person who shall be convicted of any such breach shall be adjudged
to pay a fine of not less than three dollars nor more than one hundred
dollars.

1683. In every prosecution brought for a violation of any ordi-
nance of the city of Chicago, where the offense charged is one
punishable under the laws of the State of Illinois as a misdemeanor,
the court or magistrate trying the cause may upon conviction in
lieu of the fine imposed by the ordinance or in addition thereto,
cause the offender to be imprisoned in the house of correction for a
period not exceeding three months.

1684. All the printed books containing the revised ordinances
shall be deposited with the city comptroller. He shall deliver one
copy thereof to each officer of the city, and to such other persons as
the city council may direct.

1685. The mayor shall have power to extend to or reciprocate
courtesies of other cities, by presenting to them a copy of the revised
ordinances bound at the expense of the city in such manner as to
him may seem suitable.

## Article XLIII.

### Parks and Public Grounds.

1686. The several public parks, squares and grounds in the
city of Chicago, shall be known and designated by the names applied
thereto respectively on the map of the city of Chicago published by
J. Van Vechten and Snyder in the year 1877.

1687. It shall be the duty of the commissioner of public works
to superintend all inclosed public grounds and keep the fences there-
of in repair, the walks in order and the trees properly trimmed and
improve the same according to plans approved by the city council.
He shall likewise cause printed or written copies of prohibitions
of this article to be posted in the said grounds or parks.

1688. No person shall enter or leave any of the public parks of
the city of Chicago except by their gateways; no person shall climb
or walk upon their walls or fences.

1689. Neither cattle, horses, goats, swine or other animals, ex-
cept as herein provided, shall be turned into any one of the said parks
by any person.

1690. All persons are forbidden to carry firearms or to throw
stones or other missiles within any one of the public parks. All
persons are forbidden to cut, break or in any way injure or deface

the trees, shrubs, plants, turf or any of the buildings, fences, bridges or other construction or property within or upon any of the said parks.

1691. No person shall converse with or in any way hinder those engaged in their construction.

1692. No person shall expose any article or thing for sale upon any of said parks, except such person shall have been previously licensed by the commissioner of public works, nor shall any hawking or peddling be allowed therein.

1693. No threatening, abusive, insulting or indecent language shall be allowed in any part of either of the said parks whereby a breach of the peace may be occasioned. No person shall be allowed to tell fortunes or play at any game of chance at or with any table or instrument of gaming, nor to do therein any obscene or indecent act.

1694. In case of any emergency where life or property is endangered, all persons if required so to do by the superintendent or any of his assistants, shall remove from the portion of either of said parks specified by the superintendent or his assistants and remain off the same until permission is given to return.

1695. The commissioner of public works may direct that any of the entrances to the public parks be closed at any time.

1696. No person shall bathe or fish in, or go or send or ride any animal in any of the waters of either of the said public parks, nor disturb any of the fish, water fowl or other birds in any of said parks, or any deer, sheep or other animal belonging to and preserved therein, nor throw or place any article or thing in the waters within either of said parks.

1697. No person shall post or otherwise affix any bills, notice or other paper upon any structure or thing within either of said parks nor upon any of the gates or inclosures thereof.

1698. No person shall without the consent of the commissioner of public works, play upon any musical instrument nor shall any person take into or carry or display in the said public parks any flag, banner, target or transparency. No military or target company civic or other shall be permitted to parade, drill or perform therein any military or other evolutions or movements. Nor shall any fire engine, hook and ladder truck, hose cart or other machine on wheels commonly used for the extinguishing of fires be allowed on any part of said parks without the previous consent of the commissioner of public works.

JA1598

# ANNUAL REPORTS

### OF THE

# CITY OFFICERS AND CITY BOARDS

### OF THE

## CITY OF SAINT PAUL,

### FOR THE FISCAL YEAR ENDING DECEMBER 31, 1888.

———— ————  — — —

GLOBE JOB OFFICE,
D. RAMALEY & SON, PRINTERS,
1889.

JA1599
Digitized by Google

Case 423-1900-AMD Document 48 Page: 428 Date Filed 07/20/2023

RULES AND REGULATIONS OF THE PUBLIC PARKS AND GROUNDS
OF THE CITY OF SAINT PAUL.

1. No person shall drive or ride in any Park in the City of Saint Paul at a rate exceeding seven (7) miles per hour.

2. No person shall ride or drive upon any other part of any Park than the avenues and roads.

3. No coach or vehicle used for hire shall stand upon any part of any Park for the purpose of hire, unless licensed by the Board of Park Commissioners.

4. No person shall indulge in any threatening or abusive, insulting or indecent language in any Park.

5. No person shall engage in any gaming nor commit any obscene or indecent act in any Park.

6. No person shall carry firearms or shoot birds in any Park or within fifty yards thereof, or throw stones or other missiles therein.

7. No person shall disturb the fish or water fowl in any pool or pond or birds in any part of any Park, or annoy, strike, injure, maim or kill any animal kept by direction of the Board of Park Commissioners, either running at large or confined in a close; nor discharge any fireworks, nor affix any bills or notices therein.

8. No person shall cut, break or in anywise injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, bridges, structures or statuary, or foul any fountain, well or spring within any Park.

9. No person shall throw any dead animal or offensive matter, or substance of any kind into any lake, stream or pool, within the limits of any Park.

10. No person shall go in to bathe within the limits of any Park.

11. No person shall turn cattle, goats, swine, horses, dogs or other animals loose in any Park, nor shall any animals be permitted to run at large therein.

12. No person shall injure, deface or destroy any notices, rules or regulations for the government of any Park, posted or in any other way fixed by order or permission of the Board of Park Commissioners within the limits of any Park.

13. Complaints against any employe of any Park may be made at the office of the Superintendent of Parks.

14 No person shall use any Park drive for business purposes, or for the transportation of farm products, dirt or any like material, or for the passage of teams employed for such purposes.

Any person who shall violate any of the foregoing rules and regulations shall be guilty of a misdemeanor, and for each and every offense shall be fined not less than the sum of Five Dollars ($5), nor more than Fifty Dollars ($50), which sum shall be paid into the city treasury for park purposes.

JOHN D. ESTABROOK,
Superintendent.


JA1600
Digitized by Google

# A DIGEST

OF THE

# ACTS OF ASSEMBLY

RELATING TO,

AND THE

# GENERAL ORDINANCES.

OF THE

# CITY OF PITTSBURGH

*From 1804 to Jan. 1, 1897,*

WITH REFERENCES TO DECISIONS THEREON.

SECOND EDITION.

PREPARED UNDER RESOLUTION OF COUNCILS

BY

W. W. THOMSON

OF THE PITTSBURGH BAR.

PITTSBURGH, PA.:

W. T. NICHOLSON SONS, PRINTERS AND BINDERS.

1897.

JA1601

Digitized by Google

Case 2:23-cv-01003-WSS Document 48-8 Page 430 of 546 Date Filed 07/20/2023

## BUREAU OF PARKS.

July 31, 1893, § 1.
O. B. 9, 262.

Bureau of parks created.

1. There shall be and is hereby created a bureau to be known as the "bureau of parks," which bureau shall consist of one superintendent whose compensation shall be two hundred dollars per month, one superintendent, whose compensation shall be one hundred and fifty dollars per month, and one assistant superintendent whose compensation shall be one hundred and twenty-five dollars per month, one clerk whose compensation shall be eighty-three dollars and thirty-three cents per month, and such foremen and laborers as may be required from time to time, at the same pay as like labor in other departments of the city (*a*).

Officers and employees.

July 6, 1896.
O. B. 11, 139.

Preamble.

2. WHEREAS, The control, maintenance, supervision and preservation of the public parks is by law vested in the department of public works ; and

Preamble.

WHEREAS, It is essential to proper exercise of these powers that persons should be employed as watchmen in the public parks for the protection of the public property therein.

Ibid § 1.

Watchmen compensation.

3. *Be it ordained, &c.*, That the director of the department of public works shall, and he is hereby authorized to employ such watchmen as may be necessary for the properly caring for, maintaining and protecting the public property in the public parks of this city at the daily compensation of two dollars and fifty cents each.

Ibid. § 2.

4. The compensation of such watchmen shall be paid out of appropriation No. 36, public parks.

July 27, 1893. § 1.
O. B. 9, 280.

Rules adopted.

5. Upon the passage and approval of this ordinance the following rules and regulations shall be and are hereby established for the management and protection of the parks and public grounds of the city of Pittsburgh, to wit :

*First.* No person shall injure, deface or destroy any notices, rules or regulations for the government of the parks, posted or in any other manner permanently fixed by order of the chief of department of public works.

*Second.* No person shall be allowed to turn any chickens, ducks, geese or other fowls, or any cattle, goats, swine, horses or other animals loose within the parks or to bring led horses or a horse that is not harnessed and attached to a vehicle or mounted by an equestrian.

*Third.* No person shall be allowed to carry firearms, or to shoot or throw stones at or to set snares for birds, rabbits, squirrels or fish, within the limits of the parks or within one hundred yards thereof.

*Fourth.* No person shall cut, break, pluck or in anywise injure or deface the trees, shrubs, plants, turf or any of the buildings, fences, structures or statuary, or place or throw anything whatever in any springs or streams within the parks, or fasten a horse to a tree, bush or shrub.

(*a*) As amended by ordinance of Nov. 23, 1893, O. B. 9, p. 320, and ordinance of March 31, 1896. O. B. 11, p. 40.

Digitized by Google      JA1602

# COMMENTARIES

## ON THE

# L A W S

### O F

# E N G L A N D.

## BOOK THE THIRD.

### B Y

### Sir WILLIAM BLACKSTONE, Knt.

#### ONE OF THE JUSTICES OF HIS MAJESTY'S
#### COURT OF COMMON PLEAS.

---

### THE TENTH EDITION,

WITH THE LAST CORRECTIONS OF THE AUTHOR;
*ADDITIONS BY RICHARD BURN, LL.D.*
AND CONTINUED TO THE PRESENT TIME,
BY JOHN WILLIAMS, ESQ.

---

## L O N D O N:

PRINTED FOR A. STRAHAN; T. CADELL, IN THE STRAND;
AND D. PRINCE, OXFORD.

M DCC LXXXVII.

JA1603

## CHAPTER THE TWELFTH.

## OF TRESPASS.

IN the two preceding chapters we have confidered fuch injuries to real property, as confifted in an oufter, or amotion of the poffeffion. Thofe which remain to be difcuffed are fuch as may be offered to a man's real property without any amotion from it.

THE fecond fpecies therefore of real injuries, or wrongs that affect a man's lands, tenements, or hereditaments, is that of *trefpafs*. Trefpafs, in it's largeft, and moft extenfive fenfe, fignifies any tranfgreffion or offence againft the law of nature, of fociety, or of the country in which we live; whether it relates to a man's perfon, or his property. Therefore beating another is a trefpafs; for which (as we have formerly feen) an action of trefpafs *vi et armis* in affault and battery will lie; taking or detaining a man's goods are refpectively trefpaffes; for which an action of trefpafs *vi et armis*, or on the cafe in trover and converfion, is given by the law: fo alfo nonperformance of promifes or undertakings is a trefpafs, upon which an action of trefpafs on the cafe in *affumpfit* is grounded: and, in general, any misfeafance, or act of one man whereby another is injurioufly treated or damnified, is a tranfgreffion, or trefpafs in it's largeft fenfe; for which we have already feen [a] that, whenever the act itfelf is directly and immediately injurious to the perfon or property of another,

[a] See pag. 123.

and

and therefore neceſſarily accompanied with ſome force, an
action of treſpaſs *vi et armis* will lie ; but, if the injury is
only conſequential, a ſpecial action of treſpaſs *on the caſe* may
be brought.

BUT in the limited and confined ſenſe, in which we are at
preſent to conſider it, it ſignifies no more than an entry on
another man's ground without a lawful authority, and doing
ſome damage, however inconſiderable, to his real property.
For the right of *meum* and *tuum*, or property, in lands being
once eſtabliſhed, it follows as a neceſſary conſequence, that
this right muſt be excluſive; that is, that the owner may re-
tain to himſelf the ſole uſe and occupation of his ſoil : every
entry therefore thereon without the owner's leave, and eſpe-
cially if contrary to his expreſs order, is a treſpaſs or tranſ-
greſſion. : The Roman laws ſeem to have made a direct pro-
hibition neceſſary, in order to conſtitute this injury: " *qui ali-*
" *enum fundum ingreditur, poteſt a domino, ſi is praeviderit,*
" *prohiberi ne ingrediatur* [b]." But the law of England, juſtly
conſidering that much inconvenience may happen to the
owner, before he has an opportunity to forbid the entry, has
carried the point much farther, and has treated every entry
upon another's lands, (unleſs by the owner's leave, or in
ſome very particular caſes) as an injury or wrong, for ſatis-
faction of which an action of treſpaſs will lie ; but determines
the *quantum* of that ſatisfaction, by conſidering how far the
offence was wilful or inadvertent, and by eſtimating the va-
lue of the actual damage ſuſtained.

EVERY unwarrantable entry on another's ſoil the law en-
titles a treſpaſs by *breaking his cloſe* ; the words of the writ of
treſpaſs commanding the defendant to ſhew cauſe, *quare clau-
ſum querentis fregit.* For every man's land is in the eye of the
law incloſed and ſet apart from his neighbours : and that
either by a viſible and material fence, as one field is divided
from another by a hedge ; or, by an ideal inviſible boundary,

JA1605
Digitized by Google

exifting only in the contemplation of law, as when one man's land adjoins to another's in the fame field. And every fuch entry or breach of a man's clofe carries neceffarily along with it fome damage or other : for, if no other fpecial lofs can be affigned, yet ftill the words of the writ itfelf fpecify one ge-neral damage, *viz.* the treading down and bruifing his herbage[c].

ONE muft have a property (either abfolute or temporary) in the foil, and actual poffeffion by entry, to be able to main-tain an action of trefpafs : or at leaft, it is requifite that the party have a leafe and poffeffion of the vefture and herbage of the land[d]. Thus if a meadow be divided annually among the parifhioners by lot, then, after each perfon's feveral por-tion is allotted, they may be refpectively capable of maintain-ing an action for the breach of their feveral clofes[e] : for they have an exclufive intereft and freehold therein for the time. But before entry and actual poffeffion, one cannot maintain an action of trefpafs, though he hath the freehold in law[f]. And therefore an heir before entry cannot have this action againft an abator ; though a diffeifee might have it againft the diffeifor, for the injury done by the diffeifin itfelf, at which time the plaintiff was feifed of the land : but he cannot have it for any act done after the diffeifin, until he hath gained poffeffion by re-entry, and then he may well maintain it for the intermediate damage done ; for after his re-entry the law, by a kind of *jus poftliminii,* fuppofes the freehold to have all along continued in him[g]. Neither, by the common law, in cafe of an intrufion or deforcement, could the party kept out of poffeffion fue the wrongdoer by a mode of redrefs, which was calculated merely for injuries committed againft the land while *in the poffeffion* of the owner. But now by the fta-tute 6 Ann. c. 18. if a guardian or truftee for any infant, a hufband feifed *jure uxoris,* or a perfon having any eftate or intereft determinable upon a life or lives, fhall, after the deter-

c F. N. B. 87, 88.  f 2 Roll. Abr. 553.
d Dyer. 285.  2 Roll. Abr. 549.  g 11 Rep. 5.
e Cro. Eliz. 421.

mination

mination of their refpective interefts, hold over and continue
in poffeffion of the lands or tenements, without the confent of
the perfon intitled thereto, they are adjudged to be trefpaffers;
and any reverfioner or remainder-man, expectant on any
life-eftate, may once in every year, by motion to the court
of chancery, procure the *ceftuy que vie* to be produced by the
tenant of the land, or may enter thereon in cafe of his refufal
or wilful neglect.    And, by the ftatutes of 4 Geo. II. c. 28.
and 11 Geo. II. c. 19. in cafe after the determination of any
term of life, lives, or years, any perfon fhall wilfully hold
over the fame, the leffor or reverfioner is entitled to recover
by action of debt, either at the rate of double the annual va-
lue of the premifes, in cafe he himfelf hath demanded and
given notice in writing to the tenant to deliver the peffeffion;
or elfe double the ufual rent, in cafe the notice of quitting
proceeds from the tenant himfelf, having power to determine
his leafe, and he afterwards neglects to carry that notice into
due execution.

A MAN is anfwerable for not only his own trefpafs, but
that of his cattle alfo: for, if by his negligent keeping they
ftray upon the land of another (and much more if he permits,
or drives them on) and they there tread down his neighbour's
herbage, and fpoil his corn or his trees, this is a trefpafs for
which the owner muft anfwer in damages.  And the law gives
the party injured a double remedy in this cafe; by permitting
him to diftrein the cattle thus *damage-feafant*, or doing da-
mage, till the owner fhall make him fatisfaction; or elfe by
leaving him to the common remedy *in foro contentiofo*, by ac-
tion.    And the action that lies in either of thefe cafes, of
trefpafs committed upon another's land either by a man him-
felf or his cattle, is the action of trefpafs *vi et armis*; whereby
a man is called upon to anfwer, *quare vi et armis claufum ip-
fius A. apud B. fregit, et blada ipfius A. ad valentiam centum
folidorum ibidem nuper crefcentia cum quibufdam averiis depaftus
fuit, conculcavit, et confumpfit, &c.* [b]: for the law always cou-
ples the idea of force with that of intrufion upon the property
of another.    And herein, if any unwarrantable act of the

[b] *Regiftr.* 94.

O 4                              defendant

JA1607
Digitized by Google

defendant or his beafts in coming upon the land be proved,
it is an act of trefpafs for which the plaintiff muft recover
fome damages; fuch however as the jury fhall think proper
to affefs.

In trefpaffes of a permanent nature, where the injury is
continually renewed, (as by fpoiling or confuming the herb-
age with the defendant's cattle) the declaration may allege the
injury to have been committed by *continuation* from one given
day to another, (which is called laying the action with a
*continuando*) and the plaintiff fhall not be compelled to bring
feparate actions for every day's feparate offence [i]. But where
the trefpafs is by one or feveral acts, each of which terminates
in itfelf, and being once done cannot be done again, it can-
not be laid with a *continuando*; yet if there be repeated acts of
trefpafs committed, (as cutting down a certain number of
trees,) they may be laid to be done, not continually, but at
divers days and times within a given period [k].

In fome cafes trefpafs is juftifiable; or, rather, entry on
another's land or houfe fhall not in thofe cafes be accounted
trefpafs: as if a man comes thither to demand or pay money,
there payable: or to execute, in a legal manner, the procefs
of the law. Alfo a man may juftify entering into an inn or
public houfe, without the leave of the owner firft fpecially
afked; becaufe when a man profeffes the keeping of fuch inn
or public houfe, he thereby gives a general licence to any
perfon to enter his doors. So a landlord may juftify entering
to diftrein for rent; a commoner to attend his cattle, com-
moning on another's land; and a reverfioner, to fee if any
wafte be committed on the eftate; for the apparent neceffity
of the thing [l]. Alfo it hath been faid, that by the common
law and cuftom of England the poor are allowed to enter
and glean upon another's ground after the harveft, without

---

[i] 2 Roll. Abr. 545. Lord Raym. 240.   7 Mod. 152.
[k] Salk. 638, 639. Lord Raym. 823.   1 3 Rep. 146.

being

Digitized by Google          JA 1608

being guilty of trespass[m] : which humane provision seems borrowed from the mosaical law[n]. In like manner the common law warrants the hunting of ravenous beasts of prey, as badgers and foxes, in another man's land; because the destroying such creatures is said to be profitable to the public[o]. But in cases where a man misdemeans himself, or makes an ill use of the authority with which the law entrusts him, he shall be accounted a trespasser *ab initio*[p] : as if one comes into a tavern and will not go out in a reasonable time, but tarries there all night contrary to the inclinations of the owner; this wrongful act shall effect and have relation back even to his first entry, and make the whole a trespass[q]. But a bare non-feasance, as not paying for the wine he calls for, will not make him a trespasser; for this is only a breach of contract, for which the taverner shall have an action of debt or *assumpsit* against him[r]. So if a landlord distreined for rent, and wilfully killed the distress, this by the common law made him a trespasser *ab initio*[s] : and so indeed would any other irregularity have done, till the statute 11 Geo. II. c. 19. which enacts, that no subsequent irregularity of the landlord shall make his first entry a trespass; but the party injured shall have a special action of trespass or on the case, for the real specific injury sustained, unless tender of amends hath been made. But still, if a reversioner, who enters on pretence of seeing waste, breaks the house, or stays there all night; or if the commoner who comes to tend his cattle, cuts down a tree; in these and similar cases the law judges that he entered for this unlawful purpose, and therefore, as the act which demonstrates such his purpose is a trespass, he shall be esteemed a trespasser *ab initio*[t]. So also in the case of hunting the fox or the badger, a man cannot justify breaking the soil, and digging him out of his earth: for though

---

m Gilb. Ev. 253.  Trials *per pais.*
eb. 15. pa. 438.
n Levit. c. 19. v. 9. & c. 23. v. 22.
Deut. c. 24. v. 19, &c.
o Cro. Jac. 321.

p Finch. L. 47.  Cro. Jac. 148.
q 2 Roll. Abr. 561.
r 8 Rep. 147.
s Finch. L. 47.
t 8 Rep. 146.

the

JA1609
Digitized by Google

the law warrants the hunting of fuch noxious animals for the public good, yet it is held ᵘ that fuch things muft be done in an ordinary and ufual manner; therefore, as there is an ordinary courfe to kill them, *viz.* by hunting, the court held that the digging for them was unlawful.

A MAN may alfo juftify in an action of trefpafs, on account of the freehold and right of entry being in himfelf; and this defence brings the title of the eftate in queftion. This is therefore one of the ways devifed, fince the difufe of real actions, to try the property of eftates; though it is not fo ufual as that by ejectment, becaufe that, being now a mixed action, not only gives damages for the ejection, but alfo poffeffion of the land: whereas in trefpafs, which is merely a perfonal fuit, the right can be only afcertained, but no poffeffion delivered; nothing being recovered but damages for the wrong committed.

IN order to prevent trifling and vexatious actions of trefpafs, as well as other perfonal actions, it is *(inter alia)* enacted by ftatutes 43 Eliz. c. 6. and 22 & 23 Car. II. c. 9. §. 136. that where the jury, who try an action of trefpafs, give lefs damages than forty fhillings, the plaintiff fhall be allowed no more cofts than damages; unlefs the judge fhall certify under his hand that the freehold or title of the land came chiefly in queftion. But this rule now admits of two exceptions more, which have been made by fubfequent ftatutes. One is by ftatute 8 & 9 W. III. c. 11. which enacts, that in all actions of trefpafs, wherein it fhall appear that the trefpafs was wilful and malicious, and it be fo certified by the judge, the plaintiff fhall recover full cofts. Every trefpafs is *wilful,* where the defendant has notice, and is efpecially forewarned not to come on the land; as every trefpafs is *malicious,* though the damage may not amount to forty fhillings, where the intent of the defendant plainly appears to

ᵘ Cro. Jac. 321.

be

be to harafs and diftrefs the plaintiff. The other exception is by ftatute 4 and 5 W. & M. c. 23. which gives full cofts againft any inferior tradefman, apprentice, or other diffo- lute perfon, who is convicted of a trefpafs in hawking, hunting, fifhing, or fowling upon another's land. Upon this ftatute it has been adjudged, that if a perfon be an inferior tradefman, as a clothier for inftance, it matters not what qualification he may have in point of eftate; but, if he be guilty of fuch trefpafs, he fhall be liable to pay full cofts ".

w Lerd Raym. 149.

Digitized by Google

A

# TREATISE

### ON THE JURISDICTION AND PROCEEDINGS
OF

## JUSTICES OF THE PEACE,

#### IN

### CIVIL SUITS IN NEW-JERSEY,

WITH AN

# APPENDIX,

#### CONTAINING,

| | |
|---|---|
| ADVICE TO EXECUTORS, ADMINISTRA-TORS, AND GUARDIANS; | THE LAW OF SHERIFFS, CORONERS, CONSTABLES, AND OTHER TOWN-SHIP OFFICERS; |
| AN EPITOME OF THE LAW OF LAND-LORD AND TENANT; | THE LAW AND FORM OF PROCEEDING RELATING TO THE LAYING OUT AND VACATING ROADS. |
| DIRECTIONS AND FORMS OF PROCEED-ING FOR JUSTICES OF THE PEACE IN CRIMINAL CASES; | |

#### INTERSPERSED WITH

## PROPER FORMS AND INSTRUCTIONS.

THE THIRD EDITION, REVISED, CORRECTED, AND CONSIDERABLY ENLARGED.

## BY WILLIAM GRIFFITH, ESQ.

#### COUNSELLOR AT LAW.

### BURLINGTON, N. J.

#### PUBLISHED BY DAVID ALLINSON,
DANIEL FENTON, AND MOORE & LAKE, Trenton.
Printed at the Lexicon Press,
By J. S. Meehan,

1815.

JA1612

Digitized by Google



*District of New-Jersey.*

BE IT REMEMBERED, That on the third day of August, in the thirty-eighth year of the independence of the United States of America, DAVID ALLINSON, of the said district, hath deposited in this office the title of a book, the right whereof he claims as proprietor, in the words following, to wit:

L. S.

" *A Treatise on the jurisdiction and proceedings of Justices of the Peace, in Civil Suits in New-Jersey: with an Appendix, containing, Advice to Executors, Administrators and Guardians; An Epitome of the law of Landlord and Tenant; Directions and forms of proceeding for Justices of the Peace in Criminal Cases; The law of Sheriffs, Coroners, Constables, and other Township Officers; The law and form of proceeding in cases relating to Highways; An abridgment of all the decisions of the Supreme Court, on the act for the trial of small causes. Interspersed with proper Forms and Instructions. The third edition, revised, corrected and considerably enlarged. By Wm. Griffith, Esq. Counsellor at Law.*

In conformity to the Act of the Congress of the United States, entitled, " An Act for the encouragement of learning, by securing the copies of maps, charts, and books, to the authors and proprietors of such copies, during the times therein mentioned;" and also to the Act, entitled, " An Act supplementary to an Act, entitled, an Act for the encouragement of learning, by securing the copies of maps, charts, and books to the authors and proprietors of such copies, during the times therein mentioned, and extending the benefits thereof to the arts of designing, engraving, and etching historical and other prints."

ROBERT BOGGS,
*Clerk of the District of New-Jersey.*

Digitized by Google

# PREFACE

## TO THE FIRST AND SECOND EDITIQNS.

THE first part of this publication, contains an attempt to explain the theory, and fix the forms of procedure, in the courts for the trial of small causes, in New-Jersey. That such a work, if properly executed, would furnish great assistance to magistrates, and prevent much of the litigation and injustice which too often flow from mistakes in *legal* forms, may reasonably be supposed: but in what degree this essay can pretend to a satisfactory execution of such a plan, is not for its author to pronounce. The number of gentlemen in commission, their various opinions, and different habits, leave me no hope, that in its outline or filling up it will secure entire approbation. Characters experienced in business, may, in many things, regard it as too *minute;* whilst others, less versed in legal matters, might wish it more *dilated.* Differences of opinion also, may arise upon *legal* points advanced in the book: to those who disagree with me, I can say, that I have no desire to make proselytes, every gentleman has a right to his opinion; I may assert, however, for mine, that in laying down the construction of legislative acts, and in discussing general questions, I am not conscious of having adopted any exposition, *merely* in favour of any particular theory of my own; I have endeavoured throughout, to adapt my commentary to the plain meaning of the legislature, the general principles of law, and the decisions of the supreme court. With respect to these, I had it in view, at one time, to insert such as were in my hands, in the form of short *reports;* but on reflection, I gave it up, preferring the method of interweaving the rules established by them, as principles, into the body of the work; by which the purpose is better attained, and at much

less expense. It will appear that the *forms*, attached to the different titles, are very copious, and have been drawn to the best of my judgment, with a strict attention to legal requisites: if they should differ from some in common use, the inconvenience cannot be great, nor need to be long.

The *second part* of this book, will be received under circumstances more favourable perhaps, to general approbation. Some professional experience, and a great deal more derived through the channel of the surrogate's office, which I have held for some years, has discovered to me the perplexities which they lie under, who have the management, or who expect the enjoyment of property given by will, or fallen by intestacy.

The little tract, containing *advice to executors, administrators, and guardians*, making part of the *Appendix*, will be found to contain almost every article of instruction necessary for the right management of *decedents'* estates, and full information to all interested, of their reciprocal rights and duties.

The law of *landlord* and *tenant*, of *distress* and *replevin*, with the *Scrivener's Guide*, which make out the rest of the Appendix, are of very general concern, and being thrown into a small compass, with proper forms and directions, may be considerably useful.

Although my leading view has been, to construct a book, which might benefit those who are in private situations and employments in the country; yet I have not been unmindful of professional gentlemen, who, upon looking through this work, will find many of its titles adapted to afford them some assistance in the *practice* of the subordinate branches of the law.

BURLINGTON, 1st *May*, 1797.

JA1615

Digitized by Google

# PREFACE

## TO THE THIRD EDITION.

THE legislature having introduced great changes since the *first* edition of this Treatise,* in the jurisdiction and proceeding of Justices of the Peace, a *revisal* became indispensable, in order to prevent the embarrassment and errour which constantly resulted from the use of it as first published.

In the present book, it has been attempted to obviate those inconveniences by conforming the Treatise to the existing law: In doing this, the matter of the work, and much of its form, have undergone an almost entire change; and the author flatters himself that it will be found not only enlarged, but extensively improved, in the whole scope and execution of it as a guide to magistrates.

To the contents of the *Appendix* in the first and second editions, have been added in *this*, directions and forms for justices of the peace in *criminal* cases; the law of sheriff, coroners, and other township officers, and in cases of highways, &c. forming almost a complete *digest* of whatever relates to these important, and in some respects, difficult subjects: It were needless to observe how greatly this has added to the labour of the compilation, as well as to its usefulness,—should the execution be found adequate to the design. In presenting this *revised* Treatise and *new* Digests to the publick, the author is bound to acknowledge the great obligations he is under to a gentleman of the bar,† for his friendly and persevering assistance through the whole. The aid derived from his knowledge of the statutes, and his practical ability is

* 1796.
† Charles Kinsey, Esq.

A 2

JA1616

Digitized by Google

|                                                                        | Page |
|------------------------------------------------------------------------|------|
| Ticket to a subpœna,                                                   | 86   |
| Subpœna duces tecum,                                                    | —    |
| Entry of a fine, on a defaulting witness,                              | —    |
| Execution against goods of a defaulting witness,                       | 87   |
| Notice of taking deposition of a witness,                             | 93   |
| Oath to obtain a commission for examination of a witness,              | 94   |
| Commission for             do.                                         | 95   |
| Rule of reference, entry of,                                           | 99   |
| Report of referees, the form,                                          | —    |
| Entry of demand of a jury in the docket,                               | 101  |
| Venire and endorsement,                                                | 102  |
| Oath of triers, on challenge of the jury,                             | 109  |
| Oath of witness, on trial of such challenge,                          | —    |
| Oath of voire dire, to a juror challenged,                            | —    |
| Challenge to the array, form of,*                                      | 110  |
| ——— to the polls,*                                                    | —    |
| Oath of a juror,                                                       | 111  |
| Oath of a witness,                                                     | 112  |
| Oath to a witness, if alleged, interested, &c.                         | 115  |
| Entry of a non-suit in the docket,                                     | 120  |
| Entry of the verdict in the docket,                                    | 122  |
| Table of costs in justice's court,                                     | 124  |
| Execution, form of against executors,                                  | 127  |
| Entry of setting aside a verdict for irregularity,                     | 136  |
| Table of fees in the sessions on appeal,                               | —    |
| Entry of demand of appeal in the docket,                               | 139  |
| Appeal bond,                                                           | —    |
| Entry of an appeal in the sessions,                                    | 140  |
| Entry of a judgment of affirmance there,                               | —    |
| ——— of a reversal,                                                    | 141  |
| Execution out of the sessions,                                         | —    |
| Method of keeping docket,                                              | 142  |
| Entry of an appeal therein,                                            | 143  |
| Certificate to be annexed to the transcript,                           | —    |
| Bond given, on bringing certiorari,                                    | 148  |
| Certiorari to a justice of the peace,                                  | —    |
| Return thereto by the justice,                                         | 149  |
| Form of alleging diminution in supreme court,                          | 150  |
| Form of assigning reasons to reverse judgment,                         | —    |
| Execution out of supreme court, on affirmance,                         | 151  |
| Execution common, by a justice of the peace,                          | 155  |
| ——— for costs only,                                                   | 156  |
| Oath to obtain immediate execution against a freeholder,              | —    |

|  | Page |
|---|---|
| *Security, form of, to prevent immediate execution,* | 157 |
| *Security to be given for sum above* 60 *dollars to stay execution six months,* | — |
| *Scire facias to revive judgment after a year and a day,* | 163 |
| ———— *against executors,* | 164 |
| ———— ——— *administrators,* | 165 |
| ———— *for executor, where plaintiff dies before execution,* | 166 |
| ———— *for an administrator,* | 167 |
| ———— *upon a judgment in case of death or removal of justice before execution,* | — |
| *State of demand in scire facias,* | 168 |
| *Advertisement of a constable to sell,* | 172 |
| *Entry of a suit, where a minor sues by guardian,* | 175 |

*Note,* That the forms against which an asterisk * is placed, are not inserted on an idea that it is necessary to draw them up in so precise a manner, but it is done rather with a view to point out what should in substance be pleaded, or alleged in such cases to the justice, who will enter the matter on his docket.

For the principal forms in the Appendix, the reader may be referred to page 227 to 255, as relates particularly to executors and administrators; 261 to 264, 271 to 275, as respects landlord and tenant; 281 to 284, in regard to replevin; and to the general heads in the latter part of the volume.

JA1618
Digitized by Google

ner* with the said C. D. and ought to have joined with him in bringing the said action, and this he is ready to prove.

<div style="text-align: right">A. B.</div>

2d. Where all the persons proper to be made defendants are not joined in the action.

A. B.  
At suit of  } On a summons in debt for $ be-  
C. D.  } fore justice W. W.

The said A. B. cometh at the return of the summons and prays that the action brought against him by the said C. D. may be abated for this, to wit, that one E. F. is partner† with this defendant and ought to have been joined with the said A. B. as a defendant in the said action, and this he is ready to prove.

<div style="text-align: right">A. B.</div>

---

## IV. *Concerning the different kinds of actions cognizable by a Justice of the Peace.*

THE act directs,‡ " That every suit of a civil nature at law, where the debt, balance, or other matter in dispute, does not exceed, exclusive of costs, the sum or value of sixty dollars, shall be, and hereby is made cognizable before any justice of the peace of any county in this state, who is hereby authorized to hold a court within such county, to hear, try, and determine the same according to law, although the cause of action did not arise in the said county; and further, that the said court shall be a court of record, and vested for the purposes aforesaid, with all such power as is usual in courts of record of this state: *Provided always*, That this act shall not extend to any action of replevin, slander, trespass, for assault, battery or imprisonment, or to any action wherein the title of any lands, tenements, hereditaments, or other real estate, shall or may in any wise come in ques-

---

* Co-administrator, co-executor, &c. as the case is.
† Ibidem.   ‡ Pat. 313, sec. 1.

tion." And by the supplement, passed November 30th, 1801,* it is enacted, " That every suit of a civil nature at law, where the debt, balance, or matter in dispute does not exceed the sum of one hundred dollars, exclusive of costs, shall be, and is hereby made cognizable before any justice of the peace of any county in this state, who is hereby authorized to hold a court within such county, to hear, try, and determine the same according to law, and according to the same rules, regulations and exceptions, made and provided in the before recited act for the trial of causes not exceeding sixty dollars, and according to a supplement to said act, passed February the sixteenth, seventeen hundred and ninety-nine."

The actions most common before justices of the peace, and which may sufficiently comprehend the cases usually occurring are,

1st. Debt.
2d. Covenant.
3d. Trespass with *force and arms.*
4th. Trespass *on the case.*
5th. Attachment.

As gentlemen in the commission very frequently err, in stating the true nature of the plaintiff's demand in the summons or warrant; and these mistakes do sometimes occasion reversals of their judgments upon certiorari in the supreme court; it may, I hope, lessen their embarrassments on this subject, if I place under each head of action, the cases which fall within the description of such action.

1st. Cases in which the summons or warrant, should be to answer in debt.

The supplement passed March 1st, 1804,† directs, That all suits brought or commenced before any justice of the peace on any bond or other specialty, note of hand, bill of exchange, book account, or any other demand formed on simple contracts for the payment of money only, shall be in the name and style of actions of debt, and not otherwise.

* **Bloom. 73.**       † Bloom. 74.

Digitized by Google

Therefore the action must be debt,

1st.  Where one sues,  on a former judgment.
2d.                    on a bond.
3d.                    on a sealed note or bill.
4th.                   on an agreement sealed, to pay a
                       particular sum of money.
5th.                   on an act of assembly to recover
                       penalties.*
6th.                   on a lease for a rent certain.
7th.                   on a note of hand or agreement
                       not sealed.
8th.                   for wages for work and labour
                       done.
9th.                   for articles sold and delivered.
10th.                  for money lent.
11th.                  for money received by defendant
                       for plaintiff.
12th.                  for money paid to the use of the
                       defendant at his request.
13th.                  on special contracts not under
                       seal, for breach of which, da-
                       mages have accrued to the
                       plaintiff.
14th.                  on all implied contracts, for breach
                       of which the plaintiff is entitled
                       to damages.

2d. Cases in which the summons or warrant should be,
to answer in covenant.

This action lies only upon agreements under seal; and is
proper in all cases, where there is an agreement, or cove-
nant to do, or not to do some particular thing, and no pre-
cise sum is fixed on in the deed as a penalty for the breach
of it; or if such sum is fixed, the party suing prefers an

* As on the timber act to recover £3 per tree.  No mistake is more
common than to bring trespass on this act, which is entirely erroneous,
and for which judgment will be reversed.

action for damages, to a suit for the penalty,* in either of
which cases, neither debt nor assumpsit would be a proper
form of action, but covenant.

This action may be used,

1st. On a covenant to pay rent.
2d. On a covenant for quiet enjoyment of premises leas-
    ed or sold.
3d. On a covenant to save harmless, or keep indemnifi-
    ed.
4th. On a covenant not to assign premises leased.
5th. On a covenant to keep in repair.
6th. On a covenant to make a title, or further assurance
    of title.
7th. On a covenant to pay taxes.
8th. On a covenant not to plough meadows, commit
    waste, and other usual covenants in leases.
9th. On agreement, under seal, to do work, deliver a
    horse, &c.†

3d. Cases in which the summons or warrant should be
    to answer in trespass with force and arms.

This action is proper when the defendant has forcibly
done injury to the plaintiff in respect of his goods or lands;
and for which his claim of damage doth not exceed one
hundred dollars.

### 1st. *To his goods as,*

1st. For wrongfully taking his horse, hog, or other live
    chattel.
2d. For taking his fowls, pigeons, fish, &c.

* In agreements and covenants, a penalty is often inserted—for this
debt will *lie*; but sometimes the penalty is too small to cover the dam-
age, and then covenant is the better action; for in that action he is not
confined to the penalty, but may recover more or less: and sometimes
the penalty is beyond a justice's jurisdiction, and yet the damage within
it; and in this case covenant is the proper action, and not debt.
† As the supplement, Bloom. 74, directs debt to be brought in case
the demand arises on a specialty; I presume actions of covenant are not
now to be used; but not being certain of this, I have continued this
class as before.

3d. For taking his furniture, boat, wood, bond, money, deeds, clothes, hay, or any other dead chattel.

4th. For beating, wounding, disabling, or killing (unjustifiably and to his damage) a man's horse, ox, sheep, hog, or other live thing.*

5th. For spoiling, burning, or destroying, his hay, wood, garments, deeds, securities, or other dead thing.

### 2d. *To his lands.*

6th. For entering a man's house, lands, &c. without license, whether owner, or only tenant of the same.

7th. For hunting on his grounds.

8th. For breaking fences, ditches, hedges, &c.

9th. For breaking his banks, opening his sluices, &c.

10th. For cutting his trees.

11th. For entering upon his fishery.

12th. For entering upon his possession, and treading down his grass, &c. cutting and carrying away his produce, ore, wood, &c.

13th. So trespass lies for injuries done by the cattle of another breaking into enclosures.†

4th. Cases in which the summons, or warrant, should be to answer in trespass on the case.

This is a very comprehensive action, and may be adopted in the following cases.

1st. For all deceits and frauds in contracts, by which damage accrues to the plaintiff, as for false representations, warranties, and the like.

2d. In all cases of imposition and knavery, by which the plaintiff is wronged, though there be no contract; as for cheating at dice, or other game, swindling him out of his money, by forgery, false tokens, or personating another.

* Trespass is also a proper action for injuries to the person of a man, as assault and battery, false imprisonment and maim; but these injuries fall not under the civil cognizance of a justice.

† Some of these injuries, when complained of, frequently end in a contest about the title to the land; in which case, the justice will act as before directed.

Digitized by Google

3d. In all cases of malicious and vexatious prosecutions at law, by which injury is sustained.

4th. In cases of breach of trust, by one's attorney, agent or servant, by his surgeon, physician, taylor, smith, or other profession, acting ignorantly, carelesly or maliciously in their several undertakings, by which an injury is done to a man's person or property.

5th. In all cases of breach of official duty, as where a sheriff, constable, overseer, justice or other officer, neglects his duty or abuses the trust reposed in him by law, to the damage of another; as if a constable neglects to serve his precept, or a justice to issue one, when properly applied to.

6th. In all cases of negligence, whereby injury is done; as suffering fire by carelesness to burn the plaintiff's woods, or a dog to bite his person, a bull to gore his child.

7th. In all cases of nuisance.

8th. In all cases of unjust conversion of the plaintiff's property, which has come to the defendant's hands, by finding, delivery, accident, mistake, or by defendant's contrivance, and he refuses, upon demand, to give it up.

9th. For injuries to a man in the character of husband, father, master, guardian, or citizen, by enticing away a man's wife, debauching his daughter, inveigling his servant, spiriting away his ward, preventing his lawful vote. In short this action lies in every possible case, where an injury is received, without direct violence, and is of such a nature as not to come within any other prescribed form of action.

### 5th. Cases of attachment.

The authority of a justice to issue an attachment, is founded on the attachment act, *Pat.* 301, *sec.* 33, which enacts, " That any justice of the peace within this state on application and affidavit made before him to the purpose aforesaid,* shall, and is hereby required to issue an attach-

* See form of affidavit hereafter.

**D**

# John Locke

# Second Treatise of Government

Edited by
**C. B. Macpherson**

JA1625

# ❧ JOHN LOCKE ❧

# Second Treatise of Government

Edited, with an Introduction, by
C. B. Macpherson

Hackett Publishing Company, Inc.
Indianapolis · Cambridge

JA1626

JOHN LOCKE: 1632-1704

*Second Treatise of Government* was
originally published in 1690

Introduction copyright© 1980 by C. B. Macpherson
All rights reserved
Printed in the United States of America
04 03 02 01                                    15 16 17 18 19 20

Cover design by Richard L. Listenberger
Interior design by James N. Rogers

For further information please address

Hackett Publishing Company, Inc.
P.O. Box 44937
Indianapolis, Indiana 46244-0937

**Library of Congress Cataloging in Publication Data**

Locke, John, 1632-1704
  Second treatise of government

  Published in the author's Two treatises of government
under title: Essay concerning the true original extent
and end of civil government.
  Bibliography: p.
  1. Political science—Early works to 1700.
2. Liberty.  3. Toleration.  I. Macpherson, Crawford
Brough.  II. Title.
JC153.L85   1980              320′.01              80-15052
ISBN 0-915144-93-X
ISBN 0-915144-86-7 (pbk.)

more than his share, and belongs to others. Nothing was made by
God for man to spoil or destroy. And thus, considering the plenty
of natural provisions there was a long time in the world, and the
few spenders; and to how small a part of that provision the industry
of one man could extend itself, and ingross it to the prejudice of
others; especially keeping within the *bounds*, set by reason, of what
might serve for his *use*; there could be then little room for quarrels
or contentions about property so established.

§. 32. But the *chief matter of property* being now not the fruits of
the earth, and the beasts that subsist on it, but *the earth itself*; as
that which takes in and carries with it all the rest; I think it is plain,
that *property* in that too is acquired as the former. *As much land* as
a man tills, plants, improves, cultivates, and can use the product of,
so much is his *property*. He by his labour does, as it were, inclose it
from the common. Nor will it invalidate his right, to say every body
else has an equal title to it; and therefore he cannot appropriate, he
cannot inclose, without the consent of all his fellow-commoners, all
mankind. God, when he gave the world in common to all mankind,
commanded man also to labour, and the penury of his condition re-
quired it of him. God and his reason commanded him to subdue the
earth, *i. e.* improve it for the benefit of life, and therein lay out
something upon it that was his own, his labour. He that in obe-
dience to this command of God, subdued, tilled and sowed any part
of it, thereby annexed to it something that was his *property*, which
another had no title to, nor could without injury take from him.

§. 33. Nor was this *appropriation* of any parcel of *land*, by im-
proving it, any prejudice to any other man, since there was still
enough, and as good left; and more than the yet unprovided could
use. So that, in effect, there was never the less left for others
because of his inclosure for himself: for he that leaves as much as
another can make use of, does as good as take nothing at all. No
body could think himself injured by the drinking of another man,
though he took a good draught, who had a whole river of the same
water left him to quench his thirst: and the case of land and water,
where there is enough of both, is perfectly the same.

§. 34. God gave the world to men in common; but since he gave
it them for their benefit, and the greatest conveniencies of life they
were capable to draw from it, it cannot be supposed he meant it
should always remain common and uncultivated. He gave it to the
use of the industrious and rational, (and *labour* was to be *his title* to
it;) not to the fancy or covetousness of the quarrelsome and conten-

Case 1:22-cv-01333-RDA-AJT Document 88 Page 457 02/20/23 Filed 07/20/2023 PageID: 1752

tious. He that had as good left for his improvement, as was already taken up, needed not complain, ought not to meddle with what was already improved by another's labour: if he did, it is plain he desired the benefit of another's pains, which he had no right to, and not the ground which God had given him in common with others to labour on, and whereof there was as good left, as that already possessed, and more than he knew what to do with, or his industry could reach to.

§. 35. It is true, in *land* that is *common* in *England*, or any other country, where there is plenty of people under government, who have money and commerce, no one can inclose or appropriate any part, without the consent of all his fellow-commoners; because this is left common by compact, *i. e.* by the law of the land, which is not to be violated. And though it be common, in respect of some men, it is not so to all mankind; but is the joint property of this country, or this parish. Besides, the remainder, after such inclosure, would not be as good to the rest of the commoners, as the whole was when they could all make use of the whole; whereas in the beginning and first peopling of the great common of the world, it was quite otherwise. The law man was under, was rather for appropriating. God commanded, and his wants forced him to *labour*. That was his *property* which could not be taken from him where-ever he had fixed it. And hence subduing or cultivating the earth, and having dominion, we see are joined together. The one gave title to the other. So that God, by commanding to subdue, gave authority so far to *appropriate:* and the condition of human life, which requires labour and materials to work on, necessarily introduces private possessions.

§. 36. The *measure of property* nature has well set by the extent of men's *labour and the conveniencies of life:* no man's labour could subdue, or appropriate all; nor could his enjoyment consume more than a small part; so that it was impossible for any man, this way, to intrench upon the right of another, or acquire to himself a property, to the prejudice of his neighbour, who would still have room for as good, and as large a possession (after the other had taken out his) as before it was appropriated. This *measure* did confine every man's *possession* to a very moderate proportion, and such as he might appropriate to himself, without injury to any body, in the first ages of the world, when men were more in danger to be lost, by wandering from their company, in the then vast wilderness of the earth, than to be straitened for want of room to plant in. And the

L:C2-Sa0e2223-RMB-A-IDO6-Decum1nt48c8fPage4458r1 O2fDat 2e15r/tldc/2017/120/2023ge4D

## CHAP. XXVI.

*April,*
*1715.*

An ACT for the speedy trial of criminals, and ascertaining their punishment in the county courts when prosecuted there, and for payment of fees due from criminal persons.

A Supplementary act, May 1766, ch. 6.

**Preamble.** WHEREAS many acts of assembly have been heretofore made against thieving and stealing, which at this present are not sufficient to prevent the committing those crimes, or to punish them when committed ;

**Justices of the county courts, of what crimes they may hold plea.** II. BE IT THEREFORE ENACTED, *by the King's most excellent majesty, by and with the advice and consent of his majesty's Governor, Council and Assembly of this province, and the authority of the same,* That it shall and may be lawful to and for the several justices of the county courts of this province to hold plea of, adjudge, and in lawful manner determine, all thieving and stealing of any goods or chattels whatsoever, not being above the value of one thousand pounds of tobacco (robbery, burglary, and house-breaking excepted,) *(a)* and every person or persons legally convicted of any such thieving and stealing (except before excepted,) by testimony of one sufficient evidence, not being the party grieved, before any such county court as aforesaid, shall and may cause to be punished, by paying fourfold of the value of the goods so thieved or stolen as aforesaid, and the stolen goods returned to the party or parties grieved thereby, and by putting in the pillory, and whipping so many stripes as the court before whom such matter is tried, shall adjudge, not exceeding forty ; which court shall always adjudge the value of the goods so thieved and stolen as aforesaid ; and if any such person, so convicted, have not sufficient goods and chattels, or be a servant, whereby he is incapable to have goods and chattels to satisfy and pay the said fourfold, in every such case, such person or persons shall receive the corporal punishment as aforesaid, and satisfy the fourfold, and fees of conviction, by servitude.

**Time of service, when to commence.** III. AND BE IT HEREBY ENACTED AND DECLARED, *by the authority, advice and consent aforesaid,* That the time of service of a free person convict as aforesaid, not having goods and chattels as aforesaid, shall commence from the time of his conviction as aforesaid ; and the time of service of a servant, convict as aforesaid, shall commence at the expiration of such time of servitude, to which, at the time of his conviction, he stood bound, which time of servitude, for satisfaction for the

*(a)* By 1785, ch. 87, section 7, the justices of the county courts are empowered, (unless in cases particularly directed by law to be tried in the general court) to try all persons who have committed any manner of offence, although it may subject such person to the pains of death.

JA1630

Digitized from Best Copy Available

L:Ca-Be8e222-RVMB-A-BDS Doctrin 148c8/Page 459d OEL Date Filed 07/20/2023 of 4D

stolen goods, and fees accrued as aforesaid, shall be adjudged
by such county court, either to the party grieved, or any other
person the court shall order such convict to, that will then and
there pay, or secure to be paid, the fourfold and costs aforesaid,
at the discretion of the court ; and if any person or persons
shall receive or take part of such stolen goods, or assist the
person so stealing as aforesaid to make away or conceal them,
being legally convicted as aforesaid, shall suffer the same cor-
poral pains with the party stealing as aforesaid, any law, stat-
ute, usage or custom to the con rary notwithstanding.

**IV.** And, If any person or persons have been once convicted
of any such thieving and stealing, (except before excepted,)
and shall after be again presented for thieving and stealing of
any goods or chattels, laid to be above the value of twelve-
pence, it shall not be tried and determined by any county court,
but the party presented, upon such presentment, shall be pro-
ceeded against in the provincial court as a felon for simple fel-
ony, but shall not be punished by death, but only paying the
fourfold, branding with a hot iron, or such other corporal pun-
ishment as the court shall adjudge, saving life ; and such pre-
sentment shall be, by the clerk of every such county court,
immediately sent to the then next provincial court, together
with a transcript of his former conviction, if such conviction
was in the same court where the presentment aforesaid shall be,
or otherwise, made known to the attorney-general in what
other court such former conviction was, if to him known, under
the penalty of five hundred pounds of tobacco to our sovereign
lord the king, his heirs and successors, for the support of gov-
ernment ; and the parties witnesses against such felons, if in
court at the time of such presentment, shall be bound over to
give evidence as aforesaid, or otherwise, if not in court, an
account of their names and places of dwelling to be sent to the
attorney-general, to be summoned against the then next pro-
vincial court, in order to such trial ; and the party presented,
if in court, to be bound over also, by due course of law, to
answer such presentment, or, if not in court, proceeded
against by due course of law as aforesaid.

*Persons again prose-cuted must be tried in the provin-cial court, if the present-ment char-ges them with steal-ing above the value of 12 pence.*

**V.** And be it further enacted, *by the authority, advice
and consent aforesaid,* That any person or persons whatsoever
that shall kill any unmarked swine above three months old, if
not upon his or their own land, or not in company with his or
their own stock, shall and is hereby adjudged an hog stealer,
and shall be liable to restore fourfold, and suffer such corporal
pains as against the first offence in this act mentioned.

*Penalty for killing un-marked swine.*

**VI.** And, to prevent any person or persons concealing or
disfiguring the mark of any swine killed as aforesaid, Be it
further enacted, *by the authority advice and consent afore-
said,* That if any person or persons killing any such unmark-
ed swine in the woods, or elsewhere, and shall wilfully disfig-
ure the mark, or cut off the ears of such swine, so as to con-

*For disfig-uring their mark, &c.*

JA1631

Digitized from Best Copy Available

L:C2-Case223-KMB0A-1DBoDentent148c8Page4460e10FDate15iled007720/2023ofe4D

*April,*
1715.

And on persons convicted for hunting, &c.

ceal the true and real mark, or whether it were marked or not, shall be deemed and adjudged a hog stealer within the purview of this act, and shall suffer accordingly.

**VII.** And, to prevent the abusing, hurting or worrying of any stock of hogs, cattle or horses, with dogs, or otherwise, Be it enacted, That if any person or persons whatsoever, that have been convicted of any of the crimes aforesaid, or other crimes, or that shall be of evil fame, or a vagrant, or dissolute liver, that shall shoot, kill or hunt, or be seen to carry a gun, upon any person's land, whereon there shall be a seated plantation, without the owner's leave, having been once before warned, shall forfeit and pay one thousand pounds of tobacco, one half to our sovereign lord the king, his heirs and successors, the other half to the party grieved, or those who shall sue for the same, to be recovered in any county court of this province by action of debt, bill, plaint or information, wherein no essoin, protection or wager of law to be allowed.

Criminals to pay their own fees, by servitude, if not otherwise capable.

**VIII.** And be it further enacted, *by the authority, advice and consent aforesaid,* That from henceforth no sheriff, gaoler, clerk, crier, or other officer, shall charge either their own county, to which they belong, or the public, with any fees for any criminal committed to the charge of the said sheriff or gaoler, having sufficient estate in this province wherewith to pay the same, or being capable to pay the same by servitude, but that such criminals, being discharged by order and due course of law, shall pay their own fees to the sheriff, gaoler, clerk and crier, and other officers, being such as they may demand according to law, either out of his estate, or by servitude, or otherwise.

Vide 1781, ch 11.

Proviso.

**IX.** Provided always, That this act shall not extend to malefactors that are executed, or to such other persons who are banished, having no estate in this province, or to servants criminals, for whom the county shall pay such fees as are due by the acts of assembly to the sheriff, gaoler, clerk, crier, or other officers of such court where such criminal shall be convicted.

Officers fees, how to be paid.

**X.** And be it further enacted, *by the authority aforesaid,* That all officers' fees due by law from (a) criminal servants, shall be paid by the county where the facts shall be committed ; and that all and every such criminal servants for

(a) By the act of 1727, ch. 2, all fees due on the prosecution of imported servants, were to be paid by the masters, &c. of such servants, and not by the public or county ; and the owners (unless in case of conviction and execution for capital offences,) to have recompence for such fees, by such servitude of the servants (not exceeding three years) as should be thought reasonable by the county court, &c. By May, 1766, ch. 6, the legal fees on the prosecution of any negro, or other slave, in any county court, (whether convicted or acquitted,) shall be paid by and assessed in the levy of the respective counties where prosecuted.

JA1632

Digitized from Best Copy Available

L:CasBase223-RMBBA-BOS-Dceunttm48c8Ragg446b4 0FLDisttel5/iEiteg27/2608Rg4D

whom the county shall pay the fees due by law to such officers as aforesaid, shall, after the end and expiration of their time of servitude to their master or mistress, satisfy and pay unto the commissioners of the county who paid such fees for them to the sheriff, and other officers as aforesaid, for the use of the county, such sums as they have paid as aforesaid : and the several commissioners of the several counties shall, and are hereby empowered to make inquisition after all such servants, criminals, for whom the county hath defrayed the said fees to the sheriff, and other officers as aforesaid ; and they, the said commissioners, according to their best discretion, shall cause to be entered rules for the servants to make such reasonable satisfaction to the county as they shall think fit, and in such manner as they shall find convenient.

*April, 1715.*

XI. And, for the better security of the county which shall pay such fees for such criminal servants as aforesaid, Be it enacted, *by the authority aforesaid,* That the master, mistress or dame of all such servants, be and are hereby enjoined and required, at the expiration of the time of such servant's servitude to such master, or mistress or dame, to render and deliver up to the sheriff of the county, for the use of the county aforesaid, such servants criminals as aforesaid, under the penalties to such master, mistress or dame, refusing or neglecting to deliver up such servants as aforesaid, of making satisfaction to the county for all such fees as by the county aforesaid have been paid for such criminal as aforesaid ; and such sheriff to whom such criminal servant shall be delivered as aforesaid, is hereby required to receive and secure such servants criminals as aforesaid, so that he be and appear at the then next county court to be held for the said county, to be disposed of as the said court shall consider.

Masters, &c. to deliver up servants, criminals under penalty of paying the fees, paid for the criminal by the county.

Vide list of acts respecting crimes and punishments, 1692, ch. 16.

## CHAP. XXVII.

### An ACT for the punishing the offences of adultery and fornication.

Other acts : 1749, ch. 12.—Nov. 1781, ch. 13—1785, ch. 47.—1796, ch. 34.

BE it enacted, *by the King's most excellent majesty, by and with the advice and consent of his majesty's Governor, Council and Assembly of this province, and the authority of the same,* That after the end of this session of assembly, whosoever shall, directly or indirectly, entertain, provide for, or cause to be entertained or provided for, any lewd woman or women, or that shall frequent her or their company, after that admonition to him or them be given by the minister, or the vestry, or the churchwarden or churchwardens of the parish where such person or persons shall inhabit, shall be adjudged

Certain persons to be adjudged fornicators, &c.

JA1633

Digitized from Best Copy Available

# THE

# 𝕾𝖙𝖆𝖙𝖚𝖙𝖊𝖘 𝖆𝖙 𝕷𝖆𝖗𝖌𝖊

OF

# PENNSYLVANIA

FROM

# 1682 to 1801

COMPILED UNDER THE
AUTHORITY OF THE ACT OF MAY 19 1887 BY
JAMES T MITCHELL AND HENRY FLANDERS
COMMISSIONERS

---

# VOLUME III
1712 to 1724

---

CLARENCE M BUSCH
STATE PRINTER OF PENNSYLVANIA
1896

JA1634

Case 1:23-cv-01908-ACR   Document 46-8   Page 463 of 546   Date Filed 07/20/2023   PageID: 17

five shillings, one-half to the use of the poor of the said city, and the other half to the use of him or them who shall prosecute and cause such offender to be as aforesaid convicted: which forfeitures shall be levied by distress and sale of the offender's goods as aforesaid; and for want of such distress, if the offender refuse to pay the said forfeiture, he shall be committed to prison for every such offense the space of two days, without bail or mainprise.

Provided, That such conviction be made within ten days after such offense committed. And if such offender be a negro or Indian slave, he shall, instead of imprisonment, be publicly whipped, at the discretion of the magistrate.

> Passed August 26, 1721. Apparently never considered by the Crown, but allowed to become a law by lapse of time in accordance with the proprietary charter. See Appendix IV, Section II, and Hill's letter and Fane's opinion in Appendix V, Section I, and the Acts of Assembly passed August 14, 1725, Chapter 237; February 6, 1730-31, Chapter 322; March 29, 1735-36, Chapter 338; February 9, 1750-51, Chapter 388; March 26, 1762, Chapter 481; March 9, 1771, Chapter 624; March 21, 1772, Chapter 648; December 24, 1774, Chapter 705; November 25, 1779, Chapter 867; March 28, 1787, Chapter 1279; September 29, 1787, Chapter 1318; April 13, 1791, Chapter 1573; April 11, 1793, Chapter 1698; April 18, 1794, Chapter 1743; April 18, 1795, Chapter 1857; March 29, 1802, P. L. 127; March 29, 1803, P. L. 542; April 4, 1807, P. L. 132; March 30, 1812, P. L. 182; March 14, 1818, P. L. 189; March 29, 1824, P. L. 152; February 10, 1832, P. L. 64; June 13, 1836, P. L. 551; March 16, 1847, P. L. 473; April 11, 1848, P. L. 504; April 8, 1851, P. L. 382; April 14, 1851, P. L. 549; March 20, 1856, P. L. 137; May 5, 1864, P. L. 841; March 23, 1865, P. L. 744; March 12, 1866, P. L. 160; June 2, 1870, P. L. 1316; April 17, 1878, P. L. 23; June 10, 1881, P. L. 111; June 11, 1885, P. L. 111.

---

## CHAPTER CCXLVI.

AN ACT TO PREVENT THE KILLING OF DEER OUT OF SEASON, AND AGAINST CARRYING OF GUNS OR HUNTING BY PERSONS NOT QUALIFIED.

[Section I.] Be it enacted by Sir William Keith, Baronet, Governor of the Province of Pennsylvania, &c., by and with the advice and consent of the freemen of the said Province in General Assembly met, and by the authority of the same, That if

Case 1:22-cv-01221-JMB-CSU Document 48 Page 464 of Date Filed 07/20/2023 Page ID: 17

any person or persons, after the publication hereof, shall kill or destroy any buck, doe, fawn, or any other sort of deer whatsoever, at any other time or season except only betwixt the first day of July and first day of January, he shall forfeit and pay for every such buck, doe, fawn, or other deer so killed or destroyed as aforesaid, the sum of twenty shillings; one-half thereof to the poor of the township where the offense is committed, and the other half to him who shall inform or sue for the same, before any justice of the peace of this province, who is hereby empowered and authorized to hear and determine the same, and to convict the offender, by the oath or affirmation of one or more witnesses.

Provided, That such conviction be made within two months after such offense is committed.

And for the better conviction of offenders against this act:

[Section II.] Be it enacted, That every person in whose custody shall be found, or who shall expose to sale any green deer skins, fresh venison, or deer's flesh, at any other time of the year than what is before excepted, and shall be convicted thereof as aforesaid, shall be deemed guilty of the said offense. And that the same green deer skins, fresh venison or deer's flesh so found as aforesaid shall be held to be good evidence in the cases aforesaid.

Provided always, That nothing contained in this act shall be deemed or construed to extend to any free native Indians carrying guns, hunting, killing, and having in their custody any skins or deer's flesh for their own use, anything in this act to the contrary notwithstanding.

And whereas divers abuses, damages and inconveniencies have arose by persons carrying guns and presuming to hunt on other people's lands, for remedy whereof for the future:

[Section III.] Be it enacted by the authority aforesaid, That if any person or persons shall presume, at any time after the sixteenth day of November, in this present year one thousand seven hundred and twenty-one, to carry any gun or hunt on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner of such lands or plantation, and shall be thereof convicted, either

se 1:23-cv-1223-ABOB-BDS Document 48-8 Page 465 of 5 Date Filed 07/20/2023 ge 5D: 17

upon view of any justice of the peace within this province, or by the oath or affirmation of any one or more witnesses, before any justice of the peace, he shall for every such offense forfeit the sum of ten shillings. And if any person whatsoever, who is not owner of fifty acres of land and otherwise qualified in the same manner as persons are or ought to be by the laws of this province for electing of members to serve in assembly, shall, at any time after the said sixteenth day of November, carry any gun, or hunt in the woods or uninclosed lands, without license or permission obtained from the owner or owners of such lands, and shall be thereof convicted in manner aforesaid, such offender shall forfeit and pay the sum of five shillings for every such offense.

[Section IV.] And be it further enacted by the authority aforesaid, That no person whatsoever shall presume to shoot at or kill with a firearm any pigeon, dove, partridge, or other fowl in the open streets of the city of Philadelphia, or in the gardens, orchards and inclosures adjoining upon and belonging to any of the dwelling houses within the limits of the said city, upon the forfeiture of five shillings for every such offense, to be convicted in manner aforesaid.

All which penalties and forfeitures shall go, one moiety to the informer, and the other to the poor of the township where such offense is committed. But if convicted upon view of a justice of the peace, the whole forfeiture shall be to the use of the poor. And if the offender refuse to pay, the same shall be levied by distress and sale of the offender's goods, by warrant under the hand and seal of the justice before whom such offender shall be convicted, returning the overplus, if any be, the charge of distraining being first deducted. And for want of such distress he shall be committed to prison, where the forfeiture is twenty shillings, for the space of ten days; and, where the forfeiture is ten shillings, for the space of five days: and, if the forfeiture is five shillings, for the space of two days, without bail or mainprise.

Passed August 26, 1721. Apparently never considered by the Crown, but allowed to become a law by lapse of time in accordance with the proprietary charter. See Appendix IV, Section II, and Hill's letter and Fane's opinion in Appendix V, Section I, and

Case 1:23-cv-01008-ADC Document 48-8 Filed 07/20/2023 Page 466 of 546 Page ID: 17

the Acts of Assembly passed February 6, 1730-31, Chapter 323;
January 27, 1749-50, Chapter 383. Repealed by Act passed April 9,
1760, Chapter 456.

---

## CHAPTER CCXLVII.

---

AN ACT FOR THE WELL TANNING AND CURRYING OF LEATHER, AND
REGULATING OF CORDWAINERS, AND OTHER ARTIFICERS, USING
AND OCCUPYING LEATHER WITHIN THIS PROVINCE.

Whereas very great abuses have been committed by tanners,
cutters and other persons, using and working of leather within
this government, and the prices of leather become very exor-
bitant and burdensome to the people of this province: To the
intent therefore that a reasonable and indifferent course for
the true and well tanning, currying and working of leather, may
be from henceforth established and appointed, and yet the per-
sons using the several crafts and mysteries aforesaid may not
be more strictly bound or limited than the necessary regard of
the welfare and general commodity of all His Majesty's sub-
jects within the said province requireth:

[Section I.] Be it enacted by Sir William Keith, Baronet,
Governor of the Province of Pennsylvania, &c., by and with
the advice and consent of the freemen of the said Province in
General Assembly met, and by the authority of the same, That
from and after the twenty-fifth day of November next, in this
present year of our Lord one thousand seven hundred and twen-
ty-one, if any person or persons using, or which shall use, the
mystery or faculty of tanning, or any person or persons im-
porting, or who shall import, any leather into this province,
shall at any time or times hereafter offer or put to sale any kind
of leather which shall be insufficiently and not thoroughly
tanned, so that the same, by the triers of leather lawfully ap-
pointed by virtue of this present act, for the time being, shall
be found to be insufficiently not thoroughly tanned, that then
all and every such person and persons so offending shall for-
feit such leather, as shall be found insufficiently and not thor-
oughly tanned, unless the party importing the same will give

Case 1:23-cv-00001-TSE Document 00000-0000 Filed 00/00/00 Page 1 of 1 PageID# 1262

# L A W S

### OF

# *NEW-YORK,*

### FROM

## The Year 1691, to 1773 inclusive.

---

PUBLISHED ACCORDING TO AN ACT OF THE

### G E N E R A L  A S S E M B L Y.

---

## VOLUME THE SECOND.

---



---

QUUM LEGES ALIÆ SUPER ALIAS ACCUMULATÆ, EAS DE INTEGRO
RETRACTARE, ET IN CORPUS SANUM ET HABILE REDIGERE, EX
USU SIT.

BACON.

---

## N E W - Y O R K:

Printed by HUGH GAINE, Printer to the King's Most Excellent Majesty in the
Province of New-York,
MDCCLXXIV.

JA1639

also be neceffary to annex to the faid Certificate, an Affidavit of the fol-
lowing Tenor, fworn to before any Magiftrate in the City of *New-York*:
A. B. *being duly fworn, depofeth and faith, That he certainly knows* [or has
Affidavits to prove, as the Cafe may be] *that the Hemp mentioned in the
above, or the annexed Certificate, was all raifed after the firft of* March,
One thoufand feven hundred and fixty-four, *in the Colony of* New-York, *in
the County of* [here mentioning the County] *and that no Bounty has yet
been paid for it, or any Part of it, to the beft of his Knowledge and Belief:*
And further faith not. The Infpectors above mentioned, before they enter
on the Execution of their Office, fhall take an Oath, faithfully to dif-
charge the Duty of Infpectors, according to the Meaning of this Act.

> 4th *GEORGE* III.
> A. D. 1763.
>
> Form of Affidavit
> to be fworn to before
> the Bounty fhall be
> paid.

[The Reft of this Act is OBSOLETE.]

---

## C H A P. MCCXXIX.

*An* A C T *to regulate the guaging of Wine, Rum, and other Spirituous Li-
quors, Molaffes, and other Purpofes therein mentioned.*
Pafs'd the 20th December, 1763.

> Expired 1ft Janu-
> ary, 1771.

---

## C H A P. MCCXXX.

*An* ACT *to lay a Duty of Tonnage on Veffels for defraying the Expence of
the Light-Houfe on* Sandy-Hook.
Pafs'd the 20th December, 1763.

> Continued Chap.
> 1277.
> Expired 1ft Janu-
> ary, 1772.
> Provided for Ch.
> 1515.

---

## C H A P. MCCXXXI.

*An* ACT *impowering* John Cruger, Robert R. Livingfton, Philip Livingfton,
Leonard Lifpenard, *and* William Bayard, *Efquires, to receive from the
Colony of* Pennfilvania, *the Sum of* Four Thoufand Three Hundred and
Sixty-eight Pounds Two Shillings and Six-pence, *Sterling, overpaid to
the faid Colony, out of the Parliamentary Grant for the Service of the
Year One thoufand feven hundred and fixty.*
Pafs'd the 20th December, 1763.

> This Money being
> received and paid
> into the Treafury,
> the Act is therefore
> Obfolete.

---

## C H A P. MCCXXXII.

*An* ACT *to continue an Act, entitled,* An Act *for the Relief of Infolvent
Debtors, and for repealing the Acts therein mentioned, with an Addition
thereto.*
Pafs'd the 20th December, 1763.

> See Chap. 1148.
> Continued Ch. 1309.

---

## C H A P. MCCXXXIII.

*An* A C T *to prevent hunting with Fire-Arms in the City of
New-York, and the Liberties thereof.*
Pafs'd the 20th December, 1763.

WHEREAS it has long been the Practice of great Numbers of idle
and diforderly Perfons in and about the City of *New-York*, and
the Liberties thereof, to hunt with Fire-Arms, and to tread down the
Grafs, and Corn and other Grain ftanding and growing in the Fields and
Inclofures there, to the great Danger of the Lives of his Majefty's Sub-
jects, the Ruin and Deftruction of the moft valuable Improvements, the
grievous Injury of the Proprietors, and the great Difcouragement of their
Induftry.

> Preamble.

5 T                                           I. In

Case 1:23-cv-11195-UMB-JCO Document 100-19 Page 4469 of 546 PageID# 33290 Page 4D 1764

4th *GEORGE* III.
A. D. 1763.

Penalty for entering with Fire-Arms into any inclosed Land within this City or its Liberties.

Or paffing thro' Orchards, &c. without Arms.

Before whom Offenders to be convicted.

I. In order therefore the more effectually to punifh and prevent fuch Abufes as forefaid, **Be it Enacted** *by his Honour the Lieutenant Governor, the Council, and the General Affembly, and it is hereby Enacted by the Authority of the fame,* That if any Perfon or Perfons whatfoever, other than the Owner, Proprietor, or Poffeffor, or his or her white Servant or Servants, do and fhall, at any Time or Times from and after the Publication of this Act, carry, fhoot, or difcharge any Mufket, Fowling-Piece, or other Fire-Arm whatfoever, into, upon, or through any Orchard, Garden, Corn-Field, or other inclofed Land whatfoever, within the City of *New-York,* or the Liberties thereof, without Licence in Writing firft had and obtained for that Purpofe from fuch Owner, Proprietor, or Poffeffor of fuch Orchard, Garden, Corn-Field, or other inclofed Land ; or fhall enter into, or pafs through any Orchard, Garden, Corn-Field or Mowing-Ground, in any of the aforefaid Places without Fire-Arms, and thereof fhall be convicted before any Member of his Majefty's Council, either of the Juftices of the Supreme Court, or the Mayor, Recorder, or any one of the Aldermen of the City of *New-York,* for the Time being, by the Oath of one credible Witnefs, or by Confeffion of the Party offending, he, fhe, or they fo offending, fhall feverally forfeit and pay for every fuch Offence, the Sum of *Twenty Shillings*; to be recovered and applied in the Manner herein after directed.

Forfeitures how to be recovered and applied.

II. **And be it further Enacted** *by the Authority aforefaid,* That every Fine and Forfeiture, which fhall accrue upon or by Virtue of this Act, fhall be recovered, with reafonable Cofts, not exceeding *Ten Shillings,* by any Perfon or Perfons who fhall and will fue, and profecute for the fame ; One Half of fuch Fine and Forfeiture when recovered and received, to be applied to his, her, or their own Ufe; and the other Half thereof to be paid by him, her, or them, to the Church Wardens of the faid City for the Time being, for the Ufe of the Poor thereof.

Offenders to be imprifoned if the Fines are not paid,

Provifo.

III. **And be it further Enacted** *by the Authority aforefaid,* That every Offender, who fhall incur any fuch Fine or Forfeiture as aforefaid, fhall, by Warrant under the Hand and Seal of any Member of his Majefty's Council, Juftice of the Supreme Court, or the Mayor, Recorder, or Aldermen before whom he or they fhall be convicted, ftand and be committed to the Common Goal of the faid City, there to remain for the Space of three Months, unlefs the Fine or Forfeiture, with Cofts, be fooner paid. **Provided always,** That the Members of his Majefty's Council, and the Juftices of the Supreme Court, fhall be at Liberty to act in the Execution of this Law or not, as to them fhall feem fitting.

---

## C H A P. MCCXXXIV.

Expired 1ft *January,* 1770. Provided for Ch. 1441.

*An* ACT *to eftablifh the Rates to be taken for Wharfage of Ships and other Veffels ufing the Wharfs within the Limits therein mentioned,*

Pafs'd the 20th December, 1763.

---

## C H A P. MCCXXXV.

Obfolete.

*An* ACT *to raife, levy, and collect, the Sum of* Sixty-one Pounds Nineteen Shillings, *in the City and County of* New-York, *for Services performed by the Coroner of the faid City and County.*

Pafs'd the 20th December, 1763.

C H A P.

Case 1:21-cv-02501-MKB-VMS Document 80-1 Filed 11/02/22 Page 471 of 546 PageID #: 1765

Laws Of New-York, From The Year 1691, To 1773 Inclusive. Vol. 2, Hugh Gaine,
    MDCCLXXIV. The Making of Modern Law: Primary Sources, link.gale.
    com/apps/doc/DT0103403799/MMLP?u=efgssf&sid=bookmark-
    MMLP&xid=d8a580f7&pg=22. Accessed 12 Oct. 2022.

Case 1:23-cv-00108-...Document 48...Page 471 of... Date Filed 07/20/2023... ID: 1766

# A DIGEST

OF THE

# LAWS OF TEXAS:

CONTAINING THE LAWS IN FORCE,

AND

# THE REPEALED LAWS

ON WHICH RIGHTS REST,

FROM 1754 TO 1874,

## CAREFULLY ANNOTATED.

BY GEORGE W. PASCHAL,

*OF AUSTIN, TEXAS,*

LATE REPORTER OF THE SUPREME COURT OF TEXAS, AUTHOR OF PASCHAL'S ANNOTATED
CONSTITUTION, PASCHAL'S DIGEST OF DECISIONS, ETC., ETC.

### Fourth Edition—Volume II

WASHINGTON, D. C.:

## W. H. & O. H. MORRISON,

HOUSTON, TEXAS: E. H. CUSHING.

NEW YORK: BAKER, VOORHIS & CO.

1874,

JA1643

Entered according to Act of Congress, in the year 1874, by

GEORGE W. PASCHAL,

In the Office of the Librarian of Congress, at Washington, D. C.

STEREOTYPED AND PRINTED BY
M'GILL & WITHEROW,
WASHINGTON, D. C.

Case 1:23-cv-01008-DCN Document 48 Page 473 of Date Filed 07/26/2023 JA1645 ID: 1768

TITLE XI.—OF OFFENSES AGAINST THE PUBLIC PEACE.

CHAPTER I.—UNLAWFUL ASSEMBLIES.

**AN ACT TO AMEND THE PENAL CODE FOR THE STATE OF TEXAS.**

ART. 6508. [1] The penal code for the state of Texas [shall] be amended as follows, by inserting after article 363 the following: [363a] If the purpose of the unlawful assembly be to alarm and frighten any person or persons, by appearing in disguise, so that the real persons so acting and assembling cannot be readily known, and by using language or gestures calculated to produce in such person or persons the fear of bodily harm, all persons engaged therein shall be punished by fine not less than one hundred dollars nor more than one thousand dollars each; and if such unlawful assembly shall take place at any time of the night, that is, between sunset and sunrise, the fine shall be doubled; and if three or more persons are found together disguised, and armed with deadly weapons, the same shall be *prima facie* evidence of the guilty purpose of such persons, as above described; and if any other unlawful assembly mentioned in this chapter consist in whole or in part of persons disguised and armed with deadly weapons, the fine to be assessed upon each person so offending shall be double the penalty hereinbefore prescribed.

*Marginal notes:* 6 Nov., 1871; took effect from passage. Vol. 21, part 3. p. 19. Art. 1993. / Unlawfully appearing in disguise as Ku-klux, White Camelias, and other deviltry. punished. Arts. 7030–7036. / If at night, double punishment. / Three or more together. Prima facie evidence.

CHAPTER III.—AFFRAYS AND DISTURBANCES OF THE PEACE.

*Marginal note:* Arts. 2011–2013.

**AN ACT TO PROHIBIT THE DISCHARGING OF FIREARMS IN CERTAIN PLACES THEREIN NAMED.**

*Marginal note:* 12 Nov., 1866; took effect 13 Jan., 1867. Vol. 20, p. 210.

ART. 6508a. [1] It shall not be lawful for any person to discharge any gun, pistol, or firearms of any description whatever, on, or across any public square, street, or alley, in any city or town in this state: *Provided*, This act shall not be so construed as to apply to the "outer town," or suburbs, of any city or town.

*Marginal note:* Discharging firearms within municipal limits made unlawful;

ART. 6508b. [2] Any person who shall discharge any firearms, in violation of the provisions of the first section of this act, shall be deemed guilty of disturbing the public peace, and on conviction thereof, before any court having competent jurisdiction, shall be fined in any sum not exceeding one hundred dollars, to be recovered as other fines and penalties.

*Marginal note:* and punished, as disturbance of the peace, by fine not exceeding $100.

**AN ACT TO AMEND ARTICLE 382, TITLE XI, CHAPTER 3, OF THE PENAL CODE.**

*Marginal note:* 26 Oct., 1866; took effect from passage. Vol. 20, p. 60. Disturbance of the peace, &c., by quarreling. Art. 2012.

ART. 6509. [1] Article 382, title XI, chapter III, of the penal code, shall hereafter read as follows: If any one or more persons shall, in any public place, by loud and vociferous talking, swearing, or rudely displaying any pistol, or other deadly weapon, so as to disturb the inhabitants of the place in the prosecution of their lawful business, any person engaged in such disturbance shall be fined in any sum not exceeding fifty dollars.*

*Marginal note:* Fine not to exceed $50.

**AN ACT TO PROHIBIT THE CARRYING OF FIREARMS ON PREMISES OR PLANTATIONS OF ANY CITIZEN WITHOUT THE CONSENT OF THE OWNER.**

*Marginal note:* 6 Nov., 1866; took effect 13 Jan., 1867. Vol. 20, p. 90.

ART. 6510. [1] It shall not be lawful for any person or persons to carry firearms on the inclosed premises or plantation of any citizen, without the consent of the owner or proprietor, other than in the lawful discharge of a civil or military duty, and any person or persons so offending shall be fined a sum not less than one nor more than ten dollars, or imprisonment in the county

*Marginal note:* Carrying firearms an offense. / $10 fine, or ten

* 1330a. This is sufficiently certain and complete. *Sisk v. The State*, 35 Tex., 496.

days' imprison-
ment.

jail nor less than one day nor more than ten days, or both, in the discretion of the court or jury before whom the trial is had.

### AN ACT REGULATING THE RIGHT TO KEEP AND BEAR ARMS.

12 Aug., 1870;
took effect 12
Oct., 1870. Vol. 21,
part 1, p. 63.
Persons not to
bear arms at pub-
lic assemblies.
Social inter-
course and elec-
tions not to be
made dangerous.

ART. 6511. [1] If any person shall go into any church or religious assembly, any school-room or other place where persons are assembled for educational, literary, or scientific purposes, or into a ball-room, social party, or other social gathering, composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk, or butcher-knife, or fire-arms, whether known as a six-shooter, gun, or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same: *Provided*, That nothing contained in this section shall apply to locations subject to Indian depredations: *And provided further*, That this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law.

Art. 6512.

Kinds of weapons
prohibited.

Fine $50 to $500.
Notes, 111, 167.

Scalp-lifting
country except-
ed.

Armed officials.

### AN ACT TO REGULATE THE KEEPING AND BEARING OF DEADLY WEAPONS.

12 April, 1871;
took effect 12
June, 1871. Vol.
21, part 2, p. 25.
Carrying arms a
misdemeanor,
punishable by
fine and forfeit-
ure, unless, &c.
Patriots and mili-
tiamen excepted.
Art. 6511.
[This section is
constitutional.
*English v. The
State*, 35 Tex.,
474.]

ART. 6512. [1] Any person carrying on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purpose of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense the state, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed: *Provided*, That this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the state from keeping or carrying arms with their baggage: *Provided further*, That members of the legislature shall not be included under the term "civil officers" as used in this act.

Fine $25 to $100
for first offense.

Imprisonment
for second of-
fense.
Notes 111, 167.

People at home
and officials ex-
cepted.
[Carrying weap-
ons to and from
market is within
the proviso. *Wad-
dell v. The State*,
37 Tex., 356. But
carrying a pistol
hog hunting in
the woods is not
within the ex-
ception. *Baird
v. The State*, 39
Tex., 600.]
Art. 6512.
Justification
must be immedi-

ART. 6513. [2] Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was

shall have power to grant a "leave of absence" to all inmates of the institution who shall prove by their diligence and upright behavior that they are entitled to the same; *provided*, that such "leave of absence" shall be given only upon the condition that such youth shall continue to lead a useful and honorable life; and the board shall have full power to recall all such absentees who may lapse into their former vicious habits.

Section 18. Any boy or girl committed to the state reform school shall be there kept, disciplined, instructed, employed, and governed until he or she arrives at the age of majority, or is bound out, reformed, or legally discharged under the direction and discretion of the said board. The binding out or discharge of a boy or girl as reformed, or having arrived at the age of majority, shall be a complete release from all penalties incurred by conviction of the offense for which he or she was committed, except as provided for in section 17 of this act.

Section 19. If any boy or girl convicted of any misdemeanor, committed to the reform school, shall prove unruly or incorrigible, or if the board of trustees shall decide that his or her presence is dangerous to the welfare of the school, the board shall have power to order his or her return to the county from which he or she came and deliver to the sheriff of the said county, and proceedings against him or her shall be resumed as if no warrant or order committing him or her to the reform school had been made; and the said sheriff shall be notified of such order by the superintendent of the school, and shall immediately, or at the earliest practicable day thereafter, visit the said school and receive such youth from the authorities of said institution.

Section 20. When any youth are committed to the reform school all expenses occurring in such cases, including the cost of transportation, both going and coming, shall be borne by the county from which such youth are committed. Commitments to said reform school shall be made in accordance with the provisions of this act; *provided, however*, that upon the application to the proper court by any religious society or body to which said youth or the parents of said youth may belong for the custody of such youth, when such religious society or body has provided a suitable institution for the care and reform of delinquent children or minors, the court, upon satisfactory showing by such religious society or body of such fact, may commit such minor to such religious institution.

Section 21. Upon the temporary or permanent discharge of any person committed to the reform school, the superintendent shall provide him with suitable clothing and procure transportation for him to his home, if resident in this state, or to the county in which

he may have been convicted; *provided*, that such discharge shall be approved by the said board of trustees; *and provided further*, that all expenses of transportation occurring in such cases shall be paid by the counties from which such youth were committed.

Section 22. If any parent or guardian or master to whom a youth has been apprenticed, or any person occupying the position of a parent, protector, or guardian in fact or in reality by blood or marriage, shall feel aggrieved by such commitment to such institution, he [may] make written application to the board of trustees of the institution for the discharge of such youth, which application shall be filed with the superintendent, who shall inform the board thereof, and the same shall be heard and determined by such board at such time and place as they shall appoint for that purpose, not later than the next regular meeting of the board. Such application shall state the grounds of the applicant's claim to the custody of the youth, and the reasons for claiming such custody. Within ten days after hearing said application, the board shall make and announce their opinion thereon, and if they shall be of the opinion that the welfare of such youth would be promoted by granting the application, they shall make an order to that effect; otherwise they shall deny the application; *provided*, that all expenses occurring in such cases shall be paid by said parents, guardians, or masters.

Section 23. Whenever the number of boys committed to the reform school shall exceed the accommodations thereof, it shall be the duty of the board of trustees to notify all the proper courts of the same, and no more commitments to the school shall be made until due proclamation shall have been made by the board of trustees that additional room has been provided.

Section 24. If any person shall procure the escape of any youth committed to the reform school, or devise, or connive at, aid or assist in such escape, or conceal any such youth so committed after such escape, he shall, upon conviction thereof in any court of competent jurisdiction, be punished by a fine of not less than one hundred nor more than one thousand dollars, or be imprisoned in the county jail not less than two months nor more than one year, or by both such fine and imprisonment; or if such youth so convicted be under the age of sixteen years, then he shall be committed to the reform school, as in this act provided.

Section 25. So much of the acts entitled "An act to establish a reform school for juvenile offenders, and erect necessary buildings therefor," approved February 18, 1889, and "An act to provide for the further establishment, advancement, and development of the state reform school," approved February 20, 1891, as is in conflict with the provisions of this act, is hereby repealed.

JA1648

Case 3:23-cv-01994-IM Document 43 Page 477 Filed 07/26/2023

Section 26. Inasmuch as there is urgent need for the application of the amendments herein made, this act shall be in force from and after its approval by the governor.

Filed in the office of the secretary of state, February 20, 1893.

AN ACT [s. b. 164].

To Amend an Act entitled "An Act to Protect Hotel Keepers, Inn-keepers, and Boarding-house Keepers," approved February 25, 1889.

*Be it enacted by the Legislative Assembly of the State of Oregon:*

Section 1. That section 1 of an act entitled "An act to protect hotel keepers, inn-keepers, and boarding-house keepers," approved February 25, 1889, be and the same is hereby amended so as to read as follows:—

Sec. 1. Hotel keepers, inn-keepers, lodging-house keepers, and boarding-house keepers shall have a lien upon the baggage, clothing, jewelry, and other valuables of their guests, lodgers, or boarders brought into such hotel, inn, lodging-house, or boarding-house by such guest, lodger, or boarder for the reasonable charges due from such guests, lodgers, or boarders for their accommodation, board, or lodging, and such extras as are furnished at the request of such guest, lodger, or boarder; and such hotel keeper, inn-keeper, lodging-house keeper, or boarding-house keeper may retain and hold possession of such baggage, clothing, jewelry, and other valuables until such charges be paid.

Filed in the office of the secretary of state, February 20, 1893.

AN ACT [s. b. 179.]

To Amend Section 1 of an Act entitled "An Act to Amend Sections 2246 and 2247 of the Laws of Oregon, as Compiled and Annotated by W. Lair Hill, Relating to the Boundaries of Clatsop County, and the Line of Boundary between the Counties of Clatsop and Tillamook," approved February 20, 1891.

*Be it enacted by the Legislative Assembly of the State of Oregon:*

Section 1. That section 1 of an act entitled "An act to amend sections 2246 and 2247 of the laws of Oregon, as compiled and annotated by W. Lair Hill, relating to the boundaries of Clatsop county and the line of boundary between the counties of Clatsop and Tillamook," be and the same is hereby amended so as to read as follows:—

JA1649

Sec. 1. That section 2246 of the general laws of Oregon, as compiled and annotated by W. Lair Hill, relating to the boundaries of the county of Clatsop, be and is hereby amended so as to read as follows:

§ 2246. The boundaries of the county of Clatsop shall be as follows: Commencing at a point where the west boundary line of Columbia county intersects the line of low tide on the south shore of the Columbia river, and thence southerly along the west boundary line of Columbia county to and along the line between ranges five and six west of the Willamette meridian to an intersection with the line dividing townships numbered three and four north; and thence west along the line dividing townships numbered three and four north to the shore of the Pacific ocean; and thence west to the west boundary line of the state of Oregon; and thence northerly along said west boundary line of said state to a point due west of and opposite the middle of the north ship channel of the Columbia river; thence easterly to and up the middle channel of said river along the north boundary line of the state of Oregon to a point due north of the point of beginning, and thence south to the point of beginning. And said Clatsop county and the courts in and for the said county are hereby vested with jurisdiction in civil and criminal cases upon the Columbia river to the north shore thereof opposite the said county of Clatsop.

Filed in the office of the secretary of state, February 20, 1893.

---

AN ACT                              [s. b. 207.]

To Change the Boundary Line of Multnomah and Clackamas Counties in the State of Oregon.

Be it enacted by the Legislative Assembly of the State of Oregon:

Section 1. That portion of Clackamas county, Oregon, lying within the present boundary lines of the city of Sellwood, and described as follows: Commencing at a point at the ¼ post between sections 23 and 26, township 1 south, range 1 east; thence east to the east line of said city of Sellwood; thence south along the east line of said city of Sellwood to the southeast corner of said city; thence west and westerly along the south line of said city to the center of the Willamette river; thence down the center of said river to the line between sections 22 and 27, township 1 south, range 1 east; thence east along the line between sections 22, 27. 23, and 26 to the place of beginning,—be and the same is hereby detached from the county of Clackamas and annexed to the county

Case 1:24-cv-01151-CDS Document 48-86 Page 479 of 546 Filed 07/26/2023 page 11

of Multnomah. All acts and parts of acts in conflict with this act are hereby repealed.

Section 2. The county court of Multnomah county, Oregon, shall procure or cause to be procured properly attested copies of the records of Clackamas county, Oregon, affecting the title to real estate situated in the territory described in section one of this act, and have the same recorded in the records of Multnomah county, Oregon, and thereafter such records shall be recognized and become a part of the official records of said Multnomah county, Oregon.

Filed in the office of the secretary of state, February 20, 1893.

---

## AN ACT [ s. b. 15.]

To Prevent a Person from Trespassing upon any Enclosed Premises or Lands not His Own Being Armed with a Gun, Pistol, or other Firearm, and to Prevent Shooting upon or from the Public Highway.

*Be it enacted by the Legislative Assembly of the State of Oregon:*

Section 1. It shall be unlawful for any person, other than an officer on lawful business, being armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof.

Section 2. It shall be unlawful for any person to shoot upon or from the public highways.

Section 3. It shall be unlawful for any person, being armed with a gun or other firearm, to cause, permit, or suffer any dog, accompanying such person, to go or enter upon any enclosed premises without the consent of the owner or possessor thereof; *provided,* that this section shall not apply to dogs in pursuit of deer or varmints.

Section 4. Any person violating the provisions of this act shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not less than fifteen dollars nor more than fifty dollars, and in default of the payment of the fine imposed shall be committed to the county jail of the county in which the offense is committed, one day for every two dollars of the said fine.

Section 5. Justices of the peace for the proper county shall have jurisdiction of the trial of offenses herein defined.

Filed in the office of the secretary of state, February 20, 1893.

JA1651

Case 6:23-cv-00986-ADS   Document 48-86   Page 480   Date Filed 07/26/2023

<center>AN ACT       [ H. B. 318.]</center>

**To Reïmburse Certain Counties in this State, entitled to Rebate on Account of Overpaid Taxes.**

Whereas under a decision of the supreme court of the state of Oregon, filed June 18, 1892, certain taxes levied by the governor, the secretary of state, and state treasurer, acting jointly as a state board of levy, were declared illegal; and whereas prior to the rendition of the decision referred to, sundry amounts were paid into the state treasury and the official receipt of the state treasurer issued therefor to the treasurers of the counties hereinafter named, thus overpaying the amount due from said counties for the year 1891; therefore,

*Be it enacted by the Legislative Assembly of the State of Oregon:*

Section 1. That the state treasurer be and hereby is authorized and directed to credit the counties hereinafter named with the amounts overpaid by them on account of state taxes for the year 1891, upon any taxes now due, or that may become due from such counties, as follows:—

To Columbia county —
Current expense tax, 1891_____ _____$152 54
Militia tax, 1891_____   6 55
University tax, 1891_____   4 68—$163 77
    To Grant county —
Militia tax, 1891_____ _____$  2 56
University tax, 1891_____   1 83—$   4 39
    To Harney county —
Militia tax, 1891_____ _____$ 34 95
University tax, 1891_____ _____   24 96—$ 59 91
    To Josephine county —
Current expense tax, 1891_____$483 81
Militia tax, 1891_____ _____   21 77
University tax, 1891___'_____   14 83—$520 41
    To Klamath county —
Militia tax, 1891_____ _____$ 34 58
University tax, 1891_____   24 68—$ 59 26
    To Lake county —
Militia tax, 1891_____ _____$ 67 94
University tax, 1891_____   48 54—$116 48
    To Lane county —
Militia tax, 1891_____ _____$ 14 53
University tax, 1891_____   10 37—$ 24 90

JA1652

Case 3:23-cv-00901-AJB-DDL Document 43 Page 481 of Date Filed 07/26/2023

To Sherman county —
Current expense tax, 1891_____$ 19 29
Militia tax, 1891_____ ____ _____     82
University tax, 1891_____ ___ _____     59—$ 20 70

Section 2.   That the state treasurer be and is hereby authorized and directed to credit to Umatilla county on account of the current expense and the special state taxes for 1891, the sum of $224.05, on account of errors in the assessment roll of said county of 1891, as shown by a statement on file in the office of the secretary of state.

Section 3.   Inasmuch as the counties named have been for several months deprived of the use of the several amounts named, this act shall take effect and be in force from and after its approval by the governor.

Approved February 21, 1893.

[NOTE.—See note respecting H. B. 318 under head of "Certificate of Secretary of State," post.]

## AN ACT [S. B. 159.]

#### To Provide for the Satisfaction of Mortgages when Foreclosed.

*Be it enacted by the Legislative Assembly of the State of Oregon:*

Section 1.   That it shall be the duty of all clerks of the circuit court in the counties where there is a recorder, whenever a decree of foreclosure shall be returned in such court foreclosing a mortgage on real estate, to make out a certificate stating that such mortgage has been foreclosed, and the date of such foreclosure, and the number of the journal and page thereof in which such decree is entered, and deliver the same to the recorder, and thereupon such recorder shall enter upon the margin of the record of such mortgage the word "foreclosed," and the date of such foreclosure with the number and page of the journal of such decree.

Section 2.   In counties where the county clerk acts as recorder of conveyances, he shall, upon the entry of any decree foreclosing a mortgage on real estate, make on the margin of the record of such mortgage the record provided for in section 1 of this act.

Section 3.   Whenever any person shall present to the recorder of conveyances, or county clerk acting as such, a certificate from the clerk of the United States circuit court of the foreclosure of any mortgage on real estate, as provided in section 1 of this act, such recorder shall make the record so provided in such section.

Approved February 21, 1893.

6

JA1653

## AN ACT      [ s. b. 145.]

To Authorize County Courts to Offer Rewards for the Apprehension of Crimi-
nals and Fugitives from Justice.

*Be it enacted by the Legislative Assembly of the State of Oregon:*

Section 1. If any person or persons charged with or convicted
of any felony within this state, shall break prison, escape, or flee
from justice, or abscond, or secrete himself, in such cases it shall be
lawful for the county court of such county where said crime has
been committed, if the said court shall deem necessary, to offer a
reward not to exceed the sum of one thousand ($1,000) dollars for
the apprehension and delivery of each of the bodies of said person
or persons to the custody of such officer as the said court shall
direct.

Section 2. Any person apprehending and delivering the body
or bodies of such person or persons to the proper officer and pro-
ducing to the county court the receipt of such officer, shall be
entitled to and shall be paid the reward offered by the county
court.

Section 3. The county court shall on the presentation of the
duly certified claim of the applicant for reward and accompanied
by the proper orders and receipts, shall certify the amount offered
in such reward to the county clerk of such county under the seal
of such county court, and the county clerk of such county shall
draw a warrant on the treasurer of such county for the amount so
authorized.

Section 4. If the sheriff of any other county than the one
where said crime was committed apprehend the said criminal, he
shall elect to receive either the reward offered or the regular fees
allowed him by law for such service.

Approved February 21, 1893.

---

## AN ACT      [ s. b. 59.]

To Amend an Act entitled "An Act to Provide Times and Places of Holding
the Terms of Court in the Sixth Judicial District of the State of Oregon,
and to Repeal all Acts and Parts of Acts in Conflict with this Act," and to
Increase the Salaries of the Judges therein.

*Be it enacted by the Legislative Assembly of the State of Oregon:*

That an act entitled an act to provide the time and places of
holding the circuit court in the sixth judicial district in the state of
Oregon, and to repeal all acts and parts of acts in conflict with this

Case 3:24-cv-01098-IM Document 43-6 Page 3486 of Date Filed 07/26/2023 Page 1

act, which act was approved February 20, 1891, be and the same is hereby amended so as to read as follows:—

Section 1. That the circuit court of the state of Oregon in and for the sixth judicial district of said state, shall be held each year at the county seat of the respective counties of said district as follows, to wit:—

In the county of Umatilla, on the third Monday in January, the first Monday in June, and the second Monday in October.

In the county of Union, on the fourth Monday in February, the second Monday in July, and the fourth Monday in October.

In the county of Wallowa, on the third Monday in April and the third Monday in September.

In the county of Baker, on the third Monday in June, the second Monday in November, and the second Monday in February.

In the county of Malheur, on the first Monday in June and the fourth Monday in November.

In the county of Grant, the fourth Monday in May and the second Monday in October.

In the county of Harney, on the third Monday in May and the fourth Monday in October.

Section 2. Inasmuch as there exists at the present, in order to dispatch the business of said district, a necessity for the passage of this act, it is further provided that the same shall be in force and effect from and after its approval by the governor.

Approved February 21, 1893.

———

### AN ACT [S. B. 45.]

To Amend Section 951 of Title I. of Chapter XII. of the Code of Civil Procedure, as Compiled and Annotated by W. Lair Hill, and Section 954 of Title II. of Chapter XII. of the Above-mentioned Code, and Sections 958 and 968 of Title III. of Chapter XII. of the Above-mentioned Code.

*Be it enacted by the Legislative Assembly of the State of Oregon:*

Section 1. That section 951 of title I. of chapter XII. of the code of civil procedure, as compiled and annotated by W. Lair Hill, be and the same is hereby amended so as to read as follows:—

§ 951. A person may be excused from acting as a juror when his own health or the death or sickness of a member of his family requires his absence; but no person shall be required to serve as a petit juror at any one term of the court for more than four weeks, and shall upon application be entitled to be discharged from further attendance upon the court as such juror at such term, after he has served for such period of four weeks as aforesaid.

84 GENERAL LAWS.

Section 2. That section 954 of title II. of chapter XII. of the code of civil procedure, as compiled and annotated by W. Lair Hill, be and the same is hereby amended so as to read as follows:—

§ 954. The jury list shall contain the names of at least two hundred persons, if there be that number of qualified jurors upon the assessment roll, and not more than six hundred persons. They shall be selected from the different portions of the county in proportion to the number qualified upon the assessment roll as much as practicable.

Section 3. That section 958 of title III. of chapter XII. of the above-mentioned code, be and the same is hereby amended so as to read as follows:—

§ 958. For the circuit court, thirty-one names shall be drawn, from which number the grand and trial jurors for the term are selected, as elsewhere provided in this code; provided, that in districts composed of no more than one county and having more than one judge of that circuit court in said district, a large number of jurors shall be drawn when ordered by the oldest judge in commission of such circuit court, in his discretion; or, in case of his absence or inability to act, the next oldest in commission. For the county court, twelve names shall be drawn, from which number the trial juries are selected in like manner.

Section 4. That section 968 of title III. of chapter XII. of the above-mentioned code, be and the same is hereby amended so as to read as follows:—

§ 968. Whenever, for any reason, the number of jurors, either in whole or in part, required by this code, do not attend a term of the court, or when they have served the full time required by this code as jurors, and have been discharged, as elsewhere provided, the court has power to order an additional number of jurors drawn from the jury box to fill up the regular panel in the same manner as the original panel is required to be drawn, which jurors shall be summoned and required to attend as jurors in the same manner and with like effect as if drawn on the original panel; provided, that whenever the regular panel becomes exhausted for any reason, the court may in its discretion direct the sheriff to summons forthwith from the body of the county, persons whose names are upon the tax roll and having the qualifications of jurors to serve in said cause, but persons so summoned from the body of the county shall not be disqualified by reason thereof from being drawn and serving as jurors upon the regular panel as hereinbefore provided and shall not be subject to challenge for that cause.

Approved February 21, 1893.

AN ACT [S. B. 22.]

To Define and Punish Obstruction to Railroads, Railroad Trains, Railroad Tracks, Street Cars and Street-Car Tracks in the State of Oregon, and to Protect the Passengers and Employés Riding upon any Train or Car in said State.

*Be it enacted by the Legislative Assembly of the State of Oregon:*

Section 1. Any person who shall wilfully or maliciously place any obstruction on any railroad track or roadbed, or street-car track in the state of Oregon, or who shall, without the right so to do, loosen, tear up, remove, or misplace any rail, switch, frog, guard-rail, cattle-guard, or any part of such railroad track or roadbed or street-car track, or who shall, in any manner so as to endanger the safety of any train, car, or engine, or so as to endanger or injure any passenger or person riding thereon, tamper with or molest any such road, roadbed, track, signal flag or signal torpedo, shall, upon conviction thereof, be punished by imprisonment in the penitentiary not exceeding ten years or by imprisonment in the county jail not exceeding one year.

Section 2. Any person who shall, within the state of Oregon, wilfully or maliciously place any obstruction upon any railroad track or roadbed, or street-car track, or shall misplace, remove, obstruct, detach, damage, or destroy any rail, switch, frog, guard-rail, cattle-guard, or any other part of such railroad track or roadbed or street-car track, thereby causing the death of any passenger or employé of such railroad or street railway, shall, upon conviction thereof, be deemed guilty of murder and punished accordingly.

Section 3. Whereas the public safety is imperiled on account of attempted train wrecks by evil-minded persons, and there is no adequate protection against the same under existing law, this act shall take effect and be in force from and after its approval by the governor.

Approved February 21, 1893.

---

AN ACT [H. B. 379.]

To Provide for the Collection of Taxes.

Whereas the act known as house bill No. 125, passed at the present session of the legislature, appears to repeal the method now provided for the collection of taxes on mortgages for the year 1892 as same are now assessed and have been equalized on the assessment rolls for said year; and whereas it was not intended that

2-Case423-R90B-AN Document 48t 88 Page: F86 02 Date Filed 07/20/2023 ge

Louisiana. Laws, statutes, etc. Revised
Statutes

# AN ANNOTATED
# REVISION

——OF THE——

# STATUTES OF LOUISIANA
## THROUGH THE SESSION OF 1915

CONTAINING ALL THE EXISTING LAWS OF THE STATE
OF A GENERAL CHARACTER, EXCEPT THOSE
EMBRACED IN THE REVISED CIVIL CODE
OF 1870 AND THE REVISED CODE OF
PRACTICE OF 1870, ARRANGED IN
ORDER AND REDUCED TO
ONE CONNECTED TEXT

*BY*

## ROBERT H. MARR
### OF THE NEW ORLEANS BAR

*Jam vero illud stultissimum, existimare omnia justa esse, quae sita
sint in populorum institutis aut legibus,* Cic. de Leg. I. 15.

## VOLUME I.

S
11:/L
263A1
F15

PUBLISHED BY
### F. F. HANSELL & BRO., Ltd.
### NEW ORLEANS

JA1658

COPYRIGHT 1915
F. F. HANSELL & BRO., Ltd.
NEW ORLEANS, LA.

AUG 31 1915

PRESS OF
HAUSER PRINTING CO.
NEW ORLEANS

# PREFACE

———

This compilation follows as nearly as may be the Revised Statutes of 1869 (adopted as Act 96 of 1870). During the forty-six years since the last authoritative revision, we have had in Louisiana forty-four sessions of the General Assembly and three Constitutional Conventions, and are now upon the eve of another Convention. Thus necessarily many of the provisions of the Revised Statutes have been rendered inoperative and many have been repealed directly. Other sections have been held by our Supreme Court unconstitutional. The legislation upon wholly new subjects is of huge bulk.

An alphabetical arrangement of subjects can never be a logical arrangement, and such an arrangement increases the number of unavoidable repetitions. The constant recurrence of the same sections printed with a different number under a different heading is one of the serious imperfections of our authorized Revision. These repetitions I have tried to reduce to a minimum.

The whole body of the law may be classified under three headings: Public law, private law and procedure. Strictly speaking, the Revised Statues ought to contain only the public statutes, that is to say, statutes regulating the duties and fixing the powers of public officers, and laws regulating the public duties and public rights of persons. Put into definitions: The Revised Statutes are a digest of the statutes defining the mutual rights and obligations of State and individual. The Civil Code, or Code of Private Law, is the codification of all the statutes defining the mutual rights and obligations of persons; the Code of Practice is the codification of all the legal modes of enforcing rights and obligations, and consists of two parts: The Rules of Civil Procedure and the rules of Criminal Procedure. We have in Louisiana no Code of Criminal Procedure and so little legislation on the subject that all of it is comprised within 156 sections of this Revision. The fundamental classification of private statutes, public statutes and procedure is not closely followed in our two Codes, and altogether lost sight of in our Revised Statutes.

Those sections of the Revised Statutes identical with Articles of the Revisions of 1870 of the Civil Code or Code of Practice have been omitted, but all amendments to the Codes subsequent to 1870 have been included.

In this Revision my effort (within the limitations imposed by the Revised Statutes of 1870) has been to present just such work as would have been presented had my employment been public, but, of course, the unofficial compiler cannot confer the blessings of the repealing clause. Gibbon does not believe that Justinian resorted to the rather primitive method of repeal by reducing to ashes all the laws of a more ancient date than his own; and it may be that R. S. 3990, repealing all prior laws on the same subject matters, except such as are contained in the Revisions of 1870, does not hark back to that Legislator whose name "is inscribed on a fair and everlasting monument," but whatever the origin of the provision it is inherently of great value.

JA1660

## PREFACE.

The purpose of this compilation is to present the actual law, therefore, all statutes and all parts of statutes which have been repealed or held unconstitutional by our own Supreme Court, or by the Supreme Court of the United States have been omitted. So far as I know, the only repealed statute in this Revision is Act 17 of 1876 (1167, p. 368); and the reason for inserting it is, that under the power conferred by Act 70 of 1884 (1173, p. 370) the Supreme Court has adopted this Act of 1876 as a rule of Court.

While these volumes were in press the Legislative Session of 1915 was held, but, as far as possible, the Acts of that session have been inserted in their proper places. Act 203 of 1914 (printed, in part, as 1262-1266, pp. 397, 398) has been replaced by Act 23 of 1915, but it was adopted too late to make possible the proper correction under Common Carriers, but has been inserted in Vol. II, p. 1499, under Liquor Laws.

In State vs. Jackson (not yet reported) Act 204 of 1914 was held unconstitutional. This Act is printed as 2099-2101, p. 285, under Crimes.

In State vs. Dantonio, 67, S. 828, it was held that that part of Sec. 45, Act 14, of 1914, conferring upon the City Court of Bogalusa *exclusive* criminal jurisdiction was unconstitutional. Had this decision been received in time, "exclusive" would have been stricken from the section, and the decision inserted as a note to 3850, p. 1341.

Much time, thought, and hard work have been expended upon this Revision, and whether good, bad, or indifferent, honestly, it is the best that I can do.

Most law-book prefaces are addressed to a "generous profession," but, while generous, lawyers, like wives, are, *virtute officii*, critics. It is, therefore, certain that these volumes will come in for a full and fair share of censure. My brethren of the bench and bar, who have always been pretty good to me anyhow, are here afforded an opportunity to be both critical and generous: say what you please about the book, but be generous enough not to tell me of its failings and shortcomings. In due time, I shall find a good many faults myself without any outside help, and each such discovery will mean a pang.

On a certain sunny morning at Arpinum, Atticus and Brother Quintus suggested to their host Cicero—he was then out of politics and big cases had quit coming his way—that he ought to write works on the Civil Law. Cicero's reply well expresses the prevailing view of the lawyers of to-day: *"Egone? Quam ob rem quo me vocas aut quid hortaris? ut libellos conficiam de stillicidiorum ac de parietum jure? an ut stipulatiorum et judiciorum formulas componam? quae et conscripta a multis sunt diligenter et sunt humiliora quam illa, quae a nobis expectari puto."*

This work was undertaken with a light heart and with no just appreciation of the task before me; but it soon became apparent that Sinbad's old man of the sea had fastened his legs around my neck and was firmly seated on my back. At last the burden has been gotten rid of, and I think I know what Simeon felt when he said, "Lord, now lettest thou thy servant depart in peace."

July 2, 1915.

ROBERT H. MARR.

### Breaking Contribution Box.

**1806.** [Act 25, 1912, p. 511.] Any person who shall break open, or attempt to break open, any box or any other receptacle, in any church or any other place, where money is deposited shall be guilty of a misdemeanor, and upon conviction, shall suffer imprisonment for a term of not less than three months nor more than two years, at the discretion of the court.

## TRESPASS.

### Taking Possession of Realty; Destruction of Fences.

**1807.** [R. S. 818.] Whoever shall take possession of any tract of land, or any part thereof, or of any house or other tenement, being the property of another person, without any legal right so to do (and whose possession shall not have continued for one year without disturbance) or shall wilfully, maliciously, burn, tear down, cut, break, tear loose or down any wire fence, or any part thereof, or otherwise impair or destroy the enclosure or fence around or protecting the field, pasture, or lot of ground belonging to any person, corporation or institution, shall on conviction be fined not less than fifty dollars or more than one thousand dollars or imprisoned not less than ten days nor more than six months or both at the discretion of the court. (Amd. Act 85, 1890, p. 90.)

### Taking Possession of Sixteenth Section.

**1808.** [Sec. 2, Act 14, 1882, p. 10.] Whoever shall knowingly use, cultivate or inclose any free school land, known as the sixteenth section, without authority from the parish Board of School Directors, shall on conviction be condemned to pay a fine or not less than fifty, nor more than one thousand dollars, and in default of the same, be sentenced to imprisonment not less than ten days, nor more than one year.

### Entering Another's Plantation With Firearms.

**1809.** [R. S. 821.] It shall not be lawful for any person or persons to carry firearms on the premises or plantations of any citizen, without the consent of the owner or proprietor, other than in the lawful discharge of a civil or military order; and any person or persons so offending shall be fined a sum not less than one dollar nor more than ten dollars, or imprisoned not less than one day nor more than ten days in the parish jail, or both, at the discretion of any court of competent jurisdiction.

JA1662

### Entering on Posted Premises.

**1810.** [R. S. 822.] Whoever shall enter upon any plantation or farm, or upon any grounds upon which crops or fruits of any kind are grown, or into any enclosure without the permission of the owner, shall upon conviction therefor be sentenced to pay a fine of not exceeding Fifty Dollars, or to imprisonment not exceeding ninety days, provided that this Act shall not apply except to such enclosures as are properly and sufficiently posted by the owner warning trespassers off such premises. (Amd. Act 162, 1910, p. 246.)

### TIMBER LAWS.

### Destruction of Timber.

**1811.** [R. S. 817.] Whoever shall wilfully and feloniously cut, pull down, burn, destroy, kill or deaden or carrying or float away, any trees, wood, or timber growing or lying on the land of another or lying in the water on the land of another, or cause same to be done without the consent of the owner or actual possessor thereof with authority, on conviction shall be fined not more than Five Hundred Dollars ($500.00) or be imprisoned for not more than two years at the discretion of the court and in default of payment of said fine and costs, shall be imprisoned not less than thirty days nor more than six months. (Amd. Act 135, 1912, p. 173.)

State vs. Prince, 42 A. 817; State vs. Gainey, 135 La. — (65 S. 609).

### Destroying Floating Timber Fastenings.

**1812.** [Sec. 1, Act 34, 1888, p. 26.] Whoever shall wilfully and maliciously cut, burn, break, pull out, or otherwise destroy any iron, rope, wooden or other fastening used to secure any floating timber in any of the waters of this State, shall be deemed guilty of misdemeanor, and on conviction shall suffer a fine not exceeding five hundred dollars or imprisonment not exceeding six months.

### Destroying Fastenings by Vessel.

**1813.** [Sec. 2.] Whoever being in command of any steam vessel, sailing or rowing craft, plying in the navigable waters of this State, shall wilfully and maliciously permit such vessel or craft to break or tear from its fastenings any booms or rafts of floating timber shall be punished as set forth in the preceding section of this act; provided that such timber is not impeding the free navigation of said stream.

 

DATE DOWNLOADED: Mon Feb 13 09:40:22 2023
SOURCE: Content Downloaded from HeinOnline

Citations:

Bluebook 21st ed.
1869-1870 [i] .

ALWD 7th ed.
, , 1869-1870 [i] .

Chicago 17th ed.
"," Tennessee - 36th General Assembly, 2nd Session : [i]-[i]


AGLC 4th ed.
'' Tennessee - 36th General Assembly, 2nd Session [i]

OSCOLA 4th ed.
'' 1869-1870 [i]

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
 Conditions of the license agreement available at
 https://heinonline.org/HOL/License
-- The search text of this PDF is generated from  uncorrected OCR text.

# ACTS

OF THE

# STATE OF TENNESSEE,

PASSED BY THE SECOND SESSION OF THE

## THIRTY-SIXTH GENERAL ASSEMBLY.

FOR THE YEARS 1869–70.

PUBLISHED BY AUTHORITY.

NASHVILLE:

JONES, PURVIS & CO., PRINTERS TO THE STATE.

1870

JA1665

boundary line; thence with said Wandville and Chestnut Bluff road, in a north-eastern direction, to a point where the Haywood and Lauderdale County line crosses said road, and that portion of Haywood lying west of said line as designated, be stricken off from Haywood and attached to Lauderdale County, also that portion of Thos. Lea's land lying in Haywood County, being about ten acres, be attached to Lauderdale County.

SEC. 2. *Be it further enacted*, The public welfare requiring it, that this Act take effect from and after its passage.

Passed June 6, 1870.

<div style="text-align:center">

W. O'N. PERKINS,
*Speaker of the House of Representatives.*
D. B. THOMAS,
*Speaker of the Senate.*

</div>

Approved June 17, 1870.

<div style="text-align:center">

D. W. C. SENTER,
*Governor.*

</div>

---

## CHAPTER XIII.

### AN ACT to Preserve the Peace and Prevent Homicide.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That it shall not be lawful for any person to publicly or privately carry a dirk, sword-cane, Spanish stiletto, belt or pocket pistol or revolver. Any person guilty of a violation of this section shall be subject to presentment or indictment, and on conviction, shall pay a fine of not less than ten nor more than fifty dollars, and be imprisoned at the discretion of the Court for a period of not less than thirty days nor more than six months, and shall give bond in a sum not exceeding one thousand dollars to keep the peace for the next six months after such conviction.

SEC. 2. *Be it further enacted,* That it shall be the duty of all peace officers in this State to see that the first section of this Act is strictly enforced, and if they know of its violation, it is hereby made their duty to report the same to the Grand Jury of their county at its next term after such violation, who shall proceed to make present-

*Marginal notes:* Carrying of arms privately. / Penalty. / Duty of officers.

ment without a prosecutor. All Sheriffs, Deputy Sheriffs, Coroners, Justices of the Peace and Constables shall be deemed peace officers under the provisions of this Act. *Peace offic'rs.* If any of the aforesaid officers fail or refuse to perform the duties required of them by the provisions of this Act, they shall be liable to presentment or indictment, and on conviction shall be fined not less than ten nor more than fifty dollars, and shall be dismissed from office, and shall be disqualified from holding said office for the period of *Penalty for neglect'g du- ty.* their unexpired term. It shall be the duty of the Grand Juries to send for witnesses in all cases where they have *Duty of gr'nd juries.* good reason to believe that the provisions of this Act have been violated, and upon satisfactory evidence of its violation, they shall make presentments of the same without a prosecutor. It shall be the duty of the Circuit *Judges' duty.* and criminal Judges and all other Judges whose Courts have criminal jurisdiction, to give this Act specially in charge to the Grand Jury at each term of the Court.

SEC. 3. *Be it further enacted,* That the provisions of *Officers, po-* the first section of this act shall not apply to an officer or *licemen, etc.* policeman while *bona fide* engaged in his official duties in the execution of process, or while searching for or engaged in the arrest of criminals; nor to any person who is *bona fide* aiding the officers of the law or others in the legal arrest of criminals, or in turning them over to the proper authorities after arrest; nor to any person who is not on a journey out of their county or State.

SEC. 4. *Be it further enacted,* It shall be the duty of the several courts in this State to give this act a liberal *Duty of* construction, so as to carry out its true intent and mean- *Courts.* ing. This act to take effect forty days from and after its passage.

Passed June 11th, 1870.

W. O'N. PERKINS,
*Speaker of the House of Representatives.*
D. B. THOMAS,
*Speaker of the Senate.*

Approved June 16, 1870.

D. W. C. SENTER,
*Governor.*

**1996 La. Sess. Law Serv. 1st Ex. Sess. Act 4 (S.B. 2) (WEST)**

LOUISIANA 1996 SESSION LAW SERVICE

1996 First Extraordinary Session

Additions and deletions are not identified in this document.

Vetoed provisions within tabular material are not displayed.

ACT NO. 4

S.B. No. 2

CONCEALED HANDGUNS—STATEWIDE PERMITS; NEGLIGENT CARRYING OF CONCEALED HANDGUN

AN ACT to amend and reenact R.S. 40:1379.1(I), 1379.3, 1381, and 1382, relative to concealed handgun permits; to authorize and provide relative to statewide permits for concealed handguns to be issued and administered by the Department of Public Safety and Corrections; to provide relative to application procedures; to provide relative to eligibility requirements and conditions; to provide relative to denial of an application; to provide relative to the revocation of a permit; to provide for the term of a permit; to provide for definitions; to provide relative to criminal penalties for violations; to provide relative to special officers and their commissions, powers, and duties; to provide for exceptions; to provide for prohibitions of concealed weapons in certain public facilities; to require certain notification to the Department of Public Safety and Corrections; to authorize the Department of Public Safety and Corrections to perform certain duties; to provide for sufficiency of the background check to meet certain other federal requirements; to provide for the offense of negligent carrying of a concealed handgun; and to provide for related matters.

Be it enacted by the Legislature of Louisiana:

Section 1. R.S. 40:1379.1(I), 1379.3, 1381, and 1382 are hereby amended and reenacted to read as follows:

<< LA R.S. 40:1379.1 >>

§ 1379.1. Special officers; powers and duties; concealed handgun permit

* * *

I. Special officer commissions shall be valid only for a period of one year from the date of their issuance. However, special officer commissions issued to employees of the department shall be valid until revoked by the superintendent.

* * *

<< LA R.S. 40:1379.3 >>

§ 1379.3. Statewide permits for concealed handguns; application procedures; definitions

A. Notwithstanding any other provision of law to the contrary, the deputy secretary of public safety services of the Department of Public Safety and Corrections shall issue a concealed handgun permit to any citizen who qualifies for a permit under the provisions of this Section and may promulgate rules and adopt regulations regarding concealed handgun permits in

accordance with the Administrative Procedure Act. The permit shall contain a permit number, expiration date, photograph, and the name, address, and date of birth of the permittee.

B. A concealed handgun permit issued pursuant to this Section shall grant authority to a citizen to carry a concealed handgun on his person.

C. To qualify for a concealed handgun permit, a citizen shall:

(1) Make sworn application to the deputy secretary of public safety services of the Department of Public Safety and Corrections. The application shall reflect training in pistols, revolvers, or both. Any permittee under this Section shall notify the department of any address or name change within thirty days of the change.

(2) Agree in writing to hold harmless and indemnify the department, the state or any peace officer for any and all liability arising out of the issuance or use of the concealed handgun permit.

(3) Be a resident of the state and have been a resident for six months or longer immediately preceding the filing of the application.

(4) Be twenty-one years of age or older.

(5) Not suffer from a mental infirmity due to disease, illness, or retardation which prevents the safe handling of a handgun.

(6) Not be ineligible to possess a firearm by virtue of having been convicted of a felony.

(7) Not have been committed, either voluntarily or involuntarily, for the abuse of a controlled dangerous substance, as defined by R.S. 40:961 and 964, or been found guilty of, or entered a plea of guilty or nolo contendere to a misdemeanor under the laws of this state or similar laws of any other state relating to a controlled dangerous substance within a five year period immediately preceding the date on which the application is submitted, or be presently charged under indictment or a bill of information for such an offense.

(8) Not chronically and habitually use alcoholic beverages to the extent that his normal faculties are impaired. It shall be presumed that an applicant chronically and habitually uses alcoholic beverages to the extent that his normal faculties are impaired if, within the five-year period immediately preceding the date on which the application is submitted, the applicant has been found guilty of, or entered a plea of guilty or nolo contendere to operating a vehicle while intoxicated, or has been committed, either voluntarily or involuntarily, for treatment as an alcoholic.

(9) Not have entered a plea of guilty or nolo contendere to or been found guilty of a crime of violence as defined in R.S. 14:2 at the misdemeanor level, unless five years have elapsed since completion of sentence or any other conditions set by the court have been fulfilled, or unless the conviction was set aside and the prosecution dismissed, prior to the date on which the application is submitted.

(10) Not have been convicted of, have entered a plea of guilty or nolo contendere to, or not be charged under indictment, or a bill of information for any crime of violence or any crime punishable by imprisonment for a term of one year or greater. A conviction, plea of guilty, or plea of nolo contendere under this Paragraph shall include a dismissal and conviction set-aside under the provisions of Code of Criminal Procedure Article 893.

(11) Not be a fugitive from justice.

(12) Not be an unlawful user of, or addicted to, marijuana, depressants, stimulants, or narcotic drugs.

(13) Not have been adjudicated to be mentally deficient or been committed to a mental institution.

(14) Not be an illegal alien in the United States.

(15) Not have been discharged from the Armed Forces of the United States with a discharge characterized as "Under Other than Honorable Conditions", a "Bad Conduct Discharge", or a "Dishonorable Discharge". In the case of Commissioned Officers and Warrant Officers of the United States Armed Forces, the punishment of "Dismissal" rendered subject to a verdict of "guilty" at a trial by military court-martial is deemed to be disqualifying under this Paragraph. For the purposes of this Paragraph, the United States Coast Guard is considered an armed force.

D.(1) In addition to the requirements of Subsection C of this Subsection, an applicant shall demonstrate competence with a handgun by any one of the following:

(a) Completion of any National Rifle Association handguns safety or training course conducted by a National Rifle Association certified instructor.

JA1669

(b) Completion of any Department of Public Safety and Corrections approved firearms safety or training course or class available to the general public offered by a law enforcement agency, college, or private or public institution or organization or firearms training school.

(c) Completion of any law enforcement firearms safety or training course or class approved by the Department of Public Safety and Corrections and offered for security guards, investigators, special deputies, or any division or subdivision of law enforcement or security enforcement.

(d) Possession of a current valid license to carry a concealed weapon issued by a parish law enforcement officer.

(e) Completion of any firearms training or safety course or class approved by the Department of Public Safety and Corrections.

(f) Completion of a law enforcement training academy program certified by the Council on Peace Officer Standards and Training.

(g) Completion of small arms training while serving with the Armed Forces of the United States of America as evidenced by any of the following:

(i) For personnel released or retired from active duty, possession of an "Honorable Discharge" or "General Discharge Under Honorable Conditions" as evidenced by a Department of Defense Form 214 (DD–214).

(ii) For personnel on active duty or serving in one of the National Guard or reserve components of the Armed Forces, possession of certification of completion of basic training with service record evidence of having successfully completed small arms training and qualification.

(h) The National Rifle Association's personal protection course.

(2) Instructors for any class, training, or course of instruction authorized by this Subsection, except for small arms training in military service as provided in Subparagraph (g) of this Section, shall be certified as an instructor by the National Rifle Association as an instructor for civilians or law enforcement or by the Council on Peace Officer Standards and Training as a firearms instructor. Any safety or training course or class as described in this Subsection, except for basic handgun training in military service provided in Subparagraph (g) of this Subsection, shall include instruction in child access prevention.

E. A photocopy of a certificate of completion of any of the courses or classes, or an affidavit from the instructor, school, club, organization, or group that conducted or taught said course or class attesting to the completion of the course or class by the applicant, or a copy of any document which shows completion of the course or class or confirms participation in firearms competition or honorable discharge shall constitute evidence of qualification pursuant to Subsection D of this Section.

F.(1) The deputy secretary shall revoke the permit if at any time during the permit period, the permittee fails to satisfy any one of the qualification requirements provided for in Subsection C of this Section.

(2) The deputy secretary shall revoke the permit for a violation of Subsection I of this Section or R.S. 40:1382.

G. Neither the state, the deputy secretary of public safety services, nor any applicable permitting process employee of the Department of Public Safety and Corrections shall be liable for acts committed by the permittee, unless the deputy secretary or applicable permitting process employee had actual knowledge at the time the permit was issued that the permittee was disqualified by law from carrying a concealed handgun.

H. The deputy secretary of public safety services of the Department of Public Safety and Corrections shall, within two working days of the initial application, notify the chief of police of the municipality and the chief law enforcement officer of the parish in which the applicant is domiciled of such application. Those officers shall have ten days to forward to the deputy secretary any information relating to the applicant's legal qualification to receive a permit. The deputy secretary of public safety services of the Department of Public Safety and Corrections shall issue timely and without delay the concealed handgun permit to all qualified applicants, which permit shall be for a term of four years and which shall be valid in all parishes statewide. The permit shall be retained by the permittee who shall immediately produce it upon the request of any law enforcement officer. Anyone who violates the provisions of this Subsection shall be fined not more than one hundred dollars.

I. (1) No individual to whom a concealed handgun permit is issued may carry and conceal such handgun while under the influence of alcohol or a controlled dangerous substance. While a permittee is under the influence of alcohol or a controlled

dangerous substance, an otherwise lawful permit is considered automatically suspended and is not valid. A permittee shall be considered under the influence as evidenced by a blood alcohol reading of .05 percent or greater by weight of alcohol in the blood, or when a blood test or urine test shows any confirmed presence of a controlled dangerous substance as defined in R.S. 40:961 and 964.

(2) A permittee armed with a handgun in accordance with this Section shall notify any police officer who approaches the permittee in an official manner or with an identified official purpose that he has a weapon on his person, submit to a pat down, and allow the officer to temporarily disarm him. Whenever a law enforcement officer is made aware that an individual is carrying a concealed handgun and the law enforcement officer has reasonable grounds to believe that the individual is under the influence of either alcohol or a controlled dangerous substance, the law enforcement officer may take temporary possession of the handgun and request submission of the individual to a department certified chemical test for determination of the chemical status of the individual. Whenever a law enforcement officer is made aware that an individual is behaving in a criminally negligent manner as defined under the provisions of this Section, or is negligent in the carrying of a concealed handgun as provided for in R.S. 40:1382, the law enforcement officer may seize the handgun, until adjudication by a judge, if the individual is issued a summons or arrested under the provisions of R.S. 40:1382. Failure by the permittee to comply with the provisions of this Paragraph shall result in a six month automatic suspension of the permit.

(3) The permit to carry a concealed weapon shall be revoked by the deputy secretary when the permittee is carrying and concealing a handgun under any of the following circumstances:

(a) The blood alcohol reading of a permittee is .05 percent or greater by weight of alcohol in the blood.

(b) A permittee's blood test or urine test shows the confirmed presence of a controlled dangerous substance as defined in R.S. 40:961 and 964.

(c) A permittee refuses to submit to a department certified chemical test when requested to do so by a law enforcement officer pursuant to Paragraph (2) of this Subsection.

(d) An individual is found guilty of negligent carrying of a concealed handgun as provided for in R.S. 40:1382.

(4) The person tested may have a physician or a qualified technician, chemist, registered nurse, or other qualified person of his own choosing administer a chemical test or tests in addition to any administered at the direction of a law enforcement officer, and he shall be given the opportunity to telephone and request the qualified person to administer such test.

(5) Whenever a peace office determines that grounds under this Subsection exist for the revocation of a concealed handgun permit, he shall prepare an affidavit, on a form provided by the Department of Public Safety and Corrections, indicating the reasons for the revocation and all other information regarding the revocation available to the officer. A copy of the peace officer's report relating to the incident shall be attached to the affidavit when submitted to the department.

J. For the purposes of this Section, the following terms shall have the meanings ascribed herein:

(1) "Handgun" means a type of firearm commonly referred to as a pistol or revolver originally designed to be fired by the use of a single hand and which is designed to fire or is capable of firing fixed cartridge ammunition. The term "handgun" shall not include shotguns or rifles that have been altered by having their stocks or barrels cut or shortened.

(2) "Criminal negligence" means there exists such disregard of the interest of others that the license holder's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonable careful man under like circumstances.

K. The department shall execute a thorough background investigation, including a criminal history check, of every applicant for the purpose of verifying the qualifications of the applicant pursuant to the requirements of this Section. For purposes of this Subsection, a background check shall be defined as a computer check of available on-line state records, and, if warranted, the fingerprints may be forwarded to the Federal Bureau of Investigation for a national criminal history record check.

L. Anyone who carries and conceals a handgun in violation of any provision of this Section, unless authorized to do so by another provision of the law, shall be fined not more than five hundred dollars, or imprisoned for not more than six months, or both.

M. No concealed handgun permit shall be valid or entitle any permittee to carry a concealed weapon in any facility, building, location, zone, or area in which firearms are banned by state or federal law.

N. No concealed handgun may be carried into and no concealed handgun permit issued pursuant to this Section shall authorize or entitle a permittee to carry a concealed handgun in any of the following:

(1) A law enforcement office, station, or building.

(2) A detention facility, prison, or jail.

(3) A courthouse or courtroom, provided that a judge may carry such a weapon in his own courtroom.

(4) A polling place.

(5) A meeting place of the governing authority of a political subdivision.

(6) The state capitol building.

(7) Any portion of an airport facility where the carrying of firearms is prohibited under federal law, except that no person shall be prohibited from carrying any legal firearm into the terminal, if the firearm is encased for shipment, for the purpose of checking such firearm as lawful baggage.

(8) Any church, synagogue, mosque or other similar place of worship.

(9) A parade or demonstration for which a permit is issued by a governmental entity.

(10) Any portion of the permitted area of an establishment that has been granted a Class A–General retail permit, as defined in Part II of Chapter 1 or Part II of Chapter 2 of Title 26 of the Louisiana Revised Statutes of 1950, to sell alcoholic beverages for consumption on the premises.

(11) Any school "firearm-free zone" as defined in R.S. 14:95.6.

O. The provisions of Subsection N of this Section shall not limit the right of a property owner, lessee, or other lawful custodian to prohibit or restrict access of those persons possessing a concealed handgun pursuant to a permit issued under this Section. No individual to whom a concealed handgun permit is issued may carry such concealed handgun into the private residence of another without first receiving the consent of that person.

P. Within three months of the effective date of this Act, the Department of Public Safety and Corrections shall promulgate rules and regulations in accordance with the Administrative Procedure Act to provide an appeal process in the event that an applicant is denied issuance of a permit. The department may also promulgate educational requirements for renewal of concealed handgun permits.

Q. The provisions of this Section shall not apply to commissioned law enforcement officers.

R.(1) Each permittee, within fifteen days of a misdemeanor or a felony arrest, other than a minor traffic violation, in this state or any other state, shall notify the deputy secretary of public safety services by certified mail. The deputy secretary may suspend, for up to ninety days, the permit of any permittee who fails to meet the notification requirements of this Section.

(2) The Department of Public Safety and Corrections shall submit a report by March thirty-first of each year to the Senate Committee on Judiciary C and the House Committee on the Administration of Criminal Justice relative to concealed handgun permits. The report shall include information on the number of licenses issued, denied, revoked, or suspended and the reasons for such denial, revocation, or suspension to be categorized by age, sex, race, and zip code of the applicant or licensee. The report shall include data concerning any known accidents or deaths involving permittees.

S. Notwithstanding any other provision of law to the contrary, the department may develop, print, and distribute an informational newsletter relative to concealed handgun permittees, safety training, and related matters.

T. Possession of a current and valid concealed handgun permit issued pursuant to this Section shall constitute sufficient evidence of the background check required pursuant to Title 18 U.S. Code Section 922(s). The deputy secretary of public safety services is authorized to endeavor to enter into reciprocity agreements with other states which have substantially the same or more restrictive requirements for obtaining a concealed handgun permit so that possession of a current and valid concealed handgun permit issued by another state shall be deemed to be valid within this state and possession of a current and valid concealed handgun permit issued by Louisiana shall be deemed valid in those states.

* * *

<< LA R.S. 40:1381 >>

§ 1381.  Concealed weapons; employees; highway patrol

  A. All employees, officers, or agents of the division of state police may carry arms and weapons, concealed or openly, while in the actual performance of any duty or while under assignment to any duty under this Subpart.

  B. The police employees of the division shall be the highway patrol of the state and as such shall perform only real police duties as provided by R.S. 40:1379.

<< LA R.S. 40:1382 >>

§ 1382.  Negligent carrying of a concealed handgun

  A. Negligent carrying of a concealed handgun is the intentional or criminally negligent carrying by any person, whether or not authorized or licensed to carry or possess a concealed handgun, under the following circumstances:

  (1) Where it is foreseeable that the handgun may discharge, or where others are placed in reasonable apprehension that the handgun may discharge.

  (2) Where the handgun is being carried, brandished, or displayed under circumstances that create a reasonable apprehension on the part of members of the public or a law enforcement official that a crime is being committed or is about to be committed.

  B. It shall be within the discretion of the law enforcement officer to issue a summons to a person accused of committing this offense in lieu of making a physical arrest. The seizure of the handgun pending resolution of the offense shall only be discretionary in the instance where the law enforcement officer issues a summons to the person accused. If the law enforcement officer makes a physical arrest of the person accused, the handgun and the person's license to carry such handgun shall be seized.

  C. Whoever commits the offense of negligent carrying of a concealed handgun shall be fined not more than five hundred dollars, or imprisoned without hard labor for not more than six months, or both. The adjudicating judge may also order the forfeiture of the handgun, and may suspend or revoke any permit or license authorizing the carrying of the handgun.

  Section 2. This Act shall become effective upon signature by the governor or, if not signed by the governor, upon expiration of the time for bills to become law without signature by the governor, as provided in Article III, Section 18 of the Constitution of Louisiana. If vetoed by the governor and subsequently approved by the legislature, this Act shall become effective on the day following such approval.

Approved April 19, 1996.

LA LEGIS 1ES 4 (1996)

---

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

<div align="center">

**South Carolina General Assembly**
111th Session, 1995-1996

</div>

**Bill 3730**

---

<div align="center">

Current Status

</div>

| | |
|---|---|
| Bill Number: | 3730 |
| Ratification Number: | 534 |
| Act Number: | 464 |
| Type of Legislation: | General Bill GB |
| Introducing Body: | House |
| Introduced Date: | 19950302 |
| Primary Sponsor: | J. Young |
| All Sponsors: | J. Young, Allison, Askins, Bailey, Baxley, Beatty, Boan, G. Brown, H. Brown, J. Brown, T. Brown, Byrd, Cain, Cato, Cave, Chamblee, Clyburn, Cobb-Hunter, Cooper, Cotty, Cromer, Dantzler, Davenport, Delleney, Easterday, Elliott, Fair, Felder, Fleming, Fulmer, Gamble, Govan, Hallman, Harrell, J. Harris, Harrison, Harvin, Harwell, Haskins, Herdklotz, Hines, Hodges, Huff, Hutson, Inabinett, Jennings, Keegan, Kelley, Kennedy, Kinon, Klauber, Knotts, Koon, Lanford, Law, Limbaugh, Limehouse, Littlejohn, Lloyd, Marchbanks, Martin, Mason, McAbee, McCraw, McElveen, Meacham, Moody-Lawrence,  Neilson, Phillips, Quinn, Rhoad, Rice, Richardson, Riser, Robinson, Sandifer, Scott, Seithel, Sharpe, Shissias, Simrill, D. Smith, R. Smith, Spearman, Stille, Stoddard, Stuart, Thomas, Townsend, Tripp, Trotter, Vaughn, Waldrop, Walker, Wells, Whatley, S. Whipper, Wilder, Wilkes, Wilkins, Williams, Witherspoon, Wofford, Worley, Wright and A. Young |
| Drafted Document Number: | DKA\3731CM.95 |
| Companion Bill Number: | 680, 681 |
| Date Bill Passed both Bodies: | 19960613 |
| Date of Last Amendment: | 19960612 |
| Governor's Action: | S |
| Date of Governor's Action: | 19960724 |
| Subject: | Law Abiding Citizens Self-Defense Act of 1996 |

---

<div align="center">

History

</div>

| Body | Date | Action Description | Com | Leg Involved |
|---|---|---|---|---|
| ------ | 19960805 | Act No. A464 | | |
| ------ | 19960724 | Signed by Governor | | |
| ------ | 19960626 | Ratified R534 | | |
| House | 19960613 | Ordered enrolled for ratification | | |
| Senate | 19960612 | Conference Committee Report adopted | 88 SCC | |

JA1674

| | | | | |
|---|---|---|---|---|
| House | 19960612 | Conference Committee Report adopted | 98 HCC | |
| House | 19960530 | Conference powers granted, appointed Reps. to Committee of Conference | 98 HCC | J. Young Klauber Simrill |
| Senate | 19960530 | Conference powers granted, appointed Senators to Committee of Conference | 88 SCC | Peeler Courtney Bryan |
| Senate | 19960530 | Insists upon amendment | | |
| House | 19960529 | Non-concurrence in Senate amendment | | |
| Senate | 19960523 | Read third time, returned to House with amendment | | |
| Senate | 19960522 | Amended, read second time, unanimous consent for third reading on Thursday, 19960523 | | |
| Senate | 19960521 | Amended, debate interrupted by adjournment | | |
| Senate | 19960516 | Debate interrupted | | |
| Senate | 19960508 | Debate adjourned | | |
| Senate | 19960424 | Made Special Order | | |
| Senate | 19960403 | Committee report: majority favorable, with amendment, minority unfavorable | 11 SJ | |
| Senate | 19950518 | Introduced, read first time, referred to Committee | 11 SJ | |
| House | 19950517 | Read third time, sent to Senate | | |
| House | 19950516 | Amended, read second time | | |
| House | 19950511 | Debate interrupted by adjournment | | |
| House | 19950511 | Amended | | |
| House | 19950426 | Objection by Representative | | Wright Cotty Quinn Harrison Anderson McMahand Breeland Cave Neal Scott Williams Witherspoon Clyburn Hines Marchbanks Herdklotz Keegan Kelley Wilkes Davenport |
| House | 19950419 | Committee report: Favorable with amendment | 25 HJ | |
| House | 19950302 | Introduced, read first time, referred to Committee | 25 HJ | |

View additional legislative information at the LPITS web site.

---

(Text matches printed bills. Document has been reformatted to meet World Wide Web specifications.)

(A464, R534, H3730)

**AN ACT TO AMEND THE CODE OF LAWS OF SOUTH CAROLINA, 1976, BY ADDING ARTICLE 4 TO CHAPTER 31, TITLE 23 SO AS TO ENACT THE "LAW ABIDING CITIZENS SELF-DEFENSE ACT OF 1996" AND TO PROVIDE THE REQUIREMENTS FOR THE STATE LAW ENFORCEMENT**

DIVISION TO ISSUE PERMITS TO ALLOW CERTAIN INDIVIDUALS TO CARRY CONCEALED WEAPONS; BY ADDING ARTICLE 6 TO CHAPTER 31, TITLE 23 SO AS TO PROVIDE THAT IT IS UNLAWFUL TO USE A FIREARM WHILE UNDER THE INFLUENCE OF ALCOHOL OR A CONTROLLED SUBSTANCE; TO AMEND SECTION 16-23-20, RELATING TO THE UNLAWFUL CARRYING OF A PISTOL, SO AS TO REVISE THE CIRCUMSTANCES IN WHICH A HUNTER OR FISHERMAN MAY CARRY A PISTOL AND TO MAKE A TECHNICAL CHANGE; TO AMEND SECTION 16-23-460, AS AMENDED, RELATING TO THE UNLAWFUL CARRYING OF CERTAIN CONCEALED WEAPONS, SO AS TO REVISE THE TYPE OF CONCEALED WEAPONS THAT MAY BE CARRIED WITH AND WITHOUT A PERMIT AND TO REVISE THE PENALTY; TO AMEND SECTION 16-23-465, AS AMENDED, RELATING TO THE PENALTY FOR UNLAWFULLY CARRYING A FIREARM ONTO A PREMISES OF A BUSINESS SELLING CERTAIN ALCOHOLIC BEVERAGES, SO AS TO PROVIDE THAT A PERSON CONVICTED OF THIS OFFENSE WHO POSSESSED A CONCEALABLE WEAPON PERMIT MUST HAVE HIS PERMIT REVOKED; TO AMEND SECTION 16-23-420, AS AMENDED, RELATING TO CARRYING OR DISPLAYING A FIREARM IN OR AROUND AN EDUCATIONAL INSTITUTION OR A PUBLIC BUILDING, SO AS TO REVISE THE LOCATIONS IN WHICH A FIREARM MAY NOT BE CARRIED ONTO; BY ADDING SECTION 23-31-217 SO AS TO PROVIDE THAT NOTHING CONTAINED IN ARTICLE 4, CHAPTER 31, TITLE 23 AFFECTS THE PROVISIONS CONTAINED IN SECTION 16-23-20; TO PROVIDE THAT NOTHING CONTAINED IN ARTICLE 4, CHAPTER 31, TITLE 23 SHALL BE CONSTRUED TO LIMIT, DIMINISH, OR INFRINGE ON CERTAIN RIGHTS; TO AMEND SECTION 10-11-340, RELATING TO PERFORMANCE OF DUTIES BY MEMBERS OF THE GENERAL ASSEMBLY AND PERSONS REQUIRED TO PERFORM DUTIES WITHIN THE CAPITOL BUILDING, SO AS TO REVISE THE PERSONS THIS PROVISION APPLIES TO; TO AMEND SECTION 40-17-120, AS AMENDED, RELATING TO PERMITS TO CARRY FIREARMS, SO AS TO PROVIDE THAT THIS PROVISION DOES NOT PRECLUDE A PRIVATE DETECTIVE FROM OBTAINING A CONCEALABLE WEAPON PERMIT AND THAT A PERSON ISSUED A PERMIT TO CARRY A WEAPON PURSUANT TO THIS PROVISION MAY ALSO OBTAIN A CONCEALABLE WEAPON PERMIT; TO PROVIDE THAT NOTHING CONTAINED IN THIS ACT AFFECTS THE VALIDITY OF CERTAIN PERMITS ISSUED PURSUANT TO ARTICLE 3, CHAPTER 31, TITLE 23; TO PROVIDE THAT A PERSON HOLDING A CONCEALABLE WEAPON PERMIT PURSUANT TO ARTICLE 4, CHAPTER 31, TITLE 23 MAY NOT CARRY A CONCEALABLE WEAPON INTO THE RESIDENCE OF ANOTHER PERSON WITHOUT THE PERMISSION OF CERTAIN PERSONS AND TO PROVIDE PENALTIES; TO PROVIDE THE MANNER IN WHICH THE POSTING OF SIGNS PROHIBITING THE CARRYING OF A CONCEALABLE WEAPON UPON A PREMISES MAY BE SATISFIED; TO PROVIDE THAT A PERSON MAY CARRY A CONCEALABLE WEAPON FROM A MOTOR VEHICLE TO CERTAIN RENTED ROOMS; AND TO REPEAL SECTION 23-31-120 RELATING TO PERSONS TO WHOM WEAPON PERMITS MAY BE ISSUED.

Be it enacted by the General Assembly of the State of South Carolina:

**Concealed weapons permits**

SECTION 1. Chapter 31, Title 23 of the 1976 Code is amended by adding:

"Article 4

Concealed Weapons Permits

Section 23-31-205. This article may be cited as the `Law Abiding Citizens Self-Defense Act of 1996'.

Section 23-31-210. As used in this article:

(1) `Resident' means an individual who is a resident of South Carolina for at least twelve months preceding the date on which an application to carry a weapon is submitted under this section or military personnel on permanent change of station orders.

JA1676

(2) `Picture identification' means:

(a) a valid South Carolina driver's license; or

(b) an official photographic identification card issued by the Department of Revenue and Taxation, a federal or state law enforcement agency, an agency of the United States Department of Defense, or United States Department of State.

(3) `Proof of residence' means a person's current address on the original or certified copy of:

(a) a valid South Carolina driver's license;

(b) an official identification card issued by the Department of Revenue and Taxation, a federal or state law enforcement agency, an agency of the United States Department of Defense, or United States Department of State;

(c) a voter registration card; or

(d) another document that SLED may determine that fulfills this requirement.

(4) `Proof of training' means an original document or certified copy of the document supplied by an applicant that certifies that he is either:

(a) a person who, within three years before filing an application, has successfully completed a basic or advanced handgun education course offered by a state, county, or municipal law enforcement agency or a nationally recognized organization that promotes gun safety. This education course must be a minimum of eight hours and must include, but is not limited to:

(i) information on the statutory and case law of this State relating to handguns and to the use of deadly force;

(ii) information on handgun use and safety;

(iii) information on the proper storage practice for handguns with an emphasis on storage practices that reduces the possibility of accidental injury to a child; and

(iv) the actual firing of the handgun in the presence of the instructor;

(b) an instructor certified by the National Rifle Association or another SLED-approved competent national organization that promotes the safe use of handguns;

(c) a person who can demonstrate to the Director of SLED or his designee that he has a proficiency in both the use of handguns and state laws pertaining to handguns;

(d) an active duty police handgun instructor;

(e) a person who has a SLED-certified or approved competitive handgun shooting classification; or

(f) a member of the active or reserve military, or a member of the National Guard who has had handgun training in the previous three years.

SLED shall promulgate regulations containing general guidelines for courses and qualifications for instructors which would satisfy the requirements of this item. For purposes of subitems (a) and (b), `proof of training' is not satisfied unless the organization and its instructors meet or exceed the guidelines and qualifications contained in the regulations promulgated by SLED pursuant to this item.

(5) `Concealable weapon' means a firearm having a length of less than twelve inches measured along its greatest dimension that must be carried in a manner that is hidden from public view in normal wear of clothing except when needed for self-defense, defense of others, and the protection of real or personal property.

Section 23-31-215. (A) Notwithstanding any other provision of law, except subject to subsection (B) of this section, a permit to carry a concealable weapon must be issued by SLED to a resident who is at least twenty-one years of age and who is not prohibited by state law from possessing the weapon upon submission of:

(1) a completed application signed by the person;

(2) three current one-inch by one-inch full face color photographs of the person;

(3) proof of residence;

(4) proof of actual or corrected vision rated at 20/40 within six months of the date of application or, in the case of a person licensed to operate a motor vehicle in this State, presentation of a valid driver's license;

(5) proof of training;

(6) payment of a fifty-dollar application fee. This fee must be waived for disabled veterans and retired law enforcement officers; and

(7) a complete set of fingerprints. A law enforcement agency may charge a fee not to exceed five dollars for fingerprinting an applicant.

(B) Upon submission of the items required by subsection (A) of this section, SLED must conduct or facilitate a local, state, and federal fingerprint review of the applicant. SLED must also conduct a background check of the applicant through notification to and input from the sheriff of the county where the applicant resides. The sheriff must, within ten working days after notification by SLED, submit a recommendation on an application. Before making a determination whether or not to issue a permit under this article, SLED must consider the recommendation provided pursuant to this subsection. The failure of the sheriff to submit a recommendation within the ten-day period constitutes a favorable recommendation for the issuance of the permit to the applicant. If the fingerprint review and background check are favorable, SLED must issue the permit.

(C) SLED shall issue a written statement to an unqualified applicant specifying its reasons for denying the application within ninety days from the date the application was received; otherwise, SLED shall issue a concealable weapon permit. If an applicant is unable to comply with the provisions of Section 23-31-210(4), SLED shall offer the applicant a handgun training course that satisfies the requirements of Section 23-31-210(4) (a). The course shall cost fifty dollars. SLED shall use the proceeds to defray the training course's operating costs. If a permit is granted by operation of law because an applicant was not notified of a denial within the ninety-day notification period, the permit may be revoked upon written notification from SLED that sufficient grounds exist for revocation or initial denial.

(D) Denial of an application may be appealed. The appeal must be in writing and state the basis for the appeal. The appeal must be submitted to the Chief of SLED within thirty days from the date the denial notice is received. The chief shall issue a written decision within ten days from the date the appeal is received. An adverse decision shall specify the reasons for upholding the denial and may be reviewed by the administrative law judge division pursuant to Article 5, Chapter 23 of Title 1 upon a petition filed by an applicant within thirty days from the date of delivery of the division's decision.

(E) SLED must make permit application forms available to the public. A permit application form shall require an applicant to supply:

(1) name, including maiden name if applicable;

(2) date and place of birth;

JA1678

(3) sex;

(4) race;

(5) height;

(6) weight;

(7) eye and hair color;

(8) current residence address; and

(9) all residence addresses for the three years preceding the application date.

(F) The permit application form shall require the applicant to certify that:

(1) he is not a person prohibited under state law from possessing a weapon;

(2) he understands the permit is revoked and must be surrendered immediately to SLED if the permit holder becomes a person prohibited under state law from possessing a weapon;

(3) he has either been a resident of this State for at least twelve months preceding the date of his application or he is military personnel on permanent change of station orders; and

(4) all information contained in his application is true and correct to the best of his knowledge.

(G) Medical personnel, law enforcement agencies, organizations offering handgun education courses pursuant to Section 23-31-210(4)(a), and their personnel, who in good faith provide information regarding a person's application, must be exempt from liability that may arise from issuance of a permit; provided, however, a weapons instructor must meet the requirements established in Section 23-31-210(4)(b), (c), (d), (e), or (f) in order to be exempt from liability under this subsection.

(H) A permit application must be submitted in person or by mail to SLED headquarters which shall verify the legibility and accuracy of the required documents.

(I) SLED must maintain a list of all permit holders and the current status of each permit. Upon request, SLED must release the list of permit holders or verify an individual's permit status. SLED may charge a fee not to exceed its costs in releasing the information under this subsection.

(J) A permit is valid statewide unless revoked because the person has:

(1) become a person prohibited under state law from possessing a weapon;

(2) moved his permanent residence to another state;

(3) voluntarily surrendered the permit; or

(4) been charged with an offense that, upon conviction, would prohibit the person from possessing a firearm. However, if the person subsequently is found not guilty of the offense, then his permit must be reinstated at no charge.

Once a permit is revoked, it must be surrendered to a sheriff, police department, a SLED agent, or by certified mail to the Chief of SLED. A person who fails to surrender his permit in accordance with this subsection is guilty of a misdemeanor and, upon conviction, must be fined twenty-five dollars.

JA1679

(K) A permit holder must have his permit identification card in his possession whenever he carries a concealable weapon. A permit holder must inform a law enforcement officer of the fact that he is a permit holder and present the permit identification card when an officer (1) identifies himself as a law enforcement officer and (2) requests identification or a driver's license from a permit holder. A permit holder immediately must report the loss or theft of a permit identification card to SLED headquarters. A person who violates the provisions of this subsection is guilty of a misdemeanor and, upon conviction, must be fined twenty-five dollars.

(L) SLED shall issue a replacement for lost, stolen, damaged, or destroyed permit identification cards after the permit holder has updated all information required in the original application and the payment of a five-dollar replacement fee. Any change of permanent address must be communicated in writing to SLED within ten days of the change accompanied by the payment of a fee of five dollars to defray the cost of issuance of a new permit. SLED shall then issue a new permit with the new address. A permit holder's failure to notify SLED in accordance with this subsection constitutes a misdemeanor punishable by a twenty-five dollar fine. The original permit shall remain in force until receipt of the corrected permit identification card by the permit holder, at which time the original permit must be returned to SLED.

(M) A permit issued pursuant to this section does not authorize a permit holder to carry a concealable weapon into a:

(1) police, sheriff, or highway patrol station or any other law enforcement office or facility;

(2) detention facility, prison, or jail or any other correctional facility or office;

(3) courthouse or courtroom;

(4) polling place on election days;

(5) office of or the business meeting of the governing body of a county, public school district, municipality, or special purpose district;

(6) school or college athletic event not related to firearms;

(7) day care facility or pre-school facility;

(8) place where the carrying of firearms is prohibited by federal law;

(9) church or other established religious sanctuary;

(10) hospital, medical clinic, doctor's office, or any other facility where medical services or procedures are performed unless expressly authorized by the employer.

A person who wilfully violates a provision of this subsection is guilty of a misdemeanor and, upon conviction, must be fined not less than one thousand dollars or imprisoned not more than one year, or both, at the discretion of the court and have his permit revoked for five years.

Nothing contained herein may be construed to alter or affect the provisions of Sections 10-11-320, 16-23-420, 16-23-430, 16-23-465, 44-23-1080, 44-52-165, 50-9-830, and 51-3-145.

(N) Valid out-of-state permits to carry concealable weapons held by a resident of a reciprocal state must be honored by this State. SLED shall make a determination as to those states which have permit issuance standards equal to or greater than the standards contained in this act and shall maintain and publish a list of those states as the states with which South Carolina has reciprocity.

(O) A permit issued pursuant to this article is not required for a person:

(1) specified in Section 16-23-20, items (1) through (5) and items (7) through (11);

JA1680

(2) carrying a self-defense device generally considered to be nonlethal including the substance commonly referred to as `pepper gas';

(3) carrying a concealable weapon in a manner not prohibited by law.

(P) A permit issued pursuant to this article is valid for four years. Subject to subsection (Q) of this section, SLED shall renew a permit upon:

(1) payment of a fifty-dollar renewal fee by the applicant. This fee must be waived for disabled veterans and retired law enforcement officers;

(2) submission of three current one-inch by one-inch full color photographs of the applicant; and

(3) a complete set of fingerprints. A law enforcement agency may charge a fee not to exceed five dollars for fingerprinting an applicant.

(Q) Upon submission of the items required by subsection (P) of this section, SLED must conduct or facilitate a local, state, and federal fingerprint review of the applicant. If the background check is favorable, SLED must renew the permit.

(R) No provision contained within this act shall expand, diminish, or affect the duty of care owed by and liability accruing to, as may exist at law immediately prior to the effective date of this act, the owner of or individual in legal possession of real property for the injury or death of an invitee, licensee, or trespasser caused by the use or misuse by a third party of a concealable weapon. Absence of a sign prohibiting concealable weapons shall not constitute negligence or establish a lack of duty of care."

**Firearm use while under the influence**

SECTION 2. Chapter 31, Title 23 of the 1976 Code is amended by adding:

"Article 6

Using a Firearm While Under the Influence of

Alcohol or a Controlled Substance

Section 23-31-400. (A) As used in this article:

(1) `Use a firearm' means to discharge a firearm.

(2) `Serious bodily injury' means a physical condition which creates a substantial risk of death, serious personal disfigurement, or protracted loss or impairment of the function of a bodily member or organ.

(B) It is unlawful for a person who is under the influence of alcohol or a controlled substance to use a firearm in this State.

(C) A person who violates the provisions of subsection (B) is guilty of a misdemeanor and, upon conviction, must be fined not less than two thousand dollars or imprisoned not more than two years.

(D) This article does not apply to persons lawfully defending themselves or their property.

Section 23-31-410. (A) A person who uses a firearm within this State shall submit to a SLED-approved breath test to determine the alcoholic content of the blood and to a urine test to detect the presence of a controlled substance if there is probable cause to believe that the person was using a firearm while under the influence of alcohol or a controlled substance or if the person is arrested lawfully for an offense allegedly committed while he was using a firearm while under the influence of alcohol or a controlled substance. The breath or urine test

must be administered at the request of a law enforcement officer who has probable cause to believe the person was using the firearm while under the influence of alcohol or a controlled substance. The administration of either test shall not preclude the administration of the other test. The refusal to submit to a breath or urine test upon the request of a law enforcement officer pursuant to this section is admissible into evidence in a criminal proceeding.

(B) If the arresting officer does not request a breath or urine test of the person arrested for an offense allegedly committed while the person was using a firearm while under the influence of alcohol or a controlled substance, the person may request the arresting officer to have a breath test made to determine the alcohol content of the person's blood or a urine test for the purpose of determining the presence of a controlled substance. The failure of the person who requests a breath or urine test to actually be so tested shall bar the prosecution of the person for using a firearm while under the influence of alcohol or a controlled substance.

(C) The provisions of Section 56-5-2950 relating to the administration of tests for determining the weight of alcohol in an individual's blood, additional tests at the individual's expense, availability of test information to the individual or the individual's attorney, and liability of medical institutions and persons administering the tests are applicable to this section.

(D) The results of a test administered pursuant to this section for the purpose of detecting the presence of a controlled substance are not admissible as evidence in a criminal prosecution for the possession of a controlled substance.

(E) Information obtained pursuant to this section must be released to a court, prosecuting attorney, defense attorney, or law enforcement officer in connection with an alleged violation of Section 23-31-400 upon request for this information.

Section 23-31-415. (A) If a law enforcement officer has probable cause to believe that a person used a firearm while under the influence of alcohol or a controlled substance and caused the death or serious bodily injury of an individual, the person shall submit, upon the request of the law enforcement officer, to a test of his blood for the purpose of determining its alcohol content or for the presence of a controlled substance.

(B) A criminal charge resulting from the incident precipitating the officer's demand for testing should be tried concurrently with a charge of a violation of Section 23-31-400. If the charges are tried separately, the fact that the person refused, resisted, obstructed, or opposed testing is admissible at the trial of the criminal offense which precipitated the demand for testing.

(C) The results of any test administered pursuant to this section for the purpose of detecting the presence of a controlled substance is not admissible as evidence in a criminal prosecution for the possession of a controlled substance.

Notwithstanding another provision of law pertaining to the confidentiality of hospital records or other medical records, information obtained pursuant to this section must be released to a court, prosecuting attorney, defense attorney, or law enforcement officer in connection with an alleged violation of Section 23-31-400 upon request for such information.

Section 23-31-420. (A) Upon the trial of a civil or criminal action or proceeding arising out of acts alleged to have been committed by a person while using a firearm while under the influence of alcohol or a controlled substance, the results of any test administered pursuant to Section 23-31-410 or 23-31-415 and this section is admissible into evidence and the amount of alcohol in the person's blood at the time alleged, as shown by chemical analysis of the person's blood or breath, shall create the following presumptions:

(1) If there was at that time five one-hundredths of one percent or less by weight of alcohol in the person's blood, it must be presumed that the person was not under the influence of alcohol.

(2) If there was at that time in excess of five one-hundredths of one percent but less than ten one-hundredths of one percent by weight of alcohol in the person's blood, that fact shall not give rise to any inference that the person was or was not under the influence of alcohol to the extent that his normal faculties were impaired, but that fact may be considered with other competent evidence in determining whether the person was under the influence of alcohol.

(3) If there was at that time ten one-hundredths of one percent or more by weight of alcohol in the person's blood, this creates an inference that the person was under the influence of alcohol.

(B) The percent by weight of alcohol in the blood must be based upon grams of alcohol per one-hundred milliliters of blood. The provisions of this section must not be construed as limiting the introduction of any other competent evidence bearing upon the question of whether the person was under the influence of alcohol."

**Carrying a pistol**

SECTION 3. Section 16-23-20 of the 1976 Code, as last amended by Act 85 of 1995, is further amended to read:

"Section 16-23-20. It is unlawful for anyone to carry about the person any pistol, whether concealed or not, except as follows:

(1) Regular, salaried law enforcement officers and reserve police officers of a municipality or county of the State, uncompensated Governor's constables, law enforcement officers of the federal government or other states when they are carrying out official duties while in this State, and deputy enforcement officers of the Natural Resources Enforcement Division of the Department of Natural Resources.

(2) Members of the Armed Forces of the United States or of the National Guard, organized reserves, or the State Militia when on duty.

(3) Members of organizations authorized by law to purchase or receive firearms from the United States or this State, or regularly enrolled members of clubs organized for the purpose of target shooting or collecting modern and antique firearms while these members are at or going to or from their places of target practice or their shows and exhibits.

(4) Licensed hunters or fishermen while engaged in hunting or fishing or going to or from their places of hunting or fishing.

(5) Any person regularly engaged in the business of manufacturing, repairing, repossession, or dealing in firearms, or the agent or representative of this person while possessing, using, or carrying a pistol in the usual or ordinary course of the business.

(6) Guards engaged in protection of property of the United States or any agency thereof.

(7) Any authorized military or civil organizations while parading or the members thereof when going to and from the places of meeting of their respective organizations.

(8) Any person in his home, or upon his real property, or fixed place of business.

(9) Any person in a vehicle where the pistol is secured in a closed glove compartment, closed console, or closed trunk.

(10) Any person carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or a fixed place of business or while in the process of the changing or moving of one's residence or the changing or moving of his fixed place of business.

(11) Any prison guard while engaged in his official duties.

(12) Any person who is granted a permit under provision of law by the State Law Enforcement Division to carry a pistol about his person, under conditions set forth in the permit.

Persons authorized to carry weapons pursuant to items (6) and (12) of this section may exercise this privilege only after acquiring a permit from the State Law Enforcement Division as provided for in Article 4 of Chapter 31 of Title 23."

**Carrying a deadly weapon**

SECTION 4. Section 16-23-460 of the 1976 Code is amended to read:

"Section 16-23-460. Any person carrying a deadly weapon usually used for the infliction of personal injury concealed about his person is guilty of a misdemeanor, must forfeit to the county, or, if convicted in a municipal court, to the municipality the concealed weapon, and must be fined not less than two hundred dollars nor more than five hundred dollars or imprisoned not less than thirty days nor more than ninety days. Nothing herein contained may be construed to apply to (1) persons carrying concealed weapons upon their own premises or pursuant to and in compliance with Article 4 of Chapter 31 of Title 23, or (2) peace officers in the actual discharge of their duties. The provisions of this section do not apply to rifles, shotguns, dirks, slingshots, metal knuckles, or razors unless they are used with the intent to commit a crime or in furtherance of a crime."

**Carrying a firearm onto a business premises**

SECTION 5. Section 16-23-465 of the 1976 Code, as last amended by Act 184 of 1993, is further amended to read:

"Section 16-23-465. In addition to the penalties provided for by Sections 16-11-330 and 16-23-460 and by Article 1 of Chapter 23 of Title 16, a person convicted of carrying a pistol or firearm onto the premises of a business which sells alcoholic liquor, beer, or wine for consumption on the premises is guilty of a misdemeanor and, upon conviction, must be fined not more than two thousand dollars or imprisoned not more than three years, or both.

In addition to the penalties described above, a person who violates this section while carrying a concealable weapon pursuant to Article 4, Chapter 31, Title 23 must have his concealed weapon permit revoked."

**Carrying a firearm onto the premises of an educational institution or public building**

SECTION 6. Section 16-23-420 of the 1976 Code, as last amended by Act 184 of 1993, is further amended to read:

"Section 16-23-420. (A) It is unlawful for a person to carry onto any premises or property owned, operated, or controlled by a private or public school, college, university, technical college, other post-secondary institution, or any publicly-owned building a firearm of any kind, without the express permission of the authorities in charge of the premises or property.

(B) It is unlawful for a person to enter the premises or property described in subsection (A) and to display, brandish, or threaten others with a firearm.

(C) A person who violates the provisions of this section is guilty of a felony and, upon conviction, must be fined not more than five thousand dollars or imprisoned not more than five years, or both.

(D) This section does not apply to a guard, law enforcement officer, or member of the armed forces, or student of military science. A married student residing in apartments provided by the private or public school whose presence with a weapon in or around a particular building is authorized by persons legally responsible for the security of the buildings is also exempted from the provisions of this section.

JA1684

(E) For purposes of this section, the terms `premises' and `property' do not include state or locally owned or maintained roads, streets, or rights-of-way thereof, running through or adjacent to premises or property owned, operated, or controlled by a private or public school, college, university, technical college, or other post-secondary institution, which are open full time to public vehicular traffic."

## Carrying a pistol

SECTION 7. The 1976 Code is amended by adding:

"Section 23-31-217. Nothing in this article shall affect the provisions of Section 16-23-20."

## Right to carry a weapon

SECTION 8. Nothing contained in this article shall in any way be construed to limit, diminish, or otherwise infringe upon:

(1) the right of a public or private employer to prohibit a person who is licensed under this article from carrying a concealable weapon upon the premises of the business or work place or while using any machinery, vehicle, or equipment owned or operated by the business;

(2) the right of a private property owner or person in legal possession or control to allow or prohibit the carrying of a concealable weapon upon his premises.

The posting by the employer, owner, or person in legal possession or control of a sign stating "No Concealable Weapons Allowed" shall constitute notice to a person holding a permit issued pursuant to this article that the employer, owner, or person in legal possession or control requests that concealable weapons not be brought upon the premises or into the work place. A person who brings a concealable weapon onto the premises or work place in violation of the provisions of this paragraph may be charged with a violation of Section 16-11-620. In addition to the penalties provided in Section 16-11-620, a person convicted of a second or subsequent violation of the provisions of this paragraph must have his permit revoked for a period of one year. The prohibition contained in this section does not apply to persons specified in Section 16-23-20, item (1).

## Performance of duties in the capitol building

SECTION 9. Section 10-11-340 of the 1976 Code is amended to read:

"Section 10-11-340. Nothing contained in this article prohibits any officer or employee or persons otherwise authorized and required to perform duties within the capitol building from performing their normal duties, including the carrying of firearms, except as may be limited by the rules of either House within their respective chambers."

## License to carry a firearm

SECTION 10. Section 40-17-120 of the 1976 Code, as last amended by Section 9, Act 78 of 1991, is further amended to read:

"Section 40-17-120. (A) Except as provided in subsection (D), the division may grant to a person licensed or registered in accordance with this chapter a permit to carry a pistol, revolver, or other firearm. Application for the permit must be made on forms provided by the division, and the fee is twenty dollars a year. The permit is for one year and application for renewal must be on a form furnished by the division. The permit is not transferable.

(B) No person may be issued a permit until he has presented to the division proof that he is proficient in the use of firearms and has received a minimum of four hours' classroom instruction.

(C) A person engaged in the private security business or registered in accordance with Section 40-17-80 and issued a permit in accordance with this section may carry a firearm in an open and fully-exposed manner only while on duty, in uniform, and going to and from work. However, the division in its discretion may issue an additional written permit to the person to carry the firearm about his person, concealed or not, even though he is not in uniform nor on duty if the division determines that the additional permit will enable the permittee to better perform his assigned duties. No additional permit may be issued to a permittee to be effective in a place where alcoholic beverages, beer, or wine are sold or consumed.

(D) Permits for carrying firearms must not be issued pursuant to this section to persons registered as private detectives. Nothing in this section prohibits a private detective from carrying a concealable weapon pursuant to and in compliance with Article 4, Chapter 31, Title 23.

(E) A person licensed or registered in accordance with this chapter may, in addition to the permit issued pursuant to subsections (A) through (C) of this section, apply for a permit pursuant to Article 4, Chapter 31, Title 23."

**Validity of permits**

SECTION 11. Nothing herein affects the validity of permits issued prior to the effective date of this act pursuant to Article 3 of Chapter 31 of Title 23. These permits are valid until they expire and are governed by any laws or regulations in effect on the date of their issuance.

**Carrying a concealable weapon into the residence of another person**

SECTION 12. No person who holds a permit issued pursuant to Article 4, Chapter 31, Title 23 may carry a concealable weapon into the residence or dwelling place of another person without the express permission of the owner or person in legal control or possession, as appropriate. A person who violates this provision is guilty of a misdemeanor and, upon conviction, must be fined not less than one thousand dollars or imprisoned for not more than one year, or both, at the discretion of the court and have his permit revoked for five years.

**Posting of signs**

SECTION 13. Notwithstanding any other provision of this act, any requirement of or allowance for the posting of signs prohibiting the carrying of a concealable weapon upon any premises may be satisfied by a sign expressing the prohibition in written language interdict or universal sign language.

**Carrying a concealable weapon from a vehicle to a rented room**

SECTION 14. Notwithstanding any provision of law, any person may carry a concealable weapon from an automobile or other motorized conveyance to a room or other accommodation he has rented and upon which an accommodations tax has been paid.

**Repeal**

SECTION 15. Section 23-31-120 of the 1976 Code is repealed.

**Time effective**

SECTION 16. This act takes effect thirty days after approval by the Governor.

Approved the 24th day of July, 1996.

Case 1:22-cv-01483-ARR-Document 48-8 Page 515 of 546 PageID: 1810

July 1672

by mr Jo: Frere

2.

# In this bo-
# lume are

conteined the statutes
made and established
from the time of king
Henry the thirde,
vnto the first yere
of the reigne
of our most
gracious
and
victorious soue-
raigne lorde
kyng hen-
ry the
viii.

Imprinted at London in Fleet-
strete by Henry Wykes.

**ANNO DOMINI**
1564.

Mr Wales gaue me this booke. 19.º Aug. 1639. n 4t. prssence of Tho: Wales the younger & Mr Thomas Cater

& me Jo: Frere

JA1687

## TO THE READER.

Here is nothynge so necessarye and profitable in a common weale as good lawes whiche are establyshed not only to let & represse the malice of the il doers, but also to thentent that the good quiet people mought lyue in reste from spoyle and oppression. And as the frowarde wyly wittes haue ben daily occupied to imagine and put in vre newe kindes of iniuries and wronges, so the soueraigne gouernours, the kynges of this realme, haue ben no lesse diligent from time to time, with all pollitike industrie, to make and establishe holsome lawes for the conseruation of peace, and to withstande rauin and wronge to be done. And as at the begynninge, there were fewe dyseases of the body, and therfore neded fewe medicines: So lykewyse at the first as well in all other as this common weale, the transgressions were bety fewe, and therfore neded fewe lawes, but afterwarde as they increased, the multitude of lawes grewe. And therfore it is nowe impossible, that (as many men argue) the lawes shoulde be fewe or breue, to thende the people shoulde soone knowe, cunne, and beare theim awaye. Wherfore my counsaple is, that euery man be alway obedient vnto the lawes and ministers of the same, and endeuour him selfe to lyue well and vprightly, and neuer intende worse to his neyghbour, than he would his neighbour shuld vnto him & to lyue sobrely & temperatly, accordyng as the Gospell of Christe teacheth and he shal not lightly offend agaynst the lawes. But neuertheless sowwhat to ease and helpe those as haue not time & leasur sufficient to rede ouer these statutes, or beare them in minde, I haue deuised a Table hereafter folowing wherin he that diligetly marketh it, shal soue finde out what that be desireth to knowe, conteined within this volume. First ye shall vnderstand, that the figure or figures, folowyng the worde that ye desyre to fynde, signifieth anno, the yere. The letter nexte after the figure, E. H. or R. betokeneth Edwarde, Henry, or Richarde, the figure after the letter, sheweth whiche kyng in numbre: the letter .c. after that figure signifieth capite, the chapiter. the figure after that .c. betokeneth the numbre of the chaptre, as in example. Abbettour.

13. E. 1. c. 12. that is, anno, 13. Edwardi prim, capite, 12. and so lyke wyse of other.

JA1688

## HENRICI QVARTI.

o₂ withoute in any countie, hundred, o₂ courte within the lande of wales, of what so euer estate, but by englishmen and of the nert venue, and people of **wales.** good fame, and not p₂ocured, no₂ that the englysshe burgesses whiche haue maried walsh women, haue fraunchises with the englishe burgeses.

☞ Item to eschewe many diseases and mischieues, whiche hath happened **Cap. rrbij** befo₂e this time in the land of wales, by many wasters, rimours, minstrels **wales.** and other vacabonds. It is o₂deined and stablished, that no master, rimour **Rimer.** mynstrell, no₂ vacabonde be in any wyse sustepned in the lande of wales, to **minstrel.** make common₂thes no₂ gatherynge vpon the comon people there,

☞ Item it is o₂deined and stablysshed, that no congregacions be made no₂ **Ca. rrbiij.** suffred to be made by y welshme in any place of wales, fo₂ to make o₂ take **Congregatiō** any counsell, oneles it be fo₂ an euident and necessarie cause, and by lycence **wales.** of the chiefe officers ⁊ ministers of the same seigniorie, where suche thynge shall be done, and in the p₂esence of the same officers and ministers, vppon payne of imp₂isonment, and to make syne and raunsom at the kynges wyll

☞ Item it is o₂depned ⁊ stablished, that from hencfo₂th no man be armed **Cap. rrir.** no₂ beare defensible armour to marchaunt to wnes churches no₂ congrega **Armour.** cion in the same, no₂ in the highe waies, in affray of the peace of the kynges liege people, vppon peine of imp₂isonment, and make syne and raunsom at the kynges wyll, ercepte those which be lauful liege people to our soueraine lo₂de the kyng.

☞ Item it is o₂deined and stablysshed, that no englysh man no₂ walsheman of what estate o₂ condicion that he be, send o₂ b₂ynge by colour of marchan-**Capi. rrr.** dise o₂ other waye, any vitayle o₂ armour to any partie of wales, withoute **Vitayle.** the speciall lycence of our soueraigne lo₂de the kynge o₂ of his counsell, one-**Armour.** les it be fo₂ stuffing o₂ enstoring of castels and englishe townes, vpon peine of fo₂feiture the same vittailes and armour, and that in euerye parte of the marches of wales and townes of the marches, there be englysh constables **Constable.** fo₂ to enquy₂e serche and arrest all such vitayles and armour, and the same constables fo₂ they₂ trauayle shall haue the. bi. parte of suche fo₂faitures so by them founde.

Item it is o₂deined and stablysshed, that no walshman shall haue castell, fo₂-**Cap. rrri.** tresse, no₂ house defensiue of his owne no₂ of other to kepe, otherwyse than was vsed in the tyme of kynge Edwarde conquerour of wales, vpon peyne of fo₂faiture of the same. Ercept bysshops and other tempo₂all lo₂des fo₂ they₂ owne bodies.

☞ Item it is o₂depned that no walshman be made iustice, chaumberlaine, chaunceler, treaso₂er, sheriffe, stewarde, constable of castell, receiuour, esche-**Ca.rrrii.** tour, co₂oner, no₂ chiefe fo₂ester no₂ other officer, no₂ keper of the reco₂des, **walshmen.** no₂ lieutenaunte in any of the saide offices in no parte of wales, no₂ of the **wales.** counsell of any englysshe lo₂de, notwithstandynge any patente made to the contrarie with this clause, non obstant quod sit wallicus natus, ercept bys-shops in wales, and of those and other whom the king our soueraigne lo₂d hath founde his good and laufull liege people he wyll to be adupsed by his counsell.

**Item**

Case 423-RMB-AMD  Document 48t 88Page File8l 02D3r21 Fledg 071201f2

# AN EXACT
# Abridgment
## OF ALL
# STATUTES
### In *Force* and *Use*.

From the beginning of

## *MAGNA CARTA,*

Untill 1641.

By *EDM. WINGATE* of *Grayes-Inne,* Esq.

---

With a Continuation, under their proper
Titles, of all ACTS in Force and Use, untill the
Year, 1666. And Alphabetically
Digested under apt Titles.

Whereto is annexed Four T A B L E S,
directing to the several Matters and Clauses
throughout the said Statutes.

---

## *LONDON,*
Printed by *John Streater, James Flesher,* and *Henry
Twyford,* Assigns of *Richard Atkyns,* and *Edward
Atkyns,* Esquires; *Anno Dom.* 1666.

Cum gratia & Privilegio Regiæ Majestatis.

JA1690

I. *The second Volume of the Book of Old Statutes is a long Act made Anno 12 E. 5. entituled, Statuta Walliæ, whereby it appeareth, that Wales was then incorporated and united to England, and there you shall also find many good Laws concerning the division of Wales into Counties, Trials and Division of Actions, together with divers forms of Writs, and the proceeding thereon much like to the Laws of England; For all which, see there that Act at large.*

II. **Stat.** 28 E. 3. 2. All Lords of the Marches of *Wales* shall be perpetually attending and annexed to the Crown of *England*, as they and their Ancestors have been in times past, and not to the Principality of *Wales*, in whose hands soever the same shall come.

III. **Stat.** 9 H. 4. 4. No Thief or Felon in *Wales* (openly known) shall be suffered to disclaim out of the Seigniory, where the Felony was committed. But such manner of disclaimer, shall be from henceforth utterly put out: and such Thieves shall be put to answer to Indictments and other accusations in the Seigniory, where they are taken, without being delivered by disclaiming or Letters of Marque.

IV. **Stat.** 2 H. 5. *Sta.* 2. 5. If a *Welsh*-man that doth forcibly take and detain an *English*-man until he be ransomed, will not upon process awarded against him by the Justices, appear and answer the same untill he be outlawed; the Justices shall certifie the same under their seals to the Officers of the Seigniories, where such outlaw is, who shall apprehend and do execution upon him, according to the Law. *But this is now altered by 27 H. 8. 26. which see after.*

V. **Stat.** 26 H. 4. 8. Forthwith upon the charge given to an Enquest in *Wales*, or the Marches thereof, upon any traverse against the King, or trial of any recognizance broken, or any forfeiture due to the King, or upon trial of any murderer, felon, or accessary, an officer or other person shall be deputed and sworn in open Court for the true keeping of the Jurors, who (without special order of the Court) shall not suffer them to have any bread, drink, meat, fire, or light, nor to speak to any person whatsoever; nor speak to them himself, before they are agreed upon their verdict, unless it be only to ask them, whether or no they are agreed; and all this such Keeper shall observe, in pain to be imprisoned and fined, at the discretion of the Court.

JA1691

Here,

VI. Here, if the Jurors give any untrue verdict against the King, contrary to good and pregnant evidence, or otherwise misdemean themselves, the Lord President and Council (upon complaint thereof) have power to convent them before the said Council, and to punish them at their discretions.

VII. ☞ Stat. 26 H.8.6. All persons dwelling in *Wales* or the Marches thereof, upon warning of any Court to be kept within their respective limits, shall appear there in proper person to do their service in pain of such Fines, forfeitures, and amerciaments, as shall be assessed upon them by the respective Courts, where they owe such service, to be levied by distress, to the use of the King within his Lordships there, and of other Lords marchers within theirs.

VIII. If any Steward or other Officer there do feign any untrue surmise against any person that shall so appear, as aforesaid, and thereupon commit him to prison, contrary to Law, or the custom of that Lordship, the Commissioners or Council (upon complaint) have power to send for such Steward or Officer, and if upon good proof it be found that the party was so imprisoned without lawful cause, they shall assess such Steward or Officer to pay him 6 s. 8 d. for every day of his imprisonment, or more at their discretions, as the damage shall deserve; the Commissioners shall also fine him to the Kings use, whether he appear or not, and may compell him by imprisonment to pay such fines and penalties both to the King and the party grieved.

IX. None in *Wales* or the Marches thereof, coming to any Sessions or Court there, shall bring or cause to be brought thither, or to any other place within two miles thereof, or to any Town, Church, Fair, Market, or other Congregation, except upon a Hue and Cry, or into the High-way, affray of the Peace of the Kings People, any Bill, Low-Bow, Cross-bow, hand-gun, Sword, Staff, Dagger, Halbert, Morespike, Spear or any other Weapon, Privy Coat or Armour, in pain to forfeit the same, unless it be by the command or license of the Justices, a Steward, or other Officer, or of the Commissioners or Council there.

X. None, without the Commissioners license in writing, shall there, or in the Counties thereto adjoyning, require or levy any *Commorth Eydal*, Tenants Ale, or other collection, or exact any money, goods, or other thing, under colour of marriage or suffering of their children saying or singing their first Masses, or Gospels of any Priests or Clerks, or for the redemption of any murder or other felony, or for any other cause whatsoever, or shall make or procure

to

Yale Law School
LILLIAN GOLDMAN LAW LIBRARY
in memory of Sol Goldman

THE AVALON PROJECT *Documents in Law, History and Diplomacy*

Search Avalon

| Avalon Home | Document Collections | Ancient 4000bce - 399 | Medieval 400 - 1399 | 15th Century 1400 - 1499 | 16th Century 1500 - 1599 | 17th Century 1600 - 1699 | 18th Century 1700 - 1799 | 19th Century 1800 - 1899 | 20th Century 1900 - 1999 | 21st Century 2000 - |

## Constitution of Delaware; 1776 (1)

| Art 1 | Art 2 | Art 3 | Art 4 | Art 5 | Art 6 | Art 7 | Art 8 | Art 9 | Art 10 |
| Art 11 | Art 12 | Art 13 | Art 14 | Art 15 | Art 16 | Art 17 | Art 18 | Art 19 | Art 20 |
| Art 21 | Art 22 | Art 23 | Art 24 | Art 25 | Art 26 | Art 27 | Art 28 | Art 29 | Art 30 |

The Constitution, or System of Government, agreed to and resolved upon by the Representatives in full Convention of the Delaware State, formerly styled "The Government of the Counties of New Castle, Kent, and Sussex, upon Delaware," the said Representatives being chosen by the Freemen of the said State for that express Purpose.

ARTICLE 1. The government of the counties of New- Castle, Kent and Sussex, upon Delaware, shall hereafter in all public and other writings be called The Delaware State.

ART. 2. The Legislature shall be formed of two distinct branches; they shall meet once or oftener in every year, and shall be called, " The General Assembly of Delaware."

ART. 3. One of the branches of- the Legislature shall be called, " The House of Assembly," and shall consist of seven Representatives to be chosen for each county annually of such persons as are freeholders of the same.

ART. 4.4 The other branch shall be called " The council," and consist of nine members; three to be chosen for each county at the time of the first election of the assembly, who shall be freeholders of the county for which they are chosen, and be upwards of twenty-five years of age. At the end of one year after the general election, the councillor who had the smallest number of votes in each county shall be displaced, and the vacancies thereby occasioned supplied by the freemen of each county choosing the same or another person at a new election in manner aforesaid. At the end of two years after the first general election, the councillor who stood second in number of votes in each county shall be displaced, and the vacancies thereby occasioned supplied by a new election in manner aforesaid. And at the end of three years from the first general election, the councillor who had the greatest number of votes in each county shall be displaced, and the vacancies thereby occasioned supplied by a new election in manner aforesaid. And this rotation of a councillor being displaced at the end of three years in each county, and his office supplied by a new choice, shall be continued afterwards in due order annually forever, whereby, after the first general election, a councillor will remain in trust for three years from the time of his being elected, and a councillor will be displaced, and the same or another chosen in each county at every election.

ART. 5. The right of suffrage in the election of members for both houses shall remain as exercised by law at present; and each house shall choose its own speaker, appoint its own officers, judge of the qualifications and elections of its own members, settle its own rules of proceedings, and direct writs of election for supplying intermediate vacancies. They may also severally expel any of their own members for misbehavior, but not a second time in the same sessions for the same offence, if reelected; and they shall have all other powers necessary for the legislature of a free and independent State.

ART. 6. All money-bills for the support of government shall originate in the house of assembly, and may be altered, amended, or rejected by the legislative council. All other bills and ordinances may take rise in the house of assembly or legislative council, and may be altered, amended, or rejected by either.

ART. 7. A president or chief magistrate shall be chosen by joint ballot of both houses' to be taken in the house of assembly, and the box examined by the speakers of each house in the presence of the other members, and in case the numbers for the two highest in votes should be equal, then the speaker of the council shall have an additional casting voice, and the appointment of the person who has the majority of votes shall be entered at large on the minutes and journals of each house, and a copy thereof on parchment, certified and signed by the speakers respectively, and sealed with the great seal of the State, which they are hereby authorized to affix, shall be delivered to the person so chosen president, who shall continue in that office three years, and until the sitting of the next general assembly and no longer, nor be eligible until the expiration of three years after he shall have been out of that office. An adequate but moderate salary shall be settled on him during his continuance in office. He may draw for such sums of money as shall be appropriated by the general assembly, and be accountable to them for the same; he may, by and with the advice of the privy council, lay embargoes or prohibit the exportation of any commodity for any time not exceeding thirty days in the recess of the general assembly; he shall have the power of granting pardons or reprieves, except where the prosecution shall be carried on by the house of assembly, or the law shall otherwise direct, in which cases no pardon or reprieve shall be granted, but by a resolve of the house of assembly, and may exercise all the other executive powers of government' limited and restrained as by this constitution is mentioned, and according to the laws of the State. And on his death, inability, or absence from the State, the speaker of the legislative council for the time being shall be vice-president, and in case of his death, inability, or absence from the State, the speaker of the house of assembly shall have the powers of a president, until a new nomination is made by the general assembly.

ART. 8. A privy council, consisting of four members, shall be chosen by ballot, two by the legislative council and two by the house of assembly: *Provided*, That no regular officer of the army or navy in the service and pay of the continent, or of this, or of any other State, shall be eligible; and a member of the legislative council or of the house of assembly being chosen of the privy council, and accepting thereof, shall thereby lose his seat. Three members shall be a quorum, and their advice and proceedings shall be entered of record, and signed by the members present, (to any part of which any member may enter his dissent,) to be laid before the general assembly when called for by them. Two members shall be removed by ballot, one by the legislative council and one by the house of assembly, at the end of two years, and those who remain the next year after, who shall severally be ineligible for the three next years. The vacancies, as well as those occasioned by death or incapacity, shall be supplied by new elections in the same manner; and this rotation of a privy councillor shall be continued afterwards in due order annually forever. The president may by summons convene the privy council at any time when the public exigencies may require, and at such place as he shall think most convenient, when and where they are to attend accordingly.

ART. 9. The president, with the advice and consent of the privy council, may embody the militia, and act as captain-general and commander-in-chief of them, and the other military force of this State, under the laws of the same.

ART. 10. Either house of the General assembly may adjourn themselves respectively. The president shall not prorogue, adjourn, or dissolve the general assembly, but he may, with the advice of the privy council, or on the application of a majority of either house, call them before the time they shall stand adjourned; and the two houses shall always sit at the same time and place, for which purpose immediately after every adjournment the speaker of the house of assembly shall give notice to the speaker of the other house of the time to which the house of assembly stands adjourned.

ART. 11. The Delegates for Delaware to the Congress of the United States of America shall be chosen annually, or superseded in the mean time, by joint ballot of both houses in the general assembly.

JA1693

ART. 12. The president and general assembly shall by joint ballot appoint three justices of the supreme court for the State, one of whom shall be chief justice, and a judge of admiralty, and also four justices of the courts of common pleas and orphans' courts for each county, one of whom in each court shall be styled *"chief justice,"* (and in case of division on the Ballot the president shall have an additional casting voice,) to be commissioned by the president under the great seal, who shall continue in office during good behavior; and during the time the justices of the said supreme court and courts of common pleas remain in office, they shall hold none other except in the militia. Any one of the justices of either of said courts shall have power, in case of the noncoming of his brethren, to open and adjourn the court. An adequate fixed but moderate salary shall be settled on them during their continuance in office. The president and privy council shall appoint the secretary, the attorney-general, registers for the probate of wills and granting letters of administration, registers in chancery, clerks of the courts of common pleas and orphans' courts, and clerks of the peace, who shall be commissioned as aforesaid, and remain in office during five years, if they behave themselves well; during which time the said registers in chancery and clerks shall not be justices of either of the said courts of which they are officers, but they shall have authority to sign all writs by them issued, and take recognizances of bail. The justices of the peace shall be nominated by the house of assembly; that is to say, they shall name twenty-four persons for each county, of whom the president, with the approbation of the privy council, shall appoint twelve, who shall be commissioned as aforesaid, and continue in office during seven years, if they behave themselves well; and in case of vacancies, or if the legislature shall think proper to increase the number, they shall be nominated and appointed in like manner. The members of the legislative and privy councils shall be justices of the peace for the whole State, during their continuance in trust; and the justices of the courts of common pleas shall be conservators of the peace in their respective counties.

ART. 13. The justices of the courts of common pleas and orphans courts shall have the power of holding inferior courts of chancery, as heretofore, unless the legislature shall otherwise direct.

ART. 14. The clerks of the supreme court shall be appointed by the chief justice thereof, and the recorders of deeds, by the justices of the courts of common pleas for each county severally, and commissioned by the president, under the great seal, and continue in office five years, if they behave themselves well.

ART. 15. The sheriffs and coroners of the respective counties shall be chosen annually, as heretofore; and any person, having served three years as sheriff, shall be ineligible for three years after; and the president and privy council shall have the appointment of such of the two candidates, returned for said offices of sheriff and coroner, as they shall think best qualified, in the same manner that the governor heretofore enjoyed this power.

ART. 16. The general assembly, by joint ballots shall appoint the generals and field-officers, and all other officers in the army or navy of this State; and the president may appoint, during pleasure, until otherwise directed by the legislature, all necessary civil officers not hereinbefore mentioned.

ART. 17. There shall be an appeal from the supreme court of Delaware, in matters of law and equity, to a court of seven persons, to consist of the president for the time being, who shall preside therein, and six others, to be appointed, three by the legislative council, and three by the house of assembly, who shall continue in office during good behavior, and be commissioned by the president, under the great seal; which court shall be styled the " court of appeals," and have all the authority and powers heretofore given by law in the last resort to the King in council, under the old government. The secretary shall be the clerk of this court; and vacancies therein occasioned by death or incapacity, shall be supplied by new elections, in manner . aforesaid.

ART. 18. The justices of the supreme court and courts of common pleas, the members of the privy council, the secretary, the trustees of the loan office, and clerks of the court of common pleas, during their continuance in office, and all persons concerned in any army or navy contracts, shall be ineligible to either house of assembly; and any member of either house accepting of any other of the offices herein before mentioned (excepting the office of a justice of the peace) shall have his seat thereby vacated, and a new election shall be ordered.

ART. 19. The legislative council and assembly shall have the power of making the great seal of this State, which shall be kept by the president, or, in his absence, by the vice-president, to be used by them as occasion may require. It shall be called *"The Great Seal of the Delaware State,"* and shall be affixed to all laws and commissions.

ART. 20. Commissions shall run in the name of " The Delaware State," and bear test by the president Writs shall run in the same manner, and bear test in the name of the chief-justice, or justice first named in the commissions for the several courts, and be sealed with the public seals of such courts. Indictments shall conclude, *"Against the peace and dignity of the State."*

ART. 21. In case of vacancy of the offices above directed to be filled by the president and general assembly, the president and privy council may appoint others in their stead until there shall be a new election.

ART. 22. Every person who shall be chosen a member of either house, or appointed to any office or place of trust, before taking his seat, or entering upon the execution of his office, shall take the following oath, or affirmation, if conscientiously scrupulous of taking an oath, to wit:

" I, A B. will bear true allegiance to the Delaware State, submit to its constitution and laws, and do no act wittingly whereby the freedom thereof may be prejudiced."

And also make and subscribe the following declaration, to wit:

" I, A. B. do profess faith in God the Father, and in Jesus Christ His only Son, and in the Holy Ghost, one God, blessed for evermore; and I do acknowledge the holy scriptures of the Old and New Testament to be given by divine inspiration."

And all officers shall also take an oath of office.

ART. 23. The president, when he is out of office, and within eighteen months after, and all others offending against the State, either by maladministration, corruption, or other means, by which the safety of the Commonwealth may be endangered, within eighteen months after the offence committed, shall be impeachable by the house of assembly before the legislative council; such impeachment to be prosecuted by the attorney-general, or such other person or persons as the house of assembly may appoint, according to the laws of the land. If found guilty, he or they shall be either forever disabled to hold any office under government, or removed from office *pro tempore*, or subjected to such pains and penalties as the laws shall direct. And all officers shall be removed on conviction of misbehavior at common law, or on impeachment, or upon the address of the general assembly.

ART. 24. All acts of assembly in force in this State on the 15th day of May last (and not hereby altered, or contrary to the resolutions of Congress or of the late house of assembly of this State) shall so continue, until altered or repealed by the legislature of this State, unless where they are temporary, in which case they shall expire at the times respectively limited for their duration.

ART. 25. The common law of England, as-well as so much of the statute law as has been heretofore adopted in practice in this State, shall remain in force, unless they shall be altered by a future law of the legislature; such parts only excepted as are repugnant to the rights and privileges contained in this constitution, and the declaration of rights, &c., agreed to by this convention.

ART. 26. No person hereafter imported into this State from Africa ought to be held in slavery under any presence whatever; and no negro, Indian, or mulatto slave ought to be brought into this State, for sale, from any part of the world.

ART. 27. The first election for the general assembly of this State shall be held on the List day of October next, at the court-houses in the several counties, in the manner heretofore used in the election of the assembly, except as to the choice of inspectors and assessors, where assessors have not been chosen on the 16th day of September, instant, which shall be made on the morning of the day of election, by the electors, inhabitants of the respective hundreds in each county. At which time the sheriffs and coroners, for the said counties respectively, are to be elected; and the present sheriffs of the counties of Newcastle and Kent may be rechosen to that office until the 1st day of October, A. D. 1779; and the present sheriff for the county of Sussex may be rechosen to that office until the 1st day of October, A. D. 1778, provided the freemen think proper to reelect them at every general election; and the present sheriffs and coroners, respectively, shall continue to exercise their offices as heretofore, until the sheriffs and coroners, to be elected on the said 21st day of October, shall be commissioned and sworn into office. The members of the

JA1694

legislative council and assembly shall meet, for transacting the business of the State, on the 28th day of October next, and continue in office until the 1st day of October, which will be in the year 1777; on which day, and on the 1st day of October in each year forever after, the legislative council, assembly, sheriffs, and coroners shall be chosen by ballot, in manner directed by the several laws of this State, for regulating elections of members of assembly and sheriffs and coroners; and the general assembly shall meet on the 20th day of the same month for the transacting the business of the State; and if any of the said 1st and 20th days of October should be Sunday, then, and in such case, the elections shall be held, and the general assembly meet, the next day following.

ART. 28. To prevent any violence or force being used at the said elections, no person shall come armed to any of them, and no muster of the militia shall be made on that day; nor shall any battalion or company give in their votes immediately succeeding each other, if any other voter, who offers to vote, objects thereto; nor shall any battalion or company, in the pay of the continent, or of this or any other State, be suffered to remain at the time and place of holding the said elections, nor within one mile of the said places respectively, for twenty-four hours before the opening said elections, nor within twenty-four hours after the same are closed, so as in any manner to impede the freely and conveniently carying on the said election: *Provided always*, That every elector may, in a peaceable and orderly manner, give in his vote on the said day of election.

ART. 29. There shall be no establishment of any one religious sect in this State in preference to another; and no clergyman or preacher of the gospel, of any denomination, shall be capable of holding any civil once in this State, or of being a member of either of the branches of the legislature, while they continue in the exercise of the pastorial function.

ART. 30. No article of the declaration of rights and fundamental rules of this State, agreed to by this convention, nor the first, second, fifth, (except that part thereof that relates to the right of suffurage,) twenty-sixth, and twenty-ninth articles of this constitution, ought ever to be violated on any presence whatever. No other part of this constitution shall be altered, changed, or diminished without the consent of five parts in seven of the assembly, and seven members of the legislative council.

GEORGE READ, President.

Attest:

JAMES BOOTH, Secretary. - Friday, September 10,1776.

(1) Verified from " The Constitutions of the Several Independent States of America, Published by order of Congress, Boston: Printed by Norman and Bowen, 1785."

This constitution was framed by a Convention which assembled at New Castle, August 27, 1776, in accordance with the recommendation of the Continental Congress that the people of the Colonies should form independent State Governments. It was not submitted to the people but was proclaimed September 21, 1776.

Back

Source:
The Federal and State Constitutions Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America
Compiled and Edited Under the Act of Congress of June 30, 1906 by Francis Newton Thorpe
Washington, DC : Government Printing Office, 1909.

Colonial Charters Page

| Avalon Home | Document Collections | Ancient 4000bce - 399 | Medieval 400 - 1399 | 15th Century 1400 - 1499 | 16th Century 1500 - 1599 | 17th Century 1600 - 1699 | 18th Century 1700 - 1799 | 19th Century 1800 - 1899 | 20th Century 1900 - 1999 | 21st Century 2000 - |

© 2008 Lillian Goldman Law Library
127 Wall Street, New Haven, CT 06511.

Avalon Statement of Purpose | Accessibility at Yale | Contact Us | Yale Law Library | University Library | Yale Law School | Search Morris | Search Orbis



DATE DOWNLOADED: Tue Feb  7 22:19:52 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
Benjamin Vaughan Abbott. Judge and Jury: A Popular Explanation of Leading Topics in
the Law of the Land (1880).

ALWD 7th ed.
Abbott, Benjamin Vaughan. Judge & Jury: A Popular Explanation of Leading Topics in
the L of the L& (1880).

APA 7th ed.
Abbott, B. (1880). Judge and Jury: Popular Explanation of Leading Topics in the Law
of the Land. New York, Harper & Bros.

Chicago 17th ed.
Abbott Benjamin Vaughan. Judge and Jury: A Popular Explanation of Leading Topics in
the Law of the Land. New York, Harper & Bros.

McGill Guide 9th ed.
Benjamin Vaughan Abbott, Judge & Jury: A Popular Explanation of Leading Topics in the
L of the L& (New York: Harper & Bros., 1880)

AGLC 4th ed.
Benjamin Vaughan Abbott, Judge and Jury: A Popular Explanation of Leading Topics in
the Law of the Land (Harper & Bros., 1880

MLA 9th ed.
Abbott, Benjamin Vaughan. Judge and Jury: A Popular Explanation of Leading Topics in
the Law of the Land. New York, Harper & Bros. HeinOnline.

OSCOLA 4th ed.
Abbott, Benjamin Vaughan. Judge and Jury: A Popular Explanation of Leading Topics in
the Law of the Land. New York, Harper & Bros.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

CHAPTER XXXIII.

FIREARMS AND FIREWORKS.

So many calamities and fatal accidents arise from careless use of gunpowder that the legal responsibility for those who use or misuse firearms or fireworks has been steadily growing more strict.

THE RIGHT TO BEAR ARMS.

There is an important distinction between firearms and fireworks. Some general knowledge of firearms is important to the public welfare; because it would be impossible, in case of war, to organize promptly an efficient force of volunteers unless the people had some familiarity with weapons of war. The Constitution secures the right of the people to keep and bear arms. No doubt, a citizen who keeps a gun or pistol under judicious precautions, practises in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right. No doubt, a person whose residence or duties involve peculiar peril may keep a pistol for prudent self-defence. But these are very different habits from keeping pistols for playthings; carrying them carelessly in the pocket; toying with them at picnics, on board steamers, and in saloons; exhibiting them to curious girls; lending them to boys; firing at random with them upon city sidewalks. These are practices upon which every good citizen will frown, and which the law of the land is every year more explicitly discouraging. For grown men to use pistols as playthings should be everywhere rebuked. They should be firmly refused to children. Carrying them for defence, in the more settled parts of the land, savors of cowardice rather than of prudence; a well-behaved man has less to fear

from violence than from the blunders of himself and friends in managing the pistol he might carry as a protection. And the grounds on which the right to keep and practise with weapons of war is protected lend no support whatever to an indiscriminate use of fireworks for amusement. These are restricted, and may be even prohibited altogether by the authorities. If allowed, they are merely tolerated; and the users are held to a strict responsibility.

As to guns and pistols, then, the citizen who practises with them is in the exercise of a constitutional right; and to mulct him for any unfortunate consequences, proof is needed that he was careless. He must exercise due care to avoid doing mischief. *Sic utere tuo ut alienum non lædas*—use your gun so as not to hurt another man—is a time-honored maxim. In July, 1866, the pleasure yacht *Rambler*, as she came to anchor at her rendezvous in the Hudson portion of the harbor, fired the customary salute of one gun to the other vessels of the yacht squadron. The wadding struck a passenger upon a Hoboken ferryboat passing near, knocking him down and breaking his arm, rendering it useless for life. He sued the owner of the *Rambler*. The latter escaped judgment upon the ground that he was not in any manner in fault. He was not on board, did not authorize the firing, and had given general orders that the yacht's gun should not be fired without directions from him. It was the master of the yacht who directed the salute. The court said that under these circumstances the owner was not liable. He had done all in his power. It was no necessary part of the business of navigating the yacht, for which the master was hired, to fire complimentary salutes; if he did so, he acted on his own responsibility, and he, if anybody, was the proper person to pay damages.*—The Colonel of a New York regiment was less fortunate in a suit brought against him. This case occurred in

---

* Haack *v.* Fearing, 5 *Robt.* 528.

July, 1855. The regiment was in camp near Kingston, and, in the early morning, practised target-firing, using, of course, ball-cartridges; and some few of the guns were not discharged. The Colonel ordered these taken to the rear and unloaded, which was supposed to have been done. One rifle, however, was overlooked. In the afternoon, the men were paraded for some exercises involving firing with blank-cartridges. When the Colonel gave the word "fire!" the regiment was fronting a crowd of spectators, who supposed themselves in perfect safety, as only blank-cartridges were to be used. But the ball from the gun remaining loaded killed a child in its mother's arms, also breaking the mother's arm. The jury found a verdict of $1500 against the Colonel, and it was sustained. The Colonel argued that he ordered the firing in the performance of a public duty as a military officer training his men, and was not liable. But the court said that such use of firearms requires a very high degree of care to avoid injury; and unless he could show that he had given all proper orders, and taken precautions to have them faithfully obeyed, and that the injury was done in violation of his judicious orders, he was chargeable.* The case would have been differently decided, doubtless, if the woman had been in any respect careless.—In Indiana, a man lent his gun to four boys, who, when they had done with it, loaded it up heavily and returned it to the owner. This was done as a trick, and to have him hurt by the recoil when he discharged the gun next time. He did fire it, and was hurt, and then sued the boys. But they proved that he had suspected the trick, and tested the loading before he fired, and knew it was overloaded with six inches of charge. The judges said he had no business to fire the gun, and must bear the consequences himself, as they were partly his own fault.† One has a general right to practise with firearms; but the least

---

* Castle v. Duryee, 1 *Abb. App. Dec.* 327; 32 *Barb.* 480.

† Smith v. Thomas, 23 *Ind.* 69.

:22-c·Cas4e623-R9M0B AMDocDroeumnt4t8 88Pfaτqe F528 02/Da/e3Fi1eadg975/2t0/2023ageID

carelessness exposes him to pay for all injury done. And, no doubt, whoever amuses himself with firearms on the Fourth of July or any other day, in crowded streets and public places, is liable for any injury that is caused, except where the injured person is in fault.

### DISPLAY FIREWORKS.

The rule relative to all mere display fireworks is probably stricter than that which applies to firearms, properly so called. To secure the training of the people in the use of weapons, the Constitution declares that individuals may keep them; hence, to obtain damages for an injury from a gun or pistol, one must show some impropriety in time, place, or manner of using it. There is no such right as to rockets, squibs, and crackers; and as they are necessarily dangerous things, one who uses them for amusement should be held—except, perhaps, where he keeps fully within his own land—liable, irrespective of any carelessness. He takes the risk.

Thus, with respect to rockets, there was a case in Boston at a time when a Grant Club organized a torch-light procession. The plan was that, as the procession passed along the street, the residents who sympathized with the club in politics should greet it with various fireworks. Mr. Fisk and his son George were in the vestibule of their house letting off Roman candles; and Mr. Wait, directly opposite, was firing rockets, and one of these rockets, instead of taking course upward, flew across the street and put out George's eye. Mr. Wait's lawyer argued that he could not be charged, because he and Fisk were both members of the Grant Club, and had united in getting up the celebration, and so it was a joint affair, and Fisk was in fault as well as Wait. But the court said that had nothing to do with Wait's carelessness in aiming rockets across the street, when the plain rule for rockets is *sic itur ad astra.*   And the jury awarded $2000.

---

\* Fisk *v.* Wait, 104 *Mass.* 71.

It seems strange there have not been lawsuits by persons injured by the fall of rocket-sticks, but we do not remember that any such case has been before the courts.

As to fire-crackers, it was upon the Fourth of July, 1857, that a man was driving his horse and wagon through a Poughkeepsie street, when a patriot, aged fourteen, threw a lighted cracker under the horse. Its explosion frightened the horse, which dropped dead. Lawsuit; in which the lawyers argued that the wagon-driver knew that Poughkeepsie boys were accustomed to fire these crackers on the Fourth, and he had no business to be driving through their streets; also, that the horse had heart-disease, and died of that, not of the cracker at all; also, that he was so old he would have died very soon anyway. But the owner recovered his damages. And the court said that the whole business of exploding crackers in the streets on the Fourth or any other day is unlawful.* Mere custom cannot justify it. The crackers are tolerated, but not authorized; and whoever fires them to the injury of travellers acts at his peril, and is liable for all the damage he causes.

## CARRYING CONCEALED WEAPONS.

One token of progress towards a restricted use of firearms is seen in the laws which now prevail in most of the States against carrying concealed weapons. It was formerly claimed that because a man has a right to own a pistol he might carry it in any manner he pleased. But the legislatures interposed by saying, "Carry a pistol if you please, but you shall carry it openly. Hang it in a belt, or hold it in your hand, or keep it in sight so that people can see you go armed, and keep out of your way accordingly. You shall not hide it in a pocket or carpet-bag." And the courts have sustained laws like these, for they do not interfere with the substantial right of self-defence. Another ex-

---

* Conklin *v.* Thompson, 29 *Barb*. 218.

15

ample of this progress is in decisions that the constitutional right is limited to correspond with its purpose—the cultivating an ability of armed defence—and does not extend to toy and petty weapons. The meaning is that the citizen has the right to keep and bear such weapons as are used in civilized warfare. The little pistols that are sold and carried so much for the mere amusement of the lad of the period probably have no constitutional protection.

### "I DID NOT THINK IT WAS LOADED."

Another aspect of this matter is seen in various decisions in recent years subjecting persons to severe responsibility for annoying others with unloaded pistols. It was considered in former times that if the pistol was not loaded, no offence was committed in aiming it at a bystander, for by no possibility could it do harm. And the every-day excuse for what is called an accidental shooting is, "I did not think it was loaded." But now many courts hold this no excuse. It is lawless and criminal behavior to brandish a gun or pistol at another person, whether the weapon is loaded or not. For the act must be considered from his point of view. If one sees a pistol aimed at himself, the annoyance, insult, or sense of alarm, or provocation may be just as great, although it is not loaded, if he does not assuredly know it is not. What if it be not loaded? What great difference does that make, after all? The one who holds the butt may know that the barrel is innocuous; but what can the one who fronts the muzzle know as to the fact? Why, then, should it be thought a trivial matter to point even unloaded firearms at one's friends and neighbors? It ought to be universally understood and realized that threatening a person with even an unloaded weapon, or making believe to shoot with a pistol which has no charge, is a rude, unmannerly, disgraceful act. It is often as likely to give alarm as if the weapon were really loaded; and the feelings of the person threatened are the true

test of the mischief done, not the belief or supposition of the actor.

The story narrated by the complainant in a North Carolina case was this. He was approaching church one Sunday morning, and saw a group of people at the door. One of these—coincidentally named Church, by-the-way—called to him to go back. He refused to go back. Church then stood up and said, " I have a pistol," and placed his hand on a pistol that was belted around him. Then the complainant began to walk back. Church followed him, saying he would shoot him ; and as he walked, he drew the pistol, but did not cock it or aim it. The court held that Church was punishable. Drawing his pistol and threatening to shoot was an offer of violence, and constituted an assault, and the fact that the pistol was not cocked made no difference.*

In an Iowa case, a man accompanied by a dog was crossing a neighbor's field where sheep were pastured, when the dog attacked and bit some of the sheep. This angered the sheep-owner (upon whom the report humorously bestows the name Shepard) ; and he came forward with his gun, and attempted to shoot the dog. The owner of the dog expostulated, saying, " Don't shoot my dog. I will pay for any damage he has done." But Shepard shot the dog. Then there was a prolonged controversy. At last Shepard pointed the gun at the owner of the dog, and threatened to shoot him. For this he was brought to trial. He argued that there was no offence, for the gun, which was an old-fashioned single-barrelled one, had just been fired at the dog, and had not been reloaded. It could not possibly have been discharged. But the court adjudged it an assault ; for, they said, the offence of aiming a gun at another is to be determined by the apprehension of the person at whom it is aimed, not by the intent of the offender.†

About six years ago, a quarrelsome fellow named White,

---

* State *v.* Church, 63 *N. C.* 15.　　† State *v.* Shepard, 10 *Iowa*, 126.

driving in his wagon along the highway, came to a spot where several men were mending the road. One of these, Sullivan, asked White to drive in the middle of the road. White answered rudely, and Sullivan inquired, pointedly, what he meant. Then White took up a gun which he had in the wagon, and aimed it at Sullivan, and then at another of the workmen, Harrington, and said, "I have got something here that will pick the eyes of you." White was tried for this. It was proved that Harrington believed for the moment that White would shoot, and was alarmed. The judge told the jury that if White, within shooting distance, menacingly pointed a gun at Harrington, which Harrington had reasonable cause to believe was loaded, and if he were in fact alarmed, and with good reason, there was a criminal assault, whether the gun were in fact loaded or not.*

Once upon a time, in Texas, Flournoy was drinking in Grace's bar-room. He became drunk, excited, and abusive. Grace tried to quiet him. He drew a pistol, which a bystander pulled away from him. "Why," said he, "it isn't loaded!" And it had no cap upon it. Flournoy was tried for an assault with a deadly weapon. His lawyer argued that an unloaded pistol, without a cap, is not a deadly weapon. But the judge left that question to the jury, who found Flournoy guilty, and he was fined $150. The Supreme Court approved this, and said, "If juries would generally impose more exemplary punishment for offences of this character, reckless men would feel the necessity of more self-restraint, and offences committed by violence would be less frequent."†

There have been other decisions of the courts to the same general effect. They show that courts regard aiming guns and pistols at people as a rude and lawless act, even if they are not loaded. If done with intent to alarm, it may be a criminal of-

---

* Commonwealth *v.* White, 110 *Mass.* 407.

† Flournoy *v.* State, 16 *Tex.* 31.

fence, and proving that the weapon was not loaded makes no difference. If done in jest, it cannot fail to excite the contempt and reprehension of every right-minded person at the spirit and temper which can find pleasure in such jests.

### SHOOTING IN SELF-DEFENCE.

Few principles of law are more uncertain and variable in their application to a particular case than the doctrine of self-defence. That there is a right to kill an assailant in defence of one's own life is perfectly well established; and some generalities in regard to it are declared, in about the same terms, year after year in successive law-books. It is agreed that there must be a well-founded apprehension that one's own life is in imminent danger; but the danger need not be real; if it be apparent, so as to convince a cool, reasonable man, this is enough. Thus, if one should be attacked by an enemy who had threatened his life, or by one appearing like a robber on the highway, who should level a pistol at his head with every demonstration of intending to shoot, he might very well believe his life in immediate peril, and be excused for shooting in advance, if he could, notwithstanding the assailant's pistol was not loaded, so that there was not, actually, any danger. The apparent peril would give an excuse. It must be a peril inferred from acts of violence; threats alone, however boisterous or often repeated, do not present a case for killing in self-defence. And the person claiming this defence must be substantially free from blame in the commencement of the affray; one cannot commence a fight and then, when it proceeds to extremity, kill the other and rely on a plea of self-defence, unless the jury, in view of special circumstances, should be more liberal in applying the rule than the law-books are in prescribing it. It used to be said that a person attacked must retreat if possible, and as far as he could—must "back to the wall," as the old phrase was—before he might exercise the right of self-defence; but this rule has been hacked by so many ex-

ceptions and qualifications that there is not much of it left. Modern trials have proceeded more upon the theory that a peaceable, innocent man, rightfully in the place where he stands, may keep his ground and defend himself against unlawful violence without first retreating. There is, however, an important and clear limitation, that one who has retreated and reached a place of safety cannot arm himself and then return and renew the quarrel, and plead self-defence for afterwards shooting the other. The judiciary naturally incline strongly against persons taking the law into their own hands and settling their quarrels by violence. In the judicial view there is a legal remedy for every wrong, and all persons are expected to avail themselves of it if possible. Only when circumstances absolutely prevent a resort to the law is violence excused. The strong tendency of opinion is that if a man escapes out of a fight, he should apply for legal protection, should have his enemy bound over to keep the peace, and not return better armed and renew the conflict. Juries sometimes view such cases differently from judges. And as the system is to submit the question to the judgment of twelve common-sense men, with general instructions from the judge as to all legal doctrines involved, there is ample opportunity for both the theory of the law and the general conscience of mankind to co-operate in the decision.

The peculiar feature of going into the house to get a gun after an altercation has commenced has actually occurred in several cases, at the South and West particularly. In Tennessee there was a quarrelsome bully named Garret, a drinking man, and known to be of very passionate, dangerous temper when intoxicated, who had an old grudge against Williams, and who had made various threats against that individual in the hearing of third persons, who had informed him of them. One day when Williams was at work for a distiller in the neighborhood, testing or bottling a quantity of brandy, Garret came to the place and began drinking some of the brandy, and picking a quarrel with

Williams. Williams said to his employer, the distiller, " I must leave here, or I shall have a difficulty with Garret." The distiller advised him to go. Accordingly he went to the distiller's house, about a quarter of a mile away, where he had left his gun when he began work. Half an hour afterwards the employer and other workmen went to the house, and Garret went with them, brandishing a pistol. This, however, he put up when he actually reached the house. While he sat on his horse in front of the house, talking with the distiller, Williams came to the door and said, " Garret, you have come for a fuss, and, if you don't mind, you will get it." Garret said, " Let it come." Then Williams stepped back into the house, got his gun, came to the door again, and shot Garret dead. Although there was a good deal of proof that Garret had been for several months previous threatening to kill Williams, and had repeated these threats among the party on the trip to the house at this very time, yet the judges decided that the case could not be called self-defence, because, at the time of the shooting, Williams was not in any immediate danger. He had withdrawn safely from the quarrel in the distillery, and Garret had not done any act at the house to renew the danger. He came out from the front door and discharged his gun, when, to all appearance, he might have stayed inside in safety.*

In Nevada, Schooley and Smith were drawn into a violent quarrel, arising from Smith charging Schooley with having stolen whiskey from him, which Schooley denied and resented. Smith went into his house and got his gun, cocked it, and advanced upon Schooley, who ran a few rods, as if to escape ; but when he came upon a big stick that lay in his way, he picked it up for a club, and returned upon Smith. The latter then lowered his gun, and exclaimed that he " was only fooling." Notwithstanding this, Schooley continued to rush towards him with

---

* Williams v. State, 3 Heisk. 376.

LIFE IN CITY AND COUNTRY.

the club. When he came within nine feet of Smith, Smith raised his gun again and fired, and Schooley was killed. The judge decided that this could not be allowed as a case of self-defence. Smith was himself too much in fault, in commencing the violence and precipitating the conflict, to set up that plea.*

In Alabama, two men quarrelled over a game of cards. One claimed to be winner and the other would not pay. The claimant went away, obtained his gun, and returned with it. As he came back to the spot of the quarrel, the other approached him in a threatening manner, as if, perhaps, he would draw a pistol. The claimant retreated, with his gun presented, saying, " Stand back !" The other cried, " Shoot ! I can shoot as quick as you." Upon this the claimant fired his gun, which killed the other player, while the latter drew and discharged a pistol, which, however, did no harm. The judges said that this could not be called self-defence, because the accused, after the first quarrel, went away and returned with his gun to shoot the other player if he refused to do what the accused requested.†

Which person was in fault in commencing the quarrel may sometimes have an important influence in deciding the question of self-defence. An example is in the nearly forgotten shooting of young Austin by Selfridge in State Street, Boston, in 1806. In that instance, a son endeavored to avenge political abuse of his father. The case is noted in the law-books, but their references to it do not disclose the circumstances out of which the shooting arose; these are to be learned from pamphlets of the time, now rare. The city authorities had decided upon a public semi-political dinner for the Fourth of July. The committee, of which Benjamin Austin, the father, was chairman, employed a caterer named Eager to supply the dinner; he did so; the authorities and invited guests ate it, and Chairman Austin then

---

* State *v.* Smith, 10 *Nev.* 106.

† Lewis *v.* State, 51 *Ala.* 1.

disputed the bill. A suit was brought on behalf of Eager, and payment enforced. In this suit Selfridge was Eager's attorney, and some gossip arose to the effect that Eager did not, in the first instance, apply to Selfridge, but that the latter solicited the suit. Benjamin Austin circulated this story pertinaciously and offensively. As rules of professional ethics then very stringently forbade such soliciting, and the two men were prominent in the opposing parties, the charge made Selfridge very indignant. Through a friend, he furnished Austin with proofs, which the latter accepted, that the charge was unfounded; yet Austin would not make a satisfactory acknowledgment. Thereupon Selfridge published in the newspapers a card charging Benjamin Austin with having circulated an infamous falsehood and refusing satisfaction for it, and declaring him a coward, a liar, and a scoundrel. Austin retaliated with a counter-card. The quarrel at this stage was taken up by Charles Austin, a son of Benjamin, upon his father's behalf. He intercepted Selfridge while walking in State Street, and made an attack upon him with a heavy cane; upon which Selfridge drew a pistol and shot him fatally. On trial of Selfridge for murder, the judge told the jury that Selfridge was wholly unjustifiable in publishing the card he did about the elder Austin. To call a man " coward, liar, and scoundrel " in the public papers is not justifiable, as courts view such matters, by any circumstances whatever. But the abuse, bad as it was, could not possibly justify young Austin in making the street attack with the cane. No words, however aggravating, no libel, however scandalous, can authorize a son of the person abused to resort to violence in retaliation or revenge. A son may aid his father, if beaten, and if the assailant is killed the son will be excused; but neither son nor parent can justify resorting to violence to avenge an injury consisting in words, however opprobrious, or writings, however defamatory. Austin's attack being thus legally unjustifiable, Selfridge was acquitted on the ground of self-defence.

<div align="center">15*</div>

Much depends, however, in these cases upon what the jury think of the characters of the two men and of the circumstances of the case. It is only where they have found the accused guilty that the question has come before the bench of judges for decision. There has been, doubtless, a multitude of cases in which the jury have acquitted the accused, and no formal law decision made. It has never been customary to spend any time in arguing about the law of these cases after a jury has rendered an acquittal.

A very remarkable and difficult case involving these principles occurred in 1879 in New Jersey. The details will be generally remembered. The leading facts were: A, being in B's employ as coachman, misbehaved so as to give cause for dismissal. B told him to give up the keys and leave. A met the notice in what was from one point of view turbulent defiance, from another a rightful refusal to leave until his wages should be paid. B, probably meaning no more than to enforce his rights as he understood them, went to the house for a pistol as a means of protection; returned; and, without desiring or threatening to kill A, resumed insisting that A should surrender the keys and depart. But he became satisfied, and with apparent good grounds, from A's acts and demeanor, that the latter intended shooting. To anticipate this and disable A from doing it, he gave what was not intended to be, though it was, a fatal shot with the pistol he had brought from the house. Of course this chain of circumstances presented as one element the returning armed to the conflict. Another element was also involved—the right to eject an unlawful intruder. There is a general understanding that a householder may shoot a burglar. But how far does such a right extend? Can it be asserted towards any one who wrongfully insists upon remaining after he has been rightfully ordered to leave? A customer visits a store, buys goods, and disputes the change offered. A tenant or boarder denies that his month is up. A passenger proffers an insufficient ticket to the conductor.

22-cv-04563-RMB-AMD Document 488-4 Filed 02/13/26 Page 1 of 20 PageID

Either one ought, we will say, to yield in the dispute, leave peaceably at the demand of the rightful owner, and sue at law for the money due him or the damages sustained. But suppose he will not; may he be shot like a burglar, or must the owner, in his turn, keep the peace and seek redress in the courts? Certainly a servant, who has rightfully entered the premises, and is remaining in the assertion of a right, stands on a different footing, even if his claims are not tenable, from a midnight criminal. Probably the limit of the rule would be that a householder has the right gently to expel an intruder, and to use such force as is necessary in doing this.

But in the case described A resisted to the extent of threatening, or preparing to shoot B. The jury probably reduced their view of the facts to something like this: that B supposed, sincerely, that it was right and necessary for him to resume the possession of the barn, which he had temporarily intrusted to A, and that he might meet dangerous resistance in endeavoring to do so; that he armed himself to repel any such danger; and that he fired when he believed that resistance which imperilled his own life was seriously threatened. Accordingly they found a verdict of acquittal on the ground of self-defence.

JA1711





DATE DOWNLOADED: Fri Feb 10 15:38:05 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1874 3 .

ALWD 7th ed.
, , 1874 3 .

Chicago 17th ed.
"," Missouri - 27th General Assembly, Adjourned Session : 3-[ii]


AGLC 4th ed.
'' Missouri - 27th General Assembly, Adjourned Session 3

OSCOLA 4th ed.
'' 1874 3

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

# LAWS OF MISSOURI.

## GENERAL AND LOCAL LAWS

PASSED AT THE

ADJOURNED SESSION

OF THE

## XXVIITH GENERAL ASSEMBLY,

BEGUN AND HELD AT

## THE CITY OF JEFFERSON, WEDNESDAY, JANUARY 7, 1874.

*BY AUTHORITY.*



JEFFERSON CITY:
REGAN & CARTER, STATE PRINTERS.
1874.

JA1713

1:22-Case422-R90B-AMDocument48t 8Page:F542l 02Date3Filedage0720/2023ageID

Sec. 5. The clerks so appointed shall, before entering upon their duties, enter into bond, with two or more sufficient securities, in the sum of not exceeding five thousand dollars, payable to the state of Missouri, conditioned for the faithful performance of the duties devolved upon them by this act—said bond to be taken and the amount thereof fixed by the judge of the circuit court of the county in which such clerk shall be appointed; which bond shall be filed in the office of the clerk of the circuit court of said county, and may be sued on in the name of the state of Missouri, for the use of any one injured by the breach thereof.

Sec. 6. This act to take effect and be in force from and after its passage.

Approved March 19, 1874.

---

CRIMES AND MISDEMEANORS: Carrying Concealed Weapons.

AN ACT to prevent the carrying of concealed weapons.

| Section | Section |
|---|---|
| 1. Carrying concealed weapons in public assemblages prohibited. | 2. Act to take effect immediately. |

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

Section 1. Whoever shall, in this state, go into any church or place where people have assembled for religious worship, or into any school-room, or into any place where people may be assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court-room during the sitting of court, or into any other public assemblage of persons met for other than militia drill or meetings, called under the militia law of this state, having concealed about his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not less than ten nor more than one hundred dollars, or by imprisonment in the county jail not to exceed six months, or by both such fine and imprisonment: *Provided*, that this act shall not apply to any person whose duty it is to bear arms in the discharge of duties imposed by law.

Sec. 2. This act shall take effect and be in force from and after its passage.

Approved March 26, 1874.

The Norman Transcript. (Norman, Okla. Terr.), Vol. 02, No. 05, Ed. 1 Saturday, November 22, 1890 Page: 1 of 4



Crawford, W. C. The Norman Transcript. (Norman, Okla. Terr.), Vol. 02, No. 05, Ed. 1 Saturday, November 22, 1890, newspaper, November 22, 1890; Norman, Oklahoma Territory. (https://gateway.okhistory.org/ark:/67531/metadc136964/m1/1/? q=%22the%20norman%20transcript%22%20+%20november%20+%201890: accessed January 5, 2023), The Gateway to Oklahoma History, https://gateway.okhistory.org; crediting Oklahoma Historical Society.

JA1715

1/5/23, Case 1:22-Case-423-F900-AND Document 46-84 Page 544-02 Date Filed 07/20/2029 age ID 1300

JA1716

Case 1:22-cv-07464-RMB-AMD Document 48 Page: 545 02/13/23 Filed 07/20/2023 ageID: 1840

Newspapers
by ancestry

The Missouri Republican (St. Louis, Missouri) · Wed, Nov 20, 1872 · Page 4

https://www.newspapers.com/image/666854678

Downloaded on Jan 4, 2023

## Concealed Weapons.

We suppose it is practically impossible, by any legislative enactment, to entirely abolish the practice of carrying concealed weapons, but we sincerely wish there were a law whereby every person guilty of this practice—who has not given his reasons therefor, and obtained permission from the proper authorities—could be sent to the penitentiary for twelve months. Two-fifths of the homicides which now occur would not transpire at all, if men were thoroughly convinced that the carrying of firearms and daggers would lead to certain and severe punishment. It is entirely safe to say that not one murder in ten is committed in cold blood; all but a comparatively small proportion are done in the heat of passion, and done, too, simply because the murderer happens to have the instrument of death close at hand.

Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers
POWERED BY
.com

JA1717

Case 1:22-cv-07464-RMB-AMD Document 88 Page: 546 Date Filed: 07/20/2023 PageID: 1841

Newspapers
by ancestry

Moniteau Journal (California, Missouri) · Thu, Oct 3, 1872 · Page 3

https://www.newspapers.com/image/666920305

Downloaded on Jan 4, 2023

CONCEALED WEAPONS.—The practice of carrying concealed weapons is becoming quite common in these parts, and ought to be discontinued. In three or four instances, during the late Fair, it came nigh resulting in serious trouble. No good citizen will be found with a loaded revolver in his pocket, unless he knows his life to be in actual danger; indeed, to be known as carrying one is to imperil his personal safety. Every man is liable to have his temper excited by sudden and powerful provocative, and under the influence of that temporary excitement will do things he would not do otherwise; and, when maddened by liquor, if he has a deadly weapon on his person, he will be just as likely to use it upon his best friend as anybody else. Besides, the danger of carrying deadly weapons, it is, in itself, a mark of cowardice. Don't do it—it may get you into trouble when you least expect such a thing.

Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers
POWERED BY
.com

JA1718