# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

Nos. 23-1900, 23-2043

---

RONALD KOONS et al.,
*Plaintiffs-Appellees*,

v.

MATTHEW J. PLATKIN et al.,
*Defendants-Appellants*

---

AARON SIEGEL et al.,
*Plaintiffs-Appellees / Cross-Appellants*,

v.

MATTHEW J. PLATKIN et al.,
*Defendants-Appellants / Cross-Appellees*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(Nos. 22-cv-7463, 22-cv-7464 (RMB))

---

## JOINT APPENDIX

## VOLUME VI

## JA1719 – JA2131

---

MATTHEW J. PLATKIN
  *Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
  *Solicitor General*

ANGELA CAI
  *Deputy Solicitor General*

JEAN REILLY
  *Assistant Attorney General*

DAVID CHEN
VIVIANA HANLEY
SAMUEL RUBINSTEIN
  *Deputy Attorneys General*

Office of the New Jersey Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625-0080
(609) 414-5954
angela.cai@njoag.gov

*Attorneys for Defendants-Appellants*
*New Jersey Attorney General*
*Matthew J. Platkin and Superintendent of*
*New Jersey State Police Colonel*
*Patrick Callahan*

# JOINT APPENDIX
## TABLE OF CONTENTS

### VOLUME I                                                              JA Page

Defendants' Notice of Appeal (ECF 126)[1] ..................................................... JA1

*Siegel* Plaintiffs' Notice of Cross-Appeal (ECF 128)....................................... JA4

Order Granting In Part And Denying In Part Plaintiffs' Motions for
   Preliminary Injunction (ECF 125)................................................................. JA6

Opinion Granting In Part And Denying In Part Plaintiffs' Motions for
   Preliminary Injunction (ECF 124)................................................................ JA10

### VOLUME II

*Koons* District Court docket sheet ..................................................................... JA245

*Koons* Complaint (ECF 1) ................................................................................. JA264

*Siegel* Complaint (Case No. 22-cv-7463, ECF 1)............................................. JA286

Defendants' Expedited Motion to Consolidate (Case No. 22-cv-7463,
   ECF 7)............................................................................................................ JA345

*Siegel* Plaintiffs' Motion for Temporary Restraining Order And For A
   Preliminary Injunction (Case No. 22-cv-7463, ECF 8)............................... JA349

   Declaration of Aaron Siegel (Ex. 2) ......................................................... JA352

   Declaration of Jason Cook (Ex. 3).............................................................. JA360

   Declaration of Joseph DeLuca (Ex. 4)........................................................ JA368

   Declaration of Nicole Cuozzo (Ex. 5) ....................................................... JA374

   Declaration of Timothy Varga (Ex. 6)........................................................ JA377

---

[1] ECF numbers are to the *Koons* docket (Case No. 1:22-cv-07464) unless otherwise indicated.

Declaration of Christopher Stamos (Ex. 7) ................................................. JA382

Declaration of Kim Henry (Ex. 8) ............................................................ JA385

Declaration of Scott Bach (Ex. 9) ............................................................. JA388

Declaration of Daniel Schmutter (Ex. 10) ................................................ JA391

*Koons* Plaintiffs' Motion for Order to Show Cause, Motion for
    Temporary Restraining Order, Motion for Preliminary Injunction
    (ECF 8) ................................................................................................... JA438

Declaration of Ronald Koons (ECF 10) .................................................... JA441

Declaration of Nicholas Gaudio (ECF 11) ................................................ JA446

Declaration of Jeffrey Muller (ECF 12) .................................................... JA455

*Koons* Show Cause Order (ECF 13) ........................................................ JA462

## **VOLUME III**

Opinion on *Koons* Plaintiffs' Motion for Temporary Restraining Order
    (ECF 34) ................................................................................................. JA465

Order re: *Koons* Plaintiffs' Motion for Temporary Restraining Order
    (ECF 35) ................................................................................................. JA525

Transcript of *Koons* TRO Motion Hearing (ECF 37) ............................... JA527

Legislators' Motion to Intervene (ECF 47) ............................................... JA625

Proposed Intervention Pleading (Ex. A) .................................................... JA628

L. 2022, c. 131 (Ex. B) ............................................................................. JA655

Summary of legislative history of A4769 (Ex. C) ..................................... JA682

A4769 – as introduced (Ex. D) ................................................................. JA687

Report of the Assembly Judiciary Committee (Ex. E) .............................. JA720

Report of the Assembly Appropriations Committee (Ex. F) ...................... JA727

Report of the Assembly Oversight Committee (Ex. G) ............................. JA737

Report of the Senate Budget and Appropriations Committee (Ex. H)....... JA745

*Siegel* Consolidation Order (ECF 50)............................................................. JA753

Opinion on *Siegel* Plaintiffs' Motion for Temporary Restraining Order
(ECF 51)................................................................................................. JA759

Order re: *Siegel* Plaintiffs' Motion for Temporary Restraining Order
(ECF 52)................................................................................................. JA805

Order granting Legislators' Motion to Intervene (ECF 53)........................... JA807

*Siegel* Plaintiffs' Letter seeking clarification of TRO Order (ECF 54)............ JA810

Transcript of Siegel TRO Motion Hearing (ECF 56)...................................... JA812

Supplemental Declaration of Aaron Siegel (ECF 64) .................................... JA897

Supplemental Declaration of Jason Cook (ECF 65)....................................... JA900

Supplemental Declaration of Joseph DeLuca (ECF 66).................................. JA903

Supplemental Declaration of Timothy Varga (ECF 67).................................. JA904

Declaration of Ria Jairam (ECF 68) ............................................................... JA907

*Koons* Amended Complaint (ECF 69)............................................................. JA910

Declaration of Gil Tal (ECF 70) ..................................................................... JA933

Supplemental Declaration of Nicholas Gaudio (ECF 71) .............................. JA943

Stipulation & Order dismissing county prosecutors as defendants
(ECF 73)................................................................................................. JA947

**VOLUME IV**

Certification of Joseph R. Klett (ECF 76) ...................................................... JA950

1722 NJ Law "… against Carrying of Guns … by Persons not
Qualified" (Ex. A) ................................................................................ JA958

1751 Supplement to 1722 NJ Law "… against Carrying of Guns …
by Persons not Qualified" (Ex. B)........................................................ JA964

1769 NJ Law "… for the more effectual Preservation of Deer …" (Ex. C) .................................................................................. JA974

1771 NJ Law "… to prevent trespassing with Guns" (Ex. D)................... JA980

NJ State Constitution of 1776 (Ex. E) ........................................ JA986

1771 NJ Law "… to prevent trespassing with Guns" (Ex. F) .................. JA997

1753 Pennsylvania Gazette extract (Ex. G)................................... JA1005

1846 NJ Law Revision "… to prevent trespassing with Guns" (original enrolled law) (Ex. H) ............................................. JA1008

1846 NJ Law Revision "… to prevent trespassing with Guns" (as printed in Revised Statutes of 1846) (Ex. I) .................................. JA1026

1852 NJ Supplement (Ex. J) ................................................ JA1032

First 1859 NJ Supplement (Ex. K) .......................................... JA1036

Second 1859 NJ Supplement (Ex. L) ......................................... JA1039

1866 NJ Supplement (Ex. M) ................................................ JA1043

1867 NJ Supplement (Ex. N)................................................. JA1048

1873 NJ Supplement (Ex. O)................................................. JA1051

1846 NJ Law relative to "Carrying guns, where prohibited" (as printed in Revised Statutes of 1877) (Ex. P) ................................. JA1054

1846 NJ Law referred to as "An act to Prevent Trespassing with Guns" (as included in 1880 synopsis of laws) (Ex. Q) ....................... JA1060

1895 NJ Law "to prevent trespassing with guns" (Ex. R).......................... JA1067

1911 NJ Supplement (Ex. S) ................................................ JA1075

1928 Repeal of 1846 NJ Law (Ex. T)........................................ JA1081

N.J. Stat. Ann. § 2A:63-1 (Ex. U) ........................................ JA1096

Certification of Sarah Adelman (ECF 77) ................................... JA1099

Certification of George Fedorczyk (ECF 78) .................................................... JA1107

Certification of Bonny Fraser (ECF 79) ........................................................... JA1114

Certification of Steven Gorelick (ECF 80) ........................................................ JA1122

Certification of Robin Madden (ECF 81) .......................................................... JA1127

Certification of Judith A. Nason (ECF 82) ........................................................ JA1132

Certification of David L. Rebuck (ECF 83) ....................................................... JA1137

Declaration of Hendrik Hartog (ECF 84) .......................................................... JA1143

    Resume of Hendrik Hartog (Ex. A) .......................................................... JA1153

    1722 NJ Statute: "An Act to prevent killing of deer out of season, and against carrying of guns and hunting by persons not qualified." (Ex. B) .................................................................... JA1163

    1769 NJ Statute: "An Act for the more effectual preservation of deer in this Colony." (Ex. C) .................................................... JA1167

    1771 NJ Statute: "An Act for the preservation of deer and other game, and to prevent trespassing with guns." (Ex. D) ........................ JA1172

    1846 NJ Statute: "An Act for the preservation of deer and other game, and to prevent trespassing with guns." (Ex. E) .......................... JA1180

    Lucius Elmer's 1868 Digest of the Laws of New Jersey 362 (4th ed., Newark, 1868) (Ex. F) ........................................................ JA1186

    1895 NJ Public Law, ch. § 148 (Ex. G.) .................................................. JA1194

## VOLUME V

Declaration of Brennan Gardner Rivas (ECF 85) ............................................. JA1196

    Curriculum Vitae of Brennan Gardner Rivas (Ex. A) ............................... JA1219

    2 Edw. 3, c. 3 (1328) (Eng.) (Ex. B) ....................................................... JA1223

    25 Edw. 3, st. 5, c. 2, § 13 (1350) (Eng.) (Ex. C) ................................... JA1224

    1786 Va. Laws 33, ch. 21 (Ex. D) ............................................................ JA1227

1835 Mass. Acts 750 (Ex. E) ...................................................................... JA1228

Francois Xavier Martin, A Collection of Statutes of the Parliament
of England in Force in the State of North Carolina, 60-61
(Newbern 1792) (Ex. F)........................................................................ JA1232

1821 Me. Laws 285, ch. 76, § 1 (Ex. G) .................................................. JA1235

1813 La. Acts 172, § 1 (Ex. H)................................................................... JA1242

Revised Statutes of the State of Arkansas, Adopted at the October
Session of the General Assembly of Said State, A.D. 1837
(Ex. I) .................................................................................................... JA1247

1870 Tex. Gen. Laws 63, ch. 46, § 1 (Ex. J) ............................................. JA1249

1871 Tex. Gen. Laws 25, ch. 34 § 1 (Ex. K)............................................. JA1252

Penal Code of the State of Texas, (1879), Title X, Offenses Against
the Public Peace, Chapter 4, Unlawfully Carrying Arms (Ex. L)........ JA1255

Ch. 22, 1869 Tenn. Pub. Acts 23 (36th Assembly, 1st Sess.) §2
(Ex. M)................................................................................................. JA1257

Act No. 285, 1870 Ga. Laws 421 (Ex. N) ................................................. JA1260

Revised Statutes of the State of Missouri (1879), ch.24, §1274
(Ex. O) ................................................................................................. JA1263

1890 Okla. Stat. 495-96 (Ex. P)................................................................. JA1266

Annotated Code of the General Statute Laws of the State of
Mississippi (1892), "Crimes and Misdemeanors," §1030 (Ex. Q) ...... JA1269

Laws of Vermont, Special Session (1891), No. 85, §2 (Ex. R) ................. JA1272

1870 La. Acts 159-60, § 73 (Ex. S) ........................................................... JA1275

George Washington Paschal, A Digest of the Laws of Texas, 3rd ed.
(1873) II: 1317-1318 (Ex. T)............................................................... JA1293

John Prentiss Poe, The Maryland Code: Public Local Laws,
Adopted by the General Assembly of Maryland March 14, 1888
(Vol. 2, 1888), 1457 (Ex. U) ............................................................... JA1296

1886 Md. Laws 315, ch. 189 §1 (Ex. V) .................................................... JA1298

1877 Va. Acts 305, Offenses Against The Peace, § 21 (Ex. W) ............... JA1299

Oscar F. Greene, Revised Ordinances of the City of Boulder (1899),
    157 (Ex. X) ............................................................................................ JA1303

"An Ordinance," San Antonio Express (San Antonio, Texas),
    December 23, 1870 (Ex. Y) .................................................................. JA1304

Declaration of Patrick J. Charles (ECF 86) ...................................................... JA1305

Curriculum Vitae of Patrick J. Charles (Ex. 1) ........................................... JA1319

2 Edw. 3, c. 3 (1328) (Eng.) (Ex. 2) ........................................................... JA1326

Royal Proclamation as to the Wearing of Arms in the City, and at
    Westminster; and as to Playing at Games in the Palace at
    Westminster, Memorials of London and Life 268-69
    (H.T. Riley ed., 1868) (Ex. 3) ............................................................... JA1327

John Carpenter, Liber Albus: The White Book of the City of
    London at 335 (Henry Thomas Riley ed., 1861) (Ex. 4) ..................... JA1330

4 Hen 4, c. 29 (1403) (Eng.) (Ex. 5) ........................................................... JA1332

An Act to Prevent Routs, Riots, and Tumultuous Assemblies, and
    the Evil Consequences Thereof, September Session, Chapter
    VIII (Mass. 1786) (Ex. 6) ...................................................................... JA1333

An Act for the More Speedy and Effectual Suppression of Tumults
    and Insurrections in the Commonwealth, January Session,
    Chapter IX (Mass. 1787) (Ex. 7) ........................................................... JA1335

An Act to Prevent Routs, Riots, and Tumultuous Assemblies
    (N.J. 1797) (Ex. 8) ................................................................................. JA1339

An Act to Prevent Hunting with Fire-Arms in the City of New-
    York, and the Liberties Thereof (NY 1763) (Ex. 9) ............................. JA1341

An Act Against Riots and Rioters (Pa. 1705) (Ex. 10) ............................. JA1342

William Rawle, A View of the Constitution of the United States 126
    (2d ed., 1829) (Ex. 11) .......................................................................... JA1343

3 Calendar of Close Rolls, Richard II, 1385-1389, at 399-400 (May 16, 1388, Westminster) (H.C. Maxwell-Lyte ed., 1914) (Ex. 12) ....... JA1345

1 Calendar of Close Rolls, Richard II, 1377-1381, at 34 (December 1, 1377, Westminster) (H.C. Maxwell-Lyte ed., 1914) (Ex. 13) ......... JA1347

1647 Md. Laws 216 (Ex. 14) ................................................................. JA1348

1650 Md. Laws 273 (Ex. 15) ................................................................. JA1349

Chapter XVII: Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, Etc., May 22, 1890, reprinted in General Ordinances of the Town of Columbia, In Boone County, Missouri 34, 35 (Lewis M. Switzler ed., 1890) (Ex. 16) .................... JA1350

1877 Mo. Laws 158, 166 (Ex. 17) ........................................................ JA1352

Ordinance No. 577: An Ordinance Defining What Shall constitute Misdemeanors or Offenses Against the City of Webb City, and Providing Penalties Therefor, May 15, 1905, reprinted in Revised Ordinances of the City of Webb City, Missouri, 1905, at 99-100 (1905) (Ex. 18) ...................................................... JA1354

An Ordinance in Relation to Carrying Deadly Weapons, July 17, 1894, The Revised Ordinances of the City of Huntsville, Missouri of 1894, at 58-59 (1894) (Ex. 19) ......................................... JA1356

1874 Mo. Laws 43 (Ex. 20) .................................................................. JA1361

1875 Mo. Laws 50 (Ex. 21) .................................................................. JA1362

1883 Mo. Laws 76 (Ex. 22) .................................................................. JA1364

*State v. Reando* (Mo. 1878) (Ex. 23) .................................................... JA1365

Ordinance No. 76: An Ordinance Prohibiting Deadly Weapons, July 1, 1887, reprinted in Stockton Review and Rooks County Record (KS), July 1, 1887 (Ex. 24) ...................................................... JA1366

Public Statutes of the State of Tennessee Since the Year 1858, at 108 (James H. Shankland ed., 1871) (Ex. 25) ...................................... JA1368

1870 Tex. Gen. Laws 63 (Ex. 26) ......................................................... JA1369

1870 Ga. Laws 421 (Ex. 27)........................................................ JA1370

1889 Ariz. Sess. Laws 16 (Ex. 28) ............................................. JA1371

1890 Okla. Stat. 495 (Ex. 29) ..................................................... JA1373

A Digest of the Laws and Ordinances for the Government of the
    City of Harrisburg, Pennsylvania in Force January 1, A.D. 1906,
    at 557-58 (1906) (Ex. 30) ................................................... JA1375

The Revised Ordinances of Provo City, Utah 96 (1893) (Ex. 31) ............. JA1377

The Revised Ordinances of Payson City, Utah 84 (1893) (Ex. 32) ........... JA1378

The Revised Ordinances of Tooele City, Utah 87 (1893) (Ex. 33)............ JA1379

An Ordinance to Prohibit Intoxication, Breach of Peace, Carrying
    Deadly Weapons, the Use of Obscene Language, the Discharge
    of Fire-Arms, and to Close Places of Amusement on Sunday in
    the City of Wallace, Kansas, Jan. 31, 1889, reprinted in Wallace
    County Register (KS), Feb. 9, 1889, at 2 (Ex. 34) ............................... JA1381

Ordinance No. 97: Ordinance Related to Carrying Deadly Weapons,
    May 17, 1882, reprinted in Burlington Democrat (KS), May 26,
    1882, at 2 (Ex. 35) .................................................................. JA1383

Miscellaneous Ordinance, Jun. 24, 1871, reprinted in Abilene
    Weekly Chronicle (KS), Jun. 29, 1871, at 3 (Ex. 36) ........................ JA1385

Declaration of Peter Kochenburger (ECF 87) .................................... JA1387

Curriculum Vitae of Peter Kochenburger (Ex. A)...................... JA1401

Declaration of Angela Cai and Exhibits Volume I (ECF 88).......................... JA1418

P.L. 2022 ch. 131, A4769/S3124, An Act concerning the sale and
    possession of firearms and supplementing and amending
    various parts of the statutory law (Ex. 1) ............................. JA1431

Compilation of Order, D.E. 41, *Christian v. Nigrelli*, No. 22-2987
    (2d Cir. Dec. 12, 2022); Order, D.E. 75, *Antonyuk v. Hochul*,
    No. 22-2908 (2d Cir. Dec. 7, 2022); Order, D.E. 53, *Hardaway
    v. Nigrelli*, No. 22-2933 (2d Cir. Dec. 7, 2022) (Ex. 2) ...................... JA1470

Transcript of Preliminary Injunction Hearing, Corbett v. Hochul,
    1:22-cv-5867-LGS (S.D.N.Y. Nov. 29, 2022) (Ex. 3) ......................... JA1473

63 Proceedings and Acts of the Maryland General Assembly 338,
    § 5 (June 15-July 3, 1773) (Ex. 4) ....................................................... JA1504

1870 Tex. Gen. Laws 63 (Ex. 5)................................................................... JA1505

1786 Va. Laws 25 (Ex. 6).............................................................................. JA1508

Gen. Digest of the Ordinances & Res. of the Corp. of New Orleans
    371 (1831) (Ex. 7) .............................................................................. JA1509

1869-70 Tenn. Pub. Acts 23 (Ex. 8) ............................................................ JA1510

Art. 320, Tex. Act of April 12, 1871 (Ex. 9) ............................................. JA1513

Mo. Rev. Stat. 1879, at 224 (§ 1274) (Ex. 10) .......................................... JA1515

1859 Conn. Acts 62, ch. 82, § 5 (Ex. 11) ................................................... JA1517

1867 Kans. Sess. Laws 25 (Ex. 12) ............................................................ JA1521

1771 N.J. Laws 344, §1 (Ex. 13) ................................................................ JA1523

1865 La. Extra Acts 14, No. 10 § 1 (Ex. 14) .............................................. JA1531

1876 Iowa Acts 142, ch. 148, § 1 (Ex. 15) ................................................ JA1537

1929 Iowa Acts 90, § 30 (Ex. 16) ............................................................... JA1540

1919 Me. Laws 193 (Ex. 17) ....................................................................... JA1543

Ark. Rev. Stat. § 13, p. 280 (1838) (Ex. 18)............................................... JA1548

1839 Ala. Acts no. 77, § 1 (Ex. 19) ............................................................ JA1550

1821 Tenn. Acts ch. 13, § 1 (Ex. 20) .......................................................... JA1553

Ian Ayres & Spurthi Jonnalagadda, Guests with Guns: Public
    Support for "No Carry" Defaults on Private Land, 48 J. L.
    Medicine & Ethics 183, Table A4 (2020) (Ex. 21) .............................. JA1556

1873 Ga. Code 818, § 4528 (Ex. 22) ......................................................... JA1591

Fourth Annual Report of the Board of Commissioners of the Central
Park 106 (1861) (Ex. 23) ........................................................ JA1593

Acts of Assembly Relating to Fairmount Park 18 (1870) (Ex. 24) ............ JA1594

Michael John Sullivan, The Revised Ordinance of the City of St.
Louis, Together with the Constitution of the United States,
Constitution of the State of Missouri, the Scheme for the
Separation of the Governments of the City and County of St.
Louis, the Charter of the City, and a Digest of the Laws
Applicable to the City 635 (1881), § 3 (Ex. 25) ................................... JA1595

Egbert Jamieson and Francis Adams, The Municipal Code of
Chicago, Comprising the Laws of Illinois Relating to the City of
Chicago and the Ordinances of the City Council, Codified and
Revised 391 (1881). Art XLIII, § 1690 (Ex. 26) ................................. JA1596

Annual Reports of the City Officers and City Boards of the City of
Saint Paul 689 (1889) (Ex. 27) ................................................... JA1599

W.W. Thompson, A Digest of the Acts of Assembly Relating To,
and the General Ordinances of the City of Pittsburgh, From
1804 to Jan. 1, 1897 at 496 (2d Ed. 1897) (Ex. 28) ............................. JA1601

Excerpt from William Blackstone, Commentaries on the Laws of
England, 3d. (10th ed. 1787) (Ex. 29) ................................................ JA1603

Excerpt from William Griffith, A Treatise on the Jurisdiction and
Proceedings of Justices of the Peace in Civil Suits in New
Jersey (1813) (Ex. 30) .......................................................... JA1612

Excerpt from John Locke, Second Treatise of Government (1690)
(Ex. 31) ............................................................................ JA1625

1715 Md. Laws, ch. 26 § 7, as supplemented by 1766 Md. Laws
ch. 6, at 90 (Ex. 32) ............................................................. JA1630

1721 Pa. Act ch. 426 § 3, printed in Mitchell & Flanders, The
Statutes at Large of Pa. 1682 to 1801, vol.2, at 255 (Ex. 33) .............. JA1634

1763 N.Y. Law ch. 1233 §1, printed in Laws of N.Y., 1691 to 1771,
vol. 2, at 442 (Ex. 34) .......................................................... JA1639

1867 Tex. Act Vol, 20, p. 90, at art. 6510, printed in Paschal, A
    Digest of the Laws of Tex. Ann., vol. 2, at 1321 (Ex. 35) ................... JA1643

1893 Ore. Act S.B. 15, § 1, at 79 (Ex. 36)................................................. JA1647

La. R.S. 821, § 1809, printed in R.H. Marr, Ann. Rev. Stat. La., vol.
    1, at 600 (1915) (Ex. 37)......................................................... JA1658

1870 Tenn. Acts. ch. 13 (Ex. 38)........................................................ JA1664

1996 La. Sess. Law. Serv. 1st Ex. Sess. Act 4 (S.B.2), R.S.
    40.1379.3(O) (Ex. 39)............................................................ JA1668

Bill 3730, 1996 S.C. Assemb., Rev. to § 23-31-210(M)(10) (Ex. 40)....... JA1674

29Excerpt from 1564 Stat. King Henry III (Ex. 41)................................... JA1687

Wingate, An Exact Abridgement of All Statutes In Force & Use
    From The Beginning Of Magna Carta Until 1641 (1666), at 591
    at § 9 (Ex. 42) ...................................................................... JA1690

1776 Del. Const. art. 28 (Ex. 43)....................................................... JA1693

Excerpts from Benjamin Vaugahn Abbott, Judge and Jury: A
    Popular Explanation of Leading Topics in the Law of the Land
    (1880) (Ex. 44) .................................................................... JA1696

1874 Mo. Laws at 43, s. 1 (Ex. 45)..................................................... JA1712

The Norman Transcript, (Norman, Okla. Terr), Vol. 2, No. 5, Ed. 1
    (Nov. 22, 1890) (Ex. 46)........................................................ JA1715

The Missouri Republican, (St. Louis, Mo.) (Nov. 20, 1872) (Ex. 47)....... JA1717

The Moniteau Journal (California, Mo.) (Oct. 3, 1872) (Ex. 48).............. JA1718

## **VOLUME VI**

Collected Venue Policies, NJ (Ex. 49) ...................................................... JA1719

Excerpts from R. Rosenzweig & E. Blackmar, *The Park And The
    People: A History Of Central Park* (Cornell Univ. Press 1992)
    (Ex. 50) .............................................................................. JA1790

Declaration of Angela Cai and Exhibits Volume II (ECF 89).......................... JA1818

    1789 Mass. Acts ch.28, at 438 (Ex. 51)...................................................... JA1831

    1895 Mich. No. 436 Sec. 44, at 596 (Ex. 52) ............................................. JA1834

    1905 Minn. 620, Sec. 53 (Ex. 53)................................................................ JA1843

    1917 Wisc. Ch. 668, at 1243 Sec. 29.57(4) (Ex. 54)................................... JA1872

    1921 N.C. Public Laws & Res. ch. 6 § 3, at 54 (Ex. 55)............................. JA1929

    1937 N.J. Rev. Stat. 32:14-13.1(8) (Ex. 56) ............................................... JA1932

    1875 Laws & Ord. Governing Village of Hyde Park at 310, § 6 (Ex.
        57)...................................................................................................... JA1935

    1883 Rev. Ord. of the City of Danville, ch.19 § 4, at 83 (Ex. 58) ............. JA1941

    Tower Grove Park of the City of St. Louis 117 (1883) (Ex. 59)................ JA1945

    Rev. Ordinances of Salt Lake City 248, ch. 27 § 6 (1888) (Ex. 60) .......... JA1949

    Laws & Ordinances for the Gov't of the Mun. Corp. of the City of
        Williamsport, Pa. 141 (1891) (Ex. 61) ................................................ JA1953

    Park Ordinances, Springfield, Mass. (1891) (Ex. 62) ................................ JA1964

    Compiled Ordinances of the City of Grand Rapids 163, § 432
        (1907) (enacted 1891, amended 1892 & 1897) (Ex. 63)...................... JA1965

    3rd Ann. Rep. of the Park Comm'rs of the City of Lynn 23 (1891)
        (Ex. 64) .............................................................................................. JA1970

    Laws & Ordinances of the City of Peoria, Illinois 667 (1892) (Ex.
        65)...................................................................................................... JA1973

    Mun. Code of the City of Spokane, Wash. 123 (1903) (enacted
        1892) (Ex. 66)..................................................................................... JA1977

    Charter of the City of Wilmington, Rules and Regulations of the
        Board of Park Commissioners, Part VII, § 7 (1893) (Ex. 67)............. JA1982

    Rev. Ordinances of the City of Canton, Ill. 240 (1895) (Ex. 68).............. JA1984

Gen. Ordinances of the City of Indianapolis 648, § 1971 (1904)
(enacted 1896) (Ex. 69) ........................................................ JA1989

Digest of the Acts of Assembly Relating to & the Gen. Ordinances
of the City of Pittsburgh 496 (1897) (enacted 1893) (Ex. 70) ............. JA1995

Digest of the Laws & Ordinances for the Gov't of the Mun. Corp. of
the City of Reading, PA 240 (1897) (Ex. 71)...................................... JA2001

Rev. Ordinances of the City of Boulder, CO 157 (1899) (Ex. 72)............. JA2002

General Municipal Ordinances of the City of Oakland, Cal.,
Addendum at 15 (1909) (Ex. 73)........................................... JA2003

The Code of City of Birmingham, Alabama 662 (1917) (Ex. 74) ............. JA2004

Firearms Regulations in the National Parks, 1897-1936 (NPS 2008)
(Ex. 75) ................................................................................ JA2008

Sen Yuan Wu, N.J. Pop. 1790 to 2010, Div. Labor Market &
Demographic Rsch. (Dec. 2010) (Ex. 76)............................... JA2083

2021 Population Density: N.J. Counties, U.S. Census Bureau, Pop.
Div. (Apr. 2022), prepared by N.J. Dept. Labor & Workforce
Dev't (Ex. 77) ...................................................................... JA2086

1874 Mo. Laws 43 (§ 1) (Ex. 78) .............................................. JA2087

1883 Mo. Laws 76 (§ 1) (Ex. 79) .............................................. JA2090

1889 Ariz. Sess. Laws 17 (§ 3) (Ex. 80).................................... JA2093

1890 Okla. Sess. Laws 496 (§ 7) (Ex. 81)................................. JA2096

1903 Mont. Laws. 49-50 (§ 3) (Ex. 82)..................................... JA2099

M. Kevane & W. Sundstrom, Development of Public Libraries in
the U.S., 1870-1930, Information & Culture, Vol 49, no. 2
(2014) (Ex. 83) .................................................................... JA2103

## <u>VOLUME VII</u>

Pop. of Mass. by Counties & Minor Civil Divs., Census Bulletin
(Nov. 8, 1990) (Ex. 84)........................................................ JA2132

1746 N.J. Laws ch. 102 (Ex. 85) ................................................................ JA2139

1797 N.J. Laws (R.S. 572), at 367 (Ex. 86)................................................ JA2144

1874 N.J. Laws (P.L. 1871, p.109) (Ex. 87)................................................ JA2149

G. Fenich, A Chronology of (Legal) Gaming in the U.S., Gaming
Rsch & Rev. J, vol.3, Iss.2 (1996) (Ex. 88)........................................ JA2151

Report & Recommendations of the Governor's Advisory
Commission on Gambling, Jun. 30, 1998 (Ex. 89) ............................. JA2165

Port Authority of NY & NJ, Dec. 2021 Traffic Report, Aviation
Dep't, https://www.panynj.gov/airports/en/statistics-general-
info/Monthly_Airport_Activities.html (Ex. 90).................................. JA2447

Caroline Norris, A History of Madness: Four Venerable Virginia
Lunatic Asylums, Virginia Magazine of History & Biography,
Vol. 125, Issue 2 (2017) (Ex. 91) ........................................................ JA2450

1776 N.C. Sess. Laws 168 (Ex. 92)............................................................ JA2478

1800 Ga. Laws 428 (Ex. 93)........................................................................ JA2479

1837 Md. Acts 108 (Ex. 94) ....................................................................... JA2481

1868 Oh. Supp. Rev. Stat 13 (Ex. 95) ........................................................ JA2484

1872 Wisc. Rev. Stat 1960 (Ex. 96) ........................................................... JA2486

1872 Conn. Acts 108 (Ex. 97) .................................................................... JA2489

1872 Or. Acts 26 (Ex. 98)........................................................................... JA2491

1873 S.C. Rev. Stat. 404 (Ex. 99)............................................................... JA2493

1887 W.Va. Code, ch. 148, § 7 (Ex. 100) .................................................. JA2495

Declaration of Angela Cai and Exhibits Volume III (ECF 90) ........................ JA2499

1881 Kan. Sess. Laws 92, § 23 (Ex. 101)................................................... JA2512

1875 Ark. Acts 156 (Ex. 102)..................................................................... JA2514

1847 Va. Laws 129 (Ex. 103)...................................................................... JA2516

1868 W. Va. Code 153 (Ex. 104) ................................................................ JA2523

1872 Portland Ord. No. 1108 (Ex. 105) .................................................... JA2526

1813 Ky. Acts 10 (Ex. 106) ........................................................................ JA2528

1813 La. Acts 172 (Ex. 107) ....................................................................... JA2532

1819 Ind. Acts 39 (Ex. 108) ....................................................................... JA2536

1838 Va. Acts 76 (Ex. 109) ........................................................................ JA2538

1859 Ohio Acts 56 (Ex. 110) ...................................................................... JA2541

1861 Ga. Laws 859 (Ex. 111) ..................................................................... JA2544

1835 Mass. Rev. Stat., ch. 134, § 16 (Ex. 112) ........................................ JA2546

1838 Terr. of Wis. Stat. § 16 (Ex. 113) .................................................... JA2548

Me. Rev. Stat., ch. 169, § 16 (1840) (Ex. 114) ........................................ JA2550

Mich. Rev. Stat., ch. 162, § 16 (1846) (Ex. 115) ..................................... JA2552

Excerpts from M. Dalton, The Country Justice (1690) (Ex. 116) ............. JA2554

Terr. of Minn. Rev. Stat., ch. 112, § 18 (Ex. 117) .................................... JA2560

1854 Ore. Stat. ch. 16, § 17 (Ex. 118) ...................................................... JA2562

1857 D.C. Rev. Code ch. 141, § 16 (Ex. 119) ........................................... JA2564

1860 Pa. Laws p. 432, § 6; § 8 (Ex. 120) .................................................. JA2566

1844 Miss. Law p. 182, Art. 16, § 1, in Anderson Hutchinson, Code
    of Mississippi, from 1798 to 1848, 182 (1848) (Ex. 121) ................... JA2568

1856-1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled
    "Revenue," ch. 34, § 23, pt. 4 (Ex. 122) .............................................. JA2570

1866 Ga. Laws p. 27-28, Title VI, No. 41 (Ex. 123) ................................ JA2572

Rev. Code of Alabama, p. 169, ch. 3, § 10 (1867) (Ex. 124) .................... JA2575

1867 Miss. Laws 327-28, An Act To Tax Guns And Pistols in The
County Of Washington, ch. 249, § 1 (Ex. 125)....................................JA2577

George W. Hess, Revised Ordinances of the City of Evanston, 131-
132 (1893) (Ex. 126) ...........................................................................JA2580

1895 Neb. Laws 210, Laws of Nebraska Relating to the City of
Lincoln, Art. XVI, § 6 (Ex. 127) .........................................................JA2582

1902-04 Va. Acts 155-157, An Act to Raise Revenue for Support of
the Government and Public Free Schools, sched. B, § 6,
Tangible Personal Property, Eighteenth (Ex. 128)...............................JA2584

Orville Park, Park's Annotated Code of the State of Georgia 1914,
Penal Code, Article 3, Carrying pistols without license, §
348(a)-(d) (Ex. 129)............................................................................JA2587

Ohio Law, p. 633, §§ 24-25 (1884) (Ex. 130).............................................JA2590

Mass. Law, p. 479-484, ch. 22, §§ 1-10 (1776) (Ex. 131) .........................JA2592

1777 Pa. Laws 110-113 (Ex. 132) ...............................................................JA2598

Va. Act of May 5, 1777, ch. 3 (Ex. 133) .....................................................JA2604

Excerpt from Bernard Schwartz, The Bill of Rights: A
Documentary History, Vol, 2, at 662 (1971) (Ex. 134) .......................JA2608

Excerpt from Debates & Proc. in the Convention of the
Commonwealth of Mass. Held in the Year 1788 (1856) (Ex.
135).......................................................................................................JA2616

Charles C. Branas, SeungHoon Han, and Douglas J. Wiebe, Alcohol
Use and Firearm Violence, 38 Epidemiologic Rev. 32, 40-43
(2016) (Ex. 136) ..................................................................................JA2618

Jonathan Jay, Alcohol Outlets and Firearm Violence: a Place-Based
Case–Control Study Using Satellite Imagery and Machine
Learning, Inj. Prev. 61, 64 (2019) (Ex. 137).......................................JA2632

Pamela J. Trangenstein et al., Outlet Type, Access to Alcohol, and
Violent Crime, 42 Alcohol Clin. Exp. Re. 2234, 2241 (2018)
(Ex. 138) ..............................................................................................JA2638

Matthew Miller et al., 'Road rage' in Arizona: Armed and
    Dangerous, 34 Accident Analysis and Prevention, 807, 811
    (2002) (Ex. 139) ............................................................... JA2650

Arlin J. Benjamin Jr., Sven Kepes, & Brad. J. Bushman, Effects of
    Weapons on Aggressive Thoughts, Angry Feelings, Hostile
    Appraisals, and Aggressive Behavior: A Meta-Analytic Review
    of the Weapons Effect Literature, 22 Personality & Social
    Psych. R. 347, 359 (2018) (Ex. 140) .................................... JA2658

David Hemenway, Chloe Shawah, & Elizabeth Lites, Defensive
    gun use: What can we learn from news reports?, 9 Injury
    Epidemiology 19, 27 (2022) (Ex. 141)................................. JA2689

David Hemenway, Deborah Azrael, & Matthew Miller, Whose guns
    are stolen? The epidemiology of Gun theft victims, 4 Injury
    Epidemiology 11, 14 (2017) (Ex. 142)................................. JA2699

## **VOLUME VIII**

John J. Donohue et al., More guns, more unintended consequences:
    the effects of right-to-carry on criminal behavior and policing in
    U.S. cities, Nat'l Bureau of Econ. Research, Working Paper
    Series, Working Paper 30190, at 29,
    http://www.nber.org/papers/w30190 (Ex. 143).................................... JA2704

D. Hemenway & S.J. Solnick, The epidemiology of self-defense
    gun use: Evidence from the National Crime Victimization
    Surveys 2007–2011, 79 Preventative Medicine 22, 27 (2015)
    (Ex. 144) ............................................................................ JA2740

John J. Donohue, Abhay Aneja, & Kyle D. Weber, Right-to-Carry
    Laws and Violent Crime: A Comprehensive Assessment Using
    Panel Data and a State-Level Synthetic Control Analysis, 16 J.
    Empirical L. Studies 198, 240 (April 2019) (Ex. 145)......................... JA2746

Michael Siegel et al., Easiness of Legal Access to Concealed
    Firearm Permits and Homicide Rates in the United States, 107
    AJPH Research 1923, 1929 (2017) (Ex. 146)....................................... JA2796

1875 Wyoming Terr. Acts ch.52, §1 (Ex. 147) .......................................... JA2803

Code of City of Lynchburg, Va. Ch. XIX, § 20 (1887) (Ex. 148) ............. JA2806

1869 N.M. Gen Laws ch.32, at 313 (Ex. 149).............................................. JA2809

A. Holgersson & U. Bjornstig, Mass-casualty attacks on public
transportation, J Transp. Security 7:1–16 (2014) (Ex. 150)................. JA2812

1795 Mass Gen Law ch.26, § 2 (Ex. 151) .................................................. JA2828

1686 N.J. Laws, ch. 9, in The Grants, Concessions, and Original
Constitution of the Province of New Jersey, at 289–90 (2d ed.
1881) (Ex. 152)................................................................................... JA2830

Second Supplemental Declaration of Jason Cook (ECF 98) ............................ JA2834

Supplemental Declaration of Nicole Cuozzo (ECF 99) .................................... JA2837

Declaration of Ronald D'Angelo (ECF 100)...................................................... JA2839

David Jensen Affidavit (ECF 103) .................................................................... JA2841

1777 N.J. Laws 26-36, ch. XX (Ex. 1) ...................................................... JA2843

1780 N.J. Laws 39-54, ch. XIII (Ex. 2) ...................................................... JA2855

1798 N.J. Laws 609-28, ch. DCCCXXII (Ex. 3)........................................ JA2872

1806 N.J. Laws 771-83, ch. CLVI (Ex. 4).................................................. JA2893

1829 N.J. Laws 109-33, An Act for the punishment of crimes (Ex.
5) ....................................................................................................... JA2907

Act of May 28, 1746, ch. X, Acts and Laws of Massachusetts Bay
207-08 (Ex. 6)..................................................................................... JA2933

19 Colonial Records of the State of Georgia: Part I, Statutes,
Colonial and Revolutionary 137-40 (Ex. 7) ......................................... JA2935

Digest of the Laws of Georgia 157-58 (1800) (Ex. 8) ................................ JA2940

1812 Del. Laws 522-24, ch. CXCV (Ex. 9) ................................................ JA2943

1818 Vermont Acts & Resolves 22-65, ch. II (Ex. 10) .............................. JA2947

1823 N.H. Laws 72-75, ch. XXXIV (Ex. 11)............................................. JA2992

1885 N.J. Laws 52, ch. XLIV (Ex. 12)......................................................JA2997

1799 N.J. Laws 561-63, ch. DCCCVI (Ex. 13)...........................................JA2999

1811 N.J. Laws 300 (Ex. 14) ...................................................................JA3003

Public Laws of South Carolina 275-76 (1790) (Ex. 15)...........................JA3005

Acts and Laws of the State of Connecticut 36-37 (1784) (Ex. 16) ...........JA3008

Manual of the Laws of North Carolina 234-36 (1814) (Ex. 17) ...............JA3011

Digest of the Laws of Georgia 428 (1800) (Ex. 18)..................................JA3015

Public Laws of Rhode-Island and Providence Plantations 568
    (1798) (Ex. 19) .................................................................................JA3017

1812 Del. Laws 522-24, ch. CXCV (Ex. 20) .............................................JA3019

5 Laws of the Colony of New York 11-13, ch. 1410 (1894) (Ex. 21) .......JA3023

## VOLUME IX

Letter from Defendants (ECF 104) ...........................................................JA3027

Letter from Defendants (ECF 105) ...........................................................JA3029

Supplemental Certification of Director Rebuck (Ex. 1).............................JA3031

Letter from Defendants (ECF 107) ...........................................................JA3034

Letter from *Siegel* Plaintiffs Regarding Standing (ECF 114)..........................JA3035

Declaration of Kenneth Armellino (Ex. 1) ...............................................JA3038

Declaration of Daniel L. Schmutter (Ex. 2)...............................................JA3048

Third Supplemental Declaration of Jason Cook (ECF 115)...........................JA3091

*Siegel* Plaintiffs' Emergency Motion for Leave to File Supplemental
    Papers Containing Newly Obtained Information on Issues of
    Standing (ECF 116) ...........................................................................JA3093

Transcript of Hearing on Motion for a Preliminary Injunction (ECF
    118) ..................................................................................................JA3095

Letter from Defendants enclosing electronic copies of exhibits
   submitted to the court at motion hearing (ECF 119) ................................. JA3263

Timothy Cunningham, 1 A New and Complete Law Dictionary
   (1771) (Tab 1) ...................................................................................... JA3265

Samuel Johnson, Dictionary of the English Language (1773)
   (Tab 2) .................................................................................................. JA3270

T. Sheridan, A Complete Dictionary of the English Language
   (1797) (Tab 3) ...................................................................................... JA3277

N. Bailey, Dictionarium Britannicum (1736) (Tab 4) ............................... JA3282

S. Colt, Revolving gun, patented Feb. 25, 1836 (from Rutgers
   University Libraries) (Tab 5) ................................................................. JA3286

James Robinson Planché, 1 A Cyclopædia of Costume or
   Dictionary of Dress (1876) (Tab 6) ..................................................... JA3289

Order administratively terminating actions pending appeal (ECF 130) ........... JA3297

# EXHIBIT "A"

JA1719

Zoo Open Daily 10am to 3pm

ESSEX COUNTY    ZOOLOGICAL SOCIETY OF NEW JERSEY    MEMBERS 



ANIMALS    EXPERIENCES    VISITOR INFO    GROUPS & PARTIES    EDUCATION

VISITOR INFO
—

# ZOO RULES & FAQ'S

🕐 Hours & Admission

🗺 Zoo Map

📍 Directions

🖐 FAQ & Zoo Rules

🖐 **ZOO RULES**

- Turtle Back Zoo is a smoke-free facility. Smoking permitted in designated areas only.

- Visitors age 17 and under must be accompanied by a chaperone.

- **Pets are NOT permitted.** Guests who rely on service animals may bring them into the Zoo, provided that the animals remain properly leashed. Guests are solely responsible for the care and control of their animals.

- Power wheel and remote controlled devices are not permitted on grounds.

- **Do NOT** feed our animal residents or throw things in exhibits. All guests should stay on public paths at all times.

- *Weapons of any kind, balloons, piñatas, radios, bikes, skateboards, or scooters are NOT permitted* in the Zoo or the surrounding complex. Styrofoam coolers and alcoholic beverages are also prohibited.

- Deposit trash in designated receptacles.

- Please **Do NOT** chase, feed or touch our free roaming animals such as the peacocks and peahens.

JA1720

Zoo Open Daily 10am to 3pm

- Non-commercial photography for personal use is allowed, but tripods maybe restricted at the discretion of zoo staff. Commercial photograp and filming requests must go through the *Guest Relations Office.*

- We reserve the right to escort from zoo grounds any individuals or groups who are acting in ways deemed harmful to our animals or the par that impinge upon the enjoyment of the park by other guests.

**Following these simple rules will make your visit and those of other guests enjoyable.**

## ❓ FREQUENTLY ASKED QUESTIONS

| | |
|---|---|
| + **Are there new directives due to COVID-19?** | |
| + **Can I purchase tickets online?** | |
| + **Can I bring my own food into the zoo?** | |
| + **Are the zoo's hours different in the winter?** | |
| + **Are admission prices lower in the winter months?** | |
| + **Can I rent a wheelchair or stroller?** | |
| + **Can I bring my own stroller?** | |
| + **Does the zoo offer lockers available for rent?** | |

**Still have a question?** Contact us for further information, or give us a call 973-731-5800.

## ♿ ACCESSIBILITY

Turtle Back Zoo is **100% ADA compliant.**

*We have a limited number of wheelchairs and strollers that are available for rent on a first-come, first-served basis.*

DISCOVER MORE

Education Programs ›

About The Zoo ›

THE ZOOLOGICAL SOCIETY OF NJ

Become a Member ›

Donate ›




JA1721

Case 1:22-cv-04563-RM-AMD Document 49-2 Filed 07/20/2023 Page 1 of 2 PageID: 1845

# EXHIBIT "B"

# Policies

+ Code of Conduct

+ Coolers

+ Pets

+ Photography

+ Augmented Reality Games

– Prohibited Items

The following is a list of prohibited items at Adventure Aquarium.

- Weapons of any kind or objects that appear to be weapons including firearms, ammunition, fireworks, water grenades (metal or plastic) or knives.
- Alcoholic beverages of any type.
- Tripods/Monopods.
- Pepper spray/mace.
- Recreational devices with wheels, such as skateboards, hover boards, balance boards, scooters, inline skates or shoes with built-in wheels.
- Wheeled mobility:Devices with less than 3 wheels; devices that cannot maintain stability and balance when stopped, unpowered or unoccupied, training wheels or similar modifications; devices powered by any means other than manually or electrically; devices that travel faster than walking pace; multi-rider devices or devices that exceed 36 inches in width or 52 inches in length.
- Pets or other animals, except for approved service animals (e.g. dogs); service animals must be under the control of the owner at all times and should remain on a leash or harness (due to the nature of some attractions, service animals may not be permitted to ride or enter certain attractions).
- Any other items that the park determines may be suspicious, harmful, unsafe or disruptive.

All persons and bags are subject to screening prior to admission, this may include metal detection.

+ Smoking

+ Ticket Policy

# Get the latest news and special offers

Subscribe to our newsletter, special offers and promotional emails.

JA1723

# EXHIBIT "C"



| CUS-2: Customer Behavior Policy |
| --- |
| **Effective June 15, 2022,** Supersedes: April 13, 2022; March 7, 2022; August 19, 2021; July 13, 2021; June 8, 2021; April 13, 2021; September 8, 2020; October 14, 2014; November 18, 2008; November 16, 2006 |

| **Policy Statement:** The Camden County Library System has established regulations for behavior to ensure that all patrons can use the Library safely and without disruption. |
| --- |

**The following activities are prohibited in Library buildings and grounds:**

1. Talking loudly, making noise or engaging in other disruptive conduct.

2. Disruptive use of personal entertainment and communication devices including loud cell phone conversations and volume high enough to be heard by others.

3. Leaving a child aged 7 or under unattended in the library without the supervision of a responsible person aged 13 or older.

4. Interfering with another person's use of the library or with the library personnel's performance of their duties.

5. Disobeying reasonable directives of a Library staff member.

6. Eating or drinking in unauthorized areas.

7. Not wearing shoes and shirt.

8. Misusing the restrooms (i.e., using as a laundry or washing facility).

9. Bringing animals into the library except those needed to assist a patron with a disability or for a Library-sponsored event.

10. Soliciting of any kind, including petitioning, canvassing, conducting surveys, and distributing written materials for political, charitable, commercial or religious purposes, within the Library, within ten (10) feet of all entrances or in any way that interferes with the ability of library customers to enter and exit the premises.

11. Excessive displays of public affection.

12. Entering staff areas without authorization.

JA1725

13. Loitering outside on library property, including failure to vacate the property after removal from the property.

14. Rollerblading, skateboarding or bike riding in unauthorized areas.

15. Smoking.

16. Carrying a weapon into the Library unless authorized by law. Any patron authorized to carry a weapon must notify Library staff that he/she is carrying a weapon in the Library.

17. Damaging library property.

18. Stealing library materials.

19. Threatening, harassing or physically harming staff or customers.

20. Purposely circumventing computer security or filtering software or otherwise tampering with the operation of the computer network.

21. Engaging in any other activities prohibited by law including those regulating conduct in public places and computer tampering.

The Library Director is authorized to revoke or restrict Library privileges of any individual who behaves contrary to these rules and to promulgate procedures for enforcing the rules. The Director is also authorized to file charges against individuals who continually transgress these rules.

**Staff Responsibilities:**

All staff members are responsible for enforcing this policy and as infractions are witnessed will address them immediately in accordance with established procedures, including calling police as needed.

**Sanctions:**

The person in charge of a branch is authorized to utilize or initiate as indicated the sanctions listed below for additional responses to uncooperative or repeat violators.

1. Violations of minor offenses 1-15:

A customer who refuses to stop offending behavior after two verbal warnings will be banned from the Library branch by the person in charge for the rest of the day.

A customer with repeated violations may be banned from the Library branch by the person in charge for one week.

JA1726

For continued violations a warning letter may be sent by the branch manager to the offending customer or his/her parent(s) or guardian(s).

If violations continue the customer may be banned from the entire system as determined appropriate by the Director.

2. Violations of major offenses 16 - 21:

The customer will be immediately banned from the Library branch by the person in charge for two weeks and told to expect a letter about the length and nature of a longer ban.

The customer will be banned from the entire system as determined appropriate by the Director.

3. Conditions of the ban:

The suspended customer may not enter the grounds or building of any branch of the system. If the suspended customer does enter the grounds or building, the police will be called and the customer will face charges of criminal trespass.

4. Any individual who has been banned from the Library may have the decision of the Director reviewed by submitting a request in writing to the Camden County Library Commission at:

Camden County Library Commission
203 Laurel Road
Voorhees, NJ 08043

JA1727

# EXHIBIT "D"

JA1728



 (https://www.oldbridgelibrary.org/)

| Enter search terms here | Search |

Website    Catalog

(https://www.facebook.com/Old-Bridge-Public-Library-770173226513708/)(https://twitter.com/BridgePublic)(https://www.oldbridgelibrary.org/adults/computer-center/wifi-information/)

**Central Branch**
(732) 721-5600 x5010
One Old Bridge Plaza
Old Bridge NJ, 08857

**Hours**
Monday-Friday 10am-9pm
Saturdays 10am-5pm
Sundays 12pm-5pm

**Laurence Harbor (LH Recreation Center)**
(908) 217-3620
58 Wilson Avenue
Laurence Harbor, NJ 08879

**Hours**
Tues. Wed. Thurs. 1pm-5pm

Home (https://www.oldbridgelibrary.org/)          Library Info (https://www.oldbridgelibrary.org/library-info/)

News Releases (https://www.oldbridgelibrary.org/news_releases/)

Resources (https://www.oldbridgelibrary.org/resources/)          Adults (https://www.oldbridgelibrary.org/adults/)

Teens (https://www.oldbridgelibrary.org/teens/)          Children (https://www.oldbridgelibrary.org/children/)

Events (https://www.oldbridgelibrary.org/events/)          Contact (https://www.oldbridgelibrary.org/contact/)



# Acceptable Behavior Policy

All members of the public are welcome at the Old Bridge Public Library. We expect all Library staff to treat customers of the Library with courtesy. In turn, we expect Library customers to behave in the Library with dignity and in such a way that they do not interfere with the functions of the Library or with the convenience and comfort of other patrons. While in the Library:

JA1729

- All persons shall not engage in loud, boisterous or unreasonable conduct, harassment or abusive language, unwanted communication or other intrusive behavior. No one shall interfere with Library personnel in the performance of their duties.
- Conversations shall be conducted quietly and, if possible, outside of quiet study areas. Shouting, loud voices and abusive language are not acceptable behavior.
- Ringing cell phones are disruptive. The Library requires that cell phones be turned off or set to "manner mode" while in the Library. While conversing on cell phones, customers must speak quietly and with discretion.
- Smoking is not permitted anywhere in the Library building.
- Nonalcoholic beverages in covered containers are permitted only in some areas of the Library. Food and drink are not allowed in computer areas or on computer tables and stands.
- Consumption of snack food is allowed in all areas of the Library except the computer areas. It is expected that customers will dispose of litter and debris in trash containers and leave table tops and chairs clean.
- Meals may not be eaten in the Library. The delivery of food to the Library is not allowed and will not be accepted.
- Animals, except for service animals as defined in the Americans With Disabilities Act, are not permitted except in connection with Library programs.
- No one may deface, destroy, steal or misuse any Library materials, furnishings, equipment or other Library property. Library restrooms shall not be used as a laundry or for personal bathing.
- The use of alcohol or any drug constituting a controlled, dangerous substance as defined by New Jersey Law is not permitted. No one under the influence of alcohol or such drugs shall be permitted into the Library.
- Shirts and shoes must be worn at all times. Improper attire, including bare feet or chests, is not permitted in the Library. Library staff shall have the discretion to determine whether any person is improperly attired.
- Personal use of audio, visual or electronic equipment must not disturb others.
- No person shall possess or carry any weapons into the Library unless authorized to do so by law. Any person authorized to carry weapons must notify Library staff that they are in possession of a weapon in the library.
- Personal belongings are subject to inspection by Library personnel.
- Personal belongings are not to be left unattended for more than 30 minutes.
- Running, rollerblading, skateboarding and similar activities are not permitted in the Library or on Library grounds.
- Bicycles must be parked outside of the building and cannot be brought inside.
- No sales or solicitations of contributions or signatures by any outside organization or individual is permitted in the Library facility or on its grounds.
- All persons must leave the Library premises by closing time, when evacuation of the building is necessary or at any time when requested to do so by Library personnel.
- Parents are responsible for the behavior of their children while the children are in the Library. Library staff will notify the parent or guardian of any child who is not behaving in accordance with this "Acceptable Library Behavior Policy." If it is not possible to contact a parent or guardian, the police may be notified.
- The Library is not responsible for the safety of any child in the Library.
- No child under eight (8) years of age shall be left without adult supervision for any reason in any part of the Library.
- Librarians will attempt to locate the parents of children left unattended in the Library. In the event a parent or caregiver cannot be located, the police will be notified and asked to supervise the child until the parents or caregiver can be located.
- Anyone who fails to meet these standards of acceptable behavior or any other Library policy may be required to leave the premises. If unacceptable behavior occurs again, the individual may be denied the privilege of Library use for a set period of time or indefinitely.

Approved by the Library Board of Trustees: 09/08/99; Amended: 03/10/2010

## Library Policies

**Acceptable Behavior Policy**

Circulation Policy

Computer & Internet Use Policy

For Parents: Our Youth Services Policy

Gift and Donation Policy

Policy for Displays and Exhibits

Quiet Study Room Policy

Social Media Policy

Idea Farm Workshop & 3D Printing Usage Policy

Meeting Room Rental Policy

Notary Public Service Policy

Collection Development Policy

# EXHIBIT "E"

  50°


    

CORNERSTONE    PARTNERS

# GUEST POLICIES

## Alcohol Policy

MetLife Stadium Company strives to present a safe, pleasant and family-friendly environment for every guest who visits the Stadium. To achieve this goal, the following policies have been established to promote the responsible use of alcohol.

- Any guest who appears to be 40 years of age or younger will be required to provide appropriate proof of age with a one the following forms of identification:
  - Valid United States Driver's License
  - Any valid US State or Federal Government issued ID
  - Any Valid US Passport and/or Passport Card
  - U.S. Military ID
  - Valid Foreign Passport with a completed NJABC Age Representation Form

- ***International guests looking to purchase alcohol must present a valid passport in order to complete a transaction as part of New Jersey State Law.  MetLife Stadium cannot accept a driver's license from another country to establish proof of age.  Please note, guests with a valid passport may also be subject to an additional age verification form to complete a transaction.***

- Guests may not possess or purchase more than two (2) alcoholic beverages at a time.
- All outdoor concession stands and portable units will stop serving alcohol at the beginning of the third quarter. For non-football events, alcohol cut-off times will be determined by MetLife Stadium Company management.
- Alcohol of any kind may not be brought into or removed from the Stadium
- Any guest who is determined to be deliberately concealing alcohol while entering the Stadium will not be permitted to enter the building
- A person exhibiting visible signs of impairment will not be permitted into the Stadium
- Any guest who exhibits behavior that distracts, inconveniences or otherwise interferes with another guest's enjoyment of the event may be removed from the Stadium
- Alcohol will not be served to any underage person or visibly impaired guest
- Alcohol beverage sales may be curtailed or prohibited at the discretion of management

**Chat with Us**

JA1732

# Carry-In Policy

**Guests are welcome to carry-in the following items into MetLife Stadium:**

- Clear bags that are 12" x 6" x 12" or less in size (1 bag per person)
- Small purses/handbags (clutch-type bags) that are 4.5" x 6.5" or less in size (1 per person)
- Hand sanitizer 6 oz. or less in size and disinfecting wipes
- Food of any kind that is contained in a clear plastic bag
- Factory-sealed water or soft drinks that are 20 oz. or less in size
- Reusable water bottles (both plastic and aluminum). **Bottles must be empty upon entry.** See Water Fountains in our A-Z Guide for a list of water fountain locations where bottles may be filled.
- Still-photography cameras with a lens that is 6" or less in length **not contained in a case**
- Hand-carried jackets, blankets, or other items, which will be patted down or searched
- Official national flags that can reasonably be hand-held by a single person and do not obstruct the view of other guests (no sticks or poles)

**All bags and other permissible items will be subject to multiple screenings prior to entering MetLife Stadium.**

**The following items are not permitted to be carried into MetLife Stadium:**

- Seat cushions of any size except those for medical needs
- Battery operated clothing (socks, jackets, etc.)
- Glass bottles, coolers of any kind, thermoses or ice chests
- Alcohol of any kind
- Banners of any size
- Flags that are not the official flag of a country, ones that are displayed on a stick or a pole or cannot reasonably be hand-held by a single person
- Umbrellas, strollers, laser pointers, and balls of any kind including full-sized footballs
- Single purpose video cameras or still-photography cameras with a lens longer than 6"
- Drones
- Selfie Sticks
- Weapons, any item that may be used as a projectile or one that is deemed dangerous by Stadium management
- Adult sized football helmets with facemasks
- Any animal with the exception of a service animal
- Any other item deemed inappropriate by Stadium management

# Search Procedures

To ensure the highest level of safety and security, all guests will be subject to a courteous screening by Safety Services team members prior to entering the Stadium. All vehicles are subject to inspection prior to entering the MetLife Sports Complex and all bags will be inspected prior to entering the Stadium. Ticket holders who refuse to allow their vehicles to be inspected will be denied entry into the Sports Complex and those who refuse to be screened or have their bags inspected will be denied entry into the Stadium. By having a ticket, the ticket holder consents to such inspections and waives any and all related claims against MetLife Stadium, the New York Jets and the New York Football Giants. Alcohol, weapons, or any items that the Safety Services team deems dangerous will be confiscated. Illegal items will be turned over to the New Jersey State Police.

JA1733

EXHIBIT "F"

Case 1:22-cv-05867-LMM Document 38-4 Filed 02/03/23 Page 40 of 436 PageID 1858

(https://prucenter.com/events/eagles/)

Our Family

(https://www.nhl.com/devils/)

(https://whiteeaglehalljc.com/)

(/)

(https://shupirates.com/sports/mens-basketball)

(https://www.grammymuseumexp.org/)

# Arena Policy

All guests are subject to a security screening prior to entering Prudential Center. For safety reasons the arena prohibits certain items from entering facility. Guests in possession of prohibited items will be denied entry or the items will be confiscated and not returned to the guest. In the event an illegal item is discovered, security staff will immediately notify the local law enforcement personnel detailed to the event. If a guest is found to have a prohibited item while inside the arena the item will be confiscated and the guest is subject to an official ejection.

## Prohibited Items Include



- Weapons (e.g. ,Firearms, Guns, Knives, Bats, Brass Knuckles, Black Jacks, Billy Clubs, Night Sticks, Spikes, Handcuffs, Stun Guns, etc.)
- All Electronic Devices with the Exception of Cell Phones and Non-Professional Cameras
- Aerosol Cans, Self Defense Sprays, Hazardous Substances and Chemicals (e.g., Pepper Spray, Mace Tear Gas, Lighter Fluid)
- Tools, Razor Blades, Box Cutters and Scissors
- Animals / Pets (except service animals)
- Audio / Video Equipment
- Projectiles (e.g., Frisbees, Balloons and Beach Balls)
- Backpacks of Any Size
- Bags or Purses Over 12"x14"Inches in Size (with the exception of childcare or medical bags)
- Cans, Bottles, Glass or Other Beverage Containers
- Chains, Studded Bracelets, etc.
- Coolers or Ice Chests
- Hard Sided Bags of Any Size
- Alcohol, Illegal Drugs or Paraphernalia
- Laser Pens and Pointers
- Noisemaking Devices (e.g., Whistles, Air Horns, Drums, Horns, Vuvuzelas)
- Outside Food and Beverage
- Professional Photography Equipment
- Drones (UAS Unmanned Aircraft Systems) or other aircraft
- Explosives, Fireworks and Ammunition
- Selfie Sticks, Tripods and GoPros
- Poles to Display Banners, Flags, etc.
- Signs with wires, lights, and/or batteries
- Un-approved Pamphlets, Handouts, Advertisements, etc.
- Skateboards, Hoverboards and/or Rollerblades
- Packages of Any Kind
- Any Other Item Deemed to be Inappropriate or Dangerous by Prudential Center Management

If you are having problems using this website, including problems accessing any portion of this site using screen reader technology, please call 973-757-6000 (tel:973-757-6000) or email guestservices@prucenter.com (mailto:guestservices@prucenter.com) for assistance.

JA1755

x

# EXHIBIT "G"

JA1736

Home 

# PNC BANK ARTS CENTER

Latest Events & Tickets

## FAQ

**+ Is Parking Free at the PNC Bank Arts Center?**

**+ Can I get alcohol at the PNC Bank Arts Center?**

**+ Can I bring food into the PNC Bank Arts Center?**

**+ Are all seats covered at the PNC Bank Arts Center?**

**+ Can I bring chairs to the PNC BANK Arts Center?**

**+ Are you allowed to bring a bag into the Pnc Arts center?**

**− ITEMS NOT ALLOWED**

Weapons of any kind

Alcohol

Illegal drugs/substances

Glass and metal containers

Cans

Hard sided/large coolers

Large or oversized bags/back packs, such as luggage, duffel bags, or industrial/camping-sized back packs (Bags larger than 16x16x8)

Laser pointers

GoPro Cameras

Chairs of any kind

Animals (except service animals)

Fireworks

iPads

Selfie sticks

Menu ✕

Home

Schedule

Covid-19 Info

Privacy & Cookies Policy

JA1737

EXHIBIT "H"



welcome   directions & parking   box office   our spaces   dining & exploring   accessibility   **faq**

**the basics**

where is njpac?                                                              +

where is the njpac arts education building?                                  +

which events are coming up?                                                  +

how do i get the best seats or prices?                                       +

can i get a refund if i miss my performance?                                 +

**before the show**

if the weather's bad, will you cancel a performance?                         +

how do i get to njpac?                                                       +

where do i park?                                                             +

can i bring my kids? what's the recommended age limit?                       +

how do i use a ticket on my mobile device?                                   +

how do i transfer my tickets to someone else?                               +

what is will call and where is it?                                           +

i lost my tickets or i never got my tickets in the mail. what do i do?       +

**inside njpac**

what time do the doors open?                                                 +

can i still be seated if i arrive late?                                       +

is there anywhere to eat nearby?                                             +

can i bring a drink inside?                                                   +

JA1739

can i film the performance? +

is there an atm? +

are there a lot of stairs? +

what's your bag search policy? are there any prohibited items? —

- All bags are subject to search. Backpacks, suitcases, bags and women's purses larger than 12" x 12" x 8" may not be taken into the theaters. Patrons carrying larger bags will be asked to bring them to the coat check at no charge and will be given a plastic bag for carrying select items, such as wallets and cell phones, into the theater.

language       '

- Violators of this policy may be subject to ejection from NJPAC property and/or civil or criminal penalties.
- To ensure the safety and comfort of our patrons, the following items are prohibited on NJPAC property. For safety reasons, guests will be refused entry onto NJPAC property if they are in possession of any prohibited item. Illegal items will be confiscated and turned over to the police. If a patron is found on NJPAC property with any prohibited item, the item will be confiscated and the patron may be ejected from the property. NJPAC property includes all buildings, performance venues, restaurants, outdoor and common areas, surface parking lots and the Military Park Garage.
- Prohibited items:
  - firearms, stun guns, cutting weapons, striking weapons, chemical weapons, fireworks, explosives, or any other dangerous or hazardous devices or weapons.
  - animals other than a registered service animals assisting persons with disabilities.
  - signs, posters, banners, balloons, flags, laser pointers/pens.
  - any item with offensive writing or images.
  - any food or beverage not purchased from an NJPAC approved vendor.
  - cans, bottles, glass or other beverage container.
  - illegal drugs.
  - aerosol cans.
  - any noisemaking device (i.e. whistles, air horns, drums, horns, vuvuzelas).
  - selfie sticks or gopros.
  - cameras, video or audio equipment.
  - unapproved pamphlets, handouts, advertisements etc.
  - pedi cycles, skateboards, roller blades/skates, hover boards, drones or other model aircraft or remote controlled device of any kind, may not be operated on NJPAC property.
  - any other item deemed to be inappropriate or dangerous by njpac management.

is there a coat check? +

is there an njpac gift shop or merchandise stand? +

is there wifi? +

can i get an autograph? +

do you have opera glasses to rent? +

is there a dress code? +

what kind of restrooms do you have? +

i lost something at the theater. who do i call? +

renting our spaces

how can i rent your theater? +



accessibility

For a more comprehensive list of accessibility info visit our [accessibility page.](#)

1 center street newark, nj 07102

1.888.696.5722

accessibility



EXHIBIT "I"

JA1742

Home (/) > Admittance Procedures

# Admittance Procedures

## Regal Age Policy

It is REG's policy to support the MPAA ratings system to the fullest extent possible.

For films rated "R" by the MPAA:

1. REG will not sell tickets to any person under the age of 17 (18 where applicable).
2. A person must be at least 21 years old in order to purchase multiple tickets without providing additional photo I.D. for additional tickets.
3. The purchaser must also attend the movie for which the additional tickets are purchased.
4. Patrons 17 to 20 years of age may only purchase more than one ticket if they are able to provide photo I.D. for proof of age for each additional ticket being purchased.
5. Children under the age of 6 years old will not be admitted.
6. Managers may empower Ushers to check for photo identification if a guest appears to be underage and is holding a ticket for an "R" rated feature.
7. Kiosk ticket sales are an important service for our guests. Tickets can be purchased online and picked up at the theatre, or an individual may purchase tickets directly from the kiosk. It is important to remember that the admittance procedures still apply to those individuals that make purchases or redeem on-line ticket purchases from a ticketing kiosk.
8. Theatre Employees may be stationed at the entrance to theatre(s) playing MPAA rated "R" films to check tickets and photo identification for all who enter to prevent minors from improperly entering.
9. REG reserves the right to refuse entrance to anyone that cannot present valid photo identification along with a ticket for the proper show time of the "R" rated film.

Note: Admission policies may vary by location due to state or local ordinances. Contact your local theatre if you have questions regarding any state or local requirements.

For films rated "NC17" by the MPAA:

1. No one under the age of 18 is allowed admittance to the feature, regardless of accompaniment or consent.
2. A patron desiring to purchase multiple tickets must provide a valid photo I.D. for each ticket they purchase.
3. Ushers may conduct additional photo I.D. checks for MPAA guideline adherence at the doorman's post and theatre checks.
4. Kiosk ticket sales are an important service for our guests. Tickets can be purchased online and picked up at the theatre, or an individual may purchase tickets directly from the kiosk. It is important to remember that the admittance procedures still apply to those individuals that make purchases or redeem on-line ticket purchases from a ticketing kiosk.
5. Theatre Employees may be stationed at the entrance to theatre(s) playing MPAA rated "NC17" films to check tickets and photo identification for all who enter to prevent minors from improperly entering.
6. REG reserves the right to refuse entrance to anyone that cannot present valid photo identification along with a ticket for the proper show time for the "NC17" rated film.

Regal Cinemas

Children under 3 are free except in reserved seating and recliner locations. Children 3 to 11 must pay the child admission price. Senior tickets are valid for adults 60 years and older. Not all ticket types are available for all performances.

Cinebarre

Please call theatre for any local restrictions.

# Regal Admittance Policy

### Covid-19 Safety and Procedures

1. Due to the current Coronavirus pandemic, all guests will be required to wear face masks in the lobby, hallways, restrooms, and auditoriums. Masks can be removed inside the auditorium only while eating and drinking.
2. To learn more about our Coronavirus Safety and Response protocols, please see our Reopening Safety Measures Against Coronavirus (/static/en/us/corona-virus-response) page.

### ADA Seating & Companion Pass:

1. Regal Entertainment Group theatres are handicap accessible. All seating designated as "handicapped" with the familiar wheelchair symbol is reserved for the disabled and their companions.
2. Guests attending our theatres in an assistant/companion role for one of our guests with disabilities may be passed in by management.
3. If you need assistance for any reason, please ask one of our theatre personnel for assistance.

### Costumes with Masks and Props:

Protecting the safety of our clientele and cast members is always top priority at Regal Entertainment Group. Therefore, REG does not allow admission to our locations for guests of any age wearing masks*, face paint or face-obscuring hood; or possessing weapons, props or fake weapons. *(Facemasks for health and safety reasons are allowed.)

### Backpacks/Packages/Bags:

Security issues have become a daily part of our lives in America. Regal Entertainment Group wants our customers and staff to feel comfortable and safe when visiting or working in our theatres. In that regard, as a general rule all backpacks, packages and large bags of any kind are subject to inspection. However, our admission policies may be modified periodically as necessary to ensure, to the extent possible, the safety of our guests. We acknowledge that this procedure can cause some inconvenience and that it is not without flaws, but hope these are minor in comparison to increased safety.

### Skateboards and Hoverboards:

In the interest of safety in the lobby and auditoriums, skateboards and hover boards are not allowed on theatre property. These boards can cause slip, trip and fall hazards for our guests as well as our staff. Management cannot hold these items for guests and guests will be asked to remove them from the theatre entirely.

### Lost and Found:

Regal Entertainment is not responsible for lost, stolen, or recovered personal items. Before leaving the auditorium, please check around your seat for any personal belongings. For assistance, contact a staff member.

JA1744

**Film Theft:**

No recording devices (cameras, video recorders, sound recorders, etc.) are permitted to be used within any Regal Entertainment Group facility.

**Personal Communication Devices:**

In consideration of all our guests, Regal Entertainment group asks that you please refrain from using cell phones, pagers, or any other personal communication device while in the auditorium.

**No Solicitation:**

Soliciting or loitering on Regal Entertainment Group premises is not allowed.

**No Smoking:**

All Regal Entertainment Group theatres are smoke-free environments.

**Outside Food or Drink:**

No outside food or drink is permitted in the theatre.

**3-D Presentations:**

Films in 3-D may not be available at all locations. In some cases, theatre locations may show a particular film in both the 3-D and 35mm (2D) formats. When purchasing tickets for a 3-D film, please confirm with the box office cashier that the ticket you purchased is in fact for the 3-D presentation. Please see one of our theatre managers if you have any questions regarding 3-D films.

**Refund Policy:**

Refunds are available in certain limited circumstances described below. Movie tickets purchased through Regal's mobile apps or websites include non-refundable convenience fees. Before purchasing, we urge you to confirm the title, time, location and quantity of tickets for the movie you wish to see.

You can receive refunds for tickets up to 60 minutes before the showtime. For purchases made online via Regal's mobile apps or websites please use the contact us (https://account.regmovies.com/rcc/contact-us) form on our site or follow the link to refund tickets on your confirmation email. Funds will be returned to the same payment card or gift card used to make the booking and Crown Club movie ticket rewards loaded to your Crown Club card will be restored to your Crown Club account, but please note that (i) convenience fees for tickets booked online via Regal's mobile apps or websites will not be refunded, and (ii) redeemed Crown Club credits cannot be refunded or restored by Regal or re-used by you. For tickets purchased through other ticketing agencies, guests must contact the agency directly before the scheduled movie showtime to request a refund, and refunds are subject to the refund policies of those agencies. There are no refunds after the printed showtime. For extenuating circumstances, please consult theatre management.

# EXHIBIT "J"

# FREQUENTLY ASKED QUESTIONS

**Questions about the Show**

What exactly is Medieval Times?  ⌄

What should be expected at a Medieval Times performance?  ⌄

Is the show historically accurate?  ⌄

What else does Medieval Times have besides a feast and show?  ⌄

Is the show appropriate for all ages?  ⌄

What is the running time of the show?  ⌄

~~Chat With Us~~

Will strobe lights be used in the show?  ⌄

Is the show accessible to those with disabilities? ⌄

How early should I get there? ⌄

What is the dress code? ⌄

Do you sell merchandise? ⌄

## Questions about Tickets

How can I purchase tickets? ⌄

What is the performance schedule? ⌄

Do the tickets include parking? ⌄

What's the difference between the different packages? ⌄

At what age does a child require a ticket? ⌄

I am having an issue purchasing tickets online. Who can I contact? ⌄

I have a promo code that is not working at checkout? How do I use it? ⌄

I can no longer go – how do I get a refund on my tickets?                    ⌄

---

How can I add a guest to my order?                    ⌄

---

How can I be seated with other guests?                    ⌄

---

I didn't receive my ticket confirmation email                    ⌄

---

Can I book tickets from outside the United States or Canada?                    ⌄

---

Can I change the date on my reservation?                    ⌄

---

How old do you have to be to attend Medieval Times?                    ⌄

---

Is gratuity included?                    ⌄

---

Can I purchase tickets as a gift for someone else?                    ⌄

---

## Questions about Groups

Do you offer any special ticket pricing for large groups?                    ⌄

---

What type of group celebrations do you offer?    ⌄

## Questions about the Food

What's on the banquet menu?    ⌄

Do you offer options for vegetarians or vegans?    ⌄

Do you have gluten-free options?    ⌄

Do you offer nutritional and allergen information?    ⌄

Will I leave hungry?    ⌄

Is identification required to purchase alcohol?    ⌄

What if I don't want to use my hands to eat?    ⌄

Can I bring in outside food/cake?    ⌄

## Other General Questions

Can I bring my camera or video camera to the show?    ⌄

Can we meet the cast? ⌄

---

Who do I contact about my experience at the show? ⌄

---

Where can I get information about and press, media samples, or an interview? ⌄

---

Can I bring in balloons? ⌄

---

Can I bring in a weapon/toy weapon? ⌃
Medieval Times does not allow weapons of any kind (real or fake!) into the Castle.

---



# EXHIBIT "K"



**BUY TICKETS**

**(HTTPS://WWW.TICKETMASTER.COM/CURE-INSURANCE-ARENA-TICKETS-TRENTON/VENUE/1502)**

| EVENTS & TICKETS (#) | ARENA INFO (#) | PLAN YOUR VISIT (#) | BOOK AN EVENT (#) | NEWS (/NEWS) |

**CYBER CLUB (/CYBER-CLUB)**

**KIDS CLUB (/KIDS-CLUB)**

**WAR MEMORIAL PATRIOTS THEATER (/WAR-MEMORIAL-PATRIOTS-THEATER)**

**PREMIUM SEATING (/PREMIUM-SEATING)**

## Arena Policies

🔍

f (https://www.facebook.com/CUREInsuranceArena/)

🐦 (https://twitter.com/curearena?lang=en)

📷 (https://www.instagram.com/curearena/?hl=en)

| BAG POLICY | ⌄ |

| ALCOHOL | ⌄ |

| CAMERAS AND RECORDING DEVICES | ⌄ |

| GENERAL RULES | ⌄ |

| GUEST CONDUCT | ⌄ |

| LEAFLETS/BROCHURES | ⌄ |

| RE-ENTRY INTO ARENA | ⌄ |

| SELLING OF ILLEGAL MERCHANDISE (BOOTLEGGING) | ⌄ |

JA1753

**CURE INSURANCE SPONSORSHIPS**

EVENTS & TICKETS (#) ARENA PLAN YOUR VISIT BOOK AN EVENT NEWS (/NEWS)

SMOKING (/) ∨

BUY TICKETS (HTTPS://WWW.TICKETMASTER.COM/CURE-INSURANCE-ARENA-TICKETS-TRENTON/VENUE/1502)

PROHIBITED ITEMS (#) ∧

CYBER CLUB (/CYBER-CLUB)

KIDS CLUB (/KIDS-CLUB)

WAR MEMORIAL PATRIOTS THEATER (/WAR-MEMORIAL-PATRIOTS-THEATER)

PREMIUM SEATING (/PREMIUM-SEATING)

- Aerosol cans
- Air horns
- Alcoholic beverages or illegal drugs
- Animals (except certified service dogs for the disabled)
- Beach balls and other inflatables
- Bota bags or wine skins
- Bullhorns or noise makers
- Cameras or recording devices (varies by event)
- Confetti
- Fireworks, firearms, or other weapons
- Framed Backpacks
- Glass bottles or aluminum cans
- Ice chests (coolers) or thermos containers
- Laser pointers
- Outside food or beverage
- Skateboards or roller blades
- Sticks or clubs (including signs attached to sticks)
- Stools or folding chairs
- Water bottles or mugs

f (https://www.facebook.com/CUREInsuranceArena/)

🐦 (https://twitter.com/curearena?lang=en)

📷 (https://www.instagram.com/curearena/?hl=en)

OUTSIDE FOOD & BEVERAGE ∨

METAL DETECTORS (MAGNETOMETERS) ∨

JA1754

# EXHIBIT "L"

JA1755

# STATE THEATRE NEW JERSEY

(/)

# ABOUT

## POLICIES

## COVID-19 SAFETY GUIDELINES

*Updated July 1, 2022*

**Thank you for helping ensure we are all able to gather safely to enjoy the transformative POWER OF LIVE PERFORMANCES.**

During the Covid-19 pandemic the theater underwent extensive renovations to its facilities and systems, many of which were designed with the health and safety of our patrons in mind:

- All new restrooms with touchless technology.
- New HVAC system that exceeds industry standards for virus filtration and air flow.
- Brand-new theater seats.
- Fully renovated lobbies and concessions.
- Hand Sanitizer stations are throughout the facility.
- Protective Barriers at Concessions and Guest Services.

Based on advice from the CDC and the state of New Jersey as well as best practices adopted by the performing arts industry, State Theatre has implemented the following health and safety guidelines.

- As of July 1, 2022, proof of vaccination status or results of a negative Covid-19 test are no longer required to enter the theater.
- Masks are strongly encouraged but not required.
- If you are feeling ill the day of an event or have been exposed to someone who has Covid-19, we kindly ask that you do not attend the performance. Call Guest Services no later than 3 hours before performance time to discuss your options at 732-246-7469.

*Guidelines are subject to change at any time, and some artists and shows may require more stringent measures. Please refer to the performance page on this website before coming to the theater or your preshow email for the latest policies applicable to your show. Failure to follow posted guidelines will result in denial of entry or expulsion from the theater without a refund.*

# TICKET EXCHANGES

**There are no ticket exchanges unless you fall within one of the following categories listed below:**

JA1756

- **President's Council member and above** (donors at $2,500 and above): For a $5 fee, ticket exchanges are permitted for State Theatre New Jersey-presented events no later than 72 hours prior to a performance (and during Guest Services operating hours). The original ticket purchaser must call their Ticket Concierge, Guest Services at 732-246-7469, or visit Guest Services to exchange tickets. The value of exchanged ticket monies must be redeemed within one year (365 days) of the date of the exchange and will expire thereafter. Exchange values can only be applied to tickets for State Theatre New Jersey-presented events and cannot be used for any other goods or services. All exchanges are subject to availability. Ticket sales for rental and special events are final sales and exchanges are not permitted. Tickets purchased from GoldStar or TodayTix cannot be exchanged through State Theatre New Jersey Guest Services.
- **Broadway Series Season Ticket Holders:** Ticket exchanges are permitted within the same show at least 24 hours in advance, subject to availability. The original season ticket purchaser must call the Season Ticket Concierge at 732-246-7469, ext. 555 or visit Guest Services to exchange tickets.

You can donate the value of your ticket(s) to State Theatre New Jersey as a tax-deductible contribution by 1pm the day prior to the performance date. Please note donated tickets only apply to State Theatre-presented event, rental and special events (/events/special-events) are excluded.

# TICKET CREDITS & REFUNDS

Once an order is placed, there are NO REFUNDS on tickets unless the event is cancelled. Refunds are only made to the original purchaser and are issued for the value of the tickets only. In the event of a cancellation, every effort will be made to notify the purchaser.

**If a show is impacted due to Covid-19 mitigation efforts original ticket holders can choose from these options within 30 days of notification of the performance change:** If a show is rescheduled to a new date you can keep your existing tickets and they will be valid for the new date, or if a show is rescheduled and you cannot make the new date, or a show is cancelled you can: 1) Donate your tickets, the total ticket value will count toward member benefits and you can receive a tax deduction (ticket donations do not normally count towards membership but considering the circumstances we've decided to change our standard procedures for events affected by Covid-19). 2) Exchange your tickets for a STNJ gift certificate. 3) Receive a full refund for the value of the ticket and associated fees.

# TICKET FEES

There is a $4 facility fee assessed to each individual ticket and a transaction fee is applied to all phone and online orders. The transaction fee for group orders is $12 per order. The transaction fee is waived for walk up orders at State Theatre New Jersey Guest Services (15 Livingston Avenue, New Brunswick, NJ). Season Ticket packages have a $4 per ticket facility fee and a transaction fee.

# TICKET UPGRADES

Based upon availability, ticket upgrades are permitted at the discretion of the presenter up until curtain and patron must pay any difference in the cost of the upgraded ticket price plus a $9 upgrade fee.

JA1757

# TICKETS FROM UNAUTHORIZED SOURCES

State Theatre New Jersey strongly cautions against guests buying tickets from ticket sources not officially sanctioned by us. Many guests that have purchased tickets from brokers or scalpers find themselves in possession of counterfeit tickets at inflated prices. This is especially true on sold out shows. A counterfeit ticket will not be accepted. State Theatre New Jersey values customers' privacy and security, and we will not access records nor reprint tickets for anyone who cannot be verified as the original ticket buyer. The name on the ticket must match the name of the party presenting the ticket for entry. If you wish to change the name on your ticket, please contact Guest Services at least two business days in advance of the performance date to update your ticket. We will not be able to offer any refunds or exchanges if the ticket is deemed counterfeit or the name of the party presenting the ticket for entry into the performance does not match the name on the ticket order. We can only guarantee entry for tickets purchased from our official source: STNJ.org. Tickets for State Theatre performances are also occasionally offered on these approved sites: Goldstar, Groupon, TDF, and TodayTix. Watch our video on how to make sure you are purchasing official State Theatre New Jersey tickets. (/about/official-ticket-source)

# SECURITY

## BAG CHECKS

For the safety of our guests, bags may be searched upon entry and patrons may be asked to pass through magnetometers or hand held metal detectors. Sharp objects, weapons, and illegal contraband are not permitted into the venue. The items listed below, and any additional items that State Theatre New Jersey determines could potentially distract from the audience's safety and enjoyment, are prohibited items which will not be allowed inside the venue. State Theatre reserves the right to eject or ban entry to patrons who have such prohibited items in their possession. Items include but are not limited to: cameras, audio / video recording devices, tripods / monopods, or selfie sticks; laser pointers; illegal drugs / substances; weapons; chemical weapons, including mace and pepper spray; noise making devices; signs / flags / banners; outside food or beverage, including alcohol; oversized bags or backpacks; pets (service animals exempt); or laptops / tablets.

# SEATING POLICIES

## LATE SEATING

Traffic and parking in New Brunswick can become congested prior to a performance. We suggest that you allow extra time to arrive relaxed and ready to enjoy your event. Those arriving after a performance has begun will be seated at the discretion of the State Theatre New Jersey staff and should expect that they will miss a portion of the show, based on their arrival time and artist policies.

## CHILD SEATING POLICY

No children under the age of 14 are permitted into the theater without a parent or guardian. Children under the age of 14 must be seated directly adjacent to parent or guardian and will not be seated without a parent or guardian. Please refer to each event page for the ages we strongly

recommend as appropriate for each performance.

Please reference our Guest Code of Conduct (/your-visit/guest-code-of-conduct) regarding expected behavior of both children and adult guests.

## INFANT VOUCHER

Occasionally, for certain events geared towards very young children, free infant lap vouchers are available for children 11 months or younger (lap vouchers require that children must be sitting on the lap of a parent or guardian). When available, information regarding free infant lap vouchers will be posted on the webpage for that specific event, or please call Guest Services. If your child will have reached their first birthday by the date of the performance, they must have a paid ticket and must be seated next to a parent or guardian. No individual will be admitted into the audience chamber without either a ticket or infant voucher.

## CAMERAS AND ELECTRONIC DEVICES

All audio / visual devices and photography, filming, recording, and taping is strictly prohibited. State Theatre New Jersey reserves the right to deny entry to, or to remove any guest from the premises that refuses to comply with this policy.

## VENUE RECORDING CONSENT

**By entering facilities where State Theatre New Jersey is presenting programming, you consent to be photographed, filmed and/or otherwise recorded.** Your entry constitutes consent on behalf of yourself and your minor children to such photography, filming, and/or recording and to any use in any and all media in perpetuity. You understand that all photography, filming, and/or recording will be done in reliance on this consent given by you entering these areas. If you do not agree to the foregoing, do not enter.

## INCLEMENT WEATHER POLICY

In the case of inclement weather, refunds will be awarded only if the show is cancelled. Every effort will be made to contact the original ticket buyers if a show is cancelled.

If you purchased tickets from Groupon, please call 888-664-4482. If you purchased tickets from Goldstar, please call 626-204-3960.

## DISCOUNTS

If discounts or promotions are offered, those discounts are not retroactive and cannot be combined (*unless otherwise specified*). Discounts and promotions have terms which may include expiration dates, limited availability, or additional fees and restrictions. Please read terms carefully before making your purchase.

# VOUCHERS & COUPONS

Vouchers and coupons are valid for up to one year from the date issued and are only valid for select State Theatre New Jersey events *(not all events apply).* View a complete listing of events that are voucher and coupon eligible (/vouchers). To receive your tickets you must hand deliver or mail your voucher or coupons to State Theatre New Jersey Guest Services (15 Livingston Ave, New Brunswick, NJ 08901) with your performance request(s). When mailing or handing in your voucher, please be sure to include your contact information (address, phone, email, etc.). Vouchers and coupons do not serve as admission and must be redeemed for actual tickets. Tickets are subject to availability and section and location of seats is at the discretion of Guest Services (vouchers or coupons cannot be redeemed for select seating). Seats are not offered in all sections. Vouchers or coupons will not be honored if altered or reproduced in any way. They are not transferable and are not redeemable for cash. Vouchers or coupons cannot be combined with other discounts or offers. No upgrades in seating area are permitted. Vouchers and coupons are not valid for rental events. State Theatre New Jersey complimentary ticket vouchers and coupons have no monetary value. Vouchers will not be extended beyond the date for which they are valid. Tickets redeemed from a voucher are delivered via email or Will Call pick-up only.

Please note that coupon offers, such as those in the Entertainment Book as well as from other sources, listing State Theatre are not valid, have not been authorized by State Theatre New Jersey, and cannot be honored. We apologize for any inconvenience. Please contact the resource the coupon was purchased from directly with any questions.

*Policies, programs, artists, dates, times, and prices are subject to change without notice. Additional fees may apply.*

15 LIVINGSTON AVENUE
NEW BRUNSWICK, NJ 08901

PHONE: 732-246-7469
EMAIL: INFO@STNJ.ORG (MAILTO:INFO@STNJ.ORG)

GUEST SERVICES HOURS
*BY PHONE/EMAIL:* TUE-FRI 11AM-5PM
*IN-PERSON:* TUE-FRI 12PM-4:30PM

STATE THEATRE NEW JERSEY
IS A 501(c)(3) ORGANIZATION.
NJ CHARITABLE REGISTRATION #CH-2457300



(HTTP://WWW.YOUTUBE.COM/STATETHEATRENJ)

(HTTP://WWW.FACEBOOK.COM/STATETHEATRENJ)

(HTTP://TWITTER.COM/STATETHEATRENJ)




(HTTP://WWW.INSTAGRAM.COM/STATETHEATRENJ)

ALL RIGHTS RESERVED. USE OF THIS SITE IS GOVERNED BY OUR PRIVACY POLICY (/PRIVACY-POLICY). SITE MAP (/SITE-MAP).

© 2023 STATE THEATRE NEW JERSEY

Designed by L2 Interactive. Powered by eRube 2.

JA1760

# EXHIBIT "M"

Events & Tickets   Plan Your Visit   Arena Info   BOARDWALK HALL   Connect With Us   Atlantic City Convention Center

## Prohibited Items

- Alcoholic beverages, controlled or unlawful substances, and controlled substance paraphernalia

- Items that could be used as weapons, such as firearms, knives, chains, and spiked jewelry

- Cans, bottles (glass or plastic), or coolers

- Outside food or beverages

- Professional cameras, audio or video recording devices, and tripods

- Mobile tablet devices and laptops

- Laser pointers and pens, pepper spray, and Mace

- Noisemakers, such as air horns, fireworks, Frisbees, balls, and other projectiles

- Umbrellas

- Baggage, such as shopping bags, briefcases, backpacks (of any size), duffle bags, luggage, and diaper bags, is strictly prohibited.

- Any other item deemed unacceptable by the event or building management

- Jim Whelan Boardwalk Hall does not provide storage for any confiscated baggage, so visitors should leave these items at home or in a secured area prior to arrival at the

JA1762

English  >

# EXHIBIT "N"



## Event Center

Definitive proof that bigger really is better: We have 30,000 square feet of event space, 30-foot ceilings, immense stars and huge acts. The Event Center houses everything in an intimate venue with remarkable acoustics and optimal sightlines. Come on in and live large in the Atlantic City event venue just for you.

## Contact

**General Information**
609.317.1000

## Box Office Hours

**Mon - Tue** Closed

**Wed - Sun** 3:00 PM - 9:00 PM

The Box Office will remain open later on headliner event days.

**Seating Chart**

Entertainment Calendar

## Ticketing Policy

- See Below:

Counterfeit tickets will not be honored. Tickets from unauthorized sources will not be honored. Borgata can only guarantee the validity of event tickets purchased from Ticketmaster, Facilolan, The Borgata Box Office, and other sanctioned MGM Box Offices. Please retain your ticket at all times.

- Entertainment Calendar

## Prohibited Items

- Venue Details
  - No bags will be permitted into the venue except for small purses (14" x 14"x 6" max). Backpacks or suitcases of any size are not allowed.
  - Cameras with interchangeable/detachable lens or external flash (No Professional Photography)
- Prohibited Items
  - Audio/Visual Recording Devices (includes GoPro, Google Glass, Spectacles, etc.)
  - Selfie Sticks, Tripods, Monopods
  - Outside Food, Beverage or Alcohol – One Drink Poured into Plastic Container. No Outside Food Allowed.
  - Cans, Metal/Glass/Plastic Containers, Bottles, or Flasks (empty or sealed bottles included)
  - Laptops, Tablets, Personal Computers, or Two-Way Radios
  - Weapons, Firearms, Pepper Spray, Pocket Knives or Mace
  - Bats, Poles or Clubs
  - Illegal Drugs or Substances
  - Flammable Liquids, Aerosol Cans, or Permanent Markers
  - Flashlights, Laser Pointers, Flares, or Fireworks
  - Noise Making Devices (i.e. Air Horns, whistles, bells, vuvuzelas, etc.)
  - Balloons, Balls, Projectiles, or Optical Illusions
  - Skateboards, Segways, Scooters, Rollerblades, Bicycles, Hover boards, and Helmets
  - Strollers

  - Coolers, Ice Chests, Folding Chairs, or Umbrellas
  - Flowers (unless otherwise permitted by Tour Production)
  - Seat Cushions or Booster Seats
  - Patrons Without Shoes or Shirt
  - Masks, Chains, or Studded Belts/Bracelets
  - Drones (without prior written consent from Arena Management)
  - Animals or Pets (accommodations made for trained, harnessed, and housebroken service animals)
  - Unapproved Pamphlets, Handouts, Ads, or Flyers without prior consent from Arena Management
  - Clothing, garments, or signs displaying explicit language, profanity, or derogatory characterization toward any person(s)
  - Signs, Flags, or Banners
  - No bag check-in services are available for guests. Guests attempting to enter the arena with prohibited items will be turned away and asked to return the items to their hotel rooms and/or vehicles.

  Any such items should be returned to your vehicle or discarded.

CloseDining Reservation | Make a Free Reservation

Back to Top

EXHIBIT "O"

## Attending Performances at bergenPAC

**Can I bring a firearm or other weapon to the concert?**

No. The safety and well-being of our patrons are of the utmost importance to us.

Please be aware that firearms and other weapons are not permitted in the venue and/or public spaces owned or operated by Bergen Performing Arts Center, Inc. (bergenPAC or The Performing Arts School at bergenPAC).

**What security measures are used for entering the theater?**

**What items are prohibited?**

**What is your late seating policy?**

**Is dancing allowed?**

**What is your recording/photograph policy?**

**Are pets allowed inside the theater?**

**Is bergenPAC accessible to people with disabilities?**

**Are there elevators to all floors of the theater?**

**What is your bag policy?**

**Do you allow drinks or food to be brought into the theater?**

**Is there a place to check my coat or briefcase?**

**Do you have a lost and found?**

EXHIBIT "P"



📞 (856) 327-6400

📍 126-130 N. High Street, Millville, NJ 08332

✉ info@levoy.net

  

# Policies

There is a non-refundable service fee per ticket through all sales channels.

**TICKET RESERVATIONS AND VOUCHERS**

We encourage all patrons to purchase tickets in full in advance of every performance to ensure they get the seats they want. Tickets can be reserved without payment for a period of 72 hours prior to two weeks from a performance date. After the 72 hour period, tickets without payment will be released and made available for sale.

Gift Certificates, Levoy Dollars, and other performance vouchers do not constitute a ticket and must be redeemed in person at the Box Office at least 48 hours prior to the performance date. They cannot be taken as payment online or over the phone.

**WILL CALL**

Any patrons picking up tickets at Will Call, located in the theatre lobby next to our concession stand, must have their driver's license or purchasing credit card ready before coming to the window. Sales of tickets for future performances must be completed during non-performance hours.

Lost tickets may be reprinted at the Box Office with proof of purchase.

**REFUND/EXCHANGE POLICY**

**All sales are final.** There are no refunds or exchanges unless a performance is cancelled. Event artists, dates and times are subject to change. Broadway season subscription shows are also subject to substi-

JA1769

tution when necessary. Only Levoy Theatre Members can exchange tickets into another performance for a $3 fee per ticket. Premium Seat Donations are not eligible for refunds, credits, or exchanges. Because of contractual relationships with artists, we must have a 48-hour notice to make exchanges. See membership guide for exchange limitations.

**THIRD PARTY TICKET SELLERS**

The Levoy Theatre does not endorse or partner with any third party ticket sellers. We are not responsible for any purchases made through third party services. If a performance is cancelled, and you purchased tickets through a third party ticketing service, you must contact them.

Purchase from or resale by an unauthorized source may invalidate your ticket. The Levoy Theatre Box Office will only assist original ticket purchaser with potential issues with this ticket, including but not limited to refunding for rescheduled or cancelled events and duplicate transactions.

**INCLEMENT WEATHER POLICY**

If the performance continues despite inclement weather, the Levoy is not required to issue a refund or an exchange. In the event of a cancellation, the Levoy will notify patrons in a timely manner, at which point a refund or exchange into another performance will be offered.

**LIABILITY AND RELEASE POLICY**

Ticket holder voluntarily assumes all risks in attending the event, whether occurring before, during or after the event and releases the Levoy Theatre from all related claims. Ticket holder grants permission to utilize the holder's image or likeness in connection with any photograph, video or other recording means for transmission, broadcast, or promotional use on any media.

**AGE RESTRICTIONS**

While there is not a strict policy on whether or not a child should attend a performance, please note that the content of performances may vary. Many comedy shows contain language and content best suited for a mature audience.

The Levoy Theatre does not require a ticket for children under the age of three as long as the child is sitting on a lap.

**LATE SEATING**

Latecomers will be seated at the discretion of the Levoy Theatre and the visiting artist(s). Patrons arriving late to their scheduled performance may be required to wait in the lobby, or be seated in a designated area until intermission or an appropriate break allows seating without disruption to the audience.

**BAG INSPECTION POLICY/PROHIBITED ITEMS**

JA1770

All bags, including handbags and purses, will be subject to inspection upon entry to detect prohibited items for your safety and the safety of the other patrons, staff, and performers. Bags that have passed inspection and not on the prohibited list must fit comfortably under your seat or side. The Levoy Theatre does not provide an area to check bags, or any other personal belongings. We are not responsible for any property that is lost, stolen, or damaged.

The following items are **not allowed inside** the Levoy Theatre.  If you have any questions in regards to what can or cannot be brought into the Theatre, please contact Levoy Theatre:

– Weapons or knives of any kind or type
– Full facial coverings (such as costume face masks)
– Outside food and beverage*
– Illegal drugs
– Outside alcohol is not allowed in the building.  Alcohol must be purchased from the Vaudeville Bar. No exceptions.
– Cigarettes, vaping devices and other tobacco materials such as pipes and pipe tobacco, cigars and chewing tobacco
– Professional photography equipment
– Audio and video recording devices
– Noisemaking devices (Ex. air horns)
– Laser pointers
– Any animal with the exception of a service animal
– Any other item deemed inappropriate or dangerous by Levoy Theatre staff

*An exception will be made for medical needs after proper inspection.

### ACCESSIBILITY

The Levoy Theatre offers elevator access on every floor. Seating for wheelchair accessibility is available both on the orchestra and balcony levels – please fill out the request form online or call the Box Office to request special seating. All wheelchair accessible spaces have 3 companion seats reserved until 1 week prior to the show, then only 1 companion seat will be reserved. All remaining ADA and companion seating will be released for regular sale 24 hours prior to the show.

### GROUP SALES AND DISCOUNTS

Group discounts are available for parties of 10 or more for some programming at the Levoy Theatre. Cannot be combined with other discounts. Group rates may be limited to rear orchestra and/or balcony. Call our Box Office or email us at info@levoy.net for more information.

Children (Ages 3 to 12) and seniors (65 or older) are currently entitled to discounts for our Broadway programming. Questions about what shows qualify? Give us a call or stop in at our Box Office!

Discounted Student Rush tickets are available for our Broadway shows. Student discount tickets are available only on the day of the given performance with valid student ID at time of purchase. One dis-

JA1771

# EXHIBIT "Q"

# The Wellmont Theater
# THEATER POLICIES AND FAQS

## COVID-19 POLICIES

In the best interest of fans and staff, the Wellmont Theater will continue to monitor local COVID-19 trends and meet or exceed protocols mandated by local governments. By purchasing tickets to this event, unless prohibited by law, you agree that you and all individuals in your attending party will abide by the health and safety measures in effect at the time of the event, which may include, but not be limited to, providing proof of vaccination status and/or providing proof of a negative COVID-19 test.

## SECURITY CHECK

All persons entering the theater will undergo a courteous security screening procedure performed by our trained security safety team. The Wellmont Theater reserves the right to deny admission to anyone who does not undergo security screenings and/or is in possession of a prohibited item.

## BAGS

All bags, including handbags and purses, are permitted but will be subject to inspection upon entry to detect prohibited items for your safety and the safety of the other patrons, staff, and performers. **Backpacks of any kind are prohibited from entering the theater.** The

Wellmont Theater does not provide an area to check bags, or any other personal belongings not permitted in the theater. We are not responsible for any property that is lost, stolen, or damaged.

JA1773

# PROHIBITED ITEMS

## The Wellmont Theater

The items listed below, and any ... mont Theater management determines could potentially distract the audience's safety and enjoyment from are prohibited items which will not be allowed inside the venue. Any confiscated illegal items will be turned over to the Montclair Police Department, not held or returned, and no refunds will be issues.

• Cans, glass bottles, and open containers
• Outside food and beverages
• Luggage, computer bags, briefcases, backpacks or camera cases
• CamelBak, thermoses, coolers, or similar apparatus
• Skateboards, hoverboards, rollerblades, scooters, or bicycles
• Alcohol, illegal substances, or drugs of any kind. Any prescriptions medication must be in its original bottle and match your state issued identification card
• Weapons of any kind including pocket knives, spikes, sharp studs, excessively long wallet/key chains, or any item that may be used weapon/projectile that is deemed dangerous by Wellmont Theater management
• Firearms regardless of a permit
• Noisemakers, horns, whistles, or laser pointers
• Flammable liquids, aerosol cans, markers, paint pens, paint sticks, or stickers of any kind
• Professional photo, video, or audio recording equipment (including detachable lenses and tripods/monopods)
• Fireworks, flares, smoke bombs, or any similar type of item
• Pets or animals of any kind with the exception of certified service animals with proper documentation.

• Clothing that contain explicit language, may be offensive, or gang related (see Sign Policy)
• Large signs, banners, or other similar items that may be deemed inappropriate by theater management (see Sign Policy)

JA1774

Sign Policy

The Wellmont Theater

- Banners and signs may no          anderous, (ii) is obscene, offensive, vulgar or indecent and inappropriate for viewing by children, (iii) contains "fighting words" likely to provoke a breach of the peace, (iv) contains commercial advertising or commercial product or service identification, or (v) contains derogatory matter relating to race, age, color, ethnicity, sex, pregnancy, sexual orientation, gender identity, religion, national origin, ancestry, mental or physical disability, marital status, familial status, military or veteran status, or any other category protected by federal, New Jersey state or local law.

*\*\*The Wellmont Theater reserves the right to prohibit any item, including items not listed above, from entering the premises based on any particular show request or requirement.\*\**

# BOX OFFICE INFORMATION

## HOURS OF OPERATION

The Wellmont Theater box office is open Monday through Friday from 12pm to 5pm. If there is an evening performance, the box office stays open until fifteen minutes after the headliner takes the stage. If there is a Saturday performance, the box office opens on Saturday from 1pm until fifteen minutes after the headliner takes the stage. If there is no performance, the box office is closed on weekends.

## PAYMENTS

• The box office accepts Cash, Visa, MasterCard, American Express, Discover, and a Wellmont Theater gift certificate as forms of payment.

JA1775

# EXHIBIT "R"

JA1776



My Account

BUY TICKETS

EVENTS CALENDAR

DONATE

COMMUNITY

Search

BOX OFFICE  >  THEATER POLICIES & FAQS

MENU ▾

Read more about Mayo Performing Arts Center policies and frequently asked questions. Find out about box office hours, healthy and safety guidelines, gift certificates, accessibility, and more.

# FAQ

**＋ Refund Policy**

**＋ Box Office Assistance**

**＋ Box Office Hours**

Live Chat 💬

JA1777

**+ Health and Safety Precautions**

---

**+ Third Party Ticket Sellers And Authorized Partners**

---

**✖ What Items Are Prohibited?**

The following items are not allowed inside Mayo Performing Arts Center.  If you have any questions in regard to what can or cannot be brought into the Theatre, please contact MPAC:

– Weapons of any kind or type
– Knives or blades of any kind or type
– Flares or Fireworks
– Pepper spray or mace
– Full facial coverings (such as masks)
– Outside food and beverage*
–  Illegal drugs & outside alcohol or opened bottles of water or soda
– Cigarettes, vaping devices and other tobacco materials such as pipes and pipe tobacco, cigars and chewing tobacco
– Professional photography equipment
– Audio and video recording devices
– Selfie sticks
– Items with offensive writing or images
– Posters and signs
– Noisemaking devices (Ex. air horns)
– Laser pointers
– Any animal with the exception of a service animal
– Any other item deemed inappropriate or dangerous by MPAC staff

*An exception will be made for medical needs after proper inspection.

*MPAC has the right to inspect any bags brought into the building.*

---

**+ Inclement Weather Policy**

---

**+ VIP Packages Policy**

---

Live Chat 💬

JA1778

# EXHIBIT "S"

JA1779

**South Orange Performing Arts Center**
**Audience Services Department**

**SOPAC Security Policies**
**Revised 01.08.20**

To ensure the safety of SOPAC patrons, artists, staff and volunteers, the following policies are in effect.

**Search/Inspection**

All bags are subject to search upon entry and re-admittance to the theatre.

SOPAC employees and security personnel may search patrons' personal belongings such as handbags, briefcases, handbags, backpacks or other packages.

Any patron who refuses to permit a search will be denied entrance to the performance and will receive a refund for the ticket price.

Any personal item or bag larger than 12"x 12" x 8" that will not safely stow under seats are strictly prohibited in the theatre.

Unattended items are subject to search.

SOPAC is not responsible for any property that is lost, stolen or damaged.

Hand held metal detector screening or security wanding may be instituted if a guest speaker or artist requires this as a precondition to performing at SOPAC. In such cases, SOPAC will make every effort to provide attending patrons with reasonable advance notice via website, email and on-site signage.

SOPAC employees and security personnel will not conduct any pat down searches or require patrons to empty their pockets. They do reserve the right to deny entrance to any patron who is believed to be a danger to themselves or others or is otherwise in possession of any item that violates a SOPAC policy.

**Prohibited Items**

Patrons will be refused entry to SOPAC if in possession of any prohibited item.

Illegal and prohibited items will be confiscated and turned over to local law enforcement.

The following are prohibited:

> Weapons including but not limited to firearms, knives and chemical defense weapons such as pepper spray or mace.

> Fireworks, explosives, illegal drugs or any other dangerous, hazardous or suspicious devices or weapons.

JA1780

# EXHIBIT "T"



BECOME A MEMBER

Buy Tickets



Home > Visit > Health, Accessibility & Safety > Code of Conduct

# Code of Conduct

**Liberty Science Center is a community of people committed to providing a safe, welcoming, awesome space for learners of all ages.** We value scientific inquiry, discovery, and curiosity. We treat each other with kindness. We care about the well-being and safety of LSC staff and guests. We celebrate the diversity of our community, respect our different backgrounds and perspectives, and foster inclusivity. We model courteous and responsible behavior for our younger guests.

**Visitors to LSC shall conduct themselves in ways that enable other guests to enjoy the Center and allow staff to do their jobs.** All visitors must adhere to posted instructions and follow any directions from staff. All children under the age of 16 must be accompanied by an adult at all times.

The following items and behaviors are prohibited at LSC:

Chat with Us

JA1782

Guns, knives, martial arts weapons, ceremonial weapons, tasers, explosives, and pepper spray (except guns carried by active law enforcement personnel)

Illegal drugs

Bikes, scooters, skates, and wheelie shoes

Dogs and other pets (except service animals)

Outside food or beverages (except reusable water bottles and baby bottles)

Eating and/or drinking in exhibits, theaters, the planetarium, and other prohibited areas

Smoking or vaping in LSC or within 50 feet of the building or within 50 feet of an LSC outdoor activity

Running, pushing, or shoving

Climbing on exhibits that aren't meant to be climbed on

Creating a disturbance, yelling, or using audible music devices

Using abusive, profane, racist, or other offensive language

Violence or threats of violence

Stealing or damaging museum property

Indecent exposure or sexual acts

Soliciting for commercial or noncommercial purposes

Posting or distributing any sign, notice, ad, or printed material

Entering non-public areas without authorization

Being shirtless or barefoot or wearing offensive clothing

Unauthorized commercial photography/videography

Adherence to the Center's Code of Conduct is mandatory, and noncompliance may result in removal. LSC reserves the right to prohibit other kinds of behavior and items and to change these policies at any time.

JA1783

# EXHIBIT "U"

**Plan Your Thrills at**  📍 Six Flags Great Adventure ⌄

 Six Flags GREAT ADVENTURE ☰

 **Buy now!**

⌄

# Park Policies

Because Six Flags is a family park, we expect guests to behave appropriately. Violating our park policies may be cause for ejection from the park without refund. For more information, please review the park policies below.

NEW: Card Payments

**Six Flags Great Adventure accepts card payments only at all locations** including restaurants, retail stores, games, ticket windows, and parking toll booths. You can either pay for purchases using a Visa, Mastercard, American Express, Discover, or debit card. Only have cash? You can convert your cash to a prepaid debit card at one of the multiple kiosks located throughout the park and anywhere in the U.S. where Visa is accepted. We highly encourage you to pre-purchase your parking, tickets, and more online before visiting the park.

[Buy Tickets & Parking](#)

*For the duration of Fright Fest, Six Flags has implemented enhanced public safety measures, including x-ray screening of all bags and limiting bag size. Bags, including backpacks and purses, must be no larger than*
*12"x 12" x 6" to enter the park. Exceptions will be made for bags carried for medical reasons and diaper bags that accompany infants and young children.*

Because Six Flags is a family park, we expect guests to behave appropriately. Violating our park policies may be cause for ejection from the park without refund. For more information, please review the park policies below.

## NEW: Card Payments

**Six Flags Great Adventure accepts card payments only at all locations** including restaurants, retail stores, games, ticket windows, and parking toll booths. You can either pay for purchases using a Visa, Mastercard, American Express, Discover, or debit card. Only have cash? You can convert your cash to a prepaid debit card at one of the multiple kiosks located throughout the park and anywhere in the U.S. where Visa is accepted. We highly encourage you to pre-purchase your parking, tickets, and more online before visiting the park. [Buy Tickets & Parking](#)

▸ **Alcoholic Beverages**

▸ **Animal Exhibits**

▸ **Behavior**

▸ **Filming**

▸ **Dress Code**

▸ **Drink Bottles**

▸ **Food, Drinks, and Coolers**

▸ **Food Allergies**

▸ **Fright Fest**

▸ **Language**

▸ **Line Jumping**

▸ **Loose Articles**

JA1785

Plan Your Thrills at

 ☰



⌄

In addition to items identified in our Guest Code of Conduct and other park policies, the following are prohibited items:

- Firearms, ammunition, knives and weapons of any kind.
- Mace/pepper spray and other self-defense or restraining devices.
- Marijuana (including marijuana enriched products) or any illegal substance.
- Fireworks or other similarly explosive and/or flammable objects.
- Spiked clothing/jewelry.
- Lawn/folding chairs.
- Glass bottles (excluding small containers such as baby food jars).
- Spray paint/markers.
- Recreational devices such as drones, remote controlled devices, laser pointers, scooters, skateboards and shoes with built-in wheels.
- Selfie sticks, tripods, monopods and similar hand held extension poles for cameras or mobile devices are all prohibited.

▶ **Rain and Severe Weather**

▶ **Restricted Areas**

▶ **Ride Restrictions**

▶ **Rider Responsibility**

▶ **Season Passes and Hand Stamp for Re-Entry:**

▶ **Selfie Sticks, Monopods, and Similar Devices**

▶ **Service Animals**

▶ **Smoking**

▶ **Unmanned Aerial Vehicles (UAVs)**

▶ **Additional Questions**

| Things to Do | Plan Your Visit | Park Support | About Six Flags | Tickets & Passes | Tickets & Passes |
|---|---|---|---|---|---|
| All Rides | Park Hours & Schedule | FAQ | About Us | One Day Add-Ons | Jobs |
| Thrill Rides | Health & Safety Guide | Help | News Room | Season Pass Add-Ons | Events |
| Family Rides | Park Map | Email Signup | Corporate Partners | Groups | Health & Safety |
| Kids Rides | Accessibility | Mobile App | Community | VIP Tours | Contact Us |
| Event Schedule | Español | Connect | Diversity & Inclusion | Military | Español |
| Live Shows | Guest Safety | Guest Advisory Panel | National Site | | Terms of Use |
| Restaurants & Dining | Park Policies | Guest Relations | Investor Site | | Privacy Policy |
| Shops & Gifts | Driving Directions | Lost & Found | Careers | | |
| Merch Store | | Member Support | Terms of Use | | |



#mysixflags

JA1786

EXHIBIT "V"

JA1787

Flags no bigger than 3' x 5' without poles are permitted. Flags must be event related and may not cover any Arena signage. All flags or banners deemed inappropriate by Arena management are subject to removal.

Laptops and tablet devices without bags. All must be powered on during entry.

Small, fold up umbrella strollers are allowed in Red Bull Arena. Fold-up strollers should be stored under your seat. Strollers that cannot fit under your seat will not be permitted. Strollers will be subject to an X-Ray search.

Baby seat carriers are permitted but will require a ticket for the carrier. Baby seat carries will be subject to an X-Ray search.

For more information or to confirm anything for a specific event, contact us.

## PLAYER ENTRY AND BENCHES

Teams will enter at midfield from the west side of the Arena between Sections 109 and 110, which is the same side the player benches are located. The Red Bulls player bench will be located in front of Section 109.

## PROHIBITED ITEMS & BAG POLICY

No Luggage, Computer Bags, Briefcases, Backpacks, Large Purses, Camera Cases, Coolers of any kind, Thermoses or Ice Chests of any size permitted

Red Bull Arena has introduced a new bag policy beginning with the 2022 season. Fans are permitted to bring clear bags sized 14"x14"x6" or smaller. All bags sized 4"x7" are still permitted. Medical and Baby Bags are an exception but will be subject to an X-Ray search. (It should also be noted that the Bag Check trailer will no longer be available, however, a limited number of secure bag lockers will be available for rent for $5. The lockers will be located next to gate B1.)

Weapons

Bottles, cans, coolers, containers

JA1788

Noisemakers, plastic horns, air horns, whistles, drums, musical instruments of any kind

Fireworks, flares, smoke bombs or any similar type item

Pets or animals of any kind with the exception of certified service animals

Selfie sticks, professional camera equipment, tripods, laser pointers, etc.

Water guns, toy/replica type **weapons**, squirt bottles, soap bubbles, etc.

Beach balls, frisbees, balloons, skateboards, hoverboards, rollerblades, brooms, skates, etc.

Streamers or confetti

Strollers that do not fit under the seats

Prohibited items discovered during inspections at the Arena entrances must either be returned to the owner's vehicle or discarded. The Arena will not provide a storage area for these items. Unlawful items that are discovered during security inspections are subject to confiscation and the person in possession of those items subject to arrest. Guests arriving by mass transit must take particular caution not to bring any prohibited items, as no exceptions will be made. Thank you for your continued cooperation and please be assured that the comfort and safety of all our guests is our primary goal. For more information or to confirm anything for a specific event, contact us.

## PUBLIC TRANSPORTATION

View Transportation Hub

## RAMPS

There is a ramp located by Gate D

## REENTRY

Exit/Reentry to the stadium is prohibited.

JA1789

# The Park and the People



## A HISTORY OF

### Central Park



"ORIGINAL AND PROVOCATIVE . . .
A DEEPLY FELT CELEBRATION OF THE ROLE OF PUBLIC SPACE."
<u>THE NEW YORK TIMES BOOK REVIEW</u>

## Roy Rosenzweig & Elizabeth Blackmar

JA1790

THIS BOOK HAS BEEN SUPPORTED BY A GRANT FROM THE NATIONAL
ENDOWMENT FOR THE HUMANITIES, AN INDEPENDENT FEDERAL AGENCY.

Copyright © 1992 by Cornell University

All rights reserved. Except for brief quotations in a review, this book,
or parts thereof, must not be reproduced in any form without
permission in writing from the publisher. For information, address
Cornell University Press, Sage House, 512 East State Street,
Ithaca, New York 14850.

Excerpt from "Central Park" from *Selected Poems* by Robert Lowell.
Copyright © 1976 by Robert Lowell. Reprinted by permission of
Farrar, Straus & Giroux, Inc. As excerpt from *Near the Ocean* by
Robert Lowell reprinted by permission of Faber and Faber Ltd.

"City Greenery" (6 lines from "Our City, Our Citizens or Patience
and Fortitude"). From *EVERYONE BUT THEE AND ME* by Ogden
Nash. Copyright 1962 by Ogen Nash. Copyright © renewed 1986
by Frances Nash, Isabel Nash Eberstadt, Linnell Nash Smith. By
permission of Little, Brown and Company and Curtis Brown Ltd.

First published 1992 by Cornell University Press
First printing, Cornell Paperbacks, 1998

*Library of Congress Cataloging-in-Publication Data*
Rosenzweig, Roy.
     The park and the people : a history of Central Park / Roy
Rosenzweig and Elizabeth Blackmar.
          p.   cm.
     Includes bibliographical references (p.        ) and index.
     ISBN-13: 978-0-8014-2516-5 (cloth : alk. paper)
     ISBN-10: 0-8014-2516-6 (cloth : alk. paper)
     ISBN-13: 978-0-8014-9751-3 (pbk. : alk. paper)
     ISBN-10: 0-8014-9751-5 (pbk. : alk. paper)
     1. Central Park (New York, N.Y.)—History.   2. New York (N.Y.)—
History.   I. Blackmar, Elizabeth, 1950–  .   II. Title.
F128.65.C3R67   1992
974.7'1—dc20                                              92-7062

Cornell University Press strives to use environmentally responsible
suppliers and materials to the fullest extent possible in the publishing of
its books. Such materials include vegetable-based, low-VOC inks and
acid-free papers that are recycled, totally chlorine-free, or partly
composed of nonwood fibers. For further information, visit our website
at www.cornellpress.cornell.edu.

Cloth printing   10   9   8   7   6   5   4   3   2   1

Paperback printing   10   9   8   7   6   5   4   3

JA1791

# INTRODUCTION

In 1890 Eugene Schieffelin, a member of an old and wealthy New York family, released eighty starlings in Central Park, so New Yorkers could see the birds mentioned in Shakespeare's plays. Today, their 200 million descendants fill the skies across America. The influence of Central Park similarly spans the country. Thousands of municipal parks are direct descendants of this first landscaped public park in the United States. Its organization, policing arrangements, rules for use, and especially its design have been a powerful model (and sometimes countermodel). Central Park, one popular architectural guide concludes, is "the granddaddy of America's naturally landscaped parks."[1]

Central Park has been, in addition, a symbol of our national culture. In its first decade, the 1860s, the lithographs of Currier and Ives displayed to a national audience elegant New Yorkers riding in their carriages and strolling on the paths. In 1879 the democratic poet Walt Whitman noted the "rich, interminable circus" of the carriage parade "of New York's wealth and 'gentility' " in the park.[2] A century later it appears in films as a place of sophisticated urbanity. Woody Allen's cerebral New Yorkers ponder the meaning of life as they negotiate its walks in *Hannah and Her Sisters.* The "yuppies" of the 1980s in *When Harry Met Sally* sip drinks at the boathouse cafe. In *Wall Street* a young stockbroker confronts a ruthless inside trader on the Sheep Meadow.

But Central Park is also a place where crowds of ordinary New Yorkers gather and play. In the 1890s William Dean Howells marveled at the "spectacle" of the immigrants who jostled on the Mall as they took in "this domain of theirs." A half century later, the musical *Up in Central Park* celebrated the park as the common possession of all New Yorkers—"the big back yard of the city," a place "to laugh, to dream, to love, to roam." In the movie musical *Hair,*

JA1792

dreamers in long hair and Day-Glo clothing roam there. In E. B. White's 1945 children's book *Stuart Little*, no one thinks it odd to cheer a mouse to victory in a model-boat race on the Conservatory Water.[3]

Central Park has been envisioned as a place of romance and of destiny as well. In Edith Wharton's *Custom of the Country*, Undine Spragg seeks out an assignation in the wisteria arbor. Robert Nathan's Eben Adams finds love with a young woman from the past on the Mall and the Lake in *Portrait of Jennie*. In a more sultry key, Billie Holiday sang about "lovers that bless the dark on benches in Central Park." J. D. Salinger's Holden Caulfield watches his sister Phoebe reach for the golden ring on the Carousel. In Isaac Bashevis Singer's "Neighbors," an old man glimpses death in the winter in the park: "The desolate park became a cemetery. The buildings on Central Park South towered like headstones."[4]

Central Park has also powerfully symbolized the redeeming power of nature. In George Loring Brown's 1862 canvas, people are barely visible amid the serene greens and browns of the trees and grass. In the postimpressionist Maurice Prendergast's turn-of-the-century paintings of May Day, the people seem to turn into flowers. W. B. Van Ingen's landscapes have no people at all, only nature. Marianne Moore saw the park through its seasons: "Spring: masses of bloom, white and pink cherry blossoms on trees given us by Japan. Summer: fragrance of black locust and yellow-wood flowers. Autumn: a leaf rustles. Winter: one catches sight of a skater, arms folded, leaning to the wind—the very symbol of peaceful solitude, unimpaired freedom. We talk of peace. This is it."[5]

For all the celebrations of the park's pastoral attractions, perhaps the most compelling image for artists and writers has been the juxtaposition of the city and nature, of New York and Central Park. Photographers have been fascinated by the contrast offered by steel and glass office towers and art deco apartments looming over trees and lakes. Reversing the perspective, Ruth Orkin captures the park from the heights of those same buildings. Other images counterpose the charms of nature to the city's dangers. As early as the 1880s the plot of *The Mystery of Central Park* revolved around a murder in the park, though only two or three murders occurred in the park's first thirty years. In the 1960s Johnny Carson joked about the danger: "It was so quiet in Central Park last night. You could have heard a knife drop." The poet Robert Lowell invoked the fears of violence:

> We beg delinquents for our life.
> Behind each bush, perhaps a knife;
> each landscaped crag, each flowering shrub,
> hides a policeman with a club.[6]

Whether in the form of a one-liner or a poem, these stark hints of urban

Case 1:22-cv-08314-RMB-AMD Document 49-88 Filed 07/25/2023 Page 99 of 436 PageID: 1917

danger in a pastoral setting have unfairly exaggerated the threat of crime in Central Park. Yet they do remind us that America's most important naturally landscaped park is an *urban* space, best understood in relation to its city. That reminder is particularly important since most nonfiction about Central Park (as distinguished from imaginative representations) has tended to view it as isolated from city life and conflicts, as a landscape of vistas, birds, bridges, buildings, rocks, and trees. Few have written of the *people* who made, maintained, and above all, enjoyed the park that was their own.

Historians have shared the tendency to study this public space apart from the city's people. No full-scale history has been published; most historians concentrate instead on the career and the vision of Frederick Law Olmsted, who designed the park with Calvert Vaux in 1858. The two envisioned it as a pastoral retreat from the pressures and aesthetic monotony of a growing city, and historians and landscape architects have seen it reflected in their eyes, as a work of landscape art.[7]

To be sure, it is impossible to comprehend Central Park fully without understanding its appeal as a designed natural landscape, and we have bene-fited enormously from the work of those who have explored these dimensions of the park. Nevertheless, our goal in this book is to offer a different perspective on the park's history—one that puts people at the center and relates the park to the city. We tell the story of the park's people—the merchants and uptown land-owners who launched the project; the immigrant and black residents who lived on the land seized for the park; the politicians, gentlemen, and artists who disputed its design and operation; the German gardeners, Irish laborers, and Yankee engineers who actually built it; and the generations of New Yorkers for whom Central Park was their only backyard.

We begin this history of Central Park as a social institution and space, an aspect of the city rather than just a natural or designed landscape, by asking a seemingly easy question: What is a "public park"? In its broadest terms, this book is an exploration of the changing meanings New Yorkers have attached to that deceptively simple phrase.

Parks have evolved over the centuries in concept and in form. In medieval and early modern England, a *park* was "an enclosed tract of land held by royal grant or prescription for keeping beasts of the chase," usually deer. More and more of these parks were created in the sixteenth century as English aristocrats and gentry cleared and enclosed large tracts of land around country estates, taking over entire villages and common fields. Eighteenth-century landlords continued what cultural critic Raymond Williams characterizes as the "imposi-tion and theft" of the English enclosure movement, but instead of mere private hunting preserves, these new parks were often artificially constructed scenic landscapes. With the assistance of landscape gardeners such as Humphrey Repton and Lancelot ("Capability") Brown, landlords created "the view, the ordered proprietary repose, the prospect," Williams writes, "a rural landscape

emptied of rural labour and labourers; a sylvan and watery prospect, with a hundred analogies in neo-pastoral painting and poetry, from which the facts of production had been banished."[8]

Paradoxically, then, these carefully crafted English landscapes were intended to mimic or improve nature, to present idealized nature so arranged as to disguise human intervention. And since this work "was centered upon the great expanse of land and woods that in the typical large country place was simply called the Park," historian Norman Newton writes, the word *park* came to be attached to an artificially natural landscape. English travelers readily extended this usage to the royal and aristocratic grounds of the Continent, where landscape gardeners arranged nature in a more formal style.[9]

In the late eighteenth and early nineteenth centuries, parks increasingly became identified with cities. German towns turned old fortifications into public gardens. The London public had been admitted, with regulations, to royal grounds such as Hyde Park as early as the seventeenth century, and over the next two centuries other royal lands were opened to public use. By the early nineteenth century municipal and national governments had begun to establish and landscape public parks that represented the romantic ideal of *rus in urbe*—country in the city.

Alongside this formal strand of park development, there has long existed a vernacular concept of public open space, whose tradition is more difficult to document. The cultural geographer J. B. Jackson contrasts "two types of park land": the " 'designed' parks" produced by landscape gardeners and " 'unstructured' playgrounds," where, at least until the late nineteenth century, "the common people and particularly adolescents, could exercise and play and enjoy themselves, and at the same time participate in community life." Jackson finds evidence of these unstructured "parks" in the churchyards of medieval Europe, in the stretches of undeveloped land outside the city walls or along riverbanks (what the French call *terrains vagues*), and in the "grove out in the country near the river."[10]

The dual heritage of designed and vernacular public spaces shaped the development of urban parks in the United States. One strand of the vernacular tradition stretches back to the New England commons—spaces held by the community for shared utilitarian purposes (for example, grazing cattle or gathering fuel) as well for public assemblies, particularly militia drills. New York's own Common served a variety of purposes in the seventeenth and eighteenth centuries—pasture for cattle, the setting for executions, the home of the almshouse and jail, and the site of public festivals and protests. But only in 1797, five years after it was enclosed for the first time, was it labeled "The Park" (rather than "The Fields" or "The Common") on a city map. And the designation "City Hall Park" or "The Park" came into wide use only in the first decade of the nineteenth century when it was landscaped in connection with the construction of City Hall.[11]

Another vernacular strand derives from the early nineteenth-century com-

mercial proprietors who opened private parks such as New York's Vauxhall Gardens, modeled on pleasure gardens in London. More elusive to historical recovery and less structured in their composition were the innumerable open spaces appropriated by youths and adults for sports and games—for example, along the Manhattan waterfront or in vacant lots uptown. On the cusp of the vernacular and formal park traditions in the United States stood "rural" cemeteries landscaped in the English romantic style. In the 1830s and 1840s Cambridge's Mount Auburn, Philadelphia's Laurel Hill, and Brooklyn's Greenwood cemeteries helped to foster a taste for pastoral landscapes and a habit of "country" picnics and excursions within the city.

When New Yorkers created Central Park in the 1850s, they turned to formal landscaped European parks for their model rather than to vernacular traditions—but not without opposition. Even before the city acquired land for a park New Yorkers began to debate how this new public institution should be defined.

Frederick Law Olmsted, who was the park's first superintendent, said that the public would have to be "trained" to use a park "properly so-called," by which he meant a pastoral landscape in the English tradition. But what *was* a "proper" park? New Yorkers repeatedly proposed to alter Central Park's natural design—for example, by adding ornamental gates, formal gardens, or baseball diamonds with spectator stands. Parkgoers created their own paths ("desire lines," as landscape architects call them) and turned meadows into playing fields. When automobiles arrived, administrators responded to the pressure of new uses and new users by rearranging paths and adjusting the drives. City residents also enthusiastically greeted new park features, from statues and restaurants to children's rides and tennis courts, that distracted attention from the natural scenic effects. Through a vernacular process, the meaning of the park, proper or not, evolved. Still a "natural landscape," it also became a social institution and city space.

Just as there are two traditions in the definition of Central Park as a park, its meaning as a public institution also has two dimensions: its political character as property and its cultural character as an open space. *Public*, in one sense, signifies property rights, government ownership and control of land removed from the real estate market. Public property, owned by the government, thus contrasts to private property, owned by individuals or corporations who can exclude others from their land. But public property also differs from common property, that is, land or resources to which all members of a community have unrestricted access. The right to control public property is vested in government officials who determine who has access to it and under what conditions. In a democracy, when land is owned by the "public," government officials are thought to represent the interest of all citizens. In this sense, the people who organize and control a public park constitute the sovereign or political public. Yet the political process of selecting public officials is itself a matter of contest in which not all participants are equal.[12]

In a democratic and capitalist society, municipal politics revolve around

Tocqueville's charge that Americans became involved in civic affairs more out of self-interest and greed than from pride or a sense of duty. "Why," asked one early park advocate, "should monarchy be allowed to do more . . . for its subjects than republican civic policy can achieve for a City of Sovereigns?"[25]

Arguments for the necessity of fulfilling New York's destiny as a great world city intersected with concerns about the city's competitive position within its own emerging metropolitan area. To answer any doubts business readers might have about the relation between a public park and sustained economic growth, the editor of the *Commercial Advertiser* drew a practical analogy: "Many a tradesmen finds it profitable to expend money in extra fixtures and ornaments for his store. . . . to lay out money to bring in money is a common axiom of commerce." Many who lived in Manhattan were now seeking residence and recreation in Brooklyn and New Jersey, the editor explained: "It is to prevent this drawing away of our population and their money that we ought to be concerned."[26]

In 1844 when Bryant first called for a park, the city was still recovering from the ravages of the 1837 Panic and no movement emerged to implement his proposal. The economic boom of the early 1850s directly fueled confidence that the city would be "immensely advantaged pecuniarily" as well as fulfilled in its metropolitan destiny by establishing a great park. But the march of the city's economy had produced grave public health problems that marred New York's reputation as an attractive place to visit, settle, or do business. Here, as in other industrial cities, the staggering mortality rate stemmed from contagion, accidents, malnutrition, exposure, contaminated water, and conditions of childbirth as well as from lung diseases associated with polluted air, but doctors believed it was the bad air of cities that caused disease. In the 1830s and 1840s health reformers in England, proclaiming that parks would serve as "lungs for the city," had launched campaigns for new public grounds as an antidote to the ills of industrial society. New York editors and politicians repeatedly invoked this phrase, urging the healthful benefits of parks for fresh air and exercise. Other measures (better housing and sanitation and more downtown public spaces, for example) would have more directly addressed health problems than a public park. Still, during muggy summer months in a fetid atmosphere of dust, coal smoke, and decaying manure and garbage, many naturally viewed fresh air and tree-filtered breezes as a primary source and certainly the symbol of physical well-being.[27]

To most of the park's promoters, moreover, health represented as much a moral as a biological condition. Disease was associated with "dissipation," and nowhere did dissipation seem more threatening than in such popular male recreations as drinking, gambling, cockfighting, and boxing. A public park would provide a site for "healthy" and "manly" exercise. Bryant and his fellow editors stressed the contribution of parks "to the health . . . and to the morals of the community." In contrast to rough male sports or the temptations of "brightly

Case 1:22-cv-01824-RMB-AMD Document 48-88 Page 103 02/Date Filed 07/20/2023 PageID: 1921

lighted streets," a *Courier and Enquirer* article said, a park would encourage *family* outings and inspire "home associations."[28]

Park advocates believed that women and children (the two usually linked) would be the particular beneficiaries of a public park, "where the masses can enjoy perambulation, pure air, and exercise in summer." Although women were far from cloistered in nineteenth-century New York City, they had few opportunities for exercise and relaxation. In the 1840s writers had expressed alarm at the sickly condition of American women. Pointing to the burden of domestic duties as well as to constricted middle-class conventions of female dress, Catharine Beecher urged increased exercise; others charged that women's ill health reflected their general lack of opportunity for physical and mental development. A public park, advocates suggested, would "tempt fair pedestrians to . . . healthful and natural exercise." Assertions of its value to women as essentially moral beings also affirmed the essentially "moral" (and hence healthful) character of a public park.[29]

### "Good Morals and Good Order"

The appeal to health and virtue does not alone explain the rise of a movement to establish a large, landscaped park as a new *public* institution. Undeveloped lots and uptown resorts, as near to the city's center as the proposed park, could offer New Yorkers open space for fresh air and exercise. So could the extensive pleasure grounds of Hoboken's Elysian Fields, Brooklyn's Fort Green, and resorts on Long Island and Staten Island. Improved and cheaper mass transportation could make such resorts even more accessible. But editors agreed, only city government had the power to remove land from the rapacious Manhattan real estate market; only government could establish a park as a permanent and orderly environment for recreation.[30]

Tocqueville linked Americans' impoverished civic culture to "conditions of equality" in a democracy, but wealthy New Yorkers worried as much about the conditions of inequality that fostered new kinds of social disorder. In 1849 riots had broken out when native-born mechanics protested the appearance of an elite-backed British actor at the downtown Astor Place Theater; the troops brought in to restore order fired into a crowd and killed twenty-two people. The following year, the city's nascent trade unions formed the New York Industrial Congress to coordinate their opposition to employers' degradation of the crafts. New waves of German and Irish immigrants, concentrated in crowded tenement districts, created their own cultural institutions, including beer gardens and corner saloons. The power of the city's merchants and bankers to dictate the terms of economic growth or maintain a unified cultural order was steadily being undermined.[31]

Older conceptions of republican benevolence held that wealthy citizens had



Manhattan north of 57th Street in 1854 included a mixture of country estates, asylums, and small villages such as Yorkville at East 85th Street. The rectangular Croton Reservoir later became part of Central Park, as did the Mount St. Vincent convent (far left) and the turreted New York State Arsenal.

instance, percentage of people owning land or numbers of people per dwelling), they were slightly better off. These figures undercut two other often-repeated, contradictory characterizations of uptown: that it was a slum or shantytown of twenty thousand squatters or that it was a bucolic watering place of the elite.[2]

Wealthy New Yorkers who built country estates along both river shores in upper Manhattan were never more than a small minority of the uptown population, though their social prominence—and the prominence of their dwellings—rendered them much more visible in both contemporary and historical accounts. In 1855 at least twenty-three hundred industrial workers in the "rural" districts toiled in sixty-four mostly small shops, including fourteen carriage- and coach-making establishments and various "nuisance industries" (soap, wax, paint, match, chemical, and bone-boiling plants). The uptown farms and gardens were also small; only the northernmost corners of the island retained

Case 1:22-cv-06424-RMB-AMD   Document 49-8   Filed 05/12/23   Page 105 of 436 PageID: 1923

intensive agriculture, with a total of perhaps a thousand acres actively cultivated for oats, potatoes, turnips, and other crops.[3] Uptown Manhattan was, thus, less agricultural and more industrial than standard accounts suggest.

But the most distinctive uptown feature—the profusion of orphan asylums, hospitals, old age homes, and lunatic asylums—has rarely been noticed at all. A startling 15 percent of the population of the upper three wards (perhaps as many as nine thousand people) lived in such institutions, presumably because land was relatively cheap, because a "country" atmosphere was seen as rehabilitative, and because paupers, "lunatics," and criminals were considered undesirable neighbors.[4]

At midcentury, then, uptown Manhattan was a "suburb" in the sense of a settlement outside the densest urban concentration. But it was the opposite of the modern sense of a suburb as a regulated residential environment. Instead, it was a jumble of small craft shops, large factories, tiny garden patches, two-hundred-acre farms, plank shanties, country estates, and institutional homes for the poor, criminal, and disabled. Between 1840 and 1855, the population above 40th Street multiplied five times, twice as fast as the rest of the city.

Many newer residents clustered in the areas made accessible by the emerging transportation system, which favored the East Side over the West Side. In 1834 regular runs of the New York and Harlem Railroad to 86th Street and Fourth Avenue attracted skilled American, German, and Irish workers and clerks to Yorkville, as did the opening of upper Third Avenue around the same time. Three years later, the railroad extended its range (and its impact) to Harlem; by the end of the decade it was carrying one million passengers per year just within Manhattan alone. On the West Side, the limited service of the Bloomingdale stagecoach line retarded West Side development. New transportation accelerated the exit of some older inhabitants. The Hudson River Railroad's appearance on the far West Side in the late 1840s, observed longtime resident John Punnett Peters, "drove the occupants of those old homes to other regions." But actually, the destruction of the West Side's rural ambiance began in the previous decade with the laying of the Croton aqueduct, which cut through several of the old country estates and obtrusively ran pipes above ground between 84th and 113th streets.[5]

Disease also undermined the West Side elite's gentry ideal. Wealthy New York merchant families had built uptown summer residences to escape the port's yellow fever epidemics, but by the 1840s uptown no longer offered safe refuge from downtown diseases. In 1849 cholera appeared in the upper wards, hitting as one of its victims the wife of the minister of St. Michael's Protestant Episcopal, the church of wealthy West Siders. Uptown residents such as Horace Greeley (who lost his only son to cholera) blamed the epidemic—inaccurately—on the arrival uptown of twenty thousand hogs that had been driven out of downtown by city police that summer. The intrusion of cholera as well as charitable institutions, railroad tracks, and aqueduct pipes prompted

Bloomingdale's elite to move their summer homes farther from the city—to be replaced, Peters writes, by "a poorer, if more numerous, class of residents."[6]

With the city's outer wards undergoing rapid changes, some uptown landowners had begun to lobby for a large landscaped park within their district in the hope of shaping these powerful forces of development. A park, they thought, would eliminate the "nuisance" of workshops, hogpens, and asylums by replacing them with a new kind of suburb organized around private residences—the "garden, villa, and village settlement" that some uptown real estate investors promoted. "If the opening of the Park raises the actual or speculative value of lands in its vicinity," the *Sun* pointed out in 1855, "it is certain that the poorer class of citizens will not settle them extensively when homesteads can be obtained cheaper elsewhere." Uptown landowners saw the park both as a way of screening out new poor residents and their associated trades (an early form of zoning) and as a means of removing the existing poor population (an early form of urban renewal). "We want a park up town," one citizen declared at a public hearing, "to remove the hog pens and filth that crowd people in the upper part of our city together," but such uptown representatives as landowner and future mayor Daniel Tiemann privately admitted the concern was at least as much about a disagreeable urban population as about the disagreeable urban industries. West Siders, not coincidentally, advocated a park precisely in the territory with the largest concentration of poor uptown residents.[7]

In contemporary and historical accounts, those who lived in Central Park before it became Central Park have generally been unrepresented or misrepresented, either ignored or disparaged as a debased population of savages. Legislative discussions and public reports contain only indirect hints that anyone at all lived on proposed park land. Guides to the city that described East Side settlements like Yorkville and Carmanville made no mention of the equally large community of park dwellers. A few newspaper reporters evinced slightly more interest, none of it sympathetic. On March 5, 1856, a *Times* reporter drew on the recurrent New York motif of a dual city of "sunlight and shadows" to contrast the "human misery" in its "lowest and filthiest depths" within the park boundaries to "the luxury and elegance" that he expected to flourish when the finished park rivaled the Champs Elysées. He described the residents as "principally Irish families" living in "rickety . . . little one storie shanties . . . inhabited by four or five persons, not including the pig and the goats." The *Evening Post* wrote that the duties of the new Central Park police would be "arduous," since the park was the "scene of plunder and depredations," "the headquarters of vagabonds and scoundrels of every description," and the location of "gambling dens, the lowest type of drinking houses, and houses of every species of rascality." An even more pervasive charge (really, an assumption) was that the park dwellers had stolen the land itself, that they were squatters.[8]

Most subsequent writers have drawn their information (often embellishing along the way) from a single paragraph written by the park's first engineer,

Egbert Viele, who from the distance of forty years recalled the park as "the refuge of about five thousand squatters, dwelling in rude huts of their own construction, and living off the refuse of the city." "These people who had thus overrun and occupied the territory were principally of foreign birth, with but very little knowledge of the English language, and with very little respect for the law. Like the ancient Gauls, they wanted land to live on, and they took it."[9]



The "pre-parkites," as one commentator called them, left no firsthand accounts to counter these scornful reports, but it is possible to piece together an alternative portrait of the roughly sixteen hundred residents from manuscript censuses, city directories, tax lists, land records, church registers, and the maps and petitions generated by the acquisition of the park land. More than 90 percent of those who lived on that land were immigrants—mostly Irish or German—or African Americans, compared to about half of the overall population of the city and also of uptown Manhattan. More than two-thirds of the adults worked at unskilled and service jobs—as laborers, gardeners, domestics, and the like—and most of the rest as tailors, carpenters, masons, or in other skilled trades. About one in ten ran a small business—a grocery or a butcher shop, for example.[10]

These aggregate figures challenge the existing portraits of the "pre-parkites" as criminals and vagabonds, but they hide much of the complex reality of life in the park. To uncover some of that reality, we need to look more closely at a particular park settlement known as Seneca Village.[11] The densely settled area between 82nd and 88th streets and Seventh and Eighth avenues had least three times as many people per block as the rest of the park. Atypical in its racial composition and its length of settlement, it deserves close scrutiny both because



Nearly 1,600 people lived in shanties and farmhouses scattered across the swampy and rocky terrain of the future park. Topographical map by Egbert Viele, 1856.

joined them in the next ten years. When asked in an 1857 court case about her familiarity with a tract of land in the upper park, Catherine Coggery replied: "I . . . have been looking at it for 20 years."[33]

The area of the park under longest continuous settlement was probably the northeast corner, where the old Boston Post Road made its way between two rocky ridges. By the 1750s Jacob Dyckman had built a tavern on a hill in the vicinity of 105th Street and Fifth Avenue. It soon passed into the McGown family, which owned the tavern and the surrounding land for most of the next century. During the Revolutionary War, Hessian mercenaries occupied McGown's Pass, as it had come to be called, and in 1814 sixteen hundred militiamen guarded the area against a threatened British invasion. (The stone blockhouse at West 109th Street, the oldest building in the park today, is a surviving relic of the chain of fortifications built then.) In 1847 the Sisters of Charity of New York purchased a dilapidated frame house surrounded by pools of water on the site of the abandoned tavern; they took turns cooking their meals on a small coal stove and carried water from the nearest spring. "I have heard of poverty, but I never saw such a picture of it before," a young candidate for the order said to herself when she arrived in 1849. Within a few years, the sisters had constructed a flourishing religious community on what they called Mount St. Vincent. By the mid-1850s, their convent, with seventy sisters (half of them Irish-born), eleven Irish female servants, and nine Irish male employees, encompassed several substantial buildings including a laundry, a large brick chapel, a boarding academy for two hundred "young ladies," and a free school for fifty or sixty children from surrounding areas.[34]

The religious buildings at McGown's Pass were not the only impressive structures within the proposed park boundaries. In 1848 the State of New York had erected the Arsenal on ten acres of land at 64th Street and Fifth Avenue. About fifteen blocks north the wealthy Wagstaff family maintained an old farmhouse at Fifth Avenue and 79th Street, one of the few paved streets in the area. And at around 68th and Sixth, the broker Peter B. Amory and his family of ten occupied the Amory family homestead.[35]

On the western side of the park, a world away from the Amorys and the Wagstaffs, were the bone-boiling plants of George Moller and William Menck. Such "nuisance" industries were being driven out of lower Manhattan by ordinances, restrictive covenants, and public pressure. Leather dresser Benjamin Beaman, butcher Ludwig Sheff, and soap boiler Charles Lucke also faced fewer restrictions on their trades here than downtown. Some park dwellers helped to gather the thirty-four thousand bushels of animal bones that Moller and Menck required each year; others found the dollar-a-day wages offered at the plants attractive; and the rest were willing to tolerate (or at least lacked the resources to complain about) the noxious odors released when bones were boiled to produce fuel for sugar refining.[36] (The current occupant of the

Case 1:22-cv-Case623RNN90AMDDocument4988-Page-File0902/13aC8 Filedq07520/20223ageID: 1927

gentlemen who hoped to instruct the public in manners and values. Central Park was open to the public, but not all behavior was equally welcome there.

## Training the "Ignorant" How to Use a Park

Olmsted claimed credit for crafting the park's rules and enforcement procedures; in 1863 he informed Calvert Vaux that the "administration & management of the public introduction to and use of the park" was his "most valuable property" in the entire project. But Olmsted hardly shaped the rules for park use by himself. The board of commissioners had begun to consider park ordinances and policing before Olmsted joined the staff as superintendent. They did ask him to draft the regulations, and the first set of rules seems to have been devised by Olmsted in collaboration with his rival, Chief Engineer Egbert Viele. Olmsted himself held undisputed authority over the park for only a brief time between his appointment as architect-in-chief in May 1858 and Andrew Green's appointment as comptroller in October 1859. He and Vaux resigned as landscape architects in 1863 and they returned in that capacity two years later. Their connection to the park was interrupted again when Tammany Democrats captured the board from 1870 to 1871 but resumed in November 1871. A year later Olmsted and Vaux dissolved their partnership; Olmsted continued on the park in various superintending positions until 1877, and Vaux was a consulting landscape architect for some of this time. Park politics, however, constrained Olmsted's control of the park keepers and other administrative matters.[2]

Olmsted had set the tone for public use of Central Park in the first place back in the 1850s. "A large part of the people of New York," he told the commissioners shortly after he was hired as superintendent, "are ignorant of a park, properly so-called. They will need to be trained to the proper use of it, to be restrained in the abuse of it, and this can be best done gradually, even while the Park is yet in process of construction." From the start, he was determined to "train" the public to understand the difference between this park and other open spaces; he drew a particularly sharp line between public property (as government-owned property) and both unregulated private property and common property. "Visitors to the Park, should be led to feel as soon as possible," he declared, "that wide distinction exists between it and the general suburban country, in which it is the prevalent impression of a certain class that all trees, shrubs, fruit and flowers, are common property."[3]

Olmsted hit on the same theme fifteen months later just as the first ice skaters were venturing onto the frozen lake. The *New York Times* reprinted and expanded on his remarks on the importance of "instructing [people] in the proper use of the park." The "careless stupidity" Olmsted discovered among early park users came from the mistaken notion that a park was like a "wood," with which Americans associated "the idea of perfect liberty." The *Times* agreed

JA1804

Case 1:22-cv-01234-RMB-AMD Document 49-88 Filed 07/20/2023 Page 1002/1346 PageID: 1928



The Park Proper: A promenade along the Lake.

with the need to distinguish parks from what it called "common spaces." Central Park should not be treated like other public spaces in New York City, which it believed the municipal government had surrendered to "sharpers and rowdies": "The treasury, the streets, the wharves, the City Hall, the urinal, the Court-rooms, 'the [City Hall] Park' have all been left to the care of the elements and the peculators; so that the mere fact of a piece of ground's belonging to the public has become very naturally to be considered by the less intelligent classes . . . a license to commit nuisance on it. . . . Everyone must cease as soon as possible to associate [Central Park] in his mind with the dirty play-ground in front of the City Hall or Jones' Wood."[4]

Writing on the aesthetic motive of the Greensward plan in 1859, Olmsted had explained that the park "should present an aspect of spaciousness and tranquility . . . thereby affording the most agreeable contrast to the confinement, bustle, and monotonous street-division of the city. The Park should . . . as far as practicable, resemble a charming bit of rural landscape, such as, unless produced by art, is never found within the limits of a large town."[5] For Vaux this aesthetic goal had the intrinsic value of creating a beautiful public space that

JA1805

perhaps the hard line taken in the first year succeeded in "training" visitors in proper park use, and violations diminished. Most likely, both were true.

### *"Fast Trotting," "Vulgar" Wagons, Gambling, Hawking, and "Indecent Language"*

About half the rules focused on proper movement through the park, reflecting the emphasis of the Greensward plan on the visitors' relationship to the scenery. Parkgoers were enjoined to enter only at the specified gateways, to use the paths (not the grass), and not to block the roads with horses or carriages. More than a hundred signs scattered across the park directed the movement of individuals through the landscape and to particular features.[11]

Two other rules on movement affected who would use the park and how. The first concerned speed limits. In an effort to keep out sporting men and trotting matches, the Greensward plan had omitted long, straight drives; nonetheless, some newspapers worried that Central Park might turn into an "aldermanic commons for fast driving." It was a realistic fear. In the 1850s harness racing was the nation's leading spectator sport, according to sports historian Melvin Adelman, and New York City had at least seven trotting tracks. The *Irish News*, reflecting the cross-class nature of the sporting crowd, bemoaned the absence of "a raised, broad carriage and equestrian drive, round the park," a "grand Excelsior Course" that the "great Equestrian Order of New York" could "race and rattle over, to their hearts' content." "Is there any amusement in the world," it asked rhetorically, "which we prefer to . . . the whirling action of a gay nag throwing one mile behind her in three minutes?"[12]

Trotting matches and fast driving did not "stir the blood" of most park commissioners as it did the editors of the *Irish News*. The preliminary rules recommended to the board in September 1859 set the speed limit for carriages at five miles per hour and for horses at six. When the preliminary regulations were reported, one board member, the well-known fancier of fast horses August Belmont, moved to raise the speed limit for carriages to eight miles per hour and to eliminate all speed limits on the bridle paths. The board settled on a compromise of seven miles per hour for carriages and ten for saddle horses.[13]

Belmont had specifically crafted his proposal to "keep the fast-trotting men and other rowdies out" of the park. As his biographer explained, Belmont "liked to race horses on and off the racetracks," but "he did not think the park would be an appropriate setting for anything that might be dangerous to wives and children." Moreover, he was shifting his affections from harness racing to thoroughbred racing, then emerging as the favorite sport of wealthy New Yorkers. He regarded the heterogeneous sporting crowds that gathered to join in (and bet on) street harness races as an inappropriate constituency for Central Park.[14]

Despite speed limits and curved roads, the park initially proved "vastly attractive to the trotters," but soon regular arrests "made generally understood," as the *Atlantic Monthly* reported, "the law and customs of the park . . . restricting speed to a moderate rate." Between 1862 and 1863, speeding arrests dropped by two-thirds. The ban on fast driving was intended to ensure not only safety but also gentlemanly refinement. The *Herald* explained that "the rowdy habit of rapid driving" excluded a man from "the recognized list of gentlemen. . . . Any person thus demeaning himself upon a public fashionable promenade would be as indelibly stamped as ill-bred as if he were to be found running violently up and down a ball room in the midst of the dance."[15] Just as women governed manners within the ballroom, they would also determine what constituted decorum on the park drives.

If the park was like a ball room, not only certain speeds could be judged "vulgar" (as the *Herald* put it) but certain types of vehicles as well. The thousands of commercial wagons owned by cartmen, undertakers, and other tradespeople that filled the city streets were, from the start, barred from the park. Regulations prohibited omnibuses and express wagons, as well as "any cart, dray, wagon, truck, or other vehicle carrying goods, merchandise, manure, soil, or other article." Olmsted's ban was intended to provide a noncommercial alternative to the city streets, but it had class implications. His "business regulation," explained one local newspaper, would prevent the "invasion of the Central Park by improper vehicles and improperly behaved persons" and would thus keep the park from being "deserted by the better classes of our population."[16] At a stroke, Olmsted and the commission stopped butchers and bakers from joining bankers and brokers on the drives.

Trouble broke out almost immediately. Just a few months after the carriage drives opened, Olmsted reported that "frequent altercations take place between gatekeepers and persons endeavoring to enter the park with vehicles which gatekeepers judge should be excluded in obedience to the ordinances." "Some of our wagon-owning citizens," the *Times* noted around the same time, "have been already greatly aggrieved at finding themselves excluded from the 'people's park' by the 'people's policemen,' when they took their families there for a Sunday's drive in the respectable vehicles which do duty during the week in transporting legs of mutton, or cans of milk, or kegs of crackers, or boxes of candles from their shops to the customers' houses." These "sufferers . . . instantly break forth into indignant denunciations of the 'aristocracy,' and impassioned vindications of the 'rights of labor.'"[17]

Perceiving the implicit class bias in the park regulations, the *Leader* sarcastically praised them for setting out "what is *au fait* in a place of public resort" and wondered whether "our democratic citizens" would be "turned out of the enclosure as Adam and Eve were kicked out of the Garden of Eden." In prohibiting gambling, gaming, fortune-telling, hawking, peddling, or any other unlicensed commercial activity, the board had excluded not only the activities

Case 1:22-c Case 623 RMD AMD Document 4988-Page File 302/13426 Filed 07/20/2023 ageID: 1931

many wealthy New Yorkers found disagreeable but the equally disagreeable people who enjoyed them. Not coincidentally, the regulation against "threatening, abusive, or indecent language" followed the rules against peddling and riding in commercial wagons and preceded the rule on gambling and fortune-telling. In the mid-nineteenth century, respectable New Yorkers lumped these activities together as part of a lower-class street scene. Such prohibitions furthered Olmsted's larger aspiration to set the park apart from other urban public spaces, to institute "the most agreeable contrast" to the "bustle" of the city.[18]

Other rules adopted in 1859 insisted on the distinction between the park and the woods or the commons. One regulation explicitly barred visitors from cutting, breaking, or defacing the trees, shrubs, and plants, and another prohibited "persons" from turning cattle, horses, goats, or swine into the park to graze. In effect, officials wanted to ensure that the park would not be "common," in either sense of the word—nonexclusive or low and vulgar.

Olmsted's early efforts to grapple with the problem of controlling public use of Central Park could not entirely anticipate the controversies that would emerge when it opened. Within a year of adopting the original park ordinances, for example, the board added rules forbidding swimming or fishing in the ponds, setting off fireworks, playing musical instruments, displaying any "flag, banner, target or transparency," posting any bills or notices, or parading in military or target company or civic processions.[19]

From Olmsted's perspective, however, the most persistent threat to the park came from any destruction of the turf. The original ordinances did not include the later infamous "keep off the grass" rule, but the first visitors did find placards advising: "For the Present Visitors are Prohibited to Tread on the Grass." The seemingly temporary ban (justified by the newly seeded lawns) became permanent. By fall 1860 the first item on the poster that listed park regulations warned visitors "not to walk upon the grass; (except of the Commons)." Olmsted had decided to ban walking on the meadows but to permit exceptions by labeling some areas either temporarily or permanently as "commons," thus ceding some public right of free access. Park officials allowed Saturday visitors to use the lawns, particularly the twenty-two-acre Green in the center of the park (originally called the Parade and later known as the Sheep Meadow). But as the *News* pointed out in 1860, such park regulations did not permit "the family of the poor artisan," who could only visit on Sunday, to "carry the basket of cheap luxuries, a few apples or peaches, the home made pie and sandwiches . . . and sit and enjoy them under one of the trees of the only rural retreat open to him and his after the confining toils of the week." Olmsted's effort to preserve the lawns interfered as a practical matter with one of his own announced goals for the park: to provide the opportunity for poor families to enjoy as well as contemplate nature.[20]

Adelman notes, of "the growing rowdyism . . . and especially gambling and partisanship" that was infecting baseball. "Indeed," comments another sports historian, "the revenues from liquor sales and gambling were the engines driving the sports boom of the 1850s."[25]

New Yorkers organized new baseball clubs almost weekly in the late 1850s at the same time that the city swallowed up many of the available playing fields—the "out-lying common[s]," as a sporting paper called them. The ball clubs saw the new park as the answer to their dreams, but Olmsted and the board began to wonder whether their presence might prove, instead, to be a nightmare. In May 1861 the commission rejected the applications of baseball clubs for use of the park. "It is obviously impossible," it explained, to accommodate more than fifty ball clubs with more than fifty members each; "the space is not sufficient." Nor, the board explained in a later annual report, would it be possible "to satisfy the requirements of the numerous cricket, ball, and other adult clubs within the area of the Park, and at the same time preserve in the grounds an appearance that would be satisfactory to the much more numerous class that frequent the Park for the enjoyment of the refined and attractive features of its natural beauties." "The Park," the 1861 annual report had similarly noted, "has attractions to those that visit it, merely as a picture. . . . Whatever defaces or injures this picture makes it less attractive to the great mass of visitors, and should, for the general good, be excluded." Moreover, as the board later said, banning the ball clubs "effectually prevented" "match games and the objectionable features that have been the frequent attendant of these games."[26]

If the park board would not allow baseball and cricket clubs, what was to be done with the playgrounds that had been in the plans from the start? After nine years of intensive discussion, probably under the influence of Andrew Green, a former president of the board of education and now comptroller of the park board, the commissioners restricted the playgrounds to schoolboys who could produce a certificate of good attendance and character from a teacher. And even these exemplary lads found the fields open to them only three days of the week. Working-class youths were largely excluded, since relatively few of them went beyond elementary school in this period.[27]

A year after the commissioners opened the fields to schoolboys, they made a similar arrangement for girls. In 1867 they permitted schoolgirls to play croquet (whose popularity had boomed in the United States after the Civil War) on the lawns three afternoons each week. (Adults were permitted to play on the East Green.) Several contestants in the design competition, aware of the growing interest in physical fitness for women at midcentury, had proposed equipped fields for women's gymnastics, but these suggestions were not pursued by the commissioners, because they feared that equipped fields would detract from the park's scenic beauty.[28] The genteel and restrained game of croquet, whose movable equipment could be stored, fitted better with the designers' conceptions of a natural park. The park would be open to women's recreation, but only

JA1809

# 13

# A PUBLIC MENAGERIE AND
# TWO PRIVATE MUSEUMS

In March 1856 financier August Belmont wrote from the Hague to his father-in-law, Commodore Matthew Perry, about the new park proposed for Manhattan. Three years earlier, Perry had opened Japanese ports to American ships, and Belmont had been dispatched by President Franklin Pierce to the Netherlands to negotiate the opening of Dutch ports in the East Indies. Now the two men were thinking about opening uptown Manhattan to elite residential development. Just as they looked to the national government to facilitate private trade ventures, so too they saw new opportunities for private initiative in the city's provision of a public park. "Your project of buying and building on the Central Park seems a very good one," Belmont told the commodore. But if the park was to protect such investment and attract "nice neighbors," it would have to be properly managed. Thus, two years before he joined the park board himself, Belmont was already speculating on what rules would be necessary to "keep the fast trotting men and other rowdies" out of Central Park and its surrounding neighborhoods.[1]

Belmont's speculations to his father-in-law went beyond the question of how public officials should manage the park in the best interests of adjacent landowners to a new kind of private initiative: the creation of a private zoological and botanical garden within the public Central Park. If the city set aside thirty or forty acres, Belmont suggested, a state-chartered private company headed by "a few of our spirited citizens," might take control of the property and open a zoo, "only to subscribers." "A great many much smaller places than New York, such as Brussels, Antwerp, etc. have similar establishments without any aid of Government," Belmont noted, "and they have succeed[ed] very well." How much greater the chances for success if the city provided the land.[2]

Belmont's vision of a private zoo and botanical garden was not realized.

340

Case 1:22-cv-... Case 623-RMB-AMD Document 49-88 Page Filed 602/12/43 Page 07/20/2023 PageID: 1934

Instead, the Central Park Menagerie developed under public auspices and with much more emphatically popular appeal than the exclusive institution Belmont had imagined. But two other important institutions emerged within Central Park in the last third of the nineteenth century that much more closely matched Belmont's model of private and elite control of public cultural institutions—the American Museum of Natural History on the West Side at 77th Street (in Manhattan Square, which had been annexed to Central Park in 1864) and the Metropolitan Museum of Art in the park facing Fifth Avenue near 81st Street. Although taxpayers provided the land and funds to build the museums, a private board of trustees controlled their management and use.

The divergent paths marked out by the zoo and the museums reflected the park's own changing relationship to its publics. In the 1860s when the zoo emerged on an ad hoc basis, the park's political public was composed of gentlemen like those on the original board and its cultural public was dominated by the gentlemen and gentlewomen of the carriage parade. By the 1870s and 1880s, as the two museums took shape and the zoo acquired its popular audience, the political and cultural publics were broader and more divided. The museums' elite founders viewed this democratization as a threat to their prerogatives and mission as patrons of art and science—particularly because they believed that party politics and popular crowds might undermine the cultural authority of their own institutions. Museum trustees accepted the need to deal with politicians to secure public funds, but they resisted opening their institutions to the same inclusively defined public that now infused the park. Their resistance was only partly successful. Dependence on public money ultimately forced the museum trustees to yield to the demands of working-class New Yorkers for greater access, particularly on Sundays.

The stake that new groups had developed in the park—and their definition of it as a common space—became most evident when a coalition united across party, class, and ethnic lines to block the introduction of a fourth cultural institution, a racetrack. A broadly constituted public defense of the park, rather than Belmont's private initiative, succeeded in keeping the "fast trotting men" out of Central Park.

### The "Poor Man's Monkeys"

The Greensward plan did not provide for a zoo, although other design competitors had favored the idea. In 1859 August Belmont, now back from Europe and on the park board, persuaded the commissioners to look into the operation of English and European zoological and botanical gardens. That year's annual report called for a zoo to be run by a private group that would pay rent and charge admission. Shortly after the beginning of the new year, some of the city's wealthiest gentlemen—including Belmont and four of the original

signers of the Minturn petition for a park (as well as Frederick Law Olmsted) organized the American Zoological and Botanical Society to plan the zoo. Within another few months, the state legislature authorized the board to set apart up to sixty acres in Central Park for a zoological and botanical garden to be run by the new society.[3]

As had been true of the initial movement to create a public park, prominent New York gentlemen impressed by European models led the way. Although no American cities had zoos at this time, many of the founders of the American Zoological and Botanical Society had probably visited the Jardin des Plantes in Paris and the London Zoological Garden. And like early advocates of the park, these gentlemen saw a zoological garden as a way to establish New York as "the acknowledged seat of wealth and moral power."[4]

Just as some advocates viewed Central Park as the future rendezvous of the polite world, so some enthusiasts imagined a zoological garden as a place for their socializing—particularly if it were organized, as Belmont had urged, with special privileges for subscribers. The private society's projected zoo would be open to the public but closed to the general public on Sundays. (London's Zoological Garden admitted only subscribers on Sunday, "the fashionable day" to visit.) The *Herald* warned that "such class regulations" "in favor of the wealthy few" would not be tolerated in republican America, and the *Irish News* similarly declared the plan to restrict the zoo on Sundays "absurd" and "un-American."[5]

Some early elite advocates also envisioned the zoo as a more republican institution that would educate ordinary citizens. Thus, the comptroller, Andrew Green, who had begun his career of public service as a school commissioner, repeatedly stressed the park's educational mission. In 1862 the board's annual report picked up on this theme, arguing that a zoo would serve as an auxiliary to the "great free educational system" of the city itself.[6]

The board acknowledged that a display of wild animals would have yet another appeal: "that such an establishment is demanded, both for *popular amusement* and instruction, there can be no question."[7] Most New Yorkers, who had never visited European capitals, had seen wild animals only in the traveling "menageries" (a term that generally connoted a less scientific enterprise than a "zoological garden"), which had been coming to the city since the early part of the century, or to the permanent menageries that had been a feature of New York's popular entertainment in New York at least since the 1830s.

The *Irish News,* one of the most enthusiastic promoters of a zoo, summoned up the alternative appeal of the menagerie when it described the zoo as "a wilderness peopled with all sorts of *fera natura*—lions, tigers, elephants and jaguars—monkeys chattering in a row to please the nurses and children, and huge black bears performing gymnastic exercise on long poles to keep the cramp out of their legs." *Frank Leslie's Illustrated Newspaper,* speaking for its middle-class readers, offered a similar vision; it made fun of the exclusive, elite

Case 1:22-cv-03424-RA-MAD Document 4988-8 Page Filed 02/13/06 Date Filed 07/20/2023 PageID: 1936

...sion of a zoological garden and declared: "We want some camels, an elephant or two, a deep-chested lion, and plenty of quaint bears, and funny monkeys— but bears especially—in the Central Park."[8]

When the zoological society's plans foundered during the Civil War, the state legislature authorized the park commission to establish a zoo under its own auspices in 1864. Olmsted had recommended in 1860 that the board set aside the relatively level land east of the rectangular Lower Reservoir (between 73rd and 86th streets along Fifth) that Viele had once envisioned as a parade ground and the Greensward plan had designated for a playground. But by 1864 Olmsted and Vaux were insistently opposed to a zoo in the main body of the park, and they drew up a plan to put one at Manhattan Square (the tract of land between 77th and 81st streets and Eighth and Ninth avenues, later the site of the American Museum of Natural History), which the 1864 legislation annexed to Central Park. Delays in grading the surrounding streets slowed progress, and at the end of 1869, only preliminary excavations and a portion of the foundation wall were completed.[9]

As park officials argued about management, location, and organization, a zoo had actually emerged under their noses. Almost from the opening, people had been making gifts to the board, including a strange assortment of historical relics (shells fired at Fort Sumter, for example), art works (a large collection of plaster casts from the late sculptor Thomas Crawford, which were ultimately displayed in the old Mount St. Vincent Chapel), and especially live animals. Olmsted recalled later that most of the first animals received were "pets of children who had died" or left town. If true, New York children kept a rather weird collection of pets in the 1860s, since among the animals presented to the park were a deer, a goose, an alligator, a peacock, a porcupine, a pelican, a prairie wolf, a silver gray fox, and a boa constrictor. By the summer of 1863, the board had set up a wire-enclosed space near the Mall for some of these animals. There, a disabled Civil War veteran looked after five or six deer, three bald eagles, two yellow-tufted cockatoos, an antlered buck, a raccoon, and three monkeys.[10]

Mounting donations—more than 250 animals arrived in 1864 and 1865 alone—gradually built the zoo. In 1865 General William T. Sherman contributed three African Cape buffaloes he had picked up in his march through Georgia. That same year, the commissioners placed the collection in more permanent quarters at the Arsenal. In warm weather larger animals—for example, Sherman's buffaloes—grazed out behind the Arsenal, tied to a willow tree. In 1868 the park authorities fenced in an area east of the Lower Reservoir (the present site of the Metropolitan Museum) for a deer park. Despite continuing complaints about the need for better quarters, the zoo emerged as one of the park's most popular attractions, especially after an 1865 fire destroyed the "happy family" animal exhibit run by America's best-known entertainment impresario, P. T. Barnum, at his American Museum. Such upper-class New

Yorkers as George Templeton Strong griped that it "amount[ed] to little" and was arranged "without any system" but conceded that it received "much attention from visitors."[11]

With the ascension of the Sweeny park board in 1870, the zoo received even more attention from park administrators. A few months after taking office, the new commissioners turned over the Arsenal interior to park offices and a burgeoning natural history collection and moved the animals into five newly constructed buildings in the Arsenal yard. The parks department then began to buy animals rather than just take whatever was left at its doorstep. Commissioner Henry Hilton, reported the *Times* in July 1871, "has purchased eight well-trained 'low comedian' monkeys." These "comical 'Darwinian links' will occupy two splendid cages." Even Olmsted, who had very little good to say about the accomplishments of the Sweeny board, admitted that the new zoo buildings were "the best of the class on the continent."[12]

Although the Sweeny commissioners did not record their motives for renovating and expanding the zoo, such attractions (and the jobs created by the new construction) were popular among the constituents who had swept the Democrats into office. Meanwhile, the Tammany board proposed shifting the permanent site of the zoo from Manhattan Square to the North Meadow. Olmsted and Vaux denounced the idea as a "fatal mistake" that would destroy "the only broad space of quiet rural ground on the island which has been left undisturbed by artificial objects," but the board had little sympathy for the designers' vision of a pastoral park. For the next three decades designers and politicians would debate zoo sites (Olmsted later counted twelve different unsuccessful proposals), and meanwhile visitors streamed in to visit the "temporary" menagerie.[13]

The renovation of the menagerie and the Arsenal museum in 1870 (and the opening of the Carousel) together provide the best explanation for the dramatic jump in park attendance around that time. In 1869 about one-quarter of the park's pedestrian visitors came into the park through the Fifth Avenue gates nearest the zoo; just two years later close to half were entering there. By 1873, according to the menagerie director William Conklin, the zoo attracted more than two and a half million visitors, about one-quarter of all those who came to the park. And by 1888 Conklin claimed that "nine out of every ten persons who enter the Park by the lower entrances wend their way to the menagerie." The zoo was particularly popular on Sundays, when working-class New Yorkers, especially children, flocked to see the exotic animals.[14] It brought new crowds to the park precisely because it was one of the few *free* attractions to which working-class families could bring their children.

As a popular cultural institution, the zoo subverted the genteel conception of Central Park as an arena of bourgeois (and primarily adult) decorum and order. Critics derided the "ill-assorted" menagerie, claiming that it attracted a "rabble of curiosity seekers" and was "useless" for education. The line between the zoo



Menagerie, Central Park

In 1870 the Sweeny park board built permanent quarters for the zoo west of the Arsenal.

and commercially organized amusement centers was increasingly blurred as the visitors and animals shuttled back and forth between them. Barnum developed an especially close relationship with the zoo, for in the cold months of the year, he and other circus operators quartered their animals there. In turn, Barnum used the zoo's collection as a resource for his commercial operations. When he needed an eagle for his Centennial Show, he borrowed one from the Central Park.[15]

Popular newspapers also had a reciprocal relationship with the zoo. They provided unusually detailed coverage of the animals in order to sell newspapers and entertain their readers. Readers would turn out to look at the new kangaroos or see how much "Murphy, the Hippo" had grown. On November 9, 1874, the *Herald* devoted its entire front page to a story that described in grisly detail an escape of the animals. The sensational hoax threw many New Yorkers into a panic. Even the *Herald*'s war correspondent showed up at the zoo with two big navy revolvers, ready to fight the rampaging animals. The response showed how centrally the zoo had come to figure in the popular imagination.[16]

Monkeys held a particular fascination for crowds in an era in which Darwin's theories were being popularized. The menagerie's peak as a center of popular amusement probably came in the mid-1880s after it acquired a chimpanzee brought back from Africa by the American consul to Liberia. Overflow crowds packed the Monkey House to get a look at the first chimp exhibited in

Case 1:22-cv-03424-RMB-AMD   Document 48-08   Filed 02/13/23   Page 121 of 436 PageID: 1589

"The Late Mr. Crowley of Central Park in His Last Illness": New York newspapers closely followed the life and death of the first chimpanzee exhibited in the United States, who was also the park's most famous celebrity.

the United States. Former president Ulysses S. Grant and dozens of photographers and artists showed up. Controversy flared over whether the name given to the chimp—Mike Crowley—was an insult to the Irish, and Irish-American organizations sent protest delegations to the parks department. When "Mr. Crowley" took ill, the zoo had to issue regular bulletins about his condition, which were printed daily in the newspapers. Letters poured in offering sympathy and popular health remedies. Faith healers showed up to pray for the chimp, and prohibitionists protested against the use of ardent spirits as a cure. After he recovered, a paperback book (price: thirty cents) recounted the chimp's life and times.[17]

Such a popular sensation could not escape the notice of the aging Barnum, who desperately wanted the chimp as a leading attraction of his Greatest Show on Earth. When the park board rejected his initial bid of five thousand dollars, he offered to throw in the largest elephant in his collection, which he valued at ten thousand. "All these propositions being declined," Mr. Crowley's biographer reported, "the great showman departed, with some vexation on his usually cheerful features."[18]

That the zoo had a bigger drawing card than Barnum no doubt pleased park officials, but for Olmsted such popular attractions had nothing to do with the Greensward plan. Asked by the board in 1890 to review the still-controversial question of the best location for the zoo, Olmsted readily conceded that there was no "portion of the Park that is more crowded, or in which the people, and

Case 1:22-cv-01032-PKC-JAM Document 498-8 Page ID 122/1346 Filed 07/20/2023 PageID: 1940



In 1873 more than 2.5 million people (roughly one-fourth of all parkgoers) visited the Central Park Menagerie.

especially the children find more amusement." But "the leading purpose of the Park is not the amusement of the People," particularly the sort of amusement provided by a menagerie, a theater, a "Punch and Judy performance," or a "negro minstrel show." Quite the contrary, the "proper and only justifying purpose of so large a park" was to provide "great numbers of people living in a compactly built town . . . with an opportunity to get quickly out of the scenery of buildings, streets and yards into scenery to be formed with a view of supplying a refreshing contrast with it."[19]

By 1890 Olmsted's objection to the menagerie reflected his increasingly adamant insistence that Central Park should provide natural scenery and little else. Most New Yorkers who joined Olmsted in his opposition, however, wanted the zoo moved because it was the wrong zoo in the wrong spot rather than

JA1817

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| AARON SIEGEL, JASON COOK, JOSEPH DELUCA, NICOLE CUOZZO, TIMOTHY VARGA, CHRISTOPHER STAMOS, KIM HENRY, AND ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey; and PATRICK CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police, <br><br> Defendants. | Hon. Renée Marie Bumb, U.S.D.J. <br> Hon. Ann Marie Donio, U.S.M.J. <br><br> Docket No. 22-CV-7463 <br><br> **CIVIL ACTIONS** <br> **(ELECTRONICALLY FILED)** |
| RONALD KOONS; NICHOLAS GAUDIO; JEFFREY M. MULLER; GIL TAL; SECOND AMENDMENT FOUNDATION; FIREARMS POLICY COALITION, INC.; COALITION OF NEW JERSEY FIREARM OWNERS; and NEW JERSEY SECOND AMENDMENT SOCIETY, <br><br> *Plaintiffs,* <br><br> v. <br><br> MATTHEW J. PLATKIN, in his official | Hon. Reéne Marie Bumb, U.S.D.J. <br> Hon. Ann Marie Donio, U.S.M.J. <br><br> Docket No. 22-CV-7464 |

JA1818

capacity as Attorney General of the State of
New Jersey; and PATRICK CALLAHAN,
in his official capacity as Superintendent of
the New Jersey State Police,

*Defendants.*

### Attorney Declaration of Angela Cai In Support Of
### Defendants' Opposition To Plaintiffs' Motions For Preliminary Injunction

I, ANGELA CAI, of full age, hereby declare as follows:

1. I am employed as Deputy Solicitor General by the State of New Jersey, Department of Law and Public Safety. I provide this Declaration in support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction.

2. Attached to this Declaration are true and accurate copies of the below Exhibits cited in the State's Brief In Opposition.

3. To accommodate technological constraints of CM/ECF, the exhibits are divided into three volumes.

4. Exhibit 1 to 28 are the same exhibits as those filed to my December 30, 2022 Declaration In Support of Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order.

5. For the Court's ease of reference, where applicable, I list where the same exhibits appear as attached exhibits to a witness declaration submitted in support of Defendant's Opposition to Preliminary Injunction.

**Exhibits Volume 1:**

1. P.L. 2022 ch. 131, A4769/S3124, An Act concerning the sale and possession of firearms and supplementing and amending various parts of the statutory law.

2. Compilation of:

JA1819

    a.    Order, D.E. 41, *Christian v. Nigrelli*, No. 22-2987 (2d Cir. Dec. 12, 2022);

    b.    Order, D.E. 75, *Antonyuk v. Hochul*, No. 22-2908 (2d Cir. Dec. 7, 2022);

    c.    Order, D.E. 53, *Hardaway v. Nigrelli*, No. 22-2933 (2d Cir. Dec. 7, 2022).

3.    Transcript of Preliminary Injunction Hearing, *Corbett v. Hochul*, 1:22-cv-5867-LGS (S.D.N.Y. Nov. 29, 2022).

4.    63 Proceedings and Acts of the Maryland General Assembly 338, § 5 (June 15-July 3, 1773).

5.    1870 Tex. Gen. Laws 63.

    *A version of the same law can also be found in Rivas Decl. Ex. J and Charles Decl. Ex. 26.*

6.    1786 Va. Laws 25.

    *A version of the same law can also be found in Rivas Decl. Ex. D.*

7.    Gen. Digest of the Ordinances & Res. of the Corp. of New Orleans 371 (1831).

8.    1869-70 Tenn. Pub. Acts 23.

    *A version of the same law can also be found in Rivas Decl. Ex. M and Charles Decl. Ex. 25.*

9.    Art. 320, Tex. Act of April 12, 1871.

    *A version of the same law can also be found in Rivas Decl. Ex. K.*

10.    Mo. Rev. Stat. 1879, at 224 (§ 1274).

    *A version of the same law can also be found in Rivas Decl. Ex. O.*

11.    1859 Conn. Acts 62, ch. 82, § 5.

12.    1867 Kans. Sess. Laws 25.

13.    1771 N.J. Laws 344, §1.

    *A version of the same law can also be found in Hartog Decl. Ex. D*

*and in Klett Decl. Ex. F.*

14.  1865 La. Extra Acts 14, No. 10 § 1.

15.  1876 Iowa Acts 142, ch. 148, § 1.

16.  1929 Iowa Acts 90, § 30.

17.  1919 Me. Laws 193.

18.  Ark. Rev. Stat. § 13, p. 280 (1838).

     *A version of the same law can also be found in Rivas Decl. Ex. I.*

19.  1839 Ala. Acts no. 77, § 1.

20.  1821 Tenn. Acts ch. 13, § 1.

21.  Ian Ayres & Spurthi Jonnalagadda, Guests with Guns: Public Support for "No Carry" Defaults on Private Land, 48 J. L. Medicine & Ethics 183, Table A4 (2020).

22.  1873 Ga. Code 818, § 4528.

     *A version of the same law can be found in Charles Decl. Ex. 27.*

23.  Fourth Annual Report of the Board of Commissioners of the Central Park 106 (1861).

24.  Acts of Assembly Relating to Fairmount Park 18 (1870).

25.  Michael John Sullivan, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, Constitution of the State of Missouri, the Scheme for the Separation of the Governments of the City and County of St. Louis, the Charter of the City, and a Digest of the Laws Applicable to the City 635 (1881), § 3.

26.  Egbert Jamieson and Francis Adams, The Municipal Code of Chicago, Comprising the Laws of Illinois Relating to the City of Chicago and the Ordinances of the City Council, Codified and Revised 391 (1881). Art XLIII, § 1690.

27.  Annual Reports of the City Officers and City Boards of the City of Saint Paul 689 (1889).

28. W.W. Thompson, A Digest of the Acts of Assembly Relating To, and the General Ordinances of the City of Pittsburgh, From 1804 to Jan. 1, 1897 at 496 (2d Ed. 1897).

29. Excerpt from William Blackstone, Commentaries on the Laws of England, 3d. (10th ed. 1787).

30. Excerpt from William Griffith, A Treatise on the Jurisdiction and Proceedings of Justices of the Peace in Civil Suits in New Jersey (1813).

31. Excerpt from John Locke, Second Treatise of Government (1690).

32. 1715 Md. Laws, ch. 26 § 7, as supplemented by 1766 Md. Laws ch. 6, at 90.

33. 1721 Pa. Act ch. 426 § 3, printed in Mitchell & Flanders, The Statutes at Large of Pa. 1682 to 1801, vol.2, at 255.

34. 1763 N.Y. Law ch. 1233 §1, printed in Laws of N.Y., 1691 to 1771, vol. 2, at 442.

    *A version of the same law can be found in Charles Decl. Ex. 9.*

35. 1867 Tex. Act Vol, 20, p. 90, at art. 6510, printed in Paschal, A Digest of the Laws of Tex. Ann., vol. 2, at 1321.

36. 1893 Ore. Act S.B. 15, § 1, at 79.

37. La. R.S. 821, § 1809, printed in R.H. Marr, Ann. Rev. Stat. La., vol. 1, at 600 (1915).

38. 1870 Tenn. Acts. ch. 13.

39. 1996 La. Sess. Law. Serv. 1st Ex. Sess. Act 4 (S.B.2), R.S. 40.1379.3(O).

40. Bill 3730, 1996 S.C. Assemb., Rev. to § 23-31-210(M)(10).

41. Excerpt from 1564 Stat. King Henry III.

42. Wingate, An Exact Abridgement of All Statutes In Force & Use From The Beginning Of Magna Carta Until 1641 (1666), at 591 at § 9.

43. 1776 Del. Const. art. 28.

44. Excerpts from Benjamin Vaugahn Abbott, Judge and Jury: A Popular Explanation of Leading Topics in the Law of the Land (1880).

45. 1874 Mo. Laws at 43, s. 1.

*A version of the same law can also be found in Charles Decl. Ex. 20*

46. The Norman Transcript, (Norman, Okla. Terr), Vol. 2, No. 5, Ed. 1 (Nov. 22, 1890).

47. The Missouri Republican, (St. Louis, Mo.) (Nov. 20, 1872).

48. The Moniteau Journal (California, Mo.) (Oct. 3, 1872).

49. Collected Venue Policies, NJ.

   a. Zoological Society of New Jersey, Inc., Zoo Rules, https://turtlebackzoo.com/zoo-rules

   b. Adventure Aquarium, Policies, https://www.adventureaquarium.com/plan/aquarium-policies

   c. Camden County Library Customer Behavior Policy, https://tinyurl.com/ytvnfk62;

   d. Old Bridge Library, Acceptable Behavior Policy, https://www.oldbridgelibrary.org/library-info/library-policies/acceptable-behavior-policy/.

   e. MetLife Stadium in East Rutherford, https://www.metlifestadium.com/guest-services/guest-policies;

   f. Prudential Center Visitor Guide, https://prucenter.com/a-z-guide#;

   g. PNC Bank Arts Center FAQs, http://banksartscentre.com/faq/;

   h. NJPAC https://www.njpac.org/visit/faq/#:~:text=NJPAC%20property%20includes%20all%20buildings,or%20hazardous%20devices%20or%20weapons (toggle to "are there any prohibited items")

   i. Regal Movie Theaters, https://www.regmovies.com/static/en/us/admittance-procedures;

   j. Medieval Times: https://www.medievaltimes.com/experience/faq (toggle to last FAQ)

   k. CURE Insurance Arena in Trenton, https://www.cureinsurancearena.com/arena-policies;

   l. State Theatre in New Brunswick, https://www.stnj.org/about/policies;

m.   Boardwalk Hall Arena in Atlantic City,
     https://www.boardwalkhall.com/plan-your-visit/a-z-guide;

n.   Borgata Event Center in Atlantic City,
     https://borgata.mgmresorts.com/en/entertainment/event-center.html;

o.   Bergen Performing Arts Center in Englewood,
     https://www.bergenpac.org/plan-your-visit/faqs;

p.   Levoy Theatre in Millville, https://levoy.net/policies/;

q.   Wellmont Theatre in Montclair,
     https://wellmonttheater.com/venue/theater-policies-and-faqs/;

r.   Mayo Performing Arts Center in Morristown,
     https://www.mayoarts.org/tickets/policies;

s.   South Orange Performing Arts Center in South Orange, "House
     Policies"  https://www.sopacnow.org/box-office/

t.   Liberty Science Center in Jersey City, Code of Conduct,
     https://lsc.org/visit/health-accessibility-and-safety/code-conduct

u.   Six Flags Great Adventure in Jackson, Park Policies,
     https://www.sixflags.com/greatadventure/plan-your-visit/park-policies

v.   Red Bull Arena, Harrison, Prohibited Items & Bag Policy,
     https://www.newyorkredbulls.com/redbullarena/policies

50.  Excerpts from R. Rosenzweig & E. Blackmar, THE PARK AND THE
     PEOPLE: A HISTORY OF CENTRAL PARK (Cornell Univ. Press 1992)

**Exhibits Volume 2:**

51.  1789 Mass. Acts ch.28, at 438.

52.  1895 Mich. No. 436 Sec. 44, at 596.

53.  1905 Minn. 620, Sec. 53

54.  1917 Wisc. Ch. 668, at 1243 Sec. 29.57(4)

55.  1921 N.C. Public Laws & Res. ch. 6 § 3, at 54.

56.  1937 N.J. Rev. Stat. 32:14-13.1(8).

57.  1875 Laws & Ord. Governing Village of Hyde Park at 310, § 6.

58.  1883 Rev. Ord. of the City of Danville, ch.19 § 4, at 83.

59.  Tower Grove Park of the City of St. Louis 117 (1883)

60.  Rev. Ordinances of Salt Lake City 248, ch. 27 § 6 (1888)

61.  Laws & Ordinances for the Gov't of the Mun. Corp. of the City of Williamsport, Pa. 141 (1891)

62.  Park Ordinances, Springfield, Mass. (1891)

63.  Compiled Ordinances of the City of Grand Rapids 163, § 432 (1907) (enacted 1891, amended 1892 & 1897).

64.  3rd Ann. Rep. of the Park Comm'rs of the City of Lynn 23 (1891).

65.  Laws & Ordinances of the City of Peoria, Illinois 667 (1892).

66.  Mun. Code of the City of Spokane, Wash. 123 (1903) (enacted 1892).

67.  Charter of the City of Wilmington, Rules and Regulations of the Board of Park Commissioners, Part VII, § 7 (1893).

68.  Rev. Ordinances of the City of Canton, Ill. 240 (1895).

69.  Gen. Ordinances of the City of Indianapolis 648, § 1971 (1904) (enacted 1896).

70.  Digest of the Acts of Assembly Relating to & the Gen. Ordinances of the City of Pittsburgh 496 (1897) (enacted 1893).

71.  Digest of the Laws & Ordinances for the Gov't of the Mun. Corp. of the City of Reading, PA 240 (1897).

72.  Rev. Ordinances of the City of Boulder, CO 157 (1899).

   *A version of the same law can also be found in Rivas Decl. Ex. X.*

73.  General Municipal Ordinances of the City of Oakland, Cal., Addendum at 15 (1909).

74.  The Code of City of Birmingham, Alabama 662 (1917).

75.  Firearms Regulations in the National Parks, 1897-1936 (NPS 2008).

76. Sen Yuan Wu, N.J. Pop. 1790 to 2010, Div. Labor Market & Demographic Rsch. (Dec. 2010).

77. 2021 Population Density: N.J. Counties, U.S. Census Bureau, Pop. Div. (Apr. 2022), prepared by N.J. Dept. Labor & Workforce Dev't.

78. 1874 Mo. Laws 43 (§ 1)

79. 1883 Mo. Laws 76 (§ 1)

   *A version of the same law can be found in Charles Decl. Ex. 22.*

80. 1889 Ariz. Sess. Laws 17 (§ 3)

   *A version of the same law can be found in Charles Decl. Ex. 28.*

81. 1890 Okla. Sess. Laws 496 (§ 7)

   *A version of the same law can also be found in Rivas Decl. Ex. P and Charles Decl. Ex. 29.*

82. 1903 Mont. Laws. 49-50 (§ 3)

83. M. Kevane & W. Sundstrom, Development of Public Libraries in the U.S., 1870-1930, Information & Culture, Vol 49, no. 2 (2014).

84. Pop. of Mass. by Counties & Minor Civil Divs., Census Bulletin (Nov. 8, 1990).

85. 1746 N.J. Laws ch. 102.

86. 1797 N.J. Laws (R.S. 572), at 367.

87. 1874 N.J. Laws (P.L. 1871, p.109).

88. G. Fenich, A Chronology of (Legal) Gaming in the U.S., Gaming Rsch & Rev. J, vol.3, Iss.2 (1996).

89. Report & Recommendations of the Governor's Advisory Commission on Gambling, Jun. 30, 1998.

90. Port Authority of NY & NJ, Dec. 2021 Traffic Report, Aviation Dep't, https://www.panynj.gov/airports/en/statistics-general-info/Monthly_Airport_Activities.html.

91. Caroline Norris, A History of Madness: Four Venerable Virginia Lunatic Asylums, Virginia Magazine of History & Biography, Vol. 125, Issue 2 (2017).

92. 1776 N.C. Sess. Laws 168.

93. 1800 Ga. Laws 428.

94. 1837 Md. Acts 108.

95. 1868 Oh. Supp. Rev. Stat 13.

96. 1872 Wisc. Rev. Stat 1960.

97. 1872 Conn. Acts 108.

98. 1872 Or. Acts 26.

99. 1873 S.C. Rev. Stat. 404.

100. 1887 W.Va. Code, ch. 148, § 7.


**Exhibits Volume 3:**

101. 1881 Kan. Sess. Laws 92, § 23.

102. 1875 Ark. Acts 156.

103. 1847 Va. Laws 129.

104. 1868 W. Va. Code 153.

105. 1872 Portland Ord. No. 1108.

106. 1813 Ky. Acts 10.

107. 1813 La. Acts 172.

   *A version of the same law can also be found in Rivas Decl. Ex. H.*

108. 1819 Ind. Acts 39.

109. 1838 Va. Acts 76.

110. 1859 Ohio Acts 56.

111. 1861 Ga. Laws 859.

112. 1835 Mass. Rev. Stat., ch. 134, § 16.

   *A version of the same law can also be found in Rivas Decl. Ex. E*

113. 1838 Terr. of Wis. Stat. § 16.

114. Me. Rev. Stat., ch. 169, § 16 (1840).

115. Mich. Rev. Stat., ch. 162, § 16 (1846).

116. Excerpts from M. Dalton, The Country Justice (1690).

117. Terr. of Minn. Rev. Stat., ch. 112, § 18.

118. 1854 Ore. Stat. ch. 16, § 17.

119. 1857 D. C. Rev. Code ch. 141, § 16.

120. 1860 Pa. Laws p. 432, § 6; § 8.

121. 1844 Miss. Law p. 182, Art. 16, § 1, in Anderson Hutchinson, Code of Mississippi, from 1798 to 1848, 182 (1848).

122. 1856-1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled "Revenue," ch. 34, § 23, pt. 4.

123. 1866 Ga. Laws p. 27-28, Title VI, No. 41.

124. Rev. Code of Alabama, p. 169, ch. 3, § 10 (1867).

125. 1867 Miss. Laws 327-28, An Act To Tax Guns And Pistols in The County Of Washington, ch. 249, § 1.

126. George W. Hess, Revised Ordinances of the City of Evanston, 131-132 (1893).

127. 1895 Neb. Laws 210, Laws of Nebraska Relating to the City of Lincoln, Art. XVI, § 6.

128. 1902-04 Va. Acts 155-157, An Act to Raise Revenue for Support of the Government and Public Free Schools, sched. B, § 6, Tangible Personal Property, Eighteenth.

129. Orville Park, Park's Annotated Code of the State of Georgia 1914, Penal Code, Article 3, Carrying pistols without license, § 348(a)-(d).

130. Ohio Law, p. 633, §§ 24-25 (1884)

131. Mass. Law, p. 479-484, ch. 22, §§ 1-10 (1776)

132. 1777 Pa. Laws 110-113.

133. Va. Act of May 5, 1777, ch. 3.

134. Excerpt from Bernard Schwartz, The Bill of Rights: A Documentary History, Vol, 2, at 662 (1971).

135. Excerpt from Debates & Proc. in the Convention of the Commonwealth of Mass. Held in the Year 1788 (1856).

136. Charles C. Branas, SeungHoon Han, and Douglas J. Wiebe, Alcohol Use and Firearm Violence, 38 Epidemiologic Rev. 32, 40-43 (2016).

137. Jonathan Jay, Alcohol Outlets and Firearm Violence: a Place-Based Case–Control Study Using Satellite Imagery and Machine Learning, Inj. Prev. 61, 64 (2019).

138. Pamela J. Trangenstein et al., Outlet Type, Access to Alcohol, and Violent Crime, 42 Alcohol Clin. Exp. Re. 2234, 2241 (2018).

139. Matthew Miller et al., 'Road rage' in Arizona: Armed and Dangerous, 34 Accident Analysis and Prevention, 807, 811 (2002).

140. Arlin J. Benjamin Jr., Sven Kepes, & Brad. J. Bushman, Effects of Weapons on Aggressive Thoughts, Angry Feelings, Hostile Appraisals, and Aggressive Behavior: A Meta-Analytic Review of the Weapons Effect Literature, 22 Personality & Social Psych. R. 347, 359 (2018).

141. David Hemenway, Chloe Shawah, & Elizabeth Lites, Defensive gun use: What can we learn from news reports?, 9 Injury Epidemiology 19, 27 (2022).

142. David Hemenway, Deborah Azrael, & Matthew Miller, Whose guns are stolen? The epidemiology of Gun theft victims, 4 Injury Epidemiology 11, 14 (2017).

143. John J. Donohue et al., More guns, more unintended consequences: the effects of right-to-carry on criminal behavior and policing in U.S. cities, Nat'l Bureau of Econ. Research, Working Paper Series, Working Paper 30190, at 29, http://www.nber.org/papers/w30190.

144. D. Hemenway & S.J. Solnick, The epidemiology of self-defense gun use: Evidence from the National Crime Victimization Surveys 2007–2011, 79 Preventative Medicine 22, 27 (2015).

145. John J. Donohue, Abhay Aneja, & Kyle D. Weber, Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis, 16 J. Empirical L. Studies 198, 240 (April 2019).

146. Michael Siegel et al., Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States, 107 AJPH Research 1923, 1929 (2017).

147. 1875 Wyoming Terr. Acts ch.52, §1.

148. Code of City of Lynchburg, Va. Ch. XIX, § 20 (1887).

149. 1869 N.M. Gen Laws ch.32, at 313.

150. A. Holgersson & U. Bjornstig, Mass-casualty attacks on public transportation, J Transp. Security 7:1–16 (2014).

151. 1795 Mass Gen Law ch.26, § 2.

152. 1686 N.J. Laws, ch. 9, in The Grants, Concessions, and Original Constitution of the Province of New Jersey, at 289–90 (2d ed. 1881).

I declare that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

I further certify that on February 13, 2023, I electronically filed the foregoing Declaration and Exhibits with the Clerk of the United States District Court for the District of New Jersey. Counsel for all parties are registered CM/ECF users and will be served via CM/ECF.

By:  /s/ Angela Cai
Angela Cai
Deputy Solicitor General

February 13, 2023

JA1830

# ACTS AND LAWS,

PASSED BY THE GENERAL COURT OF *MASSACHUSETTS;* BEGUN AND HELD AT *BOSTON,* IN THE COUNTY OF *SUFFOLK,* ON WEDNESDAY THE TWENTY-SEVENTH DAY OF *MAY, ANNO DOMINI,* 1789; AND FROM THENCE CONTINUED BY ADJOURNMENT TO WEDNESDAY THE THIRTEENTH OF *JANUARY* FOLLOWING.

---

## 1789. — Chapter 27.

[January Session, ch. 1.]

### AN ACT TO ENABLE *DUDLEY ATKINS* ESQUIRE TO TAKE THE SURNAME OF *TYNG.*

*Whereas* Dudley Atkins *of* Newbury *in the County of* Essex *Esquire, has Petitioned this Court, setting forth that he is descended from the Family of* Tyng, *that Mrs.* Sarah Winslow *of* Tyngsborough, *in the County of* Middlesex *being a descendant from the same family and having no children has devised to him a considerable part of her estate and has requested him to take the Surname of* Tyng, *& therefore praying the interposition of this Court for that purpose:* Preamble.

*Be it therefore enacted by the Senate and House of Representatives in General Court assembled and by the authority of the same,* that the said *Dudley Atkins* be and he hereby is enabled to take upon himself the Surname of *Tyng* in addition to his present name, and that he be hereafter known and called by the name of *Dudley Atkins Tyng.* *January 16, 1790.* Dudley Atkins, enabled to take the surname of Tyng.

---

## 1789. — Chapter 28.

[January Session, ch. 2.]

### AN ACT FOR THE PROTECTION AND SECURITY OF THE SHEEP AND OTHER STOCK ON *TARPAULIN COVE ISLAND* OTHERWISE CALLED *NAUSHON ISLAND* AND ON *NENNEMESSETT ISLAND,* AND SEVERAL SMALL ISLANDS CONTIGUOUS, SITUATED IN THE COUNTY OF *DUKES COUNTY.*

*Whereas there have been of late great depredations made by Gunners and Hunters on* Tarpaulin Cove *or* Naushon island Nennemessett Island, *and several small Islands con-* Preamble.

*tiguous thereto situate in the County of* Dukes County *by
which great numbers of Sheep and Deer have been killed and
other damages sustained : And whereas the few persons re-
siding on said Islands cannot give proper security to the
stock thereon ; and to provide an additional remedy in this
behalf.*

*Be it therefore enacted by the Senate and House of
Representatives in General Court assembled and by the
authority of the same* that if any person or persons shall
hereafter unlawfully take away, shoot, kill or destroy ; or
shall cause to be taken away, shot, killed or destroyed,
any Sheep or other stock or creatures, on either of the
said Islands and shall be thereof convicted every such
person or persons shall besides paying the value thereof,
forfeit and pay a sum not exceeding *forty shillings* nor
less than *ten shillings* for every Sheep or other creature
he or they may so take away, shoot, kill or destroy, or
cause to be taken away, shot, killed or destroyed, the
same to be recovered with costs of suit, by action of debt
before any Court proper to try the same ; and the sums
so recovered shall one half thereof accrue to the prose-
cutor, and the other half for the use of the poor of the
town in which said Islands are, or may be situated.

*And be it further enacted* that if any Person or persons,
except such as shall have the special licence of the pro-
prietors of the said Islands, or shall be able to shew suffi-
cient reason therefor, shall be seen with any gun or guns
upon either of the said Islands other than that part of
said *Naushon Island* at the extreme west end thereof ex-
tending between the house there now occupied by *Shad-
rack Robinson* and the shore of that Island known as
*Robinson's Hole*, such person or persons shall forfeit such
gun or guns or the value thereof, to any person or per-
sons who will sue, and prosecute therefor, to be recovered
with costs of suit by action of Trover before any Court
proper to try the same : And if any person or persons
shall be found collecting, driving, or in any way molesting
any of the Sheep or creatures upon and belonging to the
said Islands, or shall be found on either of the aforesaid
lands with any skin, limb or carcass, and any Sheep or
other creature hath been there lately killed, and such per-
son or persons or his or their company may be reasonably
suspected to have killed the same, such person or persons
so found shall be deemed and adjudged guilty of such
killing, and shall be liable for each and every Sheep or

*Persons unlaw-
fully taking
away, or de-
stroying stock,
subject to
forfeiture, &c.*

*Gunning pro-
hibited, without
licence.*

*Forfeiture.*

*Persons driving
or molesting
sheep, subject
to Penalty.*

JA1832

other creature which hath been there lately killed as afore-
said to such penalty as is already provided in this act
against such killing to be recovered with costs by action
of debt, and to accrue in like manner as aforesaid, besides
being liable for the value thereof.

*And be it further enacted by the authority aforesaid*
that no person by reason of being an inhabitant of the
Town to which such penalty shall accrue, shall be dis-
qualified from being a witness in any suit or prosecution
for any breach of this Act.

*Provided nevertheless, and be it further enacted* that any
person or persons having suffered any penalty or forfeiture
incurred by this Act shall be exempted from any other
penalty for the same offence.          *January 30, 1790.*

*Proviso.*

---

## 1789. — Chapter 29.

[January Session, ch. 3.]

AN ACT IN ADDITION TO AN ACT ENTITLED "AN ACT TO PRE-
VENT THE DESTRUCTION & TO REGULATE THE CATCHING
OF THE FISH CALLED SALMON, SHAD AND ALEWIVES IN THE
RIVERS & STREAMS IN THE COUNTIES OF *CUMBERLAND* AND
*LINCOLN* & TO REPEAL ALL LAWS HERETOFORE MADE FOR
THAT PURPOSE."

*Whereas it would be beneficial that said Act should ex-*
*tend to several rivers and streams not enumerated therein:*

*Therefore be it enacted by the Senate and House of*
*Representatives in General Court assembled and by the*
*authority of the same*, that the said Act and every part
thereof shall extend to and include *Machias River, Pleasant*
*River, Narraguagus River, Coops-Cook River, Denny's*
*River, Union River, Chandlers River, Tunk Stream,* &
*Donnels Stream,* together with all the other Rivers east-
ward of *Penobscot River* in the Counties of *Hancock* &
*Washington* and the several streams emptying into the
same in as full & ample a manner as if said Rivers &
Streams had been enumerated in said Act.

*February 2, 1790.*

*Preamble.*

*Rivers included in a former act.*

---

## 1789. — Chapter 30.

[January Session, ch. 4.]

AN ACT FOR REPEALING AN ACT ENTITLED "AN ACT ESTAB-
LISHING NAVAL-OFFICES IN THIS COMMONWEALTH & FOR
THE REPEALING LAWS MADE FOR THAT PURPOSE" AND FOR
REPEALING THE SEVERAL LAWS REGULATING THE FEES &
FORMS IN THAT OFFICE.

*Be it enacted by the Senate and House of Representa-*
*tives in General Court assembled and by the authority of*





DATE DOWNLOADED: Fri Feb 10 15:19:46 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1895 591 .

ALWD 7th ed.
, , 1895 591 .

Chicago 17th ed.
"," Michigan - Local Acts, Regular Session : 591-598

AGLC 4th ed.
'' Michigan - Local Acts, Regular Session 591

OSCOLA 4th ed.
'' 1895 591

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

tion (so called), and also all that part of said city lying and being east of the east bank of the Au Sable river, be and the same is hereby detached from the city of Au Sable, in said county of Iosco, State of Michigan, and the same shall be, and is hereby attached to the township of Au Sable in said county and State aforesaid. But the territory hereby detached shall not be relieved in any manner from its just share and propor- *Territory detached shall not be relieved of its share of legal bonded indebtedness.* tion of the present legal bonded indebtedness of said city of Au Sable, together with interest thereon, and said indebtedness shall be apportioned in accordance with the provisions of act number thirty-eight of the session laws of eighteen hundred and eighty-three, approved April twenty-first, eighteen hundred and eighty-three, entitled "An act to provide for the adjustment of rights and liabilities on division of territory of cities and townships," and acts amendatory thereof.

SEC. 2. This act shall not be construed as nullifying or repealing an act entitled "An act to incorporate the board of education of the city of Au Sable," being act number two *This act not to repeal the act incorporating the board of education.* hundred and eighty-five of the local acts of eighteen hundred and ninety-one, and the persons elected as members of such board of education under the provisions thereof shall continue to have and exercise all the duties, powers and jurisdictions conferred upon them by the provisions thereof, within the territory and district in which their jurisdiction now extends.

SEC. 3. The matter of procedure in the matter of appor- *Procedure in the matter of taxes.* tioning, levying and collecting taxes for the support of the schools within said district, and for altering the boundaries thereof, shall be the same as near as may be as is provided by law in the case of fractional school districts.

Approved May 24, 1895.

---

[ No. 436. ]

AN ACT to amend an act entitled "An act supplemental to the charter of the city of Detroit, and relating to parks, boulevards and other public grounds in said city, and to repeal act number three hundred and seventy-four of the local acts of eighteen hundred and seventy-nine, entitled 'An act to provide for the establishment and maintenance of a broad street or boulevard about the limits of the city of Detroit and through portions of the townships of Hamtramck, Greenfield and Springwells, in the county of Wayne,' approved May twenty-one, eighteen hundred and seventy-nine," as amended by act number four hundred and fifteen of the local acts of eighteen hundred and ninety-three, approved May twenty-ninth, eighteen hundred and ninety-three, by amending sections six, seven and fourteen thereof, and to add to said act twenty new sections to stand as sections thirty-two, thirty-three, thirty-four, thirty-five, thirty-

592                    LOCAL ACTS, 1895.—No. 436.

six, thirty-seven, thirty-eight, thirty-nine, forty, forty-one, forty-two, forty-three, forty-four, forty-five, forty-six, forty-seven, forty-eight, forty-nine, fifty and fifty-one of said act.

Act amended and sections added.

SECTION 1.  *The People of the State of Michigan enact,* That an act entitled "An act supplemental to the charter of the city of Detroit, and relating to parks, boulevards and public grounds in said city, and to repeal act number three hundred and seventy-four of the local acts of eighteen hundred and seventy-nine, entitled 'An act to provide for the establishment and maintenance of a broad street or boulevard about the limits of the city of Detroit and through portions of the townships of Hamtramck, Greenfield and Springwells, in the county of Wayne,' approved May twenty-one, eighteen hundred and seventy-nine," as amended by act number four hundred and fifteen of the local acts of eighteen hundred and ninety-three, approved May twenty-nine, eighteen hundred and ninety-three, be amended by amending sections six, seven and fourteen thereof, and by adding twenty new sections to stand as sections thirty-two, thirty-three, thirty-four, thirty-five, thirty-six, thirty-seven, thirty-eight, thirty-nine, forty, forty-one, forty-two, forty-three, forty-four, forty-five, forty-six, forty-seven, forty-eight, forty-nine, fifty and fifty-one, to read as follows:

Commissioners to have control, management, and charge of improvements of all parks and public grounds.

SEC. 6.    The commissioners shall have the control and management, and shall have charge of the improvement of all the parks and public grounds of said city, including the island park (known as "Belle Isle park"), and of such parks or public grounds as may hereafter be acquired, laid out, purchased or dedicated for public use in said city.    And they shall likewise have control, management and charge of the improvement and maintenace of the boulevard, which was laid out and established as provided by the (said) act creating said board of boulevard commissioners, and of any other boulevard which may at any time be hereafter acquired, laid out, established or located by said city.    The authority hereby conferred shall not be construed as giving charge or control to said commissioners over and to the improvement of any ordinary public street or alley.    When the estimated cost of any work or improvement ordered by said commissioners shall exceed the sum of one thousand dollars, the same shall be done by contract, after advertisements for bids in at least two daily papers, printed in said city, for at least seven days.

When improvements to be done by contract.

May make rules and regulations for maintenance and care of.

SEC. 7.    The said commissioners may make all needful rules and regulations for the management, maintenance and care of the said parks, public grounds and boulevard or boulevards, and for the regulation thereof, and the common council of said city may provide by ordinance for the observance of the same, and may also in like manner provide for the observance and enforcement of any other rules and regulations duly made by said commissioners under any of the provisions of this act.

Protection of.

And said common council may by ordinance further provide for the preservation and protection of the parks, public grounds

Case 4:23-cv-... Document 49 Page 142 Date Filed 07/20/2023 PageID...

LOCAL ACTS, 1895.—No. 436. 593

and boulevards, and any of the property in charge of said commissioners against any destruction or injury, and prevent the destruction or injury to or the taking of any trees, shrubs, plants, flowers or other things set out, planted or used by said commissioners in beautifying, improving or ornamenting said parks, public grounds or boulevards, and to prevent any disorder or disturbance on or about said parks, public grounds or boulevards, or any encroachment thereon or interference with the quiet and peaceable use and enjoyment of the same for the purpose for which the same are established and maintained. Said ordinances may provide for the punishment for any breach or violation of any of their provisions by like penalties provided for violation of ordinances of said city. The commissioners of metropolitan police for the city of Detroit, upon the request of said commissioners of parks and boulevards, shall detail for service in any of the grounds under the charge of said park and boulevard commissioners, so many of the police force as may be necessary to maintain order and protect the property thereon, and any policeman on duty on said grounds may remove therefrom any person who may violate any of the rules and regulations of said commissioners, or any of the ordinances of said city, adopted as aforesaid, relating to said parks, public grounds or boulevards: *Provided*, That said commissioners of parks and boulevards, may in lieu of such detail by said commissioners of metropolitan police, appoint as many persons as may be necessary to maintain order and protect the property on any of the grounds, under the charge of the said park and boulevard commissioners, and such persons so appointed shall have all the powers of regularly appointed policemen of said city in and upon said grounds, but not elsewhere. *(margin: Police commissioner to detail police to maintain order and protect property on request.)* *(margin: Proviso.)*

SEC. 14. The grounds of which 'said commissioners may have control shall be used and enjoyed solely for the purposes for which they were established: *Provided*, That privileges for the hiring of boats and vehicles and other like purposes such as are usual in public parks may be let by the commissioners for a period not exceeding three years, but the same shall be exercised and permitted only upon the same being subject to their supervision and direction, and to such orders, rules and regulations as the said commissioners may make at any time: *Provided further*, That said commissioners may prohibit the construction, use and maintenance of any and all railway or tramway cars, tracks, engines or motors on Belle Isle park, or other city park or boulevard. *(margin: To be used for purpose for which they were established.)* *(margin: Proviso.)* *(margin: Further proviso.)*

SEC. 32. No person shall bring, drive or lead any swine, goat, cattle or any other animal other than horses or other beasts of burden in, on or along the boulevard, Belle Isle or any other parks or public grounds in charge of the commissioners of parks and boulevards; and no person shall lead any horse, mule or other animal on said boulevard or the driveways of either of said parks, or draw a second carriage, wagon or other vehicle with any horse or other motive power, nor drive thereon any *(margin: Driving or leading any swine, goat or cattle on or along boulevard or parks prohibited.)*

75

1:22-Case-42341900B-AMDocumentm49nt 8Page Fil48 02/Date3Filedg07/20/2023geID:

horse, before any sleigh or sled, unless there shall be a suffi-
cient number of bells attached to harness of such horse, or to
such sleigh or sled to warn persons of their approach.

**Driving or speeding.** SEC. 33. No person shall ride or drive in said park or along
said boulevard at a rate of speed exceeding eight miles per
hour, excepting that horses may be speeded on such parts of
said boulevard or Belle Isle park as may be set apart by said
commissioners for that purpose, and then only under such reg-
ulations as the commissioners may prescribe.

**Riding, driving, or drawing any velocipede, bicycle, hand-cart, horse or animal on the walks, etc., prohibited.** SEC. 34. No person shall ride, drive or draw any velocipede,
bicycle, tricycle, wheelbarrow, handcart or any other vehicle,
or any horse or other animal on the footwalks or sidewalk,
grass plots or planting places of said parks or boulevard, or
upon any other part or portion thereof, excepting upon the
carriage drives; and no person shall permit any vehicle or
animal to stand upon such roadways or carriage drives to the
obstruction of the way or inconvenience of travel, and no per-
son shall solicit passengers for hire on either of said park or
boulevard, excepting by direction or permission of said com-
missioners.

**Not to tie any animal to trees, shrubs, electric light tower or lamp post.** SEC. 35. No person shall tie any animal to any tree or
shrub, electric light tower, lamp post, fire hydrant, or dock or
building in said park or boulevard, nor pluck, break, trample
upon or interfere with any grass, flower, plant or shrub in any
of said parks or boulevards, or climb, peel, cut, deface,
remove, injure or destroy any tree or shrub in any public park
or boulevard, or pasture any animal on the grass in any of said
parks or boulevards, and no person shall stand, walk or lie
upon any part of any public park or boulevard laid out and
appropriated for shrubbery or for grass when there shall have
been placed thereon a sign having the words, "Keep off the
grass," or other similar words thereon.

**No heavy traffic permitted.** SEC. 36. No heavy traffic shall be permitted on said boule-
vard or any of said parks, and no person shall drive any wagon,
cart, dray, truck or other vehicle for the carrying of or laden
with merchandise, manure, coal, wood or building material of
**Proviso.** any kind: *Provided,* That where there is no alley or side
street by which premises fronting on the boulevard can be
reached, trucks and such heavy vehicles carrying goods, mer-
chandise or other articles to or from any house or premises
abutting on the boulevard shall be permitted to enter thereon
at the cross street nearest said house or premises in a direction
in which the same are moving, and deliver or receive such
goods, merchandise or articles, but shall not proceed thereon
**Further proviso.** further than the nearest cross street thereafter: *Provided fur-
ther,* That nothing in this section shall prevent the driving of
milk wagons and ordinary light grocery or meat delivery
wagons, along the boulevard for the accommodation of resi-
dents thereon.

**Not to cut, break or injure any property, or post notices.** SEC. 37. No person shall cut, break or in any way injure
any electric light tower, lamp post, fence, bridge, dock, build-
ing, fountain or other structure or property in or upon any of
said parks or boulevards, and no person shall post or fix any

notice or bill or other writing or printing on any tree, tower, lamp post, hydrant, curbstone, coping, flagstone, fence, dock, bridge, wall, building or other place under the charge or control of said commissioners.

SEC. 38.   No person shall drive any vehicle displaying any placard or advertisement of any kind along said boulevard or on or along the driveway of any of said parks, nor shall any person display any placard or any advertisement of any kind on or upon or along the said boulevard or any of the said parks for advertising only. *Not to drive any display advertisement or placards along the parks or boulevards.*

SEC. 39.   No person shall dig, remove or carry away any sward, sand, turf or earth in or from any public park, or boulevard, and no person shall open or dig up or tunnel under any part or portion of the boulevard without a permit from the commissioners of parks and boulevards, and before granting any such permit the applicant therefor shall be required to deposit with the secretary of said commissioners such sum of money as the superintendent of the boulevard or such other officer as the commissioners may designate for that purpose, shall estimate, will fully cover any expense to be incurred by the commissioners in connection with such opening or tunneling, and the commissioners may make suitable regulations and conditions with respect to issuing said permits.   And said commissioners may retain the actual expense, which shall be certified by the superintendent, which may be incurred by the commissioners in connection with any work done by them, for the purpose of restoring any roadway, sidewalk, planting place or other portion of said boulevard, and the secretary shall refund to the person to whom said permit shall be issued the difference, if any, between the amount deposited and the amount so certified by the superintendent.   Carriage or driveways and footwalks connecting with any premises adjoining the boulevard, or hitching posts thereon, shall be allowed only on a permit issued under this section, and the material used in making such ways, walks or posts shall be determined by the said commissioners. *Not to dig, remove or carry away any sward, sand or turf from parks.*

SEC. 40.   No person shall place or deposit any dead carcass, ordure, filth, dirt, stone, ashes, garbage or rubbish of any kind, or other matter or substance on the said boulevard, or of any of said public parks, and no person shall wade into or throw any wood, sand, stone, or other substance into any basin, pool, lake or fountain in any public park, or bathe or fish in any of the waters thereon, except on Belle Isle park, where persons may bathe and swim, but only under such restrictions and conditions as may be prescribed by the commissioners of parks and boulevards; and no person shall send or ride any animal into same, nor shall any person kill, molest or disturb any fish, fowl or animals kept thereon. *Not to deposit dead carcasses, filth, dirt, stones, etc., on the boulevard or parks.*

SEC. 41.   No person shall build or place any fence, or other barrier around any grass plot or planting place on said boulevard or public park, or place any building or obstruction of any kind thereon. *Not to build any fence or barrier around grass plots or planting place.*

SEC. 42.   No person shall play at any game whatever in or upon said boulevard, or on any of the said parks, under the *Not to play certain games.*

**Proviso.**
charge of the said commissioners: *Provided, however,* That ball, cricket, lawn tennis and other like games of recreation may be played upon such portions of said parks as may be designated from time to time by the commissioners and under such rules and regulations as may be prescribed by them.

**Not to engage in sport liable to frighten horses.**
SEC. 43. No person shall engage in any sport or exercise upon said boulevard or park as shall be liable to frighten horses, injure travelers, or embarrass the passage of vehicles thereon.

**Not to discharge firearms or fireworks.**
SEC. 44. No person shall fire or discharge any gun or pistol or carry firearms, or throw stones or other missiles within said park or boulevard, nor shall any person fire, discharge or set off any rocket, cracker, torpedo, squib or other fireworks or things containing any substance of any explosive character on said park or boulevard, without the permission of said commissioners, and then only under such regulations as they shall prescribe.

**No person shall expose or offer any article or thing for sale, play any musical instrument, etc., without permission of commissioners.**
SEC. 45. No person shall expose any article or thing for sale or do any hawking or peddling in or upon said parks or boulevard, and no person, without the consent of said commissioners, shall play upon any musical instrument, or carry or display any flag, banner, target or transparency, nor shall any military or target company, or band or procession parade, march, drill or perform any evolution, movement or ceremony within any of said parks, or upon or along said boulevard, without the permission of said commissioners, and no person shall do or perform any act tending to the congregating of persons on said boulevard or in said parks.

**Gambling and disorderly conduct.**
SEC. 46. No person shall gamble, nor make any indecent exposure of himself or herself, nor use any obscene language, or be guilty of disorderly conduct, or make, aid, countenance or assist in making any disorderly noise, riot, or breach of the peace, within the limits of the said parks or boulevards; and

**Intoxicating liquors.**
no person shall sell or dispose of any intoxicating liquors in or upon any public park without the consent of the said commissioners.

**All boats, carriages, railroad cars, and vehicles running for hire to be licensed.**
SEC. 47. All boats and vessels, carriages, railroad cars and other vehicles running for hire to and from said Belle Isle park, or any other park, shall be duly licensed and shall be subject to all the rules and regulations that may be established by said commissioners or by the common council from time to time, and no person shall carry on the business of carrying passengers to and from either of said parks unless their vehicles shall be so licensed. And no person commanding or having charge of any boat, carrying passengers for hire shall land or permit any passengers thereform to land at any dock on Belle Isle park, excepting such as may be designated for that purpose by the commissioners, and no person having charge of any vessel shall fasten or tie the same at any wharf or dock in Belle Isle park, excepting for the purpose of receiving or discharging passengers as permitted by this section.

SEC. 48. No person shall place or deposit or allow to be placed or keep or deposit on any part of said boulevard any

building material without the written permission of said commissioners, which permit shall state the space to be occupied and the length of time during which said permit shall be in force, and every person having use of any portion of said boulevard for the purpose of erecting or repairing any building or for placing or keeping any building material or any other article or thing thereon which shall cause any obstruction to travel thereon or render the same in any respect dangerous to travelers thereon, shall cause two red lights to be placed in conspicuous places, one at the end of said obstruction, from sunset until sunrise in the morning of each day during the time such obstruction shall remain, and shall also construct and maintain proper safeguards, and a good and safe plank sidewalk around such obstruction, which sidewalk shall be at least two feet wide, and no such permit shall be granted under this section unless in the application therefor the party applying shall agree to indemnify the city against all liability from injury to any person or property arising from such obstruction.

*Not to deposit building material on any part of boulevard without written permission of commissioners.*

*Red lights to be placed in conspicuous places.*

SEC. 49. No person shall conduct or permit any funeral procession or hearse to be driven upon the boulevard: *Provided*, That nothing herein contained shall be construed to prevent the removal of any corpse from any house abutting upon said boulevard, and the forming of the funeral procession thereon, but the hearse or procession shall not proceed further thereon than the nearest paved cross street in the direction in which said hearse shall move.

*Funeral processions not to drive on boulevard. Proviso.*

SEC. 50. No person shall remove any house or building on, along or across the boulevard, except on the written permission of said commissioners, which shall be issued only upon such terms and conditions, and under such regulations as they may prescribe, and upon a deposit with the secretary of said commissioners of such sum as may be fixed by said commissioners, and as they shall estimate will fully cover all damages to walks, roadways, grass plots, trees and other property and improvements of said boulevard, and said permit shall be issued only upon the express condition that said moving shall be commenced and completed between the hours of one and six o'clock in the forenoon, and the occupancy of the said boulevard shall continue only between said hours and after said moving shall have been completed, the roadway, grass plot, walks and other property and improvements shall be restored to their former condition by the said commissioners or under the supervision of their superintendent, and their superintendent shall thereupon certify to the secretary the actual expense incurred in such restoration, and the secretary shall refund to the person to whom said permit shall be issued the difference, if any, between the amount deposited and the amount so certified by the superintendent.

*Not to remove any house or building on or along the boulevard without written permission of commissioner.*

SEC. 51. Any violation of the provisions of this act shall be punished in the recorder's court by a fine not to exceed one hundred dollars and costs, and, in the imposition of any fine and costs, the court may make a further sentence, that the offender be imprisoned in the Detroit House of Correction

*Penalty for violation.*

until the payment of such fine, for any period of time not exceeding six months.

This act is ordered to take immediate effect.

Approved May 24, 1895.

---

[ No. 437. ]

AN ACT to amend sections two, five, seven and eleven of act number three hundred eighty-three of the local acts of eighteen hundred ninety-three, entitled "An act to provide for the election of two justices of the peace and for the appointment of a justice clerk in and for the city of Saginaw, and to define their jurisdiction and to fix their compensation; and to abolish and discontinue the five offices of justice of the peace of said city, upon the expiration of the terms of the present incumbents thereof; and to provide for the filing of the files, records and dockets belonging to or appertaining to the offices abolished and discontinued, and for the issuance of executions upon judgments appearing on said dockets and to repeal all provisions of the charter of the city of Saginaw and of all other acts or parts of acts in any wise contravening the provisions of this act," approved May thirteenth, eighteen hundred ninety-three.

**Sections amended.** SECTION 1. *The People of the State of Michigan enact,* That sections two, five, seven and eleven of act number three hundred eighty-three of the local acts of eighteen hundred ninety-three, entitled "An act to provide for the election of two justices of the peace, and for the appointment of a justice clerk in and for the city of Saginaw, and to define their jurisdiction and to fix their compensation, and to abolish and discontinue the five offices of justices of the peace of said city, upon the expiration of the terms of the present incumbents thereof, and to provide for the filing of the files, records and dockets belonging to or appertaining to the offices abolished and discontinued, and for the issuance of executions upon judgments on said dockets, and to repeal all provisions of the charter of the city of Saginaw and of all other acts or parts of acts in any wise contravening the provisions of this act," approved May thirteenth, eighteen hundred ninety-three, be amended so as to read as follows:

**Justices to have same jurisdiction as justices of townships.** SEC. 2. The said justices of the peace for the city of Saginaw shall have the same jurisdiction and powers and perform the same duties as are now exercised and performed, or may at any time hereafter be conferred by law upon justices of the peace for townships, together with **Jurisdiction of civil cases.** jurisdiction in civil cases, where either of the parties to any such action reside in the county of Saginaw, and such further jurisdiction as may be provided by statute. In cases of examination of offenders by either of said justices, for offenses committed against the crim-




DATE DOWNLOADED: Fri Feb 10 15:25:19 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1905 598 .

ALWD 7th ed.
, , 1905 598 .

Chicago 17th ed.
"," Minnesota - General and Special Laws, 34th Session : 598-625

AGLC 4th ed.
'' Minnesota - General and Special Laws, 34th Session 598

OSCOLA 4th ed.
'' 1905 598

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

:22-Case423-R90B-AMDocumentm49t 89-age-il-4902/1342e Filedge07/2022023ageID

## CHAPTER 344.

H. F. No. 794.

*Game and fish.*

*An act for the preservation, propagation, protection, taking, use and transportation of game and fish, and certain harmless birds and animals.*

### GENERAL PROVISIONS.

Be it enacted by the Legislature of the State of Minnesota :

SECTION 1. Game and Fish Commission—Appointment—Terms—A state game and fish commission is hereby created, consisting of five (5) members to be appointed by the governor for a term of four (4) years each. Those heretofore appointed pursuant to chapter three hundred thirty-six (336) of the laws of 1903 shall continue in office until the expiration of their respective terms. Vacancies arising from any cause shall be filled by the governor. Members shall serve without compensation except for necessary expenses to be paid upon an itemized statement thereof duly audited by said commission.

*Term of present com.*

SEC. 2. Office—Said commission shall have an office in the capitol and be supplied with suitable stationery, a seal and blanks and postage for the transaction of its business.

SEC. 3. General Powers—Duties—Said commission shall enforce the laws of this state involving the protection and propagation of all game animals, game birds, fish and harmless birds and animals.

Said commission shall have general charge of—

*Propagation and protection.*

1. The propagation and preservation of such varieties of game and fish as it shall deem to be of public value.

*Statistics.*

2. The collection and diffusion of such statistics and information as shall be germane to the purpose of this act.

*Fish hatcheries.*

3. The construction, control and management of all state fish hatcheries, including the control of grounds owned or leased for such purposes.

*Spawn or fry from U. S. com. of fisheries and others.*

4. The receiving from the United States commissioner of fisheries or other person, and the gathering, purchase and distribution to the waters of this state, of all fish spawn or fry.

*Stocking of waters.*

5. The taking of fish from the public waters of the state for the propagation and stocking of other waters therein.

6. The seizure and disposition of all game birds, game animals and fish, either taken, killed, transported or possessed contrary to law, of all dogs, guns, seines, nets, boats, light, or other instrumentalities unlawfully used or held with intent to use, in pursuing, taking, attempting to take, concealing or disposing of the same.

SEC. 4. Reports—Records—Said commission shall on or before December 1st of each year, submit to the governor a detailed report of its actions, including the amount of money received from all sources, an inventory of all game, fish, guns, dogs, seines, nets and other property seized and sold, with the names of the purchasers, and the amount received, and an itemized statement of its disbursements. The books and vouchers of said commission shall be subject to examination by the public examiner at all times.

*Seizure and disposition.*

*Report to governor annually before Dec. 1.*

*Subject to examination by public examiner.*

SEC. 5. Executive Agent—The commission shall appoint one of its members its executive agent, who shall devote all his time to the discharge of his duties, and shall receive compensation therefor to be fixed by the said commission, not exceeding two thousand ($2,000) dollars per year. He shall act as such executive agent during the pleasure of the commission and be subject to its direction. When the commission is not in session, he is hereby authorized to exercise in its name, all the rights, ·powers and authority vested in said commission. Before entering upon the discharge of his duties he shall give a bond to the State of Minnesota, with sureties or security to be approved by the commission, in the penal sum of five thousand dollars ($5,000), conditioned for the faithful accounting of all state property coming into his hands.

*Appointment of executive agent, salary, duties, etc.*

*Bond.*

SEC. 6. Employees—The commission may appoint and remove at pleasure, a superintendent of fisheries, at a salary not exceeding three thousand dollars ($3,000) a year, and such assistants as may be necessary. It may also employ a sufficient number of game wardens, other persons, and office assistants, as may be necessary to carry out the purposes of this chapter, and fix their periods of service and compensation.

*Supt. of fisheries, game wardens and office force.*

SEC. 7. Other Officials—Attorney—The county attorneys, sheriffs, constables and other peace officers, are hereby required, and it is made their duty, to enforce the provisions of this chapter and the commission may employ an attorney or attorneys to perform such legal services as said commission may require. He shall appear

*Duties of Co. Attorney and others.*

for said commission in all civil actions in which it or its wardens may be interested officially, and may assist the county attorney in the prosecution of criminal actions arising under this chapter, and when for any reason the county attorney does not prosecute such criminal actions, he may conduct such prosecutions on behalf of the state with the same authority as the county attorney. The compensation to be paid said attorney shall be fixed by the commission and paid out of the funds provided for the enforcement of this act.

**Who may serve.**

SEC. 8.   Execution of Writs.—The executive agent of said commission, all members and all wardens appointed by said commission, shall have full power and authority to serve and execute all warrants and process of law issued by the court in enforcing the provisions of this act, or any other law of this state relating to the preservation and protection of game and fish, in the same manner as any constable or sheriff may serve and execute the same and for the purpose of enforcing the provisions of this chapter, they may call to their aid any sheriff, deputy sheriff, constable or police officer, or any other person, and it shall be the duty of all sheriffs, deputy sheriffs, constables or police officers and other persons, when called upon, to enforce and aid in enforcing the provisions of this chapter.

SEC. 9.   Bonds.—The following appointees shall give bonds to be approved by the commission and filed in the office of the secretary of state, conditioned for the faithful discharge of their respective duties, in the following amounts :

**Amount.**

First—Superintendent of fisheries, one thousand dollars ($1,000).

Second—Each game warden five hundred dollars ($500).

**Meaning of words; sell, sale, person, possession, etc., defined.**

SEC. 10.   Terms Defined—Agency no excuse. The words "sell" and "sale" as used in this chapter shall be construed as meaning any sale of (or) offer to sell or having in possession with intent to sell, use or dispose of the same contrary to law. The word "person" shall be deemed to include partnerships, associations, and corporations, and no violation of any provisions of this chapter shall be excused for the reason that the prohibited act was done as the agent or employe of another, nor that it was committed by or through an agent or employe of the person charged. The word "possession" shall be deemed

to include both actual and constructive possession as well as the control of the article referred to. The terms "waters of this state" shall be held to include all the boundary waters of the state, and the provisions of this chapter shall be deemed to extend and be in force and effect over, upon and in all thereof. The terms "any part thereof" or "the parts thereof," whenever used in this chapter shall be deemed to include the hides, horns and hoofs of any animal so referred to, and the plumage and skin and every other part of any bird so referred to. The terms "fur bearing animals" shall not be deemed to include deer, moose or caribou.

SEC. 11. Inspection of Hotels, Etc.—The game and fish commission and all game wardens shall inspect from time to time hotels, restaurants, cold storage houses or plants and ice houses commonly used in storing meats, game or fish for private parties, including all buildings used for a like purpose, for the purpose of determining whether game or fish are kept therein in violation of the provisions of this chapter. Any person, in possession or control, or in charge of any hotel, restaurant, storage plant or building referred to, or any part thereof, who refuses or fails to permit any member of the game and fish commission or any warden appointed by said commission to enter any such building or any part thereof, or any receptacle therein, for the purpose of making such inspection, is guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not less than fifty (50) or over one hundred (100) dollars, including costs of prosecution, or imprisonment in the county jail for a term of not less than thirty (30) or over ninety (90) days for the first offense, and upon conviction for a second offense shall be punished by imprisonment in the county jail for a period of not less than sixty (60) or over ninety (90) days.

*Power to enter hotels, etc., to determine whether law is violated, given commission and its agents.*

*Inspection refused or hindered, penalty.*

SEC. 12. Contraband Game, Seizure and Search— Any bird, animal, fish or any part thereof, caught, killed, shipped or had in possession or under control contrary to any of the provisions of this chapter, is hereby declared to be contraband.

The game and fish commission, all game wardens, sheriffs and their deputies, constables and police officers, shall seize and take possession of any and all birds, animals, or fish or any part thereof which have been caught, taken, killed or had in possession or under control or

shipped contrary to any of the provisions of this chapter. Any court having jurisdiction may upon complaint showing probable cause for believing that any bird, animal, fish or any part thereof caught, taken, killed or had in possession or under control by any person, or shipped or transported contrary to the provisions of this chapter, is concealed or illegally kept in any building, car or receptacle, shall issue a search warrant and cause a search to be made in any such place for any such birds, animals, fish or any part thereof, and may cause any building, inclosure or car to be entered, and any apartment, chest, box, locker, crate, basket, package, or any other receptacle whatever to be broken, opened and the contents thereof examined. All such officers taking or seizing any such birds, animals or fish, or any part thereof, shall at once report all the facts attending the same to the commission.

**Probable cause sufficient for court to issue such warrant.**

SEC. 13.　Contraband Devices—All nets, seines, lanterns, snares, devices, contrivances and materials, while in use, or had, or maintained, for the purpose of catching, taking or killing, or attracting or deceiving any bird, animal, or fish contrary to any provision of this chapter, within this state or upon or in the boundary waters thereof, including fish houses, inclosures or other sheltering structures or appliances erected or maintained upon the ice or in any water, or on the shore of any lake, pond or stream, is hereby declared to be and is a public nuisance. The commission, all game wardens, sheriffs and their deputies, constables and police officers shall without warrant or process, take, seize, abate and destroy any and all of the same while being used, had or maintained for such purpose and no liability shall be incurred therefor to any person.

**Declared a public nuisance. Command to seize and destroy without warrant.**

SEC. 14.　Witnesses—In any prosecution under the provisions of this chapter, a participant in the violation thereof may testify as a witness against any other persons violating the same, without incriminating himself, any criminal proceeding for such violation.

**Participant's testimony not incriminating.**

SEC. 15.　Limitations—All prosecutions under this chapter shall be commenced within two years (2) from the time the offense was committed.

**Prosecutions must be made within 2 years.**

SEC. 16.　Exchange Specimens—The commission may secure by purchase or otherwise, and exchange specimens of game birds, game animals or fish with the game commission or state game warden of other states for breeding purposes, and not otherwise; and may also grant

**For breeding and scientific purposes.**

JA1848

permission under the seal of said commission, to any accredited representative of any incorporated society of natural history to collect for scientific purposes only, nests, eggs, birds, animals or fish protected by this chapter. Such specimens shall not be sold or transferred.

SEC. 17. Fishways—Any person owning, erecting, managing or controlling any dam or other obstruction across any river, creek or stream, within or forming the boundary line of this state, shall construct in connection with such dam, durable and efficient fishways in such a manner and of such shape and size that the free passage of all fish inhabiting such waters shall not be obstructed. Such fishways shall be maintained in such condition and kept in good repair by the person so owning, controlling, managing, operating or using such dam or obstruction. *Dams to have free passageways.*

If any such person fails to construct or keep in good repair durable and efficient fishways as herein provided, for the space of ten (10) days after notice, the commission may construct or repair the same and the cost thereof may be recovered from the owners or any person managing or being in control thereof, in a civil action brought in the name of the State of Minnesota. Any money so recovered shall be credited to the game and fish commission. *Failure to construct or keep.*

All fishways heretofore or hereafter erected in any dam or obstruction across any of the streams of this state, shall at all times be under the supervision and control of the commission. *To be under supervision.*

Any person violating any of the provisions of this section shall be deemed guilty of a misdemeanor. *A crime.*

SEC. 18. Sawdust Deposits—Any person who deposits any sawdust or other refuse in any streams or water wherein the commission has deposited fish fry, or may deposit any such fry, or where any brook trout naturally abound, shall be deemed guilty of a misdemeanor.

SEC. 19. Disposition of fines—All fines collected under any of the provisions of this chapter shall be paid into the county treasury of the county wherein the conviction was had, to the credit of the general revenue fund. *Paid in to Co. treasury.*

SEC. 20. Disposition of Other Moneys—All moneys collected by the commission upon licenses issued by it, or bonds or contracts entered into with any person, including money received from all other sources, except fines, shall be paid into the state treasury and credited to the game *Credited to game and fish commission fund.*

and fish commission fund to be used for the purpose of enforcing the provisions of this chapter.

**To other than game wardens.** Sec. 21. Rewards—The commission is authorized to offer and pay out of the funds subject to its order, a reward of ten dollars ($10) for the arrest and conviction of any person violating any provision of this chapter, to the person making such complaint, upon proof that a fine amounting to ten dollars ($10) has been paid into the county treasury by the person so convicted, *provided, further,* this section shall not apply to game wardens regularly employed under pay by said commission.

**Permits.** Sec. 22. Domesticated game and fish: Complaint—Presumption. The commission may issue permits to breed or domesticate deer, moose, elk and caribou upon application to it which shall contain:

1. The name and address of applicant.

2. A description of the premises on which applicant will keep such domesticated animals.

3. The number and kinds of animals in possession at the time of making the application and whether they are wild or domesticated.

**Application fee, report.** The application shall be accompanied by a fee of fifty cents (.50) for each animal in possession. The commission may thereupon issue a permit to the applicant to keep such animals. Any person holding such permit shall annually on the first day of January report to the commission any increase or decrease had upon the original number applied for, together with a fee of 50 cents for each additional animal. The commission shall keep a record of all persons holding such permits and shall send to them numbered tags to be attached to each of the animals.

**To sell, or ship.** Any such animals may be sold or shipped within or without the state upon receipts of written permission to do so from the commission.

**Private hatcheries.** Persons desiring to maintain a private hatchery for the propagation of trout may do so upon application to said commission giving the name and address of the person owning or controlling the same and a mark used to designate it. Trout grown in such hatcheries may be sold and shipped within or without the state in boxes or packages upon which such mark is placed.

**Evidence as to violations.** *Provided, however,* that in any prosecution for any violation of any of the provisions of this chapter it shall not be necessary for the prosecution to allege or prove that the birds or animals were not domesticated or that

:22-Case 423-R90B-AMDocument 49t 89age File 602/13426 File07/20220a3geID

the trout were not grown in a private hatchery or that the birds, animals or fish were not taken for scientific purposes, but the person claiming that such birds, or animals were domesticated, or the trout grown in a private hatchery, or that the said birds or animals were taken for scientific purposes, as herein provided, shall prove on the hearing or trial that such birds or animals were domesticated, or that such trout were grown in a private hatchery or that such birds or fish were taken for scientific purposes as by law provided, or were not caught, taken or killed outside this state, or had in possession without license or permit therefor.

## GAME BIRDS AND ANIMALS.

SEC. 23.   Ownership in State—No person shall at any time or in any manner acquire any property in, or subject to his dominion or control, any of the birds, animals or fish or any part thereof of the kinds herein mentioned, but they shall always and under all circumstances be and remain the property of this state; except, that by killing, catching or taking the same in the manner and for the purposes herein authorized, and during the periods when their killing is not herein prohibited, the same may be used by any person at the time, in the manner and for the purposes herein expressly authorized; and whenever any person kills, catches, takes, ships or has in possession, or under control, any of the birds, animals or fish, or any part thereof, mentioned in this chapter, at a time or in a manner prohibited by this chapter, such person shall thereby forfeit and lose all his right to the use and possession of such bird, animal or fish, or any part thereof, and the state shall be entitled to the sole possession thereof. *Except as in this act provided.*

SEC. 24.   Nests and Eggs—No person shall at any time take or have in possession or under control, break up or destroy or in any manner interfere with any nest, or the eggs of any of the kinds of birds, the killing of which is at any or all times prohibited. *Prohibitions.*

SEC. 25.   Manner of Taking—No person shall at (any) time, catch, take or kill any of the birds or animals mentioned in this chapter, in any other manner than by shooting them with a gun held to the shoulder of the person discharging the same. *Do.*

SEC. 26.   Traps, Snares, Lights, Etc.—No person shall at any time set, lay, prepare, or have in possession *Do.*

606          GENERAL LAWS          [Chap.

any trap, snare, artificial light, net, bird lime, swivel gun or set gun or any contrivance whatever, for the purpose of catching, taking or killing any of the game animals or birds in this chapter mentioned, except that decoys and stationary blinds may be used in hunting wild geese, brant and ducks.

**Decoys.**

**Further prohibitions.**

SEC. 27.  Shooting After Dark—Sink—Boats, Etc. —No person shall at any time hunt with or shoot from any boat, canoe or contrivance whatever on any of the waters in this state between dark and daylight, and no person shall at any time make use of, hunt with or shoot from any floating battery, sink boat, sunken barrels, boxes, tubs, floating blinds or any similar device whatever, on any of the waters of this state.

**Do.**

SEC. 28.  Shooting With Dogs—No person shall hunt, pursue, catch, take or kill any of the animals in this chapter mentioned, with any dog or dogs.  Any dog or dogs used or attempted to be used in violation of any of the provisions of this section is hereby declared to be and is a public nuisance, and it shall be lawful for any person to kill any dog or dogs so being used or attempted to be used.  The use or running of either pointer or setter dogs in fields or upon lands frequented by or in which game birds may be found during the month of August, or at any time except during the open season for killing game birds, and the keeping and maintaining of any dog at or about any hunting camp or lumber camp used by hunters, situated in any locality frequented by deer, moose or caribou, is hereby prohibited and made unlawful.

**Do.**

SEC. 29.  Entering Growing Grain—No person shall at any time enter into any growing or standing grain not his own with intent to take, or kill any bird, or animal, nor permit any dog with which he shall be hunting to do so for such purpose, without permission from the owner or person in charge thereof.  No person shall at any time enter upon any land not his own with intent to take or kill any birds or animals after being notified by the owner or occupant thereof not to do so.  Such notice may be given orally or by posting written or printed notices to that effect, in the English language, in conspicuous places on the land so protected.

**Do.**

SEC. 30.  Game Killed in Another State—No person shall at any time have in his possession or under his control within this state any bird, animal or fish, or any

:22-cv-01618-RMG-AMD Document 49 89 Page 158 2/13/22 Date Filed 07/20/2023ageID

part thereof, which has been caught, taken or killed outside of this state at a time when it is unlawful to have in possession or under control such birds, animals or fish, or parts thereof, if caught, taken or killed in this state, or which have been unlawfully taken or killed outside this state, or unlawfully shipped therefrom into this state.

SEC. 31.   Possession of Game and Fish, Presumption —The possession or having under control by any person of any bird, animal or fish, or any part thereof, the killing of which is at any time herein prohibited, shall be prima facie evidence that it was the property of this state at the time it was caught, taken and killed (in this state), also that such possession or having under control at any time when the killing, taking or possession thereof is by this chapter declared to be unlawful, shall be prima facie evidence that such taking and killing occurred during the closed season, unless there remains attached to such game bird or animal or any part thereof, the tag and seal of the state game and fish commission, provided for by this chapter to disprove which it shall be necessary for the party in possession thereof to show that at the time it was caught, taken or killed, it was lawfully caught, taken or killed outside, or within this state, or that it was lawfully caught, taken or killed within the state and that he was lawfully in possession thereof.

*Prima facie evidence of possession.*

SEC. 31½.   Nothing in this act shall be construed as prohibiting the buying, shipping or having in possession at any time the skins of fur-bearing animals killed within or without the state, or hides of moose, deer or caribou killed without the state upon proof that the hides were so taken. *Provided, however,* that raw hides of moose, deer or caribou taken or killed within this state out of season shall not be bought or sold at any time.

*Skins of fur bearing animals.*

SEC. 32.   Game Birds—Season for Killing—No person shall hunt, take, kill, ship, convey or cause to be shipped or transported by common or private carrier, to any person either within or without the state, expose for sale, sell to any one, have in possession with intent to sell, or have in possession or under control, at any time, any turtle dove, snipe, prairie chicken, pinnated, whitebreasted or sharp-tailed grouse, quail, partridge, ruffed grouse. Chinese, ring-neck or English pheasant, wild duck of any variety, wild goose of any variety, brant or any variety of aquatic fowl, whatever, or any part there-

*Prohibitions.*

GENERAL LAWS [Chap.

of, except: 1—That any turtle dove, snipe, prairie chicken, pinnated, white-breasted or sharp-tailed grouse, woodcock, upland plover and golden plover may be killed and had in possession between the first day of September and the first day of November following. 2nd—That any quail, partridge, ruffed grouse or pheasant, other than Mongolian, Chinese ring-neck or English pheasant, may be killed or had in possession between the first day of October and the first day of December following. 3rd— That wild duck of any variety, wild goose of any variety, brant or any variety of aquatic fowl whatever, may be killed and had in possession between the first day of September and the first day of December following.

And when any of the birds mentioned in this section have been lawfully caught, taken, killed or had in possession within the time herein allowed, they may be had in possession for five (5) days thereafter. But no person shall in any one day take or kill more than fifteen (15) birds or have in his possession at any time more than forty-five (45) turtle dove, prairie chicken, white-breasted or sharp-tailed grouse, quail, partridge, ruffed grouse or pheasant, woodcock, upland plover, golden plover or any or all of the same combined, or fifty (50) snipes, wild duck, goose, brant, or any variety of aquatic fowl, whatever, or any or all of the same combined.

**Number of birds allowed.**

SEC. 33. Deer and Moose—Season for Killing—No person shall hunt, catch, take, kill, ship, convey or cause to be shipped or transported by common or private carrier, to any person, either within or without the state, or purchase expose for sale, have in possession with intent to sell, sell to any person, or have in possession or under control at any time, any elk, moose, caribou, deer or fawn, or any part thereof, including the hides and horns, except as hereinafter provided. *Provided,* that deer may be killed between Nov. 10 and Nov. 30 of the same year, and any deer or any part thereof, may be had in possession by any person during the same time; but no person shall kill or have in possession during said time more than two (2) deer, or parts thereof; and *provided further,* that any person who is lawfully in possession of any deer, or any part thereof, may ship or cause the same to be shipped in the manner provided for by this chapter, but not otherwise; and *provided, further,* that male antlered moose may be killed between Nov. 10th and Nov. 30th of the same year, and any such male moose, or

:22-cv-04623-RMG-AM Document 49 89 Page 160 02/13 Date Filed 03/20/2023 age ID

part thereof, may be had in possession by any person during the time aforesaid, but no person shall kill or have in possession during said time more than one (1) male moose, or part thereof; and *provided, further,* that when any deer or such male moose or any part thereof, are lawfully in the possession of any person as provided for in this chapter, such person may continue in the possession of the same for five (5) days after the time herein limited for killing said animals; and *provided, further,* that no cow or female moose can be killed or had in possession at any time.

Sec. 34. Resident License—Shipment of Game—Every resident of this state is prohibited from hunting, taking or killing any game bird or game animal, unless he shall have first procured a license therefor from the county auditor of the county in which he resides; except that any citizen of this state may hunt, take or kill any of the game birds mentioned in this chapter in the county in which he is a bona fide resident without having a license to so hunt. Said auditor shall upon application issue to such person under his seal, upon blanks to be furnished him by the game and fish commission, a license to hunt game animals and game birds, upon the payment to him of a license fee of one dollar ($1), which license shall expire on the 31st day of December following its issuance. Ten cents of the amount received for the issuance of said license shall be retained by the county auditor as his fee, and the balance remitted to the state treasurer, who shall credit the same to the game and fish commission fund to be used for the purpose of enforcing the provisions of this chapter. Every such applicant shall prove to the satisfaction of the county auditor that he is a bonafide resident of this state, and shall state, under oath, his name, resident and postoffice address. Only one of such licenses shall be issued to any person and it shall not be transferable, and it is hereby made the duty of such licensee to exhibit the same to any person upon request. Such license shall describe the licensee, designate his place of residence, and shall have attached thereto three (3) coupons upon which shall be printed respectively the words, "moose," "deer," and "game birds." Each coupon, except the ones marked "deer" and "game birds," shall be divided into two (2) sections lettered respectively "A" and "B." The coupons marked "deer" and "game birds" shall be divided into four (4) sections, two (2) of which

*Marginal notes:*

No license required in home county.

County auditor's issue.

License, coupons, etc.

shall be lettered "A" and two (2) "B." Any resident who has paid said fee and procured such license to hunt game animals and game birds may during the open season hunt, take and kill one (1) male antlered moose, two (2) deer and also game birds, in the manner and subject to the limitations and conditions prescribed by this chapter, and may ship by common carrier in the manner herein provided, and not otherwise, to any point in the county in which he resides, one (1) male antlered moose, and two (2) deer, or any part thereof, and fifty (50) game birds, in two shipments of not to exceed twenty-five (25) birds, each, so lawfully shot or had in his possession. Said game animals and game birds may be shipped by said licensee to himself at his place of residence by common carrier, upon attaching to such game animals or any part thereof, or game birds, respectively, section "B" of said coupon. Upon receiving such game it is made the duty of said common carrier to detach from the license section "A" of said coupon and at once forward the same by mail to the game and fish commission.

*Game as baggage.*

*Provided, however,* that nothing in this chapter contained shall be deemed or construed to prevent any resident of this state from personally carrying with him as baggage, on any train or conveyance, any game birds or fish which may be legally in his possession and any common carrier is hereby permitted to carry any such game birds or fish as baggage, when the same is so accompanied and carried on the same train or conveyance by the person who is legally in possession of the same.

*Prohibition as to employes of common carriers.*

*Provided further,* that nothing herein contained shall be construed to permit employes of a common carrier to carry any such game birds, animals or fish or parts thereof with them, whether as baggage or otherwise, while engaged in the performance of the duties of their said employment, and they are specifically prohibited from so doing.

SEC. 35. Non-resident License—Shipment of Game—Every person not a resident of this state is prohibited from hunting, taking or killing any game bird or game animal unless he shall have first procured a license therefor from the game and fish commission. Said commission shall upon application issue to any non-resident, a license to hunt game animals, upon the payment to it of a license fee of twenty-five dollars ($25) and to hunt game birds upon the payment to it of a license fee of

*Fee.*

ten dollars ($10), which license shall expire on the 31st day of December following its issuance.

Said license to hunt game animals shall describe the licensee, designate his place of residence, and shall have attached thereto two (2) coupons divided into three (3) sections, lettered respectively "A," "B" and "C." The words "deer" and "moose" shall be printed upon the coupons attached thereto. Any non-resident who has paid said fee and procured such license to hunt game animals, may during the open season, kill in the manner authorized by this chapter, one (1) male antlered moose, and one (1) deer, and also ship such deer so killed by him to his said place of residence outside the state, upon attaching to such game animal, or any part thereof, respectively, sections "B" and "C" of said coupon, and ship such moose to any place within the state by attaching section "B" of said coupon. Upon receiving said game, it is the duty of said common carrier to detach from the license section "A" of said coupon and at once forward the same by mail to the commission. Sections "B" and "C" of said coupons must remain on said deer, or part thereof, so shipped outside the state while in transit in this state, and section "C" of said coupon must be detached by said common carrier at the last station or place in this state where the train or other conveyance of such common carrier shall stop, and it shall be the duty of said common carrier to forward section "C" of said coupon to the game and fish commission immediately upon being detached.

*Shipping game by non-resident.*

Said license to hunt game birds shall describe the licensee, designate his place of residence and shall have attached thereto one (1) coupon divided into three (3) sections, lettered respectively, "A," "B" and "C." The words "game birds" shall be printed upon the coupon attached thereto. Any non-resident who has paid said fee and procured a license to hunt game birds, may hunt, take and kill game birds, in the manner authorized by this chapter, during the open season, subject to the limitations applicable to residents of this state, and may ship to his place of residence outside this state twenty-five (25) game birds so lawfully shot and taken by him, upon attaching to such game birds sections "B" and "C" of said coupon. Upon receiving said game birds, it is the duty of said common carrier to detach from the license section "A" of said coupon, and at once forward the same by mail to

the game and fish commission. Sections "B" and "C" of said coupon must remain on said game birds while in transit in this state, and section "C" of said coupon must be detached by said common carrier at the last station or place in this state where the train or conveyance of such common carrier shall stop, and it shall be the duty of said common carrier to forward section "C" of said coupon to the game and fish commission immediately upon being detached.

Said licenses shall not be transferable, and it is hereby made the duty of said licensee to exhibit the same to any person upon request.

For viola-
tions of act.

SEC. 36. Forfeiture of License—Any person who shall violate any of the provisions of this chapter and who is at the time of such violation in the possession of a license duly issued to him, shall, upon conviction thereof, forfeit such license to the State of Minnesota, and such person shall deliver to the court before whom he was tried any such license, and the court shall forward the same to the commission.

SEC. 37. Retaining Game—Tags—Penalty—Any person who is a resident of this state and legally in possession of any of the game birds or game animals, or any part thereof, which have been caught, taken or killed at a time or in a manner permitted by the provisions of this chapter, and who is desirous of retaining possession of the same for his own use after the time in this chapter limited, and who shall before such time make application to the commission for leave to retain the same, which application shall be in writing and signed or sworn to by the applicant, and shall state:

Retaining
game during
closed sea-
son, appli-
cation.

First—The name and residence of the person in possession of such birds or animals, or parts thereof.

Second—The number, kind and location of said birds or animals or parts thereof, which number shall not exceed forty-five (45) turtle dove, prairie chicken, pinnated, white breasted or sharp-tailed grouse, quail, partridge, ruffed grouse or pheasant, woodcock, upland plover or golden plover, or any or all of the same combined, or fifty (50) snipe, wild duck, goose, brant or any variety of aquatic fowl whatever, or any or all of the same combined, two (2) deer or the parts thereof, one (1) male moose or the parts thereof for each applicant.

Third—That if permitted to retain the same by said commission the applicant will retain possession of said

birds and animals for his own use and will not ship, sell or dispose of the same.

If said commission is satisfied that said application is made in good faith and said applicant will keep said birds and animals and parts thereof for his own use and not for sale, the said commission shall cause tags or seals, which shall not be duplicated by others, and which shall not be removed, to be attached to each bird or animal, or parts thereof, not exceeding forty-five (45) turtle dove, prairie chicken, pinnated, white-breasted or sharp-tailed grouse, quail, partridge, ruffed grouse or pheasant, woodcock, upland plover or golden plover, or any or all of the same combined; or fifty (50) snipe, wild duck, goose or brant or any varieties of aquatic fowl whatever, or any or all of the same combined; two (2) deer or the parts thereof and one (1) male moose, or the parts thereof, for each applicant; or in lieu thereof, if any applicant therefor resides at a distance from any game warden, then the commission may issue to such applicant a written permit to keep and use such game. <span style="float:right">Tag and seals attached to game so kept.</span>

The person making such application shall, before said tags or seals are attached, pay to the commission the reasonable expense of making and attaching such tags and seals.

After the tags and seals have been so attached, or such permit received, the person holding such permit may, while the tags or seals remain upon said birds and animals and parts thereof, retain possession of the same until consumed; *provided,* that nothing in this chapter contained shall prevent a person from disposing of as a gift any of the birds and animals mentioned herein. The having in possession of any game bird or animal or any part thereof which is not so tagged and sealed, or for which a retention permit has not been received, except during the open season and five (5) days thereafter, is hereby made unlawful. Any such game bird or game animal, or any part thereof, had or held in possession by any person during the season when it is unlawful to have the same in possession, is hereby declared contraband and the right of any such person to retain or use the same shall cease. Any person who shall destroy, imitate or duplicate any tag or seal attached to any bird or animal, or part thereof, or who shall ship, sell or dispose of any bird or animal, or any part thereof, which has been tagged or sealed as aforesaid, or for which a permit to keep and use the same <span style="float:right">Game kept without permit, contraband.</span>

GENERAL LAWS [Chap.

has been issued, shall be guilty of a misdemeanor and up-
on conviction thereof shall be punished by a fine of not
**Fine.** less than twenty-five ($25) nor more than fifty dollars
($50) and costs of prosecution, or by imprisonment in
the county jail for not less than thirty (30) nor more
than sixty (60) days for each and every bird or animal
or part thereof, so shipped, sold or disposed of.

**Close season, exception.** SEC. 38. Mink, Muskrat, Otter, Beaver—No person
shall catch, take or kill any mink, muskrat, otter or beaver
between the first day of May and the first day of No-
vember following. *Provided,* that when any of the ani-
mals mentioned in this section are doing damage to or de-
stroying any property the persons whose property is be-
ing damaged or destroyed may kill them at any time.

**Prohibitions.** SEC. 39. Harmless Birds—Game Birds Defined—No
person shall catch, take, kill, ship or cause to be shipped
to any person within or without the state, purchase, offer
or expose for sale, sell to any one, have in possession with
intent to sell, or have in possession or under control at
any time, living or dead, any wild bird other than a game
bird, nor any part thereof, and for the purposes of this
chapter the following only shall be considered game
**Game birds defined.** birds. The Antidas, commonly known as swan, geese,
brant, river and sea ducks, the linolae, commonly known
as plover, snipe and woodcock; the gallinae, commonly
known as grouse, prairie chickens, pheasants, partridges
**Song and other birds.** and quail; *provided,* that blackbirds, crows, English spar-
rows, sharp-shinned hawks, cooper hawks and greathorn-
ed owls may be killed and had in possession at any time;
but nothing herein contained shall be construed to pre-
vent the keeping and sale of song birds as domestic pets.

## FISH.

SEC. 40. Fish May be Taken, When. No person shall
catch, take, kill or have in possession or under control,
for any purpose whatever, and of the fish hereinafter men-
**Closed season.** tioned within the periods herein limited, to-wit: Any
variety of trout, except lake trout, between the first day
of September and the fifteenth day of April following;
any black, grey or Oswego bass between the first day of
March and the twenty-ninth day of May following; any
variety of pike, muskallonge, croppie, perch, sunfish, stur-
geon, catfish or any other variety of fish between the first
day of March and the first day of May following.

JA1860

:22-c-Case4-23-R903-AMDocDmeumtn49 89PageFil66602/1Date Filede 0920/2023ageID

SEC. 41.    Manner of Taking—No person shall catch, **Limitations.**
take or kill more than twenty-five (25) fish, except sun-
fish, perch, pickerel or bullheads in any one day, nor in
any other manner than by angling for them, with a hook
and line held in the hand, or attached to a rod so held,
nor with more than one line or with more than one hook
attached thereto; and no person shall have in his posses-
sion any fish caught, taken or killed in any of the waters
of this state, except as provided in this chapter.

*Provided,* that pickerel, suckers, redhorse, carp and **Spearing.**
bullheads may be taken with a spear without limit at any
time and artificial lights may be used in so doing.

*Provided further,* that in all of the inland lakes in this **Permission
to use nets,**
state, permission having been granted therefor, but not **size, etc.**
otherwise, a net may be used for the purpose of taking
and catching whitefish or trelipies from November tenth
to December tenth of the same year.    Said net shall not
exceed two hundred (200) feet in length and four (4)
feet in width, and the meshes of said net shall not be less
than three and one-half (3½) inches in size of mesh
when the same is extended.

Any person desiring to use any such net shall first
make application for a permit therefor to the commis-
sion, in writing, and shall state that the said net is to be
used by them for the purpose of obtaining fish for their
own domestic use and not for the purpose of sale, which
application shall be accompanied by a fee of one dollar
($1.00) for each net, but no person shall be permitted
to use more than two (2) of such nets.

SEC. 42.    Netting in Mississippi River Within State— **Limitations.**
Except in certain portions of the Mississippi river here-
inafter defined, and in certain defined boundary waters
of the state, a pound net, seine or dip net may be used in
the Mississippi river from the Falls of St. Anthony to a
point one thousand (1,000) feet above the mouth of the **St. Croix**
St. Croix river for catching sturgeon, redhorse, dogfish, **river.**
buffalo fish, catfish, pickerel, carp and suckers, but no such
net or seine shall be used within a distance of one thou-
sand (1,000) feet from the mouth of any stream, and
that the said pound net shall not exceed seventy-five feet
in length, and the length of such seine shall not exceed
one hundred and fifty (150) feet.    The mesh in said net
or seine shall not be less than two and one-half (2½)
inches in the bar and five (5) inches when the same is ex-
tended, and before any such pound net or seine is used

the person desiring to use the same shall first make application therefor to the game and fish commission of this state for permission to use such net or seine, which application shall state the name of the person and the place where the applicant desires to use the same, and which application shall be accompanied by a fee of five dollars ($5.00) for every net desired to be used.

Permit for 1 season.

The commission may issue such a permit for the use of such net or seine to such applicant, which permit shall be for one season only. The person to whom such permit or license is issued shall not change the location of such net or seine without first giving written notice of his intention to do so to the commission, and in such notice describing the place to which he intends to remove his or her net or seine.

Commission may license.

Sec. 43. Netting in International Waters—Penalty—The game and fish commission is hereby authorized to license the use, in international waters, of pound nets of the character and subject to the regulations hereinafter contained, and to issue licenses therefor.

Regulations.

The size of the mesh of the pot or pound of the pound net shall not be less than one and three-quarters (1¾) inches, bar measure, or three and one-half (3½) inches extension measure. Said pound nets may be set in strings, but no string of such nets shall exceed three (3) in number and the leads of such nets shall in no case exceed the following lengths: The shore lead eighty (80) rods and the leads between the pounds or pots fifty (50) rods in length. Said net or string of nets shall not be less than twenty-five hundred (2,500) feet apart, nor within five hundred (500) feet of the mouth of any stream, and for every ten (10) miles of net set there shall remain an open space of five (5) miles where no net shall be set, which five (5) miles space shall be in excess of the twenty-five hundred (2,500) feet above mentioned. Any one desiring to use such nets or string of nets shall, before so doing, make written application for such privilege to the commission, setting forth therein the name of the applicant, the number of nets desired to be used, with an accurate description in detail of each net, the waters in which it is desired to set in, and a statement of the location of all other nets then in use in such waters situated within five thousand (5,000) feet of the place where it is desired to set such nets, which application shall be accompanied by a license fee of twenty-five dol-

lars ($25) for each net. The commission may issue a license to the applicant who shall be a citizen of the United States. Said license shall not be transferable and shall be good for one (1) fishing season only. Said license shall permit the use of so many of said nets at the place indicated in said application as the commission shall deem for the best interest of the state. Said commission shall retain twenty-five dollars ($25) for each net so licensed. The commission shall not issue to any one person for the use or benefit of such applicant a license to use more than fifty (50) nets during a single fishing season and whenever more than one person shall apply for a license to fish in the same locality, the priority of such application shall be determined in such manner as the commission may designate. No such license shall be issued authorizing the use of any net or nets in international waters between the first day of April and the twentieth day of May following, and it shall be unlawful for any person to assist in placing or place any such net during such season:

Each applicant to whom a license is issued shall make a written report at the end of such fishing season to said commission, stating the number of nets used and where used by him, and the amount in number, kind and the pounds of each kind of fish taken by him in each net.

**Report to commission.**

Any pound net, seine or dip net which is being used without a license or any pound net, seine or dip net which is being used in violation of a license, issued for its use, is hereby declared to be and is a public nuisance, and it shall be the duty of all the members of the commission, game wardens, sheriffs and their deputies, police officers and constables, without warrant or process, to take, seize, abate and destroy any and all of the same.

**Seizure without warrant.**

The commission, game wardens, sheriffs, and their deputies, police officers and constables, shall seize any and all nets and seines when illegally used and all fish taken therewith, and at once report the seizure to the commission.

Every person using, aiding or abetting the use of any such net contrary to the provisions of this section, shall be guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine of one hundred dollars ($100) or by imprisonment in the county jail for ninety (90) days for each and every net so illegally used.

**Misdemeanor penalty.**

**Not within 400 feet.**

SEC. 44.  Fishing Near Fishways—No person shall catch, take or kill any fish in any lake or stream within four hundred (400) feet of any fishway, or have in his possession or under his control any fish so caught, taken or killed.

**Prohibited.**

SEC. 45.  Use of Drugs, Dynamite, Traps, Etc.—No person shall lay, set, use or prepare any drug, poison, lime, medicated bait, fish berries, dynamite, or any other deleterious substance whatever, or lay, stretch or place any tip-up, trap, snare, set or trot-line, or any wire string, rope or cable of any sort in any of the waters of this state with intent to thereby or therewith catch, take or kill any fish.

SEC. 46.  Fish Houses—No person shall erect, have or maintain upon the ice in any of the waters of this state any fish house, structure, enclosure or shelter whatever to protect the person of the occupant while engaged in fishing through the ice.

**Exception.**

Except, that on all inland lakes of this state, a fish house may be used for the purpose of taking pickerel, suckers and redhorse from the fifteenth of December to the first (day) of April following; *provided further,* that any person desiring to use such house shall first make application for a permit for such use to, and obtain such permit from, the game and fish commission, stating that the same is to be used by him for the purpose of obtaining fish for his domestic use and not for commercial purposes, which application shall be accompanied by a fee of one dollar, but no such person shall be permitted to use more than one fish house.

**Sale or shipment of.**

SEC. 47.  Sale of Trout, Black and Grey Bass—No person shall have in possession for sale, or with intent to sell, expose or offer for sale or sell to any person, any brook trout, or grey, black or Oswego bass, at any time, or ship, cause to be shipped, or have in possession with intent to ship to any person, either within or without the state, any such fish, or have any black, grey or Oswego bass in his possession during the season for taking the same, or any trout during the closed season, except they are caught in a private hatchery.

**Return to water fish less than 6 inches.**

SEC. 48.  Size of Fish to be Taken—No person shall at any time catch, take, kill or have in possession or under control any fish for any purpose whatever, except minnows for bait, rock bass, sunfish and bullheads that are less than six inches in length.  Any person catching such

fish shall at once return same to the water from which they are taken with as little injury as possible.

No person shall take, kill, have in possession for sale or with intent to sell, offer or expose for sale, or have in possession or under control for any purpose whatever any lake trout or whitefish of less than two pounds, round or undressed weight, or one and one-half pounds, dressed weight, or any wall-eyed pike of less than fourteen inches in length or one pound round or undressed weight, or any muskallonge less than thirty inches in length, or any blue pike or sangers of less than ten inches in length. Measurement in each case to be made from the tip of the snout to the fork of the tail. Any such fish when caught shall be immediately returned to the water.

*Lake trout or whitefish less than 2 pounds.*

*Wall-eyed pike less than 14 inches. Muskallonge 30 inches. Blue pike 10 inches.*

SEC. 49. Fishing in Lake Superior—Fish of any description shall not be caught with nets or seines in the waters of Lake Superior under the jurisdiction of the State of Minnesota, between the fifteenth day of October and the thirtieth day of November following. · No person shall take, catch or have in possession or under his control for any purpose whatever, any sturgeon caught in Lake Superior prior to June 1st 1910.

*Closed season in Lake Superior.*

Any person violating the provisions of this section shall be guilty of a misdemeanor, and upon conviction thereof be punished by a fine of not less than one hundred (100) nor more than five hundred (500) dollars, and costs of prosecution, or by imprisonment in the county jail for not less than thirty (30) nor more than ninety (90) da· for each and every net so used, had or maintained.

*Misdemeanor penalty.*

SEC. 50. Shipping Outside of State—No person shall ship, have in possession with intent to ship or cause to be shipped beyond the borders of this state any fish of the kinds mentioned in this chapter, except as herein provided, except that the commission may give a written permit to any responsible person (a bona fide resident of this state) to ship fish commonly known as bullheads, buffalo fish, carp, redhorse, suckers, sheephead, eel-pout, garfish, dogfish, sturgeon and catfish out of the state upon such reasonable conditions as it may adopt. *Provided further,* that any non-resident of this state who is desirous of taking any fish beyond its borders for his personal use may carry with him on the same train or conveyance, not to exceed fifty pounds of fish caught by him. *Provided further,* that all boxes and packages containing fish, or all boxes, bags, or packages of any description used

*Permits given residents to ship certain kinds.*

*As to non-residents.*

*Packages plainly marked.*

620     GENERAL LAWS     [Chap.

in shipping fish, either within or without this state, shall be plainly marked with the name and address of the consignor and consignee, and with the contents of the package.

In counties of 150,000 and over.

SEC. 51. Sale of Fish Prohibited, When—No person shall sell, have in possession with intent to sell, or offer for sale any fish caught in any lake situated partly or wholly within a county in this state that has a' population of one hundred and fifty thousand, or over.

## MISCELLANEOUS PROVISIONS.

SEC. 52. Game and Fish Taken in One Day.—No person shall wantonly waste or destroy any of the birds, animals or fish of the kinds mentioned in this chapter.

Fifteen birds in one day.

Twenty-five fish.

Exception.

The catching, taking or killing of more than fifteen birds by any one person in any one day, or the catching, taking or killing of more than twenty-five fish by any one person in any one day, except fish caught, taken or killed in the Mississippi river or international waters with nets or seines, as by this chapter permitted, shall be deemed a wanton waste, and destruction of all such birds or fish caught, taken or killed in excess of such number.

Hunting, etc., prohibited.

SEC. 53. State Parks.—No person shall pursue, hunt, take, catch, or kill any wild bird or animal of any kind within the limits of any territory set apart, designated, used or maintained as a state public park, or within one-half mile of the outer limits thereof or have any such bird or animal or any part thereof in his possession or under his control within said park or within one-half mile of said outer limits.

As to fire arms.

No person shall have in his possession within any such park or within one-half mile of the outer limits thereof, any gun, revolver, or other firearm unless the same is unloaded, and except after the same has been sealed by the park commissioner or a deputy appointed by him, and except also such gun or other firearm at all times during which it may be lawfully had in such park remains so sealed and unloaded. Upon application to the park commissioner or any deputy appointed by him, it is hereby made his duty to securely seal any gun or firearm in such a manner that it cannot be loaded or discharged without breaking such seal. The provisions of this section shall apply to all persons including Indians.

To residents.

SEC. 54. Sale of Game by Commission—The game and fish commission is hereby authorized to sell to resi-

JA1866

dents of this state at the highest market price obtainable therefor, all furs, fish, game, game animals or game birds now or which may hereafter come into its possession. The proceeds thereof shall be turned into the state treasury and credited to the game and fish commission funds. A record of such sales, including the name of the purchaser and the price paid, shall be kept by the commission. Said commission shall, before selling, tag the same in a manner to be determined by it.

*Proceeds turned into state treasury, record of sales.*

SEC. 55. Game Shall Not be Resold—Fish, game, game animals and game birds, or any part thereof, sold pursuant to the terms of the foregoing section, shall not be resold, offered for sale or held for the purpose of sale, or otherwise disposed of, to any other person by said purchaser. Said game shall not be bought or taken into possession by any person other than said purchaser from the commission.

SEC. 56. Obstructing Commission—Gathering Spawn —No person shall obstruct the commission, its executive agent or any warden appointed by it while engaged in gathering fish spawn, nor shall any person place in any stream or river any logs or other debris at any time when said commission and its employes are gathering spawn, or about to gather spawn or catch fish for that purpose in any such stream or river. Any person violating any of the provisions of this section shall be deemed guilty of a misdemeanor. The commission may institute a civil action in the name of the state to recover from any person or persons obstructing it in the performance of its duties, or who shall place logs or other debris in such stream, for all damages resulting therefrom, and in addition thereto may in such action enjoin such party or parties from doing the acts hereby prohibited.

*Logs or other debris in rivers or streams.*

*Prosecution.*

SEC. 57. Appropriation—The sum of thirty-five thousand dollars ($35,000), or so much thereof as may be necessary, is hereby appropriated annually, commencing August 1st, 1905, for the purpose of carrying on and enforcing the provisions of this chapter, to be paid for such purpose out of any moneys in the state treasury not otherwise appropriated.

*$35,000, annually.*

SEC. 58. Illegal Use of Coupons—Any person who uses any coupon described in this chapter other than those issued and delivered to him personally by the county auditor in the shipping or transporting of any game bird or animal or any part thereof, or uses such coupon for

*Misdemeanor*

622 GENERAL LAWS [Chap.

any purpose or in any manner other than in this chapter authorized shall be guilty of a misdemeanor.

**Procuring of illegally, penalty.**

SEC. 59. Coupons—Conspiracy—Any person who solicits, or directly or indirectly procures the issuance and delivery of any such coupon to any fictitious person or persons other than himself and uses it in any manner, or who obtains possession of any such coupon and delivers it to any person, or who solicits or procures the shipment to himself or any third person, from another, of any game bird or game animal or any part thereof shall be guilty of a conspiracy to violate the game laws and upon conviction thereof shall be fined not less than fifty nor more than one hundred dollars for the first offense and confined in the county jail not less than sixty or over ninety days for the second offense, and confined in the state prison at Stillwater not less than sixty days for each subsequent offense.

**Prohibited.**

SEC. 60. Cold Storage—The placing or receiving within or storage of any game bird or game animal, or any part thereof, in any cold storage plant is hereby prohibited and made unlawful.

### PENALTIES.

SEC. 61. Resisting Commissioner or Warden—Whoever shall resist or obstruct the executive agent of said commission, or any member thereof, or any warden or other officers of this state, in the discharge of his duties under this chapter, shall be guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not less than fifty (50) nor more than one hundred (100) dollars and costs of prosecution, or by imprisonment in the county jail for not less than sixty (60) nor more than ninety (90) days for each and every offense.

**Misde-meanors.**

SEC. 62. Killing, Selling, Buying or Shipping Moose and Deer—Any person who takes or kills, has in possession, has in possession with intent to sell, sells, offers or exposes for sale, ships by common carrier, conveys or causes to be conveyed, has in possession with intent to so ship, or to convey in any manner, to any point within or without this state, any moose, deer, or any part thereof, including the hides and horns, or any person who buys any such game animal, or any part thereof, in violation of any of the provisions of this chapter, or any common carrier or agent thereof who ships or aids or abets any person in shipping any such game animal or any part

thereof, or has possession of the same with intent to ship or transport or convey to any point either within or without this state, contrary to any of the provisions of this chapter, shall be guilty of a misdemeanor and be punished by a fine of not less than fifty (50) or more than one hundred (100) dollars and costs of prosecution, or by imprisonment in the county jail for not less than thirty (30) nor more than ninety (90) days for each and every moose or deer, or any part thereof, including the hide and horns, taken, caught, killed, sold, offered or exposed for sale, had in possession, or had in possession with intent to sell, shipped by common carrier or conveyed in any manner, or had in possession with intent to so ship, or transport to any point within or without this state in violation of any provisions of this chapter; *provided, however,* that such fine shall not exceed two thousand (2,000) dollars, or such imprisonment exceed the term of one (1) year.

SEC. 63.  Taking, Killing, Selling, or Shipping Game Birds and Fish—Any person who takes, catches, or kills, has in possession, or has in possession with intent to sell, sells, offers or exposes for sale, ships by common carrier, conveys or causes to be conveyed, has in possession with intent to so ship or convey to any point either within or without this state, any game bird or fish, or any part thereof, in violation of any of the provisions of this chapter, or any common carrier or agent thereof who aids or abets any person in shipping such game birds or fish, or has the same in possession with intent to ship or convey, to any point either within or without this state, contrary to any of the provisions of this chapter, shall be guilty of a misdemeanor and upon conviction thereof be punished by a fine of not less than ten (10) nor more than one hundred (100) dollars and costs of prosecution, or by imprisonment in the county jail for not less than ten (10) nor more than sixty (60) days for each and every game bird or fish or part thereof, taken, caught, killed, sold, offered or exposed for sale, had in possession, or had in possession with intent to sell, shipped by common carrier, or transported in any manner, or had in possession with intent to so ship or transport to any point within or without this state, in violation of any of the provisions of this chapter; *provided, however,* that such fine shall not exceed two thousand (2,000) dollars or such imprisonment exceed the term of one (1) year.

SEC. 64. Attempts—Any attempt to violate any of the provisions of any section of this chapter shall be deemed a violation of such provision, and any person attempting to violate any of the provisions of any section of this chapter shall be guilty of a misdemeanor, and upon conviction thereof punished by a fine of not less than ten (10) nor more than fifty (50) dollars, and costs of prosecution, or by imprisonment in the county jail for not less than ten (10) nor more than sixty (60) days for each and every offense.

SEC. 65. Hunting Without License—Any person, either a resident or non-resident of this state who shall hunt, take or kill any of the game birds or game animals in this state, without having first procured a license therefor as provided in this chapter, shall be guilty of a misdemeanor, and upon conviction thereof, punished by a fine of not less than twenty-five (25) nor more than one hundred (100) dollars, and costs of prosecution, or by imprisonment in the county jail for not less than ten (10) nor more than ninety (90) days for each and every offense.

SEC. 66. Harmless Birds.—Any person who takes, catches, kills, ships or causes to be shipped to any person within or without this state, purchases, offers, or exposes for sale, sells, has in possession, has in possession with intent to sell, any harmless bird, either living or dead, or any part thereof, in violation of the terms of section thirty-nine (39) of this chapter, shall be guilty of a misdemeanor, and upon conviction thereof punished by a fine of not less than ten (10) nor more than twenty-five (25) dollars and costs of prosecution, or by imprisonment in the county jail for not less than thirty (30) days, for each and every bird or any part thereof so caught, taken, killed, shipped or caused to be shipped to any person, either within or without this state, purchased or sold to any one, had in possession, had in possession with intent to sell, offered or exposed for sale, or had in possession or under his control. This section shall not be construed to apply to the keeping or selling of parrots or song birds as domestic pets.

Domestic pets.

SEC. 67. General Penalty—Any person who violates any provision of this chapter for which a penalty has not been heretofore specifically provided, shall be guilty of a misdemeanor, and be punished by a fine of not less than ten (10) nor more than fifty (50) dollars and costs of

prosecution, or by imprisonment in the county jail for not less than thirty (30) nor more than sixty (60) days.

SEC. 68.   All acts and parts of acts inconsistent with the provisions of this chapter, are hereby repealed.

SEC. 69.   This act shall take effect and be in force from and after its passage.

Approved April 19, 1905.

---

CHAPTER 345.

S. F. No. 218.

*An act to amend chapter 261 of the General Laws of Minnesota for 1903, entitled "An act abolishing days of grace and fixing the maturity of negotiable instruments and other evidences of indebtedness."*

Days of grace.

Be it enacted by the Legislature of the State of Minnesota:

SECTION 1.   That chapter 261 of the General Laws of Minnesota for 1903, entitled "An act abolishing days of grace and fixing the maturity of negotiable instruments and other evidences of indebtedness, except drafts drawn at sight," be and the same is hereby amended as follows:

That section one (1), of said chapter 261 be and the same is hereby amended to read as follows:

Section 1.   No promissory note, draft, check, acceptance, bill of exchange or other evidence of indebtedness, shall be entitled to days of grace, but the same shall be payable at the time fixed therein without grace.

That section two (2) of said chapter, 261 be and the same is hereby amended so as to read as follows:

Section 2.   All promissory notes, drafts, checks, acceptances, bills of exchange, or other evidences of indebtedness, falling due or maturing on Good Friday, Thanksgiving Day, Sunday, or on any legal holiday, shall be deemed due or maturing on the next succeeding business day; and when Sunday and one or more legal holidays, or two or more legal holidays, fall on the same day, the following day shall be deemed a legal holiday, and when Sunday and one or more legal holidays, or two or more legal holidays, immediately succeed each other, then such instrument, paper or indebtedness shall be deemed as due or maturing on the day following the last of such days.

Maturity of negotiable instruments.




DATE DOWNLOADED: Fri Feb 10 15:29:22 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1917 1197 .

ALWD 7th ed.
, , 1917 1197 .

Chicago 17th ed.
"," Wisconsin - Biennial Session : 1197-1252

AGLC 4th ed.
'' Wisconsin - Biennial Session 1197

OSCOLA 4th ed.
'' 1917 1197

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

1:22-Case423-F90B-AMDocDmentmeNt49t 89Pages-ileX802/1Date FiledeD7/20/2023geID

No. 666, A.] [Published July 16, 1917.

## CHAPTER 668

AN ACT to repeal sections 62.04 to 62.58, inclusive, and sections 4562d, 4567b, and 4567c; to create a new chapter to be numbered 29, and sixty-four new sections thereof, to be numbered 29.01 to 29.63, inclusive; to amend sections 4567d and 4567f; and to create sections 4562d and 172—41, relating to wild animals, and the regulation of the enjoyment, disposition and conservation thereof, prescribing penalties, and creating a conservation fund.

*The people of the State of Wisconsin, represented in Senate and Assembly, do enact as follows:*

SECTION 1. Sections 62.04 to 62.58, inclusive, and sections 4562d, 4567b, and 4567c of the statutes are repealed.

SECTION 2. A new chapter is added to the statutes, to be numbered and entitled as follows: "CHAPTER 29. WILD ANIMALS, AND THE REGULATION OF THE ENJOYMENT, DISPOSITION AND CONSERVATION THEREOF."

SECTION 3. Sixty-four new sections are added to the statutes, to be inserted in chapter 29, and to be numbered and to read:

### TABLE OF CONTENTS

### CHAPTER 29

### WILD ANIMALS, AND THE REGULATION OF THE ENJOYMENT, DISPOSITION AND CONSERVATION THEREOF; GENERAL CONTROL AND REGULATION

29.01  General definitions:
    (1)  Wild animal.
    (2)  Carcass.
    (3)  Game; game fish; rough fish.
    (4)  Waters classified.
    (5)  Hunting.
29.02  Title to wild animals.
29.03  Public nuisances.
29.04  Abandoned dams.
29.05  Police powers; searches; seizures.
    (1)  Arrests.
    (2)  Investigations.
    (3)  Search warrants.

1198          LAWS OF WISCONSIN—Ch. 668.

          (4) Opening packages.
          (5) Access to storage places.
          (6) Seizure and confiscation of game, or game fish.
          (7) Seizure and confiscation of property.
          (8) Entire shipment affected.
          (9) Exemption from liability.
29.06  Sales of confiscated game and apparatus.
29.07  Assistance of police officers.
29.08  Interstate comity.

### GAME LICENSES

29.09  General provisions.
          (1) License requisite.
          (2) Form of application.
          (3) Form of license.
          (4) Duplicates.
          (5) Supply of blanks.
          (6) Licenses issued by county clerks.
          (7) Return of fees by county clerks.
          (8) Record of licenses issued.
29.10  Resident hunting licenses.
29.11  Settlers' hunting licenses.
29.12  Nonresident hunting licenses.
29.13  Trapping licenses.
29.14  Hook and line fishing licenses.
29.15  Other licenses.
29.16  Interstate license privileges.
29.17  Certificates to scientists.

### CLOSE SEASONS

29.18  Close seasons for wild mammals and birds.
29.19  Close seasons for hook and line fishing.
29.195 Close season in Rush lake.
29.20  Close seasons for crawfish and frogs.

### CONSERVATION COMMISSION

29.21  Powers of commission.

### METHODS OF HUNTING AND FISHING

29.22  General restrictions on hunting.
          (1) Prohibited methods.
          (2) Possession of ferrets.
          (3) Guide licenses.
          (4) Guides as special deputies.

29.23   Deer hunting.
          (1) Prohibited methods.
          (2) Dogs in camp.
29.24   Fur-bearing animals; methods of taking.
29.25   Game birds; hunting.
          (1) Prohibited methods.
          (2) Open water defined.
          (3) Live decoys.
          (4) Use of dogs.
29.26   **Prohibited fishing under particular conditions.**
29.27   Prohibited methods of fishing.
          (1) Hook and line fishing; spearing.
          (2) Snag lines.
29.28   Ice fishing.
29.29   Noxious substances.
          (1) Explosives; stupefactives.
          (2) Medicated bait.
          (3) Deleterious substances.

## FISHING WITH NETS AND SET LINES

29.30   Fishing with nets and set lines.
          (1) License required.
          (2) Restrictions on use of nets.
29.31   Dip nets in inland waters.
29.32   Minnow nets.
          (1) Use limited.
          (2) Inland waters.
          (3) Outlying waters.
29.33   Net and set hook fishing in outlying waters.
          (1) License authorized.
          (2) Form of license.
          (3) License period and fees.
          (4) Metal tags.
          (5) Reserve waters.
          (6) Close seasons.
          (7) Prohibited nets.
          (8) Bass, muskellunge and sturgeon.
          (9) Undersize fish.
         (10) Possession, sale, and transportation.
         (11) Penalty.
         (12) Reports.
29.34   Net licenses; Mississippi river waters.
          (1) License authorized.
          (2) Bond.

     (3) License period; nets specified.
     (4) License fees.
     (5) Metal tags.
     (6) Protected fish.
     (7) Reserve waters.
     (8) Temporary ponds; shipments.
     (9) Reports.
29.35  Net licenses; whitefish and cisco in inland lakes.
29.36  Net licenses; rough fish in Winnebago waters.
29.37  Set line licenses; inland waters.

## CLAMMING

29.38  Clamming licenses.

## POSSESSION OF GAME

29.39  Possession during close season, or in excess of bag limits.
29.40  Possession of deer.
     (1) Deer tags.
     (2) Home consumption.
     (3) Heads and skins.
29.41  Skins of fur-bearing animals.
29.42  Possession of game birds.
     (1) Without license.
     (2) Nests and eggs.

## TRANSPORTATION OF GAME

29.43  Transportation; general provisions.
     (1) During close season.
     (2) Trunks, valises.
     (3) Transportation employes.
     (4) Labeling game shipments.
29.44  Interstate transportation.
29.45  Transportation of deer.
29.46  Transportation of game birds.
29.47  Transportation of fish.
     (1) Time limitation.
     (2) From inland waters.
     (3) From outlying waters.
     (4) Shipments from inland points.
     (5) Foreign shipments.
     (6) Injurious fish minnows.

## COMMERCE IN GAME

29.48　Sale of game.
29.49　Serving of game to guests.
　　　(1) Prohibited.
　　　(2) Free lunch.
　　　(3) Penalty.

## PROPAGATION OF WILD ANIMALS

29.50　Propagation privileged.
29.51　State propagation of fish.
　　　(1) State fish hatcheries.
　　　(2) Transplantation of fish.
　　　(3) Delivery of spawn.
　　　(4) Removal of spawn or fish from state.
　　　(5) Unlawful fishing by employes.
29.52　Private fish hatcheries.
29.54　State propagation of wild mammals and birds.
29.55　Wild animals for parks.
29.56　Forest county game refuge.
29.57　Wild life refuges.
　　　(1) Establishment.
　　　(2) Enclosure.
　　　(3) Publication.
　　　(4) Absolute protection.
　　　(5) Animals procured by the commission.

## DESTRUCTION OF INJURIOUS ANIMALS

29.58　Muskrats injuring dams.
29.59　Beaver causing damage.
　　　(1) Complaint.
　　　(2) Supervision.
　　　(3) Disposition of animals.
　　　(4) Sale and disposition of proceeds.
　　　(5) In Price, Rusk and Sawyer counties.
　　　(6) Penalty.
29.595　Deer causing damage.
29.60　Bounties on wolves.
　　　(1) Rate of bounty.
　　　(2) Presentation of claim.
　　　(3) Examination of carcass.
　　　(4) Payment by county.

76—L.

(5) Payment by state.
(6) Return of skin.
(7) Blanks.
(8) Poisoned baits for wolves, wildcats and lynxes.

29.61   Destruction of other injurious animals; rewards.
29.62   Removal of injurious rough fish.

### PENALTIES

29.63   General penalty provisions.
        (1) Penalties.
        (2) "Person" defined.
        (3) Revocation of license.
        (4) Construction of penalty provisions.
        (5) Presumptions.
        (6) Reward to informers.

### GENERAL CONTROL AND REGULATION

29.01   GENERAL DEFINITIONS.  The following terms, wherever used in this chapter, shall be construed to apply as follows:

(1) Wild animal.  "Wild animal" means any mammal, bird, fish, or other creature of a wild nature endowed with sensation and the power of voluntary motion.

(2) Carcass.  "Carcass" means the dead body of any wild animal to which it refers, including the head, hair, skin, plumage, skeleton, or any other part thereof.

(3) Game; game fish; rough fish.  "Game" includes all varieties of mammals or birds for which, at any time of the year anywhere within the state, a close season is prescribed in or pursuant to this chapter; "game fish" includes all varieties of fish except rough fish; and, until the state conservation commission otherwise determines "rough fish" includes chubs, dace, suckers, carp, red horse, sheephead, eelpout, dogfish, garfish, buffalo fish, and lawyers, in all waters, and pickerel in lakes Winnebago, Winneconne, Poygan, Big Butte des Morts, Little Butte des Morts, and in the Fox river in Winnebago county.

(4) Waters classified.  All waters within the jurisdiction of the state are classified as follows:  Lakes Superior and Michigan and the harbors and bays immediately connected therewith, Green Bay, Sturgeon Bay, Sawyer's Harbor, and the Fox river from its mouth up to the dam at De Pere are "outlying waters." All other waters are "inland waters."

(5) Hunting.  "Hunt" or "hunting" includes shooting,

:shooting at, pursuing, taking, catching, or killing of any wild
animal or animals.

29.02   TITLE TO WILD ANIMALS.   (1) The legal title to,
and the custody and protection of, all wild animals within this
state is vested in the state for the purposes of regulating the
enjoyment, use, disposition, and conservation thereof.

(2) The legal title to any such wild animal, or carcass or
part thereof, taken or reduced to possession in violation of this
chapter, remains in the state; and the title to any such wild
animal, or carcass or part thereof, lawfully acquired, is subject
to the condition that upon the violation of any of the provi-
sions of this chapter relating to the possession, use, giving,
sale, barter, or transportation of such wild animal, or carcass
or part thereof, by the holder of such title, the same shall
revert, ipso facto, to the state.   In either case, any such wild
animal, or carcass or part thereof, may be seized forthwith,
wherever found, by the state conservation commission or its
deputies.

29.03   PUBLIC NUISANCES.   The following are declared
public nuisances:

(1) Any net of any kind, or other device, trap, or contriv-
ance for fishing operated without a license or without a metal
tag as required by law; or set, placed, or found in any waters
where the same is prohibited to be used, or in a manner prohib-
ited by law.

(2) Any unlicensed set line, cable, rope, or line, with more
than one fish line attached thereto; or any licensed set line set,
placed, or found in any waters where the same is prohibited to
be used, or in a manner prohibited by law; or any fish line left
in the water unattended, whether having one or more hooks
attached.

(3) Any screen set in public waters to prevent the free pas-
sage of fish, or set in any stream which has been stocked by state
authories.

(4) Any building, enclosure, structure, or shelter placed, oc-
cupied, or used on the ice of any waters in violation of this
chapter.

(5) Any unlicensed trap, snare, spring gun, set gun, net or
other device or contrivance which might entrap, ensnare, or
kill game; or any trap without a metal tag attached as required
by law.

(6) Any boat, together with its machinery, sails, tackle and
equipment, or any lamp, light, gun, pivot gun, swivel gun, or
other firearm used in violation of this chapter; or any boat,

floating raft, box, or blind set in open water and used in hunting game birds.

(7) Any decoys set in any water during the close season for waterfowl, or in excess of the number authorized to be used, or more than two hundred feet from the weeds, rushes, or other vegetation in which the hunter is concealed; and any decoys left in the water unattended.

(8) Any dog found running deer at any time, or used in violation of this chapter.

(9) Any ferret, rat, weasel, or guinea pig in possession or used while hunting.

29.04 (1) ABANDONED DAMS. The state conservation commission may remove or cause to be removed, in such manner as they may deem fit, old and abandoned dams in streams in the state of Wisconsin, upon giving sixty days' notice in writing to the owner thereof, if he can be found. If the owner of such dam be unknown or cannot, by due diligence, be found, the commission shall publish notice once each week for four successive weeks in some newspaper published in the county in which such dam is situated.

(2) Whenever the conservation commission shall determine that the conservation of any species or variety of wild animals will be promoted thereby, the commission is authorized to maintain and repair any dam located wholly upon lands the title to which is in the state either as proprietor or in trust for the people; subject, however, to the powers of the railroad commission to fix the level and regulate the flow of the public waters.

29.05 POLICE POWERS; SEARCHES; SEIZURES. (1) Arrests. The state conservation commission and its deputies are hereby authorized to execute and serve all warrants and processes issued by any justice of the peace or police magistrate or by any court having jurisdiction under any law relating to wild animals, in the same manner as any constable may serve and execute such process; and to arrest, with or without a warrant, any person detected in the actual violation, or whom such officer has reasonable cause to believe guilty of the violation of any of the provisions of this chapter, and to take such person before any court and make proper complaint.

(2) Investigations. Such officers shall, upon receiving notice or information that any provision of this chapter has been violated, as soon as possible make a thorough investigation thereof, and cause proceedings to be instituted if the proofs at hand warrant it.

(3) Search warrants. Upon complaint made to any magis-

trate who has authority to issue warrants in criminal cases, by any person that he knows or has good reason to believe that any wild animal, or carcass or part thereof, caught, taken, killed, or had in possession contrary to the provisions of this chapter, is concealed in any particular house or place, the magistrate shall examine such complainant on oath, reduce his complaint to writing, describing as particularly as may be the place where said wild animal, or carcass or part thereof, is alleged to be concealed, and cause the same to be subscribed by the person complaining. If it appears to the magistrate that there is reasonable cause to believe that the facts alleged in said complaint are true he shall immediately issue his warrant, reciting therein the substance of the complaint and the description of the premises described therein, and requiring the officer to whom it is directed to forthwith search such premises and seize any such wild animal, or carcass or part thereof, and bring the same when found, and the person in whose possession the same is found, before the magistrate who issued the warrant, or before some other magistrate or court having jurisdiction of the case. The officer executing such warrant shall state in his return, as particularly as may be, the property seized, which shall be safely kept under the direction of the court or magistrate so long as necessary for the purpose of being used as evidence on any trial; and if such trial results in a conviction, the property so seized shall be confiscated.

(4) Opening packages. The state conservation commission and its deputies may examine and open any packages in the possession of a common carrier which they suspect or have reason to believe contains contraband wild animals, or carcasses or parts thereof, or is falsely labeled in violation of the provisions of this chapter; and every such common carrier, and every agent, servant, or employe thereof, shall permit any such officer to examine and open any such package. Any package so opened shall be restored to its original condition.

(5) Access to storage places. They shall be permitted by the owner or occupant of any cold storage warehouse or building used for the storage or retention of wild animals, or carcasses or parts thereof, to enter and examine said premises; and the said owner or occupant, or his agent, servant, or employe, shall deliver to any such officer any wild animal, or carcass or part thereof, in his possession during the close season therefor, whether taken within or without the state.

(6) Seizure and confiscation of game, or game fish. They shall seize and confiscate in the name of the state any wild

animal, or carcass or part thereof, caught, killed, taken, had in possession or under control, sold or transported in violation of this chapter; and any such officer may, with or without warrant, open, enter and examine all buildings, camps, vessels or boats in inland or outlying waters, wagons, automobiles or other vehicles, cars, stages, tents, suitcases, valises, packages, and other receptacles and places where he has reason to believe that wild animals, taken or held in violation of this chapter, are to be found; but no dwelling house or sealed railroad cars shall be searched for the above purposes without a warrant.

(7) Seizure and confiscation of property. They shall seize and forthwith confiscate or destroy any apparatus, appliance, or device declared by any provision of this chapter to be a public nuisance; and shall seize and hold subject to the order of the commission, any other apparatus, appliance, or any vehicle, or device, which they shall have reason to believe is being used in violation of this chapter, and if it be proven that the same is, or has been within six months previous to such seizure, used in violation of this chapter the same shall be confiscated.

(8) Entire shipment affected. Confiscation of any part of a shipment under this section shall include the entire shipment.

(9) Exemption from liability. Each commissioner and each deputy conservation warden, in the performance of his official duties, shall be exempt from any and all liability to any person for acts done or permitted or property destroyed by authority of law; and in any action brought against any such commissioner or warden personally, arising from alleged excess of his authority, the taxable costs awarded to either party shall include a reasonable attorney's fee, to be fixed by the court, provided the party has appeared therein by an attorney of a court of record.

29.06 SALES OF CONFISCATED GAME AND APPARATUS. (1) All confiscated wild animals, or carcasses or parts thereof, and all confiscated apparatus, appliances, or devices shall, if not destroyed as authorized by law, be sold at the highest price obtainable, by the state conservation commission or its deputies, or by an agent on commission under the written authority and supervision of the state conservation commission or its deputies. The net proceeds of such sales, after deducting the expense of seizure and sale and any such commissions, shall be promptly remitted by the warden by whom or under whose authority and supervision the sales are made, to the state conservation commission and by it paid into the state treasury; the remittance to be accompanied by a complete and certified

report of such sales, supported by proper vouchers covering all deductions made for expenses and commissions, to be filed for record in the office of the state conservation commission.

(2) On any such sales of wild animals, or carcasses or parts thereof, the warden or agent selling them shall issue to each purchaser a certificate, on forms to be prepared and furnished by the state conservation commission, covering such sales. The animals, or carcasses or parts thereof, so purchased shall be consumed or otherwise disposed of by the purchaser within five days thereafter, but shall not be resold, bartered, or exchanged, in whole or in part, to any other person, except as provided in subsection (3).

(3) Confiscated fish or game sold to the keeper, manager, or steward of any restaurant, club, hotel, or boarding house may be served to the guests thereof; but in such case the certificate covering the purchase shall be hung in public view in the place where the fish or game is served, and such fish or game shall at the time of sale be tagged by the warden or agent selling it, such tag to show the date of sale and be returned to said warden or agent within five days thereafter.

29.07 ASSISTANCE OF POLICE OFFICERS. All sheriffs, deputy sheriffs, coroners, and other police officers are ex officio deputy conservation wardens, and shall assist the state conservation commission and its deputies in the enforcement of this chapter whenever notice of a violation thereof is given to either of them by the commission or its deputies.

29.08 INTERSTATE COMITY. (1) Whenever and so long as any other state confers upon the officers of this state reciprocal powers, any officer of such other state, who is by the laws of said state authorized or directed to enforce the laws of said state relating to the protection of wild animals, is hereby designated an agent of said state within this state. It shall be lawful for said officer to follow any wild animal, or carcass or part thereof unlawfully shipped or taken from his state into this state, seize and convey the same back to his own state; and so far as concerns any such wild animal, or carcass or part thereof, the laws of the state from which the same was brought into this state are hereby adopted as the laws of this state. Transportation companies shall deliver to such officer, upon submission of proper proof of his official capacity, any wild animal, or carcass or part thereof, so demanded or seized by him. Said officer may dispose of any such wild animal, or carcass or part thereof, within this state, in accordance with the laws of the state from which the same was taken or shipped, under the

supervision of any conservation commissioner or deputy con-
servation warden of this state, whose expenses for his assistance
shall be a lien upon such wild animal or carcass or part thereof,
or the proceeds thereof.

(2) Except as provided in subsection (1), the state conserva-
tion commission or its deputies shall seize, hold and dispose, ac-
cording to the laws of this state, of any wild animal, or carcass
or part thereof, brought or shipped into or through this state,
or attempted to be carried through this state, in violation of
the laws of any other state.

(3) The state game warden of every other state, and his
deputies and all other officers therein charged with the enforce-
ment of the laws relating to wild animals are hereby designated
agents of this state for the taking possession, seizing, holding
and disposing, within such state, of any wild animal, or car-
cass or part thereof, protected by the laws of this state.

(4) Whenever and so long as any other state confers upon
the officers of this state reciprocal powers, the state conserva-
tion commission is hereby authorized to appoint persons who
shall have been appointed game wardens or deputy game war-
dens of such other state to act as and have all the powers of
deputy conservation wardens of this state, but without com-
pensation from this state.

## GAME LICENSES

29.09  GENERAL PROVISIONS.  (1) Hunting, trapping
or fishing without a license prohibited.  Except as expressly
provided, no person shall hunt, trap or fish any game or game
fish unless a license therefor has been duly issued to him which
shall be carried on his person at the time and shall be exhibited
to the state conservation commission or its deputies on demand.
Such licenses shall be issued only to persons, and not more than
one of the same series to the same person in any year.  No li-
censee shall transfer his license or deer tag to or permit the
use thereof by any other person, nor shall any person while
hunting, trapping or fishing use or carry any license, or guide's
badge, issued to another.  No hunting license shall be issued to
any person who is less than fifteen years of age; nor to any per-
son who is not a citizen of the United States, except as provided
in section 29.11.  Indians hunting, fishing or trapping off Indian
reservation lands are subject to all provisions of this chapter.

(2) Form of application.  The application for such license
shall state the residence and post-office address of the applicant,
a description of his person, and such other facts, showing him

to be entitled to the license for which he applies, as may be required by the commission, and shall be verified by the affidavit of the applicant; but no written or verified application shall be required for any hook and line fishing license. Each such application shall be accompanied by the license fee prescribed for the license applied for.

(3) Form of license. Each license shall state for what year the same is issued and the date of expiration, and except as otherwise provided shall be effective only from the first day of May until the next succeeding thirtieth day of April, subject to the conditions, limitations and restrictions prescribed in this chapter. Each license issued shall further **state the name and** residence of the licensee, a description of his person, and such other matter as may be determined by the commission; shall bear upon its face a true signature of the licensee; and shall be signed by the officer who issues it.

(4) Duplicates. Whenever any such license is lost the person to whom the same was issued may present to the commission an affidavit proving such loss, together with a fee of fifty cents, whereupon the latter shall issue a duplicate license to such person.

(5) Supply of blanks. The commission **shall prepare, pro**cure the printing of, and supply all necessary blanks for such licenses and applications. The licenses shall be numbered consecutively, at the time of printing, in a separate series for each kind of license; and each license blank shall be provided with a corresponding stub numbered with the serial number of the license. Each requisition for the printing of such license blanks shall specify the serial numbers thereof.

(6) Licenses issued by county clerk. Of each license issued by a county clerk he shall retain the stub for record in his office. He shall also keep an alphabetical index of the names of all persons to whom he issues licenses, such names to be entered therein at the time the licenses are issued. The state conservation commission or its deputies may at any time examine such records.

(7) Return of fees by county clerk. Of the fees paid for such licenses the county clerk may retain ten per cent as compensation for his services to the state; the remainder he shall return to the state conservation commission on the first day of each month, with a report of the number of licenses issued by him during the preceding month and the amount of money thus remitted. All stubs of licenses issued and all unused license blanks shall be returned by the county clerk to the commission at the close of the year for which they are supplied.

(8) Record of licenses issued. A complete record of all licenses issued shall be kept by the commission, which shall also be accountable for all unused license blanks.

29.10  RESIDENT HUNTING LICENSES. Resident hunting licenses shall be issued subject to the provisions of section 29.09, by the county clerks of the several counties upon blanks supplied to them by the state conservation commission, to residents of each such county duly applying therefor who have resided in this state for at least one year next preceding the application. The fee for each such license is one dollar. Such license does not grant the privilege of hunting deer unless the licensee is in possession of a deer tag numbered to correspond with his license, which shall be issued to him by the state conservation commission on application and the payment of an additional fee of ten cents. The commission may cause such tags to be issued through agents, but no commission to be allowed for the sale of such tags.

29.11  SETTLERS' HUNTING LICENSES. Settlers' hunting licenses subject to the provisions of section 29.09 may be issued by the state conservation commission in its discretion, to actual settlers in this state duly applying therefor who have resided in this state less than one year next preceding the application. A bona fide settler shall be a person who has either purchased or rented, or has negotiations in progress to purchase or rent residence property in Wisconsin and who has moved to and settled in this state. Such licenses shall be in substantially the same form, subject to the same conditions and restrictions, and entitle the holder to the same rights, privileges and immunities as a resident hunting license. No nonresident hunting license shall be issued in the same year to any person to whom a settlers' hunting license has been issued, and no settlers' hunting license to any holder of a nonresident hunting license.

29.12  NONRESIDENT HUNTING LICENSES. (1) Nonresident hunting licenses shall be either general or limited, and shall be issued by the state conservation commission, subject to the provisions of section 29.09, to persons duly applying therefor who are not residents of this state or who have resided therein less than one year next preceding the application. The fee for each such general license is fifty dollars, and for each such limited license twenty-five dollars.

(2) Each such general license shall extend to the hunting of all wild animals during the open season therefor, respectively, and shall be accompanied by a deer tag, numbered to correspond with the license and to be supplied without additional fee.

(3) Each such limited license shall extend to the hunting of all wild animals during the open season therefor, respectively, except deer. The holder of such limited license may at any time before its expiration surrender the same for cancellation, and in lieu thereof, upon payment of an additional fee of twenty-five dollars, the commission shall issue to him a general license as prescribed in subsection (2).

29.13 TRAPPING LICENSES. (1) Trapping licenses, which shall authorize the use of traps for trapping fishers, martens, minks, muskrats, raccoons, and skunks, shall be issued by the state conservation commission, subject to the provisions of section 29.09, to persons duly applying therefor who have resided in this state for at least one year next preceding the application. The fee for each such license is one dollar.

(2) All shipments of hides must be marked showing the number and kinds of hides in the package, the name and address of the shipper, and the number of his trapping license.

(3) On or before June first next after the expiration of his license, such licensee shall report to the state conservation commission, by affidavit, on blanks furnished by the commission, the number of his license, the number and value of each variety of animals taken, and such other information as may be required on the blanks furnished.

29.14 HOOK AND LINE FISHING LICENSES. (1) Any person, other than nonresident males over the age of sixteen years, may without a license take, catch or kill with hook and line fish of any variety, subject to all other conditions, limitations and restrictions prescribed in this chapter.

(2) Any male nonresident over the age of sixteen years shall have the rights of a resident to take, catch or kill fish of any variety with hook and line in outlying waters; but not in inland waters unless a license has been duly issued to him, subject to the provisions of section 29.09, by the state conservation commission. Each such license shall be provided with three coupons each of which shall entitle the licensee to make one shipment of game fish as provided in section 29.47, but no more. One coupon shall be attached to each shipment so made. The agent of any common carrier who shall accept any such shipment without a coupon attached shall be guilty of a violation of this chapter and shall be punished by a fine of not less than twenty-five dollars nor more than fifty dollars. The fee for each such license is one dollar. The commission may cause such licenses to be issued through agents for a compensation of ten per cent of the license fees collected therefor; but no such

compensation shall be paid to any of its regular deputies or other employes.

29.15   OTHER LICENSES.   Guiding licenses, net and set line licenses, and clamming licenses, shall be issued by the state conservation commission as provided in subsection (3) of section 29.22 and sections 29.33, 29.34, 29.35, 29.36, 29.37 and 29.38, respectively.

29.16   INTERSTATE   LICENSE   PRIVILEGES.   Whenever and so long as the states of Minnesota or Iowa confer upon the licensees of this state reciprocal rights, privileges and immunities, any hook and line or other fishing license, or clamming license issued by such other state shall entitle the licensee to all the rights, privileges and immunities, in and upon the boundary waters between such state and this state, enjoyed by the holders of equivalent licenses issued by this state; subject, however, **to** the duties, responsibilities and liabilities imposed on **its own** licensees by the laws of this state.

29.17 CERTIFICATES TO SCIENTISTS.   (1) The state conservation commission may grant, on satisfactory testimonials of well-known scientists only, a certificate to any member of an incorporated society of natural history, or to any professor of any university, school or college, or to any person properly accredited by any such institution, or to any custodian of a public museum, authorizing such person or institution to collect for scientific purposes only, any nests, eggs, or wild animals, except deer.   Such specimens may be transported by any common carrier; but no person to whom such certificate is issued   shall dispose of any such specimen except in exchange for scientific purposes.   All such certificates shall expire on the first day of January following the date of their issue, and shall not be transferable.

(2) The application for such certificate shall be made upon blanks to be furnished by the state conservation commission, shall be accompanied by a fee of two dollars, and the applicant shall execute and deliver to the state conservation commission a bond running to the state of Wisconsin, in the sum of one hundred dollars, with two sureties, and conditioned that if the applicant shall well and faithfully observe and comply with all the requirements of this section, and the certificate issued thereunder, said obligation to be null and void, otherwise to remain in full force.   Each said surety shall be worth and qualify in at least the sum of one hundred dollars, over and above all his debts and liabilities, in property within this state not exempt from sale on execution.

(3) The certificate of any person convicted of a violation of this section shall be forfeited and revoked, and such convicted person shall not be entitled to another certificate for the period of one year from and after the date of such conviction.

## CLOSE SEASONS

29.18   CLOSE SEASONS FOR WILD MAMMALS AND BIRDS. A close season is established for each variety of wild animals and birds listed in the following table, extending during all the time in each year except the period embraced within the dates, both inclusive, set opposite the name of each variety or each locality, respectively, in the column headed "Open Season"; and, except as expressly provided in this chapter, no person shall hunt or trap any such wild mammal or bird at any time other than the open season therefor, nor in the open season in excess of the number designated opposite each variety or each locality, respectively, in the column headed "Bag Limit," nor wild birds of more than one variety except a mixed bag limit of twenty each day in the open season, but containing not more than the bag limit of any one variety. Wild ducks and American coots or mudhens shall be deemed, collectively, as one variety:

| Kind of Animal and Locality | Open Season | Bag Limit |
| --- | --- | --- |
| (1) Moose, elk | None | |
| (2) Deer: | | |
| (a) Any deer in the velvet, or in the red or blue coat, in any county | None | |
| (b) Any deer in the counties of Adams, Brown, Buffalo, Calumet, Columbia. Crawford. Dane, Dodge, Door. Dunn. Fond du Lac, Grant, Green, Green Lake, Iowa, Jefferson, Juneau. Kenosha, Kewaunee. La Crosse, Lafayette, Manitowoc, Marquette, Milwaukee, Monroe, Outagamie, Ozaukee, Pepin, Portage. Racine, Richland, Rock. Sauk, Sheboygan. Vernon, Walworth, Washington, Waukesha, Waupaca, Waushara, and Winnebago | None | |
| (c) Any deer not specified in paragraph (a) in any county not specified in paragraph (b) | Nov. 21 to Nov. 30. | One each year |
| (3) Bear | Nov. 10 to Dec. 1 | No limit |
| (4) Beaver, otter. | None | |
| (a) Beaver in Price Rusk. and Sawyer counties as stipulated in subsection (5) of section 29.59 | Dec. 1 to Dec. 31. 1917 & 1918 | No limit |
| (5) Fisher, marten, mink, skunk | Nov. 15 to Feb. 1 | No limit |
| (6) Muskrat: | | |
| (a) In the counties of Polk, Barron, Rusk, Price, Lincoln. Langlade, Forest, Marinette. Florence, Iron, Oneida, Vilas, Ashland. Washburn, Sawyer, Burnett. Douglas, Bayfield. | Oct. 25 to April 20 | No limit |
| (b) In any other place | Oct 25 to April 10. | No limit |

1214 LAWS OF WISCONSIN—Ch. 668.

| Kind of Animal and Locality | Open Season | Bag Limit |
|---|---|---|
| (7) Raccoon. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Oct. 15 to Jan. 1.... | Five each day |
| (8) Squirrels of any variety.... . . . . . . . . . | Oct. 15 to Jan. 1.... | Five each day |
| (a) In Dodge, Keno-ha, Racine, Wauke-sha, Washington, Ozaukee, Wil-waukee counties . . . . . . . . . . . . . . . . . . | None.... . . . . . . . | . . . . . . . . . . . . . . . . |
| (9) Rabbit: | | |
| (a) In Columbia, Crawford, Door, Grant, Iowa, Jackson, Juneau, Monroe, Outagamie, Pierce, Polk, Richland, Rusk, Sauk, Sawyer, Sheboygan, and Winnebago counties . . . . . . . . | All year . . . . . . . . . | No limit |
| (am) In Dane county . . . . . . . . . . . . . . . | Oct. 1 to Mar. 1 .... | No limit |
| (b) In Dodge, Jefferson, Kenosha, Ozau-kee, Racine, Walworth, Washing-ton, and Waukesha counties . . . . . . . | Nov. 1 to Jan. 1.... | Five each day |
| (c) In Clark, Green and Wood counties.. | Oct. 15 to Feb 1.... | Ten each day |
| (d) In any other place . . . . . . . . . . . . . . . | Sept. 7 to Feb. 1.... | No limit |
| (10) Wild swan. . . . . . . . . . . . . . . . . . . . . . . . . | None . . . . . . . . . . . . . | . . . . . . . . . . . . . . . . . . |
| (11) Wild goose, brant. . . . . . . . . . . . . . . . . . . | Sept. 7 to Dec. 20 .. | Ten each day |
| (12) Wild duck, including American coot or mudhen, but excepting wood duck . . . . . | Sept. 7 to Dec. 10 .. | Fifteen each day |
| (13) Wood duck, wood cock. . . . . . . . . . . . . . . | None. . . . . . . . . . . . . . | . . . . . . . . . . . . . . . . |
| (14) Plover, snipe, rail, rice hen . . . . . . . . . . | Sept. 7 to Dec 20.. | Fifteen each day |
| (15) Partridge or ruffed grouse, spruce hen.... | None until Oct. 1 to Nov. 1, 1919.... | Five each day |
| (16) Prairie chicken or pinnated grouse, sharp-tailed grouse . . . . . . . . . . . . . . . . . . . . . . . . | None until Sept. 7 to Oct. 1, 1919 ..... | Five each day |
| (17) Mongolian, Chinese, or English pheasant, Hungarian partridge . . . . . . . . . . . . . . | None . . . . . . . . . . . . . . | . . . . . . . . . . . . . . . . . . |
| (18) Quail or bobwhite . . . . . . . . . . . . . . . . . . . . | None . . . . . . . . . . . . . . | . . . . . . . . . . . . . . . . . . |
| (19) Crows, English sparrows, blackbirds, sharp-shinned hawks, Cooper's hawks, great horned owls . . . . . . . . . . . . . . . . | All year . . . . . . . . . . | No limit |
| (20) Song birds, and all other wild birds not specified above . . . . . . . . . . . . . . . . . . | None . . . . . . . . . . . . . . | . . . . . . . . . . . . . . . . . . |

(Penalty $50.00-$100.00 plus $5.00 for each bird.)

29.19 CLOSE SEASONS FOR HOOK AND LINE FISH-ING. A close season is established for each variety of fish listed in the following table, extending during all the time in each year except the period embraced within the dates, both inclusive, set opposite the name of each variety of each locality, respectively, in the column headed "Open Season"; and, except as expressly provided in this chapter, no person shall take, capture, or kill fish of any such variety with hook and line at any time other than the open season therefor, nor in the open season in excess of the quantity; or under the minimum length for each fish, designated opposite each variety or each locality, respectively, in the columns headed "Bag Limit". Such meas-urement of length shall be taken in a straight line from the tip of the nose to the utmost end of the tail fin.

| Kind of Fish and Locality | Open Season | Bag Limit | |
|---|---|---|---|
| | | Quantity | Minimum length |
| (1) Large and small mouthed black bass. Oswego bass. green bass, and yellow bass. In Big Green Lake, Green Lake county...... ...... | July 1 to Mar. 1 | Ten each day........ | 10 inches |
| (1a) In all other waters large and small mouthed black bass .. | June 15 to Mar. 1 | Ten each day... .... | 10 inches |
| (1b) In all other waters Oswego bass, green bass and yellow bass.................. | May 29 to Mar. 1 | Ten each day........ | 10 inches |
| (2) White bass: | | | |
| (a) In the Big Wolf river from Lake Poygan to New London. .......... | All the year...... | No limit. ........... | 7 inches |
| (b) In all other waters ...... | May 29 to Mar. 1 | No limit ............. | 7 inches |
| (3) Strawberry bass, calico bass, silver bass, crappie, rockbass | All year........... | No limit ............ | No limit |
| (3m) Rock bass: | | | |
| (a) In Green Lake county... | All year........... | | |
| (b) In all other inland and outlying waters....... | May 29 to Mar. 1 | Thirty each day.... | 6 inches |
| (4) Trout of any variety, except lake trout, in all waters..... | May 1 to Aug. 31 | Thirty-five each day | 7 inches . |
| (5) Pike of any variety........... | May 29 to Mar. 1 | Ten each day........ | 13 inches |
| (6) Pickerel ................... | May 29 to Mar. 1 | Fifteen each day .... | 16 inches |
| (7) Muskellunge ............... | May 29 to Mar. 1 | Two each day........ | 24 inches |
| (8) Sturgeon. and the spawn, eggs and fry thereof ........ ..... | None............. | | |
| (9) Catfish.................... | May 29 to Mar. 1 | Ten each day........ | 15 inches |
| (a) On Mississippi river.... | May 29 to Mar. 1 | No limit ........... | 15 inches |
| (10) Bullhead.................... | All year .......... | 30 lbs. each day..... | No limit |
| (11) Perch: | | | |
| (a) In counties bordering on the Mississippi river and in Lakes Winnebago. Butte des Morts and Poygan, Fox river and Wolf river and tributary streams within Winnebago county..... | May 29 to Mar. 1 | No limit ............. | No limit |
| (b) In all other waters...... | All year ..... .... | No limit............. | No limit |
| (12) Sunfish: roach: | | | |
| (a) In counties bordering on the Mississippi river... | May 29 to Mar. 1 | No limit............. | No limit |
| (b) In all other waters...... | All year........... | No limit............... | No limit |

(Penalty $50.00–$100.00.)

There shall be no close season for hook and line fishing, except for large and small mouthed black bass, sturgeon and trout, in any of the following described waters: In the waters of Juneau, Lafayette, and Green counties, except in the Wisconsin river between Juneau and Adams in the waters of lakes Winnebago in Fond du Lac, Calumet and Winnebago counties, in Buffalo lake, Marquette county, in Puckaway lake in Marquette and Green Lake counties, in Lake Poygan in Winnebago and Waushara counties in lakes Winneconne, Big and

Little Butte des Morts in Winnebago county, in the Fox river in Marquette, Green Lake, Waushara and Winnebago counties, in the Wolf river in Winnebago county and in Waupaca county as far as the city limits of New London, in the Rock and Crawfish rivers and Lake Koshkonong in Rock, Jefferson and Dodge counties. During the period from March 1 to May 28, both dates inclusive, live or dead minnows shall not be used for bait in any of the above waters specified in Jefferson county. ·The open season for hook and line fishing in the waters of the Mississippi river, except for large and small mouthed black bass, shall open on May 1.

29.195 There shall be no closed season except from the first day of March to the succeeding twentieth day of May for any fish, except trout, in Rush lake or in the streams flowing into said lake, situate in Fond du Lac and Winnebago counties, and fish therein may be taken in any manner, except with explosives, during the open season, except trout; provided, that no person shall have more than fifty pounds of such fish, taken from said Rush lake or said streams flowing into said lake, in his possession or under his control in any one day.

29.20 CLOSE SEASON FOR CRAWFISH AND FROGS. No person shall take, catch, or kill, in any waters of this state, or have in possession, any crawfish or crab of any variety between the first day of March and the next succeeding first day of July; or any frog from March 1 to May 1 of each year; but nothing in this section shall prevent any person from having frogs in his possession who is in the business of propagating frogs, or where the same are used for scientific or educational purposes.

## CONSERVATION COMMISSION

29.21 POWERS OF COMMISSION. (1) The state conservation commission shall have power to issue orders determining in what manner, in what numbers, in what places and at what times the taking, catching, or killing of wild animals shall be inconsistent with the proper protection, propagation and conservation of fish, birds or mammals protected by law in this state, and the perpetuation of wild life. No such order providing protection or additional protection to any such wild animals shall be issued except upon petition filed with said commissioners, and after hearing thereon as hereinafter provided.

(2) Ten or more persons of any township or twenty-five or

more persons of any county, may file with the state conservation commission a petition signed with their names and addresses, requesting the granting of protection or additional protection within such county, to one or more species of wild animals designated in said petition. And such petition shall state the extent such protection or additional protection is desired and the grounds therefor. If after hearing the petitioners, the conservation commission shall determine to entertain the petition it shall order a public hearing to be held thereon within the town or county described in the petition, within twenty days from the filing of said petition. At least ten days prior to such public hearing notice thereof containing a brief statement of the grounds upon which application is made therefor, and the time and place of hearing shall be published in a newspaper having a general circulation in the district to be affected, and a copy of such notice shall be mailed to each petitioner, at the address given in the petition.

(3) If upon such hearing the conservation commission find and determine that the protection or additional protection requested, is necessary for the proper protection, propagation and conservation of the designated wild animals within the designated territory, the commission shall issue an order prohibiting or regulating during the open season therefor, the taking of any or all species of fish, birds or mammals within such territory. At least thirty days before the date fixed for such order to take effect, copies of the same should be filed in the office of the clerk for each county containing a district or any part of a district in which such order or regulation shall apply, and cause the same to be published in a newspaper having general circulation in the town, county or district in which such regulation shall apply, or to cause the same to be published by means of at least five large notices posted in or near public buildings or on the highways within said territory, and when the territory affected is less than a township in area, in conspicuous places on the boundaries thereof.

(4) Any order issued by the state conservation commission pursuant to this section shall have the force of law, and the penalties prescribed for violations of the provisions of this chapter shall follow and be applicable to violations of any such order, to the same effect and extent, respectively, as though such order had been enacted a part of this chapter.

77—L.

## METHODS OF HUNTING AND FISHING

**29.22 GENERAL RESTRICTIONS ON HUNTING. (1)** Prohibited methods. No person shall hunt game with any means other than the use of a gun held at arm's length and discharged from the shoulder; or place, spread or set any net, pitfall, snare, spring gun, pivot gun, swivel gun, or other similar contrivance for the purpose of catching, or which might catch, take or ensnare game; or use or have in his possession or under his control any ferret, rat, weasel, or guinea pig while hunting; and no person shall carry with him in any vehicle, any gun or rifle unless the same is unloaded, and knocked down or enclosed within a carrying case. No person while hunting or in possession of firearms shall have in possession or under control any light used for the purpose of shining deer.

(2) Possession of ferrets. No person shall have in his possession or under his control at any time any ferret unless a permit therefor has been issued to him by the state conservation commission; but such permit shall not authorize the use of any ferret for hunting game except in Door county.

(3) Guide licenses. No person shall engage, or be employed, for any compensation or reward, to guide, direct, or assist any other person in hunting, trapping, or fishing unless a license therefor, subject to the provisions of section 29.09, has been duly issued to him by the state conservation commission. The fee for each such license is one dollar. The applicant shall deliver to the state conservation commission a bond running to the state of Wisconsin, in the sum of two hundred dollars, with two sureties, and conditioned that if the applicant shall well and faithfully observe and comply with all the requirements of this chapter, and the guide license issued thereunder, said obligation shall be null and void, otherwise to remain in full force. But this subsection does not apply to the employment of labor by, or services rendered to, the licensee of any net fishing license.

(4) Guides as special deputies. Each licensed guide may be a special deputy conservation warden, appointed by the commission and shall execute the same oath of office and bond as required by regularly salaried wardens. Licensed guides may be employed for temporary service as a regular deputy conservation warden, for any period not exceeding fifty days in any one year, at a compensation to be fixed by the commission.

**29.23 DEER HUNTING. (1)** Prohibited methods. No

person shall hunt deer between one hour after sunset and one hour before sunrise, of the following morning; or in the water or on the ice of any stream, lake, or pond; or with a dog or dogs; or with the aid of artificial light; nor place any salt in any place for the purpose of enticing deer thereto, or construct, occupy, or use any elevated scaffold or other device for the purpose of hunting, watching for, or killing deer.

(2) Dogs in camps. During the period from November 10 to December 10, in the counties where there is an open season for deer, no person shall hunt any wild animal with a dog or dogs; nor have a dog or dogs in his possession or under his control in or about a hunting or logging camp, unless a permit therefor has been issued to him by the state conservation commission.

29.24 FUR-BEARING ANIMALS; METHODS OF TAK-ING. (1) No person shall hunt any fisher, marten, mink, or muskrat with the aid of any spear, gun, or dog, disturb or molest any raccoon den or tree for the purpose of capturing the raccoons, or any muskrat house, beaver house or beaver dam; or set any trap or traps at any time within five hundred feet of any beaver house or beaver dam.

(2) The owner or occupant of any land, and any member of his family may without license hunt thereon rabbits at any time, and squirrels during the open season therefor.

(3) Except as provided in subsection (2), no person shall have in his possession or under his control, or use, for hunting rabbits, any ferret, snare, trap, or any device or contrivance designed or used for the purpose of driving rabbits out of their holes or dens. The owner or occupant or any person upon written request of the owner or occupant of any land in the county of Door may use a ferret thereon for hunting rabbits.

29.25 GAME BIRDS; HUNTING. (1) Prohibited methods. No person shall hunt any game bird between sunset and thirty minutes before sunrise of the following morning; or by shooting it or at it from any boat, canoe, raft, blind, contrivance or device in open water, or from any boat or craft other than such as are propelled by paddle, oars, or pole or with the use of more than fifty decoys within, or any decoys beyond, two hundred feet from the blind or covering in which the hunter is located, or with any decoys left in the water unattended; or any game bird other than wild geese and brant with the use of a rifle.

(2) Open water defined. Open water is any water outside

or beyond a natural growth of vegetation extending over the water surface, and of such height as to offer partial or whole concealment for the hunter.

(3) Live decoys. The set of twenty-five decoys allowed for each hunter used on the water in hunting game birds may include not more than five live decoys; but each such live decoy so used shall be provided with a registration tag, which shall be issued by the state conservation commission to any holder of a hunting license on payment of a fee of ten cents for each tag.

(4) Use of dogs. No person carrying or being in possession of a gun shall run or use a dog or dogs in the field, or upon lands frequented by game birds or upon which game birds may be found, between the first day of August and the seventh day of September in each year.

29.26 PROHIBITED FISHING UNDER PARTICULAR CONDITIONS. No person shall take, capture, or kill fish of any variety, during the close season for trout, in streams and creeks containing trout; or at any time in or from any spring hole or artificial well connected with any of the waters of this state; or by means of shutting or drawing off water for that purpose; nor shall any person take, capture or kill fish within two hundred feet of any fishway, lock or dam otherwise than with a hook and line. No fish of any variety shall be taken in any manner within five hundred feet below any fishway, lock or dam in the counties of Burnett, Washburn, Sawyer, Oneida, Florence, Vilas, Iron, Ashland, Bayfield, Douglas, and north of townships number 35 in Price and Forest counties, and within three hundred feet above and five hundred feet below the dam at Kilbourn on the Wisconsin river. No person shall take or catch fish from a boat or float in Flites pond on the Big Rush O'Cree creek in the town of Plainfield, Waushara county.

29.27 PROHIBITED METHODS OF FISHING. (1) Hook and line fishing; spearing. No person shall take, catch, kill, or fish for fish of any variety with more than three lines, or with any line equipped with more than two hooks or one trolling spoon or artificial bait, or with more than such number of lines and hooks left in the water unattended, unless a license for a set line shall be procured therefor; or any game fish by any means other than angling or trolling, except as provided in subsection (2) of section 29.28 and section 29.30; nor shall any person use a spear for the purpose of taking, catching or killing any rough fish at any time in nonnavigable waters con-

taining trout, or during the close season for trout in navigable waters containing trout, or at any time in Lake Mason, commonly known as Briggsville pond, or the inlet, outlet or marshes adjacent to the same, or in Pine lake, in the town of Hancock, and Fish lake, in the towns of Hancock and Deerfield, Waushara county, or in the Chain of Lakes, in Mirror or Shadow lakes, in the towns of Farmington, Dayton, Waupaca, and the city of Waupaca, Waupaca county, or in Devil's lake, Sauk county, or in the waters known as Koenig's mill pond, situated in sections seven, eight, seventeen and eighteen of township nine north, of range six east, town of Prairie du Sac, or in the nighttime in any other inland waters.

(2) Snag lines. No person shall set, place, use, have, or control any snag line or snag pole, meaning any line, cable, or pole to which a number of fishhooks or clusters of fishhooks of any kind or description are attached, and designated to be placed in or drawn through the water for the purpose of catching or drawing such hooks into the body of fish. Violations of this subsection shall be punished by a fine of not less than one hundred nor more than two hundred dollars, or by imprisonment in the county jail not less than six months nor more than nine months, or by both such fine and imprisonment.

29.28  ICE FISHING.  (1) No person shall take, catch, or kill fish of any variety through the ice on Silver lake, situated within the city limits of Portage, Columbia county; Pine lake, town of Hancock, and Fish lake, towns of Hancock and Deerfield, and the mill pond in the village of Wautoma, Waushara county; Lake Nocquebay in Marinette county; Lake Mason, commonly known as Briggsville pond, in the counties of Adams and Marquette; Shell lake, Washburn county; Chain of Lakes in townships thirty-seven and thirty-eight north, of range twelve west, in Washburn county; Spring lake and the upper mill lake in the village and town of Palmyra, Jefferson county; Big Slough in Lewiston, Columbia county; Devil's lake and Mears lake, and tributary streams; the waters known as Koenig's mill pond, in sections seven, eight, seventeen and eighteen of township nine north, of range six east, town of Prairie du Sac, and Mirror lake, in Sauk county; Twin lakes, in the town of Lincoln, Polk county; any lake in the counties of Langlade, Portage, Marquette, except in Buffalo lake, and Shawano.  The bag limit for cisco in any lake in Waukesha county shall be twenty-five each day, except in Pine lake where there shall be no bag limit.

(2) Spears may be used for spearing pickerel through the

ice of the Mississippi river, Lake Pepin, Lake St. Croix, and the lakes, bays, bayous and sloughs tributary thereto and connected therewith.

(3) Fish shanties or shelters may be used on the ice of the Mississippi river, Lake Geneva in Walworth county, Lakes Winnebago, Winneconne, Big and Little Butte des Morts, and Poygan; Beaver Dam lake; the Fox river in Brown county; the Oconto river within the limits of the city of Oconto; all lakes in Waukesha county, except Phantom and Howitt's lakes; and where there is not less than fifty feet of water in Big Green lake. Wind shields may be used on the ice of Mendota, Monona, Waubesa and Kegonsa lakes in Dane county.

29.29  NOXIOUS SUBSTANCES.  (1) Explosives; stupefactives.  No person shall take, capture or kill fish of any variety in any waters of this state by means of dynamite or other explosives or poisonous or stupefying substances; or place in any waters of this state explosives which might cause the destruction of fish, except for the purpose of raising dead bodies whenever ordered by the public authorities, or for the purpose of clearing a channel or breaking a log jam; or have in his possession or under his control, upon any inland waters, any dynamite or other explosives for the purpose of taking, catching or killing fish.  Violations of this subsection shall be punished by a fine of not less than two hundred nor more than five hundred dollars, or by imprisonment in the county jail not less than nine months nor more than one year, or by both such fine and imprisonment.

(2) Medicated bait.  No person shall use, set, lay or prepare in any of the waters of this state any lime, poison, medicated bait, fish berries, or any other substance deleterious to fish life or which might attract fish in unusual numbers; but the feeding of cisco with oatmeal for the purpose of catching such fish with hook and line through the ice, is lawful.

(3) Deleterious substances.  No person shall cast, deposit, or throw overboard from any boat, vessel or other craft into any waters within the jurisdiction of the state, or deposit or leave upon the ice thereof until it melts, any fish offal; or throw or deposit, or permit to be thrown or deposited, into any waters within the jurisdiction of the state any lime, tanbark, ship ballast, stone, sand, slabs, decayed wood, sawdust, sawmill refuse, planing mill shavings, or any acids or chemicals or waste or refuse arising from the manufacture of any article of commerce, or any other substance deleterious to fish life other than authorized drainage and sewage from municipalities.

FISHING WITH NETS AND SET LINES

29.30  FISHING WITH NETS AND SET LINES.  (1) License required.  Nets and set lines may be used for the purpose of taking, catching, or killing rough fish and game fish, subject to the conditions, limitations and restrictions prescribed in this chapter; but no person shall set, place or use in any waters of this state any net, trap, snare, set hook, or set line, which is intended to or might take, catch or kill fish of any variety, other than a landing net, dip net, minnow seine or minnow dip net, unless a license therefor has been duly issued to such person.

(2) Restrictions on the use of licensed nets and set lines. The use of licensed nets and set lines is subject, further, to the following conditions:

(a) No apron or other device shall be used in any pound net, which might prevent the escape of small fish through the meshes of the net when it is set or raised.

(b) No net of any kind shall be set so as to shut off more than one-half of any channel or passageway of any stream, or set within one thousand feet of any other net in said stream.

(c) No licensee shall join his net to that of any other licensee.

(d) At each end of every licensed net or set line, when set in any waters. shall be placed and maintained a white flag of not less than sixteen inches square, with the upper end of the staff extending at least two feet above the water, and numbered with figures at least three inches in height corresponding with the number of the license authorizing the use of such net or set line.

(e) The licensees of licensed nets or set lines used in outlying waters shall, on their boats, carry the state conservation commission, or its deputies, to and from their nets or set lines when set and, on demand of such officer, shall raise the same for his inspection; and any such officer is authorized, in the presence or absence of the licensee. at any time, to raise any set line in any waters, with as little damage as may be, for inspection. If any such licensee shall refuse to carry any such officer as herein provided his license shall be revoked and cancelled.

(f) No license net shall be drawn or lifted at any time between one hour after sunset and sunrise of the following morning, in any waters other than Lake Superior, Lake Michigan, Green Bay, the Fox river beyond a distance of 500 feet below the dam at De Pere, and Sturgeon Bay.

(g) No fish of any kind shall be taken or retained in any net, when drawn or lifted, other than the kind or kinds expressly authorized to be taken or retained in such net, as provided in this chapter; and except as provided in paragraph (h) any such other kind or kinds of fish coming into or taken in such nets shall be immediately returned, carefully and with as little injury as possible, to the waters from which they were taken.

(h) All rough fish taken in net in inland water shall be brought to shore and buried, sold, or otherwise lawfully disposed of; but none of such fish shall be returned to any waters of this state.

(i) Whenever the size of mesh of any net is specified in this chapter it shall be the size of such mesh, stretch measure, at the time of its use.

29.31 DIP NETS IN INLAND WATERS. (1) No person shall set, use or operate any dip net in any of the inland waters of the state for taking, catching or killing of any variety of fish other than as specified in this section.

(2) Dip nets not exceeding eight feet in diameter with meshes of not less than three inches may be used for taking, catching or killing rough fish in the Fond du Lac river within three miles of its mouth; in Silver creek in the town of Ripon, Fond du Lac county, from the old Arcade dam to the Green Lake county line; in the Big Wolf river; in Butternut lake, Ashland and Price counties; in the Manitowoc river from its mouth up to Ripp's bridge in the town of Rockland, Manitowoc county, and in all the streams and rivers flowing into Lake Michigan in that part of such streams beginning at the mouth and extending ten miles inland.

29.32 MINNOW NETS. (1) Use limited. No person shall set, use or operate any minnow seine or minnow dip net in any of the waters of this state for taking, catching or killing fish of any variety, other than as specified in this section.

(2) Inland waters. Minnow seines not exceeding forty feet in length and five feet in depth, and minnow dip nets not exceeding six feet in diameter may be used in all inland waters for taking, catching or killing rough fish minnows for bait only; but not in any such waters, creeks or streams inhabited by trout or in which trout have been planted, or in Turtle creek in Walworth and Rock counties, unless supervised by the state conservation commission or its deputies.

(3) Outlying waters. Minnow seines not exceeding one hundred feet in length and five feet in depth and minnow dip nets

not exceeding six feet in diameter may be used in Lake Superior, Lake Michigan, Green Bay, Sturgeon Bay, and the Fox river below the dam at De Pere, for taking, catching, or killing rough fish minnows for bait only.

29.33  NET AND SET HOOK FISHING IN OUTLYING WATERS.  (1) License authorized.  Net or set hook licenses which shall authorize the use of one or more of the kinds of nets or lines of set hooks named in this section, as limited herein, for the taking, catching, or killing of fish in the waters of Lake Superior, Lake Michigan, Green Bay, Sturgeon Bay, and the Fox river below the dam at De Pere, shall be issued, subject to the provisions of section 29.09, by the state conservation commission to any person duly applying therefor.

(2) Form of license.  In addition to the facts required by section 29.09, each application for such license, and the license issued thereon, shall state the name and kind of vessel and whether with or without a steam lifter, and the number and kind of nets or set hooks to be covered by the license applied for.

(3) License period and fees.  Each such license shall be effective only from the first day of January until the thirty-first day of December of the same year; and the fee for each license issued to any resident of this state is two dollars for a gill net or nets; five dollars for each seine; two dollars for each pound net and leader; five dollars for trap net or nets, fyke net or nets, drop net or nets, with leaders; and one dollar for each trammel net, or for set hooks.  The fee for each license issued to any nonresident is the same as the resident fee, except for gill nets operated in conjunction with or from any vessel; and for gill nets so operated, two dollars for any vessel propelled by oars, paddle, or pole, fifty dollars for any other vessel propelled otherwise than by steam, one hundred dollars for any steam vessel without a steam lifter, and two hundred dollars for any steam vessel with a steam lifter.

(4) Metal tags.  No such licensed net or set hooks shall be used until the same are equipped with metal tags stamped to designate the kind of net or set hooks and number of the license covering the same.  One such tag shall be securely fastened to each two thousand lineal feet, or fraction thereof, of gill net or set hooks; one to each pound net; one to each five hundred lineal feet, or fraction thereof, of seine; and one to each fyke, drop, trap, submarine or trammel net.  Such tags shall be furnished by the state conservation commission to the licensee at the time of issuing the license, on payment of a fee of twenty-

five cents for each tag, except that tags for gill nets shall be fifty cents.

(5) Reserve waters. The following waters are reserve waters, and no nets of any kind shall be set therein, namely: In Lake Superior within one-fourth mile from the entry of the channel between Wisconsin Point and Minnesota Point, or from any harbor, pier or breakwater, or from the mouth of any stream flowing into Lake Superior, or from the shore line of Douglas county. In Lake Michigan and Green Bay within one-fourth mile of any harbor, pier or breakwater, or from the mouth of any stream flowing into Lake Michigan or Green Bay, or within one mile from any harbor, pier or breakwater in Milwaukee county, or within one mile from the shore line of Milwaukee county. In the waters of Lake Michigan or Green Bay no gill net shall be set within one-fourth mile from the shore line of Door county and no net of any kind shall be used in the following bays or harbors in Door county, namely: Sturgeon Bay, Little Sturgeon Bay, Fish Creek Harbor, Eagle Harbor, Bailey's Harbor, Mud Bay, North Bay, Rowley's Bay, and Washington Harbor and Detroit Harbor in Washington Island. No gill net of less than four inches stretch measure shall be set in less than forty fathoms of water, except in Green Bay proper.

(6) Close seasons. For the purpose of this subsection the waters of Green Bay shall be considered to include all that area south of a line drawn between Limekiln Bluff in Door county and the mouth of the Menominee river in Marinette county, and including the Fox river as far as the dam at De Pere, and all the waters of Green Bay north of the above described line shall be subject to the law covering Lake Michigan.

(a) In Green Bay there shall be a close season on lake trout and whitefish from October 21 to November 21. A close season for pike and pickerel from March 10 to May 1. A close season for all varieties of fish, except lake trout and whitefish from the first day of April to the fifteenth day of May, inclusive.

(b) In Lake Michigan there shall be a close season on lake trout and whitefish from October 21 to November 21.

(c) In Lake Superior there shall be a close season for lake trout and whitefish from September 15 to November 1.

(7) Prohibited nets. Minnow nets. For the purpose of this subsection the waters of Green Bay shall be considered to include all that area south of a line drawn between Limekiln Bluff in Door county and the mouth of the Menominee river in Marinette county and including the Fox river as far as the dam

at De Pere. All the waters of Green Bay north of the above described line shall be subject to the law covering Lake Michigan.

(a) In Green Bay nets with a mesh not less than four inches may be used for the taking of lake trout and whitefish. Gill nets with a mesh not less than two and three-eights inches may be used for taking herring, chub, bluefin, or perch. Seines with a mesh of not less than three inches, and pound nets with a mesh of not more than two inches in the pound may be used. No nets of any kind shall be set for the purpose of catching any variety of fish during the close season for such fish and from the first day of April to the fifteenth day of May, inclusive, except gill nets with mesh of not less than four inches for the purpose of taking lake trout or whitefish, no nets of any kind shall be set in the waters of Green Bay. During the period from January 1 to March 10 gill nets with a mesh of two and one-eighth inches may be used under the ice for the purpose of catching herring.

(b) In Lake Superior gill nets with a mesh of not less than four inches may be used for the purpose of taking lake trout and whitefish. Gill nets with a mesh of not less than two and three-eighths inches may be used during the months of November and December for the purpose of taking herring. Seines with a mesh of not less than three inches and pound nets with a mesh of not more than two inches in the pound may be used. No nets of any kind shall be set or used for the purpose of taking any variety of fish during the close season for such fish.

(c) In Lake Michigan gill nets with a mesh of not less than four inches may be used for the purpose of taking lake trout and whitefish. Gill nets with a mesh of not less than two and one-half inches may be used for the purpose of taking herring, chub, bluefin and perch but no such nets shall be set in less than forty fathoms of water. Seines with a mesh of not less than three inches and pound nets with a mesh of not more than two inches in the pound may be used. No nets of any kind shall be set for the purpose of taking any variety of fish during the close season for such fish.

(d) In Green Bay and Lake Michigan minnow seines fifty feet long and five feet deep may be used for taking rough fish minnows for bait. Each set hook licensee may use not more than two thousand feet of gill net with a mesh of one and three-eighths inches, except in reserve waters, for the purpose of taking bloaters for bait. The provisions of subdivision (d) of

subsection (7) of section 29.33, shall not take effect until January 1, 1918.

(e) All nets with a mesh other than such as above specified and all nets used in violation of this chapter are contraband nets and shall be seized and confiscated whenever found in the water or on any vessel, dock or reel. Any such contraband nets so found shall be deemed sufficient evidence of the use of such nets by the owner thereof.

(8) Bass, muskellunge and sturgeon. All black bass, muskellunge and sturgeon taken in any net shall be immediately returned alive and without avoidable injury, to the waters from which taken.

(9) Under size fish. No licensee of any net or set hooks shall transport or cause to be transported, fish of any of the varieties mentioned in this subsection of a length less than that specified for each variety; and such measurement of length shall be taken in a straight line from the tip of the nose to the utmost end of the tail fin, except that the measurement of dressed fish be of the length of the carcass, namely:

| | | |
|---|---|---|
| Lake trout | 12 | inches |
| Whitefish | 13 | " |
| Suckers | 10 | " |
| Carp | 12 | " |
| Suckers with head and tail off | 7 | " |
| Perch | 8 | " |
| Perch with head and tail off | 5 | " |
| Pike | 13 | " |
| Pike with head and tail off | 10 | " |
| Pickerel | 16 | " |
| Pickerel with head and tail off | 11 | " |
| Catfish | 15 | " |
| Catfish with head off | 13 | " |
| Any other variety | 7 | " |

Any licensee taking such undersize fish shall bring them to shore and immediately notify the state conservation commission or its deputy; and the latter shall take possession of such fish and deliver them to some state, county, or charitable institution, or otherwise dispose of the same.

(10) Possession, sale and transportation. No such licensee and no other person shall transport or cause to be transported, or deliver or receive or offer to deliver or receive for transportation or have in possession or under control any fish of the varieties mentioned in subsection (9) of a length less than that

specified therein for each variety, respectively, whether lawfully or unlawfully taken within or without the state. **When**ever such undersize fish are received by or offered to any person for transportation in the course of business, such person shall forthwith notify the state conservation commission, or its deputy, stating full particulars.

(11) Penalty. Any violation of subsections (1), (5), (6), (7), (8), (9), and (10) of section 29.33 shall be punished by a fine of not less than three hundred dollars nor more than five hundred dollars, or by imprisonment in the county jail for not less than six months nor more than nine months, or by both such fine and imprisonment.

(12) Reports. On or before January 10 following the expiration of his license, each such licensee shall report to the state conservation commission in writing, on blanks furnished by the said commission, the number of his license, the kind, number and size of nets, the length of lines of set hooks used, number of lineal feet of gill nets, the number of pounds and value of each variety of fish caught; and such other information as may be required on the blanks furnished. Such report shall be subscribed to before a notary public or a justice of the peace.

29.34   NET LICENSES; MISSISSIPPI RIVER WATERS. (1) License authorized. Net licenses which shall authorize the use of nets, as limited herein, during the period of time extending from the fifteenth day of June to the next succeeding fifteenth day of April, for taking, catching, or killing fish in the waters of the Mississippi river, Lake Pepin, and Lake St. Croix, and the lakes, bays, bayous, and sloughs tributary thereto and connected therewith, shall be issued subject to the provisions of section 29.09 by the state conservation commission to any resident of the state duly applying therefor.

(2) Bond. Before any such license is issued, the applicant shall execute and deliver to the state conservation commission a bond running to the state of Wisconsin, in the sum of two hundred dollars, with two sureties, and conditioned that if the applicant shall well and faithfully observe and comply with all the provisions of this chapter, said obligation to be null and void, otherwise to remain in full force. Each said surety shall be worth and qualify in at least the sum of two hundred dollars, over and above all his debts and liabilities, in property within this state not exempt from sale on execution.

(3) License period; nets specified. Each such license shall

expire on the fifteenth day of April next succeeding the date of its issue, and shall authorize the use of one or more of the following nets only: Seines not exceeding a total length of four thousand feet, and having meshes of not less than five inches on the wings or four inches in the center of the pot, the pot not exceeding one hundred and fifty feet in length; gill nets having meshes of not less than seven inches; pound or hoop nets having meshes of not less than six inches in the leaders, five inches in the hearts, or three inches in the hoops; and bait nets to be used without leads, having meshes of not less than three inches, and not more than a four-foot hoop front.

(4) License fees. The fee for each such license is as follows: For seines, one dollar per hundred for the first five hundred lineal feet, two dollars per hundred for the second five hundred lineal feet, three dollars per hundred for the third five hundred lineal feet, four dollars per hundred for the fourth five hundred lineal feet, five dollars per hundred for the fifth five hundred lineal feet, and six dollars for each one hundred lineal feet over twenty-five hundred; for gill nets, five dollars for the first two thousand lineal feet, and five dollars for each additional one thousand lineal feet; for pound or hoop nets, five dollars for each seven hundred lineal feet of leader and one pound, and five dollars for each additional pound; for bait nets, one dollar each.

(5) Metal tags. No such licensed net shall be used until the same is equipped with metal tags stamped to designate the kind of net and number of the license covering the same. One such tag shall be securely fastened to each five hundred lineal feet, or fraction thereof, of seine; one to each two thousand lineal feet, or fraction thereof, of gill net; and one to each fyke, hoop, or bait net. Such tags shall be furnished by the state conservation commission to the licensee at the time of issuing the license, on payment of a fee of twenty-five cents for each tag.

(6) Protected fish. No such licensed net shall be used for taking, catching, or killing any of the following named fish: catfish of any variety under fifteen inches in length in the rough, or twelve inches dressed with the head detached; pike of any variety, bass of any variety, crappies, sunfish, pickerel, sturgeon, or perch.

(7) Reserve waters. No such licensed net shall be used for taking, catching, or killing fish of any kind in any of the following named waters: Rice lake, French lake, Mud lake, Round lake, Long lake, French slough, Spring creek, Spring slough,

and Black river in La Crosse county; Courtois pond, Pickerel, Spring, Nigger and Frenchtown sloughs and Gordon bay, in Crawford county; the De Soto bay, Long slough, T slough, Green lake, Pick's lake and all sloughs, lakes and bayous from De Soto bay to the main channel of the Mississippi river and as far north as Battle Bar in Vernon county; Cassville sloughs from Glen Haven to Cassville; Daley lake, Wyalusing bay and Glen lake between Wyalusing and the Burlington railway bridge, Plondke and Harris sloughs, Crawford lake, Ferry lake, and Bertram lake, all in Grant county; Trention lake, Trention slough, Mud lake and Mero slough in Pierce; and Beef slough in Buffalo county; and the Mississippi river within fifteen hundred feet of the mouth of the Chippewa river.

(8) Temporary ponds; shipments. Each such licensee may construct temporary fish ponds and keep his fish therein until they can be marketed; and a card shall be attached to each shipment thereof, on which shall be written "Shipped under section 29.34," the signature of the licensee, and the number of his license.

(9) Reports. Each such licensee shall keep a strict record and account as to each variety of fish and the number of pounds thereof taken by him in such licensed nets; and shall report thereon to the state conservation commission on or before the fifteenth day of May covering his operations during the preceding year.

29.35 NET LICENSES; WHITEFISH AND CISCO IN INLAND LAKES. (1) Net licenses which shall authorize the use of not exceeding one hundred lineal feet of gill net, with meshes not less than two and three-fourths inches, or dip nets with a diameter of not more than eight feet and with meshes not less than one and one-half inches, for taking, catching or killing whitefish in any of the inland waters of the state containing whitefish, or not exceeding one hundred lineal feet of gill net, with meshes not less than two inches, for the purpose of catching ciscos in any of the inland waters of the state containing cisco may be issued by the state conservation commission, subject to the provisions of section 29.09, to any resident of the state duly applying therefor. Such licenses may also be issued by the commission in its discretion, for the catching of whitefish or ciscos, respectively, in any other inland waters. The fee for each such license is fifty cents.

(2) Each such license shall be limited to such period of twenty days as shall be fixed by the state conservation commission, and no such whitefish licensee shall have in his possession

or under his control at any time more than one hundred pounds of whitefish.

(3) No such licensed net shall be used until the same is equipped with a metal tag, stamped to designate the kind of net and number of the license covering the same, to be securely fastened to each net. Such tag shall be furnished by the commission at the time of issuing the license. Spears may be used in the waters of Vilas county during the period from October 15 to November 15 for the purpose of spearing cisco.

29.36 NET LICENSES; ROUGH FISH IN WINNEBAGO WATERS. (1) The state conservation commission may upon application therefor issue to any person a license to use and operate a seine, fyke, hoop net or a turtle net in lakes Winnebago, Winneconne, Poygan, Butte des Morts, Little Butte des Morts, and the Fox and Wolf rivers, for the purpose of taking and catching rough fish between the fifteenth day of June of each year and the next succeeding first day of April. All the following varieties of fish so caught shall be the property of the licensee, i. e., pickerel, buffalo fish, carp, eelpout, dogfish, sheepshead, billfish, red horse, suckers, lawyers and lizards.

(2) The fee for each such license is as follows: For a seine of five hundred feet and not over one thousand feet, twenty-five dollars; of one thousand feet or over, fifty dollars each; for seines of less than five hundred feet, or fyke, hoop or turtle nets, five dollars each. No nets shall be used until the same are equipped with metal tags, stamped to designate the kind of net and numbered to correspond with the number of the license authorizing the operation of said net or nets, one such metal tag to be securely fastened to each net. Such metal tag shall be furnished to the licensee by the state conservation commission on the payment of a fee of twenty-five cents for each tag. Any licensee operating a seine, seines, fyke or hoop net, under the provisions of this section, shall do so under the direction and personal supervision of the state conservation commission or one of its deputies, but not otherwise; but the state conservation commission may order one deputy to direct and supervise the operation of a seine, seines, fyke or hoop nets by more than one licensee.

(3) All licenses under the provisions of this section shall be issued upon the express condition that each licensee operating a seine or seines shall pay to the state conservation commission one-half cent per pound for all fish taken under such license and which are packed ready to be shipped or otherwise disposed of. Any and all moneys so received by the commission shall be paid into the state treasury.

(4) Any licensee shall be allowed to ship or transport to any place he desires any·fish taken under the provisions of this section, except those required to be immediately returned to the waters. A card shall be attached to the package or box in which the same shall be shipped, on which shall be written "Shipped under section 29.36," the signature of the licensee, and the number of his license.

(5) Each such licensee may construct temporary fish ponds and keep his fish therein until they can be marketed.

29.37 SET LINE LICENSES; INLAND WATERS. (1) Set line licenses which shall authorize the use of one set line only, with not exceeding twenty-five hooks, for taking, catching or killing fish, shall be issued, subject to the provisions of section 29.09, by the county clerk of the county bordering on the waters where such set lines are intended and permitted to be used, to any person duly applying therefor.

(2) Each such license shall be limited to the period of time extending from the twenty-ninth day of May to the next succeeding fifteenth day of February. The fee for each such license is one dollar.

(3) No such licensed set line shall be used until the same is equipped with a metal tag, stamped to designate the number of the license covering the same, which shall be securely fastened to one end of the set line. Such tag shall be furnished by the state conservation commission to the county clerk, and by the latter to the licensee at the time of issuing the license, on payment of a fee of twenty-five cents. All fees received by county clerks for such metal tags shall be returned and reported in the same manner as are license fees, as prescribed in section 29.09, but without deduction.

(4) Such licensed set lines may be used only in the following waters: Big Wolf river in Waupaca and Outagamie counties; Lake Winnebago, Lake Butte des Morts, Little Butte des Morts, Lake Winneconne, Lake Poygan, Lake Puckaway, and the river connecting said lakes, Fox river, except below the dam at De Pere; Wisconsin river from the north line of Sauk county to its mouth; Black river from the north line of Jackson county to its mouth; the Chippewa river from its mouth to the·dam at Jim Falls, Chippewa county; Menomonee river bordering on Marinette county; the Pecatonica river in Green county; and the Mississippi river, Lake Pepin and Lake St. Croix.

·(5) In the Mississippi river, Lake Pepin and Lake St. Croix, Big Wolf river in Waupaca and Winnebago counties; in the

78—L.

Fox river in Winnebago county and in Outagamie county as far as the dam at De Pere; in Lake Winnebago, Lake Winneconne, Lake Butte des Morts, Little Butte des Morts, Lake Poygan, three hundred hooks may be used but in such waters no frog, minnow or live bait shall be used. No licensed set line shall be equipped with any hooks smaller than 5/0.

## CLAMMING

29.38 Clamming licenses. (1) No person who is not a resident of this state or who has resided in this state less than one year next previous shall take, catch or kill any clam in the inland waters of this state unless a license therefor has been duly issued to him. Such licenses shall be issued subject to the provisions of section 29.09 by the state conservation commission to all such persons duly applying therefor. The fee for each such license is fifty dollars. Each such licensee may use one boat only, in the exercise of his clamming privilege.

(2) No person shall take, catch or kill any mussels in any of the waters of this state at any time with the use of a dredge.

## POSSESSION OF GAME

29.39 POSSESSION DURING CLOSE SEASON, OR IN EXCESS OF BAG LIMIT. No person shall have in his possession or under his control, or have in storage or retention or as common carrier for any one person, any game, game fish, or other wild animal or carcass or part thereof, during the close season therefor, or in excess of the bag limit for one day or below the minimum size thereof at any one time during the open season, whether lawfully or unlawfully taken within or without the state.

29.40 POSSESSION OF DEER; HEADS AND SKINS. (1) Deer tags. Any person having lawfully killed a deer shall immediately attach and leave attached to the carcass, or part thereof, the deer tag corresponding to his license; and no person shall have in his possession or under his control, or have in storage or as a common carrier, any such carcass, or part thereof, without such tag attached.

(2) Home consumption. Any person residing in this state having lawfully killed a deer, may have in his possession and consume the meat thereof in his own family at any time, but must leave the tag attached thereto.

(3) Heads and skins. The head and skin of any deer lawfully killed, when severed from the rest of the carcass, are not

subject to the provisions of this chapter; but no person shall have in his possession or under his control the green head or green skin of a deer between the tenth day of January and the succeeding 21st day of November of each year, or at any time a deer head in the velvet, or a deer skin in the red, blue or spotted coat.

**29.41  SKINS OF FUR-BEARING ANIMALS.**  The skin of any fur-bearing animal lawfully killed, when separated from the rest of the carcass is not subject to the provisions of this chapter; but no person shall have in his possession or under his control the skin of any fisher, marten, mink, or muskrat showing that the same has been shot or speared, nor the green skin of any fur-bearing animal from the fifth day after the beginning of the close season for such animal until the ending thereof.

**29.42  POSSESSION OF GAME BIRDS.**  (1) Without license.  No person, other than the holder of a hunting license or scientist's certificate duly issued to him and in force and carried by him on his person, shall have in his possession or under his control any game bird, or animal, or the carcass or any part thereof.

(2) Nests and eggs.  No person shall take or needlessly destroy, or have in his possession or under his control, except by virtue of a scientist's certificate, the nest or eggs of any wild bird for which a close season is prescribed in this chapter.

## TRANSPORTATION OF GAME

**29.43  TRANSPORTATION; GENERAL PROVISIONS.**  (1) During close season.  No person shall transport or cause to be transported, or deliver or receive or offer to deliver or receive for transportation, any game or game fish or carcass or part thereof during the close season therefor, whether lawfully or unlawfully taken within or without the state.  Whenever any game or game fish or carcass or part thereof is offered to any person for transportation during the close season therefor such person shall forthwith notify the state conservation commission or its deputy, stating full particulars of such offer and by whom made.

(2) Trunks; valises.  No person shall carry with him or under his control in any trunk, valise, or other package or enclosure, at any time, any game or game fish, or carcass or part thereof.

(3) Transportation employes.  No employe of any railroad, express, or other transportation company, and no steward, porter, or other employe of any dining, parlor or sleeping car shall

have in his personal possession or under his personal control, at any time while in such service, any game or game fish, or carcass or part thereof.

(4) Labeling game shipments. No person shall transport or cause to be transported, or deliver or receive for transportation, any package or parcel containing any wild animal or carcass or part thereof, unless the same is labeled in plain letters on the address side of such package or parcel so as to disclose the name and address of the consignor, the name and address of the consignee, and the number of pounds of each kind of fish or the number of each variety of other wild animals: or carcasses, or parts thereof, contained therein; and unless the consignor is the owner of such shipment and shall deliver to the common carrier therewith, either personally, or by agent, a writing signed by him personally, stating that he is the owner of the shipment.

29.44 INTERSTATE TRANSPORTATION OF GAME. No person shall transport or cause to be transported, or deliver or receive or offer to deliver or receive for transportation, into or through this state, any game or game fish or carcass or part thereof from any other state in violation of the laws of such state relating to the transportation thereof; nor any game or game fish or carcass or part thereof lawfully transported from any other state, nor have the same in his possession or under his control, during the close season or in excess of the limitations prescribed for such animal in this chapter, unless a permit therefor has been duly issued to such person by the state conservation commission; but any person who has lawfully killed a deer in this state may, on his license only, take such deer into any adjoining state, if the laws thereof permit, and ship the same from any point in that state to any point within this state.

29.45 TRANSPORTATION OF DEER. (1) No common carrier shall receive for transportation or transport or attempt to transport any deer, or carcass or part thereof, otherwise than as provided in this section.

(2) Each holder of a resident hunting license, settlers' hunting license, or nonresident general hunting license, may transport or cause to be transported one deer between the last ten days of November of each year; but must accompany the same from the point of shipment to the point of destination.

(3) The place of delivery of any such shipment by a resident licensee shall be within the state, and by a nonresident licensee may be either within the state or at his residence without the state.

:22-cv-... Case 4:23-... Document 49-... Page 218... Date Filed 07/20/2023...

LAWS OF WISCONSIN—Ch. 668.        1237

29.46  TRANSPORTATION OF GAME BIRDS.  (1) No common carrier shall receive for transportation or transport or attempt to transport any game bird, or carcass or part thereof, otherwise than as follows:  Each holder of a hunting license may carry with him openly, in his personal possession, a mixed bag of not more than twenty such birds, but not more than the bag limit for one day of any one variety; but no such licensee resident within this state shall carry or convey any such bird beyond the borders of the state.

29.47  TRANSPORTATION OF FISH.  (1) Time limitation.  No person shall transport or cause to be transported, or deliver or receive or offer to deliver or receive for transportation, any game fish taken from inland waters, during the period extending from the first day of January to the last day of the close season for such fish, in each year.

(2) From inland waters.  No person shall transport or cause to be transported, or deliver or receive or offer to deliver or receive for transportation, at any time, any game fish taken from inland waters other than as follows:

(a) One shipment only of not more than one package, and containing not more than twenty pounds of game fish of any variety other than those named in paragraphs (c) and (d) of this subsection, or containing in lieu thereof not more than two such fish of any weight, may be transported by any resident to any point within the state, or by any nonresident licensee to any point without the state in each period of seven days.  Nonresident hook and line fishing licenses may be issued by the state conservation commission to any nonresident female over the age of sixteen years for the purpose of making shipment without the state, under the provisions of this section.

(b) Any shipment containing more than twenty but not exceeding fifty pounds of game fish of any variety other than those named in paragraphs (c) and (d) of this subsection may be transported only to a point within this state, and must be accompanied by the owner from the point of shipment to the point of destination.

(c) Thirty-five trout of any variety other than lake trout may be transported to any point within or without the state, when accompanied by the owner from the point of shipment to the point of destination.

(d) One shipment only, containing not more than twenty pounds of lake trout taken from inland waters, may be transported by any person in each period of seven days, to any point within or without this state, when accompanied by the owner from the point of shipment to the point of destination.

(3) From outlying waters. The transportation of fish taken in outlying waters is subject to the following limitations:

(a) No green fish of any variety shall be shipped from any port located on outlying waters during the close season for such fish, except the first three days thereof.

(b) Pike and pickerel of lawful size and lawfully taken from outlying waters may be transported to points within or without the state without limitation as to quantity; but all such shipments shall be billed only from a port on outlying waters directly to their destination, and shall not be rebilled or reshipped from any other point within the state.

(4) Shipments from inland points. Any shipment of game fish of any variety originating at any point in this state other than ports located on outlying waters is subject to the provisions of this section governing the transportation of game fish taken from inland waters.

(5) Foreign shipments. Pike and pickerel in a frozen state, whether dressed or not dressed, legally taken or imported from any foreign country, are not subject to any of the provisions of this chapter except subsection (10) of section 29.33; but the person importing, transporting, dealing in, or selling such fish shall keep a separate record of all shipments and consignments thereof, containing the number of pounds, the date received, the name of the consignor, and the name of the carrier transporting the same, which shall be at all times open to inspection by the state conservation commission or its deputies.

(6) Injurious fish. Live carp minnows and dogfish minnows shall not be transported within the state.

## COMMERCE IN GAME

29.48 SALE OF GAME. Except as provided by section 29.52 no person shall sell, purchase, or barter, or offer to sell, purchase, or barter, or have in his possession or under his control for the purpose of sale or barter, any deer, squirrel, game bird, black bass, muskellunge, or trout other than lake trout, or the carcass or part thereof, at any time; nor any other game fish taken from inland waters during the period extending from the first day of January to the next succeeding twenty-ninth day of May of each year; nor any other game or other wild animal, or carcass or part thereof, during the close season therefor. This section applies, whether such animals were lawfully or unlawfully taken within or without the state.

29.49 SERVING OF GAME TO GUESTS. (1) Prohibited. Except as provided by section 29.52 no innkeeper, manager or

steward of any restaurant, club, hotel, boarding house, saloon, logging camp, or mining camp shall sell, barter, serve or give, or cause to be sold, bartered, served, or given to the guests or boarders thereof the meat of any deer, squirrel, game bird, or trout other than lake trout, or the carcass or part thereof, at any time; nor any other game fish taken from inland waters during the period extending from the first day of January to the next succeeding twenty-ninth day of May of each year; nor any frog or other game or other wild animal, or carcass or part thereof, during the close season therefor, except rabbits in counties containing a city of the first class.   This section applies, whether such animals were lawfully or unlawfully taken within or without the state.

(2) Free lunch.  The giving, offering, or affording opportunity to take free lunch in any of the places named in the preceding subsection shall be held to be embraced within the prohibitions thereof.

(3) Penalty.  Violations of this section shall be punished by a fine of not less than two hundred nor more than five hundred dollars, or by imprisonment in the county jail not less than nine months nor more than one year, or by both such fine and imprisonment.

## PROPAGATION OF WILD ANIMALS

29.50  PROPAGATION PRIVILEGED.   Nothing in the foregoing provisions concerning the protection of wild animals shall affect the operation of state hatcheries, the removal of fish which have died from natural causes or the removal of deleterious fish by the state conservation commission or under its authority; or the propagation or transportation, collecting and transplanting of fish or fish fry by state authority; nor the transportation of fish into or through this state or out of it by the commissioners of fisheries of other states or of the United States; nor the operation of private fish hatcheries, or the propagation of fish in private waters, or the transportation and sale of fish therefrom as hereinafter provided; but the state conservation commission, or its agents and employes, shall not furnish fish or fry from state hatcheries to private ponds, private clubs, corporations or preserves, and shall not plant them in waters where the general public is not allowed the rights and privileges enjoyed by any individual.

29.51  STATE PROPAGATION OF FISH.  (1) State fish hatcheries.  The state conservation commission shall have gen-

eral charge of the following matters, and all necessary powers therefor, namely:

(a) The propagation and breeding of fish of such species and varieties as they may deem of value.

(b) The collection and diffusion of useful information in regard to the propagation and conservation of fish.

(c) The government and control, care, supply, and repair of the state fish hatcheries and the grounds used therefor, whether owned or leased, and the buildings, ponds, fish car and other apparatus, and all other property belonging to or held by the state for the propagation of fish.

(d) The purchase and establishment and control, in like manner, of new hatcheries when appropriations shall be made by law, and the establishment of such temporary hatching 'ations as they may deem necessary.

(e) The receiving from the commissioners of fisheries of the United States, and from the commissioners of fisheries of other states, or other persons, of all spawn, fry or fish donated to the state or purchased, and in the most practical ways, by exchange or otherwise, to procure, receive, distribute, and dispose of spawn and fish; to make contracts and carry on the same for the transportation of fish cars, cans, commissioners and employes by land or water as may be most advantageous to the state; and to take such other measures as in their judgment shall best promote the abundant supply of food fishes in the waters of the state.

(f) The commission shall keep an inventory of the property of the several hatcheries, with the cost of each article, and account in detail and separately of the expenses of each hatchery; also of the distribution of the fish, of maintaining and repairing property and of such improvements as may from time to time be ordered.

(2) Transplantation of fish. The commission may take or cause to be taken fish at all seasons of the year from any waters of the state for stocking other waters, or for the purpose of securing eggs for artificial propagation in the state hatcheries. Such fish or eggs shall be taken only under a special permit issued by the commission, and then only in the presence of the commission or its deputies. Such permit shall specify the kinds of fish that may be taken and the manner in which they may be taken; and shall be subject to the conditions that the holder shall pay for the services of and furnish free transportation and meals on his boat to a competent person approved by the com-

mission to spawn the fish and fertilize the eggs, and that such eggs shall be delivered at such place as may be designated by the commission and forwarded to some state hatchery for propagation.

(3) Delivery of spawn.  Any person fishing in any waters of this state shall deliver, on demand, to the state conservation commission or its deputies or authorized agents, all kinds of fish, during the spawning season, for the purpose of being stripped of their eggs and milk; and the person receiving them shall, immediately after having stripped the fish, return them to the person from whom received. Any such person shall permit the commission, or its deputies, or authorized agents to enter any boats, docks, grounds or other places where such fish may be, for the purpose of stripping the same while alive, and shall render such assistance as may be necessary to expedite the work of mixing the eggs and milk for proper impregnation.

(4) Removal of spawn or fish from state.  No person shall remove any fish eggs or live fish from this state except as authorized by law, unless a permit therefor has been issued to him by the state conservation commission.

(5) Unlawful fishing by employes.  No employe of the commission, and no other person, while engaged in catching wild fish from the public waters for purposes of artificial propagation, shall take or have in his possession or under his control any kind of fish other than those he has been directed, by the commission or its deputy or agent, to take therefrom.

29.52  PRIVATE FISH HATCHERIES.  (1) No person shall stock any private fish hatchery with fish or fry obtained from any Wisconsin state fish hatchery, or from any waters of the state except when such fish have been taken in a lawful manner.

(2) The term "private fish hatchery" includes only private ponds, with or without buildings, used for the purpose of propagating fish and located as follows:

(a) At the headwaters of or along a stream for a distance of not to exceed one mile, on private land possessed and controlled by the owner or owners of such hatchery.

(b) On private land where the supply of water for the hatchery is furnished by springs or artificial wells.

(c) On private land where the supply of water for the hatchery is obtained by the use of flumes, pipes, or ditches from flowing streams, provided that said flumes, pipes, or ditches, shall be properly screened so as to prevent fish from passing from such streams to the ponds of such hatchery.

(3) The owner or lessee of any private hatchery shall report to the state conservation commission the name, if any, and location of such hatchery, whereupon the commission shall inspect, and in its discretion number and register such hatchery and immediately inform the owner or lessee of the number given such hatchery; such owner or lessee shall, however, pay a registration fee of five dollars, and all expenses of inspection except the salary of the employe who inspects the hatchery.

(4) Each package or box containing fish propagated and raised in any private hatchery and shipped or offered for shipment shall be branded with an iron brand as follows: "Shipped from the private fish hatchery of (insert name of owner or lessee, location, and number of hatchery)" and such brands shall not be used on packages containing fish not taken from such private hatchery.

(5) Any person who shall, without permission of the owner, trespass or fish on the waters of a private hatchery or fish pond properly registered with the state conservation commission, shall be punished by a fine of not less than fifteen dollars nor more than twenty-five dollars and in default of payment thereof shall be imprisoned in the county jail for not less than ten days nor more than twenty days; provided, that the owner of such private fish hatchery or fish pond gives notice by maintaining signboards, at least one foot square, in at least two conspicuous places to every forty acres. Prosecutions under this subsection shall be by the owner of such private hatchery or pond.

29.54 STATE PROPAGATION OF WILD MAMMALS AND BIRDS. (1) The state conservation commission is authorized to take or purchase wild mammals and birds and their eggs for propagation. The distribution thereof shall be made throughout the various parts of the state under the supervision and direction of the commission, and according to such regulations as they shall prescribe.

(2) No person shall take, remove, sell, or transport from the public waters of this state to any place beyond the borders of the state, any duck potato, wild celery, or any other plant or plant product except wild rice native in said waters and commonly known to furnish food for game birds.

29.55 WILD ANIMALS FOR PARKS. (1) The state conservation commission may, on application of any park board, grant permit to take, have, sell, barter, or transport, at any time, live wild animals for park purposes.

(2) The state conservation commission may, on application

of any person, grant a permit to such person to take and transport wild animals for propagation within the state, under the supervision of the commission or its deputies

29.56  FOREST COUNTY GAME REFUGE.  Townships thirty-eight north, of range twelve and thirteen east, Forest county, shall be known as the Forest County Refuge.  No person shall at any time or in any manner, hunt any game within said refuge.

29.57  WILD LIFE REFUGES.  (1) Establishment.  The owner or owners of any tract, or contiguous tracts, of land comprising in the aggregate not less than one hundred and sixty acres located outside the limits of any city or village, may apply to the state conservation commission for the establishment of said lands as a wild life refuge.  The commission may thereupon employ such means as it may deem wise to inform itself regarding the premises; and if, upon inspection, investigation, hearing, or otherwise, it shall appear to the satisfaction of the commission that the establishment of said lands as a wild life refuge will promote the conservation of one or more useful species or varieties not native within this state. it may by order designate and establish the said lands as a wild life refuge.

(2) Enclosure.  Within thirty days after the date of such order the owner or owners of the said lands shall enclose the same, wherever the same are not already enclosed by a fence, with a single substantial wire, and shall post and maintain along the said wire or fence, at each interval of twenty rods, signs or notices, furnished by the state conservation commission, proclaiming the establishment of said refuge.

(3) Publication.  No such order shall be effective until at least thirty days after the date of its issue; nor unless the commission shall have caused notice thereof to be given by its publication, once in each week for three successive weeks next preceding the date of its effect, in at least one newspaper published in the county embracing the said lands.  Thereupon the said lands shall be a wild life refuge, and shall so remain for a period of not less than five years, from and after the date of effect stated in said order.

(4) Absolute Protection.  No owner of lands embraced within any such wild life refuge, and no other person whatever, shall hunt or trap within the boundaries of any wild life refuge, state park, or state fish hatchery lands; nor have in his possession or under his control therein any gun or rifle, unless the same is unloaded and knocked down or enclosed within its carry-

ing case; but nothing herein shall prohibit, prevent, or interfere with the state conservation commission, or its deputies, agents or employes, in the destruction of injurious animals.

(5) Animals procured by commission. The state conservation commission may place within any such wild life refuge, for the purpose of propagation, wild animals of any species or variety.

## DESTRUCTION OF INJURIOUS ANIMALS

29.58  MUSKRATS INJURING DAMS.  The owner or lessee of any dam may in any manner capture or kill muskrats at any time when said muskrats are injuring or destroying such dams or the levees connected therewith; but shall not sell, barter, or give to any other person the skin of any muskrat captured or killed during the close season therefor.

29.59  BEAVER  CAUSING  DAMAGE.  (1) Complaint. Upon complaint in writing, by the owner or lessee of any lands, to the state conservation commission, that beaver are causing damage thereto the commission shall employ such means as it may deem wise to inquire into the matter; and if, upon inspection, investigation, hearing, or otherwise, it shall appear to the satisfaction of the commission that the facts stated in such complaint are true, it may, by written permit, authorize the said owner or lessee to capture and remove such beaver, as hereinafter prescribed.

(2) Supervision. No beaver shall be captured or killed under such permit except only during such period of time, from and after the first day of January in each year, as may be limited by the commission, and then only under the direct supervision of a deputy conservation warden.

(3) Disposition of animals.  The owner or lessee shall capture, alive and without avoidable injury, such number of beaver as may be designated by the commission, for delivery to zoological parks or collections or for transplantation to other localities within the state; all others shall be killed and skinned with care to conserve the value of the skins, which shall be shipped without delay to Madison, consigned to the state conservation commission.

(4) Sale and disposition of proceeds.  All such skins shall be sold by the commission, in the manner of a sale of confiscated game, and the proceeds paid into the conservation fund.

(5) In Price, Rusk, and Sawyer counties.  Licenses for the taking, catching or killing of beaver in Price, Rusk, and Sawyer

counties during the open season therefor, as provided in sub-
division (a) of subsection (3m) of section 62.16, may be issued
by the conservation commission to residents who duly apply
therefor and no person shall take, catch or kill beaver in said
counties without procuring such a license. Said license shall
cover the period for the month of December in the year for
which the same was issued and the fee therefor shall be two
dollars and fifty cents for each such license. No skin of any
beaver taken, caught or killed under said license shall be de-
livered, transported or shipped unless it has attached thereto
a distinctive tag to be prescribed and furnished by the state
conservation commission. Licensees shall dispose of all beaver
skins on or before the twentieth day of January following the
date of the issuance of the license and every licensee shall on
or before the thirtieth day of January following the date of the
issuance of his license return the same to the state conservation
commission for cancellation together with a complete report on
a blank to be furnished by the said commission stating the num-
ber of beavers taken, caught or killed, the name of the town
in which the same were taken, caught or killed, the disposition
of the hides and the amount received therefor. Any resident of
Price, Rusk and Sawyer counties who have suffered or is likely
to suffer damage because of any beaver dam on his land shall
notify the game warden of his district of such fact. After the
expiration of five days after giving such notice, said resident
may open said dam. No resident of said county shall be allowed
any claim against this state for damages sustained on account
of beaver during the years 1917 and 1918.

(6) Penalty. Violations of this section shall be punished by
a fine of not less than two hundred nor more than five hundred
dollars, or by imprisonment in the county jail not less than
nine months nor more than one year, or by both such fine and
imprisonment.

29.595 DEER CAUSING DAMAGE. Upon complaint in
writing by the owner or lessee of any lands, to the state con-
servation commission, that deer are causing damage therein the
commission shall inquire into the matter; and if upon inspec-
tion, investigation, hearing, or otherwise, it shall appear to
the satisfaction of the commission that the facts stated in each
such complaint are true, it may capture or destroy such deer,
and dispose of the same as provided in subsections (3) and (4)
of section 29.59.

29.60 BOUNTIES ON WOLVES. (1) Rate of bounty.

The county board of each county shall provide for the payment of a reward to each person who shall kill any wolf or wolf cub within such county, at the following rate: For each wolf cub killed between the first day of April and the first day of September in any year, five dollars; and for each wolf killed at any time, ten dollars. An equal amount shall be paid by the state, in each case, from the appropriation for bounties for the destruction of wolves.

(2) Presentation of claim. Any person claiming such reward shall, at his own expense, deliver the skin of the animal entire with the skull attached at the nose, within six days after the killing of such animal and in well-preserved condition, to the county clerk of the county wherein said animal was killed, together with a certificate in substantially the following form:

To the county clerk of _____county: I, the undersigned, hereby state and declare that on the _____day of _____ ____191____, in the town of _____, county of _____, I did kill, or cause to be killed_____mature wolves,_____ ____wolf cubs, the skin__ and head__ of which I herewith present for your inspection. I further declare that I did not raise or rear, or cause to be raised or reared for me, any wolf, nor have I spared the life of any wolf in my power to kill.

Dated this_____day of _____, 191____
Witness:

        _____              _____
(Address) _____              Claimant.

(3) Examination of carcass. Thereupon the county clerk and the register of deeds, or their duly authorized deputies, shall make a careful examination to ascertain that the skin is that of a wolf or wolf cub; that it has not been previously marked for bounty, and that the claimant's certificate is true and correct. If the county clerk and register of deeds are unable to identify the skin and skull, they shall transmit the same, for identification, to the state conservation commission; and in any such case the decision of the commission shall be final, and if the skin be found to be of a wolf or wolf cub it shall be returned to the county clerk, except the skull, which may be destroyed by the commission or deposited in some scientific museum.

(4) Payment by county. When convinced that the claim is just and true, the county clerk shall cause the skull, if still attached, to be removed from the skins and destroyed, and the skin to be marked by a longitudinal slit, not less than six inches long, in the scalp between the ears. He shall thereupon draw

an order on the county treasurer for the amount payable by the county on said claim; and he and the register of deeds shall sign in duplicate a certificate in the following form:

We, the undersigned, county clerk and register of deeds, respectively, of_____county, hereby certify that according to the records and the evidence which we have examined and marked as provided by law, _____, whose post-office address is _____, is entitled to_____dollars, state bounty on _____which he certifies _____killed in the town of____ _____, county of_____, on the_____day of _____, 19____, and for which this county has paid him_____ dollars.

Dated at _____, this _____ day of _____, 191__

_____

County Clerk.

_____

Register of Deeds.

(5) Payment by state. One of said duplicates shall be transmitted to the state conservation commission who shall examine and certify such claims, and the amount payable by the state thereon shall be audited and paid, as other state accounts are paid, from the appropriation for bounties for the destruction of wolves.

(6) Return of skin. At the request of the claimant the skin which has been marked for bounty shall be returned to him at his own expense; but the cost of transporting specimens from the county clerk to the state conservation commission shall be borne by the county, and the cost of returning said specimens, or transmitting them to other points for identification for bounties for the destruction of wolves.

(7) Blanks. All blanks required to carry out the provisions of this section shall be furnished by the state conservation commission and charged to the appropriation for bounties for the destruction of wolves; and the chairman and clerk of each town shall obtain from the county clerk and keep on hand blank certificates for the use of claimants.

(8) Poisoned baits for wolves, wildcats and lynxes. For the destruction of wolves, wildcats or lynxes it is lawful to put out baits containing poison between the first day of December and the first day of March, but the same shall not be placed within eighty rods of a dwelling house, and the person putting out such baits shall, before doing so, post in three public places in the town notice of putting out such baits, describing the land

and location where such baits are placed and the date when put out, and within three days after the first day of March shall take up and effectively destroy the same. For the failure or neglect to so post such notices or to so take up and destroy said baits the person so putting out the same shall be liable for all damages resulting therefrom and shall be punished as provided in the last section of this chapter. The same reward shall be paid for any wolf so destroyed by poison as is herein provided for otherwise killing wolves.

29.61  DESTRUCTION OF OTHER INJURIOUS ANIMALS; REWARDS. (1) The county board of any county may direct that every person who shall kill any crow shall be entitled to a reward of not to exceed fifteen cents, or any sharpshinned or cooper's hawk twenty-five cents, or any pocket gopher twenty-five cents, or any streaked gopher ten cents, or any English sparrow four cents, or any blackbird four cents, or any rattlesnake fifty cents.

(2) Any person claiming such reward shall exhibit the head or rattles of the animal so killed to the chairman of the town or the president of the village wherein it was killed and present an affidavit to such president or chairman stating that said head or rattles are of the animal killed by him and that he has not spared the life of any such animal or bird within his power to kill. Such chairman or president shall then issue a certificate in the following form:

STATE OF WISCONSIN⎱
    County of_____⎰ ss.

I_____, chairman of the town of_____(or president of the village of_____), do certify that_____ _____ has this day exhibited to me the head (or rattles) of _____, which he claims to have killed in said town (village). and that the head (or rattles) of said_____was (were) destroyed in my presence, and that the said_____is on presentation of this certificate to the town clerk (village clerk), within twenty days from the date hereof, entitled to an order on the town (village) treasurer for the sum of_____ dollars. to be drawn from the general fund of said town (village).

Dated this_____day of_____, 19\_\_\_\_.

                          _____
                        Chairman (President)
               of the town (village) of_____

(3) The town or village clerk, respectively, shall on the production of the certificate of the chairman of the town, or president of the village, issue to the holder thereof an order on the town or village treasurer, respectively, for the amount stated in said certificate.

(4) The treasurers of the various villages and towns shall, at the close of their accounts on the thirtieth day of October in each year certify to the county clerk the amount of money expended by their respective towns and villages under the provisions of this section. Such treasurer shall attach to the certificate an affidavit stating that the account is just and that his town or village has actually expended the amount therein stated. The certificate and affidavit shall be placed on file in the office of the county clerk and the account shall be audited by the county board and the amount thereof paid to the treasurers of the respective towns and villages from any money in the general fund of the county not otherwise appropriated.

29.62 REMOVAL OF INJURIOUS ROUGH FISH. (1) The state conservation commission is authorized to take rough fish by means of nets, or cause the same to be so taken, from any of the inland waters of this state other than those specified in subsection (2), whenever it shall find that such fish are detrimental to, retard the propagation of, or destroy game fish therein.

(2) The authority granted to the commission by subsection (1) does not extend to Lake Koshkonong; any stream or river flowing into Green Bay or Lake Michigan except that part of the Fox river and its tributaries above the Menasha dam; the Mississippi river, Lake Pepin, Lake St. Croix, and the lakes, bays, bayous and sloughs tributary thereto and connected therewith; and any stream or river flowing into the Mississippi river, within a distance of forty miles above the mouth of such stream or river.

(3) All fish taken under the authority of this section shall be disposed of by the commission to the best interests of the state; and temporary fish ponds may be created in the waters of this state for the purpose of keeping such fish until the same can be advantageously disposed of.

## PENALTIES

29.63 GENERAL PENALTY PROVISIONS. (1) Penalties. Any person who, for himself, or by his agent, servant, or employe, or who, as agent, servant, or employe for another,

79—L.

violates any of the provisions of this chapter shall be punished, respectively, as follows:

(a) For the unlawful use of any gill net in taking, catching or killing fish of any variety in any waters, or for the use of any net in taking, catching or killing trout of any variety in inland waters, by a fine of not less than two hundred nor more than five hundred dollars, or by imprisonment in the county jail not less than nine months nor more than one year, or by both such fine and imprisonment.

(b) For hunting, trapping, fishing, or clamming without a license duly issued, whenever a license therefor is required by the provisions of this chapter, or for hunting, under a receipt or other evidence of having filed an application, in anticipation of the issuance and delivery of such license, or for the violation of any provision relating to deer, by a fine of not less than fifty nor more than one hundred dollars, or by imprisonment in the county jail not less than thirty days nor more than one year, or by both such fine and imprisonment.

(c) For the violation of any provision relating to game birds, by a fine of not less than fifty nor more than one hundred dollars, and in addition thereto five dollars for each bird affected by such violation, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment.

(d) For any violation for which no other penalty is prescribed, by a fine of not less than fifty nor more than one hundred dollars, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment.

(2) "Person" defined. The word "person" as used in this section includes natural persons, firms, associations, and corporations.

(3) Revocation of license. Upon conviction of any person for any violation under any license issued to such person, such license shall be immediately revoked and canceled, and no license shall be issued to such person for a period of one year thereafter.

(4) Construction of penalty provisions. No penalty prescribed in any section of this chapter shall be held to be diminished because the violation for which it is prescribed falls also within the scope of a more general prohibition.

(5) Presumptions. In any prosecution under this section it shall not be necessary for the state to allege or prove that

the animals were not domesticated or were not taken for scientific purposes, or were taken or in possession or under control without a license or permit therefor; but the person claiming that such animals were domesticated, or were taken for scientific purposes, or were taken or in possession or under control under a license or permit duly issued, shall have the burden of proving such fact or facts.

(6) Reward to informers. Any person other than the regular employes of the state conservation commission, informing of the violation of any provision of this chapter and assisting in the prosecution of the offender to conviction shall receive one-third of any fine imposed and collected thereupon.

Section 5. A new section is added to the statutes to be numbered and to read: Section 4562d. Any person who shall break, remove or interfere with any seal or tag attached to any animal, carcass, article or other thing by the state conservation commission, or who shall meddle or interfere with any animal, carcass, article or other thing with such seal or tag attached, or who shall counterfeit any such seal or tag, attached or unattached, shall be punished by a fine of not less than two hundred nor more than five hundred dollars, or by imprisonment in the county jail not less than nine months nor more than one year, or by both such fine and imprisonment.

Section 6. Sections 4567d and 4567f of the statutes are amended to read: Section 4567d. Any person who shall enter upon the grounds of any state fish hatchery for the purpose of unlawfully killing or taking any fish therefrom shall be punished by *a* fine of not less than ⁂ *one hundred* dollars nor more than ⁂ *two hundred* dollars, or by imprisonment not less than ⁂ *thirty* days nor more than ⁂ *sixty* days.

Section 4567f. Any person who shall injure any fish, or in any manner interfere harmfully with the ponds, streams, troughs or other property of the state fish hatchery, without lawful authority so to do, shall be punished by a fine of not less than ⁂ *fifty* dollars nor more than one hundred dollars; but this section shall in no wise change or affect any liability for arson or other burnings, nor burglary or other breakings, nor larceny of any property.

Section 7. A new section is added to the statutes, to be numbered 172—41 and to read: Section 172—41. All moneys, except fines, accruing to the state by reason of any provision of chapter 29 of the statutes, or otherwise received or collected

by each and every person for or in behalf of the state conservation commission, if not payable into the forest reserve fund, shall constitute the "conservation fund" and shall be paid, within one week after receipt, into the state treasury and credited to said fund. No money shall be expended or paid from the conservation fund except in pursuance of an appropriation by law; but any unappropriated surplus in said fund may be expended subject to the approval of the governor, secretary of state, and state treasurer, for additional equipment, new buildings, new hatcheries, or hatchery ponds, property, improvements, increasing the warden force at any particular period, or any other similar special purpose except road work or improvement work on the state parks.

SECTION 8. The section and subsection titles are inserted in this bill for convenience of reference; but are not a part of this enactment.

SECTION 9. This act shall take effect July 1, 1917.

Approved July 12, 1917.

---

No. 594, S.]                                    [Published July 16, 1917.

# CHAPTER 669

AN ACT to create section 4391m of the statutes, prohibiting the use of dynamite, blasting powder or other explosive for any purpose within the boundaries of any state park of Wisconsin, and providing a penalty.

*The people of the State of Wisconsin, represented in Senate and Assembly, do enact as follows:*

SECTION 1. A new section is added to the statutes to read: Section 4391m. Any person who discharges or explodes or causes to be discharged or exploded for any purpose any dynamite, blasting powder or other similar explosive at any place or point within the boundaries of any park owned by the state of Wisconsin, unless the use of such explosive is necessary for carrying on works of improvement done by, for or under the authority of the state or done by, for or under the authority of the county or town wherein such park in whole or in part is situated, shall be deemed guilty of a misdemeanor and upon conviction thereof shall be punished for the first offense by a fine of not less than fifty dollars nor more than one hundred dollars or by imprisonment in the county jail for not less than thirty days nor more than six months, and for a second or subsequent offense by both such fine and imprisonment. This

JA1928





DATE DOWNLOADED: Fri Feb 10 15:27:54 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1921 53 .

ALWD 7th ed.
, , 1921 53 .

Chicago 17th ed.
"," North Carolina - Public Laws and Resolutions, Extra Session - 1921 : 53-54

AGLC 4th ed.
'' North Carolina - Public Laws and Resolutions, Extra Session - 1921 53

OSCOLA 4th ed.
'' 1921 53

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

*First.* To supplement the funds in those counties specified in section two of this act, in order to provide a six months school term in each of said counties; *Supplements to county funds.*

*Second.* After the provisions of section two have been complied with, then the State Board of Education shall apportion the residue of the funds provided in this section in order to pay the salaries of the county superintendents and assistant superintendents for six months, and all city superintendents, all supervisors not otherwise provided for, all principals of elementary schools having ten or more teachers, and principals of standard high schools, for three months. *Apportionment of residue. County superintendents and assistants. City superintendents. Supervisors. Principals of elementary and high schools.*

Sec. 5. That section five thousand four hundred and eighty-eight of the Consolidated Statutes, as amended, be and the same is hereby further amended by adding at the end thereof the following: "*Provided*, that no action in the nature of a writ of mandamus shall be brought against the board of county commissioners to compel said board to levy a rate of taxation greater than the rate authorized by the General Assembly." *Proviso: mandamus for increase of tax rate not to lie.*

Sec. 6. All laws and clauses of laws in conflict with the provisions of this act are hereby repealed. *Repealing clause.*

Sec. 7. This act shall be in full force and effect on and after the date of its ratification.

Ratified this the 20th day of December, A.D. 1921.

---

### CHAPTER 6

## AN ACT TO PROTECT ANIMALS AND GAME IN PARKS AND GAME RESERVATIONS IN EITHER PRIVATE OR PUBLIC PARKS OR PLACES.

*The General Assembly of North Carolina do enact:*

Section 1. That it shall be unlawful for any person or persons to hunt, trap, capture, willfully disturb, or kill any animal or bird of any kind whatever, or take the eggs of any bird within the limits of any park or reservation for the protection, breeding, or keeping of any animals, game, or other birds, including buffalo, elk, deer, and such other animals or birds as may be kept in the aforesaid park or reservation, by any person or persons either in connection with the Government of the United States, or any department thereof, or held or owned by any private person or corporation. *Protection of game in parks or reservations.*

Sec. 2. That any person or persons who shall hunt, trap, capture, willfully disturb, or kill any animal or bird, or take the eggs of any bird of any kind or description in any park or reservation *Misdemeanor.*

**Punishment.**

as described in section one of this act, at any time during the year, shall be guilty of a misdemeanor, and shall be fined or imprisoned in the discretion of the court for each and every offense.

**Carrying weapons in parks or reservations.**
**Misdemeanor.**

Sec. 3. That any person who shall carry a pistol, revolver, or gun in any park or reservation such as is described in section one of this act, without having first obtained the written permission of the owner or manager of said park or reservation, shall be guilty of a misdemeanor, or shall be fined or imprisoned, in the discretion of the court, for each and every offense.

**Punishment.**

**Application of act.**

Sec. 4. That the provisions of this act shall apply only to that part of the State of North Carolina situated west of the main line of the Southern Railway running from Danville, Virginia, by Greensboro, Salisbury, Charlotte, and Atlanta, Georgia.

**Repealing clause.**

Sec. 5. All laws and clauses of laws in conflict with this act are hereby repealed.

Sec. 6. That this act shall be in force from and after its ratification.

Ratified this the 15th day of December, A.D. 1921.

---

## CHAPTER 7

### AN ACT TO CHANGE THE MONTH DURING WHICH ACCOUNTS OF STATE OFFICERS ARE EXAMINED BY COMMISSIONERS OF THE LEGISLATURE.

*The General Assembly of North Carolina do enact:*

**Date changed.**

Section 1. That section seven thousand six hundred and ninety-two of the Consolidated Statutes be and the same is hereby amended by striking out the word "December" in line six of said section and inserting in lieu thereof the word "July."

Sec. 2. That this act shall be in force from and after its ratification.

Ratified this the 10th day of December, A.D. 1921.

---

## CHAPTER 8

### AN ACT TO AUTHORIZE THE TREASURER TO BORROW NOT EXCEEDING $710,000 FOR THE STATE PUBLIC SCHOOL FUND.

**Preamble : tax at special session.**

**Purpose.**

Whereas the special session of the General Assembly of one thousand nine hundred and twenty, chapter ninety-one, section one, Public Laws, provided a State tax of thirteen cents for the purpose of paying "one-half the annual salary of the county superintendents and three months salary of all teachers of all sorts



DATE DOWNLOADED: Fri Feb 10 15:33:01 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
Revised Statutes of New Jersey, 1937: Effective December 20, 1937 (1937).

ALWD 7th ed.
. Revised Statutes of New Jersey, 1937: Effective December 20, 1937 (1937).

APA 7th ed.
(1937). Revised Statutes of New Jersey, 1937: Effective December 20, 1937. Trenton,
State of New Jersey.

Chicago 17th ed.
Revised Statutes of New Jersey, 1937: Effective December 20, 1937. Trenton, State of
New Jersey.

McGill Guide 9th ed.
Revised Statutes of New Jersey, 1937: Effective December 20, 1937 (Trenton: State of
New Jersey., 1937)

AGLC 4th ed.
Revised Statutes of New Jersey, 1937: Effective December 20, 1937 (State of New
Jersey., 1937)

MLA 8th ed.
Revised Statutes of New Jersey, 1937: Effective December 20, 1937. Trenton, State of
New Jersey. HeinOnline.

OSCOLA 4th ed.
Revised Statutes of New Jersey, 1937: Effective December 20, 1937. Trenton, State of
New Jersey.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

serve, care for and protect all the lands, parks and parkways under its jurisdiction.

Source. L. 1935, c. 114, §1, p. 303, suppl. to L. 1900, c. 87, p. 163.

**32:14–13.1. Acts prohibited; punishment.** No person shall:

1. Injure, deface, disturb, or befoul any part of the park nor any building, sign, equipment or other property found therein, nor remove, injure or destroy any tree, flower, shrub, rock or other mineral found therein; or

2. Deposit in any part of the park any garbage, sewerage, refuse, waste or other obnoxious material, otherwise than in receptacles or pits provided by the board of commissioners for such purpose; or

3. (a) Drive or propel or cause to be driven or propelled along or over any road within the park any vehicle at a greater rate of speed than twenty miles per hour, or (b) around curves at a greater rate of speed than fifteen miles per hour, or (c) between points so marked at a greater rate of speed than ten miles per hour; or

4. (a) Operate, or cause to be operated, a commercial vehicle on the Henry Hudson drive, or (b) if an operator of any commercial vehicle, in driving off any ferry boat landing in the park, drive otherwise than to the right of the road and stop, permitting all pleasure vehicles to pass ahead of such commercial vehicle, or (c) move out of his place in any line of traffic at any time established by the board of commissioners on any of the park roads, or (d) ride a bicycle on the Henry Hudson drive or on either of the two ferry approach drives, or (e) park or store any motor car, motor cycle, bicycle, wagon or other vehicle within the park except in places designated by the board of commissioners for such purpose, or (f) park or operate any vehicle in the park, after dark, without lights, or (g) park any vehicle in the park after midnight, during the hours of darkness, in areas other than those designated by the board of commissioners for such purpose; or

5. (a) Maintain any camp or camps in the park for any period except at such places as may from time to time be designated by the board of commissioners for camping, or (b) camp at any place in the park without obtaining a permit from the board of commissioners for such purpose; or

6. (a) Light any fire or fires at any time in any part of the park except on or between the shore path and the river, or in places designated by the board of commissioners for such purpose, or (b) leave a fire until same has been completely extinguished; or

7. (a) Sell or offer for sale within the park any property or privilege whatsoever, or (b) if a person to whom property of the park has been intrusted by the board of commissioners for personal use, hire, lease or let out the same to any other person, without a permit from the board of commissioners, or (c) take photographs· or moving pictures within the park for the purpose of selling the negatives thereof or prints therefrom without a permit from the board of commissioners, or (d) operate a bus, taxicab or

other vehicle for the transportation of passengers or property for hire within the park without a permit from the board of commissioners, or (e) if a person operating a boat or airplane for hire, land or receive passengers at any of the docks or lands owned or controlled by the board of commissioners, without a permit from the board of commissioners; or

8. Except employees or officers of the board of commissioners, carry firearms of any description within the park, or carry any air gun, sling shot, bow and arrow, or any other device whereby a missile may be thrown, without a permit from the board of commissioners; or

9. Hunt, pursue with dogs, trap or in any way molest any of the wild birds and beasts found within the confines of the park, without a permit from the board of commissioners; or

10. (a) Gamble in the park, or (b) bring into the park or have in his possession while there any implement or device commonly used or intended to be used for gambling purposes; or

11. Erect or post any sign or notice at any place in the park without a permit from the board of commissioners; or

12. Herd, graze or drive any live stock of any kind in or through the park or let such live stock run at large in the park, without a permit from the board of commissioners; or

13. (a) Bring into, have or keep in the park any cat or other animal destructive of bird life, or (b) bring into, have or keep in the park any dog or any other pet or domesticated animal unless the same is in leash or in cage, without a permit from the board of commissioners; or

14. (a) Run or walk on any of the park drives except to cross the same at points designated by the board of commissioners for that purpose, or (b) climb the cliffs at points other than those designated by the board of commissioners for that purpose; or

15. (a) Use loud, boisterous or indecent language, or (b) interfere with any officer of the park in the performance of his duty, or (c) be indecently dressed or exposed within the confines of the park, or (d) conduct himself in such a manner as to endanger the life, limb or property of other visitors to the park; or

16. Possess within the park any narcotic drug or intoxicating liquor other than liquor on sale under state license; or

17. (a) Bathe, dive or swim in or off any property of the park, except at points designated by the board of commissioners for that purpose, or (b) change his clothing or disrobe except in the bath houses provided by the board of commissioners for that purpose, or (c) propel, land or store any canoe, boat or any other vessel in or near any waters within or off the park property, except at points designated by the board of commissioners for that purpose; or

18. Fish or crab off any docks or property of the park except at points designated by the board of commissioners for that purpose.

Every person who shall violate any of the provisions of this section shall be liable to a

penalty for each offense of a fine of not more than fifty dollars or imprisonment in the county jail for a term of not more than thirty days, or both.

Sources. L. 1935, c. 114, §§2, 3, pp. 304, 306, suppl. to L. 1900, c. 87, p. 163.

**32:14-13.2.  Jurisdiction of prosecutions; procedure.**  The court or judges before whom any proceedings for the recovery of any penalty under section 32:14-13.1 of this title shall be brought and the proceedings and processes by which such actions shall be enforced shall be those provided for in sections 32:14-22 to 32:14-27 of this title.

Source. L. 1935, c. 114, §4, p. 306, suppl. to L. 1900, c. 87, p. 163.

**32:14-14.  Roads and ways in and to park.**  The board of commissioners shall have power to lay out, construct and maintain roads, pathways and boulevards upon, across and over the park; lay out, construct and maintain roads between and connecting any separated portions of the park, and, for this purpose, may acquire right of ways upon and across any intervening lands; and lay out, construct and maintain roads and ways connecting the roads and ways within the park with other public roads outside of and adjacent thereto.

Source. L. 1900, c. 87, §5, p. 164, as am. by L. 1901, c. 112, §1, p. 247 [C. S. p. 3891, §5], L. 1915, c. 259, §1, p. 462, L. 1921, c. 269, §1, p. 797, L. 1922, c. 154, §1, p. 268 [1924 Suppl. §147-5], L. 1925, c. 160, §2, p. 401.

**32:14-15.  Continuity of park with New York park.**  The said board of commissioners shall, in laying out and maintaining said park, have regard for the laying out and maintenance of such park as may be established by the state of New York along the Palisades and Hudson river, and shall, so far as may be, lay out and maintain said park in such manner that it, together with such park as may be established by the state of New York, shall form a continuous park, the intention of this chapter being to provide, in conjunction with the state of New York, for the establishment of a park along the front of the Palisades, from Fort Lee in this state to the termination thereof in New York, thereby preserving the scenic beauty of the Palisades.

Source. L. 1900, c. 87, §5, p. 164, as am. by L. 1901, c. 112, §1, p. 247 [C. S. p. 3891, §5], L. 1915, c. 259, §1, p. 462, L. 1921, c. 269, §1, p. 797, L. 1922, c. 154, §1, p. 268 [1924 Suppl. §147-5], L. 1925, c. 160, §2, p. 401.

**32:14-16.  Access to lands not in park upon and across park lands.**  Nothing contained in this chapter shall prevent access upon and across lands which have been acquired by the board of commissioners as portions of the park, to or from lands of private individuals or corporations lying along the foot of the Palisades within the limits of the park in this state which have not been so acquired, or from the lands lying on the top of the Palisades to the Hudson river, by elevator, highway, steam, electric or other road; and such access may be acquired in the manner provided by law, as though the park lands were privately owned.

Source. L. 1900, c. 87, §11, p. 167 [C. S. p. 3892, §11].

**32:14-17.  Use of park lands by municipalities for pipe lines and public sewage and drainage outlets.**  Any municipality in this state, lying adjacent to lands belonging to, controlled or held by the board of commissioners, under and by virtue of the provisions of this chapter, shall have the right to cross, occupy and use the lands belonging to, controlled or held by the board of commissioners, lying between such municipality and the Hudson river, for the purpose of constructing, operating and maintaining a pipe line or lines and outlet or outlets for public sewage and drainage purposes in such municipality, and to repair, relay, enlarge, operate and maintain such line or lines, outlet or outlets at all times.

The location of such pipe line or lines or outlet or outlets and the plans and specifications therefor shall be approved by the state department of health; which approval shall only be given upon application of the municipality after hearing, notice of which has been given to the board of commissioners.

The lands so crossed, occupied and used shall, after the construction, repairing, relaying or enlarging of any pipe line or outlet, be replaced in a condition satisfactory to the board of commissioners, and shall be maintained in a condition satisfactory to the board of commissioners at all times.

Source. L. 1925, c. 43, §1, p. 116, suppl. to L. 1900, c. 87, p. 163.

**32:14-18.  Grants of lands to port authority for bridge purposes.**  The board of commissioners may, at any time upon application therefor, make a grant or grants of lands to the Port of New York Authority (a body corporate and politic, created and existing under and by virtue of a compact between the states of New York and New Jersey, with the consent of the congress of the United States), for the purpose of enabling the port authority to construct, operate and maintain a bridge or any part thereof on, over or under lands under the control of the Palisades Interstate park, whether the same are on the top, edge or base of the Palisades, or the crest or slope thereof.

Such grant or grants may include any interests of the board of commissioners in any and all lands which may be in the ownership of and under the control of the board of commissioners and lying under the waters of the Hudson river to the east of such lands.

The grant or grants may be made for such consideration, nominal or otherwise, as the board of commissioners may deem proper, and, when made, shall be signed by the president and attested by the secretary of the board of commissioners, and the seal of the board of commissioners shall be affixed thereto.

Source. L. 1927, c. 64, §1, p. 118, suppl. to L. 1900, c. 87, p. 163.

**32:14-19.  Sale of unnecessary lands.**  The board of commissioners may sell such lands on the top of the Palisades as, in its judgment, may not be necessary for park purposes, together with a right to grant easements over such lands for public improvements.

Source. L. 1900, c. 87, §5, p. 164, as am. by L. 1901, c. 112, §1, p. 247 [C. S. p. 3891, §5], L. 1915, c. 259, §1, p. 462, L. 1921, c. 269, §1, p. 797, L. 1922, c. 154, §1, p. 268 [1924 Suppl. §147-5], L. 1925, c. 160, §2, p. 401.

2d copy     Dept.    CH. S.

Mar. 18.

41

C
‡

O

# LAWS AND ORDINANCES

GOVERNING THE

# VILLAGE OF HYDE PARK

TOGETHER WITH ITS

## CHARTER AND GENERAL LAWS

AFFECTING MUNICIPAL CORPORATIONS; SPECIAL ORDINANCES AND
CHARTERS UNDER WHICH CORPORATIONS HAVE VESTED RIGHTS
IN THE VILLAGE. ALSO, SUMMARY OF DECISIONS OF THE
SUPREME COURT RELATING TO MUNICIPAL CORPO-
RATIONS, TAXATION AND ASSESSMENTS.

———————

PRINTED AND PUBLISHED BY

AUTHORITY OF THE PRESIDENT AND BOARD OF TRUSTEES

OF THE VILLAGE OF HYDE PARK.

———————

REVISED AND ARRANGED

## By CONSIDER H. WILLETT,

VILLAGE ATTORNEY.



CHICAGO
HISTORICAL
SOCIETY

HYDE PARK:
1876.

JA1935



172 AND 174 CLARK STREET.

FEB 4    1915

Case | 20 Cook 436-9900 - Documents 40 | (Page/744 0) Date filed 07/09/08 Page D 2000

§ 2. The bonds authorized to be issued by the act of which this is amendatory and supplemental, may be issued, sold, and the proceeds applied for acquiring said lands, and for any and all purposes in the said act mentioned. Said bonds shall be retired and canceled as fast as the money for that purpose can be obtained, by the collection of the money due upon the special assessment provided for in section seven of the act hereinbefore mentioned, and a sufficient amount of any bonds that may be issued by the city of Chicago under any law now in force or hereinafter enacted, and received oy said commissioners, shall be applied to the purpose of retiring the bonds authorized by said act.

§ 3. The ninth section of said act is hereby so amended that the words "during the current year," shall read "during the next succeeding year."

§ 4. That the twelfth section of said act be and the same is hereby amended so as to read as follows: The said commissioners, or either of them, may be removed from office by the judge of the circuit court of Cook county, upon the petition presented to him in term time, or in vacation, by one hundred freeholders of said towns of South Chicago, Hyde Park and Lake, if it shall appear after hearing proof before said judge, that the said commissioners, or either of them, have been guilty of misdemeanor or malfeasance in office under this act; and if the said 'judge shall remove any one or more of said commissioners from office for any cause before the expiration of their term of office, he is hereby authorized and empowered to fill the vacancy or vacancies thus created by appointing other commissioners in their place, who shall serve during the unexpired terms of the commissioners so removed.

§ 5. The commissioners to be appointed under said act are hereby vested with the same powers and duties as are conferred by said act in relation to lands designated for parks, over all streets running longitudinally along and adjoining any and all of the proposed parks, or strips of land designated in said original act, as are conferred by said act in relation to such parks and strips of land, as may be necessary to improve and keep in repair the same, in connection with the said parks or strips of land without obstructing the fences or other structures, free access to the said streets from existing roads and streets, and by owners of land abutting on the same.

§ 6. The elections held in the towns of South Chicago, Hyde Park and Lake, on the twenty-third day of March, A. D. 1869, under and by virtue of the eighteenth section of the act to which this is an amendment, are hereby legalized and confirmed, and said act shall be held and deemed to have been regularly and legally adopted by the legal voters of said towns, and shall remain in full force and effect, and shall be liberally construed in all courts, with a view to carry out and enforce the intent and meaning of the same.

§ 7. This act is hereby declared a public act, and shall take effect and be in force from and after its passage.


## SOUTH PARK ORDINANCES.


Whereas, by an act of the general assembly of the State of Illinois, entitled an act to provide for the location and maintenance of a park for the towns of South Chicago, Hyde Park and Lake, it is provided as follows, to-wit:

JA1937

"The said board shall have full and exclusive powers to govern, manage and direct said park ; to lay out and regulate the same ; to pass ordinances for the regulation and government thereof ; to appoint such engineers, surveyors, clerks, and other officers, including a police force, as may be necessary ; to define and prescribe their respective duties and authority ; to fix the amount of their compensation ; and, generally, in regard to said park, they shall possess all the powers and authority now by law conferred upon or possessed by the common council of the city of Chicago, in respect to public squares and places in said city."

*Therefore, be it ordained by the South Park Commissioners as follows:*

§ 1.   The said park, which is under the management and direction of the South Park Commissioners, shall be, and the same is hereby designated, as the South Park.

§ 2.   No person shall, without the consent of the superintendent, play at ball, cricket, or any other game or play whatever, in said park.

§ 3.   No person shall climb or walk upon any wall or fence of said park.

§ 4.   Cattle, horses, goats, swine, or other animals, or domestic fowls, shall not be turned into said park, or allowed to run at large therein.

§ 5.   No dog or bitch, or domestic fowl, belonging to any officer or employee of said commissioners residing within the limits of said park, shall be permitted to run at large.

§ 6.   All persons are forbidden to carry fire arms, or to throw stones or other missiles within said park.   All persons are forbidden to cut, break, or in any way injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, bridges, or other construction or property within or upon said park.

§ 7.   No person shall converse with, or in any manner hinder those engaged in constructing or repairing said park.

§ 8.   No animal shall be driven or ridden in said park, at a rate of speed exceeding eight miles per hour.

§ 9.   No vehicle, or horse, or other animal, shall be permitted on the foot walks, the same being assigned exclusively to pedestrians ; nor shall any vehicle, or horse or other animal of burden, go or be taken upon any part of said park, except upon the carriage drives and upon such places as are appropriated for carriages at rest.

§ 10.   No vehicles or animals shall be permitted to stand upon the drive or carriage roads of said park, or of any part thereof, to the obstruction of the way, or the inconvenience of travel ; nor shall any person solicit passengers within said park without consent of the board.

§ 11.   No person shall, within said park, expose for sale any article or thing, nor shall any hawking or peddling be allowed therein.

§ 12.   No omnibus, wagon, cart, dray, truck, or other vehicle for carrying goods, merchandise, manure, or other articles, except such as are engaged in repairing or constructing said park, shall be allowed to enter the same.

§ 13.   No language, abusive, insulting, obscene, or calculated to occasion a breach of the peace, shall be permitted in said park, nor shall persons tell fortunes, play at any game of chance, at any table or instrument, be drunk, or do any indecent acts therein.

JA1938

§ 14.   No person shall bathe or fish, or go or send, or ride any animals into the waters of said park, nor shall any person disturb any fish, fowl or other animals kept therein, or throw or place any article or thing into the waters or upon the grounds thereof.

§ 15.   No person shall discharge, or set, or touch off, or enkindle, or operate any manner of fire, or fireworks in the said park.

§ 16.   No person shall, in the said park, post or fix any notice or bill ; nor shall such be posted or fixed on any tree, fence, or any place therein.

§ 17.   No person shall, in the said park, play any musical instrument, nor carry or display any flags, banners, transparencies, or target.

§ 18.   No band or company shall be permitted to parade, drill, or perform any movements, evolutions or ceremony in said park without the consent of the park commissioners.

§ 19.   No funeral procession, or hearse carrying a deceased body, shall be in the said park permitted.

§ 20.   No horse or other animal shall be permitted to go upon any grass or lawn, nor shall any person be permitted to go thereon except where the word " common " shall be posted to indicate the permission so to do.

§ 21.   Any member of the South Park police shall have power to arrest, and commit for examination, any person who shall not, when directed, desist from any violation thereof.

§ 22.   Any person who shall disobey, or neglect, fail, or refuse to comply with this ordinance, or any section thereof, except when otherwise herein provided, shall, on conviction thereof, pay a fine of not less than *five*, or more than one hundred dollars.

§ 23.   The police force of said South Park Commissioners, shall consist of one captain, three sergeants, and such number of policemen as shall from time to time be appointed, and they shall hold their respective offices during the pleasure of the park commissioners.   The captain of police shall have the general charge of the police force, subject to such rules and regulations as shall from time to time be established, and it shall be his duty to report to the commissioners, in writing, the delinquency of any member of the police force, and may suspend any such member, until such delinquency shall be acted upon by the commissioners.

§ 24.   The several members of the police force, when on duty, shall devote their time and attention to discharge of the duties of their station according to the ordinance, rules, and regulations and directions of the superintendent, and it shall be their duty, to the best of their ability, to preserve order, peace, and quiet, and to enforce the laws and the ordinances of said commissioners, and they shall not engage in conversation with an employée of the park during working hours, except in the line of duty ; they shall have power to arrest any persons in the park found in the act of violating any law or ordinance, or abetting and aiding in any such violation, and shall take all such persons so arrested, as follows, to-wit : when the offense is committed in that portion of the park situated in the town of Hyde Park, to some justice or magistrate in Hyde Park ; when the offense is committed in that portion of the park situated in the town of Lake, to some justice or magistrate in said town of Lake ; and when the offense

JA1939

is committed in that portion of the park situated in the town of South Chicago, to some justice of the peace in said town of South Chicago.

§ 25. Whoever, in said park, shall resist any member of the police force in the discharge of his duty, or shall in any way interfere with, or hinder or prevent him from discharging his duty, as such member, or shall offer or endeavor to do so ; and whoever shall in any manner assist any person in custody of any member of the police force to escape, or attempt to escape, from such custody, or shall rescue, or attempt to rescue, any person in custody, shall be fined not less than five dollars, or more than one hundred dollars.

§ 26. The superintendent, in cases of emergency, is hereby authorized and empowered to appoint special policemen, and such special policemen shall have the same power and authority of regular policemen, provided the appointment of such special policeman shall in no case continue for a period exceeding twenty-four hours.

§ 27. The sergeant of police shall perform the duties of the captain when the latter shall be absent from duty.

§ 28. The police force shall be uniformed as follows : Gray frock coat, pants and vest, and cap with brass buttons, and black cord on leg of the pants.

§ 29. Any person who shall falsely represent or personate any of the members of the police force, or who shall maliciously, with intent to deceive, use or imitate any of the signs, signals, or devices adopted and used by the police department, or shall wear in public the uniform adopted as the police uniform, after having been removed or suspended, shall be subject to a fine of not less than five dollars nor more than one hundred.

§ 30. These ordinances shall take effect and be in force from and after the 19th day of November, 1875.

JA1940

Case 1:22-Case: 22-1900 -Document 40 - Page: 246 - Date Filed: 07/28/2022 D 2064

# THE REVISED

# ORDINANCES

### OF THE

# CITY OF DANVILLE.



## PUBLISHED BY AUTHORITY OF THE CITY COUNCIL.



### REVISED AND ARRANGED BY

# MANN, CALHOUN & FRAZIER.

DANVILLE, ILL.:

BOWMAN & FREESE, BOOK AND JOB PRINTERS.

1883.

JA1941

# GENERAL INCORPORATION LAW

OF

# CITIES AND VILLAGES.

OCT 13 1915

JA1942

Case 1:22-cv-00123-ABC-JDW Document 48-1 Page 248 of 436 PageID #: 2005

# CHAPTER XIX.

### PARKS.

SECTION.

1. Committee on public grounds, etc. to have charge.
2. Entering Parks, etc.—Climbing on fences.
3. Turning animals into park, etc.
4. Firearms—Shooting—fire works prohibited.
5. Injury to trees, grass, buildings.
6. Selling, hawking, peddling, etc. forbidden.
7. Bathing, fishing, etc. prohibited.

SECTION.

8. Abusive, profane language, etc. prohibited.
9. Gaming, etc. prohibited.
10. Intoxicated persons, indecent or unlawful acts.
11. Fires in parks forbidden.
12. Carriages on turf, etc.— hitching horses to trees, etc.
13. Throwing stones, rubbish, etc. in parks.
14. Posting bills, etc. forbidden.

COMMITTEE ON PUBLIC GROUNDS, ETC., TO HAVE CHARGE OF PARKS.] § 1. It shall be the duty of the committee on Public Grounds and Buildings to superintend all inclosed public grounds or parks in said city, and keep the fences thereof in repair, the walks in order, the trees properly trimmed, and to improve the same according to plans approved by the city council.

PENALTY FOR LEAVING PARK EXCEPT AT GATEWAYS—CLIMBING ON FENCE, ETC.] § 2. Whoever shall enter or leave any of the public parks of this city except by their gateways, or shall walk or climb upon any of the fences inclosing, or in the same, shall be fined not less than one dollar nor more than ten dollars for each offense.

TURNING ANIMALS INTO PARK PROHIBITED.] § 3. Whoever shall turn any cattle, horses, goats, swine or other animals into any park of said city, or permit the same, or any of them, to run therein, shall be fined not less than three dollars, nor more than fifty dollars, for each offense.

FIRE-ARMS AND FIRE-WORKS FORBIDDEN.] § 4. Whoever shall carry any fire-arms into said parks, or shall fire off or discharge the same in, or into said parks, or any of them ; or whoever shall shoot, fire or discharge any kind of fire-works therein, shall be fined not less than one dollar nor more than one hundred dollars, for each offense.

INJURY TO TREES, GRASS, BUILDINGS, ETC.] § 5. Whoever shall cut, break or injure in any way any tree, shrub or plant, in any such park ; or shall cut, tramp, or injure in any way the turf or grass therein, or shall walk or lie upon the grass at any place where placards are posted directing persons to keep off, or not to walk upon the same ; or shall cut, mark, deface or in any way injure any of the buildings, fences, bridges, or other constructions, or property of any kind, in any such park, shall be fined not less than one dollar, nor more than one hundred dollars for each offense.

JA1943

SELLING, HAWKING OR PEDDLING FORBIDDEN.] § 6. Whoever shall sell, or offer to sell, any article or thing, in any such park, or shall hawk or peddle any article or thing therein, or attempt so to do, shall be fined not less than three dollars, nor more than one hundred dollars.

BATHING—FISHING, ETC., PROHIBITED.] § 7. Whoever shall bathe, fish in, or ride or drive any animal in the waters of any such park, or throw any rubbish or garbage or other thing into any stream or waters of such park, shall be fined not less than three dollars, nor more than ten dollars.

ABUSIVE LANGUAGE, ETC.] § 8. Whoever shall use any threatening, abusive, insulting, profane, or indecent language in any part of any such park, shall be fined not less than three dollars, nor more than one hundred dollars.

GAMING, ETC., PROHIBITED.] § 9. Whoever shall gamble for money or other valuable thing, or anything representing or intended to represent money, or other thing of value, or shall play at any game of chance, or at or with any table, instrument or device of gaming, in any part of any such park, shall be fined not less than five dollars, nor more than two hundred dollars for each offense.

INTOXICATED PERSONS—INDECENT OR UNLAWFUL ACTS.] § 10. Whoever shall be found in any such park in an intoxicated condition, or shall resort to such park for any indecent, or unlawful purpose ; or shall be guilty of any indecent, obscene, vulgar, improper or unlawful act while there, shall be fined not less than five dollars, nor more than two hundred dollars.

FIRES IN PARK PROHIBITED.] § 11. Whoever, except employees, or laborers in such park, shall light or make any fire in said parks, shall be fined not less than three dollars, nor more than one hundred dollars.

DRIVING CARRIAGES, ETC., ON TURF—HITCHING HORSES TO TREES.] § 12. Whoever shall drive any carriage or vehicle of any kind, or any horse or other animal upon the grass, lawn or turf, of any such park, or shall hitch a horse to any of the shrubs or trees therein, shall be fined not less than one dollar, nor more than fifty dollars for each offense.

THROWING STONES, RUBBISH, ETC., IN PARKS.] § 13. Whoever shall throw any stones into, or in such parks, or shall throw or place any rubbish or garbage of any kind therein, or shall leave or place any bottle, cans, paper, or scraps of any kind therein, shall be fined not less one dollar, nor more than twenty-five dollars for each offense.

POSTING BILLS, ETC., FORBIDDEN.] § 14. Whoever shall post, or otherwise affix any bills, notice or other paper, upon any fence, tree, bridge, building or other structure therein, shall be fined not less than three dollars.

JA1944

*From Henry Shaw to
Doct. Asa Grey
Cambridge
April 1884*

# TOWER GROVE PARK

— OF THE —

## CITY OF ST. LOUIS.

Review of its Origin and History, Plan of Improve-
ment, Ornamental Features, Etc.

WITH ILLUSTRATIONS.

Prepared by Order of the Board of Commissioners.

By David H. MacAdam.

1883:

R. P. Studley & Co., Printers.

St. Louis, Mo.

Digitized by Google

## RULES AND REGULATIONS.

In accordance with the authority conferred by the Act creating Tower Grove Park, the Board of Commissioners have adopted the following rules and regulations:

All persons are forbidden —

1. To enter or leave the park except by the gateways.

2. To climb the fences.

3. To turn cattle, horses, goats or swine into the park or the avenues surrounding the park.

4. To carry firearms or to throw stones or other missiles within it.

5. To cut, break, or in any way injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, bridges, or other constructions upon the park;

6. Or to converse with, or in any way hinder, those engaged on the work of the park.

7. A pound is hereby established within the Tower Grove Park for the impounding of horses, cattle, sheep, goats, dogs and swine found trespassing upon said park or the adjacent avenues. All such animals found at large may be taken by any person or persons and driven or carried to the pound, and may be kept enclosed therein during five days, at the end of which time, if not previously claimed, they may be sold at public auction; provided, that, within two days after they shall have been impounded, notice of the sale shall have been conspicuously posted in the pound or vicinity.

Any person claiming property in such impounded animals before the day of sale, may recover the same, after suitable proof of his or her right thereto, upon payment for each animal of the sum of two dollars and the expenses of keeping; the expenses of keeping to be reckoned as follows:

For each horse, dog, or head of neat stock, sixty cents per day;

For each goat, swine, or sheep, twenty-five cents per day.

These charges shall be paid to the chief park keeper of Tower Grove Park, and the money thus collected shall by him be handed over within one week to the comptroller of the board.

If within one month after the sale of any impounded animals their former owner shall appear and claim the same, the treasurer shall, after deducting the full amount of the charges provided for above, pay over to him the proceeds of their sale; otherwise the amount shall be added to the funds of the board.

8. No animal shall travel on any part of the Tower Grove Park, except upon the drive or carriage road, at a rate exceeding six miles per hour. Persons on horseback shall not travel on the drive or equestrian road at a rate exceeding seven miles per hour.

9. No vehicle or riding shall be permitted on the walks, the same being devoted exclusively to pedestrians; nor shall any vehicle, horse, or burden, go



upon any part of the park except upon the " drive,"and upon such places as are appropriated for carriages at rest.

10.  No animal or vehicle shall be permitted to stand upon the "drive" or carriage roads of the park, or any part thereof, to the obstruction of the way or to the inconvenience of travel, nor shall any person upon the park solicit or invite passengers.

11.  No hackney coach, carriage, or other vehicle for hire, shall stand upon any part of the park for the purpose of taking in any other passengers or persons than those carried to the park by said coach, carriage, or vehicle, unless invited by the persons having said vehicle.

12.  No person shall expose any article or thing for sale upon the park except previously licensed by the Board of Commissioners of Tower Grove Park, nor shall any hawking or peddling be allowed on the park.

13.  No omnibus or express wagon, with or without passengers, nor any cart, dray, wagon, truck, or other vehicle carrying goods, merchandise, manure, soil or other article, or solely used for the carriage of goods, merchandise, manure, or other articles, shall be allowed to enter any part of Tower Grove Park, or any vehicle carrying more than six persons.

14.  No threatening, abusive, insulting or indecent language shall be allowed on the park whereby a breach of the peace may be occasioned.

15.  No person shall be allowed to tell fortunes or play at any game of chance at or with any table or instrument of gaming, nor to do any obscene or indecent act whatever in Tower Grove Park.

16.  Tower Grove Park shall be open daily to the public during the months of December, January and February from seven o'clock in the morning until half an hour after sunset in the evening; during the months of March, April, May, June, October, and November, from six in the morning until half an hour after sunset, and during the months of July, August, and September, from five in the morning until half an hour after sunset in the evening.

17.  The comptroller or superintendent may direct that the park or any of the entrances to the park be closed at any time, and may, on special occasions, also direct that the park or any portion thereof remain open at other times than those specified.

18.  No person other than employees of the Board of Commissioners of Tower Grove Park shall enter or remain in the park except when it is open as above provided.

19.  No person, except in the employ of the Board of Commissioners of the Tower Grove Park, shall bring upon the Tower Grove Park any tree, shrub, plant, or flower, nor any newly plucked branch or portion of a tree, shrub, plant, or flower.

20.  No person shall fire, discharge or set off in Tower Grove Park any rocket, cracker, torpedo, squib, balloon, snake, chaser, or double-header, nor any fireworks or thing under any other name composed of the same or similar material, or of the same or similar character, as the fireworks above specified, except with consent of Board of Commissioners or comptroller.

21.  No person shall place or propel any invalid chairs, perambulators,



bicycles or velocipedes upon any portion of the Tower Grove Park except upon the walks.

22.   No person shall post or otherwise affix any bill or notice, in paper or paint, upon any structure or thing within the park, nor upon any of the gates or surrounding avenues.

23.   No person shall without the consent of the comptroller of the park play upon any musical instrument within Tower Grove Park, nor shall any person take into or carry or display in the park any flag, banner, target, or transparency.

24.   No military or target company, or civic or other procession, shall be permitted to parade, drill or perform upon the park any military or other evolutions or movements without the written consent of the comptroller.

25.   No fire-engine, hook or ladder, cart, hose, truck, or other machine on wheels commonly used for the extinguishing of fire, shall be allowed on any part of Tower Grove Park without the previous consent of the comptroller of the park.

26.   No funeral procession or hearse, or other vehicle or person carrying the body of a deceased person, shall be allowed on any part of Tower Grove Park.

27.   No person, except in the employ of the Board of Commissioners of Tower Grove Park, shall light, make or use any fire upon the Tower Grove Park.

Case 1:22-Case 423-RMB-ANDocument 48-8 Page 254 02.Date Filed 07/20/2023geID: 2072

[Published by Authority.]

# THE

# REVISED ORDINANCES

OF

# Salt Lake City,

*Ordinances, etc.*

WITH THE

# CITY CHARTER AND AMENDMENTS THERETO.

## FEBRUARY 14, 1888.

SALT LAKE CITY, UTAH:
PRINTED BY THE STAR PRINTING COMPANY.

1888.

JA1949

CC
Salt Lake City
3
1888

44-158
Judah P. Benjamin

JA1950

Case 1:22-cv-00483-RBW-AMD Document 46-8 Page 256 Date Filed 07/20/2023 PageID 2074

# CHAPTER XXVII.

### OF LIBERTY PARK.

1.  May or to control Park and appoint Keepers.    Keepers given police powers.
2.  When gates to be closed.
3.  Drays, trucks, etc., not to travel upon drives.
4.  Rate of speed.   Racing prohibited.
5.  Vending in Park prohibited.
6.  Injuring property.    Disturbance.    Animals trespassing, etc. Firearms.
7.  Rule in meeting vehicles.
8.  Associations, etc., to get permit.
9.  Penalty.

SECTION 1.  The Mayor shall have the control and charge of Liberty Park, and shall have power to appoint one or more Park Keepers, whose duties shall be to have charge of the Park ,under the Mayor's direction, and to see that the provisions of this chapter are carried into effect; and for that purpose they are hereby given police powers and authorized to arrest any person violating any of the provisions of this chapter.

*Mayor to control Park and appoint Keepers.*

*Keepers given police powers.*

SEC. 2.  All the gates of Liberty Park shall be closed at nine o'clock each evening; and all travel on the roads of said Park, or other use of the grounds between nine o'clock P. M. and five o'clock A. M., shall be unlawful except by permission of the Mayor.

*When gates to be closed.*

SEC. 3.  No dray, truck, wagon, cart or other vehicle carrying, or if not carrying, employed regularly in carrying goods, merchandise, manure, soil or other article of commerce or trade, shall be allowed to travel upon the drives of said Park.

*Drays, trucks, etc., not to travel upon drives.*

SEC. 4  All persons are hereby prohibited from riding or driving upon the roads within said

*Rate of speed.*

JA1951

Case 1:22-cv-00423-RMB-AMD Document 48-8 Page 257 of 436 Filed 07/20/2023 PageID: 2075

Park at a rate of speed exceeding eight miles per hour, and it shall be unlawful for two or more persons to engage in racing with animals in said Park except by consent of the Keeper thereof.

*Racing prohibited.*

SEC. 5.  No person shall vend or sell, or offer to vend or sell any article or thing whatever within said Park without the consent of the City Council.

*Vending in Park prohibited.*

SEC. 6.  No person shall, within Liberty Park, cut, break, or in any way injure or deface any trees, shrubs, plants, buildings, fences or property of any kind; or indulge in noisy, boisterous, riotous, or indecent behavior, or use any boisterous or offensive language; or, except authorized by the Mayor:  1—Let loose any cattle, horses, goats, sheep or swine.  2—Drive a herd of said animals through the grounds.  3—Carry or discharge firearms.  4—Camp, lodge or tarry over night. 5—Ride or drive any horse or other animal, with or without vehicle, elsewhere than on the roads or drives for such purposes provided.  6—Catch or kill any birds or fish of any kind.

*Injuring property.*

*Disturbance.*

*Animals trespassing, etc.*

*Firearms.*

SEC. 7.  All persons in riding or driving in said Park, when meeting other animals or vehicles, shall pass to the right.

*Rule in meeting vehicles.*

SEC. 8.  When any company or association of persons exceeding fifty in number desire to resort to the Park for any lawful purpose, they, or one representing them, shall first get the permission of the Mayor.

*Associations, etc., to get permit.*

SEC. 9.  Any person violating any of the provisions of this chapter shall, upon conviction, be liable to a fine of not to exceed fifty dollars.

*Penalty.*

JA1952

Case 1:22-cv-01459-RMB-AMD Document 49 Page 258 of 436 Filed 07/28/2023 PageID: 2076

# A DIGEST

OF THE

# Laws and Ordinances

FOR THE GOVERNMENT OF THE MUNICIPAL CORPORATION OF THE

CITY OF WILLIAMSPORT, PENNSYLVANIA, *Ordinances, etc.*

IN FORCE AUGUST 1, 1900.



PUBLISHED BY AUTHORITY OF THE CITY COUNCILS

IN THREE PARTS

By LOUIS RICHARDS and WILLIAM D. CROCKER, Esqs.

NEWARK, N. J.
SONEY & SAGE
1900

JA1953

CC
Williamsport
3
1900

Copyright, 1900, by Soney & Sage.

Presented by
The Williamsport Mayor

JA1954

Case 1:22-cv-... Document... Filed 07/28/2023 Page 260 of ... PageID: 2078

P4.1.

# GENERAL ACTS OF ASSEMBLY

## FOR THE GOVERNMENT OF

# CITIES OF THE THIRD CLASS.

Prepared by Louis Richards.

## Aldermen.

### [SEE FINES AND PENALTIES.]

**I. ELECTION OF ALDERMEN.**

1. Constitutional provision. Qualifications.
2. Election of aldermen in cities of third class.
3. When terms to expire.
4. Constables to give notice.

**II. VACANCIES.**

5. How vacancies to be filled.
6. Aldermen to file acceptance with prothonotary. Governor to issue commission. Fee. Oath.

**III. FEES.**

7. Fees of aldermen throughout the state. Fees under U. S. laws.

**IV. APPEALS AND TRANSCRIPTS.**

8. Aldermen may demand costs in advance before delivering transcript. When to be recovered back.
9. Also costs upon transcript of judgment. Except where appellants are unable to pay.
10. Transcript in cases of felony to be returned within five days. Penalty.

## I. Election of Aldermen.

1. Except as otherwise provided in this constitution, justices of the peace or aldermen shall be elected in the several wards, districts, boroughs and townships at the time of the election of constables, by the qualified electors thereof, in such manner as shall be directed by law, and shall be commissioned by the governor for a term of five years. No township, ward, district or borough shall elect more than two justices of the peace or aldermen, without the consent of a majority of the qualified electors within such township, ward or borough;[1] no person shall be elected to such office unless he shall have resided within the township, borough, ward or district for one year next preceding his election. In cities containing over fifty thousand inhabitants, not more than one alderman shall be elected in each ward or district.

*Const. 1874, Art. V, § 11.*

*Constitutional provision.*

*Qualifications.*

2. Each of the wards of each of the said cities shall be entitled to elect one alderman,[2] who shall have all the powers

*23 May 1874 § 32. P. L. 248.*

---

[1] This provision does not command the election of two justices of the peace for each ward of a borough. *Commonwealth v. Morgan,* 178 Pa. 198.
[2] Cities of the third class, whether incorporated under the Act of 1874 or that of 1889, are entitled to elect but one alderman in each ward. *Commonwealth v.*

*Hastings,* 16 Pa. C. C. R. 425; *Harris's Application,* 4 Dist. R. 320. *Quaere,* whether, under the constitution, the election of an alderman in every ward in cities of the second and third classes is obligatory, or whether the present number in such cities may not be reduced by legislation?

23 May 1874.

Election of aldermen in cities of third class.

and jurisdiction of a justice of the peace, and said alderman shall be elected at the municipal election next preceding the expiration of the commission of the justice of the peace resident in the district out of which the said ward shall be created; if two justices of the peace reside therein, then the alderman shall be the successor of the justice of the peace whose commission shall first expire; and no successor shall be elected to the one still in office, but his commission shall be and remain in full force until its expiration.[1]

22 March 1877
§ 1. P. L. 12.

When terms to expire.

3. All aldermen or justices of the peace who shall be elected on the third Tuesday of February next, or in any year thereafter, whose terms of office would under existing laws expire prior to the first Monday of May, shall continue in office from the date at which said term would otherwise expire until the first Monday of May next ensuing thereto.

Id. § 2.

Constables to give notice.

4. It shall be the duty of the constable of the proper ward, district, borough or township to give at least twenty days' notice, by advertisement preceding the election to be held on the third Tuesday of February of each year, of the expiration of the term of the commission of any alderman or justice of the peace that may expire on or before the first Monday of May following, and also of any vacancy that may happen by death, resignation or otherwise.

## II. Vacancies.

22 March 1877
§ 3. P. L. 12.

How vacancies to be filled.

5. If any vacancy shall take place after any ward, district, borough or township election, by reason of the erection of any new ward, district, borough or township, or from the neglect or refusal of any person elected to accept a commission within sixty days after the date thereof, or by death, resignation or otherwise, such vacancy shall be filled by appointment by the governor until the first Monday of May succeeding the next ward, district, borough or township election.[2]

Id. § 4.

Aldermen to file acceptance with prothonotary.

6. The aldermen or justices of the peace, elected under the provisions of this act, shall file an acceptance of said office with the prothonotary of the proper county, stating therein the name of the alderman or justice of the peace whom they succeed, with the cause of vacancy; and said prothonotary shall certify the same under his seal of office to the sec-

---

[1] The amount of the official bond of aldermen and justices of the peace is to be fixed by the Court of Common Pleas, under the Act of June 21, 1839, § 6, P. L. 376, and the bond must be recorded. By the Act of June 1, 1891, P. L. 143, they are authorized to provide themselves with an official seal, similar to that used by notaries public.

[2] This section is not in conflict with Sec. 8 of Art. IV of the constitution, authorizing the governor to fill vacancies until the next succeeding general election. The constitutional provision was not in-

tended to apply to officers elective at the February election. *Commonwealth v. Callen*, 101 Pa. 375. It also modifies the act of May 6, 1874, P. L. 118, in respect to the duration of the term of the appointee. The power given to the governor by the act of 1877 to fill vacancies is not disturbed by the provision for the election of ward officers in territory annexed to a city of the third class under Sec. 5 of Art. III of the Act of May 23, 1889, P. L. 281. *Commonwealth v. Machemer*, 18 Pa. C. C. R. 92; 5 Dist. R. 560.

JA1956

Case 1:22-cv-04259-AMD Document 49 Page 262 of 436 Filed 07/28/2023 PageID: 2080

# PARTS II. AND III.

Special Acts—Charters,

Ordinances and Resolutions.

COMPILED BY W. D. CROCKER.

JA1957

# PART III.

---

## Ordinances and Resolutions

OF THE BOROUGH AND CITY OF

WILLIAMSPORT, PA.

Comp. by W. D. Crocker.

JA1958

Case 1:22-cv-04069-AMD Document 48 Filed 264 of DateFiled 07/20/2023 PageID 2082

# Ordinances and Resolutions of the Borough and City of Williamsport.

## Academy.

[See DICKINSON SEMINARY; SPECIAL ACTS OF ASSEMBLY.]

I. PURCHASE OF—1, 2.
II. SALE OF—3-10.

1. That the town council for the use of the borough of Williamsport, purchase from John K. Hays and Peter Vanderbelt, the Academy and lot of ground attached to same, (formerly the property of Lycoming county, and sold by the sheriff of said county,) for the price paid by the said Hays and Vanderbelt, with costs and interest: *Provided,* That they, the said Hays and Vanderbelt accept the same.[1]

> Res. May 19, 1845.
> B.M.B. 1, 13.
> § 1.
> Purchase of property.

2. That a tax be laid for the purpose of paying for the Academy and lot of ground, and to pay all demands against said borough of Williamsport.

> Id. § 2.
> Tax for.

3. That said (the borough) authorities shall make a legal transfer or conveyance of all the right, title and interest of the borough of Williamsport in said Academy, grounds and appurtenances, to a board of trustees under the style and title of "Trustees of Dickinson Seminary at Williamsport."

> Res. Jan. 5, 1848.
> B.M.B. 1, 33.
> § 1.
> Sale of to Dickinson Seminary.

4. That said board shall have power to fill its own vacancies and two-thirds thereof shall be members of the M. E. Church, and one-third of other denominations of Christians.

> Id. § 2.
> Board of trustees.

5. That a school shall be established under the title of Dickinson Seminary at Williamsport, auxiliary to Dickinson College at Carlisle.

> Id. § 3.
> Name changed.

6. That instruction shall be given to youth of both sexes designed to afford a liberal education to females and qualify young men for entrance upon a regular college course, and pupils of all denominations shall be admitted on the same terms.

> Id. § 4.
> Pupils of.

7. That the school shall be under the supervision and patronage of the Baltimore Conference, and shall sustain a religious character similar in all respects to the parent institution at Carlisle.

> Id. § 5.
> Supervision of.

8. That whenever the M. E. Church shall cease to use the property for educational purposes it shall again revert to the borough of Williamsport with all such improvements as shall be made thereon.

> Id. § 6.
> Reversion of.

[1] The purchase above referred to was consummated July 5, 1845. See B. M. B. 1, p. 14.

Case 1:22-cv-00028-R900-AMD Document 89-8 Page 265 02/28/2023 PageID 2083

**Id. § 7.**
**Consideration for sale.**

9. That said M. E. Church shall assume and pay to John K. Hays and Peter Vanderbelt, their heirs and assigns, the sum of two hundred and thirty-nine dollars and thirty-seven cents with interest from the 28th of June, 1847, and pay to the borough of Williamsport the sum of two hundred and four dollars and thirty-one cents, with interest from the fifth day of July, 1845.

**Id. § 8.**
**Conditions of sale.**

10. That the above stipulations are conditional on the part of the M. E. Church until sanctioned by the Baltimore Conference.

## Additions.

Andrews' Addition, 12.
Church's Addition, 2.
Gilmore's Addition, 10.
Herdic, Lentz & White Addition, 6.
Mahaffey's Addition, 14.
McCormick's Addition, 11.
Newberry, Plan of, 1.
Reighard's Addition, 16.

Ross Addition, 3.
Thompson's Addition, No. 1, 5.
Thompson's Addition, No. 2, 8.
Vanderbelt's Addition, No. 1, 4.
Vanderbelt's Addition, No. 2, 9.
Williamsport Manufacturing Co., 7.
Wilson's Addition, 13.
Woodward's Addition, 15.

**Newberry, plan of.**

1. Plot dated October 31, 1810, of land bounded N. by (High) now Newberry street, E. by line of Water street, S. by line of (Pine) now Baker street, and W. by (Pine) now Poplar street. See Deed Book 8, front of book.

**Church's addition.**

2. Deed F. & J. Church, May 22, 1833, for plot bounded N. by E. Third street, E. by (Vanderbelt) Penn street, S. by the river, and W. by Academy street. Rec. D. B. 20, p. 182. For vacation of streets and alleys in that part of same S. of canal, see Spec. Acts of Assembly, title "Streets."

**Ross addition.**

3. Deed W. F. Packer, May 5, 1855, for plot bounded N. by E. Third street, E. by Edkin and Heisley, S. by river, and W. by (Vanderbelt) Penn street. Rec. D. B. 36, p. 835.

**Vanderbelt's addition, No. 1.**

4. Deed W. R. Vanderbelt et al., October 24, 1857, for plot bounded N. by Sloan alley, E. by Elizabeth street, S. by P. & E. R. R., and W. by Market street. Rec. D. B. 38, p. 641.

**Thompson's addition, No. 1, 1.**

5. Plot recorded April 25, 1867, of land bounded N. by P. & E. R. R., E. by Arch street, S. by D. Updegraff, and W. by ——? Rec. D. B. 53, p. 2.

**Herdic, Lentz and White addition.**

6. Plot accompanying deed of partition dated December 19, 1867, for land bounded N. by W. Third street, E. by Locust street, S. by (Gilmore) Second and by (Jefferson) First streets, and W. by Park street. Rec. D. B. 54, pp. 304, 330.

**Williamsport Manufacturing Co.**

7. Plot recorded September 3, 1868, for lands bounded N. by Rural avenue, E. by Center street, S. by P. & E. R. R., and W. by Seventh avenue. Rec. D. B. 57, back of book.

**Thompson's addition. No. 2.**

8. Plot recorded June 1, 1870, for land bounded N. by T. Add. No. 1, and S. by Lincoln street. Rec. D. B. 61, pp. 657-9.

**Vanderbelt's addition, No. 2.**

9. Plot accompanying deed of partition dated May 5, 1872, for following two plots, viz.: No. 1, bounded N. by P. & E. R. R., E. by Butler street, S. by E. Third street, and W. by Penn street. No. 2, bounded N. by canal, E. by Penn street, S. by Cat. R. R. Co., and W. by Academy street. Rec.

# Brandon Park.

I. ACCEPTANCE OF—1-6.
II. RULES AND REGULATIONS—7-9.

## I. Acceptance Of.

1. Whereas, A. Boyd Cummings, of the city of Philadelphia, has executed a deed of conveyance to the city of Williamsport for forty-three acres and thirty-nine perches of land situate in the Eighth ward of the city in trust for the purpose of a park for public uses, and to be known as "Brandon Park," and has placed said deed of conveyance in the hands of his counsel, Allen & Reading, for delivery to the city upon the passage by the councils of an ordinance accepting such conveyance and appointing a commission, and providing for the improvement, regulation and government of said park; therefore,

*Ord. 358 C. C., March 20, 1889. O. B. 2, p. 332. Preamble.*

2. That the deed of conveyance from the said A. Boyd Cummings to the city of Williamsport, in trust, of forty-three acres and thirty-nine perches of land situate in the Eighth ward of the said city for the purpose only of an open space or park for the use of the public forever, and to be called and known as Brandon Park, be and the same is hereby accepted by the city of Williamsport in accordance with the terms of said conveyance as will fully appear by the deed of conveyance for said lands bearing date the twenty-first day of February in the year of our Lord one thousand eight hundred and eighty-nine.

*Id. § 1. Deed accepted.*

3. That Robert P. Allen, Hugh H. Cummin, Lindsey Mahaffey, Oliver H. Reighard, J. Artley Beeber, Robert Neilson and the mayor of the city of Williamsport be and they are hereby appointed park commissioners to serve during good behavior without compensation, whose duty it shall be to prepare and report to councils a plan for the improvement, regulation and government of said Brandon Park, and to supervise the work of improvement of said park, and expend the moneys which may be appropriated from time to time by the city for such improvements, and of which said commission shall make report at least once in every year as to the progress of the improvements upon said park and the condition of the same to the city councils.

*Id. § 2. Commissioners appointed. Duties of commissioners.*

4. That no circuses, menageries, athletic games for exhibition, or any other kind of public exhibition shall ever be allowed upon said park.

*Id. § 3. Exhibitions, etc., prohibited.*

5. That the mayor of the city of Williamsport by and with the consent of the majority of the select council shall have authority to fill, upon the nomination only of the surviving members of the commission, all vacancies in said park com-

*Id. § 4. Vacancies, how filled.*

Case 1:22-cv-00339-AMD Document 4689 Page 267 of 436 Filed 07/20/2022 PageID 2085

mission which may be occasioned by death, resignation or
otherwise.

Id. § 5.

Pledge.

6. That the faith of the city of Williamsport be and the
same is hereby pledged to the performance on the part of said
city of the terms of the acceptance from the said A. Boyd
Cummings of the conveyance of said Brandon Park in ac-
cordance with the foregoing ordinance.

Ord. 404 C.
C., June 18,
1890, § 1. O.
B. 2, p. 393.

Regulations.

## II. Rules and Regulations.

7. The following rules and regulations be and are hereby
established as the rules and regulations for the government
and protection of Brandon Park, viz. :

Driving regu-
lated.

(1.) No person shall drive or ride in Brandon Park at a
rate exceeding seven miles an hour.

(2.) No person shall ride or drive upon any part of the
park, except on the avenues and roads.

Vehicles for
traffic pro-
hibited.

(3.) No vehicle of burden or traffic shall be permitted
within said park, except when employed in the business of
the park.

Bicycles in
park.

(4.) No bicycles, tricycles or other vehicles of a similar
nature, shall be driven at a greater speed than seven miles
per hour in the park.

Law of road.

(5.) When carriages, bicycles, tricycles or equestrians
meet, the parties respectively shall keep to the right as the
law of the road.

Entrance and
exit.

(6.) No person shall enter or leave the park except by such
gates or avenues as may be for such purposes arranged.

Led horses.

(7.) No person shall bring or lead a horse or horses within
the limits of the park not harnessed and attached to a vehicle,
or mounted by an equestrian.

Animals at
large.

(8.) No person shall turn cattle, goats, swine, horses, dogs
or other animals loose into the park.

Trees and
shrubbery.

(9.) No person shall cut, break or in anywise injure or
deface the trees, shrubs, plants, flowers, fruit, turf or any of
the buildings, fences, bridges, structures or statuary, or foul

Fountains.

Ponds.

any fountains or springs within the park, or throw stones
or rubbish of any kind into any lake or pond of the park, or
bathe in the same.

Nuisances.

(10.) No person shall throw any dead animal or offensive
matter or substance of any kind within the boundaries of the
park.

Birds, fish,
etc.

(11.) No person shall disturb the fish or water fowl in the
pool or pond, or birds in any part of the park, or annoy, strike,
injure, maim or kill any animal kept by direction of the com-
missioners, either running at large or confined.

Trees, protec-
tion of.

(12.) No person shall attach a swing to, fasten a horse to,
or climb a tree in said park.

Notices.

(13.) No person shall injure, deface or destroy any no-
tices, rules or regulations for the government of the park

Case 1:22-cv-00340-AMD Document 4899 Page 2602 Date Filed 07/20/2023 PageID 2086

posted or in any other manner permanently fixed by order or permission of the commissioners of the park, nor affix any bills or notices within the limits of the same. <span style="float:right">Posting bills forbidden.</span>

(14.) No person shall expose any article for sale within the park. <span style="float:right">Traffic prohibited.</span>

(15.) No person shall have any musical or other entertainment in the park, nor shall any parade or procession take place in or pass through the park, nor shall any picnic, gathering or public meeting of any kind be permitted therein without the previous permission of the commissioners. <span style="float:right">Parades, etc., prohibited.</span> <span style="float:right">Picnics prohibited.</span>

(16.) No person shall engage in any play at base ball, cricket, shinny, foot ball, croquet, or at any other athletic games within the limits of the park, except on such grounds only as shall be specially designated for such purposes by the park commissioners. <span style="float:right">Games prohibited.</span>

(17.) No person shall introduce any spirituous, malt or brewed liquors into said park, either for his own use, to sell, or to give away, nor shall any intoxicated person enter or remain in said park. <span style="float:right">Liquors prohibited.</span>

(18.) No person shall curse or swear or use threatening or abusive language, or fight or throw stones, or behave in a riotous or disorderly manner in said park. <span style="float:right">Swearing.</span> <span style="float:right">Disorderly conduct.</span>

(19.) No person shall indulge in any insulting or indecent language, or commit a nuisance in the park. <span style="float:right">Nuisances.</span>

(20.) No person shall engage in playing cards or gambling in said park. <span style="float:right">Gambling.</span>

(21.) No person shall carry fire-arms, or shoot in the park, or discharge any fire-works, or throw stones or missiles therein. <span style="float:right">Firearms.</span>

8. Any person who shall violate any of said rules and regulations shall be liable to a fine of not less than five dollars nor more than fifty dollars, to be recovered before any alderman of the city of Williamsport, with costs, together with judgment of imprisonment not exceeding thirty days, if the amount of said judgment and costs shall not be paid, which fines shall be paid into the city treasury for park purposes. <span style="float:right">Id. § 2.</span> <span style="float:right">Penalty.</span>

9. Packer street, where it passes through the park, is hereby abandoned as a public highway and declared to be a part of the park, subject to the rules and regulations adopted for its government and protection.[1] <span style="float:right">Id. § 3.</span> <span style="float:right">Packer Street vacated.</span>

[1] See "Streets—Vacation of."

# Bridges.

Almond Street, Bridge over McClure's Run, N. 1.
Center Street, Bridge over Grafius Run, 2.
Cherry Street, Bridge over Grafius Run, 7.
Elmira Street, Bridge over Grafius Run, 1.

Evaline Alley, Bridge over Grafius Run, 3.
High Street, Bridge over Grafius Run, 4-5.
Lycoming Creek Bridges, N 2.
Rural Avenue, bridge over Grafius Run, 6.

[1] On Dec. 9, 1889, a resolution passed common council for the construction of a bridge over the Run (McClures Run) on Almond Street near Wyoming Street; See C. C. M. B., p. 475. The resolution passed select council on Dec. 16, 1889; See S. C. M. B., p. 346. The resolution cannot be found, but the bridge was built. In the case of *Kennedy v. The City*, No. 385, Sept. T. 1897, the question arose as to whether the bridge had been built by the city or by Loyalsock Township.

JA1963

# PARK ORDINANCES.

SPRINGFIELD, MASS., May 2, 1891.

The Board of Park Commissioners of the City of Springfield, by virtue of its authority to make Rules for the use and government of the Public Parks of said city, and for breaches of such rules to affix penalties, hereby ordains that within the Public Parks, except with prior consent of the Board, it is forbidden : —

1.  To cut, break, injure, deface, defile, or ill-use any building, fence, or other construction, or any tree, bush, plant, or turf, or any other thing or property of said city, or to have possession of any freshly plucked tree, bush, or plant, or part thereof.

2.  To allow animals of any kind to pass over or stray upon the Park lands, provided this shall not apply to dogs when closely led by a cord or chain not more than six feet long.

3.  To throw stones, balls, or other missiles; to discharge or carry firearms, firecrackers, torpedoes, or fireworks; to make fires; to play musical instruments; to have any intoxicating beverages; to sell, offer, or expose for sale any goods or wares; to post or display signs, placards, flags or advertising devices; to solicit subscriptions or contributions; to play games of chance, or to have possession of instruments of gambling; to make orations, harangues, or loud outcries; to enter into political canvassing of any kind; to utter profane, threatening, abusive, or indecent language, or to do any obscene or indecent act; to bathe or fish; to solicit the acquaintance of, or follow, or otherwise annoy other visitors.

4.  To take birds, fish, or any live animal or birds' nest, or in any way interfere with cages, boxes, places, or inclosures for their protection.

5.  To play ball or any other games in any Public Park except such portions thereof as may be set apart for that purpose.

6.  To drive any carriage, cycle, cart, wheelbarrow, hand cart or horse, upon any Park except upon regular carriage roads, and no heavy teaming will be allowed whatsoever.

7.  To drive or ride a horse or horses at a rate faster than eight miles an hour.

8.  To drive or ride any horse or animal not well broken and under perfect control of the driver.

9.  To ride a cycle at a rate faster than eight miles an hour.

10. To refuse to obey the orders or requests of either of the Commissioners, or of the Park Police or other agents of the Commissioners, and to refuse to assist them when required.   Any person willfully doing either of the things above forbidden, shall be punished by fine not exceeding twenty dollars.

*Compliance with foregoing regulations is a condition of the use of these premises.*

DANIEL J. MARSH, *President,*
ORICK H. GREENLEAF,
JOHN E. TAYLOR,
EVERETT H. BARNEY,
WILLIAM F. CALLENDER, *Secretary,*

} *Park Commissioners.*

JA1964


Digitized by Google

Grand Rapids, Mich. Ordinances, etc.

# COMPILED ORDINANCES

### OF THE

# City of Grand Rapids

Containing all Ordinances passed by the
Common Council, of the City of Grand Rapids,
in force September 1, 1906

———————

Compiled and Indexed
Under Authority of the Common Council
By
COLIN P. CAMPBELL. LL. M.

———————

PUBLISHED BY AUTHORITY OF THE
COMMON COUNCIL

1907?

JA1965

dollars and costs of prosecution, or by imprisonment at hard labor in the common jail of the County of Kent, or in any penitentiary, jail, work-house, house of correction, or alms-house of said city, in the discretion of the court or magistrate before whom the conviction may be had, for a period of not less than five days, nor more than ninety days; and in case such court or magistrate shall only impose a fine and costs, the offender may be sentenced to be imprisoned at hard labor in the common jail of the County of Kent, or in any penitentiary, jail, work-house, house of correction, or alms-house of said city, until the payment of such fine and costs, for a period of not less than five days nor more than ninety days.

### Repealing Clause.

Sec. 429 (14). The following ordinances are hereby repealed, to-wit: An ordinance entitled "An Ordinance Relative to Public Lamps and Lamp Posts in the City of Grand Rapids," passed March 1, 1873;

Also an ordinance entitled, "An ordinance Relative to Public Parks and Places in the City of Grand Rapids," passed March 8, 1873;

Also an ordinance entitled, "An Ordinance Relative to the Protection, Preservation and Use of Bridges Across Grand River in the City of Grand Rapids, belong to said city," passed June 21, 1873;

Also an ordinance entitled, "An Ordinance Relative to the Preservation of Public Property of the City of Grand Rapids," passed March 1, 1873;

Also all other ordinances and parts of ordinances in anywise contravening the provisions of this ordinance.

**An Ordinance to Regulate the Use of the Public Parks of the City of Grand Rapids, and to Provide for the Preservation of Public Property Therein. Passed May 4, 1891. Amended June 20, 1892, and October 11, 1897.**

The Common Council of the City of Grand Rapids do ordain as follows:

### Parks—Injury to Trees, Etc.—Animals, Etc.—Handbills.

Sec. 430 (1). No person shall break, cut, mutilate, injure,

---

SEC. 429. Record A of Ordinances, p. 143.

SECS. 430-435. Charter, Section 73.

SECS. 430-432. Record B of Ordinances, p. 130.

overturn, remove or carry away any tree, shrub, plant, flower, stone, or stone-work, bench, chair, seat, bower, stand, house, arbor, structure, fence or property, or anything whatsoever in, upon or belonging to any park, spuare or open space, in the City of Grand Rapids, or in any street, avenue, or highway in, adjoining to or around the same; nor shall any person climb up, or upon, any building, house, fence, table, seat or other structure in said park, place or square; nor shall any person kill, disturb, or molest any bird or bird's nest, or any fish or animal within, belonging to or being therein; nor shall any person paste or affix or inscribe any hand-bill, sign, poster, card, device or inscription to, upon or against any fence, tree, structure, or property of or on such park, place, square or highway, in or adjoining the same; nor shall any person disfigure or injure any sward, gravel, sand, turf or earth, or any tree, fence or structure therein, or adjoining thereto; nor shall any person fasten or hitch any animal to any tree, fence or structure in, or upon, the same, unless the same shall be designated and set apart for such purpose; nor shall any person ride or drive any animal or vehicle therein except upon the proper roadways, avenues and drives, and shall not drive therein at a speed exceeding eight miles per hour.

### Parks—Speeches in.

Sec. 431 (2). No person shall deliver any oration, address, speech, sermon or lecture therein unless he shall have first received permission from the Common Council of the City of Grand Rapids, or the Mayor or other lawful authority so to do; nor shall any public meeting be held therein unless leave is first obtained.

### Parks—Dogs in—Fire Arms.

Sec. 432 (3). No person shall allow or permit any domestic animal to go, be, or run at large within any such park, place or square; nor shall any person carry any rifle, gun, or other fire arm of any kind within any park of the City of Grand Rapids, and no dog shall be allowed therein except when fastened or led by a cord or string not exceeding six feet in length.

### Parks—Disorderly Language—Games—Handbills—Peddlers— Picnics in.

Sec. 433 (4). (As amended October 11, 1897.) No person shall

---

Sec. 433. Record B of Ordinances, p. 448.

Case 1:22-Cv-04123-RMG-AKD Document 4-8 Page 000-10 Date Filed 07/30/07 p0 2091

use any threatening, obscene, profane or indecent language in any such park, open place or square, or be guilty of any disorderly or indecent conduct; nor shall any person indulge in any games, acts or demeanor calculating or tending to mar or disturb the feelings or enjoyment of the visitors attending such parks, places or squares; nor shall any person or persons deposit any rubbish or refuse in or upon such park, place or square, except the same be deposited in waste baskets to be provided by the Committee on Parks; nor shall any person post, exhibit or distribute any advertisement, circular or hand bill therein; nor shall any peddler or petty dealer sell, or in any manner dispose of any article in or immediately adjoining any public park, place or square in said city, unless he shall first obtain express permission so to do from the Common Council of the City of Grand Rapids. Picnics and social parties may be allowed in such portions of said parks as shall be designated and set apart by the Park Committee of the Common Council of the City oif Grand Rapids from time to time.

## Hours When Parks Open to Public.

Sec. 434 (5). (As amended June 20, 1892.) The three public parks belonging to said city and respectively named and known as the "John Ball Park," "Lincoln Park" and "Highland Park," shall be open to the public only between the hours of sunrise and 9 p. m. of each and every day, and it shall not be lawful for any person or persons, except the person and employes in charge of any such park, to enter therein before the hour above named for the opening of said park, or to remain therein after the hour above fixed for the closing thereof; Provided, however, That the Committee on Parks of the Common Council or Mayor of said city shall have the power, in their discretion, whenever special occasion may require it, to specially provide for all or any of said parks above named being opened at an earlier hour or closed at a later hour than the hours above designated.

Any person who shall violate any of the provisions or requirements of this section shall be liable to the punishment prescribed in Section 6 of this ordinance.

## Penalty.

Sec. 435 (6). (As re-numbered June 20, 1892, and amended

---

SEC. 434. Record B of Ordinances, p 240. | SEC. 435. Record B of Ordinances, p. 240-448

JA1968

Case 1:22-cv-00838-RDA-JFA Document 1-6 Filed 07/27/22 Page 92 of 202

October 11, 1897.) Any person or persons who shall violate any of the provisions or requirements of this ordinance, on conviction thereof, shall be punished by a fine of not less than two dollars nor more than one hundred dollars and costs of prosecution, or by imprisonment at hard labor in the common jail of the County of Kent, or in any penitentiary, jail, workhouse or house or correction of said city, in the discretion of the court or magistrate before whom the conviction may be had, for a period of not less than two days nor more than ninety days; and in case such court or magistrate shall only impose a fine and costs, the offender may be sentenced to be imprisoned at hard labor in the common jail of the County of Kent, or in any penitentiary, jail, workhouse or house of correction of said city, until the payment of such fine and costs, for a period of not less than two days nor more than ninety days.

**An Ordinance Relative to Cemeteries and the Protection Thereof and the Burial of the Dead in the City of Grand Rapids. Passed January 13, 1896.**

The Common Council of the City of Grand Rapids do ordain as follows:

### Public Cemeteries—What Are.

Sec. 436 (1). All cemeteries now owned or which may hereafter be acquired by the City of Grand Rapids, wherever situated, and all cemeteries now within the limits of said city, whether owned by said city or not, are hereby declared to be public burial grounds, and no person or persons, corporation, society or congregation shall establish or locate any other cemetery within the limits of said city.

### No Interments Except in Cemeteries.

Sec. 437 (2). No interment of the body of any person shall be made in any other place than within a cemetery devoted to that purpose.

### Cemeteries—Property in Not to be Injured.

Sec. 438 (3). No person or persons shall injure, cut or remove any trees, shrubbery, gate, fence, post or steps, standing, growing or being in and upon any cemetery or cemetery grounds belonging to said city.

**SECS. 436-454. Charter, Section 73. Record B of Ordinances, p. 378.**



# THIRD ANNUAL REPORT

THE NEW YORK
PUBLIC LIBRARY
39797
ASTOR, LENOX AND
TILDEN FOUNDATIONS

OF THE

# PARK COMMISSIONERS

OF THE

# CITY OF LYNN

For the Year Ending December 20, 1891.

BOSTON PUB. LIBRARY

LYNN, MASS. :
WHITTEN & CASS, PRINTERS,
1892.

Digitized by Google

## ORDINANCES.

The Board of Park Commissioners of the City of Lynn, by virtue of its authority to make rules for the use and government of the Public Parks of said City, and for breaches of such rules to affix penalties, hereby ordains that within the limits of Lynn Woods, except with the prior consent of the Board, it is forbidden :

1. To cut, break, injure, deface, defile or ill use any building, fence, or other construction, or any tree, bush or turf, or any other thing or property.

2. To have possession of any freshly-plucked tree or bush.

3. To throw stones or other missiles ; to discharge or carry firearms, except by members of the Police Force in the discharge of their duties ; to discharge or carry firecrackers, torpedoes or fireworks ; to make fires ; to have any intoxicating beverages ; to sell, to offer or expose for sale, any goods or wares ; to post or display signs, placards, flags, or advertising devices ; to solicit subscriptions or contributions ; to play games of chance, or have possession of instruments of gambling ; to utter profane, threatening, abusive or indecent language, or to do any obscene or indecent act ; to bathe or fish ; to solicit the acquaintance of, or follow, or otherwise annoy other visitors.

4. To allow cattle, horses, or other animals to pass over or stray upon the Park lands, provided that this shall not apply to those used for pleasure travel when on the ways or places provided and open for the purpose.

5. To drive a horse or horses at a rate faster than eight miles an hour.

6. To ride a horse at a rate faster than ten miles an hour.

7. To drive or ride any animal not well broken and under perfect control of the driver.

8. To play ball or other games or sports, except on grounds provided therefor.

9. To engage in conversation with men at work, or to obstruct, hinder or embarrass their movements.

10.  To refuse to obey the orders or requests of either of the Commissioners, or of the Park Police, or other agents of the Commissioners, and to refuse to assist them when required.

Any person wilfully doing either of the things above forbidden shall be punished by fine not exceeding twenty dollars.

Compliance with the foregoing regulations is a condition of the use of these premises.

Google

Case 1:22-Gv84103-RMB-JdBotument-46-1 Page 0288 COD85 Filed 20/2289pID 3096

# LAWS AND ORDINANCES

OF THE



# CITY OF PEORIA

## ILLINOIS

REVISED AND EDITED BY

## WILBERT I. SLEMMONS, ISRAEL C. PINKNEY

AND

## DANIEL F. RAUM

AND

# PUBLISHED BY AUTHORITY OF THE

# CITY COUNCIL

———

PEORIA

J. W. FRANKS & SONS, PRINTERS AND BINDERS

1892

JA1973

SEP 13 1927

JA1974

mitigated by any provision of this ordinance, such provision may, by the consent of the party affected, be applied to any judgment pronounced after this ordinance takes effect.

## ARTICLE 35.

### PARKS AND PUBLIC GROUNDS.

Section.
1721. Parks and Public Grounds--Superintendence of.
1722. Entrance and Egress.
1723. Animals Prohibited.
1724. Fire-arms, Missiles, etc.--Injury to Property.
1725. Sales--Peddling and Hawking--Prohibited.

Section.
1726. Indecent Words or Act--Fortune Telling--Gaming.
1727. Bill Posting Forbidden.
1728. Grass Not to be Trodden--Except.
1729. Police- Arrest of Offenders.
1730. Penalty.

**1721. Parks and Public Grounds—Superintendence of.**] § 1. The commissioner of public works of the city of Peoria, shall have supervision and control of all public parks, public squares, and public grounds, in the city of Peoria, and shall appoint such park janitors as the city council may authorize, and shall keep the fences thereof in repair, the walks in order, and the trees properly trimmed, and improve the same according to the plans approved by the city council.

**1722. Entrance and Egress.**] § 2. No person shall enter or leave any of the public parks, public squares, or public grounds of the city of Peoria, except by their gateways; and no person shall climb, or walk upon their walls or fences.

**1723. Animals Prohibited.**] § 3. Neither cattle, horses, goats, swine, or other animals, shall be turned into, or allowed in any of the parks, public squares, or public grounds, of the city of Peoria, by any person.

**1724. Fire Arms, Missiles, Etc.—Injury to Property.**] § 4. All persons are forbidden to carry fire arms, or to throw stones, or other missiles, within any of the public parks, public squares, or public grounds, within said city. All persons

are forbidden to cut, break, or in any way injure, or deface, the trees, shrubs, plants, turf, or any of the buildings, fences, bridges, or other property, within or upon any of the public grounds heretofore mentioned.

**1725. Sales, Peddling and Hawking Prohibited.**] § 5. No person shall expose any article or thing for sale upon any of said public parks, public squares or public grounds; nor shall any hawking, or peddling be allowed therein.

**1726. Indecent Words or Acts—Fortune Telling—Gaming.**] § 6. No threatening, abusive, insulting, or indecent language shall be allowed in any part of said public grounds, whereby a breach of the peace may be occasioned. No person shall be allowed to tell fortunes, or play at any game of chance, or with any table or instrument of gaming, nor to do therein, any obscene or indecent act.

**1727. Bill Posting Forbidden.**] § 7. No person shall post, or otherwise affix, any bills, notice, or other paper upon any structure or thing, within any of the said public grounds, nor upon any of the gates or enclosures thereof.

**1728. Grass Not to be Trodden—Except.**] § 8. No person shall go upon the grass, lawn, or turf of the parks, except when and where the word "common" is posted; indicating that persons are at liberty, at that time and place, to go on the grass.

**1729. Police—Arrest of Offender.**] § 9. Any member of the city police shall have power to arrest any person who shall not desist from any violation hereof, when directed, and cause him to be committed for examination.

**1730. Penalty.**] § 10. Any person who shall violate any or either of the provisions, of any section, or clause of this chapter or article, or who shall neglect, or fail, or refuse, to comply with any or either of the requirements thereof, shall, on conviction, pay a fine of not less than five dollars, nor more than one hundred dollars.

JA1976

Case 1:22-cv-00180-AB Document 46 Page 282 of 436 Filed 06/20/2009 PageID 2100

# MUNICIPAL CODE

OF THE

# CITY OF SPOKANE

## WASHINGTON

TOGETHER WITH THE

# CITY CHARTER

AND AMENDMENTS, RULES OF THE CITY COUNCIL, AND LIST
OF FRANCHISE ORDINANCES

REVISED, COMPILED AND CODIFIED BY

## E. O. CONNOR

OF THE SPOKANE BAR

*PUBLISHED BY AUTHORITY OF CITY COUNCIL.*

SPOKANE, WASH.:
THE INLAND PRINTING COMPANY
1903

JA1977

Case 1:22-cv-01463-MDB Document 46-1 Page 588 020347 Filed 03/30/23 PageID 2101

THE INLAND PRINTING COMPANY

*Inland Press*

SPOKANE, WASHINGTON

FEB 18 1913

JA1978

Case 1:22-cv-00123-DCN Document 43-4 Filed 08/18/22 Page 284 of 436 PageID 2102

wise injure or destroy the turf thereof, or who shall willfully cut down, lap, girdle, break, destroy, injure, or carry away any timber or tree whatsoever, being on land not owned or controlled by such person or persons, or who shall cut, break, destroy or in any manner injure any goods, wares, merchandise, or other personal property of another, or who shall wilfully or carelessly break, injure, deface or destroy, any house or building, or any part thereof, or fence, railing, or any part thereof, or any sign, tree-box, lamp, lamp-post, hydrant, or fire-plug, or any chain or lock attached thereto, or in or about the same, or any other property of the City of Spokane, or who shall daub, or cause to be daubed, any such property with paint or other substances; and any person or persons, who shall hitch, fasten, or cause or suffer to be hitched or fastened, any animal, under the control or in the service of such person or persons, to any ornamental, shade tree, plant or shrub, in or upon any street, avenue, alley, sidewalk, park, public square, or other public place in the City of Spokane, or to any case or tree-box around any such tree, plant or shrub, or suffers or permits any such animal to remain so hitched or fastened after knowing that such animal is so hitched or fastened, or who shall stop, hitch or fasten, or suffer or cause to be stopped, hitched or fastened, any such animal so near any such tree, plant, shrub, case or box, or any hydrant or fire-plug, that such animal can ordure, bite or injure, such tree, plant, shrub, case, box, hydrant, or fire-plug, or any person or persons who shall cause or suffer any animal under such person or persons control, to bite, or in any manner injure, any such tree, plant, shrub, case, box, hydrant or fire-plug, shall upon conviction for any such offense, be fined not more than fifty dollars nor less than ten dollars and pay the costs of prosecution, and be confined in the city jail until such fine and costs are paid; *provided,* nothing herein shall be so construed as to prevent the owner or owners, or agent, of the property along side thereof, from trimming any such tree, plant or shrub in a proper manner and at the proper time of the year for such trimming, or from repairing such case or tree-box whenever the same needs such repairs.

SEC. 2.   This ordinance shall take effect and be in force ten days after its passage.

Passed the City Council March 5, 1895.

---

## ORDINANCE NO. A170.

AN ORDINANCE RELATING TO PARKS AND PUBLIC SQUARES OF THE CITY OF SPOKANE.

*The City of Spokane does ordain as follows:*

SECTION 1.   The management and control of all public parks and public squares of the city is vested in the Park Commission.

SEC. 2.   It shall be the duty of the Park Commission to keep the fences of all enclosed public grounds in repair, and also all sidewalks around said public grounds.

JA1979

Case 1:22-Co00133-1000 Al6Dodoment4s l3Flage 080 02BB07Pedg0720009pdD 2883

SEC. 3. No person shall enter or leave any of the public parks or other enclosed public grounds of the City of Spokane except by their gateway. No person shall climb or walk upon their walls or fences.

SEC. 4. Neither cattle, horses, goats, swine or other animals, except as herein provided, shall be turned into any one of said parks, public squares or public grounds by any person. All persons are forbidden to carry firearms or to throw stone or other missles within any one of the public parks or other public grounds of the city. All persons are forbidden to cut, break or in any way injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, or other constructions or property within or upon any of the said parks or public grounds.

SEC. 5. No person shall expose any article or thing for sale upon any of said parks or other public grounds, except such person shall have been previously licensed by the Park Commission, nor shall any peddling or hawking be allowed therein.

SEC. 6. No threatening, abusive, insulting or indecent language shall be allowed in any parks or public grounds of the city whereby a breach of the peace may be occasioned. No person shall be allowed to tell fortunes or to play at any game of chance at or with any table or instrument of gaming, nor to do therein any obscene or indecent act.

SEC. 7. The Park Commission may direct that any of the entrances to the public park be closed at any time.

SEC. 8. No person shall post or otherwise affix any bills, notice or other paper upon any structure or thing within any park or other public grounds of the city nor upon any of the gates or enclosures thereof.

SEC. 9. No person shall, without the consent of the Park Commission, play upon any musical instrument, nor shall any person take into or carry or display in said public parks any banner, target or transparency. No military or target company, civic or other, shall be permitted to parade, drill or perform therein any military or other evolution or movement. Nor shall any fire engine, hose cart or other machine on wheels, commonly used for the extinguishing of fire, be allowed on any part of said parks or other public grounds without the previous consent of the Park Commission, except in case of fire.

SEC. 10. No person other than employes shall light, make or use any fire in said parks or other public grounds.

SEC. 11. No person shall go upon any grass, lawn or turf of the parks or other public grounds, except when and where the word "Common" is posted; indicating that persons are at liberty at that time and place to go on the grass. The Park Commission shall cause printed or written copies of prohibitions of this ordinance to be posted in said parks or grounds.

SEC. 12. Any member of the city police shall have power to arrest any person who shall not desist from any violations of this ordinance when directed, and cause him to be committed for examination.

SEC. 13. Any person who shall violate any provisions of this ordi-

JA1980

Case 1:22-cv-00123-RMR AMD Document 4b  Filed 03/08/23 Filed JA1981 Page3D 2104

nance, or who shall neglect or fail or refuse to comply with any or either of the requirements thereof, shall, on conviction, pay a fine of not less than five dollars nor more than one hundred dollars, and the costs of prosecution.

SEC. 14.   All ordinances and parts of ordinances in conflict herewith are hereby repealed.

SEC. 15.   This ordinance shall take effect ten days after its passage. Passed by the City Council March 11, 1892.

---

ORDINANCE NO. 99.

AN ORDINANCE TO REGULATE SOLICITORS FOR HOTELS, BOARDING HOUSES, HACKS, OMNIBUSES AND OTHER VEHICLES.

*The City of Spokane Falls does ordain as follows:*

SECTION 1.   No person shall solicit for a hotel, boarding house, hack, omnibus or other vehicle or for any other purpose whatever inside the depot of any railroad company within the City of Spokane Falls, nor upon the platform thereof, excepting three feet of said platform next to and abutting on the street, which space shall be designated by a line being placed upon said platform or painted by said railroad company thereon.

As amended by Ordinance No. 117, passed March 8, 1888.

SEC. 2.   Any person acting as solicitor for a hotel, boarding house, hack, omnibus, or other vehicle, whether for himself or as agent for another, shall conduct his business in a quiet, orderly manner, and in an ordinary tone of voice, and shall not molest or intrude himself upon any passenger or other person or individual with him or his baggage, except as requested by the owner thereof.

SEC. 3.   No person shall habitually lounge or stay in a railroad depot in the city without having and making known, when so requested by any policeman or civil magistrate, his business thereat, nor without having legitimate business or errand at such railroad depot.

SEC. 4.   No person shall hitch his horse, mule or team to any truck, platform or lamp-post at said depot, or on the platform thereof.

SEC. 5.   Any person violating any of the provisions of this ordinance shall, upon conviction thereof, be punished by a fine of not less than five dollars nor more than fifty dollars.

SEC. 6.   This ordinance shall take effect and be in force from and after five days after its passage and publication.

Passed the City Council December 28, 1887.

JA1981



WILLARD HALL PORTER
ATTORNEY-AT-LAW,
JAN 15 1894
WILMINGTON. DEL

# THE CHARTER

OF THE

# ...TY OF WILMINGTON

As Amended to May 6th, 1893;

## ...ts of the General Assembly

RELATING TO THE CITY,

Including the Session of 1893;

*(being vol. 19. Laws of Del.)*

—AND—

## ...INANCES, AND RULES AND REGULATIONS

Of Departments of the City Government,

...s Amended and in Force, September 1st, 1893;

—ALSO—

# ...E ORIGINAL BOROUGH CHARTER.

PUBLISHED BY ORDER OF THE COUNCIL.

Wilmington, Del.:
DIAMOND PRINTING COMPANY,
1893.



Google

## RULES AND REGULATIONS OF THE BOARD OF PARK COMMISSIONERS,

### As Amended and in Force September 1st, 1893.

1.   No person shall ride or drive upon any other part of the Park than upon such roads as may be designated for such purposes. . . . . . . . . . . . . . . . Penalty, $5 00

2.   No person shall be permitted to bring led horses within the limits of the Park, or to turn any horses, cattle, goats, swine, dogs, or other animals loose in the Park. . . . . Penalty. $5 00

3.   No person shall indulge in any threatening, abusive, insulting, or indecent language in the Park. . . . . Penalty, $5 00

4   No person shall engage in gaming, or commit any obscene or indecent act in the Park. . . . . . . Penalty, $10 00

5.   No person shall go into bathe in any of the waters within the Park. . . . . . . . . . . . . . . Penalty, $5 00

6.   No person shall throw any dead animal or offensive matter or substance of any kind into the Brandywine, or into any spring, brook, or other water, or in any way foul any of the same, which may be within the boundaries of the Park   Penalty, $5 00

7.   No person shall carry fire-arms or shoot birds or other animals within the Park, or throw stones or other missiles therein.
Penalty, $5 00

8.   No person shall disturb birds, or annoy, strike, injure or kill any animal, whether wild or domesticated, within the Park.
Penalty, $5 00

9.   No person shall cut, break, or in anywise injure or deface any trees, shrubs, plants, turf or rocks, or any buildings, fences, bridges, or other structures within the Park.
Penalty, $10 00

10   No person shall injure, deface, or destroy any notices, rules or regulations for the government of the Park posted or in any other manner permanently fixed, by order or permission of the Board of Park Commissioners or their officers or employes.
Penalty, $10 00

*Adopted October* 12, 1887.

Case 1:22-cv-00123-XXX-XXXXXXXX Page XXX Document Filed XX/XX/XXXX pID 2337

# REVISED ORDINANCES

OF THE

# CITY OF CANTON

## ILLINOIS.

REVISED 1894-1895

BY

B. M. CHIPERFIELD, *City Attorney.*

PUBLISHED BY AUTHORITY OF THE CITY COUNCIL.

CANTON, ILL.:
DAILY REGISTER PRESS:
1895.

JA1984

DEC 31 1908

JA1985

Case 1:22-cv-00031-MMB-JMB Document 45 (Page 294) of 436 Filed 09/09/2009

advertise, by outcry or by the ringing of any bell or the blowing of any horn or the beating of any drum, his, her or their business, or any sale or sales at auction or otherwise. Any person violating any of the provisions of this section shall be fined not less than ten dollars nor more than one hundred dollars for each offense.

SEC. 20 *Sales on streets prohibited.* No person shall be allowed to sell at auction or public outcry, nor to erect or occupy a stand of any kind for the purpose of making sales, upon any of the streets, alleys, avenues, sidewalks, crossings or other public places in said city, nor shall any person be permitted to sell from any carriage, buggy or other vehicle, upon any of the streets, alleys, avenues, sidewalks, crossing, or other public place in said city, except as hereinafter provided, under a penalty of ten dollars for each offense.

SEC. 21. *Construction of foregoing section.* The foregoing section shall not be so construed as to apply to any person or persons coming into the city from the country with teams or otherwise with any produce for market raised by themselves, or to any person selling vegetables, berries, fruit, milk or other farm produce of their own production ; nor shall the same be so construed as to make it a penal offense to peddle newspapers, nor to apply to judicial sales ; Provided, that farmers or others selling under the provisions of this section shall not occupy a stand upon any sidewalk, alley or crossing, nor within a space of ten feet of any such sidewalk or crossing upon any street or public square, nor shall they allow their stand, wagon or other vehicle from which they may be selling to remain in front of any person's place of business without the consent of the occupant of such place of business, nor so as to obstruct the convenient travel of the street.

SEC. 22. *Telephone and telegraph poles.* No person or corporation shall set or cause to be set any telegraph, telephone or other poles upon any street or alley within the City of Canton, or string or hang any wire along or across any street or alley, unless authorized so to do by the City Council, under a penalty of ten dollars for each offense.

JA1986

Case 1:22-Cv-00323-1880-AB document-46-1Page 3960 02/1887446P/50000509040D 2116

SEC. 23. *Public Parks shall be known by their respective names.* The several Public Parks, Squares and grounds in the City of Canton shall be known and designated by the names applied thereto respectively on the map of the City of Canton, that may be designated by ordinance.

SEC. 24. *Care of parks.* It shall be the duty of the Committee on Parks and Public Buildings of the City Council to superintend all public grounds and keep the fences thereof in repair, the walks in order, and the trees properly trimmed, and improve the same according to plans approved by the City Council. The said committee shall likewise cause printed or written copies of prohibitions of this article to be posted in the said Parks or Grounds.

SEC. 25. *Regulations of Parks.* No person shall enter or leave any of Public Parks of the City of Canton except by their gateways; no person shall climb or walk, sit or stand upon the walls or fences thereof.

SEC. 26. *Depredations not to be committed in Parks.* Neither cattle, horses, goats, swine or annimals, except as herein specified shall be turned into any one of the said Parks by any person. All persons are forbidden to carry firearms or to throw stones or other missiles within any one of these Public Parks. All persons are forbidden to cut, break or in any way injure or deface the trees, shrubs, plants, turf or any of the buildings, fences or other structure, or property within or upon any of the said Parks.

SEC. 27. *Bills are not to be posted in Parks.* No person shall post or otherwise use or affix any bills, notice. or other paper upon any structure or thing within either of said Parks nor upon any of the gates nor enclosures thereof.

SEC. 28. *Persons in Parks must keep off the grass.* No person shall go upon the grass, lawn or turf of the Parks except when and where the word "common" is posted, indicating that persons are at liberty at that time and place to go on the grass. Any member of the city police shall have the power to arrest any person who shall not desist from any vio-

JA1987

Case 1:22-cv-01333-RBW-ABR Document 46-1 Filed 06/30/2008 Page 2111

lation hereof when directed, and cause him to be committed for examination or be taken before the proper officer for trial.

SEC 29. *Penalty.* Any person who shall violate any or either of Sections 25, 26, 27 or 28, of this Chapter, or whoever shall neglect or fail or refuse to comply with any or either of the requirements thereof, shall upon conviction pay a fine of not less than five dollars nor more than two hundred dollars.

SEC. 30. *Sidewalks shall be constructed by special taxation.* All new sidewalks and condemned sidewalks shall be constructed by special taxation, levied upon abutting land owners, and it shall be the duty of said land owners, whenever the same becomes defective or needs repairs, to repair the same without notice and keep the same in repair, using the same kind of material of which the walk is constructed.

SEC. 31. *Abutting property owners shall repair sidewalks.* Whenever any sidewalk in said City shall need repairs, the abutting land owner shall make the needed repairs; and if any owner shall fail to repair the same, the Street Superintendent shall give such owner three days notice to repair, and shall file a copy of the said notice with the City Clerk; and upon such owner failing or refusing to repair the same, an ordinance shall be passed to repair, renew or condemn the same and shall require the same to be constructed by special taxation; which ordinance shall be passed according to law, for such purpose.

SEC. 32. *Defective sidewalks.* Whenever any sidewalk shall not be repairable, an ordinance shall be passed condemning such defective sidewalk and requiring the same to be rebuilt by special taxation ; and new sidewalks shall be built by like taxation.

SEC. 33. *What ordinances shall specify.* All ordinances shall provide and specify the material which shall be used in such construction or repair, and the width and location of the same, and that the owners of abutting lands shall have the time allowed by law to build and construct the same, and in all other respects said ordinance shall conform to law.

16

JA1988

Case 1:27-cv-08423-1000-AND Document 8 Page 294 02Date Filed 97/20/2028geID: 2112

# Revision of 1904

## THE

# General Ordinances

OF THE

# City of Indianapolis

CONTAINING, ALSO

## Acts of the Indiana General Assembly

SO FAR AS THEY CONTROL SAID CITY

TO WHICH IS PREFIXED

## A CHRONOLOGICAL ROSTER OF OFFICERS

FROM 1832 TO 1904

## AND RULES GOVERNING THE COMMON COUNCIL

Collated and Annotated by Edgar A. Brown and William W. Thornton, Commissioners.

*PUBLISHED BY AUTHORITY OF THE CITY OF INDIANAPOLIS.*

INDIANAPOLIS
WM. B. BURFORD, PRINTER AND BINDER
1904

JA1989

CC
Indianapolis
3
1904

Gift of
Joseph R. Morgan
1981

JA1990

Case 1:22-cv-01321-RLY-MKK Document 49 Filed 07/20/23 Page 296 of 436 PageID 2114

AN ORDINANCE regulating the use and enjoyment of parks, park grounds and parkways of the City of Indianapolis, providing penalties for the violation of the same, repealing all conflicting ordinances, providing for the publication thereof, and fixing the time when the same shall take effect.

[Approved June 30, 1896.]

**1968. When Open for Public—Entrance.** 1. *Be it ordained by the Common Council of the City of Indianapolis, Indiana,* That the parks shall be open to the public from 5:00 a. m. until 11:00 p. m., and no person other than employes shall be permitted to remain therein, except when open as herein specified, and no person at any time shall enter or leave any park except by the established entrances, walks or drives.

**1969. Writing on Park Buildings, etc.** 2. No person shall write, cut, mutilate or deface in any manner any building, fence, bench, masonry, statue, ornament, or tree in any public park.

**1970. Injury to Flowers or Trees.** 3. No person shall pull, pluck, break or touch any flowers or fruit, whether wild or cultivated; cut down, girdle or break down any sapling, tree, shrub or plant; break or bend limbs or branches of trees or bark trees; or bend, pluck, handle or injure any trees, flowers, shrubs or plants whatever, or limbs, twigs or leaves thereof, or climb any tree in any public park.

**1971. Discharging Fire-Arms.** 4. No person shall discharge any fire-arm, or have possession of any fire-arm within the limits of any public park.

**1972. Use of Profane or Abusive Language.** 5. No person shall use profane, obscene, threatening or abusive language, or fight or throw any stone or missile, or behave in a disorderly or improper manner, or commit any offense against decency or good morals in any public park.

**1973. Starting Fire in Park—Molesting Animals.** 6. No person not an employe shall make a fire for any purpose within the bounds of any park; and no person shall chase, catch, injure, molest or disturb any animal, bird or fish kept within any public park for the use, instruction or entertainment of the public, nor shall any person give or offer to give any such animal tobacco or other noxious article.

**1974. Animals or Fowls Trespassing on Parks.** 7. No person being the owner or having control of the same shall suffer or permit any chickens, ducks, geese, hogs, cattle, horses, sheep, or goats, or other animals or fowls to stray into, run at large or trespass upon any public park land.

**1975. Fastening Horse to Tree.** 8. No person shall fasten a horse to a tree, or bush, or building, or leave the same unattended, or be permitted to bring or lead horses within the limits of any public park, or a horse that is not harnessed and attached to a vehicle or mounted by a rider.

JA1991

Case 1:22-cv-04063-AMD Document 44-8 Filed 02/03/23 Page 297 of 436 PageID 2115

**1976. Wagons in Forbidden—Standing on Driveways.** 9. All vehicles other than pleasure carriages, as distinguished from wagons, carts and drays, are prohibited within any public park, except when employed in the business of said parks; and no vehicle or horse shall be permitted to stand upon the drives or any part thereof to the obstruction of the way.

**1977. Bicyclers.** 10. Bicyclers and tricyclers shall be strictly confined to the roadways of the public parks, and be controlled by the same rules which govern horsed vehicles and equestrians, and must keep and pass to the right when meeting the same. When passing a carriage or equestrian from the rear to the front it must be done on the left side, and at a speed not to exceed four miles per hour. Bicyclers and tricyclers must not travel more than two abreast, nor without displaying a light in front if it be one-half hour after sunset, and carrying regular bicycle or tricycle bells at all times.

**1978. Carriages Passing Each Other.** 11. When carriages, equestrians or cyclers meet, the shall respectively keep to the right.

**1979. Riding or Driving on Grass.** 12. No person shall ride or drive upon the grass, footways or elsewhere than on the roads for the use of carriages, equestrians and cyclers.

**1980. Speed for Driving.** 13. No person shall ride or drive a horse or cycle faster than at the rate of six miles an hour.

**1981. Picnics—Permits—Cleaning Up Debris.** 14. No picnic shall take place in any public park without a written permit of the Superintendent, in which shall be designated the place where it is to be held. Picnics permitted for Sunday and secular schools must always be accompanied by their respective teachers and masters, who will be held personally responsible for all infringements by the scholars of these rules and regulations. No person shall intrude him or herself upon a picnic without consent of those in charge of it, nor disturb any picnic within said parks. Parties holding picnics in the said parks must clean up the ground that has been occupied by them, on quitting it, and remove all paper and litter.

**1982. Sleeping in Parks—Begging—Games.** 15. No person shall be allowed to sleep on the benches or grass of any public park, nor to beg, to tell fortunes, to play at any game of chance, or with any instrument of gaming therein, and gambling in any form and playing cards is prohibited in the public parks.

**1983. Use of Liquors Prohibited.** 16. No person shall introduce spirituous, malt or fermented liquors into any public park, either for his own use or for sale, nor use, sell or give away the same.

**1984. Dogs.** 17. No person shall bring a dog into any public park.

JA1992

Case 1:22-cv-01183-RCL Document 44-8 Filed 07/07/23 Page 298 of 436 PageID 2116

**1985. Parades—Drills—Meetings.** 18. No military, civic or other company shall be permitted to parade, drill or perform within any park any military evolutions or movements without the consent of the Park Commissioners, and no public meetings or public discussions of any subject, religious, social, political, or of any other kind, shall be held within the limits of any park without the consent of the Park Commissioners.

**1986. Funeral Procession.** 19. No funeral procession, or hearse, nor any vehicle carrying the body of a deceased person, shall be allowed within any park.

**1987. Bringing Trees Into Park—Advertisement.** 20. No person other than employes shall bring upon any park any tree, shrub or plant, nor any newly plucked branch or portion of tree, shrub or plant; and no person shall paint, post or otherwise affix any bill, notice, sign, or other paper or sign upon any structure or thing within the parks nor upon any of the gates in the enclosures thereof.

**1988. Walking on Grass.** 21. No person shall go upon the grass, lawn or turf of any parks where the sign inscribed "Keep Off the Grass" has been posted by the Superintendent.

**1989. Watermelons.** 22. All persons are forbidden to carry watermelons into any park.

**1990. Bathing—Fishing—Disturbing Animals.** 23. No person shall bathe, wash or fish in, or go or send or ride any animal into any waters of any park, nor feed or disturb any of the fish, water fowls or other birds or animals preserved therein; or throw stones or rubbish of any kind into any lake, pond, stream or fountain, or any roadway of any public park.

**1991. Playgrounds.** 24. Portions of the parks may be set aside by the Superintendent for ball, croquet, golf or other games, and where any such portion of any park is set apart for any games, as aforesaid, no game of baseball shall take place without the written consent of the Superintendent, and no person shall practice ball or intrude himself upon the players on the space so set apart while a game is in progress. (As amended June 24, 1904.)

**1992. Hammocks.** 25. Hammocks, except for the use of babies, shall not be permitted within the parks. In such cases permission must be obtained from the Custodian, who will designate the trees to which the hammock may be attached.

**1993. Removal of Benches.** 26. No benches or seats shall at any time be removed or changed from their place in the said parks without permit shall be obtained from the Superintendent.

**1994. Swings.** 27. No person shall attach a swing to any tree within any public park without the consent of the Superintendent.

**1995. Sales Within Park.** 28. No person shall sell or offer for sale any article whatever within any public park without first having obtained written consent of the Board of Park Commissioners.

JA1993

Case 1:22-cv-01440-AEM Document 44 Page 299 0200 Filed 07/20/2023 PageID 2117

**1996. Intoxication.** 29. No intoxicated person shall be permitted in any public park.

**1997. Entering Water Closet of Opposite Sex.** 30. No person of opposite sex shall enter any water closet set apart for ladies, nor use in any improper way any water closet.

**1998. Penalty.** 31. Any person violating any of the provisions of this ordinance shall, upon conviction thereof, be fined not less than five ($5.00) dollars, nor more than one hundred ($100.00) dollars

**1999. Officers Given Police Powers.** 32. Officers or employes of the various parks are in power [empowered] to enforce the rules and regulations as herein set forth, and summary [summarily] to arrest and judge violators thereof.

**2000. Repeals.** 33. All ordinances and parts of ordinances in conflict with this ordinance are hereby repealed.

**2001. Publication.** 34. This ordinance shall take effect and be in force from and after its passage and publication one day each week for two consecutive weeks in the Sun, a daily newspaper of general circulation, printed and published in the City of Indianapolis.

### PAWN-BROKERS.

AN ORDINANCE to license and regulate pawn-brokers; defining and declaring who shall be deemed pawn-brokers; fixing the license fee therefor; providing for the keeping of lists and descriptions of articles pledged or deposited with pawn-brokers; for the inspection of such lists and articles; the registering of the names and residences of depositors, and prescribing penalties; also providing for the publication of said ordinance and the time when the same shall take effect.

[Approved November 27, 1893.]

**2002. License—Definition—Fee.** 1. *Be it ordained by the Common Council of the City of Indianapolis,* That it shall be unlawful for any person to engage in or continue in the business of a pawn-broker in said city, unless such person shall have first paid the license fee to the City Treasurer and procured the license as a pawn-broker as in this ordinance prescribed. Every person whose business it is to take or receive by way of pledge, pawn, or exchange, any goods, wares or merchandise, or any kind of personal property whatsoever, as a security for the repayment of money lent thereon, or who purchases personal property or choses in action, on the condition of selling the same back again at a stipulated price, is hereby defined and declared a pawn-broker, and shall pay to the City Treasurer an annual fee of one hundred dollars.

1. See also Second-Hand Dealers.

**2003. Issuing License—Date.** 2. It shall be the duty of the City Comptroller, upon the presentation of the treasury certificate showing the payment of said fee into the city treasury, to issue to the person entitled thereto the license applied for. Such license shall

# A DIGEST

OF THE

# ACTS OF ASSEMBLY

RELATING TO,

AND THE

# GENERAL ORDINANCES.

OF THE

# CITY OF PITTSBURGH

*From 1804 to Jan. 1, 1897,*

WITH REFERENCES TO DECISIONS THEREON.

SECOND EDITION.

PREPARED UNDER RESOLUTION OF COUNCILS

BY

W. W. THOMSON

OF THE PITTSBURGH BAR.

PITTSBURGH, PA.:
W. T. NICHOLSON SONS, PRINTERS AND BINDERS.
1897.

Digitized by Google

JA1995

496                    ORDINANCES—EXECUTIVE DEPARTMENTS.

## BUREAU OF PARKS.

July 31, 1893, § 1.
O. B. 9, 262.

**Bureau of parks created.**

**Officers and employees.**

1.   There shall be and is hereby created a bureau to be known as the "bureau of parks," which bureau shall consist of one superintendent whose compensation shall be two hundred dollars per month, one superintendent, whose compensation shall be one hundred and fifty dollars per month, and one assistant superintendent whose compensation shall be one hundred and twenty-five dollars per month, one clerk whose compensation shall be eighty-three dollars and thirty-three cents per month, and such foremen and laborers as may be required from time to time, at the same pay as like labor in other departments of the city (*a*).

July 6, 1894.
O. B. 11, 139.

**Preamble.**

**Preamble.**

Ibid § 1.

**Watchmen compensation.**

2.   WHEREAS, The control, maintenance, supervision and preservation of the public parks is by law vested in the department of public works ; and

WHEREAS, It is essential to proper exercise of these powers that persons should be employed as watchmen in the public parks for the protection of the public property therein.

3.   *Be it ordained, &c.,* That the director of the department of public works shall, and he is hereby authorized to employ such watchmen as may be necessary for the properly caring for, maintaining and protecting the public property in the public parks of this city at the daily compensation of two dollars and fifty cents each.

Ibid. § 2.

4.   The compensation of such watchmen shall be paid out of appropriation No. 36, public parks.

July 27, 1893. § 1.
O. B. 9, 260.

**Rules adopted.**

5.   Upon the passage and approval of this ordinance the following rules and regulations shall be and are hereby established for the management and protection of the parks and public grounds of the city of Pittsburgh, to wit :

*First.*   No person shall injure, deface or destroy any notices, rules or regulations for the government of the parks, posted or in any other manner permanently fixed by order of the chief of department of public works.

*Second.*   No person shall be allowed to turn any chickens, ducks, geese or other fowls, or any cattle, goats, swine, horses or other animals loose within the parks or to bring led horses or a horse that is not harnessed and attached to a vehicle or mounted by an equestrian.

*Third.*   No person shall be allowed to carry firearms, or to shoot or throw stones at or to set snares for birds, rabbits, squirrels or fish, within the limits of the parks or within one hundred yards thereof.

*Fourth.*   No person shall cut, break, pluck or in anywise injure or deface the trees, shrubs, plants, turf or any of the buildings, fences, structures or statuary, or place or throw anything whatever in any springs or streams within the parks, or fasten a horse to a tree, bush or shrub.

(*a*)  As amended by ordinance of Nov. 23, 1886, O. B. 9, p. 320, and ordinance of March 31, 1896, O. B. 11, p. 40.

Digitized by Google

*Fifth.* No military or other parade or procession, or funeral shall take place in or pass through the limits of the parks without permission from the chief of department of public works.

July 27, 1883.
Park rules.

*Sixth.* No one shall ride or drive therein except on the avenues or roads, or at a rate of speed exceeding eight miles per hour.

*Seventh.* No gathering or meeting of any kind, assembled through advertisement, shall be permitted in the parks without previous permission of the chief of the department of public works, nor shall any gathering or meeting for political purposes in the park be permitted under any circumstances.

*Eighth.* No wagon or vehicle of burden or traffic shall pass through the park, except on such road or avenue as shall be designated by the chief of the department of public works for burden transportation.

*Ninth.* No coach or vehicle used for hire, shall stand upon any part of the parks for the purpose of hire, nor except in waiting for persons taken by it into the park, unless at points designated by the chief of the department of public works.

*Tenth.* No profane, indecent, abusive or insulting language, gambling or drunkenness shall be allowed within the parks, nor shall any one be allowed to introduce any spirituous liquors within the limits of the same, either for his own use or for sale.

*Eleventh.* No person shall climb any tree or attach any swing thereto, without the consent of the superintendent.

*Twelfth.* No picnic shall take place in the parks without a written permission for the purpose being obtained from the superintendent, in which shall be designated the spot where it shall be held, and parties holding picnics shall clean up the ground that has been occupied by them on quitting it, and not leave paper and other refuse on the ground.

*Thirteenth.* No person shall disturb any picnic in the parks, or intrude himself or herself on it without the consent of those composing it.

*Fourteenth.* No person shall stand, walk or sit on any fence, wall or embankment, or stand, slide, sit or roll upon any slope of the parks.

*Fifteenth.* No person shall set up any booth, table or stand for the sale of any article whatever, without the consent of the chief of the department of public works, previously obtained in writing.

*Sixteenth.* When carriages or equestrians meet, the parties respectively shall keep to the right as the law of the road.

*Seventeenth.* No person shall drive any vehicle displaying any placard or advertisement of any kind along any road or avenue in the parks, nor shall any person display any placards or advertisements of any kind, or post or fix any notice or bill or other writing or printing of any kind on any tree, lamp-post, hydrant, curbstone, coping, flagstone, fence, wall, building or other place within the parks.

*Eighteenth.* No benches or seats shall at any time be removed

**33**

Digitized by Google

498                    ORDINANCES—EXECUTIVE DEPARTMENTS.

July 27, 1893

or changed from their places in the parks, except by the order first obtained of the superintendent.

*Nineteenth.* Bicycles and tricycles shall be restricted to the use of the roadways, and be controlled by the same law which governs horses, vehicles and equestrians, and must pass to the right, when meeting the same or each other. When passing a carriage or equestrian from the rear to the front, it must be done to the left side and at a moderate rate of speed. Bicycles and tricycles must not travel more than two abreast.

*Twentieth.* All racing with horses, vehicles, tricycles and bicycles is prohibited at any time, and bicycles and tricycles must not be driven or propelled at greater speed than eight miles per hour.

Ibid. § 2.

Penalty.

6. Any violation of any of the foregoing rules shall subject the party so offending to a fine of twenty-five dollars, to be collected by summary process.

Aug. 28, 1871, § 1.
O. B. 3, 122.

Improvement of part of Bluff street as a park authorized.

7. The citizens of the Sixth and Fourteenth wards of the city of Pittsburgh, residing in the vicinity of Bluff street, shall be and are hereby authorized to enclose with a good substantial fence a portion of Bluff street, from Gist to Magee street, as follows, viz: Commencing at Gist street thirty feet south of the northern curb line, and thence running by a line preserving the same width to Magee street, said fence to be constructed with openings at the street crossings, and at such other points as may be deemed proper openings for the convenient access of foot passengers. Said citizens shall be further authorized to lay off the grounds south of said fence to the line of said street with walks, and within said enclosure, and on the outside thereof, to plant trees and shrubbery, erect fountains and make other improvements thereon suitable for a public promenade: *Provided,* That no trees or other improvements shall be placed upon said street within a distance of twenty feet from the north curb line of said street.

Ibid. § 2.

City not liable for expense.

8. Said improvements shall be made and maintained at the expense of the parties making the same, and the city shall not be liable for any expense contracted for or on account of the same.

Ibid. § 3.

City may grade and pave.

9. Said city reserves the right to direct the grading and paving of said street at any time hereafter, without compensation for the improvement which may be made thereon as fully as if this ordinance had not been adopted.

Ibid. § 4.

10. Said improvements and the maintenance and care of the same shall be under the charge of such persons as may be selected by subscribers to the fund for making the same.

Ibid. § 5.

Penalty for injuring improvements.

11. It shall be unlawful for any person to injure or destroy any fence, trees, shrubbery or other improvement upon said ground; and if any person shall wilfully injure or destroy the same, or any part thereof, he or she shall forfeit and pay the sum of ten dollars, in addition to a sum sufficient to repair or replace the damage, to be recovered by action in the name of the city of Pittsburgh, or by summary conviction before the mayor

Case 1:22-cv-07846-AND Document 49-1 89 Page: 304 02/13/23 Filed 07/20/2023 PageID: 2122

or any alderman of said city, and the sum so recovered shall be paid to the person having charge of said improvements, to be expended upon the same. *Aug. 28, 1871.*

12. The superintendent of the water works shall be authorized to direct a supply of water, free of charge, for not more than two fountains upon said ground at all reasonable times and to reasonable amounts, from the first day of April to the fifteenth day of October in each year: *Provided,* That said superintendent shall be authorized to prevent the unnecessary waste of water, and to prohibit its use during times of short supply. *Ibid. § 6. Supply of water for two fountains authorized.*

13. WHEREAS, The public market-house on Second street is of no benefit to the city ; *Sept. 27, 1858. O. B. 2, 125.*

*And whereas,* The heirs and legal representatives of the estate of James O'Hara have, by deed dated the seventeenth day of May, one thousand eight hundred and twenty, and on the ninth of August, one thousand eight hundred and fifty-eight, consented that the ground dedicated by the late James O'Hara, on Second between Ross and Grant streets, may be used as a public square or area ; therefore, *Preamble.*

14. *Be it ordained, &c.,* That all that portion of Second street extending from Grant to Ross street, and used for the purpose of a market house, be and the same is hereby devoted to the purpose of a public park, to be ornamented in such manner as shall be directed by the mayor of the city and members of councils for the time being of the Second ward, who are hereby authorized to adopt such rules for the same as may, in their judgment, be proper, and to keep the same posted on the gate-posts thereof : *Provided,* The whole expense of removing the market-house and of constructing said public park and keeping the same in repair, shall be provided by voluntary subscription, and shall in no case be a charge on the city treasury. *Ibid. § 1. Second street market to be made a park.* *Rules.* *Proviso.*

15. Any person that shall injure or destroy any tree, shrub or any other thing within said park, or the wall or fence that may surround it, shall, upon conviction before the mayor, be fined a sum not exceeding five dollars, in addition to the amount necessary to repair any injury so done, to be recovered as like penalties are by law recoverable. *Ibid. § 2. Penalty for injuries.*

16. It shall be lawful to erect within the said area or park one or more fountains, to be supplied from the public water pipes without any charge for the use of the water. *Ibid. § 3. Fountains.*

17. Before the work necessary for said improvement shall be commenced, the mayor and members of councils from the Second ward shall meet at the mayor's office and choose from among themselves one president, one secretary, and one treasurer, and shall proceed to agree upon a plan of the work, &c. *Ibid. § 4.*

18. For the purpose of constructing and maintaining a public park, there shall be and is hereby set aside, dedicated and appropriated so much of the ground belonging to said city as is not indispensably necessary for the safe and proper use of the reservoir known as the Herron Hill Reservoir. *Sept. 14, 1889 § 1. O. B. 7, 134. Dedication of Herron Hill Park.*

Google

500 ORDINANCES—EXECUTIVE DEPARTMENTS.

**Sept. 14, 1889, ¶ 2.**
**Improvement.**

19.   The chief of the department of public works of said city be and he is hereby authorized and directed to improve all said ground lying around, adjacent to and connected with said reservoir, and which shall not be found actually necessary for the operation of said reservoir, to be used and enjoyed as a public park, to be known as and by the name of the "Herron Hill Park."

**Sept. 16, 1889, ¶ 1.**
**Dedication of Highland Park.**

20.   For the purpose of constructing and maintaining a public park, there shall be and is hereby set aside, dedicated and appropriated so much of the ground belonging to said city as is not indispensably necessary for the safe and proper use of the reservoirs known as the Highland Reservoirs.

**Ibid. § 2.**
**Improvements.**

21.   The chief of the department of public works of said city be and he is hereby authorized and directed to improve all said ground lying around, adjacent to and connected with said reservoirs or which may be added thereto, and which shall not be found actually necessary for the operation of said reservoirs, to be used and enjoyed as a public park, to be known as and by the name of "Highland Park."

## BUREAU OF CITY PROPERTY.

**Dec. 17, 1887, ¶ 18.**
**O. B. 6, 227.**
**Bureau created.**
**Title of head.**
**Salary.**
**Duties.**

**Clerk.**

1.   There shall be and is hereby created a bureau to be known as the bureau of city property, the head of which shall be known as superintendent of city property, and who shall receive the sum of one hundred and fifty dollars per month as his compensation. The duties of this bureau shall be to take charge of all public property belonging to said city not otherwise conferred upon some other department, including markets, city buildings, wharves, and such other property of the city as is not specially conferred elsewhere: *Provided*, That the chief clerk of this bureau shall act as clerk of the Diamond markets without extra compensation.

**Feb. 28 1890, ¶ 1.**
**O. B. 7, 321.**
**Salary of clerk of bureau of city property.**

2.   From and after the date of the passage of this ordinance, the salary of the clerk to the bureau of city property (who also acts as clerk of markets) shall be and is hereby fixed at fifteen hundred dollars per annum, and the said clerk to the bureau of city property shall receive compensation for his services at the rate of fifteen hundred dollars per annum from and after the date of the approval or passage of this ordinance.

**City Code, 234, ¶ 1.**
**Penalty for injuring.**

**Proviso.**

3.   If any person shall destroy or injure in any way whatsoever any public property within this city, he shall forfeit and pay for every such offense a fine of not less than ten dollars and not exceeding fifty dollars, besides the amount of the costs and expenses of repairing the same: *Provided*, That when the injury is accidental no further fine shall be imposed than the amount of the cost and expense of repairing.

**Ibid. § 2.**
**City officers to report to controller.**

4.   It shall be the duty of every city officer to report to the controller any damage or injury which may be done to any public property in his possession, that the same may be laid

# A Digest of the Laws and Ordinances for the Government of the Municipal Corporation of the City of Reading, Pennsylvania, Park Rules and Regulations, 240 (1897)

|

(8) No person shall carry firearms, or shoot in the common, or within fifty yards thereof, or throw stones or other missiles therein.

Full Text: Google Books

Case 1:22-Gv040A5-RBM ABDorchmest ent 69 Pdge RBD 10Det Fibhg2/10/2120pd1D 2125

thirty-two in township one north of range seventy west, is hereby named and shall hereafter be known as VALVER-DAN PARK.

**510.  Washington Park.**

SEC. 5.   That the city property in the west half of the south-west quarter of section twenty-five in  township one north of range seventy-one west, shall be  named and here-after known as WASHINGTON  PARK.

## PARKS.

An Ordinance for the Protection of the Several Parks Belonging to the City and of the Buildings and Reservoirs and Trees and Other Improvements at and Within Said Parks, and to Pro-vide Penalties for Injuring the Same.
Passed  October 4, 1898.

(With  amendment  as  noted.)

**511.   No firearms or shooting in.**

SECTION 1.   Any person other than the police officers of the city who  shall  take  or carry  or cause to be taken or carried  into  any of the parks  belonging  to the City of Boulder, any gun, pistol, revolver, or other firearm, or who shall shoot  any  firearm at  or  towards  or  over or into or upon  any  of  said  parks,  shall  be  deemed  guilty  of  a misdemeanor.   (As amended August 2, 1899.)

**512.   No powder or explosives in.**

SEC. 2.   Any person who shall take or carry or cause to be taken  or carried into any of  said parks, any powder of any quality or kind or  any  explosive or dangerous or inflammable or combustible  substance,  shall  be  deemed guilty of a misdemeanor.

**513.   No fires or explosives.**

SEC. 3.   Any person  who shall start any  fire or cause or permit  to  be  started  any fire in any of said parks, not

SEC. 4.   No military or other parade or procession or funeral shall take place, or pass through the limits of the parks under the control of the Park Commission, without the order or permission of the Park Commissioners.

SEC. 5.   No person shall engage in any play, at baseball, cricket, shinney, football, croquet, or at any other game, with ball and bat, within the limits of the parks under the control of this Commission, except on such grounds only as shall be specially designated for such purpose.

SEC. 6.   No person shall be permitted to use the shores of Lake Merritt as a landing place for boats, or keep thereat boats for hire, or floating boathouses with pleasure boats for hire, except by special order or permission of the Park Commissioners, and only at places designated by and under restrictions determined upon by said Commissioners.

SEC. 7.   No regatta or boat race by clubs shall take place upon Lake Merritt without special permission granted by the Park Commission.

SEC. 8.   No person shall turn loose into the parks controlled by this Commission any cattle, goats, swine, horses, or other animals.

SEC. 9.   No person shall carry firearms, or shoot birds or throw stones or other missles within the boundaries of the parks controlled by the Park Commission.

SEC. 10.   No person shall cut, break, or in anywise injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, structures, or statuary or foul any fountains or springs within the parks controlled by the Park Commission.

SEC. 11.   No person shall drive or ride within the boundaries of the parks controlled by the Park Commission at a rate exceeding seven miles an hour.

SEC. 12.   No person shall ride or drive within the limits of the parks controlled by the Park Commission upon any other than the avenues and roads therefor.

SEC. 13.   No coach or vehicle used for hire shall stand upon any part of the parks controlled by the Park Commission for the purpose of hire, nor except in waiting for persons taken by it into the parks, unless in either case at points designated by the Park Commission.

SEC. 14.   No wagon or vehicle of burden or traffic shall pass through the parks, except upon such road or avenue as shall be designated by the Park Commissioners for burden transportations.

SEC. 15.   No person shall expose or display any article for sale within the parks without the order or permission of the Park Commission.

Digitized by Google

Original from
HARVARD UNIVERSITY

*Birmingham, Ala. — Ordinances*

# THE CODE

of

# CITY OF BIRMINGHAM

## ALABAMA

UNIVERSITY OF ILLINOIS LIBRARY

PREPARED BY

HENRY L. ANDERTON

JUL 8 1919

BY AUTHORITY OF THE COMMISSION
OF THE CITY OF BIRMINGHAM



## 1917

Digitized by Google

## CHAPTER XLIV

---

# Parks and Public Places

Sec. 1542. **All Parks Dedicated to Public Use.** All the parks heretofore marked out and dedicated to the city, and all public parks hereafter acquired by the city shall be and remain set apart and dedicated to the use of the public as parks and public grounds, and the same shall be regulated and governed in such manner as the Commission may from time to time ordain.

Sec. 1543. **For the Protection of Parks.** Any person who wilfully or maliciously breaks, cuts, disfigures, injures or destroys any tree, shrub, plant or flower within the enclosure of any of the public parks of the city, or any railing, structure or monument therein, or who shall hitch any horse or animal to any tree or shrub therein, shall, on conviction, be fined not less than one nor more than one hundred dollars.

Sec. 1544. **Conduct in Parks.** No person shall enter or leave any of the public parks of the City of Birmingham except by the gateways; no person shall climb or walk upon the walls or fences thereof; no person shall turn or lead any cattle, horses, goat, swine or other animals into any of such parks; no person shall carry firearms or throw stones or other missiles within any of such public parks; no person shall expose any article or thing for sale within any of such parks, nor shall any hawking or peddling be allowed therein; no threatening, abusive, insulting or indecent language shall be allowed in any part of any of such parks calculated to provoke a breach of the peace, nor shall any person tell fortunes or play at any game of chance at or with any table or instrument of gaming nor commit any obscene or indecent act there-

Digitized by Google

in; no person shall post or otherwise affix any bills, notice or other paper upon any structure or thing within any such park nor upon any gate or enclosure thereof; no person shall play upon any musical instrument, nor shall any person take into, carry or display in any such public park any flag, banner, target or transparency; no military company shall parade, drill or perform therein any military or other movements; no person shall light, make or use any fire in any such public park; no person shall go upon the grass, lawn or turf of the parks, except when and where the word "common" is posted, indicating that persons are at that time and place at liberty to go on the grass.

Sec. 1545. **Commission May Close Entrances.** The Commission may direct that any of the entrances to the public parks be closed at any time, and when so closed in obedience to such directions no person shall enter at any such place.

Sec. 1546. **Obstructions on Plats Along Public Streets.** It shall be unlawful for any person in possession of any lot or parcel of ground abutting on any public highway in the City of Birmingham to erect, maintain or permit any other person to erect or maintain or to continue or fail to remove within a reasonable time after notice or knowledge of the presence thereof of any wire, chain, rope or other obstruction or guard on any grass plat or parkway on any public highway in the City of Birmingham, unless such guard or obstruction shall conform to the following specifications, to-wit: The upright posts or stakes shall be made of dressed lumber four inches square and shall extend above the ground not less than three feet and shall be painted white. The cross bar shall consist of some rigid material and may be made either of iron pipe, an iron bar or a wooden bar which shall be placed at a height of not less than three feet above the surface of the ground and such bar or pipe shall also be painted white and shall be securely fastened to the said stakes or posts, which stakes shall be firmly placed in the ground and not more than eight feet apart.

Digitized by Google

Sec. 1547. **Guards or Stakes Not to be Placed Within Six Inches of Paved Sidewalk.** No guards or stakes shall be placed on any grass plat or parkway on any public highway in the City of Birmingham within six inches of the paved portion of the sidewalk.

Sec. 1548. **Agents, Tenant and Owner Charged With Removing Obstructions.** The owner of the abutting property, as well as the person in possession thereof, whether as agent, tenant or owner, shall be under the duty of removing all guards or obstructions from said parkways or grass plats which do not conform to the foregoing specifications.

Sec. 1549. **Names of Parks.** The various parks and public places owned by the city shall be named and known as follows: Avondale Park, Behrens Park, Caldwell Park, Capitol Park, East Park, Ensley Park, Halls Park, Idlewild Park, Lakeview Park, Linn Park, Magnolia Park, Mineral Wells and Reservoir Park, North Birmingham Park, North Haven Park, Phelan Park, Rhodes Park, West Park, Woodlawn Park, Woodward Park.

---

# CHAPTER XLV

---

# Pawnbrokers

Sec. 1550. **Definition.** Pawnbroker under this chapter is and shall be defined to be one whose business it is to lend money upon a pawn or pledge.

Sec. 1551. **Shall Keep Register of Pawns.** It shall be the duty of each person in business in the City of Birmingham as a pawnbroker to keep at his place of business a book in which he shall enter, or cause to be entered in writing, a minute description of all personal

Digitized by Google

# FIREARMS REGULATIONS IN THE NATIONAL PARKS

# 1897—1936

**May 13, 2008**

JA2008

**Background**

This information has been compiled to provide National Park Service employees more complete insight into the history of NPS firearms regulations. The first Servicewide regulations were adopted in 1936.[1] Although it has not been widely noted, those regulations prohibited firearms and required that they be surrendered when visitors entered the parks. Visitors could obtain written permission to carry them through the park if the weapons were "sealed."

The current Servicewide regulations governing weapons in parks were adopted in almost their present form in 1983, and published at 36 CFR 2.4.[2] However, in 1984, several adjustments were made to:

a. Make it clear that Alaska had different rules, and individual parks might have some variations in park-specific special regulations.

b. Re-order some of the wording to make it easier to follow.

c. Add a definition of what constitutes a "residential dwelling."

d. Add the word "temporarily" in front of the word "inoperable."

e. Clarify that the regulations applied on privately owned lands and waters under the legislative jurisdiction of the US.

f. Add a definition for the word "unloaded."

Item 1.e above was further amended in 1987 to clarify that the regulations apply "regardless of land ownership, on all lands and waters within a park area that are under the legislative jurisdiction of the U.S."

Prior to adoption of the 1936 Servicewide regulations, parks adopted park-specific regulations prohibiting weapons—the first (apparently) being Yellowstone National Park in 1897. Attached is a compilation of those regulations. Due to difficulty in retrieving archival materials, there are some gaps in this compilation. We will continue our efforts to fill these gaps, so check www.nps.gov/policy/Firearms.pdf to ensure you have the latest edition. We invite park superintendents to provide the NPS Office of Policy any additional information they may have that would help in this effort.

---

[1] The 1936 regulations are on-line at http://www.nps.gov/policy/1936Regulations.pdf
[2] 36 CFR 2.4 is on-line at http://edocket.access.gpo.gov/cfr_2007/julqtr/pdf/36cfr2.4.pdf

# FIREARMS REGULATIONS
## 1897 – 1936

**TABLE OF CONTENTS**

|  |  | Page(s) |
|---|---|---|
| 1. Yellowstone National Park | | |
| (a) | June 1, 1897 | 1 |
| (b) | April 1, 1899 | 3 |
| (c) | July 1, 1900 | 3 |
| (d) | February 7, 1902 | 3 |
| (e) | July 2, 1908 | 5 |
| (f) | May 27, 1911 | 5 |
| (g) | April 15, 1918 | 5 |
| (h) | February 18, 1929 | 6 |
| (i) | January 11, 1930 | 6 |
| (j) | December 20, 1930 | 7 |
| (k) | January 23, 1932 | 7 |
| (l) | December 21, 1932 | 8 |
| 2. Sequoia and General Grant National Parks | | |
| (a) | June 2, 1902 (Sequoia) | 9 |
| (b) | June 2, 1902 (Gen'l Grant) | 9 |
| (c) | March 30, 1907 | 11 |
| (d) | March 30, 1912 | 11 |
| (e) | April 15, 1918 | 11 |
| (f) | January 14, 1928 | 12 |
| (g) | January 2, 1930 | 12 |
| (h) | December 6, 1930 | 13 |
| (i) | December 21, 1932 | 14 |
| 3. Yosemite National Park | | |
| (a) | June 2, 1902 | 15 |
| (b) | February 29, 1908 | 18 |
| (c) | June 1, 1909 | 19 |
| (d) | March 30, 1912 | 19 |
| (e) | May 11, 1914 | 20 |
| (f) | April 15, 1918 | 21 |
| (g) | November 24, 1928 | 21 |
| (h) | January 14, 1930 | 22 |
| (i) | December 8, 1930 | 23 |
| (j) | January 13, 1932 | 23 |
| (k) | December 21, 1932 | 24 |
| 4. Mesa Verde National Park | | |
| (a) | March 19, 1908 | 25 |

JA2010

|     |     |                   |    |
|-----|-----|-------------------|----|
|     | (b) | March 30, 1912    | 25 |
|     | (c) | April 15, 1918    | 26 |
|     | (d) | December 11, 1928 | 26 |
|     | (e) | March 1, 1930     | 27 |
|     | (f) | January 8, 1931   | 27 |
|     | (g) | December 21, 1932 | 28 |

5. Crater Lake National Park
|     |     |                   |    |
|-----|-----|-------------------|----|
|     | (a) | August 27, 1902   | 28 |
|     | (b) | June 10, 1908     | 29 |
|     | (c) | March 30, 1912    | 29 |
|     | (d) | April 15, 1918    | 30 |
|     | (e) | January 19, 1928  | 30 |
|     | (f) | December 28, 1929 | 31 |
|     | (g) | January 14, 1931  | 31 |
|     | (h) | January 15, 1932  | 32 |
|     | (i) | December 21, 1932 | 32 |

6. Mount Rainier National Park
|     |     |                   |    |
|-----|-----|-------------------|----|
|     | (a) | August 1, 1903    | 33 |
|     | (b) | June 10, 1908     | 34 |
|     | (c) | March 30, 1912    | 34 |
|     | (d) | April 15, 1918    | 35 |
|     | (e) | November 22, 1928 | 35 |
|     | (f) | December 30, 1929 | 36 |
|     | (g) | December 8, 1930  | 36 |
|     | (h) | December 21, 1932 | 37 |

7. Platt National Park
|     |               |    |
|-----|---------------|----|
|     | June 10, 1908 | 38 |

8. Wind Cave National Park
|     |     |                   |    |
|-----|-----|-------------------|----|
|     | (a) | June 10, 1908     | 38 |
|     | (b) | March 30, 1912    | 38 |
|     | (c) | April 15, 1918    | 39 |
|     | (d) | March 8, 1926     | 39 |
|     | (e) | December 28, 1929 | 40 |
|     | (f) | December 2, 1930  | 40 |
|     | (g) | December 21, 1932 | 41 |
|     | (h) | In effect 1933    | 41 |

9. Glacier National Park
|     |     |                   |    |
|-----|-----|-------------------|----|
|     | (a) | December 3, 1910  | 42 |
|     | (b) | March 30, 1912    | 42 |
|     | (c) | May 13, 1914      | 43 |
|     | (d) | April 15, 1918    | 43 |

JA2011

(e)   December 12, 1928                                    44
(f)   March 6, 1930                                        44
(g)   December 3, 1930                                     45
(h)   December 21, 1932                                    46

10.  Rocky Mountain National Park
(a)   May 29, 1915                                         47
(b)   April 15, 1918                                       48
(c)   January 17, 1928                                     48
(d)   January 2, 1930                                      48
(e)   December 6, 1930                                     49
(f)   December 21, 1932                                    50

11.  Hawaii National Park
(a)   In effect 1929                                       50
(b)   December 21, 1932                                    51

12.  Acadia National Park
(a)   In effect 1929                                       51
(b)   In effect 1930                                       52
(c)   January 14 and December 21, 1932                     52

13.  Lassen Volcanic National Park
(a)   In effect 1929                                       52
(b)   In effect 1930                                       52
(c)   January 14, 1932                                     53
(d)   December 21, 1932                                    54

14.  Mount McKinley National Park
(a)   In effect 1929                                       54
(b)   In effect 1930                                       55
(c)   January 29, 1932                                     56

15.  Zion and Bryce Canyon National Parks
(a)   January 12, 1929                                     56
(b)   In effect 1931                                       57
(c)   February 6, 1932                                     57
(d)   December 21, 1932                                    58

16.  National Monuments
(a)   November 19, 1910                                    59
(b)   In effect 1930                                       59

17.  Carlsbad Caverns National Park
      February 28, 1933                                    59

JA2012

18.  Great Smoky Mountains National Park
     (a)   May 9, 1932                                      60
     (b)   March 10, 1933                                   60
     (c)   In effect 1934/35                                60

19.  Grand Canyon National Park
     (a)   January 16, 1928                                 61
     (b)   January 2, 1930                                  61
     (c)   January 9, 1931                                  62
     (d)   February 15, 1932                                62
     (e)   December 21, 1932                                63

20.  Grand Teton National Park
     (a)   In effect 1929                                   64
     (b)   In effect 1930                                   64
     (c)   January 29, 1932                                 64

21.  General (Service-wide) regulations
         June 18, 1936                                      65

Appendix A:
     1872 Yellowstone regulations                           67
Appendix B:
     1881 Yellowstone regulations                           68
Appendix C:
     1888 Yellowstone regulations                           69

JA2013

**FIREARMS REGULATIONS**
**1897 – 1936**

YELLOWSTONE NATIONAL PARK[3]

1.  Regulations of June 1, 1897 –

   (5)  Hunting or killing, wounding or capturing, of any bird or wild animal, except dangerous animals, when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits[4], including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed in the park under other circumstances than prescribed above, will be forfeited to the United States, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation.  Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard, parties having firearms will turn them over to the sergeant in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park.

   "Rules and Regulations of the Yellowstone National Park," June 1, 1897.  *Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1898, Miscellaneous Reports [vol. 3]* (Washington:  Gov't Printing Office, 1898), p. 972.  See also, Act of May 7, 1894, ch. 72, 28 Stat. 73, in particular, §4 (28 Stat. 74).

   N.B.  In his report to the Secretary of August 31, 1897, the acting superintendent, Maj. Gen. S.B.M. Young, United States Volunteers (Colonel Third Cavalry), wrote in connection with this regulation:

   Carrying Firearms through the Park

   The custom of carrying firearms through the park has been almost universal among those who live in the neighboring States and travel in their own conveyances, or on saddle animals accompanied by pack animals.  During the first half of the season it was found that many firearms, fastened with red tape and sealing wax at the point of entry, had broken seals at the point of exit.  In many cases it was evident that the seals were broken by accident; others showed signs of having been broken and resealed.  To remedy this a new system of sealing has been adopted similar to that used by express companies . . . .  The regulation prohibiting firearms in the park, except on written permission from the superintendent [in which case the arms were sealed], has been strictly enforced.  It is essential to the protection of the park.

---

[3]  The very first park regulations were apparently promulgated by Secretary of the Interior Columbus Delano at the time of the dedication of YELL.  They are attached hereto as Appendix A.
[4]  The first park regulations to mention "outfits," were the YELL regulations of July 1, 1888, reproduced in Appendix C.  The interim regulations, dated May 4, 1881, are found in Appendix B.

A certain sentiment of hostility toward the park and of antagonism toward the efforts of the authorities to protect the wild animals from destruction has existed and continues to exist among the ranchers and the people of the settlements near the park boundaries.  This feeling of hostility seems to be due to an idea, which prevails widely, that a reservation of any part of the public domain for the perpetual benefit of the whole people is an invasion and an abridgement of the private rights of the people of the adjoining region.  This idea naturally arises from an ignorance of the benefits that result from such reservations to the people of the whole country and an equal ignorance of the advantages which accrue to the inhabitants of the immediate vicinity.  In consequence of the benefits which have already resulted to this region from the existence of this park as a breeding place from which the surplus game may wander down into the adjoining country where it may be freely taken, and from the opportunities afforded by the park for remunerative employment during the summer season, there is already a marked diminution of this hostile feeling.  As these benefits come to be better understood I believe that this hostility will further diminish, and my best efforts shall be devoted to the encouragement of a friendly sentiment toward the park among the citizens of the surrounding country.

*Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1897. Miscellaneous Reports [vol. 3]* (Washington:  Gov't Printing Office, 1897), pp. 781-82.

In his report for the year prior to the regulation's adoption, Acting Superintendent Young stated:

Over 200 stand of arms have been taken from persons entering the park by the two main thoroughfares, including those taken from parties found inside, and as a probable resultant, young broods of quail and grouse abound throughout the park.  The deer, bear, lynx, fox, coon, tree squirrel, and chipmunk, although not scarce, are not so plentiful as they should be in their natural home in the park.  If firearms, hunters, and trappers are kept out of the park they will multiply and become plentiful, and their instinctive fear of man will gradually so lessen in a few years that visitors will be enabled to see and study them in their natural state.  These animals drift down below the heavy snow line in winter and the supply that is taken by ranchmen and hunters outside the park boundaries will be a sufficient trimming in numbers to promote a healthful breeding and growth in the natural game nursery within the boundaries.

*Report of Secretary of the Interior; Being Part of the Message and Documents Communicated to the Two Houses of Congress at the Beginning of the Second Session of the Fifty-Fourth Congress.  In Five Volumes.* (Washington:  Gov't Printing Office, 1896), vol. III, p. 740.

After the regulation's promulgation, the Sec'y of the Interior commented as follows:

The regulations prohibiting firearms in the park, except under written permission of the superintendent, have been strictly observed, the enforcement thereof being essential to the best interest of the park.

2

*Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1897, Report of the Secretary of the Interior [vol.1] (Washington: Gov't Printing Office, 1897)*, p. LXXXIII.

2. Regulations of April 1, 1899 –

(5)  Hunting or killing, wounding, or capturing of any bird or wild animal, except dangerous animals, when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed in the park under other circumstances than prescribed above, will be forfeited to the United States, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation.  <u>Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard, parties having firearms will turn them over to the sergeant in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park.</u>

"Rules and Regulations of the Yellowstone National Park," April 1, 1899.  *Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1900*, p. 535.

3. Regulations of July 1, 1900 –

(5)  Hunting or killing, wounding or capturing of any bird or wild animal, except dangerous animals, when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed in the park under other circumstances than prescribed above, will be forfeited to the United States, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner thereof was not a party to such violation.  <u>Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard, parties having firearms will turn them over to the sergeant in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park.</u>

*Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1901, Miscellaneous Reports, Part I* (Washington:  Gov't Printing Office, 1901), p. 540.

4. Regulations of February 7, 1902 –

(5)  Hunting or killing, wounding, or capturing of any bird or wild animal, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed in the park under

JA2016

other circumstances than prescribed above, will be forfeited to the United States, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner thereof was not a party to such violation.  <u>Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard, parties having firearms will turn them over to the sergeant in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park.</u>

> "Rules and Regulations of the Yellowstone National Park," February 7, 1902.  *Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1904.  Miscellaneous Reports.  Part I. Bureau Officers, etc.* (Washington:  Gov't Printing Office, 1904), p. 367.

Superintendent S.B.M. Young included the following in his annual report for FY '07:

> Evidence of poaching in former unfrequented portions of the park difficult of access have been found particularly in the northwest corner, where within the last fortnight a trapper's cabin, supplied with provisions, cooking utensils, and bedding, was found . . . .
>
> In addition to the trails shown on the map crossing the boundary lines of the park there are numerous other trails – all originally made by hunters, trappers, and prospectors.  There are now four main entrance roads leading into the park – north, east, south, and west – which seem to be sufficient for all purposes concerning the park and for accommodation of visitors.  Applications have come to this office from far and near for permission to enter the park on these various trails with arms, in order to pass through the park for the purpose of hunting outside of the park.  All such applications for permits to carry guns unsealed through any portion of the park have been refused, but permission to carry sealed guns has been granted to persons who enter the park at one of the regular stations where their guns may be sealed, and make exit at one of the regular stations (their route through the park being particularly specified) where their guns may be unsealed and condition reported upon.  Permits to carry game or game trophies through the park have been refused.  There has been much adverse criticism by hunters and guides on these rulings, but the best interests of the park demand that is shall no longer continue a thoroughfare for sportsmen, hunters, and game-slaughterers.

> *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1907.  Administrative Reports in 2 Volumes.* (Washington:  Gov't Printing Office, 1907), pp. 551-52.

In 1908, Young added:

> Poachers and other violators of the law were arrested in every quarter of the park, and several arrests were made outside the park in Wyoming and Montana on information and evidence furnished by park scouts, and the parties were convicted.  It is evident, however, that many poachers escaped arrest.  There are not sufficient scouts for thorough protection against poachers.

JA2017

*Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1908.*
*Administrative Reports in 2 Volumes.* (Washington:  Gov't Printing Office, 1908), p. 409.

5.  Regulations of July 2, 1908 –

    (5)  Hunting or killing, wounding or capturing any bird or wild animal, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed in the park under other circumstances than prescribed above, will be forfeited to the United States, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner thereof was not a party to such violation.  <u>Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard, parties having firearms, traps, nets, seines, or explosives will turn them over to the sergeant in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park.</u>

    *Laws and Regulations Relating to the Yellowstone National Park, Wyoming* (Washington: Gov't Printing Office, 1908), p. 13.

6.  Regulations of May 27, 1911 –

    (5)  Hunting or killing, wounding, or capturing any bird or wild animal, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed in the park under other circumstances than prescribed above, will be forfeited to the United States, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner thereof was not a party to such violation.  <u>Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard parties having firearms, traps, nets, seines, or explosives will turn them over to the sergeant in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park.</u>

    *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1911.*
*Administrative Reports in 2 Volumes.  Volume I* (Washington:  Gov't Printing Office, 1912), p. 575.

7.  Regulations in effect April 15, 1918 –

    (4)  *Hunting.*—The park is a sanctuary for wild life of every sort and no one may frighten, hunt or kill, wound or capture any bird or wild animal in the park, except

JA2018

dangerous animals when it is necessary to prevent them from destroying life or inflicting injury.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, must be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation. Firearms will be permitted in the park only on written permission of the superintendent. Visitors entering or traveling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.

*General Information Regarding Yellowstone National Park – Season of 1918* (Washington: Gov't Printing Office, 1918), p. 67.

8. Regulations of February 18, 1929 –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner was not a party to such violation. Firearms are prohibited in the park except on written permission of the superintendent. Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer and in proper cases may obtain leave to carry them through the park sealed. The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer nor are park officers authorized to accept responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Yellowstone National Park* (1929), pp. 61-62.

9. Regulations of January 11, 1930 –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

JA2019

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner was not a party to such violation. Firearms are prohibited in the park except on written permission of the superintendent. Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain leave to carry them through the park sealed. The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Yellowstone National Park* (1930), p. 64.

10. Regulations of December 20, 1930 –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner was not a party to such violation. Firearms are prohibited in the park except on written permission of the superintendent. Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain leave to carry them through the park sealed. The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Yellowstone National Park* (1931), pp. 56-57.

11. Regulations of January 23, 1932 –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying life or inflicting personal injury, is prohibited within the limits of the park.

Molesting, teasing, or touching the bears is prohibited. Persons feeding bears do so at their own risk and peril.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service. Possession within said park of the dead bodies or any part thereof of any wild bird or animals shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except upon written permission of the superintendent. Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed. The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in section 4 of the act of Congress approved May 7, 1894 (28 Stat. 73), entitled: "An act to protect the birds and animals of Yellowstone National Park, and to punish crimes in said park, and for other purposes."

*Circular of General Information Regarding Yellowstone National Park* (1932), pp. 57-58.

12. Regulations of December 21, 1932 –

(4) *Hunting.*—The park is a sanctuary for wild life of every sort, and all hunting, or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the park.

Feeding directly from the hand, touching, teasing, or molesting bears is prohibited. Persons photographing bears do so at their own risk and peril.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be forfeited to the United States and may be seized by the officers of the park and held pending the prosecution of any person or persons arrested under the charge of violating this regulation, and upon conviction, such forfeiture shall be adjudicated as a penalty in addition to other punishment. Such forfeited property shall be disposed of and accounted for by and under the authority of the Secretary of the Interior. Possession within said park of the dead bodies or any part thereof of any wild bird or animals shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season, arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the parks.

Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the parks sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in section 4 of the act of Congress approved May 7, 1894 (28 Stat. 73), entitled: "An act to protect the birds and animals in Yellowstone National Park, and to punish crimes in said park, and for other purposes."

*General Information Regarding Yellowstone National Park* (Washington:  Gov't Printing Office, 1933), pp. 48-49.


SEQUOIA AND GENERAL GRANT NATIONAL PARKS

1.  Regulations of Sequoia National Park of June 2, 1902 –

(6)  Hunting or killing, wounding, or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent then from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person, or persons, violating this regulation and the actual owner thereof was not a party to such violation. Firearms will only be permitted in the park on written permission from the superintendent thereof.

"Rules and Regulations of the Sequoia National Park," June 2, 1902.  *Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1903*, *Miscellaneous Reports, Part I* (Washington:  Gov't Printing Office, 1903), p. 551.

2.  Regulations of General Grant National Park of June 2, 1902 –

(6)  Hunting or killing, wounding, or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent then from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person, or persons,

JA2022

violating this regulation and the actual owner thereof was not a party to such violation. <u>Firearms will only be permitted in the park on written permission from the superintendent thereof</u>.

> "Rules and Regulations of the General Grant National Park," June 2, 1902. *Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1903*, *Miscellaneous Reports, Part I* (Washington: Govt' Printing Office, 1903), p. 553.

<u>N.B.</u> The acting superintendent of Sequoia and Gen'l Grant National Parks added the following to his annual report for the Fiscal Year ended June 30, 1905:

> In my opinion, tourists entering this park have no use for guns. Hunting is at no time permitted, and the game is not threatening or dangerous. The excuse might be offered that the tourists were en route to the forest reserve and were simply taking their guns through. I would therefore recommend that the carrying of guns through the park be permitted only on the Mineral King road, which is a county road, and that it be made generally known that no gun will be permitted within the park at any other place without first obtaining the permission of the acting superintendent, and that this permission be generally denied, except to those for whom the acting superintendent himself could be individually responsible. The sealing of guns would soon lead to the belief that the general right to carry guns in the park exists, and that the absence of one authorized to seal the gun at the point where the park was entered was sufficient justification for entering the park with an unsealed gun. Notices and regulations are soon ignored and lose their effect when privileges begin to be considered as rights, and the work of the rangers and guards is increased, as a practice once tolerated, because of a misunderstanding or mistaken belief, grows into an ungovernable nuisance and a source of never-ending trouble. I therefore consider it best to have it generally known that no persons will be permitted to carry guns in the park, except over the Mineral King road, above mentioned. There would then be no excuse for a man being found in the park with an unsealed gun. Rangers and guards can not be at all points, especially along the reserve, at which people enter.

> *Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1905. Report of the Secretary of the Interior and Bureau Officers, etc.* (Washington: Gov't Printing Office, 1905), pp. 712-13.

The next year, the Secretary of the Interior commented thus:

> The rules and regulations were carefully observed by the soldiers, and their duties were performed in a thorough and satisfactory manner. The visitors to the parks seemed disposed to confirm to all the requirements, while the residents in the vicinity of the parks seemed interested in having the regulations obeyed. Violations of the regulations occurred in but two instances: A man brought a pistol into Sequoia Park without having it sealed; it was taken from him and will be held until the close of the season. Another man was found hunting in Sequoia Park; his gun was taken from him and he was ejected from the park.

JA2023

*Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1906. Report of the Secretary of the Interior and Bureau Officers, etc.* (Washington: Gov't Printing Office, 1906), p. 203

3.  Regulations [of both parks] of March 30, 1907 –

    (6)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person, or persons, violating this regulation, and the actual owner thereof was not a party to such violation. Firearms will only be permitted in the park on written permission from the superintendent thereof.

    *Laws and Regulations Relating to the Sequoia and General Grant National Parks, California* (Washington:  Gov't Printing Office, 1908), pp. 9, 11.

4.  Regulations of March 30, 1912 –

    (6)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person, or persons, violating this regulation and the actual owner thereof was not a party to such violation. Firearms will only be permitted in the park on written permission from the superintendent thereof.

    *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1912. Administrative Reports in 2 Volumes.  Volume I* (Washington:  Gov't Printing Office, 1913), p. 683.

5.  Regulations in effect April 15, 1918 –

    (4)  *Hunting*.—The park is a sanctuary for wild life of every sort and no one may frighten, hunt or kill, wound or capture any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury.

    The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild

11

JA2024

animals, or in possession of game killed on the park lands under circumstances other than prescribed above, must be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  <u>Firearms will be permitted in the park only on written permission of the superintendent.  Visitors entering or travelling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.</u>

> *General Information Regarding Sequoia and General Grant National Parks – Season of 1918* (Washington:  Gov't Printing Office, 1918), pp. 33-34.

6.  Regulations of January 14, 1928 –

(4)  *Hunting*.—The parks are sanctuaries for wild life of every sort and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals, when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of said parks.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description, used by any person or persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals within the limits of said parks, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service.  Possession within said parks, or either of them, of the dead bodies, or any part thereof, of any wild bird or animal shall be prima facie evidence that the person or persons having same are guilty of violating this regulation.  <u>Firearms are prohibited within the parks except upon written permission of the superintendent.  Visitors entering or traveling through the parks to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the parks sealed.  The Government assumes no responsibility for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 5 and 6 of the act of Congress, approved June 2, 1920 (41 Stat. 732), accepting the cession by the State of California of exclusive jurisdiction of the lands embraced within the Yosemite National Park, Sequoia National Park, and General Grant National Park, respectively, and for other purposes.

This act by its terms applies to all lands within said parks, whether in public or private ownership.

> *Circular of General Information Regarding Sequoia and General Grant National Parks* (Washington:  Gov't Printing Office, 1928), p. 23.

7.  Regulations of January 2, 1930 –

JA2025

(4) *Hunting*.—The parks are sanctuaries for wild life of every sort and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals, when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of said parks.

Molesting, teasing, or touching the bears is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description, used by any person or persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals within the limits of said parks shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service. Possession within said parks, or either of them, of the dead bodies, or any part thereof, of any wild bird or animal shall be prima facie evidence that the person or persons having same are guilty of violating this regulation. <u>Firearms are prohibited within the parks except upon written permission of the superintendent. Visitors entering or traveling through the parks to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the parks sealed. The Government assumes no responsibility for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 5 and 6 of the act of Congress approved June 2, 1920 (41 Stat. 732), accepting cession by the State of California of exclusive jurisdiction of the lands embraced within the Yosemite National Park, Sequoia National Park, and General Grant National Park, respectively, and for other purposes.

This act by its terms applies to all lands within said parks, whether in public or private ownership.

*Circular of General Information Regarding Sequoia and General Grant National Parks* (1930), p. 33-34.

8. Regulations of December 6, 1930 –

(4) *Hunting*.—The parks are sanctuaries for wild life of every sort and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals, when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of said parks.

Molesting, teasing, or touching the bears is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description, used by any person or persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals within the limits of said parks shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service. Possession within said parks, or either of them, of the dead bodies, or any part thereof, of any wild bird or animal shall be prima facie evidence that the person or persons having same are guilty of violating this regulation. <u>Firearms are prohibited within the parks except upon written permission of the superintendent. Visitors entering or traveling through the parks to places beyond shall, at entrance, report and surrender all firearms,</u>

traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the parks sealed. The Government assumes no responsibility for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 5 and 6 of the act of Congress approved June 2, 1920 (41 Stat. 732), accepting cession by the State of California of exclusive jurisdiction of the lands embraced within the Yosemite National Park, Sequoia National Park, and General Grant National Park, respectively, and for other purposes.

This act by its terms applies to all lands within said parks, whether in public or private ownership.

*Circular of General Information Regarding Sequoia National Park and General Grant National Park* (1931), pp. 43-44.

9. Regulations of December 21, 1932 –

(4) *Hunting.*—The parks are a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the parks.

Feeding directly from the hand, touching, teasing, or molesting bears is prohibited. Persons photographing bears do so at their own risk and peril.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals within the limits of the parks shall be forfeited to the United States and may be seized by the officers of the park and held pending the prosecution of any person or persons arrested under the charge of violating this regulation, and upon conviction, such forfeiture shall be adjudicated as a penalty in addition to other punishment. Such forfeited property shall be disposed of and accounted for by and under the authority of the Secretary of the Interior. Possession within said parks of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the parks carcasses of birds or animals killed outside of the parks.

Firearms are prohibited within the parks except upon written permission of the superintendent. Visitors entering or traveling through the parks to places beyond shall, at entrance, report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the parks sealed. The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 5 and 6 of the act of Congress approved June 2, 1920 (41 Stat. 732),

accepting cession by the State of California of exclusive jurisdiction of the lands embraced within the Yosemite National Park, Sequoia National Park, and General Grant National Park, respectively, and for other purposes.

This act by its terms applies to all lands within said parks, whether in public or private ownership.

*General Information Regarding Sequoia and General Grant National Parks* (Washington: Gov't Printing Office, 1933), pp. 37-38.

YOSEMITE NATIONAL PARK

1.  Regulations of June 2, 1902 –

(6)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party  to such violation. Firearms will only be permitted in the park on written permission from the superintendent thereof.

"Rules and Regulations of the Yosemite National Park," June 2, 1902.  *Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1903*, *Miscellaneous Reports, Part I* (Washington:  Govt' Printing Office, 1903), p. 526.

In his Annual Report for 1905, Secretary Hitchcock commented on Yosemite's firearm regulation as follows:

The duty of enforcing the regulation prohibiting the killing of game in the park continues to be a matter of considerable difficulty.  Heretofore the custom has been to require persons entering the park with firearms in their possession to surrender such arms during their stay in the park, or, when the parties desired to leave the reservation by a different route, the arms were sealed up and delivered to the owners, with a permit to carry the sealed arms through the park.  It has been found, however, that this system afforded no protection to the game in the park, inasmuch as persons entering the reservation with the object of hunting would have their arms sealed up by the first detachment of troops they met and as soon as they were out of sight would break the seals; thereafter, if they met other troops, they would claim that their arms had not been previously sealed; and there being no means of disproving this statement, the second detachment could only again put seals upon the weapons, to be a second time broken, so that the owners could use the weapons in violation of the park regulations.

15

Owing to this practice, the sealing of arms has been discontinued during the past season, and persons entering the park have been required by the first patrol they encountered to surrender any weapons in their possession.  A large number of applications for permits to carry rifles and shotguns into the park for alleged "protection" were received; but as the applicants declined to give any information regarding their plans and purposes, only one such request was granted.  In the case of parties of tourists consisting partly of women permits to carry revolvers were given to some of the men in the party.  Notwithstanding these precautions, it has been impracticable to prevent entirely the killing of game in the park, as entrance thereto can be had at almost any point, and hunters can thus sometimes evade the various detachments of troops patrolling the reservation.

*Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1905. Report of the Secretary of the Interior and Bureau Officers, etc.* (Washington:  Gov't Printing Office, 1905), pp. 165-66.

Captain H.C. Benson, Fourth Cavalry, the acting superintendent of Yosemite reported as follows:

## Permits to Carry Arms

Numerous letters have been prepared at the instance of one Congressman, requesting that a number of parties who are desirous of making trips through the park be permitted to carry firearms for their protection, promising to conform to all the regulations.  Regulations positively prohibit the killing of game.  The carrying of firearms in the Yosemite National Park, or any national park, means that the person so carrying them is on a hunting trip; and it is so recognized throughout this part of the country.  These letters were never presented, as stated in the body of the letter, but were always mailed to the acting superintendent by the party desiring a permit, with the request that the permit be forwarded to him saying nothing, however, about his intention of conforming to the rules and regulations.  Letters were therefore addressed to these people, requesting that they inform the acting superintendent of the date when they expected to reach the park, where they expected to enter, what places they expected to visit, and how long they expected to remain, requesting also a statement from each member of the party that the arms would not be used for the killing of game.  In no instance whatever have these questions been answered.  In some cases the letters were not answered at all, while in other instances their reply simply was that the party had changed his mind and would not visit the Yosemite, and others, again, stated that they had decided not go on a camping trip this year.  The spectacle of from five to seven men arriving on the park limits on the first day of the "open" season, each an provided with a rifle, and the majority of them with shotguns also, all for the purpose of "protection," would be an amusing one were it not for the fact that it meant the slaughter of game within the park.  Under the circumstances, but one such permit was granted.  Permits were given for the carrying of revolvers by men when they were accompanied by women, but in no other cases.

16

JA2029

It was positively known to the acting superintendent that the sealing of arms in previous years was but a farce, as the seals were broken immediately upon leaving the detachments, in many cases, and that when the next detachment was encountered the statement was made that the guns had not been previously sealed. As there was nothing to disprove this statement, the guns would be again sealed to be again broken and used in violation of park regulations. For this reason, arms have not been sealed this season.

The protection of game is a very difficult matter, due to the fact that entrance can be had to the park at almost any point whatever, and to the fact that all of the inhabitants of this region believe that the game in the mountains belongs to them. With the withdrawal of the troops, there is absolutely nothing to prevent the annual influx of hunters. The game having been driven from the higher mountains by the snow and having grown quite tame during the summer from not being interfered with or frightened, fall easy prey to the unscrupulous.

Id. at 697-98.

In his report for the Fiscal Year ended June 30, 1906, Secretary Hitchcock stated:

[According to the Yosemite superintendent] the Yosemite Valley has, under the control of the State of California, been a death trap to game unfortunate enough to enter it. Practically every person living in the valley kept a rifle, shotgun, and revolver, and game of every description was considered legitimate prey. It is hoped that within a short time, now that the rules and regulations prescribed by the Department for the protection of game can be enforced in Yosemite Valley, that the game will soon learn that it is a safe retreat and not a death trap.

The rules do not permit the carrying of firearms in the park. In the early part of the season two men were arrested by the park rangers for killing deer in the park; they were prosecuted under the State game laws and each fined . . . .

*Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1906. Report of the Secretary of the Interior and Bureau Officers, etc.* (Washington: Gov't Printing Office, 1906), p. 195.

The acting superintendent gave an example of the constant battle against poaching in his annual report:

In the latter part of August, 1906, a letter was received from the Department stating that Mr. W.T. Scoon, of Modesto, Cal., with a party of friends, would make a trip through the reservation for protection, promising to conform to all the regulations. Notice was received by me from Mr. Scoon on September 5 that it was his purpose, with his party of four, to leave Modesto on or about the 10th of September. I thereafter requested him to advise me as to the names of the people who would compose his party and the point at which he expected to enter the park, in order to make arrangements for their reception at the point of entrance, to which he replied,

17

JA2030

under date of September 11, stating "We will go up on the Oak Flat road by the way of Crockers and there will be in the party A.N. Crow, R.B. Crow, James Klo, and myself, and the party expects to leave Modesto September 13."

As there is absolutely no reason for carrying firearms for "protection" in the park, and the rules do not permit the carrying of firearms, and noting that the two members of this party, namely, the Crow Brothers, have on previous occasions killed game in the park when they were carrying firearms under a permit in which they had stipulated to conform to the rules and regulations, I sent an officer and two men to accompany this party in order that they might secure the "protection" they desired. They seemed much surprised and greatly put out that they were to be furnished with this protection. They stated that they had no intention whatever of hunting generally, but desired only to kill two or three bucks, just sufficient for their own use. They remained several days, debating whether they would go on the trip if they were not permitted to hunt, but finally moved to Poopenaut Valley, remained there several days, then went to Lake Eleanor for a few days, and finally left the park. It was undoubtedly their intention of going on a hunting trip pure and simple, as each man carried a rifle and a shotgun and they were provided with thirty days' rations. They remained in the park but ten days. It was not "protection" they desired of their firearms, but a definite intention to violate the rules and regulations of the park by hunting.

. . . . Immediately upon the withdrawal of the troops from the park it is overrun with pot hunters, and these same men often remain throughout the entire winter, killing and trapping all the game in their vicinity.

As the park can be entered from all points of the compass it is impracticable to keep these hunters out except by constant patrolling on the part of troops or rangers. As the rangers live, one on the south side and the other to the far southwest of the park, and make no attempt to patrol except a few miles from the residence of one, and that only on a wagon road, their services during winter are of but little value, and the game receives scarcely any protection from them.

Id. at 653-54.

2. Regulations of February 29, 1908[5] –

(4) Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited. The outfits, including guns, traps, teams, horses, or

---

[5] In connection with YOSE, as early as 1896 the Sec'y of the Interior noted that "all persons [were] required to surrender" firearms, no permits for their carry being issued. Given "the depredations upon the game and song birds" it was felt that this policy was necessary, in order "[t]o prevent as far as possible trespass and flagrant violation of the rules of the park during the close-season . . . of California." The Sec'y went on to state that "[p]ersons entering by trails from the north and east on which there were no permanent guard posts, were, when discovered, disarmed by patrol parties. Notwithstanding the adoption of such stringent measures firearms have been occasionally smuggled in by campers." *Report of the Secretary of the Interior* [etc.] (Washington: Gov't Printing Office, 1896), vol. 1, p. CV.

means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner thereof was not a party to such violation. Firearms will only be permitted in the park on written permission from the superintendent thereof.

*Laws and Regulations Relating to the Yosemite National Park, California* (Washington: Gov't Printing Office, 1908), p. 15.

3.  Regulations of June 1, 1909 –

(4)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation. Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard, parties having firearms, traps, nets, seines, or explosives, will turn them over to the sergeant in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park.

*Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1909. Administrative Reports in 2 Volumes.  Volume I* (Washington:  Gov't Printing Office, 1910), p. 436.

4.  Regulations of March 30, 1912 –

(4)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation. Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard, parties having firearms, traps, nets, seines, or explosives, will turn them over to the sergeant in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park.

JA2032

> *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1912. Administrative Reports in 2 Volumes. Volume I* (Washington: Gov't Printing Office, 1913), pp. 670-71.

5. Regulations of May 11, 1914 –

> (4)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation.  <u>Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard, parties having firearms, traps, nets, seines, or explosives, will turn them over to the sergeant in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park</u>.

> *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1914. Administrative Reports in 2 Volumes. Volume I* (Washington: Gov't Printing Office, 1915), p. 738.

In his annual report for Fiscal Year 1916, the superintendent addressed the firearms regulation as follows:

> Approximately 1,500 firearms of various sorts and calibers have been sealed or taken up during the year.  At present firearms carried by through automobile passengers are sealed and the owners are permitted to retain possession.  In such cases the number of guns sealed is stated on the permit and the seals are broken by the ranger at the point of exit.  Those brought into the park by people on foot or horseback are taken up and turned in to the supervisor's office, whence they are shipped to the owner at the latter's risk.  This method of handling firearms has proven very satisfactory.  There should, however, be incorporated in the firearms regulations a clause stating, in effect, that in cases where arms once sealed are later found with seals broken, or in cases where arms are brought into the park unsealed in direct violation of the regulations, or in cases where there is any attempt to evade the regulations by denial of possession or concealment, said arms shall be promptly confiscated and the party shall forfeit all claim thereto.

> *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1916.  Volume I* (Washington: Gov't Printing Office, 1917), p. 794.

For Fiscal Year 1917, the superintendent noted:

20

JA2033

Firearms to the number of 1,794, of various classes, were handled by the ranger department during the year. Of these 1,236 were sealed at the park entrances, and 558 were taken up by the park rangers at various points and were later returned to their respective owners. The method of handling firearms was the same as that used through the latter part of the 1916 season. Firearms carried by automobile passengers are sealed at the park entrance and are allowed to remain in the possession of the owner. In this case the number of guns sealed is noted on the permit by the ranger issuing the permit and the seals are in turn broken by the ranger at point of exit. Those brought into the park by people on foot or horseback are taken up and turned into the supervisor's office, whence they are shipped to the owners at the latter's risk. Likewise, in cases where persons are found in the park with firearms which have not been sealed, such firearms are taken up and handled in the same manner. In the latter case, unless the owner can readily explain the reason for carrying unsealed firearms, additional penalties in the way of fines are imposed.

*Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1917. Volume I* (Washington: Gov't Printing Office, 1918), p. 935.

6. Regulations in effect April 15, 1918 –

(5) *Hunting*.—The park is a sanctuary for wild life of every sort, and no one may frighten, hunt or kill, wound or capture any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, must be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation. <u>Firearms will be permitted in the park only on written permission of the superintendent. Visitors entering or traveling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.</u>

*General Information Regarding Yosemite National Park – Season of 1918* (Washington: Gov't Printing Office, 1918), pp. 33-34.

7. Regulations of November 24, 1928 –

(5) *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of said park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, trapping,

ensnaring, or capturing birds or wild animals within the limits of said park shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service. Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having same are guilty of violating this regulation. <u>Firearms are prohibited within the park except upon written permission of the superintendent. Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed. The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

NOTE. The foregoing regulation is in effect a declaration of the law on this subject contained in sections 5 and 6 of the act of Congress, approved June 2, 1920 (41 Stat. 732), accepting cession of the State of California of exclusive jurisdiction of the lands embraced within the Yosemite National Park, Sequoia National Park, and General Grant National Park, respectively, and for other purposes.

This act by its terms applies to all lands within said park whether in public or private ownership.

*Circular of General Information Regarding Yosemite National Park* (1929), pp. 41-42.

8. Regulations of January 14, 1930 –

(5) *Hunting.*—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of said park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals within the limits of said park shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service. Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having same are guilty of violating this regulation. <u>Firearms are prohibited within the park except upon written permission of the superintendent. Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed. The Government assumes no responsibility for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 5 and 6 of the act of Congress, approved June 2, 1920 (41 Stat. 732), accepting cession by the State of California of exclusive jurisdiction of the lands embraced within the Yosemite National Park, Sequoia National Park, and General Grant National Park, respectively, and for other purposes.

JA2035

This act by its terms applies to all lands within said park whether in public or private ownership.

*Circular of General Information Regarding Yosemite National Park* (1930), p. 45.

9.  Regulations of December 8, 1930 –

(5)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of said park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals within the limits of said park shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service.  Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having same are guilty of violating this regulation.  Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 5 and 6 of the act of Congress, approved June 2, 1920 (41 Stat. 732), accepting cession by the State of California of exclusive jurisdiction of the lands embraced within the Yosemite National Park, Sequoia National Park, and General Grant National Park, respectively, and for other purposes.

This act by its terms applies to all lands within said park whether in public or private ownership.

*Circular of General Information Regarding Yosemite National Park* (Washington:  Gov't Printing Office, 1931), pp. 45-46.

10.  Regulations of January 13, 1932 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying life or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service.  Possession within said park of the dead bodies or any part thereof of any wild bird or

animals shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 5 and 6 of the act of Congress approved June 2, 1920 (41 Stat. 732), accepting cession by the State of California of exclusive jurisdiction of the lands embraced within the Yosemite National Park . . . and for other purposes.

This act by its terms applies to all lands within said park whether in public or private ownership.

*Circular of General Information Regarding Yosemite National Park* (1932), pp. 42-43.

11.  Regulations of December 21, 1932 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the parks.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be forfeited to the United States and may be seized by the officers of the park and held pending the prosecution of any person or persons arrested under the charge of violating this regulation, and upon conviction such forfeiture shall be adjudicated as a penalty in addition to other punishment.  Such forfeited property shall be disposed of and accounted for by and under the authority of the Secretary of the Interior.  Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Feeding directly from the hand, touching, teasing, or molesting bears is prohibited. Persons photographing bears do so at their own risk and peril.

Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park

24

officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 5 and 6 of the act of Congress approved June 2, 1920 (41 Stat. 732), accepting cession by the State of California of exclusive jurisdiction of the lands embraced within the Yosemite National Park, Sequoia National Park, and General Grant National Park, respectively, and for other purposes.

This act by its terms applies to all lands within said parks, whether in public or private ownership.

*General Information Regarding Yosemite National Park* (Washington:  Gov't Printing Office, 1933), pp. 34-35.


MESA VERDE NATIONAL PARK

1.  Regulations of March 19, 1908 –

(8)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than those prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation.  Firearms will be permitted in the park only on written permission from the superintendent thereof.

*Laws and Regulations Relating to the Mesa Verde National Park, Colorado* (Washington:  Gov't Printing Office, 1908), p. 9.

2.  Regulations of March 30, 1912 –

(8)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation.  Firearms will be permitted in the park only on written permission from the superintendent.

25

*Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1912. Administrative Reports in 2 Volumes.  Volume I* (Washington:  Gov't Printing Office, 1913), pp. 715-16.

3.  Regulations in effect April 15, 1918 –

(5)  *Hunting*.—The park is a sanctuary for wild life of every sort and no one should frighten, hunt or kill, wound or capture any bird or wild animal in the park except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, must be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  <u>Firearms will be permitted in the park only on written permission of the superintendent.  Visitors entering or travelling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases, may obtain his written leave to carry them through the park sealed.</u>

*General Information Regarding Mesa Verde National Park – Season of 1918* (Washington: Gov't Printing Office, 1918), p. 47.

4.  Regulations of December 11, 1928 –

(5)  *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  <u>Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

26

*Circular of General Information Regarding Mesa Verde National Park* (Washington:  Gov't Printing Office, 1929), p. 54.

5.  Regulations of March 1, 1930 –

(5)  *Hunting.*—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Mesa Verde National Park* (Washington:  Gov't Printing Office, 1930), p. 56.

6.  Regulations of January 8, 1931 –

(5)  *Hunting.*—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers

authorized to accept responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Mesa Verde National Park* (Washington: Gov't Printing Office, 1931), p. 57.

7. Regulations of December 21, 1932 –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting, killing, wounding, capturing, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service. Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season, arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

*General Information Regarding Mesa Verde National Park* (Washington:  Gov't Printing Office, 1933), pp. 55-56.


CRATER LAKE NATIONAL PARK

1. Regulations of August 27, 1902 –

(4)  Hunting or killing, wounding or capturing, any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner thereof was not a party to such violation.

JA2041

<u>Firearms will only be permitted in the park on written permission from the superintendent thereof.</u>

> "Rules and Regulations of the Crater Lake National Park," August 27, 1902. *Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1903. Miscellaneous Reports. Part I. Bureau Officers, etc.* (Washington: Gov't Printing Office, 1903), p. 567.

2. Regulations of June 10, 1908 –

    (4)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation. <u>Firearms will only be permitted in the park on written permission from the superintendent thereof.</u>

> *Laws and Regulations Relating to the Crater Lake National Park, Oregon* (Washington: Gov't Printing Office, 1908), p. 6.

<u>N.B.</u>  In his annual report for Fiscal Year 1911, superintendent W.F. Arant addressed the system of surrendering firearms upon arrival thus:

> During the last season all guns were taken at the superintendent's office, checked, and returned upon presentation of the coupon when the visitor was ready to depart from the park.
>
> As a matter of safety and a prevention of violation of the rules and regulations of the reserve this mode was not objectionable, but was laborious and somewhat inconvenient to both the management of the park and the public.  Under this method there are usually from 20 to 50 guns in the office all the time.  I made requisition to the department for gun seals, such as are used in the Yellowstone Park, with instructions regarding their use.

> *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1911. Administrative Reports in 2 Volumes. Volume I* (Washington: Gov't Printing Office, 1912), p. 657.

3. Regulations of March 30, 1912 –

    (4)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or

JA2042

means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation. <u>Firearms will only be permitted in the park on written permission from the superintendent thereof</u>.

> *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1912. Administrative Reports in 2 Volumes. Volume I* (Washington: Gov't Printing Office, 1913), p. 730.

4. Regulations in effect April 15, 1918 –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort and no one should frighten, hunt or kill, wound or capture any bird or wild animal in the park except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, must be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation. <u>Firearms will be permitted in the park only on written permission of the superintendent. Visitors entering or travelling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases, may obtain his written leave to carry them through the park sealed</u>.

> *General Information Regarding Crater Lake National Park – Season of 1918* (Washington: Gov't Printing Office, 1918), pp. 14-15.

5. Regulations of January 19, 1928 –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals, when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals or in possession of game killed on the park lands under circumstances other than prescribed above shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation. <u>Firearms are prohibited</u>

30

JA2043

<u>in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases, may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibility for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officers nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

>   *Circular of General Information Regarding Crater Lake National Park* (Washington:  Gov't Printing Office, 1929), p. 13.

6.  Regulations of December 28, 1929 –

   (4)  Hunting.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals, when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.
   The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  <u>Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases, may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officers, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

>   *Circular of General Information Regarding Crater Lake National Park* (Washington:  Gov't Printing Office, 1930), p. 13.

7.  Regulations of January 14, 1931 –

   (4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals, when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.
   The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of

JA2044

the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner was not a party to such violation. Firearms are prohibited in the park except on written permission of the superintendent. Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases, may obtain his written leave to carry them through the park sealed. The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Crater Lake National Park* (1931), pp. 14-15.

8. Regulations of January 15, 1932 –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying life or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service. Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except upon written permission of the superintendent. Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed. The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE. The foregoing regulation is in effect a declaration of the law on this subject contained in section 4 and 5 of the act of Congress approved August 21, 1916 (39 Stat. 521), accepting cession by the State of Oregon of exclusive jurisdiction of the lands embraced in the Crater Lake National Park, and for other purposes.

This act by its terms applies to all lands within said park whether in public or private ownership.

*Circular of General Information Regarding Crater Lake National Park* (1932), pp. 22-23.

9. Regulations of December 21, 1932 –

(4)  *Hunting.*—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or wild animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be forfeited to the United States and may be seized by the officers of the park and held pending the prosecution of any person or persons arrested under the charge of violating this regulation, and upon conviction, such forfeiture shall be adjudicated as a penalty in addition to other punishment.  Such forfeited property shall be disposed of and accounted for by and under the authority of the Secretary of the Interior.  Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season, arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, seines, nets or explosives in their possession to the first park officer and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibility for loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept responsibility of custody of any property for the convenience of visitors.

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 4 and 5 of the act of Congress approved August 21, 1916 (39 Stat. 521), accepting cession by the State of Oregon of exclusive jurisdiction of the lands embraced in the Crater Lake National Park, and for other purposes.

This act by its terms applies to all lands within said park whether in public or private ownership.

*General Information Regarding Crater Lake National Park* (Washington:  Gov't Printing Office, 1933), pp. 20-21.


MOUNT RAINIER NATIONAL PARK

1.  Regulations of August 1, 1903 –

(2)  The hunting or killing, wounding or capturing of any bird or wild animal on the Government lands in the park, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  Firearms will only be permitted in the reservation on the written permission of the acting superintendent.

JA2046

"Regulations Governing Mount Rainier National Park." *Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1904. Miscellaneous Reports. Part I. Bureau Officers, etc.* (Washington: Gov't Printing Office, 1904), p. 442.

<u>N.B.</u>  In his annual report, the acting superintendent commented on this regulation thus:

> Public sentiment very strongly indorses the regulation which prohibits carrying firearms within the limits of the park except by written permit issued by the acting superintendent.  This regulation has been thoroughly enforced by the forest rangers without any special difficulty.  In one instance they were obliged to take the guns from two men who were in the park under the pretext of being prospectors, but who were actually there to kill whatever large game they might come across.  This was not long after the regulation was issued, and they were, perhaps, not at the time aware that guns were prohibited.

> <u>Id.</u> at 440.

2.  Regulations of June 10, 1908 –

(4)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation. <u>Firearms will only be permitted in the park on written permission from the superintendent thereof</u>.

*Laws and Regulations Relating to the Mount Rainier National Park, Washington* (Washington:  Gov't Printing Office, 1908), p. 8.

3.  Regulations of March 30, 1912 –

(4)  Hunting or killing, wounding, or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation. <u>Firearms will only be permitted in the park on written permission from the superintendent thereof</u>.

JA2047

> *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1912.*
> *Administrative Reports in 2 Volumes.  Volume I* (Washington:  Gov't Printing Office, 1913),
> p. 700.

4.  Regulations in effect April 15, 1918 –

(4)  *Hunting.*—The park is a sanctuary for wild life of every sort and no one should frighten, hunt or kill, wound or capture any bird or wild animal in the park except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, must be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  Firearms will be permitted in the park only on written permission of the superintendent.  Visitors entering or travelling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases, may obtain his written leave to carry them through the park sealed.

> *General Information Regarding Mount Rainier National Park – Season of 1918* (Washington:
> Gov't Printing Office, 1918), p. 33.

5.  Regulations of November 22, 1928 –

(4)  *Hunting.*—The park is a sanctuary for wild life of every sort and hunting, killing, wounding or capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds, or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or travelling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases, may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines or other property so surrendered to any park officer nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

JA2048

*Circular of General Information Regarding Mount Rainier National Park* (Washington: Gov't Printing Office, 1929), p. 28.

6. Regulations of December 30, 1929 –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort and hunting, killing, wounding, capturing, or frightening any bird or wild animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases may obtain his written permission to carry them through the park sealed. The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Mount Rainier National Park* (1930), p. 29.

7. Regulations of December 8, 1930 –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases, may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers

36

JA2049

authorized to accept responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Mount Rainier National Park* (Washington: Gov't Printing Office, 1931), pp. 28-29.

8.  Regulations of December 21, 1932 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be forfeited to the United States and may be seized by the officers of the park and held pending the prosecution of any person or persons arrested under the charge of violating this regulation, and upon conviction such forfeiture shall be adjudicated as a penalty in addition to other punishment.  Such forfeited property shall be disposed of and accounted for by and under authority of the Secretary of the Interior.  Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 4 and 5 of the act of Congress approved June 30, 1916 (39 Stat. 243), accepting cession by the State of Washington of exclusive jurisdiction of the lands embraced within the Mount Rainier National Park.

This act by its terms applies to all lands within said park whether in public or private ownership.

*General Information Regarding Mount Rainier National Park* (Washington:  U.S. Gov't Printing Office, 1933), pp. 27-28.

<u>PLATT NATIONAL PARK</u>[6]

Regulations of June 10, 1908 –

    (6)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation. <u>Firearms will only be permitted in the park on written permission from the superintendent thereof</u>.

    *Laws and Regulations Relating to the Platt National Park, Oklahoma* (Washington:  Gov't Printing Office, 1908), pp. 11-12.

<u>WIND CAVE NATIONAL PARK</u>

1.  Regulations of June 10, 1908 –

    (5)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation. <u>Firearms will only be permitted in the park on written permission from the superintendent thereof</u>.

    *Laws and Regulations Relating to the Wind Cave National Park, South Dakota* (Washington:  Gov't Printing Office, 1908), p. 7.

2.  Regulations of March 30, 1912 –

    (5)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or

---

[6] Originally Sulphur Springs Reservation, renamed and redesignated Platt National Park June 29, 1906; combined with Arbuckle National Recreation Area and additional lands and renamed and redesignated Chickasaw National Recreation Area March 17, 1976.

JA2051

inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the supervisor and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation.  <u>Firearms will only be permitted in the park on written permission from the supervisor thereof</u>.

> *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1915.  Administrative Reports in 2 Volumes.  Volume I* (Washington:  Gov't Printing Office, 1916), p. 1046.

3.  Regulations in effect April 15, 1918 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort and no one may frighten, hunt or kill, wound or capture any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, must be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  <u>Firearms will be permitted in the park only on written permission of the superintendent.  Visitors entering or travelling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed</u>.

> *General Information Regarding Wind Cave National Park – Season of 1918* (Washington:  Gov't Printing Office, 1918), pp. 16-17.

4.  Regulations of March 8, 1926 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this

regulation, and the actual owner was not a party to such violation.  <u>Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases, may obtain his written leave to carry them through the park sealed.</u>

 <u>The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines or other property so surrendered to any park officer nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

 *Circular of General Information Regarding Wind Cave National Park* (Washington:  Gov't Printing Office, 1929), pp. 9-10.

5.  Regulations of December 28, 1929 –

 (4)  *Hunting.*—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

 The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  <u>Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer and in proper cases may obtain leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept responsibility of custody of any property for the convenience of visitors.</u>

 *Circular of General Information Regarding Wind Cave National Park* (1930), pp. 9-10.

6.  Regulations of December 2, 1930 –

 (4)  *Hunting.*—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

 The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory

evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  <u>Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.</u>

<u>The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept responsibility of custody of any property for the convenience of visitors.</u>

*Circular of General Information Regarding Wind Cave National Park* (Washington:  Gov't Printing Office, 1931), pp. 9-10.

7.  Regulations of December 21, 1932 –

(4)  *Hunting.*—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park, under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.

During the hunting season, arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

<u>Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

*General Information Regarding Wind Cave National Park* (Washington:  U.S. Gov't Printing Office, 1933), pp. 9-10.

8.  Regulations in effect 1933 –

(4)  *Hunting.*—The park is a sanctuary for wild life of every sort, and all hunting, killing, wounding, frightening, capturing or attempting to capture at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from

JA2054

destroying human lives or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park, under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the Office of National Parks, except I cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.

During the hunting season, arrangements may be made at entrance stations to identify and transport through the park carcasses of birds or animals killed outside of the park.

Firearms and traps are prohibited within the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender, if required, all firearms, traps, seines, nets or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept responsibility of custody of any property for the convenience of visitors.

> *General Information Regarding Wind Cave National Park* (Washington:  Gov't Printing Office, 1934), p. 11.

GLACIER NATIONAL PARK

1.  Regulations of December 3, 1910 –

(4)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation. Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard, parties having firearms, traps, nets, seines, or explosives will turn them over to the officer in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park.

> *Laws, Regulations, and General Information Relating to Glacier National Park, Montana 1910* (Washington:  Gov't Printing Office, 1911), p. 6.

2.  Regulations of March 30, 1912 –

JA2055

(4)  Hunting or killing, wounding or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner thereof was not a party to such violation. <u>Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard parties having firearms, traps, nets, seines, or explosives will turn them over to the sergeant in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park.</u>

> *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1912.  Administrative Reports in 2 Volumes.  Volume I* (Washington:  Gov't Printing Office, 1913), p. 752.

3.  Regulations of May 13, 1914 –

(4)  Hunting or killing, wounding, or capturing any bird or wild animal on the park lands, except dangerous animals when necessary to prevent them from destroying life or inflicting an injury, is prohibited.  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, will be taken up by the superintendent and subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner thereof was not a party to such violation. <u>Firearms will only be permitted in the park on written permission from the superintendent thereof.  On arrival at the first station of the park guard, parties having firearms, traps, nets, seines, or explosives will turn them over to the officer in charge of the station, taking his receipt for them.  They will be returned to the owners on leaving the park.</u>

> *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1914.  Administrative Reports in 2 Volumes.  Volume I* (Washington:  Gov't Printing Office, 1915), p. 833.

4.  Regulations in effect April 15, 1918 –

(4)  *Hunting.*—The park is a sanctuary for wild life of every sort and no one should frighten, hunt or kill, wound or capture any bird or wild animal in the park except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than

JA2056

prescribed above, must be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation. <u>Firearms will be permitted in the park only on written permission of the superintendent. Visitors entering or travelling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases, may obtain his written leave to carry them through the park sealed.</u>

> *General Information Regarding Glacier National Park – Season of 1918* (Washington: Gov't Printing Office, 1918), p. 65.

5. Regulations of December 12, 1928 –

    (4) *Hunting.*—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, pursuing, or capturing at any time of any bird or wild animal, except dangerous animals, when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of said park.

    The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons within said park limits when engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service. Possession within said park of the dead bodies, or any part thereof, of any wild bird or animal shall be prima facie evidence that the person or persons having same are guilty of violating this regulation. <u>Firearms are prohibited within the park except upon written permission of the superintendent. Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed. The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

    NOTE. The foregoing regulation is in effect a declaration of the law on this subject contained in sections 4 and 5 of the act of Congress, approved August 22, 1914 (38 Stat. 700) accepting cession by the State of Montana of exclusive jurisdiction over the lands embraced within the Glacier National Park.

    This act by its terms applies to all lands within the park, whether in public or private ownership.

> *Circular of General Information Regarding Glacier National Park* (1929), pp. 33-34.

6. Regulations of March 6, 1930 –

    (4) *Hunting.*—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, pursuing, or capturing at any time of any bird or wild animal, except dangerous animals, when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited, within the limits of said parks.

JA2057

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons within said park limits when engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service.  Possession within said park of the dead bodies, or any part thereof, of any wild bird or animal shall be prima facie evidence that the person or persons having same are guilty of violating this regulation.  <u>Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

NOTE.—This paragraph is in effect a declaration of the law on this subject contained in sections 4 and 5 of the act of Congress approved August 22, 1914 (38 Stat. 700), accepting the cession by the State of Montana of exclusive jurisdiction over the lands embraced within the Glacier National Park.

This act by its terms applies to all lands within the park, whether in public or private ownership.

Game killed or taken within the park, and firearms in possession therein, in violation of these regulations, shall be forfeited to the United States, and any employee of the park assigned to police duty shall have authority to search without a warrant any automobile or other vehicle, or any container therein, for such game or firearms and to seize the same if found, when he has reasonable grounds for belief that the automobile or other vehicle, or container therein, contains game or firearms subject to forfeiture as provided herein.

*Circular of General Information Regarding Glacier National Park* (Washington:  Gov't Printing Office, 1930), p. 33.

7.  Regulations of December 3, 1930 –

(4)  *Hunting.*—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, pursuing, or capturing at any time of any bird or wild animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of said park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons within said park limits when engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service.  Possession within said park of the dead bodies, or any part thereof, of any wild bird or animal shall be prima facie evidence that the person or persons having same are guilty of violating this regulation.  <u>Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no</u>

JA2058

responsibility for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

Game killed or taken within the park, and firearms in possession therein, in violation of these regulations, shall be forfeited to the United States, and any employee of the park assigned to police duty shall have authority to search without a warrant any automobile or other vehicle, or any container therein, for such game or firearms and to seize the same if found, when he has reasonable grounds for belief that the automobile or other vehicle, or container therein, contains game or firearms subject to forfeiture as provided therein.

NOTE.—This paragraph is in effect a declaration of the law on this subject contained in sections 4 and 5 of the act of Congress approved August 22, 1914 (38 Stat. 700), accepting cession by the State of Montana of exclusive jurisdiction over the lands embraced within the Glacier National Park.

This act by its terms applies to all lands within the park, whether in public or private ownership.

*Circular of General Information Regarding Glacier National Park* (1931), pp. 29-30.

8. Regulations of December 21, 1932 –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the park.

Feeding directly from the hand, touching, teasing, or molesting bears is prohibited. Persons photographic bears do so at their.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be forfeited to the United States and may be seized by the officers of the park and held pending the prosecution of any person or persons arrested under the charge of violating this regulation, and upon conviction, such forfeited property shall be disposed of and accounted for by and under the authority of the Secretary of the Interior. Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season, arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except upon written permission of the superintendent. Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed. The Government assumes no responsibility for loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 4 and 5 of the act of Congress approved August 22, 1914 (38 Stat.

46

JA2059

700), accepting cession by the State of Montana of exclusive jurisdiction of the lands embraced within the National Park.

This act by its terms applies to all lands within said park whether in public or private ownership.

*General Information Regarding Glacier National Park* (Washington: Gov't Printing Office, 1933), p. 23.

R̲O̲C̲K̲Y̲ M̲O̲U̲N̲T̲A̲I̲N̲ N̲A̲T̲I̲O̲N̲A̲L̲ P̲A̲R̲K̲

1. Regulations of May 29, 1915 –

(5)  The park is a sanctuary for wild life of every sort, and no one should frighten, hunt or kill, wound or capture any bird or wild animal in the park except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury.

(6)  The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under other circumstances than prescribed above, must be taken up by the superintendent and held subject to the order of the Secretary of the Interior, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner was not a party to such violation.  <u>Firearms will be permitted in the park only on written permission of the supervisor.  Visitors entering or travelling through the park to places beyond should, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases, may obtain his written leave to carry them through the park sealed.</u>

"Rules and Regulations Approved May 29, 1915."  *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1915*, *Administrative Reports in 2 Volumes* (Washington: Gov't Printing Office) vol. 1, p. 1124.

In his annual report for Fiscal Year 1916, the superintendent added:

There is no evidence of the slaughter of game during the past year in the park, a strict vigilance having been kept during the winter months for hunters and trappers. Mountain sheep are plentiful and no doubt increasing, and have been seen more frequently by tourists than in former years.   It is now possible to approach them quite closely, and one instance is known where an automobile came within 30 feet of a group which did not disturb them.  One ranger reports seeing 182 in one group near Specimen Mountain.

Firearms are not allowed in the park and notice to this effect is posted at all entrances.

*Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1916.  Volume I* (Washington:  Gov't Printing Office, 1917), p. 794.

JA2060

2. Regulations in effect April 15, 1918 –

   (4) *Hunting*.—The park is a sanctuary for wild life of every sort and no one may frighten, hunt or kill, wound or capture any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury.
   The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing such birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, must be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  Firearms will be permitted in the park only on written permission of the superintendent.  Visitors entering or travelling through the park to places beyond must, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases, may obtain his written leave to carry them through the park sealed.

   *General Information Regarding Rocky Mountain National Park – Season of 1918* (Washington:  Gov't Printing Office, 1918), pp. 26-27.

3. Regulations of January 17, 1928 –

   (4) *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding or capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.
   The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation.  Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and, in proper cases, may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines or other property so surrendered to any park officer nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

   *Circular of General Information Regarding Rocky Mountain National Park* (Washington: Gov't Printing Office, 1929), p. 30.

4. Regulations of January 2, 1930 –

(4) *Hunting.*—The park is a sanctuary for wild life of every sort and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation. <u>Firearms are prohibited in the park except on written permission of the superintendent. Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed. The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

   *Circular of General Information Regarding Rocky Mountain National Park* (1930), p. 29.

5.  Regulations of December 6, 1930 –

(5) *Hunting.*—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation. <u>Firearms are prohibited in the park except on written permission of the superintendent. Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed. The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

   *Circular of General Information Regarding Rocky Mountain National Park* (Washington: Gov't Printing Office, 1931), p. 30.

6. Regulations of December 21, 1932 –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be forfeited to the United States and may be seized by the officers of the park and held pending the prosecution of any person or persons arrested under the charge of violating this regulation, and upon conviction such forfeiture shall be adjudicated as a penalty in addition to other punishment. Such forfeited property shall be disposed of and accounted for by and under authority of the Secretary of the Interior. Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except upon written permission of the superintendent. Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed. The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject contained in sections 4 and 5 of the act of Congress approved March 2, 1929 (45 Stat. 1536), accepting cession by the State of Colorado of exclusive jurisdiction of the lands embraced in the Rocky Mountain National Park.

This act by its terms applies to all lands within said park whether in public or private ownership.

*General Information Regarding Rocky Mountain National Park* (Washington: U.S. Gov't Printing Office, 1933), p. 26.

HAWAII NATIONAL PARK

1. Regulations in effect 1929 –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, wounding, capturing, or frightening any bird or animal in the park, except the wild goat, as provided in Rule 1, is prohibited. Firearms are prohibited in the park except on written permission of the superintendent, who also has authority to waive inquiry as to the possession of firearms by visitors traveling through the park to places beyond.

JA2063

*Circular of General Information Regarding Hawaii National Park* (Washington:  Gov't Printing Office, 1929), p. 14.

2.  Regulations of December 21, 1932 –

(4)  *Hunting.*—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except wild goats and pigs as provided in Rule I, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park, shall be forfeited to the United States and may be seized by the officers of the park and held pending the prosecution of any person or persons arrested under the charge of violating this regulation, and upon conviction, such forfeiture shall be adjudicated as a penalty in addition to other punishment.  Such forfeited property shall be disposed of and accounted for by and under the authority of the Secretary of the Interior.  Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park, except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

Note.—The foregoing regulations is [sic] in effect a declaration of the law on this subject as contained in sections 4 and 5 of the act of Congress approved April 19, 1930 (46 Stat. 227), to provide for the exercise of sole and exclusive jurisdiction by the United States over the Hawaii National Park in the Territory of Hawaii, and for other purposes.

The act by its terms applies to all lands within said park, whether in public or private ownership.

*General Information Regarding Hawaii National Park* (Washington:  Gov't Printing Office, 1933), p. 17.


ACADIA NATIONAL PARK

1.  Regulations in effect 1929 –

(4)  *Hunting.*—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park is prohibited.

51

JA2064

Firearms are prohibited in the park except on written permission of the superintendent.

*Circular of General Information Regarding Acadia National Park* (Washington:  U.S. Gov't Printing Office, 1929), p. 13.

2.  Regulations in effect 1930 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park is strictly prohibited.  No light shall be used for the purpose of observing the wild life in the park except as authorized in writing by the superintendent.
Firearms are prohibited in the park except on written permission of the superintendent.

*Circular of General Information Regarding Acadia National Park* (1930), p. 12.

3.  Regulations of January 14 and December 21, 1932 –

(4)  Hunting.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park is prohibited.  No light shall be used for the purpose of observing the wild life in the park except as authorized in writing by the superintendent.
Firearms are prohibited in the park except on written permission of the superintendent.

*Circular of General Information Regarding Acadia National Park* (1932), p. 13; *General Information Regarding Acadia National Park* (1933), p. 16.


LASSEN VOLCANIC NATIONAL PARK

1.  Regulations in effect 1929 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park is prohibited.
Firearms are prohibited in the park except on written permission of the superintendent.

*Circular of General Information Regarding Lassen Volcanic National Park* (Washington: Gov't Printing Office, 1929), p. 11.

2.  Regulations in effect 1930 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of said park.
The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals within the limits of said park, shall be taken

JA2065

up by the superintendent and held subject to the order of the Director of the National Park Service.  Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having same are guilty of violating this regulation.  Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.  The foregoing regulation is in effect a declaration of the law on this subject contained in section 4 and 5 of the act of Congress, approved April 26, 1928 (45 Stat. 463), accepting cession by the State of California of exclusive jurisdiction of the lands embraced within the Lassen Volcanic National Park, and for other purposes.

This act by its terms applies to all lands within said park, whether in public or private ownership.

*Circular of General Information Regarding Lassen Volcanic National Park* (1930), pp. 12-13.

3.  Regulations of January 14, 1932 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying life or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service. Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.  The foregoing regulation is in effect a declaration of the law on this subject contained in section 4 and 5 of the act of Congress, approved April 26, 1928 (45 Stat. 463), accepting cession by the State of California of exclusive jurisdiction of the lands embraced within the Lassen Volcanic National Park, and for other purposes.

JA2066

This act by its terms applies to all lands within said park whether in public or private ownership.

*Circular of General Information Regarding Lassen Volcanic National Park* (1932), p. 16.

4. Regulations of December 21, 1932 –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be forfeited to the United States and may be seized by the officers of the park and held pending the prosecution of any person or persons arrested under the charge of violating this regulation, and upon conviction such forfeiture shall be adjudicated as a penalty in addition to other punishment.  Such forfeited property shall be disposed of and accounted for by and under the authority of the Secretary of the Interior.  Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park, except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

NOTE.—The foregoing regulation is in effect a declaration of the law on this subject as contained in sections 4 and 5 of the act of Congress approved April 26, 1928 (45 Stat. 463), accepting cession by the State of California of exclusive jurisdiction of the lands embraced within the Lassen Volcanic National Park, and for other purposes.

The act by its terms applies to all lands within said park, whether in public or private ownership.

*General Information Regarding Lassen Volcanic National Park* (Washington:  Gov't Printing Office, 1933), pp. 16-17.


MOUNT MCKINLEY NATIONAL PARK

1. Regulations in effect 1929 –

(4) *Hunting.*—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, and snaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner was not a party to such violation. Firearms are prohibited in the park except on written permission of the superintendent. Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed. The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

No game meat shall be taken into the park without prior permission in writing from the superintendent or his nearest representative.

*Circular of General Information Regarding Mount McKinley National Park* (Washington: Gov't Printing Office, 1929), p. 19.

2. Regulations in effect 1930 –

(4) *Hunting.*—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, and snaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner was not a party to such violation. Firearms are prohibited in the park except on written permission of the superintendent. Visitors entering or traveling through the park to places beyond shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed. The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

JA2068

No game meat shall be taken into the park without prior permission in writing from the superintendent or his nearest representative.

*Circular of General Information Regarding Mount McKinley National Park* (Washington: Gov't Printing Office, 1930), pp. 21-22.

3.  Regulations of January 29, 1932 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying life or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service. Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except upon written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Mount McKinley National Park* (1932), pp. 22-23.

ZION AND BRYCE CANYON NATIONAL PARKS

1.  Regulations of January 12, 1929 –

(4)  *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this

56

regulation and the actual owner was not a party to such violation. <u>Firearms are prohibited in the park except on written permission of the superintendent.</u>

<u>Visitors entering or traveling through the park to places beyond shall at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer and in proper cases may obtain his written leave to carry them through the park sealed. The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

> *Circular of General Information Regarding Zion and Bryce Canyon National Parks* (Washington: Gov't Printing Office, 1929), p. 14.

2. Regulations in effect 1931 –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner was not a party to such violation. <u>Firearms are prohibited in the park except on written permission of the superintendent.</u>

<u>Visitors entering or traveling through the park to places beyond shall at entrance report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer and in proper cases may obtain his written leave to carry them through the park sealed. The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

> *Circular of General Information Regarding Zion and Bryce Canyon National Parks* (Washington: Gov't Printing Office, 1931), p. 20.

3. Regulations of February 6, 1932 –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying life or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be taken up by the

JA2070

superintendent and held subject to the order of the Director of the National Park Service. Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except upon written permission of the superintendent. Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed. The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Zion and Bryce Canyon National Parks* (1932), pp. 20-21.

4. Regulations of December 21, 1932 –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description, used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service. Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park, except upon written permission of the superintendent. Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed. The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

*General Information Regarding Zion and Bryce Canyon National Parks* (Washington: Gov't Printing Office, 1933), pp. 16-17.

N<small>ATIONAL</small> M<small>ONUMENTS</small>

1. Regulations of November 19, 1910[7] –

    (2) <u>No firearms are allowed</u>.[8]

    *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1912. Administrative Reports in 2 Volumes. Volume I* (Washington:  Gov't Printing Office, 1913), p. 769.

2. Regulations in effect 1930[9] –

    (5) *Hunting*.—The national monuments are sanctuaries for wild life of every sort, and the hunting, killing, wounding, capturing, or frightening of any bird or wild animal in any monument is strictly prohibited, except poisonous snakes or dangerous animals when it is necessary to prevent them from destroying life or inflicting injury.

      *Glimpses of Our National Monuments* (Washington:  U.S. Gov't Printing Office, 1933), p. 71.

    <u>N.B.</u>  Note that the explicit firearm prohibition of the 1910 regulation has been deleted.

C<small>ARLSBAD</small> C<small>AVERNS</small> N<small>ATIONAL</small> P<small>ARK</small>

Regulations of February 28, 1933 –

    (1)  Preservation of Natural Features and Curiosities.

* * *

    <u>No</u> canes, umbrellas, or sticks of any kind, or <u>firearms</u> or any other explosive material <u>will be permitted to be taken into the caverns</u>.

* * *

---

[7] Prior to being promulgated for general application to all national monuments, this same regulation was prescribed for Muir Woods National Monument, on September 10, 1908. *General Information Regarding the National Monuments Set Aside under the Act of Congress Approved June 8, 1906* (Washington:  Gov't Printing Office, 1917), p. 9.

[8] National Monuments administered by the Department of the Interior at the time, and administered by the National Park Service today, include:  Devils Tower, Montezuma Castle, El Morro, Chaco Canyon, Muir Woods, Pinnacles, Tumacacori, Mukuntuweap (now part of Zion NP), Natural Bridges, Gran Quivira, Sitka, Rainbow Bridge, Colorado, and Petrified Forest.  See, *Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1912.  Administrative Reports in 2 Volumes.  Volume I* (Washington:  Gov't Printing Office, 1913), p. 769.

[9] National Monuments administered by the National Park Service in 1930:  Arches, Aztec Ruins, Capulin Mtn., Casa Grande, Chaco Canyon, Colorado, Craters of the Moon, Devils Tower, Dinosaur, El Morro, Fossil Cycad, Geo. Washington's Birthplace, Glacier Bay, Gran Quivira, Hovenkeep, Katmai, Lewis and Clark Cavern, Montezuma Castle, Muir Woods, Natural Bridges, Navajo, Petrified Forest , Pinnacles, Pipe Spring, Rainbow Bridge, Scotts Bluff, Shoshone Cavern, Sitka, Tumacacori, Verendrye, Wupatki, and Yucca House. *Glimpses of Our National Monuments* (Washington:  U.S. Gov't Printing Office, 1930), pp. I-II.

(3) Hunting.—The park is a sanctuary for wildlife of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

Story, Isabella F., *Carlsbad Caverns National Park* (Washington: U.S. Gov't Printing Office, 1935), p. 23.

## GREAT SMOKY MOUNTAINS NATIONAL PARK

1. Regulations of May 9, 1932 –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, pursuing, or capturing at any time of any bird or wild animal, except dangerous animals, when it is necessary to prevent them from destroying human lives or inflicting personal injury, or taking the eggs of any bird, is prohibited within the limits of said park. <u>Firearms are prohibited within the park except upon written permission of the superintendent</u>.

*General Information [Regarding] Great Smoky Mountains National Park* (1932), p. 11.

2. Regulations of March 10, 1933 –

(4) Hunting.—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, pursuing, or capturing at any time of any bird or wild animal, except dangerous animals, when it is necessary to prevent them from destroying human lives or inflicting personal injury, or taking the eggs of any bird, is prohibited within the limits of said park. <u>Firearms are prohibited within the park except upon written permission of the superintendent</u>.

*General Information Regarding Great Smoky Mountains National Park* (Washington: 1933), p. 16.

3. Regulations in effect 1934/35 –

(4) *Hunting*.—The park is a sanctuary for wildlife of every sort, and all hunting or the killing, wounding, frightening, pursuing, capturing or attempting to capture at any time of any bird or wild animal, except dangerous animals, when it is necessary to prevent them from destroying human lives or inflicting personal injury, or taking the eggs of any bird, is prohibited within the limits of said park. <u>Firearms are prohibited within the park except upon written permission of the superintendent</u>. The outfits, including guns, teams, traps, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be forfeited to the United States and may be seized by the officers of the park and held pending the prosecution of any person or persons arrested under the charge of violating this regulation, and upon conviction such forfeiture shall be

60

JA2073

adjudicated as a penalty in addition to other punishment. Such forfeited property shall be disposed of and accounted for by and under the authority of the Secretary of the Interior. Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation. During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

*General Information Regarding Great Smoky Mountains National Park* (1933[10]), p. 16.

GRAND CANYON NATIONAL PARK

1. Regulations of January 16, 1928[11] –

(4) *Hunting*.—The park is a sanctuary for wild life of every sort and hunting, killing, wounding, capturing, or frightening any bird or animal in the park is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation. Firearms are prohibited in the park except on written permission of the superintendent. Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer and in proper cases may obtain his written leave to carry them through the park sealed. The Government assumes no responsibility for loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Grand Canyon National Park* (Washington: U.S. Gov't Printing Office, 1929), p. 43.

2. Regulations of January 2, 1930 –

---

[10] While the publication date given on the face of the pamphlet states "1933," this regulation would appear to be later in date, given that (1) the regulation of March 10, 1933 (see part I at < http://www.nps.gov/policy/Firearmsregs.pdf>) appears to have been significantly expanded, and (2) the pamphlet was found in a bound volume of similar brochures dated 1936.

[11] In a 1928 article entitled "U.S. National Parks Magnificent Schools," Dr. Frank Thomas, formerly the park naturalist at Yellowstone, gave potential visitors to the parks a few helpful tips, including the following:

Don't carry any firearms. They'll only be sealed at the park entrance, and you lose the gun and a stiffish fine besides if you tamper with the seal.

*The Science News-Letter*, Vol. 13, No. 366, American Traveler Number (April 14, 1928), pp. 227, 228.

JA2074

(4) *Hunting.*—The park is a sanctuary for wild life of every sort and hunting, killing, wounding, capturing, or frightening any bird or animal in the park is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation. <u>Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibility for loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.</u>

> *Circular of General Information Regarding Grand Canyon National Park* (Washington:  U.S. Gov't Printing Office, 1930), p. 44.

3.  Regulations of January 9, 1931 –

(4) *Hunting.*—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or animal in the park is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner was not a party to such violation. <u>Firearms are prohibited in the park except on written permission of the superintendent.  Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer and in proper cases may obtain his written leave to carry them through the park sealed.  The Government assumes no responsibilities for loss or damage to any firearms, traps, nets, seines, or other property so surrendered to any park officer, nor are park officers authorized to accept responsibility of custody of any property for the convenience of visitors.</u>

> *Circular of General Information Regarding Grand Canyon National Park* (Washington: Gov't Printing Office, 1931), p. 44.

4.  Regulations of February 15, 1932 –

(4) *Hunting.*—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal,

except dangerous animals when it is necessary to prevent them from destroying life or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service. Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except upon written permission of the superintendent. Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed. The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Grand Canyon National Park* (1932), p. 47.

5. Regulations of December 31, 1932 –

(4) *Hunting.*—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park, shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service. Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except upon written permission of the superintendent. Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, seines, nets, or explosives in their possession to the first park officer, and in proper cases may obtain his written permission to carry them through the park sealed. The Government assumes no responsibility for loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

63

*General Information Regarding Grand Canyon National Park* (Washington: Gov't Printing Office, 1933), p. 35.

G<small>RAND</small> T<small>ETON</small> N<small>ATIONAL</small> P<small>ARK</small>

1. Regulations in effect 1929 –

(4) *Hunting.*—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent or his authorized representative at the park and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation and the actual owner was not a party to such violation. <u>Firearms are prohibited in the park except on written permission of the superintendent or his authorized representative.</u>

*Circular of General Information Regarding Grand Teton National Park* (Washington: U.S. Gov't Printing Office, 1929), p. 17.

2. Regulations in effect 1930 –

(4) *Hunting.*—The park is a sanctuary for wild life of every sort, and hunting, killing, wounding, capturing, or frightening any bird or wild animal in the park, except dangerous animals when it is necessary to prevent them from destroying life or inflicting injury, is prohibited.

The outfits, including guns, traps, teams, horses, or means of transportation used by persons engaged in hunting, killing, trapping, ensnaring, or capturing birds or wild animals, or in possession of game killed on the park lands under circumstances other than prescribed above, shall be taken up by the superintendent or his authorized representative at the park and held subject to the order of the Director of the National Park Service, except in cases where it is shown by satisfactory evidence that the outfit is not the property of the person or persons violating this regulation, and the actual owner was not a party to such violation. <u>Firearms are prohibited in the park except on written permission of the superintendent or his authorized representative.</u>

*Circular of General Information Regarding Grand Teton National Park* (Washington: U.S. Gov't Printing Office, 1930), p. 16.

3. Regulations of January 29, 1932 –

JA2077

(4) *Hunting.*—The park is a sanctuary for wild life of every sort, and all hunting or the killing, wounding, frightening, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying life or inflicting personal injury, is prohibited within the limits of the park.

The outfits, including guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons engaged in hunting, killing, ensnaring, or capturing birds or wild animals within the limits of the park shall be taken up by the superintendent and held subject to the order of the Director of the National Park Service. Possession within said park of the dead bodies or any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements may be made at entrance stations to identify and transport through the park, carcasses of birds or animals killed outside of the park.

Firearms are prohibited within the park except upon written permission of the superintendent. Visitors entering or traveling through the park to places beyond, shall, at entrance, report and surrender all firearms, traps, nets, seines, or explosives in their possession to the first park officer, and in proper cases may obtain his written leave to carry them through the park sealed. The Government assumes no responsibility for the loss or damage to any firearms, traps, nets, or other property so surrendered to any park officer, nor are park officers authorized to accept the responsibility of custody of any property for the convenience of visitors.

*Circular of General Information Regarding Grand Teton National Park* (1932), pp. 15-16.

GENERAL REGULATION[12]

Regulation of June 18, 1936 –

(7) *Protection of wildlife.*—The parks and monuments are sanctuaries for wildlife of every sort, and all hunting, or the killing, wounding, frightening, capturing, or attempting to capture at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of the parks and monuments.

---

[12] The general regulation states it is "for the proper use, management, government, and protection of, and maintenance of good order in all the National Parks, National Monuments, National Military Parks, National Historical Parks, Battlefield Sites, and miscellaneous memorials which are, or hereafter may be, under the administrative jurisdiction of the National Park Service of the Department of the Interior: *Provided, however,* That these rules and regulations shall not apply to National Cemeteries or to National Capital Parks. All previous rules and regulations . . . except such local subsidiary regulations as are continued in force under the provisions hereof . . . are hereby repealed." Id. Such "subsidiary regulations" included explicit special regulations, such as those for mining in Death Valley National Monument (section 16), and the prohibition on fishing in Muir Woods National Monument (section 9), contained in the general regulation itself. Other park-specific regulations were clearly contemplated therein, for example, those regulating the hours of swimming at Hot Springs National Park (section 2(m)), and restricting the use of spring water at Platt National Park (section 4). No special regulations, either explicit or implicit, were included with respect to firearms. Id. at 673-75.

JA2078

Unauthorized possession within a park or monument of the dead body of any part thereof of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this regulation.

During the hunting season arrangements must be made at entrance stations to identify and transport through the parks and monuments, where necessary, the carcasses of birds or animals legally killed outside the parks and monuments. Failure to make such arrangements shall be deemed a violation of this regulation.

(8) *Firearms, etc.*—Firearms, explosives, traps, seines, and nets are prohibited within the parks and monuments, except upon written permission of the superintendent or custodian. Visitors entering or traveling through the parks and monuments to places beyond shall, at entrance, report and, if required to do so, surrender all such objects in their possession to the first park or monument officer, and, in proper cases, may obtain his written permission to carry them through the park or monument sealed. Failure to obtain such written permission shall be deemed a violation of this regulation. The Government assumes no responsibility for the loss of, or damage to, any such objects so surrendered to any park or monument officer, nor are park or monument officers authorized to accept the responsibility or custody of any other property for the convenience of the visitors.

1 *Federal Register* 672, 673-74 (June 27, 1936).

JA2079

## APPENDIX A

### Original Rules and Regulations of Yellowstone National Park

1st.  All hunting, fishing, or trapping within the limits of the Park, except for purposes of recreation, or to supply food for visitors or actual residents, is strictly prohibited; and no sales of fish or game taken within the park shall be made outside of its boundaries.

2nd.  Persons residing within the park, or visiting it for any purpose whatever, are required under severe penalties to extinguish all fires which it may be necessary to make, before leaving them.  No fires must be made within the park except for necessary purposes.

3rd.  No timber must be cut in the park without a written permit from the superintendent.

4th.  Breaking the siliceous or calcareous borders or deposits surrounding or in the vicinity of the springs or geysers for any purpose, and all removal, carrying away, or sale of specimens found within the park, without the consent of the superintendent, is strictly prohibited.

5th.  No person will be permitted to reside permanently within the limit of the park without permission from the Department of the Interior, and any person now living within the park shall vacate the premises occupied by him within thirty days after having been served with a written notice so to do, by the superintendent or his deputy, said notice to be served upon him in person or left at his place of residence.


Source:  *Report of the Secretary of the Interior; Being Part of the Message and Documents Communicated to the Two Houses of Congress at the Beginning of the Third Session of the Forty-Fifth Congress, in Two Volumes* (Washington:  Gov't Printing Office, 1878), vol. I, pp. 993-94.

JA2080

# APPENDIX B

<u>1881 Rules and Regulations of Yellowstone National Park</u>

* * *

4.  Hunting, trapping, and fishing, except for purposes of procuring food for visitors or actual residents, are prohibited by law; and no sales of game or fish taken inside the Park shall be made for purposes of profit within its boundaries or elsewhere.

* * *

Approved by Sec'y of the Interior S.J. Kirkwood, May 4, 1881.


<u>Source</u>:  *Annual Report of the Secretary of the Interior on the Operations of the Department for the Year Ended June 30, 1881, in Four Volumes* (Washington:  Gov't Printing Office, 1882), vol. II, p. 819.

JA2081

# Appendix C

## 1888 Rules and Regulations of Yellowstone National Park

* * *

5.  Hunting, capturing, injuring, or killing any bird or animal within the Park is prohibited. The outfits of persons found hunting or in possession of game killed in the Park will be subject to seizure and confiscation.

* * *

Approved by Sec'y of the Interior William F. Vilas, July 1, 1888.

Source:  *Report of the Secretary of the Interior for the Fiscal Year Ending June 30, 1888.  In Six Volumes* (Washington:  Gov't Printing Office, 1888), vol. III, p. 656.

JA2082

# New Jersey Population: 1790 to 2010

*by Sen-Yuan Wu, Division of Labor Market & Demographic Research*

The nation's first Census — conducted in 1790 — counted 184,139 residents in New Jersey. According to the most recent (the 2010) Census, New Jersey's current population – 8,791,894 – was more than 47 times of the population we had some 220 years ago. Nationally, total population increased by 7,757 percent between 1790 and 2010.

*Table 1*

| Census Population Trend: United States and New Jersey, 1790-2010 | | | |
|---|---|---|---|
| Year | United States Population | New Jersey Population | | NJ's Seats in the Congress |
| | | Number | Rank | |
| Constitution | | | | 4* |
| 1790 | 3,929,214 | 184,139 | 9 | 5 |
| 1800 | 5,308,483 | 211,149 | 10 | 6 |
| 1810 | 7,239,881 | 245,562 | 12 | 6 |
| 1820 | 9,638,453 | 277,575 | 13 | 6 |
| 1830 | 12,866,020 | 320,823 | 14 | 6 |
| 1840 | 17,069,453 | 373,306 | 18 | 5 |
| 1850 | 23,191,876 | 489,555 | 19 | 5 |
| 1860 | 31,443,321 | 672,035 | 21 | 5 |
| 1870 | 38,558,371 | 906,096 | 17 | 7 |
| 1880 | 50,189,209 | 1,131,116 | 19 | 7 |
| 1890 | 62,979,766 | 1,444,933 | 18 | 8 |
| 1900 | 76,212,168 | 1,883,669 | 16 | 10 |
| 1910 | 92,228,496 | 2,537,167 | 11 | 12 |
| 1920 | 106,021,537 | 3,155,900 | 10 | 12** |
| 1930 | 123,202,624 | 4,041,334 | 9 | 14 |
| 1940 | 132,164,569 | 4,160,165 | 9 | 14 |
| 1950 | 151,325,798 | 4,835,329 | 8 | 14 |
| 1960 | 179,323,175 | 6,066,782 | 8 | 15 |
| 1970 | 203,302,031 | 7,171,112 | 8 | 15 |
| 1980 | 226,545,805 | 7,365,011 | 9 | 14 |
| 1990 | 248,709,873 | 7,730,188 | 9 | 13 |
| 2000 | 281,421,906 | 8,414,350 | 9 | 13 |
| 2010 | 308,745,538 | 8,791,894 | 11 | 12 |

*The first apportionment was established by the Constitution based on population estimates made by the Philadelphia Convention, and was not based on any census or enumeration.*

**Congress failed to pass any reapportionment act during the 1920s. Consequently, distribution of seats from 1910 Census remained in effect, despite population shifts.*

*Source: US Bureau of the Census*

The numeric increase in the population since the 2000 Census (population count: 8,414,350) was 377,544 in New Jersey, the 22nd largest in the nation. The state's 4.5 percent growth rate between 2000 and 2010 was faster than 13 other states. Nevada led the nation's population growth with a 35.1 percent gain during the first decade of the 21st century, followed by Arizona (+24.6%), Utah (+23.8%), Idaho (+21.1%), and Texas (+20.6%). Michigan was the only state to experience population decline in this decade. Michigan (-0.6%), Rhode Island (+0.4%), Louisiana (+1.4%), Ohio (+1.6%) and New York (+2.1%) rounded out the five slowest growth states for the decade. Nationally, the 9.7 percent increase from 2000 to 2010 was the slowest since the Great Depression. The nation's population growth rate was 13.2 percent between 1990 and 2000.

Population growth was relatively slow in New Jersey during the first half of the 19th century when the nation was expanding rapidly from 18 states in 1790 to 38 states by 1850. Since the 1860s, population growth in New Jersey had outpaced the nation as a whole until 1970, with exceptions in the 1870s and 1930s. Similar to other "Rust Belt" states, New Jersey's population growth has lagged behind the nation since the rise of the "Sun Belt" states in the 1970s. The rate of population growth in New Jersey was 2.7 percent between 1970 and 1980, 5.0 percent between 1980 and 1990, 8.9 percent between 1990 and 2000, and 4.5 percent from 2000 to 2010.

New Jersey's population ranked ninth among the nation's 18 states, according to the 1790 Census. The state's population ranking dropped gradually to the 21st (out of 43 states) in 1860, but rose sharply from the 16th (among 50 states) in 1900 to the 11th in 1910 owing to a large influx of foreign (mostly European) immigrants. New Jersey became the nation's 8th largest state in 1950, and maintained that rank for three decades until it dropped to the 9th in 1980. New Jersey continued to be the 9th largest state in 1990 and 2000, but became the 11th in accordance with the 2010 Census.

With 1,195 persons per square mile, New Jersey's distinctive status as the nation's most densely populated state remains unchallenged for more than 40 years. Rhode Island (population density: 1,018) was the only other state with more than 1,000 persons per square mile, as of 2010. Alaska's 1.2 persons per square mile was the lowest density in the nation. The current population density was 87.4 persons per square mile in the nation as a whole.

A fundamental reason for conducting the decennial census of the United States is to apportion the members of the House of Representatives among the 50 states to ensure equal representation for all. The Constitution set the number of representatives at 65 in 1787 when four seats were assigned to New Jersey. After the first Census of 1790, the number increased to 105 while New Jersey was assigned five seats. The total seats in the House of Representatives were fixed at 435 after the 1910 Census. New Jersey's congressional seats peaked at 15 in 1960 and 1970. The state lost a congressional seat after the 1980 Census and, again, after the 1990 Census. New Jersey is estimated to lose one of its current 13 seats in the reapportioned 113th Congress (convenes in January 2013). Nine other states will also lose congressional seats based on the 2010 Census counts: Ohio (-2), New York (-2), Pennsylvania (-1), Missouri (-1), Michigan (-1), Massachusetts (-1), Louisiana (-1), Iowa (-1) and Illinois (-1). In contrast, eight states are expected to gain one or more seats after the 2010 Census: Texas (+4), Florida (+2), and one each for Arizona, Georgia, Nevada, South Carolina, Utah and Washington.

Before 1850, population in New Jersey's mid-Atlantic neighbors – New York and Pennsylvania – grew faster than New Jersey. However, the state's population growth has outpaced New York and Pennsylvania since 1850 (except in the 1930s when New York had a

higher population growth rate than New Jersey). New York ranked 46th with its 2.1 percent growth between 2000 and 2010 while Pennsylvania's 3.4 percent growth ranked 41st among the 50 states. In comparison, New Jersey's 4.5 percent growth rate ranked 37th in the nation. Its 377,544 net gain of population was the 22nd largest numeric growth among 50 states.

*Chart 1*



**Population Growth Rate by Decade: US, NY, NJ and PA**

*Source: US Bureau of the Census*

## Data Availability

The 2010 Census population counts and New Jersey population data from previous censuses are available on this Department's Labor Planning and Analysis web site: http://lwd.dol.state.nj.us/labor/lpa/dmograph/Demographics_Index.html. For information regarding New Jersey population, contact New Jersey Department of Labor and Workforce Development, Division of Labor Market and Demographic Research. Tel. 609-292-0076, email: sywu@dol.state.nj.us.



# 2021 Population Density:
## New Jersey Counties

**2021 Persons Per Square Mile**

- 196.0 - 581.4
- 581.4 - 1,718.5
- 1,718.5 - 2,806.8
- 2,806.8 - 6,773.6
- 6,773.6 - 15,207.8

**New Jersey:  1,260.1**

SUSSEX 280.4
PASSAIC 2,806.8
BERGEN 4,093.5
WARREN 310.2
MORRIS 1,110.4
ESSEX 6,773.6
HUDSON 15,207.8
UNION 5,562.3
HUNTERDON 303.7
SOMERSET 1,145.2
MIDDLESEX 2,786.6
MERCER 1,718.5
MONMOUTH 1,376.6
BURLINGTON 581.4
OCEAN 1,032.2
CAMDEN 2,367.2
GLOUCESTER 945.6
SALEM 196.0
ATLANTIC 494.8
CUMBERLAND 317.6
CAPE MAY 380.5

0    10    20    30    40 miles

Data Source: US Census Bureau, Population Division, April 2022
Prepared By:
New Jersey Department of Labor and Workforce Development
New Jersey State Data Center
April 2022

JA2086





DATE DOWNLOADED: Fri Feb 10 15:38:05 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1874 3 .

ALWD 7th ed.
, , 1874 3 .

Chicago 17th ed.
"," Missouri - 27th General Assembly, Adjourned Session : 3-[ii]

AGLC 4th ed.
'' Missouri - 27th General Assembly, Adjourned Session 3

OSCOLA 4th ed.
'' 1874 3

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
 Conditions of the license agreement available at
 *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

# LAWS OF MISSOURI.

## GENERAL AND LOCAL LAWS

PASSED AT THE

ADJOURNED SESSION

OF THE

## XXVIITH GENERAL ASSEMBLY,

BEGUN AND HELD AT

## THE CITY OF JEFFERSON, WEDNESDAY, JANUARY 7, 1874.

*BY AUTHORITY.*



JEFFERSON CITY:
REGAN & CARTER, STATE PRINTERS.
1874.

JA2088

SEC. 5. The clerks so appointed shall, before entering upon their duties, enter into bond, with two or more sufficient securities, in the sum of not exceeding five thousand dollars, payable to the state of Missouri, conditioned for the faithful performance of the duties devolved upon them by this act—said bond to be taken and the amount thereof fixed by the judge of the circuit court of the county in which such clerk shall be appointed; which bond shall be filed in the office of the clerk of the circuit court of said county, and may be sued on in the name of the state of Missouri, for the use of any one injured by the breach thereof.

SEC. 6. This act to take effect and be in force from and after its passage.

APPROVED March 19, 1874.

---

CRIMES AND MISDEMEANORS: CARRYING CONCEALED WEAPONS.

AN ACT to prevent the carrying of concealed weapons.

| SECTION | SECTION |
|---|---|
| 1. Carrying concealed weapons in public assemblages prohibited. | 2. Act to take effect immediately. |

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

SECTION 1. Whoever shall, in this state, go into any church or place where people have assembled for religious worship, or into any school-room, or into any place where people may be assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court-room during the sitting of court, or into any other public assemblage of persons met for other than militia drill or meetings, called under the militia law of this state, having concealed about his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not less than ten nor more than one hundred dollars, or by imprisonment in the county jail not to exceed six months, or by both such fine and imprisonment: *Provided*, that this act shall not apply to any person whose duty it is to bear arms in the discharge of duties imposed by law.

SEC. 2. This act shall take effect and be in force from and after its passage.

APPROVED March 26, 1874.

 

DATE DOWNLOADED: Fri Feb 10 15:41:45 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1883 1 .

ALWD 7th ed.
, , 1883 1 .

Chicago 17th ed.
"," Missouri - 32nd General Assembly, Regular Session : 1-2

AGLC 4th ed.
'' Missouri - 32nd General Assembly, Regular Session 1

OSCOLA 4th ed.
'' 1883 1

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

# LAWS OF MISSOURI,

PASSED AT THE SESSION OF THE

# THIRTY-SECOND GENERAL ASSEMBLY,

BEGUN AND HELD AT THE CITY OF JEFFERSON,

# WEDNESDAY, JANUARY 3, 1883.

## (REGULAR SESSION.)

*BY AUTHORITY.*



JEFFERSON CITY:
STATE JOURNAL COMPANY, STATE PRINTERS.
1883.

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

SECTION 1. Any person or persons doing a commission business in this state who shall receive cattle, hogs, sheep, grain, cotton or other commodities consigned or shipped to him or them for sale on commission, and who shall wilfully make a false return to his or their consignor or shipper, in an account of sale or sales of any such cattle, hogs, sheep, grain, cotton or other commodities made and rendered by such person or persons for and to such consignor or shipper, either as to weights or prices, shall be guilty of a misdemeanor and shall, on conviction, be punished by imprisonment in the county jail not exceeding one year, or by a fine not exceeding five hundred dollars nor less than two hundred dollars, or by fine not less than one hundred dollars and imprisonment in the county jail not less than three months.

Approved April 2, 1883.

---

## CRIMES AND CRIMINAL PROCEDURE: CONCEALED WEAPONS.

AN ACT to amend section 1274, article 2, chapter 24 of the Revised Statutes of Missouri, entitled "Of Crimes and Criminal Procedure."

SECTION 1. Carrying concealed weapon. etc., penalty for increased.

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

SECTION 1. That section 1274 of the Revised Statutes of Missouri be and the same is hereby amended by inserting the word "twenty" before the word "five" in the sixteenth line of said section, and by striking out the word "one" in the same line and inserting in lieu thereof the word "two," and by striking out the word "three" in the seventeenth line of said section and inserting in lieu thereof the word "six," so that said section, as amended, shall read as follows: Section 1274. If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

Approved March 5, 1883.



DATE DOWNLOADED: Fri Feb 10 15:53:28 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1889 7 .

ALWD 7th ed.
, , 1889 7 .

Chicago 17th ed.
"," Arizona - 15th Legislative Assembly : 7-74

AGLC 4th ed.
'' Arizona - 15th Legislative Assembly 7

OSCOLA 4th ed.
'' 1889 7

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
 Conditions of the license agreement available at
 *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

# SESSION LAWS

OF THE

## FIFTEENTH

# LEGISLATIVE ASSEMBLY

OF THE

## TERRITORY OF ARIZONA.

SESSION BEGUN ON THE TWENTY-FIRST DAY
OF JANUARY, A. D. 1889.

or policeman, or person summoned to his aid, nor to a revenue or other civil officer engaged in the discharge of official 'duty, nor to the carrying of arms on one's own premises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack upon legal process.

SEC. 3.   If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this Territory are collected to vote at any election, or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of a knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty nor more than five hundred dollars, and shall forfeit to the County the weapon or weapons so found on his person.

SEC. 4.   The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated.

SEC. 5.   Any person violating any of the provisions of Articles 1 and 3, may be arrested without warrant by any peace officer and carried before the nearest Justice of the Peace for trial; and any peace officer who shall fail or refuse to arrest such person on his own knowledge, or upon information from some credible person, shall be punished by a fine not exceeding three hundred dollars.

SEC. 6.   Persons traveling may be permitted to carry arms within settlements or towns of the Territory for one-half hour after arriving in such settlements or town, and while going out of such towns or settlements; and Sheriffs and Constables of the various Counties of this Territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties of their respective offices.

SEC. 7.   It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted up in a conspicuous place in his bar room, or reception room if there be no bar in the house, a plain notice to travelers to divest themselves of their weapons in accordance with Section 9 of this Act, and the Sheriffs of the various Counties




DATE DOWNLOADED: Fri Feb 10 15:57:40 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1890 412 .

ALWD 7th ed.
, , 1890 412 .

Chicago 17th ed.
"," Oklahoma - 1st Regular Session : 412-522

AGLC 4th ed.
'' Oklahoma - 1st Regular Session 412

OSCOLA 4th ed.
'' 1890 412

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

# THE

# STATUTES OF OKLAHOMA

## 1890,

Compiled under the supervision and direction of Robert Martin,
Secretary of the Territory,

—BY—

WILL T. LITTLE, L. G. PITMAN and R. J. BARKER,

—FROM—

The Laws Passed by the First Legislative Assembly of the Territory,

GUTHRIE, OKLAHOMA:
THE STATE CAPITAL PRINTING CO.,
PUBLISHERS.
1891.

**Chap. 25.** viction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

*Public buildings and gatherings.* (2438) § **7.** It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

*Intent of persons carrying weapons.* (2439) § **8.** It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

*Pointing weapons at another.* (2440) § **9.** It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

*Violation of section seven.* (2441) § **10.** Any person violating the provisions of section seven, eight or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three not more than twelve months.

## ARTICLE 48.—FALSE PERSONATION AND CHEATS.

SECTION.
1. False impersonation, punishment for.
2. False impersonation and receiving money.
3. Personating officers and others.
4. Unlawful wearing of grand army badge.
5. Fines, how paid.
6. Obtaining property under false pretenses.

SECTION.
7. False representation of charitable purposes.
8. Falsely representing banking corporations.
9. Using false check.
10. Holding mock auction.

*Punishment for false impersonation.* (2442) § **1.** Every person who falsely personates another, and in such assumed character, either:

First. Marries or pretends to marry, or to sustain the marriage relation toward another, with or without the connivance of such other person; or,

Second. Becomes bail or surety for any party, in any proceeding whatever, before any court or officer authorized to take such bail or surety; or,

Third. Subscribes, verifies, publishes, acknowledges or proves, in the name of another person, any written instrument, with intent that the same may be delivered or used as true; or,

Fourth. Does any other act whereby, if it were done by the person falsely personated, he might in any event become liable to any suit or prosecution, or to pay any sum of money, or to incur any charge, forfeiture or penalty, or whereby any benefit might accrue to the party personating, or to any other person.





DATE DOWNLOADED: Fri Feb 10 15:46:03 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1903 1 .

ALWD 7th ed.
, , 1903 1 .

Chicago 17th ed.
"," Montana - 8th Legislative Assembly, Regular & 2nd Extraordinary Sessions : 1-356


AGLC 4th ed.
'' Montana - 8th Legislative Assembly, Regular & 2nd Extraordinary Sessions 1.

OSCOLA 4th ed.
'' 1903 1

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

# Laws, Resolutions and Memorials

OF THE

## STATE OF MONTANA

PASSED AT THE

# ... EIGHTH REGULAR SESSION ...

OF THE

## LEGISLATIVE ASSEMBLY

———— ————

HELD AT HELENA, THE SEAT OF GOVERNMENT OF SAID STATE, COM-
MENCING JANUARY 5th, 1903, and ENDING MARCH 5th, 1903.

———— ————

### PUBLISHED BY AUTHORITY

————————————

Helena, Montana:
STATE BUBLISHING COMPANY,
Legislative Stationers, Printers and Binders
1903

## CHAPTER XXXV.

An Act to prohibit unlawful carrying of concealed weapons, to provide penalties for violations of this act and to define the meaning of the term concealed weapons.

*Be it Enacted by the Legislative Assembly of the State of Montana:*

### Section 1.

Any person in this State who shall carry concealed or partially concealed on or about his person any revolver, pistol, dirk, dagger, slung shot, sword cane, or knuckles made of any metal or any hard substance shall be deemed guilty of a misdemeanor and shall be punished by a fine of not less than twenty five nor more than two hundred dollars, or by imprisonment in the County jail not less than ten nor more than thirty days, or by both such fine and imprisonment.

*Carrying weapons concealed or partially concealed about.person.*

*Penalty.*

### Section 2.

The preceeding section shall not apply to a person in actual service as a militiaman, nor to a police officer or policeman, or person summoned to his aid nor to a revenue or other civil officer engaged in the discharge of official duty, nor to the carrying of arms on one's own premises, or place of business.

*Reservation.*

Section 3. If any person shall go into any church or religious assembly, any school room or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election precinct or any place of registration, on the day or days of any election or registration, where any portion of the people of the State are collected to register or vote at any election, or to any other place where people may be assembled to perform any public duty, or at any public assembly, and shall have or carry concealed or partially concealed about his person a

*Carrying weapons in certain places.*

pistol or other firearm, dirk, dagger, slung shot, sword cane, knuckles, or bowie knife, he shall be punished by a fine of not less than fifty nor more than five hundred dollars.

**Penalty.**

## Section 4.

The preceding section shall not apply to peace officers or other persons authorized or permitted by law to carry arms at the places therein designated. "And any District Judge of any judicial district of the State of Montana, may, upon satisfactory proof being produced before him of the good moral character and peaceable disposition of any person, grant permission to such person to bear concealed or otherwise a "pistol" or "revolver" for such a period of time as such judge may deem necessary."

**Reservation.**

**Permit of District Judge.**

## Section 5.

Any person violating any of the provisions of sections one and three of this act may be arrested without warrant by any peace officer and carried before the nearest justice of the peace for trial: and any peace officer who shall fail or refuse to arrest such person on his own knowledge, or upon information from some creditable person, shall be punished by a fine not exceeding five hundred dollars.

**Arrest.**

**Peace officer failing to arrest.**

**Penalty.**

## Section 6.

The term concealed weapons shall be taken to mean any weapon mentioned in the foregoing sections which shall be wholly or partially covered by the clothing or wearing apparel of the person so carrying the weapon.

**"Concealed weapon" defined.**

## Section 7.

The provisions of this Act shall not apply to or be in force in any county which the governor may designate by proclamation as a frontier county and liable to incursions by hostile Indians.

**Act not to apply to county designated by proclamation by Governor.**



The Development of Public Libraries in the United States, 1870–1930: A Quantitative
Assessment

Author(s): Michael Kevane and William A. Sundstrom

Source: *Information & Culture*, 2014, Vol. 49, No. 2 (2014), pp. 117–144

Published by: University of Texas Press

Stable URL: https://www.jstor.org/stable/43737483

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide
range of content in a trusted digital archive. We use information technology and tools to increase productivity and
facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at
https://about.jstor.org/terms



*University of Texas Press* is collaborating with JSTOR to digitize, preserve and extend access to
*Information & Culture*

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

JA2103

# The Development of Public Libraries
# in the United States, 1870–1930:
# A Quantitative Assessment

## Michael Kevane and William A. Sundstrom

The period 1870–1930 witnessed the emergence of the local public library as a widespread and enduring American institution. We document the expansion of public libraries in the United States using data drawn from library surveys conducted by the federal Bureau of Education. We then review causal accounts for that expansion. Exploiting cross-state and temporal variation in the data, we use statistical techniques to assess a number of plausible demand-and-supply factors affecting the pace of library development. Social and economic variables in the analysis include state income or wealth, urbanization, ethnic composition, and gender ratios. We also examine the effect of institutional innovations, such as state library commissions and library associations, that likely affected the establishment of public libraries. We confirm that library expansion was robustly related to urbanization and greater ethnic (immigrant) diversity and to institutional innovations and that it was greatly delayed in southern states.

Public libraries in the modern sense—local or municipal institutions offering free library services to the general public and supported by tax money—in the United States date back at least to 1833, when Peterborough, New Hampshire, established its public library. The first large public library in a major city was established in Boston over the period 1848–54. In 1849 New Hampshire became the first state to pass comprehensive enabling legislation, facilitating the process for localities to establish public libraries. But the public library movement grew only slowly in the decades after these New England firsts.[1] During the

*Michael Kevane is an associate professor in the Economics Department at Santa Clara University. Recent research focuses on the impact of community libraries and reading programs in West Africa. He is codirector of Friends of African Village Libraries (www.favl .org), a nonprofit he cofounded in 2001.*

*William A. Sundstrom is a professor of economics at Santa Clara University. His main research interests concern the economic history of labor markets, education, and racial inequality in the United States. He holds a PhD in economics from Stanford University.*

*Information & Culture*, Vol. 49, No. 2, 2014
©2014 by the University of Texas Press
DOI: 10.7560/IC49201

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

JA2104



*Figure 1.* Public libraries per 10,000 population, by library size threshold. Narrow definition of public library. Branches counted as separate libraries. *Source: US Bureau of Education.*

late 1800s, however, the growth of public libraries accelerated, as can be seen in figures 1 and 2, which plot public libraries and volumes held in public libraries on a per capita basis for the period 1875–1929. The underlying data are derived from Bureau of Education library survey reports (discussed below) for different thresholds of library size.[2]

Although public libraries have come to fill a variety of roles, recreational as well as educational, they were originally conceived as part of the nation's broader educational movement, and it was their educational function that provided the principal justification for public support. Thus it is instructive to place the timing of public library expansion within the broader context of two other important changes in the educational apparatus of the United States: the emergence of compulsory primary education and secondary school enrollment. The free and compulsory elementary school movement championed by Horace Mann was already almost fifty years old by the time the library movement got rolling. By the late nineteenth century, most children in the country were enrolled in primary school, and many states were approaching nearly universal primary education. The high school movement, on the other hand, gained momentum slowly in the 1890s and took off only after 1910.[3] Figure 3 plots a measure of public library

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

e 1:22-cv-02435-LMM Document 49 Page 441 02/Date Filed 07/20/2023 ageID: 2



*Figure 2.* Volumes in public libraries per capita, by library size threshold. Narrow definition of public library, topcoded. *Source: US Bureau of Education.*

penetration—library volumes per capita—along with secondary school enrollment rates. By these measures, the public library movement appears to have begun its acceleration somewhat in advance of the major uptick in high school enrollments.[4]

Many researchers in the field of library history have devoted attention to the emergence and growth of the public library movement.[5] Some of them have made use of the comprehensive library censuses conducted periodically by the United States Bureau of Education and its successor departments. But apparently only Robert Williams connected the library statistics with census and other data sources and then used statistical techniques to weigh the importance of various causal factors.[6] Williams's analysis, however, was limited to cross-county and cross-state correlations and basic regression analysis. Furthermore, his period of focus, 1850–70, was before the period of ascent of public libraries, and the data on libraries from the census were, as he notes, quite unsatisfactory.

This article explores the impact of various factors that have been adduced to explain the growth of public libraries. We use the more comprehensive data of the Bureau of Education library surveys and cross-sectional, time-series statistical techniques. The next section discusses the library survey data we employ and summarizes the growth path of the public library movement, highlighting the expansion of library

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

e 1:22-cv-04623-R900-AMDocDocument 49t 89 Page F4 412 02/Date3 Filed 07/20/2023 PageID: 2



*Figure 3*. Volumes in public libraries per capita, plotted with secondary enrol-
ment rate. Narrow definition of public library, libraries with 5000+ volumes, top-
coded. *Source: US Bureau of Education.*

services after 1895 and geographical variation in the extent and tim-
ing of library development. We then review some of the salient theories
that have been offered to explain the trends in library development. Fi-
nally, we provide some panel estimates (using data at the state level, over
time) of the correlates of public library development. We show that pub-
lic library development was more rapid in states with more immigrants,
larger cities, and state-level institutions aimed at fostering library devel-
opment. Public library development lagged in the South, even after con-
trolling for various correlates that might explain regional differences.

### Measuring the Growth of Public Libraries
### in the United States after 1870

Early momentum to establish public libraries was slow. In his exhaus-
tive study of American libraries prior to 1876, Haynes McMullen was
able to identify only 484 free public libraries as having existed at any
point in time in the United States during the period before 1876.[7] More
than half (253) were located in New England. One-sixth (81) were the
last remnants of an ill-fated experiment by the states of Michigan and

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

Indiana, which passed state laws mandating the creation of so-called township libraries. In all, 1,559 of these township libraries were created in these two states during the 1840s and 1850s, but most were very short-lived and so were not included by McMullen in his 484 total. The southern states lagged in the early development of public libraries, as they did in the development of educational institutions more generally, with only twelve free public libraries identified through the entire first century of the country's existence. Thus a region that accounted for nearly a third of the country's total population and a quarter of its white population in 1870 had produced only about 3 percent of its public libraries.

To track and analyze the spread of public libraries after 1870, we have assembled and coded data on individual libraries from special reports on libraries issued intermittently by the US Bureau of Education.[8] These reports included extensive tables of information on individual libraries gathered from surveys conducted by the bureau. The surveys covered in our full data set were conducted in 1875, 1885, 1891, 1896, 1900, 1903, 1908, 1913, 1923, and 1929. The first of these reports, which appeared in 1876, notes that planning for the survey began with a list of every town "the population of which was sufficient to seem to justify the belief that it possessed a public library of some sort."[9] Letters of inquiry were then sent, generally to the local postmaster, soliciting the names of any public libraries. In larger towns and in cities, the superintendent of public schools was also contacted, and in the larger cities "persons were selected to make special investigations."[10] Previous listings of libraries, city directories, gazetteers, offices of institutions and societies, clergy, public officials, and the like were also consulted. Direct inquiries were then sent to the libraries identified: "This preliminary work involved the writing of some 10,000 letters, to which the responses have generally been most prompt and gratifying."[11] Statistics of libraries with at least three hundred volumes were tabulated in chapter 37 of the special report. Subsequent reports appear to have used similar methods.

The statistics reported in the published tables typically included the name and location of the library, some classification as to the type of library, whether services were free or by subscription, and the number of volumes in the collection. In some years the tables included financial statistics, year of founding, and/or name of librarian. Unfortunately, reports for different years use different minimum size thresholds for publishing individual library data. The reports for 1875 and 1885 list all libraries with three hundred or more volumes; the reports of 1891, 1896, 1900, and 1903 use a threshold of one thousand volumes; 1923 and 1929 use a threshold of three thousand volumes; and 1908 and

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

1913 use a threshold of five thousand volumes. In analyzing the evolution of libraries across years, we restrict our attention to consistent size thresholds. Our main findings are similar if instead we assume that the "minimal size" of what constitutes a library changed over time, so that a three-hundred-volume library in 1875 is comparable for our purposes to a three-thousand-volume library in 1923.

The library surveys reached and counted a wide range of libraries, such as those run by private associations (e.g., fraternal organizations) for their own membership; school, college, and university libraries; and other sorts of library institutions. Our interest here is in public libraries as community-based institutions providing access to books and other reading materials that were free and open to the public. Eventually these would largely be truly public institutions in the sense that they would be owned, operated, and financed by local governments. But especially in the early years of public library development, many free community libraries were run by nongovernmental voluntary associations. Such libraries were often termed "social libraries."

The classification schemes used in the reports are inconsistent across years and often unsatisfactory for our purposes. Some degree of ambiguity is inevitable given the situation on the ground: the institution of the public library was itself evolving rapidly during these decades in both form and function. To allow for some flexibility, we have reclassified the libraries as public or not using two alternative schemes, one defining public libraries quite narrowly, the other somewhat more broadly. This article employs the narrow definition throughout, but the results are qualitatively similar using the broader definition.

For the 1875–1908 surveys, the reports typically classified what were clearly local public libraries as "public" or "general" libraries, and our narrow classification counts all of these as public. In addition, the narrow definition counts as public some other libraries that were classified in other categories but had names that clearly indicated that they served as a community's or municipality's public or "free" library. This would include such library names as "XX Public Library" and "YY City Library."[12] To these libraries, our broader definition of public libraries adds all the libraries that were classified as "social" or "fraternal" libraries. Starting in 1913, the classification scheme used in the reports changed rather dramatically, shifting from a classification based on type of parent organization to "level of control," such as local government, state government, or some nongovernmental entity. For the 1913–29 surveys, our narrow definition of public libraries includes those libraries

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

controlled by local governments plus libraries run by nongovernmental entities with "public"-sounding names, as above. For the broader definition, we add to these all other nongovernmental libraries, excluding those with names that clearly indicated they were not local public libraries (e.g., "XX Botanical Garden Library").

Counts of total libraries and total volumes by minimum size threshold are presented in table 1. In 1891 there were 565 public libraries of three thousand volumes or more in the United States, and the number grew to 6,031 by 1929, a tenfold increase. This represents a growth rate of just under 8 percent per year. The total number of volumes experienced a similar tenfold increase. From this data on libraries, we calculated two basic measures of the penetration of public libraries by state and year of survey: libraries per capita and library volumes per capita. In this article we focus on the latter (volumes) for two reasons: first, volumes seem like a natural measure for actual library services; and second, the volumes measure is less sensitive to truncation problems introduced by varying thresholds of library size in the reports. Figures 1 and 2 illustrate the effect on per capita measures of varying the threshold number of volumes for inclusion in the data. Excluding smaller libraries leads to a fairly significant undercount of libraries (figure 1), but the impact on the volume count is much more modest (figure 2).[13] Larger libraries get more weight in the volume count, so excluding the lower tail of the distribution has less impact. In the figures and the regression analysis reported below, we have truncated ("topcoded") the number of volumes in any single library at fifty thousand. This procedure aims to prevent a very small number of huge libraries (such as the New York Public Library) from dominating our statistics. Volume counts for such "libraries of record" are probably not indicative of the access of the general public to library books. As it happens, none of our findings is substantively changed if we do not truncate the number of volumes in these larger libraries in our volume counts.

Figure 4 plots volumes per capita by region (using the five-thousand-volume threshold for consistency). As in the case of secondary education, the Northeast led the way early on, but by the late 1920s the West had assumed the lead with the highest per capita penetration of library services. In the South, public libraries continued to be all but nonexistent before 1903, and even after that the region's library development lagged far behind the rest of the country. A question we address with the statistical analysis is whether the South's retardation in library development can be explained by other regional differences, such as lower rates of urbanization, income, or general education in the South.

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

Table 1. Number of public libraries and total volumes in public libraries from library surveys for different minimum size thresholds

| | Number of libraries with at least: | | | | Total volumes in libraries with at least: | | | |
|---|---|---|---|---|---|---|---|---|
| | 300 vols. | 1,000 vols. | 3,000 vols. | 5,000 vols. | 300 vols. | 1,000 vols. | 3,000 vols. | 5,000 vols. |
| 1875 | 375 | 256 | 134 | 75 | 1,907,307 | 1,839,018 | 1,627,864 | 1,401,866 |
| 1885 | 1,174 | 750 | 391 | 248 | 5,753,674 | 5,523,291 | 4,917,133 | 4,392,105 |
| 1891 | | 1,049 | 565 | 363 | | 8,567,092 | 7,740,126 | 6,986,226 |
| 1896 | | 1,332 | 756 | 493 | | 11,741,453 | 10,711,807 | 9,722,638 |
| 1900 | | 1,740 | 1,005 | 672 | | 16,353,564 | 15,066,578 | 13,820,407 |
| 1903 | | 2,256 | 1,315 | 888 | | 20,231,272 | 18,581,536 | 16,972,527 |
| 1908 | | | | 1,500 | | | | 23,084,696 |
| 1913 | | | | 2,078 | | | | 28,118,216 |
| 1923 | | | 4,046 | 3,294 | | | 49,599,477 | 47,155,277 |
| 1929 | | | 6,031 | 5,528 | | | 69,306,177 | 67,363,166 |

*Source*: US Bureau of Education, library survey reports, various years.

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

JA2111



*Figure 4.* Volumes per capita by region, for public libraries with at least 3,000 volumes. Narrow definition of public library, topcoded at 50,000 volumes. *Source: US Bureau of Education.*

## Explaining the Growth of Public Libraries

Jesse Shera reviews early work by historians of the public library movement and suggests that Arnold Borden's essay in the first volume of *Library Quarterly* was a "harbinger of a new phase in library historiography."[14] Borden adduced several factors behind the rise of public libraries, which he (prematurely) dated as occurring between 1850 and 1890. First was the role of the federal government, second was the largesse of philanthropists, and third was the demand for educational activities resulting from the rise of an affluent middle and working class that had more time for leisure and was more capable of influencing public spending through suffrage. Borden seems to have been the first library historian to begin cataloging the set of supply-and-demand factors and institutional innovations that were likely responsible for the growth of public libraries in villages, towns, cities, and counties across the United States.

The remainder of this section follows his lead, reviewing many factors discussed by Borden's successors.[15] While our list has a bit of the "what to buy at the store" quality, it is abbreviated compared with Gwladys Spencer's colossal dissertation on the establishment of the Chicago Public Library in 1872.[16] She concludes her work with a list of ninety-four causes that led to

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

the establishment of the library at that particular moment in history. We divide our discussion into the following four kinds of factors, though obviously there is much overlap: (1) institutional precedents for public libraries; (2) institutional innovations that enabled the establishment of public libraries; (3) supply-side factors; and (4) demand-side factors.

### Institutional Precedents

The public libraries that marched across the American landscape at the end of the 1800s evolved from a number of antecedent institutions, most notably, so-called social libraries and school district libraries. Social libraries were typically corporations formed by voluntary associations and funded by subscription or the issuance of shares. McMullen identifies 3,296 social libraries in existence at some point in time in the United States before 1876.[17] Many of these social libraries were ultimately transformed into truly public libraries.[18] As McMullen notes, "When the members of a library society lost interest in their collection, they often turned it over to the town government, which converted it to a public library by supporting it financially and opening it to the citizens of the town."[19] In some communities, publicly supported libraries competed with social libraries for a time. In Otsego, Michigan, for example, the Ladies' Library Association developed its own collection of books beginning in 1868, despite the presence of the township library, founded in 1844. Eventually, however, expansion of the township library collection in the 1880s drew members away from the association. According to Claxton Helms, "Free service, supported by taxes, was much more attractive than membership in an organization of somewhat limited service."[20] The two institutions ultimately merged when the Ladies' Association sold its building and books to the township in 1905.

Social libraries commonly shared the same basic organizational form as free public libraries, being governed by a board of trustees whose membership often constituted a "who's who" of local residents. In a number of communities, free public libraries continued to be nongovernmental legal entities and provided their services under contract to local governments. As late as the early 1930s, according to Carleton Joeckel, one-sixth of public libraries in cities of more than thirty thousand people were owned or controlled by associations or corporations legally independent of the city government.[21] In this sense, boards of trustees of the social libraries agreed to turn over the "private" social libraries for public use in return for steady funding from municipalities. The existence of a large supply of these social libraries available for

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

conversion must be taken into account when explaining the growth of public libraries. Joeckel estimates that "of the first twenty-five free libraries established in Massachusetts . . . seventeen absorbed one or more preceding social libraries in various ways, some as outright gifts, some by purchase, and some as more or less permanent loans."[22] Of course, taking account of the role of social libraries as a precursor of truly public institutions merely pushes the question of causal factors back a step.

The school district library was another important precursor to the modern free public library. Libraries run by local school districts were often intended to make reading materials available not only to school-children but to adults as well. In 1835 the state of New York passed the nation's first school district library law, permitting school districts to tax for the purpose of providing free library service to pupils and the public.[23] Similar laws would be passed in fourteen other states by 1855. Such libraries were quite numerous by midcentury: the census of 1850 reported a total of just over twelve thousand nationwide.[24] The scheme of providing library services to the general public through libraries administered by local school districts eventually gave way to the public library run by towns or cities. Joeckel and C. Seymour Thompson suggest that the school district library movement was ill-fated in all but a few places, having been imposed top-down from the state level and generally creating libraries that were too small to be viable community institutions: "Beginning with much promise in most states, [the school district library movement] either died out completely or became solely a school library movement."[25] Nevertheless, school district libraries set important precedents, establishing the legitimacy of taxation in support of free public library service and linking libraries and public education (in this case, adult education) in the mind of the public.

### *Institutional innovations*

Localities desirous of public libraries could not just establish them willy-nilly. Before the New Hampshire enabling legislation of 1849 spread to other states, a locality had no convenient legal basis for taxing local property to fund a library. To the extent that local library services were a local public good subject to free riding, where residents took advantage of library services without contributing toward the library's upkeep, library-enabling legislation was a potentially critical legal innovation permitting the state's coercive power to be applied to library funding. Enabling legislation that authorized localities to use tax funds to support public libraries evolved from the precedent of local funding

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

of public schools via the school district library movement, mentioned above. Legislation during the period after 1870 was much more expansive in giving municipalities authority to establish tax-supported public libraries. In some states, residents had to vote on measures to authorize taxation for libraries, while in other states town councils could enact the necessary legislation on their own.[26]

The state constitutions of Indiana and Michigan included provisions essentially mandating township libraries during the period 1830–60. Consequently, of the 1,659 free public libraries that McMullen was able to identify in the midwestern states between 1786 and 1876, some 1,559 were township libraries in either Michigan or Indiana. Thus during this period, for seemingly exogenous reasons, Michigan and Indiana had more public libraries than similar states nearby, such as Wisconsin, Illinois, and Ohio. These mandated township libraries established in Michigan and Indiana during the mid-1800s were small, often no more than a shelf of books, and did not survive many years. By the beginning of the period under consideration in this article (1870), Michigan and Indiana did have more public libraries per capita than their neighbors Illinois and Ohio but not more library volumes per capita.

Also important in enabling public libraries were state library commissions and state library associations, which acted as full-time advocates and guides for the creation of new libraries in townships and counties in the state. Established by legislation, library commissions were state entities, typically with small budgets, consisting of a few professional and full-time employees charged with helping localities establish libraries. These officials traveled the state explaining library legislation and helping establish libraries. They also explained procedures for obtaining Carnegie grants for public library buildings. Writing about Alabama, Shannon White opined that "without an effective state library program in place and lacking public support, communities experienced great difficulty in gathering information necessary for participation in the Carnegie program."[27] Associations were voluntary organizations with a similar mission, having as members the librarians of existing public libraries. The New Hampshire Library Association was apparently the first state association, established in 1889, while the New York Library Association was founded in 1890, and other state library associations followed.

The timing of the great expansion of public libraries coincides closely with the formation of state library associations and commissions. Figure 5 details the diffusion of commissions and associations across states after 1890.[28] Of course, to some extent these entities were endogenous outgrowths of the spread of local public libraries and allied interest groups.

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms



*Figure 5.* State library associations and commissions, cumulative number of states, 1885-1930. *Author data from various sources.*

Students of local and national public library history note that the library movement was inextricably tied to the growth of women's organizations and eventual attaining of suffrage. The last quarter of the nineteenth century witnessed a proliferation of women's literary and cultural clubs in American cities and towns.[29] The clubwomen's ideology of "domestic feminism" emphasized the role of women in education and cultural uplift, and libraries became a key component of their civic reform efforts.[30] A frequent claim in the library historiography is that by the 1930s, "75 percent of the public libraries in this country owed their origins to women's clubs."[31] Although the original source and the veracity of this figure are uncertain, it seems to be of a plausible magnitude. Paula Watson cites documentary evidence from a number of states to back up the general claim. As of 1937, for example, 70 percent of Oklahoma public libraries "owe[d] their existence to women's clubs."[32] Women's organizations also founded the large majority of public libraries in such states as Kansas, Virginia, Florida, and North Dakota during the period under consideration, and they often were the driving force behind soliciting funds from philanthropic sources such as Andrew Carnegie. The Iowa Federation of Women's Clubs was a prime mover in pressing the state legislature for the establishment of a state library commission to promote local library development and librarian training.[33]

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

JA2116

### The Supply Side

The philanthropy of Andrew Carnegie played an important role in the spread of public libraries. Carnegie grants, for example, helped establish about 85 percent of the larger public libraries in California existing in 1919.[34] Almost seventeen hundred communities received grants to establish, improve, or replace library buildings. A common refrain is that Carnegie "transformed the American library landscape."[35] Figure 6 plots the cumulative number of libraries supported by Carnegie library grants along with the total number of public libraries of at least five thousand volumes enumerated in the library surveys for the period 1890–1923. Because Carnegie grants did not always establish new libraries, and because some percentage of Carnegie libraries presumably fell below the five-thousand-volume threshold to be counted in the survey data, the two series are not strictly comparable, but the plot nonetheless suggests that Carnegie libraries constituted a significant share of public libraries built prior to World War I. Carnegie attached only a few conditions to the grants: the municipality had to donate the land and had to agree to dedicate for the library annual tax revenue equivalent to 10 percent of the building grant; and building plans had to be reviewed by Carnegie's secretary, James Bertram, before funds were delivered.

Carnegie was not the only library philanthropist, and across the country major benefactors either funded libraries during their lifetime or left bequests for public libraries. To our knowledge, no one has compiled a set of comprehensive numbers to estimate the sum of this other private philanthropy, but casual observation of the histories of hundreds of local libraries suggests it was substantial. Samuel Green provides a contemporary account in which he reminisces on his involvement with many of the philanthropic and volunteer efforts of the period.[36] James Wellard also gives prominence to philanthropy in his 1937 *Book Selection: Its Principles and Practice.*[37]

Local governments were obviously the other principal source of funding for public libraries, and the fiscal capacity of local governments seems to have grown substantially during this period. John Wallis refers to the period 1842–1933 as "the era of property finance and local government."[38] Between 1890 and 1922, corresponding roughly to the period of rapid public library expansion, local government revenues increased from under 3 percent of GDP to over 5 percent. The share of local government in total government revenues at all levels reached its historical peak on the eve of World War I, at about 56 percent.[39] The predominant source of local tax revenues was property taxes. Increased property taxation was politically feasible to the extent that it funded

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms



*Figure 6.* Public libraries and Carnegie libraries. Narrow definition of public library. Branches counted as separate libraries. *Source: US Bureau of Education.*

benefits that increased local property values such as schools, public utilities, local infrastructure, and perhaps library services. Although libraries probably remained a small and fairly stable fraction of local budgets, the general expansion of local governments over this period shifted the budget constraints for all forms of local spending.[40]

### Demand Factors

To the extent that public libraries are viewed as an aspect of a broader movement toward increased public provision of education, some of the same demand factors associated with the rise of mass schooling in the nineteenth and early twentieth centuries should be relevant for libraries as well. Recent research suggests that economic growth and consequent rising average income and wealth, well under way in the United States at the turn of the century, played an important role in the increase in school enrollments at both the primary and secondary levels.[41] But rising income can only be part of the story. As Claudia Goldin and Lawrence F. Katz note, high school attendance rates in England lagged far behind those in the United States during the first half of the mid-twentieth century in spite of similar per capita incomes.[42]

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

JA2118

Rising levels of literacy and educational attainment themselves must have increased demand for library services, although the reverse causation may have occurred as well. A perennial debate in the history of education and literacy in the United States is the importance of legislative mandates. In explaining high primary and secondary school enrollment rates, attention has been paid to compulsory schooling and child labor laws. Recent work suggests that compulsory schooling laws had a quite modest causal impact on school enrollments.[43] But to the extent that these laws were effective, they bolstered the demand for libraries under the weak assumption that libraries and schooling were seen as complements rather than substitutes. (For a time line of compulsory education laws, see the work of August Steinhilber and Carl Sokolowski.)[44]

The population size of any particular locality would also likely have influenced the development of libraries. To be attractive to readers, a library collection had to be of some minimum scale. The larger the community of taxpayers, the lower the per-person cost of attaining that scale. Because of this, local libraries were unlikely to emerge until a local community reached a threshold population size or density.

Many authors have suggested that libraries were demanded by established citizens as a way to assimilate or control immigrant groups.[45] But the presence of large numbers of immigrants may also have worked against the demand for public libraries to the extent that ethnic heterogeneity was associated with greater heterogeneity in preferences for public goods or lower levels of civic engagement, as suggested, for example, by Goldin and Katz in their work on the high school movement.[46] Dora Costa and Matthew Kahn summarize a range of empirical work by economists using both current and historical data that show lower civic engagement in communities with greater ethnic or economic heterogeneity, where civic engagement is measured by rates of volunteering, membership in organizations, state spending on public goods or redistribution, self-reported levels of trust, and other measures.[47]

Finally, shifts in preferences and ideology were probably important, if difficult to measure. Such shifts were actively pursued by early library promoters, referred to as "missionaries" and "apostles" by Dee Garrison.[48] Lowell Arthur Martin suggests that the ideology of the public library movement was an amalgam of four conceptions of the role of libraries: as democratic institutions promoting good citizenship (see Sidney Ditzion); as educational institutions complementing public schools, early on intended for continuing adult education and self-education but by the 1920s increasingly serving children as their main educational function; as a source of recreational reading material; and as institutions

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

JA2119

serving a humanitarian mission, offering an alternative to the saloon, elevating youth, and controlling the masses.[49] Susan Swetman carefully reviews public discourse surrounding drives to establish public libraries in twenty communities in Utah and Washington at the turn of the century.[50] In the booming Inland Empire communities of Washington, libraries were seen as markers of economic progress and enticements to settlers to take up residence in progressive "can-do" kinds of towns. In Utah, by contrast, public discourse treated libraries as places where the morals of wayward youth might be improved. Swetman draws attention in particular to libraries as an amenity and signal of prosperity used in the competition between towns to attract new residents, even in cases where current residents did not place much value on library services.

## Descriptive Statistics of the Data

Quantitative measures of many of the causal factors that loom large in library historiography, such as the women's movement, philanthropy, and local voluntarism, are elusive. But the impact of some basic economic and demographic influences can be estimated along the lines of Goldin and Katz's work on cross-state variation in the high school movement.[51] To assess the potential importance of some of these factors in the spread of public libraries, we present statistical results based on panel regressions at the state-by-year level of aggregation using as a dependent variable per capita library volumes held in public libraries. These regressions must be considered essentially reduced-form and descriptive, but the results are nonetheless suggestive of factors at play in library development and point to some similarities to as well as contrasts with the case of secondary education. We employ data from seven of the library surveys that are spread fairly evenly in time: 1875, 1885, 1896, 1903, 1913, 1923, and 1929. The years of the United States census, source of most of our explanatory variables, do not correspond with the library survey years, and so census variables are interpolated and then predicted for the library survey years. We interpolate using a cubic spline technique, which involves fitting a curve to the census values when charted over the years and then predicting the values for the years of the library surveys.

Table 2 provides summary statistics for the dependent and explanatory variables for all years combined and selected individual cross sections. Our core explanatory variables are very much in the spirit of the variables used in Goldin and Katz's state-level regressions on secondary education. Basic demographic controls include proportion female,

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

JA2120

proportion black, proportion foreign-born, proportion of the population under eighteen, and proportion sixty and over. The United States grew older over this period, with the proportion under eighteen declining from .42 in 1875 to .38, while the elderly increased their share of the population from .05 to .08.

Demand for library services may have varied with the local age composition to the extent that libraries were viewed as complementary to educational services more generally. Furthermore, as Goldin and Katz argue, demographic variables may serve as proxies for community solidarity or homogeneity (or its absence), which could have been important in decisions over the provision of a public good such as libraries. In their results, a measure of ethnic heterogeneity (percent Catholic) is negatively related to secondary education rates, whereas proportion elderly is positively related, the latter variable perhaps proxying for community stability and therefore solidarity.

We use two urbanization variables, both of which measure the proportion of the population residing in "urban" areas. The first employs the conventional census urban population threshold of twenty-five hundred, and the second employs a larger urban threshold of twenty-five thousand. The urban proportion rose from .20 in 1875 to .46 in 1929, while the proportion in cities similarly rose from .10 to .28. Place size would matter if library services were subject to local scale economies. Addition of the larger threshold reflects our presumption that rather few towns with populations as small as 2,500 would have been able to support their own libraries; Carnegie, for example, gave the large majority of his grants to towns with populations in excess of 2,500. Under the assumption of some minimum population threshold, library penetration in a state might also have depended not only on the proportion of the population urban but also on the actual *number* of such places per capita. We experimented with including as an explanatory variable the ratio of the number of urban places to population at the same urban population thresholds and other variants, but these variables are highly collinear with the standard urbanization variables and are not presented here.

We include two variables related to the level of economic development. The proportion of workers in manufacturing, which rose from .12 in 1875 to .19 in 1929, is an indicator of industrialization. Real property tax revenue per capita, which quadrupled over the period, should serve as a proxy for both local fiscal capacity on the supply side and per capita wealth on the demand side. State-level estimates of per capita income, which are available for some years in our sample period, are positively correlated with our property tax variable and yield similar results in regressions, not reported here.

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

Table 2. Means and standard deviations of variables in state-year panel data, all years combined and selected years

| | All years | 1875 | 1896 | 1913 | 1929 |
|---|---|---|---|---|---|
| Volumes per capita in public libraries with at least 300 volumes | 0.06 | 0.028 | | | |
| | (0.134) | (0.076) | | | |
| Volumes per capita in public libraries with at least 1,000 volumes | 0.121 | 0.026 | 0.142 | | |
| | (0.233) | (0.073) | (0.232) | | |
| Volumes per capita in public libraries with at least 3,000 volumes | 0.231 | 0.022 | 0.119 | | 0.549 |
| | (0.357) | (0.062) | (0.197) | | (0.497) |
| Volumes per capita in public libraries with at least 5,000 volumes | 0.216 | 0.017 | 0.101 | 0.253 | 0.521 |
| | (0.324) | (0.048) | (0.168) | (0.295) | (0.467) |
| Proportion female | 0.475 | 0.459 | 0.474 | 0.476 | 0.488 |
| | (0.043) | (0.077) | (0.036) | (0.030) | (0.017) |
| Proportion black | 0.110 | 0.127 | 0.112 | 0.104 | 0.096 |
| | (0.165) | (0.188) | (0.176) | (0.160) | (0.137) |
| Proportion foreign-born | 0.133 | 0.156 | 0.148 | 0.134 | 0.093 |
| | (0.103) | (0.127) | (0.107) | (0.096) | (0.076) |
| Proportion under 18 | 0.399 | 0.422 | 0.412 | 0.378 | 0.379 |
| | (0.063) | (0.085) | (0.057) | (0.056) | (0.045) |
| Proportion over 59 | 0.066 | 0.048 | 0.063 | 0.068 | 0.084 |
| | (0.024) | (0.026) | (0.022) | (0.019) | (0.020) |
| Proportion living in a place with 2,500 population or more | 0.345 | 0.203 | 0.305 | 0.389 | 0.457 |
| | (0.215) | (0.176) | (0.207) | (0.209) | (0.200) |
| Proportion living in a place with 25,000 population or more | 0.198 | 0.098 | 0.166 | 0.229 | 0.285 |
| | (0.188) | (0.125) | (0.167) | (0.200) | (0.204) |
| Proportion of workers in manufacturing | 0.153 | 0.120 | 0.117 | 0.185 | 0.185 |
| | (0.119) | (0.109) | (0.104) | (0.129) | (0.109) |
| State and local property tax levies per capita in thousands (1900 dollars) | 0.011 | 0.004 | 0.008 | 0.013 | 0.018 |
| | (0.007) | (0.003) | (0.004) | (0.006) | (0.007) |
| Years with state library association | 10.121 | | 2.125 | 12.813 | 27.5 |
| | (12.554) | | (2.907) | (8.826) | (11.310) |
| Years with state library commission | 7.876 | | 0.813 | 9.688 | 22.708 |
| | (11.213) | | (1.806) | (8.008) | (12.509) |
| Observations | 330 | 45 | 48 | 48 | 48 |

*Note:* "Unweighted" means "across states." Standard deviations are in parentheses. Hawaii, Alaska, and Washington, DC, are not included, and there are no census results for Oklahoma and the Dakotas prior to 1890.

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

JA2122

In a separate specification we examine the impact of two variables for statewide institutions in support of library development: state library commissions and associations. Using the founding dates of each association and commission, we calculate the number of years the organization had been in existence at the time of each library survey. These variables measure the length of exposure to any library-boosting activities undertaken by such institutions. Obviously, these institutions are also very likely to be endogenous to local library development or other unobserved factors affecting demand for public libraries, so their coefficients cannot be considered estimates of causal effects without further analysis.

The panel regressions include the equivalent of "dummy variables" that take on a value of zero or one for observations from each particular state. These dummy variables are the equivalent of controlling for the "fixed effect" of each state. By controlling for fixed effects, we capture any unobserved systematic differences across states in the propensity to develop public libraries. In particular, the fixed effects should control for cross-state variation in initial conditions, such as the extent of quasi-public social or association libraries that might be converted to public libraries. The inclusion of state fixed effects means that the effects of the explanatory variables are estimated from within-state variation across time in those variables. That is, the estimate of the effect of an explanatory variable is akin to an average of the effect of changes over the time period in that variable in each of the fifty states, and thus the estimate of the effect is not due to differences across states in the explanatory variable. In each regression we also include a separate dummy variable for each survey year (leaving 1875 as the excluded category). The coefficients on the year dummies capture any time trend in public library development not explained by movements in our other dependent variables. Finally, we add interactions between the year dummies and a dummy variable for the South.[52] This allows us to see whether the pattern of divergence between the South and non-South, so evident in figure 4, can be explained by movements in the measurable explanatory variables.

## Results of Analysis

Table 3 reports the results for four alternative specifications of the regressions. The first two use all seven survey years, restricting our count of volumes per capita to public libraries with at least five thousand volumes for consistency across samples. Specification 1 uses only the explanatory variables that were likely to be exogenous to public library development, while specification 2 adds the library association

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

Table 3. Correlates of public library development: fixed-effects regressions. (Dependent variable: Volumes per capita in public libraries.)

| | Minimum number of volumes in library | | | |
| --- | --- | --- | --- | --- |
| | 5,000 | 5,000 | 3,000 | 1,000 |
| | (1) | (2) | (3) | (4) |
| Proportion of population female | 0.204 | 1.192[a] | -0.0364 | 1.688[b] |
| | (0.65) | (0.64) | (0.78) | (0.77) |
| Proportion of population black | -0.61 | -0.273 | -0.653 | -0.251 |
| | (0.54) | (0.52) | (0.64) | (0.95) |
| Proportion of population foreign-born | 1.191[c] | 1.024[c] | 1.014[c] | 2.322[c] |
| | (0.28) | (0.27) | (0.34) | (0.36) |
| Proportion of population urban | -0.464[a] | -0.579[b] | -0.119 | -1.008[c] |
| | (0.24) | (0.23) | (0.30) | (0.31) |
| Proportion of population in cities of 25,000+ | 0.547[c] | 0.509[c] | 0.355 | 0.121 |
| | (0.21) | (0.20) | (0.26) | (0.34) |
| Proportion of workers in manufacturing industry | -0.0461 | -0.32 | -0.192 | -0.0353 |
| | (0.29) | (0.28) | (0.36) | (0.53) |
| Proportion of population under age 18 | 0.773[a] | 0.372 | 0.764 | 0.0473 |
| | (0.40) | (0.38) | (0.48) | (0.51) |
| Proportion of population over age 59 | -2.075[b] | -3.159[c] | -2.429[b] | -4.427[c] |
| | (0.97) | (0.93) | (1.18) | (1.06) |
| State and local property tax levies per capita in thousands (1900 dollars) | -5.877[a] | -4.93 | -13.68[b] | 0.256 |
| | (3.53) | (3.30) | (5.28) | (6.96) |
| Years with state library commission | | 0.004[b] | | |
| | | (0.00) | | |
| Years with state library association | | 0.008[c] | | |
| | | (0.00) | | |
| Year 1885 | 0.0956[b] | 0.109[c] | 0.113[b] | 0.189[c] |
| | (0.04) | (0.04) | (0.05) | (0.04) |
| Year 1896 | 0.225[c] | 0.198[c] | 0.267[c] | 0.394[c] |
| | (0.05) | (0.04) | (0.06) | (0.05) |
| Year 1903 | 0.374[c] | 0.297[c] | 0.445[c] | 0.579[c] |
| | (0.05) | (0.05) | (0.06) | (0.07) |
| Year 1913 | 0.549[c] | 0.392[c] | | |
| | (0.06) | (0.06) | | |
| Year 1923 | 0.772[c] | 0.513[c] | 0.887[c] | |
| | (0.07) | (0.08) | (0.09) | |
| Year 1929 | 1.047[c] | 0.711[c] | 1.175[c] | |
| | (0.08) | (0.09) | (0.10) | |

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

JA2124

Table 3, *cont'd.*

|  | Minimum number of volumes in library | | | |
|  | 5,000 (1) | 5,000 (2) | 3,000 (3) | 1,000 (4) |
|---|---|---|---|---|
| South 1885 | -0.0743 | -0.0751 | -0.0929 | -0.128[c] |
|  | (0.06) | (0.05) | (0.07) | (0.05) |
| South 1896 | -0.164[c] | -0.116[b] | -0.205[c] | -0.269[c] |
|  | (0.06) | (0.06) | (0.07) | (0.06) |
| South 1903 | -0.288[c] | -0.192[c] | -0.350[c] | -0.411[c] |
|  | (0.06) | (0.06) | (0.07) | (0.06) |
| South 1913 | -0.412[c] | -0.277[c] |  |  |
|  | (0.07) | (0.07) |  |  |
| South 1923 | -0.558[c] | -0.399[c] | -0.645[c] |  |
|  | (0.08) | (0.08) | (0.09) |  |
| South 1929 | -0.758[c] | -0.589[c] | -0.851[c] |  |
|  | (0.08) | (0.08) | (0.10) |  |
| Constant | -0.352 | -0.544[b] | -0.183 | -0.700[b] |
|  | (0.26) | (0.24) | (0.31) | (0.33) |
| Observations | 327 | 327 | 279 | 183 |
| R-squared | 0.776 | 0.807 | 0.773 | 0.683 |
| Number of states | 48 | 48 | 48 | 48 |

*Notes:* Standard errors are in parentheses. [a] $p < 0.1$. [b] $p < 0.05$. [c] $p < 0.01$.

and commission variables, which were likely endogenous to unobserved factors that contributed to library development. Specifications 3 and 4 show estimates that allow for libraries with at least three thousand and one thousand volumes, respectively, which entails restricting the sample to those survey years with these volume counts.

In all four specifications, the demographic controls that are consistently statistically significant are the proportion foreign-born and the proportion over age fifty-nine. The effect of nativity is large. The proportion foreign-born is about .13 over the entire period and set of states, with standard deviation of about .10. A one-standard-deviation increase in proportion foreign-born, then, is associated with an increase in volumes per capita of about .12 (because a full one-unit increase in the explanatory variable increases the outcome by 1.19), which is more than a third of the full-sample standard deviation. The sizable positive impact of proportion foreign-born is the reverse of the effect of ethnic heterogeneity that Goldin and Katz find for secondary schooling, suggesting

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

JA2125

that the ideology of Americanization may have played a relatively more important role in the demand for public libraries than did social homogeneity or solidarity.

The proportion of the population over the age of fifty-nine has a fairly large negative impact. A one-standard-deviation increase is associated with a decrease in volumes per capita of about .05; the mechanism for such a finding is not clear, though perhaps the age composition is an effect of migration from rural homesteads to more urban places that are more likely to have larger libraries. The remaining demographic controls—proportion female, proportion black, and youth composition variables—do not generally have significant effects. It is likely that these variables do not change much from decade to decade within states, making it difficult to identify their impact on library development statistically.

The two urbanization coefficients are revealing: other things being equal, an increase in the proportion of the population residing in urban areas has a marginally significant negative impact on library development, whereas an increase in the proportion residing in larger towns (more than twenty-five thousand) has a positive and statistically significant impact, at least in those regressions that include libraries with over five thousand volumes (columns 1–2). The coefficient is .547 in column 1, indicating that a one-standard-deviation increase in the proportion living in cities (about .19) would lead to a roughly .10 increase in volumes per capita (.19 x .547). This pattern is consistent with the existence of a minimum scale threshold for the viability of a local public library. Certainly Carnegie, in deciding whether to fund a local community's request, took into account the town's population.

Unexpectedly, the coefficient on real per capita tax revenue is generally negative, although it is significantly different from zero in only two specifications. The effect of proportion of employment in manufacturing is insignificant in most specifications.

The coefficients on the year dummies indicate a significant positive time trend in library development outside the South, even after controlling for the variables included here. The interactions of the South and year dummies, with their clear negative time trend, reveal that the South was falling further behind the rest of the country in library development, even after controlling for demographics and urbanization.

Specification 2 adds the variables for state library associations and commissions to the specification in column 1. Again, these count the number of years in existence of the organization as of the library survey year. Both coefficients are positive and statistically significant. The effects are modest in magnitude. An additional ten years of exposure

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

JA2126

to a library commission increased volumes per capita by 0.04, about an eighth of a standard deviation, and the effect of associations was about twice that size. As noted, the existence of a library commission and association may be endogenous to local library development, so this coefficient cannot be assumed to reflect causation.

From table 1 it is apparent that the five-thousand-volume threshold for inclusion in the data misses a large number of small public libraries, particularly in the earlier years of our sample. To check the robustness of our results to this truncation, we ran the panel regressions for the entire sample excluding 1913 (table 3, column 3), which permits us to use a three-thousand-volume threshold, and for the period 1875–1903 (column 4), for which we can include all libraries with at least one thousand volumes. These estimates suggest that the basic results are very similar whether the one-thousand-, three-thousand-, or five-thousand-volume threshold is used. The only notable inconsistency is that the large-city effect disappears in the sample restricted to 1875–1903, which may indicate that the city scale effect became more important after the turn of the century or that there simply were too few larger cities in the data for earlier years to estimate their impact.

An alternative measure of public library development would be the count of libraries per capita rather than volumes per capita. Because there were presumably economies of scale in the provision of library services, many communities may have expanded those services simply by increasing the size and holdings of a single library. For this reason, counts of libraries per capita may be less indicative of access to library services. We replicated the regression specifications reported above using per capita libraries as the dependent variable. The results, not reported here, are largely consistent with the results using volumes per capita. Notably, the proportion foreign-born as well as a state's experience with library associations or commissions continue to have positive coefficients, although not always statistically significant in this case. The proportion of the population over fifty-nine has again a significant negative impact. The South again increasingly falls behind the rest of the country in public library development. The measure of real property tax revenue per capita has a significantly negative coefficient. It could be that as states became wealthier they devoted their resources to expanding the scale of existing libraries rather than building more libraries, or it could be that increases in average local tax revenue were correlated with income distribution across members of communities in a way that skews the results. This discrepancy warrants further inquiry.

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

## Conclusions

Public libraries are an enduring institutional legacy of the Progressive Era in the United States. Using data from detailed library surveys conducted by the US Bureau of Education, we have documented the pace of public library development between 1870 and 1930, a period of substantial growth and institutional change in local library services. Panel regressions using state-year data show that access to public library services, as measured by volumes per capita, was positively associated with the presence of immigrants, more towns and cities, and the presence of a state library commission or association.

A significant positive time trend in library development remains even after controlling for socioeconomic changes. This suggests more room for exploring how the rise in incomes of the late 1800s complemented a change in tastes toward more public expenditures on libraries. It may be that as books became less expensive, allowing more people to read fiction as a leisure activity, support for public libraries grew.

Finally, the factors captured by our explanatory variables do not explain the significant lag in public library development in the South relative to the rest of the country, a dubious distinction that echoes the region's lagging extension of primary and secondary education as well. It seems plausible that a major impediment to the development of public libraries in the heavily segregated South was fear that public funding of reading and access to information would shift the racial balance of power.[53] An important agenda for future research is to determine whether such fears were justified: Did access to public libraries change voting and political outcomes?

## Notes

1. Haynes McMullen, *American Libraries before 1876* (Westport, CT: Greenwood Press, 2000).

2. The survey years included here are 1875, 1885, 1891, 1896, 1900, 1903, 1908, 1913, 1923, and 1929. Data on public libraries with at least one thousand volumes were available only through 1903. Data on libraries with at least three thousand volumes were unavailable for 1913, so the plots interpolate a straight line between 1903 and 1923 for those series.

3. Claudia Goldin, "America's Graduation from High School: The Evolution and Spread of Secondary Schooling in the Twentieth Century," *Journal of Economic History* 58 (1998): 345–74.

4. Although it might be natural to view high school education as a precursor to demand for library services, the timing suggests that library development was coincident or perhaps even prior to the spread of secondary education. Indeed,

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

a case could be made for a causal role of libraries in the high school movement. Andrew Carnegie's library philanthropy, for example, quite plausibly extended the reach of the public high school movement. Theodore Jones observed that "in many towns, Carnegie libraries were the only large public buildings, and they became hubs of social activities like concerts, lectures, and meetings and did double duty as museums and community storehouses" (*Carnegie Libraries across America: A Public Legacy* [Washington, DC: Preservation Press and John Wiley, 1997], 17). It is not unimaginable that they also served as catalysts for high schools.

5. John Colson, "The Public Library Movement in Wisconsin" (PhD diss., University of Chicago, 1973); Samuel Swett Green, *The Public Library Movement in the United States, 1853–1893. From 1876, Reminiscences of the Writer,* reprint of 1913 work (Boston: Gregg Press, 1972); William S. Learned, *The American Public Library and the Diffusion of Knowledge* (New York: Harcourt, Brace & Co., 1924); Lowell Arthur Martin, *Enrichment: A History of the Public Library in the United States in the Twentieth Century* (Lanham, MD: Scarecrow Press, 1998); McMullen, *American Libraries*; Paul Sturges, "The Public Library and Reading by the Masses: Historical Perspectives on the USA and Britain 1850–1900," 60th IFLA General Conference, Conference Proceedings, 1994; C. Seymour Thompson, *Evolution of the American Public Library, 1653–1876* (Washington, DC: Scarecrow Press, 1950).

6. Robert W. Williams, "Sources of the Variability in Level of Public Library Development in the United States: A Comparative Analysis," *Library Research* 2, no. 2 (1980): 157–76; Robert V. Williams, "Public Library Development in the United States, 1850–1870: An Empirical Analysis," *Journal of Library History* 21, no. 1 (1986): 177–201.

7. McMullen, *American Libraries.*

8. Details of the data are available in a data appendix from the authors (mkevane.com/libraries-us.htm).

9. United States Bureau of Education, *Public Libraries in the U.S., Their History, Condition, and Management, Special Report* (Washington, DC: Government Printing Office, 1876), xviii.

10. Ibid.

11. Ibid., xix.

12. Although in some years the surveys asked whether the library's services were free or by subscription, and such information would be helpful in classifying libraries as public, a large number of libraries failed to respond to this question, and thus we cannot rely on the responses.

13. Indeed, the apparent differential between the three-thousand- and five-thousand-volume lines in figures 1 and 2 is exaggerated because data for the three-thousand-volume count are missing in 1913, so the plot draws a spuriously straight line between 1903 and 1923. Presumably, the plot for the five-thousand-volume threshold, with its acceleration after 1913, is more indicative of the actual pace of library development.

14. Arnold Borden, "The Sociological Beginnings of the Library Movement in America," *Library Quarterly* 1 (1931): 278–82; Jesse Hauk Shera, *Knowing Books and Men; Knowing Computers, Too* (Littleton, CO: Libraries Unlimited, 1973).

15. Robert Devore Leigh, *The Public Library in the United States: The General Report of the Public Library Inquiry* (New York: Columbia University Press, 1950); Shera, *Knowing Books and Men*; Lewis Steig, "Notes on the Origins of Public Libraries in California, 1850–1900," *Library Quarterly* 22 (1952): 263–69; Robert V.

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

JA2129

Williams, "Theoretical Issues and Constructs Underlying the Study of Library Development," *Libri* 34, no. 1 (1984): 1–16; Robert V. Williams, "The Public Library as the Dependent Variable: Historically Oriented Theories and Hypotheses of Public Library Development," *Journal of Library History* 16, no. 2 (1981): 329–41.

16. Gwladys Spencer, *The Chicago Public Library: Origins and Background* (Chicago: University of Chicago Press, 1943), 389.

17. McMullen, *American Libraries*, 59.

18. Carleton Joeckel, *The Government of the American Public Library* (Chicago: University of Chicago Press, 1935); Shera, *Knowing Books and Men*.

19. McMullen, *American Libraries*, 123.

20. Claxton Helms, "The Development of Library Services in Allegan County, Michigan," in *Contributions to Mid-West Library History*, ed. Thelma Eaton (Champaign: Illini Union Bookstore, 1964), 115.

21. Joeckel, *Government*, 79.

22. Ibid., 24.

23. George S. Bobinski, *Carnegie Libraries: Their History and Impact on American Public Library Development* (Chicago: American Library Association, 1969), 4.

24. Haynes McMullen, "The Distribution of Libraries throughout the United States," *Library Trends* 25 (1976): 23–53.

25. Thompson, *Evolution*; and Joeckel, *Government*, 13–14.

26. Colson, "The Public Library Movement"; Raymond Kilpela, "A Historical-Legalist Review of Indiana Library Legislation," *Library Occurent*, September 1964, 159–63.

27. Shannon Diane White, "The Development of the Statewide Tax-Supported Library System in Alabama: 1901–1974" (master's thesis, University of South Carolina, 1997).

28. Data on commission and association founding dates were derived from a variety of sources, including Bureau of Education reports, association and commission websites, and correspondence (see the data appendix, available from the authors).

29. Karen J. Blair, *The Clubwoman as Feminist: True Womanhood Redefined, 1868–1914* (New York: Holmes and Meier Publishers, 1980).

30. Elfrieda McCauley, "The New England Mill Girls: Feminine Influence in the Development of Public Libraries in New England" (PhD diss., Columbia University, 1971); Victoria Mussman, "Women and the Founding of Social Libraries in California, 1859–1910" (PhD diss., University of Southern California, 1982).

31. A. R. Gere, *Intimate Practices: Literacy and Cultural Work in U.S. Women's Clubs, 1880–1920* (Urbana: University of Illinois Press, 1997).

32. Paula Watson, "Carnegie Ladies, Lady Carnegies: Women and the Building of Libraries," *Libraries & Culture* 31, no. 1 (1996): 159–96.

33. Daniel Goldstein, "The Spirit of an Age: Iowa Public Libraries and Professional Librarians as Solutions to Society's Problems, 1890–1940," *Libraries & Culture* 38, no. 3 (2003): 214–35.

34. Lucy Deam Kortun, "Carnegie Library Development in California and the Architecture It Produced" (master's thesis, Sonoma State University, 1990), 1.

35. Daniel Akst, "Do Libraries Still Matter?," *Carnegie Reporter* 3, no. 2 (2005).

36. Green, *The Public Library Movement*.

37. James Wellard, *Book Selection: Its Principles and Practice* (London: Grafton & Co., 1937).

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

JA2130

38. John Joseph Wallis, "American Government Finance in the Long Run: 1790 to 1990," *Journal of Economic Perspectives* 14, no. 1 (2000): 61–82.

39. Figures derived from ibid., 65.

40. Joeckel (*Government*, 29) notes that the share of library operating expenses out of total municipal expenditures in American cities remained steady at about 1.3 percent between 1905 and 1930.

41. Goldin, "America's Graduation"; Peter Lindert, "The Rise of Social Spending, 1880–1930," *Explorations in Economic History* 31, no. 1 (1994): 1–37.

42. Claudia Goldin and Lawrence F. Katz, "Human Capital and Social Capital: The Rise of Secondary Schooling in America, 1910–1940," *Journal of Interdisciplinary History* 29, no. 4 (1999): 683–723.

43. Claudia Goldin and Lawrence F. Katz, "Mass Secondary Schooling and the State: The Role of State Compulsion in the High School Movement," in *Understanding Long-Run Economic Growth: Geography, Institutions, and the Knowledge Economy*, ed. Dora L. Costa and Naomi R. Lamoreaux (Chicago: University of Chicago Press, 2011), 275–310.

44. August William Steinhilber and Carl J. Sokolowski, *State Law on Compulsory Attendance* (Washington, DC: US Department of Health, Education and Welfare, Office of Education, 1966).

45. Plummer Alston Jones, Jr., *Libraries, Immigrants, and the American Experience* (Westport, CT: Greenwood Press, 1999); Elaine Fain, "Books for New Citizens: Public Libraries and Americanization Programs, 1900–1925," in *The Quest for Social Justice: The Morris Fromkin Memorial Lectures, 1970–1980*, ed. Ralph M. Aderman (Madison: University of Wisconsin Press, 1983), 255–76; Nelson R. Beck, "The Use of Library and Educational Facilities by Russian-Jewish Immigrants in New York City, 1880–1914: The Impact of Culture," *Journal of Library History* 12, no. 2 (1977): 128–49.

46. An example of empirical analysis finding negative effects of ethnic heterogeneity is Alberto Alesina, Reza Baqir, and William Easterly, "Public Goods and Ethnic Divisions," *Quarterly Journal of Economics* 114, no. 4 (1999): 1243–84.

47. Dora L. Costa and Matthew E. Kahn, "Civic Engagement and Community Heterogeneity: An Economist's Perspective," *Perspectives on Politics* 1, no. 1 (2003): 103–11.

48. Dee Garrison, *Apostles of Culture: The Public Librarian and American Society, 1876–1920* (New York: Free Press, 1979).

49. Martin, *Enrichment*; Sidney Ditzion, *Arsenals of a Democratic Culture* (Chicago: American Library Association, 1947).

50. Susan H. Swetman, "Pro-Carnegie Library Arguments and Contemporary Concerns in the Intermountain West," *Journal of the West* 30, no. 3 (1991): 63–68.

51. Goldin and Katz, "Human Capital."

52. A separate dummy variable for the South cannot be included because the region is already controlled for by the state fixed effects.

53. Patterson Toby Graham, *A Right to Read: Segregation and Civil Rights in Alabama's Public Libraries* (Tuscaloosa: University of Alabama Press, 2002); Cheryl Knott Malone, "Autonomy and Accommodation: Houston's Colored Carnegie Library, 1907–1922," *Libraries & Culture* 34, no. 2 (1999): 95–112.

This content downloaded from
128.103.147.149 on Mon, 13 Feb 2023 15:29:32 UTC
All use subject to https://about.jstor.org/terms

JA2131