# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

Nos. 23-1900, 23-2043

---

RONALD KOONS et al.,
*Plaintiffs-Appellees,*

v.

MATTHEW J. PLATKIN et al.,
*Defendants-Appellants*

---

AARON SIEGEL et al.,
*Plaintiffs-Appellees / Cross-Appellants,*

v.

MATTHEW J. PLATKIN et al.,
*Defendants-Appellants / Cross-Appellees*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(Nos. 22-cv-7463, 22-cv-7464 (RMB))

---

**JOINT APPENDIX**

**VOLUME VIII**

**JA2704 – JA3026**

---

MATTHEW J. PLATKIN
  *Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
  *Solicitor General*

ANGELA CAI
  *Deputy Solicitor General*

JEAN REILLY
  *Assistant Attorney General*

DAVID CHEN
VIVIANA HANLEY
SAMUEL RUBINSTEIN
  *Deputy Attorneys General*

Office of the New Jersey Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625-0080
(609) 414-5954
angela.cai@njoag.gov

*Attorneys for Defendants-Appellants
New Jersey Attorney General
Matthew J. Platkin and Superintendent of
New Jersey State Police Colonel
Patrick Callahan*

# JOINT APPENDIX
## TABLE OF CONTENTS

**VOLUME I**                                                    **JA Page**

Defendants' Notice of Appeal (ECF 126)[1] ...................................... JA1

*Siegel* Plaintiffs' Notice of Cross-Appeal (ECF 128)...................................... JA4

Order Granting In Part And Denying In Part Plaintiffs' Motions for Preliminary Injunction (ECF 125)............................................... JA6

Opinion Granting In Part And Denying In Part Plaintiffs' Motions for Preliminary Injunction (ECF 124)............................................... JA10

**VOLUME II**

*Koons* District Court docket sheet .................................................... JA245

*Koons* Complaint (ECF 1) ............................................................. JA264

*Siegel* Complaint (Case No. 22-cv-7463, ECF 1)............................................ JA286

Defendants' Expedited Motion to Consolidate (Case No. 22-cv-7463, ECF 7)............................................................................ JA345

*Siegel* Plaintiffs' Motion for Temporary Restraining Order And For A Preliminary Injunction (Case No. 22-cv-7463, ECF 8)............................ JA349

Declaration of Aaron Siegel (Ex. 2) ........................................ JA352

Declaration of Jason Cook (Ex. 3)............................................ JA360

Declaration of Joseph DeLuca (Ex. 4)....................................... JA368

Declaration of Nicole Cuozzo (Ex. 5) ...................................... JA374

Declaration of Timothy Varga (Ex. 6)...................................... JA377

---

[1] ECF numbers are to the *Koons* docket (Case No. 1:22-cv-07464) unless otherwise indicated.

Declaration of Christopher Stamos (Ex. 7) ................................................. JA382

Declaration of Kim Henry (Ex. 8) ............................................................ JA385

Declaration of Scott Bach (Ex. 9) ............................................................ JA388

Declaration of Daniel Schmutter (Ex. 10) ................................................ JA391

*Koons* Plaintiffs' Motion for Order to Show Cause, Motion for
Temporary Restraining Order, Motion for Preliminary Injunction
(ECF 8) ................................................................................................ JA438

Declaration of Ronald Koons (ECF 10) .................................................... JA441

Declaration of Nicholas Gaudio (ECF 11) ................................................ JA446

Declaration of Jeffrey Muller (ECF 12) .................................................... JA455

*Koons* Show Cause Order (ECF 13) ......................................................... JA462

## **VOLUME III**

Opinion on *Koons* Plaintiffs' Motion for Temporary Restraining Order
(ECF 34) ............................................................................................... JA465

Order re: *Koons* Plaintiffs' Motion for Temporary Restraining Order
(ECF 35) ............................................................................................... JA525

Transcript of *Koons* TRO Motion Hearing (ECF 37) ................................ JA527

Legislators' Motion to Intervene (ECF 47) ............................................... JA625

Proposed Intervention Pleading (Ex. A) .................................................. JA628

L. 2022, c. 131 (Ex. B) ........................................................................... JA655

Summary of legislative history of A4769 (Ex. C) ................................... JA682

A4769 – as introduced (Ex. D) ............................................................... JA687

Report of the Assembly Judiciary Committee (Ex. E) .............................. JA720

Report of the Assembly Appropriations Committee (Ex. F) ..................... JA727

Report of the Assembly Oversight Committee (Ex. G) ............................ JA737

Report of the Senate Budget and Appropriations Committee (Ex. H) ....... JA745

*Siegel* Consolidation Order (ECF 50) ............................................................ JA753

Opinion on *Siegel* Plaintiffs' Motion for Temporary Restraining Order
(ECF 51) ................................................................................................... JA759

Order re: *Siegel* Plaintiffs' Motion for Temporary Restraining Order
(ECF 52) ................................................................................................... JA805

Order granting Legislators' Motion to Intervene (ECF 53) ............................ JA807

*Siegel* Plaintiffs' Letter seeking clarification of TRO Order (ECF 54) ............ JA810

Transcript of Siegel TRO Motion Hearing (ECF 56) ...................................... JA812

Supplemental Declaration of Aaron Siegel (ECF 64) ..................................... JA897

Supplemental Declaration of Jason Cook (ECF 65) ........................................ JA900

Supplemental Declaration of Joseph DeLuca (ECF 66) .................................. JA903

Supplemental Declaration of Timothy Varga (ECF 67) .................................. JA904

Declaration of Ria Jairam (ECF 68) ................................................................ JA907

*Koons* Amended Complaint (ECF 69) ............................................................ JA910

Declaration of Gil Tal (ECF 70) ..................................................................... JA933

Supplemental Declaration of Nicholas Gaudio (ECF 71) ............................... JA943

Stipulation & Order dismissing county prosecutors as defendants
(ECF 73) ................................................................................................... JA947

## VOLUME IV

Certification of Joseph R. Klett (ECF 76) ...................................................... JA950

1722 NJ Law "… against Carrying of Guns … by Persons not
Qualified" (Ex. A) ................................................................................. JA958

1751 Supplement to 1722 NJ Law "… against Carrying of Guns …
by Persons not Qualified" (Ex. B) ......................................................... JA964

1769 NJ Law "… for the more effectual Preservation of Deer …" (Ex. C) ................................................................................ JA974

1771 NJ Law "… to prevent trespassing with Guns" (Ex. D).................. JA980

NJ State Constitution of 1776 (Ex. E) ........................................ JA986

1771 NJ Law "… to prevent trespassing with Guns" (Ex. F) .................. JA997

1753 Pennsylvania Gazette extract (Ex. G)................................... JA1005

1846 NJ Law Revision "… to prevent trespassing with Guns" (original enrolled law) (Ex. H) ........................................... JA1008

1846 NJ Law Revision "… to prevent trespassing with Guns" (as printed in Revised Statutes of 1846) (Ex. I) .................... JA1026

1852 NJ Supplement (Ex. J) .................................................. JA1032

First 1859 NJ Supplement (Ex. K) ........................................... JA1036

Second 1859 NJ Supplement (Ex. L) .......................................... JA1039

1866 NJ Supplement (Ex. M) .................................................. JA1043

1867 NJ Supplement (Ex. N)................................................... JA1048

1873 NJ Supplement (Ex. O)................................................... JA1051

1846 NJ Law relative to "Carrying guns, where prohibited" (as printed in Revised Statutes of 1877) (Ex. P) ................... JA1054

1846 NJ Law referred to as "An act to Prevent Trespassing with Guns" (as included in 1880 synopsis of laws) (Ex. Q) ....... JA1060

1895 NJ Law "to prevent trespassing with guns" (Ex. R)..................... JA1067

1911 NJ Supplement (Ex. S) .................................................. JA1075

1928 Repeal of 1846 NJ Law (Ex. T).......................................... JA1081

N.J. Stat. Ann. § 2A:63-1 (Ex. U) ........................................... JA1096

Certification of Sarah Adelman (ECF 77) ..................................... JA1099

Certification of George Fedorczyk (ECF 78) .................................................... JA1107

Certification of Bonny Fraser (ECF 79) ............................................................ JA1114

Certification of Steven Gorelick (ECF 80) ...................................................... JA1122

Certification of Robin Madden (ECF 81) ......................................................... JA1127

Certification of Judith A. Nason (ECF 82) ...................................................... JA1132

Certification of David L. Rebuck (ECF 83) ..................................................... JA1137

Declaration of Hendrik Hartog (ECF 84) ........................................................ JA1143

    Resume of Hendrik Hartog (Ex. A) ........................................................ JA1153

    1722 NJ Statute: "An Act to prevent killing of deer out of season,
        and against carrying of guns and hunting by persons not
        qualified." (Ex. B) ....................................................................... JA1163

    1769 NJ Statute: "An Act for the more effectual preservation of
        deer in this Colony." (Ex. C) ...................................................... JA1167

    1771 NJ Statute: "An Act for the preservation of deer and other
        game, and to prevent trespassing with guns." (Ex. D) ........................ JA1172

    1846 NJ Statute: "An Act for the preservation of deer and other
        game, and to prevent trespassing with guns." (Ex. E) ........................ JA1180

    Lucius Elmer's 1868 Digest of the Laws of New Jersey 362 (4th ed.,
        Newark, 1868) (Ex. F) ................................................................. JA1186

    1895 NJ Public Law, ch. § 148 (Ex. G.) ................................................ JA1194

**VOLUME V**

Declaration of Brennan Gardner Rivas (ECF 85) ............................................ JA1196

    Curriculum Vitae of Brennan Gardner Rivas (Ex. A) ............................... JA1219

    2 Edw. 3, c. 3 (1328) (Eng.) (Ex. B) ..................................................... JA1223

    25 Edw. 3, st. 5, c. 2, § 13 (1350) (Eng.) (Ex. C) .................................. JA1224

    1786 Va. Laws 33, ch. 21 (Ex. D) ......................................................... JA1227

1835 Mass. Acts 750 (Ex. E) ...................................................................... JA1228

Francois Xavier Martin, A Collection of Statutes of the Parliament
    of England in Force in the State of North Carolina, 60-61
    (Newbern 1792) (Ex. F)........................................................................ JA1232

1821 Me. Laws 285, ch. 76, § 1 (Ex. G) ................................................... JA1235

1813 La. Acts 172, § 1 (Ex. H)................................................................... JA1242

Revised Statutes of the State of Arkansas, Adopted at the October
    Session of the General Assembly of Said State, A.D. 1837
    (Ex. I) ..................................................................................................... JA1247

1870 Tex. Gen. Laws 63, ch. 46, § 1 (Ex. J) ............................................ JA1249

1871 Tex. Gen. Laws 25, ch. 34 § 1 (Ex. K)............................................. JA1252

Penal Code of the State of Texas, (1879), Title X, Offenses Against
    the Public Peace, Chapter 4, Unlawfully Carrying Arms (Ex. L)........ JA1255

Ch. 22, 1869 Tenn. Pub. Acts 23 (36th Assembly, 1st Sess.) §2
    (Ex. M)................................................................................................... JA1257

Act No. 285, 1870 Ga. Laws 421 (Ex. N) ................................................. JA1260

Revised Statutes of the State of Missouri (1879), ch.24, §1274
    (Ex. O) ................................................................................................... JA1263

1890 Okla. Stat. 495-96 (Ex. P)................................................................. JA1266

Annotated Code of the General Statute Laws of the State of
    Mississippi (1892), "Crimes and Misdemeanors," §1030 (Ex. Q) ...... JA1269

Laws of Vermont, Special Session (1891), No. 85, §2 (Ex. R) ................. JA1272

1870 La. Acts 159-60, § 73 (Ex. S) ........................................................... JA1275

George Washington Paschal, A Digest of the Laws of Texas, 3rd ed.
    (1873) II: 1317-1318 (Ex. T)................................................................ JA1293

John Prentiss Poe, The Maryland Code: Public Local Laws,
    Adopted by the General Assembly of Maryland March 14, 1888
    (Vol. 2, 1888), 1457 (Ex. U) ................................................................ JA1296

1886 Md. Laws 315, ch. 189 §1 (Ex. V) .................................................. JA1298

1877 Va. Acts 305, Offenses Against The Peace, § 21 (Ex. W) ............... JA1299

Oscar F. Greene, Revised Ordinances of the City of Boulder (1899), 157 (Ex. X) ...................................................................................... JA1303

"An Ordinance," San Antonio Express (San Antonio, Texas), December 23, 1870 (Ex. Y).................................................................. JA1304

Declaration of Patrick J. Charles (ECF 86) ...................................................... JA1305

Curriculum Vitae of Patrick J. Charles (Ex. 1)........................................... JA1319

2 Edw. 3, c. 3 (1328) (Eng.) (Ex. 2) .......................................................... JA1326

Royal Proclamation as to the Wearing of Arms in the City, and at Westminster; and as to Playing at Games in the Palace at Westminster, Memorials of London and Life 268-69 (H.T. Riley ed., 1868) (Ex. 3).................................................................. JA1327

John Carpenter, Liber Albus: The White Book of the City of London at 335 (Henry Thomas Riley ed., 1861) (Ex. 4) ..................... JA1330

4 Hen 4, c. 29 (1403) (Eng.) (Ex. 5)........................................................... JA1332

An Act to Prevent Routs, Riots, and Tumultuous Assemblies, and the Evil Consequences Thereof, September Session, Chapter VIII (Mass. 1786) (Ex. 6) ....................................................................... JA1333

An Act for the More Speedy and Effectual Suppression of Tumults and Insurrections in the Commonwealth, January Session, Chapter IX (Mass. 1787) (Ex. 7) ............................................................ JA1335

An Act to Prevent Routs, Riots, and Tumultuous Assemblies (N.J. 1797) (Ex. 8)................................................................................. JA1339

An Act to Prevent Hunting with Fire-Arms in the City of New-York, and the Liberties Thereof (NY 1763) (Ex. 9)............................. JA1341

An Act Against Riots and Rioters (Pa. 1705) (Ex. 10) ............................. JA1342

William Rawle, A View of the Constitution of the United States 126 (2d ed., 1829) (Ex. 11)....................................................................... JA1343

3 Calendar of Close Rolls, Richard II, 1385-1389, at 399-400 (May 16, 1388, Westminster) (H.C. Maxwell-Lyte ed., 1914) (Ex. 12) ....... JA1345

1 Calendar of Close Rolls, Richard II, 1377-1381, at 34 (December 1, 1377, Westminster) (H.C. Maxwell-Lyte ed., 1914) (Ex. 13) ......... JA1347

1647 Md. Laws 216 (Ex. 14) ................................................................. JA1348

1650 Md. Laws 273 (Ex. 15) ................................................................ JA1349

Chapter XVII: Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, Etc., May 22, 1890, reprinted in General Ordinances of the Town of Columbia, In Boone County, Missouri 34, 35 (Lewis M. Switzler ed., 1890) (Ex. 16) .................... JA1350

1877 Mo. Laws 158, 166 (Ex. 17) ....................................................... JA1352

Ordinance No. 577: An Ordinance Defining What Shall constitute Misdemeanors or Offenses Against the City of Webb City, and Providing Penalties Therefor, May 15, 1905, reprinted in Revised Ordinances of the City of Webb City, Missouri, 1905, at 99-100 (1905) (Ex. 18) ..................................................... JA1354

An Ordinance in Relation to Carrying Deadly Weapons, July 17, 1894, The Revised Ordinances of the City of Huntsville, Missouri of 1894, at 58-59 (1894) (Ex. 19) ........................................ JA1356

1874 Mo. Laws 43 (Ex. 20) ................................................................. JA1361

1875 Mo. Laws 50 (Ex. 21) ................................................................. JA1362

1883 Mo. Laws 76 (Ex. 22) ................................................................. JA1364

*State v. Reando* (Mo. 1878) (Ex. 23) ................................................... JA1365

Ordinance No. 76: An Ordinance Prohibiting Deadly Weapons, July 1, 1887, reprinted in Stockton Review and Rooks County Record (KS), July 1, 1887 (Ex. 24) .................................................... JA1366

Public Statutes of the State of Tennessee Since the Year 1858, at 108 (James H. Shankland ed., 1871) (Ex. 25) .................................... JA1368

1870 Tex. Gen. Laws 63 (Ex. 26) ........................................................ JA1369

1870 Ga. Laws 421 (Ex. 27) ..................................................... JA1370

1889 Ariz. Sess. Laws 16 (Ex. 28) ........................................... JA1371

1890 Okla. Stat. 495 (Ex. 29) ................................................... JA1373

A Digest of the Laws and Ordinances for the Government of the
    City of Harrisburg, Pennsylvania in Force January 1, A.D. 1906,
    at 557-58 (1906) (Ex. 30) ................................................... JA1375

The Revised Ordinances of Provo City, Utah 96 (1893) (Ex. 31) ............. JA1377

The Revised Ordinances of Payson City, Utah 84 (1893) (Ex. 32) ........... JA1378

The Revised Ordinances of Tooele City, Utah 87 (1893) (Ex. 33)............ JA1379

An Ordinance to Prohibit Intoxication, Breach of Peace, Carrying
    Deadly Weapons, the Use of Obscene Language, the Discharge
    of Fire-Arms, and to Close Places of Amusement on Sunday in
    the City of Wallace, Kansas, Jan. 31, 1889, reprinted in Wallace
    County Register (KS), Feb. 9, 1889, at 2 (Ex. 34) ............................... JA1381

Ordinance No. 97: Ordinance Related to Carrying Deadly Weapons,
    May 17, 1882, reprinted in Burlington Democrat (KS), May 26,
    1882, at 2 (Ex. 35) ............................................................... JA1383

Miscellaneous Ordinance, Jun. 24, 1871, reprinted in Abilene
    Weekly Chronicle (KS), Jun. 29, 1871, at 3 (Ex. 36) ......................... JA1385

Declaration of Peter Kochenburger (ECF 87) ................................... JA1387

Curriculum Vitae of Peter Kochenburger (Ex. A)...................... JA1401

Declaration of Angela Cai and Exhibits Volume I (ECF 88)......................... JA1418

P.L. 2022 ch. 131, A4769/S3124, An Act concerning the sale and
    possession of firearms and supplementing and amending
    various parts of the statutory law (Ex. 1) ............................ JA1431

Compilation of Order, D.E. 41, *Christian v. Nigrelli*, No. 22-2987
    (2d Cir. Dec. 12, 2022); Order, D.E. 75, *Antonyuk v. Hochul*,
    No. 22-2908 (2d Cir. Dec. 7, 2022); Order, D.E. 53, *Hardaway
    v. Nigrelli*, No. 22-2933 (2d Cir. Dec. 7, 2022) (Ex. 2) ...................... JA1470

Transcript of Preliminary Injunction Hearing, Corbett v. Hochul,
    1:22-cv-5867-LGS (S.D.N.Y. Nov. 29, 2022) (Ex. 3) ......................... JA1473

63 Proceedings and Acts of the Maryland General Assembly 338,
    § 5 (June 15-July 3, 1773) (Ex. 4) ....................................... JA1504

1870 Tex. Gen. Laws 63 (Ex. 5)................................................ JA1505

1786 Va. Laws 25 (Ex. 6) ..................................................... JA1508

Gen. Digest of the Ordinances & Res. of the Corp. of New Orleans
    371 (1831) (Ex. 7) ....................................................... JA1509

1869-70 Tenn. Pub. Acts 23 (Ex. 8) ........................................... JA1510

Art. 320, Tex. Act of April 12, 1871 (Ex. 9) ................................. JA1513

Mo. Rev. Stat. 1879, at 224 (§ 1274) (Ex. 10) ................................ JA1515

1859 Conn. Acts 62, ch. 82, § 5 (Ex. 11) .................................... JA1517

1867 Kans. Sess. Laws 25 (Ex. 12) ........................................... JA1521

1771 N.J. Laws 344, §1 (Ex. 13) ............................................. JA1523

1865 La. Extra Acts 14, No. 10 § 1 (Ex. 14) ................................. JA1531

1876 Iowa Acts 142, ch. 148, § 1 (Ex. 15) ................................... JA1537

1929 Iowa Acts 90, § 30 (Ex. 16) ............................................ JA1540

1919 Me. Laws 193 (Ex. 17) .................................................. JA1543

Ark. Rev. Stat. § 13, p. 280 (1838) (Ex. 18)................................. JA1548

1839 Ala. Acts no. 77, § 1 (Ex. 19) ......................................... JA1550

1821 Tenn. Acts ch. 13, § 1 (Ex. 20) ........................................ JA1553

Ian Ayres & Spurthi Jonnalagadda, Guests with Guns: Public
    Support for "No Carry" Defaults on Private Land, 48 J. L.
    Medicine & Ethics 183, Table A4 (2020) (Ex. 21) ......................... JA1556

1873 Ga. Code 818, § 4528 (Ex. 22) ......................................... JA1591

Fourth Annual Report of the Board of Commissioners of the Central
 Park 106 (1861) (Ex. 23) ...................................................................... JA1593

Acts of Assembly Relating to Fairmount Park 18 (1870) (Ex. 24) ............ JA1594

Michael John Sullivan, The Revised Ordinance of the City of St.
 Louis, Together with the Constitution of the United States,
 Constitution of the State of Missouri, the Scheme for the
 Separation of the Governments of the City and County of St.
 Louis, the Charter of the City, and a Digest of the Laws
 Applicable to the City 635 (1881), § 3 (Ex. 25) .................................... JA1595

Egbert Jamieson and Francis Adams, The Municipal Code of
 Chicago, Comprising the Laws of Illinois Relating to the City of
 Chicago and the Ordinances of the City Council, Codified and
 Revised 391 (1881). Art XLIII, § 1690 (Ex. 26) ................................. JA1596

Annual Reports of the City Officers and City Boards of the City of
 Saint Paul 689 (1889) (Ex. 27) ............................................................. JA1599

W.W. Thompson, A Digest of the Acts of Assembly Relating To,
 and the General Ordinances of the City of Pittsburgh, From
 1804 to Jan. 1, 1897 at 496 (2d Ed. 1897) (Ex. 28) ............................ JA1601

Excerpt from William Blackstone, Commentaries on the Laws of
 England, 3d. (10th ed. 1787) (Ex. 29) ................................................... JA1603

Excerpt from William Griffith, A Treatise on the Jurisdiction and
 Proceedings of Justices of the Peace in Civil Suits in New
 Jersey (1813) (Ex. 30) .......................................................................... JA1612

Excerpt from John Locke, Second Treatise of Government (1690)
 (Ex. 31) ................................................................................................. JA1625

1715 Md. Laws, ch. 26 § 7, as supplemented by 1766 Md. Laws
 ch. 6, at 90 (Ex. 32) ............................................................................. JA1630

1721 Pa. Act ch. 426 § 3, printed in Mitchell & Flanders, The
 Statutes at Large of Pa. 1682 to 1801, vol.2, at 255 (Ex. 33) .............. JA1634

1763 N.Y. Law ch. 1233 §1, printed in Laws of N.Y., 1691 to 1771,
 vol. 2, at 442 (Ex. 34) .......................................................................... JA1639

1867 Tex. Act Vol, 20, p. 90, at art. 6510, printed in Paschal, A
    Digest of the Laws of Tex. Ann., vol. 2, at 1321 (Ex. 35) ................... JA1643

1893 Ore. Act S.B. 15, § 1, at 79 (Ex. 36) ................................................ JA1647

La. R.S. 821, § 1809, printed in R.H. Marr, Ann. Rev. Stat. La., vol.
    1, at 600 (1915) (Ex. 37) ........................................................ JA1658

1870 Tenn. Acts. ch. 13 (Ex. 38) ............................................................ JA1664

1996 La. Sess. Law. Serv. 1st Ex. Sess. Act 4 (S.B.2), R.S.
    40.1379.3(O) (Ex. 39) ............................................................ JA1668

Bill 3730, 1996 S.C. Assemb., Rev. to § 23-31-210(M)(10) (Ex. 40) ....... JA1674

29Excerpt from 1564 Stat. King Henry III (Ex. 41) ................................ JA1687

Wingate, An Exact Abridgement of All Statutes In Force & Use
    From The Beginning Of Magna Carta Until 1641 (1666), at 591
    at § 9 (Ex. 42) .................................................................... JA1690

1776 Del. Const. art. 28 (Ex. 43) ............................................................ JA1693

Excerpts from Benjamin Vaugahn Abbott, Judge and Jury: A
    Popular Explanation of Leading Topics in the Law of the Land
    (1880) (Ex. 44) .................................................................... JA1696

1874 Mo. Laws at 43, s. 1 (Ex. 45) ........................................................ JA1712

The Norman Transcript, (Norman, Okla. Terr), Vol. 2, No. 5, Ed. 1
    (Nov. 22, 1890) (Ex. 46) ........................................................ JA1715

The Missouri Republican, (St. Louis, Mo.) (Nov. 20, 1872) (Ex. 47) ....... JA1717

The Moniteau Journal (California, Mo.) (Oct. 3, 1872) (Ex. 48) .............. JA1718

**VOLUME VI**

Collected Venue Policies, NJ (Ex. 49) .................................................... JA1719

Excerpts from R. Rosenzweig & E. Blackmar, *The Park And The*
    *People: A History Of Central Park* (Cornell Univ. Press 1992)
    (Ex. 50) .............................................................................. JA1790

Declaration of Angela Cai and Exhibits Volume II (ECF 89)........................... JA1818

1789 Mass. Acts ch.28, at 438 (Ex. 51)..................................................... JA1831

1895 Mich. No. 436 Sec. 44, at 596 (Ex. 52) ............................................ JA1834

1905 Minn. 620, Sec. 53 (Ex. 53).............................................................. JA1843

1917 Wisc. Ch. 668, at 1243 Sec. 29.57(4) (Ex. 54)................................... JA1872

1921 N.C. Public Laws & Res. ch. 6 § 3, at 54 (Ex. 55)............................. JA1929

1937 N.J. Rev. Stat. 32:14-13.1(8) (Ex. 56)............................................... JA1932

1875 Laws & Ord. Governing Village of Hyde Park at 310, § 6 (Ex.
57) .................................................................................................... JA1935

1883 Rev. Ord. of the City of Danville, ch.19 § 4, at 83 (Ex. 58) ............. JA1941

Tower Grove Park of the City of St. Louis 117 (1883) (Ex. 59)................ JA1945

Rev. Ordinances of Salt Lake City 248, ch. 27 § 6 (1888) (Ex. 60) .......... JA1949

Laws & Ordinances for the Gov't of the Mun. Corp. of the City of
Williamsport, Pa. 141 (1891) (Ex. 61) ................................................. JA1953

Park Ordinances, Springfield, Mass. (1891) (Ex. 62) ............................... JA1964

Compiled Ordinances of the City of Grand Rapids 163, § 432
(1907) (enacted 1891, amended 1892 & 1897) (Ex. 63)....................... JA1965

3rd Ann. Rep. of the Park Comm'rs of the City of Lynn 23 (1891)
(Ex. 64) ............................................................................................. JA1970

Laws & Ordinances of the City of Peoria, Illinois 667 (1892) (Ex.
65)...................................................................................................... JA1973

Mun. Code of the City of Spokane, Wash. 123 (1903) (enacted
1892) (Ex. 66)..................................................................................... JA1977

Charter of the City of Wilmington, Rules and Regulations of the
Board of Park Commissioners, Part VII, § 7 (1893) (Ex. 67).............. JA1982

Rev. Ordinances of the City of Canton, Ill. 240 (1895) (Ex. 68).............. JA1984

Gen. Ordinances of the City of Indianapolis 648, § 1971 (1904)
(enacted 1896) (Ex. 69) ........................................................ JA1989

Digest of the Acts of Assembly Relating to & the Gen. Ordinances
of the City of Pittsburgh 496 (1897) (enacted 1893) (Ex. 70) ............ JA1995

Digest of the Laws & Ordinances for the Gov't of the Mun. Corp. of
the City of Reading, PA 240 (1897) (Ex. 71)...................................... JA2001

Rev. Ordinances of the City of Boulder, CO 157 (1899) (Ex. 72)............. JA2002

General Municipal Ordinances of the City of Oakland, Cal.,
Addendum at 15 (1909) (Ex. 73)........................................... JA2003

The Code of City of Birmingham, Alabama 662 (1917) (Ex. 74) ............ JA2004

Firearms Regulations in the National Parks, 1897-1936 (NPS 2008)
(Ex. 75) ................................................................................. JA2008

Sen Yuan Wu, N.J. Pop. 1790 to 2010, Div. Labor Market &
Demographic Rsch. (Dec. 2010) (Ex. 76) ............................... JA2083

2021 Population Density: N.J. Counties, U.S. Census Bureau, Pop.
Div. (Apr. 2022), prepared by N.J. Dept. Labor & Workforce
Dev't (Ex. 77) ...................................................................... JA2086

1874 Mo. Laws 43 (§ 1) (Ex. 78) ............................................... JA2087

1883 Mo. Laws 76 (§ 1) (Ex. 79) ............................................... JA2090

1889 Ariz. Sess. Laws 17 (§ 3) (Ex. 80)...................................... JA2093

1890 Okla. Sess. Laws 496 (§ 7) (Ex. 81).................................... JA2096

1903 Mont. Laws. 49-50 (§ 3) (Ex. 82)....................................... JA2099

M. Kevane & W. Sundstrom, Development of Public Libraries in
the U.S., 1870-1930, Information & Culture, Vol 49, no. 2
(2014) (Ex. 83) ..................................................................... JA2103

## VOLUME VII

Pop. of Mass. by Counties & Minor Civil Divs., Census Bulletin
(Nov. 8, 1990) (Ex. 84)........................................................... JA2132

1746 N.J. Laws ch. 102 (Ex. 85) ................................................................. JA2139

1797 N.J. Laws (R.S. 572), at 367 (Ex. 86)............................................... JA2144

1874 N.J. Laws (P.L. 1871, p.109) (Ex. 87)................................................ JA2149

G. Fenich, A Chronology of (Legal) Gaming in the U.S., Gaming
    Rsch & Rev. J, vol.3, Iss.2 (1996) (Ex. 88)....................................... JA2151

Report & Recommendations of the Governor's Advisory
    Commission on Gambling, Jun. 30, 1998 (Ex. 89) ............................. JA2165

Port Authority of NY & NJ, Dec. 2021 Traffic Report, Aviation
    Dep't, https://www.panynj.gov/airports/en/statistics-general-
    info/Monthly_Airport_Activities.html (Ex. 90).................................. JA2447

Caroline Norris, A History of Madness: Four Venerable Virginia
    Lunatic Asylums, Virginia Magazine of History & Biography,
    Vol. 125, Issue 2 (2017) (Ex. 91) ....................................................... JA2450

1776 N.C. Sess. Laws 168 (Ex. 92)............................................................ JA2478

1800 Ga. Laws 428 (Ex. 93)........................................................................ JA2479

1837 Md. Acts 108 (Ex. 94) ........................................................................ JA2481

1868 Oh. Supp. Rev. Stat 13 (Ex. 95) ....................................................... JA2484

1872 Wisc. Rev. Stat 1960 (Ex. 96) ........................................................... JA2486

1872 Conn. Acts 108 (Ex. 97) ..................................................................... JA2489

1872 Or. Acts 26 (Ex. 98)............................................................................ JA2491

1873 S.C. Rev. Stat. 404 (Ex. 99)............................................................... JA2493

1887 W.Va. Code, ch. 148, § 7 (Ex. 100) ................................................. JA2495

Declaration of Angela Cai and Exhibits Volume III (ECF 90) ....................... JA2499

1881 Kan. Sess. Laws 92, § 23 (Ex. 101)................................................... JA2512

1875 Ark. Acts 156 (Ex. 102)...................................................................... JA2514

1847 Va. Laws 129 (Ex. 103)...................................................................... JA2516

1868 W. Va. Code 153 (Ex. 104) ............................................................... JA2523

1872 Portland Ord. No. 1108 (Ex. 105) .................................................... JA2526

1813 Ky. Acts 10 (Ex. 106) ........................................................................ JA2528

1813 La. Acts 172 (Ex. 107) ....................................................................... JA2532

1819 Ind. Acts 39 (Ex. 108) ....................................................................... JA2536

1838 Va. Acts 76 (Ex. 109) ........................................................................ JA2538

1859 Ohio Acts 56 (Ex. 110) ..................................................................... JA2541

1861 Ga. Laws 859 (Ex. 111) ..................................................................... JA2544

1835 Mass. Rev. Stat., ch. 134, § 16 (Ex. 112) ...................................... JA2546

1838 Terr. of Wis. Stat. § 16 (Ex. 113) .................................................... JA2548

Me. Rev. Stat., ch. 169, § 16 (1840) (Ex. 114) ...................................... JA2550

Mich. Rev. Stat., ch. 162, § 16 (1846) (Ex. 115) ................................... JA2552

Excerpts from M. Dalton, The Country Justice (1690) (Ex. 116) .............. JA2554

Terr. of Minn. Rev. Stat., ch. 112, § 18 (Ex. 117) .................................. JA2560

1854 Ore. Stat. ch. 16, § 17 (Ex. 118) ...................................................... JA2562

1857 D.C. Rev. Code ch. 141, § 16 (Ex. 119) .......................................... JA2564

1860 Pa. Laws p. 432, § 6; § 8 (Ex. 120) .................................................. JA2566

1844 Miss. Law p. 182, Art. 16, § 1, in Anderson Hutchinson, Code
    of Mississippi, from 1798 to 1848, 182 (1848) (Ex. 121) .................... JA2568

1856-1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled
    "Revenue," ch. 34, § 23, pt. 4 (Ex. 122) .............................................. JA2570

1866 Ga. Laws p. 27-28, Title VI, No. 41 (Ex. 123) ................................. JA2572

Rev. Code of Alabama, p. 169, ch. 3, § 10 (1867) (Ex. 124) .................... JA2575

1867 Miss. Laws 327-28, An Act To Tax Guns And Pistols in The County Of Washington, ch. 249, § 1 (Ex. 125)....................................JA2577

George W. Hess, Revised Ordinances of the City of Evanston, 131-132 (1893) (Ex. 126) ............................................................JA2580

1895 Neb. Laws 210, Laws of Nebraska Relating to the City of Lincoln, Art. XVI, § 6 (Ex. 127) ...............................................JA2582

1902-04 Va. Acts 155-157, An Act to Raise Revenue for Support of the Government and Public Free Schools, sched. B, § 6, Tangible Personal Property, Eighteenth (Ex. 128)..............................JA2584

Orville Park, Park's Annotated Code of the State of Georgia 1914, Penal Code, Article 3, Carrying pistols without license, § 348(a)-(d) (Ex. 129)..............................................................JA2587

Ohio Law, p. 633, §§ 24-25 (1884) (Ex. 130)..........................................JA2590

Mass. Law, p. 479-484, ch. 22, §§ 1-10 (1776) (Ex. 131) ........................JA2592

1777 Pa. Laws 110-113 (Ex. 132) ...........................................................JA2598

Va. Act of May 5, 1777, ch. 3 (Ex. 133) .................................................JA2604

Excerpt from Bernard Schwartz, The Bill of Rights: A Documentary History, Vol, 2, at 662 (1971) (Ex. 134) ......................JA2608

Excerpt from Debates & Proc. in the Convention of the Commonwealth of Mass. Held in the Year 1788 (1856) (Ex. 135)................................................................................JA2616

Charles C. Branas, SeungHoon Han, and Douglas J. Wiebe, Alcohol Use and Firearm Violence, 38 Epidemiologic Rev. 32, 40-43 (2016) (Ex. 136) ................................................................JA2618

Jonathan Jay, Alcohol Outlets and Firearm Violence: a Place-Based Case–Control Study Using Satellite Imagery and Machine Learning, Inj. Prev. 61, 64 (2019) (Ex. 137)........................................JA2632

Pamela J. Trangenstein et al., Outlet Type, Access to Alcohol, and Violent Crime, 42 Alcohol Clin. Exp. Re. 2234, 2241 (2018) (Ex. 138) ...............................................................................JA2638

Matthew Miller et al., 'Road rage' in Arizona: Armed and
   Dangerous, 34 Accident Analysis and Prevention, 807, 811
   (2002) (Ex. 139) ..................................................................... JA2650

Arlin J. Benjamin Jr., Sven Kepes, & Brad. J. Bushman, Effects of
   Weapons on Aggressive Thoughts, Angry Feelings, Hostile
   Appraisals, and Aggressive Behavior: A Meta-Analytic Review
   of the Weapons Effect Literature, 22 Personality & Social
   Psych. R. 347, 359 (2018) (Ex. 140) ...................................... JA2658

David Hemenway, Chloe Shawah, & Elizabeth Lites, Defensive
   gun use: What can we learn from news reports?, 9 Injury
   Epidemiology 19, 27 (2022) (Ex. 141).................................... JA2689

David Hemenway, Deborah Azrael, & Matthew Miller, Whose guns
   are stolen? The epidemiology of Gun theft victims, 4 Injury
   Epidemiology 11, 14 (2017) (Ex. 142).................................... JA2699

## VOLUME VIII

John J. Donohue et al., More guns, more unintended consequences:
   the effects of right-to-carry on criminal behavior and policing in
   U.S. cities, Nat'l Bureau of Econ. Research, Working Paper
   Series, Working Paper 30190, at 29,
   http://www.nber.org/papers/w30190 (Ex. 143)................................. JA2704

D. Hemenway & S.J. Solnick, The epidemiology of self-defense
   gun use: Evidence from the National Crime Victimization
   Surveys 2007–2011, 79 Preventative Medicine 22, 27 (2015)
   (Ex. 144) ............................................................................. JA2740

John J. Donohue, Abhay Aneja, & Kyle D. Weber, Right-to-Carry
   Laws and Violent Crime: A Comprehensive Assessment Using
   Panel Data and a State-Level Synthetic Control Analysis, 16 J.
   Empirical L. Studies 198, 240 (April 2019) (Ex. 145)........................ JA2746

Michael Siegel et al., Easiness of Legal Access to Concealed
   Firearm Permits and Homicide Rates in the United States, 107
   AJPH Research 1923, 1929 (2017) (Ex. 146)...................................... JA2796

1875 Wyoming Terr. Acts ch.52, §1 (Ex. 147) ......................................... JA2803

Code of City of Lynchburg, Va. Ch. XIX, § 20 (1887) (Ex. 148) ............ JA2806

1869 N.M. Gen Laws ch.32, at 313 (Ex. 149)............................................ JA2809

A. Holgersson & U. Bjornstig, Mass-casualty attacks on public
    transportation, J Transp. Security 7:1–16 (2014) (Ex. 150)................ JA2812

1795 Mass Gen Law ch.26, § 2 (Ex. 151) ................................................ JA2828

1686 N.J. Laws, ch. 9, in The Grants, Concessions, and Original
    Constitution of the Province of New Jersey, at 289–90 (2d ed.
    1881) (Ex. 152)..................................................................................... JA2830

Second Supplemental Declaration of Jason Cook (ECF 98) ............................ JA2834

Supplemental Declaration of Nicole Cuozzo (ECF 99) ................................... JA2837

Declaration of Ronald D'Angelo (ECF 100) .................................................... JA2839

David Jensen Affidavit (ECF 103) .................................................................... JA2841

1777 N.J. Laws 26-36, ch. XX (Ex. 1) ...................................................... JA2843

1780 N.J. Laws 39-54, ch. XIII (Ex. 2) ..................................................... JA2855

1798 N.J. Laws 609-28, ch. DCCCXXII (Ex. 3)....................................... JA2872

1806 N.J. Laws 771-83, ch. CLVI (Ex. 4)................................................. JA2893

1829 N.J. Laws 109-33, An Act for the punishment of crimes (Ex.
    5) ........................................................................................................... JA2907

Act of May 28, 1746, ch. X, Acts and Laws of Massachusetts Bay
    207-08 (Ex. 6)........................................................................................ JA2933

19 Colonial Records of the State of Georgia: Part I, Statutes,
    Colonial and Revolutionary 137-40 (Ex. 7) ......................................... JA2935

Digest of the Laws of Georgia 157-58 (1800) (Ex. 8) .............................. JA2940

1812 Del. Laws 522-24, ch. CXCV (Ex. 9) .............................................. JA2943

1818 Vermont Acts & Resolves 22-65, ch. II (Ex. 10) ............................ JA2947

1823 N.H. Laws 72-75, ch. XXXIV (Ex. 11).............................................. JA2992

1885 N.J. Laws 52, ch. XLIV (Ex. 12)......................................................JA2997

1799 N.J. Laws 561-63, ch. DCCCVI (Ex. 13)..........................................JA2999

1811 N.J. Laws 300 (Ex. 14) ....................................................................JA3003

Public Laws of South Carolina 275-76 (1790) (Ex. 15)............................JA3005

Acts and Laws of the State of Connecticut 36-37 (1784) (Ex. 16) ............JA3008

Manual of the Laws of North Carolina 234-36 (1814) (Ex. 17) ...............JA3011

Digest of the Laws of Georgia 428 (1800) (Ex. 18).................................JA3015

Public Laws of Rhode-Island and Providence Plantations 568
     (1798) (Ex. 19) ................................................................................JA3017

1812 Del. Laws 522-24, ch. CXCV (Ex. 20) ............................................JA3019

5 Laws of the Colony of New York 11-13, ch. 1410 (1894) (Ex. 21) .......JA3023

## VOLUME IX

Letter from Defendants (ECF 104) ...................................................................JA3027

Letter from Defendants (ECF 105) ...................................................................JA3029

     Supplemental Certification of Director Rebuck (Ex. 1) ............................JA3031

Letter from Defendants (ECF 107) ...................................................................JA3034

Letter from *Siegel* Plaintiffs Regarding Standing (ECF 114)..........................JA3035

     Declaration of Kenneth Armellino (Ex. 1) ................................................JA3038

     Declaration of Daniel L. Schmutter (Ex. 2)...............................................JA3048

Third Supplemental Declaration of Jason Cook (ECF 115)............................JA3091

*Siegel* Plaintiffs' Emergency Motion for Leave to File Supplemental
     Papers Containing Newly Obtained Information on Issues of
     Standing (ECF 116) .......................................................................JA3093

Transcript of Hearing on Motion for a Preliminary Injunction (ECF
     118) ................................................................................................JA3095

Letter from Defendants enclosing electronic copies of exhibits
submitted to the court at motion hearing (ECF 119) .................................. JA3263

Timothy Cunningham, 1 A New and Complete Law Dictionary
(1771) (Tab 1) ...................................................................................... JA3265

Samuel Johnson, Dictionary of the English Language (1773)
(Tab 2) .................................................................................................. JA3270

T. Sheridan, A Complete Dictionary of the English Language
(1797) (Tab 3) ...................................................................................... JA3277

N. Bailey, Dictionarium Britannicum (1736) (Tab 4) ............................... JA3282

S. Colt, Revolving gun, patented Feb. 25, 1836 (from Rutgers
University Libraries) (Tab 5) ................................................................ JA3286

James Robinson Planché, 1 A Cyclopædia of Costume or
Dictionary of Dress (1876) (Tab 6) ..................................................... JA3289

Order administratively terminating actions pending appeal (ECF 130) ........... JA3297

NBER WORKING PAPER SERIES

MORE GUNS, MORE UNINTENDED CONSEQUENCES:
THE EFFECTS OF RIGHT-TO-CARRY ON
CRIMINAL BEHAVIOR AND POLICING IN US CITIES

John J. Donohue
Samuel V. Cai
Matthew V. Bondy
Philip J. Cook

Working Paper 30190
http://www.nber.org/papers/w30190

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
June 2022

We are grateful to Richard Sweeney as well as participants at the ETH Zürich Workshop and Lecture Series in Law and Economics and Tel Aviv University for comments on the paper. Theodora Boulouta, Ammar Inayatali, and Nicolas Peña Tenjo provided outstanding research assistance. John Donohue has at various times served as an expert witness in litigation involving firearm regulation. The views expressed herein are those of the authors and do not necessarily reflect the views of the National Bureau of Economic Research.

NBER working papers are circulated for discussion and comment purposes. They have not been peer-reviewed or been subject to the review by the NBER Board of Directors that accompanies official NBER publications.

© 2022 by John J. Donohue, Samuel V. Cai, Matthew V. Bondy, and Philip J. Cook. All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

JA2704

More Guns, More Unintended Consequences: The Effects of Right-to-Carry on Criminal Behavior and Policing in US Cities
John J. Donohue, Samuel V. Cai, Matthew V. Bondy, and Philip J. Cook
NBER Working Paper No. 30190
June 2022
JEL No. K0,K14,K40,K42

## ABSTRACT

We analyze a sample of 47 major US cities to illuminate the mechanisms that lead Right-to-Carry concealed handgun laws to increase crime. The altered behavior of permit holders, career criminals, and the police combine to generate 29 and 32 percent increases in firearm violent crime and firearm robbery respectively. The increasing firearm violence is facilitated by a massive 35 percent increase in gun theft ($p=0.06$), with further crime stimulus flowing from diminished police effectiveness, as reflected in a 13 percent decline in violent crime clearance rates ($p=0.03$). Any crime-inhibiting benefits from increased gun carrying are swamped by the crime-stimulating impacts.

John J. Donohue
Stanford Law School
Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA 94305
and NBER
donohue@law.stanford.edu

Samuel V. Cai
Stanford Law School
samcai@law.stanford.edu

Matthew V. Bondy
Stanford Law School
mvbondy@law.stanford.edu

Philip J. Cook
Professor Emeritus of Economics
Sanford School of Public Policy
Duke University
PO Box 90312
Durham, NC 27708
and NBER
pcook@duke.edu

# More Guns, More Unintended Consequences:  The Effects of Right-to-Carry on Criminal Behavior and Policing in US Cities

*By*  John J. Donohue, Samuel V. Cai, Matthew V. Bondy, and Philip J. Cook

In 2019, police agencies in the United States reported nearly 300,000 aggravated assaults, robberies, and homicides committed with a firearm (Federal Bureau of Investigation, 2020).  At the political epicenter of this social problem is the legal right of individuals to carry concealed handguns in public.  Many economists, beginning with Lott and Mustard (1997), have attempted to measure the effect of Right-to-Carry (RTC) concealed handgun laws on violent crime (see Smart et al. (2020) for a serviceable review of the early literature on the topic).  While much of this early literature found no statistically significant effects of RTC laws on crime rates (Dezhbakhsh and Rubin, 1998; Ludwig, 1998; Black and Nagin, 1998), the predominant conclusion from studies in the last five years has been that RTC laws increase violent crime.[1]  This more recent literature has benefited from 1) more complete data, which enables the use of longer panels with greater treatment variation as more states have passed RTC laws, 2) advances in policy evaluation, such as improved econometric techniques in model selection and standard error estimation, and 3) the development of new tools such as synthetic controls (Donohue, Aneja and Weber, 2019) and Bayesian methods (Schell et al., 2020).[2]  Using a state-level panel from 1979-2014, Donohue, Aneja and Weber (2019) estimated that RTC laws increased violent crime by 9.02 percent ($p < 0.01$) and provided event-study analyses that both supported the critical parallel-trends assumption and illustrated that the upward trend in violent crime began in the year following adoption of the RTC law.  Since we now have five additional years of data beyond the 1979-2014 data period used by Donohue, Aneja and Weber (2019), we begin by running this same state-level panel data model over the 1979-2019 period.  The results are virtually identical: the static estimate shows that RTC laws increase violent crime by 9.25 percent ($p < 0.01$), and the event-study analysis shown in Figure 1 again highlights the validity of the model and buttresses the causal finding that RTC laws elevate violent crime.

While the weight of the most advanced research on RTC laws now supports a finding that such

---

[1]See Table 1 of Donohue (2022) summarizing 14 recent papers that reach this conclusion.

[2]Schell et al. (2020) find that firearm homicides increased one year after implementation of RTC laws with probability of .99, but suggest that this effect weakens over time.



Figure 1. : The Impact of RTC Laws on Violent Crime, Donohue, Aneja and Weber (2019) model, 1979-2019.

*Note:* We regress crime on dummies for pre-and post-passage years and DAW covariates. Year 0 represents the first year with RTC in place at any time, meaning that in states that adopt after January 1, this will capture only a partial effect of RTC laws. We display the 95 percent confidence interval for each estimate using cluster-robust standard errors and show the number of RTC jurisdictions that contribute to each estimate.
*Source:* Author-cleaned data set.

laws generate net increases in violent crime, there has been relatively little work clarifying the mechanisms that lead to this outcome. Donohue, Aneja and Weber (2019) discussed a number of plausible pathways, ranging from increased violence and road rage by permit holders to diminishing police effectiveness as officers became less able or willing to engage in crime-suppressing activity after RTC adoption (see also Fridel, 2021). In addition, Donohue, Aneja and Weber (2019) drew upon survey data from Hemenway, Azrael and Miller (2017) to estimate that the increased gun carrying in the wake of RTC adoption would lead to an additional 100,000 guns stolen from permit holders each year. Additionally, Billings (2020), using rich data from a single county in North Carolina concluded that RTC laws facilitate gun thefts that stimulate violent crime increases. Of course, there can be crime-reducing benefits from gun carrying by private citizens if crimes are thwarted or deterred and criminals are captured or injured from defensive gun use, but if the current weight of the evidence is correct any such benefits are substantially offset by the crime-enhancing impacts of increased gun carrying. It is these pernicious mechanisms that this paper attempts to clarify and measure.

To this end, we exploit differential timing in the adoption of RTC to examine the effect of concealed carrying on the rates of and mechanisms driving firearm and nonfirearm violent crime in America's largest cities during the period from 1979 to 2019. We introduce an author-cleaned

2

dataset derived from agency-level Uniform Crime Reporting (UCR) and Supplementary Homicide Reports (SHR) records and perform a difference-in-differences (DiD) analysis to estimate the impact of RTC laws on firearm and non-firearm violent crimes, clearance rates (the rate at which police are able to identify and arrest the perpetrators of crime), and the monetary value of stolen guns.[3]

We present evidence to suggest that the mechanisms of greater levels of gun loss and theft and reduced police effectiveness are potent drivers of increased crime following RTC adoption. We find that RTC laws cause a roughly 13 percent decline in the rates that police clear violent crime, suggesting that RTC laws strike at the very heart of law enforcement's abilities to address criminal conduct. Moreover, this significant decline in police clearance rates is not simply a product of RTC laws encouraging more crime, which implies that the strains on police are due to more than simply an increase in the number of crimes. Even when we control for this increased violent crime rate, RTC laws still dampen the rate at which violent crime is cleared. We also find that the introduction of an RTC law elevates gun thefts by roughly 35 percent, introducing tens of thousands of guns into the hands of criminals or illegal gun markets each year.

We also show RTC laws cause statistically significant increases in crime, thus indicating that the summation of these two (and other) criminogenic effects unambiguously dominate any crime-reducing benefits derived from criminals' perceived increased probability that they will meet armed resistance while committing a crime or from actual incidents of effective defensive gun use. The rate of firearm violent crimes rises by 29 percent due to RTC, with the largest increases shown in firearm robberies. We address issues regarding the robustness of our findings to threats from heterogenous treatment effects, non-parallel pretrends, and other DiD assumptions using Goodman-Bacon (2021) decompositions and event-study analyses.

Our paper offers several contributions. First, we illustrate that widespread gun carrying has many implications for the dynamics of crime that go beyond whether a permit-holder can defend against crime or uses a gun to cause harm in a moment of anger. Indeed, the effects of RTC laws that we are able to document most precisely—increased gun thefts and diminished police effectiveness—are largely caused by criminogenic mechanisms unleashed by even law-abiding concealed carry permit-holders.[4] This paper is the first of which we are aware that provides credible causal estimates of the effects of RTC laws on gun theft or policing. Situating our findings within the Becker (1968)

---

[3]Note that in discussing our analysis and results, we make the simplifying assumption that the monetary value of guns stolen is directly proportional to the number of guns stolen.

[4]Recognizing the dangers to the public from stolen guns, Israel imposes substantial criminal penalties, including jail time, for negligent storage of weapons resulting in theft, which would include the common practices of many American RTC permit holders (and gun toters in permitless carry states) that elevate the risk of gun theft, such as leaving firearms in unlocked cars.

crime model, we provide both a theoretical and empirical basis for understanding these effects.

Second, our focus on major cities, where violent crime is most concentrated, stands in contrast to the vast preponderance of the existing literature, which has been focused on state-level and county-level panel data for the last several decades. County-level crime data have been shown to be marred by problematic imputation practices (Kaplan, 2021e). Kovandzic, Marvell and Vieraitis (2005) were among the most recent to examine the causal effect of RTC across major cities in the US.[5] The study covered the period from 1980 to 2000 and used a linear spline model to identify the effect of RTC laws on trends in violent crime.[6] Our current study, which relies on agency-level UCR data from 1979 to 2019, uses better quality data covering a longer time period, and presents findings on overall average treatment effects as well as event-study analyses.

Finally, we seek to make a methodological contribution to the empirical literature through the application of rigorous new techniques of robustness testing for panel data policy analysis. We provide event studies to consider concerns regarding potential violation of parallel trends as well as Goodman-Bacon (2021) decompositions of our regressions into individual 2x2 treatment vs. control comparisons to 1) demonstrate the robustness of our findings to heterogenous treatment effects and 2) consider the validity of our proposed counterfactual by performing weighted covariate balance testing. Our application of the insights gained from recent DiD econometric scholarship reinforces a large body of research finding that RTC laws elevate violent crime.

The remainder of this paper is organized as follows. Section I presents a brief overview of concealed carry laws in the US. Section II presents the theoretical motivation for our study using the Becker (1968) economic model of crime. Section III describes the data used to complete our main empirical analysis. Section IV contains our empirical estimates. Section V discusses how our results conform to the outcomes predicted within our theoretical model and to the existing literature on the economics of crime. Section VI concludes.

---

[5]In their literature review, Smart et al. (2020) also note the findings of La Valle and Glover (2012) and La Valle (2013), but we find several serious flaws in their coding of the adoption of RTC laws that lead to the results being unreliable as estimates of the true effect of RTC laws on crime in US cities.

[6]KMV essentially found that each component of violent crime rose by roughly 1 percent per year following RTC adoption, except for aggravated assault which grew at twice that rate (and was the only one of the four estimates that was statistically significant). The specific estimated annual increment to crime for the four crime categories (with t statistics in parentheses) were 1.1 percent (0.80) for homicide, 1.0 percent (0.91) for robbery, 1.2 percent (1.33) for rape, and 1.9 percent (2.59) for aggravated assault, in their main specification. Regressions were "weighted by a function of population as determined by the Breusch-Pagan Test."

# I.   Background

The United States has undergone a major shift in gun policy over the last four decades.  In 1980, the vast majority of American states either banned the concealed carry of firearms or had laws that required someone who wished to carry a gun to apply for a permit and perhaps justify a need to do so or establish that the individual was a person of good character.  Most states that initially allowed concealed carry tended to have may-issue laws, so called because they stipulated that authorities "may issue" concealed carry licenses under certain conditions, but did not guarantee it as a basic right.  In contrast to may-issue regimes, RTC laws require that the state "shall issue" a license to any individual who requests one with certain narrow exceptions, such as those with felony convictions or underage individuals.  For example, from 1870 to 1995, Texas banned carrying of firearms outside the home, with few exceptions.  This applied to both openly carried and concealed firearms (Rivas, 2019).  In 1996, it transitioned to a RTC regime, thereby allowing concealed carrying of handguns, and in 2015 it endorsed open carry of firearms.  Finally, in September 2021 the state adopted "permitless carry" allowing all citizens older than 21 to carry firearms without a license.[7]

An extensive and highly successful gun lobby campaign designed to promote lagging gun sales gradually encouraged most states to adopt RTC laws.  The gun lobbying campaign to promote RTC laws enlisted gun enthusiasts who believe the right to carry was a "principle of individual right, of personal honor" (Patrick, 2010) that could be advanced by promoting an individualistic interpretation of the Second Amendment (Charles, 2018).  Politicians who supported expanding the right to carry often cited the Second Amendment as their rationale (Marley and Glauber, 2011) or asserted that these laws could protect civilians from crime.

This last factor raises a possible difficulty for researchers if RTC adoption is endogenously linked to rising crime rates.  However, the systematic review of the role of RTC laws in affecting crime that is now frequently cited in legislative hearings and court cases did not begin until the late 1990s, by which time most states who would adopt RTC laws had already done so.  Furthermore, RTC adoption came via different paths for different states (either court ordered or legislatively mandated), often only after repeated failed attempts, and was driven by a relatively small group of highly politically active progun operatives and citizens (Patrick, 2010).  Additionally, the RTC laws present in the cities in our sample were adopted at the state level, suggesting that forces driving the passage of state RTC laws were at least one step removed from the forces driving city crime trends.

---

[7]Donohue, Aneja and Weber (2019) analyzed the statutory history of RTC laws in conjunction with an extensive search of newspaper archives to determine the dates of concrete changes in concealed carry law through 2014.  We update this data to reflect relevant legal changes since 2014.



Figure 2. : Trends in Violent Crime in 30 RTC Cities Prior to Passage of RTC Law

*Note:* Crime rates are shown as a percent change from the 10th year prior to RTC passage. Cities that pass RTC laws in the same year are collapsed into a single population-weighted unit for clarity. The 1996 group consists of: Austin, Charlotte, Dallas, El Paso, Fort Worth, Houston, Las Vegas, Oklahoma City, Philadelphia, Raleigh, San Antonio, and Tulsa. Seattle (1961), Indianapolis (1980), Jacksonville (1988), Miami (1988), Louisville (1997), and Omaha (2007) are omitted due to lack of sufficient data.
*Source:* Author-cleaned data set.

Indeed, Figure 2 visually shows that violent crime rates do not follow any noticeable pattern in cities in the ten years prior to RTC adoption. Thus, we conclude that the adoption of RTC across cities in our sample can be considered reasonably exogenous to the outcomes we study. In our section on robustness, we produce event-study plots and perform qualitative tests of conditional parallel pre-trends to further justify our empirical strategy.

## II.   Theoretical Motivation

We draw insight from the Becker (1968) crime model to consider theoretically how a rational criminal may react to the passage of RTC laws.[8] Becker models the expected utility of an individual

[8]Note that the Becker model is not without its drawbacks, as it does not provide a direct basis for understanding the *rate* of committing crime. The framework models a single individual making a yes/no decision about whether to commit a crime, but in reality potential criminals choose from a rich environment of possibilities. Further, the model does not consider how committing crimes in the past affects the decision to commit a crime in the present, which Mocan, Billups and Overland (2005) have tried to overcome in developing a dynamic economic model of crime. Nevertheless, we inform our discussion of the mechanisms by which RTC laws influence crime using the Becker model because its parsimonious nature enables us to provide some useful predictions that find support in our empirical analysis.

6

considering crime as

$$(1) \qquad EU = pU(Y - f) + (1 - p)U(Y)$$

where $p$ represents the probability of getting caught, $Y$ represents the income associated with committing a crime,[9] and $f$ represents the average sanction associated with getting caught committing a crime. For our analysis, we make some small modifications to Becker's model: we define income as net income after costs, and we also split $f$ and $p$ into two separate sanctions and probabilities: $f_j$ represents legal sanctions (like jailtime), while $f_s$ represents the sanction of being shot at by a firearm (and possibly injured or killed) while committing a crime, and $p(j)$ and $p(s)$ represent the probabilities of each of these events respectively. Thus, we redefine expected utility of crimes as[10]

$$(2) \qquad EU = U(Y) - p(j)U(f_j) - p(s)U(f_s)$$

Using this framework, we consider the expected utility of crime before and after an RTC regime. Let variables denoted with $'$ signify that they refer to *post-RTC implementation*. Then the change in expected utilities due to an RTC regime can be modeled as

$$(3) \qquad EU' - EU = \underbrace{U(Y' - Y)}_{1} - \underbrace{[p'(s) - p(s)]U(f_s)}_{2} - \underbrace{[p'(j) - p(j)]U(f_j)}_{3}$$

Our following analysis considers the deterrence effect and criminal response to RTC laws, and identifies under what conditions $EU' - EU > 0$ (when expected utility grows under an RTC regime).

The easier access to guns that RTC laws enable can trigger both stimulants to and constraints on crime. RTC laws can suppress overall violent crime by deterring, thwarting, or incapacitating criminals due to the enhanced risk of attack from an armed victim, which increases the cost of crime. Within the above framework, if an RTC law raises the probability of adverse outcomes for criminal actors, $p'(s) > p(s)$, and so Term 2 will reduce the net utility of crime under a RTC regime, all else equal. An unintended consequence of the enhanced potential danger from permit holders, however, may be that criminals arm themselves in response to this increased perceived

---

[9]As Becker notes, this income can be both "monetary and psychic."

[10]Suppose that p(s) and p(j) are independent. Then we can decompose the expected utility into the four distinct possibilities, $(1 - p(j))(1 - p(s))U(Y) + p(j)(1 - p(s))U(Y - f_j) + (1 - p(j))p(s)U(Y - f_s) + p(s)p(j)U(Y - f_s - f_j)$, which simplifies to Expression (2) if one assumes linear addition of utilities, e.g. $U(f_j) + U(f_s) = U(f_j + f_s)$.

7

threat, elevating the proportion of crime committed with a firearm. Additionally, there are at least two other mechanisms tied to the criminal response to RTC laws that may have damaging criminogenic effects.[11]

First, RTC laws may decrease the cost of obtaining firearms for criminals. We refer to this mechanism as the "facilitation effect." Billings (2020) establishes a strong link between RTC permits leading to increased gun thefts using 2007-2011 data from Charlotte, North Carolina. Increased legal carrying of firearms outside the home may lead to more opportunities for gun theft, particularly from vehicles (Elinson and McWhirter, 2022). The increased supply of illegally obtained firearms would be expected to decrease the price of illegal firearms on the informal market, thereby facilitating illegal firearm use even beyond the original gun thief. Lowering the cost of committing a firearm crime would increase the net income of committing a firearm crime (i.e. $Y' > Y$ for firearm crimes), and have no effect on the utility of non-firearm crimes. It is of note that only 40 percent of robberies are committed with a firearm in our sample, despite the fact that firearms greatly increase payoff to robbery by increasing the probability of "success" and allowing criminals to pursue more robust targets like commercial establishments (Cook, 1987, 1991). This suggests that firearms are scarce to robbers, and that the availability of firearms is an important margin in criminals' decision-making on whether to pursue more lucrative firearm crimes. Additionally, RTC laws may decrease the risk of carrying an illegal firearm, as police may be less proactive about searching individuals for illegal firearms.

Second, increased gun carrying by citizens will increase crime if it impairs police effectiveness in any of a number of ways.[12] RTC laws may generate a host of demands on police time and resources that reduces the amount of time they have to fight crime. Processing complaints about the increased gun thefts, accidental discharges and injuries, processing RTC permit applications, and taking time to check for permit validity by those carrying guns will all encumber police resources (Donohue, Aneja and Weber, 2019). Additionally, police officers may be more likely to shy away from confronting (possibly) armed citizens, investigating certain suspicious activities, or engaging in effective crime-fighting actions due to the increased risk that guns pose to them. Moreover, Doucette et al. (2022) found that adoption of permitless carry laws between 2014 and 2020 caused a 13 percent average increase in officer-involved shootings and argued this effect may be because concealed carrying increases officers' perceived risk of coming under fire in the line of duty. Increased

---

[11]For a more thorough discussion of the theoretical mechanisms for RTC laws to affect crime, see Donohue, Aneja and Weber (2019).
[12]An established literature that has shown, on the margins, additional policing reduces crime rates (Levitt, 1997; Mello, 2019; Klick and Tabarrok, 2005).

killings by police can strain relations with the community in ways that impair the solving of crimes. If RTC laws degrade police effectiveness through this array of mechanisms, then the probability of facing legal sanctions decreases. In the context of our model, $p'(j) < p(j)$ and Term 3 will increase $EU' - EU$.[13]

The findings from our model indicate that if violent crime increases due to an RTC law, then the criminal response to RTC laws — whether through the facilitation effect or diminished police effectiveness — is unambiguously larger than the impact of the deterrence effect for the marginal potential criminal. Given our focus on illuminating empirically the mechanisms that generate the net adverse consequences of RTC laws, we do not model the effects of RTC laws on permit holders since our data does not directly address their behavior. We recognize, however, that increased carrying of guns by this group may also lead directly to more criminal acts, since a person legally carrying a concealed weapon would have more opportunity to reach for a gun in a moment of anger (e.g when experiencing road rage (Goodman, 2022)), leading to more assaults and homicides.[14] We also note that Becker's framework only models a single individual, and we expect there to be heterogeneity in how perceptions of expected utility will change in response to RTC laws. In particular, we consider how career criminals may react differently than other individuals in our discussion section, below.

### III.   Data

The primary data used for our analysis comes from the 47 U.S. cities with a 2019 population estimate of 400,000 or more.[15] We take agency-level monthly crime, clearance, and stolen property data cleaned by Jacob Kaplan from the FBI Uniform Crime Reporting (UCR) Return A files (Kaplan, $2021b,c$) and Supplementary Homicide Reports (SHR) (Kaplan, $2021d$) and aggregate to the city-year level using an agency-city crosswalk published by the Bureau of Justice Statistics (2018). We use SHR data for homicides because UCR data do not disaggregate firearm and

---

[13]It is also possible, however, that the probability of going to jail increases for a criminal who is shot or constrained by armed resistance. If this is the case, then an RTC law will have two effects on $p(j)$ that work in opposite directions, leaving the direction of term 3 ambiguous.

[14]Changes in permit holder behavior may also indirectly influence the utility for other individuals. First, permit holders may be emboldened to go to higher crime areas or carry more valuables, which can indirectly increase crime committed by others by increasing the availability of suitable targets and the size of payouts. Second, if the victim is carrying a gun on their person or in their vehicle, this can be taken as part of the robbery, increasing the expected income of the robbery (Ludwig and Cook, 2004). These mechanisms would increase the net expected income of robberies, particularly for firearm robberies, since robbers with firearms are less likely to shun a firearm-carrying victim. We do not address these mechanisms in our modeling, but they would act in the same direction as our theoretical and empirical findings, since the RTC-induced increase in income from committing a crime would rise (Y' increases), just as it does with the facilitation effect.

[15]While there are benefits to using more agencies to increase the power of analysis or to observe non-urban settings, there are also potential costs. Specifically, UCR agency crime data, whose biases in imputation procedures may already be attenuating our estimates (Boylan, 2019a), appears to have even greater reporting flaws for agencies serving smaller populations (Boylan, 2019b).

nonfirearm homicides.[16]

Our choice of control variables makes only one addition to the nine socioeconomic and demographic controls used in Kovandzic, Marvell and Vieraitis (2005) (hereinafter "KMV"), one of the most recent city-level studies of the effect of RTC laws. The KMV nine controls are the percentage of the population made up of female headed households, the percentage of people living alone, per capita income, percentage of people in poverty, and four demographic controls, all at the city level and obtained through Census and American Community Survey (ACS) data, as well as one-year lagged incarceration rates at the state-level from the Bureau of Justice Statistics. We add one-year lagged sworn officers per capita at the city level obtained from UCR police employment data (Kaplan, 2021a), due to the well-established relationship between police and crime.[17]

We apply a cleaning procedure that removed crime observations that were sharp discontinuities from the preceding and following year. We also removed all observations for a particular city-crime if that city-crime was missing more than 15 observations out of the 41 total city-crime observations from 1979 to 2019. This is because we suspect that the data with high degrees of missingness would lead to unreliable estimates for the years in which the particular crime data for that city does exist. This applies to all variables for Louisville; to homicide (and by extension, violent crime) in Jacksonville, Miami, and Omaha; to violent crime clearance in Chicago; and to the value of stolen guns in Chicago, Minneapolis, New York, Omaha, San Jose, and Washington DC. Further, if a city is missing data for any robbery-related outcome variable (total robberies, firearm robberies, or nonfirearm robberies) in a given year, we remove the data for all robbery related variables for that city-year to maximize interpretability of results within different robbery regressions. We do the same for homicide and aggravated assault. More details on our data cleaning procedure can be found in Online Appendix A.

Table 1 reports summary statistics from UCR crime, clearance, and stolen property data.[18] Column 1 shows overall values for our entire sample, and columns 2-5 show these values for both 1979 and 2019 for never-adopters (the cities in our sample that were never covered by RTC laws), and for switchers (cities in our sample that adopted an RTC law between 1979 and 2019). A survey of the difference in the change in crime between 1979 and 2019 for never-adopting and switching

---

[16]While we recognize the SHR homicide data is less reliable than the CDC's Vital Statistics data, only the former is available at the city level.

[17]In Online Appendix B, we show that that the removal of police as a control variable only increases the magnitude of our findings of the effect of RTC laws on crime.

[18]UCR defines aggravated assault as an "unlawful attack by one person upon another for the purpose of inflicting severe or aggravated bodily injury. The UCR Program further specifies that this type of assault is usually accompanied by the use of a weapon or by other means likely to produce death or great bodily harm." This is distinguished from simple assaults, which UCR defines as "[a]ssaults that do not involve the use of a firearm, knife or cutting instrument, or other dangerous weapon, and in which the victim did not sustain serious or aggravated injuries" (Federal Bureau of Investigation, 2020).

10

cities provides a preview of our main results reported in section IV, below. Violent crime decreases across both samples, but the never-adopting cities show much larger decreases, particularly for firearm violent crimes. Table 1 reveals that police effectiveness as measured by the clearance rates changed dramatically for the two sets of cities from 1979 to 2019. Over this period, clearance rates improved in never-adopting cities but worsened in cities adopting RTC laws. While the value of stolen guns per capita declined in both groups of cities, the decrease is larger in never-treated cities, both in absolute and percentage terms. These simple comparisons are consistent with our theory of the criminogenic effects of RTC laws, which is more fully explicated by the more complete statistical analysis below.

Table 1—: Summary Statistics

| Variable | Overall | Never-Adopters 1979 | Never-Adopters 2019 | Switchers 1979 | Switchers 2019 |
|---|---|---|---|---|---|
| Violent Crime | 11.28 | 15.39 | 6.04 | 8.87 | 7.81 |
|  | (6.06) | (4.06) | (2.59) | (3.9) | (3.58) |
| Firearm Violent Crime | 3.81 | 4.53 | 1.12 | 3.66 | 3.44 |
|  | (2.57) | (1.04) | (1.24) | (1.9) | (2.23) |
| Robbery | 5.19 | 9.25 | 2.13 | 4.84 | 2.27 |
|  | (3.59) | (2.94) | (1.42) | (2.53) | (1) |
| Firearm Robbery | 2.08 | 3.05 | 0.49 | 2.23 | 1.05 |
|  | (1.56) | (0.79) | (0.75) | (1.34) | (0.61) |
| Homicide | 15.98 | 23.06 | 6.61 | 23.95 | 13.31 |
|  | (11.05) | (5.72) | (9.54) | (11.79) | (7.81) |
| Firearm Homicide | 11.16 | 13.45 | 4.74 | 15.75 | 10.45 |
|  | (8.51) | (3.87) | (8.79) | (8.51) | (6.67) |
| Aggravated Assault | 6.05 | 5.9 | 3.84 | 3.9 | 5.27 |
|  | (3.18) | (1.38) | (1.21) | (1.9) | (2.69) |
| Firearm Aggravated Assault | 1.67 | 1.35 | 0.59 | 1.28 | 2.21 |
|  | (1.21) | (0.45) | (0.45) | (0.72) | (1.65) |
| Violent Crime Clearance | 0.41 | 0.32 | 0.51 | 0.46 | 0.36 |
|  | (0.11) | (0.09) | (0.14) | (0.09) | (0.1) |
| Robbery Clearance | 0.26 | 0.19 | 0.39 | 0.34 | 0.27 |
|  | (0.09) | (0.06) | (0.12) | (0.1) | (0.1) |
| Homicide Clearance | 0.66 | 0.61 | 0.78 | 0.75 | 0.61 |
|  | (0.16) | (0.07) | (0.16) | (0.11) | (0.15) |
| Aggravated Assault Clearance | 0.52 | 0.49 | 0.55 | 0.61 | 0.41 |
|  | (0.13) | (0.1) | (0.15) | (0.11) | (0.11) |
| Stolen Gun Value | 683.45 | 772.62 | 466.91 | 986.07 | 790.58 |
|  | (466.89) | (518.16) | (371.86) | (538.45) | (473.8) |

*Note:* All values are weighted by population, excluding values removed via cleaning procedure (see Online A). The units for violent crime, robbery, aggravated assaults are incidents per 1,000 population, while the units for homicide are incidents per 100,000 population. The unit for stolen guns is thousands of nominal dollars of firearms stolen per 1,000 population. Clearance rates are proportions between 0 and 1. Population-weighted standard deviations in parentheses. Owing to missing data on stolen guns for the large city of Los Angeles, the values reported in columns 2 and 4 for stolen guns are not 1979 values but 1986 values (the first year Los Angeles reported stolen guns data).

11

## IV.   Empirical Estimates

### A.   Methodology

Our two-way fixed effects model takes the following form:

$$(4) \qquad y_{it} = \beta RTC_{it} + X_{it}\gamma + \alpha_t + \delta_i + \epsilon_{it}$$

where $y_{it}$ represents some outcome variable in unit $i$ at time $t$ and $X$ represents a set of covariates and a constant.[19]   The coefficient $\beta$ reflects the average estimated treatment effect of adopting a RTC law on crime, and $\alpha$ and $\delta$ represent time and city fixed effects, respectively.   For total crimes, firearm crimes, nonfirearm crimes, and clearance rates, we use 100 times the logged rate as the dependent variable; for stolen guns, the dependent variable is 100 times the logged monetary value of stolen guns per 1,000 people.   We define violent crime as the sum of robbery, homicide, and aggravated assault; we exclude rape due to the change in definition of rape in UCR coding in 2013 and because rape data is not disaggregated by firearm and nonfirearm crime.[20]   We cluster robust standard errors at the *state* level, the level at which "random assignment" occurs, since all RTC laws in our study are state-level changes.   All regressions are weighted by time-varying city populations.

Our *RTC* treatment variable is coded as a 0 for each observation where concealed carrying is prohibited or a may-issue regime is in place and is coded as a 1 starting from when a "shall-issue" law goes into effect and remains a 1 even if a city moves to a permitless-carry system.[21]   Since RTC laws do not always go into effect at the start of the year, we code the first year as a fractional value that reflects the proportion of the year that the law is in place.   Carrying forward our example of Texas from Section I, the RTC variable for Dallas is coded as a 0 in our sample from 1979

---

[19]While KMV use the natural logarithms of their control variables, we opt for unlogged covariates instead, as we expect that using unlogged control variables will intuitively be more likely to yield conditional parallel trends between our treated and nontreated units.   Additionally, KMV include the lagged dependent variable as a control, but we opt for static panel model instead, since we do not expect that there are strong dynamic mechanisms causing current values of our dependent variables to be dependent on previous values, and the interpretation of the coefficients of the dynamic model is more difficult to conceptualize and compare to other results in the literature.

[20]There are two other reasons why empirical researchers may want to consider rape separately from other categories of violent crime.   First, the data quality for this crime are questionable.   As the head of the Bureau of Justice Statistics stated to the National Research Council: "[rape and sexual assault] remain the darkest of the 'dark figure' of crime" (Kruttschnitt et al., 2014).   Second, legal and social changes have encouraged women to report sexual violence, and police have become more likely to report assaults (Clay-Warner and Burt, 2005; Miczek, Reiss and Roth, 1993, 408-416).   Thus, trends in the reporting of sexual violence could quite plausibly be changing temporally and geographically throughout our study window to a greater degree than for other types of crime.   The study of the effect of RTC laws on this category of violence merits further research using more suitable data.

[21]The treatment variable is monotonic because no cities in our sample moved from a less-restrictive regime back to a more-restrictive one.   This was the categorization scheme adopted in the original Lott and Mustard (1997) paper, maintained in the National Research Council et al. (2005) report on *Firearms and Violence*, and followed in Donohue, Aneja and Weber (2019).

until 1995, inclusive, during which time the Lone Star State prohibited concealed carry, and then switches to a 1 starting in 1996 because Texas became a shall-issue state on January 1, 1996. While different methods of capturing the time-varying effect of RTC are possible, we choose to estimate the average effect of RTC laws using a static model and then to provide event-study analyses that illustrate the change in the effect of RTC laws over time.

### B.   The Impact of RTC Laws on Violent Crime Rates and Its Underlying Mechanisms

VIOLENT CRIME. — Table 2 provides our first set of empirical results for our city-level analysis, using the specification in Equation (4). Our point estimates for violent crime, robbery, and aggravated assault indicate overall crime rises roughly 11 to 15 percent, with the firearm component increasing by roughly twice that level. While point estimates for nonfirearm crimes in these three categories are positive and sizable, the similarly large standard errors render inconclusive our findings on nonfirearm crimes. For violent crime and robbery, the roughly 30 percent increases in firearm crime are statistically significant at the 0.05 level and for firearm aggravated assault the 24.5 percent estimated increase is significant at the 0.01 level. Homicide is estimated to rise by 9 percent and firearm homicide by 13 percent, and nonfirearm homicide is estimated to drop by 3.4 percent, but these coefficients are not statistically significant at conventional levels (with $p$-values of 0.39, 0.29, and 0.70 respectively).[22] Robberies is the violent crime subtype with the largest estimated impact of RTC laws, for both total crimes and firearm crimes. In our discussion, we suggest that the criminogenic mechanisms we proposed in our model may be particularly strong among individuals prone to commit robberies relative to individuals prone to commit other violent crimes.

Having confirmed the findings of the recent literature on the impact of RTC laws on violent crime rates, we now present empirical evidence concerning two possible criminogenic mechanisms: declines in police effectiveness and the facilitation effect.

DECLINES IN POLICE EFFECTIVENESS. — To empirically estimate the impact of RTC laws on police effectiveness, we use the same specification in Equation (4), using police clearance rates as our outcome variables. The first four columns of Table 3 provide these estimates controlling for the same set of covariates used in our crime regressions above. Across the four violent crime categories,

---

[22]If one were just looking at the 3 homicide point estimates in Table 2, one might interpret them to mean that RTC laws have a very large impact in increasing firearm murders by over 12.5 percent but perhaps one-quarter of this increase comes from killers switching from other methods to firearms to complete their crimes. The -3.4 value for nonfirearm doesn't convey much information, though, since its standard error is more than 2.5 times as great as the point estimate.

Table 2—: Effect of Right to Carry on Crime, OLS Estimates

| | 100 times log rate of ... | | | | | | |
|---|---|---|---|---|---|---|---|
| | Violent Crime | | | | Robbery | | |
| | Total | Firearm | Nonfirearm | | Total | Firearm | Nonfirearm |
| RTC | 12.54 | 28.78 | 6.86 | | 14.86 | 31.91 | 6.96 |
| | (7.48) | (11.94) | (6.71) | | (10.02) | (14.62) | (7.88) |
| | p = 0.10 | p = 0.02 | p = 0.31 | | p = 0.14 | p = 0.03 | p = 0.38 |
| N | 1,673 | 1,673 | 1,673 | | 1,811 | 1,811 | 1,811 |
| $R^2$ | 0.87 | 0.86 | 0.84 | | 0.90 | 0.86 | 0.91 |
| | Homicide | | | | Aggravated Assault | | |
| | Total | Firearm | Nonfirearm | | Total | Firearm | Nonfirearm |
| RTC | 8.52 | 12.62 | −3.43 | | 11.18 | 24.51 | 6.16 |
| | (9.75) | (11.75) | (8.86) | | (7.00) | (9.30) | (7.87) |
| | p = 0.39 | p = 0.29 | p = 0.70 | | p = 0.12 | p = 0.01 | p = 0.44 |
| N | 1,740 | 1,740 | 1,740 | | 1,824 | 1,824 | 1,824 |
| $R^2$ | 0.85 | 0.83 | 0.82 | | 0.77 | 0.84 | 0.72 |

*Note:* City-level panel data estimates with city and year fixed effects, 1979-2019. Cluster-robust standard errors with clustering at the state level shown in parentheses. All models control for lagged sworn officers per capita as well as a set of nine unlogged KMV controls that are not shown to conserve space. Jacksonville, Louisville, Miami, and Omaha are dropped from homicide and violent crime regressions because of missing homicide data. Louisville is also dropped from robbery and aggravated assault regressions due to missing data. Violent crime, robberies, and aggravated assaults are measured as crimes per 1,000 population; homicides are measured per 100,000 population.

clearance rates fall by roughly 7.5 to 15 percent due to RTC laws.[23] The statistically significant 13.0 percent drop ($p = 0.03$) in the clearance rate of all violent crimes is striking. Given the generally low rate at which violent crimes are cleared, these RTC-induced reductions in the ability of police to detect and sanction violent criminals are noteworthy and troubling.

One reason that clearance rates might fall in the wake of RTC adoption is that the crime increases resulting from the new regime burdens the police, thereby impairing their ability to clear crimes at the same rate. For example, the police only have the ability to solve 40 out of 100 crimes, if crime rises by 20 percent and they still can only solve 40 crimes, the clearance rate would fall from 40 percent to 33 percent (40 out of 120). To determine if this factor alone explains some or all of the RTC-induced drop in clearance rates, columns 5-8 in Table 3 re-estimate our clearance rate regressions controlling for violent crime rates. The resulting estimates show that the estimated decline in the clearance rate ranges from 7 to 14 percent.[24] This suggests that the RTC-triggered

---

[23]Note that while our preceding analysis used SHR homicide data, the variable for violent crime clearance rate in this section is based on UCR homicide data, since those are the only homicide clearance data available.

[24]Note that the regression estimate on the column (5) controlling for violent crime is likely biased downward by the presence

14

decline in police effectiveness is primarily caused by factors other than the overall increase in violent crime that RTC laws stimulate, such as the burdens on police time caused by greater gun carrying, police hesitation to engage with a more heavily armed civilian population, or weakened police-community relations.

Table 3—: Effect of Right to Carry on Clearance Rates

| | | | | 100 times log clearance rate for ... | | | | |
|---|---|---|---|---|---|---|---|---|
| | Violent Crime | Robbery | Homicide | Aggravated Assault | Violent Crime | Robbery | Homicide | Aggravated Assault |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| RTC Law | −12.96 | −14.90 | −7.48 | −14.29 | −11.79 | −10.41 | −6.79 | −13.64 |
| | (5.89) | (6.63) | (4.39) | (7.54) | (5.98) | (6.51) | (4.22) | (7.52) |
| | p = 0.03 | p = 0.03 | p = 0.09 | p = 0.06 | p = 0.05 | p = 0.12 | p = 0.11 | p = 0.07 |
| Log Violent Crime Rate | | | | | −6.91 | −31.47 | −4.48 | −4.65 |
| | | | | | (6.02) | (10.08) | (5.03) | (8.63) |
| | | | | | p = 0.26 | p = 0.002 | p = 0.38 | p = 0.60 |
| Observations | 1,484 | 1,667 | 1,550 | 1,667 | 1,484 | 1,667 | 1,550 | 1,667 |
| R² | 0.55 | 0.58 | 0.40 | 0.44 | 0.55 | 0.61 | 0.40 | 0.44 |
| Adjusted R² | 0.52 | 0.56 | 0.36 | 0.41 | 0.52 | 0.59 | 0.36 | 0.41 |

*Note:* City-level panel data estimates with city and year fixed effects, 1979-2019. Cluster-robust standard errors with clustering at the state level shown in parentheses. All models control for lagged sworn officers per capita as well as a set of nine unlogged KMV controls but are not shown to conserve space. Jacksonville, Miami, and Omaha are dropped from homicide clearance and violent crime clearance regressions because of missing homicide data. While Chicago is included in robbery clearance, homicide clearance, and aggravated assault clearance regressions, it is dropped from violent crime clearance regressions because when these categories are combined, the amount of missing data is excessive.

INCREASES IN GUN THEFT. — We also estimate the impact of the facilitation effect by examining the effect of RTC on reported gun theft. In Table 4, we regress 100 times the logged monetary value of stolen guns per 1,000 persons on our RTC dummy, controlling for city and year fixed effects, and our standard set of covariates. We find that RTC laws are associated with a sizeable 35 percent increase in stolen gun value per capita ($p = 0.06$). Assuming a constant average value per stolen gun, then for roughly every three guns that were being stolen before RTC, four are being stolen after. And if the magnitude of our finding on the effect of RTC laws on stolen guns in major US cities is roughly the same as the effect of RTC laws on stolen guns across the US, then we would predict that over 100,000 guns were stolen in 2015 due to RTC laws,[25] quite similar to the estimate

of ratio bias. This occurs because overall violent crime is in the denominator of the clearance rate dependent variable and in the numerator of the independent variable, which will bias the estimate downward because violent crime is measured with error. The same rationale also applies, albeit to a lesser extent, to the regressions in columns (6)-(8), since violent crime will also be correlated with the component crimes of overall violent crime.

[25]Hemenway, Azrael and Miller (2017) estimates that 380,000 guns were stolen in the US in 2015, and Bureau of Alcohol, Tobacco, Firearms and Explosives (2015) indicates that over 85 percent of National Firearms Act registered weapons were from RTC states. If we assume that this suggests that 85 percent of gun thefts occurred in RTC states and that RTC laws increased gun thefts by 35 percent, then there were about 113,000 RTC-induced gun thefts in 2015. Given the upward trend in gun thefts that Azrael and Miller observed over their data period, as well as the increased number of RTC and permitless jurisdictions with the attendant greater carrying of guns outside the home, the total number of gun thefts in the country and those induced by more permissive gun carrying are likely higher today than these figures based on 2015 data.

15

provided by (Donohue, Aneja and Weber, 2019) based on survey data showing higher rates of gun thefts for those who take the gun outside the home.[26]

Table 4—: Effect of Right to Carry on Gun Theft

|  | 100 times log dollar value per 1,000 persons of ... |
| --- | --- |
|  | Stolen Guns |
| RTC Law | 34.77 |
|  | (18.36) |
|  | p = 0.06 |
| Observations | 1,538 |
| R$^2$ | 0.78 |
| Adjusted R$^2$ | 0.77 |

*Note:* City-level panel data estimates with city and year fixed effects, 1979-2019. Cluster-robust standard errors with clustering at the state level shown in parentheses. All models control for lagged sworn officers per capita as well as a set of nine unlogged KMV controls but are not shown to conserve space. Chicago, Louisville, Minneapolis, New York, Omaha, San Jose, and Washington DC are dropped because of excessive missing data.

## C.  Addressing Potential Concerns

We supplement our main empirical analyses with an event-study analysis as well as Goodman-Bacon (2021) decompositions of our regressions. The event-study analysis gives us a framework for investigating the validity of the conditional parallel trends assumption in our empirical context as well as the evolution of the impact in RTC laws over time. Goodman-Bacon (2021) decompositions provide insight into the robustness of our regressions to heterogenous treatment effects. We also perform covariate balance tests using the weights obtained from the Goodman-Bacon (2021) decomposition to assess how well the regression counterfactual matches the treatment group on observable characteristics.

EVENT-STUDY ANALYSIS. — We employ an event-study design to allow us to inspect the stability of our pre-passage time trends and examine how the impact of RTC law evolves over time. The findings of a DiD OLS design such as those presented in Table 2 depend on the following assumption: conditional on covariates, if treated units never adopted the treatment, their outcomes would have evolved in parallel to the untreated units. In our empirical context, this assumption might not hold if, for instance, selected states were experiencing a secular increase in violent crime rates in their

[26]The specific estimate in (Donohue, Aneja and Weber, 2019) was that of the roughly 400,000 guns stolen each year, the RTC-induced increase in thefts had increased that number from 300,000 to 400,000.

16

major cities and adopted RTC laws as a response. As stated previously in Section I, we argue that the adoption of RTC laws is unrelated to pre-existing crime trends.

While this parallel trends assumption cannot be tested directly because we cannot observe the counterfactual city, we can examine whether conditional parallel trends held in the period prior to RTC adoption. To do this, we ran regressions including the values on yearly dummy variables for each of the 10 years prior to RTC adoption to 10 years after RTC adoption as well as catch-all variables for 11 or more years before and 11 or more years after RTC adoption, to measure the dynamic effect of the policy change in the cities that switched RTC laws during our study window. The dummy for one year prior is omitted, so all coefficients are normalized to the value in the year prior to RTC adoption. Equation 5 shows the model used for our analyses: let $AdoptYear$ be the rounded year of RTC implementation for the cities that came under a RTC regime during our 1979-2019 data period, and equal to zero for all other cities. That is, with some shorthand notation for the "11-or-more" variables, we computed the least squares fit for:

$$(5) \qquad y_{it} = \sum_{k \in \{-11^+, -10, \ldots, 10, 11^+\} \setminus \{-1\}} \beta_k \mathbf{1}[t = AdoptYear_i + k] + X_{it}\gamma + \alpha_t + \delta_i + \epsilon_{it}$$

We then plotted the point estimates and confidence intervals of each of the yearly dummies $\beta_k$. Figure 3 presents these event-study estimates for the firearm violent crime and firearm robbery rate. We see that in both cases, the trend is flat in pre-passage years and rises sharply following RTC adoption. We find a similar pattern for overall robberies and overall violent crime rates, as well as overall aggravated assault and firearm aggravated assault rates. Our plots suggest that the adoption of RTC laws leads to sharp increases in these crime rates in the first three years, followed by a far more slowly rising crime rate thereafter. A similar pattern is also seen for both clearance rates and stolen guns. The finding that in RTC-adopting cities crime clearance starts dropping and the value of stolen guns starts increasing at the same time crimes start rising lends support to our hypothesis that declines in police effectiveness and the facilitation effect are key mechanisms by which RTC laws generate increased violent crime.

A standard test for assessing the parallel trends assumption is to establish that one cannot reject the assumption that the yearly dummies from two up to five years prior to adoption are jointly different from zero. With the exception of nonfirearm aggravated assault, we find non-significance at the ten percent level for all F-tests on our crime rate, clearance rate, and stolen guns outcome variable regressions. Event-study plots and F-tests for all outcome variables are provided in Online

17



| (a) Firearm Violent Crime | (b) Firearm Robbery |

Figure 3. : Firearm Crimes Rise Sharply at the Point of Adoption of RTC Laws

*Note:* 95 percent confidence intervals with cluster-robust standard errors displayed. The number of switcher cities contributing to each coefficient are indicated on the chart.
*Source:* Author-cleaned data set.

Appendix D.

Beyond our F-tests and visual inspections of the event-study analyses, we also note that for all our statistically significant outcome variables, any deviations from parallel pretrends are small relative to the treatment effect. Manski and Pepper (2018) used partial identification analysis to study the effect of RTC laws on crime in three states (albeit using an incorrect date for RTC passage for the state of Virginia). As a quantitative analysis in the spirit of Manski and Pepper (2018), we consider the magnitude of our estimated treatment effects relative to any prepassage deviation from parallel pretrends. For example, consider how our point estimate that RTC laws increase firearm violent crime by 28.96 percent compares to the largest deviation from zero in any of the the five placebo years prior to RTC passage, $\hat{\theta} = \max\{|\hat{\beta}_{-5}|, ..., |\hat{\beta}_{-2}|\} = 2.50$. The estimated treatment effect is $28.96/2.50 = 11.58$ times as large as this $\hat{\theta}$, meaning that the magnitude of the deviation from parallel trends in the *post*-treatment period that would be required to reverse the sign of our average treatment effect is more than 11 times as large as any deviation observed in the five years prior to passage.

HETEROGENEOUS TREATMENT EFFECTS. — Goodman-Bacon (2021) illustrates how heterogeneous treatment effects and trends could undermine the robustness of the staggered DiD OLS estimator of the average treatment effect on the treated (ATT), and provides a method for decomposing the estimates to assess their validity. Goodman-Bacon demonstrates that the overall ATT estimate is a weighted average of many "2x2" DiD comparisons divided into the following five categories:

18

1) Timing Group vs Timing Group: This is the combination of 2 different cases:

   a) An earlier treated group as the treatment group with a later treated group as a control; or

   b) A later treated group as the treatment group with an earlier treated group as the control

2) A treated group as the treatment group with the always-treated group as the control;

3) A treated group as the treatment group with the never-treated group as the control;

4) The always-treated group as the treatment group with the never-treated group as the control;

5) Within Timing Groups: using differences in covariates as variation, this category compares two units that implemented an RTC law at the same time to each other.

Only comparison 3 (treated group vs. never-treated group) remains unbiased if treatment effects change over time. How heavily weighted a 2x2 DiD comparison will be is related to the population of the control and treatment units in that comparison, as well as the timing of the change in the RTC law in the treatment group (since groups that change their treatment indicator in the middle of the time frame of a study tend to be more heavily weighted than those who changed their treatment indicator at the beginning or end of the study period). All weights vary between 0 and 1 and sum to 1. Note that due to limitations in the Stata program "BACONDECOMP" (Goodman-Bacon, Goldring and Nichols, 2019), we are unable to use population-varying weights for the Goodman-Bacon decomposition, so we instead used fixed weights within each city based on their average population throughout the study period. Additionally, Goodman-Bacon decompositions currently do not consider partial treatment values, so we round all of our treatment values meaning that all states that adopted an RTC law in a given (rounded) year are considered to be part of the same treatment group. Lastly, the procedure does not support unbalanced data, so we used a multiple imputation procedure by Honaker, King and Blackwell (2011) to fill in missing data. In Online Appendix C, we explain the imputation procedure and replicate the main findings using our balanced dataset of imputed values and show that the results do not change substantially from those of our complete case analysis.

The Goodman-Bacon decomposition results are supportive of our conclusions. The calculated ATTs and relative weights of each type of comparison (the category "Timing Groups" combines both comparisons 1 and 2, which are currently not able to be disaggregated with the current Stata program when including control variables) for the regressions on firearm violent crime and firearm

19

robbery are presented in Table 5. In Online Appendix E, we provide equivalent tables for all crime outcome variables, and we also present decomposition plots showing the weight and ATT of each individual comparison. As illustrated in Table 5, the never vs. timing comparisons, which are not vulnerable to bias from heterogeneous treatment effects over time, are the most heavily weighted type of comparison. In every model the single most heavily weighted comparison of any two groups is the 1996 treatment group, consisting of 12 cities, to the 11 never-adopting cities.[27] Across all regressions, the never-treated vs. timing comparisons consistently have higher estimated treatment effects greater than or roughly equivalent to the overall group of 2x2 comparisons, suggesting that the removal of "unclean" comparisons would increase our aggregate ATTs.

Table 5—: Goodman-Bacon (2021) Decomposition Results

|  | Firearm Violent Crime | | Firearm Robbery | |
|  | Beta | Weight | Beta | Weight |
|---|---|---|---|---|
| Timing Groups | -11.27 | 0.40 | -11.38 | 0.42 |
| Always vs. Timing | 7.58 | 0.02 | 14.45 | 0.02 |
| Never vs. Timing | 39.93 | 0.43 | 44.90 | 0.42 |
| Always vs. Never | 6.16 | 0.001 | 20.80 | 0.001 |
| Within | -52.71 | 0.15 | -34.95 | 0.14 |

*Note:* OLS decomposition weights for the regression on firearm violent crimes and firearm robberies from Table 2, with imputed data, rounded treatment values, and fixed 2019 population weighting. Missing data imputed using imputation procedure described in Appendix A.2.4.

The Goodman-Bacon decomposition allows us to identify the weight of each 2x2 comparison in the regression. Using this information, we can conduct weighted balance tests of the covariates used in our regressions. Following the reweighted balance testing procedure proposed in Goodman-Bacon (2019), we determine the "balance weight" for each timing group (e.g all cities that passed RTC laws in 1996 constitute a single timing group) based on the relative weight of the comparisons in which it is used as a treatment group versus the comparisons in which it is used as a control group. We then run a cross-sectional regression of each covariate on a dummy variable representing whether a timing group is weighted more as a treatment group than it is a control group in the overall regression. These regressions are weighted by each timing group's "balance weight." The reweighted balance test provides a more accurate assessment of the similarity (with respect to covariates) of the treated vs. counterfactual comparison in the regression than a traditional balance test.

Table 6 indicates reasonable covariate balance between our treated and counterfactual groups.

---

[27]The 1996 treatment group consists of: Austin, Charlotte, Dallas, El Paso, Fort Worth, Houston, Las Vegas, Oklahoma City, Philadelphia, Raleigh, San Antonio, and Tulsa. The never-treated cities are: Baltimore, Boston, Fresno, Long Beach, Los Angeles, New York, Oakland, Sacramento, San Diego, San Francisco, and San Jose.

Table 6—: Goodman-Bacon (2021) Reweighted Balance Test, Firearm Violent Crime

| | Percent 18 to 24 | Percent 25 to 44 | Percent Black | Percent Hispanic | Percent Female Headed Households |
|---|---|---|---|---|---|
| Treatment Group | 0.16 | −0.99 | −0.19 | 0.89 | −0.76 |
| | (0.71) | (0.65) | (7.00) | (9.01) | (1.51) |
| | p = 0.83 | p = 0.13 | p = 0.98 | p = 0.93 | p = 0.62 |
| N | 1,763 | 1,763 | 1,763 | 1,763 | 1,763 |

| | Percent Living Alone | Percent in Poverty | Per Capita Income | Lagged Incarceration | Lagged Officers |
|---|---|---|---|---|---|
| Treatment Group | −0.68 | −1.09 | −444.13 | 119.89 | −0.01 |
| | (1.13) | (1.45) | (167.08) | (45.78) | (0.58) |
| | p = 0.55 | p = 0.46 | p = 0.01 | p = 0.01 | p = 0.99 |
| N | 1,763 | 1,763 | 1,763 | 1,763 | 1,763 |

*Note:* To create balance weights, we sum the decomposition weight for all 2x2 comparisons where a group $k$ is the treatment group and subtract the sum of the decomposition weights for all 2x2 comparisons where group $k$ is the control group. We then create a dummy that equals one for all groups $k$ for whom the balance weight is positive. The coefficients in the table represent the results of a cross-sectional regression of each covariate on that dummy, weighting by the balance weight. To match the analysis on firearm violent crime, Louisville, Omaha, Miami, and Jacksonville are dropped from the regression.

Most covariates show only small differences between the treated and counterfactual groups that are not statistically significant at a meaningful level. While the difference in per capita income between the treated and counterfactual groups that is significant at the 5 percent level, the difference of $444 is marginal compared to the average per capita income in our sample of $3921 (both values in 1967 dollars). As noted in Donohue, Aneja and Weber (2019), RTC states had larger increases in incarceration than other states following RTC adoption, and we observe that treatment observations have higher incarceration levels in our panel. If we restrict the comparison to only the years prior to RTC, however, we find no statistically significant difference between ever-treated and never-treated cities (see Online Appendix F for details). Thus, we conclude that generally the regression counterfactual is reasonably similar to the treatment group on observable covariates.

## V.   Discussion

In this section, we revisit our theoretical model and discuss the implications of our empirical findings for how we understand the effect of RTC on criminal behavior and policing. We then explain why the greater proportion of robberies committed by "career criminals" may explain the more sizable effects for RTC on robbery compared to homicide and aggravated assault. Finally, we compare our empirical results to other findings from the recent literature.

A.   *Deterrence is Outweighed by Criminogenic Effects of RTC Laws*

One of the major theoretical and empirical shortcomings of the policy discourse concerning the impact of laws promoting gun carrying outside the home is the implicit assumption that there are only two sets of actors relevant to the inquiry: criminals who will tend to be deterred by RTC laws and permit holders who may use their guns in a criminal fashion, either in a moment of anger or provocation or in some opportunistic act. This paper widens the lens with a theoretical model that shows that much of the prior literature has overlooked the numerous unintended consequences of RTC laws, which uniformly tend to elevate crime. Specifically, the prior literature has largely ignored the ways in which police and criminals respond to RTC laws in ways that increase crime and its social costs.

Recall that our theoretical model suggests that the impact of RTC laws on crime can be decomposed into three key effects: the facilitation effect (increased ease of obtaining and using guns) and declining police effectiveness both work to increase crime, and the deterrence effect (increased threat of retaliation from their victims, thereby increasing the perpetrators risk of injury, death, or arrest) pushes in the opposite direction.[28] The literature appears to be converging on the finding that the net effect of RTC laws is to significantly elevate violent crime (Cook and Donohue, 2017; Donohue, 2022), and this paper adds to this literature by once again illustrating the harmful net effect of RTC laws both with an updated state-level panel data analysis and also using a new data set of major U.S. cities. The most important new contribution of this work goes further to establish empirically how changes in the behavior of criminals and police following the adoption of RTC laws stimulate crime. While permit holders will also be influenced by the passage of RTC laws in ways both good and ill, this paper shows that the criminogenic effects of RTC laws broadly stimulate firearm violent crimes.

Our finding that the net effect of RTC laws is crime-inducing implies that the combination of the criminogenic influences of RTC laws outweigh any associated deterrence effect associated with RTC adoption, though we still have not empirically tested for the direct presence of any deterrent effect.[29] Recent work on legal expansions on defensive use of force have also found that any beneficial

---

[28]As noted in Section II, the increased threat of facing an armed victim may cause some criminals to respond not by foregoing crime, but rather by carrying out offenses with firearms whereas they previously would have used another weapon or gone unarmed.

[29]There is anecdotal evidence of some thwarting, injuring, and killing of criminals by permit holders as well as anecdotal evidence of permit holders inadvertently killing noncriminals or trying to portray their own criminal assaults as self-defense gun use. Prior empirical research has linked observable victim precaution measures, such as private security (Meehan and Benson, 2017), security alarm systems (Zimmerman, 2014), and neighborhood public safety organizations (Cook and MacDonald, 2011), to lower rates of robbery. Ayres and Levitt (1998) analyze the staggered rollout of Lojack across US geographic markets and find that the introduction of Lojack decreased auto-theft rates, which suggests that the deterrence effect of unobservable victim

deterrence they afford has been outweighed by their criminogenic effects. Specifically, Cheng and Hoekstra (2013) and McClellan and Tekin (2017) find that the adoption of stand-your-ground laws on balance escalates violence and has led to statistically significant increases in homicides. Like these two studies, we are unable to directly measure the deterrence effect of increased firearm carrying on crime, but we show that such an effect, if it exists, is small compared to the criminogenic effects of RTC laws. This point is driven home most dramatically by the fact that we find that RTC laws induced large *increases* in robberies since this is the crime most often committed outside the home with the largest potential for RTC-induced deterrence (Cook, Moore and Braga, 2004).[30]

How Large is the Policing Effect?. — Our results showed that RTC laws decreased the police clearance rates across many violent crime categories. Our finding that the drop in clearance rates does not change substantially when controlling for the rate of violent crime suggests that the decrease in clearance rates is driven by causes other than police being overwhelmed with the need to address increased violent crime. Possible other factors could include the taxing of police resources to deal with the RTC-induced increases in gun thefts, accidental gun discharges and shootings, processing of gun permits, and the array of factors that flow from police interactions with a more heavily armed public. Specifically, police effectiveness may be undermined because officers may be more hesitant to engage with a more heavily armed civilian population (Donohue, Aneja and Weber, 2019).[31] In addition to this police "pull-back" effect, there is little doubt that police react more aggressively because of their fears about being shot, and the deaths and beatings at police hands that emanate from this fear can degrade police-community relations in ways that further dampens police effectiveness at solving crime (as the community pulls back from assisting the police).

Table 3 revealed that RTC laws cause the probability of arrest for violent crime to fall by 12.96 percent, which would translate to about a 5.4 percentage point reduction relative to the population-weighted average clearance rate of 42 percent in adopting cities the calendar year immediately

---

protection can have positive externalities even for unprotected victims. It will take further work to establish if there is any similar protective effect from concealed carry, and also to ascertain whether and to what extent criminals respond with greater violence to all potential victims because they cannot observe those who are carrying weapons.

[30]Cook, Moore and Braga (2004) also notes that Lott (2000), which supersedes the work from Lott and Mustard (1997), provides little support for RTC laws reducing robbery, while his reported results for homicide are generally negative and statistically significant. Cook, Moore and Braga (2004) suggests that such findings are inconsistent with the predicted deterrence effect of RTC laws.

[31]This effect is distinct from the de-policing hypothesis in response to "viral" incidents of deadly force on police effectiveness studied in Devi and Fryer Jr (2020) and other literature investigating the potential "Ferguson effect," as discussed in Donohue (2017). We note that work in this area is still preliminary, and police fear for their personal safety due to the potential increase in confrontations with armed civilians is distinct from police concerns about the consequences of the increased salience of police activity.

preceding RTC adoption.[32]  Previous empirical estimates place the elasticity of violent crime with respect to arrest rates in the neighborhood of -0.225 to -0.9, and between -0.26 and -0.5 for the elasticity of robbery with respect to arrests (see Bun et al. (2020), pp. 2308-2310, for a summary of estimates).  If the true elasticity falls within the range given by the literature, then our empirical estimates would imply that impaired police effectiveness due to RTC laws could be responsible for an increase in violent crime of roughly 3 to 12 percent.  This seems within the right order of magnitude compared to our estimate of the aggregate effect of RTC laws (which includes the facilitation and deterrence effects) driving a 13 percent increase in violent crime rates.

How Large is the Facilitation Effect?. — Our empirical analysis also suggests that RTC laws increase the total value of stolen guns by around 35 percent, providing the first causal estimate of the effect of RTC laws on gun thefts.  Compared to the literature on the elasticity of crime with respect to arrests, fewer studies have estimated the relationship between crime and stolen guns. Khalil (2017) estimates that the elasticity of of firearm assaults with respect to illegal firearm flows within the last year is 0.15, which would suggest that the 35 percent increase in stolen guns due to RTC laws would lead to a 5 percent increase in firearm assaults.[33]  Khalil's estimated harm from gun theft may also be understated since it does not consider how illegal gun flows may cross borders, creating negative spillover effects.  Studies of firearms recovered in Chicago between 2009 and 2013 (Cook et al., 2014) and Boston between 1991 and 1995 (Braga, 2017) suggest that around 60 to 70 percent of guns recovered come from out of state, and Knight (2013) suggests that guns may flow from states with weaker gun laws to those with stronger gun laws.  The large externalities associated with increased gun theft in a particular jurisdiction suggest that our estimates understate the harmful impact of RTC laws on crime and clearance rates.

Criminogenic Mechanisms and the Proportion of Violent Crimes Committed with a Firearm. — For both robberies and overall violent crimes, our results showed a strong and significant increase in firearm crime, positive but insignificant point estimates on nonfirearm crimes, and marginally

---

[32]Similarly, the estimate that robbery clearances fall by 14.90 percent due to RTC (Table 3) translates to a 4.0 percentage point decline in the probability of arrest relative to the weighted average clearance rate of 27 percent the year prior to RTC adoption in our sample.

[33]While the Kahlil study is impressive in many respects, Kahlil acknowledges the challenges for his estimation strategy without plausibly exogenous variation of gun theft.  Nonetheless, this estimate may be within the right order of magnitude. Prisoner surveys suggest that less than three percent of incarcerated individuals who used a gun to commit a felony stole the gun themselves but about a quarter to a third of them obtained guns on the black market (and an unknown proportion obtained the gun from a friend or relative who obtained the weapon illegally).  Assaults are by far the most common crime committed with firearms, so an estimated elasticity of 0.15 of firearm assaults with respect to illegal gun flows within the last year does not seem unreasonable.

significant positive effects for overall crime. The difference in magnitude of findings on firearm and nonfirearm crimes indicate that in addition to increasing total rates of violent crimes, RTC laws also shift the composition of crimes towards more frequent criminal firearm usage. This pattern is consistent with our hypothesis that both the facilitation effect, which would increase the utility of firearm crimes, and declines in police effectiveness, which would increase both the utility of firearm and nonfirearm crimes, contribute to increases in crime linked to RTC laws. It is also consistent with the possibility that criminals arm themselves proactively due to the perceived increased threat of meeting armed resistance. Aside from providing further evidence bolstering our hypothesis, the shifting composition of violent crimes towards increased firearm usage is striking in and of itself due to its societal implications. Firearm robberies are far more likely to result in murder and serious injury than nonfirearm robberies, which increases the social burden from RTC laws (Cook, 1987). Moreover, firearm robberies are more lucrative, and therefore more costly to society, than nonfirearm robberies.

### B.  RTC's Heterogeneous Effects by Crime Type

The statistically significant estimates that RTC laws increase overall firearm violent crime as well as the component crimes of firearm robbery and firearm aggravated assault by remarkably large amounts with an attendant finding of no sign of any benefit from RTC laws represent a remarkable indictment of permissive gun carrying laws. Perhaps the most noteworthy and novel result is the finding that RTC laws increase firearm robbery by a striking 32 percent. Our estimates of the varying declines in police effectiveness across different crime types, as well as Khalil (2017)'s findings on the elasticity of stolen guns relative to different crime types, suggest that it is reasonable to expect heterogeneous effects of RTC laws on different types of violent crime.

One key distinction between robberies and other components of violent crime that may be driving heterogeneous treatment effects is that a significantly larger share of robberies are committed by "career criminals."[34] These criminals differ from other individuals in their risk assessment due to their experience in criminal settings (Anwar and Loughran, 2011). We reason that most will respond to RTC laws not by ending their criminal careers but rather by adjusting their behavior to continue to effectuate their criminal designs by using guns themselves and more aggressively confronting their victims to foreclose the prospect of armed resistance. They are aided in these

---

[34]While the share of each type of violent crime that is committed by career criminals is difficult to determine, a proxy for this may be the share of each type of crime that is committed by strangers. National crime victimization data suggests that the proportion of robberies committed by strangers is substantially higher than the proportion of aggravated assaults or homicides committed by strangers (Harrell, 2012).

efforts by the law-abiding citizens who carry guns outside the home, thereby leading to their theft on the order of about 100,000 stolen guns per year and by the cascade of influences operating on police that ultimately result in lower police effectiveness, as shown in our documentation of substantial drops in the clearance rates of violent crime.

Since an influx of stolen guns and diminished police effectiveness are both factors that can lead to the success and profitability of criminal misconduct, we would expect that the criminogenic effects of RTC laws are likely to be stronger among career criminals than other potential criminals. The illicit facilitation effect mechanism through increased gun theft will disproportionately aid career criminals, and we suspect for three reasons that they will perceive the increased risk of victim retaliation to be smaller and the decreased risk of legal sanctions to be larger than other individuals will. First, because of their past experiences in crime, career criminals are likely to better assess the increased risk posed to them by an armed victim, and are thus less likely to inflate the increased risk due to risk averse preferences (Schulz, 2014). Second, their past experiences, social networks, and active interest in observing law enforcement, will make them more likely to perceive the RTC-induced declines in police effectiveness. Third, career criminals may be more selective about their victims and may simply choose to commit crimes against victims they predict are less likely to be armed or engineer their attacks in ways that thwart any defensive response.

### C.  Situating Our Findings in Existing Literature

By applying the methodology from Goodman-Bacon (2021), we join the emerging literature applying new econometric techniques that provides evidence of the link between RTC laws and violent crime. Colmer and Doleac (2021) avoid many of the challenges we describe in the robustness section of our paper by instead studying how RTC laws affect the homicide-temperature relationship, finding that lenient gun laws lead to substantially greater increases in homicide as temperatures rise. McElroy and Wang (2017) employ a "seemingly inextricable dynamic differences (SIDiD) estimator" using a proxy for age-specific violent crime rates to study entry and exit behaviors of violent criminal cohorts and and find that RTC laws led to a substantial increase in violent crime.

Comparison of our current city-level analysis of 1979-2019 data to the state-level panel data analysis for 1979-2014 in Donohue, Aneja and Weber (2019) may also be a useful benchmark, as both studies use a parsimonious set of socioeconomic and demographic covariates and are similar in many of their other specifications. Our present study has a higher estimate of the effect of violent crime, although the two estimates are not statistically distinct when compared with a two-sample

z-test (Clogg, Petkova and Haritou, 1995). If it is the case that RTC laws cause a larger increase in violent crime in our present study sample than in the study sample of Donohue, Aneja and Weber (2019) and in the updated state-level estimates we provide in this paper, one reasonable interpretation is that the harmful effect of RTC laws on violent crimes is greater in large urban areas than in other parts of the country. This may be due to the fact that there are more guns to steal in cities or that police effectiveness degrades more in cities, where most violent crimes occur.

## VI.   Conclusion

Using a novel data set on crime in the most highly populated US cities, we showed that RTC laws cause an increase in firearm violent crimes, robberies and aggravated assaults, and provide suggestive evidence of increases in overall violent crimes, robberies and aggravated assaults as well. We emphasize the importance of rigorous robustness checks of the various assumptions made in an empirical model. To that end, we use both context-dependent qualitative and quantitative demonstrations of the robustness of our population-weighted least squares regression to the possibility of non-parallel pretrends and bias due to heterogeneous treatment effects.

We then provide important new information on two mechanisms that underlie these increases in crime following the adoption of RTC laws. The increasing firearm violence is facilitated by a massive 35 percent increase in gun theft ($p = 0.06$), with further crime stimulus flowing from diminished police effectiveness, as reflected in a 13 percent decline in violent crime clearance rates. Taking the midpoint of the relevant elasticities discussed above, these two factors would generate an 8.7 percent increase in violent crime, when the total increase in violent crime from RTC laws is estimated to be 13 percent.[35] On this accounting, roughly two-thirds of the increase in violent crime resulting from RTC laws is caused by impaired policing and increased gun theft. It is plausible that two other factors whose individual effects we have not been able to estimate in this study contribute to this increase in firearm violence: 1) criminals who previously committed crime without carrying guns decided to arm themselves in response to the increased potential of armed resistance and 2) some permit holders responded to stressful situations by engaging in criminal violence with their newly carried weapons. At the same time, any benefits from deterrence or thwarting/incapacitating

---

[35]We noted that impaired police effectiveness due to RTC laws could increase violent crime by roughly 3 to 12 percent, so the above calculation takes the midpoint value of 7.5 percent. Using Khalil (2017)'s measure of determining elasticities of each component of violent crime with respect to stolen guns, we estimate that overall firearm violent crime has an elasticity of about 0.10 with respect to stolen guns, based on the relative proportion of each sub-type of firearm violent crime. Given that firearms were used in about 34 percent of violent crimes in our sample, a reasonable estimate is that the elasticity of violent crime with respect to gun theft is in the neighborhood of 0.034. This means that a 35 percent increase in stolen guns would lead to an additional increase in violent crime of 1.2 percent. The combined increase in violent crime from these (admittedly imprecise) estimates would be $7.5 + 1.2 = 8.7$ percent.

JA2732

criminals from increased gun carrying under RTC laws would dampen crime. All we can conclude at this time is that the combined effect of these unobserved factors seems to explain only half as much of the violent crime increase as the mechanisms we have measured.[36]

These findings are illuminating for both policymakers and researchers considering the effect of different types of gun laws on criminal behavior. Our study investigates the criminogenic effects associated with increased gun carrying. The same mechanisms we identify in our paper with respect to increased gun carrying are relevant in other policy contexts as legal changes that promote or decrease gun theft will presumably have predictable repercussions for criminal activity. Similarly, the end of the federal assault weapons ban and the attendant federal ban on high-capacity magazine ban or eliminating gunfree zones might well be associated with declines in police effectiveness. Certainly, the experience in the Parkland High School mass shooting in 2018 and the Uvalde mass shooting of 2022 were examples of police reluctance to confront a teenage killer armed with an AR-15. A key contribution of our article is to advance our understanding of the mechanisms governing criminal and police responses to gun laws, thereby clarifying how these laws may affect crime and public safety.

Our findings suggest a number of avenues for future research. First, while our study contributes to the literature finding that RTC laws elevate crime on balance, more work needs to be done to tease out the individual contributions of the three factors whose combined effect (but not necessarily their individual effects) is likely to be small in comparison to the criminogenic effects we have identified herein. For example, it will be interesting to nail down whether there is any detectable benefit associated with these laws and if the burdens of the law that we have clearly identified fall equally on permit holders and others. Second, given the right data, it may be possible to clarify the reasons for RTC-induced declines in police effectiveness by measuring whether RTC laws reduce police-civilian interactions, effectively pose a tax on police time, degrade police-community relations, or diminish risky but effective crime-suppressing police interventions or operations. Third, more granular data on the black market for stolen guns and the flow of illegal firearms could clarify the extent to which firearms stolen under an RTC regime increase crime by converting thieves into violent criminals or simply increasing the weaponry available to violent criminals. Finally, Goodman-Bacon (2021) is only one of the many developments emerging from the active econometric methods research on

---

[36]Note that since the three other factors that we cannot individually estimate work in opposition (two would stimulate crime and one would suppress it), their individual effects could be meaningful, even if their combined influence was negligible. Using our elasticity calculations in footnote 38, above, we would surmise that the combined effect of all other factors, including these three and possibly others we have not addressed, would be to increase violent crime by about one-third of the total 13 percent increase that flows from RTC adoption.

staggered-adoption panel data analyses. Further research will likely refine the best econometric techniques in this domain.

## References

**Anwar, Shamena, and Thomas A Loughran.** 2011. "Testing a Bayesian Learning Theory of Deterrence Among Serious Juvenile Offenders." *Criminology*, 49(3): 667–698.

**Ayres, Ian, and Steven D Levitt.** 1998. "Measuring Positive Externalities from Unobservable Victim Precaution: An Empirical Analysis of Lojack." *The Quarterly Journal of Economics*, 113(1): 43–77.

**Becker, Gary S.** 1968. "Crime and Punishment: An Economic Analysis." *Journal of Political Economy*, 76(2): 169–217.

**Billings, Stephen B.** 2020. "Smoking Gun? Linking Gun Ownership to Neighborhood Crime." *SSRN working paper.*

**Black, Dan A, and Daniel S Nagin.** 1998. "Do Right-to-Carry Laws Deter Violent Crime?" *The Journal of Legal Studies*, 27(1): 209–219.

**Boylan, Richard T.** 2019a. "Imputation Methods Make Crime Studies Suspect: Detecting Biases via Regression Discontinuity."

**Boylan, Richard T.** 2019b. "Official Statistics Underreport Crime: Evidence from Regression Discontinuity and State Reporting Laws."

**Braga, Anthony A.** 2017. "Long-Term Trends in the Sources of Boston Crime Guns." *RSF: The Russell Sage Foundation Journal of the Social Sciences*, 3(5): 76–95.

**Bun, Maurice JG, Richard Kelaher, Vasilis Sarafidis, and Don Weatherburn.** 2020. "Crime, Deterrence and Punishment Revisited." *Empirical economics*, 59(5): 2303–2333.

**Bureau of Alcohol, Tobacco, Firearms and Explosives.** 2015. "2015 Report on Firearms Commerce in the U.S."

**Bureau of Justice Statistics.** 2018. "Law Enforcement Agency Identifiers Crosswalk, United States, 2012 (ICPSR 35158)."

**Charles, Patrick J.** 2018. *Armed in America: A History of Hun Rights from Colonial Militias to Concealed Carry.* Prometheus Books.

**Cheng, Cheng, and Mark Hoekstra.** 2013. "Does Strengthening Self-Defense Law Deter Crime or Escalate Violence? Evidence from Expansions to Castle Doctrine." *Journal of Human Resources*, 48(3): 821–854.

**Clay-Warner, Jody, and Callie Harbin Burt.** 2005. "Rape Reporting After Reforms: Have Times Really Changed?" *Violence against women*, 11(2): 150–176.

**Clogg, Clifford C, Eva Petkova, and Adamantios Haritou.** 1995. "Statistical Methods for Comparing Regression Coefficients Between Models." *American journal of sociology*, 100(5): 1261–1293.

**Colmer, Jonathan, and Jennifer L Doleac.** 2021. "Access to Guns in the Heat of the Moment: The Effect of Gun Laws on Violent Crime." Working paper.

**Cook, Philip J.** 1987. "Robbery Violence." *Journal of Criminal Law and Criminology*, 78: 357.

**Cook, Philip J.** 1991. "The Technology of Personal Violence." *Crime and Justice*, 14: 1–71.

**Cook, Philip J, and John J Donohue.** 2017. "Saving Lives by Regulating Guns: Evidence for Policy." *Science*, 358(6368): 1259–1261.

**Cook, Philip J, and John MacDonald.** 2011. "Public Safety Through Private Action: An Economic Assessment of BIDS." *The Economic Journal*, 121(552): 445–462.

**Cook, Philip J, Mark H Moore, and Anthony A Braga.** 2004. "Gun Control." In *Crime: Public Policies for Crime Control.* , ed. James Q Wilson and Joan Petersilia, Chapter 11, 291–329. Institute for Contemporary Studies.

**Cook, Philip J, Richard J Harris, Jens Ludwig, and Harold A Pollack.** 2014. "Some Sources of Crime Guns in Chicago: Dirty Dealers, Straw Purchasers, and Traffickers." *Journal of Criminal Law and Criminology*, 104: 717.

**Devi, Tanaya, and Roland G Fryer Jr.** 2020. "Policing the Police: The Impact of "Pattern-or-Practice" Investigations on Crime." National Bureau of Economic Research.

**Dezhbakhsh, Hashem, and Paul H Rubin.** 1998. "Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime." *The American Economic Review*, 88(2): 468–474.

**Donohue, John J.** 2017. "Comey, Trump, and the Puzzling Pattern of Crime in 2015 and Beyond." *Columbia Law Review*, 117: 1297.

**Donohue, John J.** 2022. "Forthcoming. The Effect of Permissive Gun Laws on Crime." *The ANNALS of the American Academy of Political and Social Science.*

**Donohue, John J, Abhay Aneja, and Kyle D Weber.** 2019. "Right-to-Carry Laws and Ciolent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis." *Journal of Empirical Legal Studies*, 16(2): 198–247.

**Doucette, Mitchell L, Julie A. Ward, Alex D McCourt, Daniel Webster, and Cassandra K. Crifasi.** 2022. "Officer-involved Shootings and Concealed Carry Weapons Permitting Laws, 2014-2020." *Journal of Urban Health.*

**Elinson, Zusha, and Cameron McWhirter.** 2022. "Gun Thefts Are Rising and Leading to More Crime, Including Sacramento Mass Shooting." *Wall Street Journal.*

**Federal Bureau of Investigation.** 2020. "Crime in the United States, 2019."

**Fridel, Emma E.** 2021. "Comparing the Impact of Household Gun Ownership and Concealed Carry Legislation on the Frequency of Mass Shootings and Firearms Homicide." *Justice Quarterly*, 38(5): 892–915.

**Goodman-Bacon, Andrew.** 2019. "Difference-in-Differences with Variation in Treatment Timing." *Working Paper.*

**Goodman-Bacon, Andrew.** 2021. "Difference-in-Differences with Variation in Treatment Timing." *Journal of Econometrics*, 225(2): 254–277.

**Goodman-Bacon, Andrew, Thomas Goldring, and Austin Nichols.** 2019. "BACONDECOMP: Stata module to perform a Bacon decomposition of difference-in-differences estimation." Statistical Software Components S458676, Boston College Department of Economics.

**Goodman, David.** 2022. "Stressed Drivers, Lots of Guns: An Explosion in Road Rage Shootings." *New York Times.*

**Harrell, Erika.** 2012. "Violent Victimization Committed by Strangers, 1993-2010."

**Hemenway, David, Deborah Azrael, and Matthew Miller.** 2017. "Whose Guns are Stolen? The Epidemiology of Gun Theft Victims." *Injury Epidemiology*, 4(1): 1–5.

**Honaker, James, Gary King, and Matthew Blackwell.** 2011. "Amelia II: A Program for Missing Data." *Journal of Statistical Software*, 45: 1–47.

31

**Kaplan, Jacob.** 2021*a*. "Jacob Kaplan's Concatenated Files: Uniform Crime Reporting Program Data: Law Enforcement Officers Killed and Assaulted (LEOKA) 1960-2020."

**Kaplan, Jacob.** 2021*b*. "Jacob Kaplan's Concatenated Files: Uniform Crime Reporting Program Data: Offenses Known and Clearances by Arrest, 1960-2019."

**Kaplan, Jacob.** 2021*c*. "Jacob Kaplan's Concatenated Files: Uniform Crime Reporting (UCR) Program Data: Property Stolen and Recovered (Supplement to Return A) 1960-2020."

**Kaplan, Jacob.** 2021*d*. "Jacob Kaplan's Concatenated Files: Uniform Crime Reporting (UCR) Program Data: Supplementary Homicide Reports, 1976-2019."

**Kaplan, Jacob.** 2021*e*. "Uniform Crime Reporting (UCR) Program Data: A Practitioner's Guide."

**Khalil, Umair.** 2017. "Do More Guns Lead to More Crime? Understanding the Role of Illegal Firearms." *Journal of Economic Behavior & Organization*, 133: 342–361.

**Klick, Jonathan, and Alexander Tabarrok.** 2005. "Using Terror Alert Levels to Estimate the Effect of Police on Crime." *The Journal of Law and Economics*, 48(1): 267–279.

**Knight, Brian.** 2013. "State Gun Policy and Cross-State Externalities: Evidence fro Crime Gun Tracing." *American Economic Journal: Economic Policy*, 5(4): 200–229.

**Kovandzic, Tomislav V, Thomas B Marvell, and Lynne M Vieraitis.** 2005. "The Impact of "Shall-Issue" Concealed Handgun Laws on Violent Crime Rates: Evidence from Panel Data for Large Urban Cities." *Homicide Studies*, 9(4): 292–323.

**Kruttschnitt, Candace, William D Kalsbeek, Carol C House, et al.** 2014. "Estimating the Incidence of Rape and Sexual Assault."

**La Valle, James M.** 2013. "Gun Control" vs. "Self-Protection": A Case Against the Ideological Divide." *Justice Policy Journal*, 10(1): 1–26.

**La Valle, James M, and Thomas C Glover.** 2012. "Revisiting Licensed Handgun Carrying: Personal Protection or Interpersonal Liability?" *American Journal of Criminal Justice*, 37(4): 580–601.

**Levitt, Steven D.** 1997. "Using Electoral Cycles in Police Hiring to Estimate the Effects of Police on Crime." *American Economic Review*, 87(3): 270–290.

**Lott, John R.** 2000. *More Guns, Less Crime: Understanding Crime and Gun Control Laws.* University of Chicago Press.

**Lott, Jr, John R, and David B Mustard.** 1997. "Crime, Deterrence, and Right-to-Carry Concealed Handguns." *The Journal of Legal Studies*, 26(1): 1–68.

**Ludwig, Jens.** 1998. "Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data." *International Review of Law and Economics*, 18(3): 239–254.

**Ludwig, Jens, and Philip J Cook.** 2004. *Evaluating Gun Policy: Effects on Crime and Violence.* Brookings Institution Press.

**Manski, Charles F, and John V Pepper.** 2018. "How do Right-to-Carry Laws Affect Crime Rates? Coping with Ambiguity Using Bounded-Variation Assumptions." *Review of Economics and Statistics*, 100(2): 232–244.

**Marley, Patrick, and Bill Glauber.** 2011. "Wisconsin Senate Passes Concealed-Carry Bill." *Milwaukee Journal Sentinel*.

**McClellan, Chandler, and Erdal Tekin.** 2017. "Stand Your Ground Laws, Homicides, and Injuries." *Journal of Human Resources*, 52(3): 621–653.

**McElroy, Marjorie B, and Will Wang.** 2017. "Seemingly Inextricable Dynamic Differences: The Case of Concealed Gun Permit, Violent Crime and State Panel Data." *SSRN working paper*.

**Meehan, Brian, and Bruce L Benson.** 2017. "Does Private Security Affect Crime?: A Test Using State Regulations as Instruments." *Applied Economics*, 49(48): 4911–4924.

**Mello, Steven.** 2019. "More COPS, Less Crime." *Journal of Public Economics*, 172: 174–200.

**Miczek, Klaus A, Albert J Reiss, and Jeffrey A Roth.** 1993. *Understanding and Preventing Violence.* Vol. 3, National Academies Press.

**Mocan, H Naci, Stephen C Billups, and Jody Overland.** 2005. "A Dynamic Model of Differential Human Capital and Criminal Activity." *Economica*, 72(288): 655–681.

**National Research Council, et al.** 2005. "Firearms and Violence: A Critical Review."

**Patrick, Brian Anse.** 2010. *Rise of the Anti-Media: In-forming America's Concealed Weapon Carry Movement.* Rowman & Littlefield.

**Rivas, Brennan Gardner.** 2019. "When Texas Was the National Leader in Gun Control." *Washington Post.*

**Schell, Terry L, Matthew Cefalu, Beth Ann Griffin, Rosanna Smart, and Andrew R Morral.** 2020. "Changes in Firearm Mortality Following the Implementation of State Laws Regulating Firearm Access and Use." *Proceedings of the National Academy of Sciences,* 117(26): 14906–14910.

**Schulz, Sonja.** 2014. "Individual Differences in the Deterrence Process; Which Individuals Learn (Most) from their Offending Experiences?" *Journal of Quantitative Criminology,* 30(2): 215–236.

**Smart, Rosanna, Andrew R. Morral, Sierra Smucker, Samantha Cherney, Terry L. Schell, Samuel Peterson, Sangeeta C. Ahluwalia, Matthew Cefalu, Lea Xenakis, Rajeev Ramchand, and Carole Roan Gresenz.** 2020. *The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States, Second Edition.* Santa Monica, CA:RAND Corporation.

**Zimmerman, Paul R.** 2014. "The Deterrence of Crime Through Private Security Efforts: Theory and Evidence." *International Review of Law and Economics,* 37: 66–75.

Preventive Medicine 79 (2015) 22–27



Contents lists available at ScienceDirect

# Preventive Medicine

journal homepage: www.elsevier.com/locate/ypmed





# The epidemiology of self-defense gun use: Evidence from the National Crime Victimization Surveys 2007–2011

David Hemenway [a,*], Sara J. Solnick [b]

[a] Harvard School of Public Health, 677 Huntington Avenue, Boston, MA 02115, USA
[b] Department of Economics, University of Vermont, 237 Old Mill, Burlington, VT, USA

### ARTICLE INFO

Available online 21 April 2015

Keywords:
Self-defense
Gun
Protection
Property loss

### ABSTRACT

Objectives. To describe the epidemiology of self-defense gun use (SDGU) and the relative effectiveness of SDGU in preventing injury and property loss.

Methods. Data come from the National Crime Victimization Survey for 2007–2011, focusing on personal contact crimes. For property loss, we examined incidents where the intent was to steal property. Multivariate analyses controlled for age, gender of offender and victim, if offender had a gun, urbanicity, and thirteen types of self-protective action.

Results. Of over 14,000 incidents in which the victim was present, 127 (0.9%) involved a SDGU. SDGU was more common among males, in rural areas, away from home, against male offenders and against offenders with a gun. After any protective action, 4.2% were injured; after SDGU, 4.1% of victims were injured. In property crimes, 55.9% of victims who took protective action lost property, 38.5 of SDGU victims lost property, and 34.9% of victims who used a weapon other than a gun lost property.

Conclusions. Compared to other protective actions, the National Crime Victimization Surveys provide little evidence that SDGU is uniquely beneficial in reducing the likelihood of injury or property loss.

© 2015 Elsevier Inc. All rights reserved.

## Introduction

The main reason Americans own guns is for protection (Pew Research Center for the People and the Press, 2014). Yet little is actually known about who uses guns in self-defense, and in what circumstances. While there has been much debate about self-defense gun use, the conclusion of the National Academy of Sciences Panel still stands: self-defense is an ambiguous term and whether one is a defender or a perpetrator may depend on perspective (National Research Council, 2005).

Virtually all available data on self-defense come from the self-report of victims—either from private one-time surveys or from the National Crime Victimization Survey (NCVS). The private surveys have the disadvantage of being relatively small—the reported self-defense gun uses are too few to provide stable disaggregate estimates about the epidemiology of self-defense gun use. Each NCVS is much larger than any private survey. In addition, the NCVS is conducted twice each year and results from numerous years can be aggregated together.

NCVS data have been used in various studies of protective action. Many of these studies have few self-defense gun uses to analyze as they focus on a single type of crime such as assaults against women (Bachman et al., 2002; Thompson et al., 1999) or robberies (Kleck and

DeLone, 1993). Early studies using NCVS specifically to analyze the effect of self-defense gun use on injury were not able to determine whether the injury occurred before or after the victim used the gun (Kleck and DeLone, 1993; Kleck and McElrath, 1991; Southwick, 2000). We only found one study of the effect of self-defense use which focused on injury occurring AFTER (or during) gun use (Tark and Kleck, 2004).

We could not find a basic, thorough, descriptive epidemiologic analysis of self-defense gun use using NCVS data—describing who uses guns, where and in what circumstances. Among relevant studies (Tark and Kleck, 2004; McDowall and Wiersema, 1994), the study (Hart and Miethe, 2009) that comes closest to that target analyzes the data in a manner that is not particularly helpful for policy or individual decision-making. That study by Hart and Miethe divides crime situations into 48 categories, as determined by five variables as follows: (a) sexual assault, non-sexual assault, or robbery; (b) offender armed or not; (c) daytime or not; (d) private or public location; and (e) offender on drugs/alcohol or not. These situations are then ranked by the likelihood that a firearm is used in self-defense. Not surprisingly, very low incident categories have both the highest rates and the lowest rates of self-defense gun use. For example, the highest incident rate of self-defense gun use—17% of the time (1/6)—occurred in sexual assaults, when the offender was armed, in a private location, during the day, when the offender was high on drugs/alcohol; the lowest rate—0% of the time (0/7)—occurred for robberies in a private location at night when the offender was armed and high on drugs/alcohol.

* Corresponding author.
E-mail addresses: hemenway@hsph.harvard.edu (D. Hemenway),
sara.solnick@uvm.edu (S.J. Solnick).

http://dx.doi.org/10.1016/j.ypmed.2015.03.029
0091-7435/© 2015 Elsevier Inc. All rights reserved.

D. Hemenway, S.J. Solnick / Preventive Medicine 79 (2015) 22–27

Our article has two goals. The first goal is to present more fully the epidemiology of self-defense gun use—the demographics of the defensive gun user and the type of situation in which self-defense gun use typically occurs. The second goal is to provide an up-to-date description of the effectiveness of self-defense gun use relative to other forms of protective action, in terms of both injury and loss of property.

## Methods

The National Crime Victimization Survey (NCVS) is the primary source of information in the United States on the nature and extent of criminal victimization. The NCVS collects information on nonfatal personal crimes (rape or sexual assault, robbery, aggravated and simple assault, and personal larceny) and household property crimes (burglary, motor vehicle theft, and other theft) both reported and not reported to police. It is conducted by the U.S. Census Bureau for the Bureau of Justice Statistics.

NCVS is a self-report survey in which respondents are asked about victimizations experienced during the prior 6 months. Data are obtained from a sample of about 90,000 households, comprising nearly 160,000 individuals which are weighted to be nationally representative. Response rates are typically over 85% for both households and eligible persons.

Each household is interviewed twice during the year. Household remain in the sample for 3 years, and eligible persons in these household are interviewed every six months for a total of seven interviews. The first interview is typically in-person with subsequent interviews by phone.

The NCVS is administered to household members age 12 or older. Excluded are persons living in military barracks and institutional settings, such as correctional facilities. Victimizations that occurred outside of the United States (less than 1% of all victimizations) are excluded.

Data for the current study come from the NCVS for a five year period, 2007–2011. To examine the epidemiology of self-defense gun use, we examined only incidents that involved some degree of personal contact between the offender and the victim—incidents in which a self-protective action was possible. This includes all assaults (both sexual and non-sexual), robberies, in-person verbal threats and purse snatching, as well as a fraction of burglaries and other thefts. This same subsample of crimes is used to examine the effectiveness of self-defense gun use and other self-protective actions on the likelihood of victim injury. To examine the effect of self-defense gun use on property loss, we examine a different subset of crimes—those where the primary intent was to steal property. This subset includes all robberies, personal contact larcenies and personal contact burglaries, but not assaults, sexual assaults or verbal threats.

Victims are asked, "Was there anything you did or tried to do about the incident while it was going on?" If they say yes, then they are asked "What did you do?" and the answer is classified into one of sixteen types of self-protective action. Victims are then asked "Anything else?" until they have volunteered all the self-protective actions taken. Thus each victim could name many actions. In our analysis, the variable for each action indicates whether the victim did or did not take that particular action. We reduced the sixteen actions to thirteen by combining "Attached offender with a gun" and "Threatened offender with a gun" into "Attacked or threatened with gun" and likewise for "other weapon" and "without weapon."

To ensure that significance tests were not distorted, we used the NCVS "incident weights" but then adjusted them so that the apparent sample size was equal to the actual unweighted sample size. While Lohr and Liu (1994) find that weights are not always necessary when using the NCVS for complex analysis, they also say that weighted estimates are more robust to misspecification of the model and that standard errors are generally higher, leading us to conclude that weighting is the more conservative choice. We used chi-square tests to test for

significance. For specific self-defense actions, significant tests compared taking that specific action to not taking that specific action.

We defined "at home" as inside respondent's own lodging (dwelling, attached garage, enclosed porch, detached building on own property, vacation home/second home). The NCVS divides locations into rural and urban; because of the perceived high rates of crime in many large cities, we subdivided the urban group into locations with population < 1,000,000 and with population ≥ 1,000,000 (large urban).

Victims were classified as being injured after they took protective action if they were injured concurrently or after taking protective action. We analyzed the data both including (shown in tables) and not including (not shown) incidents in which the victim did not take any protective action.

We define "crimes of violence" as assaults, sexual assaults and robberies; not included as crimes of violence are verbal threats, pick pocketing and property crimes.

In multivariate analyses we control for age, gender, event occurring at home or away from home, in rural, urban or large urban areas, whether the offender was a male or female, whether the offender had a gun, and thirteen specific self-protective actions the victim might take.

As the NCVS data are publicly available and do not contain personal identifiers, the Harvard School of Public Health Institutional Review Board deemed this study to be exempt.

## Results

In the NCVS surveys from 2007 to 2011, there were 14,145 crime incidents in which the victim was present at the incident. The victim used a gun to threaten or attack the perpetrator in less than 0.9% of these incidents (n = 127) (Table 1). Males were more likely to use a gun in

**Table 1**
Who takes self-protective actions in what type of circumstances.

| Characteristics of victim or incident | N | Attacked or threatened offender with gun | Other self-protective action | No self-protective action |
|---|---|---|---|---|
| All | 14,145 | 0.9% | 42.5% | 56.6% |
|  |  |  |  |  |
| 12–19 years old | 3341 | 0.0% | 43.1% | 56.9% |
| 20–29 years old | 3563 | 1.5% | 46.1% | 52.4% |
| 30–39 years old | 2301 | 1.1% | 45.3% | 53.6% |
| 40–49 years old | 2098 | 1.1% | 44.6% | 54.3% |
| 50–59 years old | 1596 | 0.7% | 37.4% | 61.8% |
| ≥60 years old | 1245 | 1.1% | 28.4% | 70.5%[***] |
|  |  |  |  |  |
| Male | 6877 | 1.4% | 44.2% | 54.3% |
| Female | 7268 | 0.4% | 40.9% | 58.7%[***] |
|  |  |  |  |  |
| At home | 4357 | 1.0% | 33.8% | 65.3% |
| Away from home | 9788 | 0.9% | 46.4% | 52.7%[***] |
|  |  |  |  |  |
| Rural | 2054 | 1.5% | 42.0% | 56.5% |
| Urban | 10,892 | 0.8% | 42.8% | 56.4% |
| Large urban | 1199 | 0.4% | 40.7% | 58.9%[**] |
|  |  |  |  |  |
| Male offender | 8991 | 1.3% | 52.6% | 46.1% |
| Female offender | 2969 | 0.1% | 39.0% | 60.9%[***] |
|  |  |  |  |  |
| Offender had gun | 730 | 3.3% | 42.6% | 54.2% |
| Off didn't have gun | 13,415 | 0.8% | 42.5% | 56.7%[***] |
|  |  |  |  |  |
| Type of crime |  |  |  |  |
| Sexual assault | 337 | 0.0% | 62.0% | 38.0% |
| Robbery | 1085 | 1.2% | 55.4% | 43.5% |
| Assault (not sexual) | 5241 | 0.9% | 59.4% | 39.6% |
| Verbal threats | 2634 | 0.8% | 50.5% | 48.6% |
| Purse snatching or pocket picking | 315 | 0.0% | 14.8% | 85.2% |
| Property crimes | 4531 | 1.0% | 15.6% | 83.4%[***] |

** p < .01 in chi-squared test.
*** p < .001 in chi-squared test.

24    D. Hemenway, S.J. Solnick / Preventive Medicine 79 (2015) 22–27

defense (1.4% of the incidents) than females (0.4%). Self-defense gun use was more common for crimes in rural areas (in 1.5% of the rural crimes the victim reported using a gun in self-defense) compared to crimes in urban areas (0.8%) or large urban areas (0.4%). Victims were more likely to use a gun for self-defense in crimes when there was a male offender (1.3%) rather than a female offender (0.1%), and when the offender had a gun (3.3% of the incidents) than when the offender did not have a gun (0.8%). There was no statistical difference in the likelihood of self-defense gun use for crimes at home vs. away from home. Nor was there any statistical difference in the likelihood of self-defense gun use in robberies vs. assault vs. verbal threats vs. property crimes. There were no gun uses in self-defense reported for either sexual assaults or purse snatching/pick pocketing. Multivariate analyses did not change these major findings (not shown).

Males and females were close to equally likely to be a victim in a criminal incident, while males were three times more likely to use a gun in self-defense in such incidents. Accordingly, about three quarters of self-defense gun uses were by males (Table 2a). Approximately two thirds of personal contact crimes occurred away from home, and gun use in self-defense was equally likely to occur in home or away incidents. Accordingly, about two thirds of all self-defense gun uses occurred away from home. Victims were far more likely to use a gun in self-defense when the perpetrator had a gun, but since the perpetrator had a gun in only 3.3% of the incidents (730/14,415), over 80% of self-defense gun use occurred when the perpetrator did not have a gun. Perpetrators used guns 5.7 times more often than did victims (730/127). Crimes of violence (assaults, sexual assaults, robberies) accounted for 47% of personal contact crimes and 50% of self-defense gun uses.

For males, almost three quarters of their self-defense gun uses occurred away from home (73%), while close to half of female self-defense gun uses occurred at home (48%) (Table 2b). This difference was particularly apparent in terms of (non-sexual) assaults where close to 90% of male self-defense gun use occurred away from home while over 60% of female self-defense gun uses by women occurred at home. Most female self-defense gun use (52%) was for protection against property crime, while property crime accounted for only 28% of male self-defense gun use.

Victims were injured in 17.3% of the incidents and younger victims were more likely to be injured than older victims (Table 3a). Victims took some type of protective action 43.4% of the time. Victims were injured in 25.5% of the incidents in which they took protective action and in 11.0% of the incidents in which they did not take action

(Table 3b). In the incidents in which victims took self-protective action, in 4.2% they were injured (concurrently or) AFTER they took action.

Of the 127 incidents in which victims used a gun in self-defense, they were injured AFTER they used a gun in 4.1% of the incidents. Running away and calling the police were associated with a reduced likelihood of injury after taking action; self-defense gun use was not. In multivariate analyses (Table 3c), attacking or threatening the perpetrator with a gun had no significant effect on the likelihood of the victim being injured after taking self-protective action.

Victims were significantly less likely to be injured BEFORE they took self-protective action when their self-protective action involved using a gun (6.8% of these 127 incidents) than in incidents in which they took other protective actions (21.3%) (Table 3b). In terms of the likelihood of receiving an injury AT ANY TIME during the incident, using a gun in self-defense was associated with a lower likelihood of injury compared to other self-protective actions, but the likelihood of injury when there was a self-defense gun use (10.9%) was basically identical to the likelihood of injury when the victim took no action at all (11.0%). In the multivariate analysis, compared to all other contact crime incidents, those where a gun was used in self-defense was not associated with a significant reduction in the likelihood of being injured during the crime (Table 3c).

For robbery, burglary and personal contact larceny crimes, when victims took no action they lost property 84.9% of the time (Table 4a). When victims took self-protective action, they lost property 55.9% of the time. When victims used a gun, they lost property 38.5% of the time. When they used a weapon other than a gun they lost property 34.9% of the time. Multivariate analysis (Table 4b) did not substantially alter these results.

**Table 2b**
Number and percent of self-defense gun uses by gender.

|  | Males (N = 97) | Females (N = 30) |
|---|---|---|
| Rural | 18.0% | 46.1% |
| Urban/large urban | 82.0% | 53.9% |
| At home | 26.9% | 52.1% |
| Away from home | 73.1% | 47.9% |
| Property crime | 28.0% | 53.9% |
| Verbal threat | 20.8% | 5.6% |
| Robbery | 9.9% | 10.8% |
| Assault (not sexual) | 41.4% | 29.7% |
| At home | 4.2% | 18.9% |
| Away from home | 37.2% | 10.8% |

**Table 2a**
Number and percent of self-defense gun uses.

|  | Number of SDGU | Percent of SDGU |
|---|---|---|
| All | 127 | 100% |
| Male | 97 | 76.2% |
| Female | 30 | 23.8% |
| Rural | 31 | 24.6% |
| Urban | 91 | 71.6% |
| Large Urban | 5 | 3.8% |
| At home | 42 | 32.9% |
| Away from home | 85 | 67.1% |
| Offender had gun | 24 | 18.8% |
| Offender didn't have gun | 103 | 81.2% |
| Type of crime |  |  |
| Sexual assault | 0 | 0.0% |
| Robbery | 13 | 10.1% |
| Assault (not sexual) | 49 | 38.6% |
| Verbal threats | 22 | 17.1% |
| Purse snatch/pocket picking | 0 | 0.0% |
| Property crimes | 43 | 34.1% |

**Table 3a**
Who is injured?

|  | Among respondents present at the incident | | |
|---|---|---|---|
|  | N | Not injured | Injured |
| All | 14,145 | 82.7% | 17.3% |
| 12–19 years old | 3341 | 78.9% | 21.1% |
| 20–29 years old | 3563 | 79.0% | 21.0% |
| 30–39 years old | 2301 | 82.7% | 17.3% |
| 40–49 years old | 2098 | 85.1% | 14.9% |
| 50–59 years old | 1596 | 89.0% | 11.0% |
| ≥60 years old | 1245 | 91.4% | 8.6%*** |
| Male | 6877 | 82.1% | 17.9% |
| Female | 7268 | 83.4% | 16.6%* |
| At home[1] | 4357 | 83.2% | 16.8% |
| Away from home | 9788 | 82.5% | 17.5% |
| Rural | 2054 | 83.6% | 16.4% |
| Urban | 10,892 | 82.6% | 17.4% |
| Large urban | 1199 | 81.7% | 18.3% |

D. Hemenway, S.J. Solnick / Preventive Medicine 79 (2015) 22–27

25

**Table 3b**

Effect of self-protective actions on victim injury.

| | Among respondents present at the incident | | | |
|---|---|---|---|---|
| | N | Not injured | Injured before action | Injured after action |
| All | 14,145 | 82.7% | 15.5% | 1.8% |
| Was there anything you did or tried to do about the incident while it was going on? | | | | |
| Yes | 6139 | 74.5%*** | 21.3%*** | 4.2% |
| No/took no action/kept still | 8006 | 89.0% | 11.0% | – |
| Specific actions | | | | |
| Attacked or threatened with gun | 127 | 89.1%*** | 6.8%*** | 4.1% |
| Attacked or threatened with other weapon | 121 | 74.5% | 20.2% | 5.3% |
| Attacked or threatened without a weapon | 733 | 59.3%*** | 33.9%*** | 6.8%*** |
| Defended self or property (struggled, ducked, blocked blows, held onto property) | 1557 | 47.0%*** | 44.5%*** | 8.5%*** |
| Chased, tried to catch or hold offender | 256 | 77.5% | 16.5% | 6.0% |
| Yelled at offender, turned on lights, threatened to call police, etc. | 1095 | 73.0% | 21.5% | 5.5%* |
| Cooperated or pretended to | 150 | 80.5% | 15.9% | 3.6% |
| Argued, reasoned, pleaded, bargained, etc. | 890 | 75.9% | 18.8% | 5.4%* |
| Ran or drove away or tried, hid, locked door | 1086 | 79.1%*** | 18.5%* | 2.4%*** |
| Called police or guard | 1068 | 82.7%*** | 15.2%*** | 2.2%*** |
| Tried to attract attention or help | 245 | 58.6%*** | 35.7%*** | 5.6%*** |
| Screamed from pain or fear | 248 | 27.7%*** | 66.2%*** | 6.0%*** |
| Something else | 737 | 86.6%*** | 10.9%*** | 2.6%* |

For specific actions, each specific action is compared to not taking that specific action among victims who took action (n = 6139).

## Discussion

Self-defense gun use is a rare event. Results from the NCVS find that guns are used by victims in less than 1% of crimes in which there is personal contact between the perpetrator and victim, and about 1% in cases of robbery and (non-sexual) assault. There were no reported cases of self-defense gun use in the more than 300 cases of sexual assault.

Who typically uses a gun in self-defense? While the numbers are small (n = 127), we can say that males are far more likely than females to use a gun in self-defense. Indeed, this is not surprisingly since most gun owners are male. This result is consistent with some (Hemenway and Azrael, 2000; Hemenway et al., 2000) but not all (Kleck, 1995; Cook and Ludwig, 1998) of the one-time private surveys, and is consistent with earlier studies using the National Crime Victimization Survey (Schnebly, 2002).

Our results indicate that most self-defense gun uses by males occur in urban areas, most occur away from home, and most occur during an assault or robbery. By contrast, most female self-defense gun uses occur at home and most involve property crimes.

It should be noted that a self-defense gun use requires the presence of a gun. By contrast most of the other self-protective actions, such as running away, arguing, struggling, cooperating, screaming or trying to attract attention, can occur in almost any crime. While the US has many more firearms and allows firearms in many more places than other first world countries, the readily availability of even more guns in more places would likely increase the number of self-defense gun uses.

However, the data provide little evidence that using a gun in self-defense reduces injury. Slightly more than 4% of victims were injured during or after a self-defense gun use—the same percentage as were injured during or after taking all other protective actions. Some self-protective actions were associated with higher probabilities of subsequent injury. The reader must be warned, however, that the sample of those injured after using a gun (5/127) is really too small to warrant

**Table 3c**

Multivariate analysis: effectiveness of self-protective actions on victim injury (odds ratios).

| Independent variables | Any injury: compared to all incidents | Injury after self-protective action: compared to incidents where victims took action |
|---|---|---|
| Male | 0.87+ | 0.97 |
| Age (omitted category is 12–19 years old) | | |
| 20–29 years old | 1.00 | 1.08 |
| 30–39 years old | 0.85* | 0.93 |
| 40–49 years old | 0.71*** | 0.65+ |
| 50–59 years old | 0.53*** | 0.71 |
| ≥60 years old | 0.44*** | 0.40* |
| Urban area | 1.07 | 0.97 |
| Large urban area | 1.17 | 1.34 |
| At home | 1.12* | 1.40* |
| Self-protection actions | | |
| Attacked or threatened with gun | 0.67 | 1.28 |
| Attacked or threatened with other weapon | 1.57+ | 1.52 |
| Attacked or threatened without a weapon | 3.19*** | 1.95*** |
| Defended self or property (struggled, ducked, blocked blows, held onto property) | 6.66*** | 3.22*** |
| Chased, tried to catch or hold offender | 1.08 | 1.53 |
| Yelled at offender, turned on lights, threatened to call police, etc. | 1.01 | 1.42* |
| Cooperated or pretended to | 0.91 | 1.04 |
| Argued, reasoned, pleaded, bargained, etc. | 1.20* | 1.58** |
| Ran or drove away or tried, hid, locked door | 1.29** | 0.76 |
| Called police or guard | 0.87 | 0.61* |
| Tried to attract attention or help | 1.62** | 1.27 |
| Screamed from pain or fear | 7.99*** | 0.85 |
| Something else | 1.07 | 1.05 |
| Constant | 0.15*** | 0.02*** |
| N | 10,696 | 4431 |
| Pseudo R$^2$ | 0.14 | 0.07 |

For self-protective actions, each specific action is compared to not taking that specific action.
* p < .05.
** p < .01.
*** p < .001.

strong conclusions. The large majority of crime victims who are injured are injured before they take any action.

Where self-defense gun use stands out compared to other forms of self-protection is the low rate of injury that occurs to gun users BEFORE their protective action. Any explanation for this finding must currently be speculative. One of the various possibilities is that gun users are more vigilant, wary and aware than other victims, and able to respond more rapidly to threats. Another possibility is that incidents where guns are used are different; for example they may more likely be the result of mutual hostility such as escalating arguments. Such arguments may end in verbal aggression or physical assaults where the victim is less likely to be taken completely by surprise. Results from private surveys that ask respondents to describe the event in their own words (Hemenway and Azrael, 2000; Hemenway et al., 2000) find that the reported self-defense gun use in these surveys usually occur in escalating hostile interactions.

Most prior claims about the relative effectiveness of self-defense gun use come from evaluations of NCVS data which could not distinguish injury before or after the gun use (Kleck and DeLone, 1993; Schnebly, 2002). As Ullman (1998) states, without information on the sequence of resistance and injury, you cannot draw conclusions about whether the resistance provoked the injury or an injury provoked resistance from previously non-resisting victims. In our study, controlling for the demographics of the incident (i.e., age and gender of victim, whether it occurred at home, and in an urban area), self-defense gun use

*D. Hemenway, S.J. Solnick / Preventive Medicine 79 (2015) 22–27*

**Table 4a**
Property loss: who loses property in robbery, burglary or personal contact larceny.

| Characteristics of victim or incident | N | Something taken |
|---|---|---|
| All | 6486 | 82.5% |
| 12–19 years old | 630 | 81.0% |
| 20–29 years old | 1468 | 81.5% |
| 30–39 years old | 1218 | 84.4% |
| 40–49 years old | 1197 | 83.0% |
| 50–59 years old | 974 | 81.2% |
| ≥60 years old | 998 | 83.4% |
| Male | 3128 | 82.9% |
| Female | 3358 | 82.1% |
| At home | 5288 | 83.9% |
| Away from home | 1198 | 76.6%*** |
| Rural | 1124 | 81.8% |
| Urban | 4729 | 83.2% |
| Large urban | 633 | 79.0%* |
| Male offender | 1413 | 67.4% |
| Female offender | 307 | 74.1%* |
| Offender had gun | 293 | 83.3% |
| Offender didn't have gun | 1937 | 72.8%*** |

| Self-protective actions | N | Something taken |
|---|---|---|
| Was there anything you did or tried to do about the incident while it was going on? | | |
| Yes | 825 | 55.9% |
| No/took no action/kept still | 1404 | 84.9%*** |
| Specific actions | | |
| Attacked or threatened with gun | 22 | 38.5%*** |
| Attacked or threatened with other weapon | 21 | 34.9%*** |
| Attacked or threatened without a weapon | 98 | 48.8%*** |
| Defended self or property (struggled, ducked, blocked blows, held onto property) | 252 | 65.2%*** |
| Chased, tried to catch or hold offender | 57 | 57.9%** |
| Yelled at offender, turned on lights, threatened to call police, etc. | 188 | 48.7%*** |
| Cooperated or pretended to | 40 | 93.0%** |
| Argued, reasoned, pleaded, bargained, etc. | 91 | 60.0%** |
| Ran or drove away or tried, hid, locked door | 139 | 46.6%*** |
| Called police or guard | 136 | 53.1%*** |
| Tried to attract attention or help | 51 | 45.3%*** |
| Screamed from pain or fear | 41 | 56.9%* |
| Something else | 83 | 62.7%* |

For self-protective actions, each is compared to not taking that specific action.

**Table 4b**
Multivariate analysis: property-loss.

| Independent variables | Something taken in a robbery, burglary or personal contact larceny: odds ratios | |
|---|---|---|
| | Model 1 | Model 2 |
| Male | 1.01 | 0.92 |
| Age (omitted category is 12–19 years old) | | |
| 20–29 years old | 0.95 | 0.91 |
| 30–39 years old | 0.95 | 0.96 |
| 40–49 years old | 0.64* | 0.56** |
| 50–59 years old | 0.90 | 0.88 |
| ≥60 years old | 0.70+ | 0.67+ |
| Urban area | 1.66*** | 1.45* |
| Large urban area | 1.04 | 0.97 |
| At home | 0.66*** | 0.59*** |
| Self-protection actions | | |
| Attacked or threatened with gun | 0.26** | 0.30* |
| Attacked or threatened with other weapon | 0.12*** | 0.17*** |
| Attacked or threatened without a weapon | 0.29*** | 0.38*** |
| Defended self or property (struggled, ducked, blocked blows, held onto property) | 0.71* | 0.89 |
| Chased, tried to catch or hold offender | 0.88 | 1.26 |
| Yelled at offender, turned on lights, threatened to call police, etc. | 0.39*** | 0.47*** |
| Cooperated or pretended to | 7.06** | 7.27** |
| Argued, reasoned, pleaded, bargained, etc. | 0.68 | 0.77 |
| Ran or drove away or tried, hid, locked door | 0.25*** | 0.30*** |
| Called police or guard | 0.56** | 0.69+ |
| Tried to attract attention or help | 0.47* | 0.52+ |
| Screamed from pain or fear | 1.61 | 1.38 |
| Something else | 0.42*** | 0.60+ |
| Male offender | | 0.76+ |
| Offender had gun | | 1.98*** |
| Constant | 4.28*** | 4.42*** |
| N | 1723 | 1235 |
| Pseudo R² | 0.09 | 0.10 |

For self-protective actions, each is compared to not taking that specific action.

(compared to other possible protective actions) was not significantly associated with a reduced likelihood of injury during/after the self-defense gun use. In addition, in multivariate analysis, victims who used a gun in self-defense were not less likely receive an injury during the entire event compared all other contact crime victims.

The evidence suggests that using a weapon in self-defense may reduce the likelihood of losing property during the commission of crime. However, it is not clear that using a gun is better or worse than using other weapons. Unfortunately, unlike what is done for injury, the NCVS does not try to tease out the chronological sequence of events concerning property loss. So we cannot determine whether the property was lost before or after the victim took protective action, nor whether the protective action recovered the victim's property that the offender had taken.

Overall, about half of self-defense gun use occurs in robberies and assaults, about half involves verbal threats or property crimes. The NCVS only asks about major crimes, and so does not provide the possibility for respondents to mention self-defense gun use against trespassing or other minor crimes.

NCVS data far more criminal gun uses than self-defense gun uses. This result has been found consistently in studies using the NCVS (McDowall and Wiersema, 1994; Cook, 1991; Guns, 1994) and in private surveys asking comparable questions about both offensive and

defensive gun use (Hemenway and Azrael, 2000; Hemenway et al., 2000; Hemenway and Miller, 2004; Hemenway, 2006).

Many of our findings relating to the frequency of self-defense gun use and its effect on injury and property loss are similar to those found in an examination of the NCVS for the decade 1992–2001 (Tark and Kleck, 2004). For that decade, of the 27,595 personal contact crimes reported, the victim similarly used a gun in self-defense in less than 0.9% of the incidents. Among the 1119 sexual assaults reported, in only one did the victim report using a gun. There were no significant differences in the likelihood of being injured during or after a self-defense gun use compared to being injured during or after taking other forms of protective action. Self-defense gun use was associated with lower rates of property loss than most other forms of protective action.

Our study has various limitations. As do virtually all studies of self-defense gun use, the NCVS relies on self-report by the victim. There is no external validation of the events, nor is anyone giving the other side of the story about this hostile interaction. Even given the large size of each NCVS, and our use of data from ten surveys, the number of reported self-defense gun uses is relatively small (127), so it is not possible to obtain stable estimates of small subcategories of events (e.g., self-defense gun use by women in rural areas). The number of victims seriously injured after specific protective actions is too small to analyze and (since this a self-report survey) there is no information about crimes that led to the death of the victim (Zimring and Zuehl, 1986). In addition, the focus of the NCVS is on crimes rather than the

D. Hemenway, S.J. Solnick / Preventive Medicine 79 (2015) 22–27

response to crime. Respondents are asked twice if they did anything in response to the crime, but there are no specific questions about self-defense gun use, or the use of other weapons. And there are no follow-up questions. Thus there are no details on self-defense gun use regarding the type of gun, whether it was initially loaded and unlocked, how long it took to get, etc. Finally, our analysis is descriptive rather than causal. While we use multiple regression to control for many variables, instances of self-defense gun use may differ in many ways—including ways we could not control for—from instances where the victim used other forms of self-defense or took no self-protective action (Cook, 1986).

While it has limitations, the National Crime Victimization Survey has important strengths. A single NCVS is far larger than any of the one-time private (non-governmental) self-defense gun surveys ever undertaken, and we have combined data from ten surveys. The NCVS also has a much higher response rate than private surveys. In addition, the NCVS effectively eliminates the problem of telescoping of events by dropping the first household survey and on subsequent surveys asking only about events since the previous survey. Most important, it eliminates the large false-positive problem by only asking about protective actions if the respondent has first reported that a crime was attempted against him or her (Hemenway, 1997a; Hemenway, 1997b; Cook et al., 1997).

By contrast, private surveys typically ask first about self-defense gun use and thus allow respondents to report gun uses against suspicious characters, in scary situations or during any hostile interaction (Hemenway, 2006; McDowall et al., 2000; Cook and Ludwig, 1996). Pre-emptive strikes may be reported. The number of self-defense gun uses reported in private surveys is substantially higher than in the NCVS (McDowall et al., 2000; Ikdea et al., 1997), but narratives suggest that most of these incidents are probably gun use in escalating arguments, rather than gun use against clear criminal acts. Such gun use is typically socially undesirable and probably illegal (Hemenway and Azrael, 2000; Hemenway et al., 2000).

Overall, our analyses of the NCVS data indicate that self-defense gun use is very rare, and victims virtually never use guns in sexual assaults. The data also indicate that self-defense gun uses are far fewer than criminal gun uses. Most self-defense gun use is by males and occurs outside the home. Half of the self-defense gun uses occur in what appear to be non-violent crimes (e.g., verbal threats). The NCVS data provide little evidence that self-defense gun use reduces the likelihood of victim injury during a crime. The data do suggest that using a gun may be useful at preventing property loss, but not more effective than protective action using other weapons.

### Conflict of interest

The authors declare that there are no conflicts of interests.

### References

Anon., 2005. National Research Council. Firearms and Violence: A Critical Review. National Academy Press, Washington DC.

Bachman, R., Saltzman, L.E., Thompson, M.P., Carmody, D.C., 2002. Disentangling the effects of self-protective behaviors on the risk of injury in assaults against women. J. Quant. Criminol. 18, 135–157.

Cook, P.J., 1986. The relationship between victim resistance and injury in noncommercial robbery. J. Leg. Stud. 15, 405–416.

Cook, P.J., 1991. The technology of personal violence. In: Tonry, M. (Ed.), Crime and Justice: An Annual Review of Research vol. 14. University of Chicago Press, Chicago, IL, pp. 1–71.

Cook, P.J., Ludwig, J., 1996. Guns in America: Results of a Comprehensive National Survey on Firearm Ownership and Use. Police Foundation, Washington DC.

Cook, P.J., Ludwig, J., 1998. Defensive gun uses: new evidence from a national survey. J. Quant. Criminol. 14, 111–131.

Cook, P.J., Ludwig, J., Hemenway, D., 1997. The gun debate's new mythical number: how many defensive uses per year? J. Policy Anal. Manage. 16, 463–469.

Hart, T.C., Miethe, T.D., 2009. Self-defensive gun use by crime victims: a conjunctive analysis of the situational contexts. J. Contemp. Crim. Justice 25, 6–19.

Hemenway, D., 1997a. The myth of millions: a self-defense gun use: a case study of survey overestimates of rare events. Chance (Am. Stat. Assoc.) 10, 6–10.

Hemenway, D., 1997b. Survey results and self-defense gun use: an explanation of extreme overestimates. J. Crim. law Criminol. 87, 1439–1445.

Hemenway, D., 2006. Private Guns Public Health. University of Michigan Press, Ann Arbor, MI.

Hemenway, D., Azrael, D., 2000. The relative frequency of offensive and defensive gun sue: results of a national survey. Violence Vict. 15, 257–272.

Hemenway, D., Miller, M., 2004. Gun threats against and self-defense gun use by California adolescents. Arch. Pediatr. Adolesc. Med. 158, 395–400.

Hemenway, D., Miller, M., Azrael, D., 2000. Gun use in the United States: results from two national surveys. Inj. Prev. 6, 263–267.

Ikdea, R.M., Dahlberg, L.L., Sacks, J.J., Mercy, J.A., Powell, K.E., 1997. Estimating intruder-related firearm retrievals in U.S. households, 1994. Violence Vict. 12, 363–372.

Kleck, G., DeLone, M.A., 1993. Victim resistance and offender weapon effects in robbery. J. Quant. Criminol. 9, 55–81.

Kleck, G., Gertz, M., 1995. Armed resistance to crime: the prevalence and nature of self-defense with a gun. J. Crim. Criminol. 86, 150–187.

Kleck, G., McElrath, K., 1991. The effects of weaponry on human violence. Soc. Forces 69, 669–692.

Lohr, S.L., Liu, J., 1994. A comparison of weighted and unweighted analyses in the National Crime Victimization Survey. J. Quant. Criminol. 10, 343–360.

McDowall, D., Wiersema, B., 1994. The incidence of defensive firearm use by US crime victims, 1987 through 1990. Am. J. Public Health 84, 1982–1984.

McDowall, D., Loftin, C., Presser, S., 2000. Measuring civilian defensive firearm use: a methodological experiment. J. Quant. Criminol. 161, 1–19.

Pew Research Center for the People and the Press. Why own a gun? Protection is now top reason. http://www.people-press.org/2013/03/12/why-own-a-gun-protection-is-now-top-reason/. Accessed August 2014.

Rand, M., Rand, M., 1994. Guns and Crime: Handgun Victimization, Firearm Self-defense and Firearm Theft. US Bureau of Justice Statistics. Government Printing, Office, Washington D.C. (NCJ-147003).

Schnebly, S., 2002. An examination of the impact of victim, offender and situational attributes on the deterrent effect of defensive gun use: a research note. Justice Q. 19, 377–398.

Southwick, L., 2000. Self-defense with guns. J. Crim. Just. 28, 351–370.

Tark, J., Kleck, G., 2004. Resisting crime: the effects of victim action on the outcomes of crimes. Criminology 861–909.

Thompson, M.P., Simon, T.R., Saltzman, L.E., Mercy, J.A., 1999. Epidemiology of injuries among women after physical assaults: the role of self-protective behaviors. Am. J. Epidemiol. 150, 235–244.

Ullman, S.E., 1998. Does offender violence escalate when rape victims fight back? J. Interpers. Violence 13, 179–192.

Zimring, F.E., Zuehl, J., 1986. Victim injury and death in urban robbery: a Chicago study. J. Leg. Stud. 15, 1–40.

JA2745

Check for updates

JOURNAL OF
EMPIRICAL LEGAL STUDIES

*Journal of Empirical Legal Studies*
Volume 16, Issue 2, 198–247, April 2019

# Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis

*John J. Donohue, Abhay Aneja, and Kyle D. Weber**

This article uses more complete state panel data (through 2014) and new statistical techniques to estimate the impact on violent crime when states adopt right-to-carry (RTC) concealed handgun laws. Our preferred panel data regression specification, unlike the statistical model of Lott and Mustard that had previously been offered as evidence of crime-reducing RTC laws, both satisfies the parallel trends assumption and generates statistically significant estimates showing RTC laws *increase* overall violent crime. Our synthetic control approach also finds that RTC laws are associated with 13–15 percent *higher* aggregate violent crime rates 10 years after adoption. Using a consensus estimate of the elasticity of crime with respect to incarceration of 0.15, the average RTC state would need to roughly double its prison population to offset the increase in violent crime caused by RTC adoption.

## I. Introduction

For two decades, there has been a spirited academic debate over whether "shall-issue" concealed carry laws (also known as right-to-carry or RTC laws) have an important impact on crime. The "More Guns, Less Crime" hypothesis originally articulated by John Lott and David Mustard (1997) claimed that RTC laws decreased violent

*Address correspondence to John J. Donohue, Stanford Law School, 559 Nathan Abbott Way, Stanford, CA 94305; email: donohue@law.stanford.edu. Abhay Aneja, Haas School of Business, 2220 Piedmont Avenue, Berkeley, CA 94720; email: aaneja@law.stanford.edu; Kyle D. Weber, Columbia University, 420 W. 118th Street, New York, NY 10027; email: kdw2126@columbia.edu.

We thank Phil Cook, Dan Ho, Stefano DellaVigna, Rob Tibshirani, Trevor Hastie, Stefan Wager, Jeff Strnad, and participants at the 2011 Conference of Empirical Legal Studies (CELS), 2012 American Law and Economics Association (ALEA) Annual Meeting, 2013 Canadian Law and Economics Association (CLEA) Annual Meeting, 2015 NBER Summer Institute (Crime), and the Stanford Law School faculty workshop for their comments and helpful suggestions. Financial support was provided by Stanford Law School. We are indebted to Alberto Abadie, Alexis Diamond, and Jens Hainmueller for their work developing the synthetic control algorithm and programming the Stata module used in this paper and for their helpful comments. The authors would also like to thank Alex Albright, Andrew Baker, Jacob Dorn, Bhargav Gopal, Crystal Huang, Mira Korb, Haksoo Lee, Isaac Rabbani, Akshay Rao, Vikram Rao, Henrik Sachs and Sidharth Sah who provided excellent research assistance, as well as Addis O'Connor and Alex Chekholko at the Research Computing division of Stanford's Information Technology Services for their technical support.

JA2746

:22-cv-07464-RMB-AMD   Document 90-45   Filed 02/13/23   Page 2 of 50 PageID

crime (possibly shifting criminals in the direction of committing more property crime to avoid armed citizens). This research may well have encouraged state legislatures to adopt RTC laws, arguably making the pair's 1997 paper in the *Journal of Legal Studies* one of the most consequential criminological articles published in the last 25 years.

The original Lott and Mustard paper as well as subsequent work by John Lott in his 1998 book *More Guns, Less Crime* used a panel data analysis to support the theory that RTC laws reduce violent crime. A large number of papers examined the Lott thesis, with decidedly mixed results. An array of studies, primarily those using the limited data initially employed by Lott and Mustard for the period 1977–1992 and those failing to adjust their standard errors by clustering, supported the Lott and Mustard thesis, while a host of other papers were skeptical of the Lott findings.[1]

It was hoped that the 2005 National Research Council report *Firearms and Violence: A Critical Review* (hereafter the NRC Report) would resolve the controversy over the impact of RTC laws, but this was not to be. While one member of the committee—James Q. Wilson—did partially endorse the Lott thesis by saying there was evidence that murders fell when RTC laws were adopted, the other 15 members of the panel pointedly criticized Wilson's claim, saying that "the scientific evidence does not support his position." The majority emphasized that the estimated effects of RTC laws were highly sensitive to the particular choice of explanatory variables and thus concluded that the panel data evidence through 2000 was too fragile to support any conclusion about the true effects of these laws.

This article answers the call of the NRC Report for more and better data and new statistical techniques to be brought to bear on the issue of the impact of RTC laws on crime. First, we revisit the state panel data evidence to see if extending the data for an additional 14 years, thereby providing additional crime data for prior RTC states as well as on 11 newly adopting RTC states, offers any clearer picture of the causal impact of allowing citizens to carry concealed weapons. We distill from an array of different panel data regressions for various crime categories for two time periods using two major sets of explanatory variables—including our preferred specification (DAW) and that of Lott and Mustard (LM)—a subset of regressions that satisfy the critical parallel trends assumption. All the statistically significant results from these regressions show RTC laws are associated with *higher* rates of overall violent crime, property crime, or murder.

Second, to address some of the weaknesses of panel data models, we undertake an extensive synthetic control analysis in order to present the most complete and robust

_____

[1]In support of Lott and Mustard (1997), see Lott's 1998 book *More Guns, Less Crime* (and the 2000 and 2010 editions). Ayres and Donohue (2003) and the 2005 National Research Council report *Firearms and Violence: A Critical Review* dismissed the Lott/Mustard hypothesis as lacking credible statistical support, as did Aneja et al. (2011) (and Aneja et al. (2014) further expanding the latter). Moody and Marvell (2008) and Moody et al. (2014) continued to argue in favor of a crime-reducing effect of RTC laws, although Zimmerman (2014) and McElroy and Wang (2017) find that RTC laws *increase* violent crime and Siegel et al. (2017) find RTC laws increase murders, as discussed in Section III.B.

14611, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12149 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

results to guide policy in this area.[2] This synthetic control methodology—first introduced in Abadie and Gardeazabal (2003) and expanded in Abadie et al. (2010, 2014)—uses a matching methodology to create a credible "synthetic control" based on a weighted average of other states that best matches the prepassage pattern of crime for each "treated" state, which can then be used to estimate the likely path of crime if RTC-adopting states had not adopted an RTC law. By comparing the actual crime pattern for RTC-adopting states with the estimated synthetic controls in the postpassage period, we derive year-by-year estimates for the impact of RTC laws in the 10 years following adoption.[3]

To preview our major findings, the synthetic control estimate of the average impact of RTC laws across the 33 states that adopt between 1981 and 2007[4] indicates that violent crime is substantially higher after 10 years than would have been the case had the RTC law not been adopted. Essentially, for violent crime, the synthetic control approach provides a similar portrayal of RTC laws as that provided by the DAW panel data model and undermines the results of the LM panel data model. According to the aggregate synthetic control models—regardless of whether one uses the DAW or LM covariates—RTC laws led to increases in violent crime of 13–15 percent after 10 years, with positive but not statistically significant effects on property crime and murder. The median effect of RTC adoption after 10 years is 12.3 percent if one considers all 31 states with 10 years worth of data and 11.1 percent if one limits the analysis to the 26 states with the most compelling prepassage fit between the adopting states and their synthetic controls. Comparing our DAW specification findings with the results generated using placebo treatments, we are able to reject the null hypothesis that RTC laws have no impact on aggregate violent crime.

The structure of the article proceeds as follows. Section II begins with a discussion of the ways in which increased carrying of guns could either dampen crime (by thwarting or deterring criminals) or increase crime by directly facilitating violence or aggression by permit holders (or others), greatly expanding the loss and theft of guns, and burdening the functioning of the police in ways that diminish their effectiveness in controlling crime. We then show that a simple comparison of the drop in violent crime from

---

[2]Abadie et al. (2014) identify a number of possible problems with panel regression techniques, including the danger of extrapolation when the observable characteristics of the treated area are outside the range of the corresponding characteristics for the other observations in the sample.

[3]The accuracy of this matching can be qualitatively assessed by examining the root mean square prediction error (RMSPE) of the synthetic control in the pretreatment period (or a variation on this RMSPE implemented in this article), and the statistical significance of the estimated treatment effect can be approximated by running a series of placebo estimates and examining the size of the estimated treatment effect in comparison to the distribution of placebo treatment effects.

[4]Note that we do not supply a synthetic control estimate for Indiana, even though it passed its RTC law in 1980, owing to the fact that we do not have enough pretreatment years to accurately match the state with an appropriate synthetic control. Including Indiana as a treatment state, though, would not meaningfully change our results. Similarly, we do not generate synthetic control estimates for Iowa and Wisconsin (whose RTC laws went into effect in 2011) or for Illinois (2014 RTC law), because of the limited postpassage data.

15424161, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12219 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

15452, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12219 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

1977–2014 in the states that have resisted the adoption of RTC laws is almost an order of magnitude greater than in RTC-adopting states (a 42.3 percent drop vs. a 4.3 percent drop), although a spartan panel data model with only state and year effects reduces the differential to 20.2 percent. Section III discusses the panel data results, showing that the DAW model indicates that RTC laws have increased violent and property crime, with weaker evidence that RTC laws increased homicide (but not non-gun homicide) over our entire data period, while both the DAW and the LM model provide statistically significant evidence that RTC laws have increased murder in the postcrack period.

The remainder of the article shows that, using either the DAW or LM explanatory variables, the synthetic control approach uniformly supports the conclusion that RTC laws lead to substantial increases in violent crime. Section IV describes the details of our implementation of the synthetic control approach and shows that the mean and median estimates of the impact of RTC laws show greater than double-digit increases by the 10th year after adoption. Section V provides aggregate synthetic control estimates of the impact of RTC laws, and Section VI concludes.

## II. The Impact of RTC Laws: Theoretical Considerations and Simple Comparisons

### A. Gun Carrying and Crime

#### 1. Mechanisms of Crime Reduction

Allowing citizens to carry concealed handguns can influence violent crime in a number of ways, some benign and some invidious. Violent crime can fall if criminals are deterred by the prospect of meeting armed resistance, and potential victims or armed bystanders may thwart or terminate attacks by either brandishing weapons or actually firing on the potential assailants. For example, in 2012, a Pennsylvania concealed carry permit holder became angry when he was asked to leave a bar because he was carrying a weapon and, in the ensuing argument, he shot two men, killing one, before another permit holder shot him (Kalinowski 2012). Two years later, a psychiatric patient in Pennsylvania killed his caseworker, and grazed his psychiatrist before the doctor shot back with his own gun, ending the assault by wounding the assailant (Associated Press 2014).

The impact of the Pennsylvania RTC law is somewhat ambiguous in both these cases. In the bar shooting, it was a permit holder who started the killing and another who ended it, so the RTC law may actually have increased crime. The case of the doctor's use of force is more clearly benign, although the RTC law may have made no difference: a doctor who routinely deals with violent and deranged patients would typically be able to secure a permit to carry a gun even under a may-issue regime. Only a statistical analysis can reveal whether in aggregate extending gun carrying beyond those with a demonstrated need and good character, as shall-issue laws do, imposes or reduces overall costs.

Some defensive gun uses can be socially costly and contentious even if they do avoid a robbery or an assault. For example, in 1984, when four teens accosted Bernie Goetz on a New York City subway, he prevented an anticipated robbery by shooting all four,

1461, 2019, 2. Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12219 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

202   *Donohue et al.*

permanently paralyzing one.[5] In 2010, a Pennsylvania concealed carry holder argued that he used a gun to thwart a beating. After a night out drinking, Gerald Ung, a 28-year-old Temple University law student, shot a 23-year-old former star lacrosse player from Villanova, Eddie DiDonato, when DiDonato rushed Ung angrily and aggressively after an altercation that began when DiDonato was bumped while doing chin ups on scaffolding on the street in Philadelphia. When prosecuted, Ung testified that he always carried his loaded gun when he went out drinking. A video of the incident shows that Ung was belligerent and had to be restrained by his friends before the dispute became more physical, which raises the question of whether his gun carrying contributed to his belligerence, and hence was a factor that precipitated the confrontation. Ung, who shot DiDonato six times, leaving DiDonato partially paralyzed with a bullet lodged in his spine, was acquitted of attempted murder, aggravated assault, and possessing an instrument of crime (Slobodzian 2011). While Ung avoided criminal liability and a possible beating, he was still prosecuted and then hit with a major civil action, and the incident did impose significant social costs, as shootings frequently do.[6]

In any event, the use of a gun by a concealed carry permit holder to thwart a crime is a statistically rare phenomenon. Even with the enormous stock of guns in the United States, the vast majority of the time that someone is threatened with violent crime no gun will be wielded defensively. A five-year study of such violent victimizations in the United States found that victims reported failing to defend or to threaten the criminal with a gun 99.2 percent of the time—this in a country with 300 million guns in civilian hands (Planty & Truman 2013). Adding 16 million permit holders who often dwell in low-crime areas may not yield many opportunities for effective defensive use for the roughly 1 percent of Americans who experience a violent crime in a given year, especially since criminals can attack in ways that preempt defensive measures.[7]

## 2. Mechanisms of Increasing Crime

Since the statistical evidence presented in this article suggests that the benign effects of RTC laws are outweighed by the harmful effects, we consider five ways in which RTC laws could increase crime: (a) elevated crime by RTC permit holders or by others, which can be induced by the greater belligerence of permit holders that can attend gun carrying or even through counterproductive attempts by permit holders to intervene protectively; (b) increased crime by those who acquire the guns of permit holders via loss or theft; (c) a change in culture induced by the hyper-vigilance about one's rights and the need

---

[5]The injury to Darrell Cabey was so damaging that he remains confined to a wheelchair and functions with the intellect of an eight-year-old, for which he received a judgment of $43 million against Goetz, albeit without satisfaction (Biography.com 2016).

[6]According to the civil lawsuit brought by DiDonato, his injuries included "severe neurological impairment, inability to control his bowels, depression and severe neurologic injuries" (Lat 2012).

[7]Even big city police officers rarely need to fire a weapon despite their far greater exposure to criminals. According to a 2016 Pew Research Center survey of 7,917 sworn officers working in departments with 100 or more officers, "only about a quarter (27%) of all officers say they have ever fired their service weapon while on the job" (Morin & Mercer 2017).

1461, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12319 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

to avenge wrongs that the gun culture can nurture; (d) elevated harm as criminals respond to the possibility of armed resistance by increasing their gun carrying and escalating their level of violence; and (e) all of the above factors will either take up police time or increase the risks the police face, thereby impairing the crime-fighting ability of police in ways that can increase crime.

*a. Crime committed or induced by permit holders:* RTC laws can lead to an increase in violent crime by increasing the likelihood a generally law-abiding citizen will commit a crime or increasing the criminal behavior of others. Moreover, RTC laws may facilitate the criminal conduct of those who generally have a criminal intent. We consider these two avenues below.

## i. The pathway from the law-abiding citizen

Evidence from a nationally representative sample of 4,947 individuals indicates that Americans tend to overestimate their gun-related abilities. For example, 82.6 percent believed they were less likely than the average person to use a gun in anger. When asked about their "ability to responsibly own a handgun," 50 percent of the respondents deemed themselves to be in the top 10 percent and 23 percent placed their ability within the top 1 percent of the U.S. population. Such overconfidence has been found to increase risk taking and could well lead to an array of socially harmful consequences ranging from criminal misconduct and gun accidents to lost or stolen guns (Stark & Sachau 2016).

In a number of well-publicized cases, concealed carry permit holders have increased the homicide toll by killing someone with whom they became angry over an insignificant issue, ranging from merging on a highway and talking on a phone in a theater to playing loud music at a gas station (Lozano 2017; Levenson 2017; Scherer 2016). In one particularly tragic example in January 2019 at a bar in State College, Pennsylvania, a lawful permit holder, Jordan Witmer, got into a fight with his girlfriend. When a father and son sitting at the bar tried to intervene, Witmer killed both of them, shot his girlfriend in the chest, and fled. When his car crashed, Witmer broke into a nearby house, killed the 82-year-old homeowner, who was with his wife on their 60th wedding anniversary, and then killed himself (Sauro 2019). Another such example occurred in July 2018 when Michael Drejka started to hassle a woman sitting in a car in a disabled parking spot while her husband and five-year-old son ran into a store. When the husband emerged, he pushed Drejka to the ground, who then killed him with a shot to the chest. The killing is caught on video and Drejka is being prosecuted for manslaughter in Clearwater, Florida (Simon 2018).

When Philadelphia permit holder Louis Mockewich shot and killed a popular youth football coach (another permit holder carrying his gun) over a dispute concerning snow shoveling in January 2000, Mockewich's car had an NRA bumper sticker reading "Armed with Pride" (Gibbons & Moran 2000). An angry young man, with somewhat of a paranoid streak, who has not yet been convicted of a crime or adjudicated as a "mental defective," may be encouraged to carry a gun if he resides in an RTC state.[8] That such

---

[8]The Gun Control Act of 1968 prohibits gun possession by felons and adjudicated "mental defectives" (18 U.S.C. 922(d)(4), 2016).

1602, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12319 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

individuals will be more likely to be aggressive once armed and hence more likely to stimulate violence by others should not be surprising.

Recent evidence suggests that as gun carrying is increasing with the proliferation of RTC laws, road rage incidents involving guns are rising (Biette-Timmons 2017; Plumlee 2012). Incidents in which "someone in a car brandished a gun in a threatening manner or fired a gun at another driver or passenger have more than doubled in the last three years, from 247 in 2014 to 620 in 2016 …. The highest-profile recent road rage incidents involved two NFL players, Joe McKnight and Will Smith, killed … in separate road rage shootings in New Orleans" (Shen 2017).[9] In the nightmare case for RTC, two Michigan permit-holding drivers pulled over to battle over a tailgating dispute in September 2013 and each shot and killed the other (Stuart 2013). Without Michigan's RTC law, this would likely have not been a double homicide. Indeed, two studies—one for Arizona and one for the nation as a whole—found that "the evidence indicates that those with guns in the vehicle are more likely to engage in 'road rage'" (Hemenway et al. 2006; Miller et al. 2002).[10] These studies may suggest either that gun carrying emboldens more aggressive behavior or reflects a selection effect for more aggressive individuals.[11] If this is correct, then it may not be a coincidence that there are so many cases in which a concealed carry holder acts belligerently and is shot by another permit holder.[12]

---

[9]Joe McNight and Ronald Gasser were arguing through their open car windows as they drove for miles. When they were both stopped at a red light, McNight walked over to Gasser's car, and the "two argued through the passenger-side window until Gasser pulled a gun from between his seat and the center console and shot McKnight three times." Gasser was convicted of manslaughter and sentenced to a prison term of 30 years (Calder 2018).

[10]A perfect illustration was provided by 25-year-old Minnesota concealed carry permit holder Alexander Weiss, who got into an argument after a fender bender caused by a 17-year-old driver. Since the police had been called, it is hard to imagine that this event could end tragically—unless someone had a gun. Unfortunately, Weiss, who had a bumper sticker on his car saying "Gun Control Means Hitting Your Target," killed the 17-year-old with one shot to the chest and has been charged with second-degree murder (KIMT 2018).

[11]While concealed carry permit holders should be free of any felony conviction, and thus show a lower overall rate of violence than a group that contains felons, a study in Texas found that when permit holders do commit a crime, it tends to be a severe one: "the concentration of convictions for weapons offenses, threatening someone with a firearm, and intentionally killing a person stem from the ready availability of a handgun for CHL holders" (Phillips et al. 2013). See, for example, a Texas permit holder who told police he shot a man in the head at an IHOP restaurant in Galveston because "he was annoyed by the noise the victim and others were making just a table away" (ABC News 2018).

[12]We have just cited three of them: the 2012 Pennsylvania bar shooting, the 2000 Philadelphia snow-shoveling dispute, and the 2013 Michigan road-rage incident. Here are two more. Former NFL player Will Smith, a concealed carry permit holder with a loaded gun in his car, was engaged in a road rage incident with another permit holder, who killed him with seven shots in the back and one into his side and shot his wife, hitting both knees. The shooter was convicted of manslaughter and sentenced to 25 years in prison (Lane 2018). In yet another recent case, two permit holders glowered at each other in a Chicago gas station, and when one drew his weapon, the second man pulled out his own gun and killed the 43-year-old instigator, who died in front of his son, daughter, and pregnant daughter-in-law (Hernandez 2017). A video of the encounter can be found at https://www.youtube.com/watch?v=I2j9vvDHlBU. According to the police report obtained by the *Chicago Tribune*, a bullet from the gun exchange broke the picture window of a nearby garden apartment and another shattered the window of a car with four occupants that was driving past the gas station. No charges were brought against the surviving permit holder, who shot first but in response to the threat initiated by the other permit holder.

9461, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12219 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

In general, the critique that the relatively low number of permit revocations proves that permit holders do not commit enough crime to substantially elevate violent criminality is misguided for a variety of reasons. First, only a small fraction of 1 percent of Americans commits a gun crime each year, so we do not expect even a random group of Americans to commit much crime, let alone a group purged of convicted felons. Nonetheless, permit revocations clearly understate the criminal misconduct of permit holders, since not all violent criminals are caught and we have just seen five cases where six permit holders were killed, so no permit revocation or criminal prosecution would have occurred regardless of any criminality by the deceased.[13] Second, and perhaps more importantly, RTC laws increase crime by individuals other than permit holders in a variety of ways. The messages of the gun culture, perhaps reinforced by the adoption of RTC laws, can promote fear and anger, which are emotions that can invite more hostile confrontations leading to violence. For example, if permit holder George Zimmerman hassled Trayvon Martin only because Zimmerman was armed, then the presence of Zimmerman's gun could be deemed to have encouraged a hostile confrontation, regardless of who ultimately becomes violent.[14]

Even well-intentioned interventions by permit holders intending to stop a crime have elevated the crime count when they ended with the permit holder either being killed by the criminal[15] or shooting an innocent party by

---

[13]In addition, NRA-advocated state laws that ban the release of information about whether those arrested for even the most atrocious crimes are RTC permit holders make it extremely difficult to monitor their criminal conduct.

[14]Psychologists have found that the very act of carrying a gun tends to distort perceptions of reality in a way that exaggerates perceived threats. "We have shown here that … the act of wielding a firearm raises the likelihood that nonthreatening objects will be perceived as threats. This bias can clearly be horrific for victims of accidental shootings" (Witt & Brockmole 2012). As one permit holder explained: "a gun causes its bearer to see the world differently. A well-lit city sidewalk full of innocent pedestrians becomes a scene—a human grouping one of whose constituents you might need to shoot. Something good in yourself is, by this means, sacrificed. And more. In a sudden, unwieldy hauling-out of your piece, or just by having your piece in your pocket, you can fumble around and shoot yourself, as often happens and isn't at all funny. Or you might shoot some little girl on a porch across the street or two streets away, or five streets away. Lots and lots of untoward things can happen when you're legally carrying a concealed firearm. One or two of them might turn out to be beneficial—to you. But a majority are beneficial to neither man nor beast. Boats are said, by less nautical types, always to be seeking a place to sink. Guns—no matter who has them—are always seeking an opportunity to go off. Anybody who says different is a fool or a liar or both" (Ford 2016).

[15]In 2016 in Arlington, Texas, a man in a domestic dispute shot at a woman and then tried to drive off (under Texas law it was lawful for him to be carrying his gun in his car, even though he did not have a concealed carry permit.) When he was confronted by a permit holder, the shooter slapped the permit holder's gun out of his hand and then killed him with a shot to the head. Shortly thereafter, the shooter turned himself into the police (Mettler 2016). Similarly, when armed criminals entered a Las Vegas Walmart in 2014 and told everyone to get out because "[t]his is a revolution," one permit holder told his friend he would stay to confront the threat. He was gunned down shortly before the police arrived, adding to the death toll rather than reducing it (NBC News 2014). Finally, in January 2010, Stephen Sharp arrived at work at a St. Louis power plant just as co-worker Timothy Hendron began firing at fellow workers with an AK-47. Retrieving a pistol from his truck, Sharp opened fire at Hendron, and fecklessly discharged all six rounds from across the parking lot. Unharmed, Hendron returned fire, grievously wounding Sharp and continuing his rampage unabated. When the police arrived, there was "no clear distinction between attacker and victims." In the end, Hendron killed three and wounded five before killing himself (Byers 2010).

9461, 2019, 2. Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jols.12199 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*206    Donohue et al.*

mistake.[16] Indeed, an FBI study of 160 active shooter incidents found that in almost half (21 of 45) the situations in which police engaged the shooter to end the threat, law enforcement suffered casualties, totaling nine killed and 28 wounded (Blair & Schweit 2014). One would assume the danger to an untrained permit holder trying to confront an active shooter would be greater than that of a trained professional, which may in part explain why effective intervention in such cases by permit holders to thwart crime is so rare. Although the same FBI report found that in 21 of a total of 160 active shooter incidents between 2000 and 2013, "the situation ended after unarmed citizens safely and successfully restrained the shooter," there was only one case—in a bar in Winnemucca, Nevada in 2008—in which a private armed citizen other than an armed security guard stopped a shooter, and that individual was an active-duty Marine (Holzel 2008).

### ii.  The pathway from those harboring criminal intent

Over the 10-year period from May 2007 through January 2017, the Violence Policy Center (2017) lists 31 instances in which concealed carry permit holders killed three or more individuals in a single incident. Many of these episodes are disturbingly similar in that there was substantial evidence of violent tendencies and/or serious mental illness, but no effort was made to even revoke the carry permit, let alone take effective action to prevent access to guns. For example, on January 6, 2017, concealed handgun permit holder Esteban Santiago, 26, killed five and wounded six others at the Fort Lauderdale-Hollywood Airport, before sitting on the floor and waiting to be arrested as soon as he ran out of ammunition. In the year prior to the shooting, police in Anchorage, Alaska, charged Santiago with domestic violence, and visited the home five times for various other complaints (KTUU 2017). In November 2016, Santiago entered the Anchorage FBI office and spoke of "mind control" by the CIA and having "terroristic thoughts" (Hopkins 2017). Although the police took his handgun at the time, it was returned to him on December 7, 2016 after Santiago spent four days in a mental health facility because, according to federal officials, "there was no mechanism in federal law for officers to permanently seize the weapon"[17] (Boots 2017). Less than a month later, Santiago flew with his gun to Florida and opened fire in the baggage claim area.[18]

In January 2018, the FBI charged Taylor Wilson, a 26-year-old Missouri concealed carry permit holder, with terrorism on an Amtrak train when, while carrying a loaded

---

[16]In 2012, "a customer with a concealed handgun license … accidentally shot and killed a store clerk" during an attempted robbery in Houston (MacDonald 2012). Similarly, in 2015, also in Houston, a bystander who drew his weapon upon seeing a carjacking incident ended up shooting the victim in the head by accident (KHOU 2015). An episode in June 2017 underscored that interventions even by well-trained individuals can complicate and exacerbate unfolding crime situations. An off-duty Saint Louis police officer with 11 years of service was inside his home when he heard the police exchanging gunfire with some car thieves. Taking his police-issued weapon, he went outside to help, but as he approached he was told by two officers to get on the ground and then shot in the arm by a third officer who "feared for his safety" (Hauser 2017).

[17]Moreover, in 2012, Puerto Rican police confiscated Santiago's handguns and held them for two years before returning them to him in May 2014, after which he moved to Alaska (Clary et al. 2017).

[18]For a similar story of repeated gun violence and signs of mental illness by a concealed carry permit holder, see the case of Aaron Alexis, who murdered 12 at the Washington Navy Yard in September 2013 (Carter et al. 2013).

15406, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jols.12219 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

weapon, he tried to interfere with the brakes and controls of the moving train. According to the FBI, Wilson had (1) previously joined an "alt-right" neo-Nazi group and traveled to the Unite the Right rally in Charlottesville, Virginia in August 2017; (2) indicated his interest in "killing black people" and was the perpetrator of a road-rage incident in which he pointed a gun at a black woman for no apparent reason while driving on an interstate highway in April 2016; and (3) possessed devices and weapons "to engage in criminal offenses against the United States." Research is needed to analyze whether having a permit to legally carry weapons facilitates such criminal designs (Pilger 2018).

In June 2017, Milwaukee Police Chief Ed Flynn pointed out that criminal gangs have taken advantage of RTC laws by having gang members with clean criminal records obtain concealed carry permits and then hold the guns after they are used by the active criminals (Officer.com 2017). Flynn was referring to so-called human holsters who have RTC permits and hold guns for those barred from possession. For example, Wisconsin permit holder Darrail Smith was stopped three times while carrying guns away from crime scenes before police finally charged him with criminal conspiracy. In the second of these, Smith was "carrying three loaded guns, including one that had been reported stolen," but that was an insufficient basis to charge him with a crime or revoke his RTC permit (DePrang 2015). Having a "designated permit holder" along to take possession of the guns when confronted by police may be an attractive benefit for criminal elements acting in concert (Fernandez et al. 2015; Luthern 2015).

*b. Increased gun thefts:* The most frequent occurrence each year involving crime and a good guy with a gun is not self-defense but rather the theft of the good guy's gun, which occurs hundreds of thousands of times each year.[19] Data from a nationally representative web-based survey conducted in April 2015 of 3,949 subjects revealed that those who carried guns outside the home had their guns stolen at a rate over 1 percent per year (Hemenway et al. 2017). Given the current level of roughly 16 million permit holders, a plausible estimate is that RTC laws result in permit holders furnishing more than 100,000 guns per year to criminals.[20] As Phil Cook has noted, the relationship between gun theft and crime is a complicated one for which few definitive data are currently available (Cook

---

[19]According to Larry Keane, senior vice president of the National Shooting Sports Foundation (a trade group that represents firearms manufacturers): "There are more guns stolen every year than there are violent crimes committed with firearms." More than 237,000 guns were reported stolen in the United States in 2016, according to the FBI's National Crime Information Center. The actual number of thefts is obviously much higher since many gun thefts are never reported to police, and "many gun owners who report thefts do not know the serial numbers on their firearms, data required to input weapons into the NCIC." The best survey estimated 380,000 guns were stolen annually in recent years, but given the upward trend in reports to police, that figure likely understates the current level of gun thefts (Freskos 2017b). According to National Crime Information Center data, the number of guns reported stolen nationally jumped 60 percent between 2007 and 2016 (Freskos 2018a).

[20]While the Hemenway et al. study is not large enough and detailed enough to provide precise estimates, it establishes that those who have carried guns in the last month are more likely to have them stolen. A recent Pew Research Survey found that 26 percent of American gun owners say they carry a gun outside of their home "all or most of the time" (Igielnik & Brown 2017, surveying 3,930 U.S. adults, including 1,269 gun owners). If 1 percent of 16 million permit holders have guns stolen each year, that would suggest 160,000 guns were stolen. Only guns stolen outside the home would be attributable to RTC laws, so a plausible estimate of guns stolen per year owing to gun carrying outside the home might be 100,000.

1641, 2019, 2. Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12319 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*208*   *Donohue et al.*

2018). But if there was any merit to the outrage over the loss of about 1,400 guns during the Fast and Furious program that began in 2009 and the contribution that these guns made to crime (primarily in Mexico), it highlights the severity of the vastly greater burdens of guns lost by and stolen from U.S. gun carriers.[21] A 2013 report from the Bureau of Alcohol, Tobacco, Firearms, and Explosives concluded that "lost and stolen guns pose a substantial threat to public safety and to law enforcement. Those that steal firearms commit violent crimes with stolen guns, transfer stolen firearms to others who commit crimes, and create an unregulated secondary market for firearms, including a market for those who are prohibited by law from possessing a gun" (Office of the Director—Strategic Management 2013; Parsons & Vargas 2017).

For example, after Sean Penn obtained a permit to carry a gun, his car was stolen with two guns in the trunk. The car was soon recovered, but the guns were gone (Donohue 2003). In July 2015 in San Francisco, the theft of a gun from a car in San Francisco led to a killing of a tourist on a city pier that almost certainly would not have occurred if the lawful gun owner had not left it in the car (Ho 2015). Just a few months later, a gun stolen from an unlocked car was used in two separate killings in San Francisco and Marin in October 2015 (Ho & Williams 2015). According to the National Crime Victimization Survey, in 2013 there were over 660,000 auto thefts from households. More guns being carried in vehicles by permit holders means more criminals will be walking around with the guns stolen from permit holders.[22]

As Michael Rallings, the top law enforcement official in Memphis, Tennessee, noted in commenting on the problem of guns being stolen from cars: "Laws have unintended consequences. We cannot ignore that as a legislature passes laws that make guns more accessible to criminals, that has a direct effect on our violent crime rate" (Freskos 2017a). An Atlanta police sergeant elaborated on this phenomenon: "Most of our criminals, they go out each and every night hunting for guns, and the easiest way to get them is out of people's cars. We're finding that a majority of stolen guns that are getting in the hands of criminals and being used to commit crimes were stolen out of vehicles" (Freskos 2017c). In 2015, 70 percent of guns reported stolen in Atlanta came from cars and trucks (Freskos 2016). Another Atlanta police officer stated that weapons stolen from cars "are used in crimes to shoot people, to rob people" because criminals find these guns to be easy to steal and hard to trace. "For them, it doesn't cost them anything to break into a car and steal a gun" (Freskos 2016).[23]

------

[21]"Of the 2,020 guns involved in the Bureau of Alcohol, Tobacco, Firearms, and Explosives probe dubbed 'Operation Fast and Furious,' 363 have been recovered in the United States and 227 have been recovered in Mexico. That leaves 1,430 guns unaccounted for" (Schwarzschild & Griffin 2011). Wayne LaPierre of the NRA was quoted as saying: "These guns are now, as a result of what [ATF] did, in the hands of evil people, and evil people are committing murders and crimes with these guns against innocent citizens" (Horwitz 2011).

[22]In early December 2017, the sheriff in Jacksonville, Florida announced that his office knew of 521 guns that had been stolen so far in 2017—from unlocked cars alone! (Campbell 2017).

[23]Examples abound: Tario Graham was shot and killed during a domestic dispute in February 2012 with a revolver stolen weeks earlier out of pickup truck six miles away in East Memphis (Perrusquia 2017). In Florida, a handgun stolen from an unlocked Honda Accord in mid-2014 helped kill a police officer a few days before Christmas that year (Sampson 2014). A gun stolen from a parked car during a Mardi Gras parade in 2017 was used a few days later to kill 15-year-old Nia Savage in Mobile, Alabama, on Valentine's Day (Freskos 2017a).

Of course, the permit holders whose guns are stolen are not the killers, but they can be the but-for cause of the killings. Lost, forgotten, and misplaced guns are another dangerous byproduct of RTC laws.[24]

*c. Enhancing a culture of violence:* The South has long had a higher rate of violent crime than the rest of the country. For example, in 2012, while the South had about one-quarter of the U.S. population, it had almost 41 percent of the violent crime reported to police (Fuchs 2013). Social psychologists have argued that part of the reason the South has a higher violent crime rate is that it has perpetuated a "subculture of violence" predicated on an aggrandized sense of one's rights and honor that responds negatively to perceived insults. A famous experiment published in the *Journal of Personality and Social Psychology* found that southern males were more likely than northern males to respond aggressively to being bumped and insulted. This was confirmed by measurement of their stress hormones and their frequency of engaging in aggressive or dominant behavior after being insulted (Cohen et al. 1996). To the extent that RTC laws reflect and encourage this cultural response, they can promote violent crime not only by permit holders, but by all those with or without guns who are influenced by this crime-inducing worldview.

Even upstanding citizens, such as Donald Brown, a 56-year-old retired Hartford firefighter with a distinguished record of service, can fall prey to the notion that resort to a lawful concealed weapon is a good response to a heated argument. Brown was sentenced to seven years in prison in January 2018 by a Connecticut judge who cited his "poor judgment on April 24, 2015, when he drew his licensed 9mm handgun and fired a round into the abdomen of Lascelles Reid, 33." The shooting was prompted by a dispute "over renovations Reid was performing at a house Brown owns" (Owens 2018). Once again, we see that the RTC permit was the pathway to serious violent crime by a previously law-abiding citizen.

*d. Increasing violence by criminals:* The argument for RTC laws is often predicated on the supposition that they will encourage good guys to have guns, leading only to benign effects on the behavior of bad guys. This is highly unlikely to be true.[25] Indeed, the

---

[24]The growing TSA seizures in carry-on luggage are explained by the increase in the number of gun carriers who simply forget they have a gun in their luggage or briefcase (Williams & Waltrip 2004). A chemistry teacher at Marjory Stoneman Douglas High School in Parkland, Florida, who had said he would be willing to carry a weapon to protect students at the school, was criminally charged for leaving a loaded pistol in a public restroom. The teacher's 9mm Glock was discharged by an intoxicated homeless man who found it in the restroom (Stanglin 2018).

[25]Consider in this regard, David Friedman's theoretical analysis of how right-to-carry laws will reduce violent crime: "Suppose one little old lady in ten carries a gun. Suppose that one in ten of those, if attacked by a mugger, will succeed in killing the mugger instead of being killed by him—or shooting herself in the foot. On average, the mugger is much more likely to win the encounter than the little old lady. But—also on average—every hundred muggings produce one dead mugger. At those odds, mugging is a very unattractive profession—not many little old ladies carry enough money in their purses to justify one chance in a hundred of being killed getting it. The number of muggers—and muggings—declines drastically, not because all of the muggers have been killed but because they have, rationally, sought safer professions" (Friedman 1990). There is certainly no empirical support for the conjecture that muggings will "decline drastically" in the wake of RTC adoption. What Friedman's analysis overlooks is that muggers can decide not to mug (which is what Friedman posits) or they can decide to initiate their muggings by cracking the old ladies over the head or by being

15461, 2020, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12249 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

1541, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12319 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*210    Donohue et al.*

evidence that gun prevalence in a state is associated with higher rates of lethal force by police (even controlling for homicide rates) suggests that police may be more fearful and shoot quicker when they are more likely to interact with an armed individual (Nagin forthcoming).[26] Presumably, criminals would respond in a similar fashion, leading them to arm themselves more frequently, attack more harshly, and shoot more quickly when citizens are more likely to be armed. In one study, two-thirds of prisoners incarcerated for gun offenses "reported that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun" (Cook et al. 2009). Such responses by criminals will elevate the toll of the crimes that do occur.

Indeed, a panel data estimate over the years 1980 to 2016 reveals that the percentage of robberies committed with a firearm rises by 18 percent in the wake of RTC adoption ($t = 2.60$).[27] Our synthetic controls assessment similarly shows that the percentage of robberies committed with a firearm increases by 35 percent over 10 years ($t = 4.48$).[28] Moreover, there is no evidence that RTC laws are reducing the overall level of robberies: the panel data analysis associates RTC laws with a 9 percent higher level of overall robberies ($t = 1.85$) and the synthetic controls analysis suggests a 7 percent growth over 10 years ($t = 1.19$).

*e. Impairing police effectiveness:* According to an April 2016 report of the Council of Economic Advisers: "Expanding resources for police has consistently been shown to reduce crime; estimates from economic research suggests that a 10% increase in police size decreases crime by 3 to 10%" (CEA 2016:4). In summarizing the evidence on fighting crime in the *Journal of Economic Literature*, Aaron Chalfin and Justin McCrary note that adding police manpower is almost twice as effective in reducing violent crime as it is in reducing property crime (Chalfin & McCrary 2017). Therefore, anything that RTC laws do to occupy police time, from processing permit applications to checking for permit validity to dealing with gunshot victims, inadvertent gun discharges, and the staggering number of stolen guns is likely to have an opportunity cost expressed in higher violent crime.

The presence of more guns on the street can complicate the job of police as they confront (or shy away from) armed citizens. Daniel Nagin finds a pronounced positive association between statewide prevalence of gun ownership and police use of lethal force (Nagin forthcoming). A Minnesota police officer who stopped Philando Castile for a broken taillight shot him seven times only seconds after Castile indicated he had a permit to carry a weapon because the officer feared the permit holder might be reaching for the

---

[26]prepared to shoot them if they start reaching for a gun (or even wear body armor). Depending on the response of the criminals to increased gun carrying by potential victims, the increased risk to the criminals may be small compared to the increased risk to the victims. Only an empirical evaluation can answer this question.

[26]See footnotes 29–31 and accompanying text for examples of this pattern of police use of lethal force.

[27]The panel data model uses the DAW explanatory variables set forth in Table 2.

[28]The weighted average proportion of robberies committed by firearm in the year prior to RTC adoption (for states that adopted RTC between 1981 and 2014) is 36 percent while the similar proportion in 2014 for the same RTC states is 43 percent (and for non-RTC states is 29 percent).

gun. Another RTC permit holder, stranded in his disabled car early one morning on a Florida highway exit ramp, grabbed the gun he had legally purchased three days earlier when a police officer in plainclothes pulled up in a van with tinted windows and no lights. "It was not immediately clear what happened after [the officer] got out of his van, but the permit holder at some point started running … and [the officer] fired six times," killing the permit holder, whose body fell "about 80 to 100 feet from his vehicle," with his undischarged handgun on the ground somewhere in between (Robles & Hauser 2015). After a similar encounter between an officer and a permit holder, the officer asked the gun owner: "Do you realize you almost died tonight?" (Kaste 2019).[29]

A policemen trying to give a traffic ticket has more to fear if the driver is armed. When a gun is found in a car in such a situation, a greater amount of time is needed to ascertain the driver's status as a permit holder. A lawful permit holder who happens to have forgotten his permit may end up taking up more police time through arrest and/or other processing.

Moreover, police may be less enthusiastic about investigating certain suspicious activities or engaging in effective crime-fighting actions given the greater risks that wide-spread gun carrying poses to them, whether from permit holders or the criminals who steal their guns.[30] In a speech at the University of Chicago Law School in October 2015, then-FBI Director James Comey argued that criticism of overly aggressive policing led officers to back away from more involved policing, causing violent crime to rise (Donohue 2017a). If the more serious concern of being shot by an angry gun toter impairs effective policing, the prospect of increased crime following RTC adoption could be far more substantial than the issue that Comey highlighted.[31]

---

[29]A permit to carry instructor has posted a YouTube video about "How to inform an officer you are carrying a handgun and live" that is designed to "keep yourself from getting shot unintentionally" by the police. The video, which has over 4.2 million views, has generated comments from non-Americans that it "makes the US look like a war zone" and leads to such unnatural and time-consuming behavior that "an English officer … would look at you like a complete freak" (Soderling 2016).

[30]"Every law enforcement officer working today knows that any routine traffic stop, delivery of a warrant or court order, or response to a domestic disturbance anywhere in the country involving people of any race or age can put them face to face with a weapon. Guns are everywhere, not just in the inner city" (Wilson 2016). In offering an explanation for why the United States massively leads the developed world in police shootings, criminologist David Kennedy stated: "Police officers in the United States in reality need to be conscious of and are trained to be conscious of the fact that literally every single person they come in contact with may be carrying a concealed firearm." For example, police in England and Wales shot and killed 55 people over the 25-year period from 1990–2014, while in just the first 24 days of 2015, the United States (with six times the population) had a higher number of fatal shootings by police (Lopez 2018).

[31]A vivid illustration of how even the erroneous perception that someone accosted by the police is armed can lead to deadly consequences is revealed in the chilling video of five Arizona police officers confronting an unarmed man they incorrectly believed had a gun. During the prolonged encounter, the officers shouted commands at an intoxicated 26-year-old father of two, who begged with his hands in the air not to be shot. The man was killed by five bullets when, following orders to crawl on the floor toward police, he paused to pull up his slipping pants. A warning against the open carry of guns issued by the San Mateo County, California, Sheriff's Office makes the general point that law enforcement officers become hyper-vigilant when encountering an armed individual: "Should the gun carrying person fail to comply with a law enforcement instruction or move in a way that could be construed as threatening, the police are forced to respond in kind for their own protection. It's well and good in hindsight to say the gun carrier was simply 'exercising their rights' but the result could be deadly" (Lunny 2010).

19412, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12219 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

26261, 2019, 2. Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12219 by Rutgers University Libraries, Wiley Online Library on [08/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

212    *Donohue et al.*

The presence of multiple gun carriers can also complicate police responses to mass shootings and other crimes. When police arrived at an Alabama mall in November 2018, they saw a 21-year-old concealed carry permit holder with gun drawn, and mistakenly killed him, thinking he was the shooter. In fact, the dead man had been assisting and protecting shoppers, and the real shooter escaped (McLaughlin & Holcombe 2018). Another benign intervention that ended in tragedy for the good guy with a gun occurred in July 2018 when police officers arrived as a "good Samaritan" with a concealed carry permit was trying to break up a fight in Portland, Oregon. The police saw the gun held by the permit holder—a Navy veteran, postal worker, and father of three—and in the confusion shot and killed him (Guevarra 2018).

Good guys with guns also can interfere with police anti-crime efforts. For example, police reported that when a number of Walmart customers (fecklessly) pulled out their weapons during a shooting on November 1, 2017, their "presence 'absolutely' slowed the process of determining who, and how many, suspects were involved in the shootings, said Thornton [Colorado] police spokesman Victor Avila" (Simpson 2017).

Similarly, in 2014, a concealed carry permit holder in Illinois fired two shots at a fleeing armed robber at a phone store, thereby interfering with a pursuing police officer. According to the police: "Since the officer did not know where the shots were fired from, he was forced to terminate his foot pursuit and take cover for his own safety" (Glanton & Sadovi 2014).

Indeed, preventive efforts to get guns off the street in high-crime neighborhoods are less feasible when carrying guns is presumptively legal. The passage of RTC laws normalizes the practice of carrying guns in a way that may enable criminals to carry guns more readily without prompting a challenge, while making it harder for the police to know who is and who is not allowed to possess guns in public.

Furthermore, negligent discharges of guns, although common, rarely lead to charges of violent crime but they can take up valuable police time for investigation and in determining whether criminal prosecution or permit withdrawal is warranted. For example, on November 16, 2017, Tennessee churchgoers were reflecting on the recent Texas church massacre in Sutherland Springs when a permit holder mentioned he always carries his gun, bragging that he would be ready to stop any mass shooter. While proudly showing his Ruger handgun, the permit holder inadvertently shot himself in the palm, causing panic in the church as the bullet "ripped through [his wife's] lower left abdomen, out the right side of her abdomen, into her right forearm and out the backside of her forearm. The bullet then struck the wall and ricocheted, landing under the wife's wheelchair." The gun discharge prompted a 911 call, which in the confusion made the police think an active shooting incident was underway. The result was that the local hospital and a number of schools were placed on lockdown for 45 minutes until the police finally ascertained that the shooting was accidental (Eltagouri 2017).[32]

---

[32]Negligent discharges by permit holders have occurred in public and private settings from parks, stadiums, movie theaters, restaurants, and government buildings to private households (WFTV 2015; Heath 2015). Thirty-nine-year-old Mike Lee Dickey, who was babysitting an eight-year-old boy, was in the bathroom removing his handgun from his waistband when it discharged. The bullet passed through two doors, before striking the child in his arm while he slept in a nearby bedroom (Associated Press 2015). In April 2018, a 21-year-old pregnant mother of two in

JA2760

15461, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jols.12219 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Everything that takes up added police time or complicates the job of law enforcement will serve as a tax on police, rendering them less effective on the margin, and thereby contributing to crime. Indeed, this may in part explain why RTC states tend to increase the size of their police forces (relative to nonadopting states) after RTC laws are passed, as shown in Table 1.[33]

### B. A Simple Difference-in-Differences Analysis

We begin by showing how violent crime evolved over our 1977–2014 data period for RTC and non-RTC states.[34] Figure 1 depicts percentage changes in the violent crime rate over our entire data period for three groups of states: those that never adopted RTC laws, those that adopted RTC laws sometime between 1977 and before 2014, and those that adopted RTC laws prior to 1977. It is noteworthy that the 42.3 percent drop in violent crime in the nine states that never adopted RTC laws is almost an order of magnitude greater than the 4.3 percent reduction experienced by states that adopted RTC laws during our period of analysis.[35]

The NRC Report presented a "no-controls" estimate, which is just the coefficient estimate on the variable indicating the date of adoption of a RTC law in a crime rate panel data model with state and year fixed effects. According to the NRC Report: "Estimating the model using data to 2000 shows that states adopting right-to-carry laws saw 12.9 percent increases in violent crime—and 21.2 percent increases in property crime—relative to national crime patterns." Estimating this same model using 14 additional years of data (through 2014) and 11 additional adopting states (listed at the bottom of Appendix Table C1) reveals that the average postpassage increase in violent crime was

---

Indiana was shot by her three-year-old daughter when the toddler's father left the legal but loaded 9mm handgun between the console and the front passenger seat after he exited the vehicle to go inside a store. The child climbed over from the backseat and accidentally fired the gun, hitting her mother though the upper right part of her torso. (Palmer 2018) See also Savitsky (2019) (country western singer Justin Carter dies when the gun in his pocket discharges and hits him in the face); Schwarz (2014) (Idaho professor shoots himself in foot during class two months after state legalizes guns on campuses); Murdock (2018) (man shoots himself in the groin with gun in his waistband in the meat section of Walmart in Buckeye, Arizona); Barbash (2018) (California teacher demonstrating gun safety accidentally discharges weapon in a high school classroom in March 2018, injuring one student); Fortin (2018) (in February 2018, a Georgia teacher fired his gun while barricaded in his classroom); US News (2018) (in April 2018, an Ohio woman with a valid concealed carry permit accidentally killed her two-year-old daughter at an Ohio hotel while trying to turn on the gun's safety); and Fox News (2016) ("the owner of an Ohio gun shop was shot and killed when a student in a concealed carry permit class accidentally discharged a weapon," striking the owner in the neck in a different room after the bullet passed through a wall).

[33]See Adda et al. (2014), describing how local depenalization of cannabis enabled the police to reallocate resources, thereby reducing violent crime.

[34]The FBI violent crime category includes murder, rape, robbery, and aggravated assault.

[35]Over the same 1977–2014 period, the states that avoided adopting RTC laws had substantially smaller increases in their rates of incarceration and police employment. The nine never-adopting states increased their incarceration rate by 205 percent, while the incarceration rates in the adopting states rose by 262 and 259 percent, for those adopting RTC laws before and after 1977, respectively. Similarly, the rate of police employment rose by 16 percent in the never-adopting states and by 38 and 55 percent for those adopting before and after 1977, respectively.

1961, 2019, 2, 2. Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12219 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*214   Donohue et al.*

*Figure 1:*   The decline in violent crime rates has been far greater in states with no RTC laws, 1977−2014.



<small>Data Sources: UCR for crime rates; Census for state populations.
Note: Illinois excluded since its concealed carry law did not go into effect until 2014. From 1977–2013, the violent crime rate in Illinois fell by 36 percent, from 631 to 403 crimes per 100,000 people.</small>

20.2 percent, while the comparable increase in property crime was 19.2 percent (both having $p$ values less than 5 percent).[36]

Of course, it does not prove that RTC laws increase crime simply because RTC states experience a worse postpassage crime pattern. For example, it might be the case that some states decided to fight crime by allowing citizens to carry concealed handguns while others decided to hire more police and incarcerate a greater number of convicted criminals. If police and prisons were more effective in stopping crime, the "no-controls" model might show that the crime experience in RTC states was worse than in other states even if this were not a true causal result of the adoption of RTC laws. As it turns out, though, RTC states not only experienced higher rates of violent crime but they also had larger increases in incarceration and police than other states. Table 1 provides panel data evidence on how incarceration and two measures of police employment changed after RTC adoption (relative to nonadopting states). All three measures rose in RTC states, and the 7–8 percent greater increases in police in RTC states are statistically significant. In other words, Table 1 confirms that RTC states did *not* have relatively declining rates of

---

[36]The dummy variable model reports the coefficient associated with a RTC variable that is given a value of 0 when a RTC law is not in effect in that year, a value of 1 when a RTC law is in effect that entire year, and a value equal to the portion of the year a RTC law is in effect otherwise. The date of adoption for each RTC state is shown in Appendix Table A1. Note the fact that violent crime was noticeably higher in 1977 in the nine states that did not adopt RTC laws indicates that it will be particularly important that the parallel trends requirement of a valid panel data analysis is established, which is an issue to which we carefully attend in Section III.A.3. All our appendices are posted online at https://works.bepress.com/john_donohue/.

Table 1:   Panel Data Estimates Showing Greater Increases in Incarceration and Police Following RTC Adoption: State- and Year-Fixed Effects, and No Other Regressors, 1977–2014

|  | *Incarceration* | *Police Employment per 100k* | *Police Officers per 100k* |
|---|---|---|---|
|  | *(1)* | *(2)* | *(3)* |
| Dummy variable model | 6.78 (6.22) | 8.39*** (3.15) | 7.08** (2.76) |

NOTE: OLS estimations include state- and year-fixed effects and are weighted by population. Robust standard errors (clustered at the state level) are provided next to point estimates in parentheses. The police employment and sworn police officer data are from the Uniform Crime Reports (UCR). The source of the incarceration rate is the Bureau of Justice Statistics (2014). *$p < 0.1$; **$p < 0.05$; ***$p < 0.01$. All figures reported in percentage terms.

incarceration or total police employees after adopting their RTC laws that might explain their comparatively poor postpassage crime performance.

# III.  A PANEL DATA ANALYSIS OF RTC LAWS

## A.  *Estimating Two Models on the Full Data Period 1977–2014*

We have just seen that RTC law adoption is followed by *higher* rates of violent and property crime (relative to national trends) and that the elevated crime levels after RTC law adoption occur despite the fact that RTC states actually invested relatively more heavily in prisons and police than non-RTC states. While the theoretical predictions about the effect of RTC laws on crime are indeterminate, these two empirical facts based on the actual patterns of crime and crime-fighting measures in RTC and non-RTC states suggest that the most plausible working hypothesis is that RTC laws *increase* crime. The next step in a panel data analysis of RTC laws would be to test this hypothesis by introducing an appropriate set of explanatory variables that plausibly influence crime.

The choice of these variables is important because any variable that both influences crime and is simultaneously correlated with RTC laws must be included if we are to generate unbiased estimates of the impact of RTC laws. At the same time, including irrelevant and/or highly collinear variables can also undermine efforts at valid estimation of the impact of RTC laws. At the very least, it seems advisable to control for the levels of police and incarceration because these have been the two most important criminal justice policy instruments in the battle against crime.

### 1.  The DAW Panel Data Model

In addition to the state and year fixed effects of the no-controls model and the identifier for the presence of an RTC law, our preferred "DAW model" includes an array of other factors that might be expected to influence crime, such as the levels of police and incarceration, various income, poverty, and unemployment measures, and six demographic controls designed to capture the presence of males in three racial categories (black, white, other) in two high-crime age groupings (15–19 and 20–39). Table 2 lists the full

15414361, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12219 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Table 2:   Table of Explanatory Variables for Four Panel Data Studies

| Explanatory Variables | DAW | LM |
|---|---|---|
| Right-to-carry law | x | x |
| Lagged per capita incarceration rate | x | |
| Lagged police staffing per 100,000 residents | x | |
| Poverty rate | x | |
| Unemployment rate | x | |
| Per capita ethanol consumption from beer | x | |
| Percentage of state population living in metropolitan statistical areas (MSA) | x | |
| Real per capita personal income | x | x |
| Real per capita income maintenance | | x |
| Real per capita retirement payments | | x |
| Real per capita unemployment insurance payments | | x |
| Population density | | x |
| Lagged violent or property arrest rate | | x |
| State population | | x |
| 6 Age-sex-race demographic variables —all 6 combinations of black, white, and other males in 2 age groups (15–19, 20–39) indicating the percentage of the population in each group | x | |
| 36 Age-sex-race demographic variables —all possible combinations of black, white, and other males in 6 age groups (10–19, 20–29, 30–39, 40–49, 50–64, and over 65) and repeating this all for females, indicating the percentage of the population in each group | | x |

NOTE: The DAW model is advanced in this article and the LM model was previously published by Lott and Mustard.

set of explanatory variables for both the DAW model and the comparable panel data model used by Lott and Mustard (LM).[37]

Mathematically, the simple dummy model takes the following form:

$$\ln\left(\text{crime rate}_{it}\right) = \beta X_{it} + \gamma RTC_{it} + \alpha_t + \delta_i + \varepsilon_{it} \tag{1}$$

where $\gamma$ is the coefficient on the RTC dummy, reflecting the average estimated impact of adopting a RTC law on crime. The matrix $X_{it}$ contains either the DAW or LM covariates

---

[37]While we attempt to include as many state-year observations in these regressions as possible, District of Columbia incarceration data are missing after the year 2001. In addition, a handful of observations are also dropped from the LM regressions owing to states that did not report any usable arrest data in various years. Our regressions are performed with Huber-White robust standard errors that are clustered at the state level, and we lag the arrest rates used in the LM regression models. The rationales underlying both choices are described in more detail in Aneja et al. (2014). All the regressions presented in this article are weighted by state population.

19401, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12219 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Table 3:   Panel Data Estimates Suggesting that RTC Laws Increase Violent and Property Crime: State- and Year-Fixed Effects, DAW Regressors, 1979–2014

|  | Murder Rate | Firearm Murder Rate | Nonfirearm Murder Rate | Violent Crime Rate | Property Crime Rate |
|---|---|---|---|---|---|
|  | (1) | (2) | (3) | (4) | (5) |
| Dummy variable model | 2.27 (5.05) | 2.90 (6.74) | 1.53 (3.32) | 9.02*** (2.90) | 6.49** (2.74) |

NOTE: All models include year- and state-fixed effects, and OLS estimates are weighted by state population. Robust standard errors (clustered at the state level) are provided next to point estimates in parentheses. The violent and property crime data are from the Uniform Crime Reports (UCR) while the murder data are from the National Vital Statistics System (NVSS). Six demographic variables (based on different age-sex-race categories) are included as controls in the regression above. Other controls include the lagged incarceration rate, the lagged police employee rate, real per capita personal income, the unemployment rate, poverty rate, beer, and percentage of the population living in MSAs. *$p < 0.1$; **$p < 0.05$; ***$p < 0.01$. All figures reported in percentage terms.

and demographic controls for state $i$ in year $t$. The vectors $\alpha$ and $\delta$ are year and state fixed effects, respectively, while $\varepsilon_{it}$ is the error term.

The DAW panel data estimates of the impact of RTC laws on crime are shown in Table 3.[38] The results are consistent with, although smaller in magnitude than, those observed in the no-controls model: RTC laws on average increased violent crime by 9.0 percent and property crime by 6.5 percent in the years following adoption.[39] The effect of RTC laws on murder is seen in Table 3 to be very imprecisely estimated and not statistically significant.[40]

We should also note one caveat to our results. Panel data analysis assumes that the treatment in any one state does not influence crime in nontreatment states. However, as we noted above,[41] RTC laws tend to lead to substantial increases in gun thefts and those guns tend to migrate to states with more restrictive gun laws, where they elevate violent crime. This flow of guns from RTC to non-RTC states has been documented by gun trace data (Knight 2013), and Olson et al. (2019) find that "firearm trafficking from states with less restrictive firearm legislation to neighboring states with more restrictive firearm legislation

---

[38]The complete set of estimates for all explanatory variables (except the demographic variables) for the DAW and LM dummy models are shown in Appendix Table B1.

[39]Defensive uses of guns are more likely for violent crimes because the victim will clearly be present. For property crimes, the victim is typically absent, thus providing less opportunity to defend with a gun. It is unclear whether the many ways in which RTC laws could lead to more crime, which we discuss in Section II.A.2, would be more likely to facilitate violent or property crime, but our intuition is that violent crime would be more strongly influenced, which is in fact what Table 3 suggests.

[40]We thank Phil Cook for informing us that UCR murder data are both less complete and less discerning than murder data collected by the National Vital Statistics. Note that we subtract all cases of justifiable homicides from the murder counts in our own Vital Statistics data.

[41]See text at footnotes 20–22.

15415, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12219 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*218    Donohue et al.*

increases firearm homicide rates in those restrictive states."[42] As a result, our panel data estimates of the impact of RTC laws are downward biased by the amount that RTC laws induce crime spillovers into non-RTC states.[43] One police investigation revealed that of the 224 guns a single gun trafficker in the DC area was known to have sold in just five months of 2015, 94 were later found at crime scenes from Virginia to New York (Hermann & Weiner 2019).

## 2.  The LM Panel Data Model

Table 2's recitation of the explanatory variables contained in the Lott and Mustard (LM) panel data model reveals there are no controls for the levels of police and incarceration in each state, even though a substantial literature has found that these factors have a large impact on crime. Indeed, as we saw in Table 1, both factors grew substantially and statistically significantly after RTC law adoption. A Bayesian analysis of the impact of RTC laws found that "the incarceration rate is a powerful predictor of future crime rates," and specifically faulted this omission from the Lott and Mustard model (Strnad 2007:201, n.8). We have discussed an array of infirmities with the LM model in Aneja et al. (2014), including their reliance on flawed pseudo-arrest rates, and highly collinear demographic variables.

As noted in Aneja et al. (2014):

> The Lott and Mustard arrest rates … are a ratio of arrests to crimes, which means that when one person kills many, for example, the arrest rate falls, but when many people kill one person, the arrest rate rises, since only one can be arrested in the first instance and many can in the second. The bottom line is that this "arrest rate" is not a probability and is frequently greater than one because of the multiple arrests per crime. For an extended discussion on the abundant problems with this pseudo arrest rate, see Donohue and Wolfers (2009).

The LM arrest rates are also econometrically problematic since the denominator of the arrest rate is the numerator of the dependent variable crime rate, improperly leaving the dependent variable on both sides of the regression equation. We lag the arrest rates by one year to reduce this problem of ratio bias.

Lott and Mustard's use of 36 demographic variables is also a potential concern. With so many enormously collinear variables, the high likelihood of introducing noise into the estimation process is revealed by the wild fluctuations in the coefficient estimates on these variables. For example, consider the LM explanatory variables "neither black nor white male aged 30–39" and the identical corresponding female category. The LM dummy variable model for violent crime suggests that the male group will significantly

---

[42]"Seventy-five percent of traceable guns recovered by authorities in New Jersey [a non-RTC state] are purchased in states with weaker gun laws, according to … firearms trace data … compiled by the federal Bureau of Alcohol, Tobacco, Firearms and Explosives … between 2012 and 2016" (Pugliese 2018). See also Freskos (2018b).

[43]Some of the guns stolen from RTC permit holders may also end up in foreign countries, which will stimulate crime there but not bias our panel data estimates. For example, a recent analysis of guns seized by Brazilian police found that 15 percent came from the United States. Since many of these were assault rifles, they were probably not guns carried by American RTC permit holders (Paraguassu & Brito 2018).

Table 4:   Panel Data Estimates of the Impact of RTC Laws: State-and Year-Fixed Effects, Using Actual and Modified LM Regressors, 1977–2014

| | *Panel A: LM Regressors Including 36 Demographic Variables* | | | | |
|---|---|---|---|---|---|
| | *Murder Rate* | *Firearm Murder Rate* | *Nonfirearm Murder Rate* | *Violent Crime Rate* | *Property Crime Rate* |
| | *(1)* | *(2)* | *(3)* | *(4)* | *(5)* |
| Dummy variable model | −5.17 (3.33) | −3.91 (4.82) | −5.70** (2.45) | −1.38 (3.16) | −0.34 (1.71) |

| | *Panel B: LM Regressors with 6 DAW Demographic Variables* | | | | |
|---|---|---|---|---|---|
| | *Murder Rate* | *Firearm Murder Rate* | *Nonfirearm Murder Rate* | *Violent Crime Rate* | *Property Crime Rate* |
| | *(1)* | *(2)* | *(3)* | *(4)* | *(5)* |
| Dummy variable model | 3.75 (5.92) | 4.34 (7.85) | 2.64 (4.02) | 10.03** (4.81) | 7.59** (3.72) |

| | *Panel C: LM Regressors with 6 DAW Demographic Variables and Adding Controls for Incarceration and Police* | | | | |
|---|---|---|---|---|---|
| | *Murder Rate* | *Firearm Murder Rate* | *Nonfirearm Murder Rate* | *Violent Crime Rate* | *Property Crime Rate* |
| | *(1)* | *(2)* | *(3)* | *(4)* | *(5)* |
| Dummy variable model | 4.99 (5.50) | 5.96 (7.20) | 3.76 (4.29) | 10.05** (4.54) | 8.10** (3.63) |

NOTE: All models include year- and state-fixed effects, and OLS estimates are weighted by state population. Robust standard errors (clustered at the state level) are provided next to point estimates in parentheses. In Panel A, 36 demographic variables (based on different age-sex-race categories) are included as controls in the regressions above. In Panel B, only six demographic variables are included. In Panel C, only six demographic variables are included and controls are added for incarceration and police. For all three panels, other controls include the previous year's violent or property crime arrest rate (depending on the crime category of the dependent variable), state population, population density, real per capita income, real per capita unemployment insurance payments, real per capita income maintenance payments, and real retirement payments per person over 65. *$p < 0.1$; **$p < 0.05$; ***$p < 0.01$. All figures reported in percentage terms.

*increase* crime (the coefficient is 219), but their female counterparts have an even greater dampening effect on crime (with a coefficient of −258). Both conflicting estimates (not shown in Appendix Table B1) are statistically significant at the 0.01 level, and they are almost certainly picking up noise rather than revealing true relationships. Bizarre results are common in the LM estimates among these 36 demographic variables.[44]

_____

[44]Aneja et al. (2014) test for the severity of the multicollinearity problem using the 36 LM demographic variables, and the problem is indeed serious. The variance inflation factor (VIF) is shown to be in the range of 6 to 7 for the RTC variable in the LM dummy model when the 36 demographic controls are used. Using the six DAW variables reduces the multicollinearity for the RTC dummy to a tolerable level (with VIFs always below the desirable threshold of 5).

1961, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12319 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

15412, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jols.12319 by Rutgers University Libraries, Wiley Online Library on [08/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*220    Donohue et al.*

Table 4, Panel A shows the results of the LM panel data model estimated over the period 1977–2014. As seen above, the DAW model generated estimates that RTC laws raised violent and property crime (in the dummy model of Table 3), while the estimated impact on murders was too imprecise to be informative. The LM model generates no statistically significant estimates, except for an apparent decline in non-firearm-related murders. We can almost perfectly restore the DAW Table 3 findings, however, by simply limiting the inclusion of 36 highly collinear demographic variables to the more typical array used in the DAW regressions, as seen in Panel B of Table 4. This modified LM dummy variable model suggests that RTC laws increase violent and property crime, mimicking the DAW dummy variable model estimates, and this same finding persists if we add in controls for police and incarceration, as seen in Panel C of Table 4.

### 3. Testing the DAW and LM Models for the Parallel Trends Assumption

Many researchers are content to present panel data results such as those shown in Tables 3 and 4 without establishing their econometric validity. This can be a serious mistake. We have already registered concerns about the choice of controls included in the LM model, but, as we will see, the LM model regressions in Panel A of Table 4—including the spurious finding that RTC laws reduce non-firearm homicides—uniformly violate the critical assumption of parallel trends. In sharp contrast, the DAW model illustrates nearly perfect parallel trends in the decade prior to RTC adoption for violent crime and sufficiently satisfies this assumption in three of the other four regressions in Table 3 (murder, non-firearm murder, and property crime).

To implement this test and to provide more nuanced estimates of the impact of RTC laws on crime than in the simple dummy models of Tables 3 and 4, we ran regressions showing the values on yearly dummy variables for 10 years prior to RTC adoption to 10 years after RTC adoption. If the key parallel trends assumption of panel data analysis is valid, we should see values of the pre-adoption dummies that show no trend and are close to zero. Figure 2 shows that the DAW violent crime model performs extremely well: the pre-adoption dummies are virtually all zero (and hence totally flat) for the eight years prior to adoption, and violent crime starts rising in the year of adoption, showing statistically significant increases after the law has been in effect for at least a full year. The upward trend in violent crime continues for the entire decade after adoption. Figure 2 also highlights that the single dummy models of Tables 3 and 4 (which implicitly assume an immediate and constant post-adoption impact on crime) are mis-specified. Importantly, we can now see the exact timing and pattern of the estimated impact on crime, which can, and in this case does, provide further support for a causal interpretation of the estimated increase in violent crime.

In contrast to the ideal performance of the DAW violent crime model, all of the Table 4 regressions using the LM model perform extremely poorly. For example, consider the LM model for firearm murder depicted in Figure 3, which shows that there is

2641, 2691, 2. Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12319 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Right-to-Carry Laws and Violent Crime*    *221*

*Figure 2:*   The impact of RTC laws on violent crime, DAW model, 1979–2014.



NOTE: We regress crime on dummies for pre– and post–passage years and DAW covariates. Reference year is year before adoption and adoption year is first year with RTC in place at any time, meaning that in states that adopt after January 1, this will capture only a partial effect of RTC laws. We display the 95 percent confidence interval for each estimate using cluster-robust standard errors and show the number of states that contribute to each estimate.

an enormously steep downward trend in the values of the pre-adoption dummies. Indeed, we see that the downward trend reverses just at the time of adoption of the RTC law and after six years we observe statistically significant increases in firearm

*Figure 3:*   The impact of RTC laws on firearm murder, LM model, 1977–2014



murder above the prior trend. Thus, while Table 4 ostensibly showed a statistically insignificant 3.9 percent drop in violent crime, the more discerning analysis of Figure 3 shows that that estimate is econometrically invalid, given such an influential violation of the parallel trends requirement. In fact, the LM model estimated for Figure 3 provides evidence that the adoption of RTC laws reversed a previous benign trend starting exactly at the time of RTC adoption and led to higher levels of firearm homicide.

Appendix D depicts the same year-by -year estimates for the other crimes using both the DAW and LM models. It is worth noting that, for our entire data period, the four DAW and LM murder and firearm murder figures show an apparent malign break in trend at the time of RTC adoption, while the trend for non-firearm murder remains unchanged in the DAW and LM models. The unchanged downward trend in the LM non-firearm model illustrates the violation of the parallel trends assumption, invalidating the anomalous finding for that crime in Panel A of Table 4.[45]

For the DAW and LM property crime panel data estimates, we see almost the same pattern. While the pre-adoption performance of the DAW property crime model (see Appendix Figure D2) is not quite as perfect as it was for violent crime, it still shows a roughly flat pattern for the eight years prior to adoption, followed by a persistent pattern of increasing property crime in the 10 years after RTC adoption. The increase in property crime turns statistically significant at the time of adoption. In Appendix Figure D3, however, we again see the same deficient pattern observed for the LM model in Appendix Figure D1: property crime falls in the 10 years prior to adoption, and the pattern reverses itself, leading to increasing property crime in the decade following RTC adoption.

We also conducted a panel data assessment looking at the 11 states that adopted RTC laws in the period from 2000–2014 when the confounding effect of the crack epidemic had subsided. The results provide further support that RTC laws increase crime, including estimates that overall murder and firearm murder rise substantially with RTC adoption. See further discussion and relevant figures and estimates in Appendix C. Figure 4 shows the year-by-year estimated effect of RTC laws on overall murder for the DAW model for this postcrack time period. The figure shows a flat pretrend (albeit with some variance around it) and then a sizeable jump in murder starting just at the year of RTC adoption. The LM model shows substantially the same statistically significant increase in murder.

---

[45]Appendix Figure D1 also illustrates why the LM dummy model estimate on violent crime in Panel A of Table 4 was not positive and statistically significant (as it was for the DAW model in Table 3 and the modified LM models in Panels B and C of Table 4): Appendix Figure D1 reveals that, for the LM model, violent crime was trending down throughout the pre-adoption period, dropping from 5 percentage points to zero over that decade, at which point it reverses and violent crime increases to roughly a 6 percent increase by 10 years after RTC adoption. The v-shape pattern over that two-decade period leads the LM dummy model to obscure the increase in violent crime that is clearly seen in Appendix Figure D1.

15206461, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12219 by Rutgers University Libraries, Wiley Online Library on [08/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Right-to-Carry Laws and Violent Crime   223

*Figure 4:*   The impact of RTC laws on murder, DAW model, 2000–2014



1961, 2019, 2. Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12319 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*B.  Summary of Panel Data Analysis*

The uncertainty about the impact of RTC laws on crime expressed in the NRC Report was based on an analysis of data only through 2000. The preceding evaluation of an array of different specifications over the full data period from the late 1970s through 2014 as well as in the postcrack period has given consistent evidence that something bad happened to murder and violent and property crime right at the time of RTC adoption. The most statistically significant crime increases for the full period were seen for DAW violent and property crime. For the postcrack period, the largest and most highly statistically significant increases were seen for murder and firearm murder.

Other work has also provided evidence that RTC laws increase murder and/or overall violent crime—see Zimmerman (2014), examining postcrack-era data and the recent work by Donohue (2017b) and Siegel et al. (2017) concluding that RTC laws increase firearm and handgun homicide. Work by McElroy and Wang (2017) reinforces this conclusion, with results from a dynamic model that accounts for forward-looking behavior finding that violent crime would be one-third lower if RTC laws had not been passed. We discuss other recent published studies finding that RTC laws increase violent crime in Appendix C.

Despite the substantial panel data evidence in the post-NRC literature that supports the finding of the pernicious influence of RTC laws on crime, the NRC suggestion that

2061, 269, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12319 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*224    Donohue et al.*

new techniques should be employed to estimate the impact of these laws is fitting. The important paper by Strnad (2007) used a Bayesian approach to argue that none of the published models used in the RTC evaluation literature rated highly in his model selection protocol when applied to data from 1977–1999.

Durlauf et al. attempt to sort out the different specification choices in evaluating RTC laws by using their own Bayesian model averaging approach using county data from 1979–2000. Applying this technique, the authors find that in their preferred spline (trend) model, RTC laws elevate violent crime in the three years after RTC adoption: "As a result of the law being introduced, violent crime increases in the first year and continues to increase afterwards" (2016:50). By the third year, their preferred model suggests a 6.5 percent increase in violent crime. Since their paper only provides estimates for three postpassage years, we cannot draw conclusions beyond this but note that their finding that violent crime increases by over 2 percent per year owing to RTC laws is a substantial crime increase. Moreover, the authors note: "For our estimates, the effect on crime of introducing guns continues to grow over time" (2016:50).[46]

Owing to the substantial challenges of estimating effects from observational data, it will be useful to see if yet another statistical approach that has different attributes from the panel data methodology can enhance our understanding of the impact of RTC laws. The rest of this article will use this synthetic control approach, which has been deemed "arguably the most important innovation in the policy evaluation literature in the last 15 years" (Athey & Imbens 2017).

## IV. Estimating the Impact of RTC Laws Using Synthetic Controls

The synthetic control methodology, which is becoming increasingly prominent in economics and other social sciences, is a promising new statistical approach for addressing the impact of RTC laws.[47] While most synthetic control papers focus on a single

---

[46]While our analysis focused on crime at the state level, there is obviously heterogeneity in crime rates within states, which is amalgamated into our population-weighted state average figures. A paper by Kovandzic et al. (KMV) buttresses the view that our state-focused estimates are not giving a misleading impression of the impact of RTC laws on violent crime. KMV limited their analysis to urban areas within each state, estimating the impact of RTC laws on crime using a panel data analysis from 1980–2000 on 189 cities with a population of 100,000 or more (Kovandzic et al. 2005). Although they did not estimate an overall violent crime effect, they did report that RTC laws were associated with a highly statistically significant increase in the rate of aggravated assault, the largest single component of violent crime. Their figures suggest that RTC laws led to a 20.1 percent increase in aggravated assault in the 10 years following adoption.

[47]The synthetic control methodology has been deployed in a wide variety of fields, including health economics (Nonnemaker et al. 2011), immigration economics (Bohn et al. 2014), political economy (Keele 2009), urban economics (Ando 2015), the economics of natural resources (Mideksa 2013), and the dynamics of economic growth (Cavallo et al. 2013).

17563967, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12219 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

treatment in a single geographic region, we look at 33 RTC adoptions occurring over three decades throughout the country. For each adopting ("treated") state we will find a weighted average of other states ("a synthetic control") designed to serve as a good counterfactual for the impact of RTC laws because it had a pattern of crime similar to that of the adopting state prior to RTC adoption. By comparing what actually happened to crime after RTC adoption to the crime performance of the synthetic control over the same period, we generate estimates of the causal impact of RTC laws on crime.[48]

### A.  The Basics of the Synthetic Control Methodology

The synthetic control method attempts to generate representative counterfactual units by comparing a treatment unit (i.e., a state adopting an RTC law) to a set of control units across a set of explanatory variables over a preintervention period. The algorithm searches for similarities between the treatment state of interest and the control states during this period and then generates a synthetic counterfactual unit for the treatment state that is a weighted combination of the component control states.[49] Two conditions are placed on these weights: they must be nonnegative and they must sum to 1. In general, the matching process underlying the synthetic control technique uses pretreatment values of both the outcome variable of interest (in our case, some measure of crime) and other predictors believed to influence this outcome variable.[50] For the reasons set forth in Appendix K, we use every lag of the dependent variable as predictors in the DAW and LM specifications. Once the synthetic counterfactual is generated and the weights associated with each control unit are assigned, the *synth* program then calculates values for the outcome variable associated with this counterfactual and the root mean squared prediction error (RMSPE) based on differences between the treatment and synthetic control units in the pretreatment period. The effect of the treatment can then be estimated by comparing the actual values of the dependent variable for the treatment unit to the corresponding values of the synthetic control.

### B.  Generating Synthetic Controls for 33 States Adopting RTC Laws During Our Data Period

To illustrate the procedure outlined above, consider the case of Texas, whose RTC law went into effect on January 1, 1996. The potential control group for each treatment state

---

[48]For a more detailed technical description of this method, we direct the reader to Abadie and Gardeazabal (2003) and Abadie et al. (2010, 2014).

[49]Our analysis is done in Stata using the *synth* software package developed by Alberto Abadie, Alexis Diamond, and Jens Hainmueller.

[50]Roughly speaking, the algorithm that we use finds $\mathbf{W}$ (the weights of the components of the synthetic control) that minimizes $\sqrt{(\mathbf{X_1} - \mathbf{X_0W})'\mathbf{V}(\mathbf{X_1} - \mathbf{X_0W})}$, where $\mathbf{V}$ is a diagonal matrix incorporating information about the relative weights placed on different predictors, $\mathbf{W}$ is a vector of nonnegative weights that sum to 1, $\mathbf{X_1}$ is a vector containing pretreatment information about the predictors associated with the treatment unit, and $\mathbf{X_0}$ is a matrix containing pretreatment information about the predictors for all the control units.

15412961, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12149 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*226    Donohue et al.*

consists of all nine states with no RTC legislation as of the year 2014, as well as states that pass RTC laws at least 10 years after the passage of the treatment state (e.g., in this case, the five states passing RTC laws after 2006, such as Nebraska and Kansas, whose RTC laws went into effect at the beginning of 2007). Since we estimate results for up to 10 years postpassage,[51] this restriction helps us avoid including states with their own permissive concealed carry laws in the synthetically constructed unit (which would mar the control comparison).

After entering the necessary specification information into the *synth* program (e.g., treatment unit, list of control states, explanatory variables, etc.), the algorithm proceeds to construct the synthetic unit from the list of control states specific to Texas and generates values of the dependent variable for the counterfactual for both the pretreatment and posttreatment periods. The rationale behind this methodology is that a close fit in the prepassage time series of crime between the treatment state and the synthetic control generates greater confidence in the accuracy of the constructed counterfactual. Computing the posttreatment difference between the dependent variables of the treatment state and the synthetic control unit provides the synthetic control estimate of the treatment effect attributable to RTC adoption in that state.

1.  Synthetic Control Estimates of Violent Crime in Two States

Figure 5 shows the synthetic control graph for violent crime in Texas over the period from 1977 through 2006 (10 years after the adoption of Texas's RTC law). The solid black line shows the actual pattern of violent crime for Texas, and the vertical line indicates when the RTC law went into effect. Implementing the synthetic control protocol identifies three states that generate a good fit for the pattern of crime experienced by Texas in the pre-1996 period. These states are California, which gets a weight of 57.7 percent owing to its similar attributes compared to Texas, Nebraska with a weight of 9.7 percent, and Wisconsin with a weight of 32.6 percent.

One of the advantages of the synthetic control methodology is that one can assess how well the synthetic control (call it "synthetic Texas," which is identified in Figure 5 by the dashed line) matches the pre-RTC-passage pattern of violent crime to see whether the methodology is likely to generate a good fit in the 10 years of postpassage data. Here the fit looks rather good in mimicking the rises and falls in Texas violent crime from 1977–1995. This pattern increases our confidence that synthetic Texas will provide a good prediction of what would have happened in Texas had it not adopted an RTC law.

Looking at Figure 5, we see that while both Texas and synthetic Texas (the weighted average violent crime performance of the three mentioned states) show declining crime rates in the postpassage decade after 1996, the crime drop is

_____

[51]Our choice of 10 years is informed by the tradeoffs associated with using a different timeframe. Tables 5 and 6 indicate that the increase in violent crime due to RTC laws is statistically significant at the .01 level for all years after seven years post-adoption.

JA2774

15414.2, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12319 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Right-to-Carry Laws and Violent Crime* 227

*Figure 5:* Texas: Violent crime rate.



Effect of 1996 RTC Law 10 Years After Adoption: 16.9%
Note: Passage Year Difference From SC: 3.6% Composition of SC: CA (0.577); NE (0.097); WI (0.326) CVRMSPE: 0.06 (8 of 33 states, where 1 denotes the state with the best pre-passage fit.).
States Never Passing RTC Laws Included in Synthetic Control: CA;
RTC Adopting States Included in Synthetic Control: NE (2007); WI (2012).

substantially greater in synthetic Texas, which had no RTC law over that period, than in actual Texas, which did. As Figure 5 notes, 10 years after adopting its RTC law, violent crime in Texas was 16.9 percent *higher* than we would have expected had it not adopted an RTC law.[52]

Figure 5 also illustrates perhaps the most important lesson of causal inference: one cannot simply look before and after an event to determine the consequence of the event. Rather, one needs to estimate the difference between what did unfold and the counterfactual of what would have unfolded without the event. The value of the synthetic control methodology is that it provides a highly transparent estimate of that counterfactual, using a tool designed to ensure the validity of the parallel trends assumption that we have already seen is so critical to achieving meaningful causal estimates. Thus, when Lott

[52]Texas's violent crime rate 10 years post-adoption exceeds that of "synthetic Texas" by 20.41 percent $= \frac{517.3 - 429.6}{429.6} \times 100\%$. While some researchers would take that value as the estimated effect of RTC, we chose to subtract off the discrepancy in 1996 between the actual violent crime rate and the synthetic control value in that year. This discrepancy is 3.55 percent $= \frac{644.4 - 622.3}{622.3} \times 100\%$ (shown in the line just below the graph of Figure 5). See footnote 58 for further discussion of this calculation. Figure 5 shows a (rounded) estimated violent crime increase in Texas of 16.9 percent. We arrive at this estimate by subtracting the 1996 discrepancy of 3.55 percent from the 20.41 percent 10th-year discrepancy, which generates a TEP of 16.86 percent.

1541, 2891, 2. Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12319 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*228    Donohue et al.*

(2010) quotes a Texas District Attorney suggesting that he had reversed his earlier opposition to the state's RTC law in light of the perceived favorable experience with the law, we see why it can be quite easy to draw the inaccurate causal inference that Texas's crime decline was facilitated by its RTC law. The public may perceive the falling crime rate post-1996 (the solid black line), but our analysis suggests that Texas would have experienced a more sizable violent crime decline if it had not passed an RTC law (the dotted line). More specifically, Texas experienced a 19.7 percent decrease in its aggregate violent crime rate in the 10 years following its RTC law (between 1996 and 2006), while the state's synthetic control experienced a larger 31.0 percent decline. This counterfactual would not be apparent to residents of the state or to law enforcement officials, but our results suggest that Texas's RTC law imposed a large social cost on the state.

The greater transparency of the synthetic control approach is one advantage of this methodology over the panel data models that we considered above. Figure 5 makes clear what Texas is being compared to, and we can reflect on whether this match is plausible and whether anything other than RTC laws changed in these three states during the post-passage decade that might compromise the validity of the synthetic control estimate of the impact of RTC laws.

Figure 6 shows our synthetic control estimate for Pennsylvania, which adopted an RTC law in 1989 that did not extend to Philadelphia until a subsequent law went into

*Figure 6:*   Pennsylvania: Violent crime rate.



Effect of 1989 RTC Law 10 Years After Adoption: 24.4%
NOTE: Passage Year Difference From SC: -1.1%. Composition of SC: DE (0.078); HI (0.073); MD (0.038); NE (0.016); NJ (0.103); OH (0.27); WI (0.424) CVRMSPE: 0.017 (1 of 33 states, where 1 denotes the state with the best pre-passage fit.)
States Never Passing RTC Laws Included in Synthetic Control: DE; HI; MD; NJ;
RTC Adopting States Included in Synthetic Control: NE (2007); OH (2004); WI (2012).

15406461, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12219 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Figure 7:*   The effect of RTC laws on violent crime after 10 years, synthetic control estimates for 31 states (1977–2014).



effect on October 11, 1995. In this case, synthetic Pennsylvania is comprised of eight states and the prepassage fit is nearly perfect. Following adoption of the RTC laws, synthetic Pennsylvania shows substantially better crime performance than actual Pennsylvania after the RTC law is extended to Philadelphia in late 1995, as illustrated by the second vertical line at 1996. The synthetic control method estimates that RTC laws in Pennsylvania increased its violent crime rate by 24.4 percent after 10 years.[53]

### 2.  State-Specific Estimates Across All RTC States

Because we are projecting the violent crime experience of the synthetic control over a 10-year period, there will undoubtedly be a deviation from the "true" counterfactual and our estimated counterfactual. If we were only estimating the impact of a legal change for a single state, we would have an estimate marred by this purely stochastic aspect of changing crime. Since we are estimating an average effect across a large number of states, the

---

[53]In Appendix I, we include all 33 graphs showing the path of violent crime for the treatment states and the synthetic controls, along with information about the composition of these synthetic controls, the dates of RTC adoption (if any) for states included in these synthetic controls, and the estimated treatment effect (expressed in terms of the percent change in a particular crime rate) 10 years after adoption (or seven years after adoption for two states that adopted RTC laws in 2007, since our data end in 2014). The figures also document the discrepancy in violent crime in the year of adoption between the actual and synthetic control values.

15206-2699, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12319 by Rogers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*230*   *Donohue et al.*

stochastic variation will be diminished as the overestimates and underestimates will tend to wash out in our mean treatment estimates. Figure 7 shows the synthetic control estimates on violent crime for all 31 states for which we have 10 years of postpassage data. For 23 of the 31 states adopting RTC laws, the increase in violent crime is noteworthy.[54] Although three states were estimated to have crime reductions greater than the –1.6 percent estimate of South Dakota, if one averages across all 31 states, the (population-weighted) mean treatment effect after 10 years is a 14.3 percent *increase* in violent crime. If one instead uses an (unweighted) median measure of central tendency, RTC laws are seen to *increase* crime by 12.3 percent.

### 3. Less Effective Prepassage Matches

Section IV.B.1 provided two examples of synthetic controls that matched the crime of the treatment states well in the prepassage period, but this does not always happen. For example, we would have considerably less confidence in the quality of the synthetic control estimates for Maine, whose poor estimate is depicted in Appendix Figure I11. Maine also happens to be the state showing the greatest reduction in violent crime following RTC adoption, as indicated in Figure 7.

For Maine, one sees that the synthetic control and the state violent crime performance diverged long before RTC adoption in 1986, and that, by the date of adoption, Maine's violent crime rate was already 37.9 percent below the synthetic control estimate. The violent crime rate of actual Maine was trending down, while the synthetic control estimate had much higher and trending up in the immediate pre-adoption period. The difficulty in generating good prepassage matches for states like Maine stems from their unusually low violent crime in the prepassage period.

Appendix Figure D11 reproduces Figure 7 while leaving out the five states for which the quality of prepassage fit is clearly lower than in the remaining 26 states.[55] This knocks out North Dakota, South Dakota, Maine, Montana, and West Virginia, thereby eliminating three of the five outlier estimates at both ends of the scale, and leaving the mean and median effects of RTC laws relatively unchanged from Figure 7. As Appendix Figure D11 shows, the (weighted) mean increase in crime across the listed 26 RTC-adopting states is 13.7 percent while the (unweighted) median increase is now 11.1 percent. Increases in violent crime of this magnitude are troubling. Consensus estimates of the elasticity of crime with respect to incarceration hover around 0.15 today, which suggests that to offset the increase in crime caused by RTC adoption, the average RTC state would need to approximately double its prison population.

---

[54]The smallest of these, Kentucky, had an increase of 4.6 percent.

[55]In particular, for these five states, the prepassage CVRMSPE—that is, the RMSPE transformed into a coefficient of variation by dividing by the average prepassage crime rate—was 19 percent or greater. See note 61 for further discussion of this statistic.

## V. Aggregation Analysis Using Synthetic Controls

A small but growing literature applies synthetic control techniques to the analysis of multiple treatments.[56] We estimate the percentage difference in violent crime between each treatment (RTC-adopting) state and the corresponding synthetic control in both the year of the treatment and in the 10 years following it. This estimate of the treatment effect percentage (TEP) obviously uses data from fewer posttreatment years for the two treatment states[57] in which RTC laws took effect less than 10 years before the end of our sample.

We could use each of these 10 percentage differences as our estimated effects of RTC laws on violent crime for the 10 postpassage years, but, as noted above, we make one adjustment to these figures by subtracting from each the percentage difference in violent crime in the adoption year between the treatment and synthetic control states. In other words, if 10 years after adopting an RTC law, the violent crime rate for the state was 440 and the violent crime rate for the synthetic control was 400, one estimate of the effect of the RTC law could be 10 percent $\left( = \frac{440 - 400}{400} \right)$. Rather than use this estimate, however, we have subtracted from this figure the percentage difference between the synthetic and treatment states in the year of RTC adoption. If, say, the violent crime rate in the treatment state that year was 2 percent higher than the synthetic control value, we would subtract 2 from 10 to obtain an estimated 10th-year effect of RTC laws of 8 percent.[58] We

---

[56]The closest paper to the present study is Arindrajit Dube and Ben Zipperer (2013), who introduce their own methodology for aggregating multiple events into a single estimated treatment effect and calculating its significance. Their study centers on the effect of increases in the minimum wage on employment outcomes, and, as we do, the authors estimate the percentage difference between the treatment and the synthetic control in the posttreatment period. While some papers analyze multiple treatments by aggregating the areas affected by these treatments into a single unit, this approach is not well-equipped to deal with a case such as RTC law adoption where treatments affect the majority of panel units and more than two decades separate the dates of the first and last treatment under consideration, as highlighted in Figure 7.

[57]These two states are Kansas and Nebraska, which adopted RTC laws in 2007. See note 4 discussing the states for which we cannot estimate the impact of RTC laws using synthetic controls.

[58]It is unclear ex ante whether one should implement this subtraction. The intuitive rationale for our choice of outcome variable was that pretreatment differences between the treatment state and its synthetic control at the time of RTC adoption likely reflected imperfections in the process of generating a synthetic control and should not contribute to our estimated treatment effect if possible. In other words, if the treatment state had a crime rate that was 5 percent greater than that of the synthetic control in both the pretreatment and posttreatment period, it would arguably be misleading to ignore the pretreatment difference and declare that the treatment increased crime rates by 5 percent. On the other hand, subtracting off the initial discrepancy might be adding noise to the subsequent estimates.

We resolve this issue with the following test of our synthetic control protocol: we pretend that each RTC-adopting state actually adopted its RTC law five years before it did. We then generate synthetic control estimates of this phantom law over the next five years of actual pretreatment data. If our synthetic control approach is working perfectly, it should simply replicate the violent crime pattern for the five pretreatment years. Consequently, the estimated "effect" of the phantom law should be close to zero. Indeed, when we follow our subtraction protocol, the synthetic controls match the pretreatment years more closely than when we do not provide this normalization. Specifically, with subtraction the estimated "effect" in the final pretreatment year is a wholly insignificant 3.2 percent; without subtraction, it jumps to a statistically significant 5.3 percent. Consequently,

1961, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12319 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*232    Donohue et al.*

then look across all the state-specific estimates of the impact of RTC laws on violent crime for each of the 10 individual postpassage years and test whether they are significantly different from zero.[59]

### A. RTC Laws Increase Violent Crime

We begin our analysis of the aggregated synthetic control results using predictors derived from the DAW specification. Table 5 shows our results on the full sample examining violent crime.[60] Our estimates of the normalized average treatment effect percentage (TEP) suggest that states that passed RTC laws experienced more deleterious changes in violent criminal activity than their synthetic controls in the 10 years after adoption. On average, treatment states had aggregate violent crime rates that were almost 7 percent higher than their synthetic controls five years after passage and around 14 percent higher 10 years after passage. Table 5 suggests that the longer the RTC law is in effect (up to the 10th year that we analyze), the greater the cost in terms of increased violent crime.

 As we saw in Figures 6 (Pennsylvania) and I11(Maine), the validity of using the posttreatment difference between crime rates in the treatment state (the particular state adopting an RTC law that we are analyzing) and its corresponding synthetic control as a measure of the effect of the RTC law depends on the strength of the match between these two time series in the pretreatment period. To generate an estimate of pretreatment fit that takes into account differences in pretreatment crime levels, we estimate the coefficient of variation for the root mean squared prediction error (RMSPE), which

---

normalization is the preferred approach for violent crime. It should also be noted that our actual synthetic control estimates will be expected to perform better than this phantom RTC estimate since we will be able to derive our synthetic controls from five additional years of data, thereby improving our pretreatment fit.

 As it turns out, the choice we made to subtract off the initial-year crime discrepancy is a conservative one, in that the estimated crime increases from RTC laws would be *greater* without subtraction. We provide synthetic control estimates for the DAW model without subtraction of the adoption-year percentage difference for violent crime, murder, and property crime in Appendix F. Comparison of these Appendix F estimates with those in the text (Table 5) reveals that our preferred method of subtracting yields more conservative results (i.e., a smaller increase in violent crime due to RTC). In Table 5, we estimate the 10th-year TEP for violent crime as roughly 13.5 to 14.3 percent, while the comparable estimates without subtraction are roughly 17–18 percent, as seen in Appendix Tables F1, F2, and F3. Indeed, without subtraction, every estimated impact would show RTC laws lead to a statistically significant increase in every crime category we consider except non-firearm homicide, as seen in Appendix F.

[59]This test is performed by regressing these differences in a model using only a constant term and examining whether that constant is statistically significant. These regressions are weighted by the population of the treatment state in the posttreatment year under consideration. Robust standard errors corrected for heteroskedasticity are used in this analysis.

[60]We discuss the synthetic control estimates for murder and property crime in Section V.F.

Table 5:  The Impact of RTC Laws on the Violent Crime Rate, DAW Covariates, Full Sample, 1977–2014

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) |
|---|---|---|---|---|---|---|---|---|---|---|
| Average normalized treatment effect percentage (TEP) | −0.117 | 2.629* | 3.631* | 4.682* | 6.876*** | 7.358** | 10.068** | 12.474*** | 14.021*** | 14.344*** |
| | (1.076) | (1.310) | (1.848) | (2.068) | (2.499) | (3.135) | (2.823) | (3.831) | (3.605) | (2.921) |
| $N$ | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 31 | 31 | 31 |
| Pseudo $p$ value | 0.936 | 0.274 | 0.220 | 0.192 | 0.094 | 0.106 | 0.060 | 0.038 | 0.032 | 0.032 |

Note: Standard errors in parentheses. Column numbers indicate postpassage year under consideration; $N$ = number of states in sample. The synthetic controls method is run using the nested option, and each year's estimate and statistical significance is computed as explained in note 59. * $p < 0.10$; ** $p < 0.05$; *** $p < 0.01$.

15406461, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12219 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

15406, 2019, 2. Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12319 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*234    Donohue et al.*

is the ratio of the synthetic control's pretreatment RMSPE to the pretreatment average level of the outcome variable for the treatment state.[61]

To evaluate the sensitivity of the aggregate synthetic control estimate of the crime impact of RTC laws in Table 5, we consider two subsamples of treatment states: states whose coefficients of variation are less than two times the average coefficient of variation for all 33 treatments and states whose coefficients of variation are less than this average. We then rerun our synthetic control protocol using each of these two subsamples to examine whether restricting our estimation of the average treatment effect to states for which a relatively "better" synthetic control could be identified would meaningfully change our findings.

All three samples yield roughly identical conclusions: RTC laws are consistently shown to increase violent crime, with the 10th-year increase ranging from a low of 13.5 (when we remove the six states with above-average values of the CV RMSPE) to a high of 14.3 percent (Table 5).

### B. The Placebo Analysis

Our ability to make valid inferences from our synthetic control estimates depends on the accuracy of our standard error estimation. To test the robustness of the standard errors that we present under the first row of Table 5, we incorporate an analysis using placebo treatment effects similar to Ando (2015).[62] For this analysis, we generate 500 sets of randomly generated RTC dates that are designed to resemble the distribution of actual RTC

---

[61]While the RMSPE is often used to assess this fit, we believe that the use of this measure is not ideal for comparing fit across states, owing to the wide variation that exists in the average pretreatment crime rates among the 33 treatment states that we consider. For example, the pretreatment RMPSE associated with our synthetic control analysis using the DAW predictor variables and aggregate violent crime as the outcome variable is nearly identical for Texas (37.1) and Maine (36.4), but the pretreatment levels of Texas's aggregate violent crime rate are far greater than Maine's. To be more specific, Texas's average violent crime rate prior to the implementation of its RTC law (from 1977 through 1995) was 617 violent crimes per 100,000 residents, while the corresponding figure for Maine was 186 violent crimes per 100,000 residents, less than one-third of Texas's rate. The more discerning CV of the RMSPE is 0.06 for Texas (with a year of adoption discrepancy of only 3.6 percent), while for Maine, the CV is a dramatically higher at 0.196 (with an initial year discrepancy of –37.9 percent). Accordingly, since the percentage imprecision in our synthetic pretreatment match for Maine is so much greater than for Texas, we have greater confidence in our estimates that in the 10th year, Texas's RTC law had increased violent crime by 16.9 percent than we do in an estimate that Maine's law had decreased violent crime by 16.5 percent.

[62]Ando (2015) examines the impact of constructing nuclear plants on local real per capita taxable income in Japan by generating a synthetic control for every coastal municipality that installed a nuclear plant. Although the average treatment effect measured in our article differs from the one used by Ando, we follow Ando in repeatedly estimating average placebo effects by randomly selecting different areas to serve as placebo treatments. (The sheer number of treatments that we are considering in this analysis prevents us from limiting our placebo treatment analysis to states that never adopt RTC laws, but this simply means that our placebo estimates will likely be biased *against* finding a qualitatively significant effect of RTC laws on crime, since some of our placebo treatments will be capturing the effect of the passage of RTC laws on crime rates.) Our estimated average treatment effect can then be compared to the distribution of average placebo treatment effects. Heersink and Peterson (2016) and Cavallo et al. (2013) also perform a similar randomization procedure to estimate the significance of their estimated average treatment effects, although the randomization procedure in the latter paper differs from ours by restricting the timing of placebo treatments to the exact dates when actual treatments took place.

1061, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12319 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

passage dates that we use in our analysis.[63] For each of the 500 sets of randomly generated RTC dates, we then use the synthetic control methodology and the DAW predictors to estimate synthetic controls for each of the 33 states whose randomly generated adoption year is between 1981 and 2010. We use these data to estimate the percentage difference between each placebo treatment and its corresponding synthetic control during both the year of the treatment and each of the 10 posttreatment years (for which we have data) that follow it. Using the methodology described in notes 52 and 58, we then test whether the estimated treatment effect for each of the 10 posttreatment years is statistically significant.

To further assess the statistical significance of our results, we compare each of the 10 coefficient estimates in Table 5 with the distribution of the 500 average placebo treatment effects that use the same crime rate, posttreatment year, and sample as the given estimate. To assist in this comparison process, we report a pseudo $p$ value that is equal to the proportion of our placebo treatment effects whose absolute value is greater than the absolute value of the given estimated treatment effect. This pseudo $p$ value provides another intuitive measure of whether our estimated average treatment effects are qualitatively large compared to the distribution of placebo effects. Our confidence that the treatment effect that we are measuring for RTC laws is real increases if our estimated treatment effect is greater than the vast majority of our estimated average placebo treatment effects. Examining our pseudo $p$ values in Table 5, we see that our violent crime results are always statistically significant in comparison to the distribution of placebo coefficients at the 0.05 level eight years or more past RTC adoption.

### C.  Synthetic Control Estimates Using LM's Explanatory Variables

In our Section III panel data analysis, we saw that RTC laws were associated with significantly higher rates of violent crime in the DAW model (Table 3), but not in the LM model (Table 4, Panel A). Under the synthetic controls approach, however, we find that the results are the same whether one uses the DAW or LM explanatory variables. This is necessarily true when one uses yearly lags in implementing the synthetic controls – see Kaul et al. (2016) – but it is also true when we use three lags of the dependent variable in our synthetic control protocol, as shown in Table 6. The detrimental effects of RTC laws on violent crime rates are statistically significant at the 0.05 level starting three years after the passage of an RTC law, and appear to increase over time. The treatment effects associated with violent crime in Table 6 range from 9.6 percent in the seventh posttreatment year to 12.8 percent in the 10th posttreatment year. Remarkably, the DAW and LM synthetic control estimates of the impact of RTC laws on violent crime are nearly identical

---

[63]More specifically, we randomly choose eight states to never pass RTC laws, six states to pass RTC laws before 1981, 33 states to pass RTC laws between 1981 and 2010, and three states to pass their RTC laws between 2011 and 2014. (Washington, DC is not included in the placebo analysis since it is excluded from our main analysis.) These figures were chosen to mirror the number of states in each of these categories in our actual data set.

15413461, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12219 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

236   *Donohue et al.*

Table 6:   The Impact of RTC Laws on the Violent Crime Rate, LM covariates, Full Sample, 1977–2014

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) |
|---|---|---|---|---|---|---|---|---|---|---|
| Average Normalized TEP | 0.309 | 1.981 | 4.063* | 5.211* | 7.159** | 6.981** | 9.644*** | 11.160*** | 12.115*** | 12.794*** |
| | (1.318) | (1.646) | (2.192) | (2.572) | (2.887) | (3.319) | (3.016) | (3.680) | (3.857) | (3.200) |
| $N$ | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 31 | 31 | 31 |

NOTE: Standard errors in parentheses. Column numbers indicate post-passage year under consideration; $N$ = number of states in sample. The synthetic controls method is run using the non-nested option, and each year's estimate and statistical significance is computed as explained in footnote 59. *$p < 0.10$; **$p < 0.05$; ***$p < 0.01$.

JA2784

15406041, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12219 by Rutgers University Libraries, Wiley Online Library on [08/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

(compare Tables 6 and Appendix Table K1), and this is true even when we limit the sample of states in the manner described above.[64]

### D. The Contributions of Donor States to the Synthetic Control Estimates: Evaluating Robustness

One of the key elements of the synthetic control approach is its selection among plausible control states. For each state adopting an RTC law in year X, the approach selects among states that do not have RTC laws through at least ten years after X, including never-adopting states. Appendix Figure D10 lists all the states that are eligible under this criterion to serve as synthetic controls for one or more of the 33 adopting states, and shows how often they are selected. The horizontal length of each bar tells us how much that state contributes to our synthetic control violent crime estimates.[65] As the figure indicates, Hawaii appears most frequently—contributing to a synthetic control 18 of the 33 times it is eligible and averaging a 15.2 percent contribution—but California, a substantial contributor to multiple large states, edges it out for the largest average contribution (18.1 percent).

Hawaii's relatively large contribution as a donor state in the synthetic control estimates has some advantages but also raises concern that this small state might be unrepresentative of the states for which it is used as a control. For example, note that the largest share of Virginia's synthetic control comes from Hawaii (27.9 percent), with Rhode Island, Kansas, and Nebraska making up the lion's share of the remaining synthetic control. We had already mentioned one problem with the panel data analysis caused by the tendency of lax gun control states to serve as a source for guns that contribute to crime in the non-RTC states, and Virginia has always been a major source of that interstate flow. Since Virginia's guns are not likely to end up in Hawaii, the bias that the treatment infects the control is reduced for that particular match. Nonetheless, one may be concerned that Hawaii might be unduly skewing the estimates of the impact of RTC laws on violent crime.

To address this, as well as the analogous concern for other potentially idiosyncratic control states, we generated 18 additional TEP estimates, with each one generated by dropping a single one of the 18 states that appears as an element of our synthetic control analysis (as identified in Appendix Figure D10). The results of this exercise are presented in Appendix Figure D12, which shows that our estimated increase in violent crime resulting from the adoption of an RTC law is extremely robust: All 18 estimates remain statistically significant at the 0.01 percent level, and

---

[64]The 10th-year effect in the synthetic control analysis using the LM variables is 12.4 percent when we eliminate the three states with more than twice the average CV of the RMSPE. Knocking out the seven states with above-average values of this CV generates a similar 12.5 percent effect.

[65]In particular, it reflects the portion of each synthetic state it becomes part of, weighted by the treated state's population. For example, Texas's population is 13.6 percent of the total treated states' population. As a result, a state that made up 50 percent of synthetic Texas (but is not a donor for any other treatment state) would have a bar of size 6.8 percent.

26612689, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12349 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*238*    Donohue et al.

the smallest TEP, which comes from dropping Illinois as a control state, is 12.0 percent. Note in particular that dropping Hawaii from the list of potential donor states slightly *increases* the estimate of the increase in violent crime caused by RTC laws. In fact, when we dropped Hawaii completely as a potential control and repeated the previous protocol of dropping one state at a time, the estimated increase in violent crime from RTC never fell below 12 percent (which was the value when New York was dropped as well as Hawaii). Indeed, the synthetic control finding that RTC laws increase violent crime is so robust that even if we drop California, New York, and Hawaii from the pool of potential donor states, RTC laws still increase violent crime by 8.9 percent after 10 years ($p = 0.018$).

### E. Does Gun Prevalence Influence the Impact of RTC Laws?

The wide variation in the state-specific synthetic control estimates that was seen in Figures 7 and D11 suggests that there is considerable noise in some of the outlier estimates of a few individual states. For example, it is highly improbable that RTC laws led to a 16.5 percent decrease in violent crime in Maine and an 80.2 percent increase in violent crime in Montana, the two most extreme estimates seen in Figure 7. Since averaging across a substantial number of states will tend to eliminate the noise in the estimates, one should repose much greater confidence in the aggregated estimates than in any individual state estimate. Indeed, the fact that we can average across 33 separate RTC-adopting states is what generates such convincing and robust estimates of the impact of RTC laws on violent crime.

Another way to distill the signal from the noise in the state-specific estimates is to consider whether there is a plausible factor that could explain underlying differences in how RTC adoption influences violent crime. For example, RTC laws might influence crime differently depending on the level of gun prevalence in the state.

Figure 8 shows the scatter diagram for 33 RTC-adopting states, and relates the estimated impact on violent crime to a measure of gun prevalence in each RTC-adopting state. The last line of the note below the figure provides the regression equation, which shows that gun prevalence is positively related to the estimated increase in crime ($t = 2.39$).[66]

### F. The Murder and Property Crime Assessments with Synthetic Controls

The synthetic control estimates of the impact of RTC laws on violent crime uniformly generate statistically significant estimates, and our phantom RTC law synthetic control estimates for the five pretreatment years (described in note 58) give us confidence that the synthetic control approach is working well for our violent crime estimates, as illustrated in Appendix Table L1. Since the estimated increases in violent crime are

---

[66]The gun prevalence data were collected by the data analytics firm YouGov in a 2013 online survey (Kalesan et al. 2016); 4,486 people were initially surveyed, although only 4,000 results are used in the final data set. YouGov used a proximity matching method to select the survey results for inclusion, matching respondents by race, age, gender, and education to the demographic breakdown of the 2010 American Community Survey.

15424051, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12219 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Figure 8:* The impact of gun ownership on the increase in violent crime due to RTC laws (synthetic control estimates, 1977−2014).



NOTE: Treatment effect displayed is for the 10th year after RTC adoption (but 7th post−passage year for Kansas and Nebraska). Treatment Effect = −9.15 + 0.69 * Gun Prevalence. t = 2.39; R 2 = 0.16. Regression weighted by population in the final TEP year.

statistically significant and consistently observed in both our panel data and synthetic control analyses, these represent our most robust finding.

Just as we saw in the panel data analysis, the synthetic controls provide evidence of increases in the murder and firearm murder categories, but it is weaker and less precise than our violent crime estimates. For example, both Appendix Tables E1 and E2 show estimated crime increases of 8.7 percent (murder) and 15.3 percent (firearm murder), but only the 8.7 figure is statistically significant at the 0.10 level. Interestingly, our phantom law test works well for murder and even suggests statistically significant increases in that crime beginning right at the time of RTC adoption (Appendix Table L3). The firearm murder estimates perform less well in this test, generating an estimated fall in crime of 6.8 percent in the year prior to RTC adoption (Appendix Table L5).

The results from implementing this phantom law approach for property crime are perhaps our less encouraging estimates. While our estimated "effect" in the year prior to adoption would ideally be close to zero in this test, for property crime it is 6.9 percent, with the latter significant at the 0.10 level. (The full results of this test for all the crime categories are shown in Appendix L.) If we accept our normalized estimate for the impact of RTC laws on property crime it would give little reason to reject a null hypothesis of no effect (Appendix Table E8). Because our synthetic control estimates for violent crime are validated by our phantom adoption test and generate uniform and highly

1661, 2691, 2. Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12319 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

240    *Donohue et al.*

robust results whether dropping selected donor states or states with poor fit, or using either the DAW or LM models, we have greater confidence in and therefore highlight our violent crime estimates. Accordingly, we consign our further discussion of the synthetic control estimates of murder and property crime to Appendix E.

## VI. Conclusion

The extensive array of panel data and synthetic control estimates of the impact of RTC laws that we present uniformly undermine the "More Guns, Less Crime" hypothesis. There is not even the slightest hint in the data from any econometrically sound regression that RTC laws reduce violent crime. Indeed, the weight of the evidence from the panel data estimates as well as the synthetic control analysis best supports the view that the adoption of RTC laws substantially raises overall violent crime in the 10 years after adoption.

In our initial panel data analysis, our preferred DAW specification predicted that RTC laws have led to statistically significant and substantial increases in violent crime. We also presented both panel data and synthetic control estimates that RTC laws substantially increase the percentage of robberies committed with a firearm, while having no restraining effect on the overall number of robberies. Moreover, to the extent the massive theft of guns from carrying guns outside the home generates crime spillovers to non-RTC states, our estimated increases in violent crime are downward biased.

We then supplemented our panel data results using our synthetic control methodology, and the finding from our panel data analysis was strongly buttressed. Whether we used the DAW or LM specifications, states that passed RTC laws experienced 13–15 percent *higher* aggregate violent crime rates than their synthetic controls after 10 years (results that were significant at either the 0.05 or 0.01 level after five years).

The synthetic control effects that we measure represent meaningful increases in violent crime rates following the adoption of RTC laws, and this conclusion remained unchanged after restricting the set of states considered based on model fit and after considering a large number of robustness checks. The consistency across different specifications and methodologies of the finding that RTC elevates violent crime enables far stronger conclusions than were possible over a decade ago when the NRC Report was limited to analyzing data only through 2000 with the single tool of panel data evaluation.

The best available evidence using different statistical approaches—panel data regression and synthetic control—with varying strengths and shortcomings and with different model specifications all suggest that the net effect of state adoption of RTC laws is a substantial increase in violent crime.

## References

Abadie, Alberto, Alexis Diamond, & Jens Hainmueller (2010) "Synthetic Control Methods for Comparative Case Studies: Estimating the Effect of California's Tobacco Control Program," 105 (490) *J. of the American Statistical Association* 493.

———— (2014) Comparative Politics and the Synthetic Control Method," 59(2) *American J. of Political Science* 495.

Abadie, Alberto, & Javier Gardeazabal (2003) "The Economic Costs of Conflict: A Case Study of the Basque Country," 93(1) *American Economic Rev.* 113.

ABC News (2018) "Man Annoyed by IHOP Customer Before Allegedly Shooting Him in Head," *ABC News*. https://abc13.com/man-annoyed-by-ihop-customer-before-allegedly-shooting-him/3160627/

Adda, Jérôme, Brendon McConnell, & Imran Rasul (2014) "Crime and the Depenalization of Cannabis Possession: Evidence from a Policing Experiment," 122(5) *J. of Political Economy* 1130.

Ando, Michihito (2015) "Dreams of Urbanization: Quantitative Case Studies on the Local Impacts of Nuclear Power Facilities Using the Synthetic Control Method," 85 *J. of Urban Economics* 68.

Aneja, Abhay, John J. Donohue, & Alexandria Zhang (2011) "The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy," 13(2) *American Law & Economics Rev.* 565.

———— (2014) "The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy," *National Bureau of Economic Research Working Paper* 18294.

Associated Press (2014) "Official: Suspect in Deadly Hospital Shooting Had Lengthy History of Gun Arrests, Violence," July 26 *Fox News*. http://www.foxnews.com/us/2014/07/26/official-suspect-in-deadly-hospital-shooting-had-lengthy-history-gun-arrests.html

———— (2015) "8-Year-Old Arizona Boy Accidentally Shot by Baby Sitter," September 8 *Daily Record*. http://www.canoncitydailyrecord.com/ci_28778997/8-year-old-arizona-boy-accidentally-shot-by

Athey, Susan, & Guido W. Imbens (2017) "The State of Applied Econometrics: Causality and Policy Evaluation," 31(2) *J. of Economic Perspectives* 3.

Ayres, Ian, & John J. Donohue (2003) "The Latest Misfires in Support of the 'More Guns, Less Crime' Hypothesis," 55 *Stanford Law Rev.* 1371.

Barbash, Fred (2018) "Calif. Teacher Resigns After Unintentionally Firing Weapon in Gun Safety Class," April 12 *Washington Post*. https://www.washingtonpost.com/news/morning-mix/wp/2018/04/12/calif-teacher-resigns-after-unintentionally-firing-weapon-in-gun-safety-class/?noredirect=on&utm_term=.68faa7eb0133

Biette-Timmons, Nora (2017) "More People Are Pulling Guns During Road-Rage Incidents," August 10 *Trace*. https://www.thetrace.org/2017/08/guns-road-rage-cleveland-2017

Biography.com (2016) "Bernhard Goetz," November 15 *Online*. https://www.biography.com/people/bernhard-goetz-578520

Blair, J. Pete, & Katherine W. Schweit (2014) *A Study of Active Shooter Incidents in the United States Between 2000 and 2013*. Washington, DC: Texas State Univ. & Federal Bureau of Investigation, U.S. Department of Justice.

Bohn, Sarah, Magnus Lofstrom, & Steven Raphael (2014) "Did the 2007 Legal Arizona Workers Act Reduce the State's Unauthorized Immigrant Population?" 96(2) *Rev. of Economics & Statistics* 258.

Boots, Michelle Theriault (2017) "In Alaska, a High Bar for Taking Guns from the Mentally Ill," January 9 *Anchorage Daily News*. https://www.adn.com/alaska-news/2017/01/09/in-alaska-a-high-bar-for-the-mentally-ill-to-part-with-their-guns/

Bureau of Alcohol, Tobacco, Firearms, & Explosives (2012) *2012 Summary: Firearms Reported Lost and Stolen*. https://www.atf.gov/resource-center/docs/2012-firearms-reported-lost-and-stolenpdf-1/download

Bureau of Justice Statistics (2014) *The Nation's Two Measures of Homicide*. https://www.bjs.gov/content/pub/pdf/ntmh.pdf

Byers, Christine (2010) "Police Report Details AAB Shooting Chaos," November 18 *St. Louis Post-Dispatch*. https://www.stltoday.com/news/local/crime-and-courts/police-report-details-abb-shooting-chaos/article_bb52f36b-3757-5c95-a775-384c52dfd887.html

9841, 289, 2. Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12119 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

242    Donohue et al.

Calder, Chad (2018) "Legal Analysts Weigh in on Ronald Gasser's Defense in Joe McKnight Killing as Trial Set to Begin," January 15 *New Orleans Advocate*. https://www.theadvocate.com/new_orleans/news/courts/article_f51f97ca-fa45-11e7-a3eb-2fa820d7858f.html

Campbell, Elizabeth (2017) "521 Guns Stolen in 2017 from Unlocked Cars, Jacksonville Police Say," December 11 *News 4 Jax*. https://www.news4jax.com/news/local/jacksonville/521-guns-stolen-in-2017-from-unlocked-cars-jacksonville-police-say

Carter, Chelsea J., Ed Lavandera, & Evan Perez (2013) "Who Is Navy Yard Gunman Aaron Alexis?" *CNN*. http://www.cnn.com/2013/09/16/us/navy-yard-suspects/index.html

Cavallo, Eduardo, Sebastian Galiani, Ilan Noy, & Juan Pantano (2013) "Catastrophic Natural Disasters and Economic Growth," 95(5) *Rev. of Economics & Statistics* 1549.

CEA (2016) *Economic Perspectives on Incarceration and the Criminal Justice System*. Washington, DC: Council of Economic Advisors, Executive Office of the President of the United States.

Chalfin, Aaron, & Justin McCrary (2017) "Criminal Deterrence: A Review of the Literature," 55(1) *J. of Economic Literature* 5.

Clary, Mike, Megan O'Matz, & Lisa Arthur (2017) "Puerto Rico Police Seized Guns from Airport Shooter Esteban Santiago," January 13 *Sun Sentinel*. http://www.sun-sentinel.com/news/fort-lauderdale-hollywood-airport-shooting/fl-santiago-guns-puerto-rico-20170113-story.html

Cohen, Dov, Richard E. Nisbett, Brian F. Bowdle, & Norbert Schwarz (1996) "Insult, Aggression, and the Southern *Culture of Honor*: An 'Experimental Ethnography'," 70(5) *J. of Personality & Social Psychology* 945.

Cook, Philip J. (2018) "Gun Theft and Crime," 95(1) *J. of Urban Health* 305.

Cook, Philip J., Jens Ludwig, & Adam M. Samaha (2009) "Gun Control After *Heller*: Threats and Sideshows from a Social Welfare Perspective," 56(5) *UCLA Law Rev.* 1041.

DePrang, Emily (2015) "The Mystery of Milwaukee's 'Human Holster'," July 16 *Trace*. https://www.thetrace.org/2015/07/concealed-carry-wisconsin-human-holster/

Donohue, John J. (2003) "The Final Bullet in the Body of the More Guns, Less Crime Hypothesis," 2 (3) *Criminology & Public Policy* 397.

———— (2017a) "Comey, Trump, and the Puzzling Pattern of Crime in 2015 and Beyond," 117(5) *Columbia Law Rev.* 1297.

———— (2017b) "Laws Facilitating Gun Carrying and Homicide," 107(12) *American J. of Public Health* 1864.

Donohue, John J., & Justin Wolfers (2009) "Estimating the Impact of the Death Penalty on Murder," 11(2) *American Law & Economics Rev.* 249.

Dube, Arindrajit, & Ben Zipperer (2013) "Pooling Multiple Case Studies Using Synthetic Controls: An Application to Minimum Wage Policies," *IZA Discussion Paper* 8944. https://ssrn.com/abstract=2589786

Durlauf, Steven N., Salvado Navarro, & David A. Rivers (2016) "Model Uncertainty and the Effect of Shall-Issue Right-to-Carry Laws on Crime," 81 *European Economic Rev.* 32.

Eltagouri, Marwa (2017) "Man Accidentally Shoots Himself and His Wife at a Church, Shortly After a Discussion on Shootings," November 17 *Washington Post*. https://www.washingtonpost.com/news/acts-of-faith/wp/2017/11/17/a-man-accidentally-shot-himself

Fernandez, Manny, Liam Stack, & Alan Blinder (2015) "9 Are Killed in Biker Gang Shootout in Waco," May 17 *New York Times*. http://www.nytimes.com/2015/05/18/us/motorcycle-gang-shootout-in-waco-texas.html

Ford, Richard (2016) "Richard Ford on America's Gun Problem," March 18 *Financial Times*. https://www.ft.com/content/d0cea3d0-eaab-11e5-bb79-2303682345c8

Fortin, Jacey (2018) "Georgia Teacher Fired Gun While Barricaded in Classroom, Police Say," February 28 *New York Times*. https://www.nytimes.com/2018/02/28/us/georgia-teacher-gun-shooting.html

Fox News (2016) "Ohio Gun Shop Owner Killed During Concealed Carry Class," June 19 *Fox News*. https://www.foxnews.com/us/ohio-gun-shop-owner-killed-during-concealed-carry-class

Freskos, Brian (2016) "Guns Are Stolen in America Up to Once Every Minute. Owners Who Leave Their Weapons in Cars Make it Easy for Thieves," September 21 *Trace*. https://www.thetrace.org/2016/09/stolen-guns-cars-trucks-us-atlanta/

———— (2017a) "As Thefts of Guns from Cars Surge, Police Urge Residents to Leave Their Weapons at Home," March 6 *Trace*. https://www.thetrace.org/2017/03/as-thefts-of-guns-from-cars-surge-police-urge-residents-to-leave-their- weapons-at-home/

———— (2017b) "Missing Pieces," November 20 *Trace*. https://www.thetrace.org/features/stolen-guns-violent-crime-america/

———— (2017c) "These Gun Owners Are at the Highest Risk of Having Their Firearms Stolen," April 11 *Trace*. https://www.thetrace.org/2017/04/gun-owners-high-risk-firearm-theft/

———— (2018a) "Citing *The Trace*'s Reporting, Top Gun Violence Scholar Calls for More Research on Threat of Stolen Firearms," April 26 *Trace*. https://www.thetrace.org/rounds/stolen-guns-research-agenda-phil-cook/

———— (2018b) "Maryland Will Invest in Gun Trafficking Crackdown," April 30 *Trace*. https://www.thetrace.org/2018/04/maryland-gun-trafficking-task-force-wiretapping-baltimore/

Friedman, David D. (1990) *Price Theory: An Intermediate Text*. South-Western Publishing Co. http://www.daviddfriedman.com/Academic/Price_Theory/PThy_Chapter_20/PThy_Chapter_20.html

Fuchs, Erin (2013) "Why the South Is More Violent Than the Rest of America," September 18 *Business Insider*. http://www.businessinsider.com/south-has-more-violent-crime-fbi-statistics-show-2013-9

Gibbons, Thomas, & Robert Moran (2000) "Man Shot, Killed in Snow Dispute," January 27 *Philadelphia Inquirer*. http://articles.philly.com/2000-01-27/news/25598207_1_snow-dispute-man-shot-christian-values

Glanton, Dahleen, & Carlos Sadovi (2014) "Concealed Carry Shooting Reignites Debate," July 31 *Chicago Tribune*. http://www.chicagotribune.com/news/ct-crestwood-concealed-carry-0730-20140730-story.html

Guevarra, Ericka Cruz (2018) "Man Killed by Armed PSU Officers Had Valid Concealed Carry Permit," June 30 *OPB*. https://www.opb.org/news/article/portland-state-shooting-victim-jason-erik-washington/

Hauser, Christine (2017) "White Police Officer in St. Louis Shoots Off-Duty Black Colleague," June 26 *New York Times*. https://www.nytimes.com/2017/06/26/us/saint-louis-black-officer.html?_r=0

Heath, Michelle (2015) "Gun Goes Off Inside Christus Facility, Injures Woman," October 19 *Beaumont Enterprise*. http://www.beaumontenterprise.com/news/article/Gun-goes-off-inside-Christus-facility-injures-6578001.php

Heersink, Boris, & Brenton Peterson (2016) "Measuring the Vice-Presidential Home State Advantage with Synthetic Controls," 44(4) *American Politics Research* 734.

Hemenway, David, Deborah Azrael, & Matthew Miller (2017) "Whose Guns Are Stolen? The Epidemiology of Gun Theft Victims," 4(1) *Injury Epidemiology* 11.

Hemenway, David, Mary Vriniotis, & Matthew Miller (2006) "Is an Armed Society a Polite Society? Guns and Road Rage," 38(4) *Accident Analysis and Prevention* 687.

Hermann, Peter, & Rachel Weiner (2019) "He Put 224 Guns on the Streets. His Family Would Pay a Price," January 24 *Washington Post*. https://www.washingtonpost.com/local/public-safety/he-put-224-guns-on-the-streets-his-family-would-pay-a-price/2019/01/23/68cd2520-1a57-11e9-8813-cb9dec761e73_story.html?utm_term=.8bfebbb0072e

Hernandez, Alex V. (2017) "Police: No Charges in Fatal Shootout at Elmwood Park Gas Station," April 10 *Chicago Tribune*. http://www.chicagotribune.com/suburbs/elmwood-park/news/ct-elm-elmwood-park-shooting-tl-0413-20170409-story.html

Ho, Vivian (2015) "Gun Linked to Pier Killing Stolen from Federal Ranger," July 8 *San Francisco Chronicle*. http://www.sfchronicle.com/crime/article/Gun-linked-to-S-F-pier-killing-was-BLM-6373265.php

1961, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12219 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

2941, 2891, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jols.12149 by Rogers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

244     *Donohue et al.*

Ho, Vivian, & Kale Williams (2015) "Gun in 2 Killings Stolen from Unlocked Car in Fisherman's Wharf, Cops Say," October 9 *San Francisco Chronicle.* http://www.sfgate.com/crime/article/Gun-in-2-killings-stolen-from-unlocked-car-in-6562039.php

Holzel, Dee (2008) "Shootout in Winnemucca: Three Dead, Two Injured in Early-Morning Gunfight," May 24 *Elko Daily Free Press.* https://elkodaily.com/news/local/shootout-in-winnemucca-three-dead-two-injured-in-early-morning/article_83fe3832-cc3b-528b-88bd-a85ce65f5967.html

Hopkins, Kyle (2017) "Accused Florida Airport Shooter to Appear in Alaska Case by Phone," March 28 *2 KTUU Anchorage.* http://www.ktuu.com/content/news/Diagnosed-with-serious-mental-illness-accused-airport-shooter-to-appear-in-Alaska-case-by-phone-417394013.html

Horwitz, Josh (2011) "Speaking of 'Fast and Furious': NRA Leaders Well-Versed in Fomenting Foreign Conflicts," September 13 *Huffington Post.* https://www.huffingtonpost.com/josh-horwitz/speaking-of-fast-and-furi_b_959633.html

Igielnik, Ruth, & Anna Brown (2017) *Key Takeaways on Americans' Views of Guns and Gun Ownership.* Pew Research Center. http://www.pewresearch.org/fact-tank/2017/06/22/key-takeaways-on-americans-views-of-guns-and-gun-ownership

Kalesan, Bindu, Marcos D. Villarreal, Katherine M. Keyes, & Sandro Galea (2016) "Gun Ownership and Social Gun Culture," 22(3) *Injury Prevention* 216.

Kalinowski, Bob (2012) "Police: Plymouth Homicide Suspect Shot by Patron," September 10 *Citizens' Voice.* http://citizensvoice.com/news/police-plymouth-homicide-suspect-shot-by-patron-1.1370815

Kaste, Martin (2019) "Gun Carry Laws Can Complicate Police Interactions," July 19 *NPR.* https://www.npr.org/2016/07/19/486453816/open-carry-concealed-gun-permits-add-to-police-nervousness

Kaul, Ashok, Stefan Klobner, Gregor Pfeifer & Manuel Schieler (2016) "Synthetic Control Methods: Never Use All Pre-Intervention Outcomes as Economic Predictors."

Keele, Luke (2009) "An Observational Study of Ballot Initiatives and State Outcomes," *Working Paper.* https://www.researchgate.net/publication/228715196_An_observational_study_of_ballot_initiatives_and_state_outcomes

KHOU (2015) "One Man Injured After Carjacking, Shooting at Gas Station," September 27 *KHOU 11.* http://www.khou.com/news/one-man-injured-after-carjacking-shooting-at-gas-station/142447940

KIMT (2018) "Update: Court Documents Chronicle Tense Moments Prior to Rochester Shooting" January 17 *KIMT 3 News.* http://www.kimt.com/content/news/Rochester-shooting-Weiss-charged-with-2nd-degree-murder-469747873.html

Knight, Brian (2013) "State Gun Policy and Cross-State Externalities: Evidence from Crime Gun Tracing," 5(4) *American Economic J.: Economic Policy* 200.

Kovandzic, Tomislav, Thomas Marvell, & Lynne Vieraitis (2005) "The Impact of 'Shall-Issue' Concealed Handgun Laws on Violent Crime Rates: Evidence from Panel Data for Large Urban Cities," 9 *Homicide Studies* 292.

KTUU (2017) "Esteban Santiago, Accused Fort Lauderdale Shooter, Agreed to Anger Management Courses in Alaska," January 9 *2 KTUU Anchorage.* http://www.ktuu.com/content/news/Esteban-Santiago-accused-Fort-Lauderdale-shooter-had-agreed-to-under-anger-management-in-Alaska-410177225.html

Lane, Emily (2018) "Cardell Hayes Again Claims Self-Defense in Will Smith Shooting Death: Appeal," February 15 *NOLA.com.* https://www.nola.com/crime/2018/02/cardell_hayes_self_defense_wil.html

Lat, David (2012) "*DiDonato v. Ung*: The Temple Law Shooter Gets Hit—With a Civil Suit," January 12 *Above the Law.* https://abovethelaw.com/2012/01/didonato-v-ung-the-sequelor-the-temple-law-shooter-gets-hit-with-a-lawsuit

Levenson, Eric (2017) "Judge Denies 'Stand Your Ground' Defense in Movie Theater Shooting," March 11 *CNN.* http://www.cnn.com/2017/03/10/us/stand-your-ground-movie-trial/index.html

Lopez, German (2018) "Police Shootings Are Also Part of America's Gun Problem," April 9 *Vox*. https://www.vox.com/2018/4/9/17205256/gun-violence-us-police-shootings

Lott, John R. (2010) *More Guns, Less Crime: Understanding Crime and Gun Control Laws*. Chicago, IL: Univ. of Chicago Press.

Lott, John R., & David B. Mustard (1997) "Crime, Deterrence, and Right-to-Carry Concealed Handguns," 26(1) *J. of Legal Studies* 1.

Lozano, Alicia Victoria (2017) "28-Year-Old David Desper Charged in Road Rage Killing of 18-Year-Old Bianca Roberson," July 2 *NBC Philadelphia*. https://www.nbcphiladelphia.com/news/local/Police-Update-on-Road-Rage-Killing-of-18-Yr-Old-432100983.html

Lunny, SanRay (2010) *Unloaded Open Carry*. San Mateo County Sheriff's Office. http://www.calgunlaws.com/wp-content/uploads/2012/09/San-Mateo-County-Sheriffs-Office_Unloaded-Open-Carry.pdf

Luthern, Ashley (2015) "Concealed Carry Draws Opposite Views—And a Murky Middle," June 11 *Milwaukee Wisconsin J. Sentinel*. http://www.jsonline.com/news/crime/concealed-carry-draws-opposite-views--and-a-murky-middle-b99510854z1-307079321.html

MacDonald, Sally (2012) "CHL Holder Fired Shot that Killed Store Clerk," May 31 *Free Republic*. http://www.freerepublic.com/focus/f-news/2889792/posts

McElroy, Majorie B., & Will Peichun Wang (2017) "Seemingly Inextricable Dynamic Differences: The Case of Concealed Gun Permit, Violent Crime and State Panel Data." https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2992058

McLaughlin, Eliott, & Madeline Holcombe (2018) "Mother of Man Killed by Police at Alabama Mall Ponders Open Casket as Family Seeks Justice," November 26 *CNN*. https://www.cnn.com/2018/11/25/us/alabama-shooting-family-seeks-answers/index.html

Mettler, Katie (2016) "'He Thought He Could Help': Concealed Carry Gun-Wielder Intervenes in Domestic Dispute and Is Shot Dead," May 3 *Washington Post*. https://www.washingtonpost.com/news/morning-mix/wp/2016/05/03/he-thought-he-could-help

Mideksa, Torben K. (2013) "The Economic Impact of Natural Resources," 65(2) *J. of Environmental Economics & Management* 277.

Miller, Matthew, Deborah Azrael, David Hemenway, & Frederic I. Solop (2002) "'Road Rage' in Arizona: Armed and Dangerous," 34(6) *Accident Analysis & Prevention* 807.

Moody, Carlisle E., & Thomas B. Marvell (2008) "The Debate on Shall-Issue Laws," 5(3) *Econ J. Watch* 269.

Moody, Carlisle E., Thomas B. Marvell, Paul R. Zimmerman, & Fasil Alemante (2014) "The Impact of Right-to-Carry Laws on Crime: An Exercise in Replication," 4 *Rev. of Economics & Finance* 33.

Morin, Rich, & Andrew Mercer (2017) *A Closer Look at Police Officers Who Have Fired Their Weapon on Duty*. Pew Research Center. https://www.pewresearch.org/fact-tank/2017/02/08/a-closer-look-at-police-officers-who-have-fired-their-weapon-on-duty/

Murdock, Jason (2018) "Arizona Man Accidentally Shoots Himself in Groin in Walmart," November 29 *Newsweek*. https://www.newsweek.com/arizona-man-accidentally-shoots-himself-groin-walmart-1236287

Nagin, Daniel S. (Forthcoming) "Firearm Availability and Police Use of Force," *Annals of American Academy of Political & Social Science*.

National Research Council (2005) *Firearms and Violence: A Critical Review*. Washington, DC: National Academies Press.

NBC News (2014) "Cost of Bravery: Vegas Bystander Died Trying to Stop Rampage," June 10 *NBC News*. https://www.nbcnews.com/storyline/vegas-cop-killers/cost-bravery-vegas-bystander-died-trying-stop-rampage-n127361

Nonnemaker, James, Mark Engelen, & Daniel Shive (2011) "Are Methamphetamine Precursor Control Laws Effective Tools to Fight the Methamphetamine Epidemic?" 20(5) *Health Economics* 519.

Office of the Director—Strategic Management (2013) *2012 Summary: Firearms Reported Lost and Stolen*. U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives. https://www.atf.gov/resource-center/docs/2012-firearms-reported-lost-and-stolenpdf-1/download

14607, 2019, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12319 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

2941, 2691, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jels.12319 by Rutgers University Libraries, Wiley Online Library on [06/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

246    Donohue et al.

Officer.com (2017) "Chief: Concealed-Carry Law Is 'Irresponsible'," June 29 *Officer.com*. https://www.officer.com/command-hq/news/12348064/milwaukee-police-chief-calls-concealedcarry-law-irresponsible

Olson, Erik J., Mark Hoofnagle, Elinore J. Kaufman, William C. Schwab, Patrick Reilly, & Mark J. Seamon (2019) "American Firearm Homicides: The Impact of Your Neighbors," February 7 *J. of Trauma & Acute Care Surgery*. https://journals.lww.com/jtrauma/Abstract/publishahead/American_Firearm_Homicides__The_Impact_of_Your.98406.aspx#pdf-link

Owens, David (2018) "Retired Hartford Firefighter Donald Brown Sentenced to 7 Years in Shooting," January 9 *Hartford Courant*. http://www.courant.com/news/connecticut/hc-hartford-donald-brown-sentenced-0110-story.html

Palmer, Ewan (2018) "Pregnant Woman Shot by Daughter, 3, After Finding Gun in Car," April 18 *Newsweek*. http://www.newsweek.com/pregnant-woman-shot-daughter-3-after-finding-gun-car-outisde-platos-closet-891073

Paraguassu, Lisandra, & Ricardo Brito (2018) "U.S. Biggest Source of Illegal Foreign Guns in Brazil: Report," January 10 *Reuters*. https://www.reuters.com/article/us-usa-brazil-arms/u-s-biggest-source-of-illegal-foreign-guns-in-brazil-report-idUSKBN1EZ2M5

Parsons, Chelsea, & Eugenio Weigend Vargas (2017) *Stolen Guns in America: A State-by-State Analysis*. Center for American Progress. https://cdn.americanprogress.org/content/uploads/2017/07/25052308/StolenGuns-report.pdf

Perrusquia, Marc (2017) "Stolen Guns: 'Getting Them Is the Easy Part'," *Commercial Appeal*. http://projects.commercialappeal.com/woundedcity/stolen-guns-this-fence-makes-a-bad-neighbor.php

Phillips, Charles D., Obioma Nwaiwu, Darcy K. McMaughan Moudouni, Rachel Edwards, & Szu hsuan Lin (2013) "When Concealed Handgun Licensees Break Bad: Criminal Convictions of Concealed Handgun Licensees in Texas, 2001–2009," 103(1) *American J. of Public Health* 86.

Pilger, Lori (2018) "FBI Accuses White Supremacist of Terror Attack on Amtrak Train in Rural Nebraska," January 4 *Lincoln J. Star*. http://journalstar.com/news/state-and-regional/nebraska/fbi-accuses-white-supremacist-of-terror-attack-on-amtrak-train/article_82f0860e-3c75-5a66-ab0c-a2e3a3c16aab.html

Planty, Michael, & Jennifer Truman (2013) "Firearm Violence, 1993–2011." *U.S. Department of Justice Bureau of Justice Statistics BJS Special Report* 241730.

Plumlee, Rick (2012) "Eight with Concealed-Carry Permits Charged with Felonies in Sedgwick County," November 17 *Wichita Eagle*. http://www.kansas.com/latest-news/article1103131.html

Pugliese, Nicholas (2018) "It's Tough to Buy a Gun in New Jersey. So Where Do All the Guns Used in Crimes Come From?" April 16 *NorthJersey.com*. https://www.northjersey.com/story/news/new-jersey/2018/04/16/nj-new-jersey-where-do-guns-used-crimes-come/503115002/

Robles, Frank, & Christine Hauser (2015) "Lawyers Provide Details in Police Shooting of Corey Jones in Florida," October 22 *New York Times*. https://www.nytimes.com/2015/10/23/us/florida-corey-jones-police-shooting.html

Sampson, Zachary T. (2014) "Stolen Guns, Like One Used to Kill Tarpon Springs Officer, Routine at Crime Scenes," December 24 *Tampa Bay Times*. http://www.tampabay.com/news/publicsafety/crime/gun-police-say-was-used-to-kill-tarpon-springs-officer-stolen-from/2211436

Sauro, Sean (2019) "Plans Made to Honor Men Killed in State College Shooting Spree," January 26 *Penn Live*. https://www.pennlive.com/news/2019/01/plans-made-to-honor-men-killed-in-state-college-shooting-spree.html

Savitsky, Sasha (2019) "Country Singer Justin Carter Dead at 35 After Accidental Shooting," March 22 *Fox News*. https://www.foxnews.com/entertainment/country-singer-justin-carter-dead-at-35-after-accidental-shooting

Scherer, Jasper (2016) "Fla. 'Loud Music' Murder: Firing into Car Full of Teens Playing Rap Music Not 'Self-Defense,' Court Rules," November 18 *Washington Post*. https://www.washingtonpost.com/news/morning-mix/wp/2016/11/18/fla-loud-music-murder-firing

Schwarz, Hunter (2014) "Idaho Professor Shoots Himself in Foot Two Months After State Legalizes Guns on Campuses," September 5 *Washington Post*. https://wapo.st/1nAtjTj?tid=ss_mail&utm_term=.a706e9990995

Schwarzschild, Todd, & Drew Griffin (2011) "ATF Loses Track of 1,400 Guns in Criticized Probe," July 12 *CNN*. http://www.cnn.com/2011/POLITICS/07/12/atf.guns/index.html

Shen, Aviva (2017) "When the Driver Who Just Cut You Off Also Has a Gun," April 10 *Trace*. https://www.thetrace.org/2017/04/road-rage-shootings-guns/

Siegel, Michael, Molly Pahn, Ziming Xuan, Craig S. Ross, Sandro Galea, Bindu Kalesan, Eric Fleegler, & Kristin A. Goss (2017) "Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States," 107(12) *American J. of Public Health* 1923.

Simon, Darran (2018) "Manslaughter Defendant in 'Stand Your Ground' Case Said He Felt Scared in Altercation," September 3 *CNN*. https://www.cnn.com/2018/09/03/us/michael-drejka-stand-your-ground-jailhouse-interview/index.html

Simpson, Kevin (2017) "Shoppers Pulled Guns in Response to Thornton Walmart Shooting, But Police Say that Slowed Investigation," November 2 *Denver Post*. http://www.denverpost.com/2017/11/02/shoppers-pulled-weapons-walmart-shooting/

Slobodzian, Joseph A. (2011) "Ung Acquitted in Wounding of DiDonato in Old City," February 16 *Inquirer*. http://www.philly.com/philly/news/local/20110216_Ung_acquitted_in_wounding_of_DiDonato_in_Old_City.html

Soderling, Luke (2016) *How to Inform an Officer You Are Carrying a Handgun and Live* [video file]. https://www.youtube.com/watch?v=fOO99qcASEM

Stanglin, Doug (2018) "Parkland Teacher Charged with Leaving Loaded Gun in Public Restroom," April 13 *USA Today*. https://www.usatoday.com/story/news/2018/04/13/parkland-teacher-charged-leaving-loaded-gun-public-restroom/514855002/

Stark, Emily, & Daniel Sachau (2016) "Lake Wobegon's Guns: Overestimating Our Gun-Related Competences," 4(1) *J. of Social & Political Psychology* 8.

Strnad, Jeff (2007) "Should Legal Empiricists Go Bayesian?" 9(1) *American Law & Economics Rev.* 195.

Stuart, Hunter (2013) "2 Concealed Carry Holders Kill Each Other In Road Rage Incident," September 19 *Huffington Post*. http://www.huffingtonpost.com/2013/09/19/michigan-concealed-carry-road-rage-two-dead_n_3956491.html

US News (2018) "Cops: Mom Was Turning on Safety When Gun Fired, Killing Girl," April 23 *US News*. https://www.usnews.com/news/best-states/ohio/articles/2018-04-23/cops-mom-was-turning-on-safety-when-gun-fired-killing-girl

Violence Policy Center (2017) *Mass Shootings Committed by Concealed Carry Killers: May 2007 to the Present*. http://concealedcarrykillers.org/wp-content/uploads/2017/06/ccwmassshootings.pdf

WFTV (2015) "3 Injured When Man's Gun Goes Off in Sanford Cracker Barrel," November 2 *WFTV 9*. http://www.wftv.com/news/local/man-not-charged-after-gun-goes-sanford-cracker-bar/26880670

Williams, Clois, & Steven Waltrip (2004) *Aircrew Security: A Practical Guide*. New York, NY: Ashgate Publishing.

Wilson, Robert (2016) "Common Sense," February 29 *American Scholar*. https://theamericanscholar.org/common-sense/#

Witt, Jessica K., & James R. Brockmole (2012) "Action Alters Object Identification: Wielding a Gun Increases the Bias to See Guns," 38(5) *J. of Experimental Psychology: Human Perception & Performance* 1159.

Zimmerman, Paul R. (2014) "The Deterrence of Crime Through Private Security Efforts: Theory and Evidence," 37 *International Rev. of Law & Economics* 66.

# Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States

*Michael Siegel, MD, MPH, Ziming Xuan, ScD, SM, MA, Craig S. Ross, PhD, MBA, Sandro Galea, MD, DrPH, MPH, Bindu Kalesan, PhD, MPH, MSc, Eric Fleegler, MD, MPH, and Kristin A. Goss, PhD, MPP*

*Objectives.* To examine the relation of "shall-issue" laws, in which permits must be issued if requisite criteria are met; "may-issue" laws, which give law enforcement officials wide discretion over whether to issue concealed firearm carry permits or not; and homicide rates.

*Methods.* We compared homicide rates in shall-issue and may-issue states and total, firearm, nonfirearm, handgun, and long-gun homicide rates in all 50 states during the 25-year period of 1991 to 2015. We included year and state fixed effects and numerous state-level factors in the analysis.

*Results.* Shall-issue laws were significantly associated with 6.5% higher total homicide rates, 8.6% higher firearm homicide rates, and 10.6% higher handgun homicide rates, but were not significantly associated with long-gun or nonfirearm homicide.

*Conclusions.* Shall-issue laws are associated with significantly higher rates of total, firearm-related, and handgun-related homicide. (*Am J Public Health.* 2017;107:1923–1929. doi:10.2105/AJPH.2017.304057)

 **See also Donohue, p. 1864, and also Galea and Vaughan, p. 1867.**

Firearm violence is a major public health problem. In 2015, there were approximately 36 000 firearm-related deaths in the United States; 13 463 were homicides, 22 018 were suicides, and 489 were unintentional injuries.[1] During the same year, 72.9% of homicides were firearm homicides[1] and, of these, approximately 90% were committed with a handgun. A central question in the debate about public policies to reduce firearm violence is whether easier access to concealed handguns increases or decreases the rate of firearm-related homicides.[2] Some have argued that the feared or actual presence of armed citizens may deter violent crime.[3] Others have suggested that a higher prevalence of people carrying guns will increase the likelihood that an altercation results in a fatality.[4] Thus, having a clear understanding of the impact of concealed-carry laws on firearm-related homicide would help guide policymakers who are aiming to reduce firearm violence.

As of the end of 2015, all states allowed certain persons to carry concealed handguns, but there were 3 major variations in permitting policy[5] (Table 1). In 9 states, law enforcement officials had wide discretion over whether to issue concealed-carry permits; these are referred to as "may-issue" states. In 32 states, there was little or no discretion; these are referred to as "shall-issue" states because permits must be issued if requisite criteria are met. In an additional 9 states, there was no permit necessary to carry a concealed handgun; these are referred to as "permitless-carry" states. The wide variation in these policies between states and over time presents the opportunity to compare homicide rates between states with varying concealed-carry permitting policies to examine the impact of concealed-carry laws on homicide.

The critical difference between may-issue and shall-issue laws is that in may-issue states, law enforcement officials may use their judgment in making decisions about whether to approve or deny a permit application, whereas in shall-issue states, no judgment is involved—the application must be approved unless the applicant is categorically prohibited from concealed handgun possession. In may-issue states, the element of discretion allotted to law enforcement is typically a judgment regarding the "suitability" or "need" of a person to carry a concealed weapon (Table 2). Law enforcement officials have a wide degree of latitude in making these judgments. In shall-issue states, the categorical prohibitions consist of a list of specific criminal convictions.

Unfortunately, the existing literature on the impact of concealed carry laws is inconsistent. At least 10 national studies have examined the relationship between shall-issue concealed-carry laws and firearm-related or total homicide rates at the state level (Table A, available as a supplement to the online version of this article at http://www.ajph.org).[3,6–14] In 2 studies, shall-issue laws were found to decrease homicide rates.[3,6] In 2 studies, these laws were found to increase homicide rates.[7,8] Six studies reported no clear impact of shall-issue laws on homicide rates.[9–14] The inconsistency of these results has understandably created some confusion about what approach is most effective to address the firearm violence problem.

Most of the published literature on this topic includes data that are more than a decade old: the most recent year of data analyzed was

**ABOUT THE AUTHORS**

*Michael Siegel, Ziming Xuan, Craig S. Ross, and Sandro Galea are with the Boston University School of Public Health, Boston, MA. Bindu Kalesan is with the Boston University School of Medicine. Eric Fleegler is with Children's Hospital Boston. Kristin A. Goss is with the Sanford School of Public Policy, Duke University, Durham, NC.*

*Correspondence should be sent to Michael Siegel, MD, MPH, Department of Community Health Sciences, Boston University School of Public Health, 801 Massachusetts Ave, Boston, MA 02118 (e-mail: mbsiegel@bu.edu). Reprints can be ordered at http://www.ajph.org by clicking the "Reprints" link.*

*This article was accepted August 1, 2017.*

*doi: 10.2105/AJPH.2017.304057*

TABLE 1—Concealed-Carry Permitting Laws and Age-Adjusted Firearm Homicide Rates by US State, 2015, and Status of Laws During the Period of 1991 to 2015

| State | Age-Adjusted Firearm Homicide Rate,[a] 2015 (per 100 000) | Status of Concealed-Carry Permitting Law, 2015 | Effective Date of Current (as of 2015) Concealed-Carry Law |
|---|---|---|---|
| Hawaii[b] | 0.75 | May issue | Before 1991 |
| New Hampshire | 0.96 | Shall issue | Before 1991 |
| Rhode Island | 0.99 | May issue | Before 1991 |
| Maine | 1.14 | Shall issue | Before 1991 |
| Massachusetts | 1.26 | May issue | Before 1991 |
| Utah | 1.39 | Shall issue | 1995 |
| Idaho | 1.29 | Shall issue | Before 1991 |
| Iowa | 1.62 | Shall issue | Before 1991 |
| North Dakota | 1.69 | Shall issue | Before 1991 |
| Vermont | 1.76 | Permitless carry | Before 1991 |
| Minnesota | 1.77 | Shall issue | 2003 |
| South Dakota | 1.97 | Shall issue | Before 1991 |
| New York | 2.07 | May issue | Before 1991 |
| Wyoming | 2.16 | Permitless carry | 2011[c] |
| Montana | 2.17 | Shall issue | Before 1991 |
| Washington | 2.32 | Shall issue | Before 1991 |
| Oregon | 2.35 | Shall issue | Before 1991 |
| Connecticut | 2.43 | May issue | Before 1991 |
| Colorado | 2.46 | Shall issue | 2003 |
| Nebraska | 2.67 | Shall issue | 2007 |
| West Virginia | 2.89 | Shall issue | Before 1991 |
| Wisconsin | 3.18 | Shall issue | 2011 |
| New Jersey | 3.22 | May issue | Before 1991 |
| Virginia | 3.29 | Shall issue | 1995 |
| Kansas | 3.35 | Shall issue | 2007 |
| California | 3.52 | May issue | Before 1991 |
| Arizona | 3.56 | Permitless carry | 2010[c] |
| Kentucky | 3.96 | Shall issue | 1996 |
| Texas | 4.04 | Shall issue | 1995 |
| Pennsylvania | 4.34 | Shall issue | Before 1991 |
| Ohio | 4.38 | Shall issue | 2004 |
| Nevada | 4.49 | Shall issue | 1995 |
| North Carolina | 4.54 | Shall issue | 1995 |
| Indiana | 4.61 | Shall issue | Before 1991 |
| Florida | 4.66 | Shall issue | Before 1991 |
| Michigan | 4.74 | Shall issue | 2001 |
| New Mexico | 4.79 | Shall issue | 2001 |
| Alaska | 5.22 | Permitless carry | 2003[c] |

*Continued*

2010, and only 3 of the 10 studies examined data past the year 1998 (Table A, available as a supplement to the online version of this article at http://www.ajph.org). Since 1998, 11 additional states have enacted shall-issue laws.[5] This provides more variation over time and a longer follow-up period to examine this research question. Moreover, Ayres and Donohue[15] and Hepburn et al.[11] have suggested that the relationship between concealed-carry laws and homicide rates may have been different during the period before and after the early 1990s. In addition, studies that included homicide rates from before 1994 were examining a trend that was increasing, whereas studies examining homicide rates after 1994 were capturing declining trends. For these reasons, a reexamination of this research question with more recent data is needed.

One limitation of the existing literature is that no previously published research has examined the specific impact of concealed-carry laws on handgun versus long-gun homicide rates. This is important because if such laws increase homicide by making it easier for people at high risk for violence to carry handguns, this effect should only be observed in relation to handgun-related homicides, not homicides committed with long guns. On the other hand, if permissive concealed-carry laws deter crime by generating fear among potential perpetrators of encountering an armed individual, then all crime including handgun, long-gun, and nonfirearm homicide should decrease.

Another limitation of previous studies is that nearly all of them used linear models. However, homicide rates represent count data, and the distribution of homicide rates across states is highly skewed[16] (Figure A, available as a supplement to the online version of this article at http://www.ajph.org). Plassmann and Tideman argued that a count model (such as a Poisson or negative binomial model) is the most reliable for analyzing crimes, such as homicides, with low occurrence rates.[16] Beyond the Plassmann and Tideman study, only 1 other study[11] used a count model.

We examined the relationship between shall-issue concealed-carry laws and total, firearm-related, and non–firearm-related homicide rates, as well as handgun versus long-gun homicide rates across all 50 states

A-0797

| | TABLE 1—Continued | | |
|---|---|---|---|
| State | Age-Adjusted Firearm Homicide Rate,[a] 2015 (per 100 000) | Status of Concealed-Carry Permitting Law, 2015 | Effective Date of Current (as of 2015) Concealed-Carry Law |
| Arkansas | 5.34 | Shall issue | 1995 |
| Illinois | 5.45 | Shall issue | 2013 |
| Tennessee | 5.51 | Shall issue | 1994 |
| Georgia | 5.73 | Shall issue | Before 1991 |
| Oklahoma | 5.87 | Shall issue | 1995 |
| Delaware | 6.12 | May issue | Before 1991 |
| South Carolina | 7.55 | Shall issue | 1996 |
| Maryland | 7.69 | May issue | Before 1991 |
| Missouri | 7.92 | Shall issue | 2003 |
| Alabama | 8.43 | Shall issue | 2013 |
| Mississippi | 9.11 | Shall issue | 1991 |
| Louisiana | 9.96 | Shall issue | 1996 |

*Note.* "May-issue" states are those in which law enforcement officials had wide discretion over whether to issue concealed-carry permits. "Shall-issue" states are those in which there was little or no discretion; permits must be issued if requisite criteria are met. "Permitless-carry" states are those in which there was no permit necessary to carry a concealed handgun.

[a]From Centers for Disease Control and Prevention (CDC).[1]

[b]Data for Hawaii are unavailable for the years 2010 to 2015 because the CDC's Web-Based Injury Statistics Query and Reporting Systems does not report homicide counts fewer than 10. The data here are from 2009.

[c]Changed from "may issue" to "shall issue" in 1994.

during the 25-year time period of 1991 to 2015 with both count and linear regression models. We examined the specificity of the relationship between concealed-carry laws and homicide rates by separately modeling firearm versus nonfirearm homicide rates and then within firearm-related homicides by modeling handgun versus long-gun homicide rates. We analyzed the relationship between shall-issue concealed-carry laws and homicide rates by using both a count and a linear regression model, thus examining the robustness of results to the type of model used.

## METHODS

We used a quasi-experimental panel design, taking advantage of changes in state concealed-carry permitting laws over time, to explore the relationship between these laws and total, firearm-related, and non–firearm-related homicide rates in the 50 states over a 25-year period, 1991 to 2015. We

modeled homicide rates in 2 ways: (1) using a negative binomial regression with homicide rates as the outcome variable and (2) using linear regression with log-transformed homicide rates as the outcome variable. In both cases, we included year and state fixed effects and controlled for a range of time-varying, state-level factors.

## Variables and Data Sources

*Outcome variables.* The main outcome variable was the age-adjusted firearm homicide rate in each year analyzed. For example, Missouri's shall-issue law went into effect in 2003; thus, we analyzed homicide rates associated with Missouri's shall-issue law for the years 2004 to 2015. We obtained homicide rates from the Centers for Disease Control and Prevention's (CDC's) Web-Based Injury Statistics Query and Reporting Systems (WISQARS) database.[1] This is the ideal source for homicide data because there is complete annual reporting from all 50 states and because the data are extracted from the

Vital Statistics death registry maintained by the National Center for Health Statistics, which is based on standardized death certificates. The completeness of reporting is approximately 99%.[17] The CDC age-adjusted the rates to the 2000 standard population.

The second outcome variable was the handgun or long-gun homicide rate, obtained from the Federal Bureau of Investigation's Uniform Crime Reports, Supplemental Homicide Reports (SHR).[18] Although WISQARS does provide mortality data from *International Classification of Diseases, Ninth Revision* and *Tenth Revision,* codes that can list handgun and long gun as the cause of death, unfortunately, most death certificates involving a firearm homicide do not specify the type of weapon used. Therefore, most firearm homicide deaths in WISQARS are classified as "other and unspecified" firearm, and it is not possible to use these data to disaggregate handgun and long-gun homicides.[19] By contrast, the SHR is missing data on the type of weapon used in firearm homicides in just 13.4% of cases. Thus, the SHR is the best, if not only, source for state-specific, firearm type–specific homicide data.

The SHR disaggregates firearm homicides into handgun, rifle, shotgun, and other (and unknown). We used the handgun deaths to generate handgun homicide rates and the sum of rifle, shotgun, and other gun deaths to generate long-gun homicide rates for each state and year. Although SHR data may include listing of multiple weapons in an incident, only 1 weapon may be associated with a homicide death.[20] Because of missing data on weapon type, we excluded 13.4% of firearm homicide cases in estimating handgun homicide rates. Nevertheless, there was little discrepancy between the firearm homicide totals from WISQARS and the SHR, which were correlated at r = 0.98.

Because not all local law enforcement agencies complete the supplemental reports, the SHR data set excludes approximately 10% of all homicides.[21] This problem was addressed by applying weights that adjusted each state- and year-specific estimate up to the overall number of homicides reported in the Uniform Crime Report for that state and year. Fox kindly provided us with updated SHR files that added previously

| TABLE 2—Elements of Discretion in Law Enforcement Decisions to Approve or Deny Concealed Handgun Carry Permits: "May-Issue" US States, 2015 | | |
|---|---|---|
| State | Elements of Discretion | Citation |
| California | Applicant must be of "good moral character" and must have "good cause" for issuance of the license. | California Penal Code § 26150, § 26155 |
| Connecticut | Applicant must intend only to make "legal use" of the handgun and must be a "suitable person to receive such permit." | Connecticut General Statutes § 29-28 |
| Delaware | Applicant must be "of good moral character," must desire the handgun for "personal protection" or "protection of the person's property," and must submit signed, written statements of 5 "respectable citizens" of the county who testify that the applicant is a person "of sobriety and good moral character" and "bears a good reputation for peace and good order in the community" and that a handgun is "necessary for the protection of the person or the applicant's property." The Superior Court has discretion to approve or deny the application. | Delaware Code § 1441 |
| Hawaii | Must be "an exceptional case," the applicant must show "reason to fear injury to the applicant's person or property," the applicant must be "a suitable person" to be licensed, and the chief of police must determine that the person "is qualified to use the firearm in a safe manner." | Hawaii Revised Statutes § 134-9 |
| Maryland | Applicant must have a "good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger," and the applicant must not have "exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another." | Maryland Public Safety Code § 5-306 |
| Massachusetts | Applicant must be a "suitable" person and must not be judged to potentially create a risk to public safety. | Massachusetts General Laws 140 § 131 |
| New Jersey | Applicant must demonstrate a "justifiable need to carry a handgun" and must submit endorsements by 3 individuals who have known the applicant for at least 3 years that the applicant is "a person of good moral character and behavior." | New Jersey Statutes § 2C:58-4 |
| New York | Applicant must be "of good moral character," must be "of good character, competency, and integrity," and there must be no "good cause" for denial of the license. | New York Penal Law § 400.00 |
| Rhode Island | Applicant must have "good reason to fear an injury to his or her person or property" or have "any other proper reason" for carrying a handgun and must be a "suitable person to be so licensed." | General Laws of Rhode Island § 11-47-11 |

*Note.* "May-issue" states are those in which law enforcement officials had wide discretion over whether to issue concealed-carry permits.

missing data for Florida and included data through 2015.[21]

*Main predictor variable.* Using *Thomson Reuters Westlaw* to access historical state statutes and session laws, we developed a database indicating the presence or absence of 100 provisions of firearm laws in each state over the 25-year period.[5] We coded laws by the year they went into effect, regardless of the month of the effective date. However, in the analytic models, we lagged the state laws by 1 year, which ensured that all laws were in effect during the year in which their impact was being assessed. Following Lott and Mustard,[22] we assessed the impact of laws starting in the first full year they were in effect.

We examined the potential impact of shall-issue laws, comparing them to may-issue laws. In other words, using the may-issue states as the reference group, we

estimated the impact of shall-issue laws on homicide rates. Because only 4 states had permitless-carry laws in place during the study period, there were not enough observations to allow any meaningful analyses of these laws. Therefore, we deleted state–year observations in which a permitless-carry law was in effect.

*Control variables.* We controlled for 12 state-level factors that (1) were found in the previous literature[3,6–14] to be significantly related to homicide rates and (2) were significantly related to the presence of shall-issue laws in our data set (i.e., the regression coefficient for the variable was significant at a level of $P = .05$ in a logistic regression with shall-issue law as the dependent variable): household firearm ownership (using the standard proxy, which is the percentage of all suicides committed with a firearm), proportion of Blacks, proportion of young adults

(aged 18 to 29 years), proportion of men among young adults, proportion of the population living in urban areas, total population, population density, per capita alcohol consumption, the nonhomicide violent crime rate (aggravated assault, robbery, and forcible rape), the poverty rate, unemployment rate, median household income, per capita disposable income, incarceration rate, and per capita number of law enforcement officers. Variable definitions and data sources are provided in Table B, available as a supplement to the online version of this article at http://www.ajph.org. We also controlled for the following state firearm laws that could serve as alternative explanations for changes in homicide during the study period: (1) universal background checks required for all handgun purchases, (2) waiting periods required for all handgun purchases, and (3)

ba2799

permits required to purchase or possess firearms.

## Analysis

*Count models.* Because homicide rates are not normally distributed but skewed and overdispersed, we modeled this outcome by using a negative binomial distribution. To control for clustering in our data by year (25 levels) and by state (50 levels), we entered year and state as fixed effects in the regression models. We used robust standard errors that account for the clustering of observations, serial autocorrelation, and heteroskedasticity.[23]

Our final model was as follows:

$$(1) \quad Pr(H_{st} = h_{st}) = [\Gamma(y_{st} + \alpha^{-1})/$$
$$\Gamma((y_{st} + 1)\Gamma\alpha^{-1})][1/$$
$$(1 + \alpha \mu_{st})]^{1\alpha}[\mu_{st}/(\alpha^{-1} + \mu_{st})]^{yst},$$

where $Pr(H_{st} = h_{st})$ is the probability that state $s$ in year $t$ has a homicide rate equal to $h_{st}$, $E(H_{st}) = \mu_{st}$, and $Var(H_{st}) = \mu_{st} + \mu^2_{st}$.

The mean homicide rate was then modeled as follows:

$$(2) \quad ln(\mu_{st}) = \alpha + \beta_1 CC_{st} +$$
$$\beta_2 C_{st} + S + T + e,$$

where $CC_{st}$ is a dummy variable for the presence of a shall-issue law, $C$ is a vector of control variables, $S$ represents state fixed effects, and $T$ represents year fixed effects.

The negative binomial regression coefficients are reported as incidence rate ratios (IRRs). The IRR indicates the percentage difference in homicide rate for states with a shall-issue concealed-carry law compared with states with a may-issue law.

*Linear models.* To check the robustness of our findings, we repeated the analyses with a linear regression model, with the log-transformed homicide rate as the outcome variable, again by using robust standard errors.[23] As with the negative binomial models, we included year and state fixed effects, and we included the same state-level control variables.

We conducted analyses with Stata version 14.1 (StataCorp LP, College Station, TX).

We evaluated the significance of regression coefficients by using a Wald test at $\alpha = 0.05$.

We checked the robustness of our results by conducting several sensitivity analyses, including

1. Restricting the analysis to the 23 states in which shall-issue laws were adopted during the study period,
2. Using raw count data instead of homicide rates,
3. Restricting the analysis to states with population greater than 1 000 000,
4. Restricting the analysis to the period 1991 to 2002,
5. Restricting the analysis to the period 2003 to 2015, and
6. Using SHR instead of WISQARS homicide data (thus avoiding the problem of missing data for some smaller states after 1998).

## RESULTS

During the study period, 23 states adopted shall-issue laws (Table 1). By 2015, 37 states had such laws. In the same year, the average firearm homicide rate in the states with shall-issue laws was 4.11 per 100 000, compared with 3.41 per 100 000 in the may-issue states. The number of states that had permitless-carry laws in effect at all during the study period was small (n = 4), as was the number of observations (n = 46), limiting our ability to analyze the impact of these laws. Because CDC does not report homicide counts of fewer than 10 in years after 1998, we were missing outcome data for several years for 6 states (Hawaii, New Hampshire, North Dakota, South Dakota, Vermont, and Wyoming); a sensitivity analysis with SHR data revealed that these omissions do not affect our findings.

In negative binomial regression models, shall-issue concealed-carry permitting laws were significantly associated with 6.5% higher total homicide rates compared with may-issue states (IRR = 1.065; 95% confidence interval [CI] = 1.032, 1.099; Table 3). The association was specific to firearm homicide rates, which were 8.6% higher in shall-issue states (IRR = 1.086; 95% CI = 1.047, 1.126). There was no significant

association between shall-issue laws and nonfirearm homicide rates (IRR = 1.014; 95% CI = 0.963, 1.068). Further disaggregation within firearm homicides showed that the association between shall-issue laws and firearm homicide rates was specific to handgun homicide. Shall-issue states had handgun homicide rates that were 10.6% higher (IRR = 1.106; 95% CI = 1.039, 1.177), but there was no significant association with long-gun homicide rates (IRR = 0.999; 95% CI = 0.915, 1.090).

The results of the linear regression analyses were similar. Here, shall-issue laws were significantly associated with 6.6% higher total homicide rates compared with may-issue states (95% CI = 3.0%, 10.4%; data not shown). The association was specific to firearm homicide rates, which were 11.7% higher in "shall issue" states (95% CI = 6.4%, 17.2%); there was no significant association between these laws and nonfirearm homicide rates. Further disaggregation within firearm homicides showed that the association between shall-issue laws and firearm homicide rates was specific to handgun homicide. Shall-issue states had handgun homicide rates that were 19.8% higher (95% CI = 10.3%, 30.1%), but rates of long-gun homicide were not significantly different in states with shall-issue compared with may-issue laws.

The significant association between shall-issue and higher total, firearm, and handgun-related homicide rates remained when we restricted the analysis to the 23 states in which these laws were adopted during the study period (Table 3). This pattern of results was robust to a series of additional sensitivity checks, including using raw count data, restricting the analysis to states with a population of more than 1 000 000, restricting the analysis to the period 1991 to 2002, restricting the analysis to the period 2003 to 2015, and using SHR instead of WISQARS homicide data.

## DISCUSSION

To the best of our knowledge, this is the first study to examine the relationship between concealed-carry permitting laws and handgun-specific homicide rates. We found that, when we used both count and linear

JA2800

models and after we controlled for a range of time-varying state factors and for unobserved time-invariant state factors by using a fixed-effects model, shall-issue concealed-carry permitting laws were significantly associated with 6.5% higher total homicide rates, 8.6% higher firearm-related homicide rates, and 10.6% higher handgun-specific homicide rates compared with may-issue states.

A major reason for inconsistent results in the existing literature on the effects of concealed-carry laws may be that the relationship between concealed-carry laws and homicide rates was different during the period before and after the early 1990s.[11,15] It is possible that despite the enactment of early shall-issue laws in the 1970s and 1980s, the demand for handgun permits in those states was modest. There has been a striking increase in the demand for pistols, especially those designed for concealed carry, during the past decade.[24] Recently, Steidley found that the adoption of shall-issue laws during the period 1999 to 2013 was associated with a persistent, long-term increase in handgun sales in all 7 states studied.[25] Our analysis provides further support for the hypothesis that the relationship between shall-issue laws and higher homicide rates increased over time, as the regression coefficients for these laws was higher for the second half of the study period

(2003–2015) compared with the first half (1991–2002).

Our finding that the association between shall-issue laws and homicide rates is specific to handgun homicides adds plausibility to the observed relationship. If the relationship between shall-issue laws and homicide rates were spurious, one might expect to see the relationship hold for long-gun as well as handgun homicide rates. Moreover, this finding is inconsistent with the hypothesis that permissive concealed-carry laws deter crime by increasing the presence of armed individuals. Were that the case, one would expect to see lower handgun, nonhandgun, and nonfirearm homicide rates in shall-issue compared with may-issue states. The lack of an association between shall-issue laws and long-gun homicide rates is also inconsistent with the hypothesis that the presence of more concealed weapons escalates the level of violence in encounters that may involve a long gun.

## Strengths and Limitations

This study has several novel strengths, including the use of both count and linear models, the use of recent data (through 2015), and the disaggregation of homicide rates. Nevertheless, caution should be exercised in assessing causality from an ecological study

such as this one. In particular, these results should be interpreted with caution because of the possibility that they reflect a reverse association. That is, it is possible that the adoption of shall-issue concealed carry laws is associated with higher baseline homicide rates so that we are picking up not a causal effect of these laws on homicide but a systematic difference in baseline homicide rates between states that do or do not have these laws. However, our findings hold even when the analysis is restricted to states that started with may-issue laws at the beginning of the study period and adopted shall-issue laws during the study period.

An additional limitation of this study is that we could not consider the enforcement of concealed-carry laws.[26] Enforcement of these laws may vary not only among states, but also among counties in the same state.[11] In addition, we did not have information on the number of concealed-carry permits issued in each state or the number of homicides committed by concealed-carry permittees.

It is also important to note that we examined only fatal firearm injuries. Further research should investigate potential effects of concealed-carry laws on nonfatal firearm injuries.

Finally, we were unable to analyze the impact of permitless-carry laws because of the small number of observations. Only 4 states

**TABLE 3—Sensitivity Analyses of Relationship Between "Shall-Issue" Concealed-Carry Permitting Laws and Homicide Rates: United States, 1991–2015**

| Type of Analysis | Homicide Rate, IRR (95% CI) | | |
| --- | --- | --- | --- |
| | Total | Firearm | Handgun |
| Main analysis | 1.065 (1.032, 1.099) | 1.086 (1.047, 1.126) | 1.106 (1.039, 1.177) |
| Analysis restricted to states that adopted shall-issue concealed-carry laws during study period | 1.063 (1.028, 1.099) | 1.068 (1.030, 1.108) | 1.074 (1.002, 1.150) |
| Analysis using raw count of homicides with population as the exposure variable | 1.051 (1.020, 1.083) | 1.079 (1.039, 1.120) | 1.139 (1.067, 1.217) |
| Analysis restricted to states with population >1 million | 1.055 (1.023, 1.087) | 1.067 (1.030, 1.105) | 1.095 (1.029, 1.166) |
| Analysis restricted to years before 2003 (1991–2002) | 1.058 (1.014, 1.104) | 1.067 (1.019, 1.116) | 1.107 (1.037, 1.180) |
| Analysis restricted to years after 2002 (2003–2015) | 1.064 (1.009, 1.122) | 1.100 (1.028, 1.176) | 1.274 (1.092, 1.488) |
| Analysis using Supplemental Homicide Report data instead of Vital Statistics data | 1.044 (1.006, 1.083) | 1.094 (1.047, 1.143) | 1.106 (1.039, 1.177) |

*Note.* "Shall-issue" states are those in which there was little or no discretion; permits must be issued if requisite criteria are met. CI = confidence interval; IRR = incidence rate ratio. All models include year and state fixed effects and control for the following time-varying, state-level factors: household gun-ownership levels, proportion of young men, proportion of young adults, proportion of Blacks, proportion living in an urban area, total population, population density, median household income, poverty rate, unemployment rate, per capita disposable income, per capita alcohol consumption, violent crime rate, incarceration rate, per capita law enforcement officers, universal background check laws for all handguns, waiting periods for all handguns, and permits required for all firearms.

JA2801

had permitless-carry laws in place during the study period. However, in the past 2 years, an additional 5 states have enacted such laws. Elucidating the impact of permitless-carry laws will require follow-up for the 9 states that now have such laws in effect.

## Conclusions

Despite these limitations, this study suggests that there is a robust association between shall-issue laws and higher rates of firearm homicides. The trend toward increasingly permissive concealed-carry laws is inconsistent with public opinion, which tends to oppose the carrying of guns in public.[27] Our findings suggest that these laws may also be inconsistent with the promotion of public safety. *AJPH*

## CONTRIBUTORS

M. Siegel conceptualized the study, led the data analysis and writing, and was the principal author of this article. Z. Xuan and C. S. Ross assisted with the study design and analytical plan. All authors contributed toward the interpretation of data analyses, critical review of the article, and revision of the article.

## ACKNOWLEDGMENTS

Support for this research was provided by the Robert Wood Johnson Foundation Evidence for Action Program (grant 73337).

We gratefully acknowledge the assistance of James Alan Fox, PhD, the Lipman Family Professor of Criminology, Law, and Public Policy at the School of Criminology and Criminal Justice at Northeastern University, who kindly provided the Multiply-Imputed Supplemental Homicide Reports File, 1976–2015, including the data sets and a codebook.

**Note.** The views expressed here do not necessarily reflect those of the Robert Wood Johnson Foundation.

## HUMAN PARTICIPANT PROTECTION

This study made use of secondary data only and did not require institutional review board approval.

## REFERENCES

1. Centers for Disease Control and Prevention. Web-Based Injury Statistics Query and Reporting Systems: fatal injury reports. Available at: http://www.cdc.gov/injury/wisqars/fatal_injury_reports.html. Accessed March 15, 2017.

2. Donohue JJ. Guns, crime, and the impact of state right-to-carry laws. *Fordham Law Rev*. 2005;73:623–652.

3. Lott JR. *More Guns, Less Crime: Understanding Crime and Gun Control Laws*. 3rd ed. Chicago, IL: The University of Chicago Press; 2010.

4. Miller M, Azrael D, Hemenway D. Firearms and violent death in the United States. In: Webster DW, Vernick JS, eds. *Reducing Gun Violence in America: Informing Policy With Evidence and Analysis*. Baltimore, MD: The Johns Hopkins University Press; 2013.

5. Siegel M, Pahn M, Xuan Z, et al. Firearm-related laws in all 50 states, 1991–2016. *Am J Public Health*. 2017; epub ahead of print May 18, 2017.

6. Lott JR Jr, Whitley JE. Safe-storage gun laws: accidental deaths, suicides, and crime. *J Law Econ*. 2001;44: 659–689.

7. Zimmerman PR. The deterrence of crime through private security efforts: theory and evidence. *Int Rev Law Econ*. 2014;37:66–75.

8. Ludwig J. Concealed-gun-carrying laws and violent crime: evidence from state panel data. *Int Rev Law Econ*. 1998;18:239–254.

9. Aneja A, Donohue JJ, Zhang A. The impact of right-to-carry laws and the NRC report: lessons for the empirical evaluation of law and policy. *Am Law Econ Rev*. 2011; 13(2):565–632.

10. Rosengart M, Cummings P, Nathens A, Heagerty P, Maier R, Rivara F. An evaluation of state firearm regulations and homicide and suicide death rates. *Inj Prev*. 2005;11(2):77–83.

11. Hepburn L, Miller M, Azrael D, Hemenway D. The effect of nondiscretionary concealed weapon carrying laws on homicide. *J Trauma*. 2004;56(3):676–681.

12. Sommers PM. Deterrence and gun control: an empirical analysis. *Atl Econ J*. 1980;8:89–94.

13. DeZee MR. Gun control legislation: impact and ideology. *Law Policy Q*. 1983;5(3):367–379.

14. Murray DR. Handguns, gun control laws and firearm violence. *Soc Probl*. 1975;23:81–93.

15. Ayres I, Donohue JJ III. Shooting down the "more guns, less crime" hypothesis. *Stanford Law Rev*. 2003;55: 1193–1300.

16. Plassmann F, Tideman TN. Does the right to carry concealed handguns deter countable crimes? Only a count analysis can say. *J Law Econ*. 2001;44:771–798.

17. Regoeczi W, Banks D. *The Nation's Two Measures of Homicide*. Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Studies; 2014.

18. National Archive of Criminal Justice Data. *Uniform Crime Reporting Program Data Series. Supplemental Homicide Reports, 1981–2015*. Ann Arbor, MI: Inter-university Consortium for Political and Social Research; 2016.

19. Rokaw WM, Mercy JA, Smith JC. Comparing death certificate data with FBI crime reporting statistics on US homicides. *Public Health Rep*. 1990;105(5):447–455.

20. Supplementary homicide report (OMB form no. 1110–0002), offense 1a. Murder and nonnegligent manslaughter. Washington, DC: Federal Bureau of Investigation; 2017. Available at: https://ucr.fbi.gov/nibrs/addendum-for-submitting-cargo-theft-data/shr. Accessed June 17, 2017.

21. Fox J. Multiply-imputed supplementary homicide reports file, 1976–2015. Boston, MA: Northeastern University; 2017.

22. Lott JR, Mustard DB. Crime, deterrence, and right-to-carry concealed handguns. *J Legal Stud*. 1997;26:1–68.

23. White H. A heteroskedasticity-consistent covariance matrix estimator and a direct test for heteroskedasticity. *Econometrica*. 1980;48(4):817–838.

24. Smith VM, Siegel M, Xuan Z, et al. Broadening the perspective on gun violence: an examination of the firearms industry, 1990–2015. *Am J Prev Med*. 2017; Epub ahead of print.

25. Steidley T. *Movements, Malefactions, and Munitions: Determinants and Effects of Concealed Carry Laws in the United States* [dissertation]. Columbus, OH: The Ohio State University; 2016.

26. Lott JR. Not all right-to-carry laws are the same, yet much of the literature keeps ignoring the differences. Crime Prevention Research Center. 2014. Available at: https://ssrn.com/abstract=2524729. Accessed April 15, 2017.

27. Wolfson JA, Teret SP, Azrael D, Miller M. US public opinion on carrying firearms in public places. *Am J Public Health*. 2017;107(6):929–937.

BY AUTHORITY OF THE LEGISLATIVE ASSEMBLY.

# REVISED STATUTES

OF

# WYOMING.

In Force January 1, 1887.

INCLUDING

THE DECLARATION OF INDEPENDENCE, THE ARTICLES
OF CONFEDERATION, THE CONSTITUTION OF
THE UNITED STATES, THE ORGANIC
ACT OF WYOMING,

AND ALL

LAWS OF CONGRESS AFFECTING THE TERRITORIAL
GOVERNMENT.

PREPARED AND EDITED BY

JOHN W. BLAKE,  WILLIS VAN DEVANTER,

AND

ISAAC P. CALDWELL,
COMMISSIONERS.



CHEYENNE, WYOMING:
THE DAILY SUN STEAM PRINTING HOUSE.
1887.

JA2803

Digitized by Google

### Officer refusing to prevent duel.

SEC. 977.  If any judge, justice of the peace, sheriff or other officer, bound to preserve the public peace, shall have knowledge of an intention on the part of any two persons to fight with any deadly weapon or weapons, and such officer shall not use and exert his official authority to arrest the parties and prevent the duel, every such officer shall be fined not exceeding five hundred dollars.  [C. L. 1876, ch. 35, § 104.]

### Libeling person for not accepting challenge.

SEC. 978.  If any person or persons shall, in any newspaper or handbill, written or printed, publish or proclaim any other person or persons as coward or cowards, or use any other opprobrious or abusive language for not accepting a challenge to fight a duel, such person or persons so offending, on conviction, shall be fined in a sum not exceeding five hundred dollars, or imprisoned for a term not exceeding three months.  The publisher or printer of any such newspaper, handbill or other publication may be summoned as a witness, and shall be required to testify against the writer or writers of such handbill or publication, and if any such printer or printers shall refuse to testify in relation to the premises, either before the grand or petit jury, he or they shall be deemed guilty of a flagrant contempt of the court, and may be punished by fine and imprisonment or either; *Provided, however,* That the testimony given by such witness shall in no case be used in any prosecution against such witness.  [C. L. 1876, ch. 35, § 105.]

### Libel.

SEC. 979.  A libel is a malicious defamation, expressed either by printing or by signs, or pictures, or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue or reputation, or publish the natural defects of one who is alive, and thereby to expose him or her to public hatred, contempt or ridicule.  Every person, whether writer or publisher, convicted of this offense, shall be fined in a sum not exceeding five hundred dollars, or imprisoned in the penitentiary not exceeding one year.  In all prosecutions for a libel, the truth thereof may be given in evidence in justification, except libels tending to blacken the memory of the dead, or expose the natural defects of the living.  [C. L. 1876, ch. 35, § 106.]

### Carrying concealed weapons.

SEC. 980.  Hereafter it shall be unlawful for any resident of any city, town or village, or for any one not a resident of any city, town or village, in said territory, but a sojourner therein, to bear upon his person, concealed or openly, any fire-arm or other deadly weapon, within the limits of any city, town or village.  [C. L. 1876, ch. 52, § 1.]

### Non-resident carrying weapons after notification by officer.

SEC. 981.  If any person not a resident of any town, city or village of Wyoming Territory, shall, after being notified of the existence of the last preceding section by a proper peace officer, continue to carry or bear upon his person any fire-arm or other deadly weapon, he or she shall be deemed to be guilty of a violation of the provisions of said section and shall be punished accordingly.  [C. L. 1876, ch. 52, § 2.]

### Penalty for violating last two sections.

SEC. 982.  Any person violating any of the provisions of the last two preceding sections shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine of not less than five dollars nor more than fifty dollars, and, in the default of the payment of any fine which may be assessed against him, shall be imprisoned in the county jail for not less than five days nor more than twenty days.  [C. L. 1876, ch. 52, § 3.]

Digitized by Google

**Exhibiting deadly weapon in angry manner.**

SEC. 983. Whoever shall, in the presence of one or more persons, exhibit any kind of fire-arms, bowie knife, dirk, dagger, slung shot, or other deadly weapon, in a rude, angry or threatening manner not necessary to the defense of his person, family or property, shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be punished by a fine of not less than ten dollars, nor more than one hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment. [S. L. 1884, ch. 67, § 1.]

**Discharging fire-arms from or near railroad trains—Copy of law to be posted in cars.**

SEC. 984. It shall be unlawful for any person in this territory to fire any rifle, revolver or other fire-arm of any description whatever, from any window, door, or other part of any railroad car or train, engine or tender, or along the line of railroad during the passing of any train or engine, or when any person is passing in the vicinity of the person having in his possession such fire-arm, and any person so offending, shall, on conviction, be fined in a sum not exceeding twenty dollars, and for a second offense, confined in the county jail for a term not exceeding sixty days. And it shall be the duty of any railroad company to post a copy of this and the next succeeding section in every railroad car used for the transportation of passengers passing through this territory. But nothing in this section contained, shall be construed as preventing employes on railroad trains from carrying fire-arms, and using the same when necessary for the protection of themselves and the persons and property under their charge. [S. L. 1879, ch. 43, § 1.]

**Arrest and trial of offenders against last section.**

SEC. 985. It shall be lawful for any conductor, brakeman, or any person in charge of such railroad car, train or engine, to arrest any such person so offending, and take him before some justice of the peace in the county where the offense was committed, or deliver him to some officer of the county, and the justice, upon information as in other cases of misdemeanor, shall proceed to examine into the complaint, as if the arrest had been made by virtue of a warrant duly issued. [S. L. 1879, ch. 43, § 2.]

**Selling or giving liquor to Indians.**

SEC. 986. Any person or person who shall sell, barter or give away any spirituous or intoxicating liquor to any Indian or Indians within the limits of this territory, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined in any sum not less than five hundred dollars, nor more than one thousand dollars, to which may be added imprisonment in the county jail for any period not less than ninety days nor more than six months, or both, at the discretion of the court. [C. L. 1876, ch. 86, § 1.]

**Provoking an assault.**

SEC. 987. Every person who shall use words, sign or gestures toward another, which are of a nature adapted to provoke, or who by such words, signs or gestures, shall provoke or attempt to provoke another to commit an assault, or assault and battery, or other breach of the peace, such person shall, upon conviction, be fined in any sum not exceeding twenty-five dollars, or imprisoned in the county jail for a term not exceeding ten days. [S. L. 1879, ch. 25, § 1.]

Digitized by Google

Davis, Thomas D. The Code of the City of Lynchburg, Va., Containing the Charter of 1880, with the Amendments of 1884, 1886 and 1887, and the General Ordinances in Force July 1st, 1887, Also a Digest of Acts of Assembly and of Ordinances Affecting the Rights and Interests of the City of Lynchburg and its Citizens, Together with a Brief Sketch, Historical and Statistical. J. P. Bell & Co., 1887. The Making of Modern Law: Primary Sources, link.gale.com/apps/doc/DT0106162178/MMLP?u=camb55135&sid=bookmark-MMLP&xid=c3eab047&pg=129. Accessed 13 Feb. 2023.

Case 1:22-cv-07464-RMB-AMD  Document 90-48  Filed 03/13/23  Page 2 of 3 PageID 2990

dynamite or other explosives as they may deem necessary.   Said wholesale dealers may also, for the purposes of their trade, have in their possession elsewhere than in a magazine, between the hours 7 A. M. and 5 P. M., any quantity of such explosives not exceeding three hundred pounds.

18. Every dealer in gunpowder, blasting powder, dynamite or other high explosive, shall place on the building containing the same, over or at the side of the front door thereof, a sign with the words "Powder for Sale," printed or painted thereon in legible characters at least three inches in height ; he shall store said powder or other explosives, including explosive cartridges, within fifteen feet of the front entrance to the building, and shall notify the Chief of the Fire Department in writing that the same has been done.

The Chief of the Fire Department is hereby authorized to enter any building in which powder or other explosives may be habitually kept for sale and familiarize himself with the location of such explosives, to the end that he may be able to take the necessary steps to prevent disaster therefrom in case of a fire.

19. No person shall carry gunpowder, blasting powder, dynamite or other explosives on a vehicle in any part of the city unless the same shall be secured in kegs, boxes, or canisters, so that no part thereof can fall out or escape.

20. No person shall allow any vehicle under his charge or control, containing more than one keg or case of twenty-five pounds of gunpowder, blasting powder, dynamite or other high explosives, to remain within the city limits more than two hours, and no person shall permit more than the said quantity of any of the said articles to be upon any street or sidewalk more than thirty minutes ; *provided*, however, that said articles may, during the day, be brought from magazines or depots in such quantities as may be required to supply the trade of merchants and wholesale dealers.

21. Any person who shall violate any of these ordinances in

regard to gunpowder, or other explosives, or permit the same to be violated with his consent by any person in his employment or under his control, shall, upon conviction, be fined not less than five dollars nor more than fifty dollars for each offence.

DATE DOWNLOADED: Mon Feb 13 12:56:23 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
L. Bradford Prince, Compiler. General Laws of New Mexico including All the Unrepealed
General Laws from the Promulgation of the Kearney Code in 1846, to the End of the
Legislative Session of 1880 (1880).

ALWD 7th ed.
Prince, L. Bradford, Compiler. General Ls of New Mexico including All the Unrepealed
General Ls from the Promulgation of the Kearney Code in 1846, to the End of the
Legislative Session of 1880 (1880).

APA 7th ed.
Prince, L. (1880). General Laws of New Mexico including All the Unrepealed General
Laws from the Promulgation of the Kearney Code in 1846, to the End of the Legislative
Session of 1880. Albany, N.Y., W.C. Little & Co.

Chicago 17th ed.
Prince L. Bradford, Compiler. General Laws of New Mexico including All the Unrepealed
General Laws from the Promulgation of the Kearney Code in 1846, to the End of the
Legislative Session of 1880. Albany, N.Y., W.C. Little & Co.

McGill Guide 9th ed.
L. Bradford Prince, Compiler, General Ls of New Mexico including All the Unrepealed
General Ls from the Promulgation of the Kearney Code in 1846, to the End of the
Legislative Session of 1880 (Albany, N.Y.: W.C. Little & Co., 1880)

AGLC 4th ed.
L. Bradford Prince, Compiler, General Laws of New Mexico including All the Unrepealed
General Laws from the Promulgation of the Kearney Code in 1846, to the End of the
Legislative Session of 1880 (W.C. Little & Co., 1880

MLA 9th ed.
Prince, L. Bradford, Compiler. General Laws of New Mexico including All the
Unrepealed General Laws from the Promulgation of the Kearney Code in 1846, to the End
of the Legislative Session of 1880. Albany, N.Y., W.C. Little & Co. HeinOnline.

OSCOLA 4th ed.
Prince, L. Bradford, Compiler. General Laws of New Mexico including All the
Unrepealed General Laws from the Promulgation of the Kearney Code in 1846, to the End
of the Legislative Session of 1880. Albany, N.Y., W.C. Little & Co.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

JA2809

312                 MISCELLANEOUS.

shall be responsible for the payment of the expenses of his retention in jail.

### Rewards for the Apprehension of Escaped Prisoners. Act of February 1, 1860.

SECTION 1. When any person shall make his escape from any county of this Territory after having been sentenced by the court to suffer any penalty, it shall be the duty of the court to inform immediately the governor thereof, giving a description of such fugitive.

§ 2. The governor is hereby authorized to offer a reward, to be paid out of the funds of the Territory, to any person who shall find and deliver such fugitive: *Provided,* that such reward shall be at the will of the governor.

### Reward for Accused Persons. Act of 1874, Ch. 12.

SECTION 1. In cases of murder or other felony, when the person or persons accused of the crime shall be at large, the governor, when in his judgment it shall be necessary to secure the apprehension of the accused, shall be authorized to issue his proclamation offering a reward, not exceeding five hundred dollars, for the apprehension and delivery of the accused to the proper office.

§ 2. The auditor of public accounts is hereby authorized to draw a warrant on the treasury of the Territory, in favor of the person entitled to a reward, under the provisions of the preceding section, for the amount thereof, upon the presentation by such person of his account certified and approved by the governor.

### Deadly Weapons. Act of 1869, Ch. 32.

SECTION 1. It shall be unlawful for any person to carry deadly weapons, either concealed or otherwise, on or about their persons within any of the settlements of this Territory, except it be in the lawful defense of themselves, their families or their property, and the same being then and there threatened with danger, or by order of legal authority, or on their own landed property, or in execution of an order of court.

§ 2. Deadly weapons, in the meaning of this act, shall be construed to mean all kinds and classes of pistols,

JA2810

## MISCELLANEOUS.

whether the same be a revolver, derringer, repeater, or any other kind or class of pistol; any and all kinds of bowie knives, daggers, poniards, butcher knives, dirk knives and all such weapons with which cuts can be given or by which wounds can be inflicted by thrusting, including sword canes and such sharp-pointed canes with which deadly thrusts can be given, and all kinds of slung-shots, and any other kinds of deadly weapon, by whatever name it may be called, by which a dangerous wound can be inflicted.

§ 3. The penalty for the violation of the preceding sections of this act shall not be less than ten dollars nor more than fifty dollars for each offense, or not less than ten days' imprisonment nor more than fifty days' imprisonment in the county jail, or both; such fine and imprisonment in the discretion of the jury trying the case.

§ 4. Any person who shall draw a deadly weapon on another, or who shall handle a deadly weapon in a threatening manner at or towards another, in any part of this Territory, except in the lawful defense of himself, his family, or his property, or by order of legal authority, upon conviction thereof before the proper tribunal, shall, for each offense, be fined in a sum not less than twenty-five dollars nor more than seventy-five dollars, or by imprisonment in the county jail for a term of not less than twenty days or more than sixty days, or be punished by both such fine and imprisonment, in the discretion of the jury trying the cause.

§ 5. Any person who shall draw or use any deadly weapon in any ball, dance, or other public gathering of the people, or near where any election authorized by law is being held in any part of the Territory, except it be in the lawful defense of himself, his family, or his property, or in obedience to legal authority, shall, upon conviction before the proper tribunal, be punished by a fine not less than fifty dollars nor more than one hundred dollars for each offense, or by imprisonment in the county jail for a term of not less than one month nor more than three months for each offense, or by both such fine and imprisonment, in the discretion of the jury trying the cause.

§ 6. Justices of the peace, as well as the District Court, shall have jurisdiction of all offenses under the preceding sections of this act; and in all cases of prosecution under this act, in which a plea of guilty shall be entered, the court shall proceed to hear and determine the case, and

JA2811

J Transp Secur (2014) 7:1–16
DOI 10.1007/s12198-013-0125-z

# Mass-casualty attacks on public transportation

**Annelie Holgersson · Ulf Björnstig**

Received: 4 July 2013 / Accepted: 8 July 2013 / Published online: 20 July 2013
© Springer Science+Business Media New York 2013

**Abstract** The 21st century has provided many examples of the devastating effects attacks can have when public transportation has been targeted or used as weapons. Four hundred and seventy seven mass-casualty attacks (≥10 fatally injured and/or ≥100 non-fatally injured) against public transportation and terminal buildings during the years 1970–2009 were studied with data from the Global Terrorism Database in addition to open media sources, scientific journals, and books. Asia was the most frequently targeted region, followed by the Middle East & North African region and Sub-Saharan Africa. Airplanes were the most frequently attacked mode of transport during the 1970s, but were surpassed by buses in the mid-80s. There was also an alarming increase in attacks against terminal buildings during 2000–2009. The two most common types of attacks were bombings and armed assault. Complex tactical approaches so as to achieve as much carnage as possible were apparent—e.g., maximizing the number of exposed people, enhancing weapon effects, approaching victims one-by-one, combining several attack types, and targeting rescue personnel. These approaches were more predominant during the last two decades and attacks against rescue personnel were exclusive to the 21st century. The average number of injured increased considerably, despite a quite stable incidence rate since the 1980s. High numbers of non-fatally injured people were connected to attacks on terminal buildings, multiple targets and complex tactical approaches. These incidents, with more and more non-fatally injured, challenge our societal response structures and thus require more research.

**Keywords** Antagonism · Mass transportation · Terrorism · Transit · Violence

## Introduction

Public transportation is inherently vulnerable to attacks due to its openness and availability. The various modes of transport often pass specified locations at certain intervals, have a wide geographical coverage, offer the possibility of anonymity, have

A. Holgersson (✉) · U. Björnstig
Department of Surgical and Perioperative Sciences, Division of Surgery - Research Center for Disaster Medicine, Umeå University, SE-901 87 Umeå, Sweden
e-mail: annelie.holgersson@surgery.umu.se

many escape routes, and are dependent on their availability to large numbers of people—properties which can make them rewarding targets for people with malicious intent (Jenkins 2001; Wilson et al. 2007). Public transportation has both been the means and goals for attacks, as seen during the attacks on 9/11 in the USA, which changed the way we perceive modern society's vulnerability and risk. Other high-profile mass-casualty attacks (MCAs) on public transportation include Tokyo 1995 (Tokuda et al. 2006), Madrid 2004 (Bolling et al. 2007), London 2005 (Lockey et al. 2005), Mumbai 2006 (Rai and Sengupta 2006), and Moscow 2009 (The Economist 2009) and 2010 (BBC 2010). Moreover, there are similar threats to the surrounding infrastructure such as stations and terminals, as seen in the Minsk metro (The Economist 2011) and Moscow airport, both in 2011 (BBC 2011).

Public transportation has become an obvious target for attacks throughout the world. Terrorist acts against public transportation, as a type of antagonistic mass-violence, have intensified during the last four decades (Jenkins and Butterworth 2010), with urban public transport systems increasingly becoming the target of such hostile acts (Loukaitou-Sideris et al. 2006). While such systems have been around for about 150 years, terrorist attacks against them are a relatively recent phenomenon, growing in frequency since about 1970 and accelerating since the 1990s (Jenkins and Butterworth 2010). Public transportation, such as trains, not only symbolizes the functioning of economic and daily life due to its characteristics, meaning they can be valuable targets for psychological or propagandistic reasons, but attacks on these systems can also produce a large number of casualties (Wilson et al. 2007). Research has shown that these attacks are usually and increasingly designed to kill (Jenkins and Butterworth 2010) and indeed succeed in causing a higher percentage of fatalities than terrorist attacks in general (Jenkins 2004). Thus, contemporary society requires effective, safe public transportation, as well as preparedness of relevant societal structures with resources and expertise to provide citizens with help if an attack occurs.

High profile cases, such as 9/11, may lead one to assume that contemporary antagonism is increasingly technical and dependent on advanced weapons, but the vast majority of attacks involve explosives or firearms (LaFree et al. 2010). Thus, terrorist attacks increasingly result in explosion injuries, at times complicated by detonations in confined spaces (Leibovici et al. 1996). Moreover, secondary threats against responding professionals increase the risk of causing more death and destruction and impeding medical treatment (Stein and Hirshberg 1999; Frykberg 2002), which in turn requires special techniques and tactics from the police and medical personnel (Hodgetts and Mackway-Jones 2004). Meanwhile, attacks on public transportation can amount to additional difficulties, e.g., regarding medical evacuation in some locations (Björnstig and Forsberg 2010; Levinson and Granot 2002), in addition to the special injury spectrum due to antagonistic violence (Shapira and Cole 2006). By mapping previous incidents, this study is an important first step in reducing the consequences of an attack, with respect to mortality and injuries.

Aim

This study investigates international trends of mass-casualty attacks on public transportation and associated terminal buildings, during the years 1970–2009, focusing on



temporal and geographical patterns, attack type, and the number of fatally and non-fatally injured.

**Methods and materials**

Conducting a study combining research relating to mass casualty incidents, antagonism, and public transport entails challenges that require careful consideration regarding definitions, sources of data, and selection criteria.

Definitions and limitations

The study entails "mass-casualty attacks", which are not just confined to terrorism but a wider sphere of hostile acts, including large-scale violence in the form of mass murder and attacks based on ethnicity, oppression by state powers, and incidents in which the perpetrator or cause was disputed. Thus, the reason for the violence is not in focus but rather its effects, in terms of human suffering and mortality. The motive for this broad approach was to include several large-scale attacks that would otherwise have been excluded due to some technical uncertainty or deliberate concealment. To be considered an MCA, the arbitrary cut-off point chosen for this study was 10 dead and/or 100 non-fatally injured people. This number was chosen since it has been used as part of the labeling of an incident as a disaster by the Center for Research on the Epidemiology of Disasters (CRED)(2009). Of course, what constitutes a disaster is not in reality determined by transgressing a specific number of casualties, but rather when the need for aid is disproportionately high to the available resources and management capacity (Hodgetts and Mackway-Jones 2004).

"Public transportation" implies a means of transport where passengers are not traveling in their own vehicles. It is pre-organized, with regular transportation available to the public. This includes local, regional, national, and international modes of transportation such as trains, buses, trams, trolleys, subways, ferries, and airplanes, as well as associated terminals and stations. Examples of services that were excluded are chartered buses, private car-sharing, and taxis.

"Multiple targets" has been chosen as a label for attacks against distinguishable incident sites during the same day, no matter if these sites were connected to similar and different transport modes—i.e., multi-site attacks against public transportation as part of a coordinated assault. This implies, e.g., that the attack in Madrid 2004 was counted as one incident (not four based on different locations, nor ten based on the number of detonated bombs) in the "multiple target" category. The need for a special category for such attacks is clarified by way of comparison to the attacks in London 2005 where both subway trains and a bus were targeted simultaneously. Coordinated multi-site attacks like those perpetrated in Madrid and London share several characteristics which imply that they will likely require a different type and scope of management than single attacks.

Lastly, "non-fatal injuries" are restricted to physical injuries, thus possibly excluding cases that resulted in psychological trauma among many people. Terrorism as a method partly aims to create a state of fear in a broader population than those directly involved (Wilkinson 2011); consequently, it's designed to also inflict psychological injury or suffering, though this is an aspect that will not be examined in this study.

Materials

The collected data was based partly on open-source data from the Global Terrorism Database (GTD) and partly on other open media sources, scientific journals, and books.

*The Global Terrorism Database (GTD)*

The GTD is maintained by The National Consortium for the Study of Terrorism and Responses to Terrorism (START) at the University of Maryland and includes cases of terrorism, e.g., against public transport, aviation and maritime targets, from more than 104,000 terrorist incidents recorded between 1970 and 2011 (The National Consortium for the Study of Terrorism and Responses to Terrorism 2012).

   To be included in the GTD, the incident must: (a) be intentional; (b) entail some violence or threat of violence; and (c) be perpetrated by a sub-state actor. Additionally, two out of three supplementary criteria must be filled: (1) the act must be aimed at attaining a political, economic, religious, or social goal; (2) there must be evidence of an intention to coerce, intimidate, or convey some other message to a larger audience than the immediate victims; (3) the action must be outside the context of legitimate warfare activities (The National Consortium for the Study of Terrorism and Responses to Terrorism 2011).

*Complimentary data sources*

The scope of this study goes beyond what the GTD encompasses due to the database's inherent focus on terrorism, its inclusion criteria, and its total absence of data (due to loss) from the year 1993. Additional cases were sought from scientific journals (e.g., Journal of Trauma, Prehospital and Disaster Medicine, Studies in Conflict and Terrorism), reports (e.g., from Mineta Transportation Institute, National Counterterrorism Center, CIA), books (e.g., Semmens 1994; DeRouen and Heo 2007; Rubin and Rubin 2008), news channels (e.g., Al Jazeera, BBC, CNN) and (> 25) newspapers (e.g., China Daily, Los Angeles Times, The Tribune-India), as well as websites (e.g., from the organizations Human Rights Watch, UNHCR, and Action on Armed Violence). Since media reports may contain inaccuracies, lies, or conflicting information, thorough checks of each case, with at least three independent sources, were deemed necessary in order to be included in the study.

Selection criteria

The inclusion criteria were that the event 1) occurred between the years 1970–2009, 2) occurred on or next to a public transportation vehicle or station, 3) targeted a mainly civilian population, and 4) resulted in at least 10 people fatally injured and/or 100 or more people non-fatally injured. Thus, if an event met all these criteria, it was included, whether perpetrated by state-, non-state, or unknown actors, or caused "by mistake."

   Out of the included cases, 329 were found in the GTD, 96 were found in other sources, and 52 additional cases were backtracked to the GTD, where they had been categorized or counted in a way that made them previously excluded.

 Springer

JA2815

Presentation of data

Data regarding geographic distribution is divided into 7 regions, where the GTDs original 13 regions (LaFree and Dugan 2007) were compounded into: Asia (South Asia, East Asia, Southeast Asia), Europe (Western Europe, Eastern Europe), Latin America (South America, Central America & Caribbean), Middle East & North Africa, North America, Russia & the Newly Independent States (NIS) (including Central Asia), and Sub-Saharan Africa. No MCA on public transportation occurred in the Australasia & Oceania region.

**Results**

Distribution of attacks in the world

There were 477 MCAs on public transportation during the years 1970–2009. Most of the attacks occurred in Asia ($N$=236; 50 %), with more than double the attacks of the second worst hit region, the Middle East & North Africa ($N$=104; 22 %), and almost four times as many as the third most attacked region, Sub-Saharan Africa ($N$=63; 13 %). The remaining, roughly 15 % of attacks, were shared among Latin America ($N$=30; 6 %), Russia & the NIS ($N$=21; 4 %), Europe ($N$=19; 4 %), and North America ($N$=4; 1 %) (Fig. 1). The most affected countries were India ($N$=77; 16 %), Sri Lanka ($N$=68; 14 %), and Algeria ($N$=32; 7 %), together accounting for more than a third of all incidents.

Transport mode targeted

During the first decade, 1970–1979, airplanes were the type of transport where MCAs on public transportation were most common ($N$=21). Attacks against airplanes were



**Fig. 1**   Regional distribution of MCAs on public transportation and total incidence, 1970–2009

even more frequent ($N$=25) during the 1980s, but by then attacks against trains ($N$=28) and buses ($N$=65) had also become increasingly common. From 1985 onwards, road-bound modes of public transportation were the worst hit practically every year, at times suffering two to three times as many attacks as the other modes of transport. Attacks against ferries have been quite rare, with almost all of the incidents ($N$=20; 87 %) clustered between the years 1984–1996. Attacks against terminal buildings and multiple-target attacks occurred infrequently over the years, but became more common after the year 2000. Out of the total number of attacks against stations, harbors, and airports ($N$=46), more than half ($N$=27; 59 %) occurred during the last decade (Fig. 2).

Seen in total during the four decades, MCAs on public transportation were most common ($N$=251; 53 %) in connection to road-bound transport, accounting for over half of all incidents. The road-bound sector was the primary antagonistic target in the Middle East & North Africa ($N$=75; 72 %) as well as Latin America ($N$=20; 67 %), Asia ($N$=123; 52 %), and Sub-Saharan Africa ($N$=29; 46 %). After road, rail ($N$=78; 16 %) and air ($N$=56; 12 %) were the most frequently targeted transport types. Most of the attacks against the rail-bound sector occurred in Asia ($N$=45; 58 %) and Sub-Saharan Africa ($N$=14; 18 %), but trains and subways were disproportionately popular targets for attacks in the Russia & NIS region ($N$=8; 38 %), accounting for more than a third of the attacks there. Airplanes were mostly targeted in Asia ($N$=20; 36 %), and were the most common sector for MCAs on public transportation in Europe ($N$=8; 42 %). Most of the attacks against water-borne transport ($N$=14; 61 %) and multiple targets ($N$=11; 48 %) took place in Asia. Terminals were almost exclusively targeted in Asia ($N$=23; 50 %) and the Middle East & North Africa ($N$=16; 35 %), and most commonly in connection with buses ($N$=20; 43 %).



Fig. 2 Distribution of attacks by target, 1970–2009



### Type of attack

Bombings accounted for more than half of the attacks ($N$=264; 55 %) and the second most common type of attack was armed assault ($N$=158; 33 %). These two attack types were used in nearly 9 out of 10 of cases. Most of the bombings ($N$=122; 46 %) and armed assaults ($N$=113; 72 %) were directed against the road-bound sector and took place in Asia. Hijacking and hostage taking, the third most commonly used attack type ($N$=24), accounted for about 5 % of all attacks and were also most commonly used in Asia ($N$=11; 46 %). Sabotage ($N$=9; 2 %), solely used against trains through removal of critical equipment or track, was exclusive to Asia ($N$=7) and Sub-Saharan Africa ($N$=2). Arson ($N$=8; 2 %) as primary attack type was also mainly used in Asia ($N$=3) and Sub-Saharan Africa ($N$=2) and mostly against the road- ($N$=3) and rail-bound ($N$=2) sectors. In the few cases where the type of attack was labeled other/unknown ($N$=14; 3 %), this was either because the incident did not fit into the other categories, like intentional crashes by pilots ($N$=2) and disagreements in incident investigations about the cause ($N$=4), or because there was too little information ($N$=8).

Roughly one in five cases ($N$=101; 21 %) revealed that the perpetrators undertook complex tactical approaches seemingly in order to assure as much carnage as possible. These tactics were used in 27 countries altogether, but mainly in India ($N$=16), Sri Lanka ($N$=15), Algeria ($N$=12), and Iraq ($N$=10). Beginning an attack during rush hour or when a vehicle was at a station were examples of *maximizing population exposed* ($N$=32). Another technique was that of targeting victims with axes, knives, or firearms one-by-one in *execution*-style attacks ($N$=23). In some execution attacks, there was an obvious selection process in which some passengers were selected, while others were released, after showing identification papers or reciting certain prayers to prove kinship or religious affiliation. However, in other cases, whole busloads of passengers had their throats slit or were lined up and shot point blank for no apparent reason, except that they were "in the wrong place at the wrong time" in a context of civil strife or drug war. There were incidents were the perpetrators used several types of attacks in succession, here called the *over-kill* technique ($N$=29). Examples of over-kill were stopping a vehicle with a mine or bomb and following up with shooting at the vehicle or fleeing survivors, or firing at the vehicle first and later setting it on fire. In a few cases, buses were pushed off cliffs or victims thrown off trains at full speed, in combination with other armed attacks. Both the execution and the over-kill techniques required perpetrators to stay on site for a longer time, with over-whelming firepower at hand or numerically superior to the victims. In a few cases, perpetrators took measures so as to *enhance weapon effects* ($N$=11), i.e., make them more effective at doing harm to the victims. Examples of this were seen in incidents where nails or scrap metal were added to bombs, where bombs were detonated in confined spaces such as trains in tunnels or when vehicles were set alight while blocking the exits. Secondary *attacks against rescue personnel* and hospitals ($N$=6) were manifested as a another bomb detonated on site, as the rescue personnel got there—which may be the most obvious danger—but there were also examples of attacks in or outside of the receiving trauma department timed to target survivors, rescue personnel, and worried family members while also taking out critical medical infrastructure as seen, e.g., in the multiple-target attacks in Ahmedabad, India in 2008. Most of these techniques ($N$=90; 89 %) were used during the last two decades and secondary attacks against rescue personnel were exclusive to the 21st century.

 Springer

Fatally and non-fatally injured

During the 40-year period included in this study, 18,769 people lost their lives in MCAs on public transportation (m=39) and 32,641 were non-fatally injured (m=69). The average number of fatalities fluctuated slightly over the decades (range m=27–48), but the average number of injured in these attacks continuously increased, from an average of 33 to 107 non-fatally injured per incident. Despite the fact that the incidence rate has been quite stable since the 1980s, there was a huge increase in the total number of non-fatally injured people from the incidents during the last two decades (Fig. 3). The 9/11 incidents in 2001 and the Tokyo subway attack in 1995 each had over 6,000 injured and were the major contributors to these huge numbers of non-fatally injured. The 10 incidents that fatally injured the most people accounted for 29 % of the fatalities ($N$=5,379) and the 10 incidents that non-fatally injured the most people accounted for 55 % of the injuries ($N$=18,097), even though they only accounted for two percent of the incidents.

The numbers of fatally ($N$=6,948) and non-fatally injured ($N$=16,532) were highest in Asia, but the high incidence lowered the average fatalities per incident (FPI) (m=29) and injuries per incident (IPI) (m=70) in that region (Table 1). On the contrary, North America had high FPI (m=90[a]) (despite excluding 9/11), because there were so few incidents there severe enough to meet the inclusion criteria. Europe also had high numbers of FPI (m=81) and IPI (m=196); fatalities were mainly due to attacks against the air-bound sector during the 1980s and injuries mainly due to the multiple-target attacks in Madrid 2004 and London 2005.

The air-bound sector had high FPI (m=80) and low IPI (m=8), largely due to the fact that if an incident was severe enough to result in an MCA, it was usually catastrophic. Each flight accommodated many passengers, and the MCAs often



Fig. 3   Fatally and non-fatally injured people in MCAs on public transportation, 1970–2009

 Springer                                                          JA2819

**Table 1** Fatally-injured, average fatalities per incident (FPI), non-fatally injured, and average injuries per incident (IPI) as distributed in different regions, by transport mode, and dependent on type of attack

| | No. of incidents | Fatally injured | FPI | Non-fatally injured | IPI |
|---|---|---|---|---|---|
| **Region** | | | | | |
| Asia | 236 | 6948 | 29 | 16532 | 70 |
| Europe | 19 | 1547 | 81 | 3715 | 196 |
| Latin America | 30 | 674 | 22 | 169 | 6 |
| Middle East & North Africa | 104 | 2469 | 24 | 3017 | 29 |
| North America | 4 | 3264 | 90[a] | 6466 | 25[a] |
| | | | 816[b] | | 1617[b] |
| Russia & NIS | 21 | 980 | 47 | 957 | 46 |
| Sub-Saharan Africa | 63 | 2887 | 46 | 1785 | 28 |
| **Transport mode** | | | | | |
| Air | 56 | 4594 | 82 | 467 | 8 |
| Rail | 78 | 3049 | 39 | 5435 | 70 |
| Road | 251 | 4925 | 20 | 4719 | 19 |
| Water | 23 | 992 | 43 | 678 | 29 |
| Terminal | 46 | 1048 | 23 | 3881 | 86 |
| Multiple targets | 23 | 4161 | 53[a] | 17461 | 503[a] |
| | | | 181[b] | | 759[b] |
| **Type of attack** | | | | | |
| Armed assault | 158 | 4382 | 28 | 9334 | 59 |
| Arson | 8 | 673 | 84 | 250 | 31 |
| Bombing/Explosion | 264 | 8368 | 32 | 15126 | 58 |
| Hijacking/Hostage Taking | 24 | 4118 | 49[a] | 6936 | 24[a] |
| | | | 172[b] | | 289[b] |
| Sabotage | 9 | 428 | 48 | 946 | 105 |
| Other/Unknown | 14 | 800 | 57 | 49 | 4 |

[a] average excluding 9/11   [b] average including 9/11

resulted in the death of all passengers and crew onboard, leaving few non-fatally injured. In contrast, attacks against terminals (IPI=86) and rail (IPI=70) on average led to many non-fatally injured. The attacks against multiple targets resulted both in high FPI (m=53[a]) and IPI (m=503[a]). Out of the ten incidents that contributed most to the high number of non-fatally injured, five were categorized as "multiple-target" attacks, whereas only one of the top ten incidents that led to the most fatalities was multiple target. Thus, attacks against multiple targets have been largely effective at injuring a large number of people; however, single incidents often cause more fatalities (excluding 9/11).

Bombings (FPI=32) and armed attacks (FPI=28) caused the fewest average number of fatally injured per incident, despite being the most common types of attack. Arson was a highly lethal method (FPI=84), while sabotage (IPI=105) on average led to many non-fatally injured. However, both these types of attacks were rare. Of the attacks defined as bombings (N=264), 51 were deemed suicide bombings. All but two

of these occurred during the last two decades, with 41 MCAs on public transportation caused by suicide bombings (80 %) occurring since the start of the 21st century. For non-suicide bombings, the average number of people killed was 34, while the average number of people killed from suicide bombings was 22. Conversely, when it came to the number of non-fatally injured, the situation was reversed; in suicide bombings, the average number of injured was 68, while the average number of injured from the other bombings was 55. There were also cases ($N$=13) where the perpetrator(s) died due to the choice of execution of the attack; two cases of arson—one in the confined spaces of a subway and another in an airplane—and several cases ($N$=11) of hijacked vehicles that crashed or were crashed on purpose by the pilot (excluding disputed cases ($N$=4) regarding cause). In the attacks with complex tactical approaches mentioned earlier, the average number of fatalities was slightly higher when they were used (m=38 vs. m=32), while the average number of non-fatally injured was over three times as high (m=90 vs. m=29) in those instances (even with 9/11 and Tokyo excluded).

## Discussion

This study investigated 477 MCAs on public transportation during the years 1970–2009. The underlying purpose of studying these types of incidents is to ultimately reduce the consequences of such attacks in the future: to collect data on the size of the issue and its characteristics before honing in on possible injury-preventive and mitigative implications. Such an approach is supported by the statement of injury prevention researcher Carolyn Fowler (2009) who said, "if we fail to monitor activities and trends upstream, we cannot equip ourselves to deal with future consequences downstream." In order to provide directions for future research to reduce the consequences of MCAs on public transportation, this discussion will highlight the current trends of targeted modes of transportation and the circumstances that resulted in the most severe consequences, in terms of fatalities and injuries.

Asia ($N$=236; 50 %) and the Middle East & North Africa ($N$=104; 22 %) were the most commonly targeted regions. The overall geographical patterns in terms of the two most targeted regions coincides with Jenkins and Butterworth's (2010) research on all attacks on road- and rail-bound public transportation, which includes attacks with less severe consequences that thus lay beyond the scope of this study. However, the status of Sub-Saharan Africa as the third most commonly targeted region ($N$=63;13 %) in our current study differed from that one, which ranked it second to last in terms of number of attacks. This is likely due to the high average numbers of fatally and non-fatally injured per attack in Sub-Saharan Africa, as shown by Jenkins and Butterworth (2010). Since the inclusion criteria of this study included 10 fatally and/or 100 non-fatally injured, it is "biased" towards attacks with severe consequences. Thus, relatively more attacks from Sub-Saharan Africa were included precisely because they more often led to severe consequences, in comparison to the other study where more numerous, less severe attacks were included mainly from the other regions.

Airplanes were the most targeted transport mode during the 1970s and were also commonly targeted during the 80s. Despite this, the road-bound transport sector has



been the worst hit practically every year since 1985, accounting for over half of all incidents. Irrespective of the debate regarding airport security measures, the number of MCAs involving airplanes internationally have greatly decreased throughout the last two decades. However, one cannot overlook the fact that when attacks against airplanes have occurred, they were the single most deadly target (even excluding 9/11); most people onboard perish in these attacks. Preventive efforts are thus warranted, but the ways in which security in airports and on airplanes is achieved remain unclear. The balance between privacy and national security (Frimpong 2011; Abeyratne 2010) need to be considered, as do the risks of attack versus costs for security measures (Akhtar et al. 2010). Some would hold that keeping terrorists from planes is not even the job of airport security, but of government agencies and law enforcement (Pico 2007). If that holds true then, from a broader perspective, these agencies need to adhere to fundamental human rights in their pursuit and capture of people suspected of planning or actualizing attacks—or they risk being counterproductive (Hoffman 2004).

An increase in attacks against terminal buildings has been noted during the 21st century. More than half of the incidents occurred after the year 2000 and resulted in many injuries compared to other targeted transport modes. During the last decade, harbors, airports, and stations were the most targeted sector, second only to road-bound transport. In studies of bombings and incendiary attacks against public bus transportation, other researchers (Jenkins et al. 2010) have also found that the percentage of attacks directed at bus stations and bus stops have increased significantly, while attacks on buses have decreased. The increase in incidence and severe consequences, in terms of injuries, from these attacks indicates a need to focus preventive efforts especially around terminals. In the UK, their experiences of attacks perpetrated by the Irish Republican Army (IRA) as well as other incidents led to the introduction of design and technological strategies of the Crime Prevention Through Environmental Design (CPTED) program (Jenkins and Gersten 2001). Taylor et al. (2005) proposed several reasons why such design changes have not been given much attention in the literature of transit terrorism security. For one, some now perceive security to be an illusion in an era of suicide bombings and that there is no defense against a determined terrorist. Thus, the best hope for transit is to minimize disruption by having an organized response strategy. The researchers go on to point out that such a fatalistic mindset ignores the potential role that design plays in security planning against individual crimes and terrorism. Design constitutes one of many layers of protective strategies. Even if good policing is the best defense and effective response is the best way to minimize the effects of an attack, design can serve as an important function. The goal of CPTED is to influence the social and physical use of space through environmental designs that discourage antisocial and criminal behavior (Taylor et al. 2005). Design strategies also include opportunities for dual-use to improve safety and efficiency within the public transport system as well as innovative construction and material use, all of which can reduce the risk of injury if an attack does occur. In relation to the rail-bound sector, O'Neill et al. (2012) have suggested that counter-measures such as the choice of materials and design can mitigate the effects of attacks making a target less attractive for terrorists and reducing the risk of future attacks. In addition to structural designs to mitigate the

 Springer

effects of an attack, they also propose design upgrades to key systems that would improve survivability by enabling efficient management of rescue operations.

Attacks with multiple targets, as part of a coordinated assault on public transportation, have been quite few in number but have led to severe consequences when they occurred. The most telling examples of this were the 9/11 attacks and the Tokyo subway attacks, which had major impact on the numbers of injured during the last two decades. The five incidents leading to the most numerous non-fatally injured were all incidents with multiple targets. Moreover, the 10 incidents that caused the most fatalities and the 10 incidents that caused the most non-fatally injured accounted for 29 % of fatalities ($N$=5,379) and 55 % of non-fatal injuries ($N$=18,097), even though they only accounted for 2 % of the incidents. This shows what an immense impact a few incidents can have in terms of consequences. By extension, it implies that while some regions have been targeted more often than others, the consequences of attacks in terms of fatally and non-fatally injured people may not coincide. As pointed out by Gary LaFree (2012) the perception one may get from the media coverage – that no location is safe from terrorism – is a myth. He however also cautioned against ignoring the threat, due to its unpredictable and bursty nature. Thus every society should be prepared to deal with such an incident, in order to minimize its consequences.

Bombings and armed assault were by far the most common types of attack, accounting for nearly 90 % of the MCAs on public transportation. Consequently, these were connected to the highest absolute numbers of fatally and non-fatally injured people. Since bombings constitute the primary attack type, many of the incidents result in blast injuries, which civilian medical communities may be ill-prepared to handle (Frykberg 2002). Unsurprisingly, medical responses to attacks are often more sophisticated and effective in countries that are more commonly exposed (Frykberg 2002). Israel is one example where experiences of attacks have prompted advances in medical management and the development of "terror medicine" as a discipline (Shapira and Cole 2006). Military medical forces constitute another resource from which the civilian medical community can learn, as they are well prepared and trained to deal with mass casualty incidents with similar injury spectrum (Frykberg 2002).

Despite gaps in knowledge and resources for some areas of the world, this study also showed that the average number of fatalities per incident was lower for bomb attacks and armed assaults than other attack types. Arson was a more deadly attack type, while sabotage caused many non-fatally injured. The development and spread of the suicide bombing technique have caused considerable concern and fear for officials and populations of countries that have been attacked by or are likely targets of such attacks (Jenkins and Butterworth 2010). In this study, 51 MCAs were considered caused by suicide bombings, i.e., roughly 10 % of the total. Moreover, practically all of these incidents occurred during the last two decades. The data also indicated that they caused slightly more non-fatal injuries than other bombings and that those bombings using timers, remote controlled devises, or pressure triggers were seemingly more deadly. This coincides with Jenkins and Butterworth's (2010) findings that suicide bombings are generally not the most lethal combination of attack and weapon and that most terrorist campaigns deliver bombs in other ways because it is far easier.

The development of complex tactical approaches to increase the number and severity of injuries among victims is disconcerting; almost 9 out of 10 ($N$=90;

 Springer

89 %) of such attacks have occurred since 1990. These techniques generally only increased fatalities slightly (m=38 vs. m=32) but led to more than a threefold increase of average number of non-fatally injured (m=90 vs. m=29). Examples of this were *maximizing exposed population* (beginning an armed attack when as many people as possible will be exposed, e.g., when a train is in station; *N*=32), by *enhancing weapon effects* (e.g., adding nails in bombs or detonating in confined spaces; *N*=11), by approaching the victims one-by-one *execution* style (*N*=23), by using an *over-kill* technique (combining several types of attack; *N*=29), or through secondary deliberate *targeting of rescue personnel* or hospitals (*N*=6). These tactics were most commonly used in India (*N*=16), Sri Lanka (*N*=15), and Algeria (*N*=12), the same three countries with the highest incidence of MCAs against public transportation.

Clearly a lot has happened in the arena of antagonistic attacks in the last 40 years. Terrorism expert Brian Jenkins has gone from saying that "terrorists want a lot of people watching, not a lot of people dead" (Jenkins 1985) to giving testimony that "terrorists who target transportation systems are often seeking slaughter" (Jenkins 2004), approximately 20 years later. With regards to public surface transportation, Jenkins and Gersten (2001) pointed out that people with malicious intent now perceive these areas as "killing fields" and that they cannot be stopped altogether. Nevertheless, fatalism is not an appropriate response since, e.g., explosive devices can indeed be found and defused and passengers can be evacuated before an explosion (Jenkins et al. 2010).

Attacks on airplanes have caused the highest average number of fatalities, but to prevent these fatalities the incidents themselves must likely be prevented altogether. In terms of non-fatal injuries from MCAs on public transportation, which have increased during the last two decades, attacks against terminal buildings, multiple targets, and attacks carried out with complex tactical approaches have been major contributing factors. Attacks involving several incident sites require more coordination, and those with large numbers of injuries constitute challenges for, e.g., triage, logistics, medical resources, and knowledge, while also keeping security issues in mind. Such incidents constitute the ultimate test for the societal response system in a country, and may very well require outside assistance. In-depth studies of the past can provide valuable knowledge for the future for the development of emergency preparedness within organizations that would be on site after an attack—the first responders.

## Methodological considerations

The major strength of this study was the comprehensiveness of the data collection, which included antagonistic acts and not just the terrorism cases found in the Global Terrorism Database. By searching outside of the GTD, 96 additional cases were found. As described by LaFree and Dugan (2007), databases like the GTD rely on reports about terrorism from print or electronic media, which involves some limitations, one of them being an inherent bias towards the most newsworthy forms of terrorism. This could have influenced the data in this study, especially in regions with less media penetration or possibly where such antagonistic acts have become so common that the public's interest in the issue has been "saturated". Moreover, government censorship and disinformation could also affect results. Authorities

 Springer

A. Holgersson, U. Björnstig

may be reluctant to disclose certain information for fear of looking weak, or unwilling to admit to any terrorism in its territory. On the other hand, governments may also use attacks and inflate the number of casualties as a justification for more repressive tactics. The targeted state or terrorist organization may both have reasons to inflate or deflate certain numbers or threats as part of their strategy to affect the credibility of their opponent and disorient the public (Neumann and Smith 2005). Despite searching for additional data from open media sources, reports, scientific journals, and books, these issues remain, which implies that the study is still not all-encompassing.

An associated strength of the additional data search was the validation of information from the database. Only through merging the GTD data and the additional data and then re-searching the GTD could 52 more cases be found. This was because those cases had not been classified in any of the "aviation," "maritime," or "transportation" categories or because the numbers were not updated, so they initially fell below the cut-off point in the GTD. The counts presented should still be considered estimates, rather than exact—an innate weakness of the research. Identifying the number of persons killed in any given attack is extremely difficult because, prior to an attack, it is generally unknown how many people are onboard a particular mode of transport (with the exception of airliners). For example, with respect to sea-bound modes of transport, it is intrinsically difficult to determine the number of victims since some may be lost in the water. Jenkins and Butterworth (2010) also mention difficulties regarding count, e.g., stating that reports on fatalities generally are more accurate than reports on injuries. Furthermore, some countries may record only serious injuries, which can be defined differently, while others report all injuries. Finally, some injuries later become deaths, and these may not be updated in media reports.

## Conclusion

Increased numbers of non-fatally injured people from contemporary mass-casualty attacks on public transportation were connected to attacks on terminal buildings, multiple targets and complex tactical approaches. Therefore, future in-depth research of such incidents is required in order to develop more effective emergency preparedness among first responders, with regard to the specific challenges when dealing with the consequences in the immediate aftermath of an attack.

**Acknowledgments**   The authors thank the Swedish National Board of Health and Welfare for financial support. Critical readings of the manuscript by Professor Britt-Inger Saveman were also appreciated.

## References

Abeyratne R (2010) Full body scanners at airports—the balance between privacy and state responsibility. J Transp Secur 3(2):73–85. doi:10.1007/s12198-010-0040-5

Akhtar J, Bjornskau T, Veisten K (2010) Assessing security measures reducing terrorist risk: inverse ex post cost-benefit and cost-effectiveness analyses of Norwegian airports and seaports. J Transp Secur 3(3):179–195. doi:10.1007/s12198-010-0046-z

BBC (2010) Moscow Metro hit by deadly terrorist bombing. http://news.bbc.co.uk/2/hi/8592190.stm. Accessed 3/4-2012

 Springer

BBC (2011) Moscow bombing: Carnage at Russia´s Domodedovo airport. http://www.bbc.co.uk/news/world-europe-12268662 Accessed 3/4-2012

Björnstig U, Forsberg R (2010) Transportation disasters. In: Koenig K, Schultz C (eds) Koenig and Schultz's disaster medicine: Comprehensive principles and practices. Cambridge University Press, New York, pp 253–274

Bolling R, Ehrlin Y, Forsberg R, Rüter A, Soest V, Vikström T, Örtenwall P, Brändström H (2007) KAMEDO Report No. 90: Terrorist attacks in Madrid, Spain, 2004. Prehosp Disaster Med 22(3):252–257

Centre for Research on the Epidemiology of Disasters - CRED (2009) Criteria and Definition. CRED. http://www.emdat.be/criteria-and-definition. Accessed 23/11-2012

DeRouen K, Heo U (eds) (2007) Civil wars of the world: Major conflicts since World War II. ABC-CLIO, Santa Barbara

Fowler CJ (2009) Injury prevention. In: McQuillan K, Flynn Makic MB, Whalen E (eds) Trauma nursing: From recuscitation through rehabilitation, vol 4. Saunders/Elsevier, St. Louis, pp 67–90

Frimpong A (2011) Introduction of full body image scanners at the airports: a delicate balance of protecting privacy and ensuring national security. J Transp Secur 4(3):221–229. doi:10.1007/s12198-011-0068-1

Frykberg ER (2002) Medical management of disasters and mass casualties from terrorist bombings: how can we cope? J Trauma 53(2):201–212

Hodgetts C, Mackway-Jones K (eds) (2004) MIMMS- På svenska! Major Incident Medical Management and Support, Ett metodiskt sätt att hantera allvarliga händelser. Studentlitteratur, Lund

Hoffman P (2004) Human rights and terrorism. Hum Rights Quart 26(4):932–955

Jenkins B (1985) Future trends in international terrorism. RAND Corporation, Santa Monica

Jenkins B (2001) Protecting public surface transportation against terrorism and serious crime: An executive overview. Mineta Transportation Institute, San José

Jenkins B (2004) Terrorism and the Security of Public Surface Transportation. Senate Committee on Judiciary. RAND Corporation

Jenkins B, Butterworth B (2010) Explosives and incendiaries used in terrorist attacks on public surface transportation: A preliminary empirical examination. Mineta Transportation Institute, San José

Jenkins B, Gersten L (2001) Protecting public surface transportation against terrorism and serious crime: Continuing research of best security practices. Mineta Transportaion Institute, San José

Jenkins B, Butterworth B, Shrum K (2010) Terrorist attacks on public bus transportation: A preliminary empirical analysis. Mineta Transportation Institute Collage of Business, San José

LaFree G (2012) Black swans and burstiness: Countering myths about terrorism. 2012 Global Terrorism Index: Capturing the impact of terrorism 2002–2011. Institute of Economics and Peace, Sydney & New York

LaFree G, Dugan L (2007) Introducing the global terrorism database. Terror Polit Violence 19(2):181–204. doi:10.1080/09546550701246817

LaFree G, Dugan L, Cragin K (2010) Trends in global terrorism. In: Hewitt J, Wilkenfeld J, Gurr TR (eds) Peace and conflict 2010: Executive summary. University of Maryland, Collage Park, p 22

Leibovici D, Gofrit ON, Stein M, Shapira SC, Noga Y, Heruti RJ, Shemer J (1996) Blast injuries: bus versus open-air bombings–a comparative study of injuries in survivors of open-air versus confined-space explosions. J Trauma 41(6):1030–1035

Levinson J, Granot H (2002) Transportation disaster response handbook. Academic, London

Lockey D, MacKenzie R, Redhead J, Wise D, Harris T, Weaver A, Hines K, Davies G (2005) London bombings July 2005: immediate pre-hospital medical response. Resuscitation 66(2):ix–xii

Loukaitou-Sideris A, Taylor BD, Fink CNY (2006) Rail transit security in an international context - Lessons from four cities. Urban Aff Rev 41(6):727–748. doi:10.1177/1078087406287581

Neumann PR, Smith MLR (2005) Strategic terrorism: the framework and its fallacies. J Strateg Stud 28(4):571–595

O'Neill C, Robinson A, Ingleton S (2012) Mitigating the effect of firebomb and blast attacks on metro systems. Procedia Soc Behav Sci 48:3518–3528

Pico I (2007) Opinion Pages: The Airport Security Follies. New York Times

Rai S, Sengupta S (2006) Series of Bombs Explode on 7 Trains in India, Killing Scores. New York Times

Rubin B, Rubin J (2008) Chonologies of modern terrorism. M.E. Sharpe, Inc., New York

Semmens P (1994) Railway disasters of the world. Patrick Stevens Limited, Sparkford

Shapira SC, Cole LA (2006) Terror Medicine: Birth of a Discipline. J Homel Secur Emerg Man 3 (2): Article 9

Stein M, Hirshberg A (1999) Medical consequences of terrorism: the conventional weapon threat. Surg Clin North Am 79(6):1537–1552

Taylor B, Loukaitou-Sideris A, Liggett R, Fink C, Wachs M, Cavanagh E, Cherry C, Haas P (2005) Designing and operating safe and secure transit systems: Assessing current practices in the united states and abroad. Mineta Transportation Institute, San José

The Economist (2009) Terrorism in Russia: Bombings away. http://www.economist.com/node/15019904?story_id=15019904 Accessed 3/4-2012

The Economist (2011) The Belaus bomb: Terrorism comes to Minsk. http://www.economist.com/blogs/easternapproaches/2011/04/belarus_bomb Accessed 3/4-2012

The National Consortium for the Study of Terrorism and Responses to Terrorism (2011) Global Terrorism Database Codebook: GTD Variables & Inclusion Criteria. U.S. Department of Homeland Security University of Maryland

The National Consortium for the Study of Terrorism and Responses to Terrorism (2012) Global Terrorism Database (GTD). University of Maryland. http://www.start.umd.edu/gtd/. Accessed 2012-08-22

Tokuda Y, Kikuchi M, Takahashi O, Stein G (2006) Prehospital management of sarin nerve gas terrorism in urban settings: 10 years of progress after Tokyo subway sarin attack. Resuscitation 68(2):193–202

Wilkinson P (2011) Terrorism versus democracy: The liberal state response, 3rd edn. Routledge, New York

Wilson J, Jackson B, Eisman M, Steinberg P, Riley J (2007) Securing America's passenger-rail systems. RAND Corporation, Santa Monica



# THE
# GENERAL LAWS

OF

## 𝕸𝖆𝖘𝖘𝖆𝖈𝖍𝖚𝖘𝖊𝖙𝖙𝖘,—

### FROM THE ADOPTION OF THE CONSTITUTION,

TO FEBRUARY, 1822.

WITH THE

## CONSTITUTIONS

OF THE

### 𝕌𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝖆𝖓𝖉 𝖔𝖋 𝖙𝖍𝖎𝖘 𝕮𝖔𝖒𝖒𝖔𝖓𝖜𝖊𝖆𝖑𝖙𝖍,

TOGETHER WITH

THEIR RESPECTIVE AMENDMENTS, PREFIXED.

REVISED AND PUBLISHED, BY

## AUTHORITY OF THE LEGISLATURE,

IN CONFORMITY WITH A RESOLUTION PASSED

22D. FEBRUARY, 1822.

By ASAHEL STEARNS & LEMUEL SHAW, Esquires,
COMMISSIONERS.
THERON METCALF, Esq. Editor.

IN TWO VOLUMES.

VOL. I.

## BOSTON:

PUBLISHED BY WELLS & LILLY AND CUMMINGS & HILLIARD.

1823.

Digitized by Google       JA2828

**454**              **1794.——Chap. 21—31.**

*Chap. 21.* — An Act to incorporate certain persons by the name of The Northwest Congregational Society in North-Yarmouth. [*June* 26, 1794.] Add. act—1795 ch. 15.

*Chap. 22.*
1793 ch. 65. — An Act to suspend the operation of an Act, entitled "An Act ascertaining the Quality of Stone-Lime, and the size of Lime Casks, and for repealing all Laws heretofore made relative thereto." [*June* 27, 1794.] Original act repealed—1809 ch. 62.

*Chap. 23.* — An Act to repeal all Laws of this Commonwealth imposing Duties and Excise on Carriages, and inflicting Penalties for selling Wines and foreign distilled Spirits, so far as the same respect said matters. [*June* 27, 1794.] Add. act—1796 ch. 21.

*Chap. 24.* — An Act for dividing the Commonwealth into Districts for the Choice of Representatives in the Congress of the United States, and prescribing the Mode of Election. [*June* 27, 1794.] Add. act—1796 ch. 15. See 1801 ch. 47. All expired.

*Chap. 25.* — An Act for incorporating certain Land in Dedham and Sharon, in the County of Norfolk, into a Common Field. [*Jan.* 22, 1795.]

*Chap. 26.*
4 W.& M.ch.6. — An Act for repealing an Act, made and passed in the year of our Lord one thousand six hundred and ninety-two, entitled, "An Act for punishing Criminal Offenders," and for re-enacting certain Provisions therein.

Act repealed.

SECT. 1. *BE it enacted by the Senate and House of Representatives, in General Court assembled, and by the authority of the same,* That said Act be and hereby is repealed, and made wholly null and void.

Justices of the Peace empowered to stay affrayers, rioters, &c. and bind them to keep the peace.

SECT. 2. *And be it further enacted by the authority aforesaid,* That every Justice of the Peace, within the county for which he may be commissioned, may cause to be staid and arrested, all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth, or such others as may utter any menaces or threatening speeches, and upon view of such justice, confession of the delinquent, or other legal conviction of any such offence, shall require of the offender to find sureties for his keeping the peace, and being of the good behaviour; and in want thereof, to commit him to prison until he shall comply with such requisition: And may further punish the breach of the peace in any person that shall assault or strike another, by fine to the Commonwealth, not exceeding twenty shillings, and require sureties, as aforesaid, or bind the offender to appear and answer for his offence at the next Court of General Sessions of the Peace, as the nature or circumstances of the case may require. [*Jan.* 29, 1795.]

And to punish breaches of the peace.

1803 ch.154,&3.

*Chap. 27.* — An Act to set off William Goodspeed, with his estate, from the Town of Washington in the County of Berkshire, and annex him and his estate to the Town of Lenox, in the same County. [*Jan.* 31, 1795.]

*Chap. 28.* — An Act to incorporate Valentine Rathburn, and others, inhabitants of the Town of Pittsfield, into a religious Society, by the name of The Baptist religious Society in the Town of Pittsfield. [*Feb.* 10, 1795.]

*Chap. 29.* — An Act for incorporating certain persons therein named, by the name of The Trustees of the Church and Congregation in the second Precinct in Pembroke. [*Feb.* 10, 1795.] Add. act—1816 ch. 93.

*Chap. 30.* — An Act for erecting and maintaining a Bridge over Westfield-River, in the Town of Norwich, in the County of Hampshire. [*Feb.* 10, 1795.]

*Chap. 31.* — An Act to ascertain the Jurisdiction and Limits of the Counties of Suffolk and Middlesex, over and upon Charles River.

SECT. 1. *BE it enacted by the Senate and House of Represen-*

Digitized by Google    JA2829

THE

# GRANTS, CONCESSIONS,

AND

## ORIGINAL CONSTITUTIONS

OF THE PROVINCE OF

# NEW JERSEY

THE

# ACTS

Passed during the Proprietary Governments, and other
material Transactions before the Surrender
thereof to Queen Anne.

The Instrument of Surrender, and her formal Accept-
ance thereof

Lord CORNBURY's COMMISSION and Instructions Conse-
quent thereon.

Collected by some Gentlemen employed by the General Assembly.
And afterwards

Published by virtue of an Act of the Legislature of the said Province

With proper Tables alphabetically Digested, containing the prin-
cipal Matters in the Book.

---

By AARON LEAMING and JACOB SPICER.

---

PHILADELPHIA:
Printed by W. BRADFORD, Printer to the King's Most Excellent
Majesty for the Province of New Jersey.

Digitized by Google

Original from
UNIVERSITY OF WISCONSIN

8 2. 9 4 2

## NOTE TO SECOND EDITION.

THE original edition of this volume of GRANTS AND CONCESSIONS was printed by William Bradford, of Philadelphia, as the imprint states ; but the exact year is unknown.  Griffith, in his *Law Register*, vol. iv., states that it was "about 1751 or 1752," which is, perhaps, as nearly correct as can now be ascertained. It is the second, in order, of the compilations of the laws of New Jersey—the first being *Kinsey's Acts*, of 1732.

In reprinting the original GRANTS AND CONCESSIONS, copies of which have become scarce, we have endeavored to make the work an exact duplicate of the Bradford edition in the paging, spelling and punctuation.  In a few instances, errors clearly typographical, as misplacement of letters, have been corrected ; but the unique and inconsonant spelling, and the equally curious punctuation, have been, as a rule, strictly maintained.  The only perceptible difference is in capitalization and italicizing.  It was thought unnecessary and unwise to follow the original in these respects, because of the greater difficulty in reading the text, and because no one, in any printed quotations from such old works, at this day, would retain those particular typographical oddities.

It is true the original edition had, as is believed, some slight errors in it, which were the fault of the transcribers from the English or Colonial records, or of the printer, or both ; but these we have not undertaken to correct, inasmuch as only a comparison of every word with the ancient documents themselves (could they be found) would enable one to discover wherein the 1752 edition was at fault. This no person is likely ever to undertake : and the utmost that will be expected of the present publishers is, that this edition shall conform to that of 1752.

HONEYMAN & COMPANY.

SOMERVILLE, N. J., July, 1881.

STEAM PRINT OF
THE SOMERSET GAZETTE,
SOMERVILLE, N. J.

RECEIVED

SEP 1  1894

WIS. HIST. SOCIETY.

Digitized by Google

Original from
UNIVERSITY OF WISCONSIN

JA2831

ny persons as they shall think fit, not exceeding seven, to make orders from time to time, such as may be suitable and beneficial for every town, village, hamlet, or neighbourhood, for preventing all harms by swine, in town, meadows, pastures and gardens, in any respect, and to impose penalties according to their best discretions.

### Chap. VIII.

## An Act appointing some new Commissioners of the Highways.

WHEREAS there was an act made in the year 1682, for the county of Monmouth, to enable Col. Lewis Morris, John Bound, and Joseph Parker, to lay out highways, passages, ferry's, and making bridges and such like; there being three of those persons disenabled for the true performance of the said services, *be it therefore enacted* by the Governor, Council and Deputies now met and assembled, and by the authority of the same, that John Frogmerton, John Slocame, and Nicholas Brown, in the stead and room of Col. Lewis Morris, John Bound, and Joseph Parker, be made capable and hereby invested with the same power to all intents and purposes in the said premises, as the aforesaid Col. Lewis Morris, John Bound, and Joseph Parker, were by the said acts.

### Chap. IX.

## An Act against wearing Swords, &c.

WHEREAS there hath been great complaint by the inhabitants of this Province, that several persons wearing swords, daggers, pistols, dirks, stilladoes, skeines, or any other unusual or unlawful weapons, by reason of which several persons in this Province, receive great abuses, and put in great fear and quarrels, and challenges made, to the great abuse of the inhabitants of this Province. *Be it therefore enacted* by the Governor, and Council, and Deputies now met in General Assembly, and by authority of the same, that no person or persons within this Province, presume to send any challenge in writing, by word of mouth,

19

Digitized by Google        Original from
UNIVERSITY OF WISCONSIN

## 290     Laws passed in 1686.

or message, to any person to fight, upon pain of being imprisoned during the space of six months, without bail or mainprize, and forfeit ten pounds; and whosoever shall except of such challenge, and not discover the same to the Governor, or some publick officer of the peace, shall forfeit the sum of ten pounds; the one moiety of the said forfeiture to be paid unto the Treasurer for the time being, for the public use of the Province, and the other moiety to such person or persons as shall discover the same, and make proof thereof in any court of record within this Province, to be recovered by the usual action of debt, in any of the said courts. *And be it further enacted* by the authority aforesaid, that no person or persons after publication hereof, shall presume privately to wear any pocket pistol, skeines, stilladers, daggers or dirks, or other unusual or unlawful weapons within this Province, upon penalty for the first offence five pounds, and to be committed by any justice of the peace, his warrant before whom proof thereof shall be made, who is hereby authorized to enquire of and proceed in the same, and keep in custody till he hath paid the said five pounds, one half to the public treasury for the use of this Province, and the other half to the informer: And if such person shall again offend against this law, he shall be in like manner committed (upon proof thereof before any justice of the peace) to the common gaol, there to remain till the next sessions, and upon conviction thereof by verdict of twelve men, shall receive judgment to be in prison six month, and pay ten pounds for the use aforesaid. *And be it further enacted* by the authority aforesaid, that no planter shall ride or go armed with sword, pistol, or dagger, upon the penalty of five pounds, to be levied as aforesaid, excepting all officers, civil and military, and soldiers while in actual service, as also all strangers, travelling upon their lawful occasions thro' this Province, behaving themselves peaceably.

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RONALD KOONS, *et al.* | ) | Civil Action No. 1:22-cv-07464-RMB-AMD |
| *Plaintiffs* | ) | |
| v. | ) | **CIVIL ACTION** |
| WILLIAM REYNOLDS, *et al.* | ) | **(ELECTRONICALLY FILED)** |
| *Defendants* | ) | |
| ------------------------------------------------- | ) | **CONSOLIDATED ACTIONS** |
| AARON SIEGEL, *et al.* | ) | |
| *Plaintiffs,* | ) | |
| v. | ) | |
| MATTHEW PLATKIN, *et al.* | ) | |
| *Defendants.* | ) | |

## SECOND SUPPLEMENTAL DECLARATION OF JASON COOK IN FURTHER SUPPORT OF SIEGEL PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

1.      I, Jason Cook, am a plaintiff in the above-titled action.  I am over the age of 18, have personal knowledge of the facts and events referred to in this Declaration, and am competent to testify to the matters stated below.

2.      I own my own home, and I have homeowners insurance. The coverage limit on my policy for personal liability is $100,000.  Accordingly, in order to comply with the insurance requirement of Chapter 131 Section 4, I will be required to purchase additional insurance in order to exercise my right to carry a handgun for personal protection, and I do not wish to buy more insurance.

3.      Further, as I indicated in both of my previous declarations, I like to visit movie sets on location.

4.      According to an article from February 17, 2023 on NJ.1015.com, "Joker 2" will be filming on location in New Jersey in late March 2023. The article notes "It looks like New Jersey will be standing in for Gotham City again." *See* https://nj1015.com/parts-of-the-joker-sequel-will-be-shot-in-new-jersey/?utm_source=tsmclip&utm_medium=referral (last visited February 24, 2023).

5.      I will be researching to see where the filming will be taking place so I can go there and watch. According to the article, Newark and Jersey City may be the places to start my research. *Id*.

7.      I would carry my handgun at these filming locations, but I will refrain from doing so because of Chapter 131 Section 7(a)(23), as I fear arrest and prosecution.

I declare under penalty of perjury that the foregoing is true and correct.

Executed within the United States.

_____
Jason Cook

2/24/2023_____
Date

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RONALD KOONS, *et al.* ) | Civil Action No. 1:22-cv-07464- |
| ) | RMB-AMD |
| *Plaintiffs* ) | |
| ) | |
| v. ) | **CIVIL ACTION** |
| ) | |
| WILLIAM REYNOLDS, *et al.* ) | **(ELECTRONICALLY FILED)** |
| ) | |
| *Defendants* ) | |
| ) | |
| ---------------------------------------------- ) | **CONSOLIDATED ACTIONS** |
| ) | |
| AARON SIEGEL, *et al.* ) | |
| ) | |
| *Plaintiffs,* ) | |
| ) | |
| v. ) | |
| ) | |
| MATTHEW PLATKIN, *et al.* ) | |
| ) | |
| *Defendants.* ) | |

## SUPPLEMENTAL DECLARATION OF NICOLE CUOZZO IN FURTHER SUPPORT OF SIEGEL PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

1.      I, Nicole Cuozzo, am a plaintiff in the above-titled action.  I am over the age of 18, have personal knowledge of the facts and events referred to in this Declaration, and am competent to testify to the matters stated below.

2.      I have a renters insurance policy. The coverage limit on my policy for personal liability is $100,000.  Accordingly, in order to comply with the insurance

requirement of Chapter 131 Section 4, I will be required to purchase additional insurance in order to exercise my right to carry a handgun for personal protection, and I do not wish to buy more insurance.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States.

Nicole Cuozzo                          2/24/2023
                                       Date

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

RONALD KOONS, *et al.*        )
                            )
            *Plaintiffs*    )
                            )
  v.                      )
                            )
WILLIAM REYNOLDS, *et al.*    )
                            )
           *Defendants*   )
                            )
-------------------------------------------------- )
                            )
AARON SIEGEL, *et al.*        )
                            )
           *Plaintiffs,*   )
                            )
  v.                      )
                            )
MATTHEW PLATKIN, *et al.*    )
                            )
           *Defendants.*   )

Civil Action No. 1:22-cv-07464-RMB-AMD

**CIVIL ACTION**

**(ELECTRONICALLY FILED)**

**CONSOLIDATED ACTIONS**

## DECLARATION OF RONALD D'ANGELO IN SUPPORT OF SIEGEL PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

1.    I, Ronald D'Angelo, am a member of Plaintiff Association of New Jersey Rifle & Pistol Clubs, Inc.   I am over the age of 18, have personal knowledge of the facts and events referred to in this Declaration, and am competent to testify to the matters stated below.

2.      I own a small airplane that I keep at Monmouth Executive Airport in Wall Township, New Jersey. I fly once or twice per week among various airports in New Jersey, including but not limited to Lakewood Airport, Old Bridge Airport, Trenton Airport, Cape May/Wildwood Airport, and Atlantic City Airport. I also spend 4 or 5 days per week at Monmouth Executive Airport maintaining my plane.

3.      I am also the holder of a New Jersey permit to carry a handgun.

4.      I would carry my handgun to these airports and have it with me when I fly, but I refrain from doing so because of Chapter 131 Section 7(a)(20), as I fear arrest and prosecution.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States.

Ronald D'Angelo

2/24/2023
Date

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| AARON SIEGEL, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | No. 1:22-cv-07463-RMB-AMD |
| | : | |
| v. | : | |
| | : | **DECLARATION OF** |
| MATTHEW J. PLATKIN, *et al.*, | : | **DAVID D. JENSEN, ESQ.** |
| | : | |
| Defendants. | : | |
| | : | |
| RONALD KOONS, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | No. 1:22-cv-07464-RMB-EAP |
| | : | |
| v. | : | |
| | : | |
| MATTHEW J. PLATKIN, *et al.*, | : | |
| | : | |
| Defendants. | : | |

I, David D. Jensen, declare as follows:

1.      I am counsel for Plaintiffs in *Koons, et al. v. Platkin, et al.*, captioned above. My primary office is in the City of Beacon in Dutchess County, New York. I am over 18 years of age and am competent to testify on my own behalf. I submit this declaration to provide courtesy copies of certain historical authorities cited in Plaintiffs' briefings.

2.      Attached hereto are true and correct copies of the following documents, the numbers of which correspond to references in Plaintiffs' Reply Brief (Doc. No. 101):

| Exhibit | Document |
|---|---|
| 1 | 1777 N.J. Laws 26-36, ch. XX |
| 2 | 1780 N.J. Laws 39-54, ch. XIII |
| 3 | 1798 N.J. Laws 609-28, ch. DCCCXXII |

| Exhibit | Document |
|---------|----------|
| 4 | 1806 N.J. Laws 771-83, ch. CLVI |
| 5 | 1829 N.J. Laws 109-33, An Act for the punishment of crimes |
| 6 | Act of May 28, 1746, ch. X, Acts and Laws of Massachusetts Bay 207-08 |
| 7 | 19 Colonial Records of the State of Georgia: Part I, Statutes, Colonial and Revolutionary 137-40 |
| 8 | Digest of the Laws of Georgia 157-58 (1800) |
| 9 | 1812 Del. Laws 522-24, ch. CXCV |
| 10 | 1818 Vermont Acts & Resolves 22-65, ch. II |
| 11 | 1823 N.H. Laws 72-75, ch. XXXIV |
| 12 | 1885 N.J. Laws 52, ch. XLIV |
| 13 | 1799 N.J. Laws 561-63, ch. DCCCVI |
| 14 | 1811 N.J. Laws 300 |
| 15 | Public Laws of South Carolina 275-76 (1790) |
| 16 | Acts and Laws of the State of Connecticut 36-37 (1784) |
| 17 | Manual of the Laws of North Carolina 234-36 (1814) |
| 18 | Digest of the Laws of Georgia 428 (1800) |
| 19 | Public Laws of Rhode-Island and Providence Plantations 568 (1798) |
| 20 | 1812 Del. Laws 522-24, ch. CXCV |
| 21 | 5 Laws of the Colony of New York 11-13, ch. 1410 (1894) |

I affirm all of the foregoing statements under penalty of perjury under the laws of the United States of America.

Dated: February 27, 2023

s/ David D. Jensen
David D. Jensen

JA2842

# A C T S

### OF THE

# GENERAL ASSEMBLY

### OF THE

## STATE OF NEW-JERSEY,

At a SESSION begun at PRINCETON on the 27th Day
of *August* 1776, and continued by Adjournments.

### TO WHICH IS PREFIXED,

## T H E

# C O N S T I T U T I O N

### OF THE

# S T A T E.

BURLINGTON:
Printed by ISAAC COLLINS, M.DCC.LXXVII.

Case 1:22-cv-07464-RMB-AMD   Document 103-1   Filed 02/27/23   Page 2 of 12 PageID: 3361

## C H A P.  XX.

### An ACT *for the better regulating the Militia.*

Preamble.

WHEREAS it is at all Times of great Importance to the Safety of the State, that the Militia fhould be under proper Regulation and Government; but more efpecially fo at the prefent critical and interefting Period, in which the utmoft Exertions of a well-difciplined Militia are occafionally neceffary to defeat the Defigns of the *Britifh* Court, and to preferve and defend the Freedom and Independence of tue United States of *America*;

Lifts to be made.

Sect. 1. BE IT THEREFORE ENACTED *by the Council and General Affembly of this State, and it is hereby Enacted by the Authority of the fame,* That every Captain or Commanding Officer of a Company, who now is or hereafter fhall be duly appointed and commiffioned by the Governor, fhall, immediately after the Publication of this Act, take a Lift of all able-bodied Men, not being Slaves (except as is herein after excepted) between the Ages of fixteen and fifty Years, who refide in his Diftrict, and are capable of bearing Arms; a Copy of which Lift he fhall deliver to the Colonel or commanding Officer of the Regiment or Battalion to which he belongs.

Returns to be made.

2. THAT every Captain or commanding Officer fhall make Return of the Number of Men in his Company, their Accoutrements and Ammunition, at leaft quarterly, to the Colonel or commanding Officer of the Regiment to which he belongs; and that every Colonel or commanding Officer of a Regiment fhall make Return of the Condition of his Regiment, at leaft once in every fix Months, to the Brigadier-General of the Brigade to which he fhall belong; on Failure whereof the Captain fhall forfeit the Sum of *Thirty Shillings*, and the Colonel *Three Pounds* for each and every Offence, to be levied and appropriated in the Manner herein after directed.

Returns of the Brigades.

3. THAT each Brigadier-General fhall make Return of the Condition of his Brigade once in fix Months to the Commander in Chief of this State, under Penalty of *Ten Pounds* for each Default, to be levied and appropriated as herein after directed.

How to be equipped,

4. THAT every Perfon above directed to be enrolled fhall bear Arms, attend Mufters, and in all Things be conformable to the Rules and Orders herein after mentioned; and fhall, as foon as poffible, furnifh himfelf with a good Mufket, well fitted with a Bayonet, Steel Ramrod, Worm, Priming-wire and Brufh, a Knapfack, Canteen, twelve Flints, Cartouch-Box, and twenty-three Rounds of Cartridges fuited to his Gun, under the Forfeiture of *Five Shillings* for Want of a Mufket, and *One Shilling* for the Want of any of the other Articles; provided, that in cafe any Perfon fhall be furnifhed with a good Rifle Gun, with all its neceffary Apparatus, and a Sword, Cutlafs or Tomahawk, it fhall be accepted in Lieu of a Mufket and the Accoutrements proper thereto.

Q

5. THAT every Perfon, directed to be enrolled as aforefaid, fhall, at his

## WILLIAM LIVINGSTON, Esquire, Governor. 27

'his Place of Abode, be provided with one Pound of good merchantable *and provided.* Gun-Powder, and three Pounds of Ball fitted to the Size of his Musket or Rifle, under the Forfeiture of *Three Shillings* for Want of either.

6. THAT each whole Company of Militia do assemble, properly *Times of* accoutred as aforesaid, on the first *Monday* in every Month (except the *Muster.* Companies in the County of *Cape-May*, and those of the first Battalion of Militia in the County of *Salem*, who shall assemble, accoutred as aforesaid, on the first *Saturday* in every Month) at such Place as the Captain or commanding Officer shall direct, *That is to say*, From the Month of *October* to the Month of *April* inclusive, they shall meet at ten o'Clock in the Forenoon, and from the Month of *May* to the Month of *September* inclusive, they shall meet at two o'Clock in the Afternoon, and there shall spend the Remainder of the Day in improving themselves in military Discipline, Exercise and Knowledge; and that a general Muster or Review be had of each Regiment three Times in every Year, at such Times and Places as the Field-Officers, or a Majority of them, shall direct: But if the local Situation of the Companies, which compose any Regiment, render it inconvenient to have a regimental Review, the Field-Officers, or a Majority of them, may review such Regiment in Divisions, provided each Division be reviewed three Times in a Year.

7. THAT every Regiment be officered with a Colonel, Lieutenant- *How the Re-* Colonel, two Majors, an Adjutant and Quarter-Master, and may be *giments and* provided with a Chaplain, Surgeon and Mate; and that every Compa- *Companies* ny shall be officered with a Captain, two Lieutenants and an Ensign; *officered.* and that each Company shall appoint any Number not exceeding four Sergeants, four Corporals, one Drummer and one Fifer.

8. THAT in case any Person shall refuse or neglect to serve as a Ser- *Fines for non-* geant, Corporal, Drummer or Fifer in any Company, being thereunto *commissioned* appointed as aforesaid, he shall forfeit the Sum of *Forty Shillings*; and *Officers refus-* any Sergeant who shall neglect or refuse to warn the Company to meet *ing Duty.* when required by the Captain or commanding Officer, shall forfeit the Sum of *Three Pounds* for every such Refusal or Neglect; provided that none be appointed Sergeants or Corporals but such as have actually appeared or shall appear in Arms; Provided also, That no Person be fined more than once a Year for refusing to accept any of said Offices.

9. THAT the following Penalties be inflicted on those who do not *Penalties for* attend and obey orders on the Days appointed for general Musters or *Non-Attend-* Reviews, *to wit*, On a Colonel the Sum of *Six-Pounds*, on a Lieutenant- *ance on gene-* Colonel *Five Pounds*, on a Major *Four Pounds*, on a Captain *Three* *ral Musters.* *Pounds*, Lieutenants, Ensigns, Adjutants and Quarter-Masters *Two Pounds* each, and upon Sergeants, Corporals, Drummers, Fifers, and all Privates directed to be enrolled as aforesaid, not less than *Seven Shillings and Six-pence*, nor more than *Twenty-two Shillings and Six-pence* for each and every Default, to be assessed at the Discretion of the Field-Officers of the Regiment, or a Majority of them, due Regard being had to the Estate and Circumstances of the Delinquents; and

K                                     that

Case 1:22-cv-07464-RMB-AMD   Document 103-1   Filed 02/27/23   Page 4 of 12 PageID: 3363

that the same Penalties be inflicted on those Officers and Privates of
Companies who do not attend properly accoutred, and obey Orders on
the Times appointed for the Meeting of Companies, at the Discre-
tion of the commissioned Officers of the Company to which the Delin-
quents belong.  And if any commissioned Officer, at such Meeting of
the Company or general Review, shall misbehave or demean himself in
an unofficer-like Manner, he shall, for such Offence, be cashiered or
otherwise punished by Fine, at the Discretion of a general or regimental
Court-Martial, as the Case may require, so that such Fine exceed not
the Sum of *Ten Pounds*, and in such Case due Regard shall be had to
the Rank and Circumstances of the Offender.

**Non-commissioned Officers or Soldiers misbehaving on Duty,**

10. THAT any non-commissioned Officer or Soldier who shall, while
on Duty, be found drunk, or who shall use reproachful or abusive
Language towards any of his superior Officers, or shall quarrel him-
self, or promote any Quarrel among his Fellow-Soldiers, shall be dis-
armed by the Captain or commanding Officer at the Head of the Com-
pany, be turned out of the Ranks for that Day, and be fined by the
said Captain or commanding Officer in any Sum not more than *Twenty
Shillings*; and, if necessary, shall be put under Guard during the Time
the Company shall continue under Arms, but no longer.

**or appearing with bad Arms or Accoutrements.**

11. THAT any non-commissioned Officer or Soldier who shall, on
the Day appointed for the Meeting of the Company, or of a general
Review, appear with his Arms or Accoutrements in an Order or
Condition unfit for Service, shall be fined by the Captain or command-
ing Officer, in any Sum not less than *One Shilling*, nor more than *Five
Shillings*.

**Non-Attendance in due Season.**

12. THAT any non-commissioned Officer or Soldier, who shall not
attend in due Season on the Day appointed for the Meeting of the
Company, or of a general Review, shall, in the first Case, be fined by
the Captain or commanding Officer in any Sum not exceeding *Ten
Shillings*; and, in the second Case, in any Sum not exceeding *Twenty
Shillings*.

**Persons unable to purchase Arms and Accoutrements, when to be exempted.**

13. THAT any Person who, by a Majority of the commissioned Of-
ficers of the Company to which he belongs, shall be deemed unable
to purchase the Arms, Accoutrements and Ammunition afore-menti-
oned, shall be exempted from the Payment of Fines, on appearing at
the Time of Meeting or Review, without the necessary Equipment,
until the same be provided for him.

**Fines of Infants and Servants.**

14. THAT the Fines of young Men living with their Masters, Mis-
tresses, or Parents, who are above the Age of fixteen Years, and under
that of twenty-one, and of white Servants who shall neglect or refuse
to do the Duties enjoined by this Act, shall be levied on the Estates of
the Masters, Mistresses, or Parents.

**Lists of Delinquents, when and how to be transmitted.**

15. THAT the Field-Officers, once in every six Months, and the Cap-
tains and Subalterns, once in every two Months, do transmit a List of
Delinquents in their respective Departments, with the Fines annexed
and properly attested, to any Justice of the Peace for the County in
which

## WILLIAM LIVINGSTON, Efquire, Governor.    29

which fuch Delinquents refide. Provided always, That no fuch
Lift fhall be fo returned till two Weeks after fuch Fines fhall be awarded.

16. That the military Officers, in all Cafes where they are empow- <span>Reafonable Excufes.</span>
ered to impofe Fines on Delinquents, are hereby directed to admit rea-
fonable Excufes, and thereon to difcharge any Perfon fined from Pay-
ment of his Fine ; provided fuch Fine be not returned to the Juftice.

17. That the commanding Officer of every Regiment be and here- <span>Who are to receive Fines.</span>
by is empowered and directed to receive any Fine awarded by the Field-
Officers of the fame, and to give Receipt therefor ; and the command-
ing Officer of every Company is hereby empowered and directed to re-
ceive any Fine awarded by the Officers of the fame, and to give Receipt
therefor ; provided the Payment of fuch Fine be offered before the De-
linquent's Name be returned as aforefaid ; and fuch commanding Of-
ficer fhall, once in every fix Months, tranfmit to the County Collector
all Fines by him, and the Names of the Perfons from whom, received ;
and, in cafe of Default, fhall forfeit the Sum of *Five Pounds* ; to be
recovered by faid County Collector in any Court of Record where the
fame fhall be cognizable, the one Half for the Ufe of the Poor of the
Townfhip where the Defaulter refides, and the other Half for the Ufe
of the County Collector fo fuing for the fame, with Cofts of Suit ; and
fuch commanding Officer fhall alfo, in fuch Cafe, be fubject to an Ac-
tion of Debt, at the Suit of fuch Collector, for the Recovery of the
whole Sum by him received, with Intereft on the fame, and Cofts of Suit.

18. That in all Cafes, where the Age of any Perfon fhall be difput- <span>Age difputed.</span>
ed, fuch Perfon fhall prove his Age to the Satisfaction of a Majority of
the Officers in the Limits of whofe Company he refides.

19. That all Militia Officers fhall take an Oath or Affirmation for <span>Militia Offi-cers to be qualified.</span>
the due Performance of their Truft, with Refpect to the Affeffment of
Fines by Virtue of this Act.

20. That if any Perfon remove from the Limits of his own into <span>Perfons re-moving and Strangers coming.</span>
thofe of any other Company, he fhall be confidered as belonging to
the Company into the Limits of which he may remove, and fhall be
enrolled accordingly ; and every Perfon, between the Ages of fixteen
and fifty Years, capable of bearing Arms as aforefaid, who fhall come
from any of the neighbouring States into this State, fhall, within two
Weeks after his Arrival, be enrolled in the Company within the Li-
mits of which he may happen to refide, and thereafter in every Refpect
be deemed to be one of faid Company.

21. That all Fines, herein before impofed upon any Officer or Sol- <span>Fines, how to be levied,</span>
dier, fhall, in cafe of Refufal of Payment, be levied on the Goods and
Chattels of the Offender, by Warrant of Diftrefs from a Juftice of the
Peace, directed to the Conftable of the Townfhip or Diftrict wherein
fuch Offender fhall refide ; who fhall, at leaft five Days before the Sale,
give Notice thereof by Advertifements, in three publick Places in the
Neighbourhood.

22. That the Fines and Forfeitures aforefaid, levied by any Con- <span>and paid.</span>
ftable,

Case 1:22-cv-07464-RMB-AMD   Document 103-1   Filed 02/27/23   Page 6 of 12 PageID: 3365

ftable, fhall, when recovered, be paid to the Juftice who iffued the Warrant, who is hereby directed to pay the fame to the Collector of the Diftrict in which the Offender refides.

**Three Companies of Horfe ;** 23. AND WHEREAS light Horfe are extremely ufeful and neceffary, BE IT THEREFORE ENACTED *by the Authority aforefaid,* That three Companies of Horfe fhall be embodied in this State, and no more; that each Company fhall confift of thirty-three Privates, and be officered by a Captain, Lieutenant and Cornet, who fhall be confidered as of equal Rank with the Captains, firft Lieutenants and Enfigns of Foot Militia.

**their Regulations,** 24. THAT the Officers and Privates in every Troop fhall, in every Refpect (fave that of Equipment and Forfeiture for Want thereof) be conformable to the Regulations herein eftablifhed for the Government of the Foot Militia.

**and Accoutrements.** 25. THAT every Trooper fhall furnifh himfelf with a good Horfe, a good Bridle and Saddle, Holfters and Cafe of Piftols well fitted, a Sword or Cutlafs, a well fixed Carbine, with Belt, Swivel and Sling, and a Cartouch Box that will contain twelve Rounds of Cartridges, under the Forfeiture of *Six Pounds* for the Want of a Horfe, and of *Twenty Shillings* for the Want of a Saddle and Bridle, or Carbine, or Holfters and Cafe of Piftols, and of *Three Shillings* for the Want of any of the other Articles.

**Troopers to have Powder and Ball.** 26. THAT every Trooper fhall, at his Place of Abode, be provided with one Pound of good merchantable Gun-Powder, and three Pounds of Ball fitted to his Carbine and Piftols, under the Forfeiture of *Three Shillings* for the Want of any of the faid Articles : All which Fines and Forfeitures fhall be levied and paid in Manner aforefaid.

**Who may enlift in the Horfe.** 27. THAT no Perfon, fave fuch only as is able to furnifh himfelf with all the Accoutrements neceffary to equip a Trooper, fhall enlift in any of the faid Companies of Horfe.

**Pay and Rations of the Horfe.** 28. THAT the Horfe Militia, when in actual Employ, fhall, as a Compenfation for their perfonal Service, have the fame Pay, Rations and Allowance as the Horfe of the United States of *America* ; and, as the Horfemen furnifh themfelves with Horfes, they fhall, when in actual Service, be allowed at the Rate of *One Shilling and Six-pence* a Day over and befides the Continental Pay, as a Compenfation for the Ufe of their Horfes.

**Power of the Captain-General.** 29. THAT the Captain-General or Commander in Chief for the Time being, in cafe of Invafion, Infurrection or Alarm, or in Time of War, may, and he is hereby empowered to call into actual Service the whole Militia, or to order fuch Detachments as he fhall judge neceffary ; and on Application of the Congrefs, or the Commander in Chief of the Continental Army, it fhall and may be lawful for the Commander in Chief of this State for the Time being, with the Advice of the Legiflature when fitting, or, in their Recefs, with the Advice of the Privy Council, to order the faid Militia, or any Part thereof, to affift the Con-
tinental

JA2848

## WILLIAM LIVINGSTON, Esquire, Governor.

tinental Army in any of the neighbouring States : And that any Militia Officer, in case of sudden Alarm, may and is hereby required to assemble the Men under his Command, and to use his best Endeavours to annoy the Enemy, or to repel an Invasion, without waiting for Orders from the Commander in Chief, making Return of such his Proceedings to the Commander in Chief, or to his Brigadier-General as soon as possible.

30. THAT, in order the more effectually to secure personal Service in Times of imminent Danger, every non-commissioned Officer or Soldier, directed to be enrolled as aforesaid, who shall neglect or refuse to march when called upon on an Invasion or Alarm, or who, when the Company to which he belongs shall be convened for the Purpose of raising Levies, or detaching the Whole or Part of the Militia for the Defence of the State, or any of the neighbouring States, shall neglect or refuse to march when detached in his Turn, or to provide a fit Person to march in his Stead, shall, for each Offence, be fined at the Discretion of the Persons herein after named, and in the Manner herein after directed, in any Sum not less than *Five Pounds*, nor more than *Thirty Pounds*. *Fines of non-commissioned Officers and Soldiers for not marching.*

31. THAT every commissioned Officer, who shall neglect or refuse to march with the Battalion or Company to which he belongs, at the Time of an Invasion or Alarm, or to take his Tour of Duty when called upon, shall, if a Field-Officer, be tried by a general Court-Martial ; and, if under the Rank of a Field-Officer, be tried by a regimental Court-Martial ; and, if convicted, shall be cashiered and deemed unfit for further Service as an Officer ; and, on Certificate of such Conviction returned to the Assessor herein after mentioned, shall also, at the Discretion of the Persons herein after named, and in the Manner herein after directed, be fined in any Sum not less than *Eight Pounds*, nor more than *Forty Pounds*. *Fines and Punishment of commissioned Officers for not marching.*

32. THAT, when Part only of the Militia shall be called for, the Field-Officers of each Battalion shall ascertain the Proportion to be taken from each Company in their Battalion, observing as a Rule the Number of Men in the several Companies which compose such Battalion ; and, in such Case, the commissioned Officers of each Company shall be, and they are hereby empowered to count off such Proportion, and to determine who shall go from their Company, paying due Attention to, and keeping in View as a general Rule, the Course or Tour of Duty. *Detachments from the Militia.*

33. THAT, in order to equip as far as possible every Man who shall be detached, the commissioned Officers of every Company are hereby empowered and directed to impress and take from such of the Militia in their Company, as are not ordered into Service, a Number of Muskets with their Accoutrements, sufficient to equip those who are detached as aforesaid, giving Receipts and taking Appraisements under Oath for the same : And the Muskets and Accoutrements so at any Time taken, if lost or damaged in the Service, shall be made good by the State : PROVIDED ALWAYS, That it be in the Option of any Owner to take back his Musket or Accoutrements, and have the Damage valued by *How to equip the Detachments.*

L                                                              the

the former Appraifers, and made good, or to be paid the full Price of the fame, as afcertained by the afore-mentioned Appraifers. And the County Collector is hereby empowered and directed to pay, as the Cafe may require, the full Value of fuch Mufket and Accoutrements, or the Amount of the Damage fo as aforefaid appraifed; which faid Mufket and Accoutrements, if fully paid for, fhall be delivered to the commanding Officer of the Battalion for the Ufe of the State; and the Treafurer is hereby empowered and directed to repay the Sum fo as aforefaid advanced by fuch County Collector.

<div style="margin-left:2em">Commiffion-ed Officers to judge of Ex-cufes.</div>

34. THAT the commiffioned Officers of every Company fhall be, and they hereby are authorifed and directed to hear and adjudge of any Excufe that may be offered by any non-commiffioned Officer or Soldier of their Company, for not performing any Duty enjoined by the thir-tieth Section of this Act; and they fhall, by Advertifements, in two publick Places in the Limits of faid Company, give Notice of the Time and Place of their Meeting to hear and adjudge thereof: And the faid Officers are hereby further directed to obferve as a general Rule (although there may be fome fpecial Exceptions, of which too they are to judge) that no Excufe, fave that of Sicknefs, fhall be admitted as legal and valid for not performing any Duty enjoined by the Section laft above-mentioned; and, in order to enable faid Officers fairly and fully to decide upon any Excufe, they are hereby empowered to exa-mine on Oath, which any of them may adminifter, any Perfon touch-ing the Truth of fuch Excufe.

<div style="margin-left:2em">How the Fines are to be affeffed.</div>

35. AND WHEREAS it is highly proper and neceffary that the Fines directed to be levied in Confequence of any Violation of the thirtieth and thirty-firft Sections of this Act, fhould be in Proportion as well to the Eftate as to the military Rank of the Offenders, BE IT THEREFORE ENACTED *by the Authority aforefaid,* That the Field-Officers of every Battalion, or a Majority of them, and the commiffi-oned Officers of every Company, or a Majority of them, (as the Cafe may require) fhall, as foon as poffible, make Return of the Names of the Offenders againft the Sections laft mentioned to the Affeffor with-in whofe Diftrict fuch Offenders refide; and the faid Affeffor fhall, and he is hereby directed and empowered to call to his Affiftance any two Juftices of the Peace of the County, and, in Conjunction with them, to afcertain and affefs the Fine to be paid by every Perfon in fuch Dif-trict, who fhall have offended againft the two Sections aforefaid; ob-ferving always, neither to go above nor below the Sums mentioned therein. PROVIDED, That the Agreement of any two of the three, as to faid Affeffments, fhall be conclufive.

<div style="margin-left:2em">Affeffors Qualification.</div>

36. THAT every Affeffor, previous to his doing any Thing in the Affeffment-Way by Virtue of this Act, fhall make Oath before fome Juftice of the Peace for the County in which he refides, *That he will truly and impartially, according to the beft of his Skill and Underftanding, afcertain and affefs the Fine of every Offender agreeably to his ratable Eftate, and military Rank, and to the true Intent and Meaning of this Act.*

37. THAT every fuch Affeffor fhall, with all convenient Speed, tranf-mit to the Collector, in whofe Diftrict fuch Offenders refide, an Account of

## WILLIAM LIVINGSTON, Esquire, GOVERNOR.

of all Fines fo as aforefaid affeffed; and every fuch Collector fhall make a Demand of all fuch Fines fo tranfmitted to him, within ten Days after receiving the Account.

*Account of Fines to be tranfmitted to the Collector.*

38. THAT in cafe any Perfon fhall refufe or neglect to pay fuch Fine to the Collector when demanded, or on Notice properly given at the Place of his Abode, fuch Collector, within fifteen Days after the Demand or Notice, fhall return the Name of the Offender, with the Sum he is to pay, to any Juftice of the Peace in the County in which the Offender refides ; which Juftice is hereby empowered and directed to adminifter an Oath or Affirmation to faid Collector, that the Fine had been demanded of, or Notice thereof given to, the Offender, and thereupon to iffue his Warrant to the Conftable to raife from any Goods and Chattels of the Offender (except Arms, Accoutrements and Ammunition) by Diftrefs and Sale, after proper Advertifement as aforefaid, the Sum in which he was affeffed, with Cofts, as herein after is directed. And the Conftable is hereby required to pay the faid Sum to the Collector in whofe Diftrict the Offender refides, and the Overplus, if any, to return to the Owner.

*Mode of recovering the Fine.*

39. THAT every Conftable fhall forfeit the Sum of *Six Pounds* for Breach of any Part of the Duty enjoined on him by this Act, to be recovered by the Collector in whofe Townfhip or Diftrict he refides, in any Court of Record where the fame fhall be cognizable, with Cofts of Suit, to be appropriated the one Half to the Ufe of the Poor of the faid Townfhip or Diftrict, and the other Half to the Ufe of the Collector fo fuing for the fame : And in cafe any Collector fhall knowingly conceal the Affair, or neglect to fue the Conftable offending as aforefaid, for the Space of ten Days after receiving Notice of fuch Offence, or fhall any otherwife commit a Breach of the Duty enjoined him by this Act, he fhall forfeit the Sum of *Six Pounds* for every Offence, to be recovered by any Perfon who will fue for the fame ; the one Half for the Ufe of the Poor of the Townfhip or Diftrict in which the Collector refides, and the other Half, with Cofts of Suit, for the Ufe of the Perfon fuing.

*Conftables Forfeiture.*

40. THAT any Juftice of the Peace, who fhall neglect or refufe to perform any Act or Duty hereby enjoined on him, fhall forfeit for each Offence the Sum of *Twelve Pounds;* to be recovered by any Perfon who will fue for the fame, of which the one Half fhall be paid to the Overfeer of the Poor, in whofe Townfhip or Diftrict the Offender refides, for the Ufe of the Poor in faid Diftrict ; and the other Half, with Cofts of Suit, to the Perfon fuing for the fame.

*Juftices Forfeiture.*

41. PROVIDED ALWAYS, That any Perfon, who fhall think himfelf aggrieved by any fuch Affeffment, may, on Payment of the fame, and at any Time within the Space of ten Days after Demand or Notice thereof as aforefaid, appeal therefrom to the next, but no other, Court of General Quarter Seffions of the Peace for the County ; which Court is hereby empowered to decide thereon, and faid Decifion fhall be conclufive.

*Appeal.*

42. THAT the Affeffors fhall have and receive the Sum of *One Shilling*

34        STATE of *NEW-JERSEY*, 1777.

**Assessors and Collectors Fees.** *ling* for every Fine, as a Compensation for their Trouble in Assessing ; and the Collector shall receive *Four-pence* in the *Pound* for collecting the Fines herein directed to be by them assessed and collected ; except the County Collectors, who shall have only *Two-pence* in the *Pound* allowed them.

**Justices Fees.** 43. THAT the Justice shall receive the Sum of *One Shilling* for every Warrant of Distress issued for military Default, the same to be levied, with the Penalty, on the Estate of the Offender.

**Constables Fees.** 44. THAT every Constable shall levy upon the Estate of each Offender, mentioned in the Warrant to him directed, the following Sums, over and besides the Penalties laid in the Warrant, as a Compensation for his Trouble, *to wit*, For every non-commissioned Officer and Soldier the Sum of *One Shilling and Six-pence*, and for every Field-Officer, Captain, Lieutenant, Ensign, Adjutant, and Quarter-Master, the Sum of *Two Shillings and Six-pence.*

**Town Collectors to pay the County Collectors.** 45. THAT every Town Collector shall, once in six Months, pay the Collector of the County in which he resides, the Sum of Money he may collect and receive by Virtue of the Directions of this Act ; and any such Collector, who shall neglect or refuse to pay all such Sums to the County Collector in Manner aforesaid, shall, besides the Penalty before mentioned for the Breach of Duty, be subject to an Action of Debt, at the Suit of such County Collector, for the Recovery of the whole Sum by him received, with Interest on the same, and Costs of Suit. And that the County Collectors pay to the Captains of each Company as much Money out of the Fines paid into his Hands, as the Field-Officers of each Battalion, in Conjunction with the Justices and Assessor herein before mentioned, or a Majority of them, shall judge necessary to be expended for the instructing Drummers and Fifers in the respective Companies ; which Adjudication, with the Captain's Receipt thereon, shall be a Discharge for so much of the publick Money to the said Collector.

**County Collector to pay the Treasurer annually.** 46. THAT every County Collector shall annually pay to the Treasurer of this State the Sums of Money he shall receive from the Township Collectors as aforesaid, except so much as shall have been adjudged to be expended for the Instruction of Drummers and Fifers as aforesaid ; and any County Collector, who shall neglect or refuse to pay the same, shall forfeit for every Offence the Sum of *Fifty Pounds*, to be recovered by the Treasurer in any Court of Record where the same shall be cognizable, the one Half for the Use of the State, and the other Half for the Use of the Treasurer, with Cost of Suit ; and such County Collector shall also in such Case be subject to an Action of Debt, at the Suit of the Treasurer, for Recovery of the whole Sum by him received, with Interest, and Cost of Suit.

**County Collectors to transmit Accounts to the Legislature.** 47. THAT all the County Collectors shall annually transmit to the Legislature of this State an Account of the Monies which they shall have received and transmitted to the Treasurer by Virtue of the Directions of this Act.

48. THAT

## WILLIAM LIVINGSTON, Esquire, Governor. 35

48. THAT the Foot Militia, when in actual Service, shall have the same Pay, Rations and Allowance, as the Forces of the United States of *America*.

*Pay and Rations of the Foot Militia.*

49. THAT no Process whatever, unless in Behalf of the State, shall be served on any Officer or Soldier, who shall appear and obey Orders on the Day and at the Place appointed for any private or general Muster ; or while in actual Service ; or in going to or returning from such Place of Muster or Service.

*Officers and Soldiers, when exempted from Process.*

50. THAT no Officer or Soldier, in going to or returning from his Place of Training, shall pay more than one third Ferriage ; and any Ferryman refusing to ferry at that Rate shall forfeit the Sum of *Twenty Shillings*, the one Half to the Prosecutor with Costs of Suit, and the other Half to the Use of the Poor of the Township or Precinct where such Ferry is kept ; and every Officer and Soldier shall pass free over Toll-Bridges in going to or returning from Training.

*What Exemption from Ferriages and Tolls.*

51. THAT Offenders shall, in all Cases, be committed to Gaol when Effects cannot be found whereon to levy Execution.

*Where Offenders are to be committed to Gaol.*

52. THAT the Militia, as well Horse as Foot, shall, when in actual Service, be subject to Courts-Martial, and be under the same Regulations, as the Troops of the United States of *America*. Provided, That the Militia of this State shall be tried by their own Officers only ; and provided also, that the Pains and Penalties imposed by a Court-Martial shall not extend to the taking of Life or Member, or to the Infliction of any corporal Punishment, unless in the Cases following, to wit, *Any Officer or Soldier, who shall hold a treacherous Correspondence with or give Intelligence to the Enemy, or who shall desert to the Enemy, and afterwards be taken, or who shall misbehave himself before the Enemy, or shamefully abandon any Post committed to his Charge, or shall speak Words inducing others to do the like, shall suffer Death, or such other Punishment as a general or regimental Court-Martial shall direct.*

*Courts-Martial.*

53. THAT the Members of the Legislative Council and Assembly, the Delegates of the Honourable Congress for this State, the Attorney-General, the Secretary and Treasurer of this State, the Judges and Justices of the Supreme and Inferior Courts and Courts of Admiralty, the Clerks of the Council and Assembly, the Clerks of the Courts of Record, the Governor's private Secretary, the Ministers of the Gospel of every Denomination, the President, Professors and Tutors of Colleges, the Sheriffs and Coroners of this State, one Constable for each Township, to be selected by the Court of Quarter-Sessions, in case neither Constable in the Township shall be exempted by Age, and Ferrymen, *That is to say,* Two for each publick Ferry on the *Delaware* below the Falls at *Trenton,* and one for every other publick Ferry in this State, shall be, and they hereby are exempt from military Duty.

*Exceptions.*

54. THAT nothing in this Act contained shall be construed to oblige the Men, not exceeding ten in Number, employed at the Salt Works erected by Doctor *Samuel Bard,* and exempted by an Ordinance of the Convention of this State, to do any military Duty during the Continuance of this Act.

*Ten Men at Dr. Bard's Salt Works exempted.*

M                                    55. AND

36          STATE of *NEW-JERSEY*, 1777.

*Persons exempted to pay a Tax.* 55. AND WHEREAS it is highly reasonable that the Burden of the publick Service should be laid as equal as possible on all the Inhabitants: AND WHEREAS every Principle of Justice and civil Society requires, that all such as are exempted from actual Service in the Militia should, in a pecuniary Way, contribute their just Proportion towards the Defence and Preservation of the Government, under which they claim, and are entitled to receive, Protection; BE IT THEREFORE ENACTED *by the Authority aforesaid*, That upon and out of the Estates, Real and Personal, of such Persons within this State as are of the Age of fifty Years and upwards, and are exempted from military Service on the Score of Age, and of such as are between the Ages of sixteen and fifty Years, and are exempted on the Score of Inability of Body, and of such as are exempted on the Score of Profession, or Office, or otherwise, there shall yearly and every Year, during the Continuance of this Act, be assessed, levied, and collected, over and besides all other Taxes, a Rate or Tax to the same Amount, in the same Proportion, and in the same Manner, as such Persons and their Estates would be rated and assessed at in Taxes for the Sinking Fund, in such Year when the Sum of *Fifteen Thousand Pounds* was directed to be raised in this State, and in every Respect agreeably to and under the same Penalties as are expressed in an Act, entitled, *An Act to settle the Quotas of the several Counties in this Colony, for the levying Taxes*, and passed the sixth Day of *December*, in the Year of our Lord One Thousand Seven Hundred and Sixty-nine. PROVIDED ALWAYS, That every Person, exempted as aforesaid from actual Service in the Militia, who shall, at his own Expence, fit out any one or more Son or Sons, under Age, and living in his Service, Apprentice or Apprentices, Servant or Servants, and keep him or them properly equipped and accoutred as by this Act is required, shall, for every Son, Apprentice or Servant, so kept equipped and accoutred as aforesaid, be entitled to a Deduction of one Third Part of the said Tax; and if he shall so fit out and keep equipped and accoutred three or more Sons, Apprentices and Servants, he shall not be subject to the Payment of any such Tax.

*Fund for Relief of disabled Soldiers, and of Widows and Children.* 56. THAT the Money, arising from the Fines aforesaid, and from the Taxation of Exempts, and directed to be deposited in the State Treasury, shall be set a part and appropriated, as a Fund, for the Relief and Benefit of such Soldiers, as may be wounded or disabled, and of the Widows and Children of such as may lose their Lives in the Service of this State, in Proportion to their respective Necessities, and to such other Purposes as the Legislature shall direct.

*Former Militia Laws repealed.* 57. THAT all Laws made by any former Legislature of this State, and Ordinances of any Congress or Convention, for regulating the Militia, or in anywise respecting the same, shall be, and they are hereby repealed and made void.

*Continuance.* 58. THAT this Act shall continue in Force for the Space of one Year, and from thence to the End of the next Sitting of General Assembly, and no longer.

*Passed at* Haddonfield, March 15, 1777.

C H A P.

# A C T S

## OF THE FIFTH

# GENERAL ASSEMBLY

## OF THE

## S T A T E

## OF

# *N E W - J E R S E Y,*

At a SESSION begun at TRENTON on the 24th Day of *October,* 1780, and continued by Adjournments.

---

## T R E N T O N:

Printed by ISAAC COLLINS, Printer to the State.

M.DCC.LXXXI.

JA2855

In the County of *Gloucester,* Bodo Otto, jun. Esquire.
In the County of *Salem,* the Reverend *William Schenck.*
In the County of *Cape-May,* Henry-Young Townsend, Esquire.
In the County of *Hunterdon, Nathaniel Hunt,* Esquire.
In the County of *Morris,* Colonel *Ellis Cook.*
In the County of *Cumberland, Joel Fithian,* Esquire.
In the County of *Sussex,* Edward Dunlap.

And the said Agents shall keep their Offices open until the first Day of *December* next ensuing, and no longer; and in case any of the Persons aforesaid shall neglect or refuse to accept the Appointment, or remove out of the County after the Acceptance thereof, or by Death or by Disability should be rendered incapable of exercising the Office aforesaid, it shall and may be lawful for the Representatives of the County, or a Majority of them, wherein such Vacancy shall happen, as soon as convenient after their Knowledge thereof, to supply the Vacancy, and report their Appointment to the Treasurer as soon as possible; and the Person so appointed shall be vested with the same Powers, perform the like Duties, and be entitled to equal Rewards with those appointed to that Service in this Act, as though he had been named therein.

*Vacancies, how to be supplied.*

5. AND BE IT FURTHER ENACTED, That the Certificates for Money borrowed on the Faith of this State, as pledged in and by Virtue of this Act, shall be given payable in three Years from their Date, bearing an Interest of *Seven per Centum per Annum,* and that the said Certificates shall not be subjected to the Imposition of any Tax or Taxes. And each and every of the Agents acting by Virtue of this Act, shall be entitled to retain in their Hands *One per Centum* for their Trouble, on all Money they may borrow and pay, agreeably to the Directions of this Act.

*Certificates to be payable in three years, and bear an Interest of Seven per Cent.*

*Passed at Trenton, January 8, 1781.*

## C H A P. XIII.

*An* A C T *for the regulating, training, and arraying of the Militia, and for providing more effectually for the Defence and Security of the State.*

WHEREAS the several Laws heretofore made for the Government of the Militia, and for the Purpose of directing the internal Force of the State to the Preservation and Safety of the same, have been found inadequate to these important Purposes, and have become, from their Number and Diversity, difficult to be understood and executed; Therefore,

*Preamble.*

*Sect.* 1. BE IT ENACTED *by the Council and General Assembly of this State, and it is hereby Enacted by the Authority of the same,* That from and after the Publication of this Act, the Militia of this State shall be divided into three Brigades, as follows: The Militia of the Counties of *Bergen, Essex, Morris, Sussex,* and of those Parts of the Counties of *Middlesex* and *Somerset* lying on the Northern and Eastern Side of *Raritan* River, and of the South Branch of the same, shall compose the upper Brigade; the Militia of the Counties of *Monmouth, Hunterdon* and *Burlington,* and

*Militia, how to be divided.*

Case 1:22-cv-07464-RMB-AMD   Document 103-2   Filed 02/27/23   Page 3 of 17 PageID: 3374

and of those Parts of the Counties of *Middlesex* and *Somerset* lying on the Southern and Western Side of the said River *Raritan*, and of the South Branch of the same, shall compose the middle Brigade; and the Militia of the Counties of *Gloucester*, *Salem*, *Cape-May* and *Cumberland*, shall compose the lower Brigade.

*Brigades, by whom to be commanded.*

2. AND BE IT FURTHER ENACTED, That each Brigade shall be commanded by a Brigadier or Colonel Commandant, who shall be the eldest Colonel, and if there is no Colonel, the eldest Lieutenant-Colonel of the Regiments which compose the Brigade, to be determined by the Date of their several Commissions; which Brigadiers, Colonels, or Lieutenant-Colonels Commandant, shall be empowered to appoint a Major of Brigade, to rank as Major of the Militia, and receive Pay on the Certificate of his Brigadier, Colonel or Lieutenant-Colonel Commandant.

*Regiments, how to be officered.*

3. AND BE IT FURTHER ENACTED, That each Regiment or Battalion shall be officered with one Lieutenant-Colonel (except where a Colonel is already appointed) and one Major; and also with an Adjutant, who shall be taken from the Line, and rank as First Lieutenant, and when in Service be entitled to the Pay and Rations of a Captain; one Quartermaster, who shall also be taken from the Line, rank with Lieutenants, and receive like Pay and Rations when in Service; and when Circumstances will admit, a Surgeon; which Regimental Staff-Officers shall be appointed by the Field Officers or a Majority of them; and the Commanding Officer of each Regiment or Battalion shall appoint a Sergeant-Major. PROVIDED ALWAYS, That where two Majors have been heretofore appointed and commissioned in any Regiment or Battalion both shall be continued, but Vacancies happening in the Office of Second Major, shall not hereafter be supplied.

*Proviso.*

*Treasurer to be appointed to each Regiment.*

4. AND BE IT FURTHER ENACTED, That the Field Officers of each Regiment or Battalion within this State, in Conjunction with the commissioned Officers of the several Companies of their respective Regiments or Battalions, shall, immediately after the Publication of this Act, appoint one reputable Freeholder, not a Military Officer, within the District of their Regiment or Battalion, to act as Treasurer to the same; who, on Notification of his Appointment, shall repair to some Justice of the Peace and take an Oath for the due Performance of his Office, whose Duty it shall be to receive all the Monies arising from the Fines and Forfeitures directed to be raised or imposed by Virtue of this Act, and not otherwise disposed of, and to pay such Draughts as may be made from Time to Time by the Commanding Officer of the Regiment or Battalion, or of the several Companies which compose the Regiment or Battalion to which he belongs. PROVIDED NEVERTHE-LESS, That the County of *Monmouth* shall, on Account of its present Circumstances, have one common Treasurer to the three Regiments within the same, to be appointed by a Majority of the Officers of the said Regiments jointly, whose Duties, Powers, and Compensation shall be the same in all Cases respecting the said three Regiments with those of the Treasurer of any particular Regiment appointed as aforesaid, excepting that he shall not discharge the Draught of either of the Commanding Officers of the said Regiments to any other Amount than in Proportion to the usual Numbers who turn out from the said Regiments respectively,

*Proviso.*

respectively, in the Military Service of their Country, a Return of which Numbers shall be by the Officers appointing the Treasurer as aforesaid, the said Treasurer from Time to Time, as Occasion may require.

5. AND BE IT ENACTED, That the Regimental Treasurer for the Time being, shall keep proper and distinct Accounts of the Monies arising from the Fines and Forfeitures of the Field and Staff-Officers, and of the Officers and Privates of each Company which compose the Regiment, entered separately in a Book kept by him for that Purpose, keeping proper Vouchers for all Sums of Money he may pay out on the Draughts of the Officers aforesaid, and render an Account of the Monies received and paid out as aforesaid every six Months, to the Board of Officers appointed for that Purpose; and the said Treasurer shall be entitled to *One per Centum* for all Monies he may receive or pay out. *Regimental Treasurers to keep and render Accounts. Wages.*

6. AND BE IT ENACTED, That the Field and other commissioned Officers of each Regiment or Battalion are hereby constituted a Board, vested with full Authority to examine and adjust the Accounts of the Regimental Treasurer, and are hereby required to meet once in six Months for that Purpose, at some Time and Place, of which all Parties shall be timely notified; and in case of Mal-practice, Embezzlement, or any sufficient Default, the said Board of Officers are required to displace the said Treasurer and appoint another in his Room; which Successor in Office is hereby authorized and empowered to prosecute the Defaulter for any Sum or Sums of Money remaining in his Hands belonging to the Regiment, in any Court where the same may be cognizable, with Costs of Suit. *Field and Commission Officers, a Board to examine Accounts.*

7. AND BE IT FURTHER ENACTED, That each Company shall be officered with a Captain, a Lieutenant, and an Ensign, and also with four Sergeants and four Corporals, to be elected by the Companies respectively; and the commissioned Officers shall appoint for the same a Drummer and a Fifer; and in case of any Vacancy or Vacancies happening amongst the commissioned Officers of any Company, the Captain or Commanding Officer of the same shall, within thirty Days thereafter, call his Company together, and the Officers and Privates, when met, shall appoint a Clerk to manage the Election, and certify the same when made, and by Plurality of Voices elect such Officer or Officers as may be wanting; and in case no commissioned Officer should remain in any Company, the Commanding Officer of the Regiment or Battalion shall in the same Time, by Advertisements set up in at least three of the most publick Places within the Bounds of the said Company, call them together for the Purpose aforesaid, and himself attend to direct and regulate the Election. PROVIDED ALWAYS, That where two Lieutenants have been heretofore appointed and commissioned in any Company, both shall be continued, but Vacancies happening in the Office of Second Lieutenant shall not hereafter be supplied. *Companies, how to be officered; and Vacancies supplied; Proviso.*

8. AND BE IT FURTHER ENACTED, That all Vacancies happening among the non-commissioned Officers of any Company shall be supplied as often as necessary by such Company when assembled for training, and if the Company refuse to choose such non-commissioned Officers, they shall be appointed by the commissioned Officers of the Company; and if any Person refuse to act as a Sergeant, Corporal, Drummer *Vacancies in the non-commissioned Officers, &c. and Penalty for refusing to act as one.*

L

JA2858

**42**      ACTS OF THE GENERAL ASSEMBLY

*Provifo.*

mer or Fifer, when duly elected or appointed for that Purpofe, he fhall be fined the Sum of *Three Pounds*, to be recovered and applied as herein after is directed. PROVIDED ALWAYS, That no Perfon fhall be fined more than once in the Space of a Year for refufing to ferve in any Office to which he may be elected or appointed.

*Officers, how commiffioned, &c.*

9. AND BE IT FURTHER ENACTED, That the faid Brigade, Field, and other commiffioned Officers and Staff-Officers refpectively, fhall be commiffioned by the Governor or Commander in Chief for the Time being, upon Certificates of their due Election or Appointment from thofe who elect or appoint them refpectively, or by their Order ; and the non-commiffioned Officers of Companies fhall act under Warrants from the Captain or Commanding Officer of the Company to which they belong. PROVIDED ALWAYS, That every Officer elected as aforefaid, previous to his receiving his Commiffion, fhall take and fubfcribe

*To take the Oaths.*

the Oaths of Abjuration and Allegiance, as prefcribed in an Act, intitled, *An Act for the Security of the Government of* New-Jerfey, paffed the nineteenth Day of *September*, One Thoufand Seven Hundred and Seventy-fix, before fome Perfon authorized to adminifter the fame, which fhall be certified by the fame Perfons, and in the fame Certificate with his Election into Office ; and if any Perfon elected or appointed an Officer as aforefaid fhall neglect to take the Oaths aforefaid within thirty Days after his faid Election or Appointment, his Office fhall be deemed vacant, and a new Choice be made.

*Captains to keep Lifts.*

10. AND BE IT ENACTED, That the Captain or Commanding Officer of each Company fhall keep a true and perfect Lift or Roll of all effective Men between the Ages of fixteen and fifty Years, refiding within

*Exemptions.*

the Diftrict of fuch Company. PROVIDED ALWAYS, That the Delegates reprefenting this State in the Congrefs of the United States, the Members of the Legiflative-Council and General Affembly, the Judges and Juftices of the Supreme and Inferior Courts, the Judge of the Court of Admiralty, the Attorney-General, the Secretary, the Treafurer, the Auditor of Accounts, the Clerks of the Council and General Affembly, the Clerks of the Courts of Record, the Governor's private Secretary, the Superintendant of Purchafes, the County Contractors, Poftmafters, Minifters of the Gofpel of every Denomination, the Prefident, the Profeffors and Tutors of Colleges, Sheriffs, Coroners, one Conftable for each Townfhip, to be determined by the Court of Quarter Seffions of the County, two Ferrymen for each publick Ferry on the *Delaware* below the Falls at *Trenton*, and one for every other publick Ferry in this State, Slaves, and every Perfon exempted by any particular Law of this State, fhall not be borne on any fuch Lifts or Rolls, or be fubject to Military Duty.

*Arms and Accoutrements to be procured by each Man.*

11. AND BE IT ENACTED, That every Perfon enrolled as aforefaid fhall conftantly keep himfelf furnifhed with a good Mufket well fitted with a Bayonet, a Worm, a Cartridge-Box, twenty-three Rounds of Cartridges fized to his Mufket, a Priming-Wire, Brufh, fix Flints, a

*Penalty on Neglect.*

Knapfack and Canteen, under the Forfeiture of *Seven Shillings and Sixpence* for Want of a Mufket, and *One Shilling* for Want of any other of the aforefaid Articles, whenever called out to Training or Service ; to

*Provifo.*

be recovered and applied as herein after is directed. PROVIDED ALWAYS, That if any Perfon be furnifhed as aforefaid with a good Rifle-

Gun,

Gun, the Apparatus neceſſary for the ſame, and a Tomahawk, it ſhall be accepted in Lieu of the Muſket and the Bayonet and other Articles belonging thereto.

12. AND BE IT ENACTED, That each Perſon enrolled as aforeſaid, ſhall alſo keep at his Place of Abode one Pound of good merchantable Gunpowder, and three Pounds of Ball fixed to his Muſket or Rifle, and for Want of either ſhall forfeit the Sum of *Three Shillings,* to be recovered and applied as herein after is directed. PROVIDED ALWAYS, That if any Perſon enrolled as aforeſaid ſhall, by a Majority of the commiſſioned Officers of the Company to which he may belong, be deemed and adjudged unable to purchaſe the Arms, Accoutrements, and Ammunition above ſpecified, he ſhall be exempted from the Forfeiture for any Deficiency therein until he can procure them, or they are provided for him.  *Ammunition to be kept by each Man. Proviſo.*

13. AND BE IT FURTHER ENACTED, That the Captain or Commanding Officer of each Company ſhall, once in every four Months, order a Sergeant to call at the Place of Abode of each Perſon enrolled as aforeſaid, for the Purpoſe of examining the State of his Arms, Accoutrements, and Ammunition, of which the Sergeant ſhall make exact report to the Officer iſſuing the Orders, and if the Captain ſhall neglect his Duty herein he ſhall forfeit *Six Pounds;* and if any Sergeant ſhall neglect his Duty in this Reſpect he ſhall forfeit and pay for each Offence the Sum of *Three Pounds,* to be recovered and applied as herein after is directed; and for this Service he ſhall receive the Sum of *Three Shillings and Nine-pence* for each Day he ſhall be neceſſarily engaged therein, to be paid by the Treaſurer of the Regiment, on an Order from the Captain or Commanding Officer of the Company, certifying the Number of Days the Sergeant was on the Duty, the Treaſurer taking the Sergeant's Receipt on the Back of the Order for the ſame.  *Sergeants to examine and report State of Arms, &c. Penalty for Neglect. Wages for this Service.*

14. AND BE IT FURTHER ENACTED, That each Company ſhall aſſemble, properly armed and accoutred, not later than ten o'Clock in the Forenoon of the firſt *Monday* in the Months of *April* and *September* every Year, at ſuch Place as the Commanding Officer of the Company ſhall appoint, and there ſpend the Remainder of the Day in Training and Exerciſe, and that the Penalty in caſe of Abſence ſhall be as follows: On a Captain, *Three Pounds;* on a Lieutenant or Enſign, *Forty Shillings;* on a non-commiſſioned Officer or Private, any Sum not under *Five Shillings* nor more than *Forty Shillings;* and in due Proportion for attending later than the Hour above limited.  *Days of muſtering in Companies. Penalty in caſe of Abſence.*

15. AND BE IT FURTHER ENACTED, That each Regiment or Battalion ſhall aſſemble, properly armed and accoutred, twice in a Year, *videlicet,* On the firſt *Monday* in *June* and *November,* at ſuch Hour and Place as the Field Officers, or a Majority of them, ſhall appoint, for the Purpoſe of Training and Exerciſe; and the Colonel or Commanding Officer, after parading his Regiment or Battalion, ſhall require from the Captain or Commanding Officer of each Company a Return of the commiſſioned and non-commiſſioned Officers and Privates of his Company, and a State of their Arms, Accoutrements, and Ammunition; and if the Captain or Commanding Officers of Companies ſhall neglect or refuſe to make ſuch Return, they ſhall forfeit for each Neglect or **Refuſal**  *Days of Regimental Muſters. Returns of Companies to be required and made.*

44   ACTS of the GENERAL ASSEMBLY

Forfeitures.

Refusal the Sum of *Six Pounds ;* and the Penalty in case of Absence on the Day of Regimental Training or Review shall be as follows : on a Colonel or Lieutenant-Colonel Commandant, *Ten Pounds* ; on a Lieutenant-Colonel, *Eight Pounds ;* on a Major, *Six Pounds ;* on a Captain or Adjutant, *Five Pounds ;* on a Lieutenant, Quartermaster, or Ensign, *Three Pounds ;* on non-commissioned Officers and Privates, any Sum not less than *Ten Shillings* nor more than *Three Pounds ;* and in due Proportion for attending later than the Hour specified in the Order for Meeting ; to be recovered and applied as herein after is directed. Pro-

Proviso.

VIDED ALWAYS, That if the local Situation of the Companies composing any Regiment or Battalion be such as may render it inconvenient to assemble the Whole at the same Time and Place, it shall and may be lawful for the Field Officers, or a Majority of them, to assemble such Regiment or Battalion by Parts, at different Times, and in different Places, each Part being assembled twice in a Year.

Returns of Regiments to be made and when, and Penalties for Neglect.

16. AND BE IT FURTHER ENACTED, That the Colonel or Commanding Officer of each Regiment or Battalion shall make Returns of his Regiment or Battalion, and of the State of their Arms, Accoutrements and Ammunition, in the Months of *July* and *December*, yearly, and every Year, to the Brigadier or commanding Officer of the Brigade to which such Regiment may belong, under the Penalty of *Twenty Pounds*, and shall also make Return in the said Months, of the State of the Magazines of Arms, Accoutrements and Ammunition belonging to his Regiment or Battalion, to the Keeper of the Magazine or Commissary of Military Stores of the State for the Time being, under the Pe-

Of Brigades.

nalty of *Twenty Pounds ;* and the Brigadier or Commanding Officer of each Brigade shall make Return of his Brigade to the Major-General, in the Months of *January* and *August*, every Year, under the Penalty of

Of the Whole of the Militia.

*Twenty-five Pounds ;* and the Major-General shall make Returns to the Governor or Commander in Chief of the State, in the Months of *February* and *September*, every Year, under the Penalty of *Fifty Pounds* for each Default : Which several Penalties shall be recovered from the Officer whose Duty it was to make the Return, by a Justice of the Peace of the County where the Offender may reside, at the Instance of the Officer to whom the Returns in the above Cases are directed to be made, and paid to the Treasurer of the Regiment within the Bounds of which the Offender may reside.

Officers or Privates misbehaving on Parade, how to be punished.

17. AND BE IT FURTHER ENACTED, That if any Field or other commissioned Officer, or Staff-Officer, at any Regimental Review or Company Training, or on any other Occasion, when the Regiment, Battalion or Company to which he may belong, or in which he holds Command, is paraded in Arms, shall misbehave or demean himself in an unofficer like Manner, he shall for such Offence be cashiered or punished by Fine, at the Discretion of a Brigade or Regimental Court-Martial, as the Case may require, in any Sum not exceeding *Ten Pounds ;* and if any non-commissioned Officer or Private shall on any Occasion of parading the Company to which he may belong, appear with his Arms and Accoutrements in an unfit Condition, be found drunk, disobey Orders, or shall use any abusive Language to his Officers, or any of them, or shall engage in or promote Quarrels among his Fellow-Soldiers, he shall be punished by Fine in any Sum not under *Five Shillings* nor above *Three Pounds*, or be disarmed and put under Guard, by Order of the Commanding Officer present, until the Company is dismissed.

18. AND

18. AND BE IT FURTHER ENACTED, That if the Colonel or Commanding Officer of any Regiment or Battalion, shall neglect or refuse to give Orders for assembling his Regiment or Battalion, on any necessary Call of the Militia into actual Service, at the Direction of his Brigadier, Colonel or Lieutenant-Colonel Commandant of the Brigade, he shall be cashiered or punished by Fine, at the Discretion of a Brigade Court-Martial, in any Sum not exceeding *Fifty Pounds,* to be recovered and applied as herein after is directed; and if the Captain or Commanding Officer of any Company shall, on any Occasion where it may be necessary as aforesaid, neglect or refuse to give Orders for assembling his Company, at the Direction of the Colonel or Commanding Officer of the Regiment or Battalion to which such Company belongs, he shall be cashiered or punished by Fine, at the Discretion of a Regimental Court-Martial, in any Sum not exceeding *Thirty Pounds,* to be recovered and applied as herein after is directed; and if any Sergeant or Corporal shall neglect or refuse to warn the Company to which he may belong, on any Occasion when it may be necessary, agreeably to the Orders of the Captain or Commanding Officer thereof, he shall be subject to be fined in any Sum not exceeding *Five Pounds,* to be recovered and applied as herein after is directed; and every non-commissioned Officer whilst engaged in warning the Company to which he belongs, shall receive *Three Shillings and Nine-pence* by the Day, for the Time he may be necessarily engaged in said Service.

*[margin: Disobedience of Orders for assembling Militia, how to be punished.]*

*[margin: Wages for warning the Company.]*

19. AND BE IT ENACTED, That the Captain or Commanding Officer of each Company shall at all Times keep a true List of his Company, divided into eight Classes, as nearly equal as possible, and reckoned from one to eight numerically, allotting to each Class a Sergeant or a Corporal, which Classes shall perform Duty in Rotation; a Copy of which List, divided into Classes, the Captain or Commanding Officer of the Company is required to transmit to the Commanding Officer of the Regiment or Battalion, on any Occasion of making a Return of his Company.

*[margin: Companies to be classed.]*

20. AND BE IT FURTHER ENACTED, That where it is not already done, the Colonel or Commanding Officer of each Regiment or Battalion shall immediately call the Officers of the several Companies in his Regiment or Battalion together, and determine the Tour of Duty of the Captains, Lieutenants and Ensigns distinctly, and on any Call of the Militia into Service, the Commanding Officer of the Regiment or Battalion shall order out the Officers in just Rotation, proportioned to the Number of Privates who may appear to march into Service; and the Brigadier or Commanding Officer of the Brigade shall determine the Tour of Duty of the Field Officers, and when Occasion requires, shall order them into Service accordingly.

*[margin: Tour of Duty of the Officers to be determined.]*

21. AND BE IT ENACTED *by the Authority aforesaid,* That it shall and may be lawful for the Governor or Commander in Chief for the Time being, with the Consent of the Legislature when Sitting, and during their Recess with the Advice and Consent of the Privy Council, on Requisition of the Congress of the United States, or upon Application of the Commander in Chief of the Army of the United States, or of any General Officer commanding a Division or Detachment thereof, or of the Executive Power of any of the adjoining States, or on any Emergency

*[margin: Not more than Half the Militia to be ordered out of the State at the same Time.]*

M.

# 46   ACTS OF THE GENERAL ASSEMBLY

Emergency that may make the same necessary, to order into actual Service into any of the adjoining States, such and so many of the Classes of the Militia as may be necessary, not exceeding four at any one Time, to be drawn alike from the several Companies of such Regiments or Battalions as are to furnish the Detachment, to be officered accordingly.

**Governor may order out Half the Militia as Guards.**

**22.** AND BE IT FURTHER ENACTED, That it shall and may be lawful for the Governor or Commander in Chief for the Time being, to call out, station and continue by Reliefs, as a Defence to the State, within the same, such and so many Classes as may be at any Time necessary, not exceeding four, to be arrayed and officered as aforesaid. PROVIDED ALWAYS, That where not more than Half the Militia are called out and embodied, no Detachment shall be continued in Service more than one Month at the same Time.

**Proviso.**

**Governor may order out the whole Militia in case of Invasion, &c.**

**23.** AND BE IT FURTHER ENACTED, That in case of sudden Invasion, Insurrection, Sedition or Alarm by the Enemy or their Adherents, it shall and may be lawful for the Governor or Commander in Chief for the Time being, to call out and array the Whole of the Militia, or such or so many entire Regiments or Battalions situate near to the Place where the same may be required, as he may think necessary to repel the Invasion, and to restore the Peace of the State.

**In case of Invasion, &c. Officers of Regiments and Companies to assemble them.**

**24.** AND BE IT ENACTED, That it shall and may be lawful for the Captain or Commanding Officer of any Company, and he is hereby required and commanded to assemble his Company in every such Case, and oppose the Invaders or Insurgents, without waiting for Orders from the Commanding Officer of the Regiment or Battalion to which such Company belongs, and for the Colonel or Commanding Officer of any Regiment or Battalion to assemble his Regiment or Battalion for the same Purpose, without waiting for Orders from his superior Officer. PROVIDED ALWAYS, That every Officer so acting without Orders, shall make Report to his Commanding Officer of his Proceedings in due Form, as soon as possible.

**Verbal Notice sufficient.**

**25.** AND BE IT FURTHER ENACTED, That in all Cases where Notice is required to be given to the Militia by this Act, verbal Notice given to the Party himself or left at his usual Place of Abode, with any white Person of Years of Discretion belonging to the Family, by any commissioned or non-commissioned Officer of the Company, shall be deemed legal and sufficient.

**Alarm sufficient Notice in some Cases.**

**26.** AND BE IT FURTHER ENACTED, That where any Company shall be under the Necessity, on any sudden Alarm, to retire before the Enemy, and it may be dangerous or impracticable for the Captain or Commanding Officer of such Company to give regular and proper Notice to the Persons belonging to such Company to appear or march against the Enemy or their Adherents, then and in that Case such Alarm shall, without any other Notice, be sufficient Warning, and Delinquents shall be liable to Punishment accordingly.

**Officers refusing to march, how to be punished**

**27.** AND BE IT ENACTED, That if any Field or other commissioned Officer, or Staff-Officer shall neglect or refuse to serve in his proper

Case 1:22-cv-07464-RMB-AMD   Document 103-2   Filed 02/27/23   Page 10 of 17 PageID: 3381

Tour of Duty, when a Part only of the Militia is called, or to march immediately with his Regiment, Battalion or Company, when the Whole is called, he shall for each Default be tried by a Brigade or Regimental Court-Martial, as the Case may require ; and if convicted, shall be cashiered and rendered incapable of holding any Military Office for one Year, or shall be punished by Fine in any Sum not less than *Ten* nor more than *Fifty Pounds :* And if any non-commissioned Officer or Private shall neglect or refuse to serve in his Tour, or find a sufficient Substitue to serve in his Stead, to be approved by the Captain or Commanding Officer of the Company, or shall neglect or refuse to render Personal Service when the Whole of the Militia are called, he shall for each Default be fined not less than *Five* nor more than *Thirty Pounds.*

*Non-commission Officers and Privates.*

28. AND BE IT FURTHER ENACTED, That if any commissioned or non-commissioned Officer or Private at any Time when the Whole or any Detachment of the Militia are called out upon Duty, or before the Expiration of his Tour or the Discharge of his Regiment or Company, leave his Regiment or Company without a Furlough obtained of his superior Officer, if a commissioned Officer, be tried by a Court-Martial, and be cashiered and fined at their Discretion, in any Sum not exceeding *Fifty Pounds ;* and every non-commissioned Officer or Private so offending shall, for every such Offence, forfeit all the Pay or other Reward which may be due to him at the Time of his Desertion, and moreover shall be fined in any Sum not exceeding *Fifty Pounds ;* and the Commanding Officer of such Detachment is hereby strictly required and enjoined to make Return of such Officer or Private as aforesaid, to the Commanding Officer of the Regiment, Battalion or Company to which he may respectively belong, who is likewise required to proceed against him accordingly.

*Officers or Privates departing from Duty without Furlough, how to be punished.*

29. AND BE IT FURTHER ENACTED, That all Fines and Forfeitures herein before directed or imposed for the Assessment, Recovery or Application of which no special Provision is made, shall be assessed by the Officers, and recovered and applied in Manner herein after directed ; and all Officers empowered to assess Fines and Forfeitures, are likewise empowered to adjudge of and admit reasonable Excuses, in Discharge of the Whole or a Part thereof, always having strict Regard to the Rank, Condition or Estate of the Offender or Delinquent, and the Circumstances of the Offence.

*Fines, how to be assessed.*

*Reasonable Excuses to be admitted.*

30. AND BE IT FURTHER ENACTED, That the Colonel or Commanding Officer of each Regiment or Battalion shall hear and decide upon the Reasons assigned by any other Field Officer thereof punishable by Fine, provided such Reasons be offered within ten Days ; and the Field Officers of each Regiment or Battalion, or a Majority of them, shall meet at some more convenient Time, not exceeding fifteen Days after any Regimental Training or Review, or after a Call of such Regiment or any Part of such Regiment or Battalion into actual Service, if it may be necessary, of the Time and Place of which Meeting timely Notice shall be given to the Parties concerned, by the Direction of the Colonel or Commanding Officer, and shall then and there decide upon the Excuses of the Captains or Commanding Officers of Companies, and Staff-Officers ; and the Captain or Commanding Officer of each Company shall hear and determine upon the Reasons offered by any Subaltern

*How Excuses are to be decided upon.*

tern Officer thereof for Default, punishable by Fine, provided such Reasons be given within ten Days ; and the commissioned Officers of each Company, or a Majority of them, shall meet at some convenient Time, not exceeding fifteen Days after any Regimental or Company Training, or any Call of a Part or the Whole thereof into actual Service ; of the Time and Place of which Meeting due and seasonable Notice shall be given by Advertisements set up in at least three of the most publick Places within the Bounds of the Company, ten Days before such Meeting, or otherwise as the Commanding Officer may think best, and shall then and there hear and decide upon the Excuses of non-commissioned Officers and Privates. PROVIDED ALWAYS, That if by any unforeseen Circumstances, the Duties herein required cannot be performed within the Times limited, the same shall be performed as soon thereafter as Circumstances will admit.

**Proviso.**

**Fines, how to be recovered.** 31. AND BE IT FURTHER ENACTED, That when any Fine or Forfeiture is incurred by any Field Officer, other than the Commanding Officer of the Regiment, Staff-Officers, Captains or Commanding Officers of Companies by Virtue of this Act, it shall be recovered by a Warrant from the Colonel or Commanding Officer of the Regiment to which they respectively belong, directed to his Sergeant-Major ; and that when any Fines or Forfeitures are incurred by any Subaltern, non-commissioned Officer or Private, by Virtue of this Act, they shall be recovered by Warrant from the Captain or Commanding Officer of the Company to which they may belong, directed to a Sergeant or Corporal of the said Company ; which Fines and Forfeitures, in case of non-Payment on the first Demand, shall be made by Distress and Sale of the Goods and Chattels of the Offender or Offenders ; and where no Goods can be found whereon to levy, that then and in such Case the said Sergeant or Corporal shall deliver the Delinquent or Delinquents to the Sheriff of the County, or to his Gaol-Keeper, who are hereby required to receive and keep in close Custody the said Delinquent or Delinquents, until the Fines or Forfeitures be fully satisfied ; and the said Sergeant-Major, Sergeant or Corporal respectively, shall receive for each Person specified in the Warrant, on the Recovery of their respective Fines and **Fees of levying.** Forfeitures, the Sum of *Three Shillings and Nine-pence*, to be paid out of the Money arising from the Fines, if under the Direction of the twenty-seventh and twenty-eighth Sections of this Act ; if otherwise, by the Treasurer of the Regiment, on an Order from the Commanding Officer of the Regiment or Company, as Occasion may be, who is hereby required to discharge the same, and take their Receipts therefor.

**What Goods to be levied upon.** 32. AND BE IT FURTHER ENACTED, That on any Occasion where Distress may be made for any Fine or Forfeiture in Virtue of this Act, on the Goods and Chattels of any Person or Persons delinquent as aforesaid, the Sergeant or Corporal officiating in such Case, shall levy on such Goods as may be pointed out by the Delinquent, or as the said Officer may judge can be best spared, and so much only as may be sufficient to make the Amount of the said Fine, as nearly as may be, **Notice of Sale to be given.** and shall, previous to the Sale, give at least five Days Notice thereof by Advertisements set up in three of the most publick Places within the Bounds of the Company.

33. AND BE IT ENACTED, That the Fines and Forfeitures of the

Colonel or Commanding Officer of any Regiment or Battalion, shall <sub>FinesonCommanding Officers, by whom to be recovered.</sub> be demanded and recovered by any Justice of the Peace of the County in which he may reside, at the Instance of any commissioned Officer of the Regiment or Battalion; which Fine, when recovered, shall be paid, after deducting Costs by the said Justice, to the Treasurer of the Regiment.

34. AND BE IT ENACTED, That the Fines and Forfeitures of Mi‑ <sub>Fines on Minors, &c. by whom to be paid.</sub> nors, living with their Parents, and others having the proper Care and Charge of them, and those of Apprentices and Servants, shall be paid by their respective Parents, Guardians, Masters or Mistresses, or levied on their Goods and Chattels.

35. AND BE IT ENACTED, That no Distress shall be levied on the <sub>Distress not to be levied on Arms, unless, &c.</sub> Arms, Accoutrements or Ammunition of any non-commissioned Offi‑ cer or Private, unless he shall be possessed of more than are necessary for his own Use and Equipment.

36. AND WHEREAS Complaints have been made that too much <sub>Excuses to be attended to.</sub> Rigour and Severity have been used heretofore, in carrying the Militia Law of this State into Execution, and that in some Instances reasonable Excuses have not been properly attended to, whereby many of the good Citizens of this State have been greatly oppressed: BE IT THERE‑ FORE ENACTED *by the Authority aforesaid,* That the several Officers empowered by this Act to hear and decide upon the Excuses of any Delinquent, do, and they are hereby required and enjoined to attend to every just Complaint or Excuse, arising from Inability of Body or In‑ sanity of Mind; and where no Excuses are exhibited, owing to Scruples of Conscience, they are likewise required to make every reasonable En‑ quiry of the Cases of those who might otherwise apply for Exemption or Relief, and in every Instance where such Matters are committed to their Decision, to act so that Justice and not Severity may characterize those who execute the Laws; and if any Doubt should arise respecting the Health or Validity of any Person, the Officers who are to judge of the same, are hereby authorized to call to their Assistance some skilful Physician or Surgeon, as the Case may require, whose Judgment, cer‑ tified on Oath, shall be conclusive.

37. AND BE IT FURTHER ENACTED, That on the Day of each Re‑ <sub>Court of Appeals to moderate Fines.</sub> gimental Training or Review, the Colonel or Commanding Officer of each Regiment or Battalion shall nominate two Justices of the Peace, residing within the Bounds of such Regiment or Battalion, who, toge‑ ther with any one of the Field Officers of the same, shall constitute a Court for hearing and determining upon Appeals of such Persons as think themselves aggrieved by any Fines or Forfeitures imposed as afore‑ said, to continue till the next Regimental Training, and shall fix the Times of their Meeting, which shall be sufficiently advertised through the District of the Regiment or Battalion; and the said Court, or any two of them, shall have Power to moderate or remit any Fine or For‑ feiture for just and equitable Reasons, and a Certificate from them, or any two of them, shall enable the Appellant to receive from the Trea‑ surer of the Regiment the Sums so remitted. PROVIDED ALWAYS, <sub>Proviso.</sub> That no Appeal be allowed unless the Money be first paid.

JA2866

50    ACTS OF THE GENERAL ASSEMBLY

Doubts re-
specting Age,
how to be
obviated.

38. AND BE IT ENACTED, That in all Cases of Doubt respecting the Age of any Person enrolled, or intended to be enrolled in the Militia, the Party questioned shall prove his Age to the Satisfaction of the Officers of the Company within the Bounds of which he may reside, or a Majority of them.

Persons re-
moving, to
apply for a
Discharge,
&c.

39. AND BE IT FURTHER ENACTED, That every Person enrolled as herein before directed, intending to remove from the Company to which he may belong, into the Bounds of another within this State, shall, previous to such Removal, apply to the Captain or Commanding Officer of the Company from which he is about to remove, who shall give him a Discharge and Certificate, specifying the Time when and how long he was last in Service; which Certificate he shall produce to the Captain or Commanding Officer of the Company into the Bounds of which he shall so remove, within ten Days after such his Removal, and enrol himself accordingly; and if any Person shall neglect to apply for such Discharge and Certificate, and to produce it and enrol himself as aforesaid, he shall forfeit and pay any Sum not exceeding *Five Pounds*, to be recovered by the Captain or Commanding Officer of the Company within the Bounds of which he may remove, in the same Manner and to be applied to the same Uses as other Military Fines; and every Person who may be enrolled agreeably to the Description of this Act, removing from any of the neighbouring States into this State, shall, within ten Days after his coming within the Bounds of any Company into which he may remove, be enrolled by the Captain or Commanding Officer thereof.

Members of
Courts-Mar-
tial, &c. their
Pay.

40. AND BE IT FURTHER ENACTED, That it shall and may be lawful for Officers who may from Time to Time be summoned to attend as Members of Courts-Martial for the Trial of any Offender in Virtue of this Act, to receive Pay and Allowance for Rations, agreeably to their Rank when in actual Service; and all Persons attending on the same as Evidences, shall be entitled to receive the same Pay and Allowance for Rations as Privates whilst in actual Service, to be paid on a Certificate from the President of the Court-Martial, specifying the Number of Days they attended, by the Treasurer of the Regiment within the Bounds of which the Offender may reside.

Commanding
Officers to
administer
Oaths.

41. AND BE IT FURTHER ENACTED, That the Commanding Officer of each Regiment, Battalion or Company within this State, is hereby authorized and empowered to administer an Oath or Affirmation on any necessary Occasion, in the Execution of this Act.

Civil Process,
when not to
be served.

42. AND BE IT FURTHER ENACTED, That no civil Process shall be served on any non-commissioned Officer or Private at any Regimental Review or Company Training, or on his Way to or from the same.

Ferriage.

43. AND BE IT FURTHER ENACTED, That no Officer or Private shall on the Way to or from the Place of any Regimental Review or Company Training, be obliged to pay more than one-third the usual Rate of Ferriage, or be charged any Toll for passing any Toll-Bridge; and if any Ferryman or Keeper of any Toll-Bridge shall presume to refuse a Passage, or make Demand contrary to the Direction of this Act, he shall for each Offence forfeit and pay the Sum of *Three Pounds*, to

to be recovered by any Person who will sue for the same, one Half to the Prosecutor, the other Half to be paid by the Justice to the County Collector, for the Use of the State.

44. AND BE IT FURTHER ENACTED, That all Fines and Forfeitures *Fines to be* imposed by this Act, except those incurred under the Direction of the *paid to the Treasurer.* twenty-seventh and twenty-eighth Sections of the same, or particularly disposed of by the Section under the Direction of which they may be incurred, shall be paid immediately after the Recovery thereof into the Hands of the Treasurer of the Regiment by the Officer by whose Warrant they were recovered, taking his Receipt for the same: And the Commanding Officer of each Regiment, Battalion or Company, is hereby required to keep an exact Account of all the Fines recovered by him from the Officers or Privates of his Regiment, Battalion or Company, and paid to the Treasurer aforesaid, in a Book kept for that Purpose, which may be produced as a Check on any future Settlement with the Treasurer.

45. AND BE IT FURTHER ENACTED, That one Half of the Mo- *And how ap-* nies arising from the Fines and Forfeitures incurred under the Direction *propriated.* of the twenty-seventh and twenty-eighth Sections of this Act, and recovered from the non-commissioned Officers and Privates of any Company of the Militia, after deducting the Costs of collecting the same, shall be equally divided and distributed by the Commanding Officer of the Company amongst the non-commissioned Officers and Privates of his Company who may have turned out in the Defence of their Country, taking their Receipts respectively for the same, and the other Half shall be paid into the Treasury of the Regiment; and one Half of the Fines and Forfeitures of any Subaltern Officer incurred or recovered as aforesaid, shall in like Manner be distributed among the Subaltern Officers of the Company who have performed the Duty required, and the other Half shall be paid into the Treasury of the Regiment; and the Fines and Forfeitures of Field Officers and Captains shall be paid by the Commanding Officer of the Regiment or Battalion, after deducting the Costs on collecting the same, into the Hands of the Treasurer of the Regiment, taking his Receipt therefor.

46. AND BE IT FURTHER ENACTED, That the Colonel or Com- *Who to draw* manding Officer of each Regiment or Battalion may, and he hereby is *Money for Arms, &c.* authorized and empowered to draw from the Treasury of his Regiment or Battalion, such Sum or Sums of Money as he may from Time to Time find necessary for the Purpose of furnishing the several Companies composing the same with Arms, Accoutrements, Ammunition, Drums and Fifes, and for instructing Drummers and Fifers, so that the whole Amount of the Sums so drawn shall not at any Time exceed one Half the Amount of the Fines and Forfeitures which have been levied within his said Regiment or Battalion ; for which Sums the said Commanding Officer shall give his Receipt to the said Treasurer, and remain accountable to the Board of Officers for the Disbursement of the same.

47. AND BE IT ENACTED *by the Authority aforesaid,* That the Mi- *Militia sub-* litia of this State, when in actual Service, shall be subject to the Rules *ject to the Articles of* and Articles of War established for the Government of the regular *War.* Troops of the United States. PROVIDED ALWAYS, That the Militia
shall

Case 1:22-cv-07464-RMB-AMD   Document 103-2   Filed 02/27/23   Page 15 of 17 PageID: 3386

Provifo.

fhall be tried by Courts-Martial compofed of their own Officers only ; and, Provided also, That the Pains and Penalties inflicted by any Court-Martial fhall not extend to the taking of Life or Limb, or to any Corporal Punifhment, unlefs in the Cafes following ; *That is to fay*, Any Officer or Private who fhall hold a treacherous Correfpondence with, or give Intelligence to the Enemy, or who fhall mifbehave before the Enemy in Time of Action, or fhall defert to them, or fhamefully abandon any Poft, or who fhall fpeak Words inducing others to offend in any of thefe Inftances, fhall, on due Conviction, fuffer Death, or fuch other Punifhment as a Court-Martial fhall direct.

Pay and Rations.

48. And be it Enacted, That the Militia whilft in Service fhall be entitled to the fame Pay and Rations as the regular Forces of the United States ; the faid Pay to be drawn from the Paymafter appointed for the County to which they belong, on Payrolls made out on Oath by the Officer commanding the Company or Detachment on Duty.

Penalty on Officers neglecting to pay Monies arifing from Fines to the Treafurer.

49. And WHEREAS it appears that many Officers both Civil and Military, who have collected the Fines and Forfeitures of the Militia heretofore, have been remifs in paying the fame into the Hands of the County Collectors as heretofore directed ; Be it Enacted, That it fhall and may be lawful for every Officer, Civil and Military, and they are hereby ftrictly required and enjoined to pay any Sums of Money arifing from the Fines and Forfeitures of the Militia as aforefaid, and that may yet remain in their Hands, to the Treafurer of the Regiment or Battalion from which the fame was collected, under the Penalty of *Fifty Pounds*, to be recovered by the faid Treafurer ; one Half of which he fhall receive for himfelf, and the other Half for the Ufe of the Regiment or Battalion to which he belongs ; and the faid Treafurer is hereby authorized and required to make ftrict Enquiry where any fuch Fines and Forfeitures have been kept back, and on proper and fufficient Proof of the Fact, to profecute the faid Officer or Officers for any Sum which may appear to remain in his or their Hands, together with the Amount of the Penalty above-mentioned, in any Court where the fame may be cognizable, with Cofts of Suit.

Account of Purchafes, &c. of Arms, to be rendered to the Commiffary of Military Stores.

50. And be it further Enacted, That *Elias Woodruff*, Commiffary of Military Stores, or the Commiffary of Military Stores for the Time being of this State, do, and he is hereby authorized and required to call upon all Perfons within the fame who have heretofore been appointed to purchafe Fire-Arms, Accoutrements, and Ammunition, or who have been entrufted with any Fire-Arms belonging to the State, to render an Account of their Purchafes and Difpofal thereof ; and the Commanding Officer of each Regiment, Battalion or Company, and all other Perfons whatfoever who have been entrufted with publick Arms and Accoutrements for the Ufe of the Militia of this State, are hereby required and enjoined to make a Return of the fame to the faid Commiffary of Military Stores without Delay, that a true State of the publick Magazine may be known.

To whom Application is to be made for Ammunition, &c.

51. And be it further Enacted, That the Colonel or Commanding Officer of each Regiment or Battalion in this State fhall be, and he is hereby authorized and empowered as often as the fame may be neceffary, to apply in Perfon or by Order in Writing under his Hand,

JA2869

Hand, to the Commiſſary of Military Stores of the State for a Supply of Ammunition for his Regiment or Battalion, and to agree with ſome ſuitable Perſon to convey the ſame from the Magazine for that Purpoſe, the reaſonable Expences of which Conveyance ſhall be paid by the Treaſurer of this State, on an Order and Certificate from the ſaid Commanding Officer to the ſaid Treaſurer ; and the Commanding Officer of each Regiment or Battalion ſhall deliver out to the Commanding Officers of Companies the Ammunition ſo obtained in due Proportion to the Number of Men in each Company.

52. AND BE IT FURTHER ENACTED, That the Troops of Horſe-Militia already formed within this State ſhall be completed and kept up, and that in Addition thereto another Company or Troop of Horſe be immediately raiſed and formed in the Townſhips of *Woodbridge* and *Piſcataway* ; and it ſhall and may be lawful for ſuch of the Inhabitants of the ſaid Townſhips as are willing and deſirous to be embodied and enrolled into the ſaid Troop or Company, to aſſemble and meet together at a Time and Place to be for that Purpoſe appointed by the Colonel or Commanding Officer of the Regiment of Foot-Militia to which they at preſent belong, and then and there by Plurality of Voices to elect one Captain, one Lieutenant, and one Cornet ; who upon due Certification of ſuch Election, and their having taken the Oaths of Abjuration and Allegiance as herein before directed in the ninth Section of this Act, ſhall be commiſſioned by the Governor or Commander in Chief for the Time being ; and the ſaid Inhabitants when ſo met ſhall alſo at the ſame Time elect four Sergeants and a Trumpeter.

*[margin: Militia Troops of Horſe to be completed and kept up, Additional Troop.]*

53. AND BE IT ENACTED, That the Eſtabliſhment of each Troop of Horſe ſhall be a Captain, a Lieutenant, a Cornet, four Sergeants, a Trumpeter, and twenty-nine Privates ; and that the Officers ſhall hold the ſame Rank reſpectively with the Officers of the Foot-Militia having like Command.

*[margin: Eſtabliſhment of a Troop of Horſe.]*

54. AND BE IT FURTHER ENACTED, That each non-commiſſioned Officer and Private of every Troop of Horſe ſhall at all Times keep himſelf provided with a good Horſe, a Saddle properly furniſhed with a Pair of Piſtols and Holſters, a Cartridge-Box with twelve Rounds of Cartridges ſized to his Piſtols, a Broad-Sword and Belt, a Cloak which will cover all the Arms and Accoutrements, with ſuch other Articles of Armour and Furniture made in like Form and Manner as are uſual and accuſtomed in the Equipment of Cavalry, and ſhall alſo keep at his Place of Abode one Pound of good merchantable Gun-Powder and three Pounds of Ball ſized to his Piſtols, under the Penalty of forfeiting *Six Pounds* for Want of a Horſe, *Thirty Shillings* for Want of the Saddle and Bridle, *Twenty Shillings* for the Want of Piſtols or a Broad-Sword, and *Five Shillings* for the Want of any other neceſſary Article whenever called out to Training or Service.

*[margin: How to be accoutred, Penalties.]*

55. AND BE IT FURTHER ENACTED, That each Troop of Horſe ſhall be under the Command and Direction of the Colonel or Commanding Officer of the Regiment or Battalion within the Bounds of which the Captain or Commanding Officer of ſuch Troop may reſide, and ſhall aſſemble for Training and Exerciſe, and in caſe of Alarm or other Exigency, with ſuch Regiment or Battalion, and in all other Reſpects,

*[margin: Horſe to be under the Orders of the Commanding Officer of the Regiment.]*

O                           except

except as is before specified and declared, shall be under the same Regulations with the Foot Militia.

**Artillery Companies to be completed and kept up.**

56. AND BE IT FURTHER ENACTED, That the Companies of Artillery already formed agreeably to Law in the several Parts of the State shall be completed and kept up, and their Establishment of Officers and Privates, and also their Equipment, shall be conformable to the Establishment and Equipment of Artillery-Companies in the regular Forces of the United States; and the Officers shall hold the same Rank respectively with the Officers of the other Militia having like Command; and moreover, the Fines and Forfeitures inflicted on the Officers and Privates for any Default shall be recovered and disposed of in like Manner as those inflicted on the regimented Militia.

**To be under the Orders of the Commanding Officer of the Regiment.**

57. AND BE IT FURTHER ENACTED, That each Company of Artillery shall be under the Command and Direction of the Colonel or Commanding Officer of the Regiment or Battalion within the Bounds of which the Captain or Commanding Officer may reside, and shall assemble with the same as is herein before directed with Respect to the Troops of Horse, and in all other Respects shall be under the same Regulations with the Companies of the other Militia, as far as Circumstances will admit.

**Who may not enter himself of a Troop of Horse, &c.**

58. AND BE IT FURTHER ENACTED, That no Minor, Apprentice, or Servant shall be allowed to enter himself into any Troop of Horse or Company of Artillery without the Consent of those under whose Government, Care or Direction, such Minor, Apprentice, or Servant may be; and generally no Person who is not able to provide himself with the Furniture and Equipment of a Horseman shall be allowed to enter himself into any such Troop.

**Allowance for Rations.**

59. AND BE IT FURTHER ENACTED, That the Troops of Horse belonging to the Militia of this State, when in actual Service, if at any Time they should be so situated as to make it impracticable to draw Rations or Forage for their Horses, shall be entitled to receive *One Shilling and Three-pence* per Day in Lieu of Rations or Forage for each Horse; and if any of the Militia of this State, when in actual Service, should be so situated as to make it impracticable to draw Rations, they shall receive the Sum of *One Shilling and Three-pence* per Day for each Ration they may be entitled to respectively, to be paid by the Paymaster of the County to which they may belong, on a Return made out and certified on Oath by the Officer commanding the Company or Detachment on Duty, containing a List of the Mens' Names, the Time they were on Duty, and Number of Rations each was entitled to.

**Repealing. Clause.**

60. AND BE IT FURTHER ENACTED, That the Act, intitled, *An Act for regulating, training, and arraying of the Militia*, passed the fourteenth Day of *April*, One Thousand Seven Hundred and Seventy-eight, except the repealing Clause therein, and the several supplemental Acts thereto, be, and they hereby are repealed.

*Passed at* Trenton, January 8, 1781.

C H A P.

# A C T S

### OF THE

### *TWENTY-THIRD*

# GENERAL ASSEMBLY

### OF THE

## S T A T E

### OF

# N E W - J E R S E Y.

AT A SESSION BEGUN AT TRENTON, ON THE TWENTY-THIRD DAY OF OCTOBER,
ONE THOUSAND SEVEN HUNDRED AND NINETY-EIGHT, AND CON-
TINUED BY ADJOURNMENTS.

### *BEING THE THIRD SITTING.*



### *T R E N T O N:*

PRINTED BY *GERSHOM CRAFT*, PRINTER TO THE STATE.

M,DCC,XCIX.

JA2872

be received or read in any court of law or equity in this state, as law or evidence of the law, or elucidation or explanation thereof, any practice, opinion or sentiment of the said courts of justice, used, entertained or expressed to the contrary hereof notwithstanding.

6. *And be it enacted*, That the act, entitled, " An act to alter " the appropriation of fees, on passing of private laws," passed the twentieth day of February, in the year of our Lord, one thousand, seven hundred and ninety-four, be and the same is hereby repealed.

*[Former act repealed.]*

A.            Passed at Trenton, June 13, 1799.

---

## C H A P.  DCCCXXII.

## An Act for the Regulation of the Militia of New-Jersey.

WHEREAS the several laws heretofore enacted for the regulation of the militia, have been found to require material alterations, in order to which, it is deemed adviseable to revise the whole system : Therefore,

Sect. 1. BE IT ENACTED *by the Council and General Assembly of this state, and it is hereby enacted by the authority of the same,* That every free able-bodied white male inhabitant of this state, who is, or shall be of the age of eighteen years, and under the age of forty-five years, (except ministers of the gospel, the vice-president of the United States ; the officers judicial and executive of the government of the United States ; the members of both houses of Congress, and their respective officers ; all custom-house officers, with their clerks ; all post-officers and stage-drivers, who are employed in the care and conveyance of the mail of the post-office of the United States ; all ferrymen usually employed at any ferry on the post-road ; all inspectors of exports ; all pilots, all mariners actually employed in the sea-service of any citizen or merchant within the United States) shall severally and respectively be enrolled in the militia by the captain or commanding officer of the company within whose bounds such citizen shall reside. *Provided always,* That in all cases of doubt respecting the age of any person enrolled, or intended to be enrolled, the party questioned shall prove his age to the satisfaction of the officers of the company within whose bounds he may reside, or a majority of them.

*[Who shall be enrolled in the militia.]*

2. *And be it enacted,* That the militia shall continue their present arrangements in brigades and divisions, as follows :

610     ACTS of the GENERAL ASSEMBLY

Militia divided into brigades and divisions.

The militia in the counties of Gloucester and Burlington, shall form one brigade, and the militia in the counties of Cumberland, Salem and Cape-May, shall form one brigade; which brigades shall form the first division: The militia in the counties of Bergen, Essex and Morris, shall each form a brigade; which brigades shall form the second division: The militia in the counties of Somerset, Middlesex and Monmouth, shall each form a brigade; which brigades shall form the third division: The militia in the counties of Hunterdon and Sussex, shall each form a brigade; which brigades shall form the fourth division. And the several regiments, independent battalions, battalions and companies of infantry, light-infantry and grenadiers, shall also continue as at present arranged. The cavalry of this state shall be formed into one brigade, and squadrons, and regiments, as follows: The troops of horse in the county of Bergen, shall form one squadron, and the troops of horse in the county of Essex, shall form one squadron; which two squadrons shall form one regiment: The troops of horse in the county of Morris, shall form one squadron, and the troops of horse in the county of Sussex, shall form one squadron; which two squadrons shall form one regiment: The troops of horse in the county of Middlesex, shall form one squadron, and the troops of horse in the county of Monmouth, shall form one squadron; which two squadrons shall form one regiment: The troops of horse in the county of Hunterdon, shall form one squadron, and the troops of horse in the county of Somerset, shall form one squadron; which two squadrons shall form one regiment: The troops of horse in the counties of Burlington and Gloucester, shall form one squadron, and the troops of horse in the counties of Salem, Cumberland and Cape-May, shall form one squadron; which two squadrons shall form one regiment. The artillery of this state shall be formed into one regiment, as follows: The companies now formed, and that may hereafter be formed, in the counties of Bergen, Essex, Middlesex, Monmouth, Somerset and Morris, of the second and third division, shall form one battalion: And the companies of artillery now formed, or which hereafter may be formed, in the counties of Hunterdon, Sussex, Burlington, Gloucester, Cape-May, Salem and Cumberland, of the first and fourth division, shall form one other battalion.

Militia officers to hold their present rank.
Vacancies how supplied.

3. *And be it enacted*, That the present officers of the militia of this state, shall continue and exercise the several ranks and commissions which they now respectively hold. Vacancies by death, removal, resignation or otherwise, shall be filled up, so that the militia shall be officered, as follows: To each division there shall be one major-general and two aids-de-camp, with the rank of major; to each brigade, one brigadier-general, with one brigade-inspector, to serve also as brigade-major, with the rank of major, one brigade or senior surgeon, and one bri-

gade quartermaster; one adjutant-general, with the rank of
brigadier-general; to each regiment, one lieutenant-colonel
commandant; and to each battalion and squadron, one major;
to each company of infantry, light-infantry and grenadiers, one
captain, one lieutenant and one ensign, four serjeants, four
corporals, one drummer, one fifer, and not more than sixty-four
nor less than forty private individuals, or as near as may be
having regard to their local situation; to each troop of horse,
there shall be one captain, two lieutenants and one cornet, four
serjeants, four corporals, one saddler, one farrier and one trum-
peter, and not more than forty-eight nor less than thirty-two
troopers; to each company of artillery, there shall be one cap-
tain and two lieutenants, four serjeants, four corporals, six gun-
ners, six bombadiers, one drummer, one fifer, and not more
than thirty-two nor less than twenty matrosses. There shall
be a regimental-staff, to consist of one adjutant and one quarter-
master, to rank as lieutenants, one paymaster, one surgeon and
one surgeon's mate, one serjeant-major, one drum-major, and
one fife-major. All officers shall take rank according to the date
of their commissions; and when two of the same grade bear an
equal date, then their rank shall be determined by lot, to be
drawn by them before the commanding officer of the division,
brigade, regiment, battalion, company or detachment. The
regimental-staff shall be appointed by the field-officers. The
brigade and regimental-staff shall be commissioned by the com-
mander in chief, on certificates of their appointment, under the
hands and seals of the officers making the same: *And further,*
There shall be one adjutant to each squadron of cavalry.

4. *And be it enacted,* That the whole of the militia of this state
shall be subject to be mustered and exercised in companies, bat-
talions and regiments, by their respective officers, to wit: In
companies, on the first Monday in October of every year, at
such place within the bounds of the companies, as the respect-
ive captains or commanding officers of companies shall order:
In battalions as follows: The first battalion of the first regiment,
on the third Monday in May; the second battalion of the first
regiment, on the Tuesday following; the first battalion of the
second regiment, on the Wednesday following; the second bat-
talion of the second regiment, on the Thursday following; the
first battalion of the third regiment, on the fourth Monday in
May; the second battalion of the third regiment, on the Tues-
day following; the first battalion of the fourth regiment, on the
Wednesday following, and the second battalion of the fourth
regiment, on the Thursday following: And in regiments as fol-
lows; the first regiment in each and every brigade, shall be
exercised on the first Tuesday in June; the second regiment on
the Wednesday following; the third regiment on the Thursday
following, and so on, according to the numerical rank, on every

*[margin note: Time of com-
pany trainings.]*

*[margin note: Battalion
trainings;]*

*[margin note: And regimen-
tal trainings;]*

C c

day thereafter (Saturday and Sunday excepted) until the whole number of regiments in every brigade fhall have muftered in the order aforefaid: *Provided*, That the regimental training in the county of Cumberland, fhall begin on the fecond Tuefday in June, and continue on in the above order; and where there fhall be any battalions not annexed to any regiment, the faid battalions fhall exercife on the third and fourth Mondays of May, yearly, except the battalion in the county of Cape-May, which fhall exercife on the fecond Tuefday in April: *Provided always*, That the militia of the townfhips of Little Egg-Harbour, in the county of Burlington, and of Great Egg-Harbour, and Galloway, in the county of Gloucefter, and of Stafford and Dover, in the county of Monmouth, and the over-mountain battalion in the county of Suffex, and all fuch companies as may be formed at any manufactory or iron-works, not within twenty miles of the places of their battalion or regimental trainings, may meet and exercife at the ufual place or places of parade in the faid townfhips or diftricts, or at the faid manufactories or iron-works, on the days appointed for regimental and battalion trainings, which fhall be confidered inftead of meeting in regiments and battalions: *And further*, That if the order afore-

Brigadier-general may change the order of exercife, &c.

faid, in which the regiments and battalions are directed to exercife, fhall be found inconvenient, it fhall be lawful for the brigadier-general and field-officers of each brigade, or a majority of them, to change the order in which the regiments and battalions aforefaid fhall be exercifed, at their difcretion, not altering the days of training and exercife, but confining fuch difcretion to naming the particular regiment or battalion that fhall train or exercife on a particular day, fo that the infpection thereof may be rendered more convenient to the brigade-infpect-

Brigade-infpector to advertife.

or, who is hereby directed to give notice, by advertifements in three of the moft public places within the limits of the brigade, at leaft thirty days previous to the day of meeting.

Of artillery and cavalry trainings.

5. *And be it enacted*, That every troop of horfe and company of artillery, attached to any of the brigades of infantry of this ftate, fhall be confidered as being attached to the regiment or independent battalion, within the bounds of which the major part of the company was raifed, and fhall affemble for exercife and infpection with fuch regiment or independent battalion; and it fhall be the duty of the captain or commanding officer to make a return of all delinquents in their refpective companies, in the fame manner as the captains or commanding officers of the infantry are by law directed to make returns. And the cavalry fhall affemble in fquadron or troop, at fuch place as the commanding officer thereof may direct, on the fame days as are directed by law, for the infantry in the feveral counties of this ftate, and fhall in all things be fubject to the rules, regulations and penalties prefcribed and impofed by this act, on the militia of this ftate.

JA2876

OF THE STATE OF NEW-JERSEY. 613

6. *And be it enacted*, That the fines for non-attendance on days of exercife fhall be as follows: On a field-officer, the fum of fix dollars per day; on every other commiffioned officer, three dollars per day, and on every non-commiffioned officer and private, one dollar per day; and the fame fines fhall be refpectively paid by every officer, non-commiffioned officer and private, who fhall leave the parade or abfent himfelf from his regiment, battalion, fquadron, troop or company, without leave of the commanding officer, before the faid regiment, battalion, fquadron, troop or company fhall be difcharged; and if any militia-man fhall appear on parade without a mufket or firelock, or if any trooper fhall appear without his fword or piftols, he fhall forfeit and pay fifty cents, and for want of other accoutrements, excepting knapfacks and ammunition, fhall forfeit and pay fix cents for each and every article fo deficient: *Provided*, That no militia-man fhall be liable to fuch fines, who, in the opinion of a majority of the commiffioned officers of the company, may be deemed unable to procure arms or accoutrements, or either of them.

*Fines for non-attendance on days of exercife.*

7. *And be it enacted*, That in order to afcertain thofe perfons, who by their abfence on days of exercife, fhall be liable to the fines and forfeitures of this act, a fergeant of the troop or company fhall, on every fuch day, in the prefence of the captain or commanding officer of the troop or company, one hour after the time appointed for the meeting of the troop, company, battalion, fquadron or regiment, and alfo after the exercife is over, and before the men are difcharged, call over the roll of the troop or company, noting thofe who are abfent.

*Roll when to be called.*

8. *And be it enacted*, That the commanding officer of each regiment, fhall hear and decide upon the reafons affigned by the other field-officers thereof, for the non-performance of duties for which they are punifhable by fine, provided fuch reafons be offered within ten days: and the field-officers of each regiment, or commandants of independent battalions, fhall meet at fome convenient time and place, not exceeding twelve days after any regimental or battalion training, or after the call of the whole or a part thereof into actual fervice, if it may be neceffary, of the time and place of which meeting, at leaft eight days notice fhall be given by the commandants of regiments or independent battalions; and the faid officers, when fo met, fhall hear and decide upon the reafons affigned by the captains, fubalterns and ftaff-officers, for the non-performance of duties for which they are punifhable by fine; and the commiffioned officers of each troop or company, or a majority of them, fhall meet at fome convenient time and place, not exceeding fifteen days after any regimental, battalion, or troop or company training, or the call of a part or the whole into actual fervice, of

*Excufes for non-performance of militia duty, &c. by whom to be heard and when.*

*i*

JA2877

614          ACTS of the GENERAL ASSEMBLY

which time and place, due notice fhall be given, by advertife-
ments fet up in at leaft three of the moft public places in the
bounds of the troop or company, at leaft eight days previous
thereto, and fhall then hear and decide upon the reafons affign-
ed by the non-commiffioned officers and privates, for the non-
performance of duties for which they are punifhable by fine;
and the faid officers, refpectively, fo appointed to hear and de-
cide upon the reafons offered by the commiffioned officers, non-
commiffioned officers and privates, for non-performance of du-
ties and deficiency of equipments, for which they are punifha-
ble by fine, fhall, at the expiration of twenty days, make out
duplicate lifts of fuch affeffment, noting the names of fuch de-
linquents as have paid, one whereof he or they fhall, without
delay, deliver to the paymafter of the regiment, who fhall deli-
ver the fame to a juftice of the peace, within the bounds of the
regiment or independent battalion, who is hereby required,
forthwith to iffue execution againft the perfons named in the faid
lift, for the fums annexed to their refpective names, with the
fame cofts as are allowed them on the return of the ftate taxes,
directed to one of the conftables of the county, who is hereby
required to levy the fame of the goods and chattels of the re-
fpective delinquents, and to pay the feveral fums contained in the
faid execution, within thirty days, to the paymafter of the regi-
ment or independent battalion, to whom the faid delinquents
belong; and the other of the faid lifts, he or they fhall deliver
or fafely tranfmit to the commanding officer of the regiment or
independent battalion, to ferve as a check on the faid paymaf-
ters, in the fettlement of their accounts.

Duplicate lifts of delinquents to be made out, and how to be difpofed of.

9. *And be it enacted*, That if any money fhall remain in the
hands of any conftable, after making fale of the property of a
delinquent, and paying the fines of fuch delinquent, fuch mo-
ney fhall be paid by the faid conftable to the faid delinquent;
but if he fhall refufe to receive the fame, then the conftable
fhall pay the faid money to the paymafter of the regiment or
independent battalion, to which fuch delinquent belongs, to
and for the ufe of fuch delinquent.

Overplus money how to be difpofed of.

10. *And be it enacted*, That the fines and forfeitures impofed
by this act on minors, living with their parents, and others
having the proper care or charge of them, and thofe of appren-
tices, fhall be paid by their refpective parents, guardians, maf-
ters or miftreffes, or levied of their refpective goods and chat-
tels.

Fines on minors, by whom to be paid.

11. *And be it enacted*, That the commanding officer of each
battalion or fquadron, fhall call to his affiftance the furgeon or
furgeon's mate of the fame, and a juftice of the peace, or one
of the chofen freeholders, refiding within the limits thereof,

Who fhall compofe the court of appeals, in cafes of fines for non-per-formance of military duty.

OF THE STATE OF NEW-JERSEY.                    615

who fhall conftitute a court for hearing and deciding on appeals, and fhall meet for that purpofe on the firft Monday in November, yearly, at fome convenient place, to be appointed by the faid commanding officer, public notice whereof fhall be given by advertifements, fixed up in at leaft three of the moft public places within the limits of the faid battalion or fquadron, at leaft ten days previous to the day of meeting ; and all perfons fuppofing themfelves aggrieved by any fines or forfeitures impofed on them for the non-performance of military duty, may apply to the faid court, who are hereby vefted with full power and authority, to hear and decide upon the excufes offered, and to remit any fines or forfeitures for juft and equitable reafons, and a certificate from the faid court, or any two of the members thereof, fhall entitle the appellant to receive from the paymafter of the regiment or independent battalion, any fum fo remitted : *Provided always*, That no appeal fhall be allowed, unlefs the fines and forfeitures be firft paid.

12. *And be it enacted*, That the following fees fhall be paid to the officers hereafter named, to wit : To the major, for advertifing and attending every election of company officers, two dollars ; to the members compofing the board of officers for fettling the accounts of the paymafters, one dollar each, for every day they may be engaged in the fettlement of the faid accounts ; to the members of the court of appeals, one dollar each, for every day they may be engaged therein ; and to the adjutant, one dollar, for every day neceffarily employed in fummoning courts-martial, or other extra fervice in the execution of his office : All which fums fhall be paid by the refpective paymafters, on a certificate under the hand of the commanding officer of the regiment or independent battalion, to which they refpectively belong, and fhall be allowed in the fettlement of their accounts.

*Fees to be paid to officers for their fervices.*

13. *And be it enacted*, That all fines and forfeitures that fhall be incurred, as well for non-attendance on days of exercife, and deficiency of equipments, as for neglect of performing tours of duty, and alfo all fuch fines as fhall be impofed by courts-martial, or otherwife, on perfons made liable by this act, fhall be returned, and paid into the hands of the paymafter of the regiment or independent battalion, from which fuch fines and forfeitures may be due, and fhall be applied to the ufe of fuch regiment or independent battalion, in the manner by this act directed. And it fhall be the duty of the faid paymafters, refpectively, to pay all fuch drafts as fhall from time to time be made on him, agreeably to this act, by the commanding officer of the regiment or independent battalion, to which they refpectively belong.

*Fines to be paid to the paymafter.*

*His duty.*

D d

616                    ACTS OF THE GENERAL ASSEMBLY

*Of the settle-*
*ment with the*
*paymasters.*

14. *And be it enacted,* That the paymasters of the different regiments or independent battalions for the time being, shall keep proper and distinct accounts of all monies received for fines and forfeitures, and enter the same separately in a book to be kept for that purpose; and all drafts of the commanding officer of the regiment or independent battalion, for which proper vouchers shall be produced, shall be allowed to the said paymasters, respectively, in the settlement of their accounts ; and the field-officers of each regiment, and commandants, and two senior captains of independent battalions, are hereby constituted a board for that purpose, and are authorized and empowered, every twelve months, to inspect, and if approved by them, finally to allow the same ; and the said paymasters are hereby

*Allowance to*
*paymasters.*

allowed and authorized, to retain in their hands five per cent. on all monies by them received and paid, which shall be allowed them in the settlement of their accounts ; and if it shall appear that any of the said paymasters have been guilty of mal-

*Penalty for*
*mal-practice.*

practice or embezzlement, the said board of officers of each regiment or independent battalion, shall put such delinquent paymaster under arrest, and if upon trial by a court-martial, he shall be found guilty, he shall be cashiered and fined by the said court, in any sum not exceeding sixty dollars ; and the succeeding paymaster shall prosecute said delinquent, for any sum or sums of money remaining in his hands, belonging to the regiment or independent battalion to which such delinquent did belong, in any court where the same may be cognizable, and recover the same, with costs.

*Persons may*
*be employed to*
*instruct drum-*
*mers, &c.*

15. *And be it enacted,* That one drum and one fife-major and one trumpeter, may be employed by the commanding officer of each regiment or independent battalion, whose duty it shall be to instruct and exercise the drummers, fifers and trumpeters of each company or troop in the necessary military music, at such times and under such regulations, as the commanding officer of the regiment or independent battalion may direct, not exceeding twelve days in the year, and shall for such services be paid

*Allowance to*
*them.*

the sum of two dollars per day each, by the county collector of each county, out of the exempt monies, on the certificate of the commanding officer of the regiment or independent battalion where he may so practise or be employed ; and the said drummers, fifers and trumpeters, shall each be paid as aforesaid, fifty cents per day, for the time they shall attend to such instruction.

*Monies may be*
*drawn to re-*
*pair drums,*
*&c.*

16. *And be it enacted,* That it shall be lawful for the commanding officers of the respective regiments, independent battalions and squadrons, from time to time, to draw from the collectors of the respective counties, such sums as may be necessary for the purchase or repair of drums, fifes, trumpets or colours for

OF THE STATE OF NEW-JERSEY.                    617

their refpective regiments, battalions and fquadrons; and the
faid drafts fhall be allowed the faid county collectors, in the fet-
tlement of their accounts with the treafurer, as fo much of the
exempt fines hereby directed to be raifed in the faid county;
but if a fufficiency for that purpofe fhould not be in the treafu-
ry from faid county, the treafurer is hereby directed to pay the
faid deficiency unto the faid county collector, out of the exempt
money in the treafury.

17. *And be it enacted*, That the commander in chief of this
flate, for the time being, may, in cafe of invafion or other emer-
gency, when he fhall judge it neceffary, order out any propor-
tion of the militia of this flate, to march to any part thereof,
and continue as long as he may think it neceffary, not exceed-
ing two months.

<span style="float:right">Governor may order out militia in cafe of invafion.</span>

18. *And be it enacted*, That all able bodied white male inhabit-
ants, between the ages of eighteen and forty-five years, who
have been or may be exempted from military duty, on paying
annually the fum of three dollars for fuch exemption, fhall, not-
withftanding, be liable to be drafted in the fame manner as the
enrolled militia, when called into actual fervice; for which pur-
pofe the feveral captains of militia within this flate, fhall enter
upon their lifts the names of all fuch exempts as may refide
within the bounds of their refpective companies; and the ex-
empts, when fo drafted, fhall be under the fame regulations,
and liable to the fame fines and penalties with the enrolled mi-
litia of this flate.

<span style="float:right">Exempts from training liable to be drafted for actual fervice.</span>

19. *And be it enacted*, That when a part of the militia fhall be
called into actual fervice, it fhall be the duty of the captain or
commanding officer, to divide his troop or company (including
the exempts referred to in the preceding fection) into as many
claffes as there fhall be men required of him, and by lot, enlift-
ment or draft, to detach one man from each clafs; and fuch
draft or detachment fhall be officered with fuch officer or offi-
cers, and of fuch grades as fhall be proper, agreeably to mili-
tary difcipline; the tour of duty of which commiffioned officers
fhall be determined by a roafter to be kept by the adjutant for
that purpofe: *And further*, That no non-commiffioned officer or
private fhall (after the making of the firft draft) be liable to per-
form actual fervice, until it fhall become his proper tour agree-
ably to a roafter of the company, to be kept by the command-
ing officer of the fame; and that no draft or detachment fhall
be continued in fervice, more than two months at any one time,
and if neceffary, they fhall be relieved by a detachment to be
made in the manner aforefaid; which relief fhall arrive at leaft
two days before the expiration of the term of the detachment to
be relieved; but nothing herein contained fhall prevent the

<span style="float:right">Of making the drafts for actual fervice.</span>

<span style="float:right">Roafters to be kept, and perfons to take their tour agreeably thereto.</span>

<span style="float:right">Not exceeding two months.</span>

618

## ACTS OF THE GENERAL ASSEMBLY

commander in chief from calling into fervice the whole or any part of the militia, when the exigencies of the ftate fhall, in his opinion, require it: *And further*, That the pay of the militia **Pay when to** in actual fervice, fhall commence two days before marching, **commence.** and that they fhall receive pay and rations at the rate of fifteen miles per day, on their return home; and in requifitions by the Prefident or Congrefs of the United States, the like mode fhall be purfued in drafting and turning out the quota of this ftate.

**Perfons may find fubftitutes.** 20. *And be it enacted*, That it fhall and may be lawful for any perfon, called to do a tour of duty, to find a fubftitute, who, if approved of by the captain or commanding officer of the company, may ferve in the place of fuch perfon.

**Notice of draft how to be given.** 21. *And be it enacted*, That when any draft or drafts of the militia fhall be called to perform any tour of duty, the majors of the battalions fhall caufe each and every perfon fo called, to be notified of fuch call, by a written or printed notice being de- livered to him perfonally, or left at his houfe or ufual place of abode, by fome officer or other fuitable perfon employed for that purpofe by the commanding officer of the faid company, at leaft three days before the time of affembling faid militia, unlefs the commander in chief, on a fudden exigency, fhall think pro- per to order any part of the militia into immediate and actual fervice, and then the notice mentioning fuch fpecial order, fhall be given for immediate attendance; and any perfon refufing or **Penalty for re-** neglecting to perform fuch tour of duty, or to procure a fubfti- **fufing to do** tute, fhall pay a fine of twenty dollars for every fuch neglect or **duty.** refufal; which fines as aforefaid, fhall be paid to the captain or commanding officer of the company to which fuch delinquent belongs, and be by him appropriated, under the direction of **Fines may be** the commander of the regiment or battalion to which the faid **appropriated** company belongs, for the purpofe of hiring fubftitutes to fup- **to the hiring** ply the place of the delinquents belonging to the faid company; **of fubftitutes.** and in cafe of a furplufage of money arifing from fuch fines, it fhall be paid to the paymafter of the regiment, to be appropri- ated and accounted for as other fines are directed to be by law. And every non-commiffioned officer, whilft engaged in warning the company to which he belongs, under the orders of the com- manding officer of the company, fhall receive one dollar per day, for the time he may be neceffarily engaged in fuch duty.

22. *And be it enacted*, That the militia of this ftate fhall be governed by the following articles, rules and regulations:

**Rules for the government of the militia.** Art. 1. If any field or other commiffioned officer, at any re- view, or on any other occafion, when the regiment, battalion or company to which he may belong, or in which he holds a

## OF THE STATE OF NEW-JERSEY.                619

command, is paraded in arms, fhall mifbehave, or demean him-
felf in an unofficer-like manner, he fhall, for fuch offence, be
cafhiered, or punifhed by fine, at the difcretion of a general
court-martial, as the cafe may require, in any fum not exceed-
ing thirty dollars; and if any non-commiffioned officer or pri-
vate, fhall, on any occafion of parading the company to which
he belongs, appear drunk, or fhall difobey orders, or ufe any
reproachful or abufive language to his officers, or any of them,
or fhall quarrel himfelf, or promote any quarrel among his fel-
low-foldiers, he fhall be difarmed and put under guard, by or-
der of the commanding officer prefent, until the company is
difmiffed, and fhall be fined at the difcretion of a regimental
court-martial, in any fum not exceeding eight dollars.

Art. 2. If the commanding officer of any regiment, battalion
or fquadron, fhall neglect or refufe to give orders for affembling
his regiment, battalion or fquadron at the time appointed by
this law, or at the direction of the infpector of the brigade to
which he belongs, when the faid infpector is thereto command-
ed by the commander in chief, or in cafe of an invafion of the
city or county to which fuch regiment, battalion or fquadron
belongs, he fhall be cafhiered, and punifhed by fine not exceed-
ing one hundred dollars, at the difcretion of a general court-
martial; and if a commiffioned officer of any company or troop,
fhall on any occafion, neglect or refufe to give orders for affem-
bling the company to which he belongs, or any part thereof, at
the direction of the commanding officer of the regiment, batta-
lion or fquadron to which fuch company or troop belongs, he
fhall be cafhiered or punifhed by fine not exceeding thirty dol-
lars, at the difcretion of a regimental court-martial; and a
non-commiffioned officer offending in fuch cafe, fhall be fined
at the difcretion of a regimental court-martial, in any fum not
exceeding twenty dollars.

Art. 3. If any captain or commanding officer of a company or
troop, fhall refufe or neglect to make out a lift of the perfons
noticed to perform any tour of duty, and fend or convey the
fame to the commanding officer of the regiment, battalion or
fquadron to which fuch company or troop may belong; for fuch
neglect or refufal, he fhall be cafhiered or fined, at the difcre-
tion of a regimental court-martial, in any fum not exceeding
thirty dollars.

Art. 4. If any militia-man fhall defert while he is on a tour
of duty, he fhall be fined in any fum not exceeding twenty dol-
lars for every fuch offence, or may be imprifoned for any time
not exceeding two months, at the difcretion of a court-martial;
and if a non-commiffioned officer, he fhall alfo be degraded, and
placed in the ranks.

E e

620    ACTS of the GENERAL ASSEMBLY

Art. 5. Every general court-martial shall consist of thirteen members, all of whom shall be commissioned officers, and of such rank as the case may require; and the senior officer shall be president, and not under the rank of a field-officer.

Art. 6. Every regimental court-martial shall be composed of five members, all commissioned officers, the senior officer to be president, not under the rank of a captain.

Art. 7. In any court-martial, not less than two-thirds of the members must agree in every sentence for inflicting any punishment, otherwise the person charged shall be acquitted.

Art. 8. The president of each and every court-martial, whether general or regimental, shall require all witnesses, in order to the trial of offenders, to declare on oath or affirmation, that the evidence they shall give is the truth, the whole truth, and nothing but the truth; and the members of all such courts shall take an oath or affirmation, which the president is required to administer to them, that they will give judgment with impartiality; and the officer next in rank to the president, shall administer the like oath or affirmation to the president.

Art. 9. Every militia-man, called as a witness in any case, before a general court-martial, who shall neglect or refuse to attend and give evidence, shall be censured or fined at the discretion of the court, not exceeding one hundred dollars, and if before a regimental court-martial, not exceeding twenty-five dollars, unless he shall render a satisfactory reason to the president of the court for his non-attendance, in one month thereafter.

Art. 10. No officer or private, being charged with transgressing these rules, shall be suffered to do duty in the regiment, company or troop to which he belongs, until he has had his trial by a court-martial; and every person so charged, shall be tried as soon as a court-martial can be conveniently assembled.

Art. 11. If any officer or private shall think himself injured by the commanding officer of the regiment, battalion or squadron, and shall, upon due application made to him, be refused redress, he may complain to the brigadier-general, who shall direct the inspector of the brigade to summon a general court-martial, that justice may be done.

Art. 12. If any inferior officer or private shall think himself injured by his captain or other superior officer in the regiment, troop or company to which he belongs, he may complain to the commanding officer of the regiment or independent battalion,

who fhall fummon a regimental court-martial, for doing juftice according to the nature of the cafe.

Art. 13. No penalty fhall be inflicted at the difcretion of a court-martial, other than degrading, cafhiering, fining or imprifoning agreeable to the fourth article.

Art. 14. Every offender convicted by any regimental court-martial, may be pardoned or have the penalty mitigated by the commanding officer of the regiment or independent battalion, excepting only where fuch cenfures or penalties are directed as a fatisfaction for injuries received by any officer or private from another; but in cafe of officers, every fentence of a court-martial fhall be approved of by the commander in chief, or the major-general of the divifion, who are refpectively empowered to pardon or mitigate fuch fentence.

Art. 15. The militia on the days of exercife, may be detained under arms, on duty in the field, any time not exceeding fix hours, provided they are not kept above three hours under arms at any one time, without allowing them a proper time to refrefh themfelves.

Art. 16. Any perfon who fhall bring any kind of fpirituous liquors to the place of exercife, fhall forfeit fuch liquors, for the ufe of the poor, belonging to the city or townfhip where fuch exercife is had; and the commanding officer of the regiment, battalion or company, is charged with the execution of this article.

Art. 17. The rules of difcipline approved and eftablifhed by Congrefs, in their refolution of the twenty-ninth day of March, one thoufand feven hundred and feventy-nine, fhall be the rules of difcipline to be obferved by the militia throughout this ftate, except fuch deviations from faid rules, as may be rendered neceffary by the requifitions of the acts of Congrefs, or fome other unavoidable circumftances. It fhall be the duty of the commanding officer, at every training, whether by regiment or fingle company, to caufe the militia to be exercifed and trained, agreeably to the faid rules of difcipline; and the inftructions laid down by the Baron Steuben, and annexed to the faid rules of difcipline, pointing out the refpective duties of the officers, non-commiffioned officers and privates, are recommended and enjoined upon the militia of this ftate, as particularly and fully as if the faid inftructions were repeated in this act at length.

Sect. 23. *And be it enacted,* That every officer who fhall attend on courts-martial, or courts of enquiry, fhall be entitled

622                ACTS OF THE GENERAL ASSEMBLY

Allowance to officers attending court-martial.

to receive from the paymaster of the regiment or independent battalion in which the offender resides, the sum of one dollar each, for every day they shall respectively attend; and all persons attending before said courts, or either of them, as witnesses, shall be entitled to receive from the said paymaster, fifty cents each per day, provided that no more than two witnesses on the part of the state, and two witnesses on the part of the offender, shall be entitled to pay ; all which sums shall be paid by the said paymaster, on certificates signed by the president of the court-martial.

Salary of the adjutant-general and brigade-inspectors

24. *And be it enacted,* That the adjutant-general for the time being, shall be allowed as a compensation for his services, the sum of one hundred and fifty dollars, annually, on his producing a certificate from the governor of the state, certifying that he has performed the services required of him by law ; and the several brigade-inspectors of infantry, shall be entitled to receive of the treasurer for the time being, out of the exempt money in the treasury, the sum of thirty dollars each, annually, after the passing of this act, upon their producing to the said treasurer, a certificate from the brigadier-general of the brigade to which they belong, certifying that they have performed the services required of them by law.

Cavalry horses by whom to be appraised and paid for.

25. *And be it enacted,* That the brigade-inspector shall call to his assistance two reputable freeholders, above forty-five years of age, who shall appraise, on oath or affirmation, the horse of each person serving as a light-horse-man, immediately before the time of going into actual service, and describe the age, size, colour and marks of the said horse, and enter the same in a book ; and in case such horse shall be killed or be taken by the enemy, he shall be paid the full value of his horse, according to the said appraisement, by an order to be drawn on the certificate of the inspector, by the brigadier-general or commanding officer of the brigade, on the treasurer of this state, provided such claim be made in one year after the loss so sustained.

Uniform companies how to be completed.

26. *And be it enacted,* That it shall and may be lawful for the captains or commanding officers of the several companies of cavalry, artillery, infantry and grenadiers, to enroll in their respective companies, from the several companies composing the regiment or battalion to which they may belong, such men as may from time to time, be necessary to complete their respective companies ; and a certificate from the said captain or commanding officer, shall exonerate the bearer from serving or paying any fine thereafter imposed on him by the officers of the company to which he formerly belonged, any law, usage or custom to the contrary notwithstanding : *Provided always,* That it shall

OF THE STATE OF NEW-JERSEY.

623

not be lawful for the captain or commanding officer of the cavalry, artillery or other uniform company, to grant a certificate to any person prior to his appearing in uniform agreeably to law.

27. *And be it enacted*, That every captain, lieutenant or ensign, who shall from time to time be chosen by the several companies, and shall report his acceptance of the office, within thirty days after having received notice thereof, to the major or commanding officer of the regiment or battalion ; and in case such report is not made as aforesaid, the said office shall be deemed as vacant. And the resignation of every captain, lieutenant and ensign, shall be delivered to the lieutenant-colonel or commanding officer of the regiment, independent battalion or squadron, to which the said company or troop shall belong ; and where vacancies shall happen in any company or troop, by the death, removal or resignation of a captain, lieutenant, ensign or cornet, it shall be lawful for the commanding officer of the regiment or independent battalion, by warrant under his hand and seal, directed, if by the commanding officer of the regiment, to the major or commanding officer of the battalion or squadron to which such company or troop belongs ; if by the commanding officer of an independent battalion, to the senior captain thereof, to hold an election within the limits of such company or troop, to supply the vacancy occasioned by the non-acceptance, resignation, removal, death or otherwise, of any such officer ; and thereupon the said major or commanding officer of the said battalion or squadron, or senior captain, shall give fifteen days notice, by advertisement in three of the most public places within the limits of such company, of an election to supply the place of the officer or officers of the company or troop which may be vacant ; and the said company or troop, or such of them as may attend, shall proceed by plurality of votes, to choose such officer or officers residing within the bounds of the said company or troop ; and the said major or commanding officer of the said battalion or squadron, or senior captain, shall certify under his hand and seal, annexed to or indorsed on the warrant aforesaid, the name and rank of each officer so chosen or elected, to the commander in chief of the state, who shall commission the said officer accordingly.

28. *And be it enacted*, That if any commissioned officer shall remove out of the bounds of his proper division, brigade, regiment, battalion, squadron, troop or company, or shall be absent therefrom more than nine months, his office shall be thereby vacated.

29. *And be it enacted*, That if the lieutenant-colonel, major and captains of any regiment, or the major and captains of any

F f

624                    ACTS of the GENERAL ASSEMBLY

Bounds of companies, &c. may be altered by the brigadier-general.

independent battalion in this ſtate, ſhall think it neceſſary to make an alteration in the bounds of any company, battalion or regiment, then the ſaid lieutenant-colonel, majors and captains, or the ſaid major and captains, as the caſe may be, ſhall, under their hands in writing, apply to the brigadier-general, to make ſuch alteration as they may think neceſſary; and the ſaid brigadier-general is hereby authorized to make ſuch alteration as he may think neceſſary in any regiments, battalions or companies within his brigade, and ſhall inform the ſaid officer or officers commanding the ſaid regiments, battalions or companies, of ſuch alteration, who are hereby required to give at leaſt ten days notice, by advertiſement, of ſuch alteration, previous to the meeting of the ſaid regiments, battalions or companies; and all perſons annexed to any regiments, battalions or companies as aforeſaid, ſhall be ſubject to the command of the ſaid officers, reſpectively, and alſo to all fines and penalties for neglect of duty, which are inflicted by law on perſons who originally belonged to the ſaid regiments, battalions or companies.

Of forming new companies

30. *And be it enacted,* That if at any time hereafter, from the increaſe of the militia, or otherwiſe, it ſhall be deemed neceſſary, in the opinion of the field-officers of any regiment, to form a new company or companies, it ſhall be lawful for the brigadier-general, upon application of the field-officers, to order ſuch company or companies to be formed accordingly, and to attach them to their proper battalions; which company ſhall chooſe their officers in the preſence of the major; and the officers ſhall be commiſſioned by the commander in chief, upon a certificate ſigned by the ſaid major.

Militia-men exempt from paying ferriage, &c.

31. *And be it enacted,* That no officer or private ſhall, on the way to or from the place of any review, regimental or company training to which he ſhall belong, pay more than one third of the uſual rate of ferriage, or be charged any toll for paſſing any toll-bridge; and if any ferryman or keeper of any toll-bridge, ſhall refuſe a paſſage, or make a demand contrary to the directions of this act, he ſhall for each offence, forfeit and pay the ſum of eight dollars, to be recovered by any perſon who will ſue for the ſame, one half to the proſecutor, and the other half to the paymaſter, for the uſe of the regiment or independent battalion, where ſuch demand or refuſal is made, any law, uſage or cuſtom to the contrary notwithſtanding.

Candidates not to treat on days of election.

32. *And be it enacted,* That no candidate ſhall give any ſpirituous liquors or treat, to any officers or privates on any day of election of officers, under the penalty of twenty dollars.

33. *And be it enacted,* That if any ſuit ſhall be brought or commenced againſt any perſon, for any thing done in purſuance

## OF THE STATE OF NEW-JERSEY. 625

of this act, the *venue* shall be laid in the county where the cause of action arose; and the defendant in such action may plead the general issue, and give this act and the special matter in evidence.

<p style="float:right">In actions against militia-men, <i>as such, venue</i> to be laid in the proper county.</p>

34. *And be it enacted,* That the captains or commanding officers of the different companies or troops of militia in this state, shall, yearly, on or before the twentieth day of June, make and deliver a full and complete roll, on oath or affirmation, to the affessors of the respective townships in which they reside, of all persons duly enrolled in their respective companies, who perform military duty; for which service the said captains or commanding officers shall respectively be entitled to receive of the collector of the county, the sum of one dollar, on producing a receipt of his having delivered the said roll to the affessor as aforesaid; and the affessors of the several townships of this state shall, yearly, between the twentieth day of June and the twentieth day of August, take an exact list of the names and surnames of all free white male inhabitants in their respective townships, between the ages of eighteen and forty-five years, except such persons as are exempted from militia duty by the first section of this act, and all general, field and staff-officers in actual commission, and excepting those who shall produce to the said affessor, a certificate signed by the commanding officer, surgeon or surgeon's mate, and any one captain of said battalion to which they belong, or any two of them, of their inability of body to perform military duty; and the said affessors respectively, shall, after comparing the returns made by the respective captains or commanding officers, with the list of names by them respectively taken, infert all the names not contained in the rolls or returns made by the said captains or commanding officers, in a feparate list to be annexed to their respective duplicates or tax lists, and they and every of them, shall be considered as exempts, and the several affessors shall fine them in their respective duplicates, the sum of three dollars each, over and above the amount of their taxes; and the said affessors shall yearly and every year, make out a duplicate list of the names of every exempt contained in his or their respective duplicates or tax lists, and shall deliver or safely transmit the same to the collector of their respective counties; and also, at their annual meeting in September, yearly, make out a general abstract of the same, which they shall deliver or safely transmit to the said county collector, who is hereby required and enjoined, to deliver or safely transmit the same to the treasurer of the state; and the said treasurer shall thereupon charge the county, in which the said townships are situated, with the amount of the money due on the said duplicate lists for exempt fines, in the public books of his office; and the several county collectors of this state, shall pay forward to the treasurer thereof, the sum due on the respective lists for

<p style="float:right">Captains to deliver roll of their companies to the affessors.</p>

<p style="float:right">Allowance therefor.</p>

<p style="float:right">Who shall be considered as exempts, &c.</p>

<p style="float:right">Abstract to be furnished the treasurer;</p>

<p style="float:right">His duty.</p>

626                    ACTS OF THE GENERAL ASSEMBLY

exempt fines, over and above the quotas due from the several counties by law, on the same day on which the said quotas become due, unless he or they shall produce an account from the township collector or constable, certified on oath or affirmation, that the persons named in the said account for exempt fines, are either dead, absconded or insolvent, and that the money cannot be recovered; and on neglect thereof, the said treasurer shall prosecute the said county collector for and recover the same, or any part thereof, in any court where the same may be cognizable; and the said treasurer is hereby directed to keep separate and distinct accounts of all monies received in pursuance of this act, and to lay an account thereof, annually, before the legislature. And if any assessor shall neglect or refuse to insert the names of the persons not contained in the company rolls as aforesaid, he or they so offending, shall forfeit and pay the sum of six dollars for every name by him or them omitted or neglected to be inserted in his duplicate, to be recovered by the collector of the township, in an action of debt, in any court where the same may be cognizable, with costs of suit, to and for the use of the state; and the said assessors, respectively, shall be entitled to receive, in addition to their other fees to which they are entitled by law, the sum of two cents for every name contained in their lists, of all persons between the ages of eighteen and forty-five years; and the said collectors, respectively, shall be entitled to receive, in addition to their other fees, the sum of two cents for the name of every exempt contained in their respective duplicates; all which fees shall be paid by the county collector, out of the exempt fines, and a receipt of such payment, with two cents on a dollar, shall be allowed such county collector in his settlement with the treasurer.

*Penalty on assessors;*

*Allowance to them.*

*Allowance to the county collector.*

*Who shall constitute a court of appeals in cases of improper enrollments; when to meet and power of the court.*

35. *And be it enacted,* That the commanding officer of the regiment or independent battalion, the surgeon or surgeon's mate, and any one captain of the same, shall constitute a court of appeal, and shall meet for that purpose on the second Monday in November, yearly, at some convenient place to be appointed by the said commanding officer, public notice whereof shall be given by advertisements, fixed up in at least three of the most public places within the limits of the said battalion or regiment, at least ten days previous to the day of meeting; and any person who may think himself aggrieved, may apply to the said court, which is hereby invested with full power and authority to hear and decide thereon; and if he shall make it appear to the satisfaction of the said court, that he is wholly unable to perform military duty, or not within the age prescribed by law, or is enrolled as a militia-man, to remit such exempt fine; and a certificate from the officers composing the said court, or any two of them, shall be deemed good and valid, and the appellant shall thereupon be discharged from the payment thereof; and

the faid court fhall make out and tranfmit a duplicate certificate to the collector of the county in which fuch applicant refides; which certificate fhall be allowed as a fufficient voucher to the county collector, in his fettlement with the treafurer of this ftate, for fo much of the exempt fines.

36. *And be it enacted*, That the refpective townfhip collectors, fhall collect the faid exempt fines, at the fame time and in the fame manner in which the townfhip quota of other taxes is directed by law to be collected; and if the faid townfhip collectors, or any of them, fhall neglect or refufe to pay forward the a-mount of faid exempt fines as aforefaid, the collector of faid county fhall profecute for and recover the fame, in the manner the ftate taxes are recoverable. *Exempt fines how to be collected.*

37. *And be it enacted*, That if any affeffor fhall neglect or re-fufe to execute any of the duties enjoined on him by this act, he fhall forfeit and pay the fum of thirty dollars for each of-fence, to be recovered by action of debt, with cofts of fuit, by the collector of the county; and if any county collector fhall ne-glect or refufe to execute any duty enjoined on him by this act, he fhall forfeit and pay the fum of one hundred dollars for each offence, to be recovered by action of debt, with cofts, by the treafurer of this ftate, and applied to the ufe of the ftate; and all other officers, as well civil as military, who fhall neglect or refufe to perform any of the duties required of them by this act, and not otherwife punifhable by the fame, or who fhall neglect or refufe to pay forward the monies by them received in purfu-ance of this act, to the paymafter of the regiment or independent battalion to which they belong, or in which they refide, they fhall refpectively forfeit and pay the fum of thirty dollars for each offence, to be recovered by action of debt, by the paymafter of the faid regiment or battalion, in any court where the fame may be cognizable, with cofts of fuit, to and for the ufe of the faid regiment or independent battalion; and fhall moreover be liable to an action at the fuit of the faid paymafter of the regi-ment or independent battalion, for the fums which may be in his or their hands, to be recovered in any court where the fame may be cognizable, with cofts of fuit, to be applied as aforefaid. *Penalty on af-feffors for ne-glect of duty; On county col-lectors; And on all o-ther officers.*

38. *And be it enacted*, That if any youth of the age of twelve years, and not exceeding the age of eighteen years, fhall, with the confent and approbation of his parents, attach himfelf to any company of militia for the purpofe of learning to beat the drum, play on the fife or blow the trumpet, provided the num-ber fhall not exceed one perfon for the drum and one for the fife, in each company, and one for the trumpet in each troop of horfe, every fuch perfon or perfons fhall be put under the inftructions of the drum or fife-major, or trumpeter, as the cafe *Mufic to be taught, &c.*

G g

628        ACTS OF THE GENERAL ASSEMBLY

may be, whose duty it shall be to teach such person or persons
in the best manner in his power; and as soon as such person or
persons shall be able to perform field duty, to the satisfaction of
the commanding officer, he shall draw his warrant on the pay-
master of the regiment, in favour of the drum or fife-major, or
trumpeter, who may have taught such person or persons to
beat the drum, play the fife or blow the trumpet as aforesaid,
for the sum of ten dollars for every person so taught; and the
person so taught shall be furnished with a suit of regimentals,
to be paid for out of the funds of the regiment or battalion, as
the case may be; and the father of every youth who shall have
been instructed as aforesaid, shall be exempted and excused
from every kind of military duty, so long as his son shall conti-
nue to perform the duties of a drummer, fifer or trumpeter in
any militia company or troop, and be under the age of eighteen
years.

Surplus money
how to be ap-
propriated.

39. *And be it enacted,* That the surplus money which may be
in the hands of any paymaster of any regiment or independent
battalion, on the settlement of his accounts, shall be appropri-
ated to the purchase of arms and accoutrements for the use of
the said regiment or independent battalion, at the discretion of
a majority of the commissioned officers thereof.

Militia on pa-
rade days not
to be arrested
and arms not
to be levied on.

40. *And be it enacted,* That no commissioned officer, non-com-
missioned officer or private, shall be arrested on any civil pro-
cess in going to or returning from any place of exercise or train-
ing, nor shall any arms or accoutrements of a militia-man be
levied on or sold by virtue of any execution.

Former acts
repealed.

41. *And be it enacted,* That the act, entitled, " An act for or-
" ganizing and training the militia of this state," passed the thir-
tieth day of November, one thousand seven hundred and nine-
ty-two, and the several supplements thereto, be and the same
are hereby repealed: *Provided always,* That nothing herein con-
tained, shall be deemed to repeal, alter or dispense with the
powers, authorities or duties of the several officers under the
said acts, in and concerning the fines, penalties and forfeitures
heretofore incurred under the same, and that the proper officers
be and they are hereby authorized and enjoined to collect, or
cause to be collected, all such fines and forfeitures as have been
incurred, and pay the same agreeably to the laws aforesaid, on
or before the first day of January next: *And provided,* That so
much of this act as respects the time of trainings and exercises
of the several regiments, battalions and independent battalions,
shall not be in force until the first day of January next.

A.        Passed at Trenton, June 13, 1799.

# ACTS

OF THE

## THIRTY-FIRST

# GENERAL ASSEMBLY

OF THE

### STATE OF NEW-JERSEY,

*At a Session begun at Trenton, on the twenty-eighth day of October, one thousand eight hundred and six, and continued by adjournments.*

BEING THE FIRST SITTING.



NEWARK:

PRINTED BY W. TUTTLE & Co.

PRINTERS ON THE LAWS OF THE STATE.

1807

JA2893

771

with sureties, unto the Governor of this State, in such amount as shall be approved of by the Orphan's Court of the county of Monmouth, conditioned for the true and faithful performance of the trust assigned him by this act, which bond shall be deposited in the Surrogate's office of the said county of Monmouth.

SEC. 4. *And be it enacted,* That the said Tylee Williams shall within six months after the sale of the lands and real estate aforesaid, make, subscribe and exhibit under oath or affirmation unto the Surrogate of the county of Monmouth, an exact statement of the amount of the said sale or sales, to be by him recorded and filed agreeable to law ; and the said Tylee Williams shall be accountable for all monies by him received by virtue of this act.

*Statement to be exhibited.*

SEC. 5. *And be it enacted,* That no deed or conveyance of such lands and real estate made by the trustee aforesaid, shall be valid unless it be certified in or upon such deed or conveyance by James Lefetra and George Corlies, or the survivor of them, under their hands and seals, that such sale is made bona fide, and for the highest price that could be obtained for such property at the time of said sale.

*Deed how to be certified.*

Passed at Trenton, November 28, 1806.

~~~~~~

## CHAP. CLVI.

An act supplementary to an act entitled " An act for establishing and conducting the military force of New-Jersey."

SEC. 1. BE IT ENACTED *by the Council and General Assembly of this State, and it is*

772

*hereby enacted by the authority of the same,*
That the commanding officer of every regiment,
independent battalion and squadron, may call a meeting of the commissioned officers of their respective regiments, independent battalions and squadrons, at such time and place as he shall appoint for improvement in military exercise, which shall not exceed twice in any year; and the commissioned officers having notice of such meeting and making default shall be subject to a fine not exceeding four dollars, at the discretion of the board of general and field officers when convened; and return shall be made of such defaulter or defaulters, by the commanding officer present at such meeting.

*Meeting of officers.*

SEC. 2. *And be it enacted,* That the militia of this state shall rendezvous three times in every year for the purpose of training, disciplining and improving in martial exercise, once by companies or troops, within their respective bounds on the first Monday in April; once by battalions within their respective bounds, the first battalion of the first regiment, on the first Monday of May; the second battalion of said regiment on the Tuesday following; the first battalion of the second regiment on the Wednesday following; the second battalion of the said regiment on the Thursday following; the first battalion of the third regiment on the second Monday of May, the second battalion of said regiment on the Tuesday following; the first battalion of the fourth regiment on the Wednesday following, and the second battalion of the said regiment on the Thursday following; the first battalion of the fifth regiment on the third Monday of May, the second battalion of said regiment on the Tuesday following; and the independent battalions shall parade on the days immediately succeeding the trainings of such battalions as may be formed into regiments

*Times of training.*

JA2895

776

according to their rank in the brigade, always excepting the first and last days of the week : the squadron of horse in each brigade, shall meet for exercise and inspection on the fourth Monday of May, and such squadrons of horse as are so situated as to make it inconvenient to meet in squadron for inspection, shall meet by troop for that purpose, at the time and place directed for the battalion within which the majority of said troop resides ; and once by regiments and independent battalions, with the troop or troops of horse and company or companies of artillery, the major part of which shall be raised within the bounds of each regiment or independent battalion attached to the same ; the first regiment on the first Monday of June, the second regiment on the Tuesday following ; the third regiment on the Wednesday following ; the fourth regiment on the Thursday following, and the fifth regiment on the second Monday of June. It shall be the duty of the captains or commandants of companies or troops, the majors or commandants of battalions, and the colonels or commandants of regiments, to advertise the hour and place of meeting of their respective corps, on the days appointed by law at least two weeks in two of the most public places in the company, four of the most public places in the battalion, and six of the most public places in the regiment so called to exercise. That it shall be the duty of every general of brigade, when more than one independent battalion exists under his command, to direct that they draw for rank by their commanding officer in the presence of the general ; and the battalion drawing the lowest number shall be highest in rank, and called the first independent battalion of the brigade, and the other or others shall be numbered and named accordingly ; and in ev-

I

JA2896

774

ery brigade in which there is an independent battalion or battalions the regiments shall proceed in their trainings each on the day designated by law, and the independent battalion or battalions shall follow according to their numerical order or rank on the days immediately succeeding, always excepting the first and last days of the week. The boards of general and field officers of each brigade shall have full power and authority at their discretion once in three years to order a brigade training, on one of the regimental days within the bounds of the brigade, which brigade training shall be instead of the regimental training for that year, and the same fines and penalties shall be imposed for deficiencies as are directed in cases of regimental muster, and the said board may leave out of such brigade orders any regiment or independent battalion the local situation of which may in their opinion require it, which regiment or independent battalion shall observe the day or days above appointed for such detachment. *And further,* That if the order aforesaid, in which the regiments and battalions are directed to exercise, shall be found inconvenient, it shall be lawful for the brigadier general, to change the order in which the said regiments and battalions aforesaid shall be exercised at his discretion not altering the days of training and exercise; but confining such discretion to naming the particular regiment or battalion that shall train or exercise on a particular day as before mentioned, so that the inspection and review may be rendered more convenient to the brigadier general and brigade inspector. The brigade inspector by order of the brigadier general to give notice by advertisement set up in three of the most public places within the bounds of each regiment and independent battalion be-

*(margin note:)* Brigade trainings how ordered.

JA2897

775

longing to the said brigade at least thirty days previous to the day of meeting. That it shall be the duty of the captain or commanding officer of every company, of the major or commanding officer of every battalion, of the lieutenant-colonel or commanding officer of every regiment, of the general or commanding officer of every brigade, of the major general or commanding officer of every division to make accurate returns of the troops under their respective commands, to their next superior officer, at least once in every year, which shall be done in two months after the annual trainings.

*Sec.* 3. *And be it enacted,* That the fines for non attendance on days of exercise shall be as follows : on a general officer the sum of ten dollars, on a field officer the sum of five dollars, on every other commissioned officer the sum of three dollars per day, on every non-commissioned officer and private the sum of one dollar per day, and the same fines and penalties shall be respectively paid by every officer, non commissioned officer and private, who shall leave the parade or absent himself from his regiment, battalion, squadron, troop or company, without leave of the commanding officer before the said regiment, battalion, squadron, troop or company shall be discharged, and if any militia man shall appear on parade without his musket or firelock, or if a trooper without his sword and pistols, he shall forfeit and pay fifty cents, and for want of a cartridge-box six cents, and if a footman for want of a bayonet and belt six cents. *Provided,* That no militia man shall be liable to such fines who in the opinion of the company court created by this supplement may be deemed unable from whatever cause to procure arms and equipments or either of them : but when any militia man shall be called into

776

actual service, he shall appear fully equipped with every article required by act of congress, or be subject to a fine, if an officer, of ten dollars, or if a private two dollars.

**Clerk's duty ; and** SEC. 4. *And be it enacted*, That in order to ascertain those persons who by their absence on days of exercise shall be liable to the fines and forfeitures of this supplement, a clerk appointed by the captain or commanding officer of every troop or company, shall on every day of training, in the presence of the said captain or commanding officer of said troop or company, one hour after the time appointed for the meeting of the troop, company, battalion, squadron, regiment or brigade, and also after the exercise is over and before the men are dismissed call over the muster roll of the said troop or company, noting those who are absent at each roll call and also all those who are deficient in arms or equipments and the particular article or articles for want of which they are liable to be fined ; and shall ten days prior to the day appointed for the meeting of the company court set up in three of the public places within the bounds of said company a written advertisement, publishing the names of all delinquents and the fines and forfeitures that each delinquent in said troop or company is liable to and shall deliver a true and particular return of all such delinquents and deficiencies on oath or affirmation to the president of said company court, which oath or affirmation shall be in the following form :

**Oath.** I        clerk of the        company (or troop as the case may be) of the        battalion (or squadron as the case may be) within the        regiment of the        brigade, do in the presence of Almighty God sincerely swear (or affirm as the case may be) that this return contains the names of all the delinquents of said company or troop,

JA2899

777

according to the best of my knowledge and belief, and that the fines accrued and all the deficiencies are truly marked opposite the name of each delinquent, &c.

Sec. 5. *And be it enacted*, That the commissioned officers of each and every company or troop shall constitute a company court, the officer first in rank shall be president ; they shall when convened for business administer to each other the following oath or affirmation : *Company court,*

I       do swear (or affirm as the case may be) that I will perform the duties of a member of this company court agreeably to the true intent and meaning of the militia law of this state, according to the best of my skill and understanding without favor, affection or partiality. So help me God *their oath*

And said company court shall meet on the first Monday of August in every year at such place within the bounds of said company as the captain or commanding officer thereof shall publicly direct and proceed to hear the testimony and allegations of all such parties appearing by themselves or representatives as have been returned delinquent at the preceding trainings and impose such fines and forfeitures as in justice and equity this act requires.   The president of said court shall within five days thereafter make an accurate return to the major or commanding officer of the battalion of the names of all delinquents and the sum imposed on each by the said company court. *and time of meeting.* *Return by the president.*

Sec. 6. *And be it enacted*, That the major or commanding officer of each battalion, with the captain next in seniority of the same, and the surgeon or surgeon's mate of the regiment to which such battalion belongs shall constitute the battalion court of appeals, and shall meet on the third Monday of August in every year *Battalion court.*

JA2900

778

and when met shall take the oath prescribed by the thirteenth section of the act to which this is a supplement, which oath or affirmation shall be administered by the captain to the major or commanding officer of the battalion, and by the major or commanding officer of the battalion to the other members ; the duties of this court shall be to hear the testimony and allegation of all such parties as shall appear by themselves or their representatives and conceive themselves aggrieved by any decisions of the company court. They shall have power to administer oaths to witnesses, and the president shall keep a record of all the proceedings of the said court ; there shall be no appeal from their decision nor any certiorari allowed : they shall also have full power and authority to grant certificates of exemption from military duty, to all such applicants as shall appear to them to labor under permanent inability of body or insanity of mind, which certificate shall be a sufficient warrant for the captain or commanding officer of the company to which such person belonged to erase his name from the muster roll of said company.

**Their powers and duties.**

Sec. 7. *And be it enacted,* That the major or president of the battalion court of appeal shall within ten days of holding said court make accurate returns of the names of all delinquents and the sum imposed on each, one to the battalion paymaster, one to the brigade paymaster, and one to the board of general and field officers, directed to the judge advocate.

**Returns by the president.**

Sec. 8. *And be it enacted.* That the board of general and field officers shall convene annually on the first Monday in September for the ordinary business of the brigade to whom the brigade inspector shall make return of all such delinquencies of the general, field and staff officers as shall come to his knowledge, whose duty it shall be to ascertain said delinquency by ordering the

**Duty of the board of general and field officers.**

779

adjutants of the several regiments and independ-
ent battalions to make a return of said delin-
quents to him, and the said board shall proceed
(when no satisfactory excuses are offered) to
assess such fines on each defaulter as are direct-
ed by law, and the same shall be collected by
the brigade paymaster on a return from the
president of the said board, which fine if not
paid within ten days, the said paymaster shall
prosecute for before any court having compe-
tent jurisdiction. And whenever the board of
general and field officers of any brigade in this
state shall re-attach a company to any other re-
giment or battalion, such company so attached
shall hold the same rank in such regiment or
battalion that they held in their former regi-
ment or battalion, unless there should happen
to be a company of the same rank in such re-
giment or battalion, in which case the company
so attached shall be considered the lowest in
rank of the said regiment or battalion.

SEC. 9. *And be it enacted,* That the fiftieth
section of the act to which this is supplementary
shall be so construed as to apply only to day's
of exercise appointed by this act, and to cases
of invasion and insurrection.

Construc-
tion of 5th
section.

SEC. 10. *And be it enacted,* That the majors
or commanding officers of battalions shall be
charged with organizing the several companies
under their respective commands ; so far as
where militia men of any company district ne-
glect or refuse to choose their company officers,
the major or commanding officer to which such
company belongs, shall under his hand and
seal appoint a serjeant within the said company
district, whose duty it shall be to take command
of the said company and conduct it agreeable to
the militia laws of this state until proper offi-
cers are elected and qualified according to law ;
and to constitute his company court, the said

Organiza-
tion of
companies.

JA2902

780

serjeant shall appoint three of the most respect-
able enrolled persons from the list of said com-
pany who shall choose one of their number to be
president of said court ; they shall take the
oath or affirmation prescribed by the fifth sec-
tion of this supplement, and in all things be
governed by the same regulations as are direct-
ed for other company courts.

**Battalion and squadron inspections may be appointed.** SEC. 11. *And be it enacted,* That it shall be
lawful for the brigade inspector to attend the
battalion and squadron trainings (instead of the
regimental trainings) for inspection during the
time of their being under arms, whenever in
the opinion of the board of general and field
officers of the brigade the good of the service
shall require it.

**Artillery & cavalry companies how to be completed.** SEC. 12. *And be it enacted,* That it shall be
lawful for the captains or commanding officers
of cavalry and artillery to enroll in their respec-
tive companies from the several companies com-
posing the brigade, regiment or battalion, to
which such troop or company may belong,
such men as may be necessary to complete their
respective companies subject to all the other
regulations of the act to which this is a supple-
ment.

**Exemption from military duty.** SEC. 13. *And be it enacted,* That any person
desirous of becoming exempt from military du-
ty, may in the month of March in every year
pay into the hands of the battalion paymaster
the sum of three dollars, which shall exempt
such person from military duty for the year then
next ensuing, and the said battalion paymaster
shall make out a certified list under his hand
and seal of all such exempts (if any there are)
and transmit the same to the captain or com-
manding officer of the company to which such
person may belong, and also a duplicate of said
list to the brigade paymaster, on or before the
second Monday of April in every year and the

JA2903

781

captain shall not erase such persons name from the master roll of said company but write opposite such name exempted for 180 and said exempts shall be liable to be draughted in the same manner as the enrolled militia, when called into actual service, and liable to the same fines and penalties. And within two months thereafter the said captain shall transmit the said certified list on which he has acted to the brigade judge advocate for the use of the board of general and field officers to serve as a check on the battalion paymaster in the settlement of their accounts with the said board.

SEC. 14. *And be it enacted,* That the following fees be allowed: To the clerk of every company or troop for duties required of him one dollar for each year, to each of the members of the company court one dollar, to the presiding officer of said court for making the return of the delinquents of said company or troop one dollar, to each of the members of the battalion court one dollar and fifty cents, to the major or presiding officer of said court for making the returns required of him as such three dollars; and the paymasters of the battalions where such officers belong are hereby authorized to pay the above fees on a certificate from the presiding officer of each court before whom the business is immediately transacted. To the board of general and field officers for the time they shall necessarily be engaged in the business of the brigade to which they belong each per day two dollars.

SEC. 15. *And be it enacted,* That the monies arising from military fines, forfeitures and exemptions which may have been paid into the treasury of this state are hereby appropriated exclusively to the purchase of muskets and bayonets for the use of the military force of New Jersey, which muskets shall be of the same caliber

K

JA2904

782

and construction with those used in the service of the United States, and as often hereafter as the sum of five thousand dollars shall be paid into the treasury as aforesaid, the board of general officers shall proceed to apply the same as before directed, and shall cause the same to be distributed amongst the several brigades in proportion to the number of militia present on duty according to the last return, and the several brigade quarter masters shall on the receipt of the arms cause the same to be distributed in equal proportions among the several battalions in their respective brigades, for which purpose they shall be delivered to the quarter masters of the several regiments and independent battalions, and the said quarter masters respectively shall cause them to be deposited in some convenient and safe place in the vicinity of the usual place of battalion parade, under the care of some discreet person, who shall be entrusted with the custody and preservation of the same and shall be entitled to a reasonable compensation for his services in keeping and cleaning the same, to be paid by the battalion paymaster on an order drawn by the commanding officer of the said battalion ; and the said quarter masters of regiments and independent battalions shall cause the said arms to be delivered to the order of the commander in chief whenever the same may be required for public service. And it shall be the duty of the commander in chief to lay before the legislature at their first meeting in every year, the proceedings of the board of general officers under this section.

Promulgation of this act.

SEC. 16. *And be it enacted,* That two thousand copies of this act shall be printed and distributed under the direction of the commander in chief, by the adjutant general to the several officers of the militia, and it shall be the duty of any officer having such copy or copies on

785

his going out of office to deliver, or in case of
death his executors or administrators shall deliv-
er under the penalty of five dollars to the suc-
cessor in office, who shall prosecute for the same
of the person so going out of office or dying the
aforesaid copy or copies.

SEC. 17. *And be it enacted*, That the duties
of the battalion paymasters contained in the six-
teenth and seventeenth sections, on receiving
the return of delinquents from the brigade judge
advocate shall continue the same on receiving
a delinquent return from the major or presiding
officer of the battalion courts of appeals, that
the fifth, sixth, seventh, eighth, ninth, eleventh,
twelfth and fifteenth sections, the thirteenth
section except so far as prescribes the oath for
the members of the court of appeals, so much
of the third section as respects the appointment
of company clerks, so much of the sixteenth
section as directs the battalion paymasters to
advertise the names of delinquents, and so much
more of the act to which this is a supplement
as comes within the purview of this act shall be
and the same are hereby repealed.

Passed at Trenton, November 27, 1806.

Parts of
former act
repealed.

JA2906

# ACTS

OF THE

# FIFTY-THIRD

# GENERAL ASSEMBLY

OF THE

## State of New=Jersey,

AT A SESSION BEGUN AT TRENTON ON THE TWENTY-EIGHTH DAY OF
OCTOBER, ONE THOUSAND EIGHT HUNDRED AND TWENTY-
EIGHT, AND CONTINUED BY ADJOURNMENTS.

———

**BEING THE SECOND SITTING.**



## Trenton:

PRINTED BY A. W. PHILLIPS.

## 1829.

**109**

·AN ACT to authorize John Budd, of the county of Morris, to remove the obstructions from the outlet of Budds Lake, in said county of Morris.

WHEREAS it is represented, that the outlet of Budds Lake, in the township of Roxbury, in the county of Morris, has been obstructed by the wash of the road and stone placed at said outlet, by means of which the waters of said lake have been raised so high as to overflow a large quantity of land— Therefore, *Preamble.*

BE IT ENACTED *by the Council and General Assembly of this State, and it is hereby enacted by the authority of the same,* That it shall be lawful for John Budd to clear out and remove, or cause to be cleared and removed, the obstructions at the outlet of said Budds Lake, in the township of Roxbury, in said county of Morris: *Provided nevertheless,* that the same shall be done at the proper expense of the said John Budd. *Improvement authorized.*

C. February 23, 1829.

AN ACT for the punishment of crimes.

SEC. 1. BE IT ENACTED *by the Council and General Assembly of this State, and it is hereby enacted by the authority of the same,* That if any person or persons, owing allegiance to this state, shall levy war against it, or shall adhere to its enemies, or to the enemies of the United States, giving them aid or comfort within this state or elsewhere, or by giving them advice or intelligence by letters or writing of any kind, or by messages, words, signs, or tokens, or in any way whatsoever within this state or elsewhere, or by procuring for, or furnishing to them, money or any kind of provisions, arms, or warlike stores within this state or elsewhere, or by bribery, or for reward, or promise thereof, or through favor, partiality, or treachery, yielding or surrendering to them any town or fortress, castles, garrisons, troops, militia, citizen, or citizens of this state or of the United States, or any ship, boat or vessel of this state, or of the United States, or by giving them aid or comfort in any other way, and shall be thereof convicted or attainted on confession in open court, or on the testimony of two witnesses, to the same overt act of the treason whereof he, she, or they shall stand indicted, such person or persons shall be adjudged guilty of treason, and shall suffer death. *Treason, what cases shall be adjudged, how proved and punished.*

SEC 2. *And be it enacted,* That if any person or persons, having knowledge of the commission of any of the treasons *Misprision of treason, what, and how punished.*

110

aforesaid, shall conceal, and not, as soon as may be, disclose and make known the same to the governor of this state, or to some one of the justices of the Supreme Court thereof, or to some one of the justices of the peace in and for any of the counties of this state, such person or persons, on conviction, shall be adjudged guilty of misprision of treason, and shall suffer an imprisonment at hard labor for any term not exceeding seven years, or be fined not exceeding one thousand dollars, or both, at the discretion of the court before whom such offender or offenders shall be convicted.

SEC. 3. *And be it enacted*, That every person who shall commit murder, or shall aid, abet, counsel, hire, command, cause, or procure any person or persons to commit murder, shall, on being thereof convicted or attainted, suffer death; and in such case the court may, at their discretion, add to the judgment, that the body of such offender shall be delivered to a surgeon for dissection: and the sheriff who is to cause such sentence to be executed, shall accordingly deliver the body of such offender, after execution done, to such surgeon as the court shall direct, for the purpose aforesaid : *Provided*, that such surgeon, or some person by him appointed for the purpose, shall attend to receive and take away the dead body at the time of the execution of such offender.

*Murder to be punished with death ; and court may deliver criminals to surgeon for dissection.*

SEC. 4. *And be it enacted*, That if any person or persons, after such execution had, shall rescue, or attempt to rescue the body of such offender out of the custody of the sheriff or his officers, or the surgeon or his agents, during the conveyance of such body to any place for dissection, as aforesaid, or shall rescue, or attempt to rescue such body from the house of any surgeon where the same shall have been deposited in pursuance of this act, every person so offending shall be liable to a fine not exceeding one hundred dollars, and an imprisonment at hard labor not exceeding twelve months, or either of them, at the discretion of the court.

*Rescue of body delivered for dissection, punishment for.*

SEC. 5. *And be it enacted*, That if any person or persons commit the crime of manslaughter, and be thereof convicted, such person or persons shall be liable to a fine, not exceeding one thousand dollars, and an imprisonment at hard labor, not exceeding ten years, or either of them, at the discretion of the court.

*Manslaughter, how punished.*

SEC. 6. *And be it enacted*, That from and after the passage of this act, in all cases wherein heretofore any person or persons would have been deemed or taken to have committed the crime of petit treason, such person or persons shall be deemed and taken to have committed the crime of murder only, and shall be indicted and prosecuted to final judgment accordingly ; and the same punishment and no other shall be inflicted as in case of murder.

*Petit treason to be deemed murder only, and punished accordingly.*

SEC. 7. *And be it enacted*, That sodomy, or the infamous

111

crime against nature, committed with mankind or beast, shall be adjudged a high crime and misdemeanor, and be punished by fine not exceeding one thousand dollars, or imprisonment at hard labor, for any term not exceeding twenty-one years, or both.

*Sodomy, how punished.*

Sec. 8. *And be it enacted,* That any person who shall have carnal knowledge of a woman, forcibly and against her will, or who shall aid, abet, counsel, hire, cause, or procure any person or persons to commit the said offence, or who being of the age of fourteen years, shall unlawfully and carnally know and abuse any woman child, under the age of ten years, with or without her consent, shall, on conviction, be adjudged guilty of a high misdemeanor, and be punished by fine not exceeding one thousand dollars, or imprisonment at hard labor for any term not exceeding fifteen years, or both.

*Rape, what, and how punished.*

*Carnal knowledge of a female under ten years of age, how punished.*

Sec. 9. *And be it enacted,* That if any person shall unlawfully take any maid, widow, or wife, contrary to her will, and shall marry her himself, or cause or procure her to be married to another, either with or without her consent, or shall defile, or cause her to be defiled, such person so offending, his aiders, abettors, counsellors, and procurers, and such as wittingly receive such woman so taken against her will, and knowing the same, shall be deemed guilty of a high misdemeanor, and on conviction thereof, shall be fined and sentenced to imprisonment at hard labor, for any term not exceeding twelve years ; and every such marriage shall be void ; and also the person to whom such woman shall be so married, shall not receive, take, hold, possess, or enjoy any part of her estate, real or personal, by any gift, grant, bequest, or devise, of, from, or under her ; but every such gift, grant, bequest, or devise so made to him, or for his use, shall be void, and of no effect.

*Abduction of a woman, &c., how punished.*

*Such marriages void, and the pretended husband deprived of possessing her estate &c.*

Sec. 10. *And be it enacted,* That if any person shall unlawfully convey or take away any woman child, unmarried, whether legitimate or illegitimate, being within the age of fifteen years, out of or from the possession, custody, or governance, and against the will of the father, mother, or guardian of such woman child, though with her own consent, with an intent to seduce, deflower, or contract matrimony with her, such offender shall be deemed guilty of a misdemeanor, and on conviction, shall be punished by fine and imprisonment at hard labor for any term not exceeding two years, or either of them, and if he deflower such woman child, or without the consent of her father, mother, or guardian, contract matrimony with her, then, and in such case, he shall be deemed guilty of a high misdemeanor, and on conviction, shall be punished by fine and imprisonment at hard labor, for any term not exceeding five years ; and further, every such marriage shall be void.

*Taking a woman child under the age of fifteen years from the possession, or against the will of parents &c. with intent to defile her, how punished &c.*

Sec. 11. *And be it enacted,* That if any person being married, or who hereafter shall marry, shall marry any person,

*Polygamy, what, and how punished &c.*

112

the former husband or wife being alive, then the person so offending shall be deemed guilty of a high misdemeanor, and on conviction thereof, shall be punished by fine and imprisonment at hard labor for any term not exceeding ten years, or either of them, at the discretion of the court before whom such conviction shall be had; but neither this act, nor any thing therein contained shall extend to any person whose husband or wife shall be continually remaining without the United States of America for the space of five years together, or whose husband or wife shall absent him or herself, the one from the other, for the space of five years together in any parts within this state or the United States, the one of them not knowing the other to be living within that time; nor to any person who is, or shall be, at the time of such marriage, divorced by the sentence or decree of any authority or court having cognizance thereof; nor to any person where the former marriage hath been, or shall be, by the sentence or decree of any such authority or court declared to be void and of no effect; nor to any person for or by reason of any former marriage had or made, or to be had or made within the age of consent.

**Women pregnant with bastard children, concealing their pregnancy, and being delivered in secret, how punished.**

SEC. 12. *And whereas* many lewd and dissolute women, being pregnant with bastard children, but regardless of natural affection, or to avoid shame or escape punishment, conceal their pregnancy and the birth of such children, whereby many of them perish for want of the usual and necessary aid and assistance, and also conceal the death of such children, so that it cannot be known whether they were murdered or not, *Be it therefore enacted,* that if any woman shall conceal her pregnancy, and shall willingly and of purpose be delivered in secret by herself, of any issue of her body, male or female, which shall by law be a bastard, every such woman so offending shall be adjudged to be guilty of a misdemeanor, and, on conviction

**Concealing death of bastard child, the punishment prescribed.**

thereof, shall be punished by fine, not exceeding one hundred dollars, or by imprisonment at hard labor, not exceeding four months, or both. *And be it further enacted,* that if any woman shall endeavor privately, by drowning or secret burying, or in any other way, either by herself, or the procurement of others, to conceal the death of any such issue of her body, which if it were born alive would by law be a bastard, so that it may not come to light whether it were born alive or not, or whether it were murdered or not, then in every such case; the woman so offending, her aiders, abettors, counsellors, and procurers shall be adjudged to be guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine, not exceeding two hundred dollars, or by imprisonment at hard labor, not exceeding one year, or both, at the discretion of the court before whom such conviction shall be had.

**Incest, what constitutes it, and how to be punished.**

SEC. 13. *And be it enacted,* That all persons who shall intermarry within the degrees prohibited by law, shall be ad-

·113

judged to be guilty of incest and a misdemeanor, and, on conviction thereof, shall be punished by fine, not exceeding five hundred dollars, or by imprisonment at hard labor, not exceeding eighteen calendar months, or both, at the discretion of the court before whom such conviction shall be had.

SEC. 14. *And be it enacted*, That every person who shall commit adultery, and be thereof convicted, shall be punished by fine, not exceeding one hundred dollars, or by imprisonment, not exceeding the term of six months. *(margin: Adultery, how punished.)*

SEC. 15. *And be it enacted*, That every person who shall commit fornication, and be thereof convicted, shall be punished by a fine of fourteen dollars, to be paid to the overseers of the poor of the township where the offence was committed, for the use of the poor of said township. *(margin: Fornication, how punished &c.)*

SEC. 16. *And be it enacted*, That every person who shall be guilty of open lewdness or any notorious act of public indecency, grossly scandalous, and tending to debauch the morals and manners of the people, shall, on conviction, be liable to a fine, not exceeding one hundred dollars, and to an imprisonment at hard labor, not exceeding twelve months, or either of them, at the discretion of the court. *(margin: Open lewdness &c. to be punished &c.)*

SEC. 17. *And be it enacted*, That no prosecution, suit, or proceeding shall be commenced or carried on in any court of this state against any person for conjuration, witchcraft, sorcery, or enchantment, or for charging another with any such offence. *(margin: No suit against witchcraft, conjuration, &c. to be carried on.)*

SEC. 18. *And*, for the effectual prevention and punishment of any pretences to such arts or powers as are before mentioned, whereby ignorant persons are frequently deluded or defrauded, *Be it enacted*, that if any person shall pretend to exorcise, or use any kind of conjuration, witchcraft, sorcery, or enchantment, or pretend, from his or her skill or knowledge in any occult or crafty science, to discover where, or in what manner any goods or chattels, supposed to have been stolen or lost, may be found, every person so offending, being thereof convicted, shall, for every such offence, be punished by fine, not exceeding fifty dollars, or imprisonment, not exceeding three months, or both, at the discretion of the court. *(margin: Persons pretending to witchcraft or occult science, how punished.)*

SEC. 19. *And be it enacted*, That all impostors in religion, such as personate our Saviour Jesus Christ, or suffer their followers to worship or pay them divine honors, or terrify, delude, or abuse the people by false denunciations of judgments, shall, on conviction, be punished for every such offence by a fine, not exceeding one hundred dollars, or an imprisonment, not exceeding six months, or both, at the discretion of the court. *(margin: Religious impostors, how to be punished.)*

SEC. 20. *And be it enacted*, That if any person shall wilfully blaspheme the holy name of God, by denying, cursing, *(margin: Blasphemy, how punished.)*

P

or contumeliously reproaching his being or providence, or by cursing or contumeliously reproaching Jesus Christ, or the Holy Ghost, or the Christian religion, or the holy word of God, that is the canonical Scriptures contained in the books of the Old and New Testaments, or by profanely scoffing at or exposing them, or any of them, to contempt and ridicule, then every person so offending shall, on conviction thereof, be punished by a fine, not exceeding two hundred dollars, or an imprisonment at hard labor, not exceeding twelve months, or both, at the discretion of the court.

<p style="margin-left:2em;">Sec. 21. <i>And be it enacted,</i> That if any person shall wilfully and corruptly commit perjury, or shall by any means procure or suborn any person to commit corrupt and wilful perjury, on his or her oath or affirmation, in any action, plea, suit, bill, answer, complaint, indictment, controversy, matter, or cause depending, or which may depend, in any of the courts of this state, or before any references or arbitrators, or in any deposition taken or to be taken pursuant to the laws of this state, every person so offending shall be deemed guilty of a high misdemeanor, and, on being thereof convicted, shall be punished by fine, not exceeding eight hundred dollars, or by imprisonment at hard labor, not exceeding seven years, or both, at the discretion of the court, and be thereafter rendered incapable of giving testimony in any of the courts of this state, until such time as the judgment so given against the said offenders shall be reversed.</p>

**Perjury, and suboration of perjury, how to be punished.**

<p style="margin-left:2em;">Sec. 22. <i>And be it enacted,</i> That in every presentment or indictment to be prosecuted against any person for wilful and corrupt perjury, it shall be sufficient to set forth the substance of the offence charged upon the defendant, and by what court, and before whom the oath or affirmation was taken, averring such court or person or persons to have competent authority to administer the same, together with the proper averment or averments to falsify the matter or matters wherein the perjury or perjuries is or are assigned, without setting forth the bill, answer, information, indictment, declaration, or any part of any record or proceedings, either in law or equity, other than as aforesaid, and without setting forth the commission or authority of the court or person or persons before whom the perjury was committed.</p>

**In prosecutions for perjury, it is sufficient to set forth the substance of the charge.**

<p style="margin-left:2em;">Sec. 23. <i>And be it enacted,</i> That in every presentment or indictment for subornation of perjury, or for corrupt bargaining or contracting with others to commit wilful and corrupt perjury, it shall be sufficient to set forth the substance of the offence charged upon the defendant, without setting forth the bill, answer, information, indictment, declaration, or any part of any record or proceedings, either in law or equity, and without setting forth the commission or authority of the court</p>

**Also, in prosecutions for subornation of perjury.**

115

or person or persons before whom the perjury was committed, or was agreed or promised to be committed.

Sec. 24. *And be it enacted*, That if any person shall directly or indirectly give any sum or sums of money, or any goods, chattels, lands, or real estate, or any other bribe, present, or reward, or give or make any promise, contract, covenant, obligation, or security for the payment, delivery, alienation, or transfer of any money, goods, chattels, lands, or real estate, or other bribe, present, or reward to obtain, procure, or influence the opinion, judgment, decree, or behavior of any judge or judges, justice or justices, of this state, in any action, plea, suit, complaint, indictment, controversy, matter, or cause depending, or which shall depend before him or them, such person so giving, promising, contracting, covenanting, or securing to be given, paid, delivered, aliened, or transferred any sum or sums of money, goods, chattels, lands, real estate, or other present, reward, or bribe as aforesaid, and the judge or judges, justice or justices, who shall in any wise receive or accept the same, shall be adjudged guilty of a high misdemeanor, and, on conviction thereof, be punished by fine or imprisonment, or both, or by fine or imprisonment at hard labor, or both; but such fine shall not exceed eight hundred dollars, and such imprisonment shall not exceed five years: and also shall for ever be disqualified to hold any office of honor, trust, or profit under this state.

*Bribery, what cases shall be adjudged, and how punished.*

Sec. 25. *And be it enacted*, That no judge, justice, sheriff, coroner, constable, jailer, or other officer of this state, ministerial or judicial, shall receive or take any fee or reward to execute and do his duty and office, but such as is or shall he allowed by the laws of this state; and if any doth, he shall restore to the party grieved double damages and costs: *And further*, that if any such judge, justice, sheriff, coroner, constable, jailer, or other officer as aforesaid, shall receive or take, by color of his office, any fee or reward whatsoever, not allowed by the laws of this state, for doing his office, and be thereof convicted, he shall be punished by fine or imprisonment, or both, or by fine or imprisonment at hard labor, or both, the fine not to exceed four hundred dollars, nor the imprisonment the term of two years.

*Extortion, what, and how punished.*

Sec. 26. *And be it enacted*, That embracery, and all attempts to corrupt or influence a jury, or any of them, or any way to incline such jury, or any of them, to be more favorable to the one side than to the other, by promises, persuasions, entreaties, threats, letters, money, entertainments, or other sinister means, and all indirect, unfair, and fraudulent practices, arts, and contrivances to obtain a verdict, and all attempts to instruct a jury or juror beforehand, or at any place or time, or in any manner or way, except only in open court at the trial of the cause by the strength of the evidence, the arguments of the parties or their counsel, or the opinion or

*Embracery, how punished.*

116

charge of the court, shall be deemed misdemeanors, and be punished by fine or imprisonment, or both, or by fine or imprisonment at hard labor, or both, the fine in such case not to exceed three hundred dollars, nor the imprisonment the term of one year: *And further*, if any juror take money, goods, chattels, or other reward of the one party or the other, or be so as aforesaid embraced, then every such juror shall, on conviction, be punished by fine or imprisonment, or both, or by fine or imprisonment at hard labor, or both, the fine in such case not to exceed six hundred dollars, nor the imprisonment the term of two years, and, also, shall be for ever disqualified to serve or act as a juryman.

<div style="margin-left:2em">A juror who shall take a bribe, how to be punished.</div>

Sec. 27. *And be it enacted*, That if any person wilfully and maliciously shall burn, or cause to be burned, or aid, counsel, procure, or consent to the burning of the dwelling house of another, or any kitchen, shop, barn, stable, or other outhouse that is parcel thereof, or belonging or adjoining thereto, or any other building, by means whereof a dwelling house shall be burnt, then, and in every such case, the persons so offending shall be adjudged guilty of arson, and be proceeded against for a high misdemeanor, and, on conviction, shall be punished by fine, and imprisonment at hard labor for any term not exceeding fifteen years.

<div style="margin-left:2em">Arson, and the punishment thereof.</div>

Sec. 28. *And be it enacted*, That if any person wilfully and maliciously shall burn, or cause to be burned, or aid, counsel, procure, or consent to the burning of any barn, stable, or other building of another, not parcel of the dwelling house, or any shop, storehouse, warehouse, malthouse, mill, or other building of another, or any ship, boat, or other vessel of another, lying within the body of any county in this state, or any church, meetinghouse, courthouse, workhouse, jail, or other public building, then, and in every such case, the person so offending shall be adjudged guilty of a misdemeanor, and, on conviction, shall be liable to a fine, and imprisonment at hard labor for any term not exceeding ten years, or either of them.

<div style="margin-left:2em">Burning public buildings, mills, and outhouses, how to be punished.</div>

Sec. 29. *And be it enacted*, That if any person shall wilfully and maliciously set fire to, or aid, procure, or consent to the setting fire to any church, meetinghouse, courthouse, workhouse, jail, or other public building, or any dwellinghouse, kitchen, shop, storehouse, warehouse, malthouse, mill, barn, stable, or other house or building of another, or any ship, boat, or other vessel of another, lying within the body of any county in this state, with intent to burn the same, then, and in every such case, the person so offending shall be adjudged guilty of a misdemeanor, and, on being thereof convicted, shall be punished by fine, and imprisonment at hard labor for any term not exceeding five years, or either of them.

<div style="margin-left:2em">Dwelling houses, mills, &c., setting fire to, with intention to burn, how punished.</div>

Sec. 30. *And be it enacted*, That if any person shall, by

night, wilfully and maliciously break and enter any church, meetinghouse, dwellinghouse, shop, warehouse, mill, barn, stable, outhouse, or other building whatsoever, with intent to kill, rob, steal, commit a rape, mayhem, or battery, every such offender, and his and her procurers, counsellors, aiders, and abettors shall be deemed guilty of a high misdemeanor, and, on being thereof convicted in due course of law, shall be punished by fine, not exceeding five hundred dollars, and imprisonment at hard labor, not exceeding ten years, or both, at the discretion of the court before whom such conviction shall be had. *Burglary defined, and punishment prescribed.*

Sec. 31. *And be it enacted,* That if any person shall steal of the money or personal goods and chattels of another under the price or value of twenty dollars, he or she so offending shall be deemed guilty of a misdemeanor, and, on conviction of any such offence, shall be punished in the county where the conviction may be had by fine, or imprisonment in the cells, or imprisonment at hard labor in the common jail of the county, or by whipping, at the discretion of the court before whom such conviction shall be had, the fine not to exceed one hundred dollars, nor the term of imprisonment three months, nor the whipping to exceed thirty-nine lashes; and that every person accused of offending as aforesaid may be taken before any two of the justices of the peace of the county, city, or town corporate where the offence was committed, who are hereby authorized and required to hear and determine the same, if the person accused shall consent thereto; and if on trial such person shall, from the evidence produced, appear to be guilty, the said justices shall sentence him or her accordingly;—and no person hereafter convicted of larceny under the value of twenty dollars, shall be sent to the state-prison for such offence: *And further,* all fines that are imposed upon any person for offences that are tried and punished in any of the courts in this state (fornication excepted) shall be paid to the county collector, for the use of the county. *Larceny to the value of twenty dollars, how punished.*

Sec. 32. *And be it enacted,* That if any person shall steal of the money or personal goods and chattels of another, under the sum or value of twenty dollars, such person being committed to jail for the same for want of bail, and requesting to be tried before two justices of the peace, in the manner prescribed in the next preceding section, shall and may, by virtue of a warrant under the hands and seals of any two justices of the county, city, or town corporate wherein such fact was committed, or wherein such money, goods, or chattels were found on the person, or in his custody, to the sheriff or constable of such county, city, or town corporate, directed to be brought before the said justices, at such time and place as in the said warrant shall be appointed; and such sheriff or constable shall attend the said justices with the prisoner, during such reasonable time as the said justices shall direct: that the *No person convicted of stealing, under the sum of twenty dollars, to be sent to the state-prison.*

said justices shall then cause the clerk of the Court of Quarter Sessions of the county, city, or town corporate, or such other person as the said justices shall see fit to appoint and direct, to prefer to the said justices an accusation, in writing, alleging the time, place; and nature of the offence of the prisoner so as aforesaid brought before them, which the said justices are hereby fully empowered and required to hear and determine; to which accusation the said prisoner shall plead: and on refusal to plead, or on trial and conviction in manner aforesaid, shall suffer and incur, by order of the said justices, the punishment, penalty, and forfeiture prescribed and directed in the preceding section of this act, at the discretion of the said justices.

SEC. 33. *And be it enacted,* That if any person shall steal of the money or personal goods and chattels of another of or above the price or value of twenty dollars, or shall steal the money or personal goods and chattels of another, from his or her person, whether privately or without his or her knowledge, or openly and in his presence, to any value whatever above the sum of twenty dollars, or shall, in any church, meetinghouse, or place of worship, or any dwellinghouse, shop, storehouse, warehouse, mill, barn, stable, outhouse, or other building, steal of the money or personal goods and chattels of another, to any value whatever above the said sum of twenty dollars, every person so offending shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine, not exceeding five hundred dollars, or imprisonment at hard labor, not exceeding ten years, or both.

> *Above the value of twenty dollars &c., how to be punished.*

SEC. 34. *And be it enacted,* That if any person shall forcibly take from the person of another money or personal goods and chattels, to any value whatever, by violence, or putting him or her in fear, every person so offending, and his or her aiders, procurers, and abettors shall be adjudged guilty of a high misdemeanor, and, on conviction, shall be punished by a fine, not exceeding one thousand dollars, or imprisonment at hard labor for any term not exceeding fifteen years, or both.

> *Robbery, how punished.*

SEC. 35. *And be it enacted,* That if any person shall unlawfully and maliciously assault another with any offensive weapon or instrument, or by menaces, or in and by other forcible and violent manner and means, demand of another any money or personal goods and chattels, with intent to rob him or her, or shall, by day, wilfully and maliciously break and enter any dwelling-house, shop, warehouse, storehouse, mill, barn, stable, outhouse, or other building whatever, with intent to kill, rob, steal, or commit a rape, mayhem, or battery, then, and in every such case, the person so offending, and his or her counsellors, procurers, aiders, and abettors shall be deemed guilty of a high misdemeanor, and, on being thereof convicted, shall be punished by fine, not exceeding five hundred dollars,

> *Assault, with intent to rob, or housebreaking, by day, with intent to kill, rob, &c., how punished.*

or imprisonment at hard labor for any term not exceeding ten years, or both.

SEC. 36. *And be it enacted,* That if any person shall wilfully and maliciously enter, either by day or by night, without breaking the same, any church, meetinghouse, or place of worship, or any dwellinghouse, shop, warehouse, storehouse, mill, barn, stable, outhouse, or other building whatsoever, with intent to kill, rob, steal, or commit a rape, mayhem, or battery, then, and in every such case, the person so offending, and his or her counsellors, procurers, aiders, and abettors shall be deemed guilty of a high misdemeanor, and, on being thereof convicted, shall be punished by fine, not exceeding three hundred dollars, or imprisonment at hard labor for any term not exceeding five years, or both. *(margin: Entering dwelling house without breaking, with intent to kill &c., how punished.)*

SEC. 37. *And be it enacted,* That if any apprentice or servant, whether bound or hired, to whom any money, bank bill or note, or goods or chattels, shall be, by his or her master or mistress, delivered to be safely kept, shall withdraw himself or herself from his or her said master or mistress, and go away with the said money, bank bill or note, goods or chattels, or any part thereof, with intent to steal the same, and defraud his or her said master or mistress thereof, contrary to the trust and confidence in him or her reposed by his or her said master or mistress, or, being in the service of his or her said master or mistress, without assent or commandment of his or her said master or mistress, shall embezzle the said money, bank bill or note, goods or chattels, or any part thereof, or otherwise shall convert the same to his or her own use, with like purpose to steal the same, then, and in every such case, the person so offending shall be judged guilty of a high misdemeanor, and, on being thereof convicted, shall be punished by fine, not exceeding one hundred dollars, or imprisonment at hard labor for any term not exceeding two years, or both: *Provided,* that this clause or section shall not extend to any apprentice or servant, guilty of any of the premises therein mentioned, within the age of fourteen years. *(margin: Apprentices or servants, intrusted by their masters with money or goods, and who shall go away, with intent to steal them, or who shall embezzle them, how punished.)* *(margin: Proviso.)*

SEC. 38. *And be it enacted,* That if any lodger shall take away, with intent to steal, embezzle, or purloin any bedding, furniture, goods, or chattels, which by contract or agreement he or she is to use, or shall be let to him or her to use, in or with his or her lodging, then, and in such case, every person so offending shall be deemed guilty of a misdemeanor, and, on being thereof convicted, shall be punished by fine, not exceeding two hundred dollars, or imprisonment at hard labor, not exceeding two years, or both. *(margin: Lodger, stealing goods from his landlord, how punished.)*

SEC. 39. *And be it enacted,* That if any person shall steal or take by robbery, any bank bill or note, bill of exchange, order, warrant, draught, check, bond, bill, or promissory note for payment of any money, or any certificate or other public *(margin: For stealing bills, bonds, notes &c., how punished.)*

JA2918

**120**

security of the United States, or of this state, or of any of the United States, for payment of money, or acknowledging the receipt of money or goods, being the property of any other person or persons, or of any corporation, notwithstanding the said particulars, or any of them are, or may be termed in law choses in action, it shall be deemed and construed a misdemeanor of the same nature, in the same degree, and in the same manner, as it would have been if the offender had stolen or taken by robbery any other goods of like value, with the money due on such bank bill or note, bill of exchange, order, warrant, draught, check, bond, bill, or promissory note, or certificate or other public security, or secured thereby and remaining unsatisfied, and such offender shall suffer such punishment as he or she should or ought to have done if he or she had stolen or taken by robbery other goods of the like value, with the money due on such bank bill or note, bill of exchange, order, warrant, draught, check, bond, bill, or promissory note, or certificate or other public security, respectively, or secured thereby, and remaining unsatisfied.

Sec. 40. *And be it enacted,* That if any person shall steal or take, by robbery, any letters patent, charter, testament, will, or deed, whether indented or poll, covenant, assurance, lease, indenture of apprenticeship, articles of agreement, contract, letter of attorney, or other power, or any instrument of writing respecting any property, real or personal, or any release, acquittance, voucher, receipt, receipt book, waste book, day book, journal, leger, or other book of accounts of or belonging to another, every such offender shall be deemed guilty of a misdemeanor, and, on being convicted thereof, shall be punished by fine, not exceeding five hundred dollars, or imprisonment at hard labor, not exceeding ten years, or both.

*Stealing deeds &c., how punished.*

Sec. 41. *And be it enacted,* That if any clerk, coroner, sheriff, justice, or judge, or any other person, shall steal, embezzle, take away, alter, withdraw, falsify, or avoid any record, or parcel of the same, writ, return, panel, process, minutes, documents, book, or other proceeding, of or belonging to any of the courts of this state, or of or belonging to the office of the secretary of this state, or of the office of the clerk of the Supreme Court, or of the Inferior Court of Common Pleas, or General Quarter Sessions of the Peace, of any city or county in this state, by means whereof any verdict, judgment, sentence, or decree shall be reversed, annulled, made void, or lose its force and effect, then every such offender, his or her procurers, counsellors, aiders, and abettors, shall be adjudged guilty of a high misdemeanor, and, on being convicted thereof, shall be punished by fine, not exceeding seven thousand dollars, or imprisonment at hard labor, not exceeding seven years, or both; and in case no verdict, judgment, sentence, or decree shall be reversed, annulled, made void, or lose its force and effect by

*Persons stealing and altering records &c., whereby any judgment is reversed, their punishment prescribed.*

*And if judgment &c. be not reversed, the punishment prescribed.*

JA2919

any such stealing, embezzling, taking away, altering, withdrawing, falsifying, or avoiding of any of the records, proceedings, minutes, books, matters, or things aforesaid; then every such offender, his or her procurers, counsellors, aiders, and abettors shall, on conviction, be punished by fine, not exceeding one thousand dollars, or imprisonment at hard labor, not exceeding four years, or both : *Provided always*, that this act shall not extend to any amendment or entry made, or to be made, by any rule, order, judgment, or decree of any court.

*Proviso.*

SEC. 42. *And be it enacted*, That if any person shall falsely make, alter, forge, or counterfeit, or cause, counsel, hire, command, or procure to be falsely made, altered, forged, or counterfeited, or willingly act or assist in the false making, altering, forging, or counterfeiting any record or other authentic matter of a public nature, charter, letters patent, deed, lease, writing sealed, will, testament, annuity, bond, bill, writing obligatory, bank bill or note, check, draught, bill of exchange, promissory note for the payment of money, endorsement, or assignment of any bill of exchange or promissory note for the payment of money, or any acceptance of a bill of exchange, or the number or principal sum of any accountable receipt for any note, bill, or other security for the payment of money, or any warrant, order, or request for the payment of money, or delivery of goods or chattels of any kind, or any acquittance or receipt, either for money or goods, or any acquittance, release, or discharge of any debt, account, action, suit, demand, or other thing, real or personal, or any transfer or assurance of money, stock, goods, chattels, or other property whatsoever, or any letter of attorney or other power to receive money, or to receive or transfer stock or annuities, or to let, lease, sell, dispose of, alien, or convey any goods or chattels, lands or tenements, or other estate, real or personal, with intent to prejudice, injure, demand, or defraud any person or persons, body politic or corporate, or shall utter or publish, or cause, counsel, hire, command, or procure to be uttered or published, as true, any of the above false, altered, forged, or counterfeited matters, as above specified and described, knowing the same to be false, altered, forged, or counterfeited, with intent to prejudice, injure, damage, or defraud any person or persons, body politic or corporate, then every such offender shall be deemed guilty of a high misdemeanor, and, on being thereof convicted, shall be punished by fine and imprisonment at hard labor, or both, provided such imprisonment shall not exceed the term of ten years.

*Forgery, the punishment thereof prescribed.*

*Persons ൹ knowledging fines, recoveries, deeds, bail, judgments, &c. in the names of others, not privy thereto, or personating others as bail, their punishment prescribed.*

SEC. 43. *And be it enacted*, That if any person shall acknowledge, or procure to be acknowledged, any fine or fines, common recovery or recoveries, deed or deeds, recognizance or recognizances, bail or bails, judgment or judgments, in the

Q

122

name or names of any other person or persons not privy or consenting to the same; and if any person shall, before any person or persons authorized to take bail or bails, represent or personate any other person or persons, whereby the person or persons so represented or personated may be liable to the payment of any sum or sums of money for debt or damages, to be recovered in the same suit or action wherein the person or persons are represented or personated, as if he, she, or they had really acknowledged and entered into the same bail or bails, every such person or persons so offending shall be adjudged guilty of a high misdemeanor, and, on being thereof convicted, shall be punished by fine, not exceeding seven thousand dollars, or imprisonment at hard labor, or both: *Provided* such imprisonment shall not exceed the term of seven years: *And provided also*, that this act shall not extend to the acknowledgment of any judgment or judgments by any attorney or attorneys, duly admitted, for any person or persons against whom any such judgment or judgments shall be had or given.

*Proviso.*

Sec. 44. *And be it enacted,* That all persons who knowingly and designedly, by color of any false token, counterfeit letter or writing, or false pretence or pretences, shall obtain from any person money, wares, merchandise, goods, or chattels, or other valuable thing, with intent to cheat or defraud any person or persons, body politic or corporate, of the same, then every person so offending shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine, not exceeding one thousand dollars, or imprisonment at hard labor, not exceeding three years.

*Persons using any false token or writing to obtain money or goods with intent to cheat or defraud, how punished.*

Sec. 45. *And be it enacted,* That if any person or persons shall knowingly and wilfully obstruct, resist, or oppose any sheriff, coroner, constable, or other officer of this state, or other person or persons duly authorized, in serving or attempting to serve or execute any mesne process, writ, warrant, rule, or order of any of the courts of this state, or any other legal or judicial writ, warrant, or process whatsoever, or shall assault, beat, or wound any sheriff, coroner, constable, or other officer or person duly authorized, in serving or executing any writ, rule, order, process, or warrant aforesaid, or for having served or executed the same, every person so knowingly and wilfully offending in the premises shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine, not exceeding eight hundred dollars, or by imprisonment at hard labor, not exceeding two years, or both.

*The obstructing the execution of process by any officer &c., how to be punished.*

Sec. 46. *And be it enacted,* That if any sheriff, coroner, jailer, keeper of a jail, constable, or other officer or person whatsoever, having any offender guilty of treason, murder, or other crime punishable with death, in his custody for any such crime, shall voluntarily permit or suffer such offender to es-

*Sheriffs and other officers, guilty of voluntary escapes in capital cases, how punished.*

JA2921

123

cape and go at large, then every such sheriff, coroner, jailer, keeper of a jail, constable, or other officer or person so offending shall be adjudged guilty of a high misdemeanor, and, on being thereof convicted, shall suffer death: *Provided*, that nothing herein contained shall be construed to prevent any sheriff, coroner, jailer, keeper of a jail, constable, or other officer or person so guilty of such voluntary escape as aforesaid from being prosecuted or proceeded against for a misdemeanor at common law.

SEC. 47. *And be it enacted*, That all voluntary escapes in cases not punishable with death, and all negligent escapes, of whatever kind, in criminal matters, shall be deemed misdemeanors, and punished by fine, not exceeding one thousand dollars, or imprisonment at hard labor, not exceeding three years, or both: *And further*, any sheriff, coroner, jailer, keeper of a jail, constable, or other officer who shall be guilty of any voluntary escape in any criminal case whatever, shall for ever be disqualified to hold any office of honor, trust, or profit under this state. *[marginal note: Voluntary escapes, in cases not capital, and negligent escapes, the penalty for.]*

SEC. 48. *And be it enacted*, That all rescues of any person or persons guilty of treason, murder, or other crime punishable with death, shall be deemed high misdemeanors, and every person so offending shall, on conviction, suffer death: *Provided*, that nothing herein contained shall be construed to prevent any such rescue as aforesaid from being prosecuted and proceeded against for a misdemeanor at common law. *[marginal note: Rescuer of persons guilty of capital crimes, penalty &c. Proviso.]*

SEC. 49. *And be it enacted*, That all rescues in criminal cases not punishable with death, and in all civil cases, shall be deemed misdemeanors; and every such rescuer shall, on conviction, be liable to a fine, not exceeding one thousand dollars, or an imprisonment at hard labor, not exceeding three years, or both. *[marginal note: Rescuers in criminal cases which are not capital, and in all civil cases, the penalty &c.]*

SEC. 50. *And be it enacted*, That from henceforth no person who, being imprisoned, shall break prison shall have judgment of life or member for breaking prison only, except the cause for which such prisoner was taken and imprisoned did require such judgment if he had been convicted thereupon: and if any person, being imprisoned for a crime not punishable with death, shall break prison, and escape, or shall break prison, although no escape be actually made, he or she so offending shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine, not exceeding one thousand dollars, or imprisonment at hard labor, not exceeding three years, or both. *[marginal note: Prisoner breaking prison, not to suffer death, except confined for a crime punishable with death.]*

SEC. 51. *And be it enacted*, That if any person shall, by any means whatsoever, be aiding or assisting to any prisoner in jail, indicted for, or convicted of any offence against this state, or sentenced to imprisonment on such conviction, or lawfully committed or detained in such jail for any crime *[marginal note: Assisting a prisoner in jail to escape, penalty for.]*

124

against this state, expressed in the warrant of his or her commitment or detainer, to make or to attempt to make his escape from any jail, although no escape be actually made, every person so offending as aforesaid, and being thereof convicted, shall be deemed to be guilty of a misdemeanor, for which he or she shall be liable to a fine, not exceeding five hundred dollars, or an imprisonment at hard labor, not exceeding two years, or both: and if any person shall convey, or cause to be conveyed, into any jail or house of correction any mask, visor, or other disguise, or any instrument or arms proper to facilitate the escape of such prisoners as aforesaid, and the same shall deliver, or cause to be delivered to any such prisoner in any such jail or house of correction, or to any other person there, for the use of any such prisoner, without the consent or privity of the keeper of such jail or house of correction, every such person, although no escape, or attempt to escape be actually made, shall be deemed to have delivered such mask, visor, or other disguise, instrument, or arms, with intent to aid or assist such prisoner to escape, and being thereof convicted, shall be deemed and judged to be guilty of a misdemeanor, for which he or she shall be liable to a fine, not exceeding five hundred dollars, or an imprisonment at hard labor, not exceeding two years, or both: *And further,* if any person shall aid or assist any prisoner to attempt to make his or her escape from the custody of any constable, officer, or other person who shall have the lawful charge of such prisoner, in order to conduct or carry him or her to jail by virtue of a warrant of commitment for any crime against this state, expressed in such warrant, or to the house of correction, by virtue of any order, sentence, or judgment of imprisonment on conviction of any crime against this state, then every person so offending, on being thereof convicted, shall be deemed and adjudged to be guilty of a misdemeanor, for which he or she shall be liable to a fine, not exceeding five hundred dollars, or an imprisonment at hard labor, not exceeding two years, or both.

*Conveying to such prisoner any disguise or arms proper to facilitate his escape, the penalty for.*

*Assisting a prisoner to escape from a constable or other person, how punished.*

Sec. 52. *And be it enacted,* That if any person take money, goods, chattels, lands, or other reward, or promise thereof, to compound, or upon agreement to compound, any treason, misprision of treason, murder, manslaughter, sodomy, rape, arson, forgery, burglary, housebreaking, robbery, larceny, kidnapping, escape, rescue, breach of prison, embracery, bribery, perjury, or subornation of perjury, every person so offending shall be deemed to be guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine, not exceeding three hundred dollars, or imprisonment at hard labor, not exceeding twelve months, or both.

*Compounding of treason and other crimes, how punished.*

Sec. 53. *And be it enacted,* That all such as combine, unite, confederate, conspire, or bind themselves by oath, covenant, agreement, or other alliance, that they shall and will mutually

*Conspiracy, what and how punished.*

125

aid, support, and help one another falsely and maliciously to indict, or cause or procure to be indicted, any person or persons, shall be deemed guilty of conspiracy, and, on being thereof convicted, shall be punished by fine, not exceeding five hundred dollars, or imprisonment at hard labor, not exceeding two years, or both.

Sec. 54. *And be it enacted,* That if any person shall kidnap or steal, or forcibly take away any man, woman, or child, bond or free, and send or carry, or with intent to send or carry such man, woman, or child from this state into another state or country, or shall spirit, persuade, or entice any child within the age of fourteen years to leave his or her father, mother, or guardian, or other person or persons intrusted with the care of such child, and the same child shall secrete and conceal, then the person so offending in any of the premises, and his or her procurers, shall be adjudged to be guilty of a high misdemeanor, and, on conviction, shall be punished by fine, not exceeding one thousand dollars, or imprisonment at hard labor, not exceeding five years, or both. *Kidnapping and spiriting away children, punishment for.*

Sec. 55. *And be it enacted,* That if any person shall voluntarily, unlawfully, and on purpose cut off the ear or ears, or cut out or disable the tongue, put out an eye, slit the nose, lip, or ear, cut off the nose or lip, or cut off or disable any limb or member of any person, or brand any person with intention of so doing, to murder or kill, to maim or disfigure, such person, in any of the manners before mentioned, then, and in every such case, the person so offending shall, on conviction, be punished by fine, not exceeding one thousand dollars, or imprisonment at hard labor, not exceeding seven years, or both. *Cutting out, or attempting to cut out the tongue, cutting off, or maiming the nose, ear, lip, &c. of any person, how punished.*

Sec. 56. *And be it enacted,* That if any person shall, by word, message, letter, or any other way, challenge another to fight a duel with a rapier or smallsword, backsword, pistol, or other dangerous weapon, or shall accept a challenge, although no duel be fought, or knowingly be the bearer of such challenge, or shall any way abet, prompt, encourage, persuade, seduce, or cause any person to fight a duel, or to challenge another to fight such duel, every person so offending shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine, not exceeding five hundred dollars, or imprisonment at hard labor, not exceeding two years, or both : *And further,* if any person shall engage in, and fight a duel with another, with a rapier, or smallsword, backsword, pistol, or other dangerous weapon, although death does not thereby ensue, or shall be a second in any such duel, then, and in such case, every person so offending shall be adjudged to be guilty of a high misdemeanor, and, on conviction, shall be punished by fine, not exceeding one thousand dollars, or imprisonment at hard labor, not exceeding four years, or both, and shall not, after such conviction, hold any office of profit or trust under this state. *Challenging to fight a duel, though no duel be fought, the penalty for &c.*

*Duel, punishment for fighting, where death does not ensue.*

JA2924

126

SEC. 57. *And be it enacted,* That if any person shall know-ingly send or deliver any letter or writing, with or without a name subscribed thereto, or sign, with a fictitious name, letter or letters threatening to accuse any person of a crime of an in-dictable nature by the laws of this state, with intent to extort from him or her any moneys, wares, merchandise, goods, or chattels, or other valuable thing, or demanding money, goods, or chattels, or other valuable thing, or threatening to maim, wound, kill, or murder any person, or to burn his or her house, outhouse, barn, or other building, or stack or stacks of corn, grain or hay, though no money, goods, or chattels, or other valuable things be demanded by such letter or writing, then every per-son so offending shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine, not exceeding three hundred dollars, or imprisonment at hard labor, not exceeding nine months, or both.

*Sending let-ter or other writing threat-ening to ac-cuse of an in-dictable of-fence, with intent to ex-tort money, or demanding money, or threatening to maim or kill, or to burn houses &c., how punish-ed.*

SEC. 58. *And it enacted,* That if any person shall steal, or shall rip, cut, or break, with intent to steal, any lead or iron, bar iron rail, iron gate, or iron palisado, or any lock fixed to any dwellinghouse, outhouse, stable, or any other building, or shall pull, cut, gather, or take away, with intent to steal, any flax, grass, or indian corn, wheat, rye, barley, oats, or grain of any kind, standing and growing, of another, then every per-son offending in any of the premises shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine, not exceeding fifty dollars, or imprisonment at hard labor, not exceeding nine months, or both.

*Stealing lead or iron, fixed to a house, or grass or grain standing and growing, how punished.*

SEC. 59. *And be it enacted,* That if any person shall dig, pull up, pick, or gather, with intent to steal, any turnips, po-tatoes, cabbage, parsnips, carrots, peas, beans, muskmelons, wa-termelons, apples, peaches, plums, cherries, or other roots, vegetables, or fruit of any kind, standing or growing, of an-another, under the value of twenty dollars, every person so offending shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine, not exceeding forty dol-lars, or imprisonment in the county jail, not exceeding three months, or both: and that every person accused of offending as aforesaid may be taken before any two of the justices of the peace of the county, city, or town corporate where the offence was committed, who are hereby authorized and required to hear and determine the same, if the person accused shall consent thereto; and if, on the trial, such person shall, from the evidence produced, appear to be guilty, the said justices shall sentence him or her accordingly.

*Stealing, in the nighttime, vegetables or fruit stand ng or growing, how punish-ed.
See supple-ment 51st of May, 1820.*

SEC. 60. *And be it enacted,* That if any person shall wil-fully, unlawfully, and maliciously tear, cut, burn, or in any way whatever destroy any letters patent, charter, deed, indented or poll, lease, indenture of apprenticeship, writing sealed, will, testament, bond, annuity, bill writing obligatory, release, bank bill or note, check, draught, bill of exchange, promissory note

*Persons ma-liciously de-stroying deeds, bonds, and other wri-tings, how punished.*

for the payment of money, endorsement, or assignment of any bill of exchange or promissory note for the payment of money, or any acceptance of any bill of exchange, or the number or principal sum of any accountable receipt for any note, bill, or other security for the payment of money, or any warrant, order, or request for the payment of money, or the delivery of goods or chattels of any kind, any certificate or other public security of the United States, or of this state, or of any of the United States, for the payment of money, or acknowledging the receipt of money or goods, or any acquittance or receipt, either for money or goods, or any acquittance, release, or discharge of any debt, account, action, suit, demand, or other thing, real or personal, or any transfer or assurance of money, stock, goods, chattels, or other property whatsoever, or any letter of attorney, or other power, to receive money, or to receive or transfer stock or annuities, or to let, lease, sell, dispose of alien, or convey any goods or chattels, lands, or tenements, or other estate, real or personal, or any day book, journal, leger, or book of accounts, or any agreement or contract in writing, whether sealed or not, respecting any estate, real or personal, with intent to prejudice, injure, damage, or defraud any person or persons, body politic or corporate, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine, not exceeding eight hundred dollars, or imprisonment at hard labor, not exceeding ten years, or both.

SEC. 61. *And be it enacted*, That if any person shall wilfully, unlawfully, and maliciously cut down, break down, level, demolish or otherwise destroy or damage any bridge, or sea or river-bank, or any meadow-bank, or mill-dam, or break or destroy the windows or doors of any dwellinghouse, or other house, or building, or set fire to, or burn, or destroy, or procure, or cause to be burned or destroyed, any barrack, cock, crib, rick, or stack of hay, corn, wheat, rye, barley, oats, or grain of any kind, or any fences, piles of wood, boards, or other lumber, or shall wilfully, unlawfully, and maliciously kill or destroy any horse, mare, or gelding, or any bull, ox, steer, bullock, cow, heifer, or calf, or any sheep or lamb, every person so offending shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine, not exceeding one hundred and fifty dollars, or imprisonment at hard labor, not exceeding two years, or both.

Malicious mischief to bridges, houses, horses, cattle, grain, lumber, &c., how punished.

SEC. 62. *And be it enacted*, That if any person or persons shall receive or buy any goods or chattels that shall be stolen or taken by robbery from any other person, knowing the same to have been so stolen or taken by robbery, or shall receive, harbor, or conceal any thief or thieves, robber or robbers, knowing him, her, or them to be so, he, she, or they so offending shall be deemed guilty of a high misdemeanor, and, on conviction, be punished by fine, not exceeding three hundred dol-

Receivers of goods stolen and taken by robbery, and harborers of thieves or robbers, how to be punished.

**128**

lars, or imprisonment at hard labor, not exceeding three years, or both.

**Concealment of burglary, robbery, &c., how to be punished.**

SEC. 63. *And be it enacted,* That if any person or persons, having knowledge of the actual commission of murder, manslaughter, sodomy, rape, arson, burglary, robbery, or forgery, within the jurisdiction of this state, shall conceal, and not, as soon as may be, disclose and make known the same to some one of the justices of the Supreme Court, or one of the justices of the peace in and for any of the counties of this state, such person or persons, on conviction thereof, shall be adjudged guilty of a misdemeanor, and shall be fined, not exceeding five hundred dollars, or suffer an imprisonment at hard labor, not exceeding three years, or both.

**Persons killing others attempting to rob, murder, &c. to be acquitted.**

SEC. 64. *And be it enacted,* That if any person shall attempt to commit murder, sodomy, rape, robbery, arson, or burglary, and in such attempt shall be slain, the slayer shall be deemed faultless, be liable to no forfeiture, and be totally acquitted and discharged.

**Persons killing others by misadventure, or in their own defence &c. to be acquitted.**

SEC. 65. *And be it enacted,* That if any person kill another by misadventure, or in his or her own defence, or in the defence of his or her husband, wife, parent, child, master, mistress, or servant, then the person so killing shall be deemed guiltless, be liable to no forfeiture, and be totally acquitted and discharged.

**If persons attempting to commit robbery, burglary, arson, &c. shall kill another, or death shall ensue; or if any officer of justice be killed in the execution of his office &c., such killing shall be murder.**

SEC. 66. *And be it enacted,* That if any person or persons in committing, or attempting to commit sodomy, rape, arson, robbery, or burglary, or any unlawful act against the peace of this state, of which the probable consequence may be bloodshed, shall kill another, or if the death of any one shall ensue from the committing, or attempting to commit any such crime or act as aforesaid, or if any person or persons shall kill any judge, justice of the peace, sheriff, coroner, constable, or other commonly known officer of justice, either civil or criminal, of this state, or the marshal or other commonly known officer of justice, either civil or criminal, of the United States, in the execution of his office or duty, or shall kill any of his assistants, whether specially called to his aid or not, endeavoring to keep and preserve the peace or apprehend a criminal, knowing the authority of such assistant, or shall kill a private person endeavoring to suppress an affray or to apprehend a criminal, knowing the intention with which such private person interposes, then such person or persons so killing as aforesaid, on conviction, shall be adjudged to be guilty of murder, and shall suffer death.

**Persons maintaining the authority of foreign powers over this state, how punished.**

SEC. 67. *And be it enacted,* That if any person, owing allegiance to this state, shall, by speech, writing, open deed, or act, advisedly and wittingly maintain and defend the authority or jurisdiction of any foreign power, potentate, republic, king, state, or nation whatsoever, in and over this state, or the peo-

ple thereof, such person so offending shall, on conviction, be punished by fine or imprisonment, or both, or by fine or imprisonment at hard labor, or both, the fine not to exceed four hundred dollars, nor the imprisonment the term of one year.

SEC. 68. *And be it enacted,* That if a butcher or other person shall sell, offer, or expose to sale the flesh of any animal dying otherwise than by slaughter, or slaughtered while diseased, or any contagious or unwholesome flesh; or, if a baker, brewer, distiller, or other person shall sell unwholesome bread, drink, or liquor, he or she shall be adjudged guilty of a misdemeanor, and, on conviction, shall be punished by fine, not exceeding fifty dollars, or by imprisonment in the county jail, not exceeding four months.

*Assaults, batteries, and other offences at common law, not provided for by this or some other act, how punished.*

SEC. 69. *And be it enacted,* That the court or justices before whom any negro, indian, or mulatto slave shall be convicted of any offence not punishable with death, shall have authority to impose, instead of the punishment by this act prescribed, such corporal punishment, not extending to life or limb, as such court or justices, in their discretion, shall direct.

*In what case corporal punishment may be imposed on negroes, indians and mulattoes.*

SEC. 70. *And be it enacted,* That if any person shall sell or exchange, or offer for sale or exchange, or willingly receive, any forged or counterfeit promissory note, with intention to have the same uttered or passed to defraud any person or body politic or corporate, then every such person, being thereof convicted by due course of law, shall be deemed guilty of a high misdemeanor.

*Criminals sentenced to hard labor, escaping, how to be punished.*

SEC. 71. *And be it enacted,* That if any person shall make or engrave, cause or procure to be made or engraved, any plate for forging or counterfeiting any promissory note, for the payment of money, in the name of any person or body politic or corporate, then every such person, being thereof convicted by due course of law, shall be deemed guilty of a high misdemeanor.

*Any person making or procuring a plate for the purpose of counterfeiting any promissory note &c., guilty of a misdemeanor.*

SEC. 72. *And be it enacted,* That if any person shall have in his or her possession, or receive from any other person, any forged or counterfeited promissory note for the payment of money, with intent to utter or pass the same, or to permit, or cause, or procure the same to be uttered or passed, with intention to defraud any person or body politic or corporate whatsoever, knowing the same to be forged or counterfeited, then every such person, being thereof convicted by due course of law, shall be deemed guilty of a high misdemeanor.

*Any person having or receiving counterfeit money, with the intention of passing the same &c., how considered.*

SEC. 73. *And be it enacted,* That if any person shall have or keep in his or her possession any blank or unfinished note, made in the form and similitude of any promissory note for the payment of money, made to be issued by any incorporated bank of this state, or any of the United States, with intention to fill up and complete such blank or unfinished note, or to permit, cause, or procure the same to be filled up and completed, in order to

*Persons having any blank or unfinished note, filling up, or permitting the same to be filled up, in order to pass the same, how considered.*

R

130

utter or pass the same, or permit, cause, or procure the same to be uttered or passed to defraud any person, or body politic or corporate whatsoever, the person in whose custody or possession such blank or unfinished note shall be found, being thereof convicted by due course of law, shall be deemed guilty of a high misdemeanor.

**Persons having in their possession or keeping any plate for forging &c., how considered.**

SEC. 74. *And be it enacted,* That if any person shall have, or keep in his or her custody or possession, any plate for forging or counterfeiting any promissory note for the payment of money, in the form or similitude of any promissory note issued by any of the banks aforesaid, with intent to forge or counterfeit, or to assist in forging or counterfeiting, or to permit, cause, or procure to be counterfeited any promissory note issued by any of the aforesaid banks, the person in whose possession or custody such plate shall be found, being thereof convicted by due course of law, shall be deemed guilty of a high misdemeanor.

**The punishment for the several preceding offences prescribed.**

SEC. 75. *And be it enacted,* That any person convicted of any of the offences mentioned and described in either of the five next preceding sections of this act, shall be punished by fine or imprisonment at hard labor, or both: *Provided,* that such imprisonment shall not exceed the term of ten years, nor such fine the sum of two thousand dollars, at the discretion of the court.

**Punishment for the counterfeiting gold or silver coin, prescribed.**

SEC. 76. *And be it enacted,* That if any person or persons shall counterfeit, or cause or procure to be counterfeited, any of the species of gold or silver coins now current, or which hereafter shall be current in this state, or shall pass or give in payment, or offer to pass or give in payment the same, knowing the same to be counterfeit, such person or persons so offending shall be deemed guilty of a high misdemeanor, and, being thereof convicted by due course of law, shall be punished by fine or imprisonment at hard labor, or both, at the discretion of the court before whom such conviction shall be had: *Provided* the imprisonment at hard labor shall not exceed the term of ten years, nor the fine the sum of two thousand dollars.

**The several specified offences, how punished.**

SEC. 77. *And be it enacted,* That assaults, batteries, false imprisonments, affrays, riots, routs, unlawful assemblies, nuisances, cheats, deceits, and all other offences of an indictable nature at common law, and not provided for by this or some other act of the legislature of New-Jersey, shall be deemed and taken to be misdemeanors; and any person so offending shall, on being convicted by due course of law, be punished by fine, not exceeding one hundred dollars, or imprisonment, not exceeding six months, or both.

**Further offences specified, and the punishment of the same prescribed.**

SEC. 78. *And be it enacted,* That if any person shall commit the crime of mayhem or an atrocious assault and battery upon another, such person shall be deemed guilty of a high

**131**

misdemeanor, and, on being thereof convicted by due course of law, shall be punished by fine, not exceeding one thousand dollars, or imprisonment at hard labor, not exceeding ten years, or both, at the discretion of the court before whom such conviction shall be had.

SEC. 79. *And be it enacted*, That if any offender, sentenced to hard labor, shall escape, he or she shall, on conviction thereof, suffer such additional confinement at hard labor as the court shall direct. [margin: Escapes from prison &c., how punished.]

SEC. 80. *And be it enacted*, That if any offender, sentenced to imprisonment at hard labor for manslaughter, sodomy, rape, arson, burglary, robbery, or forgery, shall be convicted of a second offence of a like nature, such offender shall suffer death. [margin: Conviction of a second offence in certain specified cases, to be punished with death.]

SEC. 81. *And be it enacted*, That if any offender, who shall have been sentenced to imprisonment at hard labor for any other crime than those specified in the next preceding section, shall be convicted of a second offence of a like nature, such offender shall be sentenced to imprisonment at hard labor for any period not exceeding double the time for which said offender might have been sentenced for the first offence. [margin: Time of imprisonment on certain occasions to be doubled.]

SEC. 82. *And be it enacted*, That if any person be convicted of any offence against this state, not punishable with death, it shall be lawful for the court before whom such conviction shall be had, to order, besides the punishment prescribed by law, that such offender shall find surety to keep the peace, or be of good behavior, or both, in such sum, for such time, and in such number and sufficiency as they shall judge proper. [margin: Offences not punishable with death on conviction, besides the punishment prescribed by law, the offender to give security &c.]

SEC. 83. *And be it enacted*, That no person or persons shall be prosecuted, tried, or punished for treason or other offence punishable with death, (murder excepted) unless the indictment for the same shall be found by a grand jury within three years next after the treason or other offence punishable with death, shall be done or committed; nor shall any person be prosecuted, tried, or punished for any offence not punishable with death, unless the indictment shall be found within two years from the time of committing the offence, or incurring the fine or forfeiture aforesaid: *Provided*, that nothing herein contained shall extend to any person or persons fleeing from justice. [margin: No prosecution for treason or other capital offence, murder excepted, unless indictment be found within three years, nor in other cases, unless within two years.]

SEC. 84. *And be it enacted*, That the manner of inflicting the punishment of death, shall be by hanging the person convicted by the neck until dead.

SEC. 85. *And be it enacted*, That no conviction or judgment for any of the offences aforesaid, or any other offence against this state, shall make or work corruption of blood, disinherison of heirs, loss of dower, or forfeiture of estate. [margin: No conviction or judgment to work corruption of blood, forfeiture of estate &c.]

SEC. 86. *And be it enacted*, That the benefit of clergy shall be, and the same is hereby abolished and for ever done away. [margin: Benefit of clergy abolished for ever.]

132

The action of appeal for murder &c. likewise for ever abolished.

Sec. 87. *And be it enacted,* That the suit or action of appeal for murder, manslaughter, rape, arson, larceny, mayhem, or other offence or wrong, whatsoever, shall be, and the same hereby is abolished and for ever done away.

Slaves convicted of certain crimes, may be sent out of this state and of the United States &c.

Sec. 88. *And be it enacted,* That when any slave shall hereafter be convicted of manslaughter, arson, burglary, rape, robbery, or burning a barn, stable, or other outbuilding, to the value of one hundred dollars, or of setting fire thereto, with intent to burn the same, or of an assault and battery, with intent to commit murder, arson, burglary, rape, or robbery, or of a misdemeanor in poisoning or attempting to poison, and so to endanger the life of any person whatsoever, and shall have judgment of imprisonment for the same, it shall be lawful for the governor of this state, at any time during the said imprisonment, by writing sealed with the great seal, to authorise and empower the owner of such slave to send him or her out of this state and the United States, and to direct the officer in whose custody such slave may be, to deliver him or her to such owner, for that purpose accordingly : *Provided,* that such

Proviso.

owner, before he or she shall obtain such authority, shall enter into bond to this state, with one or more surety or sureties, to be approved of by the governor, and filed in the secretary's office, in the penal sum of four hundred dollars, conditioned, that such slave shall be so sent out of this state and the United States, within ten days after such delivery by the said officer, and shall never return to this state without lawful permission : *And provided also,* that such owner, before the delivery of such slave by such officer, shall pay all the costs of the prosecution, imprisonment, and maintenance of such slave, up to the time of such delivery.

The power of the governor and council specified.

Sec. 89. *And be it enacted,* That the governor and council shall have power to liberate from imprisonment any criminal now confined in the prison of this state, or who shall hereafter be confined in said prison after the time for which said criminal hath been sentenced shall have expired, or said criminal hath been pardoned, in cases wherein the said governor and council shall be satisfied that the said criminal hath no property, and is unable, and will continue unable, to earn more than is sufficient to defray the expenses of his or her food and clothing : *Provided,* that nothing in this section shall be construed to destroy, or in any way to impair the right of the state to the property of the said criminal so liberated, wherever any such property can be found.

Proviso.

The punishment of certain specified crimes prescribed.

Sec. 90. *And be it enacted,* That all wilful poisoning of any person or persons that shall hereafter be done, perpetrated, or committed, or attempted to be done, perpetrated, or committed, with intent to kill, although death shall not ensue therefrom, shall be adjudged a high misdemeanor, and the offender or offenders therein, on being thereof convicted, shall be punished by fine, not exceeding one thousand dol-

**133**

lars, or imprisonment at hard labor for any term not exceeding fifteen years, or both, at the discretion of the court before whom such conviction shall be had.

SEC. 91. *And be it enacted,* That the act entitled, " An act for the punishment of crimes," passed the eighteenth day of March, seventeen hundred and ninety-six, and an act entitled, " A supplement to the act for the punishment of crimes," passed the eighteenth day of March, seventeen hundred and ninety-six, which said supplement was passed the thirty-first day of May, eighteen hundred and twenty, and the act entitled, " A further supplement to the act entitled an act for the punishment of crimes," passed the eighteenth day of March, seventeen hundred and ninety-six, which said further supplement was passed the third day of November, one thousand eight hundred and twenty, and the act entitled, " A further supplement to the act entitled an act for the punishment of crimes," passed March the eighteenth, seventeen hundred and ninety-six, which said further supplement was passed the seventh day of November, eighteen hundred and twenty-five, and the act entitled, " An additional supplement to the act entitled an act for the punishment of crimes," passed the eighteenth day of March, seventeen hundred and ninety-six, which said additional supplement was passed the seventh day of March, eighteen hundred and twenty-eight, and all other acts or parts of acts coming within the purview of this act, and contrary thereto, be, and the same are hereby repealed: *Provided always,* that such repeal shall in no wise impair or invalidate any thing had or done under or by virtue of any of the aforesaid acts. *(margin: Certain acts repealed.)*

C. February 17, 1829.

A SUPPLEMENT to the act entitled, " An act for the punishment of crimes," passed February seventeenth, one thousand eight hundred and twenty-nine.

BE IT ENACTED *by the Council and General Assembly of this State, and it is hereby enacted by the authority of the same,* That nothing contained in the ninety-third section of the act to which this is a supplement shall affect or prevent any proceedings now pending, or which may hereafter be had for any crime or offence committed before the passing of the said act; but all indictments which shall have been found, or which may hereafter be found for any crime or offence committed before the passing of the said act, may be proceeded upon the same as if the said act had not been passed. *(margin: See 93d section of " An act for the punishment of crimes.")*

C. February 23, 1829.

Case 1:22-cv-07464-RMB-AMD   Document 103-6   Filed 02/27/23   Page 1 of 2 PageID: 3450



# Acts and Laws

Paſſed by the Great and General Court or Aſſembly of HisMajeſty'sProvince of the *Maſſachuſetts Bay* in *New-England :* Beg: n and held at *Boſton* upon Wedneſday the twenty-eighth of *May* 1746. And continued by Adjournments to Wedneſday the twenty ſeventh of *Auguſt* following.

## CHAP. IX.

### An Act in further addition to an Act intitled *An Act for Highways.*

**W**HEREAS *in and by an Act made in the twelfth Year of the Reign of her lateMajeſty Queen* Ann, *intitled,* An Act *inAddition to the Law of this Province, intitled,* An Act for Highways, *made in the fifth Year of the Reign of the late King* William *and Queen* Mary *; Proviſion is made for the laying out particular private Ways between any Inhabitants or Proprietors within their reſpective Towns to or for any original Lot, but no Power or Liberty is therein given for the laying out any ſuch Way to any Tract of Land that is not an original Lot,which is oftentimes equally neceſſary :* Wherefore, **Preamble.**

**Be it enacted by the Governour, Council and Houſe of Repreſentatives,** That the Select Men of eachTown reſpectively (and in Caſe of their Delay or Refuſal his Majeſty's Juſtices of the Peace within the ſeveral Counties of this Province at any of their General Seſſions) be and hereby are fully authorized and impowered by themſelves or others to lay out or cauſe to be laid out particular or private Ways as ſhall be thought neceſſary to or for any Tract of Land, not on original Lot,as they are by ſaid Act of Queen *Anne,* for an original Lot ; under the ſame Regulations and Reſtrictions, and obſerving the ſame Rules as are therein ſpecified directed and provided. **Select-men, and inCaſe of theirRefuſal, the Juſtices, impowred to lay outHigh-Ways.**

This Act to continue in Force for the Space of three Years from the Publication thereof, and from thence to the End of the nextSeſſion of the General Court and no longer. **Limitation.**

JA2933

Digitized from Best Copy Available

1746.    *Anno Regni Regis* G E O R G I I II. Vicessimo.

### CHAP. X.

# An Act to prevent the firing of Guns charged with Shot or Ball in the Town of *Boston.*

**Preamble.**   *WHEREAS by the indiscreet firing of Guns laden with Shot and Ball within the Town and Harbour of* Boston, *the Lives and Limbs of many Persons have been lost, and others have been in great Danger, as well as other Dammage has been sustained.*

For the Prevention thereof for the future ;

**Penalty for firing off loaden Cannon.**   **Be it enacted by the Governour, Council and House of Representatives,** That no Person or Persons from and after the Publication of this Act shall presume to discharge or fire off any Cannon laden with Shot from any Wharff or Vessel in that Part of the Harbour of said Town which is above the Castle, on Pain of forfeiting the Sum of *fifteen Pounds* for each Gun so fired or discharged ; one Moiety of said Penalty to be to and for the Use of the Poor of said Town of *Boston,* and the other Moiety to him or them who shall inform, complain and sue for the same, to be recovered by Action, Bill, Plaint or Information, before any of his Majesty's Courts of Record within the County of *Suffolk,* and upon Refusal thereof such Person shall suffer three Months Imprisonment without Bail or Mainprize.

**Penalty for discharging Guns or Pistols loaden with Shot or Ball.**   **And be it further enacted,** That no Person shall from and after the Publication of this Act discharge any Gun or Pistol charged with Shot or Ball in the Town of *Boston* (the Islands thereto belonging excepted) or in any Part of the Harbour between the Castle and said Town, on Pain of forfeiting *forty Shillings* each Gun or Pistol so fired or discharged, to be recovered before one or more of his Majesty's Justices of the Peace for the County of *Suffolk,* and disposed of in Mannor as aforesaid, or shall suffer ten Days Imprisonment. And for the more effectual Conviction of any Person or Persons so offending, it shall be lawful for any Person to seize and take into Custody any Gun so fired off, and deliver the same to one of the next Justices of the Peace in said Town of *Boston,* in order to its being produced at Time of Trial.

**Proviso.**   *Provided nevertheless,* That this Law shall not be so construed or understood as to prevent Soldiers in their common Training Days with the Leave and by Order of the Commission Officers of the Company to which they belong, or other Persons at other times with the Leave of one or more of the Field Officers of the Regiment in *Boston,* from firing at a Mark or Target for the Exercise of their Skill and Judgment; provided it be done at the lower End of the Common ; nor from firing at a Mark from the several Batteries in the Town of *Boston,* with the Leave of the Captain General, and no where else.

**Limitation.**   This Law to continue and be in Force for the Space of three Years and no longer.

**CHAP.**

JA2934

Digitized from Best Copy Available

# THE

# COLONIAL RECORDS

OF THE

# STATE OF GEORGIA

———

## VOLUME XIX.

### PART I.

———

STATUTES, COLONIAL AND REVOLUTIONARY,
1768. TO 1773.

———

COMPILED AND PUBLISHED UNDER AUTHORITY

OF

# THE LEGISLATURE

BY

## ALLEN D. CANDLER, A. M., LL. D.

———

ATLANTA, GA.
CHAS. P. BYRD, STATE PRINTER.
1911.

Generated on 2023-01-26 14:49 GMT  /  https://hdl.handle.net/2027/hvd.32044032388223
Public Domain in the United States, Google-digitized  /  http://www.hathitrust.org/access_use#pd-us-google

Digitized by Google

Original from
HARVARD UNIVERSITY

JA2935

STATUTES, COLONIAL AND REVOLUTIONARY, 1768-1773.   137

Security Against Internal Dangers and Insurrections.

And be it further Enacted that the Fine & **Fine and penalties to his Ma- jesty.** Penalties by this Act Inflicted not herein before Disposed of shall be to his Majesty & applied in Aid of the General Tax.

By order of the Commons House of Assembly

N. W. JONES Speaker.

By order of the Upper House

JAMES HABERSHAM President.

Council Chamber

24ᵗʰ December 1768.

Assented to

JA: WRIGHT.

---

(State Archives.)

*An act for the better security of the inhabitants by obliging the male white persons to carry fire arms to places of public worship.*

WHEREAS it is necessary for the security **Preamble.** and defence of this province from internal dangers and insurrections, that all persons resorting to places of public worship shall be obliged to carry fire arms.

Be

Generated on 2023-01-26 14:47 GMT  /  https://hdl.handle.net/2027/hvd.32044032308223
Public Domain in the United States, Google-digitized  /  http://www.hathitrust.org/access_use#pd-us-google

Digitized by Google

Original from
HARVARD UNIVERSITY

JA2936

138                    COLONIAL RECORDS

―――――――――――――――――――――――――――――――――――――――
Security Against Internal Dangers and Insurrections.
―――――――――――――――――――――――――――――――――――――――

All male
white inhab-
itants to
carry arms
to places of
worship un-
der penalty
of ten shil-
lings.

1. BE IT ENACTED, That immediately from and after the passing of this act, every male white inhabitant of this province, (the inhabitants of the sea port towns only excepted who shall not be obliged to carry any other than side arms) who is or shall be liable to bear arms in the militia, either at common musters or times of alarm, and resorting, on any Sunday or other times, to any church, or other place of divine worship within the parish where such person shall reside, shall carry with him a gun, or a pair of pistols, in good order and fit for service, with at least six charges of gun-powder and ball, and shall take the said gun or pistols with him to the pew or seat, where such person shall sit, remain, or be, within or about the said church or place of worship, under the penalty of ten shillings for every neglect of the same, to be recovered by warrant of distress and sale of the offender's goods, under the hand and seal of any

How to be
recovered
and applied.

justice of the peace for the parish where such offence is committed, one half to be paid into the hands of the church wardens, or where there is no church wardens, to any justice for the use of the poor of the said parish, and the other half to him or them that shall give information thereof.

Church
wardens,
deacons, &c.
to examine
persons lia-
ble to carry
arms.

2. And for the better and more effectual carrying this act into execution, BE IT FURTHER ENACTED, That the church warden or church wardens of each respective parish, and the deacons,

elders

Generated on 2023-01-20 14:48 GMT  /  https://hdl.handle.net/2027/hvd.32044032308223
Public Domain in the United States, Google-digitized  /  http://www.hathitrust.org/access_use#pd-us-google

Security Against Internal Dangers and Insurrections.

elders or select men, of other places of public worship, shall be obliged, and they are hereby empowered to examine all such male persons, either in or about such places of public worship, at any time after the congregation is assembled, on Christmas and Easter days, and at least twelve other times in every year, and if, upon finding any person or persons liable to bear arms, and being then to places of public worship as aforesaid, without the arms and ammunition by this act directed, and shall not, within fifteen days after such offence is committed, inform against such person or persons so offending, in order to recover the penalty as aforesaid, said church warden or church wardens, deacons, elders, or select men, shall, for every such neglect of duty, or giving information as aforesaid, forfeit and pay the sum of five pounds, to be recovered and applied as in this act is before directed.

3.   AND BE IT FURTHER ENACTED, That any such person or persons thus liable to bring their arms, and being at any church or place of public worship, as aforesaid, that shall refuse to be examined in or about such places of public worship, or neglect, on demand of the church warden or church wardens, deacons, elders, or select men respectively, to produce and shew his or their arms and ammunition by this act required to be brought by such person or persons, to the intent it may be known whether the same be

*Persons refusing to be examined to forfeit ten shillings, to be recovered and applied as aforesaid.*

fit

Generated on 2023-01-20 14:48 GMT  /  https://hdl.handle.net/2027/hvd.32044032308223
Public Domain in the United States, Google-digitized  /  http://www.hathitrust.org/access_use#pd-us-google

Digitized by 

Original from
HARVARD UNIVERSITY

JA2938

fit for immediate use and service, such person or persons so refusing or neglecting shall severally, and for every such offence, forfeit the sum of ten shillings, to be recovered and applied in such manner as the penalty for not bringing such arms in and by this act directed.

Continua-
tion.

4. AND BE IT FURTHER ENACTED, That this act shall be and continue in force for and during the term of three years, and from thence to the end of the next session of the General Assembly, and no longer.

N. W. JONES, *Speaker.*

JAMES HABERSHAM, *President.*

JAMES WRIGHT.

February 27, 1770.

---

(State Archives.)

An Act.

*To Prohibit for a certain Time the Exportation of Indian Corn.*

WHEREAS the shortness of the last Crop of Indian Corn in this Province makes it greatly to be apprehended that a Scarcity of that Article may
ensue


Generated on 2023-01-20 14:49 GMT  /  https://hdl.handle.net/2027/hvd.32044032308223
Public Domain in the United States, Google-digitized  /  http://www.hathitrust.org/access_use#pd-us-google

Digitized by Google

Original from
HARVARD UNIVERSITY

JA2939



*Augustine S. Clayton*

*Presented*
*March 1. 180?*

A

# DIGEST

OF THE

# L A W S

OF THE

# State of Georgia.

*FROM ITS FIRST ESTABLISHMENT AS A BRITISH PROVINCE DOWN TO THE YEAR* 1798, *INCLUSIVE*

AND THE

## PRINCIPAL ACTS OF 1799:

IN WHICH

Is comprehended the declaration of independence; the State Constitutions of 1777 and 1789, with the alterations and amendments in 1794.

ALSO THE

*Constitution of* 1798.

IT CONTAINS

As well all the Laws in force, as those which are deemed useful and necessary; or which are explanatory of existing Laws; together, with the

*TITLES OF ALL THE OBSOLETE AND OTHER ACTS.*

AND CONCLUDES

WITH AN APPENDIX containing the original Charters and other Documents, ascertaining and defining the Limits and Boundary of the State; all the Treaties with the southern tribes of Indians; the articles of Confederation and perpetual union; the Constitution of the United States, and a few Acts of Congress.

Together with a copious Index to the whole.

BY

## *ROBERT & GEORGE WATKINS.*

Philadelphia:

PRINTED BY *R. AITKEN*, No. 22, MARKET STREET.

∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙

1800.

## LAWS OF GEORGIA.

157

*An Act for granting to his majesty the sum of £3046 16 8¼ for the use and support of the government of Georgia for the year 1779, to be raised at certain rates and after the method therein mentioned; and for the more effectual collecting of arrears.*

A. D. 1768.

No. 190.

December 24.

*Obsolete.*

---

*An Act for the better security of the inhabitants, by obliging the male white persons to carry fire arms to places of public worship.†*

A. D. 1770.

No. 191.

WHEREAS it is necessary for the security and defence of this province from internal dangers and insurrections, that all persons resorting to places of public worship shall be obliged to carry fire arms:

Preamble.

I. *Be it enacted,* That immediately from and after the passing of this act, every male white inhabitant of this province, (the inhabitants of the sea port towns only excepted, who shall not be obliged to carry any other than side arms) who is or shall be liable to bear arms in the militia, either at common musters or times of alarm, and resorting, on any Sunday or other times, to any church, or other place of divine worship within the parish where such person shall reside, shall carry with him a gun, or a pair of pistols, in good order and fit for service, with at least six charges of gunpowder and ball, and shall take the said gun or pistols with him to the pew or seat where such person shall sit, remain, or be, within or about the said church or place of worship, under the penalty of ten shillings for every neglect of the same, to be recovered by warrant of distress and sale of the offender's goods, under the hand and seal of any justice of the peace for the parish where such offence is committed, one half to be paid into the hands of the church wardens, or where there is no church wardens to any justice, for the use of the poor of the said parish, and the other half to him or them that shall give imformation thereof.

Enacted.

All male white inhabitants to carry arms to places of divine worship under penalty of 10s.

How to be recovered and applied.

II. And for the better and more effectual carrying this act into execution, *Be it further enacted,* That the church warden or church wardens of each respective parish, and the deacons, elders, or select men, of other places of public worship, shall be obliged, and they are hereby empowered to examine all such male persons, either in or about such places of public worship, at any time after the congregation is assembled, on Christmas and Easter days, and at least twelve other times in every year, and if, upon finding any person or persons liable to bear arms, and bring them to places of public worship as aforesaid, without the arms and ammunition by this act directed, and shall not, within fifteen days after such offence is committed, inform against such person or persons so offending, in order to recover the penalty as aforesaid, such church warden or church wardens, deacons, elders, or selectmen, shall, for every such neglect of duty, or giving information as aforesaid, forfeit and pay the sum of five pounds, to be recovered and applied as in this act is before directed.

Church wardens, &c. empowered to examine persons liable to carry arms.

III.

† *Query*—Whether this act can be enforced by any religious association, unless expressly authorised under the present government. See note, page 52.

158                              DIGEST OF THE

A. D. 1770.          III. *And be it further enacted,* That any fuch perfon or perfons thus liable to bring
No. 191.          their arms, and being at any church or place of public worfhip as aforefaid, that
Penalty on per-   fhall refufe to be examined in or about fuch places of public worfhip, or neglect, on
fons refufing to
be examined.      demand of the church warden or church wardens, deacons, elders, or felectmen
                  refpectively, to produce and fhew his or their arms and ammunition by this
                  act required to be brought by fuch perfon or perfons, to the intent it may be
                  known whether the fame be fit for immediate ufe and fervice, fuch perfon or perfons
                  fo refufing or neglecting fhall feverally, and for every fuch offence, forfeit the fum
                  of ten fhillings, to be recovered and applied in fuch manner as the penalty for not
                  bringing fuch arms in and by this act directed.

Continuation of      IV. *And be it enacted,* That this act fhall be and continue in force for and during
this act.         the term of three years, and from thence to the end of the next feffion of the gene-
                  ral affembly, and no longer.*

                                          N. W. JONES, *Speaker.*
                                          JAMES HABERSHAM, *Prefident.*

                  JAMES WRIGHT.

                  *February 27, 1770.*

                  * The next feffion after the expiration of the three years, was held in 1777, confequently this act being in
                  force at the time of the revolution, the fame is perpetuated by act of 1783, No. 279, though not particularly
                  named.

No. 192.              *An Act to prohibit for a certain time, the exportation of Indian corn.*

                  February 27, 1770.
                      *Expired.*

No. 193.          *An Act to amend an act, entitled " An act for afcertaining the qualifications of jurors,
                  and for eftablifhing the method of ballotting and fummoning jurors in the province of
                  Georgia."*

                  February 27.
                      *Obfolete.*

No. 194.          *An Ordinace re-appointing Benjamin Franklin, Efquire, agent to folicit the affairs of
                  this province in Great Britain.*

                  February 27.
                      *Obfolete.*

No. 195.          *An Ordinance for appointing James Kitchen, collector and comptroller of the country
                  duties of the port of Sunbury.*

                  February 27.
                      *Obfolete.*

                                                                                                    *An*

# L A W S

## OF THE

## STATE

### OF

# DELAWARE,

### PASSED

## *At a Session of the General Assembly,*

BEGUN AND HOLDEN AT DOVER,

ON TUESDAY THE 7th DAY OF JANUARY, AND ENDED ON
WEDNESDAY THE 12th DAY OF FEBRUARY,

IN THE YEAR OF OUR LORD,

## ONE THOUSAND EIGHT HUNDRED AND TWELVE,

AND OF THE INDEPENDENCE OF THE

## UNITED STATES OF AMERICA,

THE THIRTY-SIXTH.

*PUBLISHED BY AUTHORITY.*

DOVER—JOHN B. WOOTTEN—PRINT.

1812.

JA2943

522 **LAWS OF THE STATE**

CHAP.
CXCIV.

1812.

## CHAPTER CXCIV.

*An* ACT *to authorize Francis C. Hall, to remove and carry out from this State, into the State of Maryland, certain negro slaves therein mentioned.*

PASSED AT DOVER,
*February 2, 1812.* } PRIVATE ACT.

---

## CHAPTER CXCV.

*An* ACT *to prevent the discharging of fire-arms within the towns and villages, and other public places within this State, and for other purposes.*

Firing guns,
&c within any
towns, &c. of
this State pro-
hibited.
SEC. 1. BE IT ENACTED *by the Senate and House of Representatives of the State of Delaware, in General Assembly met,* That from and after the first day of June next, if any person or persons shall presume to fire or discharge any gun, ordnance, musket, fowling-piece, fusee or pistol, within any of the towns or villages of this State, or within the limits thereof; or where the limits cannot be ascertained, within one quarter of a mile of the centre of such town or village, shall fire or discharge any gun, ordnance, musket, fowling piece, fusee or pistol, within or on any of the greens, streets, alleys or lanes of any of the towns and villages within this State, whereon any buildings are or shall be erected, or within one hundred yards of any mill-dam, over or across where any of the main public or State roads may go or pass; every person or persons so offending, shall be fined or punished as hereinafter directed.

Penalty on
firing guns,
&c,
SEC. 2. *And be it enacted by the authority aforesaid,* That if any free white person or persons, or the

## OF DELAWARE.

593

child or children of any such person or persons, shall fire or discharge any gun, ordnance, musket, fowling-piece, fusee or pistol, within any, or at any of the places or limits aforesaid, every such person or persons, or the child or children of every such person or persons, shall forfeit and pay for every such offence, any sum, not exceeding five dollars, to be recovered from the person or persons, or from the parent of such child or children, before any justice of the peace of this State, on his own view, or on the oath or affirmation of any one or more credible witnesses, to be recovered as debts under forty shillings are recoverable by the laws of this State.

SEC. 3. *And be it enacted by the authority aforesaid,* That if any free negro or mulatto, or the child or children of any such free negro or mulatto, or any manumitted negro or mulatto, or any servant or servants, slave or slaves, apprentice or apprentices, of any person or persons whatsoever, shall fire or discharge any gun, ordnance, musket, fusee, fowling-piece or pistol, within the limits herein before described, and be thereof convicted by the view of any one justice of the peace, or on the oath or affirmation of one or more credible witnesses, every person so offending, shall forfeit and pay any sum, not exceeding five dollars: *Provided nevertheless,* That in all and every case where the money is not immediately paid on such conviction, into the hands of the justice before whom such conviction is had, it shall and may be lawful, and the said justice is hereby directed and commanded to commit such person or persons to the jail of his county, there to remain, until the forfeitures and costs are paid.

SEC. 4. *And be it enacted by the authority aforesaid,* That all fines and forfeitures incurred under this law, shall be paid over for the use of the poor of the county where the offence shall have been committed.

CHAP. CXCV.

1812.

How recoverable.

Penalty on free negroes or free mulattoes &c. firing guns &c.

Proviso.

Fines, how applied.

524                         LAWS OF THE STATE

This act not   SEC. 5. *Provided nevertheless, and be it enacted by*
to extend to   *the authority aforesaid,* That nothing in this act shall
days of public
rejoicing, &c. extend, or be construed to prevent any such firing,
on any day or days of public rejoicing, or where it
is authorized by any law of this State, or where it
shall be deemed by the justice before whom the in-
formation is lodged, that the necessity of the case
required the same.

PASSED AT DOVER,  ⎰
*February* 4, 1812.  ⎱

---

## CHAPTER CXCVI.

Chap. 96. c.  *A* SUPPLEMENT *to an act, entitled,  " An act to*
3 vol. p. 1236.        *incorporate a bank in the borough of Wilmington,*
*in this State."*

Original act  SEC. 1.   **B**E IT ENACTED *by the Senate and*
revived and             *House of Representatives of the State*
continued, till *of Delaware, in General Assembly met,* That the said
Sep. 1, 1822.
act entitled, " An act to incorporate a bank in the
borough of Wilmington, in this State ;" passed on
the ninth day of February, in the year of our Lord,
one thousand seven hundred and ninety-six ; and
every section and clause thereof, excepting so much
thereof, as may by this act be altered, supplied or
amended, shall remain, continue and be in full force
and effect until the first day of September, in the
year of our Lord, one thousand eight hundred and
twenty-two.

Forging, &c.   SEC. 2. *And be it further enacted,* That if any
how punished. person shall counterfeit the common seal of the
president, directors and company of the Bank of
Delaware, incorporated by the aforesaid act, or
shall forge any bank-bill or note, for the payment
of money made or given out, or to be made or given
out by, or for the said president, directors and com-
pany, or purporting so to be, or shall utter, vend,

# LAWS,

PASSED BY

## THE LEGISLATURE OF THE

## STATE OF VERMONT,

AT THEIR

## SESSION AT MONTPELIER,

COMMENCED ON THE SECOND THURSDAY OF

OCTOBER, ONE THOUSAND EIGHT

HUNDRED AND EIGHTEEN.

*WINDSOR, Vt.*

PUBLISHED FOR THE STATE, BY IDE & ALDRICH.

22                    PUBLIC ACTS.

# CHAPTER II.

Passed Nov.
10, 1818. An Act regulating and governing the Militia of
this State.

Sec. 1. *It is hereby enacted by the General As-*
*sembly of the State of Vermont,* That each and
every free, able-bodied, white male citizen of
this state, or of any other of the United States,
residing within this state, who is, or shall be of
the age of eighteen years, and under the age
of forty-five years, (excepting as is herein after
excepted) shall severally and respectively, be
subject to the requisitions of this act, and shall
be enrolled in the militia by the captain or com-
manding officer of the company within whose
bounds such citizen shall reside.   And it shall
be, at all times hereafter, the duty of the com-
manding officer of every such company, to en-
roll every such citizen as aforesaid, and also
those who shall, from time to time, arrive at the
age of eighteen years, or being of the age of
eighteen years and under the age of forty five
years, and not herein after excepted, shall come
to reside within his bounds; and shall, without
delay, notify such citizen of the enrollment, by
a non-commissioned officer or other person by
him duly authorised for that purpose, by whom
such notice may be proved.   And in all cases
of doubt respecting the age of any person en-
rolled, or intended to be enrolled, the party
questioned shall prove his age to the satisfaction
of the commanding officer of the company,
within whose bounds he may reside.   And any
legal notice or warning to the citizen enrolled
as aforesaid, to attend a company, battallion, or
regimental muster or training, shall be a legal
notice of his enrollment.

*Militia how,*
*and by whom*
*enrolled.*

*What shall be*
*deemed no-*
*tice of enroll-*
*ment.*

Sec. 2. *And it is hereby further enacted,* That
the vice-president of the United States, mem-
bers of congress of both houses, with their res-

*Who exempt-*
*ed.*

JA2948

pective officers, members of the council, and members of the house of representatives, with their respective officers, while in session, secretary and treasurer of the state, officers judicial and executive of the government of the United States, justices of the supreme and county courts, judges of probate, county registers, justices of the peace duly qualified to act as such, sheriffs, high bailiffs, selectmen, constables, ministers of the gospel, elders and deacons of churches, and those of the religious denomination of quakers, officers and students of colleges and academies:—also, such physicians, surgeons, stated school-masters, ferrymen and millers, as the selectmen of the town to which they shall severally belong, shall, by a writing, under their hands, signify the expediency of exempting;—all custom house officers and stage drivers, actually employed in the care and conveyance of the mail, and all persons who have heretofore been commissioned in the line of the army of the United States. or in the militia of this, or either of the United States, who have been honorably discharged, shall be, and hereby are, exempted from said enrollment. *Provided nevertheless,* That if any person, subject to military duty, shall be conscientiously scrupulous of bearing arms, and shall certify the same under oath or affirmation, before some justice of the peace, and lodge said certificate with the town clerk of the town to which he shall belong, and pay for recording the same, he shall, thereafter, be exempt from military duty, so long as he shall, annually, pay the sum of two dollars to the captain or commanding officer of the company within whose bounds he may reside; which shall be paid on or before, the first day of May, in each year.

Persons scrupulous of bearing arms, may be exempt on performance of certain conditions.

Sec. 3. *And it is hereby further enacted,* That the governor, by and with the advice of the council, shall arrange the whole of the militia into divisions and brigades. And the several

Divisions, regiments, brigades, &c. how and by whom arranged.

24                    PUBLIC ACTS.

major generals, by and with the advice of the
commanding officers of brigades, in their res-
pective divisions, shall, from time to time, ar-
range the brigades into regiments and battal-
lions.   And the field officers of regiments are
empowered to arrange their regiments, respect-
ively, into companies, and to make such altera-
tions, as from time to time, shall be found ne-
cessary.   And, if the same be convenient, each
brigade shall consist of four regiments, each
regiment of ten companies, and each company
of sixty four effective privates.

*Present ar-*
*rangement to*      *Provided notwithstanding*, That the present
*continue, un-*   arrangement of the militia shall continue as it
*til otherwise*
*ordered by*   now is, until the governor, with the advice of
*Governor.*    the council, shall otherwise order.   And each
*Each new di-*   new division, brigade and regiment, shall be
*vision, brig-*   numbered, at its formation, and a record be
*ade, &c. to be*   made of such number in the adjutant gener-
*numbered*
*and recorded.*   al's office.


       Sec. 4.  *And it is hereby further enacted*, That
*Militia, how*   the militia of this state be officered as follows,
*officered.*    to wit:—to each division, one major general
and two aids-de-camp, with the rank of majors:—
to each brigade, one brigadier general and one
aid-de-camp, with the rank of captain;—to each
regiment, one colonel, one lieutenant colonel, one
major, to be appointed by the captains and sub-
alterns of the regiments, respectively; to each
company of infantry, light infantry or rifle-
men, one captain, one lieutenant, one ensign,
four sergeants, four corporals, one drummer and
one fifer, and sixty four privates; to each com-
pany of artillery, one captain, two lieuten-
ants, and one ensign, four sergeants, four cor-
porals, six gunners, six bombardiers, one drum-
mer, one fifer, and not less than twenty four, nor
more than thirty privates or matrosses:—to each
company of cavalry, one captain, two lieu-
tenants, one cornet, four sergeants, four corpo-
rals, one saddler, one farier, one trumpeter,

and not less than thirty, nor more than fifty
privates.

Sec. 5. *And it is hereby further enacted,* That
the several staff departments shall be organized <small>Staff department how organized.</small>
as follows:—there shall be one adjutant gen-
eral, to be appointed by the governor, with the
rank of brigadier general; to each division, a
division inspector, with the rank of lieutenant
colonel, to be appointed by the major general;
to each brigade, a brigade inspector, to serve
also as brigade major, with the rank of major,
who shall be appointed by the brigadier gen-
eral; and to each regiment, one adjutant, with
the rank of lieutenant, to be appointed by the
field officers of the regiment;—all to be com-
missioned by the governor. There shall, also,
be one quarter master general, with the rank
of brigadier general, to be appointed by the
governor and council: to each division, one
division quarter master, with the rank of major,
to be appointed by the major general: to each
brigade, one brigade quarter master, with the
rank of captain, to be appointed by the briga-
dier general: to each regiment, one quarter
master, with the rank of lieutenant, to be
appointed by the field officers of the regiment:—
all to be commissioned by the governor. And
the several quarter masters shall give bonds to <small>Quarter Masters to give bonds.</small>
the treasurer of this state, with two or more
sureties, for the faithful performance of the du-
ties of their respective offices, to be taken by
the person making the appointment, previous
to granting their commission, in the following
sums to wit: The quarter master generals shall <small>Amount of bonds.</small>
give bonds in the sum of seven thousand dol-
lars; the division quarter master in the sum of
one thousand dollars; and the brigade quarter
Master, in the sum of five hundred dollars; and
the regimental quarter master in the sum of
two hundred dollars. To each regiment there
shall be one chaplain, one surgeon, and one
surgeon's mate, to be appointed by the field

4

26                    PUBLIC ACTS.

officers, and commissioned by the governor,
and one sergeant major, one quarter master
sergeant, one drum-major, and one fife major,
to be appointed by the field officers as aforesaid.

*Governor may appoint two aids.* And the governor, as captain general, be, and
hereby is authorised to appoint two aids, who
shall be commissioned with the rank of lieuten-
ant colonel. And in case the militia shall be

*May organize a pay master's department.* called into actual service, either of this state,
or of the United States, the governor may, and
hereby is authorised, to organize a paymaster's
department, and direct the appointment of such
officers therein, as, in his opinion, the exigency
of the service may require.

Sec. 6. *And it is hereby further enacted,* That
*Field, and company officers by whose orders chosen* each brigadier general be, and is hereby em-
powered, and it shall be his duty to give all
such orders, as shall, from time to time, be
necessary, for electing field officers, captains and
subalterns in regiments and companies, within
his brigade, which shall not have been already
commissioned; and for filling up vacancies of
such officers, or any of them, where they now
are, or may hereafter happen; and returns of
the elections of captains and subalterns shall
be made, as well to the commanding officer of
the regiment, as to the brigadier general.

*What notice for election of field, or commissioned officers.* *Provided always,* That when any time shall be
appointed for the appointment of any field, or
commissioned officer, the electors shall have at
least ten days notice thereof. And all returns

*Returns of elections by, &c. to whom made.* of elections, and neglects or refusals to make
choice of field officers, shall be made to the
governor by the brigadier general, in whose
brigade the election shall be ordered. And a
return of the election of all captains and sub-
alterns shall be made to the commanding offi-
cers of brigades; and all commissions shall pass
through the hands of the brigadier generals,
to the officers for whom they shall be made out.
And every person who shall be elected to any
office in the said militia, and shall not, within

fifteen days after he shall have been notified of his election, (except major and brigadier generals, who shall be allowed thirty days after they shall be notified by the secretary of state) signify his acceptance thereof, shall be considered as declining to serve, in such office, and orders shall, forthwith, be issued for a new choice.

*Acceptance of appointments within what time to be signified.*

Sec. 7. *And it is hereby further enacted,* That every person who shall be lawfully entitled to be commissioned to any office, in the militia of this state, shall, at the time of receiving his commission, take and subscribe the oath of allegiance required by the constitution, and also the oath to support the constitution of the United States, before some general, or field officer, who shall have previously taken and subscribed the same, and who is hereby authorised to administer the same; and a certificate thereof shall be made on the back of every commission, by the general, or field officer, before whom the oath shall have been taken and subscribed.

*Officers to be sworn, and certificate thereof to be made on their commissions.*

Sec. 8. *And it is hereby further enacted,* That the field officers may appoint the non-commissioned staff officers of their respective regiments, and the several companies may elect their non-commissioned officers: and all non-commissioned staff officers and sergeants shall receive warrants, under the hand of the commanding officer of the respective regiments: and the adjutant shall keep a record in a suitable book, to be by him kept for that purpose, of all warrants which shall be issued;—and no non-commissioned officer or private shall be disenrolled from the militia for disability, without a certificate from the regimental surgeon, or surgeon's mate, to the acceptance of the commissioned officers of their respective companies.

*Regimental staff and non-commissioned officers by whom appointed*

*And to receive warrants, Which shall be recorded by Adjutant.*

*Disenrolment for disability how obtained*

Sec. 9. *And it is hereby further enacted,* That the officers of each company shall appoint an

28                    PUBLIC ACTS.

<div style="margin-left:2em">

*Orderly ser-geants by whom ap-pointed.*

*Oath.*

*Duty.*

</div>

orderly sergeant from the list of sergeants, who shall take the following oath before the commanding officer of such company:

You                  swear, truly to perform the office of orderly sergeant, and to the utmost of your skill and ability, to do, and perform, with truth and fidelity, all things appertaining to said office of orderly sergeant, according to law—so help you God. And it shall be the duty of every orderly sergeant to keep a fair and exact roll of the company to which he belongs, together with a statement of the arms and accoutrements belonging to each man; which roll he shall, annually, revise and correct, in the month of June, as is in this act herein after directed. And it shall further be his duty to register all orders and proceedings in the company in an orderly book; (which book shall never be alienated from the company) to keep exact details of all detachments, and to call the roll of the company when assembled: to examine the equipments when thereunto required; to note all delinquencies, and to receive and pay over to the commanding officer of said company all fines and forfeitures, which are, by this act, directed to be recovered, for the use of the company to which he belongs.

Sec. 10. *And it is hereby further enacted*, That the brigadier generals, in their respective brigades, be, and they hereby are authorised to complete the cavalry in their respective brigades, to at least one full troop in each brigade; and there shall in no case, be more than one troop of cavalry to each regiment; and they shall be annexed to such regiments as the commanding officer of the brigade shall direct; and shall be under the command of the commanding officer of the respective regiments, to which they are annexed. And the officers of the cavalry shall furnish themselves with good horses, at least fourteen hands and a half high, and shall be armed with a pair of pistols and

*Cavalry how formed and arranged.*

*How equipped.*

sword, the holsters of which shall be covered with bearskin caps. Each horseman shall furnish himself with a serviceable horse, of at least fourteen hands and a half high, a good saddle, bridle, mail pillion, and valise—holsters, a breast plate and crupper, a pair of boots and spurs, a pair of pistols and sabre, and cartridge box, to contain twelve cartridges for pistols. No man shall be enlisted into any troop of cavalry, unless he shall own and constantly keep a suitable horse, and furniture for that service. And if any person who shall belong to any troop of cavalry, shall be destitute of a suitable horse and furniture, for more than three months, at any one time, he shall be discharged from such corps, by the captain thereof, and be enrolled in the standing company in which he resides. And when any draft or detachment shall be made from a troop of cavalry for actual service, the men thus drafted or detached, shall march with their own horses; and before they march, their horses shall be appraised by three indifferent men, to be appointed by the commanding officer of the brigade from which such detachment shall be made. And the major generals, by and with the advice of the commanding officers of the several brigades, be, and they are hereby authorized, when they shall think proper, to organize the several troops of cavalry into a squadron, under the command of a major commandant; which squadron shall consist of not less than three full companies, and be under the command of the brigadier general of the brigade in which they are raised. And the commanding officer of said squadron shall be liable to the same military rules and duties, of making returns as are prescribed by law to the officers commanding regiments; which squadron shall consist of the following officers, to wit: one major commandant, one adjutant, one quarter master, one riding master, one sergeant major, and one quarter master sergeant. And whenever there shall be

*Members of cavalry destitute of horse for certain time, to be discharged.*

*Men drafted, to march with their own horses.*

*Horses to be appraised.*

*Squadrons of cavalry, by whom organized.*

*How officered.*

four full troops in any squadron, consisting of at least two hundred and twenty men, said squadron shall be entitled to one assistant major, who shall rank with a major of infantry. *Provided always*, That it shall be lawful for the major general, on the application of two thirds of the companies composing a squadron, as aforesaid, to disband the squadron, and annex the several troops of cavalry to the respective regiments of infantry, in the same manner as though they had never been organized into a squadron, as aforesaid. And it shall be lawful for the commander in chief to transfer and transform any part of the cavalry, to light artillery; and such companies, so transferred, shall be armed and equipped as cavalry, and liable to do duty as such, until they are provided with proper ordnance and apparatus as light artillery.

Sec. 11. *And it is hereby further enacted,* That each brigadier, in his respective brigade, be, and he hereby is, authorised to complete one full company of artillery, to be attached to his brigade. And each company of artillery shall be provided with one good field piece, with a carriage and apparatus complete, to be provided by the quarter master general, at the expense of the state; whose duty it shall be, as soon as may be, to provide and furnish the same. The officers of artillery shall be armed with a sword or hanger, each, and every private or matross, with a sword;—and each non-commissioned officer and private, or matross, of those companies which are unprovided with field pieces shall furnish himself with all the equipments of a private in the infantry, until proper ordnance is provided. And the commanding officer of each company of artillery shall be accountable for the careful preservation of the pieces and apparatus provided by government. And the commanding officers of the several regiments, be, and they are hereby authorised to raise two companies of light in-

*(marginal notes)*
May be disbanded in certain cases.

Cavalry may be transferred and transformed to light artillery.

Artillery companies how formed.

How equipped.

Commanding officers accountable for preservation of ordnance.

Light companies by whom raised.

fantry or riflemen, or one of each, in each regiment. Each company of artillery or cavalry, and each company of light infantry or riflemen, may be formed of persons exempt from military duty, or of volunteers from the brigade; which companies of artillery and cavalry shall not exceed one eleventh part of the infantry. And the non-commissioned officers and privates of the companies so raised at large, from the brigade, shall be holden to serve in the companies into which they shall have enlisted, until they shall be discharged therefrom, by their respective commanding officers of companies, squadrons, battallions or regiments.

*Artillery, cavalry and light companies may be formed of exempts.*

*Non-commissioned officers and privates of independent companies holden to serve therein until discharged.*

Sec. 12. *And it is hereby further enacted,* That if any non-commissioned officer or private of the cavalry, artillery, light infantry or riflemen, or other volunteer corps, shall neglect, for the term of three months, to keep himself provided with a uniform of the company to which he belongs, as is directed by this act, he shall be discharged from such corps, by the commanding officer of the company, regiment, squadron or battallion, and be enrolled in the standing company in which he resides: and when any non-commissioned officer or private shall enlist into any company of cavalry, light infantry, artillery or other volunteer company, he shall be holden to equip himself and serve in such company, until the captain or commanding officer shall discharge him from the same: and if any person, after enlisting as aforesaid, shall neglect to equip and do duty, as required by the commanding officer of the company to which he belongs, he shall be liable to be fined and dealt with, in the same manner as a private in the standing companies would be, for neglect of duty; and the commanding officer shall have the same power to amerce delinquents and collect fines, as the captains in the standing companies have.

*Neglecting to uniform, to be discharged.*

*Neglecting to equip, liable to be fined.*

*Commanding officer may amerce delinquents, &c.*

Sec. 13. *And it is hereby further enacted,* That whenever any captain or commanding officer of any company of cavalry, artillery, light infantry or riflemen, or other volunteer company shall enlist any non-commissioned officer or private into his company, who would, otherwise, belong to the standing company, it shall be the duty of the officer enlisting such non-commissioned officer or private, forthwith to notify the commanding officer, out of whose company such person is enlisted, of such enlistment; and no person under the age of eighteen years, shall be enlisted into any company of artillery, cavalry, light infantry, riflemen or other volunteer company; and if any person under the age of eighteen years as aforesaid, shall be enlisted into any company of artillery, cavalry, light infantry, riflemen or other volunteer company, he shall be liable to be enrolled and do duty in the standing company within whose bounds he may reside, on his arriving at the age of eighteen years, the same as though he had never enlisted; and such enlistment shall be held utterly void. And no company of cavalry, artillery, light infantry, riflemen or other volunteer company shall be raised within this state, when any of the standing companies shall be, thereby, reduced to a less number than sixty-four effective privates: and no officer of any such corps, shall enlist any man belonging to a standing company, for the purpose of forming and recruiting such corps, when, by means thereof, such standing company will be reduced to a less number than sixty-four effective privates. And if any such corps, raised at large, shall at any time be destitute of commissioned officers, and shall neglect to fill up such vacancies, for one full year after being ordered to make such election; or if any such corps shall be reduced below the number of twenty privates, and remain in that situation for the term of one full year, then, in either such case, such corps, raised at large as aforesaid, may, by order of the com-

*Marginal notes:*

Officer enlisting from standing company, to give certain notice thereof.

Persons under eighteen, not to be enlisted into volunteer companies.

Persons enlisting under eighteen, liable to do duty in standing companies on arriving at that age.

Standing companies not to be reduced below 64 by formation of volunteer companies.

Corps raised at large may be disbanded in certain cases.

manding officer of the brigade, be disbanded. And the men who belong to such delinquent corps, shall be enrolled in the standing companies in which they may respectively reside; and no such corps raised at large, shall, at any time bear a greater number of men on their rolls, than the law allows necessary to constitute them: and all such corps, raised at large, not annexed to any particular regiment, shall be subject to the orders of the commanding officer of the brigade in which they shall respectively be raised; and shall make their elections and returns in the same manner as other corps of the militia. *Number on the rolls limited. To whose orders subjected. Elections and returns how made.*

Sec. 14. *And it is hereby further enacted,* That every commissioned officer of infantry, whose duty shall require him to serve on foot, shall be armed with a sword or hanger; and every officer whose duty shall require him to be mounted, shall be armed with a sword or hanger, and a pair of pistols; and the uniform, in every instance, required by this act, shall be such as the brigadier generals, within their respective brigades, shall direct. *Sundry officers of infantry how armed. Uniform by whom directed.*

Sec. 15. *And it is hereby further enacted,* That whenever any number of persons, not exceeding fourteen, shall associate themselves into a company for the purpose of instructing themselves in the art of martial music, within any regiment of the militia of this state, and shall provide at their own expense, suitable instruments for that purpose; and having equipped themselves to the acceptance and approbation of the field officers of the regiment to which they belong, they may in the discretion of the field officers of such regiment, respectively, be annexed to such regiment, and be exempt from the performance of military duty, in such way and manner, and under such rules and regulations, as the respective field officers of each regiment may provide. And each and every *Musicians may form themselves into companies. Having equipped themselves, exempt from ordinary duty.*

5

**84**                    PUBLIC ACTS.

company of musicians thus associated, within their respective regiments, under the direction of the field officers of such regiment, may, from *May recruit.* time to time, recruit said company or band, within their respective regiments, to the number of fourteen; and all such persons, so equipped, and having provided themselves with suitable instruments, as aforesaid, may, in the discretion of such field officers, be exempt from military duty as aforesaid.

*One band, only, in each regiment, exempt as aforesaid.*

*Provided nevertheless*, That nothing in this act shall be construed, to exempt from military duty the persons composing more than one band of music to each regiment within this state.

*Commanders of bands empowered to call them together, and amerce delinquents.*

Sec. 16. *And it is hereby further enacted*, That the commanders of the several bands of music which may, or shall have been organized agreeable to the provision of this act, shall have the same powers for calling the bands together for exercise, and of amercing delinquents, in penalties for non-appearance, as are by law, given to the commanders of the militia companies. And it shall be lawful for the commanders of *May require of individuals of bands to perform duty of sergeants.* such bands, to require from individuals of their bands, to perform any duties, which by law are enjoined on sergeants or other persons in the militia; and the persons of whom any such service may be required, as aforesaid, shall have the same powers, and be liable to the same penalties, as are by law given to, or inflicted on, sergeants or other persons in like cases; and a member of any band of music shall be liable *Penalty for non-appearance, &c.* to be proceeded against for non-appearance, disobedience of orders or disorderly conduct, while on parade, as is provided in case of non-commissioned officers and privates in the militia, and subject to the same penalties.

Sec. 17. *And it is hereby further enacted*, That every non-commissioned officer and private of the infantry, light infantry or riflemen, shall

## PUBLIC ACTS.                    35

constantly keep himself provided with a good musket, with an iron or steel rod, a sufficient bayonet and belt, a priming wire and brush, two spare flints and cartridge box and pouch, with a box therein sufficient to contain at least twenty four cartridges, suited to the bore of his musket, a canteen and knapsack; or with a good rifle, two spare flints, knapsack, bullet pouch, powder horn and canteen; and shall appear so armed and accoutred, and provided, whenever called out, excepting, that when called out to exercise only, he may appear without a knapsack. And all parents, masters or guardians, shall furnish those of the militia, who shall be under their care and command, with the arms and equipments above mentioned, under like penalties, for any neglect, which are hereafter provided for those who neglect to equip themselves; except such parents, masters or guardians, as shall be adjudged, by the selectmen of the town, unable to furnish said arms and equipments. And when the selectmen of any town shall judge any inhabitant thereof, belonging to the militia, unable to arm and equip himself, in manner aforesaid, or if minors, whose parents, masters or guardians are unable to equip them, they shall, at the expense of said town, provide for, and furnish such inhabitant, with the aforesaid arms and equipments, which shall remain the property of the town, at the expense of which they shall be provided. And if any soldier shall embezzle or destroy the arms and equipments with which he shall be furnished, he shall, upon conviction thereof, before the county court, be adjudged to replace the articles, which shall be by him embezzled or destroyed, and to pay the costs arising from the process against him; and if he shall not perform the same, within fourteen days after such adjudication, it shall be in the power of the selectmen of the town to which he shall belong, to bind him out to service or labor, for such term of time, as in the discretion of the select-

*Non-commissioned officers and privates of infantry, &c. how armed and accoutred.*

*Parents, masters and guardians to furnish arms, &c.*

*Penalty for neglect.*

*Selectmen to furnish in certain cases.*

*Arms so furnished to remain the property of the town.*

*Penalty for embezzling or destroying arms, &c.*

36                    PUBLIC ACTS,

men, shall be sufficient to procure a sum of money equal to the value of the article or articles so destroyed, and pay costs arising from said prosecution.

Sec. 18. *And it is hereby further enacted,* That when the commanding officer of the company shall think proper to call his company together, or shall be ordered so to do by his superior officer, he shall issue his orders therefor to one or more of the non-commissioned officers, if there be any, and if not, to one or more of the privates belonging to his company, directing him or them to notify and warn the said company to appear at such time and place as shall be appointed;—and every such person or persons who shall receive such orders, shall give notice of the time and place appointed for assembling said company, to each and every person, he or they shall be so ordered to warn, either by verbal information, or by leaving a written or printed notification thereof at the usual place of abode of the person to be notified and warned. And all notice for trainings, shall be at least four days previous to the time appointed therefor; but in case of invasion, insurrection or other emergency, the time specified in the orders shall be deemed legal. And whenever any company shall be paraded, the commanding officer of such company is hereby authorized to notify the men so paraded, to appear on some future day, not exceeding thirty days, from the time of such notification; and such notice shall be legal as it respects the men present.

*Companies how warned.*

*What notice to be given.*

Sec. 19. *And it is hereby further enacted,* That every captain or commanding officer, shall call his company together on some day between the first Tuesday of September and the first Tuesday of October annually, at nine o'clock in the forenoon, for company discipline; and once on the first Tuesday in June, annually, for the express purpose of examining and taking an

*Companies when to be called together.*

exact account of every man's arms and equipments; at which time every article required by this act, shall be brought to the place of examination; at which time it shall be the duty of the orderly sergeant, or in his absence, of some other person, to be appointed on the occasion for the time only, by the commanding officer for that purpose, to make out an exact roll of the arms and equipments which shall belong to each man.    And every commanding officer of a company, shall keep constantly by him a roll, with the arms and equipments of every man, annexed to his name, as aforesaid; from which all detachments, and the annual return of the company shall be regularly made; and the said roll shall be revised, corrected and completed on the first Tuesday of June, annually, as aforesaid.

*Commanding officer to keep a roll, embracing arms and equipments.*

*Roll when revised and corrected.*

Sec. 20. *And it is hereby further enacted,* That it shall be the duty of the adjutant general to distribute all orders from the commander in chief of the militia to the several corps, to attend all public reviews, when the commander in chief shall review the militia, or any part thereof; to obey all orders from him, relative to carrying into execution and perfecting the system of military discipline, established by law; to furnish blank forms of the different returns which may be required, and to explain the principles on which they ought to be made; to keep such rosters and records as are proper to be kept in his office; to receive from the several officers in the different corps, throughout the state, returns of the militia under their command, reporting the actual situation of their corps, their arms, ammunition and accoutrements, and their delinquencies, and every other thing which relates to the general advancement of good order and discipline; all which the several officers of the divisions, brigades, regiments, squadrons, battalions and companies are hereby required to make, in the usual

*Duty of adjutant general.*

*Officers to make returns to adjutant general of militia, their arms, &c.*

58                    PUBLIC ACTS.

From which adjutant general shall make abstract and a general return to governor annually. And a duplicate thereof to the President of the United States. manner, or as the commander in chief shall direct, so that the said adjutant general may be furnished therewith; from all which returns the adjutant general shall make the proper abstracts, and a general return of the whole of the militia of this state, and lay the same before the governor or commander in chief, in the month of October, annually; and also forward a duplicate to the President of the United States.

Sec. 21. *And it is hereby further enacted,* That Brigade inspectors duty. it shall be the duty of the brigade inspector to attend the regimental and battalion meetings of the militia composing the several brigades to which they belong, during the time of their being under arms to inspect their arms and equipments; to superintend their exercise and manoeuvres, and introduce the system of discipline established by law; to obey all orders which they may from time to time receive from the commander in chief, or other of their superior officers; to make returns to the adjutant general as herein directed, and at such other times as shall be required of the militia of the brigade to which they shall respectively belong, reporting therein the actual situation of the corps, their arms, ammunition and accoutrements, and every other thing which they may be required to report, or which in their judgement, may relate to their government, and the general advancement of good order and military discipline.

Sec. 22. *And it is hereby further enacted,* That Militia to be called out by brigades, regiments or battalions once in two years for review, &c. the militia of this state shall be assembed at least once in two years, for review, inspection and discipline, on such days as the commanding officers of the respective divisions and brigades shall order, either by brigades, regiments or battalions, as the said commanding officer may direct. And when a brigade review or Places of parade by whom appointed. inspection is ordered, the commanding officer of the brigade shall appoint the place of pa-

## PUBLIC ACTS.   39

rade. And when a regimental or battalion review or inspection is ordered, the commanding officer of the regiment shall appoint the place of parade for his regiment or battalion. The artillery, cavalry and other corps raised at large, shall also be reviewed and inspected at least once in two years, either with the regiments and battalions or by themselves, as the major general or brigadier general shall order, and at such times and places as they shall direct. And each commanding officer of a corps, when on duty, shall have full power and authority to ascertain and affix certain limits and bounds to their respective parades, (no road in which people usually travel to be included) within which no spectator shall have right to enter without liberty from said commanding officer: and in case any person shall intrude within the limits of the parade, after being once forbidden, he shall be subject to be confined under guard, during the time of the exercise, at the discretion of the commanding officer. And all officers, when on duty, shall take rank according to the date of their commissions; and when two of the same grade bear an equal date, and former pretensions of a prior commission do not decide, then their rank shall be determined by lot, to be drawn by them before the commanding officer present; and when on court martial, before the president thereof.

*Corps raised at large to meet for review, &c. once in two years.*

*Commanding officers to fix limits of parade.*

*Penalty for intruding on parade.*

*Rank of officers when on duty, how decided.*

Sec. 23. *And it is hereby further enacted,* That the field officers and regimental staff, the commissioned, non-commissioned officers and music of each regiment and separate battalion, including artillery, light infantry and riflemen, shall rendezvous, at least once in two years at nine o'clock in the forenoon, and continue through the day (necessary respites only excepted) in military exercise; the time and place of such rendezvous shall be appointed by the commanding officer of brigade, in orders to the commanding officer of the regiment or separate

*Field, staff, commissioned and non-commissioned officers and music to rendezvous once in two years for military exercise.*

*Time and place to be appointed by commanding officer of brigade.*

battalion; and it shall be the duty of the commanding officer of such regiment or battalion to require each and every of the officers and musicians aforesaid, to appear on said day with such arms, accoutrements and instruments of music as he may deem proper, for the purpose of such exercise: and if any commissioned officer in this section before enumerated shall neglect or refuse to attend when required as aforesaid, he shall be liable to be tried by a court martial, and punished as is provided in the twenty-eighth section of this act: and if any non-commissioned officer or musician shall neglect or refuse to attend when required as aforesaid, he shall be liable to be tried by a regimental court martial, and reduced to the ranks, and fined as is provided in the seventeenth article of the rules and articles in this act. And it is hereby made the duty of the brigadier general and the brigade inspector to attend all such rendezvous, in their respective brigades, superintend their exercise and manoeuvres, and introduce the system of military discipline established by law.

*Penalty for non-attendance.*

*Brigadier general and brigade inspectors required to attend.*

Sec. 24. *And it is hereby further enacted,* That each regiment or squadron shall be furnished with the regimental colours, and each company of infantry, artillery, light infantry and riflemen shall be furnished with a drum and fife or bugle-horn, each company of cavalry with a trumpet; and the commanding officers of regiments, squadrons and battalions, shall be responsible for the safe keeping of their colours; and the commanding officers of companies shall be responsible for the safe keeping of their fifes, drums, bugle-horns and trumpets, delivered them for the use of their companies.

*Each regiment or squadron to be furnished with colours. Each company of infantry &c. to be furnished with drum and fife or bugle-horn. And each company of cavalry with a trumpet. Commanding officer responsible for safe keeping of colours,&c.*

Sec. 25. *And it is hereby further enacted,* That when in case of actual or threatened invasion, insurrection or other public danger or emergency, the militia, or any part thereof, shall be ordered out or detached, if any person who

*Penalty for disobedience of orders to turn out in case of emergency.*

PUBLIC ACTS. 41

shall be ordered, or detached in obedience to such order, being duly notified thereof, and ordered to march from the place of rendezvous, shall neglect or refuse to obey such order, or shall not, within twenty four hours after he shall have been notified as aforesaid, pay a fine of fifty dollars to the commanding officer of the company to which he belongs, or procure an able bodied man in his stead, such person shall be considered as a soldier in such detachment, and be dealt with accordingly. And when a detachment is made, the officers, non-commissioned officers and privates, being able of body, shall be detached from the rosters or rolls which shall be kept for that purpose; and any person who by absconding, after being detached as aforesaid, or by deserting from such detachment, shall attempt to evade the punishment provided by law for desertion, he shall pay a fine of fifty dollars, to be sued for, and recovered by the captain or commanding officer of the company to which such person belongs, at any time within twelve months after the discharge of such detachment. And when any regiment or company shall not be organized, the officer issuing the order for such detachment, shall by himself or some other officer under him, proceed to make and complete the detachment from any part of the militia of such unorganized corps. *Penalty for absconding.* *Detachments may be made from unorganized corps.*

Sec. 26. *And it is hereby further enacted,* That when the militia, or any part thereof, of any town, shall be ordered to march for the immediate defence of this state, each officer and soldier shall provide and take with him three day's provisions, unless otherwise ordered. And the selectmen of such town shall cause carriages to attend them with further supplies of provisions and camp utensils, until notice shall be given them to desist, by the officer commanding the militia thus detached; and the selectmen shall prefer their accounts for such supplies to the auditor of accounts against this state, for allow- *Militia when ordered to march, to take three days' provision.* *Accounts of Selectmen to be preferred to auditor of accounts.*

6

JA2967

42                    PUBLIC ACTS.

ance.   And when the selectmen of any town or
district from which a detachment shall be or-
dered, shall be notified by any officer duly au-
thorized thereto, and shall neglect or refuse to
Selectmen    furnish such supplies and utensils, the town or
neglecting to   district to which such selectmen belong, shall
furnish sup-
plies,&c town  pay a fine not exceeding two hundred dollars,
to be fined.   to be sued for and recovered by any person
who shall prosecute for the same; one moiety to
the prosecutor, and the other to the use of the
state, before any court proper to try the same.
And the officer to whom such camp utensils
Officers ac-   shall be delivered, shall be accountable for the
countable for
company u-    same, unless broken or lost by some unavoida-
tensils.     ble accident.

Sec. 27. *And it is hereby further enacted,* That
Officers or   if any officer, non-commissioned officer or pri-
soldiers killed
in service,   vate of the militia shall be killed or die of his
provision for  wounds, received in the service of the state,
widows and
children.    his widow, child or children, shall be entitled
to similar relief, and under the same regulations
and restrictions, as is provided by law in such
cases for the relief of widows and orphans of
persons killed or dying of wounds received in
the service of the United States.   And if any
officer, non-commissioned officer or private of
Wounded,     the militia, shall be wounded or otherwise disa-
provision for.  bled in the service of this state, he shall be en-
titled to similar relief, and under the same
regulations and restrictions, as is provided by
law for the relief of persons wounded or disa-
bled in the service of the United States.

Sec. 28. *And it is hereby further enacted,* That
the governor or commander in chief shall ap-
Sundry courts  point general courts martial, for the trial of all
martial, by
whom ap-    officers above the rank of captain; that the
pointed.     brigadier generals, each within his own brigade,
shall appoint brigade courts martial, for the
trial of captains and all commissioned officers
under that rank; and the commanding officer
of regiments shall appoint all regimental courts

JA2968

martial, for the trial of non-commissioned officers and privates. And it shall be the duty of every officer who shall appoint a court martial as aforesaid, to approve or disapprove of every sentence of such court martial, by them appointed; and no officer who shall appoint a court martial shall be president thereof; nor shall any sentence be put in execution until it shall have been approved of as aforesaid. A general, or brigade court martial shall consist of twelve members at least, and a president and marshal; the president of which shall not be under the rank of a field officer; and no field officer shall be tried by a person under the rank of captain; and all officers shall take rank on a court martial, by seniority of commission, without regard to corps. A regimental court martial shall consist of six members, a president, and marshal; the president of which shall not be under the rank of captain. If a general court martial is to be formed, orders shall be issued to such divisions, as in the opinion of the commander in chief, may most conveniently furnish the members thereof; if it be a brigade court martial, orders shall be issued to such regiment within the brigade, as in the opinion of the brigadier general or commanding officer of the brigade, may most conveniently furnish the members thereof; if it be a regimental court martial, orders shall be issued to such companies within the regiment as in the opinion of the colonel or officer commanding the same, may most conveniently furnish the members thereof. And whenever a commanding officer of a division, brigade, regiment or company shall be ordered to furnish any officer or officers, as member or members, supernumerary or supernumeraries of a court martial, such officer or officers shall be regularly detailed from the roster of the division, brigade, regiment or company, by the commanding officer thereof, respectively, forthwith, after having received orders therefor as aforesaid. *Provided however,* That in case

*Marginal notes:*

Officers appointing courts martial to approve or disapprove sentence.

And shall not be president of such court.

Sentence not to be executed until approved.

Number necessary to constitute a general or brigade court martial.

Rank of president.

Field officer not to be tried by any under rank of captain.

Rank of officers on courts martial to be regulated.

Number of a regimental court martial.

Rank of president.

Designation of divisions, regiments and companies from which members of courts martial shall be taken, by whom made.

Members of courts martial to be detailed from rosters of divisions, brigades, &c.

44          PUBLIC ACTS.

Providing in case of inability, &c. of any officer detailed.

of inability, sickness or absence of any officer whose turn it would be to serve on a court martial, the detailing officer shall certify such circumstance to the officer who ordered the court martial, and detail the officer next in rotation; and the officers ordered to be detailed to serve on courts martial, shall be detailed in the following manner—

Detail by whom to be made in sundry cases.

major generals by the commander in chief, or his orders, from the general roster; brigadier generals, by the commanding officer of divisions, from the division roster; field officers, by the commanding officers of brigades, from the brigade roster; and captains and subalterns, by the commanding officer of regiments, from the regimental roster.

Officers ordering court martials to appoint president and marshal. And may order supernumeraries to be detailed.

Whenever a court martial is ordered, the officer ordering it, shall appoint the president and marshal of the same; he may, also, at his discretion, order a number of officers, not exceeding half the number of members of which the court is composed, to be detailed as supernumeraries, in addition to the members, to attend the court at the organization thereof; and in case there shall

From whom vacancies shall be filled by judge advocate.

be any vacancy or vacancies, the judge advocate shall fill such vacancy or vacancies, from the supernumeraries, beginning with the highest in grade, and proceeding in regular rotation.

Judge advocate, by whom appointed. His duty.

And the officer who shall appoint a court martial, shall at the same time appoint a judge advocate, whose duty it shall be, impartially to state evidence, both for and against the officer under trial, take accurate minutes of the evidence, and all the proceedings of the court; all of which he shall transmit, with the judgment of the court thereon, under seal, to the officer whose duty it is to approve or disapprove of such judgment.

Persons holden to appear and give evidence

All persons shall be holden to appear and give evidence before any court martial, under the same penalties for neglect, as are by law provided for witnesses in other cases, when thereunto summoned by a justice of the peace;

Fees of witnesses.

and shall be entitled to the same fees as witnesses attending the county court, to be paid

out of the state treasury; and all witnesses shall *How paid.* be sworn by the judge advocate, before they give their evidence to the court. Before any court martial shall proceed to the trial of any *Court to be* officer, the judge advocate shall administer to *sworn.* the president and each of the members the following oath, viz:

"You              do swear, that you will well and truly try the cause now before you, between the State of Vermont and the person or persons *Form of oath.* to be tried, according to evidence; and you do further swear, that you will not divulge the sentence of this court martial, until it shall be approved or disapproved of, and that you will not, on any account, at any time, discover the vote or opinion of any member, unless required to give evidence thereof, as a witness, by a court of justice, in a due course of law: so help you God."

And the president shall administer to the judge advocate the following oath, viz:

"You              do swear, that you will not, on any account, at any time whatever, divulge *Oath of judge* the vote or opinion of any member of this court *advocate.* martial, unless required to give evidence thereof, as a witness, by a court of justice, in due course of law: so help you God."

When any member of a court martial is *Method of* challenged, either on the part of the govern- *challenging* ment or the accused, the cause of the challenge *members of* must be stated in writing, of which the court *court martial.* after due deliberation shall determine the rele- *But one mem-* vancy or validity, and decide accordingly; and *ber to be* no challenge to more than one member at a *challenged at* time, shall be received by the court. On ques- *Member chal-* tions of challenge, the member objected to, *lenged not to* shall not vote, but the president may vote with *tion of chal-* the members; and in no case shall a challenge *lenge.* be acted upon, until the president and judge *President* advocate, and the intended members are sworn. *Question of* All trials by court martial shall be carried on in *challenge not* the day time; and when the votes are called *to be acted on* for, on a question, the judge advocate shall be- *'til court are sworn.*

*Trials to be held in day-time.*

46                    PUBLIC ACTS.

**Votes, how taken.** gin with the youngest in commission, and proceed regularly to the oldest. And at all courts **What majority necessary to find guilty.** martial, unless two thirds of the members agree that the accused is guilty, the judge advocate shall record his acquittal; but if two thirds or more pronounce the accused guilty, the court shall sentence him, if an officer, either to be **Sentence.** reprimanded in orders, or removed from office, or to pay a fine not exceeding one hundred dollars, in the discretion of said court, according to the aggravation of his offence; and if a non-commissioned officer, musician or private, to such fine, forfeiture or other punishment as is or may be provided by law. And if any offi- **Sentence of disqualification for office may be made.** cer be sentenced to be removed from office, the court shall judge him to be disqualified for, and incapable of holding any military office under this state, either for life, or for a term of years, according to the aggravation of his offence; which sentence either of reprimand in orders, removal from office, fine, forfeiture or other punishment, if approved of, shall remain in full force; but the judgment of disqualification may **May be reversed by the legislature.** be reversed by the legislature. And all fines **Fines how recovered.** imposed on any officer in pursuance of this section, shall be sued for, and recovered by action of debt, brought on this statute, before any court of competent jurisdiction; and if the officer sentenced to pay a fine as aforesaid, shall be a captain or subaltern, said action shall be **And in whose name.** brought in the name of the quarter master of the regiment to which such captain or subaltern belongs, for the use of said regiment; if a regimental, field or staff officer, said action shall be brought in the name of the brigade quarter master of the brigade to which said field or staff officer may belong, for the use of said brigade; if a brigadier general or brigade staff officer, by the quarter master of the division to which such brigadier general or brigade staff officer may belong, for the use of such division; and if any other officer, in the name of the quarter master general, for the use of the militia

JA2972

of this state. And all courts martial are authorized hereby to preserve order during their session, and if any person or persons in presence of a court martial shall behave in a disorderly manner, or make any tumult in, or disturb any court martial, and shall not upon the command of the marshal thereof, desist therefrom, it shall be lawful for the court martial to confine such disorderly person or persons, for a time not exceeding eight hours.

*Courts martial may preserve order during their sessions. Proceeding in case of disorderly behaviour.*

Sec. 29. *And it is hereby further enacted,* That the commander in chief may call boards of officers whenever in his opinion they may be necessary for settling military questions, or for other purposes relative to good order and discipline. And the commander in chief, and the brigadier generals or other officers commanding brigades, each in his own brigade, may order courts of enquiry, to examine into the nature of any transaction, or accusation, or imputation, against any officer, when made by an inferior. *Provided however,* That all courts of enquiry on general or field officers, are to be ordered by the commander in chief; all courts of enquiry on captains, regimental staff and subalterns, shall be ordered by the brigadier generals or commanding officers of brigades; and courts of enquiry shall always consist of three officers and a judge advocate, to be appointed by the person ordering the same; all of whom shall be sworn. These courts shall have the same process to summon witnesses as courts martial, and may examine them on oath; but they shall not give their opinions on the merits of the case, unless they are especially required so to do. The parties shall also be permitted to cross examine witnesses, so as to fairly investigate the circumstances in question. The proceedings of a court of enquiry are to be authenticated by the signatures of the president and judge advocate, and are to be transmitted by the judge advocate, sealed, to the officer

*Commander in chief may call boards of officers for certain purposes. Courts of enquiry may be ordered; by whom and for what purpose.*

*To consist of three officers and judge advocate. And be sworn. May summon witnesses.*

*Proceedings before a court of enquiry How authenticated.*

48                    PUBLIC ACTS.

who ordered the court. The judge advocate shall administer to each of the officers composing a court of enquiry, the following oath:

Form of oath to court of qinuiry.

"You           do swear, that you will well and truly examine and inquire into the matter now before you, without partiality, favor, affection, prejudice or hope of reward: so help you God."

After which the president shall administer to the judge advocate the following oath:

To judge advocate.

"You           do swear, that you will impartially record the proceedings of the court and the evidence to be given in the case in hearing: so help you God."

Oath to be administered to witnesses.

The judge advocate shall administer to the witnesses the same oath or affirmation, as the case may be, as is prescribed by law. And any officer who may serve on any court martial or court of inquiry, shall be entitled to receive as a compensation therefor, one dollar per day, for each day he may actually serve in, or necessarily attend such court; and five cents per mile for travel, from his place of residence to the place where such court may be holden; and the president thereof shall certify the travel and attendance of each member, and of the judge advocate and marshal, and when the same shall be allowed by the auditor of accounts against this state, the treasurer of this state is hereby directed to pay the amount thereof, out of any monies in the treasury not otherwise appropriated.

Compensation to officers attending on courts martial and courts of enquiry.

By whom allowed and paid.

Sec. 30. *And it is hereby further enacted,* That every town within this state shall be constantly supplied with thirty-two pounds of good gun powder, one hundred weight of lead or musket balls, and one hundred and twenty-eight flints, for every sixty-four soldiers in the militia of such town, enrolled as aforesaid, and the same proportion of each of the aforesaid articles, for a greater or a less number. And every town which shall neglect to keep constantly provided

Towns to supply ammunition.

with the said articles, shall forfeit and pay for the use of the county, for every sixty-four men in such town, which shall be unprovided with such articles, the sum of one hundred dollars, to be recovered by information of the state's attorney in the county court, in the county to which such town belongs.   And it shall be the duty of the quarter master of each regiment, annually to inspect the magazine of each town within his respective regiment, and make complaint to the state's attorney of the county, against all towns which neglect to keep constantly provided as aforesaid.   And when any town shall have furnished themselves with the magazine as aforesaid, it shall be the duty of the commanding officers of the several companies in such towns, to make a return of the said magazine, in the same manner as though every soldier was provided with half a pound of powder, and two pounds of lead, or musket balls, and two spare flints.

*Penalty for neglect.*

*Quartermaster to inspect the magazine of each town annually.*

*Magazines being finished, commanding officers to make returns.*

Sec. 31.  *And it is hereby further enacted,* That whenever there shall be a sufficient number of able bodied, effective men in one or more towns adjacent to each other, who by law are not subject to military duty, and who shall voluntarily enlist themselves in a sufficient number, for the purpose of doing military duty, either as a company of artillery, cavalry, grenadiers, light infantry or riflemen, and after having equipt themselves according to law, and in case of an artillery company, having provided themselves at their own expense, a good field piece, with a carriage and apparatus, to the acceptance and approbation of the brigadier general of the brigade in which they may respectively reside; it shall be the duty of such brigadier general to issue an order appointing a time and place to meet for the purpose of electing their officers, giving at least ten days notice for that purpose; and by himself, or by some person by his order named, when such company shall be

*Exempts voluntarily enlisting, may form companies.*

*How organized.*

50                     PUBLIC ACTS.

convened, to cause a muster roll to be made out from the enlistment, and proceed to lead them to a choice of such commissioned and non-commissioned officers, as shall be proper for said several companies, and as they by law are entitled to.   And such presiding officer shall within twenty days from any such election, make out a duplicate from such muster roll, with his returns of election of officers inserted thereon, to the brigadier general within whose limits such company is formed; and the original muster roll made out as aforesaid, shall be delivered by such presiding officer to the captain elected to the command of any such company, for the use thereof.   And it shall be the duty of the brigadier general to whom such returns shall be made, to commission the officers chosen as aforesaid; and all such companies shall be considered as constituting a part of the regiment within whose limits they are so raised; and shall be subject to the same duties, penalties and forfeitures as are enjoined by the several statutes of this state, regulating the militia thereof.   And such volunteer companies shall have the privilege to enlist from time to time, from the exempts as aforesaid, within the limits of the regiment in which such companies were raised, a sufficient number to keep such companies full.

*Muster roll and election of officers to be returned to brigadier general.*

*Officers to be commissioned by brigadier general.*

*Duties, penalties, forfeitures, &c.*

*Enlistments authorized.*

Sec. 32. *And it is hereby further enacted,* That every citizen enrolled and providing himself with a uniform, arms, ammunition and accoutrements required by this act, shall hold the same exempted from all suits, distresses, executions or sales for debt, or payment for taxes. And the polls of non-commissioned officers and privates in the militia of this state, subject to military duty, and the members of the several bands of music, duly organized, shall be exempted from the list, on which state taxes are made; and one horse owned by any of the cavalry who is accoutred and equipped according to law, shall be exempted likewise from the

*Uniform, arms, ammunition, &c exempt from civil process.*

*Polls of non-commissioned officers, privates, and members of bands of music, exempt from list on which state taxes are made. And horses of cavalry.*

lists on which state taxes are made.  *Provided,*
That stallions, owned by any one of the caval-
ry, shall not be exempted for any larger sum
than that at which an ordinary horse is to be set
in the list.   And the polls of all the officers,
non-commissioned officers and privates of the
militia of this state, who shall be equipped
according to law, shall be exempted from all
taxes; but no non-commissioned officer or pri-
vate shall be excused from taxation as aforesaid,
unless he shall prove to the satisfaction of the
commanding officer of the company to which
he belongs, that the said equipments are his
own personal estate; and the listers of each
town in making up the general list, shall not
place the names of such persons, equipped as
aforesaid, in the list.   And the polls of every
member of a company or band of musicians
who shall be formed as the law directs, and
shall appear at the annual review of the militia,
and be inspected by some general or field offi-
cer, who shall certify that they are uniformed
and equipped as the law directs, which certifi-
cate shall be lodged with the town clerk of the
town to which they severally belong, by the
commander of such band, in the month of June
annually; shall also be exempt from all taxes;
and the listers of each town shall not place the
polls of such persons on the list.   And if any
minor, liable to do military duty, shall be
equipped according to law, by the parent, guar-
dian or master of such minor, and such parent,
guardian or master, prove to the satisfaction of
the commanding officer of the company to
which such minor belongs, that the said equip-
ments are the personal property of such parent,
guardian or master, it shall be the duty of such
commanding officer of such company, to make
return thereof as herein after provided.   And it
shall be the duty of the listers to deduct from
the list of the person so providing and furnish-
ing such equipments, as aforesaid, the sum of
twenty dollars.   And no officer, non-commis-

*Side notes:*

Soldiers not exempt over a certain sum.

Polls of militia duly equipped, exempt from all taxes;

On proof that equipments are the property of persons claiming exemption.

Duty of listers in such cases.

Polls of musicians exempt from all taxes in certain cases.

Parent, master or guardian of minor furnishing equipments, and making proof of property therein;

Commissioned officer to make return thereof.

Deduction of $20 to be made from list of such parent, &c.

52                              PUBLIC ACTS.

**Officers and privates exempted from arrest, in certain cases.** sioned officer or private, shall be arrested on any civil process, during his going to, remaining at, or returning from, any place at which he may be ordered to meet for the election of any officer or officers.   And no officer or witness shall

**Officers and witnesses attending courts martial exempt from arrest.** be arrested on any civil process, while going to, attending upon, or returning from, any court martial, court of inquiry, or board of officers, which it may be his duty to attend.

Sec. 33. *And it is hereby further enacted,* That **Rules and articles for the government of militia.** the following be the rules and articles by which the militia of this state shall be governed, when not in actual service.

ARTICLE 1.   Every commissioned officer who **Sundry offences subjecting commissioned officers to be tried by court martial.** shall be guilty of unmilitary conduct, neglect of duty, or disobedience of orders, or who shall, when on duty, appear, or behave in an unofficer like manner, or who shall, wilfully oppress or injure any under his command, or who shall, at any time, set on foot, or join in any combination to resist or evade the lawful orders of any commissioned officer, shall be liable to be tried by a court martial.

ARTICLE 2.   Every officer to be tried by a **Officers to be tried shall be put in arrest.** court martial, shall be put in arrest, so as to be suspended from the exercise of his office, and **Shall have copy of charges.** shall have a copy of the charges exhibited against him, and notice of the time and place ap- **And 10 day's notice of time and place of trial.** pointed for his trial; which copy and notice shall be given him ten days, at leat, before his trial is commenced.

ARTICLE 3.   In case any officer, non-commis- **Proceeding in case respondent neglects to appear, or withdraws in contempt of court, or stands mute.** sioned officer, musician or private, for the trial of whom a court martial is appointed, shall neglect to appear and make defence; or if appearing, shall, afterwards, withdraw in contempt of the court; or being arraigned before a court martial, shall, from obstinacy or deliberation, stand mute, or answer foreign to the purpose, the court may

JA2978

proceed to trial and judgment, as if he had regularly pleaded not guilty.

ARTICLE 4.  If any officer, after having been put in arrest, shall presume to exercise any military command, until he be discharged from arrest, he shall be liable to be tried by a court martial, and if convicted, he shall be removed from office.

*Penalty for exercising command after arrest.*

ARTICLE 5.  No officer shall be tried by a court martial for any offence, which shall have been committed more than one year previous to the time when a complaint shall have been made, in writing, thereof, unless he, by reason of absenting himself, or some other manifest impediment, shall not have been ameanable to justice, within that period.

*Limitation of prosecution.*

ARTICLE 6.  No officer shall be permitted to resign while under an arrest.

*Officer not to resign while under arrest.*

ARTICLE 7.  No general, or field officer, shall be discharged, except by the commander in chief; or other commissioned officer, except by the brigadier general, or officer commanding the brigade to which he belongs, on the request of such officer in writing, or by sentence of a court martial, or by actual removal, or by twelve months absence from the district of his command, or by the corps to which he belongs being disbanded, or by being convicted of any infamous crime.

*Officers by whom and in what cases discharged.*

ARTICLE 8.  No officer shall consider himself as exempt from the duties of his station, except when under arrest, until he shall have been discharged by one of the methods or causes pointed out in the preceding article.

*Not exempt from duty unless discharged or under arrest.*

ARTICLE 9.  No general officer shall approve of the resignation of any officer, until such officer shall have lodged in his hands all such mili-

*General officers not to approve of resignation of any officer*

**54**                     PUBLIC ACTS.

until militia laws, orderly books, &c. are lodged in his hands.
Which shall be delivered to succeeding officer.

tary laws, orderly books, and other books, as he shall have been furnished with by government; which books and laws shall be delivered, by said general officer to the next succeeding officer, who shall be commissioned in the place of him who shall have resigned.

ARTICLE 10. The captain or commanding officer of every company of light infantry, artillery, cavalry or riflemen, shall, annually, in the month of April, make out a list of the names of the men belonging to his company, and deliver the same to the commanding officer of the regiment or regiments within whose bounds such men reside.

Commanding officer of companies to make out list of names annually, and lodge with commanding officer of regiment.

ARTICLE 11. The captains or commanding officers of every company of militia in this state, shall annually in the month of June, make a return of all the officers, non-commissioned officers, musicians and privates belonging to their respective companies, and lodge the same with the town clerk of the town to which they respectively belong; and in such return, shall designate those who are equipped, and those who are not equipped according to law; and if there be minors who are equipped, he shall also state in his return by whom said minors are equipped; and the commanding officer of said regiment shall make a similar return of field, staff and non-commissioned staff officers, of their respective regiments.

And annually in month of June, to make return to town clerk of officers, privates, &c.

And shall designate those who are, and are not equipped, &c.

Commanding officers of regiments to make similar return of field and staff officers, &c.

ARTICLE 12. That every captain or commanding officer of a company, shall make a return of the state of his company, with all the arms and equipments belonging to them, to the commanding officer of the regiment, in the month of June, annually. Every commanding officer of a regiment shall make a return of the state of his regiment to the brigadier general, in the month of July, annually; and every commanding officer of a brigade shall make out

Commanding officers of companies to make return to commanding officer of regiment in June annually.
Regimental returns to be made to brigadier general in July.

## PUBLIC ACTS.   55

duplicate returns of his brigade, one of which he shall transmit to the major general of the division to which he belongs, and the other to the adjutant general of this state, in the month of September annually.   And any officer neglecting to make the returns herein before directed, shall be fined by the officer to whom such return should have been made, a fine of twenty dollars, to be collected by any adjutant in the brigade, and proceeded with as the law directs; which fine shall be for the use of the regiment or brigade to which such delinquent belongs.

*Brigade returns to be made to major, and adjutant general in September.*

*Penalty for neglect to make returns.*

ARTICLE 13.   Any officer neglecting or refusing to make a draft or detachment, when ordered in pursuance of the duties of this act, shall be arrested and tried by a court martial, and the officer next in command shall be ordered to make the detachment.

*Officers neglecting or refusing to make drafts, &c Penalty.*

ARTICLE 14.   Whenever different corps shall parade, join or do duty together, the senior officer present shall command, without regard to corps.

*Different corps being together, senior officers to command.*

ARTICLE 15.   That at any regimental or battalion muster, the several companies shall form in regiment or battalion, according to their dignity or seniority, as numbered in the regimental books; and the same rule shall be observed when different corps are assembled together, excepting so far as by custom, usage or necessity, the artillery, cavalry, light infantry or riflemen may be detached from the battalion.

*Companies how formed at regimental or battalion muster.*

ARTICLE 16.   Any non-commissioned officer or private, who shall, while under arms, or when on duty behave himself with contempt to any officer, or shall conduct in a disorderly manner, or excite or join in any tumult or riot, or be guilty of any unmilitary conduct, may be put under guard and kept for a longer or shorter time, at the discretion of the commanding offi-

*Penalty for unmilitary conduct on parade.*

JA2981

cer of the company; not exceeding, however, the time at which the company to which he belongs may be dismissed; and shall, moreover, forfeit a sum not less than two, nor more than five dollars for each offence, according to the degree or aggravation of the same: and if a non-commissioned officer, shall be liable to be reduced to the ranks by sentence of a regimental court martial.

**ARTICLE 17.** Any non-commissioned officer or private who shall, without leave of his officer, quit his guard, section, platoon or company, shall for each offence, forfeit not less than two, nor more than four dollars; and if a non-commissioned officer, shall be liable to be reduced to the ranks by the sentence of a regimental court martial.

*Penalty for quitting guard, &c. without leave*

**ARTICLE 18.** Any non-commissioned officer or private, who shall neglect or refuse to give any notice or warning, when ordered thereto by the commanding officer of the company to which he belongs, shall for such offence, forfeit and pay a fine not exceeding four dollars, for every person he shall neglect to warn; and if a non-commissioned officer, shall be liable to be reduced to the ranks by the sentence of a regimental court martial.

*Penalty for refusing or neglecting to give any notice when ordered.*

**ARTICLE 19.** Every non-commissioned officer who shall be guilty of disobedience of orders, neglect of duty or other unmilitary conduct, may be reduced to the ranks by the sentence of a regimental court martial.

*Non-commissioned officer guilty of disobedience of orders, &c. Penalty.*

**ARTICLE 20.** Every non-commissioned officer or private, who being duly ordered to appear at the company inspection and review of arms, on the first Tuesday in June, and shall unnecessarily neglect to appear at the time and place appointed, shall forfeit and pay two dollars. And every person liable to do duty in the

*Penalty for neglecting to attend company inspection in June.*

militia, who shall be absent at the examination or view of arms, in the month of June, as aforesaid, and shall not send his arms and equipments to be examined at the time and place appointed, he shall be fined for every article required by this act, not so brought or sent to be examined, as is herein directed, besides the fine for non-appearance, as herein directed.

*Penalty for not sending arms, &c.*

ARTICLE 21. Every non-commissioned officer or private, who, being duly ordered, shall unnecessarily neglect to appear for any battalion, regimental or brigade inspection or review, at the time and place appointed, shall forfeit four dollars.

*Penalty for not attending general review.*

ARTICLE 22. Every non-commissioned officer or private, who being duly ordered, shall unnecessarily neglect to appear at any company training, at the time and place appointed, shall forfeit two dollars.

*Penalty for not attending any company training.*

ARTICLE 23. Every non-commissioned officer or private, who shall neglect to keep himself armed and equipped, as provided by this act, or who shall, at any muster day, or at any other time of examination, or any company training, be destitute of, or appear unprovided with the arms and equipments herein directed, excepting as before excepted, shall pay a fine not exceeding seventy-five cents for a gun, and twenty-five cents for each and every other article, in which he shall be delinquent; or if he shall appear with his arms in an unfit condition, he shall be fined not exceeding seventy-five cents, at the discretion of his commanding officer.

*Penalty for neglecting to keep and appear with equipments.*

ARTICLE 24. All surgeons and surgeon's mates are prohibited from taking any fee or gratuity whatever, under any pretence, from any man to whom they may give a certificate of inability to perform military duty, on account of bodily infirmity; and if any surgeon or surgeon's

*Surgeon prohibited from taking any fee for certificates of inability.*

8

68                    PUBLIC ACTS.

Penalty.

mate, shall in violation of this article, take any fee or gratuity, he shall be liable to be tried by a court martial.

Penalty in certain cases for not appearing in uniform.

ARTICLE 25.   If any non-commissioned officer or private of artillery, cavalry, light infantry or riflemen shall appear on any of the occasions mentioned in this act, without the uniform of the company to which he belongs, he shall forfeit two dollars.

Rosters to be kept by sundry officers.

ARTICLE 26.   The senior aid-de-camp to each major general, and the aid-de-camp to the brigadier general of each brigade, and the adjutant of each regiment, battalion or corps, shall constantly keep a correct roster of the division, brigade, regiment, battalion, squadron or corps to which they respectively belong.

Notice of trial, and copy of charges to be furnished ten days before session of court martial.

ARTICLE 27.   Every non-commissioned officer, musician and private to be tried by a court martial, shall be notified of the time and place appointed for his trial, and shall be furnished with a copy of the charges and specifications upon which he is to be tried, at least ten days before the trial is commenced.

Senior field officer to command in absence of brigadier general.

ARTICLE 28.   In case of the absence of any brigadier general, for the term of two months, and not exceeding one year, the senior field officer in any brigade, shall during such absence, execute all the powers given by law to the brigadier general.

General officers, their aids and general staff who are equipped, to lodge certificate thereof with town clerk.

ARTICLE 29.   General officers, their aid-de-camps and the staff, who are not attached to regiments or companies, and included in the returns herein directed to be made to the several town clerks, and who are equipped according to law, shall lodge a certificate, under their hands, with the town clerks of the towns to which they respectively belong, in the month of June annually, that they are equipped as aforesaid.

PUBLIC ACTS. 69

And if any officer shall make a false certificate, **Penalty for certifying falsely.** he shall be liable to be tried by a court martial, and shall moreover, forfeit and pay to the town treasurer of such town, the sum of twenty dollars, to be recovered by action of debt, before **Poll of officer neglecting to make certificate not exempt.** any court of competent jurisdiction. And if any officer shall neglect to make such certificate as aforesaid, his poll shall not be exempt from taxes, as is provided in this act.

ARTICLE 30. The rules and articles which **Militia when called into actual service of this state to be governed by rules and articles of congress.** are or may be established by congress, for the government of the militia, when in actual service of the United States, shall be the rules and articles for the government of the militia of this state, when called into the actual service of this state.

ARTICLE 31. These rules and articles shall **Foregoing rules and articles when and where to be read.** be read at the head of each company, on the first Tuesday of June annually.

Sec. 34. *And it is hereby further enacted,* That **Mode of collecting sundry fines.** the mode of proceeding in the collection of fines shall be as follows: the fine specified by the thirteenth article of the rules and articles aforesaid, shall be collected as follows, viz: the officer to whom the returns should have been made, shall demand the same of the officer neglecting, either personally or in writing, within sixty days after the forfeiture shall have been incurred; and if the officer neglecting to make the returns, shall neglect or refuse to pay said fine within fifteen days after demand made as aforesaid, the officer to whom such return should have been made, shall issue his execution therefor, to be directed to any adjutant in the brigade. The fines specified in the sixteenth and eighteenth articles, and the fine on non-commissioned officers in the seventeenth article, shall be imposed by a regimental court martial, and collected by an execution issued by the president of the court, after the person fined shall be

60                    PUBLIC ACTS.

notified thereof.   The fines imposed on parents, masters and guardians, shall be sued for, and recovered by the captain or commanding officer of the company to which the minor belongs, before any court of competent jurisdiction.   The fines specified in the twenty-first, twenty-second, twenty-third and twenty-fourth articles, and the fine on privates in the eighteenth article, and all fines and forfeitures to be paid by the non-commissioned officers, musicians and privates, when no other method of collecting the same is pointed out by law, shall be collected by the captain or commanding officer of the company to which the delinquent may belong, in the following manner, viz: the non-commissioned officer, musician or private, who shall be liable for the fine, or shall forfeit any sum of money, set and affixed to any default or offence mentioned in this act, shall be allowed twelve days from the time of such forfeiture, to make his excuse to the captain or commanding officer of the company to which he may belong; but if he shall neglect to make such excuse within the time aforesaid, or if the captain or commanding officer of said company shall consider his excuse insufficient, it shall be the duty of such commanding officer to issue a notification to the delinquent in the following words, viz:

Form of notice in certain case.

State of Vermont }   To                orderly
                ss. }   sergeant (or other sergeant as the case may be) of the          company in the          regiment          brigade and          division of the militia of this state,                Greeting.
   By the authority of the State of Vermont, you are hereby commanded forthwith to give notice to          of          in the county of          who is subject to military duty in said company, that he is amerced in the sum of          dollars          cents (here describe the default and the time of its commission) and unless he shall, according to law, deliver or cause to be delivered to me, a certificate in writing, from under the

hand of one of the field officers of the said regiment (or battalion as the case may be) certifying that said field officer doth remit unto, or excuse him the said            from such amercement, that execution will issue against him for the same.

Hereof fail not, but of this precept, with your doings hereon, make due return within six days from the date hereof.

Dated at        this      day of      A. D.
                  } Captain or commanding
                  } officer of said company.


Which notification shall be served, by being read in the hearing of such delinquent, or by leaving a true and attested copy thereof, at his last and usual place of abode; and it shall be the duty of such sergeant to make return of such notification, with his doings thereon, to such captain or commanding officer, within six days after receiving the same. <span style="float:right">How served.</span> <span style="float:right">Return within what time to be made.</span>

Sec. 35. *And it is hereby further enacted,* That the person upon whom the notification shall have been served, shall within six days after the service of the same, if he wishes the fine to be remitted, apply to one of the field officers of the regiment for a discharge of said fine; and the said field officer shall thereupon notify the captain or commanding officer of the company to which such delinquent belongs, of the time and place when he will hear the excuse of such delinquent, which shall be within six days from the time application shall be first made, and request the commanding officer to appear and shew cause, if any he have, why such delinquent shall not be discharged; and the person applying shall give the notice to the captain or commanding officer of the company, in such manner as such field officer shall direct; and shall also satisfy said field officer, previous to his hearing his excuse, that the notice has been given as directed. And the said field officer

*(Margin notes:)* Application for remission of fine, to whom, and within what time to be made. Commanding officer of company to be notified of time and place of hearing excuse of delinquent. Manner of notice.

PUBLIC ACTS.

*Further time for hearing excuse may be given.*

may, if he thinks proper, at the time of hearing said excuse, give further time for hearing the same, not exceeding six days from the time first appointed; and said field officer may or may not remit said fine, as the circumstances of the case may require.

*Fine not remitted execution may be issued therefor.*

Sec. 36. *And it is hereby further enacted,* That if such field officer shall not remit the fine of such delinquent, and deliver him a certificate thereof from under his hand, to be delivered such captain or commanding officer, informing such captain or commanding officer of the same, such captain or commanding officer shall issue his execution for the same, as near as circumstances will permit, in the following form, viz:

*Form of execution.*

State of Vermont ⎰   To           orderly
          ss. ⎱ sergeant (or other sergeant as the case may be) of the           company of (cavalry, artillery, light infantry, infantry or riflemen) in the           regiment           brigade and division of the militia of this state.

Whereas           of           in the county of           was, on the           day of           A. D.           by captain (or commanding officer of said company) amerced in the sum of           dollars           cents, for delinquency of military duty:—Therefore, by the authority of the State of Vermont, you are commanded to levy and collect from the goods, chattels or estate of           of           in the said county of           the sum of said amercement, amounting to           dollars and           cents, and           dollars and           cents costs, for serving notification; and for want of such goods, chattels or estate, commit the body of him the said           to the keeper of the gaol in           in the county of           within the said prison, who is hereby commanded to receive the said           and him safely keep, until he shall pay the same, with all legal fees.   Hereof fail not, and make due return to me of your doings hereon, within sixty days from the date.   Dated at           this           day of           A. D.
          A. B. Captain (or commanding officer.)

## PUBLIC ACTS. 63

Which orderly sergeant or other sergeant to whom the same shall be directed, shall have all the powers and receive the same fees, in levying, collecting and returning such execution, as are allowed sheriffs and constables for collecting other executions.

*Powers of sergeants, and fees in collecting executions.*

Sec. 37. *And it is hereby further enacted,* That when any delinquent shall obtain a discharge from any field officer, from any fine, such delinquent shall pay to the commanding officer of the company, the fees for the service of such notification, or such delinquent, unless such fees shall be discharged by such field officer, before such officer shall accept such discharge. And in case such delinquent shall neglect, for the space of twelve days to pay the fees as aforesaid, the commanding officer shall issue his execution against such delinquent, for the fine and costs, which shall be collected, the same as though no such discharge had been obtained from such field officer as aforesaid.

*Delinquent obtaining discharge from fine to pay fees for service of notification.*

*Neglecting to pay fees, fine may be collected.*

Sec. 38. *And it is hereby further enacted,* That every sergeant or other person who shall be directed by the captain or commanding officer of any company, to serve a notification on any delinquent, shall be entitled to receive the same fees as sheriffs and constables are entitled to, for serving writs of summons.

*Fee for service of notification.*

Sec. 39. *And it is hereby further enacted,* That the keeper of the common gaol in the county to which any delinquent belongs, is hereby commanded to receive and safely keep such delinquent, until such execution is fully paid; and all costs arising thereon; or that he be otherwise discharged by order of law. *Provided nevertheless,* if any delinquent shall reside within any county in which there is not a sufficient gaol, such delinquent shall be committed to the nearest gaol in any other county; the keeper of which, is commanded to receive such delinquent,

*Jailor to receive and keep delinquent, charged in execution.*

*Delinquent may be committed in another county, in certain case.*

64                    PUBLIC ACTS.

in the same manner as though he was a resident of the same county.

<div style="margin-left:2em">Sundry fines<br>how appropriated.</div>

Sec. 40. *And it is hereby further enacted,* That the several fines imposed in pursuance to this act, shall be appropriated as follows, to wit: The several fines paid to, or recovered by, the commanding officers of companies, shall be by the said captains and commanding officers appropriated for the purpose of purchasing and keeping in repair company colours, and such instruments of music as shall be directed by the commanding officer of the regiment; and should there be any fines collected to a greater amount than is necessary for that purpose, the same shall be paid annually to the regimental quarter master. All fines imposed by a regimental court martial, or which are declared to be for the use of a regiment, shall be paid to the regimental quarter master, and shall be appropriated for the purpose of procuring regimental colours, and keeping the same in repair, under the direction of the commanding officer of the regiment: and should there be a greater amount than is necessary for that purpose, the same shall be paid to the brigade quarter master, and shall be expended from time to time, under the order of the brigadier general, for the purpose of procuring tents, for the use of the militia of the brigade.

<div style="margin-left:2em">Governor<br>may commission adjutant<br>general.</div>

Sec. 41. *And it is hereby further enacted,* That the governor be, and hereby is authorised to commission the adjutant general, with the rank to which he is entitled by this act.

<div style="margin-left:2em">Unnecessary<br>firing forbidden.</div>

Sec. 42. *And it is hereby further enacted,* That no non-commissioned officer, private or citizen shall unnecessarily fire a gun, single musket or pistol, in any public road, or near any house, or place of parade, on the evening preceding, on the day or evening of the same, on which any troop, company, battalion or regiment shall

JA2990

**PUBLIC ACTS.**  65

be ordered to assemble for military duty, unless
embodied under the command of some commis-
sioned officer; and if any non-commissioned
officer, private or citizen, shall fire a musket,
single gun or pistol, except as aforesaid, on the Penalty.
day and evening as aforesaid, without being
embodied as aforesaid, he shall forfeit and pay
a fine of two dollars for each and every such
offence to the treasurer of the town where such
offence or offences shall have been committed,
to and for the use and benefit of said town,
together with costs of prosecution; to be recov-
ered by complaint of any town grand juror, How recov-
where the offence shall be committed, whose ered.
duty it is hereby declared to be, to prosecute
the same before any justice of the peace of the
same county where such offence or offences
shall have been committed. *Provided,* That
all prosecutions by virtue of this section, shall Limitation of prosecution.
be commenced within thirty days next after the
commission of such offence or offences, and not
after.

Sec. 43. *And it is hereby further enacted,* That
all laws heretofore made for governing and reg- Former mili-
ulating the militia of this state, are hereby re- tia laws re-
pealed. *Provided nevertheless,* That all officers Proviso.
actually in commission, or appointed agreeable
to said laws, shall be continued in their respec-
tive offices; and all fines and forfeitures which
have already accrued, shall and may be recov-
ered in the manner pointed out by said laws, or
in the manner prescribed by this act.

Sec. 44. *And it is hereby further enacted,* That
the rules and regulations for the field exercise Rules of disci-
and manoeuvres of infantry, compiled and adopt- pline for ar-
ed for the organization of the army of the Uni- my of United States adopt-
ted States, agreeable to a resolve of congress, ed.
passed December, 1814, be received, adopted
and established as the rules of discipline for the
militia of this state.

9

JA2991

# LAWS

OF THE

## STATE OF NEW-HAMPSHIRE,

PASSED

### June Session....1823.

PUBLISHED BY AUTHORITY.

CONCORD :

PRINTED BY JACOB B. MOORE,

FOR THE STATE.

1823.

JA2992

A. D. 1823.

## CHAP. XXXIII.

Passed June
28, 1823.

*AN ACT in addition to an act entitled " an act to incorporate certain persons by the name of the proprietors of Dalton bridge," approved June 27, 1818.*

Preamble.

**W**HEREAS the time allowed to said proprietors in and by said act for the completion of said bridge, has been found to be insufficient for that purpose ; Therefore,

Further
time allow-
ed to build
bridge.

*BE it enacted by the senate and house of representatives in general court convened,* That there be granted and allowed to the proprietors of the said Dalton bridge the further time of three years from the twenty-seventh day of June instant, to complete the building of said bridge ; and that the said act to which this is in addition, be, and continue to remain in full force the said farther term of three years, in the same manner as if the said original act had been limited to the term of eight years instead of five years from the passing thereof ; any thing therein to the contrary notwithstanding.

*Approved June 28, 1823.*

----

## CHAP. XXXIV.

Passed June
28, 1823.

*AN ACT to establish a system of police in the town of Portsmouth, and for other purposes.*

Officers of
police, how
appointed.

SECTION 1.  **B**E *it enacted by the senate and house of representatives in general court convened,* That it shall be the duty of the selectmen of the town of Portsmouth, every year, within ten days after the annual town meeting for the choice of town officers, to appoint and commission in writing under their hands, or the hands of the major part of them, a suitable number of persons, not exceeding seven, who shall be reputable freeholders and inhabitants of said town of Portsmouth, to be police officers within said town.   And said police officers shall be sworn to the faithful discharge of their

To be sworn

duty, and shall be, by virtue of said appointment, constables and conservators of the peace ; and shall hold their offices

Term of of-
fice, com-
pensation,
&c.

for one year, and until their successors shall be appointed and duly qualified ; and shall receive such compensation for their services as the said town of Portsmouth shall vote at any legal town meeting.

Persons
guilty of ri-
otous, wan-

SEC. 2.  *And be it further enacted,* That if any person, or persons, shall, in any street, lane or alley, or in any public place in the town of Portsmouth, be guilty of any

rude, indecent or disorderly conduct, or shall insult or wan-
tonly impede any person or persons passing therein, or shall
sing or repeat, or cause to be sung or repeated, any lewd, ob-
scene or profane songs, or shall speak or repeat any lewd,
obscene or profane words; or shall, within said town of
Portsmouth, write or mark in any manner any obscene or
profane word, or obscene and lascivious figure or represent-
ation on any building, fence, wall, post, or other thing whatso-
ever, or shall wantonly injure or deface any building, fence,
wall, post, signboard or sign; or shall wantonly cut and in-
jure any tree standing in the streets or highways of said
town; or shall rob any garden or field of fruit or vegetables,
or shall wantonly injure any trees, shrubs or bushes growing
therein; or shall, without lawful permission, climb on, or
over the fences of any garden or yard; or shall be found
drunk in any street, lane, alley or public place; or shall
within said town use any juggling or unlawful games or
plays; or shall be a common night-walker or prostitute, or
shall make any brawls or tumult, or shall wantonly or know-
ingly raise or repeat any false cry of fire; that every such
person, for every such act shall be taken and deemed to be
an offender against the police of Portsmouth, and shall be
liable to the penalties hereinafter expressed.

SEC. 3. *And be it further enacted,* That if any person or
persons shall in any public place, or at any wharf in the
town of Portsmouth, or within the view of any dwelling
house, or of any public street, road or wharf in said town,
in the day time, bathe or swim, without necessity, or expose
his or her person indecently in dressing or undressing for
the purpose of bathing or swimming, or otherwise without
necessity; every such person, for every such act shall be
taken and deemed to be an offender against the police of
Portsmouth, and shall be liable to the penalties hereinafter
expressed.

SEC. 4. *And be it further enacted,* That if any person or
persons shall within the compact part of the town of
Portsmouth, that is to say, within one mile of the court-
house, fire or discharge any cannon, gun, pistol or other fire
arms, or beat any drum, (except by the command of a mili-
tary officer, having authority therefor) or fire or discharge
any rockets, squibs, crackers, or any preparation of gun-
powder, (except by the permission of the police officers, or
of a major part of them first had in writing) or shall make
any bonfire; or shall in any street, lane, alley, or other
public place within the aforesaid limits, throw any stones,
bricks, snowballs or dirt, or play at ball or any game in
which ball is used, or play at any game whatsoever for
money; or smoke any pipe or cigar; every such person,

74                     *Police of Portsmouth.*

A. D. 1823. for every such act shall be taken and deemed to be an offender against the police of Portsmouth, and shall be liable to the penalties hereinafter expressed.

Offences defined.

SEC. 5. *And be it further enacted,* That if any person or persons shall place and leave, or cause to be placed and left in any street, lane or alley, or other public place within the compact part of said town for the term of two hours by day, or for the term of one hour by night, without inevitable necessity, any sled, wheelbarrow, cart, trucks, chaise or other carriage, or any boxes, crates, casks, tubs or other vessel ; or shall suffer any cord-wood or fuel to remain in any such street, lane, or alley for more than three hours, without inevitable necessity ; or shall place or throw, or cause to be placed or thrown into any such street, lane or alley, any dung, dirt or other matter, that may impede the free passage of said street, and suffer the same to remain therein without inevitable necessity for more than two hours at a time ; or shall without such necessity drive any wheel carriage or sled or wheelbarrow on or over the side pavements or walks of such street, lane or alley ; or ride or lead any horse thereon ; every such person, for every such act, shall be taken and deemed to be an offender against the police of Portsmouth, and shall be liable to the penalties hereinafter expressed.

Officers of police, with consent of selectmen, may establish regulations.

SEC. 6. *And be it further enacted,* That the police officers of said town of Portsmouth be, and they hereby are authorized to make from time to time, such regulations as they may deem expedient for the stands of hacks, trucks, and carts in any street, lane or alley within the compact part of said town ; and for the height and position of any awning, shade or other fixture that may be erected or placed in any such street, lane or alley in front of or near any building ; and also respecting any obstructions or nuisances in any street, lane or alley within the compact part of said town of Portsmouth, provided that said regulations be first approved by the selectmen of said town, for the time being, or a major part of them ; and every violation of such regulations, so made and approved as aforesaid, shall be taken and deemed to be an offence against the police of Portsmouth ; and every person so offending shall be liable to the penalties hereinafter expressed ; *Provided, always, however,* that no prosecution shall be sustained for any such violation unless notice be given of the passing of such regulations, by causing the same to be published in the newspapers printed in said town a reasonable time before they shall take effect.

Proviso.

Penalty for offences.

SEC. 7. *And be it further enacted,* That every person duly convicted of an offence against the police of Portsmouth shall be punished by a fine not exceeding five dollars,

nor less than one dollar, and shall pay costs of prosecution, and shall stand committed until the same be paid: and if said person, so convicted, be a minor under the age of fourteen years, the parent or guardian of such minor shall be liable to pay the same, and an action of debt therefor may be brought by said police officers in the name of the town of Portsmouth against such parent or guardian ; provided such parent or guardian shall have received due notice of the time and place of trial of such minor for such offence. And all penalties adjudged under this act shall be paid to the magistrate imposing the same, and shall be by him paid over to the town of Portsmouth ; and any justice of the peace in the county of Rockingham, may have cognizance of the offences enumerated in this act ; and it shall be no cause of exception to any such justice that he resides or has property in the town of Portsmouth. And no trial shall be had for any offence mentioned in this act but upon complaint first made on oath, and the form of such complaint and of the warrant issued thereon shall be as follows, to wit :

*Marginalia:* A. D. 1823.

If a minor, parent or guardian liable.

Proviso.

Penalties, to whom paid.

Complaint to be made.

(FORM OF COMPLAINT.)

## STATE OF NEW-HAMPSHIRE.

*Marginalia:* Form of complaint.

ROCKINGHAM, SS.

The information and complaint of A. B. of          in the county of          (as the case may be) taken and made before me, E. F. esquire, one of the justices of the peace, within and for said county, on this          day of          in the year of our Lord one thousand eight hundred and          , who, on his oath saith, that X. Y. of          in the county          (as the case may be), [*or if his name be not known, say,* " a person whose name is not known, but who may be recognized by the following description," (*and here set forth as particular a description as possible*)] hath been guilty of an offence against the police of Portsmouth, in this, to wit,—that he the said          [here set forth the offence with sufficient certainty of time and place] and therefore the said A. B prayeth that justice may be done in the premises.

Signed, A. B.

Sworn to before me, E. F.

# ACTS

OF THE

# One Hundred & Ninth Legislature

OF THE

## STATE OF NEW JERSEY,

AND

### FORTY-FIRST UNDER THE NEW CONSTITUTION;



CAMDEN, N. J.,
THE COURIER PUBLISHING ASSOCIATION.
1885.

52      GENERAL PUBLIC LAWS.

## CHAPTER XLIV.

An Amendment to " An act to prevent vending, using or exploding of guns, pistols, toy pistols, or other fire-arms to or by persons under the age of fifteen years in this state."

*Section amended.*    1. BE IT ENACTED *by the Senate and General Assembly of the State of New Jersey,* That the second section of the act approved February tenth, one thousand eight hundred and eighty-two, entitled as above set forth, be and the same hereby is amended so as to read as follows:

*Unlawful to sell fire-arms to persons under fifteen years of age, &c.*    [2. *And be it enacted,* That it shall not be lawful to sell, hire or loan to any person under the age of fifteen years any gun, pistol, toy pistol or other fire-arms; or for any person under the age of fifteen years to purchase, barter or exchange any gun, pistol, toy pistol or other fire-arms; nor for any person under the age of fifteen years to carry, fire or use any gun, pistol, toy pistol or other fire-arms, except in the presence of his father or guardian, or for the purpose of military drill in accordance with the rules of a school.]

*Penalty.*    2. *And be it enacted,* That any person offending against the provisions of this act shall be punished by a fine not exceeding twenty-five dollars.

Approved March 2, 1885.

JA2998

Case 1:22-cv-07464-RMB-AMD   Document 103-13   Filed 02/27/23   Page 1 of 4 PageID: 3516

# A C T S

### OF THE

### *TWENTY-THIRD*

# GENERAL ASSEMBLY

### OF THE

## S T A T E

### OF

## N E W-J E R S E Y.

AT A SESSION BEGUN AT TRENTON, ON THE TWENTY-THIRD DAY OF OCTOBER,
ONE THOUSAND SEVEN HUNDRED AND NINETY-EIGHT, AND CON-
TINUED BY ADJOURNMENTS.

### *BEING THE THIRD SITTING.*



### *T R E N T O N:*

PRINTED BY *GERSHOM CRAFT*, PRINTER TO THE STATE.

M,DCC,XCIX.

JA2999

OF THE STATE OF NEW-JERSEY.                    561

collector, as the cafe may require, for the ufe of the ftate, and fhall alfo be amerced by the court of common pleas of the county, to the amount of the fum in the faid warrant mentioned, with intereft and cofts; which amercement fhall have the force and effect of a judgment, whereon execution fhall inftantly, and without any further proceedings, be iffued againft the goods and chattels, lands, tenements, hereditaments and real eftate of the fheriff fo amerced.

39. *And be it enacted*, That if the fheriff fhall not execute the writ of execution agreeably to this act, or fhall not pay the money therein directed to be made, within ninety days after receiving fuch execution, he fhall, for every offence, forfeit and pay one hundred dollars, to be recovered, with cofts, by action of debt, by the treafurer, or the county or townfhip collector, as the cafe may require, for the ufe of the ftate, and fhall alfo be amerced by the court, out of which fuch execution iffued, to the amount of the fum in the faid execution mentioned, with intereft and cofts; which amercement fhall have the force and effect of a judgment, whereon execution fhall inftantly, and without any further proceedings, be iffued againft the goods and chattels, lands, tenements, hereditaments and real eftate of the fheriff fo amerced. <sup>Penalty on the fheriff for neglect of duty on executions.</sup>

*Penalty on the fheriff for neglect of duty on executions.*

40. *And be it enacted*, That every act and every claufe of any act, within the purview of this act, be and they are hereby repealed; but fuch repeal fhall not extend to or affect any affeffment, tax, penalty, fuit, judgment, warrant of diftrefs or writ of execution, made, arifing, commenced, entered or iffued under any act or claufe hereby repealed; but that the fame fhall be collected, profecuted, enforced and proceeded upon, in the like manner as if this act had not been made.

*Former acts repealed.*

A.          Paffed at Trenton, June 10, 1799.

---

C H A P.  DCCCVI.

An Act to defcribe, apprehend and punifh diforderly Perfons.

Sec. 1.  BE IT ENACTED, *by the Council and General Affembly of this ftate, and it is hereby enacted by the authority of the fame*, That all paupers, who fhall unlawfully return to the city or townfhip, from which they were legally removed, without a certificate from the city or townfhip to which they belong, or who fhall leave their places of legal fettlement; and all perfons who fhall go about from door to door, or place themfelves in ftreets, highways or paffages, to beg, crave charity, or col- *Who fhall be adjudged to be diforderly perfons.*

JA3000

lect alms, or who fhall wander abroad and lodge in taverns, inns, beer-houfes, out-houfes, houfes of entertainment, market-houfes, barns or other places, or in the open air, and not give a good account of themfelves, or who fhall wander abroad, and beg or folicit charity, under pretence of being or having been foldiers, mariners or feafaring men, or of lofs by fire, or other cafualty, or of lofs by the Indians, or by war, or other pretence or thing; and all perfons, who fhall leave or threaten to leave their families to be maintained by the city, townfhip or county, or to become chargeable thereto, or who, not having fufficient property or means for their fubfiftence or fupport, fhall live idle, or not engage in fome honeft employment, or not provide for themfelves or families; and all perfons who fhall ufe, or pretend to ufe, or have any fkill in phyfiognomy, palmiftry, or like crafty fcience, or who fhall pretend to tell deftinies or fortunes; and all runaway fervants or flaves, and all vagrants or vagabonds, common drunkards, common night-walkers, and common proftitutes, fhall be deemed and adjudged to be diforderly perfons.

<div style="margin-left:2em;">

*Further de-* 2. And whereas divers ill-difpofed perfons are frequently ap-
*fcription of* prehended, having upon them implements for houfe-breaking,
*diforderly per-* or offenfive weapons, or are found in or upon houfes, ware-
*fons.* houfes, ftables, barns or out-houfes, areas of houfes, coach-
houfes, fmoke-houfes, inclofed yards or gardens belonging to
houfes, with intent to commit theft, mifdemeanors or other of-
fences; and although their evil purpofes are thereby manifeft-
ed, the power of the juftices of the peace to demand of them
fureties for their good behaviour, hath not been of fufficient
effect to prevent them from carrying their evil purpofes into
execution; *Be it further enacted,* That if any perfon fhall be ap-
prehended, having upon him or her any picklock-key, crow,
jack, bit or other implement, with an intent to break and enter
into any dwelling-houfe, ware-houfe, ftable, barn, coach-houfe,
fmoke-houfe or out-houfe; or fhall have upon him or her any
piftol, hanger, cutlafs, bludgeon or other offenfive weapon,
with intent to affault any perfon; or fhall be found in or upon
any dwelling-houfe, ware-houfe, ftable, barn, coach-houfe,
fmoke-houfe or out-houfe, or in any inclofed yard or garden,
or area belonging to any houfe, with an intent to fteal any goods
or chattels, then he or fhe fhall be deemed and adjudged to be
a diforderly perfon.

</div>

<div style="margin-left:2em;">

*Diforderly per-* 3. *And be it enacted,* That it fhall be the duty of every confta-
*fons may be* ble, and lawful for any other perfon, to apprehend, without
*apprehended* warrant or procefs, any diforderly perfon of the defcription
*without war-* aforefaid, and to take him or her before any juftice of the peace of
*rant and com-*
*mitted to the* the county where apprehended; and it fhall be the duty of the
*work-houfe.* faid juftice to commit fuch diforderly perfon, when convicted

</div>

before him, by the confeffion of the offender, or by the oath or affirmation of one or more witnefs or witneffes, to the work-houfe of the city, town or county, there to be kept at hard la-bour for any time not exceeding three calendar months.

4. *And be it enacted*, That it fhall be the duty of every juftice of the peace of the proper county, to iffue, on information, or his own view, his warrant or procefs to apprehend any difor-derly perfon, within the intent and meaning of this act. *Duty of juftice*

5. *And be it enacted*, That it fhall be lawful for any two juftices of the peace, at their difcretion, to bind out the child of any beggar, vagrant, vagabond, common drunkard, or common proftitute, or of any perfon who fhall not provide for fuch child, as a fervant or apprentice to any perfon, who may be willing to take fuch child, till the age of twenty-one years, if a male, or eighteen years, if a female, or for a lefs time. *Children of vagrants may be bound ap-prentices.*

A.          Paffed at Trenton, June 10, 1799.

---

## C H A P. DCCCVII.

### An Act concerning the Boards of Chofen Free-holders.

Sec. 1. BE IT ENACTED *by the Council and General Affembly of this ftate, and it is hereby enacted by the authority of the fame*, That fo much of every ftatute of this ftate, as directs that fines, penalties, forfeitures or other monies, fhall be paid to, or that any officer or other perfon fhall account with the board of juftices and chofen freeholders of the county, fhall be and hereby is repealed ; and that the faid fines, penalties, for-feitures and other monies fhall be paid to, and the faid officer or other perfon fhall account with and be amenable to the board of chofen freeholders of fuch county. *Certain claufes in acts refpecting board of juftices and freeholders, re-pealed.* *Monies to be paid and offi-cers to account with board of chofen free-holders.*

2. *And be it enacted*, That the goods, chattels, lands, tene-ments and hereditaments, which have been given, granted, con-veyed or vefted to and in the board of juftices and chofen free-holders of any county, or any perfon for the ufe of fuch coun-ty, fhall be and hereby are transferred to and vefted in the board of chofen freeholders of the faid county, and their fuc-ceffors, and fhall be, remain and enure to and for the ufe and benefit of fuch county, in the fame manner and according to fuch eftate, title and intereft, as the faid board of juftices and chofen freeholders had therein. *Public proper-ty vefted in the board of chofen freeholders.*

O

# ACTS

### OF THE

### THIRTY-FIFTH

# GENERAL ASSEMBLY,

### OF THE

## *STATE OF NEW-JERSEY.*

AT A SESSION BEGUN AT TRENTON, ON THE FIFTEENTH DAY
OF FEBRUARY, ONE THOUSAND EIGHT HUNDRED AND
ELEVEN, AND CONTINUED BY ADJOURNMENTS.

### BEING THE SECOND SITTING.



## *TRENTON:*

PRINTED BY JAMES J. WILSON.

## 1811

JA3003

300

## AN ACT to regulate Gun-Powder Manufactories and Magazines within this state.

Sec. 1. BE IT ENACTED *by the council and general assembly of this state, and it is hereby enacted by the authority of the same,* That from and after the first day of May next no person or persons whatsoever, shall be permitted within this state to erect or establish, or cause to be erected or established, any manufactory which shall be actually employed in manufacturing gun-powder, either by himself or any other person, either on his own land or the land of another, within the distance of a quarter of a mile from any town or village or house of public worship; or within the distance of a quarter of a mile from any dwelling house, barn or out house, without the consent under hand and seal of all and every the owner or owners of such dwelling house, barn or out house, as aforesaid; and any person so offending shall be guilty of a misdemeanor, and on conviction thereof shall be fined any sum not exceeding two thousand dollars: *Provided,* that nothing in this section shall be so construed as to prevent the completing, rebuilding or repairing any powder mill now erected or erecting in this state on the site on which the same shall be now erected or erecting.

2. *And be it enacted,* That no person or persons hereafter shall be permitted to erect or cause to be erected any powder magazine within this state, either upon his own land or the land of any other person, and actually deposit gun-powder therein, within the distance of half a mile from any town or village, house of public worship, dwelling house or out house. And any person so offending shall be guilty of a misdemeanor, and on conviction thereof shall be fined not exceeding the sum of two thousand dollars.

A. Passed at Trenton, Feb. 7, 1811.

JA3004



*Edw.ᵈ Thomas ff.*
*1798*

THE

# P U B L I C   L A W S

OF THE STATE OF

# S O U T H - C A R O L I N A,

*FROM ITS FIRST ESTABLISHMENT AS A BRITISH PROVINCE
DOWN TO THE YEAR 1790, INCLUSIVE,*

IN WHICH

IS COMPREHENDED SUCH OF THE STATUTES OF GREAT BRITAIN AS WERE MADE OF FORCE BY
THE ACT OF ASSEMBLY OF 1712,

With an Appendix containing such other Statutes as have been enacted or
declared to be of force in this State, either virtually or expressly,

TO WHICH IS ADDED

THE TITLES OF ALL THE LAWS (WITH THEIR RESPECTIVE DATES) WHICH HAVE BEEN PASSED IN
SOUTH-CAROLINA DOWN TO THE PRESENT TIME,

ALSO

The Constitution of the United States with the amendments thereto,

AND LIKEWISE

*THE NEWLY ADOPTED CONSTITUTION OF THE STATE OF SOUTH-CAROLINA,*

TOGETHER WITH A COPIOUS INDEX TO THE WHOLE.

*By the Honorable JOHN FAUCHERAUD GRIMKÉ, Esq. A. B. & L. L. D. and one of the
associate Judges of the Superior Courts in the State of South-Carolina.*

*Miseræ ... est ... Jus est Vagum aut Incognitum. 4 Inst. 246,332.*

P H I L A D E L P H I A:

PRINTED BY R. AITKEN & SON, IN MARKET STREET.

M.DCC.XC.

## of South-Carolina.

275

A. D. 1769.
Nᵒ. 1098.

# An Act for establishing a Ferry at the Two-Sisters Bluff, on Savannah River; and for laying out, making and keeping in Repair, a public Road from the said Bluff, to the main Road leading from Coosaw-hatchee to Purrysburgh.

WHEREAS many of the freeholders and inhabitants of the parish of St. Peter, and parts adjacent, in Granville county, by their petition to the General Assembly set forth, that the establishing a ferry from this Province to Georgia, over Savannah river, at the Two-Sisters Bluff, will be very convenient to persons having occasion to pass from one to the other of those Provinces; and that it will be also of advantage to the said petitioners, their neighbours, and persons passing the said ferry, to have a public road laid out from the said Two-Sisters Bluff, to the lower part of Cypress Creek, thence the best and nearest way across the Savannah to Turkey Hill, from thence the nearest and best way to the fifteen mile post, on the main road leading from Coosaw-hatchee to Purrysburgh; and therefore prayed that an act may be passed for establishing the said ferry and road: *Therefore be it enacted*, That from and immediately after the passing of this act, a public ferry shall be, and is hereby established, at the Two-Sisters Bluff, on Savannah river.

*Preamble.*

*Enacted. That a ferry over Savannah river be established at the Two-Sisters Bluff.*

*( All the rest of this act is obsolete.)*

PETER MANIGAULT, Speaker.

*August* 23d, 1769.         WILLIAM BULL.

# An Act for the Preservation of *Deer, and to prevent the Mischiefs arising from Hunting at unseasonable Times.

Nᵒ. 1103.

WHEREAS many idle, loose, and disorderly persons, as well residents as non-residents in this Province, have made, and do make, a constant practice of wandering up and down the same, and of killing the deer, merely for the sake of the skins, leaving the flesh to rot; whereby wolves, and other beasts of prey, are brought among the flocks of cattle, hogs, and sheep, to the great annoyance and damage of the owners thereof: *And whereas* the dangerous practice of hunting and killing of deer, in the night time, by carrying of lighted torches through the woods, is now become very common; by means whereof several persons have been killed, and great numbers of all forts of cattle are frequently destroyed, to the manifest injury of the owners of the same : For remedy thereof, and in order to prevent, as much as may be, the like mischiefs in future, *Be it enacted*, That from and after the passing of this act, it shall not be lawful for any person whatsoever, to shoot or kill any doe or fawn, between the 1st day of January, and the last day of July, which shall be in any year; nor to shoot or kill any buck, between the 1st day of September, and the last day of October, and between the 1st day of March, and the last day of April, in any year. And if any person whatsoever, shall presume to hunt, shoot or kill, or otherwise destroy any buck, doe, or fawn, running wild in the woods, within the times herein-before respectively limited, every person so offending, shall forfeit and pay the sum of £2 proclamation money, for every buck, doe, or fawn, so killed or destroyed; the same to be recovered before any justice of the peace, in the county where such offence shall be committed, upon conviction, by the oath of 1 sufficient witness, or on confession of the party, such penalty to be applied and disposed of, in the manner herein-after directed. *Provided*, That nothing in this act contained, shall extend, or be construed

*Preamble.*

*Enacted. That no doe or fawn shall hereafter be killed between the 1st of January and the last of July, nor buck between the first of Sept. and last of October, or first of March and last of April, in any year, under a penalty of 40s. proclamation money, for every one so killed.*

* This act was perpetuated by revival act of 12th March,1783. See A. A. 13th March, 1789, amending this.   *Proviso.*

ſtrued to extend, to deprive the Indians, in amity with this Province, of any right or privileges that they are entitled to, by virtue of any treaty now ſubſiſting between them, and this government. And, if any ſervant, or ſlave, by command of his or her maſter, miſtreſs, or overſeer ſhall ſo ſhoot or kill any deer as aforeſaid, the party giving ſuch command, ſhall be liable to the like penalties reſpectively: And if ſuch ſervant or ſlave, cannot prove ſuch command (by a ticket in writing, from his or her maſter, miſtreſs, or overſeer) he or ſhe ſhall receive, by order of ſuch juſtice of the peace, for every ſuch offence, 20 laſhes, on the bare back, unleſs ſecurity be given for payment of the fine, within 1 month after ſuch conviction. *Provided always*, That it ſhall and may be lawful to and for any freeholder, or houſe-keeper, at any time, to kill, or cauſe to be killed, any kind of deer in his incloſed grounds, without being liable to any penalty for ſo doing. *Provided alſo*, That nothing in this act contained, ſhall extend, or be conſtrued to extend, to any perſon who ſhall kill, at any time, any deer for food, for the neceſſary ſubſiſtence of himſelf or family, ſo as ſuch perſon do not ſell or diſpoſe of the ſkin of any deer ſo killed. And in caſe any perſon ſhall be proſecuted for killing deer, within the times prohibited by this act, and ſuch perſon ſhall allege, that he killed ſuch deer for food for the neceſſary ſubſiſtence of himſelf or family, the burthen of the proof ſhall lie on the perſon ſo proſecuted.

No deer to be hunted or killed in the night time.

II. Any perſon or perſons (the Indians above mentioned only excepted) who ſhall hereafter hunt or kill any deer, in the night time, except in their own incloſed grounds, for every ſuch offence, ſhall forfeit and pay the ſum of £ 4 proclamation money, to be applied and diſpoſed of in the manner herein-after directed.

Nor on any lands, 7 miles diſtance from the hunter's reſidence, without the proprietors conſent.

III. If any perſon, at any time whatſoever, ſhall hunt or range, on any lands whatſoever, without the conſent of the proprietor, at a greater diſtance from his or her place of reſidence, than 7 miles, every ſuch perſon ſo offending, ſhall forfeit and pay the ſum of £ 2 proclamation money, for every ſuch offence. All which penalties and forfeitures, herein-before mentioned, ſhall and may be recovered before any juſtice of the peace, in the county where any of the offences aforeſaid ſhall be committed; and when received, ſhall be divided and paid, one half to and for the uſe of the poor of the pariſh where the offence ſhall be committed; and the other half to the perſon who will inform for the ſame; and the oath of 1 credible witneſs, or the confeſſion of the party accuſed, ſhall be allowed as ſufficient evidence to convict the offender, by every juſtice of the peace, before whom information ſhall be made, of any of the offences aforeſaid. And in caſe any perſon, ſo convicted as aforeſaid, ſhall refuſe or neglect to pay ſuch fine, then it ſhall and may be lawful for the juſtice of the peace, before whom he ſhall be ſo convicted, to commit ſuch perſon to the common gaol in Charleſtown, or to the county gaol, when ſuch ſhall be built, there to remain, without bail or mainpriſe, for the ſpace of 2 months. And where the owners of any lands ſhall proſecute, for any unlawful hunting and ranging on his or her lands, the oath of ſuch owner ſhall be ſufficient evidence to convict the offender; but in that caſe, the whole penalty ſhall go to the poor of the pariſh.

PETER MANIGAULT, Sᴘᴇᴀᴋᴇʀ.
WILLIAM BULL.

23d *Auguſt*, 1769.

---

A. D. 1770.

Nᵒ. 1106.

## An Act for eſtabliſhing a Ferry over Saludy River, at the Lands of Robert Cunningham; and alſo another Ferry over Savannah River oppoſite to Auguſta in Georgia, and appointing Commiſſioners to lay out, make and keep in repair, ſeveral Roads leading thereto.

Title.

Recital.

I. WHEREAS the inhabitants living in the Fork of Broad and Saludy river, Ninety-Six, Steven's Creek, Long Canes, and parts adjacent; by their humble petition to the General Aſſembly, have repreſented many inconveniencies which they labour under, for

# A C T S

### A N D

# L A W S

#### O F   T H E

## S T A T E

#### O F

# C O N N E C T I C U T,

### I N

# A M E R I C A.



N E W - L O N D O N :

Printed by T I M O T H Y  G R E E N,

Printer to the Governor and Company of the State of Connecticut.

MDCCLXXXIV.

Google

## ACTS AND LAWS.

entered up againſt him of his own proper Goods or Eſtate, as though it was his own Debt, and Execution ſhall, in uſual Form of Law, be granted thereon.

**Debts liable to be taken as well as the effects of abſconding debtors.**

That Debts due to any ſuch abſent or abſconding Debtor, ſhall be conſidered as his Effects in the Hands of the Perſon from whom the ſame are due ; who ſhall be conſidered as his Agent or Truſtee, and be obliged to account for the ſame under Oath ; and Recovery may be had againſt him in the ſame Manner as for Goods or Chattels of ſuch abſconding Debtor.

**Proviſo.**

*Provided nevertheleſs,* That if upon Trial, it appear that the Perſon ſummoned by ſuch *Scire Facias,* had, or hath not, any Goods or Effects of the Debtor in his Hand, nor hath any ways remitted, transferred, diſpoſed of, or converted the ſame after the ſerving the Suit taken out againſt his Principal, and ſerved as aforeſaid ; the Party that commenced the Suit by *Scire Facias,* ſhall pay Coſt to ſuch Attorney, Factor, Agent or Truſtee, to be allowed and taxed by the Court in uſual Form.

**Effects thus taken out of the hands of the factor, &c. ſhall diſcharge him from the principal.**

*And be it further enacted by the Authority aforeſaid,* That the Goods or Effects of any abſent or abſconding Debtor, taken as aforeſaid, by Proceſs and Judgment of Law out of the Hands of his Attorney, Factor, Agent or Truſtee, by any of his Creditors, ſhall fully acquit and diſcharge ſuch Attorney, Factor, Agent or Truſtee, his Executors and Adminiſtrators, from all and every Action, Suit, Trial, Payment and Demand whatſoever, that may be brought, commenced or made by his Principal, his Executors or Adminiſtrators, of, or for the ſame.

**And he may plead the general iſſue, & give this act in evidence.**

And if any ſuch Factor, Agent or Truſtee, his Executors or Adminiſtrators, ſhall be moleſted, troubled or ſued by his Principal, for any Thing by him done, in compliance with this Act, he or they may plead the general Iſſue, and give this Act in Evidence for his Juſtification.

## An Act for the preſervation and increaſe of Deer ; and for the encouragement of keeping them in Parks, or other Incloſures.

**Preamble.**

*WHEREAS the killing of Deer at unſeaſonable Times of the Year, is very Prejudicial to the public Good ; the Fleſh and Skins being then but of little Value, and their Increaſe greatly hindered :*

**Penalty for killing deer in certain ſeaſons.**

**B**E it therefore enacted by the Governor, Council and Repreſentatives, in General Court aſſembled, and by the Authority of the ſame, That no Perſon or Perſons, Indian or others, ſhall kill any Deer within this State, at any Time in the Months of *January, February, March, April, May, June* or *July,* on Penalty of paying a Fine of *four Pounds* ; one Half to any Perſon that ſhall give Information thereof, and proſecute the ſame to Effect, and the other Half to the Treaſury of the Town where the Conviction is had. And any one Aſſiſtant, or Juſtice of the Peace, is hereby authorized to hear and determine any Offences againſt this Act ; and may grant Execution on ſuch Judgment, for the Fine and Coſt in common Form : Or if the Perſon be unable to pay the ſame, the ſaid Authority may diſpoſe of him in Service for that Purpoſe, for a Term not exceeding four Months.

**Upon complaint, ſearch-warrant to iſſue, &c.**

And it ſhall and may be lawful for any Aſſiſtant or Juſtice of the Peace, on juſt Suſpicion being ſhewn that any Deer hath been killed contrary to this Act, to grant a Warrant to ſearch for the Veniſon or Skins, in the ſame Manner as in the Caſe of ſtolen Goods, that ſuch Offenders may be detected.

And in caſe any Veniſon or Skins of any Buck, Doe or Fawn, newly killed, ſhall be found with or in the Poſſeſſion of any Perſon, he ſhall be

judged

judged guilty of killing such Deer; unless such Person can satisfy the Authority before whom the Trial is, of his Innocency, by giving a satisfactory Account how the same came into his Possession, and that he did not kill such Deer, nor was aiding or assisting therein.

*(margin: And if venisons, &c. is found in the possession of any one, liable, unless, &c.)*

And the Grand Jurors in the respective Towns, shall enquire after, and inform of all Breaches of this Act: And on Conviction of the Person or Persons informed against, shall be entitled to one half of the Penalty aforesaid.

*(margin: Who to make presentment.)*

*Provided,* That nothing in this Act shall be understood to prohibit Persons killing their own Deer, by them kept in Parks or Inclosures.

*(margin: Proviso.)*

*And whereas sundry Persons in this State, have erected Parks or Inclosures for keeping and preserving Deer, which is likely to be for the Public Good, and more may be erected for the same Purpose:*

Therefore, For the Encouragement and Security thereof,

*Be it further enacted by the Authority aforesaid,* That if any Person or Persons shall kill or destroy any Buck, Doe or Fawn kept in any Park or Inclosure in this State; or shall course, chase, hunt or wound any such Deer; or shall wilfully pull up or throw down any Fence, Gates or Bars inclosing such Park or Inclosure whereby such Deer may escape, without Leave from the Owner or Owners thereof; or shall be aiding or assisting therein, every such Person or Persons shall, for every such Trespass in killing or destroying such Deer, forfeit and pay to the Owner or Owners thereof *seven Pounds,* besides the Price of such Deer so killed or destroyed.

*(margin: Penalty of 7 l. for killing deer in any park, &c.)*

And for every such Trespass in coursing, chasing, hunting or wounding such Deer, whether such Deer be found without or within the Park, if it shall appear that the Person committing such Trespass knew, or had good Reason to think that such Deer belonged to the Owner of the Park, shall forfeit and pay, as aforesaid, the Sum of *thirty Shillings,* besides all such Damages as shall be sustained by such coursing, chasing, hunting or wounding.

*(margin: 30s. for chasing, &c.)*

And for every such Trespass in so pulling up, opening or throwing down any Fence, Gates or Bars, as aforesaid, shall forfeit and pay to the Owner or Owners of such Park or Inclosure, the Sum of *thirteen Pounds* besides all such Damages as shall accrue thereby.

*(margin: 13 l. for breaking the inclosure of any park, &c.)*

*And for further Encouragement of keeping Deer in Parks, and to prevent their being destroyed when by any Accident they get out of the Park;*

*Be it further enacted,* That no Person shall course, chase or kill any Deer within two Miles of any Park wherein Deer are kept, except the Owner of the Park or by his Licence, on Pain of forfeiting *ten Pounds* to the Owner of such Park.

*(margin: 10 l. fine for chasing, &c. any deer within two miles of any park. Recoverable by bill, &c.)*

Which several Penalties, Forfeitures and Damages, shall and may be recovered by Action, Bill, Plaint or Information.

Upon Conviction of the Trespasser or Trespassers, and in the Trial of any and every Action brought for any of the Trespasses in this Act mentioned, relating to Parks, or the Deer in them, the Court before whom such Case shall be brought, may proceed according to the Method provided in the sixth Paragraph of the Law, entitled, " *An Act for detecting and punish-* " *ing Trespasses in divers Cases, and directing Proceedings therein.*"

*(margin: Trial to be had in the same manner as directed in the law against trespasses, &c.)*

*Provided nevertheless,* That if the Defendant in any such Action be an Indian, or other Person ignorant of the Nature of an Oath, then, such Court shall refuse his Oath to discharge him, and shall proceed on the Defendant's Part to enquire according to, and by any other proper Evidence that may be produced by the Defendant.

*(margin: Proviso.)*

An

# A MANUAL

OF

# THE LAWS OF NORTH-CAROLINA,

ARRANGED UNDER DISTINCT HEADS,

IN ALPHABETICAL ORDER.

WITH REFERENCES FROM ONE HEAD TO ANOTHER,

WHEN A SUBJECT IS MENTIONED IN ANY OTHER PART OF THE BOOK
THAN UNDER THE DISTINCT HEAD TO WHICH IT BELONGS.

BY JOHN HAYWOOD, ESQ.

LATE ONE OF THE JUDGES OF THE SUPREME COURTS OF LAW AND
EQUITY.

THIRD EDITION, CORRECTED TO THE PRESENT TIME.

RALEIGH:

PRINTED & SOLD BY J. GALES, AND MAY BE HAD OF THE PRINTERS
AND BOOKSELLERS IN ALL THE TOWNS IN THE STATE.

• • • • • • • • •

1814.

Digitized by Google

JA3011

ously steal any horse, mare or gelding, upon due conviction
thereof, such felon or felons shall suffer death without bene-
fit of clergy.

---

## HOSPITAL-MONEY.
### See Seamen, 1, 4.

## HOUSE-BREAKERS.
### 1806.  C. 6.

§ 1.  If any person or persons shall break any dwelling-
house, shop, ware-house or other out house thereto belong-
ing, or therewith used, in the day time, and feloniously take
away any money, goods or chattels, of the value of 20s. or
upwards, therein being, although no person shall be within
such dwelling-house, shop, ware-house or other out-house,
or shall comfort, aid, abet, assist, counsel, hire or command
any person or persons to commit such offence, and being
thereof lawfully convicted, or being indicted shall stand mute,
or peremptorily challenge more than thirty-five jurors, shall
suffer death without benefit of clergy.

*Cases in which persons breaking houses, &c. shall be deprived of benefit of clergy.*

---

## HUNTING.
### 1768.  C. 13.

I.  § 2.  From and after the first day of January next, no
person whatever (masters excepted) not having a freehold
of one hundred acres of land within this province, or tending
10,000 corn hills, at least five feet distance each, shall hunt
or kill deer, under the penalty of 10l. proclamation money
for every offence ; and moreover shall forfeit his gun, or the
value thereof ; to be recovered by action of debt, bill, plaint
or information, by any person who will prosecute for the
same, wherein, upon conviction, over and above the said
penalty and forfeiture as aforesaid, the defendant shall be
committed to gaol by order of the court, there to remain,
without bail or mainprize, for one month.

*Who shall not hurt. 2, 8, 9.*

§ 5.  Nothing herein shall bar or hinder an overseer of a
slave or slaves from hunting and killing deer with a gun, on
his employer's lands, or the waste lands of the public, with-
in five miles of the residence of such overseer.

II.  § 6.  Upon suit being commenced on action of debt,
information, &c. in a superior court, if the defendant shall
fail to give such security as aforesaid, then the sheriff shall
commit the defendant to the goal of the superior court for
the district to which the same is made returnable.

### 1774.  C. 6.

III.  § 5.  When more persons than one are engaged in the
commission of the offence of hunting *with a gun, in the night*

Digitized by Google

## HUNTING.

*by fire light*, it shall and may be lawful for one of them to give evidence against any one, or all others concerned ; and his testimony shall be held and deemed to be as effectual, and shall have equal weight as if given by any person perfectly disinterested and innocent of the offence giving like information of the same facts, subject in other respects to the general rules of law respecting witnesses : and such witness, upon giving such information, and after due conviction of one or more such offenders, shall be acquitted and held discharged from all penalties and pains to be inflicted by this act, and shall have equal right to the moiety of the fine heretofore mentioned as other informers have.

*A particeps criminis may give evidence against the others, viz. fire-hunters, 4, 5.*

### 1779. C. 3.

IV. § 9. If any person summoned as an evidence against any fire-hunter, shall refuse or neglect to give evidence against such fire-hunter, such person so refusing or neglecting, shall be committed to the gaol of the county where the offence shall be committed, until he or she shall give evidence against the offender.

*Penalty on witnesses against fire hunters refusing to give evidence.*

### 1784. C. 33.

V. § 1. If any person or persons shall be discovered hunting in the woods with a gun, in the night time, by fire light, such person or persons so offending shall, upon conviction, by indictment or presentment in any court of record in this state, be fined by such court 20l. current money, to be applied to the use of the county wherein the offence was committed ; and shall stand committed until all costs accruing upon the presentment be paid.

*Hunting by fire light, the penalty, 3, 4, 6.*

VI. § 2. If any person shall be convicted as aforesaid of killing any deer, and leaving the carcases thereof in the woods, he shall for every offence forfeit and pay 20s.

*Leaving carcases in the woods.*

VII. § 3. If any slave or slaves shall be discovered hunting, in manner herein before mentioned, the master of such slave or slaves, or the person in whose service he or they may be, shall, upon due conviction of such slave or slaves before any justice of the peace of the county wherein such offence may be committed, forfeit the sum of five pounds, to be levied by a warrant immediately to be issued by such justice for that purpose ; and if any person shall be duly convicted as aforesaid of sending his slave to hunt with a gun, in the night by fire light, he shall be subject to the same pains as are provided by this act to be inflicted on fire-hunters.

*Slaves hunting by fire light.*

VIII. § 4. It shall not be lawful for any person on the east side of the Apalachian mountains, to kill or destroy any deer running wild in the woods or unfenced grounds in this state, by gun or otherwise, between the 20th day of Februa-

*Killing deer between the 10th Feb. and 15th August*

ry and the 15th day of August then next succeeding in each year, unless on his own lands ; and if any person on the east side of the said mountains shall kill or otherwise destroy any deer within the time before described, and contrary to the meaning and intent of this act, every such person shall forfeit and pay for each and every deer so unlawfully killed or destroyed, the sum of 40s. to be recovered before any justice of the peace, and applied as is by this act directed ; and in case any servant or slave shall, on the east side of the said mountains, kill or destroy any deer, between the 20th of February and the 15th of August in any year, the owner of such slave shall be liable to pay the sum of 40s. for each deer so unlawfully killed or destroyed, to be recovered and applied as before directed.

**Hunting on others' land.**

IX. § 5. It shall not be lawful for any person or persons on the east side of the Apalachian mountains, to hunt with a gun or with dogs on the lands of any other person, without leave obtained from the owner of the said land, under the penalty of forfeiting five pounds for every offence, to be recovered by the owner before any justice of the peace of the county where such offence is committed, or the offender resides, and applied, one half to his own use and the other half to the use of the county : Provided that no such recovery shall be had for the offence afore-mentioned, unless the owner of the land shall, by advertisement posted up in two or more public places, have forbid the persons so hunting by name, or all persons generally to hunt on his land, previous to the offence : Provided also, that recovery shall not be had in any case whatever, unless the prosecution is commenced within one month after the offence is committed.

**Fines applied.**

X. § 7. All fines imposed and recovered by virtue of this act, shall be one half to the use of the informer, the other half to the use of the poor of the county wherein the offence shall be committed, except such as are otherwise directed.

### 1801. C. 31.

**Punishment.**

XI. § 1. Upon any conviction hereafter for said offence of fire-hunting, the court in which the same is made, on his failing to pay the fine prescribed by 1784, c. 33, shall be, and is hereby authorised and empowered to sentence the person or persons convicted, to such term of imprisonment as may be judged adequate to the punishment of the offence, not exceeding two months.

---

### JAILORS.

See Claims, 3—Escapes, 3—Fees, 30.

Digitized by Google



A

# DIGEST

OF THE

# L A W S

OF THE

# State of Georgia.

FROM ITS FIRST ESTABLISHMENT AS A BRITISH PROVINCE DOWN
TO THE YEAR 1798, INCLUSIVE

AND THE

## PRINCIPAL ACTS OF 1799:

IN WHICH

Is comprehended the declaration of Independence; the State Constitutions of 1777 and 1789, with the
alterations and amendments in 1794.

ALSO THE

*Constitution of* 1798.

IT CONTAINS

As well all the Laws in force, as those which are deemed useful and necessary, or which are explanatory
of existing Laws; together with the

## TITLES OF ALL THE OBSOLETE AND OTHER ACTS.

AND CONCLUDES

WITH AN APPENDIX containing the original Charters and other Documents, ascertaining and defining the
Limits and Boundary of the State; all the Treaties with the southern tribes of Indians; the articles of
Confederation and perpetual union; the Constitution of the United States, and a few Acts of Congress.

Together with a copious Index to the whole.

BY

## ROBERT & GEORGE WATKINS.

Philadelphia:

PRINTED BY R. AITKEN, Nᵒ. 22, MARKET STREET.

1800.

428                          DIGEST OF THE

A. D. 1790.  court houfe and goal in the county of †Effingham; and that Jacob Weed, Henry
No. 443.    Wright, and Thomas Stafford, be appointed commiffioners for the county of †Cam-
And for the like  den, for the like purpofe; which commiffioners fhall give bond, as is herein before
purpofe in Camden
fhall give bond  directed, for the faithful performance of the duties required of them.
and fecurity.
                 V. *And be it further enacted by the authority aforefaid,* That all laws heretofore
All laws relat-  made, fo far as relate to the clearing of Brier creek, be, and the fame is hereby re-
ing to the clear-
ing of Brier    pealed.
creek, repealed.

                    JOSEPH HABERSHAM, *Speaker of the Houfe of Reprefentatives.*
                    NATHAN BROWNSON, *Prefident of the Senate.*
        EDWARD TELFAIR, GOVERNOR.
            *December* 10, 1790.

            † Other commiffioners appointed. See act of 1791, No. 432.

---

No. 444.   *An Act to prevent the pernicious practice of hunting deer in the night*
                              *time by fire light.*

Perfons hunting  I.   **B**E it enacted by the fenate and houfe of reprefentatives of the State of Georgia in gene-
deer in the night        *ral affembly met,* That from and immediately after the paffing of this act, any
by fire light to
forfeit £5.     perfon or perfons who fhall hunt with a gun by fire light or kill any deer fo hunting
                by fire light in the night time without his or their own enclofures, every fuch perfon
                or perfons being thereof convicted, upon the oath of one or more credible witnefs,
                before any juftice of the peace for the county where fuch offence fhall be committed,
                fhall for every fuch offence forfeit and pay, not exceeding the fum of five pounds,
How to be ap-   one half thereof fhall be paid to the informer or informers, and the other half into
plied.          the clerks office of the inferior court, and to be applied to the ufe of the poor of the
                county where fuch offence fhall be committed.

How recovered        II. *And be it further enacted,* That the forfeitures incurred by this act, as aforefaid,
                fhall be levied by diftrefs and fale of the offender's goods and chattels, lands and te-
                nements, by warrant under the hand and feal of the juftice before whom the perfon
                or perfons fo incurring fhall be convicted, returning the overplus, if any, to the
                owner or owners thereof, after deducting the faid penalty or forfeiture and lawful
                charges; and in cafe the perfon or perfons fo offending and convicted fhall not have
                goods and chattels, lands or tenements, fufficient to anfwer fuch forfeiture and charges,
                it fhall and may be lawful for fuch juftice to order fuch offender or offenders fo con-
Offenders una-  victed, feverally to receive not exceeding thirty-nine lafhes, well laid on his or their
ble to pay, fhall  bare back.
receive 39 lafhes.

                     III. *And be it alfo enacted,* That this fhall be deemed a public act, and given in
                evidence.

                    JOSEPH HABERSHAM, *Speaker of the Houfe of Reprefentatives.*
                    NATHAN BROWNSON, *Prefident of the Senate.*
        EDWARD TELFAIR, GOVERNOR.
            *December* 10, 1790.

                                                                            *An*

JA3016

# THE
# PUBLIC LAWS
## OF THE STATE OF
# RHODE-ISLAND
## AND
# PROVIDENCE PLANTATIONS,

As revised by a Committee, and finally enacted by
the Honourable GENERAL ASSEMBLY, at their
Seffion in *January*, 1798.

TO WHICH ARE PREFIXED,

The CHARTER, DECLARATION OF INDEPENDENCE, ARTICLES
OF CONFEDERATION, CONSTITUTION OF THE UNITED
STATES, and PRESIDENT WASHINGTON'S ADDRESS of *Sep-
tember*, 1796.

*41259*

Published by Authority.

*IGNORANTIA LEGIS NEMINEM EXCUSAT.*
IGNORANCE OF THE LAW IS NO EXCUSE FOR ITS VIOLATION.

Printed at PROVIDENCE, by CARTER and WILKINSON,
and fold at their Book-Store. 1798.

UNIV. OF MICH. LAW LIBRARY

Digitized by Google

JA3017

568                    *Firing of Guns, &c.*

himself aggrieved at any such judgment,
may appeal to the next Court of General
Sessions of the Peace in the county, observing the same rules as in other cases of appeal.

---

<div style="margin-left:2em;">

1731.
1737.
1768.
1798.
Penalty for firing
guns, &c. in
roads, &c.

</div>

*An Act to prevent unnecessary firing of Guns,
Pistols, Squibs, or other Fire-Works.*

Section 1. BE it enacted by the General
Assembly, and by the authority thereof it is enacted, That if any person
shall fire any gun, pistol, rocket, squib,
or other fire-works, in any road, street,
lane or tavern, or other public house, after
sun setting and before sun-rising, he shall, upon complaint and conviction thereof before
any one Justice of the Peace or Warden,
pay as a fine the sum of five dollars for the
first offence, and seven dollars for every subsequent offence, one half thereof to the informer, and the other half to the State.

For making
bonfires.

Sec. 2. *And be it further enacted,* That
if any person shall make a bonfire in any
public street, road, square or lane, without
permission from the Town-Council of the
town in which the same shall be made, he
shall, upon conviction as aforesaid, forfeit a
sum not exceeding ten dollars, to be appropriated in manner aforesaid.

For firing guns
loaded with bullets, &c.

Sec. 3. *And be it further enacted,* That
if any person shall fire any gun, musket,
blunderbuss or pistol, loaded with a bullet
or shot, in or across any road, street, square
or lane, he shall, upon conviction as aforesaid,
forfeit and pay as a fine a sum not less than
three dollars, nor more than ten dollars, to
be appropriated in manner as aforesaid.

*An*

Digitized by Google

# L A W S

## OF THE

## STATE

### OF

# DELAWARE,

### PASSED

## *At a Session of the General Assembly,*

BEGUN AND HOLDEN AT DOVER,

ON TUESDAY THE 7th DAY OF JANUARY, AND ENDED ON
WEDNESDAY THE 12th DAY OF FEBRUARY,

IN THE YEAR OF OUR LORD,

## ONE THOUSAND EIGHT HUNDRED AND TWELVE,

AND OF THE INDEPENDENCE OF THE

## UNITED STATES OF AMERICA,

THE THIRTY-SIXTH.

*PUBLISHED BY AUTHORITY.*

DOVER—JOHN B. WOOTTEN—PRINT.

## 1812.

JA3019

## LAWS OF THE STATE

CHAP.
CXCIV.

1812.

## CHAPTER CXCIV.

*An* ACT *to authorize Francis C. Hall, to remove and carry out from this State, into the State of Maryland, certain negro slaves therein mentioned.*

PASSED AT DOVER,
*February 2, 1812.*

PRIVATE ACT.

---

## CHAPTER CXCV.

*An* ACT *to prevent the discharging of fire-arms within the towns and villages, and other public places within this State, and for other purposes.*

Firing guns,
&c within any
towns, &c. of
this State pro-
hibited.

SEC. 1. **B**E IT ENACTED *by the Senate and House of Representatives of the State of Delaware, in General Assembly met,* That from and after the first day of June next, if any person or persons shall presume to fire or discharge any gun, ordnance, musket, fowling-piece, fusee or pistol, within any of the towns or villages of this State, or within the limits thereof; or where the limits cannot be ascertained, within one quarter of a mile of the centre of such town or village, shall fire or discharge any gun, ordnance, musket, fowling piece, fusee or pistol, within or on any of the greens, streets, alleys or lanes of any of the towns and villages within this State, whereon any buildings are or shall be erected, or within one hundred yards of any mill-dam, over or across where any of the main public or State roads may go or pass; every person or persons so offending, shall be fined or punished as hereinafter directed.

Penalty on
firing guns,
&c,

SEC. 2. *And be it enacted by the authority aforesaid,* That if any free white person or persons, or the

## OF DELAWARE.

child or children of any such person or persons, shall fire or discharge any gun, ordnance, musket, fowling-piece, fusee or pistol, within any, or at any of the places or limits aforesaid, every such person or persons, or the child or children of every such person or persons, shall forfeit and pay for every such offence, any sum, not exceeding five dollars, to be recovered from the person or persons, or from the parent of such child or children, before any justice of the peace of this State, on his own view, or on the oath or affirmation of any one or more credible witnesses, to be recovered as debts under forty shillings are recoverable by the laws of this State.

*CHAP. CXCV.*

*1812.*

How recoverable.

SEC. 3. *And be it enacted by the authority aforesaid,* That if any free negro or mulatto, or the child or children of any such free negro or mulatto, or any manumitted negro or mulatto, or any servant or servants, slave or slaves, apprentice or apprentices, of any person or persons whatsoever, shall fire or discharge any gun, ordnance, musket, fusee, fowling-piece or pistol, within the limits herein before described, and be thereof convicted by the view of any one justice of the peace, or on the oath or affirmation of one or more credible witnesses, every person so offending, shall forfeit and pay any sum, not exceeding five dollars: *Provided nevertheless,* That in all and every case where the money is not immediately paid on such conviction, into the hands of the justice before whom such conviction is had, it shall and may be lawful, and the said justice is hereby directed and commanded to commit such person or persons to the jail of his county, there to remain, until the forfeitures and costs are paid.

Penalty on free negroes or free mulattoes &c. firing guns &c.

Proviso.

SEC. 4. *And be it enacted by the authority aforesaid,* That all fines and forfeitures incurred under this law, shall be paid over for the use of the poor of the county where the offence shall have been committed.

Fines, how applied.

This act not
to extend to
days of public
rejoicing, &c.

SEC. 5. *Provided nevertheless, and be it enacted by the authority aforesaid,* That nothing in this act shall extend, or be construed to prevent any such firing, on any day or days of public rejoicing, or where it is authorized by any law of this State, or where it shall be deemed by the justice before whom the information is lodged, that the necessity of the case required the same.

PASSED AT DOVER,
*February* 4, 1812.

---

## CHAPTER CXCVI.

Chap. 96. c.
3 vol. p. 1236.

*A* SUPPLEMENT *to an act, entitled, "An act to incorporate a bank in the borough of Wilmington, in this State."*

Original act
revived and
continued, till
Sep. 1, 1822.

SEC. 1. BE IT ENACTED *by the Senate and House of Representatives of the State of Delaware, in General Assembly met,* That the said act entitled, "An act to incorporate a bank in the borough of Wilmington, in this State;" passed on the ninth day of February, in the year of our Lord, one thousand seven hundred and ninety-six; and every section and clause thereof, excepting so much thereof, as may by this act be altered, supplied or amended, shall remain, continue and be in full force and effect until the first day of September, in the year of our Lord, one thousand eight hundred and twenty-two.

Forging, &c.
how punished.

SEC. 2. *And be it further enacted,* That if any person shall counterfeit the common seal of the president, directors and company of the Bank of Delaware, incorporated by the aforesaid act, or shall forge any bank-bill or note, for the payment of money made or given out, or to be made or given out by, or for the said president, directors and company, or purporting so to be, or shall utter, vend,

# THE

# COLONIAL LAWS

OF

# NEW YORK

FROM THE

## YEAR 1664 TO THE REVOLUTION,

INCLUDING THE

CHARTERS TO THE DUKE OF YORK, THE COMMISSIONS AND IN-
STRUCTIONS TO COLONIAL GOVERNORS, THE DUKE'S LAWS,
THE LAWS OF THE DONGAN AND LEISLER ASSEM-
BLIES, THE CHARTERS OF ALBANY AND NEW
YORK AND THE ACTS OF THE COLO-
NIAL LEGISLATURES FROM 1691
TO 1775 INCLUSIVE.

## VOLUME V.

TRANSMITTED TO THE LEGISLATURE BY THE COMMISSIONERS OF STATUTORY
REVISION, PURSUANT TO CHAPTER 125 OF THE LAWS OF 1891.

ALBANY:
JAMES B. LYON, STATE PRINTER.
1894.

Digitized by Google

JA3023

## LAWS OF THE COLONY OF NEW YORK.   •   11

the Authority of the same that the Act intitled "An Act for the
" better regulating the Public Roads in the City and County of
" New York, and to levy Money to defray the Expence thereof."
passed in the fourth Year of his present Majesty's Reign shall be
and hereby is continued, and every Clause, Article, Matter and
Thing in the said Act contained enacted to be and remain in full
Force and Virtue to all Intents, Constructions and Purposes
whatsoever until the first Day of January which will be in the
Year of our Lord one thousand seven hundred and seventy two,
except so much of the second Clause of the said Act as is therein
expressed and contained in the Words following to wit " And
" if any Person or Persons shall lay out any Road or Roads
" through his her or their Lands, and leave the same open for
" common use by the space of three Months, the said Commis-
" sioners are hereby impowered immediately thereafter to record
" all and every such Road and Roads in the Manner hereinafter
" directed; which being so recorded shall be deemed Publick
" Roads and Highways to all Intents Constructions and Purposes
" whatsoever."

### [CHAPTER 1410.]

[Chapter 1410 of Van Schaack, where the act is printed in full.  Expired
January, 1772.  Revived and continued by chapter 1522.]

An Act for the more effectual preven-
tion of Fires in the City of New York.

[Passed, December 30, 1769.]

WHEREAS the many instances of the great Destruction made
by Fire in many Populous Cities, makes it highly necessary to
use all possible precaution against the like Calamities in this
City.  AND WHEREAS the storing of Pitch Tar, Turpentine,
Rosin, Spirits of Turpentine or Shingles in any Houses, Store
Houses, Cellars or other Places within this City, may be of very
bad Consequences in Case of Fire breaking out at or near the
Place where any such commodities are stored.  AND WHEREAS
the firing and discharging of Guns, Pistols, Rockets, Crackers,
Squibs, and other Fireworks in the City of New York, may not
only be likely to do personal Injuries to the Inhabitants and
others, but the City may be in danger of being set on Fire by
such Practices for Remedy whereof.

BE IT ENACTED by his Honor the Lieutenant Governor, the
Council and General Assembly and it is hereby enacted by the

Digitized by Google

JA3024

12    LAWS OF THE COLONY OF NEW YORK.

Authority of the same that from and after the first Day of January next no Pitch, Tar, Turpentine, Rosin or Spirits of Turpentine or Shingles shall or may be put in any Place in the City of New York to the Southward of Fresh Water, other than in such proper place or places to be appointed and approved of by the Mayor Aldermen and Commonalty of the City of New York in Common Council convened under the Penalty of ten Pounds for every Offence or Refusal to remove the same to be levied by Warrant under the Hand and Seal of one or more of his Majesty's Justices of the Peace for the City and County of New York by distress and Sale of the Goods and Chattels of the Offender upon due Conviction upon Oath or upon the View of one or more of such Justices of the Peace, rendering the Overplus if any be to the Owner, and for want of such Distress the Offender shall be imprisoned by Warrant from the said Justice or Justices, who are hereby impowered and required to issue such Warrant until payment as aforesaid, which said Forfeitures shall be paid to the Church Wardens of the City of New York for the Time being for the use of the Poor of the said City.  PROVIDED ALWAYS that it shall and may be lawful to and for such of the Inhabitants of the said City who are Ship Chandlers to have near their Doors in the open Street, and not in any Building or Inclosure a small Quantity of Pitch Tar Rosin and Turpentine not exceeding in the whole at any one Time twenty Barrels in order the more readily and handily to supply the Merchant Ships, and others who may have Occasion for small Quantities of such Commodities any Thing herein before contained to the contrary thereof in any wise notwithstanding.

AND BE IT FURTHER ENACTED by the Authority aforesaid that if any Person or Persons of what Age Sex or Quality soever from and after the said first Day of January shall Fire and discharge any Gun, Pistol, Rocket, Cracker, Squib, or other Fire Work in any Street, Lane or Alley, Garden or other Inclosure or from any House or in any other Place where Persons frequently walk to the Southward of Fresh Water, that then every such person or persons so offending and being thereof convicted before one or more Justice or Justices of the Peace for the said City and County of New York either by the Confession of the Party or Parties so offending or the Oath of one or more Witness or Witnesses (which Oath the said Justice or Justices of Peace is and are hereby impowered and required to Administer) shall

## LAWS OF THE COLONY OF NEW YORK.   13

for every such Offence forfeit the Sum of twenty Shillings, the said Forfeitures to be levied by distress and sale of the Goods and Chattels of every such Offender by Warrant under the Hand and Seal of the said Justice or Justices of the Peace before whom such Conviction or Convictions shall be as aforesaid made, the which Forfeitures to be to the use of the Poor of the said City of New York; and if the said Offender or Offenders shall not pay the said Forfeiture or Forfeitures upon Conviction as aforesaid, and want of sufficient distress whereon the same can be made, that then every such Justice or Justices of the Peace is and are hereby impowered and required by Warrant under his or their Hands and Seals to commit every such person or persons so as aforesaid offending to the Common Goal of the City and County of New York, there to remain without Bail or Mainprize for the Space of ten Days unless such Forfeiture or Forfeitures be sooner paid: But in Case such Offender or Offenders in the Premises last abovementioned shall happen to be a Slave or Slaves and the Forfeiture or Forfeitures aforesaid on Conviction as aforesaid shall not be forthwith paid, that then it shall and may be lawful to and for such Justice or Justices before whom the Conviction shall be to cause such Slave or Slaves to be publickly Whiped on the naked Back such Number of Stripes as he or they shall think proper not exceeding thirty nine, which Punishment shall be in lieu and stead of the said Forfeiture; This Act to be of force from the first Day of January one thousand seven hundred and seventy, to the first Day of January which will be in the year of our Lord one thousand seven hundred and seventy two.

### [CHAPTER 1411.]

[Chapter 1411 of Van Schaack, where the act is printed in full. See chapter 890.]

'An Act to encourage the destroying of Wolves in the County of Albany.

[Passed, December 30, 1769.]

WHEREAS an Act intitled An Act to encourage the destroying of Wolves in the County of Albany passed in the twenty fourth Year of his late Majesty's Reign will expire the first Day of January next, and the said Act having been found useful, and would be more so provided a greater Reward was allowed for destroying of Wolves and Whelps than is therein mentioned.

Digitized by Google

JA3026