**Nos. 23-1900, 23-2043**

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

RONALD KOONS, et al.,

*Plaintiffs-Appellees*,

*v.*

ATTORNEY GENERAL NEW JERSEY, et al.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of New Jersey, Nos. 1:22-CV-07464, 1:22-CV-07463
Before the Hon. Renee Marie Bumb

**BRIEF FOR PROFESSORS OF PROPERTY LAW AS AMICI CURIAE IN
SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL**

SIMON B. KRESS
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6711

ALAN SCHOENFELD
JUAN M. RUIZ TORO
JOSHUA M. FEINZIG*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
(212) 937-7294

* *Admitted to practice only in Washington, D.C.
Supervised by members of the firm who are
members of the New York bar.*

July 27, 2023

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF AMICI CURIAE ............................................................1

INTRODUCTION .................................................................................2

ARGUMENT ........................................................................................4

I.  NEW JERSEY'S PRIVATE-PROPERTY RULE DOES NOT IMPLICATE
    THE SECOND AMENDMENT GIVEN PROPERTY OWNERS' RIGHT
    TO EXCLUDE .................................................................................4

    A.  The Right To Exclude Is Foundational To American Property
        Law And Presumes State-Created Default Rules .....................5

    B.  A Constitutional Right To Carry A Weapon Onto Another's
        Property Would Vitiate The Right To Exclude And Should
        Therefore Be Rejected............................................................10

        1.  There is no constitutional right to carry firearms on
            private property without a private property owner's
            consent..............................................................................11

        2.  Neither is there a constitutional right to the presumption
            that a private property owner welcomes firearms until
            they have publicly stated their opposition .................15

    C.  Alternative Theories As To How The Rule Implicates The
        Second Amendment Likewise Fail .......................................18

II. THE DISTRICT COURT'S ANALYSIS OF BRUEN STEP ONE COMMITS
    A VARIETY OF LEGAL ERRORS WARRANTING REVERSAL............19

    A.  There Is No Logical Connection Between The Concept Of
        Implied License And The Scope Of The Second Amendment...........20

    B.  Defining the Second Amendment Scope Along The Concept Of
        "Implied License" Would Be Unworkable And Internally
        Contradictory........................................................................22

    C.  The District Court's Attempt To Reconcile The Right To
        Exclude With The Right To Carry By Formulating The Right In
        Defeasible Terms Fails.........................................................24

CONCLUSION.....................................................................................27

CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

## CASES

Page

*Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.*, 391 U.S. 308 (1968) ...................................................................16

*Baker v. Howard County Hunt*, 171 Md. 159 (1936) .............................................12

*Breard v. Alexandria*, 341 U.S. 622 (1951).....................................................9, 15, 26

*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021) ........................................2, 5

*Central Hardware Co. v. NLRB*, 439 F.2d 1321 (8th Cir. 1971) ............................17

*Dietemann v. Time, Inc.*, 449 F.2d 245 (9th Cir. 1971).........................................15

*Florida Prepaid Postsecondary Educatoin Expense Board v. College Savings Bank*, 527 U.S. 627 (1999)..................................................................11

*Florida v. Jardines*, 569 U.S. 1 (2013) .................................................................20

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012)....................12

*Hopkins v. Fox & Lazo Realtors*, 132 N.J. 426 (1993) ............................................6

*Hudgens v. NLRB*, 424 U.S. 507 (1976) ...............................................................14

*Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022)......................25, 26

*Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551 (1972)..................................5, 14, 16, 17

*Marsh v. Alabama*, 326 U.S. 501 (1946) ....................................................14, 16, 22

*Martin v. City of Struthers*, 319 U.S. 141 (1943) ..................................................27

*Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018)..............................25

*New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022)............................................................................. 2, 3, 4, 11, 12, 17, 18

*PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980) ..............................5, 14

*Rowan v. U.S. Post Office Department*, 397 U.S. 728 (1970)................................14

*Schwartz-Torrance Investment Corp. v. Bakery & Confectionery Workers' Union, Local No. 31*, 394 P.2d 921(Cal. 1964)..............................17

*Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1 (2000)........................................................................................................15

*Shelly v. Kraemer*, 334 U.S. 1 (1948) ................................................13, 22

*Spanish Church of God of Holyoke, Mass., Inc. v. Scott*, 794 F. Supp. 2d 304 (D. Mass. 2011) ......................................................................15

*State ex rel. Qarmout v. Cavallo*, 774 A.2d 612 (N.J. Sup. Ct. 2001) ......6

*State v. Ingram*, 289 A.3d 509 (N.J. Sup. Ct. 2023)....................................20

*Sutherland v. Southcenter Shopping* Center, 478 P.2d 792 (Wash Ct. App. 1970) ..........................................................................................17

*Watchtower Bible & Tract Society v. Village of Stratton*, 536 U.S. 150 (2002)..........................................................................................................27

## STATUTES, RULES, AND REGULATIONS

Fed. R. App. P. 29 ............................................................................................1

Borough of Westville, NJ General Legislation (2007)
§ 187-1 ......................................................................................................8
§ 187-2 ......................................................................................................8

City of Jersey City, NJ Code of Ordinances § 245-7 (1978)......................8

Fla. Stat. § 934.50(3)(b) (2022) ....................................................................8

2022 Laws of New Jersey, Ch. 131, § 7(a)(24) ..........................................1

N.J. Rev. Stat. § 2A:63-1 (2019) ..................................................................7

Texas Parks & Wildlife Code § 61.022(a) (2020)......................................8

Township of Monroe, NJ Municipal Code § 76-1.A(30)(4) ....................7

## OTHER AUTHORITIES

Ayres, Ian & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183, tbl.A6 (2020) ...................................................................9, 19, 23

Blocher, Joseph & Darrell A.H. Miller, *What Is Gun Control? Direct Burdens, Incidental Burdens, and the Boundaries of the Second Amendment*, 83 U. Chi. L. Rev. 295 (2016) .....................................................6

Cooley, Thomas M., *A Treatise on the Law of Torts or the Wrongs Which Arise Independent of Contract* (1879)...................................20, 22, 23

Ellickson, Robert C., *Of Coase and Cattle: Dispute Resolution Among Neighbors in Shasta County*, 38 Stan. L. Rev. 623 (1986) ...........................7

Strahilevitz, Lior Jacob, *Information Asymmetries and the Rights to Exclude*, 104 Mich. L. Rev. 1835 (2006) ........................................................6

# INTEREST OF AMICI CURIAE[1]

Amici curiae are law professors specializing in property law.  Ian Ayres is Oscar M. Ruebhausen Professor at Yale Law School.  Fredrick Vars is Ira Drayton Pruitt, Sr. Professor of Law at University of Alabama School of Law.  Professors Ayres and Vars have written extensively on the relationship between property law and firearm regulation, including in their book *Weapon of Choice: Fighting Gun Violence While Respecting Gun Rights* (Harv. U. Press, 2020).

Amici have an interest in the doctrinal and policy issues implicated by this case, particularly as they relate to the constitutionality of Section 7(a)(24), the private-property rule of Chapter 131 of the 2022 Laws of New Jersey.  Because longstanding principles of property law clarify that an individual's Second Amendment right to carry ends at another's property line, this Court should find that the rule does not implicate the Second Amendment.  The district court, however, determined that the Second Amendment *is* implicated on "open" (*i.e.*, commercial) but not "closed" private property, reasoning that there is a right to carry onto property whose owner has provided a generalized "implied license" to

---

[1] The views of the amici expressed here do not necessarily reflect the views of the institutions with which they are or have been affiliated, whose names are included solely for purposes of identification.  Pursuant to Federal Rule of Appellate Procedure 29, amici state that no counsel for a party authored this brief in whole or in part, and no party or counsel for a party contributed money intended to fund the preparation or submission of this brief.  All parties consent to the filing of this brief.

enter. But the district court's attempt to strike some perceived middle ground is inconsistent with a property owner's right to exclude—not to mention constitutionally novel and conceptually untenable—and should thus be rejected by this Court.

## INTRODUCTION

The legislative selection of default rules, including whether guns are presumptively permitted on private property, is part and parcel of States' enduring prerogative to reinforce private owners' right to exclude. This selection does not implicate the Second Amendment's "plain text," *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2129-2130 (2022), because the right to carry is not a right to trespass and thus does not extend beyond another's private property line. New Jersey's private-property rule, which construes a private owner's silence on the permissibility of firearms as disallowance while preserving the owner's ability in a wide variety of ways to welcome firearms if they so choose, is thus constitutional.

As explained in Part I, the Second Amendment does not guarantee a right to bear arms on another's private property over that owner's objection. The owner's right to exclude is "universally held to be a fundamental element of the property right," *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021), and

necessarily encompasses the right to set terms of entry regarding firearms. *Bruen* did not announce a right so sweeping as to displace centuries-old property rights.

And just as there is no individual right to bear arms on another's private property contrary to the owner's will, neither is there a freestanding constitutional right to a presumption that a private owner welcomes firearms until they say otherwise—what the district court in its TRO opinions called a "rebuttable presumption to carry." JA503; JA797. But constitutional rights do not operate in such a conditional manner. Were there a right to carry firearms onto another's private property, it would trump an owner's objection—not rise or fall with their preference. Plainly, such a sweeping right would vitiate the right to exclude.

As explained in Part II, the district court's approach was flawed. To avoid displacing the right to exclude, the court sought to strike a doctrinal middle ground on two fronts—first watering down the right to public carry from a trump to a presumption, and then extending it onto "open" but not "closed" private property by reasoning that the Second Amendment tracks the state-law concept of implied license. But these compromises lack constitutional or historical justification. This Court should therefore reject the district court's approach to *Bruen* Step One and instead uphold the private-property rule for "open" and "closed" property alike.[2]

---

[2] Though this brief focuses on the *Bruen* Step One question, amici fully agree with the State's *Bruen* Step Two historical analysis. *See* Appellants' Br. at 40-44. For the reasons described by the State, New Jersey's private-property rule

## ARGUMENT

### I. NEW JERSEY'S PRIVATE-PROPERTY RULE DOES NOT IMPLICATE THE SECOND AMENDMENT GIVEN PROPERTY OWNERS' RIGHT TO EXCLUDE

Under *Bruen*, a court must first ask whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. 2111, 2129-2130 (2022). Only if the plaintiff has satisfied that inquiry does the burden shift to the government to show that the firearm regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. Plaintiffs here have failed to carry their initial burden because the common-law right to exclude, which inheres in all private property ownership, forecloses any possibility of extending Second Amendment rights into the private-property domain. There is neither a right to carry weapons onto another's property without permission, nor a freestanding right to have an owner's silence on the permissibility of guns construed in the pro-firearms direction. The selection of a default meaning of a private owner's silence is instead left to the States, consistent with their abiding prerogative to reinforce property owners' right to exclude.

---

is "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130, and should thus be upheld if the Court were to reach Step Two.

## A.    The Right To Exclude Is Foundational To American Property Law And Presumes State-Created Default Rules

The right to exclude others from interfering with one's property is "one of the most treasured" rights of property ownership. *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021).  It inheres in all forms of private property, regardless of whether property has been "opened" to the public to serve a commercial function, because property does not "'lose its private character merely because the public is generally invited to use it for designated purposes.'" *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 81 (1980) (quoting *Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551, 569 (1972)).  And it means that private owners retain broad authority over who or what to admit onto their premises, and generally cannot be forced by the State to grant access to unwanted entrants. *See Cedar Point*, 141 S. Ct. at 2080 (determining that a regulation granting a person momentary access to another's property is a *per se* taking).

But an individual's constitutional right to exclude is not self-actualizing or exercised in isolation.  It is instead nested within a broad range of criminal, tort, and property laws that effectuate the right by regulating informational exchange between parties, imposing liability on those who violate an owner's terms of entry, and clarifying default rules around which an owner and potential entrants can negotiate access.

- 5 -

*First*, States routinely shape how owners make exclusion decisions in the first instance. Legislation promoting the disclosure of information by prospective entrants can lower costs associated with the discovery of that information, enabling owners to execute terms of entry that more closely align with their preferences. *See* Strahilevitz, *Information Asymmetries and the Rights to Exclude*, 104 Mich. L. Rev. 1835, 1837-1838 (2006). Similarly, tort rules imposing liability for wrongdoing or injury arising on an owner's premises can influence owners' decisions to exclude certain people or forms of behavior. For instance, a private owner bears a duty to protect guests from foreseeable dangers present on the land or posed by other guests. *See, e.g.*, *Hopkins v. Fox & Lazo Realtors*, 132 N.J. 426, 433 (1993). In the context of firearms possession, such liability may affect owners' decisions to admit guns onto their premises even though these rules do not explicitly regulate guns as such. *See* Blocher & Miller, *What Is Gun Control? Direct Burdens, Incidental Burdens, and the Boundaries of the Second Amendment*, 83 U. Chi. L. Rev. 295, 298 (2016).

*Second*, to enforce these private exclusion decisions, States have long exercised their police power through trespass laws. Trespass statutes peg an entrant's lawful status to the informed consent of the private owner, enabling owners to enforce their chosen terms of entry with the backing of the State's criminal sanction. *See, e.g.*, *State ex rel. Qarmout v. Cavallo*, 774 A.2d 612, 614-

615 (N.J. Sup. Ct. 2001) (finding criminal trespass where defendants were given permission to enter another's land to dump clean fill but instead dumped solid waste). The law of civil trespass similarly reinforces an owner's right to exclude by empowering owners to demand compensation for unlawful entry. *See* N.J. Rev. Stat. § 2A:63-1 (2019).

*Third*, a private owner's right to exclude is enforced through general default rules. Such rules codify presumptions about the owner's terms of entry, which govern unless the owner states otherwise. As such, every State has—and must have—default rules for trespass stipulating whether the absence of common indicators of exclusion (*e.g.*, a physical fence or public notice) communicates consent to enter. States have also long adopted and reformulated default rules calibrated to particular activities. For example, most States over the course of the nineteenth century reversed the default rule as to whether domesticated cattle were permitted to graze on the land of another property owner, thereafter placing the burden on visiting ranchers to obtain an owner's consent. *See* Ellickson, *Of Coase and Cattle: Dispute Resolution Among Neighbors in Shasta County*, 38 Stan. L. Rev. 623, 660-661 & n.95 (1986). The formulation and reformulation of default rules remains a critical means by which States support the integrity of private property. *See, e.g.*, Township of Monroe, NJ Municipal Code § 76-1.A(30)(4) (prohibiting consumption of alcohol on private property without owner's consent);

Borough of Westville, NJ General Legislation § 187-1, -2 (2007) (prohibiting
graffiti on private property without owner's consent); City of Jersey City, NJ Code
of Ordinances § 245-7 (1978) (prohibiting solicitation on private property without
owner's consent); Texas Parks & Wildlife Code § 61.022(a) (2020) (prohibiting
fishing and hunting on private property without the owner's consent); Fla. Stat. §
934.50(3)(b) (2022) (prohibiting use of drone over private property without
owner's consent).

The significant variation in default rules, across American history and
between the fifty States, makes evident that default rules are not—and have never
been—fixed by federal constitutional law.  A State is free to adopt new default
rules regarding the influx of firearms onto another's private property, just as it has
been free to adopt new default rules particularized to grazing, hunting, solicitation,
graffiti, and consuming alcohol.  The flexible and non-constitutional status of
property defaults is understandable considering that the regulation of private
property is largely left to the States and that default rules do not *ban* private
behavior (constitutionally protected or otherwise)—they simply establish baseline
terms from which private owners can easily depart.

It has always been States' legislative prerogative to set and adjust these rules
in accordance with public policy, including tailoring rules to the expectations and
preferences of private owners so as to reduce opt-out costs and produce more

efficient arrangements.  The Supreme Court recognized this very point in *Breard v. Alexandria*, 341 U.S. 622 (1951), a decision upholding a municipal default rule that presumptively disallowed door-to-door solicitation (a constitutionally protected activity) unless a private owner expressly consented.  The Court understood that the City's selected rule, rather than its opposite, made it more likely that owners would have their preferred terms of entry enforced: "A householder depends for protection on his city board rather than churlishly guarding his entrances with orders forbidding the entrance of solicitors.  A sign would have to be a small billboard to make the differentiations between the welcome and unwelcome that can be written in an ordinance once cheaply for all homes."  *Id.* at 640.

New Jersey's shift from a "yes-carry" to a "no-carry" default was driven by a similar concern: that guns were being brought onto private property without informed consent from landowners.  For one, there had been widespread misunderstanding about the state of the law.  Of polled New Jersey residents, 78.9% did not know whether a "[p]lumber is allowed to bring gun without permission," 71.9% did not know whether a "[f]riend is allowed to bring gun without permission," and 70.2% did not know whether "[c]ustomers are allowed to bring gun into business."  *See* Ayres & Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183,

tbl.A6 (Winter 2020).  And the small number of respondents who thought they knew the law were often mistaken—for instance, these respondents were nearly evenly split on the question of whether customers are allowed to bring guns into private businesses.  *Id.*  The upshot of this confusion was that owners who preferred not to have guns on their premises were often unknowingly permitting them.  Moreover, the "yes-carry" default raises a host of monitoring anxieties for landowners, who have reason to fear that some carrying visitors will unintentionally (or perhaps conveniently) fail to notice "no firearms" signs and surreptitiously carry inside.  Landowners may also reasonably fear that posting "no firearms" signs, even if reflective of their underlying preferences, would lead potential criminals to infer that the owner is unarmed and the property vulnerable.

Given these circumstances, the "yes carry" default is not just bad policy; it also imperils the right to exclude and its foundational status within our legal system.  But the "no carry" default enhances the possibility of meaningful informed consent between landowner and entrant, thus bolstering the integrity of private-property ownership.

### B.    A Constitutional Right To Carry A Weapon Onto Another's Property Would Vitiate The Right To Exclude And Should Therefore Be Rejected

As a default rule, the private-property rule does not ban the carrying of firearms onto another's private property; it recasts the meaning of a private

owner's silence on the issue. Because Plaintiffs bear the burden of demonstrating that "the Second Amendment's plain text covers [their] conduct," *Bruen*, 142 S. Ct. at 2129-2130, they must demonstrate that the act of carrying a gun onto another's property without first obtaining that owner's permission—the "conduct" encumbered by the rule—is "cover[ed]" by the plain text. For that to be so, one of the following two propositions must be true: (1) the Second Amendment provides a right to carry on certain classes of private property that trumps the objections of private owners; or (2) the Second Amendment provides a standalone right to a rebuttable presumption that a private owner welcomes firearms until they state otherwise. Both propositions fail.

### 1.    There is no constitutional right to carry firearms on private property without a private property owner's consent.

Recognizing a Second Amendment right to carry onto another's property over their objection would be an unprecedented abrogation of the owner's right to exclude—the "hallmark of a protected property interest." *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 673 (1999). As the district court recognized in its preliminary injunction and temporary restraining order opinions, such a right would bar States from enforcing through criminal-trespass actions private owners' decisions to exclude firearms, whether those actions are brought under general criminal-trespass statutes or firearm-specific statutes like New Jersey's private-property rule. *See* JA137-JA138; JA511 ("No

party disputes here that private property owners … have long had the right to exclude firearms from their properties."); JA796 ("[T]he Second Amendment does not include protection for a right to carry a firearm in a place … against the owner's wishes.").

To start, nothing in *Bruen* itself indicates that the "public" right to carry extends onto another's private property.  Construing "public" to include private property, even if limited to private property open to the public, is at odds with basic tenets of our constitutional tradition.  In codifying a pre-existing common-law right, the Second Amendment "did not expand, extend, or enlarge the individual right to bear arms at the expense of other fundamental rights," including an "owner's exclusive right to be king of his own castle."  *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2111.  Rather, the right to bear arms was understandably circumscribed by the common law of trespass, which predated the Second Amendment and reflected an expansive right to exclude without any special carve-out for firearms.  *See, e.g.*, *Baker v. Howard Cnty. Hunt*, 171 Md. 159, 168 (1936) (surveying the history of "the relative rights of fox[] hunters and the owners of the land over which they hunt" and finding "no doubt that … if the hunter himself goes on the lands of another against the owner's will, he is a trespasser").

The historical absence of any firearms-related exception to the right to exclude reflects the more general relationship between an owner's right to exclude and the rights of non-owners.  Put simply, an entrant's federal constitutional rights *have virtually no bearing on another's use of their private property.*  Amici are aware of only two potential instances where a private owner's use of their property has been constrained by the constitutional rights of non-owners: the enforcement of racially restrictive covenants and restrictions on street expression in private company towns.  But neither offers a rationale relevant to the Second Amendment.

In *Shelly v. Kraemer*, 334 U.S. 1 (1948), the Supreme Court prohibited the judicial enforcement of a racially restrictive covenant.  Its analysis turned on the fact that the "[t]he owners of the properties were willing sellers" and that "but for the active intervention of the state courts, … petitioners would have been free to occupy the properties in question without restraint." *Id*. at 19.  In other words, *Kraemer* did not concern the owners' right to exclude; it instead pitted the sellers' common-law right to disposition of the property and the buyers' constitutional right to equal treatment against the rights of the other neighborhood residents to enforce the covenant.  That property rights were involved on both sides of the ledger makes it additionally difficult to isolate the role of the equal-protection right in the Court's analysis.

*Marsh v. Alabama*, 326 U.S. 501 (1946)—which held that a company maintaining complete ownership over an Alabama town was barred by the First Amendment from forbidding street distribution of religious materials—is similarly inapposite. The Court later limited *Marsh*'s reach to the company towns of the past, having recognized that "this Court has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned." *Lloyd Corp.*, 407 U.S. at 568; *see PruneYard*, 447 U.S. at 81 ("[W]hen a shopping center owner opens his private property to the public for purpose of shopping, the First Amendment to the United States Constitution does not thereby create individual rights in expression."); *Hudgens v. NLRB*, 424 U.S. 507, 516-517 (1976). Entrants thus do not have rights of expression on private property, regardless of whether the property is open or closed to the public. That remains true even though, of course, the text of the First Amendment—like that of the Second Amendment—does not draw an explicit distinction between public and private property.

Other First Amendment rights likewise end at the private-property line, regardless of whether the property is open or closed. *See, e.g.*, *Rowan v. U.S. Post Office Department*, 397 U.S. 728, 737-738 (1970) (holding that "[t]he asserted [First Amendment] right of a mailer [to send unwanted material to an unreceptive addressee] … stops at the outer boundary of every person's domain" as "[t]o hold

- 14 -

less would tend to license a form of trespass"); *Breard*, 341 U.S. at 645 (upholding a municipality's no-solicitation default rule because "[i]t would be … a misuse of the great guarantees of free speech and free press to … force a community to admit the solicitors of publications to the home premises of its residents"); *Dietemann v. Time, Inc.*, 449 F.2d 245, 249 (9th Cir. 1971) ("The First Amendment [right to newsgathering] is not a license to trespass[.]"); *Spanish Church of God of Holyoke, Mass., Inc. v. Scott*, 794 F. Supp. 2d 304, 313 (D. Mass. 2011) (rejecting a defense to trespass based in the right to religious exercise).

In short, a private owner's fundamental control over their dominion means that they can prohibit firearms, just as they can prohibit handbill distributors, association members, newsgathering journalists, or religious observers.  Had the Court in *Bruen* wished to upset the constitutional status of the right to exclude and private property at large, it would have said so.  *Cf. Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.").

> **2.    Neither is there a constitutional right to the presumption that a private property owner welcomes firearms until they have publicly stated their opposition**

Plaintiffs argue that there is a constitutional right to a *presumption* to carry onto another's private property even if there is no right to carry onto another's private property *per se*—that is, a right to carry that trumps the owner's opposition.

- 15 -

The district court reached a similar conclusion in the course of its *Bruen* Step One analysis, *see* JA142, as discussed below in Section II.C. But this formulation is likewise analytically and doctrinally unworkable.

First, nothing in the Supreme Court's constitutional jurisprudence suggests that an individual right can exist in the partial or defeasible form of a rebuttable presumption conditioning exercise on the permission of another individual. If there truly were a right to carry onto private property, "open" or otherwise, that *would* be a right to carry against an owner's wishes. Consider the brief historical period after *Marsh*, 326 U.S. 501, when the Court temporarily suggested that First Amendment rights can extend onto private commercial property in special circumstances. Before the Court reversed course and foreclosed any such possibility in *Lloyd Corporation v. Tanner*, 407 U.S. 551 (1972), it treated this right to free expression as a trump—not a mere entitlement to a presumption in the pro-expression direction. That right supplied a constitutional defense to trespass actions and thereby *prevented* owners from invoking trespass laws to exclude unwanted forms of expression. *See Marsh*, 326 U.S. at 501 (overturning a criminal trespass conviction); *Amalgamated Food Emps. Union Loc. 590 v. Logan Valley Plaza, Inc.*, 391 U.S. at 308 (1968), *overturned by Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972) (prohibiting the use of trespass laws "to exclude those members of the

public wishing to exercise their First Amendment rights on the premises.").[3]  So too here:  If this Court were to recognize a right to bear arms on another's property, that right would likewise prevent owners from excluding unwanted firearms through the invocation of trespass laws.

The "presumption" formulation is further belied by *Bruen*'s command that Second Amendment rights be treated as trumps not subject to means-end scrutiny or balancing analysis.  The Court was clear that *Heller* and *McDonald* "expressly rejected the application of any 'judge-empowering' interest-balancing inquiry." *Bruen*, 142 S. Ct. at 2129, 2130.  Courts are thus not free to balance the purported right to carry onto private property against the owner's right to exclude firearms, so as to fashion a presumption that stops short of a trump.  Instead, considering the absolute nature of a Second Amendment right, lower courts must be extraordinarily careful to define the right's scope without displacing other

---

[3] State courts and the lower federal courts similarly treated that right as a trump—never as a mere "presumption"—during this period. *See, e.g.*, *Schwartz-Torrance Inv. Corp. v. Bakery & Confectionery Workers' Union, Loc. No. 31*, 394 P.2d 921, 922 (Cal. 1964) (prohibiting an owner from enjoining as trespass a union protest); *Sutherland v. Southcenter Shopping* Center, 478 P.2d 792, 793 (Wash Ct. App. 1970) (holding that "unconsented invasion of the property rights of owners … to solicit signatures for an initiative is protected"), *overruled by Southcenter Joint Venture v. National Democratic Policy Committee*, 780 P.2d 1282 (Wash. 1989); *Central Hardware Co. v. NLRB*, 439 F.2d 1321, 1328 (8th Cir. 1971) (holding that solicitation on company premises in violation of employer's explicit prohibition was protected), *vacated by* 407 U.S. 539 (1972).

constitutional guarantees.  Here that means rejecting the notion that the right to carry extends onto private property.

### C.    Alternative Theories As To How The Rule Implicates The Second Amendment Likewise Fail

Even accepting that there is neither a right to carry onto another's private property over their objection nor a right that identifies an owner's silence with affirmative consent, Plaintiffs may try to argue that the rule encumbers the *Bruen* right to carry because it may have the effect of reducing rates of public carry (*i.e.*, gun owners seeking to enter a mix of public and private properties in a day may personally decide to leave their guns at home).  But any such "effects" theory of the Second Amendment is untenable.

*First*, aside from the Supreme Court's passing references to potential as-applied challenges to "shall-issue" licensing regimes that in practice operate as "may-issue" regimes, *see Bruen*, 142 S. Ct. at 2138 n.9; *id*. at 2162 (Kavanaugh, J., concurring), nothing in either *Heller* or *Bruen* indicates concern for a statute's downstream effects on ownership or carry rates.  In fact, concern over a law's indirect impact on protected conduct is characteristic of the means-end analysis emphatically rejected in *Bruen*.  *See id.* at 2129.

*Second*, an effects theory would sweep whole swaths of State regulation into the Second Amendment context.  Countless laws and regulations—including those that facially have nothing to do with firearms, like basic tort or criminal liability

for injuries caused by accidental discharges—have significant if not comparatively greater disincentivizing effects.  *See supra* Section I.A.  Even a general criminal-trespass statute in combination with the old default rule (a "yes-carry" default) has a disincentivizing effect that may match the effect under the new "no-carry" default, as countless storekeepers and landowners will continue to prohibit guns by leveraging trespass liability under either default rule.

*Third*, even if effects were to somehow matter constitutionally, the relevant measurement is the reduction in carrying caused by property owners who want to permit visitors to carry guns but for some reason fail to contract around the "no-carry" default.  But the size of this effect is likely limited given the broad support for a "no carry" default.  *See* Ayres & Jonnalagadda, *supra*, at 187-189, tbl.A4 (finding that only 21.1% of New Jersey respondents said that a plumber should be allowed to bring a gun onto one's premises without express permission, only 22.8% said that a visiting friend should be allowed to bring a gun without express permission, and only 33.3% said that a customer should be allowed to bring a gun onto commercial property without express permission).

## II.    THE DISTRICT COURT'S ANALYSIS OF *BRUEN* STEP ONE COMMITS A VARIETY OF LEGAL ERRORS WARRANTING REVERSAL

Calling the scope of the right to carry a "thorny question," JA134, the district court determined that the right to carry extends, in the form of a presumption, onto private property held open to the public because the right is

purportedly implicated wherever individuals "would be ordinarily considered invitees or licensees." JA136. But neither the distinction between "open" and "closed" private property, nor the "presumption" formulation of the right, has a constitutional basis—Second Amendment or otherwise.

### A. There Is No Logical Connection Between The Concept Of Implied License And The Scope Of The Second Amendment

The district court reasoned that the private-property rule meets *Bruen* Step One because it "revoke[s] firearm carriers' implied invitation to enter" another's property (JA141) and suggested that the State and amici had "conveniently glossed over" this fact (JA137). But the rule's revocation of implied license with respect to firearms is simply another way of describing its (undisputed) legal and practical effect, not an explanation for why the rule raises a constitutional problem.

When owners "open" their property to members of the public, courts infer that the owner has extended an implied license that is circumscribed by the functions of the property. *See* Cooley, *A Treatise on the Law of Torts or the Wrongs Which Arise Independent of Contract* 303 (1879) (observing that the license to enter a commercial establishment "is limited by the purpose" of the establishment); *State v. Ingram*, 289 A.3d 509, 536 (N.J. Sup. Ct. 2023) (explaining that "'[t]he scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose'" (quoting *Florida v. Jardines*, 569 U.S. 1, 9 (2013)). For instance, a grocery store extends an implied license to

shop for food but not to sit and play cards.  But the district court never explains why an owner's grant of an implied license *to enter* an establishment justifies *the extension of a constitutional right* onto that property.  In fact, if license to enter were sufficient to generate a right to carry, then lawful entrants onto "closed" private property would also have such a right—a conclusion at odds with the district court's own holding.  The focus on the concept of implied license is therefore misplaced.

Instead, the most conceivable rendering of the district court's reasoning proceeds along the following syllogism: (1) Because *Bruen* states that there is a right to carry *in public*, and (2) *the public* consists of governmental property as well as private real property that members of the public have implied license to enter, then (3) there must be a right to carry onto private property that members of the public have implied license to enter.  Implied license and the right to carry only appear to track one another because the presence of an implied license is, in the district court's view, an appropriate proxy for private real property that forms some notion of "the public."  But this syllogism's crucial premise—that "the public" referenced in *Bruen* includes private real property held open to individuals at large—finds no justification in the district court's opinion or elsewhere.  The linking of the Second Amendment to the concept of implied license thus turns entirely on a semantic elision.

As explained in detail in Part I, nothing in *Bruen* suggests that the "public" right to carry extends onto private property.  The Second Amendment did not displace the right to exclude or except firearms from that right.  And an entrant's federal constitutional rights have never constrained another's use of their private property or the State regulation of another's property.  (The only potential exceptions—*Marsh* and *Kraemer*—are inapposite.  *See* Section I.B *supra*.)  Just as First Amendment rights end at another's property line, regardless of whether the property is open or closed to the public, so too does the public right to carry.

### B.    Defining the Second Amendment Scope Along The Concept Of "Implied License" Would Be Unworkable And Internally Contradictory

Setting aside the absence of any historical or constitutional basis for treating implied license as the cornerstone of Second Amendment doctrine, the district court's approach would be unworkable for other reasons.

*First*, the district court's assumption that there had in fact been a robust implied license to bring firearms onto private premises prior to the rule's enactment (*see* JA138-JA141) is at the least questionable.  An implied license is shaped by the expectations shared between owners and entrants as to the kinds of behaviors permitted inside a particular kind of property and is thus empirical and highly contextual.  *See* Cooley, *supra*, at 303.  But before the enactment of the private-property rule, most people in New Jersey assumed that the rule had been

law: 70.2% of those polled did not know whether "[c]ustomers are allowed to bring gun into business," and half of those who believed they knew mistakenly thought that a no-carry default had already been law. *See* Ayres & Jonnalagadda, *supra*, at tbl.A6. If implied license really were the lodestar of the Second Amendment, this widespread confusion over the scope of that license with respect to firearms on commercial premises would undercut the district court's holding.

*Second*, the world of private real property is not so easily divided into "implied-license establishments" and "closed establishments." There are many kinds of establishments that resist being mapped along this binary (*e.g.*, a factory or corporate office), as underscored by the nebulous character of the district court's list. *See* JA137 (postulating that "closed" property "typically includes … some commercial, agricultural, or industrial property and/or facilities"). The confusion only grows because an "implied license to enter" is not a fixed quality but instead varies depending on a multitude of factors, including time of day and the purpose assumed by a potential entrant. *See* Cooley, *supra*, at 306. It thus remains highly unlikely that courts—much less the citizens of New Jersey—will manage to consistently anticipate which establishments fall on the right side of this binary so as to infer where the rule operates.

And *third*, the approach lends itself to contradictory results. Consider a situation where a store owner tells an entrant to leave—perhaps because the entrant

was caught stealing, accosting another customer, or declining to wear a shirt—but the entrant refuses to leave and so the police are called. It turns out that the entrant had carried a firearm into the store. Even if it could be said that the store falls on the "implied license establishment" side of the district court's binary, that license would not extend to an entrant who violates implied conditions of entry like those regarding stealing or nudity. That license would also by definition be revoked the moment an entrant refuses an explicit directive to leave the property, regardless of the owner's reasons for issuing that directive. It is thus difficult to see how this hypothetical defendant would claim an implied license to enter (and the right to carry, to the extent it is keyed to license) as a constitutional defense to the application of the rule.

### C. The District Court's Attempt To Reconcile The Right To Exclude With The Right To Carry By Formulating The Right In Defeasible Terms Fails

The district court insisted that its decision extending the right to carry onto private commercial property maintains rather than displaces the right to exclude because it established only a "rebuttable" constitutional presumption to carry onto open property but not "a right to trespass with firearms (*i.e.*, to carry 'against an owner's wishes')." JA136. But this attempt to split the difference amounts to balancing the purported right to carry against the private owner's right to exclude: It presumes that the *Bruen* right to carry extends onto private property, but when it

conflicts with the owner's right to exclude, the right to exclude generally prevails. Again, that is not how the Second Amendment right works in light of *Bruen* and background constitutional principles.  See *supra* Section I.B.

Still, in its TRO decisions (though not in the preliminary injunction decision), the district court tried to justify constitutionalizing a presumption by reasoning that such a presumption exists in the First Amendment context. According to the court, a State "cannot pass legislation that praying before a meal is unlawful unless a restauranteur expressly consents ….  Nor could the State ban an individual from wearing a political T-shirt in an office park unless the leasing agent expressly consents."  JA507.  But this comparison is inapposite.

For one, the Supreme Court cases referenced in the court's analysis— *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), and *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018)—address governmental *prohibitions* of protected conduct arising on *public property* (*e.g.*, a ban on prayer on a public football field and a ban on wearing political insignia inside a polling place), and thus do not shed light on how a default-shifting statute recasting the meaning of a private owner's silence *vis-à-vis* prayer or political attire would figure into the First Amendment.

In any case, there are significant doctrinal differences between the First and Second Amendments that complicate the analogy.  Inherent in the Religion

Clauses and Free Speech Clause are content and viewpoint neutrality principles

barring the government from favoring certain forms of speech over others, which

makes it unlikely that *any* statute involving "prayer" or "political T-shirt[s]" would

pass constitutional muster.  *See, e.g.*, *Bremerton Sch. Dist.*, 142 S. Ct. at 2422 ("A

government policy will not qualify as neutral if it is 'specifically directed at …

religious practice.'").  But there is no comparable Second Amendment neutrality

principle.  It is not the case, for instance, that States are barred from pursuing non-

neutral purposes like reducing gun violence through, say, voluntary gun-buyback

programs.  Nor is it the case that all regulations facially related to "firearms" or

"guns," which would include all firearm licensing regimes, axiomatically meet

*Bruen* Step One and are thus presumptively unconstitutional.  Otherwise, the *Bruen*

Court could have said as much without undertaking a Step One interpretation of

"keep and bear arms."

Finally, the Supreme Court's reasons for rejecting a First Amendment

constitutional presumption in *Breard*, 341 U.S. at 622, as discussed in Section I.A

*supra*, further elucidate the problems with the district court's "presumption"

formulation of the right.  The municipality's no-solicitation default alleviated

homeowners from "churlishly guarding [their] entrances with orders forbidding the

entrance of solicitors," *id.* at 640, but still respected the constitutionally protected

status of solicitation by providing owners with the possibility of opting to allow it.

Indeed, the fact that a no-solicitation *default* preserved the homeowner's authority to admit or exclude solicitors, thereby reinforcing rather than undercutting their right to exclude, distinguished it constitutionally from a no-solicitation *ban* or a regulation that reappropriates discretionary authority over entry decisions to the State.  *Cf. Watchtower Bible & Tract Soc'y v. Village of Stratton*, 536 U.S. 150 (2002) (striking down an ordinance requiring that solicitors obtain a City official's permission to engage in door-to-door solicitations); *Martin v. City of Struthers*, 319 U.S. 141, 143-144, 147 (1943) (striking down ordinance banning handbill and circular distribution because "[it] submits the distributor to criminal punishment for annoying the person on whom he calls, even though the recipient of the literature distributed is in fact glad to receive it" and thus no longer "leav[es] to each householder the full right to decide whether he will receive strangers as visitors").  New Jersey's private-property rule reflects an identical constitutional structure: it alleviates the need for a home or store owner to closely monitor the influx of firearms—so as to ensure that carrying entrants have not ignored or overlooked a notice posted at an entrance—while preserving the owner's ultimate choice over the presence of firearms on their premises.

## CONCLUSION

Enduring principles of property law establish that New Jersey's private-property rule is constitutional.  The Court should find the private-property rule

- 27 -

constitutional in full, and therefore affirm in part and reverse in part the district

court's holding with respect to that rule.

                              Respectfully submitted.


                              /s/ Alan Schoenfeld
SIMON B. KRESS               ALAN SCHOENFELD
WILMER CUTLER PICKERING      JUAN M. RUIZ TORO
   HALE AND DORR LLP         JOSHUA M. FEINZIG*
60 State Street             WILMER CUTLER PICKERING
Boston, MA  02109              7 World Trade Center
(617) 526-6711              250 Greenwich Street
                            New York, NY  10007
                            (212) 937-7294

                            * Admitted to practice only in Washington, D.C.
                            Supervised by members of the firm who are
                            members of the New York bar.


July 27, 2023

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that I am counsel of record and a member in good standing

of the Bar of the United States Court of Appeals for the Third Circuit.


/s/ Alan Schoenfeld
ALAN SCHOENFELD

July 27, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1.    Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 6,483 words.

2.    The brief has been prepared in proportionally spaced typeface using Microsoft Word 2016 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

3.    The text of the electronic brief is identical to the text of the paper copies mailed to the Court.  The electronic file of this brief was scanned with antivirus software and no virus was detected.

/s/ Alan Schoenfeld
ALAN SCHOENFELD

July 27, 2023

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 27th day of July, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Alan Schoenfeld
ALAN SCHOENFELD