Nos. 23-1900 & 23-2043

———————

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

RONALD KOONS ET AL.,
PLAINTIFFS-APPELLEES,

v.

MATTHEW J. PLATKIN ET AL.,
DEFENDANTS-APPELLANTS
AND

NICHOLAS P. SCUTARI ET AL.,
INTERVENORS-DEFENDANTS-APPELLANTS

———————

AARON SIEGEL ET AL.,
PLAINTIFFS-APPELLEES/CROSS-APPELLANTS,

v.

MATTHEW J. PLATKIN ET AL.,
DEFENDANTS-APPELLANTS/CROSS-APPELLEES
AND

NICHOLAS P. SCUTARI ET AL.,
INTERVENORS-DEFENDANTS-APPELLANTS.

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(Nos. 22-cv-7463, 22-cv-7464 (RMB))

———————

**BRIEF FOR THE DISTRICT OF COLUMBIA, THE STATES OF ILLINOIS, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, HAWAII, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEW YORK, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, WASHINGTON, AND THE NORTHERN MARIANA ISLANDS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS/CROSS-APPELLEES AND REVERSAL IN PART**

———————

i

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

JEREMY R. GIRTON
Assistant Attorney General

ALEXANDRA LICHTENSTEIN
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General for the
District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-2029
jeremy.girton@dc.gov

KWAME RAOUL
Attorney General for the State of Illinois

JANE ELINOR NOTZ
Solicitor General

SARAH A. HUNGER
Deputy Solicitor General

Office of the Attorney General for the
State of Illinois
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-5202
sarah.hunger@ilag.gov

*(Additional counsel on signature page)*

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ...............................................................1

SUMMARY OF ARGUMENT ................................................................2

ARGUMENT ..........................................................................................6

     I.    The Second Amendment Allows States To Implement Reasonable Firearm Regulations To Promote Gun Safety And Protect Against Gun Violence. ..........................................6

     II.   Consistent With Regulations Adopted By Other States, New Jersey's Designation Of "Sensitive Places" Protects Uniquely Vulnerable Locations And Populations. ...................10

     III.  New Jersey's Private-Property Provision Reflects A Reasoned Policy Decision About How Best To Protect The Rights Of Property Owners. ..............................................17

     IV.  New Jersey's Permitting Regulations Help Prevent Dangerous Individuals From Publicly Carrying Firearms. ......24

CONCLUSION ......................................................................................28

# TABLE OF AUTHORITIES

## *Cases*

*Blum v. Yaretsky*,
457 U.S. 991 (1982) ........................................................... 18

*DiGiacinto v. Rector & Visitors of George Mason Univ.*,
704 S.E.2d 365 (Va. 2011) ................................................ 13

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ................................... 1, 5, 6, 7, 8, 9, 14, 23, 24

*GeorgiaCarry.Org, Inc. v. Georgia*,
687 F.3d 1244 (11th Cir. 2012) ......................................... 17

*Kolbe v. Hogan*,
849 F.3d 114 (4th Cir. 2017) .......................................... 9, 14

*Koons v. Platkin*,
2023 WL 3478604 (D.N.J. May 16, 2023) ............................ 4

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ................................................... 1, 6, 7, 8

*Medtronic Inc. v. Lohr*,
518 U.S. 470 (1996) ............................................................ 6

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
142 S. Ct. 2111 (2022) ......................... 1, 5, 6, 7, 8, 9, 10, 14, 24

*Nordyke v. King*,
563 F.3d 439 (9th Cir. 2009) ............................................ 14

*United States v. Class*,
930 F.3d 460 (D.C. Cir. 2019) ....................................... 9, 14

*United States v. Morrison*,
529 U.S. 598 (2000) ........................................................... 6

*Voisine v. United States*,
579 U.S. 686 (2016) ......................................................... 10

*Statutes and Regulations*

Vt. Stat. Ann., tit. 13, § 4023 ................................................................. 16

430 Ill. Comp. Stat. 66/65 ......................................................... 16, 21, 23

Ala. Code § 13A-11-61.2 ........................................................................ 15

Ala. Code § 13A-11-72 ........................................................................... 25

Alaska Stat. § 11.61.220 ......................................................................... 21

Ark. Code Ann. § 5-73-306 ..................................................................... 21

Conn. Gen. Stat. Ann. § 29-28 ................................................................ 25

Conn. Gen. Stat. § 53-202d ..................................................................... 20

D.C. Code § 7-2502.03 ........................................................................... 27

D.C. Code § 7-2509.07 ........................................................................... 21

Del. Code Ann. tit. 11, § 1441 .......................................................... 25, 26

Fla. Stat. § 790.06 .................................................................................. 16

Fla. Stat. § 790.23 .................................................................................. 26

Ga. Code Ann. § 16-11-127 .................................................................... 16

Ga. Code Ann. § 16-11-129 .................................................................... 25

Ind. Code Ann. § 35-47-2-3 .................................................................... 25

80 Ind. Admin. Code 11-2-2 .................................................................... 15

Kan. Stat. Ann. § 75-7c10 ....................................................................... 23

Kan. Stat. Ann. § 75-7c24 ....................................................................... 23

Ky. Rev. Stat. § 237.110 ......................................................................... 16

La. Rev. Stat. Ann. § 40:1379.3 .................................................................... 21

Me. Stat. tit. 17-A, § 402 ............................................................................. 22

Minn. Stat. § 609.66, subd. 1d ...................................................................... 16

Mont. Code Ann. § 87-5-401 ......................................................................... 16

N.C. Gen Stat. § 14-277.2 ............................................................................. 15

N.D. Cent. Code § 20.1-11-13 ...................................................................... 16

N.J. Stat. Ann. § 2C:58-3 ............................................................................... 5

N.J. Stat. Ann. § 2C:58-4.6 ......................................................................... 3, 4

Neb. Rev. Stat. § 28-1206 ............................................................................. 26

Neb. Rev. Stat. § 69-2441 ........................................................................ 15, 21

R.I. Gen. Laws § 11-47-11 ............................................................................ 25

S.C. Code Ann. § 23-31-225 .......................................................................... 21

Tex. Penal Code § 30.05 ............................................................................... 22

Tex. Penal Code § 30.06 ............................................................................... 22

Tex. Penal Code § 30.07 ............................................................................... 22

Tex. Penal Code § 46.03 ............................................................................... 15

Va. Code Ann. § 18.2-308.01 ........................................................................ 22

Vt. Stat. Ann. tit. 10, § 5201 ........................................................................ 22

Wash. Rev. Code Ann. § 9.41.300 ................................................................. 15

*Other*

Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for*
  *"No Carry" Defaults on Private Land*,
  48 J.L. Med. & Ethics 183 (Winter 2020) .................................................. 18, 19

Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere:*
  *A New Account of Public Safety Regulation Under* Heller,
  116 NW. U. L. Rev. 139 (2021) ......................................................................... 12

Brad J. Bushman, *Guns Automatically Prime Aggressive Thoughts,*
  *Regardless of Whether a "Good Guy" or "Bad Guy" Holds the Gun*,
  9 Soc. Psych. & Personality Sci. 727 (2018) ................................................... 11

Bureau of Alcohol, Tobacco, Firearms and Explosives, *Facilitating Private*
  *Sales: A Federal Firearms Licensee Guide* (2016) .......................................... 24

Tyler Fedor et al., *9 People Wounded in South Carolina Mall Shooting,*
  *Police Say*, N.Y. Times (Apr. 16, 2022) ........................................................... 12

Giffords Law Center, *Universal Background Checks* ........................................... 26

Carina Bentata Gryting & Mark Frassetto, NYRSPA v. Bruen *and the*
  *Future of the Sensitive Places Doctrine:*
  *Rejecting the Ahistorical Government Security Approach*,
  63 B.C. L. Rev. E. Supp. I.-60 (2022) ............................................................... 11

David Hemenway et al., *Gun Use in the United States: Results from Two*
  *National Surveys*, 6 Inj. Prevention 263 (2000) ............................................... 11

David B. Kopel & Joseph G.S. Greenlee, *The Sensitive Places Doctrine*
  *Locational Limits on The Right To Bear Arms*,
  13 Charleston L. Rev. 205 (2018) ...................................................................... 10

Carlie Porterfield, *10 Injured in Stampede at New York's Barclays Center*
  *Amid Shooting Scare, Police Say*, Forbes (May 29, 2022) .............................. 12

Heather A. Turner et al., *Gun Violence Exposure and Posttraumatic*
  *Symptoms Among Children and Youth*,
  32 J. Traumatic Stress 881 (2019) ..................................................................... 13

Daniel W. Webster et al., *Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States*, 19 Crim. & Pub. Pol'y 171 (2020) .................................................................. 25

## INTEREST OF AMICI CURIAE

Amici the District of Columbia, the States of Illinois, California, Colorado, Connecticut, Delaware, Hawaii, Maryland, Massachusetts, Michigan, Minnesota, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and the Northern Mariana Islands (collectively, "Amici States") submit this brief in support of defendants-appellants/cross-appellees pursuant to Federal Rule of Appellate Procedure 29(a)(2).

As independent sovereigns, Amici States have a responsibility to protect the health, safety, and welfare of their communities, which includes protecting their residents from the harmful effects of gun violence and promoting the safe and responsible use of firearms. Amici States have historically fulfilled this responsibility by exercising their police powers to implement reasonable measures to regulate firearms, including by imposing location-based restrictions on carrying guns and commonplace licensing and permitting regimes. Such regulation does not conflict with the Second Amendment. As the Supreme Court has consistently recognized, the Second Amendment does not encompass the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," leaving states with the flexibility they need to protect their communities. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008)).

Indeed, the Second Amendment permits states to enact a variety of regulations to combat the misuse of firearms, adopting "solutions to social problems that suit local needs and values." *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010). This flexibility is an essential element of our federalist system, and it ensures that firearm regulations appropriately and effectively address the specific concerns in each locality. Although Amici States have taken different approaches to regulating firearms, they share an interest in addressing gun violence in ways that are tailored to the needs of their residents. Amici States seek to maintain their authority to address firearm-related issues through legislation that is consistent with historical tradition and responsive to the unique circumstances in their communities.

## SUMMARY OF ARGUMENT

In 2022, following the Supreme Court's opinion in *Bruen*, New Jersey enacted comprehensive legislation reforming its public carry regime. As part of that legislative enactment, which is found in Chapter 131 of the 2022 Laws of New Jersey ("Chapter 131"), New Jersey modified its permitting requirements, identified a list of "sensitive places" in which firearms are prohibited, and set a default rule that restricts carrying on private property without the owner's consent.

Shortly after Chapter 131 was passed, plaintiffs filed suit challenging these and other of Chapter 131's provisions and sought preliminary injunctive relief. The district court granted plaintiffs' motions in part and entered a preliminary injunction

enjoining defendants from enforcing many of Chapter 131's provisions, including its restrictions on public carrying in sensitive places, the default rule for carrying on private property as applied to property that is open to the public, and the in-person interview requirement as part of the permit application process.  Doc. 125 at 2. Defendants appealed from that order, and one group of plaintiffs has cross-appealed.

The challenged provisions fit squarely within a long tradition of constitutionally acceptable regulations designed to meet states' responsibility to protect their residents and should not be preliminarily enjoined.  Chapter 131 designates as sensitive places public gatherings, demonstrations, and other events that require a government permit; zoos; parks, beaches, and recreational facilities; youth sports events; public libraries and museums; bars and restaurants that serve alcohol; entertainment facilities; casinos; airports and public transportation hubs; health care facilities, including medical offices and ambulatory care facilities; and public film sets. N.J. Stat. Ann. § 2C:58-4.6(a).  This list of sensitive places accords with the types of locations that other states have designated as sensitive—a designation that limits firearm possession in especially dangerous spaces, around vulnerable populations, and where individuals are exercising other constitutionally protected rights.   As in other States, New Jersey's sensitive place designations protect the public from the heightened risk of gun violence in such locations.

Chapter 131 also prohibits the carrying of concealed handguns on "private property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit." N.J. Stat. Ann. § 2C:58-4.6(a)(24).[1]   This provision does not burden anyone's Second Amendment rights.  Instead, it *protects* property owners' rights by allowing them to make an informed decision about whether and how firearms are brought on their property, and it does so merely by setting an easily altered presumption.  This approach of empowering private property owners to make reasoned decisions about allowing firearms on their property also accords with laws adopted by other states.  Although state measures vary in form, they collectively demonstrate that setting presumptions for the carrying of firearms onto private property is well within the state's traditional regulatory role.

Finally, Chapter 131 includes two sets of provisions that work together to ensure that dangerous persons do not wield firearms in public. The first set of provisions lists statutory disqualifiers.  These provisions bar an applicant from

---

[1]  Though the provision applies to private property whether it is open or closed to the public, the district court's injunction applies only to private property that is open to the public. *Koons v. Platkin*, No. 22-7464, 2023 WL 3478604, at *56 (D.N.J. May 16, 2023).

obtaining a firearms permit if he or she "is likely to engage in conduct, other than justified self-defense, that would pose a danger to self or others" or if issuance of the permit "would not be in the interest of the public health, safety, or welfare because the [applicant] is found to be lacking the essential character of temperament necessary to be entrusted with a firearm." N.J. Stat. Ann. § 2C:58-3(c). The second set of provisions lists application requirements. Among these are requirements that (1) "four reputable persons" endorse the applicant by certifying that "the applicant has not engaged in any acts or made any statements that suggest the applicant is likely to engage in conduct, other than lawful self-defense, that would pose a danger to the applicant or others," *id.* § 2C:58-4(b); (2) the licensing authority conduct an interview with the applicant and the endorsers to inquire "whether the applicant is likely to engage in conduct that would result in harm to the applicant or others," *id.* § 2C:58-4(c); and (3) the applicant provide any additional information that the licensing authority "deems reasonably necessary to conduct review of the application," *id.* These measures, like requirements in place throughout the country, are vital to protecting public safety because they allow states to ensure that those who are likely to misuse firearms to cause harm do not have access to such weapons.

# ARGUMENT

**I.   The Second Amendment Allows States To Implement Reasonable Firearm Regulations To Promote Gun Safety And Protect Against Gun Violence.**

Since the Founding, states have enacted restrictions on who may bear arms, where arms may be brought, and the manner in which arms may be carried. *See Bruen*, 142 S. Ct. at 2145; *Heller*, 554 U.S. at 626-27. Chapter 131 is one in a long line of state regulations designed to make gun possession and use safer for the public, and it is a lawful exercise of New Jersey's regulatory powers.

States have "great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Medtronic Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (internal quotation marks omitted). Enacting measures to promote public safety—particularly those that are tailored to local circumstances—falls squarely within the reasonable exercise of states' police powers. Indeed, there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000).

The Supreme Court has repeatedly affirmed the states' authority in this area, even as it has defined the scope and import of the rights conferred by the Second Amendment. In each of its major Second Amendment opinions—*Heller*, 554 U.S.

570, *McDonald*, 561 U.S. 742, and *Bruen*, 142 S. Ct. 2111—the Court expressly acknowledged the important role states play in setting their own local policies to minimize the risk of gun violence, a role consistent with our Nation's historical tradition.

In *Heller*, the Supreme Court made clear that the Second Amendment right to keep and bear arms is "not unlimited." 554 U.S. at 626. Although states may not ban the possession of handguns by responsible, law-abiding individuals or impose similarly severe burdens on the Second Amendment right, they still possess "a variety of tools" to combat the problem of gun violence in a way that is responsive to the needs of their communities. *Id.* at 636. States may, for example, implement measures prohibiting certain groups of people from possessing firearms, and they may "forbid[] the carrying of firearms in sensitive places such as schools and government buildings." *Id.* at 626-27.

The Court reiterated this point in *McDonald*, emphasizing that the Second Amendment "by no means eliminates" the states' "ability to devise solutions to social problems that suit local needs and values." 561 U.S. at 785; *see id.* at 802 (Scalia, J., concurring) ("No fundamental right—not even the First Amendment—is absolute."). Recognizing that "conditions and problems differ from locality to locality," the Court made clear that "state and local experimentation with reasonable

firearms regulations" could and should continue "under the Second Amendment." *Id*. at 785 (brackets and internal quotation marks omitted).

The Supreme Court reaffirmed these principles in *Bruen*. The Court explicitly stated that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of provisions "designed to ensure only that those bearing arms . . . are, in fact, 'law-abiding, responsible citizens.'" 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). And, building on *Heller*, the Court "assume[d] it settled" that prohibiting firearms in certain sensitive locations (including "schools and government buildings," "legislative assemblies, polling places, and courthouses"), as well as analogous "new" sensitive locations, is constitutional. *Id*. at 2133. Indeed, the Court emphasized, the Second Amendment should not be understood to protect the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. at 2128 (quoting *Heller*, 554 U.S. at 626-27).

These decisions make clear that states retain the power to enact laws to protect their residents and that those laws need not be uniform: states are free to select "solutions to social problems that suit local needs and values," ensuring that firearm regulations appropriately and effectively address the specific circumstances in each state. *McDonald*, 561 U.S. at 785. As the Court stressed in *Bruen*, the Second Amendment is not a "regulatory straightjacket." 142 S. Ct. at 2133. On the contrary,

states are permitted to enact a wide range of firearm regulations.  S*ee id.* at 2162 (Kavanaugh, J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." (quoting *Heller*, 554 U.S. at 636)).  Nor must these state laws be frozen in time.  In *Bruen*, for example, the Supreme Court instructed courts to "use analogies" to long-recognized sensitive places—such as schools and government buildings—to "determine [whether] modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible."  142 S. Ct. at 2133-34; *see Heller*, 554 U.S. at 627 n.26 (noting that a list of "presumptively lawful regulatory measures," including restrictions on firearms in schools and government buildings, contains only "examples" and is not "exhaustive").

In short, although the Supreme Court has defined the outer bounds of permissible regulations, it did not "abrogate" the states' "core responsibility" of "[p]roviding for the safety of citizens within their borders."  *Kolbe v. Hogan*, 849 F.3d 114, 150 (4th Cir. 2017) (en banc) (Wilkinson, J., concurring) (quoting *Heller*, 554 U.S. at 635), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.  States retain not only the freedom, but also the fundamental responsibility, to implement reasonable measures designed to respond to the needs of their communities and to protect their residents from the harms associated with gun violence.

**II.    Consistent With Regulations Adopted By Other States, New Jersey's Designation Of "Sensitive Places" Protects Uniquely Vulnerable Locations And Populations.**

As the Supreme Court has consistently recognized, the Second Amendment allows states to regulate firearms in "sensitive places." *Heller*, 554 U.S. at 626; *see Bruen* 142 S. Ct. at 2132 (reaffirming that in sensitive places, "arms carrying [can] be prohibited consistent with the Second Amendment").   Because people "can preserve an undiminished right of self-defense by not entering [such] places" or by "taking an alternate route," *United States v. Class*, 930 F.3d 460, 465-66 (D.C. Cir. 2019) (internal quotation marks omitted), laws restricting firearms in places identified as sensitive "neither prohibit nor broadly frustrate any individual from generally exercising his right to bear arms," *Voisine v. United States*, 579 U.S. 686, 714 (2016) (Thomas, J., dissenting).   "[S]ensitive places" thus are "in effect exempt" "from the Second Amendment." *Bruen*, 142 S. Ct. at 2133-34 (emphasis omitted); *see* David B. Kopel & Joseph G.S. Greenlee, *The Sensitive Places Doctrine: Locational Limits on The Right To Bear Arms*, 13 Charleston L. Rev. 205, 215 (2018) ("[T]he sensitive places doctrine is an exception to the general right to bear arms.").

New Jersey's designation of various locations—including entertainment facilities, parks, libraries, establishments where alcohol is consumed, and medical offices—as sensitive places is a reasonable and appropriate response to the

10

heightened risk associated with the presence of firearms in such locations.  Without the power to institute such restrictions, New Jersey and other states would be left unable to effectively prevent gun violence in particularly dangerous places, around vulnerable populations, or where individuals are exercising other constitutionally protected rights, putting the public at risk.

*First*, states frequently restrict the use of firearms in places where volatile conditions create special risks to health and safety.  For example, states have designated places as sensitive, and limited the carrying of firearms in them, to preserve order in crowded locations, improve the safety of travelers, and diminish the risk of panic in confined spaces.  *See* Carina Bentata Gryting & Mark Frassetto, NYRSPA v. Bruen *and the Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government Security Approach*, 63 B.C. L. Rev. E. Supp. I.-60, I.-68 (2022) (explaining that "[t]he number of potential targets" and "the increased risk of conflict all seem to be relevant in the historical determination that an area constitutes a sensitive place").  Physical jostling and emotional frustration are both routine and inevitable in spaces like transportation hubs, sports arenas, theaters, and event spaces, and they can erupt into violence.  The presence of firearms would only make these situations more dangerous.  Indeed, given the "weapons effect," wherein the presence of a weapon primes individuals to think and act more aggressively, allowing firearms in these spaces would make violence all the more likely.  *See* Brad

J. Bushman, *Guns Automatically Prime Aggressive Thoughts, Regardless of Whether a "Good Guy" or "Bad Guy" Holds the Gun*, 9 Soc. Psych. & Personality Sci. 727, 730-31 (2018).[2]

Similarly, in public places where individuals consume alcohol, which impairs both judgment and dexterity, the risk of either accidental or intentional use of firearms increases. *See* David Hemenway et al., *Gun Use in the United States: Results from Two National Surveys*, 6 Inj. Prevention 263, 266 (2000) ("Regular citizens with guns, who are sometimes tired, angry, drunk or afraid, and who are not trained in dispute resolution or when it is proper to use a firearm, have many opportunities for inappropriate gun use.").[3] And in dense, confined spaces, firearm use is likely to end in tragedy—not only for the innocent bystanders who may be shot, but also for others who may be crushed or trampled by a panicked crowd. *See, e.g.*, Carlie Porterfield, *10 Injured in Stampede at New York's Barclays Center Amid Shooting Scare, Police Say*, Forbes (May 29, 2022)[4]; Tyler Fedor et al., *9 People Wounded in South Carolina Mall Shooting, Police Say*, N.Y. Times (Apr. 16, 2022)

---

[2] *Available at* https://tinyurl.com/5ypudyhd.

[3] *Available at* https://tinyurl.com/3vnx7uc7.

[4] *Available at* https://tinyurl.com/2xeuc7fj.

(noting that nine people were shot and five others were injured in the stampede that ensued during the gunfire).[5]

Allowing firearms to be carried in certain locations can also jeopardize the effective operation of the locations. The discharge of a firearm in an airport or a casino, for example, could shut down those facilities at a significant cost to individuals and businesses. And even the perceived risk of gun violence could cause social and economic repercussions, as individuals may be discouraged from visiting crowded or confined locations in which they know others may be armed. *See* Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under* Heller, 116 NW. U. L. Rev. 139, 141 (2021) ("Gun laws protect people's freedom and confidence to participate in every domain of our shared life, from attending school to shopping, going to concerts, gathering for prayer, voting, assembling in peaceable debate, counting electoral votes, and participating in the inauguration of a President.").

*Second*, designating zoos, libraries, parks, youth sporting events, medical offices, and similar locations as sensitive places helps protect particularly vulnerable populations, like children and those suffering from illness. Such individuals cannot easily defend themselves or escape a violent attack, should one occur. And even if

---

[5] *Available at* https://tinyurl.com/5n8y2w62.

they are not physically harmed by firearms, exposure to such violence can cause psychological harm.  *See* Heather A. Turner et al., *Gun Violence Exposure and Posttraumatic Symptoms Among Children and Youth*, 32 J. Traumatic Stress 881, 888 (2019) (finding that indirect exposure to gun violence, including witnessing violence or hearing gunshots, can be traumatic to children).[6]  Indeed, both federal and state courts have recognized that the regular presence of children and other vulnerable people in a particular location is a strong indication that it is properly deemed sensitive for Second Amendment purposes.  *See, e.g., DiGiacinto v. Rector & Visitors of George Mason Univ.*, 704 S.E.2d 365, 370 (Va. 2011) (holding that "GMU is a 'sensitive place'" because it "is a school" with many students "under the age of 18," including "elementary and high school students" in the summer); *Nordyke v. King*, 563 F.3d 439, 459 (9th Cir. 2009), *vacated*, 611 F.3d 1015 (9th Cir. 2010) ("The [Supreme] Court listed schools and government buildings as examples[ of sensitive places], presumably because possessing firearms in such places risks harm to great numbers of defenseless people (e.g., children).").

*Third*, states frequently designate sensitive places to protect the exercise of other constitutional rights.  The Supreme Court has recognized that areas in which constitutionally protected activities occur, such as courthouses, polling places, and

---

[6] *Available at* https://tinyurl.com/ymn9jzf6.

legislative assemblies, are quintessential examples of sensitive places. *See Bruen*, 142 S. Ct. at 2133; *Heller*, 554 U.S. at 626-27. Firearms may be prohibited in these locations because of the risk that violence could threaten key government functions. The D.C. Circuit, for example, held that a parking lot near the Capitol could be designated a sensitive place because it enabled staffers to safely travel to and from their work operating the national legislature. *Class*, 930 F.3d at 464. The same reasoning applies to areas in which individuals engage in other constitutionally protected activities, such as speech, worship, and political engagement. Not only are these locations often targets of violence, but the mere presence of firearms (and the implicit threat they communicate) could chill individuals' peaceful exercise of their rights. *See* Blocher & Siegel, *When Guns Threaten The Public Sphere*, *supra*, at 141.

Given the importance of sensitive-place designations in protecting public safety, states have long exercised their authority to restrict firearms in sensitive locations. For instance, many states limit the concealed carry of firearms or ban them altogether at event sites and other crowded locations. *See* Ala. Code § 13A-11-61.2(a) (school and professional athletic events); 80 Ind. Admin. Code 11-2-2(b) (fairgrounds); N.C. Gen Stat. § 14-277.2(a) (parade routes); Tex. Penal Code § 46.03(a) (racetracks and amusement parks). States also frequently prohibit firearms at the sites of protests or demonstrations, *see* Wash. Rev. Code Ann.

§ 9.41.300(2), and in other locations where individuals are exercising their constitutional rights, *see* Neb. Rev. Stat. § 69-2441(1)(a) (places of worship and political rallies).

The fact that the list of locations designated as sensitive may vary from state to state reflects both the need to tailor such designations to the specific characteristics of each community and a shared concern with minimizing the risk of gun violence. *See* FBI, *Uniform Crime Reporting Statistics: Their Proper Use* (May 2017) (noting that a wide variety of factors "affect the volume and type of crime occurring from place to place," including population density, the size of the youth population, poverty level, job availability, modes of transportation, climate, and cultural characteristics).[7]  For example, Montana and North Dakota prohibit firearms in wildlife preserves.  Mont. Code Ann. § 87-5-401(1) (game preserves); N.D. Cent. Code § 20.1-11-13(3) (game refuges and game management areas).  Other states prohibit firearms in bars, *see* Fla. Stat. § 790.06(12)(a)(12), Ky. Rev. Stat. § 237.110(16); at schools and on playgrounds, *see* Minn. Stat. § 609.66, subd. 1d (schools), 430 Ill. Comp. Stat. 66/65(a)(12) (public playgrounds); and in healthcare facilities, *see* Ga. Code Ann. § 16-11-127(b) (state mental health facilities), Vt. Stat. Ann., tit. 13, § 4023 (public and private hospitals).  While these measures vary based

---

[7] *Available at* https://tinyurl.com/2s3k6dxh.

on local conditions and needs, they collectively demonstrate that New Jersey's law is precisely the kind of regulation that states have traditionally adopted to address the particular concerns associated with carrying firearms in sensitive places.

### III.  New Jersey's Private-Property Provision Reflects A Reasoned Policy Decision About How Best To Protect The Rights Of Property Owners.

Chapter 131's private-property provision, which prohibits carrying arms on private property without the property owner's express permission, is also constitutionally valid.  In adopting a default rule that firearms are not allowed on private property without express permission, New Jersey has chosen an approach that is tailored to the needs and characteristics of its community.  This rule is in line with the preference of most of the state's residents, and it reflects the interest of landowners in protecting public safety and preventing gun violence on their property.  It also fits comfortably within the longstanding practice of states across the country, which have set similar presumptions for carrying firearms on private property.

The Second Amendment does not confer a right to carry firearms on another person's private property without their consent.  *See GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012) (noting that the Second Amendment "does not include protection for a right to carry a firearm [on private property] against the owner's wishes"), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. Rather, when the Amendment was adopted, it incorporated longstanding principles

of "property law, tort law, and criminal law" that recognized a private property owner's right to determine who may enter and whether they may be armed. *Id.* In light of these underlying principles, the Second Amendment was never understood to extend to private property on which the owner wished to exclude firearms. New Jersey's private-property provision, which affirms property owners' decisions about whether to allow public carrying on their property, thus does not interfere with any Second Amendment rights.

Instead, New Jersey's law merely regulates how property owners communicate their consent and clarifies the inference that can be drawn from a property owner's silence, setting a constitutionally permissible default rule. *See id.* at 1264 ("Quite simply, there is no constitutional infirmity when a private property owner exercises his, her, or its . . . right to control who may enter, and whether that invited guest can be armed, and the State vindicates that right."). This approach protects property owners' authority to make their own decisions about whether to allow firearms on their grounds and ensures they have the information they need to make an informed choice. It neither predetermines whether firearms will be barred on private property nor impairs the right to carry a firearm for self-defense. Accordingly, the private-property provision falls outside the ambit of the Second Amendment. *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) ("[C]onstitutional

standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains.").

New Jersey's default rule also reflects the public preferences of the state's residents. In a national survey, a majority of respondents expressed support for a "no carry" default rule for residences, places of employment, and retail establishments. *See* Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183, 186 (Winter 2020).[8] This preference was even more pronounced in New Jersey—only 33% of respondents thought that customers should be allowed to carry firearms into retail stores by default, and only 21% thought that service providers should be allowed to carry firearms into homes by default. *Id*. at tbl.A4. Given these preferences, the private-property provision is an efficient policy choice, minimizing transaction costs by eliminating the need for most property owners to contract around the default (while leaving others free to allow firearms if they wish). *Id*. at 183.

Indeed, many property owners have good reason to prefer the default set by New Jersey. Numerous privately owned locations have characteristics that make the presence of firearms more dangerous, similar to traditional "sensitive places," and

---

[8] *Available at* https://tinyurl.com/bde2ab76.

property owners may share the concerns that motivate the state to restrict firearms in such locations.  For instance, many places covered by the private-property provision, such as shopping malls and grocery stores, are crowded and confined spaces in which the presence of firearms poses a particular risk to public health and safety.  In addition, a variety of places, including stores and fast-food restaurants, are frequented by vulnerable populations like children, whom property owners may want to protect.  And some private spaces may also be the site of constitutionally protected activity, which a property owner might fear will be disrupted by the presence of firearms.  For example, political meetings and conventions often take place in private offices or business conference centers.  Given these concerns, a property owner could reasonably determine that allowing firearms would be too dangerous or otherwise undesirable.  *See supra* Section II.

Setting a default rule allows property owners to make their own decisions about whether to prohibit firearms while fostering clarity for members of the public. The private-property provision therefore empowers individual property owners to make informed, context-specific determinations about the risks and benefits of allowing firearms on their property.  It is a sensible and efficient default rule—not a mandate or absolute bar—that leaves firearms owners and property owners alike with myriad options for exercising their rights.

Other state legislatures have also made the policy choice to set a default rule for the carrying of firearms on private property. While the default rules in different locations vary based on local needs and conditions, New Jersey's choice fits squarely within the longstanding tradition of states regulating how and when private property owners exercise their right to exclude firearms.

Several States have enacted laws that, like New Jersey's, provide that individuals may not carry a firearm onto another person's property without that person's express permission. For example, Connecticut provides that assault weapons may only be carried "on property owned by another person with the owner's express permission." Conn. Gen. Stat. § 53-202d(f)(1). And Alaska and Louisiana, among others, provide that a person may not carry a concealed weapon into the residence of another person without their express consent. Alaska Stat. § 11.61.220(a)(1)(B); La. Rev. Stat. Ann. § 40:1379.3(O) ("No individual to whom a concealed handgun permit is issued may carry such concealed handgun into the private residence of another without first receiving the consent of that person."); *see also* D.C. Code § 7-2509.07(b)(1) (providing that the carrying of a concealed pistol "on private residential property shall be presumed to be prohibited unless otherwise authorized by the property owner . . . and communicated personally to the licensee in advance of entry onto the residential property"); S.C. Code Ann. § 23-31-225 ("No person . . . may carry a concealable weapon into the residence or dwelling place

of another person without the express permission of the owner or person in legal control or possession, as appropriate.").

Other states have flipped the presumption. Arkansas, for instance, sets a default that firearms are allowed in others' homes without express consent, but it requires that anyone who carries a concealed handgun into such a dwelling also notify the occupant. Ark. Code Ann. § 5-73-306(18). And Nebraska allows a permitholder to carry a concealed handgun "anywhere in Nebraska," excepting private property on which "the person, persons, entity, or entities in control of the property or employer in control of the property has prohibited permitholders from carrying concealed handguns." Neb. Rev. Stat. § 69-2441; *see also* 430 Ill. Comp. Stat. 66/65(a-10) (explaining that the owner of private real property may prohibit the carrying of concealed firearms on the property); Tex. Penal Code §§ 30.05(c), 30.06, 30.07 (criminalizing the open or concealed carry of a handgun on the property of another if the licensee does not have the owner's consent and has received notice that carry is forbidden); Va. Code Ann. § 18.2-308.01(c) (noting that a concealed handgun permit does not authorize possession of a handgun "in places where such possession . . . is prohibited by the owner of private property").

Similarly, States have created default rules for firearm-related activities on private property. For example, 25 states require that hunters obtain permission before entering private property. Ayres and Jonnalagadda, *Guests with Guns* 184.

And again, other states have chosen the inverse default. Vermont, for example, requires that a property owner who wishes to ban hunting post signs around their property line. Vt. Stat. Ann. tit. 10, § 5201; *see also* Me. Stat. tit. 17-A, § 402 (requiring that a property owner who wants to exclude individuals indicate that access is prohibited, either in general or for a specific activity like hunting).

In addition to setting default rules for carrying firearms on private property, several states have adopted detailed requirements regulating the way in which a private property owner should communicate whether she allows firearms on her property. Texas, for example, requires that a notice prohibiting the carry of firearms use certain language, be posted conspicuously in both English and Spanish, and use print in contrasting colors with block letters at least one inch in height. Tex. Penal Code §§ 30.05(c), 30.06, 30.07. Kansas similarly regulates "the location, content, size and other characteristics" of signs barring firearms on private property, Kan. Stat. Ann. §§ 75-7c24, 75-7c10, as does Illinois, 430 Ill. Comp. Stat. 66/65(d) (requiring that signs prohibiting firearms be conspicuously posted at building's entrance, meet design requirements established by state police, and be four by six inches in size).

In short, New Jersey's private-property provision reflects the legislature's reasoned policy determination about how best to set the default rule for carrying firearms on private property and how property owners should communicate their

decision about whether to exclude such weapons. Although this provision is not identical to provisions adopted by other states, it is similarly informed by and tailored to local conditions and the needs of residents. The law therefore fits comfortably within both the longstanding practice of other states and the bounds of the Second Amendment.

## IV. New Jersey's Permitting Regulations Help Prevent Dangerous Individuals From Publicly Carrying Firearms.

Finally, the challenged statutory disqualifiers and permitting application requirements are compatible with the Second Amendment because its protections have always been limited to those individuals considered able to responsibly handle firearms. *See Heller*, 554 U.S. at 626-27. As the Supreme Court has consistently recognized, the Second Amendment codifies only "'the right of law-abiding, responsible citizens to use arms' for self-defense." *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635). Licensing and permitting requirements offer a straightforward and effective means of screening out individuals who lack the character, temperament, or judgment necessary to be entrusted with a potentially deadly weapon. Like many other states, New Jersey imposes statutory disqualifiers on dangerous individuals and has established an application process designed to screen out unfit individuals by requiring that an applicant sit for an in-person interview, provide references to validate their character, and supply any other information necessary for the licensing authority to complete its investigation.

Collecting information about applicants and corroborating that information by talking to close contacts and performing other background checks "enhance[s] public safety, assist[s] law enforcement, and help[s] ensure firearms end up only in the hands of those who are legally allowed to possess them." Bureau of Alcohol, Tobacco, Firearms and Explosives, *Facilitating Private Sales: A Federal Firearms Licensee Guide* 2 (2016).[9] This information allows states' licensing and permitting systems to function as intended, preventing individuals who are likely to misuse firearms from being able to access them. Such provisions are effective. For instance, states with licensing laws that require an in-person application or fingerprinting have 56% fewer mass shootings incidents than states that do not collect such information. Daniel W. Webster et al., *Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States*, 19 Crim. & Pub. Pol'y 171, 181 (2020). And studies suggest "that laws requiring firearm purchasers to be licensed through a background check process" are one of the "most effective gun policies for reducing fatal mass shootings." *Id*. at 171.

Given the importance of these measures, it is unsurprising that New Jersey's permitting provisions are in line with the sorts of requirements that have long been adopted by states throughout the country to ensure that individuals have the proper

---

[9] *Available at* https://tinyurl.com/44natze8.

character, temperament, and judgment to obtain a firearm permit or license. For example, Georgia requires that a probate judge determine that an applicant is of "good moral character" before issuing a weapons carry license, Ga. Code Ann. § 16-11-129(d)(4), and Indiana similarly requires that the licensing authority ascertain whether an applicant for a license to carry a handgun "is of good character and reputation," Ind. Code Ann. § 35-47-2-3(g); *see also* Del. Code Ann. tit. 11, § 1441(a) (requiring "good moral character" for a concealed carry permit). Other states require that authorities verify that an applicant is a "suitable person" to carry a firearm. *See, e.g.*, Conn. Gen. Stat. Ann. § 29-28(b); R.I. Gen. Laws § 11-47-11. And a number of states bar individuals with certain indicators of dangerousness or bad character from receiving a license or permit. *See, e.g.*, Ala. Code § 13A-11-72(b) (prohibiting "drug addict[s]" and "habitual drunkard[s]" from owning or possessing a pistol); Neb. Rev. Stat. § 28-1206(1)(b) (criminalizing possession of a firearm by an individual who has been convicted of a misdemeanor crime of domestic violence within the past seven years); Fla. Stat. § 790.23(1) (criminalizing possession of a firearm by individuals who have been convicted of a felony).

States have also developed a panoply of regulations to collect the information they need to evaluate an individual's potential for dangerousness. Twenty-one states and the District of Columbia have implemented background check requirements

beyond what federal law requires.  Giffords Law Center, *Universal Background Checks*.[10]  Some states obligate applicants to submit character references who can confirm "that the applicant bears a good reputation for peace and good order in the community in which the applicant resides."  Del. Code Ann. tit. 11, § 1441(a)(2); *see* Ch. 371, 2022 N.Y. Laws (N.Y. Legis. Retrieval Serv.) (incorporating disclosure requirements relevant to determining whether an applicant is of good moral character, including the names and contact information of family members and cohabitants and a list of character references).  And certain jurisdictions give the licensing or registration authority the ability to collect any further information that it deems necessary.  *See, e.g.*, Ch. 371, 2022 N.Y. Laws (N.Y. Legis. Retrieval Serv.); D.C. Code § 7-2502.03(b)(13).

In sum, the challenged statutory disqualifiers and permitting requirements are valid measures designed to ensure that only law-abiding and responsible citizens obtain firearms and are similar to those in many other states.

---

[10] *Available at* https://tinyurl.com/bdh658ya.

## CONCLUSION

The Court should reverse the district court's entry of preliminary injunctive relief and affirm the portions of the order denying preliminary injunctive relief.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for
the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

/s/ Jeremy R. Girton
JEREMY R. GIRTON
Assistant Attorney General

ALEXANDRA LICHTENSTEIN
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General for the
District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-2029
jeremy.girton@dc.gov

KWAME RAOUL
Attorney General for the State of
Illinois

JANE ELINOR NOTZ
Solicitor General

SARAH A. HUNGER
Deputy Solicitor General

Office of the Attorney General for the
State of Illinois
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-5202
sarah.hunger@ilag.gov

July 2023

On behalf of:

ROB BONTA
*Attorney General*
State of California

PHILIP J. WEISER
*Attorney General*
State of Colorado

WILLIAM TONG
*Attorney General*
State of Connecticut

KATHLEEN JENNINGS
*Attorney General*
State of Delaware

ANNE E. LOPEZ
*Attorney General*
State of Hawaii

ANTHONY G. BROWN
*Attorney General*
State of Maryland

ANDREA JOY CAMPBELL
*Attorney General*
Commonwealth of Massachusetts

DANA NESSEL
*Attorney General*
State of Michigan

KEITH ELLISON
*Attorney General*
State of Minnesota

EDWARD E. MANIBUSAN
*Attorney General*
Commonwealth of the Northern Mariana
Islands

LETITIA A. JAMES
*Attorney General*
State of New York

ELLEN F. ROSENBLUM
*Attorney General*
State of Oregon

MICHELLE A. HENRY
*Attorney General*
Commonwealth of Pennsylvania

PETER F. NERONHA
*Attorney General*
State of Rhode Island

CHARITY R. CLARK
*Attorney General*
State of Vermont

ROBERT W. FERGUSON
*Attorney General*
State of Washington

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 29(a)(5) and L.A.R. 31.1(c), I certify that:

1. I hereby certify that I am a member in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

2. This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because the brief contains 6080 words, excluding exempted parts.

3. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

4. This brief complies with L.A.R. 31.1(c) in that prior to being electronically submitted, it was scanned by Microsoft Defender and found to be free from computer viruses.

5. The text of the electronic brief is identical to the text in the paper copies to be filed with the Court.  L.A.R. 31.1(c).

/s/ Jeremy R. Girton
JEREMY R. GIRTON

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on July 27, 2023, an electronic copy of the foregoing was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.

/s/ Jeremy R. Girton
JEREMY R. GIRTON