Nos. 23-1900, 23-2043

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

RONALD KOONS, et al.,

*Plaintiffs-Appellees,*

v.

MATTHEW J. PLATKIN, et al.,

*Defendants-Appellants*

and

NICHOLAS P. SCUTARI, et al.

*Intervenors-Appellants.*

AARON SIEGEL, et al.,

*Plaintiffs-Appellees/Cross-Appellants,*

v.

MATTHEW J. PLATKIN, et al.,

*Defendants-Appellants/Cross-Appellees*

and

NICHOLAS P. SCUTARI, et al.,

*Intervenors-Defendants-Appellants.*

On Appeal from the United States District Court
for the District of New Jersey

**BRIEF OF EVERYTOWN FOR GUN SAFETY AS AMICUS CURIAE
IN SUPPORT OF APPELLANTS AND REVERSAL**

Janet Carter
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
(646) 324-8174
July 27, 2023                    jcarter@everytown.org

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ..................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 2

ARGUMENT ........................................................................................................ 3

   I.   The Proper Focus for Analysis of Historical Regulation Is the Reconstruction Era, Not the Founding Era ................................................. 3

   II.   This Court Should Reject Any Effort To Dismiss the State's Historical Analogues as Insufficiently "Representative" ........................................... 16

   III.   This Court Should Consider Historical Context in Evaluating What Historical Laws Reveal about the Public Understanding of the Right ...... 20

CONCLUSION .................................................................................................. 26

# TABLE OF AUTHORITIES

## CASES

*Antonyuk v. Hochul*,
No. 1:22-cv-00986, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022), *appeal docketed*,
No. 22-2908 (2d Cir. Nov. 9, 2022) .................................................................. 20

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
910 F.3d 106 (3d Cir. 2018) ............................................................................... 2

*Davenport v. Wash. Educ. Ass'n*,
551 U.S. 177 (2007) .......................................................................................... 18

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ................................................................................... passim

*Drummond v. Robinson Twp.*,
9 F.4th 217 (3d Cir. 2021) .................................................................................. 4

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ....................................................................... 5, 6, 8

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) ............................................................................ 18

*Gould v. Morgan*,
907 F.3d 659 (1st Cir. 2018) ............................................................................... 5

*Maryland Shall Issue, Inc. v. Montgomery Cnty.*,
No. 8:21-cv-01736, 2023 WL 4373260 (D. Md. July 6, 2023), *appeal docketed*, No.
23-1719 (4th Cir. July 10, 2023) ................................................................... 7, 25

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ................................................................................ 5, 6, 18

*Nat'l Rifle Ass'n v. Bondi*,
61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc*, No. 21-12314, 2023
WL 4542153 (July 14, 2023) .......................................................................... 7, 8

*New York State Rifle & Pistol Ass'n v. Bruen*,
142 S. Ct. 2111 (2022) ................................................................................ passim

*Range v. Att'y Gen.*,
   69 F.4th 96 (3d Cir. 2023) (en banc) ................................................. 3, 4

*Rehaif v. United States*,
   139 S. Ct. 2191 (2019) ........................................................................ 2

*Rupp v. Becerra*,
   401 F. Supp. 3d 978 (C.D. Cal. 2019), *vacated and remanded*, No. 19-56004, 2022
   WL 2382319 (9th Cir. June 28, 2022) ................................................ 2

*Shelby Cnty., Ala. v. Holder*,
   570 U.S. 529 (2013) ........................................................................... 20

*Teter v. Connors*,
   460 F. Supp. 3d 989 (D. Haw. 2020) ................................................. 2

*United States v. Greeno*,
   679 F.3d 510 (6th Cir. 2012) ............................................................. 5

*United States v. Meyer*,
   No. 4:22-cr-10012, 2023 WL 3318492 (S.D. Fla. May 9, 2023) ...... 12

## STATUTES

New Jersey Public Law 2022, Chapter 131 .................................... passim

## OTHER AUTHORITIES

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ..................... 12

Ann Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston,
New York, and Philadelphia*, 40 Landscape J. 1 (2021) ........................................... 23

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n
v. Bruen*, No. 20-843 (U.S.) .................................................... 13, 16, 17

*Bulletin of the Park and Outdoor Art Association* 3 (1901), *available at*
https://bit.ly/3NPLSae ...................................................................... 24

Cynthia S. Brenwall, *The Central Park: Original Designs for New York's Greatest Treasure*
(2019) .............................................................................................. 22

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13
Charleston L. Rev. 205 (2018) .............................................. 13, 16, 17

iv

David Schuyler, *The New Urban Landscape: The Redefinition of City Form in Nineteenth-Century America* (1988) ........................................................................................ 21

Decl. of Prof. Zachary Schrag, *Angelo v. District of Columbia*, No. 1:22-cv-01878, Dkt. 18-13 (Sept. 16, 2022) ........................................................................................ 19

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1 (2022) ..... 9

Frederick Law Olmsted, *The Justifying Value of a Public Park* (1881) ........................ 23

James McPherson, *Revisionist Historians*, Persps. on Hist. (Sept. 1, 2003), https://www.historians.org/research-and-publications/perspectives-on-history/september-2003/revisionist-historians .................................................. 19

Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1 (2010) .................................................................... 8, 10

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ..... 12, 13

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) ........................................................................................ 11

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008) .................................................................... 10

Nadav Shoked, *Property Law's Search for A Public*, 97 Wash. U.L. Rev. 1517 (2020) ........................................................................................ 24

Nat'l Park Serv., *Crater Lake: History* (2001), *available at* www.nps.gov/crla/planyourvisit/upload/History-508.pdf .............................. 23

*Parks Restrictions*, everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/parks-restrictions/ ........................................................................ 21

*Sensitive Places*, everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/sensitive-places/ ........................................................................ 21

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) .................................................................... 10

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7 (2008) ...................................... 9

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021) ........................................................................... 8

U.S. Bureau of the Census, *A Century of Population Growth* 9, Table 1 (1969), *available at* https://bit.ly/3QJizrn.................................................................................. 17

**INTEREST OF AMICUS CURIAE**

Everytown for Gun Safety is the nation's largest gun-violence-prevention organization, with nearly ten million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a 20-year-old gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

Over the past several years, Everytown has devoted substantial resources to researching and developing expertise in historical firearms legislation. Everytown has drawn on that expertise to file more than 90 amicus briefs in Second Amendment and other firearms cases, offering historical and doctrinal analysis, as well as social science and public policy research, that might otherwise be overlooked. Several courts have expressly relied on Everytown's amicus briefs in

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

deciding Second Amendment and other firearms cases. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 991-92 & n.11 (C.D. Cal. 2019), *vacated and remanded*, No. 19-56004, 2022 WL 2382319 (9th Cir. June 28, 2022); *Teter v. Connors*, 460 F. Supp. 3d 989, 1002-03 (D. Haw. 2020), *appeal docketed*, No. 20-15948 (9th Cir. May 19, 2020); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2210-11 nn.4 & 7 (2019) (Alito, J., dissenting).

## INTRODUCTION AND SUMMARY OF ARGUMENT

The provisions of New Jersey Public Law 2022, Chapter 131 ("Chapter 131") the district court enjoined are constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), for the reasons defendants-appellants ("the State") set out in their brief. *See* Dkt. 43 ("State Br."). Everytown submits this amicus brief to expand on three points. *First*, in applying the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—the Court should center its analysis on 1868, when the Fourteenth Amendment was ratified, not 1791. Moreover, 1868 is neither a starting-line nor a cutoff; under *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008), both earlier and later history are also relevant. *Second*, *Bruen*'s analysis reveals that a small number of laws can be sufficient to establish this

nation's tradition of firearm regulation, at least so long as there is not

overwhelming affirmative evidence of an enduring tradition to the contrary, and it

does not require a government to prove that the laws it presents were statistically

representative of the nation. *Third*, *Bruen*'s inquiry requires consideration not just of

historical laws but also of the historical context within which states and localities

chose to legislate (or not to legislate)—a point we illustrate with the historical

context surrounding the regulation of firearms in parks.

## ARGUMENT

### I. The Proper Focus for Analysis of Historical Regulation Is the Reconstruction Era, Not the Founding Era

After *Bruen*, this Court "must first decide whether the text of the Second

Amendment applies to a person" and their "proposed conduct." *Range v. Att'y Gen.*,

69 F.4th 96, 101 (3d Cir. 2023) (en banc). If so, the burden shifts to the government

to show its regulation is "consistent with the Nation's historical tradition of firearm

regulation." *Bruen*, 142 S. Ct. at 2130.

At this second, historical step, the proper focus for this Court's inquiry is the

Reconstruction era, not the founding era. As the government has shown, the

regulations in Chapter 131 are entirely consistent with the American tradition of

firearms regulation regardless of which period this Court considers. Accordingly,

like the Supreme Court in *Bruen*, this Court need not resolve the issue of the correct

time period in this case. *See Bruen*, 142 S. Ct. at 2138 (explaining that, with respect

to carrying handguns in public without special need, "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same").[2] Nevertheless, if this Court wishes to do so to guide district courts in future cases, it should hold that the inquiry centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states.

In a case challenging the constitutionality of a state law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? The U.S. Constitution's protection of the right to keep and bear arms did not constrain the states until 1868; as *Bruen* correctly observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right at that time should control the originalist analysis today. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood

---

[2] *Range* also did not resolve the time-period issue. *See Range*, 69 F.4th at 104 (noting *Bruen*'s emphasis on "Founding- and Reconstruction-era sources" and concluding that, "[w]hatever timeframe the Supreme Court might establish in a future case," 1961 is too recent); *see also Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second and Fourteenth Amendments' ratifiers approved [the challenged] regulations[.]").

the right to be at the time they gave it effect. And that, in turn, would violate the originalist mandate of *Heller* and *Bruen*: "'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634-35; emphasis added in *Bruen*).

Prior to *Bruen*, several circuits reached this conclusion in analyzing the tradition of firearm regulation at the first, historical step of the then-applicable Second Amendment framework.[3] *See Gould*, 907 F.3d at 669 ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010),] confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*).

---

[3] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that analyzing Second Amendment claims should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a means-end scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

*Bruen* does not alter that conclusion; the step-one analyses in these cases remain, as a general matter, good law. *See* 142 S. Ct. at 2138 (leaving open the question whether 1868 or 1791 is the correct focus); *id.* at 2127 (concluding that "[s]tep one of the predominant framework [applied in the lower courts before *Bruen*] is broadly consistent with *Heller*"). Moreover, there is good reason for these courts to have reached that conclusion: insisting that the 1791 understanding should apply against the states does not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See McDonald*, 561 U.S. at 770-78 (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in an opinion by Judge Sykes, read *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.

A panel of the Eleventh Circuit recently reached the same conclusion post-*Bruen*, concluding that, in cases involving state laws, where "the Fourteenth

Amendment Ratification Era understanding of the right to keep and bear arms …
differ[s] from the 1789 understanding, … the more appropriate barometer is the
public understanding of the right when the States ratified the Fourteenth
Amendment and made the Second Amendment applicable to the States." *Nat'l
Rifle Ass'n v. Bondi* (*NRA v. Bondi*), 61 F.4th 1317, 1323 (11th Cir. 2023), *vacated on
grant of reh'g en banc*, No. 21-12314, 2023 WL 4542153 (July 14, 2023). Although
that panel opinion has now been vacated for rehearing en banc, we submit that its
analysis is correct. As the panel explained:

> This is necessarily so if we are to be faithful to the principle that
> "[c]onstitutional rights are enshrined with the scope they were understood to
> have *when the people adopted them*." As with statutes, when a conflict arises
> between an earlier version of a constitutional provision (here, the Second
> Amendment) and a later one (here, the Fourteenth Amendment and the
> understanding of the right to keep and bear arms that it incorporates), "the
> later-enacted [provision] controls to the extent it conflicts with the earlier-
> enacted [provision]." … The opposite rule would be illogical.

61 F.4th at 1323-24 (alterations in original) (citations omitted); *see also Maryland Shall
Issue, Inc. v. Montgomery Cnty.*, No. 8:21-cv-01736, 2023 WL 4373260, at *8 (D. Md.
July 6, 2023) (concluding that "historical sources from the time period of the
ratification of the Fourteenth Amendment are equally if not more probative of the
scope of the Second Amendment's right to bear arms as applied to the states by the
Fourteenth Amendment"), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023).

The conclusion that the 1868 understanding of the Second Amendment
right should apply in a case against a state is far from a radical position. Indeed, it

was the position former Solicitor General Paul Clement took as counsel for the

NRA's New York affiliate during oral argument in *Bruen*:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?

> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843).

It is also the position prominent scholars of originalist theory have taken.

"Many prominent judges and scholars—across the political spectrum—agree that,

at a minimum, 'the Second Amendment's scope as a limitation on the States

depends on how the right was understood when the Fourteenth Amendment was

ratified.'" *NRA v. Bondi*, 61 F.4th at 1322 n.9 (quoting *Ezell*, 651 F.3d at 702) (citing,

among others, Josh Blackman, Ilya Shapiro, Steven Calabresi, and Sarah Agudo);

*see also* Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or

Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms

to the States*, 8 Geo. J.L. & Pub. Pol'y 1, 52 (2010) ("Federal protection against state

encroachments on individual liberty began with the ratification of the Fourteenth

Amendment. 1868 is thus the proper temporal location for applying a whole host

of rights to the states, including the right that had earlier been codified as the Second Amendment as applied against the federal government. Interpreting the right to keep and bear arms as instantiated by the Fourteenth Amendment—based on the original public meaning in 1791—thus yields an inaccurate analysis." (footnote omitted)); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7, 115-16 & 116 n.485 (2008) (asserting that "[Akhil] Amar is exactly right"—"the question is controlled not by the original meaning of the first ten Amendments in 1791 but instead by the meaning those texts and the Fourteenth Amendment had in 1868"); Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022) ("The view is ascendant among originalists who hold that the Fourteenth Amendment requires states to respect some or all of the individual rights listed in the first eight amendments that those rights ought to be understood *as they were understood in 1868*."). Others who have endorsed this view include Michael

Rappaport[4] and Stephen Siegel.[5] In sum, originalist analysis compels applying the

1868 understanding of the right to keep and bear arms in a case challenging a state

law.[6]

To be sure, if the public understanding of the Bill of Rights changed between

ratification in 1791 and incorporation in 1868, then "[o]riginalists seem," at first

---

[4] Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008) ("[T]he incorporated Bill of Rights under the Fourteenth Amendment may have had a different meaning than the original Bill of Rights. If the rights in the original Bill had developed a new meaning in the years leading up to Reconstruction, and if the enactors of the Amendment had used those new meanings, the incorporated Bill would have a different meaning than the original Bill.").

[5] Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008) ("I am unaware of any discussion by an originalist asserting, as a matter of theory, that the meaning of the Bill of Rights in 1789 should be preferred to its meaning in 1868 when the subject is the limitations the Fourteenth Amendment imposes on the states. In addition, I am unable to conceive of a persuasive originalist argument asserting the view that, with regard to the states, the meaning of the Bill in 1789 is to be preferred to its meaning in 1868. In discussions, some originalists have suggested the importance of 'consistency' between the rights held against the national and state governments. The desire for consistency, however, is not justified on originalist grounds. In addition, consistency may be brought about by imposing the meaning of the Bill in 1868 on the national government, rather than vice-versa.").

[6] To be clear, we do not suggest that each of these scholars also believe that 1868 is the correct focus for analyzing the public meaning of the right to keep and bear arms in cases against the federal government. Professors Blackman and Shapiro, for example, maintain that 1868 is the correct focus for cases against a state and 1791 is correct for cases against the federal government. *See* Blackman & Shapiro, 8 Geo. J.L. & Pub. Pol'y at 51. As discussed below, because *Bruen* subsequently rejected the possibility of different standards for the state and federal

glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of different standards for the state and federal governments. 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."). Accordingly, originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted prior decisions that had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id.* But if the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and it pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when

---

governments, originalists must choose one period or the other, and the weight of authority and analysis favors 1868. *See infra* pp. 10-13.

the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 2138. The Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)); *see also, e.g.*, *United States v. Meyer*, No. 4:22-cr-10012, 2023 WL 3318492, at *2 n.4 (S.D. Fla. May 9, 2023) (noting that "Justice Thomas, writing for the majority in *Bruen*, signaled an openness to the feedback-effect theory of the Fourteenth Amendment").

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[7]

---

[7] *See* Amar, *The Bill of Rights*, *supra*, at xiv (noting that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[W]hen we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789. … [I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2; *see Bruen*, 142 S. Ct. at 2138. On this view, too, 1868 meanings bind both the states and the federal government.

The 1868 view is also consistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of sensitive places restrictions. There, the Court indicated that "18th- *and 19th-century*" laws contained adequate restrictions on the possession of guns in legislative assemblies, polling places, and courthouses to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added)—an incomprehensible statement if the Court believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, *see id.*, all of the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[8]

In sum, any historical inquiry this Court chooses to conduct should focus on the period around 1868, not 1791. Moreover, 1868 is neither a starting-line nor a

---

[8] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae at 11-17, *Bruen* (No. 20-843) (July 20, 2021) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869

cutoff; *Heller* and *Bruen* both examined history preceding even 1791, *see Heller*, 554 U.S. at 592-93; *Bruen*, 142 S. Ct. at 2135-36, 2142-45, and *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation," 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2137, 2154 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting decision quoting James Madison). Thus, even if evidence in the period up to and around 1868 left the meaning of the Second Amendment right "indeterminate," courts should look to "practice" in the decades that followed to "settle" the meaning of the right. Equally, even if a court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, and even if it found evidence in that period indeterminate, it should recognize that later laws (and other historical evidence of regulatory authority)

---

Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

settle the meaning of the Second Amendment right and demonstrate that the challenged laws are constitutional. *See also infra* Part III (explaining *Bruen*'s admonition that new technologies or new societal concerns may "require a more nuanced approach" to historical inquiry).

Here, state and local laws from the period beginning around Reconstruction—which are fully consistent with earlier regulations—establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and demonstrate the constitutionality of the challenged provisions of Chapter 131. *See, e.g.*, State Br. 13-25.[9] And even if this Court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, and even if the Court were uncertain that the State's extensive earlier evidence conclusively establishes the constitutionality of the challenged provisions in this case, it should then consider this later historical evidence and recognize that this evidence "settle[s] the meaning of" the right as one that allows for regulations like those in Chapter 131.

---

[9] To be clear, whether laws precisely like the challenged law existed in 1868 (or 1791) is not the question before this Court. *Bruen* stressed that the government must identify a "well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133 (emphasis in original). Therefore, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

## II.     This Court Should Reject Any Effort To Dismiss the State's Historical Analogues as Insufficiently "Representative"

In its ruling enjoining enforcement of provisions in Chapter 131, the district court below discounted the State's robust and extensive record of historical laws in part by characterizing some of those laws as "outliers" or insufficiently statistically "representative" of the nation. *See, e.g.*, JA157, 179, 192. That was erroneous. *Bruen*'s discussion of the historical laws justifying sensitive-places restrictions demonstrates that a small number of laws can establish a tradition and that small-population jurisdictions matter.

Specifically, *Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626), and then recognized that three additional, more specific locations (legislative assemblies, polling places, and courthouses) were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *id.* But the sources the Court cited for the historical record justifying restrictions in those three locations identified *only two laws* naming legislative assemblies and *two laws* naming courthouses. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235, 246; Indep. Inst. *Bruen* Br. 11-12.[10] Moreover, the two laws both sources cited as

---

[10] In addition, *Bruen* repeatedly used the singular when referring to the government's burden to produce "a" historical analogue. *See, e.g.*, *Bruen*, 142 S. Ct. at 2133.

prohibiting guns in legislative assemblies in the pages the Court referenced were enacted three years apart, in 1647 and 1650, in a single colony, Maryland, that made up an estimated 8.7 percent of the total population in 1650.[11] *See id.*; Kopel & Greenlee, 13 Charleston L. Rev. at 235. This analysis demonstrates that a small number of laws covering a small proportion of the nation's population can suffice to establish a tradition of regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary.[12]

Concluding that a small number of state laws can demonstrate a "public understanding" of a limitation on the Second Amendment right is also consistent with bedrock federalism principles that entitle a state to effectuate the policy choice

---

[11] *See* U.S. Bureau of the Census, *A Century of Population Growth* 9, Table 1 (1969), *available at* https://bit.ly/3QJizrn.

[12] To be sure, *Bruen* expressed "doubt" that three colonial regulations "could suffice to show a tradition." 142 S. Ct. at 2142. But that tentative comment should not be given undue weight given the Supreme Court's discussion of sensitive places. Moreover, that comment should be read in light of the Court's subsequent statement that it found an "'overwhelming weight of other evidence regarding the right to keep and bear arms'" that contradicted historical analogues to New York's proper-cause law. *See id.* at 2153-55 (quoting *Heller*, 554 U.S. at 632). Here, there is no such "overwhelming" evidence of a right to carry in any of the locations that Chapter 131 regulates. And—to be clear—even if there were evidence of a traditional *practice* of carrying in those locations, that would not be enough. *Compare* Kopel & Greenlee, 13 Charleston L. Rev. at 235 (arguing that Americans historically tolerated arms in legislative assemblies and that it was "common for Congressman to be armed"), *with Bruen*, 142 S. Ct. at 2133 (relying on Kopel & Greenlee article in endorsing constitutionality of prohibiting arms in legislative assemblies).

of its citizens within constitutional bounds. Local conditions matter. Just as states today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up), states historically may have chosen not to regulate certain weapons, people, or conduct, not because the public understood the right to keep and bear arms to prevent such regulations, but because of democratically supported policy choices. As Judge Easterbrook explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment." *Id.* at 412. And the fact that states have latitude to experiment with regulations that meet their unique needs means that states historically may well have chosen not to regulate to the limits of constitutional permissibility. *Cf., e.g.*, *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions."). Accordingly, while state laws restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other

states does not warrant any inference that their citizens considered such restrictions unconstitutional.

Courts should not reject historical laws merely because they covered a small percentage of the nation's population for at least two further reasons. *First*, as multiple historians have commented, the process of unearthing and understanding historical laws demands patience and openness to constant reevaluation.[13] Where a state—particularly in expedited preliminary litigation—has produced historical laws covering only a small percentage of the nation's population, newly-discoverable historical sources may later yield more examples and increase that percentage. To discard a state's proffered laws for failing to meet some unstated population threshold is to fundamentally misunderstand the gradual and cumulative nature of historical research. *Second*, dismissing the laws of states with smaller populations is in tension with what the Supreme Court has deemed a "historic tradition" and "fundamental principle" of our constitutional bargain:

---

[13] *See* Decl. of Prof. Zachary Schrag, *Angelo v. District of Columbia*, No. 1:22-cv-01878, Dkt. 18-13 (Sept. 16, 2022) (explaining historical research process and basis for conclusion (at ¶ 41) that 60 days would be inadequate even for a team of professional historians to "adequately research the questions presented in *Bruen*" in challenge to firearms prohibition on DC's metro); James McPherson, *Revisionist Historians*, Persps. on Hist. (Sept. 1, 2003), https://www.historians.org/research-and-publications/perspectives-on-history/september-2003/revisionist-historians ("History is a continuing dialogue between the present and the past. Interpretations of the past are subject to change in response to new evidence, new questions asked of the evidence, new perspectives gained by the passage of time.").

"that all the States enjoy equal sovereignty." *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 540, 544 (2013) (citations omitted). If the people of a small state responded to local needs by enacting certain policies, the fact that their neighbors in a larger state chose a different path does not nullify the constitutional agency of the smaller state.[14]

## III.   This Court Should Consider Historical Context in Evaluating What Historical Laws Reveal about the Public Understanding of the Right

In evaluating the historical laws the State has presented, this Court should recognize that context matters. Close historical cousins to a modern regulation will not exist before the societal or technological condition that prompted regulation arose. Accordingly, regulations that emerged alongside or soon after a new condition should carry particular weight, and to the extent that a court seeks additional, older historical analogues, it must accept more distant cousins as sufficient. In *Bruen*'s words, "cases implicating unprecedented societal concerns or

---

[14] The district court in *Antonyuk v. Hochul*, No. 1:22-cv-00986, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022), *appeal docketed*, No. 22-2908 (2d Cir. Nov. 9, 2022)—a decision on which the court below relied extensively—derived its population-based analysis from *Bruen*'s brief reference to laws covering "miniscule territorial populations," 142 S. Ct. at 2154. *See* 2022 WL 16744700 at \*7. But the Supreme Court there was merely explaining why a handful of territorial carry restrictions did not counteract the "overwhelming evidence" it had already found in favor of "an otherwise enduring American tradition permitting public carry," *Bruen*, 142 S. Ct. at 2154. Accordingly, absent "overwhelming" evidence of a widespread contrary tradition, a jurisdiction's relatively small population size is no reason to deny it a role in the nation's historical tradition.

dramatic technological changes may require a more nuanced approach" to history. 142 S. Ct. at 2132.

Chapter 131's restrictions on firearms in public parks exemplify this point. Dozens of historical laws from the mid-19th century through the early 20th century establish that prohibiting firearms in parks is "consistent with this Nation's historical tradition of firearm regulation," *id.* at 2126. *See* JA187 n.64 (noting that State exhibited over thirty 19th- and early 20th-century state and local parks prohibitions and a compilation of federal parks prohibitions).[15] Given that 1868 is the correct focus for this Court's analysis, these laws establish beyond doubt that prohibiting firearms in parks is constitutional. But even if the Court were to focus its analysis on an earlier period, it should still give these 19th- and 20th-century laws particular weight, because parks in the modern sense did not begin to emerge until the mid-19th century. *See generally* David Schuyler, *The New Urban Landscape: The Redefinition of City Form in Nineteenth-Century America* 1-8 (1988) (describing emergence in 19th century of "new urban landscape," whose proponents urged establishment of public parks to "create[] communal spaces" where "rural scenery might sooth the 'nerves and mind' of visitors," and identifying Central Park as "the

---

[15] *See also, e.g.*, *Sensitive Places*, everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/sensitive-places/ (citing and linking 20 parks restrictions and compilation of federal restrictions); *Parks Restrictions*, everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/parks-restrictions/ (same, for additional 49 parks restrictions).

first major attempt to achieve" the proponents' goals). Given Central Park's

position as the foundational paradigm of this new movement, it is particularly

significant that its original 1858 rules, brief enough to appear on a single sheet and

"posted in conspicuous locations that would be easily seen by all visitors," Cynthia

S. Brenwall, *The Central Park: Original Designs for New York's Greatest Treasure* 26 (2019),

forbade "[a]ll persons" to "carry fire-arms":



*Id.* at 27.

Parks in this modern sense may have had "forerunners" in places like

colonial-era greens and commons, *see* JA187, but history confirms that those places

were different in kind.[16] Frederick Law Olmsted, Central Park's principal architect

---

[16] Even the article the district court relied on (at JA187-91) in attempting to
paint modern parks as no different from colonial-era green spaces acknowledges
that "[p]ublic parks did not appear in the United States until the second half of the

and first Commissioner, explained this in 1881: "Twenty-five years ago we had no parks, park-like or otherwise, which might not better have been called something else. … Allow me to use the term *park movement*, with reference to what has thus recently occurred[.]" Frederick Law Olmsted, *The Justifying Value of a Public Park* 7-8 (1881). Olmsted explained that this notion of parks was revolutionary, not simply "an improvement on what we had before, growing out of a general advance of the arts applicable to them." *Id.* at 8. Parks in the modern sense were thus an "unprecedented societal concern[]" in the late 19th and early 20th centuries. Under *Bruen*, that is reason enough to conclude that the State's historical park regulations amply justify its current restriction, since those regulations appeared as soon as the new societal condition of modern parks emerged.[17]

Accordingly, the court below was wrong to infer from the absence from the record of 18th-century prohibitions on carrying firearms in Boston Common (and in similar pre-park common spaces in New York and Philadelphia) that prohibiting

---

nineteenth century," and refers to those earlier green spaces as "prepark landscapes." Ann Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 1, 13 (2021).

[17] This point holds equally for wilderness parks as for urban parks; for example, prohibitions on firearms in National Parks were enacted soon after the parks were established. *See, e.g.*, JA2041-42 (quoting Crater Lake National Park regulation dated August 27, 1902, prohibiting firearms without superintendent's written permission); Nat'l Park Serv., *Crater Lake: History* (2001), *available at* www.nps.gov/crla/planyourvisit/upload/History-508.pdf (park established May 22, 1902); *see also* State Br. 20-21 (citing prohibitions "in densely- and sparsely-populated regions").

guns in parks is unconstitutional. *See* JA174-76. During its first two centuries, Boston Common was shared grazing land, not a park. *See, e.g.,* Nadav Shoked, *Property Law's Search for A Public*, 97 Wash. U.L. Rev. 1517, 1556-57 (2020); *Bulletin of the Park and Outdoor Art Association* 3 (1901), *available at* bit.ly/3NPLSae (Common was used for grazing "till a very recent date" and "not until 1859" was it "finally settled" that "Boston Common should be a public park"). And even if, contrary to fact, the Common (and equivalent places in New York and Philadelphia) had been parks at the founding, the fact that the historical record has not (yet) yielded a prohibition on carrying firearms in those places proves nothing about whether Bostonians, New Yorkers, or Philadelphians historically understood the right to keep and bear arms to foreclose such a prohibition. If public carry in those cities was rare (because of social mores, limited availability of suitable firearms, carry regulations not specific to particular locations, or any other reason), then their inhabitants may have seen no need to enact sensitive-places prohibitions; or they may have chosen not to regulate (if that is what they chose) for policy, rather than constitutional, reasons. *See supra* pp. 17-19 (federalism requires respect for decisions to legislate, or not, according to local needs).

The district court was also wrong to dismiss national parks regulations and other laws as insufficiently analogous because they were "specifically enacted to protect animals … not parkgoers." JA191. Even if that factual premise were

24

correct, *but see* State Br. 21, it would be immaterial, for two reasons. *First*, it takes no analogical reasoning for this Court to see that the State's historical laws establish a regulatory tradition of prohibiting firearms in parks—*because they prohibited firearms in parks*. *See Maryland Shall Issue*, 2023 WL 4373260, at \*11 (observing that "considerations of 'how and why' historical regulations burden rights relating to firearms" are not applicable "when there is clear historical example of the exact same type of regulation—in this instance, restrictions on carrying firearms in parks"). *Second*, even if analogical reasoning were necessary, *Bruen* requires only that modern and historically laws be "*comparably* justified," *Bruen*, 142 S. Ct. at 2133 (emphasis added)—not *identically* justified. It is absurd to suggest that this analogy fails if historical laws are focused on an interest (protecting animals) that is *less important* than the primary focus of New Jersey's modern law—protecting the people of New Jersey.

## CONCLUSION

This Court should reverse the judgment of the district court.

July 27, 2023

Respectfully submitted,

/s/ Janet Carter
Janet Carter
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017

*Counsel for amicus curiae*
*Everytown for Gun Safety*

# CERTIFICATIONS

I certify that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because this brief contains 6,420 words, excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

2.      I am a member of the bar of the U.S. Court of Appeals for the Third Circuit. My date of admission was August 11, 2021.

3.      A virus detection program, SentinelOne, was run on the electronic version of this brief, and no virus was detected.

4.      The text of the electronic version of the brief is identical to the text of the paper copies.

5.      On July 27, 2023, I electronically filed this amicus brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the CM/ECF system, which will send notice to all registered CM/ECF users.

 July 27, 2023                                    /s/ Janet Carter

                                                 *Counsel for amicus curiae*
                                                 *Everytown for Gun Safety*