# United States Court of Appeals

*for the*

# Third Circuit

Case Nos. 23-1900 &
23-2043

RONALD KOONS, *et al.*,

*Plaintiffs-Appellees,*

– v. –

MATTHEW J. PLATKIN, *et al.*,

*Defendants-Appellants,*

AARON SIEGEL, *et al.*,

*Plaintiffs-Appellees/Cross-Appellants,*

– v. –

MATTHEW J. PLATKIN, *et al.*,

*Defendants-Appellants/Cross-Appellees,*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF NEW JERSEY IN CASE
NOS. 22-CV-7463 AND 22-CV-7464 (RMB)

## BRIEF OF *AMICUS CURIAE* MARCH FOR OUR LIVES FOUNDATION IN SUPPORT OF DEFENDANT APPELLANT/ CROSS-APPELLEE ATTORNEY GENERAL OF NEW JERSEY

JASMEET K. AHUJA
HOGAN LOVELLS US LLP
*Attorney for Amicus Curiae March For
Our Lives Foundation*
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
(267) 675-4600
jasmeet.ahuja@hoganlovells.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, March For Our Lives Foundation states that it has no parent corporations. March For Our Lives has no stock, and no publicly held company owns 10% or more of their stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................... i

TABLE OF CONTENTS ............................................................. ii

TABLE OF AUTHORITIES ........................................................ iv

INTEREST OF *AMICI CURIAE* .................................................. 1

SUMMARY OF ARGUMENT ...................................................... 3

ARGUMENT ...................................................................... 5

    I.    *NYSPRA v. BRUEN* ALLOWS COURTS TO TAKE MODERN IMPLICATIONS OF GUN VIOLENCE INTO THEIR DECISIONS, ESPECIALLY REGARDING SENSITIVE SPACE RESTRICTIONS ........... 5

        A.    Courts are allowed to consider modern day implications of gun violence, especially when evaluating sensitive space restrictions ............................ 5

        B.    The Court's non-exhaustive list of sensitive spaces in *Bruen* provides insight into what other spaces can be analogously deemed "sensitive" ........................... 7

    II.    MUSEUMS, PARKS, LIBRARIES, ZOOS, AND PLACES OF PROTEST ARE SENSITIVE SPACES BECAUSE THEY EXIST AT THE INTERSECTION OF SERVING VULNERABLE POPULATIONS AND SERVING IMPORTANT CIVIC FUNCTIONS .................... 13

        A.    Young people are an example of an especially vulnerable population whose presence can make spaces "sensitive" .............................................. 13

        B.    Zoos, parks, museums, and libraries are relevantly similar to the Court's list of sensitive spaces because

they are predominantly populated by young people
and serve as hubs for congregation and learning ............ 18

C.    Places of protests are relevantly similar to the
Court's list of sensitive spaces because they are
predominantly populated by young people and serve
a crucial function for American democracy ...................... 22

D.    The American history and tradition of protest, as
well as the *Bruen* methodology, was misapplied in
the district court decision .................................................. 25

III.    REGULATIONS ON THESE SENSITIVE SPACES
ARE ALSO CONSTITUTIONAL BECAUSE THEY
FALL INTO THE ROBUST AMERICAN TRADITION
OF REGULATING CONDUCT THAT CAUSES
TERROR .................................................................................. 27

A.    The United States has a robust history and tradition
of regulating conduct that causes terror .......................... 27

B.    Allowing guns into sensitive spaces uniquely
imperils young people and has the primary effect of
causing terror .................................................................... 29

C.    The terror that the possibility of guns in these
spaces invoke will have a chilling effect on our
democracy, unduly elevating Second Amendment
rights ................................................................................. 31

CONCLUSION ........................................................................... 36

CERTIFICATE OF COMPLIANCE ......................................... 38

CERTIFICATION OF ADMISSION TO BAR .......................... 39

CERTIFICATE OF SERVICE ................................................... 40

iii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*District of Columbia v. Heller*

    554 U.S. 570 (2008) ............................................................. *en passim*

*New York State Rifle & Pistol Association, Inc. v. Bruen*

    142 S. Ct. 2111 (2022) ........................................................ *en passim*

## Statutes

1692 Mass. Acts and Laws no. 6 ..............................................................27

1699 N. H. Acts and Laws ch. 1 ..............................................................27

## Other Authorities

*Admission & Hours*, Turtle Back Zoo,
https://turtlebackzoo.com/admission-hours/............................................19

*Adverse Childhood Experiences*, We Empower ACEs,
https://weempoweraces.org/aces/?gclid=Cj0KCQjwwvilBhCFARIsAD
vYi7IDbmqN0trQSXekW-
kQZVhp2S11yKUyZHcXHRuWW5Eod5WEiNEaFsUaAk77EALw_w
cB..............................................................................................................16

*Armed Assembly, Guns, Demonstrations, and Political Violence in
America*, ACLED and Everytown, August 2021,
https://acleddata.com/acleddatanew/wp-
content/uploads/2021/08/Report_Armed-
Assembly_ACLED_Everytown_August2021.pdf ..............................23, 32

*Art Museum Attendance*, American Academy of Arts & Science,
https://www.amacad.org/humanities-indicators/public-life/art-
museum-attendance ..................................................................................21

iv

Ayres, Ian, Vars, Fredrick , *Opinion: Peaceful Assembly Can't Happen Without the Option of Gun-Free Events*, Wash. Post (Oct. 28, 2020), https://www.washingtonpost.com/opinions/2020/10/28/peaceful-assembly-cant-happen-without-option-gun-free-events/ ........................ 33

Barroso, Amanda and Minkin, Rachel, *Recent protest attendees are more racially and ethnically diverse, younger than Americans overall*, Pew Research Center, https://www.pewresearch.org/short-reads/2020/06/24/recent-protest-attendees-are-more-racially-and-ethnically-diverse-younger-than-americans-overall/ .................................................................. 23

Bauers, Sandy, *Zoo Program Aims to Include Young Environmentalists*, Inquirer, https://www.inquirer.com/philly/health/science/20130407_Even_the_signage_is_inclusive.html ...................................................... 19

Blocher, Joseph and Siegal, Reva, *Guided By History: Protecting the Public Sphere From Weapons Threats Under Bruen*, New York University Law Review, Vol. 98, 2023, Duke Law School Public Law & Legal Theory Series No. 2023-17, July 10, 2023, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4355024 ............. 35

Blocher, Joseph and Siegel, Reva B., *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller*, 116 N.w. U. L. Rev. 139, 156 (2021) ........................................ 33

Campbell-Hicks, Jennifer and Brennan, Noel, *Boulder King Soopers Shooting: 1 Year Later*, 9news, https://www.9news.com/article/news/local/boulder-shooting/boulder-king-soopers-shooting-one-year/73-cc012646-e3b8-4972-a28f-953915c3d322 .................................................................... 30

*Causes of Injury-Related Death*, Centers for Disease Control and Prevention, WISQARS, https://wisqars.cdc.gov/data/explore-data/explore/selected-years .......... 15

Coylar, Brock, *6 Teels Organized a Protest. 10,000 People Showed Up*, The Cut, https://www.thecut.com/2020/06/6-teens-organized-a-protest-10-000-people-showed-up.html ................................................................................ 24

DeBoer, Katlyn E., *Clash of the First and Second Amendments: Proposed Regulation of Armed Protests*, 45 Hastings Const. L.Q. 333, 369 (2018) ............................................................................................ 34

*Early Childhood Programs*, Turtle Back Zoos, https://turtlebackzoo.com/discover/early-childhood-programs/ .............. 19

*Fast Facts: Preventing Adverse Childhood Experiences*, Center for Disease Control, https://www.cdc.gov/violenceprevention/aces/fastfact.html ................... 16

Fausset, Richard, *A Heavily Armed man Caused Panic at a Supermarket. But Did He Break The Law?*, https://www.nytimes.com/2023/01/02/us/atlanta-gun-laws.html ........... 30

Filindra, Alexandra, *Americans do not want guns at protests, this research shows*, Washington Post, https://www.washingtonpost.com/politics/2021/11/21/americans-do-not-want-guns-protests-this-research-shows/ ........................................ 36

Goldstick JE, Carter PM, Cunningham RM. *Current epidemiological trends in firearm mortality in the United States*, JAMA Psychiatry 2021;78:241-242 ......................................................... 13

Gregg, Jonathan, *Louisville Zoo program to inspire underserved Children*, Spectrum News, https://spectrumnews1.com/ky/louisville/news/2022/01/05/future-healers-louisville-zoo-underserved-children- .......................................... 19

Hemenway, David, Azrael, Deborah, Miller, Matthew, *U.S. national attitudes concerning gun carrying. Injury Prevention*, 2001; 7:282-285, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1730790/pdf/v007p00282.pdf ................................................................................................ 29

Hemenway, David, Kennedy, Bruce, Kawachi, Ichiro, and Putnam, Robert D, *Firearm prevalence and social capital*, Annals of Epidemiology. 2001; 11:484-490, https://www.sciencedirect.com/science/article/abs/pii/S104727970100 2356?via%3Dihub ................................................................... 34

*How cities use parks to . . . Help Children Learn*, Recreation and Park Commission for the Parish of East Baton Rouge, https://www.brec.org/assets/General_Info/Why_R_Parks_Important/ Papers/Parks-Help-Children-Learn.pdf ..................................... 19

Karimi, Faith, *Mass shooters are increasingly attacking 'soft targets' such as supermarkets. Experts say securing them will be difficult*, CNN, https://www.cnn.com/2022/05/20/us/mass-shooters-soft-targets-challenges-cec/index.html ....................................................... 14

McIntire, Mike, *At Protests Across America, Guns are Doing the Talking*, New York Times, https://www.nytimes.com/2022/11/26/us/guns-protests-open-carry.html ............................................................................. 23

Mostafavi, Beata, *National Poll: More Teens Participating in Protests Against Racism*, Michigan Medicine, https://www.michiganmedicine.org/health-lab/national-poll-more-teens-participating-protests-against-racism ............................ 24

*Number of Injuries and Associated Costs*, Centers for Disease Control and Prevention, WISQARS, https://wisqars.cdc.gov/cost/?y=2020&o=MORT&i=8&m=20890&g=0 0&s=0&u=TOTAL&u=AVG&u=PERCAP&t=COMBO&t=MED&t=V PSL&a=5Yr&g1=0&g2=20&a1=0&a2=199&r1=MECH&r2=INTENT &r3=NONE&r4=NONE&c1=&c2= ....................................... 15

*One-Third of US Adults Say Fear of Mass Shootings Prevents Them from Going to Certain Places or Events*, American Psychological Association, https://www.apa.org/news/press/releases/2019/08/fear-mass-shooting . 30

Palmer, Diana, *Fired Up or Shut Down: The Chilling Effect at Armed Protests*, Ne. Univ. (Apr. 2021), https://repository.library.northeastern.edu/files/neu:bz60rq30r ............ 34

*Reconsider Active Shooter Drills*, Everytown for Gun Safety, https://www.everytown.org/solutions/active-shooter-drills/ ................. 17

Strauss, Valerie, *Active-shooter drills for preschoolers: This is Who We Are Now*, Washington Post, https://www.washingtonpost.com/news/answer-sheet/wp/2018/02/16/active-shooter-drills-for-preschoolers-this-is-who-we-are-now/ ................................................................................ 17

*Teens are regular and enthusiastic patrons*, American Library Association, December 14, 2011, http://www.ala.org/tools/research/librariesmatter/teens-are-regular-and-enthusiastic-patrons ................................................................ 20

*Teens Need Libraries*, American Library Association, April 9, 2012. http://www.ala.org/yalsa/teens-need-libraries ........................................ 20

*The Impact of Active Shooter Drills in School*, Everytown, https://everytownresearch.org/report/the-impact-of-active-shooter-drills-in-schools/?_gl=1*4jswew*_ga*MTk3MzQ1MzIyNS4xNjg5NjA5NDU1*_ga_LT0FWV3EK3*MTY5MDEyNzcyOC4xLjEuMTY5MDEyNzc0OTS4wLjAuMA ................................................................ 17

Thomas, Carolyn, *Victims of Buffalo supermarket mass shooting remembered 1 year after racist massacre*, PBS, https://www.pbs.org/newshour/nation/victims-of-buffalo-supermarket-mass-shooting-remembered-1-year-after-racist-massacre ................................................................ 31

Turner, H. A., Mitchell, K. J., Jones, L. M., Hamby, S., Wade, R., Jr, & Beseler, C. L., *Gun Violence Exposure and Posttraumatic Symptoms Among Children and Youth*. Journal of traumatic stress, *32*(6), 881–889. (2019) .......................................................... 16

## INTEREST OF *AMICI CURIAE*

*Amicus Curiae* March For Our Lives Foundation ("MFOL") is a
non-profit organization of young people from across the country that
seeks to promote civic engagement in support of sensible gun regulation
and give voice to those who have been harmed by gun violence. On
February 14, 2018, a gunman armed with an AR-15-style assault
weapon murdered 17 people at Marjory Stoneman Douglas High School
in Parkland, Florida. Of the 17 killed, 14 were high school students.
MFOL formed in the wake of that tragedy, and it immediately began
organizing the largest single day of protest against gun violence in the
nation's history. Five years later, MFOL has established itself as one of
the foremost authorities at the intersection of youth-led activism and
advocacy for gun violence prevention, and thousands of young people
have formed MFOL chapters across the country, including in New
Jersey. In the nationwide effort to enact sensible gun regulation, MFOL
serves as a platform for the indispensable voice of the younger
generations, and it is a key resource for those who want to see an end to
gun violence in this country.

1

Unlike previous generations, this nation's youth have come of age at a time when mass shootings in presumptively "safe" places are all too common. Although they did not ask for it, and although no one would have wished it upon them, today's youth have obtained a unique perspective on the tragic scourge of gun violence in this country. Taking account of their voices and experiences is therefore vital to understanding the unprecedented nature of the problem, and to assessing the costs and benefits of measures that governments are attempting to employ in response to it. As a platform for young people affected by gun violence, *amicus* MFOL is uniquely positioned to provide the Court with this important perspective.[1]

---

[1] All of the parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29, Amicus states that no counsel for a party authored this brief in whole or in part. No person or entity, other than *amicus* and their counsel, has contributed money that was intended to fund preparing or submitting this brief.

# SUMMARY OF ARGUMENT

This Court is empowered to consider the negative impact guns have on youth present in sensitive spaces. *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) allows this Court to draw analogies between sensitive spaces the Court has already recognized and other places that are relevantly similar. Additionally, this Court can analogize between historical regulations prohibiting conduct that causes terror and the New Jersey regulations in question preventing firearms from terrorizing those most impacted by gun violence—young people.

From the non-exhaustive list of sensitive spaces presented by the majority opinions in *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008), there arises a key set of characteristics that make these spaces sensitive,and thus needing protection. They predominantly house uniquely vulnerable populations, and their functioning remains essential for American culture, education, and democracy. Additional places not so far enumerated by the Court that share these characteristics can be deemed sensitive through analogy and thus can

be regulated in accordance with the presumptively constitutional regulations on sensitive spaces.

Young people are particularly vulnerable to becoming targets of and being affected by gun violence. Moreover, the New Jersey legislature correctly deemed spaces such as zoos, parks, museums, libraries, and areas of public protest to be sensitive. These spaces exist at the intersection of housing vulnerable young people and bolstering American public life. Allowing guns to be present in these spaces, despite the grave harm they do, particularly to our youth, has the primary and immediate effect of causing terror and preventing youth from fully engaging in their communities and in democracy. Doing so unconstitutionally places the 2nd Amendment over the 1st Amendment. As such, this conduct can also be regulated in accordance with rich American history and tradition of prohibiting behavior that terrorizes the people.

# ARGUMENT

## I. *NYSPRA v. BRUEN* ALLOWS COURTS TO TAKE MODERN IMPLICATIONS OF GUN VIOLENCE INTO THEIR DECISIONS, ESPECIALLY REGARDING SENSITIVE SPACE RESTRICTIONS

### A. Courts are allowed to consider modern day implications of gun violence, especially when evaluating sensitive space restrictions

The Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) acknowledge the ability to regulate guns in certain contexts and for courts to consider modern implications of gun violence in upholding certain gun regulations. *Heller* held that the individual right to keep and bear arms protected by the Second Amendment "was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626.

*Bruen* affirmed that Second Amendment rights are "not unlimited." *Bruen*, 142 S. Ct. at 2128 (citing *Heller*, 554 U.S. at 626). In general, *Bruen* held that to justify laws regulating conduct otherwise protected by the Second Amendment, "the government must

demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. The Court recognized that "historical analogies" are not always "simple to draw," especially in "cases implicating unprecedented societal concerns or dramatic technological changes." *Id.* at 2132. Accordingly, what is "require[d is] only that the government identify a well-established and representative historical **analogue**, not a historical **twin**." *Id.* at 2133 (emphasis added).

*Bruen* explicitly cited *Heller*'s "sensitive places" discussion as an example of a circumstance where "courts can use analogies to [ ] historical regulations . . . to determine that modern regulations [concerning] analogous sensitive places are constitutionally permissible." *Id.*; *see also id.* at 2157 (*Bruen* did not "disturb [ ] anything that we said in *Heller* . . . about restrictions that may be imposed on the . . . carrying of guns") (Alito, J., concurring). Therefore, regulating guns in sensitive spaces is not only constitutional, even under *Bruen*, but courts are also empowered to consider the modern implications of gun violence that led to the modern regulations.

**B.   The Court's non-exhaustive list of sensitive spaces in *Bruen* provides insight into what other spaces can be analogously deemed "sensitive"**

*Heller* and *Bruen* leave room for governments to protect "sensitive places." *Heller*, 554 U.S. at 626 and *Bruen*, 142 S. Ct. at 1233. *Heller* did not fully elucidate the interplay between "sensitive places" and the Second Amendment but identified "presumptively lawful regulatory measures" such as "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Heller*, 554 U.S. at 626-27.

In *Bruen*, the Supreme Court provided additional examples of places deemed "sensitive," for which regulations banning firearms were deemed presumptively constitutional—"e.g., legislative assemblies, polling places, and courthouses." *Bruen*, 142 S. Ct. at 2133. The Court continued that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Id*.

Across the spaces in this list, which is non-exhaustive, there exists a common set of key attributes which can be used to identify other

7

spaces that are relevantly similar and thus analogous. Notably, these spaces are home to vulnerable populations — government officials, elected officials, judges, or children — who are susceptible to being uniquely affected or targeted by gun violence for a myriad of reasons. Additionally, their operation is vital to the democratic and civic health of the United States, and they must operate as safe spaces whose functioning is not suppressed by fear in order to guarantee safe and healthy democracies.

These two characteristics — which oftentimes co-occur — collided in an especially poignant example of the damage that even the mere threat of firearms can wreak when concerning sensitive spaces. No one can testify more to this than March For Our Lives' executive director **Natalie Fall, 35**, who was present when a counterprotester created a gun scare at a MFOL-hosted rally on June 11, 2022 in Washington, DC. The fear that he incited in a 40,000-person demonstration exemplifies the potential for terror and harm that guns in such spaces possess.

Natalie joined March For Our Lives in June 2019 but worked in the gun violence prevention movement for years prior. As the current

executive director, she oversees the development, operations, and
programming of the organization and has met with dozens of gun
violence survivors. Though Natalie has known of gun violence since the
Columbine shooting, which occurred just a few years before she was in
high school, she feels her work as a gun violence prevention advocate
has heightened her awareness of the possibility of encountering a gun
in public. After the tragic shootings in Buffalo and Uvalde in 2022,
Natalie and the March For Our Lives staff felt compelled to rally. She
was joined by tens of thousands of attendees in Washington D.C. on
June 11, 2022.

While planning the rally, Natalie was acutely aware of the
possibility of violence and felt "overwhelmed" by her responsibility to
ensure the safety of attendees and her team. Survivors and MFOL
spokespeople had been dealing with threats of violence for years, and
armed counterprotesters often attended MFOL events to purposefully
"intimidate" attendees. But on the morning of the rally, Natalie
primarily felt excited. She hoped that after her team's hard work, the

event would feel rewarding for them. She couldn't wait for her staff to feel the joy, relief, and pride she knew they'd experience.

Throughout the rally, Natalie stayed backstage, working to ensure the event went smoothly. When a man in the crowd yelled something during a moment of silence that sounded to some like "I am God" or "I have a gun" and threw something in the air, Natalie was no more than 50 feet from the crowd. She saw a small, round object arching through the sky and thought it might be a bomb or a smoke grenade, designed to confuse the crowd so the man could start shooting. She saw the crowd begin to panic while survivors and staff backstage looked terrified. Fearing that the man might have a gun, Natalie turned to flee, but found her path blocked by a large fence. As she turned back and forth, searching for a way to escape and finding none, Natalie thought about her parents, who had attended the rally for her, and the team of volunteers and staff she had brought together. She felt immense terror. She was certain that everyone backstage was trapped, including herself. She awaited the moment she and those in her care would be hurt.

Luckily the assailant had not thrown a smoke bomb into the crowd, but rather, a small speaker. The assailant's clear intention was to scare the protestors by threatening gun violence, and it worked. Even after the security team apprehended the culprit, Natalie was left reeling from the aftermath. Several young people and survivors backstage chose to leave. She struggled to reach her staff on the periphery of the rally, many of whom were reeling from the event themselves. These staff members also witnessed droves of protestors leave after this event — multiple survivors, parents, kids, and young people. They left the rally early, fearful, frustrated, and terrified, even after the situation was resolved.

Since the rally, Natalie and her staff feel more fear when protesting. She thinks about that day every time MFOL plans an event and holds a "much more visceral understanding" of the possibility of a shooting occurring. Natalie considers feeling safe in public spaces the core prerequisite for participating in American civic life. Unfortunately, the possibility of danger at MFOL events is as big of a concern now as it has ever been. Alongside the financial costs of ensuring MFOL events

11

are safe in the face of potential armed counterprotesters, Natalie acutely feels the "psychological and emotional wounds" carried by her and her staff due to the threat of violence at protests.

Threats against the movement and survivors feel more substantial, and armed counterprotesters, who show up to the majority of MFOL events, are a reminder of what happened that day—and what could still happen. These counterprotesters instill terror and intimidation into crowds, and especially crowds at MFOL events, who are disproportionately young people and survivors of gun violence. Protest is a vital part of the conversation in ending gun violence, and the ability to exercise that right freely and without fear is not just crucial to addressing gun violence but to ensuring the vibrance of American civic life.

Natalie's story demonstrates why sensitive spaces are so important. The vulnerability of those present, especially young people, as well as the importance of the tasks they are undertaking, whether getting an education or participating in direct action, are integral to a flourishing civic life. Places populated by young people, especially places

12

with core public and democratic functions, must be protected from the

terror and costs of gun violence.

## II. MUSEUMS, PARKS, LIBRARIES, ZOOS, AND PLACES OF PROTEST ARE SENSITIVE SPACES BECAUSE THEY EXIST AT THE INTERSECTION OF SERVING VULNERABLE POPULATIONS AND SERVING IMPORTANT CIVIC FUNCTIONS

### A. Young people are an example of an especially vulnerable population whose presence can make spaces "sensitive"

Young people are vulnerable to gun violence in two ways—not

only are they more likely to be targets of politically-motivated

shootings, but they are more severely impacted by the effects of gun

violence. As such, spaces that predominantly host youth face a dual

threat, both of which render these spaces sensitive.

Gun violence disproportionately affects young people, and firearm

homicide is the leading cause of death for children ages 1-19.[2] Because

shootings that victimize young people garner extensive media attention

and inspire similar acts of violence, children have become common

---

[2] Goldstick JE, Carter PM, Cunningham RM. *Current epidemiological trends in firearm mortality in the United States*, JAMA Psychiatry 2021;78:241-242.

targets for perpetrators looking to gain notoriety. Additionally, despite the tragically regular active shooter drills, young people are ill-equipped to respond to imminent danger, compounding their vulnerability to the effects of gun violence. Perpetrators therefore often seek out places where young children are present because they appear as "soft targets"—places especially vulnerable to gun violence—rendering schools and other places primarily frequented by youth as sensitive and therefore in need of additional protections.[3]

Aside from instances of mass violence, young people are disproportionately likely to be the victims of firearm violence in general. According to WISQARS, a Center for Disease Control tool designed to visualize fatal injuries, from 2010 to 2020, 82,909 young people between the ages of 0-24 died from gun violence. 59.4% of these deaths were

---

[3] *See, e.g.*, Karimi, Faith; *Mass shooters are increasingly attacking 'soft targets' such as supermarkets. Experts say securing them will be difficult*, CNN, https://www.cnn.com/2022/05/20/us/mass-shooters-soft-targets-challenges-cec/index.html (accessed 7/25/2023).

homicides and 3,752,826 years of potential life were lost,[4] translating

into $126 billion dollars of life lost in 2020 alone.[5]

But the devastating societal harms of having an entire generation

impacted by gun violence is not restricted to the number of lives lost,

nor can it be precisely quantified. The ramifications of firearms

reverberate outward. Young people possess a heightened susceptibility

to the mental and emotional trauma that comes with exposure to

firearms. Regardless of the level of victimization, hearing or witnessing

gun violence elicits symptoms of post-traumatic stress in young

---

[4]*Causes of Injury-Related Death*, Centers for Disease Control and
Prevention, WISQARS, https://wisqars.cdc.gov/data/explore-
data/explore/selected-years (filters included: years from 2010 - 2020, age
range of 0 - 24, mechanism of death: firearm, all injury types, all intents
of death, all geography, all sexes, all races, all ethnicities, metro and
non-metro locations, and Years of Potential Life Lost set to 65)
(accessed 7/25/2023)

[5]*Number of Injuries and Associated Costs*, Centers for Disease Control
and Prevention, WISQARS,
https://wisqars.cdc.gov/cost/?y=2020&o=MORT&i=8&m=20890&g=00&s
=0&u=TOTAL&u=AVG&u=PERCAP&t=COMBO&t=MED&t=VPSL&a
=5Yr&g1=0&g2=20&a1=0&a2=199&r1=MECH&r2=INTENT&r3=NON
E&r4=NONE&c1=&c2= (filters included: year 2020, outcome fatal,
intent violence related, mechanism firearm, geography United States,
ages 0-24 years old) (accessed 7/25/2023).

children.[6] Experiencing gun violence is acknowledged as an adverse childhood experience, or an ACE.[7] Children with 4 or more ACEs are 2.4 times more likely to have a stroke, 1.9 more likely to have cancer, 12 times more likely to attempt suicide, and have further health risks ranging from heart disease to early death.[8]

Especially after Columbine, young people have been taught that they are targets of violence, and that it is imminent enough that they must prepare for the possibility of being shot. Children are disproportionately subjected to thoughts of being victimized by gun violence because of the prevalence of active shooter drills in schools,

---

[6] Turner, H. A., Mitchell, K. J., Jones, L. M., Hamby, S., Wade, R., Jr, & Beseler, C. L., *Gun Violence Exposure and Posttraumatic Symptoms Among Children and Youth*. Journal of traumatic stress, *32*(6), 881–889. (2019) (available at: https://doi.org/10.1002/jts.22466) (accessed 7/25/2023).

[7] *Adverse Childhood Experiences*, We Empower ACEs, https://weempoweraces.org/aces/?gclid=Cj0KCQjwwvilBhCFARIsADvYi7IDbmqN0trQSXekW-kQZVhp2S11yKUyZHcXHRuWW5Eod5WEiNEaFsUaAk77EALw_wcB (accessed 7/25/2023).

[8] *Fast Facts: Preventing Adverse Childhood Experiences*, Center for Disease Control, https://www.cdc.gov/violenceprevention/aces/fastfact.html (accessed 7/25/2023).

with 95% of public schools in the nation holding active shooter drills,[9]

and preschools across the nation practicing hiding and remaining quiet

with children as young as two.[10] These drills, though intended to save

lives, are also linked with increases in depression, stress, anxiety, and

concerns over death, and cause lasting emotional and physical harm.[11]

Young people understand they are targets. They walk through life

bombarded by reminders that they are uniquely susceptible to harm.

Simultaneously, although children are exposed to these constant

threats, they also are especially ill-equipped to be able to remove

themselves from a violent situation. While very few adults are prepared

---

[9] *Reconsider Active Shooter Drills*, Everytown for Gun Safety, https://www.everytown.org/solutions/active-shooter-drills/ (accessed 7/25/2023).

[10] Strauss, Valerie, *Active-shooter drills for preschoolers: This is Who We Are Now*, Washington Post, https://www.washingtonpost.com/news/answer-sheet/wp/2018/02/16/active-shooter-drills-for-preschoolers-this-is-who-we-are-now/ (accessed 7/25/2023).

[11] *The Impact of Active Shooter Drills in School*, Everytown, https://everytownresearch.org/report/the-impact-of-active-shooter-drills-in-schools/?_gl=1*4jswew*_ga*MTk3MzQ1MzIyNS4xNjg5NjA5NDU1*_ga_LT0FWV3EK3*MTY5MDEyNzcyOC4xLjEuMTY5MDEyNzc0OS4wLjAuMA (accessed 7/25/2023).

to deescalate an active shooter situation, children lack the completed
cognitive development, decision-making capabilities, life experience,
and physical and emotional maturity to handle these situations—nor
should they be expected to do so. A 6-year-old should never be put in a
position where they are responsible for their safety and others, yet our
country expects children to handle these sorts of circumstances.

>    **B.    Zoos, parks, museums, and libraries are relevantly
>    similar to the Court's list of sensitive spaces
>    because they are predominantly populated by
>    young people and serve as hubs for congregation
>    and learning**

For the reasons enumerated above, it is clear why schools are
constitutionally protected as sensitive spaces: to protect the vulnerable
population—youth—housed within them, in acknowledgement of how
often they are targeted by perpetrators, and because they serve the
important democratic function of teaching young people how to be
engaged U.S. citizens. This same "why," sanctioned by the Supreme
Court in *Heller* and *Bruen*, is analogous to that of the regulations in
question protecting museums, libraries, parks, and zoos. Despite not
being explicitly reserved for young people, in practice these spaces are
disproportionately populated by them and are often designed to attract

them. Zoos across the country—including in New Jersey—offer

educational programming marketed to children and price their

admission rates to attract children and families.[12] Parks have open

spaces, playgrounds, and athletic courts and fields intended for youth

"informal learning, non-formal programs, and formal instruction."[13]

And cities intentionally use parks to bolster "children's participation in

community development, citizenship, and democratic processes," in

tandem with the civic development that occurs in schools.[14]

---

[12] *See, e.g.*, *Admission & Hours*, Turtle Back Zoo, https://turtlebackzoo.com/admission-hours/ (accessed 7/25/2023); *Early Childhood Programs*, Turtle Back Zoos, https://turtlebackzoo.com/discover/early-childhood-programs/ (accessed 7/25/2023); Bauers, Sandy, *Zoo Program Aims to Include Young Environmentalists*, Inquirer, https://www.inquirer.com/philly/health/science/20130407_Even_the_sig nage_is_inclusive.html (accessed 7/25/2023); and Gregg, Jonathan, *Louisville Zoo program to inspire underserved Children*, Spectrum News, https://spectrumnews1.com/ky/louisville/news/2022/01/05/future-healers-louisville-zoo-underserved-children- (accessed 7/25/2023).
[13] *How cities use parks to . . . Help Children Learn*, Recreation and Park Commission for the Parish of East Baton Rouge, https://www.brec.org/assets/General_Info/Why_R_Parks_Important/Pap ers/Parks-Help-Children-Learn.pdf (accessed 7/23/2023).
[14] *Id.*

In particular, museums and libraries often act as an extension of schools, demonstrating how analogous they are to the purpose, and thus the sensitivity of school grounds. Libraries often exist on or near school campuses and act as a place where young people, especially teens, can congregate and study after school. One study found that one-third of teens aged 12-18 visited public libraries ten times a year or more,[15] and another found that there were over 1.3 billion visits to school libraries in a given year.[16] Furthermore, 87% of public libraries offer services and jobs to teens, which demonstrates their overlap in interacting with vulnerable populations.[17]

Museums also serve as educational and cultural centers for young people. In 2016, 14% of eighth graders had visited a museum with their

---

[15] *Teens are regular and enthusiastic patrons*, American Library Association, December 14, 2011, http://www.ala.org/tools/research/librariesmatter/teens-are-regular-and-enthusiastic-patrons (accessed 7/25/2023).

[16] *Teens Need Libraries*, American Library Association, April 9, 2012. http://www.ala.org/yalsa/teens-need-libraries (accessed 7/25/2023).

[17] *Id.*

class in the previous year.[18] The importance of children's safety in public remains important both in the context of field trips and general attendance; over 25% of eighth graders had also visited museums independent of school activities. In 2017, those between the ages of 18-24 comprised 24% of all adult visitors to museums,[19] demonstrating the presence of youth in these spaces as participants in art, education, and culture.

Just as schools are not buildings that exclusively house children but are in essence created for them and predominantly frequented by them, so too are zoos, parks, libraries, and museums. Even if these spaces are not explicitly or solely reserved for young people, they serve as places primarily frequented by and oriented towards young people. They also exist as spaces of learning; host large gatherings of young people; have public access; and possess teaching and educational facilities, after-school and daycare programs, summer camps, and

---

[18] See *Art Museum Attendance*, American Academy of Arts & Science, https://www.amacad.org/humanities-indicators/public-life/art-museum-attendance (accessed 7/25/2023).
[19] *Id.*

21

additional programming. As correctly found by the lower court, daycares and youth sports events are analogous enough to merit "sensitive space" status. So too should libraries, museums, zoos, and parks.

The same constitutionally endorsed "how" and "why" made to protect the sensitive spaces listed in *Bruen* from the presence of firearms should be applied to zoos, parks, libraries, and museums. To deprive these spaces of sensitive place protections would increase their vulnerability, creating more "soft targets" for perpetrators of violence. Furthermore, allowing for more people to carry guns in these spaces will increase the likelihood of violence occurring, therefore increasing the risk and terror in what should be safe spaces for *everyone* who wishes to use them.

> ### C. Places of protests are relevantly similar to the Court's list of sensitive spaces because they are predominantly populated by young people and serve a crucial function for American democracy

Places of protest are relevantly similar to the sensitive spaces outlined in *Bruen* because they share the exact traits that make those places sensitive. Like those spaces, places of protest host particularly

vulnerable populations that often serve as targets for shootings intended to incite fear. Many demonstrations occur for political causes that invite retaliation, and most guns at protests are brought by armed counterprotesters.[20] Indeed, for many attendees, the presence of guns at protests is "just about pure intimidation."[21] Not only are such demonstrations oftentimes for political causes that invite retaliation, but they are also disproportionately populated by young people. Forty-one percent of adults aged 18-29 attended a protest from May 2020 to June 2020, compared to 19 percent of the U.S. adult population.[22]

---

[20] *Armed Assembly, Guns, Demonstrations, and Political Violence in America*, ACLED and Everytown, August 2021, https://acleddata.com/acleddatanew/wp-content/uploads/2021/08/Report_Armed-Assembly_ACLED_Everytown_August2021.pdf (accessed 7/25/2023).
[21] McIntire, Mike, *At Protests Across America, Guns are Doing the Talking*, New York Times, https://www.nytimes.com/2022/11/26/us/guns-protests-open-carry.html (accessed 7/25/2025).
[22] Barroso, Amanda and Minkin, Rachel, *Recent protest attendees are more racially and ethnically diverse, younger than Americans overall*, Pew Research Center, https://www.pewresearch.org/short-reads/2020/06/24/recent-protest-attendees-are-more-racially-and-ethnically-diverse-younger-than-americans-overall/ (accessed 7/25/2023).

Teenagers under the age of 18 have begun attending protests with increased regularity, organizing some of the highest-profile events.[23]

Places of protest, demonstration, and public assembly, whether with a government permit or spontaneous, play a uniquely important role in American society. They are where Americans air grievances, find community, celebrate, and coalesce as political bodies. This right was acknowledged and established as one of the country's first, as "the right of the people peaceably to assemble." U.S. Const. amend. I. As such, like legislative assemblies, polling places, and courthouses, places of protest remain crucial for the functioning of American democracy. The places listed in *Bruen* are sensitive because their core democratic functions require citizens, judges, and participants to be free of intimidation and feel safe in order to operate. Places of protest require these same guarantees.

---

[23] Mostafavi, Beata, *National Poll: More Teens Participating in Protests Against Racism*, Michigan Medicine, https://www.michiganmedicine.org/health-lab/national-poll-more-teens-participating-protests-against-racism (accessed 7/25/2023); and Coylar, Brock, *6 Teels Organized a Protest. 10,000 People Showed Up*, The Cut, https://www.thecut.com/2020/06/6-teens-organized-a-protest-10-000-people-showed-up.html (accessed 7/25/2023).

**D.    The American history and tradition of protest, as well as the *Bruen* methodology, was misapplied in the district court decision**

The lower court found that, historically, many public places specifically allowed for firearms at public assemblies, or even mandated it, because of a fear of danger. However, many of the laws that the lower court referenced are from the colonial era, where two truths existed that are no longer relevant in the modern world: the fear of danger from Indigenous Americans or slave revolts, and the dual role that colonial-era citizens played as law enforcement members.

Colonial-era policies around guns that drew their justification from the supposed dangers that white Americans faced from oppressed minority groups is a deeply difficult history to rely on. Additionally, the lower court misinterpreted the methodology set out in *Bruen*, which explicitly stated that laws must evolve with changing social conditions. *Bruen* said:

> [T]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. But the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated, even though its meaning is fixed according to the understandings of those who ratified it.

25

142 S. Ct. at 2132 (citation omitted).

The majority wrote this regarding the evolving nature and use of various types of arms, but it also applies to the need for updated laws based on modern concerns and new technologies. Certainly, the abolition of slavery and the passing of the 14th Amendment are grounds to look to laws that have an updated understanding of public safety in areas of assembly.

Furthermore, *Bruen* argues that judges should look at the "how" and "why" a gun regulation was created. The "how" does not apply to New Jersey's sensitive space restrictions. Those who were mandated to carry guns at these kinds of public assemblies were acting, in essence, as the singular protective force with special dispensation to act as a common defense at a time when the country lacked a standing army. These individuals were not acting as private citizens at these public events, but as militia members entrusted to ensure public safety against attacks. The justification, the "why," for these laws is also obsolete in the modern world. The threats that colonial-era lawmakers

feared, from Indigenous Americans and enslaved individuals, are moot in a modern context, especially in places of public demonstration.

## III. REGULATIONS ON THESE SENSITIVE SPACES ARE ALSO CONSTITUTIONAL BECAUSE THEY FALL INTO THE ROBUST AMERICAN TRADITION OF REGULATING CONDUCT THAT CAUSES TERROR

### A. The United States has a robust history and tradition of regulating conduct that causes terror

Regulating conduct that causes terror is well within the government's right and does not contravene the Second Amendment. Legislatures can regulate activity that causes terror in accordance with this country's rich history of prohibiting conduct that has the primary effect of spreading fear. As explicated in *Bruen*, there is a robust tradition of constitutionally regulating conduct that causes terror. Colonial-era regulations in Massachusetts and New Hampshire prohibited those who carried weapons "**in Fear or Affray of Their Majesties Liege People**." 1692 Mass. Acts and Laws no. 6, pp. 11–12; see 1699 N. H. Acts and Laws ch. 1 (emphasis added). The majority noted these laws "merely codified **the existing common-law offense of bearing arms to terrorize the people,** as had the Statute of Northampton itself." *Bruen* 142 S. Ct. at 2142-43 (emphasis added).

27

The Court then considered three additional regulations—a 1786 Virginia statute, a 1795 Massachusetts statute, and an 1801 Tennessee statute—which the Court noted "prohibit bearing arms in a way that **spreads 'fear' or 'terror' among the people**," which "require[s] something more than merely carrying a firearm in public." *Bruen*, 142 S. Ct. at 2145. The majority held that because "merely carrying a firearm in public" alone does not cause terror, the public carrying licensing law at question in *Bruen* was unconstitutional. *Id*. In doing so, they left intact the tradition of regulating firearms that are carried in a way that does cause terror to the public.

For those born after or who were in school when the Columbine shooting occurred—like Natalie—the mere presence of a gun *does* have the primary effect of causing terror. But even if it didn't, the conduct at question in this case is not "merely carrying a firearm in public." This case concerns the carrying of firearms into specific locations that, because of the populations they house and the functions they serve, are analogously sensitive like the places listed in *Bruen*. As the New Jersey legislature rightfully understood, and as the lower court did not,

28

carrying firearms into sensitive spaces is the necessary element that transforms innocuous public carry into terrorizing carry. Courts can thus draw analogies to American history of regulating terrorizing conduct to defend modern regulations enacted for similar purposes and with similar methods.

### B.    Allowing guns into sensitive spaces uniquely imperils young people and has the primary effect of causing terror

Even when not used to lethal effect, and even in spaces not deemed "sensitive," firearms instill fear and chip away at Americans' sense of security in public places. Both scientific and anecdotal evidence establish that the mere presence of firearms in public sparks terror in Americans who wish to use these spaces for their intended purposes. One study found that Americans feel less safe as more people in their community carry guns and do not believe that regular citizens should be allowed to bring their guns into certain areas, such as college campuses, sports stadiums, bars, hospitals, and restaurants.[24]

---

[24] Hemenway, David, Azrael, Deborah, Miller, Matthew, *U.S. national attitudes concerning gun carrying. Injury Prevention*, 2001; 7:282-285, can be found at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1730790/pdf/v007p0028

A 2019 Harris Poll found that 79% of Americans experience stress from the possibility of a mass shooting, with about a third reporting that they "cannot go anywhere without worrying about being a victim."[25] The possibility of encountering gun violence in public appears imminent and tangible for everyday Americans. On March 22, 2021, ten people were killed in a mass shooting at a grocery store in Boulder, Colorado.[26] Two days later, a man entering a grocery store in Atlanta, Georgia with an AR-15-style rifle caused "panic, terror and the evacuation" of the store.[27] The man did not make any threats or fire any

---

2.pdf ("By a margin of 5 to 1, Americans feel less safe rather than safer as more people in their community begin to carry guns. By margins of at least 9 to 1, Americans do not believe that regular citizens should be allowed to bring their guns into restaurants, college campuses, sports stadium, bars, hospitals or government buildings.").

[25] *One-Third of US Adults Say Fear of Mass Shootings Prevents Them from Going to Certain Places or Events*, American Psychological Association, https://www.apa.org/news/press/releases/2019/08/fear-mass-shooting (accessed 7/25/2023).

[26] Campbell-Hicks, Jennifer and Brennan, Noel, *Boulder King Soopers Shooting: 1 Year Later*, 9news, https://www.9news.com/article/news/local/boulder-shooting/boulder-king-soopers-shooting-one-year/73-cc012646-e3b8-4972-a28f-953915c3d322 (accessed 7/25/2023).

[27] Fausset, Richard, *A Heavily Armed man Caused Panic at a Supermarket. But Did He Break The Law?*,

shots, but the mere presence of him carrying a firearm into a grocery store caused mass terror. *Id.* Given that just a year later there was another mass shooting at a grocery store, this time in Buffalo, New York, the patrons of the Atlanta grocery store were reasonable to fear for their lives upon seeing an armed man enter the store.[28]

Because of sensitive places' unique vulnerability to disruption and harm, the presence of weapons—even if wielded with completely innocuous intentions—have the primary and immediate effect of causing terror, more so than in other public areas.

### C. The terror that the possibility of guns in these spaces invoke will have a chilling effect on our democracy, unduly elevating Second Amendment rights

This fear of encountering weapons in public has a negative impact on Americans' right to participate in democratic processes and access public spaces. Young people are disproportionately impacted by gun

---

https://www.nytimes.com/2023/01/02/us/atlanta-gun-laws.html (accessed 7/25/2023).
[28] Thomas, Carolyn, *Victims of Buffalo supermarket mass shooting remembered 1 year after racist massacre*, PBS, https://www.pbs.org/newshour/nation/victims-of-buffalo-supermarket-mass-shooting-remembered-1-year-after-racist-massacre (accessed 7/25/2023).

violence, and the presence of guns in public spaces especially terrorizes them. Thus, the spaces that serve significant numbers of young people must remain gun free. This is what underlies the importance of declaring museums, libraries, zoos, and parks sensitive spaces: We must protect young people in the spaces that serve them.

Likewise, we must allow protests to remain gun-free. Gun violence—or the threat of it—at protests fundamentally chills the exercise of First Amendment rights. When private citizens can bring firearms to protests, it directly affects the level and feeling of safety of others present, and can turn a volatile situation into a deadly one. Armed protestors and counterprotesters signal a threat to most rational people, and increase the risks of attending a protest; armed protests are 6 times more likely to turn violent than unarmed ones.[29]

These risks are most salient for young people, who are the most vulnerable to experiencing gun violence. In a heated political situation,

---

[29] *Armed Assembly: Guns, Demonstrations, and Political Violence in America*, ACLED and EveryTown, August 2021, accessed at: https://acleddata.com/acleddatanew/wp-content/uploads/2021/08/Report_Armed-Assembly_ACLED_Everytown_August2021.pdf.

the presence of firearms may prevent protestors from taking actions they would otherwise do because of a fear of being shot. If and when any rational person fears that guns will be brought to protest, it will impact turnout and participation. The impacts of guns at protests, especially as to how they impact vulnerable groups, is most salient in Natalie's story. When guns, or the threat of guns, are present, the gun-wielder isn't making a political statement, but rather one of intimidation. Protesting is about where the number of people matters more than their individual privilege; guns at nonviolent protests clearly stand in the way of nonviolent motives and serve to silence the opposition.

As such, armed protesters constitute "an attack on public order and public safety," as those wielding weapons at a peaceful assembly "drown out the voices of others[ ] and [ ] elevate their claims over those of others." Blocher, Joseph & Siegel, Reva B., *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller*, 116 N.w. U. L. Rev. 139, 156 (2021).[30] As a result, "[t]he government

---

[30] *See also* Ayres, Ian, Vars, Fredrick , *Opinion: Peaceful Assembly Can't Happen Without the Option of Gun-Free Events*, Wash. Post (Oct. 28, 2020), https://www.washingtonpost.com/opinions/2020/10/28/peaceful-

has a substantial interest in protecting the public from the fear,
intimidation, and increased risk of violence that armed protests create."
DeBoer, Katlyn E., *Clash of the First and Second Amendments:
Proposed Regulation of Armed Protests*, 45 Hastings Const. L.Q. 333,
369 (2018).

One study found that states with more guns have lower levels of
mutual trust and civic engagement,[31] including formal and informal
community connectedness.[32] A recent analysis of historical laws
banning guns in public spaces found that "armed crime and terror in [ ]
vital public spaces can directly or indirectly suppress voter turnout and

---

assembly-cant-happen-without-option-gun-free-events/ (accessed
7/25/2023) ("The presence of counterprotesters carrying deadly weapons
has had a chilling effect on the rights of others to engage in expressive
association."); and Palmer, Diana, *Fired Up or Shut Down: The Chilling
Effect at Armed Protests*, Ne. Univ. (Apr. 2021),
https://repository.library.northeastern.edu/files/neu:bz60rq30r (accessed
7/25/2023) (mixed methods study revealing a chilling effect on
participants' First Amendment behaviors at protests with firearms
present).
[31] Hemenway, David, Kennedy, Bruce, Kawachi, Ichiro, and Putnam,
Robert D, *Firearm prevalence and social capital*, Annals of
Epidemiology. 2001; 11:484-490; available at
https://www.sciencedirect.com/science/article/abs/pii/S104727970100235
6?via%3Dihub (accessed 7/25/2023).
[32] *Id.*

other forms of democratic participation."[33] Sensible gun restrictions like New Jersey's play a part in "protect[ing] people's freedom and confidence to participate in every domain of our shared life, from … voting, assembling in peaceable debate, counting electoral votes, and participating in the inauguration of a President." Blocher & Siegel, *supra* at 141.

What does it mean if a society has a generation, traumatized by gun violence, who is then less likely to protest? It means that even if the First and Second Amendment rights appear equal in theory, the freedoms of speech and assembly will become subordinate, second-class rights in practice. As both empirical and anecdotal evidence

---

[33] Blocher, Joseph and Siegal, Reva, *Guided By History: Protecting the Public Sphere From Weapons Threats Under Bruen*, New York University Law Review, Vol. 98, 2023, Duke Law School Public Law & Legal Theory Series No. 2023-17, July 10, 2023 (can be accessed: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4355024) (accessed 7/25/2023) (citing *e.g.*, Brennan Gardner Rivas, The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930, at 73 (May 2019) (Ph.D. dissertation, Texas Christian University) (stating that the kinds of locations and events protected by the Texas 1871 law were the very ones that most frequently became targets of Klan or other white vigilante intimidation and violence for the purpose of Black voter suppression)).

demonstrate, the fear of being injured or killed by a firearm often outweighs one's desire to express their opinions in a setting no longer guaranteed to be safe. In one nationally representative study, 60% of respondents said they would be "very unlikely" to attend a protest where guns were present.[34]

The threat of guns at places of protest or other public gatherings decreases the likelihood of peaceable assemblies. Engaging in the right to assemble should not equal forfeiting one's right to safety. While allowing for guns at places of protest may facially appear to level the constitutional playing field, quite the opposite holds true: Allowing for guns at protests elevates a Second Amendment right at the expense of the First Amendment.

## CONCLUSION

The threat of guns at places of protest or other public gatherings decreases the likelihood of peaceable assemblies. Vulnerable

---

[34] Filindra, Alexandra, *Americans do not want guns at protests, this research shows*, Washington Post, https://www.washingtonpost.com/politics/2021/11/21/americans-do-not-want-guns-protests-this-research-shows/ (accessed 7/25/2023).

populations must have guarantees that their ability to demonstrate or gather peaceably should not be threatened by a well-armed contingence of those who also decide to attend an event, and the rights of one citizen to publicly wield a firearm cannot be allowed to trump those of another who wishes to assemble but fears danger from fellow citizens.

*/s/ Jasmeet K. Ahuja*
Jasmeet K. Ahuja
I.D. No. 322903
Hogan Lovells US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
(267) 675-4600
jasmeet.ahuja@hoganlovells.com

*Counsel for Amicus Curiae March For Our Lives Foundation*

Dated: July 27, 2023

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Fed. R. App. P. 29, Circuit Rule 29, Fed. R. App. P. 32, and Circuit Rule 32 because this document contains 6,494 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This document complies with the typeface and type-style requirements of Fed. R. App. P. 32 and Circuit Rule 32 because this document has been prepared in a proportionally spaced typeface in 14-point Century Schoolbook style font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Vipre Virus Protection, version 3.1 has been run on the file containing the electronic version of this brief and no viruses have been detected.

Date: July 27, 2023

*/s/ Jasmeet K. Ahuja*
Jasmeet K. Ahuja

## CERTIFICATION OF ADMISSION TO BAR

I, Jasmeet K. Ahuja, certify as follows:

1.      I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.      Pursuant to 28 U.S.C. § 1746, I certify under penalty that the foregoing is true and correct.

Hogan Lovells US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103

*Counsel for Amicus Curiae March For Our Lives Foundation*

*/s/ Jasmeet K. Ahuja*
Jasmeet K. Ahuja (PA ID No. 322903)

Dated:      July 27, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2023, the brief of *amici curiae* March For Our Lives Foundation was filed with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Jasmeet K. Ahuja*
Jasmeet K. Ahuja