# No. 23-1900

## United States Court of Appeals
## For the Third Circuit

---

**RONALD KOONS et al.,**
*Plaintiffs-Appellees,*

- *v* -

**MATTHEW J. PLATKIN, et al.,**
*Defendants-Appellants.*

---

**AARON SIEGEL et al.,**
*Plaintiffs-Appellees,*

- *v* -

**MATTHEW J. PLATKIN, et al.,**
*Defendants-Appellants.*

---

**On Appeal from the United States District
Court for the District of New Jersey**
Nos. 22-cv-7463, 22-cv-7464 (RMB)

---

## BRIEF OF AMICUS CURIAE COUNTY
## PROSECUTOR'S ASSOCIATION OF NEW JERSEY

---

**JEFFREY SUTHERLAND**
*Cape May County Prosecutor*
*President, County Prosecutor's Association NJ*

LAURA SUNYAK
*Assistant Mercer County Prosecutor*

RANDOLPH MERSHON III
*Assistant Middlesex County Prosecutor*

MONICA DO OUTEIRO
*Assistant Monmouth County Prosecutor*

GRETCHEN PICKERING
*Assistant Cape May County Prosecutor*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ii

INTEREST OF AMICUS CURIAE ............................................................ 1

ARGUMENT

    THE DEMOCRATICALLY-ENACTED SENSITIVE PLACES
    PROVISIONS OF CHAPTER 131 ARE AN INDISPENSABLE
    TOOL OF LAW ENFORCEMENT TO PROMOTE THE SAFETY
    OF THE PUBLIC AND RESPONDING LAW ENFORCEMENT
    AGENCIES ............................................................................... 5

CONCLUSION ....................................................................................... 24

# TABLE OF AUTHORITIES

## *Cases*                                                               *Page*

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ............................................................................ 5

*New York State Rifle & Pistol Association v. Bruen,*
  142 S. Ct. 2111 (2022) ............................................................ 2, 5, 8, 9

*Shinn v. Ramirez,*
  142 S. Ct. 1718 (2022) ......................................................................... 1

*State v. Mai,*
  993 A.2d 1216 (N.J. 2010) ................................................................. 17

## Statutes

2022 N.J. Laws, ch. 131 ...............................................................passim

N.J.S.A. 2C:39-1 ............................................................................... 3

Statute of Northampton of 1328, 2 Edw. 3, c. 3 (1328) ............................ 6

## Other Authorities

*2 Shot Outside PNC Bank Arts Center After J.Cole, Big Sean Concert In
New Jersey: Cops,* https://www.nbcnewyork.com/news/local/shooting-
pnc-bank-arts-center-j-cole-holmdel-new-jersey/1189499/ (last accessed
July 27, 2023) ............................................................................... 12

Attrino, Anthony, *Road raging N.J. driver fired 2 shots at car while trying
to merge, cops say.* Available at
https://www.nj.com/somerset/2023/05/road-raging-nj-driver-fired-2-
shots-at-car-while-trying-to-merge-cops-say.html (last accessed July 20,
2023) ......................................................................................... 17

Branas, Charles C., et al., *Investigating the Link Between Gun Possession
and Gun Assault,* Am J Public Health. 2009 November; 99(11): 2034–
2040, available at https://www.ncbi.nlm.nih.gov/pmc/articles/
PMC2759797/ ................................................................................. 9

Brant, Joe, *10-Year-Old Boy Shot at Pleasantville-Camden Football Game
Dies Of His Wounds,* https://www.nj.com/atlantic/2019/11/10-year-old-
boy-shot-at-pleasantville-camden-football-game-dies-of-his-wounds.html
(last accessed July 27, 2023) ............................................................. 13

Burd-Sharps, Sarah; Tetens, Paige; Szkola, Jay *Road Rage Shootings Are Continuing to Surge*, available at https://everytownresearch.org/reports-of-road-rage-shootings-are-on-the-rise/ (last accessed July 21, 2023) ... 16

Burke, Minyvonne, *5 Arrests in New Jersey High School Football Game Shooting That Critically Injured 10-Year-Old*, https://www.nbcnews.com/news/us-news/man-young-boy-shotnew-jersey-high-school-football-game-n1084146 (last accessed July 26, 2023) ................................................................................................. 13

Everytown Research and Policy, *Guns in Bars*, available at https://everytownresearch.org/report/guns-in-bars/?_gl=1*jlxsje*_ga*mte 0mtiyntgwlje2odk2odkwotm.*_ga_lt0fwv3ek3*mty4oty4ota5nc4xljeumt y 4oty4ote3ns4wljauma (last accessed July 21, 2023) ........................... 22

Gun Violence Archive, *Mass Shootings* (All Years), available at https://www.gunviolencearchive.org/mass-shooting ................................ 8

Hauck, Grace *Road rage shootings are increasing. There were more than 500 last year, report finds.* Available at https://www.usatoday.com/story/news/nation/2023/03/20/road-rage-shootings-rising-us-report-finds/11484488002/ (last accessed July 20, 2023) ................................................................................................. 17

Johns Hopkins Bloomberg School of Public Health, *New Report Offers Policy Recommendations to Address Alcohol Use as Risk Factor for Gun Violence*, available at https://publichealth.jhu.edu/2023/new-report-offers-policy-recommendations-to-address-alcohol-use-as-risk-factor-for-gun-violence .............................................................................................. 23

Kevin Simpson, *Shoppers Pulled Guns in Responses to Thornton Walmart Shooting, But Police Say That Slowed Investigation,* The Denver Post (Nov. 2, 2017), https://www.denverpost.com/2017/11/02/shoppers-pulled-weapons-walmart-shooting/ ................................................................... 27

Kudisch, Brianna, *N.Y. man, 22, arrested for road rage shooting in N.J.* available at https://www.nj.com/news/2022/03/ny-man-22-arrested-for-road-rage-shooting-in-nj.html (last accessed July 21, 2023) ................. 18

Lippmann S. *Guns: dangerous, especially for suicide, and costly for America*. Psychiatry (Edgmont). 2010 Feb;7(2):14-5; available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2848468/ ..................... 28

Mascia, Jennifer and Fairriona Magee, *One Major Factor Missing From the Gun Safety Debate: Alcohol*, June 21, 2023, available at https://www.thetrace.org/2023/06/alcohol-gun-laws-carry-while-drunk/ ................................................................................................ 24

Mascia, Jennifer and Fairriona Magee, The Trace, *One Major Factor Missing From the Gun Safety Debate: Alcohol*, June 21, 2023, available at https://www.thetrace.org/2023/06/alcohol-gun-laws-carry-while-drunk/ ................................................................................................ 22

MetLife Stadium Guest Policies, *Alcohol Policy*, available at https://www.metlifestadium.com/guest-services/guest-policies (last accessed July 19, 2023) .......................................................................... 11

Moyer, Melinda Wenner, *Will a Gun Keep Your Family Safe? Here's What the Evidence Says*, available at https://www.thetrace.org/2020/04/gun-safety-research-coronavirus-gun-sales/ ................................................. 26

Nieto-Munoz, Sophie, *New Jersey casino owners say guns will not be permitted in casinos*, New Jersey Monitor, February 7, 2023, available at https://newjerseymonitor.com/briefs/new-jersey-casino-owners-say-guns-will-not-be-permitted-in-casinos/ .................................................. 25

*Police Respond To Shooting On Basketball Court At Park In New Jersey*, https://abc7ny.com/nj-shooting-new-jersey-passaic-county/13087004 (last accessed July 26, 2023) ................................................................. 13

Sheldon, Chris, *State Police release new photos in search for clues in road rage killing on N.J. highway*, available at https://www.nj.com/news/2022/03/state-police-release-new-photos-in-search-for-clues-in-road-rage-killing-on-nj-highway.html (last accessed July 21, 2023) ...................................................................................... 18

State of New Jersey Department of Law and Public Safety, *Combatting Gun Violence*, https://www.njoag.gov/programs/combatting-gun-violence (last accessed July 18, 2023)........................................................................ 3

Thomas, TaRhonda, *Girl, 6, Injured In Shooting During July 4th Fireworks In Camden, New Jersey*, https://6abc.com/camden-fireworks-shooting-july-4th-child-shot-fourth-of-nj/13464013/ (last accessed July 26, 2023) ................................................................................................ 14

Torrejon, Rodrigo, *2 victims of Meadowlands RaceTrack shooting IDed, found in FanDuel parking lot, records show*, available at https://www.nj.com/bergen/2020/10/two-victims-of-meadowlands-racetrack-shooting-found-in-fanduel-parking-lot-records-show.html (last accessed July 19, 2023) ........................................................................... 12

Villarreal, Silvia, et al., *Alcohol Misuse and Gun Violence: An Evidence-Based Approach for State Policy*, pp. 18, available at https://publichealth .jhu.edu/sites/default/files/ 2023-05/2023-may-cgvs-alcohol-misuse-and-gun-violence.pdf ..................................................................................... 23

Yan, Holly and Artemis Moshtaghian, *FBI Agent Loses His Gun During Dance-Floor Backflip, Accidentally Shoots Bar Patron*, June 4, 2012, available at https://www.cnn.com/2018/06/03/us/dancing-fbi-agent-gun-discharge/index.html#:~:text=Video%20of%20the%20off-duty%20agent%20showed%20him%20unleashing,gun%20as%20he%20performed%20a%20back%20handspring.%20KMGH (last accessed July 27, 2023) ................................................................................................ 21

## INTEREST OF AMICUS CURIAE

The County Prosecutor's Association of New Jersey submits this brief as *amicus curiae* in support of defendant-appellant Matthew Platkin, Attorney General of New Jersey. The parties have consented to the filing of this *amicus* brief.[1]

By its order, the District Court has enjoined New Jersey's ability to enforce key provisions of Chapter 131, *see* 2022 N.J. Laws, ch. 131 (D.E. 88-1), which prohibit concealed firearm carry in the most sensitive places, *e.g.*, entertainment facilities, libraries, museums, casino, parks, libraries, museums, zoos, places serving alcohol, and loaded and unsecured inside vehicles. D.E. 34-35; D.E. 51-52; D.E. 124 (Op.); 125 (Order). The New Jersey Legislature enacted this statute as a vital mechanism in the fight against gun violence and the protection of New Jersey's citizens from the horrors of violent crime. *See Shinn v. Ramirez*, 142 S. Ct. 1718, 1730-31 (2022) (recognizing the "State's sovereign power to enforce societal norms through criminal law").

---

[1] This brief has been authored independently of any party's counsel. CPANJ received no money from a party, a party's counsel, or any other outside source to fund the preparation or submission of this brief.

1

As the Attorney General of New Jersey has demonstrated, the challenged provisions of Chapter 131 are consistent with *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), as New Jersey has presented substantial evidence that governments at both the founding of the United States and during the Reconstruction Era limited the carrying of firearms in either identical or similar locations, *e.g.*, at fairs and in ballrooms, in educational institutions, and at parks and zoos. While *Bruen* narrows a state's ability to place restrictions upon the carrying of firearms, it does not eliminate a state's discretion to implement gun safety laws responsive to circumstances aimed at keeping the citizens of that state safe and protected.

The County Prosecutor's Association of New Jersey ("CPANJ"), which is compromised of the County Prosecutors who lead the 21 county prosecutor's offices in New Jersey, has a direct interest in the continuing validity of all the carry restrictions enumerated in Chapter 131. CPANJ's goal is to promote the orderly administration of criminal justice within each and every member county and to fairly and effectively enforce the constitution and laws of the United States and this State. Doing so is made greatly more difficult for CPANJ's member counties due to factors unique to New Jersey. New Jersey is one of the most densely populated states in

the United States and is home to almost 9.5 million residents.

The fight against gun violence is in the forefront of priorities for not only New Jersey's leaders, but also the members of CPANJ.[2] CPANJ members routinely prosecute defendants who use firearms in the commission of violent crimes throughout the State, crimes that include murders, attempted murders, aggravated assaults, aggravated sexual assaults, and robberies. CPANJ's Prosecutors and their teams are also charged with the enforcement of laws that criminalize unlicensed possession of firearms, the possession of firearms with the intent to use them unlawfully, and the possession of dangerous and unusual firearms. *See* N.J.S.A. 2C:39-1, *et seq.*

The prosecutions of crimes relating to the possession and use of firearms, however, are but one tool in law enforcement's arsenal against gun violence that plagues both New Jersey and the nation. Chapter 131's sensitive places restrictions are critical to ensure that all citizens, including the most vulnerable citizens – children – are protected from the dangerous and unnecessary presence of firearms in locations where they

---

[2]   *See* State of New Jersey Department of Law and Public Safety, *Combatting Gun Violence,* https://www.njoag.gov/programs/combatting-gun-violence (last accessed July 18, 2023).

go to learn, play, and be entertained. With New Jersey being one of the most densely populated states, these restrictions are critical to law enforcement's ability not only to keep people safe, but to safely respond to violent situations that arise. It is not just CPANJ's belief, but also plain common sense, that violent situations are far more likely to turn fatal when a firearm is introduced into the equation. Chapter 131's sensitive places provisions are, thus, a vital part of a comprehensive approach to defeating gun violence and protecting the citizens of New Jersey.

Sensitive place restrictions are neither new, nor are they unique to New Jersey. Such restrictions are directly linked to locations in which firearms have historically been regulated. The Attorney General of New Jersey has demonstrated not only that these common-sense restrictions have always been an available, critical tool for law enforcement's use in protecting our communities, but also that they must be allowed to continue as a tool available to the members of CPANJ and law enforcement throughout the State. The CPANJ, therefore, joins the Attorney General's request for relief from this Court.

## ARGUMENT

### THE DEMOCRATICALLY-ENACTED SENSITIVE PLACES PROVISIONS OF CHAPTER 131 ARE AN INDISPENSABLE TOOL OF LAW ENFORCEMENT TO PROMOTE THE SAFETY OF THE PUBLIC AND RESPONDING LAW ENFORCEMENT AGENCIES

The United States Supreme Court has repeatedly emphasized that the Second Amendment allows states to enact location-based restrictions on the right to carry a firearm. The Court has stated that the Second Amendment casts no doubt on "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings"— a list the Court did "not purport to be exhaustive." *District of Columbia v. Heller,* 554 U.S. 570, 626-27 & n. 26 (2008). Looking to 18th and 19th century, the *Bruen* Court acknowledged historical restrictions on firearms at legislative buildings, courthouses, and polling places, and explained that "modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Bruen*, 142 S. Ct. at 2133.

Without a doubt, a state as densely populated as New Jersey faces a myriad of problems the Founder Fathers would neither have encountered, nor of which they could have even dreamed possible. The *Bruen* Court recognized that "[t]he regulatory challenges posed by firearms today are

not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," and, as such, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." 142 S. Ct. at 2132.

Chapter 131's sensitive places restrictions are in line with *Bruen*. The problems posed by the presence of firearms within these modern-day sensitive locations parallels concerns that led to enactments such as the Statute of Northampton of 1328, 2 Edw. 3, c. 3 (1328), which forbade the carrying of firearms into "Fairs" and "Markets." The justification for these historical regulations was simple, and still holds true today, centuries later: 1. firearms cause substantially more harm in large crowds of people, and 2. an individual's ability to use a firearm in self-defense is limited when surrounded by the masses.

Governments have, therefore, long prohibited the possession of firearms in locations where public safety concerns were deemed most striking: on government property; in places critical to the exercise of constitutional rights, *e.g.*, houses of worship and locations of public assembly; locations performing important public educational, literary, or scientific activities; places containing vulnerable people, *e.g.*, children; and fairs, ballrooms, parties, public exhibitions, and other places where a large

6

numbers of people would gather in a confined space.

The places in which modern-day communities come together may look different from the gatherings of the Founding or Reconstruction eras. This is merely a function of the constant evolution of society. Regardless of these differences, the same risks are inherent in the gathering of large groups of people no matter the year on the calendar. It cannot be understated that large gatherings of the public amplify the inherent risks posed by firearm possession, both then and now. In fact, the CPANJ would submit that the evolution of technology over the centuries, which has resulted in the invention of firearms capable of rapidly firing more and more-deadly ammunition, has only increased the governmental need to protect the citizenry when gathered in one place.

Our nation's tragic recent history of mass shooting events bears witness to the true threat that firearms pose to crowds of our citizens: the Century 16 movie theater shooting in Aurora, Colorado (July 20, 2012; **12 murdered**); the Pulse nightclub shooting in Orlando, Florida (June 12, 2016; **50 murdered**); the Mandalay Bay Casino concert shooting in Las Vegas, Nevada (Oct. 1, 2017; **59 murdered**); the Borderline Bar and Grill shooting in Thousand Oaks, California (Nov. 7, 2018; **13 murdered**); and the Tops Supermarket shooting in Buffalo, New York (May 14, 2022; **10**

**murdered**).[3] Added to this anecdotal evidence are studies that have shown that individuals in possession of a gun were 4.46 times more likely to be shot in an assault than those not in possession of a firearm, and 4.23 times more likely to be fatally injured in an assault.[4] It is simply without dispute that the possession of firearms presents a clear danger, even when carried for self-defense – a danger that is only heightened in crowded areas.

Since the Second Amendment should be read to include the deadlier forms of firearms available today, weapons that could not even have been imagined by our Founding Founders, *see Bruen*, 142 S. Ct. at 2132, so too should it be read to apply that same flexibility to which gathering locations are threatened by these modern firearms and, thus, can constitutionally be classified as protected sensitive places.

Exemplary of this necessary constitutional flexibility are Chapter 131's restriction on firearm carrying in theaters, stadiums, museums, arenas, racetracks or "other places where performances, concerts, exhibits, games or contests are held." Ch. 131 § 7(a)(17). As the Attorney General

---

[3]    *See, e.g.*, Gun Violence Archive, *Mass Shootings* (All Years), available at https://www.gunviolencearchive.org/mass-shooting.

[4]    Branas, Charles C., et al., *Investigating the Link Between Gun Possession and Gun Assault*, Am J Public Health. 2009 November; 99(11): 2034–2040, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2759797/.

noted, the tradition of restricting firearms at public social assemblies began as early as this country's founding in North Carolina and Georgia and continued into states like Louisiana, Texas, Tennessee, and Missouri. D.E. 91 (Pl.Opp.) 49-50. While the ballrooms of 1816 New Orleans did not host exactly the same social events common today at New Jersey's Meadowlands complex – home to the 82,500-seat MetLife Stadium, which hosts 20 National Football League ("NFL") games per season, along with numerous concerts and other sporting events – the restrictions in historical New Orleans are nonetheless *relevantly* similar." *Bruen*, 142 S. Ct. at 2132. As the New Jersey Attorney General has noted, these differences only serve to amplify the existence today of the very same concerns that prompted the prohibition on firearms in ballrooms 207 years ago. Modern entertainment venues like MetLife Stadium are clearly crowded as would be an 1816 ballroom, and even more so, which, along with the very real modern-day fear of mass shootings, only amplifies the continuation of the very same forces underlying the historical prohibitions on firearms at such modern entertainment venues.

New Jersey is home to numerous professional and semi-professional sports venues, as well as concert venues, among which is East Rutherford's MetLife Stadium. As is common for such facilities, alcohol is widely

available for purchase throughout MetLife stadium.[5] While MetLife Stadium has had no shooting incidents since 2010, as reported by the New Jersey State Police, firearms are also not permitted in the stadium.

There have, however, been numerous assaults. From 2010 and 2022, there have been approximately 755 assaults at the stadium, a number which includes serious aggravated assaults and assaults on law enforcement officers. Given that there have also been approximately 293 incidents of resisting arrest in that same time period, it is clear that violence unfortunately is a regularly encountered occurrence for the patrons that attend events and the troopers that patrol the stadium and its surrounding entertainment complex. Tragically, two people were murdered by firearms at the Meadowlands complex in 2020, specifically in the parking lot located outside the FanDuel SportsBook at the Meadowlands racetrack.[6]

---

[5]   MetLife Stadium Guest Policies, *Alcohol Policy*, available at https://www.metlifestadium.com/guest-services/guest-policies (last accessed July 19, 2023).
[6]   Torrejon, Rodrigo, *2 victims of Meadowlands RaceTrack shooting IDed, found in FanDuel parking lot, records show*, available at https://www.nj.com/bergen/2020/10/two-victims-of-meadowlands-racetrack-shooting-found-in-fanduel-parking-lot-records-show.html (last accessed July 19, 2023).

Smaller entertainment venues in New Jersey unfortunately are also not immune from gun violence. In August 2015, two concertgoers were shot during a parking-lot altercation at the conclusion of a concert at the PNC Bank Arts Center in Monmouth County.[7] In November 2019, players and spectators were forced to run for cover after a gunman opened fire at a high school football game in Pleasantville, Atlantic County; a 10-year-old child died as a result of the injuries he sustained in this shooting.[8] April 2023 saw a shooting at the basketball courts of the Christopher Columbus Park in Passaic County, which sent the families and children in the park running for cover.[9] Fourth of July celebrations this year at Wiggins Waterfront Park in Camden were marred by the shooting of a six year old

---

[7]   *2 Shot Outside PNC Bank Arts Center After J.Cole, Big Sean Concert In New Jersey: Cops,* https://www.nbcnewyork.com/news/local/shooting-pnc-bank-arts-center-j-cole-holmdel-new-jersey/1189499/ (last accessed July 27, 2023).

[8]   Burke, Minyvonne, *5 Arrests in New Jersey High School Football Game Shooting That Critically Injured 10-Year-Old,* https://www.nbcnews.com/news/us-news/man-young-boy-shotnew-jersey-high-school-football-game-n1084146 (last accessed July 26, 2023); Brant, Joe, *10-Year-Old Boy Shot at Pleasantville-Camden Football Game Dies Of His Wounds,* https://www.nj.com/atlantic/2019/11/10-year-old-boy-shot-at-pleasantville-camden-football-game-dies-of-his-wounds.html (last accessed July 27, 2023).

[9]   *Police Respond To Shooting On Basketball Court At Park In New Jersey,* https://abc7ny.com/nj-shooting-new-jersey-passaic-county/13087004 (last accessed July 26, 2023).

child after an altercation erupted in gun fire. [10]

One need only look to the unfortunately numerous mass casualty events throughout the nation to guess at what could happen if the sensitive place restrictions are struck down: 755 assaults at MetLife Stadium would have the potential to become 755 shootings if the individuals involved are permitted to carry handguns into this large-scale entertainment complex. Eruptions of gun violence could similarly occur in smaller venues throughout CPANJ's member counties. The presence of firearms in the hands of the masses presents the inescapable danger that heated encounters, which would otherwise be merely verbal arguments or fistfights, will be capable of becoming shootouts that could prove deadly not only to the participants, but to innocent bystanders – children among them. Neither a family outing to see the Giants or the Jets play football, nor a much-anticipated Taylor Swift concert should not be permitted to turn deadly. Fourth of July fireworks and the basketball courts of public parks should be the site of fond childhood memories, not gun-induced terror.

---

[10] Thomas, TaRhonda, *Girl, 6, Injured In Shooting During July 4th Fireworks In Camden, New Jersey*, https://6abc.com/camden-fireworks-shooting-july-4th-child-shot-fourth-of-nj/13464013/ (last accessed July 26, 2023).

The potential danger to law enforcement officers facing these situations is equally as clear. Where officers might only have had to respond to a heated argument or a fist fight while guns have remained outside of the stadium complex and other entertainment venues, allowing firearms in entertainment facilities will exponentially increase the risk to, and the safety of, the officers responding to these incidents. It will make their duty to protect public drastically harder, creating a real risk not only that a law enforcement officer could be shot, but that attempts to disarm an aggressor could result in injury to innocent bystanders. Restricting guns from entertainment facilities, as has historically been done, will allow the citizens of New Jersey to continue to enjoy the entertainment the State has to offer, free from fear they may be caught in senseless gunfire.

The same inherent risks of gun possession are also of particular concern in vehicles, in which motorists often sit for hours each day during commutes through the maze that is New Jersey's heavily-trafficked, congested roadways. Chapter 131's sensible regulation, which requires guns be unloaded and secured while inside a vehicle traveling on a roadway, *see* New Jersey, Ch. 131 § 7(a)(17), serves two important purposes: 1. it ensures the safety of all motorists in high stress situations on this State's congested roads; and 2. it protects law enforcement officers

during routine traffic stops.

A recent study found that eight in ten motorists experienced aggressive driving, or "road rage," in the month proceeding the survey.[11] Road rage is a growing problem, especially on New Jersey's heavily-trafficked roadways. The presence of loaded, easily-accessible firearms would only serve to exacerbate this problem. Simply put, a firearm has the very real ability to turn a few minutes of the seemingly unavoidable frustration that comes with travelling on New Jersey's ever-packed roadways into a potentially life-threatening situation. This concern is not fear mongering or hyperbole. In 2022, more than 550 people were shot during road rage incidents in the United States.[12] Road rage injuries and deaths involving firearm has steadily increased every year since 2018. Ibid. In fact, the number of injuries and deaths nationwide has doubled from 2018 to 2022. Ibid.

---

[11]    Burd-Sharps, Sarah; Tetens, Paige; Szkola, Jay *Road Rage Shootings Are Continuing to Surge,* available at https://everytownresearch.org/reports-of-road-rage-shootings-are-on-the-rise/ (last accessed July 21, 2023).

[12]    Hauck, Grace *Road rage shootings are increasing. There were more than 500 last year, report finds.* Available at https://www.usatoday.com/story/news/nation/2023/03/20/road-rage-shootings-rising-us-report-finds/11484488002/ (last accessed July 20, 2023).

These types of shootings are, unfortunately, not unheard of on the roadways that cut through the counties of CPANJ's members. In May 2023, the Somerset County Prosecutor saw a motorist shoot at another motorist in that county simply because the first motorist had not been allowed to merge onto the highway.[13] In January 2023, the Camden County Prosecutor had a road rage incident that occurred on a roadway in her county turn deadly; the motorist closely followed the victim for several miles and then opened fire after crossing the Walt Whitman Bridge.[14] March 2023 saw the Passaic County Prosecutor investigating a motorist who shot another twice after a road rage incident on Route 80.[15] In the last year, the Middlesex County Prosecutor has seen a significant rise in road rage incidents involving firearms within her jurisdiction. Presently, there

---

[13] Attrino, Anthony, *Road raging N.J. driver fired 2 shots at car while trying to merge, cops say.* Available at https://www.nj.com/somerset/2023/05/road-raging-nj-driver-fired-2-shots-at-car-while-trying-to-merge-cops-say.html (last accessed July 20, 2023).

[14] Sheldon, Chris, *State Police release new photos in search for clues in road rage killing on N.J. highway,* available at https://www.nj.com/news/2022/03/state-police-release-new-photos-in-search-for-clues-in-road-rage-killing-on-nj-highway.html (last accessed July 21, 2023).

[15] Kudisch, Brianna, *N.Y. man, 22, arrested for road rage shooting in N.J.* available at https://www.nj.com/news/2022/03/ny-man-22-arrested-for-road-rage-shooting-in-nj.html (last accessed July 21, 2023).

are at least 14 active cases being prosecuted by her Office in which a motorist shot or pointed a firearm at another motorist during an altercation on the roadways.

One particularly troubling incident for the Middlesex County Prosecutor and her Office involved a retired New York Police Department officer who pointed his handgun at a minivan occupied by a family of four who were driving home on the New Jersey Turnpike from a day at Six Flag Great Adventure, an amusement park in Monmouth County. The minivan closely followed the retired officer, who was operating a motorcycle, and came within feet of the retired officer as it passed him. Angered, the retired officer exceeded speeds of 90 miles per hour to catch the minivan, all so he could point his handgun at the family within. The minivan sped off, but again the motorcycle caught up, allowing the retired officer to again threaten the family with his gun. This terrifying incident ended only when the retired exited the Turnpike and returned home. The family pulled over and called the police.

In another example of the dangers of firearms in motor vehicles, the Monmouth County Prosecutor and his Office recently prosecuted a road rage incident that almost turned deadly after an irate motorist shot another during a dispute that began when an Uber driver changed lanes

and accidently cutoff the motorist. After a highspeed chase by the motorist, which culminated in a collision with the Uber driver's vehicle, the Uber driver called a friend for help. The two located the motorist a few blocks away and stopped to confront the motorist. After words were exchanged, the motorist pulled out a handgun and fired a single shot at the Uber driver's friend, striking him in the leg. Though the friend was only injured, it is not a stretch to envision the potential for a much more tragic outcome due to the mere presence of the firearm.

The Monmouth County motorist and the Middlesex County retired officer are both exemplary of the dangers that result from the combination of a few minutes of unavoidable frustration in a car and a handgun. The conduct of both represent exactly what the New Jersey Legislature sought to protect against by way of Chapter 131's sensible regulations.

Chapter 131's regulations also serve to protect both law enforcement officers and a vehicle's occupants during routine traffic stops. It is undeniable that traffic stops are high-stress situations for both the occupants and officer. Motor vehicle stops are one of the most – if not *the* most – dangerous situations a patrol officer routinely experiences. *State v. Mai*, 993 A.2d 1216, 1223-24 (N.J. 2010). Officers are at a tactical disadvantage because they are walking into an unknown situation and are

17

forced to be reactive instead of proactive. Introducing firearms to this equation undoubtedly could lead to a rash reaction by the motorist or officer, with deadly consequences. Nervousness and high-stress situations could turn a few minutes of frustration into potentially life-threatening situations.

Another important and appropriate restriction on the possession of firearms set forth in Chapter 131 prohibits firearms in bars and restaurants that serve alcohol. Ch. 131 § 7(a)(15). This historically-based restriction limits firearms from "active and potentially chaotic" social situations where use of a firearm "would create an intolerable risk of harm to bystanders, and where the possibility of the loss, theft, or accidental discharge[16] of a firearm may be high." D.E. 91 (PI.Opp.) 46. It is no secret that alcohol "is associated with increased aggression, and people under the influence of alcohol are both more likely to be shot and more likely to kill someone else."[17] Alcohol lowers inhibitions and impairs judgment, making

---

[16]    Yan, Holly and Artemis Moshtaghian, *FBI Agent Loses His Gun During Dance-Floor Backflip, Accidentally Shoots Bar Patron*, June 4, 2012, available at https://www.cnn.com/2018/06/03/us/dancing-fbi-agent-gun-discharge/index.html#:~:text=Video%20of%20the%20off-duty%20agent%20showed%20him%20unleashing,gun%20as%20he%20performed%20a%20back%20handspring.%20KMGH (last accessed July 27, 2023).

[17]    Everytown Research and Policy, *Guns in Bars*, available at

bad decisions, such as reaching for a firearm during an argument, seem like a good idea.[18]

Researchers from the Center for Gun Violence Solutions at Johns Hopkins' Bloomberg School of Public Health found that an estimated one in three individuals who committed homicide with a firearm had been heavily drinking; more than 30 percent of firearm-involved homicide victims had been heavily drinking at the time they were killed.[19] In the report resulting from this study, researchers recommended states prohibit the public carry of firearms in locations where alcohol is consumed on premises in order to promote public safety and diminish the indisputable risk of alcohol-fueled gun violence.[20]

---

https://everytownresearch.org/report/guns-in-bars/?_gl=1*jlxsje*_ga*mte 0mtiyntgwlje2odk2odkwotm.*_ga_lt0fwv3ek3*mty4oty4ota5nc4xljeumty 4oty4ote3ns4wljauma (last accessed July 21, 2023).

[18]  Mascia, Jennifer and Fairriona Magee, The Trace, *One Major Factor Missing From the Gun Safety Debate: Alcohol,* June 21, 2023, available at https://www.thetrace.org/2023/06/alcohol-gun-laws-carry-while-drunk/.

[19]  Johns Hopkins Bloomberg School of Public Health, *New Report Offers Policy Recommendations to Address Alcohol Use as Risk Factor for Gun Violence,* available at https://publichealth.jhu.edu/2023/new-report-offers-policy-recommendations-to-address-alcohol-use-as-risk-factor-for-gun-violence.

[20]  Villarreal, Silvia, et al., *Alcohol Misuse and Gun Violence: An Evidence-Based Approach for State Policy,* pp. 18, available at https://publichealth .jhu.edu/sites/default/files/    2023-05/2023-may-cgvs-alcohol-misuse-and-gun-violence.pdf.

19

New Jersey is not alone in its endeavor to keep the patrons of our bars and restaurants free from senseless gun violence. Nearly half the nation – 24 states and the District of Columbia – prohibit guns in places where alcohol is served or consumed, such as bars and restaurants.[21] The acknowledgement by almost half of the country of the dangers of mixing firearms and alcohol illustrates just how important these restrictions are to the continued health and safety of our communities.

This same logic underlies Chapter 131's restriction on carrying concealed firearms into casinos, Ch. 131 § 7(a)(18), where the stakes and tensions routinely run high. Patrons stand to lose significant sums of money, all while alcohol flows freely throughout the casino floor. Just like concert venues and stadiums, casinos are "large, enclosed" spaces, "filled with patrons and workers, where an active shooter event or the accidental discharge of a firearm could have a particularly severe impact." *Rebuck Cert.* ¶ 11. As the Attorney General makes plain, "casino complexes (and sportsbooks at racetracks) involve congregations of people with impaired judgment (*i.e.,* the intoxicated and hyper-stimulated from the effects of

---

[21]   Mascia, Jennifer and Fairriona Magee, *One Major Factor Missing From the Gun Safety Debate: Alcohol,* June 21, 2023, available at https://www.thetrace.org/2023/06/alcohol-gun-laws-carry-while-drunk/.

gambling)." D.E. 91 (PI.Opp.) 52.

Once again, it does not take much imagination to predict how a casino patron's possession of a firearm could instantly turn an altercation from a verbal argument or fistfight into a deadly tragedy. Casino owners themselves acknowledge this. The Casino Association of New Jersey announced that nine casino owners would prohibit firearms on their properties in Atlantic City in order to preserve the "safety and well-being" of their guests and employees."[22]

Perhaps one of the more striking provisions of Chapter 131 that the District Court enjoined prohibits firearms at zoos, locations that of course have a high concentration of children in attendance. Ch. 131 § 7(a)(9). New Jersey's zoos are common destinations for class trips, birthday parties, afterschool programs, day trips, and play dates. Zoos are tailored to children, with programs and exhibits specially designed to attract and engage the young. As firearms have always been historically banned at the parks in which zoos were located, this restriction is not only constitutional, but vital to protecting the innocence of New Jersey's children.

---

[22]   Nieto-Munoz, Sophie, *New Jersey casino owners say guns will not be permitted in casinos*, New Jersey Monitor, February 7, 2023, available at https://newjerseymonitor.com/briefs/new-jersey-casino-owners-say-guns-will-not-be-permitted-in-casinos/.

The fact of the matter is that the growing presence of firearms increases danger to our community members and law enforcement officers alike. In a 2019 study, a Stanford University law professor found that a decade after states passed "shall-issue" concealed carry laws, violent crime rose to rates 13 to 15 percent higher than in states with more conservative laws.[23] In 2017, researchers found "shall-issue" laws, which make it easier to obtain concealed carry permits, to be associated with higher homicide rates, particularly homicides involving firearms. In 2018, Dutch researchers found that American states with the largest increase in gun sales following the Newtown Elementary School shooting experienced six to 15 percent more murders over the course of the following year when compared with states with less significant gun-sale increases.[24]

CPANJ's members, each of whom are the chief law enforcement official in their respective counties, are also rightly troubled by the fact that the concealed carry of firearms in sensitive places will undeniably increases the risk of gun violence to the law enforcement officers tasked

---

[23] Moyer, Melinda Wenner, *Will a Gun Keep Your Family Safe? Here's What the Evidence Says*, available at https://www.thetrace.org/2020/04/gun-safety-research-coronavirus-gun-sales/.

[24] *Id.*

with keeping our communities safe. An officer's encounter with a person carrying a concealed firearm inherently increases the risk of miscommunication and potential discharge, and could complicate an officer's response to a scene. For example, an officer responding to an active shooter could mistake an armed bystander for the shooter, or be hampered in his or her effort to identify the real perpetrator. Exemplary of this is a 2017 shooting in a Colorado Walmart, which resulted in the injury and death of several patrons. Responding officers reported that shoppers drawing weapons in self-defense slowed the process of identifying the suspect.[25]

While New Jersey must adhere to the strictures of the Second Amendment, as our Attorney General makes clear, the Constitution is not a "regulatory straightjacket" meant to hamper legislative efforts to constitutionally protect people against the immensely negative impact gun violence has on our society. Beyond the death and serious injury caused by gun violence, survivors of shootings can endure lifelong psychological trauma and grief. The adverse effects of the proliferation of firearm

---

[25] Kevin Simpson, *Shoppers Pulled Guns in Responses to Thornton Walmart Shooting, But Police Say That Slowed Investigation*, The Denver Post (Nov. 2, 2017), https://www.denverpost.com/2017/11/02/shoppers-pulled-weapons-walmart-shooting/.

carrying can span generations. Children exposed to gun violence experience mental and physical developmental consequences. It cannot reasonably be denied that "living in communities where fear of getting shot is common has detrimental effects on people and teaches inappropriate role modeling about responsible behavior to future generations."[26] The more places, events, and gatherings that allow for the concealed carry of firearms, the worse the safety, health, and security of our communities and its members will undoubtedly be.

The sensitive place restrictions set forth in Chapter 131 provide invaluable protections and benefits to the efforts of the members of CPANJ and law enforcement to protect the safety of their communities. This Court can and should reject plaintiffs' arguments and reverse the district court's order.

---

[26] Lippmann S. *Guns: dangerous, especially for suicide, and costly for America.* Psychiatry (Edgmont). 2010 Feb;7(2):14-5; available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2848468/.

## CONCLUSION

The order of the district court should be reversed.

Dated:   July 27, 2023

Respectfully submitted,

**JEFFREY H. SUTHERLAND**
*Cape May County Prosecutor*
*President, County*
*Prosecutor's Association NJ*

By:    **LAURA SUNYAK**
       *Assistant Mercer County Prosecutor*

       **RANDOLPH MERSHON III**
       *Assistant Middlesex County Prosecutor*

       **MONICA DO OUTEIRO**
       *Assistant Monmouth County Prosecutor*

       **GRETCHEN PICKERING**
       *Assistant Cape May County Prosecutor*

## CERTIFICATE OF COMPLIANCE

The word count for this brief is 4837, excluding the Table of Contents and Table of Authorities. The word processing system used to prepare this brief and to calculate the word count was Microsoft Word. This brief is in Century Schoolbook, a serified, proportionally spaced typeface. The type size is 14 points in the text, headings and footnotes. I certify that the brief complies with Rule 32a)(5)-(7) and Local Rule 32.1.

I hereby certify that the electronic version of this brief is identical to the hard copies submitted to the Court of Appeals for the Third Circuit this day.

I hereby certify that the virus check of this brief was completed using Sophos Endpoint, and no viruses were detected.

I certify that I am a member in good standing of the Bar Association for the Third Circuit Court of Appeals.

I hereby certify that on July 27, 2023, I electronically filed he foregoing with the Clerk for the United States Court of Appeals for the Third Circuit using the appellate CM/ECF system. Counsel of record or all parties are registered CM/ECF users and will be served by the appellate CM/ECF system.

GRETCHEN ANDERSON PICKERING

*Deputy First Assistant Cape May County Prosecutor*