**No. 23-1900, 23-2043**

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

RONALD KOONS, et al.,

*Plaintiffs-Appellees,*

v.

MATTHEW J. PLATKIN, et al.,

*Defendants-Appellants.*

AARON SIEGEL, et al.,

*Plaintiffs-Appellees,*

v.

MATTHEW J. PLATKIN, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the District of New Jersey,
Nos. 1:22-cv-07464, 1:22-cv-07463

## PRINCIPAL AND RESPONSE BRIEF FOR *SIEGEL* PLAINTIFFS-APPELLEES/CROSS-APPELLANTS

DANIEL L. SCHMUTTER
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, NJ 07450

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
ANDREW C. LAWRENCE*
MARIEL A. BROOKINS*
NICHOLAS M. GALLAGHER*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Supervised by principals of the firm who are members of the Virginia Bar

*Counsel for Siegel Plaintiffs-Appellees/Cross-Appellants*

August 10, 2023

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Association of New Jersey Rifle and Pistol Clubs, Inc. certifies that it does not have a parent corporation and that no publicly held corporation owns more than 10% of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES ..................................................................... v

INTRODUCTION ................................................................................ 1

JURISDICTION ................................................................................. 4

STATEMENT OF THE ISSUES ................................................................. 4

STATEMENT OF RELATED CASES AND PROCEEDINGS ............................ 5

STATEMENT OF THE CASE .................................................................. 5

    A.    Legal Background ................................................................. 5

    B.    Factual & Procedural Background ..................................... 11

SUMMARY OF ARGUMENT ................................................................. 14

STANDARD OF REVIEW ..................................................................... 17

ARGUMENT .................................................................................... 18

I.    Plaintiffs Are Likely To Succeed On The Merits ......................... 18

    A.    Chapter 131's Permitting Scheme Violates the Second Amendment Thrice Over .................................................. 18

        1.    Insurance Mandate (N.J. Stat. Ann. §§2C:58-4(d)(4), 2C:58-4.3(a)) ................................................... 18

        2.    Application Fee (N.J. Stat. Ann. §2C:58-4(c)) ....... 24

        3.    Endorsement From Four Reputable Persons (N.J. Stat. Ann. §2C:58-4(b)) .................................................... 27

    B.    Chapter 131's Sensitive-Place Provisions Violate the Second Amendment ...................................................... 30

        1.    The Second Amendment's Plain Text Presumptively Protects Plaintiffs' Conduct ..................................... 32

2.    The State Has Not Demonstrated That Its Sensitive-Place Provisions Are Consistent With Historical Tradition ................................................................ 35

a.    Private property (N.J. Stat. Ann. §2C:58-4.6(a)(24)) ............................................................36

b.    Within 100 feet of public gatherings, demonstrations, or events requiring government permits (N.J. Stat. Ann. §2C:58-4.6(a)(6)) ....................42

c.    Zoos (N.J. Stat. Ann. §2C:58-4.6(a)(9)) ........................45

d.    Beaches, parks, recreational facilities, and playgrounds (N.J. Stat. Ann. §2C:58-4.6(a)(10); N.J. Admin. Code §7:2-2.17(b)) .....................................47

e.    Public libraries and museums (N.J. Stat. Ann. §2C:58-4.6(a)(12)) ............................................................49

f.    Places where alcohol is served (N.J. Stat. Ann. §2C:58-4.6(a)(15)) ............................................................51

g.    Entertainment facilities (N.J. Stat. Ann. §2C:58-4.6(a)(17)) ............................................................53

h.    Casinos (N.J. Stat. Ann. §2C:58-4.6(a)(18); N.J. Admin. Code §13:69D-1.13) ............................................54

i.    Public filming locations (N.J. Stat. Ann. §2C:58-4.6(a)(23)) ............................................................56

j.    Health care facilities or treatment centers (N.J. Stat. Ann. §2C:58-4.6(a)(21), (22)) .................................56

k.    Vehicles (N.J. Stat. Ann. §2C:58-4.6(b)(1)) ..................58

3.    Fish and Game Restrictions ...................................................... 60

4.    The State's Government-as-Proprietor Theory Is Deeply Flawed ......................................................... 61

II.    The Remaining Factors Favor Injunctive Relief .......................................... 64

CONCLUSION ..................................................................................................... 65

CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE WITH WORD COUNT

IDENTICAL PDF AND HARD COPY CERTIFICATE

VIRUS SCAN CERTIFICATE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Andrews v. State*,
  50 Tenn. 165 (1871).................................................................. 44, 59

*Antonyuk v. Hochul*,
  2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022)....................................57

*Antonyuk v. Hochul*,
  635 F.Supp.3d 111 (N.D.N.Y. 2022)...................................................37

*Binderup v. Att'y Gen.*,
  836 F.3d 336 (3d. Cir. 2016) .............................................................28

*Bliss v. Commonwealth*,
  12 Ky. 90 (1822) ................................................................................58

*Bonidy v. U.S. Postal Serv.*,
  790 F.3d 1121 (10th Cir. 2015) .........................................................63

*Cedar Point Nursery v. Hassid*,
  141 S.Ct. 2063 (2021).......................................................................36

*Christian v. Nigrelli*,
  2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022) ........................ 34, 36

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993)..........................................................................31

*Cox v. New Hampshire*,
  312 U.S. 569 (1941)..........................................................................26

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)............................................................... 41, 46, 61

*Drake v. Filko*,
  724 F.3d 426 (3d Cir. 2013) ...............................................................5

*English v. State*,
  35 Tex. 473 (1872)............................................................................43

*Espinoza v. Mont. Dep't of Revenue*,
    140 S.Ct. 2246 (2020) ........................................................................... 48

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) .............................................................. 64

*Fernandes v. Limmer*,
    663 F.2d 619 (5th Cir. 1981) .............................................................. 26

*Fly Fish, Inc. v. City of Cocoa Beach*,
    337 F.3d 1301 (11th Cir. 2003) .......................................................... 26

*Follett v. Town of McCormick*,
    321 U.S. 573 (1944) .............................................................................. 27

*GeorgiaCarry.Org, Inc. v. Georgia*,
    687 F.3d 1244 (11th Cir. 2012) .......................................................... 33

*GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*,
    212 F.Supp.3d 1348 (N.D. Ga. 2016) ................................................ 63

*Hardaway v. Nigrelli*,
    2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022) ................................. 31

*Hill v. State*,
    53 Ga. 472 (1874) ................................................................................ 43

*iMatter Utah v. Njord*,
    774 F.3d 1258 (10th Cir. 2014) .......................................................... 26

*In re Preis*,
    573 A.2d 148 (N.J. 1990) ...................................................................... 5

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
    710 F.3d 99 (3d Cir. 2013) ................................................................. 65

*Kwong v. Bloomberg*,
    723 F.3d 160 (2d Cir. 2013) ........................................................ 26, 27

*Lloyd Corp., Ltd. v. Tanner*,
    407 U.S. 551 (1972) .............................................................................. 33

*Md. Shall Issue, Inc. v. Montgomery Cnty.*,
   2023 WL 4373260 (D. Md. July 6, 2023) ..........................................40

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010).............................................................. 40, 44

*Murdock v. Pennsylvania*,
   319 U.S. 105 (1943)..................................................................26

*N.J. Retail Merchants Ass'n v. Sidamon-Eristoff*,
   669 F.3d 374 (3d Cir. 2012) .......................................................27

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   142 S.Ct. 2111 (2022) ...................................................... *passim*

*Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*,
   618 F.Supp.3d 901 (N.D. Cal. 2022).............................................20

*Nat'l Rifle Ass'n v. Bondi*,
   61 F.4th 1317 (11th Cir. 2023) ...................................................40

*Nordyke v. King*,
   681 F.3d 1041 (9th Cir. 2012) ....................................................63

*Ramos v. Louisiana*,
   140 S.Ct. 1390 (2020)...............................................................41

*Range v. Att'y Gen.*,
   69 F.4th 96 (3d Cir. 2023) .................................................. 5, 20, 30

*Schrader v. Dist. Att'y of York Cnty.*,
   2023 WL 4612022 (3d Cir. July 19, 2023)................................ 17, 64

*Sekhar v. United States*,
   570 U.S. 729 (2013)..................................................................31

*Siccardi v. State*,
   284 A.2d 533 (N.J. 1971) .............................................................5

*Sinnickson v. Dungan*,
   8 N.J.L. 226 (1825) ..................................................................39

*Solomon v. Cook Cnty. Bd. of Comm'rs*,
  559 F.Supp. 3d 675 (N.D. Ill. 2021)....................................................37

*St. Paul Fire & Marine Ins. Co. v. Barry*,
  438 U.S. 531 (1978).........................................................................54

*State v. Buzzard*,
  4 Ark. 18 (1842)..............................................................................59

*State v. Mitchell*,
  3 Blackf. 229 (Ind. 1833)..................................................................59

*State v. One 1990 Honda Accord*,
  712 A.2d 1148 (N.J. 1998) ...............................................................38

*State v. Shelby*,
  2 S.W. 468 (Mo. 1886) .....................................................................44

*Steele v. City of Boston*,
  128 Mass. 583 (1880)........................................................................48

*Sullivan v. City of Augusta*,
  511 F.3d 16 (1st Cir. 2007) ...............................................................26

*United States v. Class*,
  930 F.3d 460 (D.C. Cir. 2019)...........................................................63

*United States v. Texas*,
  143 S.Ct. 1964 (2023).......................................................................47

*West Virginia v. EPA*,
  142 S.Ct. 2587 (2022).......................................................................54

*Wolford v. Lopez*,
  2023 WL 5043805 (D. Haw. Aug. 8, 2023)......................... 36, 37, 47

**Constitutional Provisions**

U.S. Const. amend. II.......................................................................5, 19

Pa. Const. §43 (1776).......................................................................... 39

Vt. Const. ch.II §XXXIX (1777) ......................................................... 39

**Statutes**

2022 N.J. Laws, ch. 131 .................................................................8

Alaska Stat. Ann. §11.61.220 .......................................................37

Assembly Bill A4769, 2022-2023 Leg., 220th Sess.
    (N.J. Oct. 13, 2022) ..................................................................8

D.C. Code §7-2509.07(b) ..............................................................37

Ga. Code Ann. §16-11-127 ...........................................................37

Haw. Rev. Stat. §134-E .................................................................37

La. Rev. Stat. §40:1379.3(O) ........................................................37

Md. Code, Crim. Law §6-411(c) ...................................................37

N.J. Stat. Ann. §2C:39-1(f) .......................................................... 32

N.J. Stat. Ann. §2C:43-3(b) ..........................................................11

N.J. Stat. Ann. §2C:58-4(a) ............................................................9

N.J. Stat. Ann. §2C:58-4(b) ............................................... 9, 28, 30

N.J. Stat. Ann. §2C:58-4(c) ................................................... *passim*

N.J. Stat. Ann. §2C:58-4(d) ................................................ 9, 18, 19

N.J. Stat. Ann. §2C:58-4.3 ............................................................19

N.J. Stat. Ann. §2C:58-4.3(a) .......................................................18

N.J. Stat. Ann. §2C:58-4.3(a)-(c) ...................................................9

N.J. Stat. Ann. §2C:58-4.5 ............................................................19

N.J. Stat. Ann. §2C:58-4.6 ........................................................... 32

N.J. Stat. Ann. §2C:58-4.6(a) ............................................... *passim*

N.J. Stat. Ann. §2C:58-4.6(b) ...................................................10, 11

N.J.A.C. 7:2-2.17(b) .................................................................10

N.J.A.C. 7:25-5.23(a) ...............................................................60

N.J.A.C. 7:25-5.23(c) ............................................................... 60

N.J.A.C. 7:25-5.23(f) ................................................................60

N.J.A.C. 7:25-5.23(i) ................................................................61

N.J.A.C. 13:54-2.4(d) .................................................................5

N.J.A.C. 13:69D-1.13 .............................................................. 10

N.Y. Penal Law §265.01-d(1) ..................................................37

Ohio Rev. Code Ann. §2923.126(B)(6) ..................................37

S. Bill 3214, 2022-2023 Leg., 220th Sess., (N.J. Oct. 17, 2022) .............................8

S.C. Code Ann. §23-31-215(M)(10) .......................................37

S.C. Code Ann. §23-31-215(M)(8) .........................................37

S.C. Code Ann. §23-31-225 .....................................................37

**Other Authorities**

William Blackstone, *Commentaries on the Laws of England* (1769) ...................22

Cheryl A. Brooks, *Race, Politics, and Denial:  Why Oregon Forgot to Ratify the Fourteenth Amendment*, 83 Or. L. Rev. 731 (2004) .........................41

*California City Approves 1st US Insurance Law for Gun Owners*, Associated Press (Jan. 26, 2022), https://rb.gy/mcgs1 ......................................21

E.L. Carey & A. Hart, *Philadelphia in 1830-1* (1830) .......................................... 48

Charleston Museum, *About the Museum*, https://rb.gy/0lcps (last visited Aug. 10, 2023)................................................................ 49

Thomas B. Colby, *Originalism and the Ratification of the Fourteenth Amendment*, 107 Nw. U. L. Rev. 1627 (2013) .................................................. 41

Ed Crews, *Gambling: Apple-Pie American and Older than the
    Mayflower*, Colonial Williamsburg (Autumn 2008),
    https://rb.gy/fk64p ............................................................................. 55

J.B. Cutter, *Early Hospital History in the United States*, 20 Cal. State
    J. of Med. 272 (1922) .......................................................................... 57

Digit. Pub. Libr. of Am., *A History of US Public Libraries:
    Beginnings*, https://rb.gy/wkaei (last visited Aug. 10, 2023) ........................... 50

The Federalist No. 37 (James Madison) ............................................................ 44

Stephen P. Halbrook, *The Right to Bear Arms in Texas:  The Intent of
    the Framers of the Bills of Rights*, 41 Baylor L. Rev. 629 (1989) ................... 41

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places"
    Doctrine:  Locational Limits on the Right to Bear Arms*,
    13 Charleston L. Rev. 205 (2018) ............................................................. 30, 31

Baylen J. Linnekin, "*Tavern Talk" and the Origins of the Assembly
    Clause:  Tracing the First Amendment's Assembly Clause Back to
    Its Roots in Colonial Taverns*, 39 Hastings Const. L.Q. 593 (2012).................51

Candis McLean, *Insiders' Guide to 22 Essential Philadelphia
    Museums*, Phila. Inquirer (May 12, 2023), https://rb.gy/3v4z1 ........................ 49

N.J. Motion Picture & Television Comm'n, *Now Filming*,
    https://rb.gy/3e7g0 (last visited Aug. 10, 2023) ................................................56

N.J. Office of the Att'y Gen., Victims of Crime Compensation Office,
    *About Us*, https://rb.gy/fi3bu (last visited Aug. 10, 2023)................................25

N.J. Office of the Governor, *Governor Murphy Signs Executive Order
    to Combat Gun Violence* (June 24, 2022), https://rb.gy/16k7u ...........................8

N.Y. City Dep't of Parks, *Bowling Green*, https://rb.gy/9ujrg
    (last visited Aug. 10, 2023).........................................................................48

N.Y. Hist. Soc'y, *About Us*, https://rb.gy/ch6vh
    (last visited Aug. 10, 2023).........................................................................50

Order, *Mazahreh v. Grewal*, 20-cv-17598, (D.N.J. Oct. 12, 2022),
    Dkt.51 ................................................................................................. 8

The Peale, *Our History*, https://rb.gy/5pi0q
(last visited Aug. 10, 2023)................................................................ 50

Virgil W. Peterson, *Gambling: Should It Be Legalized?*,
40 J. of Crim. L. and Criminology 259 (1949).................................. 55

Jay Precht, *Legalized Gambling*, 64 Parishes (Nov. 16, 2011),
https://rb.gy/yziqy ............................................................................ 55

Beverly A. Randles, *The Persistence of Gambling in Early American
History*, 1 Gaming L. Rev. 531 (1997)............................................55

William Rawle, *A View of the Constitution of the United States of
America* (2d ed. 1829) ...................................................................... 21

Smithsonian Am. Art Museum, *Charles Willson Peale and Titian
Ramsay Peale's* The Long Room, Interior of Front Room in
Peale's Museum, https://rb.gy/c0vem (last visited Aug. 10, 2023).................. 50

U.S. Dep't of Interior, *Compendium of Seventh Census: 1850* (1854),
https://rb.gy/zaakp............................................................................ 50

Barbra Mann Wall, *History of Hospitals*, Univ. of Pa. School of
Nursing, https://rb.gy/8jfyz (last visited Aug. 10, 2023)................................... 57

Washington Park Newark, *History*, https://rb.gy/a4cwj
(last visited Aug. 10, 2023).......................................................... 47, 49

Jay Young, *Infrastructure: Mass Transit in 19th- and 20th-Century
Urban America* (Mar. 2, 2015), https://rb.gy/x0oxe......................................... 59

## INTRODUCTION

In June 2022, the Supreme Court held that the Second Amendment protects a right to carry a handgun for self-defense outside the home and that states like New Jersey could no longer require an individual to satisfy ahistorical preconditions to obtain a permit to exercise that right. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S.Ct. 2111 (2022). While *Bruen* noted that the Second Amendment allows states to prohibit firearms in especially "sensitive places" consistent with historical tradition, it emphasized that the historical record revealed "relatively few" of these "exceptional" places, such as "legislative assemblies, polling places, and courthouses." *Id.* at 2133, 2156. *Bruen* therefore warned states not to "define[] the category of 'sensitive places' … too broadly" moving forward—*e.g.*, to encompass all places that are merely "crowded"—as doing so would "eviscerate the general right to publicly carry arms for self-defense" the Court had just recognized. *Id.* at 2134.

New Jersey "[c]learly … disagree[d]" with *Bruen*. JA19. And rather than engage in a serious effort to revise its laws to conform to the commands of *Bruen* and the Second Amendment, the state "paid little to no mind" to either as it developed a new firearms regime to replace the one *Bruen* condemned. JA17 n.2. The proof is in the prohibitions on the very rights *Bruen* reinvigorated. By the end of 2022, New Jersey had rolled out a sweeping set of new regulations—collectively

known as Chapter 131—that effectively nullified *Bruen* and the Second Amendment right to carry a firearm in public for self-defense.  Among other things, Chapter 131 imposed a rash of new and even-more-novel preconditions to obtaining a handgun permit, including requirements that applicants obtain at least $300,000 in liability insurance, pay a hefty tax to help fund a victims' compensation fund, and obtain an endorsement from "four reputable persons."  And those who survive this novel and onerous permitting process achieve only a Pyrrhic victory, as Chapter 131 includes an exhaustive "sensitive places" list that covers 26 categories and 115 subcategories—encompassing everything from a "vehicle in New Jersey" to all "private property" in New Jersey to every "beach" along New Jersey's coastline. The net effect is to render "most of New Jersey off limits for law-abiding citizens who have the constitutional right to armed self-defense."  JA19.

Accordingly, on the day Chapter 131 was signed into law, plaintiffs here (the *Siegel* plaintiffs) sought a preliminary injunction against several (but by no means all) of Chapter 131's new requirements and restrictions.  The district court correctly enjoined some of Chapter 131's most egregious elements.  As it explained, once a state law implicates the plain text of the Second Amendment—as a law that seeks to neuter the right to carry a handgun in public obviously does—the state bears the burden of demonstrating that its regulation is consistent with this Nation's historical tradition.  And as the court recognized, New Jersey time and again came nowhere

close to meeting a burden that its legislature disdained. Indeed, no other state in history has ever conditioned its citizens' Second Amendment rights on their ability to secure liability insurance or anything resembling it. Nor does the historical record corroborate the state's fanciful assertion that it managed to discover a laundry list of new sensitive places in the six months between *Bruen* and Chapter 131's enactment.

New Jersey's efforts to resist those conclusions just confirm that the state continues to resist *Bruen*. Indeed, the state asserts that its insurance mandate and its rule designating all private property a sensitive place do not even *implicate* the Second Amendment, even though both are designed to prevent people from carrying handguns outside the home for self-defense—the very Second Amendment right *Bruen* cemented. The state repeatedly marshals the very same historical evidence that *Bruen* considered and rejected as insufficient—without disclosing that *Bruen* did so. And the state posits that places should qualify as sensitive simply because they are "crowded" or "frequented by children"—precisely the sort of right-diluting, too-broad theories *Bruen* foreclosed. Simply put, the state fails to demonstrate that the court below committed any error in preliminarily enjoining state-law provisions that plainly flout *Bruen*'s dictates.

In fact, the district court's only error is that it did not go far enough. Supreme Court precedent makes clear that states may not charge a fee for a permit to exercise a constitutional right that exceeds the administrative costs of processing the

application, and Chapter 131 explicitly states that it does not abide by that rule. The historical record also reveals that Chapter 131's four-reputable-persons requirement has no historical analogue, rendering it ultimately just an effort to reinstate the kind of discretionary permitting regime *Bruen* sought to inter. And plaintiffs are entitled to broader relief as to some of the sensitive-place provisions they challenged too. In sum, far from vacating the preliminary injunction, this Court should expand it and ensure that plaintiffs and other New Jerseyans do not have to live with an unconstitutional law that thumbs its nose at the Supreme Court while this case is litigated to final judgment.

## JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §1331. The state timely appealed, and the *Siegel* plaintiffs timely cross-appealed. JA1-5. This Court has subject-matter jurisdiction under 28 U.S.C. §1292(a)(1).

## STATEMENT OF THE ISSUES

1.      Whether the district court properly granted or denied a preliminary injunction against certain provisions of Chapter 131's permitting scheme.

2.      Whether the district court properly granted or denied a preliminary injunction against certain sensitive-place provisions.

3.      Whether the district court properly denied a preliminary injunction against certain New Jersey fish and game laws.

**STATEMENT OF RELATED CASES AND PROCEEDINGS**

The *Siegel* plaintiffs are unaware of any other challenges to Chapter 131.

**STATEMENT OF THE CASE**

**A.    Legal Background**

1. The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  For much of the past century, however, New Jersey rendered that right nugatory.  The state did not allow law-abiding citizens to carry handguns for self-defense without obtaining a permit, and it refused to issue permits in all but the most extraordinary circumstances. Specifically, the state required citizens seeking a permit to demonstrate a "justifiable need" to carry a handgun, *see, e.g.*, *Siccardi v. State*, 284 A.2d 533, 538 (N.J. 1971); *In re Preis*, 573 A.2d 148, 150-52 (N.J. 1990), demanding proof of "specific threats or previous attacks demonstrating a special danger to the applicant's life that cannot be avoided by other means," *Preis*, 573 A.2d at 152; *see* N.J.A.C. §13:54-2.4(d)(1). Though few other states had ever imposed such a restrictive regime, the law survived constitutional challenge, and residents of New Jersey were denied a fundamental right enshrined in the Constitution and enjoyed by residents of the vast majority of the states in the Nation.  *See, e.g.*, *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013); *see also Range v. Att'y Gen.*, 69 F.4th 96, 100 (3d Cir. 2023) (en banc) (recounting history).

That all changed—or at least should have—when the Supreme Court issued
*Bruen* last year. *Bruen* addressed a materially identical permitting regime in New
York, which refused to issue handgun permits absent "proper cause"—*i.e.*, a "special
need." 142 S.Ct. at 2122-23; *see also id.* at 2124 & n.2 (analogizing New York's
law to New Jersey's law). The Court held that New York's regime, which gave
authorities open-ended "discretion" to deny handgun permits, violates the Second
Amendment. *Id.* at 2122, 2124. In reaching that conclusion, the Court confirmed
that the right "to keep and bear Arms" means just that—the right to keep *and bear*
arms, whether inside or outside the home. *Id.* at 2134-35. The Court reiterated that
the Second Amendment is not a "second-class right" subject to a unique set of rules
or available only to those with "some special need" to exercise it. *Id.* at 2156. And
the Court made clear that, when evaluating government-imposed burdens on Second
Amendment rights, courts must assess "this Nation's historical tradition" of firearms
regulation—"the government may not simply posit that the regulation promotes an
important interest" and call it a day. *Id.* at 2125-34. If "the Second Amendment's
plain text covers an individual's conduct," the Court declared, an effort to regulate
that conduct can survive only if the government can "affirmatively prove" that it "is
part of the historical tradition that delimits the outer bounds of the right to keep and
bear arms." *Id.* at 2126-27.

In the course of explaining how this historically rooted burden-shifting regime works, the Court observed that laws forbidding the carrying of firearms in certain "sensitive places" may accord with historical tradition. *Id.* at 2133. But the Court underscored that "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses." *Id.* And the Court explicitly rejected New York's attempt to justify its special-need restriction as a "sensitive place" law. As the Court stated, "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly," as it "would eviscerate the general right to publicly carry arms for self-defense." *Id.* at 2133-34. "Put simply," the Court said, locational restrictions on the right to carry are "exceptional," and "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.* at 2134, 2156.

2. *Bruen* did not sit well with many New Jersey lawmakers. The day after it came out, the Governor staged a press conference at which he condemned it as a "dreadful," "tragic," and "misguided" decision from a "right-wing majority" and expressed his "outrage" that the Court had recognized a "general right" for "ordinary citizens" "to carry firearms in public." N.J. Office of the Governor, *Governor*

*Murphy Signs Executive Order to Combat Gun Violence* at 2:49, 3:22-3:54, 4:31-4:33 (June 24, 2022), https://rb.gy/16k7u.  The Governor promised that the state would "continue" to take "smart actions" to restrict firearms notwithstanding *Bruen*, and he seized on *Bruen*'s language stating that firearms may be prohibited in "certain sensitive locations."  *Id.* at 5:42-5:48, 9:00-9:21.  Although the Governor conceded that the state had "very few places where the carrying of firearms is prohibited by law," he described that state of affairs as "no longer tenable" and declared that he "look[ed] forward" to working with his "legislative partners" to "expand the number and types of places where firearms cannot be carried."  *Id.* at 5:58-6:23.

The legislature got the message.  One day after a federal court permanently enjoined the state's "justifiable need" regime, *see* Order, *Mazahreh v. Grewal*, 20-cv-17598, (D.N.J. Oct. 12, 2022), Dkt.51, legislators proposed a bill consistent with the Governor's demands, *see* Assembly Bill A4769, 2022-2023 Leg., 220th Sess. (N.J. Oct. 13, 2022); S. Bill 3214, 2022-2023 Leg., 220th Sess., (N.J. Oct. 17, 2022).  While the bill pays lip-service to *Bruen* by including unsupported claims that its new regulations have deep "root[s] in history and tradition," N.J. S. Bill 3214, "[t]he legislative record reveals the Legislature paid little to no mind to *Bruen* and the law-abiding New Jerseyans' right to bear arms in public for self-defense," JA17 n.2.  Nevertheless, the Governor signed the bill—now known as Chapter 131—into law on December 22, 2022.  *See* 2022 N.J. Laws, ch. 131; JA1431-69.

Unsurprisingly given the state's cavalier approach, Chapter 131 contains numerous ahistorical and nontraditional provisions that are impossible to square with the Second Amendment or *Bruen*.  Among other things, Chapter 131 provides that, before the state will issue a handgun permit, an applicant must have "at least … $300,000" in "liability insurance coverage."   N.J. Stat. Ann. §§2C:58-4(d)(4), 2C:58-4.3(a)-(c).   Chapter 131 also increased the application fee for a permit to $200, with $50 to be "deposited into the Victims of Crime Compensation Office account."  *Id.*  §2C:58-4(c).  And Chapter 131 requires applicants to find "not less than four reputable persons who are not related by blood or by law to the applicant and have known the applicant for at least three years … who shall certify … that the applicant has not engaged in any acts or made any statements that suggest the applicant is likely to engage in conduct, other than lawful self-defense, that would pose a danger to the applicant or others."  *Id.*  §2C:58-4(b).   If the applicant successfully jumps through these hoops, she must repeat the exercise in short order, as permits expire after two years.  *See id.* §2C:58-4(a).

Chapter 131 does not stop there.  Although *Bruen* emphasized that "sensitive places" are exceedingly rare, Chapter 131 declares most of New Jersey a "sensitive place," prohibiting the carrying of firearms in 26 categories and 115 subcategories of places, including (as relevant to this appeal) the following:

- "within 100 feet of a place where a public gathering, demonstration or event is held for which a government permit is required," N.J. Stat. Ann. §2C:58-4.6(a)(6);

- "zoos," *id.* §2C:58-4.6(a)(9);

- "a park, beach, recreation facility or area or playground owned or controlled by a State, county or local government unit," *id.* §2C:58-4.6(a)(10); *see also* N.J.A.C. §7:2-2.17(b);

- "youth sports events," N.J. Stat. Ann. §2C:58-4.6(a)(10);

- "a publicly owned or leased library or museum," *id.* §2C:58-4.6(a)(12);

- "a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises," *id.* §2C:58-4.6(a)(15);

- "a privately or publicly owned and operated entertainment facility," *id.* §2C:58-4.6(a)(17);

- "a casino and related facilities," *id.* §2C:58-4.6(a)(18); *see* N.J.A.C. §13:69D-1.13;

- "a health care facility," N.J. Stat. Ann. §2C:58-4.6(a)(21);

- "a public location being used for making motion picture or television images," *id.* §2C:58-4.6(a)(23);

- "private property, … unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises," *id.* §2C:58-4.6(a)(24); and

- "a vehicle in New Jersey, unless the handgun is unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle," *id.* §2C:58-4.6(b)(1).

These prohibitions are backed by severe penalties. A violation of the vehicle provision is a fourth-degree crime, *see id.* §2C:58-4.6(b), punishable by an 18-month prison sentence and a $10,000 fine, *see id.* §§2C:43-3(b)(2), 2C:43-6(a)(4). A violation of every other provision is a third-degree crime, *see id.* §2C:58-4.6(a), punishable by a three-to-five-year prison sentence and a $15,000 fine, *see id.* §§2C:43-3(b)(1), 2C:43-6(a)(3).

### B.     Factual & Procedural Background

The *Siegel* plaintiffs include seven New Jersey citizens who wish to carry handguns in public; each is also a member of the Association of New Jersey Rifle & Pistol Clubs, another plaintiff. JA291-92. The *Siegel* plaintiffs do not claim an unfettered right to carry handguns anywhere they choose; they have no quarrel, for example, with Chapter 131's provisions covering courthouses, police stations, correctional facilities, and polling places. *See* N.J. Stat. Ann. §2C:58-4.6(a)(1)-(3), (5). But they very much take issue with the state's effort to convert virtually all of the places they frequent outside their homes into "sensitive places." Accordingly, the same day Chapter 131 was signed into law, they filed suit to challenge the provisions of Chapter 131 identified above, along with certain other provisions of New Jersey law, such as certain fish and game laws, on Second Amendment and other grounds. JA286. A separate set of plaintiffs—the *Koons* plaintiffs—filed a similar suit the same day. JA264.

11

Each set of plaintiffs sought a temporary restraining order (TRO) and preliminary injunction. JA349, 438. In an order in the *Koons* case on January 9, 2023, the district court granted a TRO against the five sensitive-place provisions the *Koons* plaintiffs had challenged in their original complaint: "a publicly owned or leased library or museum," "a bar or restaurant where alcohol is served," an "entertainment facility," "private property," and a "vehicle in New Jersey." JA466, 470. In doing so, the court concluded that carrying firearms in those locations is "clearly" protected by the Second Amendment's plain text. JA492-93. And it determined that the state failed to identify a historical tradition to justify those provisions. Indeed, the court expressed disbelief that, although "[t]he State … had six months since *Bruen* to identify well-established and representative historical analogues," and although Chapter 131 "expressly states" that the sensitive-place provisions "'are rooted in history and tradition,'" the state insisted that it needed "more time to set forth the legal justifications for the legislation." JA482-83.

After consolidating the *Koons* and *Siegel* cases, the district court resolved the TRO motion in the *Siegel* case. JA759. In addition to granting a TRO against the same Chapter 131 provisions challenged in *Koons*, JA788-91, 794-99, the court also granted a TRO against the provisions prohibiting carrying firearms in "recreational facilities," JA782-83, "beaches," JA783, "parks," JA783-86, and "casinos," JA791-94. The court declined to definitively resolve challenges to other allegedly sensitive

12

places, such as "zoos," "public demonstrations requiring a government permit," "health care facilities," and "public film sets," and did not address "certain preexisting fish and game laws."  JA23; *see* JA775-78, 781-82, 786-88, 799-801.

3. After considering preliminary injunction briefing and argument, the district court issued a 230-page decision in the consolidated cases.[1]  As relevant here, the court granted a preliminary injunction against all the sensitive-place provisions restrained by its TRO decisions, while also adding some (but not all) of the other challenged places to the list:  "public gatherings, demonstrations, or events requiring a government permit," JA166-82, "zoos," JA182-85, "health care facilities limited to the medical offices and ambulatory care facilities listed in Plaintiffs' declarations," JA208-10, and "public film sets," JA211-12.  In supplementing the list, the court lamented that, "despite assurances by the State that it would present sufficient historical evidence as required by *Bruen* to support each aspect of the new legislation, the State failed to do so" and instead tried "to justify the new legislation with 'more of the same.'"  JA17-18.  The state's shortcomings left "the Court to do what the Legislature had said it had done but clearly did not"—namely, conduct historical analysis.  JA18.  Having performed that analysis itself, the court explained that, while the state "[c]learly … disagrees with *Bruen*," there is no historical support

---

[1] Meanwhile, the *Koons* plaintiffs filed an amended complaint, which challenged additional sensitive-place provisions.  JA910.

for the notion that it may "declar[e] most of New Jersey off limits for law-abiding citizens who have the constitutional right to armed self-defense." JA19.

The court declined to grant relief, however, against "most of the new legislation's firearm permitting requirements," which it had not addressed at the TRO stage. JA19. While the court enjoined Chapter 131's novel insurance mandate, it did not disturb the application-fee or four-reputable-persons requirements. JA72-75, 80-84, 93-103.

## SUMMARY OF ARGUMENT

The Supreme Court's decision in *Bruen* made at least two things clear. First, states may not withhold handgun permits because applicants fail to satisfy ahistorical requirements—especially ahistorical requirements that render the issuance of permits more discretionary. Second, states may not undermine Second Amendment rights by declaring vast swaths of territory a "sensitive place." Chapter 131 defies both commands. The Court should not only affirm the preliminary injunction, but broaden its scope.

Chapter 131's permitting regime violates the Second Amendment thrice over. The insurance mandate, the application-fee requirement, and the four-reputable-persons requirement all directly implicate the plain text of the Second Amendment, as compliance with those requirements is a precondition to carrying a handgun in public for self-defense. Each of those provisions is also a clear deviation from

14

historical tradition. Indeed, no other state in history has ever required everyone seeking to carry a firearm in public for self-defense to obtain anything resembling liability insurance—and the only jurisdiction of any kind to impose an analogous requirement did so only last year. Moreover, the Supreme Court already concluded long ago that, to the extent the exercise of a constitutional right requires a permit, states may not charge a permit fee that exceeds the administrative costs of processing the application—a rule that Chapter 131 openly defies. And no state has ever conditioned the people's self-defense rights on the subjective opinions of "reputable" persons—and certainly no other state has imposed such a requirement in the wake of *Bruen*, a decision that sought to *eliminate* discretionary permitting regimes.

The state cannot mount a meaningful defense for any of these requirements. The state makes the remarkable claim that the insurance mandate does not even implicate the Second Amendment, but both *Bruen* and this Court's post-*Bruen* precedent confirm that restrictions on who may carry handguns for self-defense self-evidently implicate the Second Amendment. And the state's brief only confirms that the ahistorical insurance mandate is just that—ahistorical. Accidental misuse of a firearm is a problem dating back to the advent of firearms. Yet the state has not identified a single law in history that looks anything like its insurance mandate. And the other aspects of the permitting regime are equally problematic and ahistorical.

15

The challenged sensitive-place provisions are, if anything, more obviously unconstitutional and irreconcilable with *Bruen*. *Bruen* thoroughly canvassed the historical record and recognized that there are exceptionally few sensitive places where states can flatly prohibit firearms. The notion that the Supreme Court overlooked dozens of additional sensitive places lurking in plain sight, at the same time that it rejected an effort to overdesignate, is not only dubious but illogical. The sensitive-place doctrine embodies the idea that there is something uniquely different about a particular location that allows the government to disarm the people and assume responsibility for providing security there. Designating most of New Jersey a sensitive place in one fell swoop, all while the state makes no guarantees about the security of those whose self-defense rights it has eviscerated in most of those places, is impossible to square with that concept.

The state fails to demonstrate that the district court erred in reaching that straightforward conclusion. Although the state generally does not dispute that *Bruen*'s textual inquiry is satisfied as to each sensitive-place provision, it posits that the private-property provision does not implicate the Second Amendment at all. But that argument ignores *Bruen*'s holding that the right to carry "publicly" simply means anywhere outside the home, which obviously encompasses private property like grocery stores, and it confuses a private-property owner's rights with the state's rights. The state thus cannot evade the historical analysis for any sensitive-place

provision, and its evidentiary showing comes up almost comically short for each. Indeed, most of the challenged places have existed since the Founding, or at least have clear analogues from the Nation's early history, yet the state offers no evidence of any enduring American tradition of prohibiting firearms in those locations. In the end, the state's defense of its sensitive-place provisions hinges on arguments like crowds alone render a place sensitive, zoos are indistinguishable from schools, and history is simply irrelevant when the government acts as a proprietor. Such arguments defy *Bruen* and common sense.

In short, plaintiffs are exceedingly likely to prevail on the merits of their claims, and the state does not dispute that the remaining factors favor injunctive relief if the Court agrees with that conclusion. The Court should thus affirm the preliminary injunction and enlarge its scope to preserve the rights of New Jersey residents from this misguided effort to defy *Bruen*.

## STANDARD OF REVIEW

In reviewing a preliminary injunction, this Court reviews the district court's "factual findings for clear error, its legal conclusions de novo, and its ultimate grant of the injunction for abuse of discretion." *Schrader v. Dist. Att'y of York Cnty.*, 2023 WL 4612022, at *4 (3d Cir. July 19, 2023).

## ARGUMENT

**I.  Plaintiffs Are Likely To Succeed On The Merits.**

### A.  Chapter 131's Permitting Scheme Violates the Second Amendment Thrice Over.

*Bruen* reprimanded states for conditioning the right to carry a handgun outside the home on satisfying ahistorical requirements.  Remarkably, that admonition had the exact opposite of its intended effect in New Jersey.  Chapter 131 now requires applicants to satisfy three new requirements that have no more grounding in this Nation's historical tradition than the condition rejected in *Bruen*.  Those three features—the insurance mandate, the application-fee requirement, and the four-reputable-persons requirement—cannot stand.

#### 1.  Insurance Mandate (N.J. Stat. Ann. §§2C:58-4(d)(4), 2C:58-4.3(a)).

The first fatal problem with Chapter 131's permitting scheme is its insurance mandate, which requires anyone seeking a permit to carry a handgun to first obtain "at least … $300,000" in "liability insurance coverage."  N.J. Stat. Ann. §§2C:58-4(d)(4), 2C:58-4.3(a).  As the district court correctly recognized, that mandate is irreconcilable with *Bruen*.  *See* JA93-103.[2]

---

[2] The state speculates that "many preexisting homeowner's or renter's insurance policies satisfy this requirement," NJ.Br.49, but multiple *Siegel* plaintiffs have attested that they "do not have insurance policies satisfying the Insurance Mandate's minimum coverage amount."  JA88.

As *Bruen* explained, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S.Ct. at 2129-30. There is no question that the Second Amendment's plain text—which secures the "right of the people to … bear Arms," U.S. Const. amend. II— presumptively protects the *Siegel* plaintiffs' proposed course of conduct, as they seek to engage in the exact same conduct as the plaintiffs in *Bruen*: "carrying handguns publicly for self-defense." 142 S.Ct. at 2122; *see, e.g.*, JA311-32.

The state resists that conclusion, insisting that the mandate does not "fall[] within the Second Amendment's scope" "at all" because it purportedly "does not address who are 'the people' that may carry firearms; does not impact 'how' or which 'Arms' they may carry; and does not limit 'where' they may do so." NJ.Br.48. That claim blinks reality. Chapter 131 declares in no uncertain terms that the "carrying of a handgun in public" for "self-defense" is "lawful" in New Jersey "*only if*" an individual has a "permit to carry" and "proof" of $300,000 in "liability insurance," and the state will not "issue[]" a "permit to carry" to anyone who is not "in compliance with the liability insurance requirement." N.J. Stat. Ann. §§2C:58-4(c), (d), 2C:58-4.3, 2C:58-4.5 (emphasis added). The law thus operates like the proper-cause requirement in *Bruen*, dictating which people may carry handguns. As

this Court just recognized, such laws plainly implicate the Second Amendment's plain text. *See Range*, 69 F.4th at 100-103. It is little surprise, then, that the only other court to consider the issue squarely rejected the state's contrary argument. *See Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*, 618 F.Supp.3d 901, 915-16 (N.D. Cal. 2022).

The state's confusion stems from a misreading of a footnote in *Bruen* stating that "nothing in our analysis should be interpreted to suggest the unconstitutionality" of certain preconditions to the issuance of handgun permits, like "background checks." 142 S.Ct. at 2138 n.9; *see* NJ.Br.49. But the unremarkable fact that some permitting conditions may *survive* Second Amendment scrutiny hardly means that such conditions do not implicate the Second Amendment at all. To the contrary, the Court emphasized in the same footnote that it would not "not rule out" holding a permitting scheme unconstitutional if, *e.g.*, it imposed "lengthy wait times in processing license applications or exorbitant fees," 142 S.Ct. at 2138 n.9—a caveat that would make no sense if permitting conditions did not "fall[] within the Second Amendment's scope" at all, NJ.Br.48. That presumably explains why this footnote appears amidst a discussion of historical tradition—*i.e.*, after the Court already found the Second Amendment implicated. *See* 142 S.Ct. at 2138 n.9; *cf. Range*, 69 F.4th at 102 (noting that "'all people have the right to keep and bear arms,' though the legislature may constitutionally 'strip certain groups of that right'").

The state thus bears the burden of proving, based on "historical precedent," that an "enduring," "comparable tradition of regulation" supports the insurance mandate. *Bruen*, 142 S.Ct. at 2131-32, 2155. That is an exceedingly tall task, as New Jersey is only the second jurisdiction in U.S. history to impose such a mandate—and the first (San Jose, California) beat it to the punch by a matter of months. *See California City Approves 1st US Insurance Law for Gun Owners*, Associated Press (Jan. 26, 2022), https://rb.gy/mcgs1. The state is thus forced to draw increasingly strained historical analogies, none of which comes close to getting the job done.

The state first seeks to draw support from "historical surety laws." NJ.Br.50-52. But as *Bruen* explained when examining these very same laws, they required "only those" "reasonably accused of intending to injure another or breach the peace" "to post bond before carrying weapons in public"—and, even then, there is "little evidence that authorities ever enforced surety laws." 142 S.Ct. at 2148-49; *see* William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829) ("[T]he carrying of arms … would be sufficient cause to require him to give surety of the peace" only if it is "attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them[.]"). In stark contrast, the insurance mandate requires *all* individuals who wish to carry handguns in public to obtain insurance *regardless* of whether there is "probable suspicion[] that some

crime is intended or likely to happen."  4 William Blackstone, *Commentaries on the Laws of England* 249 (1769).  *Bruen* requires courts to examine the "how and why" of laws when analyzing the historical record—*i.e.*, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified."  142 S.Ct. at 2133.  As the district court recognized, surety laws that fettered the Second Amendment rights of few (if any) individuals suspected of imminent wrongdoing are self-evidently not "relevantly similar" to an insurance mandate that restricts the Second Amendment rights of all law-abiding citizens in New Jersey regardless of whether they are suspected of imminent wrongdoing.  JA98.

The state offers three reasons why the district court's "efforts to distinguish surety laws" purportedly do not "withstand scrutiny."  NJ.Br.54.  Those arguments are uniformly meritless.  It first protests that "only some state laws historically required … a showing" that the "arms-bearer posed a risk."  NJ.Br.54.  But the only antebellum examples it identifies are the surety laws from Virginia and West Virginia, NJ.Br.50, which *Bruen* discarded as "unusually broad" departures from traditional surety laws.  142 S.Ct. at 2148 n.24.  Second, the state claims that, supposedly like surety bonds, "the burden imposed by insurance is also individually calibrated."  NJ.Br.54.  That is a non-sequitur:  Calibrating insurance premiums to reflect individual risk does not change the reality that, quite unlike surety laws,

Chapter 131 demands the same minimum amount of insurance from *everyone*. Finally, the state posits that the court "misread the history" in finding that, unlike Chapter 131, surety laws imposed no "criminal penalties." NJ.Br.54. But the state musters only one Massachusetts provision that contemplates criminal penalties, which it did not mention below. *See Bruen*, 142 S.Ct. at 2130 n.6 ("Courts are … entitled to decide a case based on the historical record compiled by the parties."). And it offers no evidence that this general provision was "ever enforced" against firearms owners—or, for that matter, that *any* jurisdiction enforced *any* surety law against *anyone*. *Id.* at 2149.

The state next resorts to a handful of 19th-century judicial decisions that imposed strict liability on firearms owners following "gun accidents." NJ.Br.52. Even assuming that modest evidence reflects a historical tradition, those decisions affirmatively *undermine* any claim that the insurance mandate is consistent with historical tradition. After all, they demonstrate that earlier generations certainly understood that the "unintentional misuse" of a firearm can cause "harm"—which is the *raison d'être* for the insurance mandate. NJ.Br.48. Yet instead of "address[ing] this problem" with the functional equivalent of a prior restraint, "mandating that all arms bearers obtain insurance or post a bond to prevent injuries that may not occur," "the jurisdictions that historically imposed liability against gun owners did so only after an injury to another (or to property) and after an adversarial proceeding."

JA102.  That is fatal after *Bruen,* which explained that "if earlier generations addressed [a] societal problem, but did so through materially different means," that is powerful "evidence" that the "modern regulation is unconstitutional."  142 S.Ct. at 2131.

The state is thus left trying to chalk the novelty of its mandate up to the fact that "liability insurance did not exist anywhere outside of the workplace context well into the 20th [c]entury."  NJ.Br.53-54.  But liability insurance has been ubiquitous for decades, and even during the era when the Second Amendment was treated as a collective-rights anachronism, no state imposed such a mandate.  Moreover, the state itself argues that bonds have existed for centuries and "bear striking analogical resemblances" to liability insurance, including because both "require[] upfront payment."  NJ.Br.10, 50.  The reality that earlier generations declined to deploy a tool that the state considers directly akin to liability insurance thus confirms that New Jersey's novel insurance mandate is ahistorical and unconstitutional.

### 2.    Application Fee (N.J. Stat. Ann. §2C:58-4(c)).

Chapter 131's application-fee requirement likewise violates the Second Amendment.  To obtain a permit to carry a handgun, an individual must pay a $200 application fee.  N.J. Stat. Ann. §2C:58-4(c).  While one might expect that fee to be designed merely to offset the administrative costs associated with processing the application, that is emphatically not so by explicit statutory design.  Instead, only a

portion—$150—"shall be used to defray the costs of investigation, administration, and processing of the permit to carry handgun applications," while the remainder—$50—"shall be deposited into the Victims of Crime Compensation Office account."[3] *Id.* In effect, then, the fee forces law-abiding citizens who merely wish to exercise their Second Amendment rights to shoulder the burden of compensating people injured by criminals.

The constitutional problem with that approach is glaring. To begin, *Bruen*'s textual inquiry is no more complicated here than it is vis-à-vis the insurance mandate. Plaintiffs wish to carry handguns, but they need a permit to do so, which they cannot get without paying the application fee. And while everyone can agree that growing a fund to compensate victims of violent crime "promotes an important interest," the state did not and could not demonstrate that forcing law-abiding citizens who wish to carry firearms to shoulder that burden is consistent with this Nation's tradition of firearm regulation, which is what it must establish. *See Bruen*, 142 S.Ct. at 2126.

That should come as no surprise. It is bedrock constitutional law that "[a] state may not impose a charge"—*i.e.*, a "license tax"—"for the enjoyment of a right

---

[3] The Victims of Crime Compensation Office seeks to "provid[e] financial assistance to victims [of violent crimes], their families, and victim service providers." N.J. Office of the Att'y Gen., Victims of Crime Compensation Office, *About Us*, https://rb.gy/fi3bu (last visited Aug. 10, 2023).

granted by the federal constitution." *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943). A state may instead single out "a privilege granted by the Bill of Rights," *id.*, for special licensing fees *only* as necessary to "meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed"—*i.e.*, solely to "defray" administrative costs, *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941); *see Kwong v. Bloomberg*, 723 F.3d 160, 165 (2d Cir. 2013); *cf. iMatter Utah v. Njord*, 774 F.3d 1258, 1270 (10th Cir. 2014); *Sullivan v. City of Augusta*, 511 F.3d 16, 38 (1st Cir. 2007); *Fly Fish, Inc. v. City of Cocoa Beach*, 337 F.3d 1301, 1314-15 (11th Cir. 2003); *Fernandes v. Limmer*, 663 F.2d 619, 633 (5th Cir. 1981). Because Chapter 131 expressly commands that $50 of every permit application shall *not* be used to "defray" administrative costs, N.J. Stat. Ann. §2C:58-4(c), the constitutional violation is undeniable.

The district court's failure to recognize as much rests on a misunderstanding of the constitutional problem. The court posited that it could not resolve plaintiffs' claim without "discovery" because it "is clueless as to revenues generated by firearm permits" and the associated costs. JA82. But that overlooks the indisputable fact that 25% of every application fee is set aside for other purposes regardless of the "costs … incurr[ed]" in processing applications. To be sure, discovery could reveal that the state does not need even $150 to process an application—or it could reveal the actual cost is $175. But either way, $50 of the application fee is expressly

26

directed to something other than the costs of processing the application. The district court also noted that the Second Circuit upheld a $340 licensing fee, but it overlooked that *Kwong* did so only after emphasizing that "[t]he undisputed evidence … that the $340 licensing fee is designed to defray (and does not exceed) the administrative costs associated with the licensing scheme." 723 F.3d at 166. Here, by contrast, the undisputed evidence—the text of Chapter 131 itself—confirms that at least $50 of the $200 application fee will not be used to defray administrative costs. That "obnoxious" "exaction" on constitutional rights is indefensible. *Follett v. Town of McCormick*, 321 U.S. 573, 577 (1944).

Finally, the district court posited that plaintiffs failed to demonstrate irreparable harm because their injury "can be remedied with an award of monetary damages." JA81. But the state defendants enjoy sovereign immunity under the Eleventh Amendment, which they have never suggested they would waive, and that suffices to render plaintiffs' economic loss "irreparable harm." *N.J. Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 388 (3d Cir. 2012).

### 3. Endorsement From Four Reputable Persons (N.J. Stat. Ann. §2C:58-4(b)).

Chapter 131's four-reputable-persons requirement is as unsustainable as it is bizarre. To apply for a permit, an applicant must obtain an "endorse[ment]" from at least "four reputable persons who are not related by blood or by law to the applicant and have known the applicant for at least three years" attesting that the applicant

27

"has not engaged in any acts or made any statements that suggest the applicant is likely to engage in conduct, other than lawful self-defense, that would pose a danger to the applicant or others."  N.J. Stat. Ann. §2C:58-4(b).  Even setting aside the obvious problems with charging the state with making judgments about who counts as "reputable," the potential for abuse in a system that sounds like it was plucked from a Jim-Crow-era voting law is palpable.

The district court correctly recognized that this requirement implicates the Second Amendment's plain text and that "[t]he State ha[d] not come forward with any historical laws to support" it.  JA49, 71.  But it nevertheless declined to enjoin it based on certain historical laws the court itself unearthed that purportedly demonstrate a tradition of "disarming dangerous individuals and those who endanger the public safety."  JA52, 72-75.  Setting aside the problem that many of those laws are themselves antithetical to the basic notion of constitutional rights, they do not come close to demonstrating that the four-reputable-persons requirement is consistent with our Nation's historical tradition.

The basic problem with the court's analysis is that it confused the "why" and the "how."  To be sure, the historical record lends support to laws dispossessing "persons who *demonstrated* that they would present a danger to the public if armed." *Binderup v. Att'y Gen.*, 836 F.3d 336, 369 (3d. Cir. 2016) (en banc) (Hardiman, J. concurring in part and in the judgments) (emphasis added).  But it lends no support

to the notion that a state may presume that *everyone* who wants to carry a handgun is dangerous, and require people to pre-qualify for the exercise of a constitutional right by finding four "reputable" persons willing to attest otherwise. There is a vast difference between allowing an individual right to be lost via individual misconduct, and conditioning the exercise of a constitutional right on the assent of those with sufficient standing in the community. The latter is a formula for selective disarmament. Indeed, it is no accident that the lone state law the district court identified that imposed any kind of character-witness obligation to possess a firearm applied only to "free negros and free mulattos." JA73-74. And while the court posited that "several municipalities adopted licensing laws requiring character endorsement," two of the three laws it identified (one of which is from 1980) simply required *the police* to make a recommendation on whether to grant a permit application. *See* JA74. Beyond that, the court identified only laws that allowed individuals to be disarmed if they were actually known or suspected to be dangerous. JA73-74. Again, that is nothing like a law that prohibits law-abiding citizens from carrying handguns without the permission of four "reputable" people.

At bottom, the four-reputable-persons requirement is just an ill-disguised effort to reintroduce the same kind of discretion into New Jersey's permitting system that *Bruen* rejected. *Bruen* explained that permitting schemes are permissible if they embody "narrow, objective, and definite standards" that do not entail the "appraisal

of facts, the exercise of judgment, and the formation of an opinion." *Bruen*, 142 S.Ct. at 2138 n.9. The four-reputable-persons requirement falls at the opposite end of the spectrum, leaving it to permitting authorities to decide who is "reputable" and what "acts" and "statements" disqualify law-abiding citizens from exercising their Second Amendment rights. N.J. Stat. Ann. §2C:58-4(b). In short, the requirement resurrects exactly the kind of "open-ended discretion" that *Bruen* endeavored to inter. *Bruen*, 142 S.Ct. at 2161 (Kavanaugh, J., concurring).

### B.  Chapter 131's Sensitive-Place Provisions Violate the Second Amendment.

Chapter 131's sensitive-place provisions fare no better. As this Court recently observed, "historical restrictions on firearms in 'sensitive places' do not empower legislatures to designate any place 'sensitive' and then ban firearms there." *Range*, 69 F.4th at 105. It could hardly be otherwise: If every place were sensitive, then no place would be sensitive, and "the sensitive places doctrine would be superfluous." David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 215 (2018) ("Kopel & Greenlee").

It is little surprise, then, that sensitive places are "few" and far between in the historical record—*e.g.*, "legislative assemblies, polling places, and courthouses." *Bruen*, 142 S.Ct. at 2133. In those confined locations, government "law enforcement professionals" are "presumptively available" to compensate for the loss of self-

defense rights,[4] *id.*; *see Hardaway v. Nigrelli*, 2022 WL 16646220, at *14 (W.D.N.Y. Nov. 3, 2022), and the "misuse of arms" could have uniquely destabilizing consequences—*e.g.*, "prevent[ing] the operation of courts and other institutions of a free government." Kopel & Greenlee at 211. And while some "*new* and analogous" sensitive places have developed in "modern" times—*e.g.*, areas of airports secured by the Transportation Security Administration—sensitive places remain the "exception[]," not the norm. *Bruen*, 142 S.Ct. at 2122, 2138.

Against that backdrop, the state's sweeping effort to convert nearly all of New Jersey into a sensitive place is exceedingly constitutionally suspect. Indeed, the notion that New Jersey, mere months after *Bruen*, managed to discover 26 categories and 115 subcategories of sensitive places lurking in plain sight "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013). If an approach to the sensitive-place doctrine that would "in effect exempt cities from the Second Amendment" is "too broad[]," *Bruen*, 142 S.Ct. at 2134, then an effort to "declar[e] most of New Jersey off limits for law-abiding citizens who have the constitutional right to armed self-defense" is unconstitutional *a fortiori*, JA19.

---

[4] To the extent a state does not treat certain places as sensitive in that sense—*i.e.*, it leaves them "open to the public, without any form of special security or screening," NJ.Br.32—that is powerful evidence that they are not sensitive. *Cf. Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) ("[A] law cannot be regarded as protecting an interest 'of the highest order' … when it leaves appreciable damage to that supposedly vital interest unprohibited.").

### 1. The Second Amendment's Plain Text Presumptively Protects Plaintiffs' Conduct.

As with any firearms regulation, the threshold question when considering the constitutionality of Chapter 131's sensitive-place provisions is whether the Second Amendment presumptively protects plaintiffs' proposed course of conduct. *See Bruen*, 142 S.Ct. at 2126. As the district court agreed, the answer is plainly yes. *See* JA119-220. Plaintiffs wish to carry handguns for self-defense in the locations they have challenged, *see* JA311-32, which are indisputably "outside the home," *Bruen*, 142 S.Ct. at 2122. By "prohibit[ing]" "the carrying of a firearm"—including "any handgun"—in each of those "[p]laces," N.J. Stat. Ann. §§2C:58-4.6, 2C:39-1(f), Chapter 131 implicates conduct that the Second Amendment's "plain text covers," thus shifting the burden to the state to demonstrate that its restrictions are "consistent with this Nation's historical tradition," *Bruen*, 142 S.Ct. at 2126.

The state does not dispute that conclusion except with respect to Chapter 131's private-property provision, which presumptively prohibits the carrying of firearms on all private property in New Jersey, *see* N.J. Stat. Ann. §2C:58-4.6(a)(24). The state claims that restriction "does not implicate the Second Amendment right" at all. NJ.Br.38. The state is wrong.

The state asserts that "whether someone can carry onto private property is the result of the owner's wishes, and not constitutional entitlement." NJ.Br.38 (emphasis omitted). That argument confuses the rights of the property owner with

32

the rights of the state.  To be sure, private-property owners generally may exclude those who wish to carry firearms on their property consistent with the Second Amendment, just as they may restrict picketing and leafletting, because private-property owners are typically not state actors bound by the Bill of Rights.  That is why, unlike the plaintiffs in *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012), plaintiffs here "have not asserted" an unbridled "right to *trespass* with firearms (*i.e.*, to carry 'against an owner's wishes')," JA136, or suggested that the Second Amendment "trump[s] property law," *contra* NJ.Br.40.  But the unremarkable fact that the Second Amendment does not provide "a right to carry a firearm [on private property] *against the owner's wishes*," *GeorgiaCarry.Org*, 687 F.3d at 1264 (emphasis added), hardly means that the Second Amendment has nothing to say about *government*-imposed restrictions on carrying firearms on private property.

Here, by the state's own admission, it is the state—not a private-property owner—that has "set" a "default" rule by "law" that presumptively prohibits the carrying of handguns on all private property outside one's own home.  NJ.Br.39.  That state action readily distinguishes this case from the cases the state invokes.  *See, e.g.*, NJ.Br.45 (citing *Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551 (1972), which involved only a private-property owner's policy against distributing handbills).  And that state action unquestionably restricts conduct that "the Second Amendment's

plain text covers." *Bruen*, 142 S.Ct. at 2129-30.   Indeed, while the state may believe—apparently based on nothing more than a poll of 57 New Jersey residents conducted by a Yale Law School professor, *see* JA1570—that its private-property provision is effectuating the "likely expectations of New Jerseyans,"[5] NJ.Br.39, no academic study can change the reality that private property outside the home is, in fact, "outside the home."   State restrictions on carrying on private property thus implicate the Second Amendment's plain text, which includes no "home/public distinction." *Bruen*, 142 S.Ct. at 2122, 2134; *see Christian v. Nigrelli*, 2022 WL 17100631, at *6-9 (W.D.N.Y. Nov. 22, 2022).

Unable to articulate any textual basis for why the private-property provision would escape Second Amendment review altogether, the state faults the district court for failing to identify a "textual … basis" for its conclusion that the Second Amendment is implicated only vis-à-vis private property "open to the public." NJ.Br.44-45.   That is a fair criticism, but it is not one that helps the state.   Because the plain text of the Second Amendment does not include any "locational distinction," JA134, the better view is that the Second Amendment presumptively protects citizens against *state action* restricting their rights on *all* private property,

---

[5] It is not clear why the state believes that it is effectuating the likely expectations of New Jerseyans.   Of the 57 New Jersey respondents in the state's cited study, more thought that someone *could* carry a firearm onto a client's property or into a private business without express permission than thought someone could *not*.   *See* JA1572.

and that the validity of such efforts therefore turns entirely on historical tradition. (Of course, "[t]he parties … all agree that property owners can decide whether to allow firearms onto their property." NJ.Br.45.) But there is certainly no "textual … basis" for the state's "line-drawing enterprise," which would permanently exempt *all* private property—whether in the "plumb[ing]" context or otherwise—from the Second Amendment, NJ.Br.44-55, even when private-property owners *welcome* firearms,[6] *see* NJ.Br.10 (asserting that "carrying guns on another's property" is always "a question of property, not constitutional right").

### 2. The State Has Not Demonstrated That Its Sensitive-Place Provisions Are Consistent With Historical Tradition.

Because *Bruen*'s textual inquiry is concededly or easily satisfied as to each challenged sensitive-place provision, the state "must demonstrate" that each restriction is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2126. And because most of those places existed or had clear parallels at the Founding, historical analogies to *other* places are of limited if any utility, as reasoning by analogy is available only for "*new*" places. *Bruen*, 142 S.Ct. at 2133. The state is nowhere close to meeting its burden. Indeed, treating most of New Jersey as though it is akin to a courthouse protected by metal detectors and a

---

[6] That is no mere speculation: The state has already categorically prohibited firearms in all private vehicles, entertainment facilities, and places where alcohol is served, even if their owners welcome firearms. *See* pp.51-54, 58-60, *infra*.

specialized police force does not pass the straight-face test.  And the calculus does not change just because the state incants the word "crowded" or "children."

### a.     Private property (N.J. Stat. Ann. §2C:58-4.6(a)(24)).

To start with the private-property provision, Chapter 131 declares *all* "private property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property" a sensitive place "unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun."  N.J. Stat. Ann. §2C:58-4.6(a)(24).  That sweeping restriction, which alone would render vast swaths of the state presumptive no-carry zones given how many places open to the public are privately owned, finds no support whatsoever in the historical record.

To be sure, there is certainly a historical tradition of allowing *private-property owners* to decide whether to exclude firearms—and people—from their property. *See Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2072 (2021) ("The right to exclude is 'one of the most treasured' rights of property ownership.").  But there is no comparable historical—or even modern-day—tradition of allowing the government to create a no-carry default for invitees onto private property.  To the contrary, "[t]he Nation's historical tradition is that individuals may carry arms on private property unless the property owner chooses otherwise." *Christian*, 2022 WL 17100631, at *9 n.19; *see also Wolford v. Lopez*, 2023 WL 5043805, *26-29 (D.

Haw. Aug. 8, 2023) (the Second Amendment "grant[s] a presumptive right to carry" on "private properties held open to the public"). Indeed, the academics who inspired the private-property provision have conceded that, in the centuries before *Bruen*, "no state" had ever enacted a law like New Jersey's. JA1557.[7] The private-property provision thus is the very model of a law that is inconsistent with historical tradition.

The state resists that conclusion, pointing to a handful of colonial statutes and an even smaller batch of Reconstruction-era (or even later) statutes. *See* NJ.Br.40-41. But as the district court correctly recognized, and other courts have agreed, the state's colonial statutes—from New Jersey, Pennsylvania, New York, and Massachusetts—are all "hunting regulations designed to discourage poaching." JA150; *see also Antonyuk v. Hochul*, 635 F.Supp.3d 111, 147-48 (N.D.N.Y. 2022); *Solomon v. Cook Cnty. Bd. of Comm'rs*, 559 F.Supp. 3d 675, 690-91 (N.D. Ill. 2021);

---

[7] While the state claims that there are similar "laws across the country," NJ.Br.40, three of the ten it cites (from a collective eight states plus the District of Columbia) create a default no-carry rule only for *residential* private property, *see* Alaska Stat. Ann. §11.61.220; La. Rev. Stat. §40:1379.3(O); S.C. Code Ann. §23-31-225, two prohibit carrying only in churches, *see* Ohio Rev. Code Ann. §2923.126(B)(6); S.C. Code Ann. §23-31-215(M)(8), one only on residential property and in churches, *see* D.C. Code §7-2509.07(b), and one expressly *permits* carrying on private property unless the owner prohibits it, Ga. Code Ann. §16-11-127; *see also* D.C. Code §7-2509.07(b)(3); *cf.* S.C. Code Ann. §23-31-215(M)(10). As for the remaining three, all emanate from sweeping post-*Bruen* sensitive-place laws that are currently being challenged on Second Amendment grounds. *See* N.Y. Penal Law §265.01-d(1); Md. Code, Crim. Law §6-411(c); Haw. Rev. Stat. §134-E (TRO granted in part, *see Wolford*, 2023 WL 5043805 at *26-29).

*State v. One 1990 Honda Accord*, 712 A.2d 1148, 1156 (N.J. 1998). That much leaps off the page from their titles—*e.g.*, New Jersey's 1769 "Act for the More Effectual Preservation of Deer in This Colony," JA1168, and Massachusetts' 1789 "Act for the Protection and Security of the Sheep and Other Stock on Tarpaulin Cove Island Otherwise Called Naushon Island and on Nennemessett Island, and Several Small Islands Contiguous, Situated in the County of Dukes County," JA1831. As *Bruen* emphasized, when analogizing modern regulations to historical ones, whether they are "comparably justified" is a "*central*" consideration. *Bruen*, 142 S.Ct. at 2133. Needless to say, the Governor and his legislative partners did not enact Chapter 131's private-property provision for the more effectual preservation of deer and sheep.

The state does not dispute that the Pennsylvania, New York, and Massachusetts statutes are all anti-poaching measures. It instead quibbles only with the district court's reading of New Jersey statutes, which purportedly have dual purposes: anti-poaching and "prohibit[ing] trespass with guns regardless of intent to poach." NJ.Br.43. But the state offers no evidence that authorities "ever enforced" those statutes against anyone who was neither a poacher nor a trespasser but rather was *invited* onto private property, *Bruen*, 142 S.Ct. at 2149, and "[t]o the extent there are multiple plausible interpretations of [the statutes]," the Court must

"favor the one that is more consistent with the Second Amendment's command," *id.* at 2141 n.11.

The state is thus forced to argue that "it is irrelevant whether these laws were *motivated* by concerns with poaching" because they are purportedly "historical twins" to its private-property provision. NJ.Br.43. Nonsense. As one might expect with laws preoccupied with deer and other game, the anti-poaching statutes applied only to certain "lands"—*e.g.*, "Improved or Inclosed Lands." JA952-53; *see* JA150; *cf. Sinnickson v. Dungan*, 8 N.J.L. 226, 226 (1825) (discussing "swine trespassing on … enclosed land"). Moreover, they applied only to places where the public did *not* have a presumptive right to be, as eighteenth and nineteenth century law typically protected crossing and even hunting on *un*enclosed lands, regardless of whether they were privately owned. *See, e.g.*, Pa. Const. §43 (1776) (protecting right to hunt on lands "not inclosed"); Vt. Const. ch.II §XXXIX (1777) (same). The private-property provision, in stark contrast, covers *all* "residential, commercial, industrial, agricultural, institutional or undeveloped property," even when it is generally open to the public. N.J. Stat. Ann. §2C:58-4.6(a)(24)). It thus cannot seriously be disputed that the anti-poaching statutes did not impose "a comparable burden on the right of armed self-defense." *Bruen*, 142 S.Ct. at 2133.

Lacking historical support from the Founding era and early Republic, the state leans on an 1865 Louisiana statute, an 1867 Texas statute, and an 1893 Oregon

statute. *See* NJ.Br.41-42. The first problem with those statutes is they "come too late." *Bruen*, 142 S.Ct. 2137. "[P]ost-Civil War discussions of the right to keep and bear arms 'took place 75 years [or more] after the ratification of the Second Amendment,'" so "'they do not provide as much insight into its original meaning as earlier sources.'" *Id.* The state disagrees, insisting that 1868 (the year of the Fourteenth Amendment's ratification) is the right starting point, not 1791 (the year of the Second Amendment's ratification). *See* NJ.Br.33-34. But the Fourteenth Amendment "incorporate[d] the Second Amendment right recognized in *Heller*," *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010), and *Heller* recognized a Second Amendment right grounded in antebellum evidence, *see Bruen*, 142 S.Ct. at 2137.[8] The state's contrary theory would mean that the Second Amendment has a different meaning when applied to the federal government than when applied to the states—a radical shift in constitutional law. *See McDonald*, 561 U.S. at 765 ("[I]ncorporated Bill of Rights protections 'are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.'").

---

[8] The state relies on two post-*Bruen* decisions holding that 1868 is the better view: *National Rifle Association v. Bondi*, 61 F.4th 1317 (11th Cir. 2023), and *Maryland Shall Issue, Inc. v. Montgomery County*, 2023 WL 4373260 (D. Md. July 6, 2023). *See* NJ.Br.33-34. But the Eleventh Circuit promptly vacated *Bondi* in advance of en banc proceedings, and *Maryland Shall Issue* just adopted *Bondi*'s now-vacated rationale.

At any rate, the state's "late-19th-century" evidence "has several serious flaws even beyond the[] temporal distance from the founding." *Bruen*, 142 S.Ct. at 2154. At the outset, Louisiana and Texas enacted their statutes at a time when "Southern States" "routinely disarmed" "Blacks." *District of Columbia v. Heller*, 554 U.S. 570, 614 (2008); *see* Stephen P. Halbrook, *The Right to Bear Arms in Texas: The Intent of the Framers of the Bills of Rights*, 41 Baylor L. Rev. 629, 653 (1989) (describing the 1867 Texas law as "the closest Texas came to adopting a black code provision to disarm freedmen"). And Oregon—which famously *rescinded* its ratification of the Fourteenth Amendment in 1868 on the ground that "the Southern ratifications had been coerced and were therefore illegitimate," Thomas B. Colby, *Originalism and the Ratification of the Fourteenth Amendment*, 107 Nw. U. L. Rev. 1627, 1655 n.168 (2013)—has a "troubling history of racial discrimination" too, Cheryl A. Brooks, *Race, Politics, and Denial: Why Oregon Forgot to Ratify the Fourteenth Amendment*, 83 Or. L. Rev. 731, 732 (2004); *cf. Ramos v. Louisiana*, 140 S.Ct. 1390 (2020).

But even taking these three laws at face value, they too apply to only a limited subset of residential lands, like plantations. *See* JA1645 ("inclosed premises or plantation"), JA1651 ("enclosed premises or lands"), JA1662 (law titled "Entering Another's Plantation With Firearms"). Moreover, the state's own submission demonstrates that there is apparently a "barren record of enforcement" of these laws,

which further "discount[s]" their value (and presumably explains why they do not appear to have been challenged, NJ.Br.44). *Bruen*, 142 S.Ct. at 2149 n.25. And in all events, if "*three* colonial regulations" cannot "suffice to show a tradition" for Second Amendment purposes, *id.* at 2142, then surely three late-19th-century statutes fare no better. While the state seems to think that three statutes are enough when there is no "countervailing evidence," NJ.Br.27-28, it forgets *Bruen*'s instruction that "lack of a distinctly similar historical regulation" *is* "relevant evidence" of "inconsisten[cy] with the Second Amendment" when it comes to an issue that dates back to the Founding, 142 S.Ct. at 2131—which the rules governing carrying on private property certainly do.

### b. Within 100 feet of public gatherings, demonstrations, or events requiring government permits (N.J. Stat. Ann. §2C:58-4.6(a)(6)).

The state promises "[a] robust historical tradition" to support its provision prohibiting firearms "within 100 feet of a public gathering." NJ.Br.14. It does not deliver. As the state does not and cannot dispute, "public gatherings" are no recent phenomenon; they long predate the Founding. *See, e.g.*, JA167-70. But even though "[f]irearm injuries have occurred throughout this Nation since its founding," JA102, the state offers not a shred of evidence that authorities during the Founding era or early Republic ever prohibited firearms in or near public gatherings. Again, that makes the historical inquiry "straightforward": "[W]hen a challenged regulation

addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S.Ct. at 2131. The best response the state can muster is to claim that this evidentiary void is a product of "our federalist scheme"—*i.e.*, states purportedly "could have enacted" such regulations centuries ago, but just chose not to do so. NJ.Br.28-29. "Perhaps. But again, the burden rests with the government to establish the relevant tradition of regulation," and sheer "speculat[ion]" does not cut it. *Bruen*, 142 S.Ct. at 2149 n.25.

With no antebellum evidence on its side, the state again turns to the late-19th century: a handful of laws enacted between 1869 and 1890 by four former Confederate states resisting Reconstruction (Texas, Georgia, Tennessee, and Missouri), two territories (Oklahoma and Arizona), and two municipalities. *See* NJ.Br.14-15. These "belated innovations" cannot alone establish a historical tradition, *Bruen*, 142 S.Ct. at 2137, and they suffer from all manner of problems to boot. Indeed, while the state boasts that some of these laws "were repeatedly upheld" by courts, NJ.Br.14, those decisions just underscore that the laws do not support the historical tradition the state tries to claim. *Bruen* denounced the state's lead precedent—*English v. State*, 35 Tex. 473 (1872)—as an "outlier[]." 142 S.Ct. at 2153. Another—*Hill v. State*, 53 Ga. 472 (1874)—embraced a militia-based view

43

of the Second Amendment that *Heller* rejected (hence its appearance only in Supreme Court dissents), *see McDonald*, 561 U.S. at 937 (Breyer, J., dissenting). Another—*Andrews v. State*, 50 Tenn. 165 (1871)—briefly opined on the permissibility of firearms in places likes churches (which Chapter 131 wisely does not single out for regulation) only in "dicta." JA178. And another—*State v. Shelby*, 2 S.W. 468 (Mo. 1886)—opined on the constitutionality of various locational prohibitions only in passing when upholding a prohibition on carrying a firearm while intoxicated.

The territorial laws are even further afield. Indeed, the state simply disregards that *Bruen* found laws from the very same territories—in fact, the very same legislative sessions—"not … 'instructive,'" not least because they "were irrelevant to more than 99% of the American population" and "were rarely subject to judicial scrutiny," so "we do not know the basis of their perceived legality." 142 S.Ct. at 2154-55; *see id.* at 2155 ("[T]he meaning of ambiguous constitutional provisions can be 'liquidated and ascertained *by a series of particular discussions and adjudications*.'" (quoting The Federalist No. 37 at 229 (James Madison))).

The state lastly suggests that its public-gathering provision "maps onto two well-recognized categories of sensitive places": places where people are "especially likely to congregate" and places where "governmental and free speech activities are at their zenith," like "courthouses, legislative assemblies, and polling places."

NJ.Br.15-16. The former is the sensitive-place theory that *Bruen* rejected. *See* 142 S.Ct. at 2133 (places are not sensitive just because they are "places where people typically congregate"). As for the latter, *Bruen* observed that historical restrictions on "legislative assemblies, polling places, and courthouses" might be used to justify "modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places." *Id.* It nowhere suggested that these narrow government-function-focused laws could be used to extrapolate a sweeping principle that states may belatedly start banning firearms within 100 feet of anywhere people may gather to speak.

### c.  Zoos (N.J. Stat. Ann. §2C:58-4.6(a)(9)).

The state claims to have discovered "an extensive body of historical carry restrictions" that support its zoo provision, NJ.Br.20, but it offers nothing of the sort. While the equivalent of modern zoos did not exist at the Founding, *Bruen* requires states to "use analogies" to historical "sensitive places" to determine whether a firearms regulation at a new place is constitutional. *Bruen*, 142 S.Ct. at 2133. The state barely tries. The closest it comes is its incredible suggestion that zoos are materially indistinguishable from "schools" because both are "frequented by … children." NJ.Br.19; *see* NJ.Br.20-22. As the district court correctly recognized, *see* JA185, "expanding the category of 'sensitive places' simply to all places" frequented by children "defines the category of 'sensitive places' far too broadly," as the mere presence of children is the exact opposite of "exceptional," *Bruen*, 142 S.Ct. at 2133-

34, 2156. Moreover, for many firearms owners, the presence of their children is precisely why they carry firearms. *See Heller*, 554 U.S. at 628 (the self-defense right encompasses the right to defend not only one's "self," but also one's "family"). The state's theory would nullify the Second Amendment self-defense right in many circumstances where it is needed most.

The state is thus left relying on three ordinances enacted between 1861 and 1870 that prohibited firearms in New York City's Central Park, Philadelphia's Fairmount Park, and Chicago's Lincoln Park, which in turn contained zoos (but mostly non-zoo land). *See* NJ.Br.20. Those do not put points on the board for the state—and not just because this evidence is "too late to provide insight into the meaning of the Constitution." *Bruen*, 142 S.Ct. at 2137. While *Bruen* requires an assessment of "why" earlier generations enacted firearms regulations, *see id.* at 2133, the state offers no evidence that these three parks prohibited firearms to combat gun violence. To the contrary, at least one appears to have been animated by protecting wildlife. *See* JA1594 ("No persons shall carry fire-arms, or shoot birds in the Park[.]"). "Absent any evidence explaining *why* these unprecedented prohibitions … were understood to comport with the Second Amendment," they fail to "inform 'the origins and continuing significance of the Amendment.'" *Bruen*, 142 S.Ct. at 2155.

**d.** **Beaches, parks, recreational facilities, and playgrounds (N.J. Stat. Ann. §2C:58-4.6(a)(10); N.J. Admin. Code §7:2-2.17(b)).**

The state's defense of its beach, park, recreational-facility, and playground provision is insufficient too. Needless to say, beaches pre-date the Founding. But the state does not even *attempt* to suggest that any historical law supports its novel effort to designate its entire coastline a sensitive place—because there is none. *See Wolford*, 2023 WL 5043805 at *19-24 (finding no historical tradition prohibiting firearms in beaches and parks).

Instead, the state (briefly) focuses only on parks and recreational facilities, insisting that prohibiting firearms at those locations is consistent with various laws or ordinances enacted between the Civil War and World War II. But as with beaches, recreational parks are not an invention of the late-19th century or 20th century. Boston Common is approaching its quadricentennial anniversary. JA188. Bowling Green in New York City has existed since 1733. JA188. Philadelphia had "several" parks during the Founding era and early Republic. JA188. So did cities in New Jersey: Newark's Washington Park, for instance, dates back to 1795. *See* Washington Park Newark, *History*, https://rb.gy/a4cwj (last visited Aug. 10, 2023). The "lack of historical precedent" indicating that states banned firearms at these locations is a "telling indication of the severe constitutional problem" here. *United States v. Texas*, 143 S.Ct. 1964, 1970 (2023). And contrary to the state's

understanding, no amount of late-19th- or 20th-century evidence (yes, not even "thirty" measures from that era, NJ.Br.22) can cure that problem. *Cf. Espinoza v. Mont. Dep't of Revenue*, 140 S.Ct. 2246, 2258-59 (2020) ("[Respondent] argues that a tradition *against* state support for religious schools arose in the second half of the 19th century, as more than 30 States—including Montana—adopted no-aid provisions. Such a development, of course, cannot by itself establish an early American tradition." (citation omitted)).

The state declares (in a footnote) that all of these parks are not "relevantly similar" to modern parks—for reasons it declines to explain. NJ.Br.22 n.4. That is a bold claim coming from a party that thinks zoos are no different from schools. It is also wrong. Boston Common has served "as a place of public resort for the recreation of the people" "from time immemorial." *Steele v. City of Boston*, 128 Mass. 583, 583 (1880). The founders of New York City's Bowling Green specifically established it as a place for the "Recreation & Delight of the Inhabitants of this City." N.Y. City Dep't of Parks, *Bowling Green*, https://rb.gy/9ujrg (last visited Aug. 10, 2023). Contemporaneous accounts of Philadelphia in the early Republic described it as a city "preeminently fortunate" to have so many "public squares, and gardens" for "general resort" and "promenade." E.L. Carey & A. Hart, *Philadelphia in 1830-1*, at 145-46 (1830). And Newark's Washington Park has

functioned as "a space for recreation" for over two centuries too.  *See* Washington

Park Newark, *History*, *supra*.

The state thus is again forced to place its chips on the argument that beaches,

parks, recreational facilities, and playgrounds are like "schools" because children

sometimes "congregate" there.  NJ.Br.21-22.  That sweeping claim is a recipe to

"eviscerate the general right to publicly carry arms for self-defense."  *Bruen*, 142

S.Ct. at 2134.[9]

> ### e.    Public libraries and museums (N.J. Stat. Ann. §2C:58-4.6(a)(12)).

The state asserts that it may prohibit firearms in public libraries and museums

because they are "educational- and literary-focused spaces."  NJ.Br.19.  But early

Americans enjoyed educational and literary pursuits too.   Charleston had the

Nation's first museum—the Charleston Museum—which first opened in 1773 and

offered access to the public by 1824.  *See* Charleston Museum, *About the Museum*,

https://rb.gy/0lcps (last visited Aug. 10, 2023).  Philadelphia had the Nation's "first

public museum[s]" by the 1780s, Candis McLean, *Insiders' Guide to 22 Essential

Philadelphia Museums*, Phila. Inquirer (May 12, 2023), https://rb.gy/3v4z1—

---

[9] While the district court generally rejected the state's claim that it may prohibit the carrying of handguns anywhere children may congregate, it accepted that reasoning when it came to playgrounds, as well as to "youth sports events."  *See* JA192-93, 781-82, 787-88.  Because the court rested those holdings solely on a strained analogy to schools, the Court should reverse, or at least vacate, as to both of those locations.

including one that inspired "the early plans for a Smithsonian building," Smithsonian Am. Art Museum, *Charles Willson Peale and Titian Ramsay Peale's* The Long Room, Interior of Front Room in Peale's Museum, https://rb.gy/c0vem (last visited Aug. 10, 2023). And museums operated in other cities in the early Republic, including New York and Baltimore. *See, e.g.*, N.Y. Hist. Soc'y, *About Us*, https://rb.gy/ch6vh (last visited Aug. 10, 2023); The Peale, *Our History*, https://rb.gy/5pi0q (last visited Aug. 10, 2023).

Libraries have an equally rich tradition. Benjamin Franklin founded the Nation's first lending library in 1731 in Philadelphia. JA494. Membership libraries "sprang up in [other] cities across the country" between "the late 1700s to the mid-1800s." Digit. Pub. Libr. of Am., *A History of US Public Libraries: Beginnings*, https://rb.gy/wkaei (last visited Aug. 10, 2023). And by 1850, the U.S. Census reported over 1,200 "public" libraries throughout the country (including 77 in New Jersey).[10] *See* U.S. Dep't of Interior, *Compendium of Seventh Census: 1850* 159 (1854), https://rb.gy/zaakp.

As all of this underscores, those in the Founding era and early Republic did not want for educational and literary spaces. Yet the state tellingly has discovered

---

[10] Whether libraries are public is irrelevant, as the state insists that libraries are sensitive because people engage in "educational, literary, or scientific enterprises" there, not because they are government-operated. NJ.Br.19.

no law from that period in which authorities categorically banned firearms in these places.  Instead, it invokes the same handful of state, territorial, and municipal laws from the late 1800s that it invokes in support of its public-gathering restriction. *Compare* NJ.Br.14 *with* NJ.Br.19.  Those laws fare no better the second time around. *See* pp.43-44, *supra*.  The state thus returns to its usual refrain:  Library and museums are sensitive because they "are popular for families with children."   NJ.Br.20. Repeating something with "no historical basis" does not give it any added weight. *Bruen*, 142 S.Ct. at 2134.

### f.    Places where alcohol is served (N.J. Stat. Ann. §2C:58-4.6(a)(15)).

The state also fails to carry its burden as to places that serve alcohol.[11]  Like firearms themselves, places that serve alcohol are part of America's historical fabric. "Consuming alcohol was one of the most widespread practices in the American colonies," and "[t]averns served as the most common drinking and gathering place for colonists."  Baylen J. Linnekin, *"Tavern Talk" and the Origins of the Assembly Clause:  Tracing the First Amendment's Assembly Clause Back to Its Roots in Colonial Taverns*, 39 Hastings Const. L.Q. 593, 595 (2012).  Thus, if a historical

---

[11] Chapter 131 separately prohibits carrying a handgun while intoxicated or consuming alcohol.  *See* N.J. Stat. Ann. §2C:58-4.4(a)(1)-(2).  Plaintiffs have never challenged those provisions.

tradition of banning firearms in places that serve alcohol existed, it should require little effort to find.

The state identifies no such tradition. The only colonial or antebellum state laws it offers (a grand total of two, one unmentioned below) concern regulation of the "militia" or "military." *See* NJ.Br.17-18; JA496-97. Those laws thus succeed only in confirming that those in the Founding era and early Republic did *not* generally view firearms at drinking establishments as a problem. Nor does the state's other evidence advance the ball. It points to "territorial 'legislative improvisations'" in New Mexico in 1853 and Oklahoma in 1890, but those "conflict with the Nation's earlier approach to firearm regulation" at places that serve alcohol and "are most unlikely to reflect 'the origins and continuing significance of the Second Amendment.'" *Bruen*, 142 S.Ct. at 2154; *see* NJ.Br.17. The state's only other evidence is one (again heretofore unmentioned) post-Reconstruction-era New Orleans ordinance that prohibited firearms in "any … tavern." NJ.Br.17. What *Bruen* said last year remains binding today: "[W]e will not stake our interpretation of the Second Amendment upon a law in effect in … a single city[] 'that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms' in public for self-defense." 142 S.Ct. at 2154.

g.    **Entertainment facilities (N.J. Stat. Ann. §2C:58-4.6(a)(17)).**

The state agrees (as it must) that people have gathered for "entertainment" since at least the Middle Ages.[12]  *See* NJ.Br.16.  But it has not uncovered any historical tradition of prohibiting arms in entertainment facilities.  The state invokes the 1328 Statute of Northampton and a 1786 Virginia law that prohibited carrying under certain circumstances in "fairs" or "markets."  NJ.Br.16.  But as *Bruen* just explained when examining these very same laws—yet the state brazenly ignores—"[t]hey prohibit[ed] bearing arms" *only* "in a way that spreads 'fear' or 'terror' among the people," which does not describe "merely carrying a firearm in public." 142 S.Ct. at 2145.  The only other antebellum law the state invokes is an 1816 ordinance from New Orleans banning weapons at a "public ball-room."  NJ.Br.16.  A "single" public-ballroom law from a "single city" is "surely too slender a reed on which to hang a historical tradition of restricting the right to public carry" in all public or private entertainment facilities.  *Bruen*, 142 S.Ct. at 2149, 2153-54.

The state thus retreats to an admixture of late-19th-century state and territorial laws from Texas, Georgia, Tennessee, Missouri, Oklahoma, and Arizona—*i.e.*, the same laws it invoked while unsuccessfully trying to save its public-gathering and

---

[12] Although the state asserts that the Founders could not have "imagined a place like MetLife Stadium," NJ.Br.18, such a classically educated group would certainly have heard of ancient stadiums like the Colosseum, Circus Maximus, or Hippodrome, whose seating capacities rivalled or dwarfed MetLife Stadium's.

land libraries and museums provisions. *See* pp.43-44, *supra*. Those laws remain just as inadequate the third time around. And the bottom line does not change just because another territory (New Mexico) banned firearms at "fandangos" in 1853 and another state (Montana) followed the former Confederate states' lead in 1903. NJ.Br.16-17; *see Bruen*, 142 S.Ct. at 2154 n.28.

> **h.  Casinos (N.J. Stat. Ann. §2C:58-4.6(a)(18); N.J. Admin. Code §13:69D-1.13).**

The state's attempt to justify its casino restriction is also a non-starter, as it regurgitates the same historical evidence that supposedly supports its restrictions at places where alcohol is served and entertainment facilities. *See* NJ.Br.18.[13] Stacking one set of inadequate evidence on top of another does not make it any less inadequate. And while the state blames its paltry evidentiary showing on the supposed absence of places akin to casinos "at … the Founding," NJ.Br.18, that

---

[13] The state suggests that plaintiffs lack "standing" to challenge this provision because "every casino in New Jersey independently prohibit[ed] firearms" after the district court's TRO decision. NJ.Br.18 n.3. In reality, that is a mootness argument, as the state agrees that an Article III case or controversy existed at the outset of this case. And the state does not carry its burden to prove that it is "absolutely clear" that one no longer does. *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 537-38 (1978); *see also, e.g.*, *West Virginia v. EPA*, 142 S.Ct. 2587, 2606-07 (2022). For one thing, the casino provision applies not only to "casinos," but also to "related facilities," N.J. Stat. Ann. §2C:58-4.6(a)(18), and the two-sentence press release the state cites does not address whether casinos have established such a broad policy. Nor, moreover, does it suggest that the casinos' new policy is permanent, which is unsurprising since they *allowed* firearms before February 2023.

would not excuse the state from analogizing to Founding-era sensitive places even if true—which it is not.

As the district court found (and the state ignores), those who lived in the colonies and early Republic regularly engaged in gambling and betting. *See* JA199. As one source described that early period, "gaming was a centerpiece of colonial life," and colonists even bet on firearms-related activities like "target shooting." Ed Crews, *Gambling: Apple-Pie American and Older than the Mayflower*, Colonial Williamsburg (Autumn 2008), https://rb.gy/fk64p. Furthermore, horse-racing tracks emerged as a particularly "popular venue for gaming" in places like New York, *id.*, and one of the state's favorite jurisdictions—New Orleans—had numerous casinos and gambling houses during the antebellum period, *see, e.g.*, Jay Precht, *Legalized Gambling*, 64 Parishes (Nov. 16, 2011), https://rb.gy/yziqy; Beverly A. Randles, *The Persistence of Gambling in Early American History*, 1 Gaming L. Rev. 531, 534-35 (1997); Virgil W. Peterson, *Gambling: Should It Be Legalized?*, 40 J. of Crim. L. and Criminology 259, 286 (1949). Yet it apparently never occurred to anyone during the Founding era and early Republic that establishments where gambling occurs are among the "relatively few" "sensitive places" where the government may prohibit carrying firearms. *Bruen*, 142 S.Ct. at 2133.

        **i.**      **Public filming locations (N.J. Stat. Ann. §2C:58-4.6(a)(23)).**

The state also phones in its defense of its prohibition on firearms at public filming locations. The state describes this restriction as applying only on "movie sets." NJ.Br.18. In fact, it applies to any "public location being used for making motion picture or television images," N.J. Stat. Ann. §2C:58-4.6(a)(23), which is why plaintiffs "did not contend" that they have an unrestricted Second Amendment right to carry on private movie sets, JA211. As to the "public locations" *actually* at issue—like "sidewalk[s]," JA211, in "Jersey City," N.J. Motion Picture & Television Comm'n, *Now Filming*, https://rb.gy/3e7g0 (last visited Aug. 10, 2023)—the state (again) points only to the historical evidence supposedly supporting firearms restrictions at places where alcohol is served and entertainment facilities. The state does not explain how a sidewalk is akin to a wine bar, but in all events, that evidence remains hopelessly insufficient.

        **j.**      **Health care facilities or treatment centers (N.J. Stat. Ann. §2C:58-4.6(a)(21), (22)).**

Nor does the state succeed in defending its healthcare-facility provision. The state asks the Court for slack because "[m]odern medical facilities were unknown to the Framers." NJ.Br.22. But there is no denying that medical facilities existed at the Founding. Indeed, Benjamin Franklin himself founded the Nation's first hospital—the still-standing Pennsylvania Hospital. *See* Barbra Mann Wall, *History*

*of Hospitals*, Univ. of Pa. School of Nursing, https://rb.gy/8jfyz (last visited Aug. 10, 2023); J.B. Cutter, *Early Hospital History in the United States*, 20 Cal. State J. of Med. 272, 272 (1922). And as the district court explained (and the state once again ignores), other hospitals existed in other cities in the 1700s and early 1800s, including in New York City and Boston. JA209. Yet the state offers zero evidence that earlier generations regulated, let alone "outright" prohibited, NJ.Br.23, firearms in these locations. *See Antonyuk v. Hochul*, 2022 WL 16744700, at *60 (N.D.N.Y. Nov. 7, 2022) ("[C]ertainly the medical profession existed in 18th and 19th century America; and certainly gun violence existed in 18th and 19th century America. However, the State Defendants do not cite (and the Court has been unable to yet locate) any laws from those time periods prohibiting firearms in places such as 'almshouses,' hospitals, or physician's offices.").

The state has no persuasive response. It instead argues that healthcare facilities are sensitive because "vulnerable" people are inside them. NJ.Br.23. But while it is certainly true that hospitals treat vulnerable people, that is hardly a "uniquely modern problem." NJ.Br.23. Early American hospitals likewise treated the vulnerable—the "sick and infirm" among "the socially marginal, poor, or isolated" classes. Wall, *supra*. Accordingly, if there really were a tradition of prohibiting firearms anywhere that serves "vulnerable" people, then "the Founders themselves could have adopted" the state's preferred means "to confront" the

purported "problem" of protecting them from gun violence. *Bruen*, 142 S.Ct. at 2131. The conspicuous "lack" of any such law in the historical record demonstrates that the healthcare-facility provision is just as unconstitutional as every other challenged sensitive-place provision. *Id.*[14]

### k.    Vehicles (N.J. Stat. Ann. §2C:58-4.6(b)(1)).

The state's effective prohibition on handguns in vehicles does not pass muster either. The state acknowledges that "historical laws specifically addressed the dangers of carrying firearms while traveling," starting with laws regulating "horse" travel. NJ.Br.25. But the state ignores the problem that all of these laws are stacked against it. For instance, colonial- and Founding-era statutes repeatedly addressed "riding" with arms. As *Bruen* determined, however, those statutes did not prohibit all carrying while riding; they merely prohibited carrying "in a way that spreads 'fear' or 'terror' among the people." 142 S.Ct. at 2142-45. Indeed, even the laws cited by the losing party in *Bruen* to try to support the proposition that states may prohibit all public carrying included express exceptions for travelers. *See, e.g.*, *Bliss v. Commonwealth*, 12 Ky. 90, 90 (1822) (exception for "when travelling on a

---

[14] Although the district court correctly recognized that no historical tradition supports that provision, it inexplicably granted injunctive relief only as to "the medical offices and ambulatory care facilities listed in Plaintiffs' declarations." JA210. This Court should expand that relief to *all* such facilities, as the absence of a historical tradition renders the healthcare-facility provision facially unconstitutional.

journey"); *State v. Mitchell*, 3 Blackf. 229, 229 (Ind. 1833) (similar); *State v. Buzzard*, 4 Ark. 18, 18 (1842) (similar); *Andrews*, 50 Tenn. at 171 (similar).  On top of that, "[m]ass transit"—*e.g.*, "steam ferry service" and "horse-drawn omnibuses"—"has been part of the urban scene in the United States since the early 19th century," Jay Young, *Infrastructure: Mass Transit in 19th- and 20th-Century Urban America* (Mar. 2, 2015), https://rb.gy/x0oxe, yet the state has cited no law prohibiting firearms in such settings.

Confronted with those insurmountable obstacles, the state seizes on a 1686 New Jersey statute regulating the "rid[ing]" practices of "planters" (*i.e.*, farmers), JA2833, along with a handful of statutes enacted between 1871 and 1929, NJ.Br.25. But the 1686 New Jersey statute—on which *Bruen* refused to put "meaningful weight," 142 S.Ct. at 2143-44—actually undermines the state's case, as language excised from the state's brief expressly exempted "all strangers, travelling upon their lawful occasions thro' this Province, behaving themselves peace[fully]."  JA2833. Subsequent colonial statutes in New Jersey (including the anti-poaching statutes) included similar protections. *See, e.g.*, JA983 ("[N]othing herein contained shall be construed to extend to prevent any Person carrying a Gun upon the King's Highway in this Colony.").

As for the rest of the state's meager evidence, 20th-century laws are never relevant, and late-19th-century evidence is relevant only to the extent it "confirm[s]"

prior history, *Bruen*, 142 S.Ct. at 2137, which the state's does not. Indeed, the state only invokes "rules and regulations" established by "private" railroad companies, NJ.Br.24, which have no bearing on whether *states* can prohibit firearms in vehicles. *Cf.* pp.58-59, *supra*. And it is more than a little rich for the state to invoke the preferences of *these* "private proprietors" in defense of an effort to prohibit owners of "private automobiles" from deciding for themselves whether they want firearms in their vehicles. NJ.Br.25. The state is thus left seeking a dispensation to at least prohibit firearms on "public buses" because they are "crowded." NJ.Br.24-25. But again, *Bruen* made crystal clear that "there is no historical basis" to declare a place sensitive "simply because it is crowded." 142 S.Ct. at 2134.

### 3.    Fish and Game Restrictions

New Jersey's fish and game restrictions are not even close to "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2126. For one thing, they prohibit carrying a bow and a firearm simultaneously, hence denying bow hunters their right to carry as a matter of course. N.J.A.C. 7:25-5:23(m). Hunters who wish to carry a handgun for self-defense are equally out of luck, as handgun ammunition is prohibited "in the woods, fields, marshlands, or on the water" or while hunting certain game. N.J.A.C. 7:25-5.23(a), (c), (f). And absent authorization by the state agency, "firearm[s] of any kind" are prohibited "within the

limits of a state game refuge." *Id.* 7:25-5.23(i).  That nullifies the fundamental right under *Bruen*.

The district court's reasons for declining to enjoin those restrictions do not withstand scrutiny.[15]  The court first posited that plaintiffs do not need to "carry[] a handgun for self-defense while hunting" because they "still ha[ve] arms" available like "a shotgun or rifle."  JA232.  But as *Heller* made clear, "[i]t is no answer to say … that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed."  554 U.S. at 629.  The court next claimed that these provisions are of a piece with various "historical laws" restricting the "method of hunting."  JA232.  But laws imposing "time and method" restrictions on *hunting itself* lend no support to New Jersey's effort to restrict what arms people may carry *for self-defense while* they are hunting.  The Court should accordingly reverse the fish and game rulings.

### 4.    The State's Government-as-Proprietor Theory Is Deeply Flawed.

Unable to muster any meaningful historical support for so many of its newly minted sensitive places, the state retreats to the argument that "many" of those

---

[15] The court determined that the *Siegel* plaintiffs had standing to challenge these restrictions generally, but not with respect to state game refuges.  JA115.  But as the court recognized, plaintiff Siegel stated that he hunts "in the woods and fields of New Jersey" "every year."  *Id.*  This Court should not engage in the same piecemeal analysis.

restrictions should survive under a so-called "independent constitutional doctrine." NJ.Br.34. In the state's view, it may prohibit firearms with impunity (or should at least receive "deference") on any property that it owns as a "proprietor rather than as sovereign." NJ.Br.34, 37. That sweeping submission is flawed on multiple levels.

For one thing, the state forgets that this case is a challenge to Chapter 131 (not, *e.g.*, a local library policy), and when the legislature passed and the Governor signed that legislation to impose sweeping firearms restrictions on government and private property alike, it plainly operated in its sovereign capacity—as evidenced by the fact that Chapter 131 codifies draconian criminal punishments, which only a sovereign can impose, for anyone who violates its terms. For another, there is simply no denying that the state's theory is another end-run around *Bruen*. To ensure that states did not misinterpret the operable Second Amendment test, the Supreme Court stated—repeatedly—that a state-imposed firearms regulation could survive "[o]*nly if*" it is "consistent with this Nation's *historical tradition*." *Bruen*, 142 S.Ct. at 2126, 2131 (emphasis added); *see id.* at 2129-30 ("We reiterate that … [t]he government must … justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."). And *Bruen* admonished that this historically rooted approach applies with equal force to "government buildings." *Id.* at 2133. It strains all credulity to suggest that *Bruen* nevertheless meant to extend an invitation for courts to apply an "independent" test to all property owned by the

government as a "proprietor," without regard to whether any such historical tradition exists. NJ.Br.34.

None of the pre-*Bruen* cases on which the state relies supports its contrary argument. The state discusses cases applying "dormant Commerce Clause[]" and "pre-emption" principles. NJ.Br.34-35. But those cases have nothing to do with whether a state may trample on fundamental rights when acting as a "proprietor," let alone with the "standard for applying the Second Amendment." *Bruen*, 142 S.Ct. at 2129-30. The state also clutches to *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019)—another decision *Bruen* repudiated, *see* 142 S.Ct. at 2127 & n.4—but *Class* held only that a government-owned parking lot "on the grounds of the United States Capitol" is a "'sensitive' place." *Class*, 930 F.3d at 462, 464. *Bonidy v. U.S. Postal Service*, 790 F.3d 1121, 1126-29 (10th Cir. 2015), and *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers*, 212 F.Supp.3d 1348, 1367-74 (N.D. Ga. 2016), mention government-as-proprietor concepts only in alternative holdings applying intermediate scrutiny, and even the state concedes that such analysis "has no place in the Second Amendment analysis after *Bruen*," NJ.Br.37. And *Nordyke v. King*, 681 F.3d 1041, 1043-45 (9th Cir. 2012) (en banc), is even more off-base, as it addressed state regulation of "gun shows," not restrictions on carrying firearms. In all events, what matters now is *Bruen*, and *Bruen* could not be clearer: Whether a place qualifies as "sensitive" turns on historical tradition. *See* 142 S.Ct. at 2133-

34. The state cannot short-circuit that analysis by claiming some free-floating right to control its property.

*    *    *

In sum, this "long journey through the Anglo-American history of public carry" confirms what common sense suggests. *Bruen*, 142 S.Ct. at 2156.  Just as "there is no historical basis … to effectively declare the island of Manhattan a 'sensitive place,'" *id.* at 2134, there is no historical basis to treat "most of New Jersey," JA19, as akin to a legislative assembly, polling place, or courthouse.

## II.    The Remaining Factors Favor Injunctive Relief.

The state does not argue that the Court should vacate the injunction even if plaintiffs are likely to succeed on the merits, and for good reason.  Plaintiffs will clearly suffer irreparable harm without it.  "Chapter 131 forces Plaintiffs to choose between the noncompensable loss of their Second Amendment rights or face significant criminal penalties for exercising such rights," JA236-37, and the loss of Second Amendment rights is irreparable harm, *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011).  The public-interest and balance-of-equities factors "merge" when the government is the opposing party, and it is well-established that enforcing an unconstitutional law "vindicates no public interest." *Schrader*, 2023 WL 4612022, at *4, *6; *see also K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,

710 F.3d 99, 114 (3d Cir. 2013).[16]    The Court accordingly should affirm the injunction that has already been granted and remand with instructions for the district court to broaden that relief to ensure that plaintiffs need not live under those unconstitutional provisions while this litigation runs its course.

## CONCLUSION

For the foregoing reasons, the Court should affirm to the extent the district court granted a preliminary injunction but otherwise reverse.

Respectfully submitted,

s/Erin E. Murphy

| | |
|---|---|
| DANIEL L. SCHMUTTER | PAUL D. CLEMENT |
| HARTMAN & WINNICKI, P.C. | ERIN E. MURPHY |
| 74 Passaic Street | *Counsel of Record* |
| Ridgewood, NJ 07450 | ANDREW C. LAWRENCE* |
| | MARIEL A. BROOKINS* |
| | NICHOLAS M. GALLAGHER* |
| | CLEMENT & MURPHY, PLLC |
| | 706 Duke Street |
| | Alexandria, VA 22314 |
| | (202) 742-8900 |
| | erin.murphy@clementmurphy.com |
| | *Supervised by principals of the firm who are members of the Virginia Bar |

*Counsel for Siegel Plaintiffs-Appellees/Cross-Appellants*

August 10, 2023

---

[16] The intervenors suggest that the Court should vacate the injunction *even if* plaintiffs are likely to prevail, but they do not grapple with any of this black-letter law. *See* Intervenors.Br.46-54.

## CERTIFICATE OF BAR MEMBERSHIP

The undersigned hereby certifies pursuant to L.A.R. 46.1 that the attorney whose name appears on the Brief of Appellant was duly admitted to the Bar of the United States Court of Appeals for the Third Circuit in 2013 and is presently a member in good standing at the Bar of said court.

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

I hereby certify that this brief complies with the type-volume requirements and limitations of Fed. R. App. P. 28.1(e)(2)(B)(i). Specifically, this brief contains 15,294 words in 14-point Times New Roman font.

## IDENTICAL PDF AND HARD COPY CERTIFICATE

The undersigned hereby certifies that this brief complies with L.A.R. 31.0(c) because the text of the electronic brief is identical to the text in the paper copies.

## VIRUS SCAN CERTIFICATE

The undersigned hereby certifies that this brief complies with L.A.R. 31.0(c) because the virus detection program Windows Defender, has been run on the file and no virus was detected.

## CERTIFICATE OF SERVICE

I hereby certify that on August 10, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy