**Nos. 23-1900, 23-2043**

_____

**In the**
**United States Court of Appeals for the Third Circuit**

_____

RONALD KOONS, ET AL.,
*Plaintiffs-Appellees,*

v.

MATTHEW J. PLATKIN, ET AL.,
*Defendants-Appellants.*

_____

**On Appeal from the United States District Court**
**for the District of New Jersey**
Nos. 1:22-cv-07463, 1:22-cv-07464 (RMB)

_____

**Brief *Amicus Curiae* of Gun Owners of America, Inc.,**
**Gun Owners Foundation, Gun Owners of California,**
**The DC Project, Tennessee Firearms Association,**
**Heller Foundation, Second Amendment Law Center, and**
**California Rifle & Pistol Association**
**in Support of Plaintiffs-Appellees and Affirmance**

---

Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
stephen@sdslaw.us

Robert J. Olson*
William J. Olson
Jeremiah L. Morgan
WILLIAM J. OLSON, P.C.
370 Maple Ave. W., Ste. 4
Vienna, VA  22180-5615
(703) 356-5070
wjo@mindspring.com
Attorneys for *Amici Curiae*

August 17, 2023
*Counsel of Record

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Rule 26.1, it is hereby certified that *Amici Curiae* Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, The DC Project, Tennessee Firearms Association, Heller Foundation, Second Amendment Law Center, and California Rifle & Pistol Association are non-stock, nonprofit corporations with no parent companies; therefore, no publicly held company owns 10% or more of their stock.

# TABLE OF CONTENTS

<u>Page</u>

CORPORATE DISCLOSURE STATEMENT .............................................i

TABLE OF AUTHORITIES....................................................... iii

INTEREST OF *AMICI CURIAE*................................................1

SUMMARY OF ARGUMENT ...................................................2

ARGUMENT ...........................................................................3

    I.  *BRUEN* FORECLOSES NEW JERSEY'S ATTEMPT TO DISTORT SETTLED CONSTITUTIONAL ANALYSIS BY SHIFTING THE RELEVANT PERIOD OF HISTORICAL INQUIRY TO THE LATE NINETEENTH CENTURY......................3

    II. *BRUEN* ALREADY REJECTED THE NOTION THAT THE MERE PRESENCE OF CROWDS OR CHILDREN SOMEHOW TRANSFORMS A LOCATION INTO A "SENSITIVE PLACE" .................................................................7

    III. *HELLER* AND *BRUEN* VITIATE NEW JERSEY'S ATTEMPT TO RESTRICT CITIZENS' READY ACCESS TO ARMS .......................................11

    IV. THE SUPREME COURT'S METHODOLOGY CONTEMPLATES MUCH MORE THAN MERE NUMEROSITY OF PURPORTED ANALOGUES ..........................13

    V.  NEW JERSEY'S INSURANCE REQUIREMENT IS AN UNCONSTITUTIONAL PRETEXT TO EFFECTIVELY ELIMINATE THE RIGHT TO BEAR ARMS..........16

CONCLUSION .....................................................................26

# TABLE OF AUTHORITIES

Page

**U.S. Constitution**

Amendment I ....................................................................... 13, 14, 16

Amendment II ......................................................................... 2, *passim*

Amendment XIV ...................................................................... 6, 13, 16


**Statutes**

N.J.S.A. 2C:39-6(g) .......................................................................... 11


**Cases**

*Antonyuk v. Bruen*, 624 F. Supp. 3d 210 (N.D.N.Y. 2022) .................... 18

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) ........................................... 14

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................... 8, 11, 12

*Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246 (2020) ..... 12, 13, 16

*Hardaway v. Nigrelli*, 2022 U.S. Dist. LEXIS 200813
    (W.D.N.Y. 2022) ....................................................................... 10

*Malloy v. Hogan*, 378 U.S. 1 (1964) ..................................................... 6

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ............................... 11

*New York State Rifle & Pistol Ass'n v. Bruen*,
    142 S. Ct. 2111 (2022) ..................................................... 2, *passim*

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) ........................................ 6

*Timbs v. Indiana*, 139 S. Ct. 682 (2019) .............................................. 6

*Wolford v. Lopez*, 2023 U.S. Dist. LEXIS 138190 (D. Haw. 2023) .......... 8


**Miscellaneous**

*About the Repository*, Duke Ctr. Firearms L. ......................................... 5

Marlene Caride, *Bulletin No. 20-02*, N.J. Dep't Banking & Ins.
    (Mar. 9, 2020) ........................................................................... 24

*Chubb Consent Order*, N.Y. Dep't Fin. Servs (May 7, 2018) ................ 23

*DFS Fines Chubb Subsidiary Illinois Union Insurance Company*
    *$1.3 Million for Underwriting NRA-Branded "Carry Guard"*
    *Insurance Program in Violation of New York Insurance*
    *Law*, N.Y. Dep't Fin. Servs (May 7, 2018) .................................. 23

*Everytown, Moms Demand Action Statements Responding to Report That New York Department of Financial Services Is Investigating NRA Carry Guard Insurance*, Everytown (Oct. 25, 2017) ................................................................. 20

*Governor Cuomo Directs Department of Financial Services to Urge Companies to Weigh Reputational Risk of Business Ties to the NRA and Similar Organizations*, N.Y. DEP'T FIN. SERVS (Apr. 19, 2018) ......................................................... 21

*Governor Murphy Delivers Remarks on the U.S. Supreme Court Decisions in Dobbs v. Jackson Women's Health Organization and New York State Rifle & Pistol Association Inc. v. Bruen*, N.J. (June 24, 2022) ................................................. 19

*Governor Murphy Signs Gun Safety Bill Strengthening Concealed Carry Laws in New Jersey in Response to Bruen Decision*, N.J. (Dec. 22, 2022) ..................................... 8, 20

*Governor Murphy Signs Landmark Executive Order on Gun Safety*, N.J. (Sept. 10, 2019) .................................... 24

Gene Healy, The Cult of the Presidency: America's Dangerous Devotion to Executive Power (2008) .......................... 14

Caleb Howe, *NY Gov. Hochul Reacts Live to 'Absolutely Shocking' SCOTUS Ruling: 'I'm Sorry This Dark Day Has Come,'* Mediaite (June 23, 2022) ............................ 18

*Lockton Consent Order*, N.J. DEP'T BANKING & INS. (Sept. 3, 2019) ...... 24

*Lockton Consent Order*, N.Y. DEP'T FIN. SERVS. (May 2, 2018) ............ 23

John R. Lott, Jr., *Concealed Carry Permit Holders Across the United States: 2016, Crime Prevention Research Institute* (July 2016) ................................................... 9

Sandy Malone, *NJ Governor Makes It Nearly Impossible for Gun Owners to Get Insurance*, Police Trib. (Oct. 18, 2019) .................. 25

Jordan B. Peterson, 12 Rules for Life: An Antidote to Chaos (2018) ...... 9

Dave Roos, *The Sedition and Espionage Acts Were Designed to Quash Dissent During WWI*, Hist. (Sept. 21, 2020) .................. 14

*The Sedition Act of 1798*, OFF. ART. & ARCHIVES ................................. 14

*Senate Acts on SCOTUS Ruling Invalidating New York's Concealed Carry Law*, N.Y. STATE SENATE (July 1, 2022) ............ 18

iv

Geoffrey R. Stone, *A Lawyer's Responsibility: Protecting Civil Liberties in Wartime*, 22 WASH. U. J.L. & POL'Y (2006).................14

Michael Testa, *Democrats Flip-Flopping on Insurance for Gun Owners in New Effort to Impede 2nd Amendment Rights*, N.J. SENATE REPUBLICANS (Oct. 14, 2022) .............................25, 26

Maria T. Vullo, *Memorandum*, N.Y. DEP'T FIN. SERVS. (Apr. 19, 2018) .............................................................................22

## INTEREST OF *AMICI CURIAE*[1]

Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, The DC Project, Tennessee Firearms Association, Heller Foundation, Second Amendment Law Center, and California Rifle & Pistol Association are nonprofit organizations that work to preserve and defend the Second Amendment rights of gun owners. Most of these *amici* have filed *amicus* briefs in numerous cases raising Second Amendment issues in an effort to aid courts in a principled analysis of the enumerated right to keep and bear arms.

---

[1] These *amici* sought and received the consent of the parties to the filing of this *amicus* brief. No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparing or submitting this brief. No person other than *amici*, their members, or their counsel contributed money intended to fund preparing or submitting this brief.

## SUMMARY OF ARGUMENT

In repudiation of the people's constitutionally protected, inherent right to self-defense, and in derogation of the authority of the U.S. Supreme Court, New Jersey has enacted legislation which demonstrates its distrust of the most law abiding of its own residents. Attempting to circumvent the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen,* 142 S. Ct. 2111, 2136 (2022), the State declared vast swaths of nonsensitive public places off-limits for firearm carry even by licensed persons. Now that, after *Bruen*, New Jersey is compelled to issue carry licenses to its citizens regardless of whether the government believes them to be "needed," the State responded by rendering both newly issued and previously existing carry licenses nearly worthless, prohibiting firearms virtually everywhere members of the public are likely to frequent. In short, intent on circumventing the prospect of an armed and independent populace, New Jersey criminalized the peaceful exercise of an enumerated constitutional right.

But New Jersey's effort to reclaim the status quo before *Bruen* is repugnant to the original public understanding of the Second Amendment text. In a vain effort to meet the *Bruen* standard, New Jersey

attempts to shoehorn irrelevant historical "analogues" into the court's analysis, hijacking the sensitive-places doctrine to justify atextual and ahistorical restrictions on firearms carry that the Framers never would have sanctioned. This Nation's early historical tradition of firearm regulation simply does not justify the onerous locational restrictions on the right to carry a firearm that New Jersey has imposed. Defendants-Appellants have utterly failed to meet their heavy burden under *Bruen*, and the Second Amendment demands judgment in the people's favor.

## ARGUMENT

**I.    *BRUEN* FORECLOSES NEW JERSEY'S ATTEMPT TO DISTORT SETTLED CONSTITUTIONAL ANALYSIS BY SHIFTING THE RELEVANT PERIOD OF HISTORICAL INQUIRY TO THE LATE NINETEENTH CENTURY.**

Unable to support its law with Founding-era historical analogues, New Jersey makes the stunning request that this Court "should clarify that Reconstruction-era evidence is especially useful," asserting that "*Bruen*'s core teaching … favors the use of Reconstruction-era evidence." Opening Brief of Defendants-Appellants ("Opening Br.") at 33. This request is based on a wild mischaracterization of *Bruen*.

To support its request, New Jersey first correctly cites *Bruen*'s language that "[c]onstitutional rights are enshrined with the scope they

3

were understood to have when the people adopted them." *Id.* (quoting *Bruen* at 2136). However, the State then relies entirely on *Bruen*'s aside "that there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope." *Bruen* at 2138. But contrary to New Jersey's apparent belief that this statement encourages the use of Ratification-Era historical sources, the *Bruen* Court gave some obvious clues as to how this question should be resolved, explaining that:

> we have made clear that **individual rights** enumerated in the Bill of Rights and **made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government**. And we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right **when the Bill of Rights was adopted** in 1791. [*Id.* at 2137 (emphasis added) (citations omitted).]

Indeed, what New Jersey ignores (and must ignore) is the far stronger language elsewhere in *Bruen* that relegates Reconstruction-era sources to a mere confirmatory status, useful only for bolstering Ratification-era evidence of the *same* regulation: "to the extent later history contradicts what the text says, the text controls.... Thus, 'postratification adoption or

4

acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text.'" *Id.*; *see also id.* ("[B]ecause post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment,' … 19th-century evidence [i]s 'treated as mere confirmation of what the Court thought had already been established.'").

In other words, New Jersey cannot simply keyword-search the Duke Center for Firearms Law database[2] and bombard this Court with random late-19th-century laws that were entirely unfamiliar in 1791, in order to fabricate a "tradition" that never existed at the time of the Founding. Rather, "we must … guard against giving postenactment history more weight than it can rightly bear." *Id.* at 2136.

---

[2] To the extent that governmental parties may be relying on the Duke Center compilation, *amici* note serious concerns with its reliability. Duke publicly credits radical anti-gun group Everytown for Gun Safety for "research support," and even admits that *changes to the text* of laws have been made to "modernize[] and standardize[]" the database. *About the Repository*, Duke Ctr. Firearms L., https://perma.cc/PM53-4SPR (last visited Aug. 12, 2023). Although it asserts "[t]hese changes were not *intended* to impact the meaning of any of the materials," Duke's reassurance holds little weight when anti-gun activists are free to contribute their own flair to their "research." *Id.* (emphasis added). Moreover, with historical laws potentially rife with unknown alterations, judicial notice becomes a risky exercise.

At bottom, New Jersey asks this Court to flip *Bruen* on its head, substituting a handful of state decisions from around the time of the Fourteenth Amendment's ratification in lieu of a careful review of the historical record when the Second Amendment was framed and ratified. This is an approach that *Bruen* does not permit.

Recent Supreme Court cases have adopted the correct approach in other areas. For decades now, the Court has "rejected the notion that the Fourteenth Amendment applies to the States only a 'watered-down, subjective version of the individual guarantees of the Bill of Rights.'" *Ramos v. Louisiana*, 140 S. Ct. 1390, 1398 (2020) (quoting *Malloy v. Hogan*, 378 U.S. 1, 10-11 (1964)). In that 1964 ruling, the Court stated that the protections of the Bill of Rights are "to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.*" Malloy* at 10. And as Justice Ginsburg wrote for the Court in 2019, "if a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires." *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019). This long line of precedents vitiates New Jersey's view that the Second Amendment can be treated as

6

a "second-class right" by the states, and subjected to an expanded selection of potential historical "analogues" that would be irrelevant when challenging a similar federal enactment. *See Bruen* at 2156.

## II.    *BRUEN* ALREADY REJECTED THE NOTION THAT THE MERE PRESENCE OF CROWDS OR CHILDREN SOMEHOW TRANSFORMS A LOCATION INTO A "SENSITIVE PLACE."

New Jersey repeatedly seeks to identify as "sensitive places" any locations where crowds or children (or for that matter, any other purportedly "vulnerable" person) may be present. Thus, the New Jersey law prohibits carrying in most public locations, including:

> * Entertainment venues, including stadiums, arenas, amusement parks, casinos, racetracks, and publicly owned libraries and museum[s];
> * Zoos;
> * Youth sporting events and other recreational facilities, such as public parks, beaches, and playground[s];
> * Bars, restaurants where alcohol is served, and any other locations that serve alcohol for on-premises consumption;
> * Airports and public transportation hubs;
> * Schools, colleges, and universities;
> * Daycare and child-care facilities;
> * Hospitals and health care facilities;
> * Long-term care facilities and nursing homes;
> * Correctional facilities, juvenile justice facilities, and halfway houses;
> * Homeless shelters[3];

---

[3] New Jersey apparently takes the position that owning, renting, or otherwise enjoying stable living accommodations is a prerequisite to full enjoyment of the Bill of Rights. But this approach – deciding "whether

\* Polling places;
\* Courthouses;
\* Law enforcement stations and offices;
\* Government buildings and locations with government meetings; and
\* Demonstrations, protests, and licensed public gatherings.[4]

With a list of verboten locations as extensive as New Jersey's, perhaps it would have been more prudent to simply list the few locations where citizens *can* carry. Yet any public places left unmentioned almost assuredly would see restriction via (1) New Jersey's ban on carrying on public transit, even between permissible locations, and (2) the nefarious, so-called "vampire rule" that reverses centuries of property law by creating a no-carry default for all private properties within the state – *including properties held open to the public. See also Wolford v. Lopez*, 2023 U.S. Dist. LEXIS 138190, at \*43-47 (D. Haw. Aug. 8, 2023) (finding private properties held open to the public to be "public" for Second Amendment purposes).

---

the right is *really worth* insisting upon" – is not how the scope of constitutional rights is determined. *See District of Columbia v. Heller*, 554 U.S. 570, 634 (2008).

[4] *Governor Murphy Signs Gun Safety Bill Strengthening Concealed Carry Laws in New Jersey in Response to Bruen Decision*, N.J. (Dec. 22, 2022), https://tinyurl.com/59rpj2xs.

Make no mistake – those who have carry licensees are one of the most nonviolent demographics in the country,[5] and prohibiting them from exercising their rights has nothing to do with "public safety." Casting New Jersey's facially invalid pretext aside, a basic tenet of modern psychology may shed light on the state's true motivations: "if you cannot understand why someone did something, look at the consequences – and infer the motivation."[6] New Jersey's *Bruen*-response bill makes public carry so cumbersome and legally risky that ordinary citizens are simply discouraged from even attempting to carry a firearm in the first place. There is good reason to believe that extinguishing the rights of the *Bruen*-empowered populace just might have been New Jersey's goal all along.

New Jersey's response to the *Bruen* Court's admonition not to "effectively declare the island of Manhattan a 'sensitive place,'" *Bruen* at

---

[5] *See* John R. Lott, Jr., *Concealed Carry Permit Holders Across the United States: 2016*, *Crime Prevention Rsch. Ctr.* (July 2016), https://tinyurl.com/yz9643rn. *See also studies collected in* Amicus Brief of Gun Owners of America, Inc., *et al.*, *Wolford v. Lopez*, U.S. District Court, District of Hawaii, No. 1:23-cv-00265-LEK-WRP at 21-22.

[6] Jordan B. Peterson, 12 Rules for Life: An Antidote to Chaos at 289-90 (2018) (emphasis omitted) (quotation commonly attributed to Swiss psychoanalyst Carl Jung).

2134, is to declare almost the entire state of New Jersey a "sensitive place." But the mere presence of crowds or children – or even a general, public police presence – is insufficient as a matter of law to render a location a constitutional "gun-free zone." *See id.* (drawing no distinction about purportedly "vulnerable" populations, and instead providing that "expanding the category of 'sensitive places' simply to all places of public congregation" is impermissibly broad).

Instead, historical "sensitive places" all bear certain hallmarks that New Jersey's newly identified locations sorely lack. For example:

> [L]egislative assemblies, polling places, and courthouses are civic locations sporadically visited in general, *where a bad-intentioned armed person could disrupt key functions of democracy*. Legislative assemblies and courthouses, further, are typically secured locations, where uniform lack of firearms is generally a condition of entry, *and where government officials are present and vulnerable to attack*. [*Hardaway v. Nigrelli*, 2022 U.S. Dist. LEXIS 200813, at *33-34 (W.D.N.Y. Nov. 3, 2022) (emphasis added).]

Thus, "sensitive places" traditionally are enclosed, government-associated locations where the government takes on the responsibility of protecting occupants within – often with armed guards, metal detectors, body scanners, and an elevated security presence beyond the occasional

police patrol. Outside these few locations, the citizen's security is a personal responsibility with which the state must not interfere.

## III. *HELLER* AND *BRUEN* VITIATE NEW JERSEY'S ATTEMPT TO RESTRICT CITIZENS' READY ACCESS TO ARMS.

New Jersey seeks to render firearms inaccessible for self-defense purposes while traveling. Both *Heller* and *Bruen* already addressed such egregious infringements, and New Jersey's restriction cannot survive review.

State law provides that "[a]ny weapon being transported ... shall be carried unloaded and contained in a closed and fastened case, gunbox, securely tied package, or locked in the trunk of the automobile in which it is being transported...." N.J.S.A. 2C:39-6(g). Such a restriction renders the firearm essentially useless for "individual self-defense[, which] is 'the *central component*' of the Second Amendment right." *Bruen* at 2133 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010)). Of course, *Bruen* confirms that "the right to 'bear arms' refers to the right to 'wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person.'" *Id.* at 2134 (quoting *Heller* at 584).

11

Because "[m]any Americans hazard greater danger outside the home than in it," the Second Amendment does not provide *lesser* protection in public. *Id.* at 2135. In fact, nowhere in the Second Amendment's plain text is there any locational qualification. Yet New Jersey allows only the inaccessible, unloaded "transport" of firearms, a practice unknown to our Founders,[7] which leads to a constitutionally untenable condition à la *Heller*. *See Heller* at 630. As the well-reasoned opinion of the court below noted:

> In *Heller*, the Supreme Court held that a law requiring handguns in the home to be "rendered and kept inoperable" – either by disassembly or inclusion of a "trigger-lock" on the weapon – violated the Second Amendment. The *Heller* Court found the law unconstitutional because the law made "it impossible for citizens to use [their handguns] for the core lawful purpose of self-defense." Just like the law in *Heller* violated the Second Amendment, so, too, does Chapter 131's restriction on functional firearms in vehicles. [*Koons v. Platkin*, 2023 U.S. Dist. LEXIS 85235, at *287 (D.N.J. May 16, 2023) (alteration in original) (citations omitted).]

_____

[7] Because automobiles did not exist in 1791, the only analogous historical practice that could possibly support New Jersey's modern prohibition would be Founding-era restrictions on riding on horses or in carriages with any sort of loaded weapon. Of course, finding even one such example would not be enough to constitute an "early American tradition." *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2259 (2020). But this Court need not consider the extent to which such a practice may form a tradition because no such restrictive practice has been shown to exist.

## IV.  THE SUPREME COURT'S METHODOLOGY CONTEMPLATES MUCH MORE THAN MERE NUMEROSITY OF PURPORTED ANALOGUES.

New Jersey dismisses the opinion of the district court below, arguing that the court required too high a number of historical analogues, "even when the State supplied six or thirty." Opening Br. at 3. But New Jersey's problem is one of quality, not quantity – New Jersey could supply a multitude of irrelevant examples and still prove nothing. Indeed, the Supreme Court has made clear that even "more than 30 States" having adopted a practice "in the second half of the 19th century" cannot "by itself establish an early American tradition." *Espinoza* at 2258-59. This statement alone belies New Jersey's insistence that "Reconstruction-era evidence" can somehow trump the original meaning of the Second Amendment as understood in 1791.

Because New Jersey's analogues arise only after adoption of the Fourteenth Amendment, they are quite literally of *no value* whatsoever in the historical analysis. There is no Founding Era tradition for these sources to "confirm." New Jersey's collection of citations from state laws from the late 1800s and early 1900s cannot help to interpret the Second Amendment any more than Woodrow Wilson's notorious Espionage Act of 1917 and Sedition Act of 1918 shed light into the meaning of the First

Amendment. To illustrate, those Acts have been described as Wilson's "two key legal tools for the suppression of dissent."[8] The Acts "effectively ma[de] it a crime for any person to criticize the government, Congress, the President, the flag, the Constitution, the military, or the uniforms of the military personnel of the United States."[9] The Acts "ultimately came to be viewed as some of the most egregious violations of the Constitution's free speech protections."[10] The Supreme Court consigned the rationale for its previous decisions upholding the Acts to the dustbin of history with *Brandenburg v. Ohio*, 395 U.S. 444 (1969).[11] Just as these wartime Acts shed no light on the original meaning of the First Amendment, New Jersey's collection of Spanish-American War- or World War I-vintage gun

---

[8] Gene Healy, <u>The Cult of the Presidency: America's Dangerous Devotion to Executive Power</u> 67 (2008), <u>https://tinyurl.com/yc38uzyt</u>.

[9] Geoffrey R. Stone, *A Lawyer's Responsibility: Protecting Civil Liberties in Wartime*, 22 WASH. U. J.L. & POL'Y 47, 50-51 (2006).

[10] Dave Roos, *The Sedition and Espionage Acts Were Designed to Quash Dissent During WWI*, Hist. (Sept. 21, 2020), <u>https://tinyurl.com/2eu7azma</u>.

[11] Although the Founders saw the Sedition Act of 1798 come to pass, it was "immensely unpopular" and did not reflect a prevailing understanding of the First Amendment at the time. *The Sedition Act of 1798*, OFF. ART & ARCHIVES, <u>https://tinyurl.com/mrypdyx3</u> (last visited Aug. 12, 2023).

control measures offers no support to its claim of an "enduring American tradition."

*Bruen* makes clear that finding an "enduring tradition" requires reviewing the entirety of the backgrounds of the purported analogues, and not simply reaching some magic number of state or territorial statutes. To be sure, the number of cases may be a part of the analysis. *See Bruen* at 2153 ("[W]e will not give disproportionate weight to a single state statute and a pair of state-court decisions."). But the analysis must also consider how widespread such statutes were (or, more often, *were not*). *See id.* at 2154 ("[T]he bare existence of … localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition...."). The analysis must also include a consideration of how much of the population tolerated the restrictions. *See id.* ("Put simply, these western restrictions were irrelevant to more than 99% of the American population."). Likewise, a purported analogue cannot "'contradic[t] the overwhelming weight' of other, more contemporaneous historical evidence." *Id.* at 2155 (alteration in original). Similarly, arcane laws that were never enforced, or never challenged, provide little insight. *Id.* at 2149-50. The *Bruen* Court also made clear that historical

"restrictions deserve little weight [if] they were … short lived." *Id.* It was on this basis that the *Bruen* Court rejected the proffer of a 1686 statute of "East New Jersey" banning "the concealed carry of 'pocket pistol[s],'" *id.* at 2143 (alteration in original), noting, "it does not appear that the statute survived for very long.... [T]here is no evidence that the 1686 statute survived the 1702 merger of East and West New Jersey." *Id.* at 2144.

As the Court explained in *Espinoza*, even 30 "analogues" postdating the Fourteenth Amendment are quite literally of no value in determining the original meaning of the Bill of Rights. New Jersey's suggestion of 30 after-the-fact examples as a magic number fails to acknowledge and, in fact, rejects that precept. Like the Sedition Act to the First Amendment, New Jersey's "analogues" are too little, too late to shed light on the meaning of the Second Amendment.

## V. NEW JERSEY'S INSURANCE REQUIREMENT IS AN UNCONSTITUTIONAL PRETEXT TO EFFECTIVELY ELIMINATE THE RIGHT TO BEAR ARMS.

New Jersey's liability insurance requirement, while marketed as a "cost-shifting" device, is in reality a pretext for the state government to evade *Bruen* by regulating the Second Amendment out of practical

existence. A review of the circumstances leading up to this appeal makes this clear.

In *Bruen*, the Court overturned New York's requirement that a citizen demonstrate "proper cause," defined as "'a special need for self-protection distinguishable from that of the general community'" before being licensed to carry a firearm in public. *Bruen* at 2123. Moreover, the Court concluded that respondents' "attempt to characterize New York's proper-cause requirement as a 'sensitive-place' law" lacked merit because "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.* at 2133-34.

The *Bruen* decision was met with immediate scorn from politicians in both New York and New Jersey. The day of the Court's ruling, New York Governor Kathy Hochul declared that New York would "fight back": "We are not powerless in this situation. We're not going to cede our rights that easily. Despite the best efforts of the politicized Supreme Court, the United States of America, we have the power of the pen," Hochul said. "This is New York. We don't back down. We fight back.... [W]e have

17

language we'd like to now enacted [sic] into law."[12] "*In response to the Supreme Court's decision*, implying that guns are more important than lives in this country, we are passing legislation," said New York Senate Majority Leader Andrea Stewart-Cousins.[13] New York made good on its threat. New York's "new" "Concealed Carry Improvement Act" ("CCIA") essentially mirrors the Sullivan Law struck down by the Supreme Court, by again effectively banning the carrying of weapons outside the home. The law bans the mere possession of weapons in "sensitive locations." And "the myriad of sensitive locations listed in the CCIA is almost limitless (including, for example, public sidewalks, restaurants that serve alcohol, healthcare services, public transportation, and gatherings of individuals to express their constitutional rights)." *Antonyuk v. Bruen*, 624 F. Supp. 3d 210, 254 (N.D.N.Y. 2022).

New Jersey's repudiation of the Supreme Court was practically identical to New York's. A day after Governor Hochul's threats, Governor

---

[12] Caleb Howe, *NY Gov. Hochul Reacts Live to 'Absolutely Shocking' SCOTUS Ruling: 'I'm Sorry This Dark Day Has Come,'* Mediaite (June 23, 2022), https://tinyurl.com/45pejmkd.

[13] *Senate Acts on SCOTUS Ruling Invalidating New York's Concealed Carry Law*, N.Y. STATE SENATE (July 1, 2022), https://tinyurl.com/4fxmhzes (emphasis added).

Phil Murphy similarly attacked the Court: "The right-wing majority ruled, for the first time in our nation's history, that individuals have a general right to carry firearms in public, not just in their homes for self-defense.… A right to carry a concealed weapon is, in actuality, a recipe for tragedy. Moreover, it is not in line with our long-standing New Jersey values...."[14]

Like New York's Governor Hochul, New Jersey's Governor Murphy immediately announced legislation to defy the Court's warning that states cannot simply redefine entire "cities" as "sensitive places." "Because New Jersey has had very strict limits on carrying firearms in public until this opinion, we have very few places where the carrying of firearms is prohibited by law. Going forward, this is no longer tenable," Murphy said.[15] He then declared that New Jersey would prohibit the carrying of firearms in "[l]ocations where there will be a high density of people" and "[l]ocations with inherently vulnerable populations."[16]

---

[14] *Governor Murphy Delivers Remarks on the U.S. Supreme Court Decisions in Dobbs v. Jackson Women's Health Organization and New York State Rifle & Pistol Association Inc. v. Bruen*, N.J. (June 24, 2022), https://tinyurl.com/5ebj6pzt.

[15] *Id.*

[16] *Id.*

Assembly Speaker Craig J. Coughlin agreed that the legislation was "[d]esigned in response to the US Supreme Court's Bruen ruling."[17]

As with New York, New Jersey wasted little time in thumbing its nose at the Court, declaring most of the State a "sensitive place." And like New York, New Jersey likewise passed an "anti-carry default" provision, or "vampire rule," for all private property in the state. The intent of both provisions is clear – to nullify the Supreme Court's decision protecting Americans' Second Amendment rights.

Understood in this context, New Jersey's insurance regulation is just the state's latest effort to copycat New York, and it is clearly pretextual. In late 2017, the anti-Second Amendment group Everytown began pushing New York and other states to crack down on companies offering insurance protection for firearm owners through business partnerships with Second Amendment groups like the National Rifle Association ("NRA").[18] On April 19, 2018, then-New York Governor Andrew Cuomo announced that he would weaponize the state's

---

[17] N.J., *supra* footnote 4.

[18] *Everytown, Moms Demand Action Statements Responding to Report That New York Department of Financial Services Is Investigating NRA Carry Guard Insurance*, Everytown (Oct. 25, 2017), https://tinyurl.com/5n7bbr5x.

Department of Financial Services ("DFS") to crack down on insurance companies doing business with the NRA, threatening them with adverse regulatory action.[19] In a press release, Cuomo stated:

> New York may have the strongest gun laws in the country, but we must push further to ensure that gun safety is a top priority for every individual, company, and organization that does business across the state. I am directing the Department of Financial Services to urge insurers and bankers statewide to determine whether any relationship they may have with the NRA or similar organizations sends the wrong message to their clients and their communities who often look to them for guidance and support. This is not just a matter of reputation, it is a matter of public safety, and working together, we can put an end to gun violence in New York once and for all.[20]

In response to Cuomo's order, then-DFS Superintendent Maria Vullo stated, "DFS urges all insurance companies and banks doing business in New York to join the companies that have already discontinued their arrangements with the NRA, and to take prompt actions to manage these risks and promote public health and safety."[21]

---

[19] *See* Gun Owners of America, *et al.*, *Amicus* Brief (May 24, 2023) in *NRA v. Vullo*, Supreme Court No. 22-842.

[20] *Governor Cuomo Directs Department of Financial Services to Urge Companies to Weigh Reputational Risk of Business Ties to the NRA and Similar Organizations*, N.Y. DEP'T FIN. SERVS. (Apr. 19, 2018), https://tinyurl.com/2f62hzp9.

[21] *Id.*

The same day, Vullo sent a "guidance document" to insurers doing business in New York, advising them that "society, as a whole, has a responsibility to act and is no longer willing to stand by and wait and witness more tragedies caused by gun violence, but instead is demanding change now."[22] To that end, Vullo strongly suggested that insurers wishing to do business in New York should "sever[] their ties with the NRA," continuing: "[t]here is a fair amount of precedent in the business world where firms have implemented measures in areas such as the environment, caring for the sick, and civil rights in fulfilling their corporate social responsibility. The recent actions of a number of financial institutions that severed their ties with the NRA after the AR-15 style rifle killed 17 people in the school in Parkland, Florida is an example of such a precedent." *Id.* She then directed that "[t]he Department encourages regulated institutions to review any relationships they have with the NRA or similar gun promotion organizations, and to take prompt actions to managing [sic] these risks and promote public health and safety." *Id.*

---

[22] Maria T. Vullo, *Memorandum*, N.Y. DEP'T FIN. SERVS. (Apr. 19, 2018), https://tinyurl.com/y7cabf2y.

At the behest of Everytown, DFS then investigated Lockton and Chubb, the two groups partnering with the NRA to insure gun owners, alleging violations of New York insurance regulations. To settle DFS' investigation, both groups agreed in a Consent Order never to offer any insurance products in conjunction with the NRA again, irrespective of whether the programs complied with New York insurance regulations.[23] In a press release celebrating the consent orders achieved through threat and intimidation, Vullo stated, "DFS will continue its comprehensive investigation into this matter to ensure that … consumers are no longer conned into buying so-called 'self-defense' insurance coverage."[24]

It did not take New Jersey long to follow New York's lead. New Jersey similarly began investigating insurance companies doing business with the NRA. On September 3, 2019, the New Jersey Department of Banking and Insurance ("DBI") entered into its own consent order with Lockton. Because the NRA had helped to market the insurance, the DBI

---

[23] *Lockton Consent Order*, N.Y. Dep't Fin. Servs. (May 2, 2018), https://tinyurl.com/mwj48sk4; *Chubb Consent Order*, N.Y. Dep't Fin. Servs. (May 7, 2018), https://tinyurl.com/5n8zx452.

[24] *DFS Fines Chubb Subsidiary Illinois Union Insurance Company $1.3 Million for Underwriting NRA-Branded "Carry Guard" Insurance Program in Violation of New York Insurance Law*, N.Y. Dep't Fin. Servs. (May 7, 2018), https://tinyurl.com/4rdy6usp.

found that it constituted "solicitation of insurance by unlicensed persons" and required Lockton to pay a $1 million fine.[25] One week later, Governor Murphy issued Executive Order 83, directing the DBI to "take action against insurance policies that encourage firearm use."[26] "The department recently took enforcement action against a company for illegally operating an NRA-sponsored insurance program that encourages firearms use," echoed DBI Commissioner Marlene Caride, Vullo's New Jersey counterpart.[27] "Offering an insurance product marketed by the NRA that encourages firearm use is a serious violation of public policy," Murphy's office added.[28]

On March 9, 2020, DBI's Caride issued Bulletin 20-02, stating, "[t]he Department will … not approve firearm self-defense insurance policies submitted by admitted carriers," except for law enforcement officers.[29] Media reports noted that Murphy's executive order "effectively

---

[25] *Lockton Consent Order*, N.J. DEP'T BANKING & INS. (Sept. 3, 2019), https://tinyurl.com/y7xbfxks.

[26] *Governor Murphy Signs Landmark Executive Order on Gun Safety*, N.J. (Sept. 10, 2019), https://tinyurl.com/ypexeydf.

[27] *Id.*

[28] *Id.*

[29] Marlene Caride, *Bulletin No. 20-02*, N.J. DEP'T BANKING & INS. (Mar. 9, 2020), https://tinyurl.com/yckpwxr5.

banned the sale of insurance products that provide liability coverage to gun owners[,] making it virtually impossible for concealed carry holders in New Jersey to get coverage."[30]

Employing the sort of logic that appeals only to those with a visceral fear of an armed citizenry, the New Jersey Act now requires the very type of insurance that the state worked so hard to eliminate. As New Jersey State Senator Michael Testa put it:

> First, the Murphy administration banned firearm self-defense policies from being offered under the false belief that having insurance would encourage the improper use of firearms. Now, Democrats are trying to mandate insurance coverage that they've blocked from being available as a condition for New Jerseyans to exercise their constitutional right to concealed carry. This flip-flopping makes clear that Governor Murphy and legislative Democrats only care about insurance as a weapon they can use to impede the 2nd Amendment rights of New Jerseyans.[31]

---

[30] Sandy Malone, *NJ Governor Makes It Nearly Impossible for Gun Owners to Get Insurance*, Police Trib. (Oct. 18, 2019), https://tinyurl.com/ymrhf57v.

[31] Michael Testa, *Democrats Flip-Flopping on Insurance for Gun Owners in New Effort to Impede 2nd Amendment Rights*, N.J. SENATE REPUBLICANS (Oct. 14, 2022), https://tinyurl.com/muhv4nbe.

In fact, "Democrats know that *nobody* offers the insurance they're mandating because they've *actively blocked* companies that have tried to offer these policies in New Jersey."[32]

New Jersey's insurance requirement is wholly untethered from "gun safety." The state's argument is purely pretextual, designed to allow the state to regulate the Second Amendment out of existence. This Court should strike down the "insurance mandate" as an obvious effort to infringe the right to bear arms.

## CONCLUSION

New Jersey first declared its intention to enact legislation designed to circumvent the Supreme Court's *Bruen* decision, and then acted on that plan through legislation designed to render the right to "bear arms" a nullity. The district court's decision rejecting the State's plan was based on a careful analysis which these *amici* urge this Court to affirm.

Respectfully submitted,

/s/ *Robert J. Olson*

| | |
|---|---|
| Stephen D. Stamboulieh | Robert J. Olson* |
| Stamboulieh Law, PLLC | William J. Olson |
| P.O. Box 428 | Jeremiah L. Morgan |
| Olive Branch, MS 38654 | WILLIAM J. OLSON, P.C. |

---

[32] *Id.* (emphasis added).

(601) 852-3440
stephen@sdslaw.us

370 Maple Ave. W., Ste. 4
Vienna, VA  22180-5615
(703) 356-5070
Attorneys for *Amici Curiae*

August 17, 2023
*Counsel of Record

# CERTIFICATES OF BAR MEMBERSHIP

I, Robert J. Olson, counsel for *amici curiae*, hereby certify pursuant to Third Circuit Rule 28.3(d) that I am a member in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

By: /s/ *Robert J. Olson*
Robert J. Olson

# CERTIFICATE OF COMPLIANCE

I, Robert J. Olson, counsel for *amici curiae*, certify that this brief contains 5,270 words, based on the "Word Count" feature of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). I also certify that this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook. I further certify that the text of the electronic brief is identical to the text in the paper copies and that the virus detection software McAfee Internet Security, version 1.11.184, has been run on the file and no virus was detected.

Dated: August 17, 2023

/s/ *Robert J. Olson*
Robert J. Olson
Counsel for *Amici Curiae*

# CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: August 17, 2023

/s/ *Robert J. Olson*
Robert J. Olson