No. 23-1900

# In The United States Court of Appeals For the Third Circuit

RONALD KOONS, ET AL.,

*Plaintiffs-Appellees*,

v.

ATTORNEY GENERAL NEW JERSEY, ET AL.,

*Defendants-Appellants*.

AARON SIEGEL, ET AL.,

*Plaintiffs-Appellees*,

v.

ATTORNEY GENERAL NEW JERSEY, ET AL.,

*Defendants-Appellants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(Nos. 22-cv-07464 & 22-cv-07463 (RMB))

## RESPONSE BRIEF FOR *KOONS* PLAINTIFFS-APPELLEES

David D. Jensen
DAVID JENSEN PLLC
33 Henry Street
Beacon, New York 12508
(212) 380-6615
david@djensenpllc.com

David H. Thompson
Peter A. Patterson
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellees Ronald Koons, Nicholas Gaudio, Jeffrey M. Muller, Gil Tal, Second Amendment Foundation, Firearms Policy Coalition, Inc., Coalition of New Jersey Firearm Owners, and New Jersey Second Amendment Society*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FED. R. APP. P. 26.1(a), Plaintiffs-Appellees Second Amendment Foundation, Firearms Policy Coalition, Inc., Coalition of New Jersey Firearm Owners, and New Jersey Second Amendment Society certify that they do not have parent corporations and that no publicly held corporations own more than 10% of their stock.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

CORPORATE DISCLOUSRE STATEMENT ........................................................i

TABLE OF AUTHORITIES ....................................................................iv

INTRODUCTION ...........................................................................1

JURISDICTION............................................................................4

STATEMENT OF THE ISSUES................................................................5

STATEMENT OF RELATED CASES AND PROCEEDINGS ............................5

STATEMENT OF THE CASE.................................................................5

    I.     Chapter 131 Removes the Right To Carry Handguns in Numerous
         Locations Throughout the State of New Jersey ........................................5

    II.    Procedural History....................................................................9

SUMMARY OF ARGUMENT ...............................................................11

STANDARD OF REVIEW ..................................................................14

ARGUMENT ..............................................................................14

    I.     Plaintiffs Are Likely To Succeed on the Merits........................................14

         A. The Challenged "Sensitive-Place" Restrictions Violate the Second
            Amendment .........................................................................14

            i.   The Second Amendment's Plain Text Presumptively Protects
               Plaintiffs' Conduct ..............................................................15

            ii.  The State Cannot Prove that Any Challenged "Sensitive-Place"
               Restriction Is Consistent with a National Tradition of Firearm
               Regulation ......................................................................16

1. Controlling Standards Under *Bruen* ..............................16

2. No Valid Historical Analogue Supports Any Challenged
   "Sensitive-Place" Restriction .........................................22

   a. Publicly Owned or Leased Libraries or
      Museums .............................................................27

   b. Privately or Publicly Owned and Operated
      Entertainment Facilities.......................................31

   c. Bars, Restaurants, and Other Facilities Where
      Alcohol Is Sold for Consumption
      on the Premises.....................................................34

   d. Vehicles .................................................................35

   iii. Government Proprietorship Provides No Exception to the
        Second Amendment ..................................................38

B. The Anti-Carry Default Violates the Second Amendment .................40

   i. The Anti-Carry Default Burdens Conduct Covered by the
      Second Amendment's Plain Text.............................................41

   ii. The State Cannot Prove that the Anti-Carry Default Is
       Consistent with a National Tradition of
       Firearm Regulation ..................................................43

II.    The Equities Favor Injunctive Relief ........................................49

CONCLUSION .................................................................50

## TABLE OF AUTHORITIES

**Cases**                                                                                                                 **Page**

*Am. Civ. Lib. Union v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003)................................49

*Antonyuk v. Hochul*, No. 1:22-cv-986, 2022 WL 16744700
    (N.D.N.Y. Nov. 7, 2022) ...........................................................43, 44, 45, 48

*Antonyuk v. Nigrelli*, 143 S. Ct. 481 (2023) ......................................29, 43

*Bldg. & Constr. Trades Council of Metro. Dist. v. Associated Builders &
    Contractors of Mass./R.I., Inc.*, 507 U.S. 218 (1993) ............................38, 39

*Bradshaw v. Rawlings*, 612 F.2d 135 (3d Cir. 1979) .............................................30

*Brown v. Enter. Merchs. Ass'n*, 564 U.S. 786 (2011) .........................................42

*Christian v. Nigrelli*, No. 22-cv-695, 2022 WL 17100631
    (W.D.N.Y. Nov. 22, 2022) .......................................................................43, 44

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...........................15, 19, 20, 33

*Engquist v. Or. Dep't of Agr.*, 553 U.S. 591 (2008).................................................39

*Gamble v. United States*, 139 S. Ct. 1960 (2019).............................................21, 22

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012)....................42

*Hardaway v. Nigrelli*, --- F. Supp. 3d ----,
    2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022)...........................................23

*McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232 (3d Cir. 2010) .................30

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ........................................20, 46

*Morse v. Frederick*, 551 U.S. 393 (2007)................................................................30

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022)......... 1, 2, 3, 4, 7, 9, 12, 14, 15, 16, 17, 18, 19, 20, 21,
    22, 23, 24, 29, 31, 32, 33, 34, 35, 37, 38, 39, 41, 44, 45, 46, 47, 48, 49, 50

*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................................35

*North v. Bd. of Trs. of Univ. of Ill.*, 137 Ill. 296 (1891)..........................................30

*Osorio-Martinez v. U.S. Att'y Gen.*,
    893 F.3d 153 (3d Cir. 2018) .......................................................................14

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) ....................................................21, 48

*Reeves, Inc. v. Stake*, 447 U.S. 429 (1980) ................................38

*Simpson v. State*, 13 Tenn. 356 (1833) .................................32

*State v. Hopping*, 18 N.J.L. 423 (1842) .................................46

*State v. Mizner*, 45 Iowa 248 (1876) ...................................30

*State v. Pendergrass* 19 N.C. 365 (1837) ...............................30

*Teter v. Lopez*, --- F.4th ----,
     2023 WL 5008203 (9th Cir. Aug. 7, 2023) .........................17

*Timbs v. Indiana*, 139 S. Ct. 682 (2019) ............................21, 22

*United States v. Spears*, 449 F.2d 946 (D.C. Cir. 1971) .................27

*United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019) ..................39

*Virginia v. Moore*, 553 U.S. 164 (2008) .............................21, 22

*White v. Mass. Council of Constr. Emps., Inc.*,
     460 U.S. 204 (1983) ............................................38

## **Statutes, Codes, and Constitutional Provisions**

18 U.S.C.
     § 930(a) ........................................................6
     § 930(e)(1) .....................................................6
     § 930(g)(1) .....................................................6

Md. Const. art. 1,
     § 3 ............................................................25
     § 14 ...........................................................25

N.J.S.A.
     § 2C:39-6 .......................................................9
     § 2C:39-5(b)(1) ...............................................5, 6
     § 2C:39-5(e)(1) .................................................6
     § 2C:39-6(a) ....................................................5
     § 2C:39-6(c) ....................................................5
     § 2C:39-6(e) ..................................................5, 6
     § 2C:39-6(g) ..................................................5, 6
     § 2C:39-6(j) ....................................................6
     § 2C:39-6(*l*) ..................................................5
     § 2C:43-6(a)(3) ...............................................7, 8
     § 2C:43-6(a)(4) ...............................................7, 8
     § 2C:44-1(f)(1)(c) ............................................5, 6

§ 2C:44-1(f)(1)(d) ..................................................................................7, 8
§ 2C:44-1(f)(1)(e) .......................................................................................8
§ 2C:58-4(c) ............................................................................................6, 7
§ 2C:58-4.2(b) .............................................................................................7
§ 2C:58-4.2(e) ..........................................................................................2, 7
§ 2C:58-4.6(a) ..........................................................................................8, 9
§ 2C:58-4.6(a)(12) ..................................................................................8, 14
§ 2C:58-4.6(a)(15) ..................................................................................8, 14
§ 2C:58-4.6(a)(17) ............................................................................8, 14, 31
§ 2C:58-4.6(a)(24) ..................................................................................1, 8
§ 2C:58-4.6(b)(1) ...............................................................................8, 9, 14
§ 2C:58-4.6(e)(1) .........................................................................................9
§ 2C:58-4.6(f) ..............................................................................................9

N.J.A.C.
§ 7:2-2.17(b) ...............................................................................................6
§ 13:54-2.4(b)(1) ........................................................................................6
§ 13:69D-1.13(a) .........................................................................................6

Act of March 2, 1799, ch. 43,
§ 15, 1 Stat. 736 .......................................................................................27


**Other Authorities**

"AT THE INSTANCE OF BENJAMIN FRANKLIN": A BRIEF HISTORY OF THE LIBRARY
COMPANY OF PHILADELPHIA 5 (2015), https://bit.ly/3vdBGQk ..................28

1 LAWS OF THE STATE OF NEW YORK (1807) ............................................25

1 THE LAWS OF MARYLAND TO WHICH ARE PREFIXED THE ORIGINAL CHARTER,
WITH AN ENGLISH TRANSLATION, ch. XXV (1799) ........................................25

1784–1785 N.Y. Laws 152, ch. 81 .......................................................26

1812 Ky. Acts 100 ................................................................................36

1819 Ind. Acts 39 .................................................................................36

1821 Tenn. Acts 15 ..............................................................................36

2 LAWS OF THE STATE OF DELAWARE
(Samuel & John Adams eds., 1797) ..................................................24, 25

2 THE LAWS OF THE STATE OF VERMONT 382 (1808) .......................24, 25

9 STATUTES AT LARGE OF SOUTH CAROLINA 61 (1841) ..........................36

A COMPILATION OF THE LAWS OF THE STATE OF GEORGIA
(Augustin Smith ed., 1812)..............................................................24

An Act for the Support of Government, in 1 LAWS OF THE STATE OF NEW YORK,
(2d ed. 1807)..................................................................................24

*An Act to Admit the States of North Carolina, South Carolina, Louisiana, Georgia,
Alabama, and Florida to Representation in Congress*, 15 Stat. 73 (June 25,
1868) ...............................................................................................47

*An Act to Admit the State of Texas to Representation in the Congress of the United
States*, 16 Stat. 80 (March 30, 1870) .............................................47

A DIGEST OF THE LAWS OF THE STATE OF GEORGIA,
1800 Ga. Laws 611 (Watkins ed., 1800).........................................25

A MANUAL OF THE LAWS OF NORTH-CAROLINA, 190–91, 196 (3d ed. 1814).........25

*A Test Case For the President*, N.Y. TRIBUNE (Mar. 7, 1866), *in* 9 PUBLIC OPINION:
A COMPREHENSIVE SUMMARY OF THE PRESS THROUGHOUT THE WORLD ON
ALL IMPORTANT CURRENT TOPICS 304 (1866) .............................47

A COLLECTION OF ALL SUCH ACTS OF THE
GENERAL ASSEMBLY OF VIRGINIA (1803) .....................................25

*About Us*, CHARLESTON MUSEUM, https://bit.ly/3MPYhMB ..................................28

*About Us*, N.Y. HISTORICAL SOC'Y MUSEUM & LIBRARY, https://bit.ly/3WkCcZF
(last visited Aug. 19, 2023) ............................................................28

ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA (1796)..................25

ACTS AND LAWS OF THE STATE OF CONNECTICUT 18 (1784) .......................25, 26, 27

ACTS AND RESOLVES OF MASSACHUSETTS, 1786–87 (1893)..................................25

Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church
Autonomy*, 8 LIBERTY UNIV. L. REV. (2014) .................................26

Br. for Ctr. for Human Liberty as *Amicus Curiae* at 20–22, *Antonyuk v. Nigrelli*,
No. 22-2908, Doc. 304 (2d Cir. Feb. 8, 2023) .............................29

Brennan Rivas, *In the past, Americans confronted gun violence by taking action*,
WASH. POST. (June 3, 2022) .........................................................16

David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13
CHARLESTON L. REV. 203 (2018) ..................................................29

DEP'T OF INTERIOR, 1850 CENSUS: COMPENDIUM OF SEVENTH CENSUS 159, tbl.
CLXVII (1854), https://bit.ly/3jp7GhR.........................................28

Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J. L. MED. & ETHICS 183 (2020) ........................................................42, 43

Jay Young, *Infrastructure: Mass Transit in 19th- and 20th-Century Urban America* (Mar. 2, 2015), https://rb.gy/x0oxe .................................................36

Johnson et al., SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 2195 (3d ed. 2021) ...............................36

LAWS OF THE STATE OF NEW JERSEY, COMPILED AND PUBLISHED, UNDER THE AUTHORITY OF THE LEGISLATURE (Joseph Bloomfield ed., 1811) ...............25

Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868*, SSRN (Oct. 1, 2022), https://bit.ly/3CMSKjw ...........................................................................21

N.J. Att'y Gen. Law Enforcement Directive No. 2022-07 (June 24, 2022), https://bit.ly/3OJVP9V ....................................................................................7

Oliver W. Holmes, *The Stage-Coach Business in the Hudson Valley*, THE Q. J. OF THE N.Y. STATE HIST. ASS'N (1931) ...............................................................35, 36

Patrick J. Charles, *The Fugazi Second Amendment: Bruen's Text, History, and Tradition Problem and How to Fix It*, 71 CLEV. ST. L. REV. 623 (2023) ................16

Patrick Charles, *The Invention of the Right to 'Peaceable Carry' in Modern Second Amendment Scholarship*, U. ILL. L. REV. ONLINE 195 (2021) .................................16

PENNSYLVANIA STATUTES AT LARGE, VOLUME X: 1779-81 (Stanley Ray ed., 1904) ........................................................................................................................24, 25

*Plantation*, WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) ...........................................................................48

PROVINCIAL CONGRESS, JOURNAL OF THE VOTES AND PROCEEDINGS OF THE PROVINCIAL CONGRESS OF NEW-JERSEY: HELD AT TRENTON IN THE MONTH OF OCTOBER 1775 (1835) ...............................................................................25

*Texas Black Codes*, DIGITAL HISTORY (2021), https://bit.ly/3KV7suz ...................47

THE LAWS OF THE STATE OF NEW-HAMPSHIRE (1797) ............................................25

THE PUBLIC LAWS OF THE STATE OF SOUTH-CAROLINA 271 (Grimke ed., 1790) ..............................................24, 25

THE PUBLIC LAWS OF THE STATE OF RHODE-ISLAND AND PROVIDENCE PLANTATIONS 568 (1798) ................................................................24, 25, 26

JOURNAL OF THE HOUSE OF DELEGATES OF THE COMMONWEALTH OF VIRGINIA
(Thomas W. White ed., 1828) .................................................................24, 25

# INTRODUCTION

This case concerns a law that the New Jersey legislature enacted explicitly to undermine a Supreme Court decision. In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Court vindicated the constitutional right to publicly carry firearms for self-defense and established the invalidity of laws in a handful of states, including New Jersey, that required citizens to show a special need for a permit to carry a firearm. For a few months after the *Bruen* decision, New Jersey citizens could obtain permits and freely exercise their Second Amendment right to public carry.

The constitutional victory was short-lived. In December 2022, New Jersey enacted Chapter 131, restricting firearm possession in twenty-five broad categories of locations and prohibiting permit holders from transporting usable firearms in their own cars. Even under the subset of plainly unconstitutional provisions that the *Koons* Plaintiffs challenge here, Plaintiffs cannot bring their firearms to most places they go in their daily lives, including, under Chapter 131's Anti-Carry Default provision, any business open to the public unless the owner gives "express consent" or hangs a sign inviting permit holders to exercise constitutional rights on the property. N.J.S.A. § 2C:58-4.6(a)(24). In effect, then, Chapter 131 confines the Second Amendment to the same place it was confined under New Jersey's prior unconstitutional regime—the home—thereby eviscerating the right to public carry. Law-abiding New Jersey

citizens may walk out their front doors with their firearms, but then go virtually nowhere with them.

The challenged provisions violate the Second Amendment under *Bruen*. It is after all unlikely that restrictions enacted only because "a much greater number of individuals will now qualify to carry handguns in public" under *Bruen*—as these were, N.J.S.A. § 2C:58-4.2(e)—would be "part of an enduring American tradition of state regulation" of firearms, as *Bruen* requires. 142 S. Ct. at 2155. The following propositions follow incontrovertibly from *Bruen* and the historical record and are fatal to the State's arguments here.[1]

First, the State largely seeks to justify the challenged provisions as regulations of "sensitive places" where firearms have historically been restricted. Yet *Bruen* listed only three locations in that category—"legislative assemblies, polling places, and courthouses"—and instructed lower courts to "use analogies to *those historical regulations* to determine" whether other locational restrictions are constitutional. *Id.* at 2133 (emphasis added). The State therefore cannot point to crowds or the presence of potentially vulnerable groups to define a place as a "sensitive place." Such an argument would "effectively declare the island of Manhattan a 'sensitive place,'"

---

[1] The State bears the burden to justify the challenged provisions, *see Bruen*, 142 S. Ct. at 2135, and the Attorney General and legislative Intervenors' arguments in defense of those provisions largely overlap. Plaintiffs therefore refer to the "State" when addressing arguments made by both sets of Defendants and refers to them individually where relevant.

which *Bruen* expressly forbids. *Id*. at 2134. Rather, the State's burden is to show that whatever characteristic of Founding-era legislative assemblies, polling places, and courthouses justified the historical firearm bans in those locations likewise justifies the firearm bans that the State seeks to impose at other locations today. This the State cannot do.

Second, the historical record shows that what connects legislative assemblies, polling places, and courthouses as "sensitive places" is not the presence of crowds or potentially vulnerable groups, but the presence of comprehensive, state-provided security that rendered the need for armed self-defense unnecessary. To draw a valid analogy to "those historical regulations," therefore, the State at a minimum must show that the new places where it seeks to restrict public carry share that characteristic—which the State has not attempted to show. *Bruen*, 142 S. Ct. at 2133. Nor has the State attempted to rebut the historical evidence that, at locations without comprehensive government security, states addressed the potential of violent disruption not by prohibiting law-abiding citizens from exercising their right to carry firearms, but by encouraging and even requiring them to exercise that right.

Third, and finally, the State can bear its burden to prove that the challenged provisions are "consistent with this Nation's historical tradition of firearm regulation" only by producing historical analogues that are "well-established," "representative," and "relevantly similar" to the modern regulations. *Id*. at 2126,

3

2132–33. To be sufficiently "well-established," the historical analogues must come from the relevant period, which, under *Bruen*, centers on the Second Amendment's ratification in 1791. To be "representative," the analogues must have been more than outliers. And to be "relevantly similar," the analogues must relate to the modern regulation in "how and why" they "burden[ed] a law-abiding citizen's right to armed self-defense." *Id*. at 2133. The State's proffered analogues fail on all these metrics. They predominantly come from generations after the Founding era; after all, governments did not begin to enact locational firearm regulations until the mid-to-late 19th century. The State repeatedly relies on regulations from jurisdictions that *Bruen* has already recognized as outliers. And the State's analogues did not restrict the right to armed self-defense in a similar way or for similar reasons as the challenged provisions.

For these reasons and those elaborated below, the District Court correctly held that Plaintiffs are likely to succeed on the merits of their Second Amendment claims against the challenged provisions. The ongoing loss of constitutional rights is an irreparable injury and against the public interest. The preliminary injunction against the challenged provisions should therefore be affirmed.

## JURISDICTION

The District Court had subject-matter jurisdiction under 28 U.S.C. § 1331. This Court has subject-matter jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1.      Whether the District Court properly issued a preliminary injunction against New Jersey's new "sensitive-place" restrictions on carrying firearms in public libraries and museums, places where alcohol is sold for on-site consumption, public and private entertainment facilities, and vehicles.

2.      Whether the District Court properly issued a preliminary injunction against New Jersey's new Anti-Carry Default preventing firearm owners from carrying firearms onto private property that is otherwise open to the public without the owner's express consent.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

The *Koons* Plaintiffs are unaware of any challenges to Chapter 131 other than the *Siegel* plaintiffs' consolidated challenge.

## STATEMENT OF THE CASE

### I.      Chapter 131 Removes the Right To Carry Handguns in Numerous Locations Throughout the State of New Jersey

For many years, it has been a serious crime to "possess[]" a handgun in New Jersey unless a person either: (1) holds a New Jersey permit to carry a handgun; or (2) is a person (such as a police officer) who is exempt from the requirement to do so. *See* N.J.S.A. §§ 2C:39-5(b)(1), 2C:39-6(a)-(c), (*l*). Anyone who possesses a handgun outside these circumstances, or who does so outside the narrow exceptions to these restrictions, commits a crime of the second degree, for which the

5

presumptive sentence is seven years' imprisonment. *See id*. §§ 2C:39-6(e)–(g), 2C:39-5(b)(1), 2C:44-1(f)(1)(c).

Until recently, however, New Jersey law allowed a person with a carry permit to carry a handgun on his person throughout most of the State. By statute, he could not possess a gun "in or upon any part of the buildings or grounds of any school, college, university or other educational institution, without the written authorization of the governing officer of the institution," and regulations restricted possession in state parks and casino rooms. *See id*. § 2C:39-5(e)(1); N.J.A.C. §§ 7:2-2.17(b), 13:69D-1.13(a). Federal law additionally prohibited carrying a firearm in certain locations, including any "federal facility," which is "a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties." *See* 18 U.S.C. § 930(a), (e)(1), (g)(1). But beyond these restrictions, permit holders were generally free to carry a handgun while going about their business.

To obtain a permit to carry, a person must meet various requirements related to age, background, training, and qualification. *See* N.J.S.A. § 2C:58-4(c). Current permit holders have been required to prove their competence with firearms through, *inter alia*, "[c]ompletion of a firearms training course substantially equivalent to the firearms training approved by the Police Training Commission." N.J.A.C. § 13:54-2.4(b)(1); *see* N.J.S.A. § 2C:39-6(j). Until recently, New Jersey law also required

permit applicants to show a "justifiable need" to carry a handgun. N.J.S.A. § 2C:58-4(c) (2018).

On June 23, 2022, the Supreme Court decided *Bruen*, holding "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home" and declaring invalid a New York law that required applicants to show "proper cause" in order to obtain a license to carry handguns in public, a standard akin to New Jersey's prior "justifiable need" standard. *Bruen*, 142 S. Ct. at 2122–23, 2138. Accordingly, the New Jersey Attorney General issued a directive the next day instructing local officials that they could no longer require permit applicants to submit written certifications of justifiable need to carry a handgun. *See* N.J. Att'y Gen. Law Enforcement Directive No. 2022-07 at 2–3 (Jun. 24, 2022), https://bit.ly/3OJVP9V.

On December 22, 2022, Governor Murphy signed into law Chapter 131 of the 2022 Laws of New Jersey, which contains the new carry restrictions at issue here. Those restrictions are a direct response to *Bruen*: the express legislative justification was that, under "*Bruen*, laws requiring showings of particularized need are no longer legally viable," and thus "a much greater number of individuals will now qualify to carry handguns in public." N.J.S.A. § 2C:58-4.2(b), (e).

Chapter 131 makes it a crime of the third degree—with a presumptive sentence of four years' and a maximum of five years' imprisonment, *see* N.J.S.A.

§§ 2C:43-6(a)(3), 2C:44-1(f)(1)(d)—for anyone, including holders of handgun-carry permits, "to knowingly carry a firearm" in any of twenty-five types of locations. *Id*. § 2C:58-4.6(a). As relevant to this appeal, those locations include:

- "a publicly owned or leased library or museum";

- "a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises"; and

- "a privately or publicly owned and operated entertainment facility within this State, including but not limited to a theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held";

*Id*. § 2C:58-4.6(a)(12), (15), (17). Chapter 131 also enacts an Anti-Carry Default, prohibiting carry on "private property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued [handgun-carry] permit." *Id*. § 2C:58-4.6(a)(24). Finally, Chapter 131 prohibits permit holders from carrying functional handguns in any vehicle, making it a crime of the fourth degree—with a presumptive sentence of nine months' and a maximum of eighteen months' imprisonment, *see id*. §§ 2C:43-6(a)(4), 2C:44-1(f)(1)(e)—"to carry or transport a firearm . . . while in a vehicle in New Jersey,

8

unless the handgun is unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle." *Id*. § 2C:58-4.6(b)(1). Thus, whether or not a person has obtained a permit to carry a handgun, he must keep it unloaded and contained in a case or the truck, *i.e.*, inoperable, while driving. There are exemptions to these restrictions for, *e.g.*, law-enforcement officers, armored-car employees, and authorized security personnel, *see id*. §§ 2C:58-4.6(a), (e)(1), (f), 2C:39-6, none of which helps ordinary, law-abiding New Jersey citizens who wish to exercise the "the general right to publicly carry arms for self-defense" that *Bruen* recognized, 142 S. Ct. at 2134.

## II.    Procedural History

The *Koons* Plaintiffs are four New Jersey citizens—Ronald Koons, Nicholas Gaudio, Jeffrey Muller, and Gil Tal—and the Second Amendment Foundation, Firearms Policy Coalition, Inc., Coalition of New Jersey Firearm Owners, and New Jersey Second Amendment Society, of which the individual Plaintiffs are members. All individual Plaintiffs have New Jersey carry permits, and all wish to exercise their rights to carry firearms in public for self-defense. As set forth in their unrebutted declarations, however, the challenged provisions of Chapter 131 severely restrict their ability to do so. All individual Plaintiffs would carry a firearm for protection at one or more of the locations covered by the challenged provisions and would travel with operable firearms in their vehicles for the same reason. But all individual

Plaintiffs have refrained from doing so rather than risk incurring the criminal penalties imposed by Chapter 131. Indeed, the locations covered by the challenged provisions are so extensive that the individual Plaintiffs can no longer exercise their right to public carry in their daily lives. JA441–61 (Declarations of Plaintiffs Koons, Gaudio, and Muller); JA933–42 (Declaration of Plaintiff Tal); JA923–30 (allegations of Chapter 131's effect on Plaintiffs).

Plaintiffs therefore filed this suit seeking declaratory and injunctive relief against the challenged provisions (among others) under the Second Amendment as construed by *Bruen*, JA931–32, and moved for a temporary restraining order and preliminary injunction, JA438–40. On January 9, 2023, the District Court granted a temporary restraining order against all challenged provisions, explaining that "the plain text of the Second Amendment clearly covers . . . carrying a firearm in public for self-defense" and finding that none of the historical analogues that the State proffered for any of the challenged provisions—comprising many of the purported analogues that the State now proffers to this Court—provided historical support for those provisions. JA492 (internal quotation marks omitted); JA465–526.

After consolidating this case with *Siegel* and granting an additional temporary restraining order in *Siegel*, JA759–806, the court granted the *Koons* Plaintiffs' preliminary-injunction motion in virtually all respects—enjoining N.J.S.A. § 2C:58-4.6(a)(12) (public libraries and museums), (a)(15) (bars, restaurants, and other places

10

where alcohol is served for on-site consumption), (a)(17) (private and public entertainment facilities), (a)(24) (Anti-Carry Default) as to private property help open to the public, and (b)(1)'s prohibition on functional firearms in vehicles—and granted the *Siegel* plaintiffs' motion in additional respects. In a comprehensive, 230-page decision, the court explained that Plaintiffs were likely to succeed on the merits of their Second Amendment claim against the challenged provisions, rejecting along the way every purported historical analogue for those provisions that the State offers again here. JA6–230.

The State appealed and sought a stay pending appeal. With Judge Porter dissenting, the Court granted the stay in part, lifting the preliminary injunction of N.J.S.A. § 2C:58-4.6(a)(12), (a)(15), and (a)(17), among other provisions, for the pendency of the appeal. The Court unanimously denied a stay as to the Anti-Carry Default and prohibition on transporting function firearms in vehicles, which remain enjoined. *See* Order at 2, Doc. 29 (June 20, 2023).

## SUMMARY OF ARGUMENT

The State labors to show that the challenged provisions of Chapter 131 are consistent with a historical tradition of firearm regulation, as *Bruen* requires. But the task is impossible. Brand-new regulations are the antithesis of traditional regulation. And there is no question that the challenged provisions, enacted only after *Bruen* vindicated the right to public carry, are brand-new. Libraries, museums, bars,

entertainment venues, modes of transportation, or close equivalents were all known to the Founding generation. So, of course, was private property. Yet the State fails to cite a single law banning firearms at those locations as Chapter 131 does. Under *Bruen*, that alone is enough to conclude that New Jersey's new "sensitive-place" restrictions and Anti-Carry Default are unconstitutional.

The State fares no better with the scattered historical laws on which it must rely. Most of these laws either were enacted long after the Founding era, which *Bruen* reaffirmed as the relevant time period for this analysis; or were clear outliers covering only small or sparsely populated jurisdictions; or were expressly rejected by *Bruen* as appropriate analogues. Those issues aside, no amount of squinting can make historical firearm restrictions on students look like any of New Jersey's restrictions on all law-abiding adults, or historical restrictions on alcohol sales look like any of New Jersey's restrictions on firearms, or historical poaching laws look like the Anti-Carry Default. Nor can the State credibly rely on the overtly racist prohibitions enacted by former Confederate states before they were readmitted to the Union that it cites in support of the Anti-Carry Default.

Simply put, New Jersey cites no regulation from the relevant era, or any era, that is similar to any challenged provision in "how and why" it restricted the right bear arms. *Bruen*, 142 S. Ct. at 2133. And that makes sense, because the historical record shows that—outside of the three locations specified in *Bruen* where citizens

could be prevented from going armed because government security provided self-defense for them—the tradition was to protect potentially vulnerable populations by arming them, not disarming them.

The State also defends the challenged provisions as they apply to publicly owned and operated facilities on the ground that the State wields near-absolute power as proprietor of those facilities. But proprietorship does not exempt the State from its burden under *Bruen*. If the State wishes as proprietor to restrict the right to public carry that the Second Amendment's plain text protects, it must prove a tradition of states using their authority as proprietors in that way, which the State does not attempt to do. In any event, the State does not act as a mere proprietor when it enacts restrictions on constitutional conduct backed by criminal penalties. It acts as a sovereign, and it has done so here in violation of the Second Amendment.

The *Koons* Plaintiffs are therefore likely to succeed on the merits of their Second Amendment claims against the challenged provisions. The balance of the equities also favors preliminary injunctive relief. As the State does not contest, the deprivation of a fundamental constitutional right is inherently an irreparable injury and against the public interest. Plaintiffs are suffering an ongoing deprivation of their constitutional rights in the State of New Jersey.

13

## STANDARD OF REVIEW

"In reviewing the grant or denial of a preliminary injunction, . . . findings of fact are reviewed for clear error, legal conclusions are reviewed de novo, and the decision to grant or deny an injunction is reviewed for abuse of discretion." *Osorio-Martinez v. U.S. Att'y Gen.*, 893 F.3d 153, 161 (3d Cir. 2018) (internal quotation marks omitted).

## ARGUMENT

## I.    Plaintiffs Are Likely To Succeed on the Merits

The State separates its defense of the challenged "sensitive-place" restrictions on firearms in libraries and museums, restaurants and bars, entertainment facilities, and vehicles, *see* N.J.S.A. § 2C:58-4.6(a)(12), (a)(15), (a)(17), and (b)(1), from its defense of the Anti-Carry Default, *see id*. § 2C:58-4.6(a)(24), which the State calls the "private-property rule." This separation correctly reflects that the government may not declare private property a "sensitive place" and ban firearm possession on that ground merely because the property lacks the indicia of consent required by the Anti-Carry Default. The State's defenses of all these provisions are meritless.

### A. The Challenged "Sensitive-Place" Restrictions Violate the Second Amendment

The single "standard for applying the Second Amendment" set forth in *Bruen* rests exclusively on text and history. 142 S. Ct. at 2129. If "the Second Amendment's plain text covers an individual's conduct, . . . [t]he government must then justify its

14

regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2129–30. "*Only then* may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id*. at 2130 (emphasis added; internal quotation marks omitted).

### i. The Second Amendment's Plain Text Presumptively Protects Plaintiffs' Conduct

Under *Bruen*'s text-and-history framework, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 142 S. Ct. at 2126. The State does not dispute that the Second Amendment's plain text covers the individual Plaintiffs' desired conduct—carrying firearms for self-defense—nor could it. The Second Amendment protects "the right of the people to keep and bear Arms" without limitation, U.S. CONST. amend. II, "guarantee[ing] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). There are no locational restrictions in the text whatsoever.

The "burden" consequently "falls on [the State] to show" that the challenged provisions are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135. There is no doctrinal significance to *Heller* or *Bruen*'s dicta that restrictions on carrying firearms in certain purported "sensitive places" are "presumptively lawful." *Heller*, 554 U.S. at 626–27 & n.26; *see Bruen*, 142 S. Ct. at 2133–34. Under *Bruen*, once the Second Amendment's plain text is

15

implicated, the burden is on the government to justify the challenged firearm regulation in every case. *See* 142 S. Ct. at 2129–30.

### ii. The State Cannot Prove that Any Challenged "Sensitive-Place" Restriction Is Consistent with a National Tradition of Firearm Regulation

### 1. Controlling Standards Under *Bruen*

Showing that a modern firearm regulation is consistent with historical tradition requires historical analogues that are "well-established," "representative," and "relevantly similar" to the modern regulation. *Bruen*, 142 S. Ct. at 2132–33. What matters in this analysis are the historical regulations themselves, not interpretations of those regulations offered by, *e.g.*, the State's amici or witnesses— as in the two declarations that the State has offered, JA1196 (Rivas Declaration); JA1305 (Charles Declaration), from witnesses who either have been openly critical of *Bruen*[2] or have expressed views on the scope of the Second Amendment and relevance of particular historical evidence that the Supreme Court rejected.[3]

The text-and-history standard "set forth in *Heller* and appl[ied in *Bruen*] requires *courts* to assess whether modern firearm regulations are consistent with the

---

[2] *See* Patrick J. Charles, *The Fugazi Second Amendment: Bruen's Text, History, and Tradition Problem and How to Fix It*, 71 CLEV. ST. L. REV. 623 (2023).
[3] *See* Patrick Charles, *The Invention of the Right to 'Peaceable Carry' in Modern Second Amendment Scholarship*, U. ILL. L. REV. ONLINE 195 (2021); Brennan Rivas, *In the past, Americans confronted gun violence by taking action*, WASH. POST. (June 3, 2022).

Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131 (emphasis added). More specifically, the Court must assess whether the challenged provisions are "consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. And a regulation can be consistent with a regulatory tradition only if there *is* such a tradition, which requires the State to present firearm regulations in place at the relevant historical time. The existence of such regulations, and their content, are "legislative facts" that the Court can assess for itself. *Teter v. Lopez*, --- F.4th ----, 2023 WL 5008203, at \*6 (9th Cir. Aug. 7, 2023) (denying request to remand for further fact development post-*Bruen*, where the state had "never cited an on-point historical analogue . . . even after having an opportunity to do so," because nothing beyond that legislative fact was relevant).

A historical analogue is "relevantly similar" to a modern regulation only if the regulations burden ordinary, law-abiding citizens' right to possess firearms in a similar manner and for similar reasons. *Bruen,* 142 S. Ct. at 2132. Indeed, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Id*. at 2133 (emphasis in original). The Court must therefore ask "how and why" any restriction was historically imposed. *Id*.

Since historical analogues must also be "representative," "outlier" regulations from a few jurisdictions or from territorial governments must be disregarded. *Id*. at 2133, 2153, 2147 n.22 & 2156. Regulations that were adopted in only a handful of states, or that covered only a small portion of the national population, or that persisted for only a few years, do not represent a national regulatory tradition. *See id.* at 2155. Thus, the *Bruen* Court categorically rejected reliance on laws enacted in the territories, including "Arizona, Idaho, New Mexico, Oklahoma," given that such laws "are most unlikely to reflect 'the origins and continuing significance of the Second Amendment.'" *Id*. at 2154 (quoting *Heller*, 554 U.S. at 614).

The State seeks cover for its limited number of supposed analogues by arguing that *Bruen* does not require all that many historical analogues. *See* State Br. at 26. To the contrary, *Bruen* rejected laws from the four territorial jurisdictions above as analogues because, among other issues, they "governed less than 1% of the American population" at the time and thus "were irrelevant to more than 99% of the American population." 142 S. Ct. at 2154–55. *Bruen* further expressed "doubt" that just "*three* colonial regulations could suffice to show a tradition of public-carry regulation." *Id.* at 2142. Founding-era regulations from lone states, and certainly from lone territories or *municipalities*, are therefore insufficient. But at bottom, that is all the support the State has for many challenged provisions.

18

The State similarly suggests that the "*lack*" of similar historical laws "in other jurisdictions . . . is *not* itself proof of a law's unconstitutionality." State Br. at 27 (second emphasis added). But *Bruen* observed that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem *is relevant evidence* that the challenged regulation is inconsistent with the Second Amendment." 142 S. Ct. at 2131 (emphasis added). Which only makes sense: crowds have gathered in certain locations since the Founding; yet if Founding-era governments generally did not prohibit carrying firearms there, then the State's "sensitive-place" restrictions can have no grounding in historical tradition.

Finally, a historical analogue is "well-established" only if it was enacted during the relevant time period—which, under *Bruen*, centers on the ratification of the Second Amendment in 1791, not the ratification of the Fourteenth Amendment in 1868. This focus follows from two facts emphasized in *Bruen*: "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," and "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." 142 S. Ct. at 2137 (internal quotation marks omitted). Thus, in *Heller*, the Supreme Court held that the Second Amendment has the same scope as applied against the Federal Government today as

19

it had at the Founding. *See Heller*, 554 U.S. at 576–77. And in *McDonald*, the Court decisively rejected applying a different Second Amendment standard to the states. *See* 561 U.S. 742, 765 (2010).[4]

Accordingly, *Bruen* cautioned that, "when it comes to interpreting the Constitution, not all history is created equal" and that "post-Civil War discussions of the right to keep and bear arms [that] 'took place 75 years after the ratification of the Second Amendment . . . do not provide as much insight into its original meaning as earlier sources.'" *Id*. at 2136–37 (quoting *Heller*, 554 U.S. at 614); *see also id*. at 2163 (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights."). The *Bruen* Court did note an academic debate over whether courts should look to the Reconstruction era in determining the scope of individual rights, which the Court did not need to resolve. *See id*. at 2138 ("[T]he public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry."). But *Bruen* did not overturn—and in fact reaffirmed—*Heller* and *McDonald*. Indeed, the Court explained that its "interest in mid- to late-19th-century commentary" in *Heller* had been "secondary": "*Heller* considered this evidence

---

[4] The amicus brief filed by Everytown, which argues for focusing on the Reconstruction Era, fails to account for this principle. *See* Br. of Everytown as *Amicus Curiae* at 3–15, Doc. 61 (July 27, 2023).

'only after surveying what it regarded as a wealth of authority for its reading'" from the Founding era, treating "this 19th-century evidence . . . as mere *confirmation* of what the Court thought had already been established." *Id*. at 2137 (quoting *Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019)) (emphasis added); *see also* Mark W. Smith, *'Not all History is Created Equal': In the Post-*Bruen *World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868*, SSRN (Oct. 1, 2022), https://bit.ly/3CMSKjw.

Under *Bruen*, therefore, any purported analogues that post-date the period of the Second Amendment's ratification are relevant only insofar as they confirm the amendment's scope as understood at the Founding and thereby reflect an "enduring American tradition of state regulation." *Bruen*, 142 S. Ct. at 2155. "[P]ost-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id*. at 2137 (internal quotation marks omitted). This Founding-era focus accords with the Supreme Court's construction of other constitutional rights. Thus, in *Espinoza v. Montana Department of Revenue*, the Court held that "more than 30" provisions of state law enacted "in the second half of the 19th Century" could not "evince a tradition that should inform our understanding of the Free Exercise Clause" when those provisions lacked grounding in Founding-era practice. 140 S. Ct. 2246, 2258–59 (2020); *see also Ramos v. Louisiana*, 140 S. Ct. 1390, 1396 (2020); *Timbs v.*

21

*Indiana*, 139 S. Ct. 682, 687–88 (2019); *Gamble*, 139 S. Ct. at 1975–76; *Virginia v. Moore*, 553 U.S. 164, 168 (2008).

## 2.  No Valid Historical Analogue Supports Any Challenged "Sensitive-Place" Restriction

The State argues as an initial matter that restricting firearms in purportedly "sensitive" places is constitutionally permissible *in general*. Opening Br. of Defs.-Appellants at 13, Doc. 43 (July 20, 2023) ("State Br."). Not so. The *Bruen* majority listed three specific "sensitive places"—"legislative assemblies, polling places, and courthouses"—where firearm-carry was historically prohibited, and it suggested that lower courts could "use analogies to *those historical regulations* to determine" whether firearm restrictions "in *new* and analogous sensitive places are constitutionally permissible." 142 S. Ct. at 2133 (first emphasis added). Simply labeling a location as a "sensitive place" does not somehow shift the government's burden any more than labelling speech "obscene" would somehow obviate the need for the government to prove that the speech is actually obscene. Indeed, *Bruen* rejected such an approach when it rejected the suggestion that the island of Manhattan could be considered a sensitive place. *See id*. at 2134.

Rather, any new purportedly "sensitive" place must be analogized to the three specified in *Bruen* in the same manner that they are analogous to one another. The relevant common denominator between those three locations is not that "activities relating to governance or democracy and protected constitutional conduct occur"

there, or that "disproportionate concentrations of vulnerable or incapacitated persons can be found" there, or that "particularly large crowds gather" there "for social, recreational, educational, and/or scientific purposes." State Br. at 13. Many of those things are not even true of *Bruen*'s three locations, where people do not tend to gather to recreate or conduct science and which do not have unusually large numbers of "incapacitated persons." And all these things could be true of locations where the State unquestionably cannot restrict the right to carry firearms—for example, public streets and sidewalks, *see Bruen*, 142 S. Ct. at 2135, which can be the site of constitutional conduct (*e.g.*, parades), vulnerable persons, and large crowds.

As the District Court correctly found, what connects *Bruen*'s three specified locations is, instead, the presence of comprehensive, state-provided security that fulfilled the role of armed self-defense. As the district court emphasized, "[t]he common thread that runs through all these 'sensitive' locations is that historically the government provided security at them, and so the need for armed self-defense was reduced." JA180; *accord Hardaway v. Nigrelli*, --- F. Supp. 3d ----, 2022 WL 16646220, at *14 (W.D.N.Y. Nov. 3, 2022). Given that one of the central purposes of the Second Amendment is self-defense, it makes sense that the Second Amendment applies with less force where the government applies comprehensive security thereby reducing the need for self-defense. When citizens run the gauntlet of security at the United States Supreme Court (or any federal court), they have less

need to carry a firearm for protection. The State and Intervenors argue that "the sensitive places doctrine can apply expansively" because *Bruen* assumed the validity of "sensitive-place" regulations while purportedly noting that "there are few historical examples of sensitive places legislation." Br. of Intervenors-Defs.-Appellees at 20–21, Doc. 42 (July 20, 2023) ("Intervenor Br."); *see* State Br. at 26–27. In fact, *Bruen* noted that the historical record yielded relatively few *locations*, namely the three it specified, that could be characterized as "sensitive places." *See* 142 S. Ct. at 2133. And even if historical laws restricting firearms in such locations might have been relatively rare, laws making such places classifiable as "sensitive places" according to *Bruen*'s common denominator—*i.e.*, laws providing for comprehensive security at these locations—were widespread.

The Founding-era record is replete with laws providing government security in the form of sheriffs, sergeants-at-arms, constables, and doorkeepers at all three of *Bruen*'s specified locations: (1) legislative assemblies, *see, e.g.*, PENNSYLVANIA STATUTES AT LARGE, VOLUME X: 1779-81, p. 376, 378 (Stanley Ray ed., 1904); THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA 426, 427 (Grimke ed., 1790); 2 THE LAWS OF THE STATE OF VERMONT, 382, 387 (1808);[5] (2) courthouses, *see, e.g.*,

---

[5] *See also* 2 LAWS OF THE STATE OF DELAWARE 1100, 1118 (Samuel & John Adams, eds., 1797); THE PUBLIC LAWS OF THE STATE OF RHODE-ISLAND 220, 222 (1798); An Act for the Support of Government, in 1 LAWS OF THE STATE OF NEW YORK, 532 (2nd ed. 1807); A COMPILATION OF THE LAWS OF THE STATE OF GEORGIA, 372–73 (Augustin Smith ed., 1812); Journal of the House of Delegates of the

2 LAWS OF THE STATE OF DELAWARE, 1088, 1091 (Samuel & John Adams, eds., 1797); A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, 69–71 (1803); LAWS OF THE STATE OF NEW JERSEY, COMPILED AND PUBLISHED, UNDER THE AUTHORITY OF THE LEGISLATURE, 49–50, 58 (Joseph Bloomfield, 1811);[6] and (3) polling places, *see, e.g.*, MD. CONST. art. 1, §§ 3 & 14 (1776); A DIGEST OF THE LAWS OF THE STATE OF GEORGIA, 1800 Ga. Laws 611 (Watkins ed., 1800).[7] *See also* Br. for Citizens Committee for the Right To Keep & Bear Arms et al. as *Amici Curiae* at 9–17, Doc. 91 (Aug. 16, 2023) (providing additional details). This record confirms that, to render a modern location a "sensitive place" analogous to *Bruen*'s three places, the State must provide comprehensive security, which today

---

Commonwealth of Virginia, p.77 (Thomas W. White ed., 1828); Provincial Congress, Journal of the Votes and Proceedings of the Provincial Congress of New-Jersey: Held at Trenton in the Month of October 1775, p. 239, 240 (1835).

[6] *See also* ACTS AND LAWS OF THE STATE OF CONNECTICUT 18, 63–65 (1784); THE PUBLIC LAWS OF THE STATE OF SOUTH-CAROLINA 268, 271 (1790); THE LAWS OF THE STATE OF NEW-HAMPSHIRE 112–16 (1797); THE PUBLIC LAWS OF THE STATE OF RHODE-ISLAND 220, 222 (1798); 1 THE LAWS OF MARYLAND TO WHICH ARE PREFIXED THE ORIGINAL CHARTER, WITH AN ENGLISH TRANSLATION, ch. XXV (1799); A DIGEST OF THE LAWS OF THE STATE OF GEORGIA 471, 473–74, 478 (Watkins ed., 1800); 1 LAWS OF THE STATE OF NEW YORK, 172 (1807); 2 THE LAWS OF THE STATE OF VERMONT 382, 387 (1808); A MANUAL OF THE LAWS OF NORTH-CAROLINA 190–91, 196 (3d ed. 1814); ACTS AND RESOLVES OF MASSACHUSETTS, 1786–87, p. 235 (1893); PENNSYLVANIA STATUTES AT LARGE, VOLUME X: 1779-81, p. 57 (Stanley Ray ed., 1904).

[7] *See ALSO* ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 325 (1796); LAWS OF THE STATE OF NEW JERSEY 36 (Bloomfield, ed. 1811); 2 LAWS OF THE STATE OF DELAWARE 984 (Samuel & John Adams, eds., 1797); THE PUBLIC LAWS OF THE STATE OF SOUTH-CAROLINA, 271, 386–88 (Grimke, ed., 1790).

would include features like metal detectors and armed guards at every point of entry—and which is lacking in the locations that the challenged provisions cover.

Meanwhile, at other locations, the historical practice was not to maintain order and protect potentially populations by disarming law-abiding citizens, but by *arming* them. To the extent colonial governments regulated firearm possession at places where people might be vulnerable to attack and where comprehensive government security was not provided—such as places of worship—they did so by encouraging or even requiring law-abiding citizens to be armed. As the District Court noted, at least "six out of the thirteen original colonies required their citizens to go armed when attending religious services or public assemblies." JA170; *see also* Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653, 697–99 (2014) (reviewing colonial- and Founding-era historical precedent for requiring firearms at church services).

History also reflects that, to the extent the Founding generation restricted firearms outside of legislative assemblies, polling places, and courthouses, it did so not by limiting the carry right, but by preventing firearm *misuse* through discharge restrictions and enhanced penalties for using firearms in connection with crimes. *See* THE PUBLIC LAWS OF THE STATE OF RHODE-ISLAND AND PROVIDENCE PLANTATIONS 568 (1798) (statute first enacted in 1731 prohibiting shooting at night in certain public areas); 1784–1785 N.Y. Laws 152, ch. 81 (1785 statute restricting shooting

near buildings around New Years Day); ACTS AND LAWS OF THE STATE OF CONNECTICUT 18 (1784) (1783 statute providing enhanced punishment for being armed with a dangerous weapon in a manner that clearly indicated violent intent); Act of March 2, 1799, ch. 43, § 15, 1 Stat. 736 (federal statute originating in the early 1790s providing enhanced punishment for wounding or putting mail carrier's life in danger by using dangerous weapons while robbing the mail carrier, as discussed in *United States v. Spears*, 449 F.2d 946, 951 (D.C. Cir. 1971)).

The tradition was, in short, that citizens were protected at "sensitive places" by comprehensive government security and, at other places, by themselves, their fellow law-abiding citizens, and laws against firearm misuse. Against this tradition, it will be impossible for the State to prove that any of the challenged provisions applies to a "sensitive place" where firearm possession can be restricted under the letter of *Bruen*. But the State's efforts to classify those locations as "sensitive places" also fail on their own terms.

### a.  Publicly Owned or Leased Libraries or Museums

The only purported analogues that the State offers in defense of its library-and-museum ban are the same 19th- and 20th-century laws—many from territories and municipalities—that it cites in defense of its other challenged restrictions. These outliers cannot support this ban just as they cannot support the others. *See* Principal & Resp. Br. for *Siegel* Plaintiffs at 42–45, 49–51, Doc. 87 (Aug. 10, 2023). In any

27

case, museums, libraries, and other "places for educational, literary, and scientific gatherings existed at the time of the Founding." State Br. at 19. To name a few, the Charleston Museum, the Nation's first, opened in 1773. *See About Us*, CHARLESTON MUSEUM, https://bit.ly/3MPYhMB (last visited Aug. 19, 2023). New York's first museum opened in 1804. *See About Us*, N.Y. HISTORICAL SOC'Y MUSEUM & LIBRARY, https://bit.ly/3WkCcZF (last visited Aug. 19, 2023). Benjamin Franklin founded America's first lending library in Philadelphia in 1731. *See* "AT THE INSTANCE OF BENJAMIN FRANKLIN": A BRIEF HISTORY OF THE LIBRARY COMPANY OF PHILADELPHIA 5 (2015), *available at* https://bit.ly/3vdBGQk. By 1850, the Census reported 1,217 public libraries in the United States. *See* DEP'T OF INTERIOR, 1850 CENSUS: COMPENDIUM OF SEVENTH CENSUS 159, tbl. CLXVII (1854), *available at* https://bit.ly/3jp7GhR. And yet not one of the State's cited laws categorically banned firearms from libraries and museums as Chapter 131 does.

To the extent that it does not simply rely on repurposed analogues, the crux of the State's defense is that libraries and museums are "like schools" and that children gather there. State Br. at 19–20. But again, children are present in many places, *e.g.*, sidewalks, where *Bruen* nevertheless recognized the right to carry firearms. And contra the State's reading, *Bruen* did *not* say that schools or other places that might have children in them are all "sensitive places" where the Second Amendment does not apply. *Bruen*'s specified locations—legislative assemblies,

polling places, and courthouses—are not notable for the presence of children. Meanwhile, *Bruen*'s list pointedly does not include schools. While *Bruen* cited *Heller*'s earlier suggestion (in dicta) that "schools and government buildings" potentially could be considered "sensitive places," *Bruen* specifically approved firearm regulation only at its three specified places and, warning that "sensitive places" should not be construed "too broadly," instructed courts to "use analogies to *those* historical regulations of 'sensitive places'" when assessing the constitutionality of firearm restrictions at modern locations. 142 S. Ct. at 2133–34 (emphasis added).

Moreover, historical laws and school codes that restricted firearms on campus applied only to *students*, not to faculty, staff, or visitors. *See, e.g.*, David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13 CHARLESTON L. REV. 203, 247–48 (2018) (describing the University of Virginia's prominent 1824 ban, adopted by a Board of Visitors including Thomas Jefferson and James Madison, on student possession in response to the "spoiled and violent behavior" of students, who had previously "fired guns in the air, and shot at each other"); Br. for Cntr. for Human Liberty as *Amicus Curiae* at 20–22, *Antonyuk v. Nigrelli*, No. 1: 22-2908, Doc. 304 (2d Cir. Feb. 8, 2023) (compiling historical firearm restrictions on students). At the time of the Founding, teachers and faculty (as well as other adults) were free to carry at schools.

These restrictions are properly understood as an exercise of the state's *in loco parentis* authority over students, a doctrine that historically applied "regardless of the student's age." *Morse v. Frederick*, 551 U.S. 393, 413 n.3 (2007); *see also, e.g.*, *State v. Pendergrass*, 19 N.C. 365, 366 (1837) (recognizing that the "teacher is the substitute of the parent"); *State v. Mizner*, 45 Iowa 248, 251 (1876); *North v. Bd. of Trs. of Univ. of Ill.*, 137 Ill. 296, 306, 27 N.E. 54, 56 (1891) ("By voluntarily entering the university, or being placed there by those having the right to control him, [the student] necessarily surrenders very many of his individual rights."). Historical exercises of this authority do not support restricting firearm-carry by anyone not subject to that sort of authority.[8]

Accordingly, schools are not automatically "sensitive places" under *Bruen*, though particular schools might qualify as "sensitive places" if they bear the feature that connects *Bruen*'s specified locations—comprehensive government security. By the same token, libraries and museums cannot be deemed "sensitive places" simply by comparing them to schools if they lack comprehensive government security. And the State does not assert that its libraries and museums have that feature. Moreover, even if schools were one of *Bruen*'s recognized "sensitive places," they could serve

---

[8] Although colleges and universities were historically understood to possess *in loco parentis* authority over their students, they are no longer understood to have that authority. *See, e.g.*, *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 243 (3d Cir. 2010); *Bradshaw v. Rawlings*, 612 F.2d 135, 139 (3d Cir. 1979). These historical laws would accordingly not justify firearm bans on college students today.

as an analogy for libraries and museums only if libraries and museums exercised the same *in loco parentis* authority reflected in the above school codes. But the State again does not assert that libraries or museums have such authority over the children brought there by their parents or guardians, much less over the parents and guardians themselves.

### b. Privately or Publicly Owned and Operated Entertainment Facilities

The State lumps together its restrictions at "entertainment venues" and "establishments serving alcohol," leading with the former. State Br. at 16. But *Bruen* requires independent historical support for, not generalized similarities between, every "sensitive place" where the State seeks to ban firearms. *See* 142 S. Ct. at 2133. Otherwise, nothing would stop the "sensitive-place" doctrine from "in effect exempt[ing] cities from the Second Amendment" and "eviscerate[ing] the general right to publicly carry arms for self-defense." *Id*. at 2134. The State also makes no effort to analogize from legislative assemblies, polling places, and courthouses—or even from any of the other locations covered by its examples—to any of the specific entertainment facilities, whether publicly *or privately* owned and operated, that this challenged provision covers. *See* N.J.S.A. § 2C:58-4.6(a)(17) ("theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits,

games or contests are held"). Regardless, there is no historical support for any of these restrictions, whether considered singly or together.

For entertainment facilities, the State relies primarily on—without naming— the 14th-century Statute of Northampton. As *Bruen* has already explained, that Statute was understood at the time of the Founding only to prohibit carrying firearms in a dangerous and unusual manner. And that is all its Founding-era American counterparts did, including the Virginia statute the State cites. *See id*. at 2143 ("Far from banning the carrying of any class of firearms, [certain colonial regulations] merely codified the existing common-law offense of bearing arms to terrorize the people, as had the Statute of Northampton itself."); JA1508 (1786 Virginia statute against "go[ing]" or "rid[ing] armed . . . in terror of the county"). These laws are no analogues for restrictions on the right to carry firearms in *any* manner.[9]

The State then proceeds to cite more analogues that *Bruen* squarely rejected. The State cites an 1870 regulation from Texas, which *Bruen* recognized as an outlier at the time for its limited view of the public-carry right. *See* 142 S. Ct. at 2153. The

---

[9] The amicus brief for March for Our Lives attempts to justify the State's "sensitive-place" regulations on the ground that the exercise of the public-carry right in such places can itself cause "terror." *See* Br. of *Amicus Curiae* March for Our Lives at 27, Doc. 64 (July 27, 2023). But by protecting a general right to carry, the Second Amendment repudiates any such reasoning; "after so solemn an instrument has said the people may carry arms," it cannot "be permitted to impute to such acts thus licensed such a necessarily consequent operation as terror to the people to be incurred thereby." *Simpson v. State*, 13 Tenn. 356, 360 (1833).

State cites an 1869 regulation from Tennessee, where, as *Bruen* noted, the courts appear to have interpreted the states' carry restrictions to allow for open carry, thus leaving at least one avenue for the exercise of Second Amendment rights. *See id*. at 2147. And the State cites 1853, 1889, and 1890 regulations from New Mexico, Arizona, and Oklahoma, enacted while all were still territories. Not only do these examples come well after the Founding, but *Bruen* expressly rejected examples from these very territories, which "are most unlikely to reflect 'the origins and continuing significance of the Second Amendment.'" *Id*. at 2154 (quoting *Heller*, 554 U.S. at 614). As for the 1903 Montana regulation, *Bruen* categorically rejected 20th-century examples as relevant to the meaning of the Second Amendment. *Id*. at 2154 n.28.

The State also cites an 1870 Georgia law that prohibited carrying firearms "to any Court of justice, or any election ground," JA1261, which *Bruen* recognized as "sensitive places." In large part, then, this statute simply aligns with *Bruen*. Granted, the statute mentioned other places of assembly as well. At the Founding, however, Georgia itself required carrying firearms at such locations. *See Heller*, 554 U.S. at 601 (citing 1770 Georgia law requiring men to carry firearms "to places of public worship"). And under *Bruen*, later evidence "cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." 142 S. Ct. at 2154. *Bruen* also noted the Georgia Supreme Court's holding earlier in the 19th century that, to the extent a law "prohibited bearing arms openly, . . . it was in conflict

with the Constitution and void," suggesting that the 1870 Georgia law would have been interpreted to leave open an avenue for the exercise of Second Amendment rights. *Id*. at 2147 (discussing *Nunn*, 1 Ga. 243) (cleaned up).

Finally, the State cites 1816 and 1882 ordinances from a single municipality (New Orleans), which only proves the lack of historical support for this challenged provision. A regulation adopted in only one municipality is a self-evident outlier.

### c. Bars, Restaurants, and Other Facilities Where Alcohol Is Sold for Consumption on the Premises

The introduction of alcohol sales does not change any of the above analysis, and this restriction therefore fails for similar reasons. Indeed, the State again cites 19th-century territorial or municipal laws—from New Mexico in 1853, Oklahoma in 1890, and New Orleans in 1879—as well as laws that did not regulate firearms at all, such as the 1756 Delaware restriction on bringing liquor to militia meetings and the 1859 Connecticut law against alcohol sales near military encampments. Laws that did not restrict carrying firearms cannot be "relevantly similar" to laws that do. *Bruen*, 142 S. Ct. at 2132.

The State's last example, from Kansas in 1867, prohibited intoxicated people from carrying firearms. Thus, every one of the State's proffered analogues is a late-in-time outlier, and this evidence would at most support a restriction on carrying firearms while intoxicated. But there is no historical basis for barring everyone in the same bar or restaurant from carrying firearms. And though the Founders might

not have seen a sporting event at a venue like "MetLife Stadium" or conceived of a "screening or filming of *Barbie*," State Br. at 18–19, bars and other venues for recreation and entertainment are not modern inventions. The lack of any tradition of restricting firearms at such venues, as proven by the State's submissions, thus shows that the challenged provisions cannot fit within any such tradition. *See* 142 S. Ct. at 2131. Nor would enjoining the State's unlawful firearm restrictions at places where entertainment is had or alcohol is served prevent private or public operators of such facilities from banning firearms there. Private parties are not restricted by the Second Amendment; the government is. And if the government wishes to ban firearms at facilities it owns and operates, it may provide comprehensive security there.

### d. Vehicles

This Court effectively has already determined that Plaintiffs are likely to succeed on the merits of their challenge to Chapter 131's vehicle restrictions by denying the State's request to stay that part of the preliminary injunction, since such requests are subject to standards of review similar to the preliminary-injunction standard. *See Nken v. Holder*, 556 U.S. 418, 428 (2009). The State provides nothing new to justify the vehicle ban here.

The State suggests that public transit is a relatively modern phenomenon. Yet stagecoaches, riverboats, and ferries traveled both interstate and intrastate in the Founding era. *See, e.g.*, Oliver W. Holmes, *The Stage-Coach Business in the Hudson*

*Valley*, THE Q. J. OF THE N.Y. STATE HIST. ASS'N 231–33 (1931) ("Staging had developed somewhat in the colonies before the Revolution, especially around Boston and Philadelphia."); Jay Young, *Infrastructure: Mass Transit in 19th- and 20th-Century Urban America* (Mar. 2, 2015), https://rb.gy/x0oxe. And arms were carried there. *See, e.g.*, 9 STATUTES AT LARGE OF SOUTH CAROLINA 61 (1841) (establishing a "public ferry" as early as 1725 and mandating "free" "ferriage" for "all persons under arms in times of alarms and expresses"); Johnson et al., SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 2195 (3d ed. 2021) ("Stagecoach guards and travelers carried blunderbusses, or other short guns, such as traveling or coaching carbines, or (most often) a pair of ordinary pistols.").

Even if some of these transportation lines were privately owned and operated, it remains relevant that *the government* did not prohibit firearms on them, as the State does not dispute. Indeed, several states—including New Jersey—exempted travelers from firearm regulations. JA2833 (exempting "all strangers, travelling upon their lawful occasions thro' this Province, bearing themselves peace[fully]").[10]

---

[10] *See also, e.g.*, 1812 Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, ch. 89, § 1 ("[A]ny person in this Commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey, shall be fined."); 1819 Ind. Acts 39, An Act to prohibit the wearing of concealed weapons, ch. XXIII, § 1 ("That any person wearing any dirk, pistol, sword in cane, or any other unlawful weapon, concealed, shall be deemed guilty of a misdemeanor . . . Provided, however, that this act shall not be so construed as to affect travelers."); 1821 Tenn. Acts 15, An Act to prevent the wearing of dangerous

And the fact that some private operators might have restricted firearms on their transportation lines remains irrelevant to whether *the government*, which is bound by the Second Amendment, may do so.

The State's remaining arguments are likewise irrelevant under *Bruen*. That a location, like a public bus, can get "crowded," State Br. at 24, is never itself sufficient to render a place a "sensitive place." *Bruen*, 142 S. Ct. at 2134. Nor could even that concern apply to a person's *private vehicle*. And the State's only potential support for its private-vehicle ban are either Statute of Northampton-like prohibitions that restricted riding with arms only "in a way that spreads 'fear' or 'terror' among the people," *Bruen*, 142 S. Ct. at 2142–45, or laws enacted in particular jurisdictions at particular times that *Bruen* has rejected as sources analogues for an appropriate understanding of the public-carry right, *see* State Br. at 25 (Texas 1871), or laws enacted far too late to matter, *see id*. (Maine 1919 and Iowa 1929); *Bruen*, 142 S. Ct. at 2154 n.28 (rejecting 20th-centry laws as too late in time). None of these sources can support the State's attempt effectively to turn all its roadways into a "sensitive place."

---

and unlawful weapons, ch. XIII (exempting "any person that may be on a journey to any place of out his county or state").

### iii. Government Proprietorship Provides No Exception to the Second Amendment

Unable to satisfy the *Bruen* standard, the State tries to evade that standard by arguing that it need not respect Second Amendment rights when it "acts as a proprietor rather than a sovereign," and thus that the challenged restrictions are valid as to publicly owned and operated property because the State has absolute power there. State Br. at 34. This argument plainly proves too much: the government also "owns" sidewalks and streets, but it cannot simply ban firearms there. *See Bruen*, 142 S. Ct. at 2135. The question under *Bruen* is not whether the government owns and operates a location, but whether the location is relevantly similar to legislative assemblies, polling places, and courthouses. As seen above, none of the locations covered by the challenged provisions are.

Moreover, the State does not act as a "proprietor" in enforcing the challenged provisions, but as a sovereign. The challenged provisions are part of the State's criminal code and are backed by criminal penalties, which a normal proprietor cannot enact or enforce, and they directly regulate constitutional conduct, which no normal proprietor has the power to do. That makes this case different in kind from cases where "a state or local government enters the market as a participant," *White v. Mass. Council of Const. Emps., Inc.*, 460 U.S. 204, 208 (1983); *see also Reeves, Inc. v. Stake*, 447 U.S. 429, 439 (1980), or where the government engages in "private conduct" on its own property, *Bldg. & Const. Trades Council of Metro. Dist. v.*

*Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 227–29 (1993)—in other words, from the cases at the foundation of the State's argument. *See* State Br. at 35–37.[11] The State does not act as a market participant when it criminalizes the exercise of constitutional rights.

Even the State concedes that its proprietorship exception would not apply to government-owned places like "public roads or town squares." *Id.* at 35 n.6. Yet the State offers no basis to distinguish between imposing criminal penalties on firearm carry in those public spaces and in the spaces covered by the challenged restrictions. There is none: when the government exercises "the power to regulate or license," it acts "as lawmaker," and "there is a crucial difference, with respect to constitutional analysis, between" such actions and the government's actions "as proprietor, to manage its internal operation." *Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 598 (2008) (cleaned up); *accord Bldg. & Constr. Trades Council*, 507 U.S. at 227. The State thus does not agree with its own proposed exception, and for good reason. If the State wishes to ban firearms at the places it owns and operates, it may provide comprehensive security there. But the Second Amendment "is not a second-class right." *Bruen*, 142 S. Ct. at 2156 (internal quotation marks omitted). Thus, if the Second Amendment did not apply in government-owned and -operated spaces as in

---

[11] The State also relies heavily on *United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019), without acknowledging that this was one of the cases whose interest-balancing approach was explicitly rejected in *Bruen*, 142 S. Ct. at 2127 n.4.

others, New Jersey citizens could likewise find themselves subject to unreasonable searches and seizures, compelled to espouse the government's preferred messages, and prohibited from praying before meals in those spaces.

Regardless, the State's purported status as proprietor is ultimately irrelevant. Even if the State could be so characterized, *Bruen* would require the State to produce historical analogies to show that the government, acting as a proprietor, may infringe on Second Amendment rights—which the State has failed to do. The argument that State proprietorship provides blanket authority to infringe on Second Amendment rights would make a hash of *Bruen*'s identification of *specific* government buildings, namely legislative assemblies and courthouses, where firearms may be prohibited, as well as *Bruen*'s instruction for courts to analogize from those specific locations when assessing other "sensitive-place" restrictions. If *Bruen* meant that the government may prohibit firearm-carry in *any* government-owned building, that is what it would have said.

### B. The Anti-Carry Default Violates the Second Amendment

Like Chapter 131's vehicle restrictions, this Court has already recognized that the Anti-Carry Default likely violates the Second Amendment by refusing to stay the preliminary injunction of that provision. The State's arguments here confirm that the Court was right.

### i. The Anti-Carry Default Burdens Conduct Covered by the Second Amendment's Plain Text

The State first argues that the textual right "to keep and bear arms" does not provide a right to carry firearms into private buildings without the owner's express consent. U.S. CONST. amend. II. But again, there are no locational restrictions in that text. The text thus supports no distinction between the right to carry firearms in locations that the State might characterize as "public" and locations that the State might characterize as "private." *Accord Bruen*, 142 S. Ct. at 2134 ("Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms."). In either case, the State must justify any restriction on that right with valid historical evidence. And in any event, the only privately owned buildings at issue here are those that are open to the public.

Without any textual hook, the State emphasizes the general common-law right to exclude. It is certainly true that private property owners, who are not restricted by the Second Amendment, are "free to exclude firearms" from their property. State Br. at 38. But that is not the issue. The government is bound by the Second Amendment, and it therefore cannot make that choice for them by dictating a legal presumption against carrying firearms. Nor does the Anti-Carry Default simply "effectuate" a private property owner's control over the property. State Br. at 38. It coopts the property owner's control into a State-enforced prohibition backed by criminal penalties. The Supreme Court has already rejected efforts by the government to seek

41

to leverage the authority of private parties to establish presumptive bans in the First Amendment context. *See Brown v. Enter. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011) (noting that laws "ma[king] [it] criminal to admit a person under 18 to church" would "not enforce parental authority over children's speech and religion; they impose governmental authority, subject only to a parental veto," and as such would be subject to constitutional challenge).[12] This Court should do the same here in the Second Amendment context.

The Anti-Carry Default thus imposes a barrier to entry that would not otherwise exist. No longer may law-abiding citizens carry firearms for self-defense in gas stations and grocery stores until the property owner removes consent. Those citizens may not enter the building while carrying firearms unless the property owner expressly provides consent. This barrier limits the "general right" to public carry that the Second Amendment's plain text protects—which is, after all, the point of such a rule. *Bruen*, 142 S. Ct. at 2134; *see* Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J. L., MED. &

---

[12] The State relies on an Eleventh Circuit decision upholding a carry restriction on limited private property. *See GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012). But that case was decided before *Bruen*, and it is *Bruen*'s text-and-history reasoning—which the Eleventh Circuit did not apply—that controls here. In addition, the Eleventh Circuit framed that case as one that actually pitted the right to carry against the right to exclude, holding that "the pre-existing right codified in the Second Amendment does not include protection for a right to carry a firearm in a place of worship *against the owner's wishes*," a right that Plaintiffs do not assert. *Id*. at 1265 (emphasis added).

ETHICS 183, 190 (2020) (noting that "many defaults *are never altered*," and thus "'no carry' defaults are public-regarding by *radically expanding the areas that are de jure gun free*." (emphasis added)).[13]

### ii. The State Cannot Prove that the Anti-Carry Default Is Consistent with a National Tradition of Firearm Regulation

The historical record contains no support for the Anti-Carry Default. Indeed, the only reason that New Jersey is not the first State in U.S. history to have enacted anything like the Anti-Carry Default is that New York did so in its own anti-*Bruen* law just a few months earlier. New York's provision was also preliminarily enjoined, though, unlike here, the injunctions have been stayed pending appeal, albeit without explanation. *See Antonyuk v. Hochul*, No. 1:22-cv-986, 2022 WL 16744700, at *86 (N.D.N.Y. Nov. 7, 2022); *Christian v. Nigrelli*, No. 22-cv-695, 2022 WL 17100631, at *12 (W.D.N.Y. Nov. 22, 2022); *see also Antonyuk v. Nigrelli*, 143 S. Ct. 481 (2023) (statement of Alito, J., respecting denial of application to vacate stay).

The Anti-Carry Default is the exact opposite of this Nation's traditional regulatory approach, which has entrusted "private property owners" with principal

---

[13] Professor Ayres is also a signatory to an amicus brief in this case that incorrectly focuses on a private property owner's right to exclude, which Plaintiffs do not challenge, and argues that government need not be neutral toward the exercise of Second Amendment right as it must be to the exercise of First Amendment rights, which would impermissibly turn the Second Amendment into a "second-class right." *Bruen*, 142 S. Ct. at 2156 (internal quotation marks omitted); *see* Br. for Professors of Property Law as *Amici Curiae* at 26, Doc. 57 (July 27, 2023).

responsibility to exercise the "right to exclude others from their property." *Christian*, 2022 WL 17100631, at *9. The historical default rule has been that "carrying on private property" is "generally permitted absent the owner's prohibition." *Id*. (emphasis added). This concept is basic to the law of trespass. As the District Court noted, "the well-developed concept of implied license . . . operates to grant permission to enter another's premises according to custom or other indicia of consent." JA137–38. Accordingly, as the District Court found, the right to carry for self-defense traditionally extends to private property open to the public unless the owner affirmatively "withdraw[s] consent." JA142. The State's attempt to distinguish between an "implied license *to enter* a property" and an "implied license *to carry a firearm* onto that property," State Br. at 45, ignores the "general right" to carry a firearm wherever a person goes within traditional regulatory boundaries. *Bruen*, 142 S. Ct. at 2134. And if New Jersey "business owners actually do not actually expect" that right to be exercised on their property, they can forbid firearm owners from carrying firearms on the property. That purported expectation cannot change the Second Amendment's meaning.

The State's only purported Founding-era support for its ahistorical rule—a Pennsylvania law from 1721, New Jersey laws from 1722 through 1895, and a New York law from 1763—were "what are called 'anti-poaching laws,' aimed at preventing hunters . . . from taking game off of other people's lands (usually

44

enclosed)." *Antonyuk*, 2022 WL 16744700, at *79. Hence the Pennsylvania law's application to anyone "carry[ing] any gun or hunt[ing] on the improved or inclosed lands of any plantation other than his own," the New Jersey law's reference to deer and the problems arising "Persons carrying of Guns and presuming to hunt on other Peoples Land," and the New York law's reference to hunting. JA961–62, 1341, 1636. New Jersey's later-enacted versions of the prohibition similarly referenced dogs, traps, and deer. JA1000–01. And the 1789 Massachusetts law, which applied only to certain islands around Martha's Vineyard, was, according to its title, passed to protect the islands' sheep and stock. JA1831–33. "Simply stated, the need to restrict fowling-piece-wielding poachers on fenced-in farms in 18th and 19th century America appears of little comparable analogousness to the need to restrict law-abiding responsible license holders in establishments that are open for business to the public today." *Antonyuk*, 2022 WL 16744700, at *80.

The State's assertion that "it is irrelevant whether these laws were *motivated* by concerns with poaching," State Br. at 43, is flatly contradicted by *Bruen*. As the State acknowledges, "how *and why*" a historical law burdened the right to armed self-defense "are '*central*' considerations when engaging in an analogical inquiry. *Bruen*, 142 S. Ct. at 2133 (first emphasis added). Whether poaching laws like New Jersey's applied "regardless of an *intent* to poach," State Br. at 43 (emphasis added), they were enacted to address that form of trespass on "inclosed land"—

which, as the Supreme Court of Judicature of New Jersey explained, was "a legal and technical word, and means inclosures, or inclosed fields: lands fenced in, and thus withdrawn and separated from the wastes or common lands." *State v. Hopping*, 18 N.J.L. 423, 424 (1842). And none of the relevant provisions make any reference to dwelling-houses or buildings of any kind. For example, the 1721 Pennsylvania law made it unlawful "to carry any gun or hunt on the improved or inclosed lands of any plantation," but banned only *shooting* in "the open streets of Philadelphia" or "gardens, orchards, and inclosures adjoining upon and belonging to any of the dwelling houses," preserving the public-carry right. JA1637. None of these laws are in any sense Chapter 131's distant cousin, much less its "twin." *Bruen*, 142 S. Ct. at 2133.[14]

Given this lack of relevantly similar Founding-era evidence, the State persists in relying on three statutes from the late nineteenth century. This evidence comes too late. It also is too little. As the State refuses to acknowledge, the laws from Louisiana and Texas were part of those former Confederate states' discriminatory "Black Codes," which systematically sought to take away the newly freed slaves' rights. *McDonald*, 561 U.S. at 847 (Thomas, J., concurring in part and concurring in

---

[14] The State's suggested definition of "inclosed"—as referring "to the myriad ways in which a property owner would have evidenced his possession/ownership of a parcel of land," State Br. at 47 n.7—does not alter the relevant facts. These laws applied to *land*, where poaching might occur, not to privately owned buildings.

the judgment) (detailing this discriminatory history); *Texas Black Codes*, DIGITAL HISTORY (2021), https://bit.ly/3KV7suz; *A Test Case For the President*, N.Y. Tribune (Mar. 7, 1866), *in* 9 PUBLIC OPINION: A COMPREHENSIVE SUMMARY OF THE PRESS THROUGHOUT THE WORLD ON ALL IMPORTANT CURRENT TOPICS 304 (1866) (quoting the Louisiana law in support of its argument that the government of Louisiana was "nothing but a machine for restoring to political power the rebels who, in 1861, . . . engineered the State out of the Union" and that "[f]or the blacks we find a code of laws establishing a system of serfdom, forbidding the free passage of blacks from one plantation to another, and under the form of apprenticeship and Vagrant laws, reenacting slavery in fact.").

These laws are, if anything, *anti*-analogues, demonstrating practices that the right to keep and bear arms was meant to combat. Indeed, these laws were enacted *before* Texas and Louisiana were readmitted to the Union.[15] Such laws should be left in the dustbin of history, not used as tools to restrict rights in the modern day. *Cf. Bruen*, 142 S. Ct. at 2149 (cautioning against reliance on laws where prosecutions were directed only against "black defendants who may have been targeted for selective or pretextual enforcement").

---

[15] *See An Act to Admit the States of North Carolina, South Carolina, Louisiana, Georgia, Alabama, and Florida to Representation in Congress*, 15 Stat. 73 (June 25, 1868); *An Act to Admit the State of Texas to Representation in the Congress of the United States*, 16 Stat. 80 (March 30, 1870).

In any event, these laws applied to "premises or plantations" or "inclosed premises or plantation[s]," JA1533, 1645, which, read as a whole, suggests an application only to farmland. *See Plantation*, WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) ("[p]lantation" as "[i]n the United States and the West Indies" is "a cultivated estate; a farm"); *Plantation*, WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) ("[i]n law, land or other things mentioned in the preceding part of a deed"). The State offers no evidence that these laws were read to apply to businesses and other private property open to the public. And to the extent there is any ambiguity, it must be interpreted in favor of the Second Amendment. *See Bruen*, 142 S. Ct. at 2141 n.11. These laws thus more closely approximate the colonial hunting statutes than the Anti-Carry Default.

The State's final analogue, from Oregon in 1893, was similar. Whether or not it had similarly unsavory origins, *cf. Ramos*, 140 S. Ct. at 1405, it prohibited "go[ing] or trespass[ing] upon an enclosed premises or lands" with a firearm. JA1651. Once again, therefore, it appears to have been aimed at hunting and does not appear to have reached into businesses and other private property open to the public, *see Antonyuk*, 2022 WL 16744700, at *79. In any event it is a single outlier enacted over 100 years after adoption of the Second Amendment and as such provides little if any insight into the original meaning of the Second Amendment. *See Bruen*, 142 S. Ct.

at 2153–54. Indeed, this law was enacted only twenty years before the original enactment of the New York may-issue policy invalidated in Bruen. *Id*. at 2132.

## II.    The Equities Favor Injunctive Relief

Plaintiffs will be irreparably harmed without a preliminary injunction. As the District Court recognized, "the threat of criminal prosecution for engaging in constitutionally protected conduct certainly is" irreparable. JA221 (cleaned up); *see also, e.g.*, *A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021). And in all events, the State does not contest that the denial of constitutional rights is itself irreparable. To hold otherwise here would be to treat the Second Amendment as a "'second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald*, 561 U.S. at 780).

The public interest likewise favors a preliminary injunction, which cannot harm the State. The State might have an interest in enforcing *constitutional* laws, but "neither the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law." *Am. Civ. Lib. Union v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003). Nor can speculative public-safety concerns justify even a temporary denial of Plaintiffs' constitutional rights. The *Bruen* Court rejected such appeals to "public safety" in rejecting means-ends scrutiny. *See* 142 S. Ct. at 2126–27. Just as courts may not engage in such scrutiny "under the guise of an analogical

inquiry," *id*. at 2133 n.7, courts may not do so when balancing whether the equities favor injunctive relief. Doing so would effectively "eviscerate the general right to publicly carry arms for self-defense." *Id*. at 2134.[16] And the effect of the challenged provisions will only be to make the people whom the State itself deems vulnerable to violent conflict—that is, people in so-called "sensitive places"—*more* vulnerable by removing their right to defend themselves in those places.

## CONCLUSION

The District Court's preliminary injunction of the Chapter 131 provisions challenged by the *Koons* Plaintiffs should be affirmed.

---

[16] Eviscerating the Second Amendment through interest-balancing at the equities stage is the thrust of the amicus brief filed by the Giffords Law Center. *See* Br. of Giffords Law Cntr. as *Amicus Curiae* at 3–17, Doc. 65 (July 27, 2023). The amicus briefs submitted by various other states and local New Jersey prosecutors—discussing, respectively, Chapter 131's reasonableness and its efficacy as a law-enforcement tool—likewise boil down to outdated arguments that generalized safety interests can outweigh the Second Amendment. *See* Br. for Dist. of Columbia et al. as *Amici Curiae*, Doc. 60 (July 27, 2023); Br. of *Amicus Curiae* Cnty. Prosecutor's Ass'n of N.J., Doc. 66 (July 27, 2023). By the same token, Intervenors' purported safety concerns cannot justify denying a preliminary injunction. *See* Intervenor Br. at 46–54.

Dated: August 21, 2023                    Respectfully submitted,

                                          /s/David H. Thompson
David D. Jensen                           David H. Thompson
DAVID JENSEN PLLC                         Peter A. Patterson
33 Henry Street                           COOPER & KIRK, PLLC
Beacon, New York 12508                    1523 New Hampshire Avenue, NW
(212) 380-6615                            Washington, DC 20036
david@djensenpllc.com                     (202) 220-9600
                                          (202) 220-9601 (fax)
                                          dthompson@cooperkirk.com
                                          ppatterson@cooperkirk.com

*Counsel for Plaintiffs-Appellees Ronald Koons, Nicholas Gaudio, Jeffrey M. Muller, Gil Tal, Second Amendment Foundation, Firearms Policy Coalition, Inc., Coalition of New Jersey Firearm Owners, and New Jersey Second Amendment Society*

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that I am a member of the bar of this Court.

Dated: August 21, 2023                  <u>s/ David H. Thompson</u>
David H. Thompson

*Counsel for Plaintiffs-Appellees Ronald Koons, Nicholas Gaudio, Jeffrey M. Muller, Gil Tal, Second Amendment Foundation, Firearms Policy Coalition, Inc., Coalition of New Jersey Firearm Owners, and New Jersey Second Amendment Society*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B)(i) because this brief contains 12,406 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word for Microsoft Office 365 in 14-point Times New Roman font.

As required by L.A.R. 31.1(c), the text of the electronic brief is identical to the text in the paper copies.

The Portable Document Format version of the attached document has been scanned for viruses using VirusTotal Antivirus Software, and according to that program, the document is free of viruses.

Dated: August 21, 2023

s/ David H. Thompson
David H. Thompson

*Counsel for Plaintiffs-Appellees
Ronald Koons, Nicholas Gaudio,
Jeffrey M. Muller, Gil Tal,
Second Amendment Foundation,
Firearms Policy Coalition, Inc.,
Coalition of New Jersey Firearm
Owners, and New Jersey Second
Amendment Society*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court

for the United States Court of Appeals for the Third Circuit by using the appellate

CM/ECF system on August 21, 2023. I certify that all participants in the case are

registered CM/ECF users and that service will be accomplished by the appellate

CM/ECF system.

Dated: August 21, 2023                    s/ David H. Thompson
                                          David H. Thompson

                                          *Counsel for Plaintiffs-Appellees*
                                          *Ronald Koons, Nicholas Gaudio,*
                                          *Jeffrey M. Muller, Gil Tal,*
                                          *Second Amendment Foundation,*
                                          *Firearms Policy Coalition, Inc.,*
                                          *Coalition of New Jersey Firearm*
                                          *Owners, and New Jersey Second*
                                          *Amendment Society*