UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 23-1900

RONALD KOONS, et al.,

      Plaintiffs-Appellees,

v.

MATTHEW J. PLATKIN, et al.,

      Defendants-Appellants,

  and

NICHOLAS P. SCUTARI, President
of the New Jersey Senate, and
CRAIG J. COUGHLIN, Speaker of
the New Jersey General Assembly,

    Intervenors-Defendants-Appellees.

On Appeal from the
United States District Court
for the District of New Jersey
(Nos. 22-cv-7463, 22-cv-7464 (RMB))

REPLY BRIEF OF INTERVENORS-DEFENDANTS-APPELLEES
NEW JERSEY SENATE PRESIDENT NICHOLAS P. SCUTARI AND
NEW JERSEY ASSEMBLY SPEAKER CRAIG J. COUGHLIN
IN FURTHER SUPPORT OF THE APPEAL
FILED BY THE STATE APPELLANTS

Leon J. Sokol, Esq.
**CULLEN AND DYKMAN, LLP**
**433 Hackensack Avenue**
**Hackensack, NJ 07601**
**(201) 488-1300**

Edward J. Kologi, Esq.
**KOLOGI • SIMITZ**
**00 N. Wood Avenue**
**Linden, NJ 07036**
**(908) 486-8877**

**Attorneys for Intervenors-
Defendants-Appellees Senate
President Nicholas P. Scutari and
General Assembly Speaker
Craig J. Coughlin**

**LEON J. SOKOL, ESQ.**
**EDWARD J. KOLOGI, ESQ.**
**Of Counsel and On the Brief**

**STEVEN SIEGEL, ESQ.**
**MICHAEL SIMITZ, ESQ.**
**On the Brief**

## TABLE OF CONTENTS

TABLE OF CITATIONS....................................................................... iii

INTRODUCTION ............................................................................. 1

LEGAL ARGUMENT ....................................................................... 2

POINT I.......................................................................................... 2

PLAINTIFFS-APPELLEES MISCONSTRUE THE SCOPE AND
APPLICATION OF THE *BRUEN* COURT'S "ANALOGIC
APPROACH"

POINT II ........................................................................................ 8

THE NEW JERSEY LEGISLATURE PROPERLY APPLIED
*BRUEN'S* FLEXIBLE ANALOGIC APPROACH WHEN
ENACTING CHAPTER 131 AND WHEN DESIGNATING
CERTAIN LOCATIONS AS SENSITIVE PLACES WHERE GUN
CARRY IS PROHIBITED

POINT III....................................................................................... 15

CONTRARY TO THE SIEGEL PLAINTIFFS' ASSERTION,
CHAPTER 131's INSURANCE REQUIREMENT FOR GUN-
CARRY PERMITS IS A VALID EXERCISE OF STATE POWER
AND DOES NOT INFRINGE PLAINTIFFS' SECOND
AMENDMENT RIGHTS.

POINT IV ....................................................................................... 22

PLAINTIFFS-APPELLEES INEXPLICABLY HAVE FAILED TO
ADDRESS -- LET ALONE SATISFY -- THE THIRD AND FOURTH
STANDARDS OF INJUNCTION ANALYSIS, I.E., HARM TO
OTHERS AND THE PUBLIC INTEREST. ACCORDINGLY, THIS
COURT SHOULD VACATE THE DISTRICT COURT'S PARTIAL

**GRANT OF PRELIMINARY INJUNCTIVE RELIEF AS APPLIED TO CERTAIN LEGISLATIVELY DESIGNATED SENSITIVE PLACES IN LIGHT OF THE SUBSTANTIAL EVIDENCE IN THE RECORD ESTABLISHING THE POSSIBILITY OF HARM TO OTHER INTERESTED PERSONS IF SUCH PRELIMINARY INJUNCTIVE RELIEF WERE CONTINUED.**

**CONCLUSION** ................................................. **29**

**CERTIFICATIONS** ........................................... **30**

# TABLE OF CITATIONS

## Cases

*Antonyuk v. Hochul*,
  2022 WL 18228317 (2d Cir. 2022) ..................................... 28

*Cox v. New Hampshire*,
  312 U.S. 569 (1941) ............................................ 21

*Forsyth County v. Nationalist Movement*,
  505 U.S. 123 (1992) ............................................ 21

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
  710 F.3d 99 (3d Cir. 2013) ........................................ 23, 24

*Kos Pharms. Inc. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 1994) ........................................ 22

*Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*,
  2023 WL 4552284 (N.D. Cal. 2023) ................................ 20

*New York State Rifle & Pistol Assoc., Inc. v. Bruen*,
  142 S.Ct. 2111 (2022) .................................... *Passim*

*Reilly v. City of Harrisburg*,
  858 F.3d 173 (3d Cir 2017) ......................................... 22, 27

*The Nationalist Movement v. City of York*,
  481 F.3d 178 (3d Cir. 2007) ...................................... 21

## Statutes

N.J. Laws of 2022, Ch. 131 ........................................ *Passim*

N.J.S.A. 2C:58-4.4 .............................................. 14

## Other Authorities

A. Conan Doyle, The Adventure of Silver Blaze (1892) ....................................... 25

John J. Donohue et al., *Right to Carry Laws and Violent Crime: A Comprehensive Assessment Using Data and a State-Level Synthetic Control Analysis*, 16 J. Empirical Legal Stud. 198 (April 2019) ............................................................ 26

Michael Siegel, et al, *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 127 Am. J. Pub. Health 1923-29 (Dec. 2017) .................................................................................................................. 26

# **INTRODUCTION**

Senate President Nicholas P. Scutari and General Assembly Speaker Craig J. Coughlin (hereafter collectively "the Presiding Officers") intervened in the action below. The Presiding Officers sought to present the perspective of the New Jersey Legislature in connection with its enactment of L. 2022, c. 131 (hereafter "Chapter 131"). As intervenors, the Presiding Officers fully participated in the preliminary injunction proceedings before the District Court. Presently, the Presiding Officers are appellees but are presenting argument on the side of the State Appellants.

By our opening brief to this Court, we presented three discreet legal arguments that are intended to supplement the principal arguments that are presented by the State Appellants. Our first argument addressed Plaintiffs' challenge to Chapter 131's designation of various "sensitive places" in which the carry of firearms is prohibited. Our second argument addressed Plaintiffs' challenge to Chapter 131's provision that generally requires gun-carry permit holders to procure liability insurance in connection with liability resulting from a gun incident. Our third argument addressed Plaintiffs' entitlement to preliminary injunctive relief in light of the "harm to third parties" and "public interest" standards that are conditions precedent to the granting of such relief.

By this reply brief, we address and rebut Plaintiffs' various contentions that were proffered against each of our three arguments.

1

## LEGAL ARGUMENT

## POINT I

**PLAINTIFFS-APPELLEES MISCONSTRUE THE SCOPE AND APPLICATION OF THE *BRUEN* COURT'S "ANALOGIC APPROACH"**

A key question presented on this appeal pertains to the scope and application of the *Bruen* Court's analogic approach as applied to Chapter 131's designation of sensitive places wherein gun carry is prohibited. The Koons Plaintiffs contend that, under *Bruen*, a court assessing the validity of sensitive-place provisions is required "to assess [that these provisions] are consistent with the Second Amendment's text and historical understanding." Koons Br., at 16-17 (citing <u>Bruen</u>, 142 S. Ct. at 2131). <u>See</u> <u>also</u> Siegel Br., at 35 (stating that "the state must demonstrate that each [sensitive-place] restriction is consistent with the Nation's historical tradition of firearm regulation") (citing <u>Bruen</u>, 142 S. Ct. at 2126).

As a general proposition, we concur with Plaintiffs' broad characterization of *Bruen's* historical analogue approach. However, we part company with Plaintiffs' understanding of what *Bruen* **actually requires** in applying historical analogues to each sensitive-place designation under review.

As more fully discussed in our opening brief, the *Bruen* Court recognized a flexible "analogic approach" to the challenge of applying the dictates of the Second Amendment to contemporary society. In substance, *Bruen* held that: (1) schools

2

and government buildings are examples of sensitive places, but not an exhaustive list of what sensitive places are; (2) banning weapons in sensitive places has a longstanding historical pedigree, which does not violate or run afoul of the Second Amendment; and (3) when necessary, a district court may use analogical reasoning to identify other sensitive places. *Bruen*, 142 S.Ct. at 2132-35. The Court also determined that "central considerations when engaging in an analogical inquiry" are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. The Court stressed "that analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin" or "dead ringer." *Id*. at 2133. Finally, the Court identified two metrics to guide the analogic inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Ibid.*

Importantly, the *Bruen* Court acknowledged this self-evident truth: "The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 142 S.Ct. at 2132. The Court thus recognized the shortcomings of a strictly historical approach to constitutional interpretation in light of the United States' profound social, economic and technological changes that have taken place over the past 230 years.

The flexibility of the *Bruen* Court's analogic approach is shown by the Court's refusal to limit "arms" "only [to] those arms in existence in the 18th century." *Bruen,* 142 S.Ct. at 2132. The Court noted:

> Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, **to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.** *Ibid.*

> [*Bruen,* 142 S.Ct. at 2132 (emphasis added)]

For the same reason, the *Bruen* Court expressly acknowledged that this flexible analogic approach also applies to delineation of "sensitive places" under the Second Amendment – in that such sensitive places should not be limited to those places that were in existence in the 18th century. *Bruen,* 142 S.Ct. at 2132. The Court explained: "Much like we use history to determine which modern 'arms' are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding." *Ibid*. In other words, if the meaning and application of "arms" is not fixed, neither should the meaning and application of "sensitive places" be fixed to only those precise places that were in existence in 1791. Instead, what is required is a flexible analogic approach to both. *See id.*

A key paragraph in the *Bruen* opinion delineates the scope and application of the sensitive places doctrine:

4

Consider, for example, *Heller*'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited -- *e.g.*, legislative assemblies, polling places, and courthouses -- we are also aware of no disputes regarding the lawfulness of such prohibitions. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. **And courts can use analogies to those historical regulations of "sensitive places" to determine those modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible.**

[*Bruen*, 142 S. Ct. at 2133-34 (emphasis added)].

Stated succinctly, (1) schools and government buildings are examples of sensitive places, but not an exhaustive list of what sensitive places are; (2) banning weapons in sensitive places has a longstanding historical pedigree, which does not violate or run afoul of the Second Amendment; and (3) when necessary, a District Court may use analogical reasoning to identify other sensitive places.

In other key passages, the *Bruen* Court further addresses sensitive places doctrine and the permissible use of historical analogues. The *Bruen* Court underscored that "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Bruen*, 142 S. Ct. at 2133. Thus, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 2133. Later in the opinion, the *Bruen* Court

5

cautioned that the scope and application of historical analogues (to modern circumstances) are not unlimited.  The Court offered this example:

> Although we have no occasion to comprehensively define "sensitive places" in this case, we do think respondents err in their attempt to characterize New York's proper-cause requirement as a "sensitive-place" law. In their view, "sensitive places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available."… **It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations.** But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below. Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.
>
> [*Bruen*, 142 S. Ct. at 2133-34 (emphasis added)]

Critically, the *Bruen* Court recognized that high population density and a high level of general police protection can and do serve as a talisman of many constitutionally permissible sensitive places. *Id.* at 2133-34.   However, these defining characteristics cannot be stretched so far so as to exempt a broad geographic area (Manhattan is 22 square miles) from the reach of the Second Amendment.  "Entire cities" cannot be exempted from the Second Amendment. *Id.* at 2134.

In other words, the *Bruen* Court set an "outer limit" on the permissible level of generality underlying an historical analogy to sensitive places. By necessary implication, although constitutionally permissible sensitive places cannot extend to entire cities or to large expanses of urban areas generally, the designation of sensitive areas *can and should* extend to other locations that are characterized by high population density and a high level of general police protection -- as long as those areas are reasonably compact. *Id.* at 2133-34.

This, then, is the conceptual framework underlying *Bruen*'s analogic approach. The approach is flexible and operates at a high level of generality – as would be expected when applying historical standards to contemporary society. Thus, the analogic inquiry turns on "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. In applying the approach, courts are instructed to employ two broad metrics: i.e., "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Ibid.* The essential flexibility of the approach is also confirmed by the Court's instruction "that analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin" or "dead ringer." *Id.* at 2133.

## POINT II

**THE NEW JERSEY LEGISLATURE PROPERLY APPLIED *BRUEN'S* FLEXIBLE ANALOGIC APPROACH WHEN ENACTING CHAPTER 131 AND WHEN DESIGNATING CERTAIN LOCATIONS AS SENSITIVE PLACES WHERE GUN CARRY IS PROHIBITED**

In enacting Chapter 131, the New Jersey Legislature properly applied *Bruen*'s flexible analogic approach. This is exemplified by the Legislature's express findings and declarations (underlying Chapter 131's sensitive place designations) that are premised on – and apply -- the *Bruen* Court's analogical approach:

> The sensitive-place prohibitions on dangerous weapons set forth in this act are rooted in history and tradition. They are analogous to historical laws that can be found from the Founding era to Reconstruction, which are also found in modern laws in many states. History and tradition support at least the following location based restrictions on carrying firearms:
>
> (1) Places that are the site of core constitutional activity, such as but not limited to the exercise of First Amendment rights, or that are otherwise vital to the functioning of democracy and our system of government. That includes prohibitions of firearms in facilities within the criminal justice system;
>
> (2) Schools, universities, other educational institutions, where people assemble for educational purposes and for the purposes of teaching, learning, research, and the pursuit of knowledge;
>
> (3) Parks and other recreation spaces, including locations where children congregate;
>
> (4) Locations that protect vulnerable classes of people, such as the young and the frail;

(5) Places where intoxicating substances are sold, places where large groups of individuals congregate, and places where volatile conditions may pose a threat to public safety; and

(6) Various forms of transportation and public infrastructure, whose safety, security, and stability are critical to supporting social function.

[L. 2022, c. 131, §1]

As briefly discussed below, the Legislature's findings and declarations are fully consistent with *Bruen*'s analogic approach to the delineation of constitutionally permissible sensitive places in contemporary society that encompass relevant characteristics and features that are analogous to historically recognized sensitive places.

For example, the Legislature designated as sensitive places (among other locations): (1) places owed by government or controlled by government "for the purpose of government administration"; (2) courthouses; (3) polling places; (4) "publicly owned or leased librar[ies] or museum[s]"; (5) a "place where a public gathering, demonstration or event is held for which a government permit is required"; and (6) "a public location used for making motion picture or television images." Chapter 131, §§7(a)(1), (2) (5), (6), (12), (23). What all of these places have in common are that they are ""[p]laces that are the site of core constitutional activity, such as but not limited to the exercise of First Amendment rights." Chapter 131, §1.

Chapter 131's designations of locations where core constitutional rights, including First Amendment rights, are regularly exercised are properly deemed a sensitive place under the Second Amendment.  This is so because: (1) under *Bruen,* legislative assemblies, courthouses and polling places are historically recognized sensitive places; and (2) the distinguishing feature of legislative assemblies, courthouses and polling places is that these are locations wherein core constitutional rights are regularly exercised.  *Bruen*, 142 S.Ct. at 2133.  *See also Heller*, 554 U.S. at 626 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on ... laws forbidding the carrying of firearms in sensitive places such as ... government buildings ....").

***

Similarly, the Legislature designated as sensitive places (among other locations): (1) a juvenile justice facility; (2) a school, college, university or other educational facility and on any school bus; (3) a child care facility, including a day care facility; a nursery school, pre-school, zoo or summer camp; (4) youth sports events; (5) a shelter for the homeless; (6) a community residence for persons with developmental disabilities and similar community facilities; and (7) a health care facility.  Chapter 131, §§7(a)(3), (7), (8), (9), (11), (1#, (14), (21).

What these places have in common are that they are: (1) "[s]chools, universities [or] other educational institutions where people assemble for

educational purposes and for the purposes of teaching, learning, research, and the pursuit of knowledge; and (2) locations that protect vulnerable classes of people, such as the young and the frail." Chapter 131, §1. A school is a place where defenseless young children congregate. Schools serve diverse populations, including children with disabilities.

In that sense, all of the above-referenced locations enumerated in Chapter 131 – serving vulnerable classes of people, including the young and the frail -- are analogous to schools. Significantly, the Court in *Bruen* held, as a matter of law, that a school is a sensitive place within the meaning of the Second Amendment. *Bruen*, 142 S.Ct. at 2133 ("We therefore can assume it settled that these locations [including schools] were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment"). *See also Heller*, 554 U.S. at 626 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on ... laws forbidding the carrying of firearms in sensitive places such as ... schools.").

The *Bruen* Court instructed that – with respect to "schools" -- courts can use analogies to those historical regulations of "sensitive places" to determine that "modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Bruen*, 142 S.Ct. at 2133. *Here, the New Jersey Legislature did just as the Bruen Court instructed.* The Legislature

11

determined that – like schools – locations such as day care centers, youth sports events, health care facilities and homeless shelters – are "locations that protect vulnerable classes of people, such as the young and the frail." Chapter 131, §1. Under the *Bruen* analogical approach, day care centers, youth sports events, health care facilities and homeless shelters (among other locations) are properly deemed "sensitive places" by reference to a school – which unquestionably is a broadly analogous "sensitive place" location.

*\*\*\**

The Legislature also designated as sensitive places: (1) a bar or restaurant where alcohol is served; (2) a privately or publicly owned entertainment facility, including but not limited to a theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held; and (3) casino and related facilities. Chapter 131, §§7(a) (15), (17), (18). What these places have in common are that they are "places where large groups of individuals congregate, and places where volatile conditions may pose a threat to public safety." Chapter 131, §1.

As more fully discussed above, the *Bruen* Court -- in rejecting the entire island of Manhattan as a constitutionally permissible sensitive place -- set an "outer limit" on the permissible level of generality underlying an historical analogy to sensitive places. *Bruen*, 142 S.Ct. 2133-34. Entire cities are not to be deemed a

"sensitive place" within the meaning of the Second Amendment.   However, the *Bruen* Court recognized that high population density and a high level of general police protection can and do serve as a talisman of many constitutionally permissible sensitive places. *Id.* at 2133-34.   More particularly, *Bruen* held that, although constitutionally permissible sensitive places cannot extend to entire cities, the designation of sensitive areas *can and should* extend to other locations that are characterized by high population density and a high level of general police protection -- as long as those areas are reasonably compact.  *Ibid*.

This interpretation of *Bruen* is buttressed by reference to *Bruen*'s "central considerations when engaging in an analogical inquiry."   *Bruen*, 142 S.Ct. at 2133.  These central considerations – what the Court also refers to as "metrics" – are "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Ibid*.

In the context of a densely populated venue, the "how and why the regulations burden a law-abiding citizen's right to armed self-defense" is simply this: armed self-defense in this context presents significant threats to third parties, including bystanders and the police.  If a substantial portion of attendees at a stadium are legally armed (which is possible, even likely, if the venue is *not* designated a sensitive place), the net result would be a tinderbox that could erupt at

any time based on a minor dispute or a misunderstanding.  This is especially so in a venue in which alcoholic beverages are served.[1]

Stated succinctly, the "how and why the regulations burden a law-abiding citizen's right to armed self-defense" is that the regulation *does not burden the law-abiding citizen.*  In densely populated stadiums, arenas or indoor entertainment venues, the law-abiding citizen is safer relying on a highly trained police presence for protection in a designated gun-free venue rather than relying on his or her firearm in a venue that may be awash in firearms held by other attendees.

---

[1] The effect of alcohol consumption on human behavior is well-documented. An average adult male who consumes one drink will experience a blood alcohol content (BAC) of .02.  Even this relatively low BAC produces an effect of lightheadedness and an impairment of judgment.  Consumption of three to four drinks will yield a BAC of .9 – which will result in a substantial impairment of balance, speech, vision and self-control.  https://www.utoledo.edu/studentaffairs/

In light of these statistics correlating alcohol consumption and a resulting impairment of judgment, it makes no more sense to allow armed civilians to enter premises where alcoholic beverages are served than it would be to allow individuals to drive while intoxicated.

Moreover, it is noteworthy that that the Siegel Plaintiffs have pointedly stated that they do not challenge the provisions of Chapter 131 that prohibit an individual from carrying a handgun while intoxicated or while consuming alcohol.  *See* Siegel Pl. Br., at 51, n.11 (citing N.J.S.A. 2C:58-4.4(a)(1)-(2)).  Given that these Plaintiffs recognize the compelling public-safety rationale that makes unlawful the carrying of a handgun by a person who is consuming alcohol, it would be surprising if these Plaintiffs did not *also* recognize the compelling public-safety rationale that supports making unlawful the prohibition of handguns in eating and drinking establishments that are licensed to serve alcoholic beverages.

## POINT III

**CONTRARY TO THE SIEGEL PLAINTIFFS' ASSERTION, CHAPTER 131's INSURANCE REQUIREMENT FOR GUN-CARRY PERMITS IS A VALID EXERCISE OF STATE POWER AND DOES NOT INFRINGE PLAINTIFFS' SECOND AMENDMENT RIGHTS.**

The Siegel Plaintiffs challenge the constitutionality of Chapter 131's provision that generally requires gun carry permittees to procure liability insurance in connection with civil liability resulting from a gun incident. *See* L. 2002, c. 231, §4. Plaintiffs contend that Chapter 131's insurance requirement is an unconstitutional condition to the exercise of their Second Amendment right.[2] The District Court below agreed – finding that Plaintiffs are likely to prevail on their Second Amendment challenge to Chapter 131's insurance requirement. Op., at 89. However, as fully set forth in our opening brief, Chapter 131's insurance requirement is a valid exercise of state power and does not infringe Plaintiffs' Second Amendment rights.

More particularly, we argued in our opening brief that Chapter 131's insurance requirement does not infringe on any cognizable right secured by the

---

[2] Although the Siegel Plaintiffs have challenged Chapter 131's insurance requirement, they have not alleged -- let alone established -- an inability to afford insurance that would comply with Chapter 131. Moreover, many concealed-carry permitholders already comply with Chapter 131's insurance requirement by way of their existing homeowner's or renter's insurance policies. *See* S.E. 87 (Kochenberger Cert., ¶1). In any event, the Second Amendment's text confers no right to bear arms *for free*.

Second Amendment.  Furthermore, even if the insurance requirement were to fall within the scope of the rights protected by the Second Amendment, the insurance requirement is *nevertheless* constitutionally permissible by reference to the well-established standards that govern fee and insurance requirements in connection with government-issued permits to engage in First Amendment expressive activity on public streets and parks.   Finally, even if the insurance requirement were to fall within the scope of the rights protected by the Second Amendment, the insurance requirement is *nevertheless* constitutionally permissible by reference to historical firearms regulation. *See* Pr. Off. Opening Br., at 39-45.

In their principal brief, the Siegel Plaintiffs contest the foregoing arguments. We address and rebut each of Plaintiffs' arguments in turn.

Plaintiffs first contend that Chapter 131's insurance requirement is an unconstitutional condition on the exercise of their Second Amendment right because "the law … operates like the proper cause requirement in *Bruen*, dictating which people may carry handguns."  Siegel Pl. Br., at 19.   However, Plaintiffs' contention does not withstand scrutiny.

Plaintiffs' reading of *Bruen* is untethered to the Court's reasoning and result. First off, the Court in *Bruen* mentions not one word with respect to an insurance requirement applicable to the issuance to a carry-permit license. Instead, the constitutional infirmity recognized in *Bruen* is limited to the "proper cause"

16

requirement of New York's carry-permit law. *Bruen*, 142 S. Ct. at 2123 (citing *N.Y. Penal Law Ann.* § 400.00(2)(f)). Moreover, a statutory insurance requirement for carry-permit holders does not "effectively prevent[] its law-abiding residents from carrying a gun for [self defense]." *Id.* at 2157 (Alito, J., concurring). Rather, the insurance requirement is akin to obligations appurtenant to carrying firearms, including fingerprinting, application fees, and firearms training instruction, which fall outside the text of the Second Amendment. *See Bruen*, 142 S. Ct. at 2138, n.9 (noting with approval that "shall-issue" regimes often require licensing applicants to "undergo a background check or pass a firearms safety course").

Second, Chapter 131's insurance requirement is *even less burdensome* to the gun-carry permitholder then other requirements (such as fingerprinting, application fees, and firearms training instruction) that the *Bruen* Court expressly upheld. *See id.* Indeed, in a very real sense, Chapter 131's insurance requirement is arguably a *benefit* (rather than a burden) to gun-carry permitholders. After all, an insurance policy applicable to firearms will protect not only the public at large but also the gun-carry permitholder herself in the event of liability to the permitholder caused by the accidental or non-criminal discharge of a firearm. Stated otherwise, firearm insurance is not only in society's interest, it is in the permitholder's own self-interest.

Imagine a hypothetical scenario in which automobile insurance was not

mandatory.  Under this scenario, a prudent person might well decline to get into a

car and drive on the public highway if their actions or omissions as a driver were

uninsured.   That same prudent person likely would hesitate to procure a gun carry

permit if their actions or omissions as a gun owner were uninsured.   The effect of

Chapter 131's insurance requirement is to benefit that "prudent person" by

spreading the risk of loss to the largest pool of insured persons – thereby allowing

for lower premiums and benefitting both society as a whole and the insureds

themselves. So viewed, Chapter 131's insurance requirement is a benefit – not a

burden -- to the gun-carry permitholder within the meaning of *Bruen*.

　　　For all of these reasons, Chapter 131's insurance requirement does not

infringe on any cognizable right secured by the Second Amendment.

***

　　　Even assuming, arguendo, that Chapter 131's insurance requirement were to

fall within the scope of the rights protected by the Second Amendment, the

insurance requirement is *nevertheless* constitutionally permissible by reference to

historical firearms regulation.   Indeed, the *Bruen* Court itself carefully considered

the "surety statutes" that at least nine jurisdictions enacted both before and shortly

after the ratification of the Fourteenth Amendment and rejected any notion that

such financial requirements were "a severe constraint" on Second Amendment

conduct.  *Bruen*, 142 S.Ct. at 2148-50.  These surety statutes required individuals

to post, or have a third-party post, a bond before they could carry a firearm. *See* Eric M. Rubenm & Saul Cornell, *Firearm Regulation and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Y.L.J.F. 121, 131 (2014). The *Bruen* Court observed that "the surety laws did not prohibit public carry in locations frequented by the general community," *Bruen*, 142 S.Ct. at 2148, and that "the burden these surety statutes may have had on the right to public carry was likely too insignificant to shed light on" the regulation at issue, *id*. at 2149. At the same time, the Court recognized that the minimal economic burden that these statutes imposed promoted public interests, including the "prevention" of gun harms and "provid[ing] financial incentives for responsible arms carrying." *Id.* at 2150.

Against this backdrop, Plaintiffs challenge the applicability of surety laws as a sufficient historical analogue with respect to the permissibility of insurance requirements under the Second Amendment. Plaintiffs assert that surety laws applied only to those who were "reasonably accused of intending to injure another or breach the peace," Siegel Pl. Br., at 21 (quoting *Bruen*, 142 S.Ct. at 2148-49); whereas "the insurance mandate requires all who wish to carry handguns in public to obtain insurance," *ibid*. However, Plaintiffs' attempt to distinguish and minimize surety laws as a historical analogue (to a modern insurance requirement) overlooks the findings of *Bruen* Court itself. As previously noted, the *Bruen* Court expressly recognized that the minimal economic burden that the surety statutes

19

imposed promoted public interests, including the "prevention" of gun harms and "provid[ing] financial incentives for responsible arms carrying." 142 S.Ct. at 2150. *See also Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*, 2023 WL 4552284, at *7 (N.D. Cal. 2023) (determining that 19th century surety statutes are "sufficiently analogous" to California's insurance requirement for gun carry permit holders and, consequently, dismissing the plaintiffs' challenge to California's gun-carry licensing statute). Thus, Plaintiffs' attempts to discredit surety laws as a permissible historical analogue are properly rejected by reference to *Bruen* itself as well as by reference to case law decided thereunder. [3]

\*\*\*

Finally, as we argued in our opening brief, Chapter 131's insurance requirement for gun-carry permits is constitutionally permissible by reference to the well-established standards that govern fee and insurance requirements in

---

[3] Furthermore, the broader *historical* importance of insurance is analyzed at considerable length in the brief of *amicus curiae* Brady in support of Appellants. For example, the Brady *amici* point out that "[Chapter 131's insurance requirement] is consistent with how early Americans adopted … responsible gun-safety laws that were considered sensible at the time." Brady Br., at 2. Viewed in this light, the Brady *amici*'s analysis properly places Chapter 131's insurance requirement in the context of this country's "long history of using innovative financial regulation to solve complex and novel societal problems, including imposing financial obligations on gun owners to preserve public safety." *Ibid.* In this sense, Chapter 131's insurance requirement is fully consistent with the *Bruen* Court's "nuanced approach" to evaluating firearms regulations. Brady Br., at 3 (quoting *Bruen*, 142 S.Ct. at 2132).

connection with government-issued permits to engage in First Amendment expressive activity on public streets and parks. An insurance requirement imposed in connection with the exercise of *First Amendment* rights – such as a requirement incident to the issuance of a street permit for expressive activity – is common throughout the United States.  In the First Amendment context, insurance and permit fee requirements are upheld, provided that the amount of required insurance coverage and fees are uniform and are not imposed based on the content of the expressive activity.  *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (holding that fee regime for permitting expressive activity in a public forum will be upheld provided that it does "not delegate overly broad licensing discretion to a government official"); *The Nationalist Movement v. City of York*, 481 F.3d 178, 184 (3d Cir. 2007) ("It is beyond peradventure that a city can establish a permit scheme whose goal is to assure financial accountability for damage caused by an event").

Plaintiffs fail to address – let alone rebut – this applicability of this well-established case law upholding insurance and fee requirements in the First Amendment context. Given that uniform permit fees and insurance requirements have long been upheld in the First Amendment context, such requirements also should be upheld in the Second Amendment context of gun-carry regulations.

21

## POINT IV

**PLAINTIFFS-APPELLEES INEXPLICABLY HAVE FAILED TO ADDRESS -- LET ALONE SATISFY -- THE THIRD AND FOURTH STANDARDS OF INJUNCTION ANALYSIS, I.E., HARM TO OTHERS AND THE PUBLIC INTEREST. ACCORDINGLY, THIS COURT SHOULD VACATE THE DISTRICT COURT'S PARTIAL GRANT OF PRELIMINARY INJUNCTIVE RELIEF AS APPLIED TO CERTAIN LEGISLATIVELY DESIGNATED SENSITIVE PLACES IN LIGHT OF THE SUBSTANTIAL EVIDENCE IN THE RECORD ESTABLISHING THE POSSIBILITY OF HARM TO OTHER INTERESTED PERSONS IF SUCH PRELIMINARY INJUNCTIVE RELIEF WERE CONTINUED.**

As more fully discussed in our opening brief, preliminary injunctive relief "is an extraordinary remedy and should be granted only in limited circumstances." *Kos Pharms. Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 1994).  Such relief may be granted by the court only if the plaintiff satisfies *all* of the following four factors:

> (1) a reasonable probability of eventual success in the litigation, and (2) that [they] will be irreparably harmed.. if the relief is not granted… [In addition], the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

[*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir 2017)]

Here, if the District Court's Preliminary Injunction Order were affirmed by this Court, the evidence in the record strongly suggests "the possibility of harm to other interested persons" and a result that would be inimical to "the public interest."

*Ibid.* That being so (and for this reason alone), affirmance of the District Court's Preliminary Injunction Order is not warranted on this record.

Against this backdrop, the Plaintiffs – in over 100 pages of briefing – expend a total of three paragraphs addressing the essential third and fourth factors that are conditions precedent to the grant of preliminary injunctive relief. *See* Koons Pl. Br., at 49-50; Siegel Pl. Br., at 64-65.

For their part, the Koons Plaintiffs simply state: "the State does not contest that the denial of constitutional rights is itself irreparable" and the "Government [cannot] claim an interest in the enforcement of an unconstitutional law." Koons Pl. Br., at 49. However, the Koons Plaintiffs' conclusory assertion begs the question of whether the enforcement of Chapter 131 amounts to the denial of Plaintiffs' constitutional rights – *the very question that lies at the heart of this appeal.* It is rather odd (as well as presumptuous) for Plaintiffs to simply assume that the above question is to be answered in the affirmative (when that task is reserved for this Court) as a means to avoid addressing the third and fourth factors of preliminary injunction analysis.

Similarly, the Siegel Plaintiffs contend that the third and fourth factors of preliminary injunction analysis can be summarily dispensed with. Siegel Pl., at 64-65. Relying on this Court's decision in *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013), the Siegel Plaintiffs recite the holding

therein that "preliminary injunctive relief here is in the public interest because the enforcement of an unconstitutional law vindicates no public interest."   Siegel Pl., at 64-65 (citing *K.A.*, 710 F.3d at 114).  But the Third Circuit in *K.A.* already had held that the defendant had engaged in unconstitutional conduct when the court concluded that "public interest" analysis was unnecessary in light of its holding. *Id.* at 112-14.  *That is decidedly not the case here.*

Here, in contrast, the Siegel Plaintiffs argue that because they *purportedly* have established the "probable success" and "irreparable harms" prongs of preliminary injunction analysis, they need not bother to address the "harm" and "public interest" factors of preliminary injunction analysis.    Siegel Pl. Br., at 64. But, again, to state the obvious: the decision with regard to the application of the "probable success" and "irreparable harms" prongs is reserved for this Court – not for Plaintiffs.  Stated otherwise, given that the "harm" and "public interest" factors are conditions precedent to preliminary injunctive relief, Plaintiffs' outright dismissal of these factors is baffling.

Perhaps Sherlock Holmes offers a clue.  The "mystery" of Plaintiffs' silence with regard to the "harm" and "public interest" factors seems quite reminiscent of the famous Sherlock Holmes story that turned on the evidentiary significance of

"the dog that didn't bark."[4]  In the face of the substantial evidence in the record that establishes a powerful connection between an increased number of guns on the streets and incidents of gun violence, Plaintiffs are as mute as the dog in the Sherlock Holmes story.

The evidence in the record is compelling that substantial harm to others would be the likely result in the event that the preliminary injunction were affirmed on appeal and/or if the Siegel cross-appeal were granted. As more fully set forth in our opening brief, a study published in the American Journal of Public Health

---

[4] See A. Conan Doyle, The Adventure of Silver Blaze (1892).  "Silver Blaze" is the story of the disappearance of a race horse. It is believed that a stranger stole the horse, but Holmes is able to pin the horse's disappearance on the horse's trainer because a dog at the horse's stable did not bark on the night of his disappearance. The following exchange takes place in the short story:

> Gregory (Scotland Yard detective): "Is there any other point to which you would wish to draw my attention?"
>
> Holmes: "To the curious incident of the dog in the night-time."
>
> Gregory: "The dog did nothing in the night-time."
>
> Holmes: "**That** was the curious incident."

According to Holmes, "I had grasped the significance of the silence of the dog… Obviously the midnight visitor was someone whom the dog knew well. It was [the horse's trainer] who removed Silver Blaze from his stall and led him out on to the moor."

Here, the evidentiary principle of "the dog that didn't bark" applies to Plaintiffs' virtual silence on the application of the "harm" and "public interest" standards that are conditions precedent to the grant of preliminary injunctive relief.

(hereafter the AJPH study") focused on states that adopted shall-issue CCW laws.

*See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5678379/pdf (Michael Siegel, et al, *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 127 Am. J. Pub. Health 1923-29 (Dec. 2017)). The AJPH study "examine[d] the relation of "shall-issue" laws in which permits must be issued if requisite criteria are met; "may-issue" laws, which give law enforcement officials wide discretion over whether to issue concealed firearm carry permits or not; and homicide rates." *Id.* at 1023. The study concluded that "shall-issue laws were significantly associated with **6.5%** higher total homicide rates, **8.6%** higher firearm homicide rates, and **10.6%** higher handgun homicide rates." *Ibid.*

Similarly, a study published in the Journal of Empirical Legal Studies (hereafter "the JELS study") also focused on states that adopted "shall issue" CCW laws. *See* https://onlinelibrary.wiley.com/doi/abs/10.1111/jels.12219 (John J. Donohue, et al, *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, 16 J. Empirical Legal Stud. 198-247 (April 2017)). The study concluded that "shall issue" CCW laws "are associated with **13–15 percent higher aggregate violent crime rates** 10 years after adoption." *Id*. at 198.

We turn now to the application of these scholarly research findings to the

issues raised on this appeal.  At issue on this appeal is the question of the effect of the District Court's partial grant of preliminary injunctive relief as applied to certain sensitive-place designations *that would have been gun-free zones absent the grant of preliminary injunctive relief.* These places include: (1) public gatherings; (2) zoos; (3) parks, beaches and recreation facilities; (4) libraries/museums; (5) places that serve alcohol; (6) entertainment facilities; and (7) medical facilities.  What these places have in common is that that they contain high population density in which there is the greatest risk of multiple injuries or deaths from acts of gun violence.  On this record – and in light of the substantial scholarly research -- the conclusion to be drawn is that the continuation of the District Court's preliminary injunctive relief as applied to these locations would increase "the possibility of harm to other interested persons" and would be antithetical to the public interest. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir 2017).

***

To sum up: when the foregoing public interests (including the resulting harm to others if the injunctive relief were granted by this Court) are balanced against the interests of Plaintiffs in carrying their firearms in certain places designated as "sensitive" by the Legislature during the pendency of this litigation, it is respectfully submitted that the hardships and equities strongly weigh in favor of preventing additional likely gun-related violence during the pendency of this

litigation. For this reason (among others), this Court should reverse the portion of the District Court's decision below granting in part Plaintiffs' motion for a preliminary injunction. *See Antonyuk v. Hochul,* 2022 WL 18228317 (2d Cir. 2022) (concluding that "a stay pending appeal is warranted" of a district court's order enjoining various sensitive-place designations in New York's new post-*Bruen* gun-carry statute).

## <u>CONCLUSION</u>

For the reasons set forth above (as well as the reasons set forth in our opening brief and the briefs of the Appellants), the District Court's Preliminary-Injunction order should be vacated.

Respectfully submitted,

Cullen and Dykman LLP

By:*/s/ Leon J. Sokol*
     Leon J. Sokol



Kologi ◆ Simitz,
Counsellors at Law

By:*/s/ Edward J. Kologi*
     Edward J. Kologi

Attorneys for Intervenors-Defendants-
Appellees Senate President Nicholas P.
Scutari and Assembly Speaker Craig J.
Coughlin

Dated: September 4, 2023

**Certificate of Compliance with Type-Volume Limit,
Typeface Requirements and Type-Style Requirements**

1.      This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,500 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Times Roman 14 point in Microsoft Word 2019/Office 365 in Times Roman 14 point.

<u>  s/   Leon J. Sokol</u>
Leon J. Sokol, Esq.

Dated: September 4, 2023

**Certification**

Leon J. Sokol, Esq, certifies as follows:

1. I am the signatory of this Brief and I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.  This Brief complies with Rules 28(a)(11) and 32(a)(7)(b) of the Federal Rules of Appellate Procedure and contains 6,500 words.

3.      A true copy of the Presiding Officers' Brief was forwarded to the Appellants and Plaintiffs-Appellees, through their counsel, on September 4, 2023 by electronic means.

4.      The E-Brief and Hard Copies of the Brief are identical, and that a virus check was performed with Symantec AntiVirus.

<u>  s/   Leon J. Sokol</u>
Leon J. Sokol, Esq.

Dated: September 4, 2023