# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

Nos. 23-1900, 23-2043

---

RONALD KOONS et al.,
*Plaintiffs-Appellees,*

v.

MATTHEW J. PLATKIN et al.,
*Defendants-Appellants*

and

NICHOLAS P. SCUTARI et al.
*Intervenors-Defendants-Appellants*

---

AARON SIEGEL et al.,
*Plaintiffs-Appellees / Cross-Appellants,*

v.

MATTHEW J. PLATKIN et al.,
*Defendants-Appellants / Cross-Appellees*

and

NICHOLAS P. SCUTARI et al.
*Intervenors-Defendants-Appellants*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(Nos. 22-cv-7463, 22-cv-7464 (RMB))

---

**RESPONSE/REPLY BRIEF OF DEFENDANTS-APPELLANTS**

---

MATTHEW J. PLATKIN
  *Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
  *Solicitor General*

ANGELA CAI
  *Deputy Solicitor General*

JEAN P. REILLY
  *Assistant Attorney General*

JONATHAN ALLEN
AMY CHUNG
LIZA B. FLEMING
VIVIANA HANLEY
JASON KANE
MICHELLE MIKELBERG
SAMUEL L. RUBINSTEIN
EILEEN W. SIEGELTUCH
  *Deputy Attorneys General*

Office of the New Jersey Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625-0080
(609) 414-5954
angela.cai@njoag.gov

*Attorneys for Defendants-Appellants
New Jersey Attorney General
Matthew J. Platkin and Superintendent of
New Jersey State Police Colonel
Patrick Callahan*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS.......................................................................... i

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION.......................................................4

COUNTERSTATEMENT OF THE CASE..............................................4

SUMMARY OF THE ARGUMENT .....................................................5

ARGUMENT ........................................................................................10

I.      CHAPTER 131'S SENSITIVE-PLACE REGULATIONS ARE
CONSTITUTIONAL. ...............................................................10

      A.    The Challenged Sensitive-Place Restrictions Are Consistent With
Considerable Historical Evidence. ..................................................10

          1.   Plaintiffs Improperly Demand That This Court Ignore Reams Of
Historical Evidence.....................................................................11

          2.   Plaintiffs' Evidentiary Challenges Misunderstand The Record..25

             a.   Permitted Public Assemblies (Section 7(a)(6)). .....................26

             b.   Public Libraries And Museums (Section 7(a)(12)). ................26

             c.   Entertainment Facilities (Section 7(a)(17), Casinos
(Section 7(a)(18) And N.J. Admin Code §13:69D-1.13),
Movie Sets (Section 7(a)(23)), And Establishments
Serving Alcohol (Section 7(a)(15)). .........................................28

             d.   Public Parks, Beaches, And Recreational Facilities
(Section 7(a)(10) And N.J. Admin. Code §7:2-2.17(b));
Zoos (Section 7(a)(9)).............................................................31

             e.   Playgrounds And Youth Sports Events
(Sections 7(a)(10), (11)). .........................................................35

f.    Healthcare Facilities And Treatment Centers (Sections 7(a)(21), (22)). ........................................36

g.    Buses And Private Vehicles (Section 7(b)(1) And N.J. Admin. Code §7:25-5.23(f)(5)). ...............38

h.    Fish & Game Regulations (N.J. Admin. Code §7:25-5.23(a), (c), (f), (i), (m)). ..............41

B.    The Government-As-Proprietor Doctrine Independently Justifies Many Sensitive-Place Restrictions. ...................................42

II.    THE PRIVATE-PROPERTY RULE IS CONSTITUTIONAL. ..............47

A.    Section 7(a)(24) Does Not Regulate Conduct Within The Plain Text Of The Second Amendment. ..........................................47

B.    Section 7(a)(24) Is Supported By Extensive Historical Evidence. ..54

III.    THE LIABILITY-INSURANCE PROVISION IS CONSTITUTIONAL. ...................................66

IV.    THE PERMITTING FEES ARE CONSTITUTIONAL. ..........................73

A.    The Fee Is Consistent With Historical Evidence. ..............................74

B.    Plaintiffs' Claim Fails Even Under *Cox/Murdoch*. ..........................76

V.    THE CHARACTER-REFERENCES REQUIREMENT IS CONSTITUTIONAL. ..........................................78

CONCLUSION ...............................................83

CERTIFICATION OF BAR MEMBERSHIP ..........................................84

CERTIFICATION OF COMPLIANCE ..............................85

CERTIFICATION OF SERVICE ...............................................86

# <u>TABLE OF AUTHORITIES</u>

<u>Pages</u>

**Cases**

*Adarand Constructors v. Pena*,
   515 U.S. 200 (1995) ..........................................................................19

*Andrews v. State*,
   50 Tenn. 165 (1871) ..........................................................................13

*Antonyuk v. Hochul*,
   ___ F. Supp. ___, 2022 WL 16744700 (N.D.N.Y 2022) .....................78

*Antonyuk v. Hochul*,
   No. 1:22-CV-0986, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) ....................57

*Bauer v. Becerra*,
   858 F.3d 1216 (9th Cir. 2017) ............................................................77

*Bliss v. Commonwealth*,
   12 Ky. 90 (1822) ................................................................................13

*Brower v. City of New York*,
   3 Barb. 254 (N.Y. Sup. Ct. 1848) ......................................................63

*Brown v. Ent't Merchants Ass'n*,
   564 U.S. 786 (2011) .................................................................. 51, 52

*Burson v. Freeman*,
   504 U.S. 191 (1992) ...........................................................................24

*City of Camden v. Byrne*,
   411 A.2d 462 (N.J. 1979) ...................................................................76

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ...........................................................................78

*Clark v. Phelps*,
   4 Cow. 190 (N.Y. Sup. Ct. 1825) ..........................................................60

*Cox v. New Hampshire*,
   312 U.S. 569 (1941) ................................................................... passim

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) .................................................................. passim

*Doe v. Bonta*,
   ___ F.Supp.3d ____, 2023 WL 187574 (S.D. Cal. Jan. 12, 2023) .....................74

*Drummond v. Robinson*,
   9 F.4th 217 (3d Cir. 2021) .............................................................. 3, 64

*Dwyer v. Farrell*,
   475 A.2d 257 (Conn. 1984).................................................................79

*English v. State*,
   35 Tex. 473 (1872) .........................................................................13

*Espinoza v. Montana Dep't of Rev.*,
   140 S.Ct. 2246 (2020) ......................................................................21

*Ethypharm S.A. France v. Abbott Labs.*,
   707 F.3d 223 (3d Cir. 2013) ..............................................................34

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) .............................................................18

*Florida v. Jardines*,
   569 U.S. 1 (2013) ...................................................................... 7, 50

*Frey v. Nigrelli*,
   No. 21-05334, 2023 WL 2473375 (S.D.N.Y. Mar. 13, 2023) ............... 38, 39, 44

*Gamble v. United States*,
   139 S.Ct. 1960 (2019) ......................................................................15

iv

*Garrison v. Louisiana,*
  379 U.S. 64 (1964) ............................................................71

*GeorgiaCarry.Org, Inc. v. Georgia,*
  687 F.3d 1244 (11th Cir. 2012) ................................... passim

*GeorgiaCarry.org, Inc. v. U.S. Army Corps of Eng'rs,*
  212 F.Supp.3d 1348 (N.D. Ga. 2016) ................................43

*Gholson v. State,*
  53 Ala. 519 (1875) ...........................................................40

*Hahn v. Guardian Assurance Co.,*
  32 P. 683 (Ore. 1893) .......................................................63

*Hill v. State,*
  53 Ga. 472 (1874) ........................................................ 13, 23

*Hope v. Warden York Cnty. Prison,*
  972 F.3d 310 (3d Cir. 2020) ......................................... 41, 79

*Hughes v. Alexandria Scrap Corp.,*
  426 U.S. 794 (1976) .........................................................45

*Hunter v. Underwood,*
  471 U.S. 222 (1985) .........................................................17

*In re Coleman,*
  2005 WL 1284044 (N.J. Super. Ct. Law Div. May 31, 2005) ...........................80

*In re Wang,*
  No. A-3482-17T4, 2020 WL 864147 (Super. Ct. App. Div. Feb. 21, 2020) .......80

*Kanter v. Barr,*
  919 F.3d 437 (7th Cir. 2019) ............................................64

*Kwong v. Bloomberg,*
  723 F.3d 160 (2d Cir. 2013) .............................................74

*Langbord v. U.S. Dep't of Treasury*,
    832 F.3d 170 (3d Cir. 2016) .................................................................17

*Lanin v. Borough of Tenafly*,
    515 Fed. App'x. 114 (3d Cir. 2013) ....................................................40

*Maryland Shall Issue v. Montgomery Cnty.*,
    No. 21-1736, 2023 WL 4373260 (D. Md. July 6, 2023)..............................32, 55

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) .............................................................18, 36

*Miller v. Smith*,
    No. 22-1482, 2023 WL 334788 (7th Cir. Jan. 20, 2023) .....................................17

*Murdock v. Pennsylvania*,
    319 U.S. 105 (1943) .............................................................73, 77

*Nat'l Ass'n for Gun Rights v. City of San Jose*,
    618 F.Supp.3d 901 (N.D. Cal. 2022)...........................................65, 67

*Nat'l Ass'n for Gun Rights v. City of San Jose*,
    No. 22-cv-501, 2023 WL 4552284 (N.D. Cal. July 13, 2023).......... 65, 66, 67, 74

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) .................................................................14

*New York State Rifle & Pistol Association v. Bruen*,
    142 S.Ct. 2111 (2022) ................................................................ passim

*New State Ice Co. v. Liebmann*,
    285 U.S. 262, 311 (1932) ...........................................................14

*Nunn v. State*,
    1 Ga. 243 (1846).................................................................13

*Ramos v. Louisiana*,
    140 S.Ct. 1390 (2020) .........................................................21

*Range v. Att'y Gen.*,
    69 F.4th 96 (3d Cir. 2023) ........................................................ 35, 64, 81

*Reeves v. Stake*,
    447 U.S. 429 (1980) ......................................................................42

*Regan v. Time, Inc.*,
    468 U.S. 641 (1984), ....................................................................56

*Sandeman v. Deake*,
    17 La. 332, 335 (1841) ................................................................62

*Solomon v. Cook Cnty. Bd. of Comm'rs*,
    559 F. Supp. 3d 675 (N.D. Ill. 2021) ..........................................58

*State v. Huntly*,
    25 N.C. 418 (N.C. 1843) ..............................................................17

*State v. One 1990 Honda Accord*,
    712 A.2d 1148  (N.J. 1998) ..........................................................58

*State v. Reando*,
    (Mo. 1878) ....................................................................................13

*State v. Shelby*,
    2 S.W. 468 (Mo. 1886) ........................................................ 13, 26

*Timbs v. Indiana*,
    139 S.Ct. 682 (2019) ....................................................................15

*Tucker v. White*,
    1 N.J.L. 94 (1791) ........................................................................60

*United States v. Barton*,
    633 F.3d 168 (3d Cir. 2011) ........................................................35

*United States v. Blumenthal*,
    315 F.2d 351 (3d Cir. 1963) ........................................................45

*United States v. Class*,
930 F.3d 460 (D.C. Cir. 2019) ................................................................ 43, 44, 45

*United States v. Lopez,*
514 U.S. 549 (1995) ..................................................................................... 2, 14

*United States v. O'Brien*,
391 U.S. 367 (1968) ..........................................................................................55

*United States v. Rowson*,
No. 22-cr-310, 2023 WL 431037 (S.D.N.Y. Jan. 26, 2023) .................................63

*Utah Native Plant Soc'y v. U.S. Forest Serv.*,
923 F.3d 860 (10th Cir. 2019) ..........................................................................41

*White v. Mass. Council of Constr. Emps., Inc.*,
460 U.S. 204 (1983) ................................................................................ 7, 43, 45

*Williams v. McFadden*,
No. 22-cv-630, 2023 WL 4919691 (W.D.N.C. Aug. 1, 2023) ............................74

## Statutes and Regulations

P.L. 2022, ch. 131 ............................................................................... passim

N.J. Stat. Ann. §2C:58-4 ................................................................................ 4, 77

N.J. Admin. Code §13:69D-1.13 ...........................................................................28

N.J. Admin. Code §7:2-2.17(b) ............................................................................31

N.J. Admin. Code §7:25-5.23 ....................................................................... 4, 5, 41

2 N.J.R. 61 (Aug. 6, 1970) ....................................................................................41

1790 Del. Laws ch. 214, in 2 *Laws of the State of Delaware* 984 (1797),
https://tinyurl.com/2p96ysbt...........................................................................24

1801 Tenn. Laws c.22 §6 https://tinyurl.com/3bdyse3s ..........................................71

1835 Mass. Acts c. 134 §6, https://tinyurl.com/yknmefdr .......................................71

1838 Wis. Terr. *An Act to Prevent the Commission of Crimes* §6,
    https://tinyurl.com/mtvtncf2 ...........................................................................71

1840 Me. Rev. Stat. c. 169 §7, https://tinyurl.com/3xu2v4a8 ...............................71

1846 Mich. Rev. Stat. c. 162 §6, https://tinyurl.com/yazw29xv ...........................71

1847 Va. Acts c. 14, §6, https://tinyurl.com/mrf2cfht............................................71

1851 Minn. Terr. Rev. Stat. c. 112 §8, https://tinyurl.com/4djs7vf4 ....................71

1854 Ore. Stat. c. 16 §7, https://tinyurl.com/2wktx4bm ........................................71

1857 D.C. Rev. Code c. 141 §6, https://tinyurl.com/ymnyttb4 ..............................71

1868 W.Va. Code c. 153 §4, https://tinyurl.com/5n842rud.....................................71

2 *The Statutes at Large; Being a Collection of all the Laws of Virginia* (William
    W. Hening ed., 1810), https://tinyurl.com/2dmhzfvy .........................................25

28 U.S.C. §1292 .............................................................................................................4

*Abridgement of the Public Permanent Laws of Virginia* (1796),
    https://tinyurl.com/2p87b4w9 ...........................................................................24

*An Act Concerning Firearms and Other Dangerous Weapons*,
    New Jersey Legislature, Acts 497 (1966) ..........................................................78

*An Ordinance to Regulate the Carrying of Pistols* §2 (Oct. 4, 1880),
    bit.ly/3QOa6oM ..................................................................................................81

*City of Trenton, N.J., Charter & Ordinances* 173 (1903),
    bit.ly/45JBWGS...................................................................................................81

Md. Const. art. 1, §3 (1776), in *The Federal and State Constitutional
    Colonial Charters and Other Organic Laws* 1691 (1909),
    https://tinyurl.com/44t4wu7r ..............................................................................24

*Ordinances of Jersey City, Passed by the Board of Alderman* since
   May 1, 1871,
   bit.ly/3suPPKW...................................................................................81

*Ordinances of the Mayor, Alderman & Commonalty of the City of N.Y.*,
   ch. 8, art. 25, §265 (1881),
   bit.ly/3OXBMEX................................................................................81

*Revised Statutes of the State of Louisiana* §821 (1870)
   https://tinyurl.com/3pmmfft3 ...........................................................65

## Other Authorities

*"At the Instance of Benjamin Franklin": A Brief History of the Library Company
   of Philadelphia* (2015), https://tinyurl.com/yckzk97f.........................................27

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ..........20

Am. Acad. of Actuaries, *Risk Pooling*,
   https://tinyurl.com/2hakh6x7 ...............................................................71

Barbara Mann Wall, *History of Hospitals*, UPenn Nursing,
   https://tinyurl.com/ymrawt2n ...............................................................37

Daniela Blei, *Inventing the Beach: The Unnatural History of a Natural Place*,
   Smithsonian Magazine, https://tinyurl.com/2p8mfx4m (Jun. 23 2016) ..............34

David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*,
   13 Charleston L. Rev. 205 (2018)..................................................... 15, 16, 18, 23

David Oshinsky, *Bellevue: Three Centuries of Medicine and Mayhem at America's
   Most Storied Hospital* (2016) ...........................................................37

Ed Crews, *Gambling: Apple-Pie American & Older than the Mayflower*,
   Colonial Williamsburg (Autumn 2008), https://rb.gy/fk64p..................................30

Elinore J. Kaufman et al., *Epidemiologic Trends in Fatal and Nonfatal Firearm
   Injuries in the US, 2009-2017*, 181 JAMA Internal Med. 237 (2020)................68

Eric Foner, *The Second Founding: How the Civil War and Reconstruction Remade the Constitution* (2019) ..............................................................21

Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J.F. 121 (2015) ...................................................................72

*Firearm-Related Injuries Account for $2.8 Billion on Emergency Room and Inpatient Charges Each Year*, Johns Hopkins Med. (Oct. 2, 2017), https://tinyurl.com/27746969 ...............................................................69

John Rappaport, *Some Doubts About "Democratizing" Criminal Justice*, 87 U. Chi. L. Rev. 711 (2020) ...............................................................82

Josh Hochman, *The Second Amendment on Board: Public & Private Historical Trads. of Firearm Reg.*, 133 Yale L.J. __ (forthcoming 2023)............39

Keith Whittington, *The New Originalism*, 2 Geo. J. L. & Pub. Pol'y 599 (2004) ....................................................19

Kenneth S. Abraham, *The Liability Century* (2008)................................................73

Kenneth S. Abraham, *The Rise and Fall of Commercial Liability Insurance*, 87 Va. L. Rev. 85 (2001) .......................................................................68

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022)........................................................................20

N.J. State Police, Application for Permit to Carry a Handgun, https://www.njportal.com/NJSP/ConcealedCarry/................................................77

Nat'l Conf. of State Legislatures, *Report: Polling Places* (Oct. 2022) ......................................................................24

Nat'l Park Serv., *Boston Common*, https://tinyurl.com/3hu5fw58................................................................33

Nat'l Park Serv., Revere Beach Reservation Historic District, https://tinyurl.com/3ev9u34d................................................................34

Overview Guide to the New-York Historical Society Records 1804-2023, New-York Hist. Soc'y Museum & Libr., (2016), https://tinyurl.com/3ctbbjh4 ...........28

Pamela Haag, *The Gunning of America: Business & the Making of American Gun Culture* (2016) ...............................................................................17

Paul Starr, *The Social Transformation of American Medicine* (2d ed. 2017) .........38

*Proceedings of the American Association of Museums* (1915), https://tinyurl.com/44657p29 ...............................................................28

Sir Edward Coke, *The Third Part of the Institutes of the Laws of England* (1797), https://tinyurl.com/yc7eyayn .................................................29

Stephanos Bibas, *The Machinery of Criminal Justice* 2 (2012) .............................82

Stephen G. Gilles & Nelson Lund, *Mandatory Liability Ins. for Firearm Owners*, 18 Engage, J. of Federalist Soc'y Prac. Grps. 18 (2013) .......................71

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868*, 87 Tex. L. Rev. 7 (2008) .......................................................................21

Steven R. Pendery, *Probing the Boston Common*, Archaeology, Vol. 43, No. 2 (1990) .....................................................................33

Thomas M. Cooley, *A Treatise on the Law of Torts or the Wrongs Which Arise Independent of Contrac*t (Chi., Callaghan & Co., 1880)..................50

U.S. Bureau of Labor Stat., CPI Inflation Calculator, https://tinyurl.com/2p98xp7d.......................................................................... 75, 76

## **INTRODUCTION**

The Second and Fourteenth Amendments have always coexisted comfortably with a wide range of firearms restrictions. As the record shows, States historically restricted firearms in particularly sensitive places—such as public assemblies, schools and other educational and literary gatherings, ballrooms, shows, fandangos, fairs, and taverns, parks, zoos, in transit, and more. Founding- and Reconstruction-era States likewise long required individuals to obtain consent from private property owners before carrying firearms onto their private lands. And States historically required individuals to make surety payments before carrying firearms in public, and they imposed strict liability regimes to cover the harms of firearms misuse. States have also long imposed fees relating to firearms or permits. And States have consistently sought to ensure that those who could not be trusted to carry a firearm in public will not do so—including by checking their backgrounds.

Given their historical pedigree, the provisions Plaintiffs challenge—Chapter 131's sensitive-place restrictions, private-property provision, insurance requirement, fees, and character-reference requirement—all satisfy *New York State Rifle & Pistol Association v. Bruen*, 142 S.Ct. 2111 (2022). After all, *Bruen* adopted a historically-grounded test: if States originally understood that particular firearms policies were available under the Second and Fourteenth Amendments, those policies remain on the table for them today. Yet despite the considerable evidence the State provided in

1

its opening brief, Plaintiffs cannot produce a shred of evidence that anyone anywhere saw any of these laws as unconstitutional. In sharp contrast to the evidence in both *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008), this record contains no evidence that any court, State, official, or legal commentator viewed any of these historical sensitive-place requirements as unconstitutional. Plaintiffs cite nothing to suggest that any court, State, official, or legal commentator believed individuals had a right to carry firearms on private land without the owner's consent. Their arguments are also bereft of evidence of any challenges to the historical surety laws or to strict-liability regimes. And Plaintiffs find no decision or even constitutional debate as to historical fees and permitting processes. Instead, the record reveals "no disputes regarding the lawfulness of such prohibitions." *Bruen*, 142 S.Ct. at 2133.

Because Plaintiffs cannot identify contrary evidence, they repeatedly attempt to move the goalposts that *Bruen* laid out. Plaintiffs repeatedly castigate the State's historical statutes as measuring "too few" in number, even when the State found eight or even thirty historical predecessor statutes—reasoning that the fact some other States took a different policy approach suggests New Jersey's modern laws are unconstitutional. But Plaintiffs never explain how their view coheres with our federalist system, in which "the States may perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear." *United States v. Lopez*, 514 U.S. 549, 581 (1995) (Kennedy, J., concurring).

2

Plaintiffs also diminish the State's voluminous historical evidence as coming "too late"—even though the antebellum and Reconstruction-era evidence consistently favors the State in this case, and even though Reconstruction-era evidence particularly informs how the States understood the scope of the Fourteenth Amendment. Last, Plaintiffs insist sensitive places can only be ones with "comprehensive," TSA-style security, but the very places that *Bruen* itself recognized as sensitive (like schools) could not fit the Plaintiffs' overly-stringent and invented test.

The consequences of this debate are grave. *Bruen* recognized that the Constitution allows the States to address all manner of "regulatory challenges posed by firearms today." 142 S.Ct. at 2132. So it adopted a historical and analogical test that allows States flexibility while protecting the constitutional right. Chapter 131 respects that decision, adopting only restrictions that are in line with a centuries-old historical record. Plaintiffs distort *Bruen*'s measured approach, seeking to impose on New Jersey "a regulatory straightjacket" that limits the State's ability to protect residents from the scourge of firearms violence—limits that "our ancestors would never have accepted." *Id.* at 2133 (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)). This Court should reject Plaintiffs' arguments.

## STATEMENT OF JURISDICTION

Although this Court otherwise has jurisdiction under 28 U.S.C. §1292(a)(1), the State contests *Siegel* Plaintiffs' Article III standing to pursue three claims on cross-appeal: (1) the designation of mental health and addiction treatment centers as "sensitive places," P.L. 2022, ch. 131 §7(a)(22); (2) certain Fish & Wildlife rules governing firearms when hunting, N.J. Admin. Code §7:25-5.23; and (3) the character-reference requirement in N.J. Stat. Ann. §2C:58-4.

## COUNTERSTATEMENT OF THE CASE

The *Siegel* Plaintiffs, on cross-appeal, challenge the district court's denial of a preliminary injunction in several respects.

First, they challenge Chapter 131's[1] carry-permit fees, which the Legislature adjusted for the first time in 50 years to account for "inflation, increasing costs of background checks and related investigations," and technological upgrades to the State Police's system. §1(i); *see* §3(c).

Second, they challenge New Jersey's longstanding requirement that carry-permit applications include character references. N.J. Stat. Ann. §2C:58-4. Chapter 131 increased the number of references from three to four, and required that they certify that the applicant "has not engaged in any acts or made any statements that suggest the applicant is likely to engage in conduct, other than lawful self-defense,

---

[1] P.L. 2022, Chapter 131 is available at JA1431.

that would pose a danger to the applicant or others," including any "information concerning their knowledge of the applicant's use of drugs or alcohol." §3(b).

Third, *Siegel* Plaintiffs challenge decades-old regulations of the New Jersey Division of Fish and Wildlife, N.J. Admin. Code §7:25-5.23(a), (c), (f), (i), (m), which regulate weapons used to hunt game.

Next, *Siegel* Plaintiffs appear to challenge the district court's denial of relief as to Chapter 131's firearms restrictions at: (1) playgrounds, (§7(a)(10)); (2) youth sports events (§7(a)(11)); and (3) addiction and mental health treatment/support facilities (§7(a)(22)).

On appeal, *Koons* Plaintiffs only defend the district court's order as to public libraries and museums (§7(a)(12)); places that serve alcohol (§7(a)(15)); entertainment facilities (§7(a)(17)); the vehicle-carry regulations, (§7(b)(1)); and the private-property rule (§7(a)(24)). They appear to abandon their claims as to parks (§7(a)(10)) and medical facilities (§7(a)(21)). *Compare* JA922.

## SUMMARY OF THE ARGUMENT

I. A. Plaintiffs' challenges to the sensitive-places provisions of Chapter 131 fail because these regulations are consistent with considerable historical evidence. The State provided stacks of historical statutes—"twins" and "analogies" alike—to support each sensitive-place designation, and contemporary court decisions and commentary endorsing their validity. Unlike in *Bruen* and *Heller*, this record

5

contains no contrary evidence suggesting that anyone saw any of these prohibitions as unconstitutional.

Instead, Plaintiffs advance faulty, broad-brush objections to discount the State's voluminous historical record. First, their contention that the on-point historical statutes should be disregarded solely because other States had different policies is incompatible with tenets of our federalist democracy. Second, their contention that the cited 19th-Century statutes come too late again ignores the historical context that informed earlier States' policy choices. And to the extent the understanding of the right to bear arms had evolved by the Reconstruction-era, it is evidence from that time—when the People ratified the Fourteenth Amendment, when State and federal governments alike became bound by the Bill of Rights, and when the relationship among citizens, States, and the Republic shifted—that controls. Moreover, Plaintiffs' theory that only places that have comprehensive, TSA-level security can be designated "sensitive" finds no support in historical evidence or *Bruen*. Finally, Plaintiffs' other attacks on the State's evidence are premised on incorrect assumptions, contradicted by historical evidence, and fail to heed *Bruen*'s command to perform a "nuanced" analysis when the regulation addresses societal problems that could not have existed earlier in time.

B. Plaintiffs give short shrift to the well-settled doctrine that when the State competes with private businesses and operates a premise as a proprietor, it may

prohibit handgun carriage just as a private entity may. *E.g.*, *White v. Mass. Council of Constr. Emps., Inc.*, 460 U.S. 204, 208 (1983). Plaintiffs' objection that the government-as-proprietor doctrine is not mentioned in *Bruen* overlooks that *Bruen* had no occasion to address it, and ignores precedents applying the doctrine to all manner of constitutional constraints. Nor does the Legislature's decision to enforce premise-safety rules via criminal rather than civil penalties have any bearing on the constitutionality of the restrictions.

II. Plaintiffs' position that there is a constitutional right to carry firearms into their neighbors' homes and local coffeeshops without the owner's consent or knowledge is even more radical than the district court's ruling, and is profoundly wrong.

A. Plaintiffs' argument fails at *Bruen*'s first step because individuals have no right to enter others' private property in the first place—much less with a firearm—and any permission to enter is always limited by the scope of the express or implied invitation. *See Florida v. Jardines*, 569 U.S. 1, 9 (2013). That scope is not constitutionally-dictated but rather is the product of property law, which the State can refine to effectuate the preferences and expectations of property owners.

B. The identical or remarkably similar historical laws of several States— including in New Jersey—prove New Jersey can enact the same private-property rule today. Plaintiffs' attempts to distinguish these predecessor statutes—which date

from both the Founding and Reconstruction eras—either ignore their plain text, misread the historical evidence, or push irrelevant theories that have no bearing on the constitutional question.

III. *Siegel* Plaintiffs' challenge to the liability-insurance provision likewise crumbles at both the threshold and historical questions. First, they fail to pinpoint why the Second Amendment's plain text allows them to refuse to purchase insurance coverage for firearms accidents. As *Bruen* instructed, not every precondition of arms-carrying is presumptively unconstitutional, and the insurance requirement does not fall outside the presumption. Second, surety statutes and strict liability regimes are both apt analogues to modern-day liability insurance, since they all impose a financial burden on individuals who pose an increased safety risk by carrying firearms. Plaintiffs' objections either fail to recognize that insurance is a modern innovation that solves similar problems as these laws did, or are incorrect on the facts.

IV. *Siegel* Plaintiffs' challenge to the $50 portion of the carry-permit fee that goes to the State is based on the wrong legal test, and fails it anyway. It is *Bruen* that governs, not the means-end-scrutiny test for First Amendment challenges articulated in *Cox v. New Hampshire*, 312 U.S. 569 (1941). *Bruen* made clear that fees related to firearms-carry are only unconstitutional if they are exorbitant or deny the right to carry, and the New Jersey fee is not and does not. The

unchallenged historical record confirms the instant fee is consistent with historical ones, even accounting for inflation alone. And even if the *Cox* test applied, Plaintiffs would fail it: the $50 fee portion does represent administrative costs and costs "incident to the … maintenance of public order in the matter licensed." 312 U.S. at 577.

V. *Siegel* Plaintiffs' final claim that the State cannot require character references to identify whether the carry-permit applicant poses a risk to public safety is profoundly wrongheaded. For one, since no Plaintiff avers an inability to meet the requirement, Article III standing is lacking. For another, the objective information required by Chapter 131 is crucial for law enforcement to discern whether the applicant poses a public-safety risk—something *Bruen* endorsed as permissible. In any event, the requirement is consistent with history, as law enforcement has long required character references for this very reason, particularly in areas and at times when officials were unlikely to have personal knowledge of the applicant's prior conduct.

## ARGUMENT

## I.    CHAPTER 131'S SENSITIVE-PLACE REGULATIONS ARE CONSTITUTIONAL.

The challenged sensitive-place provisions are all consistent with considerable historical evidence. Many are further justifiable under the government-as-proprietor doctrine. Plaintiffs' arguments to the contrary fall short.

### A.    The Challenged Sensitive-Place Restrictions Are Consistent With Considerable Historical Evidence.

In its opening brief, the State provided reams of historical evidence—"twins" and "analogues" alike—to support its designation of sensitive places. *See* NJ.Br.13-26. It identified multiple jurisdictions that restricted firearms at "public assemblies" or "public gatherings." It introduced laws prohibiting firearms at social assemblies, fairs, ballrooms, and public exhibitions. It provided historical predecessors barring firearms where alcohol is sold. It cited statutes restricting firearms where persons assemble for educational, literary, or scientific purposes. It produced dozens of laws restricting carry at parks, and at the zoos within those parks. And it identified restrictions relating to places where youth and/or other vulnerable individuals congregate, as well as laws relating to vehicles and travel.

Plaintiffs' responses are notable for what they fail to do. Unlike the evidence marshalled by the majorities in *Bruen* and *Heller*, Plaintiffs offer no contrary evidence suggesting that anyone saw these prohibitions as unconstitutional. They offer no evidence that any court ever invalidated or questioned any of these

restrictions. They offer no evidence that other States declined to adopt similar policies on constitutional grounds. And they offer no evidence that any legislators, public officials, or legal commentators contemporaneously harbored any concerns about the validity of policies restricting firearms at parks, public assemblies, ballrooms, or at any of the other locations where the State's evidence shows that firearms historically were prohibited.

The responses Plaintiffs do offer cannot withstand scrutiny. First, they repeatedly levy three broad challenges: that (1) the cited laws (no matter how similar or analogous) are too few, because other States passed different policies; (2) the cited laws (no matter how similar or analogous) are too late, as any evidence from the Reconstruction era must be disregarded; and (3) each location must have comprehensive, TSA-level security to be "sensitive." Second, they launch a series of picayune attacks on specific evidence. But their three methodological objections err on the law, and the remaining evidentiary objections err on the historical record.

> 1. Plaintiffs Improperly Demand That This Court Ignore Reams Of Historical Evidence.

Plaintiffs' three broad-brush attacks on the historical record all fail.

1. Plaintiffs' repeated charge that the State's historical statutes are simply "too few"—even when the State provided dozens of examples—is wrong. Plaintiffs lean heavily on this assertion. Indeed, it is their only objection to several sensitive places, like public assemblies and entertainment venues. But they do little to justify it. *See*

Siegel.Br.42-61; Koons.Br.27-37. Where multiple jurisdictions historically adopted identical or analogous laws, and there is no evidence suggesting that these statutes were ever seen as unconstitutional, that satisfies *Bruen*'s second step.

All agree that *Bruen*'s second step reflects an originalist inquiry: the historical understanding of the scope of the constitutional right. *See* 142 S.Ct. at 2128. That is, we look to historical evidence about whether the Constitution was understood to take the "policy choice[] off the table." *Heller*, 554 U.S. at 636. So if *no* State historically enacted any identical or analogous policy, that is some evidence that they saw the policy as unavailable. *See Bruen*, 142 S.Ct. at 2131 ("[T]he lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment").

The same would be true if a few jurisdictions enacted identical or analogous policies, but their approach was contradicted by greater evidence suggesting such laws were understood to be unconstitutional: that, on balance, would support the view that the Constitution was understood to preclude that policy option. *See id.* at 2153-55, 2146-47 (refusing to rely "upon a single law" or a "handful of temporary territorial laws" when they "contradict[] the overwhelming weight of other evidence"—*e.g.*, opinions from other state courts adopting an expansive view of public-carry right). In invalidating New York's public-carry statute, *Bruen* repeatedly emphasized cases that had invalidated or questioned similar laws—

including, *e.g.*, *Bliss v. Commonwealth*, 12 Ky. 90 (1822), *Nunn v. State*, 1 Ga. 243 (1846), and *Andrews v. State*, 50 Tenn. 165 (1871).

That simply does not exist in this case. In fact, some of those the same decisions to which *Bruen* accorded weight upheld the very sensitive-place laws on which New Jersey is relying here. *See Andrews*, 50 Tenn. at 181 (discussing Tennessee 1869 law that barred carrying "concealed or otherwise, any pistol … or other deadly or dangerous weapon" at "any fair, race course, or other public assembly of the people," JA1511-12, and upholding decision to prevent an individual "from carrying his arms to church, or other public assemblage"). Other courts were uniformly in accord. *See English v. State*, 35 Tex. 473 (1872); *Hill v. State*, 53 Ga. 472 (1874); *State v. Shelby*, 2 S.W. 468 (Mo. 1886); *State v. Reando*, (Mo. 1878), *available at* JA1365.[2] That uniform reception would be an odd result if the numerous sensitive-place enactments were actually unconstitutional.

Plaintiffs ignore such history, and in doing so, make a hash of federalist and originalist principles alike. This is not a case in which States had never enacted an identical or analogous policy: rather, in its opening brief, the State cited multiple historical predecessors for each modern restriction. Nor is this a case where that historical evidence is contradicted: Plaintiffs offered no evidence that any court (or

---

[2] Also available as ECF 86, attachment 23 in the district-court docket.

anyone else) viewed these statutes as unconstitutional. Instead, multiple States had historically adopted policies matching each of Chapter 131's restrictions, while other States simply adopted different policies. That is not proof of unconstitutionality but the inevitable byproduct of federalism: elected leaders in different States have always made different policy decisions. *See Lopez*, 514 U.S. at 581 (Kennedy, J., concurring); *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 382 (2023) ("In a functioning democracy, policy choices … belong to the people and their elected representatives. They are entitled to … 'try novel social and economic experiments' if they wish" (quoting *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting))). Indeed, States act no differently today. *See* NJ.Br.28 (highlighting States that allow permit-less public carry, even after *Bruen* upheld "shall issue" permitting regimes). Far from showing a consensus understanding that these sensitive-place restrictions were "off the table," *Heller*, 554 U.S. at 636, this kind of record indicates the policy was available.

*Bruen*'s own discussion of sensitive places makes this clear—a point to which Plaintiffs offer no answer. As the State previously explained, *Bruen* concluded that "legislative assemblies, polling places, and courthouses" were all sensitive places at which firearms could be prohibited based on a law review article that identified just one Founding-era restriction at legislative assemblies, one Founding-era restriction and three Reconstruction-era restrictions at polling places, and one Reconstruction-

era restriction at courthouses. *See Bruen*, 142 S.Ct. at 2133 (citing David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229-36, 244-47 (2018)). That makes sense: although the historical predecessors were few in number, the majority could find "no disputes regarding the lawfulness of such prohibitions." *Id.* That combination—a few States adopting historical predecessors, but no contrary evidence—is precisely the sort of originalist evidence that shows the Constitution did not take a particular policy "off the table," but left it up to the States in our federalist scheme. Plaintiffs ignore this portion of *Bruen* by ignoring the evidence in the Kopel & Greenlee article, and ignoring that their approach would mean modern limits at "legislative assemblies, polling places, and courthouses" are invalid. Their insistence that the six, dozen, or even thirty predecessors that New Jersey cites are insufficient cannot be squared with *Bruen*'s discussion of these sensitive places. To hold that Plaintiffs are right is to say that *Bruen* was wrong.

2. Plaintiffs' argument that Founding-era history alone matters runs into two problems. First, if there is no direct conflict between Founding- and Reconstruction-era evidence, courts consider both. Second, if there is a conflict, the latter provides the more legitimate and instructive body of evidence.

First, as *Bruen* holds, courts need not decide whether to rely on Founding-era or Reconstruction-era evidence where there is no direct conflict between them. *See* 142 S.Ct. at 2138; *id.* at 2162-63 (Barrett, J., concurring). Indeed, Courts regularly

rely on evidence from Reconstruction when there is little Founding-era evidence on point. *See, e.g.*, *Gamble v. United States*, 139 S.Ct. 1960, 1966 (2019) (citing cases from 1840, 1850, and 1852 to construe the Double Jeopardy Clause when no cases existed at the Founding addressing the issue); *see also Timbs v. Indiana*, 139 S.Ct. 682, 688 (2019) (citing evidence "in 1868 upon ratification of the Fourteenth Amendment" as evidence of understanding the Excessive Fines Clause); *Bruen*, 142 S.Ct. at 2136 (confirming, based on judicial precedent and James Madison's writings, that a consistent "course of practice can liquidate & settle the meaning of disputed or indeterminate terms & phrases in the Constitution" (internal quotation marks omitted)).

*Bruen* itself did the same when discussing sensitive-place laws. As explained above, the Kopel & Greenlee article on which *Bruen* relied found no examples of Founding-era restrictions on firearms in courthouses, but did find a carry restriction in courthouses from 1874. Kopel & Greenlee, *supra*, at 246-47. It found only one jurisdiction with firearms prohibition at legislative assemblies—from 17th-Century Maryland. *Id.* at 236. And it found only one State that had polling-place restrictions from the Founding; the remaining examples were from Reconstruction. *Id.* at 236, 245-46. But *Bruen* agreed that both could be deemed "sensitive" based on the historical record. Since the record evinced "no disputes regarding the lawfulness of

16

such prohibitions" at either period, there was no conflict, and so Reconstruction evidence could be used to support the modern restriction. *Bruen*, 142 S.Ct. at 2133.

Indeed, the reason sensitive-place statutes were less common at the Founding than Reconstruction has to do with policy considerations—not constitutional ones. The record shows that portable handguns were not widely available to the average consumer until the mid-19th-Century, making their dangers at concerts and assemblies a less salient problem. *See* JA1205[3]; Pamela Haag, *The Gunning of America: Business & the Making of American Gun Culture* 8-18 (2016) (detailing dearth of commercial civilian gun market in late 1700s and early 1800s America); *State v. Huntly*, 25 N.C. 418, 422 (N.C. 1843) ("No man amongst us carries it about with him, as one of his every day accoutrements—as a part of his dress—and never we trust will the day come when any deadly weapon will be worn or wielded in our peace loving and law-abiding State[.]"). But when mass-produced handguns did become more commercially available, States swiftly stepped in to address the wave of violence that followed, including by restricting firearms at a wide range of

---

[3] Expert historian evidence is as valid in this case as in any other, contrary to *Koons* Plaintiffs' assertion. Koons.Br.16. *Bruen* confirms that courts decide Second Amendment cases using "evidentiary principles" and "the historical record compiled by the parties." 142 S.Ct. at 2130 n.6. Expert testimony is often crucial to adjudicating historical facts in the record. *See, e.g.*, *Hunter v. Underwood*, 471 U.S. 222, 229 (1985); *Langbord v. U.S. Dep't of Treasury*, 832 F.3d 170, 195 (3d Cir. 2016) (en banc); *Miller v. Smith*, No. 22-1482, 2023 WL 334788, at *1 (7th Cir. Jan. 20, 2023).

sensitive places. *See, e.g.*, JA1205-10 (noting history of pro-Reconstruction Radical Republicans enacting sensitive-place laws in Texas in response to widespread violence); Kopel & Greenlee, *supra*, at 244-45 (explaining many States banned guns at polling places for the first time during Reconstruction to prevent intimidation of African-American voters). There is no evidence that these States changed their view of the constitutional right from the Founding to Reconstruction, and no evidence at either time period that any State, court, or commentator saw these laws as invalid. Rather, as gun violence surged, a range of States exercised the authority they always had to protect their residents at myriad sensitive places.

Second, if this Court does (incorrectly) perceive a conflict between Founding-era and Reconstruction-era evidence, it should follow the considerable precedent and scholarship that treats the latter as more persuasive. *See* NJ.Br.33 (collecting cases); *Ezell v. City of Chicago*, 651 F.3d 684, 702 n.11 (7th Cir. 2011) (collecting scholarship); Everytown.Amicus.Br..8-13 (same). That is the only approach consistent with democratic legitimacy and logic. Hornbook law teaches that the States are not bound by the Second Amendment but the Fourteenth Amendment; it follows that "the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702. Our "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them," *Heller*, 554 U.S. at 634-

35, which means Reconstruction evidence—when the Fourteenth Amendment was ratified—logically would be the touchstone. *See McDonald v. City of Chicago*, 561 U.S. 742, 813 (2010) (Thomas, J., concurring) (noting importance of "the meaning of the Fourteenth Amendment agreed upon by those who ratified it"); Keith Whittington, *The New Originalism*, 2 Geo. J. L. & Pub. Pol'y 599, 610 (2004) ("As the founders themselves noted, the constitutional text is meaningless unless and until it is ratified. It is the adoption of the text by the public that renders the text authoritative."). If the States had laws barring firearms at public assemblies, parks, ballrooms, and more when they ratified the Fourteenth Amendment, it strains credulity to say that the Fourteenth Amendment makes those laws invalid today.

Plaintiffs' sole response falls short. Plaintiffs neither explain how States could be bound to a reading of the Fourteenth Amendment that is flatly inconsistent with what they originally ratified, nor distinguish cases like *Ezell*. Instead, they simply argue that the Bill of Rights must mean the same thing to the Federal Government and the States alike, and that because the Second Amendment (rather than the Fourteenth) applies to the Federal Government, its Founding-era understanding controls. Seigel.Br.40; Koons.Br.21. But that hardly helps them. After all, courts have long applied Reconstruction-era understandings of Fourteenth Amendment rights against the Federal Government. *See, e.g.*, *Adarand Constructors v. Pena*, 515 U.S. 200, 217 (1995) (applying Fourteenth Amendment equal protection doctrine to

the Fifth Amendment's Due Process Clause, and citing cases). And our Nation's history is replete with examples of Bill of Rights provisions that took on new meaning when incorporated through the Fourteenth Amendment—including when applied to the Federal Government. *See* Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 244-46 (1998) (explaining First Amendment right to petition only applied to voters at the Founding, but expanded to apply to women by Reconstruction, and "American women deluged the 1866 Congress with petitions"); *id.* at 251 (describing evolution of Establishment Clause from Founding-era "strict federalism rule—no law meddling with religion in the states … into a soft substantive rule: religion in general could be promoted, but no one sect at the expense of others"). There is nothing unusual about the Reconstruction-era approach to a right predominating for the Federal Government and States alike.

For good reason. "When the people adopted the Fourteenth Amendment, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022); *see also* Amar, *supra*, at 223 ( "[I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in*

*1868*, 87 Tex. L. Rev. 7, 115-16 & 116 n.485 (2008) (same). The States understood the enactment of the Reconstruction Amendments fundamentally shifted both the federal-state relationship and the relationships between these governments and their residents. *See generally* Eric Foner, *The Second Founding: How the Civil War and Reconstruction Remade the Constitution* 3-8, 55-60, 85, (2019). It is therefore unsurprising that these ratifying States would have in the process subjected the Federal Government to these new, post-Civil War understandings of these same rights—from allowing women to petition to protecting polling places from racially-motivated gun violence. By contrast, Plaintiffs' view—that the States had somehow imposed on themselves a meaning of the Fourteenth Amendment that is inconsistent with their own contemporaneous understanding at ratification—is unjustifiable.

Plaintiffs' cases do not rehabilitate their theory. *Ramos v. Louisiana*, 140 S.Ct. 1390 (2020), concerns a scenario not present here: consistent evidence of how a right was understood from Founding through Reconstruction, and later court rulings that contradict that understanding. *See id.* at 1395-97 & n.18 (explaining that Louisiana's 1898 use of non-unanimous juries cannot overcome evidence extending "400 years" before the Founding and "throughout the 19th century" that criminal verdicts had to be unanimous, and citing evidence from 1864, 1867, 1868, and 1872). *Espinoza v. Montana Department of Revenue*, 140 S.Ct. 2246 (2020), is likewise irrelevant. There, the Court identified evidence from the Founding *and* Reconstruction that state

aid could (or even had to be) given to parochial schools, and then some inconsistent evidence largely after ratification of the Fourteenth Amendment that restricted similar aid. *See id.* at 2258-59. It was that "complex[ity]"—rather than a categorical preference for Founding- over Reconstruction-era evidence—that drove *Espinoza*, which is why the Court did not consider or address any of the arguments above. *Id.* at 2259.

3. Finally, this Court should reject Plaintiffs' repeated assertions that the only valid sensitive places are ones where the State provides "comprehensive," TSA-style security. Koons.Br.22-26; Siegel.Br.31. That claim relies on two false assumptions: that modern sensitive places must be akin to legislative assemblies, courthouses, and polling places, and that those places all share TSA-style security.

As to the former, *Bruen* never said that modern sensitive places *must* be like legislative assemblies, courthouses, and polling places; and such a conclusion would make no sense. *Bruen* could hardly have been clearer: it was "not undertak[ing] an exhaustive historical analysis," 142 S.Ct. at 2134 (quoting *Heller*, 554 U.S. at 626), and so was not "comprehensively defin[ing] sensitive places," *id.* at 2133. Instead, courts would be free to identify additional sensitive places "based on the historical record compiled by the parties." *Id.* at 2130 n.6. While the record before the Court was enough at that time to support a few sensitive places, they were expressly described as examples, *see id.* at 2133 (treating as sensitive "*e.g.*, legislative

assemblies, polling places, and courthouses")—not as an exhaustive list. And it could hardly be otherwise. After all, should a party unearth additional historical evidence supporting a restriction at a particular place—whether eight laws covering public assemblies or thirty provisions restricting guns at parks—no serious originalist inquiry could disregard them simply because *Bruen* happened not to mention them. *Bruen*'s historical inquiry requires seriously engaging with the historical record before the Court and applying it to the case at hand.

In any event, even looking to legislative assemblies, courthouses, and polling places exclusively, not a shred of historical evidence supports Plaintiffs' TSA-style security refrain. Begin with courthouses in 1870s Georgia. *See* Kopel & Greenlee, *supra*, at 246-47 (only American statute cited regarding firearms restrictions at courthouses). Plaintiffs provide no evidence that Georgia maintained comprehensive security at its courthouses during that time, let alone anything resembling the kind of screening TSA provides today. And in contemporaneously upholding that Georgia law, the State's high court was clear that security had nothing to do with it. Instead, the court upheld the law because "[t]he right to go into a court-house and peacefully and safely seek its privileges, is just as sacred as the right to carry arms," and the presence of firearms interfered with that right. *Hill*, 53 Ga. at 477-78. That bears out the State's approach—that there is a historical tradition of prohibiting

firearms at locations designed for the exercise of democratic rights, such as the right to petition, to speak, to assemble, and to vote. *See* NJ.Br.13.

Other established sensitive places represent an equally poor fit for Plaintiffs' invented "comprehensive security" test. Plaintiffs cite a number of statutes providing *compensation* for security personnel at legislative assemblies, *see* Koons.Br.24-25, n.5, but identify no statutes *requiring* that legislative assemblies have comprehensive armed security. The statutes they cite regarding courts and polling places also say nothing about the officials being armed or providing comprehensive security; instead, they indicate that sheriffs were often tasked with *conducting* the election. *See* Koons.Br.25 n.6-7.[4]

Moreover, by Plaintiffs' logic, polling places are not "sensitive" today: hardly any States require or allow security screenings there. *See, e.g.*, Nat'l Conf. of State Legislatures, *Report: Polling Places* (Oct. 18, 2022), https://tinyurl.com/bdf9y32u (noting that only five states "affirmatively indicate that police officers shall be stationed at polling places or be on notice to appear if requested"); *Burson v.*

---

[4] *See, e.g.*, Md. Const. art. 1, §3 (1776), *in The Federal and State Constitutional Colonial Charters and Other Organic Laws* 1691 (1909), https://tinyurl.com/44t4wu7r (sheriff or deputy "shall be the judges of the election"); *Abridgement of the Public Permanent Laws of Virginia* 325 (1796), https://tinyurl.com/2p87b4w9 (sheriff to "attend and take the poll" and "enter[] the names of the persons voted for"); 1790 Del. Laws ch. 214, *in 2 Laws of the State of Delaware* 984 (1797), https://tinyurl.com/2p96ysbt (sheriff "require to attend, conduct, and regulate" election).

24

*Freeman*, 504 U.S. 191, 207 (1992) (adding "law enforcement officers generally are barred from the vicinity of the polls to avoid any appearance of coercion in the electoral process"). And there is no basis whatsoever to say schools historically or today generally require TSA-level screenings before parents, staff, or students enter. *But see Bruen*, 142 S.Ct. at 2133 (allowing firearms restrictions at "sensitive places such as schools" (quoting *Heller*, 554 U.S. at 626)).[5] That is far less security than many of the locations—like MetLife Stadium—at which Plaintiffs so vigorously challenge Chapter 131's restrictions.

The States' evidence is not too little. The State's evidence is not too late. And there is no basis to limit all sensitive places to those with comprehensive security. Instead, the record supports Chapter 131's restrictions across the board.

2.    Plaintiffs' Evidentiary Challenges Misunderstand The Record.

While most of Plaintiffs' objections follow from their methodological errors, their efforts to distinguish specific pieces of evidence also prove unavailing.

---

[5] Finally, Plaintiffs err in relying on colonial-era laws requiring residents to take up arms to guard certain locations. Importantly, these compelled-carry laws were motivated by a collective militia-readiness rationale and did not reflect an individual right to carry in those locations. *See GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 n.42 (11th Cir. 2012) (discussing pedigree of these laws). Notably, endorsing this theory would also mean courthouses cannot be sensitive, contra *Bruen* and *Heller*: a 1675 Virginia law required that "all people" be "required to goe armed" to both "churches and courts." 2 *The Statutes at Large; Being a Collection of all the Laws of Virginia* 333 (William W. Hening ed., 1810), https://tinyurl.com/2dmhzfvy.

### a.  Permitted Public Assemblies (Section 7(a)(6)).

Plaintiffs have little new to say about public assemblies. They argue that the State's eight historical statutes come too late, Siegel.Br.43, even though they were enacted as early as 1869—one year after the Fourteenth Amendment took effect, NJ.Br.14-15 (collecting statutes). They complain these laws are too few, but these historical twins are more numerous than those revealing "legislative assemblies, polling places, and courthouses" as sensitive. And while Plaintiffs are forced to admit that these public-assembly laws were upheld by at least four different state high courts in the 19th Century, they claim these decisions either are outliers, wrong, or dicta. *See* Siegel.Br.43-44. Plaintiffs are incorrect: these cases specifically considered laws restricting guns "where people are assembled" valid—which was key to their overall holding. *See Shelby*, 2 S.W. at 469. Moreover, even dicta can bear on the historical understanding of the right, where it reflects a consistent, contemporaneous view by multiple jurists regarding the scope of the right, especially as applied to identical sensitive places. Finally, Plaintiffs offer no cases suggesting any jurist held a contrary view.

### b.  Public Libraries And Museums (Section 7(a)(12)).

Plaintiffs repeat the same mistakes when it comes to libraries. They do not deny that multiple historical laws prohibited firearms at "place[s] where persons are assembled for educational, literary or scientific purposes." *See* NJ.Br.19 (collecting

statutes). They also sensibly do not deny that these are "twins" for public libraries and museums. Plaintiffs make the same "too few," "too late," and "not enough security" refrains, but, as discussed, they fail. And although Plaintiffs argue vociferously that not all educational or literary settings restricted firearms, that merely reflects a diversity of approaches. What is missing is any evidence remotely suggesting anyone thought firearms restrictions at public libraries were unconstitutional. *See supra* at 10-15.

Even if the absence of restrictions in analogous historical locations, standing alone, were dispositive, Plaintiffs' argument still fails because the historical libraries and museums they point to bore none of the features that make today's libraries and museums (and the Reconstruction-era literary gathering) sensitive. For example, Benjamin Franklin's 1731 lending library was a "subscription library" for *members* who paid a fee to access the collection, and was only open to the public four hours per week and required a security deposit to enter. *See "At the Instance of Benjamin Franklin": A Brief History of the Library Company of Philadelphia* 13-14 (2015), https://tinyurl.com/yckzk97f. That is a far cry from modern public libraries, which log millions of visits annually, serve children and adults, and provide "educational" and "literary" services in group settings like after-school programming.

And the few historical museums Plaintiffs point to would hardly have prompted the enactment of firearms prohibitions in museums, given that these early

institutions were not stable and publicly accessible until decades after they first opened. *See Proceedings of the American Association of Museums* 58-59 (1915), https://tinyurl.com/44657p29 (Charleston Museum not open to public for first 50 years, and then plagued by financial instability); *Overview Guide to the New-York Historical Society Records 1804-2023*, New-York Hist. Soc'y Museum & Libr., (2016), https://tinyurl.com/3ctbbjh4 (New York Historical Society "had no permanent home of its own" for "its first fifty years"). That analogous places either did not exist or were scarce in the Founding era underscores the folly of Plaintiffs' approach: the lack of firearms restrictions in that era is not evidence that the policies that were in effect in the 19th Century were viewed as legally questionable.

> c. *Entertainment Facilities (Section 7(a)(17), Casinos (Section 7(a)(18) And N.J. Admin Code §13:69D-1.13), Movie Sets (Section 7(a)(23)), And Establishments Serving Alcohol (Section 7(a)(15)).*

Plaintiffs' response as to the historical statutes prohibiting firearms at various entertainment and social venues is particularly weak. Importantly, although Plaintiffs complain that the Statute of Northampton and Founding-era American laws adopting it had more limited reach,[6] they cannot seriously deny that an 1816

---

[6] Plaintiffs correctly note that *Bruen* found that by the 18th Century these laws were no longer understood to be "sweeping restriction[s] on public carry of self-defense weapons," 142 S.Ct. at 2139-41 (citing *Sir John Knight's Case*), but *Bruen* did not discuss (or cite historical evidence that addressed) the more specific statutory prohibitions on being armed "in Fairs, markets, nor in the presence of the Justices or

New Orleans prohibition on guns at ballrooms and myriad Reconstruction-era firearms restrictions at a "social party," "race-course," "public exhibition," or "places of entertainment or amusement" are "twins" (and at the very least analogues) for Chapter 131's restrictions at modern entertainment venues. *See* NJ.Br.16-17 (collecting statutes). Rather, Plaintiffs attempt to pick each historical law apart— separating out the Founding-era New Orleans Law from six 19th Century laws, from an 1853 New Mexico law, from a 1903 Montana law—and castigate each as (again) "too few" or "too late." Those responses fall flat once more. *See supra* at 11-22.

As to casinos, Plaintiffs' responses are puzzling. They insist the States could have restricted firearms at casinos earlier, as "those who lived in the colonies and early Republic regularly engaged in gambling and betting." Siegel.Br.67. That ignores a critical detail: gambling and betting was illegal. That is, although such activities did occur, they did not occur in large, licensed, congregate locations remotely resembling today's casinos. Rather, their own sources show "gambling went underground" in the 19th Century "and pretty much stayed there until after

---

other Ministers," JA1223, which persisted into the 18th century. *See, e.g.*, JA1508; JA1233-34; Sir Edward Coke, *The Third Part of the Institutes of the Laws of England* 161-62 (1797), https://tinyurl.com/yc7eyayn (confirming no right to "assemble force, though he be extremely threatened, to go with him to church, or market, or any other place," including "before the King's Justices"); *id.* (describing punishment of Sir Thomas Figett, who "went armed under his garments… before the justice of the kings bench" for self-protection).

World War I." Ed Crews, *Gambling: Apple-Pie American & Older than the Mayflower*, Colonial Williamsburg (Autumn 2008), https://tinyurl.com/yek2ucuk. It makes little sense to expect States to have enacted regulations on illegal activity. Once made legal, casinos developed into large-scale entertainment complexes, and like other entertainment complexes, fall into an established historical tradition. And even if New Orleans allowed gambling establishments without prohibiting firearms, *see* Siegel.Br.55, that hardly means such a prohibition would have been seen as unconstitutional.[7]

Plaintiffs' response as to establishments that serve alcohol likewise misses the forest for the trees. *See* Siegel.Br.51-52; Koons.Br.34-35. They quip that places that serve alcohol have existed since the Founding while ignoring that handguns only became widely available in the mid-1800s. *See supra* at 17. They reject the "twin" restrictions on carrying firearms at places that served alcohol in New Mexico (1853); New Orleans (1879); and Oklahoma (1890), *see* NJ.Br.17, based on *Bruen*'s refusal to find a historical tradition solely from territorial laws that contradict other affirmative evidence. *See* 142 S.Ct. at 2154. But they ignore that here there is no contrary historical evidence considering such restrictions unconstitutional. They

---

[7] Plaintiffs do not contest that the casinos and racetracks' independent action to ban firearms eliminates redressability. And even their lens of mootness is no help, Siegel.Br.52, n.13, since no exception applies when third parties independently act. *See* JA3032-33 (confirming signage prohibiting firearms).

further ignore that these laws are consistent with myriad statutory prohibitions on firearms at public gatherings and social venues. *See* NJ.Br.14-17. And they have no response to the fact that the historical pedigree of firearms restrictions in places that serve alcohol is greater than what *Bruen* identified for courthouses. Finally, they ignore the analogy to historical laws flatly banning alcohol sales near militia meetings and vice versa. *See* NJ.Br.17-18.

Finally, Plaintiffs' objection to restrictions at movie sets appear to be based on a misinterpretation. Nothing in Chapter 131 prevents them from carrying firearms on a public sidewalk while observing a film set. Rather, Chapter 131 prevents them from carrying firearms *within* the set. *See* Ch. 131 §7(a)(23). That demarcation is sensible: state law requires anyone filming on "public property such as streets, roads, or parks" to obtain a permit that temporarily closes off "public access." JA1124-25. And Plaintiffs readily admit that there is no "unrestricted Second Amendment right to carry on private movie sets." Siegel.Br.56.

> *d. Public Parks, Beaches, And Recreational Facilities (Section 7(a)(10) And N.J. Admin. Code §7:2-2.17(b)); Zoos (Section 7(a)(9)).*

The State identified dozens of historical prohibitions on firearms at recreational parks—including at the first modern zoos. NJ.Br.20-22. Plaintiffs' attacks come up empty.

31

Plaintiffs' response to zoos makes little sense. They do not deny that, within a decade of the Fourteenth Amendment's ratification, laws were enacted that restricted firearms at New York City's Central Park, Philadelphia's Fairmount Park, and Chicago's Lincoln Park. Nor do they deny that these were the sites of the first American zoos. *See* Siegel.Br.45-46. Instead, they dub these restrictions "too late"—repeating their persistent error in rejecting Reconstruction-era evidence, *see supra* at 15-22—and fault the State for not producing Founding-era restrictions at analogous locations without identifying which Founding-era locations they understand to be analogous to zoos. They additionally complain that one of the historical restrictions on firearms in zoos was allegedly motivated by a desire to protect wildlife rather than for public safety. Siegel.Br.46. That is hardly apparent from the text of the rule, and badly misunderstands the law: whenever a State relies on "clear historical example[s] of the exact same type of regulation" being challenged in the modern litigation—namely, historical "twins"— considerations of why "historical regulations burden rights relating to firearms" have no bearing. *Maryland Shall Issue v. Montgomery Cnty.*, No. 21-1736, 2023 WL 4373260, at *11 (D. Md. July 6, 2023) ("*MSI*"), *appeal docketed*, No. 23-1719 (4th Cir.); *see also infra* at 55-57. And in any event, this flawed critique pertains to only one of the State's three proffered "twins."

32

Next, Plaintiffs do not deny that the State has proffered thirty historical prohibitions on firearms in parks that are twins to the challenged parks restrictions. Nor do Plaintiffs offer evidence that anyone contemporaneously viewed these restrictions as unconstitutional. Yet Plaintiffs insist this is the case solely because States did not restrict firearms in spaces like Boston Common at the Founding. But for one, until the 1830s, Boston Common contained cows and "pasture fences"— hardly like the parks of today.[8] *See, e.g.*, Steven R. Pendery, *Probing the Boston Common*, 43 Archaeology, 42-47 (1990); Nat'l Park Serv., *Boston Common*, https://tinyurl.com/3hu5fw58; NJ.Br.22 n.4 (collecting sources contrasting Boston Common's "grazing area" to history of Central Park as progenitor of modern parks); Everytown.Amicus.Br.21-24 (same). And to the extent that a few parks akin to today's existed at the Founding and firearms were not prohibited there, that says exceedingly little about the original understanding of how the Second Amendment binds the States.[9] What speaks volumes is the dozens of prohibitions on firearms in parks enacted without controversy within a decade of when the states became bound

---

[8] Indeed, Plaintiffs cite one 1880 case suggesting Boston Common had become "a place of public resort for the recreation of the people," Siegel.Br.48, but that is no indication that the Common could be so characterized at the Founding.

[9] Nor do Plaintiffs explain how any of this supports their facial challenge, given that Section 7(a)(10) is not a blanket prohibition, but rather allows governing authorities to designate whether a given park is sensitive.

by the Second Amendment, *see* NJ.Br.20-22, and just as handguns were becoming commercially available, *see supra* at 17, and recreational parks widespread.

Concerning beaches, while it is of course true that the shoreline predates the Founding, the Jersey Shore of the 1700s bore no "relevant similarities" to the beaches of today. The first American public beach did not exist until the late 1800s. *See* Nat'l Park Serv., *Revere Beach Reservation Historic District*, https://tinyurl.com/3ev9u34d (1895 was when "first ocean beach in the United States [was] acquired for the purpose of public recreation"). And even the act of visiting the beach was not popular before the mid-1800s. Those who did—elites seeking remedies for ailments—did not linger on the beach. *See* Daniela Blei, *Inventing the Beach: The Unnatural History of a Natural Place*, Smithsonian Magazine, https://tinyurl.com/2p8mfx4m (Jun. 23 2016). Put simply, the type of family recreation that takes place at the Jersey Shore today is qualitatively different from activities at the coastlines of 1800. Instead, such family recreation is far more akin to gatherings and activities at 19th-Century parks—where, as just noted, generated a significant body of firearms restrictions just after the States ratified the Fourteenth Amendment and thus became subject to the Second.

> *e. Playgrounds       And        Youth       Sports     Events (Sections 7(a)(10), (11)).*

Like the district court, this Court should swiftly reject Plaintiffs' extraordinary argument that they have a constitutional right to carry firearms at playgrounds and youth sports events. *First*, Plaintiffs ask this Court to reverse the district court on this score in a passing footnote, with no reasoning, Siegel.Br.49 n.9, but this Court has long held "arguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived," *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 231 n.13 (3d Cir. 2013). *Second*, the district court was unquestionably correct. *Bruen* explicitly held that States may restrict firearms as schools, *see* 142 S.Ct. at 2133, and playgrounds and youth sports events are closely analogous to schools. All three are locations where children congregate—for all three, it is their raison d'etre[10]—and vulnerable individuals (including children) cannot defend themselves from gun violence. *See* NJ.Br.13, 19, 22-23 (discussing historical evidence restricting firearms at locations where vulnerable persons gather).

The *Koons* Plaintiffs' response is staggering. Although they do not challenge the firearms restrictions at schools, playgrounds, and youth sports events, they devote pages of their briefing to disputing that schools can be sensitive places.

---

[10] That makes them a far cry from the "many places" like "sidewalks" that children happen to be present, *see* Koons.Br.28—but where youth are not disproportionately present and/or where the space is not designed to attract children or families.

35

Koons.Br.37-41. But that goes against the Supreme Court's thrice-repeated holding. *See Heller*, 554 U.S. at 626 (approving of "laws forbidding the carrying of firearms in sensitive places such as schools"); *McDonald*, 561 U.S. at 786 (same, adding "[w]e repeat those assurances here"); *Bruen*, 142 S.Ct. at 2133 (same). The *Koons* Plaintiffs seek to cast these teachings aside as dicta, but "*Heller*'s list of 'presumptively lawful' regulations is not dicta," *Range v. Att'y Gen.*, 69 F.4th 96, 110 (3d Cir. 2023) (Ambro, J., concurring) (quoting *United States v. Barton*, 633 F.3d 168, 171 (3d Cir. 2011)), and in any event, courts act cautiously before disregarding an express determination the Supreme Court has repeatedly made. Regardless, the historical record bears out what the Court repeatedly said: Missouri prohibited carrying firearms "into any school room" in 1879, JA1515, while other jurisdictions prohibited firearms at educational and literary gatherings, *see supra* at 26-27.

### f. Healthcare Facilities And Treatment Centers (Sections 7(a)(21), (22)).

Plaintiffs attack another restriction designed to protect vulnerable individuals: the prohibition on firearms at healthcare facilities like hospitals. While Plaintiffs only meaningfully discuss hospitals on appeal, they demand an injunction as to the entirety of Sections 7(a)(21) and 7(a)(22). *See* Siegel.Br.58 n.14. This sweeping demand fails under Article III: as the district court concluded, the pleadings contain no allegations that the *Siegel* Plaintiffs will be visiting the vast majority of the

facilities in Section 7(a)(21), or any addiction or mental health treatment center (covered by Section 7(a)(22)). *See* JA113-14. Plaintiffs point to no allegations the district court missed, meaning any court order on carrying firearms at such locations is wholly advisory.

And Plaintiffs' discussion of hospitals is confused. Plaintiffs do not deny that individuals at hospitals—whether stricken by severe ailment, or in the middle of a complicated procedure—are uniquely vulnerable and would not be able to defend themselves from firearms violence. *See* NJ.Br.23. Instead, they observe that some things called "hospitals" have existed since the 1700s (including, they emphasize, Pennsylvania Hospital in 1751), and note that those "hospitals" did not regulate firearms. *See* Siegel.Br.56-57. But such 18th- and 19th-Century hospitals were nothing like modern medical facilities, another point Plaintiffs do not deny. Nor could they: Plaintiffs' own cited source confirms that "[f]or most of the nineteenth century, … only the socially marginal, poor, or isolated received medical care in institutions," and that "[e]ven surgery was routinely performed in patient's homes." Barbara Mann Wall, *History of Hospitals*, UPenn Nursing, https://tinyurl.com/ymrawt2n/; *see also* JA2451; David Oshinsky, *Bellevue: Three Centuries of Medicine and Mayhem at America's Most Storied Hospital* 46 (2016) (noting in 1800s America, "the hospital resembled a poorhouse with a vaguely medical bent"). Far from congregate centers to treat the vulnerable, these early

facilities "only incidentally car[ed] for the sick"; instead, these facilities "received dependent persons of all kinds." Paul Starr, *The Social Transformation of American Medicine* 166 (2d ed. 2017). The hospitals of today are thus a quintessentially new facility—addressing a modern problem—and can comfortably rely on analogies to other laws that restricted firearms carrying in locations that disproportionately have vulnerable persons, like schools. *See supra* at 35-36; *Bruen*, 142 S.Ct. at 2132 ("cases implicating unprecedented societal concerns or dramatic technological changes … require a more nuanced approach").

> g. *Buses And Private Vehicle Regulations (Section 7(b)(1) And N.J. Admin. Code §7:25-5.23(f)(5)).*

While automobiles are modern inventions, the State offered multiple sources of historical evidence justifying New Jersey's firearms restrictions on buses and in cars, which does not prohibit firearms in vehicles, but only requires that they be unloaded and secured in a closed case. *See* NJ.Br.24-26.

Begin with buses. As an initial matter, Plaintiffs do not dispute that buses are crowded, hectic, and confined locations that heighten the risk of firearms accidents. NJ.Br.24-25. They also do not dispute that early rail systems, which were privately-operated, often regulated firearms. *See* NJ.Br.24 (collecting examples); *Frey v. Nigrelli*, No. 21-cv-5334, 2023 WL 2473375, at *19 (S.D.N.Y. Mar. 13, 2023), *appeal docketed*, No. 23-365 (2d Cir.); Josh Hochman, *The Second Amendment on Board: Public & Private Historical Traditions of Firearm Regulation*, 133 Yale L.J.

__ (forthcoming 2023) at 13-17 (listing historical restrictions, including on railcars as early as 1835). Instead, Plaintiffs generally contend, without support, that such private restrictions can "have no bearing on whether *states* can prohibit firearms in vehicles." Siegel.Br.60.

Plaintiffs are wrong. This tradition of private restriction reveals passengers likely expected that they could not "carry[] on board functional firearms, or weapons that would render their owners ready for confrontation." *Hochman*, *supra*, at 5; *see id.* at 28-32 (noting that some historical evidence for designating schools as sensitive likewise comes from private institution restrictions); *Frey*, 2023 WL 2473375, at *19 (denying preliminary injunction of firearms ban on New York subway and rails in part because of history of private restrictions on railcars). It would be odd to think that the lack of *government* regulation when there was already private regulation is probative of any constitutional limitation. Indeed, these widespread private regulations show that state restrictions would not have been necessary in the 19th Century—not that anyone saw firearms limits in vehicles as unconstitutional.

Plaintiffs' responses to the vehicle-related evidence also come up empty. They cannot deny that private cars were developed in the 20th Century, nor can they deny the unique risks firearms in cars present. *See* Amicus Br. of Cnty. Prosecutors Ass'n of N.J. at 13-18 (detailing risks from road rage and dangers to police during traffic stops). They also ignore that once vehicles did become commercially available,

States began regulating firearms in vehicles immediately—without any concern that these laws were infirm. *See* NJ.Br.25 (citing 1919 and 1929 laws regulating loaded firearms in vehicles). To the contrary, Plaintiffs simply complain that there is not a tight enough fit with 18th- and 19th-Century evidence, ignoring *Bruen*'s admonition that a more "nuanced approach" is needed where a particular regulation addresses a novel societal problem. 142 S.Ct. at 2132.

Regardless, Plaintiffs insufficiently address the historical evidence from the colonial and Reconstruction eras. *See* JA2833 (1686 New Jersey prohibition on planters from riding with a pistol); JA1252 (1871 Texas statute barring carrying on one's "person, saddle, or his saddle-bags"). Plaintiffs ignore the latter—except to call the evidence "too late"—and generally contend that the former has exceptions for "strangers" "travelling." Siegel.Br.59. However, Plaintiffs misunderstand the travel exceptions, which applied only if travelling outside "the ordinary habits, business, or duties of the person, to a distance from his home." *Gholson v. State*, 53 Ala. 519, 521 (1875). That did not permit carrying while moving through one's community, but instead only applied to farther journeys. *See* JA1201-04. Because the reach of Chapter 131's vehicle regulation is similar—after all, any vehicle travel within New Jersey today would not be the type of "journey" that was exempted historically—the travel exceptions Plaintiffs highlight fail to distinguish this historical evidence.

>    *h. Fish & Game Regulations (N.J. Admin. Code 7:25-5.23(a), (c), (f), (i), (m)).*

*Siegel* Plaintiffs are wrong to contend that the district court should have enjoined fish-and-game regulations. These regulations, which have existed since at least 1970, *see* 2 N.J.R. 61 (Aug. 6, 1970),[11] govern the types of weapons and ammunition hunters may bring to hunt game. *See* N.J. Admin. Code §7:25-5.23(a), (c), (f), (m). They also prohibit carrying weapons in state game refuges without permission, *id.* §(i),[12] which the district court correctly found no Plaintiff alleges intent to visit. *See* JA115.

Plaintiffs' claims fail because their proposed course of conduct is not covered by the Second Amendment. As the district court found, the Second Amendment does not encompass a right to recreational hunting. JA230-31. To the extent a State chooses to permit hunting, it has "broad trustee and police powers over wildlife within its borders." *See Utah Native Plant Soc'y v. U.S. Forest Serv.*, 923 F.3d 860, 866 (10th Cir. 2019). And the instant regulations allow those who choose to hunt to

---

[11] That Plaintiffs challenge a 53-year old regulation is—by itself—reason to deny an emergency injunction. *See* JA234 (citing *Lanin v. Borough of Tenafly*, 515 Fed. App'x. 114, 117-18 (3d Cir. 2013)). And their merits burden is also higher: Plaintiffs must show an "indisputably clear" right to relief. *Hope v. Warden York Cnty. Prison,* 972 F.3d 310, 320 (3d Cir. 2020) (citations omitted). Plaintiffs also cannot demonstrate redressability, since the game code is enforced by the Division of Fish and Wildlife, not Defendants.

[12] The district court enjoined N.J. Admin. Code §7:25-5.23(f)(5), requiring firearms be unloaded in a secure case while in vehicles, which is addressed at 38-40, *supra*.

carry various types of weapons, which serve both hunting and self-defense purposes. *See* JA231-232. Nothing in *Heller* or *Bruen* suggests there is a right to carry both handguns and other weapons simultaneously while engaging in hunting—an activity to which there is no constitutional right.

Finally, the fish and game regulations are supported by the history of state regulation of game hunting. The district court found an "established historical tradition of comparable laws to sustain the Fish and Game Restrictions." JA232-33 (collecting statutes). It relied on the State's record of numerous analogues restricting methods of hunting and the types of weapons permitted. For example, Maryland's 1838 law prohibited carrying any firearm while on water near certain wild fowl, and the mere "discovering or finding of any offensive weapon" was "deemed prima facie evidence of intent to shoot." JA2481. This Court should thus affirm.

## B. The Government-As-Proprietor Doctrine Independently Justifies Many Sensitive-Place Restrictions.

To the extent Plaintiffs challenge Chapter 131's sensitive-place restrictions as applied to businesses operated by the State, the challenges fail for a second reason: like the private businesses with whom it competes, the State may prohibit handgun carriage as proprietor without offending the Second Amendment. *See* NJ.Br.34-37; *Reeves v. Stake*, 447 U.S. 429, 439 (1980). That is, the Second Amendment does not empower Plaintiffs to visit a hospital while armed if that goes against the hospital

policy—whether the hospital is run by a private entity or the State. Plaintiffs rely on two responses, neither of which succeed. *See* Siegel.Br.61-64; Koons.Br.38-40.

Plaintiffs' first claim—that the government-as-proprietor rule never applies to Second Amendment disputes, *see* Siegel.Br.62-64; Koons.Br.40—is simply wrong. The parties agree that the plain text of the Second Amendment binds governments, not private parties. *See, e.g.*, Koons.Br.41 (emphasizing that private parties "are not restricted by the Second Amendment" but the "government is bound by the Second Amendment"); Siegel.Br.60 (arguing that history of private firearms policies "ha[s] no bearing" on governments' power, because the Second Amendment applies to the latter alone). But the government-as-proprietor doctrine *is* how the law decides when the government is acting like a sovereign, and thus subject to myriad constitutional commands, and when it is acting like a private party, and thus should be subject only to the same Second Amendment restrictions as its private business competitors. *See White v. Mass. Council of Constr. Emps., Inc.*, 460 U.S. 204, 208 (1983).[13] That is why pre-*Bruen* decisions recognize the government-as-proprietor analysis could apply to Second Amendment-related disputes. *See United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019) (confirming when government "acts as a proprietor rather

---

[13] Plaintiffs complain of fuzziness between sovereign or proprietary spaces thus rings hollow. Courts already have experience distinguishing the public "sidewalks" from a government-operated location in those other jurisprudential contexts.

than as a sovereign, it has broad discretion to govern its business operations"); *GeorgiaCarry.org, Inc. v. U.S. Army Corps of Eng'rs* ("*GeorgiaCarry II*"), 212 F.Supp.3d 1348 (N.D. Ga. 2016). Plaintiffs do not cite any firearms suits adopting Plaintiffs' categorical no-proprietor rule.

Plaintiffs' primary response—that since *Bruen* never mentions the doctrine, it cannot be a part of Second Amendment analysis, and the pre-*Bruen* government-as-proprietor cases must be rejected—is inadequate. *Bruen*'s silence is unsurprising and insignificant: the question was not raised, because New York's proper-cause statute had nothing to do with government-operated spaces, and *Bruen* does not foreclose constitutional doctrines it did not discuss. Nor are Plaintiffs' attempts to distinguish the pre-*Bruen* cases persuasive. Plaintiffs criticize these cases for discussing the since-abrogated means-end scrutiny standard, but that does not mean those cases' separate acknowledgment of the proprietor doctrine is infirm. *See, e.g.*, *Class*, 930 F.3d at 463 (expressly declining to reach means-end scrutiny, and instead finding firearms restrictions where the government is proprietor "does not impinge upon a right protected by the Second Amendment" in the first place). Indeed, the doctrine is consistent with *Bruen*'s  focus on using history to glean original understanding: historically, as now, there is no dispute that private businesses can restrict firearms as proprietors. And because the State is acting as an analogous proprietor, it can do the same at its analogous property today.  *See, e.g.*, *Frey*, 2023 WL 2473375, at *19

(noting subways are "government owned and operated, and therefore the government as proprietor can impose its own restrictions on gun-carrying upon its passengers").

Plaintiffs' second argument is no better. Plaintiffs claim the State necessarily is acting as a sovereign and not a proprietor when the firearms restriction is enacted within a statute and backed by criminal sanctions. *See* Siegel.Br.62; Koons.Br.38-39. But the application of the government-as-proprietor test turns on the substance of a restriction, not on its form or enforcement mechanism. *See Class*, 930 F.3d at 464 (applying rule to federal criminal statute). That is, what matters is what a plaintiff is prevented from doing, not how that restriction is announced or can be enforced. After all, the core precedents—which Plaintiffs do not engage with—also involve a government prohibition in a statute, and yet the Supreme Court invoked the government-as-proprietor principle in rejecting those constitutional challenges. *See Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 805 (1976) (statute) *Class*, 930 F.3d at 464 (statute); *cf. White*, 460 U.S. at 205 (executive order). It could hardly be otherwise: legislation is how Congress or a State's legislature can set policies for particular parcels of property or categories of government-operated spaces.

Under that principle, just as a privately-run hospital may demand that entrants not be armed, a State-run hospital may do the same—and the Legislature may institute that requirement for a State facility via legislation. In either case, the burden

on hospital-goers is indistinguishable. In either case, the visitor has no constitutional right to receive hospital services on the visitor's terms rather than those of the business they choose to enter. *Cf. United States v. Blumenthal*, 315 F.2d 351, 353 (3d Cir. 1963) (rejecting due process challenge brought by evicted tenant against his landlord, the United States, because as landlord it "act[ed] in it[s] proprietary rather than its governmental capacity," and thus "has the same absolute right as any other landlord to terminate a monthly lease"). Nor does it matter that those terms of entry may be enforced with criminal penalties, which likewise would apply to anyone who entered private property with a firearm over the private owner's equally-clear objection.

## II. THE PRIVATE-PROPERTY RULE IS CONSTITUTIONAL.

The requirement that individuals cannot carry firearms onto another's private property without the owner's consent (1) does not regulate conduct protected by the Second Amendment and (2) is consistent with especially extensive history. Plaintiffs barely defend the district court's holding, which allows individuals to carry firearms into their local coffeeshop without the owner's consent. But they also fail to support their even more radical rule, which would allow them to carry into neighbors' and customers' homes without seeking permission or even notifying them.

### A. Section 7(a)(24) Does Not Regulate Conduct Within The Plain Text Of The Second Amendment.

Plaintiffs have not met their burden of proving that "the Second Amendment's plain text covers an individual's conduct," *Bruen* 142 S.Ct. at 2129-30—that is, that the Constitution accords them a right to carry firearms onto another's private property without their consent. As the State explained, the Second Amendment protects the right to carry for self-defense "in the home," *Heller*, 554 U.S. at 635, and "in public," *Bruen*, 142 S.Ct. at 2135, but this right does not extend into another person's home or private property. Instead, whether someone can carry onto another's private property is the result of the owner's wishes, and the State can adopt property-law rules that properly effectuate owners' intent and expectations. *See* NJ.Br.38 (citing, *e.g.*, *GeorgiaCarry.org*, 687 F.3d at 1264). Were it otherwise, a

repairman could carry a firearm into a customer's home without her knowledge or permission, even if doing so was entirely inconsistent with her own preferences.

Plaintiffs' responses miss the point. As an initial matter, they misunderstand the operation of Section 7(a)(24). Despite acknowledging that private property owners can "exclude firearms from their property," Plaintiffs complain that Section 7(a)(24) improperly "make[s] that choice for them" and "coopts the property owner's control into a State-enforced prohibition." Koons.Br.41. But the challenged statute does nothing of the sort. It only establishes that under New Jersey property law, owners can welcome firearms—whether globally or to specific individuals, orally or in writing—but if they decline to do so, that reflects a decision not to allow carry. The provision addresses a real-world problem: all property owners are free to welcome or exclude firearms on their property, but they do not always make their choice clear. Because the owner's silence must be given *some* construction as a matter of property law, this provision does not "make the choice" for owners any more than Plaintiffs' approach would. And as the record shows, this rule is far *less* likely to effectuate a choice contrary to the owner's preferences. *See* NJ.Br.39.

Plaintiffs resist this conclusion in two ways, but both fall short. First, Plaintiffs allege that no distinction exists at *Bruen*'s first step between carrying in one's home, in public, or on another's property. *See* Koons.Br.40-41 (arguing the text "supports no distinction between the right to carry firearms in locations that the State might

characterize as 'public' and locations that the State might characterize as 'private'"); Siegel.Br.32-35 (agreeing district court's line-drawing lacks support, but arguing the Second Amendment goes even further). They claim that because *Bruen* rejected the "home/public distinction" and found that the Second Amendment applies "outside the home," *Bruen* supports the right to carry onto another's property, too. *See* Koons.Br.41; Siegel.Br.34. But *Bruen* only considered whether the right is limited to the home or extends to public spaces, and squarely answered in favor of the latter. 142 S.Ct. at 2134-35. *Bruen* did not involve a request to carry on another's property, and so it did not address that separate issue. It thus gave no guidance on the issue presented here—how to reconcile the right with the "established property law, tort law, and criminal law that embodies a private property owner's exclusive right to be king of his own castle." *GeorgiaCarry.org*, 687 F.3d at 1264.

And as a matter of first principles, private property has always been different. The plain language of the Second Amendment refers to infringements on the "right" to "bear arms," but one's "rights" on another's private property—in contrast to one's own home or in public spaces—have always incorporated and been understood with reference to "the equally fundamental right of a private property owner to exercise exclusive dominion and control over its land." *Id.* at 1265. Indeed, individuals have no right to enter private property in the first place. *See* JA1605 (Blackstone: "[E]very entry … [on another's property] without the owner's leave … is a trespass or

transgression."). And even when an individual is invited into that property—whether because a store is open to the public, or because they were personally invited in by the homeowner—that "permission is called a license," which is always "limited by the purpose" of the establishment and contours of the invitation. JA138-39 (quoting Thomas M. Cooley, *A Treatise on the Law of Torts or the Wrongs Which Arise Independent of Contract* 302-03 (Chi., Callaghan & Co., 1880)); *see Florida v. Jardines*, 569 U.S. 1, 9 (2013) ("The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose.").

Plaintiffs have not shown that an owner's act of allowing another to enter her home or business impliedly includes permission to enter with a firearm. That is, Plaintiffs have not shown that when a grocery store owner invites shoppers to enter to shop during business hours, the owner intended or expected that invitation to authorize individuals to carry firearms in the frozen section—any more than he authorized shoppers to pitch tents and camp out by the canned foods aisle. While Plaintiffs previously could have carried their firearms in the store in the face of such silence, that was not the result of a "custom or other indicia of consent," Koons.Br.44, but was merely the result of prior state property law on the subject. Indeed, the record establishes that New Jersey's property owners do not expect or intend silence to include permission to carry. *See* NJ.Br.39; *infra* at 53. Plaintiffs' approach would thus undermine owners' expectations—and wreak havoc on the

laws in at least ten jurisdictions that apply similar consent requirements for all or at least some private property. *See* NJ.Br.40 (collecting statutes).[14]

Plaintiffs' state-action argument fails for similar reasons. Their argument runs like this: even if New Jersey law does merely set a default for private property, and even if that law does properly reflect what owners likely mean by their silence, that is still "state action"—and that fact alone places Section 7(a)(24) within the Second Amendment's text. *See* Siegel.Br.33-34 (asserting presence of "state action" satisfies *Bruen*'s first step). That is a red herring. Not everything that qualifies as state action triggers a constitutional right; rather, such state action must regulate constitutionally-protected activity. And here, the only activity Section 7(a)(24) implicates is carrying firearms onto another's property without their leave—which, again, is not something Plaintiffs have a right to do. *See GeorgiaCarry.Org*, 687 F.3d at 1264.

An example helps prove that whether a statute is "state action" and whether it implicates *Bruen*'s first step are materially different inquiries. As Plaintiffs concede, New Jersey could pass a law that imposes criminal penalties on anyone who carries firearms on private property over the owner's express rejection. That law would be "state action." Yet that provision would not implicate the Second Amendment

---

[14] Plaintiffs try to distinguish some of these statutes as covering only certain private property, whether residential property or houses of worship, Siegel.Br.37 n.7, but do not deny the State's basic point: Plaintiffs' approach, which requires reading silence to allow carry on *all* forms of private property, renders these laws invalid too.

because it does not regulate any constitutionally-protected activity: the parties agree no one has a Second Amendment right to carry on private property over the owner's objection. *See* Siegel.Br.33; Koons.Br.42 n.12. Section 7(a)(24) is valid for the same reasons. Since there likewise is no Second Amendment right to carry on private property without the owner's consent, a private property rule that seeks to effectuate owners' intent does not fall within *Bruen*'s first step. Framing this as a question of "state action" thus obfuscates the real question over the scope of the right.

Plaintiffs' reliance on *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011), *see* Koons.Br.41-42, is therefore misplaced. In *Brown*, the Court determined that minors enjoy a First Amendment right to purchase or rent violent video games even *over* parental objection, and so a law stripping them of the ability to do so violated their constitutional rights. 564 U.S. at 794. This case could hardly be more different. As Plaintiffs concede, the Second Amendment does not "trump[] property law," Siegel.Br.33, and Plaintiffs thus do not have a right to carry firearms over the owner's objection, *see* Siegel.Br.33; Koons.Br.42 n.12. Rather, an individual's ability to carry firearms on private property is entirely derivative of the scope of the owner's permission. In such a situation—precisely the opposite of that in *Brown*— the State law effectuating the owner's likely intent does not impinge on constitutional rights.

Because neither Plaintiffs' one-size-fits-all locational approach nor their state-action approach pass muster, all that remains is their half-hearted claim that Section 7(a)(24) does not advance owners' likely expectations and intents. *See* Siegel.Br.34 (challenging study's sample size and the import of its conclusions). But Plaintiffs offer no contrary evidence to suggest Section 7(a)(24) gets owners' expectations and preferences wrong—let alone that it defeats the Legislature's findings on the subject. *See* Ch. 131 §1(h). And the State's evidence does show Section 7(a)(24) "reflect[s] what a majority of" New Jersey property owners "prefer." JA1556. The unrebutted survey—based upon a statistically significant sample of residents and published in a peer-reviewed journal, JA1558—shows that few New Jersey residents believe their silence grants permission to carry guns on their property, and that most agree the law should *not* construe silence as consent. *See* JA1570, JA1572 (without the owner's permission, 19.3% of respondents thought one could carry a firearm on a client's home; 15.8% believed one could bring a gun into a private business; 21.1% said plumbers should be allowed to bring gun on one's premises; 22.8% said a visiting friend should be allowed to bring a gun; 33.3% said customers should be allowed to bring a gun into a business).[15]

---

[15] Also available as ECF 88-21 on the district-court docket.

In other words, while Plaintiffs are correct to note the vast majority of respondents had no idea what current law says on this subject, *see* Siegel.Br.34 n.5, Section 7(a)(24)'s approach is more consistent with how most respondents would want their silence construed. *See* JA1561. That is, this private property regime more appropriately "vindicates" owners' preferences as to the "dominion and control" over their property. *GeorgiaCarry.Org*, 687 F.3d at 1264-65. While all property owners remain free to express and effectuate their preferences, New Jersey law today interprets their silence as they likely want it understood. Plaintiffs have no Second Amendment right to trump that approach to property rights.

### B. Section 7(a)(24) Is Supported By Extensive Historical Evidence.

Even if Section 7(a)(24) implicates the Constitution's text at *Bruen*'s step one, powerful historical evidence establishes that States understood such laws remained an available policy option under the Second and Fourteenth Amendments. As the State already explained, seven States maintained similar laws at the Founding and/or Reconstruction—requiring individuals to obtain consent before carrying guns on another's private property, thus reflecting the sacrosanct nature of property rights to those generations. *See* NJ.Br.40-44 (citing statutes from New Jersey, Louisiana, Massachusetts, New York, Oregon, Pennsylvania, and Texas); JA950-57, JA1143-52. Unlike the majorities in *Heller* and *Bruen*, Plaintiffs identify *no* evidence that any of these statutes were invalidated (let alone questioned) by any court; that other

States specifically declined to adopt such laws on constitutional grounds; or that any Founding- or Reconstruction-era commentator or public official ever questioned the validity of these provisions.

The objections that Plaintiffs do levy to these enactments cannot withstand scrutiny. Their arguments can be grouped into three categories: that some (though not all) of the statutes related to hunting or poaching; that some (though not all) were limited to certain types of private property; and that some (though not all) were Reconstruction-era laws with racially-discriminatory purposes. *See* Siegel.Br.32-42; Koons.Br.44-49. Each fails on the history and the law.

1. Begin with Plaintiffs' insistence that this Court distinguish (some of) these laws as anti-poaching measures. Plaintiffs do not argue that the Louisiana, Texas, and Oregon statutes included any hunting-related purposes, so if this Court rightly finds that those three historical twins are sufficient, this argument is of no moment. But even on its face, Plaintiffs' claim has two serious flaws.

First, this argument is legally irrelevant. As the State explained in its opening brief, whenever a government relies on "clear historical example[s] of the exact same type of regulation" being challenged in the modern litigation—what the *Bruen* majority referred to as historical "twins"—then considerations of "'how and why' historical regulations burden rights relating to firearms" have no bearing. *MSI*, 2023

WL 4373260, at *11. In other words, when the State relies on a "twin," it does not matter what the Legislature's impetus for enacting that law was.

Plaintiffs misunderstand this test. Plaintiffs complain that "'how and why' a historical law burdened the right to armed self-defense are 'central' considerations when engaging in an analogical inquiry." Koons.Br.45 (quoting *Bruen*, 142 S.Ct. at 2133). But an analogical inquiry makes no sense when historical laws were identical. When States maintained an *identical* law at the Founding and/or Reconstruction— and did so without challenge—that is strong evidence the Second and Fourteenth Amendments did not invalidate it. It is only in cases where there were *no* identical laws during those times that States may resort to analogies to support their modern provision—namely, laws that restricted *similar* conduct for *similar* reasons. Because the core inquiry is whether the modern law would have been consistent with the Second and Fourteenth Amendments, the "how and why" analysis is how courts ensure the modern law and the historical analogy really are similar enough, such that the validity of the latter proves the former would have been valid, too. But because here, these property laws involve twins—and not analogies—"motive" is inapposite. *Cf. United States v. O'Brien*, 391 U.S. 367, 383 (1968) (describing "familiar principle of constitutional law" that "legislative motive" is not a basis for determining constitutionality of legislation).

A contrary rule would make little sense, and would suggest a valid law would become constitutionally suspect if the motivation for passing it eroded. For example, while Congress initially enacted statutes restricting the use of photographic reproductions of currency "to combat the surge in counterfeiting caused by . . . the [Civil] [W]ar and the unsettled economic conditions of the time," *Regan v. Time, Inc.*, 468 U.S. 641, 643 (1984), those motivations obviously no longer exist today. But that of course does not make modern statutes prohibiting the same conduct unconstitutional. The same is true here: if the State believed it could adopt a law requiring individuals to obtain consent before carrying onto another's private property at the same time that it ratified the Second and/or Fourteenth Amendments, it obviously believed such laws were valid, regardless of the specific motivations underlying the historical enactment. That is direct evidence of constitutionality at *Bruen*'s originalism-focused second step, even if a later Legislature believed the law served different policy goals.

Second, even were this argument relevant, it is inconsistent with the historical record and expert evidence. Plaintiffs' claim that four States' Founding-era statutes are "hunting regulations designed to discourage poaching," Siegel.Br.37, rests upon cherry-picking the titles of a few statutes and ignoring the plain language of others. *See* Koons.Br.54-55 (relying primarily on *Antonyuk v. Hochul*, No. 1:22-cv-0986, 2022 WL 16744700, at *79 (N.D.N.Y. Nov. 7, 2022), which the Second Circuit

stayed, *see Antonyuk v. Hochul*, Nos. 22-2908 & 22-2972 (2d Cir. Dec. 7, 2022), JA1470); Siegel.Br.36-37 (same). As to the titles, although Plaintiffs highlight the title of New Jersey's 1769 law, "Act for the More Effectual Preservation of Deer in This Colony," Siegel.Br.38 (quoting JA1168), they ignore that by 1771, the law's title was amended to read, "An Act for the Preservation of Deer and other Game, *and to prevent trespassing with Guns*," JA1172 (emphasis added), and *that* version governed for over a century. That is telling: as the expert evidence establishes, it "was common for 18th and early 19th century statutes to have multiple goals," JA1147 (Hartog), and for different parts of a law to track those distinct goals.

That describes these historical statutes perfectly. Beyond cherry-picking titles, Plaintiffs have no answer to the operative language and structure of these laws. For instance, Section 1 of New Jersey's 1771 law does not mention hunting, but makes it unlawful for anyone "to carry any Gun on any Lands not his own … unless he hath License or Permission in Writing from the Owner." JA1173. Hunting is addressed only in a distinct prohibition in Section 2. *Id*. And other New Jersey laws are the same. The 1846 New Jersey law had the same structure and language—with one prohibition for carrying without express permission, and another for hunting. JA1181. And the language of each pre-1771 New Jersey law likewise reveals that they were intended to protect owners' private property rights and were not just limited to poaching. *See* JA962 (1722) (unlawful "to carry any Gun … on the

improved or inclosed Lands in any Plantation, and on other than his own," without

"License or Permission from the owner of such Lands or Plantation"); JA970 (1751)

(unlawful "to carry a Gun … in any … Persons Land, without leave first had and

obtained … in writing"); JA1168 (1769) (unlawful "to carry any Gun, ... on any

Lands not his own," without "Licence or Permission in Writing"). As the State

explained in its opening brief, contemporaneous historical evidence confirms the

New Jersey law prohibited trespass with guns regardless of intent to poach. *See*

NJ.Br.43 (citing JA952, JA955-57, JA1147, JA1623).[16]

Nor was New Jersey unique in this way. New York's law expressly states that

it is intended to address "the great Danger [to] the Lives of his Majesty's Subjects"

imposed by guns on others' property, including "grievous Injury of the Proprietors."

JA1640. And the language of the New York, Pennsylvania, and Massachusetts

statutes provides the same restriction on carrying without consent. *See* JA1634-38

(Pa. 1721) (unlawful to "carry any gun *or* hunt on the improved or inclosed lands of

---

[16] *State v. One 1990 Honda Accord*, 712 A.2d 1148 (N.J. 1998), and *Solomon v. Cook County Board of Commissioners*, 559 F. Supp. 3d 675, 690-91 (N.D. Ill. 2021), also do not establish that the New Jersey laws only governed poaching. Siegel.Br.37-38. *One 1990 Honda Accord* merely listed a series of "fish and gaming statutes" to show that such minor offenses proceeded before justices of the peace, 712 A.2d at 1155-56—hardly controversial, since all agree the statute *also* contained fish-and-game rules. And *Solomon* only cited the 1722 law, not the later enactments that specified non-poaching objectives. Its holding that the 1722 law did not justify an absolute prohibition on firearms in a public forest preserve also does not help Plaintiffs, since *this* case concerns a parallel private-property provision.

any plantation other than his own" without express permission) (emphasis added); JA1639-42 (N.Y. 1763) (unlawful to "carry, shoot, *or* discharge any Musket, Fowling-Piece, or other Fire-Arm" on covered private property "without License in Writing") (emphasis added); JA1831-33 (Mass. 1789, applied to Dukes County) (unlawful for "any Person or persons, except" those with "the special licence of the proprietors of the said Islands, or" a "sufficient reason," to enter "with any gun or guns upon either of the said Islands"). No matter whether hunting was one purpose or even an important concern, States at the Founding saw restrictions on carrying onto private property without permission as valid to protect property rights, on which early Americans placed "enormous weight"—and they remain so today. JA1146.

2. Plaintiffs also fall short in trying to distinguish these historical laws as only applying to certain property.[17] *See* Siegel.Br.39-41; Koons.Br.44-48. But their efforts rest on misreading or ignoring the historical statutory text.

First, Plaintiffs' claim that these laws only applied to "inclosed" properties, and thus to fenced-in properties alone, collapses for three independent reasons. For one, many of the historical predecessors did not limit their reach to inclosed premises or lands at all. In New Jersey, none of the 1769, 1771, or 1846 provisions made any

---

[17] Plaintiffs' demand for not just enforcement history—which the State provided, NJ.Br.43—but enforcement history as to specific kinds of property, is unfounded. *See infra* at 72.

reference to "inclosed" lands; they instead limited carry within the owner's express consent on "any Lands" on which the "Owner pays Taxes." JA1001, JA1167, JA1028-29. As the unrebutted expert evidence explains, that text covered "all privately held lands without limitation," including businesses. JA1148-49 (adding that law "went out of its way to mark that jurisdiction may fall to justices of the peace in towns and cities, not just rural" areas, *see* JA1173). The same is true of the Louisiana statute that persisted for five decades, which prohibited carrying firearms without consent on all "premises or plantations" without qualification. JA1662.

For another, three of the historical laws that refer to inclosed property actually refer to "*improved or* inclosed" property, and Plaintiffs cannot show that the "improved" meant "fenced-in." *E.g.*, JA962, 1634 (1722 New Jersey statute requiring consent to carry on any "improved or inclosed Lands in any Plantation, and on other than his own" without "License or Permission"); JA1634 (Pennsylvania 1721) (similar). Other sources confirm that "improved or enclosed" referred to any "land brought from its wild uncultivated state." *Clark v. Phelps*, 4 Cow. 190, 192 (N.Y. Sup. Ct. 1825); *see also Tucker v. White*, 1 N.J.L. 94, 103 (1791) (noting party did not have possession over land when "he neither cleared, fenced, nor in any manner improved the land"). Given that the homes and businesses at which Plaintiffs wish to carry without consent are certainly not "unimproved" land—and much of it is "inclosed"—it is not clear how Plaintiffs' reading helps them.

61

Finally, Plaintiffs simply misunderstand the word "inclosed" to mean only the fenced-in properties that were marked off-limits to hunting. The historical evidence shows that "improved or inclosed" lands refers to all private property other than common and wild land—and the law prohibited carry on all such property regardless of intent to hunt. *See* JA1149-50 (expert historian confirming definition referred to fact of owners' notice of his possession of land, in an era where records of land ownership were not ubiquitous). As Blackstone noted, "inclosed" means to set land "apart from" others' land, and a "visible material fence" is not required; instead, an "ideal invisible boundary, existing only in the contemplation of the law" is sufficient. JA1605-06; *see* JA1628 (Locke: "As much land as a man tills, plants, improves, cultivates, and can use the product of, so much is his property. He by his labour does, as it were, *inclose* it from the common." (emphasis added)).

Second, Plaintiffs' claim that these laws applied to "farmland" or "residential" property and not to business establishments, *see* Koons.Br.48; Siegel.Br.41, likewise ignores the actual text of the laws. The New Jersey, New York, and Massachusetts statutes were not limited to plantations. *See supra* at 59-60. The Texas, Louisiana, and Oregon laws Plaintiffs challenge specifically referred to both "*premises or* plantations." JA1645 (emphasis added); JA1531-33; JA1651 ("premises or lands"). And the "premises" unquestionably included retail establishments. *See Sandeman v.*

*Deake*, 17 La. 332, 335 (1841) (describing "store" as "premises"); *Hahn v. Guardian Assurance Co.*, 32 P. 683, 684 (Ore. 1893) (same).

Third, the *Koons* Plaintiffs' claim that the historical laws are distinguishable because they do not make specific references to "dwelling-houses" or "buildings" is both unsupported and illogical. Koons.Br.46. As already explained above, multiple laws covered "any Lands" on which the "Owner pays Taxes," which would extend to "dwelling-houses" or "buildings" in equal measure; others reached improvements, which similarly included such structures, *see Brower v. City of New York*, 3 Barb. 254, 255 (N.Y. Sup. Ct. 1848) (referring to city land that was "improved by the erection of dwelling houses"); and others spoke to "premises," which as explained, covered stores. Statutes need not woodenly mention homes and buildings when their plain language already encompasses them.

3. Plaintiffs' direct attacks on Reconstruction-era statutes in Louisiana, Texas, and Oregon, *see* JA1531-36, JA1658-63 (La. 1865 & 1915); JA1643-46 (Tex. 1867); JA1651 (Ore. 1893), fare no better. Plaintiffs claim that these statutes "come too late." Koons.Br.46; *see also* Siegel.Br.39-40 (same). But evidence from Reconstruction is powerful proof of how the States understood the Fourteenth Amendment's scope. *See supra* at 18-22. And especially here, when Reconstruction laws do not conflict with Founding-era ones, it is "unnecessary to choose between" the two. *Bruen*, 142 S.Ct. at 2163 (Barrett, J., concurring). Plaintiffs also claim these

laws are "too little." Koons.Br.46. But as discussed, three state laws can provide compelling evidence of constitutionality, especially when (as here) none were challenged or even questioned on Second Amendment grounds, and when (as here) they support Founding-era evidence from multiple other States. *See supra* at 10-18.

That leaves Plaintiffs' charge that the Louisiana, Texas, and Oregon laws were motivated by racism. As an initial matter, this motives-based attack is irrelevant. *See supra* at 55-57 (explaining that the "why" analysis does not apply to twins). The Nation's sordid history on race is condemnable, and if the States today adopted firearms laws that discriminate based on race, they should swiftly be invalidated on equal-protection grounds. But that does not make them historically irrelevant: rather, they still indicate what substantive restrictions the States viewed as available under the Fourteenth Amendment, the core of *Bruen*'s second step. *See United States v. Rowson*, No. 22-cr-310, 2023 WL 431037, *22 (S.D.N.Y. Jan. 26, 2023) (relying on prior laws that disarmed groups based on race because "the Second Amendment's inquiry into historical analogues is not a normative one"); *Drummond*, 9 F.4th at 228 n.8 (citing such laws); *Kanter v. Barr*, 919 F.3d 437, 457-58 (7th Cir. 2019) (Barrett, J., dissenting); *Range*, 69 F.4th at 122 n.50 (Krause, J., dissenting).

Regardless, this Court need not decide whether laws motivated by racism bear on *Bruen*'s second step because Plaintiffs misunderstand the history, too. They claim that the Louisiana and Texas laws were part of discriminatory "Black Codes,"

Siegel.Br.41; Koons.Br.46-47, but notably, these laws remained on the books in both States throughout the period in which Radical Republicans controlled the Legislature and Reconstruction was underway. *See* JA1643 (Texas statute on the books in 1874); Revised Statutes of the State of Louisiana at 115, 164 (1870), https://tinyurl.com/3pmmfft3 (Louisiana statute persisting after 1868 state constitution guaranteeing civil rights); JA1658 (Louisiana statute in 1915). And the *Siegel* Plaintiffs' claim as to Oregon is particularly strained. Plaintiffs offer *no* evidence to suggest that Oregon's property law was motivated by racism. Instead, the *Siegel* Plaintiffs simply contend that Oregon generally had a "troubling history of racial discrimination." Siegel.Br.41. But if courts were to discount all evidence from States that had a history of discrimination in the 18th or 19th Century, it is unclear how any historical evidence could support modern laws, or how *Bruen* could have relied on evidence from States that had seceded to justify the public-carry right. *See* 142 S.Ct. at 2146-47. Plaintiffs' approach is not originalism, but an effort to impose a regulatory straightjacket.

## III.    THE LIABILITY-INSURANCE PROVISION IS CONSTITUTIONAL.

As the only other district court to consider the question has found, States may require individuals to obtain liability insurance to cover costs of firearms accidents. *See Nat'l Ass'n for Gun Rights v. City of San Jose*, 618 F.Supp.3d 901 (N.D. Cal. 2022) ("*NAGR I*"); *NAGR v. City of San Jose*, No. 22-cv-501, 2023 WL 4552284 (N.D. Cal. July 13, 2023) ("*NAGR II*"), *appeal docketed*, No. 23-16091 (9th Cir.). Plaintiffs' responses to the contrary fail to rehabilitate the decision below.

As to *Bruen*'s first step, the liability-insurance provision does not infringe the self-defense right at all. *See* NJ.Br.48-49. *Bruen* makes clear that many regulatory preconditions to bearing arms do not implicate the Second Amendment right. *See, e.g.*, 142 S.Ct. at 2138 n.9 (explaining that "nothing in [its] analysis … suggest[s] the unconstitutionality" of requiring a permit to carry in public, nor of conditioning permit issuance on paying a fee, submitting to a background check, or completing a safety course); *id.* at 2162 (Kavanaugh, J., concurring) (same). That is because none of these requirements prevent citizens "from exercising their Second Amendment right to public carry." *Id*. at 2138 n.9. The insurance mandate is the same. It no more prevents anyone from carrying than a permit fee. And while the analysis might be different if Plaintiffs could show the cost were exorbitant or that they could not obtain such insurance—which might in fact prevent them from bearing arms—they did not do so here. In essence, Plaintiffs prefer to be free from insuring the costs of

any harms they may cause, *see* JA2835 ¶ 2 ("I do not wish to buy more insurance"), but that alleged right appears nowhere in the text. *See NAGR II*, 2023 WL 4552284, *6 ("[T]he plain text of the Second Amendment" does not convey a right "to keep and bear arms … without … insuring liability for firearm-related accidents.").

Plaintiffs resist this understanding of *Bruen*, erroneously suggesting that every law that touches on firearms implicates the Second Amendment's text. *See* Siegel.Br.19-20. But while Plaintiffs insist that the Court approved of background checks, safety courses, and permitting fees only because of their historical pedigree, Siegel.Br.20, *Bruen*'s discussion approving such measures makes no mention of history at all, *see* 142 S.Ct. at 2138 n.9. Moreover, although Plaintiffs protest that the Court contemplated that permitting measures "put toward abusive ends" could pose a constitutional problem, that is because such abuse could effectively "deny ordinary citizens their right to public carry"—a situation not alleged here. *Id.* The Court's insistence that "nothing" in its opinion casts doubt on the validity of reasonable fees and checks, *id.*, is irreconcilable with Plaintiffs' view that such measures carry a presumption of unconstitutionality that would trigger *Bruen*'s second step, *id.* at 2126.

In any event, a significant body of historical analogues likewise supports the State's liability-insurance requirement at *Bruen*'s step two. As the State explained, although modern insurance did not exist until the 20th Century, Founding- and

Reconstruction-era statutes in at least eleven States required individuals to post bonds—known as sureties—before carrying in public. *See* NJ.Br.50-55. Those laws were analogous to insurance requirements: they imposed an upfront financial burden (the how) on individuals who imposed an increased safety risk by choosing to carry weapons in public (the why). What's more, some States imposed special strict-liability regimes for gun-related injuries, consistent with the "historical tradition of shifting the costs of firearm accidents from the victims to the owners." *NAGR II*, 2023 WL 4552284, at *6. Modern American law achieves those longstanding goals through insurance.

In fighting this "striking analogical resemblance[]," *NAGR I*, 618 F.Supp.3d at 916, Plaintiffs improperly move the goalposts. Over and over, Plaintiffs contend that earlier generations did not "mandate[e] that all arms bearers obtain insurance" and thus that New Jersey cannot do so today. Siegel.Br.23-24 (stating that while "earlier generations certainly understood that the unintentional misuse of a firearm can cause harm," they addressed that via liability "only after an injury to another"). But that is because the modern conception of liability insurance did not exist until well into the 20th Century, and thus could not have been adopted by States earlier. *See* Kenneth S. Abraham, *The Rise and Fall of Commercial Liability Insurance*, 87 Va. L. Rev. 85, 86-88 & n.6 (2001). Plaintiffs do not deny this, nor do they deny that the medical costs associated with gun violence have ballooned. *See* Elinore J.

Kaufman et al., *Epidemiologic Trends in Fatal and Nonfatal Firearm Injuries in the US, 2009-2017*, 181 JAMA Internal Med. 237, 241 (2020) (average of 329 firearm injuries occur in U.S. per day, about a third of which arise from accidents); *Firearm-Related Injuries Account for $2.8 Billion on Emergency Room and Inpatient Charges Each Year*, Johns Hopkins Med. (Oct. 2, 2017), https://tinyurl.com/27746969 (average annual inpatient and emergency department charges for firearm injuries were $95,887 and $5,254, respectively). In other words, this is the sort of "dramatic" change for which *Bruen*'s "more nuanced" analogical approach was designed: to ensure modern regulatory tools would not be invalidated just because they were unavailable in the past. 142 S.Ct. at 2131-33.[18]

Plaintiffs' more specific efforts to distinguish the analogues fail too. Plaintiffs cannot deny that surety statutes required upfront payments before individuals could carry. Rather, Plaintiffs argue that surety laws allegedly (1) applied just to those who posed a risk to the peace; (2) tailored bond amounts to the risk presented; (3) did not include criminal penalties; and (4) were insufficiently enforced. *See* Siegel.Br.20-21. But these claims are ahistorical, inapposite, or both.

---

[18] Plaintiffs also complain that the States did not require firearms insurance during the 20th Century, either, Siegel.Br.24, but until *Bruen*, States like New Jersey were broadly restricting public carry in the first place. Thus, such States saw no need for public-carry liability insurance in the 20th Century. It follows that the absence of insurance requirements at that time has no bearing on whether the Second Amendment was originally understood to leave them that choice.

69

*First*, while some States applied their surety laws only to those who posed a heightened risk to the peace, *see* NJ.Br.50 (citing 8 States or Territories that turned on bearer-specific concerns), at least three others did not, requiring upfront payments by *all* individuals who sought to carry firearms without special cause, *see* NJ.Br.50-51 (citing JA2516-17 (Va. 1847); JA2523-25 (W. Va. 1868); 1893 Fla. L. at 71-72). Plaintiffs seek to discard the impact of this evidence entirely on the basis that *Bruen* described two of those measures as "unusually broad." Siegel.Br.22. But the fact that *Bruen* concluded these provisions were too dissimilar to support near-total bans on carrying says nothing about their utility as historical analogies for insurance provisions. And this record is clear: more than a quarter of the historical surety laws identified in this case had no heightened-risk criterion. Plaintiffs cite no challenges to these three laws; no evidence that other States rejected them on constitutional grounds; and no proof that anyone viewed the Virginia, West Virginia, or Florida laws as impermissible. Clearly, the States did not see the Fourteenth Amendment as eliminating this policy option.

*Second*, contrary to Plaintiffs' argument, Siegel.Br.23-24, the burden imposed by the insurance requirement—like that imposed by surety regimes—can be calibrated to each person's risk. Although, as Plaintiffs note, the insurance mandate requires that everyone carry the same minimum amount of insurance *coverage*, the *cost* to obtain that coverage can be individually tailored. *See, e.g.*, Am. Acad. of

Actuaries, *Risk Pooling*, https://tinyurl.com/2hakh6x7 (explaining how insurance markets calibrate premium cost to risk level and pool premiums to guarantee stable compensation source); Stephen G. Gilles & Nelson Lund, *Mandatory Liability Ins. for Firearm Owners*, 18 Engage, J. of Federalist Soc'y Prac. Grps. 18 (2013) (explaining that "low-risk gun owners" would pay lower premiums than "those who are more likely to cause injuries" for the same coverage). Thus, both historical surety and modern insurance requirements correlate financial burden to individual risk.

*Third*, Plaintiffs' claim that surety laws did not implicate criminal sanctions is both wrong and irrelevant. It is wrong because the historical record reveals that in addition to Massachusetts, *see* NJ.Br.54, at least nine other jurisdictions had criminal penalties that applied generally for failure to provide any required surety or specifically for failure to provide a firearms-related surety.[19] It is also illogical: whether a requirement infringes on the right to bear arms does not turn on whether

---

[19] *See* 1835 Mass. Acts c. 134 §6, 16, p.749-50, https://tinyurl.com/yknmefdr; 1838 Wis. Terr. *An Act to Prevent the Commission of Crimes* §6, 16, p.380-81, https://tinyurl.com/mtvtncf2; 1840 Me. Rev. Stat. c. 169 §7, 16, p.708-09, https://tinyurl.com/3xu2v4a8; 1846 Mich. Rev. Stat. c. 162 §6, 16, p.691-92, https://tinyurl.com/yazw29xv; 1847 Va. Acts c. 14, §6, 16 p.128-29, https://tinyurl.com/mrf2cfht; 1851 Minn. Terr. Rev. Stat. c. 112 §8, https://tinyurl.com/4djs7vf4; 1854 Ore. Stat. c. 16 §7, 17, p.219-20, https://tinyurl.com/2wktx4bm; 1857 D.C. Rev. Code c. 141 §6, 16, p.569-70, https://tinyurl.com/ymnyttb4; 1868 W.Va. Code c. 153 §4, 8, p.703, https://tinyurl.com/5n842rud; *see also* 1801 Tenn. Laws c.22 §6 https://tinyurl.com/3bdyse3s ("if he or they fail to find securities, commit him or them to jail")

the penalty is civil or criminal. That is, if a State can lawfully require liability insurance, its choice does not somehow become unlawful just because the penalty for the violation is more or less stringent. *Cf. Garrison v. Louisiana*, 379 U.S. 64, 68 (1964) (in First-Amendment context, whether libel law is civil or criminal is not dispositive for constitutional analysis).

*Finally*, Plaintiffs erroneously seek to downplay historical statutes by arguing that the record has insufficient evidence regarding their enforcement. But that claim runs into a number of methodological problems. Most obviously, a Legislature's belief at the Founding or Reconstruction that it could enact a surety requirement backed by criminal penalties is strong evidence that the requirement was originally understood to be constitutional. By contrast, a missing enforcement record could as easily reflect widespread compliance, evidence not identified from archives, or evidence lost over time—after all, surety orders from justices of the peace may not have been published. *See* JA1216; Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. F. 121, 130 n.53 (2015). There is certainly no evidence that officers declined to enforce these laws due to constitutional concerns. So although an absence of enforcement records may be the nail in the coffin when an analogy is already weak, *see* 142 S.Ct. at 2149 n.25, it cannot undermine otherwise forceful analogues.

Insurance did not exist at the Founding or Reconstruction. But the challenged insurance law addresses the same problems that States at those times addressed in analogous ways. The innovation of insurance has become "inextricably linked" with modern tort law to address risk and liability across a variety of negligent acts, Kenneth S. Abraham, *The Liability Century* 5 (2008), because it insures that victims are not left holding the bag just because the tortfeasor is indigent. Section 4 ensures the same is true for victims' ballooning firearms-injury expenses.

## IV.    THE PERMITTING FEES ARE CONSTITUTIONAL.

Recognizing that firearms-permit fees had not changed in half a century, the Legislature adjusted those fees for inflation and for the modern costs of background checks in Chapter 131. A carry permit, which lasts two years, now costs $200. The municipality that issues the permit retains $150, and the remaining $50 goes to the State. Ch. 131 §1(i); 3(c).

Plaintiffs do not dispute that the fee-increase is commensurate with (or lower than) inflation. Nor do they challenge the $150 portion. Instead, Plaintiffs solely challenge the $50 portion remitted to the State. And Plaintiffs offer just one argument for their claim: that two First-Amendment cases indicate permitting fees must go "solely to 'defray' administrative costs," Siegel.Br.26 (relying on *Cox v. New Hampshire*, 312 U.S. 569 (1941); *Murdock v. Pennsylvania*, 319 U.S. 105

(1943)), but this $50 fee is "deposited" into the Victims of Crime Compensation Office ("VCCO") account.

Plaintiffs' argument runs into two independent problems. First, they misunderstand the legal test, which is *Bruen*, not *Cox/Murdoch*. The fee passes *Bruen*'s test, since it is not exorbitant, and falls well within historical precedent. Second, even under *Cox/Murdock*, Plaintiffs' claim fails.

**A. The Fee Is Consistent With Historical Evidence.**

Text and history control this analysis, and Plaintiffs apply the wrong test. *Cox* and *Murdock* govern fees on protected First Amendment activities, and both cases rely on precisely the sort of means-end balancing that *Bruen* eschewed. *See* 142 S.Ct. at 2127. Applying the *Cox/Murdock* framework requires courts to evaluate whether the challenged fee is "unrelated to the scope of the activities of [the individual]"; represents a "state regulation of the streets to protect and insure the safety, comfort, or convenience of the public"; and is "narrowly drawn to safeguard the people of the community in their homes." *Murdock*, 319 U.S. at 113, 116. These are classic means-end justification questions, which *Bruen* deemed inapplicable in Second Amendment analysis.

Instead, *Bruen* provided explicit direction on evaluating licensing fees in Second Amendment cases: fees violate the Second Amendment if they are "exorbitant" and "deny ordinary citizens their right to public carry." 142 S.Ct. at

2138 n.9. Every court to decide the matter post-*Bruen* has applied its "exorbitant" standard or assumed it applies. *See Williams v. McFadden*, No. 22-cv-630, 2023 WL 4919691, at *6 (W.D.N.C. Aug. 1, 2023); *NAGR II*, 2023 WL 4552284, at **1, 8; *Doe v. Bonta*, ___ F.Supp.3d ____, 2023 WL 187574, at *6 (S.D. Cal. Jan. 12, 2023), *appeal docketed*, No. 23-55133 (9th Cir.).

But Plaintiffs have not pleaded and could not possibly show that these fees are "exorbitant" and "deny ordinary citizens their right to public carry." *Bruen*, 142 S.Ct. at 2138 n.9. From 1970 until Chapter 131, the State charged $50 for permits. This amount, adjusted for inflation, is roughly $390 today. *See* U.S. Bureau of Labor Stat., CPI Inflation Calculator, https://tinyurl.com/2p98xp7d. And the pre-*Bruen* case Plaintiffs cite, *Kwong v. Bloomberg*, 723 F.3d 160, 167 (2d Cir. 2013), noted that, like here, "plaintiffs have put forth no evidence to support their position that the fee is prohibitively expensive" when considering a fee that was three times greater than in this case. Thus, Plaintiffs have not shown that the fee infringes the Second Amendment.

The fee is also supported by substantial historical evidence. For example, Plaintiffs do not contest that the $200 fee today ($100 per year, only $25 of which is challenged) correlates with an 1867 Mississippi law that imposed an annual tax of up to $15 on "every gun and pistol" based on the rate of inflation alone. JA2578-79. While the Bureau of Labor Statistics inflation calculator only goes back to 1913, it

shows that even if that amount remained in 1913, it would equate to $450 today. *See* U.S. Bureau of Labor Stat., CPI Inflation Calculator, https://tinyurl.com/2p98xp7d. Other states similarly imposed taxes and fees on firearms. *See* JA2569 (Miss. 1844) ($2 tax on "dueling or pocket pistol"); JA2571 (N.C. 1856) ($1.25 tax on pistols); JA2574 (Ga. 1866) ($1 tax on "on every gun or pistol, musket or rifle over the number of three"); JA2576 (Ala. 1867) ($2 tax on pistols and revolvers); (Miss. 1867) ($5-$15 tax on guns and pistols); JA2581 (Evanston, IL 1893) ($2 fee for concealed carry license); JA2583 (Lincoln, NE 1895) ($0.50 fee for concealed carry license); JA2586 (Va. 1903) (0.0035% tax on the "aggregate value of" firearms); JA2589 (Ga. 1910) ($0.50 fee for concealed carry license). Plaintiffs never challenged the historical evidence below, and their claim fails.

**B. Plaintiffs' Claim Fails Even Under *Cox/Murdoch*.**

Even were the *Cox*/*Murdock* test applicable, Plaintiffs still cannot prevail. Plaintiffs' believe depositing the $50 portion into the VCCO account constitutes a *per se* violation under *Cox/Murdoch*, but that assumption is wrong.

First, Plaintiffs misunderstand state jurisprudence on the State's fiscal constitutional provisions. Contrary to Plaintiffs' belief, the account in which Chapter 131 "deposits" any portion of fee does not itself prove or even suggests the fee is somehow more than necessary to "defray" the costs of administration. Under New Jersey constitutional law, statutory dedications of funds just "express[] legislative

desires" as to how funds should be appropriated in a future annual appropriations act; the Legislature retains "the inherent power to disregard prior fiscal enactments" in making appropriations for a particular fiscal year. *City of Camden v. Byrne*, 411 A.2d 462, 469, 472 (N.J. 1979). And whether the State in any given year chooses to appropriate the already-collected funds to the General Fund or the VCCO account is irrelevant to the question of whether the fee amount represents administrative costs.

Second, Plaintiffs make no other argument or provide any actual evidence that the $50 is excessive relative to the costs associated with carry-permit applications. The State Police created and maintains a centralized online portal for all carry permit applications in the State, even those routed to municipalities. *See* N.J. State Police, Application for Permit to Carry a Handgun, https://www.njportal.com/NJSP /ConcealedCarry/. It also has authority to promulgate regulations under Chapter 131, including regulations  governing the carry-permit application process. N.J. Stat. Ann. §2C:58-4.7. These reflect just some of the State's "expense[s] incident to the administration" of the challenged statute, *Cox*, 312 U.S. at 577, and Plaintiffs do not even try to show that $50 exceeds it. Indeed, Plaintiffs rushed the issue to this Court even before engaging in the fact-finding the district court ordered on precisely this issue. JA82.

Finally, Plaintiffs ignore their own cited precedents: a licensing fee is *not* limited to administrative costs alone, but rather may include costs "incident to the

… maintenance of public order in the matter licensed." *Cox*, 312 U.S. at 577; *see Murdock*, 319 U.S. at 113-14 (fees may reflect "expense[ ] of policing the activities in question"). Financial assistance to gun-violence victims is "incident" to the "maintenance of public order" that may be disrupted by the public carry of handguns. *See Bauer v. Becerra*, 858 F.3d 1216, 1226 (9th Cir. 2017) (holding fees can "exceed the 'actual costs' of processing a license" and upholding fee where 25% went to *non*-administrative purposes).

## V.    THE    CHARACTER-REFERENCES    REQUIREMENT    IS CONSTITUTIONAL.

The final challenge is also one of Plaintiffs' boldest—that the State cannot require character references before entrusting residents with the ability to carry firearms in public, a decades-old requirement. *See* Ch. 131 §3(a).[20] Even the district court decisions favoring Plaintiffs on other issues rejected this claim. *See* JA58-61 (decision below); *Antonyuk v. Hochul*, ___ F. Supp. ___, 2022 WL 16744700, *49 (N.D.N.Y 2022). This Court should reject it too.

To begin, no Plaintiff can show Article III injury, since none aver they will be denied a permit for failure to satisfy the character-reference requirement. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (requiring showing that injury is "certainly impending"). Plaintiffs only allege that they will have to apply

---

[20] *See An Act Concerning Firearms and Other Dangerous Weapons, New Jersey Legislature*, Acts 497, 489 (1966).

for or renew their existing carry permits. *See* JA378 ¶ 6; JA366 ¶ 41; JA359 ¶ 46; JA375 ¶¶ 4-5; JA387 ¶ 10. But that is not a demonstration of *injury*, since Plaintiffs—who repeatedly attest they are law-abiding citizens—provide no basis to believe they cannot find references. *See* JA353 ¶2; JA361 ¶2; JA375 ¶2; JA378 ¶2; JA386 ¶2.

Nor can Plaintiffs succeed on the merits, where they have a particularly high burden to show an "indisputably clear" right to relief in seeking to upend a decades-old status quo. *Hope*, 972 F.3d at 320.[21] The State's character-reference requirement is consistent with *Bruen* and historical precedent. *Bruen* holds that States may retain carry permitting regimes "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" 142 S.Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635); *see also id.* at 2161 (Kavanaugh, J., concurring) (same). Although individual justices cautioned against permitting statutes that "grant open-ended discretion to licensing officials," *id.* at 2138 n.9, the Court made clear that licensing officials could still make decisions about whether someone's "conduct has shown them to be lacking the essential character of temperament necessary to be

---

[21] Below, Plaintiffs challenged only Chapter 131's amendments. JA308; D.Ct. Dkt. 8-1, at 20. Now, they attack the very fact of character-references requirements. Siegel.Br.39-42.

entrusted with a weapon,'" *id.* at 2123 n.1 (quoting *Dwyer v. Farrell*, 475 A.2d 257, 260 (Conn. 1984)).

As the district court rightly held, the character-reference requirement is just such an approach. Chapter 131's text "provide[s] enough standards to guide licensing officials eliminating the risk of arbitrary enforcement." JA67. Indeed, the character-reference requirement specifically seeks (1) an attestation that the applicant "has not engaged in any acts or made any statements that suggest the applicant is likely to engage in conduct, other than lawful self-defense, that would pose a danger to the applicant or others"; (2) any "information concerning their knowledge of the applicant's use of drugs or alcohol"; and (3) "the nature and extent of their relationship with the applicant." Ch. 131 §3(b). Collecting and verifying this information allows "licensing officials to examine *objective* evidence—the applicant's acts and statements—to determine whether he or she may engage in conduct that would endanger him- or herself or the public." JA68 (emphasis added).

Plaintiffs misconstrue how Chapter 131 operates—and offer no evidence for their view. Plaintiffs baldly assert that the character references are not a way to determine if an applicant has engaged in "individual misconduct," but an effort to "condition[] the exercise of a constitutional right on the assent of those with sufficient standing in the community." Siegel.Br.29. But that is unsupported by the statutory text, *see supra* at 80, or the fact that the reference requirement has served

as a crucial tool in discerning public-safety risk. *See, e.g.*, *In re Coleman*, 2005 WL 1284044, at *2, 5 (N.J. Super. Ct. Law Div. May 31, 2005) (upholding denial of a permit in part based upon reference who had known applicant for forty-five years raising concerns about the applicant's temperament and sobriety); *In re Wang*, No. A-3482-17T4, 2020 WL 864147, at *2 (Super. Ct. App. Div. Feb. 21, 2020) (affirming denial based largely upon reference who observed applicant's concerning behavior at their shared worksite for two years). Plaintiffs would strip law enforcement from obtaining information about such public-safety concerns— objective metrics *Bruen* endorsed.

Moreover, considerable historical evidence supports character-reference requirements like this one. Plaintiffs do not contest that since the Colonial era, States had disarmed persons based on assessments of their dangerousness. JA38-49 (collecting sources). And 19th-Century laws put that assessment into practice by requiring "written endorsement." *See Ordinances of Jersey City, Passed by the Board of Alderman* since May 1, 1871, at 86-87, bit.ly/3suPPKW (1873 ordinance conditioning issuance of pistol-carry permits on "a written endorsement ... from at least three reputable freeholders"); *City of Trenton, N.J., Charter & Ordinances* 173 (1903) (similar), bit.ly/45JBWGS; *Ordinances of the Mayor, Alderman & Commonalty of the City of N.Y.*, ch. 8, art. 25, §265, p. 215 (1881), bit.ly/3OXBMEX ( allowing "officer in command" to "make a recommendation" on carry permit

application); *An Ordinance to Regulate the Carrying of Pistols* §2 (Oct. 4, 1880),

bit.ly/3QOa6oM (Brooklyn, similar).[22]

That character-reference requirements emerged at this time makes sense. In

close-knit communities in early American colonies where "[e]veryone knew

everyone else" and "word-of-mouth spread quickly," *Range*, 69 F.4th at 122 n.50

(Krause, J., dissenting) (quoting Stephanos Bibas, *The Machinery of Criminal*

*Justice* 2 (2012)), the permitting official was likely to have personal knowledge of

the applicant's qualifications. But by the 19th Century, and certainly today, "[t]imes

have changed," and "[t]he informality and apparent effectiveness of the colonial

approach to crime and justice were rooted in a world that is long gone and cannot be

recreated." John Rappaport, *Some Doubts About "Democratizing" Criminal Justice*,

87 U. Chi. L. Rev. 711, 742 (2020). *Bruen* requires courts to pay attention to such

changes. 142 S.Ct. at 2132 ("[R]egulatory challenges posed by firearms today are

not always the same as those that preoccupied" those in the 18th and 19th centuries).

So just as police in the 19th Century investigated an applicant's prior conduct, and

---

[22] *Siegel* Plaintiffs argue that the latter two laws are not comparable since they "required *the police* to make a recommendation on whether to grant a permit application." Siegel.Br.41. But allowing police investigations is to allow collecting the very information character references provide today. And Section 3(a) allows the applicant to hand-pick endorsers—a less burdensome rule.

reviewed their "written endorsements," New Jersey in 2023 can allow permitting officials to take those very same steps.

## CONCLUSION

This Court should reverse and vacate the partial preliminary injunction and affirm the partial denial of relief.

Respectfully Submitted,

MATTHEW J. PLATKIN
Attorney General of New Jersey

By:    /s/ Angela Cai
       Angela Cai
       Deputy Solicitor General

Dated: September 4, 2023

## <u>CERTIFICATION OF BAR MEMBERSHIP</u>

I certify that I am an attorney in good standing of the bar of the Third Circuit.

/s/ Angela Cai
Angela Cai
Deputy Solicitor General
Office of the New Jersey Attorney General
NJ Bar #121692014

Dated: September 4, 2023

## <u>CERTIFICATION OF COMPLIANCE</u>

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a monospaced typeface using Microsoft Word 2016, in Times New Roman, 14 point, type style. I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as modified by this Court's August 31, 2023 Order (Doc. 106) because this brief contains 19,313 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and when combined with the word count of the Brief of Intervenors, does not exceed 26,000 words.

I certify that the text of the paper copies of this brief and the text of the PDF version of this brief filed electronically with the Court today are identical. I further certify that prior to electronically filing this brief with the Court today it was scanned by McAfee VirusScan Enterprise 8.8, a virus detection software, and found to be free from computer viruses.

/s/ Angela Cai
Angela Cai
Deputy Solicitor General
Office of the New Jersey Attorney General

Dated: September 4, 2023

## **CERTIFICATION OF SERVICE**

On September 4, 2023, the undersigned caused this brief to be filed with the

Clerk of the United States Court of Appeals for the Third Circuit via electronic filing.

I further certify that all participants in the case are registered CM/ECF users and that

service will be accomplished by the CM/ECF system.

/s/ Angela Cai
Angela Cai
Deputy Solicitor General
Office of the New Jersey Attorney General

Dated: September 4, 2023