```
1              IN THE UNITED STATES COURT OF APPEALS
2                     FOR THE THIRD CIRCUIT
3
4   RONALD KOONS; NICHOLAS GAUDIO; ET AL. )  No. 23-1900 / 23-2043
                                          )
5                         Appellees,      )
                                          )
6   v.                                    )  Philadelphia, PA
                                          )
7   ATTORNEY GENERAL NEW JERSEY AND       )
    SUPERINTENDENT NEW JERSEY STATE POLICE)
8   PRESIDENT OF THE NEW JERSEY STATE     )
    SENATE, SPEAKER OF THE NEW JERSEY     )
9   GENERAL ASSEMBLY                      )
          (Intervenors in District Court))
10                                        )
                          Appellants      )  October 25, 2023
11  _____  )
12  AARON SIEGEL; ET AL.                  )
                                          )
13                        Appellees,      )
                                          )
14  v.                                    )
                                          )
15  ATTORNEY GENERAL NEW JERSEY; ET AL.   )
    PRESIDENT OF THE NEW JERSEY STATE     )
16  SENATE, SPEAKER OF THE NEW JERSEY     )
    GENERAL ASSEMBLY                      )
17        (Intervenors in District Court))
    ATTORNEY GENERAL NEW JERSEY AND       )
18  SUPERINTENDENT NEW JERSEY STATE POLICE)
                                          )
19                        Appellants      )
    _____  )
20
    RONALD KOONS; ET AL.                  )
21                                        )
                          Appellees,      )
22                                        )
    v.                                    )
23                                        )
    ATTORNEY GENERAL NEW JERSEY; ET AL.   )
24        (Intervenors in District Court))
    _____
25
```

```
1
2    AARON SIEGEL; ET AL.                    )
                                             )
3                        Appellees,          )
                                             )
4    v.                                      )
                                             )
5    ATTORNEY GENERAL NEW JERSEY; ET AL.     )
            (Intervenors in District Court))
6    AARON SIEGEL; ET AL.,                   )
                                             )
7                        Appellants          )
8
9              TRANSCRIPT OF ORAL ARGUMENT
           BEFORE THE HONORABLE CHERYL ANN KRAUSE,
10            THE HONORABLE DAVID J. PORTER &
               THE HONORABLE CINDY K. CHUNG,
11             UNITED STATES CIRCUIT JUDGES
12
13
14   APPEARANCES:
15   For Appellants/           ANGELA CAI, ESQ.
     Cross-Appellees,          OFFICE OF ATTORNEY GENERAL OF
16   N.J. Attorney General:    NEW JERSEY
                               25 Market Street
17                             Richard J. Hughes Justice Complex
                               P.O. Box 112
18                             Trenton, New Jersey 08625
19   For Appellants/           LEON J. SOKOL, ESQ.
     Cross-Appellees,          CULLEN & DYKMAN
20   Presiding Officer         433 Hackensack Avenue
     Intervenors:              Hackensack, New Jersey 07601
21
22   For Appellees/            PETER A. PATTERSON, ESQ.
     Cross-Appellants,         COOPER & KIRK
23   (Koons Plaintiffs):       1523 New Hampshire Avenue NW
                               Washington, DC 20036
24
25
```

1

2    For Appellees/              ERIN E. MURPHY, ESQ.
     Cross-Appellants,          MARIEL A. BROOKINS, ESQ. - Liaison
3    (Siegel Plaintiffs):       Counsel
                                CLEMENT & MURPHY
4                               706 Duke Street
                                Alexandria, Virginia 22314
5
              Veritext National Court Reporting Company
6                         Mid-Atlantic Region
                 1801 Market Street - Suite 1800
7                     Philadelphia, PA 19103
                        1-888-777-6690
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2    ARGUMENT:                                    PAGE

3      By Ms. Cai                                   5

4      By Mr. Sokol                                50

5      By Ms. Murphy                               58

6      By Mr. Patterson                           103

7      By Ms. Cai                                 120

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              JUDGE KRAUSE:  Good morning, Counsel, and our

3    audience in attendance.  We will be hearing one case with this

4    panel this morning, and that is a consolidated matter of Koons

5    versus Attorney General and Siegel versus Attorney General,

6    and those will be Case Numbers 23-1900 and 23-2043.

7        And I believe we're going to be starting with you, Ms.

8    Cai.

9              MS. CAI:  May it please the Court?  I would

10   like to reserve five minutes for rebuttal.

11             JUDGE KRAUSE:  Of course.

12             MS. CAI:  I will focus on the merits of the

13   constitutional challenges while Mr. Sokol will be focusing on

14   the non-merits preliminary injunction factors.  He may also

15   have comments to add on the insurance provision.

16             Bruen's history and tradition test aims to

17   determine whether modern laws would have been deemed at

18   ratification as constitutionally off limits.  Chapter 131

19   passes that test.  The challenged firearm safety laws would

20   have been familiar to 18th and 19th century Americans, even if

21   many features of modern society would have been unthinkable.

22             That is because historical legislatures enacted

23   identical or analogous firearms restrictions to Chapter 131's

24   modern provisions.  Importantly, no evidence suggests any of

25   these laws were deemed constitutionally suspect.  The

1    historical record is unequivocal that the constitution did not

2    hamstring legislatures then or today from enacting the safety

3    regulations of the type in Chapter 131 when states found these

4    measures necessary to protect their citizens.

5          JUDGE KRAUSE:  So the then and what date that

6    is seems to have particular importance in this case and where

7    we may need to kind of confront that question that was left

8    open in Bruen because for many of the particular restrictions

9    that are at issue here, there's far more in terms of analogs

10   when we get into the 19th, indeed the late 19th century.

11         So can you address that issue at large?  Should

12   we be looking at incorporation?  Should we be looking at 1791,

13   and what determines that in the case of a particular

14   regulation?

15         MS. CAI:  Yes, Your Honor.

16         So before we get to the question of if there is

17   a conflict between the understanding of the right to bear arms

18   between 1791 when the Second Amendment was ratified and 1868

19   when the 14th Amendment was ratified, we have to determine

20   whether or not there even is a conflict to begin with.

21         And I would submit to Your Honors that there is

22   not in this case.  That is because there is no evidence from

23   the founding or the antebellum era that courts, commentators,

24   other legislators believed that the sensitive places

25   provisions that were enacted would have been unconstitutional.

1          JUDGE KRAUSE:  Is silence in one period and

2     regulation in another a conflict?

3          MS. CAI:  I do not believe so, Your Honor, and

4     that's true for three reasons.

5          The first is Bruen's own evidence about

6     sensitive places, examples of sensitive places that it

7     identified and the evidence it looked at shows the opposite of

8     what it believed.  So Bruen must have believed there was no

9     conflict because it looked at historical examples of firearms

10    restrictions at courthouses where the only evidence came from

11    the 1870s and not earlier.

12         And so if Bruen did not believe that to be a

13    conflict, the same is true here.  In fact, those very laws

14    that influenced Bruen and led it to say restrictions at

15    courthouse are settled as unconstitutional --

16         JUDGE CHUNG:  To say that the silence is

17    because it was so well established meaning it was part of a

18    pre-existing right that's referenced.  So what is that part of

19    the pre-existing right that it's referencing?

20         MS. CAI:  So it's either that -- one can

21    believe it's one of two things.  It's either that Bruen

22    believed that the part of the Statute of Northampton that

23    referred to you shall not go riding armed into fairs, markets

24    or before the king's ministers carried over into the common law

25    tradition in the United States such that it infused the era

1    from 1791 to 1868 when there were no statutory enactments

2    about courthouses.

3              If that's true, that would also be true for

4    this case.  The language about fairs and markets would be

5    equally influential in your determination of whether or not

6    MetLife Stadium, for example, is a sensitive place as it would

7    be for courthouses.

8              But I don't actually think that's what Bruen

9    was doing.  It was looking to the longstandingness (sic) of

10   restrictions that were enacted at the very cusp of

11   reconstruction and throughout that level -- that period of

12   history.

13             So that's the precedent answer to Judge

14   Krause's question, but there's two other answers, and that's

15   history and logic.  So I want to talk a little bit about the

16   history and historical record.

17             In this case, what we've demonstrated in the

18   record is that the later development of state legislature's

19   focus on sensitive places restrictions is explained by policy

20   pressures on those legislatures.  Sensitive places laws became

21   more of a focus in reconstruction because of that change in

22   history and the availability of easily concealable, easily

23   carriable firearms after 1850 when the Colt patent

24   expired and the civilian market became flooded, not because

25   some kind of change in constitutional understanding happened.

Page 9

1    There is no evidence that there was some change in

2    constitutional understanding.  That would go -- if there were,

3    that would go to a conflict.

4              But the change in historical facts and what was

5    pressuring legislatures to respond to a certain threat, that's

6    in the record here and that explains why these particular laws

7    were enacted when they were.

8              JUDGE KRAUSE:  Is that to say that we have a

9    new problem because there's mass production of firearms, and

10   when we get into the 18th century -- I'm sorry, into the 19th

11   century that we've got different lethality of it.  We've got

12   sort of a different societal pressures.

13             I mean, if that's so and that creates a new

14   problem, then wouldn't that infuse every Second Amendment

15   regulation that we look at today?

16             MS. CAI:  I think you could think about it as a

17   new problem that happened exactly at the -- in the middle of

18   the 19th century that legislatures were trying to respond to.

19   And I think at that time it believed that the Second Amendment

20   certainly allowed them to respond to those pressures in the

21   way that they did which is to enact specific regulations at

22   specific locations.

23             JUDGE PORTER:  What constitutional rule

24   constrained those legislatures around the antebellum era?

25             MS. CAI:  So in the antebellum era, you're

1  right, Judge Porter, that state legislatures were not bound by

2  the Second Amendment as enacted.  We do see evidence from

3  cases even cited in Heller (phonetic) and Bruen that some of

4  them had either state level analogs or source of other under

5  -- a common law understanding of the Second Amendment.

6           JUDGE PORTER:  And those that didn't?

7           MS. CAI:  I'm sorry, Your Honor.

8           JUDGE PORTER:  And for those states that didn't

9  have such maybe Second Amendment analogs?

10          MS. CAI:  Right.  So I think there are states

11  that clearly had Second Amendment analogs that --

12          JUDGE PORTER:  Right.

13          MS. CAI:  -- Heller looked at.

14          Heller also looked at states that didn't have

15  codified Second Amendment analogs, but nonetheless believed

16  there was a tradition of protecting the right to bear arms and

17  that's described in some of the cases, those cases.  I believe

18  Louisiana and Virginia were some of those cases that Heller

19  looked at to understand what is the individual right to bear

20  arms.  So it did look at states that didn't even have pre-1868

21  a codified right to bear arms.

22          I wanted to go to the third reason why

23  legislative inaction on sensitive places before 1868 is not

24  evidence of conflict, and that is just federalism and how we

25  think about the logic of what that requires.

1            Legislatures don't operate at the outer limits

2    of their constitutional authority then or today.  The choice

3    not to regulate something standing alone is not evidence of

4    constitutional limitation and plaintiffs have never answered

5    why it is that they believe that legislatures in 1791 or 1815

6    had to ban something that they did not see as a problem or

7    that their decision not to because for policy reasons they did

8    not think that was wise yields some kind of constitutional

9    limitation.

10           JUDGE KRAUSE:  Well, that's fair enough, but

11   hasn't the Supreme Court told us that we need to look to a

12   singular tradition?  And if so, how does federalism and a, you

13   know, the variegation among, you know, among different state

14   legislatures perhaps even dealing with different, you know,

15   different circumstances, different policy pressures, but how

16   are we to evaluate that when we've got federalism on the one

17   side and the mandate to identify a singular tradition on the

18   other?

19           MS. CAI:  I think this record shows that there

20   is a singular tradition and all the evidence falls in favor of

21   that tradition.  That began with regulation -- sparser

22   regulations in the 17 -- in the 18th century, but continued

23   onward throughout the 19th century including, at the very

24   moment when states became bound by the Second Amendment.

25   Those statutes were then upheld by state high courts which

Page 12

1    universally upheld them on Second Amendment grounds and that

2    is the tradition that carries forward to today.

3              So I think it would be -- you know, the upshot

4    of plaintiffs' argument, I think, would be that, you know,

5    take parks as an example.  I'll spot you that there perhaps

6    were parks where people gather for recreation, probably not

7    Boston Common, but perhaps there were other smaller parks

8    where families gathered in the 18th century.  It's possible.

9              The fact that legislatures did not regulate

10   firearms in exactly the same way as they later did at those

11   parks doesn't mean that they believed that they couldn't do so

12   constitutionally.  And the fact that starting with the opening

13   of Central Park, the prototypical recreational park in 1859, I

14   believe by 1861 Central Park then enacted a set of rules that

15   lasted I believe until today, though I could be wrong about

16   that, but certainly for a long time.  And every park that

17   followed, including here in Philadelphia at Fairmount Park, in

18   Pittsburgh and everywhere else, including the national parks,

19   all then enacted the same restriction on carrying firearms.

20             I think for plaintiffs to be right, you would

21   have to think that that is not a historical tradition that

22   Bruen would have recognized.  And I think that is impossible

23   to square with what Bruen told us about the need to identify

24   historical precursors and to assess whether or not our

25   forefathers would have thought those precursors were

1    permissible under the Second Amendment.

2              JUDGE KRAUSE:  So in others there are fewer

3    examples or the examples that you and amici have

4    pointed us towards come from the territories and some from

5    larger states, some from smaller states.

6              Talk to us about how we should weigh the

7    particular evidence.  Is it numerical?  Is it a matter of like

8    three isn't enough and it's got to be more than that?  Are we

9    looking at the percentage of the population at the time?  Does

10   that have any relevance?  And should we be considering any

11   weight given to territories given the description that the

12   Supreme Court gave them in Bruen?

13             MS. CAI:  I'll start with the last first and

14   then sort of extrapolate out from that.

15             So as to territories, it is true that Bruen

16   rejected territorial laws in that case, but for two reasons

17   that are not applicable here.

18             The first is that Bruen explained the territory

19   restrictions "cannot overcome the overwhelming evidence of an

20   otherwise enduring American tradition permitting public

21   carry."  And Bruen identified, I believe, eight or nine state

22   Supreme Court cases that expressly said states could not

23   prohibit public carry altogether.

24             And so when you have that evidence, which is

25   not here in this case, and you have a couple of territories

1    flouting that, yes, I would agree in that circumstance those

2    territorial laws do not evince a longstanding historical

3    tradition.

4           The other thing that Bruen said was that the

5    territorial laws were untested in court.  That is also not

6    true here.  They were not tested necessarily in territorial

7    court, but I'm not quite sure about that, but they were

8    identical to or almost identical to state statutes that were

9    tested in court.  And those decisions such as Shelby

10   (phonetic) in Missouri, Hill in Georgia, Andrews in Tennessee,

11   which the Supreme Court cited in Bruen, those decisions were

12   unequivocal that these types of statutes that prohibited

13   firearms at schools, at literary gatherings, at circus and

14   exhibitions and at public assemblies were undoubtedly

15   constitutional.

16          So that's the type of evidence, and

17   extrapolating out from what Your Honor was talking about, that

18   we have in this case.  I don't know what the sort of

19   irreducible minimum standard would be for, you know, how many

20   laws would be enough and what kind of case law would you have

21   to have about it.  What I do know is if there are several

22   examples of states enacting these laws, they were debated.

23   They were passed on by state high courts, discussed

24   specifically and were upheld.

25          Comment -- we have also evidence that

1    commentators at the time, legal commentators in treatises that

2    were cited in Heller, lay commentators, or actually I don't

3    know who exactly they were, but people writing in newspapers

4    at the time talking about these laws as -- and undoubtedly

5    calling them valid.  I think that is the tradition that we

6    have here and that is undoubtedly enough under Bruen's test.

7                JUDGE KRAUSE:  I'm sure we want to -- we'll

8    want to turn to some of the particulars of the restrictions.

9    But I want to ask you, if we were to accept all of the

10   arguments that you and your colleague have made, what would be

11   left of a right to public carry?

12               I mean, if it's true that in all of these

13   venues that have been laid out in the statute the state can

14   constitutionally preclude carrying, and we do a -- we have a,

15   you know, a default where folks can't -- those who have passed

16   the permit, done the background check, you know, who have

17   qualified as law abiding and responsible nonetheless can't

18   take their firearms into any private property, even property

19   that's otherwise open to the public, what is there other than

20   leaving your home and walking down the street?  Where could

21   you go and still exercise your Second Amendment rights?

22               MS. CAI:  Judge Krause, I think you're right to

23   identify there's two different kinds of laws with respect to

24   locations.  And I see my time has expired, but if I can answer

25   your question.

1              JUDGE KRAUSE:  Let's add ten minutes.

2              MS. CAI:  The first is what are prohibited

3       under the sensitive place provisions.  That is a very specific

4       enumerated list.  Some of them are challenged here.  Some of

5       them are not.

6              Separately, there is a private property

7       provision that allows the owner of the private property to

8       decide for themselves whether or not they will allow you to

9       carry.

10             So where someone may carry after those statutes

11      are enforced just depends a lot on what property owners want

12      to allow --

13             JUDGE PORTER:  Can't the property --

14             MS. CAI:  -- and --

15             JUDGE PORTER:  Can't the property -- before

16      2020 -- before this Chapter 131 couldn't property owners also

17      decide for themselves?

18             MS. CAI:  Yes.  I absolutely agree with that.

19      And I think the important thing to note about what Section

20      7A24 does is that it changes nothing about the Second

21      Amendment right which is always, and I think my friends on the

22      other side agree, is always dependent when you're on private

23      property on the property owner's absolute right to exclude

24      firearms.  So that is true, and I think this is also

25      acknowledged on the other side, regardless of how that owner

Page 17

1  chooses to use their property.

2            JUDGE PORTER:  Well, sure it does.  If the

3  Second Amendment assumes you can carry wherever you are, then

4  this flips that presumption and says, no, you can't unless you

5  get permission.

6            MS. CAI:  I don't think that plaintiffs even

7  agree that you can -- the Second Amendment gives you a right

8  to carry wherever you are.  You certainly have a right to

9  carry, but when you're on someone else's property, your right

10  to carry is contingent on that owner's decision.

11            JUDGE PORTER:  Right.  The question is, what's

12  the default presumption, what's that rule?  Under the Second

13  Amendment I think the default rule is you can carry because

14  it's like the Second Amendment.  You can carry.

15            MS. CAI:  I don't think that the Second

16  Amendment sets a default rule.  I think one way to think about

17  it, and I -- you know, I think this is the only way for the

18  plaintiffs to successfully argue that the property rule

19  somehow falls under the Second Amendment's plain text.  The

20  only way for them to show that the Second Amendment's plain

21  text implicates this rule is if they can show the plain text

22  includes a constitutional right to construe a private property

23  owner's silence as consent or permission to bring firearms.

24            I don't think that the Second Amendment's plain

25  text says that.  And it doesn't confer a right to take

Page 18

1  advantage of the property owner's silence.  And I haven't seen

2  any engagement from the plaintiffs on why that is so.

3                    JUDGE PORTER:  Why --

4                    MS. CAI:  Whether I can --

5                    JUDGE PORTER:  Why isn't the Second Amendment's

6  basic scheme this; that you can possess and carry inside the

7  home or outside the home for self-defense, but if you go on

8  someone else's property and they don't want you to carry, they

9  can tell you that, in which case you cannot?

10                    MS. CAI:  I think what I disagree with is the

11  very last thing you said, Judge Porter, which is they can tell

12  you that.  I don't think that's in the plain text of the

13  Second Amendment.  And I will -- you know, I think this part

14  is still --

15                    JUDGE PORTER:  No.  No.  No.  But I'm saying

16  the -- what is in the plain text is the presumption that you

17  can carry inside or outside the home.

18                    MS. CAI:  And I think that's still true if the

19  places you're going to are not someone else's property where

20  they have an absolute right to exclude.  And I think that's --

21  you know, this is getting a little bit into the history, but I

22  think this historical part is about what the words mean as

23  opposed to what the legislatures have done.

24                    And that's shown in our evidence, Blackstone,

25  right.  At the time of the founding, if we're talking about

1  the founding -- and I do want to get back to Judge Krause's

2  earlier question about if it's 1868 or 1791.  But at the time

3  of the founding, under property law at the time there was an

4  understanding that every entrance unwarranted, i.e., you don't

5  have permission into someone else's land is a trespass.

6          And so with that -- that understanding may have

7  changed over time, but at least at the time of the Second

8  Amendment's ratification in 18 -- 1791, that was the

9  understanding.  You can look to other cases.  United States

10  versus Jones talks about Entick versus Carrington (phonetic), a

11  1765 English case where that idea that you don't have any

12  right to be on someone else's property without their express

13  permission, that was the tradition that the founders were

14  working with.

15          JUDGE KRAUSE:  That's not disputed.  I mean,

16  the -- in all of the situations that we're talking about and -

17  - or, you know, were contemplated with this default, someone

18  is not trespassing on property in the sense of coming in

19  uninvited.  They're invited.  It's a business.  It's open to

20  the public or you've allowed someone into your home.

21          The question is what's the sort of expectation,

22  right, what's implied, a sort of implied license when it comes

23  to a consent?  And, you know, there -- it's not understood

24  that by inviting someone in you are going to dictate what

25  clothes they can wear.  Right.  If there's a right to carry,

1    why isn't that simply part of what you accept as the

2    expectation, the default once you've opened up that private

3    property?

4              MS. CAI:  Because I don't think that an implied

5    license or even an invitation has to carry with it an

6    invitation or license to carry firearms.  We know from common

7    law and from cases like Hardinez (phonetic) that an implied

8    license depends on the customs and expectations of the

9    community.

10             And so I think Justice Scalia put it very

11   colorfully in Jardines where, yes, you have an implied license

12   to walk up to someone's doorstep and ring the doorbell, but

13   you probably do not have an implied license to bring a metal

14   detector and waive around, you know, their steps or to bring a

15   large bloodhound into their yard that would, in his words,

16   prompt the owner to call the police.

17             And so the question here is what does the

18   implied license include in the State of New Jersey.  That's a

19   matter of substantive property law, and governments regulate

20   property law all the time, and that is when they set default

21   rules, when they flip default rules about property law.  As

22   long as there is a choice for the property owner to revert

23   back to whatever decision they want, that is not an

24   infringement on the Second Amendment right.  And I --

25             JUDGE PORTER:  I'm going to -- I'm sorry if I

Page 21

1    missed it.  But let's go back to Judge Krause's initial

2    question.  If we agree with you on the private property rule

3    and all of the sensitive places, where can somebody carry?

4                 MS. CAI:  Yeah.  So I think certainly Judge

5    Krause is right that you can carry on the streets.  You can

6    carry in any place that is not designated as a sensitive park.

7    That is up to the -- whoever owns the park, the county, the

8    municipality or the state.  You can own -- you can carry on

9    any other public land.

10                As to private property, that is entirely up to

11   the owner.  So that could include your neighbor's house, a

12   retail store that welcomes firearms, your own office or

13   workplace that allows you to carry firearms.  That was not

14   allowed before Bruen.  Right.  So there is a significant

15   change in what is now permitted and that is the change that

16   Bruen gave us.  But I don't think Bruen or the Second

17   Amendment said anything about the property owner's rights and

18   that the government's ability to bring those in line with the

19   expectations and desires of property owners in New Jersey is

20   somehow hamstrung by the Second Amendment.

21                And I think one example, if I may, on that

22   before I move onto the history is, you know, governments

23   regulate property by default rules all the time.  So intestacy

24   is a great example.  Rules of where a property goes in a

25   divorce is a great example.  These are things that government

1    set.  This is how the money will be distributed unless you

2    have a will or unless you write a prenuptial agreement.  Those

3    things can change.  You know, a private party can change that,

4    but we wouldn't say that by setting a default for the order of

5    priorities for secured lenders, for example, that the

6    government has somehow infringed on the underlying right to

7    transfer property or --

8                        JUDGE PORTER:  Could New Jersey --

9                        MS. CAI:  -- to own property.

10                       JUDGE PORTER:  Could New Jersey say if you go

11   onto someone else's property you can't express any opinions

12   unless you first get their permission?

13                       MS. CAI:  So I don't think that that is -- so

14   there's two answers to that, Your Honor.  I think the first is

15   that I -- it is true that there are cases saying you don't

16   have a private property right or you don't have a right to

17   leaflet on, you know, a private mall if the mall owner doesn't

18   want you to.  And so the question is can the government set a

19   default against that?

20                       I think that's exactly what the Supreme Court

21   held in Breard versus City of Alexandria (phonetic).  That

22   case involved an ordinance that said, default, no commercial

23   solicitation at homes, period.

24                       JUDGE CHUNG:  So it's your position that any

25   time the government sets a default it just does not implicate

1   a constitutional right, whether it be the First Amendment or

2   the Second Amendment, just changing a default cannot implicate

3   a constitutional right?

4                MS. CAI:  I think it can in certain

5   circumstances, and that's when the default rule or anything

6   that the government enacts, the enactment itself includes a

7   invalid classification.  So the government could not say the

8   default is no democrats on restaurant property with -- except

9   with the -- because -- but that's a different question.

10  Right.  The question is has the government classified

11  unconstitutionally, not whether or not the underlying right is

12  implicated or not.

13               So I do think that when the government changes

14  the default with respect to how you communicate your right to

15  exclude or how you transfer property between a person and

16  their heirs, those are not changes to the underlying

17  constitutional right of property, or in this case the Second

18  Amendment, but rather a change to just the communication

19  requirements for the person.

20               But if you don't agree with me, this is a case

21  where the history is especially on point.  There's unusually

22  strong evidence, both from New Jersey and from other states.

23  And I want to focus on New Jersey because, you know, we're

24  here and it's especially strange to think that New Jersey

25  could not in 2023 enact the very same rule that it had from at

1    least 1771 to 1895, possibly earlier.

2              And I think that that law, including others

3    from other states, provided without qualification that an

4    individual cannot carry a firearm on any land not his own

5    without express written permission from the owner.  And I

6    think this is an example of where there's certainly no

7    conflict between the founding and ratification of the 14th

8    Amendment because the laws included both periods of time, were

9    longstanding --

10             JUDGE CHUNG:  Isn't that reading broader than

11   what the statute was enacted for, especially in reading it in

12   context of all of its subsections?

13             MS. CAI:  So if Your Honor's referring to

14   plaintiffs' argument that the statute was enacted for the

15   purpose of preventing poaching, we actually disagree with --

16             JUDGE CHUNG:  Not exactly that.

17             MS. CAI:  -- that.

18             JUDGE CHUNG:  Isn't your reading just broader

19   in that that specification as to where you could or could not

20   default carry really referenced not places that a license had

21   been extended for the public to enter, but rather on private

22   grounds where people customarily hunted?  It didn't implicate

23   public spaces or spaces that had been opened to the public

24   because those were not the types of places where poaching was

25   taking place.

1          MS. CAI:  I think textually I would disagree

2     with that, Your Honor.  And starting with the New Jersey

3     statute -- this is the 1771 statute.  It's JA1001.

4          JUDGE CHUNG:  I understand your textual

5     argument.  But aren't you broadening how it actually was

6     interpreted and enforced?

7          JUDGE KRAUSE:  Ms. Cai, not to interrupt your

8     train of thought, but we're going to extend argument on both

9     sides, so it will be a total of one hour rather than 30

10    minutes on both sides.

11         MS. CAI:  Okay, Your Honor.  And Mr. Sokol has

12    reserved ten minutes of his time, so I don't know how that

13    breaks down, but you can tell me to stop whenever you would

14    like.

15         So, Judge Chung, I actually don't agree with

16    that for a couple of reasons.  The first, back to the 1771 New

17    Jersey statute, that statute had one section on trespass with

18    guns and then a separate statute on poaching.  In the section,

19    Section 1, on trespass with guns, in addition to the core

20    language it also stated that any justice of the peace of

21    either of the counties, cities or towns corporate of this

22    colony can enforce the law.

23         So it seems very strange to me to specify that

24    urban justices of the peace can enforce this law if the goal

25    or if the premise of the statute was really about plantations

1    or things of that nature.  So I think the text, I think, does

2    inform the extent of this particular law.

3           With respect to some of the others, I think the

4    argument is also very attenuated and I think contradicted by

5    the historical understanding of the words used in the statute.

6    So, for example, in the Louisiana 1865 statute and the Oregon

7    1893 statutes it says, premises or plantations.  And we

8    provided historical -- contemporaneous cases talking about

9    premises as businesses.  And so I think that is -- the

10   language of premises or plantations makes it quite clear that

11   the legislatures contemplated the application of this law to

12   businesses as well as private -- you know, businesses open to

13   the public as well as private homes.  And so I don't think

14   that distinction makes a ton of difference.

15          I know that the plaintiffs also focused on the

16   word, improved or enclosed.  It's really unclear to me what

17   the upshot of this argument would be because I presume that

18   all shops and businesses today that they would be entering are

19   enclosed.  There are certainly improvements on the land from,

20   you know, the commons and so I don't think that actually makes

21   any difference whatsoever.

22          So --

23          JUDGE KRAUSE:  Counsel, could you address

24   another specific one; that is, the bars and other locations

25   where alcohol is served --

1          MS. CAI:  Yes, Your Honor.

2          JUDGE KRAUSE:  -- because most of the

3    historical examples seem to be directed to the intoxicated

4    person, not the place.

5          MS. CAI:  It is certainly true that

6    legislatures sometimes chose to enact regulations that only

7    focused on people who were already intoxicated.  But other

8    legislatures did choose both then and today to restrict

9    firearms carry entirely in places where people are drinking.

10   And so we gave examples of the enactments in New Orleans in

11   1870, in New Mexico in 1873 and Oklahoma in 1890.

12          And I think that, you know, many other states,

13   including Louisiana today, Alaska, Kentucky, Florida today all

14   have the same prohibition and I think that's because that is a

15   historical tradition that is well developed.

16          I do agree that some states chose to regulate

17   it in a different way, but I don't think that that is

18   indicative that regulating it in the way that New Jersey and

19   other states have chosen today would have been seen as

20   unconstitutional.

21          I will also note that a lot of the places that

22   were discussed like ballrooms and social parties, I don't know

23   if those places would have necessarily served alcohol on

24   premises, but I do think that the idea that the underlying

25   theme is the same.  These are places where people are in a

1  heightened state of frenzy where that particular location

2  legislatures chose as sensitive because -- as opposed to, you

3  know, a bakery or a tailor or some other social place or other

4  place that you may be in as a person in public, these chose

5  these places because of the state of individuals --

6                    JUDGE CHUNG:  Yeah, but they specifically --

7                    MS. CAI:  -- who are going to be there.

8                    JUDGE CHUNG:  -- enumerated places.  They very

9  easily could have said taverns, saloon and they didn't.

10                   MS. CAI:  Yes, Your Honor.  Some of them did

11  and some of them did not.

12                   JUDGE CHUNG:  Most of them don't.  You've named

13  the only ones that do.

14                   MS. CAI:  I think those are the only ones that

15  do, but, again, Your Honor, we are not historians.  We're

16  doing what we can with the history that has been digitized and

17  provided --

18                   JUDGE CHUNG:  Before us.

19                   MS. CAI:  That's before us.  That's correct,

20  Your Honor.  So I'm just not foreclosing that there may have

21  been other ones.

22                   That is true.  That -- it is true that some

23  legislatures chose not to go in that direction, but I don't

24  think that is proof of unconstitutionality, especially because

25  --

1           JUDGE CHUNG:  But if it shows -- if the problem

2    was intoxicated with -- people with firearms, and Bruen says

3    if legislatures chose to address it another way, so this isn't

4    silence.  Most of the legislatures chose to address it by

5    banning intoxicated people from bearing firearms.  That's a

6    materially different way.  This isn't silence.  This is a

7    different burden.

8           MS. CAI:  I agree, Your Honor, that it's not

9    silence, but I think it's just a different policy choice.

10   Today legislatures make different policy --

11          JUDGE CHUNG:  But isn't it a policy choice that

12   matters under Bruen?

13          MS. CAI:  I don't think so, Your Honor,

14   because, you know, Bruen and other precedent as early -- you

15   know, as early as, you know, Justice Brandeis to, you know,

16   Justice Gorsuch in the pork producers case made it very clear

17   that legislature, state legislatures are, you know,

18   laboratories of experimentation and democracy and they get to

19   choose even novel or unprecedented or choices that other

20   states did not choose.

21          And so it's possible that New Orleans saw a

22   particular problem with people carrying firearms at taverns

23   and decided the only way we can really resolve this in a way

24   that makes our people safe is to have a broader limitation

25   that --

1          JUDGE CHUNG:  That might be, but does that

2    establish a historic tradition of regulation?

3          JUDGE PORTER:  That's -- when you said novel

4    and unprecedented, my ears perked up because that seems -- it

5    seems like how do you fit that in within -- with history and

6    tradition?

7          MS. CAI:  Yes, Your Honor.  And I think, I

8    think that the key is if it was something that so clearly

9    restrained constitutional rights, you would have expected

10   someone to be commenting about it.  You would have expected

11   legislatures to be debating about it, and you would have

12   expected them to be challenged in courts and struck down,

13   which is what happened in the cases cited by Bruen.

14          There were states that enacted total flat bans

15   on public carry.  Those cases made it to state courts almost

16   immediately and those courts then said that is not

17   permissible.  We're going to either have a limiting reading of

18   the statute to allow some other kind of carry or we're just

19   going to strike down this enactment in the first place.  You

20   don't have that here.

21          JUDGE PORTER:  Oklahoma -- on bars and

22   restaurants, Oklahoma 1890, New Mexico, did you say 1873?  New

23   Orleans --

24          MS. CAI:  1853, Your Honor, but --

25          JUDGE PORTER:  1853.  New Orleans 1879.  Did

1    those -- so that's three states, post-civil war.  I believe

2    none of them had a baby (sic) Second Amendment at the time.

3    How -- why should we consider that to be strong evidence?

4              MS. CAI:  I think that that is evidence that

5    those legislatures made that choice and it was not something

6    that the polity or other legislatures saw as unconstitutional.

7    So I think there is definitely some weight to be provided

8    there.  It would be one thing entirely, Your Honor, if as soon

9    as New Orleans came out with that restriction and there's no

10   evidence of that here, people were challenging it.  People

11   were commenting about how this tramples on the rights of the

12   constitution provided in the constitution, especially since

13   the Second Amendment now bound Louisiana.

14              I will note that Heller noted that Louisiana

15   also had a pre-Second Amendment or pre-14th Amendment version

16   of their understanding of the -- of constitutional rights to

17   allow individual right to carry.  So I think that is

18   indicative of what's --

19              JUDGE PORTER:  It sounds like you're adding to

20   the evidence that Bruen discussed, silence, as evidence of a

21   history and tradition.

22              MS. CAI:  I don't think I'm adding to it, Your

23   Honor.  I'm just contrasting it with what Bruen had.  And I

24   think the language that Bruen used talks about, you know,

25   single laws in effect in a single state that "contradict the

Page 32

1    overwhelming weight of other evidence."  That's what we're

2    focusing on.  That's the language that Bruen used to describe

3    what it saw with respect to total prohibitions on public

4    carry.  And that's what we don't have here.  There is nothing

5    on the -- there's no weight of other evidence on the other

6    side.  There is no evidence on the other side.

7              JUDGE PORTER:  I mean, Bruen seems to consider

8    silence to be a problem for the government because you need to

9    fill up that silence with, you know, widespread laws.  That's

10   the tradition.  And you're saying, no, silence works to our

11   benefit because nobody's complaining.

12             MS. CAI:  I do think, Your Honor, it would be

13   detrimental to us if the problem was a recognized social

14   problem or technological problem and nobody, not a single

15   state reacted to it with a restriction.  I think you can --

16             JUDGE PORTER:  Guns in taverns.

17             MS. CAI:  Sorry, Your Honor.

18             JUDGE PORTER:  Guns in taverns isn't a

19   widespread, you know, problem at all times.

20             MS. CAI:  It -- and I think we would lose if

21   there were no enactments whatsoever.  But there were

22   enactments by state legislatures to prohibit firearms in

23   taverns.  So that's the difference that -- what we have versus

24   what Bruen said about the lack of evidence.

25             JUDGE KRAUSE:  Should we be thinking and does

1    it matter whether this is a new problem or an old problem?

2              MS. CAI:  I think it matters only in terms of

3    the level of analogizing you would need to do.

4              JUDGE KRAUSE:  Well, in terms of old problems,

5    the sort of default going back a couple of years seems to be

6    open carry.  What do we have, you know, as the law in New

7    Jersey?

8              MS. CAI:  I'm sorry.  Are you talking about the

9    private property rule or are we still talking about taverns?

10             JUDGE KRAUSE:  Taverns.

11             MS. CAI:  So in New Jersey I believe that there

12   were -- we're not aware of sensitive place prohibitions at

13   taverns in New Jersey.  That's correct.

14             JUDGE KRAUSE:  I'm asking a different question.

15   Today what's the law in New Jersey about open carry in a bar?

16             MS. CAI:  It is not allowed.

17             JUDGE KRAUSE:  Okay.  So is part of the issue

18   here that we're dealing with the contrast of a situation where

19   it was open carry, someone becoming intoxicated and bearing

20   arms was a visible phenomenon and action could be taken

21   versus what we have today with the proliferation of firearms

22   with concealed carry and the inability to recognize that?  Is

23   this an old problem or are we confronting a new problem that

24   allows for more nuance in the way a legislature approaches the

25   issue?

1          MS. CAI:  So there's two answers to that

2     question, Your Honor.

3          The first is hist -- as a historical matter,

4     all of the statutes that we have cited in favor of both the

5     tavern provision and, you know, libraries and schools, those

6     were total prohibitions on carry at sensitive places, both

7     concealed and open.  So those are legislatures understanding

8     that open carry was otherwise permissible on the streets and

9     in other places, nonetheless designating these specific

10    locations as so sensitive that no carry is permissible.

11         JUDGE PORTER:  How long has it been prohibited

12    to carry in a New Jersey bar?

13         MS. CAI:  Well, so assuming the bar owner has

14    not said anything, it's been prohibited since December of

15    2022.  And -- but, of course, the tradition --

16         JUDGE PORTER:  No.  Before this law you could

17    in New Jersey.

18         MS. CAI:  Yes, Your Honor.  I will note before

19    Bruen you would need justifiable need to carry anywhere

20    publicly in New Jersey, and so there's the number of people

21    that are at stake are different.

22         JUDGE PORTER:  Yeah.

23         MS. CAI:  Yeah.  So -- but to Judge Krause,

24    your question about the social problem, I think that social

25    problems do change and the magnitude of them do change over

Page 35

```
 1  time and the specific concerns about them may change over

 2  time.

 3              I do think that for problems that existed in

 4  the same form, even if the magnitude is different, we do need

 5  to show an analog that is distinctly similar, relevantly

 6  similar, however you want to -- it depends on how different it

 7  is.

 8              And then there are places that perhaps existed

 9  by name, but the concerns at them did not exist in the way

10  they do today.  Beaches is a great example.  Certainly, I

11  don't contest that there were shorelines in 1791, but I would

12  hesitate to say that anyone would have thought the concerns of

13  carrying firearms at the Jersey shore today existed in 1791.

14              So I think we have to really look at what are

15  the social concerns of the place that we're talking about

16  inured with all the other issues that may not have been

17  present at the founding, including what kind of firearms, how

18  many people would have them, are they concealed or not, that

19  sort of thing.

20              JUDGE PORTER:  Can we talk about permitting

21  requirements?

22              MS. CAI:  Yes, Your Honor.

23              JUDGE PORTER:  The four-person, four reputable

24  person rule to me sounds an awful lot like, you know, sort of

25  a version of the New York rule that Bruen struck down.  You
```

1    know, you have to come in and either by your own story in New

2    York or with four reputable people in New Jersey you have to

3    persuade someone from the government that he's exercising

4    discretion and judgment and so on, that you're okay.

5                 Why doesn't this fall almost squarely within

6    Bruen?

7                 MS. CAI:  Because there's a very specific

8    standard that the licensing official is measuring against and

9    it's not justifiable need.  It's not you're okay.  It's

10   whether or not you're likely to engage in conduct other than

11   lawful self-defense that would impose a danger to yourself or

12   others.

13                And I think that is something that Bruen has

14   endorsed as something that is permissible as a licensing

15   scheme.  And that's all the reference is supposed to be.

16                JUDGE PORTER:  Why don't the background checks

17   do that?

18                MS. CAI:  I'm sorry, Your Honor.

19                JUDGE PORTER:  Why don't background checks

20   accomplish that?

21                MS. CAI:  I think this is a form of the

22   background check.  So if Your Honor is talking about a

23   criminal history check, I don't think that accomplishes this

24   goal because there are people who have not been convicted of a

25   crime --

1          JUDGE PORTER:  Well, but background checks are

2    objective, right?  This seems pretty subjective.  You bring in

3    some friends and neighbors and stuff.

4          MS. CAI:  I don't think it's subjective, Your

5    Honor.  The reference just has to sign a -- I think it's a

6    quarter of a page form, one page for all four people, and it

7    just says, you know, I -- the person who is applying, their

8    name, is unlikely to engage in conduct other than lawful self-

9    defense that would pose a danger to themselves or others, and

10   I don't know them to be abusing drugs or alcohol.

11         JUDGE CHUNG:  Is any part of it discretionary?

12   Who decides who is reputable?  What is the definition or what

13   is the guidance on reputable?

14         MS. CAI:  I don't know if there's been a

15   challenge on who is reputable or not.  I don't know if that's

16   been like a problem necessarily.  It's references that the

17   person -- the applicant identifies.

18         JUDGE CHUNG:  (Indiscernible).

19         MS. CAI:  I suppose, Your Honor, if your

20   reference is Tony Soprano, that would probably be a problem

21   and I think the law limits it to people who are not related to

22   you, so your grandmother could not vouch for you.  But it's

23   just another citizen who knows you who has information about

24   your propensity to harm yourself or others.  And I think

25   that's the objective kind of standard that Bruen endorsed.

1    And --

2                    JUDGE PORTER:  Can you think of any other

3    constitutional right where we need that kind of prelude before

4    -- you know, requirement before we can exercise it?

5                    MS. CAI:  Your Honor, I can't think of another

6    constitutional right where the possession of the item could

7    immediately cause harm to self or others.  There are certainly

8    rights that impinge on public safety.  Right.  I agree with

9    that, so the Fourth Amendment, of course, the exclusionary

10   rule could have impacts on public safety.

11                   But I think that the -- I think Bruen

12   recognizes that the Second Amendment is unique.  You do -- you

13   know, it endures things such as background checks, safety

14   training, that sort of thing, and so this is really no

15   different.

16                   Now I'll give you an example.  So I think -- I

17   don't think plaintiffs challenge and I don't think it's

18   contested, especially under Heller, McDonald and Bruen, that

19   individuals with a history of mental illness or alcohol abuse

20   are not permitted to carry firearms.  Those are things that

21   you can't just look up in a -- you know, in a data base.

22                   Historically, I imagine that the sheriff of the

23   town may already know who has those problems.  Today in New

24   York City, Jersey City, Trenton, that's very difficult for the

25   police department to do.  What they could do is go into a --

                                                              Page 39

1    what they theoretically could do is go to a broad-sweeping

2    inquiry into everybody who has ever known you of the sort that

3    you may do when you're trying to get a security clearance.

4    This is not it.  This is you, the applicant, just list four

5    people.

6                     And it -- remember, the plaintiffs themselves

7    do not say that they can't meet this requirement or that it

8    would be difficult to meet that requirement.  In fact, they

9    have met this requirement when they got their permits.  And so

10   I don't even understand what the injury is to them, much less

11   a constitutionally protected interest in not listing

12   references.

13                     JUDGE PORTER:  Facial challenge, right?

14                     MS. CAI:  It is a facial challenge, Your Honor,

15   but I think because they haven't shown that they would be

16   denied the right to carry, what they're challenging is like

17   their right to not write down someone's name, which I -- it's

18   hard for me to imagine how under Transunion or even Spokeo

19   that that is a concrete enough an injury to even be

20   here to talk about this.

21                     But even if it were, I think it is supported by

22   historical tradition because historically this has been

23   something, background checks and references have been

24   something that legislatures used to determine whether or not

25   someone poses a threat to safety of themselves or others.

                                                      Page 40

1              JUDGE KRAUSE:  Go ahead.  Do you have a

2    question?

3              JUDGE CHUNG:  In the same vein as the

4    permitting scheme, as a hypothetical could you send a $50 bill

5    annually to every permitted -- everyone who has a -- a permit

6    holder for -- to deposit into the account?  Would that be

7    constitutional?

8              MS. CAI:  Sorry, Your Honor.  Who is the you in

9    the -- who is sending the --

10             JUDGE CHUNG:  Jersey.  Could New Jersey send an

11   annual bill to every permit holder for $50 to deposit into the

12   account, the crime victims account?

13             MS. CAI:  So I think, I think it's two steps,

14   Your Honor.  So could the state charge a permit holder $50 to

15   have the permit, to continue having the permit or to --

16             JUDGE CHUNG:  I'm going beyond that.

17             MS. CAI:  -- re-up their permit.

18             JUDGE CHUNG:  They --

19             MS. CAI:  Right.

20             JUDGE CHUNG:  They now have the permit.  Every

21   year can you just send them a bill for $50 to deposit into the

22   crime victims account?

23             MS. CAI:  I think so, Your Honor.  And that's

24   true for two and perhaps three different reasons.

25             The first is historically.  We cited a number

Page 41

1    of statutes going back to, I believe Mississippi in 1847 or

2    '67, I forget, where they charged people a fee, a flat fee

3    every year for having a firearm.

4           Where that's deposited actually went into their

5    general revenue fund of the state and some were designated for

6    bridges and other forms of, you know, a police fund, a

7    government, school pensions, things like that.  That's the

8    historical analysis that Bruen asked us to undertake with

9    respect to the legitimacy of -- or validity of a current law

10   and that is supported by historical tradition.

11          The second thing to note is that plaintiffs are

12   not challenging the size of the fee.  I think their argument

13   would be exactly the same if it was $5 or $1.  They're saying

14   because the state, the legislature in December of 2022 has

15   decided this amount we're collecting from you is going into

16   this fund, that is somehow per se unconstitutional.

17          That's just not how the law works as a matter

18   of appropriations law in New Jersey.  We did raise that

19   argument below in the P.I. hearing and that's never been

20   responded to.  That's just not -- you know, the state collects

21   money.  Money is fungible and it -- wherever it decides to

22   designate that money is not something that either binds future

23   legislatures or is indicative of what the money was originally

24   for.

25          JUDGE PORTER:  Well, could New Jersey say, it

1    doesn't matter where we're sending it.  You just have to pay

2    this fee to exercise your right.  You've got to pay it.

3              MS. CAI:  So as a matter of history I think

4    yes.  To be clear, though, that's not what we're representing

5    the $50 portion to be.  I'm just saying even if it were that,

6    that would be permissible under the history test of Bruen.

7              Now I do want to specify, though, that if Your

8    Honors thought that, you know, Bruen didn't abrogate the test

9    in Cox and Murdock, their reading of Cox and Murdock is just

10   incorrect.  Nowhere in those cases do the courts say you can

11   only use the money spent to process this application, to, you

12   know, look up and -- you know, how many people are going to be

13   here, can you do your parade, and to process that application.

14             Rather, Cox and Murdock both said that the fee

15   amount would be evaluated against the strength of state

16   interests in order to police that activity.  And so it's not

17   just how much money does it take for you -- your application

18   to be processed, but rather how much -- is it related to the

19   state's interest in policing the activity of carrying firearms

20   in public.

21             JUDGE PORTER:  Is that what's being policed or

22   is it the permitting, the make -- get -- asking for a permit,

23   is that the activity that's being policed?

24             MS. CAI:  So under Cox and Murdock it's

25   certainly not getting the, getting the permit.  And we know

Page 43

 1    that because in Cox it was a up to $300 fee for a one-day

 2    silent demonstration of Jehovah's Witnesses.  I don't think

 3    anyone was suggesting it cost $300 to process that one

 4    application.

 5                Rather, the Court said you were to look at how

 6    many observers are going to be there, how big are the crowds,

 7    how many --

 8                JUDGE CHUNG:  Right.  So those are one off

 9    events that have associated costs that can be estimated for

10    that, again, based on what that one off event is.

11                These are people who have presumably means to,

12    meaning they don't have prohibiting backgrounds, to

13    legitimately possess firearms over a continuing course of

14    conduct.  That's very different than a discreet event that has

15    estimable costs that can be determined.  It's -- that activity

16    is a discreet event whereas this is an ongoing course of

17    conduct for, you know, however many times they renew the

18    permit.

19                And to attribute costs for someone who is

20    lawful and has never used their firearm or shot someone or

21    caused mayhem or disorder, I think that's the issue, like how

22    can you assess that cost to someone when it's not like a

23    parade where it's known, this much trash will be generated,

24    this many security officers will need to be assigned to this.

25                MS. CAI:  Your Honor, I think that Cox and

                                                              Page 44

1   Murdock, if we applied their reasoning, which we submit is not

2   applicable after Bruen, you would look to what they said is

3   permitted for the size of the fee.  And it is the amount

4   imposed as a regulatory -- "regulatory measure to defray the

5   expenses of policing the activities in question."

6               I agree that the activities in question are

7   different.  However, the protestors or the Jehovah's Witnesses

8   in Murdock and Cox had not demonstrated that they would

9   violate the law, cause a riot, generate trash, any of that.

10  Right.  They could have said, we're going to clean up after

11  ourselves entirely.  That's not the question.

12              The question is, the state is -- has -- will

13  incur expenses in both processing the application, maintaining

14  the platform for the application and doing the background

15  checks as well as policing the activity in question, which is

16  if people show up more and more in public with their firearms,

17  the level of policing required is going to increase.  That is

18  a cost associated with regulating the -- policing the

19  activities in question, in this case public carry of firearms.

20              JUDGE PORTER:  Let me ask a different way a

21  question I asked a few minutes ago.  I just want to make sure

22  I got your answer right.

23              Could New Jersey say -- I know it's not this

24  case.  Could New Jersey say, you want a permit, you have to

25  pay $200, and it's not for cost reduction or anything.  It's

1    because that's the amount we want to charge you to exercise

2    your right is $200 if you want a permit.

3                MS. CAI:  As a matter of history, I think the

4    answer is yes.  I don't think that's actually what's happening

5    here.  Remember, this is a --

6                JUDGE PORTER:  I --

7                MS. CAI:  -- this is a dollar amount that had

8    not been changed since 1970, so all it does is reflect the

9    amount of inflation.  It actually is less than the amount of

10   inflation.  So I don't think that's what's happening here.

11   But I think the historical answer is yes.

12               We've covered almost everything.  I do want to

13   answer a question that, Judge Krause, you asked at the very

14   beginning, which is if there is a conflict between 1791 and

15   1868, which governs.  And I answered by saying, by resisting

16   your hypothetical saying there is no conflict.  But I do want

17   to make sure that I spoke a little bit about if there is a

18   conflict, why it's so important that the right as it was

19   understood when it was ratified by the states is what controls

20   and the understanding of that right.

21               The plaintiffs' theory would not make any

22   sense.  They would have -- you would have to believe that the

23   states ratified a version of the 14th Amendment that they did

24   not understand to exist and became bound by that.  That goes

25   against every principle of originalism and of democratic

Page 46

1  legitimacy.  And I think what Heller said was constitutional

2  rights are enshrined with the scope they were understood to

3  have when the people adopted them.  The only method that

4  fulfills that goal is to look to what the people, i.e. the

5  states understood when they adopted the 14th Amendment.

6              So I just wanted to make that clear before

7  moving on to, I guess all we have left is insurance.  I don't

8  know if Your Honors had questions about it.  If not, I'll just

9  say one very quick --

10             JUDGE KRAUSE:  Well, I think we've -- we're --

11             MS. CAI:  Okay.

12             JUDGE KRAUSE:  -- at time although there's so

13  much --

14             MS. CAI:  That's all right, Your Honor.

15             JUDGE KRAUSE:  -- so much more we could cover.

16  I would like to ask you one quick question --

17             MS. CAI:  Yes.

18             JUDGE KRAUSE:  -- before you sit down.  Maybe

19  it won't end up so quick.

20       (Laughter)

21             JUDGE KRAUSE:  But what significance is there

22  to the nature of the people involved.  Some of the arguments

23  seem to be that these are spots where there are vulnerable

24  people like children or elderly people or infirmed people.

25             Where is there some historic analog for that?

1    What -- how are we supposed to think about the how and why of

2    that?

3                    MS. CAI:  Yeah.  So I think history

4    demonstrates that the Second Amendment allows legislatures to

5    make reasoned judgments about where are there specific

6    locations where the existence of firearms is so incompatible

7    with that location that we're going to ban firearms

8    altogether.  And I think what we can glean from that is how

9    they made those choices.

10                   So the fact that they chose schools as opposed

11   to offices or factories shows that it -- there's something

12   about schools that's different from those locations.  I think

13   it's one of two things, and I think it could be both.

14                   First is that it's a place where the purpose is

15   for the congregation and concentration of young, vulnerable

16   individuals such that they would feel threatened if there were

17   arms present, or it could be still with, you know, the

18   designated purpose of the place which is the gathering of

19   children where there is more damage in terms of panic or in

20   terms of accidents or in terms of disaster even if someone

21   were to only use their firearm in self-defense.

22                   So it could be both of those ideas, but the

23   fact that they drew those lines at schools as opposed to

24   offices, courthouses as opposed to law firms or racetracks and

25   ballrooms instead of bakeries and farms, right, those are

Page 48

1    decisions that historically legislatures made and we look to

2    what is distinguishable about those categorizations and

3    whether or not those categorizations make sense and are

4    analogous to the categorizations we're making today.

5              Many of our provisions are identical to the

6    same categorizations that legislature has made in the 19th

7    century because the same concerns still exist.  Some of them

8    are slightly different.  You know, they didn't -- I don't know

9    if large sporting venues existed, but they certainly do exist

10   now, the same concerns at what you would have at a racetrack

11   or a ballroom would exist today.  And so --

12             JUDGE KRAUSE:  Does the purpose extend to

13   commerce, to the, you know, exchange of goods, to -- how do we

14   -- how do you account for things like fairs?

15             MS. CAI:  Your Honor, I don't know exactly

16   whether it's the existence of commerce that led, you know,

17   Virginia in 18 -- 1789 to designate fairs and markets as

18   sensitive.  I would suspect that it's not just commerce

19   because if it were commerce it would be more than just fairs

20   and markets.  And so they are limiting it to fairs and

21   markets.  Historically we understand that many people

22   congregated there with their families to gather, you know,

23   goods for the week.  And that kind of crowded space, perhaps

24   much like, you know, the parades of today was, you know, what

25   was happening then.  That's the kind of thing that they were

1    concerned about and the people present there.

2                    JUDGE PORTER:  If the --

3                    MS. CAI:  So --

4                    JUDGE PORTER:  If the rationale was

5    vulnerability, isn't -- and if you can't carry in sensitive

6    places, isn't everyone vulnerable in that -- isn't an adult

7    male as vulnerable since he's not -- since he can't carry as a

8    child in that sensitive place against someone who is in

9    violation of the law shooting guns?

10                   MS. CAI:  I think that's a judgment that

11   historically legislatures have made.  You can make the same

12   argument about poling places.  Right.  People -- I don't think

13   that's a vulnerability standard, but it is a site of

14   democratic activity.  You can make the same argument about any

15   sensitive place that the Supreme Court has endorsed as settled

16   constitutional.

17                   And I think there are policy arguments one can

18   make.  Perhaps some legislatures agreed with those policy

19   arguments.  Other legislatures did not, and we see a specific

20   history of legislatures that have designated in their judgment

21   these are the things that we need to focus on to keep our

22   citizens safe.  And courts over and over again endorsed that

23   ability for the legislatures to make that decision, and that

24   carries through as a historical tradition to today.

25                   JUDGE KRAUSE:  Thank you.

Page 50

1          MS. CAI:  Thank you, Your Honors.

2          JUDGE KRAUSE:  Thank you.

3          Mr. Sokol, we'll give you a few minutes as

4    well.  Let's make that ten minutes.

5          MR. SOKOL:  Good morning, Your Honors.  If the

6    Court please, on behalf of the presiding officers, we join the

7    arguments that have been offered by the solicitor general for

8    the state and the attorney general.  And we will address two

9    issues:  One, the matter that is currently before the Court,

10   which is whether or not to issue a preliminary injunction, and

11   the other is the insurance requirement that is in Chapter 131.

12          Our position on the first issue is that the

13   plaintiff has not met their burden following the factors that

14   are set forth by the Supreme Court in Benisek or

15   by this Circuit in Reilly.  And because they have failed, the

16   application should be rejected and no injunction should be

17   issued against Chapter 131.

18          The -- Bruen held that the Second Amendment

19   should be considered on a par with all of the other freedoms

20   set forth in the Bill of Rights.  But it also said that like

21   all the other freedoms set forth in the Bill of Rights, it is

22   subject to the laws that are not implicated in the Second

23   Amendment.  And one of those is the -- are the factors that

24   have to be considered by the Court when an application is made

25   for a preliminary injunction.

1             And both Benisek and Reilly tell us that first

2    a preliminary injunction should be issued only in rare cases;

3    that it should be done by balancing the equities; that you

4    look at the four factors.

5             The plaintiffs have said that because we hold

6    Chapter 131 to be unconstitutional, we only need to satisfy

7    the first two, likelihood to succeed on the merits and

8    irreparable harm, and they both flow from the same issue.

9    They say that because it's an unconstitutional statute, we're

10   going to succeed and because it's unconstitutional you can't

11   force people who have permits to own and carry guns to be

12   subject to the restrictions of an unconstitutional statute.

13             JUDGE KRAUSE:  Can I --

14             JUDGE PORTER:  So --

15             JUDGE KRAUSE:  Go ahead.

16             JUDGE PORTER:  Go ahead.

17             Can we skip past the preliminary injunction

18   standards and just go straight to the merits because there's

19   an applicable clear legal rule and the facts really aren't --

20   except for maybe, you know, transportation hubs, I don't think

21   the facts are really disputed.

22             So could our -- could we just go straight to

23   the merits, in which case the burden is back to New Jersey

24   under Bruen?

25             MR. SOKOL:  I'm not sure I understand the

 1    question.  Can you repeat what you said because I missed the

 2    --

 3                    JUDGE PORTER:  Rather than --

 4                    MR. SOKOL:  -- beginning.

 5                    JUDGE PORTER:  Rather than deciding if we're

 6    going to uphold or tinker with the preliminary injunction,

 7    could we sort of just go past -- look past the preliminary

 8    injunction and go straight to the merits under Bruen, go

 9    straight to the Second Amendment question and decide it

10    ourselves.

11                    MR. SOKOL:  I suppose that you have that power

12    to do, but I believe that the matter before the Court, the

13    matter that's been briefed and the matter that we all came to

14    argue about this morning was the application for preliminary

15    injunction.

16                    JUDGE PORTER:  Uh-huh.

17                    JUDGE KRAUSE:  I would like to ask you about

18    the insurance requirement.

19                    When we are looking at things like the

20    requirements that go along with obtaining a permit and the

21    insurance requirement among them, do we need historic analogs

22    for that?

23                    MR. SOKOL:  Yes.  And I think that what we have

24    done is demonstrate that the historical analogs of the

25    antebellum era, which are more applicable, and the ones that

1    were cited by the Court in Bruen are the ones that are most

2    applicable.  And those are the ones that deal with the

3    requirement that when someone in a community is identified as

4    potentially inflicting harm with a weapon, which in those days

5    was a flint stock pistol, that there was a mechanism by which

6    the community or the leaders of the community could impose a

7    surety requirement to be posted.

8                    JUDGE KRAUSE:  But that example in history --

9    again, all but one case, involved either a showing already of,

10   you know, affray or -- bringing terror to the people or a

11   complaint that was made as to the particular person.

12                   Here, this is a blanket requirement that's

13   being imposed on everyone.  What's the historic analog for

14   that?

15                   MR. SOKOL:  Well, we follow the analysis done

16   by the Court where they surveyed the fact that the requirement

17   of a surety bond did not interfere with the right to carry.

18   So they effectively separated it from the rights that you have

19   under the Second Amendment to own and carry.

20                   They then went on, and if you take the exact

21   quote from Justice Thomas, it is, basically it's a mechanism

22   by which you assign financial responsibility for the harm that

23   could be imposed by the carrying of a weapon.

24                   And when you now use that analog and apply it

25   to current situations where instead of an individual who might

1   be dangerous, you have hundreds of -- the prospects of

2   hundreds of thousands of people in New Jersey who will now

3   legally own and carry guns in public, and all of the scholarly

4   studies and peer review studies that collectively conclude

5   that the more guns in public, the more likely there will be

6   injuries or death created by accidents, either accidental or

7   through negligence.

8            The legislature is confronted with that

9   prospect and the legislature decided correctly that the way to

10  assign financial responsibility in that case is to require

11  insurance because you then spread the risk over the full pool

12  of permit holders and you also ensure that someone who has

13  been injured can have their liability redressed monetarily.

14           And just as important, in fact, I think it's

15  even more important, it protects the gun owner because if the

16  gun owner is in a situation where an accident occurs and

17  somebody is injured and they get sued and they're not insured,

18  it could be devastating.  It could wipe them out financially.

19           JUDGE KRAUSE:  Well --

20           JUDGE CHUNG:  What kind of --

21           JUDGE KRAUSE:  Go ahead.

22           JUDGE CHUNG:  What kind of policy would satisfy

23  the insurance requirement?

24           MR. SOKOL:  What kind --

25           JUDGE CHUNG:  And it seems that New Jersey

1   looked askance at the self-defense policies and no one is

2   offering those.  So what is envisioned or are those now back

3   in play?

4             MR. SOKOL:  Well, no.  You have and the

5   evidence before the Court is that many, if not the majority of

6   permit holders would already be covered by their homeowners

7   insurance or renters insurance, and those policies covered

8   general property and casualty coverage.

9             JUDGE KRAUSE:  I thought the commissioner --

10             MR. SOKOL:  And they --

11             JUDGE KRAUSE:  -- of banking and insurance

12   wasn't even sure whether there would be coverage under renters

13   or homeowners policies.

14             MR. SOKOL:  I'm sorry.  I didn't understand the

15   question.

16             JUDGE KRAUSE:  Well, you're indicating that

17   it's, you know, clear in the record that this -- these sorts

18   of -- this coverage is available.  And it's -- I'm wondering

19   where we find that because it -- when we consider the -- on

20   the one hand this requirement that's imposed (indiscernible)

21   for being able to exercise your Second Amendment right and

22   then -- on one hand, and then on the other hand the governor's

23   executive order that has had the effect of many insurers being

24   unwilling to provide the sorts of coverage that it seems like

25   would be needed.

1          Isn't that a Catch-22 for a law-abiding citizen

2     who wants to exercise their Second Amendment right?

3               MR. SOKOL:  No.  I think that there's nothing

4     before the Court or nothing that I'm aware of that says that

5     the insurance industry collectively is unwilling to provide

6     insurance for this purpose.  And we have expert opinions that

7     says that the policies that you currently have in place will

8     cover liability that occurs from an accidental discharge of a

9     weapon that you own that causes injury to either property or

10    person.

11              JUDGE PORTER:  What do we do with Bruen's

12    observation that these surety laws were triggered only after

13    an individual reasonably accused of intending to injure

14    another or breach the peace, and without that sort of proof or

15    accusation the surety laws just didn't matter.  They didn't

16    apply.

17              MR. SOKOL:  Well, the surety laws applied to

18    the circumstances that existed in the antebellum era where you

19    had small communities.  Everybody knew everybody else.

20              JUDE PORTER:  But they weren't generally

21    applicable, were they?  They were -- they only applied to

22    somebody who, you know, went around terrorizing the community.

23              MR. SOKOL:  Well, they thought -- they were

24    viewed as a threat and --

25              JUDGE PORTER:  Right.

1          MR. SOKOL:  -- and it was a way to assign

2    financial responsibility.

3          JUDGE PORTER:  To those people.

4          MR. SOKOL:  And it's not exact twin as Bruen

5    says.  These are not exact twins.  They're analogies that you

6    then import and apply to current modern situations.

7          JUDGE PORTER:  I -- so I guess the question is

8    whether it's a close analogy if you're applying it to everyone

9    versus somebody who has shown himself to be a troublemaker.

10          MR. SOKOL:  Yes.  And I think that the best

11    argument I can give you is the argument that Justice Thomas

12    provided in his survey of the surety laws of the antebellum

13    era and concluding that they do not impose a burden on the

14    right to carry and that they are examples of assigning

15    financial responsibility.  And we've taken that lesson and

16    applied it to the current situation in Chapter 131.

17          JUDGE PORTER:  Okay.

18          JUDGE KRAUSE:  Okay.  Thank you.

19          MR. SOKOL:  Yeah.

20          Getting back to -- oh, am I finished?

21          JUDGE KRAUSE:  I think we're out of time.

22          MR. SOKOL:  Okay.

23          JUDGE KRAUSE:  Thank you for your argument.

24          MR. SOKOL:  Thank you.

25          JUDGE KRAUSE:  Ms. Murphy and Mr. Patterson,

Page 58

1    we'll give you 80 minutes to divide as you see fit.

2              MS. MURPHY:  Very good.  Thank you.

3              Thank you, Your Honors, and may it please the

4    Court, Erin Murphy on behalf of the Siegel plaintiffs.

5              Bruen made clear that states may not impose

6    ahistorical conditions on those seeking a permit to carry a

7    handgun for self-defense.  And while Bruen acknowledged that

8    the Second Amendment allows states to prohibit firearms in

9    certain sensitive places, it explicitly emphasized that the

10   historical record revealed relatively few of these exceptional

11   places and expressly cautioned against defining the category

12   of sensitive places so broadly as to eviscerate the general

13   right to publicly carry arms for self-defense.

14             JUDGE KRAUSE:  Do you agree, though, that Bruen

15   also says that we can draw on those historic analogies to

16   apply to new and analogous places?

17             MS. MURPHY:  Certainly.  But we're not here

18   talking about a bunch of new places.  I mean, New Jersey, you

19   know, if you take a look at the way Chapter 131 is designed,

20   it essentially identifies everywhere people would go except

21   for sidewalks.  I mean, even streets, if you're in a car under

22   this law you can't have your firearm.  And as I understood

23   Counsel to say when asked the question today, it doesn't allow

24   you to carry anywhere essentially except for private property

25   with the express, explicit permission of the private property

1    owner.

2             I don't see how you could possibly reconcile a

3    law that takes that approach with what -- how -- what Bruen

4    said, which is this is supposed to be the exception, not the

5    norm.  The norm is you get to carry in places where people

6    frequently go.  And the state needs to demonstrate that

7    there's something different about a particular place that

8    makes it exceptional and not like the ordinary places that

9    people typically go.

10            Yet here we have a law that basically just

11   catalogues all of the ordinary places that people go, and you

12   have arguments from the state about, you know, they're

13   crowded.  There's lots of people here.  I mean, those are the

14   explicit arguments that were rejected in Bruen because that is

15   what New York argued; that its law could be justified as a

16   sensitive places law because all of New York is very crowded

17   and there's police there to protect people if there's a

18   problem.

19            So I don't think you can do it at this high

20   level of generality we've heard this morning of just like, you

21   know, there were laws historically that defined -- that had

22   sensitive places, so we have sort of carte blanche to declare

23   them all sensitive now.  I think you really need to do the

24   hard work that Bruen contemplates of saying, okay, what is

25   their historical -- you know, what places were there, what is

1   common about those places that differentiated them from other

2   places and how do we take those principles and apply them,

3   carry them forward.

4           And I will note that, you know, Bruen made a

5   point of -- I mean, it actually italicized the word, new, when

6   it talked about new and different places that might be

7   sensitive.  So part of it has to be a question of are we

8   actually talking about new places or are we just talking about

9   new restrictions on places that have been around for a very

10  long time.

11          JUDGE KRAUSE:  And what is the -- even taking

12  the examples that we've gotten from Bruen --

13          MS. MURPHY:  Sure.

14          JUDGE KRAUSE:  -- what is the -- that common

15  principle that you were referring to?  What unites and is a

16  common how and why for schools to -- you know, courts, polling

17  places?

18          MS. MURPHY:  Sure.

19          So to start with the three that Bruen

20  specifically articulated, the courthouses, polling places and

21  legislative assemblies, I think that they had an obvious

22  commonality of those three places that doesn't exist vis-à-vis

23  a lot of other places people go is that the government treats

24  them as sensitive in lots of respects, not just as you can't

25  carry firearms there.  They have their own head of dedicated

1    security that's there.  And while they're open to the public,

2    there are restrictions.  You know, you may be screened.  They

3    ensure that people are not coming in with firearms.  They

4    don't just say, we have a law and we hope people follow it,

5    but we're doing nothing to make sure that the criminals don't

6    show up with firearms.

7                   Now I will --

8                   JUDGE KRAUSE:  Well, you --

9                   MS. MURPHY:  -- grant you --

10                  JUDGE KRAUSE:  -- you may be, but, I mean,

11   there are plenty of county courthouses where you walk in and

12   there's no security at all, and polling places where you walk

13   in --

14                  MS. MURPHY:  And I don't --

15                  JUDGE KRAUSE:  -- and there's no security.

16                  MS. MURPHY:  And I don't think it has to kind

17   of become like a factual question about is this, you know, is

18   this particular place providing sufficient security.  But if

19   you're looking for a commonality, I mean, if you take a look

20   at the Koons brief on Pages 24 and 25, they detail a ton of

21   historical laws that specifically required security to be

22   there at polling places and courthouses and legislative

23   assemblies.  And there were some laws at the time that imposed

24   those restrictions -- restricted those places, and you can

25   trace that particular -- especially the courthouses and

1   legislative assemblies, you can trace that all the way back to

2   the Northampton statute because setting aside the part the

3   Court dealt with in Bruen that was about interpreting how the

4   kind of fairs and markets and other places peace worked, there

5   was a separate provision that prohibited going, you know,

6   armed with force before the king, the king's ministers, all of

7   the people working in the government while they're doing that

8   work.

9           And so this is a tradition that, you know,

10  there's never any calling of that into question, Sir John

11  Knight's case, all the stuff Bruen talked about for purposes

12  of interpreting the ability to carry in other places.  Nobody

13  ever questioned the laws about not carrying before the king's

14  ministers, and that's the tradition that existed as a common

15  law matter and that we see carried forward.

16          And I'll admit there's not a ton of laws from

17  the founding era that actually said that as a statutory

18  matter, but the common law was, you know, existed, whether or

19  not it was codified in states, and that was a common law

20  tradition at the time.  And so I think you can look at those

21  places and say, you know, that's something that makes them

22  different.

23          Now does that mean, you know, anywhere the

24  government provides security it can declare sensitive.  I

25  don't think that's quite the right way to think about it.  I

1   think another feature you would identify as to those three

2   places is that they are places where you have really core

3   functions of government going on.  They are inherently

4   governmental places with kind of the key aspects of democracy

5   coming before the court, deliberating on the legislative

6   floor, casting your vote.  You know, so that's another feature

7   there.

8           JUDGE KRAUSE:  But couldn't you look at those

9   also as places where one's exercising your First Amendment

10  rights or where there's, you know, a conflict with other

11  constitutional rights and values?

12          MS. MURPHY:  I think that leads you right back

13  to the Bruen problem because people exercise their First

14  Amendment rights pretty much everywhere that they go in

15  public.  I mean, people are constantly talking, expressing

16  opinions.  People gather places to talk with other people and

17  debate.  That happens at -- you know, it happens at

18  restaurants.  It happens at bars.  It happens in parks.  It

19  happens on streets and sidewalks.

20          And so if you take that as the principle, I

21  think it leads you right back where taking, you know, crowded

22  as the principle does, which is nobody ends up getting to

23  carry anywhere.  And any principle that takes you there can't

24  be consistent with the way the Supreme Court was interpreting

25  this.

1            I think you've got to look for something that

2    would explain why you had laws that had to do with these

3    places, why you didn't have laws that had to do with, you

4    know, the taverns or the markets or, you know, the churches.

5    I mean, the churches, people -- at the time of the founding

6    the only laws about churches were laws that required people to

7    bring their firearms to churches, which is awfully difficult

8    to reconcile with the notion that, you know, that they are

9    historically a sensitive place.

10            JUDGE KRAUSE:  Well, that takes us back to

11   which time frame we should be looking at because --

12            MS. MURPHY:  Sure.

13            JUDGE KRAUSE:  -- there are statutes that --

14   plenty of statutes that go the other way with many of these

15   things once we get into the 19th century.

16            So which is it and why?

17            MS. MURPHY:  Yeah.  And, you know, and I had --

18   I will start by answering the same way the State did, which is

19   I actually don't think it matters in this case because the

20   only -- it's not just the -- you know, a matter of timing

21   here. New Jersey, even if you take the universe of laws

22   they've identified for the -- for most of these provisions,

23   which are like four laws passed by four states between 1869

24   and 1879 plus a handful of territorial laws and a couple of

25   municipal ones, those are almost the exact same law -- I mean,

1    there's a huge overlap between those laws and the laws that

2    Bruen itself considered and rejected as inconsistent with the

3    traditions of this country.

4              I mean, take for instance, you know, one of

5    those four laws is 18 --

6              JUDGE CHUNG:  We're considering a different

7    issue than Bruen.  They were considering whether or not there

8    was a public right to carry.  Here, you know, we really have

9    to consider each subsection of the statute and whether there's

10   a historical tradition vis-à-vis that particular subsection.

11             MS. MURPHY:  Sure.

12             But I think the problem with that is when you

13   go look at the decisions that upheld the provisions both as to

14   general carry and as to particular locations, the reasons

15   those courts upheld them was because they didn't think there

16   was a right to carry in the first place.

17             And if the reason they're saying of course you

18   can prohibit it in all these places is because they don't

19   think you have a right to carry in the first place, then the -

20   - you know, to the extent those are even sensitive places

21   laws, they fall under the same reasoning for why they fell in

22   Bruen because if your tradition that you're starting, you know,

23   that you're analyzing them against is people don't generally

24   get to carry, then of course you're going to end up saying

25   it's not a problem.

1              And I will note the way that these laws tended

2      to work, they weren't -- it wasn't like this where you have

3      something that's saying like generally you can carry, but not

4      in these places.  These were locations -- these were

5      jurisdictions where at the time you generally couldn't carry

6      and they were imposing a heightened penalty if you carried in

7      particular places.  Especially in the territories you

8      generally couldn't carry at all and there was just a

9      heightened penalty if you carried in particular places.

10             So if you're already talking about a

11     jurisdiction that is an outlier vis-à-vis our historical

12     tradition and they're saying you can't carry at all, I think

13     that's really the wrong place to look for a historical

14     tradition.  You need to come forward with some states that are

15     actually -- you know, that are applying the traditions of this

16     country and saying, yes, usually you can carry in most places,

17     but like here's a reason this place is particularly

18     problematic.

19             JUDGE KRAUSE:  Can we disregard cases where, I

20     mean, in the opinion the Court is -- it does gesture to it

21     being a right associated with the militia, but in addition to

22     that talks about it as a right to self-defense?

23             MS. MURPHY:  No.  I mean, I don't think you

24     would have to discard every case that talks about anything

25     being militia related, but what is a problem is when you have

1    a decision like something like the Hill case from the Supreme

2    Court of Georgia that upheld the carry restrictions and

3    locational restrictions.

4                 And what they said is, look, like, yeah,

5    there's some sort of right to self-defense, but like

6    ultimately this is really about a militia right.  And so they

7    said you can prohibit carrying in places where you don't need

8    to be able to carry there to learn how to carry a firearm well

9    for purposes of being as they called it, you know, a shooting

10   soldier.

11                And so if they're conflating those two things

12   so directly in that way and saying that essentially the right

13   to self-defense is like limited to the circumstances in which

14   it actually advances the militia interests, then I don't think

15   those cases work because they're not recognizing the right in

16   the right way.

17                And that really kind of goes back to Heller

18   even.  That's sort of what the Supreme Court said when they

19   were distinguishing a couple of cases.  I think the Anders

20   case or one of the cases from Tennessee that sort of took that

21   approach of, yeah, you have a right, but it's ultimately only

22   -- you know, the boundaries of your self-defense right are

23   determined by militia interest.  And so I think those cases go

24   astray.

25                JUDGE PORTER:  If the free line for the

```
 1    legislative assemblies, courthouses, polling places is these

 2    are places where the government provides heightened security,

 3    how does that apply to schools which until recently that

 4    hasn't been the case?

 5                MS. MURPHY:  So I don't -- I think the schools'

 6    justification is probably a little bit different.  Schools,

 7    there's kind of an in loco parentis concept as to schools.

 8    They are places that have custody over the children.  You

 9    know, you're essentially surrendering the children to the care

10    of the school.  And today school is compulsory, you know, so

11    you're doing that also at the behest of the state.

12                And so I think you could take that and take

13    that principle and maybe that does help the state in some of

14    the provisions, you know, of the many provisions we haven't

15    challenged here.  Some of them deal with facilities where you

16    have a custodial relationship vis-à-vis vulnerable persons or

17    people who don't have Second Amendment rights.  And so if you

18    think about that kind of the in loco parentis concept, the

19    custodial concept, that may apply, you know, to the types of

20    places that generally aren't open to the public.

21                I mean, yes, the public -- you know, schools

22    have varying degrees of security.  But nobody really thinks

23    the public can just like come and hang out and mill about in

24    the classroom while school is going on.  It's not open to the

25    public in the way the types of places that we've challenged
```

1    here are which is people are, you know, welcome to come and be

2    there pretty much whenever they want as long as the facility

3    is open.

4                    JUDGE PORTER:  Playgrounds and youth sports I

5    guess are justified because they're sort of analogous to

6    schools.  Does -- why does that work or not work?

7                    MS. MURPHY:  Yeah.  So I want to be clear about

8    the scope of the challenge as to those.

9                    So if you're talking about a playground or a

10   youth sporting event at a school or childcare facility,

11   they're already covered by the provisions we haven't

12   challenged.  So the provisions we've challenged and the -- you

13   know, what we've said to establish our standing here only have

14   to do with when you have a playground that's, you know, just

15   kind of like in your neighborhood park or whatever it may be

16   or a youth sporting event that's not connected with a school

17   or anything like that.

18                   And I think in that context, you don't -- I

19   mean, parents don't like surrender their children to the

20   custody of somebody at the local playground.  And so --

21                   JUDGE CHUNG:  I don't think you made that

22   argument in your reply.  Have you forfeited this issue?  You

23   really only addressed youth sporting events in a footnote in

24   your opening brief.

25                   MS. MURPHY:  I don't -- I think the argument is

```
 1   the same as to the arguments that we're making for purposes of
 2   defending the provisions we did win on, like zoos.  And so,
 3   you know, there just -- it doesn't -- there wasn't a lot more
 4   that needed to be said other than this applies equally to
 5   these provisions.  It's not a different argument because it's
 6   the same reason where I think the District Court was
 7   absolutely correct to say zoos are not like schools.  You
 8   don't surrender --
 9               JUDGE CHUNG:  Well, but you didn't --
10               MS. MURPHY:  -- children --
11               JUDGE CHUNG:  -- raise in loco parentis in your
12   opening brief.
13               MS. MURPHY:  I mean, I -- we were not -- we
14   were making it in response to an argument that was raised by
15   the State in its own brief in response to our cross-appeal.
16   So I think we're free in our reply brief to raise the
17   arguments as to why we think what they've said is wrong vis-à-
18   vis those places.
19               But in all events, I mean, you know, I'm -- I
20   do think the Court has to think about what it is that makes
21   schools sensitive for purposes of analyzing the District
22   Court's opinion because the District Court did, you know,
23   address -- I mean, the State has made the argument as to many
24   of these places; that the reason they should be prohibited
25   from anybody carrying a firearms is because they're like
```

1    schools.

2              And so you kind of have to answer the question

3    of what is it that makes schools different so that we can

4    figure out is a zoo really like a school.

5              JUDGE KRAUSE:  But why are you choosing that

6    rather than, for example, that they're vulnerable people which

7    would apply to things like nursing homes just as well?

8              MS. MURPHY:  Sure.

9              I think the -- I mean, I'm -- what I'm focused

10   on is kind of the custodial nature of it because I think the

11   problem is if you just say, is this the kind of place where

12   vulnerable people are present, vulnerable people are present

13   all over the place.  I mean, parents take children not just to

14   school, but to -- and not just to playgrounds.  They take them

15   to stores, to shopping malls, to movies, to restaurants.

16             Now I know New Jersey has declared all those

17   places presumptively off limits, but if we assume there

18   actually is a right to have firearms, you can't take like

19   anywhere and everywhere that children may be present because,

20   again, it's going to lead you right back to the Bruen problem.

21             JUDGE KRAUSE:  Right.  But what about places

22   that are discreet places where there's a congregation of

23   people who can't exercise their own right of self-defense?

24             MS. MURPHY:  I don't think we've challenged any

25   place that fits into that category.  We didn't challenge --

1          JUDGE CHUNG:  Long-term nursing facilities.

2          MS. MURPHY:  We challenged healthcare -- the

3    way the law is set up, it just says healthcare facilities,

4    including but not limited to a long laundry list of lots and

5    lots of other places.  We have not said we want to carry at

6    every single type of those places.  But New Jersey decided to

7    structure the law in a way where that provision is

8    exceptionally overbroad because it just says healthcare

9    facilities.  If they wanted to come back, I mean, there's a

10   separate provision that deals just with facilities that treat

11   people for addiction and mental health issues.  We didn't

12   challenge that provision.

13          So if they come back with a narrowed provision

14   that's focused on particular types of medical facilities, we

15   might have no problem with it.  But when you start from the

16   presumption of like, look there may be something in that

17   category that's problematic so we'll just take the whole

18   category off limits, I don't think that works.  It's their

19   burden to show that the way they have legislated is consistent

20   with historical tradition.  As the District Court noted,

21   there's just no historical tradition whatsoever of saying any

22   facility at which medical care is provided is one that people

23   can't carry firearms.

24          JUDGE PORTER:  If the justification were to be

25   there's a con -- these places have a concentration of

1    vulnerable people, is there a -- does that justification pass

2    the Bruen history and tradition test?

3              MS. MURPHY:  So I think you would have to

4    couple it with that kind of custodial nature and some sort of

5    heightened security in the sense of --

6              JUDGE PORTER:  Without that.

7              MS. MURPHY:  -- like --

8              JUDGE PORTER:  Without that.

9              MS. MURPHY:  Without that.  I mean, if --

10             JUDGE PORTER:  Just there's a lot of -- like

11   it's a hospital, it's a nursing home.  I don't know.  There's

12   vulnerable people.  There's a lot of kids around playgrounds.

13             MS. MURPHY:  Yeah.  I mean, I guess it's just

14   -- you know, what I struggle a little bit with is, I mean, all

15   of this is only going to matter if it's a place that's opened

16   to the general public.  And so if it's not, you know, we don't

17   have a right to be there at all, and of course we don't think

18   we have a right to trespass anywhere with firearms.

19             And so, you know, if you're only talking about

20   the universe of places where, yeah, there's vulnerable people

21   present, but we're perfectly happy for the rest of the general

22   public to be there, too, at their pleasure and they can engage

23   in any other conduct an exercise all their other

24   constitutional rights, but they can't have a firearm, I think

25   that's problematic.

1          But, again, you know, that's -- if you -- I

2    mean, I -- when I look at the law and think about, you know, I

3    mean, there's well over a dozen provisions we did not

4    challenge.  And part of the thinking is, you know, in

5    analyzing this law since it's such a long list I think the

6    Court has to kind of think about how do you put the ones on

7    one side and one on the other.

8          And all the problems arise in the context where

9    you're talking about property that's generally open to the

10   public because when you're doing that, you know, you

11   presumptively get to exercise your constitutional rights

12   there.  And Bruen resolved the question of whether that

13   includes your Second Amendment rights and said if you're

14   talking about places where the public generally gathers, then

15   presumptively you get to exercise your Second Amendment rights

16   there and it's the State's burden to show that there's

17   something special about it that makes it different.

18          JUDGE KRAUSE:  So you were talking about kind

19   of the property.  Don't we have something of a contradiction

20   in terms where we're looking at the -- a public carry right in

21   private property.  And when we think about this default and

22   what the sort of expectation is, what -- why isn't that --

23   there's got to be consent.  You agree to that, right?

24          MS. MURPHY:  I mean, we agree we can't carry

25   somewhere where there -- where the property owner is not

1   willing to let us carry.  Yes.

2              JUDGE KRAUSE:  But without --

3              MS. MURPHY:  I want to be -- I just want to be

4   clear.  We don't agree that you have to have express written

5   consent up front, but we agree that we can't carry if they

6   don't want us to.  Yes.

7              JUDGE KRAUSE:  So there needs to be a property

8   owner's consent.  And the idea of having the default of --

9   that, you know, yes, you can carry seems to be the expectation

10  that that's the way owners in this locale think about people

11  coming onto their property.

12             Is it possible that that's different in one

13  locale than another in the country?

14             MS. MURPHY:  So I guess I think that's really

15  not the right way to come at the question.  You know, I mean

16  -- and I want to talk about the history, but I also just want

17  to say that the threshold --  I mean, you know, we're not just

18  talking about kind of how laws will be enforced in some civil

19  property law trespass context.  I mean, the State's passed a

20  law that makes it a crime to exercise a constitutional right

21  at a place that is generally held open to the public.

22             If that's not -- you know, I mean, the State's

23  argument is that doesn't even implicate the Second Amendment.

24  By that logic, I don't know why the State couldn't pass the

25  law that says this is a speech free zone or you -- you know,

1    unless the owner gives you permission you cannot wear

2    religious items inside private property that's open to the

3    general public.

4            JUDGE KRAUSE:  But go back to the premises

5    because I thought you agreed that people, even law-abiding

6    citizens with their permits can't carry a firearm onto private

7    property without the owner's consent.

8            MS. MURPHY:  I would -- let me be clear so

9    maybe I -- maybe we're not agreeing to the same thing.

10            I agree that they can't do it over the owner's

11    objection.  So -- and so, you know, of course you can't do it

12    over the owner's actual objection.  But I don't think the

13    State can come in and create a rule that says, we presume they

14    object unless and until they tell you otherwise because, I

15    mean, setting aside the Second Amendment for a moment, I don't

16    know why that wouldn't mean the State could presumptively take

17    away all of everybody's constitutional rights unless and until

18    somebody at the shopping mall says, yeah, we're okay with you,

19    you know, wearing your Yarmulke here or wearing your I Love

20    Trump shirt here or whatever it may be.

21            That's a problem when the State wants to say

22    it's a crime to exercise a constitutional right somewhere that

23    you have a right to be unless and until that person gives you

24    permission, you know, you need to justify that and that takes

25    me to the history because I don't think the history remotely

1    supports what New Jersey is trying to do here.

2              JUDGE KRAUSE:  Is the expectation of a given

3    population, is that a fact question?  Is that something that

4    like say you were to, you know, poll everyone in the State of

5    New Jersey and 95 percent say, my expectation is that when

6    someone comes into my private property, they're -- they

7    wouldn't come armed without asking me.

8              MS. MURPHY:  Yeah.

9              JUDGE KRAUSE:  Do we think about it in those

10   terms and would that matter?

11             MS. MURPHY:  I don't think it does.  I think

12   that that would mean New Jersey, you know, if that were the

13   situation, they should engage on an educational campaign to

14   ensure that the -- that, you know, people-run businesses that

15   are open to the public in New Jersey understand that the -- as

16   a general matter there is a right to carry, but they're

17   welcome to put up a sign or whatever it is and tell people not

18   here, which plenty of establishments do.  Establishments do

19   that all over the country.  This is how the law operates in

20   most of the states in this country; that presumptively you can

21   carry and the burden is on the private property owner to tell

22   you if you can't if we're talking about something that's

23   generally open to the public.

24             And that's what is the problem for the State's

25   historical evidence here because the laws historically that

1   they're relying on were not laws about places that were open

2   to the public.  They're laws about enclosed land, improved

3   land, land that you paid -- New Jersey has referred to lands

4   on which you pay -- pay property taxes which is just

5   equivalent to, was the same thing as enclosed and improved

6   lands.  And they're also only talking about lands.

7               I mean, it's notable that it doesn't say

8   property other than those couple that have premises in the

9   post-reconstruction era, two laws.  And even those, one of

10  them says lands.  They typically say lands.  They are in laws

11  that explicitly say, you know, this is an act for the better

12  preservation of deer.  And then the other part of the title

13  is, and to prevent trespassing with guns.  So they are laws

14  that only apply when somebody is somewhere they're not

15  supposed to be and what they do is impose a heightened penalty

16  for trespassing if you also have a gun and you're on the land

17  because presumptively that means you're going to engage in

18  poaching.

19              That is not anything like how this law

20  operates.  This law is not confined to lands on which people

21  would engage in hunting.  It applies to, you know, the shops,

22  the taverns, the local -- everything that would have been in

23  town.  And there's just no indication at all that these laws

24  that were on their face anti-poaching measures were ever

25  applied in that context.  And Bruen says even if there's

1    ambiguity about something like that with the historical law,

2    the tie goes to the side with the constitutional right.

3                    JUDGE PORTER:  Is it relevant that this New

4    Jersey law didn't exist until ten months ago?

5                    MS. MURPHY:  I mean, I think that's a huge

6    problem for the State, that they're trying to come in now and

7    impose prohibitions that are not even consistent with the

8    historical traditions of New Jersey.

9                    I mean, even from -- you know, for all the

10   reasons I just explained, I don't think the State has it right

11   about what the law was in the 1700s in New Jersey, but by 1895

12   there's no question that New Jersey's rule was it's only a

13   problem if you have express notice that you're not supposed to

14   be carrying a firearm.  And even then we're still dealing with

15   like lands, not with, you know, laws that are singling out

16   kind of shopping malls, restaurants, bars, what have you.

17                   So I think it's a real problem for the State to

18   come in after, you know, and to come in right after Bruen said

19   this is supposed to be the exception, not the norm, and come

20   up with a rule that essentially declares like almost

21   everywhere people are going to go since, you know, most of the

22   places people frequent are going to be privately owned

23   establishments presumptively off limits to the carrying of

24   firearms.

25                   JUDGE KRAUSE:  Is there  a principal difference

1    between opening up your private property to the public as a

2    commercial establishment and doing that in your home where we

3    have a contractor coming in?  Is it the same default

4    expectation and does the law -- does this law in terms of its

5    constitutionality apply differently?

6              MS. MURPHY:  So I think the better answer is

7    that it doesn't matter.  If you're inviting someone in, that's

8    the presumption.  But, you know, I will grant that if you just

9    have -- I mean, there -- when it says there's a lot of states

10   that have laws like this, that's actually not true.  The few

11   states that had laws like this before Bruen actually were

12   states that limited it to just to residential property.

13             And, you know, maybe for the same reason that

14   the Court, the Supreme Court has been a little more welcoming

15   of restrictions on solicitation at somebody's doorstep which

16   is generally not a place that is open to the public.  It's a

17   limited license.  You know, maybe you could look at a

18   tradition of these laws and come to a little bit different

19   conclusion as to residential.

20             But like certainly not a law that sweeps in as

21   broadly as they do going out of their way to say, all private

22   property including, but not limited to, residential,

23   commercial, industrial, undeveloped, whatever it may be.

24             So, again, you know, there may be aspects of

25   this law that if they wanted to kind of sit down, roll their

1  sleeves up and think hard about how do we actually go about

2  this in a way that's consistent with historical tradition in

3  Bruen, maybe they can arrive at some much narrower protections

4  that would be historically permissible.  But I don't think

5  they can rescue this law by, you know, suggesting kind of

6  narrower ways or pointing to kind of minor aspects of what

7  they've done in a blunderbuss way that might be permissible if

8  they came about it a bit differently.

9           JUDGE KRAUSE:  How much do we defer to the --

10  to legislatures addressing what they perceive as new problems

11  for their jurisdiction?

12           MS. MURPHY:  I mean --

13           JUDGE KRAUSE:  If you have -- say

14  hypothetically you have, you know, one state where if people

15  see someone with a firearm, it -- they panic and -- because

16  that's not the norm for that locality and all the risks that

17  go along with people being panicked and, you know, in

18  confined, crowded areas, you know, you may have concerned

19  about.  In another locality, it's considered the norm and

20  people don't panic when someone walks into the supermarket,

21  you know, carrying their rifle.

22           Are those legislatures -- is that difference in

23  situations something that we should take into account in

24  evaluating a legislature's attempt to themselves draw on

25  history and regulate to address what they perceive as a new

1    problem for their locality?

2                MS. MURPHY:  Yeah.  I don't think that that can

3    be a permissible basis to restrict constitutional rights.  I

4    mean, the Court has in many context said, Heckler's vetoes are

5    not a basis to say you can't exercise the rights.  So if you

6    have a community that by virtue of some courts that have had

7    the law wrong for several decades before Heller came along.

8    People just -- and maybe just community norms.  People don't

9    really carry firearms.

10               You know, the answer is to educate that

11   community and help them better understand that this is a

12   constitutional right, not to say, you know what, like the

13   citizens of California are really uncomfortable with the fact

14   that we have a Second Amendment, so it's just not going to

15   apply there.  I mean, that's the whole point of having a

16   constitutional right enshrined in the constitution is to say,

17   we recognize that these are things that, you know, there may

18   be times when a majority of people think twice about the fact

19   that we protect them, but they're in the constitution so that

20   it's not enough to come forward and say a majority of the

21   people are uncomfortable with this because it's a right.

22               And what you need under the Second Amendment as

23   Bruen made clear is a historical tradition, and I don't think

24   there's any historical tradition that supports the idea of,

25   you know, community norms sort of allowing greater or lesser

1  leeway to regulate in areas that were protected by the

2  constitution.  And the only place you kind of see that --

3            JUDGE KRAUSE:  What if you're in the --

4            MS. MURPHY:  -- is the territories which the

5  Court doesn't --

6            JUDGE KRAUSE:  What if you're in the locality

7  where there's on a regular basis there are mass shootings in

8  theaters in particular.  Would a law that prohibited carrying

9  firearms into theaters in that jurisdiction be one that passed

10 muster in terms of the burden that it's placing and the kind

11 of reasons that in the 18th and 19th century firearms were

12 regulated?

13           MS. MURPHY:  I don't think so because the

14 historical tradition shows that the response to concerns about

15 a particular place being particularly sensitive and dangerous

16 for the carrying of firearms was to ensure, to actually like

17 provide security, not create sitting ducks of all the people

18 who go to that place.

19           And so if a locality said, you know, we've got

20 a real problem at movie theaters, so we're going to install

21 government -- you know, we're going to fund like government

22 metal detectors and screening and security at a movie theater

23 and they start treating them as sensitive places in all of

24 those respects, I mean, maybe then you can at least start to

25 have a little bit different discussion about all of this.

1          But if they're not treating a place as

2    sensitive for any other purpose, they're not restricting

3    access, they're not screening, they're not ensuring that

4    they're not just leaving the people inside it vulnerable

5    sitting ducks, I think that's really inconsistent with the

6    historical traditions of our country.

7          JUDGE PORTER:  Parks.  Your friend says as soon

8    as cities started setting aside space for parks, they also

9    banned guns there, Central Park, Fairmont Park.

10          Isn't that at least the beginning of a

11   tradition?

12          MS. MURPHY:  I don't think there's really a

13   whole lot of support for the notion that parks were not common

14   until 1850.  A particular type of park started becoming more

15   common then, but our First Amendment traditions are based on

16   the notion that there's been parks and places like that where

17   people gather and talk forever, for time immemorial I believe

18   is the phrase the Court commonly uses in that context.

19          So I think one of the problems here is the

20   same, a similar problem that kind of cuts across all of this.

21   Not all parks are created equal.  So, you know, we think

22   there's a right to carry in all parks, but certainly a law

23   that sweeps in both, you know, Central Park, the small

24   neighborhood, but also the state park where somebody might --

25   you know, is permitted to go stay in their camper for a few

1    nights, then you've got a declaration here from the State

2    saying, well, we can't allow firearms there because police

3    might not know when they got to the camper whether somebody's

4    got a firearm inside it.  I mean, by that logic, you could ban

5    firearms in the home.

6              So I think you've got to think about, you know,

7    the universe that -- the State is right, that the concept of

8    parks has changed over time, but I think in some respects that

9    actually undercuts their argument.  And if you go look at what

10   the National Park Service, some of the material that they put

11   in the record about the historical restrictions there, yes,

12   there were restrictions.  You couldn't have a loaded firearm

13   in a park.  Clearly, that was because they didn't want people

14   hunting in the parks.  You could have a firearm.  It was

15   sealed.

16             But if you read about the way the law was

17   enforced, it was very clear that if you unsealed the firearm

18   to use it in self-defense against another person or against a

19   wild animal that was actually one you're allowed to shoot,

20   that was fine.  They assumed you could do that.  So they

21   weren't saying, you know, you cannot have any means of

22   protecting yourself inside the park.  They were saying you

23   can't have loaded firearms as a general matter inside the park

24   because you're not supposed to be hunting inside the park.

25             But the Park Service itself in its study that

Page 86

1   they put in the record said, like, pretty much everybody was

2   actually bringing firearms into national parks at the time.

3   They just had them sealed and it turned out most of them ended

4   up being unsealed anyway.

5              So I don't think --

6              JUDGE CHUNG:  I think that we're --

7              MS. MURPHY:  -- you know --

8              JUDGE CHUNG:  -- we're trying to kind of get

9   at, whether it be the specific park or the community

10  standards, is sort of the idea of if there is historical

11  tradition of a burden, of a how in the how and why, can it be

12  used to addressed a new why or a new place?

13             MS. MURPHY:  I mean, it depends what you mean

14  by new place.  If it's a place that didn't exist, like an

15  airplane, you know, that's a new place and we take old

16  principles and apply them to a new place.

17             But if it's a place that did exist like a

18  tavern and nobody ever had a restriction on taverns and all of

19  a sudden in 2022 --

20             JUDGE CHUNG:  I'm talking about a new place, a

21  new place or a new problem even, a new why, can --

22             MS. MURPHY:  So a new -- I mean --

23             JUDGE CHUNG:  -- can a historic tradition of

24  that particular regulatory burden be used to address a new

25  place in the new sense of new --

1          MS. MURPHY:  Yeah.

2          JUDGE CHUNG:  -- or a new problem?

3          MS. MURPHY:  Certainly a new place, certainly.

4   I mean, like I don't think the fact that there's not

5   historical restrictions on airplanes means the government

6   loses the airplanes case.  You take the historical principles

7   and apply them.

8          And another principle, just, you know, that I

9   think is relevant in that context and in some of these other

10  contexts is if you have a place that like by its physical

11  nature the mere presence of a firearm presents a risk, we

12  concede that tradition coming from fire safety laws that

13  prohibited having large amounts of ammunition in particular

14  places where fire was -- where there was a much greater fire

15  risk.

16         I think that same principle would -- you know,

17  you can apply it to something like an airplane where it's not

18  just a matter of, you know, we're afraid someone will misuse a

19  firearm, but a shot of a firearm in an airplane could put

20  everybody, it could put the airplane itself and everybody

21  inside the airplane, their lives at risk.  That's an aspect of

22  the place that makes it different.

23         I mean, there's a provision in here that deals

24  with places with powerplants.  You know, powerplants, in

25  addition to not generally being open to the public, they may

Page 88

1   well fit in to something like that where it's the physical

2   nature of the place that it's not the kind of place that might

3   have existed 200 years ago, but you can draw principles from

4   200 years ago and apply them to that new place.

5                JUDGE KRAUSE:  Why isn't that true with the

6   legislature making a legislative judgment, for example, that

7   in a place like Met Stadium or a nightclub that if somebody

8   fires a shot, you have a stampede that puts everyone at risk?

9                MS. MURPHY:  Yeah.  I think the problem is, I

10  mean, that -- that's the Bruen argument.  That's New York's

11  argument.  Their argument is, look, Manhattan's like really

12  crowded and if people have firearms and shoot somebody there,

13  it's going to be a big, crazy mess.  And that's a problem.

14  It's crowded.

15                JUDGE KRAUSE:  Is confined space, a discreet,

16  confined space different than the Island of Manhattan?

17                MS. MURPHY:  There were tons of confined

18  discreet spaces at the time of the founding.  I mean, it is --

19  there -- entertainment facilities date back thousands of

20  years.  There were tons of those places, but we don't see laws

21  that say any place that has, you know, kind of one entry and

22  exit point you can't have a firearm.  I just don't think that

23  logic works because it would sweep in virtually everywhere

24  except outside and then, you know, the State's going to come

25  in and say you can't be outside either.

1           So you've got to identify something beyond --

2           JUDGE CHUNG:  Well, is that ever a new problem

3    that can be addressed by a historic tradition of a particular

4    burden, of a particular regulatory burden?

5           MS. MURPHY:  I mean, Bruen certainly

6    contemplates the possibility of new problems.  I -- but they

7    do have to be new.  I think what Bruen says is you can't take

8    an old problem and just say, we've decided to regulate it in a

9    way that historically it was never regulated.  That's -- you

10   know, that's essentially what the Court is saying is off

11   limits and is a real problem because you're departing from

12   historical traditions.

13          I do want to take -- I don't know what time I

14   have --

15          JUDGE KRAUSE:  I don't know if you want --

16          MS. MURPHY:  -- but I do want to talk about

17   permitting a bit.

18          JUDGE KRAUSE:  -- to leave a few minutes for

19   Mr. Patterson or not.  I think there's about three minutes

20   left.

21          MS. MURPHY:  Yeah.  I mean, I don't know how --

22   this was only -- I don't know how far we are into the 80

23   minutes.

24          JUDGE KRAUSE:  40 minutes.

25          THE CLERK:  (Indiscernible).

1          MS. MURPHY:  Right.  But this wasn't set for 80

2     minutes.

3          THE CLERK:  It was set for 40.

4          MS. MURPHY:  40 minutes.  Okay.  We were 20 --

5          JUDGE KRAUSE:  Got it.

6          MS. MURPHY:  We were 20-10, so I think I can

7     take a little bit more time and still leave Mr. Patterson with

8     a good 20 minutes or so, so.

9          JUDGE PORTER:  Four witness requirement, why

10    isn't it just sort of the -- a variation of background checks.

11         MS. MURPHY:  Because what it does is puts a

12    burden at the front.  I mean, for one it puts a burden at the

13    front end.  I have to find some, you know, people who will

14    vouch for me to be able to exercise a constitutional right.

15    That's a problem in and of itself.  I mean, I may have lots of

16    friends who think I'm a wonderful person.  If they just don't

17    like the Second Amendment and think people shouldn't get to

18    carry guns, they then get a veto power over my constitutional

19    rights.  So I think that's a huge problem.

20         And it's just -- it is too discretionary.

21    There's no discussion of like what makes somebody reputable.

22    Sure, you have a standard that's ultimately about is somebody

23    going to be a danger, but, I mean, it's an open-ended inquiry

24    into things like they can sit for an interview and be asked

25    about, you know, do you drink a lot of alcohol on the weekends

Page 91

1    or have you ever said anything, I mean, if there's anything

2    they've ever said that makes you suspect they might be

3    intemperate, that seems a whole lot like what Bruen was saying

4    when they drew the distinction.  I mean, they specifically

5    distinguished between narrow objective and definite standards

6    and things that require the appraisal of facts, exercise of

7    judgment, information of an opinion.  And they said the latter

8    is problematic, and that's what this smacks of.

9              And I don't think it's an accident --

10             JUDGE CHUNG:  Isn't it sort of an attempt to

11   mirror the surety laws where if you had information that

12   reflected someone might use a firearm unsafely, then more

13   could be required of that person?  Isn't it an attempt to sort

14   of capture that idea?

15             MS. MURPHY:  It may be the same why, but it's

16   not the same how remotely because the surety law said

17   everybody gets to carry unless and until someone comes in and

18   has a complaint that establishes reasonable cause that you

19   can't.

20             And this law says nobody gets to carry unless

21   somebody comes in and establishes reasonable cause to think

22   that you can.

23             And so, you know, I -- the tradition and Bruen

24   says the central questions are the why and the how.

25             JUDGE CHUNG:  But if it's just part of a

1    background check, I mean, if it's part of a background check

2    which is part of the tradition of ensuring that the people who

3    possess firearms are sort of of the reasonable nature or the

4    law abiding citizen who is permitted to have a firearm, if

5    it's just part of that, I mean, isn't that already part of the

6    --

7                    MS. MURPHY:  I mean, New Jersey's --

8                    JUDGE CHUNG:  -- historical tradition?

9                    MS. MURPHY:  -- good cause requirement was part

10   of a background check and the Supreme Court held it

11   unconstitutional via holding New York's unconstitutional

12   because it was not a permissible part of a background check

13   because of the nature both -- I mean, it wasn't just that it

14   amounted to a blanket prohibition.

15                    The Court went out of its way and a couple of

16   members of the Court who joined the opinion went out of their

17   way to specifically identify as the problem -- one of the

18   major problems with that, that legal regime, that it built in

19   too much discretion.  It wasn't, have you actually committed a

20   crime.  It was, you know, licensing officials have broad

21   authority to kind of investigate whether they think, even if

22   you haven't committed a crime, we're a little bit worried

23   about what kind of person you are.  I think that's a real

24   problem.

25                    And I do think it's particularly problematic to

1   require you to produce the character witnesses upfront.  If

2   you look historically, the only couple of laws that they've

3   identified that had a character witness requirement up front

4   were invidiously discriminatory laws that either applied to

5   people of a certain race or they required you to produce

6   freeholders which really smacks of class-based discrimination.

7           So I don't think -- you know, the historical

8   record proves Bruen's point which is once you have things like

9   character witness requirements, you're just creating way too

10  much possibility for, you know, for discretion and for denying

11  people their rights for impermissible reasons.

12          But we have no -- you know, we're not here

13  challenging a background check.  I mean, there's a background

14  check provision here and there's background checks that are

15  already built into all this.  This is just an add on that says

16  even if you pass all of that, you have to produce these

17  witnesses.

18          I --

19          JUDGE KRAUSE:  Well, isn't this the stuff of an

20  as applied challenge?

21          MS. MURPHY:  No, because this is something we

22  have to do to get a permit.  We have to produce these four

23  people.  And if the State is saying we have to do something

24  that we think constitutionally it can't require us to do, I

25  mean, we get to challenge that facially and there's a facial

1  problem with them demanding this of anybody, not just of my

2  client.

3              JUDGE KRAUSE:  Your -- to the extent your

4  argument seems to be that it's -- it reintroduces discretion

5  --

6              MS. MURPHY:  Yeah.

7              JUDGE KRAUSE:  -- and that it becomes an

8  unreasonable burden, wouldn't that need to be done on an as

9  applied basis?

10             MS. MURPHY:  No, I don't think so.  I mean, I

11 -- if you take the Supreme Court's Forsythe County case which

12 was the case about whether -- what the Nazi party that wanted

13 to have a parade, that was a facial challenge, too, and the

14 party, they had gone to the county and they had said, we would

15 like to have a parade.  And they said, great, you can have a

16 parade and you have to pay $100 fee.

17             And instead of accepting that, they sued.  They

18 brought a facial challenge.  They said we think the problem

19 with this law is that it gives too much discretion to the

20 permitting official to decide what the fee should be.  And the

21 Supreme Court agreed and held that law unconstitutional.

22             And so it's a facial defect in -- just as there

23 was a facial defect there, that there weren't boundaries that

24 ensured that the permitting fee wouldn't take into place

25 things -- take into account things like the content of

1    someone's speech, here it's a facial defect in this law that

2    it does not -- that first it requires us to supply these

3    character witnesses, and then that it doesn't have sufficient

4    guardrails as to how they can be used in the process.

5           JUDGE KRAUSE:  Well, the description is that

6    it's a form with very specific questions that are just sort of

7    yes or no questions.

8           MS. MURPHY:  I mean, the law on its face

9    actually requires a follow on interview of the people, of the

10   individuals and it also makes clear, you know, whether there's

11   a form.  I mean, the form is not built into the law.  That may

12   be the way it's been implemented in some respects, but the law

13   doesn't say kind of like that's all you ever have to do and

14   that's the end of it.

15          So I don't think it's really -- you know, that

16   any -- it would be at all inconsistent with this law to demand

17   much more of people than simply signing something.  But I

18   still think simply signing something is a problem.

19          JUDGE KRAUSE:  Is there anything besides a

20   criminal history check that in your view can be -- could be

21   done consistent with the Second Amendment to ensure that the

22   permit is going to someone who is a responsible law-abiding

23   citizen?

24          MS. MURPHY:  Well, the background check itself

25   takes into account more than just criminal history.  It does

1    mental health checks.  It looks at, you know, a variety of

2    different databases that are designed to get at not just

3    criminal history, but the objective characteristics that we

4    think about like mental health history as being problematic

5    for purposes of people having a firearm.

6             So -- but I do think you need that, you need to

7    have the guardrails of something that is objective, not just

8    kind of the discretionary, I've taken a look at you and I'm

9    just a little bit worried that you might not be the kind of

10   person who should have a firearm. You know, if that's what you

11   think, then you should only be applying a standard like that

12   in a context where it's because you think somebody is

13   actually, you know, about to commit a crime or not of sane --

14   not of a safe mental health in which case you should be doing

15   a lot more than just saying, you can't have a firearm.

16             If I can, I would like to talk just a little

17   bit about the financial conditions as well.  And, you know, as

18   has been discussed starting with the $50, I mean, it is

19   correct that our challenge here as to the $50 is not about the

20   amount.  It's about the nature of the fee and that it is by

21   the terms of the statute not something that's being used to

22   regulate the law-abiding conduct of the citizen who wants to

23   carry their right -- carry a firearm for self-defense.

24             By design it is saying if you want to exercise

25   your right, you have to compensate the victims of criminals.

1   That is essentially treating people as if they are responsible

2   for criminal activity for no reason other than because they

3   would like to exercise a constitutional right.

4              I think that's exceptionally problematic and it

5   doesn't matter that, you know, maybe -- if the State wanted to

6   have some sort of different fee that collected the same amount

7   of money and justify it as some other grounds, if they really

8   could show that $200 is offsetting the cost or, you know, I

9   mean, the laws that they pointed to historically are just

10  personal property taxes that are general codes of all the

11  personal property that's taxed and firearms are included.

12  We're not arguing that there's no way the State can tax or

13  impose fees on constitutionally protected conduct.  But it has

14  to do so within the guardrails that are established in this

15  context and every other, which is you can't be --

16             JUDGE CHUNG:  What about Ms. Cai's argument

17  that part of the activity, the permitted activity is not

18  necessarily because people are acting unlawfully, but just by

19  the nature of the activity increased police presence,

20  increased police force will have to be funded and that -- it,

21  therefore, is part of the maintenance of the permitted

22  activity.

23             MS. MURPHY:  Even if that argument were right,

24  at most it would justify $50 towards an extra police fund.  It

25  wouldn't justify saying you have to pay the victims of crimes.

1    That is not police activity.  That is compensation that

2    normally can only be imposed on somebody who is convicted of a

3    crime or, you know, has a judgment against them for liability

4    in court.  You don't take the innocent person and say, you

5    have to compensate someone else's victim just because -- I

6    mean, you don't do that in any context.  You certainly don't

7    do that solely because they want to exercise a constitutional

8    right.

9            So I don't think for purposes of --

10           JUDGE CHUNG:  Does it matter that their

11   argument is that it's sort of a fiction that it goes to the

12   victims' account; that it really just goes to the coffers --

13           MS. MURPHY:  No.  I think you have to take

14   the state law as it comes to you and it literally says right

15   on its face, $50 is to be set aside to go to the victims'

16   compensation fund.  So I don't think arguing, well, we could

17   have done it differently, or maybe we won't follow that and

18   we'll put the money somewhere else, that doesn't matter.  This

19   law on its face requires my clients to pay $50 to crime

20   victims if they want to exercise their constitutional right to

21   carry a firearm, and that is problematic.

22           If the State wants to pass a different law on a

23   different justification, we can have a discussion about that

24   in the next case.  But I think for purposes of this case, the

25   law that they have enacted has a real problem with the $50.

1           As to the insurance liability mandate, I mean,

2    I think you come up with some of this -- you arrive at the

3    same basic problem which is it's treating everybody as if

4    they're a frontend liability risk before they've done anything

5    wrong and saying, you know, you have to essentially go and

6    insure against the prospect that you'll misuse your

7    constitutional rights.

8           There's just no historical basis whatsoever for

9    doing that.  And I don't think the State can excuse that by

10   saying insurance is a novelty.  I mean, for one thing

11   insurance is certainly not a 21st century novelty, yet they're

12   -- this mandate is the first state mandate of its kind in

13   history.  So that wouldn't explain why nobody was enacting

14   these for the past century.

15          But even setting that aside, the surety laws

16   are a historical analog here.  The problem is they point in

17   exactly the opposite direction because the how of the way that

18   those laws operated was not to say everybody who wants to

19   carry a firearm must pay a surety.  It was to say, if and only

20   if there is reasonable cause to believe that you are actually

21   not going to just carry your firearm for self-defense, but are

22   going to harm somebody or are going to otherwise breach the

23   peace, then we can require you in particular to pay a surety.

24          So what this law does is flip that on its head

25   and say, you know, our reasonable cause to think that you're

1  going to engage in impermissible conduct is the fact that you

2  came forward and said you would like to exercise your

3  constitutional right to carry arms.

4          JUDGE KRAUSE:  Does it matter what the actual

5  premium is, which I gather we don't have in the record?

6          MS. MURPHY:  I don't think it does.  I think

7  it's just -- it -- it is -- the flaw in this is the design so,

8  you know, obviously it would be even more problematic if it

9  was completely, completely unaffordable.  But even so, I think

10  it would still be a problem even if it was pretty easy for

11  people to get to this insurance which, in reality, is not

12  going to be true.

13          JUDGE KRAUSE:  Why isn't the history -- I mean,

14  I think it was sort of articulated along these lines in one of

15  the amicus briefs, just a matter of looking back at the

16  evolution of tort liability and going from like strict

17  liability, if there was harm, you know, negligence, the rise

18  of tort liability and then, you know, insurance that was

19  dealing with that liability, that there's always been, in

20  other words, a need to compensate a victim.  And it's

21  sometimes the case that the -- you know, a defendant in a suit

22  like that is -- doesn't have the means to do so.

23          MS. MURPHY:  That's absolutely a societal

24  problem.  But, I mean, tort principles haven't evolved to such

25  a point that we require everyone in the country to carry

```
 1   umbrella insurance just because we assume they're all likely
 2   to commit a tort sometime.  When -- you know, there are costs
 3   that will be uncompensated.
 4              But the way that we deal with those is by
 5   spreading them equally among everyone in society.  So if New
 6   Jersey wants to, you know, raise additional money to put into
 7   the victims' compensation fund through a generally applicable
 8   tax, like great, have at it.  But what you can't do is say
 9   we're going to -- you know, here's how we're going to have
10   people -- we're going to address this by making people
11   shoulder a disproportionate burden of the cost of wrongful
12   conduct for no reason other than because they have expressed
13   an interest in --
14              JUDGE KRAUSE:  Why isn't --
15              MS. MURPHY:  -- Second --
16              JUDGE KRAUSE:  -- the right analogy to like
17   motor vehicle insurance?
18              MS. MURPHY:  Because there's not a
19   constitutional right to drive a car.
20              JUDGE KRAUSE:  But if we agree that there's a,
21   you know, a history that goes to compensating victims, even
22   for negligence, not, you know, not purposeful wrongful
23   conduct, you know, where we have, you know, firearms that,
24   like automobiles can easily inflict significant injury, why
25   isn't that the current how; that is, insurance, you know, with
```

Page 102

1   an insurance premium addressing a similar problem to the way

2   tort liability has handled that compensation in the past?

3              MS. MURPHY:  I mean, we haven't evolved to such

4   a point where we treat everybody as liable for the acts of

5   wrong -- of wrongdoers.  And automobiles is the exception, not

6   the norm.  It's one of the only contexts in which people have

7   to have insurance.  And, again, it's not a constitutionally

8   protected right.

9              And so particularly in a universe where the

10  Court in Bruen said about 16 times that it is the State's

11  burden to prove a historical tradition, and the only

12  historical tradition that exists here is a historical

13  tradition of imposing those costs on the wrongdoer, I don't

14  know how they can come along and say, you know, I mean,

15  societal norms have evolved to such a spot -- a point that we

16  think that we should actually make, you know, law-abiding

17  citizens pay for the acts of criminals, and the reason we're

18  going to single them out is just because they want to exercise

19  their Second Amendment rights.  I don't think that would fly

20  in any other context and it certainly isn't supported by any

21  historical tradition here.

22             With that, I will cede things to Mr. Patterson.

23             MR. PATTERSON:  I think it's now good

24  afternoon, Your Honors.  May it please the Court, Pete

25  Patterson for the Koons plaintiffs.

1          I would just like to start by saying a key kind

2    of paradigm shift that needs to take place with respect to New

3    Jersey and the mistake here is that the actual social change

4    that the State is trying to address explicitly in this law is

5    the exercise of Second Amendment rights.

6          Now that Bruen has been decided, the law

7    explicitly said we need to change the law because there's a

8    likelihood that a much greater number of individuals will now

9    qualify to carry handguns in public.  So that's expressly what

10   this law is reacting to, and it can't be that now that people

11   are exercising Second Amendment rights, somehow these places

12   that have never been considered sensitive before now somehow

13   are all of a sudden sensitive.

14          And in terms of how we analyze the how and the

15   why, the burden, Bruen is very clear that we look at the how

16   and the why, the law burdened law-abiding citizens.  So the

17   perspective is from the law-abiding.  So if you have a

18   question of now, for example, if firearms are more lethal,

19   well, then making a place where law-abiding citizens can't

20   carry firearms, that is a bigger burden on Second Amendment

21   rights and the right to self-defense now than it would have

22   been at the founding.

23          For example, if say I'm facing 1791 firearms

24   technology or 2023 firearms technology, and you're saying I

25   can't have firearms in one of those circumstances, well, the

1  burden is going to be bigger now.  So that's the relevant

2  social change where the right is actually more important.  And

3  that is how Bruen actually treated that language.  It

4  distinguished a 1686 law that New Jersey actually relies on

5  here with respect to planters and handguns and said, well,

6  maybe handguns weren't in common use then, but they're in

7  common use now.  So that's not a valid analog.

8            So, if anything, the social changes can take a

9  law that on its face looks analogous and break that analogy by

10  saying the burden is no longer the same.

11            And with respect to -- and this is really --

12            JUDGE KRAUSE:  Does it --

13            MR. PATTERSON:  Go ahead.

14            JUDGE KRAUSE:  Excuse me.

15            MR. PATTERSON:  Yes.

16            JUDGE KRAUSE:  Does a proliferation of

17  firearms, you know, the change when there was mass production

18  toward the end of the 19th century, even putting aside

19  anything current, does that create any new problem that the

20  legislatures may address?

21            MR. PATTERSON:  Well, they may address it.  For

22  example, there were a lot of laws saying you can't carry

23  concealed.  We have no issue with that.  You have to carry

24  open.  The State could do it either way.

25            But it -- with respect to if you look at the

1   how and the why, if the issue is, okay, there are more

2   firearms now.  They're being more mass produced.  They're more

3   lethal.  From the perspective of the law-abiding citizen if

4   you say you cannot have a firearm because of that, you're

5   putting them at a higher risk.

6          So that is not something that the State, it

7   can't be that, well, now there's a greater danger from misuse

8   from criminals so that we're saying that now we have to have

9   greater regulation.  No.  It's actually the opposite.  The

10  law-abiding citizen needs more protection, not less in that

11  circumstance.

12          And that's why we think the provision of

13  government security is so crucial here because that matches

14  both the historical record and the burden on Second Amendment

15  rights because as a matter of history the three locations that

16  Bruen explicitly singled out, as we show on 24 and 25 of our

17  brief, those are places that had heightened government

18  security.

19          And the reason, the burden on the Second

20  Amendment right is not the same if the government has taken on

21  that responsibility.  But it can't be the government just

22  says, okay, we're deeming this place a sensitive place where

23  guns aren't allowed.  It's that the government has to actually

24  ensure that there are not guns in that location.

25          JUDGE KRAUSE:  So if there's a county

1   courthouse that doesn't have security, in that situation

2   someone can carry into --

3               MR. PATTERSON:  There --

4               JUDGE KRAUSE:  -- the courthouse?

5               MR. PATTERSON:  There could be an as applied

6   challenge, and there actually were at the founding as the

7   other side points out some laws in some states requiring

8   firearms in places like courthouses.

9               So if the government is not providing security,

10   then the -- it is a big imposition on the Second Amendment

11   right to say that you cannot have a firearm in this location

12   because as a matter of reality, this law only matters to law-

13   abiding people.  If it's a criminal that is willing to come in

14   and commit some sort of atrocity, they're not going to care

15   that there's an additional, you know, maybe few years tacked

16   onto their sentence because this is a gun free zone.  In fact,

17   it may attract them more to --

18               JUDGE KRAUSE:  Is there --

19               MR. PATTERSON:  -- that location.

20               JUDGE KRAUSE:  -- any legitimate concern on the

21   part of the State that law-abiding citizens when they are, you

22   know, excited or agitated in, for example, a sporting event or

23   if they're intoxicated at a bar that even law-abiding citizens

24   who are armed may pose a safety risk to each other or to other

25   patrons?

1              MR. PATTERSON:  Well, with respect to

2      intoxicated people, we don't -- we're not saying intoxicated

3      people have a right to carry.  That's a separate tradition of

4      someone who -- I think a lot of this goes back to the affray

5      tradition.  If there's a reason to believe that the person

6      would misuse firearms in a terrorizing manner, then that

7      person can be regulated.

8              But as the common law also said, you can't just

9      have the bare possession.  Because there's -- this is a -- the

10     Tennessee Supreme Court said in Simpson, similar to the North

11     Carolina Supreme Court in Huntley, the mere fact that you

12     possess a firearm can't be held to cause that sort of reaction

13     because we have this constitutional right.

14             And with respect to the stadium, again, if the

15     government really believes there's a problem with firearms at

16     stadiums, then it can put metal detectors at every entrance

17     and screen people when they come in and ensure there are no

18     firearms in that stadium.  If they did that, we would not have

19     an issue with it.

20             JUDGE CHUNG:  What about places where the

21     private security already exists, like casinos with their, you

22     know, always have high security due to the vast amounts of

23     money going in and out?  If a place like that already has a

24     security and the government says, plus there's this

25     excitement, this high degree of intoxicated patrons, high

1   potential for conflict and the security is already there as a

2   matter of practice, how does that affect your analysis?

3                MR. PATTERSON:  I think it's got to be the

4   government that's providing the security, but this does not

5   override the ability.  For example, the casino, if they said

6   we don't want anybody with guns in the casino and we're going

7   to ensure -- and this is what private entities do, privately

8   owned stadiums --

9                JUDGE CHUNG:  Sure.  But --

10               MR. PATTERSON:  -- for example --

11               JUDGE CHUNG:  -- you said it has to be --

12               MR. PATTERSON:  -- that don't want --

13               JUDGE CHUNG:  -- the government.

14               MR. PATTERSON:  Yes, because --

15               JUDGE CHUNG:  Tell me more about that.

16               MR. PATTERSON:  -- otherwise it's not

17   guaranteed to be there.  The government has got to guarantee

18   that that security is present in that location.  But this does

19   not -- again, if the private location says, we have our own

20   security.  We don't want any firearms in this location and

21   we're going to ensure that doesn't happen, the private entity

22   has every right to do that.  So as a matter of fact I don't

23   think it's going to make a tremendous amount of difference.

24               And the good thing about this test is that it's

25   similar to what Heller said with respect to handguns.  It said

1    there might be a lot of reasons why people want handguns for

2    self-defense.  You can hold a phone in one hand and your

3    handgun in the other hand, or they're easier to manipulate,

4    whatever.  But whatever the reason, law-abiding citizens

5    choose them so they're protected.

6              And it's similar here.  There may be many

7    reasons why a given location is sensitive.  Maybe a lot of

8    crimes have occurred at that place.  Maybe there are

9    democratic deliberations or it's a courtroom or it's something

10   that's a high stakes that is happening there.  Maybe it is

11   like an airplane where if somebody fires a firearm even

12   legitimately it could cause a problem with the airplane.

13             But whatever the reason, the government has to

14   actually ensure there are no firearms in that place because,

15   again, if the law -- this law only makes a difference with

16   respect to the law-abiding because the non-law-abiding are not

17   going to care what this law says if they're willing to commit

18   much greater crimes than the ones that are prevented here.

19             The State says places where people are

20   vulnerable firearms can be banned.  On similar reasoning that

21   actually gets things backwards.  If there are vulnerable

22   people, there's a greater need for self-defense if the State

23   is not providing security.

24             And Bruen is actually very instructive on this

25   because Bruen mentions schools, but the history in schools, as

1    Siegel Counsel has indicated, is connected to the in loco

2    parentis authority.  And if you look at historically around

3    the founding to the extent there are restrictions in schools,

4    they were on students, which the schools had in loco parentis

5    authority.

6              But Bruen in --

7              JUDGE KRAUSE:  How about universities?  I mean,

8    there are plenty of universities --

9              MR. PATTERSON:  At the founding era,

10   universities had in loco parentis authority over students.

11   They do not now.  So that would no longer justify a

12   restriction, so that is another changed social circumstance

13   where that social circumstance has changed so now that -- now

14   the rights have expanded to match that changed social

15   circumstance.

16             But Bruen in discussing --

17             JUDGE KRAUSE:  The explanation --

18             MR. PATTERSON:  Yeah.

19             JUDGE KRAUSE:  -- for schools, don't we from

20   University of Virginia, from the sort of board meeting where

21   they come up with their regulation with a couple of founding

22   fathers who were present for that?

23             MR. PATTERSON:  Yes.  And they had in loco

24   parentis authority over the students.  It only applied to the

25   students and that's why they could do it is because they had

1    that authority over the students.

2           JUDGE KRAUSE:  Their articulation was to enable

3    them in so many words to focus on studies.

4           MR. PATTERSON:  Yes.  But it applied only to

5    the students.  It would not apply to Thomas Jefferson coming

6    onto campus.  It was only to the students that that applied.

7           And Bruen is very instructive on this because

8    in -- and to give an example of why the Second Amendment

9    continued to be important in the reconstruction era, one of

10   the examples it gave was that teachers in Freedom's Bureau

11   schools were arming themselves to protect from racist

12   terrorism.  So that just puts into sharp focus the point that

13   in areas where people are vulnerable, the Second Amendment is

14   more important if the government itself is not providing that

15   protection.  And that's how Bruen itself treated that issue.

16          There's been an issue raised with respect to

17   the parks and the State is saying that the parks in the 19th

18   century, this was a new thing.  If you actually look at the

19   source the State cites, which is this book about Central Park,

20   it's very interesting, and it's not that parks were new.  It's

21   that there was a specific sort of park where they wanted to

22   create kind of a European aristocratic environment within the

23   cities to get away from places like Boston Common which the

24   National Park Service report that the other side cites in its

25   reply says was a place for recreation since at least 1660.

1           And they wanted this to be a place kind of

2    separate from the general public.  And if you look at the

3    restrictions, they are on Page 1808 of the JA, there were

4    gatekeepers.  There were, yes, no firearms, but there was also

5    no indecent language in the parks and that was also went

6    through into a lot of these other parks that followed in that

7    stream.  So that is an anomalous -- that's not part of our

8    traditions.  That's not how our parks operate today.

9           And so that was an anomalous situation with

10   respect to those parks.  So we should not be looking to those

11   parks to establish our constitutional tradition.

12           JUDGE KRAUSE:  Mr. Patterson --

13           MR. PATTERSON:  Yes.

14           JUDGE KRAUSE:  -- could you address, is there

15   just one tradition and is there any room at all for the

16   different states to have different laws in particular places

17   of concern to citizens of that state?

18           MR. PATTERSON:  Well, I think those are two

19   different questions.  So I'll answer first the question about

20   is there just one tradition, and I think the answer is that,

21   yes, there is just one tradition as a constitutional matter.

22   That is what Heller when it's discussing the Second Amendment

23   said.  It's a pre-existing right.  There was some -- Justice

24   Stevens (phonetic) I think was citing some language in some

25   ratification proposals.  And Heller said it's dubious to look

1   at that language because this is a pre-existing right that

2   we're looking at that had an understood scope and application

3   at the founding.

4          So the Supreme Court has said there's one

5   tradition.  And I think the Court's job here is to say, okay,

6   what is part of the genuine tradition and what are outliers.

7   And separating that wheat from that chaff in terms of the

8   historical laws, and that's why I think the common law is

9   actually very important because that was generally applicable.

10          And as it was understood in America, the kind

11   of sole common law restriction on carrying in public was this

12   common law of affray which said that -- which Bruen made very

13   clear, by the time of the founding it was not understood to

14   generally bar public carry, but only when it's associated with

15   circumstances apt to terrorize the public.  So circumstances

16   that would make people think you were going to misuse the

17   firearm.

18          And what the cases, Simpson and Huntley said,

19   is the simple fact of carrying a firearm, particularly when

20   you have a constitutional right, cannot be held to create that

21   sort of terror.  But what also -- and I think my Counsel for

22   Siegel pointed this out is that the Statute of Northampton

23   which codified were held to just simply be on a codification

24   law of affray singled out courts and other places where people

25   could not carry except for their associates and ministers of

1  justice.  So there's an expectation that there's security.

2  And then all the other places that are listed there with --

3  this is the fairs and the markets, that is only if it's done

4  in a manner to terrify.  So already that separation between

5  places that provide government security and places that do not

6  is in the law.

7          So then with respect to new situations, if a

8  state has a particular problem of firearms violence at a

9  particular location, and they say, okay, to address this we

10  need to treat that place as sensitive and we need to make that

11  a gun free zone and we're actually going to do it.  We're

12  going to put people there.  It's a place that is securable, a

13  discrete location.  We can have controlled egress and ingress.

14  We can ensure everybody coming in with metal detectors does

15  not have a firearm, then that state can make that place a

16  sensitive place.

17          JUDGE KRAUSE:  So a school can't be a sensitive

18  place unless there is metal detectors at the doors?

19          MR. PATTERSON:  Correct.  Under the tradition,

20  the students, the -- over which the school has in loco

21  parentis authority, the school could restrict the students

22  from having firearms.  With respect to other people, as co-

23  counsel said, the school could say other people can't even

24  come into the school.  People don't have a general right to

25  come in and out of the school.

1          So the school can do things like that.  But in

2   -- to make it a complete gun free zone, yes, the school would

3   have to ensure there's actually no firearms there.

4          JUDGE PORTER:  Can you think of any contemp --

5   you know, current examples where the government has done that

6   in new places?

7          MR. PATTERSON:  Well, here today.  I mean, that

8   --

9          JUDGE PORTER:  I mean, sort of new places.

10         MR. PATTERSON:  Yes.  Airplanes.  Airplanes are

11  a perfect example.  So we don't -- those places didn't exist

12  at the founding, but the government has ensured that people do

13  not have firearms on airplanes.  And we do not have a problem

14  with that because the government has said, yes, you can't

15  carry a firearm, but we're going to ensure that nobody else is

16  going to be able to either except for law -- whatever law

17  enforcement that is there.

18         So I think that really is the through line with

19  respect to the three sensitive places that the Court

20  identified in Bruen and to what would make the place a

21  sensitive place today, and it also makes sense in terms of

22  what the Second Amendment is meant to protect.

23         JUDGE KRAUSE:  How do we -- what's your

24  reasoning to conclude that all of the statutes that, 19th

25  century generally, but the talk about places like ballrooms

1    and fairs and race courses and social gatherings --

2                    MR. PATTERSON:  Yes.

3                    JUDGE KRAUSE:  -- public assemblies, that all

4    of those legislatures were enacting unconstitutional laws?

5                    MR. PATTERSON:  Well, they are outliers,

6    geographically isolated.  And the post -- so this -- there is

7    nothing, maybe there's a municipal regulation, but in terms of

8    state or territorial laws, there is nothing like that before

9    the enactment of the 14th Amendment.  So even if you were a

10   judge sitting in 1868 when the 14th Amendment was enacted.

11   We're trying to interpret the Second Amendment and look

12   historically.  There is nothing of that nature.

13                    And Bruen is very clear, a tradition that

14   starts after the adoption of the constitutional right cannot

15   create a historical tradition.  And there are also very few

16   numerically --

17                    JUDGE KRAUSE:  Well, that's not quite right.

18   Doesn't Bruen go out of its way to say that it's -- the Court

19   has assumed that in some cases, but it recognizes that there

20   is an active debate and scholars like Ackilimara (phonetic)

21   who were saying it evolves.

22                    MR. PATTERSON:  Well --

23                    JUDGE KRAUSE:  And that the right time to look

24   is --

25                    MR. PATTERSON:  Yeah.

1              JUDGE KRAUSE:  -- reconstruction.

2              MR. PATTERSON:  I'm saying even if the date was

3    1868, all of those restrictions on ballrooms, et cetera, were

4    after 1868.  So there was nothing by 1868, and so those were

5    all after and so you can't have that tradition.  It is a

6    departure from the historical tradition.

7              And plus in Espinoza the Supreme

8    Court said we had more than 30 states in that time frame

9    creating no aid to parochial schools laws, and they said

10   that's too late.  You cannot create a historical tradition

11   that does not have grounding in the founding.

12             So we think 1791 is the right answer because

13   what is being incorporated is the Second Amendment.  The

14   Second Amendment was adopted in 1791.  So it retains its

15   meaning when it's incorporated.  But even putting that to the

16   side, all these restrictions, there are very few of them.

17   They are after the 14th Amendment.  They are not before, and

18   they're also a departure from what was the historical example,

19   which again was the law of affray, which was if there is --

20   your carriage is accompanied with something indicating that

21   you would misuse the firearm, and those statutes were a

22   departure from that.  So they depart from what the historical

23   tradition was.

24             And, also, if you look at the court cases that

25   address these, I think only one of them actually -- most of

1    the language that the other side points to is dicta or was not

2    critical to the case.  But almost all of these cases assumed

3    that the Second Amendment was a militia right at least with

4    respect to the right to bear arms.  So they're analyzing it in

5    a way that Bruen has said is incorrect.

6              JUDGE PORTER:  Are you saying that Bruen

7    instructs us to reject examples after 1868?

8              MR. PATTERSON:  If it is a departure from what

9    came before, yes.  And our position would be if it's after

10   1791 and it's a departure from what came before, you would

11   have to reject that.  But at a minimum, if the question is

12   what did the right mean in 1868, things that come after that

13   are a departure from anything that came before cannot inform

14   the right.  And those particular places, I think the

15   reconstruction era south is a particularly poor place to look

16   to find it.  We would not look and say, okay, we're going to

17   define our voting rights by what they were doing in Texas in

18   1870.  So I think it's a particularly poor place to look to

19   define our rights.

20              And also it's interesting even the government

21   protection comes up in one of those cases, the Hill case from

22   Georgia.  The case actually was about carrying a firearm in a

23   courtroom, so we don't have an objection to that.  But what

24   the Court says is that the people are met there and it is the

25   high constitutional duty of the state to protect them in that

1    location.

2              And so under that rationale, if the State has

3    taken on the duty to protect individuals in a place, in this

4    context by ensuring they're saying, okay, you cannot have a

5    firearm, but we're going to make sure nobody in that location

6    other than law enforcement personnel is going to have a

7    firearm either, then the burden on your right is reduced.

8              JUDGE KRAUSE:  Is there a particular number

9    that we need to have a tradition?

10             MR. PATTERSON:  I don't know that there's a

11   particular number.  I think the question is particularly with

12   respect to legislation because almost by definition

13   legislation is departing from the common law, the question is,

14   okay, we've got four statutes.  We've got six statutes.  Are

15   these consistent with what that widespread tradition was

16   either at the founding or 1868, and we think it's the

17   founding.  And we would submit that tradition is reflected in

18   the law of affray as the Supreme Court has understood it, and

19   to say is that a departure from that or is that a continuation

20   from that.

21             So with respect to the courthouses and the

22   legislative assemblies and polling places, because those

23   places were secured, they were consistent with that tradition.

24   But then if you look with respect to ballrooms and other

25   places of assembly that are not secured, they are not

1   consistent with that tradition.

2              So it's not that those -- a few number of laws

3   were creating the tradition with respect to polling places, et

4   cetera.  It's that they were part of a broader tradition.  But

5   the same cannot be said for these laws that the State has

6   pointed to where they've got, you know, one from 1853 and one

7   from 1903 and nothing else that's like it.

8              So I see my red light is on.  We've all been up

9   here for a long time, so I'm happy to answer any other

10   questions, but if not, I would ask the Court --

11              JUDGE KRAUSE:  Okay.

12              MR. PATTERSON:  -- affirm.

13              JUDGE KRAUSE:  Thank you.

14              MR. PATTERSON:  Thank you.

15        (Pause)

16              MS. CAI:  Your Honors, this case is primarily

17   about history.  And what I've heard from both Mr. Patterson

18   and Ms. Murphy is ahistorical entirely.  They have nothing to

19   say about the fact that the very statutes that Bruen relied on

20   to glean a history and a historical tradition of sensitive

21   places at courts, at polling places, at schools also enacted

22   the very provisions that Chapter 131 has today.

23              And so I think that is how you resolve this

24   case.  It is entirely consistent with Bruen's teachings.  And

25   I would just like to hit on some very specific aspects of

1   history that were mentioned.

2            The first is about security.  So both Counsel

3   for Siegel and Koons talked about how security is the

4   rationale, and what they had in mind are armed guards provided

5   by the government.  So if you wanted to make a daycare a

6   sensitive place, the government would have to have someone

7   there preventing anyone from walking in with a gun.

8            I think that is entirely ahistorical.  That is

9   not what legislatures had enacted when they prohibited

10  firearms at ballrooms in New Orleans in 1816, at fairs and

11  markets in Virginia in 1789, at literary gatherings in

12  Missouri in 1874.

13           And, in fact, if that is the rule that Bruen

14  really wanted, I don't think it would have called it a

15  sensitive place provision.  It would be a secured place

16  provision or a government security provision.  That's just not

17  what it is.  And all of the -- and I didn't hear Mr. Patterson

18  talk about their historical evidence because none of the cites

19  that he provided to this Court actually suggested that

20  courthouses, legislative assemblies or polling places had

21  armed security.  Those were provisions that made sure that the

22  constable was paid for bringing in the jury, for executing a

23  summons, and to conduct the election itself.

24           And so it is not consistent with the historical

25  tradition and, in fact, we know that polling places, for

1    example, did not have historically or today generally armed

2    security and they would not be able to do so.

3            But I heard a little bit of a contradiction as

4    well as to what is -- what does make a place sensitive.  Ms.

5    Murphy said, you know, if they are gathering for purposes of

6    democratic activity, then that does make it sensitive.  And I

7    heard Mr. Patterson resist that by saying even if it's a

8    municipal courthouse, if it's not secured then you can't make

9    it a sensitive place.

10            I think the fact that they are -- I would agree

11    with Ms. Murphy that at least as to some sensitive places what

12    the government was looking at was the fact that they were used

13    for places of exercising important rights for democracy, such

14    as the courthouses and legislative assemblies.

15            The same is true for public assemblies that are

16    prohibited in Chapter 131 as they were in the very Georgia

17    1870 statute cited by Bruen through the article and discussed

18    in Hill versus State, which Mr. Patterson talked about at

19    length.

20            What he didn't tell you was that Hill, which

21    relied on Nun (phonetic) versus State, which Bruen accepted as

22    the rule in Georgia that you couldn't prohibit public carry

23    generally.  Nonetheless in Hill the Court just a few years

24    later said the right to go into a courthouse and peacefully

25    and safely seek its privileges is just as sacred as the right

1    to carry arms.  And we cannot compel a visitor to "mingle in a

2    crowd of men loaded down with pistols."

3              That is the kind of rationale that is grounded

4    in history and that supports the same statutes that we have

5    today.

6              JUDGE KRAUSE:  So where is the limit?  We know

7    that its -- that the thread can't be that it's a, simply a

8    crowded place.  So if it's this idea of the, you know, public

9    assembly exercising important rights, does that extend into a

10   protest in the street?  Does it extend to a farmer's market

11   where they have a permit to gather there?  And how does that

12   extend to something like a film set on a street?

13             MS. CAI:  Your Honor, I think the history

14   provides the limit.  And the history did not provide that

15   anywhere anyone might be exercising First Amendment rights is

16   a sensitive place.

17             Instead, it looked to locations that are

18   designed for the purpose of exercising those rights.  So that

19   is the difference between anybody wearing a t-shirt on the

20   sidewalk versus a permitted assembly that turns that location

21   into the specific purpose --

22             JUDGE PORTER:  How does a --

23             MS. CAI:  -- of exercising rights.

24             JUDGE PORTER:  How does a film production set

25   fit into that?

1          MS. CAI:  I actually don't think the film

2    production issue is really properly challenged, so to speak.

3    As the declaration of the film motor -- not motor -- motion

4    picture commission explains, what film sets do, if they're on

5    a public location, is that they get a permit from the town to

6    make that part of the sidewalk, for example, off limits to

7    private citizens.

8          And so people are, you know, their clients are

9    more than welcome to watch as long as they don't set foot onto

10   this place that is now temporarily private, like people can't

11   just walk through a film set if they have a -- so I don't

12   think that's actually at issue.

13          JUDGE CHUNG:  Well, if it's already closed,

14   then -- and they're allowed to watch, what does the law

15   accomplish?

16          MS. CAI:  I think what it accomplishes is

17   actually the people who are permitted to walk on set, such as

18   extras and people like that, to prevent them from carrying

19   firearms in those situations --

20          JUDGE PORTER:  But --

21          MS. CAI:  -- but they are --

22          JUDGE PORTER:  But how does it fit into this

23   sort of core First Amendment rationale?

24          MS. CAI:  I don't think the film sets

25   necessarily have to fit into the core First Amendment

1    rationale.  I think they probably would be analogous to the

2    prohibitions on firearms at circuses, exhibitions, and

3    ballrooms and theaters and things of that sort.

4            But putting that aside, Your Honors, I think

5    the core of this is that the legislatures not just, you know,

6    in territories and not just in the reconstructioned south,

7    although in the reconstructioned south during eras of radical

8    republican rule to try to protect the rights of people like

9    voters, like people seeking privileges of the court prohibited

10   firearms at places like schools specifically.

11           Your Honors talked about the university

12   restrictions, but I also wanted to make sure that Your Honors

13   were aware that the very statutes that we cite, Texas in the

14   1870s, Tenn -- I'm sorry, Missouri in the 1870s as well,

15   Vermont in 1891 prohibited firearms at schools writ large.

16   And there is no in loco parentis rationale given.  In fact, in

17   cases that upheld the Texas statute, Alexander versus State,

18   this is 11 Southwest Reporters 628.  This is a Texas appellate

19   decision from 1889, said that a teacher does not have the

20   right to carry at schools.  And so there is not an in loco

21   parentis rationale.

22           If there were, I don't think the Supreme Court

23   would have thrice called it a sensitive place provision as to

24   schools.  It would have been a student exception or a parental

25   exception or something like that.  And so I think that's very

1  important.

2           I would like to just make one more comment on

3  the upshot of their argument.

4           The upshot of their argument is that the very

5  provisions that legislatures enacted in 1869, 1870, 1874, the

6  moment when they became bound by the Second Amendment right to

7  bear arms via the 14th Amendment, those were all

8  unconstitutional.  That's what Mr. Patterson and Ms. Murphy's

9  position would have you believe.  I think that is entirely

10  ahistorical.  That is obviously illogical, but also

11  contradicted by the court decisions that reviewed those

12  decisions.

13           If I may say a couple of things just clarifying

14  some of the record --

15           JUDGE PORTER:  But they didn't --

16           MS. CAI:  Oh --

17           JUDGE PORTER:  -- they didn't understand

18  themselves as bound until incorporation, right?

19           MS. CAI:  I don't actually think that's quite

20  right, Your Honor.  So one example is Tennessee.  So Bruen

21  talks about Simpson versus State, which is an 1833 decision

22  which understood that Tennessee itself had a right to bear

23  arms.  That is an individual right.  It said you can't ban

24  carry in public generally.  You must allow some form of carry.

25           Andrews versus State, 40 years later in 1871,

1   adopted the same provision as understood that Simpson was

2   binding and nonetheless held that the provision in Tennessee

3   that prohibited firearms in certain places such as race

4   courses, et cetera, was constitutional.  And, in fact, it

5   reasoned the reason for it is because people do not have a

6   right to go among the people in public assemblages where

7   others are likely to be affected by his conduct.  And that is

8   specifically what it looked to.

9           I talked about Hill.  Hill, you know, does have

10  some language about the militia right, but also mentions none

11  which the Supreme Court in Bruen referenced as one of the

12  paradigmatic examples of understanding the Second Amendment

13  right.  So I don't think those courts were operating under

14  this, you know, false assumption of what the right protects.

15          On references, I just want to make sure that we

16  are clear on one thing.  We did not challenge the District

17  Court's injunction as to in person interviews of the

18  references.  So what people can do or what the licensing

19  authority can do is if the information is unclear or it's

20  outdated, they can call the person perhaps and verify

21  information the same way you would do in any kind of

22  background check.  But we're not suggesting that there is some

23  free-ranging interview.

24          And I would note that the cases that were cited

25  in terms of the First Amendment in Forsyth and things like

1    that, there's no allegation of chill in this case.  No

2    plaintiff says I wouldn't be able to get four people to sign

3    this form for me to say that I am not going to cause harm to

4    myself or others.

5              And I would also note that I don't think that

6    this Court has ever applied the overbreadth doctrine outside

7    of the First Amendment.

8              Finally, on insurance, I just want to make a

9    couple of observations.

10             The first is that I don't think this is a -- I

11   think Ms. Murphy acknowledged there are challenges not based

12   on the cost or the ability to obtain.  Rather, it's just, as

13   the plaintiffs said in their declarations, they don't want to

14   obtain the insurance.

15             And I do think this is where we truly disagree

16   about some of the First --

17             JUDGE CHUNG:  Well, some of the declarations

18   said they had policies that the State argued covered the

19   conduct.  And, in fact, they didn't and/or it wasn't up to the

20   limit that the State required.

21             MS. CAI:  That's correct.  But I don't think

22   either of those plaintiffs alleged that they would not be able

23   to afford upping the coverage to the level necessary.  So they

24   do not make a impossibility where I couldn't afford it or I

25   wouldn't be able to get it.  It's very much the statements

1   they made were I do not want to increase my coverage.

2           JUDGE KRAUSE:  Is that a standing argument or

3   is that -- are you talking about --

4           MS. CAI:  It's not a standing --

5           JUDGE KRAUSE:  -- the state of the burden?

6           MS. CAI:  -- argument, but it is a, we'll call

7   it a Bruen Step 1 argument with respect to what is covered by

8   the Second Amendment's plain text.  I think what plaintiffs

9   are suggesting they have is a right to not be on the hook or

10  be insured against the cost of harm that they may cause by

11  accident.  And I don't think that the Second Amendment

12  provides that.

13          Where Ms. Murphy and I disagree is that I think

14  it is a truism, and I think I learned this in the first day of

15  torts in law school.  Everyone is a potential tortfeasor.

16  Everyone has the ability to cause accidents.  And so that is

17  what the insurance scheme is responding to.  And the fact that

18  it applies to every person who carries firearms in public is

19  just the modern understanding of what inherent risk that we

20  carry when we drive a car, when we bring a loaded firearm into

21  the public space.

22          And so the fact that historically legislatures

23  were unable to precisely calibrate what it is that they can

24  impose as an upfront cost to ensure that victims are

25  compensated, the fact that they didn't have the financial

```
 1   technology of liability insurance which did not exist until

 2   the 20th century doesn't mean that the goals of the surety

 3   statutes and the strict liability statutes were not trying to

 4   accomplish the same thing.  And Bruen says we can use modern

 5   innovations if they are trying to get at the same how and the

 6   same why, which exactly this is.

 7            JUDGE CHUNG:  Well, if it's ever calibrated in

 8   such a way that the actual premium is burdensome, would that

 9   be a violation?

10            MS. CAI:  I think someone could bring an as

11   applied challenge.  I would think that, you know, if someone

12   -- if you're talking about someone who is uninsurable, I would

13   imagine that person may have other problems in terms of

14   proving that they have a Second Amendment right to carry

15   without risk to other -- if they -- they're so likely to cause

16   risk to others.

17            But that's not what we have here.  It's a

18   facial challenge.  No plaintiff suggested they would be unable

19   to obtain insurance.  And, in fact, as the declaration of the

20   insurance expert that we put in the record suggests, many

21   people probably would have it today if they have homeowners'

22   insurance or renters' insurance.  They may have to up the

23   level.  That's true.  But the cost of that is not at issue.

24            And there may be in development a market for

25   this.  The provision has never been in effect so we don't know
```

1    what that would be.

2            And I would just like to clarify that the

3    insurance provision is not the same at all because it covers

4    accidents versus the executive order that the governor issued

5    in 2020 which is to prohibit the kind of insurance that is for

6    people who have committed crimes, and that's not covered by

7    regular liability insurance.  Of course no insurer would cover

8    that.  So I just wanted to clarify that.

9            JUDGE KRAUSE:  Okay.  We're -- we'll give you

10   30 seconds to wrap up.

11           MS. CAI:  Thank you, Your Honors.

12           I think what we have here is a question of what

13   the history shows, and I think that what the State has shown

14   is that throughout the period that is most critical for

15   understanding the constitutionality of Second Amendment

16   provisions, that is 1868 when the states ratified the 14th

17   Amendment, but even before that the history that even

18   plaintiffs cited, the Statute of Northampton which equally

19   provided for the same provisions in fairs and markets as they

20   did for courthouses all support the longstanding tradition of

21   New Jersey's regulations.

22           So for these reasons we ask that the Court

23   reverse the injunctions and affirm as to other respects.

24           Thank you.

25           JUDGE KRAUSE:  We thank Counsel for really

1    superb argument, briefing and arguments today.

2                    And we will take the case under advisement.  We

3    will ask with this case as well that a transcript be prepared

4    and the cost shared.

5                    Thank you.

6        (Whereupon, this hearing concluded)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

I, Sherri L. Breach, approved court transcriber, certify
that the foregoing transcript is a true and accurate record of
the proceedings.

/s/sherrilbreach

Sherri L. Breach

Approved Court Transcriber

Date:  November 1, 2023

Koons, Et Al v. Attorney General New Jersey, Et Al.

10/25/23 23-1900 / 23-2043

E R R A T A

- - - - -

PAGE    LINE      CHANGE

___ ___ ___  _____

Reason:_____

___ ___ ___  _____

Reason:_____

___ ___ ___  _____

Reason:_____

___ ___ ___  _____

Reason:_____

___ ___ ___  _____

Reason:_____

___ ___ ___  _____

Reason:_____

___ ___ ___  _____

Reason:_____

___ ___ ___  _____

Reason:_____

___ ___ ___  _____

Reason:_____

6290138

1    Koons, Et Al v. Attorney General New Jersey, Et Al.

2                        10/25/23 23-1900 / 23-2043

3              E R R A T A

4               - - - - -

5    PAGE   LINE     CHANGE

6    _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

7    Reason:_____

8    _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

9    Reason:_____

10   _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

11   Reason:_____

12   _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

13   Reason:_____

14   _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

15   Reason:_____

16   _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

17   Reason:_____

18   _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

19   Reason:_____

20   _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

21   Reason:_____

22   _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

23   Reason:_____

24   6290138

25

| & | | | |
|---|---|---|---|
| **&** 2:10,19,22 3:3 | **15** 133:17 | **1865** 26:6 | **1970** 45:8 |

**&** 2:10,19,22
3:3

**0**

**07601** 2:20
**08625** 2:18

**1**

**1** 25:19 41:13
129:7 133:1,13
**1-888-777-6...**
3:7
**10** 133:11
**10/25/23** 134:2
135:2
**100** 94:16
**103** 4:6
**11** 125:18
133:12
**112** 2:17
**12** 133:14
**120** 4:7
**13** 133:15
**131** 5:18 6:3
16:16 50:11,17
51:6 57:16
58:19 120:22
122:16
**131's** 5:23
**14** 133:16
**14th** 6:19 24:7
31:15 45:23
46:5 116:9,10
117:17 126:7
131:16

**15** 133:17
**1523** 2:23
**16** 102:10
133:18
**1660** 111:25
**1686** 104:4
**17** 11:22
133:19
**1700s** 79:11
**1765** 19:11
**1771** 24:1 25:3
25:16
**1789** 48:17
121:11
**1791** 6:12,18
8:1 11:5 19:2,8
35:11,13 45:14
103:23 117:12
117:14 118:10
**18** 19:8 48:17
65:5 133:20
**1800** 3:6
**1801** 3:6
**1808** 112:3
**1815** 11:5
**1816** 121:10
**1833** 126:21
**1847** 41:1
**1850** 8:23
84:14
**1853** 30:24,25
120:6
**1859** 12:13
**1861** 12:14

**1865** 26:6
**1868** 6:18 8:1
10:20,23 19:2
45:15 116:10
117:3,4,4
118:7,12
119:16 131:16
**1869** 64:23
126:5
**1870** 27:11
118:18 122:17
126:5
**1870s** 7:11
125:14,14
**1871** 126:25
**1873** 27:11
30:22
**1874** 121:12
126:5
**1879** 30:25
64:24
**1889** 125:19
**1890** 27:11
30:22
**1891** 125:15
**1893** 26:7
**1895** 24:1
79:11
**18th** 5:20 9:10
11:22 12:8
83:11
**19** 133:21
**1903** 120:7
**19103** 3:7

**1970** 45:8
**19th** 5:20 6:10
6:10 9:10,18
11:23 48:6
64:15 83:11
104:18 111:17
115:24

**2**

**2** 133:2
**20** 90:4,8
133:22
**20-10** 90:6
**200** 44:25 45:2
88:3,4 97:8
**20036** 2:23
**2020** 16:16
131:5
**2022** 34:15
41:14 86:19
**2023** 1:10
23:25 103:24
133:13
**20th** 130:2
**21** 133:23
**21st** 99:11
**22** 56:1 133:24
**22314** 3:4
**23** 133:24
**23-1900** 1:4 5:6
134:2 135:2
**23-2043** 1:4 5:6
134:2 135:2
**24** 61:20
105:16 133:25

**25** 1:10 2:16
61:20 105:16
133:25

**3**

**3** 133:3
**30** 25:9 117:8
131:10
**300** 43:1,3

**4**

**4** 133:4
**40** 89:24 90:3,4
126:25
**433** 2:20

**5**

**5** 4:3 41:13
133:5
**50** 4:4 40:4,11
40:14,21 42:5
96:18,19 97:24
98:15,19,25
**58** 4:5

**6**

**6** 133:6
**628** 125:18
**6290138** 134:24
135:24
**67** 41:2

**7**

**7** 133:7
**706** 3:4
**7a24** 16:20

**8**

**8** 133:8
**80** 58:1 89:22
90:1

**9**

**9** 133:9
**95** 77:5

**a**

**aaron** 1:12 2:2
2:6
**abiding** 15:17
56:1 76:5 92:4
95:22 96:22
102:16 103:16
103:17,19
105:3,10
106:13,21,23
109:4,16,16
**ability** 21:18
49:23 62:12
108:5 128:12
129:16
**able** 55:21 67:8
90:14 115:16
122:2 128:2,22
128:25
**abrogate** 42:8
**absolute** 16:23
18:20
**absolutely**
16:18 70:7
100:23
**abuse** 38:19

**abusing** 37:10
**accept** 15:9
20:1
**accepted**
122:21
**accepting**
94:17
**access** 84:3
**accident** 54:16
91:9 129:11
**accidental** 54:6
56:8
**accidents** 47:20
54:6 129:16
131:4
**accompanied**
117:20
**accomplish**
36:20 124:15
130:4
**accomplishes**
36:23 124:16
**account** 40:6
40:12,12,22
48:14 81:23
94:25 95:25
98:12
**accurate** 133:4
**accusation**
56:15
**accused** 56:13
**ackilimara**
116:20
**acknowledged**
16:25 58:7

128:11
**act** 78:11
**acting** 97:18
**action** 33:20
**active** 116:20
**activities** 44:5,6
44:19
**activity** 42:16
42:19,23 43:15
44:15 49:14
97:2,17,17,19
97:22 98:1
122:6
**acts** 102:4,17
**actual** 76:12
100:4 103:3
130:8
**actually** 8:8
15:2 24:15
25:5,15 26:20
41:4 45:4,9
60:5,8 62:17
64:19 66:15
67:14 71:18
80:10,11 81:1
83:16 85:9,19
86:2 92:19
95:9 96:13
99:20 102:16
104:2,3,4
105:9,23 106:6
109:14,21,24
111:18 113:9
114:11 115:3
117:25 118:22

121:19 124:1
124:12,17
126:19
**add** 5:15 16:1
93:15
**addiction** 72:11
**adding** 31:19
31:22
**addition** 25:19
66:21 87:25
**additional**
101:6 106:15
**address** 6:11
26:23 29:3,4
50:8 70:23
81:25 86:24
101:10 103:4
104:20,21
112:14 114:9
117:25
**addressed**
69:23 86:12
89:3
**addressing**
81:10 102:1
**admit** 62:16
**adopted** 46:3,5
117:14 127:1
**adoption**
116:14
**adult** 49:6
**advances** 67:14
**advantage** 18:1
**advisement**
132:2

**affect** 108:2
**affected** 127:7
**affirm** 120:12
131:23
**afford** 128:23
128:24
**affray** 53:10
107:4 113:12
113:24 117:19
119:18
**afraid** 87:18
**afternoon**
102:24
**agitated** 106:22
**ago** 44:21 79:4
88:3,4
**agree** 14:1
16:18,22 17:7
21:2 23:20
25:15 27:16
29:8 38:8 44:6
58:14 74:23,24
75:4,5 76:10
101:20 122:10
**agreed** 49:18
76:5 94:21
**agreeing** 76:9
**agreement** 22:2
**ahead** 40:1
51:15,16 54:21
104:13
**ahistorical** 58:6
120:18 121:8
126:10

**aid** 117:9
**aims** 5:16
**airplane** 86:15
87:17,19,20,21
109:11,12
**airplanes** 87:5
87:6 115:10,10
115:13
**al** 1:4,12,15,20
1:23 2:2,5,6
134:1,1 135:1
135:1
**alaska** 27:13
**alcohol** 26:25
27:23 37:10
38:19 90:25
**alexander**
125:17
**alexandria** 3:4
22:21
**allegation**
128:1
**alleged** 128:22
**allow** 16:8,12
30:18 31:17
58:23 85:2
126:24
**allowed** 9:20
19:20 21:14
33:16 85:19
105:23 124:14
**allowing** 82:25
**allows** 16:7
21:13 33:24
47:4 58:8

**altogether**
13:23 47:8
**ambiguity** 79:1
**amendment**
6:18,19 9:14
9:19 10:2,5,9
10:11,15 11:24
12:1 13:1
15:21 16:21
17:3,7,13,14,16
18:13 20:24
21:17,20 23:1
23:2,18 24:8
31:2,13,15,15
38:9,12 45:23
46:5 47:4
50:18,23 52:9
53:19 55:21
56:2 58:8 63:9
63:14 68:17
74:13,15 75:23
76:15 82:14,22
84:15 90:17
95:21 102:19
103:5,11,20
105:14,20
106:10 111:8
111:13 112:22
115:22 116:9
116:10,11
117:13,14,17
118:3 123:15
124:23,25
126:6,7 127:12
127:25 128:7

129:11 130:14
131:15,17
**amendment's**
17:19,20,24
18:5 19:8
129:8
**america** 113:10
**american** 13:20
**americans** 5:20
**amici** 13:3
**amicus** 100:15
**ammunition**
87:13
**amount** 41:15
42:15 44:3
45:1,7,9,9
96:20 97:6
108:23
**amounted**
92:14
**amounts** 87:13
107:22
**analog** 35:5
46:25 53:13,24
99:16 104:7
**analogies** 57:5
58:15
**analogizing**
33:3
**analogous** 5:23
48:4 58:16
69:5 104:9
125:1
**analogs** 6:9
10:4,9,11,15

52:21,24
**analogy** 57:8
101:16 104:9
**analysis** 41:8
53:15 108:2
**analyze** 103:14
**analyzing**
65:23 70:21
74:5 118:4
**anders** 67:19
**andrews** 14:10
126:25
**angela** 2:15
**animal** 85:19
**ann** 2:9
**annual** 40:11
**annually** 40:5
**anomalous**
112:7,9
**answer** 8:13
15:24 44:22
45:4,11,13
71:2 80:6
82:10 112:19
112:20 117:12
120:9
**answered** 11:4
45:15
**answering**
64:18
**answers** 8:14
22:14 34:1
**antebellum**
6:23 9:24,25
52:25 56:18

57:12
**anti** 78:24
**anybody** 70:25
94:1 108:6
123:19
**anyway** 86:4
**appeal** 70:15
**appeals** 1:1
**appearances**
2:14
**appellants** 1:10
1:19 2:7,15,19
2:22 3:2
**appellate**
125:18
**appellees** 1:5
1:13,21 2:3,15
2:19,22 3:2
**applicable**
13:17 44:2
51:19 52:25
53:2 56:21
101:7 113:9
**applicant** 37:17
39:4
**application**
26:11 42:11,13
42:17 43:4
44:13,14 50:16
50:24 52:14
113:2
**applied** 44:1
56:17,21 57:16
78:25 93:4,20
94:9 106:5

110:24 111:4,6
128:6 130:11
**applies** 70:4
78:21 129:18
**apply** 53:24
56:16 57:6
58:16 60:2
68:3,19 71:7
78:14 80:5
82:15 86:16
87:7,17 88:4
111:5
**applying** 37:7
57:8 66:15
96:11
**appraisal** 91:6
**approach** 59:3
67:21
**approaches**
33:24
**appropriations**
41:18
**approved**
133:3,12
**apt** 113:15
**areas** 81:18
83:1 111:13
**argue** 17:18
52:14
**argued** 59:15
128:18
**arguing** 97:12
98:16
**argument** 2:9
4:2 12:4 24:14

25:5,8 26:4,17
41:12,19 49:12
49:14 57:11,11
57:23 69:22,25
70:5,14,23
75:23 85:9
88:10,11,11
94:4 97:16,23
98:11 126:3,4
129:2,6,7
132:1
**arguments**
15:10 46:22
49:17,19 50:7
59:12,14 70:1
70:17 132:1
**aristocratic**
111:22
**armed** 7:23
62:6 77:7
106:24 121:4
121:21 122:1
**arming** 111:11
**arms** 6:17
10:16,20,21
33:20 47:17
58:13 100:3
118:4 123:1
126:7,23
**arrive** 81:3
99:2
**article** 122:17
**articulated**
60:20 100:14

**articulation**
111:2
**aside** 62:2
76:15 84:8
98:15 99:15
104:18 125:4
**askance** 55:1
**asked** 41:8
44:21 45:13
58:23 90:24
**asking** 33:14
42:22 77:7
**aspect** 87:21
**aspects** 63:4
80:24 81:6
120:25
**assemblages**
127:6
**assemblies**
14:14 60:21
61:23 62:1
68:1 116:3
119:22 121:20
122:14,15
**assembly** 1:9
1:16 119:25
123:9,20
**assess** 12:24
43:22
**assign** 53:22
54:10 57:1
**assigned** 43:24
**assigning** 57:14
**associated** 43:9
44:18 66:21

113:14
**associates**
113:25
**assume** 71:17
101:1
**assumed** 85:20
116:19 118:2
**assumes** 17:3
**assuming** 34:13
**assumption**
127:14
**astray** 67:24
**atlantic** 3:6
**atrocity** 106:14
**attempt** 81:24
91:10,13
**attendance** 5:3
**attenuated**
26:4
**attorney** 1:7,15
1:17,23 2:5,15
2:16 5:5,5 50:8
134:1 135:1
**attract** 106:17
**attribute** 43:19
**audience** 5:3
**authority** 11:2
92:21 110:2,5
110:10,24
111:1 114:21
127:19
**automobiles**
101:24 102:5
**availability**
8:22

113:14
**available** 55:18
**avenue** 2:20,23
**aware** 33:12
56:4 125:13
**awful** 35:24
**awfully** 64:7

**b**

**baby** 31:2
**back** 19:1
20:23 21:1
25:16 33:5
41:1 51:23
55:2 57:20
62:1 63:12,21
64:10 67:17
71:20 72:9,13
76:4 88:19
100:15 107:4
**background**
15:16 36:16,19
36:22 37:1
38:13 39:23
44:14 90:10
92:1,1,10,12
93:13,13,14
95:24 127:22
**backgrounds**
43:12
**backwards**
109:21
**bakeries** 47:25
**bakery** 28:3
**balancing** 51:3
**ballroom** 48:11

**ballrooms** 27:22 47:25 115:25 117:3 119:24 121:10 125:3

**ban** 11:6 47:7 85:4 126:23

**banking** 55:11

**banned** 84:9 109:20

**banning** 29:5

**bans** 30:14

**bar** 33:15 34:12,13 106:23 113:14

**bare** 107:9

**bars** 26:24 30:21 63:18 79:16

**base** 38:21

**based** 43:10 84:15 93:6 128:11

**basic** 18:6 99:3

**basically** 53:21 59:10

**basis** 82:3,5 83:7 94:9 99:8

**beaches** 35:10

**bear** 6:17 10:16 10:19,21 118:4 126:7,22

**bearing** 29:5 33:19

**becoming** 33:19 84:14

**began** 11:21

**beginning** 45:14 52:4 84:10

**behalf** 50:6 58:4

**behest** 68:11

**believe** 5:7 7:3 7:12,21 10:17 11:5 12:14,15 13:21 31:1 33:11 41:1 45:22 52:12 84:17 99:20 107:5 126:9

**believed** 6:24 7:8,8,22 9:19 10:15 12:11

**believes** 107:15

**benefit** 32:11

**benisek** 50:14 51:1

**best** 57:10

**better** 78:11 80:6 82:11

**beyond** 40:16 89:1

**big** 43:6 88:13 106:10

**bigger** 103:20 104:1

**bill** 40:4,11,21 50:20,21

**binding** 127:2

**binds** 41:22

**bit** 8:15 18:21 45:17 68:6 73:14 80:18 81:8 83:25 89:17 90:7 92:22 96:9,17 122:3

**blackstone** 18:24

**blanche** 59:22

**blanket** 53:12 92:14

**bloodhound** 20:15

**blunderbuss** 81:7

**board** 110:20

**bond** 53:17

**book** 111:19

**boston** 12:7 111:23

**bound** 10:1 11:24 31:13 45:24 126:6,18

**boundaries** 67:22 94:23

**box** 2:17

**brandeis** 29:15

**breach** 56:14 99:22 133:3,10

**break** 104:9

**breaks** 25:13

**breard** 22:21

**bridges** 41:6

**brief** 61:20 69:24 70:12,15 70:16 105:17

**briefed** 52:13

**briefing** 132:1

**briefs** 100:15

**bring** 17:23 20:13,14 21:18 37:2 64:7 129:20 130:10

**bringing** 53:10 86:2 121:22

**broad** 39:1 92:20

**broadening** 25:5

**broader** 24:10 24:18 29:24 120:4

**broadly** 58:12 80:21

**brookins** 3:2

**brought** 94:18

**bruen** 6:8 7:8 7:12,14,21 8:8 10:3 12:22,23 13:12,15,18,21 14:4,11 21:14 21:16,16 29:2 29:12,14 30:13 31:20,23,24 32:2,7,24 34:19 35:25

36:6,13 37:25
38:11,18 41:8
42:6,8 44:2
50:18 51:24
52:8 53:1 57:4
58:5,7,14 59:3
59:14,24 60:4
60:12,19 62:3
62:11 63:13
65:2,7,22
71:20 73:2
74:12 78:25
79:18 80:11
81:3 82:23
88:10 89:5,7
91:3,23 102:10
103:6,15 104:3
105:16 109:24
109:25 110:6
110:16 111:7
111:15 113:12
115:20 116:13
116:18 118:5,6
120:19 121:13
122:17,21
126:20 127:11
129:7 130:4
**bruen's** 5:16
7:5 15:6 56:11
93:8 120:24
**built** 92:18
93:15 95:11
**bunch** 58:18
**burden** 29:7
50:13 51:23

57:13 72:19
74:16 77:21
83:10 86:11,24
89:4,4 90:12
90:12 94:8
101:11 102:11
103:15,20
104:1,10
105:14,19
119:7 129:5
**burdened**
103:16
**burdensome**
130:8
**bureau** 111:10
**business** 19:19
**businesses** 26:9
26:12,12,18
77:14

**c**

**c** 5:1 133:1,1
**cai** 2:15 4:3,7
5:8,9,12 6:15
7:3,20 9:16,25
10:7,10,13
11:19 13:13
15:22 16:2,14
16:18 17:6,15
18:4,10,18
20:4 21:4 22:9
22:13 23:4
24:13,17 25:1
25:7,11 27:1,5
28:7,10,14,19
29:8,13 30:7

30:24 31:4,22
32:12,17,20
33:2,8,11,16
34:1,13,18,23
35:22 36:7,18
36:21 37:4,14
37:19 38:5
39:14 40:8,13
40:17,19,23
42:3,24 43:25
45:3,7 46:11
46:14,17 47:3
48:15 49:3,10
50:1 120:16
123:13,23
124:1,16,21,24
126:16,19
128:21 129:4,6
130:10 131:11
**cai's** 97:16
**calibrate**
129:23
**calibrated**
130:7
**california**
82:13
**call** 20:16
127:20 129:6
**called** 67:9
121:14 125:23
**calling** 15:5
62:10
**campaign**
77:13

**camper** 84:25
85:3
**campus** 111:6
**capture** 91:14
**car** 58:21
101:19 129:20
**care** 68:9 72:22
106:14 109:17
**carolina** 107:11
**carriable** 8:23
**carriage**
117:20
**carried** 7:24
62:15 66:6,9
**carries** 12:2
49:24 129:18
**carrington**
19:10
**carry** 13:21,23
15:11 16:9,10
17:3,8,9,10,13
17:14 18:6,8
18:17 19:25
20:5,6 21:3,5,6
21:8,13 24:4
24:20 27:9
30:15,18 31:17
32:4 33:6,15
33:19,22 34:6
34:8,10,12,19
38:20 39:16
44:19 49:5,7
51:11 53:17,19
54:3 57:14
58:6,13,24

59:5 60:3,25
62:12 63:23
65:8,14,16,19
65:24 66:3,5,8
66:12,16 67:2
67:8,8 72:5,23
74:20,24 75:1
75:5,9 76:6
77:16,21 82:9
84:22 90:18
91:17,20 96:23
96:23 98:21
99:19,21 100:3
100:25 103:9
103:20 104:22
104:23 106:2
107:3 113:14
113:25 115:15
122:22 123:1
125:20 126:24
126:24 129:20
130:14
**carrying** 12:19
15:14 29:22
35:13 42:19
53:23 62:13
67:7 70:25
79:14,23 81:21
83:8,16 113:11
113:19 118:22
124:18
**carte** 59:22
**case** 5:3,6 6:6
6:13,22 8:4,17
13:16,25 14:18

14:20 18:9
19:11 22:22
23:17,20 29:16
44:19,24 51:23
53:9 54:10
62:11 64:19
66:24 67:1,20
68:4 87:6
94:11,12 96:14
98:24,24
100:21 118:2
118:21,22
120:16,24
128:1 132:2,3
**cases** 10:3,17
10:17,18 13:22
19:9 20:7
22:15 26:8
30:13,15 42:10
51:2 66:19
67:15,19,20,23
113:18 116:19
117:24 118:2
118:21 125:17
127:24
**casino** 108:5,6
**casinos** 107:21
**casting** 63:6
**casualty** 55:8
**catalogues**
59:11
**catch** 56:1
**categorizations**
48:2,3,4,6

**category** 58:11
71:25 72:17,18
**cause** 38:7 44:9
91:18,21 92:9
99:20,25
107:12 109:12
128:3 129:10
129:16 130:15
**caused** 43:21
**causes** 56:9
**cautioned**
58:11
**cede** 102:22
**central** 12:13
12:14 84:9,23
91:24 111:19
**century** 5:20
6:10 9:10,11
9:18 11:22,23
12:8 48:7
64:15 83:11
99:11,14
104:18 111:18
115:25 130:2
**certain** 9:5 23:4
58:9 93:5
127:3
**certainly** 9:20
12:16 17:8
21:4 24:6
26:19 27:5
35:10 38:7
42:25 48:9
58:17 80:20
84:22 87:3,3

89:5 98:6
99:11 102:20
**certify** 133:3
**cetera** 117:3
120:4 127:4
**chaff** 113:7
**challenge** 37:15
38:17 39:13,14
69:8 71:25
72:12 74:4
93:20,25 94:13
94:18 96:19
106:6 127:16
130:11,18
**challenged**
5:19 16:4
30:12 68:15,25
69:12,12 71:24
72:2 124:2
**challenges** 5:13
128:11
**challenging**
31:10 39:16
41:12 93:13
**change** 8:21,25
9:1,4 21:15,15
22:3,3 23:18
34:25,25 35:1
103:3,7 104:2
104:17 134:5
135:5
**changed** 19:7
45:8 85:8
110:12,13,14

changes 16:20
23:13,16 104:8
changing 23:2
chapter 5:18,23
6:3 16:16
50:11,17 51:6
57:16 58:19
120:22 122:16
character 93:1
93:3,9 95:3
characteristics
96:3
charge 40:14
45:1
charged 41:2
check 15:16
36:22,23 92:1
92:1,10,12
93:13,14 95:20
95:24 127:22
checks 36:16
36:19 37:1
38:13 39:23
44:15 90:10
93:14 96:1
cheryl 2:9
child 49:8
childcare 69:10
children 46:24
47:19 68:8,9
69:19 70:10
71:13,19
chill 128:1
choice 11:2
20:22 29:9,11

31:5
choices 29:19
47:9
choose 27:8
29:19,20 109:5
chooses 17:1
choosing 71:5
chose 27:6,16
28:2,4,23 29:3
29:4 47:10
chosen 27:19
chung 2:10
7:16 22:24
24:10,16,18
25:4,15 28:6,8
28:12,18 29:1
29:11 30:1
37:11,18 40:3
40:10,16,18,20
43:8 54:20,22
54:25 65:6
69:21 70:9,11
72:1 86:6,8,20
86:23 87:2
89:2 91:10,25
92:8 97:16
98:10 107:20
108:9,11,13,15
124:13 128:17
130:7
churches 64:4
64:5,6,7
cindy 2:10
circuit 1:2 2:11
50:15

circumstance
14:1 105:11
110:12,13,15
circumstances
11:15 23:5
56:18 67:13
103:25 113:15
113:15
circus 14:13
circuses 125:2
cite 125:13
cited 10:3
14:11 15:2
30:13 34:4
40:25 53:1
122:17 127:24
131:18
cites 111:19,24
121:18
cities 25:21
84:8 111:23
citing 112:24
citizen 37:23
56:1 92:4
95:23 96:22
105:3,10
citizens 6:4
49:22 76:6
82:13 102:17
103:16,19
106:21,23
109:4 112:17
124:7
city 22:21
38:24,24

civil 31:1 75:18
civilian 8:24
clarify 131:2,8
clarifying
126:13
class 93:6
classification
23:7
classified 23:10
classroom
68:24
clean 44:10
clear 26:10
29:16 42:4
46:6 51:19
55:17 58:5
69:7 75:4 76:8
82:23 85:17
95:10 103:15
113:13 116:13
127:16
clearance 39:3
clearly 10:11
30:8 85:13
clement 3:3
clerk 89:25
90:3
client 94:2
clients 98:19
124:8
close 57:8
closed 124:13
clothes 19:25
codes 97:10

**codification** 113:23
**codified** 10:15 10:21 62:19 113:23
**coffers** 98:12
**colleague** 15:10
**collected** 97:6
**collecting** 41:15
**collectively** 54:4 56:5
**collects** 41:20
**colony** 25:22
**colorfully** 20:11
**colt** 8:23
**come** 13:4 36:1 66:14 68:23 69:1 72:9,13 75:15 76:13 77:7 79:6,18 79:18,19 80:18 82:20 88:24 99:2 102:14 106:13 107:17 110:21 114:24 114:25 118:12
**comes** 19:22 77:6 91:17,21 98:14 118:21
**coming** 19:18 61:3 63:5 75:11 80:3 87:12 111:5

114:14
**comment** 14:25 126:2
**commentators** 6:23 15:1,1,2
**commenting** 30:10 31:11
**comments** 5:15
**commerce** 48:13,16,18,19
**commercial** 22:22 80:2,23
**commission** 124:4
**commissioner** 55:9
**commit** 96:13 101:2 106:14 109:17
**committed** 92:19,22 131:6
**common** 7:24 10:5 12:7 20:6 60:1,14,16 62:14,18,19 84:13,15 104:6 104:7 107:8 111:23 113:8 113:11,12 119:13
**commonality** 60:22 61:19
**commonly** 84:18

**commons** 26:20
**communicate** 23:14
**communication** 23:18
**communities** 56:19
**community** 20:9 53:3,6,6 56:22 82:6,8 82:11,25 86:9
**company** 3:5
**compel** 123:1
**compensate** 96:25 98:5 100:20
**compensated** 129:25
**compensating** 101:21
**compensation** 98:1,16 101:7 102:2
**complaining** 32:11
**complaint** 53:11 91:18
**complete** 115:2
**completely** 100:9,9
**complex** 2:17
**compulsory** 68:10
**con** 72:25

**concealable** 8:22
**concealed** 33:22 34:7 35:18 104:23
**concede** 87:12
**concentration** 47:15 72:25
**concept** 68:7,18 68:19 85:7
**concern** 106:20 112:17
**concerned** 49:1 81:18
**concerns** 35:1,9 35:12,15 48:7 48:10 83:14
**conclude** 54:4 115:24
**concluded** 132:6
**concluding** 57:13
**conclusion** 80:19
**concrete** 39:19
**conditions** 58:6 96:17
**conduct** 36:10 37:8 43:14,17 73:23 96:22 97:13 100:1 101:12,23 121:23 127:7 128:19

**confer** 17:25
**confined** 78:20
  81:18 88:15,16
  88:17
**conflating**
  67:11
**conflict** 6:17,20
  7:2,9,13 9:3
  10:24 24:7
  45:14,16,18
  63:10 108:1
**confront** 6:7
**confronted**
  54:8
**confronting**
  33:23
**congregated**
  48:22
**congregation**
  47:15 71:22
**connected**
  69:16 110:1
**consent** 17:23
  19:23 74:23
  75:5,8 76:7
**consider** 31:3
  32:7 55:19
  65:9
**considered**
  50:19,24 65:2
  81:19 103:12
**considering**
  13:10 65:6,7
**consistent**
  63:24 72:19

79:7 81:2
95:21 119:15
119:23 120:1
120:24 121:24
**consolidated**
  5:4
**constable**
  121:22
**constantly**
  63:15
**constitution**
  6:1 31:12,12
  82:16,19 83:2
**constitutional**
  5:13 8:25 9:2
  9:23 11:2,4,8
  14:15 17:22
  23:1,3,17 30:9
  31:16 38:3,6
  40:7 46:1
  49:16 63:11
  73:24 74:11
  75:20 76:17,22
  79:2 82:3,12
  82:16 90:14,18
  97:3 98:7,20
  99:7 100:3
  101:19 107:13
  112:11,21
  113:20 116:14
  118:25 127:4
**constitutional...**
  80:5 131:15
**constitutional...**
  5:18,25 12:12

15:14 39:11
93:24 97:13
102:7
**constrained**
  9:24
**construe** 17:22
**contemp** 115:4
**contemplated**
  19:17 26:11
**contemplates**
  59:24 89:6
**contemporan...**
  26:8
**content** 94:25
**contest** 35:11
**contested** 38:18
**context** 24:12
  69:18 74:8
  75:19 78:25
  82:4 84:18
  87:9 96:12
  97:15 98:6
  102:20 119:4
**contexts** 87:10
  102:6
**contingent**
  17:10
**continuation**
  119:19
**continue** 40:15
**continued**
  11:22 111:9
**continuing**
  43:13

**contractor** 80:3
**contradict**
  31:25
**contradicted**
  26:4 126:11
**contradiction**
  74:19 122:3
**contrast** 33:18
**contrasting**
  31:23
**controlled**
  114:13
**controls** 45:19
**convicted**
  36:24 98:2
**cooper** 2:22
**core** 25:19 63:2
  124:23,25
  125:5
**corporate**
  25:21
**correct** 28:19
  33:13 70:7
  96:19 114:19
  128:21
**correctly** 54:9
**cost** 43:3,22
  44:18,25 97:8
  101:11 128:12
  129:10,24
  130:23 132:4
**costs** 43:9,15
  43:19 101:2
  102:13

**couldn't** 12:11
63:8
**counsel** 3:3 5:2
26:23 58:23
110:1 113:21
114:23 121:2
131:25
**counties** 25:21
**country** 65:3
66:16 75:13
77:19,20 84:6
100:25
**county** 21:7
61:11 94:11,14
105:25
**couple** 13:25
25:16 33:5
64:24 67:19
73:4 78:8
92:15 93:2
110:21 126:13
128:9
**course** 5:11
34:15 38:9
43:13,16 65:17
65:24 73:17
76:11 131:7
**courses** 116:1
127:4
**court** 1:1,9,17
1:24 2:5 3:5
5:9 11:11
13:12,22 14:5
14:7,9,11
22:20 43:5

49:15 50:6,9
50:14,24 52:12
53:1,16 55:5
56:4 58:4 62:3
63:5,24 66:20
67:2,18 70:6
70:20,22 72:20
74:6 80:14,14
82:4 83:5
84:18 89:10
92:10,15,16
94:21 98:4
102:10,24
107:10,11
113:4 115:19
116:18 117:8
117:24 118:24
119:18 120:10
121:19 122:23
125:9,22
126:11 127:11
128:6 131:22
133:3,12
**court's** 70:22
94:11 113:5
127:17
**courthouse**
7:15 106:1,4
122:8,24
**courthouses**
7:10 8:2,7
47:24 60:20
61:11,22,25
68:1 106:8
119:21 121:20

122:14 131:20
**courtroom**
109:9 118:23
**courts** 6:23
11:25 14:23
30:12,15,16
42:10 49:22
60:16 65:15
82:6 113:24
120:21 127:13
**cover** 46:15
56:8 131:7
**coverage** 55:8
55:12,18,24
128:23 129:1
**covered** 45:12
55:6,7 69:11
128:18 129:7
131:6
**covers** 131:3
**cox** 42:9,9,14
42:24 43:1,25
44:8
**crazy** 88:13
**create** 76:13
83:17 104:19
111:22 113:20
116:15 117:10
**created** 54:6
84:21
**creates** 9:13
**creating** 93:9
117:9 120:3
**crime** 36:25
40:12,22 75:20

76:22 92:20,22
96:13 98:3,19
**crimes** 97:25
109:8,18 131:6
**criminal** 36:23
95:20,25 96:3
97:2 106:13
**criminals** 61:5
96:25 102:17
105:8
**critical** 118:2
131:14
**cross** 2:15,19
2:22 3:2 70:15
**crowd** 123:2
**crowded** 48:23
59:13,16 63:21
81:18 88:12,14
123:8
**crowds** 43:6
**crucial** 105:13
**cullen** 2:19
**current** 41:9
53:25 57:6,16
101:25 104:19
115:5
**currently** 50:9
56:7
**cusp** 8:10
**custodial** 68:16
68:19 71:10
73:4
**custody** 68:8
69:20

**customarily** 24:22

**customs** 20:8

**cuts** 84:20

**d**

**d** 4:1 5:1

**damage** 47:19

**danger** 36:11 37:9 90:23 105:7

**dangerous** 54:1 83:15

**data** 38:21

**databases** 96:2

**date** 6:5 88:19 117:2 133:13

**david** 2:10

**day** 43:1 129:14

**daycare** 121:5

**days** 53:4

**dc** 2:23

**deal** 53:2 68:15 101:4

**dealing** 11:14 33:18 79:14 100:19

**deals** 72:10 87:23

**dealt** 62:3

**death** 54:6

**debate** 63:17 116:20

**debated** 14:22

**debating** 30:11

**decades** 82:7

**december** 34:14 41:14

**decide** 16:8,17 52:9 94:20

**decided** 29:23 41:15 54:9 72:6 89:8 103:6

**decides** 37:12 41:21

**deciding** 52:5

**decision** 11:7 17:10 20:23 49:23 67:1 125:19 126:21

**decisions** 14:9 14:11 48:1 65:13 126:11 126:12

**declaration** 85:1 124:3 130:19

**declarations** 128:13,17

**declare** 59:22 62:24

**declared** 71:16

**declares** 79:20

**dedicated** 60:25

**deemed** 5:17,25

**deeming** 105:22

**deer** 78:12

**default** 15:15 17:12,13,16 19:17 20:2,20 20:21 21:23 22:4,19,22,25 23:2,5,8,14 24:20 33:5 74:21 75:8 80:3

**defect** 94:22,23 95:1

**defendant** 100:21

**defending** 70:2

**defense** 18:7 36:11 37:9 47:21 55:1 58:7,13 66:22 67:5,13,22 71:23 85:18 96:23 99:21 103:21 109:2 109:22

**defer** 81:9

**define** 118:17 118:19

**defined** 59:21

**defining** 58:11

**definite** 91:5

**definitely** 31:7

**definition** 37:12 119:12

**defray** 44:4

**degree** 107:25

**degrees** 68:22

**deliberating** 63:5

**deliberations** 109:9

**demand** 95:16

**demanding** 94:1

**democracy** 29:18 63:4 122:13

**democratic** 45:25 49:14 109:9 122:6

**democrats** 23:8

**demonstrate** 52:24 59:6

**demonstrated** 8:17 44:8

**demonstrates** 47:4

**demonstration** 43:2

**denied** 39:16

**denying** 93:10

**depart** 117:22

**departing** 89:11 119:13

**department** 38:25

**departure** 117:6,18,22 118:8,10,13 119:19

dependent
  16:22
depends  16:11
  20:8 35:6
  86:13
deposit  40:6,11
  40:21
deposited  41:4
describe  32:2
described
  10:17
description
  13:11 95:5
design  96:24
  100:7
designate  41:22
  48:17
designated
  21:6 41:5
  47:18 49:20
designating
  34:9
designed  58:19
  96:2 123:18
desires  21:19
detail  61:20
detector  20:14
detectors  83:22
  107:16 114:14
  114:18
determination
  8:5
determine  5:17
  6:19 39:24

determined
  43:15 67:23
determines
  6:13
detrimental
  32:13
devastating
  54:18
developed
  27:15
development
  8:18 130:24
dicta  118:1
dictate  19:24
difference
  26:14,21 32:23
  79:25 81:22
  108:23 109:15
  123:19
different  9:11
  9:12 11:13,14
  11:15,15 15:23
  23:9 27:17
  29:6,7,9,10
  33:14 34:21
  35:4,6 38:15
  40:24 43:14
  44:7,20 47:12
  48:8 59:7 60:6
  62:22 65:6
  68:6 70:5 71:3
  74:17 75:12
  80:18 83:25
  87:22 88:16
  96:2 97:6

98:22,23
  112:16,16,19
differentiated
  60:1
differently  80:5
  81:8 98:17
difficult  38:24
  39:8 64:7
digitized  28:16
directed  27:3
direction  28:23
  99:17
directly  67:12
disagree  18:10
  24:15 25:1
  128:15 129:13
disaster  47:20
discard  66:24
discharge  56:8
discreet  43:14
  43:16 71:22
  88:15,18
discrete  114:13
discretion  36:4
  92:19 93:10
  94:4,19
discretionary
  37:11 90:20
  96:8
discrimination
  93:6
discriminatory
  93:4
discussed  14:23
  27:22 31:20

96:18 122:17
discussing
  110:16 112:22
discussion
  83:25 90:21
  98:23
disorder  43:21
disproportion...
  101:11
disputed  19:15
  51:21
disregard
  66:19
distinction
  26:14 91:4
distinctly  35:5
distinguishable
  48:2
distinguished
  91:5 104:4
distinguishing
  67:19
distributed
  22:1
district  1:9,17
  1:24 2:5 70:6
  70:21,22 72:20
  127:16
divide  58:1
divorce  21:25
doctrine  128:6
doesn't  42:1
doing  8:9 28:16
  44:14 61:5
  62:7 68:11

74:10 80:2 96:14 99:9 118:17
**dollar** 45:7
**don't** 25:15 26:20 102:19 118:23 128:5
**doorbell** 20:12
**doors** 114:18
**doorstep** 20:12 80:15
**dozen** 74:3
**draw** 58:15 81:24 88:3
**drew** 47:23 91:4
**drink** 90:25
**drinking** 27:9
**drive** 101:19 129:20
**drugs** 37:10
**dubious** 112:25
**ducks** 83:17 84:5
**due** 107:22
**duke** 3:4
**duty** 118:25 119:3
**dykman** 2:19

**e**

**e** 3:2 4:1 5:1,1 133:1 134:3 135:3
**earlier** 7:11 19:2 24:1

**early** 29:14,15
**ears** 30:4
**easier** 109:3
**easily** 8:22,22 28:9 101:24
**easy** 100:10
**educate** 82:10
**educational** 77:13
**effect** 31:25 55:23 130:25
**effectively** 53:18
**egress** 114:13
**eight** 13:21
**either** 7:20,21 10:4 25:21 30:17 36:1 41:22 53:9 54:6 56:9 88:25 93:4 104:24 115:16 119:7,16 128:22
**elderly** 46:24
**election** 121:23
**else's** 17:9 18:8 18:19 19:5,12 22:11 98:5
**emphasized** 58:9
**enable** 111:2
**enact** 9:21 23:25 27:6

**enacted** 5:22 6:25 8:10 9:7 10:2 12:14,19 24:11,14 30:14 98:25 116:10 120:21 121:9 126:5
**enacting** 6:2 14:22 99:13 116:4
**enactment** 23:6 30:19 116:9
**enactments** 8:1 27:10 32:21,22
**enacts** 23:6
**enclosed** 26:16 26:19 78:2,5
**ended** 86:3 90:23
**endorsed** 36:14 37:25 49:15,22
**ends** 63:22
**endures** 38:13
**enduring** 13:20
**enforce** 25:22 25:24
**enforced** 16:11 25:6 75:18 85:17
**enforcement** 115:17 119:6
**engage** 36:10 37:8 73:22 77:13 78:17,21 100:1

**engagement** 18:2
**english** 19:11
**enshrined** 46:2 82:16
**ensure** 54:12 61:3 77:14 83:16 95:21 105:24 107:17 108:7,21 109:14 114:14 115:3,15 129:24
**ensured** 94:24 115:12
**ensuring** 84:3 92:2 119:4
**enter** 24:21
**entering** 26:18
**entertainment** 88:19
**entick** 19:10
**entirely** 21:10 27:9 31:8 44:11 120:18 120:24 121:8 126:9
**entities** 108:7
**entity** 108:21
**entrance** 19:4 107:16
**entry** 88:21
**enumerated** 16:4 28:8

**environment**
   111:22
**envisioned** 55:2
**equal** 84:21
**equally** 8:5
   70:4 101:5
   131:18
**equities** 51:3
**equivalent** 78:5
**era** 6:23 7:25
   9:24,25 52:25
   56:18 57:13
   62:17 78:9
   110:9 111:9
   118:15
**eras** 125:7
**erin** 3:2 58:4
**especially**
   23:21,24 24:11
   28:24 31:12
   38:18 61:25
   66:7
**espinoza** 117:7
**esq** 2:15,19,22
   3:2,2
**essentially**
   58:20,24 67:12
   68:9 79:20
   89:10 97:1
   99:5
**establish** 30:2
   69:13 112:11
**established**
   7:17 97:14

**establishes**
   91:18,21
**establishment**
   80:2
**establishments**
   77:18,18 79:23
**estimable**
   43:15
**estimated** 43:9
**et** 1:4,12,15,20
   1:23 2:2,5,6
   117:3 120:3
   127:4 134:1,1
   135:1,1
**european**
   111:22
**evaluate** 11:16
**evaluated**
   42:15
**evaluating**
   81:24
**event** 43:10,14
   43:16 69:10,16
   106:22
**events** 43:9
   69:23 70:19
**everybody** 39:2
   56:19,19 86:1
   87:20,20 91:17
   99:3,18 102:4
   114:14
**everybody's**
   76:17
**evidence** 5:24
   6:22 7:5,7,10

9:1 10:2,24
   11:3,20 13:7
   13:19,24 14:16
   14:25 18:24
   23:22 31:3,4
   31:10,20,20
   32:1,5,6,24
   55:5 77:25
   121:18
**evince** 14:2
**eviscerate**
   58:12
**evolution**
   100:16
**evolved** 100:24
   102:3,15
**evolves** 116:21
**exact** 53:20
   57:4,5 64:25
**exactly** 9:17
   12:10 15:3
   22:20 24:16
   41:13 48:15
   99:17 130:6
**example** 8:6
   12:5 21:21,24
   21:25 22:5
   24:6 26:6
   35:10 38:16
   53:8 71:6 88:6
   103:18,23
   104:22 106:22
   108:5,10 111:8
   115:11 117:18
   122:1 124:6

126:20
**examples** 7:6,9
   13:3,3 14:22
   27:3,10 57:14
   60:12 111:10
   115:5 118:7
   127:12
**except** 23:8
   51:20 58:20,24
   88:24 113:25
   115:16
**exception** 59:4
   79:19 102:5
   125:24,25
**exceptional**
   58:10 59:8
**exceptionally**
   72:8 97:4
**exchange** 48:13
**excited** 106:22
**excitement**
   107:25
**exclude** 16:23
   18:20 23:15
**exclusionary**
   38:9
**excuse** 99:9
   104:14
**executing**
   121:22
**executive** 55:23
   131:4
**exercise** 15:21
   38:4 42:2 45:1
   55:21 56:2

63:13 71:23
73:23 74:11,15
75:20 76:22
82:5 90:14
91:6 96:24
97:3 98:7,20
100:2 102:18
103:5
**exercising** 36:3
63:9 103:11
122:13 123:9
123:15,18,23
**exhibitions**
14:14 125:2
**exist** 35:9 45:24
48:7,9,11
60:22 79:4
86:14,17
115:11 130:1
**existed** 35:3,8
35:13 48:9
56:18 62:14,18
88:3
**existence** 47:6
48:16
**existing** 7:18
7:19 112:23
113:1
**exists** 102:12
107:21
**exit** 88:22
**expanded**
110:14
**expectation**
19:21 20:2

74:22 75:9
77:2,5 80:4
114:1
**expectations**
20:8 21:19
**expected** 30:9
30:10,12
**expenses** 44:5
44:13
**experimentat...**
29:18
**expert** 56:6
130:20
**expired** 8:24
15:24
**explain** 64:2
99:13
**explained** 8:19
13:18 79:10
**explains** 9:6
124:4
**explanation**
110:17
**explicit** 58:25
59:14
**explicitly** 58:9
78:11 103:4,7
105:16
**express** 19:12
22:11 24:5
58:25 75:4
79:13
**expressed**
101:12

**expressing**
63:15
**expressly** 13:22
58:11 103:9
**extend** 25:8
48:12 123:9,10
123:12
**extended** 24:21
**extent** 26:2
65:20 94:3
110:3
**extra** 97:24
**extrapolate**
13:14
**extrapolating**
14:17
**extras** 124:18

**f**

**f** 133:1
**face** 78:24 95:8
98:15,19 104:9
**facial** 39:13,14
93:25 94:13,18
94:22,23 95:1
130:18
**facially** 93:25
**facilities** 68:15
72:1,3,9,10,14
88:19
**facility** 69:2,10
72:22
**facing** 103:23
**fact** 7:13 12:9
12:12 39:8
47:10,23 53:16

54:14 77:3
82:13,18 87:4
100:1 106:16
107:11 108:22
113:19 120:19
121:13,25
122:10,12
125:16 127:4
128:19 129:17
129:22,25
130:19
**factories** 47:11
**factors** 5:14
50:13,23 51:4
**facts** 9:4 51:19
51:21 91:6
**factual** 61:17
**failed** 50:15
**fair** 11:10
**fairmont** 84:9
**fairmount**
12:17
**fairs** 7:23 8:4
48:14,17,19,20
62:4 114:3
116:1 121:10
131:19
**fall** 36:5 65:21
**falls** 11:20
17:19
**false** 127:14
**familiar** 5:20
**families** 12:8
48:22

| | | | |
|---|---|---|---|
| **far** 6:9 89:22 | **finished** 57:20 | 73:18 79:24 | **fit** 30:5 58:1 |
| **farmer's** | **fire** 87:12,14,14 | 82:9 83:9,11 | 88:1 123:25 |
| 123:10 | **firearm** 5:19 | 83:16 85:2,5 | 124:22,25 |
| **farms** 47:25 | 24:4 41:3 | 85:23 86:2 | **fits** 71:25 |
| **fathers** 110:22 | 43:20 47:21 | 88:12 92:3 | **five** 5:10 |
| **favor** 11:20 | 58:22 67:8 | 97:11 101:23 | **flat** 30:14 41:2 |
| 34:4 | 73:24 76:6 | 103:18,20,23 | **flaw** 100:7 |
| **feature** 63:1,6 | 79:14 81:15 | 103:24,25 | **flint** 53:5 |
| **features** 5:21 | 85:4,12,14,17 | 104:17 105:2 | **flip** 20:21 99:24 |
| **federalism** | 87:11,19,19 | 106:8 107:6,15 | **flips** 17:4 |
| 10:24 11:12,16 | 88:22 91:12 | 107:18 108:20 | **flooded** 8:24 |
| **fee** 41:2,2,12 | 92:4 96:5,10 | 109:14,20 | **floor** 63:6 |
| 42:2,14 43:1 | 96:15,23 98:21 | 112:4 114:8,22 | **florida** 27:13 |
| 44:3 94:16,20 | 99:19,21 105:4 | 115:3,13 | **flouting** 14:1 |
| 94:24 96:20 | 106:11 107:12 | 121:10 124:19 | **flow** 51:8 |
| 97:6 | 109:11 113:17 | 125:2,10,15 | **fly** 102:19 |
| **feel** 47:16 | 113:19 114:15 | 127:3 129:18 | **focus** 5:12 8:19 |
| **fees** 97:13 | 115:15 117:21 | **fires** 88:8 | 8:21 23:23 |
| **fell** 65:21 | 118:22 119:5,7 | 109:11 | 49:21 111:3,12 |
| **fewer** 13:2 | 129:20 | **firms** 47:24 | **focused** 26:15 |
| **fiction** 98:11 | **firearms** 5:23 | **first** 7:5 13:13 | 27:7 71:9 |
| **figure** 71:4 | 7:9 8:23 9:9 | 13:18 16:2 | 72:14 |
| **fill** 32:9 | 12:10,19 14:13 | 22:12,14 23:1 | **focusing** 5:13 |
| **film** 123:12,24 | 15:18 16:24 | 25:16 30:19 | 32:2 |
| 124:1,3,4,11,24 | 17:23 20:6 | 34:3 40:25 | **folks** 15:15 |
| **finally** 128:8 | 21:12,13 27:9 | 47:14 50:12 | **follow** 53:15 |
| **financial** 53:22 | 29:2,5,22 | 51:1,7 63:9,13 | 61:4 95:9 |
| 54:10 57:2,15 | 32:22 33:21 | 65:16,19 84:15 | 98:17 |
| 96:17 129:25 | 35:13,17 38:20 | 95:2 99:12 | **followed** 12:17 |
| **financially** | 42:19 43:13 | 112:19 121:2 | 112:6 |
| 54:18 | 44:16,19 47:6 | 123:15 124:23 | **following** 50:13 |
| **find** 55:19 | 47:7 58:8 | 124:25 127:25 | **foot** 124:9 |
| 90:13 118:16 | 60:25 61:3,6 | 128:7,10,16 | **footnote** 69:23 |
| **fine** 85:20 | 64:7 70:25 | 129:14 | **force** 51:11 |
| | 71:18 72:23 | | 62:6 97:20 |

**foreclosing**
28:20
**forefathers**
12:25
**foregoing**
133:4
**forever** 84:17
**forfeited** 69:22
**forget** 41:2
**form** 35:4
36:21 37:6
95:6,11,11
126:24 128:3
**forms** 41:6
**forsyth** 127:25
**forsythe** 94:11
**forth** 50:14,20
50:21
**forward** 12:2
60:3 62:15
66:14 82:20
100:2
**found** 6:3
**founders** 19:13
**founding** 6:23
18:25 19:1,3
24:7 35:17
62:17 64:5
88:18 103:22
106:6 110:3,9
110:21 113:3
113:13 115:12
117:11 119:16
119:17

**four** 35:23,23
36:2 37:6 39:4
51:4 64:23,23
65:5 90:9
93:22 119:14
128:2
**fourth** 38:9
**frame** 64:11
117:8
**free** 67:25
70:16 75:25
106:16 114:11
115:2 127:23
**freedom's**
111:10
**freedoms** 50:19
50:21
**freeholders**
93:6
**frenzy** 28:1
**frequent** 79:22
**frequently** 59:6
**friend** 84:7
**friends** 16:21
37:3 90:16
**front** 75:5
90:12,13 93:3
**frontend** 99:4
**fulfills** 46:4
**full** 54:11
**functions** 63:3
**fund** 41:5,6,16
83:21 97:24
98:16 101:7

**funded** 97:20
**fungible** 41:21
**future** 41:22

**g**

**g** 5:1
**gatekeepers**
112:4
**gather** 12:6
48:22 63:16
84:17 100:5
123:11
**gathered** 12:8
**gathering**
47:18 122:5
**gatherings**
14:13 116:1
121:11
**gathers** 74:14
**gaudio** 1:4
**general** 1:7,9
1:15,16,17,23
2:5,15,16 5:5,5
41:5 50:7,8
55:8 58:12
65:14 73:16,21
76:3 77:16
85:23 97:10
112:2 114:24
134:1 135:1
**generality**
59:20
**generally** 56:20
65:23 66:3,5,8
68:20 74:9,14
75:21 77:23

80:16 87:25
101:7 113:9,14
115:25 122:1
122:23 126:24
**generate** 44:9
**generated**
43:23
**genuine** 113:6
**geographically**
116:6
**georgia** 14:10
67:2 118:22
122:16,22
**gesture** 66:20
**getting** 18:21
42:25,25 57:20
63:22
**give** 38:16 50:3
57:11 58:1
111:8 131:9
**given** 13:11,11
77:2 109:7
125:16
**gives** 17:7 76:1
76:23 94:19
**glean** 47:8
120:20
**go** 7:23 9:2,3
10:22 15:21
18:7 21:1
22:10 28:23
38:25 39:1
40:1 51:15,16
51:18,22 52:7
52:8,8,20

54:21 58:20
59:6,9,11
60:23 63:14
64:14 65:13
67:23 76:4
79:21 81:1,17
83:18 84:25
85:9 98:15
99:5 104:13
116:18 122:24
127:6
**goal** 25:24
36:24 46:4
**goals** 130:2
**goes** 21:24
45:24 67:17
79:2 98:11,12
101:21 107:4
**going** 5:7 18:19
19:24 20:25
25:8 28:7
30:17,19 33:5
40:16 41:1,15
42:12 43:6
44:10,17 47:7
51:10 52:6
62:5 63:3
65:24 68:24
71:20 73:15
78:17 79:21,22
80:21 82:14
83:20,21 88:13
88:24 90:23
95:22 99:21,22
99:22 100:1,12

100:16 101:9,9
101:10 102:18
104:1 106:14
107:23 108:6
108:21,23
109:17 113:16
114:11,12
115:15,16
118:16 119:5,6
128:3
**good** 5:2 50:5
58:2 90:8 92:9
102:23 108:24
**goods** 48:13,23
**gorsuch** 29:16
**gotten** 60:12
**government**
21:25 22:6,18
22:25 23:6,7
23:10,13 32:8
36:3 41:7
60:23 62:7,24
63:3 68:2
83:21,21 87:5
105:13,17,20
105:21,23
106:9 107:15
107:24 108:4
108:13,17
109:13 111:14
114:5 115:5,12
115:14 118:20
121:5,6,16
122:12

**government's**
21:18
**governmental**
63:4
**governments**
20:19 21:22
**governor** 131:4
**governor's**
55:22
**governs** 45:15
**grandmother**
37:22
**grant** 61:9 80:8
**great** 21:24,25
35:10 94:15
101:8
**greater** 82:25
87:14 103:8
105:7,9 109:18
109:22
**grounded**
123:3
**grounding**
117:11
**grounds** 12:1
24:22 97:7
**guarantee**
108:17
**guaranteed**
108:17
**guardrails** 95:4
96:7 97:14
**guards** 121:4
**guess** 46:7 57:7
69:5 73:13

75:14
**guidance** 37:13
**gun** 54:15,16
78:16 106:16
114:11 115:2
121:7
**guns** 25:18,19
32:16,18 49:9
51:11 54:3,5
78:13 84:9
90:18 105:23
105:24 108:6

**h**

**hackensack**
2:20,20
**hampshire**
2:23
**hamstring** 6:2
**hamstrung**
21:20
**hand** 55:20,22
55:22 109:2,3
**handful** 64:24
**handgun** 58:7
109:3
**handguns**
103:9 104:5,6
108:25 109:1
**handled** 102:2
**hang** 68:23
**happen** 108:21
**happened** 8:25
9:17 30:13
**happening** 45:4
45:10 48:25

109:10

**happens** 63:17
63:17,18,18,19

**happy** 73:21
120:9

**hard** 39:18
59:24 81:1

**hardinez** 20:7

**harm** 37:24
38:7 51:8 53:4
53:22 99:22
100:17 128:3
129:10

**head** 60:25
99:24

**health** 72:11
96:1,4,14

**healthcare** 72:2
72:3,8

**hear** 121:17

**heard** 59:20
120:17 122:3,7

**hearing** 5:3
41:19 132:6

**heckler's** 82:4

**heightened**
28:1 66:6,9
68:2 73:5
78:15 105:17

**heirs** 23:16

**held** 22:21
50:18 75:21
92:10 94:21
107:12 113:20
113:23 127:2

**heller** 10:3,13
10:14,18 15:2
31:14 38:18
46:1 67:17
82:7 108:25
112:22,25

**help** 68:13
82:11

**hesitate** 35:12

**high** 11:25
14:23 59:19
107:22,25,25
109:10 118:25

**higher** 105:5

**hill** 14:10 67:1
118:21 122:18
122:20,23
127:9,9

**hist** 34:3

**historians**
28:15

**historic** 30:2
46:25 52:21
53:13 58:15
86:23 89:3

**historical** 5:22
6:1 7:9 8:16
9:4 12:21,24
14:2 18:22
26:5,8 27:3,15
34:3 39:22
41:8,10 45:11
49:24 52:24
58:10 59:25
61:21 65:10

66:11,13 72:20
72:21 77:25
79:1,8 81:2
82:23,24 83:14
84:6 85:11
86:10 87:5,6
89:12 92:8
93:7 99:8,16
102:11,12,12
102:21 105:14
113:8 116:15
117:6,10,18,22
120:20 121:18
121:24

**historically**
38:22 39:22
40:25 48:1,21
49:11 59:21
64:9 77:25
81:4 89:9 93:2
97:9 110:2
116:12 122:1
129:22

**history** 5:16
8:12,15,16,22
18:21 21:22
23:21 28:16
30:5 31:21
36:23 38:19
42:3,6 45:3
47:3 49:20
53:8 73:2
75:16 76:25,25
81:25 95:20,25
96:3,4 99:13

100:13 101:21
105:15 109:25
120:17,20
121:1 123:4,13
123:14 131:13
131:17

**hit** 120:25

**hold** 51:5 109:2

**holder** 40:6,11
40:14

**holders** 54:12
55:6

**holding** 92:11

**home** 15:20
18:7,7,17
19:20 73:11
80:2 85:5

**homeowners**
55:6,13 130:21

**homes** 22:23
26:13 71:7

**honor** 6:15 7:3
10:7 14:17
22:14 25:2,11
27:1 28:10,15
28:20 29:8,13
30:7,24 31:8
31:23 32:12,17
34:2,18 35:22
36:18,22 37:5
37:19 38:5
39:14 40:8,14
40:23 43:25
46:14 48:15
123:13 126:20

**honor's** 24:13
**honorable** 2:9
  2:10,10
**honors** 6:21
  42:8 46:8 50:1
  50:5 58:3
  102:24 120:16
  125:4,11,12
  131:11
**hook** 129:9
**hope** 61:4
**hospital** 73:11
**hour** 25:9
**house** 21:11
**hubs** 51:20
**huge** 65:1 79:5
  90:19
**hughes** 2:17
**huh** 52:16
**hundreds** 54:1
  54:2
**hunted** 24:22
**hunting** 78:21
  85:14,24
**huntley** 107:11
  113:18
**hypothetical**
  40:4 45:16
**hypothetically**
  81:14

**i**

**i.e.** 19:4 46:4
**idea** 19:11
  27:24 75:8
  82:24 86:10

91:14 123:8
**ideas** 47:22
**identical** 5:23
  14:8,8 48:5
**identified** 7:7
  13:21 53:3
  64:22 93:3
  115:20
**identifies** 37:17
  58:20
**identify** 11:17
  12:23 15:23
  63:1 89:1
  92:17
**illness** 38:19
**illogical** 126:10
**imagine** 38:22
  39:18 130:13
**immediately**
  30:16 38:7
**immemorial**
  84:17
**impacts** 38:10
**impermissible**
  93:11 100:1
**impinge** 38:8
**implemented**
  95:12
**implicate** 22:25
  23:2 24:22
  75:23
**implicated**
  23:12 50:22
**implicates**
  17:21

**implied** 19:22
  19:22 20:4,7
  20:11,13,18
**import** 57:6
**importance** 6:6
**important**
  16:19 45:18
  54:14,15 104:2
  111:9,14 113:9
  122:13 123:9
  126:1
**importantly**
  5:24
**impose** 36:11
  53:6 57:13
  58:5 78:15
  79:7 97:13
  129:24
**imposed** 44:4
  53:13,23 55:20
  61:23 98:2
**imposing** 66:6
  102:13
**imposition**
  106:10
**impossibility**
  128:24
**impossible**
  12:22
**improved**
  26:16 78:2,5
**improvements**
  26:19
**inability** 33:22

**inaction** 10:23
**include** 20:18
  21:11
**included** 24:8
  97:11
**includes** 17:22
  23:6 74:13
**including** 11:23
  12:17,18 24:2
  27:13 35:17
  72:4 80:22
**incompatible**
  47:6
**inconsistent**
  65:2 84:5
  95:16
**incorporated**
  117:13,15
**incorporation**
  6:12 126:18
**incorrect** 42:10
  118:5
**increase** 44:17
  129:1
**increased**
  97:19,20
**incur** 44:13
**indecent** 112:5
**indicated** 110:1
**indicating**
  55:16 117:20
**indication**
  78:23
**indicative**
  27:18 31:18

41:23
**indiscernible**
37:18 55:20
89:25
**individual**
10:19 24:4
31:17 53:25
56:13 126:23
**individuals**
28:5 38:19
47:16 95:10
103:8 119:3
**industrial**
80:23
**industry** 56:5
**infirmed** 46:24
**inflation** 45:9
45:10
**inflict** 101:24
**inflicting** 53:4
**influenced** 7:14
**influential** 8:5
**inform** 26:2
118:13
**information**
37:23 91:7,11
127:19,21
**infringed** 22:6
**infringement**
20:24
**infuse** 9:14
**infused** 7:25
**ingress** 114:13
**inherent**
129:19

**inherently** 63:3
**initial** 21:1
**injunction** 5:14
50:10,16,25
51:2,17 52:6,8
52:15 127:17
**injunctions**
131:23
**injure** 56:13
**injured** 54:13
54:17
**injuries** 54:6
**injury** 39:10,19
56:9 101:24
**innocent** 98:4
**innovations**
130:5
**inquiry** 39:2
90:23
**inside** 18:6,17
76:2 84:4 85:4
85:22,23,24
87:21
**install** 83:20
**instance** 65:4
**instructive**
109:24 111:7
**instructs** 118:7
**insurance** 5:15
46:7 50:11
52:18,21 54:11
54:23 55:7,7
55:11 56:5,6
99:1,10,11
100:11,18

101:1,17,25
102:1,7 128:8
128:14 129:17
130:1,19,20,22
130:22 131:3,5
131:7
**insure** 99:6
**insured** 54:17
129:10
**insurer** 131:7
**insurers** 55:23
**intemperate**
91:3
**intending**
56:13
**interest** 39:11
42:19 67:23
101:13
**interesting**
111:20 118:20
**interests** 42:16
67:14
**interfere** 53:17
**interpret**
116:11
**interpreted**
25:6
**interpreting**
62:3,12 63:24
**interrupt** 25:7
**intervenors** 1:9
1:17,24 2:5,20
**interview** 90:24
95:9 127:23

**interviews**
127:17
**intestacy** 21:23
**intoxicated**
27:3,7 29:2,5
33:19 106:23
107:2,2,25
**inured** 35:16
**invalid** 23:7
**investigate**
92:21
**invidiously**
93:4
**invitation** 20:5
20:6
**invited** 19:19
**inviting** 19:24
80:7
**involved** 22:22
46:22 53:9
**irreducible**
14:19
**irreparable**
51:8
**island** 88:16
**isolated** 116:6
**issue** 6:9,11
33:17,25 43:21
50:10,12 51:8
65:7 69:22
104:23 105:1
107:19 111:15
111:16 124:2
124:12 130:23

**issued** 50:17
51:2 131:4
**issues** 35:16
50:9 72:11
**italicized** 60:5
**item** 38:6
**items** 76:2
**i'm** 40:16

**j**

**j** 2:10,17,19
**ja** 112:3
**ja1001** 25:3
**jardines** 20:11
**jefferson** 111:5
**jehovah's** 43:2
44:7
**jersey** 1:7,7,8,8
1:15,15,16,17
1:18,23 2:5,16
2:18,20 20:18
21:19 22:8,10
23:22,23,24
25:2,17 27:18
33:7,11,13,15
34:12,17,20
35:13 36:2
38:24 40:10,10
41:18,25 44:23
44:24 51:23
54:2,25 58:18
64:21 71:16
72:6 77:1,5,12
77:15 78:3
79:4,8,11
101:6 103:3

104:4 134:1
135:1
**jersey's** 79:12
92:7 131:21
**job** 113:5
**john** 62:10
**join** 50:6
**joined** 92:16
**jones** 19:10
**jude** 56:20
**judge** 5:2,11
6:5 7:1,16 8:13
9:8,23 10:1,6,8
10:12 11:10
13:2 15:7,22
16:1,13,15
17:2,11 18:3,5
18:11,15 19:1
19:15 20:25
21:1,4 22:8,10
22:24 24:10,16
24:18 25:4,7
25:15 26:23
27:2 28:6,8,12
28:18 29:1,11
30:1,3,21,25
31:19 32:7,16
32:18,25 33:4
33:10,14,17
34:11,16,22,23
35:20,23 36:16
36:19 37:1,11
37:18 38:2
39:13 40:1,3
40:10,16,18,20

41:25 42:21
43:8 44:20
45:6,13 46:10
46:12,15,18,21
48:12 49:2,4
49:25 50:2
51:13,14,15,16
52:3,5,16,17
53:8 54:19,20
54:21,22,25
55:9,11,16
56:11,25 57:3
57:7,17,18,21
57:23,25 58:14
60:11,14 61:8
61:10,15 63:8
64:10,13 65:6
66:19 67:25
69:4,21 70:9
70:11 71:5,21
72:1,24 73:6,8
73:10 74:18
75:2,7 76:4
77:2,9 79:3,25
81:9,13 83:3,6
84:7 86:6,8,20
86:23 87:2
88:5,15 89:2
89:15,18,24
90:5,9 91:10
91:25 92:8
93:19 94:3,7
95:5,19 97:16
98:10 100:4,13
101:14,16,20

104:12,14,16
105:25 106:4
106:18,20
107:20 108:9
108:11,13,15
110:7,17,19
111:2 112:12
112:14 114:17
115:4,9,23
116:3,10,17,23
117:1 118:6
119:8 120:11
120:13 123:6
123:22,24
124:13,20,22
126:15,17
128:17 129:2,5
130:7 131:9,25
**judges** 2:11
**judgment** 36:4
49:10,20 88:6
91:7 98:3
**judgments** 47:5
**jurisdiction**
66:11 81:11
83:9
**jurisdictions**
66:5
**jury** 121:22
**justice** 2:17
20:10 25:20
29:15,16 53:21
57:11 112:23
114:1

| | | | |
|---|---|---|---|
| **justices** 25:24 | 103:1 111:22 | 55:17 56:22 | 97:5,8 98:3 |
| **justifiable** | 112:1 113:10 | 58:19 59:12,21 | 99:5,25 100:8 |
| 34:19 36:9 | 123:3 127:21 | 59:25 60:4,16 | 100:17,18,21 |
| **justification** | 131:5 | 61:2,17 62:5,9 | 101:2,6,9,21,22 |
| 68:6 72:24 | **kinds** 15:23 | 62:18,21,23 | 101:23,23,25 |
| 73:1 98:23 | **king** 62:6 | 63:6,10,17,21 | 102:14,14,16 |
| **justified** 59:15 | **king's** 7:24 | 64:4,4,8,17,20 | 104:17 106:15 |
| 69:5 | 62:6,13 | 65:4,8,20,22 | 106:22 107:22 |
| **justify** 76:24 | **kirk** 2:22 | 66:15 67:9,22 | 115:5 119:10 |
| 97:7,24,25 | **knew** 56:19 | 68:9,10,14,19 | 120:6 121:25 |
| 110:11 | **knight's** 62:11 | 68:21 69:1,13 | 122:5 123:6,8 |
| **k** | **know** 11:13,13 | 69:14 70:3,19 | 124:8 125:5 |
| | 11:14 12:3,4 | 70:22 71:16 | 127:9,14 |
| **k** 2:10 | 14:18,19,21 | 73:11,14,16,19 | 130:11,25 |
| **keep** 49:21 | 15:3,15,16 | 74:1,2,4,10 | **known** 39:2 |
| **kentucky** 27:13 | 17:17 18:13,21 | 75:9,15,17,22 | 43:23 |
| **key** 30:8 63:4 | 19:17,23 20:6 | 75:24,25 76:11 | **knows** 37:23 |
| 103:1 | 20:14 21:22 | 76:16,19,24 | **koons** 1:4,20 |
| **kids** 73:12 | 22:3,17 23:23 | 77:4,12,14 | 2:23 5:4 61:20 |
| **kind** 6:7 8:25 | 25:12 26:12,15 | 78:11,21 79:9 | 102:25 121:3 |
| 11:8 14:20 | 26:20 27:12,22 | 79:15,18,21 | 134:1 135:1 |
| 30:18 35:17 | 28:3 29:14,15 | 80:8,13,17,24 | **krause** 2:9 5:2 |
| 37:25 38:3 | 29:15,15,17 | 81:5,14,17,18 | 5:11 6:5 7:1 |
| 48:23,25 54:20 | 31:24 32:9,19 | 81:21 82:10,12 | 9:8 11:10 13:2 |
| 54:22,24 61:16 | 33:6 34:5 | 82:17,25 83:19 | 15:7,22 16:1 |
| 62:4 63:4 | 35:24 36:1 | 83:21 84:21,23 | 19:15 21:5 |
| 67:17 68:7,18 | 37:7,10,14,15 | 84:25 85:3,6 | 25:7 26:23 |
| 69:15 71:2,10 | 38:4,13,21,23 | 85:21 86:7,15 | 27:2 32:25 |
| 71:11 73:4 | 41:6,20 42:8 | 87:8,16,18,24 | 33:4,10,14,17 |
| 74:6,18 75:18 | 42:12,12,25 | 88:21,24 89:10 | 34:23 40:1 |
| 79:16 80:25 | 43:17 44:23 | 89:13,15,21,22 | 45:13 46:10,12 |
| 81:5,6 83:2,10 | 46:8 47:17 | 90:13,25 91:23 | 46:15,18,21 |
| 84:20 86:8 | 48:8,8,13,15,16 | 92:20 93:7,10 | 48:12 49:25 |
| 88:2,21 92:21 | 48:22,24,24 | 93:12 95:10,15 | 50:2 51:13,15 |
| 92:23 95:13 | 51:20 53:10 | 96:1,10,13,17 | 52:17 53:8 |
| 96:8,9 99:12 | | | |

54:19,21 55:9
55:11,16 57:18
57:21,23,25
58:14 60:11,14
61:8,10,15
63:8 64:10,13
66:19 71:5,21
74:18 75:2,7
76:4 77:2,9
79:25 81:9,13
83:3,6 88:5,15
89:15,18,24
90:5 93:19
94:3,7 95:5,19
100:4,13
101:14,16,20
104:12,14,16
105:25 106:4
106:18,20
110:7,17,19
111:2 112:12
112:14 114:17
115:23 116:3
116:17,23
117:1 119:8
120:11,13
123:6 129:2,5
131:9,25
**krause's** 8:14
19:1 21:1

**l**

**l** 133:3,10
**laboratories**
29:18

**lack** 32:24
**laid** 15:13
**land** 19:5 21:9
24:4 26:19
78:2,3,3,16
**lands** 78:3,6,6
78:10,10,20
79:15
**language** 8:4
25:20 26:10
31:24 32:2
104:3 112:5,24
113:1 118:1
127:10
**large** 6:11
20:15 48:9
87:13 125:15
**larger** 13:5
**lasted** 12:15
**late** 6:10
117:10
**laughter** 46:20
**laundry** 72:4
**law** 7:24 10:5
14:20 15:17
19:3 20:7,19
20:20,21 24:2
25:22,24 26:2
26:11 33:6,15
34:16 37:21
41:9,17,18
44:9 47:24
49:9 56:1
58:22 59:3,10
59:15,16 61:4

62:15,18,19
64:25 72:3,7
74:2,5 75:19
75:20,25 76:5
77:19 78:19,20
79:1,4,11 80:4
80:4,20,25
81:5 82:7 83:8
84:22 85:16
91:16,20 92:4
94:19,21 95:1
95:8,11,12,16
95:22 96:22
98:14,19,22,25
99:24 102:16
103:4,6,7,10,16
103:16,17,19
104:4,9 105:3
105:10 106:12
106:12,21,23
107:8 109:4,15
109:15,16,16
109:17 113:8
113:11,12,24
114:6 115:16
115:16 117:19
119:6,13,18
124:14 129:15
**lawful** 36:11
37:8 43:20
**laws** 5:17,19,25
7:13 8:20 9:6
13:16 14:2,5
14:20,22 15:4
15:23 24:8

31:25 32:9
50:22 56:12,15
56:17 57:12
59:21 61:21,23
62:13,16 64:2
64:3,6,6,21,23
64:24 65:1,1,5
65:21 66:1
75:18 77:25
78:1,2,9,10,13
78:23 79:15
80:10,11,18
87:12 88:20
91:11 93:2,4
97:9 99:15,18
104:22 106:7
112:16 113:8
116:4,8 117:9
120:2,5
**lay** 15:2
**lead** 71:20
**leaders** 53:6
**leads** 63:12,21
**leaflet** 22:17
**learn** 67:8
**learned** 129:14
**leave** 89:18
90:7
**leaving** 15:20
84:4
**led** 7:14 48:16
**leeway** 83:1
**left** 6:7 15:11
46:7 89:20

**legal** 15:1
  51:19 92:18
**legally** 54:3
**legislated** 72:19
**legislation**
  119:12,13
**legislative**
  10:23 60:21
  61:22 62:1
  63:5 68:1 88:6
  119:22 121:20
  122:14
**legislators** 6:24
**legislature**
  29:17 33:24
  41:14 48:6
  54:8,9 88:6
**legislature's**
  8:18 81:24
**legislatures**
  5:22 6:2 8:20
  9:5,18,24 10:1
  11:1,5,14 12:9
  18:23 26:11
  27:6,8 28:2,23
  29:3,4,10,17
  30:11 31:5,6
  32:22 34:7
  39:24 41:23
  47:4 48:1
  49:11,18,19,20
  49:23 81:10,22
  104:20 116:4
  121:9 125:5
  126:5 129:22

**legitimacy** 41:9
  46:1
**legitimate**
  106:20
**legitimately**
  43:13 109:12
**lenders** 22:5
**length** 122:19
**leon** 2:19
**lesser** 82:25
**lesson** 57:15
**lethal** 103:18
  105:3
**lethality** 9:11
**level** 8:11 10:4
  33:3 44:17
  59:20 128:23
  130:23
**liability** 54:13
  56:8 98:3 99:1
  99:4 100:16,17
  100:18,19
  102:2 130:1,3
  131:7
**liable** 102:4
**liaison** 3:2
**libraries** 34:5
**license** 19:22
  20:5,6,8,11,13
  20:18 24:20
  80:17
**licensing** 36:8
  36:14 92:20
  127:18

**light** 120:8
**likelihood** 51:7
  103:8
**likely** 36:10
  54:5 101:1
  127:7 130:15
**limit** 123:6,14
  128:20
**limitation** 11:4
  11:9 29:24
**limited** 67:13
  72:4 80:12,17
  80:22
**limiting** 30:17
  48:20
**limits** 5:18 11:1
  37:21 71:17
  72:18 79:23
  89:11 124:6
**line** 21:18
  67:25 115:18
  134:5 135:5
**lines** 47:23
  100:14
**list** 16:4 39:4
  72:4 74:5
**listed** 114:2
**listing** 39:11
**literally** 98:14
**literary** 14:13
  121:11
**little** 8:15 18:21
  45:17 68:6
  73:14 80:14,18
  83:25 90:7

92:22 96:9,16
  122:3
**lives** 87:21
**loaded** 85:12
  85:23 123:2
  129:20
**local** 69:20
  78:22
**locale** 75:10,13
**locality** 81:16
  81:19 82:1
  83:6,19
**location** 28:1
  47:7 105:24
  106:11,19
  108:18,19,20
  109:7 114:9,13
  119:1,5 123:20
  124:5
**locational** 67:3
**locations** 9:22
  15:24 26:24
  34:10 47:6,12
  65:14 66:4
  105:15 123:17
**loco** 68:7,18
  70:11 110:1,4
  110:10,23
  114:20 125:16
  125:20
**logic** 8:15
  10:25 75:24
  85:4 88:23
**long** 12:16
  20:22 34:11

60:10 69:2
72:1,4 74:5
120:9 124:9
**longer** 104:10
110:11
**longstanding**
14:2 24:9
131:20
**longstanding...**
8:9
**look** 9:15 10:20
11:11 19:9
35:14 38:21
42:12 43:5
44:2 46:4 48:1
51:4 52:7
58:19 61:19
62:20 63:8
64:1 65:13
66:13 67:4
72:16 74:2
80:17 85:9
88:11 93:2
96:8 103:15
104:25 110:2
111:18 112:2
112:25 116:11
116:23 117:24
118:15,16,18
119:24
**looked** 7:7,9
10:13,14,19
55:1 123:17
127:8

**looking** 6:12,12
8:9 13:9 52:19
61:19 64:11
74:20 100:15
112:10 113:2
122:12
**looks** 96:1
104:9
**lose** 32:20
**loses** 87:6
**lot** 16:11 27:21
35:24 60:23
70:3 73:10,12
80:9 84:13
90:25 91:3
96:15 104:22
107:4 109:1,7
112:6
**lots** 59:13
60:24 72:4,5
90:15
**louisiana** 10:18
26:6 27:13
31:13,14
**love** 76:19

**m**

**made** 15:10
29:16 30:15
31:5 47:9 48:1
48:6 49:11
50:24 53:11
58:5 60:4
69:21 70:23
82:23 113:12
121:21 129:1

**magnitude**
34:25 35:4
**maintaining**
44:13
**maintenance**
97:21
**major** 92:18
**majority** 55:5
82:18,20
**make** 29:10
42:22 44:21
45:17,21 46:6
47:5 48:3
49:11,14,18,23
50:4 61:5
102:16 108:23
113:16 114:10
114:15 115:2
115:20 119:5
121:5 122:4,6
122:8 124:6
125:12 126:2
127:15 128:8
128:24
**makes** 26:10,14
26:20 29:24
59:8 62:21
70:20 71:3
74:17 75:20
87:22 90:21
91:2 95:10
109:15 115:21
**making** 48:4
70:1,14 88:6
101:10 103:19

**male** 49:7
**mall** 22:17,17
76:18
**malls** 71:15
79:16
**mandate** 11:17
99:1,12,12
**manhattan**
88:16
**manhattan's**
88:11
**manipulate**
109:3
**manner** 107:6
114:4
**mariel** 3:2
**market** 2:16
3:6 8:24
123:10 130:24
**markets** 7:23
8:4 48:17,20
48:21 62:4
64:4 114:3
121:11 131:19
**mass** 9:9 83:7
104:17 105:2
**match** 110:14
**matches** 105:13
**material** 85:10
**materially** 29:6
**matter** 5:4 13:7
20:19 33:1
34:3 41:17
42:1,3 45:3
50:9 52:12,13

52:13 56:15
62:15,18 64:20
73:15 77:10,16
80:7 85:23
87:18 97:5
98:10,18 100:4
100:15 105:15
106:12 108:2
108:22 112:21
**matters** 29:12
33:2 64:19
106:12
**mayhem** 43:21
**mcdonald**
38:18
**mean** 9:13
12:11 15:12
18:22 19:15
32:7 58:18,21
59:13 60:5
61:10,19 62:23
63:15 64:5,25
65:4 66:20,23
68:21 69:19
70:13,19,23
71:9,13 72:9
73:9,13,14
74:2,3,24
75:15,17,19,22
76:15,16 77:12
78:7 79:5,9
80:9 81:12
82:4,15 83:24
85:4 86:13,13
86:22 87:4,23

88:10,18 89:5
89:21 90:12,15
90:23 91:1,4
92:1,5,7,13
93:13,25 94:10
95:8,11 96:18
97:9 98:6 99:1
99:10 100:13
100:24 102:3
102:14 110:7
115:7,9 118:12
130:2
**meaning** 7:17
43:12 117:15
**means** 43:11
78:17 85:21
87:5 100:22
**meant** 115:22
**measure** 44:4
**measures** 6:4
78:24
**measuring** 36:8
**mechanism**
53:5,21
**medical** 72:14
72:22
**meet** 39:7,8
**meeting** 110:20
**members** 92:16
**men** 123:2
**mental** 38:19
72:11 96:1,4
96:14
**mentioned**
121:1

**mentions**
109:25 127:10
**mere** 87:11
107:11
**merits** 5:12,14
51:7,18,23
52:8
**mess** 88:13
**met** 39:9 50:13
88:7 118:24
**metal** 20:13
83:22 107:16
114:14,18
**method** 46:3
**metlife** 8:6
**mexico** 27:11
30:22
**mid** 3:6
**middle** 9:17
**militia** 66:21,25
67:6,14,23
118:3 127:10
**mill** 68:23
**mind** 121:4
**mingle** 123:1
**minimum**
14:19 118:11
**ministers** 7:24
62:6,14 113:25
**minor** 81:6
**minutes** 5:10
16:1 25:10,12
44:21 50:3,4
58:1 89:18,19
89:23,24 90:2

90:4,8
**mirror** 91:11
**missed** 21:1
52:1
**mississippi**
41:1
**missouri** 14:10
121:12 125:14
**mistake** 103:3
**misuse** 87:18
99:6 105:7
107:6 113:16
117:21
**modern** 5:17
5:21,24 57:6
129:19 130:4
**moment** 11:24
76:15 126:6
**monetarily**
54:13
**money** 22:1
41:21,21,22,23
42:11,17 97:7
98:18 101:6
107:23
**months** 79:4
**morning** 5:2,4
50:5 52:14
59:20
**motion** 124:3
**motor** 101:17
124:3,3
**move** 21:22
**movie** 83:20,22

**movies** 71:15
**moving** 46:7
**municipal**
 64:25 116:7
 122:8
**municipality**
 21:8
**murdock** 42:9
 42:9,14,24
 44:1,8
**murphy** 3:2,3
 4:5 57:25 58:2
 58:4,17 60:13
 60:18 61:9,14
 61:16 63:12
 64:12,17 65:11
 66:23 68:5
 69:7,25 70:10
 70:13 71:8,24
 72:2 73:3,7,9
 73:13 74:24
 75:3,14 76:8
 77:8,11 79:5
 80:6 81:12
 82:2 83:4,13
 84:12 86:7,13
 86:22 87:1,3
 88:9,17 89:5
 89:16,21 90:1
 90:4,6,11
 91:15 92:7,9
 93:21 94:6,10
 95:8,24 97:23
 98:13 100:6,23
 101:15,18

102:3 120:18
122:5,11
128:11 129:13
**murphy's**
 126:8
**muster** 83:10

**n**

**n** 4:1 5:1 133:1
**n.j.** 2:16
**name** 35:9 37:8
 39:17
**named** 28:12
**narrow** 91:5
**narrowed**
 72:13
**narrower** 81:3
 81:6
**national** 3:5
 12:18 85:10
 86:2 111:24
**nature** 26:1
 46:22 71:10
 73:4 87:11
 88:2 92:3,13
 96:20 97:19
 116:12
**nazi** 94:12
**necessarily**
 14:6 27:23
 37:16 97:18
 124:25
**necessary** 6:4
 128:23
**need** 6:7 11:11
 12:23 32:8

33:3 34:19,19
35:4 36:9 38:3
43:24 49:21
51:6 52:21
59:23 66:14
67:7 76:24
82:22 94:8
96:6,6 100:20
103:7 109:22
114:10,10
119:9
**needed** 55:25
 70:4
**needs** 59:6 75:7
 103:2 105:10
**negligence** 54:7
 100:17 101:22
**neighbor's**
 21:11
**neighborhood**
 69:15 84:24
**neighbors** 37:3
**never** 11:4
 41:19 43:20
 62:10 89:9
 103:12 130:25
**new** 1:7,7,8,8
 1:15,15,16,17
 1:18,23 2:5,16
 2:18,20,23 9:9
 9:13,17 20:18
 21:19 22:8,10
 23:22,23,24
 25:2,16 27:10
 27:11,18 29:21

30:22,22,25
31:9 33:1,6,11
33:13,15,23
34:12,17,20
35:25 36:1,2
38:23 40:10
41:18,25 44:23
44:24 51:23
54:2,25 58:16
58:18,18 59:15
59:16 60:5,6,8
60:9 64:21
71:16 72:6
77:1,5,12,15
78:3 79:3,8,11
79:12 81:10,25
86:12,12,14,15
86:16,20,21,21
86:21,22,24,25
86:25 87:2,3
88:4,10 89:2,6
89:7 92:7,11
101:5 103:2
104:4,19
111:18,20
114:7 115:6,9
121:10 131:21
134:1 135:1
**newspapers**
 15:3
**nicholas** 1:4
**nightclub** 88:7
**nights** 85:1
**nine** 13:21

nobody's 32:11
non 5:14
  109:16
norm 59:5,5
  79:19 81:16,19
  102:6
normally 98:2
norms 82:8,25
  102:15
north 107:10
northampton
  7:22 62:2
  113:22 131:18
notable 78:7
note 16:19
  27:21 31:14
  34:18 41:11
  60:4 66:1
  127:24 128:5
noted 31:14
  72:20
notice 79:13
notion 64:8
  84:13,16
novel 29:19
  30:3
novelty 99:10
  99:11
november
  133:13
nuance 33:24
number 34:20
  40:25 103:8
  119:8,11 120:2

numbers 5:6
numerical 13:7
numerically
  116:16
nun 122:21
nursing 71:7
  72:1 73:11
nw 2:23

**o**

o 5:1 133:1
object 76:14
objection 76:11
  76:12 118:23
objective 37:2
  37:25 91:5
  96:3,7
observation
  56:12
observations
  128:9
observers 43:6
obtain 128:12
  128:14 130:19
obtaining
  52:20
obvious 60:21
obviously
  100:8 126:10
occurred 109:8
occurs 54:16
  56:8
october 1:10
offered 50:7
offering 55:2

office 2:15
  21:12
officer 2:20
officers 43:24
  50:6
offices 47:11,24
official 36:8
  94:20
officials 92:20
offsetting 97:8
oh 57:20
  126:16
okay 25:11
  33:17 36:4,9
  46:11 57:17,18
  57:22 59:24
  76:18 90:4
  105:1,22 113:5
  114:9 118:16
  119:4,14
  120:11 131:9
oklahoma
  27:11 30:21,22
old 33:1,4,23
  86:15 89:8
once 20:2 64:15
  93:8
one's 63:9
ones 28:13,14
  28:21 52:25
  53:1,2 64:25
  74:6 109:18
ongoing 43:16
onward 11:23

open 6:8 15:19
  19:19 26:12
  33:6,15,19
  34:7,8 61:1
  68:20,24 69:3
  74:9 75:21
  76:2 77:15,23
  78:1 80:16
  87:25 90:23
  104:24
opened 20:2
  24:23 73:15
opening 12:12
  69:24 70:12
  80:1
operate 11:1
  112:8
operated 99:18
operates 77:19
  78:20
operating
  127:13
opinion 66:20
  70:22 91:7
  92:16
opinions 22:11
  56:6 63:16
opposed 18:23
  28:2 47:10,23
  47:24
opposite 7:7
  99:17 105:9
oral 2:9
order 22:4
  42:16 55:23

131:4
**ordinance**
22:22
**ordinary** 59:8
59:11
**oregon** 26:6
**originalism**
45:25
**originally**
41:23
**orleans** 27:10
29:21 30:23,25
31:9 121:10
**outdated**
127:20
**outer** 11:1
**outlier** 66:11
**outliers** 113:6
116:5
**outside** 18:7,17
88:24,25 128:6
**overbreadth**
128:6
**overbroad** 72:8
**overcome**
13:19
**overlap** 65:1
**override** 108:5
**overwhelming**
13:19 32:1
**own** 7:5 21:8
21:12 22:9
24:4 36:1
51:11 53:19
54:3 56:9

60:25 70:15
71:23 108:19
**owned** 79:22
108:8
**owner** 16:7,25
20:16,22 21:11
22:17 24:5
34:13 54:15,16
59:1 74:25
76:1 77:21
**owner's** 16:23
17:10,23 18:1
21:17 75:8
76:7,10,12
**owners** 16:11
16:16 21:19
75:10
**owns** 21:7

**p**

**p** 5:1
**p.i.** 41:19
**p.o.** 2:17
**pa** 1:6 3:7
**page** 4:2 37:6,6
112:3 134:5
135:5
**pages** 61:20
**paid** 78:3
121:22
**panel** 5:4
**panic** 47:19
81:15,20
**panicked** 81:17
**par** 50:19

**parade** 42:13
43:23 94:13,15
94:16
**parades** 48:24
**paradigm**
103:2
**paradigmatic**
127:12
**parental**
125:24
**parentis** 68:7
68:18 70:11
110:2,4,10,24
114:21 125:16
125:21
**parents** 69:19
71:13
**park** 12:13,13
12:14,16,17
21:6,7 69:15
84:9,9,14,23,24
85:10,13,22,23
85:24,25 86:9
111:19,21,24
**parks** 12:5,6,7
12:11,18 63:18
84:7,8,13,16,21
84:22 85:8,14
86:2 111:17,17
111:20 112:5,6
112:8,10,11
**parochial**
117:9
**part** 7:17,18,22
18:13,22 20:1

33:17 37:11
60:7 62:2 74:4
78:12 91:25
92:1,2,5,5,9,12
97:17,21
106:21 112:7
113:6 120:4
124:6
**particular** 6:6
6:8,13 9:6 13:7
26:2 28:1
29:22 53:11
59:7 61:18,25
65:10,14 66:7
66:9 72:14
83:8,15 84:14
86:24 87:13
89:3,4 99:23
112:16 114:8,9
118:14 119:8
119:11
**particularly**
66:17 83:15
92:25 102:9
113:19 118:15
118:18 119:11
**particulars**
15:8
**parties** 27:22
**party** 22:3
94:12,14
**pass** 73:1 75:24
93:16 98:22
**passed** 14:23
15:15 64:23

75:19 83:9
**passes** 5:19
**past** 51:17 52:7
52:7 99:14
102:2
**patent** 8:23
**patrons** 106:25
107:25
**patterson** 2:22
4:6 57:25
89:19 90:7
102:22,23,25
104:13,15,21
106:3,5,19
107:1 108:3,10
108:12,14,16
110:9,18,23
111:4 112:12
112:13,18
114:19 115:7
115:10 116:2,5
116:22,25
117:2 118:8
119:10 120:12
120:14,17
121:17 122:7
122:18 126:8
**pause** 120:15
**pay** 42:1,2
44:25 78:4,4
94:16 97:25
98:19 99:19,23
102:17
**peace** 25:20,24
56:14 62:4

99:23
**peacefully**
122:24
**peer** 54:4
**penalty** 66:6,9
78:15
**pensions** 41:7
**people** 12:6
15:3 24:22
27:7,9,25 29:2
29:5,22,24
31:10,10 34:20
35:18 36:2,24
37:6,21 39:5
41:2 42:12
43:11 44:16
46:3,4,22,24,24
46:24 48:21
49:1,12 51:11
53:10 54:2
57:3 58:20
59:5,9,11,13,17
60:23 61:3,4
62:7 63:13,15
63:16,16 64:5
64:6 65:23
68:17 69:1
71:6,12,12,23
72:11,22 73:1
73:12,20 75:10
76:5 77:14,17
78:20 79:21,22
81:14,17,20
82:8,8,18,21
83:17 84:4,17

85:13 88:12
90:13,17 92:2
93:5,11,23
95:9,17 96:5
97:1,18 100:11
101:10,10
102:6 103:10
106:13 107:2,3
107:17 109:1
109:19,22
111:13 113:16
113:24 114:12
114:22,23,24
115:12 118:24
124:8,10,17,18
125:8,9 127:5
127:6,18 128:2
130:21 131:6
**perceive** 81:10
81:25
**percent** 77:5
**percentage**
13:9
**perfect** 115:11
**perfectly** 73:21
**period** 7:1 8:11
22:23 131:14
**periods** 24:8
**perked** 30:4
**permissible**
13:1 30:17
34:8,10 36:14
42:6 81:4,7
82:3 92:12

**permission**
17:5,23 19:5
19:13 22:12
24:5 58:25
76:1,24
**permit** 15:16
40:5,11,14,15
40:15,17,20
42:22,25 43:18
44:24 45:2
52:20 54:12
55:6 58:6
93:22 95:22
123:11 124:5
**permits** 39:9
51:11 76:6
**permitted**
21:15 38:20
40:5 44:3
84:25 92:4
97:17,21
123:20 124:17
**permitting**
13:20 35:20
40:4 42:22
89:17 94:20,24
**person** 23:15
23:19 27:4
28:4 35:23,24
37:7,17 53:11
56:10 76:23
85:18 90:16
91:13 92:23
96:10 98:4
107:5,7 127:17

127:20 129:18
130:13
**personal** 97:10
97:11
**personnel**
119:6
**persons** 68:16
**perspective**
103:17 105:3
**persuade** 36:3
**pete** 102:24
**peter** 2:22
**phenomenon**
33:20
**philadelphia**
1:6 3:7 12:17
**phone** 109:2
**phonetic** 10:3
14:10 19:10
20:7 22:21
112:24 116:20
122:21
**phrase** 84:18
**physical** 87:10
88:1
**picture** 124:4
**pistol** 53:5
**pistols** 123:2
**pittsburgh**
12:18
**place** 8:6 16:3
21:6 24:25
27:4 28:3,4
30:19 33:12
35:15 47:14,18

49:8,15 56:7
59:7 61:18
64:9 65:16,19
66:13,17 71:11
71:13,25 73:15
75:21 80:16
83:2,15,18
84:1 86:12,14
86:14,15,16,17
86:20,21,25
87:3,10,22
88:2,2,4,7,21
94:24 103:2,19
105:22,22
107:23 109:8
109:14 111:25
112:1 114:10
114:12,15,16
114:18 115:20
115:21 118:15
118:18 119:3
121:6,15,15
122:4,9 123:8
123:16 124:10
125:23
**places** 6:24 7:6
7:6 8:19,20
10:23 18:19
21:3 24:20,24
27:9,21,23,25
28:5,8 34:6,9
35:8 49:6,12
58:9,11,12,16
58:18 59:5,8
59:11,16,22,25

60:1,2,6,8,9,17
60:20,22,23
61:12,22,24
62:4,12,21
63:2,2,4,9,16
64:3 65:18,20
66:4,7,9,16
67:7 68:1,2,8
68:20,25 70:18
70:24 71:17,21
71:22 72:5,6
72:25 73:20
74:14 78:1
79:22 83:23
84:16 87:14,24
88:20 103:11
105:17 106:8
107:20 109:19
111:23 112:16
113:24 114:2,5
114:5 115:6,9
115:11,19,25
118:14 119:22
119:23,25
120:3,21,21
121:20,25
122:11,13
125:10 127:3
**placing** 83:10
**plain** 17:19,20
17:21,24 18:12
18:16 129:8
**plaintiff** 50:13
128:2 130:18

**plaintiffs** 2:23
3:3 11:4 12:4
12:20 17:6,18
18:2 24:14
26:15 38:17
39:6 41:11
45:21 51:5
58:4 102:25
128:13,22
129:8 131:18
**plantations**
25:25 26:7,10
**planters** 104:5
**platform** 44:14
**play** 55:3
**playground**
69:9,14,20
**playgrounds**
69:4 71:14
73:12
**please** 5:9 50:6
58:3 102:24
**pleasure** 73:22
**plenty** 61:11
64:14 77:18
110:8
**plus** 64:24
107:24 117:7
**poaching** 24:15
24:24 25:18
78:18,24
**point** 23:21
60:5 82:15
88:22 93:8
99:16 100:25

102:4,15
111:12
**pointed** 13:4
97:9 113:22
120:6
**pointing** 81:6
**points** 106:7
118:1
**police** 1:7,18
20:16 38:25
41:6 42:16
59:17 85:2
97:19,20,24
98:1
**policed** 42:21
42:23
**policies** 55:1,7
55:13 56:7
128:18
**policing** 42:19
44:5,15,17,18
**policy** 8:19
11:7,15 29:9
29:10,11 49:17
49:18 54:22
**poling** 49:12
**polity** 31:6
**poll** 77:4
**polling** 60:16
60:20 61:12,22
68:1 119:22
120:3,21
121:20,25
**pool** 54:11

**poor** 118:15,18
**population**
13:9 77:3
**pork** 29:16
**porter** 2:10
9:23 10:1,6,8
10:12 16:13,15
17:2,11 18:3,5
18:11,15 20:25
22:8,10 30:3
30:21,25 31:19
32:7,16,18
34:11,16,22
35:20,23 36:16
36:19 37:1
38:2 39:13
41:25 42:21
44:20 45:6
49:2,4 51:14
51:16 52:3,5
52:16 56:11,20
56:25 57:3,7
57:17 67:25
69:4 72:24
73:6,8,10 79:3
84:7 90:9
115:4,9 118:6
123:22,24
124:20,22
126:15,17
**portion** 42:5
**pose** 37:9
106:24
**poses** 39:25

**position** 22:24
50:12 118:9
126:9
**possess** 18:6
43:13 92:3
107:12
**possession** 38:6
107:9
**possibility** 89:6
93:10
**possible** 12:8
29:21 75:12
**possibly** 24:1
59:2
**post** 31:1 78:9
116:6
**posted** 53:7
**potential** 108:1
129:15
**potentially**
53:4
**power** 52:11
90:18
**powerplants**
87:24,24
**practice** 108:2
**pre** 7:18,19
10:20 31:15,15
112:23 113:1
**precedent** 8:13
29:14
**precisely**
129:23
**preclude** 15:14

**precursors**
12:24,25
**preliminary**
5:14 50:10,25
51:2,17 52:6,7
52:14
**prelude** 38:3
**premise** 25:25
**premises** 26:7,9
26:10 27:24
76:4 78:8
**premium** 100:5
102:1 130:8
**prenuptial** 22:2
**prepared** 132:3
**presence** 87:11
97:19
**present** 35:17
47:17 49:1
71:12,12,19
73:21 108:18
110:22
**presents** 87:11
**preservation**
78:12
**president** 1:8
1:15
**presiding** 2:20
50:6
**pressures** 8:20
9:12,20 11:15
**pressuring** 9:5
**presumably**
43:11

**presume** 26:17
76:13
**presumption**
17:4,12 18:16
72:16 80:8
**presumptively**
71:17 74:11,15
76:16 77:20
78:17 79:23
**pretty** 37:2
63:14 69:2
86:1 100:10
**prevent** 78:13
124:18
**prevented**
109:18
**preventing**
24:15 121:7
**primarily**
120:16
**principal** 79:25
**principle** 45:25
60:15 63:20,22
63:23 68:13
87:8,16
**principles** 60:2
86:16 87:6
88:3 100:24
**priorities** 22:5
**private** 15:18
16:6,7,22
17:22 20:2
21:2,10 22:3
22:16,17 24:21
26:12,13 33:9

58:24,25 74:21
76:2,6 77:6,21
80:1,21 107:21
108:7,19,21
124:7,10
**privately** 79:22
108:7
**privileges**
122:25 125:9
**probably** 12:6
20:13 37:20
68:6 125:1
130:21
**problem** 9:9,14
9:17 11:6 29:1
29:22 32:8,13
32:14,14,19
33:1,1,23,23
34:24 37:16,20
59:18 63:13
65:12,25 66:25
71:11,20 72:15
76:21 77:24
79:6,13,17
82:1 83:20
84:20 86:21
87:2 88:9,13
89:2,8,11
90:15,19 92:17
92:24 94:1,18
95:18 98:25
99:3,16 100:10
100:24 102:1
104:19 107:15
109:12 114:8

115:13
**problematic**
66:18 72:17
73:25 91:8
92:25 96:4
97:4 98:21
100:8
**problems** 33:4
34:25 35:3
38:23 74:8
81:10 84:19
89:6 92:18
130:13
**proceedings**
133:5
**process** 42:11
42:13 43:3
95:4
**processed**
42:18
**processing**
44:13
**produce** 93:1,5
93:16,22
**produced**
105:2
**producers**
29:16
**production** 9:9
104:17 123:24
124:2
**prohibit** 13:23
32:22 58:8
65:18 67:7
122:22 131:5

**prohibited**
14:12 16:2
34:11,14 62:5
70:24 83:8
87:13 121:9
122:16 125:9
125:15 127:3
**prohibiting**
43:12
**prohibition**
27:14 92:14
**prohibitions**
32:3 33:12
34:6 79:7
125:2
**proliferation**
33:21 104:16
**prompt** 20:16
**proof** 28:24
56:14
**propensity**
37:24
**properly** 124:2
**property** 15:18
15:18 16:6,7
16:11,13,15,16
16:23,23 17:1
17:9,18,22
18:1,8,19 19:3
19:12,18 20:3
20:19,20,21,22
21:2,10,17,19
21:23,24 22:7
22:9,11,16
23:8,15,17

33:9 55:8 56:9
58:24,25 74:9
74:19,21,25
75:7,11,19
76:2,7 77:6,21
78:4,8 80:1,12
80:22 97:10,11
**proposals**
112:25
**prospect** 54:9
99:6
**prospects** 54:1
**protect** 6:4
59:17 82:19
111:11 115:22
118:25 119:3
125:8
**protected**
39:11 83:1
97:13 102:8
109:5
**protecting**
10:16 85:22
**protection**
105:10 111:15
118:21
**protections**
81:3
**protects** 54:15
127:14
**protest** 123:10
**protestors** 44:7
**prototypical**
12:13

**prove** 102:11
**proves** 93:8
**provide** 55:24
56:5 83:17
114:5 123:14
**provided** 24:3
26:8 28:17
31:7,12 57:12
72:22 121:4,19
131:19
**provides** 62:24
68:2 123:14
129:12
**providing**
61:18 106:9
108:4 109:23
111:14
**proving** 130:14
**provision** 5:15
16:7 34:5 62:5
72:7,10,12,13
87:23 93:14
105:12 121:15
121:16,16
125:23 127:1,2
130:25 131:3
**provisions** 5:24
6:25 16:3 48:5
64:22 65:13
68:14,14 69:11
69:12 70:2,5
74:3 120:22
121:21 126:5
131:16,19

**public** 13:20,23
14:14 15:11,19
19:20 21:9
24:21,23,23
26:13 28:4
30:15 32:3
38:8,10 42:20
44:16,19 54:3
54:5 61:1
63:15 65:8
68:20,21,23,25
73:16,22 74:10
74:14,20 75:21
76:3 77:15,23
78:2 80:1,16
87:25 103:9
112:2 113:11
113:14,15
116:3 122:15
122:22 123:8
124:5 126:24
127:6 129:18
129:21
**publicly** 34:20
58:13
**purpose** 24:15
47:14,18 48:12
56:6 84:2
123:18,21
**purposeful**
101:22
**purposes** 62:11
67:9 70:1,21
96:5 98:9,24
122:5

**put** 20:10 74:6
77:17 85:10
86:1 87:19,20
98:18 101:6
107:16 114:12
130:20
**puts** 88:8 90:11
90:12 111:12
**putting** 104:18
105:5 117:15
125:4

**q**

**qualification**
24:3
**qualified** 15:17
**qualify** 103:9
**quarter** 37:6
**question** 6:7,16
8:14 15:25
17:11 19:2,21
20:17 21:2
22:18 23:9,10
33:14 34:2,24
40:2 44:5,6,11
44:12,15,19,21
45:13 46:16
52:1,9 55:15
57:7 58:23
60:7 61:17
62:10 71:2
74:12 75:15
77:3 79:12
103:18 112:19
118:11 119:11
119:13 131:12

| | | | |
|---|---|---|---|
| **questioned** 62:13 | **ratification** 5:18 19:8 24:7 112:25 | 115:18 121:14 124:2 131:25 | **recognized** 12:22 32:13 |
| **questions** 46:8 91:24 95:6,7 112:19 120:10 | **ratified** 6:18,19 45:19,23 131:16 | **reason** 10:22 65:17 66:17 70:6,24 80:13 97:2 101:12 | **recognizes** 38:12 116:19 **recognizing** 67:15 |
| **quick** 46:9,16 46:19 | **rationale** 49:4 119:2 121:4 | 102:17 105:19 107:5 109:4,13 | **reconcile** 59:2 64:8 |
| **quite** 14:7 26:10 62:25 116:17 126:19 | 123:3 124:23 125:1,16,21 | 127:5 134:7,9 134:11,13,15 134:17,19,21 | **reconstruction** 8:11,21 78:9 111:9 117:1 |
| **quote** 53:21 | **reacted** 32:15 **reacting** 103:10 | 134:23 135:7,9 135:11,13,15 | 118:15 **reconstructio...** |
| **r** | **reaction** 107:12 | 135:17,19,21 135:23 | 125:6,7 |
| **r** 5:1 133:1 134:3,3 135:3 135:3 | **read** 85:16 **reading** 24:10 24:11,18 30:17 | **reasonable** 91:18,21 92:3 99:20,25 | **record** 6:1 8:16 8:18 9:6 11:19 55:17 58:10 |
| **race** 93:5 116:1 127:3 | 42:9 **real** 79:17 | **reasonably** 56:13 | 85:11 86:1 93:8 100:5 105:14 126:14 |
| **racetrack** 48:10 | 83:20 89:11 92:23 98:25 | **reasoned** 47:5 127:5 | 130:20 133:4 **recreation** 12:6 |
| **racetracks** 47:24 | **reality** 100:11 106:12 | **reasoning** 44:1 65:21 109:20 | 111:25 **recreational** |
| **racist** 111:11 | **really** 24:20 25:25 26:16 | 115:24 **reasons** 7:4 | 12:13 **red** 120:8 |
| **radical** 125:7 | 29:23 35:14 38:14 51:19,21 | 11:7 13:16 25:16 40:24 | **redressed** 54:13 |
| **raise** 41:18 70:11,16 101:6 | 59:23 63:2 65:8 66:13 | 65:14 79:10 83:11 93:11 | **reduced** 119:7 **reduction** |
| **raised** 70:14 111:16 | 67:6,17 68:22 69:23 71:4 | 109:1,7 131:22 **rebuttal** 5:10 | 44:25 **reference** 36:15 |
| **ranging** 127:23 **rare** 51:2 | 75:14 82:9,13 84:5,12 88:11 | **recently** 68:3 **recognize** | 37:5,20 **referenced** 7:18 |
| **rather** 23:18 24:21 25:9 42:14,18 43:5 52:3,5 71:6 128:12 | 93:6 95:15 97:7 98:12 104:11 107:15 | 33:22 82:17 | 24:20 127:11 |

**references**
37:16 39:12,23
127:15,18
**referencing**
7:19
**referred** 7:23
78:3
**referring** 24:13
60:15
**reflect** 45:8
**reflected** 91:12
119:17
**regardless**
16:25
**regime** 92:18
**region** 3:6
**regular** 83:7
131:7
**regulate** 11:3
12:9 20:19
21:23 27:16
81:25 83:1
89:8 96:22
**regulated**
83:12 89:9
107:7
**regulating**
27:18 44:18
**regulation** 6:14
7:2 9:15 11:21
30:2 105:9
110:21 116:7
**regulations** 6:3
9:21 11:22
27:6 131:21

**regulatory** 44:4
44:4 86:24
89:4
**reilly** 50:15
51:1
**reintroduces**
94:4
**reject** 118:7,11
**rejected** 13:16
50:16 59:14
65:2
**related** 37:21
42:18 66:25
**relationship**
68:16
**relatively** 58:10
**relevance**
13:10
**relevant** 79:3
87:9 104:1
**relevantly** 35:5
**relied** 120:19
122:21
**relies** 104:4
**religious** 76:2
**relying** 78:1
**remember** 39:6
45:5
**remotely** 76:25
91:16
**renew** 43:17
**renters** 55:7,12
130:22
**repeat** 52:1

**reply** 69:22
70:16 111:25
**report** 111:24
**reporters**
125:18
**reporting** 3:5
**representing**
42:4
**republican**
125:8
**reputable**
35:23 36:2
37:12,13,15
90:21
**require** 54:10
91:6 93:1,24
99:23 100:25
**required** 44:17
61:21 64:6
91:13 93:5
128:20
**requirement**
38:4 39:7,8,9
50:11 52:18,21
53:3,7,12,16
54:23 55:20
90:9 92:9 93:3
**requirements**
23:19 35:21
52:20 93:9
**requires** 10:25
95:2,9 98:19
**requiring**
106:7

**rescue** 81:5
**reserve** 5:10
**reserved** 25:12
**residential**
80:12,19,22
**resist** 122:7
**resisting** 45:15
**resolve** 29:23
120:23
**resolved** 74:12
**respect** 15:23
23:14 26:3
32:3 41:9
103:2 104:5,11
104:25 107:1
107:14 108:25
109:16 111:16
112:10 114:7
114:22 115:19
118:4 119:12
119:21,24
120:3 129:7
**respects** 60:24
83:24 85:8
95:12 131:23
**respond** 9:5,18
9:20
**responded**
41:20
**responding**
129:17
**response** 70:14
70:15 83:14
**responsibility**
53:22 54:10

57:2,15 105:21

**responsible**
15:17 95:22
97:1

**rest** 73:21

**restaurant** 23:8

**restaurants**
30:22 63:18
71:15 79:16

**restrained** 30:9

**restrict** 27:8
82:3 114:21

**restricted**
61:24

**restricting** 84:2

**restriction**
12:19 31:9
32:15 86:18
110:12 113:11

**restrictions**
5:23 6:8 7:10
7:14 8:10,19
13:19 15:8
51:12 60:9
61:2,24 67:2,3
80:15 85:11,12
87:5 110:3
112:3 117:3,16
125:12

**retail** 21:12

**retains** 117:14

**revealed** 58:10

**revenue** 41:5

**reverse** 131:23

**revert** 20:22

**review** 54:4

**reviewed**
126:11

**richard** 2:17

**riding** 7:23

**rifle** 81:21

**right** 6:17 7:18
7:19 10:1,10
10:12,16,19,21
12:20 15:11,22
16:21,23 17:7
17:8,9,11,22,25
18:20,25 19:12
19:22,25,25
20:24 21:5,14
22:6,16,16
23:1,3,10,11,14
23:17 31:17
37:2 38:3,6,8
39:13,16,17
40:19 42:2
43:8 44:10,22
45:2,18,20
46:14 47:25
49:12 53:17
55:21 56:2,25
57:14 58:13
62:25 63:12,21
65:8,16,19
66:21,22 67:5
67:6,12,15,16
67:21,22 71:18
71:20,21,23
73:17,18 74:20

74:23 75:15,20
76:22,23 77:16
79:2,10,18
82:12,16,21
84:22 85:7
90:1,14 96:23
96:25 97:3,23
98:8,14,20
100:3 101:16
101:19 102:8
103:21 104:2
105:20 106:11
107:3,13
108:22 112:23
113:1,20
114:24 116:14
116:17,23
117:12 118:3,4
118:12,14
119:7 122:24
122:25 125:20
126:6,18,20,22
126:23 127:6
127:10,13,14
129:9 130:14

**rights** 15:21
21:17 30:9
31:11,16 38:8
46:2 50:20,21
53:18 63:10,11
63:14 68:17
73:24 74:11,13
74:15 76:17
82:3,5 90:19
93:11 99:7

102:19 103:5
103:11,21
105:15 110:14
118:17,19
122:13 123:9
123:15,18,23
125:8

**ring** 20:12

**riot** 44:9

**rise** 100:17

**risk** 54:11
87:11,15,21
88:8 99:4
105:5 106:24
129:19 130:15
130:16

**risks** 81:16

**roll** 80:25

**ronald** 1:4,20

**room** 112:15

**rule** 9:23 17:12
17:13,16,18,21
21:2 23:5,25
33:9 35:24,25
38:10 51:19
76:13 79:12,20
121:13 122:22
125:8

**rules** 12:14
20:21,21 21:23
21:24

**run** 77:14

## s

**s** 5:1 133:7
**sacred** 122:25
**safe** 29:24
  49:22 96:14
**safely** 122:25
**safety** 5:19 6:2
  38:8,10,13
  39:25 87:12
  106:24
**saloon** 28:9
**sane** 96:13
**satisfy** 51:6
  54:22
**saw** 29:21 31:6
  32:3
**saying** 18:15
  22:15 32:10
  41:13 42:5
  45:15,16 59:24
  65:17,24 66:3
  66:12,16 67:12
  72:21 85:2,21
  85:22 89:10
  91:3 93:23
  96:15,24 97:25
  99:5,10 103:1
  103:24 104:10
  104:22 105:8
  107:2 111:17
  116:21 117:2
  118:6 119:4
  122:7
**says** 17:4,25
  26:7 29:2 37:7

56:4,7 57:5
58:15 72:3,8
75:25 76:13,18
78:10,25 80:9
84:7 89:7
91:20,24 93:15
98:14 105:22
107:24 108:19
109:17,19
111:25 118:24
128:2 130:4
**scalia** 20:10
**scheme** 18:6
  36:15 40:4
  129:17
**scholarly** 54:3
**scholars** 116:20
**school** 41:7
  68:10,10,24
  69:10,16 71:4
  71:14 114:17
  114:20,21,23
  114:24,25
  115:1,2 129:15
**schools** 14:13
  34:5 47:10,12
  47:23 60:16
  68:3,5,6,7,21
  69:6 70:7,21
  71:1,3 109:25
  109:25 110:3,4
  110:19 111:11
  117:9 120:21
  125:10,15,20
  125:24

**scope** 46:2 69:8
  113:2
**screen** 107:17
**screened** 61:2
**screening**
  83:22 84:3
**se** 41:16
**sealed** 85:15
  86:3
**second** 6:18
  9:14,19 10:2,5
  10:9,11,15
  11:24 12:1
  13:1 15:21
  16:20 17:3,7
  17:12,14,15,19
  17:20,24 18:5
  18:13 19:7
  20:24 21:16,20
  23:2,17 31:2
  31:13,15 38:12
  41:11 47:4
  50:18,22 52:9
  53:19 55:21
  56:2 58:8
  68:17 74:13,15
  75:23 76:15
  82:14,22 90:17
  95:21 101:15
  102:19 103:5
  103:11,20
  105:14,19
  106:10 111:8
  111:13 112:22
  115:22 116:11

117:13,14
118:3 126:6
127:12 129:8
129:11 130:14
131:15
**seconds** 131:10
**section** 16:19
  25:17,18,19
**securable**
  114:12
**secured** 22:5
  119:23,25
  121:15 122:8
**security** 39:3
  43:24 61:1,12
  61:15,18,21
  62:24 68:2,22
  73:5 83:17,22
  105:13,18
  106:1,9 107:21
  107:22,24
  108:1,4,18,20
  109:23 114:1,5
  121:2,3,16,21
  122:2
**see** 10:2 11:6
  15:24 49:19
  58:1 59:2
  62:15 81:15
  83:2 88:20
  120:8
**seek** 122:25
**seeking** 58:6
  125:9

seem  27:3
  46:23
seems  6:6 25:23
  30:4,5 32:7
  33:5 37:2
  54:25 55:24
  75:9 91:3 94:4
seen  18:1 27:19
self  18:7 36:11
  37:8 38:7
  47:21 55:1
  58:7,13 66:22
  67:5,13,22
  71:23 85:18
  96:23 99:21
  103:21 109:2
  109:22
senate  1:8,16
send  40:4,10,21
sending  40:9
  42:1
sense  19:18
  45:22 48:3
  73:5 86:25
  115:21
sensitive  6:24
  7:6,6 8:6,19,20
  10:23 16:3
  21:3,6 28:2
  33:12 34:6,10
  48:18 49:5,8
  49:15 58:9,12
  59:16,22,23
  60:7,24 62:24
  64:9 65:20

70:21 83:15,23
84:2 103:12,13
105:22 109:7
114:10,16,17
115:19,21
120:20 121:6
121:15 122:4,6
122:9,11
123:16 125:23
sentence
  106:16
separate  25:18
  62:5 72:10
  107:3 112:2
separated
  53:18
separately  16:6
separating
  113:7
separation
  114:4
served  26:25
  27:23
service  85:10
  85:25 111:24
set  12:14 20:20
  22:1,18 50:14
  50:20,21 72:3
  90:1,3 98:15
  123:12,24
  124:9,11,17
sets  17:16
  22:25 124:4,24
setting  22:4
  62:2 76:15

84:8 99:15
settled  7:15
  49:15
several  14:21
  82:7
shared  132:4
sharp  111:12
shelby  14:9
sheriff  38:22
sherri  133:3,10
sherrilbreach
  133:7
shift  103:2
shirt  76:20
  123:19
shoot  85:19
  88:12
shooting  49:9
  67:9
shootings  83:7
shopping  71:15
  76:18 79:16
shops  26:18
  78:21
shore  35:13
shorelines
  35:11
shot  43:20
  87:19 88:8
shoulder
  101:11
show  17:20,21
  35:5 44:16
  61:6 72:19
  74:16 97:8

105:16
showing  53:9
shown  18:24
  39:15 57:9
  131:13
shows  7:7
  11:19 29:1
  47:11 83:14
  131:13
sic  8:9 31:2
side  11:17
  16:22,25 32:6
  32:6 74:7 79:2
  106:7 111:24
  117:16 118:1
sides  25:9,10
sidewalk
  123:20 124:6
sidewalks
  58:21 63:19
siegel  1:12 2:2
  2:6 3:3 5:5
  58:4 110:1
  113:22 121:3
sign  37:5 77:17
  128:2
significance
  46:21
significant
  21:14 101:24
signing  95:17
  95:18
silence  7:1,16
  17:23 18:1
  29:4,6,9 31:20

32:8,9,10
**silent** 43:2
**similar** 35:5,6
  84:20 102:1
  107:10 108:25
  109:6,20
**simple** 113:19
**simply** 20:1
  95:17,18
  113:23 123:7
**simpson** 107:10
  113:18 126:21
  127:1
**single** 31:25,25
  32:14 72:6
  102:18
**singled** 105:16
  113:24
**singling** 79:15
**singular** 11:12
  11:17,20
**sir** 62:10
**sit** 46:18 80:25
  90:24
**site** 49:13
**sitting** 83:17
  84:5 116:10
**situation** 33:18
  54:16 57:16
  77:13 106:1
  112:9
**situations**
  19:16 53:25
  57:6 81:23
  114:7 124:19

**six** 119:14
**size** 41:12 44:3
**skip** 51:17
**sleeves** 81:1
**slightly** 48:8
**smacks** 91:8
  93:6
**small** 56:19
  84:23
**smaller** 12:7
  13:5
**social** 27:22
  28:3 32:13
  34:24,24 35:15
  103:3 104:2,8
  110:12,13,14
  116:1
**societal** 9:12
  100:23 102:15
**society** 5:21
  101:5
**sokol** 2:19 4:4
  5:13 25:11
  50:3,5 51:25
  52:4,11,23
  53:15 54:24
  55:4,10,14
  56:3,17,23
  57:1,4,10,19,22
  57:24
**soldier** 67:10
**sole** 113:11
**solely** 98:7
**solicitation**
  22:23 80:15

**solicitor** 50:7
**somebody** 21:3
  54:17 56:22
  57:9 69:20
  76:18 78:14
  84:24 88:7,12
  90:21,22 91:21
  96:12 98:2
  99:22 109:11
**somebody's**
  80:15 85:3
**someone's**
  20:12 39:17
  95:1
**soon** 31:8 84:7
**soprano** 37:20
**sorry** 9:10 10:7
  20:25 32:17
  33:8 36:18
  40:8 55:14
  125:14
**sort** 9:12 13:14
  14:18 19:21,22
  33:5 35:19,24
  38:14 39:2
  52:7 56:14
  59:22 67:5,18
  67:20 69:5
  73:4 74:22
  82:25 86:10
  90:10 91:10,13
  92:3 95:6 97:6
  98:11 100:14
  106:14 107:12
  110:20 111:21

113:21 115:9
  124:23 125:3
**sorts** 55:17,24
**sounds** 31:19
  35:24
**source** 10:4
  111:19
**south** 118:15
  125:6,7
**southwest**
  125:18
**space** 48:23
  84:8 88:15,16
  129:21
**spaces** 24:23,23
  88:18
**sparser** 11:21
**speak** 124:2
**speaker** 1:8,16
**special** 74:17
**specific** 9:21,22
  16:3 26:24
  34:9 35:1 36:7
  47:5 49:19
  86:9 95:6
  111:21 120:25
  123:21
**specifically**
  14:24 28:6
  60:20 61:21
  91:4 92:17
  125:10 127:8
**specification**
  24:19

specify  25:23
42:7
speech  75:25
95:1
spent  42:11
spoke  45:17
spokeo  39:18
sporting  48:9
69:10,16,23
106:22
sports  69:4
spot  12:5
102:15
spots  46:23
spread  54:11
spreading
101:5
square  12:23
squarely  36:5
stadium  8:6
88:7 107:14,18
stadiums
107:16 108:8
stake  34:21
stakes  109:10
stampede  88:8
standard  14:19
36:8 37:25
49:13 90:22
96:11
standards
51:18 86:10
91:5
standing  11:3
69:13 129:2,4

start  13:13
60:19 64:18
72:15 83:23,24
103:1
started  84:8,14
starting  5:7
12:12 25:2
65:22 96:18
starts  116:14
state  1:7,8,15
1:18 8:18 10:1
10:4 11:13,25
13:21 14:8,23
15:13 20:18
21:8 28:1,5
29:17 30:15
31:25 32:15,22
40:14 41:5,14
41:20 42:15
44:12 50:8
59:6,12 64:18
68:11,13 70:15
70:23 75:24
76:13,16,21
77:4 79:6,10
79:17 81:14
84:24 85:1,7
93:23 97:5,12
98:14,22 99:9
99:12 103:4
104:24 105:6
106:21 109:19
109:22 111:17
111:19 112:17
114:8,15 116:8

118:25 119:2
120:5 122:18
122:21 125:17
126:21,25
128:18,20
129:5 131:13
state's  42:19
74:16 75:19,22
77:24 88:24
102:10
stated  25:20
statements
128:25
states  1:1 2:11
6:3 7:25 10:8
10:10,14,20
11:24 13:5,5
13:22 14:22
19:9 23:22
24:3 27:12,16
27:19 29:20
30:14 31:1
45:19,23 46:5
58:5,8 62:19
64:23 66:14
77:20 80:9,11
80:12 106:7
112:16 117:8
131:16
statute  7:22
15:13 24:11,14
25:3,3,17,17,18
25:25 26:5,6
30:18 51:9,12
62:2 65:9

96:21 113:22
122:17 125:17
131:18
statutes  11:25
14:8,12 16:10
26:7 34:4 41:1
64:13,14
115:24 117:21
119:14,14
120:19 123:4
125:13 130:3,3
statutory  8:1
62:17
stay  84:25
step  129:7
steps  20:14
40:13
stevens  112:24
stock  53:5
stop  25:13
store  21:12
stores  71:15
story  36:1
straight  51:18
51:22 52:8,9
strange  23:24
25:23
stream  112:7
street  2:16 3:4
3:6 15:20
123:10,12
streets  21:5
34:8 58:21
63:19

| | | | |
|---|---|---|---|
| **strength** 42:15 | **sudden** 86:19 | 85:24 | **sweeping** 39:1 |
| **strict** 100:16 | 103:13 | **supreme** 11:11 | **sweeps** 80:20 |
| 130:3 | **sued** 54:17 | 13:12,22 14:11 | 84:23 |
| **strike** 30:19 | 94:17 | 22:20 49:15 | |
| **strong** 23:22 | **sufficient** 61:18 | 50:14 63:24 | **t** |
| 31:3 | 95:3 | 67:1,18 80:14 | |
| **struck** 30:12 | **suggested** | 92:10 94:11,21 | **t** 123:19 133:1 |
| 35:25 | 121:19 130:18 | 107:10,11 | 133:1 134:3 |
| **structure** 72:7 | **suggesting** 43:3 | 113:4 117:7 | 135:3 |
| **struggle** 73:14 | 81:5 127:22 | 119:18 125:22 | **tacked** 106:15 |
| **student** 125:24 | 129:9 | 127:11 | **tailor** 28:3 |
| **students** 110:4 | **suggests** 5:24 | **sure** 14:7 15:7 | **take** 12:5 15:18 |
| 110:10,24,25 | 130:20 | 17:2 44:21 | 17:25 42:17 |
| 111:1,5,6 | **suit** 100:21 | 45:17 51:25 | 53:20 58:19 |
| 114:20,21 | **suite** 3:6 | 55:12 60:13,18 | 60:2 61:19 |
| **studies** 54:4,4 | **summons** | 61:5 64:12 | 63:20 64:21 |
| 111:3 | 121:23 | 65:11 71:8 | 65:4 68:12,12 |
| **study** 85:25 | **superb** 132:1 | 90:22 108:9 | 71:13,14,18 |
| **stuff** 37:3 62:11 | **superintendent** | 119:5 121:21 | 72:17 76:16 |
| 93:19 | 1:7,18 | 125:12 127:15 | 81:23 86:15 |
| **subject** 50:22 | **supermarket** | **surety** 53:7,17 | 87:6 89:7,13 |
| 51:12 | 81:20 | 56:12,15,17 | 90:7 94:11,24 |
| **subjective** 37:2 | **supply** 95:2 | 57:12 91:11,16 | 94:25 98:4,13 |
| 37:4 | **support** 84:13 | 99:15,19,23 | 103:2 104:8 |
| **submit** 6:21 | 131:20 | 130:2 | 132:2 |
| 44:1 119:17 | **supported** | **surrender** | **taken** 33:20 |
| **subsection** 65:9 | 39:21 41:10 | 69:19 70:8 | 57:15 96:8 |
| 65:10 | 102:20 | **surrendering** | 105:20 119:3 |
| **subsections** | **supports** 77:1 | 68:9 | **takes** 59:3 |
| 24:12 | 82:24 123:4 | **survey** 57:12 | 63:23 64:10 |
| **substantive** | **suppose** 37:19 | **surveyed** 53:16 | 76:24 95:25 |
| 20:19 | 52:11 | **suspect** 5:25 | **talk** 8:15 13:6 |
| **succeed** 51:7,10 | **supposed** 36:15 | 48:18 91:2 | 35:20 39:20 |
| **successfully** | 47:1 59:4 | **sweep** 88:23 | 63:16 75:16 |
| 17:18 | 78:15 79:13,19 | | 84:17 89:16 |
| | | | 96:16 115:25 |
| | | | 121:18 |

| | | | |
|---|---|---|---|
| **talked** 60:6 62:11 121:3 122:18 125:11 127:9 | **technological** 32:14 | 125:6 | **theory** 45:21 |
| | **technology** 103:24,24 130:1 | **territory** 13:18 | **thing** 14:4 16:19 18:11 31:8 35:19 38:14 41:11 48:25 76:9 78:5 99:10 108:24 111:18 127:16 130:4 |
| **talking** 14:17 15:4 18:25 19:16 26:8 33:8,9 35:15 36:22 58:18 60:8,8 63:15 66:10 69:9 73:19 74:9,14 74:18 75:18 77:22 78:6 86:20 129:3 130:12 | **tell** 18:9,11 25:13 51:1 76:14 77:17,21 108:15 122:20 | **terror** 53:10 113:21 | |
| | | **terrorism** 111:12 | |
| | | **terrorize** 113:15 | |
| | **temporarily** 124:10 | **terrorizing** 56:22 107:6 | |
| | **ten** 16:1 25:12 50:4 79:4 | **test** 5:16,19 15:6 42:6,8 73:2 108:24 | **things** 7:21 21:25 22:3 26:1 38:13,20 41:7 47:13 48:14 49:21 52:19 64:15 67:11 71:7 82:17 90:24 91:6 93:8 94:25,25 102:22 109:21 115:1 118:12 125:3 126:13 127:25 |
| | **tended** 66:1 | **tested** 14:6,9 | |
| **talks** 19:10 31:24 66:22,24 126:21 | **tenn** 125:14 | **texas** 118:17 125:13,17,18 | |
| | **tennessee** 14:10 67:20 107:10 126:20,22 127:2 | **text** 17:19,21 17:21,25 18:12 18:16 26:1 129:8 | |
| **tavern** 34:5 86:18 | **term** 72:1 | **textual** 25:4 | |
| **taverns** 28:9 29:22 32:16,18 32:23 33:9,10 33:13 64:4 78:22 86:18 | **terms** 6:9 33:2 33:4 47:19,20 47:20 74:20 77:10 80:4 83:10 96:21 103:14 113:7 115:21 116:7 127:25 130:13 | **textually** 25:1 | **think** 8:8 9:16 9:16,19 10:10 10:25 11:8,19 12:3,4,20,21,22 15:5,22 16:19 16:21,24 17:6 17:13,15,16,16 17:17,24 18:10 18:12,13,18,20 18:22 20:4,10 21:4,16,21 22:13,14,20 |
| | | **thank** 49:25 50:1,2 57:18 57:23,24 58:2 58:3 120:13,14 131:11,24,25 132:5 | |
| **tax** 97:12 101:8 | | | |
| **taxed** 97:11 | | **theater** 83:22 | |
| **taxes** 78:4 97:10 | **terrify** 114:4 | **theaters** 83:8,9 83:20 125:3 | |
| **teacher** 125:19 | **territorial** 13:16 14:2,5,6 64:24 116:8 | **theme** 27:25 | |
| **teachers** 111:10 | | **theoretically** 39:1 | |
| **teachings** 120:24 | **territories** 13:4 13:11,15,25 66:7 83:4 | | |

| | | | |
|---|---|---|---|
| 23:4,13,24 | 71:9,10,24 | 124:12,16,24 | **tie**  79:2 |
| 24:2,6 25:1 | 72:18 73:3,17 | 125:1,4,22,25 | **time**  9:19 12:16 |
| 26:1,1,3,4,9,13 | 73:24 74:2,5,6 | 126:9,19 | 13:9 15:1,4,24 |
| 26:20 27:12,14 | 74:21 75:10,14 | 127:13 128:5 | 18:25 19:2,3,7 |
| 27:17,24 28:14 | 76:12,25 77:9 | 128:10,11,15 | 19:7 20:20 |
| 28:24 29:9,13 | 77:11,11 79:5 | 128:21 129:8 | 21:23 22:25 |
| 30:7,8 31:4,7 | 79:10,17 80:6 | 129:11,13,14 | 24:8 25:12 |
| 31:17,22,24 | 81:1,4 82:2,18 | 130:10,11 | 31:2 35:1,2 |
| 32:12,15,20 | 82:23 83:13 | 131:12,13 | 46:12 57:21 |
| 33:2 34:24 | 84:5,12,19,21 | **thinking**  32:25 | 60:10 61:23 |
| 35:3,14 36:13 | 85:6,6,8 86:5,6 | 74:4 | 62:20 64:5,11 |
| 36:21,23 37:4 | 87:4,9,16 88:9 | **thinks**  68:22 | 66:5 84:17 |
| 37:5,21,24 | 88:22 89:7,19 | **third**  1:2 10:22 | 85:8 86:2 |
| 38:2,5,11,11,16 | 90:6,16,17,19 | **thomas**  53:21 | 88:18 89:13 |
| 38:17,17 39:15 | 91:9,21 92:21 | 57:11 111:5 | 90:7 113:13 |
| 39:21 40:13,13 | 92:23,25 93:7 | **thought**  12:25 | 116:23 117:8 |
| 40:23 41:12 | 93:24 94:10,18 | 25:8 35:12 | 120:9 |
| 42:3 43:2,21 | 95:15,18 96:4 | 42:8 55:9 | **times**  32:19 |
| 43:25 45:3,4 | 96:6,11,12 | 56:23 76:5 | 43:17 82:18 |
| 45:10,11 46:1 | 97:4 98:9,13 | **thousands**  54:2 | 102:10 |
| 46:10 47:1,3,8 | 98:16,24 99:2 | 88:19 | **timing**  64:20 |
| 47:12,13 49:10 | 99:9,25 100:6 | **thread**  123:7 | **tinker**  52:6 |
| 49:12,17 51:20 | 100:6,9,14 | **threat**  9:5 | **title**  78:12 |
| 52:23 54:14 | 102:16,19,23 | 39:25 56:24 | **today**  6:2 9:15 |
| 56:3 57:10,21 | 105:12 107:4 | **threatened** | 11:2 12:2,15 |
| 59:19,23 60:21 | 108:3,23 | 47:16 | 26:18 27:8,13 |
| 61:16 62:20,25 | 112:18,20,24 | **three**  7:4 13:8 | 27:13,19 29:10 |
| 62:25 63:1,12 | 113:5,8,16,21 | 31:1 40:24 | 33:15,21 35:10 |
| 63:21 64:1,19 | 115:4,18 | 60:19,22 63:1 | 35:13 38:23 |
| 65:12,15,19 | 117:12,25 | 89:19 105:15 | 48:4,11,24 |
| 66:12,23 67:14 | 118:14,18 | 115:19 | 49:24 58:23 |
| 67:19,23 68:5 | 119:11,16 | **threshold** | 68:10 112:8 |
| 68:12,18 69:18 | 120:23 121:8 | 75:17 | 115:7,21 |
| 69:21,25 70:6 | 121:14 122:10 | **thrice**  125:23 | 120:22 122:1 |
| 70:16,17,20,20 | 123:13 124:1 | | 123:5 130:21 |

132:1
**told**  11:11
 12:23
**ton**  26:14 61:20
 62:16
**tons**  88:17,20
**tony**  37:20
**took**  67:20
**tort**  100:16,18
 100:24 101:2
 102:2
**tortfeasor**
 129:15
**torts**  129:15
**total**  25:9 30:14
 32:3 34:6
**toward**  104:18
**towards**  13:4
 97:24
**town**  38:23
 78:23 124:5
**towns**  25:21
**trace**  61:25
 62:1
**tradition**  5:16
 7:25 10:16
 11:12,17,20,21
 12:2,21 13:20
 14:3 15:5
 19:13 27:15
 30:2,6 31:21
 32:10 34:15
 39:22 41:10
 49:24 62:9,14
 62:20 65:10,22

66:12,14 72:20
 72:21 73:2
 80:18 81:2
 82:23,24 83:14
 84:11 86:11,23
 87:12 89:3
 91:23 92:2,8
 102:11,12,13
 102:21 107:3,5
 112:11,15,20
 112:21 113:5,6
 114:19 116:13
 116:15 117:5,6
 117:10,23
 119:9,15,17,23
 120:1,3,4,20
 121:25 131:20
**traditions**  65:3
 66:15 79:8
 84:6,15 89:12
 112:8
**train**  25:8
**training**  38:14
**tramples**  31:11
**transcriber**
 133:3,12
**transcript**  2:9
 132:3 133:4
**transfer**  22:7
 23:15
**transportation**
 51:20
**transunion**
 39:18

**trash**  43:23
 44:9
**treat**  72:10
 102:4 114:10
**treated**  104:3
 111:15
**treating**  83:23
 84:1 97:1 99:3
**treatises**  15:1
**treats**  60:23
**tremendous**
 108:23
**trenton**  2:18
 38:24
**trespass**  19:5
 25:17,19 73:18
 75:19
**trespassing**
 19:18 78:13,16
**triggered**  56:12
**troublemaker**
 57:9
**true**  7:4,13 8:3
 8:3 13:15 14:6
 15:12 16:24
 18:18 22:15
 27:5 28:22,22
 40:24 80:10
 88:5 100:12
 122:15 130:23
 133:4
**truism**  129:14
**truly**  128:15
**trump**  76:20

**try**  125:8
**trying**  9:18
 39:3 77:1 79:6
 86:8 103:4
 116:11 130:3,5
**turn**  15:8
**turned**  86:3
**turns**  123:20
**twice**  82:18
**twin**  57:4
**twins**  57:5
**two**  7:21 8:14
 13:16 15:23
 22:14 34:1
 40:13,24 47:13
 50:8 51:7
 67:11 78:9
 112:18
**type**  6:3 14:16
 72:6 84:14
**types**  14:12
 24:24 68:19,25
 72:14
**typically**  59:9
 78:10

**u**

**uh**  52:16
**ultimately**  67:6
 67:21 90:22
**umbrella**  101:1
**unable**  129:23
 130:18
**unaffordable**
 100:9

**unclear** 26:16
127:19
**uncomfortable**
82:13,21
**uncompensated**
101:3
**unconstitutio...**
6:25 7:15
27:20 31:6
41:16 51:6,9
51:10,12 92:11
92:11 94:21
116:4 126:8
**unconstitutio...**
28:24
**unconstitutio...**
23:11
**under** 10:4
13:1 15:6 16:3
17:12,19 19:3
29:12 38:18
39:18 42:6,24
51:24 52:8
53:19 55:12
58:21 65:21
82:22 114:19
119:2 127:13
132:2
**undercuts** 85:9
**underlying**
22:6 23:11,16
27:24
**understand**
10:19 25:4
39:10 45:24

48:21 51:25
55:14 77:15
82:11 126:17
**understanding**
6:17 8:25 9:2
10:5 19:4,6,9
26:5 31:16
34:7 45:20
127:12 129:19
131:15
**understood**
19:23 45:19
46:2,5 58:22
113:2,10,13
119:18 126:22
127:1
**undertake** 41:8
**undeveloped**
80:23
**undoubtedly**
14:14 15:4,6
**unequivocal**
6:1 14:12
**uninsurable**
130:12
**uninvited**
19:19
**unique** 38:12
**united** 1:1 2:11
7:25 19:9
**unites** 60:15
**universally**
12:1
**universe** 64:21
73:20 85:7

102:9
**universities**
110:7,8,10
**university**
110:20 125:11
**unlawfully**
97:18
**unprecedented**
29:19 30:4
**unreasonable**
94:8
**unsafely** 91:12
**unsealed** 85:17
86:4
**untested** 14:5
**unthinkable**
5:21
**unusually**
23:21
**unwarranted**
19:4
**unwilling** 55:24
56:5
**upfront** 93:1
129:24
**upheld** 11:25
12:1 14:24
65:13,15 67:2
125:17
**uphold** 52:6
**upping** 128:23
**upshot** 12:3
26:17 126:3,4
**urban** 25:24

**use** 17:1 42:11
47:21 53:24
85:18 91:12
104:6,7 130:4
**used** 26:5 31:24
32:2 39:24
43:20 86:12,24
95:4 96:21
122:12
**uses** 84:18
**usually** 66:16

| v |
| --- |

**v** 1:6,14,22 2:4
134:1 135:1
**valid** 15:5
104:7
**validity** 41:9
**values** 63:11
**variation** 90:10
**variegation**
11:13
**variety** 96:1
**varying** 68:22
**vast** 107:22
**vehicle** 101:17
**vein** 40:3
**venues** 15:13
48:9
**verify** 127:20
**veritext** 3:5
**vermont**
125:15
**version** 31:15
35:25 45:23

**versus** 5:5,5
  19:10,10 22:21
  32:23 33:21
  57:9 122:18,21
  123:20 125:17
  126:21,25
  131:4
**veto** 90:18
**vetoes** 82:4
**victim** 98:5
  100:20
**victims** 40:12
  40:22 96:25
  97:25 98:12,15
  98:20 101:7,21
  129:24
**view** 95:20
**viewed** 56:24
**violate** 44:9
**violation** 49:9
  130:9
**violence** 114:8
**virginia** 3:4
  10:18 48:17
  110:20 121:11
**virtually** 88:23
**virtue** 82:6
**vis** 60:22,22
  65:10,10 66:11
  66:11 68:16,16
  70:17,18
**visible** 33:20
**visitor** 123:1
**vote** 63:6

**voters** 125:9
**voting** 118:17
**vouch** 37:22
  90:14
**vulnerability**
  49:5,13
**vulnerable**
  46:23 47:15
  49:6,7 68:16
  71:6,12,12
  73:1,12,20
  84:4 109:20,21
  111:13

### w

**waive** 20:14
**walk** 20:12
  61:11,12
  124:11,17
**walking** 15:20
  121:7
**walks** 81:20
**want** 8:15 15:7
  15:8,9 16:11
  18:8 19:1
  20:23 22:18
  23:23 35:6
  42:7 44:21,24
  45:1,2,12,16
  69:2,7 72:5
  75:3,3,6,16,16
  85:13 89:13,15
  89:16 96:24
  98:7,20 102:18
  108:6,12,20
  109:1 127:15

128:8,13 129:1
**wanted** 10:22
  46:6 72:9
  80:25 94:12
  97:5 111:21
  112:1 121:5,14
  125:12 131:8
**wants** 56:2
  76:21 96:22
  98:22 99:18
  101:6
**war** 31:1
**washington**
  2:23
**watch** 124:9,14
**way** 9:21 12:10
  17:16,17,20
  27:17,18 29:3
  29:6,23,23
  33:24 35:9
  44:20 54:9
  57:1 58:19
  62:1,25 63:24
  64:14,18 66:1
  67:12,16 68:25
  72:3,7,19
  75:10,15 80:21
  81:2,7 85:16
  89:9 92:15,17
  93:9 95:12
  97:12 99:17
  101:4 102:1
  104:24 116:18
  118:5 127:21
  130:8

**ways** 81:6
**we've** 8:17 9:11
  9:11 11:16
  45:12 46:10
  57:15 59:20
  60:12 68:25
  69:12,13 71:24
  83:19 89:8
  119:14,14
  120:8
**weapon** 53:4
  53:23 56:9
**wear** 19:25
  76:1
**wearing** 76:19
  76:19 123:19
**week** 48:23
**weekends**
  90:25
**weigh** 13:6
**weight** 13:11
  31:7 32:1,5
**welcome** 69:1
  77:17 124:9
**welcomes**
  21:12
**welcoming**
  80:14
**went** 41:4
  53:20 56:22
  92:15,16 112:5
**whatsoever**
  26:21 32:21
  72:21 99:8

wheat 113:7
widespread
  32:9,19 119:15
wild 85:19
willing 75:1
  106:13 109:17
win 70:2
wipe 54:18
wise 11:8
witness 90:9
  93:3,9
witnesses 43:2
  44:7 93:1,17
  95:3
wonderful
  90:16
wondering
  55:18
word 26:16
  60:5
words 18:22
  20:15 26:5
  100:20 111:3
work 59:24
  62:8 66:2
  67:15 69:6,6
worked 62:4
working 19:14
  62:7
workplace
  21:13
works 32:10
  41:17 72:18
  88:23

worried 92:22
  96:9
wouldn't
  128:25
wrap 131:10
writ 125:15
write 22:2
  39:17
writing 15:3
written 24:5
  75:4
wrong 12:15
  66:13 70:17
  82:7 99:5
  102:5
wrongdoer
  102:13
wrongdoers
  102:5
wrongful
  101:11,22

**x**

x 4:1

**y**

yard 20:15
yarmulke
  76:19
yeah 21:4 28:6
  34:22,23 47:3
  57:19 64:17
  67:4,21 69:7
  73:13,20 76:18
  77:8 82:2 87:1
  88:9 89:21

94:6 110:18
  116:25
year 40:21 41:3
years 33:5 88:3
  88:4,20 106:15
  122:23 126:25
yields 11:8
york 35:25 36:2
  38:24 59:15,16
york's 88:10
  92:11
young 47:15
youth 69:4,10
  69:16,23

**z**

zone 75:25
  106:16 114:11
  115:2
zoo 71:4
zoos 70:2,7

**à**

à 60:22 65:10
  66:11 68:16
  70:17