Clement & Murphy
PLLC

January 23, 2024

**Via CM/ECF**

Patricia S. Dodszuweit
Clerk of Court
U.S. Court of Appeals for the Third Circuit
21400 United States Courthouse
601 Market Street
Philadelphia, PA 19106-1790

> Re: *Siegel v. Attorney General of New Jersey*; *Koons v. Attorney General of New Jersey* (Nos. 23-1900, 23-2043)

Dear Ms. Dodszuweit:

The *Siegel* plaintiffs submit this letter to highlight this Court's recent decision in *Lara v. Commissioner Pennsylvania State Police*, 2024 WL 189453 (3d Cir. 2024), which addressed whether Pennsylvania could effectively prohibit 18-to-20-year-olds from publicly carrying firearms. Pennsylvania argued that (1) 18-to-20-year-olds are not among "the people" protected by the Second Amendment because the law historically treated them as "infants" and (2) "dozens" of laws from 1856 and later supported its prohibition regardless. *Id.* at *4-*5, *7.

This Court rejected both arguments. As to the first, it explained that Pennsylvania "conflate[d] *Bruen*'s two distinct analytical steps": While the government is "tasked with identifying a historical analogue at the second step of the *Bruen* analysis," the threshold inquiry is simply whether the Second Amendment's "plain text covers an individual's conduct." *Id.* at *1, *4-*5. Turning to the second argument, the Court held that "the Second Amendment should be understood according to its public meaning in 1791," including in disputes involving state rather than federal action, and it definitively rejected the view that 1868 is the "correct temporal reference point." *Id.* at *6-*8. Accordingly, the Court "set aside" the "catalogue of statutes from the mid-to-late nineteenth century" that Pennsylvania proffered and found its "conspicuously sparse" Founding-era evidence insufficient. *Id.* at *8-*9.

As *Lara* makes clear, New Jersey too has conflated *Bruen*'s distinct analytical steps. *See Siegel*.Br.18-20, 32-35; *Siegel*.Reply.4-8. Plaintiffs wish to carry handguns outside the home for self-defense, and each of the challenged provisions of Chapter 131 impedes their ability to do so. That is the end of the textual analysis. As for the historical inquiry, much

Ms. Patricia S. Dodszuweit
Clerk of Court
January 23, 2024
Page 2 of 2

like Pennsylvania's evidence in *Lara*, New Jersey's exceedingly sparse historical evidence comes predominantly from the late-19th century, which New Jersey insists is "more legitimate," "instructive," and "useful" than Founding-era evidence.  N.J.Br.33; N.J.Reply.15; Oral.Arg.Tr.45-46.  *Lara* definitively rejected that anachronistic view.  New Jersey thus can no longer try to defend its sweeping carry restrictions by invoking a handful of laws enacted after 1870 and an interpretation of Virginia's Northampton statute that *Bruen* squarely rejected.  *See, e.g.*, *Siegel*.Br.35-60; *Siegel*.Reply.4-23; Oral.Arg.Tr.64-65.

Respectfully submitted,

/s/ Erin E. Murphy
Erin E. Murphy
CLEMENT & MURPHY PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8901
erin.murphy@clementmurphy.com

Counsel for *Siegel* Plaintiffs-
Appellees/Cross-Appellants

cc:     All counsel of record (*via CM/ECF*)

# Exhibit A

2024 WL 189453
Only the Westlaw citation is currently available.
United States Court of Appeals, Third Circuit.

Madison M. LARA; Sophia Knepley; Logan
D. Miller; Second Amendment Foundation,
Inc.; Firearms Policy Coalition, Appellants

v.

COMMISSIONER PENNSYLVANIA STATE POLICE

No. 21-1832
|
Argued June 28, 2023
|
(Filed January 18, 2024)

**Synopsis**

**Background:** Second Amendment advocacy groups and individuals who were over age of 18 but not yet 21 brought action seeking declaratory judgment that provisions of Pennsylvania Uniform Firearms Act prohibiting such individuals from carrying firearms on public streets and property during declared state of emergency violated Second Amendment. The United States District Court for the Western District of Pennsylvania, William S. Stickman, IV, J., 534 F.Supp.3d 478, dismissed complaint, and plaintiffs appealed.

**Holdings:** The Court of Appeals, Jordan, Circuit Judge, held that:

as matter of first impression, individuals between ages of 18 and 21 were presumptively among "People" protected by Second Amendment;

as matter of first impression, Second Amendment should be understood according to its public meaning in 1791;

statutes from mid-to-late nineteenth century, enacted at least 50 years after Second Amendment's ratification, could not be considered;

laws in question violated Second Amendment;

action fell within scope of capable of repetition, yet evading review exception to mootness rule; and

action fell within Ex parte Young exception to Eleventh Amendment's prohibition against federal court actions against states.

Reversed and remanded.

Restrepo, Circuit Judge, dissented and filed opinion.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Failure to State a Claim.

**West Codenotes**

**Held Unconstitutional**

18 Pa. Cons. Stat. Ann. §§ 6106, 6107, 6109

On Appeal from the United States District Court For the Western District of Pennsylvania (D.C. No. 2-20-cv-01582), District Judge: Honorable William S. Stickman, IV

**Attorneys and Law Firms**

John D. Ohlendorf [ARGUED], Peter Patterson, David H. Thompson, Cooper & Kirk, 1523 New Hampshire Avenue NW, Washington, DC 20036, Joshua Prince, Prince Law Offices, 646 Lenape Road, Bechtelsville, PA 19505, Counsel for Appellants

Daniel B. Mullen [ARGUED], Office of Attorney General of Pennsylvania, Appellate Litigation Section, 1251 Waterfront Place, Pittsburgh, PA 15222, Counsel for Commissioner Pennsylvania State Police

Janet Carter, Everytown Law, 450 Lexington Avenue, P.O. Box 4148, New York, NY 10017, Lisa Ebersole, Cohen Milstein Sellers & Toll, 1100 New York Avenue NW, West Tower, Suite 500, Washington, DC 20005, Counsel for Amicus Appellee Everytown for Gun Safety Support Fund

Alex Hemmer, Office of Attorney General of Illinois, 100 W. Randolph Street – 12th Floor, Chicago, IL 60601, Counsel for Amicus Appellee, State of Illinois

James P. Davy, P.O. Box 15216, Philadelphia, PA 19125, Counsel for Amicus Appellees Giffords Law Center to Prevent Gun Violence And Ceasefire Pennsylvania Education Fund

Before: JORDAN, RESTREPO and SMITH, Circuit Judges

## OPINION OF THE COURT

JORDAN, Circuit Judge.

 **\*1** Through the combined operation of three statutes, the Commonwealth of Pennsylvania effectively bans 18-to-20-year-olds from carrying firearms outside their homes during a state of emergency. Madison Lara, Sophia Knepley, and Logan Miller, who were in that age range when they filed this suit, want to carry firearms outside their homes for lawful purposes, including self-defense. They, along with two gun rights organizations, sued the Commissioner of the Pennsylvania State Police (the "Commissioner") to stop enforcement of the statutes, but the District Court ruled against them. They now appeal the District Court's order dismissing their case and denying them preliminary injunctive relief. They assert that the Commonwealth's statutory scheme violates the Second Amendment of the United States Constitution.

In response, the Commissioner contends that the Appellants [1] are not among "the people" to whom the Second Amendment applies, and that the Nation's history and tradition of firearm regulation support the statutory status quo. We disagree. The words "the people" in the Second Amendment presumptively encompass all adult Americans, including 18-to-20-year-olds, and we are aware of no founding-era law that supports disarming people in that age group. Accordingly, we will reverse and remand.

[1]    Lara, Knepley, and Miller are U.S. citizens and residents of Pennsylvania. Were it not for the challenged statutory provisions, they would have carried firearms outside of their homes. The two organizational Appellants are the Second Amendment Foundation and the Firearms Policy Coalition, both of which have at least one active 18-to-20-year-old member who is a U.S. citizen and Pennsylvania resident and who wishes to carry firearms in public for lawful purposes. For simplicity, we will speak of the "Appellants" in terms of the three named individuals, unless otherwise specified.

## I. BACKGROUND [2]

[2]    The operative facts are not in dispute. We are bound, at this stage of the proceedings, to "accept all factual allegations as true, [and] construe the complaint in the light most favorable to the [Appellants]." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

### A. Pennsylvania's firearm statutes

Under §§ 6106(a) and 6109(b) of the Pennsylvania Uniform Firearms Act of 1995 ("UFA"), 18 Pa. Cons. Stat. §§ 6101-6128, an individual may not carry a concealed firearm without a license and must be at least 21 years old to apply for a license. A concealed-carry license permits the holder to carry a firearm even during a state of emergency. *Id.* § 6107(a)(2). Ordinarily, Pennsylvanians without a concealed-carry license may carry openly, but § 6107(a) of the UFA provides that "[n]o person shall carry a firearm upon public streets or upon any public property during an emergency proclaimed by a State or municipal governmental executive[.]" *Id.* § 6107(a). Besides the exception for those with a concealed-carry license, there are exceptions for those "actively engaged in a defense" and those who qualify for one of fifteen other exceptions enumerated in § 6106(b). [3] *Id.* § 6107(a)(1)-(2).

[3]    For example, the exceptions permit individuals to carry concealed firearms if they are in law enforcement, the National Guard, or the military, and to transport firearms to and from places of purchase and shooting ranges if the firearms are not loaded. 18 Pa. Cons. Stat. § 6106(b). They do not, however, provide the typical, law-abiding Pennsylvanian with the option of carrying a loaded and operable firearm for most lawful purposes, including self-defense.

 **\*2** Taken together, §§ 6106, 6107, and 6109 – when combined with a state or municipal emergency declaration – have the practical effect of preventing most 18-to-20-year-old adult Pennsylvanians from carrying firearms. When this suit was filed in October 2020, "Pennsylvania had been in an uninterrupted state of emergency for nearly three years" due to gubernatorial proclamations related to the COVID-19 pandemic, the opioid addiction crisis, and Hurricane Ida. (Comm'r Letter Br. at 4-5.) Perhaps out of weariness with the ongoing emergency declarations, Pennsylvania recently amended its constitution to limit the governor's authority to issue such emergency declarations to twenty-one days, unless

the General Assembly votes to extend it. Pa. Const. art. IV, § 20. Subsequently, all state-wide emergency declarations lapsed.

### B. Proceedings below

The Appellants sued the Commissioner, Robert Evanchick, in his official capacity, challenging as unconstitutional under the Second Amendment the combined effect of §§ 6106, 6107, and 6109, which, together with the then-ongoing state of emergency, foreclosed them from carrying firearms in public places. [4]

[4]    Besides facially challenging the UFA, the complaint also raised as-applied challenges in the alternative. The Appellants, however, have not articulated any as-applied challenge in their briefs and have therefore forfeited those claims. *Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is [forfeited] unless a party raises it in its opening brief[.]").

They moved for a preliminary injunction in December 2020, and the Commissioner responded by moving to dismiss under Federal Rule of Civil Procedure 12(b)(6). The District Court denied the motion for a preliminary injunction and granted the Commissioner's motion to dismiss the case. Citing this Court's past decisions "giv[ing] broad construction to ... 'longstanding' and 'presumptively valid regulatory measures' in the context of licensing requirements," and the "broad consensus" of decisions from other federal courts "that restrictions on firearm ownership, possession and use for people younger than 21 fall within the types of 'longstanding' and 'presumptively lawful' regulations envisioned by [*District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008)]," the District Court concluded that Pennsylvania's restrictions "fall outside the scope of the Second Amendment." (J.A. at 5, 20.)

The Appellants timely appealed.

## II. DISCUSSION [5]

[5]    "When considering a Rule 12(b)(6) motion, we 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff

may be entitled to relief.' " *Blanyar v. Genova Prods. Inc.*, 861 F.3d 426, 431 (3d Cir. 2017). When reviewing a district court's refusal to grant a preliminary injunction, we review the court's findings of fact for clear error, its conclusions of law de novo, and its ultimate decision to deny the injunction for abuse of discretion. *Am. Express Travel Related Servs., Inc. v. Sidamon–Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). Whether the Second Amendment conflicts with the statutory scheme at issue here is a question of law that we review de novo. *Hernandez-Morales v. Att'y Gen.*, 977 F.3d 247, 249 (3d Cir. 2020).

### A. The Supreme Court's new, two-part test

The Second Amendment, controversial in interpretation of late, [6] is simple in its text: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

[6]    *Compare, e.g.*, Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 YALE L.J. 99, 105 (2023) ("Although there is still time for courts to develop workable standards (as they did after [ ]*Heller*), post-*Bruen* cases reveal an erratic, unprincipled jurisprudence, leading courts to strike down gun laws on the basis of thin historical discussion and no meaningful explanation of historical analogy."), *with* Nelson Lund, Bruen's *Preliminary Preservation of the Second Amendment*, 23 FEDERALIST SOC'Y REV. 279, 289 (2022) ("[T]he *Bruen* majority [saw] that the circuit courts were generally treating the Second Amendment with dismissive hostility, as if it were a second-class provision of the Bill of Rights.").

**\*3** In *Heller*, the Supreme Court held that, regardless of militia service, the Second and Fourteenth Amendments guarantee to an individual the right to possess a handgun in his home for self-defense. 554 U.S. at 584, 592, 128 S.Ct. 2783. In that opinion, which addressed a District of Columbia law that banned handguns and required other "firearms in the home be rendered and kept inoperable at all times," the Court observed that the challenged law would be unconstitutional "[u]nder any of the standards of scrutiny ... applied to enumerated constitutional rights." *Id.* at 628-30, 128 S.Ct. 2783. We and other courts had interpreted that

observation as endorsing a means-end scrutiny analysis in Second Amendment cases.[7]

[7]  *See, e.g., Holloway v. Att'y Gen.*, 948 F.3d 164, 172 (3d Cir. 2020) ("If a challenger makes a 'strong' showing that the regulation burdens his Second Amendment rights ... then 'the burden shifts to the Government to demonstrate that the regulation satisfies' intermediate scrutiny."); *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 128 (2d Cir. 2020) ("Laws that 'place substantial burdens on core rights are examined using strict scrutiny'; but laws that 'place either insubstantial burdens on conduct at the core of the Second Amendment or substantial burdens [only] on conduct outside the core ... can be examined using intermediate scrutiny.' ") (alteration in original); *United States v. McGinnis*, 956 F.3d 747, 754 (5th Cir. 2020) ("[A] 'regulation that threatens a right at the core of the Second Amendment'– i.e., the right to possess a firearm for self-defense in the home – 'triggers strict scrutiny,' while 'a regulation that does not encroach on the core of the Second Amendment' is evaluated under intermediate scrutiny."); *Worman v. Healey*, 922 F.3d 26, 36 (1st Cir. 2019) ("The appropriate level of scrutiny 'turn[s] on how closely a particular law or policy approaches the core of the Second Amendment right and how heavily it burdens that right.' "); *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) ("[A] severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end.").

Then, last year, in *New York State Rifle & Pistol Ass'n Inc. v. Bruen*, the Supreme Court held that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun ... outside the home." 597 U.S. 1, 142 S. Ct. 2111, 2122, 213 L.Ed.2d 387 (2022). The Court rejected "means-end scrutiny in the Second Amendment context" and announced a new two-step analytical approach. *Id.* at 2122, 2126-27. At the first step, a court determines whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2129-30. That " 'textual analysis' focus[es] on the 'normal and ordinary' meaning of the Second Amendment's language." *Id.* at 2127 (quoting *Heller,* 554 U.S. at 576-78, 128 S.Ct. 2783). If the text applies to the

conduct at issue, "the Constitution presumptively protects that conduct." *Id.* at 2130.

At the second step, a court determines whether the regulation in question "is consistent with the Nation's historical tradition of firearm regulation." *Id.* If it is, the presumption made at the first step of *Bruen* is overcome, and the regulation in question can stand.

To aid the court in that second-step analysis, the government bears the burden of identifying a "founding-era" historical analogue to the modern firearm regulation. *Id.* at 2130-33. We are to look to the founding because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Id.* at 2130, 2136 (quoting *Heller,* 554 U.S. at 634-35, 128 S.Ct. 2783). The question is "whether historical precedent from before, during, and even after the founding evinces a comparable tradition of regulation." *Id.* at 2131-32 (quoting *Heller,* 554 U.S. at 631, 128 S.Ct. 2783 (internal quotation marks omitted)). In considering that precedent, however, we discount "[h]istorical evidence that long predates" 1791 and "guard against giving postenactment history more weight than it can rightly bear." *Id.* at 2136-37.

**\*4**  Assessing the similarity of current regulations to those of the founding era calls on us to consider both "how and why the regulations [being compared] burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133; *see also id.* ("[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry.") (internal quotation marks omitted). We must be wary of a modern law that only "remotely resembles a historical analogue," because to uphold such a law risks "endorsing outliers that our ancestors would never have accepted." *Id.* (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021)). "On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

In sum, at a high level, *Bruen* requires two distinct analytical steps to determine the constitutionality of a firearm regulation. The court first decides whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does, "the government must demonstrate that the

regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

### B. The Second Amendment's reference to "the people" covers all adult Americans.

In defense of the Pennsylvania statutes, the Commissioner first argues that 18-to-20-year-olds are not among "the people" protected by the Second Amendment, and the Appellants' challenge therefore fails the first step of the *Bruen* test. This is an issue of first impression for us.

To succeed on this argument, the Commissioner must overcome the strong presumption that the Second Amendment applies to "all Americans." *Heller,* 554 U.S. at 581, 128 S.Ct. 2783. In *Heller,* the Supreme Court reiterated that "the people ... refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* at 580, 128 S.Ct. 2783 (quoting *United States v. Verdugo–Urquidez,* 494 U.S. 259, 265, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990)). The Court also explained that, like other references to "the people" in the Constitution, "the term unambiguously refers to all members of the political community, not an unspecified subset." *Id.* Accordingly, there is "a strong presumption that the Second Amendment right ... belongs to all Americans." [8] *Id.* at 581, 128 S.Ct. 2783.

[8]   *Heller* identified Second Amendment rightsholders at various points as "Americans," "all Americans," "citizens," and "law-abiding citizens." 554 U.S. at 580-81, 625, 128 S.Ct. 2783.

*Bruen* once again affirmed the broad scope of the Second Amendment, stating that the "Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to reasonable, well-defined restrictions." 142 S. Ct. at 2156 (quoting *Heller,* 554 U.S. at 581, 128 S.Ct. 2783). [9] Taking our cue from the Supreme Court, we have construed the term "the people" to cast a wide net. In *Range v. Attorney General,* we considered an as-applied challenge to the constitutionality of a federal statute that barred the defendant from purchasing firearms because of a state-level conviction for having made a false statement to obtain food stamps. 69 F.4th 96, 98 (3d Cir. 2023) (en banc). We held that the Supreme Court's past references to "law-abiding citizens" did not mean that a criminal conviction removes an American citizen from "the people." *Id.* at 101-02. We reasoned that

"[u]nless the meaning of the phrase 'the people' [in the Constitution] varies from provision to provision – and the Supreme Court in *Heller* suggested it does not – to conclude that [the defendant] is not among 'the people' for Second Amendment purposes would exclude him from those rights as well." *Id.* at 102.

[9]   *Bruen* also stated that the protections of the Second Amendment extend to "ordinary, law-abiding, adult citizens." 142 S. Ct. at 2134.

**\*5**  The Commissioner endeavors to argue around that conclusion by saying that, "[a]t the time of the Founding – and, indeed, for most of the Nation's history – those who were under the age of 21 were considered 'infants' or 'minors' in the eyes of the law[,]" "mean[ing] that they had few independent legal rights." (Comm'r Letter Br. at 8-9.) True enough, from before the founding and through Reconstruction, those under the age of 21 were considered minors. *See, e.g.,* 1 William Blackstone, *Commentaries on the Laws of England* 451 (Oxford, Clarendon Press 1765) ("So that full age in male or female, is twenty one years ... who till that time is an infant, and so styled in law."); 1 Zephaniah Swift, *A System of the Laws of the State Of Connecticut* 213 (Windham, John Byrne pub. 1795) ("Persons within the age of 21, are, in the language of the law denominated infants, but in common speech – minors."); *Infant, Black's Law Dictionary* (11th ed. 2019) ("An infant in the eyes of the law is a person under the age of twenty-one years") (quoting John Indermaur, *Principles of the Common Law* 195 (Edmund H. Bennett ed., 1st Am. ed. 1878)).

Notwithstanding the legal status of 18-to-21-year-olds during that period, however, the Commissioner's position is untenable for three reasons. First, it supposes that the first step of a *Bruen* analysis requires excluding individuals from "the people" if they were so excluded at the founding. That argument conflates *Bruen*'s two distinct analytical steps. Although the government is tasked with identifying a historical analogue at the second step of the *Bruen* analysis, we are not limited to looking through that same retrospective lens at the first step. If, at step one, we were rigidly limited by eighteenth century conceptual boundaries, "the people" would consist of white, landed men, and that is obviously not the state of the law. [10] *Cf., Bruen,* 142 S. Ct. at 2132 (noting that the Second Amendment's "reference to 'arms' does not apply 'only [to] those arms in existence in the 18th century' "); *Range,* 69 F.4th at 104-05 (observing that founding-era gun restrictions based on "race and religion" such as those

on "Loyalists, Native Americans, Quakers, Catholics, and Blacks" would now be "unconstitutional under the First and Fourteenth Amendments").

10    *See* Note, *The Meaning(s) of 'The People' in the Constitution*, 126 Harv. L. Rev. 1078, 1085 (2013) (" '[T]he people' largely meant property-owning white adult males, at least initially.").

Second, it does not follow that, just because individuals under the age of 21 lacked certain legal rights at the founding, they were ex ante excluded from the scope of "the people." As then-Judge Barrett explained, "[n]either felons nor the mentally ill are categorically excluded from our national community." *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting). But "[t]hat does not mean that the government cannot prevent them from possessing guns. Instead, it means that the question is whether the government has the power to disable the exercise of *a right that they otherwise possess.*" *Id.* (emphasis added).

Third, consistency has a claim on us. It is undisputed that 18-to-20-year-olds are among "the people" for other constitutional rights such as the right to vote (U.S. Const. art. I, § 2; *id.* amend. XVII), freedom of speech, peaceable assembly, government petitions (*id.* amend. I), and the right against unreasonable government searches and seizures (*id.* amend. IV). [11] As we recently observed in *Range*, there is "no reason to adopt an inconsistent reading of 'the people.' " 69 F.4th at 102. Indeed, wholesale exclusion of 18-to-20-year-olds from the scope of the Second Amendment would impermissibly render "the constitutional right to bear arms in public for self-defense ... 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.' " *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald v. Chicago*, 561 U.S. 742, 780, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010)).

11    The three other provisions in the Constitution that explicitly refer to "the people" are the preamble ("We the People"), the Ninth Amendment (providing that no enumerated constitutional right "shall ... be construed to deny or disparage others retained by the people"), and the Tenth Amendment (providing "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.").

**\*6** We therefore hold that 18-to-20-year-olds are, like other subsets of the American public, presumptively among "the people" to whom Second Amendment rights extend. [12] If there is any argument to be made that the Commonwealth can restrict the rights of 18-to-20-year-olds with respect to firearms, *Bruen* teaches that the Commissioner must make that argument by showing that such restrictions are part of the nation's historical tradition of gun regulation. 142 S. Ct. at 2130.

12    Two other federal appellate courts have determined that 18-to-20-year-olds are among "the people" protected by the Second Amendment. *Hirschfeld v. ATF*, 5 F.4th 407, 418-34 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021); *Jones v. Bonta*, 34 F.4th 704, 717-21 (9th Cir. 2022), *opinion vacated on reh'g*, 47 F.4th 1124 (9th Cir. 2022). *Hirschfeld* and *Bonta* were decided before *Bruen*. *Hirschfeld* was vacated as moot because the plaintiff turned 21 while the case was on appeal, 14 F.4th at 326-27, and *Bonta* was vacated and remanded to the district court for consideration in light of *Bruen*, 47 F.4th at 1125. Their analyses are nevertheless instructive.

In *Hirschfeld*, the Fourth Circuit, after reviewing the use of "the people" in the rights enumerated in the First and Fourth Amendments, expressed its view that "it is hard to conclude that 18-to-20-year-olds have no Second Amendment rights where almost every other constitutional right affords them that protection." 5 F.4th at 424. In a variant on a familiar canon of construction, the Fourth Circuit also explained that when the drafters of the Constitution and its amendments wanted to set an age restriction, they did so explicitly:

[W]hile various parts of the Constitution include age requirements, the Second Amendment does not. The Founders set age requirements for Congress and the Presidency, but they did not limit any rights protected by the Bill of Rights to those of a certain age. *See* U.S. Const. art. I, § 2 (age 25 for the House); *id.* art. I, § 3 (age 30 for the Senate); *id.* art. II, § 1 (age 35 for the President); *cf. id.* amend. XXVI (setting voting age at 18). In other words, the Founders considered age and knew how to set age requirements but placed no such restrictions on rights, including those protected by the Second Amendment.

*Id.* at 421.

The Ninth Circuit in *Bonta* reached the same conclusion about age limits, but on a different basis. It determined that the Second Amendment "protects the right of the people to keep and bear arms and refers to the militia. Young adults were part of the militia and were expected to have their own arms. Thus, young adults have Second Amendment protections as 'persons who are a part of a national community.' " *Bonta,* 34 F.4th at 724 (citing *Heller,* 554 U.S. at 580, 128 S.Ct. 2783).

We acknowledge that our dissenting colleague sees things differently. He shares the Commissioner's view that 18-to-21-year-olds are not under the protection of the Second Amendment. Our understanding, however, for the reasons already described is to the contrary.

### C. The relevant historical timeframe

The Commissioner does seek to shoulder that burden, but, before considering whether he has succeeded in his task, we must establish which period – the Second Amendment's ratification in 1791 or the Fourteenth Amendment's ratification in 1868 – is the proper historical reference point for evaluating the contours of the Second Amendment as incorporated against the Commonwealth. The Appellants direct us to 1791, but the Commissioner insists that 1868 is the correct temporal reference point.

**\*7** *Bruen* declined to resolve this timeframe question because, in that case, the public understanding of the Second Amendment right at issue was the same in 1791 and 1868 "for all relevant purposes." 142 S. Ct. at 2138. We are situated differently, however, because, while the Commissioner has not pointed to an eighteenth century regulation barring 18-to-20-year-olds from carrying firearms, he says that there are "dozens of 19th century laws restricting 18-to-20-year-olds' ability to purchase, possess and carry firearms[.]" (Comm'r Letter Br. Reply at 7.)

A premise we begin with is that the "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen,* 142 S. Ct. at 2137; s*ee also Ramos v. Louisiana,* –––– U.S. ––––, 140 S. Ct. 1390, 1397, 206 L.Ed.2d 583 (2020) ("There can be no question either that the Sixth Amendment's unanimity requirement applies to state and federal criminal trials equally."); *Timbs v. Indiana,* ––– U.S. ––––, 139 S. Ct. 682, 687, 203 L.Ed.2d 11 (2019) ("Incorporated Bill of Rights guarantees are 'enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.' ") (quoting *McDonald,* 561 U.S. at 765, 130 S.Ct. 3020); *Malloy v. Hogan,* 378 U.S. 1, 10, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) ("We have held that the guarantees of the First Amendment, the prohibition of unreasonable searches and seizures of the Fourth Amendment, and the right to counsel guaranteed by the Sixth Amendment, are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.") (internal citations omitted).

Accordingly, the Commissioner must establish that the Second Amendment – whether applied against a state or federal regulation – is best construed according to its public meaning at the time of the Fourteenth Amendment's ratification as opposed to the public meaning of the right when the Second Amendment was ratified. Although *Bruen* did not definitively decide this issue, it gave a strong hint when it observed that there has been a general assumption "that the scope of the protection applicable to the Federal Government and States [under the Bill of Rights] is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen,* 142 S. Ct. at 2137. In support, it cited *Crawford v. Washington,* 541 U.S. 36, 42-50, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *Virginia v. Moore,* 553 U.S. 164, 168-69, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008); and *Nevada Commission on Ethics v. Carrigan,* 564 U.S. 117, 122-25, 131 S.Ct. 2343, 180 L.Ed.2d 150 (2011).

In those cases, the Court interpreted the bounds of the Sixth, Fourth, and First Amendments, respectively, according to their public meaning at the founding. In *Crawford,* which considered the scope of the Confrontation Clause, the Court observed that "[t]he right to confront one's accusers is a concept that dates back to Roman times," but the emphasis in the opinion was on "English common law" because it was "[t]he founding generation's immediate source of the concept[.]" 541 U.S. at 43, 124 S.Ct. 1354. Then in *Moore,* the Court explained that, "[i]n determining whether a search or seizure is unreasonable, we begin with history." 553 U.S. at 168, 128 S.Ct. 1598. That history includes "the statutes and common law of the founding era" and the understanding "of those who ratified the Fourth Amendment." *Id.* Finally, in *Nevada Commission on Ethics,* the Court held that a Nevada statute requiring public officials to recuse themselves

from voting on certain matters did not violate the First Amendment, and founding-era evidence was "dispositive" in the analysis. [13] 564 U.S. at 122, 131 S.Ct. 2343; *see also id. at 121, 131 S.Ct. 2343* ("Laws punishing libel and obscenity are not thought to violate 'the freedom of speech' to which the First Amendment refers because such laws existed in 1791 and have been in place ever since.").

[13]    *See also Printz v. United States, 521 U.S. 898, 905, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997)* ("[E]arly congressional enactments 'provid[e] contemporaneous and weighty evidence of the Constitution's meaning.' ") (quoting *Bowsher v. Synar, 478 U.S. 714, 723-24, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986)*).

 **\*8**  While the Supreme Court has not held that all constitutional rights that have been made applicable to the states must be construed according to their public meaning in 1791, the Commissioner has not articulated a theory for defining some rights according to their public meaning in 1791 and others according to their public meaning in 1868. Moreover, *Bruen* has already instructed that historical evidence from 1791 is relevant to understanding the scope of the Second Amendment as incorporated against the states. *Bruen*, 142 S. Ct. at 2139, 2145. Accordingly, to maintain consistency in our interpretation of constitutional provisions, we hold that the Second Amendment should be understood according to its public meaning in 1791. [14]

[14]    We thus part ways with the Eleventh Circuit, which held in *National Rifle Ass'n v. Bondi, 61 F.4th 1317 (11th Cir.), reh'g en banc granted, opinion vacated, 72 F.4th 1346 (11th Cir. 2023)*, that the Second Amendment's "contours turn on the understanding that prevailed at the time of the later ratification – that is, when the Fourteenth Amendment was ratified." *Id.* at 1323. According to *Bondi*, "[t]his is necessarily so if we are to be faithful to the principle that 'constitutional rights are enshrined with the scope that they were understood to have *when the people adopted them.*' " *Id.* at 1323 (quoting *Bruen, 142 S. Ct. at 2136*) (cleaned up). *Bondi* overlooks that two generations of Americans ratified the Second and Fourteenth Amendments. If we are to construe the rights embodied in those amendments coextensively, as the Supreme Court has instructed we must, and if there is daylight between how each generation understood a particular right, we must

pick between the two timeframes and, as explained herein, we believe the better choice is the founding era.

We thus set aside the Commissioner's catalogue of statutes from the mid-to-late nineteenth century, as each was enacted at least 50 years after the ratification of the Second Amendment. [15] What is left is an eighteenth-century statute that supposedly supports the contention that Pennsylvania's current restriction on 18-to-20-year-olds is a "longstanding, presumptively lawful regulation[.]" (Answering Br. at 27.) Specifically, the Commissioner directs us to Pennsylvania's Act of August 26, 1721, which prohibited "carry[ing] any gun or hunt[ing] on the improved or inclosed lands of any plantation other than his own[.]" [16] But we can discern no near equivalence or significant analogue between the burdens imposed by that statute and those at issue here. For one thing, the 1721 statute appears to be primarily focused on preventing Pennsylvanians from hunting on their neighbors' land, not on restricting the right to publicly carry a gun. When the statute was later repealed and replaced in 1760, that subsequent statute included another provision that prevented "fir[ing] a gun on or near any of the King's highways," which indicates that carrying a firearm in public places was generally not restricted. [17] Act of Apr. 9, 1760, ch. 456, 6 Statutes at Large of Pa. 46, 48. More to the point, however, to the extent the statute did burden the right to carry a gun in public, it did so without singling out 18-to-20-year-olds, or any other subset of the Pennsylvania population for that matter.

[15]    1856 Ala. Acts 17 (banning gun sales to minors under 21); 16 Del. Laws 716 (1881) (banning concealed-carry, and banning the sale of deadly weapons to minors under 21); Wash. D.C. 27 Stat. 116 (1892) (criminalizing concealed-carry for all persons, and banning the sale of guns and dangerous weapons to minors under 21); 1876 Ga. Laws 112 (banning gun sales to minors under 21); 1881 Ill. Laws 73 (banning the sale of guns and other dangerous weapons to minors under 21); 1875 Ind. Acts 86 (banning the sale of pistols, cartridges, and other concealable deadly weapons to anyone under 21); 1884 Iowa Acts 86 (banning the sale of pistols to minors under 21); 1883 Kan. Sess. Laws 159; (banning the purchase and possession of guns and other dangerous weapons by minors under 21); 1873 Ky. Stat. art. 29, at 359 (criminalizing concealed-carry for all persons, and banning the sale of all deadly weapons to minors

under 21); 1890 La. Acts 39 (banning the sale of concealable deadly weapons to anyone under 21); 1882 Md. Laws 656 (banning the sale of firearms and deadly weapons other than rifles and shotguns to minors under 21); 1878 Miss. Laws 175 (criminalizing concealed-carry for all persons, and prohibiting the sale of firearms and deadly weapons to intoxicated persons or to minors under 21); 1883 Mo. Laws 76 (criminalizing concealed-carry for all persons, and prohibiting the sale of such weapons to minors under 21 without parental consent); 1885 Nev. Stat. 51 (prohibiting minors under 21 from carrying concealed pistols and other dangerous weapons); 1893 N.C. Sess. 468-69 (banning the sale of pistols and other dangerous weapons to minors under 21); 1856 Tenn. Pub. Acts 92 (prohibiting the sale of pistols and other dangerous weapons to minors under 21); 1897 Tex. Gen. Laws 221-22 (banning the sale of pistols and other dangerous weapons to minors under 21); 1882 W.Va. Acts 421-22 (criminalizing carrying guns and other dangerous weapons about one's person and prohibiting the sale of such weapons to minors under 21); 1883 Wis. Sess. Laws 290 (making it unlawful for "any minor ... to go armed with any pistol or revolver" and for any person to sell firearms to minors under 21); 1890 Wyo. Sess. Laws 1253 (banning the sale of pistols and other dangerous weapons to anyone under 21).

Full texts of these laws are available at the *Repository of Historical Gun Laws*, Duke Univ. School of Law, https://firearmslaw.duke.edu/repository/search-the-repository/ (last visited Sept. 26, 2023).

16 In full, the Act provided:

Be it enacted by the authority aforesaid, That if any person or persons shall presume, at any time after the sixteenth day of November, in this present year one thousand seven hundred and twenty one, to carry any gun or hunt on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner of such lands or plantation, and shall thereof convicted ether upon view of any justice of the peace within this province, or by the oath or affirmation of any one or more witnesses, before any justice of the peace, he shall for every such offense forfeit the sum of ten shillings. And if any person

whatsoever, who is not owner of fifty acres of land and otherwise qualified in the same manners as persons are or ought to be by the laws of this province for electing of members to serve in assembly, shall at any time, after the said Sixteenth day of November, carry any gun, or hunt in the woods or inclosed lands, without license or permission obtained from the owner or owners of such lands, and shall be thereof convicted in manner aforesaid, such offender shall forfeit and pay the sum of five shillings.

Act of Aug. 26, 1721, ch. 246, 3 Statutes at Large of Pa. 254, 255-56, *repealed by* Act of Apr. 9, 1760, ch. 456, 6 Statutes at Large of Pa. 46. Text available at the *Repository of Historical Gun Laws*, https://firearmslaw.duke.edu/laws/the-statutes-at-large-of-pennsylvania-c-142-p-254-an-act-to-prevent-the-killing-of-deer-out-of-season-and-against-carrying-of-guns-or-hunting-by-persons-not-qualified/ (last visited Sept. 26, 2023).

17 In full, the relevant portion of the 1760 Act provided:

Be it enacted, That if any person or persons shall presume, at any time after the publication of this act[,] to carry any gun or hunt on any enclosed or improved lands of any of the inhabitants of this province[,] other than his own[,] unless he shall have license or permission from the owner of such lands, or shall presume to fire a gun on or near any of the King's highways and shall be thereof convicted, either upon view of any [J]ustice of the [P]eace within this province or by the oath or affirmation of any one or more witnesses before any [J]ustice of the [P]eace, he shall for every such offence forfeit the sum of forty shillings.

Act of Apr. 9, 1760, ch. 456, 6 Statutes at Large of Pa. 46, 48. Text available at the Repository of Historical Gun Laws, https://firearmslaw.duke.edu/laws/laws-of-the-commonwealth-of-pennsylvania-from-the-fourteenth-day-of-october-one-thousand-seven-hundred-to-the-twentieth-day-of-march-one-thousand-eight-hundred-and-ten-page-229-image-288-vol-1/ (last visited Sept. 26, 2023).

*9 Against that conspicuously sparse record of state regulations on 18-to-20-year-olds at the time of the Second Amendment's ratification, we can juxtapose the Second

Militia Act, passed by Congress on May 8, 1792, a mere five months after the Second Amendment was ratified on December 15, 1791. The Act required all able-bodied men to enroll in the militia and to arm themselves upon turning 18.[18] Second Militia Act of 1792 § 1, 1 Stat. 271 (1792). That young adults had to serve in the militia indicates that founding-era lawmakers believed those youth could, and indeed should, keep and bear arms.

[18]   The Second Militia Act required that "every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years and under the age of forty-five years (except as herein exempted) shall severally and respectively be enrolled in the militia[.]" Second Militia Act of 1792 § 1, 1 Stat. 271 (1792). The Second Militia Act further required every member of the militia to "provide himself with a good musket or firelock ... or with a good rifle[.]" *Id.* § 1.

The First Militia Act, which Congress passed shortly before, on May 2, 1792, gave the president authority to call out the militias of the several states, "whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe." First Militia Act of 1792 § 1, 1 Stat. 264 (1792).

The Commissioner contests the relevancy of the Second Militia Act on three grounds. First, he notes that, "to the extent 1791 militia laws have any relevance, the UFA contains an exception for members of the Military and National Guard, and is thus entirely consistent with them."[19] (Comm'r Letter Br. Reply at 7 (citing 18 Pa. Cons. Stat. § 6106(b)(2)).) Second, he objects that, when the Second Amendment was ratified, nine states set the threshold for militia service at 16 and seven states set the maximum age at 50. According to the Commissioner, the "logical extension of Appellants' argument that militia laws in 1791 determine the scope of the Second Amendment would also require the invalidation of any contemporary law restricting 16-year-olds from purchasing, possessing, and carrying firearms, but would allow laws stripping 51-year-olds of the right to keep and bear arms." (Comm'r Letter Br. Reply at 5.) And third, he asserts that the Second Militia Act of 1792 – as well as similar state statutes that required 18-to-20-year-olds to participate in the militia – "often assumed that militiamen younger than 21 did not have the independent ability to acquire firearms,

and therefore required their parents to provide them with arms."[20] (Comm'r Letter Br. Reply at 5.)

[19]   Although the founding generation was "devoted to the idea of state control of the militia," modern statutes "nationalized the function and control of the militia" and reorganized it "into the modern National Guard." Saul Cornell, A Well Regulated Militia: The Founding Fathers and the Origins of Gun Control in America 37, 196 (2006).

[20]   The Commissioner also notes that Pennsylvania's 1755 Militia Act provided that "no Youth, under the Age of Twenty-one Years, ... shall be admitted to enroll himself ... without the Consent of his or their Parents or Guardians[.]" The text of that statute is available at *Militia Act, [25 November 1755]*, Nat'l Archives, https://founders.archives.gov/ documents/ Franklin/01-06-02-0116#BNFN-01-06-02-0116-fn-0001 (last visited Sept. 20, 2023).

No doubt, the Commissioner is correct that a duty to possess guns in a militia or National Guard setting is distinguishable from a right to bear arms unconnected to such service. *See Nat'l Rifle Assoc. v. Bondi*, 61 F.4th 1317, 1331 (11th Cir. 2023) (cautioning against the conflation of the obligation to perform militia service with the right to bear arms). Still, the Second Militia Act is good circumstantial evidence of the public understanding at the Second Amendment's ratification as to whether 18-to-20-year-olds could be armed, especially considering that the Commissioner cannot point us to a single founding-era statute imposing restrictions on the freedom of 18-to-20-year-olds to carry guns.[21] The Commissioner's contention that any reliance on 1789 militia laws would force us to invalidate laws prohibiting 16-to-17-year-old from possessing firearms is simply not persuasive. Although the age of militia service dipped to 16 in some states during the colonial and revolutionary periods – a development that likely can be attributed to necessities created by ongoing armed conflicts – the Appellants rightly observe that, "[a]t the time of the Second Amendment's passage, or shortly thereafter, the minimum age for militia service in *every state* became eighteen." (Reply Br. at 17 (citing *Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 714 F.3d 334, 340 (5th Cir. 2013) (Jones, J., dissenting)).) Finally, even though there were founding-era militia laws that required parents or guardians to supply arms to their minor

sons, nothing in those statutes says that 18-to-20-year-olds could not purchase or otherwise acquire their own guns.

21    *See* *Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 714 F.3d 334, 342 (5th Cir. 2013) (Jones, J., dissenting from the denial of rehearing) ("[T]hose minors were in the militia and, as such, they were required to own their own weapons. What is inconceivable is any argument that 18-to-20-year-olds were not considered, at the time of the founding, to have full rights regarding firearms.") (emphasis removed).

**\*10** We understand that a reasonable debate can be had over allowing young adults to be armed, but the issue before us is a narrow one. Our question is whether the Commissioner has borne his burden of proving that evidence of founding-era regulations supports Pennsylvania's restriction on 18-to-20-year-olds' Second Amendment rights, and the answer to that is no.

### D. This case is not moot

The Commissioner next argues that none of the foregoing matters because the Appellants no longer face any restrictions on their ability to carry publicly, which eliminates any injury for which they could obtain relief. In other words, he says the case is moot. He points to the amendment to Pennsylvania's constitution that now limits the governor's authority to issue an emergency declaration to 21 days, unless the General Assembly votes to extend it. *See* PA. Const. art. IV, § 20(c). And he notes that the emergency proclamations in place when this suit began have all lapsed. Accordingly, the Commissioner says, there is no longer any restriction on the Appellants' ability to openly carry firearms. He also argues that the claims of the individual Appellants are moot because they have reached the age of 21 and are now eligible to apply for a concealed-carry license.

Generally, a case is moot when "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Virgin Islands*, 842 F.3d 201, 208 (3d Cir. 2016). "[A]n appeal is moot in the constitutional sense only if events have taken place during the pendency of the appeal that make it impossible for the court to grant any effectual relief whatsoever." *In re World Imports Ltd.*, 820 F.3d 576, 582 (3d Cir. 2016).

Here, the Appellants invoke the "capable of repetition yet evading review" exception to the mootness rule, which applies "only in exceptional circumstances" when "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Hamilton v. Bromley*, 862 F.3d 329, 335 (3d Cir. 2017) (quoting *Spencer v. Kemna*, 523 U.S. 1, 17, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998)). A plaintiff need not show that future injury is certain, only that there is "more than a theoretical possibility of the action occurring against the complaining party again; it must be a reasonable expectation or a demonstrated probability." *Cnty. of Butler v. Governor of Pa.*, 8 F.4th 226, 231 (3d Cir. 2021) (quoting *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982)). The plaintiff has the burden of making that showing. *New Jersey Tpk. Auth. v. Jersey Cent. Power & Light*, 772 F.2d 25, 31-33 (3d Cir. 1985).

This is one such exceptional circumstance because, as the record shows, Pennsylvania has a recent history of declaring multiple emergencies, and it is reasonably likely that other 18-to-21-year-olds, including members of the organizational Appellants here, the Second Amendment Foundation and the Firearms Policy Coalition, will be banned from carrying guns in public yet again. 22 The Appellants persuasively argue that, while lengthy emergencies may now be less likely because of the recent constitutional amendment, the risk of regulated persons being unable to fully litigate this Second Amendment issue has increased since the adoption of the new constitutional amendment. Because emergencies may only last for twenty-one days, absent intervention from the General Assembly, there is not enough time to litigate a claim.

22    As the organizational Appellants acknowledge, their standing "depends upon at least one of their members having standing in their own right." (3d Cir. D.I. 71-1 at 1 (citing *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)).) Although the three named individual Appellants have reached the age of 21, the Court has been made aware of at least one individual, George Pershall, a 19-year-old resident of Chester County, Pennsylvania and U.S. citizen, who is a member of both the Second Amendment Foundation and the Firearms Policy Coalition, and will remain subject to the UFA's restrictions.

**E. The Appellants' claim is not barred by the Eleventh Amendment or Article III standing** [23]

[23]   We may consider Eleventh Amendment issues for the first time on appeal, *In re Hechinger Inv. Co. of Del., Inc.*, 335 F.3d 243, 251 (3d Cir. 2003), and may affirm the District Court's judgment on any ground supported by the record, *TD Bank N.A. v. Hill*, 928 F.3d 259, 276 n.9 (3d Cir. 2019).

**\*11**   The Commissioner's next salvo is, in essence, "they've got the wrong man." He says that the target of the Appellants' constitutional challenge is Pennsylvania's licensing scheme, not him, and that suing him is improper because he is powerless to issue licenses. [24] More specifically, he says that the *Ex parte Young* exception to the Eleventh Amendment, the exception that allows suits against an official who is a "representative of the state," [25] 209 U.S. 123, 157, 28 S.Ct. 441, 52 L.Ed. 714 (1908), is properly invoked only if the named defendant has a sufficient connection to the enforcement of the challenged law, as distinct from a generalized duty to enforce, and if there is a real potential that the official will in fact enforce the law. *See 1st Westco Corp. v. Sch. Dist. of Phila.*, 6 F.3d 108, 114-15 (3d Cir. 1993) (holding that "Commonwealth Officials' general duty to enforce the laws of the Commonwealth of Pennsylvania," standing alone, was "not ... a proper predicate for liability"). The Commissioner further argues that the Appellants lack standing under Article III of the Constitution because they cannot establish the requisite causation and redressability of their claim. [26]

[24]   Only county sheriffs may grant concealed-carry licenses.

[25]   The Eleventh Amendment generally bars suits against states in federal court without their consent. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from suit against the State itself." *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 241 (3d Cir. 2010) (citing *Will*, 491 U.S. at 71, 109 S.Ct. 2304) (cleaned up). A plaintiff can avoid that bar by naming a state official in a suit for prospective declaratory or injunctive relief to prevent a continuing violation of federal law. *Cf. Ex*

*parte Young*, 209 U.S. 123, 157, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (explaining that in bringing such an action, the "officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party").

[26]   To satisfy the Article III standing requirements of causation and redressability, a plaintiff must establish that his injury is causally connected to the government-defendant's challenged conduct, and that enjoining that conduct is likely to redress the plaintiff's injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). We agree with the Commissioner that, "[w]hen a plaintiff sues state officials to enjoin the enforcement of a state statute, the dictates of *Ex parte Young* overlap significantly with [the Article III requirements of] causation and redressability." (Answering Br. at 17-18.) If a plaintiff can show that the defendant's conduct causes an injury and that enjoining the conduct would redress the injury, that showing will satisfy the "sufficient connection" requirement under *Ex parte Young. See 1st Westco Corp. v. Sch. Dist. of Phila.*, 6 F.3d 108, 114-15 (3d Cir. 1993) (requiring a "real, not ephemeral, likelihood or realistic potential that the connection will be employed against the plaintiff's interests").

The Appellants have a ready and effective response. They say they are "agnostic" as to whether they get licenses to carry concealed weapons under §§ 6106 and 6109, or whether, despite § 6107, they can carry openly without a license during an emergency. (Reply Br. at 3-4.) In other words, the existence of a license is not what they are fighting about; it is the right to openly carry a gun regardless of a state of emergency. And they contend that enjoining the Commissioner from arresting 18-to-20-year-olds who openly carry firearms would in fact redress their constitutional injuries.

We agree that a bar on arrests would be a form of relief. [27] Accordingly, the Commissioner has an adequate connection to the enforcement of the challenged law, and neither the Eleventh Amendment nor Article III bars the Appellants' claim.

[27]   The Commissioner appears to implicitly acknowledge this as well. (*See* Answering Br. at 50 (asserting that a bar on arrests "would lead to

a perverse result, which would give an unlicensed 18-year-old high school senior the ability to carry concealed firearms in public at any time, but would leave her unlicensed parents vulnerable to criminal sanction for the same conduct. That result cannot be consistent with the intent of the General Assembly when it enacted the UFA").)

**F. The Appellants have not waived their request for injunctive relief, and their request is sufficiently specific.**[28]

[28]  Arguments not raised in an opening brief are forfeited, *In re Wettach*, 811 F.3d 99, 115 (3d Cir. 2016), and "arguments raised in passing (such as in a footnote), but not squarely argued, are considered [forfeited]," *Higgins v. Bayada Home Health Care Inc.*, 62 F.4th 755, 763 (3d Cir. 2023) (alteration in original).

**\*12** Finally, the Commissioner asserts that the Appellants forfeited their request for injunctive relief and failed to adequately describe that relief as required under Federal Rule of Civil Procedure 65(d). That argument fails too.

The Appellants repeatedly referenced their request for injunctive relief throughout their opening brief, and they discussed each of the elements of the preliminary injunction test, citing caselaw in support. The issue of injunctive relief therefore should not be a surprise to anyone in this case. The Commissioner had a full opportunity to develop a response in his answering brief. *Cf. Wood v. Milyard*, 566 U.S. 463, 473, 132 S.Ct. 1826, 182 L.Ed.2d 733 (2012) (holding that courts should exercise restraint in reaching issues that parties "would not have anticipated in developing their arguments on appeal").

And contrary to the Commissioner's argument that "it is unclear" as to "how an injunction (preliminary or permanent) against Commissioner Evanchick would function" (Answering Br. at 48), we think it is abundantly clear. As an initial matter, Rule 65(d) governs the "contents and scope of every injunction and restraining order" issued by a court, not the way in which a party requests injunctive relief. For that reason alone, the Commissioner's Rule 65(d) argument is meritless. More to the point though, while Rule 65(d) requires that the enjoined party "receive fair and precisely drawn notice of what the injunction actually prohibits," *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 322 (3d Cir. 2020), and that the injunction be "phrased in

terms of objective actions, not legal conclusions," *id.*, the Appellants' complaint did provide notice and specificity when it said, "Plaintiffs respectfully request[ ] that this Honorable Court ... [p]reliminarily, and thereafter permanently, enjoin Defendant, his officers, agents, [and] servants, employees, and all persons in active concert or participation with him from enforcing against Plaintiffs and those similarly situated, 18 PA. C.S. § 6107." (J.A. at 70-71.) There is nothing vague about that.

## III. CONCLUSION

For the foregoing reasons, we will reverse the decision of the District Court and remand with instructions to enter an injunction forbidding the Commissioner from arresting law-abiding 18-to-20-year-olds who openly carry firearms during a state of emergency declared by the Commonwealth.

RESTREPO, Circuit Judge, dissenting.

Because Pennsylvania's statutory scheme does not violate the Second Amendment of the Constitution, I respectfully dissent. The challenged statutory scheme here is "consistent with this Nation's historical tradition," as defined in *New York State Pistol & Rifle Association Inc. v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111, 2126, 213 L.Ed.2d 387 (2022).

In deciding whether a firearm regulation is constitutional under the Second Amendment, courts must examine whether the "regulation [being reviewed] is part of the historical tradition that delimits the outer boundaries of the right to keep and bear arms." *Id.* at 2127. In making this determination, "a court must decide whether the *challenger* or conduct at issue is protected by the Second Amendment and, *if so*, whether the Government has presented sufficient historical analogues to justify the restriction." *Range v. Att'y Gen.*, 69 F.4th 96, 113 (3d Cir. 2023) (Shwartz, J., dissent) (emph. added); *see* Majority Op. at II.A (citing *Bruen*, 142 S. Ct. at 2126) (explaining that, under *Bruen*, the court first decides whether "the Second Amendment's plain text covers an individual's conduct," and *if it does*, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.").

**\*13** *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), recognized that the Second Amendment protects the right of an "ordinary, law-abiding citizen to possess a handgun in the home for self-defense," *see Bruen*, 142 S. Ct. at 2122 (citing *Heller*, 554 U.S. at 581, 128

S.Ct. 2783), and *Bruen* held that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home," *id.* However, there is no dispute that there is some age threshold before which the protection of the Second Amendment does not apply.

The more acute question in this case, then, is where does that age threshold lie? A "textual analysis focused on the normal and ordinary meaning of the Second Amendment's language," *see Bruen*, 142 S. Ct. at 2127 (citing *Heller*, 554 U.S. at 576-77, 578, 128 S.Ct. 2783) (quotation marks omitted), and an "examination of a variety of legal and other sources," *see id.* at 2127-28 (quoting *Heller*, 554 U.S. at 605, 128 S.Ct. 2783), leads to the conclusion that the scope of the right, as understood during the Founding-era, excludes those under the age of 21.

## I. The public in 1791 did not understand those under 21 to be part of "the people" protected by the Second Amendment.

*Bruen* affirms the historical-textualist methodology established in *Heller*. *Bruen*, 142 S. Ct. at 2127. To interpret the language of the Second Amendment, one must look to historical sources evidencing how the public would have understood its text near the time of its ratification. *Bruen*, 142 S. Ct. at 2127-28; *Heller*, 554 U.S. at 576, 128 S.Ct. 2783. This principle presumes that constitutional rights do not change over time, but "are enshrined with the scope they were understood to have when the people adopted them." *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634-35, 128 S.Ct. 2783). When later history or understanding contradicts the original public meaning of the text, the original understanding controls. *Id.* at 2137.

Under *Bruen*, "[w]hen the Second Amendment's plain text *covers an individual's conduct*, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126, 2129-30 (emph. added). Thus, here, it would appear a presumption would apply only if the plain text of the Second Amendment covers the *Appellants'* conduct. In other words, if the text doesn't protect the Appellants here, it doesn't protect their conduct, and a presumption would not apply.

While my colleagues in the Majority acknowledge that "from before the founding and through Reconstruction, those under the age of 21 were considered *minors*," *see* Majority Op. at II.B (emph. added), the Majority also holds that the "words 'the people' in the Second Amendment presumptively

encompass all *adult* Americans, *including* 18-to-20-year-olds." *See* Majority Op. at intro. (emph. added). Thus, the Majority concludes that "all adult Americans" "include[es] 18-to-20-year-olds." *Id.* It is worth reiterating that there is no dispute that there is some age threshold before which the protection of the Second Amendment does not apply.

In *Bruen*, it was "undisputed that [the petitioners] – two ordinary, law-abiding, *adult* citizens – [were] part of 'the people' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2134 (emph. added). Whether the plain text of the Second Amendment covered the individual petitioners in *Bruen* was not at issue, and the Supreme Court "therefore turn[ed] to whether the plain text of the Second Amendment protects [the petitioners'] proposed *course of conduct.*" *Id.* (emph. added). There was no dispute in *Bruen* that the petitioners were part of "the people" in the Second Amendment. Similarly, whether individuals under 21 were part of "the people" in the Second Amendment was not at issue before the Supreme Court in *Heller* or before this Court in *Range.*

**\*14** The Majority seems to acknowledge that the Commissioner's argument that 18-to-20-year-olds are not among "the people" protected by the Second Amendment is a challenge to "the *first* step of the *Bruen* test," *see* Majority Op. at II.B (emph. added). However, the Majority then concludes that "[t]o succeed on this argument, the Commissioner must overcome the strong presumption that the Second Amendment applies to 'all Americans.' " *Id.* (citing *Heller*, 554 U.S. at 581, 128 S.Ct. 2783). It stands to reason that any reference to a definition of "the people" as it relates to 18-to-20-year-olds in *Heller, Bruen*, and *Range* is dictum.

It is only when the Second Amendment's plain text covers an "individual's conduct" (first step) that the presumption of constitutional protection applies, and "the government must *then* justify its regulation by demonstrating that it is consistent with the National historical tradition of firearm regulation" (second step). *Bruen*, 142 S. Ct. at 2129-30. Because the first step of the *Bruen* test for presumption of constitutional protection to apply is not met here, there is no burden to overcome such a presumption. *See* Majority Op. at II.B (citing *Heller*, 554 U.S. at 581, 128 S.Ct. 2783).

Nevertheless, assuming a need to overcome a "presumption that the Second Amendment applies to 'all Americans'," *see id.* (citing *Heller*, 554 U.S. at 581, 128 S.Ct. 2783), as the

Majority appears to do, in order to conclude the plain text of the Second Amendment covers the conduct of individuals under 21 at the first step of the *Bruen* test, there is evidence that the Founding-era public would not have understood the text of the Second Amendment to extend its protection to those under 21.

At the Founding, people under 21 lacked full legal personhood. Indeed, there is no disagreement that at the time of the Founding, people under 21 were considered "infants" in the eyes of the law. *See* Majority Op. at II.B; *see also* 1 William Blackstone, *Commentaries* *453; 4 James Kent, *Commentaries on American Law* 266 (W.M. Hardcastle Brown ed. 1894) (1826). Nor is there serious debate that the conception of adulthood beginning at age 18 is relatively new to American law.[1] But to understand the significance of the historical-legal conception of infant status, one must understand its predicate presumption of incapacity.

[1]    *See* Douglas E. Abrams, Susan V. Mangold, & Sarah H. Ramsey, *Children and the Law: Doctrine, Policy, and Practice* 19 (2020). Of course, the drinking age is still 21, and federal law currently prohibits tobacco sales to persons under 21. *Id.* The tradition of limiting the rights of those under 21 continues into the present.

The Founding-era generation inherited the common-law presumption that persons who lacked rationality or moral responsibility could not exercise a full suite of rights. Abrams, *supra* note 1, at 20. This idea has its roots in the Enlightenment conception of rights as being endowed only to those "with discernment to know good from evil, and with power of choosing those measures which appear ... to be more desirable." 1 William Blackstone, *Commentaries* *125; *see* Abrams, *supra* note 1, at 20. In other words, those whom society considered to be rational.

Both at English common law and in eighteenth-century American law, infants were universally believed to lack such rationality. Infants were viewed as requiring the protection of a guardian in the management of their affairs. 3 William Blackstone, *Commentaries* *48; 1 *Commentaries* *463. James Kent, a respected contemporary scholar of American constitutional law, said "[t]he necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years." Saul Cornell, "*Infants" and Arms Bearing in the Era*

*of the Second Amendment*, Yale L. & Pol'y Rev. (Oct. 26, 2021) (hereinafter "*Infants*") (quoting 2 James Kent, *Commentaries on American Law* 191 (O. Halsted ed., 1827)). Moreover, Blackstone referred to infancy as "a defect of the understanding." 4 William Blackstone, *Commentaries* *15-18.

 *15  A consequence of this legal presumption was that at the Founding, infants had few independent rights. Blackstone explains that, because of infants' inherent incapacity, parents had the power to limit their children's rights of association, to control their estates during infancy, and to profit from their labor. 1 William Blackstone, *Commentaries* *452-53. Infants could not marry without their father's consent. *Id.* at *437, *452. Fathers had a right to the profits of their infants' labor. *Id.* Even the right to contract, which the Framers thought to enshrine in the body of the Constitution, was greatly abridged for infants. *Id.* at *465; *Infants*; Eugene Volokh, *Symposium: The Second Amendment and the Right to Keep and Bear Arms After Heller*, 56 UCLA L. Rev. 1443, 1508-13 (2009) (noting restrictions on minors' exercise of fundamental rights and freedoms, including the right to contract). Blackstone went so far as to say that it was "generally true, that an infant [could] do no legal act." 1 William Blackstone, *Commentaries* *465. It was not until the infant reached the age of 21 that "they [were] then enfranchised by arriving at the years of discretion ... when the empire of the father, or other guardian, gives place to the empire of *reason*." 1 William Blackstone, *Commentaries* *463 (emph. added).

In England and the United States, infants could not sue or be sued except by joining their guardians. *Id.* at *464. For example, infants had "no legal standing to assert a claim in court to vindicate their rights, including Second Amendment-type claims." *Infants*. Because they could only access courts through their guardians, infants necessarily lacked redress against their parents except in cases of extreme neglect or abuse. 1 William Blackstone, *Commentaries* 168 n.9 (George Chase, ed.).[2]

[2]    Reason reemerges as a central justification of the delegation of rights on the question of estates: a child could only attack divestment from his father's estate if he could demonstrate a lack or deficiency of reason in doing so. 1 William Blackstone, *Commentaries* *448.

There is substantial evidence that this legal incapacity controls in the context of the Second Amendment. An

important element of Justice Scalia's reasoning in *Heller* was that the Second Amendment did not create a new right, but rather "codified a pre-existing right." *Heller*, 554 U.S. at 592, 599-600, 605, 652, 128 S.Ct. 2783. Accordingly, common-law principles are crucial to answering whether the right in question extends to people under the age of 21.

At the Founding, there was an important connection between property law and the right to keep arms. Some state constitutions expressly discussed both arms and militia service in the context of property law. *See, e.g.*, Saul Cornell, *History and Tradition or Fantasy and Fiction*, 39 Hastings Const. L.Q. 145, 153 (2022) (hereinafter "*History and Tradition*"). Several states exempted arms used in the militia from seizure during debt proceedings. *Id.* Some colonies required single men who could not afford to arm themselves, to work as servants until they could pay off the cost of a weapon. Nicholas J. Johnson et al., *Firearms Law and the Second Amendment* 243 (2022). And all colonies required certain persons to arm themselves at their own expense and without just compensation, often mandating that militia members purchase specific equipment and that dependents be armed by their guardians. *Id.* at 177-88, 242-54. There was thus an important relationship between property law and gun law at the Founding. Infants' common-law lack of independent property rights suggests that they were similarly disabled in keeping and bearing arms.

One might infer additional context from another source: the eighteenth-century college. At the Founding, "[c]ollege was one of the very few circumstances where minors lived outside of their parents' or a guardian's direct authority." *Infants.* But students were not liberated by their attendance; rather, the representatives of the college stood *in loco parentis*, a status based on parental consent which allowed them to exercise full legal power over the infants as though they were in fact the youths' parents. [3]

[3]    1 William Blackstone, *Commentaries* *453 ("[A father] may also delegate part of his parental authority, during his life, to the tutor or schoolmaster of his child; who is the *in loco parentis*, and has such a portion of the power of the parent committed to his charge, *viz.*, that of restraint and correction, as may be necessary to answer the purposes for which he is employed.").

**\*16**   Importantly, as with the parents themselves, the person standing *in loco parentis* could not excessively

punish or abuse a child, suggesting that fundamental rights remained intact under this relationship. 1 William Blackstone, *Commentaries* *168 n.9 (George Chase ed.). Yet colleges at the Founding could and did prohibit possession of firearms by students. *Infants.* This was true of Yale (founded 1701), the University of Georgia (founded 1785), the University of North Carolina (founded 1776), and Thomas Jefferson's University of Virginia (founded in 1819). *Id.* Among these schools, such prohibitions were unambiguous: students were not permitted to possess arms while on campus. *Id.* The University of Georgia even prohibited possessing weapons *off*-campus, strongly suggesting that this authority was not predicated on or justified by the student's presence at a sensitive location, but rather stemmed from the inherent power of the authority standing *in loco parentis* to dictate all but the most fundamental rights of the infants under its charge. [4]

[4]    "[N]o student shall be allowed to keep any gun, pistol, Dagger, Dirk[,] sword cane[,] or any other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever." *Infants* (quoting The Minutes of the Senate Academicus 1799–1842, Univ. of Ga. Librs. (2008) [https://perma.cc/VVT2-KFDB]).

The totality of this evidence demonstrates that the public during the Founding-era understood the plain text of the Second Amendment did not cover individuals under the age of 21. At the Founding, those under 21 were considered infants, a status that was a result of the presumption that people under the age of 21 lacked sufficient cognitive and moral faculties to govern themselves. The consequences of this presumption were profound: infants had very little independent ability to exercise fundamental rights, including those of contract and property. Indeed, except in a few narrow circumstances, infants could not seek redress in the courts except through their parents. Moreover, in one historical context, history suggests that any right that an infant may have had to bear arms could be abrogated in its entirety at the pleasure of the infant's parent or an authority standing *in loco parentis*. In light of such evidence, the conclusion that infants during the Founding-era were not meant to be protected under the Second Amendment seems clear.

The Majority points out that the Second Militia Act of 1792 required every white, male citizen between the ages of 18 and 45 to enroll in their local militia, equip themselves

with certain accoutrements (including "a good musket or firelock"), and appear when called out to exercise or into service. 1 Stat. 271. In addition, the age of militia service varied by state, with some states requiring children as young as 15 to serve. [5] Notwithstanding an argument that the Second Militia Act supports Appellants' position, there appears to be no claim that 15-year-olds are part of "the people" in the Second Amendment. In any event, the fact that infants had a *duty* under the Second Militia Act to enroll in the militia and thus to equip themselves with arms for that purpose should not be confused with such individuals otherwise having an independent *right* under the Second Amendment. Some states enacted statutes placing the burden of arming infants on their guardians. [6] Indeed, infants only rendered militia service under the supervision of page officers who, like teachers, stood *in loco parentis. See* Johnson, *supra* note 5, at 243, 251. As noted above, at the Founding, infants sought and sought redress of rights, including property rights, at the pleasure of their legal guardians. *See, e.g.,* 1 William Blackstone, *Commentaries* \*452-53; *Infants.* That individuals under 21 were required to bear arms in the militia is not evidence that such individuals otherwise consistently owned arms in their individual capacities, much less that they had a right to own such property.

[5]     Nicholas J. Johnson et al., *Firearms Law and the Second Amendment* 188 (2022). Massachusetts had a typical conscription law which required male residents between ages 16 and 60 to serve. *Id.* at 242, 244. New Hampshire and Maine had similar requirements. *Id.* at 247.

[6]     *See, e.g.,* 3 Laws of New Hampshire, Province Period 83 (Henry Harrison Metcalf ed., 1915) (1754); An Act for Forming and Regulating the Militia Within The State of New Hampshire, in New-England, and For Repealing All the Laws Heretofore Made for That Purpose, 1776 Acts & Laws of the Colony of N.H. 36, 39; An Act for Regulating and Governing the Militia of the Commonwealth of Massachusetts, c. 1, § XIX, 1793 Mass Acts & Laws May Sess. 289, 297; An Act, for Regulating and Governing the Militia of This State 1797, c. LXXXI, No. 1, § 15, 2 The Laws of the State of Vermont, Digested & Compiled 122, 131-32 (Randolph, Sereno Wright 1808); 2 William T. Dortch, John Manning & John

S. Henderson, The Code of North Carolina § 3168, 346-47 (New York, Banks & Bros. 1883).

**\*17** *Heller* made clear that the Second Amendment codifies an individual right to keep and bear arms that is unconnected to militia service: "[A]part from [a] clarifying function, [the] prefatory clause does not limit or expand the scope of the operative clause." *Heller,* 554 U.S. at 578, 128 S.Ct. 2783. Militia service cannot properly be disconnected from the right for the purpose of limiting its scope but connected for the purpose of expanding it; the two are independent. Again, *Bruen* affirmed this historical-textual analysis. *Bruen,* 141 S. Ct. at 2127.

*Heller* explains at length that the militia and "the people" are distinct. *Heller,* 554 U.S. at 650-51, 128 S.Ct. 2783. Although the militia may overlap with "the people," this does not mean that every member of the militia is by extension part of "the people" covered by the Second Amendment.

As discussed above, infants during the Founding-era did not merely lack certain legal rights, but nearly all legal rights. The fact that this class of persons had no power to independently exercise almost any rights of speech, association, conscience, marriage, contract, suffrage, petition, or property, strongly suggests that they would not be understood as receiving constitutional protections as members of "the people" under the Second Amendment.

Then-Judge Amy Coney Barrett's discussion of felons and the mentally ill, *see* Majority Op. at II.B (citing *Kanter v. Barr,* 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting)), concerns classes distinct from infants. At the Founding, felons and the mentally ill were extended greater rights than infants, and their legal disability resulted from legal findings, not *a priori* legal classifications. Felons and the mentally ill lost their rights only after they were found untrustworthy, whereas persons under 21 were classified as infants because as a class of persons they were considered untrustworthy. While insanity and criminality test the capacities and character of the individual, respectively, the age of majority as a concept suppresses individual differentiation. [7] *See* Abrams, *supra* note 1, at 19.

[7]     Of course, there are some exceptions to this general rule. For example, some criminal penalties can accrue to individuals below the age of majority, a court may find that a minor is properly developed to make certain medical decisions for themselves,

and a court may find a minor sufficiently mature to warrant emancipation. *See*, Abrams *supra* note 1, at 19.

At the Founding, people under 21 bore arms at the pleasure of their superiors. Were they to find this condition violative of their rights, they would have no right to petition the courts for redress. Stated bluntly, the same generation from whom Appellants may have begged relief would not have permitted them to bring their claim. Accordingly, I respectfully disagree with my colleagues in the Majority, and conclude that during the Founding-era, the plain text of the Second Amendment was understood to mean that persons under 21 were not part of "the people" protected by the Second Amendment.

## II. The challenged statutes are consistent with this Nation's historical tradition.

Under *Bruen*, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129-30. As explained above, the ordinary understanding of the plain text of the Second Amendment during the Founding-era was that individuals under the age of 21 were not part of "the people" whom the Second Amendment protects. Thus, the Second Amendment's plain text does not cover these Appellants' conduct, and the Constitution does not presumptively protect the conduct regulated by the challenged statutory scheme.

**\*18** The Majority points out that, under *Bruen*: "The court first decides whether 'the Second Amendment's plain text covers an individual's conduct.' ... *If it does*, 'the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.' " *See* Majority Op. at II.A (citing *Bruen*, 142 S. Ct. at 2126) (emph. added). Here, because the plain text of the Amendment does *not* protect the conduct of these Appellants, the government does not have a burden to "identify[ ] a 'founding-era' historical analogue to the modern firearm regulation." *See id.* (citing *Bruen*, 142 S. Ct. at 2130-33).

In that the ordinary Founding-era meaning of the Second Amendment's plain text does not cover these Appellants' conduct, it should not be surprising that the challenged statutory scheme "is consistent with this Nation's historical tradition," *see Bruen*, 142 S. Ct. at 2126. Whether there are any known Founding-era statutes that barred independent firearm ownership or possession by people under 21 would

not seem to be determinative of whether the challenged regulation is "consistent" with our Nation's historical tradition. Legislatures tend not to enact laws to address problems that do not exist, and the absence of such laws does not speak to an inconsistency with the Nation's historical tradition or the undisputed Founding-era understanding of the limited rights of infants. As explained above, young people at the Founding bore arms only at the pleasure of their guardians, and they had no independent right to petition courts for redress.

Under *Bruen*, it is appropriate to consider the evidence from the Founding and determine if later evidence offers greater proof and context. Between 1856 and 1893, at least 17 states passed laws restricting the sale of firearms to people under 21. David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. of Leg. 1, 192-93. Some restricted non-sale transfers. *Id.* Many included provisions expressly putting the gun rights of minors at the discretion of authority figures. *Id.*; *see also Repository of Historical Gun Laws*, DUKE CENTER FOR FIREARMS LAW, https://firearmslaw.duke.edu/repository/search-the-repository/. These laws demonstrate that, at least as early as the mid-nineteenth century, legislatures believed they could qualify and, in some cases, abrogate the arms privileges of infants. While these laws cannot independently prove the constitutionality of the challenged laws, they certainly seem to be consistent with the challenged statutory scheme here in that they regulate arms privileges of "infants." But again, the 1791 meaning of the Second Amendment controls, and it appears that the challenged statutory scheme is not inconsistent (and thus consistent) with this Nation's historical tradition.

## III. Conclusion

A review of historical sources reveals that the Second Amendment's plain text does not cover Appellants' conduct because it would have been understood during the Founding-era that Appellants are not "part of 'the people' whom the Second Amendment protects." *See Bruen*, 142 S. Ct. at 2134. Further, the challenged statutory scheme here is "consistent with this Nation's historical tradition." *Id.* at 2126. Because Pennsylvania's statutory scheme does not violate the Second Amendment of the Constitution, I respectfully dissent.

**All Citations**

--- F.4th ----, 2024 WL 189453

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.