**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 23-1900 & 23-2043
_____

RONALD KOONS; NICHOLAS GAUDIO; JEFFREY M.
MULLER; GIL TAL; SECOND AMENDMENT
FOUNDATION INC; FIREARMS POLICY COALITION
INC; COALITION OF NEW JERSEY FIREARM
OWNERS; NEW JERSEY SECOND AMENDMENT
SOCIETY

v.

ATTORNEY GENERAL NEW JERSEY AND
SUPERINTENDENT NEW JERSEY STATE POLICE,

PRESIDENT OF NEW JERSEY STATE SENATE,
SPEAKER OF THE NEW JERSEY GENERAL
ASSEMBLY
Intervenors in District Court
(D.N.J. No. 1:22-cv-07464)

AARON SIEGEL; JASON COOK; JOSEPH DELUCA;
NICOLE CUOZZO; TIMOTHY VARGA; CHRISTOPHER
STAMOS; KIM HENRY; ASSOCIATION OF NEW
JERSEY RIFLE AND PISTOL CLUBS INC.

v.

ATTORNEY GENERAL NEW JERSEY;
SUPERINTENDENT NEW JERSEY STATE POLICE

PRESIDENT OF THE NEW JERSEY STATE SENATE,
SPEAKER OF THE NEW JERSEY GENERAL
ASSEMBLY
Intervenors in District Court
(D.N.J. No. 1:22-cv-07463)

Attorney General New Jersey and Superintendent New
Jersey State Police,
Appellants in 23-1900

Aaron Siegel; Jason Cook; Joseph Deluca; Nicole Cuozzo;
Timothy Varga; Christopher Stamos; Kim Henry and
Association of New Jersey Rifle & Pistol Club, Inc.,
Appellants in 23-2043

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Nos. 1-22-cv-07464 & 1-22-cv-07643)
District Judge: Honorable Renée M. Bumb

_____

Argued October 25, 2023

Before: KRAUSE, PORTER, and CHUNG, *Circuit Judges.*

(Filed September 10, 2025)

Angela Cai **[ARGUED]**
Jeremy Feigenbaum
Office of Attorney General of New Jersey
25 Market Street
Richard J. Hughes Justice Complex
P.O. Box 112
Trenton, NJ 08625

    *Counsel for Appellants in 23-1900*

Leon J. Sokol **[ARGUED]**
Cullen & Dykman
433 Hackensack Avenue
Hackensack, NJ 07601

Edward J. Kologi
Kologi & Simitz
500 N Wood Avenue
Suite 4B
Linden, NJ 07036

    *Counsel for Intervenor-Appellants*

David A. Luttinger, Jr.
Covington & Burling
The New York Times Building
620 Eighth Avenue
New York, NY 10012

    *Counsel for Amicus Curiae Brady Center to Prevent*
    *Gun Violence in Support of Appellants*

Gretchen A. Pickering
Jeffrey H. Sutherland

Cape May County Office of Prosecutor
4 Moore Road
DN-110
Cape May Court House, NJ 08210

> *Counsel for Amicus Curiae County Prosecutor's
> Association of New Jersey in Support of Appellants*

Jeremy Girton
Office of Attorney General for the District of Columbia
Office of the Solicitor General
400 6th Street NW
Suite 8100
Washington, DC 20001

> *Counsel for Amicus Curiae District of Columbia in
> Support of Appellants*

Janet Carter
Everytown Law
450 Lexington Avenue
P.O. Box 4184
New York, NY 10163

> *Counsel for Amicus Curiae Everytown for Gun Safety
> in Support of Appellants*

Simon B. Kress
Alan E. Schoenfeld
Wilmer Cutler Pickering Hale & Dorr
7 World Trade Center
250 Greenwich Street
New York, NY 10007

> *Counsel for Amici Curiae Frederick Vars and Ian
> Ayres in Support of Appellants*

Amit Jain
Roderick & Solange MacArthur Justice Center
501 H Street NE
Suite 275
Washington, DC 20002

Joshua A. Matz
Hecker Fink
1050 K Street NW
Suite 1040
Washington, DC 20001

Disha Verma
Hecker Fink
350 Fifth Avenue
63rd Floor
New York, NY 10118

> *Counsel for Amicus Curiae Giffords Law Center to*
> *Prevent Gun Violence in Support of Appellants*

Jasmeet K. Ahuja
Hogan Lovells US
1735 Market Street
23rd Floor
Philadelphia, PA 19103

> *Counsel for Amicus Curiae March for Our Lives*
> *Foundation in Support of Appellants*

David D. Jensen
Peter A. Patterson **[ARGUED]**
David H. Thompson

Cooper & Kirk
1523 New Hampshire Avenue NW
Washington, DC 20036

    *Counsel for Appellees Koons Plaintiffs*

Paul D. Clement
Andrew C. Lawrence
Erin E. Murphy **[ARGUED]**
Daniel L. Schmutter
Clement & Murphy
706 Duke Street
Alexandria, VA 22314

Mariel A. Brookins
United States Chamber Litigation Center
1615 H Street NW
Washington, DC 20062

    *Counsel for Appellants in 23-2043*

Bradley A. Benbrook
701 University Avenue
Suite 106
Sacramento, CA 95825

    *Counsel for Amici Curiae Citizens Committee for the*
    *Right to Keep and Bear Arms and FPC Action*
    *Foundation in Support of Appellees*

Robert J. Olson
370 Maple Avenue W
Suite 4
Vienna, VA 22180

> *Counsel for Amici Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Inc., DC Project, Tennessee Firearms Association, Heller Foundation, Second Amendment Law Center, and California Rifle & Pistol Association, Inc. in Support of Appellees*

Steven W. Dulan
5311 Park Lake Road
East Lansing, MI 48823

> *Counsel for Amici Curiae Michigan Coalition for Responsible Gun Owners and New Jersey Firearm Owners Syndicate in Support of Appellees*

_____

OPINION OF THE COURT

_____

KRAUSE, *Circuit Judge*.

Today, we must decide a question of immense public importance: whether it is likely that provisions of New Jersey Public Law 2022, Chapter 131, which impose certain firearms-permitting requirements and prohibit the carrying of firearms in certain "sensitive places," passes constitutional muster. Challengers assert that these restrictions impermissibly infringe upon the Second Amendment right, recognized by the Supreme Court in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), to carry a handgun for self-defense

outside of the home.  New Jersey defends its law as "consistent with this Nation's historical tradition of firearm regulation," as *Bruen* requires.  *Id.* at 34.

For the most part, we agree with New Jersey and join our sister circuits that have upheld similar sensitive-places laws.  *See LaFave v. Cnty. of Fairfax*, —F.4th—, 2025 WL 2458491 (4th Cir. Aug. 27, 2025); *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900 (2025); *Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024).  The Supreme Court in *Bruen* recognized the authority of legislatures to prohibit the carry and use of firearms in certain categories of places in the eighteenth and nineteenth centuries, including "legislative assemblies, polling places, and courthouses," and instructed courts to "use analogies to those historical regulations . . . to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible."  597 U.S. at 30.  So what principles undergird the historic regulation of firearms in "sensitive places" to guide our analogical reasoning?  As we look through our history, a pattern emerges: our Nation has permitted restriction of firearms in discrete locations set aside for particular civic functions and where the presence of firearms was historically regulated as jeopardizing the peace or posing a physical danger to others.  We undertake our analysis of the particular places New Jersey has designated

as sensitive in light of that history and the principles it embodies.[1]

## I.    Background

### A. The Challenged Law

For many decades, New Jersey required anyone who wanted to carry a handgun in public to show a "justifiable need" for self-protection. In 2022, the Supreme Court held in *Bruen* that a similar New York law violated the Second Amendment of the U.S. Constitution. In response, the New Jersey legislature enacted a measure known as Chapter 131, which excised the "justifiable need" requirement and added new licensing provisions and locational restrictions. The legislature increased the cost of a Handgun Carry Permit from $50 to $200 and prescribed that at least some portion of that fee be deposited in the state's Victims of Crime Compensation Office (VCCO) account. N.J. Stat. Ann. § 2C:58-4(c). It also added the requirement that all Handgun Carry Permit applicants obtain character endorsements from at least "four

---

[1] Our dissenting colleague catalogues various of the locations we discuss where restrictions were historically permitted and then labels those locations as "principles" we espouse today. *See, e.g.*, Dissent at 2–4. But rhetoric cannot substitute for reality. The principles we derive from historical examples are distinct from the locations to which we apply them in determining whether a given restriction today passes constitutional muster. And as is clear from our rejection of portions of Chapter 131, those principles impose meaningful limits on New Jersey's regulation of firearms.

reputable persons," *id.* § 2C:58-4(b), and mandated that every "private citizen" who carries a handgun in public maintain at least $300,000-worth of liability insurance against potential injuries, deaths, and property damage resulting from the "ownership, maintenance, operation or use of a firearm carried in public," *id.* § 2C:58-4.3(a).

Perhaps most prominently, Chapter 131 contains various new substantive limitations on firearm carry in New Jersey. First, as codified in N.J. Stat. Ann. § 2C:58-4.6(a), it prohibits carrying a firearm in twenty-five "sensitive places," including:

> (6)   within 100 feet of a place where a public gathering, demonstration or event is held for which a government permit is required, during the conduct of such gathering, demonstration or event;

> (7)   a school, college, university or other educational institution, and on any school bus;

> (8)   a child care facility, including a day care center;

> (9)   a nursery school, pre-school, zoo, or summer camp;

> (10)  a park, beach, recreation facility or area or playground owned or controlled by a State, county or local government unit, or any part of such a place, which is

10

designated as a gun free zone by the governing authority based on considerations of public safety;

(11)  youth sports events, as defined in N.J.S.5:17-1, during and immediately preceding and following the conduct of the event, except that this provision shall not apply to participants of a youth sports event which is a firearm shooting competition to which paragraph (3) of subsection b. of section 14 of P.L.1979, c.179 (C.2C:58-6.1) applies;

(12)  a publicly owned or leased library or museum;

. . .

(15)  a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises;

. . .

(17)  a privately or publicly owned and operated entertainment facility within this State, including but not limited to a theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held;

(18)   a casino and related facilities, including but not limited to appurtenant hotels, retail premises, restaurant and bar facilities, and entertainment and recreational venues located within the casino property;

. . .

(21)   a health care facility, including but not limited to a general hospital, special hospital, psychiatric hospital, public health center, diagnostic center, treatment center, rehabilitation center, extended care facility, skilled nursing home, nursing home, intermediate care facility, tuberculosis hospital, chronic disease hospital, maternity hospital, outpatient clinic, dispensary, assisted living center, home health care agency, residential treatment facility, residential health care facility, medical office, or ambulatory care facility;

(22)   a facility licensed or regulated by the Department of Human Services, Department of Children and Families, or Department of Health, other than a health care facility, that provides addiction or mental health treatment or support services;

(23)    a public location being used for making motion picture or television images for theatrical, commercial or educational purposes, during the time such location is being used for that purpose; [and]

(24)    private property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit under N.J.S.2C:58-4, provided that nothing in this paragraph shall be construed to affect the authority to keep or carry a firearm established under subsection e. of N.J.S.2C:39-6.

Subject to minor exceptions, carrying a firearm in any of these places constitutes a crime of the third degree, which carries a maximum sentence of five years' imprisonment and a presumptive sentence of four years' imprisonment. *Id.* Chapter 131 further prohibits people from carrying a loaded and unsecured firearm "in a vehicle in New Jersey"; those who wish to transport guns must unload their firearms and keep them locked in a secured container or the vehicle's trunk. *Id.* § 2C:58-4.6(b)(1).

### B. Procedural Background

Immediately after New Jersey passed the law, two groups of plaintiffs sued the New Jersey Attorney General and State Police Superintendent in their official capacities under 42 U.S.C. § 1983, alleging that Chapter 131 violates their Second Amendment rights and requesting declaratory and injunctive relief. The first group, the "Koons Plaintiffs," is made up of several New Jersey residents and firearm advocacy organizations. The second group, the "Siegel Plaintiffs," is comprised of additional New Jersey residents and the Association of New Jersey Rifle & Pistol Clubs. The cases were consolidated, and the District Court permitted the President of the New Jersey Senate and Speaker of the New Jersey General Assembly to intervene as Defendants.

Plaintiffs cumulatively challenged many of Chapter 131's provisions, including most of its "sensitive place" restrictions, the prohibition on carrying unsecured firearms in vehicles, the increase in firearm permitting fees, and the $300,000 liability insurance requirement. They also challenged existing fish and game-related firearm regulations codified at N.J. Admin. Code. § 7:25-5.23(a), (c), (f), (i), and (m), which govern what type of ammunition and weapons can be used to hunt game in the "woods, fields, marshlands, or on the water."[2]

------

[2] Plaintiffs also challenged Chapter 131's prohibition on the "unjustified display of a handgun," its exemption of judges,

After a hearing, the District Court preliminarily enjoined the "sensitive place" restrictions contained in N.J. Stat. Ann. § 2C:58-4.6(a)(6) (within 100 feet of a permitted public gathering), (a)(9) (preschools, summer camps, and zoos), (a)(10) (parks, beaches, and public recreation facilities), (a)(12) (public libraries and museums), (a)(15) (sites where alcohol is served), (a)(17) (entertainment facilities), (a)(18) (casinos), (a)(21) (hospitals and other healthcare facilities), (a)(23) (public movie and television sets), and (a)(24) (private property held open to the public, unless the owner has expressly consented to gun carry), in addition to the prohibition on guns in vehicles and the liability insurance requirement. The State Defendants and Siegel Plaintiffs appealed.[3]  This

_____

prosecutors, and attorneys general from certain requirements, and its ban on issuing a firearm purchase permit "[t]o any person where the issuance would not be in the interest of the public health, safety or welfare because the person is found to be lacking the essential character of temperament necessary to be entrusted with a firearm" or to any person "known in the community in which the person lives as someone who has engaged in acts or made statements suggesting the person is likely to engage in conduct, other than justified self-defense, that would pose a danger to self or others," N.J. Stat. Ann. §§ 2C:39-6(a)(12), 2C:58-3(c), 2C:58-4.4(a)(5).

[3] On appeal, the Siegel Plaintiffs appear to abandon their challenges to § 2C:58-4.6(a)(7) (schools and colleges), (a)(8) (child care facilities), and (a)(20) (airports and public transportation hubs).  They also abandon their challenges to

Court granted a partial stay of the District Court's injunction, thereby allowing the law to take effect in most of the identified "sensitive places."[4]

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, and we have appellate jurisdiction under 28 U.S.C. § 1292(a)(1).  We review the District Court's grant or denial of a preliminary injunction for abuse of discretion, but we review *de novo* the underlying legal question—whether the New Jersey law violates the Second Amendment.  *See ADP, LLC v. Rafferty*, 923 F.3d 113, 119 (3d Cir. 2019).

To obtain a preliminary injunction, Plaintiffs must show that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary

---

portions of § 2C:58-4.6(a)(9) (preschools and summer camps), in addition to their challenges to the law's prohibition on the unjustifiable display of a handgun, § 2C:58-4.4(a)(5), the exemption of judges, prosecutors, and attorneys general, § 2C:39-6(a)(12), and the character-based disqualifications for firearm purchase permits, § 2C:58-3(c).

[4] The preliminary injunction remains in effect for § 2C:58-4.6(a)(23) (public movie and television sets) and (a)(24) (private property held open to the public, unless the owner has expressly consented to firearm carry), in addition to the prohibition on unsecured firearms in vehicles and the liability insurance requirement.

relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Plaintiffs must establish the existence of the first two elements; once those two requirements are satisfied, we may balance all the factors in deciding whether to issue an injunction. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017).

## III.   Existing Second Amendment Doctrine

In the absence of a "comprehensive[] defin[ition]" from the Supreme Court of what constitutes "sensitive places" where the government may restrict the right to bear arms, *Bruen*, 597 U.S. at 30, this case requires us to navigate the "unchartered frontiers," *Drummond v. Robinson Twp.*, 9 F.4th 217, 222 (3d Cir. 2021), of the Second Amendment. An overview of the state of Second Amendment law guides that journey.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court recognized for the first time an individual right to keep and bear arms "in defense of hearth and home." 554 U.S. 570, 635 (2008). The Court reached that conclusion by consulting "both text and history"—from the English and colonial origins of the "*pre-existing* right" the Second Amendment "codified," to interpretations of the Amendment "immediately after its ratification through the end of the 19th century"—to "determine *the public understanding*"

of that right. *Id.* at 592, 595, 605. Accordingly, the *Heller* Court employed an interpretive method rooted in history and tradition, assessing the validity of modern regulations by comparing them to practices that had developed over the preceding centuries.

Applying that history-and-tradition framework, the *Heller* Court struck down a District of Columbia law that "totally ban[ned] handgun possession in the home." *Id.* at 628. While breaking new ground in Second Amendment jurisprudence, the Court emphasized the limits of its holding, noting that "nothing in our opinion should be taken to cast doubt on longstanding . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings[.]" *Id.* at 626. The Court further clarified: "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.26.

Soon after *Heller*, the Court held that the individual right to keep and bear arms applied against the states in *McDonald v. City of Chicago*, 561 U.S. 742 (2010). Reasoning that the right to keep and bear arms is "fundamental," the Court decided that "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*." *Id.* at 791 (plurality opinion). Yet the Court "repeat[ed *Heller*'s] assurances" that its holding "did not cast doubt on such longstanding regulatory measures as . . . 'laws forbidding the carrying of firearms in sensitives places such as schools and government buildings[.]'" *Id.* at 786 (quoting *Heller*, 554 U.S. at 626–27).

*McDonald* spawned a host of Second Amendment challenges to state laws restricting the ability of law-abiding

Americans to bear arms beyond the "hearth and home." In one such suit, a group of New Jersey plaintiffs sought to invalidate a state statute that required an individual to demonstrate a "justifiable need" in order to obtain a license to carry a handgun in public. *Drake v. Filko*, 724 F.3d 426, 428 (3d Cir. 2013). We rejected that challenge under the two-part constitutional test we discerned from *Heller*, asking whether the challenged law "impose[d] a burden on conduct falling within the scope of the Second Amendment's guarantee," and if so, whether the law satisfied "some form of means-end scrutiny." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010).

More than a decade later, in *Bruen*, the Supreme Court resolved a Second Amendment challenge to the New York "proper cause" licensing statute. *See Bruen*, 597 U.S. at 11 (quoting 1913 N.Y. Laws ch. 608, § 1, p. 1629). In its most extensive exegesis of the Second Amendment since *Heller*, the Supreme Court observed that the Courts of Appeals "ha[d] coalesced around a 'two-step' framework . . . that combines history with means-end scrutiny" and rejected that approach as "one step too many." *Id.* at 17, 19. Instead, the Court explained, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.

That inquiry is sometimes "fairly straightforward": "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is

inconsistent with the Second Amendment." *Id.* at 26. But when a contemporary regulation "implicat[es] unprecedented societal concerns or dramatic technological changes," courts must apply "a more nuanced approach." *Id.* at 27. Namely, courts must assess whether the contemporary regulation is "relevantly similar" to a historical restriction, *id.* at 29 (quoting Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 731, 773 (1993)), by considering "how and why the regulation[] burden[s] a law-abiding citizen's right to armed self-defense," *id.* The Court stressed that this approach "is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 30. As the government must "identify a well-established and representative historical *analogue*, not a historical *twin*," a contemporary regulation that "is not a dead ringer for historical precursors . . . still may be analogous enough to pass constitutional muster." *Id.*

To illustrate the flexibility of its analogical method, the Court examined "*Heller*'s discussion of 'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings.'" *Id.* (quoting *Heller*, 554 U.S. at 626). According to the Court, while "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses," it also knew "of no disputes regarding the lawfulness of such prohibitions." *Id.* (citing David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229–36, 244–47 (2018)). The Court thus deemed it "settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment" and authorized courts to "use analogies to those historical regulations of 'sensitive places' to determine that

modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* It cautioned, however, that those analogies could not be stretched to the point of "eviscerat[ing] the general right to publicly carry arms for self-defense" because the Court rejected the view that the government could "expand[] the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement." *Id.* at 31.

Having clarified the governing test, the Court turned to New York's proper-cause licensing law. First, the Court observed that the text of the Second Amendment covered the challengers' "proposed course of conduct—carrying handguns publicly for self-defense." *Id.* at 32. So the Court considered whether the historical restrictions put forward by New York demonstrated that the "proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 34.

Although New York "appeal[ed] to a variety of historical sources from the late 1200s to the early 1900s," the Court explained that "when it comes to interpreting the Constitution, not all history is created equal." *Id.* Because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," the key periods are when "[t]he Second Amendment was adopted in 1791 [and] the Fourteenth in 1868." *Id.* (quoting *Heller*, 554 U.S. at 634–35). However, "English practices that 'prevailed up to the period immediately before and after the framing of the Constitution'" can help illuminate the traditions our forebearers ratified. *Id.* (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 311 (2008) (Roberts, C.J.,

dissenting)).    Likewise, interpretations of the Second Amendment "from immediately after its ratification through the end of the 19th century" offer a "critical tool of constitutional interpretation," so long as they do not contradict the original meaning of the right to keep and bear arms.  *Id.* at 35 (quoting *Heller*, 554 U.S. at 605).   Finally, the Court declined to resolve whether courts should look to the Founding era or Reconstruction era for the prevailing understanding of the Second Amendment, acknowledging the "ongoing scholarly debate" on the subject.  *Id.* at 37 (citing Akhil Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998)).  The Court concluded it did not make a difference in *Bruen* because "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry."  *Id.* at 38.

The *Bruen* Court proceeded to survey historical sources from medieval England through the early-twentieth century to identify the historical tradition of public carry.  *See id.* at 39–70.  That exercise proved illuminating, as it enabled the Court to discern which restrictions were "late-in-time outliers" that deviated from the otherwise-prevailing norm of "the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions."  *Id.* at 70; *see also id.* at 67–68 ("[W]e will not stake our interpretation on a handful of temporary territorial laws that . . . 'contradic[t] the overwhelming weight' of other, more contemporaneous historical evidence." (quoting *Heller*, 554 U.S. at 632)).  Apart from those outliers, the Court found a robust tradition of general public carry, so the Court struck down New York's proper-cause statute as inconsistent with the Second Amendment.  *Id.* at 70.

Two terms ago, in *United States v. Rahimi*, the Supreme Court elaborated on *Bruen*. 602 U.S. 680 (2024). There, the Court rejected a challenge to the constitutionality of 18 U.S.C. § 922(g)(8), which bars a person subject to a domestic violence restraining order from possessing a firearm if he is found to pose a credible threat to his partner. In doing so, the Court clarified the methodology for evaluating Second Amendment challenges under *Bruen*. Contrary to how some Courts of Appeals had interpreted it, the Court eschewed the notion that *Bruen*'s test portends "a law trapped in amber." *Rahimi*, 602 U.S. at 691. Instead, the "why and how" analysis operates at the level of "principles underlying the Second Amendment." *Id.* at 692. As such, whether a modern regulation comports with the Second Amendment turns on "whether the challenged *regulation* is consistent with the *principles* that underpin our regulatory tradition." *Id.* (emphasis added).

The Court went on to identify historical surety statutes requiring "individuals suspected of future misbehavior" to post a bond before "going armed" and affray laws preventing people from "going armed" when doing so would "disrupt[] the public order," reading from these dissimilar measures the general principle that, "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 695–98 (citation omitted). Having distilled this principle, the Court had little difficulty concluding that § 922(g)(8)—which "is by no means identical to these founding era regimes"—"fits neatly within the tradition" of firearm regulation in this country. *Id.* at 698.

\*     \*     \*

From this line of cases, we distill the following legal precepts.

First, our analysis of modern regulations and their fit and justification in light of historical principles does not bind legislatures in a "regulatory straightjacket." *Bruen*, 597 U.S. at 30; *see also Rahimi*, 602 U.S. at 739 (Barrett, J., concurring) ("To be *consistent* with historical limits, a challenged regulation need not be an updated model of a historical counterpart."). Our society has evolved considerably since the Nation's earliest days. Many of the "general societal problem[s]" that contemporary firearm regulations aim to address did not exist during the Founding and Reconstruction eras.[5]  *See Antonyuk*, 120 F.4th at 970 ("[C]ourts must be particularly attuned to the reality that the issues we face today are different than those faced in medieval England, the Founding Era, the Antebellum Era, and Reconstruction.  To put it plainly, our era does not resemble those.").  And as *Rahimi*

---

[5] As firearm technology has advanced and population density increased, gun violence has risen, as has the scale of fatalities. The "first known mass shooting resulting in ten or more deaths"—a phenomenon that now happens tragically on a near-daily basis, *see Past Summary Ledgers*, Gun Violence Archive, https://perma.cc/B9UY-6SDR—"did not occur in this country until 1949." *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 44 (1st Cir. 2024) (quotation omitted); *see also Range v. Att'y Gen.*, 124 F.4th 218, 250 (3d Cir. 2024) (en banc) (Krause, J., concurring in the judgment) (collecting sources detailing the "brutal gun deaths and horrific mass shootings . . . [that] are a daily occurrence in our schools, our streets, and our places of worship" (footnotes omitted)).

makes clear, our search for historical analogues calls for an inquiry into "principles" that justify modern regulations, not "historical twin[s]" or "dead ringer[s]." *Bruen*, 597 U.S. at 30. So "we cannot look at history through a pinhole," *United States v. Veasley*, 98 F.4th 906, 912 (8th Cir. 2024), and instead we analogize to principles distilled from our Nation's history and tradition as a whole.

Second, in our quest to understand the Second Amendment "according to its public meaning in 1791" and "the understandings of those who ratified it," post-ratification authorities "can be 'a critical tool of constitutional interpretation' because they can be evidence of a historical tradition and shed important light on the meaning of the Amendment as it was originally understood."[6] *Lara v. Comm'r*

---

[6] Several Justices have also espoused this view, *see, e.g.*, *Rahimi*, 602 U.S. at 728 (Kavanaugh, J., concurring) ("The Court has repeatedly employed post-ratification history to determine the meaning of vague constitutional text."); *id.* at 738 (Barrett, J., concurring) (explaining that "postenactment history can be an important tool"); *see also Heller*, 554 U.S. at 605–19 (Scalia, J., joined by Roberts, C.J., and Kennedy, Thomas, and Alito, JJ.) (surveying sources "from immediately after [the Second Amendment's] ratification through the end of the 19th century"); *McDonald*, 561 U.S. at 778 (Alito, J., joined by Roberts, C.J., and Scalia and Kennedy, JJ.) (extensively analyzing the views of both the "Framers" and the "ratifiers of the Fourteenth Amendment"), and several of our sister circuits have done the same, *see Wolford v. Lopez*, 116

*Pa. State Police* (*Lara II*), 125 F.4th 428, 441 (3d Cir. 2025) (quoting *Bruen*, 597 U.S. at 28, 35); *see also United States v. Quailes*, 126 F.4th 215, 222 & n.8 (3d Cir. 2025); *United States v. Moore*, 111 F.4th 266, 271 (3d Cir. 2024). Accordingly, where it aids in our understanding of, and does not conflict with, the original meaning, our survey of history will look to post-ratification history, as well as the Founding era, to identify relevant principles.[7] Even a comparatively rare post-Founding

---

F.4th 959, 980 (9th Cir. 2024); *Antonyuk v. James*, 120 F.4th 941, 973–74 (2d Cir. 2024); *Hanson v. District of Columbia*, 120 F.4th 223, 236–40 (D.C. Cir. 2024) (per curiam).

[7] The dissent asserts that we rely "heav[ily] and indiscriminate[ly] . . . on questionable Gilded-Age evidence." Dissent at 12. But we rely on 19th century history only where "it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. And our targeted reliance on such authorities to "provide 'confirmation of [what the Founding-era laws] established,'" *United States v. Quailes*, 126 F.4th 215, 222 (3d Cir. 2025) (quoting *Bruen*, 597 U.S. at 37), is entirely consistent with *Lara v. Comm'r Pa. State Police* (*Lara II*), in which we held that post-ratification authorities indeed "can be 'a critical tool of constitutional interpretation'" where such authority does not contradict Founding-era authority. 125 F.4th 428, 441 (3d Cir. 2025) (quoting *Bruen*, 597 U.S. at 35). So though our dissenting colleague would reject consideration of all post-ratification history that he deems "questionable," Dissent at 12, that is not the law of our Circuit.

practice may shed light on the meaning of the right to keep and bear arms if it is part of a longstanding legal tradition.

While we consider Reconstruction-era history, we nonetheless remain vigilant not to "giv[e] postenactment history more weight than it can rightly bear." *Bruen*, 597 U.S. at 35. Late-nineteenth century departures from practices at the Founding are the kinds of "outliers" upon which courts may not "stake [their] interpretation[s] of the Second Amendment[.]" *Id.* at 65 (quoting *Heller*, 554 U.S. at 632). Thus, when we look to statutory analogues from the late 1800s, we exercise caution to evaluate them in their historical context, relying on them to the extent they do not "contradict[] earlier evidence." *Lara II*, 125 F.4th at 441.

Finally, we are mindful that legislatures do not always legislate up to the constitutional line. *See Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring) (highlighting the flaws in the assumption "that founding-era legislatures maximally exercised their power to regulate"); *Antonyuk*, 120 F.4th at 969 ("Legislatures past and present have not generally legislated to their constitutional limits."). So while the lack of a historical twin is of course relevant to our distillation of principles under *Bruen* and *Rahimi*, it is not dispositive.[8]

---

[8] Our dissenting colleague suggests that the party-presentation principle forbids courts from conducting "independent judicial research" on historical sources and considering relevantly similar historical analogues not cited by the parties. Dissent at

This case presents our first occasion to answer the "where" question, that is, in which locations the government can permissibly proscribe carrying firearms. We therefore follow the Supreme Court's example in *Heller*, *Bruen*, and *Rahimi*, examining the history of relevant firearm restrictions to discern the principles underlying the traditional scope of

---

11 n.10, 86. That misunderstands both Supreme Court and our own precedent. The Court in *Bruen* observed that courts "are not *obliged* to sift the historical materials for evidence to sustain [a state's] statute," 597 U.S. at 60 (emphasis added), not that they are *prohibited* from doing so, *see id.* at 25 n.6 (explaining that courts are "entitled," not obligated, "to decide a case based on the historical record compiled by the parties"). Indeed, after observing in *Bruen* that both parties had "ignore[d] the 'outpouring of discussion of the [right to keep and bear arms]'" in the Reconstruction era, the Court proceeded to conduct its own "review of the public discourse." *Id.* at 60 (second alteration in original).

We and other Courts of Appeals have likewise held that "we have the discretion"—though not the obligation—"to conduct independent legal research and consider past laws and judicial decisions, regardless of whether they were raised below," *Quailes*, 126 F.4th at 221 n.6 (citing *Bruen*, 597 U.S. at 60); *see also United States v. Williams*, 113 F.4th 637, 645 n.2 (6th Cir. 2024); *Wolford*, 116 F.4th at 976. In short, while it is no doubt Defendants' burden to show that the challenged regulations are consistent with our historical tradition, *Bruen*, 597 U.S. at 60, it is ultimately the obligation of this Court to interpret the Second Amendment accurately.

carry restrictions, their application, and assessing possible analogues to each challenged provision of New Jersey law.

## IV.    <u>The History and Tradition of Carry Restrictions</u>

That history, as it turns out, is long.  For centuries, individuals' right to carry arms has been subject to a variety of well-defined restrictions.  Over time, these carry restrictions have protected discrete locations set aside for specific civic purposes and addressed breaches of the peace or physical safety.  To understand the metes and bounds of those historical laws and the correlative scope of the right to bear arms, we survey the historical record from: (A) early England, (B) the American colonies, (C) the Founding and Early Republic, (D) the antebellum period, and (E) Reconstruction through the *fin de siècle*.  That overview confirms that governments have long limited the carrying of guns in specific kinds of venues commensurate with their peculiar needs and functions.

### A.  British Antecedents

As early as the Anglo-Saxon period, English monarchs ensured the orderly functioning of government by enforcing "the king's peace," a concept that had a location-based component; such laws originally forbade assailing a member of the king's household or drawing "a weapon in the king's house."[9]  While disturbing the king's peace was a particularly serious transgression, English custom recognized that a

---

[9] David Feldman, *The King's Peace, the Royal Prerogative and Public Order: The Roots and Early Development of Binding over Powers*, 47 Cambridge L.J. 101, 105 (1988).

number of other sites also enjoyed their own "peace," from manors and homesteads to churches.[10]  Eventually, as part of the general expansion of royal authority over local powers, the "king's peace" absorbed "the 'peace' of the various customary jurisdictions[.]"[11]  These early obligations to respect order and refrain from violent disruption demonstrate that the protection of government functions was an important—but by no means exclusive—goal of arms regulation, as households and congregations similarly demanded peacefulness.

Preserving the peace and safety at discrete venues performing government functions remained a core focus in ensuing years.  In 1313, to preserve their function,[12] Parliament enacted a statute commanding that, "in all parliaments, treatises, and other assemblies, which should be made in the realm of England for ever, that every man shall come without all force and armour, well and peaceably, to the honour of us, and the peace of us and our realm."[13]

Fifteen years later, during a period of "turmoil," Parliament enacted the Statute of Northampton.  *Bruen*, 597 U.S. at 40 (quoting Norman Maclaren Trenholme, *The Risings*

---

[10] A.H.F. Lefroy, *Anglo-Saxon Period of English Law, Part II*, 26 Yale L.J. 388, 388–89 (1917).

[11] *Id.* at 389; *see also Young v. Hawaii*, 992 F.3d 765, 788 n.8 (9th Cir. 2021) (en banc), *vacated and remanded*, 142 S. Ct. 2895 (2022).

[12] *See* Kopel & Greenlee, *supra*, at 209–10.

[13] 7 Edw. 2 c. 170 (1313).

*in the English Monastic Towns in 1327*, 6 Am. Hist. Rev. 650, 651 (1901)).  The Statute provided:

> That no Man . . . be so hardy to come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure.[14]

---

[14] 2 Edw. 3 c. 3 (1328).  The first portion of the Statute echoes its predecessor, safeguarding "the King's peace," by forbidding "force and arms" when in the presence of the King or the King's Ministers.  The Statute appears to distinguish this first offense from the separate offenses of bringing "force in affray of the peace" (a prohibition that applied everywhere) and traveling armed in fairs, markets, in the presence of justices or ministers, or in similar places.  That is, a person could not bear arms anywhere that the King or his Ministers were physically present; going armed offensively was prohibited in fairs, markets, in the presence of justices or ministers, or in similar places.  This greater restriction in the presence of the King and the representatives of his authority, preceding the restrictions on affray set forth in the Statute, suggest that criminal culpability in this first context required no "intent to terrify" or other specific evil intent.  Merely using force or

The Supreme Court has concluded that the Statute of Northampton was limited to armor and weapons like lances that were "generally worn or carried only when one intended to engage in lawful combat or—as most early violations of the Statute show—to breach the peace." *Bruen*, 597 U.S. at 41. At common law, affray was considered more serious when "officers of justice [were] disturbed in the due execution of their office" or "where a respect to the particular place ought to restrain and regulate men's behavior, more than in common ones; as in the king's court, and the like." 4 William Blackstone, *Commentaries on the Laws of England* 145 (1769). Similarly, "affrays in a church or church-yard [were] esteemed very heinous offenses, as being indignities to him to whose service those places are consecrated." *Id.* In such circumstances, "mere quarrelsome words, which are neither an affray nor an offense in any other place, are penal."[15] *Id.*

---

carrying arms in a place where the King or his Ministers were present, and presumably engaged in governing, was sufficiently disruptive and undermining of the King's authority as to warrant punishment under the Statute.

[15] *See also* David. B. Kopel & Joseph G.S. Greenlee, *The Sensitive Places Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 203, 205, 212 (2018) (concluding that "[p]rotecting government deliberation from violent interference is the core of the sensitive places tradition," beginning with the Statute of Northampton whose "preeminent purpose was to prohibit arms carrying around the

The second portion of the Statute of Northampton added new locations, like fairs and markets, and in the presence of justices or other ministers, and it proscribed bringing force in affray of the peace and going armed.  In discussing the going armed portion of this statute, the Supreme Court has concluded that violating the Statute required both "terrify[ing] the King's subjects" and "evil intent or malice."  *Id.* at 44.

Consistent with the principle of restricting arms to protect deliberations in places of civic importance, in 1351, English law prohibited "go[ing] armed" in "the parliaments and councils of our lord the king" as "broils, riots and disputes, have arisen and been moved, for that people have gone to the places . . . armed" within London and the Palace of Westminster.[16]  These disturbances resulted in "[impeding] the business of our Lord the King and of his realm" and "the great

---

king's officials" and describing the Statute of Northampton as "serv[ing] several purposes: preventing powerful criminals from armed attacks on the functioning of courts; preventing criminal attacks on other government officials; and preventing armed overthrow of the Queen and her consort.").

[16] 25 Edw. III A.D. 1351, Royal proclamation as to the wearing of Arms in the City and at Westminster; and as to playing at games in the Palace at Westminster, *reprinted in London and London Life, in the XIIIth, XIVth, and XVth Centuries being a Series of Extracts, Local, Social, and Political from the Early Archives of the City of London, A.D. 1276-1419.*

people and others who have come there . . . have been alarmed thereat."[17]

Subsequent versions of the Statute of Northampton similarly reveal the kinds of locations that implicated concerns about maintaining peace such that the government restricted arms-bearing. During Owain Glyndŵr's uprising for Welsh independence,[18] King Henry IV extended to Wales a modified version of the Statute that "ordained and established, that from henceforth no Man [shall] be armed nor bear defensible armor to Merchant Towns, Churches, nor Congregations in the same, nor in the Highways, in affray of the Peace or the King's Liege people[.]"[19]    Although the English ultimately quelled Glyndŵr's revolt, seventy years later—in a remarkable twist of history—the Welsh-born Harri Tudur deposed King Richard III and became King Henry VII, the first of the Tudor dynasty.[20]    His son, the notorious Henry VIII, sought to integrate Wales into England through a series of statutes,[21] including a revised Statute of Northampton.[22]  That law banned

---

[17] *Id.*

[18] *See* Kopel & Greenlee, *supra* note 15, at 216 n.42.

[19] 4 Hen 4 c. 29 (1403).

[20] *See A Welsh King of England*, Cadw (2023), https://perma.cc/62CQ-WASG.

[21] *See id.*

[22] *See* Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of*

the Welsh from bringing weapons to "any sessions or court to be holden within Wales . . . or to any place within the distance of two miles from the same sessions or court, nor to any town, church, fair, market, or other congregation . . . nor in the highways, in affray of the King's peace or the King's liege people[.]"[23]   Much like the enactment a century prior, this version of the Statute of Northampton evinced a traditional principle of maintaining peace and order in a variety of communal forums.

These location-based restrictions were also adopted to address breaches of the peace in other contexts, such as by hunting with firearms.   A 1485 law was prompted by "unlawful[] hunting . . . with painted faces, some with visors, and otherwise disguised . . . riotously, and in manner of War arrayed . . . by night as by day [in] forests, parks, and warren" which led to "great and heinous rebellions, insurrections, riot, robberies, murders and other inconvenience, to the provocacion and example of riotous and evil disposed persons."[24]   Because such offenders "could not be duly

---

*Review*, 60 Clev. St. L. Rev. 1, 20 (2012) ("The tenets of the Statute were even extended to Wales in preparation of its England annexation as one of the bas[e]s of its new legal system.").

[23] 26 Hen. 8 c. 6 (1534); *see also* Clayton E. Cramer & Joseph Edward Olson, *What Did "Bear Arms" Mean in the Second Amendment?*, 6 Geo. J.L. & Pub. Pol'y 511, 513 (2008) (emphasizing the "problem that the statute sought to correct was not even Welsh rebellion").

[24] 1 Hen. VII c. 7.

punished before this Time" due to their disguises, the law punished as felonious breaches of the peace "unlawful hunting in any legal forest, park, or warren, not being the king's property, by night, or with painted faces". *Id.*; *see also* 4 Blackstone, *Commentaries* *143.

Parliament passed a similar statute in 1723—the Black Act— which tightened restrictions by prohibiting, among other things, "being armed with swords, fire-arms, or other offensive weapons, and having his or their faces blacked, or being otherwise disguised, [and] appear[ing] in any forest, chase, park, paddock, or grounds inclosed . . . wherein any deer have been or shall be usually kept ... or in any high road, open heath, common or down[.]"[25] While the Black Act sought to curtail poaching by organized gangs, it also made this practice an offense against the public peace because "the manner in which that [property] damage is committed . . . with the face blacked or with other disguise, and being armed with offensive weapons, [is] to the breach of the public peace and the terror of his majesty's subjects." 4 Blackstone, *Commentaries* at 143.[26]

Locational restrictions were not the only limitations on arms-bearing. Another line of statutes, relied upon by the

---

[25] 9 Geo. I. c. 22 (1723).

[26] *See also* 9 Geo. 1. c. 22 (seeking to "prevent[ the] wicked and unlawful practices," of people in disguise going "armed with swords, fire-arms, and other offensive weapons," "unlawfully hunt[ing] in forests belonging to his Majesty, and in the parks of divers of his Majesty's subjects . . . to the great terror of his Majesty's peaceable subjects.").

Supreme Court in *Rahimi*, reflects that, at common law, sureties were used to disincentivize future breaches of the peace.[27] *Rahimi*, 602 U.S. at 695. Blackstone explained that a justice of the peace who witnessed an individual "make an affray" or was approached by an individual who demonstrated "just cause to fear" that another would injure him or his property could "demand surety of the peace against such person."[28] The justice of the peace could then require the accused to identify "members of the community who would pledge responsibility for the defendant and risk losing their bond if the defendant failed to 'keep the peace.'"[29] If the accused failed to "find such sureties," the justice of the peace could order him "committed till he [did.]"[30]

## B. Colonial America

The settlers who founded the thirteen colonies brought with them the British notion of a right to bear arms that was

---

[27] *See* Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J.F. 121, 131 (2015).

[28] 4 William Blackstone, *Commentaries on the Laws of England* *252 (1769); Michael Dalton, *The Country Justice* 37 (1690) ("If an Affray or Assault shall be made upon a Justice of Peace or a Constable, they may not only defend themselves, but may also apprehend and commit the Offenders, until they have found Sureties for the Peace.").

[29] Ruben & Cornell, *supra* note 27, at 131.

[30] 4 Blackstone, *Commentaries* *252.

not unlimited, including with respect to certain locations.[31] Maryland—following the example of Parliament's 1313 statute—forbade individuals from carrying firearms in legislative assemblies.[32] Virginia continued to enforce the British prohibition on "rid[ing], or go[ing], offensively armed, in Terror of the People,"[33] whereas Massachusetts and New Hampshire enacted their own versions of the Statute of Northampton and codified the authority of justices of the peace to impose sureties.[34]

---

[31] *See* Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under* Heller, 116 Nw. U. L. Rev. 139, 167 (2021).

[32] *See* 1647 Md. Laws 216; 1650 Md. Laws 273; 63 proceedings and Acts of the Maryland General Assembly 338, § 5 ("[N]o Person [shall] come into the House of Assembly, while the same is sitting, with Sword or other Weapon.").

[33] George Webb, *The Office and Authority of a Justice of Peace* 92 (1736); *see also* Bruen, 597 U.S. at 49 n.14.

[34] An Act for the Punishment of Criminal Offenders, *reprinted in* 1 *Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 52–53 (1869) [hereinafter Mass. Act of 1692] ("[E]very justice of the peace in the county where the offence is committed, may cause to be staid and arrested all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively before any of their majesties' justices, or other their officers or ministers doing

The colonies also began to innovate, imposing novel restrictions tailored to the exigencies of the New World. In response to breaches of the peace and the danger caused by celebratory and drunken shooting, Virginia banned "shoot[ing] any guns at drinking (marriages and funerals only excepted)" upon pain of "forfeit[ing] 100 lb. of tobacco."[35]  Likewise,

—————————————

their office or elsewhere[;] . . . and upon view of such justice or justices, confession of the party or other legal conviction of any such offence, shall commit the offender to prison until he find sureties for the peace and good behaviour, and seize and take away his armour or weapons, and shall cause them to be apprized and answered to the king as forfeited[.]"); An Act for Establishing and Regulating Courts of Public Justice Within this Province, *reprinted in Acts and Laws of His Majesty's Province of New Hampshire: In New England; with Sundry Acts of Parliament* 1–2 (1759) [hereinafter N.H. Act of 1701] ("[E]very justice of the peace within this province, may cause to be stayed and arrested, all affrayers, rioters, disturbers or breakers of the peace, or any other who shall go armed offensively, or put his Majesty's subjects in fear, by menaces or threatening speeches: And upon view of such justice, confession of the offender, or legal proof of any such offence, the justice may commit the offender to prison, until he or she find such sureties for the peace and good behaviour, as is required, according to the aggravations of the offence.").

[35] Act of March 10, 1656, act XII [hereinafter Va. Act of 1656], *reprinted in* 1 *The Statutes at Large; Being a Collection of All the Laws of Virginia* 401-02 (William W. Hening ed., 1823)

citing the "[d]runkenness and other insolence [that] prevail[s] on New Year's and May Days" and the "deplorable accidents such as wounding, which frequently arise" from the "firing of Guns" on those holidays, New Netherland "expressly forb[ade] from this time forth all firing of Guns . . . within this Province . . . . on New Years or May days[.]"[36]  In response to nighttime shooting, New Jersey enacted even tighter controls banning, not the shooting, but the carrying of a gun within two-hundred yards of roads or paths while "watching" for deer at night.[37]

---

[hereinafter Va. Acts].  During Colonial times, "the traditional method of raising the alarm of an attack after dark involved the firing of several guns in succession."  Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second* Amendment, 25 L. & Hist. Rev. 139, 162 (2007).  Shooting unnecessarily breached the peace as "the only means for the discovery of [Native American] plotts [to attack] is by allarms, of which no certainty can be had in respect of the frequent shooting of gunns in drinking." Va. Act of 1656, at 401–02.

[36] Act of Dec. 31, 1655, *reprinted in Laws and Ordinances of New Netherland, 1638–1674: Compiled and Translated from the Original Dutch Records in the Office of the Secretary of State, Albany, N.Y.* 205 (E.B. O'Callaghan ed., 1868) [hereinafter N.Y. Act of 1655].

[37] An Act for the More Effectual Preservation of Deer in this Colony, *reprinted in Laws of the Royal Colony of New Jersey*

40

To address concerns raised by armed trespass, the colonies enacted a suite of laws codifying a presumption that one had to obtain consent from the property owner before carrying weapons on their property. While some early laws prohibited *shooting* on others' land,[38] subsequent enactments also restricted *carrying* weapons on others' property.[39] At first, those shooting and carry restrictions required a prior warning

_____

*1760–1769*, at 585 (Bernard Bush ed., 1982) [hereinafter N.J. Act of 1769] (prohibiting "watch[ing] with a gun . . . within two hundred Yards of any Road or Path . . . for shooting at Deer driven by Dogs"); An Act to Continue and Amend an Act, entitled, An Act for Better Settling and Regulating the Militia of the Colony of New Jersey for the Repelling Invasion, and Suppressing Insurrections and Rebellions, *reprinted in Acts of the General Assembly of New Jersey* 347 (Samuel Allinson ed., 1776) (enacted 1771) [hereinafter N.J. Act of 1771] (same).

[38] Acts of General Assembly, Jan. 6, 1639, *reprinted in* Va. Acts 228 [hereinafter Va. Act of 1639]; Acts of General Assembly, Mar. 2, 1642, *reprinted in* Va. Acts 248 [hereinafter Va. Act of 1642]; Acts of General Assembly, Mar. 9, 1657, *reprinted in* Va. Acts at 437 [hereinafter Va. Act of 1657].

[39] An Act for the Speedy Trial of Criminals, and Ascertaining their Punishment, in the County-courts, when Prosecuted there; and for Payment of Fees due from Criminal persons, *reprinted in Acts of Assembly, Passed in the Province of Maryland, from 1692, to 1715*, at 90 (J. Baskett ed., 1723) [hereinafter Md. Act of 1715] (imposing that restriction on individuals convicted of certain crimes or those "that shall be of evil fame, or a vagrant, or dissolute liver").

from the landowner.[40]  But that requirement eventually gave
way, as several colonies mandated that individuals obtain an
owner's permission before bearing firearms on his lands,
whether enclosed or not.[41]  Locationally, these were similar to

_____

[40] Va. Act of 1642, at 248 (hunting or shooting punishable if
person failed to get permission from the owner, as well as
received a warning not to hunt); Va. Act of 1657, at 437
(same); Md. Act of 1715, at 90.

[41] The specific lands to which these restrictions applied varied.
An Act to Prevent the Killing of Deer Out of Season, and
against Carrying of Guns or Hunting By Persons Not
Qualified, *reprinted in* 3 *The Statutes at Large of Pennsylvania
from 1682–1801*, at 255 (James T. Mitchell & Henry Flanders
eds., 1896) [hereinafter Pa. Act of 1721] ("improved or
inclosed lands of any plantation" and, unless an "owner of fifty
acres of land and otherwise qualified," "in the woods or
uninclosed lands"); An Act to prevent the Killing of Deer out
of Season, and against Carrying of Guns or Hunting by Persons
not Qualified, *reprinted in The Acts of the General Assembly
of the Province of New Jersey* 123 (W. & A. Bradford eds.,
1732) (enacted 1722) [hereinafter N.J. Act of 1722]
("Improved or Inclosed Lands in any Plantation" and, unless
an "owner of one Hundred Acres of land or otherwise
Qualified," in the "Woods or Uninclosed Lands"); A
Supplementary Act to the Act entitled, an Act to prevent the
killing of deer out of season, and against carrying of Guns, and
hunting by Persons not qualified, *reprinted in The Acts of the
General Assembly of the Province of New Jersey* 453 (W.

the English hunting laws noted above.  They also shared the recognition that hunting on the lands of others could both harm the owner's property rights and breach the peace.[42]

———————————

Bradford ed., 1752) [hereinafter N.J. Act of 1752] (same); Act of Apr. 9, 1760, *reprinted in A Digest of the Laws of Pennsylvania from the Year One Thousand Seven Hundred to the Sixteenth Day of June, One Thousand Eight Hundred and Thirty-Six* 495 (5th ed. 1837) [hereinafter Pa. Act. of 1760] ("any enclosed or improved lands of any of the inhabitants of this province"); An Act to Prevent Hunting with Fire-Arms in the City of New-York, and the Liberties Thereof, *reprinted in* 2 *Laws of New York 1691–1773*, at 441–42 (Gaine ed. 1774) [hereinafter N.Y. Act of 1763] ("any Orchard, Garden, Corn-Field, or other inclosed Land whatsoever, within the City of New-York, or the Liberties thereof"); N.J. Act of 1769, at 582 ("Lands not his own, (and for which the Owners pay Taxes) or is in his lawful Possession"); *id.* at 585 ("uninclosed land, within two hundred Yards of any Road or path in the Night-time, whether the said Road is laid out by Law or not"); N.J. Act of 1771, at 344 ("any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession"); and *id.* at 347 ("uninclosed Land within two Hundred Yards of any Road or Path in the Night Time, whether the said Road is laid out by Law or not").

[42] N.Y. Act of 1763, at 441 (banning firearms due to "the great Danger of the Lives of his Majesty's Subjects, the Ruin and Destruction of the most valuable Improvement, the grievous

## C. The Founding and Early Republic

As the colonies coalesced into the United States, legislatures struck a delicate balance between continuity in regulation of the right to bear arms and necessary adaptations of those regulations to new, emerging circumstances. Several states relied on English legal roots by enacting versions of the

---

Injury of the Proprietors, and the great Discouragement of their Industry"; Va. Act of 1642, at 248 ("Whereas the rights and interests of the inhabitants are very much infringed by hunting and shooting of diverse men upon their neighbors lands and dividends contrary to the privileges granted to them by their patents, whereby many injuries do daily happen to the great damage of the owners of the land whereon such hunting or shooting is used, It is therefore enacted and confirmed that if any planter or person shall hunt or shoot upon or within the precincts or limits of his neighbor or other dividend without leave first obtained for his so doing, and having been warned by the owner of the land to forbear hunting and shooting as aforesaid, he or they so offending shall forfeit for every such offence four hundred pounds of tobacco."); N.J. Act of 1722, at 123 ("[W]hereas divers abuses have been committed, and great Damages and Inconveniencies arisen by Persons carrying of Guns and presuming to hunt [and] for Remedy whereof for the future."); Churchill, Gun Regulation, *supra* note 35, at 162 ("Colonial governments expressed particular concern over the firing of guns after dark" due to false alarms and the "dangers to lives and property.").

Statute of Northampton;[43] indeed, North Carolina's 1792 statute was so traditional that it retained references to the

---

[43] An Act forbidding and punishing Affrays, *reprinted in Acts Passed at a General Assembly of the Commonwealth of Virginia Begun and Held at the Public Buildings in the City of Richmond, on Monday the Sixteenth Day of October in the Year of Our Lord, One Thousand Seven Hundred and Eighty-Six,* at 35 (Dixon, et al. eds., 1786) [hereinafter Va. Act of 1786]; No Man Shall come Before the Justice, or Go or Ride Armed, *reprinted in A Collection of Statutes of Parliament of England in Force in the State of North Carolina* 60–61 (Francois-Xavier Martin ed., 1792) [hereinafter N.C. Statute of Northampton]; An Act for the Punishment of Certain Crimes and Offences, Within the District of Columbia, *reprinted in Code of Laws for the District of Columbia* 235, 254 (Davis & Force eds., 1819); An Act for repealing an Act, made and passed in the year of our Lord one thousand six hundred and ninety-two, entitled, "An Act for punishing Criminal Offenders," and for re-enacting certain Provisions therein, *reprinted in* 1 *The General Laws of Massachusetts* 454 (T. Metcalf ed., 1823) [hereinafter Mass. Act of 1795] (prohibiting going "armed offensively, to the fear or terror" without reference to fairs and markets); An Act for the restraint of idle and disorderly persons, *reprinted in* 1 *Laws of the State of Tennessee: Including Those of North Carolina Now in Force in This State: From the Year 1715 to the Year 1820, Inclusive* 710 (Heiskell & Brown eds., 1821) (enacted 1801) [hereinafter Tenn. Act of 1801] (same); An Act describing the power of

King.[44]  These laws, which originally protected the integrity of "fairs and markets,"[45] extended to a significant portion of the American public.  *See Antonyuk v. Chiumento*, 89 F.4th 271, 358 (2d Cir. 2023) (describing how Virginia and North Carolina alone accounted for over a quarter of the Nation's population at the Founding).  For instance, the City of New Orleans passed an ordinance in 1817 that promoted the Statute of Northampton's longstanding goal of preserving the peace in locations akin to the "Fairs" of prior centuries by decreeing it unlawful "for any person to enter into a public ball-room with any cane, stick, sword, or any other weapon[.]"[46]  This ordinance, however, said nothing of dangerousness, offensive use of arms, affray, or to the terror, suggesting that the intent of the arms-bearer was irrelevant to his culpability.

---

Justices of the Peace in Civil and Criminal Cases, *reprinted in* 1 *Laws of the State of Maine* 352–53 (J. Griffin ed., 1821) [hereinafter Me. Act of 1821] (same).

[44] *See Bruen*, 597 U.S. at 122 (Breyer, J., dissenting).

[45] In some states, the going-armed laws no longer included a location-based element.  *See* Mass. Act of 1795, at 454 (prohibiting "going armed offensively, to the fear or terror" without reference to fairs and markets); Tenn. Act of 1801, at 710 (same); Me. Act of 1821, at 285 (same).

[46] An Ordinance respecting public Balls, *reprinted in A General Digest of the Ordinances and Resolutions of the Corporation of New-Orleans* 371 (1831) [hereinafter 1817 New Orleans Ordinance].

Most of these going armed laws also codified the state's ability to impose sureties, adding to the general context of affray the specific context of open or concealed arms carry to the terror of the people.[47] These new statutes maintained peace

---

[47] Mass. Act of 1795, at 454 (providing that a justice of the peace "may cause to be staid and arrested, all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth, . . . and upon view of such Justice, confession of the delinquent, or other legal conviction of any such offence, shall require of the offender to find sureties for his keeping the peace, and being of the good behaviour; and in want thereof, to commit him to prison until he shall comply with such requisition"); Tenn. Act of 1801, at 710 (providing that "[i]f any person or persons shall publicly ride or go armed to the terror of the people or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice, on his own view, or upon the information of any other person on oath, to bind such person or persons to their good behaviour, and if he or they fail to find securities, commit him or them to jail, and if such person or persons shall continue so to offend, he or they shall not only forfeit their recognizance, but be liable to an indictment, and be punished as for a breach of the peace, or riot at common law); Me. Act of 1821, at 285 (justices of the peace had power and duty "to cause to be staid and arrested, all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this State").

by requiring an individual "to post bond before carrying weapons in public." *Bruen*, 597 U.S. at 55.

Colonial legislatures extended these location-based carry restrictions to new contexts. In keeping with traditional English custom and Colonial-era practice of protecting peaceful operations at locations important to governmental function,[48] New York,[49] Delaware,[50] and Maryland[51] proscribed bearing arms at polling places.

The Nation's new public universities—including the University of Virginia, in a decision rendered by a Board of Visitors that counted Thomas Jefferson, James Madison, and James Breckenridge among its six members[52]—enacted locational restrictions forbidding their students from

---

[48] *See* Darrell A.H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459, 473 (2019).

[49] Act of Jan. 26, 1787, ch. 1, 1787 N.Y. Laws 345 ("[N]o person by force of arms nor by malice or menacing or otherwise presume to disturb or hinder any citizen of this State to make free election.").

[50] Del. Const. art. 28 (1776).

[51] *Proceedings of the Conventions of the Province of Maryland, Held at the City of Annapolis in 1774, 1775, & 1776*, at 185 (1836).

[52] *University of Virginia Board of Visitors Minutes* 6–7 (October 4–5, 1824).

possessing firearms.[53]  While the predecessors to these statutes were enacted by private universities,[54] and hence, not state action for purposes of the Second Amendment, the Supreme Court has recognized schools as traditional sensitive places. *Heller,* 554 U.S. at 626.  It also has noted that a paucity of historical analogues does not foreclose a finding that a tradition of regulation in recognized sensitive places, given the lack of objection to such laws.  *See Bruen,* 597 U.S. at 30 (no noted objections to sensitive place laws).

---

[53] *Id.*; *see also The Minutes of the Senatus Academicus 1799–1842*, at 86 (Univ. Ga. Libraries 1976) (setting forth the University of Georgia's 1810 ban).

[54] *A Copy of the Laws of Harvard College, 1655*, at 10 (1876) ("[N]oe students shall be suffered to have a gun in his or theire chambers or studies, or keepeing for theire use any where else in the town."); 2 Franklin Bowditch Dexter, *Biographical Sketches of the Graduates of Yale College with Annals of the College History May 1745–May 1763*, at 8 (1896) ("If any Scholar Shall keep a Gun or Pistol, or Fire one in the College-Yard or College, or Shall Go a Gunning . . . he Shall be fined not exceeding Two Shillings.").

Finally, a number of jurisdictions imposed blanket bans on concealed carry;[55] these laws, however, generally exempted travelers.[56]

## D. The Antebellum Period

In the decades leading up to the Civil War, Americans carried on the tradition of imposing carry restrictions to keep peace in important civic forums analogous to fairs, markets, and places of government deliberation, and they did so in analogous contexts that were new to the era. We can discern from these early nineteenth century statutes a continuation of the sorts of proscriptions set forth in the Statute of Northampton, excluding arms from sensitive places that facilitated governmental functions as well as new places analogous to fairs and markets. For example, the 1817 New Orleans Ordinance, discussed above, barred carrying firearms in "a public ball-room;" mere entry into a "public ball-room with any cane, stick, sword or any other weapon" was unlawful, irrespective of the arms-bearer's intent. [57] This suggests that the threat of breached peace and physical danger that could occur in a crowded space like "a public ball-room" was sufficiently obvious as to not require further indicia of evil

---

[55] *See, e.g.*, 1813 Ky. Acts 100; 1813 La. Acts 172; 1819 Ind. Acts 39.

[56] *See* 1813 Ky. Acts 100 (restricting concealed carry "unless when travelling on a journey"); 1819 Ind. Acts 39 ("[T]his act shall not be so construed as to affect travellers.").

[57] 1817 New Orleans Ordinance.

intent or malice aforethought.[58]  New Mexico enacted a law that, like the New Orleans ordinance, banned weapons in "balls or Fandangos."[59]  Like its predecessors, the statute restricted the use of firearms by individuals under the influence of alcohol, and it also proscribed carrying firearms in any "room adjoining said ball where Liquors are sold."[60]  And as the Nation's first public parks emerged,[61] Central Park proscribed "carry[ing] firearms" within its confines to preserve the

---

[58] Joseph Blocker, *Firearm Localism*, 123 Yale L.J. 82, 144 (2013) ("[C]oncealed carry laws were often tailored to heavily populated areas, either in the state laws giving cities and towns the power to restrict concealed carrying (and, sometimes, carrying of any kind), or directly in the acts incorporating municipalities.").

[59] 1852 N.M. Laws 67, 69.

[60] *Id.*

[61] *See* Frank Clark, *Nineteenth-Century Public Parks from 1830*, 1 Garden Hist. 31, 31 (1973) (explaining "[c]ity parks as we know them today first evolved in this country in the nineteenth century," and tracing the development of public parks from the "hygienic and humanitarian" concerns of industrialized Victorian Britain); *see also* Robert Lee & Karen Tucker, *"It's My Park": Reinterpreting the History of Birkenhead Park Within the Context of an Education Outreach Project*, 32 Garden Hist. 64, 65 (2010) (noting Birkenhead Park in England, opened in 1847, was "the world's first public park").

peace.[62]    Public universities likewise continued to forbid students from keeping or bearing weapons.[63]  While concealed carry bans proliferated into new jurisdictions, they continued to exempt travelers.[64]

---

[62] *Fourth Annual Report of the Board of Commissioners of the Central Park* 106 (1861) ("All persons are forbidden . . . [t]o carry firearms or to throw stones or other missiles within it."); *see also* Tricia Kang, *160 Years of Central Park: A Brief History*, Central Park Conservancy Mag. (June 1, 2017), https://perma.cc/85Y2-UZY5 ("[Frederick Law] Olmsted believed Central Park should be a democratic space, a place where people of all backgrounds, rich and poor, women and men, could congregate and enjoy leisurely activities.").

[63] *See Laws and Regulations of the College of William & Mary* 4, 19 (1830); *Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North Carolina* 15–16 (1838).

[64] *See* An act to prevent any Person in this Territory from carrying Arms secretly (1835), *reprinted in Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840*, at 423 (John P. Duval ed., 1839); 1837 Ark. Acts 280;  Act Effective 1856, *reprinted in A Digest of the Statutes of Arkansas* 381–82 (Josiah Gould ed., 1858) [hereinafter 1856 Ark. Law]; 1841 Ala. Acts 148–49; *see also Bruen*, 597 U.S. at 52 ("In the early to mid-19th century, some States began enacting laws that proscribed the concealed carry of pistols and other small weapons."); 1861

The antebellum period also witnessed the humble beginnings of a revolution in American transportation. Local railroad networks with tracks of "no more than a few miles" emerged, presaging the explosive growth of train connectivity that would follow in the ensuing decades.[65] Indiana responded to this novel technology by adopting the country's first law governing firearm safety on trains. The law forbade "shoot[ing] a gun, pistol, or other weapon . . . against any locomotive, or car, or train of cars containing persons, on any railroad in this State[.]"[66]

Surety regimes continued to bind a person to act peaceably to prevent "all forms of violence," including the "misuse of firearms." *Rahimi*, 602 U.S. at 695–96. Massachusetts's surety law, and the many statutes that emulated it, permitted government officials "on complaint of any person having reasonable cause to fear an injury, or breach of the peace," to require the accused "to find sureties" in order to "go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, for violence to his person, or to

---

Ga. Laws 859 (excepting "horseman's pistols"). *But see* 1838 Ark. Law 280 (prohibiting concealed carry without travel exception); 1838 Va. Acts 76 (same); 1859 Ohio Acts 56 (same).

[65] *Rise of Monopolies: History of American Railroads*, Stan. Univ., https://perma.cc/JJ7E-2X77.

[66] 1855 Ind. Acts 153.

his family or property[.]"[67]    This was in contrast to Massachusetts's prior surety law which authorized sureties for those who "ride or go armed offensively, to the fear or terror of the good citizens."[68]   As before, not all of these statutes required a complaint before government authorities could demand sureties for those who publicly carried dangerous and deadly weapons.[69]

### E.  Reconstruction and the *Fin de Siècle*

Following the bloodshed of the Civil War, the country grappled with how to secure both liberty and order in a deeply divided, modernizing society.  Amid the tumult and triumphs of our Second Founding, Americans not only turned to longstanding restrictions on carrying firearms but continued to apply traditional frameworks to emerging, but analogous, contexts.

Legislatures continued to enact well-established carry-restriction statutes covering discrete, historically protected locations.  For example, Louisiana, Tennessee, Georgia, Missouri, Texas, Arizona, Oklahoma, and Montana prohibited carrying firearms at places of important governmental

---

[67] Mass. Rev. Stat. ch. 134, § 16 (1836); *see also* 1838 Terr. of Wis. Stat. 381; Me. Rev. Stat. ch. 169, § 16 (1840); Mich. Rev. Stat. ch. 162, § 16 (1846); Terr. of Minn. Rev. Stat., ch. 112, § 18 (1851); 1854 Or. Laws 220; D.C. Rev. Code ch. 141, § 16 (1857); 1860 Pa. Laws 432.

[68] Mass. Act of 1795, at 454.

[69] 1847 Va. Acts 127, 129; W. Va. Code, ch. 153, § 8 (1868).

functions such as polling locations, courts, and public assemblies,[70] for example, to "regulate the conduct and to maintain the purity of elections" and to "prevent, fraud, violence, intimidation, riot, tumult, bribery or corruption at elections."[71] Similarly, four states enacted trespass laws

---

[70] 1870 La. Acts 159–60; 1870 Tex. Gen. Laws 68; Art. 320, Tex. Act of April 12, 1871, *reprinted in* 2 *A Digest of the Laws of Texas, Containing the Laws in Force, and the Repealed Law on Which Rights Rest, from 1754 to 1874, Carefully Annotated* 1322, 1323 (George W. Paschal ed., 4th ed. 1874) [hereinafter Tex. Act of 1871]; 1869 Tenn. Acts 23–24; 1870 Ga. Acts 285; 1874 Mo. Laws 43 (for concealed weapons); 1875 Mo. Laws 50 (revised to eliminate "concealed"); Mo. Rev. Stat. § 1274 (1879); 1883 Mo. Laws 76; 1889 Ariz. Sess. Laws 16–17; 1890 Okla. Acts 496; 1903 Mont. Laws 49 (concealed or partially concealed firearm, except as permitted by a judge upon a showing of "good moral character and peaceable disposition").

[71] 1870 La. Acts 159–60; *see also* 1870 Ga. Laws 421; 1870 Tex. Gen. Laws 63; Riots and Unlawful Assemblies at Elections, Violence Used Towards Electors, Art. 6490, *reprinted in* 3 *A Digest of the Laws of Texas* 1317–18 (G. Paschal ed., 1873) (prohibiting carrying of any gun, pistol or other dangerous weapon "on any day of election, during the hours the polls are open, within a distance of one half mile of any place of election"); 1871 Tex. Gen. Laws 25–27 (banning carry of firearms in certain locations as an "Offense[] Against Public Peace"); 1889 Ariz. Sess. Laws 16; 4 Blackstone, *Commentaries* *145 (breaches of peace include riot,

requiring individuals to secure consent prior to carrying firearms onto the lands of another.[72]

---

tumultuous petition, and affray that "disturbs" officers of justice "in due execution of their office" and conduct that terrorizes in a place "where a respect to the particular place ought to restrain and regulate men's behavior").

[72] *See* 1865 La. Acts 14 (prohibiting "carry[ing] fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor"); 1865 Fla. Laws 27 (forbidding "rang[ing] with a gun within the enclosed land or premises of another without the permission of the owner, tenant, or person having control thereof"); An Act to Prohibit the Discharging of Firearms in Certain Places Therein Named, Art. 6508a, *reprinted in* 4 *A Digest of the Laws of Texas* 1321 (G. Paschal ed., 1873) (enacted 1867) (proscribing "carry[ing] firearms in the enclosed premises or plantation of any citizen, without the consent of the owner or proprietor, other than in the lawful discharge of a civil or military duty"); 1876 Iowa Acts 142 (making it a misdemeanor to "enter [an] enclosure [where cattle, hogs, or sheep are being fed] with fire arms," unless with permission from the owner); 1893 Or. Laws 79 ("It shall be unlawful for any person other than an officer on lawful business, being armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof."); *see also* 1895 N.J. Law (changing prior requirement that person carrying firearm obtain permission to prohibiting carrying of firearm anytime

Largescale urbanization resulted in a rearranging of the social order and the creation of new physical and technological landscapes.[73]   Parks sprung up across the country and, following Central Park's lead, forbade visitors from carrying firearms.[74]   Travel likewise assumed a recognizably modern

<hr />

owner provides notice not to trespass: prohibiting "trespassing on any lands, carrying a gun, after public notice on the part of the owner, forbidding such trespassing").

[73] *See* David Schuyler, *The New Urban Landscape: The Redefinition of City Form in Nineteenth-Century America* 2 (1986) (describing urbanization as "perhaps the most fundamentally dislocating experience in all of American history").

[74] *E.g.*, *San Francisco Municipal Reports for the Fiscal Year 1874–5, Ending June 30, 1875*, at 887 (1875) (enacted 1872); *Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws* 310 (Consider H. Willett ed., 1876); David H. MacAdam, *Tower Grove Park of the City of St. Louis* 117 (1883); *Comprising the Laws of Illinois Relating to the City of Chicago and the Ordinances of the City Counsel* 391 (Egbert Jamieson & Francis Adams eds., 1881) [hereinafter Chi. Mun. Code]; *The Revised Ordinances of the City of Danville* 83 (Mann et al. eds., 1883); *Annual Reports of the City Officers and City Boards of the City of Saint Paul* 689 (1888); *The Revised Ordinances of Salt Lake City with the City Charter and Amendments Thereto* 248 (1888); *Ordinances and Resolutions of the Borough and City of Williamsport, Pa.* 91 (1891) (enacted 1890); *Compiled*

—————————————

*Ordinances of the City of Grand Rapids* 163 (Colin P. Campbell ed., 1906) (enacted 1891); *Third Annual Report of the Park Commissioners of the City of Lynn, for the Year Ending December 20, 1891*, at 23 (1891); *Park Commissioners' Report, Springfield, Massachusetts* 82 (1897) (enacted 1891); *Laws and Ordinances of the City of Peoria, Illinois* 667 (Wilbert I. Slemmons, et al. eds., 1892); *Municipal Code of the City of Spokane, Washington Together With the City Charter and Amendments, Rules of the City Council, and List of Franchise Ordinances* 123 (E.O. Connor ed., 1903) (enacted 1892); *The Charter of the City of Wilmington* 571 (1893); *Revised Ordinances of the City of Canton, Illinois* 240 (B.M. Chiperfield ed., 1895); *The Local Acts of the Legislature of the State of Michigan Passed at the Regular Session of 1895 With an Appendix* 596 (1895) [hereinafter 1895 Mich. Local Acts]; *The General Ordinances of the City of Indianapolis, Containing, Also, Acts of the Indiana General Assembly So Far as They Control Said City, to Which Is Prefixed a Chronological Roster of Officers from 1832 to 1904, and Rules Governing the Common Council* 648 (Edgar A. Brown & William W. Thornton eds., 1904) (enacted 1896); *A Digest of the Laws and Ordinances for the Government of the Municipal Corporation of the City of Reading, Pennsylvania* 240 (1897) (enacted 1887); *A Digest of the Acts of Assembly Relating to, and the General Ordinances of the City of Pittsburgh From 1804 to Jan. 1, 1897, with References to Decisions Thereon* 496 (W.W. Thomson ed., 1897) (enacted 1893); *Revised Ordinances of the City of Boulder* 157 (Oscar F.A.

form during this period.    After the completion of the transcontinental railroad in 1869,[75] railroad construction "increased dramatically," ushering in an era of unprecedented connectivity.[76]    To accommodate the needs of crowded passenger trains, numerous jurisdictions forbade firing at trains or recklessly handling a firearm while onboard.[77]    Iowa's statute went further by also criminalizing "present[ing] . . . any gun, pistol, or other fire arm at any railroad train, car, or

---

Greene ed., 1899); *City of Trenton, New Jersey, Charter and Ordinances* 390 (1903) (enacted 1890); 1905 Minn. Laws 620 (prohibiting firearms in state parks unless unloaded and sealed by the park commissioner); *Amendments to "The Revised Municipal Code of Chicago of 1905" and New General Ordinances* 40 (1906).  While we remain vigilant not to place more weight on municipal codes than they can rightly bear, we agree with the Ninth Circuit that because "the first modern parks were regulated, as parks are regulated today, primarily by municipalities rather than by States," those historical regulations provide relevant insight despite the fact that "many of the ordinances were local." *Wolford*, 116 F.4th at 983.

[75] *See Completion of the Transcontinental Railroad*, Libr. Cong., https://perma.cc/3QUM-RNTD.

[76] *Railroads in the Late 19th Century*, Libr. Cong., https://perma.cc/3DNP-H87Z.

[77] 1876 Iowa Acts 142; 1879 Wyo. Terr. Sess. Laws 97; 1 Rev. Stat. Ind. 338 (1881); 1889 Tex. Gen. Laws 36; 1891 Nev. Stat. 78; 1895 Ga. Laws 147; 1899 Ala. Acts 154; 1899 Fla. Laws 93.

locomotive engine[.]"[78]    Finally, Americans continued to police the dangerous relationship between firearms and alcohol. Some statutes focused on intoxicated individuals and forbade them from carrying weapons,[79] while other laws emulated New Mexico's location-based regime by prohibiting weapons in areas that served alcohol.[80]

The most comprehensive carry statutes of this period applied the centuries-old principle of preserving order in the fairs and markets of the day by regulating firearm possession and banning weapons from communal venues, including fairs, race courses, ball rooms, churches, public halls, picnic

---

[78] 1876 Iowa Acts 142.

[79] 1867 Kan. Sess. Laws 25 (prohibiting "any person under the influence of intoxicating drink" from carrying weapons); 1873 Mo. Laws 328 (proscribing carry in the town of Moberly while "intoxicated"); 1879 Mo. Laws 224 (criminalizing carrying weapons "when intoxicated or under the influence of intoxicating drinks"); 1883 Wis. Sess. Laws 290 (prohibiting "any person in a state of intoxication" from carrying guns).

[80] 1889 Ariz. Sess. Laws 17 (requiring "drinking saloon[s]" to "keep posted up in a conspicuous place in his bar room . . . a plain notice to travelers to divest themselves of their weapons"); *The Laws and Ordinances of the City of New Orleans* 1 (Edwin L. Jewell ed., 1882) (enacted 1879) [hereinafter 1879 New Orleans Ordinance] ("tavern[s]"); 1890 Okla. Laws 495 ("any place where intoxicating liquors are sold"); *see also* 1881 Nev. Stat. 19–20 (prohibiting firing a gun in any "saloon"); 1883 Wis. Sess. Laws 841 (proscribing firing a gun in "any saloon").

grounds, theatres and other places of public entertainment or amusement, and circuses.[81]  Like the New Orleans ordinance discussed above, prohibitions on carrying arms in discrete

---

[81] *See* 1869–70 Tenn. Pub. Acts 23–24 ("any fair [or] race course"); 1870 Tex. Gen. Laws 63 ("a ball room, social party, or other social gathering, composed of ladies and gentleman"); 1879 New Orleans Ordinance, at 1 ("any theatre, public hall, . . . picnic ground, place for shows or exhibitions, house or other place of public entertainment or amusement"); 1889 Ariz. Sess. Laws 17 (any "place where persons are assembled for amusement . . . any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering"); 1890 Okla. Laws 495 (any "place where persons are assembled . . . for amusement . . . any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering"); 1903 Mont. Laws 49 (any "place where persons are assembled for amusement . . . any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering").  Other jurisdictions prohibited brandishing or firing weapons in certain recreational spaces.  *See* Act of 1869, *reprinted in The General Laws of New Mexico* 312–13 (B. Prince ed., 1882) (prohibiting "draw[ing] or us[ing] any deadly weapon in any ball [or] dance") [hereinafter 1869 N.M. Law]; 1881 Nev. Stat. 19–20 ("any theater").

locations akin to fairs and markets banned carrying in and of itself as a terror to the people.[82]

Extending the logic of universities' firearm restrictions, several statutes also disallowed weapons in schools and other places with educational or scientific purposes.[83]  Additionally,

––––––––––––––––––––

[82] *See, e.g.*, 1871 Tex. Gen. Laws 25–27 ("If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,) or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured and sold for the purposes of offense and defense, unless an officer of the peace, he shall be guilty of a misdemeanor[.]").

[83] 1870 Tex. Gen. Laws 63 ("any school-room or other place where persons are assembled for educational, literary, or scientific purposes"); 1883 Mo. Laws 76 ("any school room or place where people are assembled for educational, literary or social purposes"); Stockton, Kan. Ordinances, no. 76, § 1, *reprinted in* 8 *Stockton Review and Rooks County Record*

numerous statutes outlawed public carry at *any* public assembly.[84]    In upholding these laws, state supreme courts

---

(1887) ("any school room or place where people are assembled for educational, literary or social purposes"); 1889 Ariz. Sess. Laws 17 ("any school room, or other place where persons are assembled . . . for educational or scientific purposes"); 1890 Okla. Laws 495 ("any school room or other place where persons are assembled . . . for educational or scientific purposes"); Columbia, Mo. Gen. Ordinances ch. XVII, § 163 (1890) ("any school room or place where people are assembled for educational, literary or social purposes"); 1903 Mont. Laws 49 ("any school room or other place where persons are assembled . . . for educational or scientific purposes"); *see also* 1883 Wis. Sess. Laws 841 (forbidding firing a gun in any "school house").

[84] 1869–70 Tenn. Pub. Acts 23–24 ("any election in this State, or for any person attending any fair, race course, or other public assembly of the people other public assembly of the people"); 1870 Ga. Laws 421 ("any court of justice or any election ground or precinct, or any place of public worship, or any other public gathering in this State"); 1870 Tex. Gen. Laws 63 ("any election precinct on the day or days of any election, where any portion of the people of this State or collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly"); 1874 Mo. Laws 76 ("any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met

emphasized the power of the state to regulate firearm carry and use.[85]

—————————————

for other than militia drill"); 1879 Mo. Laws. 224 (same and "other public assemblage of other persons met for any lawful purpose, other than for militia drill"); 1883 Mo. Laws 76 (same) ("any other public assemblage of persons"); Stockton, Kan. Ordinances, no. 76, § 1 (1887) ("any election on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons not met for any unlawful purpose"); 1889 Ariz. Sess. Laws 17 ("any election precinct on the day or days of any election, where any portion of the people of this Territory are collected to vote at any election, or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly"); Columbia, Mo. Gen. Ordinances ch. XVII, § 163 (1890) ("any court room, during the sitting of court, or to any election precinct on any election day; or into any other public assemblage of persons met for any lawful purpose, other than for military drill"); 1890 Okla. Laws 495 ("any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly"); 1903 Mont. Laws 49 ("any public assembly").

[85] *E.g.*, *Andrews v. State*, 50 Tenn. (3 Heisk.) 165, 182 (1871) ("Therefore, a man may well be prohibited from carrying his arms to church, or other public assemblage, as the carrying them to such places is not an appropriate use of them, nor necessary in order to his familiarity with them, and his training

\*   \*   \*

---

and efficiency in their use."); *id.* at 187–88 ("If the Legislature think proper, they may by a proper law regulate the carrying of this weapon publicly, or abroad, in such a manner as may be deemed most conducive to the public peace, and the protection and safety of the community from lawless violence."); *English v. State*, 35 Tex. 473, 478–79 (1871) ("We confess it appears to us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together."); *Hill v. State*, 53 Ga. 472, 475 (1874) ("The practice of carrying arms at courts, elections and places of worship, etc., is a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee."); *id.* at 479 ("To suppose that the framers of the constitution ever dreamed, that in their anxiety to secure to the state a well regulated militia, they were sacrificing the dignity of their courts of justice, the sanctity of their houses of worship, and the peacefulness and good order of their other necessary public assemblies, is absurd. To do so, is to assume that they took it for granted that their whole scheme of law and order, and government and protection, would be a failure, and that the people, instead of depending upon the laws and the public authorities for protection, were each man to take care of himself, and to be always ready to resist to the death, then and there, all opposers.").

From this extensive historical review, and consistent with *Bruen*'s and *Rahimi*'s instruction, we discern the following principles that underlie our Nation's regulatory tradition that are relevant to this case: First, legislatures have long enjoyed the authority to restrict the carry of firearms in specific locations central to the operation of government. And the historical record demonstrates that legislatures may also restrict the carry of weapons to protect against misuse in discrete locations set aside for particular civic functions—like the fairs, markets, parliaments, and polling places of old.[86] For example, firearms were deemed inappropriate for educational institutions not only because they can be dangerous, but also because they distracted from the civic mission of educating "responsible public citizens."[87] Likewise, statutes barring firearms from parliament-like locations protected peaceful government functions and the ability of citizens to freely

---

[86] The Supreme Court has similarly noted that carry restrictions in similar sensitive places are within the regulatory tradition of the Second Amendment. *Bruen*, 597 U.S. at 30 ("We therefore can assume it settled that these locations"—specifically, legislative assemblies, polling places, and courthouses—"were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment.").

[87] Miller, *supra* note 48, at 470; Joseph Blocher & Reva B. Siegel, *Guided by History: Protecting the Public Sphere from Weapons Threats Under* Bruen, 98 N.Y.U. L. Rev. 1795, 1807 (2023) ("Education is an activity, like voting and legislating, in which the bonds that constitute democratic community are formed and reproduced. This link between education and democracy was one that the founding generation recognized.").

associate and deliberate without fear of violent reprisal.[88]  At
bottom, history demonstrates that carry restrictions served to
protect against physical danger and alarm in discrete fora
historically designated for important civic purposes.

Second, legislatures may impose conditions on the carry
of weapons outside the home that are designed to ensure that
those who choose to carry such weapons do so safely.  The
sources surveyed in *Rahimi* itself provide ample support for
this principle.  There, the Court found support for § 922(g)(8)
in historical surety laws, a "form of 'preventive justice'" that
"could be invoked to prevent all forms of violence."  *Rahimi*,
602 U.S. at 695.  These laws authorized officials to impose
bonds on individuals who decided to carry arms as a condition
of such carry and as security "for his keeping the peace."  *Id.*
at 696 (quoting 1795 Mass. Acts ch. 2, in Acts and Resolves of
Massachusetts, 1794–1795, ch. 26, pp. 66–67 (1896)).

We also take this opportunity to respond to the dissent's
criticism of both our historical survey and methodology.  The
dissent begins by complaining of a purported "source error"
that pervades our opinion.  Dissent at 19.  As the dissent sees
it, we "blithely assume[] that the fact an ordinance was
promulgated somewhere automatically makes it historically
and legally relevant."  *Id.* at 20.  But the real problem is the
dissent's unwillingness to consider historic regulations
inconsistent with its pre-existing assumptions.  As an example,
it takes issue with our reference to a Texas statute because, by
not aligning with the dissent's own views, "[t]he legislature

---

[88] Miller, *supra* note 48, at 478; Blocher & Siegel, *supra* note
31, at 198.

and Texas Supreme Court ignored the Constitution," when interpreting the state law.[89] *Id.* at 15. But for all the dissent's professed adherence to *Heller*, *McDonald*, *Bruen*, and *Rahimi*, it rejects their teachings when they prove inconvenient for its ahistorical vision of the Second Amendment. A prime example of this dissonance is the dissent's rejection of the Statute of Northampton and its progeny as "provid[ing] little insight into the meaning of the constitutional right to public carry" because they "did not result from any kind of constitutional deliberation." Dissent at 31. That conclusion is hard to square with binding Supreme Court precedent that relies on this line of history, *see, e.g.*, *Rahimi*, 602 U.S. at 694–98, and our sister circuits' recognition of the Statute's enduring importance, *see, e.g.*, *United States v. Allam*, 140 F.4th 289, 296–99 (5th Cir. 2025) (relying almost exclusively on the

---

[89] The dissent also casts our approach as "a fine example of Second Amendment exceptionalism" before marshalling a list of hypothetical reasons for why any particular historical regulation might not be legally probative. Dissent at 15–16 ("Perhaps, as in 1870s Texas, the legislature ignored or misconstrued constitutional constraints. Perhaps the law could not be, or never was, subject to constitutional scrutiny. Perhaps the law was rarely or never enforced, . . . ." (footnotes omitted)). Apparently, under the dissent's novel—and insurmountable—Second Amendment test, a historical analogue must refute all these possibilities (and, perhaps, others) to retain its value. Even more problematic, those objections would apply equally to arms regulations from the colonial era, preventing us from being able to rely on any historical analogue.

Statute of Northampton to reject constitutional challenge to 18 U.S.C. § 922(q)(2)(A), which proscribes possession of a firearm within 1,000 feet of school grounds).

Likewise, neither the Supreme Court nor we have ever instructed that we may consider only those laws that were actually subjected to Second Amendment scrutiny. Rather, the Supreme Court's and our precedent refute this contention and routinely rely on laws from jurisdictions not subject to the Second Amendment or state equivalents. *See, e.g.*, *Rahimi*, 602 U.S. 694–95 (relying on English history to uphold § 922(g)(8)); *Quailes*, 126 F.4th at 221 (relying on colonial era estate forfeiture laws); *United States v. Harris*, 144 F.4th 154, 158–61 (3d Cir. 2025) (relying on colonial era statutes banning drinking and common law authorities incapacitating the mentally ill). And under *Bruen*'s methodology, we must determine whether relevantly similar historical regulations reflect a historic tradition with which a modern-day regulation is consistent. *See* 597 U.S. at 28–29. Excluding from consideration all historical regulations not subjected to Second Amendment scrutiny would distort the baseline of historic referents and misconstrue the accepted scope of legislative authority at the time of the Founding.

Courts overlook the manifold goals of historical carry restrictions at their peril.[90]   One cannot assess "why . . .

---

[90] *See* Blocher & Siegel, *supra* note 31, at 178 ("[C]ourts are likely to ask the wrong questions and demand the wrong types of evidence if they only recognize the government interest in

regulations burden a law-abiding citizen's right to armed self-defense," *Bruen*, 597 U.S. at 29, unless one appreciates the ends our forebearers pursued in limiting where individuals could bear arms.[91]  With these principles—and the diverse aims they serve—guiding our analysis, we address each of Plaintiffs' challenges.

## V.    <u>Constitutionality of the Challenged Provisions</u>

Below we address the insurance and permitting aspects of the statute before turning to its description of sensitive places.  Our disposition of the Plaintiffs' first three challenges—to the liability insurance requirement, payment to the Victims of Crime Compensation Office, and the four-reputable-persons requirement—turns on the factual and historical record pertaining to each claim.

---

protecting individuals from physical injury and fail to recognize the government interest in securing public safety as protecting both the individual's and society's ability to engage in valued activities—from child-rearing to education, commerce, worship, voting, and governing—free from weapons threats and intimidation.").

[91] *See* Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 Yale L.J. 99, 147 (2023) (discussing the numerous ends served by sensitive place restrictions).

## A. Permitting Restrictions and Insurance Requirements

### 1. Liability Insurance

The Siegel Plaintiffs challenge the constitutionality of N.J. Stat. Ann. § 2C:58-4.3, which requires anyone who publicly carries a handgun in New Jersey to "maintain [at least $300,000 in] liability insurance coverage insuring against loss resulting from liability imposed by law for bodily injury, death, and property damages sustained by any person arising out of the ownership, maintenance, operation or use of a firearm carried in public."

As a threshold matter, we reject Defendants' contention that § 2C:58-4.3 falls outside the scope of the Second Amendment's text. Plaintiffs seek to carry handguns in public for self-defense. Section 2C:58-4.3 forbids them from doing so unless they procure liability insurance. Accordingly, § 2C:58-4.3 burdens their right to bear arms. *See Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*, 618 F. Supp. 3d 901, 915–16 (N.D. Cal. 2022).

We turn, then, to the relevant history and tradition. While the general dangers attendant to unsafe firearm use have existed since the Founding, liability insurance as a medium to motivate safe use did not exist in eighteenth-century America. First-party insurance, which covers losses to the policyholder, dates back to the dawn of the Renaissance in the city-states of

Northern Italy.[92]  By contrast, liability insurance, which covers the policyholder against claims by third parties, "was first marketed in the United States in the 1880s, having been imported from Great Britain, where it was also a very recent invention."[93]  Because the Founding generation could not have implemented the type of insurance mandate challenged here, we must analogize to other historical regulations that functioned to address the risk of damage to person and property posed by publicly carrying a firearm.  *See Bruen*, 597 U.S at 27 (unless the regulation is one that "Founders themselves could have adopted to confront that problem," a "more nuanced approach" is appropriate).

The Defendants posit that surety statutes and nineteenth-century strict liability regimes together establish a tradition of firearms regulation and assert that the insurance mandate is consistent with that tradition.  *See N.J. Att'y Gen. Opening Br. 10–11.  Specifically, they argue that the surety statutes are relevantly similar to the insurance mandate in that they both require handgun carriers to post financial security to protect against the future danger of harm, while strict liability regimes are relevantly similar to the insurance mandate in that

---

[92] *See* W.R. Vance, *The Early History of Insurance Law*, 8 Colum. L. Rev. 1, 6–7 (1908).

[93] Kenneth S. Abraham, *Liability Insurance and Accident Prevention: The Evolution of an Idea*, 64 Md. L. Rev. 573, 580 (2005); Brief for Brady Ctr. to Prevent Gun Violence as Amicus Curiae Supporting Defendants-Appellants 17.

they both protect against handgun-inflicted harm without any finding of fault on the part of the firearm bearer.  *Id.* at 52–53.

But these proposed analogues fall well short of establishing a sufficiently similar regulatory tradition.  First, they differ with how they burden the right to bear arms.  Strict liability regimes do not impose an ex ante condition on an individual's right to bear arms.  While they do pre-apportion fault to the one with the firearm, a resulting financial burden, if any, is imposed ex post and only when actual harm from the public carrying of firearms has been realized.  In contrast, the insurance mandate requires all licensed individuals to purchase insurance as a condition to their public carry of a handgun.  Surety statutes come closer, but still miss the mark.  Broadly speaking, these statutes and the insurance mandate are both a form of "preventive justice," *Rahimi*, 602 U.S. at 695 (citation omitted), which require individuals to fulfill ex ante financial burdens in order to carry firearms in public.[94]  The temporal scope of the burden imposed by the surety statutes, however, is far more limited than that imposed by the insurance mandate, which requires perpetual maintenance of liability insurance.  N.J. Stat. Ann. § 2C:58-4.3(a); *Bruen*, 597 U.S. at 55–57 (once a judicial determination of dangerousness was no longer in effect, the surety statute's restriction was lifted); *Rahimi*, 602 U.S. at 699.  Thus, neither analogy shares an analogous means as the insurance mandate.

These analogues also differ in their purpose—the "why," as *Bruen* put it.  Historical laws required sureties of people when they were "reasonably accused of intending to

---

[94] *See supra* notes 67–69.

injure another or breach the peace," *Bruen*, 597 U.S. at 57, meaning they presented a credible threat of future harm to others. *Rahimi*, 602 U.S. at 688–90. The insurance mandate, on the other hand, imposes a condition on all individuals simply due to New Jersey's perception that carrying a firearm in public presents an unacceptable general threat of future harm to others. *See* N.J. Stat. Ann. § 2C:58-4.3(a) (requiring insurance to compensate for the injuries, deaths, and property damage "sustained by any person arising out of the ownership, maintenance, operation or use of a firearm carried in public"). As for the strict liability laws, they imposed a financial burden on some individuals due to the realization of the general risk of harm to person and property posed by a firearm. The insurance mandate, as the Siegel Plaintiffs concede, is driven by a similar concern in that it addresses the same risk but as posed by any handgun carrier. *See* Siegel Plaintiffs' Answering Br. at 23 (the strict liability decisions cited by Defendants "demonstrate that earlier generations certainly understood that the 'unintentional misuse' of a firearm can cause 'harm'—which is the *raison d'être* for the insurance mandate"). But a similar purpose alone cannot support a regulatory tradition under *Bruen*.

Read together, the surety statutes and strict liability regimes impose a narrower burden on the right to bear arms than the insurance mandate, both in how the mandate burdens that right and the reasons for which it does so. Thus, these historical laws do not establish a historical principle akin to that undergirding the insurance mandate—namely, imposing ex ante financial requirements to address the general risk of future harm to others posed by any individual's publicly carrying a handgun for self-defense. Plaintiffs are likely to succeed on the merits of this challenge because New Jersey has

not carried its burden of demonstrating the insurance mandate is consistent with our Nation's regulatory tradition.

## 2. Victims of Crime Compensation Fund

Plaintiffs also challenge the application fee associated with obtaining a Handgun Carry Permit as an "obnoxious exaction" on their Second Amendment rights. Siegel Plaintiffs' Answering Br. 24 (citation modified) (quoting *Follett v. Town of McCormick*, 321 U.S. 573, 577 (1944)). Under Chapter 131, applicants for a Handgun Carry Permit must pay a $200 application fee, $150 of which is used "to defray the costs of investigation, administration, and processing of the permit to carry handgun applications." N.J. Stat. Ann. § 2C:58-4(c). The remaining $50 portion, which Plaintiffs here object to, is "deposited into the Victims of Crime Compensation Office [(VCCO)] account." *Id.* We agree with Plaintiffs that the fee implicates the text of the Second Amendment—it imposes a condition on the "individual right to possess and carry weapons" that the Second Amendment plainly protects. *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 592). So we proceed to consider whether the fee accords with our Nation's tradition of firearms regulation.

Drawing on First Amendment principles, Plaintiffs argue that at least the portion of the $200 fee allocated toward the VCCO account offends the Constitution because a state "may not impose a charge" for "the enjoyment of a right granted by the federal constitution" when that charge is used for something other than to "meet the expense incident to the administration of the act" and "maint[ain] public order in the matter licensed." Siegel Plaintiffs' Answering Br. 25–26 (first

quoting *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943); then quoting *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941)). In other words, Plaintiffs contend, because part of the permit application fee is not used to defray the cost of the permitting scheme itself, the fee is unconstitutional.

We agree with Defendants, and Plaintiffs do not dispute, that determining the constitutionality of permitting fees does not require an assessment of historical analogues because shall-issue licensing regimes and their associated fees, like New Jersey's, remain presumptively constitutional. *See* N.J. Att'y Gen. Answering Br. 67; Siegel Plaintiffs' Reply Br. 14. But we are otherwise unpersuaded by their arguments.

In the First Amendment context, licensing fees do not infringe upon the regulated right when the purpose is "to meet the expense incident to the administration of the [licensing] Act and to the maintenance of public order in the matter licensed." *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941). *Cox* concerned a license for "perform[ing] or exhibit[ing]" a "theatrical or dramatic representation," holding a "parade or procession upon any public street or way," and hosting a "public meeting upon any ground abutting thereon," *Id.* at 571 (quotation omitted), and the fees imposed were linked to the costs caused by *licensed* conduct, *id.* at 577. Costs associated with unlicensed conduct were addressed through the penalty for non-compliance. *Id.* at 571, n. 1. In that scenario, the Supreme Court concluded that "[t]here is nothing contrary to the Constitution in the charge of a fee limited to the purpose stated." *Id.* at 577.

But it is by now pellucid that "[a] state may not impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock v. Pennsylvania*, 319 U.S. 105, 113

(1943).  Thus, following *Cox*, the inquiry becomes whether the fee at issue is a reasonable "expense incident to the administration of the Act and to the maintenance of public order in the matter licensed."  312 U.S. at 577.  Here, it is not.

New Jersey charges a fee of $50 to be "deposited into the Victims of Crime Compensation Office account."  N.J. Stat. Ann. § 2C:58-4(c).  The statute does not connect that fee to either the administration of the permitting scheme itself or maintenance of public order created by the licensed conduct.  *Contra* N.J. Stat. Ann. § 2C:58-4(c) (designating $150 "to defray the costs of investigation, administration, and processing of the permit to carry handgun applications.").  Accordingly, New Jersey's VCCO fee charges applicants for costs neither incidental to nor necessarily caused by their bearing arms.  *Cox*, 312 U.S. at 577.  For this reason, the Siegel Plaintiffs are likely to succeed in their challenge to it.

### 3. Endorsements from Four Reputable Persons

The Siegel Plaintiffs next challenge N.J. Stat. Ann. § 2C:58-4(b)'s requirement that Handgun Carry Permit applicants submit endorsements from "four reputable persons who are not related by blood or by law to the applicant and have known the applicant for at least three years preceding the date of application . . . who shall certify . . . that the applicant has not engaged in any acts or made any statements that suggest the applicant is likely to engage in conduct, other than lawful self-defense, that would pose a danger to the applicant or others."  Plaintiffs assert that this provision, which also requires the "reputable persons" to "provide relevant information . . . including the nature and extent of their relationship with the applicant and information concerning

their knowledge of the applicant's use of drugs or alcohol," §
2C:58-4(b), constitutes a "formula for selective disarmament"
and an "ill-disguised effort to reintroduce . . . discretion into
New Jersey's permitting system," Siegel Plaintiffs' Answering
Br. 29.

First, we address whether Plaintiffs have standing to
bring this challenge.  To sue in federal court, Plaintiffs must
show they suffered an injury in fact that is traceable to the
challenged law and that would be redressed by a favorable
decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61
(1992).  Generally, a plaintiff who challenges the lawfulness of
an application process without first submitting herself to that
process can establish standing only by showing that she was
"able and ready" to apply for a benefit, but that application
"would be futile."  *Ellison v. Am. Bd. of Orthopaedic Surgery*,
11 F.4th 200, 205–06 (3d Cir. 2021) (quoting *Carney v. Adams*,
592 U.S. 53, 66 (2020)).  Plaintiffs here allege plans to apply
for a Handgun Carry Permit, but they do not suggest that they
would be unable to satisfy the challenged requirement.  They
claim to possess standing anyway because "[i]n order to
exercise their Second Amendment rights, plaintiffs must
affirmatively do something that they maintain the state cannot
require them to do—namely, supply the 'endorse[ment]' of at
least 'four reputable persons.'"  Siegel Plaintiffs' Reply Br. 12
(quoting N.J. Stat. Ann. § 2C:58-4(b)).

In *Antonyuk v. James*, the Second Circuit confronted
nearly identical circumstances and determined that the plaintiff
had standing to challenge an allegedly unconstitutional firearm
permitting process.  The plaintiff in that case had not yet
applied for a firearm carry license because he felt
uncomfortable providing the relevant information required by

New York law. 120 F.4th at 977. Acknowledging that the plaintiff's failure to obtain a carry license "stem[med] from his own unwillingness to comply with the challenged requirements," the Second Circuit nonetheless concluded the plaintiff had standing, explaining that the allegedly unlawful application requirements impaired the plaintiff's interest in carrying a firearm "by deterring the plaintiff due to his individual, but reasonable, sensibilities." *Id.* We find *Antonyuk*'s analysis persuasive and conclude it applies with equal force here. If the four-reputable-persons requirement unlawfully impairs Plaintiffs' rights under the Second Amendment, they should not have to subject themselves to its strictures in order to challenge it. *See id.*

As to the merits of Plaintiffs' argument, we agree with the District Court that the four-reputable-persons requirement implicates the text of the Second Amendment, but unlike the District Court, we find it constitutionally permissible. As we stated at the outset, a longstanding principle of our Nation's tradition of firearm regulation is that legislatures may impose conditions on the carry of firearms designed to ensure the safe use of those arms. New Jersey's requirement merely continues this deeply rooted tradition. From the beginning of the Nation, jurisdictions limited the ownership and use of guns to those who were not considered dangerous by their communities. *See Rahimi*, 602 U.S. at 693–98 (summarizing that history). For example, a 1699 New Hampshire law authorized "every justice of the peace within this province" to "stay[] and arrest[] . . . any other who shall go armed offensively, or put his Majesty's subjects in fear, by menaces or threatening speeches."[95] These

---

[95] 1699 N.H. Laws 1.

justices could "commit the offender to prison" until he produced "sureties for the peace and good behaviour."[96] Massachusetts enacted a similar law,[97] as did several other states in the aftermath of the Revolutionary War.[98] States later expanded these surety requirements to apply to people who were the subject of a "complaint" from "*any* person having reasonable cause to fear an injury, or breach of peace."[99] The four-reputable-persons requirement is simply a modern-day analogue to these historic laws.

*Bruen* confirms as much. There, the Supreme Court addressed laws with provisions akin to the four-reputable-persons requirement and concluded that they passed constitutional muster. Contrasting constitutionally impermissible "may issue" gun laws with constitutionally permissible "shall issue" gun laws, the *Bruen* Court spoke approvingly of states that grant firearm permits based on a circumscribed range of "discretionary criteria." *Bruen*, 597 U.S. at 13 n.1. For example, Connecticut permits the issuance of a firearm permit only to someone deemed to be "a suitable person to receive such permit."[100] Rhode Island has a similar "suitable person" standard.[101] Delaware requires applicants to submit a certificate signed by *five* local citizens confirming

---

[96] *Id.*

[97] Mass. Act of 1692, at 52-53.

[98] Tenn. Act of 1801, at 709; Me. Act of 1821, at 285.

[99] *See supra* note 67.

[100] Conn. Gen. Stat. § 29-28(b).

[101] 11 R.I. Gen. Laws § 11-47-11(a).

"that the applicant bears a good reputation for peace and good order in the community in which the applicant resides."[102]  The *Bruen* Court cited each provision with apparent approval.  *Id.*

Of course, such provisions, including New Jersey's, may not be used by local authorities to mask invidious discrimination like that which plagued this country's historical disarming of groups that included Native Americans, Black people, and Catholics.[103]  Thus, should it come to pass that the four-reputable-persons provision results in a discriminatory licensure regime, an appropriate plaintiff would be well within her rights to bring an as-applied challenge to the law.  But we will not invalidate the provision based on facts not presented

---

[102] Del. Code Ann. tit. 11, § 1441(a)(2).

[103] *E.g.*, An Act to Prohibit the Selling of Guns, Gunpowder, or Other Warlike Stores, to the Indians, Pa. Territory Laws, *reprinted in Anno Regni Georgii III, Regis, Magnæ Britanniæ, Franciæ & Hiberniæ, Tertio* 306-07 (B. Franklin ed., 1763) (prohibiting the sale of guns to Native Americans); An Act Concerning Slaves, &c. (1694), *reprinted in Grants, Concessions, and Original Constitutions of the Province of New Jersey* 341–42 (Aaron Leaming & Jacob Spicer eds., 2d ed. 1881) (disarming enslaved people); 52 *Archives of Maryland* 454 (J. Hall Pleasants ed., 1935) (1756 Maryland law disarming Catholics); An Act for Disarming Papists, and Reputed Papists, Refusing to Take the Oaths to the Government, *reprinted in* 7 *The Statutes at Large: A Collection of All the Laws of Virginia* 35–39 (William W. Hening ed., 1820) (1756 Virginia law disarming Catholics); 7 Del. Laws 125 (1827) (disarming enslaved people).

in this case. As it exists, New Jersey's permitting requirement is a neutral, generally applicable law designed to ensure that firearms end up only with those whom their communities deem to be safe to carry them. *Cf. Antonyuk*, 120 F.4th at 976 ("A reasoned denial of a carry license to a person who, if armed, would pose a danger to themselves, others, or to the public is consistent with the well-recognized historical tradition of preventing dangerous individuals from possessing weapons.").

We conclude that New Jersey's four-reputable-persons provision fits squarely within the principles underlying our Nation's history of firearm regulation, as supported by the legion of relevantly similar historical laws cited above. As such, Plaintiffs cannot demonstrate a likelihood of success on the merits of this claim.

## B. Sensitive Places

We now turn to Plaintiffs' challenges to New Jersey's "sensitive places" regulations. Below, we address each of the challenged locational firearm restrictions and conclude, in light of our history and the principles it embodies, that most—though not all—of those restrictions comport with traditional firearms regulation.

### 1. Public Property

Before subjecting each "sensitive place" to the Second Amendment inquiry required by *Bruen* and *Rahimi*, we first address Defendants' contention that several of the challenged restrictions are constitutional, independent of any "historical grounds," when "the State acts as proprietor rather than as sovereign." N.J. Att'y Gen. Opening Br. 34.

According to Defendants, New Jersey, as a proprietor, may, like any private landowner, forbid firearms on state-owned property without triggering *Bruen*'s analogical inquiry. The District Court rejected "the sweeping proposition that carrying for self-defense in public does not extend to any location in which the government owns the land" and affirmed that whether a firearm restriction in a state-owned location comports with the right to keep and bear arms "will turn on whether analogies to historical regulation can justify the challenged law." *Koons v. Platkin*, 673 F. Supp. 3d 515, 605–06 (D.N.J. 2023).

We agree with the District Court that *Bruen*'s framework applies to firearm restrictions even when New Jersey acts as a proprietor. The handful of opinions to which Defendants cite to support their position does not convince us; indeed, half of those opinions support the contrary proposition—that states *qua* proprietors still "must comply with the Constitution." *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015); *see also GeorgiaCarry.org, Inc. v. U.S. Army Corps of Eng'rs*, 212 F. Supp. 3d 1348, 1367–68 (N.D. Ga. 2016). The remaining cases rely on *Heller*'s assurances that it did not cast doubt on certain longstanding prohibitions. *See United States v. Class*, 930 F.3d 469, 464 (D.C. Cir. 2019); *Nordyke v. King*, 681 F.3d 1041, 1044 (9th Cir. 2012) (en banc). True, *Heller* described "laws forbidding the carrying of firearms in sensitive places such as . . . government buildings" as "presumptively lawful." 554 U.S. at 626–27 & n.26. But *Bruen* clarified this statement, observing that "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses." 597 U.S. at 30. The Court's

approach indicates that carry restrictions affecting government property are subject to the same historical inquiry as other firearm regulations, rather than a categorical carveout.

In so concluding, we respectfully part ways with the Ninth Circuit which held, in evaluating similar "sensitive places" laws from California and Hawai'i, "the State, too, may exercise its proprietary right to exclude [the carry of firearms], just as a private property owner may." *Wolford*, 116 F.4th at 970–71. We read *Bruen* to foreclose this argument for the above reasons. But we also recognize that the prospect of enabling the government, in its proprietary capacity, to prohibit the possession or carry of firearms on property it owns would work great damage to individuals' Second Amendment rights. Just as New York's attempt to define the entire island of Manhattan as a "sensitive place" in *Bruen*, permitting the government to end-run the Second Amendment when it acts as a proprietor brings with it the prospect of "eviscerat[ing] the general right to publicly carry arms for self-defense" that *Bruen* articulated.[104]  597 U.S. at 31.

───────────────

[104] In applying *Bruen*'s framework to state-owned property, we do not suggest that the government's role "as proprietor rather than as sovereign" is irrelevant to our analysis. N.J. Att'y Gen. Opening Br. 34. To the contrary, *Bruen* accommodates questions of state versus private property ownership within its principles-based test by asking whether excluding weapons from a particular locale comports with "the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24,

2.  <u>Private Property</u>

Section 2C:58-4.6(a)(24) proscribes knowingly carrying a firearm on "private property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun." The District Court ruled that this restriction "impermissibly burdens Plaintiffs' Second Amendment right to carry for self-defense in public as applied to private property that is held open to the public and for which an implied invitation to enter is extended, but not on private property *not held open to the public.*" *Koons*, 673 F. Supp. 3d at 607. Plaintiffs do not challenge the District Court's conclusion, while Defendants challenge the District Court's conclusion as to privately-owned places held open to the public.

Defendants and *amici* contend that the Second Amendment's plain text does not reach carrying a firearm on another's private property, as opposed to in public or in one's own home. But the Supreme Court has held that "the right to 'bear arms' refers to the right to 'wear, bear, or carry . . . for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 584). That

―――――――――――――――――

meaning we must consider whether a regulation in each location is analogous to laws protecting sovereign functions and officials. What we decline to do is treat simple governmental ownership of property as a shield against Second Amendment scrutiny.

interpretation reaches outside the gunowner's own home. *Id.* at 33 ("After all, the Second Amendment guarantees an 'individual right to possess and carry weapons in case of confrontation,' and confrontation can surely take place outside the home." (quoting *Heller*, 554 U.S. at 592)). Even though "the need for armed self-defense" may be greater at home, that does "not suggest that the need [i]s insignificant elsewhere." *Id.* Accordingly, where New Jersey seeks to regulate the carry of firearms on private property held open to the public, its regulation implicates the Amendment's plain text. *Accord Wolford*, 116 F.4th at 993; *Antonyuk*, 120 F.4th at 1044.

Alternatively, Defendants and *amici* suggest § 2C:58-4.6(a)(24) is not a state-imposed restriction at all, as it merely "effectuate[s]" private landowners' decisions regarding guns on their property. N.J. Att'y Gen. Opening Br. 38–39. But we cannot characterize § 2C:58-4.6(a)(24) as nothing more than a conduit for private decision-making without altering the default public access to privately-owned places held open to the public and "construing the sound of silence" differently than the law had previously. *Koons*, 673 F. Supp. 3d at 613. Instead, § 2C:58-4.6(a)(24) constitutes state action and thus falls within the scope of the Second Amendment.

Accordingly, we must decide whether Defendants can "justify [that] regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Section 2C:58-4.6(a)(24) "addresses a general societal problem that has persisted since the 18th century"—namely, the threat to persons and belongings from individuals carrying firearms on the property of others opened to the public—so Defendants must identify "a distinctly similar historical regulation addressing that problem." *Id.* at 26.

As discussed above, the historical record contains several laws regulating the carrying of arms on another's land without the owner's permission. In the eighteenth century, Pennsylvania, New Jersey, New York, and Massachusetts all enacted statutes requiring an individual to procure a landowner's consent before carrying firearms on his land.[105] And after the Civil War, Louisiana, Florida, Texas, and Oregon enacted similar measures.[106] So just like § 2C:58-4.6(a)(24), these statutes altered the default rule on private property to a presumption against carrying on another's land.

But § 2C:58-4.6(a)(24) sweeps far broader than New Jersey's proffered historical analogues, as it encompasses all "private property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property." Historical examples were seemingly

---

[105] Pa. Act of 1721, at 255–56; N.J. Act of 1722, at 123; 1751 N.J. Laws 448, 451; Pa. Act. of 1760, at 495; N.Y. Act of 1763, at 441–42; N.J. Act of 1769, at 582; 1771 N.J. Laws 343, 344; An Act for the Protection and Security of the Sheep and Other Stock on Tarpaulin Cove Island, Otherwise Called Naushon Islands, and on Nennemesset Island; and Several Small Islands Contiguous, Situated in the County of Dukes County, *in Acts and Laws Passed by the General Court of Massachusetts* 437–38 (1789). Moreover, these statutes represented a logical evolution of even earlier laws forbidding armed trespass after neglecting to obtain permission and receiving a warning from a landowner. *See* Va. Act of 1642, at 248; Va. Act of 1657, at 437; Md. Act of 1715, at 90.

[106] *See supra* note 72.

limited to private property that was not impliedly held open to the public, such as plantations and estates. Otherwise, "it was standard practice for landowners to give the public formal notice in local newspapers that firearms were not permitted on their property."[107] This distinct "how" precludes us from finding that New Jersey's proffered historical analogues are "relevantly similar" to subsection (a)(24)'s application to privately-owned spaces held open to the public. The Defendants offer no other analogues that establish a historic principle of firearm regulation protecting against the manner of physical encroachment and appropriation of private property that owners have held open to the public.

Section 2C:58-4.6(a)(24) certainly resembles regulations of old, but its "how" and "why"—its broad scope to include property held open to the public and particular purpose—are not sufficiently rooted in the principles underlying this Nation's history and tradition to pass constitutional muster. We therefore conclude that Plaintiffs are likely to succeed on the merits of this claim and will affirm the preliminary injunction as to its enforcement.

### 3.  Permitted Public Gatherings

Plaintiffs challenge § 2C:58-4.6(a)(6)'s ban on carrying firearms "within 100 feet of a place where a public gathering, demonstration or event is held for which a government permit

---

[107] Patrick J. Charles, *The Second Amendment and* Heller's *"Sensitive Places" Carve-Out Post-*Rahimi*: A Historiography, Analysis, and Basic Framework*, 58 UIC L. Rev. 813, 865 (2025).

is required, during the conduct of such gathering, demonstration or event." The District Court concluded that provision was not sufficiently rooted in the American tradition of firearm regulation to withstand scrutiny under *Bruen*.

Plaintiffs' desire to bear arms at public gatherings falls within the plain text of the Second Amendment. And the "general societal problem" that § 2C:58-4.6(a)(6) addresses— the risks posed by firearms at public assemblies—has been a concern since the colonial period, albeit not to the same extent as today.[108] As a result, Defendants must offer analogous historical regulations to justify § 2C:58-4.6(a)(6)'s strictures.

After the Civil War, Tennessee, Georgia, Texas, Missouri, Arizona, Oklahoma, and Montana all forbade firearms at public assemblies and gatherings.[109] These historical prohibitions are strikingly similar to § 2C:58-4.6(a)(6). And although they emerged in the latter half of the nineteenth century, these regulations are not outliers that undermine prior understandings of the right to bear arms. To the contrary, these statutes represent a more recent application of the centuries-old practice of proscribing weapons at discrete locations—from courts to legislative

---

[108] *See infra* Part VI.

[109] *See supra* note 84. Additionally, New Mexico imposed a similar, though less restrictive, prohibition on "draw[ing] or us[ing] any deadly weapon in any . . . public gathering of the people[.]" 1869 N.M. Law 313.

bodies to polling places[110]—set aside for the purposes of governmental services and peaceful assembly. The permitted public gatherings, demonstrations, and events that § 2C:58-4.6(a)(6) protects fit comfortably within these historically designated locations.

In reaching the opposite conclusion, the District Court deemed the Georgia, Texas, and Missouri statutes inapt. Observing that the Georgia law proscribed public carry at "any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering,"[111] the District Court applied the interpretive canon of *ejusdem generis*—construing a general term by reference to the specific terms that precede it—and ruled that the statute reached gatherings related to "the performance of a civic duty, such as voting, or exercising First Amendment religious rights, such as attending religious services, or accessing the courts," but did not extend to "other types of public gatherings, such as political conventions or protests." *Koons*, 673 F. Supp. 3d at 631.

The first issue with this reasoning comes from history: The Supreme Court of Georgia rejected the restrictive interpretation given to the statute by the District Court in *Wynne v. State*, explaining "[t]he wholesome purpose of this

---

[110] *See* 7 Edw. 2 c. 170 (1313); 26 Hen. 8 c. 6 (1534); 1647 Md. Laws 216; 1650 Md. Laws 273; 1776 Del. Const. art. 28; *Proceedings of the Conventions of the Province of Maryland*, *supra* note 51, at 185; 1870 La. Acts 159–60; Tex. Act of 1871, at 1322.

[111] 1870 Ga. Laws 421.

statute would be much limited by putting a narrow construction upon the expression 'any public gathering.' A barbecue on the 4th of July, at which the public is assembled in considerable numbers constitutes a public gathering within the meaning of the statute." 51 S.E. 636, 637 (Ga. 1905). While the District Court's reading of the Georgia law might be plausible absent contrary evidence, it is untenable in light of *Wynne*. Second, the District Court fell prey to a common misunderstanding of *Bruen* that *Rahimi* clarified: "our inquiry into *principles* that underlie our regulatory tradition does not reduce historical analogizing to an exercise in matching elements of modern laws to those of their historical predecessors." *Pitsilides v. Barr*, 128 F.4th 203, 210 (3d Cir. 2025). Instead, we look to the tradition of firearm regulation as a whole, evaluating historical analogues and their "how" and "why," to distill the animating principles from that history and to consider whether a modern law fits within those principles. In light of *Rahimi*, the District Court employed a far too exacting test to determine whether proffered historical analogues were relevantly similar. Given the plain text of the statute that covers "any other public gathering," coupled with the Georgia Supreme Court's interpretation of the statute, we have little difficultly concluding that Georgia's public gathering statute is indeed "distinctly similar" to § 2C:58-4.6(a)(6). *Bruen*, 597 U.S. at 26.

As for both the Georgia and the Texas law, the District Court emphasized that those state supreme courts endorsed a militia-based interpretation of the right to bear arms in upholding the statute. *See Koons*, 673 F. Supp. 3d at 629–30 (discussing *Hill v. State*, 53 Ga. 472 (1874)); *id.* at 632 (discussing *English v. State*, 35 Tex. 473 (1871)). But the District Court's reading of the Georgia law is untenable as

*Nunn v. Georgia*, 1 Ga. (1 Kel.) 243 (1846) was decided decades before *Hill* and held that the right to bear arms was an individual right. And for Texas, any error in the Texas Supreme Court's reading of the Second Amendment does not wholly undermine the probative value of the statute, which demonstrates that the Texas *legislature* believed it could ban firearms from public gatherings,[112] offering another historical data point that such prohibitions comport with our Nation's tradition.

The District Court also reasoned that the Missouri statute was not a "reliable historical analogue" based on its view that the Missouri Supreme Court suggested the statute violated Missouri's state constitution. *Koons*, 673 F. Supp. 3d at 633. However, that decision concerned a prior version of the statute that forbade only concealed carry at public assemblies. *State v. Reando* (Mo. 1878). The Missouri Supreme Court upheld the concealed-carry law under the state's right to bear arms. *Id.* In doing so, the Court warned that an absolute ban on keeping and bearing arms would violate the state constitution, but the Court stressed that it was not addressing the validity of a ban on carrying firearms, whether concealed or openly, at a public assembly or any other sensitive location:

---

[112] The carry restriction was not included in the chapter addressing the militia, *see* 1870 Tex. Gen. Laws 11–16, but in a separate chapter; furthermore, the statute's carve-out, allowing arms possession at gatherings in "locations subject to Indian depredations," suggests the legislature recognized an individual right to carry for self-defense, *id.* at 63.

> We do not say nor do we wish to be understood as saying that the legislature might not prohibit a person from bearing arms, even openly, in such places as are mentioned in the statute, without such prohibition to constitutional objections. No such enactment as this is before us and, we apprehend, never will be, for the moral sense of every well-regulated community would be so shocked by any one who would so far disregard it, as to invade such places with fire arms and deadly weapons exposed to public view on his person that it would very rarely, if even, occur.

*Id.* The *Reando* Court did not face a challenge to the open carry statute and explicitly underscored that fact. We therefore disagree with the District Court's inference that the Missouri legislature defied the state constitution when enacting the open carry statute after *Reando*. Instead, that statute offers probative evidence of the American tradition of firearm regulation.

Finally, the District Court remarked that several colonial-era statutes *required* colonists to bring firearms to church services.[113] *Koons*, 673 F. Supp. 3d at 628. Yet an

---

[113] As the District Court recognized, these laws were enacted to ensure colonists were ready for violent clashes with Native Americans and enslaved people. Accordingly, some courts have concluded "these statutes are rooted in racism not the Second Amendment." *Goldstein v. Hochul*, 680 F. Supp. 3d 370, 396 (S.D.N.Y. 2023); *see also Range.*, 124 F.4th at 229

obligation to bear arms in *certain* locations is distinct from a license to do so at will in *any*. Indeed, one can easily draw the opposite conclusion from these colonial statutes—that "[w]hen the government imposes such a duty it assumes that it has the power to regulate the public carrying of weapons; whether it forbids them or commands them, the government is *regulating* the practice of public carrying." *Young v. Hawaii*, 992 F.3d 765, 819 (9th Cir. 2021) (en banc), *vacated and remanded*, 142 S. Ct. 2895 (2022). Given the ambiguity inherent in statutory duties to bear arms, we decline to treat those laws as evincing a limitless license to carry weapons.

These historical examples offer persuasive evidence of the principles underlying our Nation's regulatory tradition of firearm regulation. As we articulated at the outset, we read history—including the historical laws proffered by New Jersey—to include a principle that legislatures may constitutionally prohibit the carry of firearms at and around discrete locations set aside for civic and government functions. Armed with this historical pedigree, modern-day legislatures, consistent with the Second Amendment, may enact analogous laws proscribing the carry of firearms at locations set aside for the same historically protected functions. New Jersey's regulation prohibiting the carry of firearms within 100 feet of any gathering for which a governmental permit is required carries on this deeply rooted history by protecting locations of public gathering and demonstration from the historically recognized disruptive presence of firearms. As such,

--------

(Hardiman, J.) (expressing concerns with relying on historical practices "based on race and religion" to discern the scope of the Second Amendment).

Defendants have shown that § 2C:58-4.6(a)(6) comports with our national tradition of bearing arms and thus complies with the Second Amendment.

### 4. Public Parks, Beaches, Recreation Facilities, Playgrounds, Zoos, and Youth Sports Events

According to the District Court, Defendants failed to establish that parts of § 2C:58-4.6(a)(9) (prohibiting carrying firearms at zoos) and most of § 2C:58-4.6(a)(10) (prohibiting carrying firearms at "a park, beach, [or] recreation facility . . . owned or controlled by a State, county or local government unit") are consistent with our national tradition of firearm regulation. It did hold, however, that public playgrounds, § 2C:58-4.6(a)(10), as well as at youth sports events, § 2C:58-4.6(a)(11), "fall within the sphere of schools," and are thus valid sensitive locations. *Koons*, 673 F. Supp. 3d at 643 (quotation omitted).

As with the other regulations, we conclude carrying a firearm for self-defense at these locations falls within the plain text of the right to keep and bear arms. As a result, Defendants bear the burden of demonstrating that the relevant portions of § 2C:58-4.6(a)(9)–(11) satisfy *Bruen*'s history-and-tradition test. To decide what level of analogy is appropriate, we must determine if the risks posed by guns at public parks, beaches, recreation facilities, playgrounds, zoos, and youth sports events have "persisted since the 18th century" or represent a modern concern. *Bruen*, 597 U.S. at 26.

Prior to the mid-nineteenth century, the concept of a park referred to privately owned, enclosed lands where wild

game roamed.[114]  What communal green space did exist, like the Boston Common, was devoted primarily to grazing cattle.[115]  The public parks we know today did not emerge until after the onset of mass urbanization and were developed to provide a reprieve from industrialization and foster democratic solidarity across social classes.[116]  Crucially, these parks were created in response to the increasing alienation of urban dwellers, designed in part to sustain the existing "social order" and "promote the highest potential of civilization in America."[117]  They also housed the country's first zoos, which opened in the 1870s in New York and Philadelphia.[118]  Simply

---

[114] *See Park*, Noah Webster's Am. Dictionary of the English Language (1828) ("A large piece of ground inclosed and privileged for wild beasts of chase, in England, by the king's grant or by prescription.  To constitute a *park* three things are required; a royal grant or license; inclosure by pales, a wall or hedge; and beasts of chase, as deer, etc.").

[115] *See* Nadav Shoked, *Property Law's Search for a Public*, 97 Wash. U. L. Rev. 1517, 1556–57 (2020).

[116] *See supra* notes 61–62 and accompanying text; *see also* Frederick Law Olmsted, *The Justifying Value of a Public Park* 7 (1881) ("Twenty-five years ago we had no parks, park-like or otherwise, which might not better have been called something else."); Shoked, *supra* note 115, at 1557 (describing the advent of parks in the nineteenth century); Schuyler, *supra* note 73, at 1–10 (same).

[117] Schuyler, *supra* note 73, at 6.

[118] *See History of Zoos in Parks*, NYC Parks, https://perma.cc/E3LB-XC46.

put, "examples [of parks] from the Founding were not relevantly similar to parks in their modern form." *Wolford*, 116 F.4th at 982. We therefore agree with the Second and Ninth Circuits that the "relative novelty of public parks as institutions . . . justifies a flexible approach under *Bruen*." *Antonyuk*, 120 F.4th at 1022 n.86; *accord Wolford*, 116 F.4th at 982; *cf. LaFave*, 2025 WL 2458491, at *4 (rejecting facial challenge to ordinance banning firearm possession in public parks where it would be constitutional in at least some applications).

Similarly, although America has always enjoyed a magnificent coastline, the modern notion of a recreational beach first appeared in the nineteenth century. Whereas the coast was "synonymous with dangerous wilderness" in the seventeenth and eighteenth centuries, Europeans and Americans began to view the beach as a salutary escape from industrial urban centers during the mid-to-late-nineteenth century.[119] Public recreation facilities—such as gymnasia, pools, and athletics fields—likewise originated in the latter half

---

[119] Daniela Blei, *Inventing the Beach: The Unnatural History of a Natural Place*, Smithsonian Mag. (June 23, 2016), https://perma.cc/46EG-MR6U; *see also* Karl F. Nordstrom, *Beaches and Dunes of Developed Coasts* 8 (2000) ("There was little or no interest in direct use of the exposed part of the coastal zone in many countries up to the mid nineteenth century due to the difficulty of traversing lagoons and marshes and the occurrence of malaria. The second half of the nineteenth century saw the beginning of relatively large-scale coastal tourism and development of seaside resorts in many locations." (citations omitted)).

of the nineteenth century,[120] as organized sport spread from the aristocratic traditions of the upper class to the American people as whole.[121]   These locations, too, lack a relevantly similar Founding-era analogue, calling for the same flexible approach under *Bruen* and *Rahimi* that we afford regulations governing parks.

Sections 2C:58-4.6(a)(9)–(11) seek to maintain peace and curb disturbances posed by firearms at New Jersey's public parks, beaches, zoos, and recreation facilities, with an additional, more specific goal of protecting the children who frequent these locations.  These legislative goals find support in the historic principle, established through several analogous historical laws, which forbade guns from centers of community

––––––––––––––––––––––

[120] *See* Steven A. Reiss, *Sport in Industrial America 1850–1920*, at 6 (2d ed. 2013) ("Social reformers and boosters pressured municipalities to secure and develop public space for recreation.  Cities, led by the example of New York's Central Park in 1858, established beautiful suburban public parks after the Civil War.  By the early 1900s, municipalities also developed inner-city sites for small parks and playgrounds, baths, recreational piers, and schoolyards."); Miriam A. Cherry, *Exercising the Right to Public Accommodations: The Debate over Single-Sex Health Clubs*, 52 Me. L. Rev. 97, 114 (2000) ("Gymnasiums were not common in the United States until the middle of the nineteenth century.").

[121] *America at Leisure*, Libr. Cong., https://perma.cc/GJT9-PVM9 (describing the rise of sports as a leisure activity and the opening of public gymnasia, courts, and fields after the Civil War).

life, such as fairs and markets, to ensure visitors could participate without the risks and anxieties associated with deadly weapons. Further support can be found in the later application of this historic principle to new contexts such as recreational areas and places of amusements, particularly in natural settings. Throughout the second half of the nineteenth century, parks and the recreation facilities within them—including zoos—banned firearms.[122] Indeed, the emergence of the modern park brought with it virtually instantaneous prohibition of firearms in those spaces. *See Wolford*, 116 F.4th at 982–83; *Antonyuk*, 120 F.4th at 1022–26.

Examples abound. As the Ninth Circuit observed, New York City's Central Park is a prime example. "[P]erhaps the Nation's first modern public park," when it opened "[i]n 1858 . . . New York prohibited the carrying of firearms in Central Park." *Wolford*, 116 F.4th at 982. The Second Circuit recently marshaled additional evidence of legislatures "regulating firearms in public forums and quintessentially crowded places," of which parks are but one example. *Antonyuk*, 120 F.4th at 1019. That court traced the lineage of regulation of weapons in public fora to the Statute of Northampton, passed in 1328, and found that "at least two states—Virginia and North Carolina—passed statutes at the Founding that replicated the medieval English law prohibiting firearms in fairs and markets, *i.e.*, the traditional, crowded public forum." *Id.* at 1018–20 (footnotes omitted). At the time of their

---

[122] *See supra* note 74; *Fourth Annual Report of the Board of Commissioners of the Central Park* 106 (1861); *Acts of Assembly Relating to Fairmount Park* 18 (1870); Chi. Mun. Code 391.

passage, these Virginia and North Carolina statutes "applied to over a quarter of the Nation's population," with "an additional three states and two territories" enacting similar laws by 1891 which, combined, regulated over 10 million Americans. *Id.* at 1021–22. And while parks and firearm prohibitions in them flourished throughout the mid- to late-nineteenth century, "the constitutionality of those laws was not in dispute." *Wolford*, 116 F.4th at 983; *see also Antonyuk*, 120 F.4th at 1022.

In addition to parks, legislatures extended this historical principle by applying several of those prohibitions to public beaches.[123] Other laws proscribed guns in locations dedicated to amusement,[124] and they treated sites of education and youth presence with particular sensitivity.[125] Although some of these analogues appeared between the 1860s and the first decade of the twentieth century, they are nevertheless probative of the American tradition of firearm restrictions, as they developed out of earlier statutes regulating the carrying of arms in bucolic

---

[123] *E.g.*, *San Francisco Municipal Reports for the Fiscal Year 1874–5, Ending June 30, 1875*, at 887 (1875) (enacted 1872) (Golden Gate Park); Chi. Mun. Code 391 (Chicago's parks, including Lincoln Park); 1895 Mich. Local Acts 596 (Belle Isle Park); *Amendments to "The Revised Municipal Code of Chicago of 1905" and New General Ordinances* 40 (1906) (applying specifically to Chicago's beaches).

[124] *See supra* note 81.

[125] *See supra* note 83.

estates[126] and schools,[127] as well as at older sites of recreation like fairs and markets,[128] aimed at preventing breaches of the peace.    Taken together, this history evidences a "long, unbroken line," *Bruen*, 597 U.S. at 35, of firearm regulation at recreational venues indicative of consistency with our Nation's history.  Thus, consistent with this long and undisputed history of regulating parks, we join the Second and Ninth Circuits in concluding that our Nation's history of firearm regulation embraces regulating the carry of firearms in parks and similar locations of recreation and amusement.  *See Antonyuk*, 120 F.4th at 1025–26; *Wolford*, 116 F.4th at 983.

The District Court expressed concern that historical statutes and ordinances banning firearms in parks may have served to protect wildlife, "not parkgoers."  *Koons*, 673 F. Supp. 3d at 642.  But many of these carry restrictions appeared in the same subsection as prohibitions against "throwing stones and other missiles" and discharging fireworks and guns into or over the park,[129] indicating that they targeted disorderly

---

[126] *See supra* note 41; *see also* 1865 La. Acts 14; 1865 Fla. Laws 27; Tex. Act of 1871, at 1321–22; 1893 Or. Laws 79.

[127] *See supra* notes 52–54.

[128] *See* 2 Edw. 3 c. 3 (1328); 26 Hen. 8 c. 6 (1534); 1786 Va. Acts 35; N.C. Statute of Northampton 60–61.

[129] *Fourth Annual Report of the Commissioners of the Central Park* 106 (1861)  ("All persons are forbidden . . . [t]o carry firearms or to throw stones or other missiles within [the

———————————————

park]"); *Acts of Assembly Relating to Fairmount Park* 18 (1870) ("No persons shall carry firearms, or shoot birds, in the Park, or within 50 yards thereof, or throw stones or other missiles therein"); *Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws* 310 (Consider H. Willett ed. 1876) ("All persons are forbidden to carry fire arms, or to throw stones or other missiles within said park"); Chi. Mun. Code 391 ("All persons are forbidden to carry firearms or to throw stones or other missiles within any one of the public parks. All persons are forbidden to cut, break or in any way injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, bridges, or other construction or other property within or upon any of the said parks."); *The Revised Ordinances of the City of Danville* 83 (Mann et al. eds., 1883) ("Whoever shall carry any fire-arms into said parks, or shall fire off or discharge the same in, or into said parks, or any of them; or whoever shall shoot, fire or discharge any kind of fire-works therein[.]"); *The Revised Ordinances of Salt Lake City with the City Charter and Amendments Thereto* 248 (1888) ("No person shall, within Liberty Park, cut, break, or in any way injure or deface any tree, shrubs, plants, buildings, fences, or property of any kind; or indulge in noisy, boisterous, riotous, or indecent behavior, or use any boisterous or offensive language; or, except authorized by the Mayor: . . . 3 – Carry or discharge firearms."); *Ordinances and Resolutions of the Borough and City of Williamsport, Pa.* 91 (1891) (enacted 1890) ("No person shall carry fire-arms or shoot in the park, or discharge

behavior that disrupted not only wildlife but also patrons. *Id.* And we see no tension between that goal and the aims of § 2C:58-4.6(a)(9)–(11). Just as these nineteenth-century analogues, New Jersey's restriction aims at addressing the same breaches of peace and threats to parks, beaches, and zoos with which legislatures have wrestled throughout history. Additionally, even accepting that some historical regulations

---

any fire-works, or throw stones or missiles therein."); 1895 Mich. Local Acts 596 ("No person shall fire or discharge any gun or pistol or carry firearms, or throw stones or other missiles within said park or boulevard, nor shall any person fire, discharge or set off any rocket, cracker, torpedo, squib, or other fireworks or things containing any substance of any explosive character on said park or boulevard, without the permission of said commissioners, and then only under such regulations as they shall prescribe."); *Revised Ordinances of the City of Boulder* 157 (Oscar F.A. Greene ed., 1899) (misdemeanor to "take or carry or cause to be taken or carried in to any of the parks belonging to the City of Boulder, any gun, pistol, revolver, or other firearm, or who shall shoot any firearm at or towards or over or into or upon any of said parks"); *City of Trenton, New Jersey, Charter and Ordinances* 390 (1903) (enacted 1890) ("No person shall carry firearms or shoot birds in said park or squares, or within fifty yards thereof, or throw stones or other missiles therein."); *Amendments to "The Revised Municipal Code of Chicago of 1905" and New General Ordinances* 40 (1906) ("All persons are forbidden to carry firearms or to throw stones or other missiles within any of the Parks, Public Play Grounds or Bathing Beaches of the City[.]").

focused their prohibitions on protecting wildlife, we have no difficulty concluding—in the face of the legion examples we have recounted—that "the Nation's historical tradition includes regulating firearms in parks," *Wolford*, 116 F.4th at 983, and in "places that serve as public forums," *Antonyuk*, 120 F.4th at 1023.

As our history furnishes a laundry list of analogues to § 2C:58-4.6(a)(9)–(11), New Jersey's prohibition on firearms at public parks, beaches, playground, recreation facilities, and youth sports events ably fits within the principles animating that tradition of firearm regulation.   As such, Plaintiffs fail to show a likelihood on the success of this claim.

### 5.  Public Libraries and Museums

Plaintiffs aver that New Jersey's ban on carrying firearms at "a publicly owned or leased library or museum," N.J. Stat. Ann. § 2C:58-4.6(a)(12), violates their right to keep and bear arms, and the District Court agreed.

As an initial matter, the text of the Second Amendment encompasses Plaintiffs' desire to carry handguns in public libraries and museums for self-defense.   Accordingly, we must assess whether the problem § 2C:58-4.6(a)(12) addresses—the danger, disruption, and distraction of firearms in public libraries and museums—is one that "has persisted since the 18th century," *Bruen*, 597 U.S. at 26, or is of more recent vintage.

America's free public libraries emerged after the Founding and proliferated throughout the 1850s and 1870s.[130] Likewise, though Americans opened two museums in the eighteenth century—the Charleston Museum in 1773 and Charles Willson Peale's Philadelphia Museum in 1785, prior to its failure a few years later[131]—modern museums arrived in

---

[130] *Before 1876*, Am. Libr. Ass'n, https://perma.cc/VU8W-4FBQ ("The first free modern public library was opened in 1833. The Peterborough (N.H.) Town Libraries was the first institution funded by a municipality with the explicit purpose of establishing a free library open to all classes of the community. . . . [T]he Boston Public Library . . . was the first free municipal library in a large community and was founded in 1848[.]"); Kathleen de la Peña McCook & Jenny S. Bossaller, *Introduction to Public Librarianship* 30 (3d ed. 2018); *see also United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 238 (2003) (Souter, J., dissenting) (describing "the mid-19th-century development of public libraries"). The District Court remarked that Benjamin Franklin founded the Library Company of Philadelphia in 1731, but the Library Company used a private, subscription-based model that sharply distinguishes it from the openness of public libraries, *see* Edwin Wolf, *At the Instance of Benjamin Franklin: A Brief History of the Library Company of Philadelphia* 5 (1995) ("Fifty subscribers invested forty shillings each and promised to pay ten shillings a year thereafter to buy books and maintain a shareholder's library.").

[131] *See* John Edward Simmons, *History of Museums*, *in* Encyclopedia of Libr. & Info. Sciences 1812, 1818 (4th ed. 2017).

the United States in the nineteenth century with the Founding of the Smithsonian Institution in 1846 and the American Museum of Natural History, the Metropolitan Museum of Art, and the Museum of Fine Arts around 1870.[132]

The risks from firearms at public libraries and museums thus only became widespread in the second half of the nineteenth century, permitting our use of *Bruen*'s more flexible, relevantly-similar test.  Defendants ably satisfy this test and have provided the requisite historical analogues for both the "how" and the "why."  That is, New Jersey identifies historical statutes that resemble § 2C:58-4.6(a)(12), both in the means they deployed—forbidding firearms at locations where individuals congregated for educational and cultural purposes—and the ends they served—preventing the dangers and disruptions from firearms at those locations.  Nor are these enactments outliers, as they are consistent with the longstanding tradition of restricting firearms at the predecessors of public libraries and museums[133]:

---

[132] *See* Edward P. Alexander et al., *Museums in Motion: An Introduction to the History and Functions of Museums* 7 (3d ed. 2017).

[133] In addition to books, Elihu Yale donated a portrait of King George I to the Collegiate School that remains in the hands of the Yale University Art Gallery today.  *See King George I of Great Britain and Ireland*, Yale Univ. Art Gallery, https://perma.cc/8G3R-QTJX.  Yale also opened the "first gallery affiliated with a college or university in America" in 1832.  Erik Vogt, *The Trumbull Gallery*, 2000 Yale U. Art Gallery Bull. 26, 27.

universities.[134]  Indeed, New Jersey's law enjoys a uniquely deeply rooted historical pedigree premised on the principle that legislatures may permissibly regulate the carrying of firearms in places of amusement and education.  *See Wolford*, 116 F.4th at 987.  As the Ninth Circuit observed, places like casinos, stadiums, amusement parks, zoos, museums, and libraries share similar characteristics, insofar as they serve as "modern social gathering place[s] . . . visited for both amusement and educational purposes."  *Id.*  That Court went on to recognize that "[c]onvincing evidence supports the conclusion that prohibitions on firearms at places of amusement fall within the national historical tradition of prohibiting firearms at sensitive places."  *Id.*

Libraries hold a place of special solicitude in this regulatory tradition.  Their educational mission is vital to communities' and our Nation's democratic project, and legislatures protected these spaces from their emergence. Throughout our history, "[m]any libraries [were] housed in schools and courthouses, for example, and regulation of firearms in those places is plainly constitutional and within the Nation's historical tradition."  *Id.* at 988.  Additionally—and consistent with their designated educational missions— libraries and museums often serve as spaces frequented by children, a "vulnerable population" that history shows legislatures may constitutionally enact firearm regulations to protect.  *See Antonyuk*, 120 F.4th at 1011 n.70 (finding historical support for a similar regulation because "these laws tended to not only prohibit guns in school rooms, *i.e.*, spaces frequented by vulnerable children, but also anywhere people

---

[134] *See supra* notes 52–54.

'assemble[] for educational, literary or social purposes'" (quoting 1870 Tex. Gen. Laws 63, ch. 46) (alteration in original)); *cf. infra* Section V.B.9.

Equipped with these principles and analogues, Defendants have satisfied their burden of establishing that § 2C:58-4.6(a)(12) is consistent with our national tradition of firearm regulation. New Jersey's prohibition on firearms at public libraries and museums comports with the Second Amendment, and Plaintiffs fail to demonstrate a likelihood of success on the merits.

### 6. Bars and Other Locations that Serve Alcohol

Plaintiffs' challenge to N.J. Stat. Ann. § 2C:58-4.6(a)(15) (proscribing firearms in "a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises") fares no better.

The plain text of the Second Amendment covers Plaintiffs' proposed course of conduct, namely, carrying handguns for self-defense in locations where alcohol is sold for consumption on the premises. And the dangers posed by combining firearms and alcohol have existed since colonial times, as early American settlers enjoyed a variety of intoxicating beverages—from "beers and ciders, to wines[,] mixed concoctions . . . [and] rum."[135] Accordingly, Defendants

---

[135] Steven Struzinski, *The Tavern in Colonial America*, 1 Gettysburg Hist. J. 29, 33 (2002).

must identify "distinctly similar historical regulation[s] addressing that problem." *Bruen*, 597 U.S. at 26.

Just as the Second and Ninth Circuits concluded in evaluating nearly identical laws, we hold that New Jersey's statute is entirely consistent with the principle that legislatures may prohibit the carry of firearms in locations where they may be especially susceptible to misuse. *See Antonyuk*, 120 F.4th at 1031 ("Whereas the crowded space analogues justify prohibiting firearms in heavily trafficked places, the intoxicated-persons analogues justify prohibiting firearms to intoxicated persons who cannot be trusted with weapons. Together, these statutes justify regulating firearms in crowded spaces in which intoxicated persons are likely present."); *Wolford*, 116 F.4th at 986 ("[W]e conclude that [the proffered historical] laws establish that bars and restaurants that sell alcohol are among the Nation's 'sensitive places' where firearms may be prohibited.").

As we recently recognized, "the Founders . . . understood that drinking could provoke people to act dangerously." *United States v. Harris*, 144 F.4th 154, 158 (3d Cir. 2025). For instance, a Rhode Island law banned firing guns at night and in taverns.[136] Other legislatures authorized the confinement of drunks until they became sober and imposed surety regimes requiring drunkards to post security for their peaceable behavior—all in recognition of the

---

[136] *See* Acts & Laws of the English Colony of Rhode-Island & Providence-Plantations 120 (Newport, R.I., Hall 1767).

dangerous combination that firearms and alcohol present. *See id.* at 159.

In the colonial era, Delaware prohibited the sale of "strong Drink" at any "Places of [militia] Muster."[137] Likewise, "Dr. Benjamin Rush, a signer of the Declaration of Independence, delegate to the Continental Congress, and preeminent Founding-era medical authority, noted that intoxication breeds crime, including '[f]ighting,' '[b]urglary,' and '[m]urder,'" reflecting the Founders' disposition towards alcohol and drunkenness. *Id.* at 158 (quoting Benjamin Rush, A*n Inquiry into the Effects of Ardent Spirits upon the Human Body and Mind* 2 (8th ed., Boston, James Loring 1823)).

But even against the backdrop of these Founding-era laws, we should not assume that they represent "founding-era legislatures maximally exercis[ing] their power to regulate." *Id.* (quoting *Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring)). Instead, the Supreme Court has observed that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868" and instructed that, in the face of "unprecedented societal concerns," we take "a more nuanced approach" to finding similar historical regulations even without a "distinctly similar historical regulation" in the Founding era. *Bruen*, 597 U.S. at 26–27.

––––––––––––––––––––––––––

[137] 1756 Del. Acts 175, *reprinted in* 2 *Military Obligation: The American Tradition Part 3: Delaware Enactments* 6 (Arthur Vollmer ed., 1947).

Such is the case here, as in the nineteenth century and beyond, "[d]rinking became detached from earlier safeguards" and grew even more closely linked to social danger and disorder. Paul Aaron & David Musto, *Temperance and Prohibition in America*, in *Alcohol and Public Policy: Beyond the Shadow of Prohibition* 137 (Mark H. Moore & Dean R. Gerstein eds., 1981). In response, the temperance movement bloomed, and legislatures started to experiment with even more alcohol-related gun reforms, such as restrictions on carrying firearms while drinking, *see* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 Notre Dame J. Leg. 223, 300, 320, 323, 331 (2024)), and more prevalent regulation of firearms where alcohol was imbibed.

In New Mexico, Arizona, Oklahoma, and New Orleans, for example, legislatures forbade carrying firearms at locations that sold alcohol.[138] Other statutes—one of which was explicitly upheld by the Missouri Supreme Court—barred

---

[138] 1852 N.M. Laws 67, 69 (prohibiting "enter[ing] said Ball or room adjoining said ball where Liquors are sold, or to remain in said balls or Fandangos with fire arms or other deadly weapons, whether they be shown or concealed upon their persons"); 1879 New Orleans Ordinance (providing "it shall not be lawful for any person to carry a dangerous weapon, concealed or otherwise, into any . . . tavern"); 1889 Ariz. Sess. Laws 17 (requiring "drinking saloon[s]" to "keep posted up in a conspicuous place in his bar room . . . a plain notice to travelers to divest themselves of their weapons"); 1890 Okla. Laws 495 (proscribing carrying weapons "to any place where intoxicating liquors are sold").

intoxicated individuals from bearing guns[139] and penalized
discharging firearms at saloons[140] and selling guns to
intoxicated persons.[141] *See State v. Shelby*, 2 S.W. 468, 469
(Mo. 1886) ("The mischief to be apprehended from an
intoxicated person going abroad with fire-arms upon his person
is equally as great as that to be feared from one who goes into
an assemblage of persons with one of the prohibited
instruments.").

These regulations, "[t]aken together," *Rahimi*, 602 U.S.
at 698, support the common-sense notion that intoxicated
people "cannot necessarily be trusted with firearms" and may
"be unable to defend themselves effectively," *Antonyuk*, 120
F.4th at 1031. Given the sum total of regulations throughout
our Nation's history addressing alcohol, as well as protecting
discrete locales set aside for recreation and amusement, like
fairs and markets, from breaches of the peace, we conclude that
Defendants are likely to prevail in demonstrating a historical
tradition of protecting against the dangers posed by the
combination of alcohol and firearms, and prohibiting
individuals from carrying firearms at locations that serve or

---

[139] *See supra* note 79.

[140] 1881 Nev. Stat. 19–20 (prohibiting "maliciously, wantonly
or negligently discharg[ing]" firearms in any "saloon"); 1883
Wis. Sess. Laws 841 (proscribing firing a gun in "any saloon").

[141] 1878 Miss. Laws 175 (prohibiting "sell[ing] to any . . .
person intoxicated, knowing him to be . . . in a state of
intoxication, any weapon . . . or any pistol cartridge").

dispense alcohol is consistent with that tradition.[142]   *Cf. Rahimi*, 602 U.S. at 698 (looking to disparate historical regulations that, when "[t]aken together," yield a principle supporting the modern day regulation).

In ruling that § 2C:58-4.6(a)(15) runs afoul of the right to keep and bear arms, the District Court emphasized that regulations applicable to intoxicated individuals differ from § 2C:58-4.6(a)(15)'s locational regime.  That observation is true as far as it goes, but it accounts for neither the historical regulations that imposed location-based carry restrictions on places that sold alcohol, nor the relevance of restrictions directed toward intoxicated individuals as historical support for § 2C:58-4.6(a)(15): *Bruen* insists on *similar* regulations, not *identical* ones.  597 U.S. at 26.  To ignore our forebearers' recognition of the dangers of carrying while intoxicated "would be as mistaken as applying the protections of the [Second Amendment] right only to muskets and sabers." *Rahimi*, 602 U.S. at 692.  Restrictions as closely related as those disarming drunk individuals and those banning firearms at the locations where individuals become drunk speak to a common public understanding of the contours of Americans' right to bear arms, so Defendants have carried their burden to establish a historical tradition that supports § 2C:58-4.6(a)(15).

---

[142] Va. Act of 1656, at 401–02 (punishing "shoot[ing] any gunns at drinkeing (marriages and ffuneralls onely excepted)").

7.  Entertainment Facilities

Based on its review of the historical record, the District Court ruled that New Jersey violated the Second Amendment by banning firearms from any "privately or publicly owned and operated entertainment facility within this State." N.J. Stat. Ann. § 2C:58-4.6(a)(17). While that restriction implicates the text of the Second Amendment, contemporary entertainment venues involve a scale and density that was unknown at the Founding. *See Bruen*, 597 U.S. at 114 (Breyer, J., dissenting) (remarking that "nightclubs, movie theaters, and sports stadiums" have "no obvious 18th- or 19th-century analogue"); *see also* N.J. Att'y Gen. Opening Br. 18 ("Nor could the Founders have imagined a place like MetLife Stadium, with seating capacity roughly the size of Boston's population in 1830."). Accordingly, we resort to *Bruen*'s "relevantly similar" framework to evaluate the analogues Defendants offer in support of § 2C:58-4.6(a)(17).

New Jersey convincingly offers numerous analogues to support its regulation. Throughout the nineteenth century, states such as New Mexico, Texas, Georgia, Missouri, Arizona, Oklahoma, and Montana forbade carrying firearms at entertainment facilities and recreational gatherings to prevent the dangers of guns in crowded venues and preserve Americans' ability to enjoy those amusements in peace.[143]

---

[143] 1817 New Orleans Ordinance ("a public ball-room"); 1852 N.M. Laws 67, 69 (a "Ball or room adjoining said ball where Liquors are sold"); 1870 Tenn. Pub. Acts 23–24 ("any fair, race

Related statutes proscribed using firearms in such facilities.[144] The roots of these restrictions stretch back centuries, as Anglo-American law has long sought to curb the dangers from weapons in locations of public amusement—much like the

_____

course, or other public assembly of the people"); 1870 Tex. Gen. Laws 63 ("a ball room, social party, or other social gathering, composed of ladies and gentleman"); 1870 Ga. Laws 421 ("any other public gathering in this State"); 1879 New Orleans Ordinance 1 ("any theatre, public hall, tavern, picnic ground, place for shows or exhibitions, house or other place of public entertainment or amusement"); 1883 Mo. Laws 76 (any "place where people are assembled for . . . social purposes"); 1889 Ariz. Sess. Laws 17 (any "place where persons are assembled for amusement . . . any circus, show or public exhibition of any kind or into a ball room, social party or social gathering"); 1890 Okla. Laws 495 (any "place where persons are assembled . . . for amusement . . . any circus, show or public exhibition of any kind, or into any ball room, or to any party or social gathering"); 1903 Mont. Laws 49 (any "place where persons are assembled for amusement . . . any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering").

[144] 1869 N.M. Law 313 (forbidding "draw[ing] or us[ing] any deadly weapons in any ball, dance, or other public gathering of the people"); 1881 Nev. Stat. 19–20 (outlawing discharging a firearm "in any theater, hall, store, hotel, saloon or any other place of public resort").

fairs and markets of old.[145]   Thus, "[t]he State's proffered analogues set forth a tradition of regulating firearms in . . . spaces that are (1) discrete in the sense that they contain crowds in physically delineated or enclosed spaces, *e.g.*, circuses, ball rooms, fairs, and markets, and (2) 'where persons are assembled for amusement[.]'"   *Antonyuk*, 120 F.4th at 1038 (quoting 1889 Ariz. Sess. Laws 17); *Wolford*, 116 F.4th at 987 (collecting historical examples and concluding that "[c]onvincing evidence supports the conclusion that prohibitions on firearms at places of amusement fall within the national historical tradition of prohibiting firearms at sensitive places").

While our forebearers may have enjoyed waltzes in ballrooms instead of Taylor Swift concerts in sports arenas, Americans' desire for physical safety and peace of mind during leisure has endured, forging a national tradition that supports § 2C:58-4.6(a)(17).   Because New Jersey's protection of entertainment spaces is relevantly similar to numerous

---

[145] *See supra* note 128; *see also* Blocher & Siegel, *supra* note 31, at 165.   The District Court's contrary view rested on mistaken premises.   Its narrow reading of Georgia's 1870 statute as extending only to civic and religious gatherings, as opposed to sites of recreation, is inconsistent with the Georgia Supreme Court's own construction of the statute in *Wynne v. State*.   51 S.E. at 637.   And the single case the District Court cited for the proposition that Missouri's statute conflicted with its state constitution, *State v. Reando*, does not support the Court's concerns.   *See supra* Section V.B.3.

historical statutes, Defendants have met their burden under *Bruen* as to § 2C:58-4.6(a)(17).

8. Casinos

Plaintiffs also seek to invalidate New Jersey's prohibition on carrying firearms in "a casino and related facilities, including but not limited to appurtenant hotels, retail premises, restaurant and bar facilities, and entertainment and recreational venues located within the casino property." N.J. Stat. Ann. § 2C:58-4.6(a)(18).

Because the text of the Second Amendment covers Plaintiffs' proposed conduct—carrying handguns in casinos for self-defense—Defendants must demonstrate that the prohibition complies with the American tradition of firearm regulation. The District Court found that "this Nation has a long history of gambling establishments," and thus concluded that § 2C:58-4.6(a)(18) addresses a problem that has persisted since the eighteenth century. *Koons*, 673 F. Supp. 3d at 646. But our review of the record convinces us that gambling's history in the colonies and United States was far more checkered than the District Court acknowledged: Massachusetts, Pennsylvania, New Hampshire, and New Jersey banned gambling during the colonial period.[146] Other

---

[146] *See* George G. Fenich, *A Chronology of (Legal) Gaming in the U.S.*, 3 Gaming Res. & Rev. J. 65, 66 (1996); G. Robert Blakey & Harold A. Kurland, *The Development of the Federal Law of Gambling*, 63 Cornell L. Rev. 923, 1015 & n.430

colonies, such as Virginia, vacillated between more restrictive and liberal regimes.[147]   Although the District Court rightly observed that the French had permitted gambling in colonial Louisiana, they did so only after prohibiting it in both 1733 and 1744,[148] and Louisiana then banned gambling outside New Orleans once it became a U.S. territory and banned it altogether once it became a state.[149]

In addition to the fact that gambling was largely forbidden, the immense scale of contemporary casinos—which often contain entire hotels, shops, restaurants, bars, and

---

(1978); G. Robert Blakey, *Gaming, Lotteries, and Wagering: The Pre-Revolutionary Roots of the Law of Gambling*, 16 Rutgers L.J. 211, 237–38, 251 (1985).

[147] Blakey, *supra* note 146, at 257–58 (describing Virginia's 1619 anti-gambling law, but observing that Virginian society subsequently evolved "from a frontier culture to a planter dominated culture" defined by the aristocratic gambling habits of the British elite).

[148] *See* Carl A. Brasseaux, *The Moral Climate of French Colonial Louisiana, 1699–1763*, 27 La. Hist. 27, 39 (1986). The District Court also emphasized that, in an attempt to regulate gambling in New Orleans, French Governor Louis Billouart de Kerlérec opened a state-run casino in 1753.  But that measure appears to have been both seasonal and short-lived.  *See id.* at 39.

[149] *See* Jay Precht, *Legalized Gambling*, 64 Parishes (Nov. 16, 2011), https://perma.cc/8NJT-C5E3; Fenich, *supra* note 146, at 67.

entertainment venues—was unprecedented in eighteenth-century America. *Accord Wolford*, 116 F.4th at 987 (recognizing the "persuasive evidence that casinos, stadiums, amusement parks, zoos, museums, and libraries did not exist in modern form at the Founding"). Accordingly, the threat posed by firearms at New Jersey's modern-day casinos is not one that has persisted since the Founding, so Defendants may analogize more broadly under *Bruen* to justify § 2C:58-4.6(a)(18).

They have successfully done so. Defendants cite numerous statutes that proscribed carrying firearms to particular areas where people congregated that were set aside for recreation in order to preserve Americans' ability to enjoy amusement in peace, free from disturbances created by the danger and fear of deadly weapons.[150] As discussed above, those regulations were part of a centuries-long tradition of restricting the bearing of arms in areas where people gathered for leisure and amusement.[151] Section 2C:58-4.6(a)(18) also explicitly extends to the bars typically found in casinos, so historical restrictions addressing the dangers of mixing firearms and alcohol further support §2C:58-4.6(a)(18)'s consistency with American tradition.[152] "Taken together," *Rahimi*, 602 U.S. at 698, these historical traditions—restricting arms in areas where people gathered for leisure and amusement, such as fairs and markets, and restricting arms to those who are intoxicated—support § 2C:58-4.6(a)(18)'s historically-rooted restriction in the new context of modern-

---

[150] *See supra* notes 143–144.

[151] *See supra* note 128.

[152] *See supra* notes 79, 138, 142, 144.

day casinos. Consistent with these analogous regulations and the principles that underlie them, we have little difficulty concluding that New Jersey's regulation of carrying firearms in casinos enjoys substantial historical support. *See Wolford*, 116 F.4th at 988 ("The extensive set of historical regulations banning firearms at places of amusement and social gathering, consistently upheld and accepted as constitutional, justifies the conclusion that modern-day places of amusement such as casinos . . . fall within the national historical tradition of prohibiting firearms at sensitive places."). Accordingly, we conclude that § 2C:58-4.6(a)(18) does not violate the right to keep and bear arms and that Plaintiffs cannot show a likelihood of success on the merits of their claim.

### 9. Healthcare Facilities

We next turn to Plaintiffs' challenge to N.J. Stat. Ann. § 2C:58-4.6(a)(21)'s prohibition on carrying firearms at any "health care facility[.]"[153]    The District Court limited its consideration of that challenge to "medical offices and ambulatory care facilities," as it determined that Plaintiffs lacked standing to challenge the other healthcare centers covered by the law. *Koons*, 673 F. Supp. 3d at 596. We decline to adopt that limit: Because Plaintiffs bring a facial challenge to § 2C:58-4.6(a)(21), we will not subdivide the standing

---

[153]    The Siegel Plaintiffs initially challenged the constitutionality of § 2C:58-4.6(a)(22) (addiction and mental health treatment centers) as well. The District Court, observing that no party articulated any desire to bring a firearm to such treatment centers, determined that Plaintiffs lacked standing to challenge this provision of the law. We agree.

analysis by facility type.  To sever the law in this way would neither "avoid[] unnecessary constitutional adjudication" nor "sharpen[] the presentation of the issues." *Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia*, 6 F.3d 990, 996 (3d Cir. 1993).  It would also lead to considerable confusion, as many medical offices and ambulatory care facilities are themselves contained within larger healthcare facilities that, like "hospitals" and "public health centers," are subject to the firearm ban.  *See INS v. Chadha*, 462 U.S. 919, 934–35 (1983) (examining whether the remaining portion of a severed statute would be "workable" before severing).

Considering the constitutionality of § 2C:58-4.6(a)(21) as a whole, we agree with the District Court that the text of the Second Amendment covers Plaintiffs' proposed course of conduct.  But we disagree that Defendants have failed to establish a tradition of prohibiting firearms in those locations. Medical facilities, as we know them today, "do not resemble the hospitals at the Founding." *Wolford*, 116 F.4th at 999. Instead, in the eighteenth and early-nineteenth centuries, Americans overwhelmingly received healthcare at home.[154]

The institutions that eventually became modern hospitals began as charitable endeavors that more closely resembled "the hospice of the Middle Ages than . . . the twentieth-century hospital."[155]  For example, the predecessor to Bellevue Hospital opened its doors in 1736 as an almshouse

---

[154] *See* Charles E. Rosenberg, *The Care of Strangers: The Rise of America's Hospital System* 18 (1987).

[155] *Id.* at 15.

where sick paupers were incarcerated, often involuntarily.[156] The one-room building originally housed nineteen individuals and "contained a workspace for the able-bodied, a room for the sick and the insane, and a prison in the cellar for the 'unruly and obstinate,' complete with a whipping post."[157] Pennsylvania Hospital, founded in 1752, was likewise a place for Philadelphia's destitute;[158] however, to distinguish between "the worthy and unworthy poor," the hospital required "a written testimonial from a 'respectable' person attesting to the moral worth of an applicant before he or she could be admitted to a bed."[159]  The Boston Dispensary, which opened in 1796, also served "the city's poor," in part by "having volunteer doctors and nurses provide free visits to district residents that needed medical care."[160]

Given the enormous differences between the eighteenth-century forerunners of modern civilian hospitals and contemporary healthcare centers, the threat that firearms

--------------------------------------

[156] *See* David Oshinsky, *Bellevue: Three Centuries of Medicine and Mayhem at America's Most Storied Hospital* 13 (2016); Rosenberg, *supra* note 154, at 15 ("Few who entered the almshouse did so voluntarily; it was a last resort of the city's most helpless and deprived.").

[157] Oshinsky, *supra* note 156, at 13.

[158] *See* J.B. Cutter, *Early Hospital History in the United States*, 20 Cal. St. J. Med. 272, 272 (1922).

[159] Rosenberg, *supra* note 154, at 19.

[160] *History of Tufts Medical Center*, Tufts Medicine, https://perma.cc/6DGY-9E42.

pose in medical facilities today "implicat[es] unprecedented societal concerns," so Defendants need only identify more general historical analogues. *Bruen*, 597 U.S. at 27; *accord Antonyuk*, 120 F.4th at 1013; *see also Maryland Shall Issue, Inc. v. Montgomery Cnty.*, 680 F. Supp. 3d 567, 590 (D. Md. 2023), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023) (explaining that "hospitals did not exist in their modern form at the time of the ratification of the Second or Fourteenth Amendments").

While locations resembling modern civilian hospitals emerged after the Founding, military medical facilities offer one "historical cousin[]," *Harris*, 144 F.4th at 158, that provides insight into the treatment of arms at locations caring for the sick and wounded. During the Revolution, soldiers, upon entering these military hospitals, were regularly required to relinquish their arms to a ward master, whose role it was "to receive the arms, accoutrements and cloathing of each soldier admitted therein."[161] This compelled collection of arms and munitions at the threshold of military hospitals continued through the nineteenth century[162] to the Civil War, where

---

[161] Mary C. Gillett, *The Army Medical Department, 1775–1818*, at 205 (2004) (quoting Law of Feb. 6, 1778); *accord* 3 *The Historical Register of the United States* 9 (T.H. Palmer ed. 1814) ("The ward master . . . receives the arms, accoutrements, and clothing of every patient admitted into the hospital.").

[162] *See Regulations for the Medical Department of the Army* 8 (1840) ("The Wardmaster will, on the admission of a patient into the hospital, take charge of his clothing, arms, and equipments[.]").

regulations provided that soldiers were, "if possible, to leave their arms and accoutrements with their companies, and in no case to take ammunition into the hospital."[163]  Where soldiers were unable to leave them behind, military hospitals, just as at the Founding, required that soldiers turn over their "[a]rms,"[164] including "[m]uskets, sabres, [and] pistols."[165]  This "long, unbroken line," *Bruen*, 597 U.S. at 35, of history of soldiers relinquishing their arms when entering military hospitals provides compelling evidence that early medical facilities were understood to require occupants to be unarmed in order to serve their designated purpose—treating the sick and wounded.

Section 2C:58-4.6(a)(21) also resembles historical firearm regulations that prohibited carrying firearms in locations where people gathered for learned, scientific pursuits that demand a peaceful, controlled, and non-violent environment,[166] which themselves continued an even older tradition of restricting firearms at institutions of learning.[167] These laws applied not just to the schoolroom, but also

---

[163] William Grace, *The Army Surgeon's Manual, for the Use of Medical Officers, Cadets, Chaplains, and Hospital Stewards* 16 (2d ed. 1865).

[164] *Regulations for the Government of the De Camp General Hospital, United States Army, at Davids' Island, New York Harbor* 25 (1864).

[165] Joseph Janvier Woodward, *The Hospital Steward's Manual* 48 (1862).

[166] *See supra* note 83.

[167] *See supra* notes 52–54.

"anywhere people 'assemble[] for educational, literary or social purposes.'" *Antonyuk*, 120 F.4th at 1011 n.70 (quoting 1870 Tex. Gen. Laws 63) (alteration in original). They also protected classes of vulnerable people—populations like the young[168] and inebriated[169] who were generally unable to protect themselves. As a scientific profession devoted to caring for the ill—whether practiced in a large-scale hospital, an urgent care center, or an individual practitioner's office—medicine demands the same peace and security Americans have long enforced in a variety of sensitive and educational contexts. *Cf. id.* at 1012 (upholding a similar law and explaining that the legislature "need not have attempted to protect the exact same subset of vulnerable persons for its regulation to be relevantly similar to these historical analogues"). As the Second Circuit recently concluded, "statutes of Maine, Massachusetts, and Rhode Island, which prohibited those with mental illness, intellectual disabilities, and alcohol addiction from serving in militias," which "were aimed at protecting vulnerable populations from either misusing arms or having arms used against them," embody a longstanding "tradition of firearm regulation in locations where vulnerable populations are present." *Id.* at 1010–11. We agree and join our sister circuit in recognizing this principle of our Nation's regulatory tradition.

"Taken together," *Rahimi*, 602 U.S. at 698, Defendants' historical analogues demonstrate that § 2C:58-4.6(a)(21) comports with our regulatory tradition twice over. Two

---

[168] *See Antonyuk*, 120 F.4th at 1011 n.70.

[169] *See supra* section V.B.6.

principles—regulation of carrying firearms in places set aside for learning and education, and regulating the carry of firearms where vulnerable populations congregate—support New Jersey's prohibition of carrying firearms in modern hospitals. Defendants are likely to prevail, as they have carried their burden to show New Jersey's modern regulation fits within and is justified by the principles underlying our regulatory tradition.

10. Public Film and Television Sets

The Siegel Plaintiffs seek to carry firearms to "public location[s] being used for making motion picture or television images for theatrical, commercial or educational purposes, during the time such location[s are] being used for that purpose," and contend N.J. Stat. Ann. § 2C:58-4.6(a)(23)'s prohibition on guns at those sites violates the Second Amendment. The District Court agreed, explaining that the Defendants failed to justify the restriction with appropriate historical analogues.

While we agree the Second Amendment's text extends to carrying handguns in public locations being used for filming, Plaintiffs lack standing to challenge the restriction. Before the District Court, New Jersey submitted a certification from the Executive Director of the state Motion Picture and Television Development Commission explaining that Chapter 131's ban on guns at movie sets applies not to public locations where bystanders may observe the filming process, but rather to the sets themselves, which a local government must have designated as temporarily private and which are not generally open to the public. The State confirmed this understanding of the law at oral argument. Because the Siegel Plaintiffs assert

only that they enjoy attending filming as members of the public, and thus would not be allowed on a film set regardless of whether they chose to carry a firearm, they lack the "credible threat of enforcement" necessary to establish injury in fact. *See New Jersey Bankers Ass'n v. Att'y Gen. New Jersey*, 49 F.4th 849, 855 (3d Cir. 2022) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014)). As such, they fail to present a justiciable controversy, and we lack jurisdiction to reach the merits of their claim.

## C. Vehicles and Public Transportation

Section 2C:58-4.6(b)(1) prohibits non-exempt individuals from carrying or transporting a firearm "while in a vehicle in New Jersey, unless the handgun is unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle." The District Court agreed with Plaintiffs that this provision violates their Second Amendment rights. For their part, Defendants urge us to uphold that provision; however, they distinguish between private vehicles, on the one hand, and public transit vehicles (e.g., public buses and vans), on the other.

The text of the Second Amendment reaches Plaintiffs' proposed course of conduct, namely, carrying handguns in vehicles for self-defense. Yet a large part of the problem § 2C:58-4.6(b)(1) seeks to address—the dangers from firearms on New Jersey's crowded public transit and among angry drivers stuck in traffic—did not exist at the Founding. We therefore must take "a more nuanced approach" to the range of relevant analogies. *Bruen*, 597 U.S. at 27.

As to private vehicles, Defendants offer two historical restrictions: first, a 1686 East Jersey law providing that "no

planter shall ride or go armed with sword, pistol, or dagger;"[170] and second, an 1871 Texas law that forbade any person from carrying a pistol "on or about his person, saddle, or in his saddle-bags[.]"[171]    These two enactments do not support § 2C:58-4.6(b)(1)'s ban on operable firearms in private vehicles.    The 1686 East Jersey statute "except[ed] . . . all strangers, travelling upon their lawful occasions thro' this Province, behaving themselves peaceably."[172]    Likewise, the Texas law explicitly did not apply to "persons traveling."[173] Several other historical laws *protected* the ability of travelers to carry firearms,[174] confirming a tradition of permitting

---

[170] An Act Against Wearing Swords, *reprinted in The Grants, Concessions, and Original Constitutions of the Province of New Jersey* 289–90 (W. Bradford ed., 1881) (enacted 1686) [hereinafter N.J. Act of 1686].

[171] 1871 Tex. Gen. Laws 25.

[172] N.J. Act of 1686, at 289–90.

[173] 1871 Tex. Gen. Laws 25.

[174] *See, e.g.*, N.J. Act of 1769, at 582; N.J. Act of 1771, at 344; 1813 Ky. Acts 100; 1819 Ind. Acts 39; 1838 Ark. Law 280; 1856 Ark. Law 381–82; 1841 Ala. Acts 148–49; An Act to Restrain Intercourse with Indians, *reprinted in The Revised Statutes of the State of Missouri, Revised and Digested by the Thirteenth General Assembly, 1844–1845*, at 306 (Chambers & Knapp eds., 1845); 1871 Tex. Gen. Laws 25; 1878 Miss. Laws 175; 1890 Okla. Laws 495.    Before the District Court, Defendants contended that courts construed these exceptions

individuals to keep arms on journeys. Although these statutes applied to individuals traveling by horse or carriage, they indicate that Americans enjoy a similar right to keep and bear arms in their cars today. Because § 2C:58-4.6(b)(1)'s requirement as to private vehicles contradicts our Nation's history and tradition, Plaintiffs are likely to succeed on the merits of their challenge to that particular restriction.

Public transportation is another matter. Prior to the widespread adoption of rail transportation, horse-drawn carriages in a handful of cities shuttled small groups around for short, uncomfortable rides.[175] But in the mid-nineteenth century, mass transit transformed American geography.[176] The increased density and reach of public transportation resulted in novel safety concerns: with crowds of diverse individuals increasingly traveling together, and confined in sealed spaces

---

narrowly. But even if that were so, Defendants still have not identified a sufficient historical analogue to § 2C:58-4.6(b)(1)'s restriction on carrying operable firearms in private vehicles.

[175] *See* Jay Young, *Infrastructure: Mass Transit in 19th- and 20th-Century Urban America*, Oxford Rsch. Encyc. (Mar. 2, 2015), https://perma.cc/KYB9-7PKK (discussing the development of horse-drawn omnibuses in 1830s and 1840s); *see also* Paul Stephen Dempsey, *Transportation: A Legal History*, 30 Transp. L.J. 235, 248 (2003) ("Replacing horses and omnibuses (enclosed horse-drawn carriages with multiple passengers), urban railroads also became a major mode of transit.").

[176] *See supra* notes 65–66, 75–78 and accompanying text.

during transit, railroads needed to ensure order and security.[177] Accordingly, some railroads forbade firearms in their passenger cars.[178] Government regulations shored up those restrictions by proscribing firing, brandishing, or recklessly handling guns on or near trains.[179] Because Americans limited

---

[177] Indeed, as common carriers, railroads had heightened duties of care to the people and property they transported. *See* Robert J. Kaczorowski, *The Common-Law Background of Nineteenth-Century Tort Law*, 51 Ohio St. L.J. 1127, 1157–58 (1990).

[178] *See e.g.*, N. Pa. R.R. Rules & Reguls. 13 (1875) ("The Passenger Conductor . . . will see that no person passes the gate without a ticket, and that passengers do not take into the cars guns, dogs, valises, large bundles or baskets."); *Int'l & G.N.R. Co. v. Folliard*, 1 S.W. 624, 625 (Tex. 1886) ("Appellee testified that when he approached the train to take passage he was met at the door of the passenger coach by a servant of the company, and told that he could not take his gun into the coach, but must place it in the baggage car.").

[179] 1855 Ind. Acts 153 ("[A]ny person who shall shoot a gun, pistol, or other weapon . . . at or against any locomotive, or car, or train of cars containing persons, on any railroad in this State, shall be deemed guilty of a misdemeanor[.]"); 1876 Iowa Acts 148 ("If any person . . . shall present or discharge any gun, pistol, or other fire arm at any railroad train, car or locomotive engine he shall be deemed guilty of a misdemeanor and be punished accordingly."); 1879 Wyo. Terr. Sess. Laws 97 ("It shall be unlawful for any person in this Territory to fire any rifle, revolver, or other fire arm of any description whatever,

———————————————

from any window, door, or other part of any railroad car or train, engine or tender, or along the line of railroad during the passing of any train or engine[.]”); 1 Rev. Stat. Ind. 366 (1881) (“Whoever maliciously or mischievously shoots a gun, rifle, pistol, or other missile or weapon . . . at or against any stage-coach, locomotive, railroad-car, or train of cars, or street-car on any railroad in this State, . . . shall be imprisoned in the county jail not more than one year nor less than thirty days[.]”); 1889 Tex. Gen. Laws 36 (“[A]ny person who shall willfully or maliciously . . . fire a gun or pistol at or into any coach or passenger car of a moving railway train, shall be deemed guilty of a misdemeanor[.]”); 1891 Nev. Stat. 78 (“If any person or persons . . . shall discharge any gun, pistol or any other fire arm at any train, car, locomotive or tender . . . shall be deemed guilty of a misdemeanor[.]”); 1895 Ga. Laws 147 (“Any person who shall throw a rock or other missile at, towards, or into any car of any passenger train upon any railroad or street railroad, or shoot any gun, pistol, or firearms of any kind at, towards, or into any such car, or shoot while in such car any gun, pistol or other weapon of any kind, shall be guilty or [sic] a misdemeanor.”); 1899 Ala. Acts 154 (“[I]t shall be unlawful for any person to discharge any gun, pistol, or other firearm, except in self defense, while on a passenger train in this State; or to recklessly handle any firearm or other weapon in the presence of any other person or persons on any train carrying passengers in this State.”); 1899 Fla. Laws 93 (“[I]t shall be unlawful for any person to discharge any gun, pistol, or other fire-arm, except in self defense, while on any passenger train

the ability of passengers to bear firearms on trains shortly after mass transportation became a widespread phenomenon, § 2C:58-4.6(b)(1)—to the extent it applies to public transit—comports with the traditional right to keep and bear arms.

### D. Fish and Game Regulations

The Siegel Plaintiffs' last challenge is not to New Jersey's Chapter 131 revisions, but instead to preexisting fish- and game-related firearm regulations in N.J. Admin. Code § 7:25-5.23(a), (c), (f)(1)–(5), and (m).[180]  However, the bulk of their claim concerns N.J. Admin. Code §§ 7:25-5.23(a), (c), (f)(1)–(4), and (m) ("Hunting and Fishing Regulations")[181]—which restrict the type of ammunition a

in this State; or to recklessly handle any fire-arm or other weapon in the presence of any other person or persons on any train carrying passengers in this State.").

[180] The District Court determined, and we agree, that Plaintiffs lack standing to challenge N.J. Admin. Code § 7:25-5.23(i) because none has alleged an intent to visit a "state game refuge."

[181] Per these regulations, people generally may not possess or carry certain types of firearm ammunition in the "woods, fields, marshlands, or on the water."  N.J. Admin. Code § 7:25-5.23(a).  They also specify what types of firearms and ammunition can be used on different species and what types of firearms a person may carry when engaged in hunting, *id.* (c), (f)(1)–(4), and prohibit hunters from simultaneously carrying a firearm and bow and arrow, *id.* (m).  The District Court upheld these provisions as constitutional.

person may possess or firearm they may carry while "in the woods, fields, marshlands, or on the water" or while hunting—is now moot.

A claim becomes moot when an intervening development makes it "impossible for us to grant any effectual relief whatever to the prevailing party." *Clark v. Governor of New Jersey*, 53 F.4th 769, 775 (3d Cir. 2022) (quotation omitted). Such is the case here. At the outset of the lawsuit, Siegel alleged that the Hunting and Fishing Regulations barred him from carrying a handgun while hunting, and but for these regulations, he would bring his handgun and ammunition for self-defense purposes while hunting. But that barrier has since been lifted by a legislative amendment that excludes handguns from the scope of the statutory restriction. *See* P.L. 2023, ch. 330, codified at N.J. Stat. Ann. § 23:4-12, -13, -24, & -44.[182]

———————————————

[182] During the pendency of this appeal, the prior statutory restriction on possessing or carrying "any gun" while hunting unless permitted by the Fish and Game code at issue here was modified to bar only possessing and carrying "any long gun," which includes all firearms *except* for handguns. The Legislature's intent was to authorize people with a valid New Jersey concealed carry permit to carry and possess a lawfully owned handgun while hunting, provided that the handgun is not used to for hunting purposes. *See* Statement, N.J. Assemb. Judiciary Comm., Dec. 4, 2023, https://perma.cc/B7TA-ENZL ("[T]he substitute incorporates into certain provisions of current law a prohibition against carrying a 'long gun' while

Because the amended statutes now allow Siegel to carry his handgun for self-defense purposes while hunting, and because no exception to mootness applies here,[183] the Siegel

_____

hunting. Under the bill, the term 'long gun' is to include all forms of firearms except for handguns, which may be carried in accordance with Title 2C of the New Jersey Statutes."). Although the Hunting and Fishing Regulations do not yet reflect the amended statutes, "the statute[s] prevail[] over the regulation." *L. Feriozzo Concrete Co. v. Casino Reinvestment Dev. Auth.*, 776 A.2d 254, 263 (N.J. Super. Ct. App. Div. 2001). And the New Jersey Department of Environmental Protection Fish and Wildlife Division—which promulgates the regulations at issue—has made clear through guidance to the public and hunting community that a person who is carrying a handgun lawfully under Title 2C of the New Jersey Statutes may concealed-carry while hunting. Fish & Wildlife, N.J. Dep't of Env't Prot., https://perma.cc/X5JC-SDU2; *see also, e.g.*, *Firearms and Missiles*, N.J. Hunting & Trapping Digest, Aug. 2024, at 23, https://perma.cc/H7W8-VG3M.

[183] The "voluntary cessation" exception to mootness does not apply because the State Defendants did not "change unilaterally" the restrictions on concealed-carrying while hunting; instead, the state legislature codified an explicit carve-out in New Jersey law. *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 307 (3d Cir. 2020). This statutory codification makes clear that the prior restrictions on carrying handguns while hunting can "not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S.

Plaintiffs' "claim is moot"—"the issues presented are no longer live." *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 135 (3d Cir. 2022) (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)).

That leaves only the Siegel Plaintiffs' challenge to N.J. Admin. Code § 7:25-5.23(f)(5), which requires that firearms in motor vehicles be "enclosed in a securely fastened case." And on that claim, as the District Court pointed out, Plaintiffs are likely to prevail on their challenge because this regulation is unrelated to hunting. For the same reasons articulated in Section V.C, that requirement contravenes the American tradition of allowing the carrying of firearms while traveling in a private vehicle, and the challenge, accordingly, is likely to succeed.

––––––––––––––––––––––

167, 189 (2000) (quotation omitted). Ultimately, the Siegel Plaintiffs challenges to most of the fish and game code are moot.

For similar reasons, the "capable of repetition yet evading review" exception to mootness also does not apply. That exception is "narrow" and "applies only in exceptional situations," where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Hamilton v. Bromley*, 862 F.3d 329, 335 (3d Cir. 2017) (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). Neither situation is present here.

## VI.     Irreparable Harm, Balance of the Equities, and Public Interest

While likelihood of success features prominently in our review of the Plaintiffs' requested injunction, we still must consider the second of the two preliminary injunction "gateway factors"—whether Plaintiffs have shown that they are "more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly*, 858 F.3d at 179.  It is only if Plaintiffs can meet these "first two 'most critical' factors" that we turn to "the remaining two factors and determine[] . . . if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.*

Plaintiffs here have not made that second showing, with four exceptions.  As a general matter, violations of constitutional rights are not presumed irreparable outside the First Amendment context, *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 203 (3d Cir. 2024), and most of Chapter 131's restrictions neither take away Plaintiffs' guns nor impose restrictions that make it overly difficult for Plaintiffs to obtain guns.  But four of Chapter 131's most far-reaching provisions—namely, the ban on firearms in private vehicles, the change to the private property default rule, the portion of the permitting fee allocable to the Victims of Crime Compensation Office, and the liability insurance mandate—not only violate Plaintiffs' Second Amendment rights but also raise the specter of irreparable harm.  Precluding firearms in private vehicles and on private property not only impinges the right to carry, but also deprives licensees of that measure of self-defense.  And if forced to pay for what turns out to be an unconstitutional fee or liability insurance mandate, Plaintiffs may face irreparable monetary

harm for which *post hoc* recovery would be precluded by New Jersey's sovereignty. *See Entergy, Arkansas, Inc. v. Nebraska*, 210 F.3d 887, 899 (8th Cir. 2000) (citing Eleventh Amendment sovereign immunity as a reason to consider monetary harm irreparable). *But see Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994) ("Economic loss does not constitute irreparable harm[.]").

For these reasons, we evaluate the remaining two factors—any harm to the opposing party and the public interest—to determine whether any preliminary injunctive relief on these claims is warranted, recognizing that because Plaintiffs challenge the constitutionality of a state law, those factors merge. *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 332 (3d Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

For the no-carry default in private spaces held open to the public, the provisions banning the carrying of guns in private vehicles, the liability insurance mandate, and the portion of the permitting fee provisions, harm to the public interest does not weigh in favor of vacating the preliminary injunction. Private owners of public spaces held open to the public can ban firearms from those spaces on their own volition. Similarly, New Jersey can earmark any funds for the VCCO fund that it feels is appropriate. With regard to the last two provisions, carrying of guns in private vehicles and the liability insurance mandate, the record is not sufficient for us to quantify the harm to the public that would be caused by affirming the District Court's preliminary injunction such that we can conclude that, despite their likelihood of prevailing, Plaintiffs should still not be granted relief. As these restrictions

likely violate the Second Amendment, and considering all other factors, they should therefore be preliminarily enjoined.

## VII.   **Conclusion**

Throughout our Nation's history, the People have time and time again opted to limit the use of firearms at specific venues set aside for civic purposes, namely, governmental and democratic functions, and public places akin to the fairs and markets of old.  By imposing permitting requirements and restricting when and where firearms can be carried, our democratically elected leaders acknowledge that there are tradeoffs between the protections of the Second Amendment and fellow citizens' enjoyment of functional government and a host of other constitutionally enshrined rights, including the right to speak, worship, protest, and vote.  Those leaders, informed by local needs, modern circumstances, and the desires of the People today, work to achieve a balance of these interests.  It is ironic that we, who are neither elected officials nor historians, may not consider that balancing but only the extent to which it resembles the balancing of legislatures in bygone eras.  Nevertheless, we have done our best to distill the principles of our Nation's tradition of firearm regulation from the available historical record, and what we have found convinces us that New Jersey's law, at least in part, continues that tradition.

Accordingly, we will reverse the District Court's injunction as to § 2C:58-4(b) (four-reputable-persons requirement), § 2C:58-4.6(a)(6) (public gatherings), § 2C:58-4.6(a)(9) (zoos), § 2C:58-4.6(a)(10) (parks, beaches, and recreation facilities), § 2C:58-4.6(a)(12) (public libraries and museums), § 2C:58-4.6(a)(15) (locations that serve

alcohol), § 2C:58-4.6(a)(17) (entertainment facilities), § 2C:58-4.6(a)(18) (casinos), § 2C:58-4.6(a)(21) (healthcare facilities), and § 2C:58-4.6(b)(1) (public transit). We will affirm as to § 2C:58-4.3 (liability insurance), § 2C:58-4.6(a)(24) (private property), § 2C:58-4.6(a)(10) (playgrounds), § 2C:58-4.6(a)(11) (youth sports events), § 2C:58-4.6(b)(1) and N.J. Admin. Code § 7:25-5.23(f)(5) (private vehicles). We will remand with instruction to preliminarily enjoin § 2C:58-4(c) (portion of permitting fee paid to VCCO). And we will vacate the District Court's injunction as to § 2C:58-4.6(a)(23) (public film and television sets) and N.J. Admin. Code § 7:25-5.23(a), (c), (f)(1)–(4), and (m) ("Hunting and Fishing Regulations").

PORTER, *Circuit Judge*, concurring in the judgment in part and dissenting in part.

I concur in the judgment insofar as it affirms the District Court's judgment regarding New Jersey's $50 tax on public carry,[1] the $300,000 liability insurance mandate,[2] and the State's bans on guns in private vehicles,[3] on public property,[4] and on private property without the property owner's express consent.[5] I also join the majority's discussion relating to challenged fish and game regulations.[6] As to the rest of the judgment and majority opinion, I respectfully dissent.

I

In *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the Court noted that "'sensitive places' where weapons were altogether prohibited" were "relatively few" in the 18th and 19th centuries. *Id*. at 30 (specifically identifying "legislative assemblies, polling places, and courthouses"). Today, courts can analogize to "those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms to *new* and analogous sensitive places are constitutionally permissible." *Id*. But if a court expands those few sensitive-place regulations to crowded spaces generally, "cities," or "places of public congregation

---

[1] Maj. Op. 75–77.
[2] *Id.* at 71–75.
[3] *Id.* at 127–29, 135.
[4] *Id.* at 82–84.
[5] *Id.* at 85–88.
[6] *Id.* at 132–35.

that are not isolated from law enforcement," then it has analogized "far too broadly." *Id*. at 31.

*Bruen*-style analogizing asks how and why historical firearms regulations burdened the right, seeking to induce from those facts a regulatory "principle" that comports with Second Amendment principles and underpins our regulatory tradition. *United States v. Rahimi*, 602 U.S. 680, 692, 698 (2024). The most basic "principle[] underlying the Second Amendment" and our regulatory tradition of public carry, *id*. at 692, is that the right's "central component" is "individual self-defense." *Bruen*, 597 U.S. at 29; *see also McDonald v. City of Chicago*, 561 U.S. 742, 767, 787 (2010); *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008).

With those guideposts in mind, consider the astonishing number, breadth, and generality of the majority's principles justifying New Jersey's location-based elimination of the right to bear arms. In the majority's view, the principles drawn from our national history allow States to prohibit Americans from bearing firearms:

1.   In "specific kinds of venues commensurate with their peculiar needs and functions." Maj. Op. 29.

2.   To promote peacefulness in "households." *Id.* at 29–30.

3.   To promote peacefulness in "[religious] congregations." *Id.* at 30.

4.   To prevent poaching on others' land. *Id.* at 36, 41–43.

5.     On forms of private transit, like trains. *Id.* at 53, 59–60, 129–32.

6.     To "secure both liberty and order in a deeply divided, modernizing society." *Id.* at 54.

7.     In "communal venues, including fairs, race courses, ball rooms, churches, public halls, picnic grounds, theatres and other places of public entertainment or amusement, and circuses." *Id.* at 60–61.

8.     In "specific locations central to the operation of government." *Id.* at 66.

9.     In "discrete fora historically designated for important civic purposes." *Id.* at 67.

10.     "[T]o ensure that firearms end up only with those who their communities deem to be safe to carry them." *Id.* at 82.

11.     In "discrete locations . . . set aside for . . . governmental services." *Id.* at 89–90.

12.     In "discrete locations . . . set aside for . . . peaceful assembly." *Id.*

13.     In other "discrete locations set aside for particular civic functions." *Id.* at 8.

14.     In places, like parks, that "provide a reprieve from industrialization and foster democratic solidarity across social classes." *Id.* at 96.

15.    To ensure that visitors at "centers of community life" can "participate without the risks and anxieties associated with deadly weapons." *Id.* at 98–99.

16.    In "places that serve as public forums." *Id.* at 104.

17.    In discrete locations set aside for "cultural purposes." *Id.* at 106.

18.    In places deemed "vital to communities' and our Nation's democratic project." *Id.* at 107.

19.    Where alcohol is consumed. *Id.* at 111–13.

20.    In discrete locations set apart for "public amusement." *Id.* at 115.

21.    In discrete locations set aside for "learned, scientific pursuits." *Id.* at 124.

22.    In "places set aside for learning and education." *Id.* at 126.

23.    In places where "vulnerable populations" congregate. *Id.*

Taken together, these broad principles allow New Jersey to prohibit one from exercising the Second Amendment's central component nearly everywhere that ordinary human action occurs, and wherever "people typically congregate." *Bruen*, 597 U.S. at 30–31. Virtually the only places that are not "sensitive" are locations where people don't care about assembling with others, eating and drinking, commerce, divisive opinions,

amusement, recreation, education, worship, public travel, leisure, community, and where children or vulnerable people are not normally present. In such wastelands, the majority grudgingly allows, one may carry a firearm for self-defense—if he has first secured the subjective endorsement of at least four "reputable" persons. The majority tries to downplay the scope of Chapter 131 and its ruling through talismanic incantation of the adjective "discrete." Maj. Op. 8, 29, 30, 54, 61, 66–67, 89, 94, 112, 116. But most places of human interest in New Jersey and all of its public transportation network are now gun-free zones. That is hardly a "discrete" imposition on the people's right to bear arms in public for self-defense. Despite the Supreme Court's cautionary warning, the majority has analogized "far too broadly." *Bruen*, 597 U.S. at 31.

## II

The sources of the majority's error are strewn throughout fifty-three pages of text preceding its consideration of the sensitive places enumerated in Chapter 131. Maj. Op. 17–70. In that long discussion, the majority's selective reading and overreading of Supreme Court precedent, methodological mistakes, and anachronistic disdain for public carry combine to generate constitutional error. Before addressing the particular gun-free zones described in Chapter 131, I will highlight some of those flaws.

## A

From the start, the majority's discussion reveals a cramped view of the constitutional right to bear arms for self-defense. For example, it emphasizes that the right was "first" recognized in *Heller*, as if it were a novel discovery. Maj. Op. 17. But the individual right to bear arms for self-defense

was recognized in English law, by Blackstone and other contemporaries, in Colonial America, and by the Founding generation. *Heller*, 554 U.S. at 592–605. The framers recognized the preexisting right when they enumerated it in the Second Amendment. *Id*. at 592. Early Americans, and early American courts, recognized the right long before *Heller* and *Bruen* were decided and before the Bill of Rights applied to the States. *See* 2 Tucker's Blackstone 143 (1803); *Bliss v. Commonwealth*, 12 Ky. 90, 91 (1822); *Johnson v. Tompkins*, 13 F. Cas. 840, 850, 852 (C.C. Pa. 1833); *State v. Reid*, 1 Ala. 612, 619 (1840); *State v. Huntly*, 25 N.C. 418, 422 (1843); *Nunn v. State*, 1 Ga. 243, 251 (1846); *State v. Chandler*, 5 La. Ann. 489, 490 (1850). From the very beginning, the right to bear arms has been recognized as a distinctive feature of American law and society.

### B

The majority asserts that the Court in *Heller* "emphasized the limits" of its holding. Maj. Op. 18. But that is the majority's characterization, not the Supreme Court's. *Heller* was a landmark decision in part because it validated the "Standard Model" of the Second Amendment, thus unshackling the right from the much stingier "Militia View." *Heller*, 564 U.S. at 576–81. *Heller* thereby emphasized the near universality of the individual right: it may be presumptively exercised by anyone who is a member of the people. *Id*. at 579–81. And *Heller* presaged *Bruen* by confirming the constitutional right to "carry weapons in case of confrontation," *id*. at 591, or, in Justice Ginsburg's formulation, the right to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person," *id*. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)).

Courts and observers generally recognize the breadth of *Heller*'s holding and opinion. *See, e.g.*, *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 115 (10th Cir. 2024) ("expansive"); *Bianchi v. Brown*, 111 F.4th 438, 500 (4th Cir. 2024) (Richardson, J., dissenting) ("expansive"); *Young v. Hawaii*, 992 F.3d 765, 785 (9th Cir. 2021) ("broad"); Saul Cornell, *History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688-1868*, 83 Law & Contemp. Prob. 73, 88 (2020) ("expansive"). To be sure, the *Heller* Court observed that the Second Amendment right, like all other constitutional rights, "is not unlimited." 554 U.S. at 626. But the Court did not describe its holding as narrow, and in short order it extended *Heller* in *McDonald* (applicable to States) and *Bruen* (public carry).

C

In another questionable gloss on what the Supreme Court has said, the majority uses markedly different levels of generality when considering historical analogues. *See* Maj. Op. 19–21, 73–74, 95–101, 104–08, 118–19. As it moves farther away from the Founding era, the majority analogizes more broadly and at a higher level of generality to fashion principles supporting modern regulations. *See also United States v. Quailes*, 126 F.4th 215, 220 (3d Cir. 2025) (Krause, J., joined by Chung & Rendell, JJ.) ("Under *Rahimi*'s principles-focused approach to analogical reasoning, we evaluate challenged regulations at a higher level of generality than whether 'those regulations [are] identical to ones that could be found in 1791.'"). But that is not what the Supreme Court has instructed.

In *Rahimi*, the Court cautioned that lower courts should not compare early and modern gun regulations looking for a

7

"historical twin" or "dead ringer." *Rahimi*, 602 U.S. at 692. But the Court did not say that we should analogize broadly, or operate at a "higher level of generality." In describing our task affirmatively, the Court was careful and constrained. "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id*. We "must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'applying faithfully the balance struck by the founding generation to modern circumstances.'" *Id*. (quoting *Bruen*, 597 U.S. at 29).

If Founding-era laws and modern laws regulate gun use in like manner and for similar reasons, they are probably relevantly similar. *Id*. But if the "why" or "how" of the two laws differ, the modern law may be incompatible with the Second Amendment right. *Id*. The question is not whether the new regulation is broadly analogous to an older regulation at a high level of generality, but whether it "comport[s] with the principles underlying the Second Amendment." *Id*. Most of the Justices specifically warned against the majority's "higher level of generality" approach, or noted that the Court has not established the appropriate level of generality.[7]

---

[7] *See United States v. Rahimi*, 602 U.S. 680, 712 (2024) (Gorsuch, J., concurring) ("Allow judges to reign unbounded by [textual and historical] materials, or permit them to extrapolate their own broad new principles from those sources, and no one can have any idea how they might rule."); *id.* at 727 (Kavanaugh, J., concurring) ("A venerable and accepted tradition is not to be laid on the examining table and scrutinized for its conformity to some abstract principle of adjudication devised by this Court.") (cleaned up); *id.* at 739 (Barrett, J.,

The majority's rising level of generality extends broadly. Along with statutes and court decisions allegedly reflecting our regulatory tradition, it considers non-legal sources such as the private codes of railroads and universities. And when the majority compares modern laws to earlier laws, its definition of relevance is highly elastic. For example, the majority approves New Jersey's firearms prohibition on public transit by analogizing to post-Reconstruction laws banning *shooting at or on trains*. Maj. Op. 130 & n.179.[8] By that logic, a modern law prohibiting carrying firearms on one's person would be constitutional because it is broadly analogous to old laws against shooting one another.

The majority consistently downplays how historical firearm regulations worked while appealing to speculative reasons about the "why." By pitching the alleged reasons at a high level of generality it becomes child's play to justify a modern regulation by imbuing it with the same broad purpose. As

---

concurring) ("[A] court must be careful not to read a principle at such a high level of generality that it waters down the right."); *id.* at 745 (Jackson, J., concurring) (observing the Court has not yet settled the level-of-generality question); *id.* at 775 (Thomas, J., dissenting) (criticizing "the dangers of approaches based on generalized principles").

[8] Georgia, Indiana, Iowa, Texas, and Nevada banned firing or shooting guns at trains. 1895 Ga. Laws 147; 1855 Ind. Acts 153; 1876 Iowa Acts 142; 1889 Tex. Gen. Laws 36; 1891 Nev. Stat. 78. The Wyoming Territory forbade firing "from . . . any railroad car or train." 1879 Wyo. Terr. Sess. Laws 97. Alabama and Florida forbade firing or recklessly handling firearms while aboard. 1899 Ala. Acts 154; 1899 Fla. Laws 93.

noted, the majority sketches about two dozen principles but centers upon a theory that guns can be banned at "discrete locations set aside for particular civic" "purposes" or "functions." *Id.* at 8, 29, 66. Given the breadth of "sensitive places" it approves, the adjective "discrete" is empty rhetoric. "Civic purpose" is a capacious abstraction that includes activities as prosaic as an afternoon at the park, shopping, or a simple barbecue. *Id.* at 29, 67, 138. Under this theory, a State can ban public carry anywhere it considers the mere presence of firearms vaguely to detract from the desired social atmosphere. *Id.* at 98–101.

Imagine the majority's "civic purposes" rationale applied to *Rahimi*. The Supreme Court could have looked beyond peace sureties and considered broader sureties that targeted anyone "not of good fame." 4 William Blackstone, *Commentaries* at *256. Rather than conclude that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed," *Rahimi*, 602 U.S. at 702, it might have described the "why" a threat to civic purposes generally and the "how" as ex ante disarmament of anyone whose arms-bearing increased anxiety or detracted from the public good. But the *Rahimi* Court did not ascend to those levels of generality. This is another sign that the majority has gone too far. Its central principle appears to have sprung from the majority's own imagination, and it can be invoked anytime, anywhere, to justify any firearm regulation.

## D

The majority's invocation of post-Reconstruction train-shooting laws is just one example of its heavy reliance on late-

19th century sources generally.[9] Even more than broadly analogizing modern gun restrictions to obviously dissimilar older laws, the majority pulls broad principles from mostly regional Gilded-Age laws.[10] As the majority ably demonstrates, there is more material to work with from that period. But late-19th century laws sharply contrast with the sparse to non-existent regulatory burdens on public carry that existed in the Founding and antebellum periods. Post-Civil War courts, mostly in the South, "scrutinized legislation restricting public gun carrying less strictly than they did in the antebellum period" and "largely *altered* the scope of the right to bear arms." Robert Leider, *Our Non-Originalist Right to Bear Arms*, 89 Ind. L.J.

---

[9] By my count, the majority relies on 63 post-1868 sources—more than all sources that it cites from 1700 to 1867.

[10] The majority cites about 214 sources to support various assertions about history and national tradition. *Bruen* says that courts may "decide a case based on the historical record compiled by the parties." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 25 n.6 (2022). That does not foreclose independent judicial research, but New Jersey has the burden to "affirmatively prove that its firearms regulation is part of the historical tradition[.]" *Id*. at 19. A disconcerting number of the majority's sources appear to come from its independent research, including over sixty percent of its sources on alcohol, about seventy percent of its sources relating to transportation, over seventy percent of its sources relating to education, and ninety-five percent of its sources relating to museums and libraries. The majority's eagerness is commendable in one sense, but its new sources did not have the benefit of party presentation and were not subject to the adversarial process.

1587, 1619, 1627 (2014) (emphasis added) [hereinafter Leider, *Our Non-Originalist Right*].

Under our binding precedent, when post-ratification laws are "inconsistent" with the original meaning of the Second Amendment, "the constitutional right to keep and bear arms should be understood according to its public meaning in 1791, as that 'meaning is fixed according to the understandings of those who ratified it.'" *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 441 (2025) ("*Lara II*") (quoting *Bruen*, 597 U.S. at 28).

The majority professes fealty to its understanding of *Lara II* while claiming that *Lara I*[11] and this dissent reject out of hand post-1791 authorities. Maj. Op. 25–26 n.7. *Lara I* did no such thing. To the contrary, it addressed some post-ratification evidence on the merits, 91 F.4th at 131, 136, but noted that a new tradition which emerged "at least 50 years after the ratification of the Second Amendment" would not suffice. 91 F.4th at 134. *Lara II* discarded the same evidence for the same reason. 125 F.4th at 441 & n.19. *But see Lara v. Comm'r Pennsylvania State Police,* 130 F.4th 65 (Krause, J., dissenting sur denial of rehearing en banc); *Lara v. Comm'r Pennsylvania State Police*, 97 F.4th 156 (Krause, J., dissenting sur denial of rehearing en banc). Likewise, my objections are not to any purported analogue post-dating 1791 *simpliciter*, but to the majority's heavy and indiscriminate reliance on questionable Gilded-Age evidence.

---

[11] *Lara v. Comm'r Pa. State Police*, 91 F.4th 122 (3d Cir. 2024) (*Lara I*), *vacated and remanded*, *Paris v. Lara*, 145 S. Ct. 369 (2024).

As the Supreme Court observed in *Heller*, post-Civil War laws and decisions "do not provide as much insight into [the Second Amendment's] original meaning as earlier sources." 554 U.S. at 614; *see also Samia v. United States*, 599 U.S. 635, 655 (2023) (Barrett, J., concurring) ("Evidence . . . from the late 19th and early 20th centuries [is] far too late to inform the meaning [of constitutional rights enumerated] at the time of the founding.") (internal quotation marks omitted). Faced with a dearth of historical analogues in the Founding era or post-ratification period, the majority simply fast-forwards to the Gilded Age, where it has more favorable decisions to work with. That is methodological error: while mid- or late-19th century evidence might reinforce an early-American tradition, it cannot create one in the first place. *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020). That is precisely why Justice Barrett warned against "freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Bruen*, 597 U.S. at 83 (Barrett, J., concurring).

The majority justifies its freewheeling reliance on late-19th century sources by insisting repeatedly that place-based bans emerged from legislatures reacting to "new contexts." *E.g.*, Maj. Op. 99. That suggests late-blooming regulations unconnected to early-American tradition can replace original meaning. An article cited favorably by the majority[12] describes its approach as follows: "Constitutional interpreters who do not understand the Second Amendment's meaning as fixed at the Founding or at the Fourteenth Amendment's ratification would

---

[12] Maj. Op. at 38, 66–67, 69–70, 116.

find a history of regulating weapons that has continued to develop under state police power and under federal law."[13]

As a species of common law constitutionalism,[14] such jurisprudence is "dynamic," and "continues to evolve,"[15] but it bears no resemblance to the originalist methodology prescribed in *Heller*, *Bruen*, and *Rahimi*. As the *Bruen* Court explained, modern regulations are constitutional if they are consistent with the principles underlying the few "sensitive place" locations presumed to be consistent with the Second Amendment. 597 U.S. at 30. They are not constitutional simply because all and sundry gun-related laws and decisions, taken together, form an evolving American tradition of firearm regulation.

In other words, courts must discriminate between firearm regulations. The majority, however, compiles its "new contexts" tradition by citing late-19th century laws and decisions indiscriminately. One example is illustrative: the majority cites with approval *English v. State*, a Texas case that backhanded the right to keep and bear arms by adopting a strict militia view of the Second Amendment and exchanging the views of the Founding generation for those of John Stuart Mill and "the ideas of intelligent and well-meaning legislators." 35 Tex. 473, 476–80 (1871). The majority's rationale for includ-

---

[13] Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under* Heller, 116 N.W. U. L. Rev. 139, 180 (2021).

[14] *See* David A. Strauss, *Common Law Constitutional Interpretation*, 63 U. Chi. L. Rev. 877 (1996).

[15] Blocher & Siegel, *supra* note 13, at 180.

ing *English* as part of the alleged national tradition of constitutional firearms regulation is revealing: "[A]ny error in the Texas Supreme Court's reading of the Second Amendment does not wholly undermine the probative value of the statute, which demonstrates that the Texas *legislature* believed it could ban firearms from public gatherings, offering another historical data point that such prohibitions comport with our Nation's tradition." Maj. Op. 92.

The legislature and Texas Supreme Court ignored the Constitution in *English*. But for the majority, the mere fact that the legislature acted is itself a useful "historical data point" for Second Amendment interpretation. Its reliance on *English* is a fine example of Second Amendment exceptionalism: I doubt the majority would similarly rely on Texas's other 1870s views as valid data points establishing our evolving constitutional tradition. *See, e.g.*, Texas Constitution of 1876, art. VII § 14 ("The Legislature shall also when deemed practicable, establish and provide for the maintenance of a College or Branch University for the instruction of the colored youths of the State, to be located by a vote of the people; provided, that no tax shall be levied, and no money appropriated out of the general revenue, either for this purpose or for the establishment and erection of the buildings of the University of Texas.").

The mere fact that a law was enacted at some point does not make it probative. Perhaps, as in 1870s Texas, the legislature ignored or misconstrued constitutional constraints.[16] Perhaps the law could not be, or never was, subject to constitu-

---

[16] *See District of Columbia v. Heller*, 554 U.S. 570, 614–15 (2008) (Kentucky's post-Civil War law infringed the people's right to keep and bear arms).

tional scrutiny.[17] Perhaps the law was rarely or never enforced, as was the case for Statute-of-Northampton-inspired laws.[18]

---

[17] The slow process of incorporation offers a ready explanation. *Cf. Permoli v. Mun. No. 1 of City of New Orleans*, 44 U.S. 589 (1845) (declining First Amendment incorporation) *with Cantwell v. Connecticut*, 310 U.S. 296 (1940) (incorporating First Amendment); *cf. United States v. Cruikshank*, 92 U.S. 542 (1875) (declining Second Amendment incorporation) *with McDonald v. City of Chicago*, 561 U.S. 742 (2010) (incorporating Second Amendment); *cf. Johnson v. Louisiana*, 406 U.S. 356 (1972) (declining to incorporate Sixth Amendment's unanimous jury right) *with Ramos v. Louisiana*, 590 U.S. 83 (2020) (incorporating Sixth Amendment and holding late-19th and early-20th century laws unconstitutional). The *Bruen* Court also observed this problem afflicts territorial laws, because they "were rarely subject to judicial scrutiny," and so "we do not know the basis of their perceived legality." 597 U.S. at 68.

[18] Leider, *Constitutional Liquidation* at 253–57 (no evidence that Massachusetts Model laws were actually enforced against anyone carrying firearms for lawful purposes); *Heller*, 554 U.S. at 631–32 (noting a proposed analogue's "text and its prologue . . . give reason to doubt that colonial . . . authorities would have enforced that general prohibition" to abrogate the right of armed self-defense); *Bruen*, 597 U.S. at 44 n.10 (noting a medieval analogue's "last recorded prosecutions . . . occurred in 1693, neither of which appears to have been successful") (citations omitted); *Young v. Hawaii*, 992 F.3d 769, 844 (9th Cir. 2021) (O'Scannlain, J., dissenting) ("As a threshold matter, one should be wary of divining constitutional meaning form the existence of historical regulations . . . for which the majority offers no enforcement history.").

Perhaps it was ostensibly neutral but selectively enforced for racial or other suspect reasons.[19] Perhaps the law was short-lived and so never became part of any legal tradition.[20] Perhaps

---

[19] "Blacks were routinely disarmed by Southern States after the Civil War." *Heller*, 554 U.S. at 614; *see generally*, Raymond T. Diamond & Robert J. Cottrol, *"Never Intended to be Applied to the White Population": Firearms Regulation and Racial Disparity—The Redeemed South's Legacy to a National Jurisprudence?,* 70 Chi.-Kent L. Rev. 1307 (1995); Clayton E. Cramer, *The Racist Roots of Gun Control*, 4 Kan. J.L. & Pub. Pol'y 17 (1995); *Bruen*, 597 U.S. at 58 (doubting reliability of some examples of surety disarmament because these "all involv[ed] black defendants who may have been targeted for selective or pretextual enforcement"); *see also Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020) (state constitutional provisions barring aid to "sectarian" schools in the late 1800s did not form an interpretative tradition for the Establishment Clause because they were "born of bigotry . . . [against] the Catholic Church and to Catholics in general") (internal quotation marks omitted); *Ramos*, 590 U.S. at 88 (noting that Louisiana's non-unanimous-jury rule was race neutral, but created "to ensure that African-American juror service would be meaningless") (internal quotation marks omitted).

[20] *Bruen*, 597 U.S. at 35 ("a short-lived, 14th-century English practice" is less "likely to be part of our law"); *id.* at 47–49 ("At most eight years of history in half a Colony roughly a century before the [F]ounding sheds little light on how to properly interpret the Second Amendment"); *id.* at 69 ("territorial restrictions deserve little weight because they were . . . short lived."); *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 276

the law, while putatively an attempt to regulate the people's exercise of a constitutional right, operated as an abridgement or denial of the right.[21] Perhaps the law was based on the Militia Model or some other misunderstanding the Supreme Court has not endorsed.[22] Perhaps a State's constitutional "analogue" was less protective than the Second Amendment.[23]

---

(1964) (noting that the Sedition Act was never challenged in the Supreme Court owing to its temporary nature).

[21] *See, e.g.*, *State v. Reid*, 1 Ala. 612, 616–17 (1840) ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.").

[22] *Bruen*, 597 U.S. at 68 ("Those state courts that upheld broader prohibitions without qualification generally operated under a fundamental misunderstanding of the right to bear arms, as expressed in *Heller*.") (discussing *Salina v. Blaksley*, 72 Kan. 230, 232 (1905)).

[23] *See id.*; *see also Wilson v. Hawaii*, 145 S. Ct. 18, 21 (2024) (Statement of Thomas, J., joined by Alito, J., respecting denial of certiorari) (labeling Hawaii's anti-public-carry view of the right, rooted in localized anti-gun tradition as "obvious[ly] unconstitutional[]" and in "blatant defiance" of the Second Amendment (internal quotation marks omitted); *Dunne v. People*, 94 Ill. 120, 132–33, 141 (1879) (emphasizing centrality of state power over the militia and that constitutional rights are subject to state police power); *Hill v. State*, 53 Ga. 472, 479–80 (1874) (state constitutional right explicitly allows broad time, place, and manner exceptions); *English*, 35 Tex. 473, 475, 480 (right to bear arms applies only to the militia and

Perhaps the state law was idiosyncratic; an outlier that, either in the why or the how, did not connect with the broader national regulatory tradition.[24] A regulation lacking such a nexus is "unmoored from original meaning [and] is not binding law." *Rahimi*, 602 U.S. at 738 (Barrett, J., concurring). Federalism is relevant: unlike the federal Constitution of limited and enumerated powers, state governments typically enjoy plenary powers unless specifically prohibited by the state constitution.[25]

Any one or combination of these problems are a type of source error that may weaken or destroy the evidentiary value of the regulation, but the majority seems oblivious to them. Far from an "insurmountable" obstacle, Maj. Op. 68 n.89, these are the kind of ordinary questions that erode or strengthen any piece of conditionally relevant evidence. But the majority

---

is always subject to the "ideas of intelligent and well-meaning legislators"); *State v. Newsom*, 27 N.C. (5 Ired.) 250 (1844) (upholding restriction against possession of arms by free people of color since they were not citizens under the State Constitution and Second Amendment was not applicable to States).

[24] *Bruen*, 597 U.S. at 54 ("[W]e agree that Tennessee's prohibition on carrying . . . was, on its face, uniquely severe[.]"); *id.* at 30 (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021) (Krause, J.)) (courts must eschew "endorsing outliers that our ancestors would never have accepted").

[25] *See Andrews v. State*, 50 Tenn. 165, 175 (1871) (observing that unlike the Constitution, which limits the federal government through enumerated powers and the Bill of Rights, Tennessee's constitution conferred plenary power upon the state legislature).

blithely assumes that the fact an ordinance was promulgated somewhere automatically makes it historically and legally relevant.

The *Bruen* Court disagreed. It dismissed both the 1871 statute and the Texas Supreme Court's rationale in *English* as outliers. 597 U.S. at 65. Whereas the majority thinks the statute is itself evidence of the national firearms-regulation tradition, the Court rejected it as a historical example because it "'contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense' in public." *Id*. at 65–66 (quoting *Heller*, 554 U.S. at 632).

From the Supreme Court's treatment of *English*, I discern two principles about the role of tradition, both of which the majority has violated. First, evolving tradition is not a standalone source of constitutional meaning and can sometimes distort constitutional meaning. Second, courts must be discriminating when deciding what comprises a national tradition, and it is possible to err through overinclusivity.[26] *See*

---

[26] Another example: the majority relies on *Hill v. State*, 53 Ga. 472 (1874) to support place-based bans as a whole. Maj. Op. 91–92. But in *Hill*, the state Supreme Court ignored its own precedent in *Nunn v. State*, 1 Ga. 243 (1846), adopted a militia-only view of the right, and freely admitted that it was "not improbable" that its decision transgressed the original meaning of Georgia's constitution. Understandably, the Supreme Court has never cited *Hill* as a 19th century data point for the original meaning of the Second Amendment. But *Hill* was appropriately paired with *English v. State*, the 1871 Texas "outlier" decision, in Justice Breyer's *McDonald* dissent. 561 U.S. at 937. *See Bruen*, 597 U.S. at 65.

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 421 (2024) ("The framers also recognized that the judicial power described in our Constitution implies, as the judicial power did in England, a power (and duty) of discrimination when it comes to assessing the 'evidence' embodied in past decisions.") (Gorsuch, J., concurring). That is especially true of non-legal sources such as alleged social customs, which might never be appropriate for inclusion because doing so bypasses "the broad social consensus required to pass new legislation"—"a deliberately hard business under our Constitution." *McGirt v. Oklahoma*, 591 U.S. 894, 903 (2020).

The majority selectively quotes *Bruen* to give the impression that the Court views equally all Second Amendment interpretations "'from immediately after its ratification through the end of the 19th century' . . . so long as they do not contradict the original meaning of the right to keep and bear arms." Maj. Op. 22 (quoting *Bruen*, 597 U.S. at 35). That is an incomplete characterization of the Supreme Court's view of post-Civil War history. The majority omits the sentence right before the quoted language, in which the Court warned "against giving postenactment [i.e., post-1791] history more weight than it can rightly bear." *Bruen*, 597 U.S. at 35.

The majority also omits the paragraphs just after the quoted sentence, in which the Court explained *how* 19th century evidence can be a "critical tool of constitutional interpretation." *Id*. First, "a regular course of practice" since the early days of the Republic may "liquidate & settle" the meaning of "disputed or indeterminate 'terms & phrases' in the Constitution." *Id*. at 35–36 (quoting *Chiafalo v. Washington*, 591 U.S. 578, 593 (2020)). And second, "*Heller*'s interest in mid- to late-19th century commentary was *secondary*," serving "as mere confirmation of what the Court thought had already

been established." *Id*. at 37 (emphasis added); *see also Lara II*, 125 F.4th at 441 (late-19th century history can help show liquidation and confirmation). By omitting these important explanatory passages from *Bruen* and *Lara II*, the majority creates the false impression that when interpreting the Constitution all history is created equal—when the Supreme Court has explicitly said it is not. *Id*. at 34 ("[W]hen it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'") (quoting *Heller*, 554 U.S. at 634–35)).

The majority suggests the Supreme Court is agnostic about historical method when identifying the principles underlying the Second Amendment: Reconstruction-era and even more recent historical evidence is all equally valid. Maj. Op. 26–27; *see, e.g.*, *id.* at 101 n.129. Not so. The *Bruen* Court plainly said, "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." 597 U.S. at 37 (citing *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (Sixth Amendment); *Virginia v. Moore*, 553 U.S. 164, 168–69 (2008) (Fourth Amendment); and *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–25 (2011) (First Amendment)).[27]

---

[27] *See also Ramos*, 590 U.S. at 88–92 (Sixth Amendment); *Gamble v United States*, 587 U.S. 678, 683–86 (2019) (Fifth Amendment); *Timbs v. Indiana*, 586 U.S. 146, 150–52 (2019) (Eighth Amendment); *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. E.E.O.C.*, 565 U.S. 171, 179–83 (2012) (First Amendment); *Lynch v. Donnelly*, 465 U.S. 668, 673–74 (1984) (First Amendment); *Near v. Minnesota*, 283 U.S. 697,

And when the Court considered historical analogues in *Rahimi*, it did not include a single source dating from the Civil War onwards. Instead, it looked exclusively to pre-Revolution, Founding-era, and early antebellum sources. 602 U.S. at 693–98.[28]

Because the meaning and scope of constitutional rights is "pegged" to 1791, the relative lack of Founding-era and early-19th century gun regulation compared to more voluminous and restrictive Gilded-Age sources creates a problem for the majority. After all, the Supreme Court has already acknowledged that "there is little evidence of an early American practice of regulating public carry by the general public." *Bruen*, 597 U.S. at 46. And importantly, the few restrictions that did exist were "well-defined . . . governing the *intent* for which one could carry arms, the *manner* of carry, or the *exceptional circumstances* under which one could not carry arms." *Id*. at 38 (emphasis added). Aside from those "well-defined" restrictions, the early American tradition generally allowed "public carry of commonly used firearms for self-defense." *Id*.

The majority attempts to minimize this problem by adopting two interpretive principles that, taken together, weirdly enhance the value of late-19th century evidence while diminishing early American evidence. First, the majority says, "[e]ven a comparatively rare post-Founding practice may shed

713–17 (1931) (First Amendment); *Reynolds v. United States*, 98 U.S. 145, 163 (1878) (First Amendment).

[28] *See also Heller*, 554 U.S. at 614 (historical evidence from "75 years after the ratification of the Second Amendment . . . do[es] not provide as much insight into its original meaning as earlier sources").

light on the meaning of the right to keep and bear arms if it is part of a longstanding legal tradition." Maj. Op. 26–27. But a "comparatively rare practice" is by definition neither widespread nor a tradition. And the Supreme Court seems already to have rejected the majority's interpretive principle: Regulations from "a handful of late-19th century jurisdictions" are not enough to overcome the American tradition of mostly unregulated public carry for self-defense. *Bruen*, 597 U.S. at 38.

Second, the majority says the absence of an analogue is "not dispositive" because "legislatures do not always legislate up to the constitutional line." Maj. Op. 27. Fair enough, but shouldn't a lack of historical analogues be probative? Considering that the government must show its modern firearms regulation "apply faithfully the balance struck by the founding generation," *Bruen*, 597 U.S. at 29 n.7, one would think that the absence of analogous regulations from the Founding and antebellum periods is highly relevant, because they are the best available source of Second Amendment principles. That is precisely what *Bruen* teaches. 597 U.S. at 26 ("[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.").

Indeed, the Supreme Court has already given us the baseline principle for place-based firearms regulations. After reviewing pre- and post-ratification history of the public-carry right, the *Bruen* Court concluded: "Apart from a few late-19th century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense." *Id*. at 70. Place-based regulations that broadly prohibit the public carry of commonly used

guns for personal defense—like Chapter 131—violate that most basic principle.

The majority's dismissive attitude toward the lack of early historical analogues downplays *Bruen*'s burden-shifting analysis. Unlike cases where challenged laws enjoy the presumption of constitutionality, a modern gun prohibition at *Bruen* step two is presumptively unconstitutional unless the government can show that it fits within a relevant tradition of historical firearms regulation. Because the government has the affirmative burden to adduce relevantly similar historical analogues, its inability to do so is dispositive. *See* J. Joel Alicea, *Bruen Was Right*, forthcoming in 174 Pa. L. Rev. (manuscript at 30–33).[29]

And while legislatures don't always legislate up to the constitutional line, as James Madison noted they sometimes legislate *beyond* the constitutional line.[30] So we should decline

---

[29] Available                                          at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5122492.

[30] "It has been said, that it is unnecessary to load the constitution with this provision [a bill of rights], because it was not found effectual in the constitution of the particular States. It is true, there are a few particular States in which some of the most valuable articles have not, at one time or another, been violated; but it does not follow but they may have, to a certain degree, a salutary effect against the abuse of power." 1 Annals of Cong. 456–57 (J. Gales ed. 1834) (June 8, 1789) (Statement of Rep. Madison); *also in* 11 Documentary History of the First

to read too much into the mere existence of a particular regulation, because it is not necessarily evidence of *constitutional* legislation.

That caveat is particularly salient when considering many pre-incorporation municipal and territorial regulations that never faced judicial review, particularly federal judicial review. "[I]t was not until the Judiciary Act of 1875 that Congress gave the federal courts general federal-question jurisdiction." *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 807 (1986). Well after ratification of the Fourteenth Amendment, the Court steadfastly declined to apply the Second Amendment and the rest of the Bill of Rights to the States. *See, e.g.*, *Twitchell v. Commonwealth*, 74 U.S. 321 (1868) (Fifth and Sixth Amendments); *Edwards v. Elliott*, 88 U.S. 532 (1874) (Seventh Amendment); *United States v. Cruikshank*, 92 U.S. 542 (1875) (Second Amendment); *Hurtado v. California*, 110 U.S. 516 (1884) (Fifth Amendment); *Presser v. People of Ill.*, 116 U.S. 252 (1886) (Second Amendment). And before the Judiciary Act of 1914, the Supreme Court lacked the power to review state laws and executive actions against federal constitutional challenge.[31]

State laws that were not subject to the Second Amendment,[32] or to a state constitutional guarantee of the right to keep and bear arms, were an exercise of freewheeling police

---

Federal Congress of the United States of America: 4 Mar.–3 Mar. 1791, at 825 (Charlene Bangs Bickford et al. eds., 1992).

[31] Act of Dec. 23, 1914, ch. 2, 38 Stat. 790.

[32] *See Barron v. Baltimore*, 32 U.S. 243 (1833).

power, which we don't typically consider determinative of fundamental constitutional rights. Ignoring that difficulty, the majority relies extensively on laws from Delaware, Maryland, New Jersey, New York, and Virginia—none of which had a state constitutional right to keep and bear arms in the Founding or Reconstruction eras. Maj. Op. 38, 48, 80–81 & n.103, 87, 89–90 & n.110, 99–100, 110. It similarly cites an 1817 New Orleans ordinance that predates by several generations Louisiana's adoption of the right during Reconstruction. *Id.* at 50, 114 n.143.

Even after ratification of the Fourteenth Amendment, "the laws of the ratifying states frequently fell far short of the standards of the first eight amendments, and ratification produced no effort to bring those laws into conformity with the Bill of Rights." Lawrence Rosenthal, *The New Originalism Meets the Fourteenth Amendment: Original Public Meaning and the Problem of Incorporation,* 18 J. Contemp. Legal Issues 361, 390 (2009). As shown by the statute at issue in *English*, 35 Tex. at 473, discussed *supra* pp. 14–20, the proliferation of State and local gun regulations in the late-19th century does not illuminate the original meaning of the Second Amendment right.

In *Bruen*, the Court observed that "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." 597 U.S. at 38. This case involves the right to public carry, but so-called "sensitive places" are an *exception* to the public-carry right.[33] As the Majority Opinion demon-

---

[33] The "relatively few" exceptions, *Bruen*, 597 U.S. at 30, prove the rule and establish an overarching principle: The government cannot broadly prohibit a member of the people from

strates, most of these sensitive-place exceptions first appeared in the late-19th century. For example, 80 of the 138 historical analogues cited in the Majority Opinion are post-1840, and most (63) of those are post-1868.

In short, the Founding-era and post-Civil War histories of place-based firearms prohibitions are inconsistent. The majority attempts to overcome that inconsistency through two unsuccessful moves. First, the majority instructs that we should rely on "statutory analogues from the late 1800s"—and even later[34]—as long as "they do not contradict[] earlier practice." *Id.* at 18–19 (internal quotation marks omitted). That new rule puts a weighty hand on the scale. *Lara II* rejected post-ratification history because it was "incompatible" or "contradict[ed]" the 1791 meaning. 125 F.4th at 441 & n.19. We did not say an analogue could fail *only* if it revealed clear contradiction. The *Bruen* Court criticized stale "post-Civil War" evidence simply because it provides less insight into original meaning as earlier sources. *Bruen*, 597 U.S. at 36; *see also Rahimi*, 602 U.S. at 737–38 (Barrett, J., concurring) ("scattered cases or regulations" that long postdate ratification do not illuminate the meaning of the enacted law). An analogue might not brazenly

---

publicly carrying commonly used firearms for self-defense. By reading history so liberally and analogizing so broadly, the majority makes the exception swallow the rule.

[34] The majority's long view of regulatory tradition stemming from modern conditions allows it to cite laws stretching all the way into the 20th century, *see* Maj. Op. at 55 n.70, 57 n.74, 61 n.81, 62–63 nn. 83–84, 100 n.123, 101–03 n.129, 114 n.143.

"contradict" the right to keep and bear arms, but that does not make it *consistent* with the original understanding of the right.

Second, the majority attempts to create the illusion of consistency by drawing an alleged through-line from the Statute of Northampton (1328) all the way up to modern laws prohibiting public carry in any "discrete locations set aside for specific civic purposes." Maj. Op. 29. It repeatedly invokes Northampton principles to approve firearm prohibitions at elections, fairs, markets, ball rooms, public fora, recreational spaces, on concealed carry generally, and just about anywhere that it considers "discrete." *Id.* 29, 114–167. Indeed, the Statute of Northampton suffuses the majority's entire analysis and undergirds most of its conclusions.

The majority's reliance on the Statute of Northampton is misplaced. *See Bruen*, 597 U.S. at 39–41. It was enacted nearly a half-millennium before the Constitution was ratified. *Id.* at 40. It emerged from an "acute disorder" that plagued medieval England. *Id.* Its "going armed" provision mainly concerned the wearing of defensive armor. *Id.* at 41; *see also* Richard E. Gardiner, *The True Meaning of "Going Armed" in the Statute of Northampton: A Response to Patrick J. Charles*, 71 Clev. St. L. Rev. 947, 955 (2023). And to the extent that the Statute or similar laws were extended to weapons-bearing, they applied only to the brandishing of weapons to terrorize the public. *Bruen*, 597 U.S. at 43–45; *see also* 4 *Commentaries* 148–49; *Simpson v. State*, 13 Tenn. 356 (1833).

Contrary to the majority's suggestion, there is no evidence that this malice could be inferred merely from being armed in a sensitive place. Maj. Op. 33. Blackstone asserts that certain conduct "which [was] neither an affray nor an offence in any other place," could amount to one if done in certain

places, like a churchyard, "where a respect to [that] particular place ought to restrain and regulate men's behaviour." 4 *Commentaries* 146. But even then, one had to do *something* in the nature of an affray or riot to meet the mark. As discussed below, *infra* Section VI.A, armed assemblies and peaceful carry in Blackstone's example of a church were not unlawful. Indeed, the most famous application of Northampton at common law *rejected* the idea that merely bearing arms in such places constituted unlawful behavior. *Sir John Knight's Case*, 90 Eng. Rep. 330 (K.B. 1686).

Northampton-inspired going-armed laws were about dangerous and threatening conduct, not general prohibitions on public carry in sensitive places. *See* Stephen P. Halbrook, *Going Armed with Dangerous and Unusual Weapons to the Terror of the People: How the Common Law Distinguished Peaceable Keeping and Bearing of Arms* (Sept. 15, 2016).[35] Even among the handful of States that enacted versions of the Statute in the Founding era, half of them expressly excised the language about fairs and markets because the target was dangerous *conduct* rather than allegedly sensitive *places*.[36] That is also how the Supreme Court discussed it in *Rahimi*. 602 U.S. at 694, 697.

---

[35] Available at https://perma.cc/P5RD-BPCR.

[36] *See* 1786 Va. Acts 34, 35; 1795 Mass. Acts 436; 1801 Tenn. Acts 260; An Act for the Punishment of Certain Crimes and Offences, Within the District of Columbia § 40, *reprinted in Code of Laws for the District of* Columbia, at 235, 254 (Davis & Force, 1819), (https://perma.cc/W3U5-ZH5J); 1821 Me. Laws 285.

These laws did not result from any kind of constitutional deliberation, so they provide little insight into the meaning of the constitutional right to public carry. Robert Leider, *Constitutional Liquidation, Surety Laws, and the Right to Bear Arms*, *in* New Histories of Gun Rights and Regulations: Essays on the Place of Guns in American law and Society at 248–57 (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller eds. (2023) [hereinafter Leider, *Constitutional Liquidation*]. And contrary to the majority's suggestion, they did not "create a tradition or practice against public carry." *Id*. at 249. The "right to bear arms did not liquidate in favor of the [surety-based] Massachusetts Model." *Id*. "[S]urety laws were rarely invoked against those who carried weapons for lawful purposes." *Id*. Even "Massachusetts Model jurisdictions switched to narrower restrictions against the carrying of weapons in a concealed manner, including in jurisdictions outside the South." *Id*. In sum, the Statute of Northampton and its 19th century iterations are invalid analogues for any of New Jersey's place-based pro-hibitions.

E

These objections to the majority's reliance on late-19th century evidence implicate the "ongoing scholarly debate on whether courts should primarily rely on the prevailing under-standing of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Bruen*, 697 U.S. at 37; *see also Rahimi*, 602 U.S. at 692 n.1. The answer to that question bears on Second Amendment cases and has potentially farther-reaching conse-quences.

The original Bill of Rights constrained only the federal government, leaving the States free, as a constitutional matter, to enact any laws they found suitable. *Barron*, 32 U.S. at 248. The rights enumerated in the Bill of Rights, including the right to keep and bear arms, became applicable to the States through Fourteenth Amendment incorporation doctrine. So, some scholars believe, the content of the right should be determined according to the public understanding in 1868, when the Fourteenth Amendment was ratified. According to this theory, after 1868 the people's right to keep and bear arms against State action is guaranteed by the Fourteenth Amendment, not the Second Amendment, so the 1791 conception of the right is passé. That's because Fourteenth Amendment ratification allegedly refined,[37] reglossed,[38] respoke,[39] impliedly repealed and replaced,[40] and updated the original Bill of Rights in its entirety—all according to 1868 popular understandings.

The refined-and-respoken-Bill-of-Rights theory is intriguing, but I am skeptical. First, it assumes that the Bill of Rights was incorporated against the States through the

---

[37] Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 259 (2000).

[38] Akhil Reed Amar, Heller, HLR, *and Holistic Legal Reasoning*, 122 Harv. L. Rev. 145, 177–78 (2008).

[39] Kurt T. Lash, *Respeaking the Bill* of *Rights*: *A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1447–48 (2022).

[40] *Id*. at 1447.

Fourteenth Amendment's Privileges or Immunities Clause.[41] That seems correct,[42] but the Supreme Court long ago rejected that path in favor of the Fourteenth Amendment's Due Process Clause. *See McDonald*, 561 U.S. at 758–66 (summarizing the Court's incorporation jurisprudence). And when the Court thoughtfully reconsidered the matter *in the Second Amendment context*, it stayed the course. *Id*. at 754–58. So the theory's most basic assumption fights against, and would require a revolution of, the Supreme Court's controlling incorporation doctrine.

Second, a version of the theory assumes that the 1791 understanding of the right to keep and bear arms was militaristic and collective, while by 1868 the public understanding had evolved to embrace individual self-defense.[43] But the Supreme Court forcefully rejected the Militia View of the Second Amendment in *Heller*. 554 U.S. at 576–92. So another prop undergirding the theory, at least with respect to the right to keep and bear arms, offers little support.

Third, the theory rests on the Madisonian and originalist tenet that the meaning of a constitutional provision should accord with the understanding of those who ratified the provision, either in the State ratification conventions (for the original Bill of Rights) or in the State legislatures (for subsequent

---

[41] Akhil Reed Amar, *The Bill of Rights and the Fourteenth Amendment*, 100 Yale L.J. 1193, 1218–26 (1992); Lash, *supra* note 39, at 1447–48.

[42] *See, e.g.*, Kurt T. Lash, The Fourteenth Amendment and the Privileges and Immunities of American Citizenship (2014).

[43] Amar, *supra* note 37, at 216–18.

amendments), because it was their assent that made the provision constitutional law.[44] Ordinarily, that makes sense because the Article VII ratification process and the Article V amendment process confer legitimacy and authority through popular sovereignty and supermajoritarian voting. But that tenet is challenged by the irregular and coercive manner in which the Fourteenth Amendment was proposed and ratified.[45] Adding to the difficulty, the record of Fourteenth Amendment State ratification debates is largely silent,[46] and what little exists is "vague and scattered."[47] So what we know of the Fourteenth Amendment State *ratifiers'* understandings provides little or no support for the theory.

Fourth, the theory too breezily substitutes implication and sociological propositions for clear historical evidence. Even if Americans as a whole became more liberal or libertarian during the antebellum Era, that does not necessarily mean that they—let alone the men who drafted, proposed, and ratified the Fourteenth Amendment—silently discarded the origi-

---

[44] 5 Annals of Cong. 776 (1796) (statement of Rep. Madison).

[45] *See, e.g.*, Thomas B. Colby, *Originalism and the Ratification of the Fourteenth Amendment*, 107 Nw. U. L. Rev. 1627 (2013).

[46] *See, e.g.*, Charles Fairman, *Does the Fourteenth Amendment Incorporate the Bill of Rights*?, 2 Stanford L. Rev. 5, 81–132 (1949).

[47] Bryan H. Wildenthal, *Nationalizing the Bill of Rights: Revisiting the Original Understanding of the Fourteenth Amendment in 1866-67*, 68 Ohio St. L.J. 1509, 1600 (2007).

nal meaning of constitutionally enumerated rights for new, updated conceptions.

The Fourteenth Amendment was "but an amendment,"[48] not a reformation or, in contractual parlance, a novation. *Unlike* the Eleventh, Thirteenth, and Seventeenth Amendments, which explicitly abrogated and replaced Article III, § 1, Article I, § 2, and Article I, § 3, respectively,[49] there is no textual evidence that the Fourteenth Amendment changed the original meaning of any enumerated right. If those involved in advancing and ratifying the Fourteenth Amendment viewed the amendment as a mechanism to substantively reimagine the entire Bill of Rights, one suspects they would have said so—but they didn't. If they had, those who opposed the proposed amendment would have objected to the revolutionary nature of such an act. For example, when Anti-Federalists realized that Federalist delegates to the 1787 Constitutional Convention wished to replace rather than amend the Articles of Confederation, they complained bitterly,[50] forcing proponents publicly to defend

---

[48] Steven G. Calabresi, *We Are All Federalists, We Are All Republicans: Holism, Synthesis, and the Fourteenth Amendment*, 87 Geo. L.J. 2273, 2303–04 (1999).

[49] *See* Lash, *supra* note 39, at 1444–47.

[50] *See, e.g.*, Robert Yates and John Lansing, Reasons of Dissent, New York Journal, Jan. 14, 1778, reprinted in The Essential Antifederalist 46–47 (W. Allen & G. Lloyd ed. 2002); Address by a Plebian (1788), *id*. at 69–70; Federal Farmer Letter I, Oct. 8, 1787, *id*. at 82–83; John DeWitt Essay V (1787), *id*. at 207.

their actions.[51] But like the dog that didn't bark,[52] no such conversation occurred in 1866–1868.

John Bingham and other advocates of the proposed amendment never said the rights enumerated in the Constitution were being reglossed, respoken, reshaped, or updated. Instead, they urged broader application of the familiar rights long guaranteed in the "immortal" and "sacred" Bill of Rights. If anything, their rhetoric assured listeners that the Fourteenth Amendment ensured the continuity of established rights (applied more widely, to be sure), not the declaration of new or reimagined rights. These quotes from national debates on the proposed Fourteenth Amendment are illustrative.

John Bingham:

But I may say that the committee has under consideration another general amendment to the Constitution which looks to the grant of express power to the Congress of the United States to enforce in behalf of every citizen of every State and of every Territory in the Union *the rights which were guarantied to him from the beginning*, but which guarantee has unhappily been disregarded by more than one State of this Union, defiantly

---

[51] The Federalist No. 40, at 199–206 (James Madison) (Liberty Fund ed. 2001).

[52] *See* Arthur Conan Doyle, *Silver Blaze*, in The Complete Sherlock Holmes 347 (Doubleday & Co., Inc. 1930).

disregarded, simply because of a want of power in Congress to enforce that guarantee.[53]

John Bingham:

[The proposed Privileges and Immunities Clause] *stands in the very words of the Constitution of the United States as it came to us from the hands of its illustrious framers*. Every word of the proposed amendment is to-day in the Constitution of our country, save the words conferring the express grant of power upon the Congress of the United States. The residue of the resolution, as the House will see by a reference to the Constitution, is the language of the second section of the fourth article, and of a portion of the fifth amendment adopted by the first Congress in 1789, and made part of the Constitution of the country.[54]

John Bingham:

Could words be stronger, could words be more forceful, to enjoin upon every officer of every State the obligation to obey those great provisions of the Constitution, in their letter and their spirit? I submit to the judgment

---

[53] John Bingham, speech to the U.S. House of Representatives (January 25, 1866) (emphasis added), reprinted in 2 The Reconstruction Amendments: The Essential Documents 57 (K. Lash ed. 2021) (2 Lash).

[54] John Bingham, speech to the U.S. House of Representatives (February 26, 1866) (emphasis added), reprinted in 2 Lash 99–100.

of the House, that it is impossible for mortal man to frame a formula of words more obligatory than those *already in that instrument*, enjoining this great duty upon the several States and the several officers of every State in the Union.[55]

John Bingham:

And, sir, it is equally clear by every construction of the Constitution, its contemporaneous construction, its continued construction, legislative, executive, and judicial, that these great provisions of the Constitution, *this immortal bill of rights embodied in the Constitution*, rested for its execution and enforcement hitherto upon the fidelity of the States.[56]

John Bingham:

*I repel the suggestion made here in the heat of debate, that the committee or any of its members who favor this proposition seek in any form to mar the Constitution of the country, or take away from any State any right that belongs to it, or from any citizen of any State any right that belongs to him under that Constitution. The proposition pending before the House is simply a proposition to arm the Congress of the United States, by the consent of the people of the United States, with the power to*

---

[55] *Id.* at 100.

[56] *Id.*

*enforce the bill of rights as it stands in the Constitution to-day. It "hath that extent—no more."*[57]

John Bingham:

As further security for the enforcement of the Constitution, and especially of this *sacred bill of rights*, to all the citizens and all the people of the United States, it is further provided that the members of the several State Legislatures and all executive and judicial officers, both of the United States and of the several States, shall be bound by oath or affirmation to support this Constitution.[58]

James Wilson:

Mr. Speaker, I think I may safely affirm that this bill, so far as it declares the equality of all citizens in the enjoyment of civil rights and immunities, *merely affirms existing law.* We are following the Constitution. We are reducing to statute form the spirit of the Constitution. *We are establishing no new right, declaring no new principle. It is not the object of this bill to establish new rights, but to protect and enforce those which already belong to every citizen.*[59]

---

[57] John Bingham, speech to the U.S. House of Representatives (February 28, 1866) (emphasis added), reprinted in 2 Lash 109.

[58] *Id*. at 113.

[59] James Wilson, speech to the U.S. House of Representatives (March 1, 1866) (emphasis added), reprinted in 2 Lash 121.

John Farnsworth:

So far as [Section 1] is concerned, there is but one clause in it which is not already in the Constitution, and it might as well in my opinion read, "No State shall deny to any person within its jurisdiction the equal protection of the laws." But a *reaffirmation* of a good principle will do no harm, and I shall not therefore oppose it on account of what I may regard as *surplusage*.[60]

Massachusetts Legislative Committee on Federal Relations:

Two questions present themselves at the outset: First. *Does it give any additional guarantees to human rights?* Second. Does the proposed amendment impair or endanger any rights now recognized by the Constitution? The first section of the article is as follows: [quoting Section 1]. *It is difficult to see how these provisions differ from those now existing in the Constitution.*[61]

Republican advocates did not say the proposed Fourteenth Amendment would *redefine* fundamental rights—that would have been considered too radical, endangering the entire amendment project. The Section One debates were not

----

[60] John Farnsworth, speech to U.S. House of Representatives (May 10, 1866) (emphasis added), reprinted in 2 Lash 175.

[61] Massachusetts Legislative Committee on Federal Relations, Majority Report on the Proposed Fourteenth Amendment (February 28, 1867), reprinted in 2 Lash 384.

about "what the words meant," but how to protect the "preex-isting rights and freedoms" enumerated in the Constitution.[62] As Bingham said repeatedly, their simple solution to the lack of an adequate enforcement mechanism was to abrogate *Barron* by applying the Bill of Rights to the States. In other words, the amendment was mainly a forum-shifting provision for securing existing and previously defined rights.[63]

Finally, "dual-track" incorporation and wholesale reverse incorporation[64] are necessary corollaries of the theory. If courts were somehow to account for alleged public attitudi-nal shifts over time, a constitutionally enumerated right could mean different things depending on whether it is invoked (e.g., through the Second Amendment) against the federal govern-ment or (through the Fourteenth Amendment) against a state government. But the Supreme Court never embraced dual-track incorporation, and it interred the concept in *Ramos v. Louisiana*, 590 U.S. 83, 92–94 (2020). The right to keep and bear arms is "enforced against the States under the Fourteenth Amendment according to the same standards that protect [the identical Second Amendment right] against federal encroach-ment." *McDonald*, 561 U.S. at 765; *Bruen*, 597 U.S. at 37 (same); *see also Timbs v. Indiana*, 586 U.S. 146, 150 (2019)

---

[62] Amar, *supra* note 41, at 1253.

[63] *See* William Baude, Jud Campbell & Stephen E. Sachs, *General Law and the Fourteenth Amendment*, 76 Stan. L. Rev. 1185, 1191, 1202–10 (2024).

[64] Lash, *supra* note 39, at 1440; Ryan C. Williams, *The One and Only Substantive Due Process Clause*, 120 Yale L.J. 408, 430–44 (2010).

("[I]f a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires."). Dual-track incorporation and reverse incorporation are additional ways in which the theory transgresses the Court's jot-for-jot incorporation doctrine.

The Fourteenth Amendment's framers and ratifiers, and everyone else in 1868, were familiar with the "sacred" and "immortal" Bill of Rights. Applying the old-soil principle[65] in the constitutional context, it is reasonable to assume that when those people wrote, read, spoke, and heard about the "privileges or immunities" of citizens of the United States, they understood the proposed Fourteenth Amendment to transplant the well-known rights and freedoms enumerated in the 1789 Constitution and the 1791 Bill of Rights. "The notion that incorporation empties the incorporated provisions of their original meaning has no support in either logic or precedent." *McCreary Cnty. v. Am. Civ. Liberties Union of Ky.*, 545 U.S. 844, 898 (2005) (Scalia, J., dissenting). Unless the Supreme Court adopts the refined-and-respoken-Bill-of-Rights theory, this Court should not do so, either.

### III

The majority's recitation of American history is highly questionable. In its narrative, technological developments, demographic shifts, public opinion, and political movements have all worked together in remarkable unison to increase

---

[65] *See Hall v. Hall*, 584 U.S. 59, 73 (2018) (quoting Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947)).

demand for more and heavier firearms restrictions. Maj. Op. 29–70.

That potted history is false. First and most obviously, it contradicts the Supreme Court's historical overviews of firearms regulation and the Second Amendment right in *Heller*, 554 U.S. at 601–35, *McDonald*, 561 U.S. at 761–87, and *Bruen*, 597 U.S. at 38–70. Second, without belaboring the point, the majority simply takes sides, ignoring substantial scholarship undermining and disproving its historical account. *See generally* Joyce Lee Malcom, *Review: Arming America*, 79 Tex. L. Rev. 1657 (2001) (discussing gun ownership and use in England, colonial America, and the Founding era); David B. Kopel, *The Second Amendment in the Nineteenth Century*, 1998 B.Y.U. L. Rev. 1359 (1998) (surveying 19th century cases, treatises, and commentators). Third, as I discuss below, the majority's story of increasingly progressive firearms regulation falls apart upon examination.

A.    The Right to Keep and Bear Arms and the Natural Right of Self-Defense

The majority's historical survey misses the forest for the trees. For example, it focuses on the adoption of slightly revised surety laws, Maj. Op. 47, 53–54, but the truly significant antebellum development was the nationwide entrenchment of a principle that "was accepted by an overwhelming consensus of the founding generation"—the right to keep and bear arms as a necessary concomitant of the natural right of self-defense. Nelson Lund, *Second Amendment Originalism, the "General Law," and* Rahimi*'s Two-Fold Failure*, forth-

coming in 78 SMU L. Rev. (manuscript at 29–30).[66] This principle yielded a robust history and tradition permitting open and concealed carry. *See* Stephen P. Halbrook, *To Bear Arms for Self-Defense: A "Right of the People" or a Privilege of the Few?,* 21 Federalist Soc'y Rev. 56, 56 (2020) ("By 1861, 25 of 34 states allowed the carrying of weapons both openly and concealed. In the 9 states that then restricted concealed carry, open carry was lawful; it was this right of open carry that justified the restrictions of concealed carry.").

The earliest decision discussing the constitutional right to keep and bear arms rejected a concealed-carry ban. *Bliss v. Commonwealth*, 12 Ky. 90 (1822). Over the next fifty years, some state courts, mostly in the South, recognized States' discretion to regulate concealed carry according to then-contemporary sensibilities.[67] And in 1850, Kentucky's legislature

---

[66] Available at https://perma.cc/5GBU-JR74.

[67] *See, e.g.*, *Aymette v. State*, 21 Tenn 154 (1840) (adopting the military model rejected by *Heller*); *State v. Reid*, 1 Ala. 612, 621 (1840) (acknowledging that the constitutionality of a concealed-carry ban was doubtful, but upholding the statute because it was not inconsistent "with the law which recognizes the right of self-protection"); *State v. Buzzard*, 4 Ark. 18 (1842) (adopting the military model and denying the right to keep and bear arms for individual self-defense, both rationales rejected by *Heller*); *Nunn v . State,* 1 Ga. 243, 251 (1846) (ban on concealed carry does not interfere with Second Amendment right, but any prohibition against open carry "is in conflict with the Constitution, and void."); *State v. Chandler*, 4 La. Ann. 489 (1850) (law prohibiting concealed carry for self-defense does not violate the Second Amendment because it allowed open carry); *Andrews*, 50 Tenn. 165 (adopting the military model

abrogated *Bliss* by amending the state constitution to allow regulation of concealed carry.[68] But the right to carry openly for self-defense remained unabridged. *See Bruen*, 597 U.S. at 70 (historical survey shows that "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense"); *Heller*, 554 U.S. at 626; Leider, *Constitutional Liquidation* at 247; Jonathan Meltzer, *Open Carry for All:* Heller *and Our Nineteenth-Century Second Amendment*, 122 Yale L.J. 1486, 1510–20 (2014); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1516–24 (2009). Nineteenth century cases about the *mode* of carry are little help here because Chapter 131 does not regulate the mode of carry. It completely prohibits bearing arms, in any manner, across large swaths of New Jersey where people may need or wish to carry for self-defense.

B.    Statute of Northampton and Iterations Thereof

The majority's description of alleged "locational restrictions" in England, colonial America, and early America begins with the Statute of Northampton and later iterations of that law. Maj. Op. 30–37. The majority also asserts that "[t]he most comprehensive carry statutes of" the Reconstruction and post-Reconstruction periods "applied the centuries-old principle of preserving order" found in Northampton laws. *Id.* at 60. But Northampton laws are invalid analogues for any of New

---

rejected by *Heller*); *English v. State*, 35 Tex. 473 (1871) (adopting the military model rejected by *Heller*).

[68] KY Const. of 1850, art XIII, § 25.

Jersey's place-based prohibitions. *Supra* pp. 29–32; *infra* pp. 53–59.

> C.    Alcohol and Anti-Shooting Regulations

The majority attempts to leverage *Bruen*'s dicta about "new and analogous sensitive places," *Bruen*, 597 U.S. at 30, by suggesting that the "New World" presented unique "exigencies"—like alcohol consumption—leading Americans to "innovate" by imposing "novel restrictions" on misconduct by inebriated persons. Maj. Op. 39. But the notion that excessive drinking was somehow new or endemic to Colonial America, requiring legislative "innovation," is patently false.[69] Bacchus's devotees have always misbehaved in public taverns and alehouses, requiring legal and community restraints.[70] From 1576 to 1628 alone, the English Parliament considered fifty-one bills regulating alehouses, taverns, and drunken-

---

[69] *See, e.g.*, M.M. Glatt, *The English Drink Problem Through the Ages*, 70 Proc. Roy. Soc. Med. 202–06 (1977); David G. Mandelbaum, *Alcohol and Culture*, 6 Current Anthropology 281–93 (1965).

[70] *See, e.g.*, Steve Tibble, *The Perils of Medieval Pubs: Drinking, Gambling, and Disorder*, available at https://perma.cc/5MBT-KG45; Elizabeth Papp Kamali, *The Horrible Sepulture of Mannes Resoun: Intoxication* and *Medieval English Felony Law*, 30 J. of the Max Planck Inst. for Legal Hist. & Legal Theory 20–44 (2022); Phil Withington, *Intoxicants and Society in Early Modern England*, 54 The Hist. J. 631–57 (2011).

ness.[71] Unsurprisingly, Englishmen carried their hearty drinking habits from the Old World to the New.[72]

The colonists' drinking habits were not new, and their restrictions on bad behavior were not analogous to New Jersey's sensitive-place laws. Virginia banned *shooting* guns at (i.e., while) drinking, and New Netherland prohibited *firing* guns on New Year's Day or May Day—which means that one could fire guns every other day of the year, and publicly carry guns all year long without regard to location. Maj. Op. 40. The text of these regulations undermines the suggestion that their primary focus was concern for "sensitive" locations. One was prohibited from shooting—not carrying—"at drinking," not merely when around alcohol.

The target of the Virginia law was not alcohol consumption but miscommunication and preservation of gun powder. "Besides being weapons, firearms were the leading tool for rapid communication . . . . Gunfire was the standard method of raising an alarm. Inappropriate gunfire could raise a false alarm." Nicholas J. Johnson et al., Firearms Law and the Second Amendment 193 (3d ed. 2021). A 1656 variation of the Virginia law warned that "no certainty c[ould] be had" of the danger of Indian attacks on account of unrestricted gunfire. *Id.* (quoting William Waller Hening, The Statutes at Large: Being a Collection of all the Laws of Virginia from the First Session of the Legislature, in the Year 1619, 401–02 (1823)). Maryland

---

[71] A. Lynn Martin, Alcohol, Violence, and Disorder in Traditional Europe 186 (2009).

[72] W.J. Rorabaugh, *Alcohol in America*, OAH Mag. Hist., Fall 1991, at 17.

and New York enacted similar laws. *Id.*; *United States v. Connelly*, 117 F.4th 269, 280 (5th Cir. 2024). In addition, the Virginia law expressly declares itself an act to prohibit "spend[ing] powder unnecessarilie." 1631 Va. Acts 173. This aligns with antebellum state regulation of "the discharge of firearms within city limits and the storage of gunpowder to prevent fires." Leider, *Our Non-Originalist Right* at 1598. The majority's reliance on *United States v. Harris* and its analogues commends that same understanding. No. 21-3130, 2025 WL 1922605, at *3 (3d Cir. 2025). The relevant 'why' for these laws could suggest two principles: arms should be fired only if necessary, or arms should not be fired recklessly. As to both the "why" and the "how," there is a wide chasm between New Jersey's law indiscriminately prohibiting public carry by sober-minded people and nearly 400-year-old restrictions on recklessly or wastefully firing guns.[73]

D.    Anti-Poaching Laws

The majority cites a "suite" of colonial laws that it claims were enacted "[t]o address concerns raised by armed trespass" by requiring that "individuals obtain an owner's permission before bearing firearms on his lands." Maj. Op. 41–42 & n.40. But as each of the anti-poaching laws and their English antecedents show, the sole purpose was to protect the

---

[73] The majority does not say whether colonial Virginia's and New Netherland's shooting laws continued into the Founding era. Even if they did, Virginia did not adopt a Second Amendment state analogue until 1971, and New York and New Jersey have never adopted a Second Amendment analogue. So these non-location-based colonial anti-shooting laws shed little light on the constitutional right to bear arms.

"vert and venison" for the King's (or another property owner's) own hunting. *See* Nathaniel Boothe, The Rights of His Majesty's Forest Asserted 6 (1719) (defining "vert" and "venison" as "the whole Forest, both in Woods and in Lands, and the Game that is preserved in both"); *see generally* Charles R. Young, The Royal Forests of Medieval England 1–6, 18–32 (1979). Pennsylvania's 1721 statute was titled "An Act to Prevent the Killing of Deer Out of Season, and Against Carrying of Guns or Hunting Not Qualified." The statute even specified the "why" for its prohibition on hunting and carrying guns on the "improved or inclosed lands of any plantation other than his own"—because "divers abuses, damages and inconveniences have arose by persons carrying guns and presuming to hunt on other people's lands."[74] New Jersey's 1751 statute,[75] Pennsylvania's 1760 statute,[76] New York's 1763

---

[74] Act of Aug. 26, 1721, ch. 246, § 3, reprinted *in* 3 *The Statutes at Large of Pennsylvania from 1682–1801*, at 255 (James T. Mitchell & Henry Flanders eds., 1896) [hereinafter Pa. Act of 1721].

[75] This colonial law was titled "A Supplementary Act to the Act entitled, An Act to prevent the killing of Deer out of Season, and against carrying of Guns, and hunting by Persons not qualified." It was necessary because the earlier statute "hath not fully prevented many Mischiefs and Inconveniences that have often happened by Persons setting of Steel Traps to catch Deer, whereby not only other Mens Cattle have been hurt, but People have been in Danger thereof." 1751 N.J. Laws 448, 451. It did not include the "Improved or Inclosed Lands in any Plantation" language.

[76] Like the 1721 Pennsylvania statute, this "Hunting" law prohibited hunting at certain times, possessing fresh venison out

of season, shooting at fowl "in the open streets of the city of Philadelphia," hunting or killing "game on the sabbath day," and the unlicensed hunting or carrying of a gun by a person "on any enclosed or improved lands of any of the inhabitants of this province, other than his own." Act of Apr. 9, 1760, § 6 *reprinted in A Digest of the Laws of Pennsylvania from the Year One Thousand Seven Hundred to the Sixteenth Day of June, One Thousand Eight Hundred and Thirty-Six* 495 (5th ed. 1837), available at https://perma.cc/JZT3-DLEJ.

statute,[77] New Jersey's 1769 statute,[78] New Jersey's 1771 statute,[79] and Massachusetts's 1789 statute[80] all contain similar

[77] This colonial law prohibited unlicensed persons, "other than the Owner, Proprietor, or Possessor, or his or her white Servant or Servants," from hunting and carrying and shooting firearms "into, upon, or through any Orchard, Garden, Cornfield, or other inclosed Land whatsoever, within the City of New York[.]" Its purpose was to prevent unlicensed hunting on others' enclosed property. An Act to Prevent Hunting with Fire-Arms in the City of New-York, and the Liberties Thereof, 1691–1773 N.Y. Laws 441, 442 (1763).

[78] An Act for the More Effectual Preservation of Deer in this Colony (N.J. 1769) (prohibiting unlicensed persons from "carry[ing] any Gun, or Hunt[ing] or Watch[ing] for Deer, or set[ting] in any Dog or Dogs to drive Deer or any other Game" on others' land).

[79] An Act for the Preservation of Deer and other Game, and to prevent trespassing with Guns, 1771 N.J. Laws 343–47. As with all of the other examples in this "suite" of anti-poaching laws, the purpose of this statute was to ensure "the Preservation of Deer and other Game, and to prevent trespassing with Guns, Traps, and Dogs" on others' property.

[80] An Act for the Preservation and Security of the Sheep and Other Stock on Tarpaulin Cove Island, 1789 Mass. Acts 437. The lands at issue belonged to the Bowdoin family, whose patriarch James Bowdoin II served as Massachusetts Governor in the mid-1780s. The 1789 law was a classic poaching ban, applied to the property of one influential landowner. It was not a novel regulation invented for a "new context," but mirrored the privilege long accorded to British nobility and their private

language. These colonial anti-poaching laws were neither general prohibitions on public carry nor designed to protect a "sensitive place" in *Heller*'s and *Bruen*'s sense of that term. Colonial anti-poaching laws shed no light on the constitutional right to carry firearms for reasons unrelated to unlicensed hunting and poaching, such as self-defense.

E.     Student Codes of Conduct

The majority repeatedly cites university codes of student conduct to justify gun regulations in all manner of locations, Maj. Op. 48–49, 52 & n.62–63, 62–63. But such non-legal sources are invalid analogues. *Cf. Bruen*, 593 U.S. at 28–29, 46, 50–57, 60–63 (relying on historical statutes, state judicial opinions, the common law, treatises, congressional hearings, and government reports). The Constitution, of course, protects individuals against state action, not the decisions and actions of private individuals or associations. Private institutions are not state actors, so their student codes of conduct are not relevant *Bruen*/*Rahimi* analogues. Maj. Op. 49.

A university trustee, visitor, or officer is not, in that capacity, a legislator or ratifier—even if named Jefferson, Madison, or Breckenridge. *See  id.* So the fact that some colleges banned guns together with various forms of student mischief and merrymaking says nothing about whether a State government could enact a similar prohibition. Because these early colleges and universities stood *in loco parentis*, their codes of conduct were pure exercises of "virtually dictatorial"

---

parklands. *See also* 1765 Mass. Acts 832 (restricting deer hunting on Bowdoin lands at the family's request). Available at https://perma.cc/KNX9-N2GR.

discretion and power. David M. Rabban, *Judicial Review of the University-Student Relationship: Expulsion and Governance*, 26 Stan. L. Rev. 95, 98 (1973). As rules of campus decorum, they had no legal import other than as a contractual term. *Id*. at 97–98. Of course, such codes of conduct, whether private or public, were also immune from state and federal constitutional scrutiny. That is also true for the public university codes cited by the majority: Georgia (1810), Virginia (1824), and North Carolina (1838). None of these states had a Second Amendment analogue at the time. *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 196–204 (2006) [hereinafter Volokh, *State Constitutional Rights*]. So those universities' codes of student conduct were constitutionally unrestrained exercises of *in loco parentis* authority. They provide no insight into the public meaning of the constitutional right to keep and bear arms in the early Republic.

F.  Revised Surety Laws

The majority regards the arrival of a new form of surety statute as a significant development influencing place-based bans on the right to keep and bear arms. It "contrast[s]" the old surety regime as one requiring Northampton's terror-to-the-people requirement, while the latter did not. Maj. Op. 53–54. That mischaracterizes the new surety laws.

Here is Massachusetts' surety law in 1795

[E]very Justice of the Peace . . . may cause to be staid and arrested, all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth . . . and upon view

of such Justice, confession of the delinquent, or other legal conviction of any such offense, shall require the offender to find sureties for his keeping the Peace, and being of the good behavior; and in want thereof, to commit him to prison until he shall comply with such requisition[.]

1795 Mass. Laws 436, ch. 2.[81]

And here is the 1836 version of the law:

If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing[.]

Mass. Rev. Stat. ch. 134 § 16 (1836).

Under the 1795 surety law, a justice of the peace could sua sponte require an "affrayer, rioter, disturber, or breaker of the peace" to find sureties for keeping the peace. Under the 1836 surety law, the magistrate could no longer act sua sponte: someone having reasonable cause to fear an injury or breach of the peace had to first lodge a complaint, specifically against an

---

[81] Cited in *Rahimi* as 1795 Mass. Acts ch. 2, in Acts and Resolves of Massachusetts, 1794–1795, ch. 26, pp. 66–67 (1896). 602 U.S. at 696.

individual going armed offensively. Both regimes were discretionary and presumed in the first instance that anyone could carry arms.

The majority implies that because the 1836 statute lacks the same magic words from Northampton, it could be enforced against lawful carry *without* some concern about the person's conduct. But there is no evidence that these surety laws were enforced against lawful carry, and open carry was common, including in States with these surety statutes. Robert Leider, *The Myth of the "Massachusetts Model*," Duke Ctr. for Firearms Law (June 16, 2022);[82] *see also* Leider, *Constitutional Liquidation* at 251–57. Contrary to the majority's suggestions, the revised surety "laws were not bans on public carry, and they typically targeted only those threatening to do harm." *Bruen*, 597 U.S. at 55.

According to the majority, the revised surety laws required an individual "to post bond before carrying weapons in public." Maj. Op. 48 (quoting *Bruen*, 597 U.S. at 55). Not so. *Bruen* noted that surety laws—both from the 18th and 19th centuries—required only "certain individuals to post bond"— those against whom the requisite complaint was filed because they threatened harm and breach of the peace. *Bruen*, 597 U.S. at 55. Otherwise, "the surety statutes *presumed* that individuals had a right to public carry." *Id.* at 56 (emphasis added). Most relevant here, the Court concluded that surety laws are not analogous to place-based bans on public carry. *Id.* at 56–57. Similarly, *Rahimi* describes Massachusetts' 1836 law as an "even more specific" version of the original, which targeted—

---

[82] Available at https://perma.cc/X32T-DHGN.

not "individuals who decided to carry arms" generally, *id.*—but "the misuse of firearms." 602 U.S. at 696.

The majority claims that "not all of these statutes required a complaint before government authorities could demand sureties for those who publicly carried dangerous and deadly weapons." Maj. Op. 54. But its lone source for that assertion—a Virginia law that was also adopted by West Virginia upon her statehood—is unhelpful because neither State had a constitutional right to keep and bear arms at the time of enactment. *Bruen* rejected these same laws as "unusually broad," and therefore unrepresentative and unpersuasive. 597 U.S. at 56 n.24.

G.  Reconstruction and Post-Reconstruction Sources

Rounding out its historical overview, the majority cites Reconstruction-era and post-Reconstruction laws from Georgia, Louisiana, Missouri, Montana, Tennessee, and Texas, and from the Arizona and Oklahoma territories. Maj. Op. 54–56 & nn.69–71. The territorial laws have, at best, minimal relevance. *Bruen*, 597 U.S. at 67–69. And Louisiana is of limited relevance, as the purported 1870 analogue predates the State's adoption of a right to keep and bear arms by nine years.

The remaining sources suffer from a similar defect: highly circumscribed state constitutional rights in a pre-incorporation era. For example, Tennessee's constitution acknowledged a right to keep and bear arms but gave the State unlimited power "to regulate the wearing of arms with a view to prevent crime." Volokh, *State Constitutional Rights* at 203. Georgia's 1868 constitution declared a right to bear arms subject to this caveat: "the general assembly shall have power to prescribe by law the manner in which arms may be borne." *Id.*

at 211. Texas' right to keep and bear arms was utterly contingent: it was subject to "such regulations as the legislature may prescribe." *Id.*

Missouri and Montana declared a right to bear arms, provided that right did not "justify the practice of wearing concealed weapons." *Id.* at 212 (quoting Mo. Const. of 1875, art. II, § 17). And the laws cited by the majority were just that: a ban on concealed-carry in places of worship, educational and social gatherings, election precincts, courtrooms, and certain other "public assemblage[s]." 1883 Mo. Laws 76; 1903 Mont. Laws 49, § 3. Here, *Bruen* is dispositive: concealed-carry laws "[i]n the early to mid-19th century . . . were constitutional only if they did not similarly prohibit *open* carry." 597 U.S. at 52–53; *see id.* at 54 (describing bans of that period). A law that neither distinguishes the two nor requires the intent to harm or breach of the peace is an insufficiently rigorous analogue.[83]

---

[83] *Pace* the majority, late-19th century Missouri laws and decisions do not illuminate the meaning or scope of the Second Amendment right. As the District Court correctly noted, the 1874 statute at issue in *State v. Reando* (Mo. 1878) forbade only concealed carry. When the Missouri Supreme Court considered a subsequent statute, it similarly distinguished concealed carry (regulable) from open carry (not regulable) and favorably quoted *Reid*'s warning about unconstitutional regulation amounting to prohibition. *State v. Wilforth*, 74 Mo. 528, 530 (Mo. 1881); *see supra* note 22. And when the Missouri Supreme Court considered the state's 1879 statute prohibiting open carry in some situations, it refused even to consider the defendant's constitutional argument because the Second Amendment "is a restriction upon the powers of the national government only, and is not a restriction upon

The majority says Northampton-inspired laws permitted weapons bans in "communal venues, including fairs, race courses, ball rooms, churches, public halls, picnic grounds, theatres and other places of public entertainment or amusement, and circuses." Maj. Op. 60–61 & n.81. It relies on the same error-bound States and territories as before.[84] Add to this list Wisconsin and the cities of New Orleans and Stockton, Kansas. *Id.* at 41 n.79, 43 n.83. Wisconsin's statute is irrelevant as that State lacked a constitutional right to bear arms in 1883 and was not obliged to honor the Second Amendment. *Cruikshank*, 92 U.S. 542. That leaves New Orleans and Stockton. In 1890, New Orleans' population was 0.3% of the national population,[85] and Stockton's was all of 880 people.[86] Together, the two cities do not establish a constitutional tradition and, like the western territories and States, their post-Reconstruction ordi-

---

state legislation." *State v. Shelby*, 90 Mo. 302 (1886) (citing *Cruikshank*).

[84] Namely, Tennessee and Texas, which had narrow state constitutional rights; the territories of Arizona, Oklahoma, and New Mexico; and Missouri and Montana, whose bans applied to concealed carry.

[85] *See* Census Bulletin No. 133, at 5 (October 31, 1891) (total New Orleans population 216,000), available at https://perma.cc/3D4Z-EFAF; Census Bulletin No. 16, at 1 (December 12, 1890), available at (total U.S. population 62,622,250), available at https://perma.cc/M9WZ-F5M5.

[86] *See* U.S. Decennial Census Bulletin No. 114, at 17 (September 29, 1891), available at https://perma.cc/V6HD-UJPG.

nances "were irrelevant to more than 99% of the American population." *Bruen*, 597 U.S. at 67.

### IV

Before discussing Chapter 131's individual provisions, the law must be considered in its entirety. The majority minimizes the effect of Chapter 131 by disaggregating its various prohibitions and addressing each one independently, like carefully placed rifle shots. It "flog[s] the historical record"[87] hunting for disparate regulations that it might broadly analogize to a particular Chapter 131 provision. But the whole of Chapter 131 is much greater than its isolated parts. Taken together, Chapter 131's permit requirements and sensitive-place prohibitions operate as a powerful blunderbuss, obliterating public carry almost entirely wherever people congregate. The majority's one-by-one approach never even considers whether our national regulatory tradition countenances the *cumulative* burden of Chapter 131's requirements and prohibitions on the right to carry for self-defense. *See Clingman v. Beaver*, 544 U.S. 581, 607–08 (2005) (courts should examine the cumulative burdens on constitutional rights imposed by the overall regulatory scheme). And New Jersey has not proffered evidence of historical regulations so draconian in their cumulative effect as Chapter 131.

### V

A New Jersey resident may not carry a firearm anywhere, "sensitive" or otherwise, unless she satisfies three per-

---

[87] *Range v. Att'y Gen.*, 124 F.4th 218, 248 (3d Cir. 2024) (en banc) (Phipps, J., concurring).

mitting requirements that have no connection to the Nation's historical regulatory tradition: a minimum $300,000 insurance mandate; an application-fee requirement; and an endorsement by four reputable persons that satisfies the government. All three permitting requirements violate the Second Amendment.

### A.    $300,000 Insurance Mandate

I agree that New Jersey's requirement that anyone seeking to carry a handgun for self-defense must obtain $300,000 in liability insurance is unconstitutional. N.J. Stat. Ann. §§ 2C:58-4(d)4, 2C:58-4.3(a). An ex ante requirement to secure liability insurance is not analogous to the surety regime's presumption of the right to bear arms because it lacks the requisite demand from a complainant, the misuse of firearms, and review by a justice of the peace. *Rahimi*, 602 U.S. at 695–96.

Although the majority does not discuss it, New Jersey also points to certain 19th century cases that imposed strict liability for gun accidents, arguing that they show a "historical tradition" of "compensat[ing] victims of gun violence." Opening Br. of Defendants-Appellants at 52. But the very existence of these decisions undermines New Jersey's insurance mandate because they show that, while firearms accidents have existed since the Founding, "earlier generations addressed the societal problem . . . through materially different means." *Bruen*, 597 U.S. at 26. Rather than require everyone to post bond or purchase insurance before exercising the right to carry for self-defense, they imposed liability only after an injury and through the courts. That is evidence that the "modern regulation is unconstitutional." *Id*. at 26–27. New Jersey has not carried its burden regarding the insurance mandate.

B.    Application Fee Requirement

The majority correctly observes that the $50 fee is not incident to administration or necessary to "maint[ain] public order in the matter licensed." Maj. Op. 75–76 (quoting *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941)). I thus agree that the fee is an "obnoxious" tax on the exercise of a constitutional right, which is foreclosed by *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943), *Follett v. Town of McCormick*, 321 U.S. 573, 577 (1944), and their progeny.

C.    Reputable-Persons Endorsements

Chapter 131 requires that every permit application:

> shall be endorsed by not less than four reputable persons who are not related by blood or by law to the applicant and have known the applicant for at least three years preceding the date of the application, and who shall certify thereon that the applicant has not engaged in any acts or made any statements that suggest the applicant is likely to engage in conduct, other than lawful self-defense, that would pose a danger to the applicant or others.

N.J. Stat. Ann. § 2C:58-4(b).

New Jersey's historical evidence for the four-reputable-person requirement consists of an 1871 Jersey City ordinance and a 1903 Trenton ordinance that conditioned the issuance of carry permits on the written endorsements of "at least three reputable freeholders." Response/Reply Br. of Defendants-Appellants at 31. Those late-19th and early-20th century municipal laws are too late, too minuscule, were not subject to

any state or federal constitutional review, and do not establish or reflect a national tradition of relevantly similar firearms regulation.[88]

The majority attempts to situate the four-reputable-person requirement within "our Nation's tradition of firearm regulation" permitting legislatures to "impose conditions on the carry of firearms designed to ensure the safe use of those arms." Maj. Op. 79. According to the majority, "New Jersey's requirement merely continues this deeply rooted tradition." *Id.*

The majority's description of this alleged tradition is another example of its determination to analogize broadly. The Supreme Court requires governments to show that a contemporary gun regulation is relevantly similar to the national tradition of firearms regulation by comparing the why and how of its operation. The majority's approach is different: it simply reframes the challenged regulation at such a high level of generality that it will always resemble the similarly described purpose of some historical law. By characterizing firearms laws abstractly, such as "conditions on the carry of firearms

---

[88] New Jersey also adduces two New York City ordinances from 1880 and 1881 allowing a police officer to "make a recommendation" on carry permit applications. Response/Reply Br. of Defendants-Appellants 81. Those municipal ordinances are also too late, too insignificant, were not subject to any state or federal constitutional review, and did not reflect a national regulatory tradition. Moreover, they are not relevantly similar to the four-reputable-person requirement because they did not require an endorsement from anyone, let alone someone sufficiently "reputable" to satisfy a government official exercising standardless discretion.

designed to ensure the safe use of those arms," *id.* at 56, the majority can easily sidestep the fussy work of "matching" the why and the how of the regulation's particulars. *Id.* at 67. So the majority's assurance that, just like some older law, the challenged regulations vaguely seek to ensure the "responsible" or "safe" exercise of a constitutional right do not satisfy *Bruen* and *Rahimi*.[89]

## VI

I now turn to the challenged "sensitive places" regulated by Chapter 131. The term "sensitive places" does not have constitutional or historical provenance. It first appeared as dictum in *Heller*. 554 U.S.at 626. The Court did not define "sensitive places," but mentioned "schools and government buildings" as places where public carry may be forbidden. *Id.* "Sensitive place" is not a label that the government can invoke for some location that it deems sensitive. Sensitive places are rooted in our nation's historic regulatory tradition, *Bruen*, 597 U.S. at 30–31; they cannot be created by government *fiat*.

I begin the analysis where the Supreme Court left off in *Bruen*. Traditional sensitive places where carrying arms could

---

[89] The majority claims "[t]he *Bruen* Court cited each provision with apparent approval." Maj. Op. 81. But the Court merely observed that those provisions existed; it did not comment on their constitutionality. *Bruen*, 597 U.S. at 13 n.1. To the extent that some justices discussed the particulars of State licensing regimes, they emphasized the *objective* nature of the licensing requirements such as fingerprinting, background checks, mental health records checks, and firearms training. *Id.* at 80 (Kavanaugh, J., concurring, joined by Roberts, C.J.). New Jersey's four-reputable-person requirement is not objective.

be prohibited are "relatively few." 597 U.S. at 30. The sensitive-place regulations enumerated in *Bruen* can be expanded to "new" and "analogous" places, but not if it means that "places of public congregation" are excluded from the right to carry for self-defense, even if they are crowded and protected generally by the police. *Id*. at 30–31. Much of Chapter 131, and the majority's analysis, violates this basic limiting principle.

A.    Public Gatherings

Section 2C:58-4.6(a)(6) bans firearms from "a place where a public gathering, demonstration or event is held for which a government permit is required, during the conduct of such gathering, demonstration, or event." Right off the bat, this looks like a "place of public congregation" where public carry may not be prohibited. *Bruen*, 597 U.S. at 41. The majority disagrees, relying on an alleged "centuries-old" practice of proscribing weapons at "discrete locations." Maj. Op. 89. This alleged historical practice is overstated, and most of New Jersey's proffered regulations[90] are either infected with source error[91] or come from the territories.

Still, from this history the majority fashions the following principle: arms may be restricted in any place "set aside for the purposes of governmental services and peaceful assembly." Maj. Op. 90. To be sure, offensively threatening others with

---

[90] New Jersey, together with the majority, relies on laws from "Tennessee, Georgia, Texas, Missouri, Arizona, Oklahoma, and Montana." Maj. Op. 89; Opening Br. of Defendants-Appellants 14.

[91] *Supra* pp. 14–20.

arms or recklessly discharging guns threatens these aims, but such misconduct is not considered part of the right. The majority's implied premise is rather that the Second Amendment stands "in 'direct tension' with the competing demands" of the First Amendment. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 532 (2022). In *Kennedy*, the Supreme Court rejected the supposed tension between the two religion clauses, which "appear in the same sentence of the same Amendment." *Id.* at 533. But "[a] natural reading of that sentence would seem to suggest the Clauses have 'complementary' purposes, not warring ones where one Clause is always sure to prevail over the others." *Id.* (quoting *Everson v. Bd. of Ed. of Ewing*, 330 U.S. 1, 13 (1947)).

The same principle applies here. Congress proposed the Bill of Rights contemporaneously; the States considered them all together; and the States ratified the First and Second Amendments with the rest of the Bill of Rights on December 15, 1791. There is no textual conflict between the two amendments, and the Court has never hinted that the Second Amendment is antagonistic to the First Amendment. *See Heller*, 554 U.S. at 579 (comparing language used in the First, Second, and Fourth Amendments).

The majority's civic-deliberations principle is another example of its tendency to rely on broad generalizations. Public sidewalks are fora for social intercourse and civic deliberations. *Bruni v. City of Pittsburgh*, 941 F.3d 73, 83 (3d Cir. 2019). If New Jersey can for that reason ban guns from sidewalks, that is not meaningfully different from New York's attempt to ban firearms from all Manhattan. *See Bruen*, 597 U.S. at 31. Virtually all public property serves *some* government function, so the majority's broad principle would "evis-

cerate the general right to publicly carry arms for self-defense."
*Bruen*, 597 U.S. at 31.

In fact, the right to bear arms is synergistic with the right
to assemble. The majority of common-law commentators did
not presume an armed assembly was impermissible per se, but
asked whether the assembly amounted to an affray. *See* David
B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places"*
*Doctrine: Locational Limits on the Right to Bear Arms*, 13
Charleston L. Rev. 205, 221–22, 226–228 (2018)).[92] Armed
assemblies were not deemed riotous, and were not considered
riotous until and unless "[the assembly's] demeanor . . . bre[d]
some apparent disturbance of the peace." Mark Anthony
Frassetto, *To the Terror of the People: Public Disorder Crimes*
*and the Original Public Understanding of the Second*
*Amendment*, 43 S. Ill. U. L.J. 61, 80 (2018) (quoting Michael
Dalton, The Country Justice 425, 443–44 (1737)). One could
cause a riot by "shew[ing] armour." 1 William Hawkins, A
Treatise of the Pleas of the Crown 157 (1716); *Queen v. Soley*,
88 Eng. Rep. 935, 937 (Q.B. 1707) ("If *three* come out of an
ale house and go armed, it is a riot."). But an assembly that was

---

[92] The exception, *Semayne's Case*, states that a man may not
"assemble his friends and neighbours . . . to go with him to the
market . . . or elsewhere for his safeguard against violence." 77
Eng. Rep. at 195; Darrell A.H. Miller, *Constitutional Conflict*
*and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459, 476
(2019). The majority suggests Miller's article supports firearm
bans at places "important to governmental function." Maj. Op.
48 (citing Miller, *supra*, at 473). But Miller addressed only
laws securing polling places during elections, a far less ambi-
tious proposition.

merely armed would not become riotous unless its conduct was "done *in Terrorem Populi*." 1 Hawkins, *supra*, at 157.

For Founding-era Americans, armed assembly was typical. As the District Court observed, "six out of the thirteen original colonies required their citizens to go armed when attending religious services or public assemblies" to "abate [the] risk" of attack in unruly crowds. 673 F. Supp. 3d at 629 (citing *Heller*, 554 U.S. at 601). True, a carry mandate is distinct from a permissive right to carry. Maj. Op. 93–94. But that's not the point. By definition, a public assembly where people are required to be armed is not a place so "sensitive" that arms can be prohibited. The carry mandate establishes an expectation that the person next to you in the crowd is armed, thus undermining the majority's assumption that an armed person in the assembly threatens the public good. In other words, "Americans certainly did not think that bringing guns to town was a problem"—it "was normal." Kopel & Greenlee, *Sensitive Places*, *supra*, at 233–34 & n.110. For example, in 1742 the Paxton Boys' armed uprising was met by 3,000 armed civilians in Philadelphia's State House Yard. Benjamin L. Carp, Rebels Rising: Cities and the American Revolution 183–85. In the twenty-year aftermath of that incident, "Philadelphians were treated to an avalanche of out-of-door protests" at which participants, including Quakers, sometimes carried arms. *Id*.

There is no evidence that the Founders' understanding of "the right of the people peaceably to assemble" implied complete disarmament. U.S. Const. amend. I. Rather, the First Amendment right to peaceably assemble is complementary with the Second Amendment, which early Americans regarded as the "palladium" of liberty since it enables self-defense and is a check against the usurpation of rulers. *See Range v. Att'y*

*Gen.*, 124 F.4th 218, 241–42 (3d Cir. 2024) ("*Range II*") (en banc) (Matey, J., concurring) (quoting 1 *Commentaries* 300 (St. George Tucker ed., 1803)); *id.* at 247 n.6 (Phipps, J., concurring) (quoting 3 Joseph Story, Commentaries on the Constitution §§ 1890–91 (1833), *reprinted in* 5 The Founders' Constitution 214 (Philip B. Kurland & Ralph Lerner, eds., 1987)). A Virginia commentator observed that "the common" meaning of unlawful assembly did not prohibit large, armed assemblies to peaceably discuss redress. J.A.G. Davis, A Treatise on Criminal Law with an Exposition of the Office and Authority of Justices of the Peace of Virginia 254–55 (1838). That's because peaceably assembling while armed was normal behavior, not dangerous or riotous. After the Whiskey Rebellion erupted on the Appalachian frontier, Pennsylvania prosecuted "a justice of the peace . . . for failing to help suppress a supposed riot" which consisted, in part, of erecting "a liberty pole" to protest in favor of the rebellion. Eugene Volokh, *Symbolic Expression and the Original Meaning of the First Amendment*, 97 Geo. L.J. 1057, 1072 (2009). The Pennsylvania Supreme Court's short opinion defined the riot as "[t]he setting up of a pole [in support of rebellion], *in a tumultuous manner*, with arms." *Respublica v. Montgomery*, 1 Yeates 419, 422 (Pa. 1795) (emphasis added). Describing the proper role of the justice of the peace, the Court affirmed that not all armed assemblies were riotous. *Id.* (citing 1 Hawkins, *supra*, at 160).

New Jersey's post-Reconstruction sources have no basis in Founding-era law and reject the complementarity of the First and Second Amendments. Those sources fail to satisfy the State's burden.

B.    Public Parks, Beaches, Recreation Facilities, Playgrounds, Zoos and Youth Sports Events

Sections 2C:58-4.6(a)(9)–(11) of Chapter 131 ban firearms at zoos, public parks, beaches, playgrounds, youth sport events, and other recreation facilities or areas.[93] New Jersey and the majority group these places together because they are ostensibly united as "locations of recreation and amusement." Maj. Op. 101.

Neither New Jersey nor the majority attempt to show how Chapter 131's no-carry zones are "new" and "analogous" versions of *Bruen*'s specified places, 597 U.S. at 30, or that they share a common principle underpinning a regulatory tradition in those places. *Rahimi*, 602 U.S. at 692. Instead, the majority forges a new analytical path: it asserts that public parks evolved during the Victorian and Reconstruction eras so they present novel concerns and needn't be analogized to *any* sensitive place discussed in *Heller* or *Bruen*. Maj. Op. 95–98. That analogue-free methodology has no basis in *Heller*, *Bruen*, or *Rahimi*.

The majority characterizes its approach as "flexible." *E.g.*, *id.* at 97 (citing *Antonyuk v. James*, 120 F.4th 941, 1022 n.86 (2d Cir. 2024)), 73. This "flexible approach" has no provenance in *Bruen* or *Rahimi*, and it's anyone's guess how different judges would apply such a vague standard. *See Duncan v. Bonta*, 133 F.4th 852, 919–20 (9th Cir. 2025) (VanDyke, J., dissenting) ("flexible approach" means "the government need only show the sloppiest of a fit between the historical example and the modern regulation"). For the majority, it appears to

---

[93] Plaintiffs do not challenge section (a)(9)'s ban on guns at nursery schools, pre-schools, and summer camps.

mean the level of generality for principles and analogues is higher and the government's burden is lower.

The Supreme Court has said that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 597 U.S. at 27. But "nuanced" and "flexible" are different concepts. "Nuance" is a "slight or delicate variation" of meaning. Webster's New World Dictionary 975 (2d coll. ed. 1986). "Flexible" means "easily bent," "pliant," and "capable of modification." *Id*. at 533. As I read the Court's Second Amendment jurisprudence, the majority's "flexible" approach toward history, regulatory analogues, and the principles underlying our regulatory tradition is insufficiently nuanced and much too pliant.

In any event, the factual premise triggering the majority's flexible approach is incorrect. Public parks did not unleash unprecedented societal concerns or involve dramatic technological changes. As the District Court noted, "village greens, commons, gardens, and squares were the colonial fore-runners to today's public park," and were "set aside for common use, recreation, or public gatherings." 673 F. Supp. 3d at 640. Bostonians used the city's Common for athletic recreation. *Wolford v. Lopez*, 125 F.4th 1230, 1242 (9th Cir. 2025) (VanDyke, J., dissenting from denial of rehearing en banc). New York's pre-Revolution Bowling Green had an express recreational purpose, and many cities up and down the Atlantic coast were home to recreational parks by 1800. *Id.*

The commons' public-gathering aspects were important. In 1768, Londoners gathered at St. George's Field to demand the release of the dissident politician John Wilkes. Andrew Roberts, The Last King of America: The

Misunderstood Reign of George III 184–85 (2021). After Redcoats fired upon the crowd, citizens gathered in London's St. James' Park, where they contemplated tearing down Buckingham Palace in retaliation. *Id.* The same week as the St. George's Field Massacre, Rhode Islanders dedicated a Liberty Tree and gave speeches criticizing Britain's tight grip on the colony. *Id.* at 185–86. Liberty Trees sprouted from South Carolina to Boston Common,[94] generally "in public places that provided opportunities for speechifying." Roberts, *supra*, at 186. Considering the bond between the right to assemble and the right peaceably to bear arms, it is hard to imagine why the Second Amendment right would not extend to the most traditional places of public assembly, such as parks and greens.

Focusing narrowly on guns within parks, the outcome is the same. Boston Common was also used for militia training. *Koons*, 673 F. Supp. 3d at 640. During the years preceding the Revolution, "[t]he residents of [Boston] would become used to seeing troops encamped on the Common." Todd W. Braisted, The British Army in Boston, Am. Battlefield Trust (n.d.).[95] Redcoat training, unsurprisingly, included firing guns for target practice. David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 532 (2019). And when Minutemen gathered to resist British soldiers, they mustered upon Lexington Green and fought there. David Hackett Fischer, Paul Revere's Ride 188 (1994). Colonials, then, would not have thought of parks and commons

---

[94] Erick Trickey, *The Story Behind a Forgotten Symbol of the American Revolution: The Liberty Tree,* Smithsonian Mag. (May 19, 2016), available at https://perma.cc/X4C2-CWAG.

[95] Available at https://perma.cc/49PQ-WXYH.

as natural gun-free zones but places where arms-bearing could be expected.

Pursuing novelty, the majority attempts to distinguish between early parks and commons and the alleged evolution of those spaces into a new place where people could find "reprieve from industrialization and foster democratic solidarity across social classes." Maj. Op. 96. The point of this alleged distinction, of course, is to invoke the "flexible approach" allowing looser scrutiny of modern firearms regulation. *Id.* at 98. But considering the majority's disdain for "matching," *id.* at 91, it is curiously fastidious about distinguishing 18th century parks from 19th century parks. *Id.* at 95–98. For the majority, long-extant parks, greens, and commons became "novel" locations because specific usages changed from one generation to the next. Whereas older forms of recreation were allegedly "aristocratic," newer forms fostered "democratic solidarity across social classes" in a more urban population, so they are not historical twins. *Id.* at 95–98.

Respectfully, that explanation is unpersuasive. In principle, there is no difference between Colonial-era park-goers fishing, watching cockfighting, or playing whist; Victorian-era park-goers playing tennis, riding horse-drawn carriages, or doing whatever one does to foster solidarity across social classes; and modern park-goers playing pickleball, hiking, or riding hoverboards. Each is engaged in a type of recreation or leisure in a public location that sometimes doubles as a place of public assembly. The majority's analysis suffers from its refusal to consider places (and the human activity within those places) at the same level of generality that it uses to evaluate historical firearm regulations in those places.

New Jersey offers a series of possession bans that long postdate the Founding. The best Founding-era evidence it can muster consists of laws that banned firing guns in town or, in New York City, firing guns in "any orchard, garden or other inclosure, or in any place where persons frequent to walk." *Koons*, 673 F. Supp. 3d at 641 (quoting Ordinances of the City of New York § 6 (1763)). But just as surety laws are not analogous to may-issue licensing regimes, *Rahimi*, 602 U.S. at 698, reckless-discharge laws are not analogous to place-based regimes.

The majority cites a host of mostly post-Reconstruction laws and early-20th century laws banning the possession of firearms in parks. Maj. Op. 57 & n.74, 101–04 & n.129. It offers a new and imaginative argument: "the constitutionality of those laws was not in dispute," so they are permissible analogues. *Id.* at 100 (quoting *Wolford v. Lopez*, 116 F.4th 959, 983 (9th Cir. 2024)). That might make sense if the burden is on the *citizen* to justify his right to keep and bear arms, because arguably the laws were presumptively lawful. But *Bruen* places the burden on New Jersey. If the constitutionality of these Gilded Age laws was not disputed, it *might* suggest they were constitutional, but it does not prove that they were.

Moreover, the "why" of these ordinances reflects the social rigor of the era, not particular sensitivity to firearms. New York also banned playing on the park wall and talking to park workers. *Fourth Annual Report of the Board of Commissioners of the Central Park* 106 (1861). Chicago banned swimming and fishing, posting advertisements, and playing music. Mun. Code Chi. 391 (1881). Two cities banned all athletic games, such as baseball and croquet, without government permission. Hyde Park Vill., Ill. Laws & Ordinances 310 (1876); 1891 Williamsport, Pa. Laws and Ordinances 141.

And Peoria banned fortune-telling. Peoria, Ill., Laws and Ordinances 667 (1892). Those relatively picayune regulations posed no constitutional problem because, unlike a public-carry ban, they did not implicate a fundamental right. But they had no more connection to Founding-era regulations than did firearm prohibitions in the same ordinances.

The majority's discussion of beaches fares no better, starting with its implausible assertion that recreational beaches were alien to Americans before the mid-to-late 19th century. Maj. Op. 97. Having made that assertion, the majority quickly reaches for the same "flexible" approach that it applies to parks. *Id.* at 97–98. But the majority is mistaken. As common sense suggests, colonial Americans enjoyed recreational beaches before the Founding. Cape May, New Jersey was a resort town by 1766, primarily for visitors from Philadelphia. *See History of Cape May*, Official Website for the City of Cape May NJ.[96] Long Branch, New Jersey was developed as a summer coastal resort in the 1780s. *See* Long Branch, New Jersey, Encyclopaedia Britannica.[97] "The littoral and the strand of the Southampton and Brookhaven proprietary lands have been used for centuries for recreation, including bathing, boating and fishing." *Knapp v. Fasbender*, 1 N.Y.2d 212, 224 (1956). Texans used Galveston Island's sandy shore for "fishing, swimming, and camping" in the early 19th century. *Seaway Co. v. Att'y Gen.*, 375 S.W.2d 923, 927 (Tex. Civ. App. 1964).

Even if beaches were somehow unfamiliar to early Americans, the majority and New Jersey still do not explain

---

[96] Available at https://perma.cc/X4EY-AF38.

[97] Available at https://perma.cc/M9AN-TMWM.

how Chapter 131's regulations for this "new" place are analogous to firearms regulations governing *Bruen*'s presumed "sensitive places." 597 U.S. at 30. New Jersey cites park codes from San Francisco and Michigan in the 1880s and 1890s, and the majority adds a 1906 Chicago code, each of which bans guns on the beach. Maj. Op. 100 n.123. But even if three municipal codes could produce a national tradition, this evidence is much too late to elucidate the constitutional right.

That leaves zoos, playgrounds, youth sporting events, and other undefined recreational facilities. New Jersey offers nothing to justify these "sensitive places" other than a blanket principle that guns should be prohibited "where children . . . congregate." Appellant's Br. at 21.[98] New Jersey and the majority extrapolate this principle from private and public-school regulations adopted by jurisdictions acting *in loco parentis*. These codes of conduct prohibited students from carrying guns; the majority identifies no such regulation affecting staff, teachers, or anyone other than students. That is consistent with our observation that "at the time of the Founding—and, indeed, for most of the Nation's history—those who were under the age of 21 were considered infants or minors in the eyes of the law, meaning they had few independent legal rights." *Lara II*, 125 F.4th at 436 (cleaned up).[99]

---

[98] The majority suggests a similar but even broader and vaguer principle: guns can be banned in "places . . . where vulnerable populations congregate." Maj. Op. 126.

[99] *Lara II* determined that Americans between the ages of eighteen and twenty are part of "the people" in the Second Amendment. 125 F.4th at 438. It did not decide whether *in loco*

The majority finally invokes *Antonyuk*, which claimed to have discovered "historical support" for the children-congregation principle. Maj. Op. 107. *Antonyuk*'s only citations, however, are to Reconstruction-era statutes without similar antebellum precedent. 120 F.4th at 1011 n.70. *Antonyuk* claims New York cited "18th[] . . . century laws prohibiting guns in schools," but does not provide a record citation. *Id.* at 1011 n.69. New York's brief in that case merely points back to *Heller*'s assumption that these bans were lawful. Appellant's Br., 2023 WL 387184, at 5, 13, 30, 34 (Jan. 18, 2023). New Jersey offers no support for a principle that adults can be disarmed because they are in a place where children congregate. (Thus leaving the children defenseless against armed attack.) In my view, plaintiffs are likely to prevail in their claim as applied to zoos, playgrounds, youth sporting events, and other recreational facilities.

C.    Libraries and Museums

Section 2C:58-4.6(a)(12) bans firearms at "a publicly owned or leased library or museum." Yet again, the majority applies its flexible approach by claiming libraries and museums are modern innovations. Maj. Op. 104–06. That is inconsistent with the majority's own discussion: it acknowledges the first museum in America began in 1773 and a second operated for several years in the Founding era. *Id.* at 105. Harvard and Yale boasted impressive libraries from the 1600s onward. *See*

---

*parentis* restrictions could be constitutionally applied to adult students today.

*id.* at 106 n.133. And the nine colonial colleges[100] no doubt were centers of learning and culture for their communities. There is no persuasive reason, then, to treat libraries and museums as latter-day inventions.

The majority again recites general education and entertainment principles, but without any new evidence New Jersey fails to meet its burden. The majority tries to bolster the library regulation by pointing to the many "libraries . . . housed in schools and courthouses." *Id.* at 107. But that argument is self-defeating. If libraries are special places, then one would expect to find arms bans at libraries or museums independent of schools or courthouses. There is nothing distinctive about libraries and museums in our regulatory tradition that could deprive New Jerseyans of their right to bear arms for self-defense in those places.

D.    Bars, Restaurants, and Places Where Alcohol is Consumed On the Premises

Section 2C:58-4.6(a)(15) bans arms at "bar[s] or restaurant[s] where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises." As the Siegel plaintiffs correctly observe, "'[c]onsuming alcohol was one of the most widespread practices in the American colonies,' and '[t]averns served as the most common drinking and gathering place for colonists.'" Br. for Siegel Appellees at 51 (quoting *Baylen J. Linnekin, "Tavern Talk" and the Origins of the Assembly Clause: Tracing the First Amendment's Assembly*

---

[100] Harvard, Yale, William & Mary, Princeton, Columbia, Brown, Rutgers, Dartmouth, and the University of Pennsylvania.

*Clause Back to Its Roots in Colonial Taverns*, 39 Hastings Const. L.Q. 593, 595 (2012)).

Colonial and Founding-era laws linking arms with drinking regulated "the misuse of weapons while intoxicated," not the basic right to carry. *See Connelly*, 117 F.4th at 280. For example, Virginia's colonial ban on firing guns "at drinking" concerned reckless discharge. *Id*. (Virginia's law did not ban carrying firearms but "prevented colonists from misusing the guns they did have while they were drinking"). New York banned "firing guns during New Year's celebrations" on account of drunken vandalism. *Id.* In the same period, Delaware prohibited taverns at or near the site of militia muster. Maj. Op. 110 (citing 1756 Del. Acts 175). Finally, New Jersey and Pennsylvania "'disarm[ed soldiers] if they appeared for militia service 'disguised in Liquor.'" *Connelly*, 117 F.4th at 280–81 (quoting 1746 N.J. Acts ch. 200 § 3).

Only one of these States, Pennsylvania, had a constitutional right to keep and bear arms. Volokh, *State Constitutional Rights*, *supra*, at 204–05. The other States are less relevant as they weren't subject to the Second Amendment and there was virtually no "general law" of firearms regulation at the Founding.[101] But even assuming those States' shooting laws

---

[101] *See* William Baude & Robert Leider, *The General-Law Right to Bear Arms*, 99 Notre Dame L. Rev. 1467, 1496–97 (2024) ("The possession and carrying of arms were lightly regulated in early America. The law mainly regulated arms when they were kept and borne in ways that threatened the rights of others, such as by imposing storage requirements on large quantities of gun powder (which was a fire and explosion risk in cities) and by restricting the carrying of arms when done in a manner that would likely breach the peace."). Baude and

are meaningful, they lack a relevant "why." The Virginia and New York bans targeted reckless discharge, not possession or carrying for self-defense. The other laws "applied only to militia members; none of them spoke to a militia member's ability to carry outside of military service. Then, as today, restrictions on the liberties of service members tell us little about the limits acceptable for citizens at large." *Connelly*, 117 F.4th at 281.

The majority's post-Reconstruction evidence consists of laws specifically directed at intoxicated individuals and penalizing the discharge of firearms at saloons. Maj. Op. 111–12. By contrast, New Jersey's law applies to everyone, including teetotalers and unintoxicated patrons, at bars, grills, restaurants, and any place where alcohol is sold. The underlying Second Amendment principle cannot simply be "No guns wherever alcohol is present." Such a principle is so broad, undiscriminating, and unlimited that it extinguishes the right.

The majority's late-19th century evidence banning arms-possession at places serving alcohol mostly come from the sparsely populated territories of Arizona, Nevada, New Mexico, and Oklahoma, and the City of New Orleans—hardly a representative sample of the American public. [102] *Id.* at 111 n.138, 112 n.140. While not entirely irrelevant, those several

---

Leider accurately describe Chapter 131 and similarly expansive sensitive-place laws as an attempt by states "to nullify or mitigate *Bruen*'s practical effect[.]" *Id.* at 1506.

[102] The Nevada Territory and Wisconsin banned *firing* weapons in saloons, rather than disarming patrons, whether drunk or sober. 1881 Nev. Stat. 19–20; 1883 Wis. Sess. Laws 841. That is not relevantly similar to New Jersey's gun-free-zone law.

jurisdictions cannot demonstrate a national tradition or establish a national principle concerning the right to bear arms.

E.    Entertainment Facilities

Section 2C:58-4.6(a)(17) prohibits arms in any "privately or publicly owned and operated entertainment facility." To justify this provision, the majority suggests the Founders could not "imagine" venues accommodating large numbers of people, like MetLife Stadium in East Rutherford. Maj. Op. 114 (citing *Bruen*, 597 U.S. at 114 (Breyer, J., dissenting) and quoting N.J. Att'y Gen. Opening Br. at 18). Because the Founding generation was allegedly unable to fathom large crowds, the majority once again applies its flexible standard. *Id*. But as with the majority's other off-handed assertions about what the Founding generation allegedly could not possibly know or imagine, this one is unfounded.

Surely, the Founding generation was familiar with, or could at least imagine, famous historical venues like the Roman Colosseum (capacity 50,000–80,000), the Circus Maximus (capacity 150,000), and contemporaneous venues like London's Hyde Park (350 acres) or Paris's Place de la Concorde (19 acres). Closer to home, Boston's South Meeting House accommodated about 5,000 and hosted that many on the day of the Boston Tea Party.[103] In 1739, Americans heard reports that George Whitefield had preached to audiences of 20,000, 30,000, 50,000, and 60,000 at Moorfields and

---

[103] National Park Service, Boston Tea Party Timeline, available at https://perma.cc/3CED-DVDT.

Kennington Common in London.[104] When Whitefield toured America in 1740, he preached to crowds of similar size: 3,000[105] in Wilmington, Delaware (population 600),[106] 6,000 at Philadelphia's Christ Church ("nearly half of Philadelphia's urban population"),[107] 8,000 and 15,000 at Philadelphia's Society Hill,[108] and 25,000[109] at Boston Common when that city's population was 17,000.[110] In his autobiography, Benjamin Franklin corroborated reports that Whitefield had preached to a crowd of 25,000, estimating that "he might well be heard by Thirty-Thousand."[111] Even in the American back-country, far from coastal cities, so-called "big meetings" before

---

[104] Frank Lambert, Pedlar in Divinity: George Whitefield and the Transatlantic Revivals, 1737–1770 62, 104 (1994).

[105] *Id*. at 106.

[106] Josephine Eccel, *A Timeline of Wilmington's History*, Delaware Today (April 9, 2013), available at https://perma.cc/M5JF-9FK7.

[107] Harry S. Stout, The Divine Dramatist: George Whitefield and the Rise of Modern Evangelicalism 90 (1991).

[108] Lambert, *supra* note 106, 106.

[109] *Id*. at 63.

[110] Edward L. Glaeser, *Reinventing Boston: 1640–2003*, National Bureau of Economic Research Working Paper 10166 at 12, available at https://perma.cc/UM44-H23J.

[111] Benjamin Franklin, The Autobiography of Benjamin Franklin 179 (Leonard W. Labaree et al. eds.1964).

and after the Revolution regularly drew audiences in the several-thousands.[112]

In the early 19th century, a different kind of spectacle drew similar numbers of Americans: the public execution. In the 1820s and 1830s, some executions drew crowds "of 30,000 [to] 50,000 spectators." Annulla Linders, *The Execution Spectacle and State Legitimacy: The Changing Nature of the American Execution Audience, 1833–1937*, 36 Law & Soc'y Rev. 607, 618 (2002).[113] An 1822 execution in Lancaster, Pennsylvania drew 20,000 spectators. *Id.* These were notoriously "rowdy" events: at the Lancaster execution, "at least fifteen people . . . were arrested—one for murder, one for larceny, and the rest for . . . assault, battery, and vagrancy," alongside a rogue's gallery of pickpockets. *Id.* at 618–19.

So while colonial and early Americans had not yet built fancy NFL stadiums, that is both anachronistic and irrelevant: they could "imagine" large crowds and entertainment venues because they knew classical history, consumed international news, and personally attended enormous entertainment spectacles. Those public gatherings—exceeding the size of the biggest colonial cities—were relatively larger than any modern-day crowd at a Jets or Giants game. Particularly in an age pre-

[112] David Hackett Fisher, Albion's Seed 706–07 (1989).

[113] *See also* Michael Madow, *Forbidden Spectacle: Executions, the Public and the Press in Nineteenth Century New York*, 43 Buff. L. Rev. 461, 477 (1995) (describing an 1824 execution in New York City drawing "at least 50,000" spectators, and a smaller execution drawing "four or five thousand spectators" in 1829).

dating modern policing, they presented the same types of concerns and dangers in any large public gathering, which might have justified widespread disarmament. But there is no evidence of disarmament in such places. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26.

Lacking Founding-era or immediate post-ratification evidence, the majority again resorts to the revised Northampton statutes, plus New Orleans' 1800s ballroom arms ban and New Mexico's territorial equivalent, Maj. Op. 111 n.138, 114–15 n.143. As I have explained, the Northampton statutes "ha[ve] little bearing" here, *Bruen*, 597 U.S. at 41, and one city and territory combined fall short of a national regulatory tradition.

F.    Casinos and Adjacent Properties

Section 2C:58-4.6(a)(18) bans arms at "casino[s] and related facilities, including but not limited to appurtenant hotels, retail premises, restaurant and bar facilities, and entertainment and recreational venues located within the casino property." New Jersey and the majority again rely on the revised Northampton statues, and Reconstruction-era ballroom ordinances in New Orleans and a few southern states. As discussed above that evidence is insufficient and it does not improve with repetition.

As the District Court found, colonial Americans engaged in gambling and betting. When Louisiana became a

U.S. territory, casinos proliferated in New Orleans.[114] But New Jersey and the majority have adduced no regulations from New Orleans or elsewhere designating places where gambling occurs as a "sensitive place" where firearms were prohibited.

Contrary to the Louisiana experience, the majority claims casinos are new and therefore subject to its flexible approach because many States outlawed gambling. Maj. Op. 117–18. If anything, that would suggest the States could have prohibited gun use or possession in connection with illegal conduct. There is nothing unusual about subjecting an already unlawful act to additional prohibitions. But New Jersey and the majority have not adduced such laws.

Nor have New Jersey and the majority shown a regulatory tradition prohibiting public carry in hotels, restaurants, and retail establishments. But Chapter 131 annexes those places as additional gun-free zones by their sometime proximity to casinos. That metastasis of an alleged sensitive place by mere proximity to another, different place lacks historical precedent. It also expands the Supreme Court's statements about longstanding prohibitions on carrying "in"— not "near" or "around"—sensitive places. *Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786; *Bruen*, 597 U.S. at 30.

G.     Health Care Facilities

Section 2C:58-4.6(a)(21) bans firearms in any "health care facility." That prohibition includes hospitals, nursing homes, rehabilitation centers, maternity wards, marijuana dis-

---

[114] *See* Jay Precht, *Legalized Gambling*, 64 Parishes (Nov. 15, 2011), available at https://perma.cc/WA5Q-JB57.

pensaries, home health care agency offices, and any other "medical office." Our review is determined by the posture of this case: The District Court preliminarily enjoined the law but only as to medical offices and ambulatory care facilities, finding the plaintiffs lacked standing to challenge the rest. *Koons*, 673 F. Supp. 3d at 596. The Siegel plaintiffs ask us to "expand . . . relief to *all* such facilities" under subsections (a)(21) and (a)(22). Principal Br. for Siegel Plaintiffs-Appellees/Cross-Appellants at 58 n.14. But since they do not contest the District Court's finding on standing, their argument is forfeited. *See* Fed. R. App. P. 28(8)(A).

The majority, however, prematurely addresses the constitutionality of the whole provision. It acknowledges that hospitals existed at the Founding but disregards the obvious analogy because they were smaller and less sophisticated than modern hospitals—i.e., not a dead ringer. But there were sick people then as there are now, and some were treated in a common medical facility then, as now. *See* Maj. Op. 121–22 (identifying institutions in New York City, Philadelphia, and Boston). One might reasonably expect laws disarming people in those similar facilities if that were part of the regulatory tradition. New Jersey offers none.

The majority attempts to overcome New Jersey's silence by pointing to the custom of American military hospitals to disarm, undress, and receive the possessions of ailing soldiers. *Id.* at 123–24. The earliest instance of this custom was given the force of law by the Continental Congress. Law of Feb. 6, 1778, *reprinted in* Mary C. Gillett, *The Army Medical Department, 1775–1818*, at 205 (2004). There are several problems with relying on this code to determine the scope of the Second Amendment right. On its own terms, it reveals that soldiers often did not *own* these arms, and that they were mili-

tary property, *see id.* (returning arms to stockpile upon soldier's death); it applied *only* to the patient-soldiers, but not to visitors; soldiers were rearmed after recovery, with the implication that arms were kept in or near the field hospital; and the law was not a prohibition as such, but a description of the hospital director's tasks. Last, and at best, these were "restrictions on the liberties of service members" who had answered the call to serve their Nation. *Connelly*, 117 F.4th at 281. That is far from analogous to prohibitions burdening the conduct of everyday citizens not at war. The problems raised by the majority's independently researched analogue (and indeed, its whole theory of military field hospitals as analogues), which is presented for the first time years after oral argument and without any contribution from the parties, highlight the dangers of ignoring the party-presentation principle. *See supra* note 10.

The majority cannot connect this section of Chapter 131 to a longstanding tradition of firearms regulation. New Jersey's and the majority's lack of relevant evidence is fatal to State's defense of the medical-office and ambulatory-care-center provisions.

H.    Public Filming Locations

Section 2C:58-4.6(a)(23) bans guns at any "public location being used for making motion picture or television images for theatrical, commercial or educational purposes, during the time such location is being used for that purpose." The majority says the plaintiffs lack standing because New Jersey promises that the "ban . . . applies not to public locations where bystanders may observe the filming process, but rather to the sets themselves, which a local government must have designated as temporarily private and which are not generally open to the public." Maj. Op. 126.

But standing analysis does not turn on what the government promises. Standing requirements are "an indispensable part of the plaintiff's case," such that "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "Where, as here, the plaintiff seeks prospective relief to address future harm, she must show that 'the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Reading v. N. Hanover Twp.*, 124 F.4th 189, 196 (3d Cir. 2024) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). To prevail, plaintiffs (1) must establish "an intention to engage in a course of conduct arguably affected with a constitutional interest"; (2) that "the intended conduct must be arguably . . . proscribed by [the] statute that the plaintiff seeks to challenge"; and (3) "the plaintiff must face a substantial threat of future enforcement." *N.J. Bankers Ass'n v. Att'y Gen. N.J.*, 49 F.4th 849, 855 (3d Cir. 2022) (internal quotation marks omitted) (alterations in original).

As to step one, the majority agrees plaintiffs' conduct is covered by the Second Amendment's text. Maj. Op. 126. Step two "is not a stringent test"—if the statute "appear[s] broad enough to cover the intended conduct," the conduct is arguably proscribed. *N.J. Bankers Ass'n*, at 49 F.4th 855 (citing *Susan B. Anthony List*, 573 U.S. at 162). New Jersey claims public locations means only public film sets which are temporarily private. Response/Reply Br. of Defendants-Appellants at 31. The majority joins in, calling the provision a restriction on "public film and television sets" even though the term 'set'

appears nowhere in the text of the provision. Maj. Op. 126, 139.

New Jersey's reading ignores the plain text. If the law regulates only permitted movie sets closed off from the public, then why regulate all public locations used for filming? As written, the law appears to go beyond movie sets. Anyone walking on a public sidewalk or boardwalk with her cell phone can make a "motion picture" for commercial or educational purposes, which the statute encompasses.

That leaves one last factor—the threat of future enforcement. This presents a difficult question: because New Jersey's law is of recent vintage, this case is unlike *Susan B. Anthony List*, where "a history of past enforcement" established that "the threat of future enforcement . . . is substantial." 573 U.S. at 164. Plaintiffs do not claim past enforcement against them or others, but that does not suggest whether the law is likely or unlikely to be enforced against their planned conduct (i.e., public carry in public areas during filming).

Mootness doctrine is relevant here because New Jersey asserts, in effect, that it will not prosecute plaintiffs for public carry in a public location where filming is underway even though the text could cover that conduct. When the issue is allegedly moot, "[t]he voluntary cessation of challenged conduct" is normally insufficient "because a dismissal . . . would permit a resumption of the challenged conduct as soon as the case is dismissed." *Knox v. SEIU, Loc. 1000*, 567 U.S. 298, 307 (2012). Indeed, voluntary cessation "will moot a case only if it is '*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 306 (3d Cir. 2020) (quoting *Fields*

*v. Speaker of the Pa. House of Representatives*, 936 F.3d 142, 161 (3d Cir. 2019)) (emphasis added).

In *Knox*, the Supreme Court disagreed that a union policy was moot just because the union "refund[ed]" the challenged fees. 567 U.S. at 307. In an earlier case, the Court declined to dismiss an appeal of a city ordinance where the city "repeal[ed] . . . the objectionable language," because it "would not preclude [the city] from reenacting precisely the same provision." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). More recently, the Court dismissed a Second Amendment suit for injunctive relief where the City of New York repealed the challenged regulation and the State of New York amended state law to permit the conduct outlawed by the original legislation. *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 590 U.S. 336, 338–39 (2020).

New Jersey has not amended or repealed the challenged provision, and its Attorney General has not ordered state prosecutors to stand down. All we have is a recently enacted statute permitting New Jersey to act and an unenforceable promise that it will not. Without more, New Jersey's conduct is too close to a "refusal to disavow the possibility of future enforcement" to conclude there is no substantial threat of future enforcement. *Reading*, 124 F.4th at 197 (citing *Susan B. Anthony List*, 573 U.S. at 165) (emphasis deleted). In my view, plaintiffs have established a substantial threat of future enforcement, and thus have standing.

New Jersey lumps together its arguments for public filming locations with "entertainment facilities, casinos . . . and bars and restaurants serving alcohol." Appellant's Br. at 18. Because the State fails to justify its analogues for entertainment

facilities, casinos, and venues serving alcohol, its attempt to extend those analogues to public filming locations fails, too.

I.      Vehicles and Public Transportation

Chapter 131 prohibits any "person . . . who is otherwise authorized under the law to carry or transport a firearm" from doing so "while in a vehicle in New Jersey, unless the handgun is unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle." N.J. Stat. Ann. § 2C:58-4.6(b)(1). I agree with the majority that New Jersey fails to establish a tradition of disarming travelers in private vehicles, Maj. Op. 127–32, but offer some clarifications.

First, the majority's concession is practically illusory. In its view, once the driver arrives at a destination that people ordinarily visit for business or pleasure, his right to carry for self-defense evaporates and he must leave the weapon in his car. As a result, the right to keep and bear arms outside the home for most people in New Jersey is about as broad as the average road.

Second, New Jersey tries to justify this prohibition with one law from East New Jersey in 1686 and one from Texas in 1871. *Id.* at 127–28. Two disparate examples is not sufficient. *Bruen*, 597 U.S. at 65. Texas' then-existing view of the right makes its 1871 law a poor source in any case. *See supra* pp. 14–20. And New Jersey's law was not even about armed travel per se. Its first clause was a concealed-carry ban, rather than a ban on bearing weapons in public, and the second clause, which prohibited "go[ing] armed," was a ban on armor rather than weapons. *See supra* pp. 29–32.

I disagree with the majority's analysis of public transportation. It begins by claiming public transport is relatively new as a concept in our historic tradition. True, the "first steam-operated railway in the United States to be chartered as a common carrier of freight and passengers" only commenced in 1830.[115] But Americans routinely traveled by sea. *See* Joshua Hochman, The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation, 133 Yale L.J. 1676, 1685 (2024). While the coastal boats and ferryboats of the early 19th century differed from Amtrak's Acela Corridor in speed, capacity, and technological advancement, they share three crucial features: they were (1) vehicles (2) transporting passengers in compact quarters (3) on a regular basis. So if a regulatory tradition existed, one would find it applied to boats, as well as stagecoaches and early American railroads.

The majority points to some post-Reconstruction, private railroad regulations as evidence that public transportation can be regulated in the same manner. Maj. Op. 130 n.178. That fails because corporate rules were neither subject to constitutional constraints nor analogous to public regulations promulgated by state actors. *See The Civil Rights Cases*, 109 U.S. 3, 11–13 (1883) (articulating state action doctrine). Legislatures were sometimes empowered "to make all proper rules and regulations for the general conduct of the affairs of the company, relating to the running of the trains, the keeping of ticket offices open, and providing for the proper accommodation of the public," *Lake Shore & M.S. Ry. Co. v. Smith*, 173 U.S. 684, 693 (1899), but the majority does not adduce such regulations pro-

---

[115] *See* Encyclopaedia Britannica, https://perma.cc/P6QW-G9MJ.

hibiting firearms. In any event, there is no evidence connecting the majority's post-Reconstruction evidence to Founding-era regulations or principles.

The majority cites a series of mostly post-Reconstruction laws "proscribing firing, brandishing, or recklessly handling guns on or near trains." Maj. Op. 130 & n.179. Lacking historical antecedents for any form of transportation, these laws are too late to establish a longstanding regulatory tradition. And as the text of the laws makes obvious, they simply prohibited shooting at, from, or on trains, so they didn't infringe the Second Amendment right to carry for self-defense.[116]

### J.    Fish and Game Regulations

The Siegel plaintiffs challenge non-Chapter 131 firearms regulations from New Jersey's Hunting and Fishing Regulations. I agree that the State's legislative amendment excluding handguns from the scope of the statutory restriction renders this claim moot. Maj. Op. 134–35.

### VII

---

[116] Georgia, Indiana, Iowa, Texas, and Nevada banned firing guns at trains. 1895 Ga. Laws 147; 1855 Ind. Acts 153; 1876 Iowa Acts 142; 1889 Tex. Gen. Laws 36; 1891 Nev. Stat. 78. The Wyoming Territory forbade firing "*from* . . . any railroad car or train." 1879 Wyo. Terr. Sess. Laws 97 (emphasis added). Alabama and Florida forbade firing or recklessly handling firearms while aboard. 1899 Ala. Acts 154; 1899 Fla. Laws 93.

Likelihood of success on the merits and irreparable harm are the most important injunctive-relief factors. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). Especially in cases like this involving a challenge to a newly enacted law, that often collapses to likelihood of success on the merits. *See Labrador v. Poe*, 144 S. Ct. 921, 929 (2024) (Kavanaugh, J., concurring). If those gateway factors are met, we may also consider whether granting preliminary relief would result in even greater harm to the nonmovant (here, New Jersey), and whether it would serve the public interest. *Reilly*, 858 F.3d at 179.

The majority and I disagree about the parties' relative likelihood of success on the merits, so I will briefly discuss the remaining preliminary-injunction factors.

A.      Irreparable Harm to Plaintiffs

The majority concludes there is no irreparable harm to Plaintiffs, since "most of [the challenged] restrictions neither take away Plaintiffs' guns, nor impose[] restrictions that make it overly difficult for Plaintiffs to obtain guns." Maj. Op. 136. That is too facile. Plaintiffs' lawsuit is not about simply obtaining or possessing guns. It is about publicly carrying them for self-defense outside the home—the central component of the Second Amendment right. *Bruen*, 597 U.S. at 10, 29. By erecting a triple barrier to public carry and then prohibiting it altogether in most places where people ordinarily congregate, New Jersey's regime extinguishes the right's central component. That is not a bug, it is the feature of Chapter 131. When the Supreme Court issued *Bruen*, New Jersey's governor pro-

93

nounced it "awful" and "deeply flawed,"[117] and promised to deliver new legislation "maintain[ing] New Jersey's status as a model for gun safety by strengthening restrictions for who is eligible for a public carry permit, and establishing a list of places where people with carry permits cannot bring their firearms."[118] Chapter 131 is New Jersey's considered response to *Bruen*.

Although Second Amendment and other constitutional harms can be irreparable, *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 205 (3d Cir. 2025), "we do not presume constitutional harms irreparable" except in First Amendment disputes. *Id*. at 203. In that case, we affirmed the district court's refusal to preliminarily enjoin a firearms regulation even if the plaintiffs had a likelihood of success, because they had not shown irreparable harm. *Id.* at 204–05. That decision rested on two independent grounds. First, plaintiffs failed to show irreparable harm because they did "not even allege that Delaware ha[d] tried to enforce the disputed laws against them," so "the status quo shows no signs of changing." *Id*. at 205 (quoting *Warner Bros. Pictures v. Gittone*, 110 F.2d 292, 293 (3d Cir. 1940) (per curiam)). Second, "[t]he challengers [showed] no harms beyond ones that can be cured after final judgment." *Id*.

---

[117]  *See* Executive Order No. 299, available at https://perma.cc/6B5B-ACCP.

[118]  *See* "Governor Murphy Signs Gun Safety Bill Strengthening Concealed Carry laws in New Jersey in Response to Bruen Decision," available at https://perma.cc/RZH8-Q8YU.

This case is different because Plaintiffs are already experiencing harm. Siegel, a former Emergency Medical Technician and current New Jersey Medical Reserve Corps volunteer, J.A. 311, often carried his handgun, lawfully, for self-defense in his medical work. Now he doesn't carry out of fear of arrest and prosecution. J.A. 312. Like most people, Siegel frequents strip malls, museums, zoos, libraries, public parks, movie theaters, concerts, sporting events, and restaurants where alcohol is served. He rides public transportation. He sometimes visits casinos to gamble and attend shows. He takes continuing education courses, sometimes in hospitals and training centers. In these and other places where Siegel normally goes, he would ordinarily carry a handgun, but now he refrains from doing so out of fear of arrest and prosecution. J.A. 312–14. The same is true of the other plaintiffs, most of whom already have a carry permit from New Jersey allowing them to carry a handgun for self-defense. Now, however, they must refrain from carrying a firearm for self-defense in places designated "sensitive" by Chapter 131 because they fear arrest and prosecution. J.A. 352–90 (Siegel, Cook, DeLuca, Cuozzo, Varga, Stamos, Henry, and Bach Declarations). Chapter 131 changed the status quo by newly[119] restricting their Second Amendment right and making them much less safe than before. Those are not harms that can be cured after final judgment, and

---

[119] Chapter 131's requirements and prohibitions infringed longstanding Second Amendment freedoms that plaintiffs enjoyed and New Jersey always allowed before, arguably tipping the irreparable-harm and status-quo factors in plaintiffs' favor. *See O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1017 (10th Cir. 2004) (McConnell, J., concurring).

plaintiffs do not seek legal damages. Not every disarmament case results in irreparable harm, but where, as here, the government seeks practically to "eviscerate the general right to publicly carry arms for self-defense," the harm is irreparable. *Bruen*, 597 U.S. at 31; *see Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) ("Infringements of [the Second Amendment] right cannot be compensated by damages").

B.    Public Harm and Public Interest

I agree that the public-harm and public-interest factors weigh in favor of affirming the District Court's preliminary injunction as to the provisions banning the carrying of guns in private vehicles, the liability insurance mandate, the permitting fee provisions, and the no-carry default in private spaces. Maj. Op. 104. These factors also favor affirming the rest of the District Court's preliminary-injunction order.

After granting a TRO in part, the District Court "set[] this matter down for a preliminary junction hearing after the parties had engaged in discovery and a more complete record was developed." 673 F. Supp. 3d at 542. The Court then noted that New Jersey, "despite numerous opportunities afforded by this Court to hold evidentiary hearings involving the presentation of evidence . . . called no witnesses." *Id.* It also observed that the State failed to supplement the social-science studies relevant to the public-interest question, and rested instead on only those studies used by the General Assembly to pass Chapter 131 in the first place. *Id.* at 542–43. In addressing the public interest, the District Court gave its full attention to the record. It noted that New Jersey's evidence on gun violence made critical errors and oversights that undermined its credibility, *id.* at 667–68, and that Plaintiffs adduced evidence that "point[ed] the other way, finding that . . . carry permit holders

are not responsible for the increases in violent crimes," *id.* at 669.

The District Court considered the studies, evaluated them on their merits, and found the public interest would not be harmed by preliminarily enjoining Chapter 131. We review preliminary injunction judgments for abuse of discretion. *Smith v. City of Atlantic City*, 138 F.4th 759, 770 (3d Cir. 2025). "[W]e review deferentially" because the grant or "denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing that is the responsibility of the district judge." *Del. State Sportsmen's Ass'n*, 108 F.4th at 198. The District Court did not abuse its discretion.

## VIII

Under the Supreme Court's Second Amendment jurisprudence in *Heller*, *McDonald*, *Bruen*, and *Rahimi*, and our precedents in *Lara II* and *Range II*, Plaintiffs are likely to succeed on the vast majority of their Second Amendment challenges to Chapter 131. The remaining preliminary-injunction factors also favor Plaintiffs and support most of the District Court's thoughtful analysis. Accordingly, I respectfully dissent in part.