**Nos. 23-1900, 23-2043**

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

_____

RONALD KOONS, ET AL.,

*Plaintiffs-Appellees,*

v.

MATTHEW J. PLATKIN, ET AL.,

*Defendants-Appellants,*

_____

AARON SIEGEL, ET AL.,

*Plaintiffs-Appellees,*

v.

MATTHEW J. PLATKIN, ET AL.,

*Defendants-Appellants.*

_____

On Appeal from the United States District Court for the District of New Jersey,
Nos. 1:22-cv-07464, 1:22-cv-07463

_____

### *SIEGEL* PLAINTIFFS-APPELLEES / CROSS-APPELLANTS'
### PETITION FOR REHEARING AND REHEARING EN BANC

_____

DANIEL L. SCHMUTTER
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, NJ 07450

PAUL D. CLEMENT
ERIN E. MURPHY
  *Counsel of Record*
ANDREW LAWRENCE
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Siegel Plaintiffs-Appellees / Cross-Appellants*

October 8, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Association of New Jersey Rifle and Pistol Clubs, Inc. certifies that it does not have a parent corporation and that no publicly held corporation owns ten percent or more of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF CONTENTS ............................................................................................ iii

TABLE OF AUTHORITIES.................................................................................... iv

RULE 35.1 STATEMENT ........................................................................................ 1

INTRODUCTION .................................................................................................... 2

STATEMENT OF THE CASE.................................................................................. 3

REASONS FOR GRANTING REHEARING EN BANC ...................................... 6

I.    The Panel's Decision Blessing New Jersey's Four-Reputable-Persons Provision Cannot Be Reconciled With Supreme Court Precedent.................................................................................................. 6

II.   The Panel's Decision Rubber-Stamping New Jersey's Effort To Deem Nearly Everything A "Sensitive Place" Renders *Bruen* A Dead Letter ...................................................................................... 13

CONCLUSION ........................................................................................................ 18

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

CERTIFICATE OF BAR MEMBERSHIP

IDENTICAL PDF AND HARD COPY CERTIFICATE

VIRUS SCAN CERTIFICATE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen.*,
  No. 24-2450 (3d Cir. filed Aug. 9, 2024) ..........................................12

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)........................................................................13

*Dwyer v. Farrell*,
  475 A.2d 257 (Conn. 1984) ...............................................................11

*Greene v. Att'y Gen.*,
  No. 25-2309 (3d Cir. filed July 11, 2025)..........................................12

*Lara v. Comm'r, Pa. State Police*,
  125 F.4th 428 (3d Cir. 2025)...............................................................17

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  597 U.S. 1 (2022)........................................................... *passim*

*Suarez v. Comm'r Pa. State Police*,
  No. 24-2602 (3d Cir. filed Sept. 10, 2024) .........................................12

*United States v. Rahimi*,
  602 U.S. 680 (2024)............................................................ 1, 7, 8, 9

*Wolford v. Lopez*,
  No. 24-1046 (U.S. cert. granted Oct. 3, 2025) .....................................5

**Statutes**

N.J.S. §2C:58-4(b) ........................................................... *passim*

N.J.S. §2C:58-4(c) ...............................................................4, 5

N.J.S. §2C:58-4.3 ................................................................4, 5

N.J.S. §2C:58-4.6(a) ................................................................4

N.J.S. §2C:58-4.6(b) ................................................................4

iv

**Other Authorities**

N.J. Off. of Governor, *Governor Murphy Signs Executive Order to Combat Gun Violence* (June 24, 2022), https://tinyurl.com/mryjk4m6 ...............3

Petition for Writ of Certiorari,
   *Wolford v. Lopez*, No. 24-1046 (U.S. Apr. 1, 2025)..............................................6

### RULE 35.1 STATEMENT

I express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to decisions of the Supreme Court of the United States, namely *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024), and involves questions of exceptional importance, as it allows states to abridge the fundamental right of the people to bear arms in public for self-defense and other lawful purposes.

<u>s/Erin E. Murphy</u>
Erin E. Murphy

## INTRODUCTION

By the panel's admission, the issues this case presents carry "immense public importance." Op.8. Yet the panel got several of these exceptionally important issues exceptionally wrong. In its landmark decision in *Bruen*, the Supreme Court held that the Second Amendment protects law-abiding citizens' right to carry a handgun in public for self-defense. While *Bruen* noted that states may prohibit carrying firearms in "sensitive places" consistent with historical tradition, it emphasized that "relatively few" such places existed historically and warned against "defin[ing] the category of 'sensitive places' … too broadly," lest that narrow exception "eviscerate the general right to publicly carry arms for self-defense." 597 U.S. at 30-31. Despite those admonitions, the panel here blessed New Jersey's effort to designate as "sensitive places" "nearly everywhere that ordinary human action occurs," in direct conflict with *Bruen*'s holding that states "cannot broadly prohibit a member of the people from publicly carrying commonly used firearms for self-defense." Dissent.4-5, 27 n.33. Adding insult to injury, the panel blessed a provision that withholds the right to bear arms even from citizens who pass a background check unless four "reputable" nonrelatives vouch for their worthiness to the state's satisfaction. The panel opinion transforms a fundamental constitutional right into a mere privilege that states can withhold at will. The full Court should rehear this case en banc.

2

## STATEMENT OF THE CASE

For American citizens, *Bruen* was a triumphant declaration of the Founders' promise of liberty. To New Jersey's government, it was a travesty. Governor Murphy expressed "outrage" that the Court recognized a "general right" for "ordinary citizens" "to carry firearms in public" and condemned *Bruen* as a "dreadful" and "tragic" decision from a "right-wing majority." N.J. Off. of Governor, *Governor Murphy Signs Executive Order to Combat Gun Violence* at 2:49, 3:22-3:54, 4:31-4:33 (June 24, 2022), https://tinyurl.com/mryjk4m6. He promised that New Jersey would "continue" to take "actions" to restrict exercise of the right *Bruen* vindicated. *Id.* at 5:42-5:48, 9:00-9:21.

The legislature delivered on the Governor's promise by enacting Chapter 131. On the front end, Chapter 131 imposes novel conditions on law-abiding citizens' ability to lawfully bear arms in public, all premised on the assumption that bearing arms for self-defense is a public nuisance rather than a constitutional right. Three are relevant here. First, all Handgun Carry Permit applicants—even those who pass a background check—must disprove a presumption of unsuitability, which they can do only by having at least four "reputable" nonrelatives vouch for them in writing. N.J.S. §2C:58-4(b). Second, carry-permit applicants must pay not only a $150 fee that goes "to defray the costs of … processing the permit to carry handgun applications," but also a $50 tax that goes "into the Victims of Crime Compensation

3

Office account." *Id.* §2C:58-4(c). Third, Chapter 131 prohibits people from carrying a handgun in public unless they have $300,000 in liability insurance "insuring against loss resulting from … [the] use of a firearm." *Id.* §2C:58-4.3.

Even for people who clear those hurdles, their right to carry firearms in public is severely limited. Although *Bruen* emphasized that "sensitive places" should be few and far between, 597 U.S. at 30-31, Chapter 131 declares most of the Garden State a "sensitive place," making it a crime to carry a firearm in 26 categories and 115 subcategories of places that together capture nearly every square inch of public (and much private) space in the state. *See* N.J.S. §2C:58-4.6(a)-(b). Indeed, when asked at argument where citizens may lawfully carry a firearm under Chapter 131, the only place the state could come up with was "the streets." Oral. Arg. 22:13-35.

The *Siegel* Plaintiffs—seven New Jerseyans who wish to carry handguns for self-defense in places where New Jersey has now forbidden it, each of whom is a member of Plaintiff Association of New Jersey Rifle & Pistol Clubs—filed suit the day Chapter 131 was signed into law, challenging its permitting restrictions and several (but by no means all) of its "sensitive place" restrictions.[1] JA.286, 291-92. Another group, the *Koons* Plaintiffs, challenged a similar set of "sensitive place" restrictions. JA.264. After consolidating the two cases, the district court

---

[1] They also challenged "fish- and game-related firearm regulations," but the legislature later amended the law, and the panel held those claims moot. Op.132-35.

preliminarily enjoined all three of the permitting requirements discussed above and some, but not all, of the challenged "sensitive place" restrictions. *See* Op.15.

A divided panel of this Court reversed in part and affirmed in part. Starting with the permitting restrictions, the panel agreed with the district court that the *Siegel* Plaintiffs are likely to succeed in challenging §2C:58-4(c)'s $50 victim-fund tax and §2C:58-4.3's liability-insurance mandate. Op.71-77. But it reversed as to §2C:58-4(b)'s four-reputable-persons requirement. Op.77-82. In the majority's eyes, that provision is of a piece with historical surety regimes and colonial-era laws that punished people for threatening violence or terrorizing the public while armed. The majority also posited that "the *Bruen* Court spoke approvingly of states that grant firearm permits based on a circumscribed range of 'discretionary criteria.'" Op.80.

Turning to Chapter 131's "sensitive place" restrictions, the panel agreed with the district court that New Jersey likely cannot criminalize carrying firearms in private spaces, and thus affirmed the injunction vis-à-vis the prohibitions on transporting loaded firearms in private vehicles, Op.127-29, 135, and on carrying a firearm on "private property, … unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun," Op.85-88.[2] But when it came to *public* property, New Jersey batted 1.000.

---

[2] On October 3, 2025, the Supreme Court granted certiorari in *Wolford v. Lopez*, No. 24-1046 (U.S.), to decide whether "Hawaii may presumptively prohibit the carry of handguns by licensed concealed carry permit holders on private property open to

The panel held that New Jersey could validly deem all of the following "sensitive places" where the people cannot bear arms:  parks, beaches, and recreation facilities; playgrounds; zoos; public libraries and museums; youth sports events; entertainment facilities; public film sets; casinos; locations that serve alcohol; healthcare facilities; public transit; and any other "place where a public gathering … is held for which a government permit is required, during the conduct of such gathering."  Op.10-13.

Judge Porter dissented in relevant part and would have invalidated all the challenged permitting and "sensitive place" restrictions in light of "the *cumulative* burden" they impose "on the right to carry for self-defense."  Dissent.59.

## REASONS FOR GRANTING REHEARING EN BANC

### I.    The Panel's Decision Blessing New Jersey's Four-Reputable-Persons Provision Cannot Be Reconciled With Supreme Court Precedent.

Under *Bruen* and *Rahimi*, it is not enough that a modern law serves a similar end as historical restrictions at an exceedingly high level (e.g., to protect public safety).  The Supreme Court has been explicit about this:  "Even when a law regulates arms-bearing for a permissible reason, … it may not be compatible with the [Second Amendment] right if it does so to an extent beyond what was done at

---

the public unless the property owner affirmatively gives express permission to the handgun carrier."  Cert. Pet. *i-ii*.  That grant should not affect the disposition of this petition.  Although New Jersey's private-property provision is similar to the one in *Wolford*, the panel (correctly) held that provision likely unconstitutional, so it is not at issue in this petition.  Op.16 n.4, 82-88.  The "sensitive places" provisions that *are* at issue here are not presented in *Wolford*, and neither is any permitting issue.

the founding." *Rahimi*, 602 U.S. at 692.  In other words, *both* why *and* how "are central to th[e] inquiry," and a modern regulation comports with historical tradition only to the extent it "impos[es] similar restrictions" on the arms-bearing right as historical analogues (and does so "for similar reasons").  *Id.*  Despite those clear instructions, the panel majority consistently "sidestep[ped] the fussy work of 'matching' … the how of the regulation's particulars" to the proffered analogues.  Dissent.63.  In doing so, it not only defied the Supreme Court's teachings, but blessed an approach that makes it trivially easy for states to defend restrictions on the right to bear arms—even those that would have been anathema to the Founders.

While this rights-diluting approach to historical tradition infected the majority opinion writ large, it was perhaps most egregious with respect to §2C:58-4(b)'s four-reputable-person provision.  It is unfathomable that a court would uphold a law that prohibited leafletting unless other citizens upvote the would-be-pamphleteer.  Yet, under the panel opinion, New Jersey may withhold the right to bear arms even from citizens who pass a background check (confirming that the state has no reason to think that they could be disqualified from carrying arms) unless four "reputable" nonrelatives are willing to come forward to the state and vouch for their worthiness to carry a handgun.  That aberrant result was the product of an aberrant method that "consistently downplays how historical firearm regulations worked."  Dissent.9.

According to the majority, §2C:58-4(b) "merely continues [a] deeply rooted tradition," expressed in historical surety laws and "going armed" laws, under which "legislatures may impose conditions on the carry of firearms designed to ensure the safe use of those arms." Op.79. That is doubly wrong. Perhaps at some very high level of generality, §2C:58-4(b)'s "why" could be said to be similar to that of surety laws: By "authoriz[ing] magistrates to require individuals suspected of future misbehavior to post a bond" before they could publicly carry arms, surety laws "provided a mechanism for preventing violence before it occurred." *Rahimi*, 602 U.S. at 695-97. Going armed laws likewise sought to prevent violence, by "prohibit[ing] 'riding or going armed, with dangerous or unusual weapons, [to] terrify[ ] the good people of the land.'" *Id.* at 697 (alterations in original). But at that exceedingly high level of generality, the "why" inquiry becomes meaningless; after all, laws outright banning the carrying—or even possession—of handguns are certainly viewed by those who support them as a means of trying to prevent violence.

Moreover, the "why" is only half the inquiry; the "how" also matters—and even more so if the "why" is to be watered down to the point of irrelevance. And neither historical regime burdened the right to bear arms in remotely the same way as §2C:58-4(b). As *Rahimi* explained, "the surety and going armed laws … involved judicial determinations of whether *a particular defendant* likely would threaten or had threatened another with a weapon." *Id.* at 699 (emphasis added). "'[U]nder

surety laws[,] … everyone started out with robust carrying rights' and only those reasonably accused were required to show a special need in order to avoid posting a bond." *Bruen*, 597 U.S. at 57.  The same was true of the "going armed" laws, which did not impose any ex ante restriction on the right to bear arms, but instead *allowed* people to carry as a default, while making it a crime only to publicly carry arms "in a way that spread[] 'fear' or 'terror' among the people."  *Id.* at 50.  Thus, as the Supreme Court explained in *Rahimi* (in a passage the panel majority ignored), "the tradition the surety and going armed laws represent" is one under which "an individual" may be prevented from keeping or bearing arms only if *that particular individual* has been found "to present a threat to others."  602 U.S. at 698.

Section 2C:58-4(b)'s four-reputable-persons provision turns that tradition upside-down.  Whereas the surety and going armed laws allowed individuals to bear arms as the default rule, §2C:58-4(b) prohibits *everyone* from carrying arms unless they can find four "reputable" persons willing to disprove a default presumption that *everyone* is a danger to the public.  Surety laws are therefore "not a proper historical analogue" here for the same reason they were not in *Bruen*:  Like "New York's gun licensing regime," New Jersey's four-reputable-person requirement fails to heed the lesson "that the Second Amendment right may only be burdened once a defendant has been found to pose a credible threat to the physical safety of others."  *Rahimi*, 602 U.S. at 699-700; *see Bruen*, 597 U.S. at 55-59.  In other words, our Nation's

historical tradition tolerates disarming individuals when there is "reasonable cause to fear" that *a particular individual* will cause "an injury, or breach of peace." *Contra* Op.80. It does not tolerate disarming individuals simply because they do not have enough close (and old) friends who not only support their desire to carry a handgun, but also are willing to come forward and tell the state as much in writing, with documentary support for their certification to boot.

The "going armed" laws are even further afield. As explained, those laws did not impose any ex ante restriction on an individual's right to bear arms; they punished people who exercised the right to publicly carry arms "in a way that spread[] 'fear' or 'terror' among the people." *Bruen*, 597 U.S. at 50. To state what should be obvious, allowing everyone to carry arms until they *actually threaten the peace* is different in kind from forbidding everyone from carrying arms unless they muster written attestations from four "reputable" persons that they should be able to carry a firearm. In other words, "how" those "regulations burden a law-abiding citizen's right to armed self-defense," *id.* at 29, could hardly be more different. The former treats the right to bear arms as a right; the latter does not.

The panel nonetheless posited that "*Bruen* confirms" that New Jersey's four-reputable-persons provision is consistent with historical tradition. Op.80. According to the panel, *Bruen* "concluded" that modern "laws with provisions akin to the four-reputable-persons requirement" "pass[] constitutional muster." Op.80.

Nothing could be further from the truth. *Bruen* was emphatic: "[G]ranting licensing officials discretion to deny licenses based on a perceived lack of need *or suitability*" violates the Second Amendment.  597 U.S. at 13 (emphasis added).  To be sure, *Bruen* noted that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a [permit],'" *id.* at 32 n.9 (alteration in original), and separately noted that three of those 43 states' regimes—Connecticut, Delaware, and Rhode Island—"have discretionary criteria," *id.* at 13 n.1.  But far from "approving[] of" laws that condition the right to public carry on individuals' ability to satisfy "discretionary criteria," Op.80, the Court made clear that it approved of those laws only because it did *not* understand them to condition the right to carry on the kind of discretionary criteria New Jersey has embraced.

As the Court explained, "[a]lthough Connecticut officials have discretion to deny a concealed-carry permit to anyone who is not a 'suitable person,' … the 'suitable person' standard precludes permits only to those 'individuals *whose conduct* has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon.'"  597 U.S. at 13 n.1 (emphasis added) (quoting *Dwyer v. Farrell*, 475 A.2d 257, 260 (Conn. 1984)).  Connecticut's law thus appeared to the Court to fit within the historical tradition that the surety and "going armed" laws embody, under which individuals can be disarmed if their past acts

show them to be a danger. *See* pp.8-10, *supra*. As for the First State, "Delaware appears to have no licensing requirement for open carry" *at all*. 597 U.S. at 13 n.1. So while Delaware may "require[] applicants" *for concealed-carry permits* "to submit a certificate signed by *five* local citizens confirming 'that the applicant bears a good reputation for peace and good order in the community,'" Op.80-81, Delawareans retain an unfettered right to carry open in public. *Bruen* thus does not remotely suggest, let alone hold, that conditioning the right to public carry on the attestations of community members complies with the Constitution.

The panel's rights-diluting approach to historical scrutiny will have ramifications far beyond this case, and far beyond challenges to permitting laws. This Court has several Second Amendment challenges coming down the pike, including cases held in abeyance pending the panel's decision. *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen.*, No. 24-2450 (3d Cir.) (scheduled for en banc argument); *Suarez v. Comm'r Pa. State Police*, No. 24-2602 (3d Cir.) (holding consolidated appeals C.A.V. pending the panel opinion); *Greene v. Att'y Gen.*, No. 25-2309 (3d Cir.) (briefing ongoing). All of them will require historical scrutiny. If broadly gesturing at surety and affray laws suffices to justify virtually any law "designed to ensure the safe use of … arms," Op.79, then the *Bruen-Rahimi* framework has little meaning, and the Second Amendment once again becomes a second-class right.

**II.    The Panel's Decision Rubber-Stamping New Jersey's Effort To Deem Nearly Everything A "Sensitive Place" Renders *Bruen* A Dead Letter.**

After noting in dictum in *District of Columbia v. Heller* that state and local governments historically forbade "the carrying of firearms in sensitive places such as schools and government buildings," 554 U.S. 570, 626 (2008), the Supreme Court made clear in *Bruen* what the moniker "sensitive places" itself suggests:  Not every public place can be deemed a gun-free zone consistent with historical tradition. *Bruen* provided just three examples of "'sensitive places' where weapons were altogether prohibited" as a traditional matter—"legislative assemblies, polling places, and courthouses"—all three of which fit *Heller*'s "government buildings" dictum.  597 U.S. at 30.  And it admonished that "expanding the category of 'sensitive places'" to encompass nearly "all places of public congregation … would eviscerate the general right to publicly carry arms for self-defense." *Id.* at 30-31.

Yet that is precisely what the majority allowed New Jersey to do.  Under the panel opinion, "nearly everywhere that ordinary human action occurs" in the Garden State is a "sensitive place" where firearms are verboten.  Dissent.4.  That is not an overstatement.  The panel held in no uncertain terms that—despite *Bruen*'s explicit words of warning about not allowing the sensitive-place exception to swallow the rule—states may designate all of the following types of locations as "sensitive places" where no member of the public may lawfully carry a firearm:

- "specific kinds of venues commensurate with their peculiar needs and functions" (whatever that means), Op.29;

- "specific locations central to the operation of government," Op.66;

- "fora historically designated for important civic purposes," Op.67;

- "locations … set aside for … governmental services," Op.89-90;

- "locations … set aside for … peaceful assembly," Op.89-90;

- "locations set aside for particular civic functions," Op.9;

- "places that serve as public forums," Op.104;

- places "vital to communities' and our Nation's democratic project," Op.107;

- places that "provide a reprieve from industrialization and foster democratic solidarity across social classes," Op.96;

- places of "public amusement," Op.115;

- "communal venues, including fairs, race courses, ball rooms, churches, public halls, picnic grounds, theatres and other places of public entertainment or amusement, and circuses," Op.60-61;

- locations set aside for "cultural purposes," Op.106;

- anywhere set aside for "learned, scientific pursuits," Op.124;

- any place "set aside for learning and education," Op.126;

- anywhere alcohol is consumed, Op.111-13; and

- any places "where vulnerable populations congregate," Op.126.

The panel also held that New Jersey could prohibit all carry on public vehicles (buses, trains, etc.), Op.127-32, thus entirely defeating the right to carry for those who rely on public transportation to get to and from work.

14

And that is not all. In addition to those myriad locations—which together comprise just about everywhere people gather—the majority made clear that it would *also* green-light efforts to ban carrying firearms in any *other* public place where a state deemed it necessary:

- to promote peacefulness in "households," Op.29-30;

- to promote peacefulness in "[religious] congregations," Op.30;

- to prevent poaching on others' land, Op.36, 48-52;

- to "secure both liberty and order in a deeply divided, modernizing society," Op.54;

- "to ensure that firearms end up only with those who their communities deem to be safe to carry them," Op.82; and

- to ensure that visitors at "centers of community life" can "participate without the risks and anxieties associated with deadly weapons," Op.98-99.

*See* Dissent.2-4.

That is not an application of *Bruen*; it is a nullification of the fundamental constitutional right of the people to bear arms. After all, if (as *Bruen* made clear) an approach to the "sensitive places" doctrine that would "in effect exempt cities from the Second Amendment" is "too broad[]," *Bruen*, 597 U.S. at 31, then a decision that "declar[es] most of New Jersey off limits for law-abiding citizens who have the constitutional right to armed self-defense" is unconstitutional *a fortiori*, JA.19.

In reaching that rights-denying result, the majority never stopped to consider the net effect of Chapter 131's disparate provisions, instead undertaking a "one-by-

one" consideration that "misse[d] the forest for the trees." Dissent.43, 59. The majority thus did not even ask "whether our national regulatory tradition countenances the *cumulative* burden of Chapter 131's requirements and prohibitions on the right to carry for self-defense." Dissent.59. On a more granular level, moreover, the majority committed egregious methodological errors. The majority repeatedly deployed what it described as a "more flexible" approach to historical scrutiny, under which it had free rein to "analogize more broadly" when considering New Jersey's sensitive-place regulations. Op.106, 119; *see, e.g.*, Op.97, 106, 114, 119, 123, 127 (using that "flexible approach" when upholding prohibitions against carrying firearms at parks, beaches, public-recreation facilities, public libraries, museums, entertainment facilities, casinos, healthcare facilities, and on public transportation). That "flexible" approach "has no provenance in *Bruen*," Dissent.69, which made crystal clear how courts are supposed to decide whether "*new*" places can be deemed "sensitive" places cordoned off from the Second Amendment: by comparing the "modern regulations" to "historical regulations" prohibiting carriage in "legislative assemblies, polling places, and courthouses." 597 U.S. at 30.

Making matters worse, the majority doubled-down on the same errors it made when sanctioning the four-reputable-persons provision. The majority analogized "far too broadly" when comparing Chapter 131 to historical restrictions, even going so far as to "approve[] New Jersey's firearms prohibition on public transit by

16

analogizing to post-Reconstruction laws banning *shooting at or on trains*." Dissent.9. And it relied "heav[ily]" on "late-19th century sources" to justify modern location-based restrictions that lack any analogue "in the Founding and antebellum periods." Dissent.10-11. The latter error conflicts with *Lara v. Commissioner, Pennsylvania State Police*, 125 F.4th 428 (3d Cir. 2025), which heeded the Supreme Court's warning "against giving postenactment history more weight than it can rightly bear," *Bruen*, 597 U.S. at 35. *See Lara*, 125 F.4th at 434. In stark contrast, the panel here refused to treat "the Second Amendment's meaning as fixed at the Founding or at the Fourteenth Amendment's ratification," and instead relied on "late-blooming regulations unconnected to early-American tradition." Dissent.13.

Under the panel decision, nearly every inch of public space in New Jersey is a no-carry zone. That result is impossible to square with *Bruen*. And the issues at stake are far too important to let that decision be the last word on the constitutionality of New Jersey's outlier regime.

## CONCLUSION

The Court should grant the petition.

Respectfully submitted,

s/Erin E. Murphy

DANIEL L. SCHMUTTER                PAUL D. CLEMENT
HARTMAN & WINNICKI, P.C.          ERIN E. MURPHY
74 Passaic Street                        *Counsel of Record*
Ridgewood, NJ 07450                  ANDREW LAWRENCE
                                       CLEMENT & MURPHY, PLLC
                                       706 Duke Street
                                       Alexandria, VA 22314
                                       (202) 742-8900
                                       erin.murphy@clementmurphy.com

*Counsel for Siegel Plaintiffs-Appellees/Cross-Appellants*

October 8, 2025

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

I certify that this petition complies with the type-volume limitation of Federal Rule of Appellate Procedure 40(d)(3)(A) because it contains 3,898 words, excluding the parts of the brief exempted by Rule 32(f).  I further certify that this petition complies with the typeface and type style requirements of Rules 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

## CERTIFICATE OF BAR MEMBERSHIP

I certify pursuant to Third Circuit Rule 46.1 that the lead attorney whose name appears on the foregoing brief was duly admitted to the Bar of the United States Court of Appeals for the Third Circuit and is presently a member in good standing of the Bar of said court.

## IDENTICAL PDF AND HARD COPY CERTIFICATE

I certify that this petition complies with Third Circuit Rule 31.1(c) because the text of the electronic brief will be identical to the text of any hard-copy briefs the Court may request.  Pursuant to Third Circuit Rule 35.2(a), no paper copies of this brief will be provided unless directed by the Court.

## VIRUS SCAN CERTIFICATE

I certify that this petition complies with Third Circuit Rule 31.1(c) because the virus detection program (SentinelOne version 21.7.7.40005), has been run on the file and no virus was detected.

## CERTIFICATE OF SERVICE

I hereby certify that on October 8, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

October 8, 2025

s/Erin E. Murphy
Erin E. Murphy