**Nos. 23-1900, 23-2043**

---

**In the United States Court of Appeals for the Third Circuit**

---

RONALD KOONS, ET AL., *Plaintiffs-Appellees*,
v.
ATTORNEY GENERAL NEW JERSEY, ET AL., *Defendants-Appellants*.

---

AARON SIEGEL, ET AL., *Plaintiffs-Appellees*,
v.
ATTORNEY GENERAL OF NEW JERSEY, ET AL., *Defendants-Appellants*.

---

**On Appeal from the United States District Court
for the District of New Jersey**
Nos. 22-cv-07464 & 22-cv-07463 (RMB)

---

**Brief *Amicus Curiae* of Gun Owners of America, Inc.,
Gun Owners Foundation, Gun Owners of California,
Heller Foundation, Tennessee Firearms Association, Tennessee
Firearms Foundation, Virginia Citizens Defense League,
Virginia Citizens Defense Foundation, America's Future, U.S.
Constitutional Rights Legal Defense Fund, and Conservative
Legal Defense and Education Fund in Support of
Plaintiffs-Appellees' Petition for Rehearing *En Banc***

Stephen D. Stamboulieh
STAMBOULIEH LAW, PLLC
Olive Branch, MS 38654

Oliver M. Krawczyk
AMBLER LAW OFFICES, LLC
Carlisle, PA 17013

John I. Harris III
SCHULMAN, LEROY &
BENNETT, P.C.
Nashville, TN 37203

Robert J. Olson*
William J. Olson
Jeremiah L. Morgan
WILLIAM J. OLSON, P.C.
370 Maple Ave. W., Ste. 4
Vienna, VA  22180-5615
(703) 356-5070
wjo@mindspring.com
Attorneys for *Amici Curiae*

October 15, 2025
*Counsel of Record

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Rule 26.1, it is hereby certified that *Amici Curiae* Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Heller Foundation, Tennessee Firearms Association, Tennessee Firearms Foundation, Virginia Citizens Defense League, Virginia Citizens Defense Foundation, America's Future, U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund are non-stock, nonprofit corporations with no parent companies; therefore, no publicly held company owns 10% or more of their stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ...........................................ii

TABLE OF AUTHORITIES .......................................................iv

INTEREST OF *AMICI CURIAE*...................................................1

STATEMENT OF THE CASE ....................................................1

ARGUMENT .................................................................3

I.  THIS COURT SHOULD GRANT THE PETITION TO QUELL THE PANEL'S METHODOLOGICAL MUTINY AGAINST FOUNDING-ERA PRIMACY..................................................3

II. THE PANEL'S ANALYTICAL ERRORS DEMAND SWIFT CORRECTION.................................................................11

CONCLUSION .............................................................14

# TABLE OF AUTHORITIES

**U.S. Constitution**

Amendment II…………………………………………...…1-5, 8-10, 13

**Cases**

*Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 218 L. Ed. 2d 71 (2024)………..11
*District of Columbia v. Heller*, 554 U.S. 570 (2008)………………………13
*Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020)………………..9
*Lara v. Comm'r Pa. State Police*, 97 F.4th 156 (3d Cir. 2024)…4-7, 10-11
*Lara v. Comm'r Pa. State Police*, 125 F.4th 428 (3d Cir. 2025)…….3, 4, 7
*Lara v. Comm'r Pa. State Police*, 130 F.4th 65 (3d Cir. 2025)……………4
*NRA v. BATFE*, 714 F.3d 334 (5th Cir. 2013)……………………………6
*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022)…..…1, passim
*United States v. Rahimi*, 602 U.S. 680 (2024)…………………...…4, 5, 9

**Miscellaneous**

"Expanded Homicide Data Table 8," *FBI UCR* (2019)………….……….6
M. Kramer & D. Brennan, "Fresh Off Primary Win, Gov. Kathy
    Hochul Dives Right into Guns – Who Can Get Them and
    Where They Can Take Them," *CBS NY* (June 29, 2022)…………12
    .

## INTEREST OF *AMICI CURIAE*[1]

The interest of the *amici* is set out in the accompanying motion for leave to file.

## STATEMENT OF THE CASE

One day after the Supreme Court recognized the pre-existing Second Amendment right to publicly carry arms for self-defense in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), New Jersey Governor Phil Murphy decried the decision as "dangerous," "right-wing," "deeply flawed," "tragic,"[2] and even a "mockery."[3] So, in direct "[r]esponse to *Bruen*,"[4] the Governor and New Jersey legislature swiftly enacted "Chapter 131," a law designed to discourage – in fact to *criminalize* – the newly vindicated right to bear arms in nearly every public place.

To that end, Chapter 131 saddled current and prospective gun owners with new and draconian licensing requirements, including

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparing or submitting this brief. No person other than *amici*, their members, or their counsel contributed money intended to fund preparing or submitting this brief.

[2] https://www.nj.gov/governor/news/news/562022/20220623a.shtml

[3] https://www.nj.gov/governor/news/news/562022/approved/202206 24b.shtml

[4] https://www.nj.gov/governor/news/news/562022/20221222a.shtml

1

increased fees, a $300,000 liability insurance mandate, and a morality test requiring the attestation of four "reputable" persons – all as preconditions to carry a handgun outside the home.  Next, in response to *Bruen*'s repudiation of "may-issue" licensing regimes – under which only *0.014 percent* of New Jersey's population had been permitted to carry[5] – Chapter 131 rendered carry licenses practically worthless, prohibiting firearms across dozens of categories of so-called "sensitive places" that reach virtually every public place in the state.  Finally, Chapter 131 declared all private property off-limits to firearms by default, requiring prior "express consent" from the property owner to avoid criminal liability.

The district court rightfully enjoined large parts of Chapter 131, but this Court promptly stayed that decision.  And on September 10, 2025, over a 97-page dissent, a panel of this Court issued an opinion "[f]or the most part … agree[ing] with New Jersey" and upholding the vast majority of its *Bruen*-response bill as "consistent" with the Second Amendment.  *Koons v. Attorney Gen. N.J.*, 2025 U.S. App. LEXIS 23361,

---

[5] https://concealednation.org/wp-content/uploads/2018/08/SSRN-id3233904.pdf, at 13.

*3 (3d Cir. Sep. 10, 2025) ("Op.").  In so holding, the panel adopted a "flexible approach" to *Bruen*'s historical analysis to conclude that governments may "limit[] the carrying of guns in specific kinds of venues commensurate with their peculiar needs and functions."  *Op.*\*77, \*23.

## ARGUMENT

In opening its opinion, the panel all but agreed that this case should be reheard *en banc*, observing that this case presents "a question of immense public importance" – the scope of the Second Amendment right to public carry not only for 9.5 million New Jerseyans, but also more than 100 million[6] nonresidents who visit the state annually.  Op.\*3.  This case therefore "involves a question of exceptional importance" favoring rehearing, and this Court should grant the petition on that basis alone.  3d Cir. I.O.P. 9.3.1; *see also* 3d Cir. L.A.R. 35.1.  Additionally, the panel's erroneous decision provides numerous grounds for rehearing.

## I.    THIS COURT SHOULD GRANT THE PETITION TO QUELL THE PANEL'S METHODOLOGICAL MUTINY AGAINST FOUNDING-ERA PRIMACY.

In *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 441 (3d Cir. 2025), this Court recognized the right of 18-to-20-year-old adults to public

---

[6] https://www.nj.gov/state/press-2025-0508a.shtml

carry, explaining that the Second Amendment "should be understood according to its public meaning in 1791." *Lara*'s temporal holding tracks the Supreme Court's originalist approach to analyzing the Bill of Rights, which "generally assume[s] that the scope of the protection applicable to the … States is pegged to the public understanding of the right … in 1791," and treats later "19th-century evidence … 'as mere confirmation of what … had already been established.'" *Bruen* at 37 (collecting cases). A majority of this Court declined to disturb *Lara* not once, but *twice* – first in 2024, and again earlier this year, after the Supreme Court's vacatur for further consideration in light of *United States v. Rahimi*, 602 U.S. 680 (2024). *See* 97 F.4th 156 ("*Lara I*") (3d Cir. 2024) (denying first petition for rehearing); 130 F.4th 65 (3d Cir. 2025) (denying post-*Rahimi* petition for rehearing).

But not all judges of this Court subscribe to this Founding-era emphasis – including the author of the majority opinion here. Indeed, Judge Krause dissented from *both* denials of rehearing in *Lara*, opining that *Lara* "erred profoundly in the methodology" it employed to analyze the Second Amendment's history. *Lara I* at 157 (Krause, J., dissenting from denial of rehearing *en banc*); *see also* 130 F.4th at 67 (Krause, J.,

dissenting from denial of rehearing *en banc*).[7]  In contrast to *Bruen* and *Lara*'s originalist approach, Judge Krause proposed an alternative vision for Second Amendment analysis – one that endorsed the Reconstruction era "in 1868, when [states] incorporated the Bill of Rights against themselves," as "informing the constitutionality of modern-day regulations."  *Lara I* Dissent at 157.[8]  Under this approach, firearm regulations enacted a century after the Founding can justify so-called "reasonable responses to problems of gun violence," so long as a judge declares those problems "unfathomable" to the Founders.  *Id.* at 166.  In other words: living constitutionalism at its finest.

It stands to reason that such a fervent critic of *Lara*'s methodology might not apply it faithfully in a subsequent case.  Rather, having perfected the anti-originalist playbook in *Lara*, all its author would have

---

[7] Save for some alterations following *Rahimi*, Judge Krause's second dissent largely reiterates her first.

[8] Curiously, Judge Krause cited *Rahimi* – then pending before the Supreme Court – as further support of rehearing *Lara*, on the theory that *Rahimi* might analyze "the Second Amendment in the absence of comparable Founding-era precedent" and necessarily endorse her Reconstruction-era analysis.  *Lara I* Dissent at 160.  But *Rahimi* examined "founding era regimes" *only*, directing courts to "apply[] faithfully the balance struck by *the founding generation* to modern circumstances."  *Rahimi* at 698, 692 (emphasis added).

to do is implement it.  And that is precisely what occurred here.  After

paying lip service to *Bruen*, the panel identified a Founding-era principle

at the highest level of generality,[9] and then turned to Reconstruction to

do the analogical heavy lifting.  The result is a blessing of virtually all of

New Jersey's ahistorical *Bruen*-response bill, and an urgent need for

rehearing *en banc*.

Consider the parallels between *Lara*'s dissents from denial and the

majority opinion here.  Advocating reliance on Reconstruction-era history

in *Lara*, Judge Krause cited the prospect of "[i]nterpersonal gun violence"

by youths[10] using modern, "high-capacity" firearms and "assault rifles"[11]

in "largely urban" environments as historically "unprecedented,"

therefore requiring a "'more nuanced approach.'"[12]  *Lara I* Dissent at 165.

---

[9] *See, e.g.*, Op.*44 ("restrict[ing] the carry of weapons to protect against misuse in discrete locations set aside for particular civic functions").

[10] *But see NRA v. BATFE*, 714 F.3d 334, 342 (5th Cir. 2013) (Jones, J., dissenting from denial of rehearing *en banc*) ("The members of the first Congress were ignorant of thermal heat imaging devices; with late teenage males, they were familiar.").

[11] *But see* "Expanded Homicide Data Table 8," *FBI UCR* (2019) (reporting "rifles" are used far less commonly in crime than "handguns").

[12] *But see Bruen* at 27 (explaining that "the historical analogies" do not "require a more nuanced approach," even when faced with "urban" "violence" with modern firearms).

Thus, even the utter dearth of any Founding-era prohibition on 18-to-20-year-olds carrying firearms need not be dispositive of original meaning. Nor was the Founders' *contrary* tradition of *requiring* these individuals to publicly carry firearms. *See Lara*, 125 F.4th at 443. Instead, without any analogue banning public carry by 18-to-20-year-olds during the Founding, Judge Krause theorized that "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." *Lara I* Dissent at 163. Having identified this principle in the broadest of terms – one that would justify any disarmament scheme – Judge Krause moved on to Reconstruction, when "a number of states … effectively prevented, or at least hindered, 'minors' from even obtaining firearms." *Id.* at 161. The end run on *Bruen* thus becomes clear: when faced with a *pro*-gun historical record at the Founding, simply declare the societal issue "unprecedented," broadly invoke some tangential Founding-era principle, and then rely entirely on Reconstruction for historical support.

This anti-*Lara* approach permeates the panel opinion. For example, upholding Chapter 131's firearm ban on public transportation, the panel cited "crowded public transit and … angry drivers stuck in

traffic" as a purportedly unprecedented societal issue requiring "'a more nuanced approach' to the range of relevant analogies." Op.*105. Thus, the panel discounted the views of the Framers entirely, noting only that "horse-drawn carriages in a handful of cities shuttled small groups around for short, uncomfortable rides." Op.*107. But rather than examining whether the Founding generation banned firearms on *these* conveyances (or perhaps on stagecoaches or ferries, other timely analogues for public transportation), the panel fast-forwarded to "the mid-nineteenth century," when "*some* railroads forbade firearms in their passenger cars," and a single-digit number of states "proscrib[ed] *firing, brandishing, or recklessly handling* guns on or near trains." Op.*107, n.179 (emphases added). Apparently unconcerned that this limited evidence failed to establish a required *national* "historical tradition" (*Bruen* at 34) supporting New Jersey's transit ban on the *possession* (not discharge) of operable handguns, the panel relied on these mid- to late-19th-century sources even though they shed no light on what the Second Amendment meant *to the Framers*.

The panel's jettisoning of the Founding era contravenes Supreme Court precedent several times over. *Bruen* clarified that the Court's

"interest in mid- to late-19th-century commentary was secondary," warning that "'postratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text.'" *Bruen* at 37, 36. *Rahimi* likewise directed courts to examine "laws at the founding," warning that a modern law "may not be compatible with the right if' it "regulates arms-bearing … beyond what was done at the founding." *Rahimi* at 692. Numerous other constitutional decisions follow a similar track. *See, e.g.*, *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020) (observing that "a tradition" that "arose in the second half of the 19th century," even in "more than 30 States," "cannot by itself establish an early American tradition").

But perhaps most importantly, the panel's methodology corrupts and exploits *Bruen*'s "more nuanced approach." *Bruen* at 27. *Bruen* anticipated two types of Second Amendment cases. The first would be "fairly straightforward" and implicate "a general societal problem that has persisted since the 18th century." *Id.* at 26. In such a case, "the lack of a distinctly similar historical regulation addressing that problem" would be "relevant evidence that the challenged regulation is

inconsistent with the Second Amendment." *Id.* In contrast, a rarer second type of case would "implicat[e] unprecedented societal concerns or dramatic technological changes" and "may require a more nuanced approach." *Id.* at 27. This approach to "modern regulations that were unimaginable at the founding" would "involve *reasoning by analogy*" to determine "whether the two regulations are 'relevantly similar.'" *Id.* at 28-29 (emphasis added). In other words, *Bruen*'s "more nuanced approach" is nuance in "analogical *reasoning*," not an invitation to rely on later *history* to uphold a gun law when Founding-era history proves insufficient. *Id.* at 28 (emphasis added). The panel should have reasoned by analogy *at the Founding*, and if no Founding-era analogue was relevantly similar to Chapter 131, that should have ended the matter.

At bottom, the panel's opinion follows its author's prior dissents from denial of rehearing in *Lara*, thus effectively overruling *Lara*, an opinion that this Court *twice* did not see fit to disturb, and which should have guided (indeed, controlled) the decision here.[13] This Court should grant the petition to refocus (again) on the Founding, and to repudiate

---

[13] *See* 3d Cir. I.O.P. 9.1 ("holding of a panel in a precedential opinion is binding on subsequent panels," and "no subsequent panel [may] overrule[] the holding in a precedential opinion of a previous panel").

the living constitutionalist approach employed here, which "is a virus that may spread if not promptly eliminated." *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 218 L. Ed. 2d 71, 75 (2024) (Alito, J., dissenting from denial of certiorari).

## II. THE PANEL'S ANALYTICAL ERRORS DEMAND SWIFT CORRECTION.

In addition to effectively overruling *Lara*'s temporal holding, the panel contravened *Bruen*'s methodology in three distinct ways. Each undermines the "uniformity of [this Court's] decisions" and warrants rehearing *en banc*. 3d Cir. I.O.P. 9.3.1.

First, rather than seeking out "distinctly similar" or "'relevantly similar'" analogues to the purported "sensitive places" at issue (*Bruen* at 26, 29-30), the panel took an entirely scattershot approach to historical analysis, canvassing *all time periods* and virtually *every type* of firearm regulation ever known to have existed. *See* Op.*22-44; *see also* Op.*130 (Porter, J. concurring and dissenting in part) ("the majority blithely assumes that the fact an ordinance was promulgated somewhere automatically makes it historically and legally relevant"). Beginning with "British Antecedents" and ending with "Reconstruction and the *Fin de Siècle*" (Op.*23-44), the panel canvassed centuries of history to identify

11

innumerable places where governments at one point restricted firearms. Under the historical record assembled by the panel, governments could ban guns in the woods (Op.\*28-29, n.26); on athletic fields (Op.\*78); on the road[14] (Op.\*27, \*32); on public transportation (Op.\*108); in town (Op.\*28); while shopping (Op.\*26); at church (Op.\*43-44, n.82, n. 85); anywhere the government is located (Op.\*24, \*40); in parks (Op.\*28-29); for students at public universities (Op.\*35, \*37); on others' property (Op.\*32); on one's own property (Op.\*23); anywhere people gather (Op.\*28); during the day (Op.\*25); at night (*id.*); and, of course, at "Fandangos" (Op.\*37). With that sort of approach to identifying a historical record, it is hard to imagine where the government *could not* ban the bearing of arms. Of course, "there is no historical basis … to effectively declare the island of Manhattan a 'sensitive place.'" *Bruen* at 31. *Bruen* never endorsed this sort of "flexible," seemingly result-oriented approach. Op.\*77.

---

[14] Under New York's similar *Bruen*-response bill, anti-gun Governor Hochul theorized that people could "probably" still carry firearms on "some streets." M. Kramer & D. Brennan, "Fresh Off Primary Win, Gov. Kathy Hochul Dives Right into Guns – Who Can Get Them and Where They Can Take Them," *CBS NY* (June 29, 2022).

Second, the panel declared almost every historical period to be "unprecedented" from the one before it. *See* Op.*21, n.5 ("firearm technology has advanced"); Op.*31 ("exigencies of the New World"); *i* Op.*33 ("new, emerging circumstances"); Op.*38 ("transportation" "revolution"); Op.*39-40 ("modernizing society" and "emerging … contexts"); Op.*42 ("unprecedented connectivity"); Op.*105 ("angry drivers … did not exist at the Founding"). But if *everything* new is "unprecedented," then the word loses all meaning, *Bruen*'s "more nuanced" exception swallows the rule, and the Second Amendment is not actually "fixed according to the understandings of those who ratified it." *Bruen* at 28; *see also District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008). Rather, it is constantly evolving to meet the exigencies of the day. That is distinctly anti-*Bruen*, which focuses on history, not contemporary need.

Third, *Bruen* warned that, simply because "people typically congregate" in public does not mean the government can "effectively declare" the entire locale "a 'sensitive place.'" *Bruen* at 30-31. But the panel's reliance on places where "individuals" or "vulnerable populations congregate" (Op.*85, *103), "communal venues" (Op.*43), and "places of

public entertainment and amusement" (*id.*) effectively declares the entirety of New Jersey a "sensitive place." *Bruen* foreclosed such an expansive approach. *Bruen* at 31.

## CONCLUSION

For the foregoing reasons, this Court should grant the petition for rehearing *en banc*.

Respectfully submitted,

/s/ *Robert J. Olson*

| | |
|---|---|
| Stephen D. Stamboulieh | Robert J. Olson* |
| STAMBOULIEH LAW, PLLC | William J. Olson |
| P.O. Box 428 | Jeremiah L. Morgan |
| Olive Branch, MS 38654 | WILLIAM J. OLSON, P.C. |
| (601) 852-3440 | 370 Maple Ave. W., Ste. 4 |
| stephen@sdslaw.us | Vienna, VA 22180-5615 |
| | (703) 356-5070 |
| Oliver M. Krawczyk | wjo@mindspring.com |
| AMBLER LAW OFFICES, LLC | Attorneys for *Amici Curiae* |
| 115 S. Hanover St., Ste. 100 | |
| Carlisle, PA 17013 | |
| (717) 601-1526 | October 15, 2025 |
| oliver@amblerlawoffices.com | *Counsel of Record |

John I. Harris III
SCHULMAN, LEROY &
BENNETT, P.C.
3310 West End Avenue
Suite 460
Nashville, TN 37203
(615) 244-6670
jharris@slblawfirm.com

## CERTIFICATES OF BAR MEMBERSHIP

I, Robert J. Olson, counsel for *amici curiae*, hereby certify pursuant to Third Circuit Rule 28.3(d) that I am a member in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

By: /s/ *Robert J. Olson*
Robert J. Olson

# CERTIFICATE OF COMPLIANCE

I, Robert J. Olson, counsel for *amici curiae*, certify that this brief contains 2,579 words, based on the "Word Count" feature of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). I also certify that this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook. I further certify that the text of the electronic brief is identical to the text in the paper copies and that the virus detection software McAfee Internet Security, version 1.34.62.0, has been run on the file and no virus was detected.

Dated: October 15, 2025

/s/ *Robert J. Olson*
Robert J. Olson
Counsel for *Amici Curiae*

# CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: October 15, 2025

/s/ *Robert J. Olson*
Robert J. Olson