# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

## No. 23-1900, 23-2043

| | |
|---|---|
| RONALD KOONS, et al., <br><br> Plaintiffs-Appellees, <br> v. <br><br> MATTHEW J. PLATKIN, et al., <br><br> Defendants-Appellants, <br> and <br><br> NICHOLAS P. SCUTARI, President of the New Jersey Senate, and CRAIG J. COUGHLIN, Speaker of the New Jersey General Assembly, <br><br> Intervenors-Defendants-Appellees. | On Appeal from the <br> United States District Court <br> for the District of New Jersey <br> (Nos. 22-cv-7463, 22-cv-7464 (RMB)) |

**BRIEF OF INTERVENORS-DEFENDANTS-APPELLEES
NEW JERSEY SENATE PRESIDENT NICHOLAS P. SCUTARI AND
NEW JERSEY ASSEMBLY SPEAKER CRAIG J. COUGHLIN
IN RESPONSE TO PLAINTIFFS'
PETITION FOR REHEARING EN BANC**

_____

                                      **Leon J. Sokol, Esq.
CULLEN AND DYKMAN, LLP
433 Hackensack Avenue
Hackensack, NJ 07601
(201) 488-1300**

                                        **Edward J. Kologi, Esq.**
                                        **KOLOGI • SIMITZ**
                                        **00 N. Wood Avenue**
                                        **Linden, NJ 07036**
                                        **(908) 486-8877**

                                        **Attorneys for Intervenors-Defendants-Appellees Senate President Nicholas P. Scutari and Assembly Speaker Craig J. Coughlin**

**LEON J. SOKOL, ESQ.**
**EDWARD J. KOLOGI, ESQ.**
**Of Counsel and On the Brief**

**STEVEN SIEGEL, ESQ.**
**MICHAEL SIMITZ, ESQ.**
**On the Brief**

ii

# **TABLE OF CONTENTS**

**TABLE OF CITATIONS** ................................................................................ ii

**INTRODUCTION** ....................................................................................... 1

**LEGAL ARGUMENT** ................................................................................. 1

    **POINT I** ............................................................................................... 1

        **REHEARING *EN BANC* IS UNWARRANTED. THE PANEL'S DECISION CORRECTLY APPLIED THE PRINCIPLES-BASED "HISTORICAL ANALOGUE" APPROACH RECOGNIZED BY THE SUPREME COURT IN *BRUEN* AND *RAHIMI* AND IS NOT INCONSISTENT WITH ANY DECISION OF THIS COURT**

    **POINT II** ........................................................................................... 11

        **CONTRARY TO THE *KOONS* PLAINTIFFS' CONTENTION, THE DECISION OF THE PANEL BELOW IS NOT INCONSISTENT WITH THE DECISION OF THIS COURT IN *LARA V. COMMISSIONER PENNSYLVANIA STATE POLICE*, 125 F.4TH 428 (3D CIR. 2024), WITH RESPECT TO THE QUESTION OF WHETHER *BRUEN*'S HISTORICAL INQUIRY IS LIMITED TO FOUNDING-ERA LAWS -- RATHER THAN EXTENDING TO RECONSTRUCTION-ERA LAWS.**

    **CONCLUSION** ................................................................................. 13

    **CERTIFICATIONS** ......................................................................... 14

# **TABLE OF CITATIONS**

*Cases*

*District of Columbia v. Heller,*
　554 U.S. 570 (2008) .................................................................................. 11

*Joyce v. Maersk Line Ltd.,*
　676 F.3d 502 (3d Cir, 2017) ...................................................................... 12

*Lara v. Commissioner Pennsylvania State Police,*
　125 F.4TH 428 (3d Cir. 2024) .............................................................. 1, 2, 10, 11

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
　597 U.S. 1 (2022) .............................................................................. *passim*

*Range v. Attorney General,*
　69 F.4th 96 (3d. Cir. 2023) ................................................................. 11, 12

*United States v. Rahimi,*
　602 U.S. 680 (2024) .......................................................................... 8, 9, 11

# INTRODUCTION

Senate President Nicholas P. Scutari and General Assembly Speaker Craig J. Coughlin (hereafter collectively "the Presiding Officers") intervened in the action below. The Presiding Officers sought to present the perspective of the New Jersey Legislature in connection with its enactment of L. 2022, c. 131 (hereafter "Chapter 131"). As intervenors, the Presiding Officers fully participated in the preliminary injunction proceedings before the District Court. Presently, the Presiding Officers are appellees but are presenting argument on the side of Appellants New Jersey Attorney General and Superintendent of the New Jersey State Police (hereafter "the State").

The Presiding Officers adopt – and incorporate by reference – the State's response to Plaintiffs' Petition for Rehearing. To the State's response, the Presiding Officers add only the following.

# LEGAL ARGUMENT

## POINT I

**REHEARING *EN BANC* IS UNWARRANTED. THE PANEL'S DECISION CORRECTLY APPLIED THE PRINCIPLES-BASED "HISTORICAL ANALOGUE" APPROACH RECOGNIZED BY THE SUPREME COURT IN *BRUEN* AND *RAHIMI* AND IS NOT INCONSISTENT WITH ANY DECISION OF THIS COURT**

By its carefully reasoned 139-page opinion, the panel below: (1) considered

1

and applied the historical cases that were presented; (2) discerned the governing "principles" that underpin these cases; and (3) applied those governing principles to the sensitive area designations that are contained in Chapter 131. *That approach is precisely what Bruen and Rahimi prescribe.*

Underlying the panel's decision is this key passage from its opinion describing the proper "level of generality" to be applied in determining the validity under the Second Amendment of sensitive-place designations:

> From this extensive historical review, and consistent with *Bruen*'s and *Rahimi*'s instruction, we discern the following ***principles*** that underlie our Nation's regulatory tradition that are relevant to this case: First, legislatures have long enjoyed the authority to restrict the carry of firearms in specific locations central to the operation of government. And the historical record demonstrates that legislatures may also restrict the carry of weapons to protect against misuse in discrete locations set aside for particular civic functions—like the fairs, markets, parliaments, and polling places of old. For example, firearms were deemed inappropriate for educational institutions not only because they can be dangerous, but also because they distracted from the civic mission of educating "responsible public citizens." Likewise, statutes barring firearms from parliament-like locations protected peaceful government functions and the ability of citizens to freely associate and deliberate without fear of violent reprisal. At bottom, history demonstrates that carry restrictions served to protect against physical danger and alarm in discrete fora historically designated for important civic purposes.
>
> [Op., at 66-67 (emphasis added)]

As this concise summary of the decision below makes clear, the panel's analogic approach is firmly grounded in "the ***principles*** that underlie our Nation's regulatory tradition." *Id*. (emphasis added). As set forth below, this "principle-

2

based" approach is entirely consistent with the guidelines laid out in *Bruen* and *Rahimi*. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 38-32 (2022); *United States v. Rahimi*, 602 U.S. 680 (2024) (holding that "the appropriate analysis involves considering whether "the challenged regulation is consistent with the *principles* that underpin our regulatory tradition.") (emphasis added)

### A. *Bruen*

In *Bruen*, the Supreme Court expressly recognized a flexible "analogic approach" to the challenge of applying the dictates of the Second Amendment to contemporary society. In substance, the Court in *Bruen* held that: (1) schools and government buildings are examples of sensitive places, but not an exhaustive list of what sensitive places are; (2) banning weapons in sensitive places has a longstanding historical pedigree, which does not violate or run afoul of the Second Amendment; and (3) when necessary, a court may use analogical reasoning to identify other sensitive places. *Bruen*, 597 U.S. at 28-33. The Court also determined that "central considerations when engaging in an analogical inquiry" are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 29. The Court stressed "that analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin" or "dead ringer." *Id.* at 30. Finally, the Court identified two

metrics to guide the analogic inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29.

Importantly, the *Bruen* Court acknowledged this self-evident truth: "The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 U.S. at 27. The Court thus recognized the shortcomings of a strict, literal and narrow historical approach to constitutional interpretation -- in light of the United States' profound social, economic and technological changes that have taken place over the past 235 years.

The flexibility of the *Bruen* Court's analogic approach is shown by the Court's refusal to limit "arms" "only [to] those arms in existence in the 18th century." *Bruen*, 597 U.S. at 28. The Court noted:

> Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, **to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.** *Ibid.*

> [*Bruen*, 597 U.S. at 28 (emphasis added)]

For the same reason, the *Bruen* Court expressly acknowledged that this flexible analogic approach also applies to delineation of "sensitive places" under the Second Amendment – in that such sensitive places should not be limited to those places that were in existence in the 18th century. *Bruen*, 597 U.S. at 28. The Court explained: "Much like we use history to determine which modern 'arms' are

4

protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding." *Ibid.* In other words, if the meaning and application of "arms" is not fixed, neither should the meaning and application of "sensitive places" be fixed to only those precise places that were in existence in 1791. Instead, what is required is a flexible analogic approach to both. *See id.*

A key paragraph in the *Bruen* opinion delineates the scope and application of the sensitive places doctrine:

> Consider, for example, *Heller*'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited -- *e.g.*, legislative assemblies, polling places, and courthouses -- we are also aware of no disputes regarding the lawfulness of such prohibitions. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. **And courts can use analogies to those historical regulations of "sensitive places" to determine those modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible.**

[*Bruen*, 597 U.S. at 30 (emphasis added)].

Stated succinctly, (1) schools and government buildings are examples of sensitive places, but not an exhaustive list of what sensitive places are; (2) banning weapons in sensitive places has a longstanding historical pedigree, which does not violate or run afoul of the Second Amendment; and (3) when necessary, a court may use analogical reasoning to identify other sensitive places.

5

In other key passages, the *Bruen* Court further addresses sensitive places doctrine and the permissible use of historical analogues. The *Bruen* Court underscored that "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Bruen*, *Bruen*, 597 U.S. at 30. Thus, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Ibid*. Later in the opinion, the *Bruen* Court cautioned that the scope and application of historical analogues (to modern circumstances) are not unlimited. The Court offered this example:

> Although we have no occasion to comprehensively define "sensitive places" in this case, we do think respondents err in their attempt to characterize New York's proper-cause requirement as a "sensitive-place" law. In their view, "sensitive places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available."… **It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations.** But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below. Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.
>
> [*Bruen*, 597 U.S. at 31-32 (emphasis added)]

6

Critically, the *Bruen* Court recognized that high population density and a high level of general police protection can and do serve as a talisman of many constitutionally permissible sensitive places. *Id.* at 31-32. However, these defining characteristics cannot be stretched so far so as to exempt a broad geographic area (Manhattan is 22 square miles) from the reach of the Second Amendment. Entire cities cannot be exempted from the Second Amendment. *Id.* at 32.

In other words, the *Bruen* Court set an "outer limit" on the permissible level of generality underlying an historical analogy to sensitive places. By necessary implication, although constitutionally permissible sensitive places cannot extend to entire cities or to large expanses of urban areas generally, the designation of sensitive areas *can and should* extend to other locations that are characterized by high population density and a high level of general police protection -- as long as those areas are reasonably compact. *Id.* at 31-32.

This, then, is the conceptual framework underlying *Bruen*'s analogic approach. The approach operates at a high level of generality – as would be expected when applying historical standards to contemporary society. Thus, the analogic inquiry turns on "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 29. In applying the approach, courts are instructed to employ two broad metrics: i.e., "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Ibid.* The essential flexibility of the

7

approach is also confirmed by the Court's instruction "that analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin" or "dead ringer." *Id*. at 30.

### B. *Rahimi*

In *Rahimi*, the Supreme Court clarified that its prior decision in *Bruen* had not meant to suggest "a law trapped in amber." *United States v. Rahimi*, 602 U.S. at 691. Instead, the *Rahimi* Court underscored that "the appropriate analysis involves considering whether "the challenged regulation is consistent with the **principles** that underpin our regulatory tradition." *Id.* at 692 (emphasis added). Thus, the *Rahimi* decision clarified the proper "level of generality" that applies to Bruen's "historical analogue" approach – a point echoed in *Rahimi*'s many concurring opinions.

> For example, Justice Barrett observed,
>
>> Courts have struggled with this use of history in the wake of *Bruen*. One difficulty is a level of generality problem: Must the government produce a founding-era relative of the challenged regulation—if not a twin, a cousin? Or do founding-era gun regulations yield concrete principles that mark the borders of the right?... *Here, though, the Court settles on just the right level of generality…*"
>
> *Id*. at 739, 740 (Barrett, J., concurring) (emphasis added).

*See also id.*, at 745 (whether *Bruen*'s test is satisfied in a particular case seems to depend on … the level of generality at which a court evaluates [historical] sources") (Jackson, J., concurring).

8

In contrast, the sole dissenting Justice in *Rahimi* expressed the view that only the narrowest level of generality was the proper standard to be applied when a court considers an historical analogue. *Id.* at 747 (Thomas, J. dissenting) (stating that "not a single historical regulation justifies the statute at issue."). Significantly, the dissenting view expressed by Justice Thomas was resoundingly rejected by eight Justices.

Thus, to the extent that *Bruen*'s historical analogue test was less than fully clear with respect to the "level of generality" by which the test was to be applied, the Court's decision in *Rahimi* provided further clarification. The *Rahimi* majority held that "[a] challenged regulation" need only be "consistent with the ***principles*** that underpin our regulatory tradition." *Id.*, at 691-92 (emphasis added). *Rahimi*'s confirmation -- that the proper "level of generality" entails a "principles"-based analysis -- is the keystone upon which the panel's decision critically, and correctly, relies.

\*\*\*

Applying the *Bruen/Rahimi* "principles" based standard governing historical analogues, the panel determined – in light of an abundance of historical analogues that were contained in the record before it -- that "legislatures have long enjoyed the authority to restrict the carry of firearms in specific locations central to the operation of government… [and] legislatures may also restrict the carry of weapons to protect against misuse in discrete locations set aside for particular civic

9

functions—like the fairs, markets, parliaments, and polling places of old." Op. at 66. A review of the record discloses that the hundreds of cited historical cases relied on by the panel provide firm support to the panel's principles-based conclusion. *See, e.g.,* Op., at 29-65, 88-139. In the interest of brevity, we need not repeat these legions of historical cases here -- a history that the panel already canvassed and described in over one-hundred pages of careful, record-specific analysis. *See id*.

Suffice it to say that the panel: (1) carefully considered and applied the historical cases that were presented; (2) discerned the governing "principles" that underpin these cases; and (3) applied those governing principles to the sensitive area designations that are contained in Chapter 131. That approach correctly applied the principles-based "historical analogue" approach recognized in *Bruen* and confirmed in *Rahimi*.

In short, Plaintiffs have failed to identify any clear conflict between the panel's decision with respect to the sensitive-place issue and the Supreme Court's decisions in *Bruen* and *Rahimi*. Therefore, Plaintiffs' petition for rehearing *en banc* should be denied.

## POINT II

**CONTRARY TO THE *KOONS* PLAINTIFFS' CONTENTION, THE DECISION OF THE PANEL BELOW IS NOT INCONSISTENT WITH THE DECISION OF THIS COURT IN *LARA V. COMMISSIONER PENNSYLVANIA STATE POLICE*, 125 F.4TH 428 (3D CIR. 2024), WITH RESPECT TO THE QUESTION OF WHETHER *BRUEN*'S HISTORICAL INQUIRY IS LIMITED TO FOUNDING-ERA LAWS -- RATHER THAN EXTENDING TO RECONSTRUCTION-ERA LAWS.**

The *Koons* Plaintiffs also argue that there is a conflict between the panel's decision below and the decision of this Court in *Lara v. Commissioner Pennsylvania State Police*, 125 F.4th 428 (3d Cir. 2024), with respect to the question of whether *Bruen*'s historical inquiry is limited to Founding-era laws -- rather than extending to 19th century laws. *See* Siegel Br., at 17 (citing *Lara,* 125 4th at 441-42) (stating that "*Lara* held that the Second Amendment "must be construed according to [its] public meaning in 1791"). Of this point, two points can be said.

*First*, the *Koons* Plaintiffs fail to set forth *Lara*'s full analysis of this issue – including, for example, the following:

> *Rahimi* teaches that public meaning is not just "those regulations ... that could be found in 1791[,]" but rather "the principles underlying the Second Amendment," with historical regulations providing evidence of those principles. *Rahimi*, 602 U.S. at 692, 144 S.Ct. 1889. **That evidence can include laws "through the end of the 19th century[,]" which the Supreme Court has recognized can be "a 'critical tool of constitutional interpretation' "** because they can be evidence of a historical tradition and shed important light on the meaning of the Amendment as it was originally understood. *Bruen*, 597 U.S. at 35, 142 S.Ct. 2111 (quoting *Heller*, 554 U.S. at 605, 128 S.Ct. 2783).

[*Lara*, 125 F.4th at 441 (emphasis added)]

11

Therefore, contrary to the *Koons* Plaintiffs' contention, *Lara* – let alone *Bruen* and *Rahimi* – clearly do *not* limit the historical inquiry to Founding-era laws only.

*Second*, Plaintiffs' cramped (and incorrect) reading of *Lara* -- in any event -- is inconsistent with the *en banc* decision of this court in *Range v. Attorney General*, 69 F.4th 96 (3d. Cir. 2023). In *Range*, the *en banc* court underscored "the *Bruen* Court's emphasis on Founding- and **Reconstruction-era sources**." *Id.*, at 104 (emphasis added). The Court further noted that a 1961 statute was too far afield for purposes of an historical inquiry under *Bruen* – thereby implicitly confirming that a law from the Reconstruction era would be a proper subject of the *Bruen* historical inquiry. *Ibid*. *See also id*. at 112 (stating that "Founding-era regulations remain instructive unless contradicted by something specific in the Reconstruction-era.") (Ambro, C.J., concurring, joined by Greeway, C.J., and Montgomery-Reeves, C.J.); *id.* at 108 ("*Bruen* defines relevant history for these purposes as the period between approximately 1791 and 1868") (Porter, C.J., concurring).

It is a settled principle of this circuit that an *en banc* decision takes precedence over a panel decision. *Joyce v. Maersk Line Ltd.*, 676 F.3d 502, 508 (3d Cir, 2017) (citing Third Circuit I.O.P. 9.1). For this reason alone, the *Koons* Plaintiffs' selective reliance on *Lara* is misplaced.

Thus, by their Petitions for Rehearing, Plaintiffs have failed to identify any clear conflict between the panel's decision and any decision of this Court – let alone

a conflict with the Supreme Court's decisions in *Bruen* and *Rahimi*. Therefore, Plaintiffs' petition for rehearing *en banc* should be denied.

## CONCLUSION

For the reasons set forth above (as well as the other and further reasons set forth by the State), Plaintiffs' petition for rehearing *en banc* should be denied.

Respectfully submitted,

Cullen and Dykman LLP

By: */s/ Leon J. Sokol*
    Leon J. Sokol


Kologi ◆ Simitz,
Counsellors at Law

By: */s/ Edward J. Kologi*
    Edward J. Kologi

Attorneys for Intervenors-Defendants-Appellees Senate President Nicholas P. Scutari and Assembly Speaker Craig J. Coughlin

Dated: November 14, 2025

13

**Certificate of Compliance with Type-Volume Limit,
Typeface Requirements and Type-Style Requirements**

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3,004 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Times Roman 14 point in Microsoft Word 2019/Office 365 in Times Roman 14 point.

s/ Leon J. Sokol
Leon J. Sokol

Dated: November 14, 2025

**Certification**

Leon J. Sokol, Esq, certifies as follows:

1. I am the signatory of this Brief and I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2. This Brief complies with Rules 28(a)(11) and 32(a)(7)(b) of the Federal Rules of Appellate Procedure and contains 3,004 words.

3. A true copy of the Presiding Officers' Brief was forwarded to the Appellants and Plaintiffs-Appellees, through their counsel, on November 14, 2025 by electronic means.

4. The E-Brief and Hard Copies of the Brief are identical, and that a virus check was performed with Symantec AntiVirus.

s/ Leon J. Sokol
Leon J. Sokol.

Dated: November 14, 2025