Nos. 23-1900, 23-2043

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

RONALD KOONS, *et al.*,

*Plaintiffs-Appellees,*

v.

MATTHEW J. PLATKIN, *et al.*,

*Defendants-Appellants.*

AARON SIEGEL, *et al.*,

*Plaintiffs-Appellees,*

v.

MATTHEW J. PLATKIN, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of New Jersey
Nos. 1:22-cv-07464, 1:22-cv-07463

## BRIEF OF IDAHO, MONTANA, 20 OTHER STATES, AND THE ARIZONA LEGISLATURE, AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

AUSTIN KNUDSEN
MONTANA ATTORNEY GENERAL
CHRISTIAN B. CORRIGAN
Solicitor General
MONTANA DEPT. OF JUSTICE
215 N. Sanders Street
Helena, MT 59601
(406) 444-2026
christian.corrigan@mt.gov

RAÚL R. LABRADOR
IDAHO ATTORNEY GENERAL
MICHAEL A. ZARIAN
Deputy Solicitor General
SEAN M. CORKERY
Assistant Solicitor General
GADER WREN
Assistant Solicitor General
OFFICE OF IDAHO ATTORNEY GENERAL
700 W. Jefferson St., Suite 210
Boise, ID 83720
(208) 334-2400
michael.zarian@ag.idaho.gov

*Counsel for Amici Curiae*
Additional Signatories Listed Below Signature Block

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................ii

INTRODUCTION AND INTEREST OF *AMICI CURIAE* ..........................................................1

SUMMARY OF ARGUMENT ...........................................................................................3

ARGUMENT ...............................................................................................................4

I.   The scope of the Second Amendment turns on its original meaning, as illuminated by Founding-era history and tradition. ...................................4

II.  New Jersey fails to show that its sensitive-place restrictions align with this Nation's historical tradition of firearm regulations. ..................................6

    A.  New Jersey's late-nineteenth century laws fail to show a historical tradition of public-carry bans in permitted public gatherings. ........................8

    B.  New Jersey similarly fails to produce the necessary historical evidence of restricting public carry in parks and beaches. ...........................................11

    C.  New Jersey's limited historical evidence fails to establish a historical tradition of public-carry bans in bars and restaurants serving alcohol. .........15

CONCLUSION ..........................................................................................................18

## TABLE OF AUTHORITIES

### CASES

*Atkinson v. Garland,*
70 F.4th 1018 (7th Cir. 2023)........................................................................ 9, 15

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ...........................................................................1, 5, 9, 18

*English v. State,*
35 Tex. 473 (1871) .........................................................................................10

*Gamble v. United States,*
587 U.S. 678 (2019) .......................................................................................18

*Heller v. District of Columbia,*
670 F.3d 1244 (D.C. Cir. 2011) ......................................................................6

*Koons v. Attorney General of New Jersey,*
156 F.4th 210 (3d. Cir. 2025).................................................................*passim*

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022) ...................................................................................*passim*

*Wolford v. Lopez,*
116 F.4th 959 (9th Cir. 2024)..................................................................... 8, 15

*Wolford v. Lopez,*
125 F.4th 1230 (9th Cir. 2025) ................................................. 3, 11, 12, 16, 17

*United States v. Rahimi,*
602 U.S. 680 (2024) ....................................................................................3, 5

### CONSTITUTIONAL PROVISIONS AND STATUTES

N.J. Rev. Stat. § 2C:58-4.6........................................................................14, 15, 17

### OTHER AUTHORITIES

Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia,* 40 Landscape J. 1 (2021) ..........................................11

David B. Kopel & Joseph G.S. Greenlee, *The 'Sensitive Places' Doctrine,*
13 Charleston L. Rev. 205 (2018) ...................................................................7

William Baude, *Constitutional Liquidation,* 71 Stan. L. Rev. 1 (2019) ...................................6

### INTRODUCTION AND INTEREST OF *AMICI CURIAE*

Just a few years ago, the Supreme Court reminded lower courts that the right to keep and bear arms is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 70 (2022) (cleaned up). Yet in many cases, courts across the country continue to defer to legislative "judgments regarding firearm regulations" notwithstanding *Bruen*'s declaration that "judicial deference to legislative interest balancing … is not [the] deference that the [Second Amendment] demands." *Id.* at 26. Instead, the deference owed is to the balance struck by the American people, which protects "'the right of law-abiding, responsible citizens to use arms' for self-defense." *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)).

The panel majority opinion in this case failed to heed *Bruen*'s admonition. The New Jersey statute at issue bans the public carry of firearms in certain "sensitive places," which broadly includes zoos, parks, beaches, public recreation facilities, public libraries, public museums, any permitted public gathering, sites where alcohol is served, entertainment facilities, casinos, hospitals and other healthcare facilities, and public movie and television sets. And while the majority opinion at least facially attempted to interpret the Second Amendment under *Bruen* by analogizing to historical regulations— including mostly ones enacted *well* after the Founding—it ultimately resorted to many of the same abstract "safety" concerns that led New York to designate all of Manhattan

1

a "sensitive place." *Koons v. Attorney General of New Jersey*, 156 F.4th 210, 242 (3d. Cir. 2025); *Bruen*, 597 U.S. at 31.

No doubt that courts may use analogies to "historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Bruen*, 597 U.S. at 30 (emphasis omitted). But that analogical inquiry requires courts to determine whether a modern and historical regulation are "relevantly similar"—that is, whether they impose a comparable burden and are comparably justified. *Id.* at 29. And where States attempt to address issues that have existed since the Founding, the analogical fit must be even closer. *Id.* at 26–27. States may not "expand[] the category of 'sensitive places'" too broadly—*i.e.*, to "all places of public congregation"—as that would "exempt cities from the Second Amendment" and "eviscerate the general right to publicly carry arms for self-defense." *Id.* at 31.

To ensure that courts properly employ the analogical approach required by *Bruen*, the States of Idaho, Montana, Alabama, Alaska, Arkansas, Florida, Georgia, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Nebraska, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, West Virginia, Wyoming, and the Arizona Legislature submit this amicus brief in support of Plaintiffs-Appellees and urge this Court to affirm the district court's decision.

## SUMMARY OF ARGUMENT

New Jersey's broad limitation on the right to "carry a handgun for self-defense outside the home" is unconstitutional, and the panel should have held as much. *Bruen*, 597 U.S. at 10. Yet the panel reached a contrary result largely by analogizing to a smattering of localized Reconstruction-era laws that did not "impose a comparable burden on the right of armed self-defense" and were not "comparably justified." *Id.* at 29. Specifically, the panel was wrong to uphold New Jersey's restriction on public carry as a proper "sensitive place" regulation inasmuch as it prohibits carrying firearms at (1) permitted public gatherings, (2) public parks and beaches, and (3) bars and restaurants serving alcohol.

New Jersey did not meet its burden of "affirmatively prov[ing] that its [sensitive-place] regulations [are] part of the [Nation's] historical tradition" by showing "distinctly similar" Founding-era public-carry bans. *Id.* at 19, 26. Its failure to do so "should be dispositive." *Wolford v. Lopez*, 125 F.4th 1230, 1242 (9th Cir. 2025) (VanDyke, J., dissenting from the denial of rehearing en banc). And even if Reconstruction-era analogues could establish a historical tradition of firearm regulation, the panel erred in concluding that many of New Jersey's proposed analogues were "relevantly similar." *United States v. Rahimi*, 602 U.S. 680, 692 (2024).

Because New Jersey's limited historical evidence fails to establish an "enduring American tradition" of restricting the right to carry throughout much of New Jersey, the Court should affirm the district court's grant of a preliminary injunction.

**ARGUMENT**

## I.   The scope of the Second Amendment turns on its original meaning, as illuminated by Founding-era history and tradition.

After *Bruen*, courts evaluating challenges under the Second Amendment must first determine whether "the Second Amendment's plain text covers an individual's conduct." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022). If it does, "the Constitution presumptively protects that conduct." *Id.* A State attempting to justify its restriction on the ability to keep or bear arms must thereafter "demonstrate that [its] regulation[s are] consistent with this Nation's historical tradition of firearm regulation." *Id.* Only then "may a court conclude that [the regulated] conduct falls outside the Second Amendment's unqualified command." *Id.* (cleaned up).

The historical inquiry prescribed by *Bruen* varies based on whether a challenged regulation addresses (1) a longstanding "societal problem" or (2) "unprecedented societal concerns or dramatic technological changes." *Id.* at 27. In both cases, courts must compare modern regulations to similar historical regulations, but the difference is the fit necessary to show that a modern regulation aligns with our Nation's historical tradition of firearm regulation. *See id.* When a modern regulation addresses a longstanding issue that traces back to the Founding era or earlier, the modern and historical regulations should be a close fit. *See id.* at 26–27 (explaining that, in these "straightforward" cases, the "lack of … distinctly similar historical regulation[s]" addressing the same problem or

4

the presence of regulations addressing it "through materially different means" is evidence that the "modern regulation is unconstitutional").

But when evaluating modern regulations addressing "unprecedented societal concerns or dramatic technological changes" "that were unimaginable at the founding," courts may employ "a more nuanced approach." *See id.* at 27–28. In these cases, the fit need not be as close. Even so, *Bruen*'s analogical inquiry requires courts to determine that a modern regulation is "relevantly similar" to a proposed historical analogue—that is, that the "modern and historical regulations impose a *comparable burden* on the right of armed self-defense and … [are] *comparably justified*." *Id.* at 29 (emphases added); *see also United States v. Rahimi*, 602 U.S. 680, 692 (2024) (repeating the need for "relevantly similar" historical analogues).

Moreover, whether the modern regulation addresses longstanding or new societal problems, discerning "the *original meaning* of the Constitution" remains the guiding light of *Bruen*'s analogical inquiry. *Bruen*, 597 U.S. at 81 (Barrett, J., concurring) (emphasis added). And since the original meaning tracks "the public understanding of the right when the Bill of Rights was adopted in 1791," *id.* at 37, the scope of the right is necessarily best informed by evidence closest in time to 1791, *id.* at 36 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 614 (2008)); *see also Rahimi*, 602 U.S. at 738–39 (Barrett, J., concurring).

For this reason, *Bruen* cautioned courts "against giving postenactment history more weight than it can rightly bear." *Bruen*, 597 U.S. at 35; *see also id.* at 83 (Barrett, J.,

concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights."). While a regular course of conduct *can* sometimes "liquidate and settle the meaning of disputed or indeterminate terms and phrases in the Constitution," *id.* at 35–36 (cleaned up), "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text," *id.* at 36 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)) (emphasis original); *see also* William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1, 13–14 (2019) (liquidation requires indeterminacy because "[i]f first-order interpretive principles make the meaning clear in a given context, there is no need to resort to liquidation").

Finally, even though New Jersey's obligation to respect Plaintiffs' right to keep and bear arms flows from the Fourteenth Amendment, not the Second, the rights enumerated in the Bill of Rights and incorporated against the States after the Fourteenth Amendment's adoption "have the same scope as against the Federal Government." *Bruen*, 597 U.S. at 37.

## II.  New Jersey fails to show that its sensitive-place restrictions align with this Nation's historical tradition of firearm regulations.

*Heller* and *Bruen* chart the course for determining whether New Jersey's firearm regulations are consistent with the Second Amendment's text and history. Since the Amendment's plain text "protects [Plaintiffs'] proposed course of conduct—carrying

handguns publicly for self-defense," *Bruen*, 597 U.S. at 32—the Court must compare New Jersey's historical evidence with "historical precedent" to show "a comparable tradition of regulation," *id.* at 27. New Jersey must carry its burden to "affirmatively prove that its [sensitive-place] regulation[s are] part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," specifically with respect to its restrictions in (a) public gatherings, (b) public parks and beaches, and (c) bars and restaurants serving alcohol. *Id.* at 19.

To be sure, *Bruen* assumed that "it [was] settled" that certain locations—including schools, government buildings, and polling places—were "sensitive places" where carrying a firearm "could be prohibited consistent with the Second Amendment." *Id.* at 30. But *Bruen*'s list of "settled" sensitive places *omits* public gatherings, parks, beaches, and places where alcohol is served, so New Jersey must show that its modern sensitive-place regulations are sufficiently analogous to the locations *Bruen* and *Heller* assumed were settled.[1] Indeed, *Bruen*'s (and *Heller*'s) omission of these locations from the list of "settled" sensitive places at a minimum suggests that they haven't historically been viewed as sensitive places. And close scrutiny of the evidence put forward by New

---

[1] Some scholars are skeptical that there is a persuasive "rationale for extending the 'sensitive places' doctrine to places that are not schools or government buildings." David B. Kopel & Joseph G.S. Greenlee, *The 'Sensitive Places' Doctrine*, 13 Charleston L. Rev. 205, 289 (2018).

Jersey and the panel's majority opinion only confirms that restricting firearms in these places does not accord with the Nation's historical tradition of firearm regulation.

**A. New Jersey's late-nineteenth century laws fail to show a historical tradition of public-carry bans in permitted public gatherings.**

Because social gatherings have undisputedly existed since the Founding, New Jersey's burden requires it to present "distinctly similar" regulations from the Founding era showing restrictions at such gatherings. *Bruen*, 597 U.S. at 26. Yet it offers *no evidence* of historical firearm regulations in public gatherings between 1791 and 1868. Its failure to produce any evidence of relevantly similar laws during this period strongly suggests that no such tradition existed. *Cf. Bruen*, 597 U.S. at 59 (not the court's burden "to sift the historical materials for evidence to sustain" the regulation).

It's no surprise that New Jersey does not offer evidence of Founding-era regulation of firearms at public gatherings—because no such regulations existed. Facing similar restrictions in California, the Ninth Circuit concluded that "no jurisdiction had prohibited the carry of firearms at public gatherings until after the ratification of the Fourteenth Amendment." *Wolford v. Lopez*, 116 F.4th 959, 998 (9th Cir. 2024). Since "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment," *Bruen*, 597 U.S. at 26, the Ninth Circuit held that California's prohibitions were likely unconstitutional. *Wolford*, 116 F.4th at 998.

The only evidence that New Jersey presents is six post-Reconstruction statutes prohibiting firearms at certain social events. JA 1249–51, 1513–14 (1870 and 1871 Texas laws); JA 1510–12 (1869 Tennessee law); JA 1370 (1870 Georgia law); JA 1515–16, 1712–14 (1874 and 1879 Missouri laws); JA 2093–95 (1889 Arizona law); JA 2096–98 (1890 Oklahoma law). As a preliminary matter, "because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Bruen*, 597 U.S. at 36 (quoting *Heller*, 554 U.S. at 614)); *see also Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023) (explaining that "the pertinent question … is what the Founders understood the Second Amendment to mean," and noting that *Bruen* "cautioned against giving too much weight to laws passed [long] before or after the Founding").

But even if the post-Reconstruction statutes that New Jersey cites had much weight, New Jersey has still failed to show a historical tradition because many of these restrictions aren't "relevantly similar"—they either didn't impose a comparable burden on the public-carry right or were upheld on a rationale clearly inconsistent with the text of the Second Amendment. *Bruen*, 597 U.S. at 29 (cleaned up).

For instance, Missouri's 1874 law prohibiting only *concealed carry* at public assemblies is not relatively similar to prohibiting *all* carry of weapons—both open and concealed carry—at public gatherings. *See* JA 175–176 (quoting a Missouri court's observation that "[i]f the statute in question had the effect of denying this right, and

absolutely prohibiting the citizen from keeping and bearing arms, we would not hesitate to pronounce it void, as being violative of a constitutional right secured to every man by the constitution of the State").[2] State laws banning only concealed carry of weapons in public do not provide the historical proof necessary to justify complete bans on carrying weapons in public. *Bruen*, 597 U.S. at 53.

New Jersey also relies on a facially similar 1871 law from Texas, but that law provides no support either. The Texas Supreme Court held that the 1871 law was constitutional, *see English v. State*, 35 Tex. 473, 476–80 (1871), but only because the court held a "strict militia view of the Second Amendment"—a view that gave the Texas Legislature nearly plenary authority in the area of firearm restrictions and a view that *Heller* explicitly rejected. *Koons v. Attorney General of New Jersey*, 156 F.4th 210, 281 (3d. Cir. 2025) (Porter J., concurring in the judgment in part and dissenting in part). The Texas statute is a perfect illustration of the dangers of using post-ratification history: the statute was adopted and upheld based on a legal understanding "that [is] *inconsistent* with the original meaning of the constitutional text," and therefore sheds little light on the scope of the Second Amendment. *Bruen*, 597 U.S. at 36 (emphasis in original)

---

[2] Missouri later (in 1879) criminalized open carry as well at public assemblies, but given the Missouri Supreme Court's earlier determination that such a law would be unconstitutional and the fact that there is no evidence this portion of the law was ever enforced, it is not a reliable historical analogue. JA 176–177; *cf. Bruen*, 597 U.S. at 27 (explaining that "if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality").

(cleaned up) (laws based on erroneous understandings "obviously cannot overcome or alter [constitutional] text").

At bottom, because New Jersey does not meet its burden to support its prohibition on firearms in public gatherings, the provision is likely unconstitutional.

### B. New Jersey similarly fails to produce the necessary historical evidence of restricting public carry in parks and beaches.

As for New Jersey's restriction on public carry in parks and at beaches, New Jersey once again has regulated in spaces that have existed, in one form or another, since the Founding. JA 186–92 (tracing historical evidence for parks, or their analogues, to the establishment of Boston Common in 1634).[3] It must therefore point to "distinctly similar historical regulation[s]" in such spaces, *Bruen*, 597 U.S. at 26, but has not done so. *See Wolford v. Lopez*, 125 F.4th 1230, 1242 (9th Cir. 2025) (VanDyke, J., dissenting from denial of rehearing en banc) ("When the same locations that existed at the

---

[3] To sidestep this problem, the panel examined the pre-Founding and Founding-era history of parks narrowly, concluding that early parks were "devoted primarily to grazing cattle," so "[t]he public parks we know today did not emerge until after the onset of mass urbanization." *Koons*, 156 F.4th at 256. But such historical analysis is highly suspect. While parks may have been used differently, there is ample evidence dating back to Boston Common in 1634 that parks have long been used for recreational purposes. Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 3–6 (2021); *see also Wolford*, 125 F.4th 1230, 1242 (9th Cir. 2025) (VanDyke, J., dissenting from denial of rehearing en banc). This Court should reject the panel's feint to ignore the lack of analogous historical regulations.

Founding still exist today, and there is no historical tradition of banning carry in those locations at the Founding, that lack of historical regulation must count for something.").

As for its pre-1868 evidence, New Jersey doesn't rely on a state statute but on a single local ordinance adopted by the board of commissioners of New York parks. Appellant's Opening Br. at 20; JA 1593. As the Supreme Court noted, "the bare existence of [one] localized restriction[]" between 1791 and 1868 "cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry." *Bruen*, 597 U.S. at 67. The New York ordinance is precisely the type of "outlier[]" that *Bruen* warns courts not to "endors[e]" as establishing a historical tradition. *Id.* at 30; *id.* at 65 (discarding two firearm statutes as "outliers"). And the absence of any significant pre-Reconstruction tradition "should be dispositive" of the constitutionality of New Jersey's regulation. *Wolford*, 125 F.4th at 1242 (VanDyke, J., dissenting from denial of rehearing en banc).[4]

New Jersey also cites post-Reconstruction statutes, but those statutes don't justify its firearm restriction either. Again, post-Reconstruction history should not be given "more weight than it can rightly bear," since the relevant constitutional inquiry

---

[4] The panel majority also cited a 1786 Virginia law which forbade "rid[ing] armed by night nor by day, in Fairs [and] Markets, or in other places, in terror of the country." *Koons*, 156 F.4th at 258 n.128; JA 1508. But the Supreme Court in *Bruen* considered this exact statute and held that it merely "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." 597 U.S. at 49–50; *id.* at 46–47 (similar colonial statutes "merely codified the existing common-law offense of bearing arms to terrorize the people").

turns on the original understanding when the Second Amendment was ratified many decades prior. *Bruen*, 597 U.S. at 35. The Supreme Court's admonitions about the minimal insight these regulations provide are especially pertinent here given New Jersey's attempts to rely on laws enacted as recently as 1937—a full 69 years after the Fourteenth Amendment was ratified and 148 years after the Bill of Rights was ratified. *See* Appellant's Opening Br. at 20–21 (citing 22 post-Reconstruction statutes enacted between 1883 and 1937); *Bruen*, 597 U.S. at 83 (Barrett, J., concurring) (rejecting "freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights").

But even assuming historical evidence from the turn of the twentieth century is as probative of the scope of the right to bear arms, New Jersey's historical evidence still fails to support the existence of a historical tradition of relevantly similar public-park restrictions. The historical regulations it cites are far from "distinctly similar" to the law at issue here. *Bruen*, 597 U.S. at 26.

Many of these state laws and local ordinances either didn't impose a "comparable burden" on the public-carry right (the "how") or weren't "comparably justified" (the "why")—the "central considerations" in this inquiry. *Bruen*, 597 U.S. at 29 (cleaned up). Some of these historical restrictions allowed for public carry in parks if the person obtained permission beforehand. *See* JA 1964 (1891 Springfield, Massachusetts ordinance banning public carry in public parks "except with prior consent of the Board"); JA 1840 (1895 Michigan law banning public carry in Detroit parks "without

the permission of said commissioners"); JA 1931 (1931 North Carolina statute) (similar); JA 1933 (1937 New Jersey statute) (similar); JA 1971 (1891 Lynn, Massachusetts ordinance) (similar). So these restrictions imposed less of a burden on the right than § 2C:58-4.6(a)(10)'s complete ban.

Many other restrictions fail the "why" portion of the inquiry—they were justified on different grounds than the public safety interest that § 2C:58-4.6(a)(10) targets. *See* Appellant's Opening Br. at 20–22. For example, some restrictions appear tailored to prevent unlawful hunting in public parks or to protect wildlife. *See* JA 1866 (1905 Minnesota statute) (first outlining a prohibition that "[n]o person shall pursue, hunt, take, catch, or kill any wild bird or animal of any kind"); JA 1996 (1893 Pittsburgh ordinance) (shall not "carry firearms," "shoot or … set snares for birds, rabbits, squirrels, or fish"); JA 1983 (1893 Wilmington, Delaware ordinance) (shall not "carry fire-arms or shoot birds or other animals within the Park").

And many of the public-carry restrictions appear targeted to preserving the physical condition of the public parks. *See* JA 1996 (1893 Pittsburgh ordinance) (ordinance expressly providing for the "control, maintenance, supervision and preservation of the public parks"); JA 1962–63 (1890 Williamsport, Pennsylvania ordinance prohibiting firearms for "the protection of Brandon park"); *see also* JA 1952 (1888 Salt Lake City ordinance) (prohibition appears alongside restrictions that prohibit defacing trees, shrubs, plants, property, and that otherwise preserve or protect the park's physical condition); JA 2002 (1898 Boulder, Colorado ordinance) (similar); JA

1980 (1892 Spokane, Washington ordinance) (similar); JA 1987 (1895 Canton, Illinois ordinance) (similar). These distinct justifications substantially diminish the weight of New Jersey's evidence.

All told, New Jersey identifies one arguably similar pre-1868 restriction that *may* help clarify the Second Amendment's original meaning. *Atkinson*, 70 F.4th at 1020. But New Jersey's remaining evidence warrants little weight in *Bruen*'s inquiry, so the district court correctly held that New Jersey failed to meet its burden.

### C. New Jersey's limited historical evidence fails to establish a historical tradition of public-carry bans in bars and restaurants serving alcohol.

Finally, "[e]stablishments serving alcohol have existed since the Founding," *Wolford*, 116 F.4th at 985, and the issue of drunkenness is anything but an "unprecedented societal concern[]" that was "unimaginable" at the Founding. *Bruen*, 597 U.S. at 27–28; Proverbs 20:1 (King James Version) ("Wine is a mocker, strong drink is raging: and whosoever is deceived thereby is not wise."); *contra Koons*, 156 F.4th at 262 (majority opinion suggesting that alcohol was an "unprecedented societal concern" simply because later generations were *more* concerned about it than previous ones). So the district court rightly required a close fit between § 2C:58-4.6(a)(15) and New Jersey's proposed historical analogues. *See* JA 195–96.

New Jersey identified some similar historical regulations, but it still failed to show a *national* historical tradition of regulating public carry in bars or restaurants that serve alcohol. *See Bruen*, 597 U.S. at 67. As an initial matter, the three similar regulations New

Jersey cited were passed between 1853 and 1890—one was a local regulation (New Orleans) and the other two were from territories (New Mexico and Oklahoma). *See Bruen*, 597 U.S. at 66–69 (explaining that territorial restrictions deserve little weight in determining the establishment of a national tradition); *see also Koons*, 156 F.4th at 262 (adding another territorial regulation from Arizona). Moreover, "the bare existence of [three] localized restrictions" on their own "cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry." *Bruen*, 597 U.S. at 67.

To bolster its historical record, New Jersey identifies six more laws that it claims broadly prohibited any weapons "where people gather for social and entertainment purposes." Appellant's Opening Br. at 16–17 (citing JA 1505–07, 1513–14 (1870 & 1871 Texas laws); JA 1592 (1870 Georgia law); JA 1515–16, 2090–92 (1874, 1879 & 1883 Missouri laws); JA 2093–95 (1889 Arizona law); JA 2099–102 (1903 Montana law); JA 1509, Laws & Ordinances of City of New Orleans, ch.1 art.1, *reprinted in Jewell's Digest*, at 1 (1882) (1816 & 1882 New Orleans laws). Only one of those laws pre-dates Reconstruction. And none of them are nearly similar enough to support New Jersey's regulation—the only similarity is that they prohibit arms in places that are "crowded and protected" by the police, but *Bruen* forecloses any attempt to restrict public carry based on that overbroad principle. *See Wolford*, 125 F.4th at 1241 (VanDyke, J., dissenting from denial of rehearing en banc) (citing *Bruen*, 597 U.S. at 30–31).

Next, New Jersey invokes laws regulating the use of and access to alcohol by members of the militia. *See* Appellant's Opening Br. at 17–18. One of these laws (1756 Delaware law) prohibited setting militia meeting locations near taverns or other locations that sold alcohol. The other (1859 Connecticut law) banned alcohol sales near military encampments. The most that can be said about these laws is that they support a historical tradition of regulating the use of or access to alcohol by militia members. But they don't support the existence of a historical tradition of regulating members of the public from carrying firearms in bars and restaurants, without regard for whether they are consuming alcohol. *Wolford*, 125 F.4th at 1242 (VanDyke, J., dissenting from the denial of rehearing en banc).

Similarly, New Jersey leans on an 1867 Kansas law that prohibited public carry *while intoxicated*. JA 196. *See also Koons*, 156 F.4th at 262 (discussing a similar Missouri regulation). But again, § 2C:58-4.6(a)(15) completely restricts the public-carry right in bars and restaurants that serve alcohol, even if the person carrying is not consuming alcohol. And for that reason, § 2C:58-4.6(a)(15) does not impose a comparable burden to the Kansas law. *See Bruen*, 597 U.S. at 27–30; *United States v. Connelly*, 117 F.4th 269, 282 (5th Cir. 2024) (addressing these same laws and concluding that "[t]he history and tradition before us support, at most, a ban on carrying firearms while an individual is *presently* under the influence").

Thus, the total quantum of evidence that New Jersey identifies amounts to three laws arguably similar to § 2C:58-4.6(a)(15) whose timing and location makes them weak

evidence, and a smattering of other laws with similar temporal defects that either imposed different burdens or were justified on different grounds. This showing comes nowhere near establishing a national historical tradition of regulating a centuries-old problem by restricting public carry. *See* JA 196.

## CONCLUSION

As *Bruen* explained, "when it comes to interpreting the Constitution, not all history is created equal." 297 U.S. at 34. Rather, "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* (quoting *Heller*, 554 U.S. at 634–35 (emphasis in original)). So evidence closer in time to the Second Amendment's adoption is most relevant for understanding the Amendment's scope. Of course, evidence of historical regulations through the end of the nineteenth century *could* be relevant, but only to the extent that it confirms what prior evidence "already … established." *Id.* at 37 (quoting *Gamble v. United States*, 587 U.S. 678, 702 (2019)).

The Second Amendment protects the right to possess handguns, both in the home and in public, for the purpose of self-defense. *Bruen*, 597 U.S. at 10. With few exceptions, New Jersey relies on out-of-date historical analogues passed well after Reconstruction—"surely too slender a reed on which to hang a historical tradition of restricting the right to public carry" in the locations challenged here. *See id.* at 58. Even if Reconstruction-era statutes and local ordinances can provide probative evidence of the Second Amendment's original meaning, New Jersey's evidence *still fails* to identify

relevantly similar historical analogues for its statute's sensitive-place restrictions discussed above. Sweeping aside New Jersey's irrelevant evidence leaves little remaining historical support for Chapter 131's sensitive-place restrictions, and this Court should refuse to give New Jersey's evidence "more weight than it can rightly bear." *Id.* at 35.

Dated: January 8, 2026

Respectfully submitted,

AUSTIN KNUDSEN
MONTANA ATTORNEY GENERAL

RAÚL R. LABRADOR
IDAHO ATTORNEY GENERAL

*/s/ Michael A. Zarian*

CHRISTIAN B. CORRIGAN
Solicitor General

MICHAEL A. ZARIAN
Deputy Solicitor General
SEAN M. CORKERY
Assistant Solicitor General
GADER WREN
Assistant Solicitor General

*Counsel for Amici Curiae*

## ADDITIONAL SIGNATORIES

STEVE MARSHALL
Attorney General
State of Alabama

STEPHEN J. COX
Attorney General
State of Alaska

STEVE MONTENEGRO
Speaker of the Arizona
House of Representatives

WARREN PETERSON
President of the
Arizona Senate

TIM GRIFFIN
Attorney General
State of Arkansas

JAMES UTHMEIER
Attorney General
State of Florida

CHRIS CARR
Attorney General
State of Georgia

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

KRIS W. KOBACH
Attorney General
State of Kansas

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

CATHERINE L. HANAWAY
Attorney General
State of Missouri

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DAVE YOST
Attorney General
State of Ohio

GENTNER DRUMMOND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

MARTY JACKLEY
Attorney General
State of South Dakota

KEN PAXTON
Attorney General
State of Texas

DEREK BROWN
Attorney General
State of Utah

JOHN B. MCCUSKEY
Attorney General
State of West Virginia

KEITH G. KAUTZ
Attorney General
State of Wyoming

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 29(a)(5) and L.A.R. 31.1(c), I certify that:

1.      I am a member in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

2.      This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because the brief contains 4,710 words, excluding exempted parts.

3.      This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Garamond 14-point font.

4.      This brief complies with L.A.R. 31.1(c) in that prior to being electronically submitted, it was scanned by SentinelOne and found to be free from computer viruses.

5.      The text of the electronic brief is identical to the text in the paper copies to be filed with the Court. L.A.R. 31.1(c).

Dated: January 8, 2026

/s/ *Michael A. Zarian*
Michael A. Zarian

**CERTIFICATE OF SERVICE**

I certify that on January 8, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


/s/ *Michael A. Zarian*
Michael A. Zarian