# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

### No. 23-1900, 23-2043

**RONALD KOONS, et al.,**

      **Plaintiffs-Appellees,**

v.

**MATTHEW J. PLATKIN, et al.,**

      **Defendants-Appellants,**
  and

**NICHOLAS P. SCUTARI, President of the New Jersey Senate, and CRAIG J. COUGHLIN, Speaker of the New Jersey General Assembly,**

  **Intervenors-Defendants-Appellees.**

On Appeal from the
United States District Court
for the District of New Jersey
(Nos. 22-cv-7463, 22-cv-7464 (RMB))

---

**BRIEF OF INTERVENORS-DEFENDANTS-APPELLEES
NEW JERSEY SENATE PRESIDENT NICHOLAS P. SCUTARI AND
NEW JERSEY ASSEMBLY SPEAKER CRAIG J. COUGHLIN
IN RESPONSE TO THE JANUARY 8, 2026 BRIEF OF IDAHO,
MONTANA, ETC. AS *AMICI CURIAE* IN SUPPORT OF
PLAINTIFFS-APPELLEES AND AFFIRMANCE**

---

Leon J. Sokol, Esq.
CULLEN AND DYKMAN, LLP
433 Hackensack Avenue
Hackensack, NJ 07601
(201) 488-1300

Edward J. Kologi, Esq.
KOLOGI • SIMITZ
00 N. Wood Avenue
Linden, NJ 07036
(908) 486-8877

Attorneys for Intervenors-
Defendants-Appellees Senate
President Nicholas P. Scutari and
Assembly Speaker Craig J.
Coughlin

LEON J. SOKOL, ESQ.
EDWARD J. KOLOGI, ESQ.
Of Counsel and On the Brief

STEVEN SIEGEL, ESQ.
MICHAEL SIMITZ, ESQ.
On the Brief

# TABLE OF CONTENTS

TABLE OF CITATIONS.........................................................................................ii

INTRODUCTION ............................................................................................. 1

LEGAL ARGUMENT ....................................................................................... 2

POINT I ............................................................................................................ 2

**THE *AMICI*'S LEGAL ARGUMENT FAILS TO ADDRESS – LET ALONE APPLY -- THE "PRINCIPLES"- BASED HISTORICAL ANALOGUE APPROACH RECOGNIZED BY THE SUPREME COURT IN *UNITED STATES V. RAHIMI*, 602 U.S. 680 (2024). BECAUSE THE *RAHIMI* PRINCIPLES-BASED APPROACH CONSTITUTES THE CURRENT STATE OF THE LAW OF THE SECOND AMENDMENT, THE *AMICI*'S LEGAL ARGUMENT FAILS FOR THIS REASON ALONE.**

A. Overview of the facts, reasoning and result in *Rahimi* ............... 3

B. *Rahimi* clarified *Bruen*'s approach to the historical analogue inquiry ................................................................................. 5

C. Application of the *Rahimi* "principles" based standard to this case ................................................................................. 12

1. Permitted public gatherings, demonstrations and events . 14

2. Parks and beaches ............................................................. 16

3 Bars and other locations that serve alcohol ....................... 17

CONCLUSION .............................................................................................. 19

CERTIFICATIONS ........................................................................................ 20

# TABLE OF CITATIONS

*Cases*

*Antonyuk v. James*,
   120 F.4th 941 (2d Cir. 2024) .......................................................... 18, 19

*Atkinson v. Garland*,
   70 F.4th 1018 (7th Cir. 2023) ............................................................ 7

*Gonyo v. D. S.*,
   210 N.Y.S.3d 612 (2024) .................................................................... 7

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022) ..................................................................... *passim*

*United States v. Daniels*,
   77 F.4th 337 (5th Cir. 2023) .............................................................. 7

*United States v. Dubois*,
   94 F.4th 1284 (11th Cir. 2024) ........................................................... 7

*United States v. Rahimi*,
   602 U.S. 680 (2024) .................................................................. *passim*

*United States v. Sing-Ledezma*,
   706 F. Supp. 3d 650 (W.D. Tex. 2023) .................................................... 7

*Statutes*

18 U.S.C. § 922 ......................................................................... *passim*

# INTRODUCTION

Senate President Nicholas P. Scutari and General Assembly Speaker Craig J. Coughlin (hereafter collectively "the Presiding Officers") intervened in the action below. The Presiding Officers sought to present the perspective of the New Jersey Legislature in connection with its enactment of L. 2022, c. 131 (hereafter "Chapter 131"). As intervenors, the Presiding Officers fully participated in the preliminary injunction proceedings before the District Court. Presently, the Presiding Officers are appellees but are presenting argument on the side of Appellants New Jersey Attorney General and Superintendent of the New Jersey State Police (hereafter "the State").

Pursuant to Local Appellate Rule 29(a), this brief is filed in response to the January 8, 2026 brief of Idaho, Montana, etc. as *Amici Curiae* in support of Plaintiffs-Appellees and Affirmance (hereafter "*Amicus* Brief" or "*Amici*").

The Presiding Officers adopt – and incorporate by reference – the State's response to the *Amicus* Brief. To the State's response, the Presiding Officers add only the following.

# LEGAL ARGUMENT

## POINT I

**THE *AMICI*'S LEGAL ARGUMENT FAILS TO ADDRESS -- LET ALONE APPLY -- THE "PRINCIPLES"- BASED HISTORICAL ANALOGUE APPROACH RECOGNIZED BY THE SUPREME COURT IN *UNITED STATES V. RAHIMI*, 602 U.S. 680 (2024). BECAUSE THE *RAHIMI* PRINCIPLES-BASED APPROACH CONSTITUTES THE CURRENT STATE OF THE LAW OF THE SECOND AMENDMENT, THE *AMICI*'S LEGAL ARGUMENT FAILS FOR THIS REASON ALONE**

There are two recent Supreme Court decisions addressing the right to bear arms in places outside of the home: *i.e.*, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024). The *Amici* -- in their brief on the merits -- address and apply *Bruen* 42 times. By contrast, the *Amici* cite to *Rahimi* just twice – and each time as a passing parenthetical. Neither citation actually applies the principles recognized in *Rahimi* to the facts of this case.

Why do the *Amici* rely almost exclusively on *Bruen* and barely mention *Rahimi*? This seems a curious disparity – especially in light of the fact that *Rahimi* is the **more recent** of the Court's two decisions and thereby represents the Court's latest and binding decision with respect to the contours of its "historical analogue" inquiry into the Second Amendment right to bear arms. The answer to this curious disparity is that *Rahimi* clarified the *Bruen* historical analog inquiry in a way that is antithetical to the interests of the *Amici*.

As fully discussed herein, the current state of Second Amendment law is the law as stated in *Rahimi*. Therefore, it is critical that this Court consider and review the Supreme Court's analysis in *Rahimi* – as well as consider the Supreme Court's particular application of the historical analogue inquiry to the facts in *Rahimi*.

The foregoing is the focus of this brief. As set forth below, the facts, reasoning and result in *Rahimi* further bolsters the conclusion that the panel's decision below was correctly decided and should not be disturbed.

## A. Overview of the facts, reasoning and result in *Rahimi*

The facts of *Rahimi* are as follows. In 2019, Zackey Rahimi injured his girlfriend, C.M., during an argument. *Rahimi*, 602 U.S. at 686. He fired a gun as C.M. fled, later threatening to shoot her if she reported the incident. *Ibid*. Pursuant to this threat, C.M. sought a restraining order against Rahimi. *Ibid*. A state court in Texas granted the order, finding that Rahimi was "a credible threat to the physical safety of C.M. [or her child]." *Id*. at 687. The restraining order prohibited Rahimi from contacting C.M. for two years, except to discuss their child. *Ibid*. During those two years, the order also suspended Rahimi's gun license. *Ibid*.

While he was under this restraining order, law enforcement identified Rahimi as a suspect in five shootings. *Ibid*. Police searched Rahimi's home, where they found two firearms and a copy of the restraining order. *Id*. at 688. Rahimi was subsequently charged with violating 18 U.S.C. § 922(g)(8) by possessing a firearm while subject to a domestic violence restraining order. *Ibid*.

For this statute to apply, the restraining order in question must meet several requirements. The order must have been issued after a hearing. *Ibid*. The defendant must have had actual notice of that hearing and must have had an opportunity to participate. *Ibid*. The restraining order must also either prohibit the use, attempted use, or threatened use of physical force against an intimate partner or include a finding that the defendant represents a credible threat to the physical safety of a partner. *Ibid*. Rahimi's restraining order satisfied all of these elements. *Id*. at 688-89.

Asserting that § 922(g)(8) violates the Second Amendment facially, Rahimi moved to dismiss the indictment. *Id*. at 689. The district court denied the motion, and the U.S. Court of Appeals for the Fifth Circuit initially affirmed. *Ibid*. While Rahimi's petition for rehearing *en banc* was pending, *Bruen* was decided. *Ibid*. The Fifth Circuit panel withdrew its opinion and ordered additional briefing to account for the change in law. *Ibid*. On rehearing, the Fifth Circuit determined that the Government failed to present any historical evidence establishing Section 922(g)(8) as "within our Nation's historical tradition of firearm regulation," and therefore vacated Rahimi's conviction. *Ibid*. The Supreme Court granted certiorari. *Id*. at 690.

Writing for a nearly unanimous Court, Chief Justice Roberts criticized lower courts for misunderstanding *Bruen*. *Id*. at 691-92. In deciding *Rahimi*, the Fifth Circuit had looked for a "historical twin," but according to Chief Justice Roberts,

only a "historical analogue" is required to establish a law as constitutional. *Id*. at 701. A modern law only needs to be "'relevantly similar' to laws that our tradition is understood to permit" to survive a Second Amendment challenge. *Id*. at 692.

The Court then identified two types of historical legislation that are "relevantly similar" to § 922(g)(8): surety laws and affray laws. *Id*. at 695-98. Surety laws allowed judges to impose a bond on a person suspected of future misbehavior, including spousal abuse. *Id*. at 695. These bonds were temporary and based upon the findings of a magistrate. *Id*. at 696-97. Affray laws outlawed "riding or going armed, with dangerous or unusual weapons, ... [to] terrify[] the good people of the land." *Id*. at 697. Both surety laws and affray laws date back to at least the 18th century. *Id*. at 693-94.

Drawing upon these historical regulations, the Court held that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id*. at 702. With the facial constitutionality of § 922(g)(8) established, the Court reversed the Fifth Circuit's decision. *Id*. at 700-02.

**B.  *Rahimi* clarified *Bruen*'s approach to the historical analogue inquiry.**

As previously noted, *Rahimi* is the Supreme Court's first application of the historical test since *Bruen* was decided. The *Rahimi* opinion, therefore, was tasked with resolving the ambiguities in *Bruen* that have troubled lower courts. *See id.* at

739 (Barrett, J., concurring) (stating that "[c]ourts have struggled with th[e] use of history in the wake of *Bruen*"); *id.* at 742 (Jackson J. concurring) (stating that "lower courts appear to be diverging in both approach and outcome as they struggle to conduct the inquiry *Bruen* requires of them.")

Examples abound of the confusion and ambiguity created by *Bruen* – and of lower courts' pleas to the Supreme Court for further clarification. *See, e.g., United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024) ("We require clearer instruction from the Supreme Court before we may reconsider the constitutionality of [18 U.S.C. §]922(g)(1)"); *United States v. Daniels*, 77 F.4th 337, 358 (5th Cir. 2023) (Higginson, J., concurring) ("[C]ourts, operating in good faith, are struggling at every stage of the *Bruen* inquiry. Those struggles encompass numerous, often dispositive, difficult questions"); *Atkinson v. Garland*, 70 F.4th 1018, 1024 (7th Cir. 2023) ("[T]he historical analysis required by *Bruen* will be difficult and no doubt yield some measure of indeterminancy"); *Gonyo v. D. S.*, 210 N.Y.S.3d 612, 615 (2024) ("Interpretations and applications of *Bruen* by lower courts have been widely divergent and thus, very difficult to apply as precedent"); *United States v. Sing-Ledezma*, 706 F. Supp. 3d 650, 655 (W.D. Tex. 2023) ("[T]he Court pauses to join the choir of lower courts urging the Supreme Court to resolve the many unanswered questions left in *Bruen*'s wake")

These pleas for clarification did not go unanswered. On June 21, 2024, the Supreme Court decided *United States v. Rahimi*, 602 U.S. 680 (2024).

In *Rahimi*, the Court -- by way of an eight-Justice majority -- squarely addressed *Bruen*'s test of what constitutes an "historical analogue" for purposes of the Second Amendment. The Court clarified its historical analogue approach first recognized in *Bruen*. *Id*. at 690-702.

*Rahimi* held that a regulation must be "consistent with the **principles** that underpin our regulatory tradition," *Rahimi*, 602 U.S. at 692 (emphasis added). To be constitutional, according to *Rahimi*, a modern regulation only needs to be consistent with the principles of our tradition, not identical to older regulations. *Ibid*. *Rahimi*'s "principles" analysis constitutes a critical new explication of the historical analogue inquiry.[1]

---

[1] In addition to its introduction of "principles"-based analysis, *Rahimi* adds other critical guidance to *Bruen*. Both *Rahimi* and *Bruen* cite two metrics as "central" considerations: the burden placed on the Second Amendment right and the justification for that burden. *Rahimi*, 602 U.S. at 692; *Bruen*, 597 U.S. at 29. The Court refers to these metrics as "how" and "why." *Ibid*.

The Court in *Rahimi* found surety laws and going armed laws to be analogues to § 922(g)(8) because they each share a "how" and a "why." *Rahimi*, 602 U.S. at 698. (stating that the federal domestic violence statute -- Section 922(g)(8) -- is "relevantly similar to those founding era regimes in both why and how it burdens the Second Amendment right.") (quoting *Bruen*, 597 U.S. at 29).

Critically, *Rahimi*'s analysis clarified the standard enunciated in *Bruen*. When creating the test in *Bruen*, the Court discussed whether modern and historical laws were "relevantly similar" in the context of "modern regulations that were unimaginable at the founding." *Bruen*, 597 U.S. at 28. *Rahimi* explained that this analysis applies to problems that existed at the Founding as well as today. *Rahimi*, 602 U.S. at 698. Domestic violence -- at issue in *Rahimi* -- is not the sort of modern

The *Rahimi* Court clearly considered this new "principles" language an important part of the *Rahimi* opinion because it is quoted twice in the majority opinion and four times in the concurring opinions. *See id.* at 692; *id.* at 703, 704 (Sotomayor, J., concurring) ("The Court today emphasizes that a challenged regulation "must comport with the *principles* underlying the Second Amendment, but need not have a precise historical match. I agree."); *id.* at 741 (Jackson, J., concurring) (quoting the majority opinion and stating that "[g]un regulations need only comport with the *principles* underlying the Second Amendment."). Justice Sotomayor called the quote "an important methodological point that bears repeating," *id.* at 703, while Justice Jackson describes it as a welcome "clarifying effort[]," *id.* at 742.

Critically, the eight-Justice majority in *Rahimi* applied the historical analogue test at a high level of generality:

> Taken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed. Section 922(g)(8) is by no means identical to these founding era regimes, but it does not need to be... Its prohibition on the possession of firearms by those found by a court to present a

problem that would have been unimaginable when the Constitution was written. Quite to the contrary: it is, unfortunately, a "general societal problem that has persisted since the 18th century." *Id*. at 26.

Notwithstanding the foregoing, the *Rahimi* Court applied the "relevantly similar" standard to a problem that existed at the time of the founding and that continues to exist today. *Rahimi*, 602 U.S. at 698. This too represents a clarification of the standard first announced in *Bruen*.

threat to others fits neatly within the tradition the surety and going armed laws represent.

***

**Section 922(g)(8) restricts gun use to mitigate demonstrated threats of physical violence, just as the surety and going armed laws do.**

[*Rahimi*, 602 U.S. at 698 (emphasis added)]

As applied to Section 922(g)(8), the justification for the law -- at its most specific -- seems to be to protect people from being threatened or injured by intimate partners carrying firearms. But the Court in *Rahimi* finds a more general justification: "to mitigate demonstrated threats of physical violence." *Rahimi*, 602 U.S. at 698.

*Rahimi*'s general justification for a modern firearms regulation clarified the proper way to engage in historical analogue analysis. After all, the more general the description of the justification, the easier it is to identify an analogue with a matching justification. *Rahimi* thus signals an important change in the approach to historical analogue analysis that allows a more robust level of generality based on "the **principles** that underpin our regulatory tradition," *Rahimi*, 602 U.S. at 692 (emphasis added).

***

Contrast this robust level of generality implicit in the eight-Justice majority's application of the historical analogue test to the exceedingly narrow and literal

approach to the historical analogue test that is taken by Justice Thomas -- the lone

dissenting Justice:

> Even on their own terms, laws targeting "dangerous" persons cannot support § 922(g)(8). **Those laws were driven by a justification distinct from that of § 922(g)(8)—quashing treason and rebellion.** The Stuart Kings' reign was marked by religious and political conflict, which at that time were often one and the same. The Parliament of the late 1600s "re-established an intolerant episcopalian church" through legislation targeting other sects, including "[a] fierce penal code" to keep those other sects out of local government and "to criminalize nonconformist worship." Oxford Handbook of the English Revolution 212 (M. Braddick ed. 2015) (Oxford Handbook); see G. Clark, The Later Stuarts 1660–1714, p. 22 (2d ed. 1955). These laws were driven in large part by a desire to suppress rebellion. "Nonconformist ministers were thought to preach resistance to divinely ordained monarchs." Oxford Handbook 212; see Calendar of State Papers Domestic: Charles II, 1661–1662, p. 161 (M. Green ed. 1861) (Calendar Charles II) ("[P]reachers go about from county to county, and blow the flames of rebellion"). Various nonconformist insurrections gave credibility to these fears. See, e.g., Clark, The Later Stuarts, at 22; Privy Council to Lord Newport (Mar. 4, 1661), in Transactions of the Shropshire Archaeological and Natural History Society, Pt. 2, 3d Ser., Vol. 4, p. 161 (1904).

> ***

> While the English were concerned about preventing insurrection and armed rebellion, § 922(g)(8) is concerned with preventing interpersonal violence. ***"Dangerous" person laws thus offer the Government no support***.

> [*Rahimi*, 602 U.S. at 755, 756-67 (Thomas, J., dissenting) (emphasis added)]

Thus, in the view of Justice Thomas, the surety and going armed laws do not

provide an appropriate historical analogue to Section 922(g)(8) – which restricts

gun use to persons who are subject to domestic violence restraining orders. In the

dissent's view, because the surety and going armed laws were intended to "quash treason and rebellion," *id.* at 756, these laws cannot supply an appropriate historical analogue to a law intending "to mitigate demonstrated threats of physical violence" against an intimate partner. *Id*. at 698.

Justice Thomas goes even further in applying a narrow and particularistic approach to the historical analogue inquiry. He observed that "[a]lthough surety laws shared a common justification with § 922(g)(8), surety laws imposed a materially different burden." *Id*. at 764. He further explained that "[a]ffray laws are wide of the mark" because they "expressly carve out the very conduct § 922(g)(8) was designed to prevent (interpersonal violence in the home)." *Id*. at 771. He also would require a close look "at the historical law's justification as articulated during the relevant time period," *id*. at 774., and a "careful parsing of regulatory burdens" to ensure that courts do not "stray too far from [history] by eliding material differences between historical and modern laws," *id*. at 761. He also criticizes the eight-Justice majority for adopting a more "piecemeal approach" that distills principles from a variety of historical evidence rather than insisting on a precise historical analogue. *Id*. at 767.

None of these myriad considerations and "nuances" posited by Justice Thomas were adopted by the majority in *Rahimi*. For the majority it was sufficient that "Section 922(g)(8) restricts gun use to mitigate demonstrated threats of

physical violence, just as the surety and going armed laws do."[2]  *Id.* at 682.   For

the majority, that was the operative "principle" that underlay the historical analogue

inquiry as applied to Section 922(g)(8). *Ibid.*

Because the historical analogue inquiry turns on "whether the challenged

regulation is consistent with the **principles** that underpin the Nation's regulatory

tradition," *id.* at 68, the *Rahimi* Court's identification of the broad operative

"principle" (i.e., "Section 922(g)(8) restricts gun use to mitigate demonstrated

threats of physical violence, just as the surety and going armed laws do") was

sufficient to uphold the constitutionality of Section 922(g)(8).  No further analysis

or "parsing" – as sought by Justice Thomas in his dissent – needed to be undertaken.

*Id.* at 761 (J. Thomas, dissenting).  Thus, the Court's identification of the operative

"principle" – at what Justice Barrett referred to as "just the right level of generality"

– completed the Court's historical analogue inquiry.   *Id.* at 740 (J. Barrett,

concurring).

## C. Application of the *Rahimi* "principles" based standard to this case

*Rahimi*'s "principles"-based analysis – and the concomitant "right level of

generality" – necessarily informs this Court's analysis as applied to New Jersey's

_____

[2] As previously noted, one potential justification for Section 922(g)(8) -- at its most specific -- seems to be to protect people from being threatened or injured by intimate partners carrying firearms. But the Court in *Rahimi* finds a considerably more general justification: "to mitigate demonstrated threats of physical violence." *Rahimi*, 602 U.S. at 698.  Without question, the Court in *Rahimi* has indicated that a higher level of generality may be applied in the historical analogue inquiry.

sensitive place designations.

Here, the panel below issued a carefully reasoned 139-page opinion. The panel: (1) considered and applied the historical cases that were presented; (2) discerned the governing "principles" that underpin these cases; and (3) applied those governing principles to the sensitive area designations that are contained in Chapter 131. *That approach is precisely what Rahimi prescribes.*

A review of the record discloses that the hundreds of cited historical statutes and cases relied on by the panel provide firm support to the panel's principles-based conclusion. *See, e.g.,* Op., at 29-65, 88-139. In the interest of brevity, we need not repeat these legions of historical material here -- a history that the panel already canvassed and described in its lengthy and record-specific analysis. *See id*.

Suffice it to say that the panel: (1) carefully considered and applied the historical material that were presented; (2) discerned the governing "principles" that underpin them; and (3) applied those governing principles to the sensitive area designations that are contained in Chapter 131. That approach correctly applied the principles-based "historical analogue" approach recognized in *Rahimi*.

\*\*\*

Against this backdrop, *Amici* contend: "When a modern regulation addresses a longstanding issue that traces back to the Founding era or earlier, the modern and historical regulations should be *a close fit*." *Amici* Br., at 7 (emphasis added). But *Amici*'s contention flies in the face of *Rahimi*'s holding -- which merely requires

that a regulation be "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692.

We turn to address *Amici*'s various contentions with respect to certain of the panel's determinations as to the constitutionality of particular sensitive-place designations.

## 1. Permitted public gatherings, demonstrations and events

*Amici* challenge the decision of the panel below upholding a sensitive place designation for permitted public gatherings, demonstrations and events, because, *Amici* contend, the historical evidence presented was an insufficiently close fit to the modern regulation. *Amici* Br., at 8-11. The panel relied on six state statutes prohibiting firearms at certain social events. See JA 1249–51, 1513–14 (1870 and 1871Texas laws); JA 1510–12 (1869 Tennessee law); JA 1370 (1870 Georgia law); JA 1515–16, 1712–14 (1874 and 1879 Missouri laws); JA 2093–95 (1889 Arizona law); JA 2096–98 (1890 Oklahoma law). *See* Op., at 88-89.

With regard to these historical analogues, the panel noted: "although the[se] [statutes] emerged in the latter half of the nineteenth century… these statutes represent a more recent application of the centuries-old practice of proscribing weapons at discrete locations -- from courts to legislative bodies to polling places -- set aside for the purposes of governmental services and peaceful assembly." Op., at 89-90. The panel concluded: "The permitted public gatherings, demonstrations,

and events that § 2C:58-4.6(a)(6) protects fit comfortably within these historically designated locations." Op., at 90.

However, according to *Amici*, these six laws are insufficient historical analogues because: (1) they post-date *by a few years* the date of enactment of the Fourteenth Amendment; (2) the Missouri law prohibited concealed carry at public assemblies but not open carry; and (3) the Texas law -- although prohibiting gun carry at certain social events -- was premised on an incorrect view of the Second Amendment that held that the Amendment applied only to militia members. *Amici* Br., at 9-11.

However, *Amici*'s "slice-and-dice" approach to the scope and application of historical analogues is foreclosed by the *Rahimi* majority's holding that a modern regulation is properly sustained when it is "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. Instead, *Amici*'s cramped approach to historical analogues is more akin to the approach taken in the one-Justice dissenting opinion in *Rahimi* – which contemplates the narrowest possible inquiry into potential historical analogues and which would allow only historical analogues that precisely match the modern regulation.

Compare the panel's principles-based analysis to the *Rahimi* Court's identification of the broad operative "principle" that caused the Court to sustain the federal domestic violence statute as applied to firearm prohibition. As previously noted, the *Rahimi* Court held that a modern Federal statute (that sets out certain

punishments for the commission of domestic violence) "restricts gun use to mitigate demonstrated threats of physical violence, just as the surety and going armed laws do." *Rahimi*, 602 U.S. at 698  The *Rahimi* Court's principle-based finding was sufficient to uphold the constitutionality of Section 922(g)(8).

Similarly, the panel below held that six Reconstruction-era state statutes are evidence of a "centuries-old practice of proscribing weapons at discrete locations [and that] [t]he permitted public gatherings, demonstrations, and events that § 2C:58-4.6(a)(6) protects fit comfortably within these historically designated locations." Op., at 89-90.

The panel's principle-based determination fully comports with *Rahimi*'s principle-based approach to historical analogues.

## 2. Parks and beaches

*Amici* challenge the decision of the panel below upholding a sensitive place designation for parks and beaches. *Amici* Br., at 11-15.  The panel determined that the challenged regulations "seek to maintain peace and curb disturbances posed by firearms at New Jersey's public parks, beaches, zoos, and recreation facilities, with an additional, more specific goal of protecting the children who frequent these locations." Op., at 98. More particularly, the panel found that "[t]hese legislative goals find support in the historic principle, established through several analogous historical laws, which forbade guns from centers of community life, such as fairs and markets, to ensure visitors could participate without the risks and anxieties

associated with deadly weapons." Op., at 98-99 (citing examples). Moreover, the panel – citing the Second Circuit's decision in *Antonyuk v. James*, 120 F.4th 941, 1019 (2d Cir. 2024) -- noted that "the lineage of regulation of weapons in public fora [can be traced back] to the Statute of Northampton, passed in 1328, and found that "at least two states—Virginia and North Carolina—passed statutes at the Founding that replicated the medieval English law prohibiting firearms in fairs and markets, i.e., the traditional, crowded public forum." Op., at 99.

Here again, compare the panel's analysis to the *Rahimi* Court's identification of the broad operative "principle" that caused the Court to sustain the federal domestic violence statute as applied to firearm prohibition. Again, the *Rahimi* Court held that "Section 922(g)(8) restricts gun use to mitigate demonstrated threats of physical violence, just as the surety and going armed laws do." *Rahimi*, 602 U.S. at 698   The *Rahimi* Court's principle-based finding was sufficient to uphold the constitutionality of Section 922(g)(8). For the same reason, the panel's principle-based finding with respect to parks and beaches should be affirmed.

### 3. Bars and other locations that serve alcohol

*Finally, Amici* challenge the decision of the panel below upholding a sensitive place designation that applies to bars and other locations that serve alcohol. *Amici* Br., at 11-15. In support of its determination, the panel relied on historical laws from Texas, Georgia, Missouri, Arizona, Louisiana, New Mexico Oklahoma, Rhode Island and Delaware. Op., at 108-113.

After carefully cataloging and analyzing these many history analogues, the panel concluded that these regulations, "[t]aken together," *Rahimi*, 602 U.S. at 698, support the common-sense notion that intoxicated people "cannot necessarily be trusted with firearms" and may "be unable to defend themselves effectively." Op., at 112 (quoting *Antonyuk v. James*, 120 F.4th 941, 1031 (2d Cir. 2024))

As evidenced by the panel's citation to *Rahimi*, the panel's wholistic principle-based approach is precisely what *Rahimi* prescribed. *Rahimi* held:

> *Taken together*, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed. Section 922(g)(8) is by no means identical to these founding era regimes, but it does not need to be. [*Rahimi*, 602 U.S. at 698 (emphasis added)]

As previously stated, *Rahimi* held that "Section 922(g)(8) restricts gun use to mitigate demonstrated threats of physical violence, just as the surety and going armed laws do." *Id.* at 682. That was *Rahimi*'s principle-based approach that underlay the historical analogue inquiry as applied to the federal domestic violence statute.. *Ibid.* Likewise, in this case the panel -- applying the *Rahimi* principle-based approach -- concluded that "prohibiting individuals from carrying firearms at locations that serve or dispense alcohol is consistent with… the sum total of regulations throughout our Nation's history addressing alcohol, as well as protecting discrete locales set aside for recreation and amusement, like fairs and markets, from breaches of the peace." Op. at 112-13.

Here again, the panel's holding is in full accord with the principles-based historical analogue inquiry prescribed by *Rahimi*.

## CONCLUSION

For the reasons set forth above (as well as the other and further reasons set forth by the State), the decision of the panel below should be affirmed.

Respectfully submitted,

Cullen and Dykman LLP

By:*/s/ Leon J. Sokol*
Leon J. Sokol

Kologi ◆ Simitz,
Counsellors at Law

By:*/s/ Edward J. Kologi*
Edward J. Kologi

Attorneys for Intervenors-Defendants-Appellees Senate President Nicholas P. Scutari and Assembly Speaker Craig J. Coughlin

Dated: January 29, 2026

## Certificate of Compliance with Type-Volume Limit, Typeface Requirements and Type-Style Requirements

1.      This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,492 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Times Roman 14 point in Microsoft Word 2019/Office 365 in Times Roman 14 point.

<u>  s/   Leon J. Sokol  </u>
Leon J. Sokol

Dated: January 29, 2026

## Certification

Leon J. Sokol, Esq, certifies as follows:

1. I am the signatory of this Brief and I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.      This Brief complies with Rules 28(a)(11) and 32(a)(7)(b) of the Federal Rules of Appellate Procedure and contains 4,492 words.

3.      A true copy of the Presiding Officers' Brief was forwarded to the Appellants and Plaintiffs-Appellees, through their counsel, on January 29, 2026 by electronic means.

4.      The E-Brief and Hard Copies of the Brief are identical, and that a virus check was performed with Symantec AntiVirus.

<u>  s/   Leon J. Sokol  </u>
Leon J. Sokol.

Dated: January 29, 2026