# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

Nos. 23-1900, 23-2043

RONALD KOONS et al.,
*Plaintiffs-Appellees,*

v.

ATTORNEY GENERAL OF NEW JERSEY et al.,
*Defendants-Appellants*

and

NICHOLAS P. SCUTARI et al.
*Intervenors-Defendants-Appellees*

AARON SIEGEL et al.,
*Plaintiffs-Appellees / Cross-Appellants,*

v.

ATTORNEY GENERAL OF NEW JERSEY et al.,
*Defendants-Appellants / Cross-Appellees*

and

NICHOLAS P. SCUTARI et al.
*Intervenors-Defendants-Appellees*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(Nos. 22-cv-7463, 22-cv-7464 (RMB))

**DEFENDANTS-APPELLANTS' BRIEF IN RESPONSE TO
THE AMICUS BRIEF OF IDAHO, MONTANA, ET AL.
PURSUANT TO L.A.R. 29.1(A)**

JENNIFER DAVENPORT
  *Acting Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
  *Solicitor General*

ANGELA CAI
  *Assistant Attorney General*

VIVIANA M. HANLEY
  *Deputy Attorney General*

Office of the New Jersey Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625-0080
(862) 350-5800
angela.cai@njoag.gov

*Attorneys for New Jersey Attorney General*
*and Superintendent of New Jersey State Police*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ................................................................................1

ARGUMENT ......................................................................................3

    I.  AMICI MISUNDERSTAND THE FRAMEWORK GOVERNING THIS DISPUTE. ................................................................................3

    II. AMICI'S VARIOUS OBJECTIONS TO THE LOCATION-SPECIFIC RULES ARE UNFOUNDED. ...................................................14

        A.  Permitted Public Gatherings. ...............................................14

        B. Parks and Beaches. ..............................................................19

        C. Places That Serve Alcohol. ..................................................22

CONCLUSION ..................................................................................25

CERTIFICATION OF BAR MEMBERSHIP ........................................26

CERTIFICATION OF COMPLIANCE ................................................27

CERTIFICATION OF SERVICE ........................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrews v. State*,
    50 Tenn. 165 (1871) ................................................................. 4, 15, 18

*Antonyuk v. James*,
    120 F.4th 941 (2d Cir. 2024) ..................................................... *passim*

*Bliss v. Commonwealth*,
    12 Ky. 90 (1822) ................................................................................4

*Dist. of Colum. v. Heller*,
    554 U.S. 570 (2008) .............................................................. 2, 10, 18

*English v. State*,
    35 Tex. 473 (1871) ............................................................... 10, 14, 18

*Gamble v. United States*,
    597 U.S. 678 (2019) ........................................................................11

*Hill v. State*,
    53 Ga. 472 (1874) .............................................................................6

*Kipke v. Moore*,
    No. 24-1799, --- F.4th ----, 2026 WL 143528 (4th Cir. Jan. 20, 2026) ....... *passim*

*Koons v. Att'y Gen.*,
    156 F.4th 210, 228 (3d Cir. 2025) ............................................. *passim*

*Lara v. Comm'r Pa. State Police*,
    125 F.4th 428 (3d Cir. 2025) ...................................................... 10, 21

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) .........................................................................3

*Nat'l Pork Producers Council v. Ross*,
　598 U.S. 356 (2023) ................................................................9

*Nunn v. State*,
　1 Ga. 243 (1846) ....................................................................4

*NYSRPA v. Bruen*,
　597 U.S. 1 (2022) ........................................................ *passim*

*Schoenthal v. Raoul*,
　150 F.4th 889 (7th Cir. 2025) ..............................................10

*State v. Huntly*,
　25 N.C. 418 (N.C. 1843) ......................................... 8, 17, 18

*State v. Reando* (Mo. 1878),
　*available at* JA1365, District Ct. Dkt. 86-23 .....................17

*State v. Shelby*,
　2 S.W. 468 (Mo. 1886) ........................................................17

*Timbs v. Indiana*,
　586 U.S. 146 (2019) .............................................................11

*United States v. Lopez*,
　514 U.S. 549 (1995) ......................................................... 9, 24

*United States v. Rahimi*,
　602 U.S. 680 (2024) ..................................................... *passim*

*Wolford v. Lopez*,
　116 F.4th 959 (9th Cir. 2024) ....................................... *passim*

## Statutes

18 U.S.C. § 922(g)(8) ........................................ 12, 13, 16, 21

Fla. Stat. § 790.06 ................................................................23

La. Rev. Stat. § 14:95.5 ..........................................................................23

N.J. Stat. Ann. § 2C:58-4.6 ............................................... 14, 15, 19, 22

Okla. Stat. Ann. tit. 21, § 1272.1 ...........................................................23

Tex. Penal Code § 46.03 ........................................................................23

**Other Authorities**

Beamish, Anne *Before Parks: Public Landscapes in Seventeenth-*
  *and Eighteenth-Century Boston, New York, and Philadelphia,*
  40 Landscape J. 1 (2021) ...............................................................20

Kopel, David & Joseph Greenlee, *The "Sensitive Places" Doctrine,*
  13 Charleston L. Rev. 205 (2018 ........................................... 5, 6, 16

Haag, Pamela *The Gunning of America: Business & the*
  *Making of American Gun Culture* (2016) .........................................8

Brief of *Amicus Curiae* Independent Institute,
  *NYSRPA v. Bruen,* 597 U.S. 1 (2022) (No. 20-843) .........................5, 6

# **INTRODUCTION**

The Supreme Court has instructed that courts evaluating Second Amendment challenges must distill from the historical evidence the "principles that underpin our regulatory tradition," and ask "whether [each] challenged regulation is consistent" with those underlying principles. *United States v. Rahimi*, 602 U.S. 680, 692 (2024) (citing *NYSRPA v. Bruen*, 597 U.S. 1, 26–31 (2022)). The voluminous record in this case evinces the long tradition behind New Jersey's modern sensitive-locations laws. Indeed, that overwhelming record is why the other circuits to consider challenges to sensitive-places restrictions have broadly upheld them. *See, e.g.*, *Kipke v. Moore*, No. 24-1799, --- F.4th ----, 2026 WL 143528 (4th Cir. Jan. 20, 2026) (Maryland); *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024), *cert. denied* 145 S.Ct. 1900 (2025) (New York); *Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024) (California; Hawaii). This Court should not split with its sister circuits by upholding the injunction.

Instead, fidelity to *Bruen* and *Rahimi*'s history-and-tradition test requires this Court to reject plaintiffs' and Amici's entreaties. Anglo-American history evinces centuries of measures limiting firearms at analogous sensitive places. *Koons v. Att'y Gen.*, 156 F.4th 210, 228 (3d Cir.), *as amended* (Sept. 17, 2025) (panel opinion) (tracing history). States and localities have long enacted limits on firearms at a wide range of such places—including the public assemblies, parks, and places that serve alcohol Amici challenge—without any evidence that jurists, legal commentators, or

1

legislators ever viewed such laws as unconstitutional. The existence of analogous regulations, combined with a lack of controversy over their lawfulness and historical decisions confirming their validity, shows that legislatures originally understood the right to bear arms to permit firearms restrictions at certain locations based on certain essential purposes or characteristics. New Jersey's modern restrictions—including for permitted gatherings, parks, beaches, establishments that serve alcohol, and other sensitive places—fit these historical principles and precedents alike.

Amici (like the plaintiffs) commit numerous methodological errors in arguing otherwise. Amici advocate a framework that would limit regulations to only those indistinguishable from historical ones and that were adopted almost uniformly at the time of the Founding. Their test is contrary to *Bruen* and *Rahimi*, because it would constrain modern legislatures to the precise policy choices of their late 18th-century predecessors—the veritable "regulatory straightjacket," *Bruen*, 597 U.S. at 30, that leaves state laws "trapped in amber," *Rahimi*, 602 U.S. at 691, and against which the Supreme Court has repeatedly warned. Worse still, their test would even invalidate the "'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings,'" as few Founding-era legislatures chose to enact restrictions at those locations. *Bruen*, 597 U.S. at 30 (quoting *Dist. of Colum. v. Heller*, 554 U.S. 570, 626 (2008)). But the Supreme Court already deemed such restrictions "constitutionally permissible," thus proving that Amici's methodology

cannot be right—a problem to which they have no answer. *Id.*; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010). Worst of all, Amici's cramped view of the Second Amendment is contrary to both logic and federalism. Democratically-elected state legislatures have never had to uniformly agree on the optimal policy for protecting their residents' safety—any more now than at the Founding. New Jersey's law falls well within the policy options that our historical tradition leaves open.

## ARGUMENT

### I. AMICI MISUNDERSTAND THE FRAMEWORK GOVERNING THIS DISPUTE.

Amici misunderstand the framework governing Second Amendment disputes. All agree that courts must distill from historical evidence "principles that underpin our regulatory tradition," and then "consider whether [each] challenged regulation is consistent" with those principles. *Rahimi*, 602 U.S. at 692 (citing *Bruen*, 597 U.S. at 26–31); *see also id.* at 740 (Barrett, J., concurring) ("Historical regulations reveal a principle, not a mold."); *id.* at 717 (Kavanaugh, J., concurring) (agreeing that courts must discern "principles embodied" in a constitutional text). The parties also agree that when a particular social problem was historically widespread, yet *no* jurisdiction enacted analogous policies, that is "relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. And the parties agree that if similar policies were enacted by one or a couple jurisdictions, but courts or commentators opined that they were unconstitutional, their enactment could well

be outweighed by "the overwhelming weight of other evidence." *Id.* (emphasizing 19th-century courts invalidated or questioned laws similar to the public-carry statute challenged there—including, *e.g.*, *Bliss v. Commonwealth*, 12 Ky. 90 (1822), *Nunn v. State*, 1 Ga. 243 (1846), and *Andrews v. State*, 50 Tenn. 165 (1871)). That history would suggest the Second Amendment took the modern restriction off the table.

This case is materially different. The principal methodological question here is what conclusions must be drawn from a historical record indicating that some but not all jurisdictions did at various times maintain identical or analogous laws, always without any contemporaneous evidence doubting their constitutionality. New Jersey submits that this is powerful evidence indeed: because some jurisdictions did adopt the laws (in contrast to a record devoid of regulation), and since there is no contrary "overwhelming" evidence perceiving them as unconstitutional, that is a strong sign of their validity. Amici disagree. They do not deny that the State has marshaled some identical or near-identical analogues of restrictions at, *e.g.*, public assemblies, parks, and places that serve alcohol—the targets of their amicus brief. *See* Br.9, 12, 15–16 (admitting "New Jersey identified some similar historical regulations"). Rather, they urge this Court to reject that insight because States did not *uniformly* adopt *identical* restrictions *at the Founding*. Br.15 (urging invalidation of New Jersey's laws since the State "failed to show a national historical tradition"). Amici's claims—that there must be a sufficiently widespread approach, based only on identical laws—fail.

4

1. This Court should reject Amici's demand for a "national" Founding policy of firearms prohibitions at the challenged locations (based on an undetermined but higher number of historical laws) for four compelling reasons.

*First*, Amici's methodological framework would yield untenable results that are incompatible with the Supreme Court's own explicit instructions. Under Amici's framework, firearm bans at "legislative assemblies, polling places, and courthouses" would be rendered unconstitutional—contrary to the Supreme Court's holding that the constitutionality of such bans is "settled." *Bruen*, 597 U.S. at 30. *Bruen* stated that such measures are lawful based upon a law review article and amicus brief that identified just one State that prohibited firearms in each of these three places at the Founding, followed by a handful of Reconstruction-era statutes. *See id.* (citing David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 203, 233–34, 242–45 (2018) ("Kopel & Greenlee"), and Amicus Br. for Independent Institute at 11–17 ("Inst.Br.")). If Amici were correct that only Founding era history matters, and that a few state restrictions alone (even absent countervailing evidence of their unconstitutionality) is insufficient, these restrictions have to fall.

Indeed, the *Bruen*-cited sources yielded only a single state that prohibited arms at polling places in the colonial or Founding eras, *see* Kopel & Greenlee at 233 (1776 Delaware Const.); Inst.Br.11–14 (same); zero Founding-era prohibitions at legislatures, and only one pre-Founding prohibition, *see* Kopel & Greenlee at 233–

34 (1648 and 1650 Maryland laws); Inst.Br.11–12 (same); and zero Founding-era prohibitions of firearms at schools—only 19th century rules applying to students themselves, *see* Kopel & Greenlee at 247–50; Inst.Br.14–16. And they cite in passing a single Founding-era statute that prohibited firearms at courthouses. *See* Kopel & Greenlee at 240, n.134 (citing 1786 Va. Acts 33, ch.49 (JA1508)); Inst.Br. 12. Though these two sources identified several jurisdictions that enacted firearms restrictions in these locations shortly after States ratified the Fourteenth Amendment, *see* Kopel & Greenlee at 242–44 (identifying four States with polling-place bans during 1860s–80s and one with a courthouse ban in 1874[1]); *id.* at 252–55 (three States enacted prohibitions at schools, with one restricting only concealed carry), Amici's test would deem that insufficient. *See* Br.13 (writing off dozens of restrictions at parks because "[o]nly one of those laws pre-dates Reconstruction."); 9 (discounting six laws that limited firearms at public assemblies for same reason). Amici's claim that such evidence cannot overcome a lack of any so-called "national" policy at the Founding, Br.15, would transform the laws that *Bruen* deemed "settled" into suddenly unconstitutional measures. 597 U.S. at 30.

---

[1] That Georgia prohibition actually dates back to 1870, and prohibited firearms not only at courts but also polling places and "any other public gathering in this State, except militia muster grounds." JA1370. And that law was broadly upheld in *Hill v. State*, 53 Ga. 472, 474 (1874).

Because whatever test this Court adopts must be consistent with, rather than in conflict with, the explicit instructions *Bruen* has given, the insight is clear: several jurisdictions historically adopting predecessor place-restrictions, even if not mostly at the Founding, and with "no disputes regarding the lawfulness" of these historical laws, *Bruen*, 597 U.S. at 30, can establish a supportive historical principle. So limits at schools, no less than at parks or bars, can be permissibly adopted today.

*Second*, Amici's methodological framework contravenes both logic and first principles alike. In demanding "uniformity" at the Founding and insisting that it is not enough for some but not all States to have that historical regulation, Amici misunderstand the meaning of silence. The State, as noted above, agrees that if just a few States adopted a relevantly similar historical law and there is contrary affirmative evidence of unconstitutionality, a modern law might fall. But where those same States passed relevantly similar historical laws, and all challengers respond with is the other States' *silence*, the conclusion is reversed. After all, judges must not "assume[] that founding-era legislatures maximally exercised their power to regulate," *Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring), as "legislatures do not always legislate up to the constitutional line," *Koons*, 156 F.4th at 210. And so silence by some States does not reflect constitutional doubt: "it is not necessarily the case that" a State's decision not to adopt a policy was because the "legislators … deemed such a regulation inconsistent with the right to bear arms." *Antonyuk*, 120

F.4th at 969. Instead, their decision not to adopt a law may just as well be because at that time there was little perceived need for such a regulation, or disagreement on the efficacy of the policy, or a lack of political will to pass it. Treating a potentially policy-based decision not to pass a law as a sign of affirmative unconstitutionality is precisely the type of "'use it or lose it' view of legislative authority" Justice Barrett presciently warned against as flawed—as an "assumption" that originalism does not "require." *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring).

The historical evidence in this case is an apt illustration: the reason that sensitive-place statutes were less common at the Founding than Reconstruction has to do with policy—not constitutional constraints. The record shows that portable handguns that could be carried loaded were not widely available to the average consumer until the mid-1800s, making their dangers in sensitive places a less salient problem prior to that point. *See* JA1205 (mass-produced Colt revolvers and expiration of patent as genesis for mid-1800s laws); Pamela Haag, *The Gunning of America: Business & the Making of American Gun Culture* 8–18 (2016) (paltry commercial civilian gun market in post-Founding America); *State v. Huntly*, 25 N.C. 418, 422 (N.C. 1843) ("No man amongst us carries [firearms] about with him, as one of his every day accoutrements."). But when mass-produced handguns did become more commercially popular in the mid-1800s, States swiftly stepped in to address the wave of violence that followed, including by restricting firearms at a

range of sensitive places. *See, e.g.*, JA1207–10 (pro-Reconstruction Radical Republicans enacting sensitive-place laws in Texas to mitigate widespread violence). There is no proof that the States changed their view of the constitutional right from the Founding to Reconstruction, and no evidence at either period that any State, court, or commentator saw these laws as invalid. Rather, as violence surged, States exercised the authority they always had to protect their residents at myriad sensitive places. That is evidence of constitutionality, not the other way around.

*Third*, Amici's demand for uniformity of historical laws is also irreconcilable with our Nation's federalist structure. In this country, "the people and their elected representatives are entitled to try novel social and economic experiments if they wish." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 382 (2023) (cleaned up). It is a feature, not a bug, of our system that States enact different regulations—or forego regulation—in response to complex social problems. *See United States v. Lopez*, 514 U.S. 549, 581 (1995) (Kennedy, J., concurring) (noting, including when it comes to firearms, States have a "role as laboratories for experimentation to devise various solutions where the best solution is far from clear"). But Amici's position is incompatible with these bedrock principles of federalism. Their insistence that "no such tradition existed" to allow modern regulations except where a sufficiently high number of Founding-era legislatures enacted that specific sensitive place law at that precise point in time is unfounded. Br.8. This Court would never accept an argument

that a modern Pennsylvania law is unconstitutional because New Jersey or Delaware Legislatures do not also adopt it today; this Court would quickly recognize that this policy variation is welcome in a federalist democracy. So it is not clear why Amici demand this Court treat policy variation historically as supporting the contrary result. In that sense, this is even more troubling than the "use it or lose it' view of legislative authority" Justice Barrett feared—it is an argument that New Jersey cannot "use" a policy today even as some States did historically adopt it because *other States* elected to "lose it" by selecting different policy responses at the Founding.

*Fourth*, Amici's demand that the national evidence must come only from the Founding and that courts must be entirely blind to Reconstruction-era evidence flies in the face of both precedent and principles. Amici (like plaintiffs) must advance this position, of course, because the Reconstruction record provides a significant number of historical twins and analogues to New Jersey's modern measures. But *Heller* itself examined evidence contemporaneous to the adoption of the Second Amendment *and* "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century." 554 U.S. at 600. And if English law, Founding-era law, and 19th-century law all point in the same direction, this Court counts them all too. *See Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 441 (3d Cir. 2025); *see also, e.g.*, *Schoenthal v. Raoul*, 150 F.4th 889, 913 (7th Cir. 2025) ("[W]e and other circuits concur that evidence stretching into the nineteenth century is useful to a

*Bruen* inquiry"). So long as there is no conflict among them,[2] each period of history can provide evidence of the Second Amendment's meaning—including liquidation of that meaning in the American tradition, especially right around the time the States incorporated the Second Amendment right against themselves.

Nor is Founding-era *silence* somehow in any conflict with Reconstruction-era *regulation*. Courts regularly rely on evidence from Reconstruction if there is little to no Founding-era evidence on point. *See, e.g.*, *Gamble v. United States*, 597 U.S. 678, 685 (2019) (citing cases from 1840, 1850, and 1852 to construe the Double Jeopardy Clause when no cases existed at the Founding on the issue); *Timbs v. Indiana*, 586 U.S. 146, 151 (2019) (citing evidence "in 1868 upon ratification of the Fourteenth Amendment" as evidence of understanding the Excessive Fines Clause). *Bruen* itself did so in discussing sensitive-place laws, recognizing that an absence of "disputes" at any time is probative of the lawfulness of this restriction. *Bruen*, 597 U.S. at 30. And that makes especially good sense here, when the promulgation of these further sensitive-place measures reflected shifting policy concerns, not a secret evolution in constitutional understanding. *See supra* at 8–9 (discussing developing challenges with firearms violence between these periods). If those Founding-era policy choices

---

[2] Of course, if this Court were to determine that there was a conflict between Founding and Reconstruction-era evidence, the latter would control. *See* NJ.Response-Reply.Br.18–22. But this Court need not address that question here.

did not impose a "regulatory straightjacket" on state firearms laws at the very same time they incorporated the Bill of Rights against themselves, *see Bruen*, 597 U.S. at 30, it imposes no straightjacket today. That, too, undermines Amici.

2. Amici commit another methodological error in arguing the State's historical evidence is insufficiently identical. "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* And tellingly, Amici barely even cite *Rahimi*, which illustrates proper application of this framework; warns against leaving state laws "trapped in amber"; and held "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." 602 U.S. at 691–92.

*Rahimi* is as insurmountable for Amici as for the plaintiffs. There, the Court rejected a challenge to 18 U.S.C. §922(g)(8), which prohibits all individuals subject to domestic violence restraining orders from possessing firearms, *see* 602 U.S. at 690, based on principles distilled from two analogues: surety and going-armed laws, *see id.* at 695–98. The Court recognized that these historical laws were "by no means identical" to Section 922(g)(8). *Id.* at 698. Indeed: "Surety laws were, in a nutshell, a fine on certain behavior." *Id.* at 753 (Thomas, J., dissenting). They did not prohibit bearing arms, like Section 922(g)(8), but only required a person suspected of future misbehavior to post a bond which could be forfeited. *Id.* And going-armed laws were motivated by a desire to "quash[] treason and rebellion," not domestic violence—

even as that social ill existed at that time. *Id.* at 755. Such laws prohibited "[a]ffrays [as] … distinguished from [the] assaults and private interpersonal violence" at issue in Section 922(g)(8), and they imposed a different burden, including a conviction beyond a reasonable doubt. *Id.* at 769 (Thomas, J., dissenting). Yet these differences did not stop the majority from discerning a unifying principle: "when an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed" without offending the Second Amendment right. *Id.* at 698.

Here, Amici commit the very error that *Rahimi* corrected: demanding that the historical laws be a dead ringer for modern ones in operation and rationale, instead of looking to the principles behind the historical tradition. *See, e.g.*, Amicus.Br.13, 16–17. But *Rahimi* cautioned that a modern law "does not need to be" "identical to … founding era regimes." 602 U.S. at 698. Instead, they merely need to fit "within the tradition" that the historical analogues "represent." *Id.* Or as Justice Barrett aptly put it, "[t]o be *consistent* with historical limits, a challenged regulation need not be an updated model of a historical counterpart." *Id.* at 739 (Barrett, J., concurring). That is dispositive: the historical laws on which New Jersey relies are a much tighter fit with its modern sensitive-place measures than the historical and modern laws in *Rahimi*, and Amici make no effort to demonstrate otherwise. This Court should be wary before nevertheless adopting a more granular methodology, as both Amici and

plaintiffs would have it do, that rewinds Second Amendment doctrine to the pre-*Rahimi* days that the Supreme Court so explicitly castigated.

## II. AMICI'S VARIOUS OBJECTIONS TO THE LOCATION-SPECIFIC RULES ARE UNFOUNDED.

Under the correct analysis, the challenged sensitive-places laws are of a piece with the numerous historical precedents that precede them. While Amici specifically go after the State's restrictions on carrying at permitted gatherings, parks, beaches, and places that serve alcohol,[3] all are consistent with historical principles. Amici's attacks repeat the methodological errors above: they overlook reams of evidence and they incorrectly treat the absence of historical twins as fatal—contrary to *Bruen* and *Rahimi* and our Nation's federalist structure.

### A. Permitted Public Gatherings.

New Jersey's prohibition on carrying within 100 feet of a public gathering requiring a permit, *see* N.J. Stat. Ann. §2C:58-4.6(a)(6), is consistent with a robust tradition. For centuries our historical tradition has specifically carved out from carry certain gatherings of people, beginning with pre-Founding English law prohibitions on those who "ride armed by night []or by day, in Fairs, Markets, []or in the presence of the Justices or other Ministers." JA1223–24 (1328 Statute of Northampton). Indeed, at the Founding, at least two States codified these location-based restrictions.

---

[3] Because Amici address only these provisions, this brief does, too.

*See* JA1508 (1786 Virginia law singling out "fairs or markets"); JA1232–34 (1792 North Carolina law, same). Separately, both the English common law tradition and American States prohibited "unlawful … assemblies, particularly where individuals were armed with weapons." *Kipke*, 2026 WL 143528 *9 & n.5 (collecting laws from the late 1700s from Massachusetts, Pennsylvania, New Jersey, and Virginia).

At least six jurisdictions later carried forward that tradition by restricting arms at "public assemblies" or "public gatherings," and local jurisdictions adopted similar measures. *See* NJ.Opening.Br.14. For example, an 1869 Tennessee law barred persons carrying "concealed or otherwise, any pistol … or other deadly or dangerous weapon" at "any … public assembly of the people." JA1511–12. And this restriction was upheld by the Tennessee Supreme Court—in a decision *Bruen* cited for the consensus view of state courts on the scope of the right to bear arms. *See Andrews*, 50 Tenn. at 181; *Bruen*, 597 U.S. at 54–55 (discussing *Andrews*).

Not only do numerous historical laws parallel New Jersey's regulation today,[4] but they also support a broader regulatory "principle[]," *Rahimi*, 602 U.S. at 692— that firearms may be restricted in places that are sensitive because they are the site of core democratic activity, such as courthouses, legislative assemblies, and polling

---

[4] New Jersey's law—applied only to *permitted* public gatherings—is less restrictive than the historical analogues that apply to all public assemblies. And its geographic limitation is 100 feet, *see* N.J. Stat. Ann. §2C:58-4.6(a)(6), not 1,000 feet as the law considered in *Wolford* set forth, *see* 116 F.4th at 974.

places, *Bruen*, 597 U.S. at 30; *see* NJ.Opening.Br.15–16; *Koons*, 156 F.4th at 253, 255. Just as States could and did prohibit firearms in gatherings historically, and in spaces similarly important to our democracy, New Jersey may do so today.

Amici's counterarguments fall short. Their primary response, that the statutes come too late, Br.8–9, fails for the reasons discussed above, *see supra* at 10–12. And Amici criticize one cited state statute as insufficiently similar, Br.9–10 (Missouri's 1874 law), ignoring the five other nearly identical historical regulations New Jersey has proffered. Nor would any difference in that single Missouri law undermine the principle distilled from this collection of regulations—just as myriad differences between 18 U.S.C. §922(g)(8) and surety and going armed laws did not preclude the Court in *Rahimi* from recognizing the broader regulatory through line connecting them all. *See supra* at 12–13; *compare Rahimi*, 602 U.S. at 698 (majority upholding Section 922(g)(8) based on these historical laws), *with id.* at 752–53, 756–57 (Thomas, J., dissenting) (distinguishing between the modern and historical laws).

In any event, the aspect of Missouri's 1874 law that Amici focus on—that it prohibited only *concealed* carry at public assemblies, *see* Br.9–10—is a red herring.[5] Amici erroneously suggest that Missouri courts would have considered an outright prohibition on carry at public assemblies unconstitutional, but Amici base this on a

---

[5] This Missouri law is one of the three prohibitions on guns in schools identified in the *Bruen*-cited sources. *See supra* at 5–6; Kopel & Greenlee at 253.

misreading of *State v. Reando* (Mo. 1878). Br.9–10. The Missouri Supreme Court actually expressly warned against reading its opinion as Amici do. *See* JA1365 ("We do not say … that the legislature may not prohibit a person from bearing arms, even openly, in such places as are mentioned in the statute").[6] And when that State later extended its prohibition to cover both open and concealed carry, its Supreme Court upheld that as well. *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886).

Indeed, this history perfectly illustrates a persistent flaw in Amici's reasoning: that if historical legislatures did not enact a restriction, they must have believed it unconstitutional. But there are many other reasons for non-regulation. *Reando* makes clear open carry was not prohibited in 1874 because "it would very rarely, if ever, occur," as "the moral sense of every well-regulated community would be so shocked by any one who would … invade such places with fire arms and deadly weapons exposed to public view." JA1365; *Huntly*, 25 N.C. at 422. In other words, it was not constitutional limitations but the lack of policy need that led to Missouri's initially narrower restriction. Once that calculus changed because of commercial adoption of concealable pistols, the State expanded the restriction, and courts confirmed that was constitutional too. Justice Barrett's warning against use-it-or-lose-it indeed.

---

[6] A clearer copy of this opinion is available on the district court docket, ECF 86-23.

Next, Amici's attempt to discount the 1871 Texas law based upon the Texas Supreme Court's jurisprudence misunderstands that court's precedents and conflates the views of the Texas legislature with those of its Supreme Court. Initially, Amici admit there is no meaningful difference between New Jersey's modern restriction and the 1871 Texas law. Br.10. They claim that the 1871 law can be ignored because the Texas courts misconceived the scope of the right to bear arms. *Id.* (citing *English v. State*, 35 Tex. 473 (1871)). But while that court did recognize a militia-readiness component of the federal right to bear arms, it also recognized an individual right to "lawful defense" protected by the *State*'s constitution. *English*, 35 Tex. at 478. And even if the Texas Supreme Court did hold an overly narrow view of the right to bear arms, the Texas legislature is an independent entity, and its view that restricting carry at public gatherings is a constitutionally available policy option is an independently probative historical data point. *See Koons*, 156 F.4th at 254 & n.112.

Finally, Amici ignore that *Andrews*, 50 Tenn. 165, also upheld Tennessee's 1869 prohibition on carrying firearms at a public assembly. *Id.* at 182 ("Therefore, a man may well be prohibited from carrying his arms to church, or other public assemblage, as the carrying them to such places is not an appropriate use of them."). *Heller* relied on *Andrews*'s interpretation of the "state constitutional right … to personal self-defense," making its relevance especially salient. 554 U.S. at 614; *see also Bruen*, 597 U.S. at 54–55 (likewise relying on *Andrews*). So the history shows

restricting firearms at democratically critical spaces that would be undermined by the presence of firearms is consistent with the Second Amendment. New Jersey aligns with this historically-derived principle.

## B.    Parks and Beaches.

New Jersey's prohibition on firearms at parks and beaches *see* N.J. Stat. Ann. §2C:58-4.6(a)(10), likewise follows from a historical tradition. The State produced dozens of historical regulations restricting firearms in parks—including the Nation's first modern parks such as Central Park, Prospect Park, and Fairmont Park—and no evidence exists that such measures were ever held or even seen as unconstitutional. *See* NJ.Opening.Br.20–21. These regulations and New Jersey's modern ones rest on the same principle: carry can be restricted in places where crowds gather for democratic, social, and recreational activity. *See Antonyuk*, 120 F.4th at 1021.

Amici's contrary arguments fall flat. They argue (1) that spaces analogous to modern parks existed at the Founding and yet firearms were not restricted in such spaces, and (2) even if later regulations are considered, 19th-century restrictions in parks were not relevantly similar to New Jersey's. Br.11–15. Each step fails.

Spaces like modern parks did not exist at the Founding. "[P]ublic parks [as] we know [them] today did not emerge until after the onset of mass urbanization." *Koons*, 156 F.4th at 256; *Kipke*, 2026 WL 143528, at *10. While there were "green spaces in cities," like Boston Common, these spaces "are not relevantly similar";

19

they did not serve "as public forums and places of social recreation." *Antonyuk*, 120 F.4th at 1025 (upholding New York's analogous restriction); *see Wolford v. Lopez*, 116 F.4th at 982 (same); *Kipke*, 2026 WL 143528, at *10 (same). Indeed, the very article Amici cite explains that Founding-era greens like Boston Common primarily were "place[s] for grazing livestock and military use," and "the first specific appeal for 'parks' in the city did not occur until 1869." Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 3–6 (2021); *Wolford*, 116 F.4th at 982 (identifying these same dis-analogous purposes for historical commons).

Particularly given that Founding-era greens like Boston Common bore little resemblance to modern parks, the absence of firearms restrictions in such spaces is uninformative. Safety concerns in a modern park where families congregate do not similarly counsel in favor of limiting firearms in a field used for livestock and military drills. If anything, since historical commons in fact served as a site for military exercises, it is hardly surprising that firearms were allowed there. *See Antonyuk*, 120 F.4th at 1024. And even if historical commons were for social gatherings and recreation, the absence of firearm limits in these spaces hardly shows Founding era legislatures believed them to be *unconstitutional*, rather than merely unnecessary. *See supra* at 7–10; NJ.Response-Reply.33–34. After all, it cannot be that a "late-18th-century policy choice[]" not to prohibit handguns in a city commons

constitutionally precludes every legislature from making the contrary policy choice forever. *Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring).

Indeed, once the policy concern did arise as modern parks and handguns alike became more prevalent, legislatures swiftly stepped in. *See Lara,* 125 F.4th at 441 (Second Amendment principles can be distilled from "laws 'throughout the end of the 19th century'" if they do not "contradict[] earlier evidence"). In fact, as three other circuits have already concluded, "[a]s soon as green spaces began to take the shape of a modern park, … governments imposed bans on carrying firearms into the parks." *Wolford*, 116 F.4th at 982; *see Antonyuk*, 120 F.4th at 1022; *Kipke*, 2026 WL 143528, at *10. Nor were these widespread bans ever considered unconstitutional. *See Wolford*, 116 F.4th at 983. This Court should not split with three sister circuits on a sensitive place with such a strong historical pedigree.

Amici grasp for distinctions between these historical bans and New Jersey's modern one, but they fail to identify any that undermines the collective weight of at least thirty historical prohibitions of firearms in parks. Ignoring *Rahimi*'s instruction that new laws need only be "relevantly similar" to historical ones, *Rahimi*, 602 U.S. at 692, they demand replicas. They point out that a few of these restrictions (5 of 30) allowed park officials to grant exceptions. Br.13. But this minor difference, which applies to just a fraction of these laws, is much smaller than the difference between Section 922(g)(8) and historical surety laws. *See supra* at 12–13. And New Jersey's

law likewise gives modern local officials authority to apply the prohibition "based on considerations of public safety." N.J. Stat. Ann. §2C:58-4.6(a)(10).

Amici resort to claiming some of these historical restrictions were differently justified, Br.14–15, but this argument also fails. For one, Amici discuss just a handful of the regulations cited. *See id.* And most of those that Amici discuss contain language expressing clear concern with "protection" and "control" of the park. *Id.* It is unclear why Amici consider these concerns dissimilar from New Jersey's modern interest in safety. And Amici ignore that many historical limits for firearms in parks "appeared in the same subsection as prohibitions against 'throwing stones and other missiles' and discharging fireworks and guns into or over the park," indicating that they did share New Jersey's modern interest in preserving a safe and peaceful park environment. *Koons*, 156 F.4th at 258–59. Amici's nit-picking cannot undermine the weight of the dozens of restrictions in parks, imposed as soon as modern parks were created, and whose constitutionality was never questioned.

### C.    Places That Serve Alcohol.

New Jersey's restriction on carry in places that serve alcohol, *see* N.J. Stat. Ann. §2C:58-4.6(a)(15), also fits historical tradition—as every circuit to assess them has held. *See Wolford*, 116 F.4th at 986; *Antonyuk*, 120 F.4th at 1031. "[I]n a long line of regulations dating back to the colonial era, colonies, states, and cities have regulated in ways reflecting their understanding that firearms and intoxication are a

dangerous mix." *Wolford*, 116 F.4th at 985; *Antonyuk*, 120 F.4th at 1029–31; *Kipke*, 2026 WL 143528 *13. Some places enacted historical twins: prohibiting firearms in taverns, saloons, and bars; others prohibited firearms in places where consumption was likely, like ballrooms, "fandangos," and entertainment venues and near military gatherings; and others restricted carrying specifically by those who had consumed alcohol. NJ.Opening.Br.16–18; *Wolford*, 116 F.4th at 986. These regulations reflect varying policy choices by different legislatures at different times, but they all point to one principle: legislatures may still permissibly regulate to prevent a confluence of firearms and intoxicated persons. *See Koons*, 156 F.4th at 261.

Amici's challenges merely reflect their flawed methodologies. *See* Br.15–18.[7] Amici flatly discount Reconstruction-era evidence without citing any inconsistency

---

[7] Amici's challenge is especially surprising, as several prohibit carrying firearms at bars. *See, e.g.*, Fla. Stat. § 790.06(12)(a)(12) (prohibiting carry at "any portion of an establishment licensed to dispense alcoholic beverages for consumption on the premises, which portion of the establishment is primarily devoted to such purpose"); La. Rev. Stat. § 14:95.5 (prohibition of possession of firearms "while on the premises of an alcoholic beverage outlet," except concealed-carry permitholders may carry in "Class A-Restaurants"); Okla. Stat. Ann. tit. 21, § 1272.1 (prohibiting possession at "any establishment where the sale of alcoholic beverages ... constitutes the primary purpose of the business"); Tex. Penal Code §§ 46.03(a)(7) (prohibiting possession "on the premises of a business" that "derives 51 percent or more of its income from the sale or service of alcoholic beverages for on-premises consumption"). While policymakers may choose to categorize the alcohol-serving establishment in slightly different ways, these laws are all justified by the same historical tradition that undergird New Jersey's, and none operate "with regard for whether [the patrons] are consuming alcohol," Br.17.

with Founding-era thought or practice. *See* Br.16. They then consider Founding era regulations too few, *see* Br.15–16, although *Bruen* relied on fewer when identifying a "settled" historical practice of restricting guns at legislative assemblies, polling places, and courthouses. *See* N.J.Response-Reply.Br.14–15 (discussing *Bruen*, 597 U.S. at 30). They wrongly treat some jurisdictions' decisions not to prohibit carry at bars as proof that such laws are unconstitutional—contrary *Rahimi*, common sense, and Justice Barrett's prescient warnings. And they consider historical regulations too different if they differ at all—ignoring *Rahimi*'s illustration of the level of similarity that suffices, 602 U.S. at 699–700, and *Bruen*'s prohibition on demanding twins, 597 U.S. at 30. Rather than discount historical regulation in isolation, or insist on a record of a uniform, nationwide, Founding-era approach, the appropriate historical tradition reflects policy variation for handling this threat—historically as today, New Jersey and other States could limit intoxicated persons from possessing firearms or prohibit firearms from places where that mix is highly likely. Both fit our broader tradition— and both have close analogues—because policy variation has always been a feature and not a bug of our federalist system. *See Lopez*, 514 U.S. at 581 (Kennedy, J., concurring). The Constitution does not impose a one-size-fits-all tool to advance a State's powerful interest in "protecting against the dangers posed by the combination of alcohol and firearms." *Koons*, 156 F.4th at 263.

## **CONCLUSION**

This en banc Court should reject Amici's arguments, reverse and vacate the preliminary injunction, and affirm the partial denial of the injunction.

Respectfully Submitted,

JENNIFER DAVENPORT
Acting Attorney General of New Jersey

By:   /s/ Angela Cai
           Angela Cai

Dated: January 29, 2026

## CERTIFICATION OF BAR MEMBERSHIP

I certify that I am an attorney in good standing of the bar of the Third Circuit.

/s/ Angela Cai
Angela Cai

Office of the New Jersey Attorney General
NJ Bar #121692014

Dated: January 29, 2026

## CERTIFICATION OF COMPLIANCE

I certify this brief complies with L.A.R. 29.1(a) as it responds to an amicus brief and is filed within 21 days after the amicus brief was served.

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a monospaced typeface using Microsoft Word 2016, in Times New Roman, 14-point, type style. I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii) and Fed. R. App. P. 29(a)(5) because this brief contains 6,005 words, excluding portions exempted by Fed. R. App. P. 32(f).

I certify that this brief complies with L.A.R. 31.1(c) because the text of the electronic brief will be identical to the text of any hard-copy briefs the Court may request. Pursuant to L.A.R. 35.2(a), no paper copies of this brief will be provided unless directed by the Court.

I further certify that prior to electronically filing this brief with the Court today it was scanned by Crowdstrike Falcon Sensor version 7.32.20403.0, a virus detection software, and found to be free from computer viruses.

/s/ Angela Cai
Angela Cai

Office of the New Jersey Attorney General

Dated: January 29, 2026

## CERTIFICATION OF SERVICE

On January 29, 2026, the undersigned caused this brief to be filed with the Clerk of the United States Court of Appeals for the Third Circuit via electronic filing. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system with hardcopies to be sent via overnight mail when directed by the Court.

/s/ Angela Cai
Angela Cai

Office of the New Jersey Attorney General

Dated: January 29, 2026