1  UNITED STATES COURT OF APPEALS
2  THIRD CIRCUIT
3  ----------------------------------------X
   RONALD KOONS; et al.                     X
4     Appellant,                            X
   v.                                       X
5  ATTORNEY GENERAL NEW JERSEY AND          X
   SUPERINTENDENT NEW JERSEY STATE POLICE,  X
6  PRESIDENT OF THE NEW JERSEY STATE        X
   SENATE, SPEAKER OF THE NEW JERSEY        X
7  GENERAL ASSEMBLY,                        X
      Appellees,                            X
8                     AND                   X
   AARON SIEGEL; et al.                     X
9     Appellant,                            X
   v.                                       X
10 ATTORNEY GENERAL NEW JERSEY; et al.      X
   PRESIDENT OF THE NEW JERSEY STATE        X
11 SENATE, SPEAKER OF THE NEW JERSEY        X
   GENERAL ASSEMBLY,                        X
12    Appellees.                            X
         Case Nos. 23-1900/23-2043          X
13 ----------------------------------------X
14 BEFORE: HARDIMAN, SHWARTZ, KRAUSE, RESTREPO, BIBAS,
   PORTER, MATEY, PHIPPS, FREEMAN, MONTGOMERY-REEVES,
15     CHUNG, BOVE and MASCOTT, Circuit Judges;
16              CHAGARES, Chief Judge
17               Oral Argument
            Wednesday, February 11, 2026
18    The Albert Branson Maris Courtroom, 19th Floor
19
20 Job No.: 7908780
21 Pages: 1 - 91
22 Transcribed by: Jackie Scheer

```
 1              A P P E A R A N C E S
 2
 3    ON BEHALF OF THE STATE OF NEW JERSEY:
 4              ANGELA CAI, ESQUIRE
              JEREMY FEIGENBAUM, ESQUIRE
 5              (Liaison Counsel)
              Office of Attorney General of New Jersey
 6              25 Market Street
              Richard J. Hughes Justice Complex
 7              Trenton, New Jersey  08611
              Telephone: (609) 376-2690
 8
 9    ON BEHALF OF THE SIEGEL PLAINTIFFS:
10              ERIN E. MURPHY, ESQUIRE
              Clement & Murphy
11              706 Duke Street
              Alexandria, Virginia  22314
12              Telephone: (202) 742-8900
13
14    ON BEHALF OF THE KOONS PLAINTIFFS:
15              PETER A. PATTERSON, ESQUIRE
              Cooper & Kirk
16              1523 New Hampshire Avenue, N.W.
              Washington, D.C.  20036
17              Telephone: (202) 220-9670
18
19
20
21
22
```

1                 C O N T E N T S

2 ARGUMENT                           PAGE

3     By Ms. Cai                   4, 80

4     By Ms. Murphy               34

5     By Mr. Patterson           66

6

7 QUESTIONS FROM THE JUDGE PANEL

8     For Ms. Cai                 9, 80

9     For Ms. Murphy             40

10     For Mr. Patterson         66

11

12

13

14

15

16

17

18

19

20

21

22

1                    P R O C E E D I N G S

2          CHIEF JUDGE CHAGARES:  Good morning and

3      welcome to the United States Court of Appeals

4      for the Third Circuit.  We're glad you're

5      here.  And we will hear our first case, Koons

6      versus Attorney General, Number 23-1900, and

7      Siegel versus Attorney General of New Jersey,

8      23-2043.

9          You may proceed.

10         MS. CAI:  Thank you, Chief Judge

11     Chagares, and may it please the court, Angela

12     Cai for the State of New Jersey.  I'd like to

13     reserve five minutes for rebuttal.

14         CHIEF JUDGE CHAGARES:  That will be

15     granted.

16         MS. CAI:  The Supreme Court thrice

17     confirmed in Heller, McDonald, and Bruen that

18     nothing about the copious history they

19     reviewed cast doubt on the constitutionality

20     of longstanding laws prohibiting firearms at

21     sensitive locations such as schools,

22     government buildings, and -- and the like.

1    That is because the totality of this nation's

2    history from the Colonial Era to

3    reconstruction and beyond confirms that

4    legislatures could ban firearms at such

5    locations.

6         In Chapter 131, the New Jersey

7    legislature identified modern locations as

8    sensitive and limited firearms except those

9    carried by law enforcement and those

10   authorized to provide security.  The history

11   supporting that democratic decision is cut

12   from the same cloth as the history supporting

13   restrictions at schools, courts, polling

14   places, and legislatures.  Here, throughout

15   the 17 and 1800s, dozens of legislative

16   bodies around the nation restricted firearms

17   at identical or analogous locations to

18   Chapter 131.  That includes fairs and markets

19   of the Founding Era, ballrooms and parks in

20   the Antebellum Period, and schools and zoos

21   and theaters and more immediately after

22   states ratified the Fourteenth Amendment.

1      Importantly, plaintiffs cannot identify a

2      single court or a legislator or a legal

3      scholar or even lay commentator who

4      contemporaneously doubted the validity of any

5      of these historical laws.  In fact, state

6      court decisions cited favorably by both

7      Heller and Bruen reviewed these laws and

8      found them consistent with the individual

9      right to bear arms.  That is precisely the

10     kind of historical tradition that makes the

11     cut under Bruen.  To be sure, modern

12     regulations could flunk Bruen's test if no

13     historical legislature adopted an analogous

14     law when faced with the same enduring social

15     problem.  Modern regulations could also flunk

16     Bruen if historical courts struck down their

17     historical predecessors.  But where history

18     and tradition point in only one direction, as

19     they do here, we must accept the destination.

20         Plaintiffs' arguments are simply

21     incompatible with the Supreme Court's

22     instructions.  First, against the state's

1    30-plus historical park restrictions or 10

2    historical laws banning guns at places of

3    entertainment, plaintiffs insist that these

4    historical precursors weren't identical

5    enough or came too late or weren't

6    universally adopted.  But those arguments

7    would require defying the Supreme Court's

8    thrice repeated statements about schools and

9    government buildings.  After all, at the

10   founding, there were no firearm bans at

11   schools, and any such bans at legislatures,

12   polling places, and courthouses were sparse.

13        Second, plaintiffs' argument requires

14   that this court accept that the mere lack of

15   an affirmative regulation at any given point

16   in time would forever cabin legislative

17   decisions in the future.  But the Supreme

18   Court's most recent decision in Rahimi

19   teaches us that is incorrect.  The Second

20   Amendment is not so shortsighted so as to

21   leave us with only a menu of laws trapped in

22   amber from centuries ago.  And as Justice

1    Barrett warned, federalism is incompatible

2    with use it or lose it constitutionalism.

3         Third, plaintiff argued that only places

4    with government-provided metal detectors

5    could be sensitive places, but history shows

6    nothing of the sort, and that theory would

7    eviscerate longstanding polling place

8    restrictions across the nation or

9    restrictions at locations like day cares or

10   nursing homes.  It is telling that no other

11   court has agreed with this theory.

12        Fourth, plaintiffs' in loco parentis

13   theory about schools make little sense.  The

14   Supreme Court thrice named schools as a

15   paradigmatic sensitive place for prohibition

16   of firearms.  It did not single out students

17   as a class of people who could not have

18   firearms.  Instead, following Rahimi's

19   principle-based rule means the historical

20   tradition from firearm restrictions at

21   schools amply justifies Chapter 131's

22   regulations at playgrounds, field sports

1  events, and designated children's areas of

2  public libraries and museums.  Luckily, four

3  other Courts of Appeal to consider sensitive

4  places restrictions post-Bruen have rejected

5  plaintiffs' arguments, and as this court has

6  repeatedly stated, it should be reluctant to

7  contradict the unanimous position of other

8  circuits.  Fidelity to that principle and

9  fidelity to the Supreme Court's teachings

10  means this court should reject plaintiffs'

11  facial challenge.  I welcome this court's

12  questions.

13       CHIEF JUDGE CHAGARES:  Thank you.

14  You -- you mentioned history rather generally

15  and I'm afraid we're gonna have to get a

16  little more granular on that.  You -- you

17  argue in your brief in various places, in

18  particular your -- your reply brief at page

19  18, that in the event of a clash between

20  Founding Era and Reconstruction Era

21  historical analogue that the latter ought to

22  control for purposes of our inquiry under --

1    under Bruen.  Doesn't Bruen tell us something

2    different?  Doesn't Bruen tell us that --

3    that we should treat evidence from the late

4    19th century as having minimal probative

5    value when it conflicts with earlier

6    evidence?  I'd -- I'd be interested in your

7    position on that.

8        MS. CAI:  So, Your Honor, I think I

9    would urge this court not to overread

10   references in Bruen as saying it has to be

11   evidence from 1791 or 1868 because Bruen and

12   Rahimi explicitly said they were not deciding

13   that very interesting academic question.  All

14   this court needs to do is do what the Supreme

15   Court said was appropriate.

16       CHIEF JUDGE CHAGARES:  Well, well, but

17   if I could just -- if I could just quote it,

18   the -- the opinion says on page 66:  Late

19   19th century evidence cannot provide much

20   insight into the meaning of the Second

21   Amendment when it contradicts earlier

22   evidence.

1          Isn't that rather specific?

2          MS. CAI:  I think that is important to

3     understand because it's qualified.  It's

4     insufficient when it contradicts the

5     overwhelming weight of other evidence, so the

6     court said that in reference to the single

7     Texas 17 -- 1871 section, that banned all

8     public carry, because, quote, a single law in

9     effect in a single state that contradicts the

10    weight of other evidence is insufficient.

11    And that other evidence included not only

12    Founding Era or rather Antebellum cases that

13    went the other way, but also other cases from

14    that time period that also went the other

15    way.  We don't have that here.  You will not

16    find a single case that plaintiff has cited

17    from either the Founding Period or the

18    Antebellum Period or Reconstruction that says

19    restrictions at sensitive places -- and many

20    locations, many jurisdictions adopted them --

21    would have been -- was unconstitutional.

22          In fact, you have decisions like

1    Andrews, the Tennessee 1871 case that Heller

2    cited three times and Bruen cited once

3    positively for the idea that it recognized an

4    individual right to bear arms.  In Andrews,

5    the court said that is true, therefore you

6    cannot have a total ban on carrying of

7    firearms, but it also said unequivocally that

8    restrictions at places -- at sensitive

9    locations like public assemblies and the like

10   were constitutional.  So I think those cases,

11   like that case as well as Shelby, the

12   Missouri case, also cited by -- by Bruen

13   positively, is going the same direction.  It

14   is not what Bruen was looking at, which is

15   one law that was then contradicted by other

16   evidence either earlier or contemporaneously.

17        JUDGE MATEY:  Speaking of overreading

18   Bruen, should we really be overreading

19   Heller's colorful use of the phrase

20   "sensitive places" as actually creating a

21   doctrine?  It strikes me as similar to, I

22   don't know, large capacity magazines or

1    assault weapons as a regulatory term that
2    could be applied to anything that a regulator
3    wants to regulate and then used as a claim
4    for historical justification.  So how -- do
5    you really think they were intending to
6    create that, particularly when Bruen says,
7    well, we don't need to define the metes and
8    bounds of that -- of that reference?
9        MS. CAI:  I do agree with you, Judge
10   Matey, that I don't think the Supreme Court
11   defined the metes and bounds of what are
12   sensitive places and what are not, and I
13   think Bruen was pretty explicit that it's
14   just an example or a set of examples.  But I
15   will suggest that it is not just a stray line
16   type of dicta.  It was said first in Heller.
17   It was repeated as an assurance in McDonald
18   when the court understood that it was now
19   applying the Second Amendment to all states,
20   and in Bruen it was repeated for a third time
21   in the -- as a paradigmatic example as the
22   court was trying to explain to the lower

1    courts how to do the history and tradition

2    analysis.  Not for the first time but for the

3    --

4         JUDGE MATEY:  -- yeah, I mean, but --

5    but couldn't it -- but it's never been

6    defined, right.  I mean, and I understand at

7    least one example of what it means could be

8    places where government provided

9    comprehensive security, right.  And so we

10   would know that that courthouse, a military

11   base, these are places where going arms was,

12   you know, going armed was severely

13   restricted.  I mean, isn't that a helpful way

14   of thinking about this?

15        MS. CAI:  I'll note that, you know, that

16   argument has to be based on history, and the

17   history is just not there.  So, you know, I

18   think we're all trying to do what Rahimi

19   taught us to do, which is define the

20   historical principle that undergirds all

21   these -- all these historical analogues.  And

22   --

1          JUDGE MASCOTT:  -- so, Counselor, on
2     that, the New Jersey law right now has a
3     pretty comprehensive list of sensitive
4     places.  What is the state's position on
5     public locations that could not be regulated
6     as sensitive places?
7          MS. CAI:  Sure.
8          JUDGE MASCOTT:  What falls outside?
9          MS. CAI:  I think that, you know, I
10    think there's a reason why historical
11    legislatures never chose places like bakeries
12    and individual shops as sensitive places.
13    There's --
14         JUDGE MASCOTT:  -- wait, why is a bakery
15    different from a zoo or a library?
16         MS. CAI:  Because it's not -- so zoos
17    and libraries were understood as locations
18    where people gathered for literary or
19    scientific purposes.  So that's not the case
20    for a bakery as far as I can tell, right.  So
21    those are -- those are statutes that Texas
22    and Missouri and other courts that had Second

1    Amendment analogues chose as locations to

2    deem as sensitive.

3         JUDGE MASCOTT:  But what's --

4         MS. CAI:  -- and so we're --

5         JUDGE MASCOTT:  -- so you're telling me

6    there's a constitutionally significant

7    distinction in the Second Amendment between a

8    bakery and a zoo or museum?

9         MS. CAI:  Yes.  And that is grounded by

10   history --

11        JUDGE MASCOTT:  -- because of a Texas

12   state statute and how Texas defined it at one

13   point in time?

14        MS. CAI:  Texas is just one example.  We

15   cite a number of other examples, including

16   specific restrictions at zoos as soon as they

17   came into existence, which they were all

18   inside parks, and those parks generally

19   prohibited firearms in them as well and

20   that's --

21        JUDGE MASCOTT:  -- (incomprehensible)

22   purpose so if a bakery in -- bakeries in the

1     states are being used for book clubs,

2     literary meetings, they -- now all of a

3     sudden the ban can apply?

4          MS. CAI:  I think that's a question

5     that, you know, hasn't been presented to us

6     and we would think about, you know, I don't

7     think a bakery in general is used -- just

8     because it can be sometimes used as a

9     location for X purpose doesn't mean that it

10    is a sensitive location.  I think that has to

11    be designed and dedicated to that purpose, so

12    I don't think that necessarily applies.

13         JUDGE MASCOTT:  In addition to bakeries

14    in New Jersey, where else can people possess

15    firearms without being -- them being

16    regulated as sensitive places?

17         MS. CAI:  Sure.  So any number of

18    commercial establishments.  Banks, coffee

19    shop, pizzeria, grocery store.  You know, I

20    could --

21         JUDGE MASCOTT:  -- bank?  I mean, a bank

22    seems like it creates more security issues,

1      doesn't it, than a public library?

2          MS. CAI:  So as far as I understand,

3      there is not a specific historical tradition

4      of prohibiting firearms at banks, and that is

5      why New Jersey has not regulated firearms at

6      banks specifically.

7          JUDGE PORTER:  What's the -- what's --

8      what's the national historical tradition of

9      banning firearms in schools?

10         MS. CAI:  That's a really good question,

11     Judge Porter.  So the history, as we

12     understand it, from both looking in this case

13     and at the sources that Bruen cited, the

14     first time you will see a location-based

15     restriction for all who enter a school are

16     the same historical citations that we cited

17     for other locations like entertainment and

18     literary gatherings and things of that sort.

19     That started, we believe, in Texas in 1870

20     but was repeated by Missouri and many other

21     jurisdictions later on.  There were

22     student-based restrictions at certain

1    Universities in the 1820s and '30s and so
2    forth at individual schools.  So you could
3    look at that and --
4         JUDGE PORTER:  -- imposed by the schools
5    themselves?
6         MS. CAI:  Correct.  Correct.  So --
7         JUDGE PORTER:  -- does that count as
8    part of our national regulatory tradition?
9         MS. CAI:  You know, I think you could
10    look at it in context and say that's an
11    interesting thing that some schools chose to
12    do, and -- and perhaps they were concerned by
13    some of the same issues that the Texas
14    legislature and Missouri legislature was
15    concerned about and chose to go at it from a
16    different policy perspective.  But the fact
17    that they didn't choose a different
18    regulatory tool, a sensitive place
19    restriction at any given point in time,
20    doesn't mean that they were saying that's
21    unconstitutional as a matter of Second
22    Amendment.  In fact, I think some of the

1     schools that chose those student-based

2     restrictions wouldn't have been bound by an

3     understanding of the Second Amendment in the

4     time when they chose those decisions.  So

5     it's not the Second Amendment that was

6     stopping them.  It was policy decisions, and

7     federalism requires that, you know, different

8     states and different institutions within the

9     states be able to choose what policy

10    decisions fit, you know, the democratic

11    purpose.

12         JUDGE PORTER:  And Bruen and Rahimi --

13    Bruen and Rahimi are concerned about state

14    action, right?

15         MS. CAI:  Correct.

16         JUDGE SHWARTZ:  If -- if you have a

17    scenario where there is silence in the

18    legislative record, where does the court go

19    to figure out if there's some kind of

20    tradition?  For example, do we look at the

21    common criteria, objective criteria that the

22    four locations that the Supreme Court has on

1    multiple times identified, guide our efforts

2    to try to identify a tradition?  Or is that

3    irrelevant and we're stuck with what the

4    legislative record would be, the regulatory

5    record would be?

6        MS. CAI:  I think you would have to

7    first look at whether there is a natural

8    explanation for the silence as important,

9    relevant context.  So if you have, for

10   example, a longstanding acute social problem

11   that if you are looking back to, you know,

12   1800 or 1850 or 1868, that those legislatures

13   understood was a huge problem for them, and

14   if none of them chose to regulate that

15   problem with any kind of firearm restriction,

16   and that would have been the natural thing to

17   do, and perhaps especially if it was written

18   about as something that is a problem and

19   perhaps a firearm restriction was debated and

20   they chose not to do so, I think that is

21   relevant.  I don't think that's dispositive.

22   But I think that's -- that's relevant

1     evidence, and if we had that in this case, I
2     think we would have a much harder time.
3          But you don't have that here.  The
4     locations that we're talking about either
5     were regulated in some form at some point,
6     you know, in the first decades of this
7     nation's history, and especially after the
8     social problem became acute.  So we discuss
9     in our briefs, and I think a lot of the --
10    the historical evidence bears this out, that
11    before 1850 or the 1840s and '50s the
12    commercial market for handguns was really
13    just very, very small, and in fact Samuel
14    Colt himself had a hard time establishing a
15    commercial base.  And it wasn't until the
16    Colt Revolver patent expired in 1850 that
17    these relatively easy to obtain cheap
18    revolvers started flooding the market.  And
19    there may be other historical reasons why
20    people started getting them, but then you
21    start reading about interpersonal violence,
22    riots, and other kinds of social problems

1    emerging especially in the reconstruction

2    south, and the radical republicans in Texas

3    and other states that wanted to deal with

4    this problem, especially as it related to

5    suppression of people's right to vote,

6    including freed slaves' right to vote, then

7    enacted these restrictions.  And a lot of

8    them in fact were in states that had a Second

9    Amendment analogue to the individual right to

10   bear arms, and it had happened exactly also

11   at the time when the Second Amendment became

12   incorporated against the states through the

13   Fourteenth Amendment --

14        JUDGE SHWARTZ:  -- can I ask you about,

15   Judge, and I'll -- I'll yield the floor.

16   These are smaller items, not the sensitive

17   places it goes to, the insurance requirement

18   and a fee.  You are in a preliminary

19   injunction setting.  We're looking for

20   irreparable harm.  Dollars are being spent if

21   these -- if these laws are enacted.  Is the

22   state foregoing a sovereign immunity argument

1          as it relates to compensating the expenditure

2          of these funds should these statutes

3          ultimately be deemed unconstitutional?

4               MS. CAI:  Yeah.  So two answers to that.

5          So as to the insurance provision, I think

6          it's not the case that every time a person --

7          a litigant stands to lose a dollar or $50

8          that it suddenly translates to irreparable

9          harm, even if there's no cause of action or,

10         you know, some other doctrine may prevent

11         them from recovering that money from the

12         state.  If that's true, then you have

13         preliminary injunctions from all kinds of

14         cases where there is no defined path to

15         collection.  And as to the fees, you know,

16         it's interesting because the irreparable harm

17         has to be geared towards their legal theory

18         and not just the amount of money they happen

19         to be saving as a response.  Plaintiffs never

20         argue that the $200 fee, which is just, you

21         know, accounts for the rate of inflation

22         since 1970, is something that they couldn't

1        afford or is not the right number.  Their
2        only objection is where $50 of that $200
3        legislature in one year has decided to
4        allocate to a certain fund.  And that's just
5        --
6            JUDGE SHWARTZ:  -- and the record is
7        unclear exactly how that all works, correct.
8            MS. CAI:  I think the -- I don't think
9        you need a record because a binding New
10       Jersey law --
11           JUDGE SHWARTZ:  -- district court,
12       though, at that point was not clear, right --
13           MS. CAI:  -- yeah, there is binding New
14       Jersey law that, you know, with all respect
15       to the legislature who enacted that
16       provision, that does not bind future
17       legislatures as to where money in the budget
18       goes.  So I -- I think that, even putting
19       that aside, their only objection to it is
20       where the money goes --
21           JUDGE SHWARTZ:  -- I'm aware of what
22       their objection is.  I'm asking you a

1     different question, though.  It's a -- it's a

2     monetary relief and the question I had was

3     whether or not this is a -- the kind of

4     relief that should be subject to a

5     preliminary injunction, and -- and as I

6     understand from the briefing, sovereign

7     immunity was sort of discussed by the other

8     side as an impediment to relief, and that was

9     my question.  Is there an assertion of

10     sovereign immunity as a -- as a bar to

11     re-compensating them for the -- the monetary

12     amounts in those two areas?

13         MS. CAI:  Thank you, Judge Shwartz.

14     Yes.  The state is not waiving sovereign

15     immunity.  We're just suggesting that not

16     every time you stand to lose a dollar or two

17     that that suddenly becomes irreparable

18     injury.

19         JUDGE SHWARTZ:  Thank you.

20         CHIEF JUDGE CHAGARES:  Judge Krause.

21         JUDGE KRAUSE:  Thank you.

22         Ms. Cai, I'd like you to assume that,

1    notwithstanding the Supreme Court authority

2    you cited, that this court concludes that

3    laws after 1791 have minimal, if any,

4    relevance as historic analogues, even when

5    there's not a conflict.  Under those

6    circumstances, do various sensitive places in

7    the -- the list that New Jersey has generated

8    no longer qualify or are concepts of affray

9    and causing terrorizing the -- the populace

10   dating back to the founding a sufficient

11   analogue for those locations, can we think

12   about analogues at even that level of

13   generality?

14        MS. CAI:  I think you can.  I will make

15   one observation first before I get to the --

16   the crux of your question.  If you make that

17   assumption, then it cannot be that

18   courthouses or schools can be sensitive

19   locations, because I am not aware of any

20   statute pre-1776 or enacted by colonial

21   legislature that prohibited firearms at

22   schools or courthouses.  And you only have

1    one state that did so at legislative

2    assemblies, and I'm aware of only one at

3    polling places, and that's Delaware.  So

4    that's just the outcome if that is -- if that

5    is the -- the methodological angle that we're

6    taking.

7        But with respect to your question, you

8    know, I -- I do think that you could look at

9    the Statute of Northampton as it was

10   understood by the people in the colonies and

11   immediately thereafter.  And the Statute of

12   Northampton has at least two different

13   components.  So it is true in Bruen the court

14   discussed that the component that says that,

15   you know, nor bring no force in affray of the

16   peace is a qualifier on all blanket

17   restrictions on public carry.  So in order to

18   prohibit public carry, you have to have that

19   qualifier, because it was understood in the

20   Statute of Northampton as a qualifier.  It

21   can't be that if you're just going about for

22   self-defense and you're not acting in affray

1       or breach of the peace that you could

2       restrict that.  But there's a separate line

3       that says nor to go nor ride armed by night

4       nor by day in fairs, markets, nor in the

5       presence of justices or other ministers.

6           That is the sensitive place history and

7       tradition that started with the Statute of

8       Northampton that justifies restrictions at

9       courts in the same breath as restrictions at

10      fairs and markets, it's all the same clause.

11      And so when it was codified in states like

12      Virginia in 1786 and in North Carolina in

13      1792, that same fact is true.  There are

14      different clauses for the affray clause and

15      sensitive place clause.  So you could use the

16      fairs and markets and courts as its own

17      tradition and analogize from there, and

18      that's perhaps how you get to schools as

19      sensitive places, because they are places

20      where people who are -- where if you have

21      even self-defense discharge or -- or display

22      of a firearm, that may cause more harm to the

1    people gathered there because of the state

2    that they're in or because of the social

3    activities going on there.

4         If you were to just look at the affray

5    clause on its own, I think there is some

6    theory that I don't think has been well

7    briefed here, but let me offer it here, that

8    in affray would automatically be the case if

9    a firearm is even used in self-defense at

10   these particular locations, and then you

11   could then analogize from there, if that's

12   true at fairs and markets and courthouses in

13   1786 or 1700, whether or not that is true at

14   locations today.  I don't think you need to

15   do that, because at no point in any of the

16   courts, Supreme Courts' cases, have they said

17   you can only look to history that predate the

18   founding.  You don't see that in the cases

19   that we cite or plaintiffs cite.  In Gamble,

20   for example, on the double jeopardy clause

21   and the meaning thereof, the Supreme Court

22   said you don't have a lot of cases where both

1    sovereigns prosecuted an individual for all

2    kinds of reasons before the mid 1800s.  And

3    so then they look to cases from 1840s and

4    onwards up till 1922 to understand the

5    meaning and the application of the double

6    jeopardy cause.

7         Here, for different reasons, there was

8    no particular social problem that -- that

9    many legislatures saw before 1850, and so

10   that's the same reason of why we look to

11   cases from the late 1800s when, by the way, a

12   lot of states started enacting their own

13   Second Amendment analogues, and at that very

14   moment, those very states, like Missouri and

15   Tennessee and Texas, also started enacting

16   sensitive place restrictions.  Courts then

17   passed upon them and said these are

18   constitutional.  And so I think in terms of

19   history, we have an exceedingly robust

20   history of a history tradition of legislative

21   experimentation with particular places, and

22   the fact that some legislatures chose to go

1        right up to the constitutional line and some
2        legislatures did not, I don't think it's --
3             JUDGE PORTER:  -- what is -- what is
4        the -- the new social problem that was
5        identified?  Would you say it's the presence
6        of guns where people congregate?  Like, how
7        do you define that new social problem?
8             MS. CAI:  In -- in the, like, 1870s --
9             JUDGE PORTER:  -- yeah.
10            MS. CAI:  So I think it's a couple
11       different things.  So people bringing
12       firearms to daily life, activities of daily
13       life I think was a problem that they saw, and
14       you see that in the history, in the record.
15       How they solved that social problem was not
16       to generally prohibit firearms everywhere,
17       but to locate specific locations where these
18       problems are particularly acute.  At places,
19       for example, where designed for civic and
20       democratic participation, locations designed
21       for the needs of vulnerable people like
22       students and the inebriated, and in places

1          where the firearms presence -- firearms even

2          among the law-abiding, could really

3          jeopardize the safety of others.

4                JUDGE PORTER:  Why is that a new social

5          problem that had never been contemplated

6          before?  Isn't that exactly the kind of thing

7          that was addressed by the Statute of

8          Northampton going back 600 years?

9                MS. CAI:  I see my time has expired.

10               CHIEF JUDGE CHAGARES:  Go ahead, you can

11         answer that question.

12               MS. CAI:  I do think that

13         legislatures -- some legislatures may have

14         recognized and paid attention to that social

15         problem.  I think it became a much bigger

16         social problem when people were carrying

17         handguns with them more frequently in the --

18         after the 1850s.  You see cases like Huntley,

19         the North Carolina case that Heller cites.

20         It talks about how you have a general right

21         to -- to self-defense, but it also observes

22         as a matter of sociological fact at the time,

1    that nobody goes around carrying firearms,

2    and it's sort of, like, an unseemly thing to

3    do.  And if people weren't doing it because

4    of social mores, then legislatures, including

5    legislatures that were not bound by the

6    Second Amendment or any state analogue

7    thereof, chose not to enact those laws.  And

8    I think the decision of our friends in

9    Delaware in, you know, the 1800s not to

10   restrict firearms at -- at theaters and

11   performances, shouldn't and couldn't in a

12   federalist system bind the decisions of

13   Pennsylvania in 1870 or New Jersey in 2022

14   from enacting a restriction like that just

15   because one state did not choose to do so.

16        CHIEF JUDGE CHAGARES:  Thank you,

17   Counsel.  We'll get you on rebuttal.

18        We'll hear from the Siegel plaintiffs.

19   Ms. Murphy.

20        MS. MURPHY:  Good morning, Your Honors,

21   and may it please the court.  Erin Murphy on

22   behalf of the Siegel plaintiffs.

1          Bruen made clear that states may not

2     impose ahistorical conditions on those

3     seeking a permit to carry a handgun for

4     self-defense.  And while Bruen acknowledged

5     that the Second Amendment allows states to

6     prohibit firearms in certain sensitive

7     places, it went out of its way to make clear

8     that the historical record revealed

9     relatively few of these, quote, exceptional

10    places and expressly cautioned against

11    defining the category of sensitive places so

12    broadly as to eviscerate the general right to

13    publicly carry arms for self-defense.

14          Rather than heed those teachings, New

15    Jersey's response to Bruen largely defies

16    them.  The state has conditioned the exercise

17    of the right to carry a handgun on the

18    ability to produce four reputable persons

19    willing to provide a written character

20    endorsement and sit for a follow-up

21    interview.  It has imposed a novel insurance

22    mandate that treats law-abiding citizens as

1   walking liability risks simply because they

2   want to exercise their Second Amendment

3   rights.  It has imposed an application fee

4   that forces law-abiding permit applicants to

5   shoulder costs generated by violent

6   criminals.  And it has declared nearly the

7   entirety of New Jersey sensitive places that

8   are off limits to the carrying of handguns,

9   even by those who are fortunate enough to

10  secure a carry permit.  Any definition of

11  sensitive places that sweeps so broadly as to

12  encompass parks, museums, beaches, libraries

13  entertainment facilities, public gatherings,

14  all modes of transportation and more, is the

15  epitome of a definition so broad as to

16  eviscerate the general right to carry arms

17  for self-defense.

18       Now, while New Jersey has taken a

19  blunderbuss approach to identifying sensitive

20  places, we haven't responded in kind with a

21  blunderbuss attack.  Of the 25 categories

22  that New Jersey has identified, we've

1    actually challenged at this point fewer than
2    half of them and we aren't even challenging
3    each of those categories in their entirety.
4    And that's because we don't take issue with
5    the proposition that there are certain places
6    where handguns can be permitted -- can be
7    prohibited, consistent with historical
8    tradition.
9        I think it's common ground that there's
10   a category of places where a core,
11   deliberative, sensitive functions of
12   government take place, the courthouses, the
13   polling places, legislative assemblies, et
14   cetera.  We also don't take issue with
15   provisions that are focused around places
16   that have physical attributes that make a
17   firearm a safety hazard in the same way that
18   historically there were laws to deal with
19   when gun powder posed a safety hazard.  So,
20   for instance, a provision here that deals
21   with power plants where, you know, the
22   presence of a firearm might cause an

1  explosion, independent from concerns about

2  criminals misusing them.

3       We also don't take issue with the notion

4  that the state can have prohibitions in

5  places that are dedicated to housing

6  individuals who are themselves dangerous and

7  not allowed to carry firearms.  So there's

8  several provisions in this law that deal with

9  things like correctional facilities or things

10  like certain types of mental health

11  facilities, certain types of perhaps drug

12  addiction facilities.  The through line,

13  though, among those categories is that they

14  tend to be places where you have either or

15  both of restricted access and heightened

16  security because of the recognition that they

17  aren't like parks and zoos and museums and

18  libraries, but rather are the kinds of places

19  where you have dangerous activities,

20  important activities, sensitive activities,

21  dangerous people, qualities of the physical

22  property that are dangerous.  Things that

1    call for treating them as sensitive, not just

2    for purposes of carrying a firearm, but more

3    generally.  And so if the state stays within

4    those bounds, we don't take issue with the

5    idea that there are places where firearms may

6    be prohibited.

7         What we very much take issue with is the

8    notion that firearms may be prohibited

9    essentially anywhere where people congregate,

10   whether they are congregating to engage in

11   First Amendment activity, civic activity,

12   recreational activity, to watch a sporting

13   event, to watch some theater, to just take

14   your kids out for the -- a day at the park,

15   whatever it may be.  Anywhere that people

16   seem to gather, which seems to be the state's

17   approach.  If that were the law, we would

18   have seen, as a matter of historical

19   tradition, we would have seen far more than

20   four laws from four states in the 1860s that

21   took the approach of imposing these kinds of

22   broad prohibitions.  Instead what we saw, as

1      concerns about things like handguns arose in

2      the 1800s, are concealed carry restrictions.

3      Even some of the laws the state is relying on

4      here were concealed carry restrictions, not

5      efforts to say, oh, my goodness, now that

6      there's handguns, we're not gonna allow

7      anybody to carry firearms anywhere.  The few

8      jurisdictions that took that approach are the

9      exact same jurisdictions for the most part

10     that Bruen already said were taking outlier

11     approaches to the right to carry generally,

12     which makes them a very poor place to look to

13     understand the tradition surrounding what

14     could be deemed a sensitive place.

15         CHIEF JUDGE CHAGARES:  Today and in your

16     briefing you seem to limit your challenge to

17     playgrounds and youth sports events to sort

18     of off campus locations.  Do you concede that

19     Chapter 131's restrictions on playgrounds and

20     youth events could be constitutional in so

21     far as they take place at schools?  And if

22     so, how does that affect your facial

1          challenge?

2              MS. MURPHY:  So the reason -- this stems

3          from how we understand the law.  We think

4          that if they're taking place on school

5          property they're already covered by the

6          school provision, which we're not

7          challenging.  So we understand these separate

8          provisions about playgrounds and youth

9          sporting events to be there precisely to

10         capture anything that's happening not on

11         school property, so our challenge is confined

12         in the sense of how we understand those

13         provisions to be confined, which is why I do

14         think as to those particular provisions, it

15         is a facial problem, independent from, you

16         know, we can certainly have a debate about

17         the constitutionality of -- of limitations on

18         schools themselves.

19             JUDGE SHWARTZ:  If I could just

20         follow-up on that.  Assume you have a school

21         that it could be a (incomprehensible) or

22         whatever that the -- the field where the

1          practices take place and the games take place
2          are actually located in the town's park.
3               MS. MURPHY:  Uh-huh.
4               JUDGE SHWARTZ:  So if it had been
5          contiguous with the school, your position
6          would be that would be a place that could be
7          restricted, but is it your position simply
8          because it's located off the school grounds,
9          it's no longer protected even though the same
10         activity is occurring?
11              MS. MURPHY:  I mean, that's ultimately
12         the scope of our challenge.  I do wanna be
13         clear, I mean, we haven't challenged schools.
14         That's not because I'm gonna stand here and
15         concede that I think everything about a
16         restriction on schools is necessarily
17         constitutional.  We chose not to press that
18         in this case.  I think the Supreme Court, you
19         know, has mentioned schools without providing
20         much guidance at all about exactly what they
21         mean by that, if they think it is students,
22         if they think it is the whole property, if

1 they think it's teachers, all of that.

2 And -- and I'm happy to, you know, discuss

3 our -- our views on that.  But to the extent

4 we have a distinction here, it's a

5 distinction that's grounded in the provisions

6 we chose to challenge, not necessarily

7 because I'm here to tell you I think that

8 there's a radically constitutionally

9 significant difference if you have the park

10 kind of off the school property versus on the

11 school property --

12  JUDGE SHWARTZ:  -- and so what's the

13 distinction that you're drawing?  Because

14 it's open and not on school premises?

15  MS. MURPHY:  Well, I think what I was

16 just suggesting is I'm -- I'm -- I'm not

17 necessarily trying to tell you there's a

18 constitutional distinction.  I'm telling you

19 that just because we didn't challenge the

20 school's provision doesn't mean we don't

21 think that it might be a little bit

22 overbroad.

1           JUDGE SHWARTZ:  So what if -- I'm gonna
2      go back to following up on Judge -- to Judge
3      Chagares' question.  The activity in the park
4      that happened to be school-sanctioned
5      practice.
6           MS. MURPHY:  Sure.
7           JUDGE SHWARTZ:  Is that -- and it's not
8      youth, it's high school.  Is that --
9           MS. MURPHY:  -- sure.  We would be
10     challenging -- we're -- challenge this
11     provision even if it's -- if it's
12     school-sanctioned activity that's going on,
13     because we don't think the fact that activity
14     is happening somewhere that's sanctioned by a
15     school necessarily translates into converting
16     that place into a sensitive place.  And I
17     think that if you look at the tradition about
18     schools, you know, as the laws that were
19     suggested by -- by the state here that tend
20     to be provisions that were focused on dealing
21     with students while they're on campus engaged
22     in school activities, that's an in loco

1    parentis tradition, you know, we could have a

2    debate about exactly how broadly that goes

3    and at what point you're no longer in loco

4    parentis, if you are, if you're not, if

5    you're engaged in, you know, a

6    school-sanctioned activity at a park.  But I

7    think that by virtue of the way that the

8    state has set up its law that that's probably

9    outside the scope of our challenge since I

10    understand the provision we're challenging to

11    be there to kind of deal with situations that

12    are not part of school activities.

13          JUDGE SHWARTZ:  Thank you.

14          JUDGE KRAUSE:  Ms. Murphy, you

15    identified as one category of locations the

16    physical attributes that would make the

17    firearm a safety hazard.

18          MS. MURPHY:  Uh-huh.

19          JUDGE KRAUSE:  At that -- at that

20    locale.  So we -- I don't think there's any

21    debate that there's been significant

22    technological changes in the decades since --

1   since the founding, and we have firearms now

2   that, you know, for example, in Dayton, Ohio

3   killed nine people, injured 17 in 32 seconds.

4   Why in that circumstance is it unreasonable

5   for a legislature to make the determination

6   that the presence of firearms where it -- it

7   terrorizes people, where the public that's

8   there, they anticipate may over-react or even

9   law enforcement over-react, leading to

10  violence, to use those locations as sensitive

11  places?  Why doesn't that fit into your

12  category of those locations that have the

13  attributes that would make a firearm safety

14  hazard?

15        MS. MURPHY:  Sure.  So I wanna kind of

16  offer two responses.  First, just to be clear

17  about the scope of what I had in mind when

18  I'm talking about physical attributes, I mean

19  the physical attribute in the sense of

20  there's something at the property that makes

21  it likely to explode or makes it more likely

22  that you're going to have a fire or that kind

1        of safety risk that generates in the same way

2        that there were concerns about where you

3        could have a -- a gun powder factory --

4              JUDGE KRAUSE:  -- but not that there

5        would be a stampede or that other people may

6        pull out their firearms --

7              MS. MURPHY:  -- sure, I -- that's not

8        the -- you know, just to be clear, the --

9        that is not what I mean by physical

10       attributes.  And I think the concern with

11       once you start defining it the way that you

12       have suggested, is I'm not sure where there's

13       any limiting principle.  I mean, I'm just --

14       once -- you necessarily end up reaching any

15       place where people congregate in significant

16       numbers.  That is precisely the argument that

17       New Jersey -- that New York made in Bruen.

18       They said, look, times have changed and we

19       have, you know, way more people around today.

20       New York City is an incredibly populous

21       place.  If we have firearm violence there,

22       it's going to create massive problems and we

1       have a police presence around today that we
2       did not have at the founding, so times have
3       changed in a way where we have to have -- and
4       this was a sensitive places argument that
5       they made.  We have to have a different
6       conception of sensitive places, and the
7       Supreme Court specifically rejected that
8       argument and said if you define sensitive
9       places at the level of places where people
10      congregate and there's a police presence,
11      then you have eviscerated the right to carry.
12              And I think that's the problem here.  We
13      see that in practice with the way this law
14      operated, because once New Jersey started
15      with the conception of, well, we don't want
16      firearms in places where there's people,
17      where there's a significant number of people,
18      you end up with a laundry list that, I mean,
19      to be fair, it actually covers bakeries,
20      because the state's law says all private
21      property even is a sensitive place unless and
22      until somebody says we will allow you to

1      carry here, notwithstanding that it is a

2      private -- a private property.  So you end up

3      with a definition where the last time we were

4      before this court when asked the question,

5      you know, the state said the only place you

6      could carry was on the streets.  It can't be

7      that sensitive places is a concept so broad

8      that it covers everywhere outside the home

9      that people actually go.

10          JUDGE KRAUSE:  But every one of the

11     circuits that has upheld that they're

12     sensitive places laws has used approximately

13     the same four categories and defined it in

14     terms of the -- the particular attributes of

15     those places.  In the majority panel opinion

16     here, we formulated it as a discrete location

17     set aside for particular civic functions

18     where the presence of firearms was

19     historically regulated as jeopardizing the

20     peace or posing a physical danger to others.

21     Why doesn't that put bounds on the -- the --

22     the types of places that would fall within

1      the sensitive places doctrine?

2          MS. MURPHY:  I mean, I think the -- the

3      proof is a little bit in the -- the pudding.

4      The discrete locations are everything from

5      parks, beaches, museums, libraries,

6      entertainment facilities, anywhere where

7      people are engaged in a public gathering,

8      people at movie sets.  I mean, people at

9      virtually anything you can think of is a

10     discrete location.  I think the concept of

11     discreteness has kind of crept out of what

12     we're talking about.

13         But I would like to talk a little bit

14     more about the specific history that's being

15     relied upon by the cases -- the cases that

16     have gone that way, which notably, you know,

17     do happen to be courts that got reversed in

18     Bruen.  But I think that the historical

19     analysis is not really being faithful to the

20     history, and -- and I'd like to bring up a

21     point in particular.  The state brought up

22     the Northampton laws and the way in which

1    they have kind of two components to them.
2    Well, the state left out the fact that
3    Virginia's law, actually the way it has a
4    distinction is by saying that the restriction
5    on fairs and markets applies only if you are
6    carrying to terror -- in terror of the
7    country.  That's how these were set up.
8    They -- but the distinction they drew is to
9    actually say, on the one hand, you can't
10   carry arms at all in the courts, the --
11   before the ministers of justice.  You cannot
12   do so at all, Virginia's 1870s -- 1786 law is
13   a good example of this.  And then it says on
14   the other hand, nor can you ride armed by
15   night nor by day in fairs or markets or in
16   other places in terror of the country.  And
17   that is the tradition that came to this
18   country.  That is specifically, again, an
19   argument that Bruen confronted, because New
20   York pointed to the same laws and said
21   there's no right to carry generally because
22   you could ban it in fairs and marketplaces,

1     which were the principle places that people

2     went historically.  These Northampton laws

3     show that you couldn't carry historically.

4     The court didn't distinguish those laws by

5     saying they were actually sensitive places

6     laws that treated fairs and markets

7     differently.  It said that New York

8     fundamentally misunderstood how those laws

9     operated, and what they actually did is

10    prohibited carrying in those places only if

11    you were doing so with malintent or carrying

12    dangerous and unusual weapons.

13         So the court has already considered and

14    rejected the argument that Northampton

15    statutes reflect a tradition of prohibiting

16    carrying in places like fairs and

17    marketplaces.  And that leaves the state

18    really having to rely on, you know, four

19    state laws and a couple of territories all

20    coming after 1869, two of which are the same

21    states, Texas and Tennessee, that the Supreme

22    Court said in Bruen had outlier approaches.

1        Three of -- the three territories are the
2        same territories that were considered in
3        Bruen and rejected and in fact, the argument
4        in support of those territories is worse
5        here, because the laws at issue were laws --
6        they're the same laws.  So in Bruen, Bruen
7        considered the part of them that banned
8        carrying entirely and said that's not
9        relevant at all.  There's not a separate
10        sensitive places restriction.  What those
11        laws did is they banned carrying entirely,
12        and in those territories imposed a heightened
13        penalty if you carried in certain places.  So
14        if they're not even relevant because
15        (incomprehensible) ban and carry was not
16        consistent with our historical tradition,
17        they seem to be even less relevant when
18        you're pointing to them as evidence of how
19        states were deciding where you could and
20        couldn't carry if you're talking about a
21        territory that said you couldn't carry
22        anywhere in the first place.

1          CHIEF JUDGE CHAGARES:  Judge Mascott --

2          JUDGE MASCOTT:  -- for going through

3     the -- the historical examples, but going

4     back to just in general the category of

5     sensitive places and how you all would

6     suggest defining it.  I wanna -- I don't

7     wanna pick back up on some of my colleagues'

8     questions about the school doctrine versus --

9          MS. MURPHY:  -- sure.

10         JUDGE MASCOTT:  -- playgrounds, and I

11    know that you said the contours of your

12    challenge are partly governing what you think

13    the distinctions are or aren't there.  But if

14    we -- but if we look at other things that are

15    outside of the traditional public school or

16    institutional setting, like ballet schools,

17    sports academies, things that are

18    recreational like a park but outside of the

19    school setting, maybe that example could help

20    us understand what you think is the

21    constitutionally significant distinction, if

22    anything, be -- between the kinds of

1    regulations you would think might be

2    appropriate at a school.

3        MS. MURPHY:  Sure.

4        JUDGE MASCOTT:  And what's inappropriate

5    about designating a playground a sensitive

6    location?

7        MS. MURPHY:  Sure.  So I think there's a

8    couple different ways to think about schools.

9    One is if you're focusing on the in loco

10   parentis tradition, and if that's the

11   justification the Supreme Court has in mind

12   for schools, then I think it necessarily does

13   not reach really beyond -- it's certainly not

14   gonna reach parks.  You're not -- your --

15   your -- your parents are probably in control

16   of you at a park, not a school.  You're not

17   in the custody of a school.  Perhaps there

18   are going to be situations, you know, where

19   you're dealing with --

20       JUDGE MASCOTT:  -- but a camp, a camp

21   could be regulated --

22       MS. MURPHY:  -- a camp, but again, the

1      in loco parentis doctrine is gonna focus on

2      the students or the children or, you know,

3      whoever's in custody.  It's not going to

4      focus on the adults who are there engaging in

5      the activities who is -- who we're focused

6      on.  I mean, we're certainly not here to

7      assert a right for children to be carrying

8      firearms at parks.  It's about their parents

9      being able to carry them to protect their

10     children when they're at a park.  And so I

11     think if the in loco parentis doctrine is

12     what the court has in mind, the Supreme

13     Court, then it doesn't reach really, you

14     know, the types of carrying that we are

15     focused on.

16          If the court is thinking about it more

17     from the perspective of, look, schools are

18     a -- a, you know, somewhat closed environment

19     that you could think of as I was talking a

20     little bit before about places that have more

21     restricted access where you're not really

22     supposed to be coming in off the street and

1        that you -- if you have limitations on the

2        ability of the public to be somewhere in the

3        first place, that may provide greater

4        latitude for imposing restrictions, given

5        that you have children there who are not

6        themselves entitled to carry firearms --

7            JUDGE MASCOTT:  -- or a rec center that

8        maybe has a security guard in the middle of a

9        city?

10           MS. MURPHY:  Sure.

11           JUDGE MASCOTT:  That would be a

12       sensitive place.

13           MS. MURPHY:  I -- I don't think it would

14       be.  I don't think it would be because it's

15       not a place that is dedicated to, you know,

16       it's not like, well, all you do at a rec

17       center is only have children present, and I

18       don't think the mere presence of a security

19       guard is what makes all the difference

20       between whether something is sensitive or

21       not.  I think it would have struck the

22       founders as pretty extraordinary to think

1    that the way to eliminate your right to carry

2    a firearm is by ensuring that lots more

3    government actors were carrying firearms.  So

4    I don't think that's really -- can be the

5    whole distinction.

6         I think it's relevant in the sense of if

7    the government is treating a place as the

8    type of place that needs heightened security,

9    you know, that tends to show you that there's

10   something going on there that may be more in

11   the vein of sensitive activities or housing

12   dangerous persons or physical attributes of

13   what's, you know, the activities there that

14   make the place a safety risk --

15        CHIEF JUDGE CHAGARES:  -- Judge Freeman.

16        JUDGE FREEMAN:  Yeah, I have a couple

17   questions for you about your facial

18   challenges.  I know that you said that you've

19   challenged fewer than half of the -- the list

20   of places that New Jersey has designated as

21   sensitive.  But are -- is your facial

22   challenge as to each numbered subsection

1     individually that you have a facial challenge

2     to, for instance, subsection 11?

3          MS. MURPHY:  So -- so it -- some of them

4     are to the provision in their entirety and

5     some are as to certain applications, and one

6     good illustration -- I mean, actually I'll

7     give you two illustrations.  Like, for one,

8     the zoo is in a provision that lists multiple

9     things.  We're only challenging zoos in that

10    provision.  So it's a facial challenge as to

11    zoos, but not as to the other things and then

12    --

13         JUDGE FREEMAN:  -- so what -- what

14    allows you to have a facial challenge to just

15    a part of a statutory provision?

16         MS. MURPHY:  Oh, I -- I think it -- I

17    mean, as -- as long as you're singling out

18    something that is a facial component, I don't

19    think we have to challenge four items in a

20    list of four to be able to challenge one of

21    them facially.  We're not asking for that

22    provision to be invalidated in -- on -- in

1    its entirety.  We're only asking for the

2    restriction as to zoos to be invalidated.

3         JUDGE FREEMAN:  So what about the

4    example of playgrounds where you said

5    you've -- you've excluded from your challenge

6    playgrounds that are on school grounds?

7         MS. MURPHY:  I -- I wanna be clear

8    again.  It's not that we've excluded them

9    from our challenge.  We don't understand the

10   provision that we're challenging to cover

11   them.  We understand playgrounds on schools

12   to be covered by the school's provision that

13   we're not challenging.  So it's not that

14   that's an as-applied aspect of our

15   playground's challenge.  It's that I

16   understand New Jersey to have added a

17   separate provision for playgrounds to ensure

18   that it also reached playgrounds that are not

19   covered by the provision that already deals

20   with school property.

21        JUDGE FREEMAN:  Okay.  So all of the --

22   your comments about the youth sporting events

1      and recreational activities where you -- you

2      are not excluding them -- you're -- you're --

3      you -- you think that if they are on school

4      grounds, they are otherwise covered by --

5           MS. MURPHY:  -- they are already covered

6      by the school.  That is how we have always

7      understood the statute.  We've said that in

8      our briefs multiple times and I take the

9      state to agree with us that that is the right

10     way to read the statute.  And so we are only

11     challenging the provisions that are there to

12     reach things that are not happening on school

13     property.

14          CHIEF JUDGE CHAGARES:  Off campus, as we

15     say.

16          MS. MURPHY:  Yes.  Exactly, exactly.

17          JUDGE CHUNG:  Could you -- following up

18     on the facial challenge questions.  For

19     maybe, like, the insurance or the four

20     reputable persons.  If the law had been

21     drafted if you have a prior conviction, you

22     know, for harming someone or a negligence

1    finding for accidentally shooting someone, if

2    it were confined to that group of people,

3    would it be a constitutional application?

4         MS. MURPHY:  I mean, I -- I'd -- I'd

5    have to, like, think a little bit more about

6    it because that's just not the law the state

7    wrote.  But, you know, if --

8         JUDGE FREEMAN:  -- but I'm just trying

9    to understand --

10        MS. MURPHY:  -- yeah, and I -- and I

11   guess, you know, to the extent --

12        JUDGE CHUNG:  -- (incomprehensible) --

13        MS. MURPHY:  -- you're suggesting that

14   that would be enough to defeat a facial

15   challenge, I mean, that's just not really --

16   I've never understood facial challenge

17   doctrine to mean that if you can come up

18   with, like, a completely different law the

19   state could have written and shoehorn that in

20   then your facial challenge fails, because the

21   whole point of this law is to say, no, you

22   have to pay the fee, we don't care if you've

1      ever done anything wrong.  You have to pay

2      the fee anyway.  And so --

3            JUDGE CHUNG:  -- right.

4            MS. MURPHY:  -- to say all the people

5      who've never done anything wrong can't get

6      any relief because maybe there's someone out

7      there who did do something wrong, you know --

8            JUDGE CHUNG:  -- I'm just trying to

9      understand if there is a constitutional

10     application --

11           MS. MURPHY:  -- yeah --

12           JUDGE CHUNG:  -- of an insurance

13     requirement and --

14           MS. MURPHY:  -- right --

15           JUDGE CHUNG:  -- and based on the

16     analogues asserted.

17           MS. MURPHY:  Yeah, and -- and I -- just

18     to be, like, very precise in my language, I

19     don't think there's a constitutional

20     application of this statute.  There may be a

21     constitutional statute that could be written

22     that is -- is designed to deal with people

1       who actually have, you know, that -- that
2       fits more into the tradition of surety laws
3       that says if you've engaged in misconduct,
4       then we can impose different restrictions on
5       your ability to carry firearms going forward.
6       That may be a law with which we, you know,
7       wouldn't take the same Second Amendment
8       issue.  I don't think you can read that into
9       this particular law, but --
10              JUDGE CHUNG:  -- but if this one --
11              MS. MURPHY:  -- but I think that --
12              JUDGE CHUNG:  I just wanna follow your
13      concept of facial challenges.  So if this one
14      had said for those people some sort of
15      finding of special danger of misuse, they
16      need $300,000 insurance, everyone else
17      10,000, then maybe your challenge would be
18      cabined to the 10,000 people.
19              MS. MURPHY:  Probably, just given the
20      nature of the people I'm representing in this
21      case that would be the focus of our challenge
22      would have been to say, okay, if you've got

1          two applications, we're gonna challenge the,

2          you know, you got two provisions of the

3          statute, we're challenging the provision

4          that's relevant to my plaintiffs, and we're

5          not here to challenge the provision that

6          would deal with people who have engaged in

7          misconduct and have presented a -- a credible

8          threat of fear to another.  Which I think

9          that gets to, you know, the core point of our

10         challenge which is that, you know, it's one

11         thing to have those types of restrictions if

12         somebody has engaged in misconduct but as a

13         historical basis, there's just no tradition

14         that says that we're gonna treat anybody who

15         wants to exercise their rights the same way

16         we would as somebody who has been found to

17         pose a credible threat of fear to -- to -- to

18         others.

19              CHIEF JUDGE CHAGARES:  Thank you,

20         Counsel.

21              We'll hear from the Koons plaintiffs

22         now.

1          MR. PATTERSON:  Thank you, Your Honor.

2     Pete Patterson for the Koons plaintiffs.

3          We do take a little bit of a different

4     approach than the Siegel plaintiffs in -- in

5     terms of the key principle here, and so if I

6     could, I would like to say why we think

7     security is the key for sensitive places and

8     places frequented by the general public and

9     for four reasons, if I could quickly.  One,

10    Bruen said we could analogize to the Founding

11    Era legislatures, polling places, and

12    courthouses, and we have to look at how and

13    why.  And as we've shown, those were all

14    secured locations, so as to the how.

15         Second as to the why, as the Siegel

16    plaintiffs indicated, there may be many

17    reasons why a place is sensitive, but the key

18    distinguishing factor of them is that they're

19    secure.  That's the way to tell whether they

20    actually are sensitive.

21         JUDGE FREEMAN:  Does that apply to

22    schools, too, in your view?

1           MR. PATTERSON:  I'm talking here about

2      places that are frequented by the general

3      public.  Schools are generally not open to

4      the general public.  They are typically --

5      the kids are under in loco parentis authority

6      of the school, and so we could have a

7      discussion about the history around the

8      school, but that's a different category.

9           And so in terms of the places we're

10     talking about, if it truly is the exceptional

11     type of place that -- that Bruen talks about,

12     the government will be compelled to secure

13     it, wholly independent of Second Amendment

14     reasons.  This is places like nuclear power

15     plants, places like commercial airliners.

16     It's not sensitive because it's secured.

17     It's secured because it's sensitive, the

18     government will do it anyway.

19          Third and relatedly, it's judicially

20     administrable.  In case of a place open to

21     the public, a basic rule is if a criminal can

22     freely go into the place with a firearm

1       undetected, I have the right then to go in as
2       a law-abiding citizen with a firearm to
3       defend myself.
4           And fourth and relatedly, it's the
5       principle that's consistent with the
6       principles underlying the Second Amendment,
7       which Rahimi says we are to look to, and that
8       is that I have an individual right to
9       self-defense.  If the government is not
10      handling self-defense itself by ensuring that
11      bad actors are not going to be in a place
12      with a firearm, I have a right to defend
13      myself with a firearm in that place.
14          MALE JUDGE:  All right --
15          JUDGE BIBAS:  -- I'm not sure that works
16      for polling places.  Plenty of them don't
17      have security.
18          MR. PATTERSON:  Well, what -- what Bruen
19      said is we analogize to Founding Era polling
20      places, and Founding Era polling places it
21      did, because there was not a secret ballot.
22      And so there was a fundamental change in

1          polling places when the secret ballot came

2          into place, and all of a sudden the concerns

3          about intimidation weren't there.  So for

4          analogizing to Founding Era polling places is

5          completely consistent with the theory.

6          And -- and what -- and this is consistent

7          with Bruen itself, which said that things can

8          move in and out of categories based on

9          different facts in the ground.  It said, for

10         example, handguns may have been dangerous and

11         unusual at the founding or during colonial

12         times and therefore could have been banned.

13         But they no longer are.

14              And I'd also like to address the issue

15         about silence versus contradiction.  This is

16         not a --

17              CHIEF JUDGE CHAGARES:  -- well, before

18         you get there, 'cuz you have very little

19         time.

20              MR. PATTERSON:  Yes.

21              CHIEF JUDGE CHAGARES:  Is it your

22         position that Reconstruction Era evidence

1    taken alone can never establish a historical

2    tradition, and if so, why?

3         MR. PATTERSON:  Correct.  Because it is

4    far removed from the founding.  The Supreme

5    Court's been very clear that it can be

6    confirmatory.  It cannot establish the

7    tradition itself, and that's true whether

8    it's 1791 or 1868, because the tradition

9    would have had to have been in place at that

10   time.  Not now --

11        JUDGE SHWARTZ:  -- how do you -- how do

12   you reconcile that with a new societal issue

13   that arises post-1791?

14        MR. PATTERSON:  Yeah.

15        JUDGE SHWARTZ:  Are you saying that you

16   regulate --

17        (Cross talk.)

18        MR. PATTERSON:  -- you have to take the

19   principles --

20        JUDGE SHWARTZ:  -- just one sec.

21        MR. PATTERSON:  Oh, sorry, sure.

22        JUDGE SHWARTZ:  Are you saying that the

1    legislature, I think Judge Krause was talking

2    to either you or your adversary about this,

3    your co-counsel, rather, that the legislature

4    can't address a new social problem?

5         MR. PATTERSON:  It can address it using

6    the principles that were in place at the

7    founding.  And so here, again, there's not

8    silence at the founding.  There's a hundreds

9    of years long tradition of banning only

10   terrifying carry at places of public

11   congregation like fairs and markets.  And so

12   the legislature can take that tradition and

13   say if we have a new problem, we can ban

14   terrifying carry in a new sort of place.

15        What you can't do is move beyond the

16   tradition.  And these also aren't new places.

17   There were places of literary educational

18   gathering in the colonial and Founding Era

19   times.  A key place is churches, where people

20   were vulnerable during colonial times, the

21   whole community was gathered.  And what do we

22   see?  The legislatures either freely allowed

1    carry or required it.  And so the analogous

2    restriction here would be, okay, say we've

3    got a sensitive place where we're having a

4    lot of problems.  Everybody with a carry

5    permit, you have to carry your firearm to

6    that location.  Because we're going to -- we

7    can't secure that place, but we're relying on

8    you, the people who are protected by the

9    Second Amendment, to exercise your rights

10   to -- to carry firearms in those locations.

11       JUDGE HARDIMAN:  Counsel, Judge Krause

12   mentioned the four circuit courts that go the

13   other way and I was interested to see how the

14   district courts in Hawaii and California and

15   New York largely supported your position.

16   I'm interested to hear if you can explain to

17   us what move the circuit courts made in your

18   view that was wrong and what move or moves

19   the district courts made in those cases that

20   were correct.  Is there a way to sort of

21   synthesize what went wrong in those cases

22   from your perspective?

1        MR. PATTERSON:  Yeah, I think it's clear

2     what went wrong is just improper and too

3     loose historical analysis, and they -- they

4     tend to center around things like whether a

5     place is crowded, whether there are

6     vulnerable people there, or whether there are

7     other constitutionally-protected activities

8     taking place in a location.  But it's wholly

9     unsupported historically that you can ban

10    firearms in those sorts of locations,

11    because, again, the history shows only

12    terrorizing --

13        JUDGE HARDIMAN:  -- was it wholly

14    unsupported historically or just unsupported

15    relevantly historically?

16        MR. PATTERSON:  Unsupported relevantly

17    historically.  And so, yes, there are some

18    outlier --

19        JUDGE HARDIMAN:  -- so really this case

20    is gonna turn on whether we're looking at the

21    1880s and beyond or -- or focused on Founding

22    Era.

1           MR. PATTERSON:  Correct.  And the --

2       well, even as of 1868, again, there was

3       nothing, but also there's misinterpretation

4       of Founding Era evidence, such as the affray

5       laws which only restricted, again, terrifying

6       carry.

7           JUDGE PORTER:  If there's a --

8           MR. PATTERSON:  -- it did not restrict

9       peaceable carry.

10          JUDGE PORTER:  If there are a lot of

11      laws in the 1870s and '80s and so on, Gilded

12      Age, and there aren't -- you don't find such

13      laws around the Ratification Era, is that an

14      inconsistency or is it just -- is it just

15      irrelevant because, well, those states could

16      have regulated more aggressively than they

17      did but they didn't, but that doesn't mean

18      it's inconsistent with the later decades?

19          MR. PATTERSON:  It is inconsistent

20      because we have the Second Amendment at the

21      founding.  Even if there was a silence, that

22      creates a presumption that people have a

1    right to carry.  The state has a burden to

2    come forward with a tradition of regulation.

3    Nothing is not a tradition of regulation.  So

4    then states coming in is an inconsistency.

5    But even if -- the Supreme Court in Espinoza

6    said more than 30 state laws from after --

7    from the late 18th, 19th century cannot

8    create an early American tradition.  And so

9    here you've got four and three territories.

10   So if more than 30 cannot create an early

11   American tradition, it's clear that the four

12   that you've got here that are outliers,

13   geographically concentrated in states, again,

14   the Supreme Court has pointed out did not

15   have a proper understanding of the Second

16   Amendment.

17        JUDGE FREEMAN:  How do we reconcile that

18   with Bruen's brief discussion of sensitive

19   places where they say in the 18th and 19th

20   centuries and together there were relatively

21   few restrictions in these sensitive places

22   that are listed, but -- but they then said

1    courts can use analogies to those historical

2    regulations, that was enough?

3        MR. PATTERSON:  Well, they, again, the

4    later evidence can be confirmatory of what

5    was in place at the founding.  So if it's

6    there at 1791, you can say and then that

7    tradition continued on.

8        JUDGE FREEMAN:  Right, but I guess my

9    specific question is that -- that they say

10   there were very few sensitive places where

11   weapons were altogether prohibited.  There

12   are very few examples, and then they cite in

13   a law review article and -- and basically

14   there are a couple.  You know, say one or two

15   examples of banning -- banning carry in

16   legislative assemblies and -- and

17   courthouses, and they said but -- but that's

18   enough for us.  So why do we now need many

19   more than that?

20       MR. PATTERSON:  Well, because -- so

21   here's a distinction between an analogue that

22   you look at and the broader tradition that is

1          establishing the historical practice.  And so

2          the Supreme Court has said you need a

3          well-established and representative analogue,

4          but it's not the analogue that is

5          establishing the historical practice.  In

6          terms of the sensitive places, the affray

7          tradition, again, which was a hundreds of

8          years long tradition, that said generally in

9          places frequented by the general public, only

10         terrifying carry was banned.  But then as we

11         see in the 1786 Virginia statute, which

12         codified the common law, the Supreme Court

13         said that in Bruen, the first half of it said

14         that nobody can carry in courts.  This is

15         exceptionally sensitive place, except for the

16         justices and those assisting them.  So it

17         shows this tradition at the founding, and

18         again, this is a background codifying the

19         common law, something that's generally

20         applicable across the states, the colonies,

21         that arms could be barred in highly sensitive

22         places that the government secured.

1          JUDGE CHUNG:  But the North Carolina one

2     in 1792 is exactly the same as Northampton.

3          MR. PATTERSON:  There was no 1792 North

4     Carolina statute.  That was in a private

5     lawyer's collection of the laws he posited,

6     the British laws he posited that were still

7     in effect in North Carolina.  So that was

8     not, you know, North Carolina did not pass a

9     statute in 1792 referencing the king.  That

10    was just a private lawyer, like one of us,

11    you or me, writing a commentary and saying we

12    think these are the British laws that are

13    still in effect in North Carolina, and he

14    included that one.  And there was a later

15    north --

16         JUDGE CHUNG:  -- my question is, though

17    --

18         MR. PATTERSON:  -- yes.

19         JUDGE CHUNG:  -- would that not suggest

20    it's part of the common understanding at the

21    time?

22         MR. PATTERSON:  Yes, and that is exactly

1       the same -- the North Carolina Supreme Court

2       in 1847 interpreted this tradition, it said

3       there's this debate about whether the

4       statute's still in effect or not.  It doesn't

5       matter, it just codified the common law, and

6       what the common law said is in places

7       frequented by the general public like fairs

8       and markets, only terrifying carry is banned.

9       Peace able carry was always allowed.

10          CHIEF JUDGE CHAGARES:  Well, your --

11      your time is up.  Could I just ask you one

12      thing?  If you could just very briefly

13      respond to my Sister Judge Shwartz here asked

14      about irreparable harm with respect to the

15      insurance regulation and the VCCO.  Do you

16      have a response to what your -- your friend

17      across the aisle said?

18          MR. PATTERSON:  Well, I -- I am going to

19      adopt by reference here because we don't have

20      an insurance claim in this case.

21          CHIEF JUDGE CHAGARES:  Oh, that's true.

22          MR. PATTERSON:  We're only focused on

1          the sensitive places, so.

2              CHIEF JUDGE CHAGARES:  Okay.  All right.

3          Thank you, Counsel.

4              MR. PATTERSON:  Thank you.

5              CHIEF JUDGE CHAGARES:  And we'll hear

6          rebuttal from the state.

7              MS. CAI:  In order for plaintiffs to be

8          correct, Your Honors must believe that Heller

9          and Bruen and McDonald all got it wrong.

10         Both sets of plaintiffs twist themselves into

11         knots trying out theories that are totally

12         unsupported by history and instead base --

13         are based on their own free-wheeling

14         means-end scrutiny analysis --

15             JUDGE HARDIMAN:  -- what -- what

16         history?  Can you address my question of

17         Mr. Patterson about what's relevant history?

18         You've got history, but is it relevant?

19         Because it's -- it's too late.  In other

20         words, doesn't this case turn on whether we

21         focus on Founding Era and the few decades

22         after the founding or we focus on

1    Reconstruction Era and the few decades after

2    reconstruction?

3         MS. CAI:  I think this court does not

4    need to reach the question that it did reach

5    in Lara (phonetic), because in Lara this

6    court found that there was contrary

7    affirmative evidence from the founding in the

8    form of the 1782 militia laws that then

9    contradicted later evidence.  You do not have

10   that here.  There is no evidence from the

11   founding or from any of the decades following

12   the founding that sensitive place

13   restrictions were unconstitutional.

14        JUDGE HARDIMAN:  But where does the

15   tradition start, from your perspective?

16        MS. CAI:  I think the tradition

17   certainly starts with the Statute of

18   Northampton, which was --

19        JUDGE HARDIMAN:  -- well, let's set that

20   aside because --

21        MS. CAI:  -- sure.

22        JUDGE HARDIMAN:  -- the Supreme Court,

1     you know, didn't really lean into that in
2     Heller, you'd agree, right.  I mean, the
3     dissent leaned into it in Heller.
4          MS. CAI:  I think that is true and we
5     accept that for the purposes of the affray
6     clause.  But that is just a separate clause
7     --
8          JUDGE HARDIMAN:  -- all right.  So let's
9     just set aside --
10          MS. CAI:  -- put that aside --
11          JUDGE HARDIMAN:  -- let's set aside the
12     British history.  Let's focus on Founding
13     Era.
14          MS. CAI:  Yeah.
15          JUDGE HARDIMAN:  What -- where do you
16     pin the tradition starting the Founding Era?
17          MS. CAI:  So you have the few laws that
18     the court in Heller cited for the polling
19     place restriction, which was just in Delaware
20     as far as we're aware.
21          JUDGE HARDIMAN:  All right.  They've
22     conceded polling places, they've conceded

1      schools, they've conceded legislatures and

2      courts, so --

3              MS. CAI:  -- I'm not so sure.

4              JUDGE HARDIMAN:  -- you have to pin

5      it -- if we're talking sensitive places,

6      those are -- those are agreed upon.

7              MS. CAI:  I'm not so sure they have

8      actually, from what I've heard from -- from

9      my friends on the other side, but I can come

10     back to that later.  You start with other

11     jurisdictions that started enacting sensitive

12     place restrictions.  New Orleans in ballrooms

13     in 1817.  Parks, as soon as Central Park and

14     parks like that came to be in the 1850s, just

15     about every single park --

16             JUDGE HARDIMAN:  -- all right.  So let

17     me just press you on that a little bit.  You

18     said 1817 and then you said 1850s.  You've

19     got one New Orleans law from 1817 and then

20     you -- you go right to 1850s.  Do you have

21     anything else closer to 1800?

22             MS. CAI:  So in terms of the statutes

1      that we are looking at, no, Your Honor, but I

2      think the reason is because legislatures just

3      chose not to regulate.

4            JUDGE HARDIMAN:  All right.  So --

5            MS. CAI:  -- and that includes places

6      that didn't have Second Amendment components.

7            JUDGE HARDIMAN:  All right.  So you're

8      falling back on I think Justice Barrett has

9      written about this, that it's -- it's whether

10     or not -- we shouldn't assume the legislature

11     maximally exercises power.

12           MS. CAI:  That's right --

13           JUDGE HARDIMAN:  -- that's really the --

14     the -- has to be the focus of your argument

15     if all you have is one 1817 law and then you

16     go to 1850s, right?

17           MS. CAI:  I -- I had one more gloss in

18     addition to that, which is not just that, you

19     know, not every legislature's always

20     maximally regulating, but then you see

21     legislatures choosing to go up to the max in

22     some places and not in others, and I think

1       that kind of heterogeneity in policy

2       decisions across the states, including

3       decisions by legislatures that were bound by

4       an individual right to bear arms in their

5       state legislature -- state constitutions,

6       choosing those very policies, I think that is

7       really, really relevant.  It's not just like

8       we always have silence and we have nothing to

9       show for it.  We have a tradition of states

10      that were bound by their individual right to

11      bear arms and choosing these particular

12      policies and then courts that were cited by

13      Heller and Bruen approvingly actually

14      upholding those laws.  I think that is a very

15      different set of facts than what you have in

16      Espinoza, for example, where you have

17      contrary earlier evidence about the

18      limitations and the inner play between the

19      Establishment Clause and the Free Exercise

20      Clause that was contradicting later evidence.

21      You do not have that here.  And for

22      plaintiffs to be right, that means a very

1          extreme version of constitutionalizing every

2          policy choice, which is antithetical to

3          federalism.

4              But in order for them to be right, going

5          back to my other point about polling places

6          and schools -- I'm sorry, Your Honor, did you

7          have a question?

8              CHIEF JUDGE CHAGARES:  Judge Phipps.

9              JUDGE PORTER:  I -- I'd just like to --

10         to weave in a thought that you had in

11         response to Judge Krause's question on your

12         initial -- on your initial argument where you

13         said, hey, if we use 1791, then we've got a

14         real problem because there's no basis for --

15         there's no historical regulation of

16         courthouses and schools.  But how do you

17         reconcile that with this kind of use it or

18         lose it theory that you don't always have to

19         maximally regulate?  But would it be possible

20         to look at 1791 and say the absence of

21         regulation in schools and courthouses is --

22         is a situation in which we say that wasn't

1    maximal regulation?  Or do you say, no, this

2    is a case where we can view the fact that

3    there weren't regulations in that -- those

4    spaces as indicative of that's -- that's

5    actually the top, that's the ceiling?

6    What -- what do you say to that?

7         MS. CAI:  So I -- I agreed with what

8    Your Honor was saying earlier, that the fact

9    that legislatures did not choose to regulate

10   schools and courthouses at the founding, you

11   can't read into that, that they were

12   restrained by the Second Amendment, because

13   if that were true, that -- first of all, that

14   doesn't make sense, because many of those

15   legislatures were not bound by the Second

16   Amendment or any state version thereof.  So

17   it would make most sense to say, oh, they

18   must have been making that decision in

19   Delaware because Delaware was not bound by

20   it.  So the same has to apply for states that

21   were bound by the Second Amendment --

22        JUDGE PORTER:   -- do we take that into

1        account, that when legislatures legislate,

2        they're not bound by the Second Amendment or

3        a baby -- or a baby Second Amendment?

4            MS. CAI:  It -- it was a thought that

5        occurred to me as I was reading your --

6            JUDGE PORTER:  -- but it's relevant,

7        right?

8            MS. CAI:  I think it's relevant if

9        you're -- if -- as a counter-point to their

10       theory.  Now, I don't think that's what Bruen

11       was looking at, because they cited --

12           JUDGE PORTER:  -- no, is it relevant

13       when we're doing Bruen and Rahimi type

14       analysis and trying to find a national

15       historical regulatory tradition?

16           MS. CAI:  So what I'm suggesting is that

17       in response to the other side's argument

18       that, you know, silence must mean the

19       constitution forbade it.

20           JUDGE PORTER:  Right.

21           MS. CAI:  That doesn't make sense.

22           JUDGE PORTER:  I get it.  What about my

1      question?

2           MS. CAI:  I don't think that Bruen and

3      Rahimi were looking to that methodology,

4      because they did not square the citations of

5      the state laws that they were looking at with

6      states that had or didn't have the Second

7      Amendment.  So I don't --

8           JUDGE PORTER:  -- and we do that?

9           MS. CAI:  I think that would be --

10          JUDGE PORTER:  -- should we do it?

11          MS. CAI:  I don't think the

12     contra-positive is -- is correct, because

13     just because a state had the Second Amendment

14     doesn't mean that they were always

15     legislating, that that was always the

16     barrier.  And in fact in this case you can

17     look at states like Tennessee and Missouri,

18     which did have that barrier and yet still

19     found these to be constitutional.

20          CHIEF JUDGE CHAGARES:  Your time is up,

21     Counsel.

22          MS. CAI:  Thank you, Your Honors.

1          CHIEF JUDGE CHAGARES:  Thank you.  We'll

2      take this --

3          (The recording was concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1          CERTIFICATE OF TRANSCRIBER

2              I, Jackie A. Scheer, do hereby certify

3    that this transcript was prepared from the digital

4    audio recording of the foregoing proceeding; that

5    said transcript is a true and accurate record of

6    the proceedings to the best of my knowledge,

7    skills, and ability; and that I am neither counsel

8    for, related to, nor employed by any of the

9    parties to the case and have no interest,

10   financial or otherwise, in its outcome.

11

12

13

14

15

16          JACKIE A. SCHEER

17          FEBRUARY 16, 2026

18

19

20

21

22

# **CERTIFICATION OF ACCURACY**

I certify that I coordinated with all counsel on the production of this transcript.

On behalf of all counsel, I certify that this transcript is a true and accurate record of the proceedings to the best of my knowledge.

/s/ *Jeremy Feigenbaum*

Jeremy M. Feigenbaum
Solicitor General
Office of the New Jersey Attorney General

Dated: February 24, 2026

| & | | | |
|---|---|---|---|

**&**

**&** 2:10,15

**0**

**08611** 2:7

**1**

**1** 1:21
**10** 7:1
**10,000** 64:17,18
**11** 1:17 59:2
**131** 5:6,18
**131's** 8:21
40:19
**1523** 2:16
**16** 91:17
**17** 5:15 11:7
46:3
**1700** 30:13
**1776** 27:20
**1782** 81:8
**1786** 29:12
30:13 51:12
77:11
**1791** 10:11
27:3 70:8,13
76:6 86:13,20
**1792** 29:13
78:2,3,9
**18** 9:19
**1800** 21:12
83:21
**1800s** 5:15 31:2
31:11 34:9

40:2
**1817** 83:13,18
83:19 84:15
**1820s** 19:1
**1840s** 22:11
31:3
**1847** 79:2
**1850** 21:12
22:11,16 31:9
**1850s** 33:18
83:14,18,20
84:16
**1860s** 39:20
**1868** 10:11
21:12 70:8
74:2
**1869** 52:20
**1870** 18:19
34:13
**1870s** 32:8
51:12 74:11
**1871** 11:7 12:1
**1880s** 73:21
**18th** 75:7,19
**1922** 31:4
**1970** 24:22
**19th** 1:18 10:4
10:19 75:7,19

**2**

**200** 24:20 25:2
**20036** 2:16
**202** 2:12,17

**2022** 34:13
**2026** 1:17
91:17
**20692** 91:15
**220-9670** 2:17
**22314** 2:11
**23-1900** 4:6
**23-1900/23-...**
1:12
**23-2043** 4:8
**25** 2:6 36:21

**3**

**30** 7:1 75:6,10
**300,000** 64:16
**30s** 19:1
**32** 46:3
**34** 3:4
**376-2690** 2:7

**4**

**4** 3:3
**40** 3:9

**5**

**50** 24:7 25:2
**50s** 22:11

**6**

**600** 33:8
**609** 2:7
**66** 3:5,10 10:18

**7**

**706** 2:11
**742-8900** 2:12

**7908780** 1:20

**8**

**80** 3:3,8
**80s** 74:11

**9**

**9** 3:8
**91** 1:21

**a**

**aaron** 1:8
**abiding** 33:2
35:22 36:4
68:2
**ability** 35:18
57:2 64:5 91:7
**able** 20:9 56:9
59:20 79:9
**absence** 86:20
**academic** 10:13
**academies**
54:17
**accept** 6:19
7:14 82:5
**access** 38:15
56:21
**accidentally**
62:1
**account** 88:1
**accounts** 24:21
**accurate** 91:5
**acknowledged**
35:4

acting 28:22
action 20:14
  24:9
activities 30:3
  32:12 38:19,20
  38:20 44:22
  45:12 56:5
  58:11,13 61:1
  73:7
activity 39:11
  39:11,12 42:10
  44:3,12,13
  45:6
actors 58:3
  68:11
actually 12:20
  37:1 42:2
  48:19 49:9
  51:3,9 52:5,9
  59:6 64:1
  66:20 83:8
  85:13 87:5
acute 21:10
  22:8 32:18
added 60:16
addiction 38:12
addition 17:13
  84:18
address 69:14
  71:4,5 80:16
addressed 33:7
administrable
  67:20

adopt 79:19
adopted 6:13
  7:6 11:20
adults 56:4
adversary 71:2
affect 40:22
affirmative
  7:15 81:7
afford 25:1
affray 27:8
  28:15,22 29:14
  30:4,8 74:4
  77:6 82:5
afraid 9:15
age 74:12
aggressively
  74:16
ago 7:22
agree 13:9 61:9
  82:2
agreed 8:11
  83:6 87:7
ahead 33:10
ahistorical 35:2
airliners 67:15
aisle 79:17
al 1:3,8,10
albert 1:18
alexandria
  2:11
allocate 25:4
allow 40:6
  48:22

allowed 38:7
  71:22 79:9
allows 35:5
  59:14
altogether
  76:11
amber 7:22
amendment
  5:22 7:20
  10:21 13:19
  16:1,7 19:22
  20:3,5 23:9,11
  23:13 31:13
  34:6 35:5 36:2
  39:11 64:7
  67:13 68:6
  72:9 74:20
  75:16 84:6
  87:12,16,21
  88:2,3 89:7,13
american 75:8
  75:11
amount 24:18
amounts 26:12
amply 8:21
analogies 76:1
analogize 29:17
  30:11 66:10
  68:19
analogizing
  69:4
analogous 5:17
  6:13 72:1

analogue 9:21
  23:9 27:11
  34:6 76:21
  77:3,4
analogues
  14:21 16:1
  27:4,12 31:13
  63:16
analysis 14:2
  50:19 73:3
  80:14 88:14
andrews 12:1,4
angela 2:4 4:11
angle 28:5
answer 33:11
answers 24:4
antebellum
  5:20 11:12,18
anticipate 46:8
antithetical
  86:2
anybody 40:7
  65:14
anyway 63:2
  67:18
appeal 9:3
appeals 1:1 4:3
appellant 1:4,9
appellees 1:7
  1:12
applicable
  77:20
applicants 36:4

**application**
31:5 36:3 62:3
63:10,20
**applications**
59:5 65:1
**applied** 13:2
60:14
**applies** 17:12
51:5
**apply** 17:3
66:21 87:20
**applying** 13:19
**approach**
36:19 39:17,21
40:8 66:4
**approaches**
40:11 52:22
**appropriate**
10:15 55:2
**approvingly**
85:13
**approximately**
49:12
**areas** 9:1 26:12
**argue** 9:17
24:20
**argued** 8:3
**argument** 1:17
3:2 7:13 14:16
23:22 47:16
48:4,8 51:19
52:14 53:3
84:14 86:12
88:17

**arguments**
6:20 7:6 9:5
**arises** 70:13
**armed** 14:12
29:3 51:14
**arms** 6:9 12:4
14:11 23:10
35:13 36:16
51:10 77:21
85:4,11
**arose** 40:1
**article** 76:13
**aside** 25:19
49:17 81:20
82:9,10,11
**asked** 49:4
79:13
**asking** 25:22
59:21 60:1
**aspect** 60:14
**assault** 13:1
**assemblies** 12:9
28:2 37:13
76:16
**assembly** 1:7
1:11
**assert** 56:7
**asserted** 63:16
**assertion** 26:9
**assisting** 77:16
**assume** 26:22
41:20 84:10
**assumption**
27:17

**assurance**
13:17
**attack** 36:21
**attention** 33:14
**attorney** 1:5,10
2:5 4:6,7
**attribute** 46:19
**attributes**
37:16 45:16
46:13,18 47:10
49:14 58:12
**audio** 91:4
**authority** 27:1
67:5
**authorized**
5:10
**automatically**
30:8
**avenue** 2:16
**aware** 25:21
27:19 28:2
82:20

**b**

**baby** 88:3,3
**back** 21:11
27:10 33:8
44:2 54:4,7
83:10 84:8
86:5
**background**
77:18
**bad** 68:11

**bakeries** 15:11
16:22 17:13
48:19
**bakery** 15:14
15:20 16:8,22
17:7
**ballet** 54:16
**ballot** 68:21
69:1
**ballrooms** 5:19
83:12
**ban** 5:4 12:6
17:3 51:22
53:15 71:13
73:9
**bank** 17:21,21
**banks** 17:18
18:4,6
**banned** 11:7
53:7,11 69:12
77:10 79:8
**banning** 7:2
18:9 71:9
76:15,15
**bans** 7:10,11
**bar** 26:10
**barred** 77:21
**barrett** 8:1
84:8
**barrier** 89:16
89:18
**base** 14:11
22:15 80:12

**based** 8:19
14:16 18:14,22
20:1 63:15
69:8 80:13
**basic** 67:21
**basically** 76:13
**basis** 65:13
86:14
**beaches** 36:12
50:5
**bear** 6:9 12:4
23:10 85:4,11
**bears** 22:10
**behalf** 2:3,9,14
34:22
**believe** 18:19
80:8
**best** 91:6
**beyond** 5:3
55:13 71:15
73:21
**bibas** 1:14
68:15
**bigger** 33:15
**bind** 25:16
34:12
**binding** 25:9
25:13
**bit** 43:21 50:3
50:13 56:20
62:5 66:3
83:17
**blanket** 28:16

**blunderbuss**
36:19,21
**bodies** 5:16
**book** 17:1
**bound** 20:2
34:5 85:3,10
87:15,19,21
88:2
**bounds** 13:8,11
39:4 49:21
**bove** 1:15
**branson** 1:18
**breach** 29:1
**breath** 29:9
**brief** 9:17,18
75:18
**briefed** 30:7
**briefing** 26:6
40:16
**briefly** 79:12
**briefs** 22:9 61:8
**bring** 28:15
50:20
**bringing** 32:11
**british** 78:6,12
82:12
**broad** 36:15
39:22 49:7
**broader** 76:22
**broadly** 35:12
36:11 45:2
**brought** 50:21
**bruen** 4:17 6:7
6:11,16 9:4

10:1,1,2,10,11
12:2,12,14,18
13:6,13,20
18:13 20:12,13
28:13 35:1,4
35:15 40:10
47:17 50:18
51:19 52:22
53:3,6,6 66:10
67:11 68:18
69:7 77:13
80:9 85:13
88:10,13 89:2
**bruen's** 6:12
75:18
**budget** 25:17
**buildings** 4:22
7:9
**burden** 75:1

**c**

**c** 2:1 3:1 4:1
**cabin** 7:16
**cabined** 64:18
**cai** 2:4 3:3,8
4:10,12,16
10:8 11:2 13:9
14:15 15:7,9
15:16 16:4,9
16:14 17:4,17
18:2,10 19:6,9
20:15 21:6
24:4 25:8,13
26:13,22 27:14

32:8,10 33:9
33:12 80:7
81:3,16,21
82:4,10,14,17
83:3,7,22 84:5
84:12,17 87:7
88:4,8,16,21
89:2,9,11,22
**california**
72:14
**call** 39:1
**camp** 55:20,20
55:22
**campus** 40:18
44:21 61:14
**capacity** 12:22
**capture** 41:10
**care** 62:22
**cares** 8:9
**carolina** 29:12
33:19 78:1,4,7
78:8,13 79:1
**carried** 5:9
53:13
**carry** 11:8
28:17,18 35:3
35:13,17 36:10
36:16 38:7
40:2,4,7,11
48:11 49:1,6
51:10,21 52:3
53:15,20,21
56:9 57:6 58:1
64:5 71:10,14

72:1,4,5,10
74:6,9 75:1
76:15 77:10,14
79:8,9
**carrying**  12:6
33:16 34:1
36:8 39:2 51:6
52:10,11,16
53:8,11 56:7
56:14 58:3
**case**  1:12 4:5
11:16 12:1,11
12:12 15:19
18:12 22:1
24:6 30:8
33:19 42:18
64:21 67:20
73:19 79:20
80:20 87:2
89:16 91:9
**cases**  11:12,13
12:10 24:14
30:16,18,22
31:3,11 33:18
50:15,15 72:19
72:21
**cast**  4:19
**categories**
36:21 37:3
38:13 49:13
69:8
**category**  35:11
37:10 45:15
46:12 54:4

67:8
**cause**  24:9
29:22 31:6
37:22
**causing**  27:9
**cautioned**
35:10
**ceiling**  87:5
**center**  57:7,17
73:4
**central**  83:13
**centuries**  7:22
75:20
**century**  10:4,19
75:7
**certain**  18:22
25:4 35:6 37:5
38:10,11 53:13
59:5
**certainly**  41:16
55:13 56:6
81:17
**certificate**  91:1
**certify**  91:2
**cetera**  37:14
**chagares**  1:16
4:2,11,14 9:13
10:16 26:20
33:10 34:16
40:15 44:3
54:1 58:15
61:14 65:19
69:17,21 79:10
79:21 80:2,5

86:8 89:20
90:1
**challenge**  9:11
40:16 41:1,11
42:12 43:6,19
44:10 45:9
54:12 58:22
59:1,10,14,19
59:20 60:5,9
60:15 61:18
62:15,16,20
64:17,21 65:1
65:5,10
**challenged**
37:1 42:13
58:19
**challenges**
58:18 64:13
**challenging**
37:2 41:7
44:10 45:10
59:9 60:10,13
61:11 65:3
**change**  68:22
**changed**  47:18
48:3
**changes**  45:22
**chapter**  5:6,18
8:21 40:19
**character**
35:19
**cheap**  22:17
**chief**  1:16 4:2
4:10,14 9:13

10:16 26:20
33:10 34:16
40:15 54:1
58:15 61:14
65:19 69:17,21
79:10,21 80:2
80:5 86:8
89:20 90:1
**children**  56:2,7
56:10 57:5,17
**children's**  9:1
**choice**  86:2
**choose**  19:17
20:9 34:15
87:9
**choosing**  84:21
85:6,11
**chose**  15:11
16:1 19:11,15
20:1,4 21:14
21:20 31:22
34:7 42:17
43:6 84:3
**chung**  1:15
61:17 62:12
63:3,8,12,15
64:10,12 78:1
78:16,19
**churches**  71:19
**circuit**  1:2,15
4:4 72:12,17
**circuits**  9:8
49:11

**circumstance** 46:4

**circumstances** 27:6

**citations** 18:16 89:4

**cite** 16:15 30:19 30:19 76:12

**cited** 6:6 11:16 12:2,2,12 18:13,16 27:2 82:18 85:12 88:11

**cites** 33:19

**citizen** 68:2

**citizens** 35:22

**city** 47:20 57:9

**civic** 32:19 39:11 49:17

**claim** 13:3 79:20

**clash** 9:19

**class** 8:17

**clause** 29:10,14 29:15 30:5,20 82:6,6 85:19 85:20

**clauses** 29:14

**clear** 25:12 35:1,7 42:13 46:16 47:8 60:7 70:5 73:1 75:11

**clement** 2:10

**closed** 56:18

**closer** 83:21

**cloth** 5:12

**clubs** 17:1

**codified** 29:11 77:12 79:5

**codifying** 77:18

**coffee** 17:18

**colleagues** 54:7

**collection** 24:15 78:5

**colonial** 5:2 27:20 69:11 71:18,20

**colonies** 28:10 77:20

**colorful** 12:19

**colt** 22:14,16

**come** 62:17 75:2 83:9

**coming** 52:20 56:22 75:4

**commentary** 78:11

**commentator** 6:3

**comments** 60:22

**commercial** 17:18 22:12,15 67:15

**common** 20:21 37:9 77:12,19

78:20 79:5,6

**community** 71:21

**compelled** 67:12

**compensating** 24:1 26:11

**completely** 62:18 69:5

**complex** 2:6

**component** 28:14 59:18

**components** 28:13 51:1 84:6

**comprehensive** 14:9 15:3

**concealed** 40:2 40:4

**concede** 40:18 42:15

**conceded** 82:22 82:22 83:1

**concentrated** 75:13

**concept** 49:7 50:10 64:13

**conception** 48:6,15

**concepts** 27:8

**concern** 47:10

**concerned** 19:12,15 20:13

**concerns** 38:1 40:1 47:2 69:2

**concluded** 90:3

**concludes** 27:2

**conditioned** 35:16

**conditions** 35:2

**confined** 41:11 41:13 62:2

**confirmatory** 70:6 76:4

**confirmed** 4:17

**confirms** 5:3

**conflict** 27:5

**conflicts** 10:5

**confronted** 51:19

**congregate** 32:6 39:9 47:15 48:10

**congregating** 39:10

**congregation** 71:11

**consider** 9:3

**considered** 52:13 53:2,7

**consistent** 6:8 37:7 53:16 68:5 69:5,6

**constitution** 88:19

**constitutional** 12:10 31:18

32:1 40:20
42:17 43:18
62:3 63:9,19
63:21 89:19
**constitutional...**
8:2
**constitutional...**
4:19 41:17
**constitutional...**
86:1
**constitutional...**
16:6 43:8
54:21 73:7
**constitutions**
85:5
**contemplated**
33:5
**contemporan...**
6:4 12:16
**context** 19:10
21:9
**contiguous**
42:5
**continued** 76:7
**contours** 54:11
**contra** 89:12
**contradict** 9:7
**contradicted**
12:15 81:9
**contradicting**
85:20
**contradiction**
69:15

**contradicts**
10:21 11:4,9
**contrary** 81:6
85:17
**control** 9:22
55:15
**converting**
44:15
**conviction**
61:21
**cooper** 2:15
**copious** 4:18
**core** 37:10 65:9
**correct** 19:6,6
20:15 25:7
70:3 72:20
74:1 80:8
89:12
**correctional**
38:9
**costs** 36:5
**counsel** 2:5
34:17 65:20
71:3 72:11
80:3 89:21
91:7
**counselor** 15:1
**count** 19:7
**counter** 88:9
**country** 51:7
51:16,18
**couple** 32:10
52:19 55:8
58:16 76:14

**court** 1:1 4:3
4:11,16 6:2,6
7:14 8:11,14
9:5,10 10:9,14
10:15 11:6
12:5 13:10,18
13:22 20:18,22
25:11 27:1,2
28:13 30:21
34:21 42:18
48:7 49:4 52:4
52:13,22 55:11
56:12,13,16
75:5,14 77:2
77:12 79:1
81:3,6,22
82:18
**court's** 6:21 7:7
7:18 9:9,11
70:5
**courthouse**
14:10
**courthouses**
7:12 27:18,22
30:12 37:12
66:12 76:17
86:16,21 87:10
**courtroom** 1:18
**courts** 5:13
6:16 9:3 14:1
15:22 29:9,16
30:16,16 31:16
50:17 51:10
72:12,14,17,19

76:1 77:14
83:2 85:12
**cover** 60:10
**covered** 41:5
60:12,19 61:4
61:5
**covers** 48:19
49:8
**create** 13:6
47:22 75:8,10
**creates** 17:22
74:22
**creating** 12:20
**credible** 65:7
65:17
**crept** 50:11
**criminal** 67:21
**criminals** 36:6
38:2
**criteria** 20:21
20:21
**cross** 70:17
**crowded** 73:5
**crux** 27:16
**custody** 55:17
56:3
**cut** 5:11 6:11
**cuz** 69:18

**d**

**d** 4:1
**d.c.** 2:16
**daily** 32:12,12

**danger** 49:20
 64:15
**dangerous** 38:6
 38:19,21,22
 52:12 58:12
 69:10
**dating** 27:10
**day** 8:9 29:4
 39:14 51:15
**dayton** 46:2
**deal** 23:3 37:18
 38:8 45:11
 63:22 65:6
**dealing** 44:20
 55:19
**deals** 37:20
 60:19
**debate** 41:16
 45:2,21 79:3
**debated** 21:19
**decades** 22:6
 45:22 74:18
 80:21 81:1,11
**decided** 25:3
**deciding** 10:12
 53:19
**decision** 5:11
 7:18 34:8
 87:18
**decisions** 6:6
 7:17 11:22
 20:4,6,10
 34:12 85:2,3

**declared** 36:6
**dedicated**
 17:11 38:5
 57:15
**deem** 16:2
**deemed** 24:3
 40:14
**defeat** 62:14
**defend** 68:3,12
**defense** 28:22
 29:21 30:9
 33:21 35:4,13
 36:17 68:9,10
**defies** 35:15
**define** 13:7
 14:19 32:7
 48:8
**defined** 13:11
 14:6 16:12
 24:14 49:13
**defining** 35:11
 47:11 54:6
**definition**
 36:10,15 49:3
**defying** 7:7
**delaware** 28:3
 34:9 82:19
 87:19,19
**deliberative**
 37:11
**democratic**
 5:11 20:10
 32:20

**designated** 9:1
 58:20
**designating**
 55:5
**designed** 17:11
 32:19,20 63:22
**destination**
 6:19
**detectors** 8:4
**determination**
 46:5
**dicta** 13:16
**difference** 43:9
 57:19
**different** 10:2
 15:15 19:16,17
 20:7,8 26:1
 28:12 29:14
 31:7 32:11
 48:5 55:8
 62:18 64:4
 66:3 67:8 69:9
 85:15
**differently** 52:7
**digital** 91:3
**direction** 6:18
 12:13
**discharge**
 29:21
**discrete** 49:16
 50:4,10
**discreteness**
 50:11

**discuss** 22:8
 43:2
**discussed** 26:7
 28:14
**discussion** 67:7
 75:18
**display** 29:21
**dispositive**
 21:21
**dissent** 82:3
**distinction** 16:7
 43:4,5,13,18
 51:4,8 54:21
 58:5 76:21
**distinctions**
 54:13
**distinguish**
 52:4
**distinguishing**
 66:18
**district** 25:11
 72:14,19
**doctrine** 12:21
 24:10 50:1
 54:8 56:1,11
 62:17
**doing** 34:3
 52:11 88:13
**dollar** 24:7
 26:16
**dollars** 23:20
**double** 30:20
 31:5

**doubt** 4:19
**doubted** 6:4
**dozens** 5:15
**drafted** 61:21
**drawing** 43:13
**drew** 51:8
**drug** 38:11
**duke** 2:11

**e**

**e** 2:1,1,10 3:1
 4:1,1
**earlier** 10:5,21
 12:16 85:17
 87:8
**early** 75:8,10
**easy** 22:17
**educational**
 71:17
**effect** 11:9 78:7
 78:13 79:4
**efforts** 21:1
 40:5
**either** 11:17
 12:16 22:4
 38:14 71:2,22
**eliminate** 58:1
**emerging** 23:1
**employed** 91:8
**enact** 34:7
**enacted** 23:7,21
 25:15 27:20
**enacting** 31:12
 31:15 34:14

 83:11
**encompass**
 36:12
**endorsement**
 35:20
**enduring** 6:14
**enforcement**
 5:9 46:9
**engage** 39:10
**engaged** 44:21
 45:5 50:7 64:3
 65:6,12
**engaging** 56:4
**ensure** 60:17
**ensuring** 58:2
 68:10
**enter** 18:15
**entertainment**
 7:3 18:17
 36:13 50:6
**entirely** 53:8,11
**entirety** 36:7
 37:3 59:4 60:1
**entitled** 57:6
**environment**
 56:18
**epitome** 36:15
**era** 5:2,19 9:20
 9:20 11:12
 66:11 68:19,20
 69:4,22 71:18
 73:22 74:4,13
 80:21 81:1
 82:13,16

**erin** 2:10 34:21
**especially**
 21:17 22:7
 23:1,4
**espinoza** 75:5
 85:16
**esquire** 2:4,4
 2:10,15
**essentially** 39:9
**establish** 70:1,6
**established**
 77:3
**establishing**
 22:14 77:1,5
**establishment**
 85:19
**establishments**
 17:18
**et** 1:3,8,10
 37:13
**event** 9:19
 39:13
**events** 9:1
 40:17,20 41:9
 60:22
**everybody** 72:4
**evidence** 10:3,6
 10:11,19,22
 11:5,10,11
 12:16 22:1,10
 53:18 69:22
 74:4 76:4 81:7
 81:9,10 85:17
 85:20

**eviscerate** 8:7
 35:12 36:16
**eviscerated**
 48:11
**exact** 40:9
**exactly** 23:10
 25:7 33:6
 42:20 45:2
 61:16,16 78:2
 78:22
**example** 13:14
 13:21 14:7
 16:14 20:20
 21:10 30:20
 32:19 46:2
 51:13 54:19
 60:4 69:10
 85:16
**examples** 13:14
 16:15 54:3
 76:12,15
**exceedingly**
 31:19
**except** 5:8
 77:15
**exceptional**
 35:9 67:10
**exceptionally**
 77:15
**excluded** 60:5,8
**excluding** 61:2
**exercise** 35:16
 36:2 65:15
 72:9 85:19

exercises 84:11
existence 16:17
expenditure
24:1
experimentat...
31:21
expired 22:16
33:9
explain 13:22
72:16
explanation
21:8
explicit 13:13
explicitly 10:12
explode 46:21
explosion 38:1
expressly 35:10
extent 43:3
62:11
extraordinary
57:22
extreme 86:1

**f**

faced 6:14
facial 9:11
40:22 41:15
58:17,21 59:1
59:10,14,18
61:18 62:14,16
62:20 64:13
facially 59:21
facilities 36:13
38:9,11,12

50:6
fact 6:5 11:22
19:16,22 22:13
23:8 29:13
31:22 33:22
44:13 51:2
53:3 87:2,8
89:16
factor 66:18
factory 47:3
facts 69:9
85:15
fails 62:20
fair 48:19
fairs 5:18 29:4
29:10,16 30:12
51:5,15,22
52:6,16 71:11
79:7
faithful 50:19
fall 49:22
falling 84:8
falls 15:8
far 15:20 18:2
39:19 40:21
70:4 82:20
favorably 6:6
fear 65:8,17
february 1:17
91:17
federalism 8:1
20:7 86:3
federalist 34:12

fee 23:18 24:20
36:3 62:22
63:2
fees 24:15
feigenbaum 2:4
fewer 37:1
58:19
fidelity 9:8,9
field 8:22 41:22
figure 20:19
financial 91:10
find 11:16
74:12 88:14
finding 62:1
64:15
fire 46:22
firearm 7:10
8:20 21:15,19
29:22 30:9
37:17,22 39:2
45:17 46:13
47:21 58:2
67:22 68:2,12
68:13 72:5
firearms 4:20
5:4,8,16 8:16
8:18 12:7
16:19 17:15
18:4,5,9 27:21
32:12,16 33:1
33:1 34:1,10
35:6 38:7 39:5
39:8 40:7 46:1
46:6 47:6

48:16 49:18
56:8 57:6 58:3
64:5 72:10
73:10
first 4:5 6:22
13:16 14:2
18:14 21:7
22:6 27:15
39:11 46:16
53:22 57:3
77:13 87:13
fit 20:10 46:11
fits 64:2
five 4:13
flooding 22:18
floor 1:18
23:15
flunk 6:12,15
focus 56:1,4
64:21 80:21,22
82:12 84:14
focused 37:15
44:20 56:5,15
73:21 79:22
focusing 55:9
follow 35:20
41:20 64:12
following 8:18
44:2 61:17
81:11
forbade 88:19
force 28:15
forces 36:4

**foregoing** 23:22 91:4
**forever** 7:16
**form** 22:5 81:8
**formulated** 49:16
**forth** 19:2
**fortunate** 36:9
**forward** 64:5 75:2
**found** 6:8 65:16 81:6 89:19
**founders** 57:22
**founding** 5:19 7:10 9:20 11:12,17 27:10 30:18 46:1 48:2 66:10 68:19,20 69:4 69:11 70:4 71:7,8,18 73:21 74:4,21 76:5 77:17 80:21,22 81:7 81:11,12 82:12 82:16 87:10
**four** 9:2 20:22 35:18 39:20,20 49:13 52:18 59:19,20 61:19 66:9 72:12 75:9,11

**fourteenth** 5:22 23:13
**fourth** 8:12 68:4
**free** 80:13 85:19
**freed** 23:6
**freely** 67:22 71:22
**freeman** 1:14 58:15,16 59:13 60:3,21 62:8 66:21 75:17 76:8
**frequented** 66:8 67:2 77:9 79:7
**frequently** 33:17
**friend** 79:16
**friends** 34:8 83:9
**functions** 37:11 49:17
**fund** 25:4
**fundamental** 68:22
**fundamentally** 52:8
**funds** 24:2
**future** 7:17 25:16

**g**

**g** 4:1
**gamble** 30:19
**games** 42:1
**gather** 39:16
**gathered** 15:18 30:1 71:21
**gathering** 50:7 71:18
**gatherings** 18:18 36:13
**geared** 24:17
**general** 1:5,7 1:10,11 2:5 4:6 4:7 17:7 33:20 35:12 36:16 54:4 66:8 67:2 67:4 77:9 79:7
**generality** 27:13
**generally** 9:14 16:18 32:16 39:3 40:11 51:21 67:3 77:8,19
**generated** 27:7 36:5
**generates** 47:1
**geographically** 75:13
**getting** 22:20
**gilded** 74:11

**give** 59:7
**given** 7:15 19:19 57:4 64:19
**glad** 4:4
**gloss** 84:17
**go** 19:15 20:18 29:3 31:22 33:10 44:2 49:9 67:22 68:1 72:12 83:20 84:16,21
**goes** 23:17 25:18,20 34:1 45:2
**going** 12:13 14:11,12 28:21 30:3 33:8 44:12 46:22 47:22 54:2,3 55:18 56:3 58:10 64:5 68:11 72:6 79:18 86:4
**gonna** 9:15 40:6 42:14 44:1 55:14 56:1 65:1,14 73:20
**good** 4:2 18:10 34:20 51:13 59:6
**goodness** 40:5

**governing** 54:12

**government** 4:22 7:9 8:4 14:8 37:12 58:3,7 67:12 67:18 68:9 77:22

**granted** 4:15

**granular** 9:16

**greater** 57:3

**grocery** 17:19

**ground** 37:9 69:9

**grounded** 16:9 43:5

**grounds** 42:8 60:6 61:4

**group** 62:2

**guard** 57:8,19

**guess** 62:11 76:8

**guidance** 42:20

**guide** 21:1

**gun** 37:19 47:3

**guns** 7:2 32:6

**h**

**half** 37:2 58:19 77:13

**hampshire** 2:16

**hand** 51:9,14

**handgun** 35:3 35:17

**handguns** 22:12 33:17 36:8 37:6 40:1 40:6 69:10

**handling** 68:10

**happen** 24:18 50:17

**happened** 23:10 44:4

**happening** 41:10 44:14 61:12

**happy** 43:2

**hard** 22:14

**harder** 22:2

**hardiman** 1:14 72:11 73:13,19 80:15 81:14,19 81:22 82:8,11 82:15,21 83:4 83:16 84:4,7 84:13

**harm** 23:20 24:9,16 29:22 79:14

**harming** 61:22

**hawaii** 72:14

**hazard** 37:17 37:19 45:17 46:14

**health** 38:10

**hear** 4:5 34:18 65:21 72:16 80:5

**heard** 83:8

**heed** 35:14

**heightened** 38:15 53:12 58:8

**heller** 4:17 6:7 12:1 13:16 33:19 80:8 82:2,3,18 85:13

**heller's** 12:19

**help** 54:19

**helpful** 14:13

**heterogeneity** 85:1

**hey** 86:13

**high** 44:8

**highly** 77:21

**historic** 27:4

**historical** 6:5 6:10,13,16,17 7:1,2,4 8:19 9:21 13:4 14:20,21 15:10 18:3,8,16 22:10,19 35:8 37:7 39:18 50:18 53:16 54:3 65:13 70:1 73:3 76:1 77:1,5 86:15

88:15

**historically** 37:18 49:19 52:2,3 73:9,14 73:15,17

**history** 4:18 5:2,10,12 6:17 8:5 9:14 14:1 14:16,17 16:10 18:11 22:7 29:6 30:17 31:19,20,20 32:14 50:14,20 67:7 73:11 80:12,16,17,18 82:12

**home** 49:8

**homes** 8:10

**honor** 10:8 66:1 84:1 86:6 87:8

**honors** 34:20 80:8 89:22

**housing** 38:5 58:11

**huge** 21:13

**hughes** 2:6

**huh** 42:3 45:18

**hundreds** 71:8 77:7

**huntley** 33:18

## i

**idea** 12:3 39:5
**identical** 5:17 7:4
**identified** 5:7 21:1 32:5 36:22 45:15
**identify** 6:1 21:2
**identifying** 36:19
**illustration** 59:6
**illustrations** 59:7
**immediately** 5:21 28:11
**immunity** 23:22 26:7,10 26:15
**impediment** 26:8
**important** 11:2 21:8 38:20
**importantly** 6:1
**impose** 35:2 64:4
**imposed** 19:4 35:21 36:3 53:12
**imposing** 39:21 57:4

**improper** 73:2
**inappropriate** 55:4
**included** 11:11 78:14
**includes** 5:18 84:5
**including** 16:15 23:6 34:4 85:2
**incompatible** 6:21 8:1
**incomprehen...** 16:21 41:21 53:15 62:12
**inconsistency** 74:14 75:4
**inconsistent** 74:18,19
**incorporated** 23:12
**incorrect** 7:19
**incredibly** 47:20
**independent** 38:1 41:15 67:13
**indicated** 66:16
**indicative** 87:4
**individual** 6:8 12:4 15:12 19:2 23:9 31:1 68:8 85:4,10
**individually** 59:1

**individuals** 38:6
**inebriated** 32:22
**inflation** 24:21
**initial** 86:12,12
**injunction** 23:19 26:5
**injunctions** 24:13
**injured** 46:3
**injury** 26:18
**inner** 85:18
**inquiry** 9:22
**inside** 16:18
**insight** 10:20
**insist** 7:3
**instance** 37:20 59:2
**institutional** 54:16
**institutions** 20:8
**instructions** 6:22
**insufficient** 11:4,10
**insurance** 23:17 24:5 35:21 61:19 63:12 64:16 79:15,20
**intending** 13:5

**interest** 91:9
**interested** 10:6 72:13,16
**interesting** 10:13 19:11 24:16
**interpersonal** 22:21
**interpreted** 79:2
**interview** 35:21
**intimidation** 69:3
**invalidated** 59:22 60:2
**irrelevant** 21:3 74:15
**irreparable** 23:20 24:8,16 26:17 79:14
**issue** 37:4,14 38:3 39:4,7 53:5 64:8 69:14 70:12
**issues** 17:22 19:13
**items** 23:16 59:19

## j

**j** 2:6
**jackie** 1:22 91:2,16

**jeopardize** 33:3
**jeopardizing**
 49:19
**jeopardy** 30:20
 31:6
**jeremy** 2:4
**jersey** 1:5,5,6,6
 1:10,10,11 2:3
 2:5,7 4:7,12
 5:6 15:2 17:14
 18:5 25:10,14
 27:7 34:13
 36:7,18,22
 47:17 48:14
 58:20 60:16
**jersey's** 35:15
**job** 1:20
**judge** 1:16 3:7
 4:2,10,14 9:13
 10:16 12:17
 13:9 14:4 15:1
 15:8,14 16:3,5
 16:11,21 17:13
 17:21 18:7,11
 19:4,7 20:12
 20:16 23:14,15
 25:6,11,21
 26:13,19,20,20
 26:21 32:3,9
 33:4,10 34:16
 40:15 41:19
 42:4 43:12
 44:1,2,2,7
 45:13,14,19

 47:4 49:10
 54:1,1,2,10
 55:4,20 57:7
 57:11 58:15,15
 58:16 59:13
 60:3,21 61:14
 61:17 62:8,12
 63:3,8,12,15
 64:10,12 65:19
 66:21 68:14,15
 69:17,21 70:11
 70:15,20,22
 71:1 72:11,11
 73:13,19 74:7
 74:10 75:17
 76:8 78:1,16
 78:19 79:10,13
 79:21 80:2,5
 80:15 81:14,19
 81:22 82:8,11
 82:15,21 83:4
 83:16 84:4,7
 84:13 86:8,8,9
 86:11 87:22
 88:6,12,20,22
 89:8,10,20
 90:1
**judges** 1:15
**judicially** 67:19
**jurisdictions**
 11:20 18:21
 40:8,9 83:11
**justice** 2:6 7:22
 51:11 84:8

**justices** 29:5
 77:16
**justification**
 13:4 55:11
**justifies** 8:21
 29:8

**k**

**key** 66:5,7,17
 71:19
**kids** 39:14 67:5
**killed** 46:3
**kind** 6:10 20:19
 21:15 26:3
 33:6 36:20
 43:10 45:11
 46:15,22 50:11
 51:1 85:1
 86:17
**kinds** 22:22
 24:13 31:2
 38:18 39:21
 54:22
**king** 78:9
**kirk** 2:15
**knots** 80:11
**know** 12:22
 14:10,12,15,17
 15:9 17:5,6,19
 19:9 20:7,10
 21:11 22:6
 24:10,15,21
 25:14 28:8,15
 34:9 37:21

 41:16 42:19
 43:2 44:18
 45:1,5 46:2
 47:8,19 49:5
 50:16 52:18
 54:11 55:18
 56:2,14,18
 57:15 58:9,13
 58:18 61:22
 62:7,11 63:7
 64:1,6 65:2,9
 65:10 76:14
 78:8 82:1
 84:19 88:18
**knowledge**
 91:6
**koons** 1:3 2:14
 4:5 65:21 66:2
**krause** 1:14
 26:20,21 45:14
 45:19 47:4
 49:10 71:1
 72:11
**krause's** 86:11

**l**

**lack** 7:14
**language** 63:18
**lara** 81:5,5
**large** 12:22
**largely** 35:15
 72:15
**late** 7:5 10:3,18
 31:11 75:7

80:19
**latitude** 57:4
**laundry** 48:18
**law** 5:9 6:14
  11:8 12:15
  15:2 25:10,14
  33:2 35:22
  36:4 38:8
  39:17 41:3
  45:8 46:9
  48:13,20 51:3
  51:12 61:20
  62:6,18,21
  64:6,9 68:2
  76:13 77:12,19
  79:5,6 83:19
  84:15
**laws** 4:20 6:5,7
  7:2,21 23:21
  27:3 34:7
  37:18 39:20
  40:3 44:18
  49:12 50:22
  51:20 52:2,4,6
  52:8,19 53:5,5
  53:6,11 64:2
  74:5,11,13
  75:6 78:5,6,12
  81:8 82:17
  85:14 89:5
**lawyer** 78:10
**lawyer's** 78:5
**lay** 6:3

**leading** 46:9
**lean** 82:1
**leaned** 82:3
**leave** 7:21
**leaves** 52:17
**left** 51:2
**legal** 6:2 24:17
**legislate** 88:1
**legislating**
  89:15
**legislative** 5:15
  7:16 20:18
  21:4 28:1
  31:20 37:13
  76:16
**legislator** 6:2
**legislature** 5:7
  6:13 19:14,14
  25:3,15 27:21
  46:5 71:1,3,12
  84:10 85:5
**legislature's**
  84:19
**legislatures** 5:4
  5:14 7:11
  15:11 21:12
  25:17 31:9,22
  32:2 33:13,13
  34:4,5 66:11
  71:22 83:1
  84:2,21 85:3
  87:9,15 88:1
**level** 27:12 48:9

**liability** 36:1
**liaison** 2:5
**libraries** 9:2
  15:17 36:12
  38:18 50:5
**library** 15:15
  18:1
**life** 32:12,13
**likely** 46:21,21
**limit** 40:16
**limitations**
  41:17 57:1
  85:18
**limited** 5:8
**limiting** 47:13
**limits** 36:8
**line** 13:15 29:2
  32:1 38:12
**list** 15:3 27:7
  48:18 58:19
  59:20
**listed** 75:22
**lists** 59:8
**literary** 15:18
  17:2 18:18
  71:17
**litigant** 24:7
**little** 8:13 9:16
  43:21 50:3,13
  56:20 62:5
  66:3 69:18
  83:17
**locale** 45:20

**locate** 32:17
**located** 42:2,8
**location** 17:9
  17:10 18:14
  49:16 50:10
  55:6 72:6 73:8
**locations** 4:21
  5:5,7,17 8:9
  11:20 12:9
  15:5,17 16:1
  18:17 20:22
  22:4 27:11,19
  30:10,14 32:17
  32:20 40:18
  45:15 46:10,12
  50:4 66:14
  72:10 73:10
**loco** 8:12 44:22
  45:3 55:9 56:1
  56:11 67:5
**long** 59:17 71:9
  77:8
**longer** 27:8
  42:9 45:3
  69:13
**longstanding**
  4:20 8:7 21:10
**look** 19:3,10
  20:20 21:7
  28:8 30:4,17
  31:3,10 40:12
  44:17 47:18
  54:14 56:17
  66:12 68:7

76:22 86:20
89:17
**looking** 12:14
18:12 21:11
23:19 73:20
84:1 88:11
89:3,5
**loose** 73:3
**lose** 8:2 24:7
26:16 86:18
**lot** 22:9 23:7
30:22 31:12
72:4 74:10
**lots** 58:2
**lower** 13:22
**luckily** 9:2

**m**

**made** 35:1
47:17 48:5
72:17,19
**magazines**
12:22
**majority** 49:15
**make** 8:13
27:14,16 35:7
37:16 45:16
46:5,13 58:14
87:14,17 88:21
**makes** 6:10
40:12 46:20,21
57:19
**making** 87:18

**male** 68:14
**malintent**
52:11
**mandate** 35:22
**maris** 1:18
**market** 2:6
22:12,18
**marketplaces**
51:22 52:17
**markets** 5:18
29:4,10,16
30:12 51:5,15
52:6 71:11
79:8
**mascott** 1:15
15:1,8,14 16:3
16:5,11,21
17:13,21 54:1
54:2,10 55:4
55:20 57:7,11
**massive** 47:22
**matey** 1:14
12:17 13:10
14:4
**matter** 19:21
33:22 39:18
79:5
**max** 84:21
**maximal** 87:1
**maximally**
84:11,20 86:19
**mcdonald** 4:17
13:17 80:9

**mean** 14:4,6,13
17:9,21 19:20
42:11,13,21
43:20 46:18
47:9,13 48:18
50:2,8 56:6
59:6,17 62:4
62:15,17 74:17
82:2 88:18
89:14
**meaning** 10:20
30:21 31:5
**means** 8:19
9:10 14:7
80:14 85:22
**meetings** 17:2
**mental** 38:10
**mentioned** 9:14
42:19 72:12
**menu** 7:21
**mere** 7:14
57:18
**metal** 8:4
**metes** 13:7,11
**methodologi...**
28:5
**methodology**
89:3
**mid** 31:2
**middle** 57:8
**military** 14:10
**militia** 81:8
**mind** 46:17
55:11 56:12

**minimal** 10:4
27:3
**ministers** 29:5
51:11
**minutes** 4:13
**misconduct**
64:3 65:7,12
**misinterpreta...**
74:3
**missouri** 12:12
15:22 18:20
19:14 31:14
89:17
**misunderstood**
52:8
**misuse** 64:15
**misusing** 38:2
**modern** 5:7
6:11,15
**modes** 36:14
**moment** 31:14
**monetary** 26:2
26:11
**money** 24:11
24:18 25:17,20
**montgomery**
1:14
**mores** 34:4
**morning** 4:2
34:20
**move** 69:8
71:15 72:17,18
**moves** 72:18

movie 50:8
multiple 21:1
  59:8 61:8
murphy 2:10
  2:10 3:4,9
  34:19,20,21
  41:2 42:3,11
  43:15 44:6,9
  45:14,18 46:15
  47:7 50:2 54:9
  55:3,7,22
  57:10,13 59:3
  59:16 60:7
  61:5,16 62:4
  62:10,13 63:4
  63:11,14,17
  64:11,19
museum 16:8
museums 9:2
  36:12 38:17
  50:5

**n**

n 2:1 3:1,1 4:1
n.w. 2:16
named 8:14
nation 5:16 8:8
nation's 5:1
  22:7
national 18:8
  19:8 88:14
natural 21:7,16
nature 64:20

nearly 36:6
necessarily
  17:12 42:16
  43:6,17 44:15
  47:14 55:12
need 13:7 25:9
  30:14 64:16
  76:18 77:2
  81:4
needs 10:14
  32:21 58:8
negligence
  61:22
neither 91:7
never 14:5
  15:11 24:19
  33:5 62:16
  63:5 70:1
new 1:5,5,6,6
  1:10,10,11 2:3
  2:5,7,16 4:7,12
  5:6 15:2 17:14
  18:5 25:9,13
  27:7 32:4,7
  33:4 34:13
  35:14 36:7,18
  36:22 47:17,17
  47:20 48:14
  51:19 52:7
  58:20 60:16
  70:12 71:4,13
  71:14,16 72:15
  83:12,19

night 29:3
  51:15
nine 46:3
north 29:12
  33:19 78:1,3,7
  78:8,13,15
  79:1
northampton
  28:9,12,20
  29:8 33:8
  50:22 52:2,14
  78:2 81:18
nos 1:12
notably 50:16
note 14:15
notion 38:3
  39:8
notwithstandi...
  27:1 49:1
novel 35:21
nuclear 67:14
number 4:6
  16:15 17:17
  25:1 48:17
numbered
  58:22
numbers 47:16
nursing 8:10

**o**

o 3:1 4:1
objection 25:2
  25:19,22

objective 20:21
observation
  27:15
observes 33:21
obtain 22:17
occurred 88:5
occurring
  42:10
offer 30:7
  46:16
office 2:5
oh 40:5 59:16
  70:21 79:21
  87:17
ohio 46:2
okay 60:21
  64:22 72:2
  80:2
once 12:2 47:11
  47:14 48:14
onwards 31:4
open 43:14
  67:3,20
operated 48:14
  52:9
opinion 10:18
  49:15
oral 1:17
order 28:17
  80:7 86:4
orleans 83:12
  83:19
ought 9:21

outcome 28:4
91:10
outlier 40:10
52:22 73:18
outliers 75:12
outside 15:8
45:9 49:8
54:15,18
overbroad
43:22
overread 10:9
overreading
12:17,18
overwhelming
11:5
own 29:16 30:5
31:12 80:13

**p**

p 2:1,1 4:1
page 3:2 9:18
10:18
pages 1:21
paid 33:14
panel 3:7 49:15
paradigmatic
8:15 13:21
parentis 8:12
45:1,4 55:10
56:1,11 67:5
parents 55:15
56:8
park 7:1 39:14
42:2 43:9 44:3

45:6 54:18
55:16 56:10
83:13,15
parks 5:19
16:18,18 36:12
38:17 50:5
55:14 56:8
83:13,14
part 19:8 40:9
45:12 53:7
59:15 78:20
participation
32:20
particular 9:18
30:10 31:8,21
41:14 49:14,17
50:21 64:9
85:11
particularly
13:6 32:18
parties 91:9
partly 54:12
pass 78:8
passed 31:17
patent 22:16
path 24:14
patterson 2:15
3:5,10 66:1,2
67:1 68:18
69:20 70:3,14
70:18,21 71:5
73:1,16 74:1,8
74:19 76:3,20
78:3,18,22

79:18,22 80:4
80:17
pay 62:22 63:1
peace 28:16
29:1 49:20
79:9
peaceable 74:9
penalty 53:13
pennsylvania
34:13
people 8:17
15:18 17:14
22:20 28:10
29:20 30:1
32:6,11,21
33:16 34:3
38:21 39:9,15
46:3,7 47:5,15
47:19 48:9,16
48:17 49:9
50:7,8,8 52:1
62:2 63:4,22
64:14,18,20
65:6 71:19
72:8 73:6
74:22
people's 23:5
performances
34:11
period 5:20
11:14,17,18
permit 35:3
36:4,10 72:5

permitted 37:6
person 24:6
persons 35:18
58:12 61:20
perspective
19:16 56:17
72:22 81:15
pete 66:2
peter 2:15
phipps 1:14
86:8
phonetic 81:5
phrase 12:19
physical 37:16
38:21 45:16
46:18,19 47:9
49:20 58:12
pick 54:7
pin 82:16 83:4
pizzeria 17:19
place 8:7,15
19:18 29:6,15
31:16 37:12
40:12,14,21
41:4 42:1,1,6
44:16,16 47:15
47:21 48:21
49:5 53:22
57:3,12,15
58:7,8,14
66:17 67:11,20
67:22 68:11,13
69:2 70:9 71:6
71:14,19 72:3

72:7 73:5,8
76:5 77:15
81:12 82:19
83:12
**places** 5:14 7:2
7:12 8:3,5 9:4
9:17 11:19
12:8,20 13:12
14:8,11 15:4,6
15:11,12 17:16
23:17 27:6
28:3 29:19,19
31:21 32:18,22
35:7,10,11
36:7,11,20
37:5,10,13,15
38:5,14,18
39:5 46:11
48:4,6,9,9,16
49:7,12,15,22
50:1 51:16
52:1,5,10,16
53:10,13 54:5
56:20 58:20
66:7,8,11 67:2
67:9,14,15
68:16,20,20
69:1,4 71:10
71:16,17 75:19
75:21 76:10
77:6,9,22 79:6
80:1 82:22
83:5 84:5,22
86:5

**plaintiff** 8:3
11:16
**plaintiffs** 2:9
2:14 6:1,20 7:3
7:13 8:12 9:5
9:10 24:19
30:19 34:18,22
65:4,21 66:2,4
66:16 80:7,10
85:22
**plants** 37:21
67:15
**play** 85:18
**playground**
55:5
**playground's**
60:15
**playgrounds**
8:22 40:17,19
41:8 54:10
60:4,6,11,17,18
**please** 4:11
34:21
**plenty** 68:16
**plus** 7:1
**point** 6:18 7:15
16:13 19:19
22:5 25:12
30:15 37:1
45:3 50:21
62:21 65:9
86:5 88:9
**pointed** 51:20
75:14

**pointing** 53:18
**police** 1:5 48:1
48:10
**policies** 85:6,12
**policy** 19:16
20:6,9 85:1
86:2
**polling** 5:13
7:12 8:7 28:3
37:13 66:11
68:16,19,20
69:1,4 82:18
82:22 86:5
**poor** 40:12
**populace** 27:9
**populous** 47:20
**porter** 1:14
18:7,11 19:4,7
20:12 32:3,9
33:4 74:7,10
86:9 87:22
88:6,12,20,22
89:8,10
**pose** 65:17
**posed** 37:19
**posing** 49:20
**posited** 78:5,6
**position** 9:7
10:7 15:4 42:5
42:7 69:22
72:15
**positive** 89:12
**positively** 12:3
12:13

**possess** 17:14
**possible** 86:19
**post** 9:4 70:13
**powder** 37:19
47:3
**power** 37:21
67:14 84:11
**practice** 44:5
48:13 77:1,5
**practices** 42:1
**pre** 27:20
**precise** 63:18
**precisely** 6:9
41:9 47:16
**precursors** 7:4
**predate** 30:17
**predecessors**
6:17
**preliminary**
23:18 24:13
26:5
**premises** 43:14
**prepared** 91:3
**presence** 29:5
32:5 33:1
37:22 46:6
48:1,10 49:18
57:18
**present** 57:17
**presented** 17:5
65:7
**president** 1:6
1:10

**press** 42:17
 83:17
**presumption**
 74:22
**pretty** 13:13
 15:3 57:22
**prevent** 24:10
**principle** 8:19
 9:8 14:20
 47:13 52:1
 66:5 68:5
**principles** 68:6
 70:19 71:6
**prior** 61:21
**private** 48:20
 49:2,2 78:4,10
**probably** 45:8
 55:15 64:19
**probative** 10:4
**problem** 6:15
 21:10,13,15,18
 22:8 23:4 31:8
 32:4,7,13,15
 33:5,15,16
 41:15 48:12
 71:4,13 86:14
**problems** 22:22
 32:18 47:22
 72:4
**proceed** 4:9
**proceeding**
 91:4
**proceedings**
 91:6

**produce** 35:18
**prohibit** 28:18
 32:16 35:6
**prohibited**
 16:19 27:21
 37:7 39:6,8
 52:10 76:11
**prohibiting**
 4:20 18:4
 52:15
**prohibition**
 8:15
**prohibitions**
 38:4 39:22
**proof** 50:3
**proper** 75:15
**property** 38:22
 41:5,11 42:22
 43:10,11 46:20
 48:21 49:2
 60:20 61:13
**proposition**
 37:5
**prosecuted**
 31:1
**protect** 56:9
**protected** 42:9
 72:8 73:7
**provide** 5:10
 10:19 35:19
 57:3
**provided** 8:4
 14:8

**providing**
 42:19
**provision** 24:5
 25:16 37:20
 41:6 43:20
 44:11 45:10
 59:4,8,10,15,22
 60:10,12,17,19
 65:3,5
**provisions**
 37:15 38:8
 41:8,13,14
 43:5 44:20
 61:11 65:2
**public** 9:2 11:8
 12:9 15:5 18:1
 28:17,18 36:13
 46:7 50:7
 54:15 57:2
 66:8 67:3,4,21
 71:10 77:9
 79:7
**publicly** 35:13
**pudding** 50:3
**pull** 47:6
**purpose** 16:22
 17:9,11 20:11
**purposes** 9:22
 15:19 39:2
 82:5
**put** 49:21 82:10
**putting** 25:18

**q**

**qualified** 11:3
**qualifier** 28:16
 28:19,20
**qualify** 27:8
**qualities** 38:21
**question** 10:13
 17:4 18:10
 26:1,2,9 27:16
 28:7 33:11
 44:3 49:4 76:9
 78:16 80:16
 81:4 86:7,11
 89:1
**questions** 3:7
 9:12 54:8
 58:17 61:18
**quickly** 66:9
**quote** 10:17
 11:8 35:9

**r**

**r** 2:1 4:1
**radical** 23:2
**radically** 43:8
**rahimi** 7:18
 10:12 14:18
 20:12,13 68:7
 88:13 89:3
**rahimi's** 8:18
**rate** 24:21
**rather** 9:14
 11:1,12 35:14
 38:18 71:3

**ratification** 74:13
**ratified** 5:22
**reach** 55:13,14 56:13 61:12 81:4,4
**reached** 60:18
**reaching** 47:14
**react** 46:8,9
**read** 61:10 64:8 87:11
**reading** 22:21 88:5
**real** 86:14
**really** 12:18 13:5 18:10 22:12 33:2 50:19 52:18 55:13 56:13,21 58:4 62:15 73:19 82:1 84:13 85:7,7
**reason** 15:10 31:10 41:2 84:2
**reasons** 22:19 31:2,7 66:9,17 67:14
**rebuttal** 4:13 34:17 80:6
**rec** 57:7,16
**recent** 7:18
**recognition** 38:16

**recognized** 12:3 33:14
**reconcile** 70:12 75:17 86:17
**reconstruction** 5:3 9:20 11:18 23:1 69:22 81:1,2
**record** 20:18 21:4,5 25:6,9 32:14 35:8 91:5
**recording** 90:3 91:4
**recovering** 24:11
**recreational** 39:12 54:18 61:1
**reeves** 1:14
**reference** 11:6 13:8 79:19
**references** 10:10
**referencing** 78:9
**reflect** 52:15
**regulate** 13:3 21:14 70:16 84:3 86:19 87:9
**regulated** 15:5 17:16 18:5 22:5 49:19

55:21 74:16
**regulating** 84:20
**regulation** 7:15 75:2,3 79:15 86:15,21 87:1
**regulations** 6:12,15 8:22 55:1 76:2 87:3
**regulator** 13:2
**regulatory** 13:1 19:8,18 21:4 88:15
**reject** 9:10
**rejected** 9:4 48:7 52:14 53:3
**related** 23:4 91:8
**relatedly** 67:19 68:4
**relates** 24:1
**relatively** 22:17 35:9 75:20
**relevance** 27:4
**relevant** 21:9 21:21,22 53:9 53:14,17 58:6 65:4 80:17,18 85:7 88:6,8,12
**relevantly** 73:15,16
**relied** 50:15

**relief** 26:2,4,8 63:6
**reluctant** 9:6
**rely** 52:18
**relying** 40:3 72:7
**removed** 70:4
**repeated** 7:8 13:17,20 18:20
**repeatedly** 9:6
**reply** 9:18
**representative** 77:3
**representing** 64:20
**republicans** 23:2
**reputable** 35:18 61:20
**require** 7:7
**required** 72:1
**requirement** 23:17 63:13
**requires** 7:13 20:7
**reserve** 4:13
**respect** 25:14 28:7 79:14
**respond** 79:13
**responded** 36:20
**response** 24:19 35:15 79:16 86:11 88:17

**responses**
46:16
**restrained**
87:12
**restrepo** 1:14
**restrict** 29:2
34:10 74:8
**restricted** 5:16
14:13 38:15
42:7 56:21
74:5
**restriction**
18:15 19:19
21:15,19 34:14
42:16 51:4
53:10 60:2
72:2 82:19
**restrictions**
5:13 7:1 8:8,9
8:20 9:4 11:19
12:8 16:16
18:22 20:2
23:7 28:17
29:8,9 31:16
40:2,4,19 57:4
64:4 65:11
75:21 81:13
83:12
**revealed** 35:8
**reversed** 50:17
**review** 76:13
**reviewed** 4:19
6:7

**revolver** 22:16
**revolvers** 22:18
**richard** 2:6
**ride** 29:3 51:14
**right** 6:9 12:4
14:6,9 15:2,20
20:14 23:5,6,9
25:1,12 32:1
33:20 35:12,17
36:16 40:11
48:11 51:21
56:7 58:1 61:9
63:3,14 68:1,8
68:12,14 75:1
76:8 80:2 82:2
82:8,21 83:16
83:20 84:4,7
84:12,16 85:4
85:10,22 86:4
88:7,20
**rights** 36:3
65:15 72:9
**riots** 22:22
**risk** 47:1 58:14
**risks** 36:1
**robust** 31:19
**ronald** 1:3
**rule** 8:19 67:21

**s**

**s** 2:1 3:1 4:1
**safety** 33:3
37:17,19 45:17
46:13 47:1

58:14
**samuel** 22:13
**sanctioned**
44:4,12,14
45:6
**saving** 24:19
**saw** 31:9 32:13
39:22
**saying** 10:10
19:20 51:4
52:5 70:15,22
78:11 87:8
**says** 10:18
11:18 13:6
28:14 29:3
48:20,22 51:13
64:3 65:14
68:7
**scenario** 20:17
**scheer** 1:22
91:2,16
**scholar** 6:3
**school** 18:15
41:4,6,11,20
42:5,8 43:10
43:11,14 44:4
44:8,12,15,22
45:6,12 54:8
54:15,19 55:2
55:16,17 60:6
60:20 61:3,6
61:12 67:6,8
**school's** 43:20
60:12

**schools** 4:21
5:13,20 7:8,11
8:13,14,21
18:9 19:2,4,11
20:1 27:18,22
29:18 40:21
41:18 42:13,16
42:19 44:18
54:16 55:8,12
56:17 60:11
66:22 67:3
83:1 86:6,16
86:21 87:10
**scientific** 15:19
**scope** 42:12
45:9 46:17
**scrutiny** 80:14
**sec** 70:20
**second** 7:13,19
10:20 13:19
15:22 16:7
19:21 20:3,5
23:8,11 31:13
34:6 35:5 36:2
64:7 66:15
67:13 68:6
72:9 74:20
75:15 84:6
87:12,15,21
88:2,3 89:6,13
**seconds** 46:3
**secret** 68:21
69:1

section 11:7
secure 36:10
  66:19 67:12
  72:7
secured 66:14
  67:16,17 77:22
security 5:10
  14:9 17:22
  38:16 57:8,18
  58:8 66:7
  68:17
see 18:14 30:18
  32:14 33:9,18
  48:13 71:22
  72:13 77:11
  84:20
seeking 35:3
seem 39:16
  40:16 53:17
seems 17:22
  39:16
seen 39:18,19
self 28:22 29:21
  30:9 33:21
  35:4,13 36:17
  68:9,10
senate 1:6,11
sense 8:13
  41:12 46:19
  58:6 87:14,17
  88:21
sensitive 4:21
  5:8 8:5,15 9:3
  11:19 12:8,20

13:12 15:3,6
  15:12 16:2
  17:10,16 19:18
  23:16 27:6,18
  29:6,15,19
  31:16 35:6,11
  36:7,11,19
  37:11 38:20
  39:1 40:14
  44:16 46:10
  48:4,6,8,21
  49:7,12 50:1
  52:5 53:10
  54:5 55:5
  57:12,20 58:11
  58:21 66:7,17
  66:20 67:16,17
  72:3 75:18,21
  76:10 77:6,15
  77:21 80:1
  81:12 83:5,11
separate 29:2
  41:7 53:9
  60:17 82:6
set 13:14 45:8
  49:17 51:7
  81:19 82:9,11
  85:15
sets 50:8 80:10
setting 23:19
  54:16,19
several 38:8
severely 14:12

shelby 12:11
shoehorn 62:19
shooting 62:1
shop 17:19
shops 15:12
shortsighted
  7:20
shoulder 36:5
show 52:3 58:9
  85:9
shown 66:13
shows 8:5
  73:11 77:17
shwartz 1:14
  20:16 23:14
  25:6,11,21
  26:13,19 41:19
  42:4 43:12
  44:1,7 45:13
  70:11,15,20,22
  79:13
side 26:8 83:9
side's 88:17
siegel 1:8 2:9
  4:7 34:18,22
  66:4,15
signature 91:15
significant 16:6
  43:9 45:21
  47:15 48:17
  54:21
silence 20:17
  21:8 69:15
  71:8 74:21

85:8 88:18
similar 12:21
simply 6:20
  36:1 42:7
single 6:2 8:16
  11:6,8,9,16
  83:15
singling 59:17
sister 79:13
sit 35:20
situation 86:22
situations
  45:11 55:18
skills 91:7
slaves 23:6
small 22:13
smaller 23:16
social 6:14
  21:10 22:8,22
  30:2 31:8 32:4
  32:7,15 33:4
  33:14,16 34:4
  71:4
societal 70:12
sociological
  33:22
solved 32:15
somebody
  48:22 65:12,16
somewhat
  56:18
soon 16:16
  83:13

sorry 70:21
86:6
sort 8:6 18:18
26:7 34:2
40:17 64:14
71:14 72:20
sorts 73:10
sources 18:13
south 23:2
sovereign
23:22 26:6,10
26:14
sovereigns 31:1
spaces 87:4
sparse 7:12
speaker 1:6,11
speaking 12:17
special 64:15
specific 11:1
16:16 18:3
32:17 50:14
76:9
specifically
18:6 48:7
51:18
spent 23:20
sporting 39:12
41:9 60:22
sports 8:22
40:17 54:17
square 89:4
stampede 47:5
stand 26:16
42:14

stands 24:7
start 22:21
47:11 81:15
83:10
started 18:19
22:18,20 29:7
31:12,15 48:14
83:11
starting 82:16
starts 81:17
state 1:5,6,10
2:3 4:12 6:5
11:9 16:12
20:13 23:22
24:12 26:14
28:1 30:1 34:6
34:15 35:16
38:4 39:3 40:3
44:19 45:8
49:5 50:21
51:2 52:17,19
61:9 62:6,19
75:1,6 80:6
85:5,5 87:16
89:5,13
state's 6:22
15:4 39:16
48:20
stated 9:6
statements 7:8
states 1:1 4:3
5:22 13:19
17:1 20:8,9
23:3,8,12

29:11 31:12,14
35:1,5 39:20
52:21 53:19
74:15 75:4,13
77:20 85:2,9
87:20 89:6,17
statute 16:12
27:20 28:9,11
28:20 29:7
33:7 61:7,10
63:20,21 65:3
77:11 78:4,9
81:17
statute's 79:4
statutes 15:21
24:2 52:15
83:22
statutory 59:15
stays 39:3
stems 41:2
stopping 20:6
store 17:19
stray 13:15
street 2:6,11
56:22
streets 49:6
strikes 12:21
struck 6:16
57:21
stuck 21:3
student 18:22
20:1
students 8:16
32:22 42:21

44:21 56:2
subject 26:4
subsection
58:22 59:2
sudden 17:3
69:2
suddenly 24:8
26:17
sufficient 27:10
suggest 13:15
54:6 78:19
suggested
44:19 47:12
suggesting
26:15 43:16
62:13 88:16
superintendent
1:5
support 53:4
supported
72:15
supporting
5:11,12
supposed 56:22
suppression
23:5
supreme 4:16
6:21 7:7,17
8:14 9:9 10:14
13:10 20:22
27:1 30:16,21
42:18 48:7
52:21 55:11
56:12 70:4

75:5,14 77:2
77:12 79:1
81:22
**sure** 6:11 15:7
17:17 44:6,9
46:15 47:7,12
54:9 55:3,7
57:10 68:15
70:21 81:21
83:3,7
**surety** 64:2
**surrounding**
40:13
**sweeps** 36:11
**synthesize**
72:21
**system** 34:12

**t**

**t** 3:1,1
**take** 37:4,12,14
38:3 39:4,7,13
40:21 42:1,1
61:8 64:7 66:3
70:18 71:12
87:22 90:2
**taken** 36:18
70:1
**talk** 50:13
70:17
**talking** 22:4
46:18 50:12
53:20 56:19
67:1,10 71:1

83:5
**talks** 33:20
67:11
**taught** 14:19
**teachers** 43:1
**teaches** 7:19
**teachings** 9:9
35:14
**technological**
45:22
**telephone** 2:7
2:12,17
**tell** 10:1,2
15:20 43:7,17
66:19
**telling** 8:10
16:5 43:18
**tend** 38:14
44:19 73:4
**tends** 58:9
**tennessee** 12:1
31:15 52:21
89:17
**term** 13:1
**terms** 31:18
49:14 66:5
67:9 77:6
83:22
**terrifying**
71:10,14 74:5
77:10 79:8
**territories**
52:19 53:1,2,4
53:12 75:9

**territory** 53:21
**terror** 51:6,6
51:16
**terrorizes** 46:7
**terrorizing**
27:9 73:12
**test** 6:12
**texas** 11:7
15:21 16:11,12
16:14 18:19
19:13 23:2
31:15 52:21
**thank** 4:10 9:13
26:13,19,21
34:16 45:13
65:19 66:1
80:3,4 89:22
90:1
**theater** 39:13
**theaters** 5:21
34:10
**theories** 80:11
**theory** 8:6,11
8:13 24:17
30:6 69:5
86:18 88:10
**thereof** 30:21
34:7 87:16
**thing** 19:11
21:16 33:6
34:2 65:11
79:12
**things** 18:18
32:11 38:9,9

38:22 40:1
54:14,17 59:9
59:11 61:12
69:7 73:4
**think** 10:8 11:2
12:10 13:5,10
13:13 14:18
15:9,10 17:4,6
17:7,10,12
19:9,22 21:6
21:20,21,22
22:2,9 24:5
25:8,8,18
27:11,14 28:8
30:5,6,14
31:18 32:2,10
32:13 33:12,15
34:8 37:9 41:3
41:14 42:15,18
42:21,22 43:1
43:7,15,21
44:13,17 45:7
45:20 47:10
48:12 50:2,9
50:10,18 54:12
54:20 55:1,7,8
55:12 56:11,19
57:13,14,18,21
57:22 58:4,6
59:16,19 61:3
62:5 63:19
64:8,11 65:8
66:6 71:1 73:1
78:12 81:3,16

82:4 84:2,8,22
85:6,14 88:8
88:10 89:2,9
89:11
**thinking** 14:14
56:16
**third** 1:2 4:4
8:3 13:20
67:19
**thought** 86:10
88:4
**threat** 65:8,17
**three** 12:2 53:1
53:1 75:9
**thrice** 4:16 7:8
8:14
**till** 31:4
**time** 7:16 11:14
13:20 14:2
16:13 18:14
19:19 20:4
22:2,14 23:11
24:6 26:16
33:9,22 49:3
69:19 70:10
78:21 79:11
89:20
**times** 12:2 21:1
47:18 48:2
61:8 69:12
71:19,20
**today** 30:14
40:15 47:19
48:1

**together** 75:20
**took** 39:21 40:8
**tool** 19:18
**top** 87:5
**total** 12:6
**totality** 5:1
**totally** 80:11
**towards** 24:17
**town's** 42:2
**tradition** 6:10
6:18 8:20 14:1
18:3,8 19:8
20:20 21:2
29:7,17 31:20
37:8 39:19
40:13 44:17
45:1 51:17
52:15 53:16
55:10 64:2
65:13 70:2,7,8
71:9,12,16
75:2,3,8,11
76:7,22 77:7,8
77:17 79:2
81:15,16 82:16
85:9 88:15
**traditional**
54:15
**transcribed**
1:22
**transcriber**
91:1
**transcript** 91:3
91:5

**translates** 24:8
44:15
**transportation**
36:14
**trapped** 7:21
**treat** 10:3
65:14
**treated** 52:6
**treating** 39:1
58:7
**treats** 35:22
**trenton** 2:7
**true** 12:5 24:12
28:13 29:13
30:12,13 70:7
79:21 82:4
87:13 91:5
**truly** 67:10
**try** 21:2
**trying** 13:22
14:18 43:17
62:8 63:8
80:11 88:14
**turn** 73:20
80:20
**twist** 80:10
**two** 24:4 26:12
26:16 28:12
46:16 51:1
52:20 59:7
65:1,2 76:14
**type** 13:16 58:8
67:11 88:13

**types** 38:10,11
49:22 56:14
65:11
**typically** 67:4

## u

**uh** 42:3 45:18
**ultimately** 24:3
42:11
**unanimous** 9:7
**unclear** 25:7
**unconstitutio...**
11:21 19:21
24:3 81:13
**under** 6:11
9:22 10:1 27:5
67:5
**undergirds**
14:20
**underlying**
68:6
**understand**
11:3 14:6 18:2
18:12 26:6
31:4 40:13
41:3,7,12
45:10 54:20
60:9,11,16
62:9 63:9
**understanding**
20:3 75:15
78:20
**understood**
13:18 15:17

21:13 28:10,19
61:7 62:16
**undetected**
68:1
**unequivocally**
12:7
**united** 1:1 4:3
**universally** 7:6
**universities**
19:1
**unreasonable**
46:4
**unseemly** 34:2
**unsupported**
73:9,14,14,16
80:12
**unusual** 52:12
69:11
**upheld** 49:11
**upholding**
85:14
**urge** 10:9
**use** 8:2 12:19
29:15 46:10
76:1 86:13,17
**used** 13:3 17:1
17:7,8 30:9
49:12
**using** 71:5

**v**

**v** 1:4,9
**validity** 6:4

**value** 10:5
**various** 9:17
27:6
**vcco** 79:15
**vein** 58:11
**version** 86:1
87:16
**versus** 4:6,7
43:10 54:8
69:15
**view** 66:22
72:18 87:2
**views** 43:3
**violence** 22:21
46:10 47:21
**violent** 36:5
**virginia** 2:11
29:12 77:11
**virginia's** 51:3
51:12
**virtually** 50:9
**virtue** 45:7
**vote** 23:5,6
**vulnerable**
32:21 71:20
73:6

**w**

**wait** 15:14
**waiving** 26:14
**walking** 36:1
**wanna** 42:12
46:15 54:6,7
60:7 64:12

**want** 36:2
48:15
**wanted** 23:3
**wants** 13:3
65:15
**warned** 8:1
**washington**
2:16
**watch** 39:12,13
**way** 11:13,15
14:13 31:11
35:7 37:17
45:7 47:1,11
47:19 48:3,13
50:16,22 51:3
58:1 61:10
65:15 66:19
72:13,20
**ways** 55:8
**we've** 36:22
60:8 61:7
66:13 72:2
86:13
**weapons** 13:1
52:12 76:11
**weave** 86:10
**wednesday**
1:17
**weight** 11:5,10
**welcome** 4:3
9:11
**went** 11:13,14
35:7 52:2
72:21 73:2

**wheeling** 80:13
**who've** 63:5
**whoever's** 56:3
**wholly** 67:13
73:8,13
**willing** 35:19
**words** 80:20
**works** 25:7
68:15
**worse** 53:4
**writing** 78:11
**written** 21:17
35:19 62:19
63:21 84:9
**wrong** 63:1,5,7
72:18,21 73:2
80:9
**wrote** 62:7

**x**

**x** 1:3,3,4,4,5,5,6
1:6,7,7,8,8,9,9
1:10,10,11,11
1:12,12,13
17:9

**y**

**yeah** 14:4 24:4
25:13 32:9
58:16 62:10
63:11,17 70:14
73:1 82:14
**year** 25:3
**years** 33:8 71:9
77:8

**yield** 23:15
**york** 47:17,20
  51:20 52:7
  72:15
**youth** 40:17,20
  41:8 44:8
  60:22

**z**

**zoo** 15:15 16:8
  59:8
**zoos** 5:20 15:16
  16:16 38:17
  59:9,11 60:2