**Nos. 23-1900, 23-2043**

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

_____

RONALD KOONS, ET AL.,

*Plaintiffs-Appellees,*

v.

JENNIFER DAVENPORT, ET AL.,

*Defendants-Appellants.*

_____

AARON SIEGEL, ET AL.,

*Plaintiffs-Appellees,*

v.

JENNIFER DAVENPORT, ET AL.,

*Defendants-Appellants.*

_____

On Appeal from the United States District Court for the District of New Jersey,
Nos. 1:22-cv-07464, 1:22-cv-07463

_____

### *SIEGEL* PLAINTIFFS-APPELLEES / CROSS-APPELLANTS'
### SUPPLEMENTAL BRIEF

_____

| | |
|---|---|
| DANIEL L. SCHMUTTER | PAUL D. CLEMENT |
| HARTMAN & WINNICKI, P.C. | ERIN E. MURPHY |
| 74 Passaic Street | *Counsel of Record* |
| Ridgewood, NJ 07450 | CLEMENT & MURPHY, PLLC |
| | 706 Duke Street |
| | Alexandria, VA 22314 |
| | (202) 742-8900 |
| | erin.murphy@clementmurphy.com |

*Counsel for Siegel Plaintiffs-Appellees / Cross-Appellants*

July 8, 2026

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.............................................................................. ii

INTRODUCTION ...................................................................................... 1

BACKGROUND ........................................................................................ 2

ARGUMENT ........................................................................................... 5

I.      *Hemani* And *Wolford* Confirm That New Jersey's Sweeping Restrictions On The Right To Keep And Bear Arms Are Unconstitutional................................................................................. 5

    A.      New Jersey's Novel Permitting Restrictions Cannot Withstand the Meaningful Historical Scrutiny that *Hemani* and *Wolford* Demand.................................................................... 6

    B.      *Hemani* and *Wolford* Foreclose New Jersey's Effort to Hobble the Right to Public Carry................................................. 7

CONCLUSION ....................................................................................... 12

CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE WITH WORD COUNT

IDENTICAL PDF AND HARD COPY CERTIFICATE

VIRUS SCAN CERTIFICATE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

**Cases**

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022).............................................................................. 7

*United States v. Hemani*,
  No. 24-1234, 2026 WL 1751710 (U.S. June 18, 2026)...........................*passim*

*United States v. Rahimi*,
  602 U.S. 680 (2024)........................................................................ 7

*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943)........................................................................11

*Wolford v. Lopez*,
  No. 24-1046, 2026 WL 1825723 (U.S. June 25, 2026)...........................*passim*

**Statutes**

18 U.S.C. §922(g)(3)..................................................................... 2, 3

N.J. Stat. Ann. §2C:58-4(a) ............................................................ 6

N.J. Stat. Ann. §2C:58-4(b) ............................................................ 6

N.J. Stat. Ann. §2C:58-4(c) ............................................................ 6

N.J. Stat. Ann. §2C:58-4.6(a)(24) ................................................... 3, 8

**INTRODUCTION**

Shortly after the Supreme Court made clear in *Bruen* that the right to keep *and bear* arms includes the right to carry arms in public, New Jersey enacted a web of laws in an avowed effort to render that right a nullity. This case involves (among other things) the state's so-called "sensitive place" restrictions, which collectively deem the overwhelming majority of the Garden State a gun-free zone. While it always should have been clear that these restrictions are unconstitutional, the Supreme Court's recent decisions in *Wolford v. Lopez*, No. 24-1046, 2026 WL 1825723 (U.S. June 25, 2026), and *United States v. Hemani*, No. 24-1234, 2026 WL 1751710 (U.S. June 18, 2026), remove any doubt. *Hemani* forecloses the state's high-level analogies to historical laws that targeted much narrower groups of people, served very different purposes, and/or operated in demonstrably different ways. And *Wolford* precludes the state's reliance on scattered historical restrictions to defend sweeping restrictions that cumulatively "hobbl[e] what the Second Amendment protects: the right of Americans to carry arms for self-defense as they go about their daily lives." 2026 WL 1825723, at *4. This Court should follow *Hemani*, *Wolford*, and *Bruen*; reject the state's flawed arguments; and direct entry of preliminary relief against the challenged provisions.

## BACKGROUND

Since the en banc Court heard oral argument in this case, the Supreme Court has issued two decisions that reinforce *Bruen*'s historical-tradition framework and confirm that courts may not sustain modern restrictions on arms-bearing based on abstract public-safety principles or loose historical analogues.

***Hemani.*** In *United States v. Hemani*, the Supreme Court unanimously held that it violates the Second Amendment to subject an individual to imprisonment and lifetime disarmament based merely on his admission that he uses marijuana a few times a week. Federal law makes it a crime for an "unlawful user of … any controlled substance" to possess a firearm. 18 U.S.C. §922(g)(3). After Ali Hemani admitted to federal officers that he used marijuana "about every other day" and owned a handgun, the government charged him with violating §922(g)(3). 2026 WL 1751710, at *4. Hemani moved to dismiss, arguing that the prosecution violated the Second Amendment.

The Supreme Court agreed. The United States conceded that §922(g)(3) "burdens conduct presumptively protected by the Second Amendment." *Id.* at *5. The government therefore bore the "considerable" burden of proving that prohibiting any user of a controlled substance from possessing a firearm is "consistent with the Nation's tradition of firearm regulation." *Id.* It could not do so. The government attempted to meet its burden by invoking "three general categories" of historical

laws that regulated habitual drunkards: vagrancy laws, which allowed groups that included habitual drunkards to be detained; civil-commitment laws, which authorized courts to appoint guardians for habitual drunkards; and surety laws, which empowered judicial officers to compel habitual drunkards to post bond in an effort to encourage good behavior. *Id.* The government argued that those historical restrictions "targeted habitual drunkards" for the same reason that §922(g)(3) regulates unlawful controlled-substance users: because they regularly used intoxicants that make them unusually dangerous. *Id.* at *6. The government likewise argued that those historical restrictions operated in the same manner that §922(g)(3) operates because they all serve to temporarily disarm certain individuals. *See id.* The Supreme Court rejected the government's historical analogues, explaining that the "how" and "why" behind those provisions did not match §922(g)(3). *See id.* at *6-12.

**Wolford.** In *Wolford v. Lopez*, the Supreme Court made clear that states cannot impose sweeping restrictions on the right to carry without identifying genuinely similar historical analogues that embody a well-settled, *national* tradition of firearms regulation. *Wolford* involved a provision of Hawaii law that, like a provision of New Jersey law challenged here, N.J. Stat. Ann. §2C:58-4.6(a)(24), makes it a crime to enter private property while carrying a firearm without the proprietor's express authorization. Hawaii argued that its law did not even implicate the Second

Amendment because it regulated only property-default rules. 2026 WL 1825723, at *10. The Supreme Court rebuffed that effort to evade scrutiny, making clear beyond cavil that the only question "at *Bruen*'s first step" is whether a challenged law "burdens those wishing to exercise their Second Amendment right." *Id.* at *9-10. Because Hawaii's law impinged upon people's ability to "carry handguns for self-defense" in places open to the general public, it burdened conduct that "f[e]ll within the plain text of the Second Amendment." *Id.* at *9.

The Court likewise provided guidance on how "courts should undertake" the historical-tradition inquiry. *Id.* at *6. As it explained, courts cannot simply identify a single potential analogue and call it a day. They must instead consider "the number of jurisdictions in which [the proposed historical analogues] were adopted," "the extent to which they were well-accepted," and, most important of all, whether they are actually "'relevantly similar' to the modern law." *Id.* The "relevantly similar" analysis, the Court explained, does not green-light resort to exceedingly high-level principles, like protecting public safety. "Determining whether [that] condition is met requires consideration of 'how' the analogue restricted the keeping or bearing of arms—that is, whether it imposed a restriction similar to that imposed by the challenged law." *Id.* "[A] court must also consider 'why' the analogue restricted the keeping or bearing of arms—that is, whether its rationale was similar to that of the new law." *Id.*

4

Applying those principles, the Court held that the proffered analogues—historical laws that prohibited unauthorized hunting on someone else's private property, as well as an infamous Black Code provision—were not "relevantly similar" to Hawaii's effort to prevent people from carrying on any private property, even if it is held open to the public. The aim of the former historical laws "was to prevent the distinctive harms and risks associated with unauthorized hunting"; the "why" of Hawaii's law was entirely unrelated to poaching. *Id.* at *13. The "how" also differed because the anti-poaching laws were tailored "to places where poaching was likely to occur," whereas Hawaii's "prohibition" applied almost everywhere. *Id.* at *17 (Barrett, J., concurring). "The gap between the State's anti-poaching analogues and [Hawaii's] rule [was] just too wide." *Id.* at *13 (majority op.). As for Hawaii's reliance on a lone Louisiana law adopted shortly after the Civil War to "disar[m] blacks and thus leav[e] them defenseless against attacks," the Court determined that it "carr[ies] no weight" because it was "neither widespread nor widely accepted," and in all events cannot "illuminate[] the original understanding of the right to keep and bear arms" since it was tainted by racial animus. *Id.* at *14.

## ARGUMENT

**I.**   ***Hemani* And *Wolford* Confirm That New Jersey's Sweeping Restrictions On The Right To Keep And Bear Arms Are Unconstitutional.**

Much of New Jersey's defense of the sweeping provisions challenged here depends on exactly the kind of exceedingly high-level historical analysis that

*Hemani* and *Wolford* emphatically rejected. For example, New Jersey offered a handful of historical laws that criminalized *shooting* firearms at or on trains to defend a prohibition on peacefully *carrying* firearms on public transportation. *See* CA3.*Siegel*.Dkt.115 ("Panel.Op.") at 129-31 & n.179. It invoked surety and affray laws that imposed carry or other restrictions on individuals who engaged in threatening behavior to try to justify *ex ante* restrictions on who may secure a permit to purchase or carry a firearm. Panel.Op.79-82. And it relied on statutes that outlawed "discharging firearms [in] saloons" to defend a prohibition on carrying firearms anywhere alcohol is sold for on-premises consumption. Panel.Op.108, 111-12 & n.140. As *Hemani* and *Wolford* confirm, those kinds of arguments conduct the requisite historical analysis at far "too high a level of generality." *Wolford*, 2026 WL 1825723, at *16 (Barrett, J., concurring). Under a correct application of the principles set forth in *Hemani* and *Wolford* (and cases before them), the challenged provisions of Chapter 131 plainly cannot stand.

   A.   **New Jersey's Novel Permitting Restrictions Cannot Withstand the Meaningful Historical Scrutiny that *Hemani* and *Wolford* Demand.**

New Jersey has never identified any historical tradition that would begin to support forcing law-abiding citizens who merely want to exercise their Second Amendment rights to secure liability insurance, pay into a victims' compensation fund, and procure endorsements from four "reputable persons" (whatever that means). N.J. Stat. Ann. §2C:58-4(a)-(c). It has instead devoted most of its defense

6

of those provisions to arguing that they do not warrant any Second Amendment scrutiny at all—an argument that *Wolford* definitively lays to rest. *See* 2026 WL 1825723, at *9; *id.* at *14-15 (Barrett, J., concurring). The principal historical support New Jersey offered for those provisions is surety laws, *see* Panel.Op.71-82, but *Hemani* confirmed that such laws kicked in only *after* "an individual [was] shown to pose a specific threat of violence," 2026 WL 1751710, at *9. The state has never identified any jurisdiction that required law-abiding citizens to post a surety or jump through any other comparable hoop simply because they wanted to carry a firearm. And as *Hemani* underscores, the historical tradition of "protecting the public from" those who have actually been proven "violent" or "unusually dangerous," *id.* at *8, cannot justify laws that "broadly restrict arms use by the public generally," *United States v. Rahimi*, 602 U.S. 680, 698 (2024).

### B.    *Hemani* and *Wolford* Foreclose New Jersey's Effort to Hobble the Right to Public Carry.

New Jersey's sweeping restrictions on where individuals may exercise their Second Amendment rights fare no better. To be sure, "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 30 (2022). But as *Bruen* explained and *Wolford* reiterated, states cannot invoke that tradition to "hobbl[e] what the Second Amendment protects: the right of Americans to carry arms for self-

defense as they go about their daily lives." *Wolford*, 2026 WL 1825723, at *4. That is precisely what New Jersey has done here. Indeed, one of the provisions at issue here is a private-property ban virtually identical to the one struck down in *Wolford*. *See* N.J. Stat. Ann. §2C:58-4.6(a)(24); Panel.Op.85-88. And even without that provision (which plainly cannot stand after *Wolford*), Chapter 131 still outlaws carrying firearms at parks, beaches, restaurants, entertainment facilities, zoos, libraries, museums, healthcare facilities, and more, leaving it virtually impossible for individuals to exercise that constitutional right as they go about their daily lives.

As with the permitting conditions, the state's efforts to defend those sweeping restrictions conduct historical analysis "at too high a level of generality." *Wolford*, 2026 WL 1825723, at *16 (Barrett, J., concurring). The panel majority openly admitted that embracing the state's arguments required embracing a "more flexible" approach, under which it analogized "broadly" when engaging in the "relevantly similar" analysis. Panel.Op.106, 116-17, 119. Instead of comparing "how" and "why" each of the challenged provisions operates to the "how" and "why" of the historical laws New Jersey invoked, the majority embraced exceedingly high-level abstractions, like the notion that states may ban firearms anywhere that requires "peace and security," Panel.Op.125, or is used for "peaceful assembly," Panel.Op.89-90. That general-principle approach cannot be reconciled with *Wolford* and *Hemani*, which instruct that courts "must" engage in a meaningful why-and-how

8

analysis, *Wolford*, 2026 WL 1825723, at \*6, and reject resort to general public-safety interests that do not actually map on to the how or why of the historical analogues offered, *Hemani*, 2026 WL 1751710, at \*5-12.

In *Wolford*, for instance, the Court struck down Hawaii's law because "[t]he gap between the State's anti-poaching analogues and [Hawaii's] rule [was] just too wide" since they did not even target the same problem, let alone do so through the same means. 2026 WL 1825723, at \*13. Here, too, the "gap" between things like the general "principle … that legislatures may impose conditions on the carry of firearms designed to ensure the safe use of those arms," Panel.Op.79, and New Jersey's effort to effectively ban public carry, is "just too wide." *Wolford*, 2026 WL 1825723, at \*13. If an interest as abstract as "ensur[ing] the safe use of … arms," Panel.Op.79, sufficed to empower states to resort to the extreme measure of banning law-abiding citizens from carrying them at everywhere from parks to libraries to zoos to restaurants, or even having a loaded firearm in their cars, then it is hard to see what law that principle could not sustain. Indeed, by that logic, the "proper cause" condition struck down in *Bruen* and the express-consent condition invalidated in *Wolford* should have easily passed historical muster.

*Wolford* also confirms that New Jersey's historical analogues are far too new, few, and far between. *Wolford* explained that "a lone statute" enacted in 1893, "nearly a century after the adoption of the Second Amendment and well after the

9

adoption of the Fourteenth Amendment[,] sheds little if any light on the meaning of the Second Amendment right." *Id.* at *13. Yet New Jersey has relied almost exclusively on laws of similar—or even more recent—vintage. *See, e.g.,* Panel.Op.58 n.74 (1906); Panel.Op.59 n.74 (1905); Panel.Op.61 n.81 (1903); Panel.Op.131 n.179 (1899); Panel.Op.100 n.123 (1895); Panel.Op.101 n.126 (1893). If an enactment from 1893 is too late to illuminate the Second Amendment's meaning, then a collection of equally late, scattered, and unrelated enactments plainly cannot carry the state's burden here.

Moreover, by New Jersey's own telling, only a handful of jurisdictions *ever* had anything close to its sweeping anti-carry regime. *See* CA3.*Siegel*.Dkt.164 ("NJ.Supp.Br.") at 7. Even assuming the laws New Jersey identified are actually analogous in their how and why, that does not begin to cut it. As *Wolford* instructs, courts must consider not just whether any potential historical analogue exists, but "the number of jurisdictions in which [such analogues] were adopted" and "the extent to which they were well-accepted." 2026 WL 1825723, at *6. If an analogue is not "widespread, well-known, and widely accepted," then it "carries no weight," as it does not identify a historical *tradition*. *Id.* at *14. Hence, courts cannot uphold state laws based on "outlier legal rule[s] adopted in a few locales," *id.* at *11—which is precisely what New Jersey invites this Court to do here.

10

Finally, New Jersey has argued that the Second Amendment must tolerate local variations in gun-control regulation "because policy variation has always been a feature and not a bug of our federalist system." NJ.Supp.Br.24; *see also* NJ.Supp.Br.9-10. That, too, is an argument *Wolford* emphatically rejected. "[L]ocal attitudes can neither shrink nor inflate the meaning of fundamental Bill of Rights guarantees that apply to the States through the Fourteenth Amendment." 2026 WL 1825723, at *11. The Bill of Rights exists "to withdraw certain subjects from the vicissitudes of political controversy" and put them "beyond the reach of majorities and officials," thereby promising a uniform baseline of constitutional rights to all Americans. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943). States cannot infringe Second Amendment rights in the name of federalism any more than they can abridge other constitutional protections.

11

## CONCLUSION

This Court should enjoin the challenged provisions.

Respectfully submitted,

DANIEL L. SCHMUTTER
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, NJ 07450

s/Erin E. Murphy
PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Siegel Plaintiffs-Appellees / Cross-Appellants*

July 8, 2026

12

## CERTIFICATE OF BAR MEMBERSHIP

The undersigned hereby certifies pursuant to L.A.R. 46.1 that the attorney whose name appears on the Supplemental Brief was duly admitted to the Bar of the United States Court of Appeals for the Third Circuit in 2013, and is presently a member in good standing at the Bar of said court.

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

I hereby certify that this brief complies with the type-volume requirements and limitations of Fed. R. App. P. 32(a). Specifically, this brief contains 2494 words in 14-point Times New Roman font.

## IDENTICAL PDF AND HARD COPY CERTIFICATE

The undersigned hereby certifies that this brief complies with L.A.R. 31.0(c) because the text of the electronic brief is identical to the text in the paper copies.

## VIRUS SCAN CERTIFICATE

The undersigned hereby certifies that this brief complies with L.A.R. 31.0(c) because the virus detection program SentinelOne, version 22.2.4.558, has been run on the file and no virus was detected.

**CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Erin E. Murphy</u>
Erin E. Murphy